# EXHIBIT 2

 EUROPEAN COMMISSION

Brussels, 5 September 2016

sj.c(2016)5503690

## TO THE PRESIDENT AND MEMBERS OF THE
## ARBITRAL TRIBUNAL

Prof. Donald M. McRAE, C.C.

Mr. L. Yves FORTIER, P.C., C.C., O.Q., Q.C.

Prof. Laurence BOISSON DE CHAZOURNES

Secretary of the Tribunal:

Ms. Luisa Fernanda Torres

### *AMICUS CURIAE* **BRIEF**

submitted by the **European Commission**, represented by Steven NOË, Tim MAXIAN RUSCHE and Petra NEMECKOVA, members of its Legal Service, as agents, Rue de la Loi 200, B-1049 Brussels, who consent to service by e-mail via steven.noe@ec.europa.eu, tim.rusche@ec.europa.eu and petra.nemeckova@ec.europa.eu

**In the case ARB/14/11**

Nextera Energy Global Holdings B.V and Nextera Energy Spain Holdings B.V.

**Claimant**

v.

Kingdom of Spain

**Respondent**

## I. INTRODUCTION

1.  The European Commission ("Commission") would like to thank your Arbitral Tribunal for accepting its request to file an *amicus curiae* brief in the present proceedings (by means of Procedural Order No. 3, dated 6 January 2016).

2.  The claimants in the present proceeding are investors of Member States of the European Union ("EU" or "Union"), namely the Kingdom of the Netherlands ("the Netherlands"). They challenge regulatory measures taken by the Kingdom of Spain ("Spain" or "Respondent") in relation to generation of electricity from renewable energy sources ("RES electricity").

3.  The applicants consider that by ratifying the Energy Charter Treaty ("ECT"), the Kingdom of Spain has made a valid offer for entering into arbitration not only to investors from contracting parties that were at that time not Members States of the European Communities (including EURATOM)[1], but also to investors from contracting parties that were at the same time Member States of the Community ("EU investors").

4.  They claim that that offer results from Article 26 Energy Charter Treaty (ECT).

5.  The Commission would like to recall from the outset that according to Articles 3(5) and 21(1) of the Treaty on European Union ("TEU"), the Union is committed to the strict observance and respect for international law in its relations with the wider world and its external action.

6.  The dispute before your Tribunal has the particularity that it is an intra-EU dispute between two investors from one Member State and another Member State; that it is based on an international treaty, which is part of Union law; and that it covers a field that is regulated by Union law.

7.  At the same time, your Tribunal applies as its rules of procedure the ICSID convention, another treaty of international law, which is not part of Union law. The starting point of your analysis is therefore necessarily one of international law.

8.  Therefore, this *amicus curiae* brief contains an analysis from the standpoint of international law. The Commission will show, first, that under international law, the offer for entering into arbitration made by Spain when ratifying the ECT has been limited to investors from contracting parties that were at the time not Member States of the European Communities (**2.**). It will then set out that even if the offer was made also to EU investors, *quod non*, such an offer is, under international law, not a valid offer (**3.**).

9.  The Commission is aware that there are three awards, quoted and discussed by the claimants in their counter-memorial on preliminary objections, in which other tribunals have found that Spain had made a valid offer to EU investors (*Charanne*, *PV Investors*, and *RREEF Infrastructure*).

10. The Commission invites your Tribunal nevertheless to take a fresh look at the question, in particular for the following reasons:

    *   First, the question of the validity of an offer for entering into arbitration made by an EU Member State to EU investors is currently pending before the European Court of Justice ("ECJ") in *Achmea v Slovakia*. Should your Tribunal not be convinced of the line of argument presented on that point by the Commission, the Commission suggests that, in line with the views expressed by the international tribunals in *Iron Rhine* and *MOX plant*, it would be appropriate to stay the present proceedings until the ECJ gives judgment on that question.

    *   Second, there are important differences in the reasoning of earlier tribunals on the question as to how to solve *from the point of view of international law* possible conflicts between the ECT and the EU Treaties, that is the TEU and the Treaty on Functioning of European Union ("TFEU"). If your tribunal was to espouse the view taken by the *Electrabel I* tribunal, the present conflict is governed by international law, and the relevant rule of conflict can be found in Article 351 TFEU and Articles 41(1)(b) and 30(4)(a) Vienna Convention on the Laws of the Treaties ("VCLT"). That rule of conflict would give precedence, in intra-EU disputes, to Union law. On that basis, the ruling of the ECJ in *Achmea v Slovakia* is decisive for the question of jurisdiction of your Tribunal.

11. As requested by the Commission and granted by your Tribunal, the scope of this submission is limited to the question of competence of your Tribunal. The Commission also wishes to inform your Tribunal that Spain has notified its national support scheme for RES electricity and the subsequent adoption of various legislative and regulatory measures that affect producers of RES electricity to the

---

[1] One of those Communities, namely the European (initially: Economic) Community was the legal predecessor of the Union.

Commission on the basis of Article 108(3) TFEU. Should your Tribunal take the view that there is a valid offer for arbitration and consider that in order to decide the dispute in front of it on the merits, it becomes necessary to analyse the compliance of those measures with State aid rules, for example for assessing whether the claimants had legitimate expectations[2], the Commission invites your Tribunal to suspend the dispute until the Commission has taken a view on Spain's notification (**3.**).

**2.**    **THE OFFER FOR ARBITRATION MADE BY SPAIN WHEN RATIFYING THE ECT WAS ONLY ADDRESSED TO INVESTORS FROM CONTRACTING PARTIES THAT WERE NOT MEMBER STATES OF THE EUROPEAN COMMUNITIES**

12.    The Commission considers, first, that the ECT does not apply *at all* in the *inter se* relationship between those EU Member States that were Member States of the European Communities when the ECT was ratified. Rather, the European Communities and their Member States only created international obligations between third countries and the <u>competent</u> subject of international law, i.e. either the European Communities (for areas of Community competence) or its Member States (for areas of Member State competence). No international obligations were created, on the contrary, between EU Member States *inter se*, even in areas where they had the external competence to conclude those agreements with third countries. The analysis in that regard is exactly the same as for the Agreement on the World Trade Organisation ("WTO agreement"), which is in an analogous situation to the ECT. Therefore, no offer for arbitration was made to EU investors (section **2.1**).

13.    Second, the Commission takes the view that even if the ECT did create certain *inter se* obligations between the EU Member States, *quod non*, those obligations would not comprise the provisions of the ECT on investment protection (Chapter III) and dispute settlement (Article 26), for the following reason: As EU Member States have conferred part of their external competences to the European Communities/the Union, they can only enter into international obligations *inter se* to the extent that they have not transferred their external competence to that other subject of public international law which are the European Communities/the Union. *Vice versa*, the European Communities/the Union can only enter into international obligations to the extent that external competence has been transferred to it. As a consequence, the Union and its Member States are internationally responsible for the fulfilment of the obligations contained in the ECT in accordance with their respective external competences. Both the substantive competence for protection of investments by EU investors in other EU Member States, including and in particular in the field of energy, and the jurisdictional competence for those disputes have been transferred to the Union. Hence, Member States of the European Communities lacked competence to enter into *inter se* obligations between each other in those fields. They only could create *inter se* obligations in other fields, for which they retained competence (section **2.2**).

### 2.1.    The ECT has not created *inter se* obligations between EU Member States

14.    In order to establish whether by ratifying the ECT, Spain made an offer for arbitration to EU investors, it is first necessary to interpret the ECT in accordance with Article 31 of the Vienna Convention on the Law of the Treaties ("VCLT") "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*". The result thus achieved is confirmed by the "*preparatory work of the treaty and the circumstances of its conclusion*", in line with Article 32 of the Vienna Convention on the Law of the Treaties.

---

[2]    According to the case-law of ECJ, a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission, see ECJ, Judgment in *Land Rheinland-Pfalz* v *Alcan Deutschland*, C-24/95, EU:C:1997:163, paragraph 25: "*In view of the mandatory nature of the supervision of State aid by the Commission under Article [108] of the Treaty, undertakings to which aid has been granted may not, in principle, entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in that article. A diligent businessman should normally be able to determine whether that procedure has been followed (ECJ, Judgment in Commission v Germany, cited above, C-5/89, EU:C:1990:320, paragraphs 13 and 14, and ECJ, Judgment in Spain v Commission, C-169/95, EU:C:1997:10, paragraph 51)*." The ECJ concluded in paragraphs 39 to 43 of that ruling that EU law "*requires the competent authority to revoke a decision granting unlawful aid, in accordance with a final decision of the Commission declaring the aid incompatible with the [internal] market and ordering recovery, even if the competent authority is responsible for the illegality of the aid decision to such a degree that revocation appears to be a breach of good faith towards the recipient, where the latter could not have had a legitimate expectation that the aid was lawful because the procedure laid down in Article [108 TFEU] had not been followed.*" In that context, it should be noted that the ECJ, in its Order in *Elcogás SA*, C-275/13, EU:C:2014:2314, held that the special regime constitutes State aid in the sense of Article 107(1) TFEU. The case-law of the ECJ is accessible online via the Curia website: http://curia.europa.eu/

2.1.1.    *Text of the ECT and its instruments, interpreted in the light of the principle of effectiveness*

15.    The claimants rely on Article 26 ECT in order to establish that Spain has made an offer for arbitration. That Article reads:

"(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

(ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

(c) A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).

[…]

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

16.    Article 1(2) ECT defines the term "*Contracting Party*" as a "*State or Regional Economic Integration Organization which has consented to be bound by the ECT and for which that treaty is in force*".

17.    Article 1(3) ECT defines "*Regional Economic Integration Organization*" ("REIO") to mean an "*organization constituted by states to which they have <u>transferred competence</u> over certain matters a number of which are governed by the ECT, including the authority to <u>take decisions binding on them in respect of those matters</u>*" (emphasis added by the Commission). Article 36(7) ECT reflects the division of competences and foresees that the <u>Union votes on matters falling in its competence</u>, and the Member States on matters falling in their competence, and that the EC, when voting, shall have a number of votes <u>equal</u> to the number of its Member States

18.    The ECT thus recognizes that the EU Member States have transferred competences over matters governed by the ECT to the Union, including the authority to take decisions binding on them in respect of those matters. Hereby, the signatories to the ECT acknowledge the Union's role with respect to EU Member States. Furthermore, it recognizes that the Union corresponds to its parts (because it has a number of votes equal to its parts), and that each acts in the matters falling under its competence.

19.    Similarly, Article 1(10) ECT explains how the term "Area" is to be understood with respect to a REIO and its Member States: "*With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, <u>under the provisions contained in the agreement establishing that Organization</u>*" (emphasis added by the Commission).

20.    For defining the terms "Area" and "Contracting Party", the ECT therefore contains an express reference to the provisions of the EU Treaties, and recognizes that the relationships between the Contracting Parties that are member of the REIO are governed by the provisions contained in the agreement establishing the REIO. The "area" of the EU comprises all the Areas of its Member States. Therefore, an investment by a Dutch investor in Spain is not an investment in the area of another Contracting Party, but in the area of the same Contracting Party. The offer for arbitration made by Spain hence only is available to investors from Contracting Parties that are not EU Member State, as only those investors invest in the area of another Contracting Party.

21.  Significantly, Article 1(3) and (10) ECT are not limited to certain chapters of the ECT (a technique used elsewhere when the drafters wanted to exclude certain chapters or provisions of ECT from application to the entire treaty)[3]. Rather, they apply throughout the ECT and have to be taken into account whenever the interpretation of rights and obligations of Contracting Parties under the ECT's substantive provisions is at issue.

22.  A different interpretation of the term "Area" would lead to absurd results. For example, "transit" within the meaning of Article 7(10)(a) ECT can only apply to the Union, as to the entity having the substantive competence for that issue under the Treaties and being a fully-fledged customs union as a whole, and not to transportation between the EU Member States.

23.  The view taken by the tribunals in *Charanne*, *PV Investors*, and *RREEF Infrastructure*, quoted in paragraphs 23 to 25 of the claimants' counter-memorial on preliminary objections, can be summarized as follows: The term "area" has to be defined depending on who is the respondent. If an EU investor decides to bring a claim against an EU Member State, it is only the territory of that EU Member State. If the EU investor decides to bring a claim against the Union, it is the territory of all Member States.

24.  That view is not convincing. It deprives the parts of Articles 1(3) and 1(10) ECT that have been emphasized by the Commission in paragraphs 17 and 19 above of any *effet utile*[4]. It also completely disregards the emphasis which the ECT places on the fact that EU Member States have transferred competence to the Union, and that the EU Treaties shall define the term "area" for REIO and their Member States.

25.  The interpretation proposed by Spain and the Commission is also the only one that avoids "respondent shopping". By defining the area as the area of the Union, the ECT wants to make it clear that EU investors cannot bring claims against the Union. That aim would, however, be put into jeopardy if one allowed EU investors to bring a claim against an EU Member State: Indeed, EU law is usually implemented by actions of the Member States, as the Union lacks – with very narrow exceptions mainly in competition law – enforcement tools. EU investors therefore in most cases will find national acts of execution of Union law, which they could challenge by bringing a claim against the EU Member State executing Union law, rather than against the Member State itself. That such "respondent shopping" is not allowed under the ECT is also confirmed by the statement submitted by the European Communities to the Secretariat of ECT pursuant to Article 26(3)(ii) ECT. This statement is "an instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty" in the sense of Article 31(2)(b) VCLT, and therefore is part of the context of the ECT. It provides the following (emphasis added by Commission):[5]

> "The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of an Investor, the Communities and the Member States concerned will make such a determination within a period of 30 days."

The use of the word "another" clearly excludes disputes from EU investors against a Member State. This illustrates that the Union and the EU Member States consider that only investors from Contracting Parties that are not EU Member States may bring a case against the Union or its Member States, and that in such a situation, the Union and the Member States determine together who the respondent party will be.

26.  Contrary to what the *Charanne* tribunal has found at paragraph 431, the allegedly wrongful acts committed by Spain have an origin in Union law: They constitute the implementation, by Spain, of its obligations under Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources[6]. Furthermore, Spain may

---

[3]  See Article 26(1) ECT or Article 27 ECT.

[4]  See on the importance of the *effet utile* or principle of effectiveness in treaty interpretation *CEMEX* v *Venezuela*, ICSID Case No. ARB/08/15, Decision on Jurisdiction (30 October 2010), paragraph 107, with multiple further references to the case-law of the ICJ and to decisions of other investment tribunals.

[5]  The statement has been published by the secretariat of the ECT, see http://www.energycharter.org/fileadmin/DocumentsMedia/Legal/Transparency_Annex_ID.pdf at page 9. It is also attached as **Annex EC-1**.

[6]  Published in the Official Journal of the European Union ("OJ"), L 140, 5.6.2009, p. 16. The OJ is accessible on-line via the EUR-Lex website, see http://eur-lex.europa.eu/homepage.html?locale=en. See on the implementation of that Directive by Member States as implementation of Union law ECJ, Judgment in *Industrie du bois de Vielsalm & Cie (IBV)*, C-195/12, EU:C:2013:598, paragraph 49.

also have acted in order to comply with its obligations under Article 107 and 108 TFEU concerning State aid[7] (see also above paragraph 11).

27. The interpretation proposed by Spain and the Commission is also supported by the particular legal nature of multilateral agreements to which both the Union and its Member States are a party under Union law as "*relevant rule of international law applicable in the relations between the parties*" in the sense of Article 31 (3) (c) VCLT (see following section 2.1.1.2) and the object and purpose of the ECT (see then section 2.1.1.3).

> 2.1.2.    *The particular legal nature of multilateral agreements to which both the Union and its Member States are a party: "It is the objective of the Community negotiators to create rights and obligations only between the Community and its Member States on the one hand and one or more third States on the other"*

28. When analysing, from the point of view of international law, whether EU Member States have created *inter se* obligations when ratifying a multilateral agreements to which both the Union and its Member States are a party, it is of crucial importance to keep in mind the very peculiar position of such agreements within the Union legal order, which informs the behavior and actions of the EU Member States in such a context. The Union legal order constitutes in that regard a "*relevant rule of international law applicable in the relations between the parties*" in the sense of Article 31(3)(c) VCLT.

29. A multilateral agreement to which both the Union and its Member States are a party is part of Union law. The ECJ is competent to determine whether it has direct effect to the extent that the provisions concerned fall within the Union's competence, so that individuals can invoke it in national courts and tribunals as Union law, and the ECJ is in general competent to interpret its provisions. In particular, it may do so to determine whether a particular provision of the agreement falls under the external competence of the Union; and how a given provision is to be interpreted, where that provision falls under the external competence of the Union or can apply both to situations falling within the scope of national law and to situations falling within the scope of EU law. It is only where a provision falls exclusively in the competence of Member States that the ECJ is not competent for its interpretation.[8]

30. The Commission can bring infringement actions against Member States for failing to comply with their obligations under such agreements, even where there is no Union legislation covering the obligation. It is sufficient that the area in question is largely covered by Union law, and that there is a Union interest in the Member States' compliance.[9] That even includes situations where the obligation under the multilateral agreement is an obligation for the Member State to adhere to another multilateral agreement.[10]

31. When negotiating and concluding such a multilateral agreement, the Union and its Member States are bound by the general principle of Union law of unity in the international representation of the Union.[11] As a preeminent specialist put it recently:[12]

"[…] the European group (EU and Member States) appears as a single contracting party".

32. Even though, in theory, Member States have the international capacity to enter into *inter se* obligations when negotiating such a multilateral agreement for those areas of the agreement for which they retain competence, they in practice never do. *Pieter Jan Kuijper* has summarized this

---

[7]    ECJ, Judgment in *Industrie du bois de Vielsalm & Cie (IBV)*, C-195/12, EU:C:2013:598, paragraph 40.
[8]    Standing case-law, lastly summarized and applied in ECJ, judgment in *Lesoochranárske zoskupenie*, C-240/09, EU:C:2011:125, paragraphs 28 to 38, with extensive further references.
[9]    ECJ, judgment in *Commission v France* ("Etang de Berre"), C-239/03, EU:C:2004:598, paragraphs 22 to 32; ECJ, judgment *Commission v Ireland* ("Berne Convention for the Protection of Literary and Artistic Works"), C-13/00, EU:C:2002:184, paragraphs 13 to 20.
[10]   ECJ, judgment *Commission v Ireland* ("Berne Convention for the Protection of Literary and Artistic Works"), C-13/00, EU:C:2002:184, paragraphs 13 to 20.
[11]   ECJ, judgment in *Commission v Sweden* ("Stockholm Convention on Persistent Organic Pollutants "), EU:C:2010:203, paragraph 73, with extensive further references.
[12]   *Eleftheria Neframi*, "The Duty of Loyalty: Rethinking its Scope through its Application in the Field of EU External Relations" (2010) 47 *Common Market Law Review*, Issue 2, pp. 323–359, attached as **Annex EC-2**, at page 335, footnote 45. *Neframi*, professor of European Law at the University of Luxembourg, has written her PhD thesis on international agreements to which both the Union and Member States are Contracting Parties: *Les accords mixtes de la Communauté Européenne: aspects communautaires et internationaux*, Brussels: Bruylant, 2007.

very well in his account of the negotiations and conclusion of the WTO agreement (emphasis added by the Commission):[13]

> "It is clear as a matter of international law that a mixed Community agreement, concluded simultaneously between the Community, its Member States and third States, is in principle capable of creating rights and obligations between all the parties and hence also between the Member States inter se. It is most of the time equally obvious, as a matter of practical intention, that it is the objective of the Community negotiators to create rights and obligations only between the Community and its Member States on the one hand and one or more third States on the other. In bilateral mixed treaties this is nearly always explicitly expressed, broadly in terms comparable to those used in the preceding sentence.[footnote omitted] In multilateral mixed agreements, very often a so-called disconnection clause is employed, stating that the relations between the Member States of the Community, parties to the agreement, will be governed exclusively by Community law, that is to say not by the law of the treaty concerned.[footnote omitted] As the Community and its Member States always negotiated in the Uruguay Round as one unit, represented by the Commission, there can hardly have been any misunderstanding about the intention of the Community and its Member States to negotiate exclusively obligations with third States and not between Member States inter se. This was, however, never explicitly expressed in any text during the negotiations, except in the headnote of the Community's commitments in the field of services. The Commission made a brief attempt to bring the matter up and to have a clause or declaration comparable to a disconnection clause accepted by the Community's negotiation partners, after it had officially become fully clear in November of 1993 that the WTO would be of mixed Membership as far as the Community was concerned. At this time however, on the brink of the close of negotiations, the mistrust of the Member States was, if possible, even greater than that of third States. They believed that this was another convoluted tactic of the Commission to undermine their full status of membership in the WTO and, therefore, although plain Community self-interest was involved, the initiative was killed."

33. The Commission considers that for those same reasons, the ECT does not apply *at all* in the relationship between EU Member States. Just as was the case for the WTO agreement – and, given the particular historical circumstances, where the ECT was proposed by the Commission and initially conceived as a European treaty, probably even more so – the European Communities and its Member States acted throughout the negotiations like one single block, as will be detailed in the following section, which sets out the object and purpose of the ECT.[14]

### 2.1.3.    Object and purpose of the ECT and context of its conclusion

34. The origins of the ECT can be traced back to a memorandum which a Dutch prime minister, *Ruud Lubbers*, presented in June 1990 to the European Council of Dublin. At that time, shortly after the fall of the Berlin wall, the centrally planned economies of the USSR (and then Russia and the Commonwealth of Independent States) and the countries of Central and Eastern Europe started to reforms into market economies. They all were short of capital. Therefore, *Lubbers*' memorandum suggested the creation of a European Energy Community to capitalize on the complementary relationship between the European Communities, the USSR and the countries of Central and Eastern Europe. The idea was to secure investment flows from West to East, so that the energy flows from East to West would be secure.

35. The President of the Commission, *Jacques Delors*, further developed that idea in a speech on 21 November 1990 at the Conference for Security and Cooperation in Europe's ("CSCE") Summit in Paris. That summit, which closed with the adoption of the "*Charter of Paris for a New Europe*", had the purpose of laying the foundation for "*a new era of democracy, peace and unity*" (and led to the transformation of the CSCE into the Organisation for Security and Cooperation in Europe). The preamble of the ECT refers to the Charter of Paris. In its section on economic cooperation, the Charter of Paris stipulates (emphasis added by the Commission):

---

[13] *Pieter Jan Kuijper*, "The Conclusion and Implementation of the Uruguay Round Results by the European Community", (1995) 6 *European Journal of International Law*, issue 1, pp. 222-244, attached as **Annex EC-3**, at p. 228 and 229.

[14] A very similar account is given in ICSID Case No. ARB/07/19, *Electrabel v Hungary*, Award of 30 November 2012, paragraphs 4.130 to 4.142.

"We are determined to give the necessary impetus to co-operation among our States in the fields of energy, transport and tourism for economic and social development. We welcome, in particular, practical steps to create optimal conditions for the economic and rational development of energy resources, with due regard for environmental considerations. We recognize the important role of the European Community in the political and economic development of Europe."

36.   Shortly thereafter, the European Council of Rome endorsed the proposals made by *Lubbers* and the Commission.[15] In February 1991, the Commission presented a draft for that European Energy Charter, which would give life to the commitment of the Charter of Paris set out above.[16] In the Communication accompanying that draft, the Commission states the purpose of the exercise as follows in its points 5 to 7:

"5. The interest of such a Charter between the countries concerned lies in the complementary relationship in Europe between the owners of the resources, the holders of the advanced technologies and knowhow, and the consumer markets. The Charter should clearly express this interdependence in the energy field in Europe and increase the awareness of the shared responsibility for the supply and environmental problems. From all these points of view, all European citizens would benefit from effective implementation of the Charter. The Charter could also provide an opportunity for a formal declaration of the new spirit of cooperation throughout Europe.

6. This objective finds itself fully integrated within the energy policy which the Commission wishes to promote and which consists of ensuring the security of supply in the Community with a view to completing the internal energy market and providing an external relations policy to back it up. The European Energy Charter fits in fully with this strategy.

7. Such a Charter would provide the European Community with a new framework allowing an expansion of trade which, in turn, would add to the stability of its entire energy supply. The countries of Central and Eastern Europe would obtain the assistance they need for economic recovery and for obtaining energy supplies under conditions allowing a cleaner environment, a better balance between different energy sources and more efficient use of energy. Finally, for the Soviet Union, this expansion of its energy market and closer cooperation can be expected to raise the resources for modernization of the Soviet energy industry."

37.   The European Communities (represented by the Commission and the Dutch presidency of the Council) convened in 1991 an international conference to negotiate and agree on such a Charter, funded that conference and provided its secretariat. The final text of the European Energy Charter, which contains the broad political objectives, was adopted in December 1991 in The Hague.

38.   The special role of the European Communities – in addition to providing decisive input for the content of the European Energy Charter, convening and funding the international conference and providing its secretariat – is also reflected in the recitals of the European Energy Charter itself. Those acknowledge furthermore the obligations of Member States of the European Communities under the Treaties (and other existing international agreements). The precise wording of those recitals is as follows (emphasis added by the Commission):

"Assured of support from the European Community, particularly through completion of its internal energy market;

Aware of the obligations under major relevant multilateral agreements, of the wide range of international energy co-operation, and of the extensive activities by existing international organisations in the energy field and willing to take full advantage of the expertise of these organisations in furthering the objectives of the Charter;"

39.   In another recital, the European Energy Charter also underlines that the objective was to build on the complementarity between the energy resources in the East and the investment potential in the West:

"Certain that taking advantage of the complementary features of energy sectors within Europe will benefit the world economy; persuaded that broader energy cooperation among signatories is essential for economic progress and more generally for social development and a better quality of life"

40.   The ECT has the objective of implementing the policy objectives set out in the European Energy Charter. Article 2 ECT expresses that as follows:

---

[15]   Conclusions of the Presidency on the European Council in Rome, attached as **Annex EC-4**.
[16]   Communication from the Commission on European Energy Charter, COM(91) 36 final of 14 February 1991, attached as **Annex EC-5**.

"This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the [European Energy] Charter."

41.   It follows from that historical process which ultimately led to the conclusion of the European Energy Charter (a policy document) and the ECT (the translation of that policy document into international law, as witnessed by the reference in the preamble and in Article 2 ECT to the European Energy Charter), that the objective of the ECT is to create an international framework for cooperation in the energy sector between the European Communities, on the one hand, and the Russia, the CIS and the countries of Central and Eastern Europe, on the other hand.[17] The European Energy Charter and the ECT were *designed to promote East-West industrial co-operation by providing legal safeguards in areas such as investment, transit and trade*[18] Hence, they were intended first and foremost to establish a high level of investment protection in the energy sector in the relationship between the European Communities on the one hand and the Russia, the CIS and the countries of Central and Eastern Europe on the other hand.

42.   The ECT was perceived as part of the European Communities' external energy policy.[19] It was never intended that the ECT should influence their internal energy policy.

43.   Indeed, the creation of the European Communities' internal energy market was well under way when the ECT was negotiated: In 1985, the European Council in Milan endorsed the Commission's proposal for creating a single market by 1992. In order to implement that commitment in the field of energy, the Council adopted Directives 90/547/EEC on the transit of electricity through transmission grids[20] and 91/296/EEC on the transit of natural gas through grids[21]. In 1991, the Commission proposed more comprehensive rules liberalising the entire electricity and gas sector.[22] Parliament and Council adopted the legislation in 1996 (electricity)[23] and 1998 (gas)[24]. Those initiatives are explicitly mentioned and recognized in the European Energy Charter (see above paragraph 33) and hence were known to all Contracting Parties of the ECT.

44.   While the European Communities had negotiated the European Energy Charter and the ECT, it was necessary for their Member States to also become Contracting Parties, since it was considered that at the time they retained competence over certain matters covered by the ECT. This is borne out by the Decision on the conclusion of the ECT.[25] Hence, the ECT has been concluded as a multilateral agreement by the Union and by its Member States. They are each contracting party for their area of competence.

45.   In summary: It results from the object and purpose of the ECT, as established by reference to prior international agreements referenced in its preamble and the and the circumstances of its conclusion, that it was understood by all Contracting Parties that – although in theory a possibility –, the Member States of the European Communities did not intend to create *inter se* obligations between them in the areas for which they retained competence, just as was the case for the WTO agreement.

### 2.1.4.    On the question of a "disconnection clause"

46.   The claimants, relying on an academic article by *Christian Tietje*[26], which has been reproduced unquestioned by many subsequent articles on the ECT, and the awards in *Charanne*, *PV Investors*, and *RREEF*, draw further support for their position from the fact that ECT "*lacks an explicit*

---

[17]    Additionally, on the first conference held in Brussels on July 1991, the European Communities also invited the other members of the Organization for Economic Cooperation and Development (OECD) that were not EU Member States to participate in the negotiations on the Energy Charter.
[18]    Final Act of the European Energy Charter Conference – background, attached as **Annex EC-6**, p. 24.
[19]    This point is also underlined in ICSID Case No. ARB/07/19, *Electrabel v Hungary*, Award of 30 November 2012, at paragraph 4.132, quoting *Thomas Wälde*.
[20]    OJ L 313, 13.11.1990, p. 30.
[21]    OJ L147, 12.6.1991, p. 37.
[22]    OJ C 65, 14.3.1992, p.4 (for electricity) and p. 14 (for gas).
[23]    Directive 96/92/EC of the European Parliament and of the Council of 19 December 1996 concerning common rules for the internal market in electricity, OJ L 27, 30.1.1997, p. 20.
[24]    Directive 98/30/EC of the European Parliament and of the Council of 22 June 1998 concerning common rules for the internal market in natural gas, OJ L 204, 21.7.1998, p. 1.
[25]    Council and Commission Decision of 23 September 1997 on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects, OJ L 69, 9.3.1998, p. 1.
[26]    *Christian Tietje*, The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs. EU Member States. Halle: Institute of Economic Law, 2008, pp. 7-16, **CL-104**.

*disconnection clause*" (paragraphs 29 to 36 of the claimants' counter-memorial on preliminary objections, quotation at paragraph 29).

47.  However, the view expressed by *Christian Tietje* in his often-referenced work is, first of all, not at all supported by the academic sources he claims to rely upon. In order to support the view that *inter se* obligations between Member States are the rule, and that an exception to that rule is only possible where the multilateral agreement contains a disconnection clause, he relies, first, on the article by *Pieter Jan Kuijper*, quoted above in paragraph 32. By selectively quoting only the very first sentence of the quote reproduced above in paragraph 32, he completely distorts the view of *Kuijper*, which is the exact opposite of the view of *Tietje* – namely that such *inter se* obligations are a theoretical possibility, but in practice never created.

48.  The paper by *Maja Smrkolj*[27], quoted as second authority by *Tietje*, also does not provide any support for his view, to the contrary: As *Smrkolj* points out (emphasis added by the Commission), a disconnection clause is only needed where the application of Union law (and not of the international treaty) between the Member States "*affect[s] the enjoyment by other parties of their rights under the treaty or performance of their obligations*" or "*relate[s] to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole*", or in other words, is not in line with Article 41(1)(b) VCLT. Where, on the contrary, as in the present case, the rights and obligations of third countries are not affected, "*the insertion of the EU-specific 'disconnection clause' seems to be entirely superfluous*".[28]

49.  Also the last two sources on which *Tietje* relies are misquotes: *Raphael Oen*[29] and *Christoph Herrmann*[30] take the view that even in the absence of a disconnection clause, a multilateral agreement may create *inter se* obligations only for those areas where Member States retain their external competence (which is the view defended by the Commission in the alternative under **2.2**).

50.  Furthermore, disconnection clauses have initially been used in international treaties where the Union would not become a Contracting Party due to the rules of the international organisation under whose auspices the international treaty was negotiated, in particular in the past the Council of Europe. In such a setting, disconnection clauses may indeed be useful, as – despite those agreements being mixed agreements as for the question of competence – the Union does not appear in the text of the international treaty, and the disconnection clause serves as a "reminder" of its existence.

51.  The situation is completely different in international treaties where the Union is a party, and which explicitly recognize its role as "*regional economic integration organisation*", as is the case for the ECT in Article 1(3) and 1(10). Here, all Contracting Parties are fully aware of the specificities of the Union's legal order.

### 2.1.5.    Conclusion: No offer for arbitration made by Spain to EU investors

52.  Therefore, the Commission takes the view that the ECT has not created any *inter se* obligations between the EU Member States. As a consequence, Spain (and the Union) has made an offer for arbitration only to investors from Contracting Parties that are not EU Member States.

---

[27]  *Maja Smrkolj*, The Use of the 'Disconnection Clause' in International Treaties: What does it tell us about the EC/EU as an Actor in the Sphere of Public International Law? Paper presented at the GARNET Conference, „The EU in International Affairs", Brussels, 24-26 April 2008, attached as **Annex EC-7**.

[28]  *Ibidem*, p. 9.

[29]  *Raphael Oen*, Internationale Streitbeilegung im Kontext gemischter Verträge der Europäischen Gemeinschaft und ihrer Mitgliedstaaten, Berlin: Duncker and Humblot, 2008, S. 73: „*Festgehalten wurde bisher nur, dass eine völkerrechtliche Bindung der Mitgliedstaaten zueinander jedenfalls in Bereichen ausschließlicher Gemeinschaftszuständigkeit ausscheide. Die Bindung komme nur für solche Bestimmungen in Betracht, die der (ausschließlichen oder konkurrierenden) mitgliedstaatlichen Zuständigkeit unterfielen*", **Annex EC-8**.

[30]  *Christoph Herrmann*, „Rechtsprobleme der parallelen Mitgliedschaft von Völkerrechtssubjekten in Internationalen Organisationen – Eine Untersuchung am Beispiel der Mitgliedschaft der EG und ihrer Mitgliedstaaten in der WTO", in: *Gabriele Bauschke* et al., Pluralität des Rechts – Regulierung im Spannungsfeld der Rechtsebenen, Boorberg: Stuttgart, 2003, pp. 139 and following, attached as **Annex EC-9**, at p. 159: „*Soweit die Kompetenzen auf die EG übertragen worden sind, kann ein gemischtes Abkommen zwischen den Mitgliedsstaaten wohl keine Verpflichtungen begründen*".

**2.2.    In the alternative:** *Inter se* **obligations between Member States would in any event be limited to areas where Member States retain external competence; that is not the case for investment protection and ISDS**

53.    In the alternative, the Commission presents the following argument: Even if by concluding the ECT, EU Member States had entered into certain *inter se* obligations, *quod non*, those obligations would only cover areas where EU Member States retain external competence. The Commission will first set out the applicable principle of international law that applies to the determination of the extent of the responsibility of EU Member States in case they have entered into *inter se* obligation. That principle could be stated as follows: "*liability follows competence*" (**2.2.1**). It will then apply that principle to the case of the ECT (**2.2.2**).

> 2.2.1.    *Applicable principle of international law for the determining the extent of international obligations and international liability of Member States:* "Liability follows competence"

54.    The Draft articles on the responsibility of international organizations, with commentaries[31], foresee, as a rule, the liability of both the international organization and its Member State.[32]

55.    In the drafting work that led to the adoption of the Draft articles on the responsibility of international organizations, that position had been strongly criticized, *inter alia*, by the Commission, for not being in line with the majority view of international tribunals.[33] In order to accommodate that criticism, the final version of the Draft articles on the responsibility of international organizations provides in its Article 64:

> "Article 64 – *Lex specialis*
>
> These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of an international organization, or a State in connection with the conduct of an international organization, are governed by special rules of international law. Such special rules of international law may be contained in the rules of the organization applicable to the relations between an international organization and its members."

56.    In the commentaries to that provision, one finds a discussion of some of the relevant case law, in particular of the WTO panel reports in *European Communities – Protection of Trademarks and Geographical Indications for Agricultural Products and Foodstuffs* as well as in *European Communities – Measures Affecting the Approval and Marketing of Biotech Products*, which both conclude that because the matter in front of them falls under the competence of the European Communities, it is only the European Communities, and not the Member States, that are liable under international law.

57.    The same view has been taken very recently by the International Tribunal for the Law of the Sea ("ITLOS"). In case no 21, *Obligations of Flag States*, it discussed the international liability of an international organization where fishing licences are issued within the framework of a fisheries access agreement between the SRFC Member States and the organization, and vessels flying the flag of one of the Member States of the international organization violate that fisheries access agreement. It held that liability followed competence, and – as the matter fell within the external competence of the Union – it was only the Union, and not the EU Member State the flag of which a vessel flew, that was internationally liable for such a violation.[34]

58.    On the basis of Article 64 of the Draft articles on the responsibility of international organizations and the case-law discussed in the preceding paragraphs, the principle of international law applicable for

---

[31]    Adopted by the International Law Commission at its sixty-third session, in 2011, and submitted to the General Assembly as a part of the Commission's report covering the work of that session (A/66/10).

[32]    Article 19 of the Draft articles on the responsibility of international organizations.

[33]    *Frank Hoffmeister*, Litigating against the European Union and Its Member States, *European Journal of International Law* (2010) 21 *European Journal of International Law*, issue 3, attached as **Annex EC-10**, pp. 724-747, at p. 728 (position expressed by the Commission) and 728 to 739 (presentation of case-law and critique of the position adopted by the International Law Commission in its first draft).

[34]    ITLOS, Advisory opinion of 2 April 2015, case no 21, attached as **Annex EC-11**, paragraphs 151 to 174.

the determining the extent of international obligations and international liability of EU Member States can hence by summarized as follows: "Liability follows competence".

> ### 2.2.2. Application of the principle to the ECT: the Union, and not the Member States, have competence for promotion and protection of investments within the internal market

> #### 2.2.2.1. The competences of the Union and its Member States

59. The attribution of competences within the Union is governed by the principle of conferral. Under that principle, the Union shall act within the limits of the competences conferred upon it by the EU Member States in the Treaties to attain the objectives set out therein. Competences not conferred upon the Union remain with the EU Member States.[35]

60. A first important distinction with regard to the competences is between the external competences, that is the competence of the Union and the EU Member States when acting as subjects of public international law *vis-à-vis* third countries and international organisations (as well as other EU Member States[36]), and the internal competences, that is the competence of the Union and the EU Member States to legislate internally (for the Union inside the Union, for the EU Member State inside the EU Member State).

61. Starting with <u>internal competences</u>, there are two main categories of internal Union competence: exclusive internal competence and shared internal competence. When the Treaties confer on the Union exclusive internal competence in a specific area, only the Union may legislate and adopt legally binding acts, the Member States being able to do so only if so empowered by the Union or for the implementation of Union acts. When the Treaties confer on the Union an internal competence shared with the Member States in a specific area, the Union and the Member States may legislate and adopt legally binding acts in that area. The Member States shall exercise their competence to the extent that the Union has not exercised its competence.[37]

62. Turning now to <u>external</u> competence, the Union has the external competence to conclude agreements with one or more third countries or international organisations for areas of exclusive internal competence, such as the common commercial policy.[38] Thus, for instance, the Union has external competence to conclude international agreements on foreign direct investment.

63. The Union also has the external competence where the Treaties so provide or where the conclusion of an agreement is necessary in order to achieve, within the framework of the Union's policies, one of the objectives referred to in the Treaties, or is provided for in a legally binding Union act or is likely to affect common rules or alter their scope.[39] According to the ECJ, the affectation of common rules or the altering of their scope does not presuppose that the areas covered by the international commitments and those covered by the Union rules coincide fully.[40] Rather, it is sufficient that the international commitments are concerned within an area which is already covered to a large extent by such rules.[41]

64. In such a situation, EU Member States may not enter into such international commitments outside the framework of the Union, even if there is no possible contradiction between those commitments and the common Union rules.[42]

65. Crucially for the present case, it also follows from that provision that <u>EU Member States are prohibited from concluding an international agreement between themselves (*inter se*) which might</u>

---

[35] Article 5(1) and (2) TEU.

[36] ECJ, Judgment in *Pringle*, C-370/12, EU:C:2012:756, paragraph 101.

[37] Article 2 TFEU.

[38] That follows from the use of the word "also" in Article 3(2) TFEU.

[39] Article 3(2) and Article 216 TFEU.

[40] ECJ, Opinion 1/03 ("Lugano Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters"), EU:C:2006:81, paragraph 126; ECJ, judgment in *Commission v Council* ("Broadcasters"), C-114/12, EU:C:2014:2151, paragraph 69; ECJ, Opinion 1/13 ("Convention on the civil aspects of international child abduction"), EU:C:2014:2303, paragraph 72; ECJ, judgment in *Green Network*, C-66/13, EU:C:2014:2399, paragraph 30. That last judgment is of particular relevance in the present case, as it concerns the external competence of the Union in the field of renewable electricity.

[41] ECJ, Opinion 2/91 ("Convention N° 170 of the International Labour Organization concerning safety in the use of chemicals at work"), EU:C: 1993:106, paragraphs 25 and 26; ECJ, Opinion 1/03 ("Lugano Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters"), EU:C:2006:81, paragraph 126.

[42] ECJ, Opinion 2/91 ("Convention N° 170 of the International Labour Organization concerning safety in the use of chemicals at work"), EU:C:1993:106, paragraphs 25 and 26; and ECJ, judgment in *Commission* v *Council* ("Broadcasters"), C-114/12, EU:C:2014:2151, paragraph 71.

affect common rules or alter their scope.[43] On that basis, protection and promotion of investments in other Member States, as well as energy, fall into the external competence of the Union.

### 2.2.2.2.    Union law contains a complete set of investment protection rules for intra-EU investments in field of energy

66.    In order to establish whether EU Member States have the competence to conclude an *inter se* agreement on intra-EU investment protection in the field of energy, it is hence necessary to establish whether the conclusion of such an agreement might affect common rules or alter their scope.

67.    Energy and the internal market are shared internal competences.[44] The Union has extensively legislated, in particular in the area of the internal market for energy and in the area of renewable energy (see in detail above paragraphs 26 and 75 to 79).

68.    Furthermore, Union law rules on internal market rules govern and protect all steps of the life-cycle of an investment.

69.    The provisions on freedom of establishment and free movement of capital and payments forbid directly discriminatory measures by the host Member State, *inter alia* in relation to investment. As regards free movement of capital, as early as in 1988 (under the Treaty of Rome in its original version), the Community legislature clearly indicated that the Treaty freedom of capital movement applies to investment, and specifically to direct investment. Annex I to Council Directive 88/361/EEC of 24 June 1988 for the implementation of Article 67 of the Treaty[45] contains a non-exhaustive classification of capital movements ("Nomenclature"). The first item of such classification is direct investments. The ECJ has clarified that the Nomenclature continues to have indicative value for the notion of capital movements in spite of the Directive no longer being in force.[46] In addition, since the entry into force of the modifications introduced by the Treaty of Maastricht, in January 1994, the Treaty provision on free movement of capital (currently Article 63 TFEU) has been prohibiting any barrier to capital movements as between the EU Member States. It has, therefore, long been clear that EU Member States can no longer introduce international obligations regulating investment *inter se.*

70.    The provisions on freedom of establishment and free movement of capital and payments also prohibit any other restrictions, even those of a non-discriminatory nature. It is settled case-law that Union law *"precludes any national measure which, even though it is applicable without discrimination on grounds of nationality, is liable to hinder or render less attractive the exercise by Community nationals of the freedom of establishment that is guaranteed by the Treaty."*[47] EU Member States are therefore prevented from discriminating between national investors and investors of other EU Member States and more generally from maintaining measures which may deter establishment and investment from other EU Member States.

71.    Thus, national legislation that requires authorisation to be obtained in order to provide certain services constitutes a restriction of freedom of establishment within the meaning of Article 49 TFEU, in that it seeks to restrict the number of service providers, also if there is no discrimination on grounds of the nationality of the persons concerned.[48] Similarly, national legislation which prohibits, without providing for a transitional period or compensation, economic activities that used to be lawful in that EU Member State, constitutes a restriction on the freedom to provide services.[49]

72.    The free movement provisions also govern expropriation of nationals of other EU Member States.[50] More generally, Union law protects the freedom to choose an occupation, the freedom to conduct a business and the right to property. As to the latter, Article 17 of the Charter of Fundamental Rights, which has the same legal value as the Treaties[51], provides that *"[...] everyone has the right to own, use, dispose of and bequeath his or her lawfully acquired possessions. No one may be deprived of his or her possessions, except in the public interest and in the cases and under the conditions provided for by law, subject to fair compensation being paid in good time for their loss."*

---

43    ECJ, judgment in *Pringle*, C-370/12, EU:C:2012:756, paragraph 101.
44    Article 4 (2) (i) TFEU
45    OJ, L 178, 8.7.1988, p. 5.
46    See *e.g.* ECJ, judgment in *Commission v Spain*, C-207/07, EU:C:2008:428, paragraph 32, and ECJ, judgment in *Commission v Netherlands*, C-282/04 and C-283/04, EU:C:2006:608, paragraph 19, with further references.
47    See, *ex multis*, ECJ, judgments in *Commission v Netherlands*, C-299/02, EU:C:2004:620, paragraph 15, and ECJ, judgment in *Commission v Greece*, C-140/03, EU:C:2005:242, paragraph 27.
48    See ECJ, judgments in *Yellow Cab Verkehrsbetrieb*, C-338/09, EU:C:2010:814, paragraph 45, and *Hartlauer*, C-169/07, EU:C:2009:141, paragraphs 36 and 39.
49    ECJ, judgment in *Berlington Hungary and Others*, C-98/14, EU:C:2015:386, paragraphs 51-52.
50    ECJ, judgment in *Fearon*, C-182/83, EU:C: 1984:335, paragraph 7.
51    Article 6 TEU.

73. Restrictions may be justified on the grounds listed in Articles 52 or 65 TFEU (public policy, public security, public health) or by overriding requirements in the general interest as recognised in the case-law of the ECJ (such as the protection of the environment). In either case, the national provision must, in accordance with the principle of proportionality, be appropriate for ensuring attainment of the objective pursued and must not go beyond what is necessary in order to attain that objective.[52]

74. Such justifications must be interpreted in the light of the general principles of Union law, in particular the fundamental rights guaranteed by the Charter of Fundamental Rights. Thus, national rules can only justify restrictions on the freedom to provide services or the freedom of establishment (and, by the same logic, on free movement of capital) if they are compatible with the fundamental rights the observance of which is ensured by the ECJ. Those fundamental rights include the principles of legal certainty and the protection of legitimate expectations, as well as the freedom to conduct a business the right to property enshrined in Articles 16 and 17 of the Charter of Fundamental Rights.[53]

75. National legislation that restricts the free movement of capital or the freedom of establishment may also be capable of limiting the freedom to conduct a business and the right to property.[54] Under Article 52(1) of the Charter of Fundamental Rights, for such a limitation to be admissible, it must be provided for by law and respect the essence of those rights and freedoms. Furthermore, subject to the principle of proportionality, limitations may be made only if they are necessary and genuinely meet objectives of general interest recognised by the Union or the need to protect the rights and freedoms of others.

76. The protection afforded by the freedom of establishment and the free movement of capital, as well as by the general principles of Union law, applies to the whole investment life cycle. Thus, for example, the right of establishment concerns both the taking up and the pursuit of an economic activity in another EU Member State, and both the setting up and the management of undertakings.[55] For its part, the fundamental principle of free movement of capital protects direct investment, with no further limitation or qualification[56]; it also protects the free flow of financial means, whether necessary for the operation of an investment or constituting the proceeds resulting therefrom.[57] Free movement of capital further protects investors by limiting State interference in the management of companies (inter alia by means of "golden shares" or other special powers[58] ) and frames the exercise of State powers to regulate the regime of property ownership[59].

77. The provisions of the Treaties on the freedom of establishment and the free movement on capital are complemented by the other provisions on the internal market and a large number of measures adopted by the Union legislator to regulate the internal market and harmonise the laws of the EU Member States, ranging from protection of intellectual property rights to company law.

78. Union law provides for a complete set of remedies that ensure its proper application. Of particular relevance for the present case is that national courts and tribunals, in their function as ordinary courts within the Union legal order[60], have jurisdiction to hear actions for damages brought against EU Member States that have violated Union law (including, if it was to apply to investments of EU investors in another EU Member State, *quod non*, and had direct effect, the ECT). That also includes cases where the competent national courts and tribunals failed to apply Union law, or incorrectly applied that law.[61]

79. The Union legal order is based on the fundamental premise that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premise implies and justifies the existence of mutual trust between the Member States that those values will be recognised and, therefore, that the law of the EU that implements them will be respected. That general principle of Union law of mutual trust

---

[52]   ECJ, judgment in *Essent Belgium*, Joined cases C-204/12 to C-208/12, EU:C:2014:2192.
[53]   ECJ, judgment in *Berlington Hungary and Others*, C-98/14, EU:C:2015:386, paragraphs 74ff.
[54]   ECJ, judgment in *Pfleger and Others*, C-390/12, EU:C:2014:281, paragraphs 57-60.
[55]   See also the General Programme for the abolition of restrictions on freedom of establishment, OJ English Special Edition (II) pp. 7-15, esp. Title III, which since 1962 has provided examples of State measures falling within the scope of the freedom of establishment and impacting on both the taking up and the pursuit thereof (then set out in Article 52 of the Treaty establishing the European Economic Community).
[56]   See e.g. ECJ, judgment in *Commission v Portugal*, C-212/09, EU:C:2011:717, paragraphs 42-44.
[57]   For a vast, yet not exhaustive list of transactions covered by free movement of capital see the Nomenclature, cf. paragraph 39 above.
[58]   See e.g. ECJ, judgment in *Commission v Portugal*, C-212/09, EU:C:2011:717, paragraphs 6-10, 56-57; ECJ, judgment in *Commission v Germany*, C-112/05, EU:C:2007:623, paragraphs 4-7, 56, 68; ECJ, judgment in *Commission v Italy*, C-326/07, EU:C:2009:193.
[59]   See e.g. ECJ, judgment in *Essent*, C-105/12, C-106/12 and C-107/12, EU:C:2013:677.
[60]   ECJ, Opinion 1/09 ("European and Community Patents Court"), EU:C:2011:123, paragraph 80.
[61]   ECJ, Judgment in *Köbler*, C-224/01, EU:C:2003:513, paragraphs 30 to 59.

requires considering all the other Member States to be complying with EU law.[62] The general principle of Union law of mutual trust includes in particular the mutual trust accorded by the Member States to their respective legal systems and judicial institutions.[63]

2.2.2.3.    EU Member States lack the competence to conclude an investment protection treaty <em>inter se</em>

80.   By concluding an investment protection treaty *inter se*, EU Member States would hence conclude a treaty that "might affect common rules or alter their scope", namely the Union law rules on investment protection set out in the previous sub-section. That has already in 1986 been confirmed by the ECJ, when it held that the external competence for matters falling within the "four freedoms", i.e. free movement of goods, capital, services and workers, lies with the Union.[64] Furthermore and in the alternative, the Commission recalls that Union law also largely covers the field of energy. Rules on transit between Member States were already in force at the time of signing of the ECT, and comprehensive rules for an internal market for electricity and gas had been proposed by the Commission and were under negotiation in Council and Parliament (see above paragraph 43). According to the case-law of the ECJ, the exercise of a shared internal competence by the EC triggers the external competence of the EC.[65] The fact that the Commission has made a proposal for using the shared internal competence is in that context sufficient for creating an external competence.[66]

81.   Therefore, on the basis of Article 3(2) TFEU, as interpreted in the judgment in *Pringle*, EU Member States lacked the <u>external</u> competence to conclude such a treaty.

82.   The Commission is aware of the fact that there are four published awards of tribunals concerning intra-EU BIT[67] which take the opposite view.

83.   Those awards, as well as academic writing espousing the same view[68], have one fundamental flaw: They consider that EU Member States remain free to conclude international agreements in areas covered by the four freedoms *inter se*, because the <u>internal</u> competence for the internal market is qualified in Article 4(2)(a) TFEU as a "*shared competence*". On that basis, they consider that EU Member States are free to go beyond the level of investment protection afforded by the Treaties in BIT, and in particular to agree on more demanding substantive protection and to agree on the use of investor-State dispute settlement. Their position is based on Article 2(2) TFEU, which provides as follows:

> "When the Treaties confer on the Union a competence shared with the Member States in a specific area, the Union and the Member States may legislate and adopt legally binding acts in that area. The Member States shall exercise their competence to the extent that the Union has not exercised its competence. The Member States shall again exercise their competence to the extent that the Union has decided to cease exercising its competence."

84.   However, they overlook the fact that Article 2(2) only regulates to what extent EU Member States may legislate <u>within their territory</u>. It does not, on the contrary, define to what extent EU Member States may enter into <u>international agreements</u>, including into international agreements with other EU Member States. As the ECJ has held in *Pringle*, sitting as Full Court, i.e. in the most authoritative

---

[62]   ECJ, Opinion 2/13 ("Accession of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms"), EU:C:2014:2454, paragraphs 168 and 191.

[63]   ECJ, Judgment in *Gazprom*, C-536/13, EU:C:2015:316, paragraph 37.

[64]   ECJ, judgment in *Demirel*, 12/86, paragraph 9: "*Since the agreement in question is an association agreement creating special, privileged links with a non-member country which must, at least to a certain extent, take part in the Community system, Article 238 must necessarily empower the Community to guarantee commitments towards non-member countries in all the fields covered by the Treaty. Since freedom of movement for workers is, by virtue of Article 48 et seq. of the EEC Treaty, one of the fields covered by that Treaty, it follows that commitments regarding freedom of movement fall within the powers conferred on the Community by Article 238.*"

[65]   ECJ, Judgments in *Commission v Council* ("AETR"), 22/70, EU:C:1971:32; paragraphs 16 to 22; and in *Commission v Denmark* ("Open skies"), C-467/98, EU:C:2002:624, paragraphs 75 to 80.

[66]   ECJ, Opinion 1/76 ("European Laying-up Fund for Inland Waterway Vessels"), 1/76, EU:C:1977:63, paragraph 4.

[67]   *Eastern Sugar B.V. (Netherlands) v. The Czech Republic*, SCC Case No. 088/2004, Award of 27 March 2007 on jurisdiction; *Achmea B.V. v. The Slovak Republic*, PCA Case No. 2008-13 (formerly *Eureko B.V. v. The Slovak Republic*, Award of 26 October 2010 on jurisdiction, arbitrability and suspension; *Binder v The Czech Republic*, Award of 6 June 2007 on jurisdiction; *Ostergetel and Laurentius v. Slovakia*, Decision on Jurisdiction of 30 April 2010.

[68]   See for example *Thomas Eilmansberger*, "Bilateral Investment Treaties and EU Law", in: (2009) 46 *Common Market Law Review*, pp. 383-429, attached as **Annex EC-12**, at page 401; similarly *Christian Tietje*, The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs. EU Member States. Halle: Institute of Economic Law, 2008, pp. 14 and 15, **CL-104**. Since the entry into force of the Treaty of Lisbon, in addition to the competence of the Union in that field, which precluded since the entry into force of the Treaty of Rome in 1958 the conclusion of investment protection agreements between its Member States *inter se*, the Union also has the competence for concluding investment protection agreements with third countries (Article 207 TFEU), and Member States manifestly lack the competence to conclude international agreements in that field. As the present case concerns investment protection with regard to another Member State, and not with regard to third countries, that change is – contrary to *Tietje* seems to assume – without relevance for the present case.

and solemn formation, the power of EU Member States to conclude international agreements, both with third countries and other EU Member States, is governed by Article 3(2) TFEU:[69]

> "In that regard, it must be recalled that, under Article 3(2) TFEU, the Union is to have 'exclusive competence for the conclusion of an international agreement when its conclusion … may affect common rules or alter their scope'.
>
> It follows also from that provision that Member States are prohibited from concluding an agreement between themselves which might affect common rules or alter their scope."

85.  After the judgment in *Pringle*, it is now beyond doubt that the decisive question for establishing whether the application of the ECT to intra-EU situations is compatible with EU law is whether its existence "*might affect common rules [of EU law] or alter their scope*", not whether the internal market and energy are shared competences and the ECT merely goes beyond the level of protection offered by the Treaties. In that context, it is also important to recall that the ECJ considers that international investment treaties breach Union law already when they present the <u>risk</u> of conflict with <u>potential</u> Union measures, without it being necessary to demonstrate actual conflict.[70]

86.  For the sake of completeness, as some authors argue that a declaration of competence is a precondition for the applicability of the principle of "*liability follows competence*", the Commission notes that the Contracting Parties of the ECT concerned by the question of *inter se* obligations between Member States were only the EU Member States, for the following reason: it is only necessary to establish whether the ECT has created *inter se* obligations between those Member States.

87.  The Commission takes the view that the EU Member States are, from the point of view of international law, presumed to be aware of the rules governing the distribution of competences in a supranational organisation they have themselves created. Therefore, even if there was no declaration of competence in the ECT at all, *quod non* (see following paragraphs), the principle of "*liability follows competence*" would still apply between the EU Member States.

88.  In any event, the ECT contains detailed provisions by means of which Contracting Parties have been made aware of the special features of the legal order of the European Communities. Those are: Article 1(2), (3) and (10) ECT, Article 36(7) ECT, and the instrument submitted by the European Communities to the Secretariat of the ECT on the basis of Article 26(3)(ii).

89.  Those have already been discussed above in section 2.1.1. It is therefore sufficient to recall here that the ECT recognizes that the EU Member States have transferred competences over matters governed by the ECT to the Union, including the authority to take decisions binding on them in respect of those matters (Article 1(3) ECT). Article 36(7) ECT foresees that the Union votes on matters falling in its competence, and the Member States on matters falling in their competence, and that the EC, when voting, shall have a number of votes <u>equal</u> to the number of its Member States which are Contracting Parties to this Treaty. Hereby, the signatories to the ECT acknowledge the Union's role with respect to EU Member States and the distribution of competences between the Union and its Member States. Furthermore, Article 1(10) ECT refers explicitly to the EU Treaties as the "*agreement establishing that Organization*".

90.  To sum up, the ECT at several places recognizes the existence of a division of external competence between the Union and its Member States. All Contracting Parties hence are aware of the existence of the distribution of international liability on the basis of competence. That means that it is necessary to consider in each case whether Member States have conferred competence over the matter at hand to the Union. If the competence over a matter lies with the Union, it is the relevant Contracting Party and hence bound by the ECT; if the competence over a matter lies with its Member States, they are the relevant Contracting Parties and hence bound by the ECT.

91.  In order to improve the operability of the division of competences, the European Communities submitted to the Secretariat of ECT a statement pursuant to Article 26(3)(ii) ECT, which is an instrument in the sense of Article 31(2)(b) VCLT and provides the following (emphasis added by the Commisison):[71]

---

[69]   ECJ, judgment in *Pringle*, C-370/12, EU:C:2012:756, paragraphs 100 and 101.
[70]   Judgments in Case C-205/06, *Commission v Austria*, EU:C:2009:118, paragraphs 28 and 45; in Case C-249/06, *Commission v Sweden*, EU:C:2009:119, paragraphs 29 and 38 to 45; and in Case C-118/07, *Commission v Finland*, EU:C:2009:715, paragraphs 22 and 29 to 35.
[71]   The statement has been published by the secretariat of the ECT, see http://www.energycharter.org/fileadmin/DocumentsMedia/Legal/Transparency_Annex_ID.pdf at page 9. It is also attached as **Annex EC-1**.

"The European Communities are a regional economic integration organisation within the meaning of the Energy Charter Treaty. <u>The Communities exercise the competences conferred on them by their Member States</u> through autonomous decision-making and judicial institutions.

<u>The European Communities and their Member States</u> have both concluded the Energy Charter Treaty and are <u>thus internationally responsible</u> for the fulfilment of the obligations contained therein, <u>in accordance with their respective competences</u>."

92. That statement repeats the division of the external competence, and affirms that the international responsibility of the Union and its Member States is governed by the principle of "*liability follows competence*". It constitutes a declaration of competences, if such a declaration was necessary, *quod non.*

2.2.2.4.   Conclusion: If, at all, the ECT has created *inter se* obligations between EU Member States, those do not concern Part III and Article 26 ECT

93. In conclusion, as all provisions in Part III and Article 26 ECT fall within the external competence of the Union, the Union – and not its Member States – are bound under international law by those provisions. EU Member States, when ratifying the ECT, did not have the competence to conclude *inter se* obligations concerning investment protection in the field of energy.

94. That has two consequences: First, in case of a dispute between the Union and an investor of another Contracting Party (i.e. a third country), the Union is internationally responsible for any breach of the provisions on investment promotion and protection, irrespective of whether the treatment at issue is afforded by the Union itself or by a Member State.[72] Second, the provisions of the ECT on investment promotion and protection bind the Union, but not Member States *inter se.* Article 26 ECT does not allow an EU investor to initiates arbitration proceedings against a Member State, because the dispute would be one between the Union and an EU investor from the Union. Article 26 ECT does not apply to such disputes, because they are not directed against <u>another</u> Contracting Party.

95. In the alternative, should your Arbitral Tribunal consider that there is ambiguity in the terms of the ECT with regard to the question of *inter se* obligations between EU Member States, the Commission considers that the Tribunal should favour an interpretation that does not conflict with Union law. That point has been reasoned in detail by the *Electrabel I* Tribunal.[73] Therefore, in the present case brought by an EU investor against a Member State of the European Communities, for which there were *ab initio* no *inter se* obligations vis-à-vis other Member States of the European Communities, the principle of interpretation of the ECT in the light of Union law requires an interpretation pursuant to which the ECT does not apply between those Member States at all, or at the very least pursuant to which chapter III and Article 26 ECT do not apply between those Member States.

96. Also for all those reasons, Article 26 ECT does not constitute an offer for arbitration from Spain to investors from other EU Member States.

**3.   IN THE FURTHER ALTERNATIVE: THE OFFER FOR ARBITRATION MADE BY SPAIN IS NOT VALID**

97. If your Tribunal considers, contrary to the view of Spain and the Commission, that Spain has made an offer for arbitration to EU investors by ratifying the ECT, it still needs to verify whether that offer is valid. In view of the Commission, that is not the case, for two different reasons: First, such an offer would violate Union law, and in case of conflict between the ECT and Union law, Union law takes precedence over the ECT pursuant to Article 351 TFEU (**3.1**). Second, any such offer would have been modified or superseded pursuant to Articles 41(1)(b) or 30(4)(a) VCLT (**3.2**).

**3.1.   An offer for arbitration by Spain to EU investors would violate Union law; Union law takes precedence over the ECT**

98. The *Electrabel I* tribunal has at length discussed the relationship between the ECT and Union law in general.[74] Its findings can be summarized as follows:

   (1)   Union law is part of international law, and therefore has to be applied by a Tribunal established on the basis of Article 26 ECT and the ICSID Convention as a matter of law, pursuant to Article 42 of the ICSID Convention, both with regard to the validity of the arbitration agreement and the merits. That follows from the fact that both refer, with regard

---

[72]   The Union has adopted specific legislation on financial responsibility in such cases; see Regulation (EU) No 912/2014 of the European Parliament and of the Council of 23 July 2014 establishing a framework for managing financial responsibility linked to investor-to-state dispute settlement tribunals established by international agreements to which the European Union is party, OJ L 257, 28.8.2014, p. 121.

[73]   ICSID Case No. ARB/07/19, Award of 30 November 2012, paragraphs 4.130 to 4.142.

[74]   *Ibidem*, paragraphs 4.111 to 4.199.

to the law applicable to the dispute, to international law, and Union law constitutes international law that applies between the host State and the home State of the investor in case of an intra-EU dispute.[75]

(2)    Given its historic genesis and its text, the ECT should be interpreted, if possible, in harmony with Union law.[76]

(3)    If such harmonious interpretation proves to be impossible, Union law prevails on the basis of Article 351 TFEU, which is an expression of the customary rule of international law codified in Article 30 VCLT.[77]

99.    The first finding has not been disputed by subsequent tribunals, and – as far as the Commission can tell from the written submissions that have been put at its disposal by your tribunal – the claimants do not contest that point either. The Commission will therefore refrain from arguing that point in depth in this submission. Should your Tribunal have any doubt on it, the Commission is at its disposal to further expand on that question.

100.    The *PV investors* tribunal has not taken any views on the second and third point. The *Charanne* tribunal has restated the finding of the *Electrabel I* tribunal on those points.[78] Both find no need to analyse those questions further, as they consider that Union law allows for intra-EU investor-State arbitration.

101.    However, the claimants, in paragraphs 49 and 50 of the observations on the request for bifurcation, differ from the point of view expressed by the *Electrabel I* tribunal on the applicable rules in case of conflict. They can find support for their view in the award on jurisdiction rendered by the *RREEF* tribunal, which claims that in case of conflict, the ECT prevails over the EU Treaties in case of conflict even in case of an intra-EU dispute.

102.    The Commission is well aware of the awards by tribunals finding both in cases of intra-EU bilateral investment treaties and in cases of the intra-EU application of the ECT that intra-EU investor-State arbitration is not contrary to the EU Treaties.

103.    However, the Commission is not convinced by the arguments on which that reasoning is based. They overlook in particular the fundamental difference between commercial arbitration and investment treaty arbitration. Furthermore, that question is currently pending before the ECJ, in a reference made by the German *Bundesgerichtshof* in the annulment proceedings for the award in *Achmea (formerly Eureko)* v *Slovakia*.[79] The Commission therefore takes the view that at the very least, it would seem appropriate to suspend the current proceedings until the ECJ has taken a view on the question (**3.1.1**). If your Tribunal follows the view of the Commission that there is such a conflict, or if the ECJ confirms such a conflict, the Commission invites your Tribunal to apply the rule of conflict established by the *Electrabel I* tribunal. The arguments levelled against that rule by the *RREEF* tribunal are not convincing (**3.1.2**).

    3.1.1.    *The intra-EU application of the investment protection provisions of the ECT violates Union law*

        3.1.1.1.    The intra-EU application of the substantive investment protection provisions of the ECT violates Article 3(2) TFEU and Union law provisions on investment protection

104.    As has been demonstrated in detail above in section **2.2.2**, Union law provides for a complete set of rules on investment protection.

105.    Therefore, if EU Member States had indeed agreed *inter se* obligations creating a second, different set of rules on investment protection to be applied between them, they would have violated Article 3(2) TFEU, because they lacked the competence to do so.

106.    At the same time, as the substantive content of Part III ECT is not necessarily identical to the substantive content of the Union law provisions concerning investment protection, there is also a risk of conflict, and hence a violation of those Union law provisions.

---

[75]  *Ibidem*, paragraphs 4.119 to 4.126.
[76]  *Ibidem*, paragraphs 4.130 to 4.142.
[77]  *Ibidem*, paragraphs 4.178 to 4.191.
[78]  *Charanne* v *Spain*, Final Award of 21 January 2016, paragraph 439.
[79]  Case C-284/16, pending. The order for reference and an English translation are attached as **Annex EC-13**.

> 3.1.1.2.    The submission of intra-EU disputes to treaty-based investor-State arbitration violates law Articles 19(1) TEU, 267 and 344 TFEU as well as the general principles of effectiveness and unity of Union law

107. Unlike ordinary international treaties, the founding treaties of the Union established a new legal order, possessing its own institutions, for the benefit of which EU Member States have limited their sovereign rights, in ever wider fields. The subjects of that legal order include not only the EU Member States, but also their nationals. The essential characteristics of the Union legal order are in particular its primacy over the laws of the Member States and the direct effect of a series of provisions which are applicable to their nationals and the EU Member States themselves.[80]

108. The ECJ and the courts and tribunals of the Member States are the guardians of that legal order. They cooperate by way of the preliminary ruling mechanism established by Article 267 TFEU, which is essential for the preservation of the character of the legal order established by the Treaties. That mechanism aims to ensure that, in all circumstances, that law has the same effect in all Member States, and to avoid divergences in its interpretation.[81]

109. Article 19(1) TEU, Article 344 and Article 267 TFEU establish the following methods for the settlement of conflicts on the application and interpretation of the Treaties: Disputes involving two Member States, as well as disputes between a Member State and the Institutions have to be brought to the Court. Disputes between a private party and a Member State have to be brought to the competent national judge, as *juge de droit commun du droit communautaire*. The national judge may and sometimes must refer the questions concerning EU law to the Court.[82]

110. The starting point of the analysis of intra-EU investor-State arbitration under the ECT against that system is that Article 26 ECT creates a new dispute settlement system, namely investor-State arbitration. Pursuant to Article 26 (6) ECT, the law to be applied by Arbitral Tribunals in intra-EU investor-State arbitration includes Union law as part of the *"applicable rules of international law"*, because it is in force between the host State and the home State of the investor. According to Article 26 (8) ECT, any decision rendered by an Arbitral Tribunal on the basis of Article 8 shall be *"final and binding"*. That new dispute settlement system has been created – if the theory of claimants and the earlier tribunals is correct – by the EU Member States, when those ratified the ECT. When EU Member States create such a new dispute settlement system that is competent to apply Union law, they violate Article 344 TFEU.

111. The tribunals in *Electrabel I, Charanne, PV investors* and *RREEF* have taken the view that Article 344 TFEU only applies to disputes between two EU Member States, but not to disputes between an investor and an EU Member State. They have, in particular, observed that national Courts and commercial arbitration tribunals are competent to apply Union law as a matter of law, without that being a violation of Union law.

112. With regards to national Courts, that position simply overlooks that the national judge is the ordinary courts within the Union legal order[83] (see also above paragraph 78). Therefore, those disputes are submitted to a method of settlement provided for in the EU treaties.

113. With regard to commercial arbitration, the ECJ has indeed accepted that private parties enter into arbitration agreements, including on matters governed by Union law, in *Nordsee*[84] and *Ecoswiss*[85]. However, that reasoning cannot be extended to investment treaty arbitration, for three reasons.

114. <u>First</u>, the legal nature of an investment treaty is different from the legal nature of an arbitration clause in a commercial agreement. An investment treaty is an act of public international law, concluded between two States, and constitutes an *actum jure imperii*. When acting in its capacity as legislator (including through international law making), the State may not limit the scope of application of Article 267 TFEU[86]. An arbitration clause in a commercial contract, on the other hand, is an act of private law, and constitutes an *actum jure gestionis*. Here, private parties only regulate the

---

[80]  ECJ, Opinion 2/13 ("Accession of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms"), EU:C:2014:2454, in particular paragraphs 158, 163, 165; ECJ, Opinion 1/91 ("Draft agreement between the Community, on the one hand, and the countries of the European Free Trade Association, on the other, relating to the creation of the European Economic Area"), EU:C: 1991:490, paragraph 21.

[81]  ECJ, Opinion 2/13 ("Accession of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms"), EU:C:2014:2454, in particular paragraphs 170 and 174.

[82]  See, in detail, ECJ, Opinion 1/09 ("European and Community Patents Court"), EU:C:2011:123, paragraphs 64 to 89.

[83]  ECJ, Opinion 1/09 ("European and Community Patents Court"), EU:C:2011:123, paragraph 80.

[84]  ECJ, Judgment in *Nordsee*, 102/81, EU:C:1982:107.

[85]  ECJ, Judgment in *Eco Swiss*, C-126/97, EU:C:1999:269.

[86]  ECJ, Judgment in *Rheinmühlen*, 166/73, EU:C:1974:3, paragraph 4; see also Opinion 1/09 ("European and Community Patents Court"), EU:C:2011:123, paragraphs 80 to 85; Judgment in *Puligienica*, C-689/13, EU:C:2016:199, paragraphs 31 to 36.

relationship between themselves, and enjoy in principle autonomy of contract, subject only to the *ordre public*.

115. Second, the subject-matter of investor-State arbitration is not a contractual relationship, but the behaviour of the contracting States in their capacity as public authority and the exercise of public policy prerogatives.[87]

116. These first two differences have been summarized by scholars as follows:

> „Given the extent to which investment treaties incorporate a private model of adjudication, investment treaty arbitration may appear little different from commercial arbitration. But it is a mistake to confuse the two. [...] commercial arbitration is constituted by an agreement between private parties to arbitrate disputes between themselves and its authority derives from the autonomy of individuals to order their private affairs as they wish. Investment treaty arbitration, in contrast, originates in the authority of the state to use adjudication to resolve regulatory disputes between individuals and the state. It is both constituted by a sovereign act of the state and used to resolve disputes that arise from sovereign acts or omissions of the state. Thus, at its root, the misapprehension of investment treaty arbitration as commercial arbitration confuses public for private authority."[88]

> "First, unlike a commercial dispute, investment treaty arbitrations often involve questions about the scope and limits of the host state's regulatory powers. [...] Second, investment treaty arbitrations involve obligations of a different nature compared with commercial arbitration. The rights invoked by a foreign investor do not originate from a freely negotiated contract, but from obligations the host state has assumed under an international treaty with the investor's home state. [...] Finally, the host state's consent to arbitration in investment treaty disputes is of a different nature compared with the commercial context. [...] Arbitral jurisdiction in investment treaty arbitrations is not based on contractual arbitration clauses, but involves a unilaterally offer of the host state in an investment treaty. [...] It constitutes a sovereign act. "[89]

117. Third, the system of control foreseen in *Nordsee* and *Eco Swiss* is based on the assumption that the tribunal fixes its seat in the Union. However, nothing in Article 26 ECT prevents the Arbitral Tribunal from fixing its seat outside the Union. Based on experience from interventions of the Commission as *amicus curiae*, this appears nowadays even to be the rule. States – contrary to private parties – usually also have assets in third countries. This facilitates circumvention of control by judges of a Member State. That system of control fails completely in case of ICSID arbitration, where no national annulment proceedings are foreseen. In any event, the possibility of the court of an EU Member State to raise violations of Union law and make references at the stage of annulment or enforcement proceedings is limited to those rules of Union law that are part of the *ordre public*, which is acceptable for private law relationships, but not for public law relationships.

118. Furthermore and in more general, nothing in the wording of Article 344 TFEU suggests that it would only apply to disputes between EU Member States. That has also been confirmed by the ECJ: In *Opinion 2/13*, the ECJ has confirmed that Article 344 TFEU extends to disputes between the Member States and the Union[90]. In *Opinion 1/09*, the Court clarified that Article 344 TFEU did not apply to a new court structure that applies "*only to disputes between individuals*".[91] Finally, in the situation assessed in *Opinion 1/91*, the disputes concerned disputes between either the EU or an EU Member State and another contracting party.[92]

---

[87]   *Salini Costruttori S.p.A. and Italstrade S.p.A. v The Hashemite Kingdom of Jordan*, ICSID Case No. ARB/02/13, Decision on Jurisdiction of 9 November 2004, paragraph 151:
"*In fact, the State, or its emanation, may have behaved as ordinary cocontractants having a difference of approach, in fact or in law, with the investor. In order that the alleged breach of contract may constitute unfair or inequitable treatment within the meaning of the bilateral agreement, it must be the result of behaviour going beyond that which an ordinary contracting party could adopt. Only the State, in the exercise of its sovereign authority (*puissance publique*), and not as a contracting party, has assumed obligations under the bilateral agreement. In other words, an investment protection treaty cannot be used to compensate an investor deceived by the financial results of the operation undertaken, unless he proves that his deception was a consequence of the behaviour of the receiving State acting in breach of the obligations which it had assumed under the treaty.*"

[88]   Gus van Harten, *Investment Treaty Arbitration and Public Law*, Oxford University Press 2007, pp. 58 and 59, attached as **Annex EC-14**. Similarly Andreas Kulick, *Global Public Interest in International Investment Law*, Cambridge University Press 2012, who refers to investment treaty arbitration as "*Global Administrative Law*" (on p. 83)

[89]   Stephan Schill, „Crafting the International Economic Order: The Public Function of Investment Treaty Arbitration and Its Significance for the Role of the Arbitrator", in: 23 *Leiden Journal of International Law* (2010), attached as **Annex EC-15**, pp. 401-430, at pp. 410 to 412.

[90]   EU:C:2014:2454, paragraphs 202 to 204; see also Opinion 1/00, EU:C:2002:231, paragraph 17; Case T-465/08, *Czech Republic v Commission*, EU:T:2011:186, paragraphs 101-102.

[91]   EU:C:2011:123, paragraph 63.

[92]   EU:C:1991:490, paragraphs 30 to 34.

119. Both *Opinion 2/13*[93] and *Opinion 1/91*[94] stress that Article 344 TFEU is the expression of a more general principle that an international agreement cannot affect the allocation of powers fixed by the EU Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court.

120. Therefore, the Commission takes the view that Article 344 TFEU also covers an international agreement by which two EU Member States agree to submit cases brought by an investor from the other EU Member State against them and involving the interpretation or application of the Treaties to a new dispute settlement structure outside the EU Treaties. On that basis, the interpretation of Article 26 ECT favoured by the tribunals in *Electrabel I, Charanne, PV investors* and *RREEF* violates Article 344 TFEU.

121. The Union has recently affirmed that position in the context of the ECT, when signing the International Energy Charter.[95] At that occasion, the Commission made the following statement on behalf of the European Union:[96]

   "It is declared that, due to the nature of the EU internal legal order, the text in Title II, Heading 4, of the International Energy Charter on dispute settlement mechanisms cannot be construed so as to mean that any such mechanisms would become applicable in relations between the European Union and its Member States, or between the said Member States, on the basis of that text."

122. A different view could only be defended if an Arbitral Tribunal established on the basis of Article 26 ECT was to be considered a national court or tribunal in the sense of Article 267 TFEU, with the possibility of referring preliminary questions to the ECJ. In that case, it would be a "*method of settlement provided for in the EU treaties*".

123. Arbitral tribunals seized with the question thus far all agree that they lack the possibility to refer preliminary questions on the basis of Article 267 TFEU to the Court, because they are not a national court or tribunal in the sense of Article 267 TFEU.[97] The Commission concurs with that view.

124. The Commission considers that it is its duty, however, to inform your Tribunal of the fact that Advocate General *Wathelet* has recently taken a different view in his opinion in *Genentech*:[98]

   "The arbitral tribunals hearing cases within the framework of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (ICSID) could be regarded as being able to refer questions to the Court for a preliminary ruling. [...] Since the number and size of investment arbitrations raising questions on the application of EU law are increasing, particularly in the field of State aid, the possibility for arbitral tribunals to refer questions for a preliminary ruling could help to ensure the correct and effective implementation of EU law."

125. The Commission considers that view as erroneous, because an ICSID tribunal does not meet the requirements of being permanent, of having mandatory jurisdiction, and of being an organ of the State.

126. The Commission invites your Tribunal to rule itself that the interpretation of Article 26 ECT favoured by the tribunals in *Electrabel I, Charanne, PV investors* and *RREEF* violates Article 344 TFEU.

127. In the alternative, the Commission considers that your Tribunal should suspend the proceedings in front of it and await the ruling of the ECJ in *Achmea* v *Slovakia*. As the UNCLOS Tribunal in *Mox Plant*[99] and the tribunal in *Iron Rhine*[100] have convincingly argued, the ECJ is the ultimate authority

---

[93]  EU:C:2014:2454, paragraph 202.

[94]  EU:C:1991:490, paragraph 35.

[95]  The International Energy Charter is a declaration of political intention aiming at strengthening energy cooperation between the signatory states which has been formally adopted and signed at the Ministerial Conference in The Hague in May 2015. It seeks to update the ECT and maps out common principles for international cooperation in the field of energy.

[96]  Declaration attached as **Annex EC-16**. The text of declaration can be found on the website of the Secretariat of the Energy Charter: http://www.energycharter.org/fileadmin/DocumentsMedia/Legal/EU_IEC_Declaration.pdf .

[97]  They take, however, the view that this is not problematic, based on the rulings of the ECJ in *Nordsee* and *Eco Swiss*, discussed above in paragraphs 113 to 117. For the reasons set out there, the Commission does not share that view.

[98]  Opinion of Advocate General *Wathelet* in Case 567/14, *Genentech*, EU:C:2016:177, footnote 34. This view is supported by a number of scholars, see for instance *Jürgen Basedow*, „EU Law in International Arbitration: Referrals to the European Court of Justice" 32 *Journal of International Arbitration* (2015), S. 367–386; *Konstanze von Papp*, „Clash of ‚autonomous legal orders': Can EU Member States Courts bridge the jurisdictional divide between investment tribunals and the ECJ ? A plea for direct referral from investment tribunals to the ECJ" 50 *Common Market Law Review* (2013), S. 1039-1082; *John P. Gaffney*, "Should Investment Treaty Tribunals Be Permitted to Request Preliminary Rulings From the Court of Justice of the European Union?" 2 *Transnational Dispute Management* (2013); *Milos Olik* and *David Fyrbach*, "The Competence of Investment Tribunals to Seek Preliminary Rulings from European Courts", *Czech Yearbook of International Law* 2011, S. 191-205.

[99]  ITLOS Order No. 3, 24 June 2003, attached as **Annex EC-17**, at paragraphs 27 and 28: "*The Tribunal observes that the resolution of the essentially internal problems within the European Community legal order may involve decisions that are final and binding. The Tribunal further observes that its decision, including a decision on jurisdiction, will be final and binding on*

for the interpretation of Union law. Therefore, the principle of comity justifies suspension of the proceedings until that question of Union law is definitively decided by the competent forum, here the ECJ.[101] The legal basis for such a suspension of proceedings can be found in the case-management authority of the Tribunal.[102]

128. Your Tribunal can find precedent for decisions to stay proceedings in comparable situations in particular in *Mox Plant*[103] and in *SPP v Egypt*.[104] The current situation is also different from *Achmea (formerly Eureko)*, where a suspension to await the outcome of a possible infringement procedure under what is now Article 258 TFEU was declined, because it was not certain whether the Commission would eventually bring such an infringement case.[105] Here, the relevant case is already pending in the ECJ.

129. In the further alternative, in particular if your Tribunal considers that there an ICSID tribunal established on the basis of Article 26 ECT – contrary to an UNCITRAL tribunal established on the basis of an intra-EU BIT – constitutes a "national court or tribunal" in line with the view of Advocate General *Wathelet* or entertains doubts in that regard, the appropriate course of action would be to refer that question to the ECJ. Indeed, if the opposite is true, as the Commission thinks, the ECJ will have to expressly confirm that view in order to reject the reference as inadmissible.

### 3.1.2. In case of conflict between the ECT and Union law, Union law prevails if the conflict concerns an intra-EU conflict

130. As the tribunal in *Electrabel I* has very convincingly argued, refuting all arguments to the contrary and relying on the relevant case-law of the ECJ, "*the Tribunal concludes that Article 307 EC [now Article 351 TFEU] precludes inconsistent pre-existing treaty rights of EU Member States and their own nationals against other EU Member States; and it follows, if the ECT and EU law remained incompatible notwithstanding all efforts at harmonisation, that EU law would prevail over the ECT's substantive protections and that the ECT could not apply inconsistently with EU law to such a national's claim against an EU Member State.*"[106]

131. In academic writing, the late *Thomas Eilmansberger* has argued that case equally convincingly: He pointed out that public international law (which governs the law applicable to this arbitration[107]) "*requires arbitral tribunals to interpret intra-EU B ITs in the light of other international law obligations applicable to the facts at hand, i.e. in the light of relevant EC law*". As he rightly

---

the Parties [...].In the circumstances, and bearing in mind considerations of mutual respect and comity which should prevail between judicial institutions both of which may be called upon to determine rights and obligations as between two States, the Tribunal considers that it would be inappropriate for it to proceed further with hearing the Parties on the merits of the dispute in the absence of a resolution of the problems referred to. Moreover, a procedure that might result in two conflicting decisions on the same issue would not be helpful to the resolution of the dispute between the Parties."

[100] Award in the Arbitration regarding the Iron Rhine ("Ijzeren Rijn") Railway between the Kingdom of Belgium and the Kingdom of the Netherlands, decision of 24 May 2005, Chapter III, attached as **Annex EC-18**, in particular at paragraph 103: "*the Tribunal arrived at the conclusion that it could not decide the case brought before it without engaging in the interpretation of rules of EC law which constitute neither actes clairs nor actes éclairés, the Parties'obligations under Article 292 would be triggered in the sense that the relevant questions of EC law would need to be submitted to the European Court of Justice*".

[101] See *Brooks E. Allen* and *Tommaso Soave*, Jurisdictional Overlap in WTO Dispute Settlement and Investment Arbitration, in: *Arbitration International* 30, p. 1, in particular pp. 44 to 47.

[102] See in detail International Law Association, Final report on *lis pendens* and arbitration, available at http://arbitration.oxfordjournals.org/content/arbint/25/1/3.full.pdf , Recommendation 6: "[...] *as a matter of sound case management, or to avoid conflicting decisions, to prevent costly duplication of proceedings or to protect a party from oppressive tactics, an arbitral tribunal requested by a party to stay temporarily the Current Arbitration, on such conditions as it sees fit, until the outcome, or partial or interim outcome, of any other pending proceedings (whether court, arbitration or supra-national proceedings), or any active dispute settlement process, may grant the request, whether or not the other proceedings or settlement process are between the same parties, relate to the same subject matter, or raise one or more of the same issues as the Current Arbitration, provided that the arbitral tribunal in the Current Arbitration is:*

    *6.1 not precluded from doing so under the applicable law;*

    *6.2 satisfied that the outcome of the other pending proceedings or settlement process is material to the outcome of the Current Arbitration; and*

    *6.3 satisfied that there will be no material prejudice to the party opposing the stay.*

[103] ITLOS Order No. 3, 24 June 2003, 42 ILM 1187 at 1191.

[104] ICSID case No. ARB/84/3 SOUTHERN PACIFIC PROPERTIES (MIDDLE EAST) LIMITED v ARAB REPUBLIC OF EGYPT, Decision on Preliminary Objections to Jurisdiction of November 27, 1985, paragraphs 84 to 87.

[105] *Achmea B.V.* v. *The Slovak Republic*, PCA Case No. 2008-13 (formerly *Eureko B.V.* v. *The Slovak Republic*, Award of 26 October 2010 on jurisdiction, arbitrability and suspension, at point 292. Regarding the request to suspend proceedings due to a pending request for preliminary reference lodged before the ECJ by the *Bundesgerichtshof* on 23 May 2016, please see paragraph 43 in this brief.

[106] ICSID Case No. ARB/07/19, *Electrabel* v *Hungary*, Award of 30 November 2012, paragraphs 4.178 to 4.189, echoed in paragraph 439 of *Charanne*.

[107] ICSID Case No. ARB/03/16 *ADC Affiliate Ltd.* v *Republic of Hungary*, award of 2 October 2006, at paragraph 290; ICSID Case No. ARB/01/7, *MTD Equity Sdn Bhd* v. *Republic of Chile*, award of 25 May 2004, at paragraph 86; and ICSID Case No. ARB/01/12 *Azurix Corp.* v. *Argentine Republic*, award of 14 July 14 2006, at paragraph 67; see also for further references *Antonio Parra*, "Applicable Law in Investor-State Arbitration", in: *Michael Rovine* (ed.), Contemporary Issues in International Arbitration and Mediation: The Fordham Papers, Martinus Nijhoff Publishers, 2008 p. 3 (attached as **Annex EC-17** ), at pp. 7-8.

underlines, that obligation follows in particular from Article 31(3)(c) VCLT, which requires that in the interpretation of a treaty, "*any relevant rules of international law applicable in the relations between the parties*" shall be taken into account. As Eilmansberger further points out, "*the intentions of the parties are expressed in the most authoritative way by conflict rules included in the later treaty, [footnote omitted] and the EC Treaty (being the later Treaty in this case) does indeed contain such a conflict rule, namely the already mentioned Article 307 EC*".[108]

132. Article 307 TEC (now Article 351 TFEU) is worded as follows:

> "The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of this Treaty."
>
> To the extent that such agreements are not compatible with this Treaty, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.
>
> In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under this Treaty by each Member State form an integral part of the establishment of the Community and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States."

133. On the basis of a simple *a contrario* reasoning, the ECJ considers that the *pacta sunt servanda* guarantee of Article 307 TEC does not apply to treaties concluded between two EU Member States. The following quotes underline this:[109]

> "According to settled case-law, the purpose of the first paragraph of Article 307 EC is to make clear, in accordance with the principles of international law, as set out in, inter alia, Article 30(4)(b) of the Vienna Convention on the Law of Treaties of 23 May 1969, that the application of the EC Treaty does not affect the duty of the Member State concerned to respect the rights of non-member countries under a prior agreement and to perform its obligations thereunder (see, to that effect, Case 812/79 Burgoa [1980] ECR 2787, paragraph 8)"[110]
>
> "[According to] the settled case-law of the Court whilst Article 307 EC allows Member States to honour obligations owed to non-member States under international agreements preceding the Treaty, it does not authorise them to exercise rights under such agreements in intra-Community relations (Case C-473/93 Commission v Luxembourg [1996] ECR 1-3207, paragraph 40)."[111]

134. As the ECJ has clarified with regard to the GATT and the Berne Convention, that rule in particular applies to multilateral international treaties, to which both EU Member States and non-EU Member States are a party. For those treaties, in the relationship between EU Member States, the applicable rule of conflict is Article 307 EC/Article 351 TFEU.[112]

135. If Article 307 TEC/Article 351 TFEU are applied as conflict rule in the present case, the provisions of the ECT identified as being incompatible with Union law, i.e. Part III on investment protection and Article 26 on investor-State arbitration, would become inapplicable.

136. The Commission is aware that the *RREEF* tribunal[113] and, although in less stark terms, the *PV investors* tribunal[114], have taken different views. The main flaw in the reasoning of the *RREEF*

---

[108]   *Thomas Eilmansberger*, "Bilateral Investment Treaties and EU Law", in: (2009) 46 *Common Market Law Review*, pp. 383-429, attached as **Annex EC-12**, at page 421 and 425.

[109]   See, in addition to the quotes in the following two footnotes, also ICSID Case No. ARB/07/19, *Electrabel v Hungary*, Award of 30 November 2012, paragraph 4.183: "*Under this 'negative' interpretation, Article 307 EC* [now: Article 351 TFEU] *means that between E"U Member States, EU law prevails in case of inconsistency with another earlier treaty. [...] If Article 307 EC provides that treaty rights between Non-EU Members cannot be jeopardised by the subsequent entry of a Non-EU State into the European Union, it appears logical, taking into account the integration processes of the European Union, that the opposite consequence should be implied, i.e. the non-survival of rights under an earlier treaty incompatible with EU law as between EU Member States*".

[110]   ECJ, Judgment in *Commission v Slovakia*, C-264/09, EU:C:2011:580, paragraph 41.

[111]   ECJ, Judgment in *Commission v Austria*, C-147/03, EU:C:2005:427, paragraph 58.

[112]   ECJ, Judgment in *RTE v Commission*, C-241/91 P and C-242/91 P, paragraph 84 (concerning the Berne convention); see already ECJ, Judgment in *Commission v Italy*, 10/61, EU:C:1962:2, at page 10 (concerning agreements concluded under the auspices of the GATT).

[113]   At paragraphs 74 and 75. The claim of the *RREEF* tribunal that it shares the view of the *Electrabel I* tribunal at paragraph 75 seems to rest on an erroneous reading of the *Electrabel I* tribunal's award. Paragraph 4.112 of the *Electrabel I* award only sets out that the applicable law is public international law. It does not say anything as to the question what is, under public

tribunal is to disregard the fact that Union law is part of the international law applicable to the dispute, and that Article 41(1)(b) and Article 30(4)(a) VCLT cater for the possibility of having effects of posterior treaties only between certain contracting parties to the earlier agreement (see on this point in detail the following section).

### 3.2. In any event: The offer for arbitration made by Spain to intra-EU investors has been superseded pursuant to Articles 41(1)(b) or 30(4)(a) VCLT by the Treaties of Amsterdam, Nice and Lisbon

137. Even if one was to consider that the rules applicable to a conflict between the ECT and Union law are the general rules of conflict contained in the VCLT, the Commission considers that the *inter se* obligations between EU Member States would have been superseded on the basis of Articles 41(1)(b) or 30(4)(a) VCLT.

138. Article 41(1)(b) VCLT concerns the amendment of a treaty by a later treaty only between certain parties to the treaty. It stipulates that such amendment is possible, provided that it does not affect the enjoyment by other parties of their rights under the treaty or performance of their obligations and does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

139. Those conditions are complied with in the present case: The suppression of *inter se* obligations between EU Member States only concerns those EU Member States. In the case of investor-State arbitration such as the one foreseen in Article 26 ECT, it also is not incompatible with the effective execution of the object and purpose of the treaty as a whole: The possibility of investor-State arbitration between investors from non-EU Member States and either the Union or EU Member States remains untouched.

140. In the Treaties of Amsterdam, Nice and Lisbon, the investment protection rules of Union law, as well as the principles concerning the competences and the system of judicial protection, laid out above in sections 2.2.1 and 3.1.1, are re-affirmed. This could be interpreted as an amendment pursuant to Article 41(1)(b) VCLT.

141. Even if there was no such amendment, the applicable rule of conflict according to the VCLT between the earlier and the later treaty would be Article 30 VCLT Article 30(3) VCLT provides that when all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under Article 59 VCLT, the earlier treaty applies only to the extent that its provisions are compatible with those of the latter treaty.

142. Article 30(4) and (5) VCLT specify that when the parties to the later treaty do not include all the parties to the earlier one, as between States parties to both treaties the same rule applies, provided that the provisions of Article 41 VCLT are respected (see also above paragraph 48 on the importance of that provision).

143. The ECT and the EU Treaties relate to the same subject matter. The ECT establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the European Energy Charter. The EU Treaties establish a European Union to achieve European unity, including an internal market that also covers energy (see detailed description above in paragraphs 26 and 43; the Treaty of Lisbon has introduced, for the first time, a dedicated competence for energy, see Article 194 TFEU; beforehand, secondary legislation on energy had been based on the internal market competence and the environmental competence).

144. If one assumed that the provisions on investment protection in chapter III and Article 26 ECT have created *inter se* obligations between EU Member States, *quod non*, the EU Member States would be party to successive treaties that relate to the same subject matter. It therefore needs to be determined which is the earlier treaty.

145. The ECT has been concluded in 1994; the Union ratified it in 1997. After that date, the Member States have reaffirmed their commitment to Union law by various treaties, and in particular the Treaty of Amsterdam, the Treaty of Nice, and the Treaty of Lisbon.[115] The ECT is therefore the earlier treaty compared to each of those treaties. In such a situation, under Article 30(4)(a) VCLT, the ECT only applies to the extent that its provisions are compatible with those of the later treaties of Amsterdam, Nice, and Lisbon. The provisions of the ECT on investment protection (Chapter III) and dispute settlement (Article 26 ECT), when applied between two EU Member States, are not

---

international law, the applicable rule of conflict. The precedence of Article 307 EC/Article 351 TFEU, as presented in the present section, is a question of public international law, not of Union law.

[114] At paragraph 206, claiming the conflict would only affect the merits.

[115] Other treaties reaffirming Union law are the various accession treaties.

incompatible with Union law as it results from those later treaties (see sub-section 3.1.1 above). Hence, they are, pursuant to Article 30(4)(a) VCLT, not applicable.

**4.   IN THE ALTERNATIVE: SHOULD YOUR TRIBUNAL TAKE THE VIEW THAT IN ORDER TO DECIDE THE DISPUTE IN FRONT OF IT, IT BECOMES NECESSARY TO ANALYSE EU STATE AID RULES, THE COMMISSION INVITES YOUR TRIBUNAL TO SUSPEND THE DISPUTE UNTIL THE COMMISSION HAS TAKEN A VIEW ON SPAIN'S NOTIFICATION**

146.  Spain has notified the disputed measures, i.e. its national RES support scheme, and the subsequent adoption of various legislative and regulatory measures approved by the Spanish Parliament and the Spanish Government that affect producers of electric energy from renewable sources, to the Commission on the basis of Article 108(3) TFEU, because it constitutes State aid pursuant to Article 107(1) TFEU on the basis of the order of the ECJ in *Elcogás*.[116]

147.  The Commission has an exclusive competence for authorising EU Member States to grant State aid. The Commission therefore is now obliged to take a decision on that notification. The investigation is currently in the preliminary investigation period. The Claimants may make submissions to the Commission expressing their point of view already at this stage, and can seek review of any such decision in front of the EU Courts.

148.  As has been correctly pointed out by the *Electrabel I* Tribunal, the framework of the ECT recognises that EU Member States will be legally bound by decisions of the Commission under EU law. As regards protection under the ECT, investors can have had no legitimate expectations in regard to the consequences of the implementation by an EU Member State of any such decision by the European Commission.[117] In other words, the possible interference with a foreign investment through the implementation by an EU Member State of a legally binding decision of the European Commission was and remains inherent in the framework of the ECT itself.

149.  The Decision which the Commission will take on notification of Spain therefore is relevant, as a matter of law, at very least as a matter of fact, for the assessment of the merits of the present case. The assessment of the compatibility of State aid, and therefore the application of the Guidelines, is the exclusive competence of the Commission. In particular, national judges[118], and hence, by analogy, Arbitral Tribunals are not competent for carrying out that assessment. The reason is that the assessment involves the exercise of a wide discretion by the Commission, and no other body is competent to exercise that discretion in lieu of the Commission.[119]

150.  Hence, should your Tribunal take the view that it has jurisdiction, and that in order to decide the dispute in front of it, it becomes necessary to analyse the compliance of the national RES support scheme with State aid rules, the Commission invites the your Tribunal to suspend the dispute until the Commission has taken a view on Spain's notification (for the legal basis and precedent, see above paragraph 127). For State aid cases, the Commission is under an obligation to adopt a decision[120]. There is therefore certainty that the suspension will be of a rather limited duration.

***

151.  The Commission trusts that this submission will assist your Tribunal in dealing with the case at hand. It is prepared to make further written and oral submissions, if your Tribunal so decides.

*— lin Tan Cost —*

Steven NOË            Tim MAXIAN RUSCHE            Petra NEMECKOVA

Agents of the Commission

---

[116]  Order in *Elcogás SA*, C-275/13, EU:C:2014:2314.
[117]  ICSID Case No. ARB/07/19, *Electrabel v Hungary* 4.137 to 4.142.
[118]  ECJ, Judgment in *Deutsche Lufthansa*, EU:C:2013:755, C-284/12, paragraph 28; ECJ, Judgment in *SFEI and Others*, C-39/94, EU:C:1996:285, paragraph 42.
[119]  ECJ, Judgment in *SFEI and Others*, C-39/94, EU:C:1996:285, paragraph 36.
[120]  Judgment in *Athinaiki*, Case C-362/09 P, EU:C:2010:783.

TABLE OF CONTENT

1.    INTRODUCTION ...................................................................................................2

2.    THE OFFER FOR ARBITRATION MADE BY SPAIN WHEN RATIFYING THE ECT
      WAS ONLY ADDRESSED TO INVESTORS FROM CONTRACTING PARTIES THAT
      WERE NOT MEMBER STATES OF THE EUROPEAN COMMUNITIES ......................3

      2.1.    The ECT has not created *inter se* obligations between EU Member States ..............................3

              2.1.1.    Text of the ECT and its instruments, interpreted in the light of the
                        principle of effectiveness..................................................................................4

              2.1.2.    The particular legal nature of multilateral agreements to which both the
                        Union and its Member States are a party: "It is the objective of the
                        Community negotiators to create rights and obligations only between the
                        Community and its Member States on the one hand and one or more third
                        States on the other"........................................................................................6

              2.1.3.    Object and purpose of the ECT and context of its conclusion...................................7

              2.1.4.    On the question of a "disconnection clause" ...........................................................9

              2.1.5.    Conclusion: No offer for arbitration made by Spain to EU investors.....................10

      2.2.    In the alternative: *Inter se* obligations between Member States would in any event be
              limited to areas where Member States retain external competence; that is not the case
              for investment protection and ISDS ............................................................................11

              2.2.1.    Applicable principle of international law for the determining the extent of
                        international obligations and international liability of Member States:
                        "Liability follows competence"........................................................................11

              2.2.2.    Application of the principle to the ECT: the Union, and not the Member
                        States, have competence for promotion and protection of investments
                        within the internal market...............................................................................12

                        2.2.2.1.    The competences of the Union and its Member States.........................12

                        2.2.2.2.    Union law contains a complete set of investment protection
                                    rules for intra-EU investments in field of energy ...............................13

                        2.2.2.3.    EU Member States lack the competence to conclude an
                                    investment protection treaty *inter se* ....................................................15

                        2.2.2.4.    Conclusion: If, at all, the ECT has created *inter se* obligations
                                    between EU Member States, those do not concern Part III and
                                    Article 26 ECT ..............................................................................17

3.    IN THE FURTHER ALTERNATIVE: THE OFFER FOR ARBITRATION MADE BY
      SPAIN IS NOT VALID..........................................................................................17

      3.1.    An offer for arbitration by Spain to EU investors would violate Union law; Union
              law takes precedence over the ECT ............................................................................17

              3.1.1.    The intra-EU application of the investment protection provisions of the
                        ECT violates Union law ..................................................................................18

                        3.1.1.1.    The intra-EU application of the substantive investment
                                    protection provisions of the ECT violates Article 3(2) TFEU
                                    and Union law provisions on investment protection ...........................18

                        3.1.1.2.    The submission of intra-EU disputes to treaty-based investor-
                                    State arbitration violates law Articles 19(1) TEU, 267 and 344
                                    TFEU as well as the general principles of effectiveness and
                                    unity of Union law...........................................................................19

3.1.2.    In case of conflict between the ECT and Union law, Union law prevails if
the conflict concerns an intra-EU conflict ............................................................22

3.2.    In any event: The offer for arbitration made by Spain to intra-EU investors has been
superseded pursuant to Articles 41(1)(b) or 30(4)(a) VCLT by the Treaties of
Amsterdam, Nice and Lisbon.................................................................................................24

4.    IN THE ALTERNATIVE: SHOULD YOUR TRIBUNAL TAKE THE VIEW THAT IN
ORDER TO DECIDE THE DISPUTE IN FRONT OF IT, IT BECOMES NECESSARY
TO ANALYSE EU STATE AID RULES, THE COMMISSION INVITES YOUR
TRIBUNAL TO SUSPEND THE DISPUTE UNTIL THE COMMISSION HAS TAKEN A
VIEW ON SPAIN'S NOTIFICATION ............................................................................25

**List of annexes**

| | |
|---|---|
| **EC-1** | Statement submitted by the European Communities to the Secretariat of ECT pursuant to Article 26(3)(ii) ECT |
| **EC-2** | *Eleftheria Neframi*, "The Duty of Loyalty: Rethinking its Scope through its Application in the Field of EU External Relations" (2010) 47 *Common Market Law Review*, Issue 2, pp. 323–359 |
| **EC-3** | *Pieter Jan Kuijper*, "The Conclusion and Implementation of the Uruguay Round Results by the European Community", (1995) 6 *European Journal of International Law*, issue 1, pp. 222-244 |
| **EC-4** | Conclusions of the Presidency on the European Council in Rome |
| **EC-5** | Communication from the Commission on European Energy Charter, COM(91) 36 final of 14 February 1991 |
| **EC-6** | Final Act of the European Energy Charter Conference |
| **EC- 7** | *Maja Smrkolj*, The Use of the 'Disconnection Clause' in International Treaties: What does it tell us about the EC/EU as an Actor in the Sphere of Public International Law? Paper presented at the GARNET Conference, „The EU in International Affairs", Brussels, 24-26 April 2008 |
| **EC-8** | *Raphael Oen*, Internationale Streitbeilegung im Kontext gemischter Verträge der Europäischen Gemeinschaft und ihrer Mitgliedstaaten, Berlin: Duncker and Humblot, 2005 (relevant extracts) |
| **EC-9** | *Christoph Herrmann*, „Rechtsprobleme der parallelen Mitgliedschaft von Völkerrechtssubjekten in Internationalen Organisationen – Eine Untersuchung am Beispiel der Mitgliedschaft der EG und ihrer Mitgliedstaaten in der WTO", in: *Gabriele Bauschke* et al., Pluralität des Rechts – Regulierung im Spannungsfeld der Rechtsebenen, Boorberg: Stuttgart, 2003 |
| **EC-10** | *Frank Hoffmeister*, Litigating against the European Union and Its Member States, *European Journal of International Law* (2010) 21 *European Journal of International Law*, issue 3 |
| **EC-11** | ITLOS, Advisory opinion of 2 April 2015, case no 21 |
| **EC-12** | *Thomas Eilmansberger*, "Bilateral Investment Treaties and EU Law", in: (2009) 46 *Common Market Law Review*, pp. 383-429 |

| | |
|---|---|
| **EC-13** | Case C-284/16, order for reference |
| **EC-14** | Gus van Harten, *Investment Treaty Arbitration and Public Law*, Oxford University Press 2007, pp. 45 to 71 |
| **EC-15** | Stephan Schill, „Crafting the International Economic Order: The Public Function of Investment Treaty Arbitration and Its Significance for the Role of the Arbitrator", in: 23 *Leiden Journal of International Law* (2010) |
| **EC-16** | Declaration of the European Union at the signing of the International Energy Charter |
| **EC-17** | ITLOS Order No. 3, 24 June 2003 |
| **EC-18** | Award in the Arbitration regarding the Iron Rhine ("Ijzeren Rijn") Railway between the Kingdom of Belgium and the Kingdom of the Netherlands, decision of 24 May 2005 |