# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| MASDAR SOLAR &WIND COOPERATIEF U.A., ) | |
| ) | |
| *Petitioner*, ) | |
| ) | |
| v. ) | Civil Action No. 1:18-cv-2254 |
| ) | |
| THE KINGDOM OF SPAIN, ) | |
| ) | |
| *Respondent*. ) | |
| ) | |
| ) | |
| _____ ) | |

## PROPOSED BRIEF OF THE EUROPEAN COMMISSION
## ON BEHALF OF THE EUROPEAN UNION AS *AMICUS CURIAE*
## IN SUPPORT OF THE KINGDOM OF SPAIN

R. Stanton Jones (D.C. Bar No. 987088)
Sally L. Pei (D.C. Bar No. 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
T: (202) 942-5000
stanton.jones@arnoldporter.com

Dmitri Evseev (D.C. Bar No. 487747)
*Pro hac vice* application to be filed
ARNOLD & PORTER
  KAYE SCHOLER LLP
Tower 42
25 Old Broad Street
London EC2N 1HQ
UNITED KINGDOM
T: +44 (0)20 7786 6100
dmitri.evseev@arnoldporter.com

*Counsel for Proposed Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTEREST OF AMICUS CURIAE .............................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 2

RELEVANT LEGAL BACKGROUND ....................................................................... 4

      A.     The nature and special characteristics of the EU legal order .................................. 4

      B.     The Energy Charter Treaty ("ECT") .................................................................... 6

      C.     The *Achmea* Judgment ........................................................................................ 8

      D.     EU Member States' declarations on the legal consequences of the *Achmea* Judgment ........................................................................................................ 10

ARGUMENT ............................................................................................................... 11

I.     The Energy Charter Treaty, properly interpreted under the rules of customary international law on treaty interpretation, does not apply intra-EU ................................. 11

II.    The EU Treaties preclude Member States from offering to arbitrate intra-EU disputes under the Energy Charter Treaty ........................................................................ 14

      A.     Intra-EU arbitration under Article 26 conflicts with the EU Treaties and fundamental principles of EU law ...................................................................... 14

      B.     The conflict between ECT Article 26 and the EU Treaties must be resolved in favor of EU law ............................................................................................ 18

III.   At a minimum, international comity favors allowing the compatibility of intra-EU arbitration under the ECT to be decided within the EU judicial system. ........................... 23

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014) ...............................................................................23

*Sumitomo Shoji Am., Inc. v. Avagliano*,
   457 U.S. 176 (1982)..............................................................................................12

*Ungaro-Benages v. Dresdner Bank AG*,
   379 F.3d 1227 (11th Cir. 2004) ..........................................................................23

**Treaties and International Agreements**

Concluding Document of the Hague Conference on the European Energy Charter,
   17 Dec. 1991. .........................................................................................................7

Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental
   Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998,
   2080 U.N.T.S 95 (1995) ................................................................................ *passim*

Treaty on European Union, Oct. 26, 2012,
   2012 O.J. (C 326) 13..........................................................................................1, 4

Treaty on the Functioning of the European Union, Oct. 26 2012,
   2012 O.J. (C 326) 47 ...................................................................................... *passim*

Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969,
   1155 U.N.T.S. 331 ..........................................................................................11, 18

**European Union Authorities**

*Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.*
   (Oct. 31, 2018), I ZB 2/15..................................................................................20

Case 10-61, *Commission v. Italy*,
   [1962] E.C.R. 1 ..............................................................................................20, 21

Case 26-62, *Van Gend & Loos v. Netherlands Inland Revenu Administration*,
   [1963] E.C.R. 1 ....................................................................................................19

Case 121/85, *Conegate Ltd. v. HM Customs & Excise*,
   [1986] E.C.R. 01007, EU:C:1986:114.................................................................20

Case 147/03, *Commission v. Austria*,
[2005] E.C.R. I-5969 ...................................................................................21

Case 262/12, *Vent de Colère!*,
19 Dec. 2013, ECLI:EU:C:2013:851 .........................................................18

Case 286/86, *Ministère Public v. Deserbais*,
[1988] E.C.R. 4907 ....................................................................................21

Case 478/07, *Budějovický Budvar v. Rudolf Ammersin GmBH*,
[2009] E.C.R. I-07721 ...............................................................................20

Case C-66/13, *Green Network SpA v. Autorità per l'energia elettrica e il gas*,
26 Nov. 2014, EU:C:2014:2399 ...................................................................8

Case C-284/16, *Slovak Republic v. Achmea B.V.*,
6 March 2018, ECLI:EU:C:2018:158 ............................................... *passim*

Case C-301/08, *Bogiatzi v. Deutscher Luftpool et al.*,
[2009] E.C.R. I-10185 ...............................................................................21

Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"),
30 May 2006, ECLI:EU:C:2006:345 ..........................................................22

Cases C-241/91 P and C-242/91 P, *RTE and ITP v. Commission*,
[1995] E.C.R. I-743 ...................................................................................21

Case T-76/89, *Independent Television Publications Ltd v Commission of the European
Communities*, 10 July 1991, ECLI:EU:T:1991:41 .....................................22

Court of Justice Opinion 1/17, 30 April 2019 (ECLI:EU:C:2019:341).........................................15

Court of Justice Opinion 2/13, 18 December 2014 (ECLI:EU:C:2014:2454)........................4, 5, 6

Commission Communication to the European Parliament and Council on
Protection of intra-EU investment (July 19, 2018), COM(2018) 547 ...................................5, 8

Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017)....................................................16, 25

Decision on State Aid, SA.38517, 2015 O.J. (L 232) 43.............................................................25

Decision on State Aid, SA.40171, slip op. (Nov. 28, 2016)..........................................................25

Declaration of the Government of Hungary, of 16 January 2019, on the Legal
Consequences of the Judgment of the Court of Justice in *Achmea* and on
Investment Protection in the European Union .......................................................................10

iv

Declaration of the Representatives of the Governments of the Member States, of
15 January 2019, on the Legal Consequences of the Judgment of the Court of
Justice in *Achmea* and on Investment Protection in the European Union .............................10

Declaration of the Representatives of the Governments of the Member States, of
16 January on the Enforcement of the Judgment of the Court of Justice in
*Achmea* and on Investment Protection in the European Union .............................................10

Final Act of the Intergovernmental Conference which Adopted the Treaty of
Lisbon signed on 13 December 2007, 2008 O.J. C115/335 ...................................................20

Opinion of Advocate General Bot, Court of Justice Opinion 1/17, Request for an
opinion by the Kingdom of Belgium (ECLI:EU:C:2019:72) ......................................12–13, 15

Opinion of Advocate General Mazák, *Bogiatzi v. Deutscher Luftpool et al.*,
Case C-301/08, [2009] E.C.R. I-10185....................................................................................20

Statement submitted by the European Communities to the Secretariat of the
Energy Charter Treaty pursuant to Article 26(3)(b)(iii) of the Energy Charter
Treaty, [1998] O.J. L69/115 ...................................................................................................12

**Other Authorities**

*Electrabel SA v. Republic of Hungary*,
ICSID Case No. ARB/07/19, Award, Nov. 25, 2015 ..................................................20–21, 22

Johann Robert Basedow, *The European Union's international investment policy*
(Nov. 2014) (unpublished Ph.D. dissertation, London School of Economics).........................6

M. Cremona, *Disconnection Clauses in EU Law and Practice*, in *Mixed
Agreements Revisited: The EU and its Member States in the World* (2010) ..........................13

Maja Smrkolj, *The Use of the 'Disconnection Clause' in International Treaties*
(May 14, 2008) (paper presented at GARNET Conference) ...................................................13

Marcus Klamert, *The Principle of Loyalty in EU Law* (2014) ....................................................20

O. Dörr & K. Schmalenbach, *Vienna Convention on the Law of Treaties: A
Commentary* (2012) ...............................................................................................................19

Order No. 3, *Ireland v. United Kingdom* ("*Mox Plant*"),
UNCLOS Arbitral Tribunal, June 23, 2003.............................................................................19

Pieter J. Kuijper, *The Conclusion and Implementation of the Uruguay Round
Results by the European Community*, 6 Eur. J. Int'l L. 222 (1995).........................................13

Report of the Study Group of the International Law Commission, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, UN Doc. No. A/CN.4/L.682 (2006) ............................18, 20

Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. Comm'n, 95 & 219 ......................................................................................................11

## INTEREST OF AMICUS CURIAE

The European Commission ("Commission") is an institution of the European Union (the "EU"), a treaty-based international organization composed of 28 Member States.[1]  Known as the "Guardian of the Treaties," the Commission is responsible, inter alia, for ensuring the proper application of the EU treaties—including the Treaty on European Union ("TEU") and the Treaty on the Functioning of the European Union ("TFEU")—and of measures EU institutions adopt under those treaties.  The Commission is also tasked with representing the EU in legal proceedings before the Court of Justice of the EU ("Court of Justice"), national and international courts (including the WTO dispute settlement bodies) and arbitration tribunals, and has special expertise in matters of EU law and public international law.  The Commission appears before the Court of Justice of the EU in more than one thousand cases per year.  The Commission is an independent institution and acts in the interests of the Union as a whole, rather than individual Member States.

The Commission submits this amicus brief on behalf of the EU.  The Council of the EU—an EU institution composed of government ministers from each EU Member State—when expressing its unanimous agreement with the Commission's intention to file an amicus brief, has endorsed the Commission's views as the official position of the European Union pursuant to TFEU Article 218(9) on the matters addressed in this submission.[2]

The EU has a substantial interest in this case.  Masdar Solar &Wind Cooperatief U.A. ("Masdar"), an entity formed under the laws of the Netherlands, and hence an EU company,

---

[1] These Member States are Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, and the United Kingdom.

[2] Six Member States—Finland, Hungary, Malta, Luxembourg, Slovenia, and Sweden—did so while referring to their declaration of 16 January 2019 on the enforcement of the judgment of the Court of Justice in *Achmea* and investment protection in the EU.  *See infra* n.9 and accompanying text.

seeks enforcement of an investment arbitration award it has obtained against Spain, an EU

Member State, on the basis of the Energy Charter Treaty ("ECT"), a multilateral investment

protection treaty negotiated and signed in the 1990s to govern the EU's external energy policy.

This award is premised on a fundamental misinterpretation of the ECT and a disregard for the

EU laws that form part of the international obligations of Spain and the Netherlands and that

should have governed the dispute.

The EU has a critical interest in ensuring that this Court proceeds based on a correct

understanding of the EU law rules and principles at stake.  Accordingly, the Commission submits

this brief to explain the EU's official position that the ECT does not have intra-EU application.

In any event, EU law precludes investor-State arbitration for intra-EU disputes.  Such arbitration

is contrary to Articles 267 and 344 of the TFEU and the fundamental principles of autonomy,

full effectiveness, and mutual trust, which constitute the cornerstones of the EU legal order, as

the Court of Justice confirmed in the judgment in *Slovak Republic v. Achmea B.V.*, Case C-

284/16, 6 March 2018, ECLI:EU:C:2018:158.  Thus, even if—contrary to the view taken in this

brief—the ECT were to be interpreted as applying intra-EU, its investor-State arbitration

provision (and hence any arbitration award issued under that provision) would violate higher-

ranking and more recently reaffirmed norms of EU law in force between EU Member States, and

would, consequently, be inapplicable as between those Member States under international law.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The Commission understands that Spain argues here that any standing offer of arbitration

in ECT Article 26 is invalid under prevailing EU law.  That conclusion deprives this Court of

subject-matter jurisdiction under the Foreign Sovereign Immunities Act.  It also means that the

award is not entitled to full faith and credit, thus precluding enforcement under 22 U.S.C.

2

§ 1650a.  The Commission agrees that there was no valid offer of arbitration in Article 26, for three reasons.

*First*, customary international law rules of treaty interpretation compel the conclusion that the ECT (including Article 26, its dispute-settlement provision) does not apply intra-EU.  *Second*, even if Article 26 could be interpreted to encompass intra-EU disputes, such an interpretation would conflict with the EU Treaties.  That conflict—as a matter of international law—must be resolved in favor of EU law.  Because EU law is part of international law binding on all EU Member States, the inapplicability of Article 26 means that Spain has made no valid offer for arbitration to investors from other EU Member States, and no valid arbitration agreement exists between Masdar and Spain.  *Third*, principles of international comity favor dismissal.  This dispute has no connection with the United States, and the United States thus has no interest in the adjudication of this controversy in its courts.  By contrast, the EU has an overwhelming interest in this dispute and the fundamental questions of EU law that it raises.

That is particularly so because the Commission, exercising its authority to enforce EU competition law, has issued a binding decision regarding Spain's EU law obligations relating to this dispute.  The Commission observed that the ECT does not apply intra-EU and that, in any event, Spain may not pay the arbitration award unless and until the Commission decides to authorize such payment.  Masdar could have challenged that decision in the European courts, but did not.  It is thus bound to respect the Commission's decision, which is *res judicata* vis-à-vis Masdar, and Spain is precluded as a matter of EU law from implementing the award.

Rather than insert itself into the EU's internal affairs, this Court should permit the compatibility of intra-EU investor-State arbitration with the EU Treaties, and the lawfulness of the payment of arbitration awards that may implicate EU competition law, to be decided within

the EU judicial system, which offers a complete and effective system of judicial redress before

an international court—i.e., the Court of Justice.

## RELEVANT LEGAL BACKGROUND

### A.    The nature and special characteristics of the EU legal order

At present, the EU Treaties are the Treaty on the Functioning of the European Union

("TFEU"), Oct. 26, 2012, 2012 O.J. (C 326) 47 and the Treaty on European Union ("TEU"), Oct.

26, 2012, 2012 O.J. (C 326) 13 (collectively, the "EU Treaties").  While the EU retains an

international character—the 28 Member States remain the "masters of the Treaties"—the EU

also represents the most ambitious project of economic, political, and social integration hitherto

known in international law.  Under the EU Treaties, the Member States have transferred

legislative, regulatory, and enforcement competences in many fields to the EU and its

institutions.  This process of integration has "given rise to a structured network of principles,

rules and mutually interdependent legal relations binding the EU and its Member States

reciprocally and binding its Member States to each other."  Court of Justice Opinion 2/13, 18

December 2014 (ECLI:EU:C:2014:2454), ¶ 167, https://bit.ly/2SouafF; *Achmea*, ¶ 33.

A central purpose of the EU Treaties is the establishment and proper functioning of the

"internal market," defined as "an area without internal frontiers in which the free movement of

goods, persons, services and capital is ensured."  TFEU art. 26(2).  The EU's internal market

rules are contained in the Treaties, EU legislation, and the case law of the Court of Justice.

These rules cover all cross-border economic activities, including investment.  The internal

market secures to EU investors directly enforceable rights throughout the investment cycle, but

also imposes obligations, including compliance with EU competition law and various regulatory

standards designed to ensure that the internal market functions as a level, integrated playing

field.[3]  Importantly for present purposes, the EU Treaties charge the Commission with the
enforcement of EU competition law, including investigation and control of any public subsidy
schemes of Member States (known as "State aid") that distort or threaten to distort competition
in the internal market.  TFEU arts. 107 & 108.

The integrity of the EU legal order and the internal market is safeguarded by the EU
judicial system, which consists of Member State courts and the Court of Justice.  The keystone of
that system is the preliminary ruling procedure set forth in TFEU Article 267.  National courts
may (and, where they are courts of final instance, must) refer any relevant question of
interpretation and application of EU law raised in proceedings before them to the Court of
Justice for a preliminary ruling.  In addition, TFEU Article 344 prohibits Member States from
creating dispute settlement mechanisms other than those set out in the EU Treaties on any
matters implicating EU law.  The Court of Justice thus has exclusive jurisdiction to issue final
and binding interpretations of EU law and guarantee the correct and uniform application of EU
law in all the numerous areas in which it is applicable.  TFEU Articles 267 and 344 thus "ensure
that the specific characteristics and the autonomy of the EU legal order are preserved."  Opinion
2/13, ¶ 174; *Achmea*, ¶ 35.

In accordance with doctrines established by the Court of Justice as far back as the 1960s,
EU law enjoys primacy over any competing rules generated by EU Member States, whether by
domestic legislation or international treaty.  The primacy of EU law, recognized and accepted by
all Member States, is fundamental to achieving the ambitious goals set out in the EU Treaties.
Permitting Member States to deviate from the Treaties through conflicting domestic measures or

---

[3] For an overview of the EU internal market rules, see Commission Communication to the European Parliament and
Council on Protection of intra-EU investment (July 19, 2018), COM(2018) 547, at 3–4, https://bit.ly/2XtniBb
[hereinafter "*Protection of intra-EU investment*"].

*inter se* international agreements would severely undermine those goals.  In other words, EU law has a mandatory character for EU Member States and their nationals (such as Masdar), and can only be changed in the manner set forth in the EU Treaties.

Finally, relations between EU Member States are governed by the principle of "mutual trust," including trust in each other's judiciaries, which, in the words of the Court of Justice, is what "allows an area without internal borders to be created and maintained."  Opinion 2/13, ¶ 191.  The principles of autonomy, primacy, effective implementation of EU law, and mutual trust are central to a proper understanding of the issues in dispute in this case.

### B.     The Energy Charter Treaty ("ECT")

As set out in detail in the Commission's Amicus Curiae Brief to the *Masdar* arbitral tribunal, *see* Renzler Decl. Ex. 2, at 6 (ECF No. 14-2), the ECT[4] was essentially the brainchild of the EU, concluded on the EU's initiative, based on the European Energy Charter prepared by the EU, at an energy conference convened and funded by the EU.  The ECT's purpose was to create a framework for energy cooperation between the EU on the one hand, and the former communist countries of Central and Eastern Europe on the other.  That framework was intended to facilitate those countries' transition to the market economy, to prepare them for eventual accession to the EU, and to enhance energy security, efficiency and cooperation throughout Europe and its immediate vicinity by extending the free-market principles of the EU's existing internal market and energy policy beyond the Union's borders.[5]

The ECT was thus an instrument of the EU's external energy policy, in which the EU and

---

[4] Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998, 2080 U.N.T.S 95 (1995) ("ECT").

[5] *See generally* Johann Robert Basedow, *The European Union's international investment policy* 135-65 (Nov. 2014) (unpublished Ph.D. dissertation, London School of Economics), https://core.ac.uk/download/pdf/46519956.pdf.

its Member States acted as a single block.[6]  But they never intended the ECT to affect intra-EU

relations.  The EU's internal energy policy consists of an elaborate system of rules based on the

EU Treaties and EU legislation designed to create a single internal market for energy, including

full protection for energy investors under the EU's internal market rules.  The elaboration of

those rules had begun before the negotiation of the ECT—as recognized in the objectives of the

European Energy Charter, the precursor to the ECT and to which the ECT refers.[7]

EU law does not permit EU Member States (or, indeed, the EU itself) to modify or

replace those rules by an international treaty such as the ECT; nor was it ever the Member

States' intention to do so.  On the contrary, the ECT makes clear that acts of EU law are binding

on EU Member States as a matter not only of EU law, but also of the ECT itself.  Specifically,

Article 1(3) of the ECT recognizes that certain contracting states have "transferred competence"

to a "Regional Economic Integration Organization" such as the EU, "over certain matters a

number of which are governed by [the ECT], including the authority to take decisions binding on

them in respect of those matters."  Art. 1(3).  In other words, it was clear from the outset that EU

Member States had already delegated authority to the EU to regulate the internal energy market,

as well as competition law and "State aid" control.[8]

Article 1(3) also recognizes the dynamic nature of contracting states' transfer of

competences and decision-making to regional organizations like the EU.  EU Member States are

---

[6] The ECT was signed by the EU as well as its Member States because at the time, the EU did not possess full external competence over all matters to which the ECT applied.

[7] The preamble to the European Energy Charter, a nonbinding declaration now signed by 66 countries, states that the parties are: "Assured of support from the European Community, particularly through completion of its internal energy market; Aware of the obligations under major relevant multilateral agreements, of the wide range of international energy cooperation, and of the extensive activities by existing international organisations in the energy field and willing to take full advantage of the expertise of these organisations in furthering the objectives of the Charter."  Concluding Document of the Hague Conference on the European Energy Charter, 17 Dec. 1991.  ECT Article 2 specifically acknowledges the central relevance of the Charter's objectives and principles.

[8] For more on State aid, see *infra* pp. 16–17.

subject to and bound by an evolving body of EU law. In this regard, the Court of Justice has recognized that, as a result of the Renewable Energy Directive—Spain's implementation of which forms the basis of the arbitration underlying this case—the EU has exclusive external competence for renewable energy policy. Case C-66/13, *Green Network SpA v. Autorità per l'energia elettrica e il gas*, 26 Nov. 2014, EU:C:2014:2399, ¶ 65.

In sum, it was always understood that the ECT created rights and obligations vis-à-vis third countries, not within the internal energy market, which is governed by the EU Treaties.

### C.     The *Achmea* Judgment

Intra-EU investor-state arbitration is a relatively recent phenomenon that arose as a result of the 2004 accession to the Union of ten Central and Eastern European States that had bilateral investment treaties ("BITs") with existing EU Member States—as well as certain EU investors' ability to convince private arbitral tribunals that investor-State arbitration provisions like ECT Article 26 entitled them to initiate such arbitration against other EU Member States. Intra-EU investor-State arbitration essentially channels disputes concerning the acts of EU Member States and involving EU law to private arbitrators, who "cannot properly apply EU law, in the absence of the indispensable judicial dialogue with the EU Court of Justice." *Protection of intra-EU investment*, at 2.

From the outset, the Commission considered that the EU Treaties precluded intra-EU investment treaties in general as well as intra-EU investment arbitration in particular, because such arbitration undermined the integrity of the EU's judicial system secured in TFEU Articles 267 and 344, and the effectiveness and mandatory nature of EU law. The Commission intervened in numerous intra-EU investment proceedings arguing accordingly. One such proceeding was *Achmea B.V. v. Slovak Republic*. The *Achmea* arbitral tribunal rejected those arguments and adopted its own interpretation of EU law, denying any such conflict. It thus

exercised jurisdiction and awarded damages against the State.

The Slovak Republic challenged the award in Germany, where the arbitration was seated. Pursuant to TFEU Article 267, the *Bundesgerichtshof* (Federal Court of Justice, the highest civil court in Germany) sought a ruling from the EU Court of Justice clarifying whether TFEU Articles 267 and 344 precluded the arbitration provision at issue.

The Court of Justice, sitting as a Grand Chamber of fifteen distinguished judges—a configuration reserved for matters of high precedential importance—answered that question in the affirmative.  Drawing on settled case law and the general principles of autonomy and mutual trust discussed above, the Court concluded that disputes before intra-EU investor-state tribunals may well give rise to questions of EU law.  However, because such tribunals are deliberately placed outside the EU judicial system—and thus cannot refer any questions of EU law that may arise to the Court of Justice—there is no mechanism to ensure that the disputes brought before them will be "resolved in a manner that ensures the full effectiveness of EU law." *Achmea*, ¶ 56. Accordingly, the Court of Justice held that TFEU Articles 267 and 344 "must be interpreted as precluding a provision in an international agreement concluded between Member States" that permits "an investor from one of those Member States … in the event of a dispute concerning investments in the other Member States, [t]o bring proceedings against the latter Member State before an arbitral tribunal … ."  *Achmea*, ¶ 60.  In other words, the Court confirmed that the TFEU had always prohibited EU Member States from offering to resolve intra-EU investor-State disputes before arbitral tribunals.

Following the *Achmea* judgment, the German *Bundesgerichtshof* duly annulled the underlying *Achmea* award at its seat, on the grounds that no valid arbitration agreement existed.

### D.   EU Member States' declarations on the legal consequences of the *Achmea* Judgment

On January 15 and 16, 2019, all EU Member States issued, in substance, the same declaration setting forth the EU's position on the legal consequences of the *Achmea* judgment as regards intra-EU BITs.  In particular, they confirmed the long-standing principle of primacy of EU law over intra-EU agreements and explained that "all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable."  Ex. A; *see also* Exs. B & C.[9]

Twenty-two out of 28 Member States (including Spain and the Netherlands) further noted that "[a]rbitral tribunals have interpreted the [ECT] as also containing an investor-State arbitration clause applicable between Member States.  Interpreted in such a manner, that clause would be incompatible with the [EU] Treaties and thus would have to be disapplied."  Ex. A. The Member States thus undertook to inform investment tribunals about the legal consequences of the *Achmea* judgment in all pending intra-EU investment arbitrations (whether based on BITs or the ECT), and to request all state courts—including courts outside the EU—to set aside or decline to enforce intra-EU investment arbitration awards due to lack of valid consent to arbitration.  Ex. A.

Five Member States issued a separate declaration, refraining from taking a position on the status of the ECT, given that the issue was being litigated in national courts in the EU.  Ex. B. One Member State (Hungary) issued an individual declaration opining that "the *Achmea*

---

[9] Attached as Exhibits A, B, and C are true and correct copies of the Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2QXx36m; the Declaration of the Representatives of the Governments of the Member States, of 16 January on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2Xi4C7H; and the Declaration of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2Et8wTD.

judgment concerns only intra-EU bilateral investment treaties" and "is silent on the investor-state arbitration clause in" the ECT. Ex. C.

## ARGUMENT

### I. The Energy Charter Treaty, properly interpreted under the rules of customary international law on treaty interpretation, does not apply intra-EU.

Customary international law requires the ECT to be "interpreted in good faith, in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." Vienna Convention on the Law of Treaties art. 31(1), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 ("VCLT"). Furthermore, the law *requires* the interpreter to take into account (i.e., prohibits the interpreter to disregard) "any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty" and "any relevant rules of international law applicable in the relations between the parties." *Id.* art. 31(3)(c). Any remaining ambiguities or obscurities in the meaning of the treaty may be resolved by recourse to, inter alia, the circumstances of the treaty's conclusion. *Id.* art. 32. Treaty interpretation is a "single combined operation" without any hierarchy between interpretative elements. Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. Comm'n, 95 & 219.

As described *supra* pp. 6–8, the ECT's historical context clearly indicates that it was not intended to bind EU Member States *inter se*. *See also* Commission Amicus Brief, ECF No. 14-2. This also follows from the ECT's text, which, among other things, acknowledges the EU's powers to make binding decisions in respect of its Member States, ECT art. 1(3), and provides that the EU and its Member States shall vote at the Energy Charter Conference as a single block, *id.* art. 36(7). *See supra* pp. 7–8.

Furthermore, with specific regard to investor-State arbitration under the ECT, the EU and its Member States submitted a declaration showing that they envisaged that provision would be used for claims by *third-country* investors (in which case, the EU and the Member States reserved the right to designate the proper respondent, depending on the internal division of competences between the Member States and the Union). Statement submitted by the European Communities to the Secretariat of the Energy Charter Treaty pursuant to Article 26(3)(b)(iii) of the Energy Charter Treaty, [1998] O.J. L69/115. The vast majority of the Member States (including both Spain and the Netherlands) reconfirmed this position in the declarations issued on 15 and 16 January 2019, *see supra* n.9, as did the Council of the EU in authorizing the filing of this brief, *see supra* n.2. The Contracting Parties' post-ratification interpretations of an international treaty are entitled to deference. *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982).[10]

Against this backdrop, ECT Article 26 creates jurisdiction over "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former." Article 1 defines the terms "Investor," "Contracting Party," and "Area." In light of the ECT's context, object, and purpose, *see supra* pp. 6–8, these provisions must be understood to exclude EU "Investors" investing in the "Area" of the EU. Such investors are not "Investor[s] of another Contracting Party." Rather, they are "Investors" of one "Contracting Party" (the EU), making investments in the "Area" of that same Contracting Party. Such investors thus invest in "their own economic area," Opinion of Advocate General Bot, Court of Justice Opinion 1/17, Request for an opinion by the Kingdom of Belgium

---

[10] That the ECT, properly interpreted, does not apply intra-EU disposes of any perceived incongruity in the fact that the Commission has not commenced any proceedings charging that Member States that refuse to withdraw from the ECT are in violation of EU law. Such proceedings are unnecessary because, properly interpreted, the ECT presents no conflict with EU law.

(ECLI:EU:C:2019:72), ¶ 207, and are not "foreign" investors for whom the ECT's investor-State mechanism was intended.[11]

That the ECT does not specifically provide that Article 26 is inapplicable to intra-EU disputes (by means of a so-called "disconnection clause") is irrelevant. Disconnection clauses are often included in multilateral treaties that include EU Member States and third countries and serve to notify the non-EU parties that EU law will apply as between EU Member States that are parties to the same treaty. They have no bearing on intra-EU relations. The "failure to [include a disconnection clause in a multilateral treaty] would not alter the Union law obligation whereby Union law takes precedence as regards Member States' relations *inter se*." M. Cremona, *Disconnection Clauses in EU Law and Practice*, in *Mixed Agreements Revisited* 166 (2010). This is particularly so in "mixed agreements," *i.e.* agreements concluded jointly by the EU and its Member States, like the ECT.[12] The WTO Agreement—like the ECT, a "mixed agreement" that lacks a disconnection clause—illustrates the point. Despite its lack of a disconnection clause, because intra-EU trade is governed by the EU's internal market rules, "there can hardly have been any misunderstanding about the intention of the Community and its Member States to negotiate exclusively obligations with third States and not between Member States *inter se*." Pieter J. Kuijper, *The Conclusion and Implementation of the Uruguay Round Results by the European Community*, 6 Eur. J. Int'l L. 222, 228 (1995).

The text, history, and context of the ECT thus make clear that Article 26, properly interpreted, does not apply to intra-EU disputes. None of the contracting parties envisaged

---

[11] The Advocate General provides impartial, independent submissions in certain cases brought before the Court of Justice in order to assist the Court in its judicial task.

[12] *See* Maja Smrkolj, *The Use of the 'Disconnection Clause' in International Treaties* 9 (May 14, 2008) (paper presented at GARNET Conference), https://bit.ly/2IYldIT (disconnection clauses are "completely unnecessary" in mixed agreements).

Article 26 would permit EU investors to initiate arbitration against another Member State. Indeed, the contrary interpretation requires assuming that, by signing the ECT, individual Member States not only acted in complete disregard of the fact that they had already transferred competence to the EU in the area of energy, but also intended to sign away the primacy of EU law in their relations *inter se*, even though they have always viewed this principle as fundamental to the EU legal order.  That cannot be correct.

## II.   The EU Treaties preclude Member States from offering to arbitrate intra-EU disputes under the Energy Charter Treaty

In the alternative, even assuming the ECT could be interpreted to apply intra-EU, applying ECT Article 26 to intra-EU disputes would be contrary to the TFEU as interpreted by the Court of Justice in *Achmea*.  Given the prevalence of the TFEU over all other international agreements between EU Member States, any offer of intra-EU arbitration in the ECT is invalid and ineffective and cannot have given rise to a valid arbitration agreement.

### A.   Intra-EU application of ECT Article 26 conflicts with the EU Treaties and fundamental principles of EU law

The *Achmea* judgment is not limited to the BIT at issue in the *Achmea* dispute, or, indeed, any specific treaty.  In accordance with its mandate under TFEU Article 267, the Court of Justice in *Achmea* was only concerned with the interpretation of *EU law*—specifically, TFEU Articles 267 and 344.  That binding interpretation is not (and cannot, as matter of EU law) be "limited" to the particular facts in the case which gave rise to it.  It applies *erga omnes*, and how it affects a particular set of factual circumstances—including a particular treaty at issue in a given case—is a matter for the adjudicator of fact.  Here, the interpretation of TFEU Articles 267 and 344 adopted in *Achmea* applies to intra-EU ECT arbitration with at least the same force as it does to intra-EU investor-state arbitration under a BIT.

As the Court of Justice Advocate General recently observed in his opinion concerning the

EU/Canada Comprehensive Economic and Trade Agreement (CETA), the *Achmea* judgment is

primarily based on

> the idea that the judicial system of the European Union, in so far as it is based on
> mutual trust and sincere cooperation between Member States, is inherently
> incompatible with the possibility of Member States establishing, in their bilateral
> relations, a parallel dispute settlement mechanism which may concern the
> interpretation and application of EU law.

Bot, Opinion 1/17, ¶ 105.  The Court of Justice agreed, underscoring that investor-State dispute

settlement is only permissible in treaties between the EU and third countries, where, unlike in the

intra-EU situation of *Achmea*, the principle of mutual trust does not apply. [13]  Court of Justice

Opinion 1/17, 30 April 2019 (ECLI:EU:C:2019:341), ¶¶ 120–129.  Even then, such dispute

settlement is only permissible if the interpretation and application of EU law is expressly

excluded from the tribunals' jurisdiction and such jurisdiction is specifically limited to preserve

the EU's right to legislate in the public interest without investor-State tribunals interfering with

its functions, especially in the field of competition law.  *Id.* ¶¶ 106–161, 184–18.

    Like disputes arising from intra-EU investments under a BIT, disputes arising from intra-

EU investments under the ECT do not involve third-country investors. They are also "liable to

relate to the interpretation or application of EU law," which forms part of the international law

applicable in any such dispute. *Achmea*, ¶ 39; ECT art. 26(6).[14]  But ECT tribunals are no more a

part of the EU judicial system than are BIT tribunals.  Their pronouncements on EU law (or

failure to take EU law into account) threaten the integrity of the EU legal order and the principles

---

[13] Thus, the Court of Justice clarified that ¶¶ 57 and 58 of the *Achmea* judgment (on which arbitration tribunals have
previously relied to hold that the *Achmea* judgment does not apply to the ECT), carve out from *Achmea*'s scope only
relations with third countries, not a possible intra-EU application.

[14] This is in contrast to, for example, the Comprehensive Economic and Trade Agreement (CETA) between Canada
and the EU and its Member States.  Given that Canada is not party to the EU Treaties, in CETA context, EU law is
merely "domestic law of a Party" and may only be considered as a matter of fact, in accordance with the prevailing
interpretation of EU courts. Opinion 1/17 (CETA), ¶¶ 21, 130-134.

of sincere cooperation and mutual trust between the EU and its Member States.

The *Masdar* dispute itself is a case in point. *First*, Masdar's arbitration claims concerned Spain's measures to support renewable energy intended to achieve the renewable energy targets laid down in the EU's Renewable Energy Directive, which itself forms part of the EU's internal market legislation. Masdar's complaint under the ECT was that Spain "unfairly and inequitably" denied it a level of support to which it claimed to be entitled.[15] But to ensure fair competition in the internal market, TFEU Article 107 prohibits Member States from providing undertakings with *any* public support (known as "State aid"), unless such support was first notified to the Commission and specifically approved by it on defined public policy grounds. In its capacity as the EU's State aid regulator and the sole authority on whether a given measure constitutes compatible State aid, the Commission investigates potential State aid measures and renders legally binding decisions for Member States and investors based on the EU Treaties.

In its binding decision on the matter, the Commission pointed out that, in accordance with established EU State aid law, an investor cannot rely on legitimate expectations to receive State aid that had not been notified to and approved by the Commission before being granted. Ex. F ¶¶ 155-58.10.[16] This rule could not be circumvented by relying on Article 10 of the ECT, because, in an intra-EU situation, the fair and equitable treatment standard in that provision must be interpreted in conformity with EU law. *Id.* ¶ 164. The Commission further reiterated that any provision for investor-State arbitration between two Member States is contrary to EU law, including "the general principles of Union law of primacy, unity and effectiveness of Union law, of mutual trust and of legal certainty." *Id.* ¶ 160. Finally, the Commission pointed out that any

---

[15] Masdar's claims are based on Article 10 of the ECT, which provides that Contracting Parties shall accord "fair and equitable treatment" to investments of investors of other Contracting Parties.

[16] Attached as Exhibit F is a copy of the Commission's Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017).

16

compensation based on an arbitral award granted to an EU investor under the ECT on the basis that Spain has modified its support scheme would in itself amount to State aid, and that any payment of such awards by Spain without prior notification to, and approval by, the Commission would itself be unlawful as a matter of EU law. *Id.* ¶ 165. This conclusion flows from the Commission's assessment that payment of the arbitral award against Spain would constitute State aid, combined with the operation of TFEU art. 108(3), which requires a State to refrain from implementing any State aid measures pending a final Commission ruling. Investors could have challenged this decision in European courts but did not. The Commission's State aid decision is thus binding EU law.

Spain sought to submit the Commission's decision to the arbitral tribunal, but the tribunal rejected Spain's requests. *See* Award ¶¶ 79, 669, 671 (ECF No. 1-1). The tribunal then proceeded to rule as though EU State aid law (which is also binding under Article 1(3) of the ECT) did not exist, ordering Spain to pay Masdar compensation for the subsidies Masdar had claimed. As a result of Masdar's request for enforcement in this Court, Spain now faces extra-EU judicial proceedings to enforce the arbitral tribunal's award—which could place Spain in the impossible position of having to choose between complying with the order of an enforcing court or violating legally binding fundamental principles, legally binding treaty provisions, and legally binding decisions of EU law.

*Second*, Spain argued before the *Masdar* tribunal that EU law deprived the tribunal of jurisdiction, because the arbitration provision in ECT Article 26 (when applied intra-EU) would conflict with TFEU Article 344. While the case was pending, the Court of Justice confirmed in *Achmea* that TFEU Articles 267 and 344 "preclud[e] a provision in an international agreement between Member States" authorizing resolution of disputes concerning intra-EU investments

before an arbitral tribunal. *Achmea* ¶ 60. However, the tribunal found that the *Achmea*
judgment had "no bearing" on the dispute before it, Award ¶ 678–83, and held—contrary to the
*Achmea*'s express holding—that TFEU Article 344 did not apply to investor-State arbitration in
the first place, Award, ¶¶ 336–38.

The *Masdar* tribunal thus both disregarded and manifestly misinterpreted binding rules of
EU law. Given the impossibility of rectifying this failure through the EU's judicial system, this
outcome constitutes the precise challenge to the autonomy and effectiveness of EU law that the
Court of Justice in the *Achmea* judgment sought to prevent.

Questions of retroactivity are no obstacle to applying *Achmea*'s reasoning here. The
judgments of the Court of Justice generally apply *ex tunc*. Case 262/12, *Vent de Colère!*, 19
Dec. 2013, ECLI:EU:C:2013:851, ¶ 39. Only in "exceptional[]" circumstances will the Court
impose temporal limitations on an interpretation of EU law, *id.* ¶ 40, and the Court found no
such circumstances in the *Achmea* case.[17]

### B.     The conflict between ECT Article 26 and the EU Treaties must be resolved in favor of EU law.

The issue of treaty conflict is an issue of international law. Where two or more treaties
impose conflicting obligations, customary international law governs the resolution of those
conflicts. While customary international law provides residual rules for the resolution of treaty
conflict, *see* VCLT arts. 30 & 59, it is well recognized that that sovereign States may regulate the
relationship between present and future international treaties between those same States by
special rules, including by entering into a treaty that takes precedence over all others. *See, e.g.*,
Report of the Study Group of the Int'l Law Comm'n, *Fragmentation of International Law*, UN

---

[17] The government of one Member State sought the imposition of such a limitation in the *Achmea* proceedings, but
the Court of Justice did not grant that request.

Doc. No. A/CN.4/L.682 (2006), ¶ 470; O. Dörr & K. Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary* 546 (2012).

Member States' obligations under EU law are themselves international in nature. The EU legal order derives from international treaties that create binding obligations between their Member States on the international plane. While the Court of Justice has treated the EU legal order as "special" given the far-reaching goals of the treaties, it never denied its international character. *See, e.g.*, Case 26-62, *Van Gend & Loos v. Netherlands Inland Revenue Administration*, [1963] E.C.R. 1, 12 (the EU is a "new legal order of international law"); *Achmea*, ¶ 41 (EU law "deriv[es] from an international agreement between the Member States"). International courts and tribunals have consistently confirmed that EU law is international law applicable between EU Member States. *See, e.g.*, Order No. 3, Ireland v. United Kingdom ("Mox Plant"), UNCLOS Arbitral Tribunal, June 23, 2003, ¶ 28.

Thus, where Member States' commitments under the EU Treaties conflict with other international obligations between those same Member States, customary international law permits the Member States to formulate special rules to resolve those conflicts, including by providing that a particular treaty shall have primacy over others. EU Member States have done precisely that by means of the EU Treaties, which establish the primacy of EU law over Member States' other international obligations *inter se* (whenever concluded). In other words, primacy of EU law is a special rule of conflict pursuant to international law. As explained *supra* pp. 5–6, the principle of primacy applies equally to domestic law and intra-EU international treaties. *See* TFEU art. 351.[18] Indeed, for that purpose, "rules resulting from international agreements by

---

[18] Consistent Court of Justice case law confirms that TFEU Article 351 (which safeguards the effects of international obligations of EU Member States vis-à-vis third countries where such obligations predate the EU Treaties' entry into force) means that EU Member States' international obligations *inter se* are not protected from the effects of the EU

which the Member State concerned is bound" form part of "domestic law."  Opinion of Advocate

General Mazák, *Bogiatzi v. Deutscher Luftpool et al.*, Case C-301/08, [2009] E.C.R. I-10185,

¶ 55; Marcus Klamert, *The Principle of Loyalty in EU Law* 180 (2014).  And in Declaration No.

17 to the 2007 Lisbon Treaty (amending the EU Treaties), the Member States expressly

confirmed the primacy of EU law over "domestic legal provisions, *however framed.*"  Ex. D.[19]

  To be clear, primacy is not an escape hatch that allows the EU and Member States to

evade other international obligations.  Rather, in the context of intra-EU disputes like this one,

primacy is a principle for resolving conflicts between Member States' obligations under the EU

Treaties and any other international obligations in force between the those same Member States,

at least where the rights of third countries are not affected.  *See* TFEU art. 351.  That such

conflicts are resolved in favor of the TFEU is uncontroversial.  The International Law

Commission has recognized the TFEU's "absolute precedence" over any intra-EU international

agreements.  *Fragmentation of International Law*, UN Doc. No. A/CN.4/L.682 (2006), ¶ 283.

The German Federal Supreme Court was likewise clear in setting aside the *Achmea* award:

> [B]y acceding to the EU the Member States have limited their discretionary
> powers under international law and have mutually agreed to renounce the exercise
> of any international treaty rights which conflict with EU law. In view of this, the
> primacy of the provisions of EU law has the consequence that a rule in an intra-
> EU agreement between Member States which is incompatible with EU law is also
> inapplicable as a rule in an international treaty. The nationals of the Member
> States concerned cannot rely on the Member States' prior international law
> obligations that are contrary to EU law.

Ex. E, ¶ 41.[20]  The tribunal in *Electrabel v. Hungary* (to the Commission's knowledge, the only

---

Treaties and are subject to their primacy. *See infra* p. 21 (discussing *Commission v. Italy* and subsequent cases); *see also, e.g.*, Case 478/07, *Budějovický Budvar v. Rudolf Ammersin GmBH*, [2009] E.C.R. I-07721, ¶¶ 97–99; Case 121/85, *Conegate Ltd. v. HM Customs & Excise*, [1986] E.C.R. 01007, EU:C:1986:114, ¶ 25.

[19] Declarations Annexed to the Final Act of the Intergovernmental Conference which Adopted the Treaty of Lisbon signed on 13 December 2007, 2008 O.J. C115/335, at 344.

[20] *Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.* (Oct. 31, 2018), I ZB 2/15 (English translation).

investor-State tribunal to have engaged in a detailed and comprehensive analysis of the issue) also concluded that EU-inconsistent treaties "do not survive" within the EU. *Electrabel SA v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, Nov. 25, 2015, ¶ 4.183.

The principle of primacy extends to any intra-EU application of multilateral treaties, even where third countries are also parties to those treaties. Based on Article 351 of the TFEU, the Court of Justice has held in a number of judgments—beginning with the 1962 case of *Commission v. Italy*, Case 10-61, [1962] E.C.R. 1—that such treaties do not apply within the EU if they are contrary to any rule of EU law, unless they affect the rights of third countries. *Commission v. Italy* concerned the General Agreement on Tariffs and Trade ("GATT"), a multilateral treaty to which non-EU Member States were also party. In later cases, the Court applied the rule set forth in *Commission v. Italy* to numerous other multilateral treaties.[21] All obligations contained in these treaties, to the extent they conflicted with the EU Treaties, were not applicable and had to be set aside within the EU.

There is no reason to exempt the ECT from this rule. Indeed, the *Achmea* judgment expressly applies to "international agreements concluded between the Member States" —the exact same term that was used in *Commission v. Italy* to refer to the intra-EU application of GATT. *Compare Achmea* ¶ 62 *with Commission v. Italy*, [1962] E.C.R. at 10. Multilateral treaties providing for intra-EU investment arbitration such as the ECT are thus clearly within the scope of the *Achmea* judgment, for the purposes of which they are no different from purely bilateral agreements. For the same reason, EU law would, if necessary, also prevail over the

---

[21] Case 286/86, *Ministère Public v. Deserbais*, [1988] E.C.R. 4907 (Stresa Convention on Cheeses); Joined Cases C-241/91 P and C-242/91 P, *RTE and ITP v. Commission*, [1995] E.C.R. I-743 (Berne Convention for the Protection of Literary and Artistic Works); Case 147/03, *Commission v. Austria*, [2005] E.C.R. I-5969 (Council of Europe Convention on the Equivalence of Diplomas); Case C-301/08, *Bogiatzi v. Deutscher Luftpool et al.*, [2009] E.C.R. I-10185 (Warsaw Convention on International Carriage by Air).

ICSID Convention as applied among EU Member States.

Article 16(2) of the ECT, which provides that other treaties concerning investment promotion and protection and dispute resolution shall not "be construed to derogate" from the ECT, does not reverse the primacy of EU law and give precedence to the ECT instead.

*First*, by its own terms, Article 16(2) of the ECT is a rule of "construction," not conflict resolution. The applicable rule on resolving a conflict between the ECT and the EU Treaties is the primacy of EU law. *Second*, even if Article 16(2) could be interpreted as a conflict rule, it would yield to the primacy of the EU Treaties, which is a special and mandatory conflict rule applicable to all conflicting treaties, whenever concluded. EU law forbids Member States from "set[ting] aside the rules arising out of the [EU Treaties] by concluding an international agreement or convention."[22] The suggestion that they have nonetheless done so by agreeing to Article 16 is not a reasonable interpretation of either Article 16 or EU law. As the *Electrabel* tribunal correctly observed, Article 16 is itself subject to the primacy of EU law and cannot trump EU law. ICSID Case No. ARB/07/19, ¶ 4.178. In any event, the principle of primacy, which the Member States confirmed in Declaration No. 17 to the 2007 Lisbon Treaty, is later in time than any conflict rule in the ECT.

That the EU itself is a party to the ECT (whereas the BIT in *Achmea* involved only individual Member States) does not obviate the conflict between EU law and the ECT or render *Achmea* inapposite. The judgment of the Court of Justice in Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"), 30 May 2006, ECLI:EU:C:2006:345, demonstrates the point. There, the Court held that an inter-State arbitration provision in the UN Convention on the Law of the Sea

---

[22] Case T-76/89, *Independent Television Publications Ltd v Commission of the European Communities*, 10 July 1991, ECLI:EU:T:1991:41, ¶ 76.

could not be applied in a dispute between two EU Member States, because (as in *Achmea*) such application would violate TFEU Article 344 and the principle of autonomy of EU law.  That the EU was party to UNCLOS (just as it is party to the ECT) did not resolve the incompatibility.

In short, as regards intra-EU relations, the TFEU regulates its relationship with EU Member States' other *inter se* international obligations in favor of the absolute precedence of EU law in case of any conflict.  This includes Member States' obligations under multilateral treaties (to the extent the rights of non-Member States remain unaffected).  As the *Achmea* judgment confirmed, any international treaty provision permitting intra-EU investment arbitration is contrary to the TFEU.  Article 26 of the ECT is precisely such a provision.  Therefore, under the well-established conflict rules in force between EU Member States, Article 26 of the ECT cannot apply in intra-EU relations.  This dispute concerns purely intra-EU relations and does not concern any third countries or their investors.  Article 26 of the ECT is thus inapplicable here and cannot have given rise to a valid arbitration agreement.

III.    **At a minimum, international comity favors allowing the compatibility of intra-EU arbitration under the ECT to be decided within the EU judicial system.**

Whether intra-EU arbitration pursuant to ECT Article 26 is compatible with the EU Treaties raises significant questions that implicate not just EU law but also the structure of the EU legal order.  International comity—which permits U.S. courts to dismiss or stay domestic action based on the interests of the United States, a foreign government, and the international community in resolving a dispute in a foreign forum—strongly favors permitting these questions to be addressed within the EU judicial system.  *See Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).

The EU's position is that intra-EU investment arbitration under the ECT is fundamentally incompatible with EU law—a conclusion that clearly follows from the Court of Justice's recent

Case 1:18-cv-02254-JEB Document 20 Filed 05/13/19 Page 30 of 108

pronouncement in *Achmea*. Nevertheless, controversy over this conclusion remains, within academic circles as well as in arbitral practice, as this case shows. Resolving that controversy touches on matters of vital importance to the EU, including the role and jurisdiction of EU courts, the interpretation and application of EU law by non-EU adjudicatory bodies, and the future of investor-State arbitration within the EU.

These questions are best decided by EU courts, within the EU judicial system. Respect for foreign sovereigns strongly favors of permitting the enforceability of the Award to be decided by the courts of the EU Member States and ultimately the Court of Justice. Questions about the enforceability of intra-EU ECT awards are already percolating through the EU judicial system. In *Novenergia II – Energy & Environment (SCA) v. Spain*, Spain requested that the Swedish courts (the seat of that arbitration) set aside an ECT award rendered against it in an intra-EU arbitration on the ground that ECT Article 26 does not apply in intra-EU disputes. The court of appeal denied Spain's request to refer the matter to the Court of Justice for a preliminary ruling at this stage,[23] but a similar request remains pending before the same court in another case.[24] Ultimately, the Swedish Supreme Court will be obliged to refer the matter to the Court of Justice—which will then be in a position to provide an authoritative, final, and specific decision on the compatibility of intra-EU arbitrations under the ECT with EU law.

In addition, as mentioned above, during the pendency of the *Masdar* arbitration, the Commission issued a State aid decision regarding Spain's 2013 and 2014 support measures in the field of renewable energy, determining that as a matter of EU competition law, Spain has a

---

[23] Decision by the Svea Court of Appeal (Apr. 25, 2019), https://bit.ly/2Li8sLX. The decision is available only in Swedish, but the Commission will provide an English translation at the Court's request.

[24] Decl. of James Hope, *Foresight Luxembourg Solar 1 S.A.R.L. v. Kingdom of Spain*, No. 19-cv-3171 (S.D.N.Y.), ECF No. 12.

legal obligation not to pay the compensation awarded by any ECT tribunal unless and until the Commission authorizes such payment in accordance with the applicable State aid rules.[25] Masdar's failure to challenge that decision in the European courts—which could have brought the question of the intra-EU applicability of the ECT swiftly before the forum best placed to address it—means that Masdar must respect that decision, and Spain is precluded as a matter of EU law from implementing the award, absent authorization from the Commission. *See* TFEU art. 108(3). If the Commission refuses authorization, Masdar may seek redress in EU courts.

While the EU's interests in these issues are immense, the United States has no interest in the answers to these questions, nor even in the outcome of individual intra-EU investor-State disputes. None of the parties to the underlying dispute between Masdar and Spain are U.S. citizens, no U.S. property is at issue, and none of the underlying events took place on U.S. territory. U.S. law is only implicated to the extent that Masdar has asserted jurisdiction under the Foreign Sovereign Immunities Act and seeks to enforce the award in the United States under the ICSID Convention and 22 U.S.C. § 1650a. Rather than embroil itself in the EU's internal affairs, this Court should dismiss the petition so that the questions implicated by this dispute may be decided by the courts of the Member States and the EU Court of Justice, all of which have an infinitely greater stake in these issues than U.S. courts.

## CONCLUSION

For the foregoing reasons and those set forth in Spain's submissions, the Court should grant Spain's motion to dismiss the petition and deny enforcement of the award.

---

[25] Ex. F ¶¶ 160, 165; *see also* Decision on State Aid, SA.38517, 2015 O.J. (L 232) 43 (same regarding Romania); Decision on State Aid, SA.40171, slip op. (Nov. 28, 2016) (same regarding Czech Republic).

Dated: May 3, 2019

Respectfully submitted,

*/s/ R. Stanton Jones*

R. Stanton Jones (D.C. Bar No. 987088)
Sally L. Pei (D.C. Bar No. 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
stanton.jones@arnoldporter.com

Dmitri Evseev (D.C. Bar No. 487747)
*Pro hac vice* application to be filed
ARNOLD & PORTER
  KAYE SCHOLER LLP
Tower 42
25 Old Broad Street
London EC2N 1HQ
UNITED KINGDOM
T: +44 (0)20 7786 6100
dmitri.evseev@arnoldporter.com

*Counsel for Proposed Amicus Curiae*

**LIST OF EXHIBITS**

A    Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union

B    Declaration of the Representatives of the Governments of the Member States, of 16 January on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union

C    Declaration of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union

D    Declarations Annexed to the Final Act of the Intergovernmental Conference which Adopted the Treaty of Lisbon signed on 13 December 2007, 2008 O.J. C115/335, at 344

E    Order, *Slovak Republic v. Achmea B.V.* (Oct. 31, 2018), I ZB 2/15 (English translation)

F    Commission Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017)

# Exhibit A

# DECLARATION OF THE REPRESENTATIVES OF THE GOVERNMENTS OF THE MEMBER STATES,

## OF 15 JANUARY 2019

## ON THE LEGAL CONSEQUENCES OF THE JUDGMENT OF THE COURT OF JUSTICE IN *ACHMEA* AND ON INVESTMENT PROTECTION IN THE EUROPEAN UNION

THE REPRESENTATIVES OF THE GOVERNMENTS OF THE MEMBER STATES, HAVE ADOPTED THE FOLLOWING DECLARATION

In its judgment of 6 March 2018 in Case C-284/16, Achmea v Slovak Republic ('the *Achmea* judgment'), the Court of Justice of the European Union held that "*Articles 267 and 344 [... of the Treaty on the Functioning of the European Union] must be interpreted as precluding a provision in an international agreement concluded between Member States, [...] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept*" ("investor-State arbitration clauses").

Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law.

Union law takes precedence over bilateral investment treaties concluded between Member States.[1] As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable. They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses). An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty.

---

[1] With regard to agreements concluded between Member States, see judgments in *Matteucci*, 235/87, EU:C:1988:460, paragraph 21; and *Budějovický Budvar*, EU:C:2009:521, C-478/07, paragraphs 98 and 99 and Declaration 17 to the Treaty of Lisbon on primacy of Union law. The same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of the Treaties and customary international law (*lex posterior*).

Furthermore, international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties.[2] Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States.[3] Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied.[4]

When investors from Member States exercise one of the fundamental freedoms, such as the freedom of establishment or the free movement of capital, they act within the scope of application of Union law and therefore enjoy the protection granted by those freedoms and, as the case may be, by the relevant secondary legislation, by the Charter of Fundamental Rights of the European Union, and by the general principles of Union law, which include in particular non-discrimination, proportionality, legal certainty and the protection of legitimate expectations.[5] Where a Member State enacts a measure that derogates from one of the fundamental freedoms guaranteed by Union law, that measure falls within the scope of Union law and the fundamental rights guaranteed by the Charter also apply.[6]

Member States are obliged to provide remedies sufficient to ensure the effective legal protection of investors' rights under Union law.[7] In particular, every Member State must ensure that its courts or tribunals, within the meaning of Union law, meet the requirements of effective judicial protection.[8]

Member States underline the importance of providing guidance on how Union law protects intra-EU investments, including on legal remedies. In this context, Member States take note of the Communication "Protection of intra-EU investment" adopted by the Commission on 19 July 2018.[9]

---

[2]   Judgment in *Western Sahara*, C-266/16, EU:C:2018:118, paragraphs 42 to 51. For the Energy Charter Treaty, its systemic interpretation in conformity with the Treaties precludes intra-EU investor-State arbitration.

[3]   Article 26(3) of the Energy Charter Treaty. This interpretation is currently contested before a national court in Case No 4658-18 Svea Court of Appeal, Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR vs the Kingdom of Spain, SCC Arbitration (2015/06).

[4]   See Communication "Protection of intra-EU investment" adopted by the Commission on 19 July 2018 (COM(2018)547 final), pages 3-4.

[5]   Judgment in *Pfleger*, C-390/12, EU:C:2014:281, paragraphs 30 to 37.

[6]   Judgment in *Online Games Handels*, C-685/15, EU:C:2017:452, paragraphs 55 and 56.

[7]   Article 19(1) Treaty on European Union (TEU), second sub-paragraph.

[8]   Judgment in *Associação Sindical dos Juízes Portugueses*, C-64/16, EU:C:2018:117, paragraphs 31 to 37.

[9]   COM(2018)547 final.

In light of the ECOFIN Council conclusions of 11 July 2017, Member States and the Commission will intensify discussions without undue delay with the aim of better ensuring complete, strong and effective protection of investments within the European Union. Those discussions include the assessment of existing processes and mechanisms of dispute resolution, as well as of the need and, if the need is ascertained, the means to create new or to improve existing relevant tools and mechanisms under Union law.[10]

This declaration is without prejudice to the division of competences between the Member States and the Union.

Taking into account the foregoing, Member States declare that they will undertake the following actions without undue delay:

1. By the present declaration, Member States inform investment arbitration tribunals about the legal consequences of the *Achmea* judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between Member States or under the Energy Charter Treaty.

2. In cooperation with a defending Member State, the Member State, in which an investor that has brought such an action is established, will take the necessary measures to inform the investment arbitration tribunals concerned of those consequences. Similarly, defending Member States will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.

3. By the present declaration, Member States inform the investor community that no new intra-EU investment arbitration proceeding should be initiated.

4. Member States which control undertakings that have brought investment arbitration cases against another Member State will take steps under their national laws

---

[10] Council conclusions on the Communication of the Commission on the mid-term review of the Capital Markets Union Action Plan; http://www.consilium.europa.eu/en/press/press-releases/2017/07/11/conclusions-mid-term-review-capital-markets-union-action-plan/

governing such undertakings, in compliance with Union law, so that those undertakings withdraw pending investment arbitration cases.

5. In light of the *Achmea* judgment, Member States will terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.

6. Member States will ensure effective legal protection pursuant to the second subparagraph of Article 19(1) TEU under the control of the Court of Justice against State measures that are the object of pending intra-EU investment arbitration proceedings.

7. Settlements and arbitral awards in intra-EU investment arbitration cases that can no longer be annulled or set aside and were voluntarily complied with or definitively enforced before the Achmea judgment should not be challenged. Member States will discuss, in the context of the plurilateral Treaty or in the context of bilateral terminations, practical arrangements, in conformity with Union law, for such arbitral awards and settlements. This is without prejudice to the lack of jurisdiction of arbitral tribunals in pending intra-EU cases.

8. Member States will make best efforts to deposit their instruments of ratification, approval or acceptance of that plurilateral treaty or of any bilateral treaty terminating bilateral investment treaties between Member States no later than 6 December 2019. They will inform each other and the Secretary General of the Council of the European Union in due time of any obstacle they encounter, and of measures they envisage in order to overcome that obstacle.

9. Beyond actions concerning the Energy Charter Treaty based on this declaration, Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the *Achmea* judgment in relation to the intra-EU application of the Energy Charter Treaty.

Further signatories may be added at any time.

Done in Brussels on 15 January 2019.

Royaume de Belgique/
**Koninkrijk België**

Република България

Česká republika

Kongeriget Danmark

Bundesrepublik Deutschland

Eesti Vabariik

**Éire/Ireland**

Ελληνική Δημοκρατία

Reino de España

[ See Text attached ]
**République française**

**Republika Hrvatska**

**Repubblica italiana**

Κυπριακή Δημοκρατία

Latvijas Republika

Lietuvos Respublika

Koninkrijk der Nederlanden

Republik Österreich

Rzeczpospolita Polska

República Portuguesa

România

Slovenská republika

United Kingdom of Great Britain
and Northern Ireland

**DÉCLARATION DES REPRÉSENTANTS DES GOUVERNEMENTS DES ÉTATS MEMBRES,**

**DU 15 JANVIER 2019,**

**RELATIVE AUX CONSÉQUENCES JURIDIQUES DE L'ARRÊT *ACHMEA* RENDU PAR LA COUR DE JUSTICE ET À LA PROTECTION DES INVESTISSEMENTS DANS L'UNION EUROPÉENNE**

LES REPRÉSENTANTS DES GOUVERNEMENTS DES ÉTATS MEMBRES ONT ADOPTÉ LA DÉCLARATION SUIVANTE:

Dans l'arrêt qu'elle a rendu le 6 mars 2018 dans l'affaire C-284/16, République slovaque/Achmea (ci-après l'«arrêt *Achmea*»), la Cour de justice de l'Union européenne a jugé que *«les articles 267 et 344 [du traité sur le fonctionnement de l'Union européenne] doivent être interprétés en ce sens qu'ils s'opposent à une disposition contenue dans un accord international conclu entre les États membres [...] aux termes de laquelle un investisseur de l'un de ces États membres peut, en cas de litige concernant des investissements dans l'autre État membre, introduire une procédure contre ce dernier État membre devant un tribunal arbitral, dont cet État membre s'est obligé à accepter la compétence»* (ci-après les «clauses d'arbitrage entre investisseurs et États»).

Conformément aux obligations qui leur incombent en droit de l'Union, les États membres doivent tirer toutes les conséquences nécessaires de cet arrêt.

Le droit de l'Union prime les traités bilatéraux d'investissement conclus entre États membres.[1] En conséquence, toutes les clauses d'arbitrage entre investisseurs et États contenues dans les traités bilatéraux d'investissement conclus entre États membres sont contraires au droit de l'Union et, de ce fait, inapplicables. Ces clauses, et notamment les dispositions prévoyant une prolongation de la durée de protection des investissements réalisés avant l'extinction du traité (communément appelées «clauses d'extinction» ou «clauses de grand-père»), ne produisent pas d'effets. Un tribunal arbitral établi sur la base de telles

---

[1] Pour ce qui concerne les conventions conclues entre États membres, voir les arrêts rendus dans les affaires 235/87, *Matteucci*, EU:C:1988:460, point 21, et C-478/08, *Budějovický Budvar*, EU:C:2009:521, points 98 et 99, ainsi que la déclaration 17 annexée au traité de Lisbonne relative à la primauté du droit de l'Union. Le principe de primauté est également consacré par le droit international public général, et en particulier par les dispositions pertinentes de la Convention de Vienne sur le droit des traités et du droit international coutumier (*lex posterior*).

1

clauses est incompétent, du fait que l'État membre partie au traité bilatéral d'investissement sous-jacent n'a pas présenté une offre d'arbitrage valide.

Par ailleurs, les conventions internationales conclues par l'Union, notamment le traité sur la Charte de l'énergie, font partie intégrante de l'ordre juridique de l'UE et doivent donc être compatibles avec les traités européens.[2] Des tribunaux arbitraux ont jugé que le traité sur la Charte de l'énergie contenait également une clause d'arbitrage entre investisseurs et États applicable entre États membres.[3] Ainsi interprétée, cette clause serait incompatible avec les traités, et son application devrait dès lors être écartée.[4]

Lorsque les investisseurs des États membres exercent une liberté fondamentale, telle que la liberté d'établissement ou la libre circulation des capitaux, ils agissent dans le champ d'application du droit de l'Union et bénéficient dès lors de la protection conférée par ces libertés et, selon le cas, le droit dérivé applicable, par la charte des droits fondamentaux de l'Union européenne et par les principes généraux du droit de l'Union, notamment les principes de non-discrimination, de proportionnalité, de sécurité juridique et de protection de la confiance légitime.[5] Lorsqu'un État membre édicte une mesure dérogeant à une liberté fondamentale garantie par le droit de l'Union, cette mesure entre dans le champ d'application du droit de l'Union, et les droits fondamentaux garantis par la Charte s'appliquent également.[6]

Les États membres sont tenus d'établir les voies de recours nécessaires pour assurer une protection juridictionnelle effective des droits des investisseurs consacrés par le droit de l'Union.[7] En particulier, tout État membre doit assurer que ses juridictions, au sens défini par le droit de l'Union, satisfont aux exigences d'une protection juridictionnelle effective.[8]

Les États membres soulignent l'importance de fournir des orientations sur la manière dont le droit de l'Union protège les investissements intra-UE, et notamment sur les voies de recours. Dans ce contexte, les États membres prennent note de la communication intitulée «Protection

---

[2] Arrêt dans l'affaire C-266/16, *Western Sahara*, EU:C:2018:118, points 42 à 51. Dans le cas du traité sur la Charte de l'énergie, une interprétation systémique, compatible avec les traités, exclut tout arbitrage entre investisseurs et États intra-UE.

[3] Article 26, paragraphe 3, du traité sur la Charte de l'énergie. Cette interprétation fait actuellement l'objet d'un recours pendant devant une juridiction nationale, dans l'affaire nº 4658-18, Svea Court of Appeal, Novenergia II - Energy & Environment (SCA) (Grand-Duché de Luxembourg), SICAR/Royaume d'Espagne, SCC Arbitration (2015/06).

[4] Voir la communication intitulée «Protection des investissements intra-UE», adoptée par la Commission le 19 juillet 2018 [COM(2018) 547 final], pp. 3 et 4.

[5] Arrêt dans l'affaire C-390/12, *Pfleger*, EU:C:2014:281, points 30 à 37.

[6] Arrêt dans l'affaire C-685/15, *Online Games Handels*, EU:C:2017:452, points 55 et 56.

[7] Article 19, paragraphe 1, second alinéa, du traité sur l'Union européenne (TUE).

[8] Arrêt dans l'affaire C-64/16, *Associação Sindical dos Juízes Portugueses*, EU:C:2018:117, points 31 à 37.

des investissements intra-UE», qu'a adoptée la Commission le 19 juillet 2018.[9]

À la lumière des conclusions du Conseil Ecofin du 11 juillet 2017, les États membres et la Commission intensifieront à bref délai leurs discussions en vue de mieux assurer une protection complète, solide et efficace des investissements au sein de l'Union européenne. Il s'agira notamment d'évaluer les procédures et mécanismes existants pour la résolution des litiges, ainsi que la nécessité et, le cas échéant, les moyens de créer de nouveaux outils et dispositifs pertinents ou d'améliorer ceux prévus par le droit de l'Union.[10]

La présente déclaration est sans préjudice de la répartition des compétences entre les États membres et l'Union.

Eu égard aux considérations qui précèdent, les États membres déclarent qu'ils prendront les mesures suivantes dans les meilleurs délais:

1. Par la présente déclaration, les États membres informent les tribunaux d'arbitrage en matière d'investissements des conséquences juridiques de l'arrêt *Achmea*, telles qu'elles sont exposées dans la présente déclaration, pour toutes les procédures arbitrales pendantes relatives à des investissements intra-UE qui ont été engagées au titre soit de traités bilatéraux d'investissement conclus entre États membres, soit du traité sur la Charte de l'énergie.

2. En concertation avec l'État membre défendeur, l'État membre dans lequel est établi un investisseur ayant engagé ce type de recours prendra les mesures nécessaires pour informer le tribunal d'arbitrage en matière d'investissements concerné des conséquences de cet arrêt. De même, les États membres défendeurs demanderont aux juridictions, y compris de pays tiers, qui doivent prononcer une sentence arbitrale relative à des investissements intra-UE, d'annuler ou de ne pas exécuter lesdites sentences en raison de l'absence d'un consentement valide.

3. Par la présente déclaration, les États membres informent la communauté des investisseurs qu'aucune nouvelle procédure d'arbitrage en matière d'investissements intra-UE ne devrait être engagée.

4. Les États membres qui contrôlent des entreprises ayant engagé une procédure d'arbitrage

---

[9] COM(2018) 547 final.
[10] Conclusions du Conseil sur la communication de la Commission sur l'examen à mi-parcours du plan d'action concernant l'union des marchés des capitaux: https://www.consilium.europa.eu/fr/press/press-releases/2017/07/11/conclusions-mid-term-review-capital-markets-union-action-plan/

relative à un investissement à l'encontre d'un autre État membre prendront des mesures au titre de leurs dispositions législatives nationales régissant ces entreprises, dans le respect du droit de l'Union, afin que ces entreprises retirent leurs recours encore pendants.

5. À la lumière de l'arrêt *Achmea*, les États membres résilieront tous les traités bilatéraux d'investissement conclus entre eux, par la voie d'un traité plurilatéral ou, si cela est mutuellement jugé plus opportun, bilatéralement.

6. Conformément à l'article 19, paragraphe 1, second alinéa, du TUE, les États membres garantiront sous le contrôle de la Cour de justice, une protection juridictionnelle effective contre des mesures d'État qui font l'objet d'une procédure d'arbitrage en matière d'investissements intra-UE encore pendante.

7. Les arrêts et les sentences arbitrales rendus dans des affaires d'arbitrage relatives à des investissements intra-UE qui ne peuvent plus être annulés ni suspendus et qui ont été volontairement respectés ou définitivement exécutés avant l'arrêt *Achmea* ne devraient pas être contestés. Les États membres examineront, dans le cadre du traité plurilatéral ou de résiliations bilatérales et dans le respect du droit de l'Union, les modalités pratiques à adopter pour ces arrêts et sentences arbitrales. Cette démarche est sans préjudice de l'absence de compétence des tribunaux arbitraux dans les affaires intra-UE pendantes.

8. Les États membres mettront tout en œuvre pour déposer le 6 décembre 2019 au plus tard leurs instruments de ratification, d'approbation ou d'acceptation de ce traité plurilatéral ou de tout traité bilatéral résiliant des traités bilatéraux d'investissement conclus entre États membres. Ils s'informeront mutuellement et informeront le Secrétaire général du Conseil de l'Union européenne en temps utile de tout obstacle qu'ils rencontrent, et des mesures qu'ils envisagent de prendre pour surmonter cet obstacle.

9. Au-delà des mesures concernant le traité sur la Charte de l'énergie fondées sur la présente déclaration, les États membres examineront dans les meilleurs délais avec la Commission si des mesures supplémentaires sont nécessaires pour tirer toutes les conséquences de l'arrêt *Achmea* en ce qui concerne l'application intra-UE du traité sur la Charte de l'énergie.

D'autres signataires peuvent être ajoutés à tout moment.

Fait à Bruxelles, le 16 janvier 2019.


Pour la République française,


Philippe Léglise-Costa,

Ambassadeur, Représentant permanent auprès de l'Union européenne

5

**Royaume de Belgique/**
**Koninkrijk België**

ROUX François
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Belgium to the
EU

**Република България**

TZANTCHEV Dimiter
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Bulgaria to the
EU

**Česká republika**

DÜRR Jakub
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of the Czech
Republic to the EU

**Kongeriget Danmark**

ANDERSEN Per Fabricius
Ambassador
Deputy Permanent Representative of Denmark
to the EU

**Bundesrepublik Deutschland**

CLAUSS Michael
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Germany to the
EU

**Eesti Vabariik**

TAEL Kaja
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Estonia to the EU

**Éire/Ireland**

KELLEHER Declan
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Ireland to the EU

**Ελληνική Δημοκρατία**

PAPASTAVROU Andreas
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Greece to the EU

**Reino de España**

GARCÍA-BERDOY Pablo
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Spain to the EU

**République française**

LÉGLISE-COSTA Philippe
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of France to the EU

**Republika Hrvatska**

ŠKRABALO Mato
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Croatia to the EU

**Repubblica italiana**

MASSARI Maurizio
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Italy to the EU

**Κυπριακή Δημοκρατία**

EMILIOU Nicholas
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Cyprus to the EU

**Latvijas Republika**

PAVĻUTA-DESLANDES Sanita
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Latvia to the EU

**Lietuvos Respublika**

NELIUPŠIENĖ Jovita
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Lithuania to the
EU

**Koninkrijk der Nederlanden**

DE GROOT Robert
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of the Netherlands to
the EU

**Republik Österreich**

KMENTT Alexander
Ambassador
Permanent Representative to the Political and
Security Committee

**Rzeczpospolita Polska**

SADOŚ Andrzej
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Poland to the EU

**República Portuguesa**

BRITO Nuno
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Portugal to the
EU

**România**

STOICA Călin-Rolo
Minister Plenipotentiary
Permanent Representative to the Political and
Security Committee

**Slovenská republika**

JAVORČIK Peter
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of Slovakia to the
EU

**United Kingdom of Great Britain
and Northern Ireland**

BARROW Tim
Ambassador Extraordinary and Plenipotentiary
Permanent Representative of the United
Kingdom to the EU

# Exhibit B

**DECLARATION OF THE REPRESENTATIVES OF THE GOVERNMENTS OF THE MEMBER STATES,**

**OF 16 JANUARY**

**ON THE ENFORCEMENT OF THE JUDGMENT OF THE COURT OF JUSTICE IN *ACHMEA* AND ON INVESTMENT PROTECTION IN THE EUROPEAN UNION**

THE REPRESENTATIVES OF THE GOVERNMENTS OF THE FOLLOWING MEMBER STATES OF THE EUROPEAN UNION: THE REPUBLIC OF FINLAND, THE GRAND DUCHY OF LUXEMBOURG, THE REPUBLIC OF MALTA, THE REPUBLIC OF SLOVENIA AND THE KINGDOM OF SWEDEN, HEREINAFTER REFERRED TO AS THE MEMBER STATES, HAVE ADOPTED THE FOLLOWING DECLARATION

In its judgment of 6 March 2018 in Case C-284/16, Achmea v Slovak Republic ('the *Achmea* judgment'), the Court of Justice of the European Union held that "*Articles 267 and 344 [... of the Treaty on the Functioning of the European Union] must be interpreted as precluding a provision in an international agreement concluded between Member States, [...] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept*" ("investor-State arbitration clauses").

Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law.

In its judgment C-478-/07, Budějovický Budvar, národní podnik v Rudolf Ammersin GmbH, paragraph 98, the CJEU noted that "*It follows that, since the bilateral instruments at issue now concern two Member States, their provisions cannot apply in the relations between those States if they are found to be contrary to the rules of the Treaty* [..],

Therefore, according to the case law of the CJEU, the provisions of a bilateral agreement between Member States containing an investor-State arbitration clause such as the one described in the *Achmea* judgment are contrary to Union law and thus inapplicable. As a consequence, the use of such an investor-State arbitration clause would be contrary to Union

law and inapplicable also as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses).

When investors from Member States exercise one of the fundamental freedoms such as the freedom of establishment or the free movement of capital, they act within the scope of application of Union law and therefore enjoy the protection granted by those freedoms and, as the case may be, by the relevant secondary legislation, by the Charter of Fundamental Rights of the European Union, and by the general principles of Union law, which include in particular non-discrimination, proportionality, legal certainty and the protection of legitimate expectations.[1] Where a Member State enacts a measure that derogates from one of the fundamental freedoms guaranteed by Union law, that measure falls within the scope of Union law and the fundamental rights guaranteed by the Charter also apply.[2]

Member States are obliged to provide remedies sufficient to ensure the effective legal protection of investors' rights under Union law.[3] In particular, every Member State must ensure that its courts or tribunals, within the meaning of Union law, meet the requirements of effective judicial protection.[4]

The Member States underline the importance of providing guidance on how Union law protects intra-EU investments, including on legal remedies. In this context, the Member States take note of the Communication "Protection of intra-EU investment" adopted by the Commission on 19 July 2018.[5]

In light of the ECOFIN Council conclusions of 11 July 2017, Member States and the Commission will intensify discussions without undue delay with the aim of better ensuring complete, strong and effective protection of investments within the European Union. Those discussions include the assessment of existing processes and mechanisms of dispute resolution

---

[1]   Judgment in *Pfleger*, C-390/12, EU:C:2014:281, paragraphs 30 to 37.

[2]   Judgment in *Online Games Handels*, C-685/15, EU:C:2017:452, paragraphs 55 - 57.

[3]   Article 19(1) TEU, second sub-paragraph.

[4]   Judgment in *Associação Sindical dos Juízes Portugueses*, C-64/16, EU:C:2018:117, paragraphs 31 to 37.

[5]   COM(2018)547 final..

as well as the need and, if the need is ascertained, the means to create new or to improve relevant existing tools and mechanisms under Union law.[6]

The Achmea case concerns the interpretation of EU law in relation to an investor-state arbitration clause in a bilateral investment treaty between Member States. The Member States note that the *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty. A number of international arbitration tribunals post the *Achmea* judgment have concluded that the Energy Charter Treaty contains an investor-State arbitration clause applicable between EU Member States.[7] This interpretation is currently contested before a national court in a Member State[8]. Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty.

This declaration is without prejudice to the division of competences between the Member States and the Union.

Taking into account the foregoing, the Member States declare that they will undertake the following actions without undue delay:

1. By the present declaration, the Member States inform investment arbitration tribunals about the legal consequences of the *Achmea* judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought under bilateral investment treaties concluded between Member States.

---

[6]   Council conclusions on the Communication of the Commission on the mid-term review of the Capital Markets Union Action Plan; http://www.consilium.europa.eu/en/press/press-releases/2017/07/11/conclusions-mid-term-review-capital-markets-union-action-plan/

[7]   *Masdar Solar & Wind Cooperatief U.A. vs the Kingdom of Spain*, ICSID Case No ARB/14/1, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l vs the Kingdom of Spain*, ICSD Case No. ARB/13/36, *Antin Infrastructure Services Luxembourg S.à.r.l vs the Kingdom of Spain* and *Antin Energia Termosolar B.V. vs the Kingdom of Spain*, ICSID Case No. ARB, 13/2, *Vattenfall AB; Vattenfall GMBH; Vattenfall Europé Nuclear Energy GMBH; Kernkraftwerk Krümmel GMBH & Co. oHG; Kernkraftwerk Brunbüttel GMBH & Co. oHG vs the Republic of Germany*, ICSID Case No. ARB/12/12, *Antaris Solar GmbH and Michael Gode  vs Czech Republic*, PCA CASE No. 2014-01, *Athena Investments A/S vs the Kingdom of Spain*, SCC Case No. 150/2015

[8]   Set-aside proceeding in Svea Court of Appeal, Case No 4658-18, *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR vs the Kingdom of Spain*, SCC Arbitration (2015/06)

2.  In cooperation with a defending Member State the State in which an investor that has brought such an action is established, will take the necessary measures to inform the investment tribunals concerned of those consequences. Similarly, defending Member States will request the courts, including in any third country, which are to decide in proceedings relating to an intra EU investment arbitration under a bilateral investment treaty, to set these awards aside or not to enforce them.

3.  By the present declaration, the Member States inform the investor community that no new intra-EU investment arbitration proceedings under bilateral investment treaties should be initiated.

4.  Member States which control undertakings that have brought investment arbitration cases against another Member State under a bilateral investment Treaty concluded between Member States will take steps under their national laws governing such undertakings, and in compliance with Union law, so that those undertakings withdraw pending investment arbitration cases.

5.  In light of the *Achmea* judgment, the Member States will terminate all bilateral investment treaties concluded between them and other Member States by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.

6.  The Member States will ensure effective legal protection pursuant to the second subparagraph of Article 19(1) TEU under the control of the Court of Justice against State measures that are the object of pending intra-EU investment arbitration proceedings.

7.  Settlements and arbitral awards in intra-EU investment arbitration cases that can no longer be annulled or set aside and were voluntarily complied with or definitively enforced before the *Achmea* judgment should not be challenged. Member States will discuss, in the context of the plurilateral Treaty or in the context of bilateral terminations, practical arrangements for such arbitral awards and settlements, in conformity with Union law. This is without prejudice to the lack of jurisdiction of arbitral tribunals in pending intra-EU cases.

4

8. The Member States will make best efforts to deposit their instruments of ratification, approval or acceptance of that plurilateral treaty or of any bilateral treaty terminating bilateral investment treaties between Member States no later than 6 December 2019. They will inform each other and the Secretary General of the Council of the European Union in due time of any obstacle they encounter, and of measures they envisage in order to overcome that obstacle.

9. The Member States stand ready to discuss with other Member States and the Commission whether any additional steps are necessary to draw all the consequences from the *Achmea* judgment.

Done in Brussels 16 January 2019

Suomen tasavalta/Republiken Finland

Grand-Duché de Luxembourg

Repubblika ta' Malta

Republika Slovenija

Konungariket Sverige

# Exhibit C

**DECLARATION OF THE REPRESENTATIVE OF THE GOVERNMENT OF HUNGARY,**

**OF 16 JANUARY 2019**

**ON THE LEGAL CONSEQUENCES OF THE JUDGMENT OF THE COURT OF JUSTICE IN *ACHMEA* AND ON INVESTMENT PROTECTION IN THE EUROPEAN UNION**

THE REPRESENTATIVE OF THE GOVERNMENT OF HUNGARY MAKES THE FOLLOWING DECLARATION

In its judgment of 6 March 2018 in Case C-284/16, Achmea v Slovak Republic ('the *Achmea* judgment'), the Court of Justice of the European Union held that "*Articles 267 and 344 [... of the Treaty on the Functioning of the European Union] must be interpreted as precluding a provision in an international agreement concluded between Member States, [...] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept*" ("investor-State arbitration clauses").

Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law.

Union law takes precedence over bilateral investment treaties concluded between Member States.[1] As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable. They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses). Any arbitration tribunal established on the basis of an investor-State arbitration clause included in an intra-EU bilateral investment treaty lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty.

When investors from Member States exercise one of the fundamental freedoms such as the freedom of establishment or the free movement of capital, they act within the scope of application of Union law and therefore enjoy the protection granted by those freedoms and, as the case may be, by the relevant secondary legislation, by the Charter of Fundamental Rights of the European Union, and by the general principles of Union law, which include in

---

[1] With regard to agreements concluded between Member States, see judgments in *Matteucci*, 235/87, EU:C:1988:460, paragraph 21; and *Budějovický Budvar*, EU:C:2009:521, C-478/07, paragraphs 98 and 99 and Declaration 17 to the Treaty of Lisbon on primacy of Union law. The same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of the Treaties and customary international law (*lex posterior*).

particular non-discrimination, proportionality, legal certainty and the protection of legitimate expectations.[2] Where a Member State enacts a measure that derogates from one of the fundamental freedoms guaranteed by Union law, that measure falls within the scope of Union law and the fundamental rights guaranteed by the Charter also apply.[3]

Member States are obliged to provide remedies sufficient to ensure the effective legal protection of investors' rights under Union law.[4] In particular, every Member State must ensure that its courts or tribunals, within the meaning of Union law, meet the requirements of effective judicial protection.[5]

Hungary takes note of the Communication "Protection of intra-EU investment" adopted by the Commission on 19 July 2018 concerning intra-EU bilateral treaties.[6]

In light of the ECOFIN Council conclusions of 11 July 2017, Member States and the Commission will intensify discussions without undue delay with the aim of better ensuring complete, strong and effective protection of investments within the European Union. Those discussions include the assessment of existing processes and mechanisms of dispute resolution as well as of the need and, if the need is ascertained, the means to create new or to improve existing relevant tools and mechanisms under Union law.[7]

This declaration is without prejudice to the division of competences between the Member States and the Union.

Taking into account the foregoing, Hungary declares that it will undertake the following actions without undue delay:

1.  By the present declaration, Hungary informs investment arbitration tribunals about the legal consequences of the *Achmea* judgment, as set out in this declaration, in each pending intra-EU investment arbitration proceeding brought under intra-EU bilateral investment treaties concluded by Hungary and another Member State ("intra-EU bilateral investment treaties").
2.  In the event an investor who is a national of Hungary brings an action under an intra-EU bilateral investment treaty, Hungary, in cooperation with the defending Member State, will take the necessary measures to inform the investment arbitration tribunals

---

[2]   Judgment in *Pfleger*, C-390/12, EU:C:2014:281, paragraphs 30 to 37.

[3]   Judgment in *Online Games Handels*, C-685/15, EU:C:2017:452, paragraphs 55 and 56.

[4]   Article 19(1) TEU, second sub-paragraph.

[5]   Judgment in *Associação Sindical dos Juízes Portugueses*, C-64/16, EU:C:2018:117, paragraphs 31 to 37.

[6]   COM(2018)547 final..

[7]   Council conclusions on the Communication of the Commission on the mid-term review of the Capital Markets Union Action Plan; http://www.consilium.europa.eu/en/press/press-releases/2017/07/11/conclusions-mid-term-review-capital-markets-union-action-plan/

concerned of those consequences. Similarly, Hungary as a defending Member State will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU bilateral investment treaty arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.

3. By the present declaration, Hungary informs the investor community that no new intra-EU bilateral investment treaty arbitration proceeding should be initiated based on an intra-EU bilateral investment treaty.

4. In light of the *Achmea* judgment, Hungary will terminate all intra-EU bilateral investment treaties concluded with other Member States by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.

5. Hungary will ensure effective legal protection pursuant to the second subparagraph of Article 19(1) TEU under the control of the Court of Justice against State measures that are the object of pending intra-EU bilateral investment treaty arbitration proceedings.

6. Settlements and arbitral awards in intra-EU bilateral investment treaty arbitration cases, that can no longer be annulled or set aside and were voluntarily complied with or definitively enforced before the *Achmea* judgment should not be challenged. Hungary will discuss, in the context of the plurilateral treaty or in the context of bilateral termination, practical arrangements, in conformity with Union law, for such arbitral awards and settlements. This is without prejudice to the lack of jurisdiction of arbitral tribunals in pending intra-EU bilateral investment treaty cases.

7. Hungary will make best efforts to deposit its instruments of ratification, approval or acceptance of that plurilateral treaty or of any bilateral treaty terminating intra-EU bilateral investment treaties between Member States no later than 6 December 2019. Hungary will inform each Member State and the Secretary General of the Council of the European Union in due time of any obstacle it encounters, and of measures it envisages in order to overcome that obstacle.

8. Hungary further declares that in its view, the *Achmea* judgment concerns only the intra-EU bilateral investment treaties. The *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty (hereinafter: „ECT") and it does not concern any pending or prospective arbitration proceedings initiated under the ECT.

9. Against this background, Hungary underlines the importance of allowing for due process and considers that it is inappropriate for a Member State to express its view as regards the compatibility with Union law of the intra-EU application of the ECT. The ongoing and future applicability of the ECT in intra-EU relations requires further discussion and individual agreement amongst the Member States.

Done in Brussels 16 January 2019

.......................................
**Olivér VÁRHELYI**
Ambassador Extraordinary and Plenipotentiary
Permanent Representative

3

# Exhibit D

16.    **Declaration on Article 55(2) of the Treaty on European Union**

The Conference considers that the possibility of producing translations of the Treaties in the languages mentioned in Article 55(2) contributes to fulfilling the objective of respecting the Union's rich cultural and linguistic diversity as set forth in the fourth subparagraph of Article 3(3). In this context, the Conference confirms the attachment of the Union to the cultural diversity of Europe and the special attention it will continue to pay to these and other languages.

The Conference recommends that those Member States wishing to avail themselves of the possibility recognised in Article 55(2) communicate to the Council, within six months from the date of the signature of the Treaty of Lisbon, the language or languages into which translations of the Treaties will be made.

17.    **Declaration concerning primacy**

The Conference recalls that, in accordance with well settled case law of the Court of Justice of the European Union, the Treaties and the law adopted by the Union on the basis of the Treaties have primacy over the law of Member States, under the conditions laid down by the said case law.

The Conference has also decided to attach as an Annex to this Final Act the Opinion of the Council Legal Service on the primacy of EC law as set out in 11197/07 (JUR 260):

'*Opinion of the Council Legal Service*

*of 22 June 2007*

*It results from the case-law of the Court of Justice that primacy of EC law is a cornerstone principle of Community law. According to the Court, this principle is inherent to the specific nature of the European Community. At the time of the first judgment of this established case law (Costa/ENEL,15 July 1964, Case 6/641 ([1]) there was no mention of primacy in the treaty. It is still the case today. The fact that the principle of primacy will not be included in the future treaty shall not in any way change the existence of the principle and the existing case-law of the Court of Justice.*

_____

([1])  *"It follows (…) that the law stemming from the treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question."'*

18.    **Declaration in relation to the delimitation of competences**

The Conference underlines that, in accordance with the system of division of competences between the Union and the Member States as provided for in the Treaty on European Union and the Treaty on the Functioning of the European Union, competences not conferred upon the Union in the Treaties remain with the Member States.

# Exhibit E

WA Investments-Europe Nova Limited v. the
Czech Republic, PCA Case No. 2014-19
Voltaic Network GmbH v. the Czech
Republic, PCA Case No. 2014-20
Photovoltaik Knopf Betriebs-GmbH v. the
Czech Republic, PCA Case No. 2014-21
I.C.W. Europe Investments Ltd. v. the
Czech Republic, PCA Case No. 2014-22

Legal Authority
RLA-431

# FEDERAL COURT OF JUSTICE

## ORDER

I ZB 2/15

of

31 October 2018

in the proceedings

for setting aside a domestic arbitral award

Slovak Republic, represented by the Ministry of Finance of the Slovak Republic, which is represented by the Minister of Finance Ing. Peter Kažimír, Stefanovicova 5, Bratislava, Slovak Republic,

Applicant and Appelant,

– Authorised representatives: RA Dr. v. Plehwe and RA Schäfer –

Against

Achmea B.V., represented by the Director Wilhem A.J. van Ouin, Handelsweg 2, Zeist, The Netherlands,

Respondent and Appellee,

– Authorised representative: RA Prof. Raeschke-Kessler –

The First Civil Senate of the Federal Court of Justice on 31 October 2018, with Presiding Justice Prof. Dr. Koch and Justices Prof. Dr. Schaffert, Prof. Dr. Kirchhoff, Feddersen and Dr. Schmaltz

held:

In the proceedings for appeal on points of law brought by the Applicant, the Order of the Frankfurt am Main Higher Regional Court – 26th Civil Senate – of 18 December 2014 is reversed.

The arbitral award (final award) in the arbitration proceedings PCA Case No. 2008/-13 of 7 December 2012 is set aside.

The costs of the proceedings are borne by the Respondent.

<u>Amount in dispute</u>: EUR 22,100,000

Reasons:

A. The Applicant, the Slovak Republic, is the legal successor of the Czech and Slovak Republic (hereinafter: Czechoslovakia). The Respondent is a Dutch insurance group.    1

In 1991, Czechoslovakia and the Kingdom of the Netherlands (hereinafter: the Netherlands), concluded an    2
Agreement – effective 1 October 1992 – on Encouragement and Reciprocal Protection of Investments ("Bilateral Investment Treaty", hereinafter BIT). In Article 3(1) BIT, the parties undertook to ensure fair and equitable treatment to the investments of investors of the other contracting party and not to impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal thereof by those investors. According to Article 4 BIT, each contracting party must guarantee the free transfer of payments related to an investment, in particular profits, interests and dividends, in freely convertible currency and without undue restriction or delay.

Art. 8 BIT contains the following provision:    3

1. All disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall if possible, be settled amicably.

2. Each Contracting Party hereby consents to submit a dispute referred to in paragraph (1) of this Article, to an arbitral tribunal, if the dispute has not been settled amicably within a period of six months from the date either party to the dispute requested amicable settlement.

3. The arbitral tribunal referred to in paragraph (2) of this Article will be constituted for each individual case in the following way: each party to the dispute appoints one member of the tribunal and the two members thus appointed shall select a national of a third State as Chairman of the tribunal. ...

…

5. The arbitration tribunal shall determine its own procedure applying the arbitration rules of the United Nations Commission for International Trade Law (UNCITRAL).

6. The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:

- the law in force of the Contracting Party concerned;
- the provisions of this Agreement, and other relevant Agreements between the Contracting Parties;
- the provisions of special agreements relating to the investment;
- the general principles of international law.

…

The Applicant became the legal successor to Czechoslovakia on 1 January 1993, taking on its rights and    4
obligations under the BIT. Effective 1 May 2004, the Applicant became a Member of the European Union.

In the context of a health care reform, the Applicant opened the Slovak market to domestic and foreign providers    5
of private health insurance in 2004. Thereupon, the Respondent was registered as a health insurer in Slovakia. The Respondent founded Union Insurance a.s. there and, according to its submissions, invested the equivalent of approx. EUR 72 million in cash contributions into it over the course of 2006 and, through it, offered private health insurance. Following a change of government in 2006, the Applicant partially reversed the liberalisation of the health insurance market. The law of 12 December 2006 prohibited the use of insurance brokers, the law of 25 October 2007 prohibited the distribution of profits from health insurance operations and the law of 28 April 2009 prohibited the sale of insurance portfolios. In its ruling of 26 January 2011, the Slovak Constitutional Court held the prohibition of profit distributions to be unconstitutional. In the new statutory health insurance provisions that came into force on 1 August 2011, the Applicant again permitted profit distributions.

The Respondent asserts that it suffered losses in the range of tens of millions due to the Applicant's statutory    6
regulatory measures. In October 2008, the Respondent initiated arbitration proceedings against the Applicant, in

which it claimed damages for violation of its rights under the BIT. In the arbitration proceedings, Frankfurt am Main was determined as the place of the proceedings in agreement with the parties.

In the arbitration proceedings, the Applicant objected to the lack of jurisdiction of the arbitral tribunal. It argued that, with its accession to the European Union, the offer to conclude an arbitration agreement contained in Art. 8(2) BIT had become invalid because it was incompatible with EU law and thus inapplicable. In an interim ruling, dated 26 October 2010, the arbitral tribunal affirmed its jurisdiction. By Order of 10 May 2012, the Higher Regional Court rejected the Applicant's request for a declaration that the arbitral tribunal did not have jurisdiction. The Applicant's appeal against the order was unsuccessful, because the Federal Court of Justice (BGH) rejected the application against the interim ruling on the grounds of inadmissibility, given that an arbitral award had been made in the main proceedings (BGH, Order of 30 April 2014 - III ZB 37/12, *Zeitschrift für Schiedsverfahren* (hereinafter: SchiedsVZ) 2014, 200).

7

In its arbitral award of 7 December 2012, the arbitral tribunal ordered the Applicant to pay EUR 22.1 million plus interest. The Applicant applied to the Higher Regional Court for the award to be set aside. The Higher Regional Court rejected the application (OLG Frankfurt am Main, Order of 18 December 2014 - 26 Sch 3/13, juris). In the appeal at hand against that decision, the Applicant continues to seek the setting aside of the arbitral award. The Respondent has requested that the appeal be dismissed.

8

By Order of 3 March 2016, this Senate [of the Federal Court of Justice] referred the following questions to the Court of Justice of the European Union (CJEU) for a preliminary ruling (BGH, SchiedsVZ 2016, 328):

9

1.  Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?

If Question 1 is to be answered in the negative:

2.  Does Article 267 TFEU preclude the application of such legislation?

If Questions 1 and 2 are to be answered in the negative:

3.  Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?

The Court of Justice of the European Union ruled on these questions in its Judgment of 6 March 2018 - C-284/16 as follows (CJEU, SchiedsVZ 2018, 186 -Achmea):

10

Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

B. The Higher Regional Court did not find any reason to set aside the award. In reaching this conclusion, it notes:

11

The arbitration clause in Article 8(2) BIT is valid because it is compatible with EU law. It is not contrary to the exclusive nature of the EU dispute settlement mechanisms provided for in Article 344 TFEU, because the EU treaties do not provide for specific judicial proceedings with regard to disputes between a private investor and a Member State. Article 344 TFEU does not constitute a general "competence safeguarding rule" in respect of the Court of Justice of the European Union. The arbitration clause is also compatible with Article 267 TFEU. It is true that the arbitral tribunal is not entitled to refer to the Court of Justice of the European Union questions of relevance for its decision relating to the interpretation or application of EU law. According to the CJEU's case-law, however, the review of an arbitral award by the national courts – with a standard of review limited in national law to setting aside an award or refusing to recognise it – is sufficient to ensure the uniform interpretation and application of EU law in the Member States. If necessary, a reference for a preliminary ruling from the national courts to the CJEU could be made.

12

The award is also not to be set aside on the basis of an infringement of the *ordre public* EU law provisions.

13

C. The appeal is admissible (§ 574(1) sentence 1 no. 1 German Code of Civil Procedure (hereinafter: ZPO) in conjunction with § 1065(1) sentence 1, § 1062(1) no. 4 case 1 ZPO) and otherwise receivable (§ 574(2) no. 1 ZPO). It is also well-founded. In accordance with the decision of the Court of Justice of the European Union, issued as the result of a request for a preliminary ruling by the Senate [this Court], there is no arbitration agreement between the parties. The award must therefore be set aside (§ 1059(2) no. 1 letter a ZPO).

14

1. Pursuant to § 1059(2) no. 1 letter a ZPO, an award may be set aside if the Applicant reasonably submits that the arbitration agreement is invalid under the law which the parties have agreed will govern it or, if the parties have not made any such provision, under German law. The absence of an arbitration agreement is equivalent to its invalidity (cf. Schwab/Walter, Schiedsgerichtsbarkeit, 7th ed., chap. 24, para. 7; Lachmann, Handbuch für die Schiedsgerichtspraxis, 3rd ed., para. 2184).

15

1. The provision in § 1059 ZPO is applicable to the case at hand. The decision of the arbitral tribunal of 7 December 2012 is a domestic arbitral award. Pursuant to § 1025(1) ZPO, the provisions of §§ 1025 to 1066 ZPO shall apply if the place of arbitration is, within the meaning of § 1043(1) ZPO, in Germany. In accordance with § 1043(1) sentence 1 ZPO, the parties established Frankfurt am Main as the place of arbitration.

16

2. In the case at hand, the arbitration agreement could only have been concluded on the basis of the Respondent's application for the initiation of arbitration proceedings of 1 October 2008 in conjunction with Article 8(2) BIT. The provision of Article 8(2) BIT constitutes an agreement in favour of the investors of the contracting states and provides them with the possibility of choosing whether to initiate arbitration proceedings or proceedings before a national court in an investment dispute against the other contracting state (cf. Düsseldorf Higher Regional Court, SchiedsVZ 2006, 331, 333 [juris para. 28]; Frankfurt am Main Higher Regional Court, SchiedsVZ 2013, 119, 122 [juris para. 17]). Article 8(2) BIT thus contains an offer by the contracting states to conclude arbitration agreements with the investors of the other contracting state which the respective investor may accept expressly or by implication (cf. Düsseldorf Higher Regional Court, SchiedsVZ 2006, 331, 333 et seq. [juris para. 28]; Happ, IStR 2006, 649, 650; Markert, Streitschlichtungsklauseln in Investitionsschutzabkommen, 2010, p. 120). As the Higher Regional Court correctly recognised in its ruling of 10 May 2012, the Respondent accepted this offer by initiating arbitration proceedings (cf. Frankfurt am Main Higher Regional Court, SchiedsVZ 2013, 119, 122 [juris para. 73]).

17

3. Given that the arbitral tribunal was constituted only after the Applicant's accession to the European Union, pursuant to Art. 8(6) BIT, the law applicable to the Applicant for arbitral proceedings is, in particular, the EU law which enjoys primacy in its territory. This also applies in respect of the question of whether the jurisdiction of the arbitral tribunal was effectively established by the arbitration agreement or whether the arbitration agreement is invalid on the basis of conflict with EU law.

18

II. The appeal successfully claims that the Applicant's option of having an arbitral tribunal settle an investment dispute with the Respondent pursuant to Article 8(2) of the BIT is incompatible with the system of legal protection in the European Union enshrined in Articles 344 and 267 TFEU.

19

1. After the Applicant's accession to the European Union on 1 May 2004, the BIT constitutes an intra-EU agreement between Member States. According to the case-law of the Court of Justice of the European Union, in the areas governed by EU law, the provisions of EU law take precedence over provisions agreed in other agreements between the Member States prior to their entry into force in the event of a conflict of laws (see ECJ, Judgment of 27 September 1988 - 235/87, ECR 1988, 5589, para. 22 - Matteucci, with further references). An agreement concluded by one Member State with another State cannot apply in the relations between those States after the accession of the second State to the European Union, to the extent that it is contrary to EU law (cf. ECJ, Judgment of 10 November 1992 - C-3/91, ECR 1992, I-5529 = GRUR Int. 1993, 76, para. 8 - Exportur; Judgment of 8 September 2009 - C-478/07, ECR 2009, I-7721 = GRUR 2010, 143 para. 98 - American Bud II; Judgment of 21 January 2010 - C-546/07, ECR 2010, I-439 = EuZW 2010, 217, para. 44 - Commission v Germany).

20

2. With regard to the questions referred to it by the Senate [this Court], the Court of Justice of the European Union notes:

21

As is apparent, in particular, from Article 344 TFEU, an international agreement should not impair the autonomy of the EU legal order. In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties established a judicial system intended to ensure the consistency and uniformity in the interpretation of EU law. The keystone of that judicial system is the preliminary ruling procedure provided for in Article 267 TFEU, which secures the uniform interpretation of EU law (CJEU, SchiedsVZ 2018, 186, paras. 32, 35, 37 - Achmea).

22

As part of the law of the Applicant, the arbitral tribunal may, in accordance with Article 8(6) BIT, be called upon to interpret or indeed to apply EU law, particularly the provisions on freedom of establishment and free movement of capital (CJEU, SchiedsVZ 2018, 186, paras. 39 to 42 - Achmea), but it is not a court entitled to make a reference to the CJEU under Article 267 TFEU (CJEU, SchiedsVZ 2018, 186 paras. 43 to 49 - Achmea). The arbitral award made by such a tribunal is also not subject to any review by a court of a Member State, ensuring that the questions of EU law which the tribunal may have to address can be submitted to the CJEU by means of a reference for a preliminary ruling. Pursuant to Article 8(5) of the BIT, the arbitral tribunal shall itself choose its seat and consequently the law applicable to the procedure governing judicial review of the validity of the award. In addition, judicial review of the award can only be exercised by a court of a Member State to the extent permitted by national law. § 1059(2) ZPO, however, provides only for limited review, concerning in particular the validity of the arbitration agreement under applicable law and the consistency with public policy of the recognition or enforcement of the award (CJEU, SchiedsVZ 2018, 186 paras. 50-53 - Achmea).

23

It is true that, in relation to commercial arbitration, the CJEU has held that the requirements of efficient arbitration proceedings justify the fact that the review of arbitration awards by the courts of the Member States is limited in scope, provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference to the CJEU for a preliminary ruling. However, the arbitration proceedings in Article 8 BIT are different from commercial arbitration proceedings because they do not originate in the freely expressed wishes of the parties but rather derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, disputes which may concern the application or interpretation of EU law. Thus, the considerations justifying a limited review of commercial arbitration awards by national courts cannot be applied to arbitration proceedings under Article 8 BIT (CJEU, SchiedsVZ 2018, 186, paras. 54 et seq. - Achmea). Unlike in the cases of the EEA Agreement, the Agreement establishing a unified patent litigation system and the accession of the EU to the ECHR, the submition of disputes to an arbitral tribunal referred to in Article 8 BIT is provided for by an agreement which was concluded not by the EU, but by Member States. Article 8 BIT is such as to call into question not only the principle of mutual trust between Member States but also the preservation of the particular nature of the law established by the Treaties as guaranteed by Article 267 TFEU, and is therefore not compatible with the EU law principle of sincere cooperation between the Member States (CJEU, SchiedsVZ 2018, 186 paras. 57 and 58 - Achmea).

24

3. Thus, if Art. 8(2) BIT contradicts Art. 267 and Art. 344 TFEU, the provision is inapplicable (see ECJ, ECR 1988, 5589, para. 22 - Matteucci; GRUR Int. 1993, 76 para 8 - Exportur; GRUR 2010, 143, para. 98 - American Bud II; EuZW 2010, 217, para. 44 - Commission v Germany) and no valid arbitration agreement has been concluded between the parties.

25

(a) It is true that, given its bilateral nature, Article 8(2) BIT is only inapplicable since the accession of the Applicant to the EU in the relationship between the Slovak Republic and the Netherlands. However, this means that neither Contracting Party to Art. 8(2) BIT could effectively undertake towards the other Contracting Party to consent to submit a dispute referred to in Art. 8(1) BIT to an arbitral tribunal. There thus was never an offer by the Applicant to conclude an arbitration agreement with the investors from the Netherlands which the Respondent could have accepted.

26

(b) Consequently, contrary to the opinion of the Higher Regional Court in the Order of 10 May 2012, an arbitration agreement between the parties could not be concluded by the Respondent's initiating arbitration proceedings and appointing an arbitrator. If the requisite consent of the Applicant to the arbitration proceedings is lacking, the arbitral award made in the present proceedings pursuant to § 1059(2) no. 1 letter a ZPO must be set aside because no arbitration agreement exists between the parties.

27

c) The Respondent correctly submits that the decision of the Court of Justice of the European Union concerns only the content of the BIT between the Applicant and the Netherlands and not the question of whether the parties have concluded a valid arbitration agreement. In the present case, however, the BIT is inextricably linked to the arbitration agreement. The only thing which can be considered an offer by the Applicant to conclude an

28

arbitration agreement with the Respondent is the declaration to the Netherlands pursuant to Art. 8(2) BIT. However, in accordance with the decision of the Court of Justice of the European Union, that declaration cannot have any effect. Thus, there can be no finding of an offer to conclude an arbitration agreement with the Respondent.

4. The objections raised by the Respondent following the decision of the Court of Justice of the European Union against the setting aside of the award are unsuccessful.                                                        29

a) The Respondent asserts, without success, that since the Court of Justice of the European Union held the provision on the law applicable by the arbitral tribunal pursuant to Article 8(6) BIT to be objectionable, the validity of the arbitration agreement under Article 8(2) BIT is unaffected.                                       30

The CJEU found that what constituted a breach of EU law was that an investor from one of the contracting parties may, in the event of a dispute concerning investments in the territory of the other contracting party, bring proceedings against the latter party before an arbitral tribunal (CJEU, SchiedsVZ 2018, 186, para. 60 - Achmea). This statement clearly refers to the consent in Art. 8(2) BIT to submit disputes to an arbitral tribunal. By contrast, the Court's decision only addresses Article 8(6) BIT only to the extent that the fact that the arbitral tribunal must apply EU law, where appropriate, arises from its obligation to take into account EU law as the law of the contracting party concerned.                                                                               31

b) Contrary to the Respondent's view, it is immaterial whether or not, in the dispute at issue, the arbitral tribunal in fact applied EU law or was required to apply it. With regard to the question whether an arbitration agreement exists between the parties, the only relevant issue is whether the Applicant was capable, in Art. 8(2) BIT, to make a valid offer to the Respondent to conclude an arbitration agreement. According to the decision of the Court of Justice of the European Union, this was not the case, irrespective of whether or not the arbitral tribunal had to apply EU law in the given dispute.                                                                               32

c) The decision of the Court of Justice of the European Union is not based on a misunderstanding of German arbitration law.                                                                                                    33

aa) It can remain undecided here whether the Senate [this Court] correctly assumed in para. 52 of its order for reference (SchiedsVZ 2016, 328) that the mention of UNCITRAL in Article 8(5) BIT precludes an arbitral tribunal from requesting, pursuant to § 1050 sentence 1 ZPO, that a German court submit to the CJEU a question on the interpretation of EU law considered to be material in the arbitration proceedings. The Respondent submits that a distinction must be made between the UNCITRAL Arbitration Rules and the UNCITRAL Model Law. Whereas, under Art. 27 of the UNCITRAL Model Law, an arbitral tribunal may only request assistance from a state court for the taking of evidence, the UNCITRAL Arbitration Rules do not contain any provisions to that effect, so that the Code of Civil Procedure (ZPO) applies with the possibility of referral under § 1050 ZPO. This is of no relevance because this consideration is of no significance for the CJEU's decision.                              34

bb) The Court of Justice of the European Union begins by noting the significance of the fact that the arbitral tribunal in the dispute at hand is not part of the existing judicial system in the Netherlands or in Slovakia and cannot be classified as a court "of a Member State" within the meaning of Art. 267 TFEU (CJEU, SchiedsVZ 2018, 186 paras. 45 f., 49 - Achmea). The CJEU then examines whether the award is subject to review by a court of a Member State which ensures the opportunity to clarify questions of EU law by way of the preliminary ruling procedure provided for in Article 267 TFEU. The CJEU notes that only the choice of Frankfurt am Main as the place of arbitration allowed the Applicant to apply to a German court to review the arbitral award. Judicial review can be exercised only to the extent permitted by national law; § 1059(2) ZPO provides only for a limited review (CJEU, SchiedsVZ 2018, 186 paras. 50-53 - Achmea). To the extent that the CJEU considered a limited reviewability of arbitral awards to be sufficient in the area of commercial arbitration, these considerations cannot be applied to arbitration proceedings such as those under Article 8 BIT (CJEU, SchiedsVZ 2018, 186 para. 54 f. - Achmea).                                                                                                 35

The question whether the arbitral tribunal constituted under Art. 8 BIT is empowered in a specific case to make a referral to the Court of Justice of the European Union for a preliminary ruling via a national court is not mentioned in the grounds of the CJEU's judgment. Rather, the CJEU does not consider it sufficient that judicial review can only be exercised to the extent that national law permits it in the specific case. Accordingly, it is irrelevant whether the arbitral tribunal, in accordance with the German law applicable in the present case by reason of the choice of Frankfurt am Main as the place of arbitration, could have referred to the CJEU, via a       36

German court, a question on the interpretation of EU law considered to be material in the arbitration proceedings.

d) Contrary to the Respondent's view, in the dispute at hand it is not important whether Article 267 and Article 344 TFEU are prohibition laws within the meaning of § 134 BGB (German Civil Code). The invalidity of a contract concluded by two parties is not at issue, but rather the question of whether one party has even made any offer at all to conclude an arbitration agreement. The Applicant was prevented from doing so by reason of EU law. Thus, already there is no legal transaction here which could be void pursuant to § 134 BGB.   37

e) Contrary to the Respondent's assertion, it is irrelevant that the arbitration agreement alleged by the Respondent would be of a private legal nature. It is also irrelevant whether the arbitral tribunal conducted commercial arbitration proceedings.   38

The Court of Justice of the European Union did not look to the characteristics of the procedure followed by the arbitral tribunal after its constitution, but rather looked to the fact that, in a commercial arbitration, the arbitration agreement leading to the constitution of the arbitral tribunal is based on party autonomy, whereas in the case of the BIT, two Member States, as contracting parties, agreed to withdraw from the jurisdiction of their courts certain disputes that could affect the application and interpretation of EU law. The principles recognised by the Court with regard to a valid agreement on commercial arbitration can thus not be applied to arbitration proceedings under Art. 8 BIT (CJEU, SchiedsVZ 2018, 186 para. 55 - Achmea).   39

f) The Respondent argues to no avail that the decision of the Court of Justice of the European Union does not alter the effectiveness, under international law, of the BIT with regard to the relationship between the Respondent and the Netherlands, so that, in the absence of any termination of the BIT, the arbitration clause between the parties also remains effective.   40

As the Senate [this Court] already stated in its order for reference (BGH, SchiedsVZ 2016, 328, para. 85), by acceding to the EU, the Member States have limited their discretionary powers under international law and have mutually agreed to renounce the exercise of any international treaty rights which conflict with EU law (cf. ECJ, Judgment of 12 February 2009 - C-45/07, ECR 2009, I-701, para. 17 - Commission v Greece). In view of this, the primacy of the provisions of EU law has the consequence that a rule in an intra-EU agreement between Member States which is incompatible with EU law is also inapplicable as a rule in an international treaty (cf. Tietje, KSzW 2011, 128, 130 f.; Lavranos in von der Groeben/Schwarzen/Hatje, Europäisches Unionsrecht, 7th ed., Art. 351 TFEU para. 7; Schmalenbach in Calliess/Ruffert, EUV/ AEUV, 5th ed., Art. 351 TFEU para. 9; differing view, Lock, Das Verhältnis zwischen dem EuGH und internationalen Gerichten, 2010, p. 205 f.). The nationals of the Member States concerned cannot rely on the Member States' prior international law obligations that are contrary to EU law (see ECJ, Judgment of 8 December 1981 - 180/80 and 266/80, ECR 1981, 2997 para. 20 - Crujeiras Tome and Yurrita).   41

III. Good faith (*Treu und Glauben* (§ 242 BGB)) does not prevent the Applicant from invoking the invalidity of the arbitration agreement. Even so, it can be assumed in favour of the Respondent that – as regards the objection in the present case that there was no arbitration agreement – § 242 BGB would apply as part of the procedural *ordre public*.   42

1. Having said that, under German law, a party may be in violation of the principle of good faith by emphatically and unrestrictedly invoking an allegedly concluded arbitration agreement prior to the proceedings, thereby prompting its contractual partner to bring an arbitration action, but then asserting in the arbitration proceedings and in the judicial proceedings for a declaration of enforceability of an arbitral award to its detriment that a valid arbitration agreement had not been concluded (BGH, Judgment of 2 April 1987 - III ZR 76/86, NJW-RR 1987, 1194, 1195, [juris para. 13]; Order of 16 March 2017 - 1 ZB 49/16, SchiedsVZ 2018, 37 para. 32 f.). Yet the dispute at issue neither corresponds to this example nor is it comparable in terms of valuation. It can therefore be left unanswered whether the Respondent's claim based on good faith should be refused already because recognising it would be incompatible with the obligation of Member States to apply EU law effectively, since assigning disputes to an arbitral tribunal in a BIT, in contravention of EU law, would then prove to be *de facto* effective, at least to a large extent, to the benefit of the investors.   43

2. The Applicant did not create a legitimate expectation (*Vertrauenstatbestand*) upon which the Respondent could rely in good faith.   44

a) The BIT between the Applicant and the Netherlands entered into force on 1 October 1992. The validity of the arbitration clause in Art. 8(2) BIT could only be called into question as of 1 May 2004, following the Applicant's accession to the European Union. The Respondent's investments did not occur until after accession. As the Senate [this Court] already held in para. 76 of its order for reference (BGH, SchiedsVZ 2016, 328), the Respondent had to take into consideration the fact that EU law, which from then on took precedence in the relationship of the contracting parties, could have an effect on the provisions of the BIT.

45

b) The Respondent also fails to show that, after its accession to the EU, the Applicant indicated vis-à-vis the Respondent that it would protect investors generally or specifically in accordance with the arbitration clause of the BIT.

46

The fact that the Commission did not object to existing BITs at the time of the accession of the new Member States (cf. Opinion of Advocate General Wathelet in CJEU - C-284/16, paras. 40-43 - Achmea) could not create a legitimate expectation for the Respondent, attributable to the Applicant.

47

Such a legitimate expectation also does not arise from the fact that the Applicant, after joining the EU, did not express any doubts as to the validity of the BIT.

48

Furthermore, the creation of an investment-friendly environment following the accession to the EU does not allow any conclusion to be drawn as to the explicit recognition of the arbitration clause by the Applicant. In particular, a policy encouraging investment could easily be the result of accession of the EU, which a new Member State will regularly expect to provide economic stimulus.

49

The inclusion of the BIT in the list of the Applicant's existing contracts, even after accession to the EU, is also not a basis from which the Respondent can derive legitimate expectations in view of the recognition of the arbitration clause by the Applicant. Inclusion in this list is not tied to a specific message on the validity of the arbitration clause, and all the less so, given that the BIT is not necessarily or obviously rendered invalid as a whole if the arbitration clause is void.

50

The fact that the BIT has not yet been terminated by the Applicant does not give rise to any legitimate expectations for the Respondent with regard to the arbitration clause. The Applicant was not and is not prevented from taking the legal view that the BIT remains valid with the exception of the arbitration clause.

51

Contrary to the Respondent's submission, the letter of 14 April 2008 from the Applicant's then Minister of Finance does not contain any express recognition of the arbitration proceedings with regard to the present dispute. The letter merely expresses the wish of the then Minister of Finance to seek amicable settlement of the dispute within the meaning of Art. 8(1) BIT, but does not contain any recognition of the jurisdiction of the arbitral tribunal or the permissibility of arbitration proceedings pursuant to Art. 8(2) BIT.

52

Finally, the fact that the claimant entered into negotiations with the Respondent for the amicable settlement of the dispute could not create legitimate expectations for the Respondent with regard to the recognition of the arbitration clause by the Applicant. The Applicant was already obliged to negotiate an amicable settlement of the dispute with the investor pursuant to Art. 8(1) BIT. The validity of this provision is not called into question if the provisions following Art. 8(1) BIT, particularly Art. 8(2) BIT, are inapplicable by reason of EU law.

53

3. The Respondent has also failed to substantiate any contradictory conduct which would prevent the Applicant in good faith from invoking the absence of an arbitration agreement.

54

a) Contradictory conduct by a party is, in principle, permissible. It only becomes an abuse of rights if a legitimate expectation has been created vis-à-vis the other party or if other special circumstances make the exercise of the right appear to be contrary to good faith. An exercise of rights may be impermissible if the overall picture objectively shows contradictory conduct, on the grounds that the earlier conduct is factually incompatible with the later conduct and that the interests of the opposing party appear to be more worthy of protection (BGH, Judgment of 15 November 2012 - IXZR 103/11, NJW-RR 2013, 757 para. 12). It should be noted that this is a narrow exception (BGH, NJW-RR 2013, 757 para. 13).

55

b) In the dispute at hand, no legitimate expectation for the Respondent was created (cf. paras. 44 to 53). There are also no special circumstances which made the exercise of the right appear to be contrary to good faith.

56

aa) To the extent that, in disputes with other investors, the Applicant has not invoked the inapplicability of the arbitration clause on the grounds of a contravention of EU law, this shall not have the effect of constituting contradictory conduct in bad faith vis-à-vis the Respondent. A party is, in principle, free to pursue different strategies in disputes with different opposing parties. In the cases cited by both parties, Austrian Airlines and HICEE, the arbitral tribunals also declared themselves to have no jurisdiction because the content of the claims at issue there was not covered by the arbitration clause of the BIT. There was thus no reason to assert the invalidity of the arbitration clauses under EU law.

57

bb) In the present arbitration proceedings, upon filing the arbitration claim in October 2008, the claimant immediately objected to the arbitral tribunal's lack of jurisdiction on the grounds that Art. 8(2) BIT had become invalid upon the Applicant's accession to the EU. The Applicant has maintained this view unchanged since then. As outlined above (cf. paras. 48 to 53), at no time in the time between the Applicant's accession to the EU and the filing of the arbitration claim in the present proceedings, which is the only relevant period in this respect, did the conduct of the Applicant justify a legitimate expectation on the part of the Respondent to the effect that it would recognise the arbitration agreement as valid.

58

4. The Respondent asserts, without success, that the Applicant acquired its legal position through an abuse of rights (*rechtsmissbräuchlich*). The possibility for the Applicant to successfully rely on the absence of an arbitration agreement results from the interpretation of EU law which the Court of Justice of the European Union considers to be correct in the present proceedings. That does not constitute an abuse of rights.

59

IV. Contrary to the Respondent's proposal in the written statements of 14 September and 29 October 2018, the Senate [this Court] will not consider referring the decision of the Court of Justice of the European Union of 6 March 2018 - C-284/16 to the Federal Constitutional Court (*Bundesverfassungsgericht*) pursuant to Art. 100(1) or (2) of the Basic Law (*Grundgesetz*) in order to have it declared it inapplicable.

60

1. A direct application of Article 100(1) of the Basic Law to decisions of the Court of Justice of the European Union is precluded by the wording of the provision. It states that only a statute may be submitted. Whether and under what conditions an analogous application of Article 100(1) of the Basic Law might be considered for an *ultra vires* review in very exceptional cases (cf. *Entscheidungen des Bundesverfassungsgerichts* (hereinafter: BVerfGE) 123, 267, 354 f. [juris para. 241]) does not need to be decided in the present case.

61

2. In its decision, the CJEU did not act *ultra vires*, but rather answered the questions referred by the Federal Court of Justice to the extent that it deemed this necessary, in accordance with the division of jurisdiction between it and the national courts pursuant to Article 267 TFEU.

62

(a) The *ultra vires* review examines whether legal acts of the European institutions and bodies respect the EU law principle of subsidiarity (Art. 5(1) sentence 2 and (3) TEU) within the limits of the sovereign rights granted to them by way of conferral. Beyond that, the identity review serves to examine whether the inviolable core content of the Basic Law's constitutional identity in Article 23(1) sentence 3 in conjunction with Article 79(3) of the Basic Law is maintained (cf. BVerfGE 123, 267, 353 f. [juris para. 240]; 142, 123, 203 para. 153).

63

The ultra vires review as well as identity review only come into play with regard to "sufficiently qualified" infringements. For this to be the case, the challenged act must result from an obvious exceeding of competences and must carry considerable weight in the structure of competences between the Member States and the EU as regards the principle of conferral and the rule of law (cf. BVerfGE 126, 286, 304 [juris para. 61]; 142, 123, 200 para. 147). In relation to the Court of Justice of the European Union, this would only be the case if a decision exceeded the boundaries of arbitrariness in the interpretation of the Treaties (cf. BVerfGE 126, 286, 307 [juris, para. 66]; 142, 123, 200 f., para. 149 f.).

64

b) According to these principles, there is no basis in the case at hand for an ultra vires review by the Federal Constitutional Court. In any case, the decision of the Court of Justice of the European Union is not based on an arbitrary interpretation of Articles 267 and 344 TFEU. It was issued in the context of a preliminary ruling procedure under Article 267 TFEU and is thus within the scope of the powers conferred to the Court of Justice of the European Union under Article 23(1) second sentence of the Basic Law.

65

3. It is not apparent that in its assessment the Court of Justice of the European Union disregarded the arguments put forward by the Senate [this Court] and Advocate General Wathelet. It simply did not agree with them. Moreover, the CJEU's jurisdiction would remain unaffected, even if it were to have disregarded arguments. If the Senate were of the view that its arguments had not been heard by the CJEU, a new reference for a

66

preliminary ruling would have to be considered. The CJEU's acting ultra vires, however, would be out of the question. The Senate sees no grounds for a new reference for a preliminary ruling in the case at hand.

4. Contrary to the Respondent's view, the Judgment of the Court of Justice of the European Union of 6 March 2018 (SchiedsVZ 2018, 186 - Achmea) does not constitute a general rule of international law, which is integrated into federal law pursuant to Art. 100(2) of the Basic Law and could thus be the subject of a reference to the Federal Constitutional Court.

67

a) The constitutional law term "general rules of international law" encompasses the norms of universal customary international law – that is to say those norms of international law which, on the basis of general practice and a corresponding general legal conviction, are binding on the vast majority of states – as well as the general principles of law supplementing customary international law (cf. BVerfGE 15, 25, 32 f. [juris para. 37]). Stringent requirements must be placed on the establishment of a general rule of international law on account of the fundamental obligation of all states expressed therein (BVerfGE 118, 124, 137 [juris paras. 30 et seq.]; Heintschel von Heinegg in BeckOKGG, 38th ed., Art. 25 GG para. 19). This universal character does not lend itself to a decision of the Court of Justice of the European Union because its territorial effect is limited to the territory of the EU. Instead, the judgments of the Court of Justice of the European Union interpret EU law, which, on the territory limited to the Community, has created an autonomous legal order in relation to national law.

68

b) The Respondent's submission regarding the decision of the ICSID arbitral tribunal in the case ARS 12/12 - Vattenfall et al. / Federal Republic of Germany of 29 August 2018 and the statements of the Federal Republic of Germany and the European Commission reproduced therein do not lead to a different conclusion. In its submission reproduced under para. 84 of that decision, the Commission explains that the significance of the CJEU's decision in Case C-284/16 (SchiedsVZ 2018, 186 - Achmea) as regards the Vattenfall proceedings lies in the autonomy of the legal system of the EU. The German Federal Government, in paragraph 10 of the "Vattenfall" proceedings, stated that the ICSID Arbitral Tribunal would decide the dispute in accordance with the Energy Charter Treaty and the applicable rules and principles of international law, including EU law and the decision of the Court of Justice of the European Union in Case C-284/16 (SchiedsVZ 2018, 186 - Achmea). The ICSID arbitral tribunal joined this view in para. 150 of the decision.

69

It does not follow from this that judgments of the Court of Justice of the European Union are suitable subjects for referral [to the Federal Constitutional Court] under Art. 100(2) of the Basic Law. According to the system of the Basic Law and the decision-making practice of the Federal Constitutional Court, Art. 100(2) of the Basic Law only permits a referral if there are serious doubts as to the meaning or scope of a general rule of international law (BVerfG [Kammer], EuGRZ 2016, 54, 60 para. 53; NJW 2012, 293, 295 [juris para. 27], each with further references). The explicit reference to Art. 25 of the Basic Law in Art. 100(2) of the Basic Law makes it clear that only questions on the general rules of international law which are integrated into federal law can be the object of a referral (cf. Dederer in Maunz/Dürig, GG, version: April 2018, Art. 100, para. 292). Independent interpretations of EU law by the Court of Justice of the European Union do not constitute general rules of international law on account of their character as decisions taken in respect of individual cases.

70

c) Extending the possibility of referral under Article 100(2) of the Basic Law to questions concerning the meaning or scope of decisions of the Court of Justice of the European Union would also entail a very far-reaching extension of the power of the Federal Constitutional Court to examine acts of the institutions of the European Union, which is incompatible with the primacy of EU law, and which is currently limited to the observance of the fundamental constitutional principles of the Federal Republic of Germany (cf. BVerfGE 142, 123 para. 115 et seq.).

71

V. Lastly, the decision of the Court of Justice of the European Union of 6 March 2018 does not deprive the Respondent of effective legal protection. The judgment of the CJEU is based on the premiss that, in light of the principle of mutual trust between the Member States regarding the recognition of the common values of the Union (Article 2 TEU) and respect for EU law (cf. ECJ, SchiedsVZ 2018, 186 para. 34 - Achmea), the Respondent, as an investor, could obtain effective legal protection before the courts of Slovakia. The decision of the CJEU and the subsequent setting aside of the arbitral award in the case at issue is in no way tied to the deprivation of material claims of the Respondent. Also, no proprietary interest will be taken from the Respondent as a result of the setting aside of the arbitral award in the dispute at hand.

72

D. The Senate's decision is rendered without an oral hearing. While § 128(4) ZPO does in principle provide for the possibility of oral proceedings in the case of legal appeals pursuant to § 1065(1), § 577(6) first sentence ZPO, following the preliminary ruling of the Court of Justice of the European Union, there was no need for such a hearing.

73

E. The decision on costs is based on § 91 (1) ZPO.

74

Koch   Feddersen   Schaffert   Schmaltz   Kirchhoff

Previous instance:

Frankfurt am Main Higher Regional Court, Decision of 18.12.2014 - 26 Sch 3/13 -

# Exhibit F



EUROPEAN COMMISSION

Brussels, 10.11.2017
C(2017) 7384 final

---

PUBLIC VERSION

This document is made available for
information purposes only.

---

**Subject:**     **State aid SA.40348 (2015/NN) — Spain**
**Support for electricity generation from renewable energy sources,**
**cogeneration and waste**

Sir,

1. **PROCEDURE**

(1)     On 22 December 2014, the Spanish authorities notified the Commission, pursuant to Article 108(3) of the Treaty on the Functioning of the European Union (TFEU), about its specific remuneration scheme ('*regimen retributivo específico*', hereinafter referred to as 'the scheme') to support electricity generation from renewable energy sources, cogeneration and waste. As Spain implemented the scheme before it notified the Commission, the case was transferred to the register of unlawful aid. Subsequently, a number of exchanges took place between the Commission and the Spanish authorities.

(2)     In the course of the investigation, the Commission received submissions from investors that had made investments in electricity generation from renewable energy sources in Spain in the years 2007 to 2012. The Commission also received a submission from an association of producers of electricity from renewable energy sources.

(3)     On 25 September 2017, Spain waived its right under Article 342 TFEU in conjunction with Article 3 of Regulation (EEC) No 1/1958 to have the decision in this procedure adopted in Spanish and agreed that the decision be adopted and notified in English.

His Excellency Mr. Alfonso María Dastis Quecedo
Minister for Foreign Affairs and Cooperation
Plaza de la Provincia 1
28012 Madrid
Spain

2. **DETAILED DESCRIPTION OF THE MEASURE**

### 2.1. Background, objectives of the scheme, legal basis and granting authority

(4)     The scheme replaces and supersedes the *premium* economic scheme ('*régimen económico primado*'), which was governed by Royal Decrees 661/2007[1] and 1578/2008.[2] Payments under the premium economic scheme are covered by the decision in order to assess proportionality, *i.e.* the absence of overcompensation.

(5)     The scheme aims to support the development of technologies that offer environmental benefits, but would not be economically viable without State support. It helps Spain to achieve its target of at least 20% of renewable energy in gross final consumption of energy by 2020 laid down in Directive 2009/28/EC of the European Parliament and of the Council. [3]

(6)     The following legislation forms the legal basis of the scheme:

   (a)     Royal Decree-Law 9/2013 of 12 July 2013[4], which repealed the laws applicable to the premium economic scheme and set out the principles for the new one.

   (b)     Law 24/2013 of 26 December 2013 on the electricity sector[5], which confirms those principles.

   (c)     Royal Decree 413/2014 of 6 June 2014[6], which regulates the production of electricity from renewable energy sources, cogeneration and waste[7] and further develops the principles set out in the electricity sector law. It entered into force on 11 June 2014.

---

[1]   Royal Decree 661/2007 of 25 May 2007 regulating the production of electricity under the special regime. Boletín Oficial del Estado (BOE) 126 if 26 May 2007. https://www.boe.es/buscar/act.php?id=BOE-A-2007-10556

[2]   Royal Decree 1578/2008 of 26 September 2008 on the remuneration of electricity production using solar photovoltaic technology for plants having missed the remuneration maintenance deadline for such technology pursuant to Royal Decree 661/2007 of 25 May 2007. BOE 234 of 27 September 2008, https://www.boe.es/buscar/doc.php?id=BOE-A-2008-15595.

[3]   Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC (OJ L 140, 5.6.2009, p. 16).

[4]   Royal Decree-law 9/2013 of 12 July 2013, adopting urgent measures to ensure the financial stability of the electricity system (BOE 167 of 13 July 2013, https://www.boe.es/buscar/doc.php?id=BOE-A-2013-7705). This law established the principles for the new scheme and that a Royal Decree would be adopted to develop those principles. It also repealed the laws applicable to the previous scheme but established that the compensation to existing beneficiaries would still be paid on a transitional basis on account of the new scheme payments, and would be settled by the regulator once the new regulations would be in place. Prior to the Royal Decree-Law 9/2013, Royal Decree 1/2012 of 27 January 2012 had abolished the entry of new facilities into the scheme, meaning that no new aid was granted between 8 January de 2012 and 8 July 2014.

[5]   BOE 310 of 27 December 2013, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2013-13645.

[6]   BOE 140 of 10 June 2014, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2014-6123.

[7]   The scope of this decision includes waste as covered by the definition of renewable energy source in Directive 2009/28/EC.

(d)    Order IET/1045/2014 of 16 June 2014[8], which regulates the standard plant remuneration parameters applicable to certain renewable energy, cogeneration and waste-to-energy power facilities.

(e)    Order IET/1459/2014 of 1 August 2014[9], which regulates the remuneration for new wind and photovoltaic facilities in the non-peninsular territories.

(7)    The granting authority is the Ministry of Energy, Tourism and Digital Agenda by way of its Directorate-General for Energy and Mining Policy. The National Commission for Markets and Competition (CNMC) is the body responsible for managing the settlement system and administering the payments.

### 2.2.   Financing of the scheme

(8)    The scheme is partly financed from the general State budget and partly from the network access tariffs and charges imposed on electricity consumers, also called 'electricity system revenues'. These revenues finance several schemes. In 2017, 38.29 % of the revenues serve to finance the specific remuneration scheme.

(9)    In 2015, the total cost of the scheme amounted to EUR 6 666.3 million. 46.88 % (EUR 3 125.8 million) was financed from the State budget and 53.11 % (EUR 3 540.6 million) from charges, of which 33 % were imposed on electricity consumption and 67 % on the connection capacity.

(10)    The supplier collects the charges together with the network access tariffs from consumers and transfers them to the relevant distributor, who in turn declares these amounts to CNMC. CNMC carries out monthly settlements on the costs and revenues declared by beneficiaries and the energy they have actually sold in the market. A final subsequent settlement may be carried out pursuant to the electricity sector legislation.

### Figure 1 — Financing method — outline

---

[8]    BOE 150 of 20 June 2014, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2014-6495.

[9]    BOE 189 of 5 August 2014, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2014-8447.



Source: Spanish authorities

(11)    The table below contains a breakdown of aid by technology for the year 2016:

| Technology | Installed capacity (MW) | Energy sold (GWh) | Energy eligible for premium (GWh) | Number of facilities | Total remuneration (EUR 000) | Average price of total remuneration (cent€/kWh) | Compensation for investments (EUR 000) | Compensation for operations (EUR 000) | Specific compensation (EUR 000) |
|---|---|---|---|---|---|---|---|---|---|
| Cogeneration | 5 997 | 23 793 | 23 793 | 1 056 | 1 859 083 | 7.752 | 58 606 | 826 612 | 885 218 |
| Solar PV | 4 674 | 7 942 | 7 871 | 61 386 | 2 739 437 | 34.493 | 2 284 847 | 147 238 | 2 432 085 |
| Thermo solar | 2 300 | 5 071 | 5 071 | 51 | 1 472 531 | 29.040 | 1 082 349 | 193 948 | 1 276 298 |
| Wind | 23 049 | 47 598 | 34 921 | 1 359 | 2 856 614 | 6.002 | 1 254 456 | 0 | 1 254 456 |
| Hydro | 2 102 | 5 814 | 2 412 | 1 093 | 285 403 | 4.909 | 77 242 | 0 | 77 242 |
| Biomass | 744 | 3 435 | 3 394 | 214 | 419 662 | 12.218 | 141 185 | 137 821 | 279 006 |
| Waste | 754 | 3 358 | 3 137 | 40 | 240 810 | 7.170 | 80 394 | 24 031 | 104 425 |
| Waste treatment | 628 | 1 636 | 1 633 | 51 | 152 776 | 9.341 | 888 | 85 469 | 86 357 |
| Other renewable technologies | 5 | 0 | 0 | 2 | 239 | 136.174 | 233 | 0 | 233 |
| Total | **40 253** | **98 834** | **82 232** | **65 252** | **10 026 554** | **10.145** | **4 980 201** | **1 415 119** | **6 395 320** |

Source: CNMC[10]

### 2.3.    Beneficiaries

#### *2.3.1.    Eligible facilities*

(12)    Royal Decree 413/2014 distinguishes between two facility types:

(a)    Facilities that are awarded the specific remuneration scheme following the entry into force of Royal Decree 413/2014 on 11 June 2014. In this decision these facilities are referred to as '*new* facilities'.

---

[10]    CNMC    monthly    statistics    on    special    regime    sales,    published    on    4    April    2017,    https://www.cnmc.es/en/node/361698.

(b)      Facilities that were already entitled to or were already receiving support from the premium economic scheme when Royal Decree-Law 9/2013 entered into force on 14 July 2013[11]. In this decision these facilities are referred to as '*existing* (supported) facilities'.

(13)   The actual beneficiaries are the entities owning and operating the facilities.

(14)   As regards the eligible technologies, the classification of facilities can be summarised as follows:[12]

(a)      Facilities that include a cogeneration plant,[13] including cogeneration from biomass and waste, natural gas, coal or oil products; facilities that use waste energy derived from any facility, machine or industrial process whose purpose is not the production of electricity.

(b)      Facilities that use renewable energy sources: solar thermal and photovoltaic, wind (onshore and offshore), geothermal, aerothermal, hydrothermal, wave, tidal, hot dry rock, ocean thermal and tidal energy; hydroelectric power plants; biomass;[14] bioliquids[15] produced from biomass; biogas[16,17].

(c)      Facilities that use at least 70 % of a waste-to-energy source not covered above (e.g. household and similar waste, other waste, facilities that use non-commercial grade products from mining operations as fuel for generating electricity due to their high sulphur or ash content) and facilities using black liquor.

(15)   The scheme only applies to the facilities where the feedstock meets the minimum requirements as mentioned in footnotes 13, 15, 17 and paragraph (14)(c) above. If a

---

[11]   See footnote 4.

[12]   Article 2 of Royal Decree 413/2014 contains the detailed classification of eligible facilities.

[13]   Most of the fuels mentioned must represent at least 90 % or 95 % of the primary energy used, measured according to the lower calorific value. Cogeneration facilities that use natural gas as fuel can use a lower percentage of this fuel as primary energy (at least 65 %) when the rest is obtained from biomass or biogas.

[14]   Biomass produced from: energy crops, farming, livestock or gardening activities; forest management and other forestry activities in forests and green areas; industrial facilities in the agricultural or forestry sector. Royal Decree 413/2014 defines biomass in the same terms as the Environmental and Energy State Aid Guidelines (EEAG) and requires that any biomass to be used as fuel must comply with the applicable legislation on biomass sustainability.

[15]   Liquid fuel used for energy purposes other than transportation, including use for the production of electrical energy, heating or cooling.

[16]   Biogas from anaerobic digestion of energy crops, agricultural waste, livestock excrement, biodegradable waste from industrial facilities, household waste and the like, or from sludge from wastewater treatment facilities or any other anaerobic digestion process; biogas recovered from controlled landfills. Biogas generated in digestion facilities may supply these facilities with up to 50 % of their primary energy.

[17]   Biomass, bioliquids and biogas plants must be at least 90 % of the primary energy used in the plant. This category excludes a number of fuels: fossil fuels (including peat and its by-products); wood or wood waste chemically treated or mixed with chemical products of inorganic origin; biomass, biogas or bioliquids polluted by toxic substances or heavy metals; paper and cardboard, textiles, animal corpses or parts thereof, when the law only provides for non-waste-to-energy disposal; and the biodegradable portion of industrial and municipal waste, except when derived from the forestry or livestock sectors.

facility does not meet such feedstock requirements in any given year, it receives the scheme payments only for the eligible portion. A second instance of non-compliance triggers a procedure to reclassify the facility under the group or subgroup that applies to the actual fuel consumption.

(16)    To be eligible, cogeneration facilities must meet the definition of high efficiency cogeneration facility set out in Article 2 of Royal Decree 616/2007 on the promotion of cogeneration[18] and provide evidence of the useful heat produced and used by the facility's system. Existing cogeneration facilities that have not been substantially refurbished and receive compensation for investments must also comply with similar energy efficiency requirements to be eligible under the scheme.[19]

(17)    The scheme only applies to two types of hybrid facilities: solar thermal facilities that also use biomass, bioliquids or biofuels; and facilities that use two or more types of biomass and/or black liquor where these, as a whole, represent at least 90 % of the aggregate annual amount of primary energy used, measured in accordance with the lower calorific value.

(18)    The scheme applies since 11 June 2014 throughout the Spanish territory to the technologies listed in paragraph (14). In the non-peninsular territories[20], the scheme coexists with another scheme, the 'additional remuneration scheme' established by Royal Decree 738/2015[21], which applies only to these territories and is not assessed in this decision.[22] From the entry into force of Royal Decree 738/2015 (1 September 2015), new facilities are eligible under one or the other scheme according to their flexibility. Wind facilities, photovoltaic facilities, and cogeneration facilities below 15 MW are considered as non-dispatchable and are therefore eligible for support under the specific remuneration scheme. Other renewable facilities[23] and larger cogeneration facilities are considered as dispatchable and are therefore eligible for support under the additional remuneration scheme. However, all renewable, cogeneration or waste

---

[18]  Royal Decree 616/2007 of 11 May 2007 on the promotion of cogeneration transposed Directive 2004/8/EC into the Spanish legal system. The requirements set in the Royal Decree for high efficiency cogeneration mirror those in Annex II of Directive 2012/27/EU of the European Parliament and the Council of 25 October 2012 on energy efficiency, amending Directives 2009/125/EC and 2010/30/EU and repealing Directives 2004/8/EC and 2006/32/EC (OJ L 315, 14.11.2012, p. 1).

[19]  These plants must have an equivalent electrical performance above a threshold, which varies between 49 % and 59 % depending on the technology. The equivalent electrical performance is an indicator of a plant's energy efficiency. According to the Spanish authorities, if a cogeneration facility meets the minimum equivalent electrical performance, it also meets in general the high efficiency requirements laid down in Directive 2012/27/EU. The Spanish authorities have provided aggregated data on the primary energy savings (PES) for all cogeneration plant types in Spain in 2014 and 2015. According to the data provided, the weighted PES was 21.3 % in 2015 for CHP facilities with a capacity of more than 1 MW, and 23.4 % for facilities with a capacity of less than 1 MW.

[20]  The Canary Islands, the Balearic Islands, and the cities of Ceuta and Melilla on the North-African coast.

[21]  Royal Decree 738/2015, of July 31 2015 regulates electricity production and the generation dispatch procedures in the electrical systems of non-peninsular territories. BOE 83 of 1 August 2015 https://www.boe.es/diario_boe/txt.php?id=BOE-A-2015-8646

[22]  This scheme is being assessed separately under case SA.42270 Electricity production in Spanish non-peninsular territories.

[23]  Such as non-run-of-the-river hydroelectric facilities and facilities that use biomass, biogas, geothermal sources and waste as their primary source of energy.

installations which as at 1 September 2015 were already receiving support under the *specific* remuneration scheme in the non-peninsular territories will continue to do so under the same scheme.

(19)    Spain has confirmed that Directive 2000/60/EC of the European Parliament and of the Council (Water Framework Directive)[24], in particular Article 4(7), applies with regard to the support provided to hydropower plants under the notified scheme[25].

(20)    Spain has confirmed that the waste hierarchy as set out in Directive 2008/98/EC of the European Parliament and of the Council (Waste Framework Directive)[26] is respected in terms of the support provided under the notified scheme to plants using waste.

(21)    In March 2016, the scheme applied to over 60 000 facilities, owned by 44 292 natural or legal persons. The Spanish authorities have confirmed that no beneficiary facility exceeds the limits established in the Guidelines on State aid for environmental protection and energy 2014-2020[27] (EEAG) for individual aid to be notified to the Commission.

(22)    The Spanish electricity sector law[28] requires promoters to provide evidence of their legal, technical and financial capacity before they can implement a project. Notwithstanding this requirement, Spain has committed to explicitly include in the rules on scheme tenders that no aid will be granted to firms in difficulty within the meaning of point 16 EEAG.

(23)    Spanish law does not allow aid to be granted to any undertaking that is subject to an outstanding recovery order following a previous Commission decision that declared aid illegal and incompatible with the internal market.[29]

(24)    Spain has set up a register of beneficiaries to monitor the application of the scheme (the 'specific remuneration scheme register'). A facility that meets the requirements

---

[24]    Directive 2000/60/EC of the European Parliament and of the Council of 23 October 2000 establishing a framework for Community action in the field of water policy (OJ L327, 22.12.2000, p. 1).

[25]    To receive the specific remuneration regime, hydroelectric facilities have to obtain several administrative authorizations and comply with Spanish water legislation: Article 7 of Royal Decree 413/2014 requires beneficiaries to comply with the conditions, requirements and procedures established by general legislation applicable to electricity production facilities. Among these obligations, article 53 of Law 24/2013 requires an administrative authorization to set up new facilities or modify existing ones, which will be reviewed together with other permits, including the evaluation of environmental impact. Article 22 of Law 24/2013 stipulates that hydraulic facilities that produce electricity must comply with the provisions of Royal Legislative Decree 1/2001, which approves the consolidated text of the Spanish Water Law. This law was modified to transpose Directive 2000/60/EC.

[26]    Directive 2008/98/EC of the European Parliament and of the Council of 19 November 2008 on waste and repealing certain Directives (OJ L312, 22.11.2008, p. 3).

[27]    Guidelines on State aid for environmental protection and energy 2014-2020 (OJ C 200, 28.06.2014, p. 1) and corrigendum to points 51, 52 and 151 of the Guidelines (OJ C 290 of 10.8.2016, p. 11). The Guidelines started being applicable on 1 July 2014.

[28]    Article 53 of Law 24/2013.

[29]    Artícle 13 of Law 38/2003 of 17 November 2003 (General Law on Subsidies). BOE 276 of 18 November 2013. https://www.boe.es/buscar/act.php?id=BOE-A-2003-20977

established in Royal Decree 413/2014 is registered in *pre-allocation* status, which grants the holder the right to participate in the scheme. As a second step, once a facility is finally registered in the administrative register of electricity production facilities,[30] it is connected to the grid and starts operation, it is registered in *operating* status in the specific remuneration scheme register. This entitles the installation to start receiving payments under the scheme.

### 2.3.2.  Obligations on beneficiaries

(25)  Beneficiaries are subject to the general legislation governing the electricity production market. Accordingly, all facilities must submit sales bids to the market operator for each programming period (1 hour) either directly or through a representative, unless an exception provided by law applies.[31] Electricity sales offers in the Iberian Electricity Market (Mercado Ibérico de la Electricidad, MIBEL) currently have a minimum price of 0 EUR/MWh. As a result, negative prices are not possible.

(26)  The Spanish authorities explained that as of 31 May 2015, all facilities that generate electricity from renewable sources, cogeneration and waste, regardless of their size, must cover the costs of any deviations in production (unbalance of payments). In addition, they may participate in any ancillary services markets provided that they comply with the general technical requirements and obtain authorisation from the system operator. They must present bids of at least 10 MW in these markets.

(27)  Beneficiaries must provide the Ministry of Energy, Tourism and Digital Agenda or CNMC with additional information, including where appropriate: the electricity actually generated, compliance with the requirements of primary energy savings for cogeneration installations, volumes of fuel used and other information related to their eligibility to the scheme.

### 2.4.  Duration of the scheme

(28)  The scheme is organised in six-year regulatory periods. Each regulatory period is divided into two half-periods of three years each. However, the first regulatory period runs from 14 July 2013[32] to 31 December 2019. The first half-period ended on 31 December 2016.[33]

(29)  The duration of the notified scheme is not limited in time. However, the Spanish authorities have committed not to apply the scheme beyond 10 June 2024 without any Commission decision approving the measure.

---

[30]  This register includes all electricity generation facilities, whether they are eligible for the specific remuneration or not.

[31]  For example, facilities located in the non-peninsular territories may be excluded from the market as long as those electricity systems are not effectively integrated into the peninsular system.

[32]  This is when Royal Decree-Law 9/2013 of 12 July 2013 entered into force.

[33]  The notified Order IET/1045/2014 laid down the remuneration parameters for the first regulatory half-period, i.e. from 14 July 2013 until 31 December 2016.

### 2.5.  Form and amount of the support

#### 2.5.1.  Elements of the compensation

(30)  Facilities are classified under one of the various types of standard facilities on the basis of their individual characteristics. The compensation benchmarks applicable to each standard facility are established by ministerial order and include: type of technology, power generation capacity, start date of operation, lifetime, electricity system/location of the facility, standard revenue generated by selling the electricity in the market, standard operating costs required to carry out the activity and hours of operation (with a minimum and maximum value). The compensation to which an individual facility is entitled is calculated on the basis of the standard facility's compensation benchmarks and the features of the individual facility itself (e.g. the real number of running hours). Spain has submitted detailed information for each technology on the criteria, data and hypothesis used to define the standard facilities.

(31)  The specific remuneration is paid as a premium in addition to income generated from the market. It aims at helping the technologies supported to compete on an equal footing with other technologies on the market at a reasonable rate of return. The premium is made up of two components: compensation for investments and, if applicable, compensation for operations.

(32)  **Compensation for investments** (expressed in EUR/MW) applies to all facilities and offsets the investment costs which cannot be recovered by selling electricity in the market. To calculate the annual amount payable to a given facility as compensation for investment, the compensation for investment of the relevant standard facility is multiplied by the individual facility's generation capacity. Further adjustments are then made (e.g. on the basis of the number of equivalent operating hours, the net investment value and the adjustment coefficient 'C', which are described further below).

(33)  Facilities whose operating costs are higher than the market price also receive a **compensation for operations** (expressed in EUR/MWh) which compensates for the difference between the operating costs and the revenue obtained in the market. To calculate the annual amount payable to a given facility as compensation for operations, for each settlement period, the compensation for operations of the relevant standard facility is multiplied by the energy sold in that period by the individual facility.

(34)  Facilities in the electricity systems of non-peninsular territories may also be entitled to an additional **investment incentive to reduce generation costs** (expressed in EUR/MWh). In the non-peninsular territories, electricity demand is mainly met using conventional electricity plants, with renewable energy sources contributing only little to the energy mix.[34] Spain aims to reduce system costs by promoting wind and solar energy in these territories. The investment incentive therefore rewards renewable investments in these territories for their potential to reduce system costs. This incentive is applied when the savings generated by the standard facility exceed 45 % of the

---

[34]  2.3 % of demand in the Balearic Islands, 8.3 % in the Canary Islands, and very low percentages in Ceuta and Melilla according to data from 2016 (REE, El sistema eléctrico español, Avance 2016).

generation costs and when the facility is operational after a short lead time.[35] In the years 2017-2019, this incentive varies between 5.04 and 10.94 EUR/MWh depending on the type of standard facility. The right to receive this incentive applies throughout the lifetime of the facility.

### 2.5.2. Parameters used to calculate compensation

(35) To determine the compensation applicable to each standard facility, several parameters are used. These include:

(a) The **initial investment value** of the standard facility. It is calculated taking into account new main construction equipment as well as any other electromechanical equipment, control and regulation systems, measuring equipment, connecting lines, including transport, installation and start-up, together with associated engineering and project management.

(b) The **net asset value** per unit of capacity is recalculated every three years. For existing facilities, the net asset value was calculated as at 1 January 2014 as the value of the investment that had not been recovered with past income up to that date.

(c) The legal **lifetime** ('the lifetime') determines the period over which each facility receives compensation. Once it ends, the facility may remain in operation but will only receive the revenues from selling electricity in the market. The lifetime applicable to new facilities is set in the rules governing the relevant competitive selection process. For existing facilities, it is as follows:

| Facility | Lifetime (years) |
|---|---|
| Photovoltaic | 30 |
| Cogeneration, hydroelectric, biomass, biogas, waste, thermosolar | 25 |
| Wind, geothermal, hydrothermal, tidal | 20 |

Source: Orden IET/1045/2014 of 16 June, Article 5.5

(d) The compensation applicable to an individual facility is adjusted according to its actual annual **running hours.**[36] It must first operate above the relevant standard facility's *operating threshold*. Above this threshold, it receives only a proportion of the compensation until it has reached the standard facility's *minimum annual operating hours*. From this point onwards, it will receive full compensation for that year, up to the *maximum operating hours*. The Spanish authorities have undertaken to amend Article 21.2 of Royal Decree 413/2014 within seven months of the adoption of this decision in order to subtract from the operating hours eligible for support the hours during which the electricity day-ahead market prices are zero for six consecutive hours or more.

---

[35]  24 months in the case of wind technologies, and 12 months in the case of photovoltaic facilities, as opposed to the usual lead times of 36 months and 18 months respectively.

[36]  The operating hours of each individual facility are calculated as the ratio of the energy sold in the market to the installed power. For cogeneration facilities, the net electrical output will be considered.

(e) The **estimated average day-ahead and intraday market prices** are calculated for each upcoming regulatory half-period (three years).[37] This estimated price is limited by two upper and two lower market price limits (LS1, LS2, LI1 and LI2) to reduce the uncertainty surrounding the estimated market price. The estimated prices and the upper and lower limits in force during the second regulatory half-period and for the period from 2020 until the end of the installations' lifetime are shown below.

| Estimated market price and limits (EUR/MWh) | 2017 | 2018 | 2019 | 2020 onwards |
|---|---|---|---|---|
| Upper limit 2 (LS2) | 49.81 | 48.30 | 48.68 | 60.00 |
| Upper limit 1 (LS1) | 46.33 | 44.92 | 45.28 | 56.00 |
| Estimated market price | 42.84 | 41.54 | 41.87 | 52.00 |
| Lower limit 1 (LI1) | 39.35 | 38.16 | 38.46 | 48.00 |
| Lower limit 2 (LI2) | 35.87 | 34.78 | 35.06 | 44.00 |

Source: Order ETU/130/2017, of 17 February 2017

When the average annual price on the intraday or daily markets falls below or exceeds the limits, a positive or negative balance known as the 'adjustment for changes in market price' is taken into account in the aggregate annual compensation due to beneficiaries. This balance is offset over the course of the facility's lifetime when calculating the net asset value for the following period. The greater the difference between the real and the estimated price, the greater the required adjustment. If the real price falls within the LS1-LI1 band, the facility runs the market risk; if the price falls within the LS1-LS2 or LI1-LI2 band, the plant runs only at 50 % of the price risk (either it bears only half of the resulting lower income, or retains only half of the resulting higher income). If the price exceeds the LS2 or LI2 limits, the facility does not run any price risk.

The estimated market prices apply to all facilities, but are corrected by a coefficient per technology that reflects the difference between the average market price and the hourly prices actually charged by the facilities.[38]

(f) The estimated operating costs:

– **Variable operating costs** include insurance costs, administrative expenses and other general costs, representation costs, transmission costs and distribution network access tariffs, operations and maintenance, electricity production tax, consumption (water, gas, etc.) and fuel costs associated with the operation of each standard facility. For cogeneration installations, the cost of $CO_2$ emission rights not obtained from free allocations is also considered.

---

[37] They are calculated as the arithmetic mean of the listed prices of the relevant annual futures contracts traded on the electricity futures market run by the Iberian Energy Derivatives Exchange (OMIP) over the six-month period prior to the regulatory half-period for which the market price is estimated.

[38] These coefficients were calculated by CNMC on the basis of real market prices in 2014 and 2015. For example, the coefficient is 0.9997 for cogeneration facilities, 1.0207 for solar PV and 0.8889 for onshore wind.

     –   **Fixed operating costs** include the cost of renting land and, costs associated with the safety of installations and applicable taxes, such as the tax on immovable property and the tax on electricity generated. The scheme considers that these costs increase yearly by 1% (except regulated costs like taxes).

(g)  The pre-tax **reasonable rate of return** is calculated and set by law every six years based on the average secondary market yield of the ten-year Treasury bonds, plus a spread. In the first regulatory period it was calculated as follows:

   – For existing facilities, it was calculated as the average secondary market yield of the ten-year Treasury bonds during the ten years prior to the entry into force of Royal Decree-Law 9/2013 (14 July 2013) plus 300 basis points, i.e. 7.398 % before tax. The revenue obtained prior to the adoption of Royal Decree 413/2014 was taken into consideration to calculate the profitability over their lifetime.

   – For new facilities, it was the secondary market yield of the ten-year Treasury bonds for the months of April, May and June 2013 plus 300 basis points, i.e. 7.503 % before tax.

   – Facilities that attain the reasonable rate of return before the end of their lifetime are not entitled to receive compensation for investments and only receive (if applicable) compensation for operations.

(h)  **Adjustment coefficient** 'C' for the standard facility affects the value of compensation for investments. This coefficient has a value between zero and one and represents the investment costs of a standard facility that cannot be recovered from the sale of energy on the market. To calculate the adjustment coefficient, several parameters are taken into account: the net asset value of the standard facility at the start of the regulatory period, its estimated revenue and operating costs for the remainder of its lifetime and the discount rate that takes the reasonable rate of return as its value.

(36)  The eligible costs are only those related to electricity production. There is no compensation for any other costs caused by regulations or administrative acts that do not apply in the whole territory of Spain. If a facility is modified, new investments are not eligible for any additional compensation. Its remuneration is also decreased if the modifications result in a reduced installation capacity or generation volume.

(37)  The lifetime of the facility and the initial investment value of a standard facility are fixed for the entire lifetime of the facility. The remaining compensation benchmarks may be revised as follows:

- Compensation for operations applicable to technologies whose operating costs depend mainly on fuel prices is updated at least annually.

- Every three years, the estimated market prices are adjusted in line with real market prices. The estimated revenues from energy sales are also revised accordingly.

- Any compensation parameters may be reviewed every six years (each regulatory period), including the reasonable return for the remaining lifetime of the standard facilities. The parameters that are not reviewed before the beginning of the following regulatory period are extended for the following regulatory period.

(38) The compensation for cogeneration facilities takes into account the revenue indirectly derived from the generation of useful heat. The revenue is calculated by valuing the useful heat based on the alternative cost of generating it using conventional equipment that uses the same type of fuel as the cogeneration facility.

(39) The compensation for standard facilities that generate electricity from bioliquids or biogas (including cogeneration facilities) and those using waste other than household waste, biomass (where the biomass is less than 90 % of the primary energy used) and black liquors takes into account the standard revenue or costs avoided for energy recovery and waste disposal.

(40) The compensation for standard facilities that use domestic waste takes into account the standard revenue obtained from waste disposal fees.

(41) The Spanish authorities explained that the scheme intends to provide a reasonable profitability to beneficiaries, see paragraph (35)(g), i.e. that is proportionate and does not distort competition, and has a positive impact that outweigh its potential negative effects. According to the scheme's methodology, facilities that are not managed properly will obtain a lower than expected return, and vice versa.

### 2.5.3.    Cumulation of aid

(42) The specific remuneration can be cumulated with other support. Beneficiaries have to declare any subsidy received before or after the specific remuneration is granted. If beneficiaries do not provide this information or provide erroneous information, they will lose the right to receive the specific remuneration and, if necessary, have to return any sums received.

(43) Article 24 of Royal Decree 413/2014 establishes that if a facility receives other State aid, the specific remuneration could be reduced by up to 90 % of the amount of the subsidy received. The Spanish authorities have undertaken to amend this article and remove this limitation of 90 % to ensure that in the presence of other aid, the specific remuneration is reduced so as to meet the State aid cumulation rules.

### 2.5.4.    Competitive bidding processes

(44) Aid granted to new installations is generally granted by means of a competitive bidding process (auction). The laws governing the scheme provide exceptions in the form of two administrative procedures, which are described in section 2.6.1.

(45) On the competitive selection of new beneficiaries, Royal Decree 413/2014 establishes that the Government must specify the facilities or technologies that are eligible, the selection criteria and the compensation benchmarks applicable to the relevant standard facilities in advance of each auction.

(46)   The auction is designed as a descending clock auction. The starting price is the initial investment value of the standard facility. The bids need to be formulated as percentage reductions from the initial investment value. The bidders with the highest percentage reductions are selected.

(47)   The auction operates as a pay-as-clear auction. The last winning bid determines the remuneration parameters of the standard facility, which are then used to calculate the specific remuneration of the individual successful facilities. The competitive bidding process concludes with a decision that allows the successful facilities with *pre-allocation* status to be registered in the specific remuneration registry.

(48)   Spain has confirmed that as of 1 January 2017, all auctions are open to all producers in accordance with the terms laid down in point 126 of the EEAG.

### 2.6.   Aid awarded under the scheme

(49)   The Spanish authorities have confirmed that no aid was granted under the scheme between 11 June and 30 June 2014.

(50)   Existing facilities were automatically registered under the scheme on 9 July 2014, with pre-allocation status or operating status depending on their specific situation on that date.[39] If a facility had obtained the *premium* remuneration for part of its capacity under the previous scheme, only this part would be entitled to the *specific* remuneration covered by this decision.

(51)   Since 11 June 2014 (when the Royal Decree 413/2014 entered into force), the Spanish authorities have organised two administrative procedures (in 2014 and 2015) and three auctions (one in 2016 and two in 2017).

#### 2.6.1.   Administrative procedures

##### 2.6.1.1.   120 MW for cogeneration, biomass, biogas, hydroelectric and waste facilities (2014)

(52)   This call was aimed at new facilities or modifications to existing ones that had already applied to join the premium economic scheme or had received a start-up certificate within 30 days of Law 24/2013 on the electricity sector entering into force.

(53)   To be eligible, modifications to existing installations must have been authorised prior to Royal Decree-Law 1/2012 or otherwise comply with certain requirements such as replacing existing equipment with new equipment; in the case of cogeneration, this had to be highly efficient.[40]

(54)   The Spanish authorities explained that eligible facilities had already started construction under the premium economic scheme regulated by Royal Decree

---

[39]   Order IET/1168/2014 of 3 July 2014, which determines the date of automatic registration of certain installations in the register of the specific remuneration regime provided for in Title V of Royal Decree 413/2014 of 6 June 2014. BOE 164 of 7 July 2014, https://www.boe.es/diario_boe/txt.php?id=BOE-A-2014-7113.

[40]   See requirements for cogeneration facilities in paragraph (16).

661/2007[41] and Royal Decree-Law 6/2009[42], at a time when the capacity objectives assigned to each technology were still some way off being achieved. Promoters logically expected to have access to the premium economic scheme. However, Royal Decree-Law 1/2012[43] removed the economic incentives for new facilities before those expectations could materialise. To restore the continuity of support, Law 24/2013 provided for a quota of 120 MW for certain facilities, which was subsequently established by Royal Decree 413/2014. The objective of this call was therefore to increase the generation of electricity from renewable energy sources and high efficiency cogeneration facilities, allowing the facilities whose construction had already started under the previous scheme to access the specific remuneration scheme. In fact, the call establishes as a prioritisation criterion the fact that installations had applied to join the economic scheme before 28 January 2012 (date of entry into force of Royal Decree-Law 1/2012).

(55) The Spanish authorities explained that the variable costs borne by these installations are higher than the revenues from the sale of energy in the market. In the absence of compensation, they would therefore bear losses and would stop generating electricity.

2.6.1.2.  450 MW of wind facilities on the Canary Islands (2015)

(56) In 2015, the Ministry of Energy, Tourism and Digital Agenda organised a call to speed up the installation of up to 450 MW of wind power on the Canary Islands by means of an administrative procedure. The facilities had to commit to being operational within 36 months, and in any case at the latest by 31 December 2018.[44]

(57) Eligible facilities were those that had not been registered in the administrative register of electricity production facilities by 8 August 2014 and that had not been registered in the former scheme's register.[45]

(58) To justify the choice of technology and specific location of the Canary Islands, Spain argued that wind and photovoltaic energy are cheaper than conventional generation in the non-peninsular territories (conventional generation is also subsidised to maintain wholesale prices equivalent to those on the mainland[46]). Spain has provided data on the average variable generation costs and the estimated savings in the cost of support of

---

[41] Royal Decree 661/2007 of 25 May 2007, which regulates the production of electrical energy under the special regime.

[42] Royal Decree-law 6/2009 of 30 April 2009, which adopts certain measures in the energy sector and approves the social bonus.

[43] Royal Decree-law 1/2012 of 27 January 2012, which suspends the pre-allocation of remuneration procedures and removes the economic incentives for new installations for the production of electricity from cogeneration, renewable energy and waste.

[44] This call follows another call launched in 2014 that received applications from wind projects for a reduced capacity. In fact, Order IET/1459/2014 established that facilities had to enter into operation by 31 December 2016. Order IET/1953/2015 modified the 2014 Order by simplifying the selection criteria, establishing a new call for applications and extending the deadline for completion of projects to 31 December 2018. The 2015 Order also allows applicants from the first call to reapply under the simplified conditions.

[45] Royal Decree-Law 1/2012 had suspended the procedures to register electricity production facilities in the previous scheme.

[46] By way of the additional remuneration scheme. See paragraph (6).

wind and photovoltaic technologies. Once operational, the new wind power capacity attributed in the call will save the electricity system around EUR 120 million a year.

(59) The Canary Islands alone make up more than two-thirds of the total generation costs in non-peninsular systems, and these costs are increasing. In addition, 41 % of its capacity is more than 20 years old, and its abundant wind resources have not yet been fully exploited. The size of the Canary Islands' systems also allows greater integration of intermittent renewable technologies compared to smaller systems like Ceuta and Melilla.

(60) The Spanish authorities explained that the aim of this procedure was therefore to ensure that wind power plants were installed and replaced on the Canary Islands in order to improve the generation efficiency and to reduce the generation costs in the system in the shortest possible time.

### 2.6.2. Competitive bidding procedures

#### 2.6.2.1. First auctions for biomass and wind in 2016

(61) In January 2016, Spain organised two simultaneous auctions: one for 200 MW of capacity for biomass facilities (including cogeneration facilities) on the Spanish mainland, and one for 500 MW of capacity for wind facilities open to the entire Spanish territory.[47]

(62) The call was open to both new installations and to the repowering of older wind facilities provided they were not already receiving any aid under the specific remuneration scheme or another scheme. On biomass, the call aimed to increase existing capacity by 39 % to take advantage of the dispatchable nature of this technology.

(63) Companies holding more than 40 % of the market share in any given Spanish electricity system were not allowed to participate in the auction. The remuneration parameters were published in the ministerial order that regulated the call. All parameters are subject to the reviews set out in Royal Decree 413/2014.

(64) Bids were sealed and consisted of a percentage reduction on the initial investment value of the applicable standard facility for a capacity of at least 1 kW. Bids offering the highest reduction percentage were selected first, and the auction cleared at the marginal percentage of reduction once the capacity quota was exhausted. Penalties for non-delivery were set at 20 EUR/kW. The successful bidders had to finalise their projects within 48 months.

#### 2.6.2.2. Auctions organised in 2017

(65) Spain's renewable energy consumption reached 16.14% of final energy consumption in 2014. According to the Spanish authorities, the projected growth in electricity

---

[47] Royal Decree 947/2015 adopted on 16 October 2015 announced the call. Order IET/2212/2015 adopted on 23 October 2015 regulated the allocation procedure and the remuneration parameters. A resolution issued by the Secretary of State for Energy on 30 November 2015 convened the auction and established the auction rules.

consumption up to 2020 (around 0.8 % per year) justified a greater deployment of new renewable capacity to meet the target of 20 % renewable energy of final energy consumption by 2020. To this end, the Spanish authorities carried out two auctions in May 2017[48] and in July 2017[49] in which 8 037 MW of renewable energy generation capacity were allocated .

(66)  In both auctions, eligible projects were new installations in mainland Spain that did not lead to the replacement of existing capacity. In the May auction, all renewable technologies competed for the 3 000 MW auction volume. However, offers were differentiated according to three different types of reference facilities: for wind, photovoltaic (PV) and other technologies. In the July auction, wind and PV were the only eligible technologies, with both competing for the same auction volume. The initial investment values and other remuneration parameters such as operating costs per MWh, number of operating hours, lifetime[50] and compensation for investments were published in a Ministerial Order in advance of the auction. The guaranteed return on investment costs established in Royal Decree 413/2014 for new facilities (7.503 %) applied. Both auctions had a tighter schedule for completion of projects, as winning projects would have to be operational by 31 December 2019. Penalties for non-delivery were increased to 60 EUR/kW.

(67)  The Spanish authorities explained that the reference compensation parameters applicable in the auctions were benchmarked against recently commissioned renewable energy source (RES) facilities to encourage efficient projects. In particular, the operating hours for photovoltaic facilities (2 367 hours) and wind facilities (3 000 hours) were set according to the top performing facilities in Spain (around 4-5 % of the total installed photovoltaic/wind capacity). The Spanish authorities clarified that facilities that would not achieve these operating hours could still take part in the auction. However, if selected their payments under the scheme would be reduced proportionally according to the rules explained in paragraph (35)(d).

(68)  Bids were sealed and consisted of a percentage reduction on the initial investment value of the applicable standard facility. The discounted investment costs were used to calculate the applicable compensation for investments for each bid in EUR/MW. This value was divided by the reference operating hours of the technology, resulting in a compensation amount in EUR/MWh. This value can be described as the bid's unit costs for the electricity system. All bids were then ranked according to this value, regardless of technology. Successful bids were those that required the lowest unit costs up to the total capacity auctioned. In the event of a tie in unit costs, projects with the higher number of operating hours would be selected first, and if projects were still ranked equally, larger projects would be favoured.

---

[48]  Royal Decree 3529/2017 adopted on 31 March 2017 announced the call. Order ETU/315/2017 of 6 April 2017 established the parameters for each reference facility and the methodology to calculate the investment compensation. Two Ministerial resolutions dated 10 April 2017 established the auction procedures and rules.

[49]  Royal Decree 650/2017 adopted on 16 June 2017 announced the call. Ministerial Order ETU/315/2017 of 6 April 2017 also applied to this auction, with some modifications introduced by Order ETU/615/2017 of 27 June 2017. The Ministerial resolution of 10 April 2017 established the auction procedures. A Ministerial resolution of 30 June 2017 completed the auction parameters and established the timetable for the auction.

[50]  25 years for all technologies.

17

(69)    The auctions were cleared at the unit costs of the last bid. From this value, the initial investment value of each standard facility was calculated per technology and applied to all winning projects.

(70)    In the May auction, the offers were capped at a possible maximum discount of 63.43 % on the initial investment value for wind facilities, 51.22 % for PV and 99.99 % for other technologies. The maximum discounts were set at a level that allowed all technologies to compete on an equal footing – at those levels, they would entail the same costs for the system in EUR/MWh. At the maximum discount levels, the investment value was considered so low that the facility is expected to achieve the target rate of return only from market revenues, and will therefore not need investment compensation. The payments would therefore be zero until at least 2020, which is when the scheme's compensation parameters are due to be revised. Even in the absence of investment compensation, the scheme would still offer protection against wide fluctuations in the market price, as explained in paragraph (35)(e).

(71)    The May auction cleared at a level so that the income of the winning projects is likely to be limited to market revenue. However, in any event the projects will have guaranteed returns if the market prices were to fall below 39.89 EUR/MWh for wind, 42.16 EUR/MWh for PV and 41.57 EUR/MWh for other technologies. Based on the second selection criterion for the auction on running hours, almost all selected bids involved wind projects.

(72)    The July auction was open only to wind and PV projects as the authorities considered that the May auction had shown little potential for the other technologies, in particular also due to the short completion time (by December 2019). The authorities increased the maximum discounts further to 87.08 % for wind and 69.88 % for PV, which in practice would guarantee a reasonable rate of return at a lower floor price of 28.20 EUR/MWh and 32.67 EUR/MWh respectively. As the July auction cleared at the maximum discount, the authorities decided to award aid to all projects that had bid at this level. The original 3 000 MW auction volume was therefore exceeded (5 036 MW were awarded) and included both wind and PV projects.

### 2.7.    Evaluation of the scheme

(73)    Spain has submitted an evaluation plan for the measure. The main elements of the evaluation plan are described below.

(74)    The evaluation plan notified by Spain includes 28 evaluation questions in order to assess the scheme's outputs, its direct effects, its indirect effects as well as the proportionality of the aid and the appropriateness of the chosen aid instrument.

(75)    The evaluation will provide general information, including the total amount of aid granted by technology, the number and type of beneficiaries, the estimated investment cost of the facilities that received aid, and the auctions that have and will be organised.

(76)    The direct effects of the scheme will be evaluated, for example by assessing developments in the production of energy from renewable energy sources, installed capacity, the amounts of funds invested and the effects of the different auctions. The evaluation will also consider what impact alternative levels of clearing prices would have had in the auctions.

(77) The main indirect effects of the scheme that will be evaluated are its contribution to the reduction of $CO_2$ emissions, the effects of the scheme on the electricity system (for instance, on grid stability) and the effects on electricity prices, on market behaviours and on the market share of conventional electricity producers.

(78) The appropriateness of the aid instrument will be evaluated by comparing the scheme with similar schemes in other EU Member States and by considering the effectiveness of measures that prevent delays or inconsistencies in the implementation of projects receiving support.

(79) The proportionality of the aid will be evaluated, in particular by assessing the evolution of auction results and by analysing whether there was enough competitive pressure in the different auctions.

(80) Evaluation questions related to the general outputs of the scheme will be mostly answered by providing quantitative statistical evidence. Other questions may require qualitative assessment. To evaluate the direct effects of the scheme, Spain plans to employ counterfactual impact evaluation methods in line with the Commission Staff Working Document on Common methodology for State aid evaluation.[51] In particular, where appropriate, the evaluation will include a comparison of projects that were awarded the aid via the auctions with projects that did not receive support as their bids failed.

(81) The evaluation will be carried out by an independent evaluator. This could be either an organisation selected by means of a competitive bidding procedure or the national energy regulator (CNMC). The Spanish authorities explained how it will guarantee the independence and experience of the evaluator as well as protect trade secrets and personal data.

(82) The evaluation report will be subject to public consultation. Spain will submit the final evaluation report to the Commission by the end of 2020. The final report will be published on the Ministry of Energy, Tourism and Digital Agenda's website.[52]

**3. ASSESSMENT OF THE MEASURE**

### 3.1. Existence of aid within the meaning of Article 107(1) of the Treaty on the Functioning of the European Union (TFEU)

(83) A measure constitutes State aid within the meaning of Article 107 (1) TFEU if it is '*granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods [...] in so far as it affects trade between Member States*.'

(84) Support under the notified scheme is attributable to the State as it has been established by law and its implementing decrees and ministerial orders. In addition, beneficiaries receive support sourced from the Spanish treasury budget and from a charge collected from electricity consumers managed by CNMC, which the Court of Justice of the

---

[51] SWD(2014) 179 final.

[52] Currently www.minetad.gob.es.

European Union (CJEU) has declared as a State resource within the meaning of Article 107 (1) TFEU.[53]

(85)   The notified scheme favours the generation of electricity from renewable sources, high efficiency cogeneration and waste by the selected beneficiaries. The measure is therefore selective.

(86)   Beneficiaries are compensated at a rate exceeding the returns that they would normally have received from the market in the absence of aid. The measure therefore provides an advantage.

(87)   Electricity is widely traded between Member States. The notified scheme is therefore likely to distort competition on the electricity market and affect trade between Member States.

(88)   As the result, the notified measure constitutes State aid within the meaning of Article 107(1) TFEU. In its notification, Spain has also acknowledged that the measure constitutes State aid.

### 3.2.   Legality of the aid

(89)   The notified scheme is applicable from 11 June 2014. The Spanish authorities notified the Commission about the aid after they had started implementing the scheme and before a Commission decision. Spain has therefore breached the stand-still obligation provided for in Article 108(3) TFEU. The aid granted until the adoption of this decision is unlawful aid.

### 3.3.   Legal basis for the assessment

(90)   The Commission has assessed the compatibility of the notified aid scheme on the basis of Article 107(3)(c) TFEU.

(91)   The notified scheme aims to promote the generation of electricity from renewable sources. As a result, it falls within the scope of the EEAG.

(92)   In line with point 248 EEAG, unlawful environmental aid or energy aid will be assessed in accordance with the rules in force on the date on which the aid was granted. As mentioned in paragraph (49), Spain has confirmed that there was no aid granted under the scheme between 11 June 2014 and 30 June 2014. Awards to new beneficiaries have only taken place after 1 July 2014. Existing beneficiaries were officially registered in the modified scheme on 9 July 2014. This registration is considered to constitute the award act for all aid granted to these existing facilities during their entire lifetime as it takes into account the amounts received under the previous scheme in the calculation of future compensation. In other words, the scheme supersedes and fully replaces the premium economic scheme whose awards are absorbed.

(93)   The Commission has therefore assessed the compatibility of the aid under EEAG.

---

[53]   Case C-275/13, *Elcogás*, ECLI:EU:C:2014:2314; *Association Vent De Colère and Others, EU*: C: 2013: 851.

### 3.4. Compatibility with the internal market under EEAG

(94) Given that the support is granted as a premium on top of the market price during the lifetime of the facility, the Commission has assessed the notified measures on the basis of the general compatibility provisions set out in chapter 3.2 EEAG. and the specific compatibility criteria for operating aid granted for electricity from renewable energy sources set out in chapter 3.3.2.1 EEAG.

(95) According to point 151 EEAG, operating aid for high efficiency cogeneration plants may be granted on the basis of the conditions applying to operating aid for electricity from renewable energy sources when the costs for producing a unit of energy in cogeneration plants is higher than its market price.

#### *3.4.1. Contribution to an objective of common interest*

(96) The aim of the notified aid measure is to help Spain achieve the renewable energy and energy efficiency targets set by the EU as part of its 2020 strategy by supporting electricity generation from renewable energy sources and high efficiency cogeneration of heat, power and waste. The scheme will help Spain to reduce its greenhouse gas emissions and $CO_2$ emissions.

(97) The scheme provides support to electricity from cogeneration installations that meet the definition of high efficiency cogeneration as set out in Article 2(34) of Directive 2012/27/EU of the European Parliament and of the Council[54] and in line with point 139 EEAG. According to point 140 EEAG, State aid for cogeneration using waste as input fuel can make a positive contribution to environmental protection, provided that it does not circumvent the waste hierarchy principle. This has been confirmed by Spain, as mentioned in paragraph (19).

(98) The notified scheme is of unlimited duration. However, in line with point 121 EEAG, Spain has committed not to apply the scheme beyond 10 June 2024 without any Commission decision approving the measure, as mentioned in paragraph (29).

(99) The Commission considers that the notified scheme is aimed at an objective of common interest in accordance with Article 107(3) TFEU.

#### *3.4.2. Need for State intervention and appropriate instrument*

(100) According to chapter 3.2.2 EEAG, the Member State has to demonstrate that there is a need for State intervention and in particular that the aid is necessary to remedy a market failure that otherwise would remain unaddressed. In the case of production of renewable electricity, the Commission presumes that there is still residual market failure, which can be addressed through aid for renewable energy for the reasons set out in point 115 EEAG.

---

[54] Directive 2012/27/EU of the European Parliament and of the Council of 25 October 2012 on energy efficiency, amending Directives 2009/125/EC and 2010/30/EU and repealing Directives 2004/8/EC and 2006/32/EC (OJ L 315, 14.11.2012, p. 1).

(101) Under point 107 EEAG, the Commission acknowledges that '*under certain conditions State aid can be an appropriate instrument to contribute to the achievement of the EU objectives and related national targets*.'

(102) The electricity sector law (Law 24/2013) authorises the Government to set up the specific remuneration scheme to promote electricity from renewable energy sources, high efficiency cogeneration and waste in exceptional cases where there is an obligation to meet energy objectives derived from Directives or other EU law, or when their deployment reduces energy costs and dependence on external energy. As mentioned in paragraph (5), the aim of the scheme is to support the development of technologies that offer environmental benefits, which would not be economically viable without support, and to help Spain to meet the target of 20 % renewable energy of final energy consumption by 2020. Spain has acknowledged that it needs to increase the deployment of new renewable capacity to meet this target, and has found that renewable capacity auctions are the most cost-efficient alternative to achieve it.

(103) Point 27(c) EEAG stipulates that in order to be deemed compatible, State aid measures must be an appropriate policy instrument to address the objective of common interest. Point 116 EEAG states that in order to help Member States to achieve their national energy and climate change targets, the Commission presumes aid to energy from renewable sources to be appropriate and have limited distortive effects provided all other compatibility conditions are met. Point 145 EEAG provides that State aid may be considered an appropriate instrument to finance energy efficiency measures, such as cogeneration, independently of the form in which it is granted.

(104) Based on these considerations, the Commission considers that the aid is necessary and is an appropriate instrument to address the objective of common interest.

### 3.4.3. Incentive effect

(105) In line with point 49 EEAG, an incentive effect is present if the aid induces the beneficiaries to change their behaviour so that they achieve the objective of common interest, which they would not do without the aid.

(106) According to point 51 EEAG, Member States must introduce and use an application form for aid, which contains certain information on the project. The granting authority also must carry out a credibility check of the counterfactual scenario.

#### (i) Existing installations

(107) Existing facilities had already applied for aid under the premium economic scheme. The cash flows of standard facilities provided by the Spanish authorities show that the production costs of electricity from renewable energy sources and cogeneration are higher than the revenues that these facilities can obtain from the market. Without the scheme, there would therefore have been an insufficient incentive to operate the RES installations as such activity would have been unlikely to be economically viable.

#### (ii) Administrative procedures

(108) The Commission has examined the administrative procedures involved in selecting up to 120 MW capacity of certain technologies in 2014 and 450 MW capacity of wind facilities on the Canary Islands in 2015 (see section 2.6.1).

(109) In the first call, applicants had to have already applied for aid under the premium economic scheme. The call was specifically meant to allow complete projects that had been planned in the hope of receiving aid under the premium economic scheme, but did not receive it because the scheme was interrupted by Royal Decree-Law 1/2012. The registration of a facility in *pre-allocation* status ensures that the holder is entitled to receive the aid if it meets the requirements and builds the facility. As a result, applicants who applied for registration in *pre-allocation* status under the previous scheme would have been confident that their project would meet the requirements for entering the scheme.

(110) In the second call, the selection criteria were intended to quickly deploy and renovate wind capacity that would otherwise not have been deployed at the same pace. Beneficiaries had an incentive to invest thanks to the aid because the wholesale market prices in the non-peninsular territories, which are aligned with the prices on the mainland, are lower than the generation costs of new RES installations.

*(111)* In both situations, the Commission therefore considers that the aid granted by the two calls has an incentive effect.

### (iii) Competitive bidding processes

(112) The general conditions relating to the use of an application form for aid in point 51 EEAG do not apply when the aid is awarded on the basis of a competitive bidding process (point 52 EEAG). In addition, market participants are not willing to invest in RES projects as the investment and operating costs of such projects are still generally higher than what can be earned from electricity sales revenue in the market. This is also evidenced by the lack of market-based investment in RES projects from 2012[55] to the end of 2015 in the absence of generally open RES auctions. The Commission therefore considers that the aid awarded under the notified measure in competitive bidding processes has an incentive effect.

### 3.4.4. Proportionality of the aid

(113) According to point 69 EEAG, aid is considered to be proportionate if the aid amount per beneficiary is limited to the minimum needed to achieve the objective. The Commission has assessed proportionality of the aid under the provisions of chapter 3.3.2.1 EEAG on operating aid granted to energy from renewable sources. The same provisions apply to operating aid for high efficiency cogeneration plants according to point 151 EEAG when the costs for producing a unit of energy in cogeneration plants are higher than its market price. Spain has provided examples of standard cogeneration facilities and has demonstrated that the production costs per unit of energy are higher than the market price.

(114) The conditions of point 124 EEAG apply to all beneficiaries of the notified measure regardless of the procedure used to award the aid. In the absence of a competitive bidding process, point 128 EEAG stipulates that the conditions of point 131 EEAG are also applicable.

---

[55] When the previous scheme was stopped for new entrants in 2012 and later repealed in 2013. See also footnote 4.

(115) As described in paragraph (25), all facilities are subject to the electricity market rules and must participate in the market directly or through a representative. In addition, as indicated in paragraph (31), aid is granted in the form of a premium that compensates facilities for the costs that cannot be recovered by selling electricity. This is in line with the requirements of point 124(a) EEAG.

(116) Beneficiaries are subject to the same standard balancing responsibilities as other technologies as mentioned in paragraph (25), which is in line with point 124(b) EEAG.

(117) In the Spanish market, electricity prices cannot become negative and in cases of oversupply of electricity in the market the price is fixed at zero. As indicated in paragraph (35)(d), the Spanish authorities have undertaken to amend the legislation in order to subtract from the operating hours eligible for support the hours during which the electricity day-ahead market prices are zero for six consecutive hours or more. Payments of the premium will therefore be suspended in case the day-ahead market price falls to zero for at least six consecutive hours (or below zero, should the Spanish regulation allow this eventually). This is in line with point 124(c) EEAG.[56]

(118) Based on the above, the Commission considers that the conditions of point 124 EEAG have been met.

*(i) Existing facilities and facilities selected through administrative procedures*

(119) Point 131(a) EEAG applies to the compensation of existing facilities and the administrative allocation procedures applied in 2014 and 2015, and states that the aid per unit of energy must not exceed the difference between the levelised costs of energy (LCOE) and the market price of the relevant technology. Point 131(b) EEAG allows a normal return on capital to be included in the LCOE.

(120) Spain has submitted cash flow calculations of 21 standard facilities. These are representative of the various technologies and installation types supported by the scheme. The data show the past sales income (including those deriving from the premium economic scheme for existing facilities), the expected future sales income, the initial investment costs, the operating costs and the compensation to be granted to each facility both for operations and for investments. For all examples provided, the Commission has verified that the aid does not exceed what is required to recover the initial investment costs and the relevant operational costs, plus a margin of reasonable return, based on the past and estimated costs and market prices (7.503 % before tax for new facilities and 7.398 % for existing facilities). These rates appear to be in line with the rates of return of renewable energy and high efficiency cogeneration projects recently approved by the Commission and does not lead to overcompensation.[57] During the regular revisions of the compensation parameters, the payments to which each beneficiary is entitled in the future are calculated to ensure a reasonable rate of return: future payments are calculated to keep the net present value of the investment at zero

---

[56] See SA.43756 *Support to electricity for renewable sources* (Italy).

[57] See for example the decisions in cases SA.47205 *Complément de rémunération pour l'éolien terrestre à partir de 2017* (France), SA.43756 *Support to electricity for renewable sources* (Italy), SA.36023 *Support scheme for electricity produced from renewable sources and efficient cogeneration* (Estonia), SA.43140 *Support to renewable energy and CHP* (Latvia), SA.43719 *Système d'aides aux cogénérations au gaz naturel à haute efficacité énergétique* (France).

when the reasonable rate of return (ten-year Treasury bond plus a spread) is used as the discount rate. If an existing facility had reached its reasonable return by 2013, compensation for investments would end and the facility would continue to receive only compensation for operations to cover its operational costs, as described in paragraph (35)(f), in order to ensure that the rate of return is constant over the entire lifetime of the facility.

(121) Point 131(c) EEAG states that the production costs are to be updated regularly, at least every year.

(122) Beneficiaries have to submit information on various aspects of their activity related to compensation on a yearly basis. This includes, for example, proof that they fulfil the equivalent electrical performance requirements, the percentage of primary energy savings, the fuel mix and volumes used, and information on other costs. As indicated in paragraph (37), Spain revises compensation for operations applicable to technologies whose operating costs depend mainly on fuel prices at least once a year. Fixed operating costs are also adapted yearly as mentioned in paragraph (35)(f).

(123) Point 131(d) EEAG states that aid is only granted until the plant has been fully depreciated.

(124) As indicated in paragraph (35)(a), aid is only granted during the lifetime of the facility, which is calculated based on the depreciation period of the equipment and installations in each of the technologies, assuming they are properly maintained.

*(ii) Competitive bidding processes*

(125) According to point 126 EEAG, aid granted by means of non-discriminatory competitive bidding processes is presumed to be proportionate.

(126) On the requirement under point 126 EEAG to organise 'pilot tenders' for at least 5 % of the planned new electricity capacity from RES for 2015 and 2016, Spain carried out two competitive auctions for a total capacity of 700 MW (see section 2.6.2) in 2016, which far exceeds the requirement of 5 % of the total new RES capacity for 2015 and 2016. The latter was 1150 MW and included, in addition to the two auctions, only the capacity of 450 MW on the Canary Islands in 2015 (see section 2.6.1.2). As indicated in paragraph (48), Spain has confirmed that as of 1 January 2017, all aid is granted in competitive bidding processes.

(127) On the general requirement of openness to all types of generation, the two auctions organised in May 2017 and July 2017 pitted different technologies against each other. The May auction was open to all types of generation including 'other technologies' apart from wind and PV installations. As for the July auction, Spain has argued that based on the market information from the May auction, keeping the third category for other technologies in the auction would lead to suboptimal results. The results of the May auction showed that other technologies would not be able to compete with wind and PV on cost and would not be able to help achieve the 2020 RES targets in time. As a result, a process open to all generators would have led to a suboptimal result in line with point (126) EEAG.

(128) The Spanish authorities explained that the cap on discounts referred to in paragraph (70) is a way of striking the right balance between the objectives of minimising the

overall costs for the electricity system and guaranteeing a level playing field for the different technologies. It should be recalled that at the respective maximum discounts, the extra costs for the electricity system (which is the relevant parameter to determine the winning bids) are equal for all technologies. Based on the results of the May auction, the Spanish authorities increased the maximum discounts and therefore reduced the potential aid amounts further.

(129) The maximum discounts in the May auction already imply that beneficiaries are highly unlikely to receive aid since their investment compensation is zero and they will only be protected against drops in the market price to levels that are unlikely to be observed in the years to come.[58] The higher maximum discounts in the July auction in practice reduced protection against a drop in the market price even further, i.e. to an even lower guaranteed price level. At the same time, this protection against an unexpectedly sharp fall in the market price helps to ensure that projects that are granted aid have a reasonable chance of securing project financing, and therefore of being completed on time to help achieve the 2020 RES targets.

(130) The Commission considers that the support levels at the maximum discounts minimise aid with regard to the objectives pursued, in particular to allow different technologies to compete against each other and to ensure a reasonable rate of return in the event of very bleak market conditions. This therefore ensures the bankability and completion of projects.

(131) Based on the above considerations, the Commission concludes that the aid granted under the scheme is proportionate within the meaning of point (69) EEAG.

### 3.4.5.   *Avoidance of undue negative effects on competition and trade*

(132) Aid for environmental purposes will, by its very nature, tend to favour environmentally friendly products and technologies at the expense of other, more polluting ones. According to point 90 EEAG, the Commission considers that this effect of the aid will in principle not be viewed as an undue distortion of competition since it is inherently linked to the very objective of the aid.

(133) According to point 116 EEAG, the Commission presumes aid granted to energy from renewable sources to have limited distortive effects provided all other compatibility conditions are met.

(134) In addition, as set out in paragraphs (22) and (23), Spain has committed not to grant any aid to firms in difficulty or to those subject to an outstanding recovery order following a previous Commission decision that declared an aid measure illegal and incompatible with the internal market. This is in line with points 16 and 17 EEAG.

(135) As a result, the Commission concludes that the distortion of competition caused by the notified scheme is balanced by the positive contribution to common policy objectives.

---

[58]   The price forecasts for the Spanish electricity market by international organisations expect electricity prices to increase in the coming years, while the guaranteed price level corresponding to the maximum discounts of both the May and July auctions is significantly below current price levels.

### 3.4.6.   Transparency of aid

(136) According to point 104 EEAG, Member States must ensure the transparency of aid granted by publishing certain information on a comprehensive State aid website. In line with point 106 EEAG, Member States must comply with this obligation as of 1 July 2016.

(137) The Spanish authorities have confirmed that they will comply with the transparency requirements set out in points 104-106 EEAG.

### 3.4.7.   Articles 30 and 110 TFEU

(138) In accordance with point 29 EEAG, as the support for RES is partly financed by a charge levied on all electricity consumption, the Commission has examined its compliance with Articles 30 and 110 TFEU.

(139) According to the case-law, a charge that is imposed on domestic and imported products based on the same criteria may nevertheless be prohibited by the Treaty if the revenue from such a charge is intended to support activities that specifically benefit the taxed domestic products. If the advantages that those products enjoy wholly offset the burden imposed on them, the effects of that charge are apparent only with regard to imported products, and that charge constitutes a charge with an effect equivalent to custom duties, which is contrary to Article 30 of the Treaty. If, on the other hand, those advantages only partly offset the burden borne by domestic products, the charge in question constitutes discriminatory taxation for the purposes of Article 110 of the Treaty and will be contrary to that provision in terms of the proportion used to offset the burden borne by the domestic products.[59]

(140) If domestic electricity production is supported by aid that is financed by a charge on all electricity consumption (including consumption of imported electricity), then the method of financing — which imposes a burden on imported electricity that does not benefit from this financing — risks having a discriminatory effect on imported electricity from renewable energy sources and thereby violating Article 30 and/or 110 TFEU.[60] A similar issue would arise between any neighbouring country that has signed a free trade agreement with the EU that contains provisions similar to Articles 30 and 110 TFEU.

(141) As described in section 2.2, the scheme is partly financed by a charge imposed on electricity consumed in Spain, irrespective of whether it is produced domestically or imported, and this charge is partly calculated on the amount of electricity consumed and thereby imposed on the product itself. As indicated in paragraphs (8) and (9), the charge imposed on electricity consumed in Spain amounted to EUR 1 168.4 million, or 17.5 % of the financing of the specific remuneration scheme in 2015.

---

[59] Joined Cases C-128/03 and C-129/03 AEM, EU:C:2005:224; Case C-206/06 Essent, EU:C:2008:413, paragraph 42.

[60] Case 47/69 *France v Commission*, EU:C:1970:60, paragraph 20. See also Case SA.38 632 (2014/N) Germany — *EEG 2014 — Reform of the Renewable Energy Law*.

(142) Where a Member State uses a charge that is levied on imported and domestic products alike to finance aid for domestic producers, the charge may have the effect of further exacerbating the distortion on the product market caused by the aid as such.

(143) In order to remedy any possible past discrimination under Articles 30 or 110 TFEU, Spain has undertaken to reinvest the share of the charges collected on imported renewable and CHP electricity from 2007 to 2017 in projects and infrastructure that specifically benefit imports.

(144) In particular, Spain plans to allocate EUR 220 million to ongoing interconnection projects included in the Madrid Declaration signed between Portugal, France and Spain, or to similar projects that may be agreed by 2025.

(145) The choice of project will depend on its financing needs, its timetable and specific milestones according to the agreed roadmap. Depending on these criteria, it would be possible to allocate the amount proposed to one or several projects.

(146) The Spanish authorities explained that the 2025 deadline will allow it to include projects that are mature enough. It also gives the Spanish transmission system operator REE time to carry out the preparatory work required to include another project in the list.

(147) If this commitment is not feasible, as an alternative Spain undertakes to open future tenders to producers of renewable energy sources established in neighbouring countries with which it has bilateral agreements in this area for a capacity of 86.45 MW,[61] with the aim of remedying the discrimination caused in the period 2007-2017.

(148) Reinvesting the share of revenue generated by a parafiscal charge levied on imports in projects and infrastructure that specifically benefit imports has been recognised by the Commission as an appropriate means of correcting potential historical discrimination arising from Articles 30 and 110 of the Treaty.[62]

(149) In order to alleviate any concern regarding future compliance with Articles 30 and 110 TFEU, Spain has committed to opening up all future competitive bidding processes to producers of renewable energy sources established in neighbouring countries with which it has bilateral agreements in this area.

(150) The share to be opened up to the producers concerned will be calculated by multiplying Spain's gross electricity imports by the share of RES and highly efficient CHP electricity (using the previous year, or the last year available) for each of the neighbouring countries from which electricity is imported, divided by Spain's total electricity consumption and taking into account the share of the financing of the

---

[61]  Compensation for the period 2007-2017, including the power auctioned in 2017.

[62]  SA.15 876 (N49 0/200) — Italy — *Stranded costs of the electricity sector* (OJ C 250,8. 10.2005, p. 10); SA.33 995 (2013/C) (ex 2013/NN) — Germany — *Support of renewable electricity and reduced EEG surcharge for energy-intensive users* (OJ L 250, 25.09.2015); SA.46 898 (2016/N) — France — *Mécanisme de soutien aux installations de production d'électricité utilisant le biogaz produit par la méthanisation et aux installations de production d'électricité utilisant l'énergie extraite de gîtes géothermiques*.

scheme that is levied on the electricity consumed. The resulting percentage will be applied to the total capacity available in the tender.

(151) The Commission considers Spain's proposals to alleviate all concerns of discrimination against renewable electricity producers in other Member States under Articles 30 and 110 TFEU.

### 3.4.8. Compliance with environmental legislation

(152) As outlined in paragraph (19) Spain has confirmed that it complies with Directive 2000/60/EC of the European Parliament and the Council of 23 October 2000 establishing a framework for Community action in the field of water policy with regard to the support provided to hydropower plants under the notified scheme, in line with point 117 EEAG.

(153) As indicated in paragraph (20), Spain has confirmed that the waste hierarchy as set out in Directive 2008/98/EC (Waste Framework Directive) is respected in terms of the support provided under the notified scheme to plants using waste. This is in line with point 118 EEAG.

### 3.5. Comments of third parties and compliance with other EU law

#### 3.5.1. Assessment of State aid to existing installations

(154) The investors have made submissions on the application of the scheme to existing installations claiming that the previous scheme would not constitute State aid, or would in any event be compatible with the internal market.

(155) As a general comment, the Commission recalls that there is 'no right to State aid'.[63] A Member State may always decide not to grant an aid, or to put an end to an aid scheme. Where the aid has not been authorized by the Commission, the Member State is obliged to suspend the scheme until the Commission has declared it compatible with the internal market pursuant to Article 108(3) TFEU.

(156) In the present decision, the Commission has assessed the measure notified by Spain (see section 2.1). It has therefore assessed whether existing installations receive overcompensation for their entire period of life, and has found that on the basis of the total payments received under both schemes (the specific remuneration scheme and the premium economic scheme), that is not the case, as explained above in section 3.4.4. As Spain has decided to replace the premium economic scheme with the notified aid measure it is not relevant for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not.

---

[63] Opinion of Advocate General Wahl in *Kotnik*, paragraph 79: "*[…] under EU State aid rules, no undertaking can claim a right to receive State aid; or, to put it differently, no Member State can be considered obliged, as a matter of EU law, to grant State aid to a company.*" See also to that effect Order in *Milchindustrie-Verband e.V. und Deutscher Raiffeisenverband e.V. v Commission*, T-670/14, EU:T:2015:906, paragraph 29.

### 3.5.2.   General principles of Union law of legal certainty and legitimate expectations

(157)   The investors argue, both before investor-State arbitration tribunals and in their submissions to the Commission, that by modifying the support scheme with regard to existing installations, Spain has violated the general principles of Union law of legal certainty and legitimate expectations.

(158)   In the very specific situation of the present case, where a Member State grants State aid to investors, without respecting the notification and stand-still obligation of Article 108(3) TFEU, legitimate expectations with regard to those State aid payments are excluded. That is because according to the case-law of the Court of Justice, a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission.[64]

### 3.5.3.   Alleged violation of the provisions of the Energy Charter Treaty

(159)   A number of investors have initiated investor-State arbitration against Spain on the basis of the Energy Charter Treaty against the changes brought by the Royal Decree 413/2014 to beneficiaries of the premium remuneration scheme it replaces.

(160)   As a preliminary point, the Commission observes that most of the investors that have brought cases against Spain are based in other Member States of the Union. The Commission considers that any provision that provides for investor-State arbitration between two Member States is contrary to Union law; in particular, this concerns Article 19(1) TEU, the principles of the freedom of establishment, the freedom to provide services and the free movement of capital, as established by the Treaties (in particular Articles 49, 52, 56, and 63 TFEU), as well as Articles 64(2), 65(1), 66, 75, 107, 108,[65] 215, 267 and Article 344 TFEU, and the general principles of Union law of primacy, unity and effectiveness of Union law, of mutual trust[66] and of legal certainty.

(161)   The conflict concerns both substance and enforcement. On substance, Union law provides for a complete set of rules on investment protection (in particular in Articles 49, 52, 56, and 63 TFEU, as well as Articles 64(2), 65(1), 66, 75 and 215 TFEU). Member States are hence not competent to conclude bilateral or multilateral agreements

---

[64]   Case C-24/95 *Land Rheinland-Pfalz v Alcan Deutschland*, EU:C:1997:163, paragraph 25, in which the Court of Justice has concluded that "In view of the mandatory nature of the supervision of State aid by the Commission under Article [108] of the Treaty, undertakings to which aid has been granted may not, in principles, entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in that article. A diligent businessman should normally be able to determine whether that procedure has been followed." (paragraphs 13 and 14); see also the judgment in case C-169/95 *Spain v Commission* EU:C:1997:10.

[65]   See on Articles 107 and 108 TFEU Decision (EU) 2015/1470 of the Commission of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania — arbitral award of 11 December 2013 in *Micula v Romania* (OJ L 232 of 4.9.2015, p. 43).

[66]   Opinion 2/13, paragraphs 168, 191, 194 and 258 first indent; Case C-536/13 *Gazprom* EU:C:2015:316; Cases C-411/10 and C-493/10 *N.S. a.o.* EU:C:2011:865, paragraph 83; Case C-195/08 *PPU, Rinau* EU:C:2008:406, paragraph 50; Case C-185/07, *Allianz SpA and Generali Assicurazioni Generali SpA* v *West Tankers* EU:C:2009:69; Case C-159/02, *Turner* EU:C:2004:228, paragraph 24, and Cases C-187/01 and C-385/01, *Gözütok und Brügge* EU:C:2003:87, paragraph 33.

between themselves, because by doing so, they may affect common rules or alter their scope.[67] As the two sets of rules on investment protection potentially applicable between an EU Member State and an investor of another State (i.e. the Treaties and intra-EU bilateral investment treaties (BITs) or the ECT in an intra-EU setting) are not identical in content and are applied by different adjudicators, there is also a risk of conflicts between the international investment treaty and Union law.[68]

(162) On enforcement, an Arbitration Tribunal created on the basis of the Energy Charter Treaty in a dispute between an investor of one Member State and another Member State or an intra-EU BIT has to apply Union law as applicable law (both as international law applicable between the parties and, where relevant, as domestic law of the host State). However, according to the case-law, it is not a court or tribunal of a Member State, and hence cannot make references to the ECJ, because in particular the requirements of permanence, of a State nature, and mandatory competence are not met.[69]

(163) The resulting treaty conflict is to be solved, in line with the case-law of the Court, on the basis of the principle of primacy in favour of Union law. For those reasons, ECT does not apply to investors from other Member States initiating disputes against another Member States.

(164) In any event, there is also on substance no violation of the fair and equitable treatment provisions. As explained above at section 3.5.2, in the specific situation of the present case Spain has not violated the principles of legal certainty and legitimate expectations under Union law. In an intra-EU situation, Union law is part of the applicable law, as it constitutes international law applicable between the parties to the dispute. As a result, based on the principle of interpretation in conformity, the principle of fair and equitable treatment cannot have a broader scope than the Union law notions of legal certainty and legitimate expectations in the context of a State aid scheme. In an extra-EU situation, the fair and equitable treatment provision of the ECT is respected since no investor could have, as a matter of fact, a legitimate expectation stemming from illegal State aid. This has been expressly recognised by Arbitration Tribunals.[70] It is in any event settled case-law[71] that a measure that does not violate domestic provisions on legitimate expectation generally does not violate the fair and equitable treatment provision.

---

[67] Case C-370/12, *Pringle* EU:C:2012:756, paragraphs 100 and 101.

[68] See Cases C-249/06, *Commission* v *Sweden* EU:C:2009:119, paragraph 42; C-205/06, *Commission* v *Austria* EU:C:2009:118, paragraph 42; and Case C-118/07, *Commission* v *Finland* EU:C:2009:715, paragraph 33. On the fact that the risk of conflict is sufficient to trigger incompatibility, see also Case C-471/98, *Commission* v *Belgium* ("*Open Skies*") EU:C:2002:628, paragraphs 137 to 142; and Opinion 2/13, paragraphs 198, 199 and 208.

[69] See, on the requirements in general, Case C-54/96 *Dorsch Consult* EU:C:1997:413, paragraphs 22 to 37, and Case C-377/13 *Ascendi Beiras Litoral e Alta* EU:C:2014:1754, paragraphs 23 to 34. For their application to commercial arbitration, see for example Case 102/81 *Nordsee v Reederei Mond* EU:C:1982:107, paragraphs 11 and 12.

[70] *Electrabel S.A. v. Republic of Hungary, ICSID Case No. ARB/07/19.*

[71] *EDF v Romania*, ARB/05/13, paragraphs 279 to 283; *Al Bahloul v Tajikistan*, SCC/64/2008, paragraphs 221 to 225; see also in that sense *ADF Group v United States of America*, ARB(AF)/00/1, para 189

(165) The Commission recalls that any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the *premium* economic scheme by the notified scheme would constitute in and of itself State aid. However, the Arbitration Tribunals are not competent to authorise the granting of State aid. That is an exclusive competence of the Commission. If they award compensation, such as in *Eiser* v *Spain*, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation.

(166) Finally, the Commission recalls that this Decision is part of Union law, and as such also binding on Arbitration Tribunals, where they apply Union law. The exclusive forum for challenging its validity are the European Courts.

### 3.6.   Evaluation

(167) The EEAG (point 28 and Chapter 4) state that the Commission may make certain aid schemes subject to an evaluation where the potential distortion of competition is particularly high, i.e. when the measure may risk significantly restricting or distorting competition if their implementation is not reviewed in due time. Given its objectives, evaluation only applies to aid schemes with large aid budgets, containing novel characteristics or when significant market, technology or regulatory changes are scheduled.

(168) The scheme fulfils the criteria of being a scheme with a large aid budget and containing novel characteristics; it will therefore be subject to an evaluation.

(169) Spain has notified the Commission about an evaluation plan together with the aid scheme. The main elements are described in section 2.7 above. The plan defines the scope and methods to be used in the evaluation. These take into account the Commission Staff Working Document on Common methodology for State aid evaluation.[72]

(170) The Commission considers that the notified evaluation plan contains the necessary elements: the objectives of the aid scheme to be evaluated, the evaluation questions, the result indicators, the proposed methodology to conduct the evaluation, the data collection requirements, the proposed timing of the evaluation including the date of submission of the final evaluation report, the description of the independent body conducting the evaluation or the criteria that will be used for its selection and how the evaluation will be published.

(171) The Commission notes that the scope of the evaluation is suitably defined. It comprises a list of evaluation questions with matched result indicators. Data sources are defined for each question. The evaluation plan also sets out and explains the main methods that will be used to identify the impact of the scheme, and discusses why these methods are likely to be appropriate for the scheme in question.

(172) The Commission acknowledges the commitments made by Spain on ensuring that the evaluation is conducted by an independent evaluation body in accordance with the notified evaluation plan. The procedures identified for selecting such an evaluation

---

[72] SWD(2014) 179 final

body are appropriate in terms of independence and skills. In addition, the proposed publication of the evaluation results should ensure transparency.

(173) The Commission notes the commitment made by Spain to submit the final evaluation report by the end of 2020.

## 4.   AUTHENTIC LANGUAGE

(174) As mentioned under section 1 above, Spain has accepted to have the decision adopted and notified in English. The authentic language will therefore be English.

5.    CONCLUSION

The Commission laments the fact that Spain implemented the aid measure in breach of Article 108(3) TFEU.

The Commission has assessed the compensation that facilities receive under the scheme over their entire lifetime. For existing facilities, this includes the payments received under the premium economic scheme. On the basis of the aforementioned assessment, it has decided not to raise objections to the aid on the grounds that it is compatible with the internal market pursuant to Article 107(3)(c) TFEU.

If this letter contains confidential information that should not be disclosed to third parties, please inform the Commission within 15 working days of the date of receipt.

If the Commission does not receive a reasoned request by that date, it will assume that you agree to the disclosure to third parties and to the publication of the full text of the letter in the authentic language on the Internet site:
http://ec.europa.eu/competition/elojade/isef/index.cfm.

You should send your request electronically to the following address:

European Commission
Directorate-General Competition
State Aid Greffe
B-1049 Brussels
Stateaidgreffe@ec.europa.eu


Yours faithfully,
For the Commission



Margrethe VESTAGER
Member of the Commission

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2019, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system.


*/s/ R. Stanton Jones*
R. Stanton Jones