**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NEXTERA ENERGY GLOBAL HOLDINGS B.V. *and* NEXTERA ENERGY SPAIN HOLDINGS B.V., <br><br>              Petitioners, <br><br>     v. <br><br> KINGDOM OF SPAIN, <br><br>              Respondent. | No. 19-cv-01618-TSC |

**EXPERT DECLARATION OF PROF. DR. STEFFEN HINDELANG, LLM IN SUPPORT OF THE KINGDOM OF SPAIN'S MOTION TO STAY AND ULTIMATELY DISMISS PETITION TO ENFORCE ARBITRAL AWARD**

## I.    Introduction and Background

1.      I, Steffen Hindelang, make this declaration in the above-captioned case ("*NextEra Energy v. Spain*") based upon my personal knowledge, except where stated on information and belief.  The statements in this declaration, and the information upon which they are based, are true the best of my knowledge and belief.

2.      I am a German citizen, and I was born on December 6, 1978.

3.      I am Professor at the Department of Law of the University of Southern Denmark in Odense. I teach and research in the areas of EU law, international economic law, in particular, international investment law, and German public law. Previously I was guest professor at the Faculty of Law of the University of Uppsala as a Swedish Prize Laureate (2018), Professor at the Free University of Berlin (2011-2017), senior research associate and

senior lecturer at Humboldt-Universität zu Berlin (2010-2011) and research associate and lecturer at the University of Tübingen (2004-2009). I am also a senior fellow at the Walter Hallstein Institute of European Constitutional Law at Humboldt-Universität zu Berlin. My CV and the list of my publications are attached hereto as Exhibit 1 and Exhibit 2, respectively.

4.     I have no familial or business relationship or affiliation with any of the parties to this case. I have never represented any of them in any capacity.

5.     I have previously submitted eight reports on EU law, including rebuttal reports, in support of the Kingdom of Spain's motions in four other enforcement proceedings in this District: (1) *Novenergia II – Energy & Environment (SCA) v. The Kingdom of Spain*, No. 1:18-cv-1148; (2) *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. The Kingdom of Spain*, No. 1:1818-cv-114801686-CKK; (3) *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. v. The Kingdom of Spain*, No. 1:18-cv-1753 (EGS); and (4) *Masdar Solar & Wind Cooperatief U.A. v. The Kingdom of Spain*, No. 1:18-cv-02254-JEB. I have also submitted a report in one proceeding to confirm an arbitral award before the U.S. District Court for the Southern District of New York: Foresight Luxembourg Solar 1 S.À.R.L. v. The Kingdom of Spain, Civil Action No. Civil Action No. 1:19- cv-3171.  In addition, I have submitted a legal opinion in support of the Republic of Poland in appeals proceedings of the Republiken Polen (Republic of Poland) v. PL Holdings S.Á.R.L, Case No. T 1569-19 before the Högsta Domstolen (the Swedish Supreme Court).

6.     I have been asked by counsel for Respondent Kingdom of Spain ("Spain") in this matter to give my expert opinion on whether European Union ("EU") law precludes the application of Article 26 of the Energy Charter Treaty ("ECT"), in particular its paragraph 3, to disputes between an investor from one EU Member State and another EU Member State

sovereign, as well as other issues relevant to this case, such as state aid issues, as set out below.

7.      As part of my work in connection with this declaration, I have reviewed:

    a.  Petition to Confirm Foreign Arbitral Award, dated June 3, 2019, in *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Spain*, No. 19-cv-01618-TSC (Exhibit 3);

    b.  The following documents from the underlying arbitration proceedings in NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. The Kingdom of Spain, ICSID Case No. ARB/14/11:

        i.  *Amicus curiae* submission dated 5 September 2016, submitted by the European Commission (Exhibit 4);

        ii.  Reply on Preliminary Objection dated 14 October 2016, submitted by Spain (Exhibit 5);

        iii.  Rejoinder on the Merits dated 20 October 2016, submitted by Spain (Exhibit 6);

        iv.  Decision on Jurisdiction, Liability and Quantum Principles dated 12 March 2019 (Exhibit 7).

8.      All authorities I have relied upon are set forth at the end of my declaration and produced as Exhibits to this declaration.

9.      I do not express an opinion on any other law in this declaration other than EU law and public international law relevant to the issue I have been asked to address.

10.      I am being compensated at a rate of EUR 500 per hour to prepare this expert declaration and, if required, to testify in this matter.

## II.    Relevant Rules and Principles of the EU Legal Order

11.    In order for the Court to understand the question presented to me, it is first important to set out the relevant rules and principles of the EU legal order, which I discuss in this section.

12.    The European Union is comprised of 28 Member States that have ceded to the EU aspects of sovereignty to establish one integrated Europe characterized by common laws, values, and a single internal market. The two main foundational instruments of the EU are the (1) Treaty on European Union ("TEU") (Exhibit 9) and (2) the Treaty on the Functioning of the European Union ("TFEU") (Exhibit 8), signed and ratified by all EU Member States (collectively "EU Treaties"). The EU's institutions include the European Parliament, the European Council, the Council of the European Union (in the EU Treaties simply called the "Council"), the European Commission (also called the "Commission"), the Court of Justice of the European Union ("CJEU"), the European Central Bank, and the Court of Auditors. *See* TEU, art. 13(1).

13.    The most important primary sources of EU law are the EU Treaties and the Charter of Fundamental Rights of the European Union ("CFREU") (Exhibit 11). EU law also includes secondary legislation based on the EU Treaties adopted by the EU's institutions, including regulations, directives, and decisions.  In the EU legal order, the EU Treaties take precedence over any other EU law, including international agreements concluded by the EU. *See* CJEU, Case 26/78, ECLI:EU:C:1978:172, ¶ 9 – *Viola* (Exhibit 18)*;* CJEU, Joined Cases C-402/05 P and C-415/05 P, ECLI:EU:C:2008:461, ¶ 285 – *Kadi* (Exhibit 36). In addition, EU law incorporates the jurisprudence of the CJEU.[1]

---

[1] The CJEU functions in accordance with the EU Treaties and its statute. *See* Statute's Consolidated Version of the Statute of the Court of Justice of the European Union (Exhibit 12).

14.     Several features of the EU legal order are relevant to the petition filed by NextEra to recognize and enforce the Award in the United States.

### 1. The Dual Nature of the EU Legal Order: Public International Law and a Constitutional Framework Creating Law in Force in the EU Member States

15.     The European Union's legal order is both a highly elaborate legal regime in public international law and a constitutional framework creating law applicable in EU Member States. This dual legal order enables EU Member States, including Spain, to work to achieve "an ever closer union among the peoples of Europe." *See* TFEU, Preamble. *See* TEU, Preamble and art. 1(2).

16.     In its recent judgment in *Slovak Republic v. Achmea*, the CJEU explained that "[g]iven the nature and characteristics of EU law … that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States." CJEU, Case C-284/16, ECLI:EU:C:2018:158, ¶ 41 – *Achmea* ("*Achmea*") (Exhibit 46). Thus, in addition to being instruments of international law, the EU Treaties, together with other EU law, form part of the national laws of EU Member States. *See, e.g.*, CJEU, Case 6/64, ECLI:EU:C:1964:66, 3. Ruling – *Costa v. ENEL* (Exhibit 16); CJEU, Case 106/77, ECLI:EU:C:1978:49, ¶ 21 – *Simmenthal II* ("*Simmenthall II*") (Exhibit 17).

17.     The EU Treaties can be seen as limiting the Members States' sovereignty more significantly than "typical" founding instruments of international organisations. This is evidenced by the fact that in case of a conflict between a rule created by the EU Member States and EU law, EU law takes precedence and overrides such a rule. *See Simmenthal II*, ¶¶ 21-22 (Exhibit 17). This all-encompassing conflict rule is known in the EU law parlance, as the principle of primacy of EU law. As discussed below, no derogation is permitted from this

rule, save through a formal amendment procedure required to change the terms of the EU Treaties. *See* TEU, art. 48.

18.     The fact that the EU Treaties may be more limiting on the Member States' sovereign powers than other international agreements does not change the fact that EU law is public international law when applied between the EU Member States; albeit with a *superior rank* in relation to other public international law applicable between the EU Member States. *See Achmea*, ¶ 41 (Exhibit 46); CJEU, Case C-478/07, ECLI:EU:C:2009:521, ¶ 98 – *Budějovický Budvar* (Exhibit 37).

### 2. The EU Judicial System and Its Governing Principles

19.     The EU judicial system is governed by the EU Treaties. *See* TEU, art. 19; TFEU, art. 251 *et seq.* It is made up of the courts and tribunals of the EU Member States and the CJEU. While each EU Member State establishes its own courts and tribunals, all such courts and tribunals must apply and interpret EU law. *See* TEU, art. 19(1); CFREU, arts. 47, 51(1) (Exhibit 11); CJEU, Case 26/62, ECLI:EU:C:1963:1 – *van Gend & Loos* (Exhibit 15).

20.     The CJEU has exclusive jurisdiction in *ultimately* determining the content and scope of EU law.[2] Its mandate is to ensure that "in the interpretation and application of the Treaties the [EU] law is observed." TEU, art. 19(1). The CJEU reviews the legality of the acts of the institutions of the European Union, ensures that the Member States comply with obligations under the EU Treaties, and interprets EU law at the request of national courts and tribunals. *See* TEU, art. 19; TFEU, art. 251 *et seq.* In so doing, the CJEU preserves the unique characteristics of EU law and guarantees equality under the law. *See* TEU, Preamble,

---

[2] For the role of the courts and tribunals established by the EU Member States with regard to the interpretation of EU law see below ¶¶ 24 *et seq.*

arts. 2, 9. In EU law terminology: it preserves *the autonomy of EU law*.[3]

21.     The principle of autonomy is of fundamental importance to the EU legal order. In accordance with this principle, the CJEU's exclusive authority may not be circumvented or hampered by the action of EU Member States or other EU institutions. For example, the jurisprudence of the CJEU establishes that "an international agreement cannot affect the allocation of powers fixed by the [EU] Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the [CJEU]." CJEU, Opinion 2/13, ECLI:EU:C:2014:2454, ¶ 201 – *ECHR* (Exhibit 42). *See e.g.,* CJEU, Opinions 1/91, ECLI:EU:C:1991:490, ¶ 35 – *EEA* ("Opinion 1/91") (Exhibit 24), and 1/00, ECLI:EU:C:2002:231, ¶¶ 11, 12 – *European Common Aviation Area* (Exhibit 30); CJEU Judgments in C-459/03, ECLI:EU:C:2006:345, ¶¶ 123, 136 – *Commission v. Ireland (Mox Plant)* (Exhibit 34) and Joined Cases C-402/05 P and C-415/05 P, ECLI:EU:C:2008:461, ¶ 282 – *Kadi* (Exhibit 36).

22.     As noted, another fundamental principle of EU law is that of the "primacy" of EU law. According to the principle of primacy, in case of a conflict between a rule created by one of the EU Member States and EU law, EU law takes precedence and overrides such a rule. This fundamental principle in reflected in the Treaties[4] and was succinctly described in

---

[3] The principle of autonomy of EU law has been set out in a series of decisions and opinions of the CJEU. *See* especially CJEU, Opinion 1/91, ECLI:EU:C:1991:490, ¶ 35 – *EEA* (Exhibit 24); CJEU, Opinion 1/00, ECLI:EU:C:2002:231 ¶ 11-12 – *European Common Aviation Area* (Exhibit 30); CJEU, Opinion 1/09, ECLI:EU:C:2011:123, ¶¶ 77 *et seq.* – *European and Community Patents Court* (Exhibit 39); CJEU, Opinion 2/13, ECLI:EU:C:2014:2454 – *ECHR* ("Opinion 2/13") (Exhibit 42); CJEU, Case C-196/09, ECLI:EU:C:2011:388 – *Paul Miles e.a. v. Écoles européennes* (Exhibit 40); CJEU, Case C-284/16, ECLI:EU:C:2018:158 – *Achmea* (Exhibit 46).

[4] The principle of primacy is reflected, among others, in Article 351 TFEU which provides a narrow exception for "rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more *third countries* on the other, [which] shall not be affected by the provisions of the Treaties." (emphasis added). *See also* Consolidated Versions of the Treaty on European Union and the Treaty on the Functioning of the European Union, Declarations annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, Declaration concerning primacy, 2008 O.J. (C 115) 335, 344 (Exhibit 10).

the CJEU's landmark *Simmenthal II* judgement:

> [E]very national court must, in a case within its jurisdiction, apply [EU] law in its entirety … and must accordingly *set aside any* provision of national law which may conflict with it, *whether prior or subsequent* to the [EU] rule.

> Accordingly any provision of a national legal system and any legislative, administrative or judicial practice which might impair the effectiveness of [EU] law by withholding from the national court having jurisdiction to apply such law *the power* to do everything necessary at the moment of its application *to set aside national legislative provisions* which might prevent [EU] rules from having full force and effect *are incompatible* with those requirements which are the *very essence of [EU] law*.

*Simmenthal II*, ¶¶ 21-22 (emphasis added) (Exhibit 17).

23.     EU law generally takes precedence over any conflicting rule of any rank created by the EU Member States, even if this rule is contained in the constitution of an EU Member State and would afford a more favourable legal position. This was just recently re-confirmed by the CJEU in *Stefano Melloni v. Ministerio Fiscal*, where the CJEU stated that any other reading

> would undermine the principle of the primacy of EU law inasmuch as it would allow a Member State to disapply EU legal rules . . . where they infringe the fundamental rights guaranteed by that [EU Member] State's constitution.

CJEU, Case C-399/11, ECLI:EU:C:2013:107 – *Stefano Melloni v. Ministerio Fiscal*, ¶ 58 (Exhibit 41)

24.     The principle of primacy of EU law need not be pleaded by concerned parties; it must be applied by the competent court or tribunal on its own motion. *Simmenthall II*, ¶ 24 (Exhibit 17).

25.     The principle of primacy of EU law is not limited to EU Member States' courts and tribunals but requires any competent authority to both apply and give full effect to EU law. *See* CJEU, Joined Cases 205 to 215/82, ECLI:EU:C:1983:233 – *Deutsche Milchkontor*,

¶¶ 17, 22 *et seq.* (Exhibit 20); CJEU, Case C-231/96, ECLI:EU:C:1998:401 – *Edis* (Exhibit 28). Thus, any competent authority applying EU law must disregard any rule created by an EU Member State that conflicts with EU law. Moreover, it falls upon all concerned EU Member State authorities to correct the incompatibility and align their laws with EU law. *See* CJEU, Joined Cases C-231/06 to C-233/06, ECLI:EU:C:2007:373, ¶¶ 38, 41 – *Jonkman et al* (Exhibit 35).

26.     The principle of primacy of EU law also applies to international agreements or treaties between EU Member States. EU law therefore takes precedence over the rules created by EU Member States in international agreements or treaties concluded between them. *See, e.g.,* CJEU, Case 10/61, ECLI:EU:C:1962:2 – *Commission v. Government of the Italian Republic* (Exhibit 14); CJEU, Case C-3/91, ECLI:EU:C:1992:420, ¶ 8 – *Exportur* (Exhibit 25); CJEU, Case C- 469/00, ECLI:EU:C:2003:295, ¶ 37 – *Ravil* (Exhibit 32); CJEU, Case C-478/07, ECLI:EU:C:2009:521, ¶ 98 – *Budějovický Budvar* (Exhibit 37); CJEU, Case C-546/07, ECLI:EU:C:2010:25, ¶ 44 – *Commission v. Germany* (Exhibit 38). The CJEU expressly held this, for example, in relation to agreements in public international law between the Republic of Austria and the Czechoslovak Socialist Republic relating to agricultural and industrial products:

> [S]ince the bilateral instruments at issue now concern two Member States, their provisions cannot apply in the relations between those States if they are found to be contrary to the rules of the [EU Treaties].

CJEU, Case C-478/07, ECLI:EU:C:2009:521, ¶ 98 – *Budějovický Budvar* (Exhibit 37).

27.     The application of the principle of primacy is not limited to bilateral agreements but extends to all international agreements between Member States, irrespective of whether they are bilateral or multilateral, *see* CJEU, Case C-459/03, ECLI:EU:C:2006:345

– *Commission v. Ireland (Mox Plant)*, ¶¶ 169-171 (Exhibit 34) (involving the multilateral UN

Convention on the Law of the Sea)), with or without participation of the EU. (Opinion 1/91,

¶¶ 40, 70 (Exhibit 24); Opinion 1/09, ECLI:EU:C:2011:123, ¶¶ 74, 76 – *European and*

*Community Patents Court* ("Opinion 1/09") (Exhibit 39) (Agreement creating a unified patent

litigation system); and Opinion 2/13, *ECHR* ¶¶ 182-83 (Exhibit 42)).

28.     The principle of primacy of EU law is of such fundamental importance to the

proper functioning of the EU that no derogation is permitted. Moreover, the EU cannot

exempt the Member States from observing this principle. *See* CJEU, Case C-26/78,

ECLI:EU:C:1978:172, ¶ 9 – *Viola* (Exhibit 18). Nor can the EU Member States agree among

each other on any other conflict rule to override the one established by the EU Treaties. *See*

CJEU, Joined Cases C- 402/05 P and C0415/05 P, ECLI:EU:C:2008:461, ¶ 285 – *Kadi*

(Exhibit 36). CJEU, Case C-266/16, ECLI:EU:C:2018:118 ¶ 46 – *Western Sahara Campaign*

*UK* (Exhibit 47). The only way for the EU Member States to change this rule is to formally

amend the EU Treaties by following the amendment procedure set out in Article 48 of the

TEU.

29.     It follows that any other conflict rule created by the EU Member States among

each other violates the EU Treaties and cannot be applied under international law.

30.     As a matter of course, the all-encompassing conflict rule established by the EU

Treaties also prevails over any customary international law conflict rules governing the

relationships between international treaties. It is well-established that sovereign States may

establish special conflict rules among themselves, which derogate from the default rules in the

Vienna Convention on the Law of Treaties. *See*, e.g., Int'l Law Comm'n, Rep. of the Study

Group of the Int'l Law Comm'n, Fragmentation of International Law: Difficulties Arising

from the Diversification and Expansion of International Law, U.N. Doc. A/CN.4/L.682

(2006), ¶ 470 (Exhibit 55); Kirsten Schmalenbach, *Article 1: Scope of the Present Convention*, *in* VIENNA CONVENTION ON THE LAW OF TREATIES 21, ¶ 2 (Oliver Dorr & Kirsten Schmalenbach eds., 2018) (Exhibit 64). The principle of primacy of the EU Treaties constitutes such a special conflict rule.

31.     The principle of autonomy is also reflected in the provisions of the TFEU. Article 267 establishes a preliminary ruling procedure that permits national courts and tribunals to obtain rulings from the CJEU on questions concerning the interpretation and validity of EU law. The CJEU has described this keystone of the EU legal system as providing national courts with "the most extensive power, or even the obligation, to make a reference to the [CJEU] if they consider that a case pending before them raises issues involving an interpretation or assessment of the validity of the provisions of European Union law and requiring a decision by them." Opinion 1/09, ECLI:EU:C:2011:123, ¶ 83 – *European and Community Patents Court* ("Opinion 1/09") (Exhibit 39). The preliminary ruling procedure is designed to promote equality under the law by preventing discrepancies in the interpretation of EU law and to ensure that EU law is given its full effect within the framework of the judicial system of the EU Member States. *See id*.

32.     Article 344 of the TFEU prohibits EU Member States from submitting a dispute concerning the interpretation or application of the EU Treaties "to any method of settlement other than those provided for therein." *See* Opinion 2/13, ¶ 201 (Exhibit 42). This ensures that the EU Member State submit questions which may touch upon the interpretation and application of EU law only to such courts and tribunals which are able to refer questions to the CJEU under Article 267 of the TFEU, *i.e.*, the national courts and tribunals of the EU Member States. *See id.*, ¶ 210. As the CJEU has explained, the relationship between the EU Member

States is "governed by EU law to the exclusion ... of any other law," if EU law so requires. *Id.*, ¶ 212.

33.    The CJEU has stressed the fundamental importance of its direct communication with the national courts of EU Member States through the Article 267 procedure. Its Opinion 1/09, which addressed the lawfulness of a proposed European and Community Patents Court, held that EU Member States

> cannot confer the jurisdiction to resolve … disputes on a court created by an international agreement which would deprive [national] courts of their task, as 'ordinary' courts within the European Union legal order, to implement European Union law and, thereby, of the power provided for in Article 267 TFEU.

Opinion 1/09, ¶ 80 (Exhibit 39).

34.    This mechanism for communicating between the CJEU and national courts ensures the uniform application and primacy of EU law because judgments rendered by the CJEU under Article 267 of the TFEU on interpretation of EU law have general, binding effect in all EU Member States. This well-settled proposition was recently confirmed by the CJEU:

> Article 267 TFEU is to be interpreted as meaning that, after receiving the answer of the Court of Justice of the European Union to a question concerning the interpretation of EU law which it has submitted to the Court, or where the case-law of the Court of Justice of the European Union already provides a clear answer to that question, *a chamber of a court of final instance is itself required to do everything necessary to ensure that that interpretation of EU law is applied*.

CJEU, Case C-689/13, ECLI:EU:C:2016:199, 3. Ruling – *Puligienica Facility Esco SpA (PFE) v. Airgest SpA* (emphasis added) (Exhibit 44).

35.    In addition, the judgments of the CJEU have retroactive effect. The CJEU has explained:

> The interpretation which, in the exercise of the jurisdiction conferred on it by [Article 267 of the TFEU], the Court of Justice gives to a rule of Community

[now Union] law clarifies and defines where necessary the meaning and scope of that rule as it must be or ought *to have been understood and applied from the time of its coming into force*. It follows that the rule as thus interpreted may, and *must, be applied by the courts even to legal relationships arising and established before the judgment ruling on the request for interpretation*.

CJEU, Joined Cases C-66, 127 and 128/79, ECLI:EU:C:1980:101, ¶ 9 – *Salumi* (emphasis added) (Exhibit 19).

36.     In short, the CJEU's rulings in the preliminary ruling procedure are binding as to EU law, setting the content and meaning of a given rule *ab initio*.

### 3.    Protection of EU Member State Investors under EU Law

37.     EU law covers a number of subjects, including the EU's common commercial, agricultural, and transport policies, and its rules governing competition and the free movement of goods, persons, services, and capital. *See* L. WOODS ET AL., STEINER & WOODS EU LAW 55-58, 323-326 (13th ed. 2017) ("STEINER & WOODS EU LAW") (Exhibit 63).

38.     In respect of investors from one EU Member State with investments in another EU Member State, EU law guarantees that capital can circulate freely throughout the EU, and that investors enjoy freedom to establish a business, to invest in companies, and to provide services across the EU's internal borders. *See* TFEU, arts. 49, 56, 57, 63(1). EU investors enjoy the fundamental rights protected by the Charter of Fundamental Rights of the European Union, which guarantees the rights to property, access to justice, and non-discrimination. *See* CFREU, arts. 17, 21, 47-50, (Exhibit 11).  EU investors are also protected by general principles of EU law, such as proportionality, legal certainty, and the protection of legitimate expectations. *See id.*, arts. 17, 21, 47; CJEU, Case C 8/55, ECLI:EU:C:1956:7 – *Fédération Charbonnière de Belgique v. High Authority* (Exhibit 13); CJEU, Case T-115/94,

ECLI:EU:T:1997:3, ¶¶ 14 *et seq. – Opel Austria v. Council* (Exhibit 27); CJEU, Case 120/86,

ECLI:EU:C:1988:213 – *Mulder* (Exhibit 22). *See also* PAUL CRAIG & GRÁINNE DE

BÚRCA, EU LAW 229-231 (6th ed. 2015) ("CRAIG & DE BÚRCA") (Exhibit 62).

39.    Investors have access to the EU Member States' national courts to vindicate

these rights under EU law. Under Article 19(1) of the TEU, Member States are obliged to

provide remedies sufficient to ensure effective legal protection in the fields covered by EU

law. *See* CJEU, C- 64/16, ECLI:EU:C:2018:117, ¶ 29, 34 – *Associação Sindical dos Juízes*

*Portugueses* (Exhibit 45); CRAIG & DE BÚRCA 239-250 (Exhibit 62). EU Member States

are liable for damage or loss caused to any legal or natural persons as a result of violations of

EU law for which the State can be held responsible; and an aggrieved individual or company

can bring a suit against an EU Member State in national courts. *See* CJEU, Case C-6/90,

ECLI:EU:C:1991:428, ¶¶ 28 *et seq. – Francovich* (Exhibit 23); CRAIG & DE BURCA 251-

252, 261-262 (Exhibit 62).

40.    In all these cases, if a court of an EU Member State is in doubt concerning the

precise content and meaning of EU law, it can refer the question to the CJEU. The CJEU's

rulings must then be observed by the courts across the EU Member States, ensuring that all

EU investors within the EU enjoy the same rights under EU law.

41.    In addition, an investor like NextEra has further potential recourse before the

European Court of Human Rights ("ECtHR") pursuant to the European Convention on

Human Rights ("ECHR") to which both Spain and the Netherlands are signatories. The

ECHR protects fundamental rights and freedoms, such as the right to property, the right to due

process and protection from discrimination. If NextEra were to challenge the Spanish

regulations at issue in the arbitration before the Spanish courts and believed that the Spanish

courts treated them unjustly, they would have the right to lodge a complaint with the ECtHR.

42.     If the ECtHR finds that there has been a violation of the ECHR, the ECtHR can award monetary compensation to the injured investor. *See, e.g.*, *Case of OAO Neftyanaya Kompaniya Yukos v. Russia*, Eur. Ct. H.R., App. No. 14902/04, Dec. 15, 2014 at 11-12 (Exhibit 56) (finding that Russian authorities violated the investor's rights by failing to accord sufficient time for them to prepare their cases before national courts and awarding 1.9 billion EUR in damages to the ex-shareholders of the investor to be paid by Russian authorities).

### III. The Principles of Autonomy and Primacy as Articulated by the CJEU in *Achmea* Mean that Article 26 of the ECT Does Not Apply between EU Member States and Preclude an EU Member State from Extending a Valid Offer to Arbitrate to a National of Another EU Member State

43.     Any legal rule on dispute resolution originating from an international treaty entered into between EU Member States that contradicts the EU judicial system violates the principles of primacy and autonomy of EU law and particularly Articles 344 and 267 of the TFEU. Such a rule cannot be applied between Member States. The CJEU recently addressed this in the context of an investment treaty between the Netherlands and the Slovak Republic. That treaty included in Article 8 a provision allowing certain disputes between an investor from one State and the other State to be referred to arbitration. The CJEU ruled that such offers to arbitrate by an EU Member State to a national of another EU Member State in an international agreement are precluded by EU law, including the principles of primacy and autonomy and Articles 267 and 344 of the TFEU. It held:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

*Achmea*, ¶ 62 (Exhibit 46). In so holding, the CJEU re-affirmed that EU law-related issues can only be decided conclusively by the CJEU in a judicial dialogue with the EU Member State courts and tribunals:

> [T]he possibility of submitting those disputes to a body which is not part of the judicial system of the EU … call[s] into question … the preservation of the particular nature of the law established by the [EU] Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and … has an adverse effect on the autonomy of EU law.

*Achmea*, ¶¶ 58-59 (Exhibit 46).

44.    Based on this, in a decision published on November 8, 2018, the German Federal Court of Justice applied the CJEU's decision in *Achmea* and set aside *Achmea*'s award. The German Federal Court of Justice, the supreme court (court of last resort) in private and criminal matters, ruled that, "[a]ccording to the decision of the [CJEU] . . . there is no arbitration agreement between the parties" and "the Final Award made in these proceedings [between the Slovak Republic and Achmea] must be overturned." Bundesgerichtshof [BGH] [Federal Court of Justice] Oct. 31, 2018, I ZB 2/15, *Slovak Republic v. Achmea B.V.* ¶¶ 14, 15, 25, 27 (Ger.) (Exhibit 58).

45.    Because the CJEU's ruling sets the content and meaning of a given rule *ab initio*, at no point in time had there been an arbitration agreement between the disputing parties. Thus, there was no other way for the German Federal Court of Justice to properly apply the CJEU's ruling than to overturn the Final Award in *Achmea*.

46.    The *Achmea* Judgment builds upon the CJEU's prior case law. For example, in Opinion 1/09, the Court reviewed the compatibility with EU law of a proposed multilateral international agreement to be concluded between the EU Member States, the EU and third countries, creating a court with jurisdiction to hear actions related to European and

Community patents. The Court found that this dispute resolution mechanism was incompatible with EU law because EU law issues could not be resolved in the EU Member States' national courts and, hence, could not be referred to the CJEU by means of Article 267 of the TFEU. This is the same defect that led the Court to find the arbitration clause in *Achmea* to be incompatible with the requirements of EU law.

47.    For these same reasons, Article 26 of the ECT cannot be applied between EU Member States. Like the treaty in *Achmea*, the ECT in Article 26(3) does not contain a valid offer by an EU Member State to arbitrate with nationals of other EU Member States. Such an offer is precluded by the principles of primacy and autonomy and particularly by the Articles 267 and 344 of the TFEU. In this regard, twenty-two of the twenty-eight EU Member States affirmed in a joint declaration that Article 26 of the ECT violates the EU Treaties and, hence, is inoperative as between EU Member States and nationals of EU Member States.[5]

48.    Article 26 of the ECT runs afoul of the EU Treaties because it circumvents the preliminary ruling procedure under Article 267 of the TFEU and interferes with the CJEU's exclusive authority to ultimately determine the content and validity of EU law under Articles 267 and 344 of the TFEU. In consequence, Article 26 has been inoperative *ab initio* for intra-EU disputes. As a result, Spain did not make a legally permissible offer to arbitrate based on Article 26(3) of the ECT to investors from another EU Member State, such as NextEra.

---

[5] *Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* 1-2 (Jan. 15, 2019) (Exhibit 52). The other EU Member States chose not to comment on the status of Article 26 of the ECT in an intra-EU context, and instead decided to wait until further consideration, including of an eventual decision by the CJEU on this issue. *See Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* 3 (Jan. 16, 2019) (Exhibit 53); *Declaration of the Representative of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* 3 (Jan. 16, 2019) (Exhibit 54). Following the declarations made by the EU Member States, the European Commission reaffirmed that the application of the arbitration provisions in the ECT in intra-EU disputes is "incompatible with EU law." European Commission, Press Release – Daily News, at 1 (Jan. 17, 2019) (Exhibit 51)

49.    Further, a tribunal purportedly constituted under Article 26 of the ECT in relation to a dispute between an EU Member State and a national of another EU Member State would be required to apply Article 26(6) of the ECT, which provides that "[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

50.    EU law is public international law, however. The "applicable rules and principles of international law" between EU Member States therefore include EU law. This includes the EU Treaties, as interpreted by the CJEU, and specifically the principle of primacy and the principle of autonomy as reflected in Articles 267 and 344 of the TFEU.

51.    A tribunal purportedly constituted under Article 26 of the ECT would therefore be required to apply and duly observe the rules of EU law that limit or conflict with its own jurisdiction. It would have to observe the principle of autonomy of EU law as well as the primacy of EU law over any conflicting rule created by the EU Member States. Application of these rules would require the tribunal to determine that no legally permissible offer was made by an EU Member State to arbitrate with nationals of other EU Member States under the ECT because an arbitration tribunal constituted under Article 26 of the ECT, like the intra-EU investment tribunal in *Achmea*, does not qualify as a "court or tribunal of a Member State." The arbitration tribunal lacks the required "links with the judicial systems of the Member States" and follows procedures that are not "a step in the proceedings before the national courts." *Achmea,* ¶ 48 (Exhibit 46).

52.    Moreover, an arbitral tribunal established under Article 26 of the ECT "may be called on to interpret or indeed to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital." *Id.*,

¶ 42. In that regard, the CJEU stressed in *Achmea* that to violate EU law, it is not necessary that a tribunal actually apply and interpret any of the substantive provisions of EU law in the case before it. Rather, it suffices that such a tribunal "*may*" do so. *Id*. The German Federal Court of Justice, in its ruling in proceedings to overturn the Final Award in *Achmea*, explained the Court's ruling:

> [I]t does not matter whether the arbitration tribunal in fact did not apply and did not have to apply European Union law in this case. To determine whether an arbitration agreement exists between the parties, the only relevant issue is whether the Petitioner was able to make an effective offer to the Respondent to conclude an arbitration agreement . . . The decision of the European Court of Justice indicates that this was not the case, irrespective of whether the arbitration tribunal had to apply European Union law in this case.

*Achmea*, ¶ 32 (Exhibit 46).

53.    A tribunal formed under Article 26 of the ECT may be called upon to interpret or apply EU law in regard to a range of issues. For example, in an arbitration in which the claimant alleges that the respondent State has breached the requirement under Article 10(1) of the ECT to provide investment with fair and equitable treatment, the tribunal would need to assess the investor's assertion of its "legitimate expectations" vis-à-vis its investment. The content of those "expectations" is normally assessed by reference to the prevailing legal regime, which includes the applicable EU regulatory framework. More broadly, a tribunal might have to address the provisions of EU law that govern such matters as the movement of capital, freedom of establishment and to provide services, competition, non-discrimination, or any restrictive measures in relation to foreign investment. *See*, e.g. STEINER & WOODS EU LAW 416-420, 469- 474, 478 (Exhibit 63); CRAIG & DE BÚRCA 721-723, 801-805, 810, 820-821 (Exhibit 62). CJEU, Case C-299/02, ECLI:EU:C:2004:620, ¶ 15 – *Commission v. The Netherlands* (Exhibit 33). At a minimum, a tribunal constituted under Article 26 would

have to decide whether and how EU law affects its jurisdiction to arbitrate an intra-EU investment disputes – a decision that itself requires the interpretation and application of EU law.

54.    In addition, like a tribunal formed under Article 8 of the Netherlands-Slovak Republic investment treaty, a tribunal constituted under Article 26 of the ECT is unable to refer questions concerning EU law to the CJEU under Article 267 of the TFEU. According to Article 267(2) of that treaty only a "court or tribunal of a Member State" may refer questions of interpretation and validity of EU law to the CJEU. This, in turn, means that questions of interpretation and application of EU law would not reach the CJEU, depriving national courts of the EU Member States of part of their jurisdiction and the CJEU of its exclusive authority over the ultimate interpretation and lawful application of EU law. This is incompatible with the EU Treaties and puts the uniform interpretation of EU law at risk, undermines the full effect and autonomy of EU law, and transgresses the legal level playing field that is central to the EU legal regime. *See Achmea*, ¶ 37 (Exhibit 46).

55.    Finally, *Achmea* makes clear that a possible review of an arbitral award by a national court of an EU Member State in a set aside proceeding does not cure the problem. Reference of disputes to resolution by investor-State arbitration is barred by the EU Treaties even where set aside proceedings might be available. Arbitration tribunals cannot ensure the primacy of EU law and the autonomy of its legal order as required by Articles 267 and 344 of the TFEU because the review by national courts is limited in scope under national laws, even if the seat of arbitration is an EU Member State, as was the case in *Achmea*. *See Achmea,* ¶¶ 54-55 (Exhibit 46). Such review will not cover all issues decided by the arbitration tribunal, and the tribunal itself cannot refer questions to the CJEU.

56.     The CJEU's reasoning in *Achmea* thus fully applies to the ECT and the situation in *NextEra Energy v. Spain*. As with the treaty in *Achmea,* in the ECT,

> the Member States [sic!] parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.

*Achmea,* ¶ 56 (Exhibit 46). Hence, a tribunal constituted under Article 26 of the ECT to arbitrate an intra-EU investment dispute violates core principles of EU law and is thus not empowered to resolve the dispute.[6] Consequently, as in *Achmea,* "Articles 267 and 344 TFEU must be interpreted as precluding" the application of Article 26 of the ECT between EU Member States. *See Achmea,* ¶ 62 (Exhibit 46). An investment tribunal established on the basis of the ECT, such as the one in *NextEra v. Spain*, must decline its jurisdiction in an intra-EU dispute.[7] This is because there has never been and, indeed, never could have been a valid offer to arbitrate from one EU Member State to an investor from another EU Member State from the moment the ECT was concluded. The CJEU's ruling in *Achmea* that the applicable principles of EU law preclude such references to arbitration has retroactive effect to the time of inception of

---

[6] My analysis is consistent with the EU Commission's position as reaffirmed following *Achmea. See Communication from the Commission to the European Parliament and the Council*: *Protection of intra-EU investment*, at 26, COM (2018) 547 final (July 19, 2018) (Exhibit 50) and in line with the official position of the European Union taken in several similar proceedings before this Court. *See* Proposed Brief of the European Commission on Behalf of the European Union as *Amicus Curiae* in Support of the Kingdom of Spain, *Novenergia II – Energy & Environment (SCA) v. The Kingdom of Spain*, No. 18-1148 (D.D.C. Feb. 28, 2019), ECF No. 30-1 (Exhibit 60), Proposed Brief of the European Commission on Behalf of the European Union as *Amicus Curiae* in Support of the Kingdom of Spain, *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. The Kingdom of Spain*, No. 18-1686 (D.D.C. Mar. 18, 2019), ECF No. 33 (Exhibit 61), and Proposed Brief of the European Commission on Behalf of the European Union as Amicus Curiae in Support of King of Spain, *Masdar Solar & Wind Cooperatief U.A. v. The Kingdom of Spain*, No. 1:18-cv-02254-JEB, ECF No. 20.

[7] This declaration does not address the question of whether the proper construction of Article 26 of the ECT in accordance with the EU law principle of interpretation in conformity with European law, *see* CJEU, Case 157/86, ECLI:EU:C:1988:62, ¶ 11 – *Murphy* (Exhibit 21), must lead to the same result as the non-application of Article 26 of the ECT.

the EU. Therefore, no arbitration agreement could exist between an investor from one EU

Member State and another EU Member State.

### IV.   The Payment of the Award Rendered in NextEra v. Spain Would Violate EU Law

57.      The EU Treaties prohibit EU Member States from granting any subsidies to

private actors ("State aid") that might disrupt or threaten to distort competition within the EU.

The relevant provision in Article 107(1) of the TFEU provides as follows:

> [A]ny aid granted by a Member State or through State resources in any form
> whatsoever which distorts or threatens to distort competition by favouring certain
> undertakings or the production of certain goods shall, in so far as it affects trade
> between Member States, be *incompatible with the internal market*. (emphasis
> added).

State aid is a measure conferring a selective economic advantage on private operators. To

be considered such aid, the measure must be imputable to the EU Member State and

financed through State resources; it must distort or threaten to distort competition and

have the potential to affect trade between EU Member States.  *See*, *e.g.*, CJEU Case C-

39/94, EU:C:1996:285, ¶¶ 58 *et seq. – SFEI and Others* (Exhibit 26).

58.      Under the EU Treaties, subject to a few unrelated exceptions, State aid is

permissible only when first notified to and approved by the European Commission. According

to Article 108(3) of the TFEU, the Commission

> shall be informed, in sufficient time to enable it to submit its comments, of any
> plans to grant or alter aid. If it considers that any such plan is not compatible with
> the internal market having regard to Article 107 [of the TFEU], it shall without
> delay initiate the procedure provided for in paragraph 2 [of Article 108 of the
> TFEU]. The Member State concerned shall not put its proposed measures into
> effect until this procedure has resulted in a final decision.

59.      To establish whether a particular measure constitutes State aid, the CJEU has

adopted a broad reading of the notion:

> According to settled case-law, the concept of aid encompasses advantages granted by public authorities which, in various forms, mitigate the charges which are normally included in the budget of an undertaking.

CJEU, Case C-310/99, ECLI:EU:C:2002:143, ¶ 51 – *Italian Republic v. Commission* (Exhibit 29). The intention or justification of an EU Member State are irrelevant to whether a measure is considered State aid. It is the effects of the measure in question that are dispositive. *See* CJEU, Case C-382/99, ECLI:EU:C:2002:363, ¶ 60-61 – *The Netherlands v. Commission* (Exhibit 31).

60.    In its Decision 7384, the European Commission applied these factors in connection with arbitrations – such as the arbitration initiated by NextEra that have been commenced against Spain which seek compensation for the regulatory reforms that Spain adopted in its solar energy sector. *See* EC Decision 7384 of 10 November 2017 on State aid SA.40348(2015/NN) – Spain Support for electricity generation from renewable energy sources, cogeneration and waste, ¶ 165 (Exhibit 49). It stated that awards which require payment of compensation would constitute State aid. The Commission concluded that because such "Arbitration Tribunals are not competent to authorise the granting of State aid … [i]f they award compensation, … this compensation would be notifiable State aid" that cannot be paid unless authorized by the Commission. *Id.*, ¶ 165. This would mean that the damages awarded by the tribunal that purport to compensate NextEra for its alleged losses cannot be paid by Spain without the European Commission's prior approval.

61.    The view taken in Decision 7384 is consistent with a previous decision by the European Commission that determined that payment by Romania of an arbitral award rendered by a tribunal constituted under an investment treaty with another EU Member State constituted unauthorized State aid. *See* EC Decision 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – arbitral award *Micula v.*

*Romania* of 11 December 2013, OJ L 232, 43, ¶¶ 94 *et seq.* (Exhibit 48).[8]

62.     The Award, even though issued by the tribunal, is imputable to Spain as it would have to be financed through Spain's state resources. *See id.*, ¶¶ 117 *et seq.* Spain's payment of the Award would qualify as State aid. It is therefore subject to the obligation imposed by Article 108(3) of the TFEU that an EU Member State cannot put in effect any measures that constitutes State aid unless and until approved by the European Commission. The payment of the Award would therefore be in violation of EU law. *See id.*, ¶ 116.

63.     The enforcement of an award that violates EU law would also be illegal in any EU jurisdiction. As explained above, EU law precludes the application of the rules created by the EU Member States which conflict with EU law. This includes situations where the application of such rules would prevent the respective court "from drawing all the consequences of a breach of [EU State Aid rules] . . . because of a decision of a national court, which is *res judicata* . . . A significant obstacle to the effective application of EU law and, in particular, a principle as fundamental as that of the control of State aid cannot be justified either by the principle of res judicata or by the principle of legal certainty." *See* CJEU, Case C-505/14, ECLI:EU:C:2015:742  – *Klausner Holz Niedersachsen GmbH v. Land Nordrhein-Westfalen*, ¶ 45 (Exhibit 43). This effect of EU law results equally in situations where the conflicting rule is contained in the domestic law of an EU Member State or was agreed to by EU Member States in an international agreement or treaty.

64.     When the claimants in the *Micula* arbitration referenced above sought to enforce

---

[8] The recent decision from the General Court of the European Court of Justice ("GC"), Cases T-624/15, T-694/15 and T-704/15, ECLI:EU:T:2019:423 – *European Food and Others* does not change this conclusion in any way. The judgment was, moreover, appealed and is, thus, not final. *See* CJEU, C-638/19 P, pending – *Commission/European Food and others*.

the ICSID award constituting illegal State aid in Luxembourg, Belgium, and Sweden, the

Luxembourg Court of Appeal and the Swedish Nacka District Court refused to enforce the

award because to do so would violate EU law on State aid. *See* Cour Supérieure de Justice,

Cour d'Appel, Mar. 21, 2018, No. 71/18 – VII – REF, *State of Romania v. Viorel Micula* at 21

(Lux.) (Exhibit 57) ("[T]he [EU Commission's State Aid] Decision resulted in the Award

losing its relevancy and efficacy and therefore its enforceability."); Nacka District Court, Case

No. A 2550-1, Decision, Jan. 23, 2019, p. 14 (Exhibit 65) ("Sweden's commitments pursuant

to Article 4(3) [of the] TEU, therefore, entail that there are impediments to the enforcement

[of the ICSID award] sought."). The Brussels Court of Appeal stayed the enforcement of the

award and referred questions on the lawfulness of its enforceability under the EU law to the

EU Court of Justice. Cour d'appel Bruxelles, Judgment (Mar. 12, 2019) (Exhibit 59).

      65.     Because payment of the Award would also breach the law on State aid, the

enforcement of the Award in this matter would be in violation of EU law.[9]

I declare under the penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on October 11, 2019, in Berlin, Germany.

Steffen Hindelang

    _____

---

[9] I take notice that this conclusion is also shared by the European Union in its official position taken in the Proposed Brief of the European Commission on Behalf of the European Union as Amicus Curiae in Support of the Kingdom of Spain, *Novenergia II – Energy & Environment (SCA) v. The Kingdom of Spain*, No. 18-1148 (D.D.C. Feb. 28, 2019), ECF No. 30-1 (Exhibit 60) and Proposed Brief of the European Commission on Behalf of the European Union as Amicus Curiae in Support of the Kingdom of Spain, *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. The Kingdom of Spain*, No. 18-1686 (D.D.C. Mar. 18, 2019), ECF No. 33 (Exhibit 61).

**INDEX OF EXHIBITS**

**Expert Declaration of Steffen in Support of the Kingdom of Spain's Motion to Stay and Ultimately Dismiss Petition to Enforce Arbitral Award**

1. Treaties and Charters
   a) Consolidated Version of the Treaty on the Functioning of the European Union, signed on March 25, 1957, 2012 O.J. (C 326) 47 (Excerpt) (Exhibit 8)
   b) Consolidated Version of the Treaty on European Union, signed on February 7, 1992, 2012 O.J. (C 326) 13 (Excerpt) (Exhibit 9)
   c) Consolidated Versions of the Treaty on European Union and the Treaty on the Functioning of the European Union, Declarations annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, Declaration concerning primacy, 2008 O.J. (C 115) 335, 344 (Exhibit 10)
   d) Charter of Fundamental Rights of the European Union, proclaimed on December 7, 2010, 2012 O.J. (C 326) 407 (Exhibit 11)
   e) Consolidated Version of the Statute of the Court of Justice of the European Union (Exhibit 12)

2. Cases before the Court of Justice of the European Union
   a) CJEU, Case C-8/55, ECLI:EU:C:1956:7 – *Fédération Charbonnière de Belgique v. High Authority* (Exhibit 13)
   b) CJEU, Case C-10/61, ECLI:EU:C:1962:2 – *Commission v. Government of the Italian Republic* (Exhibit 14)
   c) CJEU, Case 26/62, ECLI:EU:C:1963:1 – *van Gend & Loos* (Exhibit 15)
   d) CJEU, Case 6/64, ECLI:EU:C:1964:66 – *Costa v. ENEL* (Exhibit 16)
   e) CJEU, Case 106/77, ECLI:EU:C:1978:49 – *Simmenthal II* (Exhibit 17)
   f) CJEU, Case C-26/78, ECLI:EU:C:1978:172 – *Viola* (Exhibit 18)
   *g)* CJEU, Joined Cases C-66, 127 and 128/79, ECLI:EU:C:1980:101– *Salumi* (Exhibit 19)
   h) CJEU, Joined Cases C-205 to 215/82, ECLI:EU:C:1983:233 – *Deutsche Milchkontor* (Exhibit 20)
   i) CJEU, Case C-157/86, ECLI:EU:C:1988:62 – *Murphy* (Exhibit 21)
   j) CJEU, Case C-120/86, ECLI:EU:C:1988:213 – *Mulder* (Exhibit 22)
   k) CJEU, Case C-6/90, ECLI:EU:C:1991:428 – *Francovich* (Exhibit 23)
   l) CJEU, Opinion 1/91, ECLI:EU:C:1991:490 – *EEA* (Exhibit 24)
   m) CJEU, Case C-3/91, ECLI:EU:C:1992:420 – *Exportur* (Exhibit 25)
   n) CJEU, Case C-39/94, EU:C:1996:285 – *SFEI and Others* (Exhibit 26)
   *o)* CJEU, Case T-115/94, ECLI:EU:T:1997:3– *Opel Austria v. Council* (Exhibit 27)
   p) CJEU, Case C-231/96, ECLI:EU:C:1998:401 – *Edis* (Exhibit 28)
   q) CJEU, Case C-310/99, ECLI:EU:C:2002:143 – *Italian Republic v. Commission* (Exhibit 29)

r)      CJEU, Opinion 1/00, ECLI:EU:C:2002:231 – *European Common Aviation Area* (Exhibit 30)

s)      CJEU, Case C-382/99, ECLI:EU:C:2002:363 – *The Netherlands v. Commission* (Exhibit 31)

t)      CJEU, Case C-469/00, ECLI:EU:C:2003:295 – *Ravil* (Exhibit 32)

u)      CJEU, Case C-299/02, ECLI:EU:C:2004:620 – *Commission v. The Netherlands* (Exhibit 33)

v)      CJEU, Case C-459/03, ECLI:EU:C:2006:345 –*Commission v. Ireland (Mox Plant)* (Exhibit 34)

w)      CJEU, Joined Cases C-231 to C-233/06, ECLI:EU:C:2007:373 – *Jonkman et al.* (Exhibit 35)

x)      CJEU, Joined Cases C-402/05 P and C-415/05 P, ECLI:EU:C:2008:461– *Kadi* (Exhibit 36)

*y)*     CJEU, Case C-478/07, ECLI:EU:C:2009:521 – *Budějovický Budvar* (Exhibit 37)

*z)*     CJEU, Case C-546/07, ECLI:EU:C:2010:25– *Commission v. Germany* (Exhibit 38)

aa)     CJEU, Opinion 1/09, ECLI:EU:C:2011:123 – *European and Community Patents Court* (Exhibit 39)

bb)     CJEU, Case C-196/09, ECLI:EU:C:2011:388 – *Paul Miles e.a. v. Écoles européennes* (Exhibit 40)

cc)     CJEU, Case C-399/11, ECLI:EU:C:2013:107 – *Stefano Melloni v. Ministerio Fiscal* (Exhibit 41)

dd)     CJEU, Opinion 2/13, ECLI:EU:C:2014:2454 – *ECHR* (Exhibit 42)

ee)     CJEU, Case C-505/14, ECLI:EU:C:2015:742 – *Klausner Holz Niedersachsen GmbH v. Land Nordrhein-Westfalen* (Exhibit 43)

ff)     CJEU, Case C-689/13, ECLI:EU:C:2016:199 – *Puligienica Facility Esco SpA (PFE) v. Airgest SpA* (Exhibit 44)

gg)     CJEU, Case C-64/16, ECLI:EU:C:2018:117 – *Associação Sindical dos Juízes Portugueses* (Exhibit 45)

hh)     CJEU, Case C-284/16, ECLI:EU:C:2018:158 – *Achmea* (Exhibit 46)

ii)     CJEU, Case C-266/16, ECLI:EU:C:2018:118 – *Western Sahara Campaign UK* (Exhibit 47)

3.  European Commission Documents

a)      Commission Decision 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – arbitral award *Micula v. Romania* of 11 December 2013, OJ L 232, 43 (Exhibit 48)

b)      Commission Decision 7384 of 10 November 2017 on State aid SA.40348(2015/NN) – Spain Support for electricity generation from renewable energy sources, cogeneration and waste (Exhibit 49)

c)      *Communication from the Commission to the European Parliament and the Council: Protection of intra-EU investment*, COM (2018) 547 final (July 19, 2018) (Exhibit 50)

d)      European Commission, Press Release – Daily News (Jan. 17, 2019) (Exhibit 51)

4.  European Union Authorities

    a)  *Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 15, 2019) (Exhibit 52)

    b)  *Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 16, 2019) (Exhibit 53)

    c)  *Declaration of the Representative of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 16, 2019) (Exhibit 54)

5.  United Nations Documents

    a)  Int'l Law Comm'n, Rep. of the Study Group of the Int'l Law Comm'n, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law, U.N. Doc. A/CN.4/L.682 (2006) (Exhibit 55)

6.  Other Foreign and International Court Decisions

    a)  *Case of OAO Neftyanaya Kompaniya Yukos v. Russia*, Eur. Ct. H.R., App. No. 14902/04, Dec. 15, 2014 (Exhibit 56)

    b)  Cour Supérieure de Justice, Cour d' Appel, Mar. 21, 2018, No. 71/18 – VII – REF, *State of Romania v. Viorel Micula* (Lux.) (Exhibit 57)

    c)  Bundgesgerichtshof [BGH] [Federal Court of Justice] Oct. 31, 2018, I ZB 2/15, *Slovak Republic v. Achmea B.V.* (Ger.) (Exhibit 58)

    d)  Cour d' Appel de Bruxelles, 17e ch. des affaires civiles, Mar. 12, 2019, Nos. 2016/AR/393 and 2016/AR/394, *State of Romania v. Viorel Micula* (Belg.) (Exhibit 59)

    e)  Nacka District Court, Case No. A 2550-1, Decision, Jan. 23, 2019 (Swed.) (Exhibit 65)

7.  U.S. Domestic Cases

    a)  Proposed Brief of the European Commission on Behalf of the European Union as *Amicus Curiae* in Support of the Kingdom of Spain, *Novenergia II – Energy & Environment (SCA) v. The Kingdom of Spain*, No. 18-1148 (D.D.C. Feb. 28, 2019), ECF No. 30-1 (Exhibit 60)

    b)  Proposed Brief of the European Commission on Behalf of the European Union as *Amicus Curiae* in Support of the Kingdom of Spain, *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.A.R.L. v. The Kingdom of Spain*, No. 18-1686 (D.D.C. Mar. 18, 2019), ECF No. 33 (Exhibit 61)

8. Secondary Sources

    a)      PAUL CRAIG & GRÁINNE DE BÚRCA, EU LAW (6th ed. 2015)(Excerpt) (Exhibit 62)

    b)      L. WOODS ET AL., STEINER & WOODS EU LAW (13th ed. 2017) (Excerpt) (Exhibit 63)

    c)      Kirsten Schmalenbach, *Article 1: Scope of the Present Convention*, *in* VIENNA CONVENTION ON THE LAW OF TREATIES 21 (Oliver Dorr & Kirsten Schmalenbach eds., 2018) (Exhibit 64)