# EXHIBIT 6



GOVERNMENT ATTORNEY'S OFFICE
DIRECTORATE FOR STATE LEGAL SERVICES

SUBDIRECTORATE-GENERAL OF LITIGATION
SERVICES

**IN THE CASE OF AN ARBITRATION UNDER THE CONVENTION OF 1965 ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES (ICSID CONVENTION)**

**AND**

**UNDER THE ENERGY CHARTER TREATY
(ICSID Case No. ARB/14/11)**

**BETWEEN:**

**NEXTERA ENERGY GLOBAL HOLDINGS B.V.
- and -
NEXTERA ENERGY SPAIN HOLDINGS B.V.**

**<u>Claimant</u>**

**and**

**THE KINGDOM OF SPAIN**

**<u>Respondent</u>**

---

# REJOINDER ON THE MERITS

---

**Arbitrators:**

Professor Donald Mc. Rae
Mr Yves Fortier
Professor Laurence Boisson de Chazournes

**Submitted in representation
of the Respondent by:**

Government Attorney's Office
C/ Ayala, 5
Madrid (Spain)

**20 October 2016**

**CONTENTS**

I.   LIST OF PRINCIPAL ABBREVIATIONS.................................................................. 9

II.  INTRODUCTION........................................................................................................ 14

III. MERITS OF THE CASE: THE KINGDOM OF SPAIN HAS RESPECTED THE ENERGY CHARTER TREATY (ECT) ................................................................. 23

A.   **Statement of facts.** .............................................................................................. **23**

(1)   General regulatory framework at the time of investment: Omissions and contradictions made by the Claimants ...................................................................... 23

  (1.1)   The Claimants ignore the value of the different regulations governing the SES. ... 35

  (1.2)   The Claimants ignore the fact that production activity from renewable sources is an integrated, not isolated, activity in the SES. ....................................................... 37

    (a)   Act 54/1997 requires production activity from renewable sources to be part of the SES ........................................................................................................ 38

    **(b)   Renewable rollout planning is unequivocal proof of the integration of RE in the SES** ..................................................................................................... 38

    (c)   Before their investment, the Claimants were expressly advised that possible future regulatory measures in RE were linked to the evolution of the SES ................... 42

  (1.3)   The Claimants ignore the role of the case-law of the Supreme Court of the Kingdom of Spain as done in this arbitration....................................................... 43

    (a)   RD 661/2007 was not issued for the purpose of improving the profitability of renewable technologies. ................................................................................ 47

    (b)   Article 44 (3) of RD 661/2007 has its precedent in Article 40 (3) of RD 436/2004 47

    (c)   The Claimants' theory is not shared by the main SES' Players .......................... 50

      Supreme Court of the Kingdom of Spain. ................................................. 51

      CNE.................................................................................................... 52

      Associations representing the Sector:..................................................... 53

      Charanne Award.................................................................................. 54

  (1.4)   The legal mandate for "Reasonable Return" sets out any rights or expectations of investors in the Spanish Regulatory Framework................................................ 56

    (a)   Reasonable Return is the cornerstone of the remuneration system for the production of energy from renewable sources ............................................... 57

      Legal criteria for setting subsidies........................................................... 58

      Reasonable Return as the objective of the binomial market price and subsidy .......... 58

The Claimants argue a position contrary to that of their own consultant Pöyry ......... 60

The RE Sector holds a position contrary to the Claimants .......................................... 61

The CNE and the General Attorney's Office understand that the aim and limit of the subsidies is to provide a "reasonable return" ............................................................... 65

The doctrinal positions are contrary to the thesis of the Claimants ............................ 66

(b)       Reasonable Return is an end that can be achieved in various ways ................... 66

(c)       Reasonable Return as a guarantee of balance .................................................... 67

(d)       Reasonable Return has a dynamic nature .......................................................... 69

The dynamic nature is imposed by the wording of Article 30 (4) of Act 54/1997 ..... 70

Case-law has interpreted the principle of Reasonable Return as a principle of a dynamic nature ........................................................................................................... 71

Pöyry advised the Claimants about the dynamic nature of the SES and the limits to this dynamism ........................................................................................................... 72

The contracts entered into by NextEra and the PTEs reflect the fact that they understood the dynamism of reasonable profitability ................................................. 74

(e)       The manner in which Reasonable Return was set at the time of the Claimants' investment .................................................................................................................... 74

Energy scenario in which the deployment of the RE is expected ............................... 75

State of solar thermal technology, barriers and measures to overcome these barriers. 76

The PER 2005-2010 required a valuation of the cost of implementing the targets of implementation and funding thereof by the SES ......................................................... 77

The subsidies set in RD 661/2007 aim to achieve the profitability on standardised installations established in the PER ............................................................................. 78

The importance of the PER 2005-2010 and its connection to RD 661/2007 was known by the System operators ............................................................................................... 83

(f)       The Claimants ignore their own "due diligence" ..................................................... 85

(g)       The Reasonable Return should take account of the applicable EU rules on illegal state aid, due to over-remuneration and distortion of market rules ................................ 86

(2)       The economic sustainability of the SES and the elimination of situations of over-remuneration as a *"leitmotif"* of the measures in this arbitration ............................................. 87

(2.1)       The economic sustainability of the SES, as an essential principle of the Spanish regulatory framework, and the principle of Reasonable Return, a cornerstone of the Kingdom of Spain, are the grounds which have justified the regulatory measures related to this arbitration. ................................................................................................................... 88

(2.2)       The economic sustainability of the SES and the elimination of situations of over remuneration were the reasons justifying the regulatory measures prior and contemporary to the Claimants' investment ................................................................................................ 90

(a)     RD 661/2007 was passed for the purposes of guaranteeing the economic sustainability of the SES, not with the aim of enhancing the profitability of renewable technology activities...................................................................................................... 91

The introduction of RD 661/2007 was prompted by the need to guarantee the economic sustainability of the SES ............................................................................. 91

RD 436/2004 caused effects for the sustainability of the SES .................................... 93

The Claimants were expressly notified of the reasons that justified the introduction of RD 661/2007 in their Due Diligence report ................................................................ 94

The modification of RD 436/2004 was harshly criticised by the Sector. ................... 95

The PER 2005 – 2010 did not contain an overall increase in profitability for RE...... 97

The Report on the Regulatory Impact of RD 661/2007 did not include an overall increase in subsidies ................................................................................................... 98

Analysis of the CNE.................................................................................................. 100

The reform of RD 1578/2008 demonstrates the adoption of premiums according to the sustainability of the system. .................................................................................... 104

(b)     RD-Act 6/2009, of 7 May ................................................................................ 104

(c)     Remuneration Framework Proposal for the RE Sector by APPA on 20 May 2009 108

(d)     National Action Plan for Renewable Energy in Spain 2011- 2020................... 111

(e)     RD 1565/2010, of 19 November ..................................................................... 112

(f)     RD 1614/2010, of 7 December......................................................................... 113

(g)     RD-Act 14/2010, of 23 December ................................................................... 117

(h)     Act 2/2011, of 4 March, on Sustainable Economy.......................................... 119

(2.3)     The risks of future regulatory measures were known by the consultancies and according to doctrine.......................................................................................................... 121

Brattle:.................................................................................................................... 121

Miguel Mendonca, David Jacobs and Benjamin K. Sovacool ................................ 121

(2.4)     How did the economic sustainability of the SES develop once the Claimants made their investment? ............................................................................................................... 122

(2.5)     Did the Kingdom of Spain adjust its behaviour to what was expected by the Claimants when faced with a possible situation of economic unsustainability in the SES? 123

(3)     Subjective Expectations of the Claimants ................................................................ 126

(3.1)     Absence of legal due diligence and disregard of the legal interpretation of case law 126

(3.2)     The contested measures are not retroactive....................................................... 127

4

The contested measures are not retroactive in accordance with the arbitration precedents and international law. ................................................................ 128

The contested measures are neither retroactive, as a proven FACT, in accordance with Spanish domestic legislation or under EU law. ....................................... 131

The measures have not been considered to be "retroactive" by RE Sector Associations and by other Investors, including Sener, the Claimant's partner. .............................. 132

The Claimants knew the possible scope of the contested measures, as it was expressly warned before its investment in 2007 and 2008. ...................................... 134

(3.3)   Article 44 (3) of RD 661/2007 ................................................................ 138

(a)   The wording of Article 44(3) RD 661/2007 opposes the theory of Claimants . 138

(b)   The Claimants' theory is contrary to the principle of regulatory hierarchy ...... 140

(c)   The regulatory and case law precedents emerging in Spain held the opposite view to that of the Claimant ..................................................................... 140

(d)   Arbitration scholars have held that Article 44(3) of RD 661/2007 does not imply a stabilisation clause ...................................................................... 141

(e)   The Claimants never believed that Article 44(3) of RD 661/2007 contained a tariffs stabilisation clause ....................................................................... 143

(3.4)   Article 4 of RD 1614/2010 ...................................................................... 145

(a)   The reason for the introduction of Article 4 of RD 1614/2010 ........................ 145

(b)   The literal wording of Article 4 does not constitute a stabilisation clause. ....... 147

(c)   The introduction of RD 1614/2010 led to a reduction in the profitability of solar thermal plants based on the necessary economic sustainability of the SES ................. 148

(d)   The Claimants did not appreciate the existence of a stabilisation clause in Article 44(3) RD 661/2007, nor in RD-Act 6/2009 or Article 4 of RD 1614/2010 ................ 148

(3.5)   The Communications of December 2010 .............................................. 154

**a.   Heading of the Documents:** ................................................ 155

**b.   Content of the Documents:** ................................................ 156

**c.   Notice of the right to appeal of the documents.** .............................. 159

**d.   Conclusion.** ....................................................................... 160

(3.6)   Registration in the RAIPRE ................................................................ 160

(3.7)   The expectations arising from a "major advertising campaign" launched by the Kingdom of Spain. .......................................................................... 163

(4)   Conflicting actions ...................................................................... 164

(4.1)   Tax on the value of electricity (TVPEE). .............................................. 165

(4.2)   Limitations on the use of gas by thermosolar installations ................. 167

5

(a)    The Claimants ignore the link between Spanish legislation and the related Community directives ................................................................................................ 167

(b)    The Claimants ignore the evolution of the use of gas under the regulatory framework .................................................................................................................. 169

(c)    The Claimants ignores the manner in which the use of the gas is envisaged in the new regulation .......................................................................................................... 170

(4.3)    Revision of remunerations in line with the Consumer Price Index at constant tax rates, excluding unprocessed foods and energy products ................................................. 172

(4.4)    Reduction to zero euros of the premium in the option of selling electrical energy at production market price plus the premium .......................................................................... 172

(a)    Relationship between regulated tariff and pool plus premium ......................... 173

(b)    The Claimants are unaware of the reasons for adopting this measure ............. 175

(4.5)    New remuneration model for energy production based on renewable sources ..... 176

(a)    The new remuneration model maintains the priority of access and dispatch .... 176

(b)    The remuneration system maintains the objective of endowing the investor with Reasonable Return from a project .................................................................................. 177

(c)    The two remuneration frameworks maintain the same structure to meet this objective ........................................................................................................................ 179

(d)    Both models correspond to the same concept of efficiency ............................. 182

(e)    Both models establish the subsidies based on the standards set for the different standard facilities .......................................................................................................... 183

(f)    Both models have the dynamic character that is typical of a System based on Reasonable Return .......................................................................................................... 187

(g)    The new remuneration model has been approved transparently. ..................... 191

        Public consultation held by the National Energy Commission in February 2012 ..... 192

        Public hearing during the procedures of RD 413/2014, of 6 June. .......................... 192

        Public hearing during the procedures of Order IET 1045/2014, of 16 June. ............ 195

(h)    The new System provides a Reasonable Return ................................................ 198

(5)    The Measures in dispute have been recognised as necessary Macroeconomic control measures, stabilising the economy and reasonable ............................................................... 200

(5.1)    Evaluation of the measures by the Domestic Courts of the Kingdom of Spain .... 200

(a)    Position of the Constitutional Court of the Kingdom of Spain ........................ 200

(b)    Position of the Supreme Court of the Kingdom of Spain ................................. 202

(5.2)    Appraisal of the measures by the European Commission ..................................... 203

(5.3)    Evaluation of the Measures by other International Organisations ........................ 205

(5.4)    Evaluation of the Measures by the Markets ......................................................... 207

(6)    The alternative measures proposed by the Claimants in their Reply on the Merits are not viable or effective.................................................................................................. 209

    a)    Increase in access tariffs.................................................................................. 210

    b)    Increase in indirect taxes ................................................................................. 213

    c)    Reduction of certain SES regulated costs........................................................ 214

(7)    The Termosol plants have an installed power greater than 50 MW: the Claimants cannot expect that their plants would receive the subsidies of Article 36 of RD 661/2007 indefinitely ......................................................................................................................... 216

**B.    Legal grounds of the Kingdom of Spain.......................................................................... 221**

(1)    Estoppel cannot be invoked by the Claimants in order to prevent the Kingdom of Spain from formulating its defence pleadings in regards to the merits of the matter, and if it was applied, the grounds for it to be effective would not exist.............................................. 221

    (1.1)    For matters of merit, estoppel overlaps with the FET standard of the ECT.......... 221

    (1.2)    Even if the estoppel principle was applicable, the requirements for it to be effective do not exist in this case ..................................................................................................... 222

(2)    Objective and purpose of the ECT: National or non-discriminatory treatment. ....... 226

(3)    The Kingdom of Spain has not violated the FET standard of the ECT..................... 233

    (3.1)    The Claimants do not have the Legitimate Expectations that they argue. ............ 233

    (a)    Thesis of the Claimants ...................................................................................... 235

    (b)    Lack of evidence of an exhaustive analysis of the legal framework by the Claimants.................................................................................................................................... 235

    (c)    Subsidiarily, even if the Due Diligence provided is deemed sufficient, the contested measures do not violate the objective expectations of a diligent investor..... 237

        Non-existence of specific commitments in the Spanish regulatory framework on the future immutability of the framework set out in RD 661/2007, RD-Act 6/2009, and RD 1614/2010 in favour of RE facilities................................................................. 238

        The Expectations of the Claimants are not reasonable and justified in relation to the contested measures ............................................................................................... 241

    (d)    The Claimants' Subjective Expectations accredited by their acts at the time of the investment do not sustain their thesis.............................................................................. 245

    (3.2)    The obligation to guarantee stable and transparent conditions has not been violated 249

    (a)    Creation and promotion of stable conditions of the general regulatory Framework: the right to a reasonable rate of return before and after the reforms......... 249

    (b)    Non-retroactivity of the contested measures ..................................................... 254

    (3.3)    The obligation to ensure transparent conditions to investors has not been violated. 255

(3.4)   The contested measures are not irrational, disproportionate, or discriminatory.... 260

   (a)   Relevance of EDF Test v Romania ................................................................. 261

   (b)   Compliance with the requirements laid down in the Test applied by the Arbitral Tribunal in the AES Summit Case ............................................................................. 262

     There was a rational policy supported in Test AES Summit, which has been accepted by the Claimants.......................................................................................................... 262

     The measures were reasonable and proportionate, to ensure investors a Reasonable Return ............................................................................................................................. 265

   (c)   The measures are not discriminatory................................................................ 266

**IV.  THE CLAIMANTS DO NOT HAVE THE RIGHT TO THE COMPENSATION REQUESTED** ............................................................................................................... **268**

**A.   Introduction** ........................................................................................................ **268**

**B.   The quantification of the damages claimed by the Claimants is totally and absolutely speculative** ..................................................................................................................... **268**

**C.   The contrast of the amount claimed reflects its speculative nature and the irrelevance of the DCF** .............................................................................................................. **272**

**D.   The Alternative But-for of Compass Lexecon lacks all merit and shows that their DCF is speculative** .......................................................................................................... **273**

**E.   Subsidiary calculations using DCF: positive financial impact for the Claimants** ..... **273**

**V.  PETITUM AND RESERVATION OF RIGHTS** ......................................................... **276**

I.      LIST OF PRINCIPAL ABBREVIATIONS

**"Accuracy expert report on the Claimant and its claim**": Financial-economic Expert Report on the Claimant, its claim and the thermosolar plants dated 3 March 2016, prepared by Accuracy, that accompanies this Respondent's Counter-Memorial, Jurisdictional Objections and Request for Bifurcation.

"**Act 15/2012**": Act 15/2012, of 27 December 2012, on fiscal measures for energetic sustainability.

"**Act 2/2011**": Act 2/2011 of 4 March on Sustainable Economy.

"**Act 24/2013**": Act 24/2013, of 26 December, on the Electricity Sector.

"**Act 54/1997" or "LSE 1997":** Act 54/1997, of 27 November 1997, on the Electricity Sector. It was repealed by Act 24/2013, of 26 December 2013, on the Electricity Sector, in the terms stipulated in its sole Repealing Provision.

"**AEE**": by its Spanish acronym, Spanish Wind Energy Association.

"**APPA**": By its Spanish acronym, Association of Renewable Energy Producers.

"**BIT**": Bilateral Investment Treaty.

"**Claimant**" or "**the claimant party**": Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V.

"**CNC**": By its Spanish acronym, National Competition Commission.

"**CNE**": By its Spanish acronym, National Energy Commission. This is the Body with consultative and regulatory powers for certain aspects of the energy systems in Spain (since 7 October 2013 its duties have been carried out by the National Commission for Markets and Competition).

"**CNMC**": National Markets and Competition Commission.

"**Compass Lexecon Expert report on Damages**": expert report on financial damages prepared by Compass Lexecon that accompanies the Claimants' Memorial on the Merits.

"**Contracting Party**": State or Regional Economic Integration organisation that has consented to be bound by the Energy Charter Treaty and for which the Treaty is in force, in accordance with the definition of "Contracting Party" established in article 1(2) of the Energy Charter Treaty.

"**CPI**": Consumer Price Index.

"**CPI-CT**": Consumer Price Index at constant tax rates, excluding unprocessed food and energy products.

9

"**DCF**": discounted cash flow or the current value of future cash flows.

"**DGPEM**": Directorate General for Energy Policy and Mines of the Spanish Ministry of Industry, Energy and Tourism.

"**Directive 2001/77/EC**": Directive 2001/77/EC of the European Parliament and of the Council, of 27 September 2001, on the promotion of electricity produced from renewable energy sources in the internal electricity market.

"**Directive 2009/28/EC**": Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC.

"**ECT**": Energy Charter Treaty signed in Lisbon on 17 December 1994.

"**EU**": European Union.

"**IDAE**": Institute for Diversification and Saving of Energy.

"**NAV**": Net Asset Value.

"**NextEra**": US multinational dedicated to the development and operation of energy assets with a presence mostly in the United States and Canada led by the company NextEra Energy, Inc.

"**OMEL**": The Operating Company in the Spanish Electricity Market.

"**OR**": Ordinary Regime.

"**PER**": By its Spanish acronym, Plan of Renewable Energies.

"**PTE**" or "**Termosol I**": Planta Termosolar de Extremadura, S.L or

"**PTE2**" or "**Termosol 2**": Planta Termosolar de Extremadura 2, S.L.

"**PTEs**": Planta Termosolar de Extremadura, S.L y Planta Termosolar de Extremadura 2, S.L.

"**RAIPRE**": By its Spanish acronym, Administrative record of electricity production facilities

"**RD 1432/2002**": Royal Decree 1432/2002, of 27 December, on the methodology of the Average Reference Tariff.

"**RD 1578/2008**": RD 1578/2008, of 26 September, on remuneration for the activity of electricity production using solar photovoltaic technology for facilities after the deadline for the maintenance of the remuneration fixed under Royal Decree 661/2007, of 25 May, for such technology.

"**RD 1565/2010**": Royal Decree 1565/2010, of 19 November 2010, which regulates and modifies certain aspects of the electricity production activities under the Special Regime.

"**RD 1614/2010**": Royal Decree 1614/2010, of 7 December, regulating and modifying certain aspects related to electric energy production using thermoelectric solar and wind power technologies.

"**RD 2818/1998**": Royal Decree 2818/1998, of 23 December 1998, on the production of electric energy by facilities supplied with renewable energy, waste or cogeneration resources or sources.

"**RD 413/2014**": Royal Decree 413/2014, of 6 June 2014, which regulates the electric energy production activity from renewable energy sources, cogeneration and waste.

"**RD 436/2004**": Royal Decree 436/2004, dated 12 March 2004, establishing the methodology for the updating and systematisation of the legal and economic regime for electric power production activity under the special regime.

"**RD 661/2007**": Royal Decree 661/2007, of 25 May 2007, regulating the activity of electricity production under the special regime.

"**RD-Act 1/2012**":   Royal Decree-Act 1/2012, 27 January 2012, which proceeds to the suspension of the remuneration pre-assignment procedures and the elimination of the economic incentives for new electric energy production plants based on cogeneration, renewable energy sources, and waste.

"**RD-Act 14/2010**": Royal Decree Act 14/2010, of 23 December, establishing urgent measures for the correction of the tariff deficit in the electricity sector published in the Official State Gazette of 24 December 2010.

"**RD-Act 2/2013**": Royal Decree-Act 2/2013, of 1 February 2013, on urgent measures in the electricity sector and in the financial sector.

"**RD-Act 20/2012**": Royal Decree-Act 20/2012, of 13 July, on measures to guarantee budgetary stability and promotion of competitiveness.

"**RD-Act 6/2009**": Royal Decree Act 6/2009, of 30 April 2009, which adopts certain measures in the energy sector and which approves the social bonus.

"**RD-Act 9/2013**": Royal Decree-Act 9/2013 of 12 July 2013, establishing urgent measures to ensure the financial stability of the electricity system.

"**RE**": Renewable Energies.

"**Respondent**" or the "**Respondent Party**": the Kingdom of Spain.

"**Second Accuracy expert report on the Claimant and its claim**": Financial-economic Expert Report on the Claimant, its claim and the thermosolar plants dated 20 October 2016, prepared by Accuracy that accompanies this Reply Memorial on the Merits.

"**Second Compass Lexecon Expert report on Damages"**: second expert report on financial damages prepared by Compass Lexecon that accompanies the Claimants' Reply on the Merits.

"**SES**": Spanish Electricity System.

"**Spanish Cabinet Meeting Decision of 2009"**: Decision of 19 November 2009, proceeding to the management planning of the projects or facilities submitted to the administrative register for pre-assignment of remuneration for electric energy production plants, specified in Royal Decree Act 6/2009, of 30 April, adopting certain measures in the energy sector and approving the social tariff.

"**SPV**": *Special purpose vehicle*.

"**SR**": Special Regime.

"**This arbitration**" or "**the present arbitration**": ICSID Arbitration case ARB/14/11, formally instituted by Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V.

"**This statement**" or "**the present statement**": Rejoinder on the Merits of the Kingdom of Spain, of 20 October 2016.

"**TVPEE"**: Tax on the value of the production of electrical energy. It was created with effect from 1 January 2013 by Act 15/2012 and is regulated in Articles 1 to 11 of such Act 15/2012.

"**Vienna Convention**": The Vienna Convention on the Law of Treaties, of 23 May 1969.

II.    INTRODUCTION

1.  The Kingdom of Spain submits its Rejoinder on the Merits in accordance with the schedule
    laid down by Procedural Order No. 1 and with the amendments agreed by the parties and
    approved by the Tribunal.

2.  Nextera Energy Global Holdings B.V. And Nextera Energy Spain Holdings B.V.
    (hereinafter the "**Claimants**") maintain that the Kingdom of Spain has breached the
    obligations undertaken under the Energy Charter Treaty (henceforth "**ECT**"). They state, in
    this regard that Spain: (a) has approved measures that frustrated the Claimants' legitimate
    expectations; (b) has breached the obligation to create a stable and transparent legal
    framework for the Claimants' investments and; (d) has adopted abusive, disproportionate
    and discriminatory measures.

3.  The Kingdom of Spain will request that the Tribunal reject the Claimants' claims in their
    entirety and sentence them to pay for the costs of this Arbitration. This claim is asserted
    only if the Tribunal dismisses the objections on jurisdiction raised by the Kingdom of Spain
    in its Memorial on Preliminary Objections and Request for Bifurcation of 9 September 2015
    and its Reply on Preliminary Objections filed on 14 October 2016.

4.  If the Tribunal deemed it appropriate to hear the merits of the dispute brought by the
    Claimants, the Kingdom of Spain will then develop below the arguments according to
    which the Claimants' claims must be rejected.

5.  The Claimants claim that Article 44 (3) of RD 661/2007, after the measures introduced by
    RD-Act 6/2009 and RD 1964/2010, is a regulatory stabilisation clause freezing each and
    every one of the rules contained in that Regulation for the installations in operation. The
    Claimants assert that at the time they made their investment they had the Expectation that
    the economic subsidy system for production from renewable sources could not be changed.
    This expectation would have been reinforced by alleged oral and written commitments
    given by the Respondent to the Claimants. However, the Kingdom of Spain will show that
    the Claimants fail to provide any proof to confirm that they made its investment on the basis
    of the well-founded belief that this alleged Stabilisation Clause existed. Moreover, they fail
    to produce a single legal Due Diligence report delivered on that essential legal matter. The
    facts showed precisely the opposite.

6.  Furthermore, this allegation, a key component in the Claimants expectations, is based on
    two incorrect assumptions:

    -   The Claimants continue to argue in their Reply that the only significant regulation of the
        Regulatory Framework for RE producers was RD 661/2007, which was confirmed by
        RD-Act 6/2009 and RD 1614/2010.

    -   The Claimants maintain that these regulations contain commitments in "clear and
        precise terms" to make sure that the model of the RD 661/2007 remains unchanged
        during the whole operational life of the SR Plants. Inter alia: (1) the system of
        remuneration of Article 36 of RD 661/2007; (2) other non-remunerative measures such
        as: (a) the possibility of choosing between the regulated rate or the Pool plus premium;

14

(b) the possibility of producing energy by burning gas; and (c) the updating of remuneration in accordance with the CPI.

7.  The Claimants also maintain that Article 4 of RD 1614/2010 was a ratification of the commitment to stabilisation included in RD 661/2007. Finally, they argue that the 28 December 2010 Communications issued by the Director General for Energy Policy and Mines are confirmation of the commitment of the Kingdom of Spain to make sure that the framework of RD 661/2007 remains unchanged during the whole operational life of the plants in which the Claimants have a holding.

8.  The Claimants seek to bring to the Tribunal a self-serving and biased view on electricity generation activity from renewable sources. In particular, they maintain that the CSP facilities may be an "*island*" outside the system of which they are a part. This is the only way to understand their insistence that the Government could commit itself to maintain the model of RD 661/2007 in regard to a specific technology. The Claimants also maintain that the Government of Spain could have placed the cost load entirely on the consumers, without any limit whatsoever. All of this is not correct or reasonable.

9.  The Claimants, in a self-interested way, maintain an inexcusable silence about some facts or distort some facts that are essential to ascertain the reality of the Spanish Regulatory Framework in which they invested.

10. The Claimants ignore the value of the different regulations governing the SES. They are also unaware that the principle of hierarchy structures and establishes the functioning of the various regulations by which the Spanish Regulatory Framework is configured.

11. The Claimants omit the integration of the renewable energy generation activity in the SES as a cost thereof and, therefore, subject to its sustainability. The Claimants attempt to present CSP technology and their Thermosol Plants to the Tribunal as an island outside of the SES and its development.

12. The Claimants do not bring to the attention of the Arbitral Tribunal the significance of the Case-law of the Supreme Court, as ultimate interpreter of Spanish law. Thereby, they attempt to conceal the fact that the extension and limits of the rights and expectations of RE investors had clearly been configured and reiterated by this Case-law prior to their investments in 2011. This silence is inexcusable when several of the documents that they submitted and on which they base their theories cite and contain this Case-law, such as in the CNE reports from 2007 and 2008.

13. To suit its own ends, the Claimants also distort EU law, international law applicable to this dispute. They thereby attempt to disconnect the Spanish support system for renewable energies from the EU State Aid Regime.

14. The Claimants are also unaware of the commitments assumed by the Kingdom of Spain at an international level to correct Macroeconomic imbalances: The Memorandum of Understanding of 12 July 2012. This Memorandum constitutes international law applicable to this proceeding. The commitments included in the Memorandum imposed the duty of adopting macroeconomic control measures upon the Kingdom of Spain in order to comprehensively deal with the tariff deficit. Furthermore, neither the Claimants nor the

15

Experts propose alternative hypothetical measures that could be adopted by the Kingdom of Spain taking into account these commitments.

15. The Claimants underestimate the core principle on which renewable energy remuneration was and is based: The Principle of Reasonable Return. Therefore, they seek to do away with two essential aspects derived from that principle: equilibrium and dynamism.

16. Likewise, the Claimants make no mention of the methodology that has historically been used by Spanish legislation to determine the reasonable return through the definition of standard facilities and parameters. This methodology is recorded in PFER 2000-2010 and in PER 2005-2010.

17. The Kingdom of Spain has applied the legal principle of "Reasonable Return" since 1997 by means of various regulations, in relation to different concurrent economic and technical circumstances. The scope of this principle has been reiterated in more than one hundred judgements of the Spanish Supreme Court. This Case Law is prior to the time when the Claimants' investment was made. It could not have been unknown by a diligent investor.

18. Furthermore, the Claimants fail to mention to the Arbitral Tribunal that each and every regulatory measure adopted by the Kingdom of Spain since 1997 has been guided by a single *leitmotiv*: to guarantee the economic sustainability of the system and prevent situations of over-remuneration. Proof thereof comes in the form of RD 661/2007. As the Claimants were aware, by means of the Due Diligence of Pöyry, RD 661/2007 was implemented with the aim to guarantee the economic sustainability of the SES which was threatened by the link of the subsidies to the Average Reference Electricity Tariff and to rectify the situation of over-remuneration caused by RD 436/2004 in wind technology. Under no circumstances was the purpose of this RD 661/2007 to increase remuneration to attract investors.

19. These omissions and distortions of the Claimants lead to the creation of an imaginary regulatory framework that is completely different from reality. The Framework outlined by the Claimants is contrary to the following entities' understanding of the System: (1) the Supreme Court, (2) the most representative Associations of the RE Sector, (3) RE investors in Spain (4) the constructor of Termosol Plants, Sener, (5) the Credit and Insurance Institutions that entered into the contracts according to which the investment was structured and (6) Pöyry, the regulatory consultant of the Claimants at the time of their investment, and other consultants such as KPMG and Deloitte.

20. The measures challenged in this Arbitration were adopted taking into account the different preliminary analyses of the regulator, as well as technical knowledge and technological development. They were adopted in a context of international economic crisis that produced severe effects on both the demand for electricity and capital market yields. The aforementioned international economic crisis substantially altered the economic parameters which were the basis for the subsidies to energy production from renewable sources.

21. In addition, the analysis cited revealed the existence of remuneration that, either due to deficiency or to excess, did not maintain the principle of *reasonable return* laid down for the remunerations of the so-called special regime. The changes in the Spanish Legal System

have been addressed, precisely, at underpinning and making sustainable this principle of Reasonable Return in the long term.

22. The contested measures have always maintained the pillars of the Spanish remuneration models in place since 1997. Specifically:

   a. They have maintained the concept of efficiency pursued by the SES since 1997, which involves supplying electricity to the Spanish consumer at the lowest possible cost.

   b. They have maintained the subsidies for renewables as a cost of the SES and therefore related to its economic sustainability.

   c. They have maintained and improved the priority of access and dispatch for RE.

   d. They have maintained the basic structure of the Spanish remuneration model which allows RE plants to attain Reasonable Return by the combination of two elements: the market price (pool) and a subsidy.

   e. They have maintained the characteristic attributes of the principle of Reasonable Return: its equilibrium and dynamism.

   f. They have re-established the equilibrium by eliminating situations which produced unjustifiable remunerations such as the indexation of all the components of the subsidy according to the CPI or the imbalances caused by the pool plus premium option.

   g. They have maintained the dynamic nature of Reasonable Return. Therefore, the reasonability of the return continues to be assessed in accordance with the price of money on the capital market (the price of the Spanish ten-year bond). Dynamism which makes it possible to protect the value of the investment over time, consequently endowing it with greater stability.

   h. They have maintained and improved the methodology that has historically been used by the SES to determine the Reasonable Return which involves defining standard facilities and common standards.

   i. They continue to guarantee a Reasonable Return for RE plants. The return provided by the Spanish remuneration model is better than the discount rate (opportunity cost) of the sector and, specifically, better than the discount rate (opportunity cost) of the Claimants. Consequently, the return that continues to be provided by the Spanish system is reasonable.

23. Therefore, the changes carried out due to the contested measures have precisely sought (1) to apply the principle of reasonable return; (2) to resolve situations of imbalance of the SES which threatened its economic sustainability and (3) to strengthen the stability of the regulatory framework by regulating by Act some aspects regulated previously by Royal Decrees (regulations).

24. Once these Measures have begun to produce their effects, they have been recognised as reasonable, necessary and stabilising Macroeconomic control measures for the SES by a) International Institutions; b) Rating Agencies; and c) both domestic and international investors.

25. The Claimants intended to confer an international dimension to the dispute by trying to convert Spanish rules "erga omnes" into rules specifically enacted to attract foreign investment.

26. They also seek to transform the process of consultations with the associations in the affected sectors during the preparation of the regulations into negotiations leading to "agreements" likely to be protected by international law.

27. They also aim to convert the registration in an administrative record of RE facilities into a kind of concession. In addition, they argue that certain communications on the current remunerative regime submitted by the Ministry of Industry in December 2010 at the request of the PTEs constitute a promise.

28. Finally, they presented themselves as sole investors, whose plants are unique and have stability commitments, both oral and written, given by the Government of Spain to attract the investments of the Claimants. As explained in the Counter-Memorial and as is also discussed in this Rejoinder, the attempts by the Claimants to seek commitments by the Kingdom of Spain are useless. Not only do those commitments not exist but in no case did they create in NextEra the expectation that the remuneration conditions applicable to the Termosol plants could not change. Nor is there evidence, beyond their increased storage capacity, of the uniqueness of the Termosol plants.

29. Regarding the Legal Grounds, the Claimants introduce *ex novo* the Estoppel doctrine in order to prevent the Kingdom of Spain from using its defence arguments. The principle of Estoppel is a feature of English common law that has timidly entered international law. The most similar Spanish feature is that of *"venire contra factum proprium non valet"*, but it requires explicit acts capable of generating confidence in their recipient that the author of such acts will not act against them. The Claimants intend to use Estoppel regarding omissions of the Kingdom of Spain. Therefore, they state that the Kingdom of Spain cannot: a) use the argument that the Termosol Plants are overpowered, because it has never said it internally; b) use the argument that a return of 11.6% for the Claimants is not a reasonable return; c) use the tariff deficit argument to justify the contested measures. But, the Kingdom of Spain has never: a) stated that the Termosol plants were not overpowered (in fact, it has never empirically verified their installed capacity); b) it has never expressly stated that a return of 11.6% in favour of the Claimants is reasonable; c) it has never stated that in situations of deficit it would not introduce measures to reduce the costs of the SES. Quite the contrary, the Respondent's actions have always been aimed at ensuring the sustainability of the SES and avoiding situations of over-compensation, acting on the basis of the revenues and costs thereof. If there are no acts that cannot be contradicted, the doctrine of estoppel cannot be invoked against the Respondent.

30. In any case and, as we shall see, the majority of scholars opine that for matters related to the merits, estoppel is diluted by the standard of Fair and Equitable Treatment.

31. Moreover, the Claimants try to use the ECT as an *Insurance Policy* against the risk that the Regulatory Framework might be amended by the Kingdom of Spain. In order to do so, the Claimants force an interpretation of the Treaty that does not correspond to the ordinary meaning of the text, according to its context and purpose.

32. Far from what is maintained by the Claimants, the ECT's main objective is to grant foreign investors a non-discriminatory treatment and no worse than the minimum standards guaranteed by International Law. Furthermore, according to the object and purpose of the ECT, States may adopt justified and proportionate macroeconomic control measures, even if this action affects the returns or profitability of investors.

33. The ECT obliges the Tribunal to resolve the dispute in terms of the ECT itself and the standards and principles of International Law. However, Spanish law and its correct interpretation are fundamental as relevant facts to appreciate the origin, extension and limits of the rights invoked by the Claimants. Consequently, they are of great importance in order to: 1) configure the Legitimate Expectations of the Claimants; and 2) appreciate the existence of commitments assumed by the Spanish State with the Claimants or their investment.

34. The Kingdom of Spain has adopted the measures challenged in the exercise of its regulatory power, in order to correct an imbalance in the SES and for the benefit of the general interest. As it has been explained above, the measures adopted have not violated the Claimant's Legitimate Expectations in any way.

35. In relation to the alleged violation of the duty to create stable conditions, the Claimants defend that the Kingdom of Spain has breached the duty to maintain a stable, predictable and transparent Regulatory Framework. However, the contested measures have maintained the pillars of the Spanish remuneration models in place since 1997. Furthermore, the Precedents applying the ECT have allowed justified, reasonable and proportionate macroeconomic control measures to be adopted.

36. At any rate, the reasons that have justified these measures are the same as those which have provoked the regulatory changes since RD-Act 7/2006: Economic sustainability of the system and over-remuneration. These reasons were foreseeable for a diligent investor who would have had a thorough knowledge of the Spanish regulatory framework. Indeed, Pöyry informed the Claimants of the reasons that might have justified the regulatory changes in the Due Diligence carried out in 2008.

37. In relation to the obligation to create transparent conditions, contained in ECT Article 10(1), the Claimants state that they were in "darkness" for 11 months. The Kingdom of Spain will show that this is not true. It will be shown that the plants of the Claimants participated in the process by formulating pleadings. The Association Protermosolar and hundreds of stakeholders also participated actively. Their pleadings were taken into account in the final definition of the standard facilities and common standards.

38. In addition, the measures adopted in 2013 and 2014 are coherent with the continuous announcements made by the Government on the structural reform of the SES. Said announcements were made more than a year before the adoption of the measures. These measures were adopted by maintaining the essential principles of the Spanish regulatory

19

model and according to the interpretation that the Supreme Court had been undertaking since 2005.

39. With regard to the alleged adoption of abusive, disproportionate and discriminatory measures by the Kingdom of Spain, the measures challenged are in conformity with the different Tests applied in arbitration jurisprudence to evaluate whether this standard has or has not been infringed. The application of these Tests to the measures challenged reveals that these: (1) are not discriminatory; (2) respect the FET standard laid down in the ECT; and (3) fulfil the minimum FET standard in International Law by respecting the economic equilibrium of the investment.

40. The Respondent will demonstrate that the Spanish remuneration model guarantees that the Claimants will recover their investment in the construction of the Plants and their operating costs and that it also provides a Reasonable Return. It should be highlighted that such return improves both the cost of opportunity (discount rate) of the CSP Sector as a whole.

41. Moreover, the return provided by the Spanish remuneration model is compliant with the profitability and the system model that the main Association of the RE Sector (**APPA**) proposed in May 2009 to the Kingdom of Spain. This proposal from 2009 highlights the reasonableness of the remuneration model adopted by the Kingdom of Spain.

42. Faced with the alleged oral and written commitments of the Kingdom of Spain, it is worth noting that the Respondent has not held meetings with or sent letters to any representative or employee of the Claimants. The letters sent to the representatives of NextEra in the United States were always sent in order to respond to questions made by NextEra. At no time did the Kingdom of Spain seek the Claimants' investment nor did it promise the returns of 11.6% they now claim. The Claimants base their approach on the serious misconception that the remuneration to the project offered by the subsidies in Spain is a remuneration to the shareholder.

43. In any event, the only commitment that the Kingdom of Spain assumed was to guarantee the Plant a Reasonable Return in conformity with the capital markets within the framework of a sustainable electricity system. That commitment has not been unfulfilled by the Kingdom of Spain.

44. The Claimants also have shown by their actions that they never believed in the existence of specific petrification commitments. This is demonstrated by the contracts signed throughout the investment process. In all of them, NextEra was protected against foreseeable regulatory risk. There is no evidence that the Claimants took their investment decision based on the alleged commitments. Nor is there evidence in the contracts of the exceptional situation of an investor who allegedly has specific promises from the Government of Spain. All of this will be explained in detail in the facts of this Memorial.

45. Additionally, the Claimants have confirmed the suspicions of the Kingdom of Spain that the Termosol plants have an installed capacity greater than 50MW, which automatically prevents them from being entitled to the remuneration provided for in Article 36 of RD 661/2007. This circumstance affects both their legitimate expectations and the damages claimed. With the measures, the Termosol plants and consequently the Claimants are favoured, since no remuneration distinction is made depending on the installed power.

46. Finally, with regard to the damages claimed, the Claimant has no right to the reparation requested. This section is submitted secondarily, in the event that, in the first place, the Tribunal were to accept jurisdiction over this dispute and, in addition, in the second place, if the Tribunal were to find that there was any non-compliance on the part of the Kingdom of Spain with any precept of the ECT.

47. In this chapter, in view of the Reply presented by the Claimants, we must also ratify each and every one of the points lied down in this regard in the Counter-Memorial. As we shall see, the Claimants have not refuted the arguments of the Kingdom of Spain in which it has been demonstrated that they have no right to the reparation requested.

48. As a relevant fact that occurred subsequent to the submission of our Counter-Memorial, we communicate that an article has been published which states that an international Arbitral Tribunal, within the scope of the ECT, recently rendered an Award which deems that the measures adopted by the Kingdom of Spain did not violate the ECT.[1]

49. Moreover, this section is supplemented by the Accuracy expert reply report on the Claimant and its claim of 20 October 2016, which develops certain aspects thereof.

50. It is necessary to note that, in their report the Accuracy Experts analyse and fully demolish the alternative quantification proposed by Compass Lexecon supposedly based on a hypothetical static and nominal petrified profitability. These alternative calculations proposed by Compass Lexecon lack any legal or economic basis whatsoever and "mistakenly interpret Reasonable Return". Reasonable Return is an essentially dynamic concept by its very nature. To seek to anchor it to a fixed figure *ad eternum*, without reference to any market, would not be economically reasonable either for the investors or for the State.

51. The alleged damages estimated in the Compass Lexecon reports are not subject to compensation, as they are completely and absolutely speculative. In this sense, this Party lke the Supreme Court of the Kingdom of Spain in comparable circumstances, understands that the alleged damages have not even been minimally proved. The long time horizon, together with the fact that nothing guarantees that the remuneration shall remain petrified in the current form (always ensuring Reasonable Return), makes the calculation of damage done speculative.

52. With regard to the inadmissibility of the DCF method, both the Kingdom of Spain as the Claimants themselves have made reference to scientific doctrine and to arbitral precedents which, under certain circumstances, consider the DCF inappropriate as a valuation method, as they are excessively speculative. Therefore, both parties agree that the DCF is not a method that is appropriate in all cases.

---

[1] Article of IA Reporter: "*A second Arbitral Tribunal at Stockholm weighs in with an ECT verdict in a Spanish renewables dispute*". R-0282. Also, *"El Periódico de la Energía: A second international arbitral award rules in favour of the Government in its dispute with renewable energies"*, 13 July 2016. R-0281.

53. It is the Arbitral Tribunal who will have to decide, where applicable, if predictions that must be done over a time horizon of several decades are reliable or speculative. In addition, it will also have to determine in the same way if the calculations made by Compass Lexecon's experts, who have a track record of less than one year and make projections for 30 years, are reliable or speculative.

54. To simplify the comparisons, and since the object of the subsidiary calculations DCF is to demonstrate the volatility of the method in the present case and how wrong Compass Lexecon's calculation is, Accuracy draws from the Compass Lexecon outline as far as possible. The result obtained by Accuracy is that, in application of RD 661/2007 and the real power of the plants, disputed measures have had a positive financial impact on the value of the Claimants' investment in an amount of EUR 32.5 million.

55. In any case, even if we erroneously applied the premium provided for Article 36 of RD 661/2007, performing a DCF correctly, the results yielded by the financial impact on NextEra would remain significantly below than those calculated by Compass Lexecon. Thus, in order to provide the Tribunal with a sample of sensitivity: namely, Compass Lexecon calculated in its last Report a negative financial impact of EUR 521.4 million, while Accuracy calculates an impact (we reiterate, applying the premium of article 36 -to which the NextEra plants are not entitled-) of EUR 23.1 million. That is, that the hypothetical impact would be approximately 96% lower than calculated by Compass Lexecon, comparatively negligible.

56. The discrepancies between the different DCF (that of Compass Lexecon and the one of Accuracy) derive from the different model of DCF and from the different parameters considered.

57. It should be noted that Accuracy has considered a useful life of plants of 25 years, which is the maximum according to the available information. Also, Accuracy has taken into account (as opposed to Compass Lexecon) that the conditions of the but-for scenario would obviously entail a greater risk and greater uncertainty than the current scenario. The revenue would be subject to greater risk in the But-for scenario. In fact, in the Current scenario, under the current regulations, we find a stable, more predictable framework with less risk. This is undoubtedly proved by the assessments of the market agents and the numerous transactions that have taken place since the adoption of the contested measures. These considerations, logically, will have their impact on the different discount rates to be taken into account and on the various *marketability* discounts to apply.

58. In conclusion, we have demonstrated that even when using the speculative DCF methods, the hypothetical financial impact on the value of the investment of the Claimants is positive or negligible, without any damage whatsoever.

59. This Rejoinder on the Merits is accompanied by the following three expert reports and witness statements:

    - Second Economic Report on the Claimant and its Claim of 20 October 2016, issued by Accuracy.

-   Expert report of SERVERT Engineering: "Termosol 1 and Termosol 2 Parabolic Trough CSP plants Lifetime analysis", prepared by Engineer Mr Jorge Server

-   Expert Report "Expert Report regarding installed Capacity of the Termosol Plants" by Jesús Casanova Kindelán (Polytechnic University of Madrid).

-   Second Witness statement by Mr Carlos Montoya of 19 October 2016.


III.    MERITS OF THE CASE: THE KINGDOM OF SPAIN HAS RESPECTED THE ENERGY CHARTER TREATY (ECT)

**A.    Statement of facts.**

**(1)    General regulatory framework at the time of investment: Omissions and contradictions made by the Claimants**

60. The Claimants maintain that their investment materialised on 28 April 2011, at which time the financing bank contracts were signed for the solar thermal plants in which they invested indirectly. According to the Claimants, it is on this date, 28 April 2011, when the legitimate expectations of the Claimants must be assessed.[2] This statement is shared by the Respondent.[3]

61. Thus, in April 2011 numerous facts are known that belie the theory of the Claimants:

   a.  In April 2011, there were two months since RD-Act 14/2010[4] was validated by Parliament. This RD-Act 14/2010 introduced a toll access to all producers of REs to cover the costs of the SES, given the insufficient measures adopted during the previous months (including RD 1614/2010)[5]. Therefore, those remunerations alleged as "immutable" returns of the Termosol plants were already reduced since December 2010 by RD-Act 14/2010. This standard demonstrates the lack of consistency of the theory of the Claimants, since if the tariffs and premiums were "immutable", they do not provide a single justification for the fact that 15 days after the issuance of RD 1614/2010, another rule was delivered that lowered the income of all RE Producers in order to sustain the SES. In fact, the Claimants simply indicate that RD-Act 14/2010 affected the photovoltaic sector, omitting to inform the Tribunal of the important fact that it also affected the supposedly immutable remuneration of the Termosol plants.

   b.  Also, in April 2011, the Sustainable Economy Act 2/2011 had just been passed, which announced an imminent reform of the electricity sector, long-awaited by the producers of REs[6].

---

[2] Reply on the Merits, para. 50 and 134.
[3] This was confirmed in the Counter-Memorial of the Kingdom of Spain, para. 240.
[4] RD-Act 14/2010, R-0049
[5] Validation Speech of Mr Sebastian of RD-Act 1614/2010. R-0404.
[6] AEE Yearbook 2011 R-0403

    c.    Similarly, in April 2011 it was public knowledge that the first international arbitration had already been brought against the Kingdom of Spain due to the actions taken in the photovoltaic subsector[7].

    d.    In April 2011 neither the CSP Subsector (Protermosolar) nor the wind Subsector (AEE) held or officially claimed the immutability of RD 1614/2010, nor the existence of quasi-contractual resolutions with the plants. This shows that the expectations of Claimants are not objective, since neither the Associations nor the most important investors in these technologies hold the theory of the Claimants.

    e.    Finally, it should be recalled that in April 2011, when the Claimants made the investment and undertook the actual execution of the construction of the plants, the target set in the PER 2005-2010 had already been fulfilled.[8]

62. Despite all these facts, the Claimants contend that when they made their investment the freezing of a return of 11.6% to the shareholder had been guaranteed both by the Spanish regulatory framework and the alleged promises of officials from the government of Spain aimed at the Claimants to attract their investment.

63. In this sense, the Claimants assert that, as prudent investors, they made their investment when the Spanish regulations were unequivocal in their promise of certainty regarding the premiums and tariffs that the solar thermal plants pre-registered in the RAIPRE would receive. These regulations, according to the Claimants, consisted of RD 661/2007, RD-Act 6/2009 and, above all, RD 1614/2010. The latter, according to the Claimants, was the result of an agreement between the Ministry of Industry and the solar thermal sector, which is unprecedented in the legislative history of Spain[9]. What is more, the Claimants claim that the Spanish regulations on renewables were specifically aimed at attracting foreign investment.[10]

64. However, the Spanish rules governing the Special Regime neither were nor are specifically aimed at attracting foreign investment[11]. They are not Foreign Investment Law, nor do they introduce provisions specifically aimed at stabilising foreign investment, as did other Argentine laws analysed by all the awards that the Claimants invoke in the defence of their thesis. Nor did the negotiation prior to the adoption of RD 1614/2010 lack precedents in the legislative history of Spain, as this Respondent will demonstrate. RD 1614/2010, like any other Regulation, was submitted to the consultation of the representative industry associations. This consultation, which is mandatory by law, can be done before or after the

---

[7] Allen and Overy announcement of the first arbitration initiated against the Kingdom of Spain. R-0405
[8] Second Witness Statement of Carlos Montoya.
[9] Reply on the Merits, paragraph 84.
[10] Reply on the Merits, paragraph 12.
[11] Neither the PER 2005-2010 nor RD 661/2007 intended to attract foreign investment as there were "...*sufficient initiatives by companies of recognised capacity to achieve installing 500 MW.*" And *"... the RD 436/2004, with its premiums, has stimulated new projects. ... globally projects are being promoted with a total capacity of about 500 MW."* Renewable Energy Plan PER 2005-2010, page 145. R-0052 R-0296 (complete)

start of the proceedings of drafting the regulations.[12] The report of Pöyry itself provided by the Claimants states that RD 1578/2008, approved to reduce the remuneration of photovoltaic installations, was the result of a negotiation process with the sector. [13] In fact, when the Government of Spain signs an agreement with a sector for the development of a standard it expressly says so as can be seen in the Explanatory Memorandum of Act 54/1997 on the Electricity Sector[14]. Despite this explicit recognition, the regulatory acts do not lose their character as regulations and nothing prevents them from being subsequently modified. In fact, Act 54/1997 was modified or even repealed by Act 24/2013, despite being the result of an agreement between the Government and the sectors concerned.

65. Thus, the Claimants build their Claim seeking to convey to the Arbitral Tribunal the mistaken idea that the only rules in the Spanish Regulatory Framework that any investor had to take into account were RD 661/2007, RD-Act 6/2009 and RD 1614/2010. For this purpose, they attempt to rely on a "Cherry picking" of PowerPoint presentations of InvestSpain, the IDAE and the CNE (to whom they mistakenly attribute the ability to represent the Government), that they have not demonstrated they ever knew or assessed,[15] that were not specifically aimed at attracting foreign investment, that are much earlier in time than the Claimants' investment and that, in any case, do not say what the Claimants contend. Moreover, in relation to the sole presentation of InvestSpain that NextEra acknowledged having seen[16], the Claimants said in their Memorial on the Merits that it was envisioned in Germany and they considered it "insufficient".

66. The Claimants also rely on an erroneous and distorted interpretation of the PER 2005-2010 and on paragraphs of certain reports of the CNE, without demonstrating that they have requested the Legal Due Diligence on other paragraphs of these Reports or on other regulations issued between 2006 and April 2011 (such as RD-Act 7/2006, RD-Act 10/2014 and Act 2/2011) which clearly contradict the alleged expectations of the Claimants.

67. In fact, any analysis that is made of the evolution of the Spanish regulatory framework for renewables highlights that every time the regulator has intervened since the adoption of RD 436/2004 it has been justified for two reasons: a) to put an end to situations of over-compensation contrary to the principle of "reasonable return" and b) to ensure the financial

---

[12] This is explained in our Counter-Memorial, paras. 309 et seq. This is corroborated by the Supreme Court ruling of 6 July 2012 on the Fifth legal grounds, provided as document C-207.

[13] Pöyry report: Current and future trends in the Spanish solar industry An ILEX Energy Report to FPL November 2008 edition, Document C-202.

[14] RD 54/1997, Preamble: *"This legal text also constitutes the enshrinement of the principles of the Protocol signed between the Ministry of Industry and Energy and the main electric utilities on 11 December 1996. The aforementioned Protocol, lacking the regulatory effectiveness of any general rule, led to the creation of a complex and global design for transition from one intervened and bureaucratised system to a freer system of operating in the sector. It also constituted the agreement with the main economic operators in the industry on a profound change in the hitherto existing remuneration system and the progressive phasing of the various steps leading to market liberalisation. The protocol was configured, ultimately, so that, considered in its entirety, it would be an element inspiring a profound process of change"*. R-0003

[15] Memorial on the Merits, para. 33 and footnote on page 38.

[16] Document C-23. The other presentations provided by the Claimants with their Reply on the Merits have been provided by the Respondent in the document production phase.

sustainability of the SES.[17] That was the purpose of the enactment of RD-Act 7/2006, of RD 661/2007, of RD 1578/2008, RD-Act 6/2009, of RD 1614/2010, of RD 1565/2010 and of RD-Act 14/2010 and the measures challenged in this arbitration. All these measures were applied to already existing facilities looking to the future.

68. The Claimants, who provided four technical due diligences of the Termosol plants together with their Memorial on the Merits[18], say that they requested and obtained a Legal Due Diligence on the Spanish regulatory framework before making their investment. This way, the Claimants seem to accept that an investment in such a complex regulatory Framework required a diligent and thorough knowledge of the regulatory framework as a whole, and not just the parts which are of interest for the Claimants or of brochures or *PowerPoint* presentations which they state were unknown to them. The Claimants, however, shield themselves behind legal privilege in order not to provide the alleged legal Due Diligence[19]. The Claimants have limited themselves to providing two reports by the consultancy firm Pöyry produced much earlier than the Claimants' investment. In any case, these reports show the errors and mistakes of the Claimants. Since the Claimants rely on the criterion of Pöyry, this party will provide a Pöyry report that assessed the situation of the Spanish regulatory framework immediately before the Claimants' investment, which contradicts the Legitimate Expectations held by the Claimants in this procedure.[20]

69. The Claimants argue that providing the alleged Legal Due Diligence is not necessary because in this case, unlike any other, there are specific stability commitments issued by officials of the Kingdom of Spain to the Claimants and carried out with the sole aim of "inducing the Claimants to invest in the solar thermal sector" in Spain.[21]

70. However, it is not true that officials of the Kingdom of Spain sent any letter to the Claimants (NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.) or its directors or employees. Nor has the Kingdom of Spain held meetings with the managers or employees of the Claimants. It is, therefore, impossible that the Claimants can invoke any promises in their favour. In this sense, it is not permissible that the Claimants, who are the instrument used by NextEra US to obtain the protection of the ECT, use to defend their claims documents that do not belong to them and relationships that were not established with them as "investor". The Kingdom of Spain has only sent letters to a US investor, which also used the support of the Government and the Embassy of the United States for its investment in Spain.

71. Even when, for theoretical purposes, it is assumed that the Claimants can rely on letters that were never sent to them, *quod non,* the fact is that the Kingdom of Spain has never undertaken with employees of other companies of the NextEra group in the US any specific stability commitments with the aim of attracting their investment to Spain. In fact, the

---

[17] The Pöyry report provided by the Claimants as document C-202 explains that RD 661/2007 was introduced to limit the excesses of remuneration that were taking place under the previous legislation (pages 59, 93 and 94). R-0406.
[18] Documents CLEX-9, CLEX-62, CLEX-63 and CLEX-106.
[19] Reply on the Merits, paragraph. 140.
[20] Pöyry Report, March 2011. R-0406.
[21] Memorial on the Merits, para. 6; Reply on the Merits, paras. 10, 13, among others.

Claimants stated in their Statement of Claim that their expansion to Spain occurred as a result of the invitation of Casas de Hitos. As was demonstrated in our Counter-Memorial, it was the representatives of other companies in the NextEra group (and not the Claimants) who sought out, from the United States and several years after starting to mobilise their resources in Spain, the officials of the Kingdom of Spain. The latter never promised to employees of NextEra (USA) the freezing of certain premiums and tariffs and even less a specific return of 11.6% (a new claim latter introduced by the Claimants in their Reply).[22] In addition, of the three letters invoked by the Claimants[23] (in their Memorial on the Merits they invoked even more), two merely limited themselves to reproducing what Mr Mitchel (NextEra USA) understood from his talks with officials from the Kingdom of Spain, without these impressions, in any case, being confirmed by the Respondent.

72. Finally, all these letters predate the approval of RD 1614/2010, RD-Act 14/2010 and Act 2/2011, and therefore NextEra could hardly believe, supported by those letters and in view of these rules, that the Government would not adopt the necessary measures to ensure the sustainability of the SES or to avoid situations of over-compensation. In fact, the Memorial on the Merits explains that when in April 2010 the intention was announced by the Ministry of Industry to undertake a reform to ensure the sustainability of the SES, Mr Arechabala (after discussing with Mr Davidson -recipient of the letters-) ordered his team in Spain *"not to commence any earthworks or construction until we had full certainty that the laws that had motivated our decision to invest would be respected"*[24].

73. Nor is it true that the resolutions of the DGPEyM of 28 December 2010[25] could generate in the Claimants the expectation that the remuneration conditions contained in RD 661/2007 would be maintained throughout the life of the Termosol plants. Neither due to its title, nor due to its structure nor due to the language used in them, nor due to its right to appeal, can it be considered that they contain an unequivocal promise of remuneration, as was indicated in our Counter-Memorial[26]. In fact, the only thing the letters of waiver and request for communication submitted by the Plants[27] (which led to the issuance of the Resolutions as a necessary response) show is that NextEra did not think that RD 1614/2010 contained any petrification promise. If it had contained it, the Termosol plants would not have sought any additional commitment. But they did seek it.[28] Their strategy, however, did not achieve the desired result since the DGPEyM, which is expressly obliged to reply in writing to any request from a citizen according to law[29], merely informed the interested parties of the

---

[22] Reply on the Merits, paras 199, 201, 202 and 209.

[23] Documents C-13, C-8 and C-14.

[24] Memorial on the Merits, paras 126 to 129.

[25] Resolutions of 28 December 2010, Documents C-9 and C-10 and R-0155 and R-0156.

[26] Counter-Memorial, paragraphs 335 and squet.

[27] Letters of waiver and request for communication of remuneration conditions presented by the Termosol Plants on 30 November 2010. (Documents C-70 and C-71).

[28] The email of 17 December 2010 from Jaime Malet to Michel Arechabala and others regarding the proposal to propose a regulation that was sent to them by the Ministry demonstrates that it was the officers of NextEra who were *"still pushing hard to have them in individual resolutions for each plant (which would reinforce developers' rights during the life of the plants)"*. What they received, however, was a mere communication by the DGPEyM of the remuneration conditions existing "currently". C-068.

[29] For this reason, the resolutions of 28 December 2010 are issued under article 35 of Act 30/1992. R-0155 and R-0156

remuneration regime in force at the time of the query without saying that those conditions would be maintained throughout the useful life of the facilities.

74. In any case, the most important thing is that neither the Claimants nor the employees of NextEra United States believed when they made their investment in Spain in the existence of the guarantees of stability that they now invoke. This is clearly evidenced by the letter which Mr W. Ketchum, Vice-President, CEO and Corporate Secretary of NextEra Energy Resources LLC, sent to the Minister and Secretary of Industry from the NextEra headquarters in the US. It said to the new government of Spain that had emerged from the polls on 20 November 2011:

> *"NextEra is definitely constrained to state that it would be highly unfavourable for a new Government elected on a promise <u>to break away from past practices of regulatory uncertainty (and policies detrimental to businesses in general) to pursue a similar avenue as the former Government"</u>.[30](Emphasis added)*

75. The Claimants have maintained a deafening silence regarding the content of this letter in their Reply.

76. In fact, the reality is that, despite all these alleged commitments, the regulatory risk was reflected in each and every one of the contracts that the Spanish holding companies of the Termosol Plants signed at that time[31]. It is paradoxical in this regard, that neither the holding companies of the plants nor their counterparts (SENER, Casas de Hitos and the Banks) included in their contracts the exceptional situation of the Termosol plants as alleged recipients of exclusive, unambiguous and explicit commitments of immutability from the Government of Spain. Even when NextEra USA (and not the Claimants) had to assume obligations by providing guarantees in the financing contract of 28 April 2011, it was protected through the introduction of a clause limiting liability in the case of "Change of Law"[32], which the NextEra group itself has subsequently enforced in the courts of the United States. In their Counter-Memorial, the Claimants "*seek to re-write the environment in which they invested*" (in their own words).[33] Indeed, the Claimants seek to mitigate the scope of the contractual clauses introduced by their subsidiaries to protect themselves from regulatory risk. Quoting the Claimants, they "*spend a considerable amount of time trying to*

---

[30] Letter from John Ketchum (NextEra Energy Resources, LLC) to Jose Maria Soria Lopez (Minister of Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012, Document C-90.

[31] Project development agreement" between the 4 future Plants and Casas de Hitos (CLEX-019); engineering contracts between Plant Termosolar Extremadura S.L. and SENER Ingenierías y Sistemas, S.A. (section 1.1.115) Documents C-51 and C-52; Amendment dated 10 December 2010 on the "Development Agreement" of 2007, clause providing for the regulatory risk and Annex F (CLX-034); Loan Agreement, 28 April 2011 (C-74)

[32] Guarantee contract awarded by NextEra Energy Inc on 28 April 2011. R-0401.

[33] Counter-Memorial, para. 9 when it mentions that the Kingdom of Spain is attempting to re-write the letters which were sent to NextEra representatives from the United States and the Government of Spain.

*discredit the Claimants' own contracts signed by NextEra officials. This only confirms how important they are.*"[34]

77. The Claimants have even said that "*Despite Spain's assurances that it would not change the regime of RD 661/2007, the PTEs put in place a number of risk mitigation measures to protect their interests insofar as possible, in the unlikely event that regulatory intervention materialised. This does not show that the Claimants believed this risk would materialise or that they would forego ECT claims if it did.*"[35] The Claimants seek to justify the inclusion of these clauses by saying that it is a common practice and that, in any case, they did not anticipate *"a wholesale change in the FIT regime"*.[36] In this sense, the Claimants not only agree that the regulatory risk at that time was something shared by all operators in the sector but also accept that neither the Claimants nor any other company in the NextEra group, believed in the immutability of the premiums and tariffs listed in RD 661/2007.

78. Despite the foregoing, the Claimants claim that the Termosol plants are an island within the SES, outside the principle of economic sustainability of the SES and the principle of reasonable return as a dynamic concept that involves the guarantee and limitation of the subsidies to be received by the investors, in the way in which this principles have been interpreted by the settled case law of the Spanish Supreme Court in more than one hundred judgments. As has been proven in the Counter-Memorial and will be credited in this Reply Memorial, these principles which have been interpreted by the Case-law clearly, configured the objective legitimate expectations of investors, as they were revealed by RE Sector Associations, encompassing these RE investors.

79. The Claimants, untruthfully, argue that they did not know the applicability of that case law[37]. However, the documents provided by them in the document production phase reveal that the Spanish and American subsidiaries of NextEra did know it[38]. In their Reply on the Merits the Claimants claim that the Tribunal ignores this case law of the Supreme Court of the Kingdom of Spain and, instead, accepts other judgments of this same Court that have nothing to do with this case.[39]

---

[34] This expression is used in the Reply on the Merits, para. 126 to refer to the alleged efforts of Spain to re-write the letters exchanged between the employees of NextEra from the US and officials of the Kingdom of Spain.

[35] Reply on the Merits, para. 158.

[36] Reply on the Merits, para.166.

[37] Reply on the Merits, para. 173.

[38] Email of Joana Sánchez of 30 April 2010 sending a report published by the association APPA and translated into English, where the case law of the Supreme Court of the Kingdom of Spain and its application for future regulatory changes is analysed. R-0396.

[39] The judgments provided by the Claimants refer to such diverse issues as: a) the declaration of expiry of certain concessions for five floating nurseries for growing oysters (C-206), b) the Legal Regime of Notaries, Property and Commercial Registrars assigned to the DGRN (C-207); c) on the responsibility of the general government for legislative acts, publication of the Regional Law of the Balearic Islands 1/1991, on Natural Areas and the Urban Regime of Special Protection Areas of the Balearic Islands as a result of the classification as non-developable of the land that previously was capable of being urbanised and built upon (C-208) d) or the penalties imposed on an association of carriers in respect of competition law (C-209).

80. Likewise, the Claimants consider that the principle of financial "self-sufficiency" did not exist when they made their investment at the Termosol Plants in April 2011[40]. We are surprised by this statement, because it is not only inconsistent with what the counsel of the Claimants himself is holding in other arbitrations[41] but rather, in any case, it does not prevent the SES from having to be sustainable economically and financially. In addition, when the Claimants made their investment in Spain they could not have the expectation that the SES would cease to be a progressively liberalised market whose income would come from sources different to those that existed in April 2011. Nor could they have the Legitimate Expectation that the renewable energies would no longer be a cost of the SES or that they should be funded by the State Budgets if the latter had not expressly included this provision.

81. Additionally, the Claimants contend that any inefficiency of the SES is the fault of Spain, which failed both in its forecasts for electricity demand when setting the subsidies and in the obligation to raise consumer tariffs to the level that would cover all costs of the SES[42]. In line with the above, they argue that the tariff deficit is something that was created by the Kingdom of Spain, which existed long before the integration of renewables in the SES. The Claimants, therefore, blame Spain for not having foreseen the global financial crisis based on the subprime mortgages in the United States from 2007 which led to the crisis in the euro area in subsequent years.[43] According to the Claimants, Spain should have foreseen the fall in electricity demand described as "exceptional" by the media and by the associations of renewable energy, which occurred during the years 2009 and 2010 and that has not yet recovered. [44] The Claimants also hide the fact that the tariff deficit existing until 2005 was barely significant but that since 2007 it increased exponentially as a result of the progressive introduction of renewables in the SES. They also ignore the fact that the REs in 2013 accounted for 45% of the costs of the SES[45]. They also hide the fact that the consumers tariffs rose exponentially during those years to cover the costs of the SES, to become, in a country of people earning less than 1000 euros monthly and with the highest rate of

---

[40] Reply on the Merits, para. 218-225 and para. 252.

[41] Indeed, in other arbitrations, the counsel for the Claimants is arguing that the SES *" is a complex economic system that functions independently from the Spanish Government in which all the private participants in the electricity market carry out their activities, although under the supervision and control of the CNMC, the regulatory authority. From a legal and economic perspective, the Electricity System should obtain legally-defined "incomes" to cover the legally-defined "costs" (...).In this context, the Electricity System functions in a way that could be described as a "financial closed box" in which the Incomes are received essentially (i) from consumers through the payment of access tolls (the price charged for accessing and using the electric grid) in their electricity bills; and (ii) now, also from the amounts collected through TVPEE paid by power producers. Once incorporated into the Electricity System, the Incomes remain subject to the payment of the Costs.*" (Emphasis added). In a footnote it states that *"the same pattern of income and costs existed under Regulatory Framework No.1".* Memorial on the Merits of ICSID Case No. ARB/14/18 (para. 603-605). A similar conclusion is reached in the Memorials on the Merits of ICSID Cases No. ARB/14/12 (para. 524-526) and No. ARB/15/16 (paras. 427-429).

[42] Reply on the Merits, para. 226-230.

[43] Poÿry in its 2008 report informed the Claimants of both that the analysts did not expect this crisis to reach Europe and that its consequences are not easy to determine, p.61. C-202.R-0406.

[44] Allegations of the Spanish Wind Association to RD 1614/2010. News from Libertad Digital. R-0420.

[45] CNMC report of 17 December 2013. R-0390

unemployment in the EU after Greece, one of the most expensive electricity rates in the euro area, as demonstrated in our Counter-Memorial. [46]

82. In this situation, the reform that has been carried out by the Kingdom of Spain, in the context of a bank bailout by the EU, was necessary and predictable, as explained in our Counter-Memorial and confirms the recent case law of the Supreme Court of the Kingdom of Spain.[47] NextEra stated that it was aware that the reform would take place in the letter sent by Mr Ketchum on 15 March 2012 to the Prime Minister of Spain.[48] This reform has affected both the costs and revenues of the SES and has been conducted in a proportionate manner and according to the industry's proposals submitted since 2009.[49]

83. The Claimants consider that the reform process has not been transparent[50], omitting to tell the Tribunal that Parameters Order 1045/2014 itself was modified as a result of the allegations made by the Termosol plants during the hearing procedure[51]. The consideration of these claims resulted in the Termosol plants obtaining recognition of their own SF (standard facility or IT in Spanish), due to their larger solar field (a circumstance shared with the other CSP plants of the Order) and their greater storage. This was stated by Mr Montoya in his second witness statement.[52] Outside of these two circumstances, in no case have the Claimants established that the Termosol plants have any another particularity that differentiates them from other solar thermal plants of the same technology.

84. To try to blacken the approval process of RD 413/2014 and OM 1045/2014, the Claimants focus on CNE report 18/2013 issued during the processing of RD 413/2014 and the works of two consultants hired by the IDAE in the process of conducting the calculations that would lead to the approval of OM 1045/2014, but which were not finally taken into account in the draft. The Claimants, however, omit to tell the Court that it was precisely the criticisms of CNE report 18/2013 which led to the regulator restarting the processing of RD 413/2014. Regarding the new draft, the CNE (by then, already the CNMC) issued a new report on 17 December 2013, in which it valued positively that the recommendations of its report 18/2013 be incorporated into the new draft.[53] If the Claimants had spent less time analysing the documents of Roland Berger and Boston Consulting and more on the analysis of the regulatory records of RD 413/2014 and OM 1045/2014, they would have detected that during the processing of the latter a hearing was given to all the interested parties both through the Electricity Advisory Council of the CNMC and through the Council of State (in

---

[46] Counter-Memorial, para. 84 et seq.

[47] Counter-Memorial on the Merits, paragraphs 377-379. Judgements of the Spanish Supreme Court nos. 1260/2016, of 1 June 2016 (R-0337), 1266/2016, of 1 June 2016 (R-0338), 1259/2016, of 1 June 2016 (R-0339), 1261/2016, of 1 June 2016 (R-0340), 1264/2016, of 1 June 2016 (R-0341).

[48] Letter sent by Mr Ketchum in March 2012, Document C-90. In it, following the issuance by the CNE of its report of 7 March 2012, it is said by NextEra: "*we sincerely hope that we will not be disappointed when the new Government announces the planned regulatory changed to the Spanish energy industry*".

[49] 2009 APPA Proposal.  Presentation to MINETUR (Ministry of Industry, Energy and Tourism) of the Draft Law presented by APPA-Greenpeace in May 2009 R-0333.

[50] Counter-Memorial, para 289 et seq.

[51] Allegations submitted by the holding companies of the Termosol plants during the hearing procedure held in processing of OM 1045/2014. R-0221

[52] Second Witness Statement of Carlos Montoya.

[53] CNMC report of 17 December 2013, pages 14 and 15.

the case of RD 413/2014, by restarting its processing, the opportunity to make pleadings multiplied). In addition, the Claimants would have found the explanation to certain unknowns raised in its Reply on the Merits, such as the origin of the "Spanish ten-year bond plus a spread of 300 basis points" or the concept of "efficient and well-managed company"[54], typical of the rules of State Aid that Spain must necessarily follow when setting RE subsidies. [55]

85. Despite all their criticism regarding the new legal system and the procedure followed for its approval, the Claimants conclude that their only discrepancy with the valuesassigned to their SF is that the CAPEX approved for the Termosol Plants does not include: a) the financing costs, b) the costs of related-party operations c) the costs of the Valdecaballeros substation.[56] The Respondent accepts the inclusion of the latter costs as related to the activity of electricity production despite being excessive. However, the costs of external financing of the plants cannot be included because they have never been contemplated in the Spanish system of support to renewables.[57] The costs of related-party transactions amounting to twenty-two million euros lack any kind of justification and the only paragraph that the Claimants dedicate to explaining them[58] is not convincing. Nor have their experts been able to give an explanation for these costs.

86. Moreover, The Claimants are trying to strengthen their unfounded position on the regime freeze in their favour, repeating insistently that the contested measures have been retroactive and, therefore, disproportionate or exorbitant. This statement is as repetitive as uncertain and is made with the sole purpose of presenting the Arbitral Tribunal with a distorted picture of the facts.

87. In order to clarify that the contested measures are not retroactive, the Respondent will conclusively prove that the measures: (i) are not retroactive according to international Law Precedents that have addressed the issue; (ii) they are not retroactive, as a proven fact in Spanish law, (iii) Important RE Sector Associations and Investors such as Iberdrola knew before the measures their future application on existing installations. (iv) the Claimants knew that the contested measures are not retroactive since they were advised in Documents provided from 2007, 2008 and 2010 that future reforms could be introduced that would affect future remunerations of existing installations.[59]

---

[54] The Reply on the Merits, in para. 352 criticises the inclusion of this item.
[55] Report of the Technical General Secretariat of MINETUR issued during the processing of RD 413/2014. R-0391.
[56] Reply on the Merits, para. 330-351.
[57] And the Economic Report of RD 436/2014 expressly stated in its p.5: *"Project funding: it is assumed, in all cases, that 100% of the funding will come from equity. The leverage and percentage between equity and other sources of funding are independent decisions in each project and for each promoter that, when made wisely, should provide better ratios than those estimated in this report"*(R-0421). In the same vein, the PER 2005-2010 calculated the standard case for solar thermal plants like those of the Claimants based on an assumption of 100% financing with own resources, page 272. R-052.
[58] Reply on the Merits, para.347
[59] This is evidenced by the report of Pöyry from 2008 (Document C-202) and the report of the APPA association attached to the mail sent by Joana Sánchez on 30 April 2010 to the officers of NextEra (R-0396 ), among others.

88. In short, the very contrast between the view of the Claimants and the reality of the SES and its evolution (shown by the Kingdom of Spain), provides evidence that the Claimants seek to omit from the Arbitral Tribunal highly relevant elements of the regulatory framework existing at the time of their investment.

89. Indeed, the Spanish Electricity System is a strategic economic sector, which involves (i) a wide degree of regulation, (ii) the presence of relevant public interests and (iii) the need for amendments that adapt the regulatory framework to the circumstances of the sector and the changes that may occur in the economic data. Therefore, paraphrasing the Supreme Court[60] and the Constitutional Court[61], it seems that the Claimants, despite operating in this strategic economic sector, are aiming to avoid the specific nature of the economic sector in which they invested.

90. The biased statement made by the Claimants results in the omission and, on other occasions, confusion of data essential to the resolution of this Arbitration. The following elements, in particular, should be highlighted:

   a. The Claimants confuse the value of the different regulations governing the SES and the consequences of this diversity. They omit the key concept of the hierarchy of rules of the continental rules of law and its relevance in the Spanish regulatory framework.

   b. They ignore the fact that production from RE is an integrated, not isolated, activity in the SES. This means ignoring that State aid or subsidies for SR are a cost of the SES and, therefore, are subordinated to the principle of its economic sustainability.

   c. They omit from the Arbitral Tribunal the Case-law of the Supreme Court of the Kingdom of Spain as the legal interpretation established by the Spanish State to determine the content, extent and limits of the rights of SR producers. The Claimants invoke Press releases and power-point presentations that they never knew and omit the supreme interpreter of the Law in Spain. Any minimally diligent investor knew this Case-law.

   d. The Claimants present unfounded arguments to argue that the existing Case-law of the Supreme Court since 2005, which they knew, does not apply to measures relating to this arbitration.

   e. The Claimants seek to minimise the fact that the Spanish legislation regarding support for renewable technologies is subject to Community Directives. The Claimants thereby obscure the important criteria laid down by EU Law on issues related to this arbitration. The Claimants are trying to hide the undisputed fact that the State Aid system admitted by EU directives for the development of renewables is subject to the EU State Aid Regime[62]. That is, they are subject to the principle of proportionality.

---

[60] Counter-Memorial, section III.B.(3)
[61] Constitutional Court ruling of 17 December 2015, delivered in an appeal of unconstitutionality 5347/2013. R-0056.
[62] Directive 2001/77/EC of the European Parliament and of the Council, of 27 September 2001, on the promotion of electricity produced from renewable energy sources in the internal electricity market. Article 4 (1). R-0046.

The Claimants also seek to obscure the way EU Law regulates the use of gas by solar thermal plants.

f.  The Claimants distort the principle of Reasonable Return. This principle exists since 1997 and is currently the cornerstone of the system of remuneration for the production of energy from ER. The Claimants do not understand the established idea that Reasonable Return is the objective of the support system for renewables. This objective is achieved by combining two elements (market price and subsidy), whereby there has never been a freezing of the concrete form of articulating these two elements to achieve the aforementioned objective. Furthermore, the Claimants also try to blur the essential characteristics of the principle of Reasonable Return; their balance and dynamism.

g.  The Claimants skip that the subsidies established in RD 661/2007 are grounded in Act 54/1997 and in PER 2005-2010.

h.  The Claimants seek to hide from the Tribunal that subsidies to renewables, by their link to the principles of the SES' economic sustainability are set and are conditioned by the expected changes in demand and other based financial economic data. These forecasts were set out in the Renewable Energy Plans to adapt the roll out of renewables to the economic sustainability of the SES.

i.  The Claimants also ignore that subsidies were established in 2007 based on the definition of different standard facilities and standards in PER 2005-2010. Thus, the Claimants also omit that the methodology used by the Spanish regulator was always to determine the operation and investment *costs* of a *standard facility,* in order to enable investors to recover the CAPEX, OPEX and obtain *Reasonable Return* according to the capital market.

91. Finally, the Claimants consider that the Kingdom of Spain cannot use as a defence the overpowered state of the Termosol Plants[63]. Both the Claimants and the expert report they provide with their Reply document, admit that the Termosol plants have an installed capacity exceeding 50MW. Therefore, they would be ineligible for inclusion in the special regime under the terms of RD 661/2007. Even less could they have the expectation that all the MW produced above the power limit could be subsidised. It must be said, however, that the new regulation does not establish any power limit, which benefits the Termosol plants. The relevant issue, however, is whether the Claimants could legitimately expect that for thirty years the Termosol Plants would receive a remuneration to which they were not entitled. The Claimants contend that the Respondent cannot go against its own actions when it expressly recognised that the Termosol plants met the requirements for inclusion in the SR. However, the Respondent admitted that inclusion after performing an administrative check, i.e., after checking that all the documents were provided. However, the Respondent has not had the chance to make an empirical measurement of the installed capacity of the Termosol plants to see if what the documents state fits the physical reality of the plants. In fact, when it attempted to do so, following the invitation of the Claimants to visit the

---

[63] Reply on the Merits, para. 254-278.

Termosol plants, this possibility was expressly prohibited[64]. Therefore, the Respondent cannot go against certain acts (checking the actual power installed in the Termosol plants), which never existed.

92. Subsequently, the Respondent will present these points in more detail.

**(1.1)   The Claimants ignore the value of the different regulations governing the SES.**

93. The Claimants, in presenting their version of the regulatory framework at the time of making their contended investment, cite different regulatory components. They refer to different acts such as Act 54/1997 and different regulations such as RD 661/2007 and RD 1614/2010. In reading the Claimants Memorials, the idea would seem to be deduced that all the regulatory components cited have the same legal status and legal value.

94. Any diligent investor should know that their rights and duties are imposed by the different regulations in force in the Spanish Legal System. They should also know that these regulations are structured hierarchically among themselves, said structure having important legal effects[65].

95. This principle of hierarchy implies that the regulations cannot contradict the provisions of a higher Act. In Spanish Law, when a Regulation infringes on the provisions of a rule with the Status of Act, it causes said Regulation to be null and void[66]. Moreover, the Courts have the obligation not to apply the Regulations that are contrary to Acts[67].

96. Although in their Memorial on the Merits the Claimants recognised the existence of this principle when they began their presentation of the regulatory framework in which they made their investment,[68] in their Reply they have abandoned it completely.

97. This principle of hierarchy of rules applies without any exceptions to the standards legally configuring the SES. When the Claimants made their investment, Act 54/1997, of 27 November[69] was in force, and a plurality of Regulations that developed the mandates of said Act existed. Included in these Regulations were RD 661/2007[70] and RD 1614/2010[71], which developed the mandates of Act 54/1997 concerning electricity production activity under the special regime. These Regulations, under the principle of hierarchy of rules, cannot contradict or nullify the provisions of Act 54/1997.

98. That is, an investor, unless manifestly negligent, could never invest in Spain while ignoring the mandates within Act 54/1997, based on an isolated interpretation of the provisions of

---

[64] Letter to Spain dated 11 October 2016. R-0279
[65] Counter-Memorial on the Merits, paragraph 392.
[66] Act 30/1992 of 26 November on the Legal Regime of Public Administrations and the Common Administrative Procedure. Article 62.2. R-0035.
[67] Organic Act 6/1985, of 1 July, on the Judiciary, Article 6. R-0294.
[68] Memorial on the Merits, para. 34 and footnote on page 44.
[69] Act 54/1997, of 27 November, on the Electricity Sector. R-0003.
[70] RD 661/2007, of 25 May, regulating the activity of electricity production under the special regime. R-0042.
[71] RD 1614/2010 of 7 December, Article 2. R-0068.

RD 661/2007 and RD 1614/2010. Any minimally diligent investor should know that when the Act imposes a mandate no regulatory provision may contradict or invalidate what has been prescribed by the Act.

99. The Claimants intend to omit this principle of hierarchy and its application to the present case. Indeed, the correct understanding of this principle invalidates most of the theory of the Claimants both in their Memorial on the Merits and in their Reply on the Merits.

100.    Act 54/1997 pivots on the principle of economic sustainability of the SES[72]. Therefore, diligent investors knew or should have known that RD 661/2007 could not freeze remunerations indefinitely, as this would infringe the principle of sustainability of the SES. Therefore a regulatory provision that would prevent the adoption of measures to ensure the economic sustainability of the SES would be contrary to Act 54/1997, as economic sustainability is a principle which, by legal mandate, applies to the economic regime of the Special Regime[73]. It should be recalled that subsidies paid to SR producers are a SES cost[74] that necessarily affects its sustainability.

101.    Similarly, no investor can claim the freezing of a regulatory provision maintaining a level of subsidies generating a profitability that is not reasonable, due to the subsidy being *far higher* regarding the capital market. Such an interpretation would be contrary to Act 54/1997, which sets a limit on the subsidised regime in question by stating that the binomial *market price + subsidy* aims to provide <u>*Reasonable Return pursuant to* the capital market</u>[75].

102.    Regarding the linking of the *subsidies* o the SR to the legal mandate of economic *sustainability* of the SES, the Claimants simply suggest that this problem did not affect their plants because they had specific promises from the Kingdom of Spain about the profitability of 11.6 % that they would receive during their operational life. The Claimants thereby are attempting to establish the Termosol plants as an island within the SES and omit the main *"leitmotiv"* of all the regulatory changes carried out in the SES since 2007, an issue to which we shall return later.

103.    Regarding the principle of reasonable return, the Claimants, relying on the witness statements of Mr Davidson, argue that they invested in the Termosol plants thinking that they would obtain (we do not know whether the plants or the Claimants) a guaranteed return of 11.9 % [76]and not a vague concept of "reasonable return". For the Claimants, this specific return of 11.9%:

> *"is unsurprising given that Spain's own internal assessments in connection with RD 661/2007 were that post-tax project IRR of 7.6 to 11% would be required in order to attract investment in CSP technology. A project IRR of 11.5 to 11.9% was also in line with what the CNE considered to be reasonable – Dr Abdala and Professor Spiller*

---

[72] Counter Memorial on the Merits, para. 413 and 414.
[73]  Act 54/1997, of 27 November, on the Electricity Sector, Article 29.  R-0003.
[74]  Act 54/1997, of 27 November, on the Electricity Sector, Article 16 (6). R-0003.
[75]  Act 54/1997, of 27 November, on the Electricity Sector, Article 30 (4). R-0003.
[76] Reply on the Merits, para. 201 and 202.

*relayed that the CNE estimated that the CNE considered that 11.6% was reasonable for CSP projects opting for the pool+premium.[77]" (footnotes omitted)*

104. Under no circumstances can this statement be accepted, since it involves not only forgetting the dynamic character of the concept of reasonable return but it also relies on a completely erroneous interpretation of RD 661/2007 and PER 2005-2010. We shall return to this matter when we analyse the legal principle of Reasonable Return.

105. Act 54/1997 marks clear limits to the Regulations developed under it: (i) the obligation to set out Reasonable Return with reference to the cost of money on the capital market and, (ii) that in any case the returns generated do not affect the economic sustainability of the SES.

106. Therefore, no regulatory provisions (i.e. Art. 44.3 RD 661/2007 or from Art. 4 of RD 1614/2010) can be or could be understood so as to be contrary to what is stipulated under Act. An investor could not expect that the aforementioned regulatory provisions could prevent the adoption of regulatory measures in SR necessary to maintain the economic sustainability of the SES and respect the investments' Reasonable Return. Therefore, no comprehensive or diligent investor could have the expectation that, once a situation of over-remuneration contrary to the mandate of <u>Reasonable</u> Return is observed, this situation would not be corrected to enforce the legal mandate. In fact, investors could observed these corrections in the RE sector in 2007 and in 2010, regarding the wind and PV energy.

107. The foregoing has been expressed, since 2005, by more than 100 judgements issued by the supreme interpreter of Spanish Law, the Supreme Court[78].

**(1.2)    The Claimants ignore the fact that production activity from renewable sources is an integrated, not isolated, activity in the SES.**

108. By reading the various written pleadings made by the Claimants, it is inferred that, in their opinion, the activity concerning electric power production from renewable sources is an island within the SES. For the Claimants, such activity must (and can) be separate from the future of the SES as a whole, as well as from its sustainability.

109. The SES is first and foremost an interconnected legal, economic and technical system for the generation, transmission, distribution and sale of electricity[79]. It is, therefore, a system created to ensure that (1) a power electricity supply will be maintained under conditions that are affordable for consumers and (2) to ensure that this supply will be sustainable in the long term. "*Sustainability*" specifically involves the technical, environmental and economic-financial viability of the SES[80].

110. In order to show the Arbitral Tribunal the Claimants' omission of this essential nature of the SES, the following issues will be explained: (1) The link between the system's economic

---

[77]Reply on the Merits, paragraph. 202.
[78] Counter-Memorial on the Merits, para.185 et seq.
[79] Counter-Memorial on the Merits, para. 57-70
[80] Counter-Memorial on the Merits, para. 57-59

sustainability and the subsidies to SR was clearly foreseen by Act 54/1997; (2) This concept was implemented in PER 2005-2010 by legal mandate; (3) The Claimants were advised of that fact by the Pöyry Report.

**(a)      Act 54/1997 requires production activity from renewable sources to be part of the SES**

111.      In accordance with Act 54/1997, and as another part of the SES, electric power production from RE is included. This activity has a direct impact on the economic sustainability of the SES inasmuch as the subsidies comprising the SR producers' economic regime are a cost of the SES: *"cost of diversification and security of supply"*[81] that affects its economic sustainability.

112.      As a result, Act 54/1997 Article 29 stipulates that RE activity is subject to the principle of _economic sustainability_ of the SES[82] and requires its *planning* as we shall examine below.

113.      Against the alleged principle of "financial self-sufficiency" of the SES, the Claimants simply say that this principle did not exist when they made their investment but rather was introduced by Act 24/2013.[83] We have already seen that this argument contradicts what the counsel for the Claimants is stating in other procedures. In any case, when the Claimants invested, Act 54/1997 stipulated in Article 15.1 that *"The activities for the supply of electricity will be remunerated economically in the manner provided in this Act according to the tariffs, tolls and prices paid."*[84] It was only in Act 15/2012 when, for the first time, it was authorised that it be financed from the State Budget. Therefore, the Claimants could not have, at the time of their investment, the expectation that the income of the SES with which the generation of RE would be remunerated could be anything other than the *tariffs, tolls and legally stipulated prices*.

**(b) Renewable rollout planning is unequivocal proof of the integration of RE in the SES**

114.      The close link between premiums (cost of the SES) and the economic sustainability of the SES requires the rollout of renewable technologies and its impact on the sustainability of the SES to be planned with due detail. It is necessary to reconcile (a) the cost that the rollout of renewable technologies will involve to the SES, with (b) the capacity to absorb that cost by the evolution of the only revenue of the SES: Spanish consumers, through electricity demand.

115.      Given the impact in terms of costs to the SES that the rollout of renewables involves, the Law stipulates necessary planning for such rollout. Thus, Act 54/1997, as amended by Act 17/2007, stipulates:

---

[81] Act 54/1997, of 27 November, on the Electricity Sector, Article 16 (6). R-0003.
[82]  Act 54/1997, of 27 November, on the Electricity Sector, Article 29. R-0003.
[83] Reply on the Merits, para. 218-225.
[84] Act 54/1997, Article 15. R-0003

*"The Government shall modify the Renewable Energy Promotion Plan to adapt it to the targets set in this regard by the European Union of 20% by 2020, maintaining the commitment that this plan established of 12% for 2010. These targets will be taken into account when setting premiums for these kinds of facilities"*[85]

116.    Prior to Act 17/2007, Act 54/1997 stated that:

*"For renewable energy sources to cover at least 12% of the total energy demand in Spain by 2010, a Renewable Energy Promotion Plan shall be established, the objectives of which shall be taken into account in setting premiums"*[86]

117.    The planning described is developed in *"Renewable energy plans"*. Specifically, as we shall examine, the determination of the premiums laid-down by RD 661/2007 is linked to the provisions of the Renewable Energy Plan 2005-2010[87]. In the aforementioned Plan, like in the Renewable Energy Promotion Plan 2000-2010[88], the costs to the SES that the deployment of renewable energy involves are assessed in terms of the profitability that it is foreseen will be granted as *reasonable*[89].

118.    More than just the costs are assessed in such planning. In addition, it analyses whether such costs are *sustainable* for the SES. Therefore, the forecasts of the PER 2005-2010 are included within a specific energy scenario, which is the scenario of the Renewable Energy Plan 2005-2010[90]. In this scenario, the sustainability of the renewable rollout costs is analysed under the framework of a scenario of foreseeable electricity demand. The costs are at all times subordinate to the sustainability of the SES.

119.    Consistent with and based on such planning and the requirement for the economic sustainability of the SES, RD 661/2007 set the corresponding subsidies. That is to say, as required by Act 54/1997, every investor should know that the system of subsidies implemented by RD 661/2007 was inextricably linked to basic economic assumptions (electricity demand, etc.) on which the Renewable Energy Plan was built.

120.    The link was not only reflected in Act 54/1997 as stated above. RD 661/2007, in its preamble it explicitly refers to the link between subsidies and PER as is being discussed.

121.    For that reason, it is not surprising that presentations conducted by Ms Manuela García in 2008 [91]made reference to PER 2005-2010. In these presentations, the author defined the regulating parts the renewable support system was built on. These regulating parts were: Act 54/1997, PER 2005-2010 and RD 661/2007. Specifically (highlighted in the image):

---

[85] Act 17/2007, of 4 July, amending Act 54/1997, of 27 November, on the Electricity Sector, to adapt it to the provisions of Directive 2003/54/EC of the European Parliament and of the Council of 26 June 2003, concerning common rules for the internal electricity market. It introduces Additional Provision 26 of Act 54/1997. R-0295.
[86] Act 54/1997, of 27 November, on the Electricity Sector. Sixteenth Transitional Provision. . R-0003.
[87] Spain Renewable Energy Plan 2005-2010.  Pag. 270 to 313. R-0296.
[88] Renewable Energy Promotion Plan 2000-2010. R-0202
[89] Spain Renewable Energy Plan 2005-2010 Pages 276 to 279. R-0296.
[90] Ibid. pages 323-327.
[91] Opportunities in Renewable Energy in Spain, Manuela García. C- 0023

RE Drivers: Legal Framework

| RE | Objective 2010 | | | |
|---|---|---|---|---|
| | Installed Capacity MW | Primary Energy Production (ktoe) | Expectation of fulfilment | |
| Wind Energy | 20.155 | 3.914 | Medium | |
| Solar Energy | | | | |
| Photovoltaics | 400 | 52 | High | |
| Solar Thermal energy (low temperature) | 4.900.805 (m²) | 376 | Medium / Low | |
| Thermoelectric | 500 | 509 | High | |
| Bioenergy | | | | |
| Biomass (included co-firing) | 2.039 | 5.138 | Medium | |
| Biomass (thermal use) | - | 4.070 | Medium | |
| Biogas | 235 | 455 | Medium | |
| Biofuels | - | 2.200 | Low | |

- Electric Power Act 54/1997 establishes:
  - ✓ "Special Regime" for electricity from renewable energies sources (50 MW)
  - ✓ Grid access guaranteed
  - ✓ Premium for electricity from renewable energies sources
- Renewable Energy Plan -PER 2005-2010
- RD 661/2007 Special Regime for the production of electricity from renewable energies sources
- New Obligations on biofuels

122.    Exhibited above, no diligent investor could ignore the link between Act 54/1997, PER 2005-2010 and RD 661/2007. The warnings could not be clearer.

123.    Consequently, a correct understanding of the SES necessarily should have led any investor to the conclusion that RD 661/2007 subsidies were unfailingly united to the base economic data on which PER 2005-2010 was built (changes in demand, etc.). In consequence, no investor could have the expectation that when facing major changes in economic data that formed the basis for fixing subsidies, these subsidies would not be modified.

124.    Moreover, the expectation to maintain a specific subsidy can hardly be kept if, besides their maintenance, fixed on the basis of strongly altered economic data, could jeopardise the economic sustainability of the SES.

125.    At this point, we must remember that the international financial crisis that started in 2009 had an extraordinary impact on the economic database on which RD 661/2007 premiums were projected. It is enough to simply observe the impact this crisis had from the main data taken into account in PER 2005-2010 to design RD 661/2007 subsidies, the evolution of electricity demand[92]:

---

[92] Accuracy, Second [Report] on the Claimants' Claim, page. 76

40



**Figure 6.a – Evolution of the demand for electrical energy and regulated costs**

Source: *Annual Reports of the Electricity Sector - Red Eléctrica Española, and Manual de Energía y Sociedad*

126. The foregoing was corroborated by the ruling of the Supreme Court of the Kingdom of Spain in its Judgement of 12 April 2012 and in other multiple Judgements[93] that were confined to stating the factual data referred to when they ruled on:

> *"The agents or private operators [...] knew or should have known that the public regulatory framework [...] could not ignore subsequent relevant changes to the economic database, to which the reaction from public authorities to attune it to the new circumstances is logical.* "If the latter involve adjustments in many other productive sectors [...], it is not unreasonable that it is also extended to the renewable energy sector, which wants to continue receiving the regulated tariffs [...]. And all the more so when faced with situations of widespread economic crisis and, in the case of electricity, with the increased tariff deficit which, in some part, arises from the impact on the calculation of the access fees made by the remuneration of such by way of the regulated tariff, in terms of cost attributable to the electricity system"[94] (Emphasis added)

127. Faced with this change in forecast demand, the Claimants simply say that the blame for not properly predicting the evolution of demand lies with the Kingdom of Spain and that, in any case, the Kingdom of Spain continues to be at fault due to not having sufficiently increased the consumer rates or having included the policies of solidarity towards island territories as costs of the SES.

128. We shall not continue to insist on the fact that the fall in demand that occurred from 2009 was exceptional and unpredictable for all economic agents, as evidenced by the allegations of the Wind Business Association presented during the processing of RD

---

[93] Judgement of the Spanish Supreme Court of 12 April 2012 R-0066.
[94] Judgement of the Spanish Supreme Court of 12 April 2012, appeal 40/2011. Legal Ground Four. R-0066

1614/2010. [95] Nor shall we insist that Act 54/1997 establishes as an essential principle that the supply of electricity be performed at the lowest possible cost. Even less shall we insist that the rates of Spanish consumers already increased by 61.55% between 2007 and 2014. This is a much higher increase than that in the same period for the European Union, where the total price of electricity for households increased by 21.99%[96].

129.     In any case, the Claimants could not ignore, if they studied the PER 2005-2010, that the remuneration that the Termosol Plants would receive were a cost of the SES and that they had been calculated according to certain electricity demand forecasts contained in the PER. Therefore, they could not have the expectation that if these forecasts were not met the subsidies would remain unchanged.

130.     The Claimants attempt to transfer the misconception that the subsidised production activity from RE is an island within the SES. An island that did not affect either Act 54/1997 nor PER 2005-2010. An island outside the basic principles on which the SES is built and, in particular, isolated from the principle of economic sustainability of the SES.

**(c)      Before their investment, the Claimants were expressly advised that possible future regulatory measures in RE were linked to the evolution of the SES**

131.     The Claimants were expressly advised of the link in the SES between RE development and the economic sustainability of the former. On this issue the Pöyry report entitled *"Current and Future Trends in the Spanish Solar System"* noted the close relationship between subsidies to renewables and the Economic sustainability of the SES. In this regard, he warned about the role that these subsidies, as a cost of the SES, have in generating the tariff deficit:

> *"The renewable feed-in tariff structure in Spain contributes to generate further tariff deficits so <u>future development plans need to take into account the system costs</u> of promoting expensive renewable technologies."[97]*

132.     Afterwards, Pöyry explained to NextEra that RD 661/2007 was approved to remove the "supra-normal profits" received by wind producers under RD 436/2004:

> *"Furthermore, given recent high Pool prices, Special Regimen generators, in particular wind farms, had, according to the Spanish Government, been making supra-normal profits. As a result of these excessive profits the government has intervened in order to*

---

[95] AEE Claims to RD 1614/2010 and RD 1565/2010 of 2 August 2010. AEE allegations before the CNE during the Spanish National Energy Commission public information process on the draft of the Royal Decree which regulates and modifies certain aspects of the special regime. R-0251.

[96] Half-yearly data obtained from Eurostat about the price of electricity in kWh without taxes, in Spain and in the European Union for domestic consumers between the second half of 2007 and 2014, included in Document R-0154. The above-mentioned figures are obtained from the following calculations: variation of the price of electricity for households in Spain: (0.1861-0.1152)/0.1152=0.6155, variation of the price of electricity for households in the EU: (0.142-0.1164)/0.1164=0.2199.

[97] "Current and Future Trends in the Spanish Solar System". Report to FPL November 2008 edition. Page 13. C-202. R-0406.

> *cap profits by modifying RD 436/2004 (the main special regime legislation for the period 2004-07) and publishing RD 661/2007 to replace it.*"[98]

133.    Pöyry analysis conducted in 2008 advises that "*The Spanish Government seems to be determined to alleviate any potential deficit in advance this has been done partially was done by capping the wind remuneration. This has been further complemented by the change on the Power guarantee, now Capacity payment, which implies a sharp cut for a number of generators in their revenues unless they opt for a pass-through strategy when possible. Moreover, reductions on Solar PV tariffs.*"[99]

134.    In the analysis of the relationship between the subsidies for CSP technology and the tariff deficit, Pöyry pointed out a risk of a drop in the subsidies when he noted that:

> "*It is clear that the total contribution of Solar to the tariff deficit would be much higher than the contribution from wind. Consequently, the risk of wind projects having <u>further reductions of the subsidy</u> is low while <u>the solar business risk is higher</u>. Seeing as Solar PV has just experienced a reduction of the regulated tariff, <u>we believe that the risk is now concentrated in the CSP industry</u>*"[100] (Emphasis added)

135.    Although Pöyry then says that "*However, the risk of a reduction in premiums for CSP projects is also limited as RD 661/2007 already provides a cap and floor structure*", Pöyry states that with RD 661/2007 there has been a "*a reduction of the premium for CSP projects of 10%*".[101]

136.    According to Pöyry, this measure "*does not imply a substantial impact on the tariff deficit as it reduces the deficit approximately €2bn in 2020. In order to have a lower deficit, the Government would need to decrease the CSP tariffs by 30% which we feel unlikely from an economical point of view if the Government seriously aims to meet its ambiguous targets.*"[102]

137.    Finally, the consultancy firm warned NextEra of the existence of a debate at the time regarding how to resolve the problem of the tariff deficit and its uncertain solution. It even tells it that the possibility has been raised that the premiums for renewables be covered by the State Budget and not the electricity tariff. But for Pöyry, this possibility involves the risk of uncertainty, since the State Budget is approved annually.[103]

**(1.3)    The Claimants ignore the role of the case-law of the Supreme Court of the Kingdom of Spain as done in this arbitration.**

138.    The Claimant demonstrated with their arguments that they ignore the legal system in which they invested. Besides not having a Legal Due Diligence on the Spanish Legal System and its articulation, this ignorance was further proven when they tried to diminish

---

[98] Ibid. Pages 93 and 94.
[99] Ibid. page 103.
[100] Ibid. Page 115
[101] Ibid. page 115
[102] Ibid. page 115
[103] Ibid.

the importance of the Supreme Court Case Law in their Reply on the Merits issued in relation to the remuneration of renewable energies.

139.    Surprisingly, the Claimants, who recognise the authority of the Supreme Court of the Kingdom of Spain, consider more relevant to this case other rulings that have nothing to do with the facts of this arbitration and relate to such diverse issues as a) the declaration of expiry of certain concessions for five floating nurseries for growing oysters, b) the Legal Regime of Notaries, Property and Commercial Registrars assigned to the DGRN; c) on the responsibility of the general government for legislative acts, publication of the Regional Law of the Balearic Islands 1/1991, on Natural Areas and the Urban Regime of Special Protection Areas of the Balearic Islands as a result of the classification as non-developable of the land that previously was capable of being urbanised and built upon d) or the penalties imposed on an association of carriers in respect of competition law.[104]

140.    The Claimants also argue that they could not have known that the case law issued until April 2011 could be applied to their case. However, the NextEra officers were aware of that case law. In this regard, the report of APPA, translated into English and sent by Joana Sánchez on 30 April 2010, among others, to Mr Mike Arechabalas, concludes, after a thorough analysis of the case law of the Supreme Court handed down so far:

> *"in any case, one has to state clearly the advisability of fleeing from any optimism when it comes to an appeal in the courts of law. Despite what we are saying, an eventual practical demonstration that a certain modification to the premiums would put the IRR for an installation below that 7% and would thereby cease to guarantee these "reasonable rates of return", might perfectly be "ratified" by a court simply by maintaining that the "reasonableness" of the rates of return in 2006 or 2007 could be at aforementioned 7%, but they do not have to coincide with this figure when making this modification, with which another route of attack to the adjustment to law of retroactive modifications to tariffs and premiums would be frustrated once again".* [105]

141.    This report is relevant not only because it reveals the Claimants' knowledge of the case law of the Supreme Court but also because it is evidence that the rate of return at that time given by the regulator and expected by producers was 7%, as the Respondent has always maintained, and not 11.7% which, for the first time, the Claimants defended in their Reply.

142.    This case law specifically issued in relation to the economic rights of producers of renewable energy is essential in this case because the Claimants invested in the sector of renewable energy production within the SES. They invested within a specific regulatory framework in which their rights and duties did not come from a contract, concession, license or agreement. Their rights and obligations derived directly from the Regulatory Framework as a whole.

143.    When it comes to defining the extent and limits of investors' rights in this realm, the case-law of the Supreme Court of the Kingdom of Spain plays a fundamental role. The

---

[104] Counter-memorial, paragraphs, 232 and 233. Documents C-206, C-207, C-208 and C-209.
[105] Report of the main association of producers of REs, APPA, translated into English by NextEra and attached to the email sent by Joana Sanchez on 30 April 2010 to other NextEra employees. R-0397. In the same vein, email of 21 April 2010 of Joana Sánchez. R-0396

Supreme Court is the ultimate interpreter of the Spanish Legal System according to the Spanish Constitution. The precedents repeatedly set in its Judgements complement the Legal System[106].

144.    Thus, when, in our statements, we refer to the case-law of the Supreme Court, we do not cite it as a precedent that must necessarily be followed by the Honourable Arbitral Tribunal when it comes to settling this arbitration. This is most assuredly not our purpose. When we refer to the Supreme Court Case-law of the Kingdom of Spain, we do it as fact. A fact to be taken into account by the Honourable Arbitral Tribunal when it comes to applying the ECT and other Regulations and Principles of International Law.

145.    In the regulatory framework in which the Claimants decided to invest, the main source of expectations for the Claimants must come from the rational and comprehensive understanding of the rights and obligations arising from such regulatory framework. This understanding certainly must include the case-law of the Supreme Court. Ignoring such case-law means ignoring a key component of the regulatory framework in which they invested. It also means ignoring the content and limits of the rights under which the investment is materialised. In other words, no investor in Spain can expect to base any expectations on an interpretation of the regulatory framework that disagrees with the interpretation laid-down by the Supreme Court in a consolidated manner prior to the investment.

146.    As we discussed in our Counter-Memorial,[107] said case-law, since 2005, hinges on the following key points:

- there is no right to an economic system not being changed;

- there are no grounds of invoking the principle of legal certainty or the investor´s legitimate expectations in order to challenge a modification of the economic regime;

- unless Article 30(4) of Act 54/1997 is amended, the only limit that must be respected by the Government in these regulatory changes is to grant the facilities of SR a Reasonable Return with reference to the cost of money in the capital market

- the integration of the facilities of the SR within the SES results in companies having to assume some regulatory risk.

147.    Consequently, the Judgements of the Supreme Court included in the Counter-Memorial are facts that the Honourable Tribunal cannot ignore when it comes to applying International Law.

---

[106] Counter-Memorial, paragraphs 40 and 41.
[107] Counter-Memorial, paragraphs 185-212.

148.    The other Judgements provided, although dated after the investment, are relevant as the Supreme Court confined itself to reiterating its line of case-law laid-down in the Judgements of 2005, 2006, 2007 and 2009.

149.    Regarding this point, the ruling on the Award for Charanne and Construction Investments v. the Kingdom of Spain on the value of the case-law of the Supreme Court of the Kingdom of Spain should be highlighted:

> *"The conclusion that the Court reaches according to which, in the absence of a specific commitment, the Claimants could not have had a reasonable expectation that the regulatory framework laid down by RD 661/2007 and 1578/2008 would remain unchanged, is* reinforced by the fact that the jurisprudence of the highest Spanish judicial authorities had clearly established, prior to the investment, the principle that domestic law allowed changes to be made to the regulation"[108] (Emphasis added)

> *"Although the decisions of the Spanish courts are not binding for this Arbitral Tribunal, the same are relevant, as factual elements, to check that an investor could not, at the time of the investment in dispute, have the expectation that, in the absence of a specific commitment, the regulation was not going to be modified in the course of the life of the Plants"*[109] (Emphasis added)

150.    Faced with the position taken by the Kingdom of Spain the Claimant has sustained a very different position in two pleadings. In their Memorial on the Merits, the Supreme Court Case-law on the regulatory changes simply does not exist. However, the Reply on the Merits admits its existence but notes that said case-law cannot be taken into account to set the legitimate expectations of the Claimants, because a) they had received alleged specific promises from officials of the Kingdom of Spain[110]; b) because according to them none of these rulings had been issued at the time they decided to invest[111] (the first of these rulings is from 2005); c) because none of these rulings analyses the stability commitments contained in RD 1614/2010[112] and d) because, in any case, they consider more relevant the rulings of the Supreme Court that decide on the problems of a concessionaire of nurseries for growing oysters or certain transporters that decided to raise their rates.

151.    Before analysing the Claimants' arguments it should be noted that while making their investment, the Claimants have not demonstrated carrying out a legal due diligence on the issue at hand. There is no legal due diligence that maintained, in a reasoned manner and while the Claimants were making their investment, that the Supreme Court Case-law would be inapplicable to investments made after the entry into force of RD 1614/2010. The only report that we have, is one by APPA from April 2010, even published online, that understands that the Judgments of 2005, 2006 and 2009 issued until April 2010 are applicable to any subsequent modification of RD 661/2007.[113] Another email by Joana

---

[108] Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, para. 504. RL-0088.

[109] Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, para. 508, RL-0088.

[110] Statement of Claim, paragraph. 172.

[111] Ibid, para.173.

[112] Statement of Claim, paragraph. 175.

[113] Report attached to the email of Joana Sánchez, of 30 April 2010. R-0397

Sánchez of 21 April 2010 warned the employees of NextEra of the existence of this case-law saying that *"renewable energies do not have permanent rights on the future retributions as long as profits are reasonable."*[114]

152.    The Claimants argue that Supreme Court rulings prior to RD 1614/2010 would not be applicable to future legislative changes to said Regulation. The analysis of the arguments on which the Claimants theory is built demands to answer a series of questions: (i) RD 661/2007 was not issued for the purpose of improving the profitability of different RE technologies; (ii) Article 44 (3) of RD 661/2007 was not new in the Spanish regulation (iii) RD 1614/2010 was limited to extending the wording of article 44. (3) of RD 661/2007 to the premiums and the facilities that became operational after 2010, resolving the inefficiency that had been caused by the publication of RD-Act 6/2009, (iv) The main players in the sector do not share the thesis of the Claimants; (v) The Claimants do not have specific grandfathering commitments and (vi) the Supreme Court has already resolved the appeals filed against the measures in dispute and has strongly indicated that this case law itself is applicable to those who invested after RD 1614/2010.

**(a)    RD 661/2007 was not issued for the purpose of improving the profitability of renewable technologies.**

153.    The Claimants have misleadingly claimed in their document that RD 661/2007 was issued for the purpose of improving the profitability of renewable technologies.

154.    As previously indicated in the analysed 2008 Pöyry considerations, which will be further discussed in Section III.A.2.2 (a). of this statement, RD 661/2007 was issued in order to ensure the economic sustainability of the SES and to correct over-remuneration situations. Both are situations which followed from the fact that RD 436/2004 linked the subsidies to the TMR and a pool evolution different to that foreseen.

155.    In fact, RD 661/2007 did not result in an improvement in returns compared to those from RD 436/2004. As noted above, Pöyry revealed to NextEra in its report that RD 661/2007 produced *"a reduction of the premium for CSP projects of 10%"*[115] in relation to those established by RD 436/2004.

**(b)    Article 44 (3) of RD 661/2007 has its precedent in Article 40 (3) of RD 436/2004**

156.    The Claimants state that the Supreme Court case-law prior to 2010 could not be applied because RD 1614/2010 introduced in Article 4 a series of grandfathering commitments which the previous regulations did not include. However, as we already explained in our Counter-Memorial[116], Article 4 of RD 1614/2010 merely extended the application of Article 44.3 of RD 661/2007 to the "premiums" (not just the rates) and to the facilities whose start-up certificate was obtained from the year 2012.

---

[114] Email of 21 April 2010 from Joana Sanchez to Michel DeBoch. R- 0396.
[115] Ibid. page 115
[116] Counter-Memorial, paragraphs 299-301.

157.    Indeed, the approval of RD-Act 6/2009[117] and the phasing of the entry into operation of the plants introduced by the Resolution of the Council of Ministers of 13 November 2009[118], had generated a distortion involving the fact that the plants pre-registered in the RAIPRE whose start-up certificate was granted from 1 January 2012, would be affected by the first of the revisions set out in RD 661/2007 in the year 2010. Therefore, what Article 4 of RD 1614/2010 does, as acknowledged by all the Claimants[119], is to extend the provisions of the second paragraph of Article 44 (3) (paragraph 2) of RD 661/2007 to plants not covered by it.

158.    Therefore, the Preamble of RD 1614/2010, after noting that the purpose of this Regulation is to safeguard the principle of reasonable return, states that:

> "Therefore, the present royal decree intends to resolve certain inefficiencies in the implementation of RD-Act 6/2009 of 30 April, for wind and solar thermal technologies. The latter aimed to ensure the economic regime in force in RD 661/2007, of 25 May, regulating the activity of electricity production under the special regime, for projects that were in an advanced degree of maturation".[120]

159.    The Claimants assert that the initial purpose of RD 1614/2010 was not this, since, as we recognise, the extension to the Termosol plants of the guarantee of Article 4 occurred as a result of its pleadings to the State Council. The Claimants themselves state, a few paragraphs later in their reply, that during the consultations with the sector for the drafting of RD 1614/2010, Protermosolar pushed for *"closing the loophole created by the interaction Between Art.44.3 of RD 661/2007 and RDL 6/2009"*. [121] In fact, Jaime Malet was the one to warn Luis Crespo (chairman of Protermosolar) of this inefficiency by an e-mail sent on 25 June 2009, provided by the Claimants in the documents production phase. [122]

---

[117] RD-Act 6/2009. R-0085

[118] "Spanish Cabinet Meeting Decision of 30 November 2009.

[119] The Claimant reflected that it had perfect knowledge of the meaning of RD 1614/2010 in its pleadings submitted to the State Council during the processing of that Regulation. Document C-118.

[120] RD 1614/2010, of 7 December, regulating and modifying certain aspects related to electric energy production using thermoelectric solar and wind power technologies. Preamble. R-0068.

[121] Statement of Claim, paragraph. 91.

[122] Email sent by Jaime Malet to Luis Crespo on 25 June 2009: *"Dear Luis, as we mentioned by telephone I would like you to transfer the content of this e-mail to members of the Governing Board of Protermosolar on the interaction of RD 661/2007 and RDL 6/2009 with respect to the economic regime applicable to these projects which are registered in the remuneration pre-allocation Register.*
*Article 4 of the RDL states that the registration in the Register will be necessary for the granting of the right to the economic regime established by RD 661. The AD 4th notes that all plants that meet the requirements at May 7 and register the necessary documents in the following month (and present a bank guarantee within the two following months) will be entitled to the economic system of 661, regardless of the number of preregistered MWs.*
*The question is whether the granting of the right to the economic regime established in RD 661 includes the right to obtain the rates and premiums currently in force. We believe that the correct interpretation is "it depends".*
*Article 44.3 of RD 661/2007, which to the extent that it does not clash with RDL 6/2009, is fully in force, notes that in 2010 (and every four years) the Government will review the tariffs, premiums, supplements and lower and upper limits defined in the RD. The revisions "of rates, lower and upper limits will not affect the plants that obtain their start-up certificate before 1 January of the second year following the year in which they carried out the review" (i.e. that they connect until 31.12.2011). By contrast, changes*

160.    It is, therefore, clear that Article 4 of RD 1614/2010 merely extended the application of Article 44 (3) of RD 661/2007 to plants that entered into operation from 1 January 2012 and also included "the premiums" among the items that the revisions provided in Article 44 (3) of RD 661/2007 could not touch.

161.    This issue will be discussed further in Section III.A. 3.3 of this document. Nevertheless, we must point out that said Article 44 of RD 661/2007, following the amendments to article 4 of RD 1614/2010, did not represent a new development in the Spanish Regulatory Framework.

162.    The content of Article 40 (3) of RD 436/2004[123] was similar to what was later collected in Article 44 (3) of RD 661/2007. We say similar, because according to the Claimants' theory, Article 40 (3) of RD 436/2004 was much more restrictive than Article 44 (3) of RD 661/2007. Article 40 would prevent, according to the Claimants' theory, any changes that would affect not only the regulated tariff but also premiums and supplements. These concepts were not included in Article 44 (3) of the original RD 661/2007. While under RD 1614/2010 the protection extends to the "premiums", the supplements do not receive such protection.

163.    However, at this point, we must emphasise that the two articles limit the scope of the restriction to revisions exclusively to *"reviews under this paragraph"*. That is, periodic and regular reviews. At no time do these articles prevent or restrict the possibility of conducting

---

*in supplements and premiums will immediately affect the companies that have not obtained at the time of publication of the review their start-up certificate.*
*According to the foregoing, there are three situations to consider:*
*1.     Pre-allocated plants that obtain the start-up certificate within 36 months from the pre-allocation but before 31.12.2011: the current rate will apply to them (not the premiums and supplements).*
*2.     Pre-allocated plants that obtain the start-up certificate within 36 months from the pre-allocation but after 31.12.2011: the rate agreed in the 2010 review by the Government will apply to them.*
*The latter situation would affect not only the plants that finished their construction after 31 December 2011 but also those that - according to TD 5th, 1, second paragraph - fall within "the annual restrictions on the execution and entry into operation of the registered facilities and the prioritisation thereof in order not to compromise the technical and economic sustainability of the system", adopted by the Council of Ministers, at the proposal of the Minister of Industry when the power linked to the registered projects is higher than the foreseen target (in the case of solar thermal 500 MW).*
*This interpretation is exactly the same as that which we assessed at the time between Article 22 (which was indeed completely replaced by RDL) and 44 of RD 661 and which the CNE confirmed in a written consultation.*
*Although it certainly was not the intention of the editor of the RDL to leave this legal uncertainty to plant promoters, I think that the interpretation of the law is what it is and I cannot see another way to interpret it. On the other hand, if as we were told, 4,300 MWs have been submitted, the temptation that the government may have to substantially restrict the tariffs, premiums and supplements may be very large.*
*In sum, Luis, I would ask you to convey these reflections to the members of the Board to obtain their respective views and, if necessary, urgently ask the Secretary of State for clarification, if possible in writing.*
*The temptation to leave this issue surrounded by a nebulous cloud believing that the Ministry will not rely on this interpretation because it goes against the spirit of the RDL - and therefore, will either cancel Article 44 of RD in the new RD or simply extend the current tariffs and premiums in the revision of 2010 - is a very high risk for the investment of many of the associates.*
*Regards, Jaime Malet"*. R-0399
[123] RD 436/2004, dated March 12th, establishing the methodology for the updating and systematisation of the legal and economic regime for electric power production in the special regime. Article 40 (3). R-0059.

revisions which are motivated by justified motives other than the usual, such as revisions justified by the economic sustainability of the SES or those justified by avoiding over-remuneration situations.

164.    As a result, Article 40 (3) of RD 436/2004 was not an obstacle to regulatory adjustments made by RD-Act 7/2006 and RD 661/2007. This is because the revisions implemented by these regulations were justified in cases not referred to in Article 40 (3). The aforementioned justification needed to ensure the economic sustainability of the SES and to avoid over-remuneration situations in some technologies such as wind energy technology.

| Article 40.3 of RD 436/2004 | Article 44.3 of RD 661/2007 |
| --- | --- |
| 1. In 2006, in view of the results of monitoring reports on the degree of compliance with the Development plan for renewable energy, the tariffs, premiums, incentives and supplements defined in this RD will be reviewed, attending the costs associated with each of these technologies, the degree of participation of the special regime in covering demand and its impact on the system's technical and economic management. A new review will be carried out every four years starting from 2006.<br><br>2. The tariffs, premiums, incentives and supplements resulting from any of the revisions referred to in this section will come into force on 1 January of the second year after the year the revision is carried out.<br><br>3. The tariffs, premiums, incentives and supplements resulting from any of the revisions referred to in this section shall apply only to the installations that become operational after the date of entry into force referred to in the preceding paragraph, without retroactivity to previous tariffs and premiums. | 3. During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this RD with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact on the technical and economic management of the system, and a reasonable rate of return shall always be guaranteed with reference to the cost of money in the capital markets. Every four years, thereafter, there will be a further review, maintaining the above criteria.<br><br>The reviews referred to in this section of the regulated tariff and the upper and lower limits will not affect facilities whose commissioning certificate was awarded before 1 January of the second year following the year in which the review was carried out". |

(c)    **The Claimants' theory is not shared by the main SES' Players**

165.    The Claimants' theory is meaningless. Next, we will explain how the Supreme Court Case-Law prior to RD 661/2007 was fully applicable after the entry into force of this Regulation and of RD 1614/2010. At least, it was thus understood by the Supreme Court of the Kingdom of Spain, the National Energy Commission, different RE Sector Associations and it was thus recognised by an International Arbitral Tribunal

**Supreme Court of the Kingdom of Spain.**

166.    RD 436/2004 was repealed by RD 661/2007. This caused the technologies affected by the repeal to go to the Supreme Court.

167.    The Supreme Court ruled on those issues in its Rulings of 2009[124]. However, regardless of any other relevant pronouncements, what is relevant about these rulings of the Supreme Court is that it expressly stated that its Case-law prior to RD 661/2007 was fully applicable to changes in the RE remuneration system produced after its entry into force. Specifically, the Supreme Court stated:

> *"[...]* [The Claimant] **does not pay sufficient attention to the case- law** of this Chamber issued specifically in relation to the principles of legitimate expectations and **non-retroactivity** applied to successive incentives regimes for electricity generation. These are the considerations expressed in our **Judgment of 25 October 2006 and reiterated in that of 20 March 2007**, inter alia, on the legal status of the owners of facilities producing electricity under the special regime, for whom it is not possible to recognize pro futuro an "unalterable right" to the maintenance of the remuneration framework approved by the holder of regulatory power, provided that the requirements of the Electricity Sector Law are respected as regards the Reasonable Return on investment." [125] (Emphasis added)

168.    It should be stressed that this pronouncement occurred although Article 40 of RD 436/2004 contained a similar article to Article 44 (3) of RD 661/2007. In the same vein, RD 436/2004 was an improvement in the returns of certain technologies and a decrease in the profitability of other technologies with respect to the previous legislation (RD 2318/1998). That is to say, such circumstances did not prevent the application of the previous Supreme Court Case-law to RD 661/2007.

169.    The rest of the rulings provided with the Counter-Memorial, even if they are dated after the investment, they are equally relevant to counter the objection raised by the Claimants. Specifically, in the Rulings of the Supreme Court from 2012, it reproduces the Case-law reflected in its Rulings prior to 2007.

170.    Moreover, the Case-law prior to the year 2007 has been used by the Supreme Court and the Constitutional Court of the Kingdom of Spain to solve various appeals that have been raised against the new remuneration model introduced in 2013.

171.    The forcefulness of the Supreme Court with respect to the appeals filed internally suffices. This constant jurisprudence has been newly resumed by the Supreme Court in the decisions handed down in relation to RD 413/2014 and Order IET/1045/2014:

> *"**this Court has insisted**, in view of the successive regulatory reforms, that it was not possible to recognise pro futuro an "unalterable right" to the owners of special regime electricity production facilities to the maintenance of the remuneration framework

---

[124] Counter-Memorial paragraphs 536 to 542.
[125] Judgement of the Spanish Supreme Court of 09 December 2009, rec. 152/2007, reference The Act EDJ 2009/307357, Legal Ground Sixth. R-0002.

approved by the holder of regulatory power unaltered, provided that the requirements of the LSE are fulfilled as regards the Reasonable Return of the investments.

*[...]* **the jurisprudence of this Court has been constant over the years** on pointing out, in the interpretation and application of the authorising rules of the legal and economic system applicable to electricity production using renewable energy sources, which guarantee the right to the Reasonable Return of the investments made by the owners of these facilities, but do not recognise their unalterable right to maintain the remuneration framework approved by the holder of regulatory power unaltered (...)"[126] (Emphasis added)

**CNE**

172.    The CNE, as the advisory body in energy matters, had to analyse the regulatory reform consisting in replacing RD 436/2004 with RD 661/2007.

173.    In this analysis, the CNE declared its disagreement with the amendments introduced in RD 661/2007 compared with RD 436/2004, considering that it violated the review system set forth in art. 40 of the latter regulation, noting that:

> *"However, in said draft of the Royal Decree, reviews are established that do not comply with the terms of the aforementioned Article 40 of RD 436/2004, which generates regulatory uncertainty"*[127]

174.    However, upon examination of the legality of the draft RD 661/2007 and specifically, the effects of said proposal on facilities already in operation, the CNE admitted that the proposed measure was lawful and correct. On this point, aside from other considerations, the CNE was aware that a judgement on the legality of the measure could not be made outside the Supreme Court case-law prior to RD 661/2007. The CNE knew that Supreme Court case law on the matter was binding to it. As a consequence of this, the CNE considered that the measures introduced by RD 661/2007 were adequate and possibly in accordance with Spanish Law. Specifically, it stated:

> *"In this regard, the recent Judgement of the Spanish Supreme Court of 25 October 2006, regarding the challenge to RD 2351/2004, of 23 December, is highly illustrative. In particular, said judgment analyses the regulatory change that the aforementioned RD has on the calculation of premiums that foster electricity production activity under the special regime. The Judgment of the High Court reaches the conclusion that said modification does not violate the principle of either legal certainty or of legitimate expectation"*[128]

175.    It is also interesting to note that the CNE highlighted the arguments of the Judgement of the Spanish Supreme Court that it considered essential for justifying its position. Specifically, said arguments highlighted by the CNE were the following:

---

[126] Among many others, the Decision handed down by the Supreme Court on 1 June 2016, 1260/2016 (Rec. 649/2014). R-0337.
[127] CNE Report 3/2007, of 14 February 2007, regarding the draft of the Royal Decree, regulating the activity of electricity production under the special regime. Pag. 25. R-0298.
[128] Ibid. Draft of the report on the Royal Decree proposal, regulating the activity of electricity production under the special regime, of 25 January 2007. Pages 21 and 22.

- *"the owners of electrical energy production facilities under the special regime do not have an "unmodifiable right" to maintain unchanged the way in which the collection of premiums is governed"*

- *"There is not admissible to simply invoke "legal certainty" to invalidate any regulatory amendment. (...), but it is also true that legal certainty is not incompatible with the regulatory changes from the perspective of the validity of the latter, the sole factor on which we can lawfully rule."*

- *"The same consideration applies to the principle of legitimate expectations"*

- *For so long as it is not replaced by any other, the aforementioned law (article 30 of the Electricity Sector Act) enables the companies involved to aspire that the premiums incorporate, as a relevant factor, to reach a "reasonable rates of return with regard to the cost of money in capital markets" or, according to the wording of the preamble to RD 436/2004, "a reasonable return on their investments".*

176. As it can be seen, the CNE considered the Supreme Court case law prior to 2007 to be fully applicable. That is, the CNE considered that the aforementioned case law applied to the repeal of RD 436/2004 by RD 661/2007, despite (i) the fact that RD 436/2004 contained Article 40(3); (ii) Royal decree 436/2004 increased the profitability of certain facilities when compared to the previous Regulations.

177. In 2008, the CNE again verified the applicability of Supreme Court case-law prior to 2007, after said regulation went into force[129].

**Associations representing the Sector:**

178. In contrast to the pleadings held by the Claimants, the Associations representing RE were aware of the Spanish Supreme Court case-law prior to RD 661/2007. Furthermore, said Associations considered such case-law to be applicable to the changes that could have been made in said regulation.

- **Spanish Wind Association (AEE)**

179. Proof of this are the pleadings of AEE during the processing of RD 1614/2010, filed one month after the alleged agreement of 2 July 2010. The Spanish Wind Association is a business association to which 95% of the renewable energy producers using wind technology belong[130]. This technology is the most important RE production subsector in Spain, so its relevance is clear. This Business Association declared, in pleadings submitted on 29 August 2010:

> *It is true that the Supreme Court has stated, in relation to this type of retroactive reforms, that there is no "unalterable right" for the economic regime to remain*

---

[129] Report 30/2008 by the CNE, regarding the drafted Royal Decree on remuneration for production of electrical energy using solar photovoltaic technology for facilities after the deadline for the maintenance of the remuneration fixed under RD 661/2007, of 25 May, for such technology. Pag. 9. R-0423.
[130] Who we are. Spanish Wind Association, R-0210.

*unchanged and that "from the prescriptive content of Act 54/1997 of 27 November of the Electricity Sector no freezing of the electricity power facility holders' remuneration regime in special regime can be drawn nor the impossibility to reform such regime",* **recognising thus a relatively wide margin of the Administration's "ius variandi" in a regulated sector where general interests are involved.** However, without prejudice to the above, the case-law established **limits** to the Administration's "ius variandi" regarding the retroactive amendment of that remuneration framework, especially "that the requirements of the Electricity Sector Act are respected regarding the **reasonable rate of return** on the investments". Moreover, a breach of the principle of legal certainty for a retroactive rule "can only be settled case by case "(…)".[131] (Emphasis added and footnotes omitted).

180.    In the footnotes to this statement, this RE Association specifically cites Judgments of the Spanish Supreme Court of 25 October 2006, 3 December 2009 and 9 December 2009.

181.    In short, the AEE revealed in its allegations that they had complete knowledge of the Spanish legal system, quoting Supreme Court judgements of 25 October 2006, 3 December 2009 and 9 December 2009. These Judgments are considered fully applicable, even though they were prior to the entry into force of RD 661/2007.

-    **Protermosolar**

182.    Similarly, the main association for solar thermal technology, PROTERMOSOLAR, on behalf of its members, presented written pleadings on 10 February 2012, years after the approval of RD 1614/2010, making proposals regarding the regulatory measures that should be adopted in the Electricity Sector. In these proposals, it is evident that Protermosolar was clearly aware of the *principle of Reasonable Return* and it expressly requested that this is applied to other producers.

183.    Indeed, in its proposal statement, while RD 661/2007 was in force, it asserts:

*"it is suggested [to the CNE] to study the following actions: - Applying a cut for the excess profits that generation activities in nuclear and large hydropower plants have had since the introduction of the figure of the tariff deficit,* **in accordance with the theory of the Supreme Court of "reasonable profit"**, which already justified certain measures on certain renewable energy in the past."[132] (Emphasis added)

184.    Therefore, it is proven that this principle of Reasonable Return was known by the Solar Thermal Sector while RD 661/2007 was in force. Its application by the Supreme Court was also known, as well as the fact that this principle justified the adoption of measures respecting certain renewable energies. In fact, PROTERMOSOLAR proposed that this principle of Reasonable Return continue to be applied.

**Charanne Award**

---

[131]    AEE's pleadings to the CNE during the hearing process before the Electricity Advisory Council on the draft of RD 1614/2010, which regulates and modifies certain aspects of the special regime. Page 6. R-0251.
[132] PROTERMOSOLAR pleadings to the Public Consultation of the CNE, of 10 February 2012, R-0073.

185.    The Claimant seeks to introduce the idea that the different Judgments provided in this arbitration are irrelevant or decontextualized[133]. This same argument was put forward by the Claimants in the case of Charanne against the Kingdom of Spain. However, the Arbitral Tribunal, in response to the line of reasoning by the Claimants in that case, exactly the same as that used by them here, ruled *that*:

> *"The Tribunal does not share the position of the Claimants, according to whom the aforementioned decisions would be irrelevant or decontextualised. Although they refer to different rules, such rulings clearly lay-down the principle according to which domestic law would allow, within the framework of the LSE, for changes to be made to an economic regime for promoting the generation of renewable energy such as that laid-down by RD 661/2007 and RD 1578/2008. The Tribunal believes that the Claimants could have, at the time they made their investment in 2009, conducted an analysis of the legal framework of their investment under Spanish Law and understood that there was a possibility that the regulations adopted in 2007 and 2008 could be subject to change. At least, this is the level of diligence one would expect from a foreign investor in a highly regulated sector such as the energy sector, in which a preliminary and comprehensive analysis of the legal framework applicable to the sector is essential in order to make the investment"*[134] (emphasis added)

186.    The relevance of this ruling is that the Judgements to which the award refers are the Judgements of the Supreme Court of 15 December 2005[135] and the Judgement of the Supreme Court of 25 October 2006[136], transcribed verbatim in paragraph 506 of the Award for Charanne and Construction Investments v. Spain. Bearing in mind that the footnote on page 443 of this Award confirms the ruling contained in paragraph 506 referring to the Judgement of 9 October 2007[137] and the Judgement of 9 December 2009[138]. They are the same Judgements that the Kingdom of Spain provided in this arbitration.

187.    In fact, just reading Judgement of 25 October 2006, the Claimants should have foreseen that *For so long as it is not replaced by any other, the aforementioned law (article 30 of the Electricity Sector Act) enables the companies involved to aspire that the premiums incorporate, as a relevant factor, to reach a "reasonable rates of return with regard to the cost of money in capital markets" or, according to the wording of the preamble to RD 436/2004, "a reasonable return on their investments". The remuneration regime which we examine does not guarantee, on the contrary, holders of facilities under special regime the inviolability of a certain level of return or income in relation to those obtained in past years, nor the indefinite permanence of formulas used for fixing premiums.".*[139]

188.    Therefore, the Claimants should have foreseen that, while Article 30.4 of Act 54/1997 does not change, no regulation such as RD 1614/2010 could freeze the remuneration to be received by the producers of REs.

---

[133] Counter-Memorial. Para. 208-241.
[134] Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, para. 507, RL-0088.
[135] Judgement of the Supreme Court, of 15 December 2005. R-0147.
[136] Judgement of the Supreme Court, of 25 October 2006. R-0057.
[137] Judgement of the Supreme Court, of 09 October 2007. R-063.
[138] Judgement from the Third Chamber of the Supreme Court, of 9 December 2009. R-0002.
[139] Judgement of the Spanish Supreme Court of 25 October 2006, rec. 12/2005), FJ.3º. R-0057

189.    The entire renewables sector was aware, also after RD 1614/2010, that the limit on any remuneration change was the principle of reasonable return established by law. Hence, as reflected by the authors of Power in the Green Economy, it was a constant complaint in the industry, setting the remuneration in a standard with the rank of Law:

> "The Spanish FIT scheme has the legal Rank of a Royal Decree. Even though it is "stronger" than for instance a Ministerial Order, the Spanish renewable associations have long called for a FIT law. Before the last general elections, the current Socialist government had promised to initiate the respective legislative process, but up to now nothing has changed."[140]

## (1.4)    The legal mandate for "Reasonable Return" sets out any rights or expectations of investors in the Spanish Regulatory Framework

190.    The Claimants deny that the remuneration regime for special regime facilities is based on the principle of reasonable return and its dynamic nature[141]. For the Claimants, it seems to be a simple programme principle with no legal value, based on which NextEra would never have invested in Spain.[142] According to the Claimants, the concept of reasonable profitability was *"superseded by specific tariffs and premiums indexed for inflation in RD 661/2007".* [143]

191.    This statement lacks the slightest evidential rigour. Far from it, there is multiple evidence to demonstrate the contrary. This evidence demonstrates that the remuneration regime for special regime plants, since its introduction in Act 54/1997 to the current date with the new regulation, has been based on a fundamental principle: the principle of Reasonable Return.

192.    In this regard, one need only examine the many Judgments handed down by the Supreme Court of the Kingdom of Spain provided in this arbitration. Each and every one settles the issues submitted to its ruling through the interpretation and application of the *"principle of Reasonable Return"*. Moreover, it is clear that the Claimants have not provided this arbitration with even one Judgement of the Supreme Court on issues related to RE and its remuneration that addresses the matter in a different light to that of Reasonable Return.

---

[140] Powering the Green Economy. The feed-in tariff handbook. Miguel Mendonça, David Jacobs and Benjamin Socacool. Editorial. Earthscan, 2010. R-0031.
[141] Reply on the Merits, para. 181.
[142] Second Witness Statement of Mr Davidson, para. 20
[143] Statement of Claim, paragraph. 147: "*Spain claims that informed investors should have known that the entire remuneration system for energy generation based on renewable sources revolved around the principle of reasonable return. The claim is misleading. As Spain concedes, the concept of "reasonable return" is an objective for the Spanish legislator. It is not a mandated form of return which overrides other commitments entered into by the Government. Under Regulatory Framework I, to the extent it existed in any meaningful form, the application of the concept of "reasonable return" was superseded by specific tariffs and premiums indexed for inflation in RD 661/2007. Thus at the time the Claimants invested, RD 661/2007, as amended by RD-Act 6/2009 and RD 1614/2010, provided the Termosol Plants with specific tariffs and premiums, indexed for inflation. If, as Spain now asserts, it was merely committing to provide a "reasonable return" to be amended from time to time, then the legislation would have been drafted in an entirely different form*". (Emphasis added) (Footnotes omitted). This idea is repeated elsewhere in other sections of the Statement of para. 462.

193.    We shall examine the different evidence provided in this procedure that demonstrates: (a) That Reasonable Return is the cornerstone of the remuneration system for the production of energy from renewable sources; (b) That this principle is not a means nor a minimum, but an end and a limit, that can be achieved in various ways; (c) That this principle demands a necessary balance between the benefits to be received by producers and the effort involved in the rollout of renewable technology; (d) That this balance requires that Reasonable Return is of a dynamic nature, (e)That Reasonable Return is set out in PER 2005-2010, and (f) That Reasonable Return had to and must take into account applicable EU regulations, in particular, those on State aid that is illegal due to over-remuneration and distortion of market rules.

**(a)    Reasonable Return is the cornerstone of the remuneration system for the production of energy from renewable sources**

194.    The structure and limits of the remuneration regime for producers under the special regime are laid-down by Articles 16 (7) and 30 (3) and (4) of Act 54/1997[144]. Article 16 (7), the article omitted by the Claimants, stipulates:

> *"The remuneration for production in power plant busbars of power for producers under the special regime will be that corresponding to* the production of electric power, [...] and, where appropriate, a premium that shall be determined by the Government, after consultation with the Autonomous Communities, in accordance with the provisions of Article 30.4."[145]

195.    It is deduced from this Article that producers under the special regime are entitled to receive the market price and a premium (i.e. a subsidy) for their *net* power production.

196.    Consequently, it refers to the subsidy, Article 30 (4) stipulates that:

> *"The remuneration regime for electric power production facilities under the special regime shall be supplemented by receiving a premium, under the terms legally laid down, in the following cases"*[146]

> *"To decide the premiums the following will be taken into account: the level of delivery voltage of power to the network, the effective contribution to improving the environment, saving primary energy and energy efficiency, the production of economically justifiable useful heat and the investment costs incurred for the purpose of achieving a Reasonable Return with reference to the cost of money on capital markets"*[147]

197.    The Claimants consider that Article 30 (4) "was a directive to the regulator, which Spain superseded through specific tariffs and premiums indexed for inflation in RD 661/2007"[148]. They even suggested that this article was repealed by RD-Act 6/2009. [149] For the Claimants,

---

[144] Act 54/1997, of 27 November, on the Electricity Sector. R-.0003.
[145] Ibid.
[146] Ibid.
[147] Ibid.
[148] Reply on the Merits, para.462
[149] Reply on the Merits, paragraph. 49: *"(...) Art. 4.2 of RDL 6/2009 (which has the same legal rank under Spanish law as the Electricity Act) stated that plants accepted within the Pre-Assignment Registry would*

a Reasonable Return is a minimum criterion to be considered in setting the premiums. This line of reasoning makes the mistake of confusing the criteria that must be considered in setting the premium and the ultimate aim of the premium once set.

198.    The Claimants' position is erroneous. Diverse issues must be taken into consideration: (i) the criteria to be taken into account by the regulator when it comes to setting subsidies or premiums; (ii) Reasonable Return as an objective to be achieved by the market price and the subsidy; (iii) the Claimants hold a stance that goes against its own "Due Diligence"; (iv) the RE sector holds a stance that goes against the Claimants; (v) the doctrine positions are contrary to the Claimants' line of argument

### Legal criteria for setting subsidies

199.    As regards the criteria that the Law imposes on the Regulator when it comes to determining premiums, it should be noted that the Act 54/1997 does not enable the Regulator to ensure the immutability of premiums once established. The Law says nothing about this.

200.    The Claimants try to hide and/or ignore this principle of *"reasonable return"* established by the Spanish Parliament and reaffirmed since 2005 by the supreme interpreter of Spanish Law: The Supreme Court. This mandate delimited the regulatory powers of the Government, as it clearly knew the RE sector, including the most important associations and investors in PV, wind and CSP technologies.

### Reasonable Return as the objective of the binomial market price and subsidy

201.    The first sentence of article 30 (4) begins by stating that *"To decide the premiums the following will be taken into account"*. In other words, the factors that must be taken into consideration when setting the premiums are indicated.

202.    According to this Act, these factors must include the following: "*the voltage level of delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred*"

203.    This first sentence refers only to the criteria that must be taken into consideration in setting the premium.

204.    Secondly, the last paragraph of Article 30.4 of Act 54/1997 establishes the objective of the subsidised system: *"for the purpose of achieving a Reasonable Return with reference to the cost of money on the capital market"*.

205.    A literal interpretation of Article 30 (4), last paragraph, leaves no room for doubt. The first paragraph establishes the elements that must be taken into account for setting premiums

---

receive "*the right to the economic regime established by RD 661/2007*" (*not merely the right to a reasonable return: something which Spain admits had already been in place for 10 years under a different statute, Art. 30.4 of the Electricity Act)*". (Emphasis added) (Footnotes omitted)

(*"In order to determine the premiums, the following must be taken into account"*). The second sentence discusses the aim that is sought in the addition of the market price and the subsidy: *"for the purpose of achieving a Reasonable Return with reference to the cost of money on the capital market".*

206.    The Claimants forget that the term "purpose", according to the Dictionary of the Spanish Royal Academy, means: *"aim for which something is done"*[150]

207.    The Claimants also forget that art. 16 (7) and art. 30 (4) define the subsidies as a "*supplement*" to the market price that the producers must necessarily be paid. Therefore, it is absurd to think that the Reasonable Return is the goal to be achieved exclusively by this supplement, the subsidy.

208.    With this line of reasoning, the Claimants forgets the reason for the existence of the entire support mechanism of the special regime. For diverse reasons, energy production activity under the special regime is not competitive compared to conventional techniques. The pool price is not enough to enable renewable technologies to compete with traditional energy. Given that the market price is insufficient to compete with conventional industries, said market price is supplemented with a subsidy. Thus, the pool price plus the subsidy allows renewable technologies to compete with conventional energy.

209.    Therefore, art. 30 (4) imposes a clear pairing that seeks an aim which can be expressed by the following formula:

Market price + subsidy = Reasonable Return in accordance with the cost of money on the capital market.

210.    For the Claimants, the concept of "reasonable return" has no meaning in itself but rather through RD 661/2007. However, the concept of *"Reasonable Return"* has a meaning in itself:

-    Firstly, this means that the special regime producers have the right to obtain *"profitability"*. That is, that the remuneration they receive allows them to recover both the amounts invested (CAPEX, a criterion that must be taken into account for setting premiums) as well as the operating costs for such assets (OPEX) and, moreover, obtain an industrial profit;

-    Secondly, this means that the industrial profit guaranteed to the producers must be *"reasonable"*[151]. Thus, this profit cannot be disproportionate or "*irrational*".

---

[150] Dictionary of the Spanish Royal Academy. Definition of the word "purpose". R-0299.
[151] *"Reasonable"* according to the Dictionary of the Royal Academy of the Spanish Language means: *"adequate, according to reason, proportionate, not exaggerated"* Dictionary of the Spanish language electronic version (twenty-third edition October 2014); "reasonable". Spanish Royal Academy. http://dle.rae.es/?w=razonable#.VlSem4LfJQY.email R-0300.

- Thirdly, this means that the judgment of reasonableness must be made based on an element that is objective and variable: *"with reference to the cost of money on the capital market".*

211.    The legislator did not specify the reasonable return and did not specify it purpose in a given figure despite the lobbying of the industry to achieve a *"premiums law"*[152] and we shall subsequently examine. However, it did specify said profitability from a negative perspective: the profitability could never be unreasonable.

212.    Therefore, the Act established two essential limits in RE remuneration: (1) That the market price plus a subsidy allow *Reasonable* Return to be obtained pursuant to the Capital Market. (2) That such subsidies, as a cost of the SES, must in all cases be contingent on the *economic sustainability* of the SES.

213.    The specification of such reasonable return, as we shall subsequently examine, would be attributed by Law and strictly subject to the limits set by it and to two essential instruments: the Renewable Energy Plan and the Development Regulations. Plans and Regulations are instruments that, as we have previously discussed thoroughly, must in all cases be subordinate to the Law.

214.    In the Spanish Regulatory Framework, the Reasonable Return mandate is the essential element for configuring the rights and expectations of special regime producers. If it were otherwise, the multiple Judgements handed down by the Supreme Court of the Kingdom of Spain on the Special Regime would be inexplicable[153]. The "Reasonable Return" mandate is the basic element of the grounds for such Judgements.

**The Claimants argue a position contrary to that of their own consultant Pöyry**

215.    The Claimants forget that Pöyry specifically warned them that:

> *"There are a number of* <u>uncertainties</u> surrounding the development of the Spanish renewable industry. In our view, the major obstacles arise from the existing tariff structure which is unable to account for the generation costs. [...]*
>
> *In addition, recent history tells us that even though renewable technologies are expensive,* **the Government is willing to provide a reasonable return for investors by keeping the subsidies,** *even in the event of tariff deficits being generated over time."*[154]

216.    This phrase summarises the essence of the regulatory framework of support for renewables. Pöyry expressly establishes that the support mechanisms are contingent upon the economic sustainability of the SES. Pöyry expressly notes that the Government, when developing these support mechanisms, even though changes are made to them, as had already been done, shall meet the basic aim of said mechanisms: seeking Reasonable Return

---

[152] Powering the Green Economy. The feed-in tariff handbook, page 87 R-0031.
[153] Counter-Memorial. Paras. 338-415.
[154] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008 Edition. Page 13. C-202. R-0406.

for investors. Pöyry states that the subsidies are the means for achieving Reasonable Return for investors (*by keeping the subsidies*). If the subsidies were to disappear, the only income that the plants would earn would be the sale of energy in the market.

217.    By no means can it be deduced by reading this executive summary or the report that Pöyry concludes that the tariffs or premiums in RD 661/2007 are to remain frozen or guaranteed for the useful life facilities that are built. In fact, Pöyry drafted that report after the approval of RD 1578/2008, which represents a cut in the rates established in the RD 661/2007 for the photovoltaic sector. It even warns NextEra that the risk now lies with the solar thermal sector. [155]    From the Pöyry report, only the Government commitment to granting a Reasonable Return through subsidies can be construed. This is also what happens after the adoption of the challenged measures, as they continue to be granted Reasonable Return.

### The RE Sector holds a position contrary to the Claimants

218.    Reasonable Return is the main principle on which the entire system of subsidised support for renewables is based. The Claimant objects to this assertion. However, the Claimants' position is contrary to what the renewable sector has held in Spain through both associations representing renewable energy companies and through individual companies. Below we shall examine the different declarations by the Sector, which directly oppose the Claimant's line of reasoning.

### PROTERMOSOLAR

219.    The Claimants, active members of Protermosolar, reflected in their written pleadings, an understanding contrary to that held by the Association. Interestingly, the Claimants, who complain that apparently, the Kingdom of Spain did not consider when issuing the CNE report of 7 March 2012, the pleadings made by Protermosolar, attempt to ignore the content of these pleadings:

> "it is suggested [to the CNE] to study the following actions: - Applying a cut for the excess profits that generation activities in nuclear and large hydropower plants have had since the introduction of the figure of the tariff deficit, **in accordance with the theory of the Supreme Court of "reasonable profit"**, which already justified certain measures on certain renewable energy in the past."[156] (Emphasis added)

### SWA

220.    It has already been mentioned that the Spanish Wind Association is a business association to which 95% of the renewable energy producers using wind technology belong[157]. This technology is the most important RE production subsector in Spain in terms of MW installed.

---

[155] Ibid, page115.
[156] PROTERMOSOLAR pleadings to the Public Consultation of the CNE, R-0073.
[157] Who we are. Spanish Wind Association, R-0301.

221.    RD 1565/2010 introduced important technical and economic measures on the Renewable Sector, affecting the wind sector, among others. During the process of drafting this regulation, the AEE submitted documents to the CNE in the process of passing RD 1565/2010[158], which highlight the relevance of the principle of Reasonable Return

222.    In those claims the AEE, after recalling the case law of the Supreme Court, states that:

> _"Any review of the Remuneration Regime established in RD 661/2007 must necessarily ensure Reasonable Return on investment and also meet the criteria themselves established in that RD (which have not been modified) and the higher principles of legal certainty and proportionality"_[159].

223.    These claims are very relevant because they prove that the most important members in RE Technology are fully aware of the possibility that the remuneration regime of RD 661/2007 could be modified, with the only limit to ensure the perception of Reasonable Return.

### APPA – GREEN PEACE - CUATRECASAS

224.    The Association of Renewable Energy Producers (APPA) is the largest Spanish Association of Renewable Energy Producers and covers all types of technology[160]. Nearly five hundred companies that operate in the renewable energy sector are members. Greenpeace needs no introduction. Cuatrecasas, Counsel of the Claimants in this procedure, is one of the leading law firms in Spain.

225.    On 20 May 2009, these three entities proposed an alternative project for the regulation of the subsidised remuneration regime for renewable energy[161]. We will come back to this project later. In relation to the overall awareness in the RE Sector of the concept of "Reasonable Return", what is relevant now is that in May 2009 these entities asserted that the basic principle of the Spanish regulatory framework is the principle of Reasonable Return.

226.    These entities suggested to the Government that the Reasonable Return guaranteed to the RE, as the axis of its remuneration regime, should be determined by reference to 10-year Treasury bonds, plus a spread of 300 basis points:

> _"The Government shall set the amounts for regulated tariffs, premiums and supplements, in all cases assessing the operation and maintenance costs and the investment costs incurred by facility operators_ <u>in order to reach a **reasonable rate of return**</u> with reference to the cost of money on the capital market. _As for the capital remuneration tariff, an annual percentage equal to the average of the previous year's_

---

[158] AEE allegations before the CNE during the Spanish National Energy Commission public information process on the draft of the Royal Decree which regulates and modifies certain aspects of the special regime. R-0289.
[159] Ibid. paragraph 7.
[160] APPA - Association of Renewable Energy Producers, R-0306.
[161] APPA-Greenpeace Press Release concerning the Draft Bill for the Promotion of Renewable Energy, dated 20 May 2009. R-0212.

remuneration average of Treasury obligations to 10 years will be taken, plus a spread of 300 basis points."[162] (Emphasis added)

**SENER**

227.    SENER is the company contracted by the holding companies of the Termosol Plants to design and execute the project. [163]

228.    As we shall see, SENER was aware of the principle of Reasonable Return and argued that it was the right of the Government of Spain to set the remuneration for renewable energy. In an article published in the Spanish press while RD 661/2007 was in force, the Chairman of SENER, Mr Jorge Sendagorta publicly argued that:

> *"there is another* **key idea** *that has to be taken into account, that of "* **Reasonable Return**", *laid-down by the Electricity Act as the* **basis** *for the Government to set the remuneration for new energies. Reasonable Return must, therefore, be a* **limit** *for any solution adopted, and it does not leave much room for manoeuvre."*[164]

229.    SENER publicly argues that the principle of Reasonable Return is the basis for, and the right of, the Government to set remuneration. This clearly confirms what is held by the Kingdom of Spain in this section.

**IBERDROLA**

230.    The principle of Reasonable Return and its dynamic nature has been upheld by Iberdrola, the leader in the Spanish Wind Sector. However, Iberdrola had expectations that in no way match those of the Claimants. An Iberdrola PPT Presentation from 2006 is provided, in which RD 436/2004 is described. This presentation states the true Legitimate Expectations held by Iberdrola:

> *"This system* underlined *would not affect retroactivity* *in the fundamental principles of the support framework as it would not infringe on the investor's legitimate expectations* *by ensuring Reasonable Return for the activity."*[165]

231.    Iberdrola recognised the dynamic nature of the regulatory framework and the need for adjustment to ensure the sustainability of the SES in February 2012:

> *"The unsustainable construction of renewable energies needs to be stopped and, in particular, that of hybrid gas-solar technologies, the most expensive of all today". [...] The chairman of the electricity company has strongly opposed the premium system for renewable energy [...]*

---

[162] Presentation of the Draft Law presented by APPA-Greenpeace in May 2009. Article 23.4 of R-0307.
[163] Engineering and design contracts signed with SENER. Documents C-51 and C-52
[164] Press article "Tariff deficit, retroactivity and Reasonable Return" signed by Mr Jorge Sendagorta, Chairman of SENER, and published in:
-    The financial newspaper "Expansión" on 19/7/2012:
      http://www.expansion.com/2012/07/19/opinion/tribunas/1342729151.html R-0345.
-    The thermosolar sector's digital newspaper "Helio Noticias" on 22/7/2012:
      http://www.helionoticias.es/noticia.php?id_not=813 R-0344.
[165] "Iberdrola PowerPoint Presentation. Renewable targets in Spain. 2006.pdf", R-0309.

*Galán appeared before the press with a very clear message: the current system is unsustainable and must be completely changed. [...]*

*lberdrola's chairman has turned his attention to solar and solar-gas hybrid power. At present, "the pool price (conventional energy) is €61/MWh, while for wind it is €70/MWh, PV is €121/MWh and solar-gas hybrid is €332/MWh!". (Emphasis added)[166]*

232.    In July 2012, Iberdrola requested again a cut in premiums for renewables because of the system's unsustainability:

*"Sánchez Galán also insisted that the Supreme Court upholds possible cuts in premiums for renewables and believes the review of this matter to be "logical" in the current economic crisis. "The judgements and legislation talk about **Reasonable Return**. In the **United States**[167], this is called retributive **adjustment**[168], **and not retroactivity**", he said.*

*If the new circumstances mean adjustments in all productive sectors, it is not reasonable that these are not extended to renewables when faced with a situation of widespread economic crisis and tariff deficit", he said. [...]*

*He also stated, "**It is not sustainable** to maintain an electricity system in the middle of a crisis based on subsidies that can reach between 8,000 and 10,000 million per year."[169] (emphasis added)*

233.    From Iberdrola's Statements, it is clearly deduced that their understanding of the concept of Reasonable Return and its dynamism is not similar to that of the Claimants. It is evident that Iberdrola publicly requested a cut in premiums for renewables believing that there was an evident situation of excess remuneration (particularly to the thermosolar sector) and due to the existence of an unsustainable imbalance in the SES.

### THE MOST IMPORTANT COMPANIES IN THE CSP SECTOR IN SPAIN

234.    The opinions of SENER and IBERDROLA are confirmed, shared and upheld by the most important companies in the Spanish RE Sector, besides SENER. The large companies in the solar thermal sector in Spain have not brought claims to the Supreme Court demanding that RD 661/2007 be frozen in their favour, nor are there any agreements in this regard. To the contrary, these companies demand that the principle of Reasonable Return is respected:

---

[166] "Iberdrola demands premiums for renewables stop: *"Every month that passes, the bubble gets bigger".* News published on the Digital Newspaper Libremercado.es on 23 February 2012, available at: http://www.libremercado.com/2012-02-23/iberdrola-exige-detener-la-construccion-de-nuevas-plantas-de-renovables-1276451004/. R-0310.

[167] This company operates in the energy market of the United States of America, with over 5,000 MW in 2011 and a market share of 10%: "*Iberdrola. The electricity company exceeds 5,000 MW of capacity in the US* "News from the financial newspaper Cinco Días, dated 17 October 2011, available at: http://cincodias.com/cincodias/2011/10/17/empresas/1318858780_850215.html R-0311

[168] Document R-0283.

[169] *"Iberdrola warns the Government: the "tax collection" measures will cut investment and damage income"* News published by the Online Financial Newspaper "Expansión.com, on 25 July 2012, available at: http://www.expansion.com/2012/07/25/empresas/energia/1343212765.html R-0312.

> *"The large thermosolar sector companies have joined forces to take the Government to the Supreme Court for the successive regulatory changes [...] Abengoa, FCC, Sacyr, Elecnor, Samca and Sener presented a joint legal action before the High Court on 15 April to try to stop the impact of the regulatory measures approved by the Minister for Industry [...]* <u>*Thermosolar sector companies are asking the Supreme Court to recognise the legal precept of Reasonable Return for thermosolar plants.*</u> *The Statement of Claim challenges the new fixed electricity tariffs for the facilities and promotes their review so that the companies affected can "obtain the Reasonable Return guaranteed by Law."[170] (emphasis added).*

235.    It has been established that the CSP technology association (<u>PROTERMOSOLAR</u>), the wind technology association (<u>AEE</u>), the main RE Sector association (<u>APPA</u>), the Claimant's partner (<u>SENER</u>), the biggest investor in RE in Spain (<u>IBERDROLA</u>) and the <u>most important companies in the CSP sector</u> considered that the **<u>guarantee</u> in the regulatory framework was the granting of <u>Reasonable Return</u>**, not the frozen tariffs of RD 661/2007 throughout the entire operational life of their plants.

236.    These are the <u>objective</u> expectations that any diligent investor could have had after a comprehensive examination of the regulatory framework and the legal interpretation thereof by Supreme Court case-law since 2005.

### The CNE and the General Attorney's Office understand that the aim and limit of the subsidies is to provide a "reasonable return"

237.    There are also other documents provided by the Claimants themselves with their Reply on the Merits, corroborating the common understanding of both the CNE and the General Attorney's Office regarding the idea that the aim and limit of the subsidies was to provide a reasonable return.

238.    CNE report 30/2008 states that:

> *"According to the Electricity Sector Act, the economic incentives for the promotion of renewable energy are justified so that investors* <u>*obtain a reasonable return."*</u> [171] *(Emphasis added)*

239.    In the same vein, in its Report 18/2013 the CNE states:

> *"The economic incentives were contemplated in Act 54/1997, on the Electricity Sector, so that facilities using renewable energy sources, cogeneration and waste* <u>*would achieve reasonable returns, taking into account the price of money in the capital markets".*</u> [172] *(Emphasis added)*

---

[170] News published by Helionoticias, Solar Thermal Energy News Portal: R-0343.

[171] Report 30/2008 of 29 July 2008 by the CNE, regarding the draft of Royal Decree on remuneration for production of electrical energy using solar photovoltaic technology for facilities after the deadline for the maintenance of the remuneration fixed under RD 661/2007, of 25 May, for such technology. Document C-175. R-0423.

[172] Pleadings dated 12 December 2013, urgent hearing procedure on the "Proposed RD regulating the activity of electricity production from renewable, cogeneration and waste energy sources" R-0362. Document C-233.

240.    In addition, the General Attorney's Office, in its report of 29 March 2007 on the possibility that RD 661/2007 could reduce the tariffs to be received in the future by the existing facilities, compared with those referred to in RD 436/2004, stated that:

> "In this RD (whose change is intended) <u>the rates were set by taking into account</u> the investment costs of each of the technologies of the special regime, and <u>the possibility of obtaining a reasonable return.</u> Similarly, the premiums were calculated so that the "fixed rate" option and the "market sale" option would offer a similar remuneration (and therefore profitability)." [173] (Emphasis added)

241.    As we see, both the CNE and the General Attorney's Office of the Ministry of Industry were well aware that the aim of the subsidies was to guarantee that the facilities would receive a reasonable return. The Claimants' argument is incompatible even with the documents that they themselves provide as determinants of their theory.

### The doctrinal positions are contrary to the thesis of the Claimants

242.    Moreover, faced with the astounding argument made by the Claimants we must echo what is stated in 2010 in the manual *"Powering the Green Economy. The feed-in tariff handbook"* invoked by them, which established:

> "<u>Different names have been used to describe the tariff calculation approach based on actual cost and return for producers.</u> The German FIT scheme is based on the notion of "cost-covering remuneration", the <u>Spanish support mechanism speaks of a "reasonable rate of return"</u> and the French "return index method" guarantees "fair and sufficient" profitability. Despite the variety of names and notions, <u>in all cases, the legislator sets the tariff level in order to allow for a certain internal rate of return, usually between a 5 and 10% return on investment per year</u>".[174] (Emphasis added)

243.    In the Spanish case, said manual is aware of the Regulator's intention to grant a 7% return on investment:

> "To give an example, the Spanish legislator calculated the tariffs based on 7% returns on investment under the fixed tariff option, and 5-9% under premium FIT option."[175]

244.    Faced with this strong evidence, the Claimants provide no legal Due Diligence in 2011. The only Due Diligence report requested from Pöyry in 2008 reports (1) the consequences of the rise in the tariff deficit and (2) the Government's commitment to grant Reasonable Return through subsidies, not the tariffs and premiums under RD 661/2007. It is a proven fact that the Claimants could not have objective expectations regarding the existence of a commitment by the Government "in clear and precise terms"[176] to keep RD 661/2007 in force indefinitely, in the Claimants' favour.

### (b)    Reasonable Return is an end that can be achieved in various ways

---

[173] Report of the General Attorney's Office of 29 March 2007, p.14. Document C-210.

[174] Powering the Green Economy. The feed-in tariff handbook., pag 19. R -0031.

[175] Ibid. paragraph 42.

[176] Counter-Memorial, paragraphs. 20, 108, 296, 334, 411 and 512. Furthermore, this is reiterated in similar terms in paragraphs. 266, 269, 301, 302, 303, 319.o), 403, 405, 406, 491, 506 and 513.

245.    Act 54/1997 did not define the specific mechanism through which the RE subsidy system should be articulated. The Act did not require the Government to establish a "feed-in tariff" system to articulate the RE remuneration regime. In fact, no specific system was established. The Act was confined to establishing the limits and the objective for the Government to establish, in the exercise of its discretionary powers and with full respect for the Law.

246.    In compliance with this legal mandate, since 1997, the Regulator has established different mechanisms to achieve the objectives set by the Act. Changes from one set of mechanisms to another set of mechanisms brought about major litigation on which the Supreme Court of the Kingdom of Spain has ruled[177].

247.    In all cases, the supreme interpreter of Spanish Law has held that, while the remuneration system hinges on the principle of reasonable return *"the remuneration regime that we analysed does not guarantee (...) operators of special regime facilities the inviolability of a certain level of profits or revenues relative to those obtained in previous financial years, nor the indefinite nature of the formulas used to set the bonuses"* (emphasis added)[178].

248.    This case-law of 2006 was subsequently reiterated in a Judgement on 3 December 2009[179] and in two Judgements on 9 December 2009.[180] In this specific regard, we must highlight what the Spanish Supreme Court pointed out in the latter of these Judgments

> *"It must be stated that the establishment of the economic regime for electric power production by facilities under the special regime advocated under RD 661/2007, of 25 March, cannot be abstractly classified as arbitrary, when it is subject to the objective of ensuring Reasonable Return throughout the useful life of these facilities and thus, the Government, pursuant to article 15.2 of Act 54/1997, of 27 November, on the Electricity Sector, is entitled to pass methodology for calculating and updating the remuneration of said activity using objective, transparent and non-discriminatory criteria (...)" (Emphasis added)[181]*

249.    Thus, no investor who had a rational understanding of the Spanish Regulatory Framework could have the expectation of, and much less the right to, a specific formula or mechanism for remuneration in force at any time remaining indefinitely *petrified*. And all the more so when the Kingdom of Spain never promised this regulatory petrification to the Claimants or any other investor.

**(c)    Reasonable Return as a guarantee of balance**

250.    "Reasonable Return" imposes a necessary balance between the cost to the SES of the subsidy regime for renewables and the profitability generated for the investor.

---

[177] Counter-Memorial, paragraphs 523 to 549.
[178] Judgement from the Third Chamber of the Supreme Court, of 25 October 2006.  R-0057.
[179] Judgement of the Supreme Court, of 3 December 2009, Legal Ground Third. R-0064.
[180] Judgement from the Third Chamber of the Supreme Court, of 9 December 2009 R-0002.
[181] Judgement of the Supreme Court, of 3 December 2009, Legal Ground Fourth. R-0064.

251.    Based on purely argumentative grounds, the Claimants deny these essential characteristics of the Spanish remuneration model.

252.    The Claimants assert as undisputed fact the idea that the rollout of Renewables in Spain is subject to the Guidelines arising from European Union regulations. However, the Claimants forget to mention that a subsidy or aid regime implemented by a Member State is subject to EU rules on State Aid[182]. That is, it is subject to the principle of proportionality[183].

253.    The Claimants ignore that the "reasonable" qualifier used in Article 30 (4) to describe the profitability means that it must be reasonable for investors, but also for the consumers who pay it.

254.    This error leads the Claimants to ignore the fact that the subsidies for renewables are a cost of the SES and thus, are subject to their sustainability.

255.    The Claimants fail to note that all the rules developed under 30 (4) highlighted the need to maintain this balance between profit for the investor and the cost for the consumer.

256.    The Explanatory Memorandum to RD 436/2004 expressly recalled that:

> *"Whatever the remuneration mechanism chosen, the RD guarantees the operators of special regime facilities reasonable remuneration for their investments and electricity consumers a likewise reasonable allocation of the costs attributable to the electricity system (...)"[184].*

257.    In the same vein, the Explanatory Memorandum to RD 661/2007 states:

> *"The economic framework laid-down by this RD develops the principles contained in Act 54/1997, of 27 November, on the Electricity Sector, ensuring the operators of special regime facilities Reasonable Return on their investments and electricity consumers a likewise reasonable allocation of the costs attributable to the electricity system"[185].*

258.    Moreover, in case there is any doubt in this regard, the aforementioned balance is expressly stated in the Renewable Energy Plan 2005-2010:

> *"The conducted analysis aims to balance the application of resources so that levels of return on investment are obtained that make it attractive in relation to other*

---

[182] Counter-Memorial on the Merits, paragraphs 469 to 476.

[183] Specifically, Article 4 (1) of the Directive stipulates: *"Without prejudice to the provisions of Articles 87 and 88 of the Treaty, the Commission will assess the application of the mechanisms used in Member States, under which electricity producers receive, in accordance with regulations issued by the public authorities, direct or indirect aid, and which could restrict trade, considering the fact that they contribute to achieving the objectives set out in Articles 6 and 174 of the Treaty"* Directive 2001/77/EC of the European Parliament and of the Council, of 27 September 2001, on the promotion of electricity generated from renewable energy sources in the internal electricity market. R-0046.

[184] RD 436/2004, of 12 March, establishing the method for the updating and systematisation of the legal and economic regime of the activity of electricity production under the special regime. R-0059.

[185] RD 661/2007, of 25 May, regulating the activity of energy production under the special regime. R-0042.

> *alternatives in an equivalent sector in terms of return, risk and liquidity, always attempting to optimise available public resources."[186]*

259.    As we stated in Section III.A.2.2. (a) RD 661/2007 was a response by the Spanish Regulatory to the loss of said balance. However, the Claimants omit this piece of information.

260.    There is a great deal of evidence that demonstrates as a proven fact in this Case that the principle of Reasonable Return requires a *balance* between the profits to be received by producers and the cost that said profit represents for the SES and, thus, for Spanish consumers.

**(d)     Reasonable Return has a dynamic nature**

261.    The Claimants deny the dynamic nature of the Principle of Reasonable Return. However, such denial is based on purely subjective considerations of the Spanish regulatory framework. The Claimant's view is based on several fundamental errors that weaken their entire line of reasoning.

262.    By defining the remuneration regime for renewables as if it were an island isolated from the SES, the Claimants base its line of reasoning on erroneous grounds.  This error leads the Claimants to ignore the fact that the subsidies for renewables are a cost of the SES and thus, are subject to their sustainability.  In order to protect the economic sustainability of the SES, the definition of one of its main costs (the subsidies for renewables) must be dynamic enough to enable it to be adjusted in the event that the economic sustainability of the SES is jeopardised.

263.    In addition to the first error, the Claimants make another mistake. As explained above, "Reasonable Return" is not a simple programmatic principle. It is a duty that must necessarily be respected, not only due to the obligations of article 30 (4) of Act 54/1997 but also because it is required under the European regulations on state aid to which the system of support for renewables is subjected.

264.    Therefore, the support models for renewables must be dynamic enough to make it possible to correct situations of over- or under-remuneration. Proof of this is the fact that RD 661/2007 itself was passed in order to correct situations of over-remuneration which were occurring in relation to wind technology.

265.    Finally, the Claimants make a third mistake. They do not understand the relationship that exists under Spanish law between Law and Regulation that was explained previously. This relationship is based on the principle of hierarchy. As a result of this fundamental principle in Spanish law, no article in a regulation can contradict the terms of a law, nor can it prevent the adoption of changes in regulations aimed at complying with the terms of the law.

---

[186] Spain Renewable Energy Plan. 2005 -2010.  Institute for Diversification and Energy Saving of the Ministry of Industry, Tourism and Trade. Page 27 R-0296.

266.     Thus, the principle of hierarchy, within the framework of Act 54/1997, arises as the mechanism used to afford the Spanish regulatory framework the necessary dynamism to guarantee the economic sustainability of the SES and to correct situations of over- or under-remuneration that oppose the principle of Reasonable Return.

267.     Consequently, without altering the essential principles of the Spanish regulatory framework set forth in the law, amendments can be made to the regulations as required to comply with the law. Hence, it is easily verifiable that Act 54/1997, as regards the subject at hand, has not been modified, whereas the regulations that implement it have experienced several amendments.

268.     Therefore, the remuneration model derived from Act 54/1997 guaranteed its dynamism through the principle of hierarchy. However, the manner in which said dynamism was expressed was through regulatory amendments implementing the necessary means for guaranteeing the fulfilment of the Law. In other words, the means by which this mechanism was carried out was not very flexible. It required constant regulatory reforms of the implementing regulations.

269.     In order to avoid this situation in the current remuneration model, as we shall assess below, the law establishes the different cases in which modifications can be made and the time at which such modifications can be rendered. At any rate, all these modifications are provided for in order to guarantee the two essential principles on which the new remuneration model is built: economic sustainability of the SES and respect for the principle of Reasonable Return.

270.     Therefore, we confirm that under both Act 54/1997 and RD-Act 9/2013, the remuneration model is essentially dynamic, notwithstanding the fact that the current model is less abrupt and more predictable regarding the way of implementing the modifications: it is more flexible.

271.     Beyond this, the Claimants disregard other factors that highlight the dynamic nature derived from Reasonable Return: (i) The wording of Article 30 (4) LSE (ii) It was interpreted in this way by the Supreme Court of the Kingdom of Spain long before the Claimants made their investment; (iii) Pöyry warned the Claimants of the dynamism of the system based on the principles of reasonable profitability and sustainability and (iv) Such dynamism was backed by the contracts concluded by the PTEs throughout the entire investment process.

### The dynamic nature is imposed by the wording of Article 30 (4) of Act 54/1997

272.     In holding their position, the Claimants fail to read article 30 (4) of Act 54/1997. The failure to read this article leads to their unawareness of the fact that Article 30 (4) of Act 54/1997, when describing the profitability that the system is to provide investors, does not use the terms *"unchangeable", "fixed",* or anything similar. Act 54/1997 uses the term "*reasonable*".

273.    From a simple reading of the aforementioned Article, it is concluded that *"the cost of money on the capital market"* is the element used by the Act to determine the reasonableness of the profitability.

274.    The Claimants overlook the fact that Article 30 (4) of the 1997 Act uses the expression *"with reference to".* The Dictionary of the Spanish Royal Academy defines "reference to" as the *"action or effect of referring"*[187] and "refer" is defined as *"to direct, guide or order something to a specific and determined end or object or put something in connection with something else or with a person".*[188] .

275.    Consequently, the cost of money on the capital market is not simply a "guideline". Far from it, it is the benchmark imposed by Law that allows the regulator to determine whether profitability at a given time is reasonable or not. Thus, the criterion used by the legislator to judge such reasonableness is not a static element, but is a fundamentally *dynamic* element. As dynamic as is the *cost of money on the capital market.*

**Case-law has interpreted the principle of Reasonable Return as a principle of a dynamic nature**

276.    The Supreme Court of the Kingdom of Spain, from its earliest Judgements on the matter, highlighted the dynamic nature of a system based on the principle of Reasonable Return, noting that:

> *"Article 30 of the LSE allows the respective companies to pursue premiums to be incorporated, in setting them as a relevant factor in obtaining "Reasonable Return with reference to the cost of money on the capital market"[...]. <u>On the contrary, the remuneration regime which we examine does not guarantee holders of facilities under special regime the inviolability of a certain level of return or income in relation to those obtained in past years, nor the indefinite permanence of formulas used for fixing premiums.</u>" (Emphasis added)189.*

277.    The Claimants also forget that the multiple Judgements that the Supreme Court of the Kingdom of Spain has handed down to date expressly advise that the principle of reasonable return, because of having to attend to the specific situation of the SES and the economy, has a dynamic nature[190].

278.    Moreover, any investor could see that Article 30.4 of Act 54/1997 has not undergone any substantial alteration since its introduction in 1997. Therefore, a diligent investor should have known that, while Act 54/1997 did not change, no regulatory Article could generate the expectation that given levels of profitability would be maintained for an indefinite period of time.

---

[187] Meaning of the word reference. RAE - Meaning of the word reference. (RAE) Dictionary of the Spanish language electronic version (twenty-third edition October 2014) R- 0218.

[188] Meaning of the word refer. (RAE). Dictionary of the Spanish language electronic version (twenty-third edition October 2014). R-0219.

[189] Judgement from the Third Chamber of the Supreme Court dated 25 October 2006, Appeal 12/2005, reference El Derecho EDJ 2006/282164 (Spanish). Legal Ground Third. R-0071.

[190] Counter-Memorial on the Merits, paragraphs 185 to 226.

279.     The Arbitral Tribunal on the case Charanne and Construction Investment v. the
Kingdom of Spain stated the following regarding this:

> *"The Tribunal believes that the Claimants could have, at the time they made their
> investment in 2009, conducted an analysis of the legal framework of their investment
> under Spanish Law and understood that there was a possibility that the regulations
> adopted in 2007 and 2008 could be subject to change. At least, this is the level of
> diligence one would expect from a foreign investor in a highly regulated sector such as
> the energy sector, in which a preliminary and comprehensive analysis of the legal
> framework applicable to the sector is essential in order to make the investment"[191]*

**Pöyry advised the Claimants about the dynamic nature of the SES and the limits to
this dynamism**

280.     The Claimants forget that Pöyry specifically indicated to NextEra that:

> *"In addition, recent history tells us that even though renewable technology is expensive,
> the Government is willing to provide a reasonable return for investors by keeping the
> subsidies, even if the event of tariff deficits being generated over time"[192]*

281.     Pöyry expressly warned the Claimants of the grounds that could justify regulatory
changes. On this issue, Pöyry's report noted the close relationship between the subsidies for
renewables and the economic sustainability of the SES. In this regard, it warned of the role
that these subsidies, as a cost of the SES, had in generating the tariff deficit:

> *"The renewable feed-in tariff structure in Spain contributes to generate further tariff
> deficits so future development plans need to take into account the system costs of
> promoting expensive renewable technologies"[193]*

282.     While it considered that *"the Spanish renewable business will be developing in the long
term and pushing to meet the targets"*[194] the analysis made by Pöyry at that time clearly
established an exception to this conclusion:

> *"However, technologies developing over time need to contribute to meet the share of
> demand required and do it at an affordable cost."[195]*

283.     In the analysis of the relationship between the subsidies for CSP technology and the
tariff deficit, Pöyry pointed out a risk of a drop in the subsidies when it noted that:

> *"It is clear that the total contribution of Solar to the tariff deficit would be much higher
> than the contribution from wind. Consequently, the risk of wind projects having further
> reductions of the subsidy is low while the solar business risk is higher. Seeing as Solar*

---

[191] Charanne B.V. and Construction Investment S.A.R.L. v. Kingdom of Spain SCC No 062/2012. Final
Award, 21 January 2016. RL-0088.
[192] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008 Edition. Page 13. C-
202. R-0406
[193] Ibid. Page 13.
[194] Ibid. Page 13.
[195] Ibid. Page 13.

*PV has just experienced a reduction of the regulated tariff, we believe that the risk is now concentrated in the CSP industry"[196]*

284.    Pöyry also stressed that the amendments introduced under RD 661/2007 were based on the economic sustainability of the SES and the correction of situations of over-remuneration.

285.    Specifically, in his report from November 2008, Pöyry noted, when analysing the background of the subsidies:

*"The average reference tariff (TMR) was one of the key components to the remuneration of renewable energy projects in Spain, and in the case of solar PV projects was the only component under the previous regulatory framework (RD 436/2004). Hence, higher average reference tariffs were beneficial for solar PV projects*

*With high pool prices due to high gas prices, the average reference tariffs were set to increase over and above the inflation rate.*

*The rise in the TMR would have created very significant returns for special regime generators (especially wind farms) which in turn would further increase the end user tariff and TMR. This is due to the "tariff feedback", where the TMR drove renewable earnings which contribute to total system costs which again drove TMR*

*The Spanish government was not willing to deal with this issue by raising tariffs to avoid potential inflation risk, therefore the changed the renewable scheme from RD 436/2004 (linked to the TMR) to RD 661/2007 and subsequently reviewed the Solar PV tariffs or 661/2007 via the publishing of RD 1578"[197]*

286.    Likewise, Pöyry expressly advised the Claimants that:

*"Furthermore, given recent high Pool prices, Special Regime generators, in particular wind farms, had, according to the Spanish Government, been making supra-normal profits, As a result of these excessive profits the government has intervened in order to cap profits by modifying RD 436/2004 (the main special regime legislation for the period 2004-07) and publishing RD 661/2007 to replace it"[198]*

287.    Furthermore, Pöyry warned:

*"Due to these major changes by the government, Pöyry believes the Spanish electricity industry will continue to be dominated by the government, with it actively managing the market to try and maintain a cap on generators profits. What seems increasingly probable is that the government is unlikely to opt for direct intervention in the Pool as it did with RDL 3/2006. Rather it appears to prefer intervention outside the Pool (as RD 1634/2006, ITC 400/2007 legislation to cap generators profits and total system cost). Thus the government is more likely to intervene to tax companies for windfall*

---

[196] Ibid. Page 115.
[197] Ibid. Page 50.
[198] Ibid. page 93 and 94.

*profits (i.e. clawback of allowances), or cap revenues (RD 661/2007 & RD 1578/2008), than it is to directly intervene in the wholesale market and cap prices"[199]*

288.    In its report, Pöyry noted the possibilities of changes in the regulations on renewables. In fact, Pöyry expressly indicated to the Claimants the reasons that would justify said regulatory changes: the guarantee of the economic sustainability of the SES and elimination of situations of over-remuneration. Likewise, the consultancy emphasised that the limit on the regulatory changes was found *in the* Government's commitment to guarantee the Reasonable Return of the investments by maintaining subsidies*: "the Government is willing to provide a Reasonable Return for investors by keeping the subsidies".* At no time has this commitment been violated.

### The contracts entered into by NextEra and the PTEs reflect the fact that they understood the dynamism of reasonable profitability

289.    Consistent with the above, when both NextEra and its Spanish subsidiary holders of the plants assumed contractual obligations during the investment process, they introduced clauses specifically aimed at preventing the change in remuneration, as discussed in the Counter-Memorial on the Merits of the Kingdom of Spain and as we shall see later in more detail.

290.    In their Reply on the Merits, the Claimants seek to rewrite history and sustain that all these clauses are clauses of normal risk mitigation. However, the wording of these contractual clauses reflects the understanding that the return to be received by the producers of RE is a dynamic concept susceptible to changes. Of course, what these clauses in no way reflect is that the contracting parties considered that the premiums and rates in effect at that time were frozen.

291.    They add that in no case did these clauses expect *"Changes of the magnitude that Spain has now implemented".* [200] However, this statement can hardly be reconciled with the fact that NextEra has defended before the courts of the US that the measures challenged in this arbitration constitute a "change of law" for the purposes of the financing contracts of the PTEs and the guarantee contract signed by NextEra Energy Inc on 28 April 2011. We remind you that it is a settled matter between the parties that it is on this date when the legitimate expectations of the Claimants are to be assessed.

292.    In any case, what the Claimants accept in their Reply on the Merits is that the system could change.

### (e)    The manner in which Reasonable Return was set at the time of the Claimants' investment

293.    As has been discussed in the preceding paragraphs, Act 54/1997 established the objective and the limits to be taken into account when developing the RE economic regime.

---

[199] Ibid. paragraph 94.
[200] Reply on the Merits, para.171

Act 54/1994 also established that, when setting the subsidies, the objectives established by the PER were necessarily taken into account[201].

294.    By legal mandate, the Renewable Energy Plan (PER) 2005-2010 is an essential part of the economic system of the Kingdom of Spain. As we discussed in Section IV.A.1.4, the premiums on renewables are a cost of the SES (Spanish Electricity System) and therefore their implementation must ensure the economic sustainability of these costs. This requires planning the impact of the deployment to renewables in connection with the economic sustainability of the SES. This analysis, as we have stated above, is carried out in the so-called Renewable Energy Plan 2005-2010 as the Act 54/1997 itself requires.

295.    The RD 661/2007 itself links its content to that plan when its states:

> "Benchmark installed power targets are established, coinciding with the objectives of the Renewable Energy Plan 2005-2010 and the Strategy for Energy Saving and Efficiency in Spain (E4), to which the remunerative regime established in this RD shall be applicable"[202]

296.    The terms indicated show that the subsidies established under RD 661/2007 are, by legal mandate, based on the PER 2005-2010. The PER 2005-2010 is the regulatory instrument that connects the essential principles of the regulatory model set forth in Act 54/1997 to the subsidies established in RD 661/2007. Consequently, the PER 2005-2010 is an essential regulatory instrument for understanding the principle of Reasonable Return and the way in which this principle is defined. In no way can RD 661/2007 be understood outside the scope of the PER 2005-2010.

297.    We shall take a look at the following issues below: (i) The PER analyses the energy scenario in which it is expected that the deployment of renewables will be implemented; (ii) The PER analyses the possibilities of each technology as well as the barriers that affect them; (iii) The PER determines the cost that the deployment of renewables will have for the SES based on the returns offered to the *standardised installations* foreseen for each technology; (iv) The subsidies set in RD 661/2007 aim to achieve the profitability established in the PER for the *standardised installation*; (v) The importance of the PER 2005-2010 and its connection to RD 661/2007 was known by the system operators.

**Energy scenario in which the deployment of the RE is expected**

---

[201]    Act 54/1997, of 27 November, on the Electricity Sector. Sixteenth Transitional Provision. R-0003 and Act 17/2007, of 4 July, amending Act 54/1997, of 27 November, on the Electricity Sector, to adapt it to the provisions of Directive 2003/54/EC of the European Parliament and of the Council of 26 June 2003, concerning common rules for the internal electricity market. It introduces Additional Provision 26 of Act 54/1997. R- 0200.
[202] RD 661/2007, of 25 May, regulating the activity of electricity production under the special regime. Preamble. R-0042.

298.    The energy scenario in which it is expected that the deployment of the renewables will be implemented is the scenario in the Renewable Energy Plan 2005 - 2010. This scenario is based on forecasts of the electricity demand on which the sustainability of the SES pivots[203]:

> *"Therefore, for the preparation of this Renewable Energy Plan 2005-2010, we have designed two general energy scenarios (called Trend Scenario and Efficiency Scenario) and three other scenarios for the development of renewable energies (Current, Likely and Optimistic), having chosen the Trend energy scenario as a reference for setting the targets of the Plan, and as the renewable energy scenario, the one labelled "Likely", whose targets provide the basis for this Renewable Energy Plan 2005-2010, which once integrated into the reference energy scenario chosen, from the so-called PER Scenario or Plan Scenario. The analysis of the scenarios was the subject of a specific document and is briefly discussed in Chapter 2 of this document."[204].*

299.    Consequently, the specification of the returns by technology that are included in the Renewable Energy Plan 2005-2010 (which we analyse later) is subject to a certain scenario of primary energy consumption, to a certain evolution of the electricity demand.

**State of solar thermal technology, barriers and measures to overcome these barriers.**

300.    The PER 2005-2010 addresses the status of solar thermal technology[205]. Depending on the state of the art and with the aim of achieving an installed power of 500 MW, the PER (1) details the barriers[206] and (2) establishes the measures to be taken to overcome those barriers[207].

301.    Among the existing barriers, there were technological aspects such as "Doubts about basic technical aspects such as storage, workflow, etc." and "Lack of specialised companies engaged in the manufacture of essential components".

302.    Despite detecting such technological barriers, the PER 2005 - 2010 did not propose increasing subsidies relative to those in the RD 436/2004. Specifically, the PER 2005-2010 stated:

> *"The measures to achieve this target of 500 MW of rated power in thermoelectric power plants are mainly: "Maintaining the conditions of RD 436/2004, increasing the limit of the legal framework up to 500 MW, and of RD 2351/04."[208]*

303.    The PER 2005-2010 considered that the technological risks of solar thermal energy were covered by the premium set out in RD 436/2004:

> *"RD 436/2004, with its premiums, has stimulated new projects. Currently and accounting for existing projects that are in different stages of execution, in the development of the promotion or at the beginning of the measurement phase, it can be*

---

[203] Spain Renewable Energy Plan. 2005 -2010.  Point 5.4. New energy and renewable energy scenarios. The scenario of the Renewable Energy Plan 2005 - 2010. R-0296.
[204] Ibid. Page 323.
[205] Ibid. Pages 130 to 154.
[206] Ibid. Pages 142 and 143.
[207] Ibid.  Pages 142 and 143.
[208] Ibid. Pag. 144.

*noted that globally projects with a total capacity of about 500 MW are being promoted"[209].*

304. Through this explanation, the mistake made by the Claimants in asserting that the achievement of planning targets for renewables required an increase in subsidies is clear. Quite the contrary, as evidenced above, the target regarding solar thermal required no increase in subsidies whatsoever.

**The PER 2005-2010 required a valuation of the cost of implementing the targets of implementation and funding thereof by the SES.**

305. The premiums are a cost of the SES. Therefore, the PER 2005-2010 analyses the cost for the SES produced by the implementation of the various targets set for each technology and the financing of that cost. Specifically:

> *"For the successful achievement of the objectives defined herein, a detailed assessment of the investment to be made over the period, the nature of the investment and the public support necessary to achieve the objectives has been carried out. The economic and financial analysis methodology and criteria that were applied in the 1999 Promotion Plan have been maintained. The analysis, based on the specificities of each technology -level of maturity, costs, contribution to the global objective-, is based on the equilibrium of all factors, in order to achieve the private and public profitability, mobilising the resources required to carry out the scheduled investments".[210]*

306. Accordingly, the methodology used to determine this cost is described as follows:

> *"Taking as a baseline the proposed energy objectives, the financing requirements have been determined for each technology according to its return, defining a range of <u>standard projects</u> for the calculation model.*
>
> *These standard projects have been characterised by technical parameters relating to their size, equivalent hours of operation, unit costs, periods of implementation, lifespan, operational and maintenance costs and sale prices per final unit of energy. Similarly, some financing assumptions have been applied, as well as a series of measures or financial aid designed according to the requirements of each technology." (Emphasis added)[211]*

307. Specifically for solar thermal technology, it establishes a standardised installation and the various parameters that are required for this Plant to reach a project return close to 7% stating that:

> *"**Profitability of standardised projects**: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in local currency and for each standardised project, close to 7%, with own capital (before financing) and after tax" (Emphasis added)[212]*

---

[209] Ibid. Pag. 145.
[210] Ibid. Pag. 272.
[211] Ibid. Pages 273, 274 and 280.
[212] Ibid. Pag. 274.

308.    It should be noted that the PER 2005-2010 was based, for solar thermal projects, on an opportunity cost on equity of 5%[213].

**The subsidies set in RD 661/2007 aim to achieve the profitability on standardised installations established in the PER.**

309.    By application of Act 54/1997, the premiums established in RD 661/2007 find their foundation and rationale in the PER 2005 – 2010, as it is stated in the Preamble to RD 661/2007. The PER establishes a profitability target by standardised installation to which the premiums should be subject. This target was established for solar thermal projects at approximately 7% of profitability, based on an opportunity cost on equity of 5%.

310.    Said profitability target is not only relevant for investors but also for the other interested party, the consumers, who need to know the cost of implementing each technology. That is, the cost to the SES, to the consumer, that would be entailed by reaching the implementation targets with the projected profitability.

311.    The SES does not calculate the profitability by taking into account the individual costs of each investor. The premiums established by RD 661/2007 are set with the aim of providing a standardised installation a return of about 7% according to the standards set in the PER 2005 - 2010 itself: the CAPEX of a standardised installation, the OPEX of a standardised installation, equivalent operating hours, unit costs, implementation periods, useful life and selling prices of the final energy unit.

312.    The SES does not arbitrarily set the profitability. According to the PER 2005 - 2010, the Regulator proceeds to recognise and reconstruct an economic structure of exploitation by identifying the standard cost of a standardised installation (CAPEX) and its operating and maintenance costs (OPEX), according to the actions of a diligent investor. Once this first phase has concluded, it proceeds to set a balanced and proportionate target of economic return in terms of profitability, according to certain standards established for a standardised installation.

313.    That is the system followed to set the profitability target to which the subsidies deriving from RD 661/2007 were to be aimed. Moreover, this is the methodology that currently exists to set the subsidies that make it possible to achieve the profitability established directly in the current Act.

314.    Despite the clarity of the mechanism used in the SES to establish the tariffs, the Claimant, supported by their experts and based on the economic report of RD 661/2007 to which they have had access during document production phase, argue that:

> *"The regulatory file underpinning RD 661/2007, disclosed by Spain in these proceedings, shows that Spain intended a project IRR of 8% post tax for CSP projects opting for the FiT and an IRR of between 7.6 and 11% post tax for projects opting for the pool+premium.231 This is very close to the 11.6% implicit in the 2011 Bank Model,*

---

[213] Ibid.  Pag. 141.

*and indeed the CNE implicitly assumed an 11.6% post-tax return under the pool+premium option"[214] (Footnotes omitted)*

315.    The Claimants thus contend that the fees included in RD 661/2007 give a higher than expected return than in the PER 2005-2010 and add that:

> *"Spain is estopped from asserting in these proceedings that a post-tax project IRR to the Claimants of 11.6% is unlawful, inappropriate, unreasonable or otherwise contrary to Spanish law principles."[215]*

316.    Apart from the fact that the Kingdom of Spain does not accept estoppel as a doctrine that can be invoked, the truth is that it is difficult to admit that the Claimants could base their expectations on a document that they have discovered during the document production phase. In any case, the report of RD 661/2007 provides that in the option of pool plus premium, the highest returns can reach 11%. However, the target return was not 11%. It should be noted that the option of pool plus premium incorporates an incentive to participate in the market that is not intended to encourage investment and whose tendency is to disappear: by participating in the market, competition increases, the renewables lower the price of the pool and this decrease eliminates the incentive. Moreover, it is contrary to the economic logic that those maximum returns could be maintained throughout the operational life of the facilities, as Accuracy explained in its report. [216]

317.    The Claimants' untying of the return expected in the PER from the premiums set by RD 661/2007 ignores the fact that both the need for a PER and its purpose were established in Act 54/1997. This argument also ignores the fact that RD 661/2007 was referring to said PER 2005-2010 in its Preamble.

318.    This methodology was not a new development implemented from RD 661/2007. Indeed, the methodology used by the regulator to set the subsidies under RD 661/2007 was the same as that used to set the subsidies under RD 436/2004.

319.    In application of Act 54/1997, in December 1999 the Development Plan of Renewable Energies 2000-2010 was delivered[217] (hereinafter, **"PFER"**). This close relationship between the premiums (cost of the SES) and the financial sustainability of the SES made it mandatory to plan, in due detail, for the deployment of renewable technologies and for their impact on the sustainability of the SES. Thus, the PFER 2000-2010 set the targets for implementation of REs for a baseline scenario of an annual increase in electricity demand at 2%[218].

320.    The PFER established the economic conditions and basic techniques and methodology to be followed to determinr the remunerative regime of the RE, which should be implemented by regulation.

---

[214] Reply on the Merits, paragraph. 192.
[215] Reply on the Merits, paragraph. 199.
[216] Accuracy, Second Report on the Claimants' Claim, page. 10 and seq.
[217] Renewable Energy Promotion Plan 2000-2010. R-0202.
[218] Ibid. page 31.

321.    Specifically, this methodology consisted (and has always consisted) in defining, within each technology and according to the art of the science that exists at any given time, different *standard facilities*. Once said standard facilities have been determined, different *benchmarks* were established in each one (cost of investment, operating cost, useful life of the plant, production hours subject to a premium, market price), which would allow each plant, within a certain period of time (useful life), to reach a *reasonable return* according to the cost of money on the capitals market[219]. The return of the *standard projects* is estimated at *"7% with own resources, before financing and after tax"*[220].

322.    In this sense, the PFER 2000-2010 noted:

> *"Taking as a baseline the proposed energy objectives, the financing requirements have been determined for each technology according to its return, defining a range of* **standard projects** *for the calculation model. These standard projects have been characterised by technical parameters relating to their size, equivalent hours of operation, unit costs, periods of implementation, lifespan, operational and maintenance costs and sale prices per final unit of energy. Similarly, some financing assumptions have been applied, as well as a series of measures or financial aid."*[221]

323.    RD 436/2004 was issued in order to achieve by 2011 the targets of installed capacity planned in the PFER. At this point, it is relevant to note the consideration contained in the Financial Report of RD 436/2004. Said report points out the following:

> *"The A parameter (investment, operation and maintenance costs for each technology) has great weight in setting the amount of the regulated fee sold to the distributor. <u>Thus, any plant in the special regime installed in Spain will get Reasonable Return, provided that it is equal or better than that of the group (standard plant type)"</u>*[222].

324.    This methodology, based on standard facility, was used by the CNE to prepare its report on the draft version of RD 436/2004. The CNE used the A+B+C methodology. According to this methodology, parameter A was the essential parameter in determining the Reasonable Return of the investments in renewable energy. It was explained as follows:

> *"Parameter A is the production cost that must be considered for the investments made to reach a Reasonable Return, taking into account the characteristics of each type of technology. Determination of the income required so that the investment considered in each standard project obtains an internal rate of return (IRR) of free and post-tax cash flows similar to that of a regulated activity. The basic information on each standard technology relating to the investment and the operating costs and income correspond to the average values of facilities commissioned during the four-year life of the premiums. The average technical and economic characteristics considered in each technology are:*
>
> *- Hours of use.*
>
> *- Performance.*

---

[219] Ibid. pages 200-218.
[220] Ibid. page 182.
[221] Ibid. page 180.
[222] Financial Report of RD 436/2004 R-0220.

*- Economic life of the project and payback period of the investment.*

*- Unit investment cost and, where appropriate, subsidies.*

 *- Corporate income tax and, where appropriate, valid deductions.*

*- Economic aid from the Promotion Plan and autonomous regions.*

*- Operating costs: fuel, operation and maintenance, insurance, fees (for use of land or water volume) and others.*

*- Operating income other than from the sale of electrical energy to the system: sales of electrical energy for self-consumption in the associated industry, sales of thermal energy to that same industry, sales of by-products (pomace, dry residue, fertiliser, etc.), energy recovery or waste reduction charges and, where appropriate, revenue from emissions allowances or the sale of green certificates."[223] (Emphasis added)*

325.     This same methodology was again used by the CNE in the report it issued on the draft version of RD 661/2007[224].

326.     Moreover, faced with the astounding argument made by the Claimants we must echo what is stated in 2010 in the manual *"Powering the Green Economy. The feed-in tariff handbook"* where it was established:

   "*Different names have been used to describe the tariff calculation approach based on actual cost and return for producers. The German FIT scheme is based on the notion of "cost-covering remuneration", the Spanish support mechanism speaks of a "reasonable rate of return" and the French "return index method" guarantees "fair and sufficient" profitability. Despite the variety of names and notions, in all cases, the legislator sets the tariff level in order to allow for a certain internal rate of return, usually between a 5 and 10% return on investment per year*".[225] (Emphasis added)

327.     The Manual goes on to state that:

   *"After a good frame of reference is established for tariffs, cost factors related to renewable electricity generation have to be evaluated. We recommend basing the calculation on the following criteria:*

   *. Investment cost for each plant (including material and capital cost);*

   *. Grid-related and administrative cost (including grid connection cost, costs for the licensing procedure, etc);*

   *. Operation and maintenance costs;*

   *. Fuel Costs (in case of biomass and biogas); and*

---

[223] CNE Report 4/2004, of 22 January, regarding the RD proposal, which establishes the methodology for the updating and systematisation of the legal and economic regime for electricity production in the special regime. Pag. 8-9 R-0316
[224] CNE Report 3/2007, of 14 February 2007, regarding the RD proposal, regulating the activity of electricity production under the special regime. Pag. 14. R-0298.
[225] Powering the Green Economy. The feed-in tariff handbook., Pag. 19.  R- 0058.

*. Decommissioning costs (where applicable)"[226]*

328.    These costs were taken into account in the PERs.  However, we must make it clear that in the Spanish system the financial costs have never been considered as investment costs when analysing the target profitability[227]. At this point, we must recall the terms of the economic impact report of RD 436/2004, which stated:

> *"Below follows a review of the hypotheses, estimates and assumptions taken into account in the preparation of this proposal: (...)*
>
> *Project funding: it is assumed, in all cases, that 100% of the funding will come from equity. The leverage and percentage between equity and other sources of funding are independent decisions in each project and for each promoter that, when made wisely, should provide better ratios than those estimated in this report[228]"*

329.    We must also remember that in the Spanish model the CAPEX and the OPEX have never been drawn up in reference to a particular facility of a particular investor. These costs have always referred to a *standard* facility. Always imagining an efficient investor in terms of cost. Moreover, said Manual states:

> *"For the estimate of the average generation cost, regulators can use standard investment calculation methods (such as the annuity method). The Spanish legislator even obliges renewable electricity producers to disclose all costs related to electricity generation in order to have optimal information when setting the tariff"[229]*

330.    The provision referred to in the Manual is article 44 (4) of RD 661/2007. The precedent for this article is article 40 (4) of RD 436/2004.

331.    Consequently, the Claimants overlook the methodology used by the Spanish regulator to set the premiums. This methodology was set forth in diverse regulatory instruments prior to and contemporary with the time of their investment.

332.    This proves that the Claimants' expectations were not based on a proper understanding of the Spanish regulatory framework. The declarations made by the Claimants in the statements in this arbitration proceeding spotlight the lack of knowledge of the Spanish regulatory framework.

333.    In any case, it is essential to understand that the Reasonable Return was attributed to the investment in the plants. Consequently, the guarantee of Reasonable Return established in Act 54/1997 applies only to the capital employed in the economic activity that allows the formation of the assets to be used in electricity generation. In no case is the concept of reasonable return attributable to other costs, such as premiums of a financial nature paid to acquire a solar thermal plant, fees, royalties and special payments unrelated in any way to the investment costs.

---

[226] Ibid. page  20.
[227] Spain Renewable Energy Plan. 2005 -2010.  Institute for Diversification and Energy Saving of the Ministry of Industry, Tourism and Trade. Pag. 274. R-0296.
[228] Economic Report of RD 436/2004.Page 5/10 R-0220.
[229] Powering the Green Economy. The feed-in tariff handbook., pag 20. R-0058.

334.    A diligent investor who had examined the PER 2005-2010 should know that the profitability target stipulated in the Plan, for whose attainment the subsidies in RD 661/2007 were established, had its foundation in the economic sustainability of the SES. Consequently, any investor should be aware that the subsidies in RD 661/2007 had their foundation and rationale in the scenario of projected electricity demand used as a basis for drawing up the PER 2005-2010.

335.    Similarly, every investor should also be aware that the determination of the subsidies included in the various regulations implementing the Act was preceded by a major planning effort. In this work, the Regulator examines and reconstructs an economic structure of exploitation by identifying the *standard* cost of a *standardised* installation (CAPEX) and its *operating and maintenance* costs (OPEX), according to the actions of a diligent investor. Once this first phase has concluded, it proceeds to set a balanced and proportionate target of economic return in terms of profitability, according to certain standards established for a standardised installation. This economic profitability target is subject to its reasonability and to the economic sustainability of the system. And this is the target pursued through the application of the subsidies provided in the Regulations.

**The importance of the PER 2005-2010 and its connection to RD 661/2007 was known by the System operators**

336.    ISOLUX is the leading Spanish company in the Spanish PV sector. RD 1565/2010, of 19 November, limited the rewarded production hours of the installations operating with PV technology. Isolux filed against RD 1565/2010 an appeal to the Supreme Court in May 2011[230]. ISOLUX filed its Claim together with an expert report from the consultancy firm Deloitte, in which it attempted to prove the expected remuneration under the regulatory framework of REs, the remuneration received at its plants under RD 661/2007 and the reduction implemented by RD 1565/2010.

337.    The Deloitte expert report of 23 May 2011 estimates that the expected return is close to 7%. This expert report calculates the return of PV plants after RD 661/2007 at **6.41%**, and after RD 1565/2010 it quantifies it at **5.43%** or **5.77%**.[231] The Deloitte Expert Report of 23 May 2011 reflects the return that it considers "reasonable" within the regulatory framework of REs in Spain in 2011:

*"The Spanish Renewable Energy Plan 2005-2010 (August 2005) of the Ministry of Industry, Tourism and Trade-Institute for Diversification and Saving of Energy, assumes that the return of a standard project of renewable energy is 7%.*

*Spanish Renewable Energy Plan 2005-2010 (August 2005)*

---

[230] Brief filing appeal brought by Grupo ISOLUX Corsán S.A., on 27 May 2011, in ordinary proceedings 60/2011. Said appeal was, however, dismissed by a Supreme Court Ruling of 24 September 2012. R-0317.
[231] Expert report DELOITTE, ISOLUX and T-SOLAR GLOBAL GROUP of 23 May 2011, page 52/177. R-0318.

> *"Return on Standard Projects: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in common currency and for each standard project, close to 7%, with own resources (before financing) and after taxes"[232] (emphasis added).*

338.    In addition, the Deloitte experts make a comparison with a parameter that they consider comparable, the Spanish 10-year bond, to examine the profitability derived from RD 1565/2010[233].

339.    Consequently, by providing this expert testimony to the Supreme Court, ISOLUX is stating that a diligent investor knows that the methodology for setting the premiums is found in the PER 2005-2010 and that the target profitability to be achieved with the subsidies under RD 661/2007 must be *"close to 7% with equity and after taxes"*.

340.    Abengoa was the leading Spanish company in the solar thermal sector in Spain until it sold its CSP plants to the company Atlántica Yield in 2014. In 2012, the CNE issued the Report of March 7[234], in which it declared the over-remuneration of the Solar Thermal Sector and the need for reforms to reduce such remuneration to the Plants already installed. As a result of this Report, the Chairman of Abengoa sent a letter to the Minister for Industry, Mr Soria, enclosing an expert report by KPMG to prove that there was no over-remuneration at its CSP plants, as they were achieving the Reasonable Return target that Spain had promised *"in a range close to 7%"*:

> *"The profitability of the solar thermal plants in Spain is reasonable, as evidenced by the KPMG analysis performed at our plants. The internal rate of the project hovers in a range close to 7%. This study was performed by KPMG after accessing our funding models and the actual amounts invested and the sales of plants in operation."[235]*

341.    The attention of the Court was called to this letter. Abengoa, after the cuts proposed by the CNE for the solar thermal sector regarding remuneration, does not hold or defend any *blocking* of its rights under RD 661/2007 or RD 1614/2010. Nor does it argue that the Government would breach promises or stabilisation Clauses. On the contrary, it states and tries to prove that it obtains the Reasonable Return that the Government set as a reference value. In addition, Abengoa is willing to negotiate. It is not clear from the letter that the Government is in breach of any promise or stabilisation Clause.

342.    As discussed, Abengoa enclosed with the letter an expert report by KPMG holding that:

> *"Concept of Reasonable Return:*
>
> *• The regulations governing the implementation of the Special Regime are based on the concept of Reasonable Return, mentioned in Act 54/1997 on the Electricity Sector but does not define a value for it.*

---

[232] Ibid. pages 57/177.
[233] Ibid.
[234]    Report on the Spanish Energy Sector. Introduction and Executive Summary, Part I. Measures to guarantee the economic-financial sustainability of the electricity system. National Energy Commission, 7 March 2012. R-0098
[235] Letter of Felipe Benjumea Llorente, Chairman of Abengoa, the Minister for Industry, dated 20 May 2012. R-0319.

> ▪ *In this report, a Reasonable Return shall be deemed to be a return of 7% (before financing) and after taxes, which is the reference value used in the PER 2005-2010 and used by the CNE in its reports."[236]*

343. It is clear that the Reasonable Return declared by the Spanish leader in solar thermal technology does not match that of the Claimants. It only estimates an IRR at around 7% to be required. Consequently, it is clear that it was aware that the premiums under RD 661/2007 were set in line with the economic scenario described in the Renewable Energy Plan 2005-2007.

344. Therefore, we must conclude that the Claimants (who describe themselves as sophisticated investors) read the Plan 2005-2010, as did Deloitte, KPMG, Isolux and Abengoa, and they understood it correctly.

**(f)    The Claimants ignore their own "due diligence"**

345. The "due diligence" report entrusted to Pöyry expressly warned the Claimants that the PER 2005-2010 was the key instrument in understanding the formula through which the subsidies in RD 661/2007 were established. This "due diligence" report states:

> *"The PER sets out the specific growth projections for each technology and breaks it down by autonomous region. Using the PER´s the Government then sets a tariff (published in the form of a Royal Decree) for each technology depending on the level of growth that is required*
>
> *The PER´s are the best indication of the future development of the different renewable technologies."[237]*

346. The Claimants, in their Reply on the Merits, perform a completely distorted interpretation of the PER. They turn it into an instrument to attract foreign investment, which allegedly provides for the need to increase the remunerations of CSP technology. As we have seen before, neither one affirmation nor the other are true.

347. The Claimants also ignore that according to Pöyry, RD 661/2007, far from raising the remuneration of CSP technology in the option of pool plus premium, led to a reduction of 10% compared to the remuneration received in the same option during the term of RD 436/2004. [238]

348. The Claimants also ignore the projections that Pöyry made specifically for NextEra in November 2010 compared to the profitability that could be obtained by the project: [239]

---

[236] KPMG report provided by Abengoa, May 2012. R- 0320.
[237] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008. Edition. Page 31 C-202
[238] Ibid, page115.
[239] POYRY Spanish Energy Markets A presentation to NextEra Energy Resources. November 2010. C-203



349.   Therefore, the returns of 11.9% or 11.6% which the Claimants now argue in their Reply on the Merits lack of any evidentiary support. In no case did the Kingdom of Spain guarantee those returns either in its regulations or in the letters invoked by NextEra to establish its alleged legitimate expectations. The profitability defended by the Claimants not only is not included in the Spanish legislation but rather is incompatible with the conception of that profitability by the major players in the system. The Respondent can in no way be impeded, under the doctrine of estoppel, from saying that a return of 11.6% is not reasonable according to the cost of money in the capital markets.

**(g)    The Reasonable Return should take account of the applicable EU rules on illegal state aid, due to over-remuneration and distortion of market rules**

350.   Among the obligations that the TFEU imposes on EU Member States is the prohibition on granting state aid, except in the cases permitted by the Treaties. In accordance with Article 107.1 of the TFEU, *"Save as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between the Member States, be incompatible with the internal market".*

351.   Following the definition that the aforementioned *Elcogas*[240] Court Order provided on the concept of State Aid in relation to the amounts paid by energy consumers, the Respondent was obliged, under the provisions of Articles 107 and 108 TFEU, to notify the European Commission of the existence of support measures for renewable energy and cogeneration in Spain, through Order IET/1045/2014. To this effect, the Commission has opened proceeding SA.40348 2014/N.

352.   According to Article 108 TFEU, the Commission has exclusive competence to declare aid to be compatible with EU law. The only body competent to review the legality of that decision is the Court of Justice of the European Union, according to settled case-law.

353.   Both the exclusive competence of the Commission to declare the compatibility of the aid, and that of the Court of Justice of the European Union to review the legality of the declaration, are mandatory regulations that do not permit any possible derogation and form part of the public policy of the European Union, which is applicable International law.

354.   This circumstance is particularly relevant in the light of the decision of the Commission of 26 May 2014[241], ordering Romania to suspend payment of an award handed down in an ICSID arbitration, *Micula v Romania*.

355.   Subsequently, through a decision on 30 March 2015[242], the Commission decided that "the payment of compensation by Romania to two Swedish investors by dint of the revoked aid regime breaches the EU State Aid rules" and that "by paying the compensation granted to the Claimants, Romania is actually granting an advantage equivalent to the revoked aid regime".

**(2)    The economic sustainability of the SES and the elimination of situations of over-remuneration as a *"leitmotif"* of the measures in this arbitration**

356.   The examination of the justification of the measures taken by the Kingdom of Spain can only be approached from a rational understanding of the SES as a whole. In addition, any approach to this problem must be based on the undoubted fact that the subsidised production from renewable sources is an integral part of the SES and, therefore, is subject to its principles and purposes.

357.   The achievement and maintenance of the basic principles and purposes of the SES are the reasons for the adoption of the regulatory measures adopted during the years 2012 and 2013. It must be emphasised from the outset that, contrary to what appears from the Memorials of the Claimants, these measures affected all the activities of the SES and not only the Kingdom of Spain production.

---

[240] Order of the Court of Justice of the European Union laid down regarding the preliminary ruling C-275/13, ELCOGAS, on 22 October 2014. (English version) R-0030.

[241] Document by the Commission C (2014) 6848 final of 1 October 2014, ordering Romania to suspend payment of an award handed down in an ICSID arbitration, *Micula v Romania*. R- 0139.

[242] European Commission decision of 30 March 2015 declaring the compensation recognised in arbitral award Micula v. Romania (Press Communication of the Commission, English version) to be State Aid incompatible with the TFEU. R-0140.

358. Firstly, the necessary analysis performed by the national regulators of the Electric System emphasised that the remuneration that was paid via electricity bills, should be revised in order to comply with the standards of the EU and domestic law, to ensure the guarantee of a Reasonable Return.

359. Secondly, it seems beyond doubt that the difficult economic situation facing the Kingdom of Spain due to the existence of a deep economic crisis required the adoption of measures in the SES.

360. A proper understanding of the SES leads to the conclusion that the first impact of the economic crisis on the SES was a sharp reduction in electricity demand[243]. Such reduction in demand resulted in a substantial reduction in income available to the SES to address its costs, which included the subsidies to renewables.

361. Moreover, the costs of the SES, designed in the context of a radically different economic situation, not only continued but increased[244]. This jeopardised the economic sustainability of the SES.

362. Finally, in this context, the different preliminary analyses, regulatory developments, technical knowledge and technological developments, revealed the existence of remuneration which, either by up or down, did not maintain the criterion of *Reasonable Return* established for the remuneration of the so-called special regime and that of *adequate remuneration* for the rest of the regulated activities, especially transport and distribution activities.

363. Having explained the foregoing, it is necessary to approach the following issues separately: (i) The economic sustainability of the SES (essential principle of the regulatory framework) and the principle of Reasonable Return (cornerstone of the Kingdom of Spain) prompted the measures that are the subject of this arbitration; (ii) Such *leitmotif* was evident in regulatory measures prior to the Claimants' investment; (iii) The risks of regulatory measures based on those grounds were known to the Claimants; (iv) The Claimants assessed and accepted the possibility of future regulatory measures based on those grounds.

**(2.1)   The economic sustainability of the SES, as an essential principle of the Spanish regulatory framework, and the principle of Reasonable Return, a cornerstone of the Kingdom of Spain, are the grounds which have justified the regulatory measures related to this arbitration.**

364. On 19 December 2011, the then candidate for President of the Government of the Kingdom of Spain, announced in the Spanish Congress the need for urgent reform of the SES. In such intervention, he clearly laid out the reasons for this need:

---

[243] Counter-Memorial on the merits, paragraph 79 et seq.
[244] Ibid. Para. 413

*"We must be very aware that Spain has an important energy problem, especially in the electricity sector, with an annual deficit of over 3,000 million Euros and an accumulated tariff debt of more than 22,000 million.*

*Electricity tariffs for domestic consumers are the third most expensive in Europe and the fifth highest for industrial consumers.*

*[...] If reforms are not undertaken, the imbalance will be unsustainable and increases in prices and tariffs would place Spain in the most disadvantaged situation in terms of energy costs throughout the developed world. <u>We will therefore have to apply a policy based on curbing and reducing the average costs of the system in which decisions are taken without demagoguery, using all available technologies, without exception, and regulate it with the primary objective of the competitiveness of our economy."[245]</u>*
*(Emphasis added)*

365.   The CNE issued Report 2/2012 *"On the Spanish Energy Sector" 203* on 7 March 2012, the first part of which is dedicated to the *"Measures to Ensure the Economic and Financial Sustainability of the Electricity System".* For the preparation of this report, the CNE had begun a period of public consultation in early February 2012 in which 477 claims were received from companies and sectors affected.[246]

366.   Specifically, in order to ensure the economic sustainability of the SES, the CNE proposes a series of measures in the short and medium term in relation to the production activity in the Kingdom of Spain with solar thermal technology. Much of these proposals were taken into account in the adoption of the measures subject to this arbitration: (i) "establish the time-frames of the premiums to be received by the solar thermal power plants registered in the pre-assignment registry, but without a final commissioning certificate because it is the technology with the greatest degree of penetration in the medium term and the most committed"[247]; (ii) the limitation on the use of fossil fuels with premium support to 5 percent of primary energy[248]; (iii) avoid the automatic increase in the X factor of the efficiency in the tariffs and premiums update index (CPI-X); (iv) make uniform the premium on the tariff applicable to solar thermal plants to avoid situations of over-remuneration[249] (v) the partial financing of the Kingdom of Spain premiums charged to income charged to CO2 auctions, performed under Directive 2009/29/EC[250]; (vi) the possible partial financing of premiums of the Kingdom of Spain partially charged to sectors responsible for the consumption of fossil fuels or alternatively through the General

---

[245] Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011, www.lamoncloa.gob.es. R-0092.

[246] Information on the public consultation on regulatory adjustment measures in the energy sector of 2 February and 9 March 2012, published at the National Energy Commission website: www.cne.es. R-0097.

[247] "Report on the Spanish Energy Sector Part I. Measures to guarantee the financial-economic sustainability of the electricity sector, National Energy Commission, 7 March 2012, pages 52. R-0098

[248] Ibid. paragraphs 23 and 24.

[249] Ibid. paragraph 23.

[250] Ibid. paragraph 40.

State Budget; (vii) the modulation of the rate of penetration initially expected in the PER in line with the provisions of RD-Act 1/2012[251];

367.  It also proposed measures to be taken in the medium term: (i) The establishment of competitive mechanisms (auctions) and premiums based on regulatory cost information[252] and (ii) the elimination of subsidies based on the end of the economic life (estimated useful life) of the plant[253].

368.  Many of these measures were subsequently adopted in 2012 and 2013. However, with regard to the measures subject to this arbitration, we can see that the CNE proposes these measures because (1) they contribute to the sustainability of the SES; (2) it aims to correct situations of excess remuneration, and (3) it did not affect the Reasonable Return of the plants.

369.  In particular, the situation of excess remuneration was appreciated by the CNE (1) in situations of pool plus premium in the solar thermal sector; (2) the automatic increase in the X factor of efficiency in the tariffs and premiums update index (CPI-X); and (3) in the maintenance of subsidies beyond the economic life (estimated useful life of the plant).

370.  Based on the purpose of ensuring the economic sustainability of the SES and avoiding situations of over-remuneration, the measures subject to this arbitration and previously announced by the CNE were introduced. This purpose is clearly spelt out in the Preambles to each and every one of the Regulations subject to this arbitration[254]

**(2.2)    The economic sustainability of the SES and the elimination of situations of over remuneration were the reasons justifying the regulatory measures prior and contemporary to the Claimants' investment**

371.    The Claimants base their argument on an erroneous assessment of RD 661/2007. It cannot be accepted that RD 661/2007 was enacted for the purposes of increasing subsidies for renewables. As we shall see below, RD 661/2007 was enacted for two reasons: (i) the need to protect the economic sustainability of the SES from the potential danger deriving from linking the subsidies to the Average Reference Electricity Tariff (TMR); (ii) correcting situations of over-remuneration.

372.  Furthermore, the Claimants fail to mention, even though they are aware of it, that each and every regulatory measure implemented after 2007 was based on the same purposes as mentioned above.

---

[251] Ibid. paragraphs 40 and 41.
[252] Ibid. paragraph 78-80.
[253] Ibid. paragraph 81-82.
[254] RD-Act 2/2013, of 1 February, on urgent measures in the electricity sector and the financial sector. R-0125.

373. Below, we shall prove the above by starting with an analysis of RD 661/2007 and continuing with an examination of the different regulatory measures adopted by the Kingdom of Spain prior to enactment of the measures that are the subject-matter herein.

**(a)    RD 661/2007 was passed for the purposes of guaranteeing the economic sustainability of the SES, not with the aim of enhancing the profitability of renewable technology activities.**

374. In the Reply on the Merits, the Claimants make the assumption that RD 661/2007 was enacted for the sole purpose of increasing the profitability of the diverse renewable technologies. This argument is not true. In fact, this argument can only reflect two things: (i) an evident ignorance of the evolution of the Spanish regulatory framework; (ii) a vain attempt to furnish the Tribunal with an image that is not in line with reality

375. In order to provide the Tribunal with the actual facts, we shall indicate the following points: (i) Characteristics of the remuneration model derived from RD 661/2007; (ii) The introduction of RD 661/2007 was prompted by the need to guarantee the economic sustainability of the SES; (ii) the Claimant was expressly notified of the reasons that justified the introduction of RD 661/2007; (iii) the introduction of RD 661/2007 did not lead to an overall increase in profitability; (iii) The sector rejected the reform required under RDL 7/2006 and implemented under RD 661/2007.

### The introduction of RD 661/2007 was prompted by the need to guarantee the economic sustainability of the SES

376. RD 436/2004, of 12 March,[255] repealed RD 2818/1998, in order to achieve the objectives of the PFER and eradicate the volatility of the previous system of calculating the remuneration of the REs. All of this was always subject to the principles of economic sustainability of the SES and permitting a reasonable rate of return, according to the cost of money in the capital market enshrined in Act 54/1997.

377. The approval of RD 436/2004 received harsh criticism from the sectors concerned, who at the time criticised the attack that it entailed to legal certainty due to its retroactive effect. [256]

378. Said RD set the subsidies using the calculation methodology contained in the PER 2000-2010[257]. This methodology involves identifying the economic exploitation structure of each technology *(standard facility)*, and within each standard facility, in accordance with certain standards (useful life, equivalent operating hours, unit costs, execution periods, operation and maintenance costs and selling prices of the final energy unit) sets a remuneration that is sufficient to achieve a given return target. This methodology, which also applies in RD 661/2007, also applies to the calculation of the remuneration of REs today.

---

[255] RD 436/2004, dated 12 March, establishing the methodology for the updating and systematisation of the legal and economic regime for electric power production in the special regime. R-0059
[256] APPA Presentation on RD 436/2004. R-0293.
[257] Renewable Energy Promotion Plan 2000-2010. R-0202.

379.   At this point, it is relevant to note the consideration contained in the Financial Report of RD 436/2004. Said report points out the following:

> *"The A parameter (investment, operation and maintenance costs for each technology) has great weight in setting the amount of the regulated fee sold to the distributor. Thus, any plant in the special regime installed in Spain will get Reasonable Return, provided that it is equal or better than that of the group (**standard plant type**)"[258].*

380.   From the above, it follows that the subsidies established in RD 436/2004 are not intended to grant an indeterminate return. These subsidies respond to a specific methodology aimed at granting a *standard facility* a Reasonable Return over a given period of time.

381.   On this basis, the RD 436/2004 defined a system based on the free will of the owner of the facility, which could choose between (i) selling its production or surplus electricity to the distribution system, receiving remuneration in the form of a regulated tariff or (ii) selling such products directly on the daily market, receiving in this case the price traded in the market, plus an incentive for participating in it and a premium, if the particular facility was entitled to it.

382.   Under the new model, the Tariff, or as the case may be a Premium and the incentive, consisted of a multiple of the Average Reference Tariff (hereinafter **"TMR"**). For example, in the case of wind power, in the tariff option, the incentive decreased as the years of use of the facility increased. Specifically, the facilities would receive a tariff equal to 90 percent of the TMR during the first five years of its commissioning, 85 percent over the next 10 years and 80 percent thereafter[259].

---

[258] Financial Report of RD 436/2004 R-0220.
[259] The possibility that the remuneration to be received by the existing facilities declined over time was endorsed by the CNE in its report 4/20004 of 22 January 2004 on the RD proposal which established the methodology for the updating and systematization of the legal and economic regime of the special regime activity:
*"The application, to existing facilities, of the new regulated tariff scheme, which contemplates a decrease over time, does not mean retroactivity, given that it merely constitutes a formula for remuneration according to the costs. Moreover, it must be pointed out that during the five years during which RD 2818/1998 has been in force, existing facilities have received remuneration that is equal to or exceeds the remuneration that is now proposed for the initial years of useful life. For example, during these five years, wind energy has received remuneration exceeding 90% of the mean price of electricity, which is what is established by the proposal for the first phase of its economic life (...). Therefore, it could be affirmed that, at this time, the application of decreasing remuneration according to the economic life does not jeopardise existing facilities, since these facilities have already received or are receiving remuneration that is equal to or greater than what is established in the proposal for the first part of its economic life". When talking about the transitory scheme, it adds: "The production facilities included in the special regime have the right to receive a certain remuneration for energy sold, but logically they only have the acquired right to receive said remuneration with respect to the energy already sold, but not regarding the energy they forecast selling in the future, which only constitutes an expectation.*
*Transitional Provision Two of the RD Draft does not therefore violate the principle of non-retroactivity of the restrictive rules of rights, and it cannot be considered that, due to being a transitional provision, the provision cannot, "in the future", modify the scheme provided for in RD 2818/98, without affecting any acquired right.*

383.  The TMR was set by the Regulator according to the procedure set by RD 1432/2002[260] and determined the selling price of electricity to consumers. It was subject to variables such as electricity demand, generation costs, inflation, capital costs, which are volatile variables.

**RD 436/2004 caused effects for the sustainability of the SES**

384.  The link between the subsidies for RE and the TMR involved a potential risk to the economic sustainability of the SES. This was because the TMR was calculated based on the costs of the SES themselves, including subsidies to the SR. Therefore, a loop arose in the mechanism for setting premiums: the premium was a percentage of the TMR which, in turn, was calculated taking into account the increase in the amount of the premiums. This constant feedback meant a disproportionate increase in the costs of the SES.

385.  By 2006, the weight of REs (especially wind) in the SES already represented 17% of the total production[261]. The problem of cost overrun was compounded in light of the planning targets established in the PER 2005-2010, which would have meant a greater participation of the RE in electricity generation.

386.  As a result, the Regulator urgently approved RD Act 7/2006, of 23 June. This regulation, in its Preamble, highlighted the inefficiency of the current remuneration system. Therefore, its Second Transitory Provision froze the RE subsidies until a new remuneration system was implemented based on the modifications that RD-Act 7/2006 introduced into Act 54/1997[262].

387.  These changes included the untying of premiums from the TMR. Therefore, the update of the TMR implemented by RD 809/2006 of 30 June, thereby revising the electricity tariff as from 1 July 2006, was not applicable to the renewable energy premiums and tariffs.

388.  Furthermore, RD 436/2004 generated "windfall profits" for the benefit of wind farms that it was necessary to eradicate. Windfall profits which also pushed upwards the tariff

---

*It also cannot be considered that the principle of non-retroactivity of the restrictive rules is being violated due to the fact that, for the purpose of calculating the remuneration corresponding to each facility, the age of the same is taken into account (Articles 34.1,34.2, 35.1, 36.2, 37.1 and 37.2, all of the RD Draft), given that it is simply a rule of calculation, which, in addition to being reasonable, is only taken into account to establish future remuneration, meaning the energy that is sold in the future, not with respect to what was already sold in accordance with other legislation."* R-0316

[260] RD 1432/2002, of 27 December, which establishes the methodology for the approval or modification of the average or reference electricity tariff and amends certain articles of RD

2017/1997, of 26 December, which organises and regulates the settlement procedure for transport, distribution and tariff-based sales costs, system overhead costs and the costs of diversification and security of energy supply. R-0062

[261] Renewable Energy Promotion Plan 2000-2010, p. 18. R-0202.

[262] RD-Act 7/2006, of 23 June, establishing urgent measures in the energy sector. Second Transitory provision: *"Until the regulatory implementation of the provisions contained in paragraphs one to twelve of Article 1 in accordance with the provisions of the second final provision of this RD-Act: 2. The revision of the average rate performed by the Government shall not apply to prices, premiums, incentives and tariffs that form part of the remuneration of the activity of production of electrical energy in the special regime"* R-0041.

deficit existing at the time. This untenable situation was specifically highlighted by the Secretary-General of Energy to the Congress of Deputies:

> "*The wind-power regulation in 2004 was rather unfortunate. What was done in 2004 with the current RD, number 436, was to set premiums based on an expectation of market prices. [...]*
>
> *What has happened? The market price is now 55 or 60, and wind has a total remuneration of almost 100 euros/megawatt-hour. With this remuneration there it has an IRR, returns of around 20%. I believe in renewable energies as much as anyone, but I also believe that we have to do things reasonably. Certain technologies -this is more or less my idea- that are guaranteed an investment through a premium [...] cannot have a return of 20 percent, which nobody else receives. Some speculators do have them. We must be reasonable*"[263]

389.  The new remuneration model announced in RDL 7/2006 was enacted under RD 661/2007, of 25 May. In its Preamble, it is stated for the record that the aforementioned Regulation was enacted to eliminate the perverse effect that the previous system, based on the TMR, produced for the SES' economic sustainability. The Preamble of RD 661/2007 stipulates:

> "*The economic circumstances established by RD 436/2004, of 12 March, due to the behaviour of market prices, in which lately some variables not contemplated in the aforementioned remuneration regime of the special regime have been more relevant, make it necessary to modify the remuneration regime and de-link it from the Mean Electricity Tariff, or Reference Tariff, which has been used to date.*"[264]

390.  The potential risk of unsustainability of the SES derived from linking the subsidies to the TMR and the correction of situations of over-remuneration prompted the elimination of RD 436/2004 and the enactment of RD 661/2007.

**The Claimants were expressly notified of the reasons that justified the introduction of RD 661/2007 in their Due Diligence report**

391.  The line of reasoning held by the Claimants is completely artificial if we consider that the reasons that justified replacing RD 436/2004 with RD 661/2007 were specifically spotlighted by Pöyry.

392.  Specifically, in his report from March 2008, Pöyry noted, when analysing the background of the subsidies:

> "*The average reference tariff (TMR) was one of the key components to the remuneration of renewable energy projects in Spain, and in the case of solar PV projects was the only component under the previous regulatory framework (RD 436/2004). Hence, higher average reference tariffs were beneficial for solar PV projects*

---

[263] Journal of Sessions of the Congress of Deputies of 8 November 2006, page 27, R-0388
[264] RD 661/2007, of 25 May. R-0042.

*With high pool prices due to high gas prices, the average reference tariffs were set to increase over and above the inflation rate.*

*The rise in the TMR would have created very significant returns for special regime generators (especially wind farms) which in turn would further increase the end user tariff and TMR. This is due to the "tariff feedback", where the TMR drove renewable earnings which contribute to total system costs which again drove TMR*

*The Spanish government was not willing to deal with this issue by raising tariffs to avoid potential inflation risk, therefore the changed the renewable scheme from RD 436/2004 (linked to the TMR) to RD 661/2007 and subsequently reviewed the Solar PV tariffs or 661/2007 via the publishing of RD 1578"[265]*

393.  Likewise, Pöyry advised the Claimants that:

*"Furthermore, given recent high Pool prices, Special Regime generators, in particular wind farms, had, according to the Spanish Government, been making supra-normal profits, As a result of these excessive profits the government has intervened in order to cap profits by modifying RD 436/2004 (the main special regime legislation for the period 2004-07) and publishing RD 661/2007 to replace it"[266]*

394.  It also showed it that *"a reduction of the premium for CSP projects of 10% for the new projects coming online after RD 661/2007".* [267]

**The modification of RD 436/2004 was harshly criticised by the Sector.**

395.  The Claimants' theory on RD 661/2007 contrasts with the opinion held by the Sector in the period in which the regulatory change took place.

396.  The leading associations of the renewables sector, AEE, APPA and ASIF sent a joint letter to the Minister of Industry on 26 July 2006 where, in relation to RD-L 7/2006 and the reform of the remuneration model of renewables which said RD-Act announced, they requested the *"immediate cessation of the ongoing regulatory process".* These associations then said[268]:

- *"the appearing associations can only state their rejection, their most profound discontent and their most serious concern about how and why the process is being carried out".*

- *"RD-Act 7/2006 substantially ruptures the regulation of renewable energies established in the Energy Sector Act (Act 54/1997)"*

---

[265] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008 Edition. Pag. 59 C-202.
[266] Ibid. page 93 and 94.
[267] Ibid, page115.
[268]"The Controversial Energy Decree-Act", APPA Info magazine no. 22, May –July 2006. Editorial. R-0322
APPA pleadings before the Council of State during the processing of RD 661/2007 R-0292.

- *"RD-Act 7/2006 eliminates the objective parameters that established minimum remuneration for the different renewable energies included in said Act. These minimums were the guarantee of stability, predictability and durability that attracted investment to the sector (....)"*

- *"This situation, already compromised and disconcerting by itself, is even more aggravated when one learns that the planned revision of RD 436/2004 is turning into the guiding light of a new regulatory framework -in which none of the undersigned associations have been able to take part before being made public through the CNE- whose remuneration criteria are manifestly and objectively discouraging for taking on the development of projects planned in accordance with the 2005-2010 Renewable Energies Plan (PER), approved by the Council of Ministers on 26 August 2005.*"

- *This way of proceeding would cause a generalised, adverse reaction by investors and financial entities, which would be very difficult to rectify and could lead to deactivation of the renewable energies sector"*

397. In December 2006, the association APPA continues to criticise very harshly said RD-Act:

- *"RD 436/2004 [...] is therefore conditioned by the <u>elements of **retroactivity and legal uncertainty**</u> introduced in the sector by said RD-L 7/2006."*

- *"Last June, RD-Act 7/2006 was approved, which contains a <u>**frontal attack** against the national policy of promoting</u> renewables: it eliminates the 80-90% band and the retributive stability mechanisms [of RD 436/2004], without also contemplating the guarantees and timeframes established. The regulation, which <u>breaks the rules of the game in the middle of the match, introduces</u> **retroactivity** and **grievously breaks** <u>the legitimate expectations</u> of the investors."*[269] (Emphasis added)

398. Therefore, the measures introduced by RD-Act 7/2006 and RD 661/2007, at least for the sector and in the period in which they took place, had a strong impact. At least this was the perception by the affected parties. At that time, as at present, certain parties used expressions such as the following to define the changes: "*substantial destruction of the system*", "*frontal attack against the national policy of promoting renewables*", "*breaking the rules of the game halfway through the match*", etc.

399. In fact, other documents submitted by the Claimants with their Reply on the Merits show that the purpose of RD 661/2007 to reduce the remuneration of producers of REs was known by international legal scholars. In this regard, A. Mahalingam and D. M. Reiner state:

> *"RD 661/2007, was introduced in June 2007 in order to de-link the FIT rate from the Average Electricity Tariff (AET), defined as the level of support as a percentage of the electricity Price. This was done in response to a significant increase in the retail price*

---

[269] "RD-L 7/06 and review of RD 436/04. Storm in the renewable energy sector", APPA Info Magazine No. 23, August-December 2006. Editorial and page 9. R-0323.  In the same vein, the APPA pleadings against RD 661/2007 R-0323.

*between 2005 and 2006. The choice between a premium FIT and fixed FIT was removed and all generators were obliged to accept the latter. Moreover, a cap-and-floor price system was integrated with the system, wherein RES-E generators would only receive compensation between the lower and upper bounds set by the system."[270]*

400.  In view of what has been described above, saying that RD-L 7/2006 and RD 661/2007 entailed an improvement of the remuneration, is, at the minimum, reckless.

**The PER 2005 – 2010 did not contain an overall increase in profitability for RE.**

401.  As we shall examine in further detail later, the PER 2005 – 2010 is an essential regulatory instrument for setting the tariffs. The Claimants, who accept their importance, consider it to be an instrument aimed at attracting foreign investment and perform a completely erroneous and distorted interpretation of its provisions.

402.  However, the PER 2005-2010 contains no provision specifically aimed at attracting foreign investment, as did the Argentine regulations examined due to the awards which the Claimants invoke in support of their legitimate expectations. In fact, according to PER 2005-2010 there were *"... sufficient initiatives by companies of recognised capacity to reach 500 MW installed."* and *"... RD 436/2004, with its premiums, has stimulated new projects. ... globally projects are being promoted with a total capacity of about 500 MW."[271]*

403.  Moreover, when Pöyry explained to the Claimants the Spanish CSP market, it said that *"numerous projects are being initiated involving companies with a recognised track record, which will enable the 500MW of installed capacity for CSP within the 2005-2010 PER objectives to be met."[272]* Subsequently, Pöyry lists the main developers operating in that market: ACS, Cobra, Abengoa, Endesa, Iberdrola, Acciona, Torresol, Sacyr Vallehermoso, Solar Millenium and Sener.[273] The only foreign company among the developers is precisely FPL Energy. Pöyry also tells NextEra that *"the CSP installed capacity currently under construction in Spain is sufficient to trigger the review of the tariffs (upon reaching MW of installed capacity)."[274]* All these projects were Spanish and had been attracted by the PER, which therefore was not specifically directed to attract foreign investment.

404.  The PER 2005-2010 was the basic instrument for setting the subsidies in RD 661/2007. The latter did not warn of any generalised increase in subsidies. In fact, the PER 2005-2010 maintained, in general, the subsidies established by PFER 2000-2010, which were reflected in RD 436/2004.

---

[270] A. Mahalingam and D. M. Reiner, Energy Subsidies at Times of Economic Crisis., 23 January 2016. C-252

[271] Renewable Energy Plan PER 2005-2010, page 145. R-0296.

[272] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008 Edition. Page 6. C-202

[273] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008 Edition. Page 87. C-202.

[274] Ibid, pag.89

405. Here, we must recall that the PFER 2000-2010 established, in general, for all technologies, a return for *standard projects* amounting to "*7 % with own resources, before financing and after tax*"[275]. In turn, the PER 2005-2010 set forth, in general and for all technologies:

> "*Return on Standard Projects: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in common currency and for each standard project, <u>close to 7%, with own resources</u> (before financing) and after taxes." (Emphasis added)* [276]

406. Indeed, if we look at each technology area analysed by the PER 2005-2010, far from seeing a desire to increase profitability, the idea emerges that the targets forecast in the PER 2005 -2010 can be achieved by maintaining the remuneration level. This is expressly stated for wind[277], hydro[278], thermosolar[279], photovoltaic[280], and biogas technology[281]. Said PER 2005-2010 only included increases in subsidies for thermoelectric technology[282] and for biomass[283].

**The Report on the Regulatory Impact of RD 661/2007 did not include an overall increase in subsidies**

407. According to the Claimants "*after publishing the Renewable Energy Plan 2005-2010, Spain added premiums above this base figure to attract investment in specific sectors that it wanted to roll out quickly, including the CSP sector. That is, Spain understood and supported the principle that for investments of the type entered into by the Claimants, the post-tax returns would need to be higher than 7%".*[284]

408. The purpose of RD 661/2007 is contained in the Report on the Regulatory Impact thereon[285]. An examination of this Report, far from what the Claimants maintain, cannot lead to the conclusion that the purpose of RD 661/2007 is an overall increase of the subsidies for renewables.

409. Said document emphasises the link between the PER 2005-2010 and RD 661/2007 when it states that:

> "*In turn, on 26 August 2005, the Cabinet passed the Renewable Energy Plan 2005-2010. Chapter 3 of this Plan, on the Sector Analysis, includes a summary for each renewable area of the regulatory obstacles still existing in Spain. Likewise, a summary*

---

[275] Renewable Energy Promotion Plan 2000-2010, p. 182. R-0202.
[276] Renewable Energy Plan 2005-2010. Pag. 274. R-0296.
[277] Ibid. page 59.
[278] Ibid. page 87.
[279] Ibid, page 145.
[280] Ibid. page 176.
[281] Ibid. page 247.
[282] Ibid. page 116.
[283] Ibid. page 227.
[284] Reply on the merits, para.18
[285] Report on Regulatory Impact of RD 661/2007. R-0324.

*is given of the measures deemed necessary to remove said obstacles and, in each case, increase the rate of growth of renewable energy"[286].*

410.  In the previous point of the Present Statement, we had the opportunity to examine how the 2005-2010 PER did not consider, for most technologies, an increase in subsidies as a measure for boosting the growth of renewable energies.

411.  In line with the above, the Report on RD 661/2007 continues by stating that:

"*This document presents a proposal for the amendment of RD 436/2004, so that it includes all the regulatory measures that are in line with achievement of the targets set forth in the Renewable Energy Plan 2000-2010, and the target set forth in the Action Plan 2005/2007 of the E4 to develop the full potential of cogeneration in this country"[287]*

412.  In line with PER 2005-2010, the regulatory impact report of RD 661/2007 stated that:

"*The regulated tariff has been calculated in order to ensure a return of between 7% and 8% depending on the technology. Premiums have been calculated following the same criteria as in RD 436/2004, that is to say, the premium is calculated as the difference between the regulated tariff and the expected average market price for these technologies"[288]*

413.  Specifically, the regulatory impact report includes the following table of levels of returns:

| - | Regulated tariff by standard facility | Pool return plus premium by standard facility |
|---|---|---|
| Cogeneration or other forms of production based on | facilities using natural gas- 7%<br><br>facilities with liquid fuels and LPG-6% | Receipt of a premium that is updated quarterly. |
| Photovoltaic | facilities of up to 10 MW power – approximately 7%.<br><br>facilities of over 10 MW power – an Internal Rate of Return (IRR) of under 7% is provided | RD 661/2007 eliminated the pool plus premium option for this type of facility. |

---

[286] Ibid. pages 1/26.
[287] Ibid. pages 2/26
[288] Ibid. Pages 13/18

| | | |
|---|---|---|
| Thermoelectric Solar | 8 % | 9.5 % for a typical case over 25 years with a minimum of 7.6% and a maximum of 11%. |
| Wind | 7 % | Between 5% and 9%. |
| Hydroelectric | 7% | Between 5% and 9% |

414.   From this table, the conclusion that can be reached is that RD 661/2007 did not have as an objective the establishment of a generalised increase in profitability but rather to set the profitabilities in line with the PER.

415.   Therefore, the measures introduced by RD 661/2007 entailed for the solar thermal sector a decrease of 10% compared to the remuneration set by RD 436/2004[289]. In addition, Pöyry warned NextEra of the risk that:

> "Although RD 661/2007 provides a floor (part of the Collar) aimed at avoiding low SMP risk, the floor is so low that in practice it does not really protect a CSP Project from very low SMP prices (SMP needs to fall to nearly €0/MWh to be activated)."[290]

416.   Furthermore, Pöyry also highlighted that:

> "RD 661/2007 removed the right for non-manageable renewable to collect the capacity payment (previously, power guarantee) established by the Government."[291]

**Analysis of the CNE**

417.   The previous points reflect that RD 661/2007 was not issued with the aim of increasing subsidies in order to attract investment. Far from this artificial theory, it has been shown that the aim of RD 661/2007 was to maintain the profitability objectives of RD 436/2004, eliminating the significant distortions to this objective of profitability produced by the link between subsidies and TMR. This link created an artificial and irrational increase in the levels of profitability of the installations, creating a potential danger for the economic sustainability of the SES. This risk was compounded when the new implementation objectives laid down in the 2005-2010 PER were taken into account.

418.   Despite what is stated here, the Claimants are trying to build their argument around the statements of the CNE and of some of its members.

---

[289] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008 Edition. Pag. 30 C-202.
[290] Ibid, page 112.
[291] Ibid, page 97.

419.  Before analysing what is stated by the CNE, we should recall that this institution has a consultation nature and is not competent to define or establish the Spanish regulatory framework. That is to say, it is not competent to pass the rules that make up the Spanish Regulatory Framework[292]. The Claimants were well aware of the aforementioned clarification. At the very least, the Pöyry consultancy expressly warned off this circumstance when it stated:

> "The CNE (Regulator) and the IDAE _advise_ the Government on the economic and technical viability of the different technologies and _help the Government_ _to set the tariffs_ in order to provide the promoters with an acceptable IRR."[293]

420.  Consequently, the Claimants must have known that the CNE did not take the place of the Government in setting and implementing the regulatory policy. They likewise knew that the CNE does not substitute the Supreme Court as the ultimate interpreter of Spanish law. Far from this, as we explain below, the CNE is bound by the case law of the Supreme Court that it must follow and respect. Its competences are definitively limited to purely consultative functions.

421.  Despite what is stated above, the Claimants maintain that when the CNE notified them of Draft RD 661/2007 it recognised an increase in subsidies for the different technologies. Nonetheless, the Claimants do not take into account three important factors when evaluating the analysis by the CNE.

**First:**

422.  The Claimants do not pay attention to the way in which the CNE made this comparison. This comparison is contained in Annex III of the CNE report[294]. On page 41 of said report it is precisely stated that the comparison of profitabilities between RD 661/2007 and RD 436/2004 takes as its starting point the updates to subsidies during the corresponding lifespan of the plant, both for the subsidies laid out in RD 436/2004 as well as in those laid down in RD 661/2007 in accordance with the CPI less the corresponding difference. That is to say, in accordance with the update mechanism laid down in RD 661/2007.

423.  Nonetheless, the correct comparison of the profitabilities must be made by applying to the subsidies from RD 436/2004 the update to the TMR that this regulation anticipated and to the subsidies from RD 661/2007 the update in line with the CPI less the proper spread which was 25 basis points until 31 December 2012 and 50 basis points from then onwards.[295]

424.  Having made this comparison, it is apparent that the profitabilities that RD 661/2007 provides during the lifespan that are taken into account in these calculations are lower than

---

[292] Counter-Memorial on the Merits. Paragraphs 398 to 405
[293] "Current and Future Trends in the Spanish Solar System". Pöyry 2008 Edition. Pag.29 30 C-202
[294] CNE Report 3/2007, of 14 February 2007, regarding the RD proposal, regulating the activity of electricity production under the special regime. Pages 41-51. R-0298.
[295] RD 661/2007, Additional First Provision. R-0042

the profitabilities that would derive from the lifespan of the same plants linked to the TMR and its updates as laid down by RD 436/2004.

425.   The wind sector is a clear example of what we have just stated. If the Claimants' claim were correct, it would not be possible to understand the behaviour of the wind sector since RD 661/2007 came into effect.

426.   The First Transitional Provision of RD 661/2007[296] eliminated the possibility for those installations that had originally invoked the option of RD 436/2004 for sale of electricity at market price plus a premium to benefit during the whole lifespan of the installation from the premiums system laid down in RD 436/2004.

427.   The installations referred to, in accordance with the transitional regime, had the option of invoking RD 661/2007 immediately or continuing to receive the premiums (in addition to the market price) originally laid down in RD 436/2004 until 31 December 2012. However, these premiums in the transitional period would be frozen without any type of update. It must be recorded in this sense that since the entry into force of RD-Act 7/2006 the rates and premiums of RD 436/2004 had not been updated. Once the transitory period had passed, they would then be governed, according to their economic regime, as provided in RD 661/2007.

428.   Consequently, during the transitional period laid down in RD 661/2007 the premiums drawn by the installations that wished to remain in the pool plus premium option of RD 436/2004 would remain frozen. That is to say, these premiums did not undergo any type of update from 2006 until 2012.

429.   Despite the freezing of subsidies, wind installations favoured staying at the 2006 remuneration level instead of invoking the remunerations from RD 661/2007. The Wind Sector quantified the impact of the reform, stating that:

"In 2007 wind energy remuneration fell to the levels of 2003 and 2004

---

[296] RD 661/2007. Transitional Provision One: "1. *Facilities in Categories a), b), and c) under Article 2 (therefore including wind energy and small hydro) of RD 436/2004, of 12 March, who possess a final deed of entry into service prior to 1 January 2008, may continue in the transitory period covered in the following paragraph. To this effect, they should elect prior to 1 January 2008, one of the two options for the sale of electricity energy covered under Article 22.1 of RD 436/2004, of 12 March, and they will not have the opportunity to change that option. For cases in which the option elected is option a) under the cited Article 22.1, the present transitory regime shall be applicable for the remainder of the life of the facility. In the event that no change of option is notified, the option shall become permanent as from the date cited.*
*For facilities indicated in the preceding paragraph which have elected option a) under Article 22.1, the regulated tariffs under this RD shall not be applicable. Those facilities which have elected option b) under Article 22.1 may maintain the values of the premiums and incentives set out in RD 436/2004, of 12 March, instead of those determined in the present RD until 31 December 2012. A marginal note shall be entered for such facilities indicating the specific fact that they are availing themselves of a transitory provision deriving from RD 436/2004, of 12 March. The settlement of the incentives shall be effected in accordance with the provisions established for the premiums under Article 30 of this RD." (emphasis added)*". RD 661/2007, of 25 May. C-0038_ESP R-0042.

> *In the seven months that the new RD 661/2007 has been in force, the premium has been lower than that of RD 436/2004 by 5.07 E/MWh*
>
> *All of the wind farms have remained on RD 436/2007 (sic.) with an average remuneration of 77.62 E/MWh throughout 2007, as if they had moved onto RD 661/2007 it would have been 74.11 E/MWh"[297]*

430. This behaviour makes it clear that the link between subsidies and the TMR when making the comparison over the lifespan of the plant generated greater profits than the remuneration model of RD 661/2007.

**Second:**

431. In any case, the CNE report does not question that the aim profitability pursued by RD 661/2007 was different from 7%. Furthermore, at no moment does it question whether the OPEX or CAPEX calculations for the standard facilities taken into account in the proposal analysed are incorrect. In this way it states that:

> *"Through this Circular, the costs of the facilities commissioned in the period covering the years 2004, 2005 and the first half of 2006 has been compiled, due to which it is possible to determine the average profitability of the tariffs and the premiums contained in the draft of Royal Decree for the technologies developed most during this period, namely wind energy, photovoltaic energy, mini-hydropower, landfill biogas and small-scale cogeneration with natural gas. As a result of this determination, that is included below, and in a more developed form in Annex III, levels of profitability have been calculated that are generally higher than those proposed by the Ministry for the regulated tariffs (namely, 7%)"[298]*

432. This report by the CNE reveals that RD 661/2007 started from a profitability objective for standard facilities of 7%. Nonetheless, the Claimants overlook this point.

**Third:**

433. Annex III[299] of its report the CNE makes the comparison between both Regulations in the pool plus premium option. In this comparison, it concludes that RD 436/2004 offered higher levels of profitability. Even starting from the update to premiums of RD 436/2004 in accordance with the CPI minus a difference of one point and not in accordance with the TMR.

434. The Pöyry report also concludes, as we have seen, that the premium to be received for the facilities under RD 661/2007, experiences, with respect to the remuneration given by RD 436/2004, a reduction of 10%. [300]

---

[297] "In 2007 wind energy remuneration fell to the levels of 2003 and 2004", AEE press release 10 January 2008. R-0325.

[298] CNE Report 3/2007, of 14 February 2007, regarding the RD proposal, regulating the activity of electricity production under the special regime. Pages 41-51 and p. 21. R-0298.

[299] Ibid. Annex III.

[300] "Current and Future Trends in the Spanish Solar System". Pöyry March 2009 Edition. Pag. 115 C-202

**The reform of RD 1578/2008 demonstrates the adoption of premiums according to the sustainability of the system.**

435.  RD 661/2007 was generally applicable to the entire RE sector. After reaching 85% of the capacity planned in photovoltaic technology, the mechanism provided for in Article 22 of RD 661/2007 was activated[301]. This determined the approval of RD 1574/2008[302] in September 2008. Said RD established for the new PV installations a new set of tariffs with a reduction of around 30% of the subsidies. This reduction was based on the reduction of the technology costs and also on the necessary sustainability of the SES.

436.  This necessary sustainability was highlighted by the Secretary-General for Energy in October 2008 before the Senate when explaining the reform of RD 1578/2008, of 26 September:

> "market liberalisation must be accompanied, as I have already said, by a protection of the rights of the most vulnerable customers, the development of a last resort tariff and the gradual elimination of the tariff deficit. [...] The tariff deficit that was first created in 2000 was becoming ever greater and, therefore, more unsustainable. [...]
>
> "I met some foreign investors who told me that if the premiums were maintained the next year they would invest billions of euros in Spain, but it is very easy to invest when the electricity consumers are remunerating you. [...]. We want to obtain investments that generate wealth, not just ones that absorb the consumers' resources. [...]
>
> we must be aware of the economic sustainability **of the cost of energy** that we were talking about a moment ago and that is important for families and for the production sector."[303]

437.  Therefore, it is not disputed that the reform of RD 1578/2008 has taken into account this necessary sustainability of the SES, which is omitted by the Claimants.

438.  The aims and effects of that reform are discussed in depth in the Pöyry report, which also said that the reform is the result of a *"lengthy negotiation between the Spanish Government and the Solar industry."* [304] It seems, therefore, that some sort of precedent exists of negotiation prior to RD 1614/2010.

**(b)    RD-Act 6/2009, of 7 May**

---

[301] Article 22.1 of RD 661/2007: *"Once 85% of the power target has been reached for one group or subgroup, established in articles 35 to 42 of the present royal decree, the maximum term that the installations registered in the administrative register of special regime production installations prior to the end date of said term will have the right to the bonus or, where applicable, regulated tariff established in this royal decree for such group or subgroup, which cannot be less than 12 months, will be established by means of a resolution from the Secretary-General for Energy."* R-0042
[302] RD 1578/2008, of 26 September, on remuneration for production of electricity using solar photovoltaic technology for facilities after the deadline for maintaining the remuneration of RD 661/2007, of 25 May, for such technology. R-0142.
[303] Appearance before the Senate of the Secretary-General for Energy on 16 October 2008, pages 5 and 22 R-0389
[304] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008 Edition. Pag.46. C-202

439. The Claimants knew before their investment that RD-Act 6/2009 of 7 May was issued to ensure the economic sustainability of the system. The Claimants also knew that the measures were based on (1) the international economic crisis and (2) its impact on the tariff deficit. It suffices to read the Preamble to said regulation.

440. The Preamble to RD-Act 6/2009 stated in this regard that:

> The <u>increasing tariff deficit</u> [...]is causing <u>serious problems</u> which in the current context of international financial crisis, <u>is profoundly affecting the system and endangering</u>, not only the financial situation of the companies in the electricity sector, but <u>the system's sustainability itself.</u> This <u>imbalance is unsustainable</u> and has <u>serious consequences</u> by deteriorating the security and investment financing capacity necessary to supply electricity in the quality and safety levels demanded by Spanish society. [...]
>
> Fourthly, by its increasing incidence on the tariff deficit, mechanisms are established with regard to the remuneration system of the facilities under the special regime. The trends followed by these technologies could put at risk in the short term, the sustainability of the system, both from the economic point of view due to their impact on the electricity tariff, and from a technical point of view, further compromising the economic viability of the already completed facilities, whose operation depends on the proper balance between manageable and non-manageable generation.[305] (Emphasis added)

441. The main measure of this RD-Act was to set a goal to eliminate the tariff deficit. In particular, it set out that from 1 January 2013 onwards, the access tolls had to be sufficient to satisfy all of the costs of the regulated activities without any ex-ante deficit[306].

442. Consequently, from this time on, any agent connected with the SES would be aware that the Regulator would adopt, within the Spanish legal framework, the regulatory measures that were necessary to achieve the above-mentioned objective. In other words, until this objective was attained, all costs and revenues of the SES would be subject to its achievement.

443. Moreover, the RD-Act noted that the RE would not be outside the regulatory measures necessary to adopt. The RD-Act 6/2009 expressly warned that because of "*The trends followed by these technologies could put at risk in the short term, the sustainability of the system both from the economic point of view due to their impact on the electricity tariff, and from a technical point of view (...)*". Therefore, the RD-Act noted that without prejudice to other immediate measures that could be taken, it was necessary to set *"the basis for the establishment of new economic regimes that propitiate compliance with the intended objectives."*[307]

444. Thus, in order to achieve the established objective, RD-Act 6/2009 introduced significant changes to RD 661/2007: a) the Registry of pre-allocation was created, and b) assigned to the Government the power to stagger the entry into operation of the pre-

---

[305] RD Act 6/2009, of 30 April, on certain measures in the energy sector and approving the social tariff. Preamble. R-0085.
[306] Ibid. Article 1.
[307] Ibid Preamble.

registered Facilities when so required by the SES' economic and technical sustainability. This power was made effective by means of the Council of Ministers' Agreement of 13 November 2009, scaling the entry into operation of preregistered installations[308]

445. The Claimants, relying on a phrase of the Preamble of RD-Act 6/2009[309] maintain that this regulation "*stated that plants accepted within the Pre-Assignment Registry would receive "the right to the economic regime established by RD 661/2007" (not merely the right to a reasonable return: something which Spain admits had already been in place for 10 years under a different statute, Art. 30.4 of the Electricity Act)*"[310]. We do not really know what the Claimants mean by this phrase because the truth is that RD-Act 6/2009, which indeed has the force of law, never repealed Article 30.4 of Act 54/1997, which continued to act as a goal and limit the profitability to be received by the producers of REs. In fact, the Supreme Court continued to implement this article until its repeal by Act 24/2013.

446. Despite the benefits that the Claimants seek to attribute to this RD-Act as a grantor of greater certainty for their plants regarding the future receipt of the premiums and fees of RD 661/2007 throughout the lifetime of the installation, what is true is the fact that in May 2009, the NextEra officers feared its approval. In fact, in an email sent by Juan de Unda to Mikel DeBoch on 6 May 2009, he says: *"Today it has not Been published in the BOE the RDL. Good news."* [311] Indeed, RD-Act 6/2009 was not published in the Official State Gazette on May 6 but rather on 7 May 2009. In addition, in this email, Juan de Unda transmitted to the officers of NextEra the concerns of Protermosolar regarding the implications that the approval of RD-Act 6/2009 would have for the sector:

> *"Dear partners,*
>
> *I send the full text of RDL, which it is expected is the one that was approved by the Cabinet on Thursday and which we have received through an associate, which provides for the pre-allocation register for installations under the Special Regime.*
>
> *As you can see, in the preamble, there is talk of legal certainty for the investments made, as well as a transitional regime that does not affect acquired rights and legitimate expectations.*
>
> *However, <u>the wording of the articles, due to the eligibility criteria, the reduced period for registration and the discretion that the Ministry allows itself in the transitional provision to impose financial restrictions on the execution and entry into operation of the registered facilities once the 500MW have been reached, in our case, seriously</u>*

---

[308] Ruling of 19 November 2009, of the Secretariat of State for Energy, publishing the Spanish Cabinet Meeting Decision of 13 November 2009, proceeding to the management planning of the projects or facilities submitted to the administrative register for pre-assignment of remuneration electric energy production plants, specified in RD-Act 6/2009, of 30 April, adopting certain measures in the energy sector and approving the social tariff. "Spanish Cabinet Meeting Decision of 13 November 2009. R-0086.

[309] Reply on the Merits, para.29

[310] Reply on the Merits, para.21

[311] Email sent on 6 May 2009 by Juan de Unda to Michael DeBoch. R-0392

*endangers the investments in progress and precludes any advanced financial closure of projects that could be close to fruition." [312] (Emphasis added)*

447.  These are the restrictions that were expressly highlighted on 3 September 2009 in the letter from the Secretary of State for Energy to the headquarters of NextEra Renergy Resources in Juno Beach, Florida, in response to a response to the query of Mr Davidson. [313] This letter has been silenced by the Claimants in their Reply on the Merits.

448.  The RD-Act 6/2009 was not only not well received by Protermosolar and NextEra. In May 2009, the most important Association of the RE sector, APPA, ran a strong editorial against the then Minister of Industry making him responsible for the publication of RD-Act 6/2009. When analysing the RD-Act said editorial stated:

*"[The Minister] has never received [the RE Sector] nor has he taken the sector into account for regulatory changes"*

*"Adopts various measures to reduce tariff deficit which increase the administrative burden of clean energies".*

*"The measures of the RD-Act, [...] will further hinder the development of the sector, which suffers, like the rest, financing problems arising from the crisis"*

*"The government has a unique opportunity with the Renewable Energy Act, for which it has a proposal from Greenpeace and APPA to demonstrate its commitment towards a "green economy" and allow Spain to lead, for the first time in history, in technology and development worldwide"[314] (Emphasis added)*

449.  The previous editorial was accompanied by a joint Letter signed by various associations from the renewable sector against R-DL 6/2009. The title of the Memorandum read "*The RD-Act 6/2009, newly imposed decree against renewables*". This letter was presented by APPA in its Partner gazette:

*"APPA, ADAP, APREAN, EolicCat, GiWatt and The Extremadura Cluster of Energy harshly criticised the decree and asked the Government for its contents to be developed in the future Law on Renewable Energy." [315] (Emphasis added)*

450.  Through this joint letter, the various signatories Associations strongly criticised this rule, referring to its similarity to the previous RD 1578/2008, of 26 September, Issued in the PV Sector months before:

*"There is a clear and ominous experience in RD 1578, which regulates the activity of photovoltaic solar technology and which has actually caused the shutdown of this sector, with factory closures and relocation of investments. The new RDA can cause the*

---

[312] Email sent by Juan de Unda to Michael DeBoch on 6 May 2009. R-0392
[313] Pedro Marin letter of 3 September 2009. C-6.
[314] "Europe, new policy. Spain, newly imposed decree". APPA Info 29 May 2009. Editorial.R-0327
[315] Ibid. Pages 12 to 13.

> *same effect on the rest of renewable technologies and affect even the most developed technology, wind power technology"[316].*

451.    Simply reading the Preamble of RD-Act 6/2009 is enough to appreciate that Spain had not committed to or guaranteed the freezing of any legal regime. On the contrary, the Government was convinced of the need to take measures to rebalance the tariff deficit.

452.    The imbalance situation of the SES was largely the result of a huge reduction in the electricity demand, as a consequence of the crisis. This made it necessary to reform the SES, at least with regard to the remuneration regime of the RE. As we have already stated, that was the understanding of the Regulator and of the Sector. For this purpose, a bill proposal was drafted by the RE Sector to reform the Framework of remuneration for renewable energies, as shown below.

**(c)      Remuneration Framework Proposal for the RE Sector by APPA on 20 May 2009**

453.    RE producer associations were fully aware of the dynamic nature of the reasonable rate of return and the need to take the measures necessary to guarantee the economic stability of the SES in line with the objectives set out by RD-Act 6/2009.

454.    Since January 2009 the Association of Renewable Energy Producers (APPA, by its Spanish acronym), the largest Spanish association of renewable energy producers, worked on the daft bill that would meet the claims of the RE sector. To do this, they commissioned a law firm, Cuatrecasas Gonçalves Pereira, the lawyers of the Claimants in these proceedings, with the drafting of a proposed "Draft Act on the Promotion of Renewable Energy".

455.    Said draft Act was presented jointly by the APPA Association and Greenpeace on 20 May 2009 through a Press Release[317]. That is, before the Claimants made their investment. This Press Release from APPA refers to the need to change the energy model, developing a Draft Act based on the *"best practices in legislation for RE"* and on a *"sustainable energy model"*:

> *"APPA and Greenpeace with legal support from Cuatrecasas, Gonçalves Pereira, have worked in their own RE promotion draft bill whose first objective is the transposition of the new Directive into Spanish Law. This draft is based on the best practices in legislation for RE in different countries and in a sustainable energy model, and sees the new RE directive [...] as a starting point for a change in the current energy model. In addition, it aims to assist the Government in formulating an ambitious and farsighted RE Act. But above all, this draft wants to be a legislative instrument that provides security and stability to the necessary investments for the RE to develop their full potential in a sustainable and lasting way."*

---

[316] Ibid. Pages 12 to 13.
[317] APPA-Greenpeace Press Release concerning the Draft Bill for the Promotion of Renewable Energy, dated 20 May 2009. R-0212.

456.    The two most popular newspapers in Spain covered this news, both the El Mundo and[318] El País[319] newspapers. It is evident that the main association of the RE Sector was interested in publicising its Draft Bill. Furthermore, this presentation was published by other RE Associations, such as the Wind energy association APECYL in May 2009[320] and by Foundations dedicated to the RE[321]. This proposal was also subsequently reiterated by the APPA Association[322].

457.    APPA and Greenpeace, advised by Cuatrecasas, suggested the Government that the reasonable rate of return guaranteed to the RE, as the axis of its remuneration regime should be determined by reference to the Treasury obligations yield to 10 years, plus a spread of 300 basis points:

> *"The Government shall set the amounts for regulated tariffs, premiums and supplements, in all cases assessing the operation and maintenance costs and the investment costs incurred by facility operators in order to reach a reasonable rate of return with reference to the cost of money on the capital market. As for the capital remuneration tariff, an annual percentage equal to the average of the previous year's remuneration average of 10-years State bonds will be taken, plus a spread of 300 basis points."[323]*

458.    The index proposed by the concerned associations to set reasonable rate of return is precisely equivalent to that established by the Kingdom of Spain in the challenged measures in this Arbitration. As stated by the most important Association in the RE Sector when proposing it, this is a method that provides *"security and stability for the necessary investments so that renewable energies can develop their full potential in a sustainable and lasting manner"*[324].

459.    Since this is the regime proposed by the RE Sector, the reasonableness of the remuneration regime established in the measures challenged by this Arbitration cannot be questioned.

---

[318] News release, "Spain could be 100% renewable by 2050", El Mundo, 25 May 2009. R-0328.

[319] News release, "Too much renewable energy or too expensive?" El País of 26 May. El País of 26 May 2009, on this presentation: *"The Association of Renewable Energy Producers (APPA) and Greenpeace. Both organisations that week presented a draft Act to promote renewable energy which proposed that renewable energy should account for 30% of gross final consumption by 2020".* R-.0329

[320] Apecyl Press Release, "Greenpeace and renewable energy producers propose a law to make Spain a leader in clean energy", 20 May 2009 R-0330.

[321] Presentation of the "Fundación Ciudadanía y Valores" (Foundation on Citizenship and Values) on the APPA and Greenpeace proposal, November 2009. R-0331.

[322] APPA Magazine, "Info" No. 30, 2010, pag. 14: "The AREP-Greenpeace agreement is a consensus model to consolidate Spain as a world leader in renewable energy". [...] the Draft Law on Renewables presented in May by AREP and Greenpeace is to date the only document submitted in the sector [...] As such, it is a proposal that is open to debate with the different Administrations and with the social actors affected." R-0332.

[323] Presentation to MINETUR (Ministry of Industry, Energy and Tourism) of the Draft Law presented by APPA -Greenpeace in May 2009. Article 23.4 R-0333.

[324] APPA -Greenpeace Press Release concerning the Draft Bill for the Promotion of Renewable Energy, dated 20 May 2009. R.0212.

460.    Furthermore, in 2009 the APPA Association proposed that the estimate of investment costs be carried out using *standard facilities,* in accordance with the *usual market prices*, to avoid speculative costs:

> "To this effect, the Government will estimate investment costs associated with the different classes of facilities, differentiated by technology and size, in order to reflect the common values that such investments reach in reality."[325]

461.    The similarity between the proposal from the RE Sector in May 2009 and the measures adopted by the Kingdom of Spain in 2013 is clear. In 2009 the RE Sector was already fully aware of the difficulties surrounding the economic and technical sustainability of the SES at that time. It, therefore, proposed an act that modified the remuneration system of the Renewable Energies, within the limit of respecting the principle of a "reasonable rate of return according to the capital markets" as enshrined in Act 54/1997.

462.    Moreover, since the RE sector was fully aware that the management principles of the SES' remuneration regime are contained in the Act (and not in the development regulations), they sought to pass the realisation of reasonable rate of return into law. The most authoritative doctrine reported this claim:

> "The Spanish FIT scheme has the legal Rank of a Royal Decree. Even though it is "stronger" than for instance a Ministerial Order, the Spanish renewable associations have long called for a FIT law. Before the last general elections, the current Socialist government had promised to initiate the respective legislative process, but up to now nothing has changed."[326]

463.    The Preamble of the draft bill of 2009 submitted by the APPA to the Government refers to the need to strengthen legal certainty:

> "the rank of the [proposed] law itself should serve to reflect the will for the stability and continuity of the measures it contains, For the purpose of generating the necessary confidence and credibility in the chosen legal and economic model and thereby guaranteeing the security and certainty needed for investments covered by it."

464.    The draft bill from the primary APPA Association certifies that any investor in Spain knew or should have known the *dynamic* nature of the reasonable rate of return guaranteed by Article 30.4 of Act 54/1997 and the need for *sustainability in the* SES. Therefore, the Claimants knew or should have known that any regulation issued in implementation of Act 54/1997 could have jeopardised freezing the investors' *sine die* remunerations. And even less in the scenario of an international crisis, of decline in electricity demand and the increase of the tariff deficit since 2008.

465.    Hence, there is evidence that since January 2009 the main Spanish RE Association, knew and gave public importance to the influence of the tariff deficit and the international

---

[325] Presentation to MINETUR (Ministry of Industry, Energy and Tourism) of the draft bill presented by APPA -Greenpeace in May 2009. Article 23.5 R-0333.
[326] Powering the Green Economy. The feed-in tariff handbook. Miguel Mendonça, David Jacobs and Benjamin Socacool. Editorial. Earthscan, 2010. R-0058.

crisis on the sustainability of the SES, as reasons that justified the need to amend the regulation and applicable remuneration to the RE.

**(d)    National Action Plan for Renewable Energy in Spain 2011- 2020.**

466.    Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources establishes the need for each Member State to prepare and notify the European Commission (EC), no later than 30 June 2010, a National Action Plan for Renewable Energy (hereinafter "PANER") for 2011-2020, in order to meet the binding targets established by the Directive.

467.    Pursuant to this mandate of the Directive, the Kingdom of Spain adopted its PANER on 30 June 2010[327]. It must be highlighted that prior to said PANER's final approval, a participatory process involving companies, associations and citizens was open until 22 June 2010. In this phase, many contributions and suggestions were made and were very useful for the preparation of the final document of the PANER 2011-2020.

468.    In the PANER, after making an analysis of the expected final energy consumption in the 2010-2020 period and defining the objectives and paths of renewable energy, support measures are determined to achieve those objectives. Specifically in determining the measures in the field of renewable energy with power generation, the PANER provides:

> *"Establishing a stable, predictable, flexible, controllable and safe framework for developers and the electrical system"[328]*.

469.    The warning that the PANER made regarding support measures involving the commitment of financial resources must be highlighted:

> "*The application of measures involving the commitment of financial resources must be conducted in a manner compatible with the adjustment and balance needs that the Spanish economy must meet.*"[329] .

470.    Later, in describing the legal framework on which the financial assistance is based on for electricity generation with renewable energy sources, it states that the tariff and premium regime for special regime facilities *"includes levels of remuneration for electricity generation pursuing obtaining reasonable rates of return on investment. For its determination the specific technical and economic aspects of each technology, the facility power and date of commissioning are taken into account, all of this using criteria on sustainability and economic efficiency in the system"[330]*.

471.    The necessary control and adaptability mechanisms the Spanish systems uses on subsidies for renewables are described as follows. In particular, and with regard to flexibility mechanisms, the PANER states the possibility of changing the remuneration levels for renewable technologies:

---

[327] Spain's National Renewable Energy Action Plan (PANER) 2011-2020. R-0134.
[328] Ibid. Page 50.
[329] Ibid. paragraph 61.
[330] Ibid. Page 116.

> *"The levels of remuneration may be changed depending on the sector technological evolution, market behaviour, the degree of compliance with renewable energy targets, the degree of participation of the special regime in demand coverage and its impact on the system's technical and economic management, while always ensuring reasonable rate of return- the current RD 661/2007 establishes four-year reviews. In any case, these reviews address the evolution of specific costs associated with each technology, with the triple ultimate goal for renewable technologies to achieve the highest level of competitiveness possible with the Ordinary Regime, favouring a balanced technological development and for the remuneration scheme to evolve towards the minimum socio-economic and environmental cost".[331]* (Emphasis added)

472.    Moreover, when addressing the future evolution of the remuneration system for renewable energy, according to the methodology followed to date, the PANER relies on a premise:

> *"For the determination of the remuneration, technical parameters and investment costs incurred will be taken into account, with the purpose of achieving a reasonable rate of return with reference to the cost of money in the capital market, taking into account the provisions of the Electricity Sector Law."[332] (Emphasis added)*

473.    Then the PANER emphasises the Government's duty to control the subsidies' remuneration system, and where appropriate, to take any necessary measures to avoid unwanted retributive adjustment:

> *"In addition, the effective protection of the Administration must ensure the transfer to society of the gain from the proper development of these technologies in terms of relative cost-competitiveness, minimising speculative risks, caused in the past by excessive profitability that damages not only consumers, but also the industry in the perception we have of it. It will, therefore, be necessary to arbitrate sufficiently flexible and transparent systems to provide and obtain economic and market signals that minimise the risks associated with both the investment and its remuneration, and those caused by fluctuations in the energy market"[333]. (Emphasis added)*

474.    Accordingly, the Kingdom of Spain, through the PANER notes that the maintenance of the remuneration mechanism for renewables based on the principle of reasonable rate of return on investment must revolve around its necessary "flexibility" to avoid unwanted situations.

**(e)    RD 1565/2010, of 19 November**

475.    The need to ensure the technical sustainability of the SES, as a result of the increasing degree of penetration of the renewable energies, forced the regulator to dictate the RD 1565/2010, of 19 November, which regulates and modifies certain aspects concerning the activity of electricity production under the special regime (hereinafter "RD 1565/2010"). In this regard, the Preamble showed that the RE sector:

---

[331] Ibid. Page 119.
[332] Ibid. Page 123.
[333] Ibid. Page 123.

> *"Is a very dynamic sector with a very fast pace of technological evolution. Currently, about 25 percent of the electricity produced comes from renewable energies. These facts, combined with the structural characteristics of our electrical system, require the establishment of additional technical requirements to ensure the functioning of the system and enabling the growth of these technologies".[334]*

476.    On the one hand, for technological development reasons, it was agreed to extend the deadline for wind farm facilities to meeting response requirements due to voltage voids[335].

477.    On the other hand, it included additional requirements for reactive power supplement[336]. In this sense, all facilities under the special regime, with the exceptions established by regulation, would receive a supplement or penalty, as appropriate, for keeping certain power factor values. That is, the facilities were obliged to be maintained on an hourly basis, within the required power factor range, expressly sanctioning noncompliance with the payment of penalties for the incurred noncompliance hours.

478.    Additionally, the definition of the concept of substantial modification[337] of a facility for the renewal of the economic regime was specified, to the extent that it was anticipated that this concept would be massively used in the coming years since the power generation facility had reached a certain age in which equipment renewal became necessary.

479.    It must be said that this regulation was processed jointly with RD 1614/2010, which according to the Claimants represented an agreement by the Government both with the solar thermal sector and with the wind sector.

480.    During the processing of these Regulations, the main wind association, the SWA, presented on 2 August 2010 before the CNE, pleadings in which, after recalling the case law of the Supreme Court, it stated that:

> *"Any review of the Remuneration Regime established in RD 661/2007 must necessarily ensure a reasonable rate of return on investment and also meet the criteria themselves established in that RD (which have not been modified) and the higher principles of legal certainty and proportionality"[338].*

481.    These claims are very relevant because they prove that the RE sector was fully aware of the possibility that the remuneration regime of RD 661/2007 could be modified, with the only limit to ensure the perception of a reasonable rate of return.

**(f)    RD 1614/2010, of 7 December**

482.    Continuing with the same *leitmotiv* of the preceding measures, namely the need to ensure the economic sustainability of the SES, the RD 1614/2010 was adopted by the Government of Spain before the imminent need to reform the RE remuneration regime.

---

[334] RD 1565/2010, Preamble. R-0065.
[335] Ibid. Article 15, which amends the Fifth Transitory Provision of RD 661/2007.
[336] Ibid. Article 8 amending Article 29 of RD 661/2007.
[337] Ibid. Article 1 amending Article 4.3 of RD 661/2007.  .
[338] Ibid. page 7.

113

483.    The main association of renewable energies producers, AREP, also recognised the need to undertake a reform on the renewable energies regime and to this end, it presented its proposal for a Renewable Energy Law, discussed above.

484.    In the same vein, the SWA was aware of the need to take measures because of "*the exceptional drop in electricity demand*"[339]. Therefore, the whole RE sector knew that the approval of RD 1614/2010 responded to a basic purpose and so in its preamble the following was explained:

> "*So the support regime, as stated in its formulation should be adapted, with legal certainty of investment and the principle of reasonable rate of return, to the dynamic reality of the learning curves of various technologies and technical conditions that arise with their increasing penetration in the generation 'mix', in order to maintain a necessary support and sufficiently coherent with market conditions and strategic objectives on energy and contributing to the transfer to society of the gain from the proper development of these technologies.*
>
> "*Therefore, the present royal decree intends to resolve certain inefficiencies in the implementation of RD-Act 6/2009 of 30 April, for wind and solar thermal technologies (...)[340]".*

485.    In short, the aim was to rebalance the contribution of different technologies to the SES sustainability, according to their varying degrees of penetration. It was obvious, and therefore investors were fully aware of, that there was a clear will on the Government to achieve the objective and, therefore, any necessary measures would be taken to achieve it.

486.    The fact that in the development of RD 1614/2010 the reform was supported by operators in the Sector does not alter (i) neither the legal nature of the *erga omnes* rule, (ii) nor its contents (iii) nor the possibility of adopting new measures aimed at achieving the same end, if macroeconomic circumstances so require.

487.    The Claimants' arguments aimed at turning RD 1614/2010 into a kind of contract resulting from historically unprecedented negotiations are simply nonsense. There are many examples that can be given regarding negotiations with associations carried out by the Spanish Government for the purpose of developing a regulation[341]. The Pöyry report warns the Claimants that RD 1578/2008 was the result of negotiations between the Government

---

[339] Ibid. page 2.

[340] RD 1614/2010 of 7 December, Preamble, par. 4 and 5. R-0068.Pöyry: Current and Future Trends in the Spanish Solar System pag. 46: "*The outcome of the lengthy negotiation between the Spanish Government and the solar industry has received mixed reviews from the industry players*". C-202

[340] Ibid. Preamble

[341] In the case of an action framework for coal mining, (R-0407); the Great Government - Unions Social Pact, Current Affairs, EL PAIS (R-0409); The banking sector negotiates the financial reform with the Government, ABC *(R-0410);* Protocol-Collaboration-administration-pharmaindustry (R-0411); Justice Ministry Agreement - Trade Unions on working conditions of civil servants (R-0412); The ministry agrees with students an interim reform of entrance exams to University (R-0413); Industry agrees with electricity companies and electricity costs increases 4% Thursday on average, El Diario de León (R-0416).

and the photovoltaic sector.[342] The Counsel for the Claimants argues in other arbitrations that RD 661/2007 was also the result of negotiations with the wind sector.

488.    That the consultations finally lead to an agreement or not on the text of the regulations will depend on its success. The important thing for the regulation not to be rendered meaningless is for a hearing to be given to representative industry associations at some point, either before preparing the draft or during its subsequent processing. This is stated in the very Supreme Court rulings that the Claimants provide to the Court. [343] It may even be that the negotiation leads to the non-approval of the regulation, as happened with the 2011 reform of renewable energy announced by Act 2/2011 on the Sustainable Economy, approved, by the way, right before the investment of the Claimants. The SWA published in 2012 in its yearbook that in its negotiations with the government it pushed for a new regulation not to be approved. [344]

489.    We also warned that when the Government of Spain holds real protocols and agreements with the sectors concerned to implement a regulation, it signs them, introduces monitoring committees into them to ensure compliance, and expressly states it in the rules adopted in the development of such agreements.[345] None of these circumstances is present in the famous "agreement of 2 July 2010" between Protermosolar and the Government, to which Jaime Malet attributed its fair value:

> *"Dear Mike,*
>
> *I send you attached the agreement reached with the Thermosolar sector last Friday. Just for the negotiation team, the Ministry has acceded to send us the agreement in official paper. It does not have the legal implications of a Royal Decree, but it is better than what we had until now (gentlemen's agreement plus a brief email of Director General)."[346]*

490.    The Sector also knew that the reform would be adopted regardless of whether this was accepted by them. The necessary sustainability of the SES demanded it. In this regard, it should be remembered that more stringent measures regarding the photovoltaic sector were also adopted, despite its opposition.[347]

491.    The renewable energy producers were aware that the alleged agreement of 2 July 2010 contained no commitment on freezing the remuneration regime. In this regard, it is clear that the SWA Association does not advocate the existence of any freezing commitment as stated in its claims of 2 August 2010:

---

[342] AEE Yearbook, Wind Power ´12. Wind Business Association, the reference in the Sector R-0403.
[343] Judgement of the Supreme Court, of 06 July 2012. On the lawfulness of RD 253/2011, of 28 February, on the Legal Regime of Notaries, Commercial and Property Registrars assigned to the DGRN.
[344] In this regard, Act 54/1997, on the Electricity Sector announced in its explanatory memorandum, that it is the result of negotiations with the sectors involved.
[345] For example: Agreement with the Transport Sector. R-0419; Protocol of collaboration between the General Government and the Pharmaindustry, R-0411.
[346]Email from Jaime Malet to Mike Arechabala on 8 July 2010. C-263.
[347] In this regard, measures regarding the photovoltaic sector were adopted by the RD 1565/2010 (R-0065) and RD-Act 14/2010 (R-0049), although the latter also affected the wind and thermosolar sectors, as will be discussed later.

> *"In any case, safeguarding legal certainty and ensuring a reasonable rate of return on investments constitute inviolable limits of **any regulatory changes affecting existing facilities.**"[348] (Emphasis added)*

492.    That is, the SWA not only recognises the lack of commitments but admits that there may be further changes in the profitability and the regime of existing facilities. It is only required that two principles are respected: legal certainty and ensuring a reasonable rate of return.

493.    In addition, the SWA expressly recognises before the CNE the existence and linking OF the set forth, well-established case-law:

> *"It is true that the Supreme Court has stated, in relation to this type of retroactive reforms, that there is no "unalterable right" for the economic regime to remain unchanged, and that "from the prescriptive content of Act 54/1997 of 27 November of the Electricity Sector, no freezing of the electricity power facility holders' remuneration regime under the special regime can be drawn, nor the impossibility to reform such regime", **recognising thus a relatively wide margin of the Administration's "ius variandi" in a regulated sector where general interests are involved.** However, without prejudice to the above, the case-law established limits to the Administration's "ius variandi" regarding the retroactive amendment of that remuneration framework, especially "that the requirements of the Electricity Sector Act are respected regarding the reasonable rate of return on the investments". Moreover, a breach of the principle of legal certainty for a retroactive rule "can only be settled case by case "(...)".[349] (Emphasis added and footnotes omitted).*

494.    In short, the SWA revealed in its allegations that they had complete knowledge of the Spanish legal system, quoting Supreme Court judgements of 25 October 2006, 3 December 2009 and 9 December 2009. This reflects clearly the expectations that RE producers had regarding "any" regulatory change. The SWA does not claim either freezing the remuneration regime contained in RD 661/2007, nor the assumptions or commitments established in RD-Act 6/2009, nor in the alleged agreement with the Ministry of Industry one month before submitting these claims. All they claim is respect for the legal principle of reasonable rate of return and the legal certainty of the rule.

495.    It is, therefore, clear that the Claimant knew the *"relatively **wide** range of  " ius variandi "* of the Administration in a regulated sector where general interests are involved." That is, the Claimant knew the possibility of future regulatory changes and limits that could adjust these regulatory changes: the SES' economic sustainability and ensuring a reasonable rate of return.

496.    And, what is relevant for the purposes of the biased statement of facts made by the Claimants, is that it is clear that the Claimants knew and handled the Supreme Court case

---

[348] AEE claims to the CNE during the Spanish National Energy Commission hearing process on the Proposed RD 1614/2010 which regulates and modifies certain aspects of the special regime, page 2. R-0251.

[349] Ibid. Page 6.

<u>law</u> invoked before the CNE by the SWA[350]. It is, therefore, surprising that in their Statement of Claim they omit these rulings and in their Counter-Memorial they say that they were not aware of them and that they consider more relevant other rulings on the cultivation of oysters in Spain.

497.    Reading the Impact Assessment Report for the drafting of RD 1614/2010 (hereinafter "MAIN") is enough to realise that this report was only intended to ensure SES sustainability, through cost containment linked to the renewables energy subsidy:

> *"The aims of installed power under the Renewable Energy Plan 2005-2010 have been reached or exceeded for thermosolar and wind power technologies. While this development can be considered a major achievement of all stakeholders (...) it has also caused problems that need to be addressed before they pose an irreversible threat to the economic and technical sustainability of the system[351]."* (Emphasis added).

498.    This Report adds:

> *"This RD provides a series of austerity measures to contribute to the transferring to society of the gain from the proper evolution of these technologies in terms of competitiveness in relative costs, reducing the deficit of the electrical system, while safeguarding the legal certainty of investments and the principle of reasonable rate of return[352]"* (Emphasis added).

499.    Therefore, it is clear that the purpose of RD 1614/2010 was consistent with the rest of the measures taken so far: ensuring a reasonable rate of return for investors, in the context of sustainable SES. In fact, this reason is what motivates each and every measure contained in RD 1614/2010.

**(g)    RD-Act 14/2010, of 23 December**

500.    The deficit ceilings established by RD-Act 6/2009 for the years 2010, 2011 and 2012 were raised by RD-Act 14/2010[353] since the previous limits could not be met. In fact, this is explained in its preamble:

> *"Since the adoption of said RD-Act [RD-L 6/2009] a series of circumstances have taken place which have had a direct impact on the tariff deficit forecast for the electricity system, and have meant that the maximum deficit limits [...]  have been widely exceeded. The impact of the global crisis in the Spanish economy has led to a significant drop in power demand while some circumstances on the supply side have*

---

[350] Emails of Joana Sánchez of 21 April 2010 and 30 April 2010. R-0396 and R-0397. The second of them encloses a report from APPA translated into English, which analyses this case law and its application to future modifications. R-0398

[351] Report on the Analysis of the Regulatory Impact of the Draft RD 1614/2010 regulating and modifying certain aspects related to electricity production using thermosolar and wind power technologies. R-0334.

[352] Ibid.

[353] RD-Act 14/2010 of 23 December, establishing urgent measures to correct the tariff deficit in the electricity industry. R-0049.

> *had an impact such as [...] favourable weather conditions that have led to increased electricity generation from renewable sources."[354]* (Emphasis added).

502.    So regarding all RE technologies, RD-Act 14/2010 set up in Article 1.2 that:

> *"Remuneration for regulated activities shall be financed through revenues collected by access fees for transmission and distribution networks, fully paid by consumers and producers."* [355]

503.    This RD-Act requires therefore that <u>all</u> power producers, both OR and SR, have an obligation to pay an access fee for the use of transmission and distribution networks[356]. This affected the profits of the RE producers, demonstrating the inconsistency of the Claimants' argument on the *freezing* or impossibility to reform the RD 661/2007 regime after RD 1614/2010. In fact, the access fee introduced by RD-Act 14/2010 was challenged by some Photovoltaic producers before the Supreme Court, which dismissed the appeal, reiterating - once again- its well-established case-law[357].

504.    Again, this case-law emphasised that investors knew that their remuneration could be affected by future measures, both positive and negative, without any remuneration inalterability taking place in time or the mechanism to obtain it. However, they also knew, as established by the case-law, that measures should always respect the principle of reasonable rate of return.

505.    Indeed, access fees and limiting the equivalent operating hours introduced by this RD-Act 14/2010, along with other adjustment measures adopted for the photovoltaic sector by

---

[354] Ibid. Preamble.

[355] Ibid. Article 1.2

[356] Ibid. First transitory provision.

[357] In this regard, the Supreme Court has also spoken in the case of various appeals against the ministerial orders setting tolls for 2011 (starting with Order 1TC/3353/2010), in which the RD-Act was being indirectly challenged. The Supreme Court ruling of 25 June 2013 is worth noting, in which, among other considerations, states:

"the grounds for the criticisms of the appellants are in short, limited to the fact that the payment of the toll has a negative impact on their income statement, and as a consequence, on the rate of return on their investments. <u>And since they are based on the assumption</u> – although they do not express this as such- <u>that the legal situation outlined by Royal Decree 661/2007 must remain virtually unmodified or unchanged over the 30 following years</u> (and even subsequent years), any unfavourable measure altering it, would violate repeatedly invoked principles (principles of legal certainty and legitimate expectations). In their opinion, this unchangeability, should also be extended to subsequent provisions concerning taxation –

where the tolls are viewed as a tax -, which would not be permitted to have a negative impact on the profits derived from the remuneration regime they enjoy either, according Royal Decree 661/2007.

<u>The Court has rejected this assumption in previous judgments, and will do the same here.</u> If in those judgments referring to the challenge made against Royal Decree 1565/2010, we held that the principles invoked by the appellants did not prevent the holder of the legal authority –while respecting the "reasonable rate of return" limit set by Law 54/1997 of the Electricity Sector- from introducing certain modifications to the remuneration regime provided for in Royal Decree 661/2007, we are bound to reaffirm that these principles do not prevent the holder of the legislative power (in this case, exercised by means of a Royal Decree-Law, subsequently ratified by the Spanish Congress) from approving general measures, whether they concern taxation or not, that have an impact on the regime. It is therefore legitimate to decide that all producers of electricity, without exception, should contribute through the payment of tolls to the costs that can be attributed to investments required to make it possible for the energy produced to be transported and distributed." (emphasis added) R-0070.

RD 1578/2008, were the subject of the first international arbitration against the Kingdom of Spain. This arbitration has been resolved by the Award of 21 January 2016, dismissing all the Claimants' claims.[358]

506.    We should draw attention to the fact that the Claimants only cite RD-Act 14/2010 to say that exclusively affected the photovoltaic industry. Clearly, the intention of this is to hide from the Tribunal that the implementation of the access fees had an economic impact on the profitability of their plants. In addition, the adoption of this standard on 23 December 2010 (i.e., 16 days after RD 1614/2010) shows that the latter Royal Decree in no case meant the freezing of the economic regime in RD 661/2007.

507.    Surprisingly, the Claimants attended the speech given by Minister Sebastián at the meeting held in Parliament in January 2011 for the validation of RD-Act 14/2010. As with all RD-Acts, the RD-Act 14/2010 was issued due to reasons of extraordinary and urgent need by the Government and then needed to be validated by the Congress of Deputies. The Claimants invoke the speech by Mr. Sebastian because, in it, he alluded to the fact that certain previously adopted measures were negotiated with the affected sectors. However, they omit to tell the Court what the Minister says next to justify the enactment of RD-Act 14/2010:

> *"...since 2009 the Government has been working to adopt a set of measures whose common denominator is the rationalisation of the regulated costs and the reduction of the tariff deficit (...)* <u>*All these measures have been created from the dialogue, both with the sectors concerned and with the major political parties.*</u> ***But these measures of 2009 and 2010 have not been sufficient.*** *The imbalances have been accentuated as a result of the emergence of a series of adverse circumstances, in some exceptional cases, of which I would like to highlight two. On the one hand,* <u>*growth above that planned of some of the costs regulated throughout 2010, in particular of the premiums under the special regime, and, on the other hand, the evolution of the demand for electricity, which in 2009 suffered a fall of 4.7%. This is the first decline in the demand for electricity after 25 years of sustainable increases of around 4% per year.*</u> *These decreases of the electrical demand reduce the income of the system and mean that the fixed costs have to be paid between fewer users of electricity, which raises the cost per user. These two circumstances have raised the tariff deficit and made that the measures taken so far to ensure the progressive reduction of the tariff deficit in a balanced way between all the players in the sector were insufficient.* ***Therefore, the need to adopt new measures urgently*** *(...)."*[359]

508.    That is, the Minister warned in January 2011 that the measures taken during the years 2009 and 2010 (including RD-Act 6/2009 and RD 1614/2010) are not sufficient, and therefore further measures must be taken. This declaration was made three months before the date on which the Legitimate Expectations of the Claimants should be assessed.

**(h)    Act 2/2011, of 4 March, on Sustainable Economy**

509.    In a context of widespread economic crisis, both at national and international levels, the Act for Sustainable Economy was passed on 4 March 2011. This legal text outlined the need

---

[358] Award in the case *Charanne B.V v. Kingdom of Spain.* RL-0088.
[359] Journal for the Sessions of the Congress. Validation RD-Act 14/2010. R-0404.

to undertake a reform in energy regulation in general and the incentives for the primary regime in particular[360]. The criteria on which this new regulation are settled were the following:

    i.    The link between planning and legislation concerning the management of public incentives to meet the objectives in such planning.

    ii.    The need for the planning to collect various scenarios for guidance on the future evolution of energy demand, on the resources required to meet it, on the power requirements and, in general, forecasts useful for making investment decisions for private initiative and for energy policy decisions, promoting an appropriate balance between system efficiency, security of supply and environmental protection.

    iii.    The need for public incentives ensures an adequate return on investment under special regime technologies that encourages an installation volume compatible with the objectives set out in the Energy Plans.

    iv.    The need for planning objectives to be met taking into account the principles of economic efficiency between different alternatives and the economic sustainability of the measures taken.

510.    Attention is especially drawn that the Claimants have completely failed to study this Act, especially taking into account that this law was passed one month before they conducted their investments in the renewable sector in Spain. The Claimants fail to mention this law because it is obvious that no prudent investor could think, in view of its content, that the remuneration regime established in RD 661/2007 could remain frozen.

511.    The need for reform was not only known but also demanded by the producers. In fact, during 2011 the reform planned by the Government was ultimately paralysed as a result of the pressures exerted by, among others, the SWA, as it was contrary to their interests. This is specifically recognised by SWA itself:

> "There are two words that the wind sector repeats tirelessly for some years: regulatory uncertainty. And 2011 has not been an exception. (...).
>
> At the beginning of the year, Spain was ruled by the Socialist Party; at the end, the Popular Party. In the midst, there was a hard and regulatory battle against the clock. (...).
>
> The year began with the adoption by Congress of the Sustainable Economy Act. (...) . Among other things, provided that, three months after its adoption, there should be an Act for Renewable Energies, an old demand from the sector. This never happened.
>
> _In September, and without any trace of the announced dialogue, the Ministry of Industry, Tourism and Trade (the former MITYC) forwarded to the National Energy Commission (CNE) by means of an urgent procedure a draft royal decree that was unacceptable for the sector, both in terms of model as in regard to the economic conditions (...) The parameters proposed by the Government did not guarantee the reasonable rate of return on projects. (...)._

---

[360] Act 2/2011, of 4 March, on Sustainable Economy, Articles 77, 78, 79. R-0291.

*On 20 November, a <u>new Government</u> emerged from the ballot box, without no one knew for sure what was its position in relation to the wind sector. However, the Executive <u>did not take long to make clear its priority in the field of energy: curb the tariff deficit, which by law must stop growing from 2013</u> (...)".[361]* (Emphasis added)

512.    This situation, described by the SWA itself, highlights not only the lack of conviction in the wind sector itself concerning the existence of a guarantee of freezing a certain remuneration regime, but the imminence of a regulatory change planned since 2011 and the priority of the new Government to ensure the sustainability of the SES.

**(2.3)    The risks of future regulatory measures were known by the consultancies and according to doctrine.**

513.    In 2010 many analysts believed that the adoption of future regulatory measures would be conditional on the evolution of the economic sustainability of the SES.

**Brattle:**

514.    Together with the Pöyry's opinion, other analysts such as Brattle warned at roughly the time of the implementation of the investment by the Claimants, that the SES was unsustainable and that new reforms were needed. Thus, Brattle warned in September 2010 of the unsustainability of the Spanish system due mainly to the fact that the renewable subsidies were far too generous. Therefore, it maintains that it is necessary to make the relevant changes in the model of subsidies for renewables:

*"There are two main short-term policy challenges related to renewable power and resource adequacy. The first is how to cope with the high costs (estimated at over €6 billion for 2010 alone) of subsidies to existing renewable power plants. A significant share of the subsidies accumulated over the past years have not yet been passed through to consumers; this has contributed to a growing and unsustainable "tariff deficit". Many solutions to this are on the table, including recovering the cost from taxpayers or from all carbon-emitting energy sales, not just from electricity. But the central point is that Spain set feed-in tariffs far too generously and now needs to change its renewables model without losing the confidence of investors." [362]*

**Miguel Mendonca, David Jacobs and Benjamin K. Sovacool**

515.    The authors of the book "*Powering the Green Economy: The Feed-in tariff Handbook*", also warned what the main problem was in a *feed-in tariff* system, noting that:

*"When designing FITs, the idea is to provide a balance between investment security for producers on the one hand and the elimination for windfall profits (in order to reduce the additional cost for the final consumption) on the other"[363]*

[361] AEE Yearbook, Wind Power ´12. Wind Business Association, the reference in the Sector. R-0320.
[362] Report "Resource Adequacy and Renewable Energy in Competitive Wholesale Electricity Markets" – The Brattle Group (Serena Hesmondhalgh, Johannes Pfeifenberger and David Robinson) – Pages 9 and 10. R-.0335
[363] *Powering the Green Economy. The Feed-in Tariff Handbook.*, pag. 15. R-0031.

516.     At this point, we must remember that the greatest difficulty encountered by any regulator that intends to use a feed-in tariff system in order to enable investors to recoup their investment costs, their operating costs and obtain a reasonable rate of return, is reached once the amounts of such subsidies are set correctly. At this point, we must remember:

> *"One of the most urgent questions for policy makers dealing with FITs is how to get the tariff level right. A tariff that is too low will not spur any investment in the field of renewable energies while a tariff that is too high might cause unnecessary profits and higher costs for the final consumer"[364]*

517.     In the same vein, the authors of the book "Powering the Green Economy: The feed-in tariff handbook", pointed out that:

> *"It has to be noted, however, that the vast amount of installed capacity in Spain was due to a combination of two "bad" design options: extremely high tariffs and capacity cap"*
>
> *"Who will argue for an extremely high tariff? It seems logical that the renewables industry will argue for high or even extremely high tariffs: the higher tariffs, the higher the profitability margin, However, <u>people with this attitude should be warned</u> that short-term profitability can sometimes endanger long-term objectives. The main objective of renewable energy industry associations should be the transformation of the entire power sector, <u>and not unsustainable internal rates of return</u>"[365]*

518.     In that statement, it must be added that in the Spanish case, subsidies for renewables are a cost of the SES and that they directly affect the sustainability of the SES. Consequently, a FITs system must necessarily have the adjustment mechanisms required to correct such undesirable situations. Adjustment mechanisms which in the Spanish case are even more necessary due to the implication that said cost has for the sustainability of the SES.

**(2.4)    How did the economic sustainability of the SES develop once the Claimants made their investment?**

519.     Understanding the measures adopted by the Kingdom of Spain throughout 2012 and 2013 requires to analyse the evolution of Spanish macroeconomic data from when NextEra planned its investment until the adoption of the regulatory measures relating to this arbitration: [366]

**Table 6.a - Macroeconomic indicators in Spain**

| Indicator | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| State Revenue | 442 | 410 | 376 | 392 | 387 | 391 | 394 |
| Public deficit (in % of GDP) | 2,0 % | (4,4)% | (10,9)% | (9,4)% | (9,5)% | (10,5)% | (7,0)% |
| Unemployment Rate | 8,2 % | 11,3 % | 17,9 % | 19,9 % | 21,4 % | 24,8 % | 26,1 % |
| Variation of GDP | 3,8 % | 1,1 % | (3,6)% | 0,0 % | (1,0)% | (2,6)% | (1,7)% |
| Risk premium (in bps) | 9 | 38 | 75 | 149 | 278 | 427 | 293 |

*Source: IMF Database, Bloomberg and Accuracy analysis*

[364] Ibid. par. 19.
[365] Ibid. par. 59.
[366] Accuracy, Second Report on the Claimants' Claim. Page.75

520.    The negative evolution of the Spanish economy as a result of the international economic crisis produced a substantial reduction in demand for electricity during 2009, 2010, 2011, 2012 and 2013 with a subsequent fall in income for the SES[367].

521.    In consequence, the effects of the international economic crisis led to the fulfilment of a risk that the Claimants had been warned off by Pöyry in its due diligence: an increase in the tariff deficit.

**(2.5)    Did the Kingdom of Spain adjust its behaviour to what was expected by the Claimants when faced with a possible situation of economic unsustainability in the SES?**

522.    As discussed above, after the Claimants had executed their investment, the SES continued to suffer a sharp decline in revenue due to the lower demand for electricity in a context of a very serious global economic crisis. Meanwhile, its costs, designed in the context of a radically different economic situation, not only continued but increased. This compromised the economic sustainability of the SES.

523.    In this context, (1) the different preliminary analyses, (2) regulatory developments, (3) technical knowledge and (4) technological developments, revealed the existence of remuneration which, either by default or by excess, did not maintain the criterion of *Reasonable rate of Return* established for the remuneration of the so-called special regime and that of *adequate remuneration* for the rest of the regulated activities, especially transport and distribution activities.

524.    Given this situation, the SES continued to evolve, as it had been doing to date, in a rational and proportional manner.

525.    On this point, we should note what behaviour the Claimants anticipated from the Kingdom of Spain to confront the tariff deficit. The "due diligence by Pöyry" covered this question, stating:

> *"In this regard, the CNE has been proposing substantial increases in the regulated tariffs in order to avoid future tariff deficits (CNE proposed to increase end-user tariffs by 30% during 2008). We do not believe that the Government will undertake such increases in 1 year but we estimate that it could be done gradually, provided there is political will given the economic situation, over a 2 year period, This increase will have a political cost for the Government (whatever the political party is in Office) that needs to be addressed, as this political cost might provoke that the Government delays (once again) taking the decision about when the deficit situation is managed and solved"[368]*

526.    Firstly, the Government of Spain, in line with what Pöyry noted, increased the tariffs that Spanish consumers and industry pay. We should recall that between 2007 and 2014 the price of electricity increased by 61.81% in Spanish households.

---

[367] Ibid.
[368] Current and Future Trends in the Spanish Solar System". Pöyry November 2008. Edition. Page 114 C-202



*Fuente: datos obtenidos de Eurostat.*

527.    This meant that Spain in 2014 was the country with the fourth most expensive electricity in the eurozone at the domestic consumer level and the fifth in relation to industrial consumers[369]. An increase that took place in a scenario of a strong economic crisis.

528.    The strong increase in regulated tariffs paid by consumers helped to alleviate the effects of the tariff deficit. Nonetheless, the increase in tariffs was not sufficient and could not be the only instrument in a scenario of strong economic crisis to confront the tariff deficit. The attached table shows the evolution of the costs of the system and the evolution of the tariffs paid by Spanish electricity consumers:[370]



**Figure 6.c - Evolution of the tariff deficit in the Spanish electricity system**

*Source: publicly available information (data 2000-2012 extracted from www.energiaysociedad.es, data from 2013-2015 obtained from press releases)*

---

[369] Accuracy, First Economic report on the Claimant and its claim, pag. 99.
[370] Accuracy, Second Report on the Claimants' Claim, pag. 77.

529.    It is true that the Claimants could have considered that achieving the objective of the deficit *ex ante* set in RD-L 6/2009 for 2013 could be postponed. However, we must remember that the Kingdom of Spain in 2012 signed the so-called Memorandum of Understanding with the European Union.

530.    The Kingdom of Spain, in 2012, signed the so-called *Memorandum of Understanding* with the European Union on 20 July 2012, as a result of the need to make an adjustment in the framework of the financial crisis[371]. The *Memorandum* links the financial contributions with the adoption by the Kingdom of Spain of a set of macroeconomic control measures to resolve structural imbalances in the Spanish economy[372]. Among such *structural reforms,* the *Memorandum* explicitly mentions the need to:

> *"address the electricity tariff deficit in a comprehensive way"* (Emphasis added).

531.    The signing of the Memorandum of Understanding prevented delaying beyond 2013 the problem of the tariff deficit.

532.    The Kingdom of Spain adopted, along with measures related to this arbitration, another plurality of measures to increase the income of the System and reduce the costs thereof. These measures were set out in our Counter-Memorial[373], but for the Claimants they went unnoticed.

533.    On the income side, it was agreed to feed the SES with the sums deriving from the collection of the public revenues referred to in Act 15/2012. This measure represented an exception to the principle of the self-financing of the SES, based on the aim of promoting the development of Renewable Energies[374].

---

[371] Memorandum of Understanding signed with the European Union on 20 July 2012, R-0105.

[372] Memorandum of Understanding signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform:*

29. There is a close relationship between macroeconomic imbalances, public finances and financial sector soundness. Hence, [...], with a view to correcting any macroeconomic imbalances as identified within the framework of the European semester, will be regularly and closely monitored in parallel with the formal review process as envisioned in this MoU. [...]

31. Regarding **structural reforms**, the Spanish authorities **are committed** to implement the country-specific recommendations in the context of the European Semester. These reforms aim at **correcting macroeconomic imbalances,** as identified in the in-depth review under the Macroeconomic Imbalance Procedure (MIP). In particular, these recommendations invite Spain to: [...] 6) [...] address **the electricity tariff deficit in a comprehensive way**." (emphasis added) RL-0091.

[373] Counter-Memorial par. 663 to 680.

[374] Additional fifth provision of Act 17/2012, of 27 December, on the General State Budget for 2013:
"*Five. Contributions to the Financing of the Electricity Sector*
*1. In the General State Budget Laws for each year, in order to finance the costs of the electricity system stipulated in the Electricity Sector Act, **referring to promoting renewable energy,** an amount equal to the sum of the following shall be allocated:*
a) *The estimate of the annual collection derived from taxations included in the Act of fiscal measures for energy sustainability [Act 15/2012].*
b) *90% of the estimated revenue from the auctioning of emission rights for greenhouse gases, with a maximum of € 450 million.*

534.    The measures to increase the revenues of the SES were linked to important measures to reduce the costs of the SES. Apart from the costs involved in the premiums on renewables, all the SES costs were reduced, in line with the recommendations made by the CNE on 7 March 2012, to adapt them to the new economic scenarios arising from the crisis[375].

535.    In such a situation, a number of measures were carried out aimed at reducing the costs of the SES about which the Claimants have nothing to say. The measures in question did not exist as far as they were concerned:

    1) Spain suspended the commissioning of new pre-assigned renewable energy[376]

    2) The regulated remunerations of the activities of transport and distribution were reduced[377],

    3) The remunerations of production were reduced in non-peninsular systems[378],

    4) The so-called capacity payments were reduced[379],

    5) The costs of the non-interruption system were reduced[380],

    6) The supply certainty restriction procedure was removed, which subsidised the operation of coal-fired power stations[381].

**(3)      Subjective Expectations of the Claimants**

**(3.1)    Absence of legal due diligence and disregard of the legal interpretation of case law**

536.    The Claimants indicate that the source of their Legitimate Expectations when they invested in Spain in 2011 was found in an alleged regulatory "*stabilisation clause*" contained in Art. 44(3) of RD 661/2007, reinforced by RD-Act 6/2009 and, above all, in RD 1614/2010, which prevented any alteration to the economic regime of the RE producers throughout the operational life of the Termosol plants. The Claimants highlight throughout their pleading that their expectations included the non-adoption of retroactive measures on the plants in which they invested.

537.    However, the Claimants have not been willing to produce their Due Diligence on the Spanish legal regulatory framework in 2011, even though, according to them, they have that legal Due Diligence available.

---

*2. 10% of the estimated revenue from the auctioning of emission rights for greenhouse gases, with a maximum of € 50 million, is set aside for the policy of combating climate change."* (emphasis added). R-0105.
[375] Counter-Memorial, paragraph 381.
[376] RD-Act 1/2012, of 27 January, regulating the suspension of proceedings for remuneration pre-assignment and the removal of economic incentives for new installations of electricity production from co-generation, renewable energy sources and waste. R-0096.
[377] Counter-Memorial, par. 407-409
[378] Counter-Memorial, par. 410-412.
[379] Counter-Memorial, par. 413-415.
[380] Counter-Memorial, par. 416-417
[381] Counter-Memorial, par. 418.

538.    The only report that they have provided is that by the consultancy firm Pöyry from 2008, so often mentioned in this document. The 2008 Pöyry Report warned NextEra of (1) the effects that the increase in the tariff deficit might have, and (2) the Government's commitment to provide a Reasonable rate of return through subsidies. The Pöyry report does not contain a single mention of the existence of any stabilisation clause in RD 661/2007. Nor does this report state that the tariffs and premiums of RD 661/2007 are guaranteed throughout the life of the facilities.

539.    The Claimants hold that NextEra does not need to provide in this procedure any legal Due Diligence because it has specific promises of freezing given by representatives of the Government of Spain, as well as two decisions from the DGPEyM of 28 December 2010 addressed to the Termosol plants where it clearly specifies what the remuneration regime will be that will apply to these facilities throughout their whole lifespan.

540.    However, the actions taken by NextEra show that it never believed the existence either of promises or guarantees of freezing, as was highlighted in the Counter-Memorial and as we shall demonstrate later.

**(3.2)    The contested measures are not retroactive.**

541.    The Claimants try to give the Arbitral Tribunal a distorted view of the contested measures, repeatedly describing them as "*retroactive*" throughout the Reply on the Merits[382]. That is to say, it attempts to legitimise its position based on how shocking it would be to adopt possible "*retroactive*" measures towards an investor. In its theory, the Claimants make a basic, concept-based error: for a rule to be retroactive it must affect *acquired rights*.

542.    As has already been shown in the Counter-Memorial, the Claimants have never had an "*acquired right*" to future remuneration *sine die*, through a fixed and immovable FIT. As the Kingdom of Spain has shown, the reform contained in RDL 9/2013 is only effective in the future, without affecting *acquired rights.*

543.    It is, therefore, highly relevant to note that when the Claimants use the term "*retroactivity*", they do so with the aim of distorting reality to confuse the Tribunal. This misleading and obstinate intention is evident as, throughout the over 300 pages of its Memorials, they have been unable to quote even a single international arbitration precedent that supports its theory, as they do not exist. Furthermore, the ones that do refer to this question discount the Claimants' theory.

544.    The fact that the existing arbitration precedents negate the Claimants' theory should be taken into account when evaluating the Claimants' temerity or its will to distort reality before the Arbitral Tribunal. Furthermore, this will to mislead is even more apparent when one of the existing Precedents has already examined the Spanish regulatory framework since RD 661/2007.

---

[382] Reply on the Merits, among others, par. 232, 280, 291, 350, 351, 352, 353, 354, 355, 356, 357, 358, 359.

545.    In order to clarify that the contested measures are not retroactive, the Respondent will duly prove that said measures:

(i) they are not retroactive in accordance with the parameters of international law;

(ii) they are not retroactive, as a proven fact, under Spain's domestic law,

(iii) they are not retroactive according to case law or for diligent investors such as Iberdrola.

(iv) the Claimants knew that the contested measures are not retroactive, as the Reports by the CNE from 2007 and 2008, as well as that of the General Attorney's Office in 2007, which they themselves invoke, expressly warned them that it could introduce future reforms on existing installations.

546.    The accreditation of these circumstances shall reveal that a diligent and sophisticated investor could and should have anticipated that, in the future, some reforms could be introduced involving already existing installations. These circumstances will also substantiate the Claimants' stubborn will to distort reality before the Arbitral Tribunal.

**The contested measures are not retroactive in accordance with the arbitration precedents and international law.**

547.    What the Claimants call *"retroactivity"* is not such thing, according to international case-law. The case *Nations Energy v. Panama* is particularly illustrative. On that occasion the Court examined the concept of *retroactivity* within the protection against unlawful expropriation that the BIT granted:

*"The Arbitral Tribunal does not share this theory and considers that Act 6 **does not have a retroactive nature because it does not have the effect of revoking acquired rights** and applies only to the future.[...]*

*Said requirements only apply to the future, and cannot have the effect of retroactively cancelling or reducing deductions already made in relation to income tax for previous years. [...]*

*In fact, the Claimants are **confusing** the principle of non-retroactivity with that of the immediate effect of the new Act for the future. Act 6 does not have the effect of retroactively cancelling acquired rights but rather that of modifying the conditions in which the holders of tax credit that has not yet been used may use this in the future."* [383] (emphasis added)

548.    This Award expresses the established principle in International Law of *Acquired Rights*. If the acquired rights are damaged or eliminated by a rule subsequent to the acquisition thereof, then this rule is retroactive. This is different from rules that apply to *future facts* in relation to legal situations in progress, but which do not affect *rights already acquired*.

---

[383] Case *Nations Energy Inc. and others v. the Republic of Panama* (ICSID Case No. ARB/06/19) par. 642, 644, 646 RL-0069.

549.    RD-Act 9/2013 respects the remuneration received by the installations before it came into effect, and so the new remuneration system only has future effects[384]. For the new regime to retroactively affect the levels of profitability received in accordance with RD 661/2007, it should have ordered the reimbursement of the excess payments made by Spain prior to RD-Act 9/2013. Therefore, the new regime's effects are projected in the future, not towards rights already acquired, such as profitabilities already paid.

550.    In effect, the legislator has modified the remuneration regime of the installations establishing a Reasonable rate of return for the useful activity of the installation. This remuneration makes it possible to take into consideration the remunerations already received from the facility commissioning date, for the purpose of <u>calculating the future subsidies</u> to be received outside the market, without incurring in retroactivity.

551.    In other words, Art. 30.4 of LSE guarantees remuneration alongside the market income. This remuneration or premium ensures that the investor, throughout the useful life of the installation, recovers its investment (investment cost), covers its running costs (operational costs) and obtains a Reasonable rate of return. The parameters established by the new remuneration system perform a calculation for each standard facility of both costs and set the subsidies to be received from its entry into effect to guarantee the Reasonable rate of return. The payment of remuneration under the new system, is deployed in the future, respecting the payments made prior to the entry into force. In this case, to establish future remuneration it is evident that the part of the Investment costs and Operational costs that have already been compensated via the payments previously made cannot be overlooked. Otherwise, this would result in double payments or compensation. There is not, therefore, the retroactivity that is invoked in contrast.

552.    Notable is the Award of the case Charanne v. the Kingdom of Spain that confirms the reasoning of the Nations Energy v. Panama Case when it states:

> *"the current situation is very different from the situation addressed in the award CMS v. Argentina, in which the subject was the breach of contractual commitments. In the present case, there is no such commitment. Herein we must assess <u>to what extent the State can modify, with immediate effect, generally applicable regulatory provisions</u>.*
>
> *In fact, the Claimants' argument of retroactivity is no more than a different <u>formulation of the argument according to which the State did not have the possibility of altering the regulatory framework that benefited the Claimants' plants in any way.</u> [...] In fact, such an approach would amount <u>to freeze the regulatory framework,</u> limiting any change of the regulation to new generation plants that would settle after such changes."*[385] *(Emphasis added)*

---

[384] This is clearly stated in the Third Final Provision.4 of the LSE 2013: *"Under no circumstances can there be a claim of the remuneration received by the energy produced prior to 14 July 2013 from the new remuneration model, even if it is stated that on that date this return may have been exceeded."* Act 24/2013, of 26 December, on the Electricity Sector. Final provision Three.4. R-0037.

[385] Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain (SCC v. 062/2012), Final Award, 21 January 2016, and individual opinion, par. 545 and 546, RL-0088.

553.    In this paragraph the Final Award accepts an evident consequence: the concept of retroactivity that the Claimants propose is really that of the petrification of the rules *sine die*, with regards to subsidies that are not paid by a single payment but through periodical payments over the whole of the lifespan of the installation. This petrification would be contrary to the objective and aims of the ECT.

554.    In effect, it is worth recalling that there are different degrees for distinguishing the retroactivity of the legal regulations. Far from carrying out a purely theoretical analysis, we shall refer to the specific object of this arbitration proceeding.

555.    The Claimants accept that the rules relating to RE can be modified, but they deny that this modification may affect the RE Plants commissioned with RD 661/2007. In reality, what they claim is the indefinite petrification of RD 661/2007 in favour of RE plants. This freezing of the legal framework is contrary to the objective and aim of the ECT. As we shall set out below, the ECT Guide expressly allows the adoption of macroeconomic control measures, even if this entails a loss of profits for investors. Furthermore, this potential petrification or freezing in favour of some particular plants is expressly denied in the Charanne Case, as has just been stated[386].

556.    Having discounted the position maintained by the Claimants, it is possible to apply temporarily the rules relating to RE in what is known as a <u>moderate retroactivity.</u> In accordance with this degree of retroactivity, the rule applies to legal situations that originated before it came into effect but only with regards to future effects (after the entrance into effect of the rule).

557.    This retroactivity is not prohibited under international law, as the precedent of Nations Energy v. Panama. This arbitration case law has been confirmed by the Charanne Case. However, this is the standard for retroactivity in accordance with international law that must be considered with regards to the contested measures, that are applied in the future or already existing situations <u>without affecting acquired and consolidated rights</u>.

558.    The Respondent has already proven that the Claimant does not have an acquired right that is affected by the new regulation. The arbitration precedent also reached this conclusion regarding the measures that affected Charanne in 2010:

> *"It is undisputed that the 2010 regulations <u>applied immediately, from their entry into force, to the plants already in operation, and that **they did not apply retroactively** to previous time periods</u>. The Arbitral Tribunal considers that there is <u>no principle of International Law</u> prohibiting a State to take regulatory measures with immediate effect in situations in progress except when there are specific commitments as those resulting from a contract **which prohibits a State from taking regulatory measures with immediate effect regarding situations in progress"*.[387] (emphasis added)

559.    The arbitration precedents set out are fully applicable to the present case, when the contested measures are applied going forward to legal situations that are ongoing but do not

---

[386] Ibid. par. 546.
[387] Ibid. par. 548.

affect already acquired rights. Consequently, it must be concluded that, pursuant to international case-law, the concept of retroactivity prohibited under international law does not apply to the contested measures.

**The contested measures are neither retroactive, as a proven FACT, in accordance with Spanish domestic legislation or under EU law.**

560.   The Supreme Court and the Council of State have ratified the legality of those legislative changes which, without affecting acquired rights, are applied to the future.[388] This Doctrine is the same as that applied by international arbitral Precedents.

561.   The Spanish Constitutional Court has examined the measures adopted based on RD-Act 9/2013 and ruled that they are not retroactive as their effectiveness applies *to the future*, without affecting *acquired rights*. In this regard, the Judgement of 17 December 2015 stated in an enlightening way that:

> *"Non-retroactivity is only applicable to the consolidated rights, assumed and integrated in the subject's equity and not to that pending, futures, conditioned and expected [...]*
>
> *The provisions that, lacking ablative or derogatory effects to the past, deploy their immediate effectiveness to the future even if this entails influencing a relationship or legal situation still in progress do not fall within the scope of the prohibited retroactivity. [...] There is no forbidden retroactivity when a regulation governs pro future the legal situations created prior to its entry into force or whose effects have not been consummated"[389]* (emphasis added)

562.   Two subsequent Rulings of the Spanish Constitutional Court, dated 18 February 2016[390] upheld this Decision.

563.   As a consequence of this Constitutional Court case-law, recent judgements by the Supreme Court of 2016 have expressly confirmed that the reform implemented by the contested measures is not retroactive. This retroactivity was maintained by the appellants. Nonetheless, the Supreme Court has rejected this claim in various judgements rendered[391]. The Judgement of the Spanish Supreme Court no. 1260/2016 of 1 June 2016 establishes that:

> *The modification to the expected reasonable rate of return for the lifespan of an installation [...] only affects the overall calculation of the profitability that the owners*

---

[388] Judgements of the Supreme Court of 09 December 2009. Document R-0002. The opinion of the Standing Committee of the Council of State 937/2013, of 12 September 2013 is also cited and set out. General Comment VI, document R-0144.

[389] Constitutional Court ruling of 17 December 2015, delivered in an appeal of unconstitutionality 5347/2013. R-0056.

[390] Judgement of the Constitutional Court of 18 February 2016, issued in the appeal of unconstitutionality 5852/2013 R-0072 and Judgement of the Constitutional Court of 18 February 2016, issued in the appeal of unconstitutionality 6031/2013. R-0272.

[391] Judgements of the Spanish Supreme Court nos. 1260/2016, of 1 June 2016 (R-0337), 1266/2016, of 1 June 2016 (R-0338), 1259/2016, of 1 June 2016 (R-0339), 1261/2016, of 1 June 2016 (R-0340), 1264/2016, of 1 June 2016 (R-0341),

*of these installations are entitled to receive <u>without any effect on the amounts received in the past</u>. The contrary would involve recognising the consolidated right to receive a given profitability in the future as well. This possibility <u>would involve petrifying the already existing remuneration regime</u>, something that has been <u>expressly rejected</u> by this Court and by the Constitutional Court in judgements cited [...]"[392](Emphasis added)*

564.   In its reasonings, the Supreme Court examines the lack of retroactivity as the remunerations already received in the subsidies that will be paid by the Respondent in the future are taken into account:

> *"the legislator has modified the remuneration regime of such installations establishing a Reasonable rate of return for the useful activity of the installation as a whole, making it possible to take into account the remunerations already received since its commissioning, for the purposes of calculating the remuneration that it is entitled to receive outside the market, without this being prohibited retroactivity."[393]*

565.   The attention of the Arbitral Tribunal is drawn to another significant fact. This reasoning by the Spanish Supreme Court is fully coherent with EU law, since if the subsidies already received in the past were not taken into account in the calculation of future subsidies, excess remuneration for the plants could occur, thus distorting the market rules comprising illegal State Aid, with an infraction of EU Law.

566.   As explained in the previous paragraph, the payment of the remuneration under the new system, is deployed in the future, respecting the payments made prior to the entry into force. However, future remuneration cannot overlook the part of the Investment costs and Operational costs that have already been compensated via the payments previously made. Otherwise, this would result in double payments or compensation. The Claimants intend that the contested measures be declared to be retroactive as they take into account previous subsidies to calculate future subsidies. This theory involves overlooking the EU's State Aid regime that is fully applicable to the Claimant's investments in Spain. When taking into account past remunerations in future subsidies, the contested measures avoid the existence of possible over-remuneration that distort the market. This thereby avoids their being declared to be illegal State Aid and, consequently, avoids the possible obligation to have to return the subsidies received or to be received by the owners of the RE plants.

567.   It must therefore be concluded that as a FACT proven in this Arbitration, the contested measures are not retroactive under Domestic law nor under EU law as they do not affect the rights acquired by the investors.

**The measures have not been considered to be "retroactive" by RE Sector Associations and by other Investors, including Sener, the Claimant's partner.**

568.   The possibility of adopting measures going forward that affect the existing installations was known and even claimed publicly by a diligent investor such as Iberdrola. In 2012 Iberdrola requested a cut in the RE premiums because of the unsustainability of the system:

---

[392] Judgement of the Spanish Supreme Court no. 1260/2016 of 1 June 2016, pages 14 and 15 R-0337.
[393] Judgement of the Spanish Supreme Court no. 1260/2016 of 1 June 2016, page 15 R-0337.

*"Sánchez Galán also insisted that the Supreme Court upholds possible cuts in premiums for renewables and believes the review of this matter to be "logical" in the current economic crisis. "The judgements and legislation talk about **Reasonable Return**. In the **United States**[394], this is called retributive **adjustment, and not retroactivity**", he said.*

*If the new circumstances [of economic downturn] mean adjustments in all productive sectors, it is not reasonable that these are not extended to renewables when faced with a situation of widespread economic crisis and tariff deficit", he said.[395] (emphasis added)*

569.    From Iberdrola's Statements, it is clearly deduced that their understanding of the concept of "*retroactivity*" is not similar to that of the Claimants. The Tribunal's attention is drawn to the fact that the aforementioned company identifies the concept of *"retributive adjustment"* in the regulatory framework of the United States of America with the concept used by the Claimants when talking about "retroactivity". Iberdrola knows that a reform that affects existing installations is not prohibited under international law when the new rules do not affect "*acquired rights*". Iberdrola expressly stated the following in this regard on another occasion:

*"Premiums and retroactivity: Everything is modifiable. The only thing is that assurance must be given that the facility will have Reasonable Return. But this does not mean that the profitability has to be the cost of capital multiplied two or three times [as it would be with the current premium scheme]"[396].*

570.    A diligent investor would be perfectly aware of the possible adoption of future measures. The same diligence can be required of the Claimants. Nonetheless, it has been established that the Claimants never requested a legal due diligence on this question.

571.    This is even more surprising when the construction firm of the Termosol Plants, SENER, considered admissible the reforms that also respected Reasonable Return. In an article published in the Spanish press while RD 661/2007 was in force, the Chairman of SENER, Mr Jorge Sendagorta publicly argued that:

*"there is another <u>key idea</u> that has to be taken into account, that of " <u>Reasonable Return</u>", laid-down by the Electricity Act as the basis for the Government to set the*

---

[394] Iberdrola operates in the energy market of the United States of America, with over 5,000 MW in 2011 and a market share of 10%: "*Iberdrola. The electricity company exceeds 5,000 MW of capacity in the US* "News from the financial newspaper Cinco Días, dated 17 October 2011, available at: http://cincodias.com/cincodias/2011/10/17/empresas/1318858780_850215.html. R-0311.

[395] *"Iberdrola warns the Government: the "tax collection" measures will cut investment and damage income"* News published by the Online Financial Newspaper "Expansión.com, on 25 July 2012, available at: <u>http://www.expansion.com/2012/07/25/empresas/energia/1343212765.html</u> R-02312.

[396] *"Iberdrola demands premiums for renewables stop: "Every month that passes, the bubble gets bigger".* News published on the Digital Newspaper Libremercado.es on 23 February 2012, available at: <u>http://www.libremercado.com/2012-02-23/iberdrola-exige-detener-la-construccion-de-nuevas-plantas-de-renovables-1276451004/.</u> R-0310

> *remuneration for new energies. **Reasonable Return must, therefore, be a limit for any solution adopted**, and it does not leave much room for manoeuvre."[397]*

572.    Furthermore, the most representative association of the whole wind sector, with 95% of interested parties, after the alleged agreement of July 2010 also argued for this possibility. It should be recalled that the Wind Sector is Spain's most significant RE production sector, and so its significance for the purposes of proving the representativeness of the RE sector is clear. AEE stated in September 2010 that

> *the Supreme Court has [recognised] a **relatively broad margin** for the Administration's "ius variandi" in a regulated sector in which general interests are involved. However, [...] the **case law** established **limits** to the Administration's "ius variandi" regarding the **retroactive modification** of that remuneration framework, especially "that the requirements of the Electricity Sector Law **are respected** regarding the investments' **Reasonable Return".** Moreover, a breach of the principle of legal certainty for a retroactive rule "can only be settled case by case".[398] (Emphasis added and footnotes omitted).*

573.    Therefore, this Association from the Renewable Sector is perfectly aware of the possibility of modifying in the future the regulatory framework so long as "*the Reasonable Return of investments is respected*". And it expressly accepts that it is the Supreme Court that decides on a case-by-case basis whether or not there is retroactivity. As we have explained, it is a proven FACT that the contested measures are not retroactive according to the Spanish Supreme Court.

**The Claimants knew the possible scope of the contested measures, as it was expressly warned before its investment in 2007 and 2008.**

574.    Having shown that neither the Precedents from International Law, nor Spanish Domestic Law, nor sophisticated investors in RE in Spain support the Claimants' theory, we shall now highlight another fact omitted by the Claimants that shows their will to confuse the Arbitral Tribunal.

575.    The Claimants omit any reference to the case law of the TS described in the Counter-Memorial and seek to divert the attention of the Court to judgments that have nothing to do with the facts of this case. The case law mentioned in our Counter-Memorial also considered the alleged retroactivity of the reforms in the energy sector. The Claimants knew of the existence of this case law through the emails sent by Joana Sánchez.[399] Nor does it

---

[397] Press article "Tariff deficit, retroactivity and Reasonable Return" signed by Mr Jorge Sendagorta, Chairman of SENER, and published in:
-    The financial newspaper "Expansión" on 19/7/2012:
     http://www.expansion.com/2012/07/19/opinion/tribunas/1342729151.html R-0345.
-    The thermosolar sector's digital newspaper "Helio Noticias" on 22/7/2012:
     http://www.helionoticias.es/noticia.php?id_not=813 R-0344.
[398]    AEE claims to the CNE during the Spanish National Energy Commission hearing process on the Proposed RD 1614/2010 which regulates and modifies certain aspects of the special regime. Page 6. R-0251.
[399]    Email of 21 April 2010 (R-0396) and mail of 30 April 2010 (R-0397) attaching translation of the APPA report (R-0398).

appear to be proven that the Claimants examined this case law or requested legal due diligence on the possible reforms to be adopted under the essential Regulatory Framework.

576.    The Claimants continuously rely on the opinion of the CNE, even though Pöyry had already expressly and clearly warned it in 2008 that the CNE was only a body that advised the Government and therefore only a "*consultative*"[400] body. However, even hiding the case law of the Spanish Supreme Court and the Spanish Constitutional Court, a minimally diligent investor would know of their case law regarding retroactivity from a simple reading of the CNE Reports that the Claimants now invoke. We shall restrict ourselves to stating what the CNE set out in the Reports that the Claimant has produced and invoked in 2007 and 2008, from which it can clearly be deduced that the adoption of measures going forward affecting current installations was fully possible:

**1. C-21: Report 3/2007 CNE on Draft RD 661/2007** (pp. 17 to 20).

577.    In the CNE's final report of 14 February 2007, the CNE included the existing general Case Law:

> "6.- *LEGAL CONSIDERATIONS RELATING TO THE IMPROPER RETROACTIVITY OF PROPOSED ROYAL DECREE.*
>
> [...] "*As has been shown by both scientific doctrine and* **case law,** *in a social and democratic state subject to the rule of law, the principles of legal certainty and the protection of legitimate expectations cannot be put forward as insurmountable obstacles to the innovation of the legal system,* <u>*nor can they therefore serve as instruments to be used to freeze the Law in force at a given point in time. In other words: the principle of legal certainty [...] does not mean that the system is resistant or immune to its reform. In this sense, these principles do not prevent the* **dynamic innovation** *of such system, nor do they prevent* **new regulatory provisions from being applied in the future to pre-existing situations**</u>*, but which continue to be present on the entry into force of the new regulations*"[401] (emphasis added)

578.    Nonetheless, the majority of the Administrative Board stated the "*retroactive*" nature of the Proposal of RD 661/2007, as it affects already existing installations:

> "*The proposed RD subject to this report, which will be in force until the end of 2010, is equipped with retroactivity, as it aims to be applied not only to the productive assets to be installed from its entry into force, but also to those already installed since the promulgation of RD 436/2004.*"[402]

579.    As has been proven, the CNE is a *consultative* body, whose reports are not binding on the Government. In fact, following this report that affirmed the "retroactive" character of RD 661/2007, any investor could, nonetheless, verify that RD 661/2007 had been approved.

---

[400] Document C-202, page 29: "*The CNE (regulator) and IDAE <u>advise the Government</u> on the economic and technical viability of the different technologies and <u>helps the Government</u> to set the tariffs in order to provide the promoters with an acceptable IRR*."
[401] Document C-21, p. 21 of the PDF.
[402] Ibid. page 22

That is to say, that it affected installations that were already in operation. The Claimants who have invoked this Document C-21 therefore knew, even though the CNE considered the Draft RD 661/2007 to be "*retroactive*", that this RD 661/2007 had finally been approved by the Government.

580.    This consideration was also set out by the RE Sector Associations. The Spanish Wind Energy Association confirmed in its 2007 Annual Report that RD 661/2007 annulled the non-retroactivity of revisions in the future[403]. The surprising thing is that with this significant question already having been raised in 2007, the Claimants never requested legal Due Diligence.

**2. C-135: CNE Report no. 30/2008, of 29 July 2008** (p. 9):

581.    The Claimants, without any legal Due Diligence on the previous Report also did not request any clarification or any Report following Report 30/2008 concerning the potential future reform of the legal regime, on existing installations launched before it came into effect:

> "*these principles do not prevent the dynamic innovation of such system, nor do they prevent new regulatory provisions from being applied in the future to situations already initiated before it came into effect.*"[404]

582.    Nor is there any record that the Claimants requested any legal Due Diligence to clarify this important question raised by the CNE, especially given the Fifth Additional Provision of RD 1578/2008[405]. No request for clarification of any type appears, either because the Claimants were already aware of the possibility of future modification or because they were not diligent in their exhaustive examination of the Spanish regulatory framework.

**3. C-210.- Report of the General Attorney's Office of 29 March 2007 on the alleged retroactivity of RD 661/2007 regarding RD 436/2004**

583.    The Claimants provide this report to show that the General Attorney's Office concluded that the change introduced by RD 661/2007, with retroactive effect, did not harm of the rights of the investors by introducing a transitional regime. However, the Claimants omit to tell the Court that this conclusion was added in the report "a fortiori" or for greater depth. In fact, all the considerations previously introduced by the report reinforce the possibility of modifying the remunerative regime of the existing facilities:

---

[403] Eólica 2007, Annual Report of the Spanish Wind Energy Association, page 35: "*The new Decree removes the incentive to participate in the electricity market and **annuls the non-retroactivity of this revision and of future revisions** concerning premiums and remuneration supplements, thereby **applying universally to all installations regardless of when they are commissioned**. The proposal also entails a high level of uncertainty with regard to the indices for the annual updating of all parameters. R-0342.*

[404] Section C-175, page 9

[405] RD 1578/2008, of 26 September, Fifth Additional Provision "*Modification to remuneration for production of electricity using photovoltaic energy:* "*During 2012, in view of the technological evolution of the sector and the market, and the operation of the remuneration regime, the remuneration for the production of electricity from photovoltaic solar technology can be modified.*" R-0148.

*"In this regard, in this case, following the theory of types of retroactivity, by analysing the different levels or degrees, according to the most authoritative civil law scholars (…), endorsed by the doctrine of the Supreme Court (…), the retroactivity -it must be reiterated- can be classified or ordered into three degrees or classes: maximum, medium and minimum degree.*

*The maximum degree applies the new rule to the relationship or basic situation created under the operation of the old standard and to all its consummate effects or not; in the middle grade the new rule is applied to the effects arising previously but as yet unconsummated or exhausted; and in the retroactivity of the minimum degree, the new regulation only has effects in the future although the relationship or basic situation has arisen under the previous standard.*

*It can be seen therefore that it is this minimum retroactivity which bundles the effects expected in the reform of RD 436/2004, in the aspect now studied.*

*Indeed, <u>the regulatory measure does not affect the economic effects already produced, nor those arising previously but yet unconsummated or exhausted, it does affect, in turn, the economic effects which will occur in the future with respect to the facilities that have arisen under the operation of the rule to be modified.</u>*

*This minimum retroactivity, which as we say is intended to bundle situations (not effects) occurring previously to the standard itself, is accepted peacefully since it involves -we repeat- an improper retroactivity, in which the regulation impinges on situations or current unfinished legal relations (again SSTC 42/1986, 99/1987, 227/1988, 210/1990 and 182/1997, among others, and SSTS of 18 March 1995 and 15 April 1997, among many others) which is the case now analysed.*

*With these data, it must be rejected from the outset that we are dealing with a retroactivity which has been classified as "full" or "true". The regulation attributes future legal effects to events (sale of energy) that have not yet occurred.*

*It seems, therefore, that in this type of improper retroactivity, the legal certainty is not affected, since as we have mentioned the legal certainty (STC 182/1997) is not an absolute value, otherwise the freezing of legislation would occur, nor can it be understood as a right of citizens to maintain a certain regime."* [406]

584.    The Claimants, who were aware of these reports, knew the risk that future regulations could affect future events (sale of non-produced energy). Despite this risk of future reforms being applied to existing plants, NextEra made investments in 2011, after checking that both RD 436/2004, RD 661/2007, RD 1578/2008, RD-Act 6/2009, RD 1614/2010 and RD-Act 14/2010 were applied, all of them, *pro futuro* to already existing facilities.

585.    Throughout the facts set out it has been proven that the pleadings regarding retroactivity that the Claimant continuously makes have no basis whatsoever, neither in the field of International Law, nor as a proven FACT, in the field of Spanish Law. Furthermore, what has been proven is that the Claimants knew from the Documentation provided that the Spanish Regulatory Framework, while respecting acquired rights, could establish reforms going forwards that are applicable to pre-existing situations such as plants in operation.

---

[406] Report of the General Attorney's Office in the Ministry of Industry of 29 March 2007. C-210

**(3.3)    Article 44 (3) of RD 661/2007**

586.    The Claimant claims that Article 44 (3) of RD 661/2007 is a standard regulatory stabilisation clause freezing each and every one of the rules contained in that Regulation concerning installations in operation.

587.    The theory of the Claimant is incorrect for various reasons, which will now be described separately: (a) due to the literal text of the norms cited; (b) because all regulatory precepts are subordinate to the Law; (c) because regulatory and case law antecedents maintained the contrary theses; (d) because Pöyry warned the Claimants that Art. 44(3) was not a stabilisation Clause; (e) because the Claimants could verify prior to the investment that the Kingdom of Spain had already adopted regulatory measures that affected RD 661/2007 and that its Article 44(3) was not an obstacle to this; (f) because Previous Arbitration has considered that Article 44(3) does not imply a stabilisation Clause; and g) because the contracts signed by the PTEs highlight that NextEra did not believe of the existence in article 44(3) of RD 661/2007 of a stabilisation clause.

**(a)    The wording of Article 44(3) RD 661/2007 opposes the theory of Claimants**

588.    The Claimants assert that Article 44(3) contains a clear and accurate stabilisation Clause which prevented *any* modification of the FIT from being applied to installations in operation[407].

589.    From the literal wording of said articles, no diligent and exhaustive investor can infer the existence of a stabilisation Clause that freezing the Spanish regulatory framework for an indefinite period for *"any"* revision. Article 44(3) establishes that:

> *"The revisions **referred to in this section** of the regulated tariff and the upper and lower limits will not affect facilities whose commissioning certificate was granted before 1 January of the second year following the year in which the review was conducted."[408] (emphasis added)*

590.    The Article does not refer to *"any"* revisions of the regulated tariff and the upper and lower limits. That Article limited its scope exclusively to the revisions provided in *"this section"*. That is, this paragraph of Article 44(3) RD 661/2007 only makes reference to the revisions which necessarily must be performed "in 2010" and to the revisions which must necessarily be made every "four years"[409]. That Article does not say anything else.

---

[407] Statement of Claim, para.56
[408] RD 661/2007, of 25 May, regulating the activity of energy production under the special regime. R-0042.
[409] RD 661/2007, of 25 May, Article 44 (3 paragraph one):  "*3. **During the year 2010**, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, **there shall be a review of the** tariffs, premiums, supplements and lower and upper limits defined in this RD with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact on the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets.*

591.    The attention of the Arbitral Tribunal is drawn to another significant fact. The Claimants claim that Article 44(3) covers "any" review of the tariffs and lower and upper limits, but Article 44(3) of RD 661/2007 is very clear when it says "The revisions referred to in this section".

592.    Any diligent and careful investor which has obtained a legal Due Diligence could have concluded that the wording of paragraph one <u>does not exclude</u> other revisions. This paragraph asserts that there will be <u>mandatory</u> revisions to take advantage of the reductions in the costs inherent to RE technologies. However, it does not exclude other unplanned revisions such as (i) those arising from the adoption of macroeconomic control measures or (ii) to avoid over-remuneration or unreasonable return or (iii) to guarantee the economic sustainability of the SES. In fact, this paragraph 44(3) <u>does not contain</u> anything similar to:

    *"Outside of these mandatory revisions, the tariffs, prizes, (etc.) cannot be reviewed"*

593.    It should be recalled that these types of express commitments were contained in Argentinean legislation on the energy sector. Therefore, any diligent and exhaustive investor in Spain who has requested a legal Due Diligence on this Article 44(3) would have objectively known that, in addition to the mandatory and planned revision of Article 44(3), <u>there may be other different revisions</u>. Revisions which, if they occur, would be exempted from said Article 44(3). However, given the hierarchically binding nature of the Law, these possible revisions must guarantee the <u>Reasonable Return</u> imposed by the Act 54/1997 in all cases. It has already been accredited that this was the objective conception of the <u>Associations</u> of CSP and Wind technologies of the main Association APPA, of the Termosol Plants <u>SENER</u>, of the largest RE investor in Spain (<u>Iberdrola</u>) and of the leading CSP technology companies. In other words, it was something known by any diligent and careful investor in Spain.

594.    In addition to the foregoing, the Claimants' theory is unacceptable since it seeks to freeze the system of choice between premium and tariff, the CPI update or the possibility of producing subsidised energy by burning fossil fuels. No investor conducting a diligent and exhaustive analysis of the regulatory framework could deduce that Article 44(3) is a stabilisation clause with regard to these other matters. Therefore, the freezing of each and every article of 661/2007 with regard to existing facilities, and for an indefinite period, cannot be deduced from the literal wording of this article. If we abide by the literal wording of article 44(3), it only refers to the revisions *"of the regulated tariff and of the upper and lower limits"*. It makes no reference to anything else.

595.    The attention of the Honourable Tribunal is drawn to a significant fact. Said Article 44 (3):

    (i) does not mention either the gas nor Article 2 o RD 661/2007, relative to the conditions of use of the gas in solar thermal power plants;

    (ii) neither does it refer to the update of the CPI;

---

*Subsequently <u>a further review **shall be performed every** four years</u>, maintaining the same criteria as previously*". R-0042.

(iii) neither does it refer to the possibility of introducing tax or other measures that will directly or indirectly impact the profitability of the plants and

(iv) neither does it refer to the freezing of the possibility of choosing between subsidies by means of tariffs or premiums.

596.    In short, Article 44(3) only refers to the mandatory revisions "to which the preceding paragraph refers", not the entire regime of RD 661/2007, as the Claimants seek.

597.    Therefore, it is uncertain that Article 44(3) of RD 661/2007 froze the tariffs applicable to CSP plants against any subsequent modification throughout the operational life of the facilities.

**(b)    The Claimants' theory is contrary to the principle of regulatory hierarchy**

598.    Based on the principle of regulatory hierarchy, there can be no regulatory provision that is contrary to the provisions of the Act. This issue, which was omitted by the Claimants, was widely discussed previously in point III.1.1 of this document.

599.    Consequently, no investor can claim that there is a regulatory provision that would prevent the adoption of measures to ensure the economic sustainability of the SES. If such a regulatory provision existed, it would be contrary to the basic principle on which Act 54/1997 rests: the sustainability of the SES[410]. By legal mandate, the economic regime of the Special Regime is subject to this principle[411], as the subsidies received by SR producers are a cost of the SES[412], which necessarily affects its sustainability.

600.    Similarly, no investor can claim the existence of a regulatory provision that allows for the maintenance of a level of subsidies that generate profitability in excess of that which could be rated as reasonable, according to the capitals market. This interpretation would go against Act 54/1997, which establishes a clear limit for the result that should be produced by the subsidised regime in question, by stating that the market price plus subsidy binomial is aimed at providing a reasonable return, in accordance with the capitals market[413].

**(c)    The regulatory and case law precedents emerging in Spain held the opposite view to that of the Claimant**

601.    Article 44(3) of RD 661/2007 did not represent a new development in the Spanish Regulatory Framework. RD 436/2004[414] contained a similar provision when it stated:

> *"The tariffs, premiums, incentives and supplements resulting from any of the revisions referred to in this section shall apply only to the facilities that become operational after*

---

[410] Counter-Memorial, paragraphs 284 and 285.
[411]  Act 54/1997, of 27 November, on the Electricity Sector. Article 29 R-0003.
[412] Ibid. Article 16 (6).
[413] Ibid. Article 30 (4).
[414] RD 436/2004, of 12 March, establishing the method for the updating and systematisation of the legal and economic regime of the activity of electricity production under the special regime. R-0059.

> *the date of entry into force referred to in the preceding paragraph, without retroactivity to previous tariffs and premiums"[415]*

602.    The Claimants knew that that article did not prevent the introduction of RD 661/2007 before the expiry of the deadline for the first review announced in Article 40 of RD 436/2004, which resulted in a reduction of the profitabilities of the wind plants in operation.

603.    Moreover, this regulatory change resulted in a significant number of judgments of the Supreme Court which endorsed the regulatory changes implemented through a confirmation of the previous jurisprudential pronouncements[416]. In those Judgments, it became clear that a regulatory Article such as the one mentioned was no obstacle to the introduction of regulatory measures, provided that such measures were in accordance with Act 54/1997 and respected the principle of Reasonable Return.

604.    The Claimants also knew that after the approval of RD 661/2007, the Government issued other standards such as RD 1578/2008, RD-Act 6/2009, RD 1614/2010, RD 1565/2010 and RD-Act 14/2010, which affected the remunerations of the already existing facilities despite the wording of Article 44 (3) of RD 661/2007.

**(d)    Arbitration scholars have held that Article 44(3) of RD 661/2007 does not imply a stabilisation clause**

605.    The Claimants' thesis on its subjective expectations is dismantled by what has been declared in an applicable arbitral precedent. the Final Arbitral Award issued in the case *Charanne B.V. and Construction Investments S.A.R.L. v. the Kingdom of Spain*, has established that:

> *"In this case, the Claimants could not have the legitimate expectation that the regulatory framework established by RD 661/2007 and RD 1578/2008 would remain unchanged for the lifetime of their plants. Admitting the existence of such an expectation would, in effect, be equivalent to freeze the regulatory framework applicable to eligible plants, although circumstances may change. Any modification in the amount of the tariff or any limitation of the number of eligible hours would then constitute a violation of international law. In practice, the situation would be the same that if the State had signed a stabilisation clause or adopted a commitment to not modify the regulatory framework. The Arbitral Tribunal cannot support such a conclusion. The Claimants have made very clear that they do not claim to have had the legitimate expectation that the regulatory framework would remain unchanged."[417] (footnotes omitted and emphasis added)*

606.    The Claimants' expectations are the same as those of Charanne BV and Construction Investments:

---

[415] RD 436/2004, of 12 March, establishing the method for the updating and systematisation of the legal and economic regime of the activity of electricity production under the special regime. Article 40.3 R-0059.
[416] Counter-Memorial, paragraph 400 to 406.
[417] Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, para. 503, RL-0088.

    a.   Both assert that a specific commitment could be inferred from RD 661/2007 to freeze or maintain the regime in favour of the Plants installed during its validity[418].

    b.   Both assert that an advertising campaign launched in the Kingdom of Spain created expectations in investors.

    c.   Both assert that this right was blocked in favour of the plants registered in the RAIPRE[419].

    d.   Both claim damages for the amendment of the regime established in RD 661/2007.

    e.   Both consider that the reforms of RD 661/2007 were retroactive.

607.    Therefore, the conclusions of this Final Award, dismissing the subjective expectations of Charanne and Construction Investments are fully applicable to the subjective expectations of the Claimants.

608.    The Claimants consider that the Award of the Charanne Case does not apply to them because they have specific commitments from senior officials of the Government of Spain and because they made their investment after the approval of RD-Act 6/2009 and RD 1614/2010 which, supposedly, reinforced the assurances given by RD 661/2007.

609.    As for the alleged promises of the officials of the Kingdom of Spain, which the Claimants have now reduced to three letters, we shall simply say: a) they are not letters addressed to the Claimants; b) they are letters much prior to the investment of 28 April 2011; c) two of those letters simply highlight the impression that Mr Davidson extracted from his talks with representatives of the Government of Spain, without such impressions being confirmed by their alleged issuers; d) the sole letter from the Secretary of State for Energy was merely talking about the perception of the "economic regime", which cannot be limited to a regulation but rather must be conceived as a whole and e) that the NextEra facts earlier, contemporary and subsequent to these letters show that it never trusted in the existence of such promises.

610.    Having ruled out the existence of specific commitments towards the Claimants, the Charanne Award is fully applicable to this case, since it reasons that Regulations 661/2007 and 1578/2008 (the result of negotiations with the photovoltaic sector) did not involve specific commitments due to the fact of being aimed at a specific target group (renewable energy producers) (par.491-494).

611.    Also, the Award of the Charanne case examines the alleged advertising campaign of InvestSpain invoked by the Claimants and says:

> *"Firstly, the arguments expounded by the Claimants to uphold that Spain carried out an "investment attraction campaign" should be analysed."*[420]

---

[418] Reply on the Merits, paragraphs 282 and 358.

[419] Reply on the Merits, paragraph 272: "*pursuant to the criteria laid down in RDL 6/2009, the relevant installations were pre-registered and then <u>definitively registered with the RAIPRE, thus **locking in their rights under RD 661/2007***</u>." (emphasis added)

612.    After examining the alleged campaign, the Award concludes the following:

> "these documents are not sufficiently specific to give rise to any expectations regarding the fact that RD 661/2007 and RD 1578/2008 were not going to be amended."

613.    Thus, the Award rejects that "the regulatory framework existing at the time of the investment was *capable of creating a legitimate expectation, protected by International Law*, consisting of that it was not going to be amended or altered by rules such as those adopted in 2010." (paragraphs 498 et seq.). In fact, it requires for an investor to be exhaustive in the examination of the regulatory framework in a sector such as the energy sector:

> "*To the Tribunal's understanding, **at the time of making the investment in 2009** the Claimants could have carried out an **analysis of their investment**'s legal framework in Spanish Law and understood that the regulations enacted in 2007 and 2008 could be modified. At least, that is the degree of diligence that could be expected from a foreign investor in a heavily regulated sector like the energy industry. In such a sector, thorough prior **analysis of the legal framework applicable thereto is essential** to make an investment*"[421] (Emphasis added).

614.    As for the Claimants' claim that RD 1614/2010 reinforces the stability commitment of Article 44 (3) with respect to the plants pre-registered in the RAIPRE, we shall return to this point shortly.

**(e)    The Claimants never believed that Article 44(3) of RD 661/2007 contained a tariffs stabilisation clause**

615.    The acts of NextEra itself corroborate that they knew that Article 44 (3) of RD 661/2007 is not a regulatory stabilisation clause.

616.    Indeed, in their Statement of Claim, the Claimants expressly recognised that RD 661/2007 did not offer Nextera sufficient stability[422]. This is also demonstrated in the "Project development agreement" the PTEs signed with Casas de Hitos on 10 December 2007.[423] In this contract, in Appendix I, a series of events are established that must take place under section 2.01 of the contract. Specifically, in paragraph (a), it cites a list of governmental authorisations or approvals for each project. Among them:

---

[420] Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, para. 496, RL-0088.
[421] Ibid. Para. 507.
[422] Statement of Claim, para. 77" By itself, however, RD 661/2007 was not enough to entice the Claimants to take their investment beyond the exploratory stage. Spain had to provide (and did subsequently provide) an express commitment to adhere to the tariffs and premiums being offered thereunder for plants constructed in reliance on RD 661/2007."
[423] It should be noted that the Statement of Claim, in the footnote on page number 41, says that this contract, among others cited in paragraph 33, *"are subject to confidentiality restrictions, and therefore are not attached to this Statement of Claim. Should the Respondent or the Court require copies of the relevant contracts, the Claimants shall make every effort in good faith to provide them"*. However, the Claimant itself has provided all these contracts, except for the "contract of sale of shares" with its expert report. We assume it will have no objection to provide that contract during the production of documents phase.

143

> *"4. Recognition of the Project under group b.l.2 of section 2 the special regime of RD 661/2007, <u>or similar provision under any replacing legislation (hereinafter, "Special Regime"),</u> applicable to <u>thermal-solar</u> energy plants".* (emphasis added)[424]

617.    The contract supports, therefore, that RD 661/2007 can be replaced by any subsequent legislation.

618.    Even after the approval of RD-Act 6/2009, the PTEs continued to protect themselves against regulatory risk, admitting that the rates and premiums of RD 661/2007 could be replaced by others. Indeed, when NextEra had to assume financial commitments with third parties, it expressly admitted possible regulatory changes.  Thus, when on 16 December 2009 it signed major agreements for Engineering Services, Procurement Support and Construction Support with the Spanish engineering company Sener Ingeniería y Sistemas, S.A., it defines the *"Special Tariff"* in clause 1.1 115 as follows:

> *"Special Tariff" means the fixed, regulated tariff set forth for subgroup b.I.2 in Table 3 of Article 36 of the RD 661/2007 as enacted on May 25, 2007, by the Ministry of Industry, Tourism and Commerce (Ministerio de Industria, Turismo y Comercio) of Spain, <u>as such tariff may be revised (including pursuant to article 44 of Real Decreto 661/2007)</u> by the Ministry of Industry, Tourism and Commerce with respect to power plants described in subgroup b.1.2 that (a) have been inscribed in the Registry and (b) are required to obtain definitive inscription in the administrative registry of generation plants under the special regime (RAIPRE) by the date referred to under the written notice from the Spanish administration that the Project has been inscribed in the Registry".[425] (Emphasis added)*

619.    To resolve any doubts that may arise from the interpretation of these contracts, the contracting parties clarify by mutual agreement that (clause 1.2.9):

> *"The use of the Word <u>"including"</u> in this Agreement shall be construed to mean "including without limitation" or "including but not limited to" and shall not be construed to mean that the examples given are an exclusive list of the topics covered"[426] (Emphasis added)*

620.    The Claimants' plants negotiated and signed these contracts. Therefore, they were aware that the "Special Tariff" could be subject to revisions different from those provided for in Article 44 of RD 661/2007. This understanding of the economic regime by both parties to the contract (the PTEs and Sener) fully coincides with the regime that the Kingdom of Spain has demonstrated in this Statement, and with the regime that had been established by the case law of the Supreme Court of the Kingdom of Spain since 2005.

621.    The Claimants are seeking to downplay these contractual clauses in their Reply on the Merits, saying that they are normal risk mitigation clauses. In any case, these provisions

---

[424] Project Development Agreement of 10 December 2007, CLEX-019.
[425] Agreements for Engineering Services, Procurement Support and Construction Support between PTE1 and Sener Ingeniería y Sistemas, S.A., of 16 December 2009, Document C-51, and Agreements for Engineering Services, Procurement Support and Construction Support between PTE2 and Sener Ingeniería y Sistemas, S.A., of 16 December 2009, Document C-52
[426] Idem, clause 1.2.9.

144

demonstrate that the risk that the regulations could change was known by NextEra and that it also sought to protect itself against that risk.

**(3.4)    Article 4 of RD 1614/2010**

622.    The Claimants consider that Article 4 of RD 1614/2010 *"expressly established the tariffs and premiums applicable to those CSP plants which met the requirements of Pre-assignment Registry"* [427]. However, it should be reiterated that this RD 1614/2010 does not contain any stabilisation Clause. An examination of Article 4 requires analysing the following circumstances: (i) the reason for the introduction of Article 4; (ii) the literal wording of Article 4 does not constitute a stabilisation clause; (iii) the introduction of Article 4 resulted in a reduction in the profitability of solar thermal plants based on the necessary economic sustainability of the SES (iv) Following the entry into force of RD 1614/2010 and before the Claimants' investment, the Kingdom of Spain introduced measures that resulted in a reduction in the profitability of solar thermal installations (iv) the Claimants did not consider that article as a stabilisation clause.

**(a)    The reason for the introduction of Article 4 of RD 1614/2010**

623.    As already expounded in the Counter-Memorial,[428] Article 4 of RD 1614/2010 allowed the plants affected by RD-Act 6/2009 to be exonerated from the mandatory inspection envisaged in Article 44.3 RD 661/2007 which, pursuant to said article, should have been applied in 2010.

624.    This mismatch between article 44(3) of RD 661/2007 and RD-Act 6/2009 arises from the fact that the Agreement of the Council of Ministers of 19 November 2009[429] established the staged commissioning of the solar thermal plants registered in the Remuneration Pre-assignment Registry. This staging was introduced, among other measures, by RDL 6/2009[430]. Such staggering was configured into four phases:

- Phase 1 (850 MW): In progress.
- Phase 2 (1,350 MW): Between 1 January 2011 and 31 December 2011.
- Phase 3 (1,850 MW): Between 1 January 2012 and 31 December 2012.
- Phase 4 (Remaining power pursuant to the fifth transitory provision of RDL 6/2009): between 1 January 2013 and 31 December 2013.

625.    This staged commissioning caused the plants in Phase 2, Phase 3 and Phase 4 to be affected by the mandatory periodic revision that was to take place in 2010. The literal wording of 44 (3) RD 661/2007 led to this result. This possibility was especially worrisome

---

[427] Reply on the Merits, para.58
[428] Counter-Memorial, paragraph 593.3
[429] Ruling of 19 November 2009, of the Secretariat of State for Energy, publishing the Spanish Cabinet Meeting Decision of 13 November 2009, proceeding to the management planning of the projects or facilities submitted to the administrative register for pre-assignment of remuneration electric energy production plants, specified in RD-Act 6/2009, of 30 April, adopting certain measures in the energy sector and approving the social tariff. R-0088
[430] RD-Act 6/2009, of 30 April, on certain measures in the energy sector and approving the Social Tariff. Fifth Transitional Provision. R-0085.

for NextEra officers, because they had specifically requested the transfer of the Termosol Plants to Phase IV[431]. Therefore, they had a particular risk of being affected.

626.    In fact, it was Jaime Malet who warned Protermosolar of this possibility.[432] Hence, as the Reply on the Merits says, Protermosolar explained that its proposal for a regulation to the Government meant "*few concessions on (the Protermosolar side) but which on the other hand does maintain the premium as its current level <u>and eliminates the uncertainty associated with the potential reviews contained in Article 44 of Spanish RD 661.</u>*"[433] The Reply on the Merits itself insists that at a meeting of 21 June 2010 it was agreed to close "*the loophole created by the interaction between Art.44.3 of RD 661/2007 and RDL 6/2009*".[434]

627.    Given this circumstance, Article 4 of RD 1614/2010 was introduced. It did not involve giving greater protection to those plants, but rather simply to correct a result that was not intended by the regulator, by deferring beyond 2010 their entry into operation. Therefore, the Preamble of RD 1614/2010, after noting that the purpose of this Regulation is to safeguard the principle of Reasonable Return, establishes that:

> "*Therefore, the present royal decree <u>intends to resolve certain inefficiencies in the implementation of RD-Act 6/2009 of 30 April,</u> for wind and solar thermal technologies. It was intended to ensure the economic regime in force in RD 661/2007, [...], for projects in an advanced state of maturity.*"[435] *(Emphasis added)*

628.    Accordingly, Article 4 merely extended the provisions of Article 44(3) 2nd paragraph of RD 661/2007 to plants which, by application of RD-Act 6/2009, could fall outside it. Nonetheless, it did not make any alteration to the principles and purposes of the SES. This extension was criticised by the CNE. Thus, in its report of 17 September 2010 it said:

> "*However, and without it being justified either technically or economically, extensions were granted for the application of the tariffs and premiums applicable to the new thermoelectric wind and solar installations implemented from 1 January 2012, which will have a significant impact on the cost borne by the consumer, besides <u>contradicting the provisions of Article 44.3 of RD 661/2007 of 25 May, and being discriminatory to other technologies.</u> In addition, the wording in the text of the proposed RD amends that article by introducing legal uncertainty and a lack of definition in other technologies. Therefore, the Commission understands, on the one hand, that it is <u>not appropriate to grant unjustified extensions</u> to wind or solar thermal technologies for the non-*

---

[431] Phase Change Request submitted by Mike O'Sullivan (NextEra Energy Resources, LLC) on behalf of PTE1, dated 22 December 2009 (Spanish original and English translation), Document C-53, and Phase Change Request by Mike O'Sullivan (NextEra Energy Resources, LLC) on behalf of PTE2, dated 22 December 2009 (Spanish original and English translation), Document C-54.
  Resolution of Modification of Phase for PTE, 18 February 2010 (Spanish original and English translation), Document C-55, and Resolution of Modification of Phase for PTE2, 18 February 2010 (Spanish original and English translation), Document C-56
[432] Email from Jaime Malet to Luis Crespo on 25 June 2009. R-NEW.
[433] Reply on the Merits, para.90
[434] Reply on the Merits, para.91
[435] RD 1614/2010, of 7 December, regulating and modifying certain aspects related to electric energy production using thermoelectric solar and wind power technologies. Preamble. R-0068.

*application of the new tariffs and premiums from 2012, and on the other, it believes that <u>Article 44.3 should not be amended</u>*[436]*" (Original emphasis)*

**(b)    The literal wording of Article 4 does not constitute a stabilisation clause.**

629.    A simple reading of Article 4 of RD 1614/2010 allows us to see that all said article does is to extend **the provisions of paragraph two of Article 44 (3)** of RD 661/2007 to plants not included within its scope of protection. The "*protection*" granted by this Article 4 is the same as that granted by RD 661/2007 to plants whose commissioning certificate is subsequent to 1 January 2012. Therefore, these plants would not be affected by the mandatory review that was to take place in 2010, maintaining the tariffs of RD 661/2007. Specifically:

> *"Article 4 of the project, to compensate the previous restriction, guarantees for the thermoelectric installations covered by RD 661/2007 affected thereby, <u>that the future four-year reviews</u> of tariffs, premiums and the upper and lower limit for this technology, provided under Article 44.3 thereof, <u>shall not apply thereto</u>"*[437]*(Emphasis added)*

630.    It is true that the protection of Article 4 also extends to the premiums. However, at no time is it stated that Article 4 of RD 1614/2010 should apply to revisions or modifications *other* than those set out in Article 44 (3) of RD 661/2007. Moreover, at no time is it stated that the solar thermal plants shall be left outside the scope of Act 54/1997 and that, therefore, the regulatory measures necessary to ensure the economic sustainability of the SES will not be applicable thereto, nor the regulatory measures aimed at avoiding situations of over-remuneration in the event they are detected.

631.    Therefore, Article 4 of RD 1614/2010 does not protect the affected plants from "any" future tariff review:

> *"In the case of solar thermal technology plants under RD 661/2007, of 25 May, **the reviews** of tariffs, premiums and upper and lower limits **to which Article 44.3 of said RD refers** shall not affect the plants registered with a definitive nature in the Administrative Register...."*

632.    The literal meaning is evident, the revisions that will not affect the facilities are *"those to which Article 44.3 refers"*, does not refer to *"any revision"* of tariffs or premiums. Also, neither does the literal wording of this article make reference to the possibility of opting between subsidies, nor to the possibility of producing by burning fossil fuels or updating the tariffs.

633.    In fact, what Article 4 did was to bring the wording of Article 44(3) closer to that of the preliminary Article 40.3 of RD 436/2004. But as we have seen, Article 40.3 of RD 436/2004 did not prevent the regulator from introducing RD-Act 7/2006 or RD 661/2007 to

---

[436] Report 24/2010 of the CNE on the Proposed RD which will regulate and amend certain aspects of the special regime. R-0352.
[437] Ministry of Industry, Trade and Tourism "Report of the SGT draft of RD 1614/2010 of 26 October 2010. Pages 10 and 11. R-0353.

correct the detected situation of over-compensation and ensure the future sustainability of the SES.

**(c)    The introduction of RD 1614/2010 led to a reduction in the profitability of solar thermal plants based on the necessary economic sustainability of the SES**

634.    As the Government expressly warned with the introduction of RD 1614/2010:

> *"However, it is precisely the premium under the special regime, financed by consumers, that has been one of the main factors in the increase in the tariff deficit in recent years, jeopardising the economic sustainability of the electricity system, which makes it essential to modify the economic regime, safeguarding legal certainty and the principle of Reasonable Return on investment, reducing the tariff deficit of the electricity system and transferring to consumers the productivity gains of these technologies, which have seen a decrease in their relative costs in recent years.*
>
> *Consequently, the draft of the Royal Decree in question aims to amend the current regulation of the economic system of the activity of electricity production under the special regime of thermoelectric and onshore wind power technologies to ensure the economic and technical sustainability of the electricity system"[438]*

635.    It is not disputed between the parties that RD 1614/2010 introduced measures to "cut" the wind and solar thermal sectors.

636.    RD 1614/2010 accredits that no regulatory provision may prevent the adoption of measures to guarantee the economic sustainability of the SES and the principle of Reasonable Return. Consequently, RD 1614/2010 shows that solar thermal technology is not an island within the SES alien to the basic principles of the SES.

**(d)    The Claimants did not appreciate the existence of a stabilisation clause in Article 44(3) RD 661/2007, nor in RD-Act 6/2009 or Article 4 of RD 1614/2010**

637.    Previously, it has been proved that both Pöyry and the RE sector, as well as the leading companies in Spain, knew that the remuneration would be paid in order to guarantee a reasonable return, without any commitment to freeze the regime of RD 661/2007 in favour of the investors.

638.    It has also been established that the Claimants knew there was the possibility of future regulatory changes that would affect existing plants, as corroborated by the reports of the CNE and the General Attorney's Office in 2007 and 2008, analysed above.

639.    The Claimants have refused to provide any Legal Due Diligence that mentions or assesses the possible existence of a stabilisation clause in Article 44(3) RD 661/2007 and article 4 of RD 1614/2010. The Claimants also did not assess or request a simple legal due diligence on the items now put before the Arbitral Tribunal (PowerPoint presentations of employees of the CNE and InvestSpain). Nor have they provided a Legal Due Diligence on

---

[438] Ministry of Industry, Trade and Tourism "Report of the SGT draft of RD 1614/2010 of 26 October 2010. Page 8. R-0353.

the elements hidden from the Court, such as the regulatory Framework as a whole, the Jurisprudence of the SC since 2005 or PER 2005-2010 methodology.

640.    The Claimants consider in their Reply on the Merits that it is not necessary to provide a legal Due Diligence because NextEra had specific commitments from the Government of Spain that no change in remuneration would apply to the Termosol plants. We deny the existence of such commitments, as already explained.

641.    In any case, both RD 1614/2010 and RD-Act 14/2010 are subsequent to the meetings and letters sent and received by NextEra. These regulations affected the remunerations that should be received by the Termosol plants in the future. Therefore, NextEra could determine, before making its investment on 28 April 2011, that the Government would not hesitate to introduce the necessary modifications to ensure the sustainability of the SES, within the limits established by Act 54/1997. We recall, in this regard, that it is common ground between the parties that the expectations of the Claimants should be assessed as at 28 April 2011.[439]

642.    In addition, NextEra never believed in those alleged commitments. Thus, the immediate effect which the adoption of RD 1614/2010 had on NextEra was that on 10 December 2010, just three days after its publication, the PTEs modified the *"development agreement"* which they had concluded with Casas de Hitos in 2007 and they inserted, among others, a new Section 3.01 (f) with the following content:

> *"If due to any <u>change in the law,</u> a company suffers or will suffer a reduction of compensation, each monthly payment that remains unpaid from the date of <u>such change in Law</u> shall be reduced by a percentage equal to the percentage of reduction of compensation applicable to that monthly payment. The parties attach as Annex F various <u>examples of the application of the Reduction of Compensation resulting from a Change in Law</u>"* [440]

643.    Said Annex F provides examples of <u>applying</u> a "Reduction Compensation": 1) rate changes; 2) limiting the number of hours of annual production and 3) establishment of a production tax. [441] That is, the plants themselves were anticipating, negotiating and agreeing with third parties in December 2010 that it was possible that the regime of RD 661/2007 would be amended in essential elements of that scheme, such as (i) subsidies, (ii) subsidized hours and even, (iii) the introduction of a tax on energy production.

644.    Also, the contract amendment inserts another Clause 3.01 (f) to read as follows:

> *"(g) If any of the Companies, at its sole discretion, lodges an appeal against the Administration in relation to any reduction in compensation resulting from a change in the law, and retrieves from the relevant Governmental or Regulatory Authority said Reduction of Compensation, the company in question agrees to pay the Developer an amount equivalent to the amount by which any Monthly Payment was reduced that has been paid to the Developer as a result of such Reduction of Compensation and which*

---

[439] Statement of Claim, para.50
[440] Amendment to CdH Project Development Agreement of 10 December 2010. Section 5. CLEX-034.
[441] Idem, annex F.

*has been recovered from the relevant Governmental or Regulatory Authority. None of the Companies will be obliged to appeal against any Governmental or Regulatory Authority regarding a Reduction of Compensation". [442]*

645.     The contract itself clarifies what is meant by "Foreseen Compensation":

*"the total income of a company for the sale of electricity provided by said Company during the year in which the monthly payment in question shall be made, assuming that (i) the Project of said Company will operate with 4000 hours per year at 49.9 MW per hour and (ii) if during that year, the Company sells electricity through (a) the rate option described in Article 24.1 a) of RD 661/2007, the rate is assumed to be c€/kWh 28.4983 and (b) the market price option plus premium described in Article 24.1 b) of RD 661/2007, the premium is assumed to be c€/kWh 26.8717"[443].*

646.     The contract also defines what is meant by "Percentage of Reduction of Compensation" which means the percentage equal to:

*"Reduction of Compensation / Foreseen Compensation x 100"[444]*

647.     NextEra was so aware that there was no guarantee of *immutability* of the remuneration regime in the recently approved RD 1614/2010, that three days after its approval it shielded itself in the "development agreement", including clauses that would allow the PTEs to accommodate the payments that should be made by Casas de Hitos in the event that a "Reduction in the Foreseen Compensation" took place.

648.     The Claimants in their Reply try to downplay this change, saying they are standard risk mitigation clauses, which do not involve the belief that this risk could actually materialise and that, even less, do they anticipate the adoption of measures in dispute. The question is, if NextEra believed in the immutability of the remuneration and hours of operation that were supposedly guaranteed by RD 1614/2010, why did it modify the contract with Casa de Hitos to protect themselves against the regulatory risk a few days after the approval of RD 1614/2010? Simply because they were aware that the Government would take action if the target set by RD-Act 6/2009, which was subordinate to RD 1614/2010, was not met: the complete elimination of the deficit *ex ante* by 2013. All the measures taken in RD 1614/2010 were aimed at achieving this goal in 2013. In addition, it makes no sense to enter into a contract for unforeseeable risks, inherent to the fortuitous event.

649.     It is precisely because NextEra did not believe that the approval of RD 1614/2010 would ensure the immutability of its remunerations, that they once again tried to achieve a compromise. In fact, NextEra pushed for RD 1614/2010 to incorporate a system of voluntary application of the restrictions that would be introduced by this regulation in exchange for the issuance by the Secretary of State of individual decisions that would

---

[442] Idem, paragraph 6.
[443] Idem, paragraph 16.
[444] Idem, paragraph 16.

determine the legal regime applicable to the plants throughout their useful life.[445] This proposal was not incorporated into the text of RD 1614/2010.

650.    Protermosolar, meanwhile, attempted to ensure that in the text of RD 1614/2010 it would incorporate the obligation by the Secretary of State to issue an individual decision for each facility, which would determine what the compensation regime would be throughout its entire operational life. [446] Similarly, Protermosolar sought the inclusion of a State liability clause for the case that the latter would in the future change the remunerations established in RD 1614/2010.[447] Neither one nor the other proposal were included in the text of RD 1614/2010.

651.    All these proposals show the full conviction by NextEra and Protermosolar that the remuneration conditions set by regulations could be modified later.

652.    The text of RD 1614/2010 did not incorporate any of these proposals because the Government knew it could not commit to freezing the premiums and rates throughout the useful life of the facilities. Nor was the purpose of the Ministry to freeze the premiums and rates in exchange for receiving letters of waiver. The waiver letters were the way in which the producers were able to demonstrate to the government that the plants would not come into operation on the initially planned dates. In this regard, it should be noted that the reality of the facts showed that all the plants under construction were suffering from delays that prevented them from entering into operation on the dates expected by the Agreement of the Council of Ministers of 13 November 2009[448]. The saving that this delay entailed was

---

[445] Jaime Malet email to Mr Arechabalas and others forwarding the proposal of NextEra (R-0399 and attached proposal R-0400). Also, email from Jaime Malet to Protermosolar on 23 June 2010: *"3-The system of voluntary application that we designed yesterday seems very important for two reasons: first, because the voluntariness of the developers lowers the halo of retroactivity of the measures to cap hours, removing the option of pool plus premium in the first year, and setting dates for start-up certificates, which is very important for our stakeholders (banks, analysts, etc.). Second, because the possibility of having an individual document by the Government that establishes what the economic regime will be during the life of the plant puts us in a semi-concessional situation against possible similar attempts by other governments in the future"*. C-261.
On 17 July 2010, Jaime Malet sent to Michel Arechabalas and others on the proposed regulation proposal sent to them by the Ministry:
*"Mike, I send you for a Deep and quick review the draft of the RD sent by the Ministry yesterday night. I have had the chance to take a quick look at my blackberry and it seems it includes all aspects we were negotiating with the Minister and SE two weeks ago, except plant's COD dates, as <u>we are still pushing hard to have them in individual resolutions for each plant (which would reinforce developers' rights during the life of the plants</u>)"* (Emphasis added)
[446] Termosolar proposal for the drafting of the future RD 1614/2010. R-0401.
[447] Protermosolar sent to the Ministry in June 2010 a protocol in which the inclusion of a new paragraph is proposed in Article 44.3 of RD 661/2007:
*"The State liability is recognised in the event that the economic regime established in this RD is changed to the detriment of the owner of the installation.*
*Compensation for state liability in this case may not be less than the equivalent of the difference between the amounts which ought to have been received in accordance with the decision and the shares they would be entitled to receive as a result of the modification."* Document C-63
[448] In the email sent by Protermosolar to its partners on 11 June 2010 it states: *"In connection with the meeting to which we have been summoned on Tuesday 15 June, I received a call from the Director General of Energy this morning who was open to not altering in any regulatory aspects in our industry if we are able to implement or to thoroughly convince regarding the savings expected until the end of 2013*

revealed by Protermosolar in the hearing process followed for the approval of RD 1614/2010. And NextEra was aware of it[449]. Something quite different is that the producers would take advantage of sending the letters of waiver to try to obtain from the government, in return, a petrification promise that the latter could not give and which, in fact, it never gave.

653.     To this end, the PTEs submitted written waivers to their start-up before a certain date[450] and once again tried to have included an immutability *commitment* through the fiction of requesting that they be notified what the remunerative regime would be for their plants. However, the Kingdom of Spain merely informed them about the remunerative regime in effect at the time of the request for information, without pledging the petrification or guaranteeing the regime under RD 661/2007 throughout the lifetime of the Plants[451].

654.     Note also that in order to waive any right, the Claimants must demonstrate that their plants could be operational before the dates indicated. And they cannot. The fact that the PTEs were not waiving anything is unquestionable in relation to PTE1, which waived starting operations before 1 January 2013. Indeed, PTE1 had specifically requested from the Ministry to be assigned to Phase IV[452], in order to have time to complete its construction[453], which meant it could not come into operation before 1 January 2013. No one can waive a right that they do not have.

655.     The absence of an unequivocal petrification commitment is so obvious that the Claimants have not provided a single document proving that NextEra US was aware of that commitment or that the counterparties to the contracts were informed of this exceptional guarantee. Quite the contrary, when the PTEs signed their financing contracts and when

---

which are caused both by the delay in the entry into operation that will affect almost all plants registered for various reasons (rain during construction, financial closures, etc.), and due to the proven experience at all the operational plants regarding the differences between the nominal capacity and the first year of operation. Therefore, we request that you send us the most accurate estimate possible on:. a) date from which each of your plants would begin to receive the premiums (...)". Document C-187. In the same sense, we have the email sent to the Ministry by Protermosolar of 22 June 2010, which notes that: "The solar thermal sector offers as an additional effort the determination of the dates of final start-up (delivered to the Ministry on 17 June) which, in general, represents a delay regarding the dates of the authorisations for each of the phases ( ...)". Document C-189.

[449] Email from Jaime Malet to Mr Arechabala on 8 October 2010.

[450] Written waiver submitted by PTE1, 2 December 2010, Document C-70 and Letter of Waiver submitted by PTE2, 2 December 2010, Document C-71.

[451] Resolution 1 of the Directorate General for Energy Policy and Mines at the Ministry of Industry, Tourism and Trade of Spain, of 28 December 2010, Document C-9 and Resolution 2 of the Directorate General for Energy Policy and Mines at the Ministry of Industry, Tourism and Trade of Spain, of 28 December 2010, Document C-10.

[452] Phase Change Request submitted by Mike O'Sullivan (NextEra Energy Resources, LLC) on behalf of PTE1, dated 22 December 2009 (Spanish original and English translation), Document C-53, and Phase Change Request by Mike O'Sullivan (NextEra Energy Resources, LLC) on behalf of PTE2, dated 22 December 2009 (Spanish original and English translation), Document C-54.

[453] Witness statement of Mr Davidson, paragraph 37.

NextEra Energy Inc provided its guarantees in such contracts, they sought to protect themselves against the regulatory risk.[454]

656.    On 28 April 2011, the PTEs signed a loan agreement with a banking syndicate[455]. This contract is striking for two reasons: a) it expressly provides for the existence of a regulatory risk; b) it does not mention at any time any of the Dutch entities that have filed a claim in this arbitration.[456]

657.    Regarding the regulatory risk, the contract introduces among its definitions that relating to *"change of law"*:

> *"Change of Law: means <u>any change to the RD or RD-Act 6/2009 (...), RD 1614/2010</u> (...) or any other ancillary regulations specifically related thereto, as in effect on the date hereof, which change (a) (i) results in an adjustment to the amount of compensation, tariffs, premiums, or incentives payable to the Borrowers, or (ii) adversely affects the amount of hours that either Unit is permitted to operate in the special regime (or any other equivalent measure), to the extent any such change results in lower future Project Revenues and/or lower projected minimum DSCR tan as shown in the Base Case as of the date thereof, or (b) establishes any additional requirements for the inscription of the Project in the Renewable Energy Producers Administrative Register (Registro de Instalaciones de Producción en Régimen Especial) (or any other register, as the case may be) that cannot be satisfied or obtained by the Borrowers, for reasons not attributable to either of them".[457]*

658.    The concept of *"change of law"* has an impact on several clauses of the contract. For example, it is envisaged as a circumstance that will affect the fulfilment of the requirements for the development of the contract[458]. So that, if there is a change of law, these requirements must be redefined in a timely manner. It will also determine the update of the so-called "Baseline Case"[459]. Also, it can even cause, in certain circumstances, the suspension of funding by lenders[460].

659.    On the same day, NextEra Energy Inc and NextEra Energy Capital Holdings Inc and not the Claimants signed a guarantee contract to back the loan taken out by the PTEs. Such contract defined "*Change of Law*" as "*any change to the RD (661/2007) or RD-Act 6/2009..., RD 1614/2010...or any other ancillary regulations specifically related thereto...which change...results in an adjustment to the amount of compensation, tariffs, premiums, or incentives payable to (PTE or PTE2)...*". Furthermore, in accordance with section 2.1 of this contract in the event of a "Change in Law", the guarantee of NextEra would be limited to "*the remaining unfunded portion of the Base Equity Contribution*

---

[454] PTE and PTE2 finance agreement of 28 December 2012 (C-74) and guarantee contract provided by NextEra Energy Inc. R-0402.
[455] Loan Agreement, of 28 April 2011, Evidence document C-74.
[456] The loan agreement provides that the guarantee is governed by the laws of the State of Florida.
[457] Idem, definition of "change of law".
[458] Idem, definition of "completion".
[459] Idem, definition of "updated Case Base"
[460] Idem, clause 5.3; "Change of law default".

*Obligations"*[461]. This contract is relevant because NextEra has invoked these clauses before the courts of New York to defend the limitation of their liability as a result of the "Change in Law" thereunder having taken place. This fact is not disputed.

660.    The Claimants also omit to tell the Tribunal that just before signing the financing agreements, in March 2011 the Sustainable Economy Act 2/2011 was approved announcing the necessary and desired reform of the SES. From that moment, all producers of REs were awaiting this reform[462].

661.    This was the existing legal and economic context when NextEra invested in the renewable sector in Spain. It is, therefore, impossible that the Claimants could legitimately believe that the remuneration regime of RD 661/2007 was to remain unchanged throughout the life of the facilities in which it was investing.

662.    In short, NextEra's Expectations about regulatory stability that existed when it undertook its investment are summarised in the letter that Mr Ketchum, Vice-President, CEO and Corporate Secretary of NextEra Energy Resources LLC, sent to the Minister and Secretary of Industry from the NextEra headquarters in the US. The letter was sent with copy to the Prime Minister of Spain, to the Secretary of Commerce of the USA, to the Secretary of Energy of the US and to the US Ambassador in Spain. It expressed its rejection of the amendments proposed by the CNE saying, among other things:

> *"NextEra is definitely constrained to state that it would be highly unfavourable for a new Government elected on a promise <u>to break away from past practices of regulatory uncertainty (and policies detrimental to businesses in general) to pursue a similar avenue as the former Government.</u> The international investment community has great expectations from the new Government's promises to stand by its legal commitments and to perform as a serious, predictable and reliable partner when it comes to investments that will create new jobs in Spain. We sincerely hope that we will not be disappointed when the new Government announces the planned regulatory changes to the Spanish energy industry".[463](Emphasis added)*

663.    This letter speaks for itself and is relevant for two reasons: first, because it reflects that NextEra never considered that there were express terms of stability or petrification. Second, because NextEra knew in March 2012 that the new government would carry out a reform of the SES.

**(3.5)    The Communications of December 2010**

664.    The Claimants finally base their expectations on the DGPEyM Resolutions aimed at PTEs, not the Claimants, on 28 December 2010. The analysis both of the content of the letters of waiver and the Resolutions is contained in our Counter-Memorial.

---

[461] Section 2.1 of the guarantee contract signed by NextEra Energy Inc and NextEra Energy Capital Holdings Inc with the banks on 28 December 2011. R-0402.

[462] AEE Yearbook, Wind Power ´12. Wind Business Association, the reference in the Sector. R-0403.

[463] Letter from John Ketchum (NextEra Energy Resources, LLC) to Jose Maria Soria Lopez (Minister of Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012, Evidence Document C-90.

665.    It has already been stated that the Request of the plants (not of the Claimants) included a waiver and a request for communication of the applicable remuneration[464]. Point Three of the request indicated the following: "*Three.- That it requests that it be notified about the remunerative conditions of the installation during its operational life.*"[465]

666.    It has likewise been expounded that the heading of the Reply of the Directorate-General for Energy Policy and Mining differentiates two parts of the communication:

> "**R***esolution of the Directorate-General for Mining and Energy Policy accepting the waiver submitted [...]and* **C***ommunication of the Directorate-General for Mining and Energy Policy of the remuneration conditions and the annual electrical energy discharge capacity of the installation.*"[466]*(Emphasis added)*

667.    In the Introduction, section II, it refers to this request:

> "*Finally, the party concerned asks to be informed about the remuneration conditions during the working life of the installation.*"[467]

668.    The Communication is contained in points Two and Three of the document. Point two of the document begins as follows:

> "*Two – It* **communicates** *that***, currently,** *by dint of the stipulations of section 1, transitory provision five of RD 16 enacted on April 30th 2009, the remuneration applicable to the installation is made up of the tariffs, premiums, upper and lower limits and complements set out in RD 661 enacted on May 25th 2007...*"[468]

669.    The reading of the Communications in their literal meaning leaves no doubt as to the non-existence of a future commitment for maintaining the tariffs throughout the useful life of the Plants. It is, therefore, denied that these Communications confer a right to immutability of the remuneration regime. Likewise, it is denied that the Communications include a commitment by the Government not to amend the regime of RD 661/2007. For such purposes, the mere reading (1) of the Heading of the Resolutions, (2) their content and (3) the appeals they grant is sufficient and applies to the three Resolutions.

### a.    Heading of the Documents:

670.    In fact, as indicated, the Heading is identical in the three Documents and leaves no doubt as to its content, due to its wording:

---

[464] "*Remuneration*", in Spanish, does not have a connotation of *indemnity* or *compensation* in return for something. *"Remuneration"*, according to the Dictionary of the Royal Academy of the Spanish Language, means: "payment of something." It is synonymous with "*remuneration*", not "*indemnity*" or "*compensation*". The dictionary *Word reference* translates "*Retribución*" into English as "*payment*". "Compensation" would mean an indemnity as a result of the waiver to discharge energy for one year. However, it only requests communicating the "*remuneration conditions": "payment conditions*".

[465] Section IV.A.1.3.b) of this Memorial

[466] Resolution of the Directorate General for Energy Policy and Mines regarding PTE, 28 December 2010 (R-0155), Resolution of the Directorate General for Energy Policy and Mines regarding PTE21, 28 December 2010 (R-0156).

[467] Ibid.

[468] Ibid.

> *"**R**esolution of the DGPEM accepting the waiver formulated by [...] registered in the Remuneration Pre-assignment Register of the Ministry of Industry to begin discharging electricity before a certain date within the already assigned Phase and acceptance of the classification of the installation made and Communication from the DGPEM relative to the remuneration conditions and annual electricity discharge capacity of the facility."[469]* (emphasis added)

671.    A literal reading of the Heading reveals that it contains three different administrative actions:

- The first consists of an administrative "Resolution" whereby the Administration *accepts* the waiver presented. This Resolution is expounded in Section One, paragraph one.

- The second consists of the same administrative "Resolution" whereby the Administration *accepts* the petitioner's statements on the *classification* of the installations made. This Resolution is expounded in Section One, paragraphs two and three.

- The third consists of a "<u>Communication</u>" from the Directorate-General for Energy Policy and Mining on the remuneration conditions and the *annual* electricity discharge capacity of the facility. This communication is expounded in Sections Two and Three of the document, as we shall see below. This communication is not, either due to its format or content, an administrative *Resolution*.

672.    Therefore, the Heading leaves no doubt as to the existence, on the one hand, of a ***R**esolution* and, on the other, of a mere informative ***C**ommunication*. The content of the Documents is also clear, due to being structured in differentiated Sections.

### b.    Content of the Documents:

673.    Point One of the three Documents begins with the term "*Resolves...*" and corresponds to the part of the Heading beginning with "*Resolution*". Therefore, in this Section One the Administration accepts the waiver requests and the classification of the facilities made by the petitioner.

674.    Since this acceptance affects the petitioners' rights, the Resolutions make it possible to challenge the content of this Point One. Thus, they include the so-called *notice of the right to appeal* on the last page thereof[470]:

> *"Against <u>the resolution included in point one</u> of this notification, an appeal for judicial review must be filed with the State Secretariat of Energy within a period of one month, pursuant to Act 30/1992, of 26 November, on the Legal Regime of*

---

[469] Ibid.

[470] In Spanish Administrative Law, the so-called administrative *notice of the right to appeal* is only envisaged for administrative Resolutions. Article 58 of Act 30/1992 of the Legal Regime of the Public Administrations and Common Administrative Procedure provides that: "*1. The interested parties shall be notified of the administrative resolutions and acts that affect their rights and interests, [...]. 2. All notifications [...] shall contain the full text of the resolution, indicating whether or not it is final in the administrative procedure, the expression of the relevant appeals, body with which they would have to be filed and filing deadline, notwithstanding any other they deem relevant.*" R-0035.

*Public Administrations and the Common Administrative Procedure.* (emphasis added)

675.   However, Points Two and Three begin with the expression "*Informs that...*" and correspond to the following part of the Heading: "Communication from the DGPEM on the remuneration conditions and annual electricity discharge capacity of the facility".

676.   As opposed to that asserted by the Claimants, said Points Two and Three do not contain the word "*right"* or the word "*commitment",* or the word "*confirmation*", or the word "*promise"*, or the word "*guarantee"*, or the word "*subsidies*". They do not contain any similar term. That is, the Spanish Government does not promise, guarantee or confirm the facilities[471] that will be maintained "in the future" by the regime of RD 661/2007, throughout their useful life. The attention of the Arbitral Tribunal is drawn to the fact that neither do they contain any mention to the production of electricity by burning fossil fuels such as gas.

677.   They shall only be informed of the *"current"* right -simultaneously to issuing the Documents-. And it does so in such a manner that it does not raise doubts as to what is being communicated: the regime in force, currently applicable to the CSP Plants. Therefore, the assertions made by the Claimants about the alleged "unequivocal declarations", "promises", "commitments", "confirmations" to the Claimants or to their investment are denied[472].

678.   That is, in the documents provided by the Claimants, the Spanish Government does not *promise* or *guarantee* or *acquire a commitment* or *confirm* that it shall maintain the remuneration established in RD 661/2007 unchanged "*during the useful life of the facilities*". The Claimants have not accredited in what part of the Communication the Respondent acquires a future commitment with respect to the Plants. They do not indicate where these alleged promises, guarantees and commitments reiterated throughout its Memorials are included. There is no mention to the Government's alleged promises, commitments or confirmations.

679.   The Directorate-General communicates to the PTEs the applicable regime on the remuneration conditions in force and *annual* electricity discharge capacity of the facilities, including the modifications made to date. But through said action it does not create or confirm any right, such as guaranteeing that this regime will not be modified in the future. Additionally, the reply of the Directorate-General is consistent with the request for information on its remuneration made by the interested party[473]. The Ministry clarifies, in the document's precedents, that it communicates the request for remuneration conditions

---

[471] Naturally, neither to the Claimants, to which the Resolution is not even addressed.

[472] In the Reply on the Merits it is concluded that "*This was an unambiguous statement to the effect that the Operating Plants were entitled to the RD 661/2007 FIT regime without any future changes affecting them. In other words, through these resolutions, Spain confirmed its previous clear and unambiguous representations contained in the general regulation (RD 661/2007) on which the Claimants legitimately relied in making their investments*" (emphasis added)

[473] Precedent I of the Resolutions: "*Lastly, the interested party requests the communication of the remuneration conditions during the useful life of the facility.*" R-0155 and R-0156.

made by the interested party under the scope of article 35 of Act 30/1992[474]. The Claimants argue in their Reply that the Respondent cannot rely on Spanish Administrative law to interpret these resolutions. However, these resolutions are issued by a Spanish Administration, in the exercise of administrative functions and expressly invoking an Act of Spanish Administrative Law. Therefore, Spanish Administrative Law cannot be ignored when setting the expectations that these communications could generate in the Claimants.

680.   As regards the wording of the Documents, the Communication of Section Two has an easily understandable content that leaves no room for doubt. In fact, it should be noted that it begins with a clear prevention:

> *"It informs that, **currently,** by dint of the stipulations of section 1, transitory provision five of RD 16 enacted on April 30th 2009, the remuneration applicable to the installation **is** made up of the tariffs, premiums, upper and lower limits and complements set out in RD 661 enacted on May 25th 2007[...]"*

681.   It is evident that it merely communicates the remuneration regime in force at that time. In fact, <u>it is written in the present tense</u>, not in the future tense. That is, it does make mention to the future or to the applicable regime during the life of the plants. Neither does it make any reference to the *useful life* of the plants or to the *useful life* of the facilities. In short, only the regime applicable "*at present*" is communicated at the time of issuance.

682.   From the reading of this Section Two in its literal sense, a *confirmation* by the Government as to the future permanence of RD 661/2007 *"throughout the useful operating life of the facilities"* cannot be reasonably inferred. In fact, the Communication of Point Two does not make any mention to the confirmation of any "agreement" or to the conditions throughout the *useful* operating life of the facilities.

683.   In their Reply on the Merits, the Claimants resort to the desperate argument that when the resolutions use the term "currently", they do so because they refer to the rates in the amounts in force at the time when the resolutions were issued, without updating the CPI. However, this interpretation is not only too distorted but rather is also inconsistent with the fact that the resolutions themselves first use the term "currently" to refer to the regulations in force at the time of its issue and then, after a follow-on, they say that the rates "in force" are set out below. Again, the wording of the Resolutions leaves no doubt: the Ministry is communicating the regulation "currently" in force.

684.   Other evidence that reaffirms that upheld by the Kingdom of Spain is the content of Point Three. This Point completes the information on the applicable regime in force. Said Point Three expounds the legislative modifications subsequent to RD 661/2007. This Point also begins with the expression "Informs that" and at no point promises or guarantees or confirms that there will be no subsequent amendments to the regime of RD 661/2007 during the operating life of the facilities.

---

[474] Precedent IV of the three documents indicates that:
*"Pursuant to that indicated in section g of Article 35 of Act 30/1992, of 26 November, and RD 208/1996, of 9 February, regulating the Administrative Information Service and Citizen Attention, at the request of the interested party, the data whose information it requests is hereby communicated".* R-0155 and R-0156.

685.    On the contrary, the communication of the amendments subsequent to RD 661/2007 demonstrates that the remuneration regime has been amended. On not guaranteeing or confirming anything else for the future, it may continue to be amended.

686.    The Claimants consider that, on mentioning Article 4 of RD 1614/2010, this Communication was guaranteeing the maintenance of the conditions of RD 661/2007. However, said Section Three expounds the articles of the subsequent regulation that affected the economic regime of RD 661/2007. In this manner, the mention of Article 4 does not add or remove anything from the regulation contained therein, nor does it broaden its meaning nor interprets nor promises that it implies the intangibility of RD 661/2007 or of its tariffs in the future. It only communicates that already established in Article 4. That is, that "*the reviews of the tariffs, premiums and upper and lower limits referred to in Article 44.3 of said royal decree* [that is, the periodic four-year reviews] *shall not affect registered facilities*".

687.    In short, the wording of the resolution does not exclude the possibility of other extraordinary revisions for economic circumstances or economic unsustainability of the SES.

688.    Consequently, the Claimants cannot reasonably infer a Government *promise* or *commitment* from this Point Three on the immutability of Regulation 661/2007 during the operating life of the facilities.

689.    A commitment of the type held by the Claimants (the immutability of the economic regime), for such a long period of time (throughout the entire operating life of the facilities) and with such relevant economic conditions, must be clear and obvious, without intending to infer it from subjective assumptions or interpretations, as in this case.

690.    It is surprising that a diligent and exhaustive investor can infer a "clear and accurate" commitment to the future immutability of the regime of RD 661/2007 from a phrase written in the present tense and making reference to "currently". In fact, it should be noted that the plants (receiving these documents) have never upheld before the Courts that these communications are (1) neither a source of rights for the plants (2) nor a source of obligations for the Government.

### c.    Notice of the right to appeal of the documents.

691.    In addition to the Heading and content of the Documents, further evidence against the alleged rights or promises upheld by the Claimants is that the Documents studied do not give rise to a notice of the right to appeal against the Communication of Points Two and Three.

692.    Furthermore, neither do these Communications generate an obligation or commitment for the Spanish Government with the Claimants' investment. The existence of a callable obligation of a Government cannot be expected if the instrument in which the alleged obligation is formalised lacks effectiveness under domestic law. That is, there cannot be an obligation of the Spanish Government if that obligation is not generated using the sources of the obligations of Spanish legislation.

### d.  Conclusion.

693.    The resolutions invoked by the Claimants, both based on their Heading and on the wording of their content and the indication of the appeal they include, accredit that the administrative action included in Section Two is a Communication of the regime applicable at that time to the Plants receiving the Communication. The Kingdom of Spain could not anticipate the future regime of these Facilities, since the SES is, as mentioned earlier, dynamic and technically and economically sustainable.

694.    Therefore, these Communications are not an *agreement* between the Government and the facilities, nor an administrative concession, nor a *commitment*, nor a *confirmation* of the future immutability of the remuneration regime of the facilities throughout their entire useful life. Such Communications inform the facilities (not the Claimants) of the remuneration regime in force and of their most recent amendments.

**(3.6)    Registration in the RAIPRE**

695.    The Claimants added as another source of Expectations pre-registration and the final registration of the plants in the RAIPRE. According to the Claimants, the pre-registration in the RAIPRE *"guaranteed the remuneration set by RD 661/2007"*[475] .

696.    The Claimants omit to tell the Tribunal that the registration in the RAIPRE is an administrative requirement (Articles 6 et seq. of RD 661/2007) that the facilities that wish to form part of the Special Regime must fulfil in order to operate and participate in the SES. It is a formal requirement for producing energy. It has nothing to do with the fact that the facilities must acquire the ownership of an "acquired right" to receive future yield, indefinitely, sine die. Registration in the RAIPRE is a mandatory administrative requirement for participating in the SES.

697.    The Arbitral Tribunal's attention is called to the fact that in the Administrative Registry, all the facilities, both Ordinary and Special Regime, were registered[476]. The RAIPRE is a mere Section of said Administrative Register (Section Two):

---

[475] Claimants' Reply on the Merits, para.76

[476] Act 54/1997, of 27 November, on the Electricity Sector. Article 31: "Special regime electricity production facilities must be registered in the Administrative Register of Electricity Production Facilities to which reference is made in Section 4 of Article 21 of this Act."
This reference is to another Title of the Act:

TITLE IV
Electricity production
CHAPTER I
Ordinary Regime

Article 21: "[...] 4. An Administrative Register of Electricity Production Facilities is created in the Ministry of Industry and Energy, in which all authorised electricity production facilities must be registered, including the conditions of said facilities and particularly the capacity of the facility [...]
5. Recording in the Administrative Registry of Electrical Energy Production Facilities will be a necessary condition to be able to participate in the electrical energy production market in any of the contracting modes with physical delivery. Autonomous Regions shall have access to the information contained in this Register.

> *"Special regime electricity production facilities <u>must be mandatorily registered in</u>
> <u>**Section Two of the Administrative Register**</u> of the electricity production facilities
> referred to in Article 21.4 of Act 54/1997, of 27 November, dependent upon the
> Ministry of Industry, Tourism and Trade. Said **<u>Section Two of the cited Administrative</u>**
> **<u>Register</u>** <u>shall be called</u>, hereinafter, Administrative Register of Special Regime
> Electricity Production Facilities."[477] (Emphasis added)*

698.    We also provide certificates of the number of facilities of REs currently registered in
the RAIPRE and of the changes in ownership registered[478]. According to the thesis of the
Claimants, all these facilities and new owners would have a specific commitment from the
Kingdom of Spain, although none of them owns either a license or a contract or a
concession.

699.    Registration in the RAIPRE is not, therefore, a State commitment to indefinitely and
unalterably maintain the future return of the CSP sector, but rather an administrative
requisite that makes it possible to control and know those involved in the SES. However,
the Precedent of the case Charanne v Spain has dismissed that this registration could create
the expectations claimed by the Claimants:

> *"The Claimants have alleged that, according to the existing regulatory framework, the
> registration in the RAIPRE gave generators an acquired right to receive the rate which
> would establish a legitimate expectation that it was not going to be subsequently
> amended. The Court does not accept this argument [...]*
>
> *The respondent has convincingly demonstrated that, under Spanish law, the
> registration in the RAIPRE was simply an <u>administrative requirement to be able to sell</u>
> <u>energy</u>, and did not imply that the facilities registered had an acquired right to a
> particular remuneration".[479]*

700.    The Claimants want to hide from the Court that RD 2818/1998 provided that all the
special regime production facilities be registered in an Administrative Register. This
Registry allowed the Government to keep track of the tariffs and premiums, by type of
energy, on the installed capacity and, where applicable, the date of commissioning. It also
allowed it to know the evolution of the electricity produced, the energy transferred to the
network and the primary energy used.[480] The aforementioned Register did not prevent the
adoption of RD 436/2004 and that this regulation affected the plants registered therein.

701.    As with the previous 2818/1998, RD 436/2004 maintained the obligation that all
production facilities in the special regime register in an Administrative Register.

---

6. [...] Failure to comply with the conditions and requirements established in the authorizations or any
substantial variation in the budgets that determined their award may lead to its revocation, under the terms
provided for in the applicable penalty system. [...]"  R-0003.
[477] RD 661/2007, Article 9.1 R-0042.
[478] Certificates of facilities registered in the RAIPRE and changes in ownership. R-0235 and R-0236.
[479] Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain (SCC v. 062/2012), Final
Award, 21 January 2016, and individual opinion, paragraphs 509 and 510, RL-0071.
[480] RD 2818/1998, of 23 December, on the production of electricity by facilities fed by renewable energy
sources, waste and cogeneration. Article 9.1. R-0058.

702.    As with the preceding Royal Decrees, said Register was established in 2004 in order to allow the Government to keep track of the tariffs and premiums, by type of energy, on the installed capacity and, where applicable, the commissioning date. It also allowed it to know the evolution of the electricity produced, the energy transferred to the network and the primary energy used.[481] The creation of this Registry demonstrates the legislator's intention to verify, in any case, compliance with the targets set in the Plan for the Promotion of Renewable Energy in Spain 2000-2010.

703.    Furthermore, as in previous cases, the registration of the plants in said Administrative Register during enforcement of RD 436/2004 was not an obstacle for the remuneration model implemented by RD 661/2007 to be applied to the plants already registered in said Register.

704.    Consequently, registration in this Register was not a Government commitment to indefinitely and unalterably maintain the future and immutable profitability of the facilities registered therein, but rather a way to control and know those involved in the SES.

705.    The pre-registration of the plants in the RAIPRE introduced by RD-Act 6/2009 adds nothing to this situation. It is surprising that the Claimants consider RD-Act 6/2009 to be an instrument issued to attract investment. Indeed, the only expectation that could be generated by RD-Act 6/2009, issued as a matter of extraordinary and urgent need, was that the Government, from that moment, would adopt the necessary measures to eliminate the accumulated tariff deficit in 2013.

706.    Among the measures taken to achieve this objective, the Government created the pre-allocation register to control prior to the final registration what the power was that they intended to install. In addition, it reserved the power to stagger the entry into operation of the pre-registered plants. The Government used this power in the Agreement of 13 November 2009. [482] The introduction of the pre-allocation register in 2009 allowed, given the wording of Article 44 of RD 661/2007, that the pre-registered plants with final start-up from January 2012, would be affected by the ordinary revisions of article 44 (3). This circumstance was notified immediately by Jaime Malet to Luis Celso in an email sent in June 2009. [483]

707.    The fact is that NextEra was not pleased by the approval of RD-Act 6/2009[484]. It had no reason to be. On 3 September 2009, the State Secretary for Energy wrote to the headquarters of NextEra Renergy Resources in Juno Beach, Florida, in response to a consultation from Mr Davidson. In this letter, it is expressly indicated that:[485]

> *"For the projects that are finally registered in the Registry, the retribution framework established in RD 661/2007 will be applicable in full, under which these projects were begun, without prejudice to the restrictions that may be derived due to system*

---

[481] RD 436/2004, Article 9.1. R-0059.
[482] "Spanish Cabinet Meeting Decision of 13 November 2009.
[483] Email sent by Jaime Malet to Luis Crespo on June 2009. R-0290.
[484] Email from Juan de Unda of 6 May 2009. R-0289.
[485] Claimant's Memorial, para. 102.

*economic and technical safety concerns for putting it into operation.*"[486] *(Emphasis added)*

708.    NextEra had so few expectations about RD Act 6/2009 including any freeze commitment that, when it had to assume economic commitments with third parties, it admitted possible regulatory changes.  Thus, when on 16 December 2009 it signed major agreements for Engineering Services, Procurement Support and Construction Support with the Spanish engineering company Sener Ingeniería y Sistemas, S.A., it defines the *"Special Tariff"* in clause 1.1 115 as follows:

> *"Special Tariff" means the fixed, regulated tariff set forth for subgroup b.I.2 in Table 3 of Article 36 of the Real Decreto 661/2007 as enacted on May 25, 2007, by the Ministry of Industry, Tourism and Commerce (Ministerio de Industria, Turismo y Comercio) of Spain, as such tariff may be revised (including pursuant to article 44 of Real Decreto 661/2007) by the Ministry of Industry, Tourism and Commerce with respect to power plants described in subgroup b.I.2 that (a) have been inscribed in the Registry and (b) are required to obtain definitive inscription in the administrative registry of generation plants under the special regime (RAIPRE) by the date referred to under the written notice from the Spanish administration that the Project has been inscribed in the Registry".[487] (Emphasis added)*

709.    To resolve any doubts that may arise from the interpretation of these contracts, the contracting parties clarify by mutual agreement that (clause 1.2.9):

> *"The use of the Word "including" in this Agreement shall be construed to mean "including without limitation" or "including but not limited to" and shall not be construed to mean that the examples given are an exclusive list of the topics covered"*[488] *(Emphasis added)*

710.    NextEra entered into these contracts and protected itself from regulatory risk. Therefore, it was aware that the registration of its plants in the pre-assignment registry did not give it any additional guarantee that its Plants would remain outside of the ordinary reviews of Article 44 (3) of RD 661/2007 nor the different reviews stipulated therein.

**(3.7)    The expectations arising from a "major advertising campaign" launched by the Kingdom of Spain.**

711.    The Claimants claim in a single phrase in their document, without any evidence at all, that the Kingdom of Spain launched a "*worldwide campaign of investment around the world to attract foreign investors.*"[489] Nonetheless, the Claimants have not proven: (a) that Spain made any effort to attract foreign investment; (b) that the Claimants ever knew about a big Spanish advertising campaign; and (c) that the Claimants invested in Spain based on the advertising campaign.

---

[486] Letter from Pedro Marín C-6.
[487] Agreements for Engineering Services, Procurement Support and Construction Support between PTE1 and Sener Ingeniería y Sistemas, S.A., of 16 December 2009, Document C-51, and Agreements for Engineering Services, Procurement Support and Construction Support between PTE2 and Sener Ingeniería y Sistemas, S.A., of 16 December 2009, Document C-52
[488] Idem, clause 1.2.9.
[489] Claimants' Memorial, para.476

712.    In fact, NextEra came to invest in Spain not as a consequence of any campaign organised by the Government of Spain but rather because "*a company called Casas de Hitos S.L. ("CdH"), owned by a well-known family of Spanish landowners (the Hernando family), approached NextEra with a proposal to co-develop a solar energy project on land they owned in Extremadura.*"[490]

713.    In addition, although NextEra supposedly found out about an InvestSpain presentation made in Germany in 2008, it considered it to be "insufficient".[491] The rest of the InvestSpain presentations submitted by the Claimants in their Reply on the Merits[492] are the ones that the Respondent has given them in the document submission phase.[493] The Claimants do not show where or when they were used with anyone. It does not seem likely that nine PowerPoint presentations in 2008 and 2009 could be determinant for affirming that Spain developed a worldwide campaign to attract investment. In any event, all the InvestSpain presentations that the Claimants submit show that: a) The regulatory framework is not determined solely by RD 661/2007 but rather also by Act 54/1997 (which guarantees access to the network), PER 2005-2010, and RD 661/2007; b) They do not say that the amounts of the premiums and the tariffs are guaranteed. They only say "Premium system guaranteed"; c) They do not include the amounts of the pool plus premium but only the regulated tariff.

714.    In addition, the Claimants have not shown that "*InvestInSpain is a publicly-owned State company established by ministerial decree and controlled by the Spanish Government and its actions in this context exercise elements of governmental authority, and/or were directed by the Government of Spain, for purposes of attribution under international law.*"[494] In fact, at the time these presentations were issued, InvestSpain was an entity subject to private law, with operational and equity autonomy. Its sole connection to the Government is that it is financed by public funds. InvestSpain has not previously and does not now develop functions implying public prerogatives. The Claimants are simply making up what they write down and do not prove their assertions.

715.    The other Presentations provided by the CNE[495] are educational,[496] not advertising. In addition, the CNE does not have investment development functions but is rather, as we have already explained, a government consultative body.

716.    The proof of the alleged campaign is null, since there was no such "campaign".

717.    Therefore, the Claimants' alleged subjective expectations on the basis of an alleged "major advertising campaign", evidence of which is conspicuous by its absence, are fully unfounded.

**(4)    Conflicting actions**

---

[490] Memorial on the Merits, para. 30
[491] Claimants' Memorial, para.38
[492] Document C-172.
[493] These documents, contained in Request C.1-2, were submitted by the Kingdom of Spain on 25 June 2016 in compliance with the Arbitral Tribunal's order.
[494] Memorial on the Merits, footnote on page 38.
[495] Documents C-169, C-170 and C-171.
[496] CNE course programs, R-0288 y R-0287.

718.    The measures at issue are the foreseeable result of the operation of the SES, in accordance with its principles and purposes. An objective understanding of the Spanish Regulatory Framework leads to the conclusion that all the measures under analysis are consistent with the accredited principles and aims of the SES. This system was where the Claimants made their investment.

719.    When providing the analysis of the measures subject to this arbitration we can make a distinction between the measures prior to the comprehensive reform of the SES and subsequent to it. Among the previous measures we find the following measures: (i) the introduction of the tax on the value of energy; (ii) limiting the use of gas by solar thermal installations; (iii) the updating of remunerations, tariffs and premiums of electricity sector activities to reflect the Consumer Prices Index at constant tax rates, excluding unprocessed food and energy products; and (iv) reducing to zero euros the premium on the electricity put option at production market price plus premium.

720.    The measures prior to the comprehensive reform of the SES will be analysed separately. However, we must remember that these measures have been absorbed by the new regulation.

**(4.1)    Tax on the value of electricity (TVPEE).**

721.    As already stated, the TVPEE, produced by Act 15/2012, is a tax on conducting activities involving the production and incorporation of electricity into the Spanish electricity system. The TVPEE is a measure of general application, i.e. it affects both conventional and renewable electricity producers.

722.    As also discussed, the TVPEE is a Spanish state income included in the General State Budget[497]. In addition, it is worth recalling that the Fifth Additional Provision of Act 17/2012, of 27 December, on the General State Budget for 2013, provides that an amount equal to the estimated annual revenue deriving from the taxes included in Act 15/2012, including the TVPEE, will be allocated each year to financing the electricity system costs related to the promotion of renewable energy[498].

723.    The economic impact -or rather, the absence of any economic impact- of the TVPEE on producers of renewables has already been analysed. In this sense, we should recall that the effect of the TVPEE on producers of renewables, such as those involved in this arbitration,

---

[497] Extracts from the Spanish General State Budget for 2013, R- 0119.
[498] Additional fifth provision of Act 17/2012, of 27 December, on the General State Budget for 2013:
*"Five Contributions to the Financing of the Electricity Sector*
*1. In the General State Budget Laws for each year, in order to finance the costs of the electricity system stipulated in the Electricity Sector Act, __referring to promoting renewable energy__, an __amount equal__ to the sum of the following shall be allocated:*
*a) __The estimate of the annual collection derived from taxations included in the Act of fiscal measures for energy sustainability__ [Act 15/2012].*
*b) 90% of the estimated revenue from the auctioning of emission rights for greenhouse gases, with a maximum of € 450 million.*
*2. 10% of the estimated revenue from the auction of emission rights for greenhouse gases, with a maximum of € 50 million, is set aside for the policy of combating climate change."* (emphasis added). R-0229.

is neutralised through the regulated remuneration system applicable to them. Specifically, the TVPEE is a cost that is paid to producers of renewables through the specific remuneration that they receive.

724.    The specific remuneration that producers of renewables receive enables them, as well as obtaining Reasonable Return, to recover certain costs that, unlike with conventional technologies, cannot be recovered relying on the market. In this way, it enables such producers of renewables to compete in the market on an equal footing with the rest of the technologies. One of the costs for which these producers of renewables are repaid is specifically the TVPEE.

725.    The foregoing is recognised by the Claimants in their own words, when they indicate the following in their Counter-Memorial on Preliminary objections:

> *"As Spain notes in its Counter-Memorial, the 7% levy of Act 15/2012 is included amongst the permitted operating costs that renewable energy producers can recover under Regulatory Framework III. Thus, the Claimants' losses under Regulatory Framework III do not stem from the 7% levy but from the other aspects of the new legislation."[499] (footnote omitted)*

726.    In addition, it should be taken into account that the Claimants allege that the TVPEE supposedly violates Article 10(7) of the ECT[500] on non-discrimination between national and foreign investments. According to the Claimants, the TVPEE supposedly discriminates against foreign investors in renewable energies. In this regard, the Claimants indicated in their Counter-Memorial on Preliminary objections that:

> *"the [7%] levy <u>discriminates against **foreign** renewable energy investors</u> in favour of firms that produce electricity from conventional fuels (which in Spain are predominantly domestic firms)."[501] (emphasis added)*

727.    As the Kingdom of Spain has already expressed when examining the Preliminary Objections, according to Article 21(3) of the ECT, Section (7) of Article 10 of the ECT does not apply to income taxes like the TVPEE. For this reason, the Arbitral Tribunal lacks jurisdiction to hear the claim on the supposedly discriminatory character of the TVPEE against foreign investments. Without prejudice to the foregoing, and although the Arbitral Tribunal lacks jurisdiction to hear this question, the Kingdom of Spain wishes to state that this allegation by the Claimants lacks any merit.

728.    Act 15/2012, which regulates the TVPEE, does not contain a single provision that implies any different treatment, much less discriminatory treatment, for foreign investments in favour of domestic ones. Act 15/2012 affords identical treatment to all taxpayers.

---

[499] Counter-Memorial on Preliminary objections, 8 August 2016, paragraph 85.
[500] ECT, Article 10(7):
*"<u>Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties</u>, and their related activities including management, maintenance, use, enjoyment or disposal, <u>treatment no less favourable than that which it accords to Investments of</u> its own Investors or <u>of the Investors of any other Contracting Party or any third state</u> and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable.* (emphasis added)
[501] Counter-Memorial on Preliminary objections, 8 August 2016, paragraph 90.

729.    The only argument that the Claimants seem to employ in order to try to defend their position, according to the quote cited three paragraphs above, is that the TVPEE supposedly discriminates against foreign investors because convention investors are supposedly Spanish investors and renewable energy investors are foreign investors. Well then it is obvious that this argument is absolutely false. On the one hand, it should not be forgotten that the TVPEE applies to all producers of both renewable and conventional electrical energy. In addition, it is of public knowledge and notorious that there are a great number of Spanish investors who have invested in renewable energies and that they are the majority, as is indicated in the second Witness Statement of Mr Carlos Montoya.[502] The TVPEE clearly does not imply any discrimination whatsoever, as the Claimants seek to show.

**(4.2)    Limitations on the use of gas by thermosolar installations**

730.    The Claimants submit that they made their investment with the expectation that the facilities would have the right to produce a certain amount of electricity using natural gas (12 % under the Fixed Tariff and 15 % under the Premium option)"[503].

731.    However, the Claimants do not answer the arguments maintained by the Kingdom of Spain in regards to the use of gas. In fact, in their Reply on the Merits, they only try to show that the premium was unalterable in accordance with the alleged stabilisation clause contained in Article 44(3) of RD 661/2007. However, Article 44(3) of RD 661/2007 does not refer to gas.

732.    The Claimants ambition for the production of energy with gas to be subsidised reveals important mistakes: (i) It ignores the link between Spanish legislation and the related Community directives; (ii) it ignores the evolution of the use of gas within the Spanish regulatory framework; and (iii) it ignores the manner in which the use of the gas is envisaged in the current remuneration model.

**(a)    The Claimants ignore the link between Spanish legislation and the related Community directives**

733.    Spain is an EU Member State and, therefore, is subject to its Directives, inter alia, those relating to the promotion of renewable energy sources.

734.    The system of public support for the deployment of renewable energy sources, as admitted by the Claimants[504], is linked to the achievement of the implementation objectives established in Community Regulations. Consequently, the activity of producing renewable energy can only be subsidised if it contributes to meeting the implementation objectives laid-down in community applicable regulation.

---

[502] Second Witness Statement of Mr Carlos Montoya. Section on Considerations on the Renewable Energy Plan (PER 2005-2010).
[503] Counter-Memorial on Jurisdiction, para. 467.
[504] Counter-Memorial on Jurisdiction, para. 25.

735.    The Claimants cannot be unaware that, for the purposes of calculating the achievement of the objectives of the implementation of renewable energies within the framework of the European Union, the EU regulations of 2009 expressly state:

> "In Multi fuel plants using renewable and conventional sources, only the part of the electricity produced from renewable energy sources shall be taken into account. For the purposes of this calculation, the contribution of each energy source shall be calculated on the basis of its energy content"[505] .

736.    This Community Directive was not issued in regards to Government Aid. Said directive was issued in relation to the promotion of renewable energies. Its title is as follows:

> ".DIRECTIVE 2009/28/EC OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC"[506]

737.    Consequently, in facilities such as those of the Claimants, the portion of electricity generation that can be attributed to conventional energy cannot be taken into account for the purposes of evaluating the implementation objectives laid down in EU regulations. This leads to the inevitable conclusion that the Claimants cannot harbour any expectation that the production of electricity from fossil fuels will be subsidised indiscriminately up to a given percentage. This has not prevented the production of energy using gas from being remunerated at pool prices.

738.    In addition to the foregoing, the Claimants cannot forget that Directive 2001/77/EC expressly indicated that renewable energy support systems were subject to Community regulations in terms of Government subsidies. It is thus indicated in Article 4[507] of the aforementioned Directive 2001/77.

739.    From this perspective, the Claimants cannot be unaware of the Community Directives on Government subsidies in favour of the environment. In said Directives, in compliance with Directive 2009/28, energy from gas flaring is excluded since it is not considered energy produced from renewable sources.

740.    The COMMUNITY DIRECTIVES ON GOVERNMENT SUBSIDIES IN FAVOUR OF THE ENVIRONMENT of 2008 indicate that:

> "energy from renewable energy sources: the energy produced by facilities using only renewable energy sources, as well as the portion in terms of calorific power, of the energy produced using renewable energy sources at hybrid facilities that also use conventional energy sources. It includes the renewable electricity used to fill storage systems, but excludes the electricity produced using said systems"[508]

---

[505] Directive 2009/28 EC Article 5 (3) (2)-. C-50
[506] Directive 2009/28/EC. C-50
[507] Directive 2001/77/EC. C- 0022.
[508] Community Directives on Government subsidies in favour of the environment (2008/C/82/01). Chapter 2.2. Definitions Paragraph 70 subsection 9. R-0047.

741.    The Communication of the Commission of 2014 states the following in the same terms:

> *"energy from renewable sources»: energy generated by facilities that exclusively use renewable energy sources, as well as the percentage, in terms of calorific value, of the energy produced using renewable energy sources at hybrid facilities that also use conventional energy sources; it includes renewable electricity used to fill storage systems, but excludes the electricity generated using said systems;"*[509]

742.    From the viewpoint of Community Law, the Claimants' expectations are unfounded.

**(b)    The Claimants ignore the evolution of the use of gas under the regulatory framework**

743.    The Claimants seem to forget that the use of gas in solar thermal facilities was introduced in the SES by RD 436/2004[510], modified by RD 2351/2004.[511] This last wording was definitively included RD 661/2007[512].

744.    The Claimants fail to indicate that solar thermal power plants (group b.1) must use <u>only solar energy</u> as a primary energy for electricity production, which does not include any fossil fuel. As falling within subgroup b.1.2, RD 661/2007 authorises them to use a fossil fuel, **within certain limits and for a concrete use:** the "maintenance of the heat transmitting fluid temperature in order to *compensate for the lack of solar irradiation,"* and also **when a reasonable circumstance arises:** only if this lack of solar irradiation "may affect the projected delivery of energy."

745.    In none of these wordings was the indiscriminate use of gas to produce electrical energy permitted. In any case, its use was restricted "*solely to maintaining the temperature of the heat accumulator*" in the words of RD 436/2004 or "*to compensate for a lack of solar irradiation that might affect the planned supply of energy*".

746.    Moreover, at no point did neither RD 436/2004 nor RD 661/2007 allow the use of gas to produce electricity separately from the aforementioned uses.

747.     The CNE did not endorse the indiscriminated use of gas in solar thermal plants. The reading of the evaluation carried out by the CNE leads us to a different conclusion to that reached by the Claimants. The CNE indicated:

> *"The CNE considers positive the possibility of hybridisation of solar thermal facilities <u>in the manner</u> established in the RD proposal"*[513]*. (Emphasis added)*

---

[509] Directives on Government subsidies relating to environmental protection and energy 2014-2020 (2014/C 200/01). Subchapter 1.3 Definitions Paragraph 19 point 11. R-0048.
[510] Counter-Memorial on the Merits, paragraph
[511] RD 2351/2004, of 23 December, which amends the resolution procedure for technical restrictions and other regulatory standards of the electricity market. R- 0123.
[512] RD 661/2007.R-0042.
[513] CNE Report 3/2007, of 14 February 2007, regarding the RD proposal, regulating the activity of electricity production under the special regime. R-0298.

169

748.    That is, the CNE does not endorse the Claimants theory. The CNE does not merely point out that the positive hybridisation of solar thermal plants. It indicates that the hybridisation of said plants is positive "in the manner" indicated in the project. As we have observed, the use of gas in RD 661/2007 is allowed in a certain "manner": for certain uses and up to a maximum that need not be reached. Beyond those uses, it is not possible to take into account the use of gas to configure the premium payment system of solar thermal plants.

749.    At the time of implementation of these regulations, the technical regulations that would define the necessary minimum technical requirements for the use of this support fuel had not yet been approved. That is to say, what minimum support percentage is necessary for the uses indicated for the purposes of making the plant operational. Therefore, the CNE, in its report of 3/2007, endorsed the hybridisation of solar thermal plants.

750.    In line with the foregoing, in its Report dated 7 March 2012, the National Energy Commission indicated that:

> "Until the necessary minimum technical requirements for the use of conventional fuel for each of the technologies have been established, it is proposed that the establishment a transitional period be established with a single general limitation for all of them that is equal to 5 % of the primary energy.[514]

751.    In line with Community regulations and that indicated by the CNE, the determination of the amount of gas usable for essential technical uses that do not generate electricity, neither directly nor indirectly, is included in Order IET/1882/2014, of 16 June[515]. The aforementioned Order fixes this amount of usable gas at 300 MWht/MW, which for 50 MW power plants implies reaching 15,000 MWht.

**(c)    The Claimants ignores the manner in which the use of the gas is envisaged in the new regulation**

752.    In the new regulatory framework, as we shall analyse later, the grant received by the plants is articulated through two items: Remuneration for investment and Remuneration for operation.

753.    Remuneration for investment covers the investment costs of a standard facility that cannot be recovered through the sale of energy"[516] and (ii) the Remuneration for operation covers, where applicable, the difference between operating costs and revenues from the market share of said standard facility." These remuneration items allow all efficient investors to recover their investment and operating costs while also obtaining a reasonable return.

---

[514] Report on the Spanish Energy Sector, Introduction and Executive Summary, Part I. Measures to guarantee the financial-economic sustainability of the electricity sector, National Energy Commission, 7 March 2012. Pag. 23 and 24. R-0082.

[515] Order IET/1882/2014, of 14 October, which establishes the methodology for calculating electricity attributable to the use of fuels in solar power plants. R-0262

[516] RD-Act 9/2013 of 12 July, establishing urgent measures to ensure the financial stability of the electricity system. Article 1 (2) R-0113.

754.    Operating costs include costs arising from the consumption of gas for essential technical uses. Therefore, Order IET/1045/2014,[517] in line with Order 1882/2014, establishes the consumption of gas that will be covered by Remuneration for operation at 15,000 MWht for 50 MW power plants.

755.    The new remuneration model covers, by means of the corresponding grant, (Ro), the costs incurred by plants in the consumption of gas. However, only the consumption of gas technically essential for the operation of a plant. This does not mean that the plants will only be allowed to produced a limited amount of energy using gas. Plants can produce the energy they deem convenient using gas. However, electricity production using gas flaring will not be remunerated, which is fully consistent with the purpose of the subsidy system for renewable energies. A minimum understanding of the support system for renewable energies cannot give rise to the expectation that the production of energy using fossil fuels can be subsidised.

756.    Consequently, the measure is based on the fact that the use of gas is technically necessary for the operation of these renewable energy plants. Therefore, the consumption of gas technically indispensable for operating said plants is determined and, on that basis, the technically indispensable gas consumption is subsidised. Envisaging the use of gas beyond that envisaged by Spanish regulations would give rise to a serious conflict with Community Directives in this regard, since electricity production using fossil fuels would be remunerated as renewable energy. A possibility for which there can be no expectation whatsoever.

757.    The Claimants do not mention in their Memorials how this measure affects their plants. From the documentation provided by the Claimants, we can see that the measure analysed has not affected the proper operation of the plants. Annual gas consumption data is obtained from the DISPEROSA report that shows that in 2014 and 2015 the power plants operated properly, even surpassing the hours of operation foreseen in Order IET/1045/2014, with lower gas consumption than what is considered in both Order IET/1882/2014 and Order IET/1045/2014:[518]

|  | TERMOSOL 1 | | TERMOSOL 2 | |
| --- | --- | --- | --- | --- |
|  | 2014 | 2015 | 2014 | 2015 |
| Gas consumption (MWht) *(DISPROSA Report, R-0262)* | 10,922 | 8,779 | 10,317 | 9,117 |
| Estimated consumption in Order 1882 and Order 1045 | 15,000 | | | |

*SOURCE: DISPEROSA Reports, Order IET/1882/2014 and Order IET/1045/2014*

**TABLE 2:** *Comparison of gas consumption DISPEROSA Reports vs Order IET/1882/2014*

758.    Consequently, the measure does not impact the correct operation of the plants. These, with the related measure, have improved electricity production using renewable energy sources.

---

[517] Order IET/1882/2014, of 14 October, which establishes the methodology for calculating electricity attributable to the use of fuels in solar power plants. - R-0357

[518] Second Witness Statement of Mr Carlos Montoya, para. 54

171

759.    In the new regulation, the higher investment costs incurred by the developer, in order to allow the use of gas in its facility, were taken into consideration when establishing the *investment cost* of the corresponding standard facility[519].  Consequently, the Claimants will obtain the return of the amounts invested in equipping the plants with the necessary tools for the use of gas and will also obtain a profitability of 7.398% on standard facility.

760.    Consequently, the measure is based on the fact that the use of gas is technically necessary for the operation of these renewable energy plants. Therefore, the consumption of gas technically indispensable for operating said plants is determined and, on that basis, the technically indispensable gas consumption is subsidised.

**(4.3)    Revision of remunerations in line with the Consumer Price Index at constant tax rates, excluding unprocessed foods and energy products**

761.    This measure did not eliminate the updating of remunerations, tariffs and premiums. It simply replaced one updating index with another more in keeping with the normal calculation standards of the consumer price indices in the international economy with the objective of avoiding distortions in the consumer price index, as was noted in the Counter-Memorial on the Merits[520].

762.    Furthermore, the Claimant omits to mention that the updating mechanism set out in article 44 (1) of RD 661/2007 was generated in favour of producers and to the detriment of the Spanish Energy System, an over-remuneration that it was necessary to correct. This was stated in the National Energy Commission report of 7 March 2012[521]. We will return to this question later.

763.    However, this measure has been absorbed by the new regulations under the terms that we shall analyse later. As demonstrated in our Memorial on the Merits, during the time in which the new measure was in force, it did not cause any adverse effect for the Claimants. Moreover, they were favoured by the measure due to the better performance of the CPI at constant taxes without unprocessed foodstuffs or energy products than the CPI.[522]

**(4.4)    Reduction to zero euros of the premium in the option of selling electrical energy at production market price plus the premium.**

764.     The introduction of this measure made it possible to eliminate a situation of over-payment that derived from this option. This was stated in the Preamble to RD-Act 2/2013[523]and the National Energy Commission made it clear on 7 March 2005[524]. However, the Claimant Party has made no statement in this regard.

---

[519] Witness statement by Carlos Montoya of 03 March 2015. Paragraph 48.
[520] Counter-Memorial on the Merits, paragraph 454-461
[521] *Report on the Spanish Energy Sector Part I. Measures to guarantee the financial-economic sustainability of the electricity sector,* National Energy Commission, 7 March 2012, page 22. R-0082.
[522] Counter-Memorial on the Merits, paragraph 456
[523] Counter-Memorial on the Merits, paragraph 463

765.   The Claimant Party ignores: a) the relationship that has existed between the regulated tariff and the pool plus premium options within the Spanish regulatory framework; b) the reason the pool plus premium option was established; and c) the evolution of this option in the different remuneration models.

**(a)    Relationship between regulated tariff and pool plus premium.**

766.   The Claimant Party is unaware of the connection between the two options. The pool plus premium option as remuneration option separated from the regulated tariff arose from RD 436/2004.

767.   Through said distinction, a remuneration option was established in which the producers assumed the market risk:

> *"The new regulatory and remuneration model that introduces the RD proposal improves the transparency of the special regime system, since it clearly separates in into two activity modalities:*
>
> *- Activity without risk, in which a stable remuneration is guaranteed, and in addition, for renewable energies it fulfils the legal provision that its remuneration be situated within the "range of 80%-90% of the average price of electricity".*
>
> *- Activity with risk, since apart from the premium and incentive, the rest of the remuneration is completely fee."[525]*

768.   In this environment, the regulated tariff remunerated the activity without risk:

> *"The regulated tariff establishes a remuneration that is always equal to or greater than the average market price, due to which it is remunerated in all cases, considering the rest as a (variable) premium"[526]*

769.   The pool plus premium option was the remuneration of the activity with risk. In this option, the producer received the market price, with its fluctuations, and a premium, also assuming the costs of participating in the market. Therefore, in this remuneration option RD 436/2004 also included the payment of an *"incentive"* aimed at promoting participation in the market.

770.   The reason for implementing this second remuneration option was the need to increase the efficiency of the SES:

> *"The proposed RD incentivises the participation of the special regime in the market as the main mechanism for contributing efficiency to the system as a whole. With this, in addition to the increase in the number of market players and their consequences on the competition, the operation of the system benefits from considering that special regime*

---

[524] *Report on the Spanish Energy Sector Part I. Measures to guarantee the economic-financial sustainability of the electricity system,* National Energy Commission, 7 March 2012, page 23. R-0082.

[525]   CNE Report 4/2004, of 22 January, regarding the Royal Decree proposal, which establishes the methodology for the updating and systematisation of the legal and economic regime for electricity production in the special regime. Page 17. R-0316.

[526] Ibid. page 18.

*facilities contribute their energy under better conditions for operating the system as a whole.*

*In this regard, the intention is not to discriminate the granting of the incentive among the technologies that participate in the market. If this incentive is granted in the proposed RD to cogeneration, it should also be granted to the other technologies. Also, the proposed premium seems insufficient, since its design is due to a complement of market remuneration, due to which in the best of cases the remuneration would be equated to the tariff-based remuneration (at least during the first years). The result of this, as we shall see later, is that there is no apparent incentive for the participation of the special regime in the market. <u>The CNE understands that the premium, together with the market remuneration, must remunerate the facilities in order to obtain Reasonable Return - parameter A - and to achieve the planned objectives - parameter B -, while the incentive must precisely constitute an additional remuneration when the owner of a facility increases the rating of its energy, endowing it with a short-term warranty and participates in the market.</u> This action must be remunerated by means of parameter C, which precisely constitutes the differential remuneration with respect to the regulated tariff option."*[527]

771.  Tariff and premium are two concepts that are intimately linked together. The amount of the premium is derived from the regulated tariff. In this regard, the Statement of Regulatory Impact of RD 436/2004 establishes the following link:

*"Premium: this will be a percentage of the average or reference electricity tariff each year, equal to the percentage of the regulated tariff (hypothesis 9) discounting the percentage corresponding to the estimated market price (50%, hypothesis 7)."*[528]

772.  Consequently, there cannot be differences between one remuneration option and another in terms of calculation of project profitability. The difference lies only in that the producers who opt for the option with risk would receive an incentive. This incentive was exclusively created to stimulate market participation and also to offset the costs of the aforementioned participation for producers:

*Incentive: Self-generators are entitled to receive an additional sum or incentive for participating in the market when they sell their surplus on the market. This will be a percentage of the average or reference electricity tariff each year, depending on the technology, the life of the plant and the installed capacity."*[529]

773.  RD 661/2007 maintains the regulated tariff and pool plus premium option, but not for all technologies. Said option was eliminated, inter alia, from photovoltaic technology, which could only access the regulated tariff.

774.  The impossibility of photovoltaic technology accessing this option did not pose a problem for the Sector. With the regulated tariff option, photovoltaic producers could achieve Reasonable Return guaranteed by Act 54/1997. At this point, Pöyry warned the Claimants that:

---

[527] Ibid. pages 20 and 21
[528] Report RD 436/2004. Page 7/10. R-0315.
[529] Ibid. Page 7/10.

*"Solar PV projects will not however be exposed to the pool Price, it is simply a way of integrating the energy into the market for reasons of grid dimensioning and ensuring grid stability and not as a means of setting remuneration"[530]*

775.    Notwithstanding the foregoing, RD 661/2007 maintains the essence of the distinction between pool plus premium and regulated tariff as established by RD 436/2004, although with the incentive that existed in the pool plus premium option in the premium:

*"The incentive to participate in the market, which is united with the premium and is even included therein, disappears"[531]*

776.    However, the reason for the existence of the pool plus premium option was not to grant greater profitability. The purpose of this option, as in RD 436/2004, was to incentivise participation in the market to increase the efficiency of the SES[532].

**(b)    The Claimants are unaware of the reasons for adopting this measure**

777.    Due to its unawareness of the relationship between regulated tariff and pool plus premium, in addition to the purpose of the second option, the Claimant party rejects the reasons for adopting the measure being examined.

778.    The reasons for the measure were expounded by the CNE in its CNE report where it indicates that the internal consistency between the regulated tariff and pool plus premium option had been lost, giving rise to over-remuneration situations in this second option. It, therefore, indicated that:

*"Current regulation is not consistent with respect the relative values of the thermoelectric solar premium and tariff (the current tariff is worth 298.96 Euros/MWh while the premium is worth 281.89 Euros/MWh, representing a theoretical market price of 17.1 Euros/MWh). Since the economic and financial study of the facilities is carried out with the regulated tariff, for an average market price of 50 Euros/MWh, the premium should have a value of 249 Euros/MWh, which is 12% lower than the current premium. In a first approximation, the premium corresponding to the solar thermal power plants would have to be reduced by 12%."[533]*

779.    Consequently, the pool plus premium option was generating considerable over-remuneration, since it was based on an excessively low market price.

780.    At this point, we must remember that the measure analysed was not a novelty in the Spanish regulatory market. RD 661/2007 deprived photovoltaic technologies, among other technologies, from the market option. Furthermore, we must take into account that its sole effect was to stop promoting the participation of the plants in the market.

---

[530] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008 Edition. Pag. 34 C-202.
[531] Report RD 661/2007. R-0324.
[532] CNE Report 3/2007, of 14 February 2007, regarding the RD proposal, regulating the activity of electricity production under the special regime. Pag. 35. R-0298.
[533] *Report on the Spanish Energy Sector Part I. Measures to guarantee the financial-economic sustainability of the electricity sector,* National Energy Commission, 7 March 2012. Page 23. R-0082.

781.    Consequently, the measure did not affect the commitment arising from the legal mandate of granting the plants Reasonable Return. The aforementioned plants continued to receive the regulated tariff. It should also be noted that the financial models were built upon the regulated tariff option and not the pool plus premium option.

**(4.5)    New remuneration model for energy production based on renewable sources**

782.    The Claimant asserts that the report is not justified and that the new remuneration model entails a complete revision of the previous remuneration framework. Nonetheless, these assertions derive from an erroneous understanding of the remuneration framework in which the Claimants made their investment. As we shall explain below, a large part of the elements that define the new remuneration system were already included in Act 54/1997.

**(a)    The new remuneration model maintains the priority of access and dispatch.**

783.    The regulation maintains the principles of priority of access and dispatch of electrical energy generated by the facilities using renewable energy sources and high-efficiency cogeneration. The new regulation even extends beyond what is set out in the EU regulations[534] and adds explicit recognition of this privilege, as it was not included in the previous regulations in the same way.

784.    With regards to priority of dispatch, Article 26 of Act 24/2013, states that:

> *"Electrical energy from facilities that use renewable energy sources and, after that, energy from high-efficiency cogeneration facilities, will have priority of dispatch under equal economic conditions in the market, without prejudice to the requirements that are necessary to maintain the reliability and security of the system in the terms defined by the Government.*
>
> *Without prejudice to the security of supply and the efficient operation of the system, producers of electrical energy from renewable energy sources and high-efficiency cogeneration will have priority of access and connection to the network, under the terms that are determined by the regulations, based on objective, transparent and non-discriminatory criteria."[535]*

785.    From a simple reading of this regulation, it is apparent that priority of dispatch and access and connection to the network are rights that producers of energy from renewable sources have. This right can only be limited for reasons of reliability and security of the Spanish Energy System. Furthermore, in contrast with what was laid-down by the previous Regime, this priority of dispatch even takes precedence over high-efficiency cogeneration installations.

---

[534] Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC. Article 16(2) (c): "*Member States shall ensure that when dispatching electricity generating installations, transmission system operators shall give priority to generating installations using renewable energy sources in so far as the secure operation of the national electricity system permits and based on transparent and non-discriminatory criteria.*" R-0358.

[535] Act 24/2013, of 26 December 2013, on the Electricity Sector, published in the Official State Gazette of 27 December 2013. Article 26 (2). R-0037.

**(b)    The remuneration system maintains the objective of endowing the investor with Reasonable Return from a project**

786.    Both the previous model and the current one share as an objective the idea that the system of subsidised support for renewable energy should allow investors to obtain "a Reasonable Return" from a project. A Reasonable Return is understood as the investor recovering the investment costs it has made to construct a plant, its operating costs and also make an adequate profit.

787.    An initial element that might imply a significant difference is that under the previous system the reasonableness or otherwise of the profitability was determined "*in accordance with the cost of money in the capital market*"[536]. The Law now requires that the principle of Reasonable Return be based on a specific capital market: namely the *secondary market of the State's ten-year bonds plus the adequate differential*". It is specifically stated that:

> "*This Reasonable Return will be based, before tax, on the mean return in the secondary market of the State's ten-year bonds plus the adequate differential*"[537].

788.    The new system, like the previous one, is built upon the principle of Reasonable Return.

789.    As expounded previously in Section III.A.1.4, the previous system established a specific mechanism for remunerating the production activity using renewable energy sources based on market price plus an incentive, for the purpose of granting Reasonable Return on investment.

790.    The subsidies, like now, were a supplementary remuneration that, together with the market price, were aimed at achieving Reasonable Return. It should be recalled that Article 30 (4) of Act 54/1997 used the expression "*shall supplement each other*" and that said supplement is established "*for the purpose of achieving a Reasonable Return rates with reference to the price of money on the capital market.*"

791.    Consequently, the perception of subsidies in the previous remuneration model, like this one, was linked to the Reasonable Return objective. Therefore, in the previous model when the plants achieved the aforementioned profitability objective they would not be creditors of any grant. Upon achieving the profitability objective, the plants would have reached the *"level playing field"* to compete on equal terms with conventional energy.

792.    In line with the foregoing, the Claimant forgets that Article 16 of Act 54/1997 indicated that:

> "*The remuneration of the production in plant busbars of the special regime producers shall be that corresponding to electricity production, in accordance with section 1 of this Article **and, where applicable**, a premium that will be determined by the*

---

[536] Act 54/1997, of 27 November, on the Electricity Sector. Article 30 (4). R-0003.
[537] RD-Act 9/2013 of 12 July, establishing urgent measures to ensure the financial stability of the electricity system. Article 1 (2). ). R-0113.

*Government, upon consultation with the Autonomous Regions, pursuant to Article 30.4.*[538](*Emphasis added*)

793.    The Claimant party also forgets that the Supreme Court of the Kingdom of Spain clearly defined the scope of the concept of Reasonable Return with regard to the duration of subsidies:

> *"the principle of reasonable return must be applied [...] to the whole lifespan of the la facility, but not [...] in the sense that it this principle guarantees the generation of returns for all of this lifespan, but rather in the sense that it is ensured that the investments used in the facility obtain a reasonable rate of return over its lifespan as a whole. This [...] <u>does not entail the continuance of a given premium during all of the lifespan of the installation, as it can it could well be the case that said investments have already been amortised and have produced a Reasonable Return long before the end of their period of operation.</u>"*[539]

794.    Consequently, the previous model did not guarantee any subsidy per se. The previous model guaranteed the subsidies until the plants achieved the Reasonable Return objective.

795.    In the previous system, the formula for calculating profitability was not set out in the Law. The Law referred their establishment to the so-called Renewable Energy Plans. So, in the 2005-2010 Renewable Energy Plan, profitability was set at "*approximately 7% for a standard facility after taxes and without external financing*[540]".

796.    Currently, the calculation of the profitability objective is established at the level of law by adding a notable differential to the Spanish ten-year bond, in the first regulatory period, of 300 basic points.[541] This assumes a pre-tax profitability of 7.398 for a standard facility. This way of calculating Reasonable Return coincides with the one proposed by APPA and Greenpeace in 2009.[542] Therefore, the new system is reasonable and predictable.

797.    In regards to the Claimants' argument that the new system implies a complete rupture with the previous one and does not provide them with a reasonable return, we show a table indicating the total income to be received from the plants during their service life until reaching the cited profitability target. Said table expresses that the plants, for carrying out their activity, producing energy, will receive 20% of their revenue and 80% of their revenue by way of subsidies. With these data, can it really be upheld that the Kingdom of Spain has withdrawn its support to the renewable energy industry?[543]:

---

[538]  Act 54/1997, of 27 November, on the Electricity Sector. Article 16 (7) R-0003.
[539]  Judgement of the Spanish Supreme Court of 12 April 2012, app. 40/2011 (R-0080).
[540]  Spain Renewable Energy Plan. 2005-2010.  Institute for Diversification and Energy Saving of the Ministry of Industry, Tourism and Trade. Pag. 274.R-0052.
[541]  RD-Act 9/2013 of 12 July, establishing urgent measures to ensure the financial stability of the electricity system. First Additional Provision. R-0113.
[542]  Renewable Energy Act Proposal from APPA and Greenpeace, 2009. R-0308.
[543]  Accuracy, Second Report on the Claimants' Claim. Para. 205.

**Figure 2.2 - Distribution of income received through the Plants**



*Source: CLEX-283 and Accuracy analysis*

798.    In this point the new System not only maintains continuity with the previous System, but also gives investors greater security, because (1) it passes into law the profitability that must be conferred upon the investors (objective pursued by the sector for a long time); and (2) it identifies the specific capital market that must be used to establish profitability.

**(c)    The two remuneration frameworks maintain the same structure to meet this objective**

799.    As we have already explained, in the previous model the Reasonable Return objective should have been the result of the sum of two elements: the market price and a subsidy[544]. At present, the new model maintains the same structure. So the Reasonable Return must be attained through the sum of two components: market price and a subsidy that can be broken down into two elements: Remuneration on investment and Remuneration on the operation.

800.    Specifically: (i) Remuneration for the investment: *"Composed of an amount per unit of installed capacity, shall cover, as appropriate, the investment costs of a standard installation that cannot be recovered through the sale of energy"*[545] and (ii) the Remuneration for operation: is an *"amount for the operation of the installation to cover, as the case may be, the difference between exploitation costs and the revenues obtained from the participation of such a standard installation in the market"*[546].

801.    The difference from the previous system lies in the fact that this last model grouped the three elements that must be remunerated into a single item (regulated tariff or pool plus

---

[544] Act 54/1997, of 27 November, on the Electricity Sector. Articles 16 and 30 (4). R-0003.
[545] RD-Act 9/2013 of 12 July, establishing urgent measures to ensure the financial stability of the electricity system. Article 1 (2).  R-0113.
[546] RD-Act 9/2013 of 12 July, establishing urgent measures to ensure the financial stability of the electricity system. Article 1 (2). R-0113.

premium): (i) recovery of the cost of investment; (ii) recovery of the operating costs; and (iii) obtainment of Reasonable Return. Once these three elements have been considered, we can obtain the subsidy paid per unit of energy produced. In this manner, market price plus the subsidy made it possible to achieve the Reasonable Return required by Act.

802.    The current model, like the former, is established for the purpose of remunerating the three same aforementioned elements. Likewise, in the new model the same means are used to remunerate those elements: market price and the subsidy.

803.    However, the subsidies are paid in a disaggregated manner. One portion with respect to the rated power and another with respect to the energy produced. In general, market revenue and, where applicable, the Remuneration on the operation (Ro) remunerate operating costs. Secondly, surplus market revenue, after covering operating costs, if any, together with the Remuneration on investment (Ri) remunerate the investment costs and the obtainment of a Reasonable Return.

804.    This does not mean that the production of the plants is ignored. The aforementioned production is also taken into account to calculate the subsidies.

805.    In regards to what was formerly expounded, we must add an important correction. In the former model, the paid production hours were not unlimited. As we have already had occasion to state previously, the subsidies established in RD 661/2007 were based on the PER 2005-2010.

806.    In the PER 2005-2010 it was clear that the subsidy was not attributed to all electricity production. In the PER, the subsidy was attributed to a certain number of productions hours. Specifically to those production hours that allowed the plant to obtain the Reasonable Return established in said planning tool. That is to say, until achieving a typical facility profitability objective of 7%. Which did not preclude that if the standard number of production hours was exceeded, the plants could obtain the market price for that additional production.

807.    The circumstance that we have just expounded gave rise to the determination by RD 1614/2010 for solar thermal facilities and wind farms and RD-Act 14/2010 for photovoltaic facilities of the maximum number of production hours paid in line with what is established in the PER 2005-2010. Specifically, the Statement of Regulatory Impact of RD 1614/2010 indicated the following:

> *The remuneration values of RD 661/2007 were calculated in order to obtain reasonable rate of return rates and by taking the facilities' average operating hours of these three technologies as an initial hypothesis.*
>
> *These operating hours can be found in the Renewable Energy Plan 2005-2010, for all technologies.*
>
> *Subsequently, in the real operation of the system, it has been demonstrated that the operating hours of the facilities, in some cases, exceed those initially envisaged, for different reasons: technological improvement, over-installation, etc. In any case, this*

> *meant that, for them, the remuneration being obtained is greater than the reasonable remuneration.*
>
> *In this RD, it is considered that the installations will receive an equivalent bonus or bonus, whichever is applicable, until using up the reference hours stated for each year, and subsequently they can continue to operate, receiving the market price for their electricity. In this manner, the over-remuneration received by the facility is returned to society."[547]*

808.    In this point it should be recalled that Act 54/1997 never froze a specific formula or mechanisms where through Reasonable Return could be obtained. Moreover, Act 54/1997 did not link the receipt of the subsidies to the energy produced. Consequently, since 2006 the Spanish Supreme Court has interpreted Article 30.4 of Act 54/1997, stating that:

> *"the remuneration system that we examined does not guarantee (…) the owners of special regime facilities the intangibility of a certain level of profit or revenue in relation to those obtained in previous years, <u>nor the indefinite continuance of the formulas used to set the premiums</u>"[548]. (Emphasis added).*

809.    Along this same line, this jurisprudential case Act of 2006 was subsequently reiterated in a Decision handed down on 3 December 2009[549] and in two Decisions on 9 December 2009.[550] . In this regard, we must highlight that pointed out by the Supreme Court in the last of the aforementioned Decisions:

> *"It should be noted that the establishment of the economic regime for facilities operating under the special electricity production regime, proposed by RD 661/2007, of 25 March, <u>cannot be rated en abstracto de arbitrario, since it is conditional upon the objective of ensuring Reasonable Return throughout the useful life of these facilities, such that the Government, pursuant to Article 15.2 of Act 54/1997, of 27 November, of the Electricity Sector, is authorised to approve the methodology for calculating and updating the remuneration of said activity with objective, transparent and non-discriminatory objectives (…)" (Emphasis added)[551]*

810.    In any case, both the previous and the current remuneration schemes share the same purpose: to provide the plants with a Reasonable Return on investment costs. Also, in the two models the same components are taken into account to achieve said purpose: market price and the subsidy that supplements the former. The essence of the remuneration model envisaged in Act 54/1997 is currently maintained.

811.    Moreover, the current model, like the former and with the aim of exceeding the established standards for standard facilities, incentivises electricity production. Proof of this is the behaviour shown by the Termosol Plants, which, far from reducing production, have beat the forecasts of their financial models.

---

[547] Report on the Analysis of the Regulatory Impact of the Draft RD 1614/2010 regulating and modifying certain aspects related to electricity production using thermosolar and wind power technologies. R-0334.
[548] Judgement from the Third Chamber of the Supreme Court dated 25 October 2006, Appeal 12/2005, reference El Derecho EDJ 2006/282164 (Spanish). Legal Ground Third. R-0057.
[549] Judgement of the Supreme Court, of 3 December 2009, Legal Ground Third. R-0064.
[550] Judgement from the Third Chamber of the Supreme Court, of 9 December 2009 R-0002.
[551] Judgement of the Supreme Court, of 3 December 2009, Legal Ground Fourth. R-0064.

**(d)      Both models correspond to the same concept of efficiency**

812.    The current Remuneration System corresponds to the same efficiency model on which the former was based. The Spanish Regulatory Framework has always maintained the same concept of efficacy and efficiency when designing the system for supporting the growth of renewables.

813.    Effectiveness has always been judged by achieving certain objectives and efficiency by achieving said objectives at the lowest possible cost for the benefit of the SES, end consumers and producers. Furthermore, this concept of efficiency should not only be conceived as a standard for correct regulation, but that it has always been an imposition established by the Spanish regulatory framework since Act 54/1997 and it is now maintained in the remuneration framework.

814.    In this sense, we should recall that Act 54/1997 stated specifically that the purpose of the Spanish Energy System, just like the new regulatory framework, was:

> *"to guarantee that all consumers have equal and quality access to electrical energy, ensuring that this is done <u>at the lowest possible cost</u>, without neglecting environmental protection"[552] (Emphasis added).*

815.     In this way, aid or subsidies for renewables, as a cost of the Spanish Energy System, cannot differ from that aim. This concept of efficiency was also included in the 2005-2010 Renewable Energy Plan when it stated that:

> *"The analysis carried out aims to balance the application of resources in order to obtain levels of return on investment that make it attractive in relation to other alternatives in a sector that is equivalent in profitability, risk and liquidity, and always aiming to <u>optimise the available public resources</u>"[553] (Emphasis added).*

816.    Furthermore, the 2005-2010 Renewable Energy Plan makes clear the enormous quantity of resources that were necessary to set in motion the launch of renewables. Costs that the Spanish consumer would defray. When analysing this piece of information, could anyone think that the investment and operation costs that will be paid by the consumer were not going to be those referring to an efficient and well managed business? That is to say, could any sophisticated investor think that the costs would be paid by the consumers at any price, whatever it might be?

817.    Consequently, the new model of remuneration, like the previous one, is based on the same concept of efficiency. Although it is now expressly included in the law as it establishes that:

---

[552] Act 54/1997, of 27 November, on the Electricity Sector. Preamble and Article 10. R-0003.
[553] Spain Renewable Energy Plan. 2005 -2010. Institute for Diversification and Energy Saving of the Ministry of Industry, Tourism and Trade. R-0052.

> *"To calculate said specific remuneration, they shall be taken into consideration, for a standard facility throughout its regulatory lifespan and in reference to the activity performed by an efficient and well-managed company"[554]*

818.    The aforementioned efficiency model was reflected in the articulation of different standard facilities that included the corresponding standards. Said criterion is followed in the new remuneration model, as we expound in the following point.

**(e)    Both models establish the subsidies based on the standards set for the different standard facilities.**

819.    The subsidies that derived from RD 661/2007 were not laid-down regarding each investor's individual plants. Said subsidies had the objective of achieving a certain profitability on certain investment costs established at standard facilities.

820.    As required by Act 54/1997, the subsidies set by RD 661/2007 were based on the corresponding Renewable Energy Plan[555]. In particular, Renewable Energy Plan 2005-2010. In this Renewable Energy Plan, the methodology used to determine profitability of around 7 % was set out, where it stated that:

> *"Taking as a baseline the proposed energy objectives, the financing requirements have been determined for each technology according to its return, defining a range of standard projects for the calculation model.*
>
> *These standard projects have been characterised by technical parameters relating to their size, equivalent hours of operation, unit costs, periods of implementation, lifespan, operational and maintenance costs and sale prices per final unit of energy. Likewise, financial assumptions and a series of financial or support measures designed in accordance with the requirements of each technology have been applied" [556]*

821.    In both the PER 2005-2010 and the PFER 2000-2010, the subsidies arose from a specific methodology:

      a) Recognising and reconstructing an economic operating structure (standard facility), identifying the standard investment costs (CAPEX) and their operating and maintenance costs (OPEX), according to the actions of a "diligent investor". Standard facilities;

      b) Set a balanced and proportional economic return objective, in terms of Reasonable Return on a standard facility.

822.    Consequently, if the plants adjusted or improved the established standards for a standard facility (investment costs, operating costs, etc.), they would achieve or improve the

---

[554] RD-Act 9/2013 of 12 July, establishing urgent measures to ensure the financial stability of the electricity system. Article 1 (2). R-0113.
[555] Act 54/1997, of 27 November, on the Electricity Sector. 25th additional provision. R-0003.
[556] Spain Renewable Energy Plan. 2005 -2010. Institute for Diversification and Energy Saving of the Ministry of Industry, Tourism and Trade. Pages 273, 274 and 280. R-0052 and R-0296 (complete).

profitability considered reasonable. In this regard, the Economic Report of RD 436/2004 indicated:

> "The A parameter (investment, operation and maintenance costs for each technology) has great weight in setting the amount of the regulated sell-tariff to the distributor. _Thus, any plant in the special regime installed in Spain will get Reasonable Return, provided that it (standard plant type) is equal or better than that of the group_"[557].

823.   Any diligent investor should have been aware of this methodology. In fact, Pöyry expressly warned the Claimants that:

> "The PER sets out the specific growth projections for each technology and breaks it down by autonomous region. _Using the PER´s the Government then sets a tariff (published in the form of a Royal Decree)_ for each technology depending on the level of growth that is required
>
> The PER´s are the best indication of the future development of the different renewable technologies."[558]

824.   Consequently, the concepts of standard facility, standards and parameters are not a novelty introduced by the current regulatory framework. These concepts, as examined previously in Section III.A.1.4(e) of this document, already existed as a basic element for setting the subsidies in the previous model. Therefore, the only thing that the new regulatory framework does is that, instead of referring to a Renewable Energies Plan to set them, the concept is expressly included in the Law. Once the concept is established in the law, these parameters and standards are introduced in a Regulation[559] and a Ministerial Order[560].

825.   Nevertheless, now multiple standard facilities are taken in order to adjust them to different existing investment options.[561] The regulatory framework in force differentiates between the different CSP technologies (parabolic cylinder, steam tower, salt tower, Fresnel reflectors or hybrid), in order to determine specific remuneration parameters for each of them, based on the standard value of the initial investment and on their standard exploitation costs, all of this for an efficient and well-managed company.

826.   The Claimants also indicate that the typical facilities used in the new remuneration model do not correspond to their real investment and operation costs, which is important, taking into account that the Termosol Plants are the only ones of their respective SF.[562] This assertion is completely unfounded.

---

[557] Financial Report of RD 436/2004 R-0315.
[558] "Current and Future Trends in the Spanish Solar System". Pöyry November 2008. Edition. Pag. 31 C-202.
[559] RD 413/2014, of 6 June, which regulates the activity of the production of electric energy from renewable energy sources, cogeneration and waste. R-0124.
[560] Order IET/1045/2014, dated 16 June, approving those compensation parameters for standard energy facilities applicable to certain electric power production facilities from renewable energy sources, cogeneration and waste. R-0122.
[561] Statement by Carlos Montoya of 3 March 2016, paras. 17-30
[562] Reply on the Merits, para. 300.

827.    The object of this arbitration is not to analyse the calculations made for the more than 1,000 standard facilities. However, the Claimants do not provide a single piece of evidence to show that the standards on investment and operating costs of a typical facility applicable to the Termosol Plants are incorrect.

828.    However, the Claimants could have easily demonstrated to the Tribunal that the costs of standard facilities where its plants are included do not correspond to their direct investment and operating costs. In regards to the latter, the Claimants do not devote a single paragraph of their Reply on the Merits to try to disprove that OM 1045/2014 includes their O&M costs.

829.    In terms of investment costs (CAPEX), if we analyse the investment declared by the Claimants in their annual accounts, we can see that the fixed investments declared for the Extremadura 2 Solar Plant (TERMOSOL-2) are below those contemplated for the SF for this plant (SF-00620)[563]:

| | Financial statements | | Order IET/1045/2014 |
|---|---|---|---|
| | **2013** | **2014** | **IT-00620** |
| **TERMOSOL-2** | €320,767,435 | €316,647,179 | €322,665,465 |

**SOURCE:** *2014 financial statements of TERMOSOL-2 and Order IET/1045/2014*

830.    Regarding TERMOSOL-1, its investment costs are also covered by Order IET/1045/2014 if we make a uniform comparison to SF-00619 (without financial costs), even without discussing the cost overruns the PTEs have incurred due to excessive line evacuation to the Valdecaballeros station, with a distance of about double than that of other power plants connected to the same point on the network.[564]

831.    The Claimants' disagreement only focuses on: a) the financing costs; b) the capitalised inter-company costs; and c) the investment at the Valdecaballeros station. According to the Claimants, these three costs "*account for virtually the entire gap between the allowed costs of €645 million and the actual capitalised costs of €720 million reflected in the PTEs' financial statements.*"[565]

832.    In relation to the first ones, the Respondent has already shown that they have never been taken into account by the Kingdom of Spain for setting subsidies. In the face of this statement, the Claimants say that "*independently of whether or not the regulator explicitly takes financing costs into account in setting a tariff, the cost of financing is a cost which cannot be avoided by investors in projects*".[566] But this assertion does not contradict that the Respondent's conduct follows International Law, since a diligent investor in Spain could not expect the subsidies for renewable energy to cover their financing costs, whatever they

---

[563] Second Witness Statement of Carlos Montoya, para. 69
[564] Ibid.
[565] Reply on the Merits, para. 334.
[566] Reply on the Merits, para. 336.

might be. Each investor's leveraging decision is, therefore, a risk that they assume. The financing costs for the Termosol Plants come to 72 million €. By themselves they cover the "gap" between the investment costs set in the SF of PTE.

833.    With respect to the Valdecaballeros station costs, this Respondent admits them in light of what is stated by Mr Montoya in his witness statement, in spite of the fact that he classifies them as "cost overruns."

834.    Regarding the intra-group operational costs, the Claimants dedicate a single paragraph to try to justify them.[567] They base themselves on the expert report of Dr. Abdala and Professor Spiller to justify them. But the latter do not provide any explanation other than these costs being entered into the books.

835.    In consideration of all the foregoing, we must point out that, in spite of the fact that the Claimants insist throughout their statements that the Termosol Plants are unique, the fact is that the only difference between them and other CSP Plants with the same technology is their greater storage capacity. This circumstance is the one that was taken into account during drafting process of OM 1045/2014, in order to assign two differentiated SFs to the Termosol Plants. This is what Mr Montoya explains in his witness statement:

> *"If the technical characteristics of both plants are analysed and compared with other solar thermal power plants with the same parabolic cylinder technology located in Spain, it can be seen that the equipment and main characteristics of the plants of the claimants are identical to those of other plants and similar to the rest, without there being any differentiating or unique elements".[568]*

| | TERMOSOL-1 TERMOSOL-2 | ANDASOL I ANDASOL II | LA FLORIDA LA DEHESA | ARCOSOL-50 TERMESOL-50 | ASTE 1A ASTE 1B |
|---|---|---|---|---|---|
| Technology | CCPA | CCPA | CCPA | CCPA | CCP[3] |
| Authorised Capacity | 49.90 MW | 49.90 MW | 49.90 MW | 50 MW | 49.90 MW |
| Area solar field | 523,200 m$^2$ | 510,120 m$^2$ | 552,750 m$^2$ | 510,120 m$^2$ | 510,120 m$^2$ |
| Mirrors | FLABEG (RP3) | FLABEG (RP3) | RIOGLASS | FLABEG (RP3) | FLABEG (RP3) |
| Pipes | Schott (PTR70) | Schott (PTR70) Solel (UVAC 2008) | Schott (PTR70) | Schott (PTR70) | Solel (UVAC 2010) |
| Support structure | Sener Trough | Euro Trough | SKALET | Sener Trough | |
| Storage salts | 60% Sodium Nitrate 40% Potassium Nitrate | 60% Sodium Nitrate 40% Potassium Nitrate | 60% Sodium Nitrate 40% Potassium Nitrate | 60% Sodium Nitrate 40% Potassium Nitrate | 60% Sodium Nitrate[1] 40% Potassium Nitrate |
| Storage hours | 9 | 7.5 | 7.5 | 7 | 8[1] |
| Turbine | SIEMENS STT700 | SIEMENS STT700 | SIEMENS STT700 | SIEMENS STT700 | SIEMENS STT700 |

836.    The expert report on the service life of the Plants done by Professor Servert also shows that the Termosol Plants do not have any particularity in comparison to other plants with the same technology, other than their greater storage capacity.

---

[567] Reply on the Merits, para.347
[568] Second Witness Statement of Carlos Montoya, paras. 38-55.

837.   There is definitely no evidence that the parameters contained in the specific SFs of OM 1045/2014 are not adequate for the investment costs and the O&M costs for the Termosol Plants, once unjustified—and hence inefficient—costs are excluded.

**(f)   Both models have the dynamic character that is typical of a System based on Reasonable Return.**

838.   One of the features of the Spanish Energy System, based on the Reasonable Return mandate, was its dynamic character. The remuneration model arising from Act 54/1997 guaranteed its dynamism through the principle of regulatory hierarchy. However, the manner in which said dynamism was expressed was through regulatory amendments implementing the necessary means for guaranteeing the fulfilment of the Law. That is, the means whereby said dynamism was expressed was inflexible, from a formal viewpoint. It required constant regulatory reforms of the implementing regulations.

839.   In order to avoid said situation, in the current remuneration model, both the different cases in which amendments can be introduced and the time in which said amendments can be enforced are legally established. That dynamism is endowed with greater flexibility and predictability.

840.   In any case, we must point out that all of these amendments are envisaged to guarantee the two essential principles on which the new remuneration model is built: the economic sustainability of the SES and respect for the principle of Reasonable Return.

841.   The Claimants criticise this review system with unfounded arguments. The Claimants ignore that both in the model of RD 436/2004 and of RD 661/2007, the subsidies granted by said regulations were subject to updates: RD 436/2004 in accordance with the evolution of TMR and RD 661/2007 in accordance with the evolution of the CPI. Updates that must be made annually.

842.   The Claimants likewise ignore that RD 436/2004 was repealed (i) due to the adverse effect that the association between the subsidies and the TMR had on the economic sustainability of the SES and (ii) due to the unjustified increase in profitability caused by said association.

843.   The Claimants ignore that RD 661/2007 replaced the update of the subsidies pursuant to the TMR with an update based on the CPI less the corresponding differential.

844.   The Claimants intend to hide that the mechanism for updating the subsidies in accordance with the CPI had similar effects to those of the TMR. The CNE, in its report of 7 March 2012, diagnosed the problem on pointing out:

> *"The indexation to the inflation indicator is justified because, in the absence of a fossil fuel, the variable cost of these technologies depends mainly on the rendering of various services (operation, maintenance, insurance...). However, also for these technologies, a large part of their annual revenue was assigned to hedging their investment costs*

*(approximately 85% in the case of wind and photovoltaic facilities), due to which updating the entire premium was disproportionate (only 15% should be updated)".*[569]

845.    The explanation of what has been expounded by the CNE has its rationale in that the remuneration regime of renewable energy sources is aimed at enabling investors to recover their investment costs and operating costs, while obtaining Reasonable Return. Consequently, when establishing the subsidy it must be taken into account that this subsidy, together with market price, must cover the three items: recovery of investment costs, recovery of operating costs and provide Reasonable Return.

846.    However, as opposed to the operating costs, which are variable and their amount varies in the market; the investment costs are stranded costs. Once they are made, they are not subject to any factor that alters their value. In view of this circumstance, the CNE expresses that the updates of the subsidies must exclusively affect the portion thereof that covers the variable costs. That is, the operating costs. The portion of the tariff destined for hedging the investment costs must not be updated due to them being stranded costs. The update of the part of the subsidy destined for recovering the investment costs gives rise to additional unjustified profitability.

847.    In this line, the CNE proposes that only 15% of the subsidies should be updated. That is to say, the portion of the subsidies destined for hedging the operating costs. Moreover, we must not forget another important reflection made by the CNE:

*"Given that the values of the tariffs and premiums are calculated each year (or quarter) in reference to the values of the previous period, this measure has an accumulative economic impact: it would mean annually reducing the global amount of the equivalent premium of the special regime by approximately EUR 200 million (cumulative) from 2013 onwards"*[570]

848.    Consequently, the update of the total subsidies in accordance with the CPI gave rise to unjustified remunerations. Moreover, as a result of the cumulative effect of this measure, the update was performed every year on the amount of subsidies updated in the previous year and so on. The cited updates put the economic sustainability of the SES and gave rise to over-remuneration of investment situations.

849.    The current remuneration model responds to the previous model in terms of logic with the essence of the remuneration model and as indicated by the CNE.

850.    Firstly, we must differentiate the portion of the subsidy destined to recovering the investment and the portion of the subsidy destined to recovering the operating costs. Upon determining the investment costs by standard facility, it is indicated that said value cannot

---

[569] CNE report of 7 March 2012. R-0082.
[570] *Report on the Spanish Energy Sector Part I. Measures to guarantee the financial-economic sustainability of the electricity sector,* National Energy Commission, 7 March 2012. Page 23. R-0082.

be subject to review. Neither said value nor the regulatory useful life can be subject to any update[571]. This avoids the distortions generated by the previous system.

851.    In relation to the operating costs that give rise to the subsidy (Ro), these are subjected to update at an annual rate of 1%. Furthermore, the market pool revenue can be reviewed every three years.

852.    The portion of the subsidies destined to providing a reasonable return may also be updated. This update can be performed at the end of every regulatory period: that is, every six years. The Claimants think that the existence of these regulatory periods generates instability.

853.    However, the Claimants do not pay attention to the previous model. As mentioned earlier, the subsidies with the market price hedged the investment costs, operating costs and provided Reasonable Return on the investment cost of approximately 7%. However, the part of the subsidy destined to providing Reasonable Return was also subject to updates in accordance with an index that was the CPI.

854.    The CPI is a variable index whose fluctuation gave rise to alterations in plant profitability. Therefore, if the CPI increased, the portion of the subsidy destined to providing said return increased proportionally, obtaining higher profitability. On the contrary, if the CPI fell, the portion of the subsidy destined to providing said return fell proportionally, obtaining lower profitability. This last scenario was aggravated if we take into account that, in addition to the fall in the CPI, a negative corrective factor of -0.5 had to be added.

855.    As in the previous model, in the current model the portion of the subsidy aimed at granting Reasonable Return (Remuneration on Investment -Ri-) is also variable. What happens is that instead of indexing profitability to the CPI, it is indexed to an equally robust index such as the 10-year Spanish bond plus a differential. Moreover, the update is not annual but rather can be made only every six years. At the end of each regulatory period.

856.    For the first regulatory period (six years), the Reasonable Return was established at 7.398, which is the result of increasing the average performance in the secondary market of the ten years prior to the enforcement of the current RD-Act on Ten-Year Government Bonds by 300 basis points[572].

857.    In future regulatory periods, the reasonable rate of return of the standard facilities will be calculated as the average performance of ten-year Government bonds on the secondary

---

[571] Act 24/2013, of 26 December 2013, on the Electricity Sector, published in the Official State Gazette of 27 December 2013 Article 14 (4). R-0037.
[572] RD-Act 9/2013 of 12 July, establishing urgent measures to ensure the financial stability of the electricity system. First Additional Provision. R-0113

market of the 24 months prior to the month of May of the year before that of the start of the regulatory period increased by a spread.[573]

858.    In any case, as in the case of the previous model, the aforementioned return must be fixed respecting two essential elements: the economic sustainability of the SES and the guarantee of reasonable rate of return for the investors. Specifically, the Explanatory Memorandum to Act 24/2013 states:

> "The parameters for establishing the remunerations will have a validity of six years and in the review thereof, which will be performed before the start of the regulatory period, the cyclical situation of the economy, electricity demand and adequate return for these activities shall be taken into account."[574]

859.    The indexation of return to the ten-year Spanish bond is not a novelty in our regulatory framework. Specifically, the CNE already admitted said possibility in 2007.[575]

860.    The indexation of profitability to the ten-year-plus Spanish bond is that established by the regulator for other regulated activities such as transport and distribution. Note that the profitability of transport and distribution, activities which are also regulated, is established by Law for the first regulatory period, in the profitability of the ten-year Spanish bond plus 200 basis points[576]. That is, 100 basis points less than the production activity using renewable energy sources.

861.    In this point we must recall that, as expounded in Section III.A.2.2(c), the Sector itself in 2009 proposed a reform of the regulatory framework based on the idea of linking Reasonable Return to the profitability of the ten-year Spanish bond plus 300 basis points.[577]

862.    Lastly, we cannot ignore that this dynamism makes it possible to protect the value of the investment over time:

> "A.11. Finally, it is important to underline that this dynamic and relative conception of Reasonable Return does not only apply to new investments, but also to those already made. This is due to the fact that the value of an asset depends at all times on the return that alternative investments may offer. To put it another way, if the return was set in the past—even correctly—and it cannot be revised and it turns out that it is now very high in relation to other investments, the asset will appreciate in value. If on the other hand the return set in the past turns out to be very low now, the asset will depreciate or even lose all of its value."[578]

[573] RD 413/2014, of 6 June, on the regulation of the production of electrical energy from renewable energy sources, cogeneration and waste. Article 19. R-0124.
[574] Act 24/2013, of 26 December, on the Electricity Sector. Preamble and Article 14 (4). R- 0037.
[575] CNE Report 3/2007, of 14 February 2007, regarding the RD proposal, regulating the activity of electricity production under the special regime. 16. R-0298.
[576] Act 24/2013, of 26 December, on the Electricity Sector. Tenth Additional Provision. R-0037.
[577] APPA and Greenpeace 2009 Renewable Energies Act Proposal. R-0308.
[578] Accuracy, Second Report on the Claimants' Claim, pages 71 and 75.

190

863.    The foregoing assertion can be corroborated by examining the graphs provided by Accuracy[579]:




864.    Upon examining these tables, it can be concluded that the new model guarantees the value of the investment over time. From the viewpoint of the investor it is more stable and predictable.

865.    Upon expounding the foregoing, the revisions system envisaged in the current remuneration model combines the need for stability and predictability of the economic rules and criteria with the requirement of adapting the remuneration systems in order to achieve their objectives and comply with the legal system. They follow a regulatory technique that is accepted in many countries and allows the predictability of the modifications and adaptations in order to comply with the objective of the economic regimes. Therefore, they allow the full recovery of costs and obtaining a Reasonable Return from investments.

**(g)     The new remuneration model has been approved transparently.**

866.    The Claimants maintain that the implementation of the contested measures has not been transparent.

867.    The announcement of a structural reform of the Spanish Energy System as part of these macroeconomic control measures, was made more than a year ahead of its effective adoption, that is to say, from December 2011[580]. These macroeconomic control measures were in turn undertaken as an international commitment, through a Memorandum of Understanding signed with the EU[581]. In march 2012, NextEra knew about the new Government's intention to carry out the reform. It expressed this in a letter sent on 15 March 2012 by Mr W. Ketchum, Vice-President, General Director, and Corporate Secretary of NextEra Energy Resources LLC to the Minister and Secretary of Industry from NextEra headquarters in the U.S.:

---

[579] Accuracy, Second Report on the Claimants' Claim, page. 74.

[580] Counter-Memorial on the Merits, paragraphs 377 and seq.

[581] This was reflected in the Memorandum of Understanding on Financial Sector Policy Conditionality in Spain, 20 July 2012, pages 14 and 15. R-0105

This Memorandum has been signed to give effect to "*Council Recommendation of 10 July 2012 on the National Reform Programme 2012 and delivering a Council opinion on the Stability Programme for Spain, 2012-2015*", of 10 July 2012.

> *"NextEra is definitely constrained to state that it would be highly unfavourable for a new Government elected on a promise <u>to break away from past practices of regulatory uncertainty (and policies detrimental to businesses in general) to pursue a similar avenue as the former Government</u>. The international investment community has great expectations from the new Government's promises to stand by its legal commitments and to perform as a serious, predictable and reliable partner when it comes to investments that will create new jobs in Spain. <u>We sincerely hope that we will not be disappointed when the new Government announces the planned regulatory changes to the Spanish energy industry"</u>.*[582]*(Emphasis added)*

868.    All of the challenged regulations have been enacted pursuant to the procedure set out by the Law of Spain. During their processing, various public hearing procedures were offered where all parties with an interest in the Spanish Energy System could participate[583].

869.    Furthermore, the Government accepted a significant part of the observations that the interested parties presented, including the PTEs, as we shall accredit. Nonetheless, it is appropriate to distinguish the different public hearing procedures that the Government held before successive proposals for regulation: (i) Before the National Energy Commission in February 2012, with the purpose of formulating pleadings about the "*Measures to Ensure the Economical-Financial Stability of the Electricity System.*"; (ii) during the processing of RD 413/2014 and (iii) during the procedures of Order IET 1045/2014.

### Public consultation held by the National Energy Commission in February 2012

870.    In order to prepare report 2/2012 "About the Spanish Energy Sector" of 7 March 2012, the CNE opened a public consultation period at the start of February 2012 during which it received 477 allegations from the affected companies and sectors[584].

871.    The Protermosolar Association, which defends the interests of the solar thermal sector, presented pleadings on 10 February 2012, proposing regulatory measures to be adopted in the electricity sector in view of the imbalanced situation. In said proposals, it previously stated that it was aware of the *Principle of Reasonable Return* and it expressly requested that this principle be applied to other producers[585].

### Public hearing during the procedures of RD 413/2014, of 6 June.

---

[582] Letter from John Ketchum (NextEra Energy Resources, LLC) to Jose Maria Soria Lopez (Minister of Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012, Evidence Document C-90.

[583] *Administrative* appeal relating to the draft of the Royal Decree which regulates the activity of the production of electric energy from renewable energy sources, cogeneration and waste (RD 413/2014); Opinion from the Council of State of 6 February 2014: *"Restarting the procedure allowed new participation by the Electricity Advisory Council and by the National Commission on Markets and Competition (CNMC), the hearing procedure for <u>the interested parties must be considered to have been completed, insofar as all of the sectors affected by the project have had the opportunity to participate in the preparation of the regulation -in this case, also, on two occasions- through the Electricity Advisory Council."</u>* (emphasis added) R-0363. doc. 11.01

[584] Information on the public consultation on measures for regulatory adjustment in the energy sector of 2 February and 9 March 2012, published at the National Energy Commission website: www.cne.es. On this website you can access the 477 submissions presented by the interested sectors, including those relating to renewable energies. R-0099.

[585] PROTERMOSOLAR pleadings to the Public Consultation of the CNE, 10 February 2012.  R-0158.

872.    After RD Act 9/2013 went into effect on 14 July, the draft of these Regulations was circulated 4 months later. In particular, the Thermosolar Sector Association, Protermosolar, of which NextEra is an active member, received drafts of the Royal Decree on 26 November 2013 and presented pleadings before the CNMC on 12 December 2013 about the proposed Royal Decree.[586] This fact is expressly stated in the heading of this document:

> *"through the Electricity Advisory Council, the National Commission on Markets and Competition ("CNMC") has granted us urgent hearing procedures regarding the "draft of Royal Decree [...] sent to this body on 26 November 2013 (the "Royal Decree proposal"). Within the time period granted, by means of this document we make the following Pleadings…"*

873.    The entry stamp of the National Commission on Markets and Competition (CNMC) appears on this same document, with the date 11/12/2013. Said document comprises 31 pages of pleadings on all aspects of the draft of the Royal Decree.

874.    Furthermore, numerous other pleadings were presented to this draft of the Royal Decree. The pleadings submitted during the proceedings are attached[587].

875.    A detailed examination (1) of the process carried out, (2) of the pleadings presented and (3) of them being taken into consideration by the National Commission on Markets and Competition (CNMC) appears in the Report by the Council of State of 6 February 2014, issued in the processing of this draft of the Royal Decree[588]. On its pages 17 and 18 it mentions the numerous pleadings presented.

876.    It has been proven, therefore, that 4 months after RD-Act 9/2013 took effect, the operators in the renewable energy sector already knew about the draft of RD 413/2014 and were able to make pleadings, that were assessed by the regulator, the CNMC, and the State Council.

877.    It should be noted that the Claimants, in an attempt to confuse the Tribunal, base their criticisms on the procedures for RD 413/2014 in report 18/2013 issued by the CNE on 4 September.[589] However, they fail to tell the Tribunal that it is precisely the criticism contained in that report that led the Government to restart the procedures for RD 413/2014. This restarting implied giving the interested parties a new hearing and repeating all the procedures until it came again to the CNE (which at that time was already the CNMC). The latter then issued a second return that expressly states:

> *"This Commission has a favourable assessment of the observations made by the former National Energy Commission, now the CNMC, that were made in Report 18/2013."[590]*

---

[586]    Pleadings dated 12 December 2013, urgent hearing procedure on the "Proposed RD regulating the activity of electricity production from renewable, cogeneration and waste energy sources" R-0362.

[587]    Processing of RD 413/2014, Pleadings before the National Energy Commission (CNE), National Commission on Markets and Competition (CNMC) and Council of State R-0363.

[588]    Ibid

[589]    Report 18/2013 of the CNE. 4 September, Document C-233. Reply on the Merits, para. 280 et seq.

[590]    CNMC report of 17 December 2013. R-0390.

878.    Among other aspects, the CNMC has a positive assessment of the following having been taken into account:

> *"Some remuneration groups/subgroups that were contemplated in RD 661/2007 have been recuperated;*
>
> *A period of transition has been established (until the end of 2014) so that certain facilities may be adapted in order to comply with their obligations for those for whom more stringent requirements are established;*
>
> *(...)*
>
> *The possibility of reaching negative net investment values mathematically (and therefore, negative remuneration) is expressly excluded, etc."[591]*

879.    Therefore, the criticism by the Claimants of the procedures for RD 413/2014 based on the CNE report of September 2013 have been completely surpassed by the later report from the same body in December 2013.

880.    Perhaps if the Claimants, instead of analysing the documents related to Boston Consulting[592] and Roland Berger, would have dedicated themselves to analysing the documentation provided in the regulatory files of the measures challenged, they would have found out about the origin of the parameters and the meaning of some of the concepts they now say they do not understand. This is the case, for example, with the concept of and "*efficient and well-managed company*"[593]. If the Claimants had read the report from the General Technical Secretariat of the Ministry of Industry, issued during the procedures for RD 413/2014, they would have learned the following:

> *"The indeterminate legal concept of an efficient and well-managed company is used in the application of European Union standards for State aid to the compensations given for providing general economic interest services (GEIS), in order to avoid not taking the elevated costs of an inefficient company as a reference. According to the Communication from the Commission (2012/C8/02) the mere fact of generating a return is not sufficient to obtain this classification, but rather objective criteria must be applied that are economically recognisable as representative of satisfactory management: compliance with accounting standards and analytic coefficients representative of productivity and supply quality. On the other hand, reasonable return is understood to be the capital return coefficient, i.e. the one that an average company would require in order to provide GEIS as a function of the risk level of the activity.*

---

[591] Ibid. pages 14 and 15.
[592] In this point, and in the face of the Claimants' allegations about the Respondent's omission of documents in the document submission phase, it is noted that: a) the Claimants never requested that the Respondent produce the drafts submitted by Boston Consulting; b) the Claimants justified their request on the basis that there were very few documents requested and not the large number of documents they are now claiming; and c) it is not true that the Respondent produced these documents late, since it did so on the day indicated in the Procedural Order to submit the documents ordered by the Tribunal (25 June 2016).
[593] The Reply on the Merits says, in para.352, that Spain has not explained where that concept comes from.

> *The capital return coefficient is understood to be the IRR (internal rate of return) that*
> *the company achieves on the capital invested during the entire life of the project."[594]*

881.    In this way, the Claimants would have been able to confirm that Spain's use of "State aid" is not opportunist for this Arbitration.

**Public hearing during the procedures of Order IET 1045/2014, of 16 June.**

882.     In the processing of the Order of parameters more than 600 pleadings were presented from all parties with an interest in the Spanish Energy System. These pleadings were explained and answered in the processing files of the regulatory standards[595].

883.    Firstly, it should be emphasised that the draft of the Order of Parameters was circulated to interested parties in the electrical sector on 3 February 2014. That is to say, the draft was circulated three months after the draft of the Royal Decree was published and just two months after the publication of Act 24/2013, of 27 December, on the Electricity Sector. A fact that was gathered by the CSP sector operators. Elecnor, the owner of other CSP Plants, publicly stated in its 2013 Annual Accounts that it knew of the drafts of parameters and the amounts it could receive:

> *"Later events: As has been described in Notes 6.b, 7 and 10, dated 3 February 2014 the*
> *Ministry of Industry has submitted to the CNMC the order proposal approving*
> *"restorative parameters of facilities" applicable [...] for its report. The text has also*
> *been sent to the members of the Electric Advisory Council of this agency (affected*
> *companies, consumer associations and autonomous communities).*
>
> *These parameters have cleared the uncertainties raised in Act 9/2013, of 12 July, with*
> *regard to the practical application of "Reasonable Return for the standard facility", and*
> *although this ministerial order is in a period for comment, significant changes are not*
> *expected."[596]* (Emphasis added)

884.    On the other hand, the claims submitted by Protermosolar to this draft on 25 February 2014 should be mentioned, which refer over the course of 17 folios to the different standards and parameters that make up the Order of parameters.[597]

885.    The Claimants claim that they were completely in the dark during 11 months. It has already been established that pleadings could have been filed before the reform and that after the reform the Regulation draft was circulated on 26 November 2013 and the draft for the Order of parameters on 3 February 2014. That is to say, 4 months from the publication

---

[594] Report of the General Technical Secretariat of the Ministry of Industry, 9 January 2014, n.p. No.3, page5 of the PDF. R-0391

[595] Document /Exp_orden 1045/2014/01.02 and /02 Alegaciones CNMC [4 numbered files with 638 pleadings that were presented] R-0364.

[596] Annual accounts for Elecnor, 2013, page 90, R-0359.
Available in full on http://www.elecnor.es/Common/pdf/informes-anuales/Cuentas-anuales-e-informe-de-Gestion-2013-ES.pdf

[597] Pleadings dated 25 February 2014 of the PROTERMOSOLAR Association, in the hearing procedure on the "Order Proposal approving the compensation parameters of the standard installations applicable to certain facilities producing electricity from renewable energy, cogeneration and waste sources". R-0140

of RD Act 9/2013 of 12 July, the Claimants were already familiar with the implementing rules in the drafts.

886.    In fact, the PTEs presented pleadings regarding the draft of OM 1045/2014 on 26 February 2014.[598] As Mr Montoya explains in his statement, on the first draft of OM 1045/2014.[599]

> *"the TERMOSOL-1 & TERMOSOL-2 plants were assimilated to parabolic cylinder power plants with storage without distinguishing the size of the storage, given that it can be seen in the foregoing table that their main characteristics are not any different from those of other power plants of the same type.*
>
> *Once a classification of typical facilities is done, and following the existing procedure, the Order proposal was sent to the CNMC on 31 January 2014 in order to issue the mandatory report and to begin arranging for the hearing for the interested parties through the Electricity Advisory Council. In this way, starting on 3 February 2014, a period was opened for receiving pleadings, which ended on 26 February 2014, with the purpose of collecting the contributions of the thermoelectric solar centre, promoters, and other interested parties.*
>
> *During this period pleadings were received from different renewable energy sector representatives, including the pleading submitted by Planta Termosolar de Extremadura S.L.U. and Planta Termosolar Extremadura 2 S.L.U. The pleadings received were analysed and taken into account.*
>
> *After finishing this process of studying the pleadings and additional information, changes were made to the proposal for the Order, including changes in different typical facility parameters, such as operational costs and operational hours.*
>
> *<u>In the case of the claimants power plants, TERMOSOL-1 and TERMOSOL-2, the pleading submitted was taken into consideration and two new facility types were created, SF-00619 and SF-00620, respectively, that reflect the different start-up years (2012 and 2013) on the one hand, and the slight differences between these power plants and other similar ones derived from their greater storage capacity, on the other hand.</u>*
>
> *These two new SFs (SF-00619 and SF-00620) include the proportional part in the investment costs of this difference in the larger size of the solar field and the storage in comparison to existing SFs under which the power plants had been classified in the draft of the Order (SF-01007 and SF-01008)."*[600]

887.    The result of the changes made to the Parameter Order as a consequence of the PTEs' pleadings was as follows:[601]

---

[598] Pleadings of the PTEs on OM 1045-2014 before the CNMC on 26 February 2014. R-0076.
[599] First draft of OM 1045/2014. R-0393 and Second Draft of OM 1045/2014 R-0394.
[600] Second Witness Statement of Carlos Montoya, paras. 56-61.
[601] Ibid, para.63

| Standards | Item | v. CNMC<br>IT-1007 and IT-01008 | v. FINAL<br>IT-00619 and IT-00620 |
|---|---|---|---|
| **CCPA 9h**<br>Year PeM 2012-2013<br>**TERMOSOL-1**<br>**TERMOSOL-2** | Investment | 310,000,000  € | 322,665,465  € |
| | Land | 1,500  €/Ha | 2,000  €/Ha |
| | Occupation of land | 6.0  Ha/MW | 6.5  Ha/MW |
| | O&M | 5,500,000  €/year | 5,800,000  €/year |
| | Rated power production | 3,060  Hours | 3,060  Hours |

888.    So it is untrue when the Claimants say that "*there is also no evidence that Spain actually took into consideration any of the comments or concerns put forward by stakeholders when enacting RD 413/2014 and the Ministerial Order IET/1045/2014*".[602] The pleadings of the PTEs were precisely taken into account.

889.    On the other hand, the Claimants insistently refer to the report by Roland Berger and the Report not issued by Boston Consulting. The disclosure or not of these Reports in the preparation phase of the measures does not affect the obligation of transparency contained in the ECT with regards to the Claimants, as the Claimants have not established that they ever requested their disclosure.

890.    The first of these reports was received after the publication of the Order of parameters. The report was incorporated into the administrative dossier to prepare the Regulations and has been provided in this procedure.

891.    The second of the reports was not issued because the contract with Boston Consulting was terminated. Consequently, they did not have to be circulated or handed over to those concerned. The Claimants' arguments on the lack of transparency due to these reports not being published, which they reiterate in the Reply on the Merits, therefore makes no sense. In fact, by alluding to these reports, the Claimants distract the Tribunal's attention from what is important: whether or not the calculations of OM 1045/2014 are correct (and we have demonstrated that they are for the Termosol Plants).

892.    The Claimants include among their documents the only Judgement of the Spanish Supreme Court that has annulled one of the SFs, the cogeneration for slurry.[603] However, not only does that judgement not refer to Thermosolar power plants with CSP technology but, even more important, it annuls the specific SF for those facilities in light of the test done in the procedure. That expert test demonstrated, one by one, that the costs taken into account in the Order were not correct. As we have seen, this is not the case with the SFs for the Claimants' Plants.

893.    In conclusion, in the processing of the measures challenged, the Kingdom of Spain has carried out these proceedings transparently, circulating the drafts of the regulations in the Sector. The interested parties were able to submit their claims, many of which were welcomed in the Projects.

---

[602] Reply on the Merits, para.298
[603] Judgement of the Supreme Court, of 20 June 2016.

**(h)     The new System provides a Reasonable Return**

894.    The Claimants allege that the profitability that the current system provides of 7,398% before tax is not a Reasonable Return nor sufficient. With the support of Dr Abdala and Professor Spiller, they maintain that the measures being questioned give the project an after-tax IRR of 2.4%, which implies a 4.7% pre-tax rate.[604] The Claimants maintain that the 11.6% profitability projected by NextEra for its investment in the Termosol plants was reasonable when the investment was projected in accordance with RD 661/2007 and, therefore, it cannot be changed.[605]

895.    The theory set forth by the Claimants comes from an incorrect understanding of the Regulatory Framework in which they invested. Article 30 (4) of Act 54/1997 did not guarantee maintaining certain rates of profitability indefinitely. What is more, allowing the Claimants' theory means ignoring that the premiums laid down in RD 661/2007 were based on a particular economic scenario that has radically changed. Such a change of the base data on which the subsidies of 661/2007 were based deprived the Claimants of any characteristics of rationale.

896.    The Claimants point out that a profitability of 7.398% after taxes gives rise to a net return (after taxes) that "is lower than the CNE's previous estimations of the industry WACC and is not sufficient for the Claimants to meet their debt obligations, let alone provide a return on their equity investment"[606]. However, such a conclusion has two serious errors.

897.    However, these calculations cannot be accepted. Concretely, as Accuracy points out, these calculations do not take into account the leverage of the project or the tax shield arising from the deductibility of the financial expenses. Neither do they take into account the use of negative tax bases (BINS) generated during the construction phase, which influence the calculation of profitability after tax. Likewise, the Claimants did not take into account that the tax rate currently in force in Spain is not 30%, but rather 25%[607].

898.    After correctly calculating the tax impact on profitability of 7.398, we can affirm that profitability after tax is an after-tax IRR between 6.3% and 6.8% (with a tax rate of 30%) and an after-tax IRR between 6.5% and 6.9% (with a tax rate such as that currently in force of 25%)[608].

899.    Consequently, we can conclude that the pre-tax profitability included in Ministry Order IET 1045/2014 (7.398%) is equivalent to an after-tax profitability between 6.3% and 6.9%.

900.    After having correctly calculated the impact of the tax on the profitability provided by Ministry Order IET 1045/2014, its reasonability must be determined. Firstly if we start from

---

[604] Reply on the Merits, para. 209.
[605] These arguments occur insistently in the Reply on the Merits to such a degree that the Claimants invoke the estoppel principle in order to say that the Respondent cannot question whether a return of 11.6% is reasonable. Reply on the Merits, paras. 408 et seq.
[606] Reply on the Merits. Paragraph 341.
[607] Accuracy, Second Report on the Claimants' Claim, page 81 et seq., and Appendix 10.
[608] Ibid

this profitability rate and compare it with the WACC in the Sector[609] in which the Claimants are included we can affirm that this profitability is reasonable.

901.    As Accuracy indicates, the post-tax profitability offered by the provision resulting from the Measures is greater than this figure.[610] That is to say, the market gives values below the 7.398 granted by the Spanish remuneration model.

902.    Another criterion that we can use to determine whether the profitability offered by the Spanish system is reasonable consists of comparing it with the profitability offered by the Spanish system to activities subject to the same risk level. Specifically, compare said profitability with other regulated activities such as transport and distribution.

903.    In this point, we must recall that, in order to evaluate the reasonability of the profitability of production activities based on renewable energy sources, the CNE has used the profitability of regulated activities such as transport and distribution as a comparative parameter. In this point we must recall what the CNE pointed out:

> *"Parameter A is the production cost that must be considered for the investments made to reach a Reasonable Return, taking into account the characteristics of each type of technology. The necessary revenue for the investment considered in each project to obtain an internal profitability rate of unrestricted cash flows after tax similar to that of a regulated activity"[611]*

904.    In this regard, we must recall that the profitability of transport and distribution activities, which are also regulated, is established by Law for the first regulatory period, in the profitability of the ten-year Spanish bond plus 200 basis points[612]. That is, 100 basis points less than the production activity using renewable energy sources. From this viewpoint, profitability is also reasonable.

905.    Last but not least. The profitability of 7.398 is the result of increasing the average performance of the Spanish bond of the ten years prior to RD Act 9/2013 by 300 basis points is the profitability that the Sector requested from the Spanish Government in 2009. As expounded in Section III.A.2.2(c), the sector presented a new regulatory framework proposal in which it indicated the Reasonable Return for this activity:

> *"The Government shall set the amounts for regulated tariffs, premiums and supplements, in all cases assessing the operation and maintenance costs and the investment costs incurred by facility operators in order to reach a reasonable rate of return with reference to the cost of money on the capital market. As for the capital remuneration tariff, an annual percentage equal to the <u>average of the previous year's</u>*

---

[609] Ibid.

[610] Ibid.

[611] CNE Report 4/2004, of 22 January, regarding the Royal Decree proposal, which establishes the methodology for the updating and systematisation of the legal and economic regime for electricity production in the special regime. Page 8. R-0316.

[612] Act 24/2013, of 26 December, on the Electricity Sector. Tenth Additional Provision. R-0037.

*remuneration average of Treasury obligations to 10 years will be taken, plus a spread of 300 basis points."[613] (Emphasis added)*

**(5)    The Measures in dispute have been recognised as necessary Macroeconomic control measures, stabilising the economy and reasonable**

906.    The Claimants question the measures adopted based on supposed criticism from the European Commission and the arguments of the CNE against retroactivity.[614]

907.    The Claimants reject the positive assessment of the new measures given by the International Bodies submitted by the Respondent in its Counter-Memorial on the Merits. Instead, they propose that the most proper assessments are the ones done by the staff of the European Commission, ECOFYS, the Climate Policy Initiative, IRENA, and the World Economic Forum published even before the measures under dispute were approved in full.

908.    However, such a review would be biased if we do not see the appraisal that other International Organisations have made of the new measures and how these measures have been valued by the Market.

**(5.1)    Evaluation of the measures by the Domestic Courts of the Kingdom of Spain**

**(a)    Position of the Constitutional Court of the Kingdom of Spain**

909.    The Constitutional Court of the Kingdom of Spain has already issued a number of rulings about whether the new system violates the Spanish Constitution. In particular, it has already decided on the appeals of unconstitutionality submitted by the Autonomous Community of Murcia, the Foral Community of Navarre and the Socialist Parliamentary Group against RD Act 9/2013.[615] The first pronouncement[616] has been ratified by another pronouncement that rejects the appeal of unconstitutionality submitted by the Foral Community of Navarre.[617] The Constitutional Court has also issued a new Judgement of the same date dismissing the appeal of unconstitutionality submitted by the Socialist Parliamentary Group.[618]

910.    The Constitutional Court,[619] the highest interpreter of the Spanish Legal System in matters for protection of fundamental rights, in its recent Judgement of 17 December 2015,

---

[613] APPA-Greenpeace Press Release concerning the Draft Bill for the Promotion of Renewable Energy of the Draft Bill presented by APPA-Greenpeace in May 2009. Article 23.4 R-0307.

[614] Reply on the Merits, para. 353 et seq.

[615] Reply on the Merits. Paragraph 458.

[616] Constitutional Court ruling of 17 December 2015, delivered in an appeal of unconstitutionality 5347/2013.R-0056.

[617] Constitutional Court ruling of 18 February 2016, delivered in an appeal of unconstitutionality 5852/2013. R-0336

[618] Constitutional Court ruling of 18 February 2016, delivered in an appeal of unconstitutionality 6031/2013. R-0075.

[619] The functions of the Constitutional Court are included, expressly, in Article 161 of the Spanish Constitution, which provides that: "*1. The Constitutional Court has jurisdiction throughout the Spanish territory and is competent to try:*
a) The appeal of unconstitutionality against laws and regulatory provisions with the force of law. The declaration of unconstitutionality of a legal regulation with the rank of Act as interpreted by

[620]ratified and consolidated the jurisprudential line marked by the Supreme Court, regarding the conformity of the reforms introduced in the SES for the principles of legal certainty and its corollary of legitimate expectations, to that of normative hierarchy and non-retroactivity of sanctioning or restrictive regulations of individual rights.

911.    The Claimants reject the validity of the Judgements of the Constitutional Court against the appeals brought by the Autonomous Community Governments of Navarre, Murcia, and others governed by the Socialist Party because *"The three decisions refer to one another and have virtually identical texts. They do not represent, as Spain's Counter-Memorial would have the Tribunal believe, a consistent line of Spanish constitutional law decisions, but rather an "echo chamber" in which the same findings are repeated numerous times. This echo-chamber, Spain claims, confirms that the measures it took with Regulatory Framework III are not retroactive. Leaving aside the fact that Spain cannot rely on its own domestic law to justify its breach of international law (see below, Section VII.1.A), the obvious flaw in Spain's reasoning is that its Constitutional Court was looking at a constitutional Spanish law question which has nothing to do with the factual question before this Tribunal"*[621]

912.    For the Respondent, the fact that the Constitutional Court repeats and reiterates case law turns it into "consolidated" case law. In fact, it is the obligation of the Spanish courts to guarantee "equality in the application of the law". Treating equal situations in a different way would have constituted discrimination, which is contrary to both Spanish law and the ECT. Therefore, this allegation by the Claimants is, in all regards, absurd.

913.    In regards to the allegation that the Constitutional Court only decides if the measures are retroactive in accordance with Spanish law but not in accordance with international law, we are in agreement. However, we remind the Claimants that it is they themselves who invoke the CNE, which has interpreted domestic law, in order to say that the measures are retroactive. We not only provided the Court with the true criterion of the CNE in Section III.A.3.2 of this document, but also the opinion of the best experts for interpreting Spanish law, the Supreme Court and the Constitutional Court. In addition, and more importantly, the Respondent has accredited in regard to two arbitration precedents (one of them applies the ECT in relation to later reforms of RD 661/2007 in Spain) that the measures are not

---

jurisprudence, shall affect this, although the judgement or judgements handed down shall not lose the value of res judicata.
b) The appeal for protection due to violation of the rights and freedoms referred to in Article 53, 2, of this Constitution, in the cases and ways established by Act.
c) The conflicts of jurisdiction between the State and the Autonomous Communities or of these among themselves.
d) Other matters assigned to it in the Constitution or the organic laws.
2. The Government may appeal to the Constitutional Court against provisions and resolutions adopted by the bodies of the Autonomous Communities. The Government may contest before the Constitutional Court the provisions and resolutions adopted by the agencies of the Autonomous Communities, which shall bring about the suspension of the contested provisions within a period not exceeding five months". R-0126.
[620] Constitutional Court ruling of 17 December 2015, delivered in an appeal of unconstitutionality 5347/2013. R-0056.
[621] Reply on the Merits, para.356

retroactive according to International Law. The Claimants are not able to demonstrate that the measures are retroactive according to international law. Therefore, the Claimants' argument has no merit.

914.    In addition, the Constitutional Court does not only rule on the retroactive nature of the measures but also about the principle of legitimate expectations. The Constitutional Court, reinforced by the individual votes on the judgement ruling, comes to the conclusion that no investor could have legitimate expectations that the measures under dispute would not be adopted in the face of the economic situation that Spain was experiencing.

**(b)    Position of the Supreme Court of the Kingdom of Spain**

915.    The Supreme Court, through the Judgement 63/2013 of 21 January 2016, of the Supreme Court,[622] has dismissed the claim for the liability of the State legislator for the damage caused:

-    By RD 1565/2010, of 19 November, that regulates and modifies certain aspects of the electricity production activities in the Special Regime.

-    By RD Act 14/2010 of 23 December, establishing urgent measures to correct the deficit in the electricity industry.

916.    In fact, in line with its jurisprudential doctrine that began in 2005 the Supreme Court again insists on it, by pointing out that RD 661/2007 has not resulted in any petrification of the current economic regime by expressly stipulating that:

> *"And it would also require starting from a budget which, in the opinion of the Chamber, does not coincide (or did not coincide when these same facilities began their operation): that the legal regime laid down in RD 661/2007 would be prolonged indefinitely and that it would, moreover, do so under the identical terms that were expressly provided for at that time. We do not understand, in fact, that the aforementioned RD envisages a tariff regime forever, nor that the Government, in the exercise of regulatory authority that it holds, or that the legislator, in use of its legislative power, cannot adapt or modify that regime to meet the new circumstances (economic, productive, technological or of any other nature) that might occur in such a very lengthy period of time.*
>
> *In short, not only do we not appreciate (as already pointed out in the Third Section of Chamber in the aforementioned judgement) that the temporary modification that we are examining violates the principles of legal certainty and legitimate expectations, but that, from the point of view of the institute of the financial responsibility, it cannot be confirmed in any way that the damage that it is claimed meets the characteristics of effectiveness and of the present day that would rate it as compensable".[623]*

---

[622] Judgement 63/2013, of 21 January 2016, of the Supreme Court handed down in cassation appeal 627/2012. R-0368.
[623] Ibid. Legal Ground Sixth.

917.    Furthermore, the Supreme Court has affirmed on many rulings[624] the conformity of RD 413/2014 and Order IET/1045/2014 with law, by rejecting the existence of prohibited retroactivity, violation of the principle of legitimate expectations enshrined by the EU and recognising the foreseeable nature of the measures. It also argues that the measures maintain the essential aspects of the Spanish renewable energies remuneration system, which is why it understands that the regulatory stability is maintained. The Supreme Court reaches these conclusions after reproducing the doctrine of the Constitutional Court established in the previous rulings, and its consolidated case-law in matters of SR remuneration.

918.    When ruling on whether RD 413/2014 and Order IET/1045/2014 are in accordance with the law, the Supreme Court has declared, following the jurisprudence of the Constitutional Court:

> "*the jurisprudence of this Court has been constant over the years on pointing out, in the interpretation and application of the authorising rules of the legal and economic system applicable to electricity production using renewable energy sources, which guarantee the right to the reasonable rate of return of the investments made by the owners of these facilities, but do not recognise their unalterable right to maintain the remuneration framework approved by the holder of regulatory power unaltered.*
>
> *[...] this Court has insisted, in view of the successive regulatory reforms, that it was not possible to recognise pro futuro an "unalterable right" to the owners of special regime electricity production facilities to the maintenance of the remuneration framework approved by the holder of regulatory power unaltered, provided that the requirements of the LSE are fulfilled as regards the reasonable rate of return of the investments."* [625] (Emphasis added)

919.    In this way, the Supreme Court has confirmed its consolidated jurisprudence and endorsed the measures under disputes in this arbitration as being in accordance with the Law.

**(5.2)    Appraisal of the measures by the European Commission**

920.    The new remuneration model has been analysed by the European Union. The European Commission itself, which wrote the letters in 2013 that are invoked by the Claimants, has issued different reports of the evolution of the macroeconomic measures adopted by Spain. In these reports, has recognised the compliance by Spain of the agreements entered into with the EU to adopt macroeconomic control measures since March 2012.[626]

---

[624] Among many others, Ruling 1260/2016 (Rec. 649/2014) and Ruling 1266/2016 (Rec.564/2014). R-0337 and R-0338.
[625] Among many others, the Decision handed down by the Supreme Court on 1 June 2016, 1260/2016 (Rec. 649/2014). R-0337.
[626] Every year the European Commission draws up a report *"Country report"* undertaking a comprehensive review of the economic situation of each State. These reports are part of the so-called *"Macroeconomic imbalance procedure"* which is a monitoring mechanism to correct the existing *Macroeconomic imbalances.* The result of the comprehensive reviews serves as the basis for the Council to issue *Recommendations to the Member States of the EU*, on the measures to be taken to correct these Macroeconomic imbalances.

921.    The European Union, after having examined the evolution of the economy of the Kingdom of Spain since 2012, has given a favourable judgement of macroeconomic control measures taken. This review refers to the Macroeconomic measures taken in different sectors: financial, public administration, labour market, education, insolvency, Energy and infrastructures. The European Union has confirmed in its Report of 2014, regarding the Energy Sector, that:

> *"The reform of the electricity sector is being completed [...] The reforms in the gas and electricity sectors are helping to contain the tariff deficits [...] based on the analysis in this report, repayment risks for the ESM loan are very low at present. This assumes that the authorities continue to improve the state of public finances and keep reforming the economy to address the challenges. The Spanish state can now borrow cheaper **thanks to policy actions at national and European level,** restored confidence in the Spanish economy and its public finances."[627] (Emphasis added)*

922.    These measures are developed in the most comprehensive review of the "*Progress on Policy measures relevant for the correction of Macroeconomic Imbalances*". In 2014 the European Commission stated:

> *"The 2013 reform of the electricity sector helped to contain the tariff deficit, and the 2014 deficit should be considerably smaller or the system should be in balance. The 'electricity tariff deficit' reached [...] EUR 28.5 bn at the end of 2013, almost 3% of GDP. The increase in access tariffs and the reduction in various costs of the electricity system applied with the 2013 reform help to balance the system in 2014. The authorities consider that the measures taken up to date should be sufficient to close the deficit structurally."[628] (Emphasis added)*

923.    In the subsequent review of 2015, the European Commission stated that the costs of the tariff deficit of the previous regulatory regime was being excessively passed on to consumers:

> *"The 2013 reform of the electricity sector helped to contain the tariff deficit, and the 2014 deficit should be smaller than in previous years. Energy policy choices in Spain over the last decade have resulted in an increase in regulated costs of the electricity system (Graph 3.4.1) and have been, to a large extent, passed on to electricity consumers."[...] The energy regulator, CNMC, expects that, in 2014, the system was closer to equilibrium in structural terms than in previous years."[629] (Emphasis added)*

924.    The Measures taken in the Electricity Sector by the Kingdom of Spain have meant that the Recommendations of the Council in 2015 have considered the macroeconomic problem

---

[627] Spain – Post Programme Surveillance Autumn 2014 Summary Report, page 3. (R-0274) Available at the web address:
http://ec.europa.eu/economy_finance/publications/occasional_paper/2014/pdf/ocp206_summary_en.pdf
[628] Spain — Post Programme Surveillance Autumn 2014 Report. page 27, available at:
http://ec.europa.eu/economy_finance/publications/occasional_paper/2014/pdf/ocp206_en.pdf R-0159
[629] Macroeconomic imbalances Country Report – Spain 2015, page 62.  available at:
http://ec.europa.eu/economy_finance/publications/occasional_paper/2015/pdf/ocp216_en.pdf R-0370

arising from the tariff deficit as resolved[630]. Therefore, it does not include any Recommendations for the Kingdom of Spain to take measures in 2015 and in 2016 in this area.

925.    In 2014 the National Association of Producers and Investors in Renewable Energies presented a petition to the Commission requesting that the situation be investigated that had been created for the photovoltaic industry by the various regulatory changes that, in turn, are the object of this arbitration. It should be noted that this is the investigation that is referred to in the Commission's letters submitted by the Claimants. In view of this situation, the Commission in its response dated 29 February 2016 stated:

> *"In previous 'EU semester' recommendations to Spain, the Council emphasised the need for Spain to make the structural and comprehensive reforms to the electricity sector necessary to address this tariff deficit.(…)*
>
> *The Commission has considered the petition carefully and does not believe that under Directive 2009/28/EC there are grounds for the Commission to take legal action against Spain with regard to the changes in their legislation affecting the level of support given to investors in renewable energy projects. In particular, pursuant to Article 3(3) of Directive 2009/28/EC, support schemes are but one instrument that can be chosen by Member States to achieve the binding national targets established by the Directive for the share of renewable energy in gross final energy consumption as well as in transport in 2020. Member States retain full discretion over whether they use support schemes or not and, should they use them, over their design, including both the structure and the level of support. This comprises the right for Member States to enact changes to their support schemes, for example, to avoid overcompensation or to address unforeseen developments such as a particularly rapid expansion of a precise renewables technology in a given sector.*
>
> *Therefore, in cases of changes to a support scheme as such, there is no breach of Directive 2009/28/EC" (Emphasis added)[631].*

926.    Therefore, far from what is maintained by the Claimants, neither the European Commission nor any other European institution has made a negative assessment of the measures after studying them, regardless of the results of the procedure in the matter of state aid still in process.

**(5.3)    Evaluation of the Measures by other International Organisations**

927.    The measures implemented in the Spanish electricity sector in 2013 were recognised by the International Monetary Fund (IMF) in its report on Spain of July 2014 stating:

> *"While there is encouraging progress, especially the important market unity law (Box 2) there should be no slippage on the planned reforms. For example, it will be important to move ahead with an ambitious liberalization of professional services,*

---

[630] Council Recommendation on the 2015 National Reform Programme of Spain and delivering a Council opinion on the 2015 Stability Programme of Spain: "(9) [...] *The deficit in the electricity system has been effectively eliminated as of 2014* available at: :
 http://ec.europa.eu/europe2020/pdf/csr2015/csr2015_spain_en.pdf R-0372
[631] Response of the European Commission dated 29 February 2016. R-0373.

*improve training for the unemployed, and fully implement an energy reform that eliminates the electricity tariff deficit and contains costs, while promoting a stable business environment and appropriate levels of investment. Given the many regulations at all levels of governments, regions have a critical role to play in improving the business environment—the planned introduction of regional World Bank's "Doing Business" indicators is a positive initiative"[632].*

928.    As for the International Energy Agency (IEA), this has emphasised the relevance of the measures taken and has stressed the importance of keeping them to preserve the sustainability of the financing for the electrical system in the future:

> *"The IEA welcomes the government's actions, which have eliminated the annual deficit from 2014 on. The accumulated tariff deficit has thus stopped from growing and will gradually be eliminated. The government must maintain a strong long-term commitment to balancing the costs and revenues in the natural gas system."[633]*

929.    In its 2015 report, the International Energy Agency makes the following comments regarding the reform submitted to the present arbitration:

> *"The tariff deficit, which had been accumulating since 2001, began to spiral out of control after 2005. From 2005 to 2013, the costs in the electricity system grew by 221% while revenues increased by only 100%. Subsidies for renewable electricity are the single largest cost element. By 2012, the accumulated debt in the system had reached more than EUR 20 billion and was set to expand by billions every year unless action was taken. In 2012, the government temporarily eliminated subsidies for new facilities. It also reduced remuneration for transmission and distribution network activities, increased access tariffs, and introduced a 7% tax on electricity generation (22% for hydropower). Nevertheless, the deficit grew to EUR 26 billion by the end of 2012.*
>
> *In July 2013, the government introduced a broader electricity market reform package. The reform reduced the remuneration and compensation for the activities in the electricity system by several billion euros per year. It also introduced the principle of "no new cost without a revenue increase". Importantly, the reform introduced a new way of calculating compensation for renewable energy, waste, and co-generation (combined production of heat and power). With some exceptions, by mid-2015 the comprehensive reform had been implemented. The reform has reached its aim: the sector's costs and revenues are back in balance, and the accumulated deficit, which peaked at the end of 2013 at EUR 29 billion or 3% of GDP, should gradually disappear over the next 15 years.*
>
> *Electricity market reform has been complex but necessary. The electricity system's future financial sustainability depends both on macroeconomic developments and on a sustained commitment to the reform by the country´s politicians. To overcome any perceived risks for investing in electricity infrastructure in Spain, the government should closely follow the principles of transparency, predictability, and certainty when revising the parameters for defining reasonable return. More generally, to avoid any*

---

[632] IMF Country Report 14/192 Spain, July 2014, pages 6 and 23. R-0160.
[633] Energy Policies of IEA Countries - Spain 2015 Review, Executive summary and key recommendations, published by the International Energy Agency, page 10. R-0161.

*political interference in the future, the principle of "no new cost without a revenue increase" should be strictly enforced."[634]*

930.    This report also states:

*"Spain underwent an electricity market reform from early 2012 to 2015, with the aim of ensuring the sustainability of the system, balancing costs and revenues and protecting electricity consumers. The reform was developed to give predictability and transparency to the Spanish electricity system, to put an end to a burgeoning tariff deficit that had become a financial liability for the government and to bring the electricity system back to financial stability.*

*Since the last in-depth review in 2009, also the Electricity Directive (Directive 2009/72/EC) was approved. The new Electricity Law approved in December 2013 revised the Spanish legal framework in accordance with the new European regulations and directives (the Third Package), but taking account of the Spanish situation regarding the integration of renewable energy sources and the low level of interconnections with other EU member states."[635]*

**(5.4)    Evaluation of the Measures by the Markets**

931.    The favourable reception that the Macroeconomic control measures taken by Spain since 2012 should also be stressed. The Expert Report provided with this Rejoinder on the Merits has studied the evolution of the ratings made by Agencies such as Fitch, Moody's, and media like the Street or Expansion. These Ratings have improved since November 2014.[636] This change is explained partly by the macroeconomic measures taken by the Spanish State in recent years, which have enabled the rebalancing of the tariff deficit of the electricity sector.

932.    Furthermore, in 2015, with the reform of the electricity system already completed, the regulatory uncertainty has disappeared and investment in renewable energy is recovering. It should be drawn Tribunal's attention to the fact that a number of Press reports that have echoed (1) the stability of the system produced by the Reform and (2) of the so-called *"renewable boom"* that is taking place in Spain due to the confidence of investors, national and foreign, in the profitability and stability of this system:

a.    *"Soria envisages a surplus of the electrical system for 2015"[637]*: *"The Minister of Industry has pointed out that "it is good news that there is a surplus", but has insisted that, "whatever that amount is, it shall be destined to reduce the total amount of the deficit accumulated in this system".*

b.    *"Wind operators in Spain and Portugal attract investor interest[638]"*: *"What attracts these investors is the stable return that renewable energy companies generally*

---

[634] IEA_IDR_Spain 2015 Report, Page 10. R-0376.
[635] Ibid. page 21.
[636] Accuracy, Second Report on the Claimants' Claim. Appendix 8
[637] "Soria envisages a surplus of the electrical system for 2015." Article from El Pais, 16 June 2015, R-0377.
[638] "Wind operators in Spain and Portugal attract investor interest". Article from Agencia EFE Article from Agencia EFE, 9 June 2015, R-0378.

*generate. The <u>context of low-interest rates globally</u> requires managers to search for yields beyond the equities and fixed income RETURN: And while the return offered by renewable energies are less now than before the reduction of the remuneration, <u>Spain still guarantees an annual yield of 7.5%</u> for the electricity sold by most of the wind farms in the country".*

c.    <u>*"'Boom' of operations in the renewable sector after the reform"*</u>[639]: *"The purchase of solar and wind power plants so far this year already exceeds 1 billion. Experts agree that new operations will take place in the sector in the coming months."*

d.    *"what the disappearance of the premiums has caused is a race to rationalise the industry* [Wind]*, through mergers taking advantage, in addition to the abundance of liquidity and <u>the legislative stability which the aforementioned energy reform has provided the sector with.</u>"* [640]

e.    <u>*"The renewable 'Boom' attracts investments of 5,000 million"*</u>[641]: *"The renewable Energy Sector has accumulated so far this year almost 5,000 million euros in buying and selling transactions [...]"*

f.    <u>*"Renewable energies resume their momentum in Spain"*</u> [642]*"Renewable energies come into a maelstrom of millionaire buying and selling transactions. [...] For months, not a week passes without there being a corporate operation in the renewable energy sector. [...] The renewable energy business map is changing at the stroke of a pen"*

933.    It is clear that the reform is not as unstable and unreasonable as the Claimants claim. If it were so there would be no interest by national and foreign investors in making investments or purchases in the Spanish energy sector. This investor *Boom* discredits the Claimants' arguments. It is evident that for the Press and for investors a pre-tax profitability of 7.398% is reasonable, particularly in the current international economic context, after the worldwide financial crisis suffered between 2010 and 2013.

934.    It is also worth noting that in 2015 a tendering process was opened for renewable energy producers of 500 megawatts (MW) of wind power and 200 MW from biomass. In this tender, the offers received from domestic and foreign companies exceeded the power finally awarded in January 2016 by a factor of 5[643]. This corroborates the interest from domestic and foreign markets in the system resulting from the measures challenged.

---

[639] "Operations boom in the renewable energies sector after the Reform", Article from the newspaper "El Mundo",
 dated 22 July 2015. R-0150.
[640] "Wind energy comes of age". Editorial from financial newspaper The Economist, of 24 July 2015. R-0380
[641] The renewable energies boom attracts 5,000 million in investment of funds". Article from the financial newspaper "El Economista", dated 17 October 2015. R-0151.
[642] "Renewable energies take the lead in Spain". Article from the financial newspaper "Expansión" dated 17 October 2015 R-0382.
[643] Decision of 17 March 2016 from the Directorate General for Energy Policy and Mines, which records awarded auction applications in the specific remuneration regime register with the status of advance

935.    Recently Diario Expansión, one of the economic newspapers with the largest circulation in Spain, published the opinions of various company directors and expert analysts from the sector, according to whom the measures have given the regulatory framework the stability that is demanded:

> *"The electricity reform, that started in July 2013, is already bearing fruit in the market in the form of stability. Marta Méndez Villaamil, legal director of mergers and acquisitions of EDP Renovaveis explained that the market has become more professional, is much more sophisticated and investors are more qualified".[644]*

936.    This news, the positive ratings of the Rating Agencies and the favourable reports from the European Commission, is more evidence of the reasonableness and proportionality of the Macroeconomic control measures taken in the energy Sector by the Kingdom of Spain between 2013 and 2014.

937.    Precisely on the day when we presented this document, the Ministry announced a new renewables auction to comply with the EU objectives.[645]

**(6)    The alternative measures proposed by the Claimants in their Reply on the Merits are not viable or effective**

938.    The Claimants maintain that the Respondent could have adopted other alternative means to resolve the problem of the tariff deficit. However, they forget that: a) the Arbitral Tribunal does not have to evaluate if other alternatives could have been valid but rather to determine if the measures under question are proportional and not arbitrary; b) even if the Respondent had solved the problem of the unsustainable situation of the SES with other measures, they forget that the Respondent could not allow the continuation of excess remuneration situations like the ones detected by the CNE for the CSP sector in its report of 7 March 2012.

939.    In addition, the measures proposed by the Claimants are neither viable nor effective. The Claimants allude to the White Paper sent by NextEra in 2010 to the Ministry of Industry.[646] A document issued to solve a situation in 2010 could hardly provide a solution for the macroeconomic situation existing in 2013. In fact, except for raising the rates for the consumers, all the measures proposed by the document are temporary and short-term:

   a) moratorium on assigning new renewables: a measure that was taken with RD-Act 1/2012;

   b) Extension of the CdO terms for the preassigned projects: this occurred in practice because all the CSP plants were experiencing construction delays;

---

allocation, in order to allocate the specific remuneration regime to new electricity production facilities based on biomass located in the peninsular electricity system and for wind technology facilities, R-0383.
[644] News from Diario Expansión of 3 May 2016, "Spain creates a secure legal framework to prevent another energy bubble". R-0384.
[645] Article from El Mundo, 20 October 2016: Industry relaunches renewables with a 'mega-auction' to comply with Brussels. R-0286.
[646] White Paper of 27 May 2010. Document C-62

c) Special loans in compensation for receiving a 6% premium increase in the two following years: that measure simply postponed the deficit into the future, instead of eliminating it.

d) Raising the floor in exchange for lowering the premium implies raising the floor more than 26€/MWh and offering in exchange only a 20€ decrease in the premium, so there were no savings.

940.    In any event, the Ministry of Industry evaluated the measures proposed by NextEra and rejected them with reasoned reply. This is demonstrated by a document located and submitted by the Respondent during the document submission phase. The Claimants reject it because they say that it antedated their White Paper. But in any event, the document refers to NextEra's proposal and the Claimants have not said that it is false. The Claimants do not deny that NextEra officials participated actively in the consultations prior to approval of RD 1614/2010, so a document evaluating NextEra's proposal may exist, whether or not it is contained in their White Paper.[647]

941.    On the other hand, the Claimants base themselves on the opinions of Dr. Abdala and Professor Spiller in order to propose alternative measures.[648] These measures have been analysed and rejected as unviable by Accuracy in their second expert report:

### a) Increase in access tariffs

942.    According to Accuracy, Spain already has one of the most expensive electricity costs of the European Union for both domestic and industrial consumers. Lexecon does not demonstrate what impact such increases would have had (let's remember, in addition to the ones approved) on the country's economic situation and therefore on demand for electricity and the sustainability of the System."[649]

943.    Accuracy reasons that if we just focus on the percentage of the budget assigned to electrical consumption,[650] Spain is clearly above the European average.



Figure 5.2 - Percentage of budget intended for electricity consumption in homes in 2008 vs. 2012

Source: Second Economic Report Lexecon - Figure XII

---

[647] Document of 25 May 2010 evaluating NextEra's proposals. R-0285.
[648] Reply on the Merits, paras. 243 et seq.
[649] Accuracy, Second Report on Claimants' Claim, para. 515
[650] Lexecon adds consumption from other energy sources like solid fuels, liquid fuels, gas, and heating in Figure XII of their Second Economic Report.

944.    In addition, as can be seen in the preceding figure, the consumers who dedicate a greater part of their income to electricity are, for the most part, EU countries with lower GDP per capita.

945.    Accuracy adds that the Spanish regulator already increased electricity prices much more than the European average. That is to say, if before approval of RD 661/2007 prices in Spain were below the European average (and despite that there wasn't any structural Tariff Deficit), from 2010 on the prices went above the European average:



Figure 5.3 - Evolution of the price of electricity for households between 2005 and 2014 (including taxes and charges)

Source: Eurostat

946.    In addition, the evolution of the price of electricity for Spanish industrial consumers is in line with the European average and not 11% below it,[651] as Lexecon states.



Figure 5.4 - Evolution of the price of electricity for industrial consumers between 2005 and 2014

Source: Eurostat

947.    As a consequence, Spain already has one of the highest electrical prices in Europe:

---

[651] Second Lexecon Economic Report - Figure XIII



948.    All of this also occurred in the context of the economic crisis that Lexecon has not taken into account. According to Accuracy, the regulator must seek to achieve efficient assignment of the Electrical System's financial resources with the aim of offering electricity at the lowest possible price. Increasing the prices even more has consequences for the System itself. For example, it would imply lowered competitiveness for Spanish industry at a time when the economic crisis had already decreased the number of enterprises by 41.3% and the industrial production index was at half of what it was in the period before the crisis, as shown by the following graphics:

### Figure 5.7 - Number of Spanish companies before the Measures

*Source: INE*



Figure 5.8 - Industrial Production Index (Base 2010)

*Source: INE*

949.    Therefore, Lexecon's proposal for additional price increases for electricity lacks any valid basis.[652]

**b)  Increase in indirect taxes**

950.    According to Accuracy, transferring the excess costs from one System (for example, the electrical system) to other sectors of the economy is not a correct solution. The regulator's responsibility is to strive to make their system self-sustainable.

951.    In any event, Lexecon seems to forget that in 2012 Spain was already taking these and other drastic measures to try to resolve the situation of crisis it was going through and be able to stem the public deficit: for example, the reduction of officials' salaries or the increase in the VAT.[653] Measures of this kind cannot be proposed without evaluating the impact on the economy and therefore the level of tax collection.

952.    Another one of the alternatives that Lexecon proposes as a solution to the Tariff Deficit, instead of the Measures, is to establish taxes on fuels that generate $CO_2$ emissions. Again, this proposal is not accompanied by a modelling exercise on the impact on either the economy or demand, without which it remains as mere theoretical speculation.

953.    This alternative would imply:

    a.  Increasing taxation even more on an already heavily burdened product, since more than 55% of the fuel price that consumers pay corresponds to taxes;

---

[652] Accuracy, Second Report on the Claimants' Claim, 513-521.
[653] In the Royal Decree promulgated in July 2012, measures like the following were taken:

-   In regards to salaries for officials, the extraordinary December payments were cut out, certain benefits for former holders of high posts were declared to be incompatible (unless they were not engaged in any other remunerated public or private activity), the number of days off and personal days were reduced, etc.
-   In fiscal terms: the general tax rate was increased from 18% to 21% and the reduced rate from 8% to 10%, among other measures that sought to make Spanish tax rates equivalent to those applied in the EU.
-   The tax reductions for housing were also eliminated from the personal income tax. R-0111.

b.  A reduction in fuel consumption that would result in a lower collection of taxes and would not therefore contribute to decreasing the Tariff Deficit.

954.   In addition, Lexecon's proposals ignore the fact that the per capita income in Spain is considerably lower than in the other EU countries to which Lexecon refers, and that the unemployment rate is much higher:



Figure 5.9 - Comparison of per capita income vs. unemployment rate

*Source: IMF Database and Accuracy analysis*

Figure 5.10 - Comparison of Spanish, German, Danish and Italian deficits

*Source: IMF Database and Accuracy analysis*
*Note: Results obtained from the difference between revenue and expenditure of the analysed States*

955.   Therefore, these alternative measures from Lexecon to reduce the Tariff Deficit are illusory and undesirable.[654]

### c)   Reduction of certain SES regulated costs

956.   The last alternative proposed by Lexecon consists of reducing the following regulated System costs:

---

[654] Ibid, paras.522-528

a. The subsidies for use of domestic coal;

b. The costs for interruptibility, which are payments to large electricity consumers who state that they are willing to cease their activity in the case of demand peaks.

957. According to Accuracy, once again Lexecon has not taken Spain's economic situation into account or the social and economic consequences of these alternatives.

958. A decrease in the subsidies received for using domestic coal would imply the immediate closure of coal power plants and, by extension, of Spanish mines with the consequent losses of jobs and the stagnation of activity of regions focused solely on this sector. In fact, at the end of 2010, the EU decided to extend aid to uncompetitive coal mines until 2018. Therefore, it is our opinion that this measure proposed by Lexecon could not be applied, since the negative repercussions on the well-being of the population would be very high and it would go against the measures adopted by the EU.

959. It should be emphasized that the reduction of interruptibility costs is a measure that is being carried out after the approval of order IET/2013/2013, which establishes a mechanisms for assigning the interruptibility service by auction.[655] This measure implies a reduction of costs close to 19% in 2014, as can be seen in the following graphic:[656]



**Figure 5.11 - Evolution of the interruptibility service cost**

*Source: Settlements of the electrical sector, 2010, 2011, 2013 and 2014 (CNE and CNMC)*

960. It is definitely the case that none of the alternative measures proposed by the Claimants are the fruit of proper analysis. Once such an analysis is made, the measures turn out to be unviable and not very effective in the macroeconomic context within which they would be applied.

---

[655] The mechanism consists of an auction with in-person bids where the price diminishes more and more from the starting price. Providing the service is assigned to the last bidder who remains without withdrawing and, therefore, is willing to provide it at the lowest price.
[656] Ibid, paras. 529-532

**(7)     The Termosol plants have an installed power greater than 50 MW: the Claimants cannot expect that their plants would receive the subsidies of Article 36 of RD 661/2007 indefinitely**

961.    As was made clear in our Counter-Memorial on the Merits[657] both Article 27 of Act 54/1997 and Article 36 of RD 661/2007 demanded, in order to receive subsidies, that the facilities have an installed power no greater than 50 MW. When this installed power is surpassed, the facility may not receive the benefits from the system established in Article 36 but rather of those provided for in Article 45 of RD 661/2007.

962.    Therefore, the requirement for having installed power below 50 MW becomes an essential condition for the plants to be able to access the subsidy regime of Article 36 of RD 661/2007 of the SR and benefit from the rights inherent in it, insofar as Article 30.1 of the LSE expressly stipulates the following:

> *"1. General obligations of the producers of electrical energy under special regime shall be:*
>
> *a) To apply safety standards and technical and standardisation certification regulations for installations and instruments as stipulated by the responsible Administration.*
>
> *b) To comply with technical generation standards as well as those for transmission and for the technical management of the system.*
>
> *c) To maintain the facilities in an optimal degree of operation so that they cannot cause injury to people or damages to facilities of third parties.*
>
> *d) To furnish the Administration with information on generation, consumption and the sale of power and on any other matters which may be laid down.*
>
> *e) To contract and pay the corresponding toll, either directly or through its representative, to the distribution company or transporter to which it is connected for discharging energy into their networks.*
>
> *f) To adequately fulfil the conditions laid down for the protection of the environment"*[658]*(emphasis added).*

963.    This limitation was not only established by the Act, but the CNE was very clear when settling up a public consultations in this regard.

964.    In fact, CNE issued a report on 28 February 2008 in the course of a consultation to build a Solar Thermal facility with a "rated power slightly above 50 MW, and that would have the control elements required to ensure the effective delivery of 49.99 MW"[659].

---

[657] Counter-Memorial on the Merits, paragraphs 110-126.
[658] LSE 54/1997, Article 30.1. R-0003.
[659] CNE Report of 28 February 2008 "In relation with the consultation raised by an individual regarding the possibility of developing a facility for the production of electrical solar thermal energy, whose nominal power exceeds 50 MW in such a way that it may be included under the special regime regulated by RD 661/2007, of 25 May." ." This Report bases itself on the following

965.    The CNE, outlined the regime of RD 661/2007 and concluded that:

> " 1) The **_authorisation_** of the facility subject to the consultation corresponds to the Directorate General for Energy Policy and Mines, of the Ministry of Industry, Tourism and Trade, since the _installed power_ exceeds 50 MW.
>
> 2) So that the facility can be included in the Special Regime it must _comply_ with what is provided in Article 2 RD 661/2007, among other requirements to have an **_installed power not exceeding 50 MW_**, as provided in Article 27.1 of Act 54/1997, of 27 November, for the Electric Sector.
>
> 3) _Generating facilities with a power greater than 50 MW_ must participate in the electrical energy production market. Facilities using renewable energy sources, except hydraulic, _shall be entitled in addition to receive a premium,_ provided that the power does not exceed the 100 MW.
>
> 4) Current legislation does not allow a facility of rated power greater than 50 MW to be included under the Special Regime, irrespective of the effective power supplied into the network" (emphasis added).

966.    These conclusions are easily deduced from the Articles cited by the Report itself. We must therefore conclude that the Claimants knew or should diligently had known that the _"power installed in Power Plants could not be greater than 50MW"_. Needless to clarify that this also excluded the facilities with an _installed_ power of more than 50MW, with control elements necessary to ensure the effective delivery of 49.99 MW, as the wording of the regulation is clear: installed power cannot exceed 50 MW[660].

967.    In our Counter-Memorial on the Merits we also made clear that the Termosol Plants, in light of what is established in their Due Diligence techniques, appear not to comply with this condition but rather have a greater level of installed power. This suspicion is confirmed

---

Articles of RD 661/2007 in order to reach the conclusion transcribed in paragraph 125 of this Statement: Article 1, "Constitutes the object of this Royal Decree: [...] c). The determination of a premium to complement the remuneration regime of those facilities with a power greater than 50 MW, applicable to facilities included in Article 30.5 of Act 54/1997, of 27 November, and for cogeneration plants."
Article 4.2: Correspond to the General State Administration, through the Directorate General for Energy Policy and Mines of the Ministry of Industry, Tourism and Trade: [...] b. The administrative authorization for the construction, operation, substantial modification, transmission and closure of facilities whose installed power exceeds 50 MW"
Article 6.2: "So that a production facility can benefit from the special scheme it must prove compliance with the requirements referred to in Article 2 for the main technical and operation features of the facility. A quantified assessment should be carried out of the electrical energy that is going to be transferred if applicable to the network."
Article 45: "1. Facilities with installed electrical power in excess of 50 MW described in Article 30.5 of Act 54/1997, of 27 November, are obliged to freely negotiate their net production of electricity on the market.
2. Facilities with similar technologies to those in category b, except hydroelectric ones, of installed power greater than 50 MW, shall have the right to receive a premium, applied to the electricity sold on the market, equal to a 50 MW facility in the same group and subgroup and, if applicable, same fuel and same age from the date of commissioning, determined in Article 36, multiplied by the following coefficient: 0.8 [ (Pot -50) / 50) x 0.6 ], for facilities up to 100 MW [...]" R-0043.
[660] LSE 54/1997, Article 27, R-0003.

by the data for the electricity production discharged into the network, provided by the Spanish Electricity System[661] (henceforth "SES").

968.    In their Reply on the Merits, the Claimants confess that, in fact, the Termosol Plants are over the power limits.[662] However, they say that since the "installed power" concept is not defined in the Act, the provisions of Article 3 of RD 661/2007 should be followed. This provision establishes:

> [663]*1. The rated power shall be what is specified on the technical data plate of the motor or alternator group, as the case may be, corrected by the following measurement conditions, if applicable (...)"*

969.    According to the Claimants, since the rated power specified on the technical data plate of the motor or alternator group of the Termosol Plants says 49.9MW, their plants meet the legal requirement. This in spite of the fact that the Claimants confess that the real installed power, in order to introduce 50MW of net power into the network, is 55MW or even more.

970.    The Claimants say they have always believed that they acted in accordance with the law and that this was the belief of all system agents. Despite the fact that the CNE, to which they have had recourse so many times in their Memorials, does not share this belief.

971.    In addition, the Claimants' argument fails on one point: if they thought that they could have an installed power of 55MW or more, why didn't they show this on the technical data plate? In fact, the Termosol Plants only have an authorised power of 49.9MW. Where is the authorisation obtained by the Plants to install additional MW? Such authorisation could only have been given by the DGPEyM of the Ministry of Industry and the Termosol Plants have not gotten it. This is because they would have to have recognised that their installed power was greater than 49.9MW and with that the Termosol Plants would not have benefited from the application of Article 36 of RD 661/2007.

972.    The Claimants think that the Kingdom of Spain, by virtue of the principle of estoppel, cannot argue that the Termosol Plants are over the power limits.[664] They say that the Kingdom of Spain consented to this practice because a) it registered the Plants in the RAIPRE; b) the CNE has done inspections of the Termosol Plants and it has not concluded that they are over the power limits; and c) the Electricity System has signed a contract with the Termosol Plants and it hasn't questioned the Plants' installed power either.

973.    The Claimants' arguments cannot be accepted since, despite of the fact that the estoppel principle is not applied or heard of in Spain, they ignore the fact that: a) registration in the RAIPRE occurs based on verifying compliance with the administrative and not the technical requirements of the facilities; b) verification by the CNE is purely based on documents and refers to verifying that the plant has the documents and permits necessary for its operations,

---

[661] Net production data discharged into the Network, provided by REE. R- 0078
[662] Reply on the Merits, paras. 109 et seq.
[663] RD 661/2007, Article 3. R-0042.
[664] Reply on the Merits, paras. 272 et seq.

but it is not an empirical power test;[665] c) the Electricity System is a technical system operator and not an administrative control body. It doesn't do verifications of the economic regime the facility has or should have either. The Claimants cannot, therefore, invoke that there is persistent tolerance over time on the part of the Respondent that has generated any expectations for the Claimants that their Plants could benefit from the subsidies of Article 36 of RD 661/2007 for thirty years. We can hardly speak of prolonged tolerance over time when already in March 2015 the Respondent expressed suspicions of irregular behaviour by the plants that had been in operation for less than two years.

974.    In addition, the fact is that the Respondent has never verified or calculated empirically the power installed at the Termosol Plants. What's more, when it has attempted to do so, the Claimants refused to allow it. In fact, the Claimants, since they were unable to completely comply with the obligation of providing the documents specified in document submission request No.52 of the Kingdom of Spain, proposed that the Respondent make a visit to their facilities to verify aspects related to their service life.[666] The Respondent replied to their invitation on 7 October 2016, requesting that the visit include verification of the following matters at the Plants: *a) Gross power, b) Net power and c) Access to control system historical data (at least one year).*[667]

975.    The Claimants answered the Respondent's request by means of a letter dated 11 October 2016 where they very politely, using excuses based on finishing the document submission phase, refused the possibility of verifying the installed power of the Termosol Plants.

> *"We note that while the Claimants' offer of a site visit was made in connection with the useful life of the Termosol Plants, the three "essential aspects" the Respondent lists in your email of 7 October 2016 seem to relate not to the useful life of the Termosol Plants, but rather to the installed capacity of the Termosol Plants. Insofar as Respondent's three requests are for additional information or documents relating to the installed capacity of the Termosol Plants (in particular, the request for "access to control system historical data" for at least one year), we note, for the avoidance of doubt, that the document production phase has already addressed that issue. Accordingly, the Claimants do not consider it appropriate for the Respondent to use the site visit to reopen a new roving inquiry into data not ordered to be produced by the Tribunal. Simply put, the Tribunal has already ruled in Procedural Order No. 4 in respect of Respondent's requests concerning the Termosol Plants' installed capacity and the Claimants are not proposing to revisit or revise the Tribunal's decision. This is particularly the case in circumstances when the Respondent already has access to information concerning the Termosol Plants' maximum electricity output, as evidenced by its Exhibit R-078 (the remainder of which Spain continues to refuse to provide to the Claimants), as well as to the Termosol Plants' SCADA readings from 2013 and 2015."*[668]

---

[665] The CNMC report of 11 September 2014 verifies, from a strictly documentary standpoint, that the technical date plate of the alternator indicates 62 MVA and a power factor of 0.8, which is equivalent to an active power of 49.9MW. If these two elements are multiplied (62MVA by 0.8), a power below 49.9MW is obtained, which shows that the PTEs hid information from the CNE. Document C-229
[666] E-mail and letter attached for the invitation. R-0277.
[667] E-mail of 7 October 2016 from the Kingdom of Spain R-0278
[668] Letter from Skadden on 11 October 2016. R-0279.

976.     The facts speak for themselves. If the Respondent has already inspected the installed power at the Termosol Plants, why didn't the Claimants say that? And, if it had not done so and the Claimants have nothing to hide, why do they refuse this verification?

977.     The expert report from Mr Jesús Casanova, an engineer from the Polytechnic University of Madrid, confirms the position of this Respondent, that it is not prevented at all from International Law from using this defence argument.

978.     We can mention the opinion of Wälde in this regard:

> *"an invalid right or title, not issued by the competent authority, but issued under material breach of mandatory procedures or issued in contravention of peremptory law, does not constitute an "investment". A contractual right to explore and develop oil and gas issued by an incompetent local entity, or issued without complying with mandatory tender procedures, or issued with material breach of such procedures suggesting illicit practices and, certainty, if issued under the influence of proven corruption, would not seem to constitute "investment".* [669]

979.     Within the sphere of the ECT, the case of Plama Consortium v Bulgaria is clearly relevant, where it is concluded that investments made in violation of legal standards are not protected by the ECT.

> *"The ECT does not contain a provision requiring the conformity of the Investment with a particular law. This does not mean, however, that the protections provided for by the ECT cover all kinds of investments, including those contrary to domestic or international law. [...]. The Arbitral Tribunal concludes that the substantive protections of the ECT cannot apply to investments that are made contrary to law."* [670]

980.     For this purpose, it bases itself on the application of the principles of International Law, such as:

> *"(i) the <u>principle of good faith</u> defined as the "absence of deceit and artifice during the negotiation and execution of instruments that gave rise to the investment" and (ii) the principle of <u>nemo auditur pro priam turpitudinem allegans</u> - that nobody can benefit from his own wrong - understood as the prohibition for an investor to "benefit from an investment effectuated by means of one or several illegal acts". In addition, the tribunal found that recognizing the existence of rights arising from illegal acts would violate the <u>"respect for the law"</u> which is a principle of international public policy."* [671]

---

[669] T W Wälde, "International Investment under the 1994 Energy Charter Treaty" in T W Wälde (ed) The Energy Charter Treaty: An East-West Gateway for Investment and Trade (Kluwer Law International, 1996), page 273. RL-0111.

[670] *Plama Consortium Limited v. the Republic of Bulgaria, (ICSID Case No. ARB/03/24)*, Award on 27 August 2008, paragraph 138 and 139. RL-0092.

[671] *Plama Consortium Limited v. the Republic of Bulgaria, (ICSID Case No. ARB/03/24),* Award on 27 August 2008, paragraph 141. RL-0092.

981.    These principles applicable to the investment protection sphere have been reiterated in numerous precedents.[672]

982.    The Respondent is not defending the investment violation by the Claimants as a grounds affecting the Tribunal's jurisdiction. What it is defending is that the Claimants could not have the legitimate expectation that the Termosol Plants could receive the subsidies established in Article 36 of RD 661/2007 if they had an installed power greater than 50MW. This circumstance also affects the damages claimed by the Claimants, which should not be based on the subsidies of Article 36, but rather those of Article 45 of RD 661/2007. These calculations have been made by Accuracy in their report and reflect that the Claimants would obtain greater income with the measures challenged.[673]

## B.    Legal grounds of the Kingdom of Spain

**(1)    Estoppel cannot be invoked by the Claimants in order to prevent the Kingdom of Spain from formulating its defence pleadings in regards to the merits of the matter, and if it was applied, the grounds for it to be effective would not exist**

### (1.1)    For matters of merit, estoppel overlaps with the FET standard of the ECT

983.    Estoppel is a concept of Anglo-Saxon law that is not recognised in Spanish law and that is not fully recognised in international law either. In Spanish law, what is recognised is the principle of "*venire contra factum proprium non valet*". This principle, which does not fully coincide with estoppel, is the other side of the coin of the principle of legitimate expectation and, therefore, comes under the standard of Fair and Equitable Treatment.

984.    In fact, on most of the occasions when the application of estoppel has been accepted in international investment arbitration, it has been in the jurisdictional phase and not the phase of merits. This party has undertaken an intense search and reading of awards that apply estoppel. A total of 30 have been found, and more than 25 of them dealt with jurisdiction. For their part, the Claimants say that there are awards that interpret the ECT where the estoppel principle has been applied, but they forget to mention that the two awards they cite are on jurisdiction.[674]

985.    In terms of questions that do not affect the Tribunal's jurisdiction but rather the merits of the matter, Arbitral Tribunals understand mainly that the estoppel principle is covered by

---

[672] Among others, we can cite the cases in which the requirement of the legality of the investment has been appreciation, declining jurisdiction because the investment had violated the laws of the host Government:
*Inceysa Vallisoletana S.L. versus Republic of El Salvador (ICSID Case No. ARB/03/26)*, Award of 2 August 2006, paragraph 257. RL-0047.
*Phoenix Actoion, LTD versus Czech Republic (ICSID Case No. ARB/06/05)* Award of 15 April 2009, paragraphs 113 and 144. RL-0048.
*Gustav F. W. Hamester GmbH&Co KG versus Republic of Ghana (ICSID Case No. ARB/07/24)* Award of 18 June 2010, paragraphs 123 and 124. RL-0049.
*SAUR International versus Republic of Argentina (ICSID Case No. ARB/04/4)*, Decision on Jurisdiction and Liability of 6 June 2012, paragraph 306. RL-0115.
[673] Accuracy, Second Report on Claimants' Claim, paras. 442 et seq.
[674] Documents CL-4 and CL-164.

the Fair and Equitable Treatment (FET) standard. In this sense, the Award of *Occidental Exploration and Production Company v.* The *Republic of Ecuador* declared:

> "*The Tribunal concludes on this matter that, as stated above, OEPC undertook its investments, including its participation in the pipeline arrangements, in a legal and business environment that was certain and predictable. This environment was changed as a matter of policy and legal interpretation, thus resulting in the breach of fair and equitable treatment. This breach relates to the effects of both revoking the Granting Resolutions and denying further VAT refunds. The rights of the Claimant are therefore protected under the fair and equitable treatment standard required by the Treaty and enforced by the Tribunal, independently of any estoppel. This last issue therefore becomes moot.*"[675] *(Emphasis added)*

986.    Along the same lines, in his separate opinion in the case of *International Thunderbird Gaming Corporation v. United Mexican States*, Professor Wälde stated:

> "*27. The principle of protection of "legitimate expectation" or, in common law, estoppel, has also been applied in comparative contract law, mainly to deny formal rights invoked by a party if such invocation contradicts previous statements and conduct that made the other party trust in the particular expectation so created.*"[676] *(Emphasis added) (Footnotes omitted)*

987.    Therefore, the Respondent believes that the estoppel principle is not applicable since it is already covered by the FET concept of the ECT. In any event, what our statements cover for FET should serve to rule on the question of estoppel if the Tribunal should deem that it should be considered.

### (1.2)    Even if the estoppel principle was applicable, the requirements for it to be effective do not exist in this case

988.    If the Tribunal was to consider the application of the estoppel defence to the merits of the matter, then the award of the case *Vestey Group Ltd v. Bolivarian Republic of Venezuela* should be invoked, in which the following was stated:

> "*The Tribunal is not convinced by these arguments. The requirements for acquiring property rights over immovable assets situated in Venezuela are governed by specific norms of Venezuelan property law. For a private person to have a claim under international law arising from the deprivation of its property, it must hold that property in accordance with applicable rules of domestic law. The principle of estoppel cannot create otherwise inexistent property rights. This is so if one grounds the principle of estoppel on international law.*"[677] *(Emphasis added)*

989.    Therefore, and even if the estoppel principle was applied, the Tribunal will have to rule if the rights invoked by the Claimants in this procedure exist in accordance with Spanish

---

[675] *Occidental Exploration and Production Company v. Republic of Ecuador,* LCIA Case No. UN3467, Final Award, 1 July 2004 RL-0116
[676] *International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL, Separate Opinion, 01 December 2005. RL-0117
[677] Vestey Group Ltd v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/06/4, Award, 15 April 2016. RL-0118

law. In this sense, it should be noted that NextEra does not hold any contract, concession, or license. In fact, it does not claim application of the umbrella clause. The Claimants invested in a highly regulated sector in which the rights of the producers arise exclusively from the provisions of Act 54/1997 and its regulations. Therefore, the Claimants, just as in the case of Vestey Group Ltd v. Bolivarian Republic of Venezuela, may only hold such rights as are recognised within the regulatory framework within which they invested. As we have explained exhaustively in the section on matters of fact, the Spanish regulatory framework does not recognise the right of renewable energy producers to receive an unchanging premium. That would go against the dynamic character of reasonable return guaranteed by Article 30.4 of Act 54/1997, as the Supreme Court of the Kingdom of Spain has insisted in more than one hundred judgements.

990.    Therefore, the Claimants' assertion that "*Spain fails to explain why its own domestic law is relevant when the law applicable to the dispute,*"[678],is not true. Spanish Law is in fact determinant when considering the Claimants' expectations.

991.    In addition, the features of estoppel, as taken from the document "*Estoppel before international tribunals and its relation to acquiescence,*"[679] provided by the Claimants in their Counter-Memorial on Jurisdiction, are as follows:

    a.    "*The meaning of the statement must be clear and unambiguous*"680. *In particular, the authors say: "Clearly the question whether there is any ambiguity, apparent or latent, and if so how it should be resolved, is a question to which the established rules of interpretation apply. This much is apparent from the estoppel cases, that a tribunal will not take a phrase out of its context and upon that isolated phrase create an estoppel: on the contrary, the tribunal will review the whole circumstances and the background". 681*

    b.    "*The statement or representation must be voluntary, unconditional and authorized*". That is to say, the means through which the investor makes the promise must be unequivocal: "*before a party can be bound by a representation the representation must have been made with its authority, express or implied: in the absence of such authority another party would not be entitled to rely upon the statement. Where the authority is expressly given no real difficulty arises, but in cases of implied authority it will be a question of construction of the status of the person actually making the representation and the sphere within which he purports to act with authority.*"

    c.    *Reliance in good faith upon the representation of one party by the other party to his detriment (or to the advantage of the party making the representation).*

992.    As may be shown, the feature of estoppel are completely covered by the FET standard.

---

[678] Reply on the Merits, para. 378.
[679] "Estoppel before international tribunals and its relation to acquiescence". Document CL-141
[680] Ibid, pag.188
[681] Ibid, pág.188

993.    Dealing with this in regards to the three sub-sections that the Claimants have identified, the following may be indicated.

994.    In the first place, the Claimants seek to apply the estoppel principle to the "omissions" of the Kingdom of Spain (because it had never said that the Termosol Plants were over power limits, because it has never told NextEra that a return of 11.6% is unreasonable, and because, in theory, it has never lowered the subsidies to alleviate the tariff deficit).

995.    <u>In relation to the Termosol Plants exceeding the power limit</u>, a failure to detect that the plants exceeded the power limit cannot be said to be the same as a declaration by the Kingdom of Spain that the plants meet the requirements to remain under the Special Regime. The inclusion of the Termosol Plants in the RAIPRE is done through an administrative and not a technical verification process. That is to say, the Extremadura Regional Council limited itself to verifying all the necessary papers for the Plants to be registered.

996.    The Claimants say that "*In any event, Spain cannot in this arbitration properly raise an objection as to the lawfulness of acts done by its own organs. The central Government of Spain has no power to revoke authorisations issued by a competent regional authority to a CSP plant or to revoke its inscription in the RAIPRE. Given that the Termosol Plants were duly approved by the Junta de Extremadura, the current proceedings are not the right forum to second guess the approval granted by Spain's own organs".[682]* If this were true, then *sensu contrario*, the central Government of Spain would not have acquired any supposed commitment in regards to the Plants by their inclusion in the RAIPRE. In any event, the Claimants ignore that, precisely because their Plants have more than 50MW of installed power, jurisdiction for their authorisation corresponds to the Central Government and not the Extremadura Regional Council.[683] They also ignore the fact that the loss of the special regime may occur without the need for the Plant to disappeared from the RAIPRE.[684] Finally, in relation to the conduct of the CNMC after its visit to the PTE facilities in September 2014, the CNMC limited itself to a documentary and not an empirical verification, so it did not check the real installed power.

997.    In addition, the Claimants have concealed the real installed power on their technical data plate and they have prevented the Respondent from verifying the real installed power technically, which demonstrates that the Plants' behaviour is neither tolerated nor confirmed by the Kingdom of Spain.

---

[682] Reply on the Merits, para.397
[683] Article 45.6 of RD 661/2007. R-0042
[684] In this regard, the Supreme Court of the Kingdom of Spain has clarified that there is no link between the right to receive subsidies and registration in the RAIPRE, which is obligatory for all facilities:
"The fact that a certain photovoltaic facility does not meet the required conditions to receive the premium does not imply per se that it ceases to be a special regime facility. Under this condition it may continue to be registered in the corresponding registries and operate legitimately in the market (as we have already indicated, the RD itself recognises this), although clearly without the benefits derived from having recourse to the more favourable premium regime". Judgement of the Supreme Court of 30 March 2012, (Rec.1/432/2010). R-0284.

998.    In regards to the tariff deficit, it is completely untrue that the Kingdom of Spain promised the Claimants that any solution to the deficit would not affect their remuneration conditions. The Claimants have not provided a single bit of evidence of such a promise. The facts included in this statement show that each and every one of the measures introduced by the Kingdom of Spain since RD 661/2007 (including it), have had the aim of guaranteeing the financial sustainability of the SES and of avoiding situations of excess remuneration. The Claimants could not reasonably expect, after the passage of RD 661/2007, RD 1578/2008, RD-Act 6/2009, RD 1565/2010, RD 1614/2010, RD-Act 14/2010 and Act 2/2011 on Economic Sustainability, that their Plants would not see any changes due to the measures that were necessary to guarantee the sustainability of the SES within the bounds of guaranteeing the maintenance of a reasonable return. In fact, Pöyry expressly warned the Claimants that the tendency of the Government in the fact of these situations would be to cut benefits to the producers before raising the bills to the consumers.

999.    Finally, and in regard to the IRR level of 11.6%, the Claimants say that the Kingdom of Spain cannot, due to the estoppel principle, say that a return between 8 and 11% is not reasonable. It is clear that the Claimants have not understood how the remuneration framework they have invested in works. Perhaps if they had practised Legal Diligence they would have known that the principle upon which the entire system turns is the principle of "reasonable return in accordance with the cost of money on the capital market," (Article 30.4 Act 54/1997), as explained in Section III.A.1(4) of this document.

1000.   The Claimants cannot provide a single shred of evidence that the Kingdom of Spain unequivocally promised to guarantee NextEra a return of 11.6% on their Plants for thirty years. In fact, the Claimants have included this argument *ex novo* in their Reply on the Merits after finding out in the document submission phase about the Financial Report of RD 661/2007, where it is stated that returns between 8 and 11% may be obtained under the pool plus premium option. It is impossible for the Claimants to have based their expected return on a document they only found out about a few months ago. In any case, if the Financial Reports sets a maximum return of 11% (in a remuneration modality that depends on the price oscillations of the pool), it is evident that the Kingdom of Spain never promised a constant return of 11.6% over thirty years.

1001.   The only message that the Kingdom of Spain has given through its standards, jurisprudence, the CNE reports, and the Government Attorney's Office reports known to the Claimants is that the return is dynamic and that no investor can expect the premiums and tariffs to always remain the same. In fact, the other actors in the RE sector did not share the Claimants' opinion.

1002.   Moreover, the Kingdom of Spain never promised NextEra that the incentive for participating in the market (element C of the formula A + B + C) would be maintained indefinitely for thirty years. This supplement is not an incentive for investment but rather for market participation, so no investor could have confidence in it being maintained throughout the operational life of their facilities. In fact, any diligent investor could see how this supplement was removed from photovoltaic facilities by RD 661/2007. Any diligent investor could even have foreseen that this incentive for participating in the market was aimed at lowering pool prices. This pool decline would imply an automatic reduction of

their remuneration (pool plus premium). Therefore, over the long term, it was impossible for their return to remain at the same maximum percentage.

1003.    The reasonable return guaranteed by the Kingdom of Spain is the one projected in the regulated tariff, i.e. around 7%. So all the banks' Baseline Cases are calculated on the regulated tariff option.

1004.    In addition, the Kingdom of Spain has made clear in previous sections that the CNE itself, in its report of 7 March 2012, pointed out the excess remuneration of the thermosolar sector in the pool plus premium option, due to the fact that real pool prices were far above what had been expected.

1005.    Finally, the third requisite is missing, "*Reliance in good faith upon the representation of one party by the other party to his detriment (or to the advantage of the party making the representation).*" As we have explained at length in the section on the facts and as we will soon recall again when dealing with Legitimate Expectations, NextEra never believed in the existence of a freeze commitment, as is indicated by their letters, e-mails, and the contracts they signed during the investment process.

1006.    In conclusion, none of the three requirements for the principle invoked by the Claimants is present in order to be able to demand the application of the estoppel principle: 1) the circumstances adduced by the Claimant party imply a slanted and partial interpretation of the situation that existed at the time of their investment; 2) the Kingdom of Spain has never promised the Claimants unequivocally a right to the immutability of the PTEs remunerations but rather guaranteed them the right to a "reasonable return" as a dynamic concept; 3) the Claimants never believed in the existence of freeze commitments.

**(2)    Objective and purpose of the ECT: National or non-discriminatory treatment.**

1007.    The Respondent explained the true objective and aims of the ECT at length in its Counter-Memorial on the Merits. We refer to that document so as to avoid pointless repetition.[685] Just as it was shown in our Counter-Memorial, the objective of the ECT in terms of protecting the investor is to achieve a situation without discrimination or of domestic treatment. Only when the absence of discrimination does not guarantee the investors treatment in accordance with the minimum standards of International law do these standards go into effect to ensure their protection.

1008.    In response to the arguments of the Kingdom of Spain, the Claimants think that Article 10.1 of the ECT establishes a FER standard that is independent of a superior to the minimum standards of International Law. For this purpose, they reach the unfounded conclusion that the legal authorities that the Kingdom of Spain cites in its Counter-Memorial are few, worthless, and taken out of context.[686] That is to say, for the Claimants, the opinions of authors such as Wälde and Bamberger do not matter, simply because they are contrary to their interests.

---

[685] Counter-Memorial on the Merits, paragraphs 599-637.
[686] Reply on the Merits, paras. 413 et seq.

1009.    In fact, both Wälde and Bamberger are clear that:

> "The Key Article 10 on "Promotion, Protection and Treatment of Investments" begins, in paragraph (1), with general statements concerning the favourable conditions which Contracting Parties must maintain for investments by investors of other Contracting Parties. _These provisions are intended to assure an absolute minimum standard of treatment such as has been established in bilateral investment treaty practice, based to a considerable extent on developments in international law._ (…)"[687]

1010.    However, the Claimants have not hesitated to cite Wälde when he says something that serves their interests.[688]Bamberger is one of the drafters of the ECT, so the Kingdom of Spain understands his to be a voice that is sufficiently authorised to offer an opinion regarding the ordinary sense of the wording of the ECT in relation to its context and aims.

1011.    The Claimants surprisingly affirm that:

> "Spain's reference to the object and purpose of the ECT does not help its argument. As an initial matter, it is telling that Spain jumps to Art. 2 of the 1991 European Energy Charter rather than the ECT itself as indicating what the object and purpose of the ECT are."[689]

1012.    But the Respondent has not made an unjustified jump to the 1991 European Energy Charter. The Respondent has simply read Article 2 of the ECT:

> "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, _in accordance with the objectives and principles of the Charter._"[690]

1013.    Therefore, the jump that the Respondent makes to the objectives and principles of the European Energy Charter is imposed by Article 2 of the ECT itself. In fact, Article 2 of the ECT establishes, as an objective, "_to promote long-term cooperation in the energy field, based on complementarities and mutual benefits_". But this long-term cooperation has a very clear aim, included in the European Energy Charter:

> "to promote the development of an efficient energy market throughout Europe, and a _better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation,_ taking due account of environmental concerns."[691]

1014.    The Charter adds:

> "They undertake to pursue the objectives of creating a broader European energy market and enhancing the efficient functioning of the global energy market by joint or co-ordinated action under the Charter in the following fields:

---

[687] C.Bamberger, "An Overview of the Energy Charter Treaty"(RL-0051), in T W Wälde (ed), The Energy Charter Treaty: An East-West Gateway for Investment and Trade, (Kluwer Law International, 1996). RL-0051.
[688] Reply on the Merits, para.479
[689] Reply on the Merits, para. 424.
[690] Article 2 of the ECT. RL-0020.
[691] 1991 European Energy Charter (included in the ECT), Title I. RL-0020.

> *- access to and development of energy resources;*
>
> *- access to markets;*
>
> *- liberalisation of trade in energy;*
>
> *- promotion and protection of investments;*
>
> *- safety principles and guidelines;*
>
> *- research, technological development, innovation and dissemination;*
>
> *- energy efficiency and environmental protection;*
>
> *- education and training.*"[692]

1015.   Therefore, as we said in our Counter-Memorial on the Merits, the protection of investments within the ECT, which is covered in 7 of the 50 articles of the Treaty, is done with a very concrete purpose: the creation of a free and competitive energy market all over Europe. In fact, the Charter says that: "*The signatories will strongly promote access to local and international markets for energy products for the implementation of the objectives of the Charter. Such access to markets should take account of the need to facilitate the operation of market forces, and promote competition*".[693] (Emphasis added).

1016.   That is why the idea that an investor can have protection beyond the absence of discrimination is incompatible with the creation of this competitive energy market in Europe and with the ECT. Only when national treatment is worse than what is guaranteed by the minimum standards of International Law do the latter apply.

1017.   In addition, the idea of an investor receiving subsidies that distort the energy market competition that the ECT seeks to create is also incompatible with the ECT. In this regard, we must not forget that what the Claimants seek in this arbitration is to receive a concrete amount of government aid over thirty years, even though this may distort competition on the market. In this way, the Claimants forget that the RE subsidies have the aim of guaranteeing the producers a "level playing field" that allows them to compete on the market. That "level playing field" is broken when excessive or excessively low subsidies are provided. So subsidies have to provide a "reasonable return".

1018.   The Claimants attempt to have the subsidies remain unchanged even when situations of excess or a shortfall of remuneration occur that may distort the market is contrary to the aims of the ECT.

1019.   The problem with the Claimants is that they want to turn the ECT into something it isn't: it isn't a huge BIT or investment super-treaty. The ECT is a multilateral and mixed treaty that seeks to create an all-European electricity market following the model of the

---

[692] Ibid, Title II.
[693] Ibid, Title II.

EU.[694] That's why the Claimants' interpretation of the ECT as a treaty that protects the investor above all else is contrary to the text and aims of the ECT.

1020.   In addition, the Claimants maintain that the interpretation by the Kingdom of Spain of Article 10(1) is mistaken because, if it were true that the applicable protection standards are the minimum standards of International Law, the ECT would not have included before the expression, "*Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.*"[695] In order to respond to this question, we believe that it is best to reproduce Section 10 (1) of the ECT in its entirety:

> "*Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent <u>conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.</u> Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. <u>In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.</u>*"

1021.   To the Respondent, Article 10 (1) is distinguishing between two moments: the first one, as soft law, refers to the so-called "making investment process". It is in this phase where the phrase "Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment," is pertinent. This is because the precept refers to "such conditions", i.e. the conditions "to make investments in its Area" to which the preceding phrase referred.

1022.   The second part of Article 10(1) would refer to investment once it has been made. The investment, once made, receives protection against discriminatory and irrational measures that affect the management, maintenance, use, enjoyment, and disposal of the investment. As a clause covering minimums, the precept says that, "*In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.*" Hence, there is no inconsistency in the interpretation proposed by the Respondent and what authors like Wälde and Bamberger confirm.[696]

---

[694] The Respondent makes reference in this point to what is developed in the Intra-Community objection in its Counter-Memorial on Jurisdiction and its Reply on Jurisdiction of 14 October 2016.

[695] ECT, Article 10(1).

[696] Wälde says: "The main standard imposed by the Treaty on investors is according to all authoritative accounts of the Treaty, "national treatment". (…). The strategy of the Treaty has been to incorporate the "favourable" element of national treatment, i.e. non-discrimination vis-à-vis national business, while countervailing the negative element, i.e. the application of possibly low-quality standards to foreigners, by the inclusion of international minimum standards. In other words, international law sets the minimum standard, even if national treatment would be much worse, but when it comes to governments favouring their own companies, then national treatment takes precedence".  T W Wälde, "International Investment under the 1994 Energy Charter Treaty" in T W Wälde (ed) The Energy Charter Treaty: An East-West Gateway for Investment and Trade (Kluwer Law International, 1996), (Emphasis added). RL-0046

1023.  The Claimants think that if the discrimination principle acts as postulated by the Kingdom of Spain, then Article 10(7) would make no sense. But Article 10(7) not only national treatment but also the most-favoured nation (MFN) clause.[697]

1024.  However, this guarantee of national and MFN treatment in Article 7 for investments already made contains a significant *exception* in the field of subsidies or state aid as in this case in paragraph 8 of Article 10:

> *"The conditions for the application of paragraph 7 to the programmes by which a Contracting Party provides grants or other **financial assistance** or signing of contracts for research and development on energy technologies, **shall be reserved for the supplementary treaty referred to in paragraph 4"**. (Emphasis added).*

1025.  Finally, for the Claimants, the ECT Interpretation Guide developed by the ECT Secretariat itself and attached as a document related to the ECT in its publications "*are not part of the ECT and thus serve no guide as to the interpretation of a totally different treaty, which must be applied on its own terms*".[698]

1026.  In the Respondent's view, both the European Energy Charter and the Secretariat's Treaty Guide are, due to the will of the contracting parties, instruments that serve to interpret the ECT in accordance with Article 31 of the CVDT. The Honourable Arbitral Tribunal will be the one to decide in the end whether or not these instruments are utilised to interpret the ECT.

1027.  The Respondent simply recalls that the Energy Charter Treaty Guide makes it very clear that the ECT does not prevent States from exercising their macroeconomic control power:

> *"8. Many **Governments actions**, for example the **control of the macroeconomics** or the introduction of environmental and safety legislations, **can affect investment profits** but cannot be subject to absolute rules. In this case, the best defence for a foreign investor is the **guarantee** that he will be treated **at least as well** as are domestic investors, because no government will want to destroy their own industry."[699] (Emphasis added)*

1028.  In addition, the interpretation postulated by the Respondent, following Wälde, Bamberber, and the ECT Secretariat is in accordance with the awards that have been issued concerning the FET standard of the ECT. According to these awards, in the absence of a specific commitment to stability, an Investor cannot have an expectation that a regulatory framework such as the one discussed in this arbitration will not be amended. This has been

---

[697] Article 10(7) of the ECT. "Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable."
[698] Reply on the Merits, para.442
[699]"The Energy Charter Treaty and related documents", consolidated version in Spanish, page 8, RL-0020.
Available at:  http://www.energycharter.org/fileadmin/DocumentsMedia/Legal/ECT-es.pdf

clearly stated by the precedents that have applied the ECT, such as the Cases of *Plama Consortium*[700] and *AES Summit*[701].

1029.  It was again stated in the final Award of the *Electrabel* Case, which clearly provides that:

> "*The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations* in every circumstance. [...] even assuming that Electrabel had an expectation that it would be awarded the maximum compensation [...], once weighed against Hungary's legitimate right to regulate in the public interest, such an expectation does not appear reasonable or legitimate."[702] [Emphasis added]

1030.  In applying the ECT to the Spanish SES, the Award of *Charanne v. Spain* reached the same conclusion as the aforementioned Awards:

> "Turning a regulatory provision, due to the limited number of persons that may be subject thereto, into a specific commitment entered into by the State towards each and every one of those persons would be an excessive <u>limitation of the capacity of States to regulate the economy **according to the public interest**</u>.
>
> [...] "in the absence of a specific commitment toward stability, an investor cannot have a legitimate expectation that a regulatory framework such as that at issue in this arbitration is to not be modified at any time to adapt to the needs of the market and to the public interest."[703] (Emphasis added)

1031.  Therefore, the States that are party to the ECT are not required to maintain a predictable *regulatory* Framework during any investment. We should note that Article 10(1) ECT alludes to "*stable conditions*", not a "*regulatory framework*"[704]. However, under no circumstance does it annul or limit to the extreme the power to modify the regulatory framework.

1032.  The Claimant considers that the ECT must be interpreted in its *context* and in accordance with its *subject matter*. Its *subject matter* relates to investments in the energy sector, which is a very <u>strategic</u> and <u>highly regulated</u> sector in the signatory countries of the ECT. It is not very realistic for the Parties to the ECT to agree to provide a kind of "Insurance Policy", in such a strategic sector, to foreign investors, which would protect them against regulatory reforms adopted for reasons of public interest.

1033.  Therefore, the ECT does not obligate the States that are a party to it to freeze their regulatory framework but rather to provide "stable conditions". Professor Wälde shows that

---

[700] Plama Consortium Limited v. Republic of Bulgaria, Award 27 August 2008, ¶219. RL-0092.

[701] AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary, Award 23 September 2010, para. 9.3.25; upheld by the Decision of the Ad hoc Committee for Annulment, 29 June 2012, para. 95. RL-0024 and RL-0071.

[702] Electrabel S.A. V. Hungary (ICSID Case No. ARB/07/19), Award 25 November 2015, paras 165 and 166, RL-0091.

[703] Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, para. 493 and 510. RL-0088.

[704] The Claimant manages to identify both concepts in its interpretation of the Legitimate Expectations protected by 10(1) ECT in paras. 250 and 251 of the Statement of Claim.

the obligations imposed on States in Article 10 must be tempered with the forecasts laid down in Part IV of the ECT:

> *"one needs to appreciate that these "primary" obligations are tempered by the miscellaneous provisions of part IV- with reference to sovereignty (Art.18 (1)), presumably an emphasis on respecting the power of economic regulation of states and perhaps equivalent to the reference to "subsidiarity" under the EU Treaty, the –partial and some extent only suspensive- tax veto in Art.21, the exceptions in Art.24 and the hotly contested attribution rules in Art.22 and 23."[705]*

1034. As far as Professor Schreuer, invoked by the Claimants, says:

> *"At the same time, it is clear that this principle is not absolute and does not amount to a requirement for the host State to freeze its legal system for the investor´s benefit. A general stabilisation requirement would go beyond what the investor can legitimately expect. It is clear that a reasonable evolution of the host State´s Law is part of the environment with which investor must contend."[706] (Emphasis added)*

1035. In conclusion, the Claimants claim to obtain, in practice, a non-modifiable legal framework during the whole entire lifespan of its RE plants. However, the ECT does not set out any limits on the regulatory power of the States other than the minimum standards of international law, with an objective of non-discrimination. And it is even reiterated that this treaty does not set out requirements in matters of subsidies or public aid. At any rate, the ECT allows Macroeconomic Control Measures to be adopted by the States that are party thereto, based on reasons of public interest.

1036. The Respondent has already has substantiated the fact that the Kingdom of Spain has adopted regulatory measures on reasonable grounds, of which there are several:

(1) The legal obligation to ensure that the economic regime is always consistent with the principle of reasonable return for investors, thereby preventing over-remuneration which is contrary to EU Law;

(2) The existence of public interest by the sustainability of the SES, in a context of a severe international crisis and with a sharp reduction in energy demand affecting the RE Sector, which decreased the revenue of the SES and economically destabilised the SES, along with increased RE costs; and

(3) The impossibility of passing the whole economic imbalance onto consumers.

1037. This is also put into context by a set of macroeconomic control measures that were adopted in compliance with <u>international commitments</u>, such as the European Council's Recommendations of March 2012[707] and the Memorandum of Understanding signed with

---

[705] T. W. Wälde, "Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice" (2004) 1 Transnational Dispute Management 2. RL-0056.
[706] C. Schreuer, Fair and Equitable Treatment in Arbitral Practice, 2005, Journal of World Investment & Trade ("Schreuer"), p. 365. RL-0067.
[707] Council's Recommendation of 10 July 2012: "address the <u>tariff deficit</u> of the electricity sector <u>globally</u>, in particular, by improving the return of the electricity supply chain". R-0101.

the European Union on 20 July 2012. In both documents Spain undertakes to adopt macroeconomic measures to deal with a specific imbalance: *address the electricity tariff deficit in a comprehensive way*". This undertaking has been binding on Spain since July 2012[708].

1038.   In the indicated context, the contested measures continue to provide (national and foreign) investors with a guaranteed <u>reasonable rate of return</u> within the framework of a sustainable SES. That is to say, the Spanish system allows investors to obtain the reimbursement (1) of the amounts invested in the Plants, (2) of the operating expenditure during the useful life of the Plants and (3) obtain a Reasonable Return referenced by Law to the State Bonds to 10 years [a value without risk] plus 300 points.

1039.   All of these measures have been adopted in a reasonable and proportionate manner, and affect the entire Sector equally, without any discrimination whatsoever (consumers, producers, distributors, etc.). What the Claimants attempt is not reasonable: to use the ECT as an insurance policy against situations of crisis, such that the Claimant is more protected, even, than the national investors of the Kingdom of Spain. This is not the ECT's objective.

1040.   As a result, in light of the subject matter and purpose of the ECT and according to established facts, the Kingdom of Spain has not violated the ECT. It will now be argued and shown that the Respondent has not incurred in any of the specific violations alleged by the Claimants with respect to Article 10(1) ECT.

**(3)      The Kingdom of Spain has not violated the FET standard of the ECT**

1041.   The considerations indicated about the subject matter and aims of the ECT serve as a basic premise to demonstrate that the Kingdom of Spain has not violated the FET standard of the ECT.

**(3.1)      The Claimants do not have the Legitimate Expectations that they argue.**

1042.   As a starting point, we should remember that the burden of proof in relation to the violation of the FET standard by the contested measures rests with the Claimant party. This is stated by the Tribunal in the Electrabel Case:

---

[708] Memorandum of Understanding signed with the European Union on 20 July 2012. Sections 29 and 31: "*There is a close relationship <u>between macroeconomic imbalances</u>, public finances and financial sector soundness. Hence, [...], with a view to correcting any macroeconomic imbalances as identified within the framework of the European semester, will be regularly and closely <u>monitored</u> in parallel with the formal review process as envisioned in this MoU. [...]*
*Regarding structural reforms, the Spanish authorities **are committed** to implement the country-specific recommendations in the context of the European Semester. These <u>reforms **aim at correcting**</u> <u>**macroeconomic imbalances**, as identified in the in-depth review under the Macroeconomic Imbalance</u> <u>Procedure (MIP).</u> In particular, these recommendations invite Spain to: [...] 6) [...] **address the** **electricity tariff deficit in a comprehensive way**.*" (Emphasis added). RL-0112.

> *"The Tribunal starts with the premise that it is Electrabel which bears the burden of proving its case under the ECT's FET standard."* [709]

1043. In any event, in the Counter-Memorial and in the facts in this document it has been demonstrated that the Kingdom of Spain has not violated the FET standard contained in the ECT, as this standard has been interpreted by the Arbitral Tribunals that have applied the ECT.

1044. Furthermore, as a starting point, it should be recalled that it is accepted by the parties that the Claimants' Legitimate Expectations should be evaluated as of 28 April 2011.[710]

1045. The attention of the Arbitral Tribunal is drawn to the fact that the Claimants avoid the application of significant Precedents that have applied the ECT standard, such as the AES Summit Award, the Award of the Annulment Committee of the AES Summit Case or the Final Award of Electrabel. They avoid them by saying that they address different matters. However, the Claimants invoke less important precedents, which were ordered on the basis of breaches of *contracts* or *administrative concessions* in Mexico, Ecuador, Chile, or Argentina and under Treaties other than the ECT.

1046. Fundamentally, the Claimants invoke the awards dictated in the Argentinian cases.[711] But they forget that Argentinian laws contained specific clauses aimed at attracting foreign investment (such as the calculation of the tariffs in dollars and their later conversion to pesos or updating the tariffs in accordance with United States indexes) that do not exist in this case. In addition, they contained stabilisation clauses such as the impossibility of modifying the conditions without compensation that are not contained in the Spanish provisions invoked by the Claimants. So, for example, in the award in the Case of Enron Corp. Ponderosa Assets, L.P. v. The Argentine Republic, it declared:

> *"[a]s part of its regulatory framework, <u>Argentina guaranteed that tariffs would be calculated in US dollars, converted into pesos for billing purposes, adjusted semi-annually in accordance with the US PPI and sufficient to cover costs and a reasonable rate of return. It further guaranteed that tariffs would not be subject to freezing or price controls without compensation."</u>* [712]

[709] *Electrabel S.A. v.* Hungary (ICSID Case No. ARB/07/19) Award 25 November 2015 par. 154. RL-0091.
[710] Reply on the Merits, par.50
[711] Suez, Sociedad General de Águas de Barcelona S.A. and Vivendi Universal v. The Argentine Republic, ICSID Case No. ARB/03/19; Decision on Liability 30 July 2010, CL-30; Total S.A. v. The Argentine Republic, ICSID Case No. ARB/04/1; Decision on Liability 27 December 2010, CL-31; BG Group Plc. v. Republic of Argentina, UNCITRAL, Award, 24 December 2007, RL-0065; Enron Corp. Ponderosa Assets, L.P. v. The Argentine Republic, ICSID, Case No. ARB/01/3, Award, 22 May 2007, Exhibit CL-33; National Grid PLC v. The Argentine Republic, UNCITRAL, Award, 3 November 2008, CL-45; CMS Gas Transmission Co. v. Republic of Argentina, ICSID, Case No. ARB/01/8, Award, 12 May 2005, CL-24; LG&E, Energy Corp., LG&E Capital Corp., and LG&E International Inc. v. The Argentine Republic, ICSID Case No. ARB/02/1; Decision on Liability 3 October 2006, CL-168, among others.
[712] Enron Corp. Ponderosa Assets, L.P. v. The Argentine Republic, ICSID, Case No. ARB/01/3, Award, 22 May 2007, Exhibit CL-33, par. 264-266.

1047.    The bigger significance of the Precedents that apply the ECT is obvious, as they have taken into account the context, subject matter and purpose of the ECT. Moreover, it is surprising that the Claimants claim that these elements should be taken into account; and, however, it avoids applying the Precedents that interpret the ECT, by invoking numerous Awards that apply BITs that are <u>unrelated</u> both (a) to the subject matter, context and objectives of the ECT and (b) to the facts that are under examination in this arbitration.

**(a)    Thesis of the Claimants**

1048.    The Claimants maintain that their Legitimate Expectations are derived, on the one hand, from the regulatory framework and, on the other, from specific promises received from the Kingdom of Spain. Those promises, according to the Claimants, were made to attract their investment.[713]

1049.    In regard to the regulatory framework, the Claimants maintain: "*Spanish law created in their eyes a legitimate expectation that: (i) Spain would provide the specific revenues set out in Arts. 35 and 36 of RD 661/2007, as stabilised by RDL 6/2009 and RD 1614/2010, and (ii) Spain would provide long-term certainty around the premiums and tariffs available to CSP Plants that had been admitted by Spain within its Pre-Assignment Registry.*" [714]

1050.    That is, the Claimants deny that any future reform could affect the operating CSP Plants or their regime. In practice, the Claimants are claiming the *freezing* of RD 661/2007 in their favour, *sine die*.

**(b)    Lack of evidence of an exhaustive analysis of the legal framework by the Claimants**

1051.    In order to establish whether the FET standard has been breached, the legitimate expectations that the Claimants had on the treatment that its investment would receive at the time of its completion must be assessed. These expectations must be <u>reasonable and objective</u> as regards the existing general regulatory framework. As part of this assessment, the Arbitral Tribunal must analyse the knowledge of the investor about the general regulatory framework at the time of making its investment, or rather the aspects that its knowledge should have covered.

1052.    International arbitration case-law is clear in this regard. At the time when its investment is made, the investor must know and understand (i) the *regulatory framework*, (ii) how it is applied, and (iii) how it affects its investment. An investor makes its investment based on this knowledge and must be aware of the risks assumed when its investment is made. The *Electrabel v. Hungary* Precedent, which applies the ECT, provides, in relation to the diligence of investors, that:

> "*Fairness and consistency must be assessed against <u>the background of information that the investor knew and should reasonably have known</u> at the time of the investment and of the conduct of the host State*"[715].

---

[713] Reply on the Merits, par. 443 et seq.
[714] Reply on the Merits, par. 445.
[715] *Electrabel S.A. v.* Hungary (CIADI No. ARB/07/19) of 25 November 2015, par. 7.78. RL-0091.

1053.   The Claimants agree with applying the Electrabel Case test.[716]

1054.   In this regard, the Award of *Charanne against the Kingdom of Spain*, of 21 January 2016, clearly indicates that:

> *"The finding that there has been a violation of investor's expectations must be based on an <u>objective standard or analysis</u>, as the mere subjective belief that could have had the investor at the moment of making the investment is not sufficient. [...] in order to rely on legitimate expectations, the Claimants should have conducted a diligent <u>analysis of the legal framework</u> applicable to their investment"[717].*

1055.   Therefore, any investor investing in Spain has the inexcusable obligation of knowing the *general regulatory framework* that governs investments, and which includes the provisions and Case-law that will apply to their investment. It does not seem acceptable that the investor, being unaware (or pretending to be unaware) of the applicable legal system, makes the investment and subsequently resorts to International Law to try that the Tribunal avoids applying the legal framework in which it invested.

1056.   Nor does it appear acceptable that the investor would seek for the Arbitral Tribunal to apply only part of the regulatory framework and to omit the part of the regulatory framework by which it is prejudiced.

1057.   In the current arbitration procedure, the Claimant party has not shown that when making <u>their investment on 28 April 2011</u> they requested a legal Due Diligence Report on the alleged "commitments" of the regulatory framework of RD 661/2007 as they had supposedly remained stabilised after RD-Act 6/2009 and RD 1614/2010. More important still is that no legal Due Diligence report is produced in support of its alleged expectations about a "*commitment*" of the Kingdom of Spain to petrify the regime arising from RD 661/2007 or to maintain or improve it by subsequent reforms.

1058.   Within the scope of the ECT, the Award of the Charanne Case has also required confirmation of a prior and <u>comprehensive</u> analysis of the legal framework applicable to the sector, which the Claimant could and should have conducted:

> *"To the Tribunal's understanding, at the time of making the investment in 2009, the Claimants could have carried out an analysis of their investment's legal framework in Spanish Law and understand that there was a possibility that the regulations enacted in 2007 and 2008 could be modified. At least, this is the_level of diligence one would expect from a foreign investor in a highly regulated sector such as the energy sector, in which a **prior** and **comprehensive** analysis of the legal framework applicable to the sector is **indispensable** in order to make the investment." [718](Emphasis added)*

---

[716] Reply on the Merits, par. 453.

[717] Award of Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain, of 21 January 2006, par. 495 and 505 RL-0088.

[718] Reply on the Merits, par. 463.

1059.   In this regard, the legal interpretation of the provisions made by the Supreme Court is relevant for configuring the legitimate expectations of an investor[719]. However, the Claimants deny the relevance of this Case-law.[720] It is inexcusable for the Claimants to have been unaware and ignorant of this Case-law to configure its alleged Expectations with respect to RD 661/2007 or RD 1614/2010 when it has been accredited that: (1) the CNE also had recourse to this Case-law in 2007 and 2008; (2) this Case-law was well known by (a) the RE Sector Associations and (b) by the principal investors in the RE Sector and (c) NextEra also knew about it, so it should have asked for a Due Diligence to inform it about whether this Case-law would be applied to regulatory changes after RD 1614/2010.[721]

1060.   In this Case, the Claimants do not show that they had the level of diligence one would expect from a foreign investor in a highly regulated sector such as the energy sector, in which a prior and comprehensive analysis of the legal framework applicable to the sector is essential in order to make the investment.

1061.   The lack of due diligence prevents the expectations that the Claimants allege from being considered to be real and objective when they say that they didn't know about the applicability of that Case-law. In this regard, it must be quoted, although it does not apply the ECT, the clarifying Award of Invesmart v. Czech Republic:

> "for the Tribunal, the test of whether such an expectation can give rise to a successful claim at international law is an objective one. It is not enough that a claimant has sincerely held an expectation; the expectation must be reasonable and the Tribunal must make the determination of reasonableness in all of the circumstances. If the expectation was unreasonable (for example, ill-informed or overly optimistic), it matters not that the investor held it and it will not form the basis for a successful claim."[722]

1062.   As a result, the alleged violation of its legitimate expectations by the Kingdom of Spain should be dismissed as the understanding of the regulatory Framework by the Claimants was incorrect, as shown by the Respondent.

**(c)     Subsidiarily, even if the Due Diligence provided is deemed sufficient, the contested measures do not violate the objective expectations of a diligent investor.**

1063.   There is already a sufficient number of arbitral Precedents that have applied the standard of Legitimate Expectations that the ECT covers. From these precedents, it is worth highlighting the following characteristic notes, from which an established principle may be deduced: the ECT is not a kind of *insurance policy* in favour of the investor against the risk of changes in the regulatory framework:

---

[719] Award of Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain, of 21 January 2006, par. 506 to 508. RL-0088.
[720] Reply on the Merits, par. 222 to 251.
[721] E-mails from Joana Sánchez on 21 and 30 April 2010 (R-0395 and R-0396) and APPA report translated into English that is attached to the e-mail of 30 April 2010. R-0397)
[722] Invesmart B.V. v. Czech Republic (UN-0036-01) Award of 26 June 2009, par. 250. RL-0113.

a. The existence of *specific commitments* made to *an investor* that the regulation in force is going to remain immutable is necessary. This is outlined in different Precedents of the ECT, such as the Cases Charanne B.V. v. Spain[723], AES Summit v. Hungary[724] and Electrabel v. Hungary[725].

b. The investor's Expectations must be reasonable and justified in relation to any changes in the laws of the host country. This is outlined in different Precedents of the ECT, such as the Cases Plama Consortium Limited v. Bulgaria[726], and Electrabel v. Hungary[727]

1064. Therefore, in accordance with the facts set out in the Counter-Memorial and in the already accredited Facts, (a) neither was there a specific commitment of the Kingdom of Spain in favour of the Claimants (b) nor were the expectations of the claimant reasonable and justified.

**Non-existence of specific commitments in the Spanish regulatory framework on the future immutability of the framework set out in RD 661/2007, RD-Act 6/2009, and RD 1614/2010 in favour of RE facilities.**

1065. It has been accredited in the Facts that RD 661/2007 does not contain any guarantee or promise to freeze its framework in favour of the Claimants or their investments[728]. Nor does it contain any guarantee or commitment that the successive measures will improve or maintain the framework established therein. The regulatory Framework guaranteed that the RE facilities would be able to achieve a <u>reasonable rate of return</u>, as a dynamic concept, during their service life.

1066. Furthermore, the non-existence of a specific commitment was already declared by the Tribunal of the Charanne Case, which assessed the Legal Framework in place in the electrical sector during 2007 and 2008 in Spain:

*"499. According to the Arbitral Tribunal an investor cannot have a legitimate expectation, in the absence of a specific commitment, that existing rules will not be modified [...]*

*503. "In this case, the Claimants could not have the legitimate expectation that the regulatory framework established by RD 661/2007 and RD 1578/2008 would remain unchanged during the entire lifespan of their plants. Admitting the existence of such an expectation would, in effect, be equivalent to freezing the regulatory framework applicable to eligible plants, although circumstances may change [...] The Arbitration Tribunal cannot accept such a conclusion. [...]*

---

[723] Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain (SCC V 062/2012), Final Award, 21 January 2016, and dissenting vote, par. 499. RL-0088.

[724] AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary, CIADI Case No. ARB/07/22; Award of 23 September 2010. Par. 9.3.29. RL-0024.

[725] Electrabel S.A. V. Hungary (ICSID Case No. Arb/07/19). Award of 25 November 2015 par. 155, 157 and 162, RL-0091.

[726] Plama Consortium Limited v. the Republic of Bulgaria, CIADI Case No. ARB/03/24, Award of 27 August 2008, par. 219, RL-0092.

[727] Electrabel S.A. V. Hungary (ICSID Case No. ARB/07/19), Award of 25 November 2015, par. 154, RL-0091.

[728] Section IV.A.3.3 (par. 847 and seq. of this Memorial).

*504. The conclusion drawn by the Tribunal, i.e. that in the absence of a specific commitment the Claimants could not reasonably expect that the applicable regulatory framework provided in RD 661/2007 and RD 1578/2008 would remain unchanged, is backed by the fact that Case-law from the highest judicial authorities in Spain had already established, prior to the investment, the principle that internal Law could modify the regulations in force.*

*505. [...] in the present case the Arbitral Tribunal considers that the Claimants could have easily foreseen possible adjustments to the regulatory framework [...]. <u>In fact, the Spanish Law clearly left open the possibility that the system of compensation applicable to photovoltaics could be modified. [...]</u>*

*511. Therefore, the Tribunal concludes that the Claimants could not have the reasonable expectation that RD 661/2007 and RD 1578/2008 were not going to be modified during the lifespan of their facilities."[729] (Emphasis added)*

1067.   This Award has examined the Legal System in force in 2009 and has corroborated what the Kingdom of Spain maintains and what the Associations of the RE Sector maintained in 2009 and 2010: <u>RD 661/2007 did not contain any promise or guarantee relative to the freezing</u> of its regime in favour of investors. This lack of specific commitment refers to the entire applicable regime of RD 661/2007. Therefore, there was no specific commitment with respect to: (i) the remuneration regime, (ii) the subsidised hourly or yearly production regime, (iii) the receipt of subsidies for producing using fossil fuels and (iv) the tariff update regime.

1068.   No diligently informed investor could expect the *petrification* of all these regimes in its favour by the fact that it had fulfilled the regulatory requirements to obtain subsidies, such as the registration in a compulsory administrative Register. The introduction of pre-registration in the RAIPRE as a requirement by RD-Act 6/2009 did not change the effect of registration. In fact, the enactment of RD-Act 6/2009 was not welcomed by NextEra[730] nor did it provide further certainty for their facilities. It was a provision that was passed due to an extraordinary and urgent need to try to guarantee the sustainability of the SES. Far from what the Claimants maintain, RD-Act 6/2009 introduced the possibility that the Termosol Plants might also be affected by the reviews referred to in Article 44 (3) of RD 661/2007. This was made known by Jaime Malet to Luis Crespo in an e-mail sent on 25 June 2009.[731]

1069.   The Claimants remind us that RD-Act 6/2009 has the status of law.[732] We do not know what their intention is when doing so, but we can only say that RD-Act 6/2009 did not repeal Act 54/1997 nor, therefore, the SES economic sustainability and reasonable rate of return principles. What it did do was impose, as law, the obligation to reduce the deficit to 0 by 2013.

1070.   The introduction of RD 1614/2010 didn't imply a freeze of the premiums and tariffs of RD 661/2007 either, since, in addition to introducing restrictions on the remuneration to be

---

[729]   Award of Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain, of 21 January 2006, par. 504 to 508. RL-0088.

[730] Email from Juan de Unda of 6 May 2009. R-0289.

[731] Email sent by Jaime Malet to Luis Crespo on 25 June 2009. R-0290.

[732] Reply on the Merits, par. 470.

received by producers, it limited itself to closing "*the loophole created by the interaction between Art. 44.3 of RD 661/2007 and RDL 6/2009*"[733], as is stated in the Preamble thereof.

1071.    The Claimants also fail to mention that just fifteen days after passage of RD 1614/2010, RD-Act 14/2010[734] (a provision with the force of law passed in cases of extraordinary and urgent need) was approved, which introduced an access fee for all producers, thus decreasing the remuneration of the Termosol Plants. They also fail to mention that in the Minister's Speech given for the ratification of this RD-At in the Congress in January 2011, he said:

> "*...since 2009 the Government has been working to adopt a set of measures whose common denominator is the rationalisation of the regulated costs and the reduction of the tariff deficit (...).* **All these measures have been created from the dialogue**, *both with the sectors concerned and with the major political forces.* **But these measures of 2009 and 2010 have not been sufficient.** *The imbalances have been accentuated as a result of the emergence of a series of adverse circumstances, in some cases exceptional, of which I would like to highlight two. On the one hand, growth above that planned some of the costs regulated throughout 2010, in particular of the premiums of the special regime, and, on the other hand, the evolution of the demand for electricity, which in 2009 suffered a fall of 4.7%. This is the first decline in the demand for electricity after 25 years of sustainable increases of around 4% per year. These decreases of the electricity demand reduce the income of the system and mean that the fixed costs have to be paid between fewer users of electricity, which raises the cost per user. These two circumstances have raised the tariff deficit and made that the measures taken so far to ensure the progressive reduction of the tariff deficit in a balanced way between all the players in the sector were insufficient.* **Therefore, the need to adopt new measures urgently** (...).*"*[735]

1072.    Therefore, the Minister recognised that the measures about which there was dialogue with the affected sectors in 2009 and 2010 (including RD 1614/2010) had not been sufficient and more measures needed to be adopted.

1073.    Moreover, just before the Claimants' investment was made, Act 2/2011 on Sustainable Economy announcing the necessary reform of the sector was passed in March. From then on, the sector was aware that new standards were going to be approved that would affect it, as the AEE pointed out in its 2011 yearbook.[736]

1074.    In light of the evolution of the regulatory framework, it is evident that the Claimants could not expect the remuneration conditions established in RD 661/2007 to remain in force indefinitely. It is obvious that the regulatory risk existed for the Claimant party and that it was or should have been aware of it, as (1) the doctrine that examined the Spanish

---

[733] Reply on the Merits, par.91
[734] RD-Act 14/2010.
[735] Journal for the Sessions of the Congress. Validation RD-Act 14/2010. R-0388.
[736] 2011 AEE Yearbook. R-0403.

regulatory framework[737] and (2) the Associations of the RE Sector, such as APPA and AEE, were clearly aware of it.

### The Expectations of the Claimants are not reasonable and justified in relation to the contested measures

1075.    The alleged expectations of the Claimant are not reasonable or objective. This has been accredited with respect to the regulatory framework in force at the time of its investment and with respect to other alleged sources, such as consultative reports and powerpoint Presentations invoked by the Claimants.

1076.    A significant fact has been accredited by the Kingdom of Spain for the purpose of evaluating the *objective* expectations of any investor: (1) The main Association of the CSP technology (PROTERMOSOLAR), (2) The main Association of wind technology (AEE), (3) The main Association of the RE Sector (APPA), (4) The main investor in RE in Spain (Iberdrola), (5) Sener and (6) the leading CSP Sector companies considered that the guarantee of the regulatory framework was the granting of a reasonable rate of return. This implies the dynamic and non-frozen or immutable nature of this reasonable rate of return. These Associations do not maintain the indefinite freezing of the entire regime of RD 661/2007 in its favour. Neither in 2009, nor in 2010, nor in 2012 nor at present.

1077.    In fact, the AEE Association expressly alluded to the possible regulatory changes for reasons of general interest[738] and even assumed the possible "retroactivity" that would respect the reasonable rate of return of the investments[739]. Iberdrola required such discounts for solar thermal technology and the Protermosolar Association requested that the premiums of other technologies be lowered based on this Principle.

1078.    The objective Expectation of any diligent investor which had comprehensively examined the regulatory Framework and its legal interpretation by the Case-law of the Supreme Court since 2005 was the inexistence of a commitment included in RD 661/2007 to maintain its validity throughout the entire useful life of the operating plants.

---

[737] *"Powering the Green Economy. The feed-in tariff handbook."* Miguel Mendonça, David Jacobs and Benjamin Socacool. Editorial. Earthscan, 2010. R-0031.

[738] AEE allegations before the CNE during the hearing process with the Electricity Consulting Council on the draft of the Royal Decree which regulates and modifies certain aspects of the special regime. 29 August 2010, par. 6.

"*It is true that the Supreme Court has stated*, in relation to this type of *retroactive reforms*, that there is no "unalterable right" for the economic regime to remain unchanged and that "from the prescriptive content of Act 54/1997 of 27 November of the Electricity Sector no freezing of the electricity power facility holders' remuneration regime in special regime can be drawn nor the impossibility to reform such regime", *thereby recognising a relatively wide margin of the Administration's "ius variandi" in a regulated sector where general interests are involved."* R-0251.

[739] AEE allegations before the CNE during the hearing process with the Electricity Consulting Council on the draft of the Royal Decree which regulates and modifies certain aspects of the special regime. Pag. 6. R-0251.

*" the Case-law has set limits to the Administration's "ius variandi" regarding the **retroactive modification** of that remuneration framework, particularly "that the **requirements of the Electricity Sector Act be fulfilled with regard to the reasonable rate of return** of the investments"*

1079.   In addition to this fact accredited by the Kingdom of Spain, there are other elements alluded to by the Claimants which have been disproved. The Kingdom of Spain has accredited that[740]:

(a) Article 43(3) of RD 661/2007 does not contain a stability commitment or clause in favour of the Claimant or of its plants. The Claimants did not request a legal Due Diligence with respect to the existence or non-existence of a commitment to maintain RD 661/2007.

(b) Neither does Article 4 of RD 1614/2010 have a stability commitment or clause in favour of the plants, when referring to the regime of Article 44(3) of RD 661/2007.

(c) The Communications of December 2010 do not contain a commitment in favour of the Plants to maintain the regime of RD 661/2007 frozen in the future.

1080.   The Claimants add another supposed confirmation by the Kingdom of Spain due to the final Registration of the Plants in the RAIPRE, which they try to make the equivalent of a licence issued by the State, in a desperate attempt to get a commitment.[741] It has already been accredited that registration in the RAIPRE is a mandatory administrative requirement for participating in the SES[742]. This makes it possible to control the owners and Facilities that operate under the SES, whose technical sustainability must be guaranteed to the citizens by the State. In fact, Reports on the owners[743] and changes in ownership[744] are attached to said section.

1081.   The RAIPRE is a Section of the Administrative Register in which all producers of the SES, Section 2, are registered. Registration in the RAIPRE is not, therefore, a State commitment to indefinitely maintain the future return of the FV sector, but rather an administrative register that makes it possible to control and know those involved in the SES.

1082.   The Precedent of the case Charanne v Spain has dismissed that this registration could create the expectations claimed by the Claimants:

*"The Claimants have alleged that, according to the existing regulatory framework, the registration in the RAIPRE gave generators an acquired right to receive the rate which would establish a legitimate expectation that it was not going to be subsequently amended. The Tribunal does not accept this argument [...]*

*The respondent has convincingly demonstrated that, under Spanish law, the registration in the RAIPRE was simply an <u>administrative requirement</u> to be able to sell*

---

[740] Section III.A.3 "Subjective Expectations of the Claimant".
[741] Reply on the Merits.
[742] Section III.A.3.6 of this Memorial.
[743] Report on the number of owners registered in Section 2 of the RAIPRE of the SubDirectorate-General of Electricity, MINETUR R-0355.
[744] Report on the number of changes in ownership registered in Section 2 of the RAIPREof the SubDirectorate-General of Electricity, MINETUR R-0356.

*energy, and did not imply that the facilities registered had an acquired right to a particular remuneration".[745]*

1083.  Consequently, it can also be dismissed that the Claimants could put together reasonable Legitimate Expectations that, with the registration of the CSP plants in the RAIPRE, any investor would block the regime of RD 661/2007 during the entire useful life of the plants.

1084.  The Claimants also allude to "oral commitments" and letters sent by officials of the Kingdom of Spain as a supposed source of their Legitimate Expectations, which they say must be evaluated as a whole. However, the Respondent denies the existence of such "oral commitments," which have not been accredited. In regard to the letters, the Claimants reduce them to three in their Reply on the Merits: two of them[746] are limited to reporting the impressions of Mr Davidson, without having been confirmed. The other one is from 2009[747] and does not have any promise of a petrification. In fact, it refers to the "current regime." In any event, these letters are from before even RD 1614/2010. After sending them and receiving them, NextEra supposedly froze its investment until 28 April 2011, the moment when, according to the Claimants, we must appraise their expectations. Therefore, those letters did not generate any Expectations on the part of the Claimants of a freeze in the standards. Most important of all is that none of these letters or the alleged oral commitments were addressed to the Claimants who, therefore, cannot base their expectations on commitments that have not been directed toward them. Furthermore, there is no evidence in the procedure of the Claimants making a decision to invest based on these letters.

1085.  Finally, the Claimants cite a "*worldwide campaign of investment launched around the world to attract foreign investors*."[748] However, this worldwide campaign has never been accredited. It is surprising that the Claimants make this reckless claim when the only thing that they knew about was an InvestSpain slide show in Germany in 2008 which they didn't even know who it was directed towards or in what conditions it was shown.[749]

1086.  With respect to this lack of or inconsistency in the evidence offered by the Claimants, the Kingdom of Spain has already accredited that an investor which had performed a prior and comprehensive analysis of the Regulatory Framework applicable to the Spanish RE sector would have known that this Framework had the following underlined essential principles:

(1)  The regulatory system governed by the *principle of regulatory hierarchy* and the result of legally stipulated regulation creation procedures[750].

(2)  The regulatory framework is not limited to RD 661/2007 and RD 1614/2010 as pretended by the Claimant. It is configured based on Act 54/1997 and any regulatory standards that have implemented it, as interpreted by Case-law[751].

---

[745] Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain (SCC v. 062/2012), Final Award, 21 January 2016, and individual opinion, par. 509 and 510, RL-0088.
[746] Documents C-13 and C-8.
[747] Document C-14.
[748] Reply on the Merits, par.476
[749] Memorial on the Merits, footnote on page 39.
[750] Section III.A. 1) of this Memorial.

(3) The fundamental principle that SR subsidies are a cost of the SES, secondary to the principle of *economic sustainability* thereof[752].

(4) Right to priority of access and dispatch of electricity production.

(5) That the remuneration of the SR consists of a subsidy which, once added to the market price, provides RE Plants with a *reasonable rate of return*, in the context of its entire lifespan, according to capital markets, which has a *dynamic and balanced* nature within the SES[753]. This return was linked exclusively to the cost incurred in the construction and operation of the plants.

(6) That the subsidies were determined according to the evolution of the demand and other basic economic data, expressed in the Renewable Energy Plans on the investment and operation costs of standard facilities, with a view to ensuring that these facilities are able to reach a reasonable rate of return during their useful lives[754].

(7) That the regulatory changes in the remuneration regime of the RE since 2004 have been *motivated* (i) to correct situations of over-remuneration, or (ii) by the strong variation in the economic data that served as the basis for the estimation of subsidies[755].

1087.   These essential principles constitute the objective legitimate expectations of a diligent investor. Therefore, the Claimants could not expect that the Spanish State would no longer adopt measures to resolve any deficit or economic imbalance that affected the sustainability of the SES.

1088.   Likewise, no investor could expect that the State would not rectify any situation of "over-remuneration". As shown above, the *leitmotif* inherent to all the measures was precisely to address that situation of unsustainability of the SES and to rectify situations of over-remuneration, thereby preventing its cost being exclusively borne by consumers.

1089.   Finally, the "*cherry picking*" carried out by the Claimants to attempt to attribute alleged "legitimate expectations" identical to those of the Claimants to the Kingdom of Spain are fully unjustified. The forcefulness of the Supreme Court with respect to the appeals filed internally suffices. This Case-law has been newly reiterated by the Supreme Court in the decisions handed down to confirm the validity of RD 413/2014 and Order IET/1045/2014:

> "**this Court has insisted**, in view of the successive regulatory reforms, that it was not possible to recognise pro futuro an "unalterable right" to the owners of special regime electricity production facilities to maintain the remuneration framework approved by the holder of regulatory power unaltered, provided that the requirements of the LSE are fulfilled as regards the reasonable rate of return of the investments.

---

[751] Section III.B.3 of the Counter-Memorial.
[752] Section III.A(2.1) of this Memorial
[753] Section III.B.1 of the Counter-Memorial.
[754] Sections III.A.1.4, IIII A.2.2.a.v, III.A.2.2.a.i, and III.A.4.5.e of this Memorial.
[755] Sections III.A.2.4 (par. 780 et seq.) of this Memorial.

*[...] the Case-law of this Court has been constant over the years on pointing out, when interpreting and applying the provisions regulating the legal and economic system applicable to electricity production using renewable energy sources, that such provisions guarantee the right to a reasonable rate of return to the investments made by the owners of these facilities, but do not recognise their unalterable right to maintain the remuneration framework approved by the holder of regulatory power unaltered (...)"[756] (Emphasis added)*

1090.   The messages from the Kingdom of Spain about its regulatory framework were clear in all the provisions approved since RD 436/2004. They were also interpreted clearly by the Case-law of the Supreme Court.

1091.   It is <u>inexcusable</u> for the Claimants to have been unaware and ignorant of this constant Case-law since 2005 to configure its Expectations.

1092.   It should be recalled that an arbitral Precedent has also confirmed this lack of commitment from an objective viewpoint, as expounded earlier[757]. This conclusion is consistent with previous Precedents, as in the case *Plama Consortium v. Bulgaria*[758] or *AES Summit v. Hungary*[759], which applied the ECT, in cases of lack of specific commitments in the investor's favour.

1093.   Therefore, the Expectations held by the Claimants in this Case should not be admitted.

1094.   It is. therefore, appropriate to deny that the Claimants could reasonably have legitimate expectations to maintain the regime of RD 661/2007 in their favour, *sine die*. It should be recalled, in accordance with the Precedents that ECT apply that:

> *"The Tribunal starts with the premise that it is Electrabel which bears the burden of proving its case under the ECT's FET standard[760]".*

**(d)    The Claimants' Subjective Expectations accredited by their acts at the time of the investment do not sustain their thesis**

---

[756] Among many others, the Decision handed down by the Supreme Court on 1 June 2016, 1260/2016 (Rec. 649/2014). R-0337.

[757] Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain (SCC V 062/2012), Final Award, 21 January 2016, and individual opinion, par. 503, 510 and 511, RL-0088

[758] Plama Consortium Limited v. the Republic of Bulgaria, CIADI Case No. ARB/03/24, Award of 27 August 2008, par. 219. *"the Tribunal believes that <u>the ECT does not protect investors against any and all changes in the host country's laws</u>. Under the fair and equitable treatment standard the investor is only protected if (at least) reasonable and justifiable expectations were created in that regard. <u>It does not appear that Bulgaria made any promises or other representations</u> to freeze its legislation on environmental law to the Claimant or at all." (emphasis added)* RL-0092.

[759] AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary, ICSID Case No. ARB/07/22; Jurisdiction Award of 23 September 2010. Par. 9.3.34. *"absent a specific commitment from Hungary [...], Claimants cannot properly rely on an alleged breach of Hungary's Treaty obligation to provide a stable legal environment [...]. This is because any reasonably informed business person or investor knows that laws can evolve in accordance with the perceived political or policy dictates of the times."* RL-0024.

[760] Electrabel S.A. V. Hungary (ICSID Case No. Arb/07/19) Award, dated 25 November 2015 par. 154, RL-0091.

1095.   Finally, and as has been explained in the section on the facts in this Memorial, NextEra never believed in the supposed commitments that it now invokes. This is demonstrated by all the contracts that it signed, both after the passage of RD 661/2007 and after the passage of RD-Act 6/2009 and after the passage of RD 1614/2010:

1096.   After the approval of RD 661/2007, the PTEs signed a Project Development Agreement between Casas de Hitos S.L. and Planta Termosolar De Extremadura, S.L., Planta Termosolar De Extremadura 2, S.L., Planta Termosolar De Extremadura 3, S.L. and Planta Termosolar De Extremadura 4, S.L.[761]

1097.   This agreement, when describing the governmental authorisations that the Plants needed to obtain, expressly establishes as one of them:

> *"Recognition of the Project under group b.l.2 of section 2 the special regime of RD 661/2007, <u>or similar provision under any replacing legislation</u> (hereinafter, "Special Regime"), applicable to thermal-solar energy plants[762]". (Emphasis added)*

1098.   Note that it talks about the recognition of the plant under the special regime of RD 661/2007 or any other similar provision replacing it. So, evidently, the parties to the agreement were aware of the possibility of the repeal and replacement of RD 661/2007.

1099.   The Engineering, Purchasing, and Construction Support Service agreements signed by the PTEs with Sener Ingeniería y Sistemas after approval of the RD-Act 6/2009 define (Section 1.1.115) the concept of "special tariff" in the following way:

> *"Special Tariff" means the fixed, regulated tariff set forth for subgroup b.I.2 in Table 3 of Article 36 of RD 661/2007 as enacted on May 25, 2007, by the Ministry of Industry, Tourism and Commerce (Ministerio de Industria, Turismo y Comercio) of Spain, <u>as such tariff may be revised (including pursuant to article 44 of RD 661/2007)</u> by the Ministry of Industry, Tourism and Commerce with respect to power plants described in subgroup b.1.2 that (a) have been inscribed in the Registry and (b) are required to obtain definitive inscription in the administrative registry of generation plants under the special regime (RAIPRE) by the date referred to under the written notice from the Spanish administration that the Project has been inscribed in the Registry"[763]. (Emphasis added)*

1100.   The agreement itself clarifies, in the rules for interpretation, that:

> *"The use of the Word <u>"including"</u> in this Agreement shall be construed to mean "including without limitation" or "including but not limited to" and shall not be construed to mean that the examples given are an exclusive list of the topics covered"*

1101.   That is, the term "*including*" means that the parties assumed that the tariffs could be changed not only due to the ordinary reviews established in Article 44 of RD 661/2007 but

---

[761] "Project development agreement" among the 4 future Plants and Casas de Hitos CLEX-019 NEXTERA
[762] Idem, Appendix I, section 2.01(a), page I. CLEX-019.
[763] Engineering agreements between Planta Termosolar Extremadura SL and SENER Ingenierías y Sistemas, S.A. Documents C-51 and C-52.

also by other reviews not foreseen in it, as follows from a strict application of the provisions of RD-Act 6/2009.

1102.   On 10 December 2010, just 3 days after publication of RD 1614/2010, the PTEs amended the "*development agreement*" they had entered into with Casas de Hitos in 2007 and inserted, among others, a new Clause 3.01 (f) with the following contents:

> *"If due to any <u>change in the law,</u> a Company suffers or will suffer a Reduction of Compensation, each Monthly Payment that remains unpaid from the date of <u>such Change in Law</u> shall be reduced by a percentage equal to the Percentage of Reduction of Compensation applicable to that Monthly Payment. The parties attach as Annex F various <u>examples of the application of the Reduction of Compensation resulting from a Change in Law</u>"* [764]

1103.   Said Annex F provides examples of applying a "Reduction Compensation": 1) tariff changes; 2) limiting the number of hours of annual production and 3) establishment of a production tax. [765] That is, the Plants themselves were anticipating, negotiating and agreeing with third parties in December 2010 that it was possible that the regime of RD 661/2007 would be amended in essential elements of that scheme, such as (i) subsidies, (ii) subsidized hours and even, (iii) the introduction of a tax on energy production.

1104.   The contract itself clarifies what is meant by "Foreseen Compensation":

> *"the total income of a Company for the sale of electricity previewed by said Company during the year in which the Monthly Payment in question shall be made, assuming that (i) the Project of said Company will operate with 4000 hours per year at 49.9 MW per hour and (ii) if during that year, the Company sells electricity through (a) the tariff option described in Article 24.1 a) of RD 661/2007, the tariff is assumed to be c€/kWh 28.4983 and (b) the market price plus premium option described in Article 24.1 b) of RD 661/2007, the premium is assumed to be c€/kWh 26.8717"* [766].

1105.   On 28 April 2011, the PTEs signed, after the Resolutions of 28 December 2010, a loan agreement with a bank syndicate. [767] This contract is striking for two reasons: a) it expressly provides for the existence of regulatory risk; b) it does not mention at any time any of the Dutch entities that have filed a claim in this arbitration. [768]

1106.   Regarding the regulatory risk, the contract introduces among its definitions that relating to *"change of law"*:

> *"**Change of Law**: means <u>any change to the RD or RD-Law 6/2009 (...), RD 1614/2010</u> (...) or any other ancillary regulations specifically related thereto, as in effect on the date hereof, which change (a) (i) results in an adjustment to the amount of compensation, tariffs, premiums, or incentives payable to the Borrowers, or (ii) adversely affects the amount of hours that either Unit is permitted to operate in the special regime (or any other equivalent measure), to the extent any such change results*

---

[764] Amendment to CdH Project Development Agreement of 10 December 2010. Section 5. CLEX-034.
[765] Idem, annex F.
[766] Idem, par. 16.
[767] Loan Agreement, of 28 April 2011, Evidence document C-74.
[768] The loan agreement provides that the guarantee is governed by the laws of the State of Florida.

*in lower future Project Revenues and/or lower projected minimum DSCR tan as shown in the Base Case as of the date thereof, or (b) establishes any additional requirements for the inscription of the Project in the Renewable Energy Producers Administrative Register (Registro de Instalaciones de Producción en Régimen Especial) (or any other register, as the case may be) that cannot be satisfied or obtained by the Borrowers, for reasons not attributable to either of them".*[769]

1107.   The concept of *"change of law"* has an impact on several clauses of the contract. For example, it is envisaged as a circumstance that will affect the fulfilment of the requirements for the development of the contract[770]. So that, if there is a change of law, these requirements must be redefined in a timely manner. It will also determine the update of the so-called "Baseline Case"[771]. Also, it can even cause, in certain circumstances, the suspension of funding by lenders[772].

1108.   On the same day, NextEra Energy Inc and NextEra Energy Capital Holdings Inc and not the Claimants signed a guarantee contract to back the loan taken out by the PTEs. Such contract defined "*Change of Law*" as "*any change to the Royal Decree (661/2007) Royal Decree Law 6/2009…, Royal Decree 1614/2010…or any other ancillary regulations specifically related thereto…which change…results in an adjustment to the amount of compensation, tariffs, premiums, or incentives payable to (PTE or PTE2)…*". Furthermore, in accordance with section 2.1 of this contract in the event of a "Change in Law", the guarantee of NextEra would be limited to *"the remaining unfunded portion of the Base Equity Contribution Obligations"*[773]. This contract is relevant because NextEra has invoked these clauses before the courts of New York to defend the limitation of their liability as a result of the "Change in Law" thereunder having taken place. This fact is not disputed.

1109.   Faced with the clarity of these contractual clauses, the Claimants argue that, in spite of having foreseen the regulatory risk, they assumed that it was not going to occur.[774] Therefore, they made their investment knowing that there was a regulatory risk. In reality, if an investor foresees a risk but assumes that this risk is not going to occur, as the Claimants affirm, we are then dealing with an unpredictable risk and, therefore, it would not be included in a contract because it would be covered by cases of fortuitous circumstance or force majeure. However, the Claimants did want to foresee this specific risk in their agreements.

1110.   On the other hand, none of these agreements foresaw the supposedly exceptional conditions of NextEra as a privileged investor that had express commitments from the Kingdom of Spain.

1111.   In short, NextEra's Expectations about regulatory stability that existed when it undertook its investment are summarised in the letter that Mr Ketchum, Vice-President,

---

[769] Idem, definition of "change of law".
[770] Idem, definition of "completion".
[771] Idem, definition of "updated Baseline Case"
[772] Idem, clause 5.3; "Change of law default".
[773] Section 2.1 of the guarantee contract signed by NextEra Energy Inc and NextEra Energy Capital Holdings Inc with the banks on 28 December 2011. R-0401.
[774] Reply on the Merits, par.487

CEO and Corporate Secretary of NextEra Energy Resources LLC, sent to the Minister and Secretary of Industry from the NextEra headquarters in the US. The letter was sent with copy to the Prime Minister of Spain, to the Secretary of Commerce of the USA, to the Secretary of Energy of the USA and to the US Ambassador in Spain. It expressed its rejection of the amendments proposed by the CNE saying, among other things:

> *"NextEra is definitely constrained to state that it would be highly unfavourable for a new Government elected on a promise <u>to break away from past practices of regulatory uncertainty (and policies detrimental to businesses in general) to pursue a similar avenue as the former Government</u>. The international investment community has great expectations from the new Government's promises to stand by its legal commitments and to perform as a serious, predictable and reliable partner when it comes to investments that will create new jobs in Spain. <u>We sincerely hope that we will not be disappointed when the new Government announces the planned regulatory changes to the Spanish energy industry</u>".[775](Emphasis added)*

1112.  This letter speaks for itself and is relevant for two reasons: first, because it shows that NextEra never thought that there were any clauses or express promises of stability or of a freeze. Second, because NextEra knew in March 2012 that the new Government would carry out a reform of the SES.

**(3.2)    The obligation to guarantee stable and transparent conditions has not been violated**

**(a)    Creation and promotion of stable conditions of the general regulatory Framework: the right to a reasonable rate of return before and after the reforms.**

1113.  The Claimants maintain that "*the changes introduced through Regulatory Framework II and III are the antithesis of stability*".[776] They add that: "*where a State makes repeated promises of stability, both in its laws and in its direct assurances to the investor, knowing that the investor is relying on those promises of stability in order to invest, then the ECT requirement to provide "stable conditions" must have a meaning*."[777]

1114.  Both the Counter-Memorial[778] and Section III.B (2) of this Memorial express that the true objective of the ECT was to give foreign investors national treatment or a non-discriminatory treatment, with the guarantee of the minimum standards of international law, so as to create a free energy market.

1115.  The ECT does not prevent a State from adopting non-abusive macroeconomic control measures in any way. This impossibility is contrary to the objectives of the ECT itself.

1116.  The Precedent Electrabel v. Hungary has set out a basic principle in the implementation of the ECJ standard laid down in the ECT:

---

[775] Letter from John Ketchum (NextEra Energy Resources, LLC) to Jose Maria Soria Lopez (Minister of Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012, Evidence Document C-90.
[776] Reply on the Merits, par. 493 et seq.
[777] Reply on the Merits, par. 494
[778] Counter-Memorial, par. 599-624.

*"The host State is <u>not required to elevate unconditionally the interests of the foreign investor above all other considerations</u> in every circumstance. As was decided by the tribunals in Saluka v Czech Republic and Arif v Moldova, an FET standard may legitimately involve a <u>balancing or weighing exercise</u> by the host State."[779]*

1117.   This is also expressed by the General Secretariat of the Energy Charter Treaty, in the official consolidated version in Spanish and Arabic of said Treaty.[780] In this case, it should be recalled that after the contested measures, the investors still maintain an economic equilibrium of the investment, receiving the value of the investment and long-term costs and with a reasonable rate of return guaranteed by Law.

1118.   The Claimants, who seem to know about these principles,[781] invoke the existence of supposed specific freeze commitments given both by the regulatory framework and by officials of the Kingdom of Spain to representatives of NextEra (never to the Claimants). As we have explained exhaustively in the section on facts of this document and in the part regarding Legitimate Expectations, not only do these commitments not exist but also, and more importantly, NextEra never believed that they existed.

1119.   In order to defend the thesis of stable conditions in the ECT, the Claimants seek to apply the Awards handed down in the cases of CMS, Sempra, and especially Metalclad to this case.  It is difficult, based on the facts, to find any analogy in this case to the conditions of Argentina (as we have seen in the preceding section) or to the Metalclad affair. In the latter case, which applies the U.S.-Mexico BIT, the investor built a waste treatment plant that later had to be closed because the Municipality denied the building licence. The Tribunal held that this denial was made without giving the investor a hearing and for reasons completely unrelated to the construction. For this reason, it held that Mexico violated the FET standards in the BIT. It also held that the closure of the plant was equivalent to an indirect expropriation. These facts do not have any relationship to the present case, since the Termosol Plants continue to operate after the measures and they continue to receive 80% of their remuneration in the form of subsidies paid by all Spanish consumers.[782]

---

[779] Electrabel S.A. V. Hungary (ICSID Case No. Arb/07/19) Award, dated 25 November 2015 par. 165 RL-0091.
[780] *"<u>Many Government actions, for example <b>macroeconomic control [...]</b> <b>can affect the profitability of investment</b> but cannot be subject to absolute rules."</u>* "The Energy Charter Treaty and related documents", consolidated text, page 8. Available on the Energy Charter page. http://www.energycharter.org/fileadmin/DocumentsMedia/Legal/ECT-es.pdf
[781] Reply on the Merits, par. 491:"this is not a case of an investor seeking to "petrify" the legal system, as Spain alleges (Section VII (3)(A)). What occurred here is that Spain gave a voluntary commitment to the Termosol Plants to preserve the remuneration framework on a long-term basis" RL-0020.
[782] Accuracy, Second Report on the Claimants' Claim, pag. 78.

**Figure 2.2 - Distribution of income received through the Plants**



*Source: CLEX-283 and Accuracy analysis*

1120.   By invoking awards that do not have to do with the ECT, the Claimants seek to ignore the Precedents that have applied the ECT, evidently more relevant, as they have weighted and applied the FET standard and stable conditions established by the ECT.

1121.   The Claimants start their argumentation from two premises that we consider wrong: (1) Reduce the regulatory framework to an article with two regulations and (2) Confuse the "stable conditions" guaranteed by the ECT with an alleged right to "*block"* a regime arising from regulatory provisions. In addition, the Claimants start out from the mistaken premise that the Kingdom of Spain promised NextEra that the Claimants would obtain a return of 11.6%, something which has not been demonstrated at any time.

1122.   The case *Plama v. Bulgaria*, sets out a reasoning fully applicable to this case, as the regulatory framework in itself does not constitute a specific commitment with respect to the investors.[783] This Award is evidently more relevant than those cited by the Claimants, insofar (1) as it applies the ECT and (2) there are no administrative concessions, licences or agreements between the investor and the recipient State.

1123.   The Case *Aes summit v. Hungary* is equally applicable to this case, since it sets out the purposes and objectives of the ECT clearly:

> "*The stable conditions that the ECT mentions relate to the framework within which the investment takes place. Nevertheless, it is not a stability clause. A legal framework is by definition <u>subject to change as it adapts to new circumstances</u> day by day and a state has the sovereign right to exercise its powers which include legislative acts."[784](Added emphasis)*

---

[783] *Plama Consortium Limited v. The Republic of Bulgaria,* CIADI Case No. ARB/03/24; Award of 27 August 2008: "*the Tribunal believes that <u>the ECT does not protect investors against any and all changes in the host country's laws</u>* [...]. *<u>It does not appear that Bulgaria **made any promises or other representations to freeze its legislation**</u>on environmental law to the Claimant or at all.*" (emphasis added) RL-0092.

[784]*AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary,* CIADI Case No. ARB/07/22; Award of 23 September 2010. Par. 9.3.29. RL-0024.

1124. The Arbitral Tribunal of AES Summit says with other words what the General Secretariat of the Energy Charter Treaty confirms in the Reading Guide of the Treaty.[785] Recently the Arbitral Tribunal in the matter *Mamidoil v. Albania*[786] has also followed this approach.

1125. Even this Award seems to have influenced the doctrine. Professors Dolzer and Schreuer in 2012 amended their understanding of the *full warranty and security* standard, against what had been stated in previous versions of their work "*Principles of International Investment Law"*. The explanation of this standard includes the criterion of AES Summit:

> *"The standard will not be violated if a State exercises its right to legislate and regulate and thereby takes reasonable measures under the circumstances"* [787]

1126. Consequently, while investors may reasonably and legitimately expect a host State to provide them with stable conditions for their investment, this cannot prevent a host State from making regulatory changes or legitimate and reasonable reforms imposed by justified circumstances. Moreover, the amendments to the regulatory framework questioned in this arbitration are not only possible, but also predictable. In the words of the Supreme Court, in its ruling on these measures it has established that:

> *"All these elements of <u>absence of commitments or conclusive external signs</u> of the Administration in relation to the unalterability of the regulatory framework, <u>existence of a reiterated Case-law</u> of this Court which <u>has insisted that our system does not guarantee the immutability</u> of the remuneration to the owners of the renewable electrical energy production facilities, the <u>situation of tariff deficit</u> and <u>threat to the feasibility of the electricity system</u> and the fulfilment of the <u>participation objectives of the renewable energy</u>, prevent the change made in the remuneration system of renewable energies from being considered unexpected or unpredictable by any diligent operator."*[788]

1127. The measures adopted must be evaluated in accordance with the general regulatory Framework in force in Spain at the time of the investment. This Framework includes the

---

[785] "The Energy Charter Treaty and related documents", consolidated text, page 8. RL-0020.

[786] *Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v. The Republic of Albania*, ICSID Case No. ARB/11/24; Award 30 March 2015, par. 617-618. *"Economic, social, environmental and legal circumstances and problems are by their nature dynamic and bound to constant change. It is indispensable for successful public infrastructure and public services to exist that they are adaptable to these changes.*
*Accordingly, <u>State policy must be able to evolve in order to guarantee adequate infrastructure and services</u> in time and thereby the fair and equitable treatment of investments. <u>The legal framework makes no exception.</u>"*
*"The Tribunal is reassured of its view by findings of other arbitral tribunals. Claimant has introduced AES v. Hungary into the proceedings where the tribunal found: The stable conditions that the ECT mentions relate to the framework within which the investment takes place. Nevertheless, it is not a stability clause. A legal framework is by definition subject to change as it adapts to new circumstances day by day and a state has the sovereign right to exercise its powers which include legislative acts."(Added emphasis)* RL-0094.

[787] R. Dolzer and C. Schreuer, Principles of International Investment Law, Oxford University Press, 2012, page 162. RL-0070.

[788] Among many others, the Decision handed down by the Supreme Court on 1 June 2016, 1260/2016 (Rec. 649/2014). R-0337.

LSE 1997, which enshrined the principle of "reasonable" rate of return, the Renewable Energy Plans that implement it and the Case-law that interpreted this principle. Ignoring these facts means carrying out a partial and wrong examination of the stable conditions that the Kingdom of Spain is obliged to create and promote. Note that, notwithstanding the circumstances through which the world economy has passed since 2008, the Kingdom of Spain has always maintained a reasonable rate of return in benefit of the investors.

1128.  What is more, there can be no talk of instability when the various changes in the Spanish Legal System have been addressed, precisely, at underpinning and making sustainable this principle of a reasonable rate of return in the long term.

1129.  The pillars of the Spanish remuneration model existing since 1997 have been maintained at all times. Specifically:

> a.  It has maintained the concept of efficiency pursued by the SES since 1997, which consists of providing electricity to Spanish consumers at the lowest possible cost.
> b.  It has maintained the subsidies to renewable energies as a cost of the SES and, therefore, linked to its economic sustainability.
> c.  It has maintained and improved the priority of access and dispatch for REs.
> d.  It has maintained the basic structure of the Spanish remuneration model, consisting of allowing RE plants to reach a reasonable rate of return by combining two elements market price (pool) and a subsidy.
> e.  It has maintained the characteristic attributes of the principle of reasonable rate of return: its equilibrium and dynamism.
> f.  It has restored the equilibrium by eliminating situations that generated unjustifiable remunerations such as the indexation of all the elements that integrate the subsidy to CPI or the disadjustments arising from the pool plus premium option.
> g.   It has maintained the dynamic character of reasonable rate of return. Therefore, the reasonability of the rate of return continues to be assessed in accordance with the price of money on the capital market (the price of the Spanish ten-year bond).  Dynamism which makes it possible to protect the value of the investment over time, consequently endowing it with greater stability.
> h.  It has maintained and improved the methodology historically followed by the SES to establish the reasonable rate of return, consisting of the determination of types of facilities and standards.
> i.  It continues to provide RE plants with a reasonable rate of return. The return provided by the Spanish remuneration model is better than the discount rate (opportunity cost) of the sector and, specifically, better than the discount rate (opportunity cost) of the Claimant.  Consequently, the return that continues to be provided by the Spanish system is reasonable.

1130.  I.e., one can hardly speak of instability when the changes carried out have been aimed precisely (1) to applying the principle of reasonable rate of return; (2) to resolving situations of imbalance of the SES which threatened its economic sustainability and (3) to strengthening the stability of the regulatory framework through the elevation to the regulation of legal rank of some aspects regulated previously by a RD.

1131.   Accordingly, reasonably valuing the existing system and the current one, it must be concluded that the regulatory Framework applicable to renewable energies has remained stable. The Kingdom of Spain pledged and undertakes to provide the investor with a reasonable rate of return on the investment costs in a renewable asset, currently guaranteed by a regulation with the rank of Law.

1132.   From the examination of the Precedents which have applied the ECT standard, it must be concluded that the Kingdom of Spain has complied with the obligation envisaged in Article 10(1) of the ECT to provide stable conditions for Claimants' investment.

**(b)      Non-retroactivity of the contested measures**

1133.   The Claimants insistently reiterate the existence of retroactive measures, without justifying or arguing that, in accordance with international legislation, the adopted measures are retroactive. In this Memorial, it has been revealed[789] to the Honorable Tribunal that the contested measures are not retroactive (1) nor compliant with international arbitral Case-law, (2) nor in line with Spanish national Case-law, nor compliant with scientific doctrine, (3) nor compliant with the criterion of RE Sector Associations nor of other Investors. Also, the Kingdom of Spain has accredited (4) that the Claimants learned from the documents it provided from 2007 and 2008 (CNE reports and a State Attorney's Office report, among others) that future regulatory changes in pre-existing facilities could be adopted.

1134.   The Claimants, by insisting on the assertion of retroactivity, incur a basic and conceptual mistake. For a regulation to be retroactive in the sphere of international law it must affect acquired rights. As has been proven, the Claimants have never had an "acquired right" to remuneration by means of a fixed and unchanging FIT, not subject to possible macroeconomic control measures or reforms of the SES.

1135.   The Claimants do not clarify what specific protection of those contained in Article 10(1) of the ECT was allegedly violated by Spain when it affirms the "retroactivity" of the measures. Evidence of how forced their statements are, is that the Claimants are not able to provide arbitral Case-law that supports their allusions to a retroactivity that violates the stable conditions of the regulatory Framework. This is due to the fact that there is, in fact, no Case-law that endorses their claims. The Respondent has invoked the two international arbitration Precedents that address this question and both incorporate the theory of the Kingdom of Spain, since they require the existence of an acquired Right.

1136.   The case *Nations Energy v. Panama* is particularly illustrative.

> "*it does not have a retroactive nature because it does not have the effect of revoking acquired rights and applies only to the future [...] Said requirements only apply to the future, and cannot have the effect of retroactively nullifying or reducing the deductions already made [...]*

---

[789] Section III.A.3.2 of this Memorial

> *In reality, <u>the Claimants **confuse** the principle of non-retroactivity and the principle of immediate effects of the new law for the future.</u>* [790] *(emphasis added)*

1137.   This reasoning has been confirmed by the Final Award of Charanne v. the Kingdom of Spain[791].

1138.   The Claimants, who are unable to provide a single precedent to support their thesis, try to distort those provided by the Respondent. In this regard, they say that the Award of Nations Energy Inc. v. the Republic of Panama held that the measures did not affect acquired rights but rather projected toward the future. The same thing occurs in this case. In regard to the award in the Charanne case, the Claimants maintain that it is based on other laws and in another sector (the photovoltaic sector) and that the measures challenged were not the same. However, the measures challenged had, just like the ones questioned here, the effect of reducing the remuneration for already existing photovoltaic facilities in the future. The Charanne Case Tribunal concluded that this effect could not be considered to be retroactive because it did not affect acquired rights. The same thing occurs in this case.

1139.   In this case, the reform is applied only towards the future, without possibility of claiming the subsidies paid previously. The Claimants affirm that it is retroactive, since the granted subsidies are already offset with future profit. This is incorrect. The legislator has modified the remuneration regime of the facilities, establishing a reasonable rate of return in the useful activity of the facility as a whole. This remuneration makes it possible to take into consideration the remunerations already received from the facility commissioning date, for the purpose of <u>calculating the future subsidies</u> to be received outside of the market, without incurring in retroactivity. Moreover, this avoids the perception of over-remuneration that may constitute State Subsidies contrary to EU law. In fact, all of the measures introduced since RD 436/2004 have taken into account the subsidies already received in order to determine, as a function of the return for the project, the subsidies to be received in the future so that the project may achieve a reasonable rate of return.

1140.   Consequently, the Claimants have not accredited that the contested measures, which are applied towards the future without affecting the acquired rights, violate International Law rules. The Claimants actually seek to indefinitely freeze the legal regime of RD 661/2007 towards the future by invoking an alleged retroactivity. This is not part of the ECT standard nor is it in accordance with its aims and purpose.

**(3.3)    The obligation to ensure transparent conditions to investors has not been violated.**

---

[790] Case Nations Energy Inc. and others v. Republic of Panama (CIADI Case No. ARB/06/19) par. 642, 644, 646 RL-0069.

[791]Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain (SCC v. 062/2012), Final Award, 21 January 2016, and individual opinion, par. 545 and 546: "it is about assessing <u>to what extent the Government can modify, with immediate application, regulatory rules of general application.</u>

In fact, the Claimants' argument of retroactivity is no more than a different formulation of the argument according to which the State did not have the possibility of altering the regulatory framework that benefited the Claimants' plants in any way. [...] That attitude would lead, in effect to freezing the regulatory framework, limiting any change to the regulation of new plants that were installed after such changes.", RL-0088.

1141.   As it was indicated in our Counter-Memorial on the Merits,[792] regarding transparency standard Claimants merely stated the following: *"Nor were the measures sufficiently transparent."*[793] However, they did not specify what that supposed lack of transparency consisted of or the regulatory measures affect by it. In this regard, as the Award in *Electrabel S.A. v. Hungary* stablished:

> *"The Tribunal starts with the premise that it is Electrabel which bears the burden of proving its case under the ECT's FET standard[794]".*

1142.   Nevertheless, and in spite of the lack of proper defense caused to this party by having to defend itself from a supposed breach when it is not known what this consisted of, it was demonstrated in the Counter-Memorial that the conduct of the Kingdom of Spain has been transparent. In fact, in all cases: (i) it has justified and published the need for the reforms; (ii) it has followed the legally established procedures and has guaranteed participation in the regulatory process for holders of legitimate rights; (iv) it has not incurred in any retroactivity contrary to legal system; (v) it has not hidden any information that might affect the drafting of the reforms; and (vi) it has approved a regulatory system characterised by foreseeability and dynamism.

1143.   The Claimants invoke arbitration precedents for this standard that are not applicable.

1. They quote the Tecmed Case. However, this Award has been disputed. In this regard, the Annulment Committee of the MTD Case declared that:

> *"According to the Respondent, the Tecmed programme for good governance" is extreme and does not reflect international law. [...] The Committee can appreciate some aspects of these criticisms. For example the TECMED Tribunal's apparent reliance on the foreign investor's expectations as the source of the host State's obligations [...] is questionable."*[795]

2. They mention the Electrabel Award. However, the Electrabel Arbitral Tribunal did not interpret this condition when applying the ECT. Therefore, it is not relevant:

> *"Electrabel makes <u>no allegations</u> regarding lack of transparency"*[796]

1144.   3. They cite the Plama v. Bulgaria Award, which merely <u>refers</u> this ECT standard to the FET and the stability of the regulatory framework.

1145.   As stated before, the ECT does not guarantee the predictability of the regulatory framework of the States that are party to it unless there is a *specific* commitment by the State in this regard[797]. This has been corroborated by the Tribunal of the AES Summit Case,

---

[792] Counter-Memorial on the Merits, par. 777 et seq.
[793] Memorial on the Merits, par. 269.
[794] Electrabel S.A. v. Republic of Hungary, (ICSID Case No. ARB/07/19), Award of 25 November 2015, par. 154, RL-0091
[795] MTD Equity Sdn Bhd. & MTD Chile S.A. v. The Republic of Chile (ICSID Case No. ARB/01/7) Decision on Annulment, 21 March 2007 paras. 66 and 67. RL-0114.
[796] Electrabel S.A. v. Hungary (ICSID Case No. ARB/07/19), Award 25 Nov. 2015, para. 115 RL-0091.
[797] Section IV.B(1) of this Memorial.

which applied the ECT and interpreted this *condition* of transparency established in the ECT.

1146.   In the said Case, the company AES Summit argued Hungary's *lack of transparency* when it given re-introduced administrative prices after signing an agreement with the Claimant, which was unpredictable. The Arbitral Tribunal examined, among others, the Tecmed Award[798] invoked by the Claimants. However, the Arbitral Tribunal concluded that, pursuant to the ECT, Hungary did not violate transparent conditions as it had acted within the acceptable range of legislative and regulatory conduct:

> *"Respondent's process of introducing the Price Decrees, while sub-optimal, did not fall outside the acceptable range of legislative and regulatory behaviour. That being the case, it cannot be defined as unfair and inequitable."[799]*

1147.   In the same way, the Tribunal in the case of *Philip Morris Asia Limited v. the Commonwealth of Australia* considered that a time period of 19 months was reasonable for processing and approving new regulation in a democratic state.[800]

1148.   In any event, the procedure followed by the Respondent for the approval of the measures has been transparent. In the first place, the need to face the tariff deficit and rebalance the SES was announced since RD-Act 6/2009[801] and was known by the Claimants before their investment. The Explanatory Statement of the RD-Act 6/2009 expressly stated that:

> *"The growing tariff deficit [...] is causing serious problems which, in the current international context of financial crisis, is deeply affecting the system and it endangers not only the financial situation of the electricity sector companies, but also the sustainability of the system itself. This imbalance is unsustainable and has serious consequences, [...] Fourthly, by its increasing incidence on the tariff deficit, mechanisms are established with regard to the remuneration system of the installations under the special regime"*

1149.   And in accordance with this duty to rebalance the System, which intensified at the end of 2010 (as Mr Sebastián made clear in his convalidation of RD-Act 14/2010 speech), the structural reform of the electrical sector was announced on 19 December 2011, more than a year before it was carried out.[802] These announcements were transparent, constant and consistent with the commitments made at international level to adopt macroeconomic control measures over the course of 2012 and 2013 in numerous national economic sectors.

---

[798] AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary, Case ICSID No. ARB/07/22; Award of 23 September 2010. Paragraph 9.1.6, footnote 28. RL-0024.

[799] AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary, Case ICSID No. ARB/07/22; Award of 23 September 2010. Paragraph 9.3.73. RL-0024.

[800] Phillip Morris Asia Limited v. the Commonwealth of Australia, PCA Case No. 2012-12, Award on Jurisdiction of 17 December 2015:"First, in this case a period of 19 months passed between the announcement of the intention to legislate and the passage of the actual legislation. However, the length of time it takes to legislate is not a decisive factor in determining whether the legislation is foreseeable. The Tribunal notes that democratic States often have long legislative processes involving consultations with a variety of stakeholders." RL-0119.

[801] Counter-Memorial on the Merits paragraph 430

[802] Counter-Memorial on the Merits, paragraphs 377 and seq.

The announcements of the need to rebalance the system since 2009 also fulfilled the principle generally affirmed in the case Electrabel v. Hungary:

> *"The reference to transparency can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations."[803]*

1150.   In the second place, on 7th March 2012, the CNE issued an audit report on the SES that showed the need to implement the reforms that have been undertaken through the disputed measures. The Kingdom of Spain has shown that Mr Ketchum already knew in March 2012 that a reform was going to be carried out:

> *"We sincerely hope that we will not be disappointed when the new Government announces the planned regulatory changes to the Spanish energy industry".[804]*

1151.   In the third place, the Kingdom of Spain has shown that both RD 413/2014 and OM 1045/2014 were approved after receiving opinions from all those affected.

1152.   The Claimants complain that there was no process of consultation during the drafting of RD-Act 9/2013.[805] But they omit the fact that RD-Act 9/2013, like all RD-Acts, does not allow for a period of consultation. They are laws that are passed due to extraordinary and urgent need. Regardless of that, RD-Act 9/2013 was later ratified by the Parliament.[806] Moreover, its effect is neutral, since it was a transitory measure that was superseded by Act 24/2013, RD 413/2014 and OM 1045/2014, which are the ones governing current remuneration conditions.

1153.   The Claimants also complain that they were in complete darkness until RD 413/2014 and OM 1045/2014 were approved. For its part, the Kingdom of Spain has proven that the Ministry circulated drafts of the texts of RD 413/2014 and OM 1045/2014. The draft of the Regulation was circulated on 26 November 2013 and on 3 February 2014, the draft of the Order of parameters was also circulated. Therefore it has been proven that 4 months after the publication of RD-Act 9/2013 of 12 July, the Claimants were already familiar with the drafts of its development regulations.

1154.   Likewise, it has proven that the submissions of the interested parties were taken into account in the evolution of drafting process of the parameters. In this sense, it should be emphasised that the PTEs made submissions regarding the draft of OM 1045/2014 in February 2014.[807] The submissions show that the PTEs were aware of the cost of investment

---

[803] Electrabel S.A. v. Republic of Hungary, (ICSID Case No. ARB/07/19), Decision on Jurisdiction, Applicable Law and Liability, November 30, 2012., para. 7.79. RL-0001.
[804] Letter from John Ketchum (NextEra Energy Resources, LLC) to Jose Maria Soria Lopez (Minister of Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012, Evidence Document C-90.
[805] Statement of Claim, para.510
[806] In fact, RD-Acts 6/2009, 14/2010 and 1/2012 were not submitted to consultation either, given their legal nature.
[807] Submissions from the PTEs concerning the draft of OM 1045/2014. R-0076.

references because, otherwise, they couldn't have argued that they were insufficient. The final wording of the Order included two new SFs in order to include the particularities of the Termosol Plants, just as Mr Montoya indicated in his second Witness Statement.[808] Therefore, it is completely untrue that the Respondent has not taken PTEs' submissions into account.[809]

1155.   The Claimants invoke in support of their submission the CNE report 18/2013 issued in September regarding the first draft of RD 413/2014. But they hide the fact that as a consequence of the criticisms of the CNE, the Respondent began the regulatory procedure process anew. All interested sectors were able to present submissions and these submissions were taken into account. The Claimants ignore the fact that after this new procedure the CNMC (former CNE) issued a new Report in December 2013[810] that noted that the new draft had taken into account the suggestions made in its report 18/2013.

1156.   The Claimants say that they were unaware of certain concepts that the Kingdom of Spain set in the dark, such as the new rate of return of 7,398 (determined by the Spanish ten-year bond plus a differential of 300 base points).[811] However, they hide from the Tribunal the fact that the renewable energy sector itself (APPA and Greenpeace), advised by Cuatrecasas (the Claimants' lawyer), proposed in 2009 that this should be the return to grant to RE producers.[812] In addition, they hide from the Tribunal the fact that CNE Report 3/2007, which they invoke in order to show their expectations, considered the "Spanish 10-year bond" as a good index to which to link the subsidies.[813] Finally, they hide from the Tribunal that other regulated SES activities (like transport) have been traditionally remunerated in a similar way (the Spanish ten.-year bond plus 200 base points). All of this has been explained in the factual part of this Memorial (Section III.A.4.(5)).

1157.   The Claimants also leave out the fact that the reduction of hours introduced by the reform is the result of eliminating the hours produced by gas (i.e. 15%) from the subsidies. In addition, the Claimants hide from the Tribunal the fact that the concept of an efficient and well-managed company is inherent in European standards on Government Aid, as was explained in the report of the General Technical Secretariat of the Ministry of Industry[814] delivered to the Claimants in the document submission phase.

1158.   The Claimants prefer to hide these facts from the Tribunal and call its attention to documents that were not taken into account by the Respondent for the approval of RD 413/2014 or for the drafting of OM 1045/2014. In this way, they argue that the interested parties did not have access to the reports from the consulting firms Roland Berger and

---

[808] Second Witness Statement of Mr Montoya.
[809] In their Statement of Claim, para.511, the Claimants say that Spain has not assessed the PTEs' submissions.
[810] CNMC report of 17 December 2013: "This Commission has a favourable assessment of the observations made by the former National Energy Commission, now the CNMC, that were made in Report 18/2013." R-0390.
[811] Statement of Claim, para.511
[812] APPA and Greenpeace Renewable Energies Act Proposal. R-0308.
[813] CNE Report 3/2007, page 16. R-0298.
[814] Report of the General Technical Secretariat of the Ministry of Industry issued on the drafting of RD 413/2014, of 9 January 2014. R-0391.

Boston Consulting. But, on the one hand, the Claimants have not shown that the PTEs requested its delivery by the Government at the time when the reforms were being drafted. In any event, not having delivered to the interested parties documents that are not taken into account by the regulator for drafting standards does not entail a breach of the ECT. The Claimants have not shown to what extent the ECT guarantees that Investors be aware of the formalities of a proceeding, including those that do not exist.

1159.    Furthermore, the Claimants themselves were the ones who submitted the report of Roland Berger of 31 October 2014[815] to these proceedings. All the drafts from Rolando Berger were given to them during the document production phase. With regard to the contract with Boston Consulting, the Kingdom of Spain has shown that it was rescinded before receiving the Report, so there is no final report. In addition, the Claimants did not request the drafts in the document production phase, as opposed to Roland Berger's drafts. The confidentiality clauses agreed between a Consulting firm and the Government cannot entail (as intended by the Claimants) the declaration of breach from a signatory Government of the ECT due to lack of transparency. Such an unfounded theory is not grounded on any Precedent where ECT has been applied. What is relevant is that the interested parties could make submissions and that these submissions were taken into account, as in the case of the Termosol Plants.

1160.    Therefore it has to be categorically denied that the contested measures violated the duty to create transparent conditions for investors. And this, both in the announcement of the Measures as well as in the processing of these measures.

**(3.4)    The contested measures are not irrational, disproportionate, or discriminatory.**

1161.    As explained in section III.B.2, the main objective of the ECT is the *non-discrimination* of foreign investors. Furthermore, Article 10(1) of the ECT sets a *FET standard* and also when it obliges investments already made to be granted a "*treatment no less favourable than that required by international law",* it is resorting to the *minimum standard of protection* guaranteed by International Law.

1162.    The Kingdom of Spain presented in the Counter-Memorial on the Merits three different Tests applied by international arbitration precedents, which show that the contested measures are not abusive or disproportionate, by meeting the objectives and standards of ECJ established in the ECT:

    (a) The EDF v. Romania Test, which allows us to examine whether Spain has fulfilled the main objective of the ECT, adopting non-discriminatory measures against the Claimants;

    (b) The AES Summit v. Hungary Test, accepted by the Claimants as relevant, which allows us to examine whether the Kingdom of Spain has respected the FET standard of 10(1) ECT;

---

[815] Document C-99.

1163.   The Claimants only invoke the award in *Occidental v. Ecuador*[816] to maintain that the measures adopted were not proportionate.[817] We have already dealt with the inapplicability of this award to the present case in our Counter-Memorial.[818] In their Reply on the Merits, the Claimants maintain that the Kingdom of Spain has not referred to the awards in the Azurix and Tecmed cases. It is true that we do not refer to them because the Claimants invoked them but did not prove their applicability to the case, something they still do not do in their Reply on the Merits.  The disparity between the facts and the Treaties applied in the Azurix and Tecmed cases and those of the present case is so evident that their application is not acceptable.

1164.   In any event, the Claimants accept the applicability to this case of the Tests of EDF v. Romania and the Aes Summit v. Hungary proposed by the Respondent. The fulfilment of these Tests shall determine the respect by the Kingdom of Spain for the objectives and standards of ECJ established in the ECT:

**(a)        Relevance of EDF Test v Romania**

1165.   In the appraisal of the ECJ standard, the Claimants have not opposed the implementation of the Test set out by Prof. Schreuer and included in the *case EDF v. Romania*. It is appropriate to support the full implementation of this Test in this Case, since it has already been revealed that the main objective of the ECT is to ensure the principle of *national treatment* or *non-discrimination*. The Claimants limit the objectives of the ECT, in a biased manner, to the protection of investors and the *imposition* of a regulatory framework that is predictable and stable. However, it has already been proven that privileged protection to investors is not ECT's main objective, as stated in the Guide to the Energy Treaty[819] and includes the Precedent Electrabel v. Hungary[820].

1166.   This test by Prof. Schreuer allows assessing whether the measures taken by a State have been arbitrary or discriminatory. And that is definitely the true objective of the Test applied by EDF v Romania. The Respondent has proven the compliance of the weighted elements in this Test, which have not even been discussed by the Claimants. This allows us to conclude that the contested measures, non-discriminatory in respect of the Claimants, have met the ECT's target.

1167.   The only thing that the Claimants state is that the Kingdom of Spain diverts the question of proportionality to the question of non-discrimination and arbitrariness. According to the

---

[816] Occidental Petroleum Corporation, Occidental Exploration and Production Company v. Republic of Ecuador, ICSID, Case No. ARB/06/11, Decision (5 October 2012), CL-39
[817] Statement of Claim, para. 272.
[818] Counter-Memorial on the Merits, paragraphs 814 and 815.
[819] "The Energy Charter Treaty and related documents", consolidated text of the Spanish version, page 8. "*8*. Many **Governments actions**, for example the **control of the macroeconomics** [...], **can affect investment profits** but cannot be subject to absolute rules. RL-0020.
[820] Electrabel S.A. V. Hungary (ICSID Case No. Arb/07/19) Award, dated 25 November 2015 para. 165: "*The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations in every circumstance. As was decided by the tribunals in Saluka v Czech Republic and Arif v Moldova, an FET standard may legitimately involve a balancing or weighing exercise by the host State.*" RL-0091.

Claimants, the EDF award said, in regard to proportionality, that "*there must be a reasonable relationship of proportionality between the means employed and the aim sought to be achieved.*"

1168.   From there the Claimants try to argue a lack of proportionality of the measures due to the impact that they have had on their plants, but they forget that:

  a. Proportionality is measured by the relationship between the aim and the need for the measures and the sacrifice of the investor.

  b. The measures were adopted for all agents, in proportion to their contribution to the deficit.

  c. The impact is measured in regards to typical plants and not specific plants.

  d. The IRR of 11%, which according to the Claimants was included in the Financial Report of RD 661/2007, was a maximum return, established in the market option and for a plant. But it was not the return considered for the shareholder (after taxes, bank debts, subordinate debts, reserves, and possible shareholders agreements). That is to say, the standard sets returns for the producer and not for the shareholder. The fact that it is a maximum return that depends on oscillations in the pool and on an incentive for participating in the market (not for investing) makes it unreasonable to conclude that the Kingdom of Spain promised NextEra (shareholder) a return of 11.6% over 30 years.

**(b) Compliance with the requirements laid down in the Test applied by the Arbitral Tribunal in the AES Summit Case**

1169.   The Claimants accept that the Test carried out in the case AES Summit v. Hungary be used to see if the challenged measures have been abusive or disproportionate.[821] We are pleased that the Claimants admit the relevance and applicability to this Case of an Award that applies the ECT, in spite of the fact that they say it was issued on very different facts. The review of the requirements assessed by the Tribunal in the case AES Summit will therefore allow us to see that the contested measures have not violated the ECJ standard of the ECT.

  **There was a rational policy supported in Test AES Summit, which has been accepted by the Claimants.**

1170.   The standard of admissibility of reforms arising from a rational policy has again been confirmed by another Award: In the case Electrabel v Hungary the Arbitral Tribunal has pointed out that:

  *"Standard for "Arbitrariness": As already indicated above, this Tribunal agrees with the Saluka, AES, and Micula tribunals in that <u>a measure will not be arbitrary if it is reasonably related to a rational policy. [...] A rational policy is taken by a state</u>*

---

[821] Reply on the Merits, paragraph 534.

*following a logical (good sense) explanation and with the aim of addressing a public interest matter."[822](Emphasis added)*

1171.   The Claimants state that there was no rational policy, since the justifications provided by the Kingdom of Spain are not acceptable. They distinguish each of the reasons explained by the Respondent, but none of their contentions can be accepted:

**Tariff deficit**

1172.   Firstly, the Claimants deny that the tariff deficit justifies the contested measures. The Claimants state that "*Spain assured the Claimants that it could and would address the tariff deficit in ways that would not affect the tariffs and premiums applicable to the Termosol Plants.*"[823] They also add that "*the contribution of CSP technology to total electricity supply in Spain remains very small (approx. 2% out of a total RE contribution of 47% of electricity of the installed capacity and 2 % of energy demand in Spain) meaning that Spain could easily have retained its commitments to the CSP sector.*"[824] Finally, they indicate that the Respondent had other ways to solve its problems of excess capacity and deficit.[825]

1173.   This Respondent will not insist any further on the non-existence of commitments to the Claimants. Much less that it had assured the Claimants at any time that any measure to reduce the deficit would not affect their facilities. If Pöyry addressed the Claimants any warning in 2008 and if Respondent addressed any message to Claimants and other RE producers with its reforms since RD 661/2007, it was that the measures necessary to maintain the sustainability of the SES would be adopted, with respect for the principle of a reasonable return. Having established the foregoing, we will analyse the Claimants' further pleadings:

 (1) The Claimants consider that the CSP Sector did not give rise to the deficit. This is a basis error because, once again, they attempt to separate CSP technology from the other REs. RD 661/2007 was applicable to the renewable energy sector as a whole, due to which there is no need to examine each of the subsectors as independent from the others. It is, therefore, irrelevant to try to distinguish the CSP sector from the rest of the renewable energies. In addition, this theory is deceitful, since the claimants omit the fact that the commissioning of the CSP plants was staged. Therefore, the figures for 2012 are not significant with regard to the actual volume of the CSP subsector in the tariff deficit over the years. This increase in costs would be exponential in 2014, when all the phases staged until 2013 would already be at full performance. This would have meant a new increase in the costs of the renewable energies and greater imbalance of the SES.

 (2) The Claimants think that there were other alternatives for solving the problem of excess capacity in Spain and for reducing the deficit, such as Spain's recent interconnection agreement with France and Portugal. Well then, if this statement by the

---

[822] Electrabel S.A. V. Hungary (ICSID Case No. Arb/07/19) Award, dated 25 November 2015 para. 179, RL-0091.
[823] Reply on the Merits, para.516
[824] Reply on the Merits, para.520.
[825] Reply on the Merits, paras. 519 and 521.

Claimants demonstrates anything, it is that the Respondent is trying to solve the problem by all possible means, including exporting the electricity generated.

(3) Thirdly, the Claimants assert that there were alternatives to the rise in consumer tariffs. However, they do not show the viability of the measures that they propose. Accuracy, in its expert report, has demonstrated that such measures are not viable, as has been explained in the factual section document.[826] There is no record of any modelling or study on its legal, tax and budgetary feasibility and in accordance with the international obligations assumed by the Kingdom of Spain in July 2012, such as the measures imposed by the MoU signed by Spain in relation to the bailout from the EU. The alternatives proposed by the Claimants are pointless.

**Economic crisis and the fall in demand**

1174.    In addition to the tariff deficit, the Counter-Memorial on the Merits stated the existence of an *economic crisis* that forced the Kingdom of Spain to adopt numerous macroeconomic control measures in various sectors, including the energy sector. The Claimants maintain that the drop in demand was something that was already known in 2009 when RD-Act 6/2009 was enacted and when the staged commissioning of the CSP Plants was decided by the Council of Ministers on 13 November 2009. They say that, in this sense, the demand in 2013 was the same as in 2009 when these standards were set.

1175.    Precisely for that reason, the calculations done in 2009 did not foresee the brutal fall in demand that came later: in 2009 it was estimated an increase in demand for 2013 instead of its stagnation. The exceptional fall in demand that occurred after the adoption of these standards and of RD 1614/2010 is what led the Government to have to adopt other measures at the end of 2010. This is explained in the Preamble to RD-Act 14/2010 and the ratification speech by Minister Sebastián in January 2011 before the Congress of Deputies.

> *"...since 2009 the Government has been working to adopt a set of measures whose common denominator is the rationalisation of the regulated costs and the reduction of the tariff deficit (...)* <u>*All these measures have been created from the dialogue, both with the sectors concerned and with the major political parties.*</u> ***But these measures of 2009 and 2010 have not been sufficient.*** *The imbalances have been accentuated as a result of the emergence of a series of circumstances, adverse in some cases, exceptional in others, of which I would like to highlight two. On the one hand,* <u>*growth above planned of some of the costs regulated throughout 2010, in particular of the premiums of the special regime, and, on the other hand, the evolution of the demand for electricity, which in 2009 suffered a fall of 4.7%. This is the first decline in the demand for electricity after 25 years of sustainable increases of around 4% per year.*</u> *These decreases of the electrical demand reduce the income of the system and mean that the fixed costs have to be paid between fewer users of electricity, which raises the cost per user. These two circumstances have raised the tariff deficit and made that the measures taken so far to ensure the progressive reduction of the tariff deficit in a balanced way*

---

[826] Section III.A.(6)

*between all the players in the sector were insufficient. **Therefore, the need to adopt new measures urgently** (...)."*[827]

1176.    This exceptional fall in demand was recognised by RE producers themselves, such as the AEE.[828] Therefore, the Claimants' allegations concerning electricity demand forecasts do not have any merit.

1177.    The Kingdom of Spain also has proved the difficulty of obtaining international funding, which gave rise to the need to suspend issues of the Securitisation Fund for the Tariff Deficit between March and November 2012.[829] Also, Spain has proven a well-known fact: the bailout performed in July 2012 that determined the signature of a MoU, setting limits to the public deficit in Spain. This Memorandum imposed the commitment of adopting numerous macroeconomic measures in different sectors of the economy. Among these Sectors, Spain undertook to address the tariff deficit in a global manner[830]. This implied a structural reform of the SES that would enable its long-term rebalancing and sustainability. It says nothing about the reasonableness of macroeconomic control measures aimed at guaranteeing the economic sustainability of the SES in such circumstances, when the EU's bailout and the conditions imposed are well known.

**The measures were reasonable and proportionate, to ensure investors a Reasonable Return**

1178.    The reasonableness and proportionality of the measures have been highlighted in the Counter-Memorial on the Merits[831] and in this document.[832] These facts prove that the macroeconomic control measures adopted by the Kingdom of Spain have affected all the interested parties in the SES, including consumers, distributors, carriers and producers[833].

1179.    The Claimants think that the measures are not reasonable nor proportional because they cause a negative return for the Claimants.

1180.    When judging the reasonability of profitability we must refer to generally accepted criteria. One such criterion is to consider the opportunity cost or discount rate used by the agents involved in a certain economic activity.

---

[827] Journal for the Sessions of the Congress. Validation RD-Act 14/2010. R-0388.

[828] Submissions from the AEE of 2 August 2010 on the processing of RD 1614/2010. R-0251.

[829] Counter-Memorial, paragraph 1003.

[830] Memorandum of Understanding signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform:*
"*29. There is a close relationship between macroeconomic imbalances, public finances and financial sector soundness. Hence, [...], with a view to correcting any macroeconomic imbalances as identified within the framework of the European semester, will be regularly and closely monitored in parallel with the formal review process as envisioned in this MoU. [...]*
*31. Regarding **structural reforms**, the Spanish authorities **are committed** to implement the country-specific recommendations in the context of the European Semester. These reforms aim at **correcting macroeconomic imbalances**, as identified in the in-depth review under the Macroeconomic Imbalance Procedure (MIP). In particular, these recommendations invite Spain to: [...] 6) [...] address **the electricity tariff deficit in a comprehensive way**."* (emphasis added) RL-0112.

[831] Sections IV.D.4.2 to 4.8 (paragraphs 724 et seq.)

[832] Section IV.A. 4.5.b) (paragraphs 1062 et seq.)

[833] Section IV.A.2.5 of this Memorial.

1181.    In this regard, we must recall, as pointed out by Accuracy[834], that the discount rate (opportunity cost) that the Sector expects to obtain after the measures would range between 6.38% and 6.86%. That is, values below 7.398 granted by the Spanish remuneration model.

1182.    Another criterion that we can use to determine whether the profitability offered by the Spanish system is reasonable consists of comparing it with the profitability offered by the Spanish system to activities subject to the same risk level. Specifically, compare that profitability with other regulated activities such as transport and distribution.

1183.    In this regard, we must recall that the profitability of transport and distribution activities, which are also regulated, is established by Law for the first regulatory period in the profitability of the ten-year Spanish bond plus 200 basis points[835]. That is, 100 basis points less than the production activity using renewable energy sources. From this viewpoint, profitability is also reasonable.

1184.    Thirdly, the profitability of 7.398 resulting of increasing the average performance of the Spanish ten-year bond prior to RDL 9/2013 by 300 basis points is the profitability that the Sector requested from the Spanish Government in 2009:

> *"The Government shall set the amounts for regulated tariffs, premiums and supplements, in all cases assessing the operation and maintenance costs and the investment costs incurred by facility operators in order to reach a reasonable rate of return with reference to the cost of money on the capital market. As for the capital remuneration tariff, an annual percentage equal to the <u>average of the previous year's remuneration average of Treasury obligations to 10 years will be taken, plus a spread of 300 basis points.</u>"[836] (Emphasis added)*

1185.    Consequently, the profitability is also reasonable pursuant to the requirements of the Sector itself.

1186.    Lastly, we only have to recall the profitability levels given by Banks to assess whether the interest guaranteed by law in the investments in renewable energies in Spain is reasonable or not. This simple comparison was expressly collected by the Arbitral Tribunal in the *case AES Summit v. Hungary*.[837] Let us remember that the Claimants have expressly admitted this Award as an examining parameter of the ECJ standard in this case. Consequently, a profitability of 7.298 when the Euribor (at the time of writing) records negative rates is more than reasonable.

**(c)    The measures are not discriminatory**

---

[834] Accuracy, Second Report on the Claimants' Claim. Appendix 8.

[835] Act 24/2013, of 26 December, on the Electricity Sector. Tenth Additional Provision. R-0037.

[836] APPA-Greenpeace Press Release concerning the Draft Bill for the Promotion of Renewable Energy of the Draft Bill presented by APPA-Greenpeace in May 2009. Article 23.4 R-0307.

[837] "*One need only recall recent wide-spread concerns about the profitability level of banks to understand that so-called excessive profits may well give rise to legitimate reasons for governments to regulate or re-regulate.*" AES Summit Generation Limited and AES-Tisza Erömü Kft v. Hungarian Republic, ICSID Case No. ARB/07/22, Award of 23 September 2010, paragraph 10.3.31 and 10.3.34. RL- 0024.

1187.   Finally, the Claimants consider the measures to be discriminatory because "*Regulatory Framework III discriminates against plants that were optimised and built to operate at a high level of productivity (at greater up-front costs) in the expectation that they would recover those costs through the revenue-based FiT system*"[838]

1188.   The first thing that attracts the Respondent's attention is that the Claimants do not invoke the existence of discrimination against foreign investors or their investment (capital shares) but rather against the Plants. Neither do they say that the Termosol Plants have been discriminated against because of having an indirect foreign shareholder. So it does not appear that the type of discrimination invoked by the Claimants falls within the type of discrimination that the ECT or any other foreign investment protection treaty tries to avoid. The question that the Claimants pose is, instead, a question of domestic law without importance at the international level.

1189.   In any event, the causes of the supposed plant discrimination invoked by the Claimants do not exist, as we shall now see.

1190.   The first thing that should be emphasised is that any extraordinary circumstances of the Termosol Plants that make them different from others have not in any case been proven. The only thing different about them is their greater storage capacity and a larger solar field (although not larger than that of other plants with less storage). This is what Mr Montoya explains in his witness statement.[839]

1191.   These circumstances are the ones that have justified the creation of specific SFs for the two Termosol Plants in OM 1045/2014 as a consequence of the submissions of the PTEs, with a CAPEX and an OPEX adjusted to their characteristics.

1192.   The 25-year limit on the service life of the Plants is due to the fact that, as it occured with RD 661/2007 and the forecasts of the PER 2005-2010, it is held that the investment costs will have been recovered by then. There is no evidence that the Termosol plants can surpass a service life of 25 years. We refer to Professor Servert's report on this point.

1193.   The Claimants' disagreement with the costs reflected in the corresponding SFs is focused on the financing costs and on the intra-group operational costs. As we have already explained in factual section —and the Claimants have not denied this— financing costs have never been taken into consideration for setting subsidies. This has been so since RD 436/2004.[840] In regard to the intra-group operational costs, the Claimants have not accredited their origin and applicability. Accuracy, in their report, and Mr Carlos Montoya, in his statement, show that these costs should not be taken into consideration.

1194.   Therefore, the measures adopted by the Kingdom of Spain cannot be considered to be disproportional, irrational, or discriminatory.

---

[838] Reply on the Merits, paras. 535 and 536.
[839] Second Witness Statement of Carlos Montoya.
[840] Financial Report of RD 436/2004. R-0315.

IV.    THE CLAIMANTS DO NOT HAVE THE RIGHT TO THE COMPENSATION REQUESTED

### A.    Introduction

1195.    In the first place, in view of the Reply on the Merits submitted by the Claimants, we insist on each and every one of the points made in this regard in the Counter-Memorial of 4 March 2016. As we shall see, the Claimants have not refuted the arguments of the Kingdom of Spain in which it has been demonstrated that they have no right to the reparation requested. This section is complemented with the expert report of rejoinder from Accuracy on *quantum* of 20 October 2016, in which some of these aspects are developed.

1196.    It is also necessary to note that, in their report, the experts of Accuracy examined and categorically dismantled the alternative quantification proposed by Compass Lexecon, which was supposedly based on a hypothetical static and petrified return equal to the result of adding 300 base points (i.e. 3%) to the yield demanded by the investors. These alternative calculations proposed by Compass Lexecon lack legal or economic basis and perform a mistaken interpretation of the Reasonable Return, as developed by Accuracy. In this regard, we have already argued that the Reasonable Return has to be an essentially dynamic concept in nature. To try and anchor it to a fixed figure *ad eternum*, without reference to any market, would not be economically reasonable for investors or to the State.

1197.    In any case, a correct valuation approach based on the value of the assets and reasonable returns (ABV) results in a positive financial impact for the Claimants, as indicated by Accuracy in Section 3.3 of its rebuttal report on quantum.

1198.    Lastly, it must once again be noted that this section IV is presented secondarily, for the event that, in the first place, the Tribunal accepted to have jurisdiction over this dispute and, additionally, in second place, the Tribunal understood that there is a breach by the Kingdom of Spain of any of the precepts of the ECT.

### B.    The quantification of the damages claimed by the Claimants is totally and absolutely speculative

1199.    As we already noted, the alleged damages estimated in the Compass Lexecom reports is not compensable, as they are totally and absolutely speculative.

1200.    Without intending to reiterate the arguments already held in the Counter-Memorial on the Merits, it is necessary to summarise the key points and, in view of the Reply, make some clarifications.

1201.    The Claimants intends to support a claim based on a simplistic comparison of scenarios ("actual" and butfor), assuming that the "actual" is going to be maintained during the next decades, ignoring that the guiding principle of the system consist on guaranteed reasonable profitability. Inter alia, in its models it tries to predict data like the pool price (dependent on the price of crude oil) and the demand for energy 30 years from now. Because of this, the projection of the existing parameters is hypothetical and illusory.

1202.   In this sense, this representation, the same as the Supreme Court of the Kingdom of Spain in comparable circumstances, understands that the alleged damages have not even been minimally proved. The long time horizon, together with the fact that nothing guarantees that the remuneration shall remain petrified in the current form (always ensuring Reasonable Return), makes the calculation of damage done speculative.

1203.   This reasoning was clearly embodied in nearly a hundred judgements in which the Supreme Court has known of amendments to the remuneration regime of renewable energies. Among them, mention can be made of the judgement of 24 September 2012 that, in its Legal Ground Sixth, declares the following:

> *"In short, with regard to the expert report by the party, provided along with the statement of claim, for the purpose of quantifying the impact that the application of RD 1565/2010, of 19 November, has on the profitability of projects, we will limit ourselves to reiterating that their conclusions cannot be accepted from the moment that they are based on extrapolations into a thirty year future of amounts, the determination of which lacks necessary rigour and certainty. With a "time frame" of limiting to 30 years the right to earn the regulated tariff, the loss of "asset value" of the photovoltaic plants, affirmed in the reports in question, is not demonstrated. As on previous occasions, we refer to that already stated in the judgement of 19 June 2012 (appeal 62/2011) and in ulterior judgements"[841].*

1204.   As we see, the Supreme Court understands that the extrapolation to such a distant future of the magnitudes to consider lacks the necessary rigour and certainty. And that the Claimant has not substantiated the loss of value of the Plants. In other words, the calculations of the Claimants are mere speculation and, therefore, the burden of proof required for it has not been meet in any way.

1205.   In this respect, two clarifications: first, the quantities referred to by the Supreme Court as unpredictable or "lacking the necessary rigour and certainty" are the same ones that Compass Lexecon's experts have had to predict; and secondly, the statements of the Supreme Court in this particular paragraph do not constitute any legal interpretation of Spanish law in the field of energy, but that it is a pure appreciation of the factual elements of evidence, it is a plain and simple appraisal of the evidence in accordance with the principle of sound criticism.

1206.   With regard to the inadmissibility of the DCF method, both the Kingdom of Spain and the Claimant itself have made reference to scientific doctrine and to arbitral precedents which, under certain circumstances, consider the DCF inappropriate as a valuation method, as they are excessively speculative. Therefore, both parties agree that the DCF is not a method that is appropriate in all cases.

1207.   In fact, as is established in the Award in the case of Rusoro v. Venezuela:

---

[841] Judgement from the Third Chamber of the Supreme Court, 24 September 2012, Legal Ground Sixth. R-0317.

*"DCF is not a friar's balm which cures all ailments"*[842].

1208.   This Award refers to practically the same requirements and characteristics for the DCF to be or not be appropriate that we have already analysed when discussing the manuals of Rypinski & Williams and of Marboe in the Counter-Memorial.

1209.   In this sense it is the Arbitral Tribunal who will, as the case may be, determine if the predictions that have to be carried out in a horizon of several decades, on external factors such as for example the energy demand of a country or the pool price (also identified by the evolution of the price of crude oil), are reliable or speculative. And we shall also have to determine in the same way if the calculations made by Compass Lexecon's experts, who have a *track record* of less than one year, and make projections for almost 30 years (until 2042), are reliable or speculative.

1210.   For this reason, we believe that to evaluate the existence of damage, we should resort to methods based on the cost of the assets, examining whether they are recovered and Reasonable Return is obtained from them:

> *"The method of calculating FMV by reference to actual investments has proved quite popular in arbitral practice. [...] they have turned to the historic costs of investment as the relevant approach to valuation when the evidence necessary to apply an income base method has been considered insufficient"*[843]. *(emphasis added)*

1211.   As already pointed out, *Marboe* insists on the advantages of the methods based on assets, less speculative and simpler to apply:

> *"The advantage of this approach is that, in comparison with the income capitalization approach, it appears to be much easier and less speculative. It looks into the past and not into the future and is seemingly much simpler to apply than the highly complex forecasting and discounting processes"*[844]. *(emphasis added)*

1212.   In this regard, the Claimants surprisingly say in paragraph 562 of the Reply on the Merits that "*Accuracy cites no valuation authority supporting its premise that investment cost and fair market enterprise value necessarily must coincide.*" Obviously, the Claimants couldn't be more mistaken on this point.

1213.   In this respect, we already set out in paragraph 863 of our Counter-memorial that *Marboe* makes reference to the normal profitability and the book value as an obligatory reference, particularly when the investment is very recent:

> "_Experienced economists point to_ the fact that the significance of the ABV usually works with companies with _normal rates of return_. Extraordinarily high or low rated are rather rare and cannot be explained or be appropriately reflected by this method.

---

[842] Rusoro Mining Limited v. Venezuela, ICSID Case No. ARB(AF)/12/5, Award of 22 August 2016. RL-0120.
[843] *Damages in International Investment Law*, Sergey Ripinsky with Kevin Williams, British Institute of International and Comparative Law (BIICL), page 227. RL-0082.
[844] *Calculation of Compensation and Damages in International Investment Law*, Irmgard Marboe, Oxford, Oxford International Arbitration Series, 2009, page 267. RL-0083.

270

*Stauffer notes that extraordinarily high and 'abnormally poor performance must be explained, since, by definition most firms or ventures realize "average" rates of return'. This is also confirmed by Lou Wells who supports the use of the book value method for recently established businesses*

*When the investment is very recent, or still in process of being made, there is an obvious and often easier alternative to using NPV of future cash flow to determine FMV. If the project was expected to generate 'normal' rates of return for the business, then the amount of investment itself provides a reasonable starting point for determining FMV. In most cases, the FMV of recently acquired assets is unlikely to be substantially different from the cost of those assets. Cost of investment will approximate what a buyer might pay; moreover, the investor who receives his investment back can invest the sum in another project, earn normal returns, and be equally well off. [...]"[845] (emphasis added)*

1214.   This is particularly appropriate when the date of acquisition of the assets is close to the appraisal date. Therefore, *Ripinsky* (paragraph 864 of the Counter-Memorial) states the following:

*"On the date a particular asset is bought, the price paid for it normally represents the market value of this asset. Accordingly, on that date, the price reflected in the buyer's books represents the asset's book value and market value at the same time."[846](Emphasis added)*

1215.   Coinciding with the same idea, Sabahi (again, paragraph 865 of the Counter-Memorial) discusses the recovery of the costs plus a return on them as an appropriate compensation method, considering that the investment was recent:

*"In Metalclad v Mexico, for example, [...] considering that the investment was made recently and lacked a history of profitability, held that the investor could only recover its actual investment [...] sunk costs in this case may have approximated the fair market value, because the investment was made recently.*

*Another example is the case of Wena v. Egypt [...]. The tribunal [...] did not consider DCF appropriate because the ventures were new and the claimant has not proved satisfactorily that they would have become profitable. Instead, the tribunal awarded the value of the investment actually made [...]."[847] (emphasis added)*

1216.   In short, since the factual elements mentioned above apply in this case, we understand that all of them have to be considered by the Arbitral Tribunal, in order to rule out any estimate of value based on a DCF in this case.

---

[845] *Calculation of Compensation and Damages in International Investment Law*, Irmgard Marboe, Oxford, Oxford International Arbitration Series, 2009, pages 275 and 276. RL-0083.

[846] *Damages in International Investment Law*, Sergey Ripinsky with Kevin Williams, British Institute of International and Comparative Law (BIICL), 2008, page 221. RL-0082.

[847] *Compensation and Restitution in Investor-State Arbitration – Principles and Practice,* Borzu Sabahi, Oxford, International Economic Law, 201, pages 132-133. RL-0084.

## C.    The contrast of the amount claimed reflects its speculative nature and the irrelevance of the DCF

1217.    Without the need to reiterate what has already been indicated in this regard in the Counter-Memorial, to which we continue to subscribe, it is enough to point to the conclusion of the Accuracy experts on the quantifications done by Compass Lexecon:

> "115. In light of these two principles, we have assessed the reasonableness of Lexecon's quantification and found that:
>
> •    There is a large disparity (+84.7%) between the Plants' value in Lexecon's But For (€1.1625 billion ) and the value of investment (€629.3 million). This "reassessment" in barely 3 years of operations cannot be justified by economic motives that are intrinsic to the business;
>
> •    The shareholder's exit IRR, according to Lexecon, is 30.4% , and the project's exit IRR is 16.5%. Such yields are extraordinarily high and therefore unimaginable in a regulated market that provides protection to the players. We insist that the exit IRR is a suitable reference for the FMV of the Plants, since it reflects the price that a willing buyer and willing seller would be prepared to accept in a hypothetical But-For transaction".[848]

1218.    In addition, it should be emphasized that when Compass Lexecon presents the results of their quantification they do not indicate that there is an effect that artificially reduces the return and the value for the shareholder.  They include a series of remunerations to Casa de Hitos, NEEE, and NEEO in their financial model as investment or operating costs when they are actually, according to the experts from Accuracy, either dividends disguised as management fees paid to the NextEra group or "promote or success fees" outside the market paid to linked entities. For this reason, neither Lexecon's Actual IRR nor their But For IRR properly reflect the returns for the Plants and their shareholders. These effects have been corrected in the subsidiary DCF calculation by Accuracy, the result of which we shall examine below.

1219.    There is definitely no rational explanation whatsoever, as we have already indicated, for the over-valued But For calculated by Compass Lexecon, all the more so considering that: there are no monopolies providing super-profits; the assessment date is very close to the construction date for the plants; it is a capital intensive sector; and there are no intangibles or relevant know-how to assess that could cause a considerable gap between book and market values.

1220.    All of the above ratifies from a material point of view what was previously formulated doctrinally: DCF is inappropriate to the circumstances of the case.

---

[848] Accuracy, Second Report on the Claimants' Claim, section 1.4

**D.    The Alternative But-for of Compass Lexecon lacks all merit and shows that their DCF is speculative**

1221.   In this regard we ratify everything included in the Counter-Memorial, emphasising the most elemental points developed in the Accuracy experts' report.[849]

1222.   In summary, the Claimants' "alternative but-for" is based on the following hypotheses: declared investment costs of 720.6 million Euros; a frozen return over 30 years: the WACC plus 300 points before taxes; and a nominal theoretical tax of 30%.

1223.   We first refute the investment costs taken as the basis for applying the rate of return. In fact, a "reasonable return" model must be related, in all cases, to the standard costs of typical efficient facilities, not others.

1224.   In terms of the rate of return, in the first place, reasonable return must be an essentially dynamic concept due to its very nature. To try and anchor it to a fixed figure *ad eternum*, without reference to any market, would not be economically reasonable for investors or to the State.

1225.   In regards to the concrete figure considered, there is no basis for adding an additional unjustified 300 basic points to the WACC (a concept that in and of itself includes an acceptable return for the fund suppliers, and even the calculation of the after-tax WACC is mistaken because of directly applying the nominal tax rate instead of the much lower average effective tax rate).

1226.   Considering all of the foregoing, the But-for alternative proposed by Compass Lexecon must be completely rejected, since it makes the two basic mistakes indicated.

**E.    Subsidiary calculations using DCF: positive financial impact for the Claimants**

1227.   In spite of the fact that we understand that the DCF is inappropriate for the case, as a subsidiary contention, a DCF example has already been included in the Counter-Memorial. The Accuracy experts obtained as a result that the current regime could be, in purely financial terms, more beneficial for the Claimants than RD 661/2007, as a function of the parameters and hypotheses considered. Therefore, effective damage cannot be spoken of in any case. In effect, the hypothetical impact comes out to be either positive or (applying RD 661/2007 incorrectly) quantitatively insignificant in relative terms, as the following graphic shows:[850]

---

[849] Accuracy, Second Report on the Claimants' Claim, section 2.4
[850] Counter-Memorial, para. 895.

**Figure 5.4 - Subsidiary quantification of the impact of the Measures**



Source: Accuracy Analysis

1228. In their second report, on 20 October 2016, Accuracy updated the calculations, considering the Plant financing and refinancing financial models as the baseline for the But-for and Actual scenarios, for the purpose of starting out from the same hypotheses as the Claimants and making the smallest corrections possible. In this way, the comparisons are simplified and the speculative nature of the DCF exercise undertaken by Compass Lexecon is demonstrated.

1229. In this regard, it is necessary to recall that the Memorial on the Merits, after referencing the standard established by the Chorzow Factory case, points out, in paragraph 285, that "*Under international law, full reparation can be achieved either through (i) restitution or, if restitution is not possible (...) (ii) the payment of compensation (...).*" Therefore, compensation is the alternative method of achieving reparation, and the main one is restitution. That is to say, their first claim consists of the restitution of RD 661/2007.

1230. Precisely for this reason, the experts from Accuracy have calculated the financial impact of reinstating RD 661/2007. They have calculated the impact by applying RD 661/2007 to the NextEra plants in accordance with their real power (premium of Article 45 facilities with power above 50 MW).

1231. In this way the result they obtain is that the current regime is, in purely financial terms, more beneficial for NextEra than RD 661/2007, so no damages at all can be spoken of, but rather the contrary:[851]

**Table 4.8 - Impact of the Measures (55 MW But For)**

| €m | Actual | 55 MW But For | Impact |
|---|---|---|---|
| Enterprise Value | 704.7 | 589.4 | |
| Net Financial Position | (613.8) | (532.0) | |
| **Equity Value** | **90.9** | **57.4** | |
| Illiquidity discount | 11.8 % | 17.0 % | |
| **Net Equity Value of discounts** | **80.2** | **47.6** | 32.5 |

*Source: Accuracy analysis*

---

[851] Accuracy, Second Report on the Claimants' Claim, page 46

274

1232.  It is evident that this conclusion is diametrically opposed to that advocated by the Claimants, who are claiming damages. A fundamental reason for this discrepancy is that the Claimants and their experts have, in an enormously mistaken way, considered the application of the premium of Article 36 of RD 661/2007. However, that Article applies to facilities of no more than 50 MW. And the two NextEra plants, as we have demonstrated and as the Claimants recognise, have more than 50 MW (so the notably lower premium of Article 45 applies to them).

1233.  In any event, even if we erroneously applied the premium of Article 36 of RD 661/2007, calculating DCF correctly, the results given by for the financial impact on the Claimants would remain significantly below those calculated by Compass Lexecon.

1234.  Thus, in order to provide the Court with a sample of sensitivity: namely, Compass Lexecon calculated in its last Memorial a negative financial impact of EUR 521.4 million, while Accuracy calculates an impact (we reiterate, applying the premium of article 36 -to which the NextEra plants are not entitled) of EUR 23.1 million. That is, that the hypothetical impact would be approximately 96% lower than calculated by Compass Lexecon.[852]

**Table 4.7 - Impact of the Measures**

| €m | Actual | But For | Impact |
|---|---|---|---|
| Enterprise Value | 704.7 | 656.5 | |
| Net Financial Position | (613.8) | (532.0) | |
| **Equity Value** | **90.9** | **124.5** | |
| Illiquidity discount | 11.8 % | 17.0 % | |
| **Net Equity Value of discounts** | **80.2** | **103.3** | **(23.1)** |

*Source: Accuracy analysis*

1235.  The discrepancies between the different DCFs (Compass Lexecon's and Accuracy's) are derived (in addition to the incorrect application of RD 661/2007 due to the excess power of the plants) from the different parameters considered.

1236.  As we already foresaw, the discrepancies between the different DCFs (Compass Lexecon's and Accuracy's) are derived from the different parameters considered. It is emphasised that Accuracy has taken a service life for the plants of 25 years, in line with the average service life declared in the Annual Accounts of companies owning thermosolar plants with storage for the years from 2009 to 2014. Professor Servet's report corroborates this appreciation. Compass Lexecon, on the other hand, has calculated a service life for the plants of 30 years, thereby including an unjustified extension of the hypothetical financial impact for 5 years.

1237.  Also, Accuracy has taken into account that the conditions of the but-for scenario would obviously entail a greater risk and greater uncertainty than the current scenario. The revenue would be subject to greater risk in the But-for scenario. In fact, in the Current scenario, under the current regulations, we find a stable, more predictable framework with less risk.

---

[852] Accuracy, Second Report on the Claimants' Claim, page. 45

This is undoubtedly proved by the assessments of the market agents and the numerous transactions that have taken place since the adoption of the contested measures. These considerations, logically, will have their impact on the different discount rates to be taken into account and on the various illiquidity discounts to apply.

1238.   Lastly, we reiterate with regard to the interests between the valuation date and that of the Award, Accuracy's experts consider, in the hypothetical case that the Arbitral Tribunal estimates damage, the interest to be taken into account would be very different from that chosen by Compass Lexecon. In this way, instead of opting for the bond to 10 years, applying a rational approach of correlation in time, they decided to choose the bond but to a period equal to the gap in time between the appraisal date and the estimate of the award date (approximately 2 years). The same criterion must be followed, where applicable, for subsequent interests.

1239.   As a conclusion, we have shown that even when using speculative methods for DCF, the hypothetical impact is either positive (correctly applying RD 661/2007) or quantitatively negligible in relative terms.


## V.    PETITUM AND RESERVATION OF RIGHTS

1240.   In light of the arguments expressed herein, the Kingdom of Spain respectfully requests the Arbitral Tribunal to:

   a) Declare its lacks of jurisdiction to hear the claims of the Claimants, or decide their inadmissibility, in accordance with what is set forth in the Memorial on Jurisdictional Objections and the Reply to Jurisdictional Objections;

   b) Secondarily, for the case that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, that it dismisses all the claims of the Claimants on the merits because the Kingdom of Spain has not breached in any way the ECT, in accordance with what is stated in paragraphs (A) and (B) of section III of this Document, on the substance of the matter;

   c) Secondarily, to dismiss all the Claimants' claims for damages as they are not entitled to compensation, in accordance with section IV of this Document; and

   d) Sentence the Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.


1241.   The Kingdom of Spain reserves the right to supplement, modify or complement these pleadings and present any and all additional arguments that may be necessary in accordance with the ICSID Convention, the ICSID rules of arbitration, procedural orders and the

directives of the Arbitral Tribunal in order to respond to all allegations made by the Claimant with regard to this matter.

Madrid, 20 October 2016

Respectfully submitted,

Diego Santacruz  Descartin          Mónica Moraleda Saceda