# EXHIBIT 13

*that factor into account. Additional information as to the estimated level of production costs for each category and type are necessary in order to give judgment in this instance (Convention on the Transitional Provisions, Art. 26).*

In Case 8/55

FÉDÉRATION CHARBONNIÈRE DE BELGIQUE, represented by Louis Dehasse and Léon Canivet, assisted by Paul Tschoffen, Advocate at the Cour d'Appel, Liège, and by Henri Simont, Advocate at the Cour de Cassation of Belgium, Professor at the Free University of Brussels, with an address for service in Luxembourg at 6, Rue Henri Heine,

applicant,

v

HIGH AUTHORITY OF THE EUROPEAN COAL AND STEEL COMMUNITY, represented by its Legal Adviser, Walter Much, acting as Agent, assisted by G. van Hecke, Advocate at the Cour d'Appel, Brussels, Professor at the University of Louvain, with an address for service in Luxembourg at its offices, 2, Place de Metz,

defendant,

Application for the annulment of Decision No 22/55 of the High Authority of 28 May 1955 and of certain decisions of the High Authority resulting from its letter of 28 May 1955 to the Government of the Kingdom of Belgium concerning the adjustment of the equalization system (*Journal Officiel* of 31 May 1955, pp. 753–758),


THE COURT

composed of: M. Pilotti, President, J. Rueff and O. Riese (Presidents of Chambers), P.J.S. Serrarens, L. Delvaux, Ch. L. Hammes and A. van Kleffens, Judges,

Advocate General: M. Lagrange
Registrar: A. Van Houtte

gives the following

# JUDGMENT

# Facts

## 1. Procedure

The application lodged by the 'Fédération Charbonnière de Belgique', a non profit-making association whose registered office is in Brussels, is dated 23 June 1955 and was registered at the Court on 27 June 1955 under No 657. It was lodged within the period prescribed by the third paragraph of Article 33 of the Treaty in conjunction with Articles 84 and 85 of the Rules of Procedure of the Court of Justice. The powers of the applicant's representatives are in order and their signatures have been verified as genuine.

The applicant's lawyers and the Agent and lawyer of the defendant have been properly appointed.

The procedural requirements have been complied with and the statement of defence, the reply and the rejoinder were lodged within the prescribed periods.

By order of the President of the Court the application was assigned to the First Chamber for the purposes of any preparatory inquiry. The President of the Court designated Mr van Kleffens to act as Judge-Rapporteur and, in accordance with the final paragraph of Article 9 of the Rules of Procedure of the Court, designated Mr Lagrange to be Advocate General.

After hearing the views of the Advocate General, the Court decided, at the end of the written procedure, in accordance with the preliminary Report presented by the Judge-Rapporteur under Article 34 of the Rules of Procedure of the Court, to open the oral procedure without holding any preparatory inquiry.

At the request of the parties the Court decided at the beginning of the oral procedure to deal with the present case together with Case 9/55, *Société des Charbonnages de Beeringen*, *Société des Charbonnages de Houthalen* and *Société des Charbonnages de Helchteren et Zolder* v *High Authority*.

The parties presented oral argument at the hearings held in open court on 2, 4, 5, 7 and 11 May 1956.

At the hearing on 12 June 1956 the parties replied to certain questions raised by the Judge-Rapporteur concerning the level of estimated production costs in several hypothetical situations.

On the same date the Advocate General delivered his opinion, to the effect that the application should be dismissed and that the costs should be borne by the applicant.

## 2. Conclusions of the parties

In its application, the *applicant* claims that the Court should:

1. Annul Decision No 22/55 of the High Authority of the European Coal and Steel Community of 28 May 1955 and the price list annexed thereto in so far as it fixes reduced prices for certain types of coal;

2. Annul the decision contained in the letter addressed by the High Authority to the Belgian Government and in the table of rates of equalization annexed to that letter in so far as:

(a) it leads to discrimination between producers of identical types of coal;

(b) it provides that in the future equalization payments will be or may be withdrawn from certain undertakings on the ground that they are not making the effort to re-equip considered possible and necessary or are refusing to carry out the transfers or exchanges of deposits which are regarded as indispensable for a better development of the mining areas;

(c) it fixes rates of equalization in accordance with the new price list.

According to the application the action is based upon Articles 3 and 4, in particular 4(b), 5, 33 and 57 of the Treaty of 18 April

247

1951, as well as on Articles 24, 25 and 26 of the Convention on the Transitional Provisions of the same date, and invokes lack of competence on the part of the High Authority, infringement of the Treaty and of the rules of law relating to its implementation, manifest failure to observe the provisions of the Treaty and misuse of powers, all of which vitiate the contested decisions. The *defendant* contends that the Court should dismiss the application lodged by the Fédération Charbonnière de Belgique on 27 June 1955, with all the consequences which that entails in law, in particular as regards the payment of all fees, costs and other expenses.

3. Summary of the facts

The High Authority published its first decision relating to the establishment of the equalization scheme (Decision No 1/53 of 7 February 1953) in the *Journal Officiel de la Communauté,* No 1, of 10 February 1953. That decision fixed the mode of assessment and collection of the levy by means of which the necessary funds were to be otained in order to ensure the financing of the aid provided for to that end in the Convention on the Transitional Provisions.

Since the raising of the funds necessary to cover the equalization payments has not been discussed in the course of the present case there is no need to consider the subsequent modifications made to the rules governing it which were laid down by Decision No 1/53.

As regards the calculation of the sums to be paid to the Belgian undertakings, the High Authority adopted its first decision on 8 March 1953 (Decision No 24/53, *Journal Officiel,* No 4, of 13 March 1953). That decision fixed maximum prices for the sale of certain types of Belgian coal listed in an annex to the decision.

On the same date the High Authority addressed a letter to the Belgian Government (published in the *Journal Officiel,* No 4, of 13 March 1953) in which it gave details of the aid which it proposed to grant to the Belgian collieries. It stated in the letter that as a result of preparatory work which had taken place it had been possible to fix the price list provided for in Article 26 of the Convention and to determine the aids necessary as a result of the application of that price list, that is, 29 francs per metric ton extracted, in addition to the so-called conventional subsidies already granted to certain collieries by the Belgian Government. That result had been obtained by calculating the difference between the prices in a 'price list for accounting purposes', based upon the receipts of the undertakings, and those of a 'list of selling prices' at which the collieries dispose of their products. The two lists were annexed to the letter. It should be noted that the prices set out in the so-called list of 'selling prices' are identical to the 'maximum prices' listed in the annex to Decision No 24/53.

In order to make the price adjustment which the High Authority had considered necessary the table of selling prices annexed to Decision No 24/53 was modified by Decision No 40/53 of 20 October 1953; the new table gave rise to a further letter addressed to the Belgian Government on 22 October 1953 informing it of the new table of selling prices and the new price list for accounting purposes (decision and letter published in the *Journal Officiel,* No 12, of 27 October 1953).

Decision No 41/53 and a letter to the Belgian Government dated 10 December 1953 modified the aforementioned tables (decision and letter published in the *Journal Officiel,* No 13, of 15 December 1953). On 19 March 1954 the High Authority adopted Decision No 15/54 (*Journal Officiel,* No 3, of 24 March 1954), which did not refer in its preamble either to the provisions of the Treaty relating to maximum prices or to either of the earlier decisions, but ordered the undertakings situated in the Belgian coalfield to 'comply' with the price list annexed to that decision, despite the fact that it was identical to the list already in force.

That decision was followed by a letter to the Belgian Government dated 20 March 1954 (*Journal Officiel,* No 3, of 24 March 1954) in which the High Authority informed it of its decision to prolong the application of the existing price list.

After adding certain Belgian mines to those already listed in the annex to Decision No

15/54 as being entitled to make a quality surcharge (Decision No 27/54 of 12 May 1954, *Journal Officiel,* No 10, of 20 May 1954), the High Authority declared in Decision No 15/55 of 28 April 1955 (*Journal Officiel,* No 10, of 30 April 1955) that Decisions Nos 15/54 and 27/54 would remain applicable 'until the entry into force of a new decision concerning the establishment of price lists for the Belgian undertakings'.

However, the list of 'selling' prices was modified shortly afterwards by Decision No 22/55 of 28 May 1955, whilst a letter to the Belgian Government of the same date replaced the price list 'for accounting purposes' by a table annexed to that letter which was headed 'Table of equalization rates applying to the various types of Belgian coal'. That table came into force on 16 June 1955.

The aforementioned decision and letter (published in the *Journal Officiel,* No 12, of 31 May 1955) form the subject-matter of the present application.

4. Summary of the submissions and arguments of the parties

A. *The admissibility of the application*

The *defendant* accepts that in so far as the letter of 28 May 1955 reduces the equalization payments made to three collieries it is individual in nature. There is no dispute as to the admissibility of the application on that point and the decision in question may be contested on all the grounds for annulment.

On the other hand, Decision No 22/55 is general in nature and may be contested only on the ground of misuse of powers affecting the applicant.

The foregoing applies to the letter of 28 May 1955 in so far as it makes the payment of equalization conditional upon an action, the main purpose of which is to withdraw that payment from undertakings which do not make the effort to re-equip regarded as possible and necessary, were the Court to consider that that section of the letter may form the subject-matter of an application for annulment, which the defendant considers very doubtful.

As regards the question whether the decisions are general in nature, the defendant maintains that a decision is general by reason of its nature as a regulation and of the extent of its area of application; it does not become individual as a result of the fact that its effects are not identical for all those to whom it applies. As regards the allegation of misuse of powers, the defendant accepts that reasons were given for that submission. Furthermore, it states that:

(a) The words 'affecting them' must be interpreted as referring to a camouflaged decision, that is, a decision which, although appearing to be general in nature, refers in fact only to one or a small number of undertakings;

(b) If the Court does not share that opinion and considers that there is a misue of powers 'affecting' an undertaking where the action taken constitutes a direct prejudice to its interests, it is still necessary to specify wherein the misuse of powers lies. The defendant maintains that there is a misuse of powers where an administrative measure is objectively in accordance with the legal rule but is vitiated from a subjective point of view as a result of the aim pursued by the administrative authority. It results from that definition that misuse of powers is a specific ground for annulment which is distinct from the three other grounds.

It must therefore be made clear which of the grounds of complaint put forward in the application fall outside the submission of misuse of powers, which is the sole submission which the applicant is entitled to put forward.

The *applicant* maintains that the price list, which forms part of Decision No 22/55, and the rate of equalization, which forms part of the letter of 28 May 1955, are indissolubly linked. In fact, the decisive legal basis for the obligations on the undertakings to draw up a price list in conjunction with the equalization arrangements, to have that list accepted by the High Authority and, finally, not to change it without the agreement of that body, is the grant of equalization.

Where, as in this instance, for certain un-

dertakings only, the price list no longer incorporates equalization or where it incorporates a rate of equalization which is different from that applied to the other undertakings, the effects of that list are also different and are thereby individual in nature. From that point of view Decision No 22/55 and the letter of 28 May 1955 are individual in nature and may be contested on all the grounds referred to in Article 33.

Even if the individual nature of the decision is not accepted by the Court the application is still admissible in all its points, first, because, as the applicant proposes to show, the decision is vitiated by misuse of powers and, secondly, because although the secondary rôle assigned to misuse of powers may be justifiable in the national system of administrative law it is not so within a system such as that set up by the Treaty, in which the submission of misuse of powers is the only one available to a person wishing to bring proceedings. For that reason the applicant considers that an administrative measure may, at the same time, be vitiated by misuse of powers and by the other grounds listed under Article 33, despite the fact that, in order for the application to be admissible, the applicant must put forward a reasoned submission of misuse of powers.

By putting forward submissions based on misuse of powers, lack of competence and infringement of the Treaty, the applicant proposes to show that the contested measures are entirely vitiated by misuse of powers and that most of them are vitiated by lack of competence or infringement of the Treaty.

The applicant considers that if the Court regards the decisions in question as being general in nature it must annul them on grounds of misuse of powers, since evidence of the other vitiating factors supports the evidence of misuse of powers.

B. *Substance*

I. Decision No 22/55 of 28 May 1955

(a) Power of the High Authority to fix the price list

1. In the opinion of the *applicant,* the High Authority could not unilaterally draw up and impose a price list either for all types of coal or for certain of them. It is clear from the Treaty that it is not for the High Authority but, under the terms of Article 26 of Convention, for the producers themselves to draw up that list.

First, since the equalization arrangements are designed 'to enable' prices charged for Belgian coal to be brought into line with the ruling common market prices, it follows that the initiative for doing so is left to the producers.

Secondly, by referring to the price list 'so fixed' the Convention shows clearly that the fixing of a price must be the result of a joint consideration with which the High Authority is in agreement.

Finally, the list shall not be changed 'without the agreement of the High Authority', which means that the High Authority is not empowered to fix it.

By acting on its own initiative to impose a price list the High Authority exceeded the limits of its powers and acted contrary to the terms of the Treaty, in that it used Article 26 (2) of the Convention for purposes for which it was not intended, that is, in order to bring about changes in the structure of the Belgian coal mining industry.

The applicant agrees with the defendant that, in accordance with Articles 25 et seq., the normal powers of the High Authority have been considerably extended. It does not follow, however, that its sovereign power to intervene is thereby also extended, since the purpose of Article 25 *et seq.* is to place the Belgian industry in a more favourable situation than that which results from the Treaty, in particular from Article 61.

The High Authority claims that the objective of Article 26 cannot be achieved by the free interplay of economic forces without any action on its part. That is, however, an unproved argument for which there is no basis in the Treaty—the necessary harmonization may be brought about just as well by raising the price of coal which is not produced in Belgium as by lowering the price of Belgian coal.

The *defendant* maintains, first, that the applicant only puts forward submissions which, if they were justified, would show

250

that the High Authority had taken action which was contrary to the terms of the Treaty or exceeded the limits of its powers. This facts alone deprives it of the possibility of showing a misuse of the powers of the High Authority affecting it.

That submission is, therefore, inadmissible.

Subject to that reservation, the High Authority maintains that the present complaint deals only with the question who is entitled to fix prices to the extent necessary to attain the objectives of Article 26 (2) (a). The High Authority does not claim that it is entitled to fix the list of selling prices of the undertakings themselves.

The High Authority maintains that, as a public authority, it is responsible for the attainment of the objectives of the arrangements referred to in Article 26 (2) (a) and that, as such, it cannot share that responsibility with private undertakings. Consequently, the High Authority is obliged to establish a working basis for the equalization system and must itself decide on the measures which are necessary for that purpose. It is on that ground that it considered the fixing of prices to be necessary and indispensable to the operation of the equalization system. In fact, in the absence of such a measure, the producers would not be stimulated to take action on their own initiative to lower prices to the extent considered necessary. Such a right of veto cannot be justified from the point of view of consumers, whose interests were the main reason for the creation of the equalization system. The producers cannot therefore be left to fix the prices.

If the fixing of prices is regarded solely as a measure adopted within the context of the equalization system, it is necessary to reject the argument put forward by the applicant that that measure can be adopted only under stricter conditions than those laid down by Article 61 of the Treaty for the fixing of maximum prices.

2. Secondly, the *applicant* alleges that the High Authority abused or misused its powers—or both—in that, contrary to its obligations, it failed to give the reasons which led it to refuse to accept the price list proposed by the producers in a letter dated 17 May 1955.

The *defendant* maintains that there can be no question of any misuse of powers since, if the High Authority had really failed to discharge an obligation imposed upon it by the Treaty, that would have constituted an infringement of the Treaty rather than the very specific type of wrongful act which is the misuse of powers.

The High Authority maintains in the alternative that it was not obliged to set out in the reasons for its decisions the opinions and proposals submitted to it which differed from the conclusions reached in that decision. The Treaty imposes no such obligation, even in those cases in which consultation with the Advisory Committee or with the Council of Ministers is compulsory.

(b) Power of the High Authority to fix prices at a reduced level

The *applicant* maintains that, having regard to the aims of Article 26 (2), the High Authority infringed that article and misused its powers by adopting, in the present state of the market, Decision No 22/55, which imposes reduced prices for certain types of coal. The recitals of the preamble to that decision and the grounds set out in the letter of 28 May 1955 show that the decision pursues objectives which are structural in nature, for which there is no legal basis in Article 26 (2); structural reform is the aim of a whole series of measures to reorganize production plant in order to make it possible to reduce cost prices.

In the letter of 28 May 1955 the High Authority justifies the reduction in prices by the argument that they are too high, which is shown by sales difficulties and by the fact that recourse is had to the equalization arrangements under subparagraph (c). In fact, there are no such sales difficulties and the Belgian producers have not resorted to the equalization arrangements under subparagraph (c) since April 1955, with the result that the decision cannot be based upon those grounds, since they are factually incorrect.

The applicant disagrees that the ruling common market prices may be equated

251

with those of the Ruhr. Until 1 April 1956 prices in the Ruhr were maintained at an artificially low level by a decision of the High Authority and since their liberalization on that date their rise has been limited by action taken by the German Government. The price prevailing in the Ruhr is only one of the prices for industrial coal on the market and the prices ruling in the Nord, Pas-de-Calais and Aix-la-Chapelle coalfields are close to Belgian prices and apply to the same volume of production. Furthermore, the applicant considers that prices should be brought into line by means of a gradual rise in those prevailing in the Ruhr. Finally, the reduction in Belgian prices can only make re-equipment more difficult, since the receipts of the undertakings will decrease as a result, despite the effect of equalization, since the latter is on a sliding scale.

The *defendant* observes that the applicant must show that the aim of the contested decision is extraneous to the terms of the Treaty. Decision No 22/55 clearly seeks to bring prices into line and that is the aim of Article 26 (2), regardless of the method applied. Furthermore, as a subsidiary point the defendant also denies having violated Article 26.

The alignment of Belgian coal prices is a structural aim and one of the important elements in the scheme established by the Convention for the gradual modification of the structure of Belgian coal production. The question is not whether Belgian coal may be sold at a higher price but whether a higher price allows Belgian coal production to be completely integrated into the common market, whatever the economic situation. When it stated that the reasons for the decision are factually inaccurate the applicant was speaking from the point of view of the short-term economic situation, and its opinion is valid only in the short term. The High Authority must respect the spirit of the Convention and consider the question from a structural point of view; the grounds put forward in its letter, including the sales difficulties, must be understood in that way.

As regards the influence of prices in the Ruhr, the High Authority maintains that it has never treated Ruhr prices as being those ruling in the common market. However, as regards industrial coal, it is indeed the Ruhr which determines the market prices since, unlike the French market which is traditionally a net importer, the Ruhr has the largest exportable surplus, which can compete with the output of other areas on their own market. It is competition from the Ruhr which is felt the most strongly on the Belgian market and it is with Ruhr prices that the Belgian prices must be brought into line.

The High Authority does not consider that the development of the common market will lead to a rise in Ruhr prices enabling prices to be brought fully into line. The question whether prices will come into line as a result of the effect of free economic forces or whether they can do so only if authoritative action is taken to lower Belgian prices is a question of economic policy and involves an assessment of an economic situation, on which the Court is not required to pronounce. In any case, the High Authority considered that alignment of prices formed part of its responsibilities and that, therefore, it could not take the risk that prices would be insufficiently aligned by the end of the transitional period.

(c) Relationship between selling prices and estimated production costs

By its reliance on the submissions of misuse of powers and infringement of the Treaty the *applicant* is alleging that when it fixed selling prices the High Authority exceeded its powers and failed to take into account estimated production costs at the end of the transitional period. In its reply the applicant states that, instead of acting on the basis of the trend in selling prices in the common market, the High Authority should have assessed estimated production costs once and for all at the beginning of the transitional period by an objective method based on the probable trend in those costs. The difference between the price and the production costs must be progressively reduced by improvements in production. During the oral procedure the applicant stated that the reduction in production costs which should theoretically

result from a real increase in output has been more than neutralized by increases in wages and social security contributions and the price of raw materials. With the agreement of producers, estimates were made in 1953 in which the level of wages and the other relevant factors were regarded as constant for five years. However, when the estimated costs were revised in 1955 the High Authority should have taken account of increases which had taken place in the meantime.

The applicant concludes that the average of current prices is already below the level of estimated production costs.

The *defendant* recalls, first, that Article 26 (2) (a) sets a double limitation: prices must be brought into line not only with estimated production costs at the end of the transitional period but also with the ruling common market prices, the latter being determined by Ruhr prices which, before the decision was adopted, showed a difference of between 80 and 100 francs for coking smalls.

The estimated production costs must enable producers to meet competition in the common market at the end of the transitional period. On the basis of that principle, therefore, Belgian production costs must fall. As regards individual production costs, that reduction will result from efforts to modernize and, as regards the average production costs of the Belgian coal mining industry as a whole, from the elimination of marginal producers.

During the oral procedure the defendant stated that the estimates made in 1953 have always been regarded as being provisional and open to subsequent revision in the light of the application of the programme for marginal mines. The High Authority took account of wage increases by authorizing a general price increase of 3 francs in 1955 but such wage increases, which are by their nature unforeseeable, are not included in the calculation of estimated production costs. Such costs may only be calcualted on the basis of the improvements in output which are to be expected during the transitional period if the incidence of wages, social security contributions and the price of raw materials remains constant. On that basis, the figures put forward by the applicant show that, even leaving aside the effects of the rationalization of marginal mines, production costs fell by 43 francs between 1952 and 1955. The cumulative effect of the reductions amounting to 39 francs ordered in 1953 and 1955 therefore remains within the limits of the reductions in cost estimated, without taking the marginal mines into account, when the contested decisions were adopted.

(d) Limitation on the power of the High Authority to intervene

The *applicant* maintains in its application that by adopting Decision No 22/55 the High Authority failed to give producers the opportunity of taking advantage of the short-term economic situation existing at that time and thereby infringed Article 5 of the Treaty.

The *defendant* has not given any direct answer to that submission and the applicant has not developed it further in its reply.

(e) Intervention by the Belgian Government

The *applicant* alleges that Decision No 22/55 was adopted as a result of intervention by the Belgian Government in order to advance the aims of its own economic policy and states that those aims do not fall within the area of competence of the High Authority or are, at the least, outside the objectives of the Treaty. The applicant develops that ground of complaint in its reply by stating, in particular, that Decision No 22/55 was adopted eleven months after the date of the report of the 'Joint Committee' in spite of a radical change which had taken place in the economic situation in the meantime.

The *defendant* replies that it acted in accordance with an earlier agreement made with the Belgian Government. It did not, therefore, misuse its powers, since the aims of its action were in accordance with the aims of the Convention.

(f) Fixing of selling prices without provision for equalization

253

According to the *applicant*, Decision No 22/55 is vitiated by lack of competence, infringement of the Treaty and abuse or misuse of powers—or both—in that it fixes or imposes a price list for certain types of coal, without making any provision for equalization to be paid for those types.

In its reply the applicant association maintains that equalization is in fact the reason for the price control exercised rightly or wrongly by the High Authority. Thus, without equalization, there is no legal basis for the maintenance of a price list and it is therefore unlawful, despite the possibility of a return to equalization. That is the case as regards the bituminous coals produced by the three collieries of the Campine.

The *defendant* acknowledges that Article 26 does not entitle it to fix prices for those types of coal which it regards as already integrated into the common market, such as certain anthracites and ¼ and ½ fat coals. If equalization is not paid in respect of unclassified bituminous coals, that is only true of the production of the Campine mines. The exclusion of unclassified bituminous coals from the Campine from the benefit of equalization in no way implies that those types are already sufficiently integrated into the common market to be removed from the equalization system. It is possible that if a new reduction were to be ordered, equalization payments would once again be made to the Campine collieries as well.

II. The letter of 28 May 1955

(a) Reduction or withdrawal of equalization payments to certain undertakings

The *applicant* maintains that the new equalization scheme distorts the system desired by the Convention and thus constitutes an infringement of the Treaty and of the Convention and an abuse or misuse of powers.

The reason which the High Authority put forward in its letter to justify the discrimination with regard to the mines in the Campine, that is, that their location is particularly favourable, can never be put forward in relation to the application of the equalization system, since the needs of the individual undertakings and their particular difficulties are governed by other provisions, such as the fourth paragraph of Article 5 of the Treaty and Article 26 (4) of the Convention. In its reply the applicant refers chiefly to Article 24, which emphasizes at subparagraph (b) the distinction existing between equalization arrangements (*mécanismes de compensation*) and equalization (*péréquation*).

That the equalization scheme applies generally to all consumers is shown by the very wording of Article 26 (2). Since it uses the term 'Belgian coal' rather than 'Belgian collieries' that provision must also be interpreted as applying to all producers. That interpretation is further corroborated by the general nature of the levy referred to in Article 25, instituted for the purposes of obtaining funds. The equalization referred to under subparagraph (a) differs in no way from that referred to under subparagraphs (b) and (c), the general nature of which cannot be disputed.

Prior to the adoption of Decision No 22/55 uniformity reigned, since the equalization arrangements differed only according to the particular type of coal and were the same for all coals of the same type in the same category. Since the criterion was the same for all collieries the principle of the selection of undertakings did not exist. The applicant considers that the aim of the equalization scheme is to maintain the level of receipts and that it applies to all Belgian mines. The system established by the contested decision introduces an arbitrary distribution of equalization payments, since it does not take into account the maintenance of the level of receipts of certain collieries. On those grounds the decision is contrary to Article 24. Furthermore, measures and practices which discriminate between producers are prohibited by Article 4 (b) of the Treaty.

The *defendant* dismisses the applicant's argument that the new method constitutes discrimination which is prohibited by the Treaty. In order to bring about a more effective distribution, undertakings were already subjected to a process of selection although in a much less highly developed form, by the system established in 1953. The objective of the equalization scheme is

to enable production to be adjusted to the conditions of the common market and to bring prices into line, not to provide compensation in respect of the inevitable fall in prices. That implies that equalization payments must be distributed in proportion to the individual needs of the recipients, as is moreover indicated by the term 'enable'.

According to the High Authority, Article 26 (2) does not lay down a uniform method with regard to the equalization payments to be made under subparagraphs (a), (b) and (c). The equalization arrangements provided for under subparagraph (a) are general in scope and are dependant for their application only on the needs of producers, while the other two subparagraphs cover special cases which do not relate directly to integration into the common market but compensate for additional price reductions for certain sales.

The High Authority contests the allegation that the principle of selection is contrary to Article 24. Instead of guaranteeing that receipts will be maintained at a specific level, that article is in fact intended to limit the closure of certain collieries. The Treaty in no way guarantees the maintenance of a certain level of receipts and it would in fact be impossible to do so, since the aggregate amount of the equalization payments must be gradually reduced.

(b) The threat to withdraw the equalization payments

The *applicant* considers that the decision contained in the letter of 28 May 1955 is vitiated by a misuse of powers in so far as it enables the Belgian Government, with the agreement of the High Authority, to withdraw the benefit of equalization from those undertakings which do not make the effort to re-equip regarded as necessary and possible. The aim of the equalization scheme is none other than to ensure that the level of receipts is maintained.

The *defendant* emphasizes that there can be no question of any misuse of powers in this instance. The authority which makes the equalization payments is entiled to demand that the aim of the equalization scheme, that is, the rationalization of the Belgian collieries, is effectively pursued. To that end it is particularly effective to threaten to withdraw equalization from those undertakings which do not make the necessary effort. The aim of that threat is to ensure that the equalization scheme performs the function assigned to it by the Convention.

# LAW

A — The admissibility of the application

The application seeks the annulment of:

1. Decision No 22/55 of the High Authority of 28 May 1955 and the price list annexed thereto, published in the *Journal Officiel* of 31 May 1955, in so far as they fix reduced prices for certain types of coal;

2. The decisions contained in the letter addressed by the High Authority to the Belgian Government on 28 May 1955 and in the table of rates of equalization annexed thereto in so far as:

(a) the withdrawal or reduction of equalization payments in the case of certain collieries leads to discrimination between producers of indentical types of coal;

255

(b) the letter states that in future equalization payments will be or may be withdrawn from certain undertakings on the ground that they are not making the effort to re-equip considered possible and necessary or are refusing to carry out the transfers or exchanges of deposits which are regarded as indispensable for a better development of the mining areas.

As regards Decision No 22/55, the applicant claims that it is individual in nature. The defendant, on the other hand, maintains that it is a general decision. In the opinion of the applicant, the individual nature of the decision may be deduced from the fact that, by reason of the indissoluble link between equalization and the fixing of prices, the effects of the price list on the three collieries of the Campine are different from its effects on the other Belgian mines, in so far as the equalization granted to the three Campine collieries is not the same as that recieved by the other mines.

Without denying that the effects of the price list will vary to the extent to which equalization itself varies, the Court rejects the applicant's argument that the variations in the effects of the price list determine the nature of Decision No 22/55. That decision was adopted within the context of a special system provided for in relation to Belgium for the duration of the transitional period by Article 26 of the Convention which applies in accordance with specific rules, however detailed and varied they may be, to all undertakings and transactions governed by that system.

Within the context of that system the decision concerns the undertakings only in so far as they are producers of coal and it in no way identifies them. If new deposits were discovered in Belgium the company working them would be bound to sell at the prices fixed by the decision. Furthermore, the territorial limitation does not imply individual identification and is justified by the fact that the Belgian industry is in need of equalization.

The fact that Decision No 22/55 lays down specific and detailed rules which are applicable in different situations does not conflict with the general nature of the decision. Article 50 (2) of the Treaty in fact provides that the mode of assessment and collection shall be determined by a general decision of the High Authority, which shows that the fact that such a decision has specific consequences which are individual and varied does not affect its nature as a general decision.

The fact that all the undertakings referred to by the decision—and only they—are grouped within the applicant association does not lead to a different result. If it were otherwise not even a decision applying to all the undertakings of the Community could be held to be general in nature if those undertakings were grouped within one single association. The question whether a decision is individual or general in nature must be decided on the basis of objective criteria, with the result that it is impossible to draw distinctions according to whether the applicant is an association or an undertaking.

As regards the decisions contained in the letter of 28 May 1955, the parties consider that the first, which relates to the reduction and withdrawal of equalization,

is individual in nature and that the second, which relates to the threat to withdraw the equalization, is general in nature. On that point the Court accepts the position adopted by the parties.

During the oral procedure the defendant reaised the question whether it is possible to regard the latter measure as a decision capable of forming the subject-matter of an application for annulment in accordance with Article 33 of the Treaty. In its letter of 28 May 1955 the High Authority accepted that equalization aid must be accompanied by a series of measures to be adopted by the Belgian Government. Furthermore, it considers that the Belgian Government ought to apply four measures, indicated at points (a), (b), (c) and (d). The action referred to under (d) is, therefore, one of the series of measures which the Belgian Government would be obliged to take if the circumstances so required. The High Authority has thus unequivocally determined the attitude which it had decided to take henceforth should the circumstances mentioned under point 2 (d) of the letter arise. In other words, it has laid down a rule to be applied if necessary. It must therefore be seen as a decision within the meaning of Article 14 of the Treaty.

Since the individual or general nature of each of the decisions has been established, the applicant is entitled to seek the annulment of the reduction or withdrawal of the equalization—the individual decision contained in the letter of 28 May 1955—by putting forward all the submissions referred to in Article 33 of the Treaty. In so far as the applicant considers that the two other decisions involve a misuse of powers affecting it, it may lodge an application for their annulment, since they are general in nature.

In order for an application for the annulment of a general decision to be admissible it is sufficient for the applicant to claim formally that there has been a misuse of powers affecting it, indicating convincingly the reasons which, in its opinion, give rise to the presumption of a misuse of powers.

The application satisfies the aforementioned conditions and is, therefore, admissible.

However, the parties disagree over the exact scope of Article 33 of the Treaty in relation to the admissibility of certain submissions made by the applicant against the general decisions.

The defendant maintains that an undertaking cannot put forward a submission of misuse of powers affecting it unless the High Authority has camouflaged an individual decision 'affecting' that undertaking beneath the external appearance of a measure laying down general rules.

That argument must be rejected. A disguised individual decision remains an individual decision, since its nature depends on its scope rather than on its form. Furthermore, such an interpretation of Article 33 and especially of the words 'affecting them' cannot be accepted, since the phrase 'affepting them' can be understood only in the sense of the words which express it, that is, where it concerns an undertaking which is the subject or at any rate the victim of the misuse of powers alleged by that undertaking. The Court considers that Article 33 clearly

states that associations and undertakings may contest not only individual decisions but also general decisions in the true sense of the term.

The defendant maintains in the alternative that the applicant is entitled to put forward only the submission of misuse of powers and that all the other submissions must be set aside. The applicant, on the other hand, considers not only that it is entitled to put forward all the grounds for annulment, provided that it pleads a misuse of powers convincingly, but also that it may bring proof of the other defects in order to support the submission of misuse of powers. It considers that the Treaty has established a legal system in which, in order for their actions to be admissible, private undertakings may only plead a misuse of powers affecting them; it would therefore be illogical to regard that submission as being merely exceptional and secondary in nature.

That argument must be dismissed. If the Treaty provides that private undertakings are entitled to seek the annulment of a general decision on the ground of misuse of powers affecting them, that is because they have no right of action on any other ground.

If the applicant's argument were correct, undertakings would have a right of action as extensive as that of the States and the Council and it would be difficult to explain why, instead of simply treating actions brought by undertakings in the same way as those brought by States or the Council, Article 33 introduced a clear distinction between individual decisions and general decisions, while restricting the annulment of general decisions in the case of undertakings to the submission of misuse of powers affecting them. The phrase 'under the same conditions' cannot be interpreted as meaning that, after establishing a case of misuse of powers affecting them, undertakings are entitled to put forward in addition the other grounds for annulment, since once the misuse of powers affecting them is established the decision in question is annulled, and that annulment does not have to be pronounced again on other grounds.

The foregoing considerations clearly contradict the applicant's illogical view that the interpretation of the Treaty must be subordinated to the desire to grant to private undertakings a right of action which is almost identical to that available to the States and to the Council. Although such a wish is understandable, there is nothing in the Treaty from which it may be concluded that private undertakings have been granted such a right to review the 'constitutionality' of general decisions, that is, their conformity with the Treaty, since they are quasi-legislative measures adopted by a public authority with legislative effect 'erga omnes'.

Although it is true that Article 33 accepts the existence of a right to bring an application for the annulment of a general decision on the ground of misuse of powers affecting an undertaking, that is an exception which is explained by the fact that, in this case, it is still the individual factor which prevails.

As against the general decisions, therefore, the applicant may rely only on the submission of misuse of powers affecting it. As regards the individual decision, since the parties are agreed that it may be so described, the applicant may rely

258

on all the submissions set out in the first paragraph of Article 33.



B — Substance

Before considering the questions relating to Decision No 22/55 in particular those which ask whether the High Authority is empowered to fix selling prices, and the grounds of complaint relating to the letter of 28 May 1955, it is appropriate, first, to consider the method of fixing of the level of estimated production costs.

As regards the assessment of that level the applicant has maintained, first, that the High Authority is not entitled to modify the initial assessment of estimated production costs, since it constitutes a 'standstill level' which was to be determined at the beginning of the transitional period and was to remain unalterable unless modified by common agreement.

That argument of the applicant must be rejected, since Article 26 of the Convention provides that the inevitable reduction in Belgian prices shall be determined by the level of estimated production costs at the end of the transitional period. It follows that when there is a change in the estimated level of production costs a new assessment must be made which takes that factor into account.

Secondly, the parties differ in law as to the method to be followed in assessing the level of estimated production costs. The Court considers that, before giving a ruling, it is necessary to establish what might reasonably be regarded as 'the approximate figure of production costs at the end of the transitional period' on the basis of estimates for each type and category of coal prepared in the light of the facts and circumstances known when that assessment is made.

To that end, the replies given by the parties to the questions raised by the Judge-Rapporteur are not sufficient.

As the parties have stated in their joint reply that such further details cannot be submitted to the Court within the time limits provided, it is appropriate to fix a new time limit for that purpose.



Upon reading the pleadings;
Upon hearing the parties;
Upon hearing the opinion of the Advocate General;
Having regard to Articles 2, 3 (c), 4, 8, 14, 33, 34, 36, 50, 60 and 61 of the Treaty and Articles 1, 8, 24, 25 and 26 of the Convention;
Having regard to the Protocol on the Statute of the Court;
Having regard to the Rules of Procedure of the Court and to the Rules of the Court concerning costs,

THE COURT

hereby:

1. **Declares that the application is admissible;**

2. **Reopens the oral procedure. It will be exclusively concerned with the level of estimated production costs for each type and category of Belgian coal at the end of the transitional period and their significance in relation to the prices fixed by Decision No 22/55;**

3. **Fixes the date on which the parties must lodge at the Court Registry the additional information and specifications indicated in the present judgment at 1 September 1956 and that of the oral procedure at 20 September 1956 at 10.30 a.m.;**

4. **Reserves the costs.**

|        Pilotti         |        Rueff         |         Riese         |
|                        |                      |                       |

| Serrarens | Delvaux | Hammes | van Kleffens |

Delivered in open court in Luxembourg on 17 July 1956.

M. Pilotti                                                        A. van Kleffens  
President                                                         Judge-Rapporteur

A. Van Houtte  
Registrar

## OPINION OF MR ADVOCATE GENERAL LAGRANGE  
## OF 12 JUNE 1956[2]

Summary

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . .  261  
I   —  *The texts* . . . . . . . . . . . . . . . . . . . . . . . . 261  
II  —  *The contested decisions* . . . . . . . . . . . . . . . . . 263  
III  —  *The conclusions contained in the applications* . . . . . . 265  
IV  —  *The submissions relied on in the applications* . . . . . . 265  
V  —  *The admissibility of the applications from the point of view of Article 33* . . . . . . . . . . . . . . . . . . . . . . . . 266  
      Nature of the letter of 28 May 1955 as a decision in so far as it refers to the withdrawal of equalization . . . . . . . . 267

1 — Translated from the French.