# EXHIBIT 19

It is only exceptionally that the Court may, in application of the general principle of legal certainty inherent in the Community legal order and in taking account of the serious effects which its judgment might have, as regards the past, on legal relationships established in good faith, be moved to restrict for any person concerned the opportunity of relying upon the provision as thus interpreted with a view to calling in question those legal relationships.

2. The general arrangements regarding the financial provisions of the Treaty are governed by the general principle of equality which requires that comparable situations may not be treated differently unless difference of treatment is objectively justified.

It follows that the revenues which are contributed to the Community budget and the financial advantages charged thereto must be so arranged and applied as to constitute a uniform burden or to confer uniform benefits on all persons who meet the conditions specified in the Community provisions on such burdens or advantages.

3. In so far as no provisions of Community law are relevant, it is for the national legal system of each Member State to lay down the detailed rules and conditions for the collection of Community revenues in general and agricultural levies in particular and to determine the authorities responsible for collection and the courts having jurisdiction to decide disputes to which that collection may give rise but such procedures and conditions may not make the system for collecting Community charges and dues less effective than that for collecting national charges and dues of the same kind.

A special system of national rules relating to the collection of Community charges and dues which restricts the powers granted to the national authority to ensure the collection of those charges as compared with the powers granted to the same authority in regard to national charges or dues of the same kind is therefore not in accordance with Community law.

In Joined Cases 66, 127 and 128/79

REFERENCE to the Court under Article 177 of the EEC Treaty by the Corte Suprema di Cassazione [Supreme Court of Cassation], Rome, for a preliminary ruling in the action pending before that court between

AMMINISTRAZIONE DELLE FINANZE v SALUMI

AMMINISTRAZIONE DELLE FINANZE [Italian Finance Administration]

and

S.r.l. MERIDIONALE INDUSTRIA SALUMI;

AMMINISTRAZIONE DELLE FINANZE

and

FRATELLI VASANELLI;

AMMINISTRAZIONE DELLE FINANZE

and

FRATELLI ULTROCCHI

on the temporal scope of interpretative judgments delivered by the Court of Justice under Article 177 of the EEC Treaty,

THE COURT

composed of: H. Kutscher, President, A. O'Keeffe and A. Touffait (Presidents of Chambers), J. Mertens de Wilmars, P. Pescatore, Lord Mackenzie Stuart, G. Bosco, T. Koopmans and O. Due, Judges,

Advocate General: G. Reischl
Registrar: A. Van Houtte

gives the following

JUDGMENT OF 27. 3. 1980 — JOINED CASES 66, 127 AND 128/79

# JUDGMENT

## Facts and Issues

The facts of the case and the arguments advanced by the parties in the course of the written procedure may be summarized as follows:

### I — Facts and procedure

1.   Most if not all of the Council regulations on the common organization of the agricultural markets which provide for the charging of import levies provide that the amount of the levy which is to be charged is that applicable "on the day of importation". In its judgment of 15 June 1976 (Case 113/75, *Giordano Frecassetti* v *Amministrazione delle Finanze dello Stato,* [1976] ECR 983), the Court of Justice interpreted the expression "day of importation" as being that "on which the import declaration for the goods is accepted by the customs authorities". That judgment was delivered in a dispute relating to the question whether, where the levy is reduced after the date on which the import declaration is submitted, the national authorities may apply to *agricultural levies* the Commission Recommendation of 25 May 1962 (Journal Officiel 1962, p. 1545) with regard to *customs duties* which recommended that where the customs duty was reduced after the import declaration was submitted but before the goods were released for home use, the Member States should apply the most favourable customs duty. In the above-mentioned judgment, the Court rejected application of that rule with regard to levies; the amount of the levies due must

remain fixed once and for all at the amount applicable at the date on which the import declaration is accepted by the customs authorities.

2.   In Italian law, according to Article 6 (1) of the Introductory Provisions to the Customs Tariff approved by Decree No 723 of the President of the Republic of 26 June 1965 (Supplement to the Gazzetta Ufficiale [Official Gazette] No 160 of 1 July 1965) the rate as regards customs duties applied to imported goods is that in force "at the date on which the import declaration is accepted by the customs authorities". This provision thus corresponds to the sense which the Court of Justice gave to the concept of "day of importation" as regards levies in the judgment in the *Frecassetti* case. The rule laid down in Article 6 (1) was applied by the Italian authorities both for the purpose of fixing the rate of the *agricultural levies* and for the purpose of fixing that of the *customs duties.* Article 6 (2) however provides also that where the duty is changed after the date referred to in paragraph (1), the customs authorities may, at the request of the importer, apply the most favourable rate provided that the goods have not been released to the importer. This rule too was applied by the Italian authorities both as regards agricultural levies and as regards customs duties.

3.   When the judgment in the *Frecassetti* case was delivered, the Italian Government, to comply with it,

1240

AMMINISTRAZIONE DELLE FINANZE v SALUMI

supplemented Article 6 (2) of the above-mentioned Preliminary Provisions and specified that the option of applying the most favourable rate does not extend to agricultural levies or to the other charges laid down within the context of the common agricultural policy. That new provision was laid down by Article 1 (3) of Decree No 695 of the President of the Republic of 22 September 1978 (Gazzetta Ufficiale 1978 No 319, p. 8235). Article 3 of the decree states that the provision excluding levies from the option of the application of the most favourable rate is to enter into force as from 11 September 1976, the date on which the judgment in the *Frecassetti* case was published in the Official Journal of the European Communities.

relating to them was upheld by the Tribunale, Genoa, and the Italian authorities then brought the dispute before the Corte d'Appello [Court of Appeal], Genoa. That court dismissed the appeals by judgments of 6 and 9 February 1976, observing that the fixing of the rate of the agricultural levy came not within the national provisions as regards customs duty but within Community regulations according to which the rate applicable is that of the day of importation. The Corte d'Appello considered that the day of importation coincided "with that on which the goods are definitively and irrecoverably brought on to the customs territory and put into free circulation (in cui la merce viene definitivamente e irrevocabilmente introdotta nel territorio doganale e messa in libera circolazione).

4. However, before the date of the judgment in the *Frecassetti* case, the Finance Administration had already required the three undertakings Salumi, Vasanelli and Ultrocchi to pay additional amounts on levies relating to imports of beef and veal because the rule known as that "of the most favourable rate" had been applied by mistake.

At an early stage in the dispute, the Italian authorities appear to have relied primarily if not solely on the infringement of the provision of national law according to which the "most favourable rate" may only be granted at the request of the importer, a request which was not made in that case.

The objection made by the three undertakings in question against the orders

This interpretation did not coincide with that which the Court of Justice was subsequently to accept in the judgment in the *Frecassetti* case. The dispute went before the Corte di Cassazione. In the course of the proceedings Decree No 695 of the President of the Republic of 22 September 1978 amending Article 6 of the "Preliminary Provisions of the Customs Tariff" was adopted but limiting, as stated above, the retroactive effect of the new provision to the period after 11 September 1976. At the level of the Corte di Cassazione the controversy extended to the question whether the limitation, by the mention of that date, of the declaratory *ex tunc* effect of the judgment in the *Frecassetti* case was or was not in conformity with Community law. The Italian authorities maintained the viewpoint that that limitation was entirely in conformity with Community law, since the national legislature had merely accepted a principle belonging to the Community legal order upon which

1241

JUDGMENT OF 27. 3. 1980 — JOINED CASES 66, 127 AND 128/79

the Court of Justice had based its decision in the judgment of 8 April 1976 (Case 43/75, *Defrenne*, [1976] ECR 455) and upon which the Commission based its memorandum No 75425312 of 30 May 1975 sent out as a result of the judgment delivered on 12 November 1974 in Case 34/74, *Roquette*, [1974] ECR 1217.

Thus the problem arises whether, where the interpretation of a rule of Community law is in doubt and where a misinterpretation shared by the parties in question has given rise meanwhile to payments which were not owed or to the failure to collect sums payable, the correct application of the Community rules may only be required as from the date on which the Community rules were authoritatively interpreted and the points of conflict existing between those Community rules and the provisions of internal law were determined by the competent authority.

5.  The Corte di Cassazione pointed out that the mention of the date of 11 September 1976 in the Decree of the President of the Republic of 22 September 1978 may be interpreted in two different ways, either that it merely constitutes an opinion of the legislature which does not bind a person interpreting the law or on the contrary that it has a legislative value in the sense that for the period before 11 September 1976 in spite of the judgment in the *Frecassetti* case, the Italian authorities are prohibited from recovering the difference between the amount of the levy in force on the day of importation and the smaller amount which it in fact charged at the date on which it applied to the levies the rule of the "most favourable rate". The court considered that the second hypothesis was such as to "raise doubts as to the chronological

framework of validity of the effects of interpretative judgments delivered by the Court of Justice".

6.  This finding has led the Corte di Cassazione to request the Court of Justice to give a preliminary ruling on the following two questions:

"(a)  For the purpose of Article 177 of the EEC Treaty where, in respect of imports and with regard to relationships as yet undefined according to their own national law, the national authorities of a State have charged amounts which they should not have charged or, on the other hand, not levied amounts which they should have levied pursuant to the Community provisions applicable in that sector according to the interpretation subsequently placed upon them by judgment of the Court of Justice, does that judgment also apply to such relationships within the domestic legal system of the Member State or not, or does it apply subject to specific limits and on specified conditions: if the latter is the case, what are those limits and conditions?

(b)  Also for the purposes of Article 177 of the Treaty, is it prohibited or required by Community law or irrelevant in relation thereto that in respect of such relationships those concerned are empowered under national law to institute proceedings to claim or recover, on the basis of the interpretation provided by the judgment of the Court of Justice, amounts due but not collected or amounts paid in error?"

1242

AMMINISTRAZIONE DELLE FINANZE v SALUMI

The orders containing the references were lodged at the Court Registry on 20 April 1979 and 9 August 1979.

By order of 12 September 1979 the Court decided to join these cases for the purpose of procedure and judgment.

In pursuance of Article 20 of the Protocol on the Statute of the Court of Justice of the EEC the Commission of the European Communities, represented for this purpose by Gian Piero Alessi, a member of its Legal Department, acting as Agent, the defendants in the main action, represented for this purpose by L. Cimaschi, of the Genoa Bar, and by G. M. Ubertazzi and F. Capelli, of the Milan Bar, and the Italian Government, represented for this purpose by its Ambassador Adolfo Maresca, acting as Agent, assisted by A. Marzano, Avvocato dello Stato, submitted written observations.

On hearing the report of the Judge-Rapporteur and the views of the Advocate General the Court decided to open the oral procedure without any preparatory inquiry.

II — Written observations submitted under Article 20 of the Protocol on the Statute of the Court of Justice of the EEC

A — *Observations of the defendants in the main action (Salumi, Vasanelli and Ultrocchi)*

After recalling the facts of the case and the course of the procedure before the national courts, the defendants, by way of preliminary observations, emphasize the fundamental difference between, on the one hand, the legal conditions which were at the basis of the judgments delivered by the Court of Justice relating to national charges recognized as having an effect equivalent to customs duties — judgments which gave rise to actions for recovery of money paid but not owed against the national authorities — and, on the other hand, those which resulted in the interpretation by the Court of Justice of the concept of "day of importation" in the *Frecassetti* judgment.

The purpose of the observations submitted by the defendants is to consider whether these differences must have the result of providing a different solution in the two cases to the problem of the effect in time of the judgments delivered by the Court of Justice giving an interpretation in pursuance of Article 177 of the Treaty.

As the Community texts have no special provision regarding the effect *ratione temporis* of preliminary rulings the criteria relating to such effect must be found in the case-law of the Court. That case-law includes numerous judgments establishing as from what date a Community rule has direct effect and from what date "individual rights which the courts must protect" are acquired. However, it was only as from the judgment of 8 April 1976 (Case 43/75, *Defrenne*, [1976] ECR 455) that the Court had to consider the temporal scope of its judgments. Emphasizing the uncertainty arising for the national authorities from the temporal effect of preliminary rulings on matters of interpretation the defendants remark that the alternative between the effect *ex tunc* or the effect *ex nunc* of a judgment is less straightforward than appears at first sight. In fact the retroactive effect might

be taken as being contemporaneous with (a) the rule interpreted; (b) the time at which it took direct effect; (c) other facts in relation to the provision in question; (d) the origin of the dispute or the application to the national court; or, again, (e) the reference for a preliminary ruling. On the other hand the formula of the *ex nunc* effect might relate to the day of the reading of the judgment at the hearing, that of its communication to the court which requested the ruling or, again, that of the publication of the operative part in the Official Journal of the European Communities.

However, the defendants limit themselves to considering only the criteria to be taken into consideration in support of one or other of the two main solutions, namely the *ex tunc* effect or the *ex nunc* effect, and considering the problems which they raise.

(a) As regards the *ex tunc* effect

A first factor in support of the argument that judgments giving preliminary rulings take effect *ex tunc* follows directly from the function of interpretation with which the Court is entrusted. To give an interpretation is to recognize and to make manifest the meaning of a provision and the meaning thus made clear resides from the beginning in the provisions interpreted. This opinion, which flows from the declaratory nature of the judgment, has often been used by legal commentators in national law and it is not surprising that the authors of Community law should have had recourse to the same type of argument; nevertheless, this would be to neglect the experience arising from the procedure under Article 177 and the diversity of the Court's judgments both as regards the

interpretative criteria and the results of the interpretation.

As regards the interpretative criteria, a rapid survey of the present cases must act as a warning against excessive simplifications.

When it has been possible for the questions put to the Court of Justice by the national courts to be resolved either on the basis of the preparatory studies or on that of the statement of reasons on which the measure being interpreted is based or of the various linguistic versions or, yet again, by reference to the natural meaning of the words the Court has restricted itself to declaring the content of the provision in question and has expressed the "intention" of the Community legislature at the time the provision was adopted.

In the case of a systematic interpretation, if it is based on aspects of the system prior to the provision in question or contemporaneous with it, it is permissible to suppose, at least in the abstract, that the interpretation relates equally to the only meaning to which the "Community legislature" was in a position to refer at the time. On the other hand where the systematic method relates to the system in force at the time when the Court gives its decision and where the system has undergone changes of which the interpretative judgment takes account, only a fiction would make it possible to consider such a judgment as a declaration of the original content of the provision interpreted.

Recourse to analogy, to natural justice, to the comparative method and resort to

AMMINISTRAZIONE DELLE FINANZE v SALUMI

the general principles of the legal systems of the Member States also raise problems.

Certain criteria thus lead to a simple declaration of the content of the provisions interpreted, which suggests the *ex tunc* effect, but others relate to developing and supplementing the Community legal order and in such a case if the judgment of the Court is not purely declaratory it would be difficult to concede that it must necessarily have retroactive effects.

The result of judgments delivered by way of preliminary ruling is also very variable. Some of them establish the meaning of a text in terms which are extensive or restrictive, others relate to the binding effect of a Community measure or the direct applicability of a Community rule or again read into a Community measure effects not only between Member States or the Community institutions on the one hand and the individuals on the other but also between individuals. Although when the Court restricts itself to declaring the meaning of a provision it is permissible to reflect spontaneously that the interpretation is valid from the moment when the provision in question came into force, the position would be different when the judgment fills gaps in the system by offering a kind of pretorian law. In the first instance there is no reason why the interpretive judgment should not have a retroactive effect when it brings into being for individuals *vis-à-vis* Member States individual rights which national courts must protect, but if it brings into being obligations for individuals it is necessary to check

whether the *ex tunc* effect of the judgment in question is not in conflict with the elementary requirements of legal certainty. The retroactive effect of the interpretative judgment does not raise difficulties in so far as the meaning attributed by the Court to the provision in question constitutes one of the possible meanings worked out on the basis of common experience. Outside such cases the *ex tunc* effect of the judgment may be conceded only to the extent to which Community law does not on certain conditions exclude the retroactive effect of its legislation.

According to the defendants in the main action it is also necessary to check whether the *ex tunc* effect of the interpretative judgment is justified in the light of the structural relationships between national procedure and the procedure for preliminary rulings as well as in the light of the validity *ultra partes* of the judgment given by the Court.

As the procedure for a preliminary ruling is set in motion only following a decision by a national court to submit a question it is reasonable to deduce that the judgment of the Court must have retroactive effect so as to resolve the dispute between the parties to the main action. From this first finding it is permissible to confirm the principle that interpretative judgments given in pursuance of Article 177 in general have an effect *ex tunc*. This line of argument is the more plausible because it has also been applied with regard to the temporal effect of a judgment by which the Italian Constitutional Court declares a national law unconstitutional. Such a declaration is tantamount to a declaration of the invalidity of the unconstitutional

provision and such invalidity goes back to its origin. However, according to the defendants in the main action, it does not seem possible to transpose that argument to the interpretation of Community law because the judgment of the Court which indicates the correct interpretation of the provision in question involves the illegality of a different interpretation, but does not make it possible to infer the invalidity of the provision if and so far as it has been interpreted in a manner now declared illegal.

The effect *erga omnes* attributed, subject to certain reservations, to the interpretation in a preliminary ruling has led certain writers to attribute a "quasi-authentic" value to the case-law involving Article 177. It might therefore be tempting to attribute a retroactive effect to the preliminary ruling as to the authentic interpetation. This line of argument is confirmed in certain judgments of the Court where, at the express request of the national court, the Court of Justice, after stating that a Community provision has direct effect, has indicated that it had an effect *ex tunc.* However, it would be risky to claim to find in such judgments a compelling indication of general validity. Not only do such judgments concern individual provisions but there is also evidence pointing in the opposite direction, either with regard to the effects of the rule interpreted or to those of the judgment giving the interpretation. When asked the precise date on which a provision has acquired direct effect the Court sometimes prefers to use an essentially ambiguous formula by stating that the direct effect of the provision under interpretation goes back "at the latest"

to a certain date. As regards the effect of the judgment, in Case 43/75, *Defrenne,* referred to above, the Court, after mentioning the exceptional nature of certain circumstances in the case under consideration indicated that the retroactive effect of its judgment was limited.

To these doubts there may be added others proceeding both from a forced approximation between the preliminary interpretation and the authentic interpretation and from the effects which it seems necessary to attribute to the authentic interpretation; this type of argument in fact appeals too widely to analogy and metaphor; the retroactive effect of the authentic interpretation is subject to restrictions and reservations.

(b) As regards the *ex nunc* effect

According to the defendants in the main action it is not appropriate either to lay down as a principle that the interpretative judgment delivered on the basis of Article 177 of the EEC Treaty has an *ex nunc* effect in the absence of an express provision making it possible for the Court to give an interpretative judgment directed solely towards the future. Such a solution has the most serious inconveniences when the Court restricts itself to giving an interpretation in the simplest and strictest sense of the term. The *ex nunc* effect of a judgment, far from being justified by recourse to a general principle, consequently cannot be

accepted except on the basis of the circumstances of the individual case and it is not surprising that it was in the *Defrenne* case, referred to above, that the Court took care to give reasons for its decision.

(c) Proposed solution

The defendants in the main action conclude from the foregoing that it is impossible to come to a general conclusion either on behalf of the principle of the *ex tunc* effect or of that of the *ex nunc* effect of interpretative judgments delivered in pursuance of Article 177 of the EEC Treaty. On the other hand the solution of this problem depends upon the specific nature of the various cases in which the Court is called upon to interpret Community law by way of preliminary ruling and they base their argument on the passage in the *Defrenne* judgment according to which the practical consequences of any judicial decision must be carefully taken into account (([1976] ECR at p. 480) and on the fact that it is appropriate to adopt a pragmatic rather than a dogmatic approach. They refer also to the opinion of Mr Advocate General Trabucchi in Case 2/73 *(Geddo,* [1973] ECR 884) and that of Mr Advocate General Capotorti in Case 50/76 *(Amsterdam Bulb,* [1977] ECR 156). The determination of the effect *ratione temporis* of each interpretative judgment is a matter for the Court of Justice, just as it is for the Court to determine the meaning of the provision interpreted.

However, the defendants say that it is appropriate to consider whether the proposed solution is not subject to serious difficulties at the time of the application of interpretative judgments in the national legal systems. When the judgment itself lays down what its effects in point of time are to be there are no special problems but difficulties may arise when the Court, as is most frequently the case, does not expressly decide the date on which the provision interpreted is to take effect. The answer depends on the interpretative criteria applied or on the results of the interpretation itself. An interpretation based on the preliminary studies would imply that the judgment in question takes effect *ex tunc,* whereas an interpretation based on the evolution of the legislative and socio-economic framework would suggest an effect *ex nunc.* An interpretative judgment which is purely declaratory must have an effect *ex tunc* whereas a judgment introducing new rules into the system or applying unwritten principles must on the other hand have an effect *ex nunc.* The context within which the judgment is delivered should also provide important evidence.

Whilst admitting that the scope of the judgment in Case 113/75, *Frecassetti,* is purely declaratory and has retroactive effect, the defendants in the main action take the view that it is clear that the extension of its effects to relationships prior to the judgment cannot take place so as to breach the fundamental principle of the protection of legitimate expectation. It would be unjust to claim, during the five-year prescription period after the import transaction, the payment of a difference in levy which the trader no longer has the opportunity to recover from his assigns. It does not need an analysis in depth to determine intuitively that the principle of the protection of legitimate expectation, in the absence of

JUDGMENT OF 27. 3. 1980 — JOINED CASES 66, 127 AND 128/79

a breach of Community rules by the trader in good faith must be applied to the facts of this case. Having regard however to the seriousness of the economic consequences which might follow from an incorrect application of the *Frecassetti* judgment the defendants take the view that it is necessary to give thorough examination to the problem. They recall that the principle of the protection of legitimate expectation is part of the Community legal order and point out that Mr Advocate General Mayras in his opinion in Joined Cases 44 to 51/77, *Union Malt* v *Commission*, [1978] ECR at p. 91, summarized as follows the conditions required for traders to be able to make use of the principle of the protection of legitimate expectation:

(a) They must be able to claim an established right or personal interests worthy of protection;

(b) The commercial transactions for which they claim that right or those interests must have been irrevocably entered into;

(c) The interference with that right or with those interests must have been unforeseeable and must have occurred without warning;

(d) Finally, there must be no overriding public interest preventing such personal interests from being taken into account.

The defendants take the view that all the conditions required for the application of the principle of the protection of legitimate expectation are satisfied in this case. They have an interest worthy of

protection and their commercial transactions are the consequence of irrevocable agreements contracted definitively in the past at a time prior to the delivery of the *Frecassetti* judgment. It would not be possible to find circumstances in which the change in the legal situation could have been so unforeseeable. In this respect the defendants refer to the administrative practice of the Italian customs authorities and the consistent case-law of the Corte di Cassazione and of the lower Italian courts until the *Frecassetti* judgment. They also refer to the observations lodged by the Commission in this case and the fact that the Community institution had approved the practice of the Italian authorities. To clinch the matter they also refer to a series of measures and proposals emanating from the Community institutions, in particular a document from the Committee on Customs Legislation dated 7 February 1972 (Administration of the Customs Union 188/72), a preliminary draft directive of 27 December 1972 (GUD 1049/72), a documentary note of 7 June 1973 (GUD 461/73), a preliminary draft of 24 July 1973 (GUD 569/73), a proposal for a Council directive of 21 December 1973 (Official Journal 1974, C 14, p. 45), which has meantime become Council Directive No 79/695/EEC of 24 July 1979 on the harmonization of procedures for the release of goods for free circulation (Official Journal L 205, p. 19), opinions of the European Parliament and of the Economic and Social Committee on the proposal for a directive (Official Journal 1974, C 85, p. 24, and C 125, p. 10) and finally internal documents drawn up by the institutions after delivery of the judgment in Case 113/75, such as the note of 23 August 1976 of the Working Party on Economic Problems (R/12002/76), a note of 12 April 1977 (R/1771/77), a note of 16 May 1977 (R/1161/77) and a proposal for a directive of 28 July

1977 (R/1876/77), Article 12 (2) of which entirely confirms the principle laid down by the Court of Justice in the judgment in Case 113/75.

For the rest the defendants in the main action take the view that the conduct of the Commission has been such as to make it liable inasmuch as, if the traders were not to be protected by the principle of legitimate expectation, they would be in a position to require it to pay compensation for the damage suffered by them.

Finally the fourth condition, namely that there must be no overriding public interest preventing their personal interests from being taken into account, is also satisfied in this case. The defendants take the view that in fact there is no problem in applying as regards the future Community rules in the sense in which they were interpreted by the Court since the relevant transactions have all been performed and terminated before the *Frecassetti* judgment was delivered and that from that point onwards all the Member States, including the Italian State, conformed immediately with the principle laid down by the judgment of the Court of Justice. It follows from the proposal for a regulation for the collection of duties in respect of traders, published in Official Journal C 138 of 11 June 1977, that the legitimate expectation of traders in good faith is always protected in cases similar to this one. It may be deduced from the second recital in the preamble thereto and more particularly from Article 5 of the proposal that no action may be initiated by the competent authorities for collection where import duties or export duties subsequently found to be lower than the amount which was legally due have been calculated on the basis

of information determined by the competent authorities themselves or recognized by them as being in accordance with their requirements where it is established that the declarant had acted in good faith and had complied with all the provisions laid down in the rules in force.

According to the defendants in the main action the Italian State complied with that proposal for a regulation by adopting Article 3 of Decree No 695 of the President of the Republic of 22 September 1978. That decree is accordingly entirely compatible with Community law.

In conclusion they claim that even if the Court of Justice were to decide that in principle its interpretative judgments delivered in pursuance of Article 177 have a declaratory scope and an effect *ex tunc* and that this in particular is the position with regard to the judgment in the *Frecassetti* case, it would be appropriate for the Court to acknowledge the necessity for protecting the rights of traders who, in good faith, have scrupulously observed the rules in question as interpreted before the judicial decision modifying the points of reference.

*B — Observations of the Italian Government*

The Italian Government, after recalling the history of the cases before the national court, draws the Court's attention to the connexion between them and Case 61/79, *Amministrazione delle Finanze dello Stato v Denkavit Italiana.* It emphasizes that its observations in these cases apply also to Case 61/79.

1249

The question of principle raised in the two groups of cases in question has already been mentioned in Case 33/76, *Rewe-Zentralfinanz eG and Rewe-Zentral AG* v *Landwirtschaftskammer für das Saarland* [1976] ECR 1989, at least as regards the duty to repay sums levied but not owed. In the judgment delivered on 16 December 1976 by the Court it was not however necessary to give a ruling on the question which is expressly put before it in these cases.

— The temporal scope of an interpretative judgment

Recalling and criticizing the arguments which had been submitted in Case 33/76, the Italian Government emphasizes in particular that the solution which it put forward arose from the judgment delivered on 8 April 1976 in Case 43/75 *(Gabrielle Defrenne* v *Société Anonyme Belge de Navigation Aérienne Sabena* [1976] ECR 455). In that judgment the Court acknowledged the direct effect of Article 119 of the EEC Treaty but limited its temporal application to the period after the date of its judgment, except as regards those workers who had already brought legal proceedings or made an equivalent claim.

According to the Italian Government, the criteria laid down in the *Defrenne* case are also decisive in cases such as these. Although the limitation of the direct effect of Article 119 was decided only for reasons of expediency, the acknowledgement of a right to the repayment of sums paid at a time when it was not established that they were charges having an effect equivalent to customs duties but when, on the contrary, it was generally accepted that

they were not of that nature, would be incompatible not only with the objectives of Article 13 (2) of the EEC Treaty but also with those of secondary Community law by reason of the additional adverse effect on intra-Community trade which would result from this.

Examining the opinion expressed in particular by the Advocate General in Case 33/76 *(Rewe)*, according to which the situation in that case was not comparable to that in the *Defrenne* case, the Italian Government considers that it remains to be considered whether, in view of the discrimination resulting from the various national limitation periods, the same importance should not be attached to the financial burden resulting from the duty of repayment as that attached to the harmful consequences of complete retroactivity in the *Defrenne* case, having regard, in particular, to the provisions of Article 6 (2) of the Treaty.

Thus it is necessary to examine whether, as a result of a judgment of the Court setting aside an interpretation until then generally accepted, traders are given the right, which they had not previously exercised, to claim the repayment of certain duties and charges. Along the same lines, it is necessary to examine whether in similar circumstances the Member States are given the right to claim sums to which they previously considered they were not entitled when a judgment of the Court shows that in fact those sums were legally payable.

As regards the first case, it might be considered that a solution could easily be found if reference were made to the provisions in each national legal order governing the *condictio indebiti*. This reference to national law would however

AMMINISTRAZIONE DELLE FINANZE v SALUMI

result in different solutions since the possibility of repayment might even be totally excluded by national legislation, as shown by the judgment of 26 June 1979 (Case 177/78, *Pigs and Bacon Commission* v *McCarron and Company Limited*).

The solution should therefore be sought within the context of the Community legal order. The repayment of sums levied by way of duties acknowledged to have an effect equivalent to that of customs duties can only be permitted as from the judgment of the Court of Justice in which it was held that the duty levied had an effect equivalent to that of customs duties or, possibly, as from the date of the Commission directive within the meaning of Article 13 (2) of the EEC Treaty.

In support of this argument, the Italian Government claims that the scope of the concept of a charge having an equivalent effect has not been defined by the Treaty. Pursuant to Article 13 (2) of the Treaty, the Member States should have progressively abolished charges having an effect equivalent to customs duties during the transitional period and according to a timetable determined by the Commission by means of directives based on the rules laid down in Article 14 (2) and (3) and directives issued by the Council pursuant to Article 14 (2). However, it is common knowledge that the Commission specifically determined charges having an equivalent effect initially on the basis of an analytical examination of information supplied by the various Member States in reply to a questionnaire and afterwards on the basis of an independent examination; this work has not yet been completed as regards the six old Member States although the transitional period expired several years ago and it has only just been started as regards the taxation of the new Member States.

With regard to the common agricultural policy, the regulations provided directly that the levying of charges having an equivalent effect was incompatible with the application of the system of levies even before the Commission adopted the first directive on charges having an equivalent effect, dating from 15 October 1963, without supplying accordingly any information or details enabling those charges to be determined.

The Italian Government emphasizes the irresolution of the services of the Commission and the fact that it was necessary for the Court of Justice to specify through a uniform development of its case-law the conditions which had to be satisfied in order for a charge or a duty levied on imports to be acknowledged as having an effect equivalent to customs duties. In these circumstances it is impossible to lay the blame on the Member States for maintaining, until the interpretative judgment, charges having an equivalent effect, otherwise it would be necessary to consider that every customs official should have independently taken responsibility for deducing the consequences of the direct effect of the prohibition on charges having an equivalent effect before the Commission had even issued the appropriate directives and before the interpretative judgment of the Court.

The Italian Government also maintains that there is a difference between the right of an individual not to pay a charge having an equivalent effect which arises from a directly applicable Community provision and the duty of repayment of the State resulting not from the directly applicable provision but rather from the situation in which it has been found that a State has "failed to fulfil its obligations under the Treaty". It claims that the scope of the concept of a failure to fulfil

1251

an obligation in the Community legal order is, by reason of the institutional objectives of the Communities, different from that of the same concept in national law. A State which has failed to fulfil its obligations has not been compelled by the Community institutions to recover the aid or the export refunds granted in breach of Community law. It also argues from Memorandum No 75425312 of the Commission of 30 May 1975 issued as a result of the judgment delivered on 12 November 1974 in Case 34/74 *(Société Roquette Frères* v *French State* [1974] ECR 1217) on the interpretation of Article 4 a (2) of Regulation No 974/71 of the Council. In that memorandum, the Commission took the view that, by reason of the special circumstances of the case, Member States were not under a duty to recover the sums which should not have been paid if the article in question had been interpreted to the effect indicated by the Court. It follows logically that a different criterion cannot be used within the context of the same legal relationship and by reference to the same provision according to whether certain sums must be recovered or repaid by the national authorities. Thus the duty of repayment should not necessarily be considered as the consequence of the levying of sums not owed.

The Italian Government emphasizes that the solution which it proposes is based on the judgment delivered in Case 43/75 (the *Defrenne* case, quoted above) in which the Court expressly, although by way of exception, makes a distinction between the finding that there has been a failure by a Member State to fulfil its obligations under the Treaty and the duty retroactively to eliminate the harmful effects produced by that failure to fulfil its obligations. The reasons which led the Court to depart from the purely declaratory effect of its judgments, in other words the economic consequences, the conduct of the Member States, the absence of action by the Commission and the incorrect impression of the effect of the applicable Community rules, are also valid as regards charges having an effect equivalent to customs duties and, in general, as regards the case of sums levied on the basis of a misinterpretation of the Community rules.

The economic consequences result from the simultaneous repayment of sums levied for years without any dispute and in the belief that they had to be paid; that damage is variable and discriminatory according to the limitation periods laid down by each national legal system. The conduct of the Member States and the Commission's lack of action were also decisive, since the sums in question were paid and levied in the general and obvious belief that there was no breach of the Community rules. These arguments are particularly relevant as regards the system of public health inspection dues because of the complexity of the latter. It was not until 1970 when the Community rules on the common organization of the markets in the sector of the various products subject to public health inspections had already been in force for several years that the Commission took action against two Member States only; that action had no

AMMINISTRAZIONE DELLE FINANZE v SALUMI

concrete results for approximately seven years and was only resumed after the various judgments delivered by the Court of Justice.

— Passing on the charge in question

The Italian Government then emphasizes that the repayment of the sums paid to the European Communities or to the Member States as a result of a misinterpretation of the Community rules results in an actual enrichment of the traders concerned or more exactly in a higher and unforeseen profit margin because those traders have obviously passed on the corresponding amounts in the calculation of their production costs.

*Article 92 of the EEC Treaty*

A *restitutio in integrum* which proves more harmful than the damage for which it is to compensate is also impossible in the light of the Community rules on competition. Repayment would result in substance in an aid to national traders who have passed on to their customers the burden improperly levied upon them and would cause additional damage to exporters of the other Member States who have already suffered the actual damage of a reduction in their export transactions. According to the Italian Government, the retroactive elimination of a difference in treatment which in fact has already irreversibly affected business relationships by making them subject to a system different from that intended by

the Community legislature produces an effect contrary to the objectives of the Community provisions, in other words free movement of goods on the Community territory and a system of free competition between the traders concerned. It is therefore necessary to acknowledge the relevance of the principle *cessante ratione legis, cessat et ipsa lex* and not to apply Community provisions which are incompatible with the objectives pursued.

As regards the analagous but converse case in which the misinterpretation of the Community rules has not given rise to the levying of duties which were, on the contrary, payable, it is, according to the Italian Government, certainly more difficult to consider the arguments which it put forward in relation to the first case to be relevant. There is a fundamental difference in that the levying of sums payable which have not however been paid and levied by mistake is in accordance with the function and objectives of the rules interpreted incorrectly and because the administration's mistake constitutes precisely the normal and necessary condition for the claim for additional payment. However, it cannot be excluded *a priori* that the principle of *cessante ratione legis, cessat et ipsa lex* may also be relevant where it is necessary to recover years afterwards and possibly with irreversible damage to those concerned customs duties which should have been levied. Arguments to this effect may be deduced from the above-mentioned memorandum of the Commission and from the provisions of certain proposals for regulations already submitted in this connexion by the Commission. The general belief of traders and of the customs authorities

1253

might also be taken into consideration since in this case only the charges considered as payable according to the misinterpretation were taken into consideration by the traders in question for the purpose of passing on the corresponding costs to third parties and of fixing their prices. According to the Italian Government, the principle of the protection of legitimate expectation cannot however justify this solution because, first, the Member States are not under a duty of correct interpretation which is wider than or different from that imposed on any other person to whom the law applies, secondly, it is impossible to envisage any legal duty imposed on the trader concerned to abide by an interpretation, on the assumption that it is incorrect, and, thirdly, the principle of the protection of legitimate expectation cannot be called in aid in relation to the application of provisions which have the same mandatory force as regards both Member States and individuals.

In conclusion, the Italian Government proposes that the Court should rule that in the Community legal order the duty of repayment and the duty to recover sums which have not been levied does not necessarily correspond to the right not to pay them and to the duty to levy them and that the correct retroactive application of the Community rules cannot be required where a general misinterpretation common to both parties to the legal customs relationship has given rise *medio tempore* to payments not owed or to the failure to levy sums payable, except, as from the dates on which the Community rules were interpreted authoritatively and the aspects of the conflict between those rules and the provisions of national law were settled authoritatively.

*C — The Commission's observations*

After stating that the first question must be understood as concerning the question whether a provision of Community law must be applied to facts occurring prior to a judgment of the Court of Justice in accordance with the interpretation given by the Court, the Commission claims that an affirmative reply appears inescapable having regard to the nature and the actual purpose of a reference for a preliminary ruling. Under Article 164 of the EEC Treaty the Court has a rôle which is typically judicial and excludes any legislative function. That article is an expression of the principle of legality by virtue of which the Court is to decide according to the law and not on the basis of considerations of expediency. In this context Article 177 brings about a close collaboration between the Court of Justice and national courts; the Court interprets the legislative provision generally and in the abstract whilst it is for the national court to apply that interpretation to the specific case.

Judgments given by the Court of Justice in pursuance of Article 177 necessarily bind the national court seised of the main action so as to make it possible to attain the purpose for which references for preliminary rulings were instituted as the Court expressly recalled in its judgments delivered on 3 February 1977 in Case 52/76 *(Benedetti v Munari,* [1977] ECR 163) and on 24 June 1969 in

AMMINISTRAZIONE DELLE FINANZE v SALUMI

Case 29/68 (Milch-, Fett- und Eier-Kontor GmbH v Hauptzollamt Saarbrücken [1969] ECR 165).

As regards the judicial sphere, the judgment delivered by the Court in pursuance of Article 177 is not unimportant also in other cases of the same nature brought before national courts. As far as they are concerned the importance of the interpretation given by the Court arises on the one hand from the fact that superior national courts intending to comply with it are freed from the requirement to make a further reference for a preliminary ruling in accordance with the judgment of the Court delivered on 27 March 1963 in Joined Cases 28 to 30/62 (Da Costa, [1963] ECR 31) and, on the other hand, from the fact that the lower national courts and tribunals cannot, without applying Community law erroneously, adopt a different interpretation short of inviting a further ruling from the Court of Justice in pursuance of Article 177.

Thus the Court's interpretation necessarily influences the Community provision in question in the sense that it is to be subsequently applied by any national court in accordance with that interpretation each time the question arises, subject to a variation resulting from a fresh reference for a preliminary ruling.

The fact that the Court is seised of an action relating to facts which occurred prior to the judgment of the Court cannot have any significance in this matter.

The idea that judgments of the Court of Justice delivered in pursuance of Article 177 exceed the bounds of the individual case and form part of the actual Community provision which is the subject of the interpretation is confirmed, in the Commission's view, by the case-law of the Court relating to the purpose of a reference for a preliminary ruling, to the participation of the Member States and institutions in the proceedings and, finally, to the absence of the parties, as strictly understood, to the main action.

The validity *ex tunc* of the Court's interpretation also follows from the essentially declaratory nature of the judgments in question. The Court's interpretation is in substance close to being an authentic interpretation, which applies generally to prior facts. Not to apply the Court's interpretation to facts prior to the judgment would be tantamount to depriving a provision of its effect or to giving it as regards the past a different meaning by splitting up Community law in point of time. This prerogative belongs only to the legislative arm and not to the judiciary.

The effect *ex tunc* of an interpretation given by the Court of Justice in a judgment delivered in pursuance of Article 177 does however meet with an insurmountable obstacle as regards legal situations which have already taken definitive effect. Situations which have become unassailable, for example on grounds of prescription, lapse of time or by force of *res judicata* cannot be called in question. In the present state of Community law these matters are governed by the various national legal systems.

Next the Commission considers whether the principle of the *ex tunc* effect of interpretative judgments is not, in whole or in part, paralysed by other principles

1255

of Community law which have nothing to do with references for preliminary rulings but which result from overriding considerations of legal certainty, the protection of legitimate expectation and the stability of legal relationships. These principles are based on the necessity of not assailing relationships which are henceforward consolidated in the economic context, even though they may not yet have displayed all their effects in the legal sphere, so as to avoid still more serious damage than that resulting from the erroneous application of a given legislative provision. That is the principle laid down in particular by the second paragraph of Article 174 of the Treaty, which was the subject of an extensive interpretation by the Court in the judgment given on 5 June 1973 in Case 81/72 *(Council* v *Commission,* [1973] ECR 575).

However, the Commission is of the opinion that such a view could not be applied to a reference for a preliminary ruling under Article 177 to justify the effect *ex nunc* of interpretative judgments. Although the importance of the principles of legal certainty and protection of legitimate expectation should not be underestimated they must nevertheless necessarily be co-ordinated with the principle of legality, which involves a correct and uniform application of Community law. The absence of an express provision in this respect in the Treaty does not appear to make it permissible to acknowledge that interpretative judgments delivered in pursuance of Article 177 have an *ex nunc* effect.

However, it is not possible to exclude the possibility of exceptional situations in which, whether by reason of the extent to which economic relationships would be dislocated or by reason of special effects on legitimate expectation, it may appear advisable to give preference to the principle of legal certainty by thus giving a lesser scope to the interpretation of the Court under Article 177. It should be possible in such cases for the Court to find that there is a lacuna in the procedure for preliminary rulings and to make it good by applying by analogy the principle taken from the second paragraph of Article 174 of the Treaty.

Applying these principles to the cases before the national court regarding the importation of agricultural products and agricultural levies the Commission thinks that there is no doubt that the concept of "day of importation" used by the Community regulations on this subject must be understood, in accordance with the case-law of the Court, as the date on which the import declaration is accepted. There is no reason to make a distinction between transactions prior to the judgment delivered by the Court in Case 113/75 and those subsequent to it.

With regard to the second question referred to the Court, the Commission takes the view that it follows from the case-law of the Court, in particular from the judgment in Case 33/76 *(Rewe,* previously cited), that it is accepted in the case-law that when Community law confers rights on individuals, national courts are required to ensure that they are protected and that, if procedures and time-limits for the relevant actions are, in the present state of Community law, governed by national law, they must not be as to render practically impossible the protection of the rights in question or in

AMMINISTRAZIONE DELLE FINANZE v SALUMI

any case to be less favourable than those applicable to analogous actions relating to domestic relationships. There must be no question of provisions adopted specifically for Community law so as to limit its application. On the basis of the considerations which it has put forward with regard to the first question the Commission takes the view that the fact that the events in question occurred prior to an interpretative judgment of the Court is without importance with regard to the power of those concerned to take legal action so as to obtain a correct application of the Community provisions in question. However, by virtue of the principle of legitimate expectation and solely as regards actions of the State with a view to demanding sums which it might have levied on the basis of a correct interpretation of a Community provision, it must be admitted that national law may in certain circumstances restrict the power of the State to take legal action. The proposal for a regulation (Official Journal C 138 of 11 June 1977, p. 13) presented to the Council by the Commission for the purpose of laying down uniform conditions for post-clearance collection of duties by Member States tends in this direction. According to the Commission there are good grounds for having recourse to the principle of the protection of legitimate expectation when the fact that a charge has been underpaid is due either to information transmitted by the competent authorities or to general provisions which have been subsequently annulled or invalidated by judicial decisions or finally to an error on the part of the competent authorities which cannot be identified by the individual in good faith.

In the present state of Community law it is permissible but not mandatory for national law, on grounds of legitimate expectation, to restrict the State's right to act.

On the basis of these considerations the Commission suggests that the Court should reply to the questions submitted for a preliminary ruling in the following manner:

"1. Under Article 177 of the Treaty, when the authorities of a Member State, in connexion with relationships not yet defined pursuant to national law have, with regard to imports, charged what they should not have charged or on the contrary have not charged what they should have charged in pursuance of Community law, as it has been subsequently interpreted by a judgment of the Court of Justice, the relevant Community provisions must be applied by national courts in accordance with the said judgment as regards such relationships also in the absence of a fresh reference to the Court and of exceptional circumstances resulting from the judgment itself.

2. For such relationships national law must allow persons concerned the right to take legal proceedings so as to demand the payment or the repayment, on the basis of Community law as interpreted by the Court of Justice, of what either was due and has not been charged or of what was paid although not due, subject to any restrictions applied by national law, so as to protect the legitimate expectation of individuals, to the power of the State to initiate proceedings."

III — Oral procedure

At the sitting held on 25 October 1979 the Italian Government, represented by

JUDGMENT OF 27. 3. 1980 — JOINED CASES 66, 127 AND 128/79

A. Marzano, Avvocato dello Stato, the defendants in the main action, represented by G. M. Ubertazzi and F. Capelli, of the Milan Bar, and the Commission of the European Communities, represented by G. P.

Alessi, a member of its Legal Department, submitted oral argument.

The Advocate General delivered his opinion at the sitting held on 9 January 1980.

# Decision

1   By three orders of 11 January 1979, the first of which (Case 66/79 *Meridionale Salumi)* was lodged at the registry of the Court of Justice on 20 April 1979 and the other two (Case 127/79 *Vasanelli* and Case 128/79 *Ultrocchi)* on 9 August 1979, the Corte Suprema di Cassazione, Rome, submitted for a preliminary ruling under Article 177 of the EEC Treaty two questions relating to the interpretation of Article 177 of the EEC Treaty in regard to the scope of interpretative judgments delivered by the Court of Justice in the context of that provision.

2   By those questions, which are framed in identical terms in the three orders making the references, the Court is asked:

   "(a) For the purpose of Article 177 of the EEC Treaty where, in respect of imports and with regard to relationships as yet undefined according to their own national law, the national authorities of a State have charged amounts which they should not have charged or, on the other hand, not levied amounts which they should have levied pursuant to the Community provisions applicable in that sector according to the interpretation subsequently placed upon them by judgment of the Court of Justice, does that judgment also apply to such relationships within the domestic legal system of the Member State or not, or does it apply subject to specific limits and on specified conditions: if the latter is the case, what are those limits and conditions?

   (b) Also for the purposes of Article 177 of the Treaty, is it prohibited or required by Community law or irrelevant in relation thereto that in respect of such relationships those concerned are empowered under national law to institute proceedings to claim or recover, on the basis of the interpretation provided by the judgment of the Court of Justice, amounts due but not collected or amounts paid in error?"

1258

AMMINISTRAZIONE DELLE FINANZE v SALUMI

3    The questions are put in the context of disputes between traders and the appropriate Italian administrative authority which is claiming from them, in respect of imports of beef and veal carried out in 1968, additional amounts of agricultural import levies payable by virtue of Regulation No 14/64 of the Council of 5 February 1964 on the progressive establishment of the common organization of the market in beef and veal (Journal Officiel 1964, No 34, p. 562) and of Regulation No 805/68 of the Council of 27 June 1968 on the common organization of the market in beef and veal (Official Journal, English Special Edition 1968 (I), p. 187).

4    At the time, the amount of those levies had been calculated by the Italian customs authorities by applying the method, which was also recommended in customs matters by the Commission, whereby, in the event of a reduction in customs duties occurring after the import declaration had been submitted but before the goods were released for home use, the more favourable rate was to be applied if the importer concerned so requested.

5    By its judgment of 15 June 1976 in Case 113/75 *Frecassetti* v *Amministrazione delle Finanze dello Stato* [1976] ECR 983 the Court of Justice held, however, that that method could not be applied to agricultural levies on the importation of products from non-member countries, which had to be uniformly calculated in accordance with the rate of levy in force on the day on which the import declaration was accepted by the customs authorities. Consequently, the traders concerned would have to pay levies at a higher amount.

6    Even before the *Frecassetti* judgment, the Italian administration had claimed these additional amounts on the ground, it appears, that the traders had not, in any event, observed a formality required by Italian legislation before advantage might be taken of the more favourable rate. However, in the course of the proceedings the question arose to what extent the interpretation given by the *Frecassetti* judgment provided, in regard to situations arising before the date of that judgment, a foundation in Community law for claiming the disputed additional amounts, regard being had, moreover, to the fact that, in the meantime, Decree No 695 of the President of the Republic of 22 September 1978 had amended an earlier decree so as to bring it into line, in so far as the calculation of agricultural levies was concerned, with the *Frecassetti* judgment but had provided at the same time that that amendment should take effect only on 11 September 1976, with the result

1259

that additional amounts of levy would be claimed only on products declared after that date. The date of 11 September 1976 was selected because it corresponded to that of the publication of the operative part of the *Frecassetti* judgment in the Official Journal of the European Communities, C 214, of 11 September 1976.

First question

7    In essence, this question seeks to establish, particularly in regard to charges or dues payable under Community law, whether, where the interpretation of a provision of Community law by the Court of Justice under Article 177 of the Treaty makes it apparent that the application given to that provision by the national authorities was not compatible with that provision as its scope had been defined by the Court, the provision as thus interpreted must be applied by national courts, duly seised of disputes to which that application has given rise, even to legal relationships arising and established before the date of the judgment ruling on the request for interpretation.

8    Article 177 of the Treaty provides that the Court of Justice shall have jurisdiction to give preliminary rulings, in particular, concerning the interpretation of the Treaty and of the acts of the institutions. The purpose of that jurisdiction is to ensure the uniform interpretation and application of Community law, and in particular the provisions which have direct effect, through the national courts.

9    The interpretation which, in the exercise of the jurisdiction conferred on it by Article 177 of the EEC Treaty, the Court of Justice gives to a rule of Community law clarifies and defines where necessary the meaning and scope of that rule as it must be or ought to have been understood and applied from the time of its coming into force. It follows that the rule as thus interpreted may, and must, be applied by the courts even to legal relationships arising and established before the judgment ruling on the request for interpretation, provided that in other respects the conditions enabling an action relating to the application of that rule to be brought before the courts having jurisdiction are satisfied.

1260

AMMINISTRAZIONE DELLE FINANZE v SALUMI

10   As the Court recognized in its judgment of 8 April 1976 in Case 43/75
     *Defrenne* v *Sabena* [1976] ECR 455, it is only exceptionally that the Court
     may, in application of the general principle of legal certainty inherent in the
     Community legal order and in taking account of the serious effects which its
     judgment might have, as regards the past, on legal relationships established
     in good faith, be moved to restrict for any person concerned the opportunity
     of relying upon the provision as thus interpreted with a view to calling in
     question those legal relationships.

11   Such a restriction may, however, be allowed only in the actual judgment
     ruling on the interpretation sought. The fundamental need for a general and
     uniform application of Community law implies that it is for the Court of
     Justice alone to decide upon the temporal restrictions to be placed on the
     interpretation which it lays down.

12   Finally, having regard to the clarification requested by the national court, it
     should be noted that a rule of Community law so interpreted takes effect in
     accordance with the interpretation given to it as from its entry into force
     without any necessity for making any distinction according to whether the
     provisions in question impose charges or confer benefits upon those
     concerned or whether the amounts involved are ones which the national
     administration ought to have but has not levied — in breach of Community
     law — or ones which they have levied in breach of that law.

Second question

13   The substance of the second question is whether the exercise of the rights
     which the citizen or, as the case may be, the public authorities, derive from
     the direct effect of a provision of Community law interpreted in the circum-
     stances and with the consequences described above may or may not be
     adapted and possibly limited by national law. This question contemplates in
     particular the administrative authority's power to take proceedings for
     recovery of Community charges or dues which ought to have been levied.

14    The arrangements for the fixing and the conditions of collection of the financial charges which the Community is empowered to levy and which specifically constitute its own resources, such as customs duties and agricultural levies, are laid down by the Council Decision of 21 April 1970 on the replacement of financial contributions from Member States by the Community's own resources (Official Journal, English Special Edition 1970 (I), p. 224) and the regulations in implementation thereof. These provisions must be considered within the framework of the general arrangements on the financial provisions of the Treaty which, like the corresponding arrangements of the Member States, are governed by the general principle of equality which requires that comparable situations may not be treated differently unless difference of treatment is objectively justified.

15    It follows that the system of revenues which are contributed to the Community budget must be so arranged as to constitute a uniform burden on all persons who meet the conditions specified in the Community provisions on such burdens. That requirement implies that there must be equality of treatment in respect of the procedural and substantive conditions on which traders may challenge Community charges imposed upon them by demanding a refund where payment was wrongly made. It implies an analogous equality in the conditions subject to which the authorities of the Member States, acting on behalf of the Community, may collect the said charges and, if necessary, recover financial benefits which were wrongly granted.

16    The Council has adopted this approach by enacting Regulation (EEC) No 1430/79 of 2 July 1979 on the repayment or remission of import or export duties (Official Journal 1979, L 175, p. 1) and Regulation (EEC) No 1697/79 of 24 July 1979 on the post-clearance recovery of import duties or export duties which have not been required of the person liable for payment on goods entered for a customs procedure involving the obligation to pay such duties (Official Journal 1979, L 197, p. 1). These regulations, which have not yet entered into force at the date of this judgment, nevertheless provide only a partial solution to the problems concerning the equality of persons in this sphere and the necessarily technical and detailed nature of such provisions means that a judicial interpretation can provide only a partial remedy.

1262

17   From this state of affairs it follows, as the Court held in its judgment of 21 May 1976 in Case 26/74 *Roquette* [1976] ECR 677, that disputes in connexion with the reimbursement of amounts collected for the Community are thus a matter for the national courts and must be settled by them under national law in so far as no provisions of Community law are relevant. For the like reasons the same applies to proceedings and disputes concerned with the revenue which the authorities of the Member States are bound to collect on behalf of the Community.

18   Accordingly, in so far as no provisions of Community law are relevant, it is for the national legal system of each Member State to lay down the detailed rules and conditions for the collection of Community revenues in general and agricultural levies in particular and to determine the authorities responsible for collection and the courts having jurisdiction to decide disputes to which that collection may give rise but such procedures and conditions may not make the system for collecting Community charges and dues less effective than that for collecting national charges and dues of the same kind.

19   That consideration has found expression in the Council Decision of 21 April 1970 on the replacement of financial contributions from Member States by the Community's own resources (already cited), Article 6 of which states in express terms that Community resources — which include agricultural levies — "shall be collected by the Member States in accordance with national provisions imposed by law, regulation or administrative action, which shall, where necessary, be amended for that purpose."

20   That express reference to national laws is, however, subject to the same limits as those affecting the implied reference, the need for which has been acknowledged in the absence of Community provisions, inasmuch as the application of national legislation must be effected in a non-discriminatory manner having regard to the procedural rules relating to disputes of the same type, but purely national, and in so far as procedural rules cannot have the result of making impossible in practice the exercise of rights conferred by Community law.

21  A special system of national rules relating to the collection of Community charges and dues which restricts the powers granted to the national authority to ensure the collection of those charges as compared with the powers granted to the same authority in regard to national charges or dues of the same kind is therefore not in accordance with Community law.


Costs


22  The costs incurred by the Italian Government and the Commission of the European Communities, which have submitted observations to the Court, are not recoverable. As these proceedings are, in so far as the parties to the main actions are concerned, in the nature of a step in the actions pending before the national court, the decision on costs is a matter for that court.


On those grounds,


THE COURT


in answer to the questions referred to it by the Corte Suprema di Cassazione, Rome, by order of 11 January 1979, received at the Court Registry on 20 April 1979 and 9 August 1979, hereby rules:


1. The interpretation which, in the exercise of the jurisdiction conferred on it by Article 177 of the EEC Treaty, the Court of Justice gives to a rule of Community law, clarifies and defines where necessary the meaning and scope of that rule as it must be or ought to have been understood and applied from the time of its coming into force. It follows that the rule as thus interpreted may, and must, be applied by the courts even to legal relationships arising and established before the judgment ruling on the request for interpretation, provided that in other respects the conditions enabling an action relating to the application of that rule to be brought before the courts having jurisdiction are satisfied. It is only exceptionally that the Court may be moved, in the same judgment as that ruling on the request for interpretation, to

restrict for any person concerned the opportunity of relying upon the provision as thus interpreted with a view to calling in question legal relationships arising and established prior thereto.

2. A special system of national rules relating to the collection of Community charges and dues which restricts the powers given to the national authority to ensure the collection of those charges as compared with the powers granted to the same authority in respect of national charges or dues of the same kind is not in accordance with Community law.

Kutscher      O'Keeffe      Touffait      Mertens de Wilmars      Pescatore

Mackenzie Stuart      Bosco      Koopmans      Due

Delivered in open court in Luxembourg on 27 March 1980.

A. Van Houtte                                                    H. Kutscher

Registrar                                                        President

## OPINION OF MR ADVOCATE GENERAL REISCHL
## DELIVERED ON 9 JANUARY 1980 [1]

*Mr President,*
*Members of the Court,*

The cases which form the basis of the present proceedings for a preliminary ruling are concerned with additional charges in respect of levies on imports to Italy of beef and veal. The following points are essential for an understanding of the case.

Under Italian law, namely under Article 6 (1) of the Introductory Provisions to

the Customs Tariff (Decree No 723 of the President of the Republic of 26 June 1965), the rate of customs duty to be applied to imported goods is that in force on the date on which the import declaration is accepted by the customs authorities. Under Article 6 (2) in its original form, in the event of a change in duty after the date referred to in paragraph (1), the customs authorities could, at the request of the importer, apply the lowest rate of duty, provided that the goods had not been released to the

1 — Translated from the German.