# EXHIBIT 24

OPINION PURSUANT TO ARTICLE 228 OF THE EEC TREATY

## Opinion of the Court

### I

1. In this Opinion, the Court will confine its examination, in accordance with the Commission's request, to the compatibility with the EEC Treaty of the system of judicial supervision which it is proposed to set up under the agreement. This Opinion does not consider the other provisions of the agreement, in particular those dealing with the decision-making process and the allocation of responsibilities in the field of competition.

2. The agreement is to be concluded between, on the one hand, States which are members of the European Free Trade Association and, on the other, the European Community and its Member States. As far as the Community is concerned, the agreement will be concluded by the Council, after receiving the assent of the European Parliament, under Article 238 of the EEC Treaty.

3. The purpose of the agreement is to create a European Economic Area covering the territories of the Member States of the Community and those of the EFTA countries. According to the preamble to the agreement the Contracting Parties envisage the establishment of a dynamic and homogeneous European Economic Area, based on common rules and equal conditions of competition, and provide for adequate means of enforcement, *inter alia* at the judicial level. According to Article 1 of the agreement, its aim is to promote a continuous and balanced strengthening of trade and economic relations between the Contracting Parties with equal conditions of competition and respect for the same rules.

4. The rules which are to apply in relations between the States making up the EEA cover the free movement of goods, persons, services and capital, and competition. Essentially, the rules are those laid down in the corresponding provisions of the EEC and ECSC Treaties and in measures adopted pursuant thereto. As the Commission stated in its request for an opinion, the Contracting Parties intend to extend to the EEA future Community law relating to the fields covered by the agreement as the law comes into being, develops or alters.

I - 6099

OPINION 1/91 OF 14. 12. 1991

## II

5   The aim of homogeneity in the interpretation and application of the law in the EEA as specified in Article 1 of the agreement is to be secured through the use of provisions which are textually identical to the corresponding provisions of Community law and through the establishment of a system of courts.

6   The agreement provides for the setting up of an EEA Court, to which a Court of First Instance is to be attached. The jurisdiction of the EEA Court is defined in Article 96(1) of the agreement. It covers the settlement of disputes between the Contracting Parties, actions concerning the surveillance procedure regarding the EFTA States and, in the field of competition, appeals concerning decisions taken by the EFTA Surveillance Authority.

7   The system of courts also provides for the following mechanisms.

8   Article 6 of the agreement provides that, for the purposes of their implementation and application, the provisions of the agreement are to be interpreted in conformity with rulings of the Court of Justice on the corresponding provisions of the EEC Treaty, the ECSC Treaty and measures of Community secondary legislation which were given prior to the date of signature of the agreement.

9   Article 104(1) of the agreement provides that, when applying or interpreting the provisions of the agreement or provisions of the EEC and ECSC Treaties, as amended or supplemented, or of acts adopted in pursuance thereof, the Court of Justice, the EEA Court, the Court of First Instance of the European Communities, the EEA Court of First Instance and the Courts of the EFTA States are to pay due account to the principles laid down in decisions delivered by the other courts in order to ensure as uniform as possible an interpretation of the agreement.

10  Article 95 of the agreement provides that the EEA Court is to be composed of eight judges, including five from the Court of Justice. At the EEA Court's request, the EEA Council may allow it to establish chambers, each consisting of three or

five judges. An appropriate balance of judges of the Court of Justice and EFTA judges, taking into account the nature of the cases, is to be laid down in the Statute of the EEA Court. According to Article 101, the EEA Court of First Instance is to be composed of five judges — three nominated by the EFTA States and two judges of the Court of First Instance of the European Communities.

11  Protocol 34, to which Article 104(2) of the agreement refers, contains provisions under which the EFTA States may authorize their courts and tribunals to ask the Court of Justice to express itself on the interpretation of a provision of the agreement.

12  Lastly, a note to Protocol 34 provides for a right for EFTA States to intervene in cases brought before the Court of Justice.

### III

13  Before considering the questions raised by the Commission's request for an opinion it is appropriate to compare the aims and context of the agreement, on the one hand, with those of Community law, on the other.

14  The fact that the provisions of the agreement and the corresponding Community provisions are identically worded does not mean that they must necessarily be interpreted identically. An international treaty is to be interpreted not only on the basis of its wording, but also in the light of its objectives. Article 31 of the Vienna Convention of 23 May 1969 on the law of treaties stipulates in this respect that a treaty is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose.

15  With regard to the comparison of the objectives of the provisions of the agreement and those of Community law, it must be observed that the agreement is concerned with the application of rules on free trade and competition in economic and commercial relations between the Contracting Parties.

16    In contrast, as far as the Community is concerned, the rules on free trade and competition, which the agreement seeks to extend to the whole territory of the Contracting Parties, have developed and form part of the Community legal order, the objectives of which go beyond that of the agreement.

17    It follows *inter alia* from Articles 2, 8a and 102a of the EEC Treaty that that treaty aims to achieve economic integration leading to the establishment of an internal market and economic and monetary union. Article 1 of the Single European Act makes it clear moreover that the objective of all the Community treaties is to contribute together to making concrete progress towards European unity.

18    It follows from the foregoing that the provisions of the EEC Treaty on free movement and competition, far from being an end in themselves, are only means for attaining those objectives.

19    The context in which the objective of the agreement is situated also differs from that in which the Community aims are pursued.

20    The EEA is to be established on the basis of an international treaty which, essentially, merely creates rights and obligations as between the Contracting Parties and provides for no transfer of sovereign rights to the inter-governmental institutions which it sets up.

21    In contrast, the EEC Treaty, albeit concluded in the form of an international agreement, none the less constitutes the constitutional charter of a Community based on the rule of law. As the Court of Justice has consistently held, the Community treaties established a new legal order for the benefit of which the States have limited their sovereign rights, in ever wider fields, and the subjects of which comprise not only Member States but also their nationals (see, in particular, the judgment in Case 26/62 *Van Gend en Loos* [1963] ECR 1). The essential characteristics of the Community legal order which has thus been established are in particular its primacy over the law of the Member States and the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves.

22  It follows from those considerations that homogeneity of the rules of law throughout the EEA is not secured by the fact that the provisions of Community law and those of the corresponding provisions of the agreement are identical in their content or wording.

23  It must therefore be considered whether the agreement provides for other means of guaranteeing that homogeneity.

24  Article 6 of the agreement pursues that objective by stipulating that the rules of the agreement must be interpreted in conformity with the case-law of the Court of Justice on the corresponding provisions of Community law.

25  However, for two reasons that interpretation mechanism will not enable the desired legal homogeneity to be achieved.

26  First, Article 6 is concerned only with rulings of the Court of Justice given prior to the date of signature of the agreement. Since the case-law will evolve, it will be difficult to distinguish the new case-law from the old and hence the past from the future.

27  Secondly, although Article 6 of the agreement does not clearly specify whether it refers to the Court's case-law as a whole, and in particular the case-law on the direct effect and primacy of Community law, it appears from Protocol 35 to the agreement that, without recognizing the principles of direct effect and primacy which that case-law necessarily entails, the Contracting Parties undertake merely to introduce into their respective legal orders a statutory provision to the effect that EEA rules are to prevail over contrary legislative provisions.

28  It follows that compliance with the case-law of the Court of Justice, as laid down by Article 6 of the agreement, does not extend to essential elements of that case-law which are irreconcilable with the characteristics of the agreement. Conse-

quently, Article 6 as such cannot secure the objective of homogeneity of the law throughout the EEA, either as regards the past or for the future.

29   It follows from the foregoing considerations that the divergences which exist between the aims and context of the agreement, on the one hand, and the aims and context of Community law, on the other, stand in the way of the achievement of the objective of homogeneity in the interpretation and application of the law in the EEA.

## IV

30   It is in the light of the contradiction which has just been identified that it must be considered whether the proposed system of courts may undermine the autonomy of the Community legal order in pursuing its own particular objectives.

31   The interpretation of the expression 'Contracting Party' which the EEA Court will have to give in the exercise of its jurisdiction will be considered first, followed by the effect of the case-law of that court on the interpretation of Community law.

32   As far as the first point is concerned, it must be observed that the EEA Court has jurisdiction under Article 96(1)(a) of the agreement with regard to the settlement of disputes between the Contracting Parties and that, according to Article 117(1) of the agreement, the EEA Joint Committee or a Contracting Party may bring such a dispute before the EEA Court.

33   The expression 'Contracting Parties' is defined in Article 2(c) of the agreement. As far as the Community and its Member States are concerned, it covers the Community and the Member States, or the Community, or the Member States, depending on the case. Which of the three possibilities is to be chosen is to be deduced in each case from the relevant provisions of the agreement and from the respective competences of the Community and the Member States as they follow from the EEC Treaty and the ECSC Treaty.

34  This means that, when a dispute relating to the interpretation or application of one or more provisions of the agreement is brought before it, the EEA Court may be called upon to interpret the expression 'Contracting Party', within the meaning of Article 2(c) of the agreement, in order to determine whether, for the purposes of the provision at issue, the expression 'Contracting Party' means the Community, the Community and the Member States, or simply the Member States. Consequently, the EEA Court will have to rule on the respective competences of the Community and the Member States as regards the matters governed by the provisions of the agreement.

35  It follows that the jurisdiction conferred on the EEA Court under Article 2(c), Article 96(1)(a) and Article 117(1) of the agreement is likely adversely to affect the allocation of responsibilities defined in the Treaties and, hence, the autonomy of the Community legal order, respect for which must be assured by the Court of Justice pursuant to Article 164 of the EEC Treaty. This exclusive jurisdiction of the Court of Justice is confirmed by Article 219 of the EEC Treaty, under which Member States undertake not to submit a dispute concerning the interpretation or application of that treaty to any method of settlement other than those provided for in the Treaty. Article 87 of the ECSC Treaty embodies a provision to the same effect.

36  Consequently, to confer that jurisdiction on the EEA Court is incompatible with Community law.

37  As for the second point, it must be observed *in limine* that international agreements concluded by means of the procedure set out in Article 228 of the Treaty are binding on the institutions of the Community and its Member States and that, as the Court of Justice has consistently held, the provisions of such agreements and the measures adopted by institutions set up by such agreements become an integral part of the Community legal order when they enter into force.

38  In this connection, it must be pointed out that the agreement is an act of one of the institutions of the Community within the meaning of indent (b) of the first paragraph of Article 177 of the EEC Treaty and that therefore the Court has jurisdiction to give preliminary rulings on its interpretation. It also has jurisdiction to rule on the agreement in the event that Member States of the Community fail to fulfil their obligations under the agreement.

39  Where, however, an international agreement provides for its own system of courts, including a court with jurisdiction to settle disputes between the Contracting Parties to the agreement, and, as a result, to interpret its provisions, the decisions of that court will be binding on the Community institutions, including the Court of Justice. Those decisions will also be binding in the event that the Court of Justice is called upon to rule, by way of preliminary ruling or in a direct action, on the interpretation of the international agreement, in so far as that agreement is an integral part of the Community legal order.

40  An international agreement providing for such a system of courts is in principle compatible with Community law. The Community's competence in the field of international relations and its capacity to conclude international agreements necessarily entails the power to submit to the decisions of a court which is created or designated by such an agreement as regards the interpretation and application of its provisions.

41  However, the agreement at issue takes over an essential part of the rules — including the rules of secondary legislation — which govern economic and trading relations within the Community and which constitute, for the most part, fundamental provisions of the Community legal order.

42  Consequently, the agreement has the effect of introducing into the Community legal order a large body of legal rules which is juxtaposed to a corpus of identically-worded Community rules.

43  Furthermore, in the preamble to the agreement and in Article 1, the Contracting Parties express the intention of securing the uniform application of the provisions of the agreement throughout their territory. However, the objective of uniform application and equality of conditions of competition which is pursued in this way and reflected in Article 6 and Article 104(1) of the agreement necessarily covers the interpretation both of the provisions of the agreement and of the corresponding provisions of the Community legal order.

44  Although, under Article 6 of the agreement, the EEA Court is under a duty to interpret the provisions of the agreement in the light of the relevant rulings of the Court of Justice given prior to the date of signature of the agreement, the EEA Court will no longer be subject to any such obligation in the case of decisions given by the Court of Justice after that date.

45  Consequently, the agreement's objective of ensuring homogeneity of the law throughout the EEA will determine not only the interpretation of the rules of the agreement itself but also the interpretation of the corresponding rules of Community law.

46  It follows that in so far as it conditions the future interpretation of the Community rules on free movement and competition the machinery of courts provided for in the agreement conflicts with Article 164 of the EEC Treaty and, more generally, with the very foundations of the Community.

V

47  The threat posed by the court system set up by the agreement to the autonomy of the Community legal order is not reduced by the fact that Articles 95 and 101 of the agreement seek to create organic links between the EEA Court and the Court of Justice by providing that judges from the Court of Justice are to sit on the EEA Court and in its chambers and that judges from the Community's Court of First Instance are to sit on the EEA Court of First Instance.

48  On the contrary, it is to be feared that the application of those provisions will accentuate the general problems arising from the court system to be set up by the agreement.

49  In this connection, it should be borne in mind that the EEA Court is to ensure the sound operation of rules on free trade and competition under an international treaty which creates obligations only between the Contracting Parties.

50  In contrast, the Court of Justice has to secure observance of a particular legal order and to foster its development with a view to achieving the objectives set out in particular in Articles 2, 8a and 102a of the EEC Treaty and to attaining a European Union among the Member States, as is stated in the Solemn Declaration of Stuttgart of 19 June 1983 (section 2.5) referred to in the first recital in the preamble to the Single European Act. In that context, free trade and competition are merely means of achieving those objectives.

51  Consequently, depending on whether they are sitting on the Court of Justice or on the EEA Court, the judges of the Court of Justice who are members of the EEA Court will have to apply and interpret the same provisions but using different approaches, methods and concepts in order to take account of the nature of each treaty and of its particular objectives.

52  In those circumstances, it will be very difficult, if not impossible, for those judges, when sitting in the Court of Justice, to tackle questions with completely open minds where they have taken part in determining those questions as members of the EEA Court.

53  However, since the judicial system set up by the agreement is in any event incompatible with the EEC Treaty it is unnecessary to give fuller consideration to this question or to the question whether the system is not liable to raise serious doubts as to the confidence which individuals are entitled to have in the ability of the Court of Justice to carry out its functions in complete independence.

## VI

54  It is necessary to examine whether the machinery provided for in Article 104(2) of the agreement for the interpretation of its provisions is compatible with Community law.

55  Article 104(2) of the agreement states that provisions allowing EFTA States to allow their courts or tribunals to ask the Court of Justice to express itself on the interpretation of the agreement are laid down in Protocol 34.

56  Under Article 1 of Protocol 34, when a question of interpretation of provisions of the agreement which are identical in substance to the provisions of the Community Treaties arises in a case pending before a court or tribunal of an EFTA State, the court or tribunal may, if it considers this necessary, ask the Court of Justice to express itself on the question.

57  Article 2 of Protocol 34 provides that an EFTA State which intends to make use of that protocol is to notify the Depositary of the agreement and the Court of Justice to what extent and according to what modalities the protocol is to apply to its courts and tribunals.

58  Accordingly, this procedure is characterized by the fact that it leaves the EFTA States free to authorize or not to authorize their courts or tribunals to refer questions to the Court of Justice and does not make such a reference obligatory in the case of courts of last instance in those States. Furthermore, there is no guarantee that the answers given by the Court of Justice in such proceedings will be binding on the courts making the reference. This procedure is fundamentally different from that provided for in Article 177 of the EEC Treaty.

59  Admittedly, there is no provision of the EEC Treaty which prevents an international agreement from conferring on the Court of Justice jurisdiction to interpret the provisions of such an agreement for the purposes of its application in non-member countries.

60  Neither can any objection on a point of principle be made to the freedom which the EFTA States are given to authorize or not to authorize their courts and tribunals to ask the Court of Justice questions or to the fact that there is no obligation on the part of certain of those courts and tribunals to make a reference to the Court of Justice.

61  In contrast, it is unacceptable that the answers which the Court of Justice gives to the courts and tribunals in the EFTA States are to be purely advisory and without any binding effects. Such a situation would change the nature of the function of the Court of Justice as it is conceived by the EEC Treaty, namely that of a court whose judgments are binding. Even in the very specific case of Article 228, the Opinion given by the Court of Justice has the binding effect stipulated in that article.

62   It must further be observed that the interpretation of the agreement provided by the Court of Justice in response to questions put by courts and tribunals in EFTA States also has to be taken into account by courts in Member States of the Community when they have to rule on the application of the agreement. However, the fact that the answers are not binding on the EFTA courts may give rise to uncertainty about their legal value for courts in Member States of the Community.

63   Furthermore, the possibility cannot be ruled out that courts in the Member States will be led to consider that the non-binding effect of interpretations given by the Court of Justice under Protocol 34 also extends to judgments given by the Court of Justice under Article 177 of the EEC Treaty.

64   To that extent, the machinery in question will have an adverse impact on legal certainty, which is essential for the proper operation of the preliminary rulings procedure.

65   It follows from the above considerations that Article 104(2) of the agreement and Protocol 34 thereto are incompatible with Community law in so far as they do not guarantee that the answers which the Court of Justice may be called upon to give pursuant to that protocol will have a binding effect.

## VII

66   It is necessary next to assess the right provided for EFTA States to intervene in cases pending before the Court of Justice. It is provided in a note to Protocol 34 that Articles 20 and 37 of the Protocol on the Statute of the Court of Justice will have to be amended so as to authorize such a right of intervention.

67   It is sufficient to observe in that connection that those two articles appear in Title III of the Protocol on the Statute of the Court, the provisions of which, according

to the second paragraph of Article 188 of the EEC Treaty, the Council may amend, acting unanimously at the request of the Court of Justice and after consulting the Commission and the European Parliament.

68  It follows that it is not necessary to amend the EEC Treaty, pursuant to Article 236 thereof, in order to give the EFTA countries the right to intervene in cases pending before the Court of Justice.

## VIII

69  In its last question, the Commission asks whether Article 238 of the EEC Treaty, which deals with the conclusion by the Community of association agreements with a third State, a union of States or an international organization, authorizes the establishment of a system of courts as provided for in this agreement. The Commission stated in this connection that, in the event that the Court were to answer this question in the negative, Article 238 could be amended so as to permit such a system to be set up.

70  As already pointed out in paragraph 40, an international agreement providing for a system of courts, including a court with jurisdiction to interpret its provisions, is not in principle incompatible with Community law and may therefore have Article 238 of the EEC Treaty as its legal basis.

71  However, Article 238 of the EEC Treaty does not provide any basis for setting up a system of courts which conflicts with Article 164 of the EEC Treaty and, more generally, with the very foundations of the Community.

72  For the same reasons, an amendment of Article 238 in the way indicated by the Commission could not cure the incompatibility with Community law of the system of courts to be set up by the agreement.

In conclusion,

## THE COURT

gives the following opinion:

**The system of judicial supervision which the agreement proposes to set up is incompatible with the Treaty establishing the European Economic Community.**

| Due | Slynn | Joliet |
|---|---|---|
| President | President of Chamber | President of Chamber |
| Schockweiler | Grévisse | Kapteyn |
| President of Chamber | President of Chamber | President of Chamber |
| Mancini | Kakouris | Moitinho de Almeida |
| Judge | Judge | Judge |
| Rodríguez Iglesias | | Díez de Velasco |
| Judge | | Juge |
| Zuleeg | | Murray |
| Judge | | Juge |

Luxembourg, 14 December 1991.

J.-G. Giraud

Registrar

I - 6112