# EXHIBIT 31

JUDGMENT OF THE COURT (Fifth Chamber)

13 June 2002 *

In Case C-382/99,

**Kingdom of the Netherlands,** represented by M. Fierstra, acting as Agent,

applicant,

v

**Commission of the European Communities,** represented by G. Rozet and H.M.H. Speyart, acting as Agents, assisted by J.C.M. van der Beek, avocat, and L. Hancher, adviser, with an address for service in Luxembourg,

defendant,

APPLICATION for partial annulment of Commission Decision 1999/705/EC of 20 July 1999 on the State aid implemented by the Netherlands for 633 Dutch service stations located near the German border (OJ 1999 L 280, p. 87), in so far as it states that the aid granted to certain categories of service stations is

* Language of the case: Dutch.

I - 5202

incompatible with the common market and with the functioning of the Agreement on the European Economic Area of 2 May 1992 (OJ 1994 L 1, p. 3), and requires the recovery of aid already granted,

THE COURT (Fifth Chamber),

composed of: S. von Bahr, President of the Fourth Chamber, acting for the President of the Chamber, D.A.O. Edward and M. Wathelet (Rapporteur), Judges,

Advocate General: P. Léger,
Registrar: H.A. Rühl, Principal Administrator,

having regard to the Report for the Hearing,

after hearing oral argument from the parties at the hearing on 27 September 2001, at which the Kingdom of the Netherlands was represented by J.S. van den Oosterkamp and S. Terstal, acting as Agents, and the Commission was represented by G. Rozet, assisted by J.C.M. van der Beek and L. Hancher,

after hearing the Opinion of the Advocate General at the sitting on 14 March 2002,

JUDGMENT OF 13. 6. 2002 — CASE C-382/99

gives the following

## Judgment

1    By application lodged at the Court Registry on 9 October 1999, the Kingdom of the Netherlands brought an action under the first paragraph of Article 230 EC for partial annulment of Commission Decision 1999/705/EC of 20 July 1999 on the State aid implemented by the Netherlands for 633 Dutch service stations located near the German border (OJ 1999 L 280, p. 87; 'the Decision'), in so far as it states that the aid granted to certain categories of service stations is incompatible with the common market and the functioning of the Agreement on the European Economic Area of 2 May 1992 (OJ 1994 L 1, p. 3; 'the EEA Agreement'), and requires the recovery of aid already granted.

2    Article 92(1) of the EC Treaty (now, after amendment, Article 87(1) EC) provides:

'Save as otherwise provided in this Treaty, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the common market.'

3    Commission Notice 96/C 68/06 on the *de minimis* rule for State aid, published in the *Official Journal of the European Communities* of 6 March 1996 (OJ 1996

I - 5204

C 68, p. 9; 'the Notice'), considers in more detail the meaning of the phrase 'affects trade between Member States' used in Article 92(1) of the Treaty. According to the first paragraph of the Notice:

'Clearly, any financial assistance given by the State to one firm distorts or threatens to distort, to a greater or lesser extent, competition between that firm and its competitors which have received no such aid; but not all aid has an appreciable effect on trade and competition between Member States. This is particularly true where the amount of aid involved is small.'

4    That is the reason why, in terms of the second paragraph of the Notice, Article 92(1) may be deemed not to apply to grants of aid up to a maximum amount of ECU 100 000 (now EUR 100 000) over a three-year period beginning when the first *de minimis* aid is granted. That maximum amount applies to aid of all kinds, irrespective of its form or the objective pursued, with the exception of export aid, which is excluded from the benefit of the *de minimis* rule. *De minimis* aid, which need not be notified to the Commission, does not affect the possibility of the recipient obtaining other aid under schemes approved by the Commission.

5    The last paragraph of the Notice also states that '[t]he Commission has a duty to satisfy itself that Member States are not giving their enterprises aid which is incompatible with the common market' and that the Commission 'reserves the right to take appropriate action against any aid which complies with the *de minimis* rule but infringes other provisions of the Treaty'. That paragraph also states that the Member States are under an obligation to facilitate the achievement of the task entrusted to the Commission of verifying whether aid is compatible with the common market. In particular, the Member States are called on to establish a control system 'to ensure that, where aid is given to the same recipient under separate measures all of which are covered by the *de minimis* rule, the total amount of the aid does not exceed ECU 100 000 over a

period of three years'. Furthermore, any decision granting *de minimis* aid or the rules of any scheme providing for aid of that kind must include an express stipulation that 'any additional aid granted to the same recipient under the *de minimis* rule must not raise the total *de minimis* aid received by the enterprise to a level above the ceiling of ECU 100 000 over a period of three years. The [control system] established must also enable the Member State to answer any questions the Commission might wish to ask'.

**The facts at issue and the Decision**

6    From 1 July 1997, the excise duties levied by the Netherlands on petrol, diesel and liquid gas were increased to NLG 0.11, NLG 0.05 and NLG 0.08 per litre respectively. In Article VII of the Wet tot wijziging van enkele belastingwetten c.a. (Law amending various fiscal laws, Stbl. 1996, p. 654) of 20 December 1996, the Netherlands legislature, aware that that increase would have detrimental consequences for Dutch operators of service stations located, in particular, along the German border, provided for the adoption of temporary measures intended to mitigate the disparity between the levels of excise duty payable after that increase and the amount of excise duty levied on light oils in Germany.

7    Accordingly, on 21 July 1997, the Kingdom of the Netherlands adopted the Tijdelijke regeling subsidie tankstations grensstreek Duitsland (Temporary regulation on subsidies payable to service stations located near the German border, Stcrt. 1997, p. 138), as amended by Ministerial decree of 15 December 1997 (Stcrt. 1997, p. 241; 'the Temporary Regulation'). That regulation, which came into force with retroactive effect from 1 July 1997, provided for the grant of a subsidy of NLG 0.10 per litre of petrol to operators located within 10 km of the border between the Netherlands and Germany, and of NLG 0.05 per litre of petrol to operators located between 10 and 20 km from that border. It provided that, in the event of an increase in the German excise duties, the disparity in the excise duties levied by the two countries, which was the reason for the aid

scheme, would decrease. The level of the subsidies would therefore be reduced to a maximum of 10/11ths and 5/11ths respectively of the equivalent in Netherlands currency of the increase in the German excise duties. If, as the result of such a reduction, the level of the subsidies granted to operators located within 10 km of the border fell below NLG 0.025 per litre, the Temporary Regulation would lapse in its entirety.

8   In order to comply with the conditions in the Notice, the Temporary Regulation set a ceiling on the subsidies equivalent to ECU 100 000 over a period of three years (from 1 July 1997 to 30 June 2000 inclusive), i.e. the ceiling laid down in the Notice. Moreover, the financial aid provided for by the Temporary Regulation was aid per applicant, which covered any natural or legal person, or successor in title thereto, on whose behalf, or at whose risk, one or more service stations were operated.

9   An amendment to the Temporary Regulation was then proposed whose purpose was to provide that the subsidy no longer be granted per applicant but per service station ('the Draft Amendment'). The aim of the Draft Amendment was to remove the imbalance which had been created between service stations in respect of the level of subsidies received. A number of applicants owning more than one service station received only ECU 100 000 in total, while other applicants owning only one service station received the same amount.

10  The Netherlands Government, wishing to verify that the Draft Amendment to the Temporary Regulation complied with the Notice, informed the Commission of that amendment by letter of 14 August 1997, stating that 'in the event that the Commission considers that the [proposed] scheme must nevertheless be notified pursuant to Article 93(3) of the EC Treaty, the Netherlands Government requests that this letter be deemed to be such a notification' ('the Conditional Notification').

11  The Commission carried out a preliminary examination pursuant to Article 93(3) of the EC Treaty (now Article 88(3) EC) of both the Temporary Regulation and

I - 5207

the Draft Amendment in order to ensure that the measures in question, either already in force or in draft form, were not such as to permit cumulations of aid of the kind prohibited by the Notice. The Commission was, in particular, concerned that the Temporary Regulation and the Draft Amendment would present large oil companies with the opportunity to profit indirectly from the aid granted to the various operators linked to them, by rendering inoperative the 'price management system' ('PMS') clauses contained in some exclusive purchasing agreements between those companies and their distributors.

12    In paragraph 84 of the Decision, the Commission defines PMS clauses in the following manner:

'The purpose of a PMS clause is to protect the dealer's turnover against competing petrol outlets in the immediate vicinity of his service station. The clause usually stipulates that the oil company bears part of the cost of the forecourt discount granted by the dealer in so far as domestic and/or international market conditions make a temporary or long-term adjustment of these discounts desirable or necessary. Consultations between the parties are often necessary before such reductions are introduced. The actual aid provided by the supplier is determined by means of a distribution table or participation arrangements. Its amount is normally indicated on the invoice.'

13    In order to assess whether the aid was liable to have a cumulative effect, the Commission requested that the Netherlands authorities provide it with information on the ownership structure of the 633 service stations located near the border between Germany and the Netherlands which, owing to their location, were eligible to receive the aid in question, a list of the distribution agreements binding the service stations to their suppliers, an indication of the total number of service stations in the Netherlands, and the share of the total market held by those 633 service stations.

14   Since the Commission was not satisfied with the replies given by the Netherlands authorities and feared that the Temporary Regulation and its Draft Amendment did not adequately prevent cumulations of aid of the kind prohibited by the Notice, the Commission decided, in June 1998, to initiate the procedure provided for in Article 93(2) of the Treaty (see OJ 1998 C 307, p. 10). At the end of that procedure, the Commission declared, by way of the Decision, that part of the disputed aid was incompatible with the common market and that another part of that aid was covered by the *de minimis* rule.

15   In the Decision, the Commission classified the service stations in six categories:

   — dealer-owned/dealer-operated ('Do/Do') service stations, where the dealer owns the service station, which he operates at his own risk, and is linked to the oil company by an exclusive purchasing agreement which does not contain a PMS clause;

   — company-owned/dealer-operated ('Co/Do') service stations, where the dealer rents the service station, which he operates at his own risk, and is linked, as a tenant, to the oil company by an exclusive purchasing agreement without a PMS clause;

   — service stations in respect of which the Netherlands authorities did not provide any information or provided only partial information;

   — company-owned/company-operated ('Co/Co') service stations, where the service station is operated by employees or subsidiaries of the oil company, who carry no business risk and are not free to chose their suppliers. The

Commission divided this category into two sub-categories: 'pure' Co/Co service stations where the service station is owned and operated by the oil company, and '*de facto*' Co/Co service stations, where the same dealer has applied for aid more than once and therefore appears several times on the list of recipients;

— Do/Do service stations, linked to the oil company by a PMS clause, under which, in certain circumstances, the oil company bears part of the cost of forecourt discounts made by the operator, and finally

— Co/Do service stations linked to the oil company by a PMS clause.

16    As regards the first two categories, the Commission considered that there was no risk of cumulation of aid and that the *de minimis* rule was applicable (Article 1 of the Decision).

17    For the third category, the Commission considered that a prohibited cumulation of aid could not be ruled out. Therefore, in its view, the aid granted to the service stations in question was incompatible with the common market and with the functioning of the EEA Agreement inasmuch as it could exceed EUR 100 000 per recipient over a period of three years (point (a) of the first paragraph of Article 2 of the Decision).

18    As regards the fourth category, the Commission also considered that grants of aid incompatible with the common market and the functioning of the EEA Agreement to companies owning and operating more than one service station

could not be ruled out, inasmuch as, given the possible cumulation of aid, that aid could exceed EUR 100 000 per recipient over a period of three years (point (b) of the first paragraph of Article 2 of the Decision).

19    Finally, as regards the last two categories, the Commission also considered that, for the same reasons, there was a risk of cumulation of aid to the oil companies concerned. In its view, the supplier profited from either all or part of the aid granted to the operators since those operators were no longer able to invoke the PMS clause or could only do so to a more limited extent (points (c) and (d) of the first paragraph, and the second paragraph, of Article 2 of the Decision).

20    The Commission considered that the measures taken by the Netherlands Government which were not covered by the *de minimis* rule constituted aid within the meaning of Article 92(1) of the Treaty (see paragraphs 88 to 93 of the Decision) and that that aid was not covered by any of the derogations provided for in Article 92(2) and (3) of the Treaty (see paragraphs 94 to 102 of the Decision). It therefore declared that aid to be incompatible with the common market (Article 2 of the Decision) and ordered its recovery (Article 3 of the Decision).

Substance

21    In support of its application, the Netherlands Government makes the general complaint that, by refusing to accept that the Temporary Regulation and the Draft Amendment complied with the *de minimis* rule, the Commission failed to respect the binding nature of the Notice. More specifically, the Netherlands Government claims that the Commission acted in breach of Article 92(1) of the Treaty, the *de minimis* rule, the principles of legal certainty, equal treatment and

protection of legitimate expectations, the obligation to cooperate in good faith laid down in Article 5 of the EC Treaty (now Article 10 EC), the requirement under Article 189 of the EC Treaty (now Article 249 EC) that the terms of decisions be specified with sufficient particularity, and the obligation to state reasons laid down in Article 190 of the EC Treaty (now Article 253 EC):

— by holding that, in cases where a single applicant operates more than one service station, the grant of *de minimis* aid per service station came within the scope of Article 92(1) of the Treaty and not within the scope of the Notice;

— by distinguishing, without justification, between 'pure' and '*de facto*' Co/Co service stations;

— by presuming that there was indirect aid to oil companies linked to service stations by exclusive purchasing agreements containing a PMS clause;

— by holding that the grant of aid to service stations in respect of which the Netherlands authorities had not provided any information or had provided only partial information came within the scope of Article 92(1) of the Treaty and not within the scope of the Notice;

— by failing to take account of the environmental protection objectives pursued by the Netherlands Government in its assessment of the compatibility of the disputed measures with the common market, and

— by requiring that the aid be recovered.

*The binding nature of the Notice*

22    The Netherlands Government considers that, inasmuch as the amount of aid granted to service stations near the border does not exceed the ceiling of EUR 100 000 imposed by the Notice, the Commission ought to have considered that the Temporary Regulation and the Draft Amendment were compatible with the common market. The presumption underlying the *de minimis* rule is irrebuttable, as, moreover, is apparent from paragraphs 68 and 69 of the Decision. In addition to disregarding the absolute nature of that rule, the Commission also failed to observe the principles of legal certainty, protection of legitimate expectations and equal treatment.

23    The Commission disputes the allegation that it failed to respect the irrebuttable presumption underlying the *de minimis* rule since, in its view, the strict conditions laid down in the Notice governing the application of that rule were not fully met in the present case. In particular, the Commission submits that the disputed measures are capable of having cumulative effects of the kind prohibited by the Notice where either one owner possesses more than one service station or the supplier has *de facto* control over the dealer by virtue of an exclusive purchasing agreement (see paragraph 69 of the Decision).

24    In that respect, it should be borne in mind that the Commission may adopt guidelines on the exercise of its powers of assessment, particularly in State aid matters. In so far as those guidelines do not contradict Treaty rules, the policy rules which they contain are to be followed by that institution (see Case 310/85 *Deufil* v *Commission* [1987] ECR 901, paragraph 22; Case C-313/90 *CIRFS and Others* v *Commission* [1993] ECR I-1125, paragraphs 34 and 36, and Case C-311/94 *IJssel-Vliet* [1996] ECR I-5023, paragraph 42).

25    Accordingly, by establishing the principle that 'where the amount of aid involved is small' it does not have an 'appreciable effect on trade and competition between Member States', the Notice determines the way in which the Commission is to

assess the effect of an aid measure on trade between Member States. In the first indent of its second paragraph, the Notice thus sets the ceiling for aid, below which Article 92(1) of the Treaty does not apply — with the result that the aid at issue is no longer subject to the obligation of prior notification to the Commission laid down in Article 93(3) of the Treaty — at a maximum amount of EUR 100 000 over a period of three years from when the first *de minimis* aid is granted.

26    The Notice also states, in its last paragraph, that the Member States have an obligation to facilitate the achievement of the supervisory task entrusted to the Commission and makes application of the *de minimis* rule subject to the condition of non-cumulation of aid, which provides that additional aid granted to an undertaking which receives *de minimis* aid must not bring the total amount of that type of aid to a level in excess of EUR 100 000 over a period of three years.

27    In the present case, the Commission contends that the Netherlands Government did not comply with the condition of non-cumulation of aid (see, in particular, paragraphs 69 and 71 to 75 of the Decision). The Commission therefore confined itself to verifying whether the conditions for applicability of the *de minimis* rule had been met, and did not impose any new conditions beyond the guidelines in the Notice.

28    The plea in law relating to the binding nature of the Notice thus has no factual basis and must be rejected.

*The risk of cumulation of aid*

29    The Netherlands Government complains that the Commission held that the grant of subsidies, the ceilings of which were fixed per service station, could not be

covered by the *de minimis* rule on the ground of the risk of cumulation of aid to a single *de facto* recipient, particularly where the applicant operates more than one service station. The Netherlands Government also claims that the Commission acted in breach of Article 92(1) of the Treaty, the *de minimis* rule and the principles of legal certainty, equal treatment and protection of legitimate expectations.

30    According to the Netherlands Government, where the aid is granted per service station, a single service station can never receive the *de minimis* aid more than once. The fact that the 633 subsidised service stations may be regarded as either separate undertakings or, in certain cases, as parts of larger economic entities has absolutely no economic impact on trade between Member States or on competition.

31    The Netherlands Government submits that, at the very least, the Decision does not comply with the obligation to state reasons laid down in Article 190 of the Treaty, inasmuch as it does not include a statement of reasons or, at least, does not state clear reasons explaining why the *de minimis* rule cannot be applied in respect of individual service stations in cases where a service station is part of a large economic entity.

32    According to the Commission, in order to verify that there is no cumulation of aid, the real recipient of the aid must be identified. In the present case, the recipient could be a service station but it could also be a larger economic entity such as an oil company, where, as a result of that aid, that company did not have to make compensatory payments or paid less compensation to service stations linked to it by a PMS clause, than if there had been no aid.

33    The Commission also disputes the allegation that it failed to observe the obligation to state reasons since the Decision does specify the reasons why the Commission considered that the ceiling for *de minimis* aid had not been complied with.

JUDGMENT OF 13. 6. 2002 — CASE C-382/99

34    As to the obligation to state reasons, it is apparent from paragraph 74 of the Decision that, according to the Commission, for the purpose of applying the *de minimis* rule, it is necessary to 'determin[e] who the actual aid recipient is and whether the *de minimis* threshold has been complied with for each recipient'. Furthermore, in paragraph 69 of the Decision, the Commission states that there is a 'risk of aid cumulation' where 'one owner possesses several service stations' or where 'the supplier has *de facto* control over the dealer by virtue of an exclusive purchasing agreement'. It is also apparent from paragraph 82 of the Decision that aid cumulation of the kind prohibited by the Notice occurs in cases where 'the same company owns and operates several service stations' or where 'the same dealer has applied for aid more than once and therefore appears several times in the list of eligible recipients'.

35    That statement of reasons, which clearly and unequivocally sets out the Commission's reasoning, enabled the Netherlands Government to ascertain the reasons why that institution considered that the scheme at issue, which granted aid, albeit limited, to individual service stations, was not covered by the *de minimis* rule, and also permits the Court to exercise its powers of review.

36    The Decision therefore complies with the obligation to state reasons laid down in Article 190 of the Treaty.

37    As regards the substance of the case, it should be observed that, inasmuch as the scheme at issue provides for aid to be granted per service station, by definition it provides for the owner of several service stations, all operated by him, to receive as many grants of aid as he owns service stations. Such a system thus carries a risk of exceeding the *de minimis* ceiling per recipient, an outcome prohibited by the Notice.

38    The Commission also correctly inferred that there is a similar risk of cumulation of aid where an oil company has *de facto* control over service-station operators,

I - 5216

whose freedom is limited by exclusive purchasing and lease agreements. In that case, as is apparent from paragraphs 60 to 66 of this judgment, the oil company may likewise be regarded as the real recipient of the aid granted to the service stations, inasmuch as the grant of such aid renders any PMS clause redundant.

39    In those circumstances, by taking the view that, owing to the risk inherent in the scheme that the condition as to non-cumulation of aid would not be met, the scheme for granting aid up to a maximum amount per service station did not meet the necessary conditions for it to come within the scope of the Notice, the Commission did not exceed the bounds of its discretion, nor did it act in breach of the principles of legal certainty, equal treatment and protection of legitimate expectations.

40    The plea in law relating to the risk of cumulation of aid must therefore be rejected as unfounded.

*The distinction between 'pure' Co/Co service stations and 'de facto' Co/Co service stations*

41    The Netherlands Government considers that the Commission, in applying its distinction between 'pure' and '*de facto*' Co/Co service stations, acted in breach of Article 92(1) of the Treaty, the *de minimis* rule, the principles of legal certainty, equal treatment and protection of legitimate expectations, the requirement under Article 189 of the Treaty that the terms of decisions be specified with sufficient particularity, and the obligation to state reasons laid down in Article 190 of the Treaty.

I - 5217

42    The Netherlands Government observes that, at point (a) of paragraph 82 of the Decision, the Commission found that 28 service stations fell into the 'pure' Co/Co category, that is to say, that they belonged to, and were operated by, a single oil company, yet it failed to state the factual and legal circumstances underlying that finding, or to identify the oil companies which, in its view, owned more than one service station and were thus in a position to receive more than one *de minimis* aid.

43    Similarly, at point (b) of paragraph 82 of the Decision, the Commission identified 21 service stations as falling within the '*de facto*' Co/Co category, that is to say, as being covered by the assumption that the operators of more than one service station applied for more than one grant of aid and thus appeared more than once in the list of recipients, yet the Commission likewise failed to state which of those recipients were, in its view, identical to each other or the factual and legal circumstances on which it relied when drawing that conclusion.

44    Accordingly, the Commission failed to observe its obligation to state reasons which, moreover, made it impossible for the Netherlands Government to ascertain the sums which were to be recovered and the entities from whom those sums were to be recovered.

45    The Netherlands Government adds that the obligation on Member States to provide information in respect of *de minimis* aid, laid down in the Notice, is necessarily less rigorous than the obligation imposed on them by Articles 92 and 93 of the Treaty. The Notice was adopted with the intention of simplifying the administration for both the Member States and the Commission's services, and an increase in the burden on Member States in respect of the information to be provided would run counter to that objective.

46    According to the Commission, since the Netherlands Government failed to respond to its numerous requests for information, even to a Commission decision

requesting information relating particularly to the ownership structures of the service stations, the Commission was justified in relying on the information at its disposal (see paragraphs 71 to 81 of the Decision) to carry out, *inter alia*, the classification in paragraph 82 of the Decision. It considers that, given that this was an aid scheme, it could not have been expected to identify the recipients in its Decision with the same precision as in the case of individual grants of aid.

47    The Commission observes that it identified in the Decision the undertakings for which the aid granted under the Temporary Regulation appeared questionable since the Commission had been unable to satisfy itself that the conditions for application of the *de minimis* rule had been met in respect of those undertakings. The undertakings concerned are the applicants/service stations listed in Article 2 of the Decision. It is now for the Netherlands Government to determine, on the basis of, in particular, the data in the annex to the Decision, the amount of aid granted, the amount to aid to be recovered and the entities from which the aid is to be recovered.

48    In that regard, while it is true that the Notice permits, under certain conditions, Member States to grant small amounts of aid — determined according to objective criteria — without being subject to an obligation to make prior notification, it remains necessary for the Member State intending to grant such aid to provide the Commission with all the information which would justify the application of the *de minimis* rule in precisely those cases where the Commission has doubts as to the compatibility of the aid with the common market and thus also as to whether the conditions laid down in the Notice have been met. That duty to provide information follows from the general duty of Member States to cooperate with the Commission in good faith, established by Article 5 of the Treaty.

49    In those circumstances, if a Member States does not provide the Commission with the requested information or if it provides only partial information, the legality of the decision adopted by the Commission, in particular as regards the obligation to state reasons, is to be assessed in the light of the information available to the

I - 5219

Commission when the decision was adopted (see, to that effect, in particular, Case 234/84 *Belgium* v *Commission* [1986] ECR 2263, paragraphs 16 and 22).

50    If a Member State encounters unforeseen difficulties in implementing an order for recovery, it can submit those problems for consideration by the Commission. In such a case the Commission and the Member State concerned must, in accordance with the duty of genuine cooperation, work together in good faith with a view to overcoming the difficulties whilst fully observing the Treaty provisions, in particular the provisions on aid (see, in particular, Case C-303/88 *Italy* v *Commission* [1991] ECR I-1433, paragraph 58).

51    In the present case, the complaints of the Netherlands Government relate to ambiguities in the Decision which allegedly prevent it from determining the precise identity of the real recipients of the aid granted to 'pure' and '*de facto*' Co/Co service stations.

52    The Decision identifies and quantifies the service stations owned and operated by a single oil company (the 'pure' Co/Co service stations) and those operated by a single dealer who, in the Commission's view, has applied for aid more than once and thus appears more than once in the list of recipients ('*de facto*' Co/Co service stations). The Netherlands Government has not provided any concrete evidence which would call into question the classification of the service stations in the two categories referred to above, made by the Commission on the basis of the information at its disposal.

53    Moreover, if the Netherlands Government encountered difficulties in implementing the Decision, in particular in determining the precise identity of the real recipients of the disputed aid, it should have made those difficulties known to the Commission, which would have been obliged to assist it in resolving them in accordance with the duty to cooperate in good faith laid down in Article 5 of the Treaty.

54 In view of the foregoing, the plea in law relating to the distinction between 'pure' and '*de facto*' Co/Co service stations must be rejected as unfounded.

*Indirect aid to oil companies*

55 The Netherlands Government submits that, by assuming that the scheme provides indirect aid to oil companies linked to service stations by exclusive purchasing agreements containing a PMS clause, the Commission acted in breach of Article 92(1) of the Treaty, the *de minimis* rule, the principles of legal certainty, equal treatment and protection of legitimate expectations, and the obligation to state reasons laid down in Article 190 of the Treaty.

56 According to the Netherlands Government, the indirect advantages for the oil companies do not constitute State aid within the meaning of Article 92 of the Treaty but, instead, arise out of contractual relationships in which the national authorities are in no way involved, and of whose existence they are not even aware. The national authorities cannot be required to carry out continuous checks as to whether there are such indirect effects, not visible to those authorities. Even less can they be responsible for ensuring in all circumstances that such effects do not occur.

57 The Netherlands Government adds that the PMS clauses differ in their content and, in the majority of cases, do not create an unconditional obligation on oil companies to contribute to forecourt discounts. The right to initiate such price reductions generally lies with those companies, who only agree to make them if their market share is threatened. The respective market positions of the oil

I - 5221

companies active in the Netherlands market were not affected by the price differential with Germany, since those companies were all affected to the same extent.

58  The Commission claims that as a result of the aid granted by the Netherlands, the oil companies did not have to apply the PMS clauses which bound them to their distributors. Since the forecourt discounts offered by operators to retain their market shares were compensated for by the aid granted by the Netherlands State, all requests to the oil companies for intervention, based on the PMS clause, were necessarily rejected by those oil companies for lack of cause (see paragraphs 84 and 85 of the Decision).

59  In any event, the Commission submits that it was unable, on the basis of the information provided by the Netherlands Government, to satisfy itself that in cases where the contract between the oil company and the service station included a PMS clause, there was no risk of a cumulation of aid to a single real recipient in excess of the ceiling set by the Notice (see paragraph 83 of the Decision). In the Commission's view, it was for the Netherlands Government to establish an appropriate control mechanism which would have enabled the Commission to satisfy itself that the *de minimis* ceiling on aid would never be exceeded.

60  In that regard, it is important to remember that Article 92(1) of the Treaty provides that any aid granted by a Member State, or through State resources in any form whatsoever, which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods is incompatible with the common market. In particular, measures which, in various forms, mitigate the burdens which are normally included in the budget of an undertaking and which, without therefore being subsidies in the strict meaning of the word, are similar in character and have the same effect are considered to constitute aid (see, in particular, Case C-387/92 *Banco Exterior de España* [1994] ECR I-877,

paragraph 13; Case C-75/97 *Belgium* v *Commission* [1999] ECR I-3671, paragraph 23 and Case C-156/98 *Germany* v *Commission* [2000] ECR I-6857, paragraph 25).

61    Moreover, according to settled case-law, Article 92(1) does not distinguish between measures of State intervention by reference to their causes or aims but defines them in relation to their effects (Case 173/73 *Italy* v *Commission* [1974] ECR 709, paragraph 27 and Case C-241/94 *France* v *Commission* [1996] ECR I-4551, paragraph 20).

62    In the present case, the indirect advantage to oil companies stems from the aid granted under the Temporary Regulation inasmuch as that aid renders it unnecessary, in practice, to invoke the PMS clauses.

63    The aid granted by the Netherlands was intended to prevent the service stations located near the German border from experiencing a drop in turnover as a result of the increase in fuel prices following the rise in excise duties in the Netherlands, given the more competitive rates in Germany. Conversely, the Temporary Regulation stated that, in the event of an increase in the German excise duties, the level of the subsidies would be reduced.

64    The same purpose is also served by the PMS clauses which, as is correctly pointed out in paragraph 84 of the Decision, aim to protect the dealer's turnover from competing sales in the immediate vicinity of his service station, where domestic or international market conditions make a temporary or long-term adjustment of the forecourt discounts granted by the dealer desirable or, indeed, necessary.

I - 5223

65    Therefore, the Temporary Regulation applied in circumstances which were such as to trigger the application of the PMS clauses.

66    In those circumstances, the aid granted to service stations linked to oil companies by PMS clauses had economic effects for the companies concerned since the effect of that aid was, in any event, to release those companies from their obligation to bear all or part of the costs of the forecourt discounts offered by dealers to prevent loss of market share. That State intervention therefore constituted aid to oil companies since its effect was to mitigate the burdens which would normally have affected the budget of companies anxious to maintain their market position in the light of developments in the domestic and international markets.

67    In substance, paragraph 83 et seq. of the Decision set out the foregoing points in a clear and unequivocal manner and enabled the Netherlands Government to ascertain the reasons why the Commission assumed that the scheme provided indirect aid to oil companies linked to service stations by exclusive purchasing agreements containing a PMS clause, solely on the ground that the contracts contained such clauses.

68    In those circumstances, the Commission neither exceeded the bounds of its discretion nor acted in breach of its obligation to state reasons.

69    The plea in law relating to the existence of indirect aid to oil companies is therefore unfounded and must be rejected.

*The consequences of the lack, or inadequacy, of information provided by the Member State*

70    The Netherlands Government claims that, by holding that the grant of aid to service stations in respect of which the Netherlands authorities did not provide any information or provided only partial information did not come within the scope of the Notice, the Commission acted in breach of Article 92(1) of the Treaty, the *de minimis* rule, the principles of legal certainty, equal treatment and protection of legitimate expectations, the requirement under Article 189 of the Treaty that the terms of decisions be specified with sufficient particularity, and the obligation to state reasons laid down in Article 190 of the Treaty.

71    The Netherlands Government submits, first, that the Commission's assertion that no information had been provided in respect of the service stations listed in point (a) of the first paragraph of Article 2 of the Decision is incorrect as regards the service stations identified by the numbers 297, 372 and 433.

72    Next, the Netherlands Government claims that the Commission made an error of assessment by considering that the information provided to it was incomplete on the sole ground that the exclusive purchasing agreements had not been supplied. Examination of that type of agreement is of no relevance when assessing a subsidy granted to service-station operators in the light of the conditions set out in the Notice. The same conclusion must be drawn in respect of the Commission's contention that it needed the exclusive purchasing agreements in order to discern whether there was any indirect aid to oil companies.

73    Finally, in more general terms, the Netherlands Government claims that the lack of certain information required by the Commission was not sufficient to warrant the Commission's concerns that there was a cumulation of aid in favour of the service stations concerned. Whichever situation one considers — namely, an

applicant who owns only one service station, or an applicant who owns more than one service station —, the service station receiving the aid cannot under any circumstances receive that aid more than once. Since the condition as to non-cumulation of aid was met, the Commission ought not to have applied the provisions of Article 92(1) of the Treaty.

74    The Commission contends that if the Decision contains inaccuracies, those inaccuracies are attributable to the inaccurate or incomplete information provided by the Netherlands Government. As regards, more specifically, the information relating to service stations Nos 297, 372 and 433, the Commission observes that service station No 433 is not referred to in point (a) of the first paragraph of Article 2 of the Decision but in point (b) of the first paragraph of Article 2, as a 'pure' Co/Co. As regards the two other service stations, the Commission maintains that it did not receive any information relating to them, at least not within the period prescribed by it for provision of that information.

75    According to the Commission, it is not for the Member States, but for the Commission, exercising its discretion, to decide whether the requested information is relevant or not. In any event, the exclusive purchasing agreements, which were liable to contain PMS clauses, were relevant, since their application could give rise to a cumulation of aid.

76    In that regard, as has already been observed in paragraph 49 of this judgment, the legality of a decision concerning State aid is to be assessed in the light of the information available to the Commission when the decision was adopted. A Member State therefore cannot rely on information which it failed to bring to the attention of the Commission in the course of the administrative procedure when contesting the legality of such a decision (Joined Cases C-278/92, C-279/92 and C-280/92 *Spain* v *Commission* [1994] ECR I-4103, paragraph 31). This is *a fortiori* the case where the Member State has refused to reply to an express request for information from the Commission (see *France* v *Commission*, paragraphs 36 and 37).

I - 5226

77    In the present case, it is apparent from paragraph 64 of the Decision that no information was supplied to the Commission in respect of 59 service stations and that it received incomplete information for 191 service stations. On that matter, the Commission gave the following explanation of why it considered that the information provided was incomplete:

'... the information is insufficient in cases where a service station merely completed the Senter [control body designated by the Netherlands Government] questionnaire without providing copies of its exclusive purchasing agreement, with the result that its reply was not substantiated. For instance, some service stations classified themselves as falling into one of the three categories (Do/Do, Co/Do or Co/Co) without providing any supporting evidence, while others claimed to be independent but failed to substantiate this.'

78    With the exception of the three service stations in respect of which no evidence has been provided of the alleged error of assessment made by the Commission, the Netherlands Government does not dispute that it failed to respond to the Commission's requests for information.

79    However, the information and the documentary evidence relating to the ownership structures of the service stations at issue (Do/Do, Co/Do or Co/Co) or the existence or otherwise of PMS clauses in the exclusive purchasing agreements requested by the Commission, were essential in order to determine the real recipients of the aid and, consequently, to verify that there was no cumulation of aid of the kind prohibited by the Notice.

80    Therefore, the Commission neither acted in breach of the obligation to state reasons nor made a manifest error of assessment by declaring that the aid granted

to service stations in respect of which it had not received information or had received only partial information was not covered by the *de minimis* rule. The plea in law relating to the consequences of the lack, or inadequacy, of information provided by the Member State must therefore be rejected.

*The failure to take account of environmental protection objectives*

81   The Netherlands Government claims that by failing to take account of environmental protection objectives in its assessment of the compatibility of the disputed measures with the common market, the Commission acted in breach of Article 92(3) of the Treaty and the obligation to state reasons.

82   The Netherlands Government points out that the increase in the Netherlands excise duties effective from 1 July 1997 was intended to reduce the use of cars, the congestion and the emissions produced by road traffic.

83   The precise purpose of the Temporary Regulation was to reduce as far as possible the detrimental effects of that increase on the competitiveness of service-station operators. According to the principles underlying the Commission's competition policy (see, to that effect, the XXIIth Report on Competition Policy, 1992, paragraph 451), aid may be compatible with the common market where it aims to prevent certain undertakings from sustaining a serious drop in competitiveness as a result of the implementation of national measures intended to promote protection of the environment and conservation of energy.

84    In that regard, whether or not the increase in the Netherlands excise duties was in fact justified on environmental grounds, it is enough to observe that, as pointed out by the Commission, the Netherlands Government did not invoke such grounds during the administrative phase of the procedure and, consequently, cannot now argue that the Commission failed to consider the objective of protection of the environment when assessing the compatibility of the disputed measures with Article 92(1) of the Treaty. As the Court has already observed in paragraphs 49 and 76 of this judgment, the legality of a decision concerning State aid, particulary in regard to the obligation to state reasons, is to be assessed in the light of the information provided by the Member State at the time the decision was adopted.

85    The plea in law relating to the failure to take account of environmental protection objectives must therefore be rejected.

*The recovery of aid*

86    The Netherlands Government submits that the obligation to recover aid already granted infringes Article 92(1) of the Treaty, the *de minimis* rule, the principles of legal certainty, equal treatment and protection of legitimate expectations, the requirement under Article 189 of the Treaty that the terms of decisions be specified with sufficient particularity, and the obligation to state reasons laid down in Article 190 of the Treaty.

87    In its view, it is not possible to identify definitively, on the basis of the Decision, the sums which are to be recovered or the persons from whom those sums are to be recovered. Moreover, it will never be possible to determine those sums because it would be impossible to estimate the forecourt discount which a company

would have accepted if no subsidy had been granted under the Temporary Regulation.

88    The Netherlands Government also claims that the Commission was informed as early as 18 August 1997 — the date on which the letter of Conditional Notification was lodged with the Commission — of the existence of the Temporary Regulation, of the fact that it came into force on 1 July 1997, and of the opinion of the Netherlands authorities that the measures came within the scope of the Notice. According to that Government, if the Commission thought otherwise and considered that, notwithstanding the Notice, the rules already in force would have to be reviewed by the Commission pursuant to Article 93(3) of the Treaty, as was the case for the introduction of a scheme of subsidies to individual service stations, provided for in the Draft Amendment to the Temporary Regulation which was the subject of the Conditional Notification, it was for the Commission, having regard to the obligation imposed on it under Article 5 of the Treaty to cooperate in good faith with the national authorities, immediately and unequivocally to inform the Netherlands authorities of that fact.

89    Article 93(2) of the Treaty provides that where the Commission finds that aid granted by a State or through State resources is not compatible with the common market, it is to decide that the State concerned is to abolish or alter such aid within a period of time determined by it. According to settled case-law, the obligation on a State to abolish aid regarded by the Commission as being incompatible with the common market has as its purpose to re-establish the previously existing situation (see, in particular, Case C-350/93 *Commission* v *Italy* [1995] ECR I-699, paragraph 21).

90    In the absence of pertinent provisions of Community law, the recovery of aid which has been declared incompatible with the common market is to be carried out in accordance with the rules and procedures laid down by national law, in so far as those rules and procedures do not have the effect of making the recovery required by Community law practically impossible and do not undermine the principle of equivalence with procedures for deciding similar but purely national disputes (see Joined Cases 205/82 to 215/82 *Deutsche Milchkontor and Others*

[1983] ECR 2633, paragraph 19 and Case 94/87 *Commission* v *Germany* [1989] ECR 175, paragraph 12).

91    It should be added that the obligation on a Member State to calculate the exact amount of aid to be recovered — particularly where, as in the present case, given the large number of service stations involved, that calculation is dependent on information which that Member State has not provided to the Commission — forms part of the more general reciprocal obligation to cooperate in good faith in the implementation of Treaty rules concerning State aids imposed on the Commission and the Member States.

92    As to the alleged uncertainty as to the identity of the addressees of the orders for recovery, it is clear from the Decision, in particular from paragraph 74 of its grounds, that the aid is to be recovered from the undertakings which were the real recipients of that aid. As has already been pointed out in paragraph 50 of this judgment, if the Netherlands Government had serious doubts on that matter, it could, like any Member State which encounters unforeseen difficulties in implementing an order for recovery, have submitted, and can still submit, those problems to the Commission for its consideration, with a view to overcoming them in accordance with the principle of genuine cooperation whilst fully observing the Treaty provisions on aid. Such a step would have been all the more justified since the uncertainty as to the identity of a large number of the addressees of the orders for recovery was linked to the inadequacy of the information provided to the Commission.

93    Finally, it is apparent from paragraph 1 of the Decision that on 22 September 1997, only one month after the Conditional Notification, the Commission sought to obtain additional information from the Netherlands authorities to enable it to ascertain whether the Temporary Regulation and the Draft Amendment complied with the conditions laid down in the Notice. After several reminders from the Commission and requests by the Netherlands Government for an extension to the time-limit, the Commission decided to initiate the procedure under Article 93(2) of the Treaty (see paragraph 2 of the Decision).

94    In those circumstances, the Commission cannot be accused of delaying the initiation of the procedure and the adoption of the Decision. It should be added in that regard that the decision to initiate the procedure already made clear the Commission's doubts as to the applicability of the Notice to the Temporary Regulation in respect of certain categories of service stations and drew attention to the fact that incompatible aid would have to be recovered. The pleas in law alleging failure to observe the principles of legal certainty and protection of legitimate expectations also do not appear to be well founded.

95    It follows that the last plea in law raised by the Netherlands Government must be rejected as unfounded.

96    Since none of the pleas in law raised by the Netherlands Government can be accepted, the application must be dismissed in its entirety.

Costs

97    Under Article 69(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs, if they have been applied for in the successful party's pleadings. Since the Commission has applied for costs and the Kingdom of the Netherlands has been unsuccessful, the latter must be ordered to pay the costs.

On those grounds,

THE COURT (Fifth Chamber)

hereby:

1.   **Dismisses the application;**

2.   **Orders the Kingdom of the Netherlands to pay the costs.**

von Bahr                Edward                Wathelet

Delivered in open court in Luxembourg on 13 June 2002.

R. Grass                                                P. Jann

Registrar                                    President of the Fifth Chamber