# EXHIBIT 34

JUDGMENT OF THE COURT (Grand Chamber)

30 May 2006 [*]

In Case C-459/03,

ACTION for failure to fulfil obligations under Article 226 EC and Article 141 EA, brought on 30 October 2003,

**Commission of the European Communities,** represented by P.J. Kuijper and M.B. Martenczuk, acting as Agents, with an address for service in Luxembourg,

applicant,

supported by:

**United Kingdom of Great Britain and Northern Ireland,** represented by C. Jackson and C. Gibbs, acting as Agents, and by R. Plender QC, with an address for service in Luxembourg,

intervener,

[*]  Language of the case: English.

JUDGMENT OF 30. 5. 2006 — CASE C-459/03

v

**Ireland,** represented by R. Brady and D. O'Hagan, acting as Agents, and by P. Sreenan and E. Fitzsimons, SC, P. Sands QC, and N. Hyland, BL, with an address for service in Luxembourg,

defendant,

supported by:

**Kingdom of Sweden,** represented by K. Wistrand, acting as Agent,

intervener,

THE COURT (Grand Chamber),

composed of V. Skouris, President, P. Jann, C.W.A. Timmermans (Rapporteur) and J. Malenovský, Presidents of Chambers, J.-P. Puissochet, R. Schintgen, N. Colneric, S. von Bahr, J.N. Cunha Rodrigues, M. Ilešič, J. Klučka, U. Lõhmus and E. Levits, Judges,

Advocate General: M. Poiares Maduro,

Registrar: L. Hewlett, Principal Administrator,

having regard to the written procedure and further to the hearing on 8 November 2005,

after hearing the Opinion of the Advocate General at the sitting on 18 January 2006,

gives the following

## Judgment

1    By its application, the Commission of the European Communities seeks a declaration by the Court that, by instituting dispute-settlement proceedings against the United Kingdom of Great Britain and Northern Ireland under the United Nations Convention on the Law of the Sea ('the Convention') concerning the MOX plant located at Sellafield (United Kingdom), Ireland has failed to fulfil its obligations under Articles 10 EC and 292 EC and Articles 192 EA and 193 EA.

### Legal context

2    The Convention, which was signed at Montego Bay (Jamaica) on 10 December 1982, came into force on 16 November 1994.

3    The Convention was approved on behalf of the European Community by Council Decision 98/392/EC of 23 March 1998 (OJ 1998 L 179, p. 1). The Convention has also been ratified by all of the Member States of the European Union.

4    On 21 June 1996, at the time when the Convention was being ratified by Ireland, that Member State made the following declaration:

'Ireland recalls that, as a State member of the European Community, it has transferred competence to the Community in regard to certain matters which are governed by the Convention. A detailed declaration on the nature and extent of the competence transferred to the European Community will be made in due course in accordance with the provisions of Annex IX to the Convention.'

5    According to the first citation in the preamble to Decision 98/392:

'Having regard to the Treaty establishing the European Community, and in particular Articles 43 [now, after amendment, Article 37 EC], 113 [now, after amendment, Article 133 EC], and 130s(1) [now, after amendment, Article 175(1) EC], in conjunction with the first sentence of Article 228(2) and the second subparagraph of Article 228(3) thereof [now, after amendment, the first sentence of Article 300(2) EC and the second subparagraph of Article 300(3) EC].'

6    The third, fifth and sixth recitals in the preamble to that decision read as follows:

'Whereas the conditions permitting the Community to deposit the instrument of formal confirmation provided for in Article 3 of Annex IX to the Convention and referred to in Article 4(4) of the Agreement have been fulfilled;

COMMISSION v IRELAND

…

Whereas the Convention … should be approved to enable the Community to become a party to [it] within the limits of its competence;

Whereas the Community must, when depositing the instrument of formal confirmation, also deposit a declaration specifying the matters governed by the Convention … in respect of which competence has been transferred to it by its Member States …'

7    Article 1 of Decision 98/392 provides:

'1. The United Nations Convention on the Law of the Sea and the Agreement relating to the implementation of Part XI thereof are hereby approved on behalf of the European Community.

2. The texts of the Convention and the Agreement appear in Annex I.

3. The Community's instrument of formal confirmation, which appears in Annex II, shall be deposited with the Secretary-General of the United Nations. It shall comprise a declaration under Article 310 of the Convention and a declaration of competence.'

8    The declaration of competence referred to in Article 1(3) of Decision 98/392 ('the Declaration of Community competence') is worded as follows:

'DECLARATION CONCERNING THE COMPETENCE OF THE EUROPEAN COMMUNITY WITH REGARD TO MATTERS GOVERNED BY THE UNITED NATIONS CONVENTION ON THE LAW OF THE SEA OF 10 DECEMBER 1982 AND THE AGREEMENT OF 28 JULY 1994 CONCERNING THE APPLICATION OF PART XI OF THAT CONVENTION

*(Declaration made pursuant to Article 5(1) of Annex IX to the Convention and to Article 4(4) of the Agreement)*

Article 5(1) of Annex IX to the United Nations Convention on the Law of the Sea provides that the instrument of formal confirmation of an international organisation shall contain a declaration specifying the matters governed by the Convention in respect of which competence has been transferred to the organisation by its Member States which are Parties to the Convention. …

…

The European Communities were established by the Treaties of Paris (ECSC) and of Rome (EEC and Euratom), signed on 18 April 1951 and 25 March 1957 respectively. … [Those Treaties] were amended by the Treaty on European Union, signed in Maastricht on 7 February 1992 …

…

In accordance with the provisions referred to above, this declaration indicates the competence that the Member States have transferred to the Community under the Treaties in matters governed by the Convention.

...

The Community has exclusive competence for certain matters and shares competence with its Member States for certain other matters.

1.   Matters for which the Community has exclusive competence

— The Community points out that its Member States have transferred competence to it with regard to the conservation and management of sea fishing resources. Hence in this field it is for the Community to adopt the relevant rules and regulations (which are enforced by the Member States) and, within its competence, to enter into external undertakings with third States or competent international organisations. ...

— By virtue of its commercial and customs policy, the Community has competence in respect of those provisions of Parts X and XI of the Convention and of the Agreement of 28 July 1994 which are related to international trade.

2. Matters for which the Community shares competence with its Member States

— With regard to fisheries, for a certain number of matters that are not directly related to the conservation and management of sea fishing resources, for example research and technological development and development cooperation, there is shared competence.

— With regard to the provisions on maritime transport, safety of shipping and the prevention of marine pollution contained, inter alia in Parts II, III, V, VII and XII of the Convention, the Community has exclusive competence only to the extent that such provisions of the Convention or legal instruments adopted in implementation thereof affect common rules established by the Community. When Community rules exist but are not affected, in particular in cases of Community provisions establishing only minimum standards, the Member States have competence, without prejudice to the competence of the Community to act in this field. Otherwise competence rests with the Members States.

A list of relevant Community acts appears in the Appendix. The extent of Community competence ensuing from these acts must be assessed by reference to the precise provisions of each measure, and in particular, the extent to which these provisions establish common rules.

...

*Appendix*

COMMUNITY ACTS WHICH REFER TO MATTERS GOVERNED BY THE CONVENTION AND THE AGREEMENT

— In the maritime safety and prevention of marine pollution sectors

...

Council Directive 93/75/EEC of 13 September 1993 concerning minimum requirements for vessels bound for or leaving Community ports and carrying dangerous or polluting goods (OJ L 247, 5.10.1993, p. 19)

...

— In the field of protection and preservation of the marine environment (Part XII of the Convention)

...

Council Directive 85/337/EEC of 27 June 1985 on the assessment of the effects of certain public and private projects on the environment (OJ L 175, 5.7.1985, p. 40)

...

— Conventions to which the Community is a party

Convention for the prevention of marine pollution from land-based sources, Paris, 14 June 1974 (Council Decision 75/437/EEC of 3 March 1975, published in OJ L 194, 25.7.1975, p. 5).

Protocol amending the Convention for the prevention of marine pollution from land-based sources, Paris, 26 March 1986 (Council Decision 87/57/EEC of 22 December 1986, published in OJ L 24, 27.1.1987, p. 46).

...'

9  Part IX of the Convention, entitled 'Enclosed or semi-enclosed seas', consists of Articles 122 and 123, which are worded as follows:

'*Article 122*

Definition

For the purposes of this Convention, "enclosed or semi-enclosed sea" means a gulf, basin or sea surrounded by two or more States and connected to another sea or the ocean by a narrow outlet or consisting entirely or primarily of the territorial seas and exclusive economic zones of two or more coastal States.

*Article 123*

Cooperation of States bordering enclosed or semi-enclosed seas

States bordering an enclosed or semi-enclosed sea should cooperate with each other in the exercise of their rights and in the performance of their duties under this Convention. To this end they shall endeavour, directly or through an appropriate regional organisation:

...

(b) to coordinate the implementation of their rights and duties with respect to the protection and preservation of the marine environment;

...'

10    Articles 192 to 194 of the Convention, which form part of Section 1, entitled 'General provisions', of Part XII, entitled 'Protection and preservation of the marine environment', provide as follows:

'*Article 192*

General obligation

States have the obligation to protect and preserve the marine environment.

*Article 193*

Sovereign right of States to exploit their natural resources

States have the sovereign right to exploit their natural resources pursuant to their environmental policies and in accordance with their duty to protect and preserve the marine environment.

*Article 194*

Measures to prevent, reduce and control pollution of the marine environment

1. States shall take, individually or jointly as appropriate, all measures consistent with this Convention that are necessary to prevent, reduce and control pollution of the marine environment from any source, using for this purpose the best practicable means at their disposal and in accordance with their capabilities, and they shall endeavour to harmonise their policies in this connection.

2. States shall take all measures necessary to ensure that activities under their jurisdiction or control are so conducted as not to cause damage by pollution to other States and their environment, and that pollution arising from incidents or activities under their jurisdiction or control does not spread beyond the areas where they exercise sovereign rights in accordance with this Convention.

COMMISSION v IRELAND

3. The measures taken pursuant to this part shall deal with all sources of pollution of the marine environment. These measures shall include, inter alia, those designed to minimise to the fullest possible extent:

(a) the release of toxic, harmful or noxious substances, especially those which are persistent, from land-based sources, from or through the atmosphere or by dumping;

(b) pollution from vessels, in particular measures for preventing accidents and dealing with emergencies, ensuring the safety of operations at sea, preventing intentional and unintentional discharges, and regulating the design, construction, equipment, operation and manning of vessels;

(c) pollution from installations and devices used in exploration or exploitation of the natural resources of the seabed and subsoil, in particular measures for preventing accidents and dealing with emergencies, ensuring the safety of operations at sea, and regulating the design, construction, equipment, operation and manning of such installations or devices;

(d) pollution from other installations and devices operating in the marine environment, in particular measures for preventing accidents and dealing with emergencies, ensuring the safety of operations at sea, and regulating the design, construction, equipment, operation and manning of such installations or devices.

4. In taking measures to prevent, reduce or control pollution of the marine environment, States shall refrain from unjustifiable interference with activities carried out by other States in the exercise of their rights and in pursuance of their duties in conformity with this Convention.

5. The measures taken in accordance with this part shall include those necessary to protect and preserve rare or fragile ecosystems as well as the habitat of depleted, threatened or endangered species and other forms of marine life.'

11    Articles 204 to 206 of the Convention, which feature in Section 4 of Part XII thereof, entitled 'Monitoring and environmental assessment', provide as follows:

'*Article 204*

Monitoring of the risks or effects of pollution

1. States shall, consistent with the rights of other States, endeavour, as far as practicable, directly or through the competent international organisations, to observe, measure, evaluate and analyse, by recognised scientific methods, the risks or effects of pollution of the marine environment.

2. In particular, States shall keep under surveillance the effects of any activities which they permit or in which they engage in order to determine whether these activities are likely to pollute the marine environment.

*Article 205*

Publication of reports

States shall publish reports of the results obtained pursuant to Article 204 or provide such reports at appropriate intervals to the competent international organisations, which should make them available to all States.

*Article 206*

Assessment of potential effects of activities

When States have reasonable grounds for believing that planned activities under their jurisdiction or control may cause substantial pollution of or significant and harmful changes to the marine environment, they shall, as far as practicable, assess the potential effects of such activities on the marine environment and shall communicate reports of the results of such assessments in the manner provided in Article 205.'

12    Section 5 of Part XII of the Convention, entitled 'International rules and national legislation to prevent, reduce and control pollution of the marine environment', includes in particular Articles 207 and 211, which are worded as follows:

*'Article 207*

Pollution from land-based sources

1.  States shall adopt laws and regulations to prevent, reduce and control pollution of the marine environment from land-based sources, including rivers, estuaries, pipelines and outfall structures, taking into account internationally agreed rules, standards and recommended practices and procedures.

2. States shall take other measures as may be necessary to prevent, reduce and control such pollution.

3. States shall endeavour to harmonise their policies in this connection at the appropriate regional level.

4. States, acting especially through competent international organisations or diplomatic conference, shall endeavour to establish global and regional rules, standards and recommended practices and procedures to prevent, reduce and control pollution of the marine environment from land-based sources, taking into

account characteristic regional features, the economic capacity of developing States and their need for economic development. Such rules, standards and recommended practices and procedures shall be re-examined from time to time as necessary.

5. Laws, regulations, measures, rules, standards and recommended practices and procedures referred to in paragraphs 1, 2 and 4 shall include those designed to minimise, to the fullest extent possible, the release of toxic, harmful or noxious substances, especially those which are persistent, into the marine environment.

...

*Article 211*

Pollution from vessels

1. States, acting through the competent international organisation or general diplomatic conference, shall establish international rules and standards to prevent, reduce and control pollution of the marine environment from vessels and promote the adoption, in the same manner, wherever appropriate, of routing systems designed to minimise the threat of accidents which might cause pollution of the marine environment, including the coastline, and pollution damage to the related interests of coastal States. Such rules and standards shall, in the same manner, be re-examined from time to time as necessary.

2. States shall adopt laws and regulations for the prevention, reduction and control of pollution of the marine environment from vessels flying their flag or of their registry. Such laws and regulations shall at least have the same effect as that of generally accepted international rules and standards established through the competent international organisation or general diplomatic conference.

...'

13    Article 213 of the Convention, which features in Section 6, entitled 'Enforcement', of Part XII thereof, provides as follows:

'Enforcement with respect to pollution from land-based sources

States shall enforce their laws and regulations adopted in accordance with Article 207 and shall adopt laws and regulations and take other measures necessary to implement applicable international rules and standards established through competent international organisations or diplomatic conference to prevent, reduce and control pollution of the marine environment from land-based sources.'

14    Part XV of the Convention, entitled 'Settlement of disputes', contains a Section 1 ('General provisions'). Article 282, which features in that section, provides as follows:

'Obligations under general, regional or bilateral agreements

If the States Parties which are parties to a dispute concerning the interpretation or application of this Convention have agreed, through a general, regional or bilateral

agreement or otherwise, that such dispute shall, at the request of any party to the dispute, be submitted to a procedure that entails a binding decision, that procedure shall apply in lieu of the procedures provided for in this part, unless the parties to the dispute otherwise agree.'

15    Articles 286 to 288 of the Convention, which are in Section 2, entitled 'Compulsory procedures entailing binding decisions', of Part XV thereof, read as follows:

'*Article 286*

Application of procedures under this section

Subject to Section 3, any dispute concerning the interpretation or application of this Convention shall, where no settlement has been reached by recourse to Section 1, be submitted at the request of any party to the dispute to the court or tribunal having jurisdiction under this section.

*Article 287*

Choice of procedure

1. When signing, ratifying or acceding to this Convention or at any time thereafter, a State shall be free to choose, by means of a written declaration, one or more of the following means for the settlement of disputes concerning the interpretation or application of this Convention:

(a) the International Tribunal for the Law of the Sea established in accordance with Annex VI;

(b) the International Court of Justice;

(c) an arbitral tribunal constituted in accordance with Annex VII;

(d) a special arbitral tribunal constituted in accordance with Annex VIII for one or more of the categories of disputes specified therein.

...

*Article 288*

Jurisdiction

1. A court or tribunal referred to in Article 287 shall have jurisdiction over any dispute concerning the interpretation or application of this Convention which is submitted to it in accordance with this part.

2. A court or tribunal referred to in Article 287 shall also have jurisdiction over any dispute concerning the interpretation or application of an international agreement related to the purposes of this Convention, which is submitted to it in accordance with the agreement.

...'

16    Article 290 of the Convention, which also features in Section 2 of Part XV, provides that a court or tribunal to which a dispute has been duly submitted may prescribe provisional measures.

17    Article 293 of the Convention, which also features in that section of Part XV thereof, is worded as follows:

'Applicable law

1. A court or tribunal having jurisdiction under this Section shall apply this Convention and other rules of international law not incompatible with this Convention.

...'

18    Article 296, which is also contained in Section 2 of Part XV of the Convention, provides:

Finality and binding force of decisions

1. Any decision rendered by a court or tribunal having jurisdiction under this Section shall be final and shall be complied with by all the parties to the dispute.

2. Any such decision shall have no binding force except between the parties and in respect of that particular dispute.'

19    Annex IX to the Convention, which is entitled 'Participation by international organisations', includes the following provisions:

'Article 1

Use of terms

For the purposes of Article 305 and of this Annex, "international organisation" means an intergovernmental organisation constituted by States to which its Member States have transferred competence over matters governed by this Convention, including the competence to enter into treaties in respect of those matters.

*Article 2*

Signature

An international organisation may sign this Convention if a majority of its Member States are signatories of this Convention. At the time of signature an international organisation shall make a declaration specifying the matters governed by this Convention in respect of which competence has been transferred to that organisation by its Member States which are signatories, and the nature and extent of that competence.

*Article 3*

Formal confirmation and accession

1. An international organisation may deposit its instrument of formal confirmation or of accession if a majority of its Member States deposit or have deposited their instruments of ratification or accession.

2. The instruments deposited by the international organisation shall contain the undertakings and declarations required by Articles 4 and 5 of this Annex.

*Article 4*

Extent of participation and rights and obligations

1. The instrument of formal confirmation or of accession of an international organisation shall contain an undertaking to accept the rights and obligations of States under this Convention in respect of matters relating to which competence has been transferred to it by its Member States which are Parties to this Convention.

2. An international organisation shall be a Party to this Convention to the extent that it has competence in accordance with the declarations, communications of information or notifications referred to in Article 5 of this Annex.

3. Such an international organisation shall exercise the rights and perform the obligations which its Member States which are Parties would otherwise have under this Convention, on matters relating to which competence has been transferred to it by those Member States. The Member States of that international organisation shall not exercise competence which they have transferred to it.

4. Participation of such an international organisation shall in no case entail an increase of the representation to which its Member States which are States Parties would otherwise be entitled, including rights in decision-making.

5. Participation of such an international organisation shall in no case confer any rights under this Convention on Member States of the organisation which are not States Parties to this Convention.

6. In the event of a conflict between the obligations of an international organisation under this Convention and its obligations under the agreement establishing the organisation or any acts relating to it, the obligations under this Convention shall prevail.

*Article 5*

Declarations, notifications and communications

1. The instrument of formal confirmation or of accession of an international organisation shall contain a declaration specifying the matters governed by this Convention in respect of which competence has been transferred to the organisation by its Member States which are Parties to this Convention.

2. A Member State of an international organisation shall, at the time it ratifies or accedes to this Convention or at the time when the organisation deposits its instrument of formal confirmation or of accession, whichever is later, make a declaration specifying the matters governed by this Convention in respect of which it has transferred competence to the organisation.

3. States Parties which are Member States of an international organisation which is a Party to this Convention shall be presumed to have competence over all matters

governed by this Convention in respect of which transfers of competence to the organisation have not been specifically declared, notified or communicated by those States under this Article.

4. The international organisation and its Member States which are States Parties shall promptly notify the depositary of this Convention of any changes to the distribution of competence, including new transfers of competence, specified in the declarations under paragraphs 1 and 2.

5. Any State Party may request an international organisation and its Member States which are States Parties to provide information as to which, as between the organisation and its Member States, has competence in respect of any specific question which has arisen. The organisation and the Member States concerned shall provide this information within a reasonable time. The international organisation and the Member States may also, on their own initiative, provide this information.

6. Declarations, notifications and communications of information under this Article shall specify the nature and extent of the competence transferred.

…'

**Background to the dispute**

*The dispute between Ireland and the United Kingdom concerning the MOX plant*

20    British Nuclear Fuel plc ('BNFL') operates a number of facilities on a site at Sellafield (United Kingdom), situated on the coast of the Irish Sea. Those facilities include the so-called MOX and THORP plants.

21    The MOX plant is designed to recycle plutonium from spent nuclear fuel by mixing plutonium dioxide with depleted uranium dioxide and thereby converting it into a new fuel known as MOX, an abbreviation used to designate mixed oxide fuel, intended for use as an energy source in nuclear power stations.

22    Some of the material used in the MOX plant originates in the thermal oxide reprocessing plant, or THORP, in which spent nuclear fuel from nuclear reactors in the United Kingdom and other countries is reprocessed in order to extract from it the plutonium dioxide and uranium dioxide.

23    Construction of the MOX plant was authorised by the United Kingdom authorities following an application for authorisation submitted by BNFL on the basis of an environmental statement presented by the company in 1993 ('the 1993 environmental statement').

24    In 1996 BNFL submitted an application to the UK Environment Agency for authorisation to operate the MOX plant.

25    On 11 February 1997 the Commission, basing itself on information provided by the United Kingdom Government, delivered an opinion pursuant to Article 37 EA on the plan for the disposal of radioactive waste arising from the operation of the MOX facility (OJ 1997 C 68, p. 4) in which it concluded that 'the implementation of the plan for the disposal of radioactive wastes arising from the operation of the BNFL Sellafield mixed oxide fuel plant, both in normal operation and in the event of an accident of the type and magnitude considered in the general data, is not liable to

result in radioactive contamination, significant from the point of view of health, of the water, soil or airspace of another Member State.'

26    In addition, with a view to meeting the requirements laid down by Council Directive 80/836/Euratom of 15 July 1980 amending the Directives laying down the basic safety standards for the health protection of the general public and workers against the dangers of ionizing radiation (OJ 1980 L 246, p. 1), an assessment of the economic justification for the MOX plant was prepared by a private consulting firm ('the PA report'), a version of which was published in 1997.

27    Between April 1997 and August 2001 the United Kingdom authorities also organised five rounds of public consultations on the economic justification for the MOX plant. On 3 October 2001 those authorities decided that the MOX plant was economically justified within the terms of Article 6(1) of Council Directive 96/29/Euratom of 13 May 1996 laying down basic safety standards for the protection of the health of workers and the general public against the dangers arising from ionizing radiation (OJ 1996 L 159, p. 1), which repealed Directive 80/836 with effect from 13 May 2000.

28    Between 1994 and June 2001 Ireland submitted its views on the MOX plant to the United Kingdom authorities on several occasions. In particular, Ireland repeatedly questioned the soundness of the 1993 environmental statement and of the decision concerning the economic justification for the plant. Ireland also contested the basis on which the rounds of consultations had been conducted and requested more information than that contained in the public version of the PA report.

29    In a press statement of 4 October 2001 the Irish Minister with responsibility for nuclear safety announced that Ireland was considering lodging a complaint pursuant to the Convention which would centre on the failure to carry out a proper assessment of the impact which the MOX plant would have on the environment.

*Dispute-settlement proceedings brought by Ireland in regard to the MOX plant*

30    On 15 June 2001 Ireland forwarded to the United Kingdom a request for the constitution of an arbitral tribunal and a statement of claim pursuant to Article 32 of the Convention for the Protection of the Marine Environment of the North-East Atlantic, which was signed in Paris on 22 September 1992 and approved on behalf of the Community by Council Decision 98/249/EC of 7 October 1997 (OJ 1998 L 104, p. 1). That convention replaces, inter alia, the Paris conventions for the prevention of marine pollution from land-based sources to which the Community was already a party and which, as such, were mentioned in the annex to the Declaration of Community competence.

31    In that request, Ireland claimed that the United Kingdom had failed in its obligations under Article 9 of that convention by refusing to provide Ireland with a complete copy of the PA report.

32    On 2 July 2003 the arbitral tribunal constituted pursuant to that convention dismissed Ireland's claim.

33    The institution of those proceedings is not, however, covered by the present action for failure to fulfil obligations.

34    On 25 October 2001 Ireland notified the United Kingdom that, under Article 287 of the Convention, it was instituting before the arbitral tribunal provided for in Annex VII to that convention ('the Arbitral Tribunal') proceedings for the purpose of resolving 'the dispute concerning the MOX plant, international movements of radioactive materials and the protection of the marine environment of the Irish Sea'.

35    In its statement of claim, Ireland requested the Arbitral Tribunal to order and declare:

'(1)  That the United Kingdom has breached its obligations under Articles 192 and 193 and/or Article 194 and/or Article 207 and/or Articles 211 and 213 of [the Convention] in relation to the authorisation of the MOX plant, including by failing to take the necessary measures to prevent, reduce and control pollution of the marine environment of the Irish Sea from (1) intended discharges of radioactive materials and/or wastes from the MOX plant, and/or (2) accidental releases of radioactive materials and/or wastes from the MOX plant and/or international movements associated with the MOX plant, and/or (3) releases of radioactive materials and/or wastes from the MOX plant and/or international movements associated with the MOX plant or resulting from terrorist act;

(2)  That the United Kingdom has breached its obligations under Articles 192 and 193 and/or Article 194 and/or Article 207 and/or Articles 211 and 213 of [the

Convention] in relation to the authorisation of the MOX plant by failing (1) properly or at all to assess the risk of terrorist attack on the MOX plant and international movements of radioactive material associated with the plant, and/or (2) properly or at all to prepare a comprehensive response strategy or plan to prevent, contain and respond to terrorist attack on the MOX plant and international movements of radioactive waste associated with the plant;

(3) That the United Kingdom has breached its obligations under Articles 123 and 197 of [the Convention] in relation to the authorisation of the MOX plant, and has failed to cooperate with Ireland in the protection of the marine environment of the Irish Sea inter alia by refusing to share information with Ireland and/or refusing to carry out a proper environmental assessment of the impacts on the marine environment of the MOX plant and associated activities and/or proceeding to authorise the operation of the MOX plant whilst proceedings relating to the settlement of a dispute on access to information were still pending;

(4) That the United Kingdom has breached its obligations under Article 206 of [the Convention] in relation to the authorisation of the MOX plant, including by

(a) failing, by its 1993 Environmental Statement, properly and fully to assess the potential effects of the operation of the MOX plant on the marine environment of the Irish Sea; and/or

(b) failing, since the publication of its 1993 Environmental Statement, to assess the potential effects of the operation of the MOX plant on the marine environment by reference to the factual and legal developments which have arisen since 1993, and in particular since 1998; and/or

(c) failing to assess the potential effects on the marine environment of the Irish Sea of international movements of radioactive materials to be transported to and from the MOX plant; and/or

(d) failing to assess the risk of potential effects on the marine environment of the Irish Sea arising from terrorist act or acts on the MOX plant and/or on international movements of radioactive material to and from the MOX plant;

(5) That the United Kingdom shall refrain from authorising or failing to prevent (a) the operation of the MOX plant and/or (b) international movements of radioactive materials into and out of the United Kingdom related to the operation of the MOX plant or any preparatory or other activities associated with the operation of the MOX plant until such time as (1) there has been carried out a proper assessment of the environmental impact of the operation of the MOX plant as well as related international movements of radioactive materials, and (2) it is demonstrated that the operation of the MOX plant and related international movements of radioactive materials will result in the deliberate discharge of no radioactive materials, including wastes, directly or indirectly into the marine environment of the Irish Sea, and (3) there has been agreed and adopted jointly with Ireland a comprehensive strategy paper or plan to prevent, contain and respond to terrorist attack on the MOX plant and international movements of radioactive waste associated with the plant;

(6)  That the United Kingdom pays Ireland's costs of the proceedings.'

36   The statement of claim adds that, with respect to the law to be applied by it, 'the arbitral tribunal will also be asked to take into account, as appropriate, the provisions of other international instruments, including international conventions and European Community laws …'.

37   Referring to Article 293 of the Convention, the statement of claim also states that 'Ireland considers that the provisions of the [Convention] fall to be construed by reference to other international rules which are binding upon Ireland and the United Kingdom, including the [Convention for the Protection of the Marine Environment of the North-East Atlantic] …, Directive 85/337/EEC and Directives 80/836/ Euratom and 96/29/Euratom'.

38   On 9 November 2001 Ireland also submitted a request for provisional measures to the International Tribunal for the Law of the Sea pursuant to Article 290(5) of the Convention, in which it requested in particular that the United Kingdom suspend immediately the authorisation for the operation of the MOX plant.

39   By order of 3 December 2001 (Case 10, 'The Mox Plant Case', *Ireland v. United Kingdom*), the International Tribunal for the Law of the Sea prescribed the following interim measures, which differed from those requested by Ireland:

'Ireland and the United Kingdom shall cooperate and shall, for this purpose, enter into consultations forthwith in order to:

(a)   exchange further information with regard to possible consequences for the Irish Sea arising out of the commissioning of the MOX plant;

(b)   monitor risks or the effects of the operation of the MOX plant for the Irish Sea;

(c)   devise, as appropriate, measures to prevent pollution of the marine environment which might result from the operation of the MOX plant.'

40    In that order the Tribunal declared that it had *prima facie* jurisdiction and rejected the objection of lack of jurisdiction raised by the United Kingdom on the basis of Article 282 of the Convention to the effect that certain aspects of Ireland's complaints fell within the scope of Community law and that the Court of Justice therefore had exclusive jurisdiction to deal with the dispute.

41    That objection of lack of jurisdiction was once again raised by the United Kingdom in the course of the written procedure before the Arbitral Tribunal and was the subject of pleadings during the hearings before that Tribunal.

42    By order of 24 June 2003, notified to the Commission on 27 June 2003, the Arbitral Tribunal decided to suspend the proceedings until 1 December 2003 and asked to be more extensively informed, by that date, as to the implications of Community law in regard to the dispute pending before it.

43    In that order, the Arbitral Tribunal noted that problems closely related to Community law had arisen concerning important issues such as the standing of Ireland and the United Kingdom, the division of areas of competence between the Community and its Member States in respect of the Convention, the extent to which the provisions invoked by the parties could be relied upon by the Arbitral Tribunal and the question of the exclusive jurisdiction of the Court of Justice.

44    The Tribunal took the view in this regard that there was a real possibility that the Court of Justice might be seised of the dispute and rule that the dispute was a matter of Community law, thereby precluding the Tribunal's jurisdiction under Article 282 of the Convention.

45    The Arbitral Tribunal went on to observe that the issues on which its jurisdiction depends concern essentially the internal operation of a separate legal order, namely the legal order of the Community, and that those issues must be resolved within the institutional framework of the Community and, in particular, by the Court of Justice.

46    In that connection, the Arbitral Tribunal took the view that, given the risk of conflicting decisions and bearing in mind considerations of mutual respect and comity between judicial institutions, it would not be appropriate to continue the proceedings without a resolution of the issues touching on Community law. The Arbitral Tribunal also enjoined the parties to take the appropriate steps separately or jointly to expedite resolution of the outstanding issues within the institutional framework of the European Communities.

47    By that order the Arbitral Tribunal also confirmed the provisional measures previously prescribed by the International Tribunal for the Law of the Sea and refused the further provisional measures requested by Ireland.

48    Following the Commission's decision to bring the present action for failure to fulfil obligations, Ireland requested the Arbitral Tribunal to suspend hearings until the Court of Justice has delivered judgment in the present case. The Tribunal acceded to that request by order of 14 November 2004.

*The proceedings for failure to fulfil obligations*

49    The Commission was informed of the proceedings brought by Ireland before the Arbitral Tribunal established under the Convention for the Protection of the Marine Environment of the North-East Atlantic (see paragraph 30 of the present judgment) by a letter of 18 June 2001 from the Executive Secretary of the commission established under that convention.

I - 4692

50    By letter of 8 October 2001, the Commission's services called on Ireland to suspend those proceedings on the ground that the dispute in issue came within the exclusive jurisdiction of the Court of Justice.

51    On 25 October 2001 Ireland instituted the dispute-settlement proceedings under the Convention.

52    On 20 June 2002 a meeting was held between the Commission's services and the Irish authorities concerning the totality of issues in the dispute relating to the MOX plant.

53    By letter of 27 June 2002, followed by a reminder of 8 October 2002, the Commission's services requested the Irish authorities to provide certain additional documentation, including the pleadings filed in the proceedings instituted under the Convention for the Protection of the Marine Environment of the North-East Atlantic and the Convention.

54    Under cover of a letter of 22 October 2002, Ireland acceded to that request in regard to the pleadings which it had lodged in the proceedings before the Arbitral Tribunal established pursuant to the Convention for the Protection of the Marine Environment of the North-East Atlantic and before the International Tribunal for the Law of the Sea. With regard to the proceedings before the Arbitral Tribunal, however, Ireland indicated that both parties were under a duty of confidentiality until the hearing. Ireland also stated that its letter was not to be regarded as the making of a complaint within the terms of Article 227 EC.

55    The Commission thereupon commenced an action under Article 226 EC for failure to fulfil obligations. On 15 May 2003 the Commission sent a letter of formal notice

to Ireland, requesting it to submit its observations on the complaint that, by instituting proceedings under the Convention, it had failed to fulfil its obligations under Articles 10 EC and 292 EC and under Articles 192 EA and 193 EA.

56    In a letter of 15 July 2003, Ireland expressed its disagreement with the Commission's legal interpretation, and on 19 August 2003 the Commission addressed to Ireland a reasoned opinion in which it called on Ireland to take the measures necessary to comply therewith within two weeks of receipt, a period subsequently extended by a further two weeks.

57    As it found Ireland's response to the reasoned opinion to be unsatisfactory, the Commission brought the present action.

58    By order of the President of the Court of 7 April 2004, the Kingdom of Sweden was granted leave to intervene in support of the form of order sought by Ireland and the United Kingdom was granted leave to intervene in support of the form of order sought by the Commission.

**The action**

59    The Commission raises three heads of complaint in its action. First, it claims that, by bringing proceedings against the United Kingdom under the Convention, Ireland has failed to respect the exclusive jurisdiction vested in the Court by Article 292 EC to rule on any dispute concerning the interpretation and application of Community law. Second, the Commission argues that Ireland has breached Articles 292 EC and 193 EA by referring to the Arbitral Tribunal a dispute which requires for its

resolution the interpretation and application of measures of Community law. Third, the Commission alleges that Ireland has failed to comply with its duty of cooperation under Article 10 EC by exercising a competence which belongs to the Community and that it has failed in that duty under Articles 10 EC and 192 EA by failing first to inform or consult with the competent Community institutions.

*The first head of complaint*

60    In its first head of complaint, the Commission submits that, by instituting the dispute-settlement proceedings provided for under the Convention for the purpose of resolving its dispute with the United Kingdom concerning the MOX plant, Ireland has failed to respect the exclusive jurisdiction of the Court in regard to disputes concerning the interpretation and application of Community law and has thereby breached Article 292 EC.

Arguments of the parties

61    The Commission submits that, as the Convention is a mixed agreement, the provisions of the Convention on which Ireland relies before the Arbitral Tribunal come within the scope of the Community's external competence in matters relating to environmental protection, as provided for under Article 175 EC, and that the interpretation and application of those provisions in the context of a dispute between Member States are therefore matters falling within the exclusive jurisdiction of the Court by virtue of Article 292 EC.

62    Decision 98/392, in so far as it refers inter alia to Article 175 EC, and the Declaration of Community competence, in so far as it states that the protection of the marine

environment comes within the scope of shared competence of the Community, confirm, according to the Commission, that, by becoming a party to the Convention, the Community exercised its shared powers in the field of the protection of the environment. It is for that reason not necessary to establish exclusive competence of the Community within the areas concerned by the dispute.

63    The Commission submits that it follows from the case-law that, where a dispute is brought before it in accordance with the provisions of the Treaty, the Court has jurisdiction to interpret the provisions of mixed agreements not only where the provisions in question fall within the exclusive competence of the Community but also where they fall within the shared competence of the Community and the Member States. The Commission refers in this regard to Case C-53/96 *Hermès* [1998] ECR I-3603, paragraph 33, Joined Cases C-300/98 and C-392/98 *Dior and Others* [2000] ECR I-11307, paragraph 33, and Case C-13/00 *Commission* v *Ireland* [2002] ECR I-2943, paragraph 20.

64    Furthermore, all of the issues raised before the Arbitral Tribunal are, the Commission submits, largely covered by an almost complete legislative framework of internal Community measures, some of which are mentioned in the appendix to the Declaration of Community competence.

65    That declaration, which states that the Community may become a party to the Convention only within the limits of its competence, does not, however, in any way restrict such accession to areas which are the subject of exclusive competence.

66    Ireland submits that there was no transfer to the Community of competence in relation to the matters covered by the provisions of the Convention on which that Member State bases its request before the Arbitral Tribunal.

67    As is confirmed by the Declaration of Community competence, it is necessary, in order to establish the Community's competence in the present case, to prove that measures of Community law are affected by the provisions of the Convention in issue.

68    In so far as they relate to areas in which the Community has fixed only minimum rules, the areas of shared competence specified in that declaration have not, Ireland argues, been transferred and therefore still belong to the Member States.

69    Provisions in mixed agreements relating to shared competence of the Community are an integral part of Community law only in the case where those provisions are liable to affect common rules of Community law.

70    That, Ireland claims, is not the position in the present case, as the Community rules on protection of the environment here in issue lay down only minimum rules.

71    The Commission has therefore been unable to establish that the provisions of the Convention relied on by Ireland before the Arbitral Tribunal involve the same obligations as those provided for under existing Community measures and has for that reason failed to adduce evidence that Community rules have been affected.

72    According to Ireland, the provisions of the Convention here in issue involve stricter obligations than those provided for under Community law.

73  So far as concerns the discharge of radioactive substances into the marine environment and notification and cooperation in the area of the transport of such substances by sea, no Community legislation at all exists. Nor does Community legislation feature any rule comparable to that of Article 123 of the Convention.

74  Furthermore, as Euratom is not a party to the Convention and no measure adopted on the basis of the EAEC Treaty is included in the appendix to the Declaration of Community competence, no competence based on that Treaty can be attributed to the Community within the context of the Convention.

75  The Swedish Government submits that, as the Community's external competence with respect to the protection of the environment is not exclusive, that competence becomes exclusive only if and to the extent to which the Community adopts at the internal level common rules which may be affected by obligations undertaken by Member States at the international level. The Swedish Government cites in this regard the judgment in Case 22/70 *Commission* v *Council* [1971] ECR 263, paragraph 17 ('the *AETR* judgment').

76  In the case where the common rules consist only of minimum rules, Member States, it argues, retain the power to seek greater protection at both national and international level.

77  The United Kingdom Government submits that, with regard to Part XII of the Convention, which relates to the protection of the marine environment, the Community's competence must be based on common rules adopted pursuant to Article 175 EC and not on the environmental objectives referred to in Article 174 EC.

78    In order to establish the extent of the transfer of competence to the Community within the area covered by the provisions of the Convention here in issue, the United Kingdom Government submits that reference must be made to the principles established at paragraphs 15 to 17 of the *AETR* judgment and the subsequent case-law which developed those principles, in particular, Opinion 1/94 [1994] ECR I-5267, paragraph 77, and Opinion 2/94 [1996] ECR I-1759, paragraphs 24 to 26.

79    The provisions of the Convention invoked by Ireland before the Arbitral Tribunal may affect common rules adopted by the Community because, on the points on which they are invoked and interpreted by that Member State before that Tribunal, the provisions in question relate to a field covered by the Treaty, not to a large extent, but precisely.

Findings of the Court

80    It is necessary to specify at the outset that, by its first head of complaint, the Commission is criticising Ireland for failing to respect the exclusive jurisdiction of the Court by bringing before the Arbitral Tribunal a dispute between it and another Member State concerning the interpretation and application of provisions of the Convention involving obligations assumed by the Community in the exercise of its external competence in regard to protection of the environment, and for thereby breaching Article 292 EC. The articles of the EAEC Treaty to which the Commission refers in its submissions relate to the second and third heads of complaint.

81    Under Article 300(7) EC, '[a]greements concluded under the conditions set out in [that] Article shall be binding on the institutions of the Community and on Member States'.

82    The Convention was signed by the Community and subsequently approved by Decision 98/392. It follows that, according to settled case-law, the provisions of that convention now form an integral part of the Community legal order (see, inter alia, Case C-344/04 *IATA and ELFAA* [2006] ECR I-403, paragraph 36).

83    The Convention was concluded by the Community and all of its Member States on the basis of shared competence.

84    The Court has already ruled that mixed agreements have the same status in the Community legal order as purely Community agreements, as these are provisions coming within the scope of Community competence (Case C-13/00 *Commission* v *Ireland*, paragraph 14).

85    From this the Court has concluded that, in ensuring respect for commitments arising from an agreement concluded by the Community institutions, the Member States fulfil, within the Community system, an obligation in relation to the Community, which has assumed responsibility for the due performance of that agreement (Case C-13/00 *Commission* v *Ireland*, paragraph 15).

86    As the Convention is a mixed agreement, it is for that reason necessary to examine whether the provisions of that agreement relied on by Ireland before the Arbitral Tribunal in connection with the dispute concerning the MOX plant come within the scope of Community competence.

87    It follows from the wording of Ireland's statement of claim (set out in paragraph 35 of the present judgment) that that Member State is essentially criticising the United Kingdom for granting authorisation to operate the MOX plant without having met a number of obligations arising under the Convention.

88    With the exception of Article 123 of the Convention, all of the provisions relied on in that regard feature in Part XII of that Convention, entitled 'Protection and preservation of the marine environment'.

89    Ireland criticises the United Kingdom in particular for having breached, in the first place, Article 206 of the Convention by failing in its obligation to carry out a proper assessment of the environmental impact of all activities associated with the MOX plant on the marine environment of the Irish Sea, secondly, Articles 123 and 197 of the Convention by failing in its obligation to cooperate with Ireland in order to protect the marine environment of the Irish Sea, a sea which is semi-enclosed, and, finally, Articles 192, 193 and/or 194 and/or 207, 211 and 213 of the Convention by failing to take the measures necessary to prevent, reduce and control pollution of the marine environment of the Irish Sea.

90    The Court has already interpreted Article 175(1) EC as being the appropriate legal basis for conclusion, on behalf of the Community, of international agreements on protection of the environment (see, in this regard, Opinion 2/00 [2001] ECR I-9713, paragraph 44).

91    That conclusion is reinforced by the reading of Article 175(1) EC in conjunction with the fourth indent in Article 174(1) EC, which expressly includes 'promoting measures at international level to deal with regional or worldwide environmental problems' among the objectives to be pursued within the framework of policy on the environment.

92    Admittedly, as indicated in Article 176 EC, that external competence of the Community in regard to the protection of the environment, in this case the marine environment, is not exclusive but rather, in principle, shared between the Community and the Member States (see, to that effect, Opinion 2/00, paragraph 47).

93    However, the question as to whether a provision of a mixed agreement comes within the competence of the Community is one which relates to the attribution and, thus, the very existence of that competence, and not to its exclusive or shared nature.

94    It follows that the existence of the Community's external competence in regard to protection of the marine environment is not, in principle, contingent on the adoption of measures of secondary law covering the area in question and liable to be affected if Member States were to take part in the procedure for concluding the agreement in question, within the terms of the principle formulated by the Court in paragraph 17 of the *AETR* judgment.

95    The Community can enter into agreements in the area of environmental protection even if the specific matters covered by those agreements are not yet, or are only very partially, the subject of rules at Community level, which, by reason of that fact, are not likely to be affected (see, in that regard, Opinion 2/00, paragraphs 44 to 47, and Case C-239/03 *Commission* v *France* [2004] ECR I-9325, paragraph 30).

96    That being so, it is necessary to establish whether and to what extent the Community, by becoming a party to the Convention, elected to exercise its external competence in matters of environmental protection.

97    In this regard, the reference, in the first citation in the preamble to Decision 98/392, to Article 130s(1) of the EC Treaty (now, after amendment, Article 175(1) EC) as one of the provisions constituting the legal basis of the decision approving the Convention indicates that this was indeed the case.

98    Furthermore, the fifth recital in the preamble to that decision states that approval of the Convention by the Community is designed to enable it to become a party to it within the limits of its competence.

99    The Declaration of Community competence referred to in Article 1(3) of that decision, which forms part of the Community's instrument of formal confirmation constituting Annex II to the Decision, specifies the extent and the nature of the areas of competence transferred by the Member States to the Community in the matters dealt with by the Convention in respect of which the Community accepts the rights and obligations provided for by that convention.

100    Ireland submits that Article 4(3) of Annex IX to the Convention, in particular the notion of 'transfer of competence' which features there, and the Declaration of Community competence must be construed as meaning that, in regard to shared competence, the only areas of competence transferred and exercised by the Community when it became a party to the Convention are those which have become exclusive as a result of having been affected, within the meaning of the principle set out in paragraph 17 of the *AETR* judgment.

101    This, it claims, is a particular feature of the Convention, which allows only the transfer of exclusive competence of the Community, the other areas of competence and the relevant responsibilities remaining within the purview of the Member States.

102    According to Ireland, as the Community provisions in issue are only minimum rules, they are not in principle affected; consequently, the related areas of shared competence have not been transferred within the framework of the Convention.

103    By contrast, the Commission avers that the Declaration of Community competence must be understood as meaning that the areas of shared competence in question are transferred and exercised by the Community even if they relate to matters in respect of which there are at present no Community rules.

104    It is necessary to point out in this regard that the second sentence of the first paragraph of the second indent of point 2 of the Declaration of Community competence states, with regard to, inter alia, the provisions of the Convention relating to the prevention of marine pollution, that '[w]hen Community rules exist but are not affected, in particular in cases of Community provisions establishing only minimum standards, the Member States have competence, without prejudice to the competence of the Community to act in this field'.

105    Consequently, that declaration confirms that a transfer of areas of shared competence, in particular in regard to the prevention of marine pollution, took place within the framework of the Convention, and without any of the Community rules concerned being affected, within the terms of the principle set out in the *AETR* judgment.

106    However, that passage of the Declaration of Community competence makes the transfer of areas of shared competence subject to the existence of Community rules, even though it is not necessary that those rules be affected.

107    In the other cases, that is to say, those in which there are no Community rules, competence rests with the Member States, in accordance with the third sentence of the first paragraph of the second indent of point 2 of the Declaration of Community competence.

108    It follows that, within the specific context of the Convention, a finding that there has been a transfer to the Community of areas of shared competence is contingent on the existence of Community rules within the areas covered by the Convention provisions in issue, irrespective of what may otherwise be the scope and nature of those rules.

109    In this regard, the appendix to the Declaration of Community competence, while not exhaustive, constitutes a useful reference base.

110    It appears that the matters covered by the provisions of the Convention relied on by Ireland before the Arbitral Tribunal are very largely regulated by Community measures, several of which are mentioned expressly in the appendix to that declaration.

111    Thus, with regard to the head of complaint alleging failure to meet the obligation to carry out a proper assessment of the environmental impact of all of the activities associated with the MOX plant on the marine environment of the Irish Sea, based on Article 206 of the Convention, it must be stated that this matter is the subject of Directive 85/337, which is mentioned in the appendix to the Declaration of Community competence.

112    Ireland also cannot question the relevance of Directive 85/337 since it itself referred to that directive in its statement of claim before the Arbitral Tribunal as a measure which could serve as a reference for the interpretation of the relevant provisions of the Convention.

113    In addition, Ireland derived a number of arguments from that directive in support of its complaint in its pleadings before the Arbitral Tribunal.

114    The same observation also holds true for the complaint which Ireland bases on Articles 192, 193, 194, 207, 211 and 213 of the Convention, in so far as that complaint relates to the obligation to take the measures necessary to prevent, reduce and control pollution in the Irish Sea.

115    In its pleadings before the Arbitral Tribunal, Ireland derived several arguments from Directive 85/337 with a view to supporting that complaint in regard to the obligation to prevent pollution. The relevance of Directive 85/337 to the matter under consideration is therefore manifest.

116    Furthermore, that complaint, in so far as it concerns international transfers of radioactive substances connected to the activity of the MOX plant, is closely linked to Directive 93/75, which is also mentioned in the appendix to the Declaration of Community competence and regulates the minimum requirements for vessels bound for or leaving Community ports and carrying dangerous or polluting goods.

117    Furthermore, with regard to the complaint derived from Articles 123 and 197 of the Convention concerning the lack of cooperation on the part of the United Kingdom and, in particular, its refusal to provide Ireland with certain information, such as the full version of the PA report, it must be held that the provision of information of this kind comes within the scope of Council Directive 90/313/EEC of 7 June 1990 on the freedom of access to information on the environment (OJ 1990 L 158, p. 56).

118    In addition, as has been stated in paragraph 31 of the present judgment, Ireland set out that same head of complaint before the arbitral tribunal established pursuant to the Convention for the Protection of the Marine Environment of the North-East Atlantic on the basis of Article 9 of that convention, a convention which it once again invoked in its application initiating proceedings before the Arbitral Tribunal as a reference base for the interpretation of the Convention provisions in issue. The

Convention for the Protection of the Marine Environment of the North-East Atlantic was concluded by the Community and, moreover, replaced the Paris conventions for the prevention of marine pollution from land-based sources, themselves mentioned in the appendix to the Declaration of Community competence.

119   It is also common ground that, in its pleadings before the Arbitral Tribunal, Ireland based its arguments in support of the head of claim in issue simultaneously on Directive 85/337, Directive 90/313 and the Convention for the Protection of the Marine Environment of the North-East Atlantic.

120   Those matters suffice to establish that the Convention provisions on the prevention of marine pollution relied on by Ireland, which clearly cover a significant part of the dispute relating to the MOX plant, come within the scope of Community competence which the Community has elected to exercise by becoming a party to the Convention.

121   It follows that the provisions of the Convention relied on by Ireland in the dispute relating to the MOX plant and submitted to the Arbitral Tribunal are rules which form part of the Community legal order. The Court therefore has jurisdiction to deal with disputes relating to the interpretation and application of those provisions and to assess a Member State's compliance with them (see, in that connection, Case C-13/00 *Commission* v *Ireland*, paragraph 20, and Case C-239/03 *Commission* v *France*, paragraph 31).

122   It is, however, necessary to determine whether this jurisdiction of the Court is exclusive, such as to preclude a dispute like that relating to the MOX plant being brought by a Member State before an arbitral tribunal established pursuant to Annex VII to the Convention.

123    The Court has already pointed out that an international agreement cannot affect the allocation of responsibilities defined in the Treaties and, consequently, the autonomy of the Community legal system, compliance with which the Court ensures under Article 220 EC. That exclusive jurisdiction of the Court is confirmed by Article 292 EC, by which Member States undertake not to submit a dispute concerning the interpretation or application of the EC Treaty to any method of settlement other than those provided for therein (see, to that effect, Opinion 1/91 [1991] ECR I-6079, paragraph 35, and Opinion 1/00 [2002] ECR I-3493, paragraphs 11 and 12).

124    It should be stated at the outset that the Convention precisely makes it possible to avoid such a breach of the Court's exclusive jurisdiction in such a way as to preserve the autonomy of the Community legal system.

125    It follows from Article 282 of the Convention that, as it provides for procedures resulting in binding decisions in respect of the resolution of disputes between Member States, the system for the resolution of disputes set out in the EC Treaty must in principle take precedence over that contained in Part XV of the Convention.

126    It has been established that the provisions of the Convention in issue in the dispute concerning the MOX plant come within the scope of Community competence which the Community exercised by acceding to the Convention, with the result that those provisions form an integral part of the Community legal order.

127    Consequently, the dispute in this case is indeed a dispute concerning the interpretation or application of the EC Treaty, within the terms of Article 292 EC.

128 Furthermore, as it is between two Member States in regard to an alleged failure to comply with Community-law obligations resulting from those provisions of the Convention, this dispute is clearly covered by one of the methods of dispute settlement established by the EC Treaty within the terms of Article 292 EC, namely the procedure set out in Article 227 EC.

129 In addition, it is not open to dispute that proceedings such as those brought by Ireland before the Arbitral Tribunal fall to be described as a method of settlement of a dispute within the terms of Article 292 EC inasmuch as, under Article 296 of the Convention, the decisions delivered by such a tribunal are final and binding on the parties to the dispute.

130 Ireland contends, however, by way of alternative submission, that, if the Court were to conclude that the provisions of the Convention invoked before the Arbitral Tribunal form an integral part of Community law, that conclusion would also be unavoidable with regard to the provisions of the Convention dealing with dispute settlement. Consequently, it submits, the initiation of proceedings before an arbitral tribunal referred to in Article 287(1)(c) of the Convention constitutes a method of dispute settlement provided for in the EC Treaty, within the terms of Article 292 EC.

131 That argument must be rejected.

132 As has been pointed out in paragraph 123 of the present judgment, an international agreement such as the Convention cannot affect the exclusive jurisdiction of the Court in regard to the resolution of disputes between Member States concerning the interpretation and application of Community law. Furthermore, as indicated in paragraphs 124 and 125 of the present judgment, Article 282 of the Convention precisely makes it possible to avoid such a breach occurring, in such a way as to preserve the autonomy of the Community legal system.

133    It follows from all of the foregoing that Articles 220 EC and 292 EC precluded Ireland from initiating proceedings before the Arbitral Tribunal with a view to resolving the dispute concerning the MOX plant.

134    This finding cannot be brought into question by the fact that the application by Ireland instituting proceedings before the Arbitral Tribunal also relates to certain obligations of the United Kingdom concerning the risks connected with terrorism.

135    Without it being necessary to rule on the question as to whether that part of the dispute comes within the scope of Community law, suffice it to hold that, as follows from paragraph 120 of the present judgment, a significant part of the dispute in this case between Ireland and the United Kingdom relates to the interpretation or application of Community law. It is for the Court, should the need arise, to identify the elements of the dispute which relate to provisions of the international agreement in question which fall outside its jurisdiction.

136    As the jurisdiction of the Court is exclusive and binding on the Member States, the arguments put forward by Ireland concerning the advantages which arbitration proceedings under Annex VII to the Convention would present in comparison with an action brought before the Court under Article 227 EC cannot be accepted.

137    Even if they were assumed to have been demonstrated, such advantages could not in any event justify a Member State in avoiding its Treaty obligations with regard to judicial proceedings intended to rectify an alleged breach of Community law by another Member State (see, to that effect, Case 232/78 *Commission* v *France* [1979] ECR 2729, paragraph 9).

138  Finally, with regard to the arguments put forward by Ireland concerning urgency and the possibility of obtaining interim measures under Article 290 of the Convention, suffice it to point out that, under Article 243 EC, the Court may prescribe any necessary interim measures in cases before it. It is evident that such measures may therefore be ordered in the context of proceedings brought under Article 227 EC.

139  In the light of all of the foregoing, the first head of complaint must be upheld.

*The second head of complaint*

140  By its second head of complaint, the Commission contends that the submission by Ireland of instruments of Community law for interpretation and application by the Arbitral Tribunal amounts to a breach of Article 292 EC and, in regard to the measures relied on which come within the ambit of the EAEC Treaty, a breach of Article 193 EA.

Arguments of the parties

141  The Commission criticises Ireland for its failure to respect the exclusive jurisdiction of the Court, as provided for under Articles 292 EC and 193 EA, inasmuch as that Member State invoked before the Arbitral Tribunal, in particular in its statement of claim, a number of instruments of Community law coming under the EC Treaty or the EAEC Treaty by reason of Article 293 of the Convention, and thus as law to be applied by that tribunal.

142   The United Kingdom Government, which shares this view, points out that, in the written pleadings which it lodged with the Arbitral Tribunal, Ireland invoked, under Article 293 of the Convention, several measures of Community law, in particular Directives 85/337 and 90/313, Council Directive 92/3/Euratom of 3 February 1992 on the supervision and control of shipments of radioactive waste between Member States and into and out of the Community (OJ 1992 L 35, p. 24), as well as international agreements such as the Convention for the Protection of the Marine Environment of the North-East Atlantic.

143   The United Kingdom Government also submits that Ireland set out arguments before that tribunal concerning the interpretation to be given to specific provisions of those measures or agreements and that it alleged that the conduct of the United Kingdom was incompatible with certain Community-law obligations deriving from those provisions.

144   Ireland states that it referred to instruments of Community law as non-binding elements of fact solely with a view to facilitating the interpretation of a number of terms of the Convention by indicating how those terms are understood in the practice of courts and tribunals of legal systems other than that governing the Arbitral Tribunal.

145   According to Ireland, elements of a legal system distinct from that of the Convention may also be used by way of '*renvoi*', a frequently used juridical technique designed to guarantee the harmonious coexistence of rules deriving from different legal orders.

Findings of the Court

146   It is common ground that, in its statement of claim and in its written submissions to the Arbitral Tribunal, Ireland invoked a number of Community measures.

I - 4712

147    In addition to the Convention for the Protection of the Marine Environment of the North-East Atlantic, the measures in question are essentially, in regard to the EC Treaty, Directives 85/337 and 90/313 and, in regard to the EAEC Treaty, Directives 80/836, 92/3 and 96/29.

148    It is also common ground that those Community measures were invoked by Ireland pursuant to Article 293(1) of the Convention, which provides that a tribunal such as the Arbitral Tribunal is to 'apply this Convention and other rules of international law not incompatible with this Convention'.

149    As the Advocate General has noted in points 49 and 50 of his Opinion, it follows from the different passages in the pleadings lodged by Ireland before the Arbitral Tribunal that that Member State presented those Community measures not only as relevant for the purpose of clarifying the meaning of the general provisions of the Convention in issue in the dispute but also as rules of international law to be applied by the Arbitral Tribunal pursuant to Article 293 of the Convention.

150    Thus, as the United Kingdom Government has submitted without being challenged on this point, Ireland argued inter alia before the Arbitral Tribunal that the 1993 environmental statement did not meet the requirements of Directive 85/337 and that the United Kingdom's refusal to disclose the operating plan for the MOX plant meant that it was not possible to evaluate the justification for that plant, as required under Directive 96/29, in addition to the contention that this refusal amounted to a breach of Article 6 of Directive 80/836 and of Article 6 of Directive 96/29.

151    It thus appears that Ireland submitted instruments of Community law to the Arbitral Tribunal for purposes of their interpretation and application in the context of proceedings seeking a declaration that the United Kingdom had breached the provisions of those instruments.

152    That is at variance with the obligation imposed on Member States by Articles 292 EC and 193 EA to respect the exclusive nature of the Court's jurisdiction to resolve disputes concerning the interpretation and application of provisions of Community law, in particular by having recourse to the procedures set out in Articles 227 EC and 142 EA for the purpose of obtaining a declaration that another Member State has breached those provisions.

153    Therefore, as some of the measures in question come within the scope of the EC Treaty and others within the scope of the EAEC Treaty, it must be held that there has been a breach of Articles 292 EC and 193 EA.

154    It must also be pointed out that the institution and pursuit of proceedings before the Arbitral Tribunal, in the circumstances indicated in paragraphs 146 to 150 of the present judgment, involve a manifest risk that the jurisdictional order laid down in the Treaties and, consequently, the autonomy of the Community legal system may be adversely affected.

155    That risk exists even though, as Ireland avers, it has given a formal assurance that it has not called on, and will not call on, the Arbitral Tribunal to examine or appraise, pursuant to Article 293 of the Convention or any other provision, whether the United Kingdom has breached any rule of Community law.

156    Furthermore, the existence of that risk renders entirely irrelevant the fact that Ireland may have called on the Arbitral Tribunal to apply Community law by way of *renvoi* or by recourse to any other technique.

157    The second head of complaint must accordingly be regarded as being well founded.

*The third head of complaint*

158  By its third head of complaint, the Commission submits, first, that Ireland has failed to comply with the duty of cooperation under Article 10 EC inasmuch as, by instituting proceedings under the Convention on the basis of provisions falling within the competence of the Community, Ireland exercised a competence which belongs to the Community. Second, the Commission contends that Ireland also failed in its duty of cooperation under both Article 10 EC and Article 192 EA by bringing those proceedings unilaterally without having first informed and consulted the competent Community institutions.

Arguments of the parties

159  The Commission submits that, by instituting dispute-settlement proceedings within the framework of the Convention on the basis of provisions of that Convention falling within the competence of the Community, Ireland exercised a competence which belongs to the Community.

160  An act of this kind, it argues, is liable to create confusion in non-member countries which are parties to the Convention with regard to the external representation and internal cohesion of the Community as a contracting party, and is highly damaging to the effectiveness and coherence of the Community's external action.

161  Furthermore, Articles 10 EC and 192 EA were, the Commission submits, breached by reason of the fact that a Member State cannot unilaterally bring dispute-settlement proceedings within the framework of a mixed agreement without having first informed and consulted the competent Community institutions.

162    According to the Commission, all contacts between it and Ireland occurred after the dispute-settlement proceedings had been brought within the framework of the Convention for the Protection of the Marine Environment of the North-East Atlantic and of the Convention.

163    Ireland argues that, as it is a general principle, Article 10 EC creates a residual obligation. Therefore, if the Court were to take the view that there has been a breach of Article 292 EC, there could not also be a breach of Article 10 EC.

164    The Swedish Government essentially takes the same view.

165    Ireland adds that, in the circumstances of this case, prior consultation would not have made it possible to reconcile the respective views as the Commission was clearly of the opinion that Ireland could not have recourse to the dispute-settlement procedure under the Convention.

166    The United Kingdom Government argues that Ireland ought, at the very least, to have taken the view that there was an objective basis for entertaining serious doubts as to whether its intention was in accordance with Articles 292 EC and 193 EA.

167    In those circumstances, Ireland was under an obligation to consult its partners and, if the dispute could not be resolved by that avenue, it would then have been for the Court to determine whether the Community had competence.

Findings of the Court

168    The Commission first of all criticises Ireland for having failed in its duty of cooperation under Article 10 EC inasmuch as, by bringing arbitral proceedings under the Convention, Ireland exercised a competence which belongs to the Community.

169    The obligation devolving on Member States, set out in Article 292 EC, to have recourse to the Community judicial system and to respect the Court's exclusive jurisdiction, which is a fundamental feature of that system, must be understood as a specific expression of Member States' more general duty of loyalty resulting from Article 10 EC.

170    The unavoidable conclusion must also be drawn that this first part of the third head of complaint has the same subject-matter as the first head of complaint since it focuses on the same conduct on the part of Ireland, that is to say, the bringing by that Member State of the proceedings before the Arbitral Tribunal in contravention of Article 292 EC.

171    It is for that reason unnecessary to find that there has been a failure to comply with the general obligations contained in Article 10 EC that is distinct from the failure, already established, to comply with the more specific Community obligations devolving on Ireland pursuant to Article 292 EC.

172    Second, the Commission criticises Ireland for having breached Articles 10 EC and 192 EA by bringing the proceedings before the Arbitral Tribunal without having first informed and consulted the competent Community institutions.

173 This second part of the third head of complaint relates to an alleged omission by Ireland which is distinct from the conduct forming the subject-matter of the first head of complaint. It is for that reason necessary to examine it.

174 The Court has pointed out that, in all the areas corresponding to the objectives of the EC Treaty, Article 10 EC requires Member States to facilitate the achievement of the Community's tasks and to abstain from any measure which could jeopardise the attainment of the objectives of the Treaty (see, inter alia, Opinion 1/03 [2006] ECR I-1145, paragraph 119). The Member States assume similar obligations under the EAEC Treaty by virtue of Article 192 EA.

175 The Court has also emphasised that the Member States and the Community institutions have an obligation of close cooperation in fulfilling the commitments undertaken by them under joint competence when they conclude a mixed agreement (see *Dior and Others*, paragraph 36).

176 That is in particular the position in the case of a dispute which, as in the present case, relates essentially to undertakings resulting from a mixed agreement which relates to an area, namely the protection and preservation of the marine environment, in which the respective areas of competence of the Community and the Member States are liable to be closely interrelated, as is, moreover, evidenced by the Declaration of Community competence and the appendix thereto.

177 The act of submitting a dispute of this nature to a judicial forum such as the Arbitral Tribunal involves the risk that a judicial forum other than the Court will rule on the scope of obligations imposed on the Member States pursuant to Community law.

178  Moreover, in their letter of 8 October 2001, the Commission's services had already contended that the dispute relating to the MOX plant, as referred by Ireland to the arbitral tribunal constituted pursuant to the Convention for the Protection of the Marine Environment of the North-East Atlantic, was a matter falling within the exclusive jurisdiction of the Court.

179  In those circumstances, the obligation of close cooperation within the framework of a mixed agreement involved, on the part of Ireland, a duty to inform and consult the competent Community institutions prior to instituting dispute-settlement proceedings concerning the MOX plant within the framework of the Convention.

180  The same duty of prior information and consultation was also imposed on Ireland by virtue of the EAEC Treaty in so far as that Member State contemplated invoking provisions of that Treaty and measures adopted pursuant to it within the framework of the proceedings which it was proposing to bring before the Arbitral Tribunal.

181  It is common ground that, at the date on which those proceedings were brought, Ireland had not complied with that duty of prior information and consultation.

182  Regard being had to the foregoing, the third head of complaint must be upheld in so far as it seeks a declaration by the Court that, by bringing proceedings under the dispute-settlement system set out in the Convention, without having first informed and consulted the competent Community institutions, Ireland has failed to comply with its duty of cooperation under Articles 10 EC and 192 EA.

183  The action must accordingly be upheld.

**Costs**

184  Under Article 69(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. As the Commission has applied for costs to be awarded against Ireland and the latter has been unsuccessful, Ireland must be ordered to pay the costs. In accordance with Article 69(4) of the Rules of Procedure, the United Kingdom and the Kingdom of Sweden shall bear their own costs.

On those grounds, the Court (Grand Chamber) hereby:

1. **Declares that, by instituting dispute-settlement proceedings against the United Kingdom of Great Britain and Northern Ireland under the United Nations Convention on the Law of the Sea concerning the MOX plant located at Sellafield (United Kingdom), Ireland has failed to fulfil its obligations under Articles 10 EC and 292 EC and under Articles 192 EA and 193 EA;**

2. **Orders Ireland to pay the costs;**

3. **Orders the United Kingdom of Great Britain and Northern Ireland and the Kingdom of Sweden to bear their own respective costs.**

[Signatures]