# EXHIBIT 40

JUDGMENT OF THE COURT (Grand Chamber)

14 June 2011 *

In Case C-196/09,

REFERENCE for a preliminary ruling under Article 234 EC from the Chambre de recours des écoles européennes, made by decision of 25 May 2009, received at the Court on 29 May 2009, in the proceedings

**Paul Miles and Others**

v

**European Schools**,

THE COURT (Grand Chamber),

composed of V. Skouris, President, A. Tizzano, J.N. Cunha Rodrigues, K. Lenaerts, J.-C. Bonichot, Presidents of Chambers, A. Borg Barthet, M. Ilešič (Rapporteur), J. Malenovský, U. Lõhmus, E. Levits, A. Ó Caoimh, L. Bay Larsen, and T. von Danwitz, Judges,

---

* Language of the case: French.

Advocate General: E. Sharpston,
Registrar: R. Şereş, Administrator,

having regard to the written procedure and further to the hearing on 9 June 2010,

after considering the observations submitted on behalf of:

— Mr Miles and Others, by S. Orlandi and J.-N. Louis, avocats,

— the European Schools, by M. Gillet, avocate,

— the European Commission, by B. Eggers and J.-P. Keppenne, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 16 December 2010,

I - 5140

MILES AND OTHERS

gives the following

**Judgment**

1    This reference for a preliminary ruling concerns the interpretation of Articles 18 TFEU, 45 TFEU and 267 TFEU.

2    The reference was made in proceedings brought by 137 teachers on secondment from the United Kingdom of Great Britain and Northern Ireland to the European Schools against those schools concerning, first, the refusal by the latter to adjust their remuneration in respect of the period prior to 1 July 2008 following the depreciation of the pound sterling and, second, the method of calculation applicable since that date for the adjustment of remuneration in line with fluctuations in exchange rates for currencies other than the euro.

**Legal context**

*The Convention defining the Statute of the European Schools*

3    The European Schools were originally set up by two instruments: the Statute of the European School, signed at Luxembourg on 12 April 1957 (*United Nations Treaty Series*, Volume 443, p. 129), and the Protocol on the setting-up of European Schools with reference to the Statute of the European School, signed at Luxembourg on 13 April 1962 (*United Nations Treaty Series*, Volume 752, p. 267).

4    Those instruments were replaced by the Convention defining the Statute of the European Schools, concluded in Luxembourg on 21 June 1994 (OJ 1994 L 212, p. 3, 'the European Schools' Convention'), which entered into force on 1 October 2002 and is the instrument currently applicable. Unlike the original instruments, to which only the Member States were parties, the European Schools' Convention was also concluded by the European Communities, which were empowered to do so by Council Decision 94/557/EC, Euratom of 17 June 1994 authorising the European Community and the European Atomic Energy Community to sign and conclude the Convention defining the Statute of the European Schools (OJ 1994 L 212, p. 1).

5    Recitals 1 to 4 in the preamble to the European Schools' Convention state:

'considering that, for the education together of children of the staff of the European Communities in order to ensure the proper functioning of the European Institutions, establishments bearing the name "European School", have been set up from 1957 onwards;

considering that the European Communities are anxious to ensure the education together of these children and, for this purpose, make a contribution to the budget of the European Schools;

considering that the European School system is "sui generis"; considering that it constitutes a form of cooperation between the Member States and between them and the European Communities while fully acknowledging the Member States' responsibility for the content of teaching and the organisation of their educational system, and for their cultural and linguistic diversity;

considering that:

...

— adequate legal protection against acts of the Board of Governors or the Administrative Boards should be provided to the teaching staff as well as other persons covered by it; to this end a Complaints Board should be created, with strictly limited jurisdiction;

— the jurisdiction of the Complaints Board will be without prejudice to national courts' jurisdiction in relation to civil and criminal liability'.

6    According to Article 7 of the European Schools' Convention, the Chambre de recours des écoles européennes (the Complaints Board of the European Schools, 'the Complaints Board') is, along with the Board of Governors, the Secretary-General and the Boards of Inspectors, one of the organs common to all the Schools.

7    Under Article 26 of the 1994 Convention, 'the Court of Justice shall have sole jurisdiction in disputes between Contracting Parties relating to the interpretation and application of the convention which have not been resolved by the Board of Governors'.

8    Article 27 of the European Schools' Convention provides:

'1.  A Complaints Board is hereby established.

2. The Complaints Board shall have sole jurisdiction in the first and final instance, once all administrative channels have been exhausted, in any dispute concerning the application of this Convention to all persons covered by it with the exception of administrative and ancillary staff, and regarding the legality of any act based on the Convention or rules made under it, adversely affecting such persons on the part of the Board of Governors of the Administrative Board of a school in the exercise of their powers as specified by this Convention. When such disputes are of a financial character, the Complaints Board shall have unlimited jurisdiction.

The conditions and the detailed rules relative to these proceedings shall be laid down, as appropriate, by the Service Regulations for the teaching staff or by the conditions of employment for part-time teachers, or by the General Rules of the Schools.

3. The members of the Complaints Board shall be persons whose independence is beyond doubt and who are recognised as being competent in law.

Only persons on a list to be compiled by the Court of Justice of the European Communities shall be eligible for membership of the Complaints Board.

4. The Statute of the Complaints Board shall be adopted by the Board of Governors, acting unanimously.

The Statute of the Complaints Board shall determine the number of members of the Board, the procedure for their appointment by the Board of Governors, the duration of their term of office and the financial arrangements applicable to them. The Statute shall specify the manner in which the Board is to operate.

5.  The Complaints Board shall adopt its rules of procedure, which shall contain such provisions as are necessary for applying the Statute.

The rules of procedure shall require the unanimous approval of the Board of Governors.

6.  The judgments of the Complaints Board shall be binding on the parties and, should the latter fail to implement them, rendered enforceable by the relevant authorities of the Member States in accordance with their respective national laws.

7.  Other disputes to which the Schools are party shall fall within national jurisdiction. In particular, national courts' jurisdiction with regard to matters of civil and criminal liability is not affected by this Article.'

*The Statute of the Complaints Board of the European Schools*

9    Article 1 of the Statute of the Complaints Board of the European Schools ('the Statute of the Complaints Board') provides:

'1.  The Complaints Board … shall be composed of six members, appointed for a period of five years.

2.  The Board of Governors, acting by a two-thirds majority, shall appoint them from the list compiled for this purpose by the Court of Justice of the European Communities.

3.  Their term of office shall be tacitly renewable for the same period, unless the Board of Governors, acting by a two-thirds majority, expressly decides otherwise.

...'

10  Under Article 3 of that Statute '[d]uring their term of office, members of the Complaints Board may not engage in any political or administrative activity or any occupation incompatible with their duty to behave with independence and impartiality'.

11  Article 5 of that Statute provides that '[a] member of the Complaints Board may be relieved of his office only if the other members, meeting in plenary session, decide, by a two-thirds majority of the serving members, that he has ceased to fulfil the requisite conditions'.

12  Article 15 of the Statute provides:

'...

2.  No member may take part in the investigation of a case in which he has a personal interest or in which he has been involved beforehand, either as the agent, counsel or adviser of a party or of a person with an interest in the case, or as a member of a court or of a commission of inquiry, or in any other capacity.

I - 5146

MILES AND OTHERS

3.  Where a member abstains for one of the above reasons or for a special reason, he shall inform the Chairman of the Complaints Board thereof, who shall, if necessary, arrange for his replacement by another member.

4.  If the Chairman of the Complaints Board or of the section considers that there are, in the personal circumstances of a member, grounds for his abstention, he shall conduct an exchange of views with the person concerned; in the event of disagreement, the Board or section shall decide. After having heard the member concerned, the Board or section shall deliberate and take a vote in his absence. Should the panel concerned decide that the member must withdraw, the Chairman of the Complaints Board may arrange for his replacement.'

*The Regulations for Members of the Seconded Staff of the European Schools*

13    The Regulations for Members of the Seconded Staff of the European Schools ('Regulations for seconded staff') are adopted by the Board of Governors by virtue of the power granted to it in that regard by the European Schools' Convention.

14    In the version applicable from October 2004 to 30 June 2008, Article 49 of the Regulations for seconded staff provided:

'1.  In accordance with this chapter and save as expressly provided otherwise, a member of staff shall be entitled to the remuneration carried by his post and his step in the salary scale for such a post, as laid down in Annex III to these Regulations.

2.  (a)  The competent national authorities shall pay the national emoluments to the member of staff and shall inform the Director of the amounts paid, specifying all the components taken into account for calculation purposes, including compulsory social security deductions and taxes.

    (b)  The School shall pay the difference between the remuneration provided for in these Regulations and the exchange value of all national emoluments, minus compulsory social security deductions.

    The exchange value shall be converted into the currency of the country in which the member of staff performs his duties, on the basis of the exchange rates used for the salaries of officials of the European Communities.

    If the exchange value is higher than the remuneration provided for in these Regulations for a calendar year, the member of staff concerned shall be entitled to the difference between the two sums.

    ...'

15   The commentary on Article 49(2)(b) of the Regulations for seconded staff stated:

‘The provisions of the Staff Regulations of Officials of the European Communities envisage the adoption as a reference rate for currencies other than the Euro of the budget rate in force on 1 July of the year concerned. That is the reference rate which is used for the conversion into euros of salaries.’

16  In October 2008, the Board of Governors decided to amend Article 49(2)(b) of the Regulations for seconded staff, with effect from 1 July 2008, by inserting the following subparagraph between the second and third subparagraphs of that article:

'These exchange rates shall be compared with the monthly exchange rates in force for the implementation of the budget. Should there be a difference of 5% or more in one or more currencies compared with the exchange rates used hitherto, an adjustment shall be made from that month. Should the trigger threshold not be reached, the exchange rates shall be updated after six months at the latest.'

17  Under Article 79 of the Regulations for seconded staff, administrative and financial decisions may be the subject of an administrative appeal to the Secretary-General. A contentious appeal may be brought against the express or implied decision rejecting the administrative appeal pursuant to Article 80 of those regulations, paragraph 1 of which provides:

'The Complaints Board shall have sole jurisdiction in the first and final instance in any dispute between the management organs of the School and members of staff regarding the legality of an act adversely affecting them. When such disputes are of a financial character, the Complaints Board shall have unlimited jurisdiction.'

18  Under Article 86 of the Regulations for seconded staff, '[t]he articles in these Regulations which are analogous to articles in the Staff Regulations of Officials of the European Communities shall be interpreted according to the criteria applied by the Commission'.

JUDGMENT OF 14. 6. 2011 — CASE C-196/09

**The dispute in the main proceedings and the questions referred for a preliminary ruling**

19    Mr Miles and the 136 other applicants in the main proceedings are teachers on secondment from the United Kingdom to one of the European Schools. In accordance with Article 49 of the Regulations for seconded staff, they receive the national emoluments paid by the United Kingdom authorities together with a supplement equal to the difference between the remuneration provided for in the Regulations and the exchange value of all national emoluments, minus compulsory social security deductions, which is paid by the European School ('the European supplement').

20    For the period from 1 July 2007 to 30 June 2008 the European supplement was calculated – pursuant to Article 49(2)(b) of the Regulations for seconded staff in the version applicable at that time – on the basis of the difference between the remuneration provided for by the Regulations, on the one hand, and the exchange rate for all national emoluments expressed in pounds sterling and converted on the basis of the budget rate applied by the European Community as at 1 July 2007, on the other.

21    Sterling depreciated significantly against the euro from October 2007 onwards. However, that depreciation was not taken into account in calculating the European supplement paid to the applicants in the main proceedings before 1 July 2008, as the exchange rate applied to salaries of officials of the European Communities, to which that provision refers, was adjusted only once a year.

22    Between 15 April and 20 May 2008, Mr Miles and the other applicants in the main proceedings lodged administrative appeals with the Secretary-General of the European Schools, seeking to have the conversion rate for sterling revised and the

I - 5150

European supplements recalculated from November 2007. As those appeals were implicitly rejected by the Secretary-General, the applicants in the main proceedings lodged appeals with the Complaints Board on 15 December 2008 and 9 January 2009 respectively, seeking annulment and in addition, compensation for the period from November 2007 to June 2008. In those appeals, the applicants in the main proceedings raised, inter alia, a plea of the illegality of Article 49(2)(b) of the Regulations for seconded staff in the light of Articles 12 EC and 39 EC.

23    In October 2008 the Board of Governors of the European Schools amended Article 49(2)(b) of the Regulations for seconded staff so that the conversion rate could be revised in a more flexible way in the event of extreme variations in exchange rates for currencies of Member States outside the Euro zone. The entry into force of that amendment was set for 1 July 2008 on the ground that retrospective application would have given rise to significant costs and would have meant that members of staff seconded from Member States whose currencies had increased in value would have been asked to repay the amount of the European supplement which had been overpaid.

24    The Complaints Board observed that the legal system of the European Schools is a sui generis system which is distinct both from that of the European Communities and Union and from that of the Member States, while at the same time constituting a form of cooperation between them. It points out that it may be inferred from that that, although the national or international instruments to which the European Schools are not themselves party cannot legally bind them as such, the fundamental principles which they contain or to which they refer, since they are generally accepted both in the European Union ('EU') legal order and in the legal systems of the Member States, must at least serve as a reference for the action of the Schools' organs. Furthermore,

the rules of EU law to which the provisions adopted in implementation of the Convention specifically refer are directly applicable in the system of those schools.

25    The Complaints Board found that, in those circumstances, the applicants in the main proceedings were entitled to rely on a plea of illegality of Article 49(2)(b) of the Regulations for seconded staff in the light of Articles 12 EC and 39 EC.

26    The Complaints Board observed that the European Schools' Convention expressly provided only that the Court of Justice is to have jurisdiction in disputes between contracting parties. However, the question arises whether, in interpreting and applying the principles of EU law which may be relied on before it, and the rules of that law to which the provisions adopted pursuant to that convention refer, the Complaints Board may, even though it belongs to a sui generis system distinct both from the European Union system and that of the Member States, be regarded as a court or tribunal falling within the scope of Article 234 EC.

27    The Complaints Board points out, in that connection, that it was set up by means of a convention which exclusively concerns the Community and its Member States, in order to provide uniform judicial protection in the area of the powers conferred on it. That convention also provides that the judgments of the Complaints Board are, if necessary, to be rendered enforceable by the relevant authorities of the Member States and that disputes which do not fall within its jurisdiction are to fall within national jurisdiction. It would be paradoxical, therefore, if only the national courts could make a reference to the Court of Justice of the European Union in connection with a dispute concerning the European Schools. Finally, an option for the Complaints Board to refer questions to the Court of Justice for a preliminary ruling is consistent with the objective of Article 234 EC of ensuring a uniform interpretation of EU law.

28    The Complaints Board considers that there is some difficulty over the answer to the question whether Article 49(2)(b) of the Regulations for seconded staff is compatible with Articles 12 EC and 39 EC. It observes that, since the contested provision was only amended as of 1 July 2008, that is to say, eight months after the sharp depreciation in sterling, the teachers on secondment from the United Kingdom were thus placed at a disadvantage by the calculation of their remuneration before that date. The fact that teachers seconded by other Member States were placed at an advantage by the fact that their remuneration was not adjusted before that date because of the appreciation of the currencies of those States was all the less capable of justifying the position of the European Schools in that it had the effect of exacerbating the unequal treatment between the teachers concerned. According to the Complaints Board, such a situation appears not only contrary to the principle of equal treatment and non-discrimination on the ground of nationality, but also seems liable to constitute an obstacle to freedom of movement for workers.

29    Under those circumstances, the Complaints Board decided to stay the proceedings and to refer the following questions to the Court of Justice for a preliminary ruling:

'(1)  Is Article 234 EC to be interpreted as meaning that a court or tribunal such as the Complaints Board, which was established by Article 27 of the [European Schools' Convention], falls within its scope of application and, since the Complaints Board acts as a tribunal of last instance, is competent to make a reference for a preliminary ruling to the Court of Justice?

(2)  If the answer to the first question is in the affirmative, must Articles 12 EC and 39 EC be interpreted as meaning that they prevent the application of a remuneration system such as the system in force within the European Schools in as much

as, although that system expressly refers to the system applying to Community officials, it does not allow for the taking into account, even retrospectively, of currency devaluation which leads to a decline in purchasing power for teachers who are seconded by the authorities of the Member State concerned?

(3) If the answer to the second question is in the affirmative, can a difference in situation such as that established between teachers seconded to the European Schools, whose remuneration is funded both by their national authorities and by the European School in which they teach, on the one hand, and officials of the European Community, whose remuneration is funded by the Community alone, on the other hand, justify a situation in which, in the light of the principles laid down in the articles cited above and although the Regulations for Members of the Seconded Staff of the European Schools expressly refer to the Staff Regulations of Officials of the European Communities, the exchange rates applied in order to maintain an equivalent purchasing power are not the same?'

**The jurisdiction of the Court of Justice**

*Observations put before the Court*

30    The applicants in the main proceedings and the Commission consider that the Court of Justice has jurisdiction to rule on a request for a preliminary ruling put before it by the Complaints Board and that that Board is not only empowered to make a reference for a preliminary ruling to the Court under the third paragraph of Article 234 EC but is obliged to make such a reference. The European Schools, on the other hand, take

the opposite view and, therefore, propose that the first question should be answered in the negative.

31    The applicants in the main proceedings and the Commission assert that the Complaints Board meets all the criteria on the basis of which a body is to be treated as a 'court or tribunal' within the meaning of Article 234 EC, as established by the case-law of the Court of Justice. For instance, the Complaints Board is established by law, it is established on a permanent basis, its members offer guarantees of full independence, its jurisdiction is compulsory, it applies rules of law and a procedure comparable to that followed in the ordinary courts, which meets the requirement that its procedure should be inter partes. The Commission adds that the Complaints Board, in this case, exercises a judicial function in ruling in a dispute between the applicants in the main proceedings and the European Schools as employer.

32    The applicants in the main proceedings and the Commission consider that even if the Complaints Board does not fall directly within the authority of any Member State in particular, it must be treated as 'a court or tribunal of a Member State' within the meaning of Article 234 EC. The Court of Justice has indeed already accepted, in its judgment in Case C-337/95 *Parfums Christian Dior* [1997] ECR I-6013, paragraphs 20 to 26), that a court common to a number of Member States could refer questions to it for a preliminary ruling. It based that solution on a teleological interpretation of Article 234 EC, taking account of the objective underlying that provision of ensuring a uniform interpretation of EU law. That solution ought also to be applicable as regards the Complaints Board, which should be considered to be a court common to all the Member States and to the Union and which is called upon to apply EU law like the national courts. Allowing the Complaints Board to refer a question to the Court of Justice when it is called upon to interpret the rules of EU law meets, inter alia, the objective of ensuring the uniform interpretation of that law.

33    The Commission accepts that any international court may not refer a question to the Court of Justice for a preliminary ruling solely on the ground that it applies rules of EU law. However, these proceedings concern the particular case of a court common to all the Member States which takes the place of the national courts which would otherwise have had jurisdiction. The applicants in the main proceedings argue that it is not acceptable that the Member States should escape their obligations under the Treaties by concluding the European Schools' Convention, which, moreover is manifestly not intended to restrict the scope of EU law.

34    The Commission and the applicants in the main proceedings consider that, in so far as the Union is a party to the European Schools' Convention, that convention and all the law derived from it are part of EU law in their entirety. The applicants infer from that that the Court of Justice has jurisdiction to give a preliminary ruling both on that convention and on the Regulations for seconded staff.

35    The European Schools consider that it is apparent from Article 27 of the European Schools' Convention that the Complaints Board is a court or tribunal. Clearly, however, it is not a national court. If the Court of Justice was able, inter alia in *Parfums Christian Dior*, to extend the notion of national court or tribunal to cover the Benelux Court of Justice, that was because, in the area of intellectual property there is EU legislation in existence. However the Regulations for seconded staff might be considered not so much a matter on which EU legislation is in existence as simply an expression of the relinquishment of powers by the Member States in favour of the bodies of the European Schools so that they can organise their relationships with the teachers available to them. Moreover, referral to the Benelux Court of Justice on a trade mark matter was a step in the proceedings pending before the national courts, whereas there is no link between the judicial function exercised by the Complaints Board and that exercised by the national courts. The mere fact that the national courts can be

requested to enforce the decisions of the Complaints Board is, in that respect, of no relevance.

36    The European Schools take the view that the admittedly close links they have with the Union are not sufficient for the Regulations for seconded staff to be considered to be governed by EU law. Although it is clear from the case-law of the Complaints Board that the principles of equal treatment and freedom of movement for workers are fundamental principles with which the bodies of the European Schools, including the Complaints Board, must comply, it cannot be inferred from that that the legislative texts adopted by the Board of Governors of the European Schools must be treated as EU law. The questions which arise concern only the relationships which the European Schools have with their seconded staff, without there being any direct link with EU law. In those circumstances, the Court of Justice has no jurisdiction to reply to a request for a preliminary ruling brought by the Complaints Board since there is not a sufficient link with that law.

*The Court's response*

37    According to settled case-law, in order to determine whether a body making a reference is a court or tribunal for the purposes of Article 267 TFEU, which is a question governed by EU law alone, the Court takes account of a number of factors, such as whether the body is established by law, whether it is permanent, whether its jurisdiction is compulsory, whether its procedure is inter partes, whether it applies rules of law and whether it is independent (see, inter alia, Case C-54/96 *Dorsch Consult* [1997] ECR I-4961, paragraph 23; Case C-53/03 *Syfait and Others* [2005] ECR I-4609, paragraph 29; Case C-246/05 *Häupl* [2007] ECR I-4673, paragraph 16; and Case C-118/09 *Koller* [2010] ECR I-13627, paragraph 22).

38    Although, as all the parties intervening in this case observed, the Complaints Board meets all those criteria and must, therefore, be deemed to be a 'court or tribunal' within the meaning of Article 267 TFEU, it must none the less be pointed out that the wording of that provision refers to 'a court or tribunal of a Member State'.

39    However, it must be held that the Complaints Board falls within the remit, not of 'a Member State' but of the European Schools, which constitute, as the first and second recitals of the European Schools' Convention state a 'sui generis' system, which achieves, by means of an international agreement, a form of cooperation between the Member States and between those States and the European Union, for the education together of children of the staff of the European Communities in order to ensure the proper functioning of the European institutions.

40    It is true that the Court of Justice has held, in paragraph 21 of *Parfums Christian Dior*, that there is no good reason why a court common to a number of Member States, such as the Benelux Court of Justice, should not be able to submit questions to the Court of Justice, in the same way as courts or tribunals of any of those Member States.

41    However, the Complaints Board is not such a court common to a number of Member States, comparable to the Benelux Court of Justice. Whereas the Benelux Court has the task of ensuring that the legal rules common to the three Benelux States are applied uniformly and, moreover, the procedure before it is a step in the proceedings before the national courts leading to definitive interpretations of common Benelux legal rules (see *Parfums Christian Dior*, paragraph 22), the Complaints Board does not have any such links with the judicial systems of the Member States.

42    Moreover, although the Complaints Board was created by all the Member States and by the Union, the fact remains that it is a body of an international organisation which, despite the functional links which it has with the Union, remains formally distinct from it and from those Member States.

43    In those circumstances, the mere fact that the Complaints Board is required to apply the general principles of EU law when it has a dispute before it is not sufficient to make the Board fall within the definition of 'court or tribunal of a Member State' and thus within the scope of Article 267 TFEU.

44    The applicants in the main proceedings and the Commission, however, consider that the possibility, or indeed the obligation, which the Complaints Board has of referring a question to the Court of Justice in the course of such a dispute is vital to ensure that those principles are applied uniformly and that the rights which seconded teachers derive from them are effectively protected.

45    In that regard, it must be observed that while it is possible to envisage a development, along the lines described in the previous paragraph, of the system of judicial protection established by the European Schools' Convention, it is for the Member States to reform the system currently in force (see, by analogy, Case C-50/00 P *Unión de Pequeños Agricultores* v *Council* [2002] ECR I-6677, paragraphs 44 and 45).

46    It follows from the foregoing that the Court of Justice has no jurisdiction to rule on a reference for a preliminary ruling from the Complaints Board of the European Schools.

**Costs**

47    Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

**The Court of Justice has no jurisdiction to rule on a reference for a preliminary ruling from the Complaints Board of the European Schools.**

[Signatures]