# EXHIBIT 47



Reports of Cases

JUDGMENT OF THE COURT (Grand Chamber)

27 February 2018 *

(Reference for a preliminary ruling — Fisheries Partnership Agreement between the European Community and the Kingdom of Morocco — Protocol setting out the fishing opportunities provided for by the agreement — Acts approving the conclusion of the agreement and of the protocol — Regulations allocating among the Member States the fishing opportunities set out by the protocol — Jurisdiction — Interpretation — Validity having regard to Article 3(5) TEU and international law — Applicability of that agreement and that protocol to the territory of Western Sahara and the waters adjacent thereto)

In Case C-266/16,

REQUEST for a preliminary ruling under Article 267 TFEU from the High Court of Justice (England & Wales), Queen's Bench Division (Administrative Court) (United Kingdom), made by decision of 27 April 2016, received at the Court on 13 May 2016, in the proceedings

**The Queen**, on the application of:

**Western Sahara Campaign UK**

v

**Commissioners for Her Majesty's Revenue and Customs,**

**Secretary of State for Environment, Food and Rural Affairs,**

intervening party:

**Confédération marocaine de l'agriculture et du développement rural (Comader),**

THE COURT (Grand Chamber),

composed of K. Lenaerts, President, A. Tizzano, Vice-President, R. Silva de Lapuerta, M. Ilešič, L. Bay Larsen, J. Malenovský (Rapporteur), C.G. Fernlund and C. Vajda, Presidents of Chambers, A. Arabadjiev, C. Toader, M. Safjan, D. Šváby, M. Berger, A. Prechal and E. Jarašiūnas, Judges,

Advocate General: M. Wathelet,

Registrar: L. Hewlett, Principal Administrator,

having regard to the written procedure and further to the hearing on 6 September 2017,

---

* Language of the case: English.



ECLI:EU:C:2018:118                                                                                                                  1

after considering the observations submitted on behalf of:

– Western Sahara Campaign UK, by K. Beal QC, C. McCarthy, Barrister, and R. Curling, Solicitor,

– the Confédération marocaine de l'agriculture and du développement rural (Comader), by J.-F. Bellis, R. Hicheri and M. Struys, avocats, and by R. Penfold, Solicitor,

– the Spanish Government, by M.A. Sampol Pucurull, acting as Agent,

– the French Government, by F. Alabrune, D. Colas, B. Fodda, S. Horrenberger and L. Legrand, acting as Agents,

– the Portuguese Government, by M. Figueiredo and L. Inez Fernandes, acting as Agents,

– the Council of the European Union, by Á. de Elera-San Miguel Hurtado and A. Westerhof Löfflerová, acting as Agents,

– the European Commission, by A. Bouquet, F. Castillo de la Torre, E. Paasivirta and B. Eggers, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 10 January 2018,

gives the following

**Judgment**

1   This request for a preliminary ruling concerns the validity of the Fisheries Partnership Agreement between the European Community and the Kingdom of Morocco (OJ 2006 L 141, p. 4; 'the Fisheries Partnership Agreement'), as approved and implemented by Council Regulation (EC) No 764/2006 of 22 May 2006 on the conclusion of the Fisheries Partnership Agreement between the European Community and the Kingdom of Morocco (OJ 2006 L 141, p. 1), by Council Decision 2013/785/EU of 16 December 2013 on the conclusion, on behalf of the European Union, of the Protocol between the European Union and the Kingdom of Morocco setting out the fishing opportunities and financial contribution provided for in the Fisheries Partnership Agreement between the European Union and the Kingdom of Morocco (OJ 2013 L 349, p. 1), and by Council Regulation (EU) No 1270/2013 of 15 November 2013 on the allocation of fishing opportunities under the Protocol between the European Union and the Kingdom of Morocco setting out the fishing opportunities and financial contribution provided for in the Fisheries Partnership Agreement between the European Union and the Kingdom of Morocco (OJ 2013 L 328, p. 40).

2   The request has been made in two proceedings between, on the one hand, Western Sahara Campaign UK, and, on the other, the Commissioners for Her Majesty's Revenue and Customs and the Secretary of State for the Environment, Food and Rural Affairs (United Kingdom), respectively, on the implementation, by that authority and by that minister, of international agreements concluded between the European Union and the Kingdom of Morocco and the secondary legislation associated with those agreements.

**Legal context**

*International law*

*The Charter of the United Nations*

3   Article 1 of the Charter of the United Nations, signed at San Francisco on 26 June 1945, states:

'The Purposes of the United Nations are:

...

2.  To develop friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples ...

...'

4   Chapter XI of the Charter of the United Nations, entitled 'Declaration Regarding Non-Self-Governing Territories', includes Article 73 thereof, which states:

'Members of the United Nations which have or assume responsibilities for the administration of territories whose peoples have not yet attained a full measure of self-government recognise the principle that the interests of the inhabitants of these territories are paramount, and accept as a sacred trust the obligation to promote to the utmost, within the system of international peace and security established by the present Charter, the well-being of the inhabitants of these territories ...

...'

*Convention on the Law of the Sea*

5   The United Nations Convention on the Law of the Sea, concluded at Montego Bay on 10 December 1982 (*United Nations Treaty Series*, Vol. 1833, 1834 and 1835, p. 3; 'the Convention on the Law of the Sea'), entered into force on 16 November 1994. Its conclusion was approved on behalf of the Community by Council Decision 98/392/EC of 23 March 1998 (OJ 1998 L 179, p. 1).

6   Part II of the Convention on the Law of the Sea, headed 'Territorial sea and contiguous zone', includes Article 2 of the convention, headed 'Legal status of the territorial sea, of the air space over the territorial sea and of its bed and subsoil', of which paragraphs 1 and 3 provide:

'1. The sovereignty of a coastal State extends, beyond its land territory and internal waters and, in the case of an archipelagic State, its archipelagic waters, to an adjacent belt of sea, described as the territorial sea.

...

3. The sovereignty over the territorial sea is exercised subject to this Convention and to other rules of international law.'

7   Part V of that convention, headed 'Exclusive economic zone', includes Articles 55 and 56.

8   Article 55 of that convention, headed 'Specific legal regime of the exclusive economic zone', provides that 'the exclusive economic zone is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established in this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention'.

9   Article 56(1) of that convention, that article being headed 'Rights, jurisdiction and duties of the coastal State in the exclusive economic zone', provides:

'In the exclusive economic zone, the coastal State has:

(a)  sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or non-living, of the waters superjacent to the seabed and of the seabed and its subsoil, and with regard to other activities for the economic exploitation and exploration of the zone, ...

(b)  jurisdiction as provided for in the relevant provisions of this Convention with regard to:

   ...
   (ii)  marine scientific research;

   ...

(c)  other rights and duties provided for in this Convention.'

*The Vienna Convention on the Law of Treaties*

10  The Vienna Convention on the Law of Treaties was concluded in Vienna on 23 May 1969 (*United Nations Treaty Series*, Vol. 1155, p. 331; 'the Vienna Convention').

11  Article 3 of the Vienna Convention, which is headed 'International agreements not within the scope of the present Convention', provides:

'The fact that the present Convention does not apply to international agreements concluded between States and other subjects of international law or between such other subjects of international law, or to international agreements not in written form, shall not affect:

...

(b)  the application to [such agreements] of any of the rules set forth in the present Convention to which they would be subject under international law independently of the Convention;

...'

12  Under Article 31 of the Vienna Convention, headed 'General rule of interpretation':

'1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

(b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:

(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) any relevant rules of international law applicable in the relations between the parties.

4. A special meaning shall be given to a term if it is established that the parties so intended.'

13  Article 34 of the Vienna Convention, headed 'General rule regarding third States', provides that 'a treaty does not create either obligations or rights for a third State without its consent'.

*European Union law*

*The Association Agreement*

14  The Euro-Mediterranean Agreement establishing an association between the European Communities and their Member States, of the one part, and the Kingdom of Morocco, of the other part, was signed in Brussels on 26 February 1996 (OJ 2000 L 70, p. 2; 'the Association Agreement') and was approved on behalf of the European Communities by Council and Commission Decision 2000/204/EC, ECSC of 24 January 2000 (OJ 2000 L 70, p. 1). Under Article 96 thereof, that agreement entered into force on 1 March 2000, as notified in the *Official Journal of the European Communities* (OJ 2000 L 70, p. 228).

15  Title VIII of that agreement, headed 'Institutional, general and final provisions', includes Article 94, which states 'this Agreement shall apply, on the one hand, to the territories in which the Treaties establishing the European Community and the European Coal And Steel Community are applied and under the conditions laid down in those Treaties and, on the other hand to the territory of the Kingdom of Morocco'.

*The Fisheries Partnership Agreement*

16  Under Article 17 of the Fisheries Partnership Agreement, that agreement entered into force on 28 February 2007, as notified in the *Official Journal of the European Union* (OJ 2007 L 78, p. 31).

17  As is apparent from its preamble and Articles 1 and 3, the purpose of that agreement was to intensify the working relationship between the European Union and the Kingdom of Morocco, particularly in the context of the Association Agreement, by establishing, in the fisheries sector, a partnership designed to promote responsible fishing in the Moroccan fishing zones and to implement effectively the Moroccan fisheries policy. To that end, the Fisheries Partnership Agreement establishes, inter alia,

rules on economic, financial, technical and scientific cooperation between the parties, on conditions governing the access of vessels flying the flags of the Member States to Moroccan fishing zones, and on arrangements for the policing of fishing activities in those zones.

18   In that context, it is apparent from Article 5 of the Fisheries Partnership Agreement, that article being headed 'Access by [Union] vessels to fisheries in Moroccan fishing zones', and more specifically from paragraphs (1) and (4) of that article, and from Article 6 thereof, headed 'Conditions governing fishing activities', and particularly paragraph (1) of that article, that the Kingdom of Morocco undertook 'to authorise [Union] vessels to engage in fishing activities in its fishing zones in accordance with [that] Agreement, including the Protocol and Annex thereto', provided that those vessels are in possession of a fishing licence issued by the authorities of the Kingdom of Morocco at the request of the competent EU authorities. For its part, the European Union undertook to 'take all the appropriate steps required to ensure that its vessels comply with [that] Agreement and the legislation governing fisheries in the waters over which [the Kingdom of Morocco] has jurisdiction, in accordance with the … Convention on the Law of the Sea'.

19   Article 11 of the Fisheries Partnership Agreement, headed 'Area of application', states that that agreement is to apply, as regards the Kingdom of Morocco, 'to the territory of Morocco and to the waters under Moroccan jurisdiction'. Further, Article 2 of that agreement is headed 'Definitions' and Article 2(a) states that 'Moroccan fishing zone' is to mean, for the purposes of that agreement, the protocol and the annex thereto, 'the waters falling within the sovereignty or jurisdiction of the Kingdom of Morocco'.

20   Article 16 of the Fisheries Partnership Agreement provides that the protocol and the annex and the appendices thereto are to form an integral part of that agreement.

*The 2013 Protocol*

21   The Fisheries Partnership Agreement was initially accompanied by a protocol (the initial protocol'), the purpose of which was to determine, for a period of four years, the fishing opportunities provided for in Article 5 of that agreement.

22   That initial protocol was replaced by a further protocol which, in its turn, was replaced, in 2013, by the Protocol between the European Union and the Kingdom of Morocco setting out the fishing opportunities and financial contribution provided for in the Fisheries Partnership Agreement between the European Union and the Kingdom of Morocco (OJ 2013 L 328, p. 2; 'the 2013 Protocol'). That protocol was approved by Decision 2013/785 and entered into force on 15 July 2014, as notified in the *Official Journal of the European Union* (OJ 2014 L 228, p. 1).

23   Article 1 of the 2013 Protocol, headed 'General Principles', states that 'this Protocol, together with its Annex and Appendices, form an integral part of the Fisheries Partnership Agreement …, which forms part of the [Association Agreement]'. Further, that protocol 'helps to meet the general objectives of the Association Agreement'.

24   Under Article 2 of the 2013 Protocol, headed 'Period of application, duration and fishing opportunities', vessels flying the flag of a Member State of the European Union, provided that they are in possession of a fishing licence issued in accordance with the Fisheries Partnership Agreement, that protocol and the annex thereto, are to be granted, for a period of four years, in the Moroccan fishing zone, small-scale, demersal and pelagic fishing opportunities as specified in the table attached to the protocol. Those fishing opportunities may be reviewed by mutual agreement, under Article 5 of the 2013 Protocol.

25   The Annex to the 2013 Protocol, headed 'Conditions governing fishing activities by EU vessels in the Moroccan fishing zone', includes Chapter III, headed 'Fishing zones', and is worded as follows:

'[The Kingdom of Morocco] shall inform the EU, prior to the date of application of the Protocol, of the geographical coordinates of the baselines, its fishing zone and all zones within it which are closed to fishing …

The fishing zones for each category in Morocco's Atlantic zone are defined in the datasheets (Appendix 2).'

26   Appendix 2 to that annex contains six data sheets numbered 1 to 6. Each of those data sheets concerns a specific category of fishing and sets out the conditions governing fishing activities for that category. One of the conditions referred to by each of those data sheets refers to the 'geographical limit of the authorised zone'.

27   Appendix 4 to that annex, headed 'Coordinates of fishing zones', states, inter alia, 'prior to entry into force [of the 2013 Protocol], the [Sea Fisheries Department of the Ministry of Agriculture and Sea Fisheries of the Kingdom of Morocco] will notify the Commission of the geographical coordinates of the Moroccan baseline, the Moroccan fishing zone and areas in which navigation and fishing is prohibited'.

*The acts implementing the Fisheries Partnership Agreement and the 2013 Protocol*

28   One of the objectives of Regulation No 764/2006 was, as is stated in recital 3 thereof, to define the method for allocating among the Member States the fishing opportunities provided by the Fisheries Partnership Agreement in the period when the initial protocol was applicable. Article 2 of that regulation allocated a quota of 2 500 tonnes to the United Kingdom with respect to industrial fishing for pelagic species.

29   Similarly, the objective of Regulation No 1270/2013 was to define the method for allocating among the Member States the fishing opportunities provided by the Fisheries Partnership Agreement in the period when the 2013 Protocol was applicable. Article 1 of that regulation allocated a quota of 4 525 tonnes to the United Kingdom with respect to industrial fishing for pelagic species.

**The disputes in the main proceedings, the procedure before the Court and the questions referred for a preliminary ruling**

30   Western Sahara Campaign UK is a voluntary organisation whose aim is to support the recognition of the right of the people of Western Sahara to self-determination.

31   Western Sahara Campaign UK brought two actions before the High Court of Justice (England & Wales), Queen's Bench Division (Administrative Court). The first of those actions concerns the question whether the tax and customs authority in the United Kingdom is entitled to accept the importation, into the United Kingdom, of goods certified as originating in Western Sahara, as if they were goods certified as originating in the Kingdom of Morocco for the purposes of the Association Agreement. The second action challenges the fisheries policy developed by the Secretary of State for Environment, Food and Rural Affairs in the United Kingdom, on the ground that that policy provides for the inclusion of the waters adjacent to the territory of Western Sahara within the scope of the domestic legislation intended to implement the Fisheries Partnership Agreement, the 2013 Protocol and the acts of secondary legislation whereby the European Union allocated fishing opportunities to the Member States pursuant to that agreement and that protocol.

32   Before the referring court, Western Sahara Campaign UK submits that the Association Agreement, the Fisheries Partnership Agreement, the 2013 Protocol and the acts of secondary legislation which allocate fishing opportunities to the Member States on the basis of those texts are contrary to Article 3(5) TEU, by virtue of which the European Union is to contribute to the strict observance of international law, and in particular the principles of the Charter of the United Nations, in its relations with the wider world, in so far as those various international agreements are applicable to the territory of Western Sahara and to the waters adjacent thereto. According to Western Sahara Campaign UK, the inclusion of that territory and those waters within their territorial scope is manifestly incompatible with international law and, more specifically, with the right to self-determination, Article 73 of the Charter of the United Nations, the provisions of the Convention on the Law of the Sea and the obligations incumbent on States and other subjects of international law to bring to an end serious breaches of a peremptory norm of international law, not to recognise an illegal situation resulting from such a breach, and not to provide assistance for the commission of an internationally wrongful act. Further, the Association Agreement, the Fisheries Partnership Agreement and the 2013 Protocol were not concluded on behalf of the people of Western Sahara nor in consultation with its representatives. Last, there is no evidence that the people of Western Sahara have derived any benefit from those three international agreements.

33   The referring court states that the defendants in the main proceedings contend, for their part, that the Council of the European Union and the Commission did not commit any manifest error of assessment in taking the position that the conclusion of international agreements such as the Association Agreement, the Fisheries Partnership Agreement and the 2013 Protocol was not contrary to international law.

34   In the light of those arguments, the referring court decided to stay the proceedings and to refer to the Court four questions for a preliminary ruling, the first two of which concerned the interpretation and validity of the Association Agreement, whereas the latter two questions concern the validity of the Fisheries Partnership Agreement and the various acts of secondary legislation associated with the Fisheries Partnership Agreement.

35   By means of its first question, the referring court sought from the Court an interpretation of the Association Agreement, asking whether the references to the 'Kingdom of Morocco' in that agreement were to be interpreted as referring solely to the sovereign territory of that State, and therefore precluding products originating in Western Sahara from being imported into the European Union free of customs duties pursuant to that agreement.

36   By means of its second question, referred on the premiss that the Association Agreement did in fact permit products originating in Western Sahara to be imported into the European Union free of customs duties, the referring court sought to ascertain whether that agreement was valid having regard to Article 3(5) TEU.

37   By means of its third question, the referring court raised with the Court, on the basis of a premiss analogous to that underlying its second question, the issue of the validity of the Fisheries Partnership Agreement and of the 2013 Protocol. In that regard, the referring court sought to ascertain, in essence, to what extent the European Union was entitled, having regard to Article 3(5) TEU, to conclude, with the Kingdom of Morocco, international agreements permitting the exploitation of the natural resources of the waters adjacent to the territory of Western Sahara. The referring court states that it is arguable that the conclusion of such international agreements is not generally and absolutely prohibited, notwithstanding, on the one hand, the fact that the sovereignty of the Kingdom of Morocco over Western Sahara is not recognised by the international community, and, on the other, the extended occupation of that non-self-governing territory by the Kingdom of Morocco. However, conclusion of those agreements, according to that court, is subject to the twofold requirement that

they are in accordance with the wishes of the people of Western Sahara and are for their benefit. In this case, the referring court considers that it is for the Court to assess to what extent the Fisheries Partnership Agreement and the 2013 Protocol respect that twofold requirement.

38  By its fourth question, the referring court sought to ascertain, in essence, whether a person such as the applicant in the main proceedings, whose standing to bring proceedings is established under national law, might be entitled to challenge the validity of international agreements such as the Association Agreement, the Fisheries Partnership Agreement and the 2013 Protocol, and the validity of the relevant acts of conclusion and implementation, on the ground that the European Union had infringed international law. On that issue, the referring court stated that, if the disputes in the main proceedings had to be resolved in the light of domestic law alone, the actions would be dismissed, by reason of the fact that they require an assessment of the legality of the actions of a foreign sovereign. The referring court has also pointed out that the International Court of Justice, in its judgment of 15 June 1954, Case of the Monetary Gold Removed from Rome in 1943 (ICJ Reports 1954, p. 19), held that its Statute prohibited it from making findings that impugned the conduct of, or affected the rights of, a State that was not a party to the proceedings before it and that had not consented to be bound by its decisions. The referring court added, however, that since the subject matter of the disputes in the main proceedings was the validity of EU acts, if the Court were to declare that it had no jurisdiction, in a situation where there is serious doubt concerning the validity of the acts at issue, that might undermine the efficacy of Article 3(5) TEU.

39  Since the date when the request for a preliminary ruling was lodged, the Court has held that the Association Agreement is to be interpreted, in accordance with rules of international law that are binding on the European Union, as meaning that that agreement is not applicable to the territory of Western Sahara (judgment of 21 December 2016, *Council* v *Front Polisario*, C-104/16 P, EU:C:2016:973).

40  Following the delivery of that judgment, the referring court was asked whether it wished to maintain or withdraw its first two questions, on the interpretation and the validity of the Association Agreement. The referring court's response was that those questions could be considered to have been withdrawn.

41  In those circumstances, the High Court of Justice (England and Wales) Queen's Bench Division (Administrative Court), decided to maintain its reference of the following two questions to the Court of Justice for a preliminary ruling:

'(1) Is the [Fisheries Partnership Agreement] (as approved and implemented by Regulation No 764/2006, Decision 2013/785 and Regulation No 1270/2013) valid, having regard to the requirement under Article 3(5) TEU to contribute to the observance of any relevant principle of international law and respect for the principles of the Charter of the United Nations and the extent to which the [Fisheries Agreement] was concluded for the benefit of the Saharawi people, on their behalf, in accordance with their wishes, and/or in consultation with their recognised representatives?

(2) Is [the applicant in the main proceedings] entitled to challenge the validity of EU acts based on alleged breach of international law by the EU, having regard, in particular, to:
   (a) the fact that, although [the applicant] has standing under national law to impugn the validity of the EU acts, it does not assert any rights under EU law; and/or
   (b) the principle in Case of the Monetary Gold Removed from Rome in 1943 (ICJ Reports 1954, p. 19) that the International Court of Justice may not make findings that impugn the conduct of, or affect the rights of, a State that is not before the Court and has not consented to be bound by the decisions of the Court?'

**The jurisdiction of the Court**

42  The Council considers that the Court has no jurisdiction to examine the validity of international agreements such as the Fisheries Partnership Agreement and the 2013 Protocol in a preliminary ruling procedure. The Council believes that the Court has jurisdiction solely to give a ruling on the validity of the EU acts approving the conclusion of those agreements.

43  In that regard, Article 19(3)(b) TEU and point (b) of the first paragraph of Article 267 TFEU provide that the Court has jurisdiction to give preliminary rulings on the interpretation of EU law and the validity of acts adopted by the EU institutions.

44  It follows from those provisions that the Court has jurisdiction to give preliminary rulings on the interpretation and the validity of acts adopted by the EU institutions, without exception (judgments of 13 December 1989, *Grimaldi*, C-322/88, EU:C:1989:646, paragraph 8, and of 13 June 2017, *Florescu and Others*, C-258/14, EU:C:2017:448, paragraph 30).

45  In accordance with the Court's settled case-law, international agreements concluded by the European Union pursuant to the provisions of the Treaties constitute, as far as the Union is concerned, acts of the institutions of the European Union (judgments of 16 June 1998, *Racke*, C-162/96, EU:C:1998:293, paragraph 41, and of 25 February 2010, *Brita*, C-386/08, EU:C:2010:91, paragraph 39).

46  As such, those agreements are, from the date of their entry into force, an integral part of the EU legal order (see, to that effect, judgments of 30 April 1974, *Haegeman*, 181/73, EU:C:1974:41, paragraph 5, and of 22 November 2017, *Aebtri*, C-224/16, EU:C:2017:880, paragraph 50). The provisions of such agreements must therefore be entirely compatible with the Treaties and with the constitutional principles stemming therefrom (see, to that effect, judgment of 3 September 2008, *Kadi and Al Barakaat International Foundation* v *Council and Commission*, C-402/05 P and C-415/05 P, EU:C:2008:461, paragraph 285, and Opinion 1/15 (EU-Canada PNR Agreement) of 26 July 2017, EU:C:2017:592, paragraph 67). More specifically, first, the substantive content of such agreements must be compatible with the rules governing the powers of the EU institutions and with the relevant rules of substantive law. Second, the procedure adopted for their conclusion must comply with the formal and procedural rules applicable under EU law (see, to that effect, Opinion 1/75 (OECD Understanding — Local cost standard) of 11 November 1975, EU:C:1975:145, pp. 1360 and 1361, and Opinion 1/15 (EU-Canada PNR Agreement) of 26 July 2017, EU:C:2017:592, paragraphs 69 and 70).

47  Moreover, the European Union is bound, in accordance with settled case-law, when exercising its powers, to observe international law in its entirety, including not only the rules and principles of general and customary international law, but also the provisions of international conventions that are binding on it (see, to that effect, judgments of 24 November 1992, *Poulsen and Diva Navigation*, C-286/90, EU:C:1992:453, paragraph 9; of 3 September 2008, *Kadi and Al Barakaat International Foundation* v *Council and Commission*, C-402/05 P and C-415/05 P, EU:C:2008:461, paragraph 291; and of 21 December 2011, *Air Transport Association of America and Others*, C-366/10, EU:C:2011:864, paragraphs 101 and 123).

48  Consequently, the Court has jurisdiction, both in the context of an action for annulment and in that of a request for a preliminary ruling to assess whether an international agreement concluded by the European Union is compatible with the Treaties (see, to that effect, Opinion 1/75 (OECD Understanding — Local cost standard) of 11 November 1975, EU:C:1975:145, p. 1361) and with the rules of international law which, in accordance with the Treaties, are binding on the Union.

49  It must be added that the international agreements concluded by the European Union are binding not only on the EU institutions, in accordance with Article 216(2) TFEU, but also on the non-member States that are parties to those agreements.

50   Accordingly, it must be held that, in a situation where, as in this case, the Court has received a request for a preliminary ruling concerning the validity of an international agreement concluded by the European Union, that request must be understood as relating to the EU act approving the conclusion of that international agreement (see, by analogy, judgments of 9 August 1994, *France* v *Commission*, C-327/91, EU:C:1994:305, paragraph 17, and of 3 September 2008, *Kadi and Al Barakaat International Foundation* v *Council and Commission*, C-402/05 P and C-415/05 P, EU:C:2008:461, paragraphs 286 and 289).

51   Given the obligations incumbent on the European Union as set out in paragraphs 46 and 47 of the present judgment, the review of validity which the Court may be required to carry out in that context is nonetheless capable of encompassing the legality of that act in the light of the actual content of the international agreement at issue (see, to that effect, judgment of 3 September 2008, *Kadi and Al Barakaat International Foundation* v *Council and Commission*, C-402/05 P and C-415/05 P, EU:C:2008:461, paragraph 289 and the case-law cited).

**Consideration of the questions referred**

*The first question*

*Preliminary observations*

52   By its first question, the referring court asks the Court to assess the validity, having regard to Article 3(5) TEU, of, first, Regulation No 764/2006, second, Decision 2013/785, and, last, Regulation No 1270/2013.

53   As is stated in paragraph 37 of the present judgment, the starting point for that question is the premiss that the Fisheries Partnership Agreement and the 2013 Protocol permit the exploitation of the natural resources in the waters adjacent to the territory of Western Sahara. That premiss itself implies that those waters are included with the territorial scope of both that agreement and that protocol, with the result that vessels flying the flags of the Member States can enter those waters, by virtue of those two international agreements, in order to exploit the resources at issue.

54   By means of that question, the referring court therefore seeks to ascertain, in essence, whether the fact that the exploitation of the natural resources in the waters adjacent to the territory of Western Sahara is permitted by the Fisheries Partnership Agreement and the 2013 Protocol renders invalid Regulation No 764/2006, Decision 2013/785 and Regulation No 1270/2013.

55   However, such a question concerning validity arises only if the premiss on which it is based is correct.

56   Consequently, it is necessary to establish, first, whether the waters adjacent to the territory of Western Sahara fall within the scope of the Fisheries Partnership Agreement and the 2013 Protocol. That requirement entails, in its turn, that the Court must examine the provisions determining the territorial scope of each of those two international agreements.

*The territorial scope of the Fisheries Partnership Agreement*

57   The Fisheries Partnership Agreement contains three provisions determining its territorial scope. First, Article 11 of that agreement states that it is applicable, as regards the Kingdom of Morocco, to 'the territory of Morocco and to the waters under Moroccan jurisdiction'. Second, Article 5 of that agreement provides, as regards, more specifically, fishing activities, that vessels flying the flags of the

Member States are permitted to 'engage in fishing activities in [the] fishing zones [of the Kingdom of Morocco]'. Last, Article 2(a) of that agreement states that 'Moroccan fishing zone' means the 'waters falling within the sovereignty or jurisdiction of the Kingdom of Morocco'.

58  In order to interpret those provisions, it is necessary to refer to the rules of customary international law reflected by Article 31 of the Vienna Convention, which are binding on the EU institutions and are part of the EU legal order (see, to that effect, judgment of 25 February 2010, *Brita*, C‑386/08, EU:C:2010:91, paragraphs 40 to 43 and the case-law cited), and to the Convention on the Law of the Sea, which is binding on the European Union and which is explicitly referred to in the second paragraph of the preamble to the Fisheries Partnership Agreement and in Article 5(4) of that agreement.

59  In that regard, it must be noted, first, that it is apparent from the first paragraph of the preamble to the Fisheries Partnership Agreement that that agreement is a manifestation of the mutual desire of the European Union and the Kingdom of Morocco to intensify the close working relationship established between them, particularly in the context of the Association Agreement. As such, the Fisheries Partnership Agreement is one of a body of agreements that is framed by the Association Agreement.

60  The structure of that body of agreements is clearly set out in the 2013 Protocol, which must be taken into account for the purposes of the interpretation of the Fisheries Partnership Agreement, since that protocol constitutes a subsequent agreement between the parties to that agreement, within the meaning of Article 31(3)(a) of the Vienna Convention. Article 1 of the 2013 Protocol states that both it and the Fisheries Partnership Agreement form part of the Association Agreement, the objectives of which they help to fulfil.

61  Given the existence of that body of agreements, the concept of 'territory of Morocco', in Article 11 of the Fisheries Partnership Agreement, should be construed in the same way as the concept of 'territory of the Kingdom of Morocco', in Article 94 of the Association Agreement.

62  The Court has previously held that the latter concept must be construed as referring to the geographical area over which the Kingdom of Morocco exercises the fullness of the powers granted to sovereign entities by international law, to the exclusion of any other territory, such as that of Western Sahara (judgment of 21 December 2016, *Council* v *Front Polisario*, C‑104/16 P, EU:C:2016:973, paragraphs 95 and 132).

63  If the territory of Western Sahara were to be included within the scope of the Association Agreement, that would be contrary to certain rules of general international law that are applicable in relations between the European Union and Kingdom of Morocco, namely the principle of self-determination, stated in Article 1 of the Charter of the United Nations, and the principle of the relative effect of treaties, of which Article 34 of the Vienna Convention is a specific expression (judgment of 21 December 2016, *Council* v *Front Polisario*, C‑104/16 P, EU:C:2016:973, paragraphs 88 to 93, 100, 103 to 107 and 123).

64  That being the case, the territory of Western Sahara is not covered by the concept of 'territory of Morocco' within the meaning of Article 11 of the Fisheries Partnership Agreement.

65  In the second place, the Fisheries Partnership Agreement is applicable not only to the territory of the Kingdom of Morocco, but also to the 'waters falling within the sovereignty or jurisdiction' of that State, as stated in paragraph 57 of the present judgment. The Association Agreement does not use such an expression.

66  For the purposes of interpreting that expression, reference must be made to the Convention on the Law of the Sea, as stated in paragraph 58 of the present judgment.

67  In that regard, it is stated in Article 2(1) of the Convention on the Law of the Sea that the sovereignty of a coastal State extends, beyond its land territory and internal waters, to an adjacent belt of sea described as the 'territorial sea'. Further, under Articles 55 and 56 of that convention, a coastal State is to be recognised as having jurisdiction and certain rights with respect to an area beyond and adjacent to the territorial sea, that area being described as the 'exclusive economic zone'.

68  It follows that the waters over which a coastal State is entitled to exercise sovereignty or jurisdiction, under the Convention on the Law of the Sea, are limited exclusively to the waters adjacent to its territory and forming part of its territorial sea or of its exclusive economic zone.

69  Consequently, and taking account of the fact that the territory of Western Sahara does not form part of the territory of the Kingdom of Morocco, as has been stated in paragraphs 62 to 64 of the present judgment, the waters adjacent to the territory of Western Sahara are not part of the Moroccan fishing zone referred to in Article 2(a) of the Fisheries Partnership Agreement.

70  In the third place, and last, it does indeed follow from Article 31(4) of the Vienna Convention that it is open to the parties to a treaty to agree that a term within that treaty is to be given a special meaning.

71  However, with respect to the expression 'waters falling within the sovereignty … of the Kingdom of Morocco', used in Article 2(a) of the Fisheries Partnership Agreement, it must be said that it would be contrary to the rules of international law referred to in paragraph 63 of the present judgment, which the European Union must observe and which are applicable *mutatis mutandis* in this case, if it were agreed that the waters directly adjacent to the coast of the territory of Western Sahara were to be included within the scope of that agreement. Consequently, the European Union could not properly support any intention of the Kingdom of Morocco to include, by such means, the waters in question within the scope of that agreement.

72  As regards the expression 'waters falling within the … jurisdiction of the Kingdom of Morocco' in that provision, the Council and the Commission considered, among a number of possibilities, that the Kingdom of Morocco might be regarded as a 'de facto administrative power' or as an occupying power of the territory of Western Sahara and that such a description could be of relevance in order to determine the scope of the Fisheries Partnership Agreement. In that regard, let it suffice, however, to observe, without there being any need even to examine whether any joint intention of the parties to the Fisheries Partnership Agreement to give that expression a special meaning, in order to take such circumstances into account, would have been compatible with the rules of international law that are binding on the European Union, the existence of such a joint intention cannot, in any event, be identified in this case since the Kingdom of Morocco has categorically denied that it is an occupying power or an administrative power with respect to the territory of Western Sahara.

73  It follows from all the foregoing that the waters adjacent to the territory of Western Sahara are not covered by the expression 'waters falling within the sovereignty or jurisdiction of the Kingdom of Morocco', in Article 2(a) of the Fisheries Partnership Agreement.

*The territorial scope of the 2013 Protocol*

74  As regards the 2013 Protocol, it must, first, be recalled that that protocol is one of a series of protocols all of which have it as their purpose to specify, for a defined period, the fishing opportunities provided by Article 5 of the Fisheries Partnership Agreement to vessels flying the flags of the Member States, as stated in paragraphs 21 and 22 of the present judgment.

75  Unlike the Fisheries Partnership Agreement, the 2013 Protocol does not contain any specific provision that determines its territorial scope.

76   However, various provisions of that protocol use the expression 'Moroccan fishing zone'.

77   That expression is the same as that to be found in Article 2(a) of the Fisheries Partnership Agreement, which states, first, that it must be understood as referring to 'waters falling within the sovereignty or jurisdiction of the Kingdom of Morocco', and, second, that such a definition holds good not only for that agreement, but also for the protocol to the agreement and the annex thereto. Further, it follows from Article 16 of the Fisheries Partnership Agreement and from Article 1 of the 2013 Protocol that the protocol, the annex thereto and the appendices thereto are an integral part of that agreement.

78   It follows that the expression 'Moroccan fishing zone', used in both the Fisheries Partnership Agreement and the 2013 Protocol to determine territorial scope, must be understood as referring to waters falling within the sovereignty or jurisdiction of the Kingdom of Morocco.

79   Consequently, and following the interpretation adopted in paragraph 73 of the present judgment, it must be held that the expression 'Moroccan fishing zone', for the purposes of that protocol, does not include the waters adjacent to the territory of Western Sahara.

80   Second, it is clear, in the first place, that the Annex to the 2013 Protocol provides, in Chapter III, headed 'Fishing zones', that '[the Kingdom of] Morocco is to inform the EU …, prior to the date of application [of that protocol], of the geographical coordinates of the baselines [and] its fishing zone'. In the second place, Appendix 4 to that annex, headed 'Coordinates of fishing zones', states, in the same context, that, 'prior to entry into force [of that protocol], the [Sea Fisheries Department of the Ministry of Agriculture and Sea Fisheries of the Kingdom of Morocco] will notify the Commission of the geographical coordinates of the Moroccan baseline [and] the Moroccan fishing zone'.

81   In that regard, it is apparent from the documents submitted to the Court that the geographical coordinates required by the provisions quoted in the preceding paragraph were notified only on 16 July 2014. Given that the 2013 Protocol entered into force on 15 July 2014, those geographical coordinates do not form part of the text of that protocol, as agreed by the parties.

82   In any event, in the light of the interpretation in paragraph 79 of the present judgment and the reasoning supporting that interpretation, it must be held that, even if those geographical coordinates had been notified prior to the entry into force of the 2013 Protocol, they could in no way have called into question the interpretation of the expression 'Moroccan fishing zone' adopted in that paragraph nor have extended the scope of that protocol so as to include the waters adjacent to the territory of Western Sahara.

83   Accordingly, it follows from all the foregoing that the Fisheries Partnership Agreement and the 2013 Protocol must be interpreted, in accordance with the rules of international law that are binding on the European Union and that are applicable to relations between the Union and the Kingdom of Morocco, as meaning that the waters adjacent to the territory of Western Sahara do not fall within the scope of that agreement and that protocol.

84   Consequently, the premiss to the contrary which, as stated in paragraphs 53 and 54 of the present judgment, underlies the doubts of the referring court with respect to the validity of Regulation No 764/2006, Decision 2013/785 and Regulation No 1270/2013, is in fact incorrect.

85   That being the case, the answer to the first question is that, since neither the Fisheries Partnership Agreement nor the 2013 Protocol are applicable to the waters adjacent to the territory of Western Sahara, consideration of that question has revealed nothing capable of affecting the validity of Regulation No 764/2006, Decision 2013/785 and Regulation No 1270/2013, in the light of Article 3(5) TEU.

*The second question*

86   By its second question, the referring court seeks, in essence, to ascertain whether a litigant that has standing to bring proceedings under national law, such as the applicant in the main proceedings, is entitled to challenge the validity of acts concluding and implementing the Fisheries Partnership Agreement and the 2013 Protocol, on the ground that the European Union was in breach of international law.

87   Given the answer to the first question, there is no need to answer that second question.

**Costs**

88   Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

**Since neither the Fisheries Partnership Agreement between the European Community and the Kingdom of Morocco nor the Protocol between the European Union and the Kingdom of Morocco setting out the fishing opportunities and financial contribution provided for in the Fisheries Partnership Agreement between the European Union and the Kingdom of Morocco are applicable to the waters adjacent to the territory of Western Sahara, consideration of the first question referred for a preliminary ruling has revealed nothing capable of affecting the validity of Council Regulation (EC) No 764/2006 of 22 May 2006 on the conclusion of that agreement, Council Decision 2013/785/EU of 16 December 2013 on the conclusion of that protocol, and Council Regulation (EU) No 1270/2013 of 15 November 2013 on the allocation of fishing opportunities under that protocol, in the light of**

**Article 3(5) TEU.**

| Lenaerts | Tizzano | Silva de Lapuerta |
| --- | --- | --- |
| Ilešič | Bay Larsen | Malenovský |
| Fernlund | Vajda | Arabadjiev |
| Toader | Safjan | Šváby |
| Berger | Prechal | Jarašiūnas |

Delivered in open court in Luxembourg on 27 February 2018.

A. Calot Escobar                                                                                                    K. Lenaerts
Registrar                                                                                                                  President