# EXHIBIT 50



EUROPEAN
COMMISSION

Brussels, 19.7.2018
COM(2018) 547 final

# COMMUNICATION FROM THE COMMISSION TO THE EUROPEAN PARLIAMENT AND THE COUNCIL

### Protection of intra-EU investment

**EN**          **EN**

## I.    <u>Introduction</u>

### *Encouraging and protecting investment in the EU*

The European Union's single market is a unique area of investment opportunities. A key objective in the *Investment Plan for Europe*[1] is to create a more predictable, stable and clear regulatory environment to promote investments. As part of this strand of work, the *Capital Markets Union ('CMU') Action Plan*[2] and its *Mid-term review*[3] emphasised that a stable business environment is crucial for encouraging more investment within the European Union. The Commission is committed to preserving and improving both a predictable, stable and clear regulatory environment and the effective enforcement of investors' rights. This Communication aims to provide guidance on existing EU rules for the treatment of cross-border EU investments.

EU law, as progressively developed over decades, provides investors with a high level of protection, even though it may not solve all problems investors may face in their activities. EU law has been the basis for the development of the single market as an area where investors enjoy freedom to establish a business, to invest in companies, to import and export goods and to provide services across borders and benefit from equal and non-discriminatory treatment across borders. The free movement of capital underpins any investment and the Treaty prohibits measures unduly preventing or discouraging cross-border capital movements and payments.

At the same time, EU laws allows for markets to be regulated to pursue legitimate public interests such as public security, public health, social rights, consumer protection or the preservation of the environment, which may have consequences also for investments. Public authorities of the EU and of the Member States have a duty and a responsibility both to protect investment and to regulate markets. Therefore, the EU and Member States may legitimately take measures to protect those interests, which may have a negative impact on investments. However, they can do so only in certain circumstances and under certain conditions, and in compliance with EU law.

Cross-border investors in the EU may invoke directly applicable EU rights which have supremacy over national law. National judges have a special role and responsibility in protecting investment. Together with the Court of Justice of the EU ("CJEU" or "Court of Justice") through the preliminary reference procedure[4], national judges must ensure in

---

[1]    https://ec.europa.eu/commission/priorities/jobs-growth-and-investment/investment-plan-europe-juncker-plan_en

[2] COM(2015)0468 final.

[3] COM(2017)292 final.

[4] Article 267 TFEU.

complete independence the full application of EU law and judicial protection of the rights of individuals in all Member States. Moreover, cross-border investors' rights are protected in the EU also through a number of public mechanisms aiming at preventing infringements and solving difficulties that investors may experience with national authorities.

In the last decades, governments have encouraged cross-border investments by concluding bilateral investment treaties (BITs). These BITs typically include the right to national treatment and most favourable nation treatment, to a fair and equitable treatment, to the protection against expropriation and to the free transfer of funds. Investors can claim violations of those provisions before investor-State arbitration tribunals. Similar provisions are to be found in the Energy Charter Treaty, a plurilateral investment treaty initiated by the EU to stimulate investments in the energy sector.[5] The EU has embarked on substantial reform of these agreements in the EU external context.

Some countries with which EU Member States had previously concluded BITs have since joined the EU. As a result of accession, the substantive rules of BITs, as applied between Member States ("intra-EU BITs"), became a parallel treaty system overlapping with single market rules, thereby preventing the full application of EU law. This is the case, for example, when intra-EU BITs are interpreted in such a way that they constitute the basis for the award of unlawful state aid in violation of the level playing field in the single market.

Intra-EU BITs confer rights only in respect of investors from one of the two Member States concerned, in conflict with the principle of non-discrimination among EU investors within the single market under EU law. In addition, by setting up an alternative system of dispute resolution, intra-EU BITs take away from the national judiciary litigation concerning national measures and involving EU law. They entrust this litigation to private arbitrators, who cannot properly apply EU law, in the absence of the indispensable judicial dialogue with the Court of Justice.

For these reasons, the European Commission has consistently taken the view that intra-EU BITs are incompatible with Union law. Through its reasoned opinions of 23 September 2016, the Commission sent a formal request to Austria, the Netherlands, Romania, Slovakia and Sweden to terminate their intra-EU BITs.

In the recent preliminary ruling concerning the Achmea case[6], the Court of Justice confirmed that investor-State arbitration clauses in intra-EU BITs are unlawful.

Following the Achmea judgment, the Commission has intensified its dialogue with all Member States, calling on them to take action to terminate the intra-EU BITs, given their incontestable incompatibility with EU law. The Commission will monitor the progress in this

---

[5] The Energy Charter Treaty was signed by the EU, its Member States and a number of third countries.
[6] C-284/16 Achmea, ECLI:EU:C:2018:158, paras 56 and 58.

2

respect and, if necessary, may decide to further pursue the infringement procedures.

In the aftermath of the Achmea judgment, the unlawfulness of intra-EU investor-State arbitration may result in the perception that EU law does not provide for adequate substantive and procedural safeguards for intra-EU investors. However, the EU legal system protects cross-border investors in the single market, while ensuring that other legitimate interests are duly taken into account. When investors exercise one of the fundamental freedoms, they benefit from the protection granted by: i) the Treaty rules establishing those freedoms; ii) the Charter of Fundamental Rights of the European Union ("Charter"); iii) the general principles of Union law; and iv) extensive sector-specific legislation covering areas such as financial services, transport, energy, telecommunications, public procurement, professional qualifications, intellectual property or company law.[7]

Without being exhaustive, this Communication recalls the most relevant substantive and procedural standards in EU law for the treatment of cross-border investments in the EU. It shows that EU law protects all forms of EU cross-border investments throughout their entire life cycle. It recalls the obligation on Member States to ensure that national measures they may take to protect legitimate public interests do not unduly restrict investments. It draws the attention of investors to the EU rights they may invoke before administrations and courts.

### *The Achmea judgment and its consequences*

In the Achmea judgment the Court of Justice ruled that the investor-to-State arbitration clauses laid down in intra-EU BITs undermine the system of legal remedies provided for in the EU Treaties and thus jeopardise the autonomy, effectiveness, primacy and direct effect of Union law and the principle of mutual trust between the Member States. Recourse to such clauses undermines the preliminary ruling procedure provided for in Article 267 TFEU, and is not compatible with the principle of sincere cooperation. This implies that all investor-State arbitration clauses in intra-EU BITS are inapplicable and that any arbitration tribunal established on the basis of such clauses lacks jurisdiction due to the absence of a valid arbitration agreement. As a consequence, national courts are under the obligation to annul any arbitral award rendered on that basis and to refuse to enforce it. Member States that are parties to pending cases, in whatever capacity, must also draw all necessary consequences from the Achmea judgment. Moreover, pursuant to the principle of legal certainty, they are bound to formally terminate their intra-EU BITs.

The Achmea judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations. This provision, if interpreted correctly, does not provide for an investor-State arbitration clause

---

[7] While this Communication mentions some examples drawn from sector-specific legislation, a detailed analysis of such legislation would go much beyond its remit.

applicable between investors from a Member States of the EU and another Member States of the EU. Given the primacy of Union law, that clause, if interpreted as applying intra-EU, is incompatible with EU primary law and thus inapplicable. Indeed, the reasoning of the Court in Achmea applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU. The fact that the EU is also a party to the Energy Charter Treaty does not affect this conclusion: the participation of the EU in that Treaty has only created rights and obligations between the EU and third countries and has not affected the relations between the EU Member States.

### Scope of this Communication

This Communication focuses on intra-EU investment and thus does not concern investments made by EU investors in third countries or investments made by third country investors in the EU.[8] Treaty rules on free movement apply to situations with a cross-border element or when cross-border movement is at least possible[9]. However, some EU directives and regulations which specify and further develop the fundamental freedoms may apply also to purely internal situations, thus benefiting all investors including national ones. This Communication focuses on the protection of investors against national measures and not against measures adopted by the EU institutions and bodies.

The fundamental freedoms and the majority of related EU secondary law also apply in substance to Iceland, Liechtenstein and Norway, through the Agreement on European Economic Area ('EEA Agreement'), which forms part of EU law.[10] As a result, the single market by and large includes these three countries.[11]

---

[8] The Treaty also protects capital movements to and from third countries. However, under Article 64(3) TFEU, the Council may unanimously adopt measures which constitute a step backwards as regards the liberalisation of movement of capital to and from third countries. In addition, in the context of the common commercial policy, on 14 September 2017 the Commission proposed a European framework for screening of foreign direct investments from third countries by Member States on grounds of security or public order: Proposal for a Regulation of the European Parliament and of the Council establishing a framework for screening of foreign direct investments into the European Union, COM/2017/0487 final: https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=COM:2017:487:FIN

[9] C-67/08 Block ECLI:EU:C:2009:92, para. 21; C-98/15 Berlington Hungary, ECLI:EU:C:2015:386, para. 28; Joined Cases C-197/11 and C-203/11 Libert ECLI:EU:C:2013:288, para. 34; Joined Cases C-570/07 and C-571/07 Blanco Pérez and Chao Gómez ECLI:EU:C:2010:300, para. 40; Joined Cases C-51/96 and C-191/97 Deliège, ECLI:EU:C:2000:199, para. 58.

[10] The CJEU clarified that, in light of the objective of the EEA Agreement to interpret and apply in a uniform manner its provisions that are substantially identical to those in EU legislation, fundamental freedoms for investment protection apply *mutatis mutandis* to investments between the EU and the above-mentioned EFTA States. See C-476/10 Pepic, ECLI:EU:C:2011:422, para. 33-35 C-72/09 Établissements Rimbaud, ECLI:EU:C:2010:645, para. 20-22.

[11] C-452/01 Ospelt, ECLI:EU:C:2003:493, para. 29,

## II.    EU law protects all EU cross-border investments throughout their lifecycle

Investments in the single market may take many forms, reflecting a multi-faceted economic reality. EU law covers and protects any form of investment. Indeed, any economic activity falls within the scope of at least one of the fundamental freedoms[12] and fundamental freedoms apply even if the purpose of the activity is not profit-making[13].

Unlike international investment law, EU law tends not to use the terms 'investment' and 'investor' in the context of the single market, and economic operators are usually referred to as 'nationals' (private individuals or companies) [14], or 'resident' or 'non-resident'.

In particular, EU law covers and protects investments implying capital movements and establishment. These terms refer to:

- the acts of investing in, acquiring and setting up companies;
- the right to acquire, use or dispose of immovable property;
- the repurchase of shares and bonds dealt in and quoted on a stock exchange;
- the receipt of dividends and interest;
- the commercial grant of credits (including consumer credits);
- the acquisition of units of an investment fund; mortgages, legacies and loans, etc.[15] and
- the acquisition of patents, trademarks and other intellectual property rights.[16]

EU law protects access to the market, operations on the market and retreat from the market.

*i) Access to the market*

The creation of a new economic activity is protected mainly by EU market freedoms. These are: the right of investors to transfer capital to other Member States (Article 63 TFEU), including both financial and physical capital (such as machinery, factories or other production factors); and the right to establish in other Member States, set up agencies, branches or subsidiaries (Article 49 TFEU)[17]. Secondary legislation sets limits to authorisation schemes

---

[12] C-452/04 Fidium-Finanz, ECLI:EU:C:2006:631, para. 32 .

[13] C-281/06 Jundt, ECLI:EU:C:2007:816, para. 33 .

[14] Any legal person incorporated in conformity with the company law in force in a Member State is a legal person under Article 54 TFEU and thus enjoys the fundamental freedoms laid down in the Treaty (see for example, C-6/16 Eqiom, ECLI:EU:C:2017:641, paras. 48-49).

[15] It is settled case-law that Directive 88/361/EEC, together with the nomenclature annexed to it, may be used to define a capital movement, see C-483/99 Commission v France, ECLI:EU:C:2002:327 para. 36; Joined Cases C-578/10 to C-580/10 Van Putten, ECLI:EU:C:2012:246, paras. 28 to 36.

[16] C-255/97 Pfeiffer, ECLI:EU:C:1999:240.

[17] Investment in a company can take the form of control (direct investment) or can be done for profit purposes, without any intention of controlling or influencing the decisions (portfolio investment).

which can be imposed by Member States[18] and prohibits certain types of requirements.[19]

'Establishment' means in particular the taking up and pursuit of a business with a view to participating, on a stable and continuous basis, in the economic life of a Member State other than the State of origin.[20]

For investors willing to invest cross-border in the EU, access to public procurement is an important element of the European investment ecosystem where equal opportunities of access to the market are granted. Certain types of tenders are subject to harmonised rules on public procurement[21]. In addition, EU law provides that public concessions and public tenders presenting a cross-border interest must be awarded through an open and non-discriminatory procedure based on objective, non-discriminatory and proportionate criteria[22].

---

**Example 1 – Means for exercising effective competition for new entrants from other Member States**

C-442/02 - Caixa Bank

France prohibited banks to offer remuneration on current accounts. The Court of Justice observed that such prohibition constituted, for companies from Member States other than France, a serious obstacle affecting their effective access to the French market. That prohibition made it more difficult for credit institutions which are subsidiaries of foreign companies to raise capital from the public, by depriving them of the possibility of competing more effectively with the credit institutions traditionally established in the domestic market.

While the prohibition of remuneration on current accounts pursued a legitimate public interest such as encouraging medium and long-term saving, it went beyond what was necessary to attain that objective. Thus, the Court of Justice considered it to infringe the freedom of establishment.

---

[18] See for example Articles 5-13 Directive 2006/123/EC of the European Parliament and of the Council of 12 December 2006 on services in the internal market (OJ L 376, 27.12.2006, p. 36) ("Services Directive").

[19] For example economic tests have been prohibited under Article 14 Services Directive.

[20] C-221/89 Factortame, ECLI:EU:C:1991:320 para. 20.

[21] Directive 2014/24/EU of the European Parliament and of the Council of 26 February 2014 on public procurement and repealing Directive 2004/18/EC (OJ L 94, 28.3.2014, p. 65); Directive 2014/25/EU of the European Parliament and of the Council of 26 February 2014 on procurement by entities operating in the water, energy, transport and postal services sectors and repealing Directive 2004/17/EC (OJ L 94, 28.3.2014, p. 243); Directive 2014/23/EU of the European Parliament and of the Council of 26 February 2014 on the award of concession contracts (OJ L 094, 28.3.2014, p. 1); Council Directive 89/665/EEC of 21 December 1989 on the coordination of the laws, regulations and administrative provisions relating to the application of review procedures to the award of public supply and public works contracts (OJ L 395 , 30.12.1989, p. 0033) as subsequently amended.

[22] C-458/03 Parking Brixen, ECLI:EU:C:2005:605, para. 72; C-380/05, Centro Europa 7, ECLI:EU:C:2008:59, para. 120; Joined Cases C-458/14 and C-67/15 Promoimpresa, ECLI:EU:C:2016:558, paras. 64-65.

*ii) Operating on the market*

Once EU investors start operating a business in another Member State or carry out another type of investment, EU law, as interpreted by the Court of Justice of the European Union, continues to apply. It protects them, in general, against public measures that would deprive the investors of the use of their property or that would limit the business activity in which they have engaged, even where such measures equally apply to national operators[23].

Investors are free to incorporate a company in a Member State of their choice and set up a secondary establishment in another Member State, irrespective of where the main or entire business is to be conducted[24]. Member States have to recognise companies validly formed under the law of another Member State, in particular with respect to the company's legal capacity to bring proceedings in a legal dispute[25].

If a European company wishes to move and convert itself into a company governed by the law of another Member State, it benefits from the freedom of establishment. In that regard, the Member State of origin may not impose any restrictions on the move and conversion except for overriding reasons of public interest and in a proportionate manner.[26] For instance, the mandatory liquidation of the company in the state of origin as a pre-condition for its transfer to another Member State is disproportionate and therefore contrary to EU law.[27] Member States may prevent or penalise fraud in compliance with EU law. However, the fact of establishing the registered office or real head office of a company in another Member State for the purpose of enjoying more favourable legislation does not, in itself, constitute abuse.[28]

The Commission has recently proposed a framework allowing companies to easily operate in the Single Market, including when they grow and restructure across borders to adapt to changing market conditions[29]. The initiative includes common EU procedures for cross-border conversions and divisions and it updates existing rules on cross-border mergers. It sets up strong safeguards to protect the legitimate rights and interests of employees, shareholders and creditors, and to prevent the use of these procedures to set up artificial arrangements aimed in particular at obtaining undue tax advantages, in conformity with the case law.

An EU company which wants to provide services on a temporary basis instead of establishing itself in another Member State is entitled to equip itself with the necessary infrastructure in

---

[23] Joined Cases C-52/16 and C-113/16 SEGRO, ECLI:EU:C:2018:157, para. 65; C-179/14 Commission v Hungary, ECLI:EU:C:2016:108.
[24] C-212/97 Centros, ECLI:EU:C:1999:126; C-167/01 Inspire Art, ECLI:EU:C:2003:512, para. 105.
[25] C-208/00 Überseering, ECLI:EU:C:2002:632, para. 9.
[26] C-210/06 Cartesio, ECLI:EU:C:2008:723, para. 113.
[27] C-106/16 Polbud, ECLI:EU:C:2017:804, para. 65.
[28] C-106/16 Polbud ECLI:EU:C:2017:804, para. 62.
[29] See the Commission proposals for a directive of the European Parliament and of the Council amending Directive (EU) 2017/1132 as regards cross-border conversions, mergers and divisions: https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=COM%3A2018%3A241%3AFIN

the host Member State[30]. Member States may not make the provision of services in their territory subject to compliance with all the conditions required for establishment, which would render freedom to provide services ineffective[31]. This applies for example to professional qualifications[32], social benefits for employees[33], operating licences[34], comprehensive reporting obligations for service providers[35], or comprehensive obligations for the translation of supporting documentation[36].

Moreover, investors engaged in production are also protected as goods that are legally present on the market in one Member State can, in principle, be traded freely in the single market thanks to the free movement of goods[37]. A number of EU rules have harmonised relevant matters and set out mechanisms to render workable in practice the principle of mutual recognition among Member States for the free movement of goods.[38]

When investing cross-border, investors can also hire a workforce in the host State[39]. EU workers equally have the right to move freely (Article 45 TFEU). For providers temporarily offering their services in another Member State, the host Member State cannot make the movement of staff, including workers from third countries, subject to unjustified or disproportionate restrictions such as an obligation to obtain a work permit[40]. With a view to reconciling the free movement in the single market and the protection of workers, the labour law of the host country applies to posted workers with respect to those matters listed in the Directive 96/71/EC on Posted Workers.[41]

EU law on the single market also extends to tax rules, which are of crucial importance for investors. For example, VAT, excise duties and energy taxation are regulated by EU directives. Furthermore, even if, in the current state of EU law, direct taxation falls within the scope of the Member States' competence, they must nevertheless exercise this competence in

---

[30] C-55/94 Gebhard, ECLI:EU:C:1995:411, para. 27.
[31] C-76/90 Säger, ECLI:EU:C:1991:331, para. 13.
[32] C-342/14 X-Steuerberatungsgesellschaft, ECLI:EU:C:2015:827; C-76/90 Säger, ECLI:EU:C:1991:331, para. 21.
[33] C-272/94 Guiot, ECLI:EU:C:1996:147, paras 14 and 15.
[34] C-496/01 Commission v. France, ECLI:EU:C:2004:137, para. 65.
[35] C-577/10 Commission v Belgium ("Limosa"), ECLI:EU:C:2012:814, para. 47; C-490/04 Commission v Germany, ECLI:EU:C:2007:430, para. 89.
[36] C-490/04 Commission v Germany, ECLI:EU:C:2007:430, paras. 68 and 69.
[37] Articles 28 and 29 TFEU.
[38] See in particular Commission Communication "The Goods Package: Reinforcing trust in the single market" of 19 December 2017 (COM/2017/0787 final).
[39] C-201/15 AGET Iraklis, ECLI:EU:C:2016:972, para. 52.
[40] C-113/89 Rush Portuguesa, ECLI:EU:C:1990:142, para. 12.
[41] Directive 96/71/EC of the European Parliament and of the Council of 16 December 1996 concerning the posting of workers in the framework of the provision of services (OJ L 18, 21.1.1997, p.1). See also Directive 2014/67/EU of the European Parliament and of the Council of 15 May 2014 on the enforcement of Directive 96/71/EC concerning the posting of workers in the framework of the provision of services and amending Regulation (EU) No 1024/2012 on administrative cooperation through the Internal Market Information System ('the IMI Regulation') (OJ L 159, 28.5.2014, p. 11).

compliance with EU law, including the fundamental freedoms.[42] In addition, EU secondary law also sets some limits to that national competence. For example, in order to ensure fiscal neutrality, the Parent-Subsidiary Directive[43] exempts profits which a subsidiary distributes to its parent company from withholding tax. Thus, Member States cannot unilaterally introduce restrictive measures and subject the right to exemption from withholding tax under Article 5(1) of that Directive to various conditions.[44]

---

**Example 2 – Pension funds resident in other Member States have the right to the same tax treatment as domestic pension funds**

C-493/09 - Commission v Portugal

Under Portuguese law, dividends received by Portuguese pension funds were exempt from tax on condition that the shares were kept for at least one year; by contrast, a withholding tax (in principle of 20%) was raised on dividends paid to pension funds established in other Member States in respect of income obtained in Portuguese territory. The Court of Justice confirmed that the Portuguese legislation was contrary to the free movement of capital enshrined in the Treaty. It held that Portugal had failed to justify the discriminatory treatment of dividends paid to pension funds established in other Member States. Moreover, the fact that non-resident pension funds cannot in any circumstances benefit from the exemption granted to pension funds resident in Portugal was not proportionate with regard to the difficulties pleaded by Portugal in relation to the collection of information and recovery of tax debts.

---

*iii) Exit from the market*

Investors' rights under EU law include the freedom to determine the nature and extent of their economic activity. Hence, the Court of Justice also recognised the right of economic operators to decide the size of their investment and the freedom to subsequently scale down their activity or even to give it up[45]. Such freedom can be impaired only for duly justified reasons and in a proportionate manner.

**III.    EU law protects investors against unjustified restrictions**

---

[42] C-319/02 Manninen, ECLI:EU:C:2004:484, para. 19.
[43] Article 5 of Council Directive 2011/96/EU of 30 November 2011 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States (OJ L 345, 29.12.2011, p. 8) as amended.
[44] Joined Cases C-504/16 and 613/16 Deister Holding, ECLI:EU:C:2017:1009, paras. 51-52 .
[45] C-201/15 AGET Iraklis, ECLI:EU:C:2016:972, para. 53

Restrictions on investments can take many forms. They include:

- a ban on acquiring holdings in the capital of a company in another Member State[46];
- a ban on selling shares in the electricity and gas distribution system to private investors (i.e. a privatisation ban);
- a ban on pension funds investing more than 5 % of their assets abroad [47];
- rules providing for the compulsory deposit of securities issued or payable abroad with an approved bank or a foreign bank chosen by an approved bank[48];
- special rights retained by Member States in certain undertakings after their privatisation ("golden shares")[49]; and
- prior authorisation schemes for investment in real estate (for example in farmland)[50].

However, when restricting EU investors' rights, public authorities have to comply with the limitations set out in EU law.

## 1. Discrimination and national restrictions of investors' rights are in principle prohibited

According to the Treaty, discrimination on the basis of nationality as well as other forms of discrimination is in principle prohibited and is lawful only in exceptional circumstances. This prohibition covers indirect discrimination and thus extends to measures that use criteria which are apparently neutral but lead in practice to a result equivalent to discrimination[51].

The EU legislator has outlawed completely any form of discrimination based on nationality, of a direct or indirect nature, in certain areas which are exhaustively or partially harmonised, for example in the Services Directive or in the directives in the telecoms sector.[52]

Going beyond discrimination, the Treaty also provides that a restriction is also any

---

[46] C-148/91 Veronica, ECLI:EU:C:1993:45 para. 8 et seq.

[47] C-271/09 Commission v Poland, ECLI:EU:C:2011:855 para. 51 (restrictions on pension funds).

[48] C-157/85 Brugnoni, ECLI:EU:C:1986:258 para. 21.

[49] These actions started following the "Communication of the Commission on certain legal aspects concerning intra-EU investment", 19 July 1997: http://eurlex.europa.eu/legalcontent/DE/TXT/HTML/?uri=CELEX:31997Y0719(03)&from = en.

[50] See Commission Interpretative Communication on Acquisition of Farmland and European Union Law: http://eur-lex.europa.eu/legal-content/EN/ALL/?uri=OJ:C:2017:350:TOC

[51] C-83/14 CHEZ Bulgaria, ECLI:EU:C:2015:480, para. 94. Discrimination does not presuppose that only nationals are privileged or that only foreigners are placed at a disadvantage (C-388/01 Commission v Italy, ECLI:EU:C:2003:30, para. 14).

[52] Directive 2002/20/EC of the European Parliament and of the Council of 7 March 2002 on the authorisation of electronic communications networks and services (Authorisation Directive) (OJ 2002 L 108, 24.4.2002, p. 21), as amended by Directive 2009/140/EC of the European Parliament and of the Council of 25 November 2009 (OJ 2009 L 337, 18.12.2009, p. 37); Directive 2002/21/EC of the European Parliament and of the Council of 7 March 2002 on a common regulatory framework for electronic communications networks and services (Framework Directive) (OJ 2002 L 108, 24.4.2002, p. 33), as amended by Directive 2009/140/EC; Commission Directive 2002/77/EC of 16 September 2002 on competition in the markets for electronic communications networks and services (OJ 2002 L 249, 17.9.2002, p. 21).

indistinctly applicable[53] measure that is liable to prohibit, deter or make less attractive the exercise of one of the fundamental freedoms, even if indirectly and potentially.

Such restriction is prohibited unless duly justified and compliant with the general principles of EU law and the fundamental rights,[54] even if it is of limited scope or minor importance,[55] and also if taken by the home Member State of the investor.[56] This prohibition concerns in particular national laws, other generally applicable measures, and individual administrative decisions.

---

**Example 3 – A notification obligation for investors may also constitute an unlawful restriction**

C-577/10 – Commission v Belgium ("Limosa")

Under Belgian legislation, service providers from abroad must send to the competent national authorities a prior declaration detailing their activity in Belgium. The Commission challenged this legislation as regards its application to self-employed service providers.

The Court of Justice found that the action was well-founded. It first held that the measure at issue constituted a restriction to the free provision of services. The Court of Justice accepted that the protection of workers, invoked by Belgium, is a legitimate public interest. The Court of Justice ruled however that Belgium failed to give a sufficiently convincing justification as to how the provision of that very detailed information is necessary in order to achieve the objectives of public interest on which it relies and how the obligation to give that information in advance does not go beyond what is necessary to achieve those objectives, despite the fact that it should have done so. The Court of Justice recalled in that context that any presumption of abuse by foreign economic operators is incompatible with the Treaty.

---

## 2. National restrictions have to be justified

Market freedoms and fundamental rights are not absolute but need to be balanced by public authorities with other public policy objectives.

### a. Certain restrictions can never be justified

Certain types of restrictions are *per se* incompatible with the Treaty, for example conditions of reciprocity vis-à-vis other Member States[57] or a presumption of fraud with regard to

---

[53] I.e. equally applicable to both nationals and foreigners.
[54] C-492/14 Essent Belgium, ECLI:EU:C:2016:732, para. 96-97.
[55] C-315/13 De Clercq, ECLI:EU:C:2014:2408, para. 61.
[56] C-384/93 Alpine Investments, ECLI:EU:C:1995:126, paras. 29 to 31.
[57] C-5/94 Hedley Lomas, ECLI:EU:C:1996:205, paras. 19-20; C-266/03 Commission v Luxembourg, ECLI:EU:C:2005:341, para. 35.

foreigners.[58]

Furthermore, some serious types of restriction have been completely outlawed by the EU legislator (for example the "black list" set out in Article 14 of the Services Directive bans the obligation to have a primary establishment)[59].

Moreover, for matters which are not fully harmonised, EU rules reduce the discretion of EU or national authorities, for instance by setting out the criteria for the prudential assessment of qualified holdings in financial institutions[60].

      b.      Certain restrictions can be justified by legitimate public objectives

EU law allows for restrictions to fundamental freedoms, as long as they are justified by objectives expressly listed in the Treaty. For example, Article 52 of the Treaty allows restrictions of freedom of establishment and free provision of services on grounds of public policy, public security and public health.

Restrictions that do not discriminate based on nationality can also be justified by overriding reasons in the public interest as recognised by Court of Justice case-law. These include:

- environmental protection[61],
- the cohesion of the tax system,[62]
- the fight against tax evasion,[63]
- keeping an agricultural community in place and combating excessive land speculation,[64]
- land-use planning (for example limitations on secondary residences)[65],
- consumer protection[66],
- the protection of workers[67], and

---

[58] C-577/10 Commission v Belgium ("Limosa"), ECLI:EU:C:2012:814, para. 53; C-106/16 Polbud, ECLI:EU:C:2017:804, para. 63.

[59] C-593/13 Rina Services, ECLI:EU:C:2015:399; C-179/14 Commission v Hungary, ECLI:EU:C:2016:108, para 47.

[60] Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC (CRD IV) (OJ L 176, 27.6.2013, p. 338); Directive 2014/65/EU of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments and amending Directive 2002/92/EC and Directive 2011/61/EU (MiFID II) (OJ L 173, 12.6.2014, p. 349); Directive 2009/138/EC of the European Parliament and of the Council of 25 November 2009 on the taking-up and pursuit of the business of Insurance and Reinsurance (Solvency II) (OJ L 335, 17.12.2009, p. 1).

[61] C-400/08 Commission v Spain ("shopping centers in Catalonia"), ECLI:EU:C:2011:172 para. 74. See also article 3(3) TEU and articles 11 and 191 TFEU.

[62] C-204/90 Bachmann, ECLI:EU:C:1992:35 para. 28.

[63] C-72/09 Etablissements Rimbaud, ECLI:EU:C:2010:645 para. 33 et seq.

[64] C-370/05 Festersen, ECLI:EU:C:2007:59 para. 27.

[65] C-213/04 Ewald Burtscher v Josef Stauderer, ECLI:EU:C:2005:731 para. 46.

[66] C-342/14 X-Steuerberatungsgesellschaft, ECLI:EU:C:2015:827 para. 53.

[67] C-341/05 Laval, ECLI:EU:C:2007:809 para. 103.

- the protection of creditors and minority shareholders[68].

The list of overriding reasons in the public interest has evolved as the Court's jurisprudence has recognised the ever changing interests of our societies. However, EU law does not allow national measures to restrict fundamental freedoms for administrative or purely economic reasons[69]. Moreover, the legitimate public interests admitted in the Treaty and the case law must be interpreted strictly.[70]

### 3. All restrictions need to comply with general principles of EU law (proportionality, legal certainty and legitimate expectations)

Any national measure adopted by a Member State within the scope of EU Law and affecting EU investors' rights has to comply with the applicable general principles of EU law, which may be further specified in EU legislation[71].

First, national restrictions have to be proportionate, which means that the restrictive provisions are suitable for achieving the intended objective, including the fact that they must serve the legitimate public objective in a consistent and systematic manner[72]. They should not go beyond what is necessary to achieve the public interest.[73] A restrictive measure is not proportionate if there is a possible alternative measure which could pursue the public interest at stake in a manner that is less restrictive to the free movement.[74]

In practice the principle of proportionality plays a central role. The Court of Justice exercises an in-depth scrutiny when it comes to the proportionality of the national measures restricting fundamental freedoms. When assessing the proportionality, all the factual and legal circumstances of the case should be taken into account. It is for the national authorities to demonstrate that their legislation is consistent with the principle of proportionality. In that regard, the reasons which may be invoked by a Member State as justification must be backed up with appropriate evidence or an analysis of the appropriateness and proportionality of the restrictive measure.[75]

---

[68] C-106/16 Polbud, ECLI:EU:C:2017:804 para. 53.
[69] C-367/98 Commission v Portugal, ECLI:EU:C:2002:326 para. 52; C-174/04 Commission v Italy, ECLI:EU:C:2005:350 para. 37.
[70] See among others Joined Cases C-52/16 and C-113/16 SEGRO and Horváth, ECLI:EU:C:2018:157, para. 96.
[71] See, to this effect, C-17/03 VEMW, ECLI:EU:C:2005:362, para. 57 et seq. Cf. also in this context C-195/12 Industrie du bois, ECLI:EU:C:2013:598.
[72] C-243/01 Gambelli, ECLI:EU:C:2003:597, para. 67; C-169/07 Hartlauer, ECLI:EU:C:2009:141, para. 55 and case law cited therein.
[73] Joined Cases C-52/16 and C-113/16 SEGRO and Horváth , ECLI:EU:C:2018:157, para. 76.
[74] C-452/01 Ospelt, ECLI:EU:C:2003:493, para. 41.
[75] C-333/14 Scotch Whisky, ECLI:EU:C:2015:845, para. 53; Joined Cases C‑52/16 and C‑113/16 SEGRO and Horváth , ECLI:EU:C:2018:157, para. 85

---

**Example 4 – Indirect expropriation as disproportionate restriction of the free movement of capital**

Joined Cases C‑52/16 and C‑113/16 – SEGRO and Horváth

A Hungarian company (owned by natural persons resident in Germany) and an Austrian citizen acquired, before 30 April 2014, usufructuary rights in agricultural land in Hungary, which were entered in the property register. Amendments to the relevant Hungarian law in 2013 extinguished all usufructuary rights on arable land, unless it could be proven that they were created between members of the same family. Consequently, the rights of the EU foreigners concerned were cancelled from the property register.

The Court of Justice ruled that the above-mentioned 2013 law amendments restricted the free movement of capital as they deprived the claimants of enjoyment of the property in which they invested capital and were discriminatory in that the amendments de facto targeted foreigners. The measures were not suitable to attain legitimate public policy objectives (for example, preserving viable agricultural communities), went beyond what was necessary and could have been replaced by less restrictive means.

---

Second, legal certainty is a general principle of EU law which is also relevant for investors. It requires that EU or national rules are clear, precise and predictable as regards their effects, in particular where they may have unfavourable consequences for private individuals and undertakings[76]. That requirement must be observed all the more strictly where rules may have negative consequences for private individuals and undertakings[77] or where the rules are liable to entail financial consequences for the persons concerned[78]. When public authorities act within the scope of EU law, they must exercise their discretion on the basis of objective, non-discriminatory, sufficiently specific and clear criteria known in advance.[79]

Furthermore, legal certainty also includes the protection of legitimate expectations.[80] However, only in certain circumstances may EU investors challenge the amendment of existing rules or the adoption of new rules which fall within the scope of EU law, on the basis of the protection of their legitimate expectations.

In order to be able to rely on the protection of legitimate expectations, economic operators

---

[76] C-318/10 SIAT, ECLI:EU:C:2012:415, para. 58.
[77] C-17/03 VEMW, ECLI:EU:C:2005:362, para. 80; C-347/06 ASM Brescia, ECLI:EU:C:2008:416, para. 69; C-362/12 Test Claimants in the Franked Investment Income Group Litigation, ECLI:EU:C:2013:834, para. 44.
[78] C-17/01 Sudholz, ECLI:EU:C:2004:242, para. 34.
[79] C-169/07 Hartlauer, ECLI:EU:C:2009:141, para. 64; C-54/99 Association Église de Scientologie de Paris, ECLI:EU:C:2000:124, para. 22; C-483/99 Commission v France ("Elf Aquitaine"), ECLI:EU:C:2002:327, para. 50.
[80] C-17/03 VEMW, ECLI:EU:C:2005:362, para. 73-74.

must act in good faith[81] and in a prudent and circumspect manner[82]. This means that if an investor knew or should reasonably have known that the source of their claim, the rules on which they based their claim, the behaviour of the public authority implementing those rules or the procedure followed by this public authority were contrary to EU law, they cannot invoke the principle of legitimate expectations.[83]

Economic operators cannot expect that an existing legal regime will always be maintained[84]. On the other hand, when the EU or a Member State takes a new measure in a way that negatively affects the interests of investors, they must provide, where appropriate, adaptations to the new rules that would take account of the particular situation of the affected investors, unless an overriding reason of public interest prevents them from providing such adaptations[85].

---

**Example 5 – The protection of legitimate expectations**

C-201/08 – Plantanol GmbH & Co

German tax law provided for a tax exemption for a certain type of blended biofuel until the end of 2009. The tax exemption was withdrawn on 18 December 2006, with effect from 1 January 2007, i.e. 2 full years before the expiry date.

The Court of Justice recalled the content of the principles of legal certainty and the protection of legitimate expectations. However, it also underlined that, where a prudent and circumspect investor could have foreseen that the adoption of a measure was likely to affect his interests, he cannot plead that principle if the measure is adopted. The Court of Justice concluded that this is a factual appreciation to be made by the national court, but it confirmed that legal certainty and the protection of legitimate expectations do not in principle preclude a Member State from withdrawing a tax exemption scheme before the expiry date.

---

In principle, EU investors should only occasionally need to invoke the protection of legitimate expectations because they can usually rely on the application of the fundamental freedoms enshrined in the Treaty (including proportionality and non-discrimination) and on EU secondary law. Indeed, EU rules produce legal effects from the moment of their entry into

---

[81]   C-316/88 Krücken, ECLI:EU:C:1988:201, paras. 23-24, C-5/89 Commission v Germany, ECLI:EU:C:1990:320, para. 14.
[82] C-310/04 Spain v Council, ECLI:EU:C:2006:521, para. 81.
[83] C-24/95 Land Rheinland-Pfalz v Alcan Deutschland, ECLI:EU: 1997:163, paras. 25 and 49; C-169/95 Spain v Commission ECLI:EU:C:1997:10, para 51.
[84] C-17/03 VEMW, ECLI:EU:C:2005:362, para. 81; C-201/08 Plantanol, ECLI:EU:C:2009:539, para. 53.
[85] C-17/03 VEMW, ECLI:EU:C:2005:362, para. 81; C-201/08 Plantanol, ECLI:EU:C:2009:539, para. 49;

force.[86] They are also immediately applicable and binding on a new Member State from the date of its accession, with the result that they apply to the future effects of situations arising prior to that new Member State's accession to the EU.[87]

### 4.  All national restrictions have to comply with fundamental rights

Cross-border investors can also invoke, within the scope of EU law, fundamental rights, such as the freedom to conduct a business, the right to property and the right to an effective judicial protection when acting in the scope of EU law.[88] Where a Member State (including the national legislator) takes a measure that derogates from one of the fundamental freedoms guaranteed by EU law, that measure falls within the scope of EU law. Therefore, the protection granted by EU law, including the fundamental rights enshrined in the Charter, fully applies[89].

The freedom to conduct a business can be successfully invoked against serious restrictions of the investor's contractual freedom[90]. The right to property (i.e. to own, use and dispose of one's lawfully acquired possessions) is of essential importance to every investment protection regime. Under European law, the fundamental right to property extends to "property" in the broadest sense of the word[91] and equally covers the peaceful enjoyment of the right. It directly entails a right to compensation for the deprivation of property in the general interest[92]. The protection granted on this basis is particularly important in the case of expropriation or equivalent measures.

Such rights are not absolute and their exercise may be subject to restrictions, insofar as these restrictions are justified by objectives of general interest recognised by EU law and are proportionate. The importance of the aims pursued by the restrictive measures may justify negative consequences, even of a substantial nature, for some operators. However, the restrictions may not constitute, with regard to the aim pursued, a disproportionate and intolerable interference, impairing the very substance of those rights[93].

---

[86] Joined Cases C-10/97 and C-22/97 IN.CO.GE.'90, ECLI:EU:C:1998:498, para. 23.
[87] C-122/96 Saldanha, ECLI:EU:C:1997:458, para. 14.
[88] Articles 16, 17 and 47 of the Charter. Under Article 52(3) of the Charter, in so far as this Charter contains rights which correspond to rights guaranteed by the Convention for the Protection of Human Rights and Fundamental Freedoms, the meaning and scope of those rights shall be the same as those laid down by the said Convention; this provision shall not prevent Union law providing more extensive protection.
[89] C-685/15 Online Games Handels, ECLI:EU:C:2017:452, para. 56.
[90] C-426/11 Alemo-Herron a.O. ECLI:EU:C:2013:521, para. 35.
[91] The European Court of Human Rights has on several occasions ruled that rights similar to property are covered by Article 1 Protocol 1 of the European Convention of Human Rights, on the ground that the notion of "possession" has an autonomous meaning which is not limited to ownership of physical goods; hence, certain other rights and interests constituting assets can also be regarded as "property rights", and thus as "possessions", for the purposes of this provision (see for example judgments Handyside v UK, judgment of 7 December 1976; James v. UK of 21 February 1986 regarding a leasehold; Wittek v. Germany of 12 December 2002 regarding a transferable usufruct over a piece of land; Bruncrona v. Finland of 16 February 2005 regarding a lease).
[92] Joined Cases C-78/16 and C-79/16 Pesce a.O., ECLI:EU:C:2016:428, para. 86.
[93] C-44/79 Hauer, ECLI:EU:C:1979:290, paras. 15 et seq; C-5/88, Wachauf, ECLI:EU:C:1989:321, para. 18.

### 5.    Investors may invoke EU competition rules against national measures

Undistorted competition and a level playing field among undertakings must be ensured in the EU single market. Therefore, Member States are not allowed to award State aid unless it is compatible with the internal market.[94] Moreover, Member States are not allowed to require or to favour the adoption of agreements, decisions or concerted practices contrary to Articles 101 or 102 TFEU or to reinforce their effects, or to divest their own rules of the character of legislation by delegating responsibility for taking decisions affecting the economic sphere to private economic operators[95]. Articles 102 TFEU and 106(1) TFEU are also infringed where a measure imputable to a Member State, and in particular a measure by which a Member State confers special or exclusive rights within the meaning of Article 106(1) EC, gives rise to a risk of an abuse of a dominant position.[96]

## IV.    Enforcement of investors' rights under EU law

While international investment law (for example bilateral investment treaties) focuses mainly on compensating investors after the violation has taken place, EU law enables the protection of cross-border investors in the EU through multiple ways and at different levels. Cross-border investors are protected in the EU through a number of mechanisms aiming at the prevention or resolution of violations of their rights committed by the legislator, the administration or the judiciary. The judicial enforcement of rights ensuing from EU law is one of several possible solutions. Where judicial enforcement is considered to be the most appropriate avenue or where other possibilities have been exhausted, an individual can rely on a fully-fledged and complete system of judicial remedies under EU law.

### 1.    Mechanisms for the prevention of violations and out-of-court solutions

*Prior scrutiny of national measures which could impair an individual's rights under EU law*

The prevention of violations of an individual's rights under EU law is of particular value for investors, who have a particular need to plan and execute their economic decisions in a predictable and stable regulatory environment.

With a view to ensuring a level playing field among undertakings in the single market, Article 108 TFEU has laid down a system of prior notification which aims at allowing the European Commission to ensure the compatibility of State aid measures (including national legislation)

---

[94] See in particular Articles 107 to 109 TFEU.
[95] C-198/01 CIF, ECLI:EU:C:2003:430, para. 46.
[96] C-49/07 MOTOE, ECLI:EU:C:2008:376, para. 50; C-553/12 P, C-553/12 P Commission v Greece ("DEI"), paras. 41-43.

with the Single Market before their entry into force.

As regards the EU rules on free movement, the legislator has established an obligation for Member States to notify certain measures of a legislative or administrative nature prior to their adoption and to submit them to scrutiny by the European Commission and, as the case may be, by the other Member States. Whereas in some instances the Commission is only empowered to issue a recommendation to the Member State concerned,[97] in other instances the Commission is empowered by the legislator to issue decisions under Article 288 TFEU, which are binding on the Member State concerned.[98] This decision-making power for the Commission is different and separate from the Court of Justice's power to rule on infringements committed by Member States.[99] For example, the Services Directive[100] confers upon the Commission a decision-making power as regards the justification and proportionality of certain new national barriers identified by the EU legislator as particularly harmful for the attainment of a single market for certain services. In order to make the notification procedure effective in practice, the Commission has recently proposed a "Notification Directive".[101]

---

**Example 6 – Measure imposing the transfer of certain flights from Linate to Malpensa airport**

Case C-361/98 – Italy v Commission ("Malpensa")

Regulation 2408/92 aims at rendering the free provision of services applicable in the air transport sector. Italy adopted, in July 1996 and October 1997 respectively, two decrees whereby all air traffic would be transferred from the Linate airport, close to the centre of Milan, to other more distant

---

[97] Directive (EU) 2015/1535 of the European Parliament and of the Council of 9 September 2015 laying down a procedure for the provision of information in the field of technical regulations and of rules on Information Society services (OJ L 241, 17.9.2015, p. 1). Member States must notify to the Commission certain technical regulations before their adoption, is designed, by means of preventive control, to protect the free movement of goods and services, which are one of the foundations of the Union and, in order for such control to be effective, all draft technical regulations covered by that directive must be notified and, save for exceptional cases justified by urgency, their adoption or entry into force must be suspended during the periods laid down in the directive (see, as regards free movement of goods, C-443/98 Unilever, ECLI:EU:C:2000:496, paras. 40 et seq.). See also, as an example, Regulation of the European Parliament and of the Council concerning measures to safeguard security of gas supply and repealing Directive 2004/67/EC.

[98] See, for instance, Article 9 of Council Directive 96/67/EC of 15 October 1996 on access to the groundhandling market at Community airports (OJ L 272, 25.10.1996, p. 36). On the basis of that Regulation the Commission has taken a decision in at least 10 concrete cases, and has occasionally issued a negative decision with regard to the proposed restrictive measure. See also Art. 3(2) of Directive 2010/13/EU of the European Parliament and of the Council of 10 March 2010 on the coordination of certain provisions laid down by law, regulation or administrative action in Member States concerning the provision of audiovisual media services (Audiovisual Media Services Directive) (OJ L 95,15.4.2010, p. 1).

[99] Joined Cases C-15/76 and C-16/76 France v Commission, ECLI:EU:C:1979:29, paras. 26-28; C-325/94 P An Taisce, ECLI:EU:C:1996:293, para. 25.

[100] See Article 15(7) of the Services Directive.

[101] Proposal for a Directive on the enforcement of the Directive on services in the internal market, laying down a notification procedure for authorisation schemes and requirements related to services (COM(2016) 821 final).

airports, subject to an exception that concerned, in practice, only the Milan-Rome route.

Following complaints by international air carriers, the Commission adopted on 16 September 1998 a decision prohibiting the Italian measures at issue. That decision was adopted under Art. 8 Reg. 2408/92 which empowers the Commission to take decisions regarding national measures governing the distribution of traffic to the detriment of service providers in the air transport sector. The Commission considered in its decision that the Italian measure at issue was indirectly discriminatory and disproportionate. Italy challenged that measure before the Court of Justice raising a number of pleas both as regards the Commission power and the assessment carried out.

In its judgment the Court of Justice rejected Italy's challenge. The Court ruled that the Commission was fully entitled to examine, first, whether the national measures enacted in the decrees at issue impose restrictions which are ostensibly applicable without distinction and, second, whether those restrictions are such as to achieve the objective which they envisage, without going beyond what is necessary to achieve it. It examined the assessment regarding justification and proportionality made by the Commission is its Decision and found that none of the numerous pleas put forward by Italy was well founded.

### *Application by the administration of rules in conformity with EU law*

National administrations are usually the first and most common interlocutor that investors face in a Member State when starting an investment or in the course of running their business. National administrative authorities must apply EU law effectively, interpret national law in accordance with EU law, set aside national rules contrary to EU law and undo the consequences of EU law violations (e.g. repayment of undue charges). These principles, which follow from the Member States' duty of sincere cooperation under Article 4(3) TEU and the primacy of EU law,[102] allow for the correct and effective application of the rights ensuing from EU law without the need to have resort to judicial means. They must be followed, even where national procedural rules do not provide for them expressly.[103]

---

**Example 7 – Disapplication of national rules by administrative bodies**

Case C‑476/10 – Pepic

Two nationals of Liechtenstein were refused an authorisation required by Austrian law for the purchase of secondary residences by foreign nationals.

The Court interpreted the case in light of the free movement of capital provisions of Article 40 of the

---

[102] See, among others, C-103/88 Costanzo, ECLI:EU:C:1989:256, para. 32; C-224/97 Ciola, ECLI:EU:C:1999:212, para. 30; C-341/08 Petersen, ECLI:EU:C:2010:4, para. 80.
[103] See, to that effect, C-349/07 Sopropé, ECLI EU:C:2008:746, para. 38.

> EEA Agreement, which it found to have the same legal scope as Article 63 TFEU. The Court found, first, that the authorisation requirement constituted discrimination on the grounds of nationality. The Court then stated that all national administrative bodies must respect the primacy of Union law and, therefore, must disregard such discriminatory national legislation.

Any person has the right to be heard when the authorities of the Member States take individual measures which come within the scope of EU law and which could affect that person.[104] The administration must apply rules impartially, taking into account all relevant information and without any discrimination, [105] and must provide a proper reasoning for its decisions[106]. Where a Member State has levied charges in breach of rules of EU law, it is in principle required to repay the relevant amounts, with interest.[107]

Recognising the need for speedy out-of-court solutions for cross-border problems of application of EU law, the Commission and the Member States set up SOLVIT in 2002. SOLVIT aims at providing pragmatic solutions to EU/EEA citizens and businesses when they face difficulties with their EU rights being complied with by public authorities. In its Communication *Action plan on the Reinforcement of SOLVIT: Bringing the benefits of the Single Market to citizens and businesses*,[108] the Commission committed to taking, together with Member States, further steps to strengthen SOLVIT's strategic role to make the Single Market work better in practice for citizens and businesses.

## 2. Effective judicial protection for investors' rights under EU law

### *A complete system of judicial remedies at EU and Member State level*

Pursuant to Article 19 (1) TEU Member States are obliged to provide remedies sufficient to ensure effective legal protection in the fields covered by Union law.[109] Under Article 47 of the Charter, which is directly applicable, everyone has the right to an effective remedy and to a fair trial.[110] National justice systems in the Union are subject to standards of independence, quality and efficiency, spelled out in extensive case-law of the Court of Justice and of the European Court of Human Rights (ECtHR).[111]

---

[104] C-349/07 Sopropé, ECLI EU:C:2008:746, para. 36.
[105] C-55/94 Gebhard, ECLI:EU:C:1995:411, para. 37; C-269/90 Technische Universität München, EU:C:1991:438, para. 14.
[106] C-19/92 Dieter Kraus, ECLI:EU:C:1993:125, para. 40; C-34/17 Donnellan, ECLI:EU:C:2018:282, para. 55.
[107] Joined Cases C-10/97 to C-22/97 IN.CO.GE.'90, ECLI:EU:C:1998:498, para. 24; C-591/10 Littlewoods Retail a.O., ECLI:EU:C:2012:478, paras. 25-26; C-69/14 Dragoş, ECLI:EU:C:2015:662, para. 24 and case-law cited therein
[108] http://ec.europa.eu/solvit/_docs/2017/com-2017-255_en.pdf
[109] C-64/16 Associação Sindical dos Juízes Portugueses, ECLI:EU:C:2018:117, para. 29.
[110] C-414/16 Vera Egenberger, ECLI:EU:C:2018:257, para. 78.
[111] See Articles 6 and 13 of the European Convention on for the Protection of Human Rights and Fundamental Freedoms. The case-law of the European Court of Human Rights is relevant in the interpretation of fundamental

*A multitude of remedies are available to individuals before national courts*

A number of judicial remedies are available to individuals before national courts, which consist in particular of:

- provisional measures (interim relief),[112]
- the obligation to interpret national law in a way that is consistent with EU law,[113]
- the obligation for the judge to set aside of its own motion any act (even of constitutional nature) which is in conflict with EU law,[114]
- the elimination of the consequences of a violation of EU law,[115]
- the award of damages for violations of EU law (including for judicial wrong-doing).[116]

Those remedies find a direct legal basis in EU law. Therefore, when the conditions are fulfilled, national courts must provide them regardless of whether they are laid down in national law or not. At the same time, national judgments can be enforced through all the tools provided for in national law.

---

**Example 8 – Judicial remedies based on EU law despite national constitutional law**

Case C-213/89 – Factortame and Joined Cases C-46/93 and C-48/93, Brasserie du Pêcheur and Factortame

A number of companies, owners or operators of fishing vessels, were deprived of their fishing rights after the UK authorities adopted new and discriminatory rules. The companies applied for judicial review and for the grant of interim relief. The House of Lords acknowledged that the applicants would suffer irreparable damage if the interim relief which they sought were not granted and they were successful in the main proceedings. However, under national law, the English courts had no power to grant interim relief in such a case. More specifically, the grant of such relief was precluded by the old common-law rule that an interim injunction may not be granted against the Crown, that is to say against the government, in conjunction with the presumption that an Act of Parliament is in conformity with Union law until such time as a decision on its compatibility with that law has been given. The House of Lords referred the question to the Court. The latter replied that a national court which, in a case before it concerning Union law, considers that the sole obstacle which precludes it from

---

rights, as Article 52 (3) of the Charter states that, when rights under the Charter correspond to rights guaranteed by the Convention for the Protection of Human Rights and Fundamental Freedoms, their meaning and scope shall be the same, unless the EU right grants a higher protection.

[112] C-213/89 Factortame, ECLI:EU:C:1990:257; Joined Cases C-143/88 and C-92/89 Zuckerfabrik, Süderdithmarschen ECLI:EU:C:1991:65.

[113] C-106/89 Marleasing ECLI:EU:C:1990:395; C-91/92 Faccini Dori, ECLI:EU:C:1994:292.

[114] Joined Cases C-188/10 and 189/10 Melki and Abdeli, ECLI:EU:C:2010:363, paras. 43-44. That obligation extends to setting aside conflicting case-law: see C-689/13 Puligienica, ECLI:EU:C:2016:199, para. 38.

[115] C- 503/04 Commission v Germany, ECLI:EU:C:2007:432, paras. 33 et seq.; C-276/07 Delay, ECLI:EU:C:2008:282, para. 23. See also below as regards the repayment of charges unlawfully levied.

[116] See ex multis Joined Cases C-6/90 and C-9/90 Francovich, ECLI:EU:C:1991:428; C-224/01 Köbler, ECLI:EU:C:2003:513.

granting interim relief is a rule of national law, must disapply that rule.

In a further reference from another UK Court, concerning the same investors, the Court found that the principle that Member States are obliged to make good damage caused to individuals by breaches of Union law attributable to the State is applicable where the national legislature was responsible for the breach in question. Furthermore, reparation of loss or damage cannot be made conditional upon fault (intentional or negligent) on the part of the organ of the State responsible for the breach, going beyond that of a sufficiently serious breach of Union law.

Member States have an obligation, under EU law, to put in place effective procedures that enable citizens and businesses, including investors, to claim damages for breaches of their rights under EU law by Member States. The Commission recognises that cross-border investors might face difficulties in claiming State liability due to the diversity of national procedural laws. However, the case-law of the Court does not only establish the principle of such liability, but also sets out a number of minimum requirements for extra-contractual State liability for violation of EU law[117].

### *EU requirements and support concerning the independence, quality and efficiency of the national judiciary*

The independence of the national judiciary is a common principle of the constitutional traditions of the Member States and of EU law[118], and it is recognised as essential to ensure effective judicial protection[119]. Guarantees of independence and impartiality require rules on the composition of the judicial body and the appointment, length of service and the grounds for abstention, rejection and dismissal of its members. This is to dismiss any reasonable doubt in the minds of individuals as to the imperviousness of that body to external factors and its neutrality with respect to the interests before it[120].

As announced in the Communication *EU law: Better results through better application*[121], the Commission encourages and helps Member States to improve their capacity to enforce EU law and to provide remedies to ensure that the end-users of EU law, whether private individuals or businesses can fully enjoy their rights.

---

[117] In principle, the conditions for the liability of Member States for damage caused to individuals by a breach of EU law does not differ from the conditions governing the liability of the EU and its institutions for such damage in accordance with Article 340 (2) TFEU; Joined Cases C-46/93 and C-48/93 Brasserie du Pêcheur and Factortame, ECLI:EU:C:1996:79 paras. 40 to 42.

[118] Article 47 (2) of the Charter and Article 19 Treaty on European Union.

[119] C-64/16 Associação Sindical dos Juízes Portugueses, ECLI:EU:C:2018:117, para. 41.

[120] C-506/04 Wilson, ECLI:EU:C:2006:587, paras. 50-53.

[121] Communication - *EU law: Better results through better application* (2017/C18/02) available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv%3AOJ.C_.2017.018.01.0010.01.ENG&toc=OJ%3AC%3A2017%3A018%3ATOC

The Commission encourages the modernisation of enforcement authorities through the European Semester, and when necessary through specific legislation. The Commission has worked with Member States to further improve the effectiveness of justice systems, including their independence, quality and efficiency. Improving the effectiveness of judicial systems is a priority in the European Semester and the Council regularly adopts country-specific recommendations on improving national justice systems on the basis of Commission proposals.

The EU financially supports certain justice reforms through the European Structural and Investment Funds. Between 2007 and 2023 16 Member States will have spent more than EUR 900 million to increase quality and efficiency of their justice systems[122]. EU funds have for instance facilitated the introduction of new case-management systems and user-friendly e-services in courts.

***National procedures must ensure effective enforcement of an individual's rights ensuing from EU law***

Except for Regulation 1215/2012[123] which seeks to facilitate access to justice, in particular by providing rules on the jurisdiction of the EU courts in cross-border cases and on a rapid and simple recognition and enforcement of judgments in civil and commercial matters[124], EU law usually leaves procedural rules to be determined by national law[125]. There are however exceptions, for example the Remedies Directives which harmonises procedural aspects related to enforcement and remedies in the field of public procurement.[126]

Even where EU law does not harmonise procedures, it does in any event set out minimum requirements in relation to those. For example, procedures for the enforcement of EU rights should be no less favourable than those governing similar domestic situations (*principle of equivalence*) and they should not in practice render impossible or excessively difficult the exercise of these rights (*principle of effectiveness*)[127]. The cost of a procedure should not be

---

[122] The 2018 EU Justice Scoreboard, available at https://ec.europa.eu/info/sites/info/files/justice_scoreboard_2018_en.pdf, figures 2 and 3.

[123] Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, OJ L 351, 20.12.2012, p. 1–32.

[124] Regulation 1215/2012 applies only in disputes relating to 'civil and commercial matters'. Therefore, it does not apply in disputes involving a party (e.g. State authority) exercising public powers. In the realm of civil and commercial matters, there are also several Regulations establishing specific European procedures that could be used by investors, such as the European Payment Order Regulation (18796/2006) or the European Account Preservation Order Regulation (655/2014).

[125] C‑362/12,Test Claimants in the Franked Investment Income Group Litigation, ECLI:EU:C:2013:834, para. 31.

[126] Directive 2007/66/EC of the European Parliament and of the Council of 11 December 2007 amending Council Directives 89/665/EEC and 92/13/EEC with regard to improving the effectiveness of review procedures concerning the award of public contracts (OJ L 335, 20.12.2007, p. 31).

[127] C‑169/14 Sánchez Morcillo, ECLI:EU:C:2014:2099, para. 31.

prohibitively expensive and legal aid shall be made available to those who lack sufficient resources in so far as such aid is necessary to ensure effective access to justice, including, when justified, to legal persons.[128] Furthermore, individuals have the right to have their case adjudicated and enforced in a reasonable time.[129]

---

**Example 9 – Disapplication of national rules on limitation periods in view of misleading conduct by national authorities**

Case C-327/00 – Santex

An Italian company was prevented from participating in a tender procedure because of non-compliance with one of the tender clauses included in the notice for tender. Following the publication of the notice, the contracting authority had indicated to the applicant that, given the arguments against the compliance of that clause with EU law, it would interpret it so as to allow them to participate; however, it later took the opposed view and decided to exclude it from the tender. The national time limits for challenging notices for tender had expired by the time the case was lodged with the court.

The Court found that in general the time-limit set by national legislation was reasonable and thus ensuring, in principle, legal certainty for tender participants. However, the Court considered that the circumstances of each case need to be considered to determine if the effectiveness of EU law provisions has not been jeopardised. In this case, the Court found that the conduct of the contracting authority had created a state of uncertainty and that only at the stage of the exclusion decision was that uncertainty dispelled. The authority has thus rendered excessively difficult the exercise by the harmed tenderer of the rights conferred on him by EU law. Thus, the Court concluded that in the specific circumstances of the case at hand the national court, in order to allow the plaintiff to raise the plea of incompatibility of the tender clause with applicable EU law, should interpret the national rules on limitation periods in compliance with the EU principle of effectiveness or, if that interpretation were not possible, disapply them.

---

### Referral to the Court of Justice of the European Union

National courts act as 'EU courts' and are under an obligation to disapply of their own motion national provisions that are contrary to directly effective provisions of EU law. Where the enforcement of EU rights relies on a question of interpretation of EU law before a national court, that court may request the Court of Justice for a preliminary ruling. Where such question is raised before a court or tribunal against whose decisions there is no judicial

---

[128] C-279/09 DEB, ECLI:EU:C:2010:811, para. 59.
[129] C-612/15 Kolev, ECLI:EU:C:2018:392, paras. 70-72.

remedy under national law, that court or tribunal must bring the matter before the Court of Justice[130]. Preliminary questions can also pertain to the validity of EU rules: where such questions are relevant, a national court or tribunal must refer it to the Court of Justice, which has the exclusive competence to review the validity of EU acts.[131] In order to qualify as a "court or tribunal of a Member State" under Article 267 TFEU, and thus to be able to make a reference to the Court of Justice, an organ must fulfil a number of criteria. [132] Private arbitrators and the arbitral tribunals set up in intra-EU BITs do not fulfil these criteria and therefore cannot be considered to be "courts of tribunals" under Article 267 TFEU.[133]

The interpretation given in a Court of Justice preliminary ruling is binding on the national court, for the purposes of the decision to be given in the main proceedings[134]. All national authorities are obliged to take any measure, be it general or particular, in order to comply with a preliminary ruling as soon as possible.[135] It is not necessary for the national judge to request or await the prior setting aside of provisions contrary to EU law by legislative or other constitutional means[136].

Under Article 19 TEU the Court of Justice has the authority to ensure observance of EU law, and thus plays a central role in ensuring the effectiveness and uniformity of EU rules granting rights to cross-border investors.

### 3. Commission's role as guardian of the Treaty

Article 17(1) of the Treaty on European Union entrusts the Commission with the responsibility for the effective application, implementation and enforcement of EU law. In this role, the Commission can review national measures and act to ensure compliance with EU safeguards protecting investors. The primary purpose of the infringement process is to ensure that Member States actions or omissions are brought in line with EU law (for example by amending national law), as a general interest objective. Actions by individual investors seeking the annulment of national measures or claiming financial compensation for the damage caused by such measures are in the competence of national courts.

Member States are obliged to take all the necessary measures to comply with a ruling of the Court of Justice finding an infringement. In case of failure, the Commission is empowered to

---

[130] Article 267 TFEU.
[131] C-314/85 Foto-Frost, ECLI:EU:C:1987:452.
[132] For that purpose, the Court takes account of a number of factors, such as whether the body is established by law, whether it is permanent, whether its jurisdiction is compulsory, whether its procedure is inter partes, whether it applies rules of law and whether it is independent (C-54/96 Dorsch Consult, ECLI:EU:C:1997:413, para. 23).
[133] See, respectively, C-102/81 Nordsee, ECLI:EU:C:1982:107, paras. 10 to 13, and C-284/16 Achmea, ECLI:EU:C:2018:158, paras. 43 et seq.
[134] C‑689/13 Puligienica, ECLI:EU:C:2016:199, para. 38.
[135] Joined Cases C-231/06 to C-233/06 Jonkman, ECLI:EU:C:2007:373, para. 38.
[136] C‑689/13 Puligienica, ECLI:EU:C:2016:199, para. 40.

ask the Court of Justice to impose financial penalties on the non-compliant Member State.[137]

The Commission is committed to act firmly on infringements which obstruct the implementation of important EU policy objectives or which risk undermining the four fundamental freedoms [138], which are essential for investors. The Commission gives high priority to infringements that reveal systemic weaknesses and in particular to those which affect the capacity of national judicial systems to contribute to the effective enforcement of EU law. It should be noted that a number of infringement cases are solved before the referral to the Court of Justice as the Member State concerned amends or repeals its legislation at stake or takes positive measures to remedy the infringement.

## V.    Conclusion

Enabling, encouraging and protecting investments are among the main EU priorities in the single market. EU law, as interpreted by the Court of Justice, strikes a balance between investment protection and other legitimate public interests objectives serving the wellbeing of its citizens. This balancing of different public interests should also take place when Member States act at national level within the scope of EU law.

EU law does not solve all problems investors may face in their activities. However, in the single market, EU investors' rights are protected by EU law, which allows for the pursuit and development of economic activities in all Member States. Investors can enforce their rights before national administrations and courts, according to national procedural rules which are to ensure that these rights are effectively protected.

EU investors cannot invoke intra-EU BITs, which are incompatible with Union law and no longer necessary in the single market. They cannot have recourse to arbitration tribunals established by such intra-EU BITs or, for intra-EU litigation, to arbitration tribunals established under the Energy Charter Treaty. However, the EU legal system offers adequate and effective protection for cross-border investors in the single market, while ensuring that other legitimate interests are duly and lawfully taken into account. When investors exercise one of the fundamental freedoms such as the freedom of establishment or the free movement of capital, they act within the scope of application of Union law and therefore enjoy the protection granted by that law.

---

[137] Article 260(2) TFEU.
[138] Communication - *EU law: Better results through better application* (2017/C18/02) available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv%3AOJ.C_.2017.018.01.0010.01.ENG&toc=OJ%3AC%3A2017%3A018%3ATOC

Member States have the responsibility and the power to enforce EU law in general and EU investors' rights, in particular. The Commission strives to increase the effectiveness of the enforcement system in the EU, including actions to support administrative capacity building or to strengthen justice systems, and to tackle breaches of EU law by national authorities.