**EXHIBIT 54**

# DECLARATION OF THE REPRESENTATIVE OF THE GOVERNMENT OF HUNGARY,

## OF 16 JANUARY 2019

## ON THE LEGAL CONSEQUENCES OF THE JUDGMENT OF THE COURT OF JUSTICE IN *ACHMEA* AND ON INVESTMENT PROTECTION IN THE EUROPEAN UNION

THE REPRESENTATIVE OF THE GOVERNMENT OF HUNGARY MAKES THE FOLLOWING DECLARATION

In its judgment of 6 March 2018 in Case C-284/16, Achmea v Slovak Republic ('the *Achmea* judgment'), the Court of Justice of the European Union held that "*Articles 267 and 344 [… of the Treaty on the Functioning of the European Union] must be interpreted as precluding a provision in an international agreement concluded between Member States, […] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept*" ("investor-State arbitration clauses").

Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law.

Union law takes precedence over bilateral investment treaties concluded between Member States.[1] As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable. They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses). Any arbitration tribunal established on the basis of an investor-State arbitration clause included in an intra-EU bilateral investment treaty lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty.

When investors from Member States exercise one of the fundamental freedoms such as the freedom of establishment or the free movement of capital, they act within the scope of application of Union law and therefore enjoy the protection granted by those freedoms and, as the case may be, by the relevant secondary legislation, by the Charter of Fundamental Rights of the European Union, and by the general principles of Union law, which include in

---

[1] With regard to agreements concluded between Member States, see judgments in *Matteucci*, 235/87, EU:C:1988:460, paragraph 21; and *Budějovický Budvar*, EU:C:2009:521, C-478/07, paragraphs 98 and 99 and Declaration 17 to the Treaty of Lisbon on primacy of Union law. The same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of the Treaties and customary international law (*lex posterior*).

1

particular non-discrimination, proportionality, legal certainty and the protection of legitimate expectations.[2] Where a Member State enacts a measure that derogates from one of the fundamental freedoms guaranteed by Union law, that measure falls within the scope of Union law and the fundamental rights guaranteed by the Charter also apply.[3]

Member States are obliged to provide remedies sufficient to ensure the effective legal protection of investors' rights under Union law.[4] In particular, every Member State must ensure that its courts or tribunals, within the meaning of Union law, meet the requirements of effective judicial protection.[5]

Hungary takes note of the Communication "Protection of intra-EU investment" adopted by the Commission on 19 July 2018 concerning intra-EU bilateral treaties.[6]

In light of the ECOFIN Council conclusions of 11 July 2017, Member States and the Commission will intensify discussions without undue delay with the aim of better ensuring complete, strong and effective protection of investments within the European Union. Those discussions include the assessment of existing processes and mechanisms of dispute resolution as well as of the need and, if the need is ascertained, the means to create new or to improve existing relevant tools and mechanisms under Union law.[7]

This declaration is without prejudice to the division of competences between the Member States and the Union.

Taking into account the foregoing, Hungary declares that it will undertake the following actions without undue delay:

1. By the present declaration, Hungary informs investment arbitration tribunals about the legal consequences of the *Achmea* judgment, as set out in this declaration, in each pending intra-EU investment arbitration proceeding brought under intra-EU bilateral investment treaties concluded by Hungary and another Member State ("intra-EU bilateral investment treaties").
2. In the event an investor who is a national of Hungary brings an action under an intra-EU bilateral investment treaty, Hungary, in cooperation with the defending Member State, will take the necessary measures to inform the investment arbitration tribunals

---

[2] Judgment in *Pfleger*, C-390/12, EU:C:2014:281, paragraphs 30 to 37.

[3] Judgment in *Online Games Handels*, C-685/15, EU:C:2017:452, paragraphs 55 and 56.

[4] Article 19(1) TEU, second sub-paragraph.

[5] Judgment in *Associação Sindical dos Juízes Portugueses*, C-64/16, EU:C:2018:117, paragraphs 31 to 37.

[6] COM(2018)547 final..

[7] Council conclusions on the Communication of the Commission on the mid-term review of the Capital Markets Union Action Plan; http://www.consilium.europa.eu/en/press/press-releases/2017/07/11/conclusions-mid-term-review-capital-markets-union-action-plan/

concerned of those consequences. Similarly, Hungary as a defending Member State will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU bilateral investment treaty arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.

3. By the present declaration, Hungary informs the investor community that no new intra-EU bilateral investment treaty arbitration proceeding should be initiated based on an intra-EU bilateral investment treaty.

4. In light of the *Achmea* judgment, Hungary will terminate all intra-EU bilateral investment treaties concluded with other Member States by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.

5. Hungary will ensure effective legal protection pursuant to the second subparagraph of Article 19(1) TEU under the control of the Court of Justice against State measures that are the object of pending intra-EU bilateral investment treaty arbitration proceedings.

6. Settlements and arbitral awards in intra-EU bilateral investment treaty arbitration cases, that can no longer be annulled or set aside and were voluntarily complied with or definitively enforced before the *Achmea* judgment should not be challenged. Hungary will discuss, in the context of the plurilateral treaty or in the context of bilateral termination, practical arrangements, in conformity with Union law, for such arbitral awards and settlements. This is without prejudice to the lack of jurisdiction of arbitral tribunals in pending intra-EU bilateral investment treaty cases.

7. Hungary will make best efforts to deposit its instruments of ratification, approval or acceptance of that plurilateral treaty or of any bilateral treaty terminating intra-EU bilateral investment treaties between Member States no later than 6 December 2019. Hungary will inform each Member State and the Secretary General of the Council of the European Union in due time of any obstacle it encounters, and of measures it envisages in order to overcome that obstacle.

8. Hungary further declares that in its view, the *Achmea* judgment concerns only the intra-EU bilateral investment treaties. The *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty (hereinafter: „ECT") and it does not concern any pending or prospective arbitration proceedings initiated under the ECT.

9. Against this background, Hungary underlines the importance of allowing for due process and considers that it is inappropriate for a Member State to express its view as regards the compatibility with Union law of the intra-EU application of the ECT. The ongoing and future applicability of the ECT in intra-EU relations requires further discussion and individual agreement amongst the Member States.

Done in Brussels 16 January 2019

Olivér VÁRHELYI
Ambassador Extraordinary and Plenipotentiary
Permanent Representative

3