# EXHIBIT 56



EUROPEAN COURT OF HUMAN RIGHTS
COUR EUROPÉENNE DES DROITS DE L'HOMME

FORMER FIRST SECTION

**CASE OF OAO NEFTYANAYA KOMPANIYA YUKOS v. RUSSIA**

*(Application no. 14902/04)*

JUDGMENT
(Just satisfaction)

STRASBOURG

31 July 2014

## <span style="color:red">**FINAL**</span>

<span style="color:red">15/12/2014</span>

*This judgment has become final under Article 44 § 2 of the Convention. It may be subject to editorial revision.*



COUNCIL OF EUROPE
CONSEIL DE L'EUROPE

**In the case of OAO Neftyanaya Kompaniya Yukos v. Russia,**

The European Court of Human Rights (Former First Section), sitting as a Chamber composed of:

Christos Rozakis, *President,*
Dean Spielmann,
Nina Vajić,
Khanlar Hajiyev,
Sverre Erik Jebens,
Giorgio Malinverni, *judges,*
Andrey Bushev, ad hoc *judge,*

and Søren Nielsen, *Section Registrar,*

Having deliberated in private on 24 June 2014,

Delivers the following judgment, which was adopted on that date:

## PROCEDURE

1. The case originated in an application (no. 14902/04) against the Russian Federation lodged with the Court under Article 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention") by OAO Neftyanaya Kompaniya Yukos ("the applicant company"), on 23 April 2004.

2. In a judgment delivered on 20 September 2011 ("the principal judgment"), the Court held that in the 2000 Tax Assessment proceedings the applicant company did not have sufficient time for preparation of the case at first instance and on appeal, in breach of Article 6 of the Convention (§§ 534-551 of the principal judgment), that the assessment of the penalties relating to 2000 and the doubling of the penalties for 2001 were unlawful and in breach of Article 1 of Protocol No. 1 (§§ 563-575), and that in the enforcement proceedings against the applicant company the domestic authorities failed to strike a fair balance between the legitimate aim of these proceedings and the measures employed, in breach of the same Convention provision (§§ 645-658). The Court dismissed the remainder of the applicant company's complaints.

3. Under Article 41 of the Convention the applicant company sought just satisfaction of 37,981,000,000 euros (EUR) in respect of pecuniary damage and submitted that the judgment of 20 September 2011 constituted sufficient just satisfaction in respect of non-pecuniary damage. The applicant company further requested payment of 4,333,105 pounds sterling (GBP) and 762,148 dollars (USD) in respect of fees, costs and expenses.

4. Since the question of the application of Article 41 of the Convention was not ready for decision, the Court reserved it and invited the Government and the applicant company to submit, within three months,

their written observations on that issue and, in particular, to notify the Court of any agreement they might reach (ibid., § 671 of the principal judgment, and point 10 of the operative provisions).

5. The applicant company and the Government each filed written observations on 13 June 2012. Both parties submitted further written observations and then replied to each other's observations on 31 July 2012, 1 March and 15 May 2013.

6. The composition of the Chamber was determined according to the provisions of Article 23 § 3 of the Convention and Rule 26 § 4 of the Rules of Court. Pursuant to these provisions, Christos Rozakis, Nina Vajić, Sverre Erik Jebens and Giorgio Malinverni continued to sit in the case following the expiry of their terms of office.

## THE LAW

7. Article 41 of the Convention provides:

> "If the Court finds that there has been a violation of the Convention or the Protocols thereto, and if the internal law of the High Contracting Party concerned allows only partial reparation to be made, the Court shall, if necessary, afford just satisfaction to the injured party."

### A. Pecuniary damage

#### 1. The parties' submissions

##### (a) The applicant company's arguments

8. The applicant company took the view that the violations found by the Court in the principal judgment had resulted in considerable pecuniary losses. More specifically, the company would have survived had it not been for the violation of Article 1 of Protocol No. 1 in respect of the enforcement proceedings, that is, had it not been required to sell its main production subsidiary OAO Yuganskneftegaz, and had it been given ninety days to repay each debt and been permitted to sell less valuable assets.

9. With reference to an expert report, the applicant company considered that the violation of Article 1 of Protocol No. 1 on account of the domestic authorities' failure in the enforcement proceedings to strike a fair balance between the legitimate aim of these proceedings and the measures employed had led to the direct loss of EUR 37,981,000,000, representing the expert's assessment of the applicant company's value on 19 December 2004. The applicant company did not advance any claim for interest payments in connection with this sum.

10. The applicant company submitted that the causal link between the violations found and its loss of the stated value had been established. However, it conceded that the assumptions and conclusions in the expert report which valued its loss at the above-stated amount had differed to a certain extent from the Court's conclusions in its principal judgment.

11. With regard to the issue of the appropriate method of distributing the award, the applicant company asserted that, given that it had been liquidated in 2007 and in view of the Court's flexible practice in respect of the payment of awards under Article 41 of the Convention, the amount should be paid to the Yukos International Foundation. This entity was created in the Netherlands by the applicant company with a view to distributing "after [the] payment of the creditors ... any funds received and to be received by it through a scheme to shareholders of Yukos Oil Company, in accordance with the applicable law and the principles of reasonableness and fairness".

#### (b)  The Government's arguments

12. The Government asked the Court to reject the applicant company's claim in full. They argued that no injured party remained in this case and that there was no need to award compensation, since, among other things, no financial loss arose from any violations found by the Court. In this latter respect, they took the view that the sale of OAO Yuganskneftegaz would have been necessary even if the State had used a more flexible approach to enforcement, as suggested by the Court in the principal judgment. The outcome of the enforcement proceedings would not have been different even had the enforcement fee been reduced and had the authorities carried out a full and reasoned assessment of the consequences of enforcement.

13. In respect of the violation of Article 1 of Protocol No. 1 with regard to the enforcement proceedings, the Government was of the view that at the relevant time the applicant company had simply been unable to pay its debts. The company's position was to deny the existence of any tax liabilities and to refuse payment. In such circumstances, even a reasoned review of all enforcement options would not have led to the applicant company being granted more time. The Government commented in detail on the relevant factors highlighted by the Court in the principal judgment and attached an expert report by the head counsel of the Russian bailiffs' service addressing these questions. The Government concluded that the outcome of the enforcement proceedings would have remained essentially the same.

14. The Government specifically disagreed with the working assumptions used by the expert report submitted by the applicant company. In their view, the report had mistakenly assumed increased oil production, in spite of the need to sell assets and to cut spending on investment; the report made no reduction to reflect the hasty circumstances of the sale of the

applicant company's assets, and it also allowed the company excessively long time-limits for payment, unrelated to anything in domestic law or practice. The Government submitted their own expert report suggesting that the applicant company was worthless at the relevant time on account of the fraudulent nature of its tax management and the related legal risks. More generally, with reference to the case of *McCann and Others v. the United Kingdom* (27 September 1995, Series A no. 324), the Government suggested that, given the fraudulent nature, scale and seriousness of the domestic case against the applicant company, any pecuniary award would be inappropriate in the circumstances.

15. As regards the question of the possible recipient of a payment under Article 41 of the Convention, the Government pointed out that the applicant company no longer existed and that the entity referred to by the applicant company could not be a proper recipient, in that the Court had no jurisdiction to delegate to a third party the power to grant just satisfaction. They also pointed out that the beneficiaries of the Yukos International Foundation were anonymous, that there was a risk of double compensation because some of the applicant company's shareholders were pursuing legal proceedings in other venues, and that there was no guarantee that the interests of all shareholders would be reflected in the distribution of awards by this entity, rather than the interests of merely some of them, who were likely to be the "least deserving".

16. In this latter respect, the Government took the view that the possible payment of any award under Article 41 of the Convention, either directly or indirectly, to certain shareholders and managers who at the relevant time had instigated tax fraud by the applicant company and benefited from dividends paid out of tax fraud would not be just, fair and equitable. In the Government's view, the risk of possible abuse in the distribution of funds was real. They referred to an example of how one of the surviving entities created by the applicant company, which was registered in the Netherlands and similar in nature to the Yukos International Foundation, had paid out money to an affiliate of the former majority shareholder rather than distributing it to all of the shareholders.

17. As to the damage allegedly resulting from the Court's invalidation of the penalties, the Government suggested that this should not be compensated, since at the time of the applicant company's liquidation there remained a huge unpaid debt, including unpaid taxes. Even if the impugned penalties were to have been returned to the applicant company at the relevant time, the sums would then have had to be paid back to the State in order to cover the applicant company's debts of around USD 8 billion.

### 2. The Court's assessment

#### (a) Violation of Article 6 of the Convention

18.  At the outset the Court would point out that in its principal judgment it found a violation of Article 6 of the Convention on account of the haste with which the domestic courts had conducted the 2000 Tax Assessment proceedings against the applicant company, both at first instance and on appeal. The Court cannot speculate as to what the outcome of these proceedings might have been had the violation of the Convention not occurred (see, for example, *Jalloh v. Germany* [GC], no. 54810/00, § 128, ECHR 2006-IX, and *Martinie v. France* [GC], no. 58675/00, § 59, ECHR 2006-VI).

19.  It finds that there is insufficient proof of a causal link between the violation found and the pecuniary damage allegedly sustained by the applicant company. There is therefore no ground for an award in this respect.

#### (b) Violation of Article 1 of Protocol No. 1 on account of the retroactive imposition of the penalties for the years 2000 and 2001

20.  The Court observes that in the principal judgment it concluded that the penalties in the 2000 Tax Assessment and certain of the penalties in the 2001 Tax Assessment were unlawful and in breach of Article 1 of Protocol No. 1. The amounts in question, RUB 19,185,272,697 (approximately 543,623,045 euros) in respect of the year 2000, and RUB 19,556,570,413 (approximately 569,898,525 euros) in respect of the year 2001, were effectively paid by the applicant company during the enforcement proceedings and thus represented a clear pecuniary loss, which, in the Court's view, should be compensated under Article 41 of the Convention.

21. Despite the Government's objections, the Court sees no good reasons to depart from the principle of *restitutio in integrum*, firmly established in its case-law, in assessing the amount of pecuniary compensation in the present case. In its principal judgment it found a violation of Article 1 of Protocol No. 1 concerning the imposition of the penalties for the year 2000 and in part for the year 2001. The Court ruled that the penalties were unlawful as such, and did not represent an irregularity of a merely procedural nature (see, by contrast, *Former King of Greece and Others v. Greece* [GC] (just satisfaction), no. 25701/94, §§ 78-79, 28 November 2002; and *Beyeler v. Italy* (just satisfaction) [GC], no. 33202/96, § 20, 28 May 2002).

22.  The Court considers that the figure of RUB 38,741,843,110, representing the amount of penalties for the year 2000 and one half of the penalties for the year 2001 (see paragraph 20 above), was effectively paid by the applicant company on 12 November 2007 at the latest (see

paragraph 303 of the principal judgment). This sum equalled EUR 1,078,246,919 at the conversion rate on that date.

23. In addition, the Court also recalls that the applicant company was compelled to pay the 7% enforcement fee in respect of the mentioned unlawful penalties. The Court decides that since it has declared the original penalties unlawful, the payment of the 7% enforcement fee in respect of these penalties was unlawful as well.

24. The Court notes in this connection that the applicant company was required to pay the enforcement fee of RUB 1,342,969,088.79 (approximately EUR 37,353,983) in respect of the penalties for the year 2000 and the enforcement fee of RUB 1,368,959,928.91 (approximately EUR 36,636,218) in respect of one half of the penalties for the year 2001, both sums having been effectively paid by the applicant company on 12 November 2007 at the latest (see paragraph 303 of the principal judgment).

25. These sums represented clear pecuniary losses sustained by the applicant company, in breach of Article 1 of Protocol No. 1. They should thus be compensated under Article 41 of the Convention. The amount of RUB 2,711,929,017.7, consisting of RUB 1,342,969,088.79 for the year 2000 and RUB 1,368,959,928.91 for the year 2001, equalled EUR 75,477,284 at the conversion rate on that date.

26. Taking into account the inflation rate of 12.62% for the euro between that date and the present time, the Court assesses the amount of pecuniary damage to the applicant company resulting from the violation of Article 1 of Protocol No. 1 on account of the retroactive imposition of the penalties (see paragraph 22 above) and the payment of the enforcement fee on these unlawful penalties (see paragraph 25 above) for the years 2000 and 2001 at EUR 1,299,324,198.

### (c) Violation of Article 1 of Protocol No. 1 on account of the enforcement proceedings

27. The Court refers to its finding in the principal judgment that the domestic authorities failed to strike a fair balance between the legitimate aim of the enforcement proceedings in respect of the applicant company and the measures employed, by being inflexible regarding the pace of the proceedings, obliging the company to pay excessive fees and failing to give explicit account of all of the relevant factors. The above considerations led the Court to conclude that there had been a violation of Article 1 of Protocol No. 1 on account of the enforcement proceedings in respect of the applicant company.

28. In this respect, the Court notes that the working assumptions used by the applicant company in its assessment of the prospects of the applicant company's survival and its value in the aftermath of the events remain at least in part speculative (see, for example, *Credit and Industrial Bank*

*v. the Czech Republic*, no. 29010/95, § 88, ECHR 2003-XI (extracts)). In its principal judgment the Court did not conclude, as alleged by the applicant company, that the applicant company would have survived the enforcement proceedings had it not been for the aforementioned shortcomings in these proceedings. Therefore, the Court cannot accept the applicant company's claim in full (see, for example, *Goddi v. Italy*, 9 April 1984, § 35, Series A no. 76; *Tre Traktörer AB v. Sweden*, 7 July 1989, § 66, Series A no. 159; *Beaumartin v. France*, 24 November 1994, § 44, Series A no. 296-B; *Kingsley v. the United Kingdom* [GC], no. 35605/97, § 43, ECHR 2002-IV; *Ezeh and Connors v. the United Kingdom* [GC], nos. 39665/98 and 40086/98, §§ 141 and 143, ECHR 2003-X and *Martinie v. France* [GC], cited above, § 59).

29.  Even if it cannot be said that the above-cited defects alone caused the applicant company's liquidation, they nevertheless seriously contributed to it, directly resulting in pecuniary damage satisfying the causality criteria of Article 41 of the Convention.

30.  In this respect, the Court recalls that in paragraph 655 of the principal judgment it has clearly stated that the above-mentioned defects very seriously contributed to the applicant company's demise, having identified:

> "... [a] factor which seriously affected the company's situation in the enforcement proceedings. The applicant company was subjected to a 7% enforcement fee in connection with the entire amount of its tax-related liability, which constituted an additional hefty sum of over RUB 43 billion (EUR 1.16 billion), the payment of which could not be suspended or rescheduled (see paragraphs 484-486). This was a flat-rate fee which the authorities apparently refused to reduce, and these sums had to be paid even before the company could begin repaying the main body of the debt (see paragraph 484). The fee was by its nature unrelated to the actual amount of the enforcement expenses borne by the bailiffs. Whilst the Court may accept that there is nothing wrong as a matter of principle with requiring a debtor to pay for the expenses relating to the enforcement of a debt or to threaten a debtor with a sanction to incite his or her voluntary compliance with enforcement writs, in the circumstances of the case the resulting sum was completely out of proportion to the amount of the enforcement expenses which could have possibly been expected to be borne or had actually been borne by the bailiffs. Because of its rigid application, instead of inciting voluntary compliance, it contributed very seriously to the applicant company's demise."

31.  The 7% enforcement fee (levied on unpaid taxes, interests and penalties) in respect of the applicant company amounted to:

- RUB 6,848,291,175  (approximately  EUR 190,481,640)  for  the  year 2000;

- RUB 12,652,063,176  (approximately  EUR 345,770,570)  for  the  year 2001;

- RUB 13,477,590,451  (approximately  EUR 360,688,386)  for  the  year 2002;

- RUB 11,926,766,600 (approximately EUR 355,784,986) for the year 2003.

The enforcement fee for the tax liability for the years 2000, 2001, 2002 and 2003 totalled RUB 44,904,711,402.82 (approximately EUR 1,252,725,582). As indicated above, this lead the Court to conclude that in the circumstances of the case the resulting sum was "completely out of proportion to the amount of the enforcement expenses which could have possibly been expected to be borne or had actually been borne by the bailiffs" (see paragraph 655 in the principal judgment).

32. Making a reasonable assessment of the enforcement fee and having regard to the parties' submissions in this respect, the Court accepts the Government's indication of an appropriate rate of 4%, which they made in their submissions of 30 March 2013. The Court accordingly decides that in order to satisfy the requirements of proportionality the enforcement fee should have been reduced to 4%.

33. In order to calculate the amount of the applicant company's pecuniary loss in this connection, the Court deducts the amount of RUB 2,711,929,017.7 (EUR 75,477,284) representing the 7% enforcement fee paid by the applicant company on the unlawful portion of the penalties for the years 2000 and 2001 (see paragraph 25 above), from the entire amount of the enforcement fee of RUB 44,904,711,402.82 (approximately EUR 1,252,725,582) mentioned in paragraph 31 to arrive at the figure of RUB 42,192,782,385.12 (approximately EUR 1,177,070,056).

34. It then follows that the applicant company sustained a clear pecuniary loss of RUB 18,082,621,022, representing the difference between RUB 42,192,782,385.12 (see paragraph 33 above) and the amount of that fee calculated at a 4% rate (RUB 24,110,161,362). The Court observes that the enforcement fee was effectively paid by the applicant company on 12 November 2007 at the latest (see paragraph 303 of the principal judgment). The stated amount equalled EUR 503,268,013 at the conversion rate on that date.

35. Taking into account the inflation rate of 12.62% for the euro between that date and the present time, the Court assesses the amount of pecuniary damage to the applicant company resulting from the violation of Article 1 of Protocol No. 1 on account of the manner in which the authorities conducted the enforcement proceedings at EUR 566,780,436.

### (d)  The method of distribution of the award

36. The Court has concluded that the applicant company sustained pecuniary damage as a result of the violations of Article 1 of Protocol No. 1 on account of the retroactive imposition of the penalties for the years 2000 and 2001 and the payment of the 7% enforcement fee on these penalties (see subpart (b) in paragraphs 20-26 above) and the disproportionate character of the enforcement proceedings (see subpart (c) in paragraphs 27-35 above). It

has rejected the remainder of the applicant company's claim under this head as unsubstantiated. The overall amount of pecuniary damage, including compensation for inflationary losses, sustained by the applicant company in the present case thus amounts to EUR 1,866,104,634 (see paragraphs 26 and 35 above).

37. With regard to the appropriate method of distribution of this award, the Court does not accept the applicant company's suggestion that payment be made to the Yukos International Foundation, as the case file contains no evidence confirming who exactly in such a circumstance would benefit from the award in this case.

38. Regard being had to the fact that the applicant company ceased to exist (compare to *Stankov and the United Macedonian Organisation Ilinden v. Bulgaria*, nos. 29221/95 and 29225/95, § 121, ECHR 2001-IX; and *Capital Bank AD v. Bulgaria*, no. 49429/99, § 80, ECHR 2005-XII (extracts)), the Court decides that the aforementioned amount should be paid by the respondent Government to the applicant company's shareholders and their legal successors and heirs, as the case may be, in proportion to their nominal participation in the company's stock (see, *mutatis mutandis*, *Holy Synod of the Bulgarian Orthodox Church (Metropolitan Inokentiy) and Others v. Bulgaria* (just satisfaction), nos. 412/03 and 35677/04, § 39, 16 September 2010; *Sophia Andreou v. Turkey* (just satisfaction), no. 18360/91, §§ 33-38, 22 June 2010; and *Lordos and Others v. Turkey* (just satisfaction), no. 15973/90, §§ 61-70, 10 January 2012). In order to facilitate the Government's task, the Court refers to the list of the applicant company's shareholders, as they stood at the time of the company's liquidation, which is held by ZAO VTB Registrator, the company which had held and ran the register of the applicant company.

39. Further, given the nature of the violation found, the Court does not consider relevant the Government's references to the allegedly fraudulent conduct of the applicant company's management and some of its shareholders. The applicant company has already been held liable for the actions described in the various tax and enforcement proceedings and the Court sees no reasons to reduce the amount of award to take account of conduct for which the applicant company has already been punished.

40. With regard to the Government's reference to the applicant company's allegedly unmet liabilities, amounting to over USD 8 billion at the time of its liquidation, the Court takes the view that this argument is similar to the applicant company's evaluation of the consequences of the violation of Article 1 of Protocol No. 1 in respect of the enforcement proceedings (see paragraph 28 above) and remains speculative (see, *mutatis mutandis*, *S.A. Dangeville v. France*, no. 36677/97, § 70, ECHR 2002-III).

41. In this respect, the Court would note that it is clear from the course of the enforcement and liquidation proceedings that the domestic authorities

chose not to seek repayment of the entirety of the applicant company's debt by, for instance, granting the applicant company more time. Rather, they decided to precipitate the proceedings by auctioning the applicant company's main production unit and liquidating it, notwithstanding the risk of being subsequently unable to recover some of the company's liabilities. The existence and scale of the allegedly unmet liabilities referred to by the Government resulted at least in part from the method used by the domestic authorities to recover the applicant company's tax liability.

42. Moreover, the fact remains that any liabilities that the applicant company may have had in respect of its creditors were either met or extinguished within the framework of the enforcement and liquidation proceedings in November 2007, and there is nothing in the case file or the parties' submissions to suggest that under domestic law the applicant company or its shareholders remain liable for any payments in favour of any of its creditors resulting from the above-mentioned enforcement or liquidation proceedings. In view of the above, the Court rejects the Government's argument as unfounded.

43. In so far as the respondent Government referred to various parallel proceedings allegedly brought by some of the applicant company's shareholders in other international *fora*, the Court notes that there have been two final arbitral awards in cases brought against the Russian Federation by a group of the applicant company's minority shareholders under bilateral investment treaties. These awards were made on 12 September 2010 and 20 July 2012 respectively by the Arbitration Institute of the Stockholm Chamber of Commerce. There is also a pending set of arbitration proceedings brought by the applicant company's majority shareholders (see paragraphs 519-526 of the principal judgment), in which no final award has been adopted so far.

44. As regards the former two cases, the Court would note that the case file contains no information regarding the enforcement of these awards. In such circumstances, the Court does not find it necessary to take this information into account in the context of the present judgment and at this stage of the proceedings. The Government's reference to the pending case is thus irrelevant.

## B.  Non-pecuniary damage

45. The applicant company submitted that the principal judgment was in itself sufficient just satisfaction in respect of non-pecuniary damage.

46. The respondent Government did not object.

47. The Court considers that, in the circumstances of the present case, the findings of a violation of Article 6 of the Convention and violations of Article 1 of Protocol No. 1 constitute sufficient just satisfaction for the applicant company in respect of non-pecuniary damage.

### C.  Costs and expenses

48.  The applicant company requested payment of GBP 4,333,105 in respect of the legal fees charged by its counsel Mr Piers Gardner for the work on the case prior to the principal judgment, USD 174,000 in respect of the costs of an expert report and USD 588,148 in respect of various fees incurred as a result of the preparation of submissions on Article 41 of the Convention.

49.  The Government asked the Court to take into account the fact that the initial application had been unsuccessful on most of the points of principle and that this should be reflected in any award under this head.

50.  According to the Court's case-law, an applicant is entitled to the reimbursement of costs and expenses only in so far as a violation of the Convention has been established and it has been shown that these costs and expenses have been actually and necessarily incurred and are reasonable as to quantum. In the present case, regard being had to the documents in the Court's possession and the above criteria, the Court considers it reasonable to award a lump sum of EUR 300,000 covering costs under all heads, to be paid to the Yukos International Foundation directly, as requested by the applicant company.

### D.  Default interest

51.  The Court considers it appropriate that the default interest rate should be based on the marginal lending rate of the European Central Bank, to which should be added three percentage points.

## FOR THESE REASONS, THE COURT

1. *Holds* unanimously that the finding of a violation constitutes in itself sufficient just satisfaction for the non-pecuniary damage sustained by the applicant company;

2. *Holds*, by five votes to two,
   (a) that the respondent State is to pay the applicant company's shareholders as they stood at the time of the company's liquidation and, as the case may be, their legal successors and heirs EUR 1,866,104,634 (one billion, eight hundred sixty six million, hundred and four thousand, six hundred thirty four euros), plus any tax that may be chargeable, in respect of pecuniary damage, to be converted into the currency of the respondent State at the rate applicable at the date of settlement;

(b) that the respondent State must produce, in co-operation with the Committee of Ministers, within six months from the date on which this judgment becomes final, a comprehensive plan, including a binding time frame, for distribution of this award of just satisfaction;

3. *Holds*, by six votes to one,
(a) that the respondent State is to pay within three months from the date on which the judgment becomes final in accordance with Article 44 § 2 of the Convention, EUR 300,000 (three hundred thousand euros), plus any tax that may be chargeable, in respect of costs and expenses, which sum is to be paid to the Yukos International Foundation, at the request of the applicant company;
(b) that from the expiry of the above-mentioned three months until settlement simple interest shall be payable on the above amount at a rate equal to the marginal lending rate of the European Central Bank during the default period plus three percentage points;

4. *Dismisses*, unanimously, the remainder of the applicant company's claim for just satisfaction.

Done in English, and notified in writing on 31 July 2014, pursuant to Rule 77 §§ 2 and 3 of the Rules of Court.


Søren Nielsen                                    Christos Rozakis
   Registrar                                         President

In accordance with Article 45 § 2 of the Convention and Rule 74 § 2 of the Rules of Court, the following separate opinions are annexed to this judgment:
(a) concurring opinion of Judge Jebens;
(b) partly dissenting opinion of Judge Bushev, joined in part by Judge Hajiyev.


                                                    C.L.R.
                                                    S.N.

## CONCURRING OPINION OF JUDGE JEBENS

In the principal judgment the Court concluded, by a majority of four to three, that there had been a violation of Article 1 of Protocol No. 1 on account of the 2000-2001 tax assessments. It transpires from paragraph 574 of that judgment that the Court held that those assessments were not lawful, in that they had been based on a change in the domestic courts' interpretation of the rules on the statutory time-bar for imposing penalties. It also transpires from paragraphs 606 and 607 that this was the only reason for the Court's finding of a violation on this point.

In my partly dissenting opinion I concluded that the tax assessments and the imposition of penalties for the years 2000-2001 had complied with the requirement of lawfulness. My reasons for arriving at that conclusion were that the tax assessments were based on a legal development in the higher courts' interpretation of domestic law which was reasonable and should be respected, having regard also to the States' wide margin of appreciation in this field.

In the meantime, however, the principal judgment has become final on all points. It has become *res judicata*, which means that the conclusions are binding. Thus, the situation is different from what it would have been had the Court decided on the issue of just satisfaction in its principal judgment.

The finality of the judgment is applicable not only to the parties to the case, but to the Court as well. It should apply not only to those judges who voted in favor of the Court's conclusions in that judgment, but also to the dissenting judges. To hold a different view would mean to go against a binding judgment, which could create confusion and undermine the Court's position vis-à-vis the parties and the outside world. Another important fact is that the applicants' claim for just satisfaction is based on the Court's conclusions in the principal judgment. Therefore, were a judge to decide on those claims on the basis of a dissenting opinion rather than of the Court's conclusion, he or she would not be properly addressing the applicant's claim, and the State's response to that claim.

For these reasons I have based my voting with regard to the applicant company's claim for just satisfaction on the Court's conclusions on each point in the principal judgment.

# PARTLY DISSENTING OPINION OF
# JUDGE BUSHEV, JOINED IN PART BY JUDGE HAJIYEV

The present opinion contains the joint dissenting opinion of Judge Hajiyev and Judge Bushev with regard to awarding pecuniary damage to the applicant company's shareholders (see parts 1-3 below), and that of Judge Bushev with regard to reimbursement of the costs and expenses incurred by the applicant company (see part 4 below).

We support the majority's view that the Court cannot accept the applicant company's claim in full, since it is based, at least, in part on speculative assumptions (see paragraphs 19, 28 of the just satisfaction judgment). However, we disagree with the way in which the majority applied the principle of *restitutio in integrum,* which has resulted in the awarding of an extraordinary amount of compensation. With all due respect to our colleagues, and to our deep regret, we must dissent from the majority's conclusions in the relevant parts, for the following reasons.

As a starting point, we should like to emphasise our full respect for the principle of *res judicata* and to acknowledge the binding nature of the principal judgment, although we both voted against the majority's finding of the violation of Article 1 of Protocol No. 1 (please refer to our dissenting opinion, attached to the principal judgment, for further details). In the meantime, the issue of just satisfaction was not addressed in the principal judgment, which presupposes an analysis of the circumstances of the case as set out in the principle judgment and the case file, in the light of the specific requirements (preconditions) set out in Article 41 of the Convention.

In this respect, we would argue that in the circumstances of this case the applicant company's shareholders may not be considered as victims of the breach (1), that the test of direct and clear causality has not been met (2), and that, in any event, it goes against the requirement of equity to award the pecuniary damage under the approach and in the amount defined by the majority (see points 1.4, 2.3 and 3 below).

Let us now clarify our thinking.

## 1.  Status of the Shareholders as a Victim

We believe that the majority has in essence departed from the Court's case-law regarding the criteria for assessing a company's shareholders as victims and injured parties (see points 1.1 - 1.3 below). In any event, in the circumstances of the case, awarding such an extraordinary level of compensation to the shareholders is incompatible with the requirement of equity (see point 1.4 below).

The applicant company claimed that the damages should be paid to the Yukos International Foundation – a legal entity created by the applicant company (see paragraph 11 of the just satisfaction judgment). The majority rejected this method of distribution, "as the case file contains no evidence

confirming who exactly in such a circumstance would benefit from the award in this case" (see paragraph 37 of the judgment), having concluded that payments were to be made by the Government "to the applicant company's shareholders and their legal successors and heirs, as the case may be, in proportion to their nominal participation in the company's stock".

As an illustration of the majority's conclusion on this matter, the judgment (see paragraph 38) contains a reference to the Court's previous practice. The quantity of cases referred to might create the impression that such a conclusion is based on well-established case-law. This is not the case. In exceptional circumstances heirs and successors may indeed receive the compensation which would have been awarded by the Court to the respective right holder (victim) had the latter (the Yukos company in this case) retained legal personality on the date on which the award was granted.

This result, under the judgments referred to, as well as under other case-law, requires that at least three related conditions are jointly met. *Firstly*, there must be circumstances which allow for an exception to the general rule of "direct effect" (1.1); *secondly*, the relevant right to compensation must exist (1.2); and, *thirdly*, the "successors and heirs" (the shareholders, by analogy) must confirm to the Court their intention to be protected under the Convention mechanism: at the least, they must somehow demonstrate to the Court such an intention (1.3). None of these criteria has been met in the case at hand.

1.1. "*Direct effect rule": no exceptions applicable to Yukos shareholders.*

As the Practical Guide on Admissibility Criteria makes clear:

"The act or omission in issue must *directly* affect the applicant" (§ 25). The victim must have suffered direct damage. It is further specified in § 30 that the Court may accept an individual application from a person considered an indirect victim where there is a *personal* and *specific* link between the direct victim and the applicant. However, shareholders in a company cannot claim to be victims of a violation of the company's rights under Article 1 of Protocol No. 1 (see *Agrotexim and Others v. Greece*, 24 October 1995, §§ 62 and 64, Series A no. 330-A), save in exceptional circumstances (see *Camberrow MM5 AD v. Bulgaria* (dec.), 1 April 2004)".

Bankruptcy is clearly an extraordinary situation in a company's life cycle. However, extending the notion of "exceptional circumstances" to each and every shareholder in a bankrupt company (as the majority has done) would diminish the concept of direct effect (damage). It is common knowledge in corporate law that, under all jurisdictions, a shareholder is not the only stakeholder in a given company (the creditors, the labour collective, management, society, the public authorities, etc., are also stakeholders). Shareholders are normally considered as having no additional privileges in relation to other stakeholders with regard to the distribution of

a company's assets in the event of bankruptcy. This position, namely that of last in the line of stakeholders for a bankrupt company's assets, makes the link between such an applicant company and its shareholders even more remote and more indirect. An exception should possibly be made where a shareholder has decisive and ultimate power in the company's governance, using the company's personality as a corporate instrument ("veil") for its own business (see, *inter alia*, *G.J. v. Luxembourg*, no. 21156/93, § 24, 26 October 2000). It is difficult to believe that each of the more than fifty thousand Yukos shareholders who under the majority's approach deserved compensation *pro rata* had a *personal and specific link* with the applicant company, and had decisive and ultimate power in its governance.

1.2. *The property right/interest to be protected under the Convention must exist and be real. Yukos shareholders' right to compensation did not exist.*

Shareholders' rights and interests in the circumstances of this case could potentially suffer and require protection under two scenarios – after (a) and before (b) the bankruptcy procedure was initiated.

(a) In the exceptional situation of bankruptcy, the shareholders, under all jurisdictions, may be entitled to distribution of the assets of a liquidated company. This right to obtain a share of liquidation assets only exists, however, once all creditors (including the public authorities) have been paid off. This requirement has not been met in this case. Even disregarding the allegedly "wrong maximum amount", the applicant company continued to have debts towards its diverse creditors. As is stated in § 303 of the principal judgment, "The applicant company ceased to exist, leaving over RUB 227.1 bn (around USD 9.2 bn) in unsatisfied liabilities". This fact was confirmed by the national court. The majority based its logic, though, on the assumption that any liabilities towards the creditors ceased upon the applicant company's liquidation in November 2007 (see § 42 of the just satisfaction judgment). This assumption is wrong, since it contradicts the domestic court's findings of fact. Besides, the majority's logic to the effect "no company – no liabilities" ought to be consistent: "no company – no liabilities, including liabilities to shareholders", and termination of a company's existence must also mean termination not only of all liabilities, but also of all rights relating to compensation to the company – "no company – no rights and obligations".

The idea that "shareholders step in only after other stakeholders" seems to have been acknowledged by Mr Gardner, who at the initial stage of the proceedings was accepted by the Court as Yukos's representative (see § 444 of the admissibility decision). Mr Gardner requested that payment be made to the Yukos International Foundation, the Charter of which provides a view of distributing the compensation "*after [the] payment of the creditors ...* in

accordance with the applicable law and principles of reasonableness and fairness" (see § 11 of the just satisfaction judgment).

(b)  Under the alternate scenario, where the applicant company continued to operate and had been deprived of its assets, that is, before bankruptcy was begun, payment to the shareholders as calculated under the majority's logic seems even less justified.

Before liquidation, the share price was not and could not under any circumstances be equal to the value of the company's assets, with or without the "wrong amount" being taken into account. It is well known that the share price is affected more by a company's prospects, confidence in the management and other perceptions, rather than by the value of a company's assets. *Restitutio in integrum* in the case of the shareholders, i.e. putting them in the situation where they would have been had the company not been liquidated, or had the company been paid back the "confiscated amount", does not entail payment to the shareholders of the exact "confiscated amount". In the normal course of business, a link between the share price and the value of the company's assets (including also "the confiscated amount") is not direct, as the value of the company's assets and the share price may differ significantly.

Thus, under any scenario, the Yukos shareholders could not acquire a property right to the part of the company's assets evaluated under the majority's approach.

1.3. *There must be clear evidence that an injured person (the shareholders) sought protection under the Convention machinery. The Court may not decide on behalf of private persons how they should exercise a potential right to compensation in respect of Article 1 of Protocol No. 1 to the Convention*.

It seems essential that a private person seeking compensation under a Convention provisions must explicitly say so. A pure assumption that no reasonable person would reject compensation if awarded, even if it had not been claimed, does not suffice to grant the status of victim and injured party. Moreover, as follows from paragraph 43 of this judgment, some shareholders did nonetheless express their interest in compensation, but they chose other *fora,* not this Court – they preferred the international arbitration procedures.

The Court admits an exception to the requirement for a victim's explicit consent, but only in inter-State disputes, where the Government file a claim for the benefit of a certain category of the respective State's citizens (see *Cyprus v. Turkey* (just satisfaction) [GC], no. 25781/94, 12 May 2014). However, the present case clearly does not fall under such an exception.

Nothing in the present judgment, or in the case file, clearly suggests that Mr Gardner was authorized (even implicitly) to represent not only all the shareholders, or any specific one of them, but even the Yukos Foundation in

these proceedings. No power of attorney or equivalent evidence of authority to represent the injured party has been submitted to the Court in respect of the case at hand.

It should be also borne in mind in this respect that the power of attorney submitted by Mr Gardner when lodging the application with the Court on behalf of Yukos, and while Yukos was still operating, was initially void, due to obvious breaches of Russian law; irrespective of whether or not it was void, it expired and in any event has not been renewed. It was cancelled by virtue of law as the bankruptcy was started by the international banks (as later confirmed and communicated by the liquidator). Such a situation with regard to Mr Gardner's authority does not meet the requirements of s. 11 of the Court's Practical Guide on Admissibility Criteria, in accordance with which "It is essential for representatives to demonstrate that they have received specific and explicit instructions from the alleged victim within the meaning of Article 34 on whose behalf they purport to act before the Court".

In the case referred to by the majority in paragraph 38 of the just satisfaction judgment to justify the idea that the principal shareholders may succeed the liquidated company, the shareholders lodged their application while the company in question was in the process of liquidation and had not ceased to exist as a legal person. In the case at hand, however, no such application had been lodged by the shareholders, directly or indirectly (through a representative), either when the company existed or after its liquidation. For the same reason this case must be distinguished from the cases where successors of a deceased applicant receive the compensation.

In addressing the issue of the need for explicit confirmation of a private person's consent to be subjected to the protection mechanism of the Convention we would like to support an idea of Judge Nina Vajić (who, to our regret, joined the majority), as expressed in a recent scientific publication. Our respected colleague, when comparing the Court's pilot judgments with collective actions under American law, stated that the Court cannot satisfy claims from persons who are not direct applicants in the case resolved by it[1]. In contrast, as explained in her paper, under American law a court decision may have a direct effect on those who did not participate in the relevant proceedings. In both concepts the judicial decision relates to the interests of a group of people, whereas to be eligible for an award by the Court the beneficiary must specifically indicate his or her intention to the Court. Unfortunately, we find no reasoning in the just satisfaction judgment as to why this well-established approach to the protection of identical

---

[1] Translation from Russian: «… Суд не может удовлетворить требования лиц, не являющихся непосредственными заявителями в деле, которое он рассмотрел». Нина Вайич, Григорий Диков. Пилотные постановления и групповые иски: что делать с систематическими нарушениями прав человека? // Сравнительное Конституционное обозрение (Comparative Constitutional Review). 2012. № 5(90). С. 99.

interests of numerous persons may be changed in the present case. Moreover, departure from this principle will, in our view, compromise the subsidiary role of the Court.

   1.4.  Payment to the shareholders is unjust in the circumstances of the case.

   In addition to the argument that the shareholders in this case are not, by *status*, entitled to benefit directly from compensation (no "direct effect", no exception applicable; no right to a share of the applicant company's assets existed; no evidence of the shareholders' intention to seek for protection under the Convention instruments), we should like to make a few observations to the effect that the shareholders contributed to the damage to the applicant company and, therefore, indirectly to themselves.

   - As a general rule, a shareholder accepts a risk of devaluation of the relevant shares on account of mismanagement and other reasons. Besides, there is a well-established case-law under which the State, as a general rule, is not liable for misconduct by a private person (in this case, for the applicant company as a legal entity, separate from the shareholders' legal personality, the company's management and the majority shareholder). This case does not fall under the exceptions where the State may be held liable for misconduct by its agents or for breach of its positive obligations.

   - The shareholders tolerated the management's misconduct for a relatively long period. They had clear indications of mismanagement through the mass media, as well as in PwC's[1] reports. None of the shareholders exercised their statutory right to sue the management team for mismanagement, or to challenge before the courts the sham and fraudulent transactions which led to the mounting of massive tax evasion schemes. The shareholders were entitled to elect and disqualify the applicant company's management, under whose leadership the company, as found by the Court in the principal judgment, had been engaged in illegal activities. In the meantime, the shareholders, while tolerating the management's illegal actions, were enjoying the dividends, despite the fact that the company was engaged in illegal business and did not have the right to distribute those dividends, given the huge and hidden debt towards the public authorities and to other creditors. The majority shareholders, who, if the majority's logic is followed, will be entitled to a large part of the satisfaction payment, are precisely those persons who involved the company in illegal practices.

   - Some of the shareholders obtained compensation through the Arbitration awards. There is, indeed, no evidence of payment of

---

[1] One of the biggest private audit firms in the world.

those awards by the State, as indicated in the just satisfaction judgment (see paragraphs 43-44). However, non-payment does not seem to be important for defining whether compensation was already (or, under the pending litigation, will be) granted. Under the Court's well-established case-law, such an award itself, like domestic judicial decisions, constitutes "a property" or "possession" which can be sold, used as collateral and be disposed of for value otherwise. Thus, having been granted the awards by the Arbitration tribunals, some shareholders obtained the property value, protected by Article 1 of Protocol No. 1. Russia is a Contracting State to the New York Convention of 1958 and has an effective mechanism for the enforcement of arbitration awards, which potentially increases the value of such property.

- Under any jurisdiction, heirs and successors acquire not only rights, but also obligations. Should, in the Court's view, the shareholders retain rights (to obtain compensation) after the respective company ceased to exist, the latter's unmet obligations should be deemed transferred to the shareholders as well.

*In conclusion*, in the circumstances of this case the Yukos shareholders may not be described as victims and injured parties, and in any event it would be unjust if the shareholders' contribution to the "damage" sustained by the applicant company is not properly taken into consideration.

## 2. Causality

2.1. *Finding a violation is a separate precondition for any legal liability; causality is another precondition that must be present.*

Finding a violation may not in itself automatically amount to a conclusion on causality. Causality depends on the context of the case and must be set in the course of analysis of all related facts. Thus, a typical example is where the drunken condition of a driver-participant in a traffic accident is obviously illegal (it might even amount to a grave breach of the law), and such a condition could contribute to the traffic accident. However, it might not necessarily be a direct cause for health damage to other persons involved in the accident.

In all legal systems both a violation and causality are preconditions for implying legal liability. The Court's case-law contains many previous examples (including in respect of Article 1 of Protocol No. 1), where a violation was found but causality could not be established.

Thus, in the judgment of 24 November 2005, in the case of *Capital Bank ad v. Bulgaria* (application no. 49429/99) the Court stated as follows in § 144:

"The Court finds that no causal link has been established between the violations of Article 6 § 1 of the Convention and of Article 1 of Protocol

No. 1 found in the present case and the revocation of the applicant bank's licence, its liquidation, and the alleged resulting mismanagement of its property. While the withdrawal of its licence and the order for its winding-up might well have had adverse financial consequences for the bank, the Court cannot speculate as to what the eventual result might have been if it had been able to challenge the imposition of those measures in administrative or judicial proceedings (see, *mutatis mutandis*, *Tre Traktörer AB*, p. 25, § 66, *Fredin (no. 1)*, p. 20, § 65; and *Credit and Industrial Bank*, § 88, all cited above). No award can therefore be made under this head".

In *Mascolo v. Italy* (no. 68792/01, 16 December 2004), the Court stated (in § 55) that: "The violation of the applicants' right to the peaceful enjoyment of their property is *mainly* the consequence of the tenant's unlawful conduct". In the case of *Lo Tufo v. Italy*, Judges Spielmann and Loucaides drew attention in their concurring opinion to the fact that the Court itself had acknowledged that the tenant's conduct was not the *exclusive* cause of the landlord's damage by stating that it was "*mainly*" so. The judges finally argued on that basis that the State and the tenant should be held jointly and severally liable for the damage caused.

In *Campbell and Cosans v. the United Kingdom* (25 February 1982, Series A no. 48) the Court concluded that a violation of the Convention was not "the principal cause" of the damage, since the applicant had failed to mitigate the damage.

The mere finding a link between the State's behaviour and damage does not suffice for meeting the causality test under Article 41 of the Convention. The Court's case-law poses a high standard for characteristics of causality to be acknowledged as a sufficient precondition for compensation under Article 41 of the Convention.

### 2.2. *The characteristics of causality*

The causality between a violation found by the Court and damage to the victim must be clear, direct and sufficient. The damage shall be a direct and obvious result of the violation.

Thus, as the Court's Practice Direction on "Just satisfaction claims" specifies:

"7. A clear causal link must be established between the damage claimed and the violation alleged. The Court will not be satisfied by a merely tenuous connection between the alleged violation and the damage, nor by mere speculation as to what might have been".

Those criteria do not seem to us to be met in this case. It is stated in the principal judgment that "[the violation] contributed", [and] "negatively affected" the applicant company's situation, but only in respect of the enforcement violation is it stated that the manner in which the enforcement procedure was applied "very seriously" affected and contributed to the company's demise (see § 655 of the principal judgment). In other words, the

violations had an influence, they were ministerial to the demise, but did not necessarily amount to a direct and clear cause. It is also noticeable that the majority admitted that "it cannot be said that the above-cited defects [violation as regards the enforcement procedure] alone caused the applicant company's liquidation"; yet, in the majority's view, which we cannot share, the causality criteria was met (see paragraph 29 of the just satisfaction judgment).

We believe that the most serious contribution and material effect, i.e. direct and clear cause, came from the activity of the applicant company itself, due, in particular, to the following circumstances (but not limited to them).

It is the applicant company which increased the amount of the alleged damage by making use of massive tax-evasion schemes (the more unpaid taxes – the higher the amount of the penalty), by disrespecting creditors' interests and by abusing procedural rights. It is the applicant company which, by actively impeding the tax investigation, as found by the domestic courts and not disputed by this Court (see, for example, paragraphs 17, 19 and 90 of the principal judgment), managed to extend the length of the investigation beyond the statutory limits. As a result, the majority found (by 4 to 3 votes) in the principal judgment, notwithstanding the interpretation of an allegedly unclear statutory provision provided by the national Constitutional Court, that a delay of three and a half months (which we believe is an insignificant overstepping of the 3-year time-bar in the circumstances of this case) amounted to a breach of the Convention requirement of legality (the statutory provision did not meet the criteria of reasonable clarity). The majority decided that *mala fide* behaviour by a taxpayer had not been specified or implied with the required level of certainty in Russian law, and that therefore the courts did not have sufficient legal grounds to prolong the term accordingly.

Expiry of the statutory term due to the applicant company's *mala fide* activity appears, in our view, to be a reason for a delay in the State's imposing of the tax liability. Indeed, the investigation had been started long enough in advance before the term expired, and the concluding documents had been provided within the term. Had the term not expired, the violation would not been have found. Had the term not expired, the imposition of the tax penalty for 2000-2001, the amount of which, in the majority's opinion, is now to be paid to the shareholders, would have had to be found legal.

The lapse of time and duration of the proceedings are typically assessed by the Court in respect of cases concerning Article 6 of the Convention. Since we are here addressing the significance of timing for establishing causality, the analogy with that approach is admissible. The Court has stated that "the lapse of time" renders "the [causal] link between the breach and the damage more uncertain" (see *Smith and Grady v. the United Kingdom* (just satisfaction), nos. 33985/96 and 33986/96, § 18, ECHR 2000-IX;

*Ramishvili and Kokhreidze v. Georgia*, no. 1704/06, § 147, 27 January 2009). Contribution by an applicant to the length of the proceedings is normally taken into consideration by the Court (see *Stork v. Germany*, no. 38033/02, § 43, 13 July 2006; *Peryt v. Poland*, no. 42042/98, § 63, 2 December 2003; and *Buscemi v. Italy*, no. 29569/95, ECHR 1999-VI).

As regards calculation of the damage on the basis of the 7% enforcement fee, the approach employed appears to be too mechanical and far-fetched. Indeed, the Court found the entirety of the measures used by the State in the bankruptcy proceedings disproportionate. In this respect we see no direct and clear causality between the just imposition of the fee alone and the damage.

In any event, it would be more logical to define a lump sum, rather than to single out one of the enforcement measures that were applied to the applicant company in order to protect the public interest in collecting taxes.

It can also hardly be accepted that the majority took into its consideration the entirety of the enforcement fee, charged for all of the years investigated by the tax authorities (2000-2003), instead of only that for the years in respect of which the imposition of a penalty had been found to be illegal by the Court (2000-2001). The majority argued that the total amount of the fee was disproportionate in terms of compensating the cost which might have been incurred by the State to facilitate enforcement. This argument is not based on the specifics of Russian law. As in the principal judgment (§ 655) the majority again used a mistaken interpretation of the nature of the fee (see paragraph 31 of the just satisfaction judgment). It is not compensation for the costs associated with the bailiffs' actions (which, in that amount, would indeed be disproportionate), but a penalty, the rate of which falls within the State's margin of appreciation, and which is comparable with similar penalties charged in many other jurisdictions.

In addition, it is noticeable in what manner the applicant company, advised by numerous professional lawyers, exercised its right to apply for a decrease in the fee. In August 2004 the first-instance court quashed the bailiffs' decision on imposition of the fee for 2000 as disproportionate (see § 132 of the principal judgment), although this decision was quashed by the upper courts as erroneous (see § 133 of the principal judgment). The applicant company thereby obtained an indication of possible success in cancelling the fee, and at that time it obtained clarification by the Constitutional Court in Ruling no. 13-P of 30 July 2001 to the extent that a reduction of the fee is allowed in the context of Russian law (see § 485 of the principal judgment). Regardless of this opportunity, and in contrast to all the other proceedings, the applicant company did not actively challenge the fee imposed for 2001, 2002 and 2003. Thus, it exercised its statutory right to apply for a reduction of the fee for 2002, but this application was withdrawn before the court started considering the application (see § 201 of the principal judgment). It seems that the fee for 2003 was not challenged at

all (see § 221 of the principal judgment). Such a development may raise the question of whether the applicant company intended to take the opportunity to preserve its assets for its stakeholders with regard to the amount of the fee, or whether instead it possibly chose the tactic "the worse, the better", the effectiveness of which has now been proved by the majority.

A well-established rule, supported by the Court's case law, "*conditio sine qua non*", states that: "an activity or conduct (hereafter: activity) is a cause of the victim's damage if, in the absence of the activity, the damage would not have occurred" (see also Art. 3:101 of Principles of European Tort Law). Based on this rule the cause for the damage to the applicant company was the company's own illegal behaviour, and, once such illegality had been discovered, the active impeding of the State's actions to safeguard the public interest in collecting taxes and other duties. We should like to draw attention to a few facts which demonstrate that the applicant company would have been liquidated even without disproportionate enforcement pressure by the State.

- The applicant company was displaying the characteristic features of a bankruptcy situation before the enforcement procedure started, i.e. before the State committed the enforcement violation.
- The applicant company applied for bankruptcy in the USA (December 2004, see § 249 of the principal judgment) long before the process started in Russia (September 2005, see § 269 of the principal judgment);
- The applicant company's management repeatedly reported its intention to apply for bankruptcy in the press;
- The bankruptcy procedure was initiated by a group of international banks, but not by the State (see § 269 of the principal judgment).
- The Court did not find the choice to sell off Yuganskneftegaz ("YNG") entirely unreasonable (see § 654 of the principal judgment). After the sale of the shares in YNG (December 2004, see § 259 of the principal judgment), and before the start of the bankruptcy procedure, there were no enforcement actions for almost a year; the applicant company could have continued its operations, but it did not (see §§ 268 and 302 of the principal judgment). Instead, the management was actively moving the company's assets outside Russia. Loss of the YNG shares (i.e. limited shareholder's control) was not a ground for termination of business (contractual) obligations between the applicant company and YNG. Nothing in the principal judgment or in the case files supports the idea that "loss of the shareholder's control resulted in (or even negatively affected) YNG's ability to continue business in favour of the applicant company (no evidence of failure to respect business obligations, termination of contracts or the like)". YNG continued to provide

business support to the applicant company for almost a year, whereas, in the meantime, the applicant company was actively hiding its assets and decreasing its ability to meet the diverse creditors' claims.

- As mentioned above, at the date of liquidation, the applicant company owed its creditors (not only the State) over USD 9 billion (approximately 8 billion euros). This amount was defined by the audit and confirmed by the national court. Even if the "wrong amount" (including the 7% fee for all years) is deducted, a substantial and justified debt (not only to the State) remained unpaid. This unpaid debt in itself constituted, under Russian law, sufficient grounds for liquidation, etc.

- The applicant company has never admitted a breach of the tax laws, but self-confidently insisted on the schemes' legality and on no extra grounds for paying those taxes to the State budget.

*In conclusion*, there is no direct and sufficient causality between the violations found and the damage to the applicant company and to its shareholders, although the violations could potentially affect the amount of the damage.

### 2.3. *Co-contributors to the damage and equitable principle of allocation the burden of compensation.*

The majority placed the entire burden for compensating damage on the State, having nonetheless accepted that the State's actions alone could not be said to have caused the company's liquidation (see § 29 of the just satisfaction judgment). In consequence, the State must pay to the company's shareholders an amount, which, in contradiction to the principle of *restitutio in intergrum*, is most likely higher than the shareholders would have obtained either as a price for the applicant company's shares (bearing in mind that it was in bankruptcy situation – see point 1.2 (b) above) or as a liquidation quota (bearing in mind that there existed unpaid liabilities towards the creditors – see point 1.2 (a) above).

Whomever the direct and clear cause is attributed to, the applicant company contributed materially to the damage inflicted on its stakeholders.

In this respect we refer to the provisions of s. 2 of the Court's "Practice Direction "Just satisfaction claims", under which:

" ... [The Court] may also find reasons of equity to award less than the value of the actual damage sustained or the costs and expenses actually incurred, or even not to make any award at all. This may be the case, for example, if the situation complained of, the amount of damage or the level of the costs is due to the applicant's own fault. In setting the amount of an award, the Court may also consider the respective positions of the applicant as the party injured by a violation and the Contracting State as responsible

for the public interest. Finally, the Court <u>will normally take into account the local economic circumstances"</u> (emphasis added).

This approach corresponds to the Principles of European Tort Law:

"The victim has to bear his loss to the extent corresponding to the likelihood that it may have been caused by an activity, occurrence or other circumstance within his own sphere" (Art. 3:106). The Principles also provide that "In the case of multiple activities, when it is certain that none of them has caused the entire damage or any determinable part thereof, those that are likely to have [minimally] contributed to the damage are presumed to have caused equal shares thereof" (Art. 3:105).

Besides, by virtue of s. 9 of the Practice Directions:

"The purpose of the Court's award in respect of damage is to compensate the applicant for the actual harmful consequences of a violation. It is not intended to punish the Contracting State responsible".

The amount of compensation awarded, which is far above any maximum amount previously awarded by the Court, constitutes a significant part of the State's budget: it will have to be deducted from the funds disposed of in the public interest, and in this respect the payment will result in punishment to the State. Further, the majority's approach does not seem to take into account the financial situation of the State, which the Court has done many times in respect of Russia (see *Kazartseva and Others v. Russia*, no. 13995/02, § 46, 17 November; *Korchagina and Others v. Russia*, no. 27295/03, § 24, 17 November 2005; and *Shapovalova v. Russia*, no. 2047/03, § 26, 5 October 2006) and of other States.

In this respect, placing the entire burden of compensation on only one party among several others which contributed to the damage would breach a principle of (just) equity. A decrease in the 7% enforcement fee, proposed by the majority, does not fall under this requirement, as it is grounded by other reasons.

Regard should be also given to the legality of the assets owned by the applicant company in the course of its operations and, in the light of the equity requirement, to the scope of protection to be provided by the Convention in this respect.

**3.** *Ex injuria jus non oritur.* **Part of the applicant company's assets had been acquired as a result of illegal activities.**

The applicant company was considered to be one of the most financially successful companies in Russia. However, at least, part of this achievement resulted from illegal activity.

- The applicant company raised certain funds in the course of exercising business models (sham companies and transactions; see, for instance, PwC's report, admissibility decision, §§ 186-188), which, as confirmed by the Court in the principal judgment, were

illegal. Substantial "income" was obtained through a business culture of tax evasion, and then used for the applicant company's further expansion.

- Part of the applicant company's assets was initially created through fraudulent schemes (sham tenders during the privatization process). We refer also to the judgment in *Khodorkovskiy and Lebedev v. Russia* (nos. 11082/06 and 13772/05, 25 July 2013.

- The applicant company's value increased significantly due to an unprecedented and unpredictable jump in the price of oil, as well as an increase of the FX (foreign exchange rate), that is, as a gift (luck) and not due to efficiency on the part of the applicant company's governance.

- The management did not include (consolidate) numerous foreign affiliates (see the PwC report), thus decreasing its ability to pay off the debts to the creditors and to pay the liquidation quota to the shareholders. Those assets remained under the control of the majority shareholders.

- Part of the applicant company's assets was misappropriated by its management (majority shareholders). We refer to the *Khodorkovskiy and Lebedev* judgment, cited above.

   We believe that the Convention was not designed to protect property rights and interests which were acquired illegally, irrespective of whether they were later breached by the State's unlawful actions. This factor should also have been taken into consideration by the majority when reaching its decision on awarding damages in respect of deprivation of such assets. The illegal origin of the property may make it unnecessary to provide "the victim" with protection under the Convention, at least to the full extent (the full amount), and protection granted without paying due consideration to this factor goes against the principle of equity.

### 4. Reimbursement of costs and expenses

The majority held that a sum of costs and expenses (plus any tax that may be chargeable in this respect) is to be paid to the Yukos International Foundation, at the request of the applicant company. With deep regret, I cannot join a decision under which compensation is based on activity by a representative who was not duly authorised by the applicant company throughout the whole course of the procedure before the Court (beginning in 2004 and until the applicant company's liquidation in November 2007), and who was not authorised to act as an agent before the Court by the beneficiaries of the majority's findings (i.e. the shareholders).