**EXHIBIT 60**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVENERGIA II – ENERGY & ENVIRONMENT (SCA),<br><br>*Petitioner*,<br><br>v.<br><br>THE KINGDOM OF SPAIN,<br><br>*Respondent*. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:18-cv-1148<br>)<br>)<br>)<br>)<br>)<br>) |

## PROPOSED BRIEF OF THE EUROPEAN COMMISSION
## ON BEHALF OF THE EUROPEAN UNION AS *AMICUS CURIAE*
## IN SUPPORT OF THE KINGDOM OF SPAIN

R. Stanton Jones (D.C. Bar No. 987088)
Sally L. Pei (D.C. Bar No. 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
stanton.jones@arnoldporter.com

Dmitri Evseev (D.C. Bar No. 487747)
*Pro hac vice* application to be filed
ARNOLD & PORTER
  KAYE SCHOLER LLP
Tower 42
25 Old Broad Street
London EC2N 1HQ
UNITED KINGDOM
T: +44 (0)20 7786 6100
dmitri.evseev@arnoldporter.com

*Counsel for Proposed Amicus Curiae*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

INTEREST OF AMICUS CURIAE ...................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 2

RELEVANT LEGAL BACKGROUND ............................................................................... 4

      A.    The nature and special characteristics of the EU legal order ................................ 4

      B.    The Energy Charter Treaty ("ECT") ................................................................... 6

      C.    The *Achmea* Judgment ....................................................................................... 8

      D.    EU Member States' declarations on the legal consequences of the *Achmea* Judgment ........................................................................................................... 9

ARGUMENT ....................................................................................................................... 11

I.     The Energy Charter Treaty, properly interpreted under the rules of customary international law on treaty interpretation, does not apply intra-EU ................................ 11

II.    The EU Treaties preclude Member States from offering to arbitrate intra-EU disputes under the Energy Charter Treaty ...................................................................... 13

      A.    Intra-EU arbitration under Article 26 conflicts with the EU Treaties and fundamental principles of EU law ..................................................................... 13

      B.    The conflict between ECT Article 26 and the EU Treaties must be resolved in favor of EU law ............................................................................................... 16

III.   At a minimum, international comity favors allowing the compatibility of intra-EU arbitration under the ECT to be decided within the EU judicial system. ......................... 20

CONCLUSION ..................................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014) ...........................................................................21

*Ungaro-Benages v. Dresdner Bank AG*,
   379 F.3d 1227 (11th Cir. 2004) ......................................................................21

**Statutes**

28 U.S.C. §§ 1602 *et seq.*..................................................................................2, 22

**Treaties**

Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental
   Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998,
   2080 U.N.T.S 95 (1995) .................................................................... *passim*

Treaty on European Union, Oct. 26, 2012,
   2012 O.J. (C 326) 13...........................................................................................4

Treaty on the Functioning of the European Union, Oct. 26 2012,
   2012 O.J. (C 326) 47....................................................................... *passim*

Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969,
   1155 U.N.T.S. 331 ....................................................................................11, 17

**European Union Authorities**

*Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.*
   (Oct. 31, 2018), I ZB 2/15.................................................................................18

Case 3/91, *Exportur v. LOR*,
   [1992] E.C.R. I-05529, EU:C:1992:420 ............................................................17

Case 121/85, *Conegate Ltd. v. HM Customs & Excise*,
   [1986] E.C.R. 01007, EU:C:1986:114................................................................17

Case 147/03, *Commission v. Austria*,
   [2005] E.C.R. I-5969 .........................................................................................19

Case 235/87, *Annunziata Matteucci v Communauté française de Belgique*,
   [1988] E.C.R. 05589, EU:C:1988:460................................................................17

Case 286/86, *Ministère Public v. Deserbais*,
   [1988] E.C.R. 4907 ..................................................................................................19

Case C-301/08, *Bogiatzi v. Deutscher Luftpool et al.*,
   [2009] E.C.R. I-10185 ...........................................................................................19

Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"),
   30 May 2006, ECLI:EU:C:2006:345 .....................................................................20

Case 478/07, 3, *Budějovický Budvar v. Rudolf Ammersin GmBH*,
   [2009] E.C.R. I-07721 ...........................................................................................17

Cases C-241/91 P and C-242/91 P, *RTE and ITP v. Commission*,
   [1995] E.C.R. I-743 ...............................................................................................19

Commission Communication to the European Parliament and Council on
   Protection of intra-EU investment (July 19, 2018), COM(2018) 547 .......................5

Commission Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017)....................15

Case 10-61, *Commission v. Italy*,
   [1962] E.C.R. 1 ..........................................................................................17, 18, 19

Court of Justice Opinion 2/13, 18 December 2014 (ECLI:EU:C:2014:2454)...........4, 6

Declaration of the Government of Hungary, of 16 January 2019, on the Legal
   Consequences of the Judgment of the Court of Justice in *Achmea* and on
   Investment Protection in the European Union .........................................................10

Declaration of the Representatives of the Governments of the Member States, of
   15 January 2019, on the Legal Consequences of the Judgment of the Court of
   Justice in *Achmea* and on Investment Protection in the European Union ...............10

Declaration of the Representatives of the Governments of the Member States, of
   16 January on the Enforcement of the Judgment of the Court of Justice in
   *Achmea* and on Investment Protection in the European Union ...............................10

Final Act of the Intergovernmental Conference which Adopted the Treaty of
   Lisbon signed on 13 December 2007, 2008 O.J. C115/335 ....................................18

Opinion of Advocate General Bot, Court of Justice Opinion 1/17, Request for an
   opinion by the Kingdom of Belgium (ECLI:EU:C:2019:72) .....................12-13, 14

Opinion of Advocate General Mazák, *Bogiatzi v. Deutscher Luftpool et al.*,
   Case C-301/08, [2009] E.C.R. I-10185................................................................18

*Slovak Republic v. Achmea B.V.*,
   Case C-284/16, 6 March 2018, (ECLI:EU:C:2018:158) ...............................*passim*

iv

Statement submitted by the European Communities to the Secretariat of the
    Energy Charter Treaty pursuant to Article 26(3)(b)(iii) of the Energy Charter
    Treaty, [1998] O.J. L69/115 ...............................................................................................12

**Other Authorities**

*Electrabel SA v. Republic of Hungary*,
    ICSID Case No. ARB/07/19, Award, Nov. 25, 2015 .............................................18

J. Pauwelyn, *Conflict of Norms in Public International Law: How WTO Law
    Relates to Other Rules of International Law* (2003).................................................17

M. Cremona, *Disconnection Clauses in EU Law and Practice*, in *Mixed
    Agreements Revisited: The EU and its Member States in the World* (Hillion &
    Koutrakos eds. 2010) ................................................................................................8

Marcus Klamert, *The Principle of Loyalty in EU Law* (2014) ......................................17

O. Dörr & K. Schmalenbach, *Vienna Convention on the Law of Treaties: A
    Commentary* (2012) ..................................................................................................17

Report of the Study Group of the International Law Commission, *Fragmentation
    of International Law: Difficulties Arising from the Diversification and
    Expansion of International Law*, UN Doc. No. A/CN.4/L.682 (2006) ...........................17, 18

Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report
    on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B.
    Int'l L. Comm'n, 95 & 219.......................................................................................12

## INTEREST OF AMICUS CURIAE

The European Commission is an institution of the European Union (the "EU" or "Union"), a treaty-based international organization composed of 28 Member States.[1] Known as the "Guardian of the Treaties", the Commission is responsible, inter alia, for ensuring the proper application of the EU treaties—including the Treaty on European Union ("TEU"), and the Treaty on the Functioning of the European Union ("TFEU")—and of measures EU institutions adopt under those treaties. The Commission is also tasked with representing the EU in legal proceedings. The Commission is an independent institution and acts in the interests of the Union as a whole, rather than individual Member States. The Commission submits this amicus brief on behalf of the European Union.

The Union has a substantial interest in this case. Petitioner Novenergia, a Luxembourg entity and hence an EU company, seeks recognition and enforcement of an investment arbitration award it has obtained against the Kingdom of Spain, an EU Member State, on the basis of the Energy Charter Treaty, a multilateral investment protection treaty negotiated and signed in the 1990s to govern the EU's external energy policy. This investment award is premised on a fundamental misinterpretation of the Energy Charter Treaty and a disregard for the EU laws that form part of the international obligations of both Spain and Luxembourg and that should have governed the dispute.

The EU has a critical interest in ensuring that this Court proceeds based on a correct understanding of the principles of EU law that are at stake. Accordingly, the Commission submits this amicus brief to explain the official and binding position of the EU that the Energy

---

[1] These Member States are Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, and the United Kingdom.

Charter Treaty does not have intra-EU application.[2]  In any event, EU law precludes investor-State arbitration for intra-EU disputes, because such arbitration is contrary to Articles 267 and 344 of the TFEU and the fundamental principles of autonomy, full effectiveness, and mutual trust, which constitute the cornerstones of the EU legal order, as the Court of Justice of the European Union ("Court of Justice") confirmed in the judgment in the case of *Slovak Republic v. Achmea B.V.*, Case C-284/16, 6 March 2018, (ECLI:EU:C:2018:158).  As a result, even if— contrary to the view taken in this brief—the Energy Charter Treaty were to be interpreted as applying intra-EU, its investor-State arbitration provision (and hence any arbitration award issued under that provision) would violate higher-ranking norms of EU law in force between EU Member States, and therefore would be inapplicable as between those Member States.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Commission understands the Kingdom of Spain's position in these proceedings to be that any standing offer of arbitration contained in Article 26 is invalid as a matter of prevailing EU law.  That conclusion both deprives this Court of subject-matter jurisdiction under the Foreign Sovereign Immunities Act and forecloses recognition and enforcement of the award under the New York Convention.  The Commission agrees that recognition and enforcement must be denied, for three reasons.

*First*, the proper application of customary international law rules of treaty interpretation compels the conclusion that the Energy Charter Treaty (including Article 26, its dispute-settlement provision) does not apply intra-EU.

---

[2] The Council of the European Union when expressing its unanimous agreement with the Commission's intention to file an *amicus curiae* brief, has endorsed the Commission's view as the official position of the European Union on the matter. Six Member States—Finland, Hungary, Malta, Luxembourg, Slovenia, and Sweden—did so while referring to their declaration of 16 January 2019 on the enforcement of the judgement of the ECJ in Achmea and investment protection in the EU. *See infra* n.7 and accompanying text.  The position expressed in this brief is hence the official position of the Union on the issues addressed herein.

*Second*, alternatively, even if it were possible to interpret Article 26 as encompassing intra-EU disputes, such an interpretation would conflict with the EU Treaties, and that conflict— as a matter of international law—must be resolved in favor of EU law.  Because EU law is part of public international law binding on all EU Member States, as well as the law in force in Sweden (the seat of the underlying arbitration)—i.e., the sets of laws that may govern the validity of the arbitration agreement—the inapplicability of Article 26 as a matter of EU law means that Spain has made no valid offer for arbitration to investors from other EU Member States, and no valid arbitration agreement exists between Novenergia and Spain.

*Third*, principles of international comity and due respect for foreign sovereigns counsel in favor of denying enforcement.  This dispute has no connection with the United States, and the United States therefore has no interest in the adjudication of this controversy in its courts.  By contrast, the EU has an overwhelming interest in this dispute and the fundamental structural questions of EU law that it raises.

That is particularly so because the European Commission, in the exercise of its authority to enforce EU competition law, has issued a decision regarding Spain's EU law obligations in relation to this dispute.  In that binding decision, the Commission observed that Spain has a legal obligation not to pay the arbitration award until the Commission decides, based on its EU competition law powers, whether or not to authorize such payment.  Novenergia could have challenged that decision in the European courts, but decided not to do so.  Novenergia is now bound to respect the Commission decision and Spain is precluded as a matter of EU law from implementing the award, except if the Commission authorizes such payment.

Rather than insert itself into the internal affairs of the EU, this Court should permit the compatibility of intra-EU investor-State arbitration with the EU Treaties, and the lawfulness of

the payment of arbitration awards that may implicate EU competition law, to be decided within the EU judicial system, which offers a complete and effective system of judicial redress.

## RELEVANT LEGAL BACKGROUND

### A.    The nature and special characteristics of the EU legal order

The EU is a treaty-based regional international organization of 28 Member States.  At present, the EU Treaties are the Treaty on the Functioning of the European Union ("TFEU"), Oct. 26, 2012, 2012 O.J. (C 326) 47 and the Treaty on European Union ("TEU"), Oct. 26, 2012, 2012 O.J. (C 326) 13 (collectively, the "EU Treaties").  While the EU retains an international character—the 28 Member States remain the "masters of the Treaties" and the terms of their membership in the Union—the EU also represents the most ambitious project of economic, political, and social integration hitherto known in international law.  Under the EU Treaties, the EU Member States have transferred legislative, regulatory and enforcement competences in a large number of fields to the Union and its institutions.  EU Member States owe each other and the Union expansive duties of loyalty and mutual trust, and the process of European integration under the EU Treaties has "given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other."  Court of Justice Opinion 2/13 ("Accession of the European Union to the European Convention on Human Rights"), 18 December 2014 (ECLI:EU:C:2014:2454), ¶ 167, https://bit.ly/2SouafF; *Achmea*, ¶ 33.

One of the original and central purposes of the EU Treaties is the establishment and proper functioning of the "internal market," defined in the TFEU as "an area without internal frontiers in which the free movement of goods, persons, services and capital is ensured."  TFEU art. 26(2).  The EU's internal market rules are contained in the Treaties, EU legislation and the case law of the Court of Justice of the European Union ("Court of Justice").  These rules cover

all cross-border economic activities in the EU, including investment activities.  Internal market rules secure to EU investors fundamental and directly enforceable rights throughout the investment cycle, but also impose obligations, including the obligation to comply with EU competition law and various regulatory standards that are designed to ensure that the internal market functions as a level, integrated playing field for all actors doing business in it.[3] Importantly for present purposes, the EU Treaties charge the Commission with the enforcement of EU competition law, including the investigation and control of any publicly funded support and/or subsidy schemes introduced by the Member States (known as "State aid") that distort or threaten to distort competition in the internal market.  TFEU arts. 107 & 108.

The integrity of the EU legal order (including the internal market) is safeguarded by the EU judicial system, which consists of Member State courts and the Court of Justice.  *See Protection of intra-EU investment*, at 20–26.  The keystone of that judicial system is the preliminary ruling procedure provided for in Article 267 of the TFEU, whereby national courts may (and, where they are courts of final instance, must) refer any relevant question of interpretation and application of EU law raised in proceedings before them to the Court of Justice for a preliminary ruling.  In addition, Article 344 of the TFEU prohibits Member States from creating dispute settlement mechanisms other than those set out in the EU Treaties on any matters implicating EU law.  These two fundamental provisions provide the Court of Justice with exclusive jurisdiction to issue final and binding interpretations of EU law and thus guarantee the correct and uniform application of EU law in all the numerous areas in which it is applicable.  In

---

[3] For an overview of the EU internal market rules, see Commission Communication to the European Parliament and Council on Protection of intra-EU investment (July 19, 2018), COM(2018) 547, at 3–4, https://bit.ly/2XtniBb [hereinafter "*Protection of intra-EU investment*"].

this manner, Articles 267 and 344 of the TFEU "ensure that the specific characteristics and the autonomy of the EU legal order are preserved."  Opinion 2/13, ¶ 174; *Achmea*, ¶ 35.

In accordance with the doctrines established by the Court of Justice as far back as the 1960s, EU law enjoys primacy over any competing rules generated by EU Member States, whether by domestic legislation or international treaty.  Primacy of EU law is recognized and accepted by all Member States and is fundamental to the achievement of the ambitious goals set out in the EU Treaties, which would be severely undermined if Member States were permitted to deviate from the Treaties by means of conflicting domestic measures or *inter se* agreements.  In other words, EU law has a mandatory character for EU Member States and (where applicable) their nationals, and can only be changed in the manner set forth in the EU Treaties.

Finally, the relations between EU Member States are governed by the principle of "mutual trust," including the trust in each others' judiciaries, which, in the words of the Court of Justice, is what "allows an area without internal borders to be created and maintained."  Opinion 2/13, ¶ 191.  The principles of autonomy, primacy and mutual trust are central to a proper understanding of the issues in dispute in this case.

**B.    The Energy Charter Treaty ("ECT")**

As set out in in great detail in the Commission's *Amicus Curiae* Brief to the Novenergia arbitral tribunal, *see* Decl. of Nicholas Renzler, Ex. 4, ECF No. 18-11, at 522–55, the ECT[4] was essentially the brainchild of the EU.  The ECT was concluded on the initiative of the EU, based on the European Energy Charter prepared by the EU, at an energy conference convened and funded by the EU.

---

[4] Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998, 2080 U.N.T.S 95 (1995) ("ECT").

The purpose of the ECT was to create a framework for energy cooperation between, on the one hand, the EU, and, on the other, the former communist countries of Central and Eastern Europe. That cooperation framework was intended to facilitate those countries' transition to the market economy, to prepare them for eventual accession to the EU and to enhance energy security, efficiency and cooperation throughout the continent of Europe and its immediate vicinity by extending the free-market principles of the EU's existing energy policy beyond the Union's borders.

The ECT was thus an instrument of the EU's external energy policy, in which the EU and its Member States acted as a single block.[5] However, the EU and its Member States never intended the ECT to affect intra-EU relations. The EU's internal energy policy consists of an elaborate system of rules based on the EU Treaties and EU legislation designed to ensure the achievement of a single internal market for energy, including full protection for energy investors under the EU's internal market rules. EU law does not permit EU Member States (or, indeed, the EU itself) to modify or replace those rules by an international treaty such as the ECT; nor was it ever the Member States' intention to do so. On the contrary, it was always understood that the ECT would create rights and obligations vis-à-vis third countries, and not within the internal energy market, which remains governed by the EU Treaties.[6]

---

[5] The ECT was signed by the EU as well as its Member States because at the time, the EU did not possess full external competence over all matters to which the ECT applies.

[6] The fact that the ECT does not specifically provide that Article 26 is inapplicable to intra-EU disputes (by means of a so-called "disconnection clause") is irrelevant. Disconnection clauses serve to notify non-EU Member States that are parties to a multilateral treaty that EU law will apply as between EU Member States that are also parties to the treaty. They have no bearing on intra-EU relations. As one commentator has put it, the "failure to [include a disconnection clause in a multilateral treaty] would not alter the Union law obligation whereby Union law takes precedence as regards Member States' relations *inter se*." M. Cremona, *Disconnection Clauses in EU Law and Practice*, in *Mixed Agreements Revisited: The EU and its Member States in the World* 166 (Hillion & Koutrakos eds. 2010); *see also* Reply Decl. of Steffen Hindelang, ¶¶ 29-33, ECF No. 25-3.

### C.    The *Achmea* Judgment

Intra-EU investor-state arbitration is a relatively recent phenomenon that arose as a result of the 2004 accession to the Union of ten Central and Eastern European States that had bilateral investment treaties ("BITs") with existing EU Member States—as well as certain EU investors' ability to convince arbitral tribunals that investor-State arbitration provisions like Article 26 of the ECT entitled them to initiate such arbitration against other EU Member States.  From the outset, the Commission took the position that the EU Treaties precluded such intra-EU investment arbitration and intervened in numerous intra-EU investment proceedings arguing accordingly.

One such proceeding was *Achmea B.V. v. Slovak Republic*, an arbitration brought on the basis of a BIT between the Slovak Republic and the Netherlands. In that case, both the Slovak Republic and the Commission argued that arbitration under the BIT contravened several fundamental principles derived from the EU Treaties, and, in particular, undermined the integrity of the EU's judicial system secured in Articles 267 and 344 of the TFEU, and thus the effectiveness and mandatory nature of the EU Treaties. However, the *Achmea* arbitral tribunal rejected those arguments and adopted its own interpretation of the EU Treaties, which denied the existence of any conflict between the EU Treaties and the BIT.  Consequently, the *Achmea* arbitral tribunal exercised jurisdiction and proceeded to issue an award in the investor's favor.

The Slovak Republic sought to set aside the award in Germany, where the arbitration was seated.  Pursuant to Article 267 of the TFEU, the *Bundesgerichtshof* (Federal Court of Justice, the highest civil court in Germany) sought a preliminary ruling from the EU Court of Justice clarifying whether Articles 267 and 344 of the TFEU precluded the application of the arbitration provision at issue.

8

The EU Court of Justice, sitting as a Grand Chamber of fifteen distinguished judges—a configuration reserved for matters of high precedential importance—answered that question in the affirmative.  Drawing on consistent prior case law and the general principles of autonomy and mutual trust discussed above, the Court concluded that disputes before intra-EU investor-state tribunals may well give rise to questions of EU law.  However, given that such tribunals are deliberately placed outside the EU judicial system—and thus unable to refer any questions of EU law that may arise to the Court of Justice—there is no mechanism to ensure that the disputes brought before them will be "resolved in a manner that ensures the full effectiveness of EU law." *Achmea*, ¶ 56.  Accordingly, the Court of Justice held that Articles 267 and 344 of the TFEU "must be interpreted as precluding a provision in an international agreement concluded between Member States" that permits "an investor from one of those Member States … in the event of a dispute concerning investments in the other Member States, [t]o bring proceedings against the latter Member State before an arbitral tribunal … ." *Achmea*, ¶ 60.  In other words, the *Achmea* judgment confirmed that the TFEU had always prohibited EU Member States from offering to resolve intra-EU investor-State disputes before international arbitral tribunals.

Following the *Achmea* judgment, the German *Bundesgerichtshof* duly annulled the award at its seat, on the grounds of lack of a validly formed arbitration agreement.

**D.     EU Member States' declarations on the legal consequences of the *Achmea* Judgment**

On January 15 and 16, 2019, all EU Member States issued, in substance, the same declaration setting forth the EU's position on the legal consequences of the *Achmea* judgment as regards intra-EU BITs.  In particular, they confirmed the long-standing principle of primacy of EU law over intra-EU agreements and explained that "all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to

Union law and thus inapplicable. ... An arbitral tribunal established on the basis of such investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment treaty." Ex. A; *see also* Exs. B & C.[7]

The vast majority of the Member States (22 out of 28) further noted that "[a]rbitral tribunals have interpreted the [ECT] as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the [EU] Treaties and thus would have to be disapplied." Ex. A. The Member States thus undertook, among other things, to inform investment tribunals about the legal consequences of the *Achmea* judgment in all pending intra-EU investment arbitrations (whether based on BITs or the ECT), and to request all state courts—including courts outside the EU—to set aside or decline to enforce any intra-EU investment arbitration awards due to lack of valid consent to arbitration. Ex. A.

Five Member States issued a separate declaration in which they refrained from taking a position on the status of the ECT, given that the issue was being litigated in national courts. Ex. B. One Member State (Hungary) issued an individual declaration opining that "the *Achmea* judgment concerns only intra-EU bilateral investment treaties" and "is silent on the investor-state arbitration clause in" the ECT. Ex. C. Notably, no Member State took the view that intra-EU ECT arbitration was compatible with, and permitted under, the international obligations incumbent upon Member States under the EU Treaties.

---

[7] Attached as Exhibits A, B, and C, respectively, are true and correct copies of the Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2QXx36m; the Declaration of the Representatives of the Governments of the Member States, of 16 January on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2Xi4C7H; and the Declaration of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2Et8wTD.

**ARGUMENT**

I.    **The Energy Charter Treaty, properly interpreted under the rules of customary international law on treaty interpretation, does not apply intra-EU.**

Customary international law requires the ECT to be "interpreted in good faith, in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." Vienna Convention on the Law of Treaties art. 31(1), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 ("VCLT"). Furthermore, the law *requires* the interpreter to take into account (*i.e.* prohibits the interpreter to disregard) "any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty" and "any relevant rules of international law applicable in the relations between the parties." *Id.* art. 31(3)(c). Any remaining ambiguities or obscurities in the meaning of the treaty may be resolved by recourse to, inter alia, the circumstances of the treaty's conclusion. *Id.* art. 32. Treaty interpretation is a "single combined operation" without any hierarchy between interpretative elements. Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. Comm'n, 95 & 219.

As set out *supra* pp. 6–7 (and in much greater detail in the Commission's *amicus curiae* submission to the Novenergia arbitral tribunal, Renzler Decl., Ex. 4, ECF No. 18-11), the historical context in which the ECT came about clearly indicates that it was not intended to bind EU Member States *inter se*. This also follows from the text of the ECT's provisions, which, among other things, acknowledge the EU's powers to make binding decisions in respect of its Member States, ECT art. 13(3), and provide that the EU and its Member States shall vote at the Energy Charter Conference as a single block, *id.* art. 36(7). Furthermore, with specific regard to investor-State arbitration under Article 26 of the ECT, the EU and its Member States submitted a

declaration showing that they envisaged that provision to be used for claims by *third-country* investors (in which case, the EU and the Member States reserved the right to designate the proper respondent, depending on the internal division of competences between the Member States and the Union). Statement submitted by the European Communities to the Secretariat of the Energy Charter Treaty pursuant to Article 26(3)(b)(iii) of the Energy Charter Treaty, [1998] O.J. L69/115. The vast majority of the EU Member States further reconfirmed this position in the declarations issued on 15 and 16 January 2019, *see supra* n.7, as did the Council of the EU when authorizing the filing of this brief, *see supra* n.2.

Article 26 of the ECT creates investor-state jurisdiction in "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former." The terms "Investor," "Contracting Party" and "Area" are, in turn, defined in Article 1 of the ECT. In light of the context, the object and purpose of the ECT as an instrument of the EU's external policy, and the circumstances of the ECT's conclusion as set out *supra* pp. 6–7, the ordinary meaning of these provisions must be understood as excluding EU "Investors" investing in the "Area" of the EU. Such investors are not "Investor[s] of another Contracting Party" in relation to EU Member States. Rather, they are "Investors" of one "Contracting Party" (the EU), making investments in the "Area" of that same Contracting Party. Such investors thus invest in "their own economic area," Opinion of Advocate General Bot, Court of Justice Opinion 1/17 ("EU-Canada Comprehensive Economic and Trade Agreement"), Request for an opinion by the Kingdom of Belgium (ECLI:EU:C:2019:72), ¶ 207,

https://bit.ly/2BPbyA0, and are not "foreign" investors for whom the investor-State mechanism in the ECT was intended.[8]

## II.    The EU Treaties preclude Member States from offering to arbitrate intra-EU disputes under the Energy Charter Treaty

In the alternative, even assuming the ECT could be interpreted to apply intra-EU, the application of Article 26 of the ECT to intra-EU disputes would be contrary to the TFEU as interpreted by the Court of Justice in *Achmea*.  Given the prevalence of the TFEU over all other international agreements between EU Member States, any offer of intra-EU arbitration contained in the ECT is therefore ineffective and cannot have given rise to a valid arbitration agreement.

### A.    Intra-EU arbitration under Article 26 conflicts with the EU Treaties and fundamental principles of EU law

The interpretation of Article 267 and 344 of the TFEU adopted in *Achmea* applies to intra-EU investor-State arbitration under the ECT with at least the same force as it does to intra-EU investor-state arbitration under a BIT.

As pointed out in a recent opinion by the Court of Justice Advocate General, the *Achmea* judgment is primarily based on "the idea that the judicial system of the European Union, in so far as it is based on mutual trust and sincere cooperation between Member States, is inherently incompatible with the possibility of Member States establishing, in their bilateral relations, a parallel dispute settlement mechanism which may concern the interpretation and application of EU law." Bot, Opinion 1/17, ¶ 105.

Just as in investment disputes arising out of intra-EU investments under a BIT, disputes arising out of intra-EU investments under the ECT "are liable to relate to the interpretation or application of EU law." *Achmea*, ¶ 39.  But arbitral tribunals convened under the ECT are no

---

[8] The Advocate General's duty is to provide impartial, independent submissions on certain cases brought before the Court of Justice in order to assist the Court in its judicial task.

more a part of the EU judicial system than are arbitral tribunals convened under BITs. Like the

arbitral tribunal in *Achmea*, an arbitral tribunal constituted under the ECT lies beyond the

supervision and control of the EU system, and thus its pronouncements on matters of EU law

pose a threat to the integrity of the EU legal order and the principles of sincere cooperation and

mutual trust applicable between the EU and its Member States.

This dispute is a case in point. Novenergia's claims in the underlying arbitration concern

Spanish measures to support renewable energy, which were intended to achieve the renewable

energy targets laid down in the EU's Renewable Energy Directive. Novenergia's complaint

under the ECT was that Spain "unfairly and inequitably" modified that support scheme to the

detriment of Novenergia.[9]

However, in order to ensure fair competition in the internal market, Article 107 of the

TFEU prohibits Member States from providing undertakings with public support (known as

"State aid"), unless such support was first notified to the Commission and specifically approved

by it on defined public policy grounds and in strict compliance with the principles of necessity

and proportionality. In its capacity as the Union's State aid regulator, the Commission

investigates potential State aid measures and renders legally binding decisions based on the

provisions of the EU Treaties.

The Spanish support scheme to which Novenergia and other investors claimed they were

entitled under the ECT was never notified to the Commission and therefore constituted unlawful

State aid. Spain did, however, notify its modifications to the support scheme. In the ensuing

State aid proceedings, the Commission received several submissions from existing investors that

---

[9] Novenergia's claim is based on Article 10 of the ECT, which provides that Contracting Parties shall accord "fair and equitable treatment" to investments of investors of other Contracting Parties.

argued that Spain's modification of the scheme violated their rights under both EU law and the ECT because they held legitimate expectations that the original scheme would be maintained.

In its legally binding decision on the matter, the Commission pointed out that, in accordance with established EU State aid law, an investor cannot rely on legitimate expectations to receive State aid that had not been notified to and approved by the Commission before being granted. Ex. F, ¶¶ 155-58.[10]  This rule could not be circumvented by relying on Article 10 of the ECT, because, in an intra-EU situation, the fair and equitable treatment standard in that provision had to be interpreted in conformity with EU law. *Id.* ¶ 164.  The Commission further reiterated that any provision that provides for investor-State arbitration between two Member States is contrary to Union law, including "the general principles of Union law of primacy, unity and effectiveness of Union law, of mutual trust and of legal certainty." *Id.* ¶ 160.  Finally, the Commission pointed out that any compensation based on an arbitral award granted to an EU investor under the ECT on the basis that Spain has modified its support scheme would in itself amount to State aid, and that any payment of such awards by Spain without prior notification to, and approval by, the Commission would itself be unlawful as a matter of EU law. *Id.* ¶ 165.

Both Spain and the Commission presented this decision to the Novenergia arbitral tribunal and requested that the tribunal take it into account as a matter of binding international law applicable in the ECT dispute under Article 26(6) of the ECT.  Nevertheless, the Novenergia arbitral tribunal disregarded this request—and indeed refused to take EU law into consideration altogether.  Instead, the tribunal held that EU State aid law was "entirely irrelevant to the determinations pertaining to this Tribunal" and proceeded to order Spain to pay compensation to Novenergia for the subsidies Novenergia had claimed.  Final Award, *Novenergia II v. Kingdom*

---

[10] Commission Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017).

*of Spain*, SCC Case No. 2015/063, ¶ 465) (Decl. of Fernando Mantilla-Serrano, Ex. 2, ECF No. 2-1).  Spain has moved to set aside the award before the competent court in Sweden (the seat of the arbitration) and has also requested that the Swedish court refer the matter to the EU Court of Justice for a preliminary ruling.  As a result of Novenergia's petition for recognition and enforcement in this Court, Spain is now faced with extra-EU judicial proceedings to enforce the Novenergia tribunal's award—which could place Spain in the impossible position of having to choose between complying with the order of an enforcing court or violating fundamental principles of EU law.

The Novenergia arbitral tribunal's failure to properly interpret and apply the rules of EU law in a dispute concerning a subsidy that constitutes unlawful State aid, and the impossibility of having such failure rectified by the EU's judicial system directly undermines the autonomy and effectiveness of EU law in the precise manner envisaged by the Court of Justice in the *Achmea* Judgment.  If EU investors could escape otherwise applicable mandatory EU law on State aid by convincing a private international arbitral tribunal (that may consider itself not to be bound by EU law) that applying such rules would be "unfair" or "inequitable" to the investors under the ECT, EU competition law would be a dead letter. That result constitutes precisely the kind of problem addressed in the *Achmea* judgment and provides a practical illustration of a direct conflict between the mandatory rules of EU law and any intra-EU applicability of investment arbitration provisions contained in the ECT.

**B.      The conflict between ECT Article 26 and the EU Treaties must be resolved in favor of EU law.**

The issue of treaty conflict is an issue of international law.  Where two or more treaties impose conflicting obligations, customary international law governs the resolution of those conflicts.  While customary law provides residual rules for the resolution of treaty conflict, *see*

VCLT arts. 30 & 59, it is well recognized that that sovereign States may regulate the relationship between present and future international treaties between those same States by special rules, including by entering into a treaty that claims precedence over all others.[11]

EU Member States have done precisely that by means of the EU Treaties, which establish the primacy of EU law over Member States' other international obligations *inter se*. In other words, primacy of EU law is a special rule of conflict pursuant to international law. As explained *supra* p.6, the principle of primacy of EU law applies equally to domestic law and intra-EU international treaties: a rule derived inter alia from Article 351 of the TFEU.[12] Indeed, for that purpose, "rules resulting from international agreements by which the Member State concerned is bound" form part of "domestic law." *See, e.g.*, Opinion of Advocate General Mazák, *Bogiatzi v. Deutscher Luftpool et al.*, Case C-301/08, [2009] E.C.R. I-10185, ¶ 55; Marcus Klamert, *The Principle of Loyalty in EU Law* 180 (2014). And in Declaration No. 17 to the 2007 Lisbon Treaty (amending the EU Treaties) the Member States expressly confirmed the primacy of Union law over "domestic legal provisions, *however framed*." Ex. D.[13]

---

[11] *See, e.g.*, Report of the Study Group of the International Law Commission, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, UN Doc. No. A/CN.4/L.682 (2006), ¶ 470 (referring to the "truism that 'general international law' is applied generally and foresees the eventuality that another rule of conventional international law is applicable in the relations between the parties"); O. Dörr & K. Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary* 546 (2012); J. Pauwelyn, *Conflict of Norms in Public International Law: How WTO Law Relates to Other Rules of International Law* 363 (2003).

[12] As confirmed in consistent Court of Justice case law, Article 351 of the TFEU, which safeguards the effects of international obligations of EU Member States vis-à-vis third countries where such obligations predate the entry into force of the EU Treaties, by necessary implication means that international obligations of EU Member States *inter se* are not protected from the effects of the EU Treaties and are subject to their primacy. *See infra* pp. 19-20 (discussing *Commission v. Italy* and subsequent cases); *see also, e.g.*, Case 478/07, *Budějovický Budvar v. Rudolf Ammersin GmBH*, [2009] E.C.R. I-07721, ¶¶ 97-99; Case 121/85, *Conegate Ltd. v. HM Customs & Excise*, [1986] E.C.R. 01007, EU:C:1986:114, ¶ 25; Case 235/87, *Annunziata Matteucci v Communauté française de Belgique*, [1988] E.C.R. 05589, EU:C:1988:460, ¶ 22; Case 3/91, *Exportur v. LOR*, [1992] E.C.R. I-05529, EU:C:1992:420, ¶ 8.

[13] Declarations Annexed to the Final Act of the Intergovernmental Conference which Adopted the Treaty of Lisbon signed on 13 December 2007, 2008 O.J. C115/335, at 344.

This rule resolving conflicts in favor of the TFEU over other international agreements between Member States is uncontroversial. The International Law Commission in 2004 acknowledged the rule in its Report on Fragmentation of International Law, which unequivocally recognized the "absolute precedence" of the TFEU over any intra-EU international agreements. The German Federal Supreme Court was likewise clear in its recent order setting aside the arbitral award in the *Achmea* case:

> [B]y acceding to the EU the Member States have limited their discretionary powers under international law and have mutually agreed to renounce the exercise of any international treaty rights which conflict with EU law. In view of this, the primacy of the provisions of EU law has the consequence that a rule in an intra-EU agreement between Member States which is incompatible with EU law is also inapplicable as a rule in an international treaty. The nationals of the Member States concerned cannot rely on the Member States' prior international law obligations that are contrary to EU law.

Ex. E, ¶ 41.[14] And the tribunal in *Electrabel v. Hungary* (to the Commission's knowledge, the only investor-State tribunal to have engaged in a detailed and comprehensive analysis of the issue) likewise concluded that EU-inconsistent treaties "do not survive" within the EU. *Electrabel SA v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, Nov. 25, 2015, ¶ 4.183.

It is important to emphasize that the principle of primacy of EU law also extends to any intra-EU application of multilateral treaties, even where third countries are also parties to those treaties. Based on Article 351 of the TFEU, the Court of Justice has held in a number of judgments—beginning with the 1962 case of *Commission v. Italy*, Case 10-61, [1962] E.C.R. 1—that such treaties do not apply within the EU if they are contrary to any rule of EU law, unless they affect the rights of third countries.

---

[14] *Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.* (Oct. 31, 2018), I ZB 2/15 (English translation).

*Commission v. Italy* itself concerned the General Agreement on Tariffs and Trade ("GATT"), a multilateral treaty to which non-EU Member States were also party. In later cases, the Court applied the rule set forth in *Commission v. Italy* to numerous other multilateral treaties, such as the Stresa Convention on Cheeses, *see* Case 286/86, *Ministère Public v. Deserbais*, [1988] E.C.R. 4907; the Berne Convention for the Protection of Literary and Artistic Works, *see* Joined Cases C-241/91 P and C-242/91 P, *RTE and ITP v. Commission*, [1995] E.C.R. I-743; the Council of Europe Convention on the Equivalence of Diplomas, *see* Case 147/03, *Commission v. Austria*, [2005] E.C.R. I-5969; and the Warsaw Convention on International Carriage by Air, *see* Case C-301/08, *Bogiatzi v. Deutscher Luftpool et al.*, [2009] E.C.R. I-10185. All obligations contained in these treaties, to the extent they conflicted with the EU Treaties, were not applicable and had to be set aside within the EU.

There is no reason to treat the ECT as an exception to this rule. Indeed, the *Achmea* judgment expressly applies to "international agreements concluded between the Member States" —the exact same term that was used in *Commission v. Italy* to refer to the intra-EU application of GATT. *Compare Achmea* ¶ 62 *with Commission v. Italy*, [1962] E.C.R. at 10. Multilateral treaties providing for intra-EU investment arbitration such as the ECT are thus clearly within the scope of the *Achmea* Judgment, for the purposes of which they are no different from purely bilateral agreements.

The fact that the EU itself is a party to the ECT (whereas the BIT in *Achmea* involved only individual Member States) does not obviate the conflict between EU law and the ECT or render the reasoning of *Achmea* inapposite. The best example is the judgment of the Court of Justice in Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"), 30 May 2006, ECLI:EU:C:2006:345, where the Court held that an inter-State arbitration provision contained in

the UN Convention on the Law of the Sea (UNCLOS) could not be applied in a dispute between

two EU Member States, given that (in the same way as in *Achmea*) such application would

violate Article 344 of the TFEU and the principle of autonomy of EU law.  The fact that the EU

was party to UNCLOS (in the same way as it is party to the ECT) did not remove the

incompatibility.

In short, as regards intra-EU relations the TFEU (as interpreted authoritatively by the

Court of Justice) unequivocally regulates its relationship with *inter se* international obligations of

EU Member States in favor of the absolute precedence of EU law in case of any conflict.  This

includes Member States' obligations under multilateral treaties (to the extent the rights of non-

Member States remain unaffected), and therefore includes their obligations under the ECT.

It follows from the *Achmea* judgment that any international treaty provision permitting

intra-EU investment arbitration is contrary to the TFEU. Article 26 of the ECT is precisely such

a provision. Therefore, pursuant to the conflict rule inherent in the TFEU, Article 26 of the ECT

cannot apply in intra-EU relations.  The Novenergia dispute concerns purely intra-EU relations

and does not concern any third countries or their investors.  It follows that, in accordance with

the well-established and accepted conflict rules applicable as between EU Member States,

Article 26 of the ECT is inapplicable in this matter and therefore cannot have given rise to a

valid arbitration agreement.

**III.    At a minimum, international comity favors allowing the compatibility of intra-EU arbitration under the ECT to be decided within the EU judicial system.**

As the above makes clear, whether intra-EU arbitration pursuant to Article 26 of the ECT

is compatible with the EU Treaties raises significant questions that implicate not simply EU law

but also the very structure of the EU legal order.  The doctrine of international comity—which

permits U.S. courts to dismiss or stay domestic action based on the interests of the United States,

the foreign government, and the international community in having a dispute resolved in a foreign forum—weighs heavily in favor of permitting these questions to be resolved within the EU judicial system. *See, e.g., Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).

The position of the EU is that intra-EU arbitration under the ECT is fundamentally incompatible with EU law—a conclusion that clearly follows from the Court of Justice's recent pronouncement in *Achmea*. Nevertheless, the EU recognizes that controversy over this conclusion remains. Resolving that controversy touches on matters of vital importance to the EU, including the role and jurisdiction of EU courts, the interpretation and application of EU law by non-EU adjudicatory bodies, and the future of investor-State arbitration within the EU.

These questions are best decided by EU courts, within the EU judicial system. Proper respect for foreign sovereigns counsels strongly in favor of permitting the enforceability of the Award to be debated and decided by the courts of the EU Member States and ultimately the Court of Justice of the EU. Indeed, that debate is already under way. Questions about the enforceability of an award rendered by an intra-EU ECT tribunal are percolating through the EU judicial system. In this very case, the Svea Court in Sweden (the seat of the arbitration) has already suspended enforcement of the Award. *See* Decl. of Pontus Ewerlöf, Ex. 2, Decision of the Svea Court of Appeal, May 17, 2018, at 2. Spain requested that the Svea Court set aside the Award and refer the matter to the Court of Justice for a preliminary ruling. *See* Ewerlöf Decl., Ex. 1. If that request is granted, the Court of Justice will soon be in a position to provide an authoritative, final and specific decision on the compatibility of intra-EU arbitrations under the ECT with EU law.

In addition, as noted *supra* p.15, the Commission has already issued a decision in the field of State aid, determining that, as a matter of EU competition law, Spain has a legal obligation not to pay the compensation awarded by the investment tribunal unless and until the Commission authorizes such payment in accordance with the applicable State aid rules. Novenergia could have challenged that decision in the European courts, but chose not to do so. As a result, Novenergia must respect that decision and Spain is precluded as a matter of EU law from implementing the award, absent authorization from the Commission. If the Commission refuses authorization, Novenergia may seek redress in EU courts.

While the EU's interests in the resolution of these questions are immense, the United States has no interest in the answers to these questions, nor even in the outcome of individual intra-EU investor-State disputes. Neither party to the underlying dispute between Novenergia and Spain is a U.S. citizen, no U.S. property is at issue, and none of the underlying events took place on U.S. territory. U.S. law is only implicated to the extent that Novenergia has asserted jurisdiction under the Foreign Sovereign Immunities Act and seeks to enforce the award pursuant to the New York Convention—which Convention is also equally binding on all 28 Member States of the EU. Rather than embroil itself in the internal affairs of the EU, this Court should deny recognition and enforcement of the Award—or, at a minimum, stay enforcement proceedings pending the resolution of the proceedings before the Swedish courts—so that the questions implicated by this dispute may be decided by the courts of the Member States and the EU Court of Justice, all of which have an infinitely greater stake in these issues than U.S. courts.

## CONCLUSION

For the foregoing reasons and those set forth in Respondent's submissions, the Court should grant the Kingdom of Spain's motion to dismiss the petition and deny recognition and enforcement of the Award.  In the alternative, the Court should stay enforcement proceedings pending resolution of the proceedings before the Svea Court in Sweden.

Dated: February 28, 2019                    Respectfully submitted,

                                            */s/ R. Stanton Jones*
                                            R. Stanton Jones (D.C. Bar No. 987088)
                                            Sally L. Pei (D.C. Bar No. 1030194)
                                            ARNOLD & PORTER
                                              KAYE SCHOLER LLP
                                            601 Massachusetts Ave., NW
                                            Washington, DC  20001-3743
                                            T: (202) 942-5000
                                            stanton.jones@arnoldporter.com

                                            Dmitri Evseev (D.C. Bar No. 487747)
                                            *Pro hac vice* application to be filed
                                            ARNOLD & PORTER
                                              KAYE SCHOLER LLP
                                            Tower 42
                                            25 Old Broad Street
                                            London EC2N 1HQ
                                            UNITED KINGDOM
                                            T: +44 (0)20 7786 6100
                                            dmitri.evseev@arnoldporter.com

               *Counsel for Proposed Amicus Curiae*