# EXHIBIT 62

# EU LAW

## Text, Cases, and Materials

### SIXTH EDITION

Paul Craig

and

Gráinne de Búrca



OXFORD

UNIVERSITY PRESS



**OXFORD**
UNIVERSITY PRESS

Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© Text, Introductory Materials, Selection, and Notes
Paul Craig and Gráinne de Búrca, 2015

The moral rights of the authors have been asserted

Third edition 2002
Fourth edition 2008
Fifth edition 2011

Impression: 3

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by licence or under terms agreed with the appropriate reprographics
rights organization. Enquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

Public sector information reproduced under Open Government Licence v2.0
(http://www.nationalarchives.gov.uk/doc/open-government-licence/open-government-licence.htm)

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America

British Library Cataloguing in Publication Data
Data available

Library of Congress Control Number: 2015931992

ISBN 978-0-19-871492-7

Printed in Great Britain by
Bell and Bain Ltd, Glasgow

Links to third party websites are provided by Oxford in good faith and
for information only. Oxford disclaims any responsibility for the materials
contained in any third party website referenced in this work.

# OUTLINE CONTENTS

| | | |
|---|---|---|
| 1 | The Development of European Integration | 1 |
| 2 | The Institutions | 30 |
| 3 | Competence | 73 |
| 4 | Instruments and the Hierarchy of Norms | 105 |
| 5 | Legislation and Decision-Making | 124 |
| 6 | Decision-Making and New Forms of Governance | 162 |
| 7 | The Nature and Effect of EU Law: Direct Effect and Beyond | 184 |
| 8 | The Application of EU Law: Remedies in National Courts | 225 |
| 9 | The Relationship Between EU Law and National Law: Supremacy | 266 |
| 10 | EU International Relations Law | 316 |
| 11 | Human Rights in the EU | 380 |
| 12 | Enforcement Actions Against Member States | 429 |
| 13 | Preliminary Rulings | 464 |
| 14 | Review of Legality: Access | 509 |
| 15 | Review of Legality: Grounds of Review | 544 |
| 16 | Damages Actions and Money Claims | 583 |
| 17 | The Single Market | 607 |
| 18 | Free Movement of Goods: Duties, Charges, and Taxes | 638 |
| 19 | Free Movement of Goods: Quantitative Restrictions | 665 |
| 20 | Free Movement of Capital and Economic and Monetary Union | 721 |
| 21 | Free Movement of Workers | 744 |
| 22 | Freedom of Establishment and to Provide Services | 794 |
| 23 | Citizenship of the European Union | 852 |
| 24 | Equal Treatment and Non-Discrimination | 892 |
| 25 | AFSJ: EU Criminal Law | 964 |
| 26 | Competition Law: Article 101 | 1001 |
| 27 | Competition Law: Article 102 | 1055 |
| 28 | Competition Law: Mergers | 1090 |
| 29 | The State and the Common Market | 1117 |

primary role of the national legal system in laying down the conditions governing the grant of such a remedy, so long as they satisfied the 'twin principles' of equivalence and practical possibility. As Advocate General Warner said in *Ferwerda*:[15]

> To that one might object that, if so, there will be a lack of uniformity in the consequences of the application of Community law in the different Member States. The answer to that objection is…that this Court cannot create Community law where none exists: that must be left to the Community's legislative organs.

Further, despite some strikingly interventionist later cases, the CJEU has continued to insist, notably in the important *Unibet* ruling in 2007, that EU law does not, in principle, require the creation of new national remedies.

> 40. Although the EC Treaty has made it possible in a number of instances for private persons to bring a direct action, where appropriate, before the Community Court, it was not intended to create new remedies in the national courts to ensure the observance of Community law other than those already laid down by national law…
>
> 41. It would be otherwise only if it were apparent from the overall scheme of the national legal system in question that no legal remedy existed which made it possible to ensure, even indirectly, respect for an individual's rights under Community law.[16]

The CJEU ruled in *Unibet* that there was no need for Swedish law to provide a self-standing action to challenge the compatibility of a national provision with EU law, since there were other domestic legal remedies available which enabled the compatibility question to be raised indirectly and which complied with the twin principles.

## 3 EMERGENCE OF REQUIREMENTS OF PROPORTIONALITY, ADEQUACY, AND EFFECTIVE JUDICIAL PROTECTION

In addition to cases concerning *remedies sought by individuals against the state* for violation of EU law, cases have also arisen concerning *state responses to breaches of EU law by individuals* (enforcement of EU law by the state against individuals[17] or enforcement of EU law by individuals against individuals).

In *Sagulo*, the Court ruled that while states were entitled to impose reasonable penalties for infringements of administrative requirements governing EU residence permits by migrant workers, the penalties must not be *disproportionate* to the offence in question and must not constitute an obstacle to the exercise of fundamental EU rights such as freedom of movement.[18] On the other hand, Member

---

[15] Case 265/78 *Ferwerda v Produktschap voor Vee en Vlees* [1980] ECR 617, 640. Here the Court accepted that the systematic application of the principle of legal certainty could make it practically impossible for the authorities to recover money granted in breach of an EC reg.

[16] Case C–432/05 *Unibet Ltd v Justitiekanslern* [2007] ECR I–2271. The qualification to the 'no-new-remedies' principle in [41] is clearly significant, and the Court in *Unibet* indicated that if an individual were forced to be subject to administrative or criminal proceedings with possible penalties as the sole form of legal remedy for challenging the compatibility of national law with EU law, this would not constitute effective judicial protection.

[17] See, eg, in the employment context, Case C–362/13 *Fiamingo and Others* EU:C:2014:2044; Cases C–22/13, C–61–63/13 and C–418/13 *Mascolo* EU:C:2014:2401.

[18] Case 8/77 *Sagulo, Brenca and Bakhouche* [1977] ECR 1495, [12]–[13]; Case 77/81 *Zuckerfabrik Franken* [1982] ECR 681.

States are *required* by EU law—more specifically by Article 4(3) TEU—to take 'all effective measures to sanction conduct which affects the financial interests' of the EU.[19] Moreover the states may impose criminal penalties even where EU legislation provides only for civil sanctions, so long as any penalties imposed satisfy the principle of equivalence and are 'effective, proportionate and dissuasive'.[20]

Other cases concern the adequacy and deterrent effect of national penalties for breaches by private parties of fundamental EU rules.[21] In *Von Colson*, the Court was asked to rule on the compatibility with EU law of national sanctions designed to remedy breaches of rights enjoyed by individuals under the Equal Treatment Directive (at the time 75/207).[22] The plaintiffs had been discriminated against on grounds of sex in applying for posts as prison workers, but they were told that they were entitled, by way of remedy, only to 'reliance loss', such as the costs of travel to the interview, and not compensation or appointment to the post. The Court ruled:

> 23. Although...full implementation of the directive does not require any specific form of sanction for unlawful discrimination, it does entail that that sanction be such as to guarantee real and effective judicial protection.
>
> ...
>
> 28. It should, however, be pointed out to the national court that although Directive No 76/207/EEC, for the purpose of imposing a sanction for the breach of the prohibition of discrimination, leaves the Member States free to choose between the different solutions suitable for achieving its objective, it nevertheless requires that if a Member State chooses to penalize breaches of that prohibition by the award of compensation, then in order to ensure that it is effective and that it has a deterrent effect, that compensation must in any event be adequate in relation to the damage sustained and must therefore amount to more than purely nominal compensation such as, for example, the reimbursement only of the expenses incurred in connection with the application.

The Court in *Von Colson* derived from the Equal Treatment Directive the more robust requirement of *adequacy and effectiveness* of national remedies, and added these to the established principles of practical possibility, equivalence and non-discrimination,[23] and proportionality of penalties. In *Kelly* and *Meister*, the CJEU ruled that a refusal of disclosure of relevant information on the part of a defendant in an employment discrimination case might be such as to undermine the effectiveness of the Directive, and could help to establish a presumption of indirect discrimination.[24] Rulings such as *Johnston*,[25] *Heylens*,[26] and *Panayotova*[27] confirmed that the stronger requirement to provide adequate and effective remedies was a general one, extending beyond sex discrimination law. In *Heylens*, a Belgian football trainer's diploma was refused recognition by the French authorities

---

[19] Case C–186/98 *Nunes and de Matos* [1999] ECR I–4883.

[20] Ibid. Where the penalty is imposed by the state under legislation which of itself is in breach of EU law, the penalty is automatically also invalid, and no question of its proportionality arises: Case C–13/01 *Safalero Srl v Prefetto di Genova* [2003] ECR I–8679. On the proportionality of penalties against corporations for breach of disclosure requirements under EU law, see Case C–418/11 *Textdata Software* EU:C:2013:588.

[21] See also Case 68/88 *Commission v Greece* [1989] ECR 2965; Cases C–378–380/07 *Kiriaki Angelidaki and Others* [2009] ECR I–03071, [159]–[176].

[22] Case 14/83 *Von Colson and Kamann v Land Nordrhein-Westfalen* [1984] ECR 1891.

[23] For cases in which national procedural rules on security for costs were found to be indirectly discriminatory, not as compared with equivalent EU law claims, but in relation to traders from other Member States, see Case C–43/95 *Data Delecta* [1996] ECR I–4661, [12]; Case C–323/95 *Hayes v Kronenberger* [1996] ECR I–1711, [13].

[24] Case C–104/10 *Kelly v NUI* EU:C:2011:506 and Case C–415/10 *Meister v Speech Design* EU:C:2012:217.

[25] Case 222/84 *Johnston v Chief Constable of the RUC* [1986] ECR 1651.

[26] Case 222/86 *UNECTEF v Heylens* [1987] ECR 4097.

[27] Case C–327/02 *Panayotova v Minister voor Vreemdelingenzaken en Integratie* [2004] ECR I–11055.

where he worked, and the CJEU, drawing on the right to an effective judicial remedy in Articles 6 and 13 ECHR, ruled:

> [S]ince free access to employment is a fundamental right which the Treaty confers individually on each worker in the Community, the existence of a remedy of a judicial nature against any decision of a national authority refusing the benefit of that right is essential in order to secure for the individual effective protection for his right.[28]

According to the Court, this right to effective judicial review generally requires the giving of reasons for the curtailment of an EU right and the opportunity to defend that right under the best possible conditions.

## 4 DEVELOPMENT OF THE 'EFFECTIVENESS' REQUIREMENT

### (A) A STRONG INITIAL REQUIREMENT

A robust line of cases in the early 1990s highlighted the tension between the emphasis on national procedural autonomy and the requirement that national remedies must secure the effectiveness of EU rights.

In *Dekker*, the applicant sought damages before the Dutch courts against an employer who, in breach of the EU Equal Treatment Directive, refused to employ her on grounds of her pregnancy. Citing *Von Colson* on the Directive's requirement of effective judicial protection, the CJEU ruled that to subject a claim for redress to a requirement of 'fault' on the part of the employer, or to a defence of justification or another ground of exemption, would undermine the Directive.[29] The fact that the Directive itself required access to a judicial remedy may account in part for the strength of the ruling, but the judgment marked a further dilution of the principle of national procedural autonomy, especially since the national rule did not discriminate between situations involving EU law and those involving domestic law, and the requirement of fault might not render the exercise of the EU right 'impossible' in practice.

In *Cotter and McDermott* the Court ruled that to permit reliance by the national authorities on a domestic law principle against unjust enrichment to deny married women payment of social welfare benefits for dependants which had previously been paid to married men but denied to married women in breach of EU sex discrimination law would allow the authorities to use their own unlawful conduct to undermine the Directive.[30] The desire to prevent the state profiting from its own wrong seems to have played as much a part in the Court's reasoning as the desire not to weaken the effectiveness of the Directive.[31]

In *Emmott*, the applicant sought retrospective payment of a disability benefit for the period in which EU Directive 79/7 on sex discrimination in social security had remained unimplemented in Ireland.[32] She had been told by the government department that no decision could be made in her case

---

[28] Case 222/86 *Heylens* (n 26) [14].

[29] Case C–177/88 *Dekker v Stichting voor Jong Volwassenen (VJV) Plus* [1990] ECR I–3941, [26].

[30] Case C–377/89 *Cotter and McDermott v Minister for Social Welfare* [1991] ECR I–1155, [21].

[31] Contrast Case 68/79 *Hans Just I/S v Danish Ministry for Fiscal Affairs* [1980] ECR 501, in which the state was not obliged to repay taxes it had imposed in breach of Community law, if that would unjustly enrich a trader who had passed on the cost of the tax to third parties. See also Cases C–192–218/95 *Comateb* (n 11); Case C–453/99 *Courage Ltd v Crehan* [2001] ECR I–6297, [30]; Cases C–295–298/04 *Manfredi v Lloyd Adriatico Assicurazion SpA et al* [2006] ECR I–6619. The difference in the way the unjust enrichment argument was treated in these cases on the one hand and in *Cotter* on the other is not always easy to understand. For further cases on this subject see (n 243).

[32] Case C–208/90 *Emmott v Minister for Social Welfare* [1991] ECR I–4269.

repossession proceedings during the EU economic crisis)[71] the Court has insisted on particularly strong procedural protection for EU rights.

## 5  THE CURRENT APPROACH: BALANCING EFFECTIVE JUDICIAL PROTECTION AND NATIONAL PROCEDURAL AUTONOMY

The position currently reached in the field of national remedies for EU rights can be summarized as follows: it requires national courts to strike an appropriate, proportionality-based, case-by-case balance between the requirement of effective judicial protection for EU law rights and the application of legitimate national procedural and remedial rules. In deciding whether a national rule or principle could undermine the exercise of an EU law right, national courts must weigh the requirements of effectiveness and equivalence in the light of the aim and function of the national rule, bearing in mind also the importance and objective of the EU right in question. This approach was first articulated clearly in the cases of *Peterbroeck*[72] and *Van Schijndel*,[73] concerning the authority of national courts to raise points of EU law of their own motion.

### (A)  EFFECTIVENESS

In this section some clusters of cases dealing with certain kinds of national procedural rule will be outlined briefly to illustrate what guidance the CJEU has given to national courts on how to undertake this balancing task.

### (i)  *The Authority of National Courts to Consider EU Law of their own Motion*

---

### Cases C–430–431/93 **Van Schijndel & Van Veen v Stichting Pensioenfonds voor Fysiotherapeuten** [1995] ECR I–4705

The applicants argued that the appeal court whose ruling they sought to challenge ought to have considered, if necessary of its own motion, the compatibility of a compulsory Pension Fund provision with EU competition law. They had not themselves previously raised any point of EU law. Under Dutch law, the national court could not raise such points of law of its own motion. On a reference, the ECJ was asked whether the national court must apply provisions of EU law even where the party to the proceedings had not relied on them. The ECJ referred first to the principle of national procedural autonomy, qualified by the principles of equivalence and practical effectiveness:

---

[71] For recent examples of strong CJEU consumer protecting rulings involving national procedural law, see Case C–169/14 *Sánchez Morcillo and Abril García* EU:C:2014:2099; Case C–415/11 *Aziz v Catalunyacaixa* EU:C:2013:164; Case C–472/11 *Banif plus Bank ZRT* EU:C:2013:88; Case C–618/10 *Banco Español de Crédito SA* EU:C:2012:349; Case C–449/13 *CA Consumer Finance SA v Ingrid Bakkaus* EU:C:2014:2464; V Trstenjak, 'Procedural Aspects of European Consumer Protection Law and the Case Law of the CJEU from the Perspective of Insurance Law' (2013) 21 ERPL 451.

[72] Case C–312/93 *Peterbroeck, Van Campenhout & Cie v Belgian State* [1995] ECR I–4599.

[73] Cases C–430–431/93 *Van Schijndel & Van Veen v Stichting Pensioenfonds voor Fysiotherapeuten* [1995] ECR I–4705.

## THE ECJ

19. For the purposes of applying those principles, each case which raises the question whether a national procedural provision renders application of Community law impossible or excessively difficult must be analysed by reference to the role of that provision in the procedure, its progress and its special features, viewed as a whole, before the various national instances. In the light of that analysis the basic principles of the domestic judicial system, such as the protection of the rights of the defence, the principle of legal certainty and the proper conduct of procedure must, where appropriate, be taken into consideration.

20. In the present case, the domestic law principle that in civil proceedings a court must or may raise points of its own motion is limited by its obligation to keep to the subject matter of the dispute and to base its decision on the facts put before it.

21. That limitation is justified by the principle that, in a civil suit, it is for the parties to take the initiative, the court being able to act of its own motion only in exceptional cases where the public interest requires its intervention. That principle reflects conceptions prevailing in most of the Member States as to the relations between the State and the individual; it safeguards the rights of the defence; and it ensures proper conduct of proceedings by, in particular, protecting them from the delays inherent in examination of new pleas.

22. In those circumstances, the answer to the second question must be that Community law does not require national courts to raise of their own motion an issue concerning the breach of provisions of Community law where examination of that issue would oblige them to abandon the passive role assigned to them by going beyond the ambit of the dispute defined by the parties themselves and relying on facts and circumstances other than those on which the party with an interest in application of those provisions bases his claim.

While *Van Schijndel* indicated that the principle of judicial passivity was compatible, on the facts, with the exercise of the EU right, the opposite conclusion was reached soon afterwards in the *Peterbroeck* case.[74] In *Peterbroeck*, where similar aims of legal certainty and the proper conduct of procedure underpinned a procedural provision of the Belgian Tax Code preventing both the parties and the court from raising a point of EU law after sixty days, the application of the rule was held by the CJEU to render the exercise of the EU right excessively difficult.[75] The different outcomes of these rulings indicate clearly that each national provision governing enforcement of an EU right before national courts must be examined and weighed not in the abstract, but in the specific circumstances of each case, to see whether it renders the exercise of that right excessively difficult. The rationale underpinning *Van Schijndel* was later affirmed and reasserted in *van der Weerd*, in which the CJEU ruled that the national court was *not* required to raise the relevant point of EU law of its own motion where the parties had had a genuine opportunity to raise the point themselves before a national court.[76]

In *Kraaijeveld*, the Court indicated that EU law does not confer a *general* power on national courts to consider points of EU law of their own motion but, pursuant to the equivalence principle, if they have a discretion or obligation to raise points of national law of their own motion they must also apply such discretion or obligation to points of EU law.[77] Similarly in *Fazenda Pública*, the Court linked the

---

[74] (N 72).

[75] This was apparently because no court or tribunal in the proceedings had had an opportunity to raise the point of EU law so as to make a reference to the CJEU. See also Case C–327/00 *Santex* (n 51), for a case in which a plea which would otherwise have been inadmissible on grounds of delay may have to have been considered by the national court due to the conduct of the defendant public authority.

[76] Cases C–222–225/05 *van der Weerd and Others* [2007] ECR I–4233.

[77] Case C–72/95 *Aannemersbedrijf PK Kraaijeveld BV v Gedeputeerde Staten van Zuid-Holland* [1996] ECR I–5403.

power, and 'in certain cases' the obligation, of national courts to make a reference to the CJEU with their power or obligation to raise points of EU law of their own motion.[78] In *Eco Swiss China Time* concerning competition law rules the Court also ruled that, since national courts were required to permit an application for annulment of an arbitration award on grounds of failure to observe national public policy rules, they must similarly raise a point based on breach of Article 101 TFEU,[79] giving EU competition law rules the same status as national public policy rules.

The CJEU in *Océano* however went beyond the equivalence requirement by declaring that the aims of the Unfair Contract Terms Directive would not be ensured if the consumer were obliged to raise the unfair nature of such terms, and that the national court *must have the power* to evaluate terms of this kind of its own motion.[80] This formulation, stronger than that of the earlier cases, was linked by the Court to the facts of *Océano* which concerned EU consumer protection law.[81] Similarly in *Banif Plus Bank*, which also concerned EU consumer protection legislation, the CJEU ruled that a national court which has decided of its own motion that a contractual term is unfair must be in a position (subject to the requirements of *audi alteram partem*) to inform the parties of this;[82] and in *Banco Español de Crédito* that a national procedural rule which does not allow a national court to examine, of its own motion, the unfairness of the contractual term unless the consumer has already lodged an objection, is precluded by EU law.[83]

By comparison, in *van der Weerd* the CJEU ruled that there was no breach of either the equivalence or the effectiveness principle.[84] In terms of equivalence, the provisions of the EU Directive on control of foot-and-mouth disease in issue, unlike EU competition rules or rules on consumer protection,[85] did not have the same status as public policy rules, so that national courts were not required to raise the point of their own motion. In terms of effectiveness, the Court in *van der Weerd* found no violation of this principle, and distinguished the situations in *Océano* and *Eco Swiss China Time* where the parties had no real opportunity to raise the point of EU law themselves before the national courts.[86]

## (ii) *Legal Certainty and* Res Judicata

In the case of *Kühne and Heitz*, the CJEU ruled that a national administrative body had to re-open a decision that had become final following a national court ruling which was based on a misunderstanding of EU law.[87] This was affirmed in *Kempter*, in which the CJEU ruled that an obligation of review would arise where the contested administrative decision which had become final was based on a misinterpretation of EU law adopted without any preliminary reference being made to the CJEU on the question.[88] The obligation would arise even where the parties themselves had not raised the point

---

[78] Case C–446/98 *Fazenda Pública v Camara Municipal do Porto* [2000] ECR I–11435, [48].

[79] Case C–126/97 *Eco Swiss* (n 67) [36]–[37].

[80] Cases C–240–244/98 *Océano Grupo Editorial v Rocio Murciano Quintero* [2000] ECR I–4491, [26]. See also Case C–397/11 *Jörös* EU:C:2013:340.

[81] Case C–473/00 *Cofidis* [2002] ECR I–10875; Case C–168/05 *Mostaza Claro* [2006] ECR I–10421; Case C–429/05 *Rampion* [2007] ECR I–8017; Case C–243/08 *Pannon* [2009] ECR I–4713; Case C–40/08 *Asturcom Telecomunicaciones v Cristina Rodríguez Nogueira* [2009] ECR I–9579; Case C–227/08 *Martín Martín v EDP Editores SL* EU:C:2009:792; Case C–215/11 *Szyrocka* EU:C:2012:794; Case C–488/11 *Asbeek Brusse* EU:C:2013:341.

[82] C–472/11 *Banif plus Bank ZRT* EU:C:2013:88.

[83] Case C–618/10 *Banco Español de Crédito SA* EU:C:2012:349; Case C–488/11 *Asbeek Brusse* EU:C:2013:341.

[84] (N 76) [75]–[77].

[85] Case C–40/08 *Asturcom* (n 81) [52].

[86] (N 76) [40].

[87] Case C–453/00 *Kühne and Heitz* [2004] ECR I–837; R Caranta, Note (2005) 42 CMLRev 179. See more recently Case C–249/11 *Byankov* EU:C:2012:608 where an EU citizen challenged an administrative ban on leaving Bulgaria which had become final.

[88] Case C–2/06 *Willy Kempter KG v Hauptzollamt Hamburg-Jonas* [2008] ECR I–411.

of EU law before the national court, at least in circumstances where national courts were permitted to raise rules of national law of their own motion and therefore should equally have been in a position to raise the relevant point of EU law.[89]

The subsequent *Kapferer* ruling seemed to limit the scope of *Kühne and Heitz*, by underscoring the legitimacy of the principle of *res judicata* and the finality of national judicial proceedings,[90] and by distinguishing the situation of a national court in *Kapferer* from that of national administrative bodies in *Kühne and Heitz* and *Kempter*. However, in *Lucchini*, concerning recovery of unlawful state aid, the CJEU went further and ruled that EU law precluded a national rule on *res judicata* from being applied by a court to prevent the recovery of aid which had been found by the Commission to be definitively incompatible with EU law.[91] But the Court in *Lucchini* stressed the distinctiveness of the state aid context, in which the Commission rather than the national courts or authorities has the ultimate authority to rule on the compatibility of state aid, and the Court in the subsequent *Pizzarotti* case emphasized that the *Lucchini* judgment had been given 'in a highly specific situation'.[92] In *Pizzarotti*, the Court ruled that EU law 'does not require a judicial body automatically to go back on a judgment having the authority of *res judicata* in order to take into account the interpretation of a relevant provision of EU law adopted by the Court after delivery of that judgment'.[93] Yet in the *Olimpiclub* judgment the Court ruled that a national court could not rely on the principle of *res judicata* in the context of VAT, since this would excessively undermine the effectiveness of EU VAT rules.[94]

Although the facts of these cases are all slightly different, some relying on the distinction between national courts and national administrative authorities, and others depending on the final authority of the Commission to rule on state aid cases, or on the negative effects for the domestic taxation system of a judicial ruling incompatible with EU law being treated as final, taken together these (undoubtedly confusing) rulings demonstrate that the domestic law principle concerning the finality of judicial proceedings, the principle of *res judicata*, will at times be required to give way to the need to take a binding ruling of EU law into consideration.[95]

### (iii) *Limitation Periods*

The general position laid down by the CJEU is that reasonable national limitation periods are, in principle, compatible with EU requirements.[96] However, reasonable limitation periods may be rendered incompatible with EU law where the effective protection of EU rights is negatively affected by other factors,[97] for example: where the date on which the period begins to run is unclear; or commences

---

89 Ibid [44]–[46].

90 Case C–234/04 *Kapferer* (n 67); on *res judicata* see also Case C–126/97 *Eco Swiss* (n 67); Case C–118/00 *Larsy* [2001] ECR I–5063; Case C–201/02 *Wells v Secretary of State for Transport* [2004] ECR I–723.

91 Case C–119/05 *Lucchini* [2007] ECR I–6199; A Biondi, Note (2008) 45 CMLRev 1459.

92 Case C–213/13 *Pizzarotti* EU:C:2014:335, [61].

93 Ibid [60].

94 Case C–2/08 *Amministrazione dell'Economia e delle Finanze v Fallimento Olimpiclub Srl* [2009] ECR I–7501.

95 For commentary on the confusion generated by the cases, see A Kornezov, 'Res Judicata of National Judgments Incompatible with EU Law: Time for a Major Rethink?' (2014) 51 CMLRev 809.

96 Case C–542/08 *Friedrich G Barth* EU:C:2010:193, where a three-year limitation on bringing an action to recover length-of-service increments (based on Case C–224/01 *Köbler* [2003] ECR I–10239) was acceptable; Cases C–95 and 96/07 *Ecotrade SpA* [2008] ECR I–3457, where the effectiveness of EU law was not infringed merely because the national tax authority had a longer period in which to recover unpaid VAT than the period granted to taxable persons for the exercise of their right to deduct. See also Cases C–89 and 96/10 *Q-Beef* EU:C:2011:555 in which the setting of different time limits for different types of action was in principle compatible with EU law, and Case C–429/12 *Pohl* EU:C:2014:12 on a thirty-year time period in an employment age-discrimination dispute.

97 In Case C–69/08 *Raffaello Visciano* [2009] ECR I–6741, the CJEU ruled that Dir 80/987 on the protection of employees in the event of the insolvency of their employer did not preclude a limitation period of one year, but it

before the applicant knew or should have known of the violation;[98] where the limitation period applies retroactively;[99] where the operation of the time limit makes it effectively impossible to obtain a refund due[100] or to deduct VAT;[101] or the national court has too much discretion in determining whether proceedings were brought 'promptly'.[102]

In *Manfredi* the CJEU declared that a national rule under which the limitation period begins to run from the day on which an anti-competitive agreement or concerted practice is adopted could make it practically impossible to exercise the right to seek compensation for the harm caused, particularly if the limitation period is also a short one and not capable of being suspended.[103] In *Marks & Spencer*[104] and *Grundig Italiana*,[105] the Court ruled that although national legislation reducing the period within which repayment of sums collected in breach of Community law may be sought is not in itself incompatible with the effectiveness principle, the new limitation period must remain reasonable and must include adequate transitional arrangements.[106]

The diversity of national time limits across the EU means that the Court generally grants considerable latitude in determining what is reasonable, but it is nonetheless clear that some kind of comparative judgement is being made by the CJEU with reference to the practices of other Member States.[107]

## (iv) *Rules of Evidence and Causation*

In *Boiron*, a case concerning state aid, the question was whether national rules placing the burden of proof for demonstrating overpayment of competitors on an economic operator complied with the principle of effectiveness.[108] The CJEU ruled that where the national court found that this

---

emphasized two factors which were liable to undermine its effectiveness: first, uncertainty as to when the limitation period starts to run; and, secondly, the classification of the benefit by the national court as social security, which would change the applicable time limit. Compare Case C–96/10 *Q-Beef* EU:C:2011:555 on the commencement of the time period. See also Case C–349/07 *Sopropé-Organizações de Calçado Lda* [2008] ECR I–10369, on whether a period of eight to fifteen days allowed for recovery of a customs debt was sufficient.

   [98] Case C–246/09 *Susanne Bulicke v Deutsche Büro Service GmbH* EU:C:2010:418, [40]–[41]; Case C–445/06 *Danske Slagterier v Bundesrepublik Deutschland* [2009] ECR I–2119, [49]–[56]. Compare Case C–452/09 *Iaia* EU:C:2010:54 where reliance on the expiry of the time limit was reasonable even though the state had committed a violation of EU law. In the context of public procurement, see Case C–161/13 *Idrodinamica Spurgo Velox* EU:C:2014:307 and Case C–19/13 *Fastweb* EU:C:2014:2194. In the context of a discrimination claim in an employment competition dispute, see Case C–177/10 *Rosado Santana* EU:C:2011:557.

   [99] Case C–62/00 (n 8) [39]–[42]; Case C–30/02 *Recheio-Cash & Carry SA v Fazenda Publica/Registo Nacional de Pessoas Colectivas* [2004] ECR I–6051, where a 90-day limitation period was reasonable even though applicable to taxes paid at a time when the EU Dir had not been transposed; Case C–241/06 *Lämmerzahl GmbH v Freie Hansestadt Bremen* [2008] ECR I–8415, where the Public Procurement Remedies Dir precluded a national limitation from being applied in such a way that a tenderer was refused access to a review of the procurement procedure where the specifications had not been clearly stated; in Case C–406/08 *Uniplex* (n 102), the limitation period could start to run only from the date on which the claimants knew, or ought to have known, of the alleged infringement of the provisions they wished to challenge. Also Case C–603/10 *Pelati* EU:C:2012:639.

   [100] Case C–427/10 *Banca Antoniana Popolare Veneta* EU:C:2011:844.

   [101] Case C–284/11 *EMS-Bulgaria Transport OOD* EU:C:2012:458.

   [102] Case C–406/08 *Uniplex (UK) Ltd v NHS Business Services Authority* EU:C:2010:45, [40]–[43].

   [103] Cases C–295–298/04 *Manfredi* (n 31).

   [104] Case C–62/00 *Marks & Spencer* (n 8).

   [105] Case C–255/00 *Grundig Italiana SpA v Ministero delle Finanze* [2002] ECR I–8003.

   [106] In *Grundig Italiana* [37]–[42], a 90-day transitional limitation period was unreasonable and insufficient, given that it replaced a previous five-year period for preparing and submitting proceedings. See also Case C–262/09 *Meilicke* EU:C:2011:438.

   [107] Case C–30/02 *Recheio-Cash & Carry* (n 99) [22].

   [108] Case C–526/04 *Laboratoires Boiron SA v URSSAF de Lyon* [2006] ECR I–7529.

evidentiary requirement rendered it excessively difficult for the operator to produce the necessary proof, that court was required 'to use all procedures available to it under national law, including that of ordering the necessary measures of inquiry, in particular the production by one of the parties or a third party of a particular document' to comply with the EU requirement of effective judicial protection.[109]

*Steffenson* concerned a directive on control of foodstuffs which required a second opinion on the analysis of a sample of foodstuffs to be obtained in circumstances such as those of the case, where a manufacturer was fined for misleading quality-labelling.[110] A second opinion had not been obtained in the case, and the question was whether the sample could be introduced in evidence despite the violation of the Directive's second-opinion requirement. Under German law, evidence obtained by an irregular administrative procedure could nonetheless be admitted in legal proceedings and evaluated on that basis. The CJEU gave extensive guidance to the national court on how to apply the effectiveness requirement, drawing on ECHR jurisprudence concerning the 'adversarial principle' and the right to a fair hearing.[111] *Steffensen* thus introduced yet another important factor, respect for ECHR (and now EU Charter) rights, into the matrix which national courts must consider when weighing the effectiveness of remedies for EU rights in the context of national procedural rules.[112]

The CJEU in *Unitrading* ruled that in the absence of EU legislation governing the concept of proof in customs proceedings, any type of evidence admissible under the procedural law of the Member States in similar customs proceedings would in principle be admissible, subject always to the requirements of effectiveness and equivalence.[113]

In *Kone*, the CJEU had to consider whether the Austrian legal conception of a 'causal relationship' as a necessary element of a successful claim in compensation by an individual who had suffered economic damage as a result of 'umbrella pricing' by a defendant who was not actually part of a cartel, was compatible with the EU requirement of principles of effectiveness.[114] The defendant, while not contracting with any member of the cartel, operated a pricing policy which was a result of the price-distorting cartel, and the applicant sought damages for loss suffered through the higher prices charged. While the CJEU ultimately left it for the national court to decide whether an adequate causal link had been established on the facts of the case for the purposes of the domestic cause of action, the Court ruled emphatically that:

> The full effectiveness of Article 101 TFEU would be put at risk if the right of any individual to claim compensation for harm suffered were subjected by national law, categorically and regardless of the particular circumstances of the case, to the existence of a direct causal link while excluding that right because the individual concerned had no contractual links with a member of the cartel, but with an undertaking not party thereto, whose pricing policy, however, is a result of the cartel that contributed to the distortion of price formation mechanisms governing competitive.[115]

The ruling has drawn critical attention for its interference into national rules and procedures governing antitrust damages cases.[116]

---

[109] Ibid [57].

[110] Case C–276/01 *Joachim Steffensen* [2003] ECR I–3735.

[111] Case C–276/01 (n 110) [68]–[79].

[112] Ch 11; Case C–344/08 *Rubach* [2009] ECR I–7033.

[113] Case C–437/13 *Unitrading* EU:C:2014:2318.

[114] Case C–557/12 *Kone AG v OBB Infrastruktur* EU:C:2014:1317.

[115] Ibid [33].

[116] See http://howtocrackanut.blogspot.nl/2014/06/when-cjeu-opens-umbrella-lawyers-and.html.

## (v)  *Access to Court*

We have seen that even in early cases like *Heylens*,[117] and more recently in the *Kadi*[118] and *ZZ*[119] cases even where national security concerns were implicated, the CJEU emphasized the importance of access to judicial control and to a judicial remedy for the vindication of EU law rights,[120] identifying it as a fundamental right guaranteed under the ECHR and the Charter of Fundamental Rights.[121] However, the Court has also accepted the imposition of reasonable national restrictions and preconditions on the fundamental right of access to court.

In *Upjohn* the Court ruled that EU law did not require the availability of a domestic judicial review procedure under which national courts would be competent to substitute their assessment of the facts and the scientific evidence found for that of the national decision-making body, provided that those courts were empowered effectively to apply the principles of EU law when conducting judicial review.[122] In *Evans* a system of national redress which provided for a combination of administrative review, arbitration (including appropriate procedural rights), and appellate judicial review for accident compensation claims was held to satisfy the requirement of effective protection.[123] In *Schneider*, the right was satisfied by the existence of an action for state liability before the civil courts, even if a parallel action before the administrative courts was limited in terms of the factual review which could be carried out.[124] The fact that all claims relating to EU agricultural aid had to be brought before a single court jurisdiction in Bulgaria did not violate the principle of effectiveness,[125] nor did territorial jurisdiction rules in Spain which required actions for an injunction brought by consumer protection associations to be brought before the courts where the defendant is established.[126]

In *Alassini*,[127] the requirement of prior implementation of an out-of-court settlement procedure before having recourse to legal proceedings did not, subject to a range of conditions concerning matters such as costs and delay,[128] infringe the principles of effectiveness or equivalence in the context of the Universal Service Directive. Similar rulings were given in the *Tele2*[129] and *Mono Car Styling*[130] cases, in which the ECHR and the Charter of Rights were again cited as the basis for the principle of effective judicial protection. In *Mono Car Styling*, the Court accepted that national

---

[117] (N 28).

[118] Cases C–402 and 415/05 P *Kadi and Al Barakaat International Foundation v Council and Commission* [2008] ECR I–6351.

[119] Case C–300/11 *ZZ v Secretary of State for the Home Department* EU:C:2013:363.

[120] On the right to judicial review see also Case C–228/98 *Dounias v Ypourgio Oikonomikon* [2000] ECR I–577, [64]–[66]; Case C–424/99 *Commission v Austria* [2001] ECR I–9285; Case C–1/99 *Kofisa Italia* [2001] ECR I–207; Case C–226/99 *Siples* [2001] ECR I–277; Case C–75/08 *R (Mellor) v Secretary of State for Communities and Local Government* [2009] ECR I–3799 on the fact that judicial review presupposes the right to be given reasons.

[121] Case C–185/97 *Coote v Granada Hospitality Ltd* [1998] ECR I–5199; Case C–432/05 *Unibet* (n 16); Case C–23/12 *Zakaria* EU:C:2013:24; Case C–562/12 *Liivimaa Lihaveis MTÜ* EU:C:2014:2229.

[122] Case C–120/97 *Upjohn v The Licensing Authority* [1999] ECR I–223, [33]–[36].

[123] Case C–63/01 *Evans v Secretary of State for the Environment, and the Motor Insurers' Bureau* [2003] ECR I–14447; Case C–506/04 *Wilson* EU:C:2006:587, on the requirements of independence and impartiality of effective judicial protection.

[124] Case C–380/01 *Gustav Schneider v Bundesminister für Justiz* [2004] ECR I–1389.

[125] Case C–93/12 *Agrokonsulting-04* EU:C:2013:432.

[126] Case C–413/12 *Asociación de Consumidores Independientes de Castilla y León* EU:C:2013:800.

[127] Cases C–317–320/08 *Rosalba Alassini and others* EU:C:2008:510.

[128] Ibid [53]–[60].

[129] In Case C–426/05 *Tele2 Telecommunication GmbH v Telekom-Control-Kommission* [2008] ECR I–68, a national provision which, in the context of prior non-adversarial market-analysis proceedings, granted party status only to companies formerly having significant power on the relevant market was ruled not to be contrary to the principle of effective judicial protection underpinning Art 4 of Dir 2002/21 on electronic communications networks.

[130] Case C–12/08 *Mono Car Styling SA, in liquidation v Dervis Odemis* [2009] ECR I–6653.

rules imposing various conditions on the right of action granted to workers affected by collective redundancy did not undermine the fundamental principle of effective judicial protection.[131] In *Commission v Greece*, however, a provision of national law concerning tax exemption could deprive individuals of effective judicial protection under EU law where it induced them, for the purposes of avoiding criminal proceedings, to refrain from seeking the legal remedies provided for as a matter of course by national law.[132] In *Janecek* and *ClientEarth* too, the CJEU gave strong rulings on the requirement of individual access to court to enforce particular obligations on national authorities in the context of an environmental directive.[133] In *DEB*, the CJEU ruled that the principle of effective judicial protection in Article 47 of the Charter required that it should be possible for legal (as opposed to natural) persons to rely on that principle, and required that legal aid granted may cover dispensation from advance payment of the costs of proceedings and the assistance of a lawyer.[134] It was for national courts, ultimately, to determine whether or not the conditions for granting legal aid constituted a disproportionate limitation on the right of access to court.[135] The requirement of access to court did not, however, require in the *Pohotovost* case that a consumer association should be able to intervene in a domestic case in support of a consumer against whom an arbitration award was being enforced.[136]

## (B) EQUIVALENCE

We have already seen examples of the requirement of equivalence in the cases on *res judicata* where the CJEU ruled that if a national court may raise certain points of national law of its own motion, it must also have a power to raise similar points of EU law.[137] However, it is often unclear what exactly the requirement of 'equivalence' entails, or when causes of action may be deemed sufficiently similar or comparable to require 'equivalent' treatment.[138] In many cases the Court merely states, after reiterating that national rules must comply with the principle of equivalence, that there is nothing on the file submitted by the national court to suggest any violation of that principle.

---

[131] Ibid [50]–[52]. Compare Case C–268/06 *Impact v Minister for Agriculture and Food and Others* [2008] ECR I–2483, where the CJEU ruled that the principle of effectiveness required that a specialized court which was established by legislation transposing Dir 1999/70 on the framework agreement on fixed-term work to hear claims based on infringement of that legislation must also have jurisdiction to hear an applicant's claims arising directly from the Dir itself between the date of the deadline for transposing the Dir and the date on which the transposing legislation entered into force, where the requirement to bring a separate claim based on the Dir before an ordinary court would involve procedural disadvantages liable to render excessively difficult the exercise of the EU rights; see also Cases C–378–380/07 *Kiriaki Angelidaki* (n 21).

[132] Case C–156/04 *Commission v Greece* [2007] ECR I–4129.

[133] Case C–237/07 *Janecek* [2008] ECR I–6221; Cases C–404–13 *R (ClientEarth) v Secretary of State for Environment* EU:C:2014:2382. See also Case C–416/10 *Križan* EU:C:2013:8 as regards access to information and decision-making in the context of environmental proceedings; J Jans, 'Harmonization of National Procedural Law by the Back Door?' in M Bulterman, L Hancher, A McDonnell, and H Sevenster (eds), *Views of European Law from the Mountain* (2009) 267–275; on national *locus standi* rules see Cases C–87–89/90 *Verholen v Sociale Verzekeringsbank* [1991] ECR I–3757, [24].

[134] Case C–279/09 *DEB v Bundesrepublik Deutschland* EU:C:2010:811.

[135] Ibid [60]–[62].

[136] Case C–470/12 *Pohotovost* EU:C:2014:101.

[137] See in particular Cases C–222–225/05 *van der Weerd* (n 76) [29]–[32]; Case C–488/11 *Asbeek Brusse* EU:C:2013:341, and the cases discussed at (nn 88–92) and text.

[138] See, eg, Case C–93/12 *Agrokonsulting-04* EU:C:2013:432, in which Polish provisions concerning agricultural payments on the one hand, and property rights on the other hand, were not comparable for these purposes, and Case C–361/12 *Carratu* EU:C:2013:830 on the non-comparability of fixed-term and permanent workers for the purposes of rules on compensation for termination.

*Edis* concerned the repayment of charges which had been paid but were not due under EU law, where national law imposed a time limit of three years for bringing proceedings for repayment for such charges. This was less favourable than the ordinary time limits governing actions between individuals for repayment of sums paid but not due.

### Case C–231/96 **Edis v Ministero delle Finanze**
[1998] ECR I–4951

36. Observance of the principle of equivalence implies, for its part, that the procedural rule at issue applies without distinction to actions alleging infringements of Community law and to those alleging infringements of national law, with respect to the same kind of charges or dues (see, to that effect, Joined Cases 66/79, 127/79 and 128/79 *Amministrazione delle Finanze dello Stato* v. *Salumi* [1980] ECR 1237, paragraph 21). That principle cannot, however, be interpreted as obliging a Member State to extend its most favourable rules governing recovery under national law to all actions for repayment of charges or dues levied in breach of Community law.

37. Thus, Community law does not preclude the legislation of a Member State from laying down, alongside a limitation period applicable under the ordinary law to actions between private individuals for the recovery of sums paid but not due, special detailed rules, which are less favourable, governing claims and legal proceedings to challenge the imposition of charges and other levies. The position would be different only if those detailed rules applied solely to actions based on Community law for the repayment of such charges or levies.

Similar rulings were given in the cases of *Spac*,[139] *Aprile*,[140] *Dilexport*,[141] *Roquette*,[142] *Pontin*,[143] and *Bulicke*,[144] affirming the acceptability of national time limits which were not the most favourable within the national remedial system, but which applied equally to actions based on EU law and 'similar' actions based on national law.[145] On the other hand the CJEU has also ruled that national courts cannot rely on the principle of equivalence with national procedures to avoid other EU law requirements such as the freedom to make preliminary references to the Court of Justice,[146] or indeed the provisions of the Customs Code.[147]

While the CJEU has frequently stated that it is for the national court to determine the question of equivalence,[148] it has intervened at times to indicate that the application of a particular national rule does not satisfy that principle, or that the principle of equivalence is not applicable on the facts,[149] or to suggest what other rules of domestic law might provide a comparator for the purposes of considering 'equivalence'.[150] In *Eman and Sevinger*, concerning violation of the right to vote in European

[139] Case C–260/96 *Spac* (n 50).

[140] Case C–229/96 *Aprile v Amminstrazione delle Finanze dello Stato* [1998] ECR I–7141.

[141] Case C–343/96 *Dilexport v Amministrazione delle Finanze dello Stato* [1999] ECR I–579.

[142] Case C–88/99 *Roquette Frères* (n 48).

[143] Case C–63/08 *Virginie Pontin v T-Comalux SA* [2009] ECR I–10467; Case C–591/10 *Littlewoods Retail* EU:C:2012:478.

[144] Case C–246/09 *Susanne Bulicke v Deutsche Büro Service GmbH*, 8 July 2010, [27]–[34].

[145] See also Case C–96/10 *Q-Beef* EU:C:2011:555 and Case C–427/10 *Banca Antoniana Popolare Veneta* EU:C:2011:844; Case C–470/12 *Pohotovost* EU:C:2014:101; Cases C–29 and 30/13 *Global Trans Lodzhistik OOD* EU:C:2014:140.

[146] Case C–112/13 *A* EU:C:2014:2195, [45].

[147] Cases C–129 and 130/13 *Kamino International Logistics BV* EU:C:2014:2041, [77].

[148] Case C–261/95 *Palmisani v INPS* [1997] ECR I–4025, [33]; Case C–326/96 *Levez* (n 51) [39]; Case C–177/10 *Rosado Santano* EU:C:2011:557.

[149] Case C–56/13 *Érsecsanádi Mezőgazdasági Zrt* EU:C:2014:352.

[150] Case C–213/13 *Pizzarotti* EU:C:2014:335, [55]–[57].

Parliament elections, the CJEU proposed that the national court 'may usefully refer to the detailed rules for legal redress laid down in cases of infringement of the national rules in the context of elections to the institutions of the Member State'.[151] In *Weber's Wine World*, the Court gave a clear indication of what would be likely to violate the equivalence requirement,[152] and in *Pontin*, a case concerning the dismissal of a pregnant employee, the CJEU suggested, even while leaving the ultimate decision to the national court, that a fifteen-month time limit for bringing an action for reinstatement as compared with a two-month time limit for bringing an action for damages would not seem to comply with the equivalence principle.[153] In *Club Hotel Loutraki*, the CJEU found that the principle of equivalence was violated due to the differences between domestic actions for compensation in the field of public service contracts governed by EU law and domestic actions for compensation for other unlawful action on the part of state actors.[154] And in *Vale* the principle of equivalence was breached where Member State authorities refused to record and register a company from the Member State of origin as 'predecessor in law' to a company which had engaged in a cross-border conversion, while recording the predecessor in law of a company which had made a domestic conversion.[155]

In *Levez*, an employee sought damages for arrears in payment which had been denied to her in breach of the EU equal pay rules. The CJEU had ruled that the two-year limit on arrears of damages in Industrial Tribunal proceedings could not be applied to her on account of the role played by her employer's deception in the delay.[156] However, the UK argued that the time limit should nonetheless apply to her case, because an alternative full remedy before the county court in an action for deceit against her employer and in an action based on the Equal Pay Act had been open to her, so that the exercise of her right was not rendered ineffective in practice. The CJEU accepted the effectiveness point, but went on to consider the requirement of equivalence and gave firm guidance to the national court on how to apply this.[157]

### Case C–326/96 **Levez v Jennings Ltd**
### [1998] ECR I–7835

43. In order to determine whether the principle of equivalence has been complied with in the present case, the national court—which alone has direct knowledge of the procedural rules governing actions in the field of employment law—must consider both the purpose and the essential characteristics of allegedly similar domestic actions (see *Palmisani*, paragraphs 34 to 38).

44. Furthermore, whenever it falls to be determined whether a procedural rule of national law is less favourable than those governing similar domestic actions, the national court must take into account the role played by that provision in the procedure as a whole, as well as the operation and any special features of that procedure before the different national courts (see, *mutatis mutandis*, *Van Schijndel and Van Veen*, paragraph 19).

[*The ECJ rejected the UK's argument that the equivalence requirement was satisfied by the fact that a claim under the Equal Pay Act (which was intended to implement EC law) was comparable to a claim based directly on Article 157 TFEU, and continued as follows.*]

---

[151] Case C–300/04 *Eman and Sevinger v College van burgemeester en wethouders van Den Haag* [2006] ECR I–8055.
[152] Case C–147/01 *Weber's Wine World* [2003] ECR I–11365.
[153] (N 143).
[154] Cases C–145 and 149/08 *Club Hotel Loutraki AE v Ethnico Symvoulio Radiotileorasis*, 6 May 2010, [75]–[77].
[155] Case C–378/10 *VALE Épitési* EU:C:2012:440.
[156] Case C–326/96 *Levez* (n 51).
[157] See also Case C–78/98 *Preston* (n 53).

49. Secondly, it is necessary to consider the possibilities contemplated by the order for reference. It is there suggested that claims similar to those based on the Act may include those linked to breach of a contract of employment, to discrimination in terms of pay on grounds of race, to unlawful deductions from wages or to sex discrimination in matters other than pay.

50. If it transpires, on the basis of the principles set out in paragraphs 41 to 44 of this judgment, that a claim under the Act which is brought before the County Court is similar to one or more of the forms of action listed by the national court, it would remain for that court to determine whether the first-mentioned form of action is governed by procedural rules or other requirements which are less favourable.

51. On that point, it is appropriate to consider whether, in order fully to assert rights conferred by [EU] law before the County Court, an employee in circumstances such as those of Mrs Levez will incur additional costs and delay by comparison with a claimant who, because he is relying on what may be regarded as a similar right under domestic law, may bring an action before the Industrial Tribunal, which is simpler and, in principle, less costly.

52. Also of relevance here is the fact mentioned by the national court that the rule at issue applies solely to claims for equal pay without discrimination on grounds of sex, whereas claims based on 'similar' rights under domestic law are not limited by the operation of such a rule, which means that such rights may be adequately protected by actions brought before Industrial Tribunals.

Ultimately, it was for the national court to determine whether the alternative remedy available to her would entail procedural rules or conditions less favourable than those applicable to similar domestic actions. In other words, the CJEU has developed the same context-specific balancing approach for national courts to assess the 'equivalence' of domestic rules as it did for assessing their 'effectiveness' in *Peterbroeck* and *Van Schijndel*.

In *Dounias*, the CJEU declared that it was for the national court to scrutinize domestic procedures not only to determine whether they were comparable, but also to detect whether there was any inherent discrimination in their *application* in favour of domestic claims.[158] In *Manfredi*, the Court ruled that if in similar domestic actions it is possible to award specific damages such as exemplary or punitive damages, it must also be possible to award them in actions based on EU rules.[159]

It has been argued that an excessive emphasis on the need for *effective* rather than *equivalent* protection of EU rights could actually lead to a reverse form of discrimination in favour of EU law.[160] This notion of genuine equality of remedies for EU rights and national law rights is also mirrored by another development in CJEU case law pointing to the need for parity between national-level and EU-level remedies for the enforcement of EU rights. In other words, EU law should not demand better enforcement of EU law from the national legal orders than it is prepared to provide itself at the European level.[161] And in *Bergaderm*, in an action for damages brought against the EU before the CJEU, the Court ruled that the conditions under which Member States may incur liability for damage

---

[158] Case C–228/98 *Dounias* (n 120) 65. In this case the Court seemed to suggest that the equivalence principle should be considered first, and only then the effectiveness principle: [60]. See also Cases C–392 and 422/04 *i-21 Germany GmbH and Arcor AG* [2006] ECR I–8559, [68]–[69], on the need for equivalence in the application of rules to EU and domestic law claims.

[159] Cases C–295–298/04 *Manfredi* (n 31) [99].

[160] See, eg, AG Jacobs in Cases C–430–431/93 *Van Schijndel* (n 73), and AG Léger in Case C–66/95 *Sutton* (n 39).

[161] See, eg, Case C–120/97 *Upjohn* (n 122) [33], where EU law did not require Member States to establish a more extensive review of national decisions revoking marketing authorizations for medicinal products than that carried out by the CJEU in similar cases.

to individuals caused by a breach of EU law could not, in principle, differ from those governing the liability of the EU in similar circumstances.[162]

## (c) THE EFFECT OF THE PLAINTIFF'S CONDUCT ON THE RIGHT TO AN EFFECTIVE REMEDY

In *Dionysios Diamantis*, the CJEU ruled that a national court may refuse to permit a plaintiff to rely on EU rights if such reliance constitutes an abuse of those rights.[163] However, the CJEU in *Rechberger* rejected Austria's argument that the misconduct of a relevant third party could constitute a defence to an action for damages brought against the state for breach of EU law.[164] In *Courage* the Court ruled that an individual could not be prohibited from relying on Article 101 TFEU simply because he had been party to an anti-competitive agreement, but that EU law did not prohibit a national rule preventing such a party from relying on his own unlawful actions to obtain damages where he bears significant responsibility for the distortion of competition.[165] And in *Manfredi*, the Court ruled that the requirements of effectiveness and equivalence did not prevent national courts from taking steps to ensure that the protection of EU rights did not entail the unjust enrichment of those claiming them.[166]

The CJEU has also considered the impact of a plaintiff's failure to mitigate losses on the availability and extent of national remedies. In *Metallgesellschaft* the Court dismissed the UK's argument that the plaintiffs should have refused to comply with a national tax rule which infringed their EU rights and should have relied on the direct effect of EU rights, rather than paying the tax and challenging it afterwards.[167] The Court also ruled in *Danske Slagterior* that EU law would not preclude national legislation from refusing to provide reparation for loss to an individual who had wilfully or negligently failed to avail himself of a legal remedy which would have averted such loss, provided that recourse to the legal remedy in question could reasonably be expected.[168] Thus reasonable national rules governing the responsibility of parties to show due diligence in mitigating their losses are compatible with EU law so long as they are applied equally to claims based on EU law.[169]

# 6 SUMMARY

i. While early CJEU case law emphasized the autonomy and primary responsibility of the national legal system in the absence of EU harmonization of remedies, this approach yielded over time to a stronger insistence on the effectiveness of EU law, on effective judicial protection as a fundamental right, and on the national courts' duty of loyal cooperation.

---

[162] Case C–352/98 P *Bergaderm v Commission* [2000] ECR I–5291, [41], drawing on Cases C–46 and 48/93 *Brasserie du Pêcheur* [1996] ECR I–1029, [42]; M de Visser, 'The Concept of Concurrent Liability and its Relationship with the Principle of Effectiveness' (2004) 11 MJ 47.

[163] Case C–373/97 *Dionysios Diamantis v Elliniko Dimosio* [1999] ECR I–1705, [42]–[44], in which the CJEU however ruled that some of the impugned conduct would not amount to an abuse of rights under the Second Company Dir.

[164] Case C–140/97 *Rechberger v Austria* [1999] ECR I–3499.

[165] Case C–453/99 *Courage* (n 31) [24], [36].

[166] Cases C–295–298/04 *Manfredi* (n 31) [99]. For further discussion of unjust enrichment see (nn 30–31) and text.

[167] Case C–397/98 *Metallgesellschaft Ltd v Inland Revenue* [2001] ECR I–1727, [99]–[107].

[168] Case C–445/06 *Danske Slagterior v Germany* [2009] ECR I–2119, [63]–[64]. Compare Case C–429/09 *Fuß v Stadt Halle* EU:C:2009:178, [75]–[86].

[169] This is the case for claims against the EU institutions before the CJEU: Case T–178/98 *Fresh Marine Company v Commission* [2000] ECR II–3331, [121].

ii. While certain strands of case law—mainly those in which the CJEU focuses on a particular substantive EU law right, often an EU legislative right—require *specific* national remedies to be made available, and particularly in certain sectors such as competition, consumer, and environmental law, many other cases continue to emphasize the primary responsibility of the national legal system, subject only to the principles of equivalence and effectiveness.

iii. Over time the Court has developed a highly context-specific balancing approach, which requires the importance of the EU right to be weighed against the scope and purpose of the national rule, taking all the circumstances of the case into account. And while the Court sometimes gives firm guidance on the requirements of effectiveness and equivalence, it often leaves it to the national court to assess and apply these to the facts of the case. This results in a substantial continuing flow of litigation.

# 7 THE PRINCIPLE OF (STATE) LIABILITY FOR BREACH OF EU LAW

## (A) ORIGINS OF THE PRINCIPLE

We have seen that despite its early 'no new remedies' rule in *Rewe-Handelsgesellschaft*, the CJEU in cases such as *San Giorgio* on the repayment of charges,[170] *Factortame I* on interim relief,[171] *Heylens* on judicial review,[172] *Muñoz* on civil remedies,[173] and *Courage* on damages,[174] required national courts in certain circumstances to ensure the availability of specific remedies.

However, the most distinctive of the Court's interventionist rulings which required the availability of a particular remedy as a matter of EU law is the *Francovich* judgment. This ruling established the principle of state liability to pay compensation for breach of EU law.

---

### Cases C–6 and 9/90 **Francovich and Bonifaci v Italy**
[1991] ECR I–5357

### [Note Lisbon Treaty renumbering: Art 5 EEC is now Art 4(3) TEU]

The applicants brought proceedings against Italy for the government's failure to implement Directive 80/987 on the protection of employees in the event of their employer's insolvency. No steps had been taken pursuant to the Directive to guarantee payment of wages owed by employers, and they argued that the state was liable to pay them the sums owed. The CJEU ruled that although the provisions of the Directive lacked sufficient precision to be directly effective, they nevertheless clearly intended to confer rights of which these individuals had been deprived through the state's failure to implement them.

---

170 Case 199/82 (n 11).
171 Case C–213/89 *The Queen v Secretary of State for Transport, ex p Factortame Ltd* [1990] ECR I–2433.
172 Case 222/86 *Heylens* (n 26).
173 Case C–253/00 *Muñoz* (n 62).
174 Case C–453/99 *Courage* (n 31).

### THE ECJ

29. The national court thus raises the issue of the existence and scope of a State's liability for harm resulting from the breach of its obligations under Community law....

*(a) The existence of State liability as a matter of principle*

30. It must be recalled first of all that the EEC Treaty has created its own legal system which is an integral part of the legal systems of the Member States and which their courts are bound to apply; the subjects of that legal system are not only the Member States but also their nationals. Just as it imposes obligations on individuals, Community law is also intended to create rights which become part of their legal patrimony; those rights arise not only where they are expressly granted by the Treaty but also by virtue of obligations which the Treaty imposes in a clearly defined manner both on individuals and on the Member States and the Community institutions: see Case 26/62 *Van Gend en Loos* and Case 6/64 *Costa* v. *ENEL*.

...

32. Furthermore, it has been consistently held that the national courts whose task it is to apply the provisions of Community law in cases within their jurisdiction must ensure that those rules have full effect and protect the rights which they confer on individuals: see in particular Case 106/77 *Simmenthal* and Case C–213/89 *Factortame*.

33. It must be held that the full effectiveness of Community rules would be impaired and the protection of the rights which they grant would be weakened if individuals were unable to obtain compensation when their rights are infringed by a breach of Community law for which a Member State can be held responsible.

34. The possibility of compensation by the Member State is particularly indispensable where, as in this case, the full effectiveness of Community rules is subject to prior action on the part of the State and consequently individuals cannot, in the absence of such action, enforce the rights granted to them by Community law before the national courts.

35. It follows that the principle of State liability for harm caused to individuals by breaches of Community law for which the State can be held responsible is inherent in the system of the Treaty.

36. Further foundation for the obligation on the part of Member States to pay compensation for such harm is to be found in Article 5 EEC, under which the Member States are required to take all appropriate measures, whether general or particular, to ensure fulfilment of their obligations under Community law. Among these is the obligation to nullify the unlawful consequences of a breach of Community law....

Contrasting with its early statement that the Treaty did not intend to create new remedies,[175] the CJEU ruled that the principle of state liability is inherent in the Treaty, indicating that an action for compensation against the state for breach of EU law must be available.[176] *Francovich* also required the provision by national courts of a damages remedy for breach of an EU measure which lacked direct effect.[177] This represented an important additional move towards enhancing the effectiveness of unimplemented directives,[178] by presenting an alternative remedy for cases where national law could not otherwise be construed compatibly with an unimplemented directive.[179]

---

[175] Dougan argues that while the Court intended to develop a Community system of liability of public authorities and a right to reparation, it did not necessarily intend to create a specific 'Community remedy in damages': see 'The Francovich Right to Reparation: Reshaping the Contours of Community Remedial Competence' (2000) 6 EPL 103.

[176] M Ross, 'Beyond *Francovich*' (1993) 56 MLR 55; P Craig, '*Francovich*, Remedies and the Scope of Damages Liability' (1993) 109 LQR 595.

[177] D Curtin, 'State Liability under Private Law: A New Remedy for Private Parties' (1992) 21 ILJ 74.

[178] Ch 7.

[179] See, eg, Case C–334/92 *Wagner Miret v Fondo de Garantía Salarial* [1993] ECR I–6911; Case C–54/96 *Dorsch Consult Ingenieurgesellschaft mbH v Bundesbaugesellschaft Berlin mbH* [1997] ECR I–4961; Case C–81/98 *Alcatel Austria v Bundesministerium für Wissenschaft und Verkehr* [1999] ECR I–7671; Case C–111/97 *Evobus Austria*

*Dillenkofer*,[219] concerning Germany's failure to implement the Package Holidays Directive 90/314, the CJEU ruled that *Francovich* had established that non-transposition of a directive within the prescribed time limit *of itself* amounted to a sufficiently serious breach.[220] Similarly in *Lomas*, the refusal of the UK to grant export licences for live sheep to Spain, on the ground that Spanish slaughterhouses were not complying with the terms of an EU directive, constituted a sufficiently serious breach, given the lack of discretion left to states under the directive, the clarity of the Treaty provision breached, and the absence of a properly verified justification.[221] Similar rulings were given in *AGM-COS.MET*[222] and *Synthon BV*[223] in which there was no room for state discretion.[224]

## (D) STATE LIABILITY AND THE NATIONAL REMEDIAL FRAMEWORK

While *Brasserie du Pêcheur/Factortame III* provided guidance on the conditions governing state liability, many issues were left to be governed by national law, subject to the familiar principles of equivalence and effectiveness.[225] In other words, while the core conditions of state liability for breach of EU law are determined by EU law,[226] the action for compensation is provided within the framework of domestic legal systems, with varying procedural and substantive rules on matters such as time limits, causation, mitigation of loss, and assessment of damages.[227]

Concerning the *effectiveness* principle, the CJEU in *Brasserie/Factortame* ruled that German law limiting the liability of the state exercising its legislative function, and English law requirements such as 'abuse of power' or proof of misfeasance in public office, would make it excessively difficult to obtain reparation. Concerning the extent of reparation, the Court ruled that 'reparation for loss or damage caused to individuals as result of breaches of Community law must be commensurate with the loss or damage sustained'.[228] This requirement of commensurability is strong, recalling the ruling in *Marshall II*,[229] and any restrictions imposed on the extent of damages available must be reasonable. Rules on mitigation of loss are acceptable,[230] but the total exclusion of loss of profits or the restriction of damages to certain specific interests such as property,[231] or the imposition of restrictive additional conditions for the recovery of losses other than property,[232] would violate

---

[219] Cases C–178–179 and 188–190/94 *Dillenkofer v Germany* [1996] ECR I–4845, [21]–[23]. For a case involving mis-implementation, rather than non-implementation, of the Package Holiday Dir which also constituted a sufficiently serious breach see Case C–140/97 *Rechberger* (n 164) [51]–[53].

[220] Cases C–178–179 and 188–190/94 *Dillenkofer* (n 219) [21]–[23].

[221] Case C–5/94 *R v Ministry of Agriculture, Fisheries and Food, ex p Hedley Lomas* [1996] ECR I–2553, [28]–[29]; Case C–118/00 *Larsy v INASTI* [2001] ECR I–5063; Case C–150/99 *Stockholm Lindöpark Aktiebolag v Sweden* [2001] ECR I–493.

[222] Case C–470/03 *AGM-COS.MET Srl v Suomen valtio and Tarmo Lehtinen* (n 188).

[223] Case C–452/06 *R, ex p Synthon BV v Licensing Authority of the Department of Health* [2008] ECR I–7681.

[224] Compare Case C–63/01 *Evans* (n 40) [82]–[88].

[225] For discussion of the procedural conditions prevailing in different Member States see C Kremer, 'Liability for Breach of EC Law' (2003) 22 YBEL 203; H Xanathi, 'Effective Judicial Protection at the National Level Against Breaches of EC Law' (2005) 5 EJLR 409.

[226] Case C–300/04 *Eman* (n 151) [70].

[227] In Case C–228/98 *Dounias* (n 120) the exceptional availability of witness evidence in proceedings to establish state liability was deemed compatible with the principles of equivalence and effectiveness. See also Case C–118/00 *Larsy* (n 221).

[228] Cases 46 and 48/93 (n 162) [82]. In C–429/09 *Fuß* (n 168), the CJEU ruled that it was for national law, subject to the requirements of effectiveness and equivalence, to determine whether reparation should consist of time off in lieu rather than financial compensation, and to lay down the method for calculating the reparation.

[229] Case C–271/91 *Marshall v Southampton and South-West Hampshire Area Health Authority II* [1993] ECR I–4367.

[230] Case C–445/06 *Danske Slagterior* (n 168).

[231] Cases 46 and 48/93 *Brasserie du Pêcheur* (n 162) [84]–[88].

[232] Case C–470/03 *AGM* (n 188) [90]–[96] concerning a Finnish rule subjecting the right to compensation for damage other than damage to persons or property to the condition that the damage result either from a criminal offence or from the exercise of public authority, or there are 'especially serious reasons' for awarding compensation.

the effectiveness principle.[233] Although the CJEU rejected the German Government's request for a temporal limit on the effects of the *Brasserie* ruling, the Court indicated that Germany could take account, within the framework of its *national* law on liability, of temporal concerns such as the principle of legal certainty.[234]

Certain other restrictive conditions on the action for damages have been held to be contrary to the principle of effectiveness, such as the provision making a public sector worker's right to reparation for the damage suffered due to the state's infringement of the EU Working Time Directive conditional on a prior application having been made to his employer in order to secure compliance with that provision.[235] In a trilogy of Italian cases concerning claims arising out of the *Francovich* litigation, the CJEU found national provisions limiting the availability of compensation for the state's prior breach of EU law to be excessively restrictive.[236] This breach was the failure to implement Directive 80/987 on the protection of employees following their employer's insolvency, and the CJEU found various provisions of the legislation limiting the period from which wage claims could be made to be excessively restrictive.[237]

Concerning the principle of *equivalence*, the Court in *Palmisani* left it to the national court to decide whether the one-year time limit set by Italian legislation for a claim for compensation for failure to implement Directive 80/987 was in compliance.[238] The general time limit for cases of non-contractual liability brought under the Italian Civil Code was five years, and the CJEU distinguished between claims for wages under the national law implementing the Directive (a social security benefit) and claims for damages for loss caused by the late implementation of the Directive, which were governed by the Italian compensation scheme set up by the later measure (compensation for the state's non-implementation). For this reason, it might be inappropriate to compare the time limit for actions under the compensation scheme with the time limit for social security claims in national law, rather than with the ordinary system of non-contractual liability.[239] It was for the Italian court to determine the issue of 'equivalence', although the CJEU suggested that this principle might have been violated by the legislation at issue.[240] In *Transportes Urbanos*, on the other hand, the requirement of exhaustion of domestic remedies before bringing a claim in damages for breach of EU law was clearly considered by the CJEU to violate the equivalence principle, since it did not apply to claims in damages for breach of the domestic Constitution.[241]

---

[233] On mitigation of loss and economic loss in general see Case C–410/98 *Metallgesellschaft* (n 58) [91]; Cases C–295-298/04 *Manfredi* (n 31). As regards exemplary damages in English law, the CJEU in *Brasserie du Pêcheur* ruled that an award could not be ruled out in the case of the state's breach of EU law in similar circumstances to those which would give rise to an award in an action founded on domestic law: Cases 46 and 48/93 *Brasserie du Pêcheur* (n 162) [89].

[234] Cases 46 and 48/93 *Brasserie du Pêcheur* (n 162) [98].

[235] Case C–429/09 *Fuß* (n 168). See also Case C–94/10 *Danfoss* EU:C:2012:591 concerning passing-off rules and whether they undermined the effectiveness of the action for compensation.

[236] Cases C–94–95/95 *Bonifaci and Berto v IPNS* [1997] ECR I–3969; Case C–261/95 *Palmisani* (n 148); Case C–373/95 *Maso and Gazzetta v IPNS* [1997] ECR I–4051; Dougan (n 175).

[237] The Court also ruled that while retroactive application of the measures adopted should be sufficient to ensure the adequacy of reparation, this would not necessarily be so if employees could demonstrate otherwise: Cases C–94–95/95 *Bonifaci and Berto* (n 236) [51]–[53].

[238] Case C–261/95 (n 148).

[239] See also Case C–69/08 *Visciano* (n 97) [41]–[42].

[240] Case C–261/95 (n 148) [39]; Cases C–52 and 53/99 *ONP v Camarotto* [2001] ECR I–1395; Case C–470/04 *N v Inspecteur van de Belastingdienst Oost/kantoor Almelo* [2006] ECR I–7409.

[241] Case C–118/08 *Transportes Urbanos y Servicios Generales SAL v Administración del Estado* EU:C:2010:39.



# FREE MOVEMENT OF CAPITAL AND ECONOMIC AND MONETARY UNION

## 1  CENTRAL ISSUES

i.  This chapter is concerned with free movement of capital and economic and monetary union (EMU).

ii.  The discussion begins with the free movement of capital, one of the four freedoms enshrined in the original Rome Treaty. The Treaty Articles were altered radically by the Maastricht Treaty. There is now a growing body of case law on these provisions, which raises similar issues to those encountered in the context of goods, persons, establishment, and services.

iii.  The discussion then moves to EMU. There is analysis of the movement towards EMU and the arguments for and against EMU. The position of the European Central Bank (ECB) is analysed. The discussion concludes with analysis of the strains on EMU in the light of the banking and financial crisis.

iv.  The Treaties contain provisions on both monetary and economic union. Monetary union means in essence a single currency overseen by the ECB. The meaning of economic union is more diffuse. The essence of the idea is that the health of individual Member State economies can have implications for the overall health of the EU economy and for the value of the single currency, as exemplified by the way in which the Euro crisis was precipitated by concerns over the Greek economy. The Treaties therefore contain provisions to monitor the health of Member States' economies. The extent of these controls is however a sensitive matter, since they entail EU intrusion into domestic economic policy. The weakness of the pre-existing controls was however problematic, and recent legislation has strengthened this oversight.

## 2  FREE MOVEMENT OF CAPITAL

### (A) THE ORIGINAL TREATY PROVISIONS

Articles 67–73 EEC contained the original provisions on free movement of capital,[1] but they were less peremptory than those applicable to free movement of goods, workers, services, and establishment. Thus while Article 67(1) EEC imposed an obligation to abolish progressively restrictions on

---

[1]  J Usher, *The Law of Money and Financial Services in the European Community* (Oxford University Press, 1994) 14–16.

capital movements during the transitional period, this was only to the extent necessary to ensure the proper functioning of the common market. This theme was carried over to Article 71, which required Member States to endeavour to avoid the introduction of new exchange restrictions on capital movements. The wording of these Treaty Articles necessarily impacted on the ECJ's approach to this area.[2] The Council enacted various directives pursuant to these Treaty provisions, the most important being Council Directive 88/361.[3]

## (B) THE CURRENT PROVISIONS: THE BASIC PRINCIPLE

The Maastricht Treaty completely revised the provisions on free movement of capital, with effect from 1 January 1994.[4] Article 63 TFEU (ex Article 56 EC) now provides:

> 1. Within the framework of the provisions set out in this Chapter, all restrictions on the movement of capital between Member States and between Member States and third countries shall be prohibited.
>
> 2. Within the framework of the provisions set out in this Chapter, all restrictions on payments between Member States and between Member States and third countries shall be prohibited.[5]

What is now Article 63 was held to have direct effect in *Sanz de Lera*.[6] The ECJ held that it laid down a clear and unconditional prohibition for which no implementing measure was required. The existence of Member State discretion to take all measures necessary to prevent infringement of national law and regulations contained within what is now Article 65(1)(b) TFEU did not prevent Article 63 from having direct effect, because the exercise of such discretion was subject to judicial review. This ruling concerned an action against the state. Treaty Articles often have vertical and horizontal direct effect, and thus can be used against the state and private individuals, and there is nothing in *Sanz de Lera* to indicate the contrary. It would not be difficult, as Usher states,[7] to envisage a situation in which the unilateral conduct of a financial institution could restrict payments between states. This interpretation is reinforced by the fact that Article 63 does not refer only to the state.[8] The argument to the contrary would be derived by way of analogy with Article 34 on the free movement of goods, which has been largely confined to actions against the state.[9]

---

[2] Case 203/80 *Casati* [1981] ECR 2595.

[3] [1988] OJ L178/5.

[4] S Peers, 'Free Movement of Capital: Learning Lessons or Slipping on Spilt Milk?' in C Barnard and J Scott (eds), *The Law of the Single European Market* (Hart, 2002) ch 13; L Flynn, 'Coming of Age: The Free Movement of Capital Case-Law 1993–2002' (2002) 39 CMLRev 773; J Snell, 'Free Movement of Capital: Evolution as a Non-Linear Process' in P Craig and G de Búrca (eds), *The Evolution of EU Law* (Oxford University Press, 2nd edn, 2011) ch 18.

[5] This does not cover national procedural rules governing actions by a creditor seeking payment from a recalcitrant debtor: Case C–412/97 *ED Srl v Italo Fenocchio* [1999] ECR I–3845.

[6] Cases C–163, 165 and 250/94 *Criminal Proceedings against Lucas Emilio Sanz de Lera* [1995] ECR I–4821, [41]–[47]; Case C–101/05 *Skatteverket v A* [2007] ECR I–11531, [20]–[27]; Case C–201/05 *Test Claimants in the CFC and Dividend Group Litigation v Commissioners of Inland Revenue* [2008] ECR I–2875, [90]–[91].

[7] Usher (n 1) 27.

[8] In Case C–464/98 *Westdeutsche Landesbank Girozentrale v Stefan and Republik Österreich* [2001] ECR I–173 a private defendant relied on Art 63, and in Case C–213/04 *Burtscher v Stauderer* [2005] ECR I–10309, the defendant was a private individual, although the case concerned a state measure.

[9] The rationale for this limitation on Art 34 is, however, based in large part on the overlap which would otherwise occur between Art 34 and Arts 101 and 102.

The Treaty provisions do not define movement of capital, but the ECJ held that reference can be made to the non-exhaustive list in Directive 88/361.[10] It will be for the Court to decide, with the aid of the Directive, whether a measure constitutes a restriction on the movement of capital. Thus a national prohibition on the creation of a mortgage in a foreign currency was prohibited by Article 63.[11] The ECJ has held that restrictions on share dealings and 'golden shares'[12] come within Article 63.[13] So too do restrictions on the acquisition and disposal of property,[14] such as requirements of prior administrative authorization.[15] Measures taken by a Member State that are liable to dissuade its residents from obtaining loans or making investments in other Member States constitute restrictions on the movement of capital.[16]

While direct taxation remains within Member States' competence, they must exercise that competence consistently with EU law and avoid discrimination on the grounds of nationality.[17] It is clear moreover that Article 63 covers not only measures that discriminate on grounds of nationality, but also measures that may impede capital movements, even though they are not discriminatory.[18] The ECJ has, by way of contrast, held that a Member State can apply a tax to income, notwithstanding the fact that it has already been taxed in another Member State,[19] with the consequence that double taxation is not contrary to free movement of capital.[20]

Article 63 gives the impression that capital movements within the EU, and between Member States and non-member countries, are treated the same. This is not so, since other Treaty Articles qualify the application of Article 63 to non-member countries. Article 64(1) in effect allows lawful restrictions on capital movements which existed on 31 December 1993 to remain in being, and Article 64(2) only requires the Council to endeavour to achieve free movement with non-member countries to the greatest extent possible. The Council is also empowered under Article 66 to take safeguard measures in exceptional circumstances where capital movements to or from non-member countries cause, or threaten to cause, serious difficulties for the operation of economic and monetary union. Such measures cannot last longer than six months, and can be taken only where strictly necessary.

---

[10] Case C-222/97 *Proceedings brought by Trummer and Mayer* [1999] ECR I-1661, [21]; Case C-452/01 *Ospelt v Schlossle Weissenberg Familienstiftung* [2003] ECR I-9743; Case C-446/04 *Test Claimants in the FII Group Litigation v Commissioners of Inland Revenue* [2006] ECR I-11753, [174]–[188].

[11] Case C-464/98 *Westdeutsche Landesbank* (n 8).

[12] Cases C-282–283/04 *Commission v Netherlands* [2006] ECR I-9141; Case C-171/08 *Commission v Portugal* [2010] ECR I-6817; Case C-212/09 *Commission v Portugal* EU: C:2011:717; Cases C-105–107/12 *Netherlands v Essent NV* EU:C:2013:677; Case C-250/08 *Commission v Belgium* EU:C:2011:793.

[13] Case C-446/04 *Test Claimants in the FII Group* (n 10); Case C-182/08 *Glaxo Wellcome GmbH & Co KG v Finanzamt München II* [2009] ECR I-8591.

[14] Case C-376/03 *D v Inspecteur van de Belastingdienst/Particulieren/Onderneringen/ buitenland te Heerlen* [2005] ECR I-5821; Case C-443/06 *Erika Waltraud Ilse Hollmann v Fazenda Pública* [2007] ECR I-8491.

[15] Case C-302/97 *Konle v Austrian Republic* [1999] ECR I-3099; Case C-423/98 *Albore* [2000] ECR I-5965; Cases C-515 and 527–540/99 *Reisch v Bürgermeister der Landeshauptstadt Salzburg* [2002] ECR I-2157; Case C-300/01 *Salzmann* [2003] ECR I-4899; Case C-213/04 *Burtscher* (n 8).

[16] Case C-439/97 *Sandoz GmbH v Finanzlandesdirektion für Wien, Niederösterreich und Burgenland* [1999] ECR I-7041, [19]; Case C-478/98 *Commission v Belgium* [2000] ECR I-7587, [18]; Case C-513/03 *Heirs of van Hiltern-van der Heijden* [2006] ECR I-1957, [44].

[17] Case C-80/94 *Wielockx v Inspecteur der Directe Belastingen* [1995] ECR I-2493, [16]; Case C-251/98 *Baars v Inspecteur der Belastingen Particulieren/Ondernemingen Gorinchem* [2000] ECR I-2787, [17]; Cases C-397 and 410/98 *Metallgesellschaft Ltd, Hoechst AG and Hoechst (UK) Ltd v Commissioners of the Inland Revenue and HM Attorney General* [2001] ECR I-1727, [37]; Case C-242/03 *Ministre des Finances v Weidert and Paulus* [2004] ECR I-7379, [12]; Case C-346/04 *Conjin v Finanzamt Hamburg-Nord* [2006] ECR I-6137, [14]–[15].

[18] Case C-367/98 *Commission v Portugal* [2002] ECR I-4731, [44]–[45]; Case C-174/04 *Commission v Italy* [2005] ECR I-4933, [12]; Case C-375/12 *Bouanich v Directeur des services fiscaux de la Drôme*, 13 Mar 2014.

[19] Case C-513/04 *Kerckhaert and Morres v Belgium* [2006] ECR I-10967; Case C-374/04 *Test Claimants in Class IV of the ACT Group Litigation v Commissioners of Inland Revenue* [2006] ECR I-11673; Case C-128/08 *Jacques Damseaux v Belgium* [2009] ECR I-6923; Case C-487/08 *Commission v Spain* [2010] ECR I-4843, [27].

[20] J Snell, 'Non-Discriminatory Tax Obstacles in Community Law' (2007) 56 ICLQ 339, 358–366.

Rights.[43] In their application to companies the derogations are governed by the Treaty,[44] by the general principles of EU law and the Charter of Fundamental Rights, and by the relevant provisions of the Services Directive.[45] The general principles of EU law and the Charter include the principles of non-discrimination and of proportionality, which also govern the justification of public-interest-based restrictions on freedom of movement which have been judicially developed alongside the Treaty grounds for justification. Further, the Court has ruled that Article 52 does not permit a Member State to exclude an entire economic sector from the application of the principles on freedom of establishment and services.[46]

### (E) LEGISLATION GOVERNING ENTRY, RESIDENCE, AND EXPULSION

As we see in Chapters 21 and 23, Directive 2004/38 governs the terms and conditions of entry of all EU citizens and their families into a host Member State, as well as their right to remain there after having pursued an economic activity, and the conditions under which their rights may be restricted or revoked.[47] This includes self-employed persons and service providers, so that the discussion of Directive 2004/38 in Chapters 21 and 23 is equally relevant here.

The provisions of the earlier legislation governing self-employed persons, Directive 73/148, which regulated rights of 'abode' and rights of temporary residence for the duration of the services, have been replaced with the simple right of residence for self-employed persons in Article 7(a) of Directive 2004/38. Further, as Chapter 23 on citizenship outlines, even where a self-employed person is no longer engaged in economic activity, the right of residence as an EU citizen continues unless that person has, through lack of sufficient resources, become an unreasonable burden on the host state.

## 3 THE RIGHT OF ESTABLISHMENT

### Article 49 TFEU

Within the framework of the provisions set out below, restrictions on the freedom of establishment of nationals of a Member State in the territory of another Member State shall be prohibited. Such prohibition shall also apply to restrictions on the setting up of agencies, branches, or subsidiaries by nationals of any Member State established in the territory of any Member State.

Freedom of establishment shall include the right to take up and pursue activities as self-employed persons and to set up and manage undertakings, in particular companies or firms within the meaning of the second paragraph of Article 54, under the conditions laid down for its own nationals by the law of the country where such establishment is effected, subject to the provisions of the chapter relating to capital.

Paragraph one requires the *abolition of restrictions* on freedom of primary and secondary establishment, whereas paragraph two provides for the right to pursue self-employed activities *on an equal footing* with the nationals of the Member State of establishment. The reference to capital acknowledges

---

[43] Ch 21, Section 8.

[44] For examples of the application of Arts 52 and 62 TFEU to companies see Case 3/88 *Commission v Italy* [1989] ECR 4035; Case 352/85 *Bond van Adverteerders v Netherlands* [1988] ECR 2085; Case C–114/97 *Commission v Spain* [1998] ECR I–6717; Case C–355/98 *Commission v Belgium* [2000] ECR I–1221. For a failed attempt see Case C–171/02 *Commission v Portugal* [2004] ECR I–5645.

[45] For further discussion see Section 6(b) below.

[46] Case C–496/01 *Commission v France* [2004] ECR I–2351.

[47] Dir 2004/38 replaced the previous Dir 73/148 in this respect.

that there is a separate chapter on the free movement of capital, which was subject to a different and more gradual regime of liberalization.[48]

Article 49 on its face appears to give rights only to persons in a Member State other than the Member State of their nationality. Secondly, it appears to prohibit discrimination, and to imply that its requirements are satisfied if the person exercising the right of establishment is treated in the same way as a national. However, we shall see that Article 49 has been given a broader reading on these two points: nationals may in appropriate circumstances rely on Article 49 against their own state; and Article 49 prohibits not merely unequal treatment but any unjustified obstacles to freedom of establishment.

Article 50 TFEU originally required the Council to draw up a General Programme for the abolition of restrictions on establishment (which it did in 1961[49]) and to issue directives to achieve freedom for particular activities. Article 53 now requires the European Parliament and the Council to issue directives, acting in accordance with the ordinary legislative procedure, for the mutual recognition of diplomas and other qualifications, and Article 54 places companies in the same position as natural persons for the purpose of the application of this chapter of the Treaty.

## (A) THE EFFECT OF ARTICLE 49

In 1974 in *Reyners*, the ECJ ruled that Article 49 TFEU was directly effective, despite the fact that the conditions for direct effect set out in *Van Gend en Loos* were arguably not met,[50] and despite the Council's failure to adopt the necessary implementing legislation envisaged by the Treaty provisions. Such legislation had not been adopted by the time of *Reyners*, partly on account of the slow progress of legislation in the Council in the aftermath of the Luxembourg Accords, and partly on account of the opposition within Member States to the process of opening the professions, and particularly the legal profession, to non-nationals.[51]

Reyners, a Dutch national who had obtained his legal education in Belgium, was refused admission to the Belgian Bar solely because he lacked Belgian nationality. The ECJ ruled that, despite the Treaty requirement that directives should be adopted, Article 49 laid down a precise result to be achieved by the end of the transitional period, namely the requirement of non-discrimination on grounds of nationality. The fulfilment of this result had to be made easier by, but was not dependent on, the implementation of a programme of progressive measures.[52] Thus he could invoke Article 49 directly. The ECJ acknowledged, however, that the directives were nonetheless relevant in that they aimed to make easier the effective exercise of the right of freedom of establishment.[53]

In *Thieffry*, the Court went one step further and ruled that Article 49 could be relied on by an EU national seeking to practise a profession in another Member State where the restriction he faced was based not on nationality but on the adequacy of his qualifications.[54] The case concerned a Belgian national who obtained a doctorate in law in Belgium and practised as an advocate in Brussels, and who subsequently obtained French university recognition of his qualifications as equivalent to a degree in French law, and a certificate of aptitude for the profession of *avocat*. He was however refused admission to the training stage as an advocate at the Paris Bar on the ground that he lacked a degree in French law. According to the ECJ, since he had already obtained what was recognized in France, for both

---

[48] Ch 20.
[49] OJ Spec Ed, Second Ser, IX.
[50] Case 2/74 (n 13); see Ch 7 on direct effect.
[51] Ibid, AG Mayras, 658.
[52] Ibid [26].
[53] Ibid [31].
[54] Case 71/76 *Thieffry v Conseil de l'Ordre des Avocats à la Cour de Paris* [1977] ECR 765.

professional and academic purposes, to be an equivalent qualification, and had satisfied the necessary practical training requirements, the state authorities were not justified in refusing to admit Thieffry to the Bar solely on the ground that he did not possess a French qualification, despite the absence of any EU directives in the field.[55]

In subsequent cases the Court went further still and ruled that Article 49 precluded the competent national authorities from simply refusing, without further explanation, to allow nationals of another Member State to practise their trade or profession on the ground that their qualification was *not* equivalent to the corresponding national qualification. Instead, the Treaty provisions imposed specific, positive obligations on national authorities and professional bodies to take steps to secure the free movement of workers and freedom of establishment, even in the absence of EU or national legislation providing for equivalence or for the recognition of qualifications. In *Heylens* the Court ruled, in the case of a Belgian football trainer working in France who was refused recognition of the equivalence of his Belgian diploma, that Member States were entitled, in the absence of harmonizing directives, to regulate the knowledge and qualifications necessary to pursue a particular occupation. However:

> [T]he procedure for the recognition of equivalence must enable the national authorities to assure themselves, on an objective basis, that the foreign diploma certifies that its holder has knowledge and qualifications which are, if not identical, at least equivalent to those certified by the national diploma. That assessment of the equivalence of the foreign diploma must be effected exclusively in the light of the level of knowledge and qualifications which its holder can be assumed to possess in the light of that diploma, having regard to the nature and duration of the studies and practical training which the diploma certifies that he has carried out.[56]

Further, where employment was dependent on possession of a diploma, it had to be possible for a national of a Member State to obtain judicial review of a decision of the authorities of another Member State, and to ascertain the reasons for refusing to recognize the equivalence of a diploma.

In *Vlassopoulou*, a Greek national who had obtained a Greek law degree and had practised German law for several years in Germany applied for admission to the Bar there. Her authorization to practise was rejected on the ground that she lacked the necessary qualifications because she had not passed the relevant German examinations. The ECJ began by ruling that even the nondiscriminatory application of national qualification requirements could hinder the exercise of freedom of establishment:

> Consequently, a Member State which receives a request to admit a person to a profession to which access, under national law, depends upon the possession of a diploma or a professional qualification must take into consideration the diplomas, certificates and other evidence of qualifications which the person concerned has acquired in order to exercise the same profession in another Member State by making a comparison between the specialized knowledge and abilities certified by those diplomas and the knowledge and qualifications required by the national rules.[57]

Thus the national authorities must consider any education and training received by the holder of the diploma or certificate, and must compare the knowledge and skills acquired with those required by the domestic qualification.[58] If they are found to be equivalent, the state must recognize the qualification,

---

55 Ibid [17]; Case 11/77 *Patrick v Ministre des Affairs Culturelles* [1977] ECR 1199.

56 Case 222/86 *UNECTEF v Heylens* [1987] ECR 4097, [13].

57 Case 340/89 *Vlassopoulou v Ministerium für Justiz, Bundes und Europaangelegenheiten Baden-Württemberg* [1991] ECR 2357, [16].

58 Also Case C–104/91 *Borrell* [1992] ECR I–3001.

and if they are not so found, the state must assess whether any knowledge or practical training the person may have acquired in the host Member State is sufficient to make up for what was lacking in the qualification.

*Vlassopoulou* highlights the extent to which the effectiveness of Article 49 was bolstered by the Court in the years following *Reyners*, where the ECJ held that in the absence of legislation only the core non-discrimination requirement of the Article was directly effective. By the time of *Vlassopoulou* it had been held that, despite the diversity of national educational and training systems and the lack of EU coordinating legislation, Article 49 TFEU imposed a precise obligation on national authorities to examine thoroughly the basis for the qualification held by an EU national, to inform the person concerned of the reasons if the qualification is deemed not to be equivalent, and to respect their rights in the process. The effect was that a Member State could no longer simply refuse someone entry to a profession or to practise a trade solely on the ground that he or she lacked the domestic qualification, even where there was as yet no domestic or EU recognition of the equivalence of the foreign qualification.[59]

The approach adopted by the ECJ in *Vlassopoulou* closely reflected the provisions of Council Directive 89/48 on the mutual recognition of higher education diplomas which was adopted around that time,[60] but was not applicable to the facts of *Vlassopoulou*. Directive 89/48 has since been replaced by consolidating Directive 2005/36, which embodies the same approach and the same principles.[61] Further, as we shall see below, the broad principles articulated in the *Vlassopoulou* and *Heylens* cases continue to apply to situations which are not covered by the secondary legislation.

## (B) THE SCOPE OF ARTICLE 49

### (i) *Discriminatory and Non-Discriminatory Restrictions*

It was noted above that the wording of Article 49 emphasizes the requirement of equal treatment of nationals and non-nationals.[62] Further, apart from the general non-discrimination clause in Article 18 TFEU and the specific non-discrimination requirement in Article 49, Article 24 of Directive 2004/38 on the rights of movement and residence of EU citizens also contains an umbrella equal treatment clause.

In some of its earlier case law, such as *Commission v Belgium*[63] and *Fearon*,[64] the ECJ appeared to suggest that, in the absence of direct or indirect discrimination, rules which restricted the right of establishment would not violate Article 49. However, in keeping with the pattern of its case law on the free movement of goods, services, and workers, the Court has since moved clearly away from the emphasis on unequal treatment.

In *Klopp*, a German lawyer who was refused admission to the Paris Bar on the sole ground that he already maintained an office as a lawyer in another Member State successfully challenged the rule under Article 49, even though the rule applied equally to nationals and non-nationals.[65] The Court ruled that

---

[59] See also Case C-164/94 *Arantis v Land Berlin* [1996] ECR I–135.

[60] See (n 290) and text below.

[61] (N 2) and (nn 301–302).

[62] For some cases in which the ECJ insisted on equality of treatment for persons exercising the right of establishment, see Case 63/86 *Commission v Italy* [1988] ECR 29; Case C–337/97 *Meeusen v Hofddirectie van de Informatie Beheer Groep* [1999] ECR I–3289; Case 197/84 *Steinhauser v City of Biarritz* [1985] ECR 1819; Case 143/87 *Stanton* (n 68); Case 79/85 *Segers* [1986] ECR 2375; Case C–334/94 *Commission v France* [1996] ECR I–1307, [21]; Case C–151/96 *Commission v Ireland* [1997] ECR I–3327.

[63] Case 221/85 *Commission v Belgium* [1987] ECR 719 on clinical biology services.

[64] Case 182/83 *Fearon v Irish Land Commission* [1984] ECR 3677, on a residence requirement for exemption from compulsory purchase of land. See also Cases 305/87 *Commission v Greece* [1989] ECR 1461; C–302/97 *Konle v Austria* [1999] ECR I–2651; and C–197/11 *Libert* EU:C:2013:288 on land restrictions and freedom of movement.

[65] Case 107/83 *Ordre des Avocats v Klopp* [1984] ECR 2971.

Article 49 specifically guarantees the freedom to set up more than one place of work in the EU and there were less restrictive ways, given modern transport and telecommunications, of ensuring that lawyers maintain sufficient contact with their clients and the judicial authorities, and obey the rules of the profession. *Klopp* was not of itself authority for a general proposition that even non-discriminatory rules may breach Article 49, given that Article 49 expressly guarantees the right to secondary establishment which was being denied in that case,[66] but it demonstrated that freedom of establishment requires more than equal treatment in certain circumstances.

In *Wolf*,[67] *Stanton*,[68] and *Kemmler*,[69] the ECJ however ruled that certain indistinctly applicable national rules on social-security exemptions for the self-employed were impermissible, because they constituted an unjustified impediment to the pursuit of occupational activities in more than one Member State, even though the rules contained no direct or indirect discrimination on grounds of nationality.[70] Similarly in cases concerning non-discriminatory registration requirements, the Court found a violation of Article 49 in the absence of objective justification.[71]

The *Gebhard* ruling gave the clearest indication of the Court's broad interpretation of Article 49 TFEU.[72] Here the Court declared that the same principles underpin all of the Treaty provisions on freedom of movement, and stated that the provisions on goods,[73] services,[74] workers,[75] and establishment should be similarly construed. *Gebhard* concerned a German national against whom disciplinary proceedings were brought by the Milan Bar Council for pursuing a professional activity as a lawyer in Italy on a permanent basis. He had set up his chambers using the title *avvocato*, although he had not been admitted as a member of the Milan Bar and although his training, qualifications, and experience had not formally been recognized in Italy. Having established that in the absence of EU rules, Member States may justifiably subject the pursuit of self-employed activities to *bona fide* rules relating to organization, ethics, qualifications, titles, etc, the Court continued:[76]

> It follows, however, from the Court's case law that national measures liable to hinder or make less attractive the exercise of fundamental freedoms guaranteed by the Treaty must fulfil four conditions: they must be applied in a non-discriminatory manner; they must be justified by imperative requirements in the general interest; they must be suitable for securing the attainment of the objective which they pursue; and they must not go beyond what is necessary in order to attain it.

---

[66] See also Case 96/85 *Commission v France* [1986] ECR 1475; Case C–351/90 *Commission v Luxembourg* [1992] ECR I–3945, condemning other similar single-practice rules for doctors, dentists, and vets; Case C–106/91 *Ramrath v Ministre de la Justice* [1992] ECR I–3351; Case C–162/99 *Commission v Italy* [2001] ECR I–541.

[67] Cases 154–155/87 *RSVZ v Wolf* [1988] ECR 3897.

[68] Case 143/87 *Stanton v INASTI* [1988] ECR 3877.

[69] Cases C–53/95 *INASTI v Kemmler* [1996] ECR I–704; C–68/99 *Commission v Germany* [2001] ECR I–1865, concerning social insurance law affecting artists. Compare Case C–249/04 *Allard v INASTI* [2005] ECR I–4535; Case C–565/08 *Commission v Italy*, 29 Mar 2011, in which maximum tariffs applicable to lawyers' fees were held not to restrict the freedom of establishment or to provide services.

[70] Case 143/87 *Stanton* (n 68) [9].

[71] Case 292/86 *Gullung v Conseil de l'Ordre des Avocats* [1988] ECR 111; Case 271/82 *Auer v Ministère Public* [1983] ECR 2727, [18].

[72] Case C–55/94 *Gebhard* (n 21).

[73] Cases 8/74 *Procureur du Roi v Dassonville* [1974] ECR 837; Case 120/78 *Rewe-Zentral v Bundesmonopolverwaltung für Branntwein (Cassis de Dijon)* [1979] ECR 649; C–267 and 268/91 *Keck and Mithouard* [1993] ECR I–6097; C–34–36/95 *de Agostini* [1997] ECR I–3843; C–254/98 *Schutzverband gegen unlauteren Wettbewerb v TK-Heimdienst Sass GmbH* [2000] ECR I–151. See more generally the discussion in Ch 19.

[74] See, eg, Case C–384/93 *Alpine Investments* (n 6); Cases C–369 and 376/96 *Arblade* [1999] ECR I–8453.

[75] Case C–415/93 *Bosman* (n 28) [82]–[84].

[76] Ibid [37].

## (C) ESTABLISHMENT OF COMPANIES

Article 54 TFEU provides:

> Companies or firms formed in accordance with the law of a Member State and having their registered office, central administration or principal place of business within the Union shall, for the purposes of this Chapter, be treated in the same way as natural persons who are nationals of Member States.
> 'Companies or firms' means companies or firms constituted under civil or commercial law, including cooperative societies, and other legal persons governed by public or private law, save for those which are non-profit making.

Although this Article requires companies to be treated in the same way as nationals for the purposes of the Treaty provisions on freedom of establishment, this is not strictly possible, given the differences between natural and legal persons. Further, despite the many company law directives which have been adopted, considerable differences in the way the various Member States regulate companies and their activities remain.

The definition of a company in Article 54 is wide, referring to 'legal persons governed by private or public law'. However, it excludes non-profit-making companies even though non-profit-making economic activities may be covered by Article 49.[104] The exclusion of non-profit-making companies can be compared with the exclusion from the scope of the Treaty of workers who are not remunerated and services which are not provided for remuneration, although it has been subject to criticism.[105]

### (i) *When is a Company 'Established' in a Member State?*

It is clear that, so long as a company is formed in accordance with the law of a Member State and has its registered office there and its principal place of business *somewhere* in the EU, it will be established in the first Member State within the meaning of the Treaty. The ECJ made it clear in *Segers* that this would hold true even if the company conducted no business of any kind in that Member State, but instead conducted its business through one of the various forms of secondary establishment, such as a subsidiary, branch, or agency, in another Member State.[106]

This was affirmed in *Centros*, where the ECJ ruled that a company was lawfully established in the UK even though it had never traded there.[107] Further, in the *Insurance Services* case, the Court held that even an office managed for a company by an independent person on a permanent basis would amount to establishment in that Member State.[108] This form of establishment would amount to a secondary establishment, since the registered office or seat of the company and its principal place of business would presumably be elsewhere in the EU. A company has a right of secondary establishment only if it already has its principal place of business or central or registered office within the EU.[109]

---

[104] Case C–70/95 *Sodemare* (n 22). However, the fact that a company is non-profit-making does not mean that it is not engaged in economic activity: see Case C–382/92 *Commission v UK* [1994] ECR I–2435, [45], and see below the cases on cross-border access to health care in the context of services (nn 179–189).

[105] For criticism of the exclusion of non-profit entities, see S Lombardo, 'Some Reflections on Freedom of Establishment of Non-Profit Entities in the European Union' (2013) 14 European Business Organization Law Review 225.

[106] Case 79/85 *Segers* (n 62) [16].

[107] Case C–212/97 *Centros* (n 27).

[108] Case 205/84 (n 20) [21]. Compare Case C–386/04 *Centro di Musicologia Walter Stauffer v Finanzamt München für Körperschaften* [2006] ECR I–8203, [18]–[20].

[109] For interesting cases involving elements of establishment in third countries, but which nonetheless fell within the scope of EU law on freedom of establishment, see Case C–48/11 *A* EU:C:2012:485 and C–80/12 *Felixstowe Dock and Railway Company* EU:C:2014:200, [37]–[41].

iii. Despite the importance of non-discrimination in the field of establishment, the CJEU adopts broadly the same approach to freedom of establishment as it does in other areas of free movement. In other words, any hindrance or measure which renders less attractive the right of establishment in a Member State and any restriction on 'access to the market' for persons seeking to establish themselves, whether or not it has a differential impact on nationals and non-nationals, is caught by the prohibition in Article 49 unless it can be justified.

iv. The law governing establishment of companies is more complex than that governing natural persons, mainly due to the differences between national company laws. Rather than await legislative harmonization at EU level, the CJEU has required host states to permit companies validly incorporated in another state, even under a very different corporate law regime, to exercise rights of secondary establishment in a host state without imposing undue regulatory restrictions. While the cases of *Daily Mail* and *Cartesio* concerning corporate exit from a state indicate that the Member State of incorporation of a company (home state) retains the right to set the basic conditions for acquisition and maintenance of the status as an incorporated entity, a series of other cases including most recently *Vale* and *National Grid Indus* indicate that the Court will carefully scrutinize the justification for a range of other restrictions imposed by states on the cross-border freedom of establishment of companies.

v. Tax restrictions on companies established in more than one Member State, which seek to combine the advantages and minimize the disadvantages of different tax regimes within the different states in which they are established, have been regularly and successfully challenged in recent years.

# 4 FREE MOVEMENT OF SERVICES

We have seen that the right of establishment entails the pursuit of an economic activity from a fixed base in a Member State for an indefinite period. Freedom to provide services under Article 56 TFEU, on the other hand, entails the carrying out of an economic activity for a temporary period in a Member State in which either the provider or the recipient of the service is not established.

According to the *Insurance Services* case, if a person or an undertaking maintains a *permanent* economic base in a Member State, even if only through an office, it cannot avail itself of the right to provide services in that state but will be governed by the law on freedom of establishment.[148] In *Gebhard*, however, we saw that the ECJ acknowledged that the provision of services did not necessarily cease to be *temporary* simply because the provider might need to equip herself with the necessary infrastructure, for example an office or chambers, to perform those services.[149] The relevant criterion is not the mere existence of an office in a Member State, but rather the temporary vs permanent nature of the economic activities carried on there.

This may prove difficult to establish, especially when certain services, such as the construction of large buildings, take a long time. The Court has held that the fact that services are provided over an extended period, even over several years, does not mean that Article 56 is inapplicable.[150] In *Commission v Portugal* the Court held that the imposition of authorization rules concerning construction activity in Portugal were incompatible with Article 56, since those rules imposed the same requirements on

---

[148] Case 205/84 (n 20) [21]. The earlier decision in Case 39/75 *Coenen v Sociaal-Economische Raad* [1975] ECR 1547 was somewhat contradictory on this point.

[149] Case C–55/94 *Gebhard* (n 21) [27].

[150] Case C–215/01 *Schnitzer* (n 23) [30]. For discussion, see Hatzopoulos (n 7).

the provision of temporary services as were imposed on the establishment of providers of building services.[151] According to the Court, the fact that the provision of construction services generally takes some time and that it may prove difficult to distinguish from the situation in which the provider is actually established in the host Member State does not have the effect of precluding those services from the scope of Article 56 TFEU.

The Court has also ruled that people who direct most or all of their services at the territory of a particular Member State, but maintain their place of establishment outside that state in order to evade its professional rules (the abuse/evasion theory), may in certain circumstances be treated as being established within the Member State, and thus covered not by Article 56 on services but by Article 49 on establishment instead.[152] In such a case the professional rules which were being evaded by the maintenance of an establishment in a different Member State could be applied as though the person were established in the regulating state. Cases in which such an evasion or abuse has been found seem relatively rare, and the onus is firmly on the state to show that a person was seeking to evade legitimate requirements rather than simply exercising their Treaty freedoms.[153]

---

### Article 56 TFEU

Within the framework of the provisions set out below, restrictions on freedom to provide services within the Union shall be prohibited in respect of nationals of Member States who are established in a Member State other than that of the person for whom the services are intended.

The European Parliament and the Council, acting in accordance with the ordinary legislative procedure, may extend the provisions of the Chapter to nationals of a third country who provide services and who are established within the Union.

---

Article 56 indicates that in order to benefit from the right to provide services, the person in question, natural or legal, must already have a place of establishment within the EU and, if a natural person, must possess the nationality of a Member State.[154] The General Programme on freedom to provide services specified in more detail that the right to provide services was available only to nationals established in the EU, or to companies formed under the laws of a Member State and having their seat, centre of administration, or main establishment within the EU.[155] If only the seat of a company is situated within the EU, then its activity must have a 'real and continuous link' with the economy of a Member State, other than a link of nationality.

Without that economic foothold within the EU, there is no right under EU law for a company or an EU national established *outside* the EU to provide temporary services *within* the EU.[156] A permanent economic base must first be established within a Member State, and from that base the person may provide temporary services in other Member States.

---

[151] Case C–458/08 *Commission v Portugal* [2010] ECR I–11599.

[152] Case 33/74 *Van Binsbergen* (n 16) [13]; Case 205/84 *Commission v Germany* (n 20) [22]. For an example of a justified state restriction to prevent an evasion of domestic rules where a provider of broadcasting services was established outside the Netherlands yet was directing its services at the Netherlands, see Case C–148/91 *Vereniging Veronica Omroep Organisatie v Commissariaat voor de Media* [1993] ECR I–487 and Case C–23/93 *TV10 SA v Commissariaat voor de Media* [1994] ECR I–4795. Contrast Cases C–369 and 376/96 *Arblade* (n 74) [32].

[153] Case C–212/97 *Centros* (n 27) [29]; AG's Opinion in Case C–55/94 *Gebhard* (n 21) [84].

[154] Case C–290/04 *FKP Scorpio Konzertproduktionen GmbH v Finanzamt Hamburg-Eimsbüttel* [2006] ECR I–9461.

[155] The 1961 General Programme (n 49).

[156] Case C–452/04 *Fidium Finanz v Bundesanstalt für Finanzdienstleistungsaufsicht* [2006] ECR I–9521.