# EXHIBIT 65

Sid 1 (15)



NACKA TINGSRÄTT

**PROTOKOLL**
2019-01-23
Handläggning i
Nacka

Aktbilaga 149
Ärende nr
Ä 2550-17

Handläggning i parternas utevaro

**RÄTTEN**
Lagmannen Cecilia Klerbro samt rådmännen Mats Åhrling och Olof Roos (referent)

**PROTOKOLLFÖRARE**
Referenten, biträdd av beredningsjuristen Anna Nordenskjöld

**PARTER**

**Klagande**
1. Ioan Micula, 19570408-1677
Transilvania Str. Teatrului No 1-2 Box 306
3700 Oradea
Rumänien

2. S.C Multipack S.R.L

3. S.C European S.A

4. S.C Starmill S.R.L
Adress hos ombud för 2-4

Ombud för 1–4: advokaterna Jakob Ragnwaldh, Fredrik Andersson och
Aron Skogman
Mannheimer Swartling Advokatbyrå AB
Box 1711
111 87 Stockholm

Ombud för 1–4: advokaten Kaj Hobér
Säves väg 36
752 63 Uppsala

5. Viorel Micula, 19570408-1578
Colinelor 48
3700 Dradea
Rumänien

Ombud för 5: advokaterna Jesper Tiberg och Karin Ljungman
Advokatfirman Lindahl KB
Box 1065
101 39 Stockholm

Dok.Id 574623

| Postadress | Besöksadress | Telefon | Expeditionstid |
|---|---|---|---|
| Box 69 | Sicklastråket 1 | 08-561 656 20 | måndag – fredag |
| 131 07 Nacka | | **E-post**: nacka.tingsratt.avdelning2@dom.se | 08:00–16:30 |
| | | www.nackatingsratt.domstol.se | |

Sid 2

NACKA TINGSRÄTT                    **PROTOKOLL**                    Ä 2550-17
                                    2019-01-23

**Motpart**
Rumänien genom Ministry of Public Finance
17 Apolodor Street
District 5
Bucharest
Rumänien

Ombud: advokaterna Per Nilsson och Isabel Ringsby
Flood Herslow Holme Advokatbyrå AB
Box 7615
103 94 Stockholm

**ÖVRIGA**
Europeiska kommissionen

Ombud: processföraren Knut Simonsson

**SAKEN**
Hinder mot verkställighet

**ÖVERKLAGAT AVGÖRANDE**
Kronofogdemyndighetens beslut den 16 mars 2017 i ärende nr U 25445-16/0103

_____

**BAKGRUND**
I slutet av 1990-talet införde Rumänien olika investeringsincitament, till exempel
skattelättnader och tullbefrielser, som syftade till att öka investeringar i missgynnade
regioner i landet.


Den 29 maj 2002 träffade Sveriges och Rumäniens regeringar ett avtal om främjande
och ömsesidigt skydd av investeringar (SÖ 2003:2). Enligt avtalet skulle vardera
avtalsparten inom sitt respektive territorium främja investeringar gjorda av den andra
avtalspartens investerare. I avtalet angavs att tvister i sista hand skulle lösas genom
internationell skiljedom, vid bland annat Internationella centralorganet för biläggande
av investeringstvister (ICSID – International Centre for Settlement of Investment
Disputes) enligt 1965 års Washingtonkonvention.


Förhandlingar om Rumäniens tillträde till EU inleddes i februari 2000. I EU:s
gemensamma ståndpunkt, den 21 november 2001, konstaterades att de stödordningar

NACKA TINGSRÄTT **PROTOKOLL** Ä 2550-17
2019-01-23

som investeringsincitamenten innebar inte överensstämde med EU:s regelverk om statligt stöd. Rumänien upphävde de flesta av berörda investeringsincitament den 31 augusti 2004.

Klagandena i ärendet, som hade gjort investeringar i Rumänien, väckte talan vid skiljedomstol och begärde ersättning för sina skador till följd av att investeringsincitamenten hade upphävts. Genom skiljedomstolens dom den 11 december 2013 förpliktades Rumänien att betala skadestånd till klagandena med 376 433 229 rumänska lei (motsvarande drygt 900 miljoner kr) jämte viss ränta.

I beslut den 30 mars 2015 (1470/2015) föreskrev EU-kommissionen (nedan Kommissionen) att utbetalningar i enlighet med skiljedomen utgör statligt stöd i den mening som avses i artikel 107.1 i Fördraget om Europeiska unionens funktionssätt och att de dessutom är oförenliga med den inre marknaden. Kommissionen föreskrev också att Rumänien inte får betala ut sådant oförenligt statligt stöd och ska återkräva sådant oförenligt statligt stöd som redan har betalats ut. Kommissionens beslut har överklagats och överklagandena handläggs av EU-tribunalen.

Klagandena har hos Kronofogdemyndigheten ansökt om verkställighet av skiljedomen i Sverige. Genom det överklagade beslutet biföll Kronofogdemyndigheten Rumäniens invändning om att det förelåg hinder mot den sökta verkställigheten.

**YRKANDEN M.M.**
Klagandena har begärt att tingsrätten med ändring av Kronofogdemyndighetens beslut ska förklara att det inte föreligger hinder mot sökt verkställighet. Klagandena har även begärt ersättning för rättegångskostnad.

Rumänien har bestritt ändring. Rumänien har vidare begärt att tingsrätten, för det fall tingsrätten överväger att ändra Kronofogdemyndighetens beslut, inhämtar ett förhandsavgörande från EU-domstolen, samt beslutar om vilandeförklaring av ärendet till dess sådant avgörande inkommit. Slutligen har Rumänien begärt att tingsrätten, för

NACKA TINGSRÄTT                          **PROTOKOLL**
                                           2019-01-23

det fall tingsrätten överväger att ändra det överklagade beslutet och inte anser det nödvändigt att inhämta ett förhandsavgörande från EU-domstolen, beslutar att vilandeförklara ärendet till dess att EU-tribunalens mål angående överklagandet av Kommissionens beslut slutligt har avgjorts. Rumänien har begärt ersättning för rättegångskostnad.

Kommissionen – som har rätt att yttra sig – har anfört att överklagandet bör avslås.

Tingsrätten har den 16 mars 2018 hållit sammanträde i ärendet varefter parterna och Kommissionen beretts tillfälle att avge avslutande synpunkter.

Tingsrätten har den 13 december 2018 och 22 januari 2019 hållit enskild överläggning.

**GRUNDER**

Parterna samt Kommissionen har till grund för sina yrkanden och inställningar i huvudsak och sammanfattningsvis anfört följande.

**Klagandena**

1) Sveriges skyldighet att verkställa skiljedomen, utan att någon prövning sker av domen, vare sig formellt eller materiellt, följer av Sveriges folkrättsliga åtaganden.

Skyldigheten att verkställa skiljedomen stadgas i Washingtonkonventionen artikel 54. I propositionen vid implementeringen, betonades följande.

> [S]kiljedomen skall verkställas som en lagakraftvunnen dom av svensk domstol. Någon prövning av skiljedomen avses inte få ske vare sig i materiellt eller formellt hänseende. Detta konventionsåtagande, som regleras i art. 54, gäller oberoende av om domen har meddelats i Sverige eller i annat land (proposition 1966:146, sid. 11–12).

Regleringen utesluter alla möjligheter för svenska myndigheter och domstolar, dels att pröva om verkställighet ska ske, dels att vid verkställigheten beakta alla former av

NACKA TINGSRÄTT                         **PROTOKOLL**
2019-01-23

formella eller materiella invändningar som framförs. Det innebär att även om det vid verkställigheten av ett svenskt avgörande skulle ha varit möjligt att beakta EU-rättsliga invändningar, får sådana omständigheter inte beaktas vid verkställigheten av en skiljedom av nu aktuellt slag.

Därtill rör det sig inte om en reell regelkonflikt mellan EU-rätten och svensk rätt – i form av Sveriges åtaganden enligt Washingtonkonventionen. I stället följer det av artikel 351 i Fördraget om Europeiska unionens funktionssätt, som gäller alla internationella avtal, att EU-rätten accepterar att skiljedomen verkställs även om den skulle stå i strid med EU:s statsstödsregler.

2) Skiljedomens rättskraft omfattar statsstödsinvändningen och rättskraften respekteras av EU-rätten, även om EU-rätten skulle haft företräde framför Washington-konventionen.

Skiljedomens rättskraft omfattar alla invändningar som framfördes, eller kunde ha framförts, under förfarandet och innebär även att den rättsföljd som är knuten till domen ska stå fast. Under förfarandet framförde Rumänien invändningen att ett eventuellt skadestånd skulle utgöra ett otillåtet statsstöd. Även om EU-rätten, felaktigt, skulle tillerkännas ett företräde framför Washingtonkonventionen, även om skadeståndet rent faktiskt utgör ett otillåtet statsstöd eller även om domen skulle vara materiellt felaktig, omfattas frågan således av domens rättskraft.

Rättskraftsinstitutet är centralt inom den internationella rätten och respekteras av EU-rätten eftersom en annan ordning skulle skapa betydande osäkerhet. Detta även om det skulle innebära en begränsning av EU-rättens fulla genomslag. Av samma skäl, samt att de av motparten framförda undantagen inte är tillämpliga, kan Kommissionens beslut, meddelat efter skiljedomsavgörandet, inte tillmätas betydelse i frågan om skiljedomen ska verkställas.

NACKA TINGSRÄTT                    **PROTOKOLL**                     Ä 2550-17
2019-01-23

3) Bestämmelsen i 3 kap. 21 § utsökningsbalken är inte tillämplig vid verkställighet av nu aktuellt slag.

Eftersom Kommissionens beslut enbart riktar sig mot Rumänien – och rör Rumäniens skyldighet mot EU (tredje man) med anledning av beslutet – utgör det inte ett sådant förhållande som rör parternas mellanhavanden. Bestämmelsen i utsökningsbalken tar vidare sikte på materiella förhållanden i tiden efter domen. En tillämpning av bestämmelsen skulle därtill dels, som ovan anförts, strida mot Sveriges åtaganden enligt Washingtonkonventionen, dels strida mot den speciallagstiftning som inrättats för aktuell verkställighet.

4) Det krävs inte något lagakraftbevis för verkställighet av skiljedomen och i vart fall är ingivet äkthetsbevis att beakta som ett lagakraftbevis.

Skiljedomen är ett slutligt avgörande som omedelbart vinner laga kraft. Det är inte heller möjligt att få ett lagakraftbevis eller en verkställighetsförklaring för en ICSID-dom.

5) Rumänien har inte fullgjort förpliktelsen i skiljedomen.

Den bevislättnad som gäller för andra omständigheter enligt 3 kap. 21 § andra stycket utsökningsbalken är inte tillämplig angående påstående om fullgörelse, som uttryckligen ska bedömas enligt första stycket. Rumänien har genom, verkställighetsåtgärder under 2015, betalat 40 miljoner rumänska lei av det utdömda kapitalbeloppet.

Påstådd kvittning har inte ägt rum och har därtill förklarats ogiltig av rumänsk appellationsdomstol. Först om den rumänska kassationsdomstolen, där målet ligger för prövning, meddelar att en kvittning har ägt rum har Rumänien erlagt delbetalningen. Enligt rumänsk rätt måste fordringarna vara av samma slag för att kvittning ska kunna ske mot den ena partens vilja.

NACKA TINGSRÄTT                **PROTOKOLL**                Ä 2550-17
                                2019-01-23

Kontoöverföringarna, mellan olika statskontrollerade konton, har inte inneburit
betalning enligt rumänsk rätt. Under 2015 öppnades ett statskontrollerat konto i
klagandens namn till vilket det överfördes 473 miljoner rumänska lei. Efter
Kommissionens beslut om att skadeståndet skulle anses utgöra ett otillåtet statsstöd
fördes emellertid medlen över till ett annat statskontrollerat konto, utan att klagandena
däremellan hade fått tillgång till medlen.

Överföringen om 101 000 rumänska lei till en exekutor har inte inneburit betalning
eftersom medlen aldrig har betalats ut till klagandena.

6) Pågående verkställighetsförfarande i andra jurisdiktioner utgör inte hinder mot sökt
verkställighet.

7) Det är inte möjligt att vilandeförklara ärendet.

Av lag (1966:735) om erkännande och verkställighet av skiljedomar i vissa
internationella investeringstvister framgår att det enda undantaget, från att omedelbart
verkställa skiljedomen, är om uppskov beslutas. Något sådant uppskov har inte
meddelats. Det saknas dessutom stöd för att meddela ett sådant uppskov. Det skulle
således strida mot tillämplig speciallagstiftning att vilandeförklara ärendet.

8) Eftersom klagandena har orsakats onödiga kostnader på grund av Rumäniens
processföring ska Rumänien, oavsett utgången i ärendet, förpliktigas att ersätta
klagandena för deras rättegångskostnader med sammanlagt 150 000 kr.

Kort innan tingsrättens sammanträde inkom Rumänien med yttrande, inte bara över det
yttrande med bilagor som Rumänien var förelagd att yttra sig över, utan som ett
fullständigt svar på klagandenas yttrande av den 15 december 2017. Rumäniens
agerande förorsakade att klagandena fick ställa in sitt planerade slutanförande och att
det krävdes ytterligare skriftväxling i ärendet. Hade Rumänien i stället aviserat att
staten avsåg att ge in ett yttrande avseende helt andra frågor än de som omfattades av

NACKA TINGSRÄTT                    **PROTOKOLL**
2019-01-23

rättens föreläggande hade det varit möjligt att ställa in sammanträdet eller för

klagandena att avvakta med att lägga tid på att sammanfatta målet och sina argument i

ett manus baserat på Rumäniens talan, såsom den hade formulerats innan dess.

**Rumänien**

1) Kommissionens beslut i sig – men även EU-rättens regler om otillåtet statsstöd –

utgör hinder mot att verkställa aktuellt avgörande.

Enligt Washingtonkonventionen ska Sverige verkställa en ICSID-dom som en

lagakraftvunnen svensk dom. Det innebär att domen varken ska tillerkännas en bättre

eller sämre ställning än en inhemsk svensk dom. Under liknande förutsättningar hade

Kommissionens beslut i sig – men även EU-rättens regler om otillåtet statsstöd –

utgjort hinder mot att verkställa ett svenskt avgörande. Den omständigheten att

skiljedomen inte ska prövas vare sig i formellt eller materiellt hänseende innebär

närmast att den inte ska underkastas en prövning likt den som sker av utländska

avgöranden i ett exekvaturförfarande.

Kommissionen – som har exklusiv rätt att bedöma detta – har slagit fast att betalning

till följd av skiljedomen är att betrakta som otillåtet statsstöd. Kommissionens beslut är

därmed direkt bindande för Rumänien. Enligt artikel 4.3 i Fördraget om Europeiska

unionen gäller principen om lojalt samarbete och Sverige har därmed en skyldighet att

inte omöjliggöra för Rumänien att uppfylla sina skyldigheter. Kravet på lojalt

samarbete gäller även gentemot Kommissionen. Lojalitetsplikten hindrar därmed

Sverige också från att meddela beslut som riskerar att underminera Kommissionens

beslut.

Skulle tingsrätten ändå anse att verkställigheten inte hindras av Kommissionens beslut

föreligger en skyldighet för domstolen att självständigt pröva om förfarandet står i strid

mot reglerna om otillåtet statsstöd enligt artikel 107 i Fördraget om Europeiska

unionens funktionssätt. I Sverige har EU-rätten företräde framför

NACKA TINGSRÄTT                  **PROTOKOLL**                  Ä 2550-17
                                  2019-01-23

Washingtonkonventionen och svensk domstol har att upprätthålla EU-rätten och verka
för dess effektiva genomslag.

Artikel 351 i Fördraget om Europeiska unionens funktionssätt är inte tillämplig när det
gäller förpliktelser mellan två medlemsstater. Ett tredjelands rättigheter aktualiseras
inte heller vid verkställigheten av en ICSID-dom mellan Rumänien och svenska
investerare.

2) Genom skiljedomsavgörandet har det inte skett något rättskraftigt avgörande
huruvida betalning – i enlighet med ICSID-domen – skulle utgöra ett otillåtet statsstöd
och, om så skulle vara fallet, får principen om *res judicata* ge vika för reglerna om
otillåtet statsstöd.

En ICSID-dom kan inte få rättskraft i frågor om otillåtet statsstöd eftersom en sådan
prövning ligger utanför skiljenämndens kompetens. Skiljenämnden har enbart dömt
över avslutandet av incitamentsprogrammet och uttryckligen avstått från att ta ställning
till frågan om huruvida betalning enligt domen skulle komma att utgöra otillåtet
statsstöd.

Om ett avgörande skulle tillerkännas rättskraft enligt inhemska regler får det inte heller
hindra ett effektivt genomslag av EU:s statsstödsregler. Det åligger därför de inhemska
domstolarna att underlåta att tillämpa processuella regler som eventuellt skulle
tillerkänna rättskraft till en skiljedom – om den strider mot reglerna om statsstöd.
EU-rätten har således företräde framför den inhemska rättskraftsprincipen.

Vidare har Kommissionens beslut meddelats efter skiljedomen – därför kan domen
omöjligen rättskraftigt ha avgjort frågan om utbetalning av skadeståndet skulle utgöra
ett otillåtet statsstöd.

Sid 10

NACKA TINGSRÄTT                    **PROTOKOLL**                    Ä 2550-17
2019-01-23

3) Bestämmelsen i 3 kap. 21 § utsökningsbalken är tillämplig vid verkställighet av nu aktuellt slag, och därtill åligger det tingsrätten att tolka verkställighetsförfattningen i ljuset av EU-rätten.

Kommissionens beslut som direkt hindrar Rumänien från att betala ut skadeståndet till klagandena är ett sådant beslut som rör parternas mellanhavanden. Beslutet i sig innebär att Rumänien inte får betala ut skadeståndet till klagandena och att Rumänien har en skyldighet att återkräva sådant skadestånd som redan har betalats ut. Därutöver åligger det tingsrätten att avstå från att tillämpa alternativt tolka bestämmelser relevanta för den sökta verkställigheten i ljuset av EU-rätten så att målen med gemensamhetens fördrag inte äventyras.

4) Eftersom domen inte är försedd med lagakraft-bevis föreligger i enlighet med 2 kap. 6 § utsökningsförordningen hinder mot verkställighet.

5) Rumänien har fullgjort betalningsförpliktelsen enligt skiljedomen.
Rumänien har sammanlagt fört över 472 788 675 rumänska lei till ett konto öppnat i klagandenas namn. Vid tidpunkten för transaktionerna utgjorde metoden betalning enligt rumänsk rätt varför överföringarna ska tillgodoräknas Rumänien som betalningar.

6) Samtidigt pågående verkställighet i andra länder bör utgöra ett hinder mot verkställighet i Sverige.

Klagandena har ansökt om verkställighet i flera andra länder. Det föreligger därmed en betydande risk att samtidig verkställighet medför att klagandena erhåller ett belopp som överstiger den aktuella fordran.

7) Rumänien bestrider att Washingtonkonventionen medför att tingsrätten skulle vara förhindrad att besluta om vilandeförklaring i nu aktuellt ärende.

Sid 11

NACKA TINGSRÄTT                **PROTOKOLL**                Ä 2550-17
                                   2019-01-23

8) Rumänien ska inte, oavsett utgången i ärendet, åläggas att stå för delar av
klagandenas rättegångskostnader.

Rumänien har inte agerat försumligt i sin processföring. Eftersom sammanträdet hölls
för att utreda parternas ståndpunkter kan Rumänien inte ta ansvar för klagandenas
felaktiga uppfattning om att ärendet skulle avslutas efter sammanträdet. Det var inte
heller Rumänien som var orsak till att det krävdes ytterligare skriftväxling i ärendet.

**Kommissionen**
Artikel 54 i Washingtonkonventionen ålägger stater som är parter att verkställa
skiljedomar som meddelats till förmån för en investerare i en annan fördragsslutande
stat. Skyldigheten att verkställa skiljedomen omfattar sålunda inte Sverige eftersom
investerarens hemstat i detta fall var Sverige, och Sverige därför inte var part i
skiljeprocessen.

En fördragsslutande stat ska vidare vid verkställighet behandla ett, med stöd av
Washingtonkonventionen, meddelat avgörande så som ett laga kraftvunnet avgörande
meddelat i verkställighetsstaten. Inte heller ett lagakraftvunnet svenskt avgörande, med
samma innehåll som skiljedomen, hade kunnat verkställas. Kommissionens beslut
utgör i sig hinder mot verkställigheten av skiljedomen så som det hade utgjort hinder
mot att verkställa ett svenskt avgörande. Kommissionens beslut är direkt bindande för
Rumänien. Kommissionens beslut är direkt, men under alla omständigheter indirekt,
bindande för EU:s andra medlemsstater. Det saknar vidare betydelse att
Kommissionens beslut har överklagats eftersom det är direkt verkställbart och gällande
fram till dess det förklaras ogiltigt.

Även om skiljedomen i teorin skulle kunna innebära *res judicata* i frågan om statligt
stöd är frågan huruvida skiljedomen *i sig* utgör ett sådant stöd, med hänsyn till
följande, inte avgjord på ett sådant sätt att den inte kan prövas i en senare process.
Skiljedomstolen avstod uttryckligen från att ta ställning i den frågan. Vid tillämpning
av EU-rätten tillerkänns inte ett skiljeavgörande samma ställning som ett

NACKA TINGSRÄTT                    **PROTOKOLL**                    Ä 2550-17
                                    2019-01-23

"domstolsavgörande" vid bedömningen om en fråga är rättskraftigt avgjord. Slutligen
är skiljedomstolen inte behörig att ta slutlig ställning i EU-rättsliga frågor.

Tingsrätten meddelar följande

**SLUTLIGA BESLUT**

1. Tingsrätten avslår överklagandet.

2. Ioan Micula, S.C Multipack S.R.L, S.C European S.A, S.C Starmill S.R.L och
Viorel Micula ska solidariskt ersätta Rumänien för dess rättegångskostnad med 90 000
euro avseende ombudsarvode. På beloppet utgår ränta enligt 6 § räntelagen från dagen
för detta beslut till dess betalning sker.

**SKÄLEN FÖR BESLUTET**

Inom EU gäller principen om lojalt samarbete. Enligt denna princip ska unionen och
medlemsstaterna respektera och bistå varandra när de fullgör de uppgifter som följer
av fördragen. Detta framgår av artikel 4.3 i Fördraget om Europeiska unionen.
Skyldigheten att samarbeta på detta sätt gäller inte bara för medlemsstaterna i sig utan
även för deras myndigheter och inte minst för deras domstolar (se bl.a. EU-domstolens
avgöranden i mål C-213/89 Factortame, C-453/00 Kühne & Heitz, C-119/05 Lucchini,
C-505/14 Klausner och C-284/16 Achmea). Nationell domstol som ska tillämpa EU-
rätt är skyldig att säkerställa att denna rätt ges full verkan och, om det därvid behövs,
att underlåta att tillämpa varje bestämmelse i nationell lagstiftning som strider mot EU-
rätten (se C-441/14 DI).

Genom sitt beslut den 30 mars 2015 har Kommissionen slagit fast att alla utbetalningar
till följd av skiljedomen utgör statligt stöd som står i strid med den inre marknaden. I
samma beslut slog Kommissionen fast att Rumänien inte får betala ut detta oförenliga
statliga stöd.

NACKA TINGSRÄTT                    **PROTOKOLL**                    Ä 2550-17
                                   2019-01-23

Enligt artikel 108.3 i Fördraget om Europeiska unionens funktionssätt gäller att en stödåtgärd inte får genomföras förrän den slutligt har godkänts av Kommissionen. Det finns alltså ett genomförandeförbud. Kommissionens nu aktuella beslut är visserligen överklagat men något godkännande i högre instans föreligger inte. Det ska noteras att Kommissionens förbud är riktat mot Rumänien på så vis att det är Rumänien som inte får betala ut i enlighet med skiljedomen. Det råder dock ingen tvekan om att utsökning i Sverige skulle innebära att Rumänien genom Kronofogdemyndighetens åtgärder skulle tvingas att betala, och därmed bryta mot Kommissionens förbud mot betalning, vilket i sin tur skulle tvinga Rumänien att genast kräva tillbaka vad Kronofogdemyndigheten mätt ut.

Verkställighet av skiljedomen skulle alltså innebära att svensk myndighet bidrar till att sätta Kommissionens beslut ur spel. Så länge Kommissionens beslut är giltigt är det därför enligt principen om lojalt samarbete inte möjligt att tillåta den sökta verkställigheten. Skyldigheten för nationell domstol att avstå från att anta beslut som är oförenliga med ett beslut av Kommissionen är långtgående (jfr. C-284/12 Deutsche Lufthansa). EU-rätten står i vägen för tillämpningen av principen om res judicata om sådan tillämpning skulle kunna innebära ett åsidosättande av EU:s statsstödsregler (C-119/05 Lucchini, C-505/14 Klausner och C-284/16 Achmea).

Tingsrätten noterar att Sverige enligt artikel 54 i Washingtonkonvention är förpliktigad att verkställa skiljedomen på samma sätt som ett lagakraftvunnet svenskt avgörande. Ett sådant svenskt avgörande vars verkställighet hade stått i strid med EU-rätten hade inte heller kunnat verkställas. Någon skillnad härvidlag mellan skiljedomen och ett svenskt lagakraftvunnet avgörande finns således inte. Sveriges åtaganden med anledning av artikel 4.3 i Fördraget om Europeiska unionen medför alltså att det för närvarande föreligger hinder mot begärd verkställighet. Någon tillämpning av artikel 351 i Fördraget om Europeiska unionens funktionssätt kan inte medföra annan bedömning (C-241/91 P och C-242/91 P). Överklagandena ska därför avslås.

NACKA TINGSRÄTT                **PROTOKOLL**                Ä 2550-17
                              2019-01-23

Vid den ovan redovisade utgången uppkommer fråga angående ersättning för
rättegångskostnad.

Enligt 32 § lagen (1996:242) om domstolsärenden får domstolen, i ett ärende där
enskilda är motparter till varandra, med tillämpning av 18 kap. rättegångsbalken,
förplikta part att utge ersättning för motpartens rättegångskostnader. I ärendet är
Rumänien gäldenär och är därför i detta sammanhang att betrakta som enskild part.
Vidare har det i ärendet förekommit en intressemotsättning mellan parterna som har
föranlett en handläggning i domstolen enligt samma principer som för tvistemål. Det
finns därför anledning att tillämpa bestämmelserna i 18 kap. rättegångsbalken.

Klagandena är i detta hänseende att betrakta som tappande parter och utgångspunkten
är därför att de ska ersätta Rumänien för dess rättegångskostnad. Tingsrätten anser inte
att Rumäniens processföring föranleder en annan bedömning. Klagandena ska därför
åläggas att solidariskt stå för Rumäniens rättegångskostnad i den mån den har varit
skälig för att tillvarata Rumäniens rätt.

Rumänien har begärt ersättning för rättegångskostnad med sammanlagt 302 729 euro
varav 291 286 euro avser ombudsarvode och 11 443 euro avser eget arbete.

Rumänien har inte närmare beskrivit vilka åtgärder som det yrkas ersättning för inom
ramen för eget arbete. Det är under dessa förhållanden inte möjligt för tingsrätten att
bedöma om åtgärderna har varit nödvändiga och skäliga för att tillvarata Rumäniens
rätt. Yrkandet i den delen ska därför avslås.

Skälig ersättning för ombudsarvode kan enligt tingsrättens mening, även med
beaktande av ärendets komplicerade art och omfattning, inte anses överstiga
90 000 euro inklusive mervärdesskatt.

NACKA TINGSRÄTT **PROTOKOLL** 2019-01-23

**HUR MAN ÖVERKLAGAR**, se <u>bilaga 1</u> (TR-12)

Överklagande senast 2019-02-13 (Svea hovrätt)


Olof Roos

Protokollet uppvisat/

Bilaga 1



SVERIGES DOMSTOLAR

# Hur man överklagar
## Beslut i tvistemål och ärende, tingsrätt                                   TR-12

---

Vill du att beslutet ska ändras i någon del kan du överklaga. Här får du veta hur det går till.

### Överklaga skriftligt inom 3 veckor

Ditt överklagande ska ha kommit in till domstolen inom 3 veckor från beslutets datum. Sista datum för överklagande finns på sista sidan i beslutet.

### Så här gör du

1. Skriv tingsrättens namn och målnummer.

2. Förklara varför du tycker att beslutet ska ändras. Tala om vilken ändring du vill ha och varför du tycker att hovrätten ska ta upp ditt överklagande (läs mer om prövningstillstånd längre ner).

3. Tala om vilka bevis du vill hänvisa till. Förklara vad du vill visa med varje bevis. Skicka med skriftliga bevis som inte redan finns i målet.

4. Lämna namn och personnummer eller organisationsnummer.

   Lämna aktuella och fullständiga uppgifter om var domstolen kan nå dig: postadresser, e-postadresser och telefonnummer.

   Om du har ett ombud, lämna också ombudets kontaktuppgifter.

5. Skriv under överklagandet själv eller låt ditt ombud göra det.

6. Skicka eller lämna in överklagandet till tingsrätten. Du hittar adressen i beslutet.

### Vad händer sedan?

Tingsrätten kontrollerar att överklagandet kommit in i rätt tid. Har det kommit in för sent avvisar domstolen överklagandet. Det innebär att beslutet gäller.

Om överklagandet kommit in i tid, skickar tingsrätten överklagandet och alla handlingar i målet vidare till hovrätten.

Har du tidigare fått brev genom förenklad delgivning, kan även hovrätten skicka brev på detta sätt.

### Prövningstillstånd i hovrätten

När överklagandet kommer in till hovrätten tar domstolen först ställning till om målet ska tas upp till prövning.

Hovrätten ger prövningstillstånd i fyra olika fall.

- Domstolen bedömer att det finns anledning att tvivla på att tingsrätten dömt rätt.

- Domstolen anser att det inte går att bedöma om tingsrätten har dömt rätt utan att ta upp målet.

- Domstolen behöver ta upp målet för att ge andra domstolar vägledning i rättstillämpningen.

- Domstolen bedömer att det finns synnerliga skäl att ta upp målet av någon annan anledning.

Om du *inte* får prövningstillstånd gäller det överklagade beslutet. Därför är det viktigt att i överklagandet ta med allt du vill föra fram.

### Vill du veta mer?

Ta kontakt med tingsrätten om du har frågor. Adress och telefonnummer finns på första sidan i beslutet.

Mer information finns på www.domstol.se.

Anvisningar för överklagande TR-12 - Beslut i tvistemål och ärende • Producerat av Domstolsverket, Avd. för domstolsutveckling • 2018-11

Sida 1 av 1

**TARGEM TRANSLATIONS**

T 718 384 8040
F 718 388 3516
E info@targemtranslations.com
W TargemTranslations.com

## CERTIFIED TRANSLATION

I, Wolf Markowitz, Manager at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language service firm with a track record of providing expert language services to the business and legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders are professionally trained and vastly experienced in providing professional translations, from Swedish to English and vice versa; and they have professionally translated the document referenced as **"Nacka TR Ä 2550-17 - 2019-01-23"** from Swedish to English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: April 21, 2019

Wolf Markowitz

Signature of Notary

ROCHAL WEISS
NOTARY PUBLIC-STATE OF NEW YORK
No 01WE6293785
Qualified in Kings County
My Commission Expires 12-16-2021



**NACKA DISTRICT COURT**

Case file 149
Case No
Ä 2550-1

**RECORD**
23 January 2019
Process in Nacka

Process in the absence of the parties

**THE COURT**
Chief District Judge Cecilia Klerbro and Judges Mats Åhrling and Olof Roos (rapporteur)

**RECORDER**
The rapporteur, assisted by drafting law clerk Anna Nordenskjöld

**PARTIES**

**Appellants**
1.      Ioan Micula, 19570408-1677
Transilvania Str. Teatrului No 1-2 Box 306
3700 Oradea
Romania

2.      S.C Multipack S.R.L

3.      S.C European S.A

4.      S.C Starmill S.R.L
Address: that of legal representative for 2–4

Legal representative for 1–4: Lawyers Jakob Ragnwaldh, Fredrik Andersson and
Aron Skogman
Mannheimer Swartling Advokatbyrå AB
Box 1711
111 87 Stockholm

Legal representative for 1–4: Lawyer Kaj Hobér
Säves väg 36
752 63 Uppsala

5.  Viorel Micula, 19570408-1578
Colinelor 48
3700 Dradea
Romania

Legal representative for 5:
Lawyers Jesper Tiberg and Karin Ljungman
Advokatfirman Lindahl KB
Box 1065
101 39 Stockholm

Doc.Id 574623

| **Mailing Address** | **Physical Address** | **Telephone** | **Office Hours** |
|---|---|---|---|
| Box 69 | Sicklastråket 1 | 08-561 656 20 | Monday – Friday |
| 131 07 Nacka | | **E-Mail:** nacka.tingsratt.avdelning2@dom.se | 08:00–4:30 PM |
| | | www.nackatingsratt.domstol.se | |

**Respondent:**
Romania, via the Ministry of Public Finance
17 Apolodor Street
District 5
Bucharest
Romania

Legal representative: Lawyers Per Nilsson and Isabel Ringsby
Flood Herslow Holme Advokatbyrå AB
Box 7615
103 94 Stockholm

**OTHERS**
European Commission

Legal representative: Litigator Knut Simonsson

**THE CASE**
Impediments to enforcement

**DECISION UNDER APPEAL**
Decision of the Swedish Enforcement Authority of 16 March 2017 in case U 25445-16/0103.

**BACKGROUND**
In the late 1990s, Romania introduced various investment incentive schemes, such as tax relief and customs duty exemptions, with the aim of boosting investment in disadvantaged regions of the country.

On 29 May 2002, the governments of Sweden and Romania concluded a bilateral agreement on the promotion and reciprocal protection of investments (SÖ 2003:2). According to this agreement, each party, within its territory, would promote investments made by the investors of the other party. The agreement stated that disputes would be ultimately settled by international arbitration, at *inter alia* the International Centre for Settlement of Investment Disputes (ICSID) pursuant to the 1965 Washington Convention.

Negotiations concerning Romania's accession to the EU began in February 2000. The EU Common Position of 21 November 2001 noted that the aid schemes that flowed from the investment incentives did not comply with the EU rules on State aid. Romania cancelled most of the investment incentives concerned on 31 August 2004.

The Appellants in this case, who had made investments in Romania, brought an action before the arbitral tribunal, claiming compensation for the injury caused to them by the cancellation of the investment incentives. In the arbitral tribunal's decision of 11 December 2013, Romania was ordered to pay damages to the appellants of RON 376 433 229 (equivalent to some SEK 900 million) plus certain interest.

In a decision of 30 March 2015 (1470/2015), the European Commission ('the Commission') laid down that payments pursuant to the arbitral award constituted State aid within the meaning of Article 107(1) of the Treaty on the Functioning of the European Union (TFEU), and that they are incompatible with the single market. The Commission also laid down that Romania may not pay such incompatible State aid and must recover any incompatible State aid that had already been paid out. Appeals have been lodged against the Commission's decision, and are being processed by the General Court.

The Appellants sought enforcement of the arbitral award in Sweden via the Enforcement Authority. Through the decision under appeal, the Enforcement Authority accepted Romania's objection that there were impediments to the enforcement sought.

[Page 12]

[…]

**FINAL DECISION**

1. The District Court rejects the appeal.

[…]

**GROUNDS FOR THE DECISION**

The principle of sincere cooperation applies within the EU. Pursuant to this principle, the Union and the Member States shall, in full mutual respect, assist each other in carrying out tasks which flow from the Treaties. This is laid down in Article 4(3) of the Treaty on European Union. The obligation to cooperate in this way applies not only to the Member States, but also to their authorities, and not least to their courts (see *inter alia* the CJEU rulings in cases C-213/89 *Factortame*, C-453/00 *Kuhne & Heitz*, C-119/05 *Lucchini*,

C-505/14 *Klausner* and C-284/16 *Achmea*). A national court which has the duty to apply EU law is obliged to ensure that this law is given full effect and, if so required, to refrain from applying any provision of domestic law which is in violation of EU law (see C-441/14, *DI*).

By means of its decision of 30 March 2015, the Commission established that all payments flowing from the arbitral award constitute State aid and are incompatible with the single market. In the same decision, the Commission established that Romania may not pay this incompatible State aid.

According to Article 108(3) TFEU, an aid measure may not be implemented until it has received final approval from the Commission. This is known as the standstill clause. It is true that an appeal has been lodged against the Commission decision in this case, but no higher court has upheld the appeal. It should be noted that the Commission's ban is directed at Romania; in other words, Romania is the party which may not make payments pursuant to the arbitral award. There is no doubt, however, that enforcement in Sweden would mean that Romania, by means of the actions of the Enforcement Authority, would be forced to pay, and would therefore be in breach of the Commission's prohibition on payment; this, in turn, would require Romania to immediately recover what the Enforcement Authority had seized.

Enforcement of the award, therefore, would have led to a Swedish authority helping to set aside the Commission's decision. As long as the Commission's decision is valid, therefore, it is not possible, under the principle of sincere cooperation, to allow the enforcement sought. The obligation for a national court to refrain from adopting decisions which are incompatible with a Commission decision is wide-ranging (see C-284/12 *Deutsche Lufthansa*). EU law blocks the application of the principle of *res judicata* if such application would mean that the EU State aid rules were set aside (C-119/05 *Lucchini*, C-505/14 *Klausner* and C-284/16 *Achmea*).

The District Court notes that Sweden is obliged pursuant to Article 54 of the Washington Convention to enforce the arbitral award as though it were a final Swedish judgment.

A Swedish judgment of this type, whose enforcement was in violation of EU law, could not have been enforced either. There is no difference in this respect, therefore, between a Swedish final judgment and the arbitral award. Sweden's commitments pursuant to Article 4(3) TEU, therefore, entail that there are impediments to the enforcement sought. Application of Article 351 TFEU does not lead to a different view (C-241/91 P and C-242/91 P). The appeals should, therefore, be dismissed.

[…]

[Page 15]

[…]

**HOW TO APPEAL**, see Annex 1 (TR-12)

Appeal by 13 February 2019 (Svea Court of Appeal)

Olof Roos

Record posted/