**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :

NEXTERA ENERGY GLOBAL HOLDINGS  :
B.V. and NEXTERA ENERGY SPAIN  :
HOLDINGS B.V.,                          :
                                           :   Civil Action No. 19-cv-01618-TSC

Petitioners,                           :
                                           :

v.                                         :
                                           :

KINGDOM OF SPAIN,                :
                                           :

Respondent.                          :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**EXPERT DECLARATION OF PROFESSOR GEORGE A. BERMANN IN
SUPPORT OF PETITIONERS' PETITION TO ENFORCE INTERNATIONAL
ARBITRATION AWARD AND OPPOSITION TO RESPONDENT'S
MOTION TO STAY OR DISMISS PETITION TO ENFORCE INTERNATIONAL
ARBITRATION AWARD**

               Pursuant to 28 U.S.C. § 1746, GEORGE A. BERMANN declares, under penalty of

perjury, as follows:


**I.       INTRODUCTION AND QUESTIONS FOR OPINION**

       1.      I submit this Expert Declaration in the present case at the request of counsel for

NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (together,

"NextEra"), the two petitioners in this action.

2.     This is an action to enforce an arbitral award (the "Award")[1] rendered in an arbitration (the "NextEra Arbitration") conducted under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID") (headquartered in Washington, D.C.), in a dispute between NextEra and the Kingdom of Spain ("Spain").  I note that both of these petitioners are nationals of The Netherlands.

3.     The Award was preceded by a Decision on Jurisdiction, Liability and Quantum Principles dated March 12, 2019 (the "Decision")[2], in which the ICSID arbitral tribunal that arbitrated the dispute between NextEra and Spain (the "Tribunal" or "NextEra Tribunal") upheld its jurisdiction over the dispute and found that Spain's treatment of NextEra's investments violated its obligation to provide fair and equitable treatment under Article 10(1) of the Energy Charter Treaty (the "ECT"),[3] a treaty which I describe below.  The Award is governed by the ICSID Convention,[4] a treaty that lies at the heart of this case.  It is relevant to note, at the very outset, that each of the United States, Spain and The Netherlands are Contracting States to the ICSID Convention.

4.     Another treaty central to this case is the ECT, a multilateral treaty among approximately 50 states, including Spain and The Netherlands, which affords certain protections to investors in the energy sector coming from other Contracting States and provides for arbitration,

---

[1]    *NextEra Energy Glob. Holdings B.V. v. Spain*, No. ARB/14/11, Final Award (ICSID 2019) (Nelson Decl. Ex. 1).

[2]    *NextEra Energy Global Holdings B.V. v. Spain*, No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles (ICSID 2019) (Nelson Decl. Ex. 1, Annex).

[3]    Energy Charter Treaty, Dec. 17, 1994, 2080 U.N.T.S. 95 (Nelson Decl. Ex. 3).

[4]    Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 575 U.N.T.S. 159 (the "ICSID Convention") (Nelson Decl. Ex. 2).

including under the ICSID Convention, as a mode of settlement of disputes arising out of their investments. Approximately half of the ECT Contracting Parties are States within the European Union (the "EU" and such States, the "EU Member States") and the other half are countries located outside the EU. The EU is also a Contracting Party to the ECT in its own right.

5.    In preparing this Opinion, I reviewed the Decision, the Award, the pleadings submitted by Spain and NextEra in this proceeding, as well as certain relevant pleadings from the subject arbitration, including: (i) NextEra's Petition to Confirm an International Arbitral Award Pursuant to the 1965 ICSID Convention (ECF No. 1) filed on June 3, 2019; (ii) the Motion of the Kingdom of Spain to Dismiss, or Stay, Petitioners' Petition to Enforce Arbitral Award (ECF No. 15) filed on October 11, 2019 ("Spain MTD"); (iii) the Expert Declaration of Professor Dr. Steffen Hindelang, LLM (ECF No. 15-6) dated October 11, 2019 (the "Hindelang Decl."); and (iv) the European Commission's *Amicus Curiae* Brief filed on September 5, 2016, in the NextEra Arbitration.

6.    The questions I have been asked to address are the following:

(a)    As a matter of international law, including the law of treaties:

(i)    Does Spain's accession to the ICSID Convention evince an acceptance by Spain that the courts of ICSID Convention Contracting States (including the courts of the United States) have jurisdiction to enforce awards made under the ICSID Convention?

(ii)    In view of Spain's accession to the ICSID Convention and ratification of the ECT, has Spain agreed to arbitrate disputes with nationals of other ECT Contracting Parties?

(iii)    Does the Award in this case arise from that agreement?

As I understand it, the answers to these questions may assist this Court in determining whether it has subject matter jurisdiction under either the waiver or

arbitration exceptions in the Foreign Sovereign Immunities Act of 1976 (the "FSIA").[5]

(b)   Regarding the current status of the Award:

(i)    What is the status generally of an award rendered under the ICSID Convention, particularly when enforcement is sought in a federal structure, such as the United States?

(ii)   What is the effect of Spain's application for "annulment" of the Award and for a stay of enforcement of the Award, pending the annulment application?

(iii)  In the event that the ad hoc annulment committee determines that it is not appropriate to stay enforcement pending the annulment application, what then will be the status of the Award?

(c)   What relevance, if any, should be ascribed to:

(i)    Spain's claim (and/or that of the European Commission) that EU treaty and/or case law (including the 2018 decision in *the Slovak Republic v. Achmea B.V.* by the Court of Justice of the European Union ("*Achmea*")) negates the jurisdiction of the ICSID Tribunal that rendered the Award;

(ii)   Spain's claim (and/or that of the European Commission) that payment of the Award would constitute an illegal state aid under EU law;

(iii)  Other contentions of Spain and/or the European Commission concerning the Award, including, to the extent not covered by the above issues, the contentions advanced by them and/or their experts (including Professor Hindelang) in this proceeding and the subject arbitration?

## II.    SUMMARY OF CONCLUSIONS

7.    My conclusions on each of these questions are the following:

(a)   ***On the effect of Spain's accession to the ICSID Convention and ECT:***

(i)    By signing and ratifying the ECT, Spain agreed that, in the event an investor from another ECT Contracting State claimed that Spain had violated any of the substantive investment protections in Part III of the ECT (including Article 10), that claim could be submitted to arbitration by a tribunal constituted under the ICSID Convention.

(ii)   By acceding to the ICSID Convention, Spain categorically undertook to comply with ICSID awards rendered against it and acknowledged that other

---

[5]    28 U.S.C. §§ 1602-1611. *See* 28 U.S.C. § 1605(a)(1) (waiver); *id.* § 1605(a)(6) (arbitration).

ICSID Contracting States, such as the United States, were obligated to enforce the pecuniary obligations of those awards if they remain unpaid. This necessarily entails an acceptance by Spain that the courts of the United States have the power (indeed the obligation) to recognize and enforce all ICSID awards, including those rendered against Spain.

(iii) The facts indicate that NextEra validly invoked its right under the ECT to arbitrate claims against Spain. Accordingly, the Award was rendered pursuant to the ICSID Convention, and results from an arbitration agreement subject to that Convention.

(b)    ***On the status of the Award:***

(i)     Under Article 53 of the ICSID Convention, the Award is "binding" as between the parties, and "shall not be subject to any appeal or to any other remedy except those provided for in this Convention."[6] Article 54(1) states that "[e]ach Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state."[7] Article 54 further requires only that the investor present the court with a duly certified copy of the award and that the enforcement court enforce the award as if it were a judgment of a court of that State.[8]

(ii)    The Award is therefore final and binding, and the federal courts of the United States have an international treaty obligation to enforce the pecuniary obligations of the Award as if it were a final judgment of a U.S. State court – unless, and only for so long as, enforcement of the Award has been stayed within the ICSID system.

The Award is a final and binding award between the parties for purposes of Article 53. However, Spain recently has made an application under Article 52 of the ICSID Convention for the Award to be annulled. Upon filing of the application, Spain obtained a provisional stay of enforcement of the Award. But that stay will only remain in place until the ICSID annulment committee decides whether or not to maintain the stay, pending the outcome of the annulment application. If the ad hoc committee lifts the provisional

---

6    ICSID Convention art. 53(1).

7    *Id.* art. 54(1).

8    *Id.* art. 54(2), (3).

stay, the Award will be enforceable pursuant to Article 54 of the ICSID Convention.

(c)   ***On Spain's assertions concerning the application of the ECT to intra-EU disputes, and Spain's related EU law arguments:***

(i)   Even if Spain were allowed to challenge the validity of the parties' arbitration agreement at the enforcement stage, its arguments would fail. In particular, Spain alleges that no binding arbitration agreement exists by claiming that the ECT does not and cannot authorize arbitration of intra-EU investment disputes. But there is no basis in the ECT for positing a carve-out for intra-EU disputes. Nor can Spain impose any such carve-out on the basis of an asserted "autonomy" of EU law (which purports to bar any court or tribunal outside the EU orbit from interpreting or applying EU law). Whatever one thinks of this notion of autonomy, it is a notion entirely internal to the EU, and the validity of the agreement between Spain and NextEra, like the validity of any international agreement, is governed on the international plane by international law, not domestic law.

(ii)  Moreover, under international law, a State may not invoke its internal law to relieve itself of its international treaty obligations. A State may choose, as a matter of domestic law, to disobey its treaty obligations, but that does not relieve it of international legal responsibility for doing so. Nor may a State expect other Contracting States to disrespect their own international treaty obligations out of deference to that State's internal law.

(iii) Spain claims that Article 54 of the ICSID Convention allows it to invoke the same jurisdictional arguments as would be available to a defendant/judgment debtor resisting enforcement of a sister-state judgment under the Full Faith and Credit clause.[9] But these jurisdictional arguments are merits issues that U.S. courts cannot re-open in ICSID enforcement proceedings. Even so, I note that under the Full Faith and Credit clause, although an enforcing court may, if asked to do so, examine whether the rendering sister-state court had jurisdiction to entertain the case, that exception is subject to an important qualification. A party seeking to defeat enforcement of a sister-state judgment on jurisdictional grounds may not do so if it had a full opportunity to litigate that issue before the rendering court. If one examines both the record of the proceeding here and its governing treaty framework (the ICSID Convention), Spain not only had the right, under the ICSID Convention, to contest arbitral jurisdiction before the Tribunal, but vigorously did so, and lost. Thus, Spain's attempt to invoke the jurisdictional exception in the Full Faith and Credit clause is ill-founded. Moreover, the doctrine of full faith and credit does not allow for non-recognition of judgments on public policy grounds, so the analogy to the

---

[9]   U.S. Const. art. IV, § 1.

6

Full Faith and Credit clause does not enable Spain to argue matters of public policy.

(iv)    Spain further claims that its payment of the Award would constitute an illegal state aid under EU law. EU state aid law, however, like the principle of EU law autonomy itself, is domestic law and cannot serve as a justification for violation of an EU Member State's international legal obligations.

(v)    Even if EU state aid law could be invoked to defeat the subject matter jurisdiction of this Court, enforcement of the Award would not constitute a state aid. A state aid under EU law is a measure by which a State gratuitously confers a benefit on a private enterprise and, in so doing, risks distorting the market. However, enforcement of the Award in this case is not a measure taken by Spain, but a measure taken by this Court by virtue of its own ICSID Convention obligations. Even in paying the Award, Spain would not be gratuitously conferring a benefit on NextEra, but merely doing what its international law obligations require it to do. Nor would such payment produce a market distortion. All that it would produce is a restoration of NextEra to the position it would have been in had Spain not violated its ECT obligations.

(vi)    Moreover, the European Commission has made no determination that the Spanish measure that precipitated the arbitration is an illegal state aid, nor has it even launched any such inquiry. Unless the underlying measure is in fact found to be an illegal state aid, compensation for its wrongful revocation cannot constitute an illegal state aid either.

(vii)    Spain claims that it can avoid payment of the Award on account of "compulsion" by a foreign sovereign. From an international law standpoint this makes little sense since Spain is essentially claiming that its own laws are preventing it from complying with the Award.

## III. BACKGROUND AND QUALIFICATIONS

8.    I am a Professor of Law at Columbia Law School in New York, where I hold the Jean Monnet Professorship in European Union Law and the Walter Gellhorn Professorship. As a member of the Columbia faculty since 1975, I have taught, among others, the following subjects: international commercial and investment arbitration, transnational litigation, conflicts of law, EU law, World Trade Organization (WTO) law and contracts.

9.    At Columbia, I founded and direct the Center for International Commercial and Investment Arbitration (CICIA).  I also founded and was the first director of the European Legal Studies Center (ELSC).  I am co-editor-in-chief of the *American Review of International Arbitration* (ARIA), which is produced at Columbia, as well as President of the Executive Editorial Board of the *Columbia Journal of European Law* (CJEL), which I also established.

10.    I have other regular teaching engagements at the Institut des Sciences Politiques (Sciences Po) in Paris, where I am *professeur affilié* and teach in the LL.M. program in international dispute resolution.  I also teach regularly in the Masters of International Dispute Settlement (MIDS) program at the University of Geneva.  In addition, I teach as an adjunct professor at the Georgetown University Law Center in Washington, D.C.

11.    Over the past 40 years, I have served regularly as international arbitrator in both commercial and investor-State cases, and have frequently rendered expert opinions for courts and arbitral tribunals on the law of international arbitration, transnational litigation, European Union law and the law of multiple European jurisdictions.

12.    I am Chief Reporter of the American Law Institute's *Restatement of the U.S. Law of International Commercial and Investment Arbitration*, which received final approval in May 2019.  I am also the author of numerous books, including, most recently, the following:   the *UNCITRAL Secretariat Guide on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York 1958)* (2016) (co-authored with Emmanuel Gaillard); *International Arbitration and Private International Law* (General Course in Private International Law of Hague Academy of International Law) (published by the Academy in *Recueil des cours* of the Academy and in paperback by Brill Nijhoff) (2017); *Interpretation and Application of the New York Convention by National Courts* (Springer Pub. 2017); *Mandatory Rules in International*

*Arbitration* (2d ed., forthcoming Juris Pub. 2020); and *Cases and Materials on European Union Law* (West Pub. 4th ed. 2015) (co-authored).

13.     I am the author of numerous articles, including: *The Energy Charter Treaty and European Union Law*, *in International Arbitration in the Energy Sector* (M. Scherer, ed., 2018); *What Does it Mean to be "Pro-Arbitration?"*, 34 Arb. Int'l 341 (2018); *The Role of National Courts at the Threshold of Arbitration*, 28 Am. Rev. Int'l Arb. 291 (2018); *European Union Law as a Jurisdictional and Substantive Defense in Investor-State Arbitration*, *in The Impact of EU Law on International Commercial Arbitration* (Franco Ferrari, ed., 2017); *Res Judicata in International Arbitration*, *in Cambridge Compendium of International Commercial and Investment Arbitration* (A. Bjorklund et al., eds., forthcoming 2020); *"International Standards" as a Choice of Law Option in International Commercial Arbitration*, 27 Am. Rev. Int'l Arb. 423 (2017); *The* Yukos *Annulment: Answered and Unanswered Questions*, 27 Am. Rev. Int'l Arb. 1 (2016); *Limits to Party Autonomy in Composition of the Arbitral Panel*, *in Limits to Party Autonomy in International Commercial Arbitration* 83 (F. Ferrari, ed., 2016); *International Commercial Arbitration: Present Challenges and Future Prospects*: Festschrift for John Beechey (2017); *The "Gateway Problem" in International Commercial Arbitration*, 37 Yale J. Int'l L. 1 (2012); *Navigating EU Law and the Law of International Arbitration*, 28 Arb. Int'l 397 (2012); and *Arbitrability Trouble*, 23 Am. Rev. Int'l Arb. 367 (2012).

14.     As a member of the international arbitration community, I hold and have held positions in numerous international arbitration institutions.  These include as chair of the New York International Arbitration Center (NYIAC), member of the Governing Board of the International Court of Arbitration at the International Chamber of Commerce (ICC) in Paris, and member of the ICC's Standing Committee and International Arbitration Commission.  At the

American Arbitration Association (AAA), I am a member of the Council, and at the Center for Conflict Prevention and Resolution (CPR) I am a member of the Board of Directors.

15.     I hold honorary degrees from:  the University of Fribourg, Switzerland; Universitê de Versailles-St. Quentin, France; Universidad Cesar Vallejo, Lima, Peru; and Universidade Nova de Lisboa, Lisbon, Portugal.

## IV.     THE UNDERLYING DISPUTE

16.     The underlying dispute in the present case arose out of an investment made by NextEra, a Dutch investor, in 2010 in two concentrated solar power ("CSP") plants in Spain.  Those investments were made pursuant, *inter alia*, to a 2007 Spanish government regime offering incentives for solar energy projects.

17.     The ECT, pursuant to which the Award in this case was rendered, requires Contracting States to afford certain protections to investors in the energy sector coming from other Contracting States and provides arbitration as a mode of settlement of disputes arising out of those investments.  The ECT gives investors the right to choose from among several procedural regimes in pursuing their claims through arbitration: (a) the International Centre for Settlement of Investor Disputes; (b) ICSID's Additional Facility; (c) the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL"); or (d) the Arbitration Institute of the Stockholm Chamber of Commerce.[10]  NextEra elected to pursue its claims under the aegis of ICSID.

18.     In the NextEra Arbitration, NextEra alleged that alterations made by Spain to its regulatory framework for solar investment between 2012 and 2014 violated Spain's obligations of

---

[10]  *See* ECT art. 26(4).

fair and equitable treatment under Article 10(1) of the ECT, to which both Spain and The Netherlands are parties, thereby causing significant harm to NextEra.

19.    The Tribunal issued a unanimous Decision in favor of NextEra on jurisdiction, liability and principles governing quantum.[11]  In its Award, the Tribunal ordered Spain to pay NextEra € 290.6 million in damages, plus pre-judgment interest at a rate of 0.234%, compounded monthly, from June 30, 2016.[12]

20.    On June 3, 2019, NextEra commenced the present enforcement proceeding in this Court.

## V.    BY ACCEDING TO THE ICSID CONVENTION AND RATIFYING THE ECT, SPAIN ACCEPTED JURISDICTION

### A.    Pursuant to the ICSID Convention, Spain has Submitted to the Award Enforcement Jurisdiction of ICSID Contracting State Courts, Including the United States

21.    I understand that Spain denies that this Court has subject matter jurisdiction over the case, on the ground that the case allegedly does not fall within any of the exceptions of the FSIA.  Without commenting on the terms of the FSIA or case law decided thereunder, which I understand will be addressed by the parties' respective counsel in this case,[13] I address below the

---

[11]    The Decision is attached as an annex to the Award (Nelson Decl. Ex. 1, Annex).

[12]    Award ¶ 37.

[13]    To be clear, I am conscious that the opinions in this Section are pertinent to the issues of: (i) whether Spain has "waived" objections to jurisdiction for purposes of the FSIA "waiver" exception (*see* 28 U.S.C. §1605(a)(1)); and (ii) whether the FSIA arbitration exception 28 U.S.C. § 1605(a)(6) applies.  While I am expert in these areas of FSIA and statutory construction, and am willing to express my views on these issues if this Court requires, the opinions expressed in this Expert Declaration are limited to issues of international law, including the law of treaties.  Where relevant, I also deal with matters of EU law.

international law implications of Spain's having become bound by the two treaties which lie at the heart of this case – the ICSID Convention and the ECT.

22.    The ICSID Convention is a multi-party treaty that was finalized in 1965 under the auspices of the World Bank.  Its aim is to create a framework for resolving disputes between signatory States and private investors.  Among other things, the ICSID Convention establishes an arbitration institution, ICSID (or the "Centre"), to administer arbitration between "Contracting States" and "nationals of other Contracting States."  It creates rules for the conduct of arbitration, the appointment of arbitrators, and the rendering and enforcement of awards in cases governed by the ICSID Convention.

23.    Article 25 of the ICSID Convention provides that an ICSID arbitral tribunal shall have jurisdiction to hear and determine investment disputes between a Contracting State and a national of another Contracting State when they have both "consented" to such arbitration.  The ICSID Convention allows "consent" to arbitration to be expressed in a variety of ways, including through a direct contract between the investor and the state, and also through a treaty in which a Contracting State agrees, in advance, that it will be subject to ICSID Convention arbitration of future disputes with investors of a given nationality or nationalities (provided, of course, that the investor is a national of a Contracting State).  Spain consented to arbitration through the latter means.

24.    Under Article 41(1) of the ICSID Convention, once an ICSID tribunal is formed, "[t]he Tribunal shall be the judge of its own competence."  Article 41(2) of the ICSID Convention continues:

> Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

25.    The ICSID Convention contains unique provisions concerning the enforcement of an arbitration award, intended to maximize recognition and enforcement of such awards.

26.    The relevant ICSID Convention provisions are the following:

Article 53:

(1)    [An ICSID] award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention.  Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

Article 54:

(1)    Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State.  A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2)    A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General.

27.    These provisions give an ICSID Convention award a special status.  They reflect an understanding that the ICSID Convention has among its central purposes to ensure (a) that Contracting States treat as binding, and comply with, ICSID awards rendered against them in favor of an investor; and (b) that if a Contracting State fails to do so, any and every other Contracting State to which the investor brings that award for enforcement will enforce it.[14]  Compliance with

---

[14]    *See* Christoph H. Schreuer et al., *The ICSID Convention: A Commentary* 1125 (2d ed. 2009) ("Failure of a State party to the Convention to recognize and enforce an award would be a breach of a treaty obligation.") (Ex. 1 hereto).

and enforcement of ICSID awards by Contracting States is a key element of the ICSID Convention.[15]

28.    Article 54 makes enforcement subject to two simple conditions, and only those conditions.  The first, found in paragraph (1), requires States to enforce ICSID awards in the same manner in which they enforce judgments of their own courts.  The second, found in paragraph (2), requires that a party seeking enforcement produce a copy of the Award certified by the Secretary-General.  Subject to these two conditions, enforcement by a Contracting State is obligatory.

29.    ICSID Convention awards, unlike awards under the 1958 New York Convention on Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), are not subject to any scrutiny by national courts on the occasion of their enforcement.[16]  Shielding ICSID awards from judicial review was among the ICSID Convention's prime purposes and is the most important aspect of the ICSID regime's "self-contained" character.[17]  Neither the jurisdiction of an ICSID tribunal nor the merits of the award it issues may be questioned at the enforcement stage.

---

[15]    The United States has implemented Article 54 through the Convention on the Settlement of Investment Disputes Act of 1966, which states relevantly:

> An award of an arbitral tribunal rendered pursuant to [the ICSID Convention] shall create a right arising under a treaty of the United States.  The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.  The Federal Arbitration Act (9 U.S.C. [§§ 1 to 16]) shall not apply to enforcement of awards rendered pursuant to the convention.

22 U.S.C. § 1650a(a).

[16]    *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, No. 17-1457 (TJK), 2018 WL 6605633, at *6 (D.D.C. Dec. 17, 2018).

[17]    *See* ¶¶ 26-32, *supra*; *see also* Schreuer, *supra* note 14 at 1139 ("The system of review under the Convention is self-contained and does not permit any external review.").

30.    There were efforts during the negotiations that led to what became Article 54(1) of the ICSID Convention to introduce exceptions to the absolute enforcement obligation of Contracting States, and they were all rejected.[18]  One proposal was to subject the enforcement of ICSID awards to the same defenses to enforcement applicable to New York Convention awards.[19]  This proposal was expressly rejected.  The proponents' "fall back" suggestion was that at least a public policy defense should be inserted.[20]  This suggestion, too, was expressly rejected.  Article 54(1) was adopted with no such exceptions at all.

31.    Thus, Spain, in acceding to the ICSID Convention, not only affirmed that it would consider itself bound by an ICSID award rendered against it, but also recognized that, pursuant to Article 54(1) of the ICSID Convention, all other Contracting States, including the United States, were required to enforce any such award if it remained unpaid, doing so in the same manner in which they enforce judgments of their own courts – with no "public policy" exception, much less merits review.  Spain thus necessarily submitted to the jurisdiction of a court of any Contracting State over an action to enforce an ICSID award against it.

32.    Moreover, under Article 53(1) of the ICSID Convention, the Contracting States agreed not only to comply with ICSID awards rendered against them, but also to refrain from exercising "any appeal or [ ] any other remedy except those provided for in this Convention."  That exclusive remedy consists of a review within ICSID itself, decided by a so-called "*ad hoc* committee" established under Article 52 of the ICSID Convention.[21]  Thus, in ratifying the ICSID

---

[18]    *See* II-1 *History of the ICSID Convention*, 346, 426, 427, 466, 575 (4th ed. 2009) (Ex. 2 hereto).

[19]    *See id.* at 425, 426, 429, 521.

[20]    *See id.* at 345, 346, 347, 427, 521, 575.

[21]    ICSID Convention art. 52.

Convention, Spain forswore any possibility of review at the national court level regarding whether the Tribunal possessed jurisdiction over it.

33.     In my opinion, a request for a national court (including this Court) to revisit the issue of ICSID Convention jurisdiction is unquestionably a form of recourse against the Award and is impermissible under Article 53.

34.     Accordingly, I conclude that, as a matter of international law, Spain has waived any objection to jurisdiction of the courts of an ICSID Contracting State when those courts are asked to enforce the pecuniary obligations of a binding ICSID award, such as the Award at issue in this case.  This includes the courts of the United States.

**B.     Through Article 26 of the ECT, Spain Has Agreed to ICSID Arbitration With Nationals of Other ECT Member States, Including Petitioners**

35.     As noted above, an ICSID Convention arbitration may be initiated when an ICSID Contracting State and a national of another ICSID Contracting State have "consented" to arbitrate investment disputes of a particular type.

36.     A very common means for an ICSID Contracting State to express "consent" to ICSID Convention arbitration is to enter into a reciprocal investment treaty or trade treaty with one or more other States.  These treaties often contain provisions intended to assure investors of a given level of treatment in the host country (e.g., assurances of "fair and equitable treatment," "protection and security," and compensation in the event of nationalization/expropriation).  Such treaties then typically provide for ICSID Convention arbitration of investor-State disputes that might arise, in the event an investor contends that the host country has violated those substantive treaty protections.

37.     Thus, in the case of a bilateral investment treaty ("BIT"), each State not only incurs substantive obligations of protection to investors from the other State, but also makes a "standing

offer" to submit investment claims by those investors to arbitration in accordance with the terms of the BIT. This standing offer is thus addressed to all nationals of the other State. Having thus been made, this offer may then be accepted by any investor from the other State, that acceptance occurring at the time the investor initiates arbitration.[22]  That is when and how an agreement to arbitrate under a BIT comes into being.

38.     Multilateral investment treaties, such as the ECT, operate in much the same way. Each Contracting State, upon signing and ratifying such a treaty, makes a standing offer to arbitrate disputes with nationals from all the other Contracting States that have made investments in its territory and have an investment claim against it. An investor from any one of those other Contracting States is deemed to accept the standing offer when it initiates arbitration under the ECT.

39.     The ECT specifically so provides. Article 26(3)(a) thereof states that "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article," including arbitration under the ICSID Convention. *See* ECT art. 26(4)(a)(i). Article 26(5) of the ECT states that this combination of a State's consent to arbitrate, coupled with an investor's initiation of arbitration in writing, constitutes an agreement to arbitrate which satisfies the ICSID Convention's requirement of written consent to arbitrate. *See* ECT art. 26(5)(a)(i).

40.     This is what occurred here. The Award and the Decision both indicate that NextEra instituted an ICSID Convention arbitration against Spain, claiming that Spain had violated the

---

[22]  *See* ECT, art. 26(3)(a) (Contracting Parties give their "unconditional consent to the submission of a dispute to international arbitration . . . in accordance with the provisions of this Article"); *id.* art. 26(4)(a)(i) (ICSID arbitrations are available under the ECT where "the Contracting Party of the [i]nvestor and the Contracting Party . . . to the dispute" are parties to the ICSID Convention and the investor elects ICSID arbitration).

substantive protections in Articles 10(1) and 10(7) of the ECT.[23]  In doing so, NextEra accepted Spain's standing offer and "consented" to ICSID Convention arbitration.  For its part, Spain also consented to ICSID Convention arbitration when it signed and ratified the ECT.[24]

41.     Accordingly, it is my opinion that Spain and NextEra have, since at least 2014, when NextEra initiated arbitration, been party to an arbitration agreement under which all of NextEra's ECT-related claims were subject to arbitration by a tribunal constituted under the ICSID Convention.

## C.     The NextEra Award Arises from an Agreement to Arbitrate between Spain and NextEra

42.     In my opinion, the Award clearly arises from the agreement by Spain and NextEra that, in turn, arose from Spain's ratification of the ECT and its submission to arbitration under the ICSID Convention, coupled with NextEra's consent, which occurred when it initiated arbitration.

43.     I understand, from my review of its submissions, that Spain now contends that the Tribunal lacked jurisdiction to hear and determine the dispute.  But when Spain agreed to arbitration before ICSID, it agreed to the provisions of the ICSID Convention (in particular Article 41), giving the Tribunal the power to determine issues of jurisdiction.  I note that the Tribunal in this case decided those issues.[25]  Thus, the Tribunal's rulings on jurisdiction are themselves part of an award resulting from an agreement between Spain and NextEra to arbitrate disputes.

---

[23]   *See* Decision ¶ 180.

[24]   Spain signed the ECT on December 17, 1994.  It ratified the ECT on December 11, 1997.  The ECT (including the agreement to ICSID Convention arbitration) was expressed to become "provisionally applicable" upon signing, meaning that some states were immediately bound by its provisions even before they ratified the ECT. I will not in this Opinion address this issue because there is no dispute that Spain ratified the ECT well before the present dispute arose.

[25]   *See* Decision ¶¶ 332-57; Award ¶ 37(1).

## VI.    THE CURRENT STATUS OF THE AWARD

44.    The Award is a final arbitral award under the ICSID Convention.  Under Article 53 of the ICSID Convention, it is "binding on the parties and shall not be subject to any appeal or to any other remedy" outside of the ICSID annulment process.  Upon issuance, it was entitled to be enforced and recognized in each Contracting State pursuant to Article 54 of the ICSID Convention.

45.    On September 26, 2019, Spain filed an application to annul the Award pursuant to Article 52 of the ICSID Convention.  This article allows for an internal review within the ICSID system of awards by an *ad hoc* committee comprised of three arbitrators appointed by the ICSID Administrative Chairman from ICSID's Panel of Arbitrators.  The grounds for annulling an award consist of certain limited grounds as specified in Article 52(1) of the ICSID Convention, including improper tribunal constitution, manifest excess of power, corruption, serious departure from a fundamental rule of procedure, and failure to give reasons.[26]

46.    Although the bringing of an annulment application does not affect an award's status as final and binding under Article 53 of the ICSID Convention, an annulment application has a potential impact on whether it is entitled to be recognized and enforced in member state courts pursuant to Article 54 of the ICSID Convention.  This is because Article 52(5) thereof states:

> The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision.  If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.

47.    Article 52(5) thus allows an applicant to request a stay of enforcement and grants an *ad hoc* committee the authority (but not the obligation) to issue such a stay pending the outcome

---

[26]    *See* Schreuer, *supra* note 14, at 933 (discussing the "five grounds for annulment" under the ICSID Convention).

of the annulment application.[27]   That stay is a "provisional" one, operative only "until the Committee rules" on the request.

48.    Here, Spain's application included a request for a stay of enforcement of the Award pending the outcome of the annulment application.  Article 52(5) thus triggered a provisional stay of enforcement.  That stay is not permanent.  Once an annulment committee is constituted, it may decide to lift the stay and allow enforcement to proceed.

49.    Therefore, if the *ad hoc* committee lifts the stay, the Award will again become subject to enforcement under Article 54 of the ICSID Convention.

## VII.   SPAIN'S ASSERTIONS CONCERNING THE ALLEGED "INTRA-EU" CARVE-OUT OF THIS DISPUTE

### A.   Under Articles 53 and 54 of the ICSID Convention, Spain's Intra-EU Argument Cannot Be Considered by National Courts at the Enforcement Stage

50.    Spain and Professor Hindelang contend that the ECT simply does not apply to so-called "intra-EU" investment disputes (i.e., claims brought by a national of one EU Member State against another EU Member State).  According to this argument, Spain could not, under the ECT, make a standing offer of arbitration to investors having Dutch nationality, and an investor having Dutch nationality could not accept any such offer if it were made.  This, in Spain's view, renders the arbitration agreement between Spain and NextEra invalid.[28]

---

[27]    *See* Schreuer, *supra* note 14, at 1062 ("All drafts as well as the Convention itself use permissive language in relation to the *ad hoc* committee's power to stay enforcement of the award. The *ad hoc* committee may, but need not, take this step."(citations omitted)).

[28]    As I understand it, this argument is being advanced in an effort to deny subject matter jurisdiction, on the basis that the "waiver" or "arbitration" exceptions under the FSIA allegedly have not been met.  Based on my expert knowledge of the FSIA's rules concerning international arbitration, I consider that these arguments are based on an erroneous premise.  I believe that the FSIA's provisions were not intended to allow issues of arbitral jurisdiction (particularly ICSID arbitral jurisdiction) to be re-litigated at the award enforcement stage.  Since my

51.    In analyzing Spain's "intra-EU" argument, attention must be paid to the precise language and meaning of the ICSID Convention itself.  As previously noted,[29] Article 53 of the ICSID Convention provides for the finality of an ICSID Award, subject to no "appeal" or "other remedy," and Article 54 of the ICSID Convention requires courts of Contracting States to enforce an ICSID award as if it was a local judgment, on condition that the petitioner produces a duly certified copy of the award.[30]

52.    Articles 53 and 54 of the ICSID Convention thus provide that, in an action to enforce an ICSID award, a national court may not review the substance of the award or question a tribunal's authority to render it.[31]  This precludes consideration of Spain's "intra-EU" argument at the enforcement stage.

53.    Accordingly, I conclude that a national court enforcing the Award in this case under the ICSID Convention cannot enter into a re-examination of the Tribunal's jurisdiction to decide

---

opinions are confined to issues of international law, including the law of treaties, however, I will not address issues of FSIA interpretation unless this Court so directs.

[29]    *See* ¶¶ 26-28, *supra*.

[30]    As noted above, Article 54 has been implemented through U.S. law.  *See supra* n. 15.

[31]    *See* Schreuer, *supra* note 14, at 1139 ("A domestic court or authority before which recognition and enforcement is sought is restricted to ascertaining the award's authenticity.  It may not re-examine the ICSID Tribunal's jurisdiction.  It may not re-examine the award on the merits. Nor may it examine the fairness and propriety of the proceedings before the ICSID Tribunal."). I note that U.S. courts have followed this rule.  *See Mobil Cerro Negro, Ltd. v. Venezuela*, 863 F.3d 96, 102, 118 (2d Cir. 2017) (holding that an "ICSID-award debtor [is] not permitted to make substantive challenges to the award" and that an enforcing court is "not permitted to examine the ICSID award's merits, its compliance with international law, *or the ICSID tribunal's jurisdiction to render the award*" and "may do no more than examine the [award's] authenticity and enforce the obligations imposed by the award." (emphasis added)); *see also TECO Guatemala Holdings, LLC v. Guatemala*, No. 17-102 (RDM), 2018 WL 4705794, at *2 (D.D.C. Sept. 30, 2018).  According to the United States Court of Appeals for the Second Circuit, Article 54 "reflects an expectation [under the ICSID Convention] that the courts of a member nation will treat the award as final."  *Mobil Cerro Negro*, 863 F.3d at 102.

NextEra's claims.  This means that the lengthy arguments set out by Spain and Professor Hindelang challenging application of the ECT to intra-EU disputes are simply irrelevant.  The treaty obligation of a United States court to enforce the Award under the ICSID Convention is clear and does not permit rehearing of the Tribunal's finding of jurisdiction.

**B.    By Its Terms, the ECT Does Not Exclude Intra-EU Disputes**

54.    In my opinion, even if the intra-EU argument could be entertained by an enforcing court under the ICSID Convention, Spain's and Professor Hindelang's argument is erroneous because there is no basis whatsoever for excluding intra-EU investment disputes from the ECT's scope of application.

55.    The ECT specifically states that "*each* Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article" ECT art. 26(3)(a) (emphasis added).  The ECT further requires that "*[e]ach* Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards."  *Id.* art. 26(8) (emphasis added).  The term "each Contracting Party" in both Article 26(3) and Article 26(8) of the ECT means what it says: each Contracting Party, including Contracting Parties that are EU Member States.  Spain and The Netherlands are both Contracting Parties in their own right; each undertook the ECT's obligations and submitted to arbitration in the event of claims against it by investors from the other.

56.    I observe that there is nothing in the text of the ECT – and neither Spain nor Professor Hindelang have pointed to any such text – to suggest that the obligation of any Contracting Party to comply with an ECT award differs depending on the nationality of the investor, as long as the investor is a national of another Contracting State.  That the EU is also an ECT Contracting Party does not alter the fact that each and every EU Member State became a full-

fledged party to the ECT with the same treaty-based obligations vis-à-vis nationals of every other Contracting Party.[32]  That the EU is a party only reflects the fact that, because the subject matter of the ECT falls within the competence of both the EU and the EU's Member States, it had to be concluded, on the EU side, as a so-called "mixed agreement."  In the *Achmea* case (which I address below), the Advocate General of the Court of Justice of the European Union (the "CJEU" or "ECJ") made that point clearly and the CJEU did not challenge his conclusion in its *Achmea* judgment. Speaking of the ECT, Advocate General Wathelet concluded:

> That multilateral treaty on investment in the field of energy operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing.  In that sense, the material provisions for the protection of investments provided for in that Treaty and the ISDS [investor-State dispute settlement] mechanism also operate between Member States.[33]

57.    Moreover, as the Tribunal in this case itself observed,[34] the practice of the EU, when it wants to carve away a treaty's application to intra-EU situations, is to negotiate for and have inserted in the treaty a so-called "disconnection clause."  A disconnection clause in a treaty entered into by the EU is a provision stating unambiguously that a treaty has no application to relationships that are entirely internal to the EU.  Its purpose is to ensure that, in cases between or

---

[32]   One EU Member State (Italy) has since withdrawn from the ECT, but that has no impact on the current analysis.

[33]   *Slovak Republic v. Achmea BV*, No. C-284/16, Opinion of Advocate General Wathelet ¶ 43 (ECJ Sept. 19, 2017) (Ex. 3 hereto).

[34]   *See* Decision ¶ 342 ("Therefore, in absence of a disconnection clause and a revision of the ECT by the Contracting Parties, the Tribunal cannot conclude that presence of the EU as REIO [regional economic integration organization] consenting to the provisions of the ECT would supersede the consent given by each EU Member State individually to the ECT.  Rather, a good faith interpretation of the terms of the ECT leads to the conclusion that a REIO, such as the EU, may have standing under the ECT in arbitration proceedings.").

among EU Member States, any inconsistency between EU law and a provision of the treaty is resolved in favor of EU law.[35]  Prior to signing and ratifying the ECT, the EU and the EU Member States had included disconnection clauses in certain other multilateral treaties, illustrating that they were familiar with this type of treaty carve-out and had used it several times.[36]

---

[35]  Marise Cremona, *Disconnection Clauses in EU Law and Practice, in Mixed Agreements Revisited: The EU and its Member States in the World* 160 (Christophe Hillion & Panos Koutrakos, eds., 2010) (Ex. 4 hereto).

[36]  As I describe *infra* ¶ 64, the preparatory works of the ECT also indicate that the EU specifically proposed a disconnection clause in the case of the ECT, but its proposal was rejected.  For examples of disconnection clauses employed by the EU and/or EU Member States prior to signing the ECT in 1994, *see, e.g.*:

- Convention on Civil Liability for Damage Resulting from Activities Dangerous to the Environment art. 25(2), June 21, 1993, E.T.S. No. 150 (to which the EU's predecessor – the European Economic Community – was also a signatory, as is the case with the ECT): "*In their mutual relations, Parties which are members of the European Economic Community shall apply Community rules and shall therefore not apply the rules arising from this Convention except in so far as there is no Community rule governing the particular subject concerned*."  *Id.* (emphasis added) (Ex. 5 hereto);

- European Convention on Transfrontier Television art. 27(1), May 5, 1989, E.T.S. No. 132 (to which the EU's predecessor – the European Economic Community – was also a signatory, as is the case with the ECT): "*In their mutual relations, Parties which are members of the European Community shall apply Community rules and shall not therefore apply the rules arising from this Convention except in so far as there is no Community rule governing the particular subject concerned*."  *Id.* (emphasis added) (Ex. 6 hereto);

- Joint Council of Europe/OECD Convention on Mutual Administrative Assistance in Tax Matters art. 27(2), Jan. 25, 1988, E.T.S. No. 127, which stated in its original text: "*Notwithstanding the rules of the present Convention, those parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community*."  *Id.* (emphasis added) (Ex. 7 hereto); and

- Convention on Insider Trading art. 16bis, Apr. 20, 1989, E.T.S. No. 130, *as amended* by Protocol, Oct. 1, 1991, E.T.S. No. 133: "*In their mutual relations, Parties which are members of the European Economic Community shall apply Community rules and shall therefore not apply the rules arising from this Convention except insofar as there is no Community rule governing the particular subject concerned*."  *Id.* (emphasis added) (Ex. 8 hereto).

58.    The ECT contains no such clause.  Moreover, when the EU sought special treatment for EU Member States as ECT parties, it knew how to do so.  The EU saw to it that a special provision – Article 25 – was inserted into the ECT to ensure that parties to a regional economic integration organization ("REIO") are not required under the ECT's most-favored-nation ("MFN") clause to extend to other ECT Contracting Parties the benefits that they confer on one another as members of that REIO. In other words, the EU did not want non-EU parties to the ECT or their nationals to be able to avail themselves, through MFN, of the extra benefits that EU Member States extend to one another under EU law.  The EU evidently cared enough about excluding this possibility that it negotiated, and saw to it that the ECT contained, a provision reflecting the special relationship that obtains between and among EU Member States as a matter of EU law.  This clearly shows the will and capacity of the EU to negotiate an EU carve-out when that is its intention.  It did not do so in connection with Article 26 of the ECT.

59.    According to Article 31(1) of the Vienna Convention on the Law of Treaties ("VCLT"), "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."[37]

60.    The ECT clearly contains no "intra-EU carve-out."  There is not the slightest textual basis for reading the ECT as if it did.  On the contrary, where the ECT Contracting Parties wanted to disapply the investor-State dispute mechanism under Part V of the ECT in favor of other treaties, they did so expressly – even where it concerned treaties of less obvious significance, such as the Svalbard Treaty, which relates to an archipelago in the Arctic.[38]  This careful attention to detail by

---

[37]    Vienna Convention on the Law of Treaties art. 31(1), May 23, 1969, 1155 U.N.T.S. 331 (Ex. 9 hereto).

[38]    See ECT, Decision 1 ("In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the

the ECT drafters stands in stark contrast to the alleged "implicit" carve-out now urged by Spain and Professor Hindelang, which is totally absent from the ECT. Prior ECT tribunals have rightly observed the significance of this as a matter of treaty interpretation.[39]

61.    The only way a disconnection clause could be formally introduced into the ECT would be by amendment of the ECT. Under Article 42 of the ECT, the text of proposed amendments must first be adopted by the Charter Conference and distributed to all Contracting Parties for approval. Amendments cannot become effective without adoption by a three-quarters majority of Contracting States.[40] Even under the VCLT, a subset of contracting states cannot modify a treaty by a separate agreement among themselves without "notify[ing] the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides."[41] None of the above has occurred.

---

Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.").

[39]    *See, e.g.*, *Masdar Solar & Wind Cooperatief U.A. v. Spain*, No. ARB/14/1, Award ¶ 311 & n.208 (ICSID 2018) ("It would seem striking that the Contracting Parties made an express exception for the Svalbard Treaty, which concerns an archipelago in the Arctic, but somehow omitted to specify that the ECT's dispute settlement system did not apply in all of the EU member states' relations. Compared to the Svalbard Treaty Exception, an exception with regard to intra-EU relations would be of much greater significance. It would be extraordinary that an essential component of the Treaty, such as investor-State arbitration, would not apply among a significant number of Contracting Parties without the treaty drafters addressing this exception.") (Ex. 10 hereto) (quoting *PV Investors v. Spain*, PCA No. 2012-14, Preliminary Award on Jurisdiction ¶ 183 (UNCITRAL 2014)); *accord Eskosol S.p.A. in liquidazione v. Italy*, No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection Based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes ¶ 99 n.232 (ICSID 2019) (quoting *PV Investors*, Preliminary Award on Jurisdiction ¶ 183) (Ex. 11 hereto).

[40]    *See* ECT art. 42.

[41]    VCLT art. 41(2).

62.    It is especially significant that the ECT expressly prohibits the making of any reservations by Contracting States.[42]   In my view, if the EU is barred from introducing a disconnection clause by means of a reservation to the ECT, it is also barred from finding a disconnection clause in the ECT, from which such a clause is conspicuously absent – all the more so where, as here, the treaty says the very opposite, i.e., that the consent given to arbitration by "each Contracting Party" is "unconditional."[43]

63.    Faced with these realities, Spain argues that a disconnection clause should nevertheless be inferred from the circumstances.  In my opinion, however, there is absolutely no basis for any such inference in either the ECT's context or its object and purpose, within the meaning of Article 31(1) of the VCLT.[44]   The context in which the ECT was produced was a determination, led by the EU itself, to establish a uniform regime for regulation of the energy sector.  The establishment of a uniform regime in the energy sector sits poorly with the notion of a carve-out for pairs of EU Member States.  The object and purpose of the ECT's arbitration provisions in particular, was to put in place a system for arbitrating all energy-related disputes between any Contracting State and a national of any other Contracting State.  The notion of an intra-EU carve-out is not consistent with this object and purpose.

64.    Under these circumstances, one should look no further in giving meaning to treaty language.  But, even if one were to turn to a supplementary source, on the ground that the meaning

---

[42]   *See* ECT art. 46 ("No reservations may be made to this Treaty.").

[43]   *Id.* art. 26(3)(a).

[44]   *See* VCLT art. 31(1) ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.").

of the treaty remains ambiguous,[45] and therefore consult the ECT's negotiating history, the result would, in my view, be no different. During the ECT negotiations, the European Commission specifically proposed that a disconnection clause be included in the ECT, and that proposal was rejected. The ECT, as signed, contained no such provision.[46]

65.    In many arbitrations over recent years, respondent EU Member States, and the European Commission as *amicus curiae*, have unfailingly argued that the ECT does not apply to disputes arising between EU nationals and other EU states (in effect, arguing for an implied disconnection clause), but never to any avail. Every ICSID tribunal presented with this issue has unanimously rejected any such claim – with most of those decisions being rendered after the *Achmea* judgment.[47]

---

[45]    *See* VCLT art. 32 ("Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31 . . . [l]eaves the meaning ambiguous or obscure.").

[46]    *See* Draft, Basic Agreement for the European Energy Charter at 84 (Aug. 12, 1992) (Ex. 12 hereto); *see also* Decision ¶ 298.

[47]    In addition to the Tribunal's Decision in the NextEra arbitration, *see Blusun S.A. v. Italy*, No. ARB/14/3, Award ¶ 291 (ICSID 2016) ("[T]he Tribunal holds that the *inter se* obligations in the ECT have not subsequently been modified or superseded by later European law.") (Ex. 13 hereto); *Rockhopper Italia S.p.A. v. Italy*, No. ARB/17/14, Decision on the Intra-EU Jurisdictional Objection ¶¶ 172-75 (ICSID 2019) (same) (Ex. 14 hereto); *Belenergia S.A. v. Italy*, No. ARB/15/40, Award ¶ 321 (ICSID 2019) ("[T]his Tribunal finds that Article 26 ECT on investor-State arbitration is complementary rather than incompatible to the remedies of the EU legal order.") (Ex. 15 hereto); *Vattenfall AB v. Germany*, No. ARB/12/12, Decision on the *Achmea* Issue ¶ 207 (ICSID 2018) ("[T]he Tribunal finds that a Contracting Party to the ECT in Article 26 ECT includes EU Member States and non-EU Member States without distinction.") (Ex. 16 hereto); *OperaFund Eco-Invest SICAV PLC v. Spain*, No. ARB/15/36, Award ¶¶ 327-30 (ICSID 2019) (same conclusion) (Ex. 17 hereto); *Cube Infrastructure Fund SICAV v. Spain*, ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum ¶¶ 118-38 (ICSID 2019) (same conclusion) (Ex. 18 hereto); *Eskosol* ¶ 93 (same conclusion); *SolEs Badajoz GmbH v. Spain*, No. ARB/15/38, Award ¶ 235-37 (ICSID 2019) (same conclusion) (Ex. 19 hereto); *9REN Holding S.À.R.L. v. Spain*, No. ARB/15/15, Award ¶ 147 (ICSID 2019) (same conclusion) (Ex. 20 hereto); *Eiser Infrastructure Ltd. v. Spain*, No. ARB/13/36, Award ¶ 207 (ICSID 2017) (same conclusion) (Ex. 21 hereto); *Masdar Solar &*

66.    To my knowledge, all investor-State tribunals constituted under other arbitral rules[48] to have addressed the "intra-EU" objection also have rejected that argument – again unanimously.[49] In total, therefore, more than 20 ECT tribunals have independently examined this issue and all of them have concluded that the ECT applies on an intra-EU basis.

67.    In sum, I conclude that neither the text, nor the context, nor the object and purpose of the ECT – and certainly not the negotiating history – supports Spain's "intra-EU" argument.

---

*Wind Cooperatief U.A. v. Spain*, No. ARB/14/1, Award ¶¶ 306-24 (ICSID 2018) (same conclusion); *Antin Infrastructure Servs. Lux. S.à.r.l v. Spain*, No. ARB/13/31, Award ¶¶ 204-30 (ICSID 2018) (same conclusion) (Ex. 22 hereto); *RREEF Infrastructure (G.P.) Ltd. v. Spain*, No. ARB/13/30, Decision on Jurisdiction ¶¶ 78-89 (ICSID 2016) (same conclusion) (Ex. 23 hereto).

[48]    *E.g.*, the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce ("SCC") and Arbitration Rules of the United Nations Commission on International Trade Law, which are also provided as options for arbitration in Article 26 of the ECT.

[49]    *See, e.g.*, *Greentech Energy Sys. A/S v. Italy*, No. 2015/095, Final Award ¶ 396 (SCC 2018) ("This Tribunal agrees with the other arbitral tribunals that have held ECT jurisdiction satisfied by the terms of Article 26 notwithstanding objections based on the character of a dispute as between an EU investment and an EU host state.") (Ex. 24 hereto); *Foresight Lux. Solar 1 S.à.r.l. v. Spain*, No. 2015/150, Final Award ¶¶ 198-222 (SCC 2018) (same conclusion) (Ex. 25 hereto); *Novenergia II – Energy & Env't (SCA) (Grand Duchy of Lux.), SICAR v. Spain*, No. 2015/063, Final Arbitral Award ¶¶ 459-62 (SCC 2018) (same conclusion) (Ex. 26 hereto); *Charanne B.V. v. Spain*, No. 062/2012, Final Award ¶ 437 (SCC 2016) (same conclusion) (Ex. 27 hereto); *Isolux Infrastructure Neth. B.V. v. Spain*, No. 2013/153, Final Award ¶ 656 (SCC 2016) (same conclusion) (Ex. 28 hereto). SCC and UNCITRAL awards are not subject to the same unique status as an ICSID award, and some of them are the subject of a challenge in the national courts in which the arbitration tribunal was seated, on the grounds that the tribunal lacked jurisdiction. Nevertheless, the jurisdictional reasoning of the tribunals in those cases remains, in my view, valid and relevant. *See also Stadtwerke München GmbH v. Spain*, No. ARB/15/1, Award ¶ 137 (ICSID 2019) (rejecting jurisdictional argument based on ECT art. 26) (Ex. 29 hereto).

**C.** **Spain's Efforts to Invalidate the Arbitration Agreement By Reference to EU Law – Including its *Achmea* Argument – Are Unavailing**

    **1.** **EU Law Cannot Override Spain's Binding International Law Obligations to Arbitrate ECT Disputes, and to Abide by the ICSID Convention**

68.    Spain and Professor Hindelang argue in the alternative that, regardless of how the ECT may be interpreted, and regardless of the existence of an arbitration agreement between Spain and NextEra selecting ICSID Convention arbitration, "intra-EU" investment disputes cannot, as a matter of law, be subject to arbitration of any kind. In this regard, Professor Hindelang contends that "Article 26 of the ECT cannot be applied between EU Member States,"[50] and that "Article 26 has been inoperative *ab initio* for intra-EU disputes," with the "result," he claims, that "Spain did not make a legally permissible offer to arbitrate based on Article 26(3) of the ECT to investors from another EU Member State, such as NextEra."[51]

69.    In Spain's view, therefore, any arbitration agreement providing for the arbitration of investment disputes between an EU Member State and a national of another EU Member State – such as the arbitration agreement in this case – is necessarily invalid.[52]

70.    This argument relies exclusively upon EU law itself.[53] Indeed, it is noteworthy that Professor Hindelang's opinion is expressly premised as being one based on EU law (rather than

---

[50]  Hindelang Decl. ¶ 47.

[51]  *Id.* ¶ 48.

[52]  *See* Spain MTD at 30-33.

[53]  *See id.* at 31 ("It is axiomatic that the EU Treaties constitute rules of international law. Thus, any dispute resolved under Article 26(6) of the ECT, including a dispute on the existence or validity of the arbitration agreement, must be decided in accordance with EU law, giving priority to the EU Treaties."(citation omitted)).

the ECT or public international law).[54]  Spain and Professor Hindelang have argued that any "intra-EU" investment disputes must be adjudicated exclusively in the courts of the EU Member States, which enjoy the possibility of making preliminary references to the CJEU when they have doubts about the interpretation or validity of EU law.  In this way, no court other than a court within the EU can interpret and apply EU law.[55]  According to Spain, because tribunals operating under an international treaty such as the ECT, entered into by the EU and the EU Member States, cannot make preliminary references to the CJEU, the agreement establishing them is therefore necessarily invalid to the extent that it authorizes the submission of intra-EU investment disputes to arbitration.

71.    I postpone to a later section discussion of the precise basis for Spain's intra-EU objection to the enforcement of awards won by a national of one EU Member State against another EU Member State.  In this section, I instead explore a more general proposition advanced by Spain and Professor Hindelang, namely that an EU law prohibition can override the ECT – an international treaty, to which both the EU and all EU Member States are parties – so as to deprive the ECT of its intended effect.

72.    This is a remarkable proposition and one that warrants close scrutiny.  In fact, I find Spain's and Professor Hindelang's position in this regard to be deeply flawed.

73.    In this litigation, Spain's and Professor Hindelang's basic position appears to be that, if EU law prohibits the arbitration of intra-EU investment disputes, then an international treaty, such as the ECT, cannot authorize the arbitration of such disputes, even if that is its purpose.  In other words, Contracting States' obligations under a treaty to which Spain and the EU are parties,

---

[54]    Hindelang Decl. ¶ 6.

[55]    *See* Spain MTD at 32 ("Here, similarly, tribunals formed under Article 26 of the ECT are neither courts nor tribunals within the EU legal system, and they therefore lack the requisite 'links with the judicial systems of the Member States.'"(citation omitted)).

properly interpreted, are subordinated to the dictates of EU law.[56]  On this view, such a treaty cannot be given effect – even by a third-country court, such as a U.S. court – to the extent that its application would offend EU law.[57]

74.     Spain acknowledges that the law applicable to the ECT, including the rights and obligations that the ECT creates, is international law, and that international treaties such as the ECT constitute international law.[58]  Article 26(6) of the ECT provides that a Tribunal "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

75.     Spain and Professor Hindelang, however, go further and contend that, because the EU is the product of an international treaty, international law necessarily includes EU law.[59]  On that basis, they argue that the ECT (and in particular, Article 26(6), requiring application of "applicable rules and principles of international law") must be read as making EU law applicable

---

[56]  *See* Hindelang Decl. ¶ 26 ("The principle of primacy of EU law also applies to international agreements or treaties between EU Member States.  EU law therefore takes precedence over the rules created by EU Member States in international agreements or treaties concluded between them.").

[57]  *See id.* ¶ 25 ("The principle of primacy of EU law is not limited to EU Member States' courts and tribunals but requires any competent authority to both apply and give full effect to EU law.").

[58]  *See* Spain MTD at 8.

[59]  Hindelang Decl. ¶ 18 ("The fact that the EU Treaties may be more limiting on the Member States' sovereign powers than other international agreements does not change the fact that EU law is public international law when applied between the EU Member States; albeit with a *superior rank* in relation to other public international law applicable between the EU Member States.").  I note that Professor Hindelang invokes the CJEU decision in *Budějovický Budvar v. Rudolf Ammersin GmbH*, Case C-478/07 (ECJ Sept. 8, 2009) (Hindelang Decl. Ex. 37) in support of this proposition.  Yet the holding in *Budějovický Budvar* dealt with a treaty between two EU Member States that regulated the use of certain trade names in the sale of beer, in a manner "contrary" to EU law, "in particular the rules on the free movement of goods." *Id.* ¶ 98.  That case is not comparable to the present situation.

as the governing law in ECT disputes, with the result, according to Spain and Professor Hindelang, that EU law's prohibition on the arbitration of intra-EU investment disputes must prevail.[60]

76.    In my view, this position is untenable.

77.    It is worth recalling at this point the text of Article 26 of the ECT, including in particular Article 26(6). In relevant part, Article 26 states:

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months . . . the Investor party to the dispute may choose to submit it for resolution [in accordance with various dispute resolution options, including international arbitration as set out in paragraph (4)].
>
> . . . .
>
> (6) A tribunal established under paragraph (4) [including an ICSID Convention tribunal] shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.[61]

78.    It can thus be seen that the Contracting Parties to the ECT selected the treaty (i.e., the ECT itself) and "applicable rules and principles of international law" as the law governing the issues in dispute where, as in the arbitration underlying this case, claims are filed pursuant to Article 26 of the ECT. Article 26(1) of the ECT makes clear that the "[d]ispute" being entrusted to an ECT tribunal can only be one which "concern[s] an alleged breach of an obligation of [the respondent State] under Part III" of the ECT. (Part III of the ECT contains the substantive investment protections, including Article 10 which formed the basis for the Tribunal's finding of

---

[60]    *See* Spain MTD at 16 ("The law is clear that an exception to sovereign immunity exists only if a valid arbitration agreement exists, and EU law is unambiguous that no valid arbitration agreement ever existed between Spain and Petitioners.").

[61]    ECT, art. 26(1)-(2), (6).

liability in NextEra's case). This, in turn, informs the reference to "the issues in dispute" in Article 26(6) – i.e., the treaty is referring to a disputed breach of Part III of the ECT – not disputed breaches of EU law or domestic law.

79.     By contrast, the drafters of an investment treaty sometimes intend for the law of a Contracting Party, such as the EU or EU Member States, to form part of the applicable law. In such cases, they generally make this explicit in the treaty. The clause identifying the applicable law will specifically include among the bodies of applicable law "the law in force of the Contracting Party concerned," or an equivalent phrase. This is the language of the applicable law clause, Article 8, of the Netherlands-Slovakia BIT underlying the *Achmea* case which is discussed at length below.[62] Such language is conspicuously absent from the above-quoted applicable law provision of the ECT.

80.     Given that omission, therefore, and regardless of how EU law is characterized, EU law is *not* part of the "applicable rules and principles of international law" that apply alongside the ECT when resolving disputes pursuant to Article 26(6) of the ECT. An ECT tribunal does not, therefore, apply EU law as governing law to the dispute before it. It applies to that dispute exclusively the terms of the ECT itself, and international law more generally.[63]

81.     ICSID tribunals have repeatedly declined to treat EU law as being among the "applicable rules and principles of international law" referred to in Article 26(6) of the ECT. Based

---

[62]   *See* Netherlands-Slovakia BIT, art. 8(6) (Ex. 30 hereto). Indeed, in the *Achmea* case the CJEU declined to find that EU law fell within the scope of the phrase "general principles of international law" in Article 8(6) of that BIT. I address this *infra* ¶ 122.

[63]   As I explain in ¶ 120 *infra*, this also removes ECT awards from the concerns expressed by the CJEU in the *Achmea* case, because – unlike a BIT tribunal mandated to decide cases in accordance with EU law – ECT tribunals are not deciding the issues in dispute under EU law. They do not, therefore, present a risk to the uniform interpretation of EU law or its autonomy, which were the policy concerns underlying the CJEU's judgment in *Achmea*.

on the ordinary meaning of Article 26(6) of the ECT as well as its object and purpose,[64] they have rightly read the words "applicable rules and principles of international law" as signifying general rules and principles of international law (applicable to all ECT Contracting Parties) – and neither "a special species of international law"[65] nor a purely "regional [as distinct from] a worldwide system of law" (applicable only to a subset of ECT Contracting Parties).[66]  As one tribunal observed:

> To say that EU law is a part of international law and yet has supremacy over other, non-EU components of international law is . . . to mischaracterize EU law and confuse questions belonging to two different legal orders.  The EU treaties are, certainly, international agreements of a kind familiar in international law, binding as between the States Parties . . . .  The rules established by EU secondary legislation are essentially supra-national regulations rather than part of the corpus of international law as such.  Similarly, EU law has supremacy *within the EU legal system* over the national laws of the States that are Members of the EU and accordingly subscribe to the EU legal system.  But EU law is only one among several regional, and many national, legal systems . . . .  Within the system of international law, EU law does not have supremacy, and has no hierarchical priority over the laws of non-Member States, or over rules of international law, including the ECT.[67]

---

[64]  As noted above, VCLT art. 31(1) requires that treaties be interpreted according to their ordinary meaning, having regard to their object and purpose.  *See supra* ¶ 59.

[65]  *Eskosol* ¶ 115.

[66]  *Id.* ¶ 121.  To the same effect, *see Greentech Energy Sys. A/S v. Italy*, No. 2015/095, Final Award ¶ 397 (SCC 2018) ("The Tribunal has not been called upon to apply EU law, since Claimants asserted breaches of the ECT and international law, but not of EU law.") ; *Cube Infrastructure Fund SICAV v. Spain*, No. ARB/15/20, Decision on Jurisdiction, Liability, and Partial Decision on Quantum ¶¶ 129-30, 158 (ICSID 2019); *Rockhopper Italian S.p.A. v. Italy*, No. ARB/17/14, Decision on the Intra-EU Jurisdictional Objection ¶ 174 (ICSID 2019).

[67]  *Eskosol* ¶ 130.

82.    First, if EU law is relevant to an ECT determination, it is relevant only as a factual matter upon which the question of whether a violation of the ECT has occurred may in some respect depend.  Investment tribunals have repeatedly so held.[68]

83.    Second, even if EU law were considered to be part of the law applicable to "the issues in dispute" in an ECT claim, that does not mean that EU law determines the validity of the treaty or a tribunal's jurisdiction under the treaty.  Several ECT tribunals have expressly recognized this distinction in holding that Article 26(6) does not apply to matters of jurisdiction.[69]  The law designated in a treaty's applicable law clause, such as Article 26(6) of the ECT, is the law applicable, in the very words of that provision, to "the issues in dispute" in a case arising under the treaty.  In other words, it is the law applicable to the interpretation and application of the treaty, including of course the rights and obligations of the parties to the treaty.  However, the issue raised by Spain in this proceeding has nothing to do with the interpretation and application of the ECT or the rights and obligations of the parties thereunder.  Rather, Spain invokes EU law solely for purposes of challenging the ECT's very validity as applied to intra-EU investment disputes, thereby challenging the enforceability of the Award.  That is not the purpose of the designation of applicable law in Article 26(6) of the ECT.

84.    Moreover, viewing Article 26(6) of the ECT as applicable to matters of interpretation and application only comports with the principle of harmonious interpretation,

---

[68]    *See, e.g.*, *id.* ¶ 160 ("Spanish law and EU law are relevant only as facts in the light of which the rights and duties of the Parties under the ECT and international law are to be determined.").

[69]    The *Vattenfall* tribunal stated "Article 26(6) . . . applies only to the merits of a dispute between the Parties.  It does not apply to issues or questions relating to the Tribunal's jurisdiction." *Vattenfall* ¶ 121; *accord Eskosol* ¶ 113.

which demands apparently conflicting provisions of a legal instrument, such as a treaty, to be read in harmony with one another whenever possible.

85.    Third, if EU law governs ECT disputes simply because, as founded on a treaty, it itself constitutes international law, then the meaning and effect of the ECT would be subject to *all* international treaties, not just the treaties establishing the EU.  Certain ECT Contracting States would then easily be able to lessen or otherwise alter their obligations under the ECT by entering into other international agreements among themselves.  Under Spain's view, every time States that are parties to an international treaty choose to enter into an agreement touching on the same matters, their agreement overrides the treaty.  This cannot be right.

86.    Fourth, even if both international law and EU law govern the question of the validity of the ECT's submission of intra-EU investment disputes to arbitration, which is not the case, there is no reason why the EU's opposition to the arbitration of such disputes should override the ECT's authorization of it.  If an international treaty unquestionably confers certain rights and obligations, but the law of a Contracting State would curtail them – i.e., if they are in conflict – why should the latter take precedence?  Moreover, the EU treaties were concluded by only a subset of ECT Contracting States; as such, they cannot alter the ECT of which all Contracting States – and the EU itself – are members.  In sum, the possible characterization of EU law as being "international law" does not mean that EU law can prohibit what an international law instrument prescribes.

87.    More generally, by virtue of a fundamental principle of international law, a State remains bound by its international law obligations even if performance of those obligations would run afoul of that State's internal law.  Article 27 of the VCLT puts the proposition very plainly:

> A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.[70]

88.    Fifth, the drafters of the ECT expressly addressed the relationship between international law and EU law.  Article 16 of the ECT provides that, where Contracting States have also entered into another international agreement on investment protection:

> nothing in . . .  the other agreement shall be construed to derogate from any provision of [the ECT on investment protection] or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.[71]

89.    I find Article 16 of the ECT to be very clear.  It provides that the ECT prevails over any other treaties between or among the Contracting States to the extent that it affords greater investment protection.  Thus, the EU Treaties, to which both Spain and The Netherlands are parties, cannot operate to lessen the level of investment protection afforded to the nationals of those countries by the ECT.  Even more directly pertinent to the particular matter before this Court, nothing in the EU treaties can, under the language of Article 16, impair the "dispute resolution" provisions of the ECT.  The assertion that EU law can invalidate an arbitration agreement giving an investor a "right to dispute resolution" pursuant to the ECT flies directly in the face of Article 16.

90.    Even in the absence of Article 16, EU law cannot override the provisions of the ECT, due to the principle of *lex posterior*, according to which, in the event of conflict, the later of two instruments on the same subject matter prevails over the earlier one.  Both Spain and The Netherlands became members of the EU when they acceded to the 1957 Treaty Establishing the

---

[70]   VCLT art. 27.

[71]   ECT art. 16.

European Community ("TEC"),[72] the forerunner to the current Treaty on European Union ("TEU") and Treaty on the Functioning of the European Union ("TFEU") on whose provisions Spain relies in this proceeding.[73]   The Netherlands was an original signatory of the 1957 TEC, which established the original European Economic Community ("EEC"), while Spain acceded to the EEC in 1986.  Only subsequently, in 1998, did the ECT enter into force.

91.     Sixth, according to the EU's own founding treaties, the EU is committed to "respect for . . . international law"[74] and considers international agreements to be "binding upon the institutions of the Union and on its Member States."[75]   The notion that an EU Member State can invoke EU law to defeat its international treaty obligations is, in my view, antithetical to a fundamental principle that the EU itself professes.

## 2.     EU Law Cannot Supplant Binding International Law

92.     The problem with Spain's arguments run much deeper.  Spain fundamentally fails to appreciate the difference between the validity of a treaty *under the law of a Contracting State* and the validity of that treaty *on the international plane*.  If a Contracting State finds that its own

---

[72]   The current Article 344 of the TFEU was originally Article 219 of the TEC.  When the TEC was amended by the 1992 Maastricht Treaty, it was renumbered as Article 292.  Article 267 was originally Article 177 of the TEC.  When the TEC was amended by the Maastricht Treaty, it was renumbered as Article 234.  These became Articles 344 and 267 as a result of the 2007 Treaty of Lisbon.  Throughout these renumberings, the language of neither Article 344 nor 267 was changed.

[73]   Treaty on European Union, June 7, 2016, 2016 O.J. (C202) 1 (Consolidated Version);  Treaty on the Functioning of the European Union, June 7, 2016, 2016 O.J. (C202) 47 (Consolidated Version) (collectively, Ex. 31 hereto).  Earlier versions (2012) of the TFEU and TEU are Exhibits 8 and 9, respectively, to the Hindelang Declaration.

[74]   TEU art. 21(1).

[75]   TFEU art. 216(2).  The EU is also bound to "strict observance and the development of international law."  TEU art. 3(5).

law prevents it, for any reason, from giving effect to an international agreement to which it is a party, it may presumably, purely as a matter of domestic law, decline to give it effect. It may even go so far as to invalidate domestic law measures that are based on that agreement. But a Contracting State may not invalidate the international agreement itself or escape its international obligations under it. It certainly cannot impose its views on the validity of a treaty on the other parties to the treaty, as Spain attempts to do in seeking to persuade this Court to decline subject matter jurisdiction.

93.     Thus, while Professor Hindelang asserts that "[i]n the EU legal order," EU treaties take "precedence" over other instruments including "international agreements" concluded by the EU,[76] this merely reflects that, in some countries, internal domestic laws might conflict with, or fail to give full effect to international law. If this happens, however, it has no effect on the state's binding obligations under international law, and other states are not required to accept or act in accordance with that country's domestic laws that conflict with international law.

94.     The CJEU has, in fact, endorsed this view. In the case of *Kadi v. Council of the European Union*[77] (which Professor Hindelang relies upon in his opinion), the claimants challenged a series of regulations of the Council of the EU implementing a UN Security Council resolution requiring the freezing of assets of certain individuals alleged to be associated with Al Qaeda. The claimants argued that the EU measure violated their fundamental rights under EU law.

---

[76]    Hindelang Decl. ¶ 13.

[77]    *Kadi v. Council of the European Union*, Joined Cases C-402/05 P & C-415/05 P, 2008 E.C.R. I-6352 (ECJ 2008) ("*Kadi*") (Ex. 32 hereto).

The EU Court of First Instance sustained the EU measure on the ground that the EU and the Member States were bound to respect the primacy of their obligations under the UN Charter.[78]

95.    In the appeal, in *Kadi*, Spain argued that the lower court ruling should be upheld in its entirety,[79] a position it effectively abandons here. Although the CJEU reversed the lower court by declining to subordinate EU law to the UN Charter,[80] in doing so it drew a sharp distinction between validity *under EU law*, on the one hand, and validity *under international law*, on the other. The CJEU emphasized that while it had authority to treat the EU measure as invalid within the EU, it had no authority to treat the UN Resolution itself as invalid:

> In this regard it must be emphasised that, in circumstances such as those of these cases, the review of lawfulness [under EU law] … to be ensured by the Community judicature applies to the Community act intended to give effect to the international agreement at issue, *and not to the latter as such*. [81]
>
> . . .
>
> [A]ny judgment given by the Community judicature deciding that a Community measure intended to give effect to [a U.N.] resolution is contrary to a higher rule of

---

[78] The Court of First Instance ruled that "[f]rom the standpoint of international law, the obligations of the Member States of the United Nations under the Charter of the United Nations clearly prevail over every other obligation of domestic law or of international treaty law including, for those of them that are members of the Council of Europe, their obligations under the ECHR and, for those that are also members of the Community, their obligations under the EC Treaty." *Kadi v. Council & Commission*, Case T-315 [2005] ECR II-3649 ¶ 181 (CFI 2005) (Ex. 37 hereto).  As a result, the EU Member States, as Members of the United Nations, were bound to accept the principle of the primacy of their obligations under the Charter of the United Nations, including as enshrined in Article 103 thereof.  *Id.* ¶¶ 181-184.  Article 103 of the U.N. Charter provides that "[i]n the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail."  (Ex. 33 hereto).

[79]  *Kadi* ¶ 113.

[80]  *Id.* ¶ 285.

[81]  *Id.* ¶ 286 (emphasis added).

law in the Community legal order *would not entail any challenge to the primacy of that resolution in international law*.[82]

96.     Applying that principle here, European Union law is not capable of overriding an international obligation – whether of the EU or the U.S – that arises under the ECT and ICSID Convention.

### 3.   Spain's Arguments About the "Autonomy" of the EU Legal Order, and its Reliance Upon the *Achmea* Decision, are Unavailing

(a)     The *Achmea* Case

97.     Spain and Professor Hindelang base their challenge to Spain's arbitration agreement with NextEra, and to the arbitration of intra-EU investment disputes generally, on a principle of EU law that, in EU circles, is labeled the "autonomy of the EU legal order."[83]  In so doing, they invoke the judgment of the CJEU in the case of *Slovak Republic v. Achmea B.V.*[84] as illustrating that principle's application to investor-State arbitration.[85]

98.     In my opinion, Spain's and Professor Hindelang's reliance on the *Achmea* judgment and on the purported autonomy of the EU legal order is misconceived.

---

[82]   *Id.* ¶ 288 (emphasis added).

[83]   *See* Spain MTD at 1 ("[T]he arbitration of intra-EU disputes through ISDS mechanisms violates the principle of primacy and the principle of autonomy, as reflected in Articles 267 and 344 of the Treaty on the Functioning of the European Union ('TFEU'), which invalidates any such alleged arbitration agreement.").

[84]   *Slovak Republic v. Achmea B.V.*, Case C-284/16 (ECJ 2018) ("*Achmea ECJ 2018*") (Hindelang Decl. Ex. 46).

[85]   *See, e.g.*, Spain MTD at 2 ("While the *Achmea* case arose in relation to an arbitration agreement in a bilateral investment treaty (BIT), it has been widely read as applying to all intra EU ISDS arbitration agreements . . . .  As a result, no arbitration agreement could have existed between Petitioners and Spain.").

99.    Below I analyze *Achmea*, and the principle of "autonomy" that is said to underlie that decision.

100.    In *Achmea*, a dispute arose between a Dutch company (Achmea) and the Slovak government concerning certain legislation in the health sector which, according to the investor, violated the terms of the Netherlands-Slovakia BIT.  An arbitration was commenced in 2008 pursuant to the UNCITRAL Rules, and a three-member UNCITRAL tribunal was constituted that same year, and it was agreed that Frankfurt, Germany would be the "seat" of the arbitration.[86]

101.    On December 7, 2012, the UNCITRAL tribunal found Slovakia guilty of violating the Netherlands-Slovakia BIT, and rendered an award in the claimant's favor against Slovakia in the amount of €22.1 million.  Slovakia sought annulment of the award in a court in Frankfurt, Germany, the seat of arbitration, claiming that the arbitration agreement between Achmea and Slovakia on which the proceeding was based was invalid because submission of an intra-EU investment dispute to arbitration was contrary to EU law.  On that basis, Slovakia asserted that the *Achmea* tribunal lacked jurisdiction, and the resulting award was invalid and should be annulled.[87]

102.    On December 18, 2014, Slovakia's contention was rejected by the Frankfurt court.[88] The case then went to the German Federal Court of Justice, which on March 3, 2016, made a

---

[86]    The fact that UNCITRAL arbitration was chosen (and not arbitration under the ICSID Convention) meant that the *Achmea* award was *not* subject to the unique ICSID Convention regime that I describe at paragraphs 21 to 34, *supra*.  Indeed, it meant that the arbitration proceedings were subject to a degree of scrutiny at the national court level, in the form of: (i) German arbitration law, to the extent it governed an international arbitration proceeding seated in Frankfurt; and (ii) the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 330 U.N.T.S. 3.

[87]    *Achmea ECJ 2018* ¶¶ 11-12.

[88]    *Slovak Republic v. Achmea B.V.*, Bundesgerichtshof [BGH] [Federal Court of Justice] Oct. 31, 2018, I ZB 2/15 ¶ 8 ("*Achmea BGH 2018*") (Hindelang Decl. Ex. 58).

preliminary reference to the CJEU, seeking a ruling on the compatibility between the BIT

provision for arbitration and EU law.[89]  It bears emphasis that because Germany is an EU Member

State, its own domestic law incorporates European law, and its domestic courts are required to

abide by decisions of the CJEU.

103.    In its *Achmea* judgment delivered in April 2018, the CJEU declared, on the basis

of the principle of autonomy of EU law, that the BIT provision for arbitration of an intra-EU

investment was indeed incompatible with EU law and accordingly invalid:

> [B]y concluding the BIT, the Member States parties to it established a mechanism
> for settling disputes between an investor and a Member State which could prevent
> those disputes from being resolved in a manner that ensures the full effectiveness
> of EU law, even though they might concern the interpretation or application of that
> law.[90]
>
> …
>
> In those circumstances, Article 8 of the [Netherlands-Slovakia] BIT has an adverse
> effect on the autonomy of EU law.[91]

104.    In *Achmea*, the CJEU found the principle of autonomy to be anchored in two of the

articles of the TFEU.[92]

105.    The CJEU first invoked Article 344 of the TFEU, according to which "Member

States undertake not to submit a dispute concerning the interpretation or application of the Treaties

---

[89]    *Id.* ¶ 9.

[90]    *Achmea ECJ 2018* ¶ 56.

[91]    *Id.* ¶ 59.

[92]    I note that the same arguments (relying upon the same articles of the TFEU) had been relied
upon by Slovakia in the arbitration.  They have also been relied upon by the European
Commission, as *amicus curiae*, in *Achmea* and many other investment arbitrations.  Slovakia
also invoked a third provision of EU law, arguing that the arbitration agreement violated the
principle of non-discrimination under Article 18 of the TFEU.

to any method of settlement other than those provided for therein." In the CJEU's view, submission of an investment dispute between a Dutch investor and Slovakia to arbitration violated the EU Member States' obligation under Article 344 to submit their disputes over the interpretation or application of EU law exclusively to EU Member State courts, again with the possibility of a preliminary reference to the CJEU on any issue of EU law. The CJEU thus construed Article 344 of the TFEU to cover not only disputes between EU Member States, but also disputes between one EU Member State and a national of another.

106.    This is not how courts, tribunals and commentators have generally understood Article 344 of the TFEU. They have understood it to cover EU Member State-to-EU Member State disputes only, and indeed the only occasion on which the CJEU has invoked the provision was an EU Member State-to-EU Member State dispute.[93] Article 344 is unconcerned with disputes between an EU Member State and a private party. Obviously, the CJEU's interpretation of EU law is authoritative and must be respected. But the CJEU's views on the impact of Article 344 of the TFEU on Member States' international treaty obligations are another matter. The CJEU's remit is limited to interpreting and applying EU law, not international law. In addition, its rulings on EU law are not binding on institutions outside the EU.

107.    Furthermore, even as a matter of EU law, it is clear that Article 344 of the TFEU is expressed as a prohibition directed at each of the EU Member States ("*Member States undertake not to submit . . .* ") in which they commit, as a matter of EU law, not to take actions which derogate from their commitments in the TFEU. Article 344 of the TFEU is not directed at actions taken by the entire EU acting through all of the EU Member States and the EU itself when they jointly

---

[93]    *See Commission v. Ireland*, Case C-459/03 (ECJ May 30, 2006) (otherwise known as the *Mox Plant* case) (Hindelang Decl. Ex. 34).

decided to enter into a separate treaty, the ECT.  In fact, the *Achmea* judgment clearly distinguished between bilateral investment treaties and multilateral treaties to which the EU is a party.[94]

108.    The same distinction applies to the related EU law principle of "mutual trust between the Member States" invoked by the CJEU in *Achmea*.[95]  It is a principle that applies as between the EU Member States, including trust in each other's national courts.  It is not a principle that logically translates to a situation where the EU itself, and all of the EU Member States, decide to enter into a multilateral treaty, such as the ECT.

109.    The CJEU in *Achmea* dwelled more heavily on Article 267 of the TFEU, according to which EU Member State courts may, and under some circumstances must, make preliminary references to the CJEU on questions of the validity or interpretation of EU law in cases in which such questions arise, with the answers they receive from the CJEU being binding on them.  Use of these preliminary references is meant to ensure that the CJEU has final authority over the interpretation and application of EU law: a final authority that the CJEU considers crucial to the autonomy of EU law.  The problem for the CJEU arises from the fact that, as noted,[96] under EU law only courts or tribunals of EU Member States are able to make preliminary references to the CJEU; no other court or tribunal, including an international arbitral tribunal, may do so.[97] According to the CJEU, such other bodies, lacking competence to make preliminary references,

---

[94]    *See infra* ¶ 115.

[95]    *Achmea ECJ 2018* ¶ 34.

[96]    *See supra* ¶ 70.

[97]    *See Eco Swiss China Time Ltd. v. Benetton Int'l N.V.*, Case C-126/97, ¶ 40 (ECJ 1999) ("[I]t should be recalled that . . . . arbitrators, unlike national courts and tribunals, are not in a position to request this Court to give a preliminary ruling on questions of interpretation of Community law.") (Ex. 34 hereto).

are not allowed to make pronouncements on EU law. Their doing so, in the CJEU's view, would impair the effectiveness of EU law and thereby impermissibly prejudice the autonomy of the EU legal order. It is on this basis that the CJEU found bilateral agreements to arbitrate disputes between an EU Member State and a national of another EU Member State to be incompatible with EU law.

110.    Accordingly, the CJEU held that investor-State arbitration under the Netherlands-Slovakia BIT was incompatible with European law.[98] On the basis of this preliminary ruling, the German courts annulled the *Achmea* award because "[a]ccording to the decision of the [CJEU] . . . the relationship between the parties does not include an arbitration agreement."[99]

111.    I agree with Professor Hindelang to the extent that he views the CJEU's decision as based on the principle of autonomy. But I find the *Achmea* decision (or the autonomy principle) to be both irrelevant and inapplicable to this case.

(b)    <u>*Achmea* is Neither Relevant nor Applicable to this Case</u>

112.    Relying upon *Achmea*, Spain and Professor Hindelang contend that the arbitration agreement between NextEra and Spain violates the autonomy principle, and thus is invalid. Indeed, they claim that any arbitration agreement reached under Article 26 of the ECT between European nationals and an EU Member State will be invalid because, on their interpretation of the autonomy principle, any international agreement entered into by an EU Member State that would empower an arbitral tribunal established by that treaty to interpret or apply EU law without the possibility of making a preliminary reference to the CJEU – such as an intra-EU BIT – is invalid.[100]

---

[98]    *Achmea BGH 2018* ¶ 62.

[99]    *Id.* ¶¶ 14, 27.

[100]    Hindelang Decl. ¶¶ 47-56.

113.    But, as I have already indicated, European law is not part of the law governing jurisdiction under the ECT or the resolution of substantive disputes under the ECT, with the result that Article 26 of the ECT is not subject to the autonomy principle or any other rule of European Union law.[101]

114.    I also believe that, in any event, even as a matter of European law, the *Achmea* judgment is not applicable to the present case.

115.    First, the *Achmea* judgment itself is limited to arbitral proceedings and awards arising out of BITs between EU Member States and to which the EU is not a party.  In *Achmea*, the CJEU specifically addressed its critique of intra-EU investor-State arbitration agreements to those "arbitration proceedings such as those referred to in . . . the BIT."[102]  In this respect, the CJEU made it clear that investment treaties to which the EU is a party – such as the ECT – are situated very differently from BITs entered into by pairs of EU Member States.  Though unnecessary for deciding the *Achmea* case itself, the CJEU stated explicitly that the EU can validly

---

[101]  *See supra* ¶ 65.  Although Professor Hindelang invokes a number of authorities in support of the notion that Article 26 of the ECT is contrary to EU law, *see* Hindelang Decl. ¶ 53, these authorities do not actually deal with Article 26 (or any investor-State commitments), and thus do not support his proposition.  The case of *Commission v. Netherlands,* Case C-299/02 (ECJ Oct. 14, 2004) (Hindelang Decl. Ex. 33), dealt with a challenge to Dutch maritime regulations concerning the criteria for registration of Dutch ships as unduly restricting the ability of other European nationals to establish their businesses within The Netherlands.  *See id.* ¶ 11.  The challenge was upheld, among other things, because it violates EU law if member state legislation "hamper[s]" or "render[s] less attractive the exercise by Community nationals of the freedom of establishment guaranteed by the Treaty." *Id.* ¶ 15.  This obviously has nothing to do with the ECT or investor-State arbitration.  The various pages cited from Lorna Woods et al., *Steiner & Woods EU Law* 416-20, 469-74, 478 (13th ed. 2017) (Hindelang Decl. Ex. 63), are a general survey and discussion of EU law, not a critique of the ECT.  The same is true of the various pages from the Craig textbook cited by Professor Hindelang. *See* Paul Craig & Grainne de Burca, *EU Law* 721-23, 801-05, 810, 820-21 (6th ed. 2015) (Hindelang Decl. Ex. 62).

[102]  *Achmea ECJ 2018* ¶ 55 (Hindelang Decl. Ex. 46).

enter into treaties "providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the [CJEU]."[103]  The ECT is a treaty which, as noted,[104] the EU has itself signed and ratified.  In relevant part, the CJEU observed:

> It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law.
>
> . . . .
>
> [By contrast, here] . . . the possibility of submitting . . . disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States.[105]

116.    Clearly, then, when the CJEU in *Achmea* condemned the agreement between Netherlands and Slovakia, it was not condemning agreements arising out of an international agreement, such as the ECT, to which the EU itself is a party.  Indeed, to my knowledge, every ECT tribunal to have considered this point since the *Achmea* judgment has concluded that *Achmea*'s reasoning does not translate to the ECT.[106]

---

[103]  *Id.* ¶ 57. Notably, the EU is party to several free trade agreements containing investment chapters providing for dispute resolution before adjudicatory bodies that cannot make preliminary references to the CJEU.

[104]  *See supra* ¶ 57.

[105]  *Achmea ECJ 2018* ¶¶ 57-58.

[106]  *See Masdar* ¶ 679 ("[T]he *Achmea* Judgment does not take into consideration, and thus it cannot be applied to, multilateral treaties, such as the ECT, to which the EU itself is a party."); *Rockhopper* ¶ 172 (*Achmea* is "of no application as such to the ECT"); *see also Greentech Energy Systems A/S* ¶ 398 ("[T]he ECJ in *Achmea* was careful to confine its ruling to agreements 'concluded between Member States', hereby leaving open the possibility of dispute resolution pursuant to international agreements that are not 'intra-EU' in the sense of being concluded by Member States as among themselves." (citations omitted)); *Belenergia* ¶ 323 ("This Tribunal agrees with the *Masdar v. Spain* tribunal that the ECJ's reasoning cannot be transposed to the ECT which is a mixed agreement with the EU as a Contracting Party."); *SolEs Badajoz GmbH*

117.    This is borne out by the CJEU's subsequent *Opinion 1/17* on the validity under EU law of the Canada-EU Trade Agreement ("CETA").[107]  Like the ECT, CETA is a mixed agreement. It is one to which both the EU and the EU Member States are parties, and under which Canada, on the one hand, and the EU and the EU Member States, on the other hand, reciprocally extend protections to investors from the other party and agree to submit claims of the other party's nationals to arbitration (referred to in the judgment as Investor-State Dispute Settlement or "ISDS").[108]  According to the CJEU in *Opinion 1/17*:

> [T]he fact that the envisaged ISDS mechanism stands outside the EU judicial system does not mean, in itself, that that mechanism adversely affects the autonomy of the EU legal order.[109]

118.    The CJEU explained further:

> [W]ith respect to international agreements entered into by the [European] Union, the jurisdiction of the courts and tribunals [in the EU] to interpret and apply those agreements does not take precedence over either the jurisdiction of the courts and tribunals of the non-Member States with which those agreements were concluded

---

¶ 248 ("[T]he Tribunal finds that the provisions of the TFEU are not more favourable to an investor than is Part V of the ECT, and thus that the TFEU cannot derogate from the rights of an investor of Part V of the ECT."); *9REN* ¶ 157 ("There is nothing in the *Achmea* decision that suggests the ECJ contemplated ECT claims against the EU itself . . . .  Spain is as firmly bound by the ECT dispute resolution mechanism as is the EU itself."); *Eskosol* ¶ 174 ("[T]he [ECJ]'s concern about an arbitral tribunal applying EU law under the *Achmea* BIT is not directly transposable to the ECT.  EU law simply is *not* part of the applicable law of any ECT dispute . . . .").

[107]  Comprehensive Economic and Trade Agreement, Canada-European Union, Oct. 30, 2016, 2017 O.J. (L 11) 23 (Ex. 35 hereto.).

[108]  The applicable law clause in the CETA is also phrased in terms similar to Article 26(6) of the ECT.  Article 8.31.1 of the CETA (entitled Applicable Law and Interpretation) states: "When rendering its decision, the Tribunal established under this Section shall apply this Agreement as interpreted in accordance with the *Vienna Convention on the Law of Treaties*, and other rules and principles of international law applicable between the Parties."

[109]  Opinion 1/17, ¶ 115 (ECJ Apr. 30, 2019) (discussing CETA) (Ex. 36 hereto).

or that of the international courts or tribunals that are established by such agreements.[110]

119.    The CJEU therein clearly stated that EU law would not override the interpretation and application of CETA given not only by the courts of Canada but also by arbitral tribunals constituted under CETA.  There is no reason why this same position should not be equally applicable to the ECT, to which the EU is also a party.  Accordingly, the ruling on jurisdiction made by the arbitral tribunal, which is a ruling that the Tribunal in the present case made pursuant to the ECT, deserves respect.

120.    The CJEU's *Opinion 1/17* confirms that international arbitration agreements to which the EU is a party – such as CETA and the ECT – are not threats to the autonomy of EU law, even though tribunals constituted thereunder cannot make preliminary references to the CJEU on issues of EU law.  Also, the European Commission has been acting on that same assumption, for it has been negotiating free trade agreements containing investment chapters with several other countries, including Vietnam, Mexico and Singapore, even though the tribunals to be established pursuant to those agreements would have no capacity to make preliminary references to the CJEU.

121.    In its *Opinion 1/17*, the CJEU also stated unequivocally that the only way in which an issue of EU law can come up before a CETA tribunal is as a factual matter for purposes of the tribunal's application of CETA, not as the law applicable to disputes under CETA.[111]  This is still

---

[110]  *Id.* ¶ 116.

[111]  *Opinion 1/17* states:

> [T]he CETA Tribunal, when it is called upon to examine the compliance with the CETA of the measure that is challenged by an investor and that has been adopted by the investment host State or by the Union, will inevitably have to undertake, on the basis of the information and arguments presented to it by that investor and by that State or by the Union, an examination of the effect of that measure.  That examination may, on occasion, require that the domestic law of the respondent Party be taken into account.  However, . . . that examination cannot be classified as

further evidence that, in international agreements entered into by the EU, such as the ECT, international law, including the terms of the treaty, is the applicable law, and EU law is not. Moreover, if EU law is not applicable as law, but only as fact, the asserted threat to the autonomy of EU law is not a serious one.

122.    Second, *Achmea* concerned a BIT (the Netherlands-Slovakia BIT) in which disputes were specifically to be resolved according to, among other things, the law of the host state.[112]  By contrast, as noted already, Article 26(6) solely requires application of the ECT itself and "applicable rules and principles of international law."[113]  In this context, it is noteworthy that the CJEU in *Achmea* referred to "*the autonomy of EU law with respect both to the law of the Member States and to international law.*"[114]  In other words, it considered EU law to be autonomous and distinct from both the national law of the EU Member States and international law.  More to the point, CJEU declined to hold that EU law fell within the BIT's reference to "general principles of international law" (which is the closest comparable wording in that treaty).[115]

---

equivalent to an interpretation, by the CETA Tribunal, of that domestic law, but consists, on the contrary, of that domestic law being taken into account as a matter of fact . . . .

*Opinion 1/17* ¶ 131.  *See also Stadtwerke München GmbH* ¶ 142 (rejecting an *Achmea* argument against ECT jurisdiction because "[*Achmea*] did not consider the position of a tribunal constituted on the basis of the ECT").

[112]  *See supra* ¶ 79.

[113]  *See Rockhopper* ¶ 171(c) (stressing that it was the specific wording of the Netherlands-Slovakia BIT that "transgressed" European law).

[114]  *Achmea ECJ 2018* ¶ 33 (emphasis added).

[115]  In the *Achmea* judgment, the CJEU identified the four sources of applicable law specified in Article 8 of the Netherlands-Slovakia BIT, which were "the law in force of the Contracting Party concerned; the provisions of this Agreement, and other relevant agreements between the Contracting Parties; the provisions of special agreements relating to the investment; [and] the general principles of international law."  *Achmea ECJ 2018*, ¶ 6.  Importantly, however, the

123.    Third, the holding of the CJEU in *Achmea* was simply that the arbitration provisions of an intra-EU BIT were incompatible with EU law.  Consistent with its limited mandate and its approach in the *Kadi* case, the CJEU did not invalidate the Netherlands-Slovakia BIT, nor could it have done so.  Instead, the European Commission took steps encouraging EU Member States to terminate their intra-EU BITs.  Many such intra-EU BITs have been terminated, but the same process has never occurred in the case of the ECT.  Furthermore, the CJEU certainly did not determine that, as a result of their incompatibility with EU law, intra-EU BITs were unenforceable under international law or otherwise lessen the treaty obligations of other Contracting States, such as the United States.

(c)    Spain's Reliance on the Recent EU Member State "Declarations"

124.    Spain and Professor Hindelang cite in support of their position a communication from the European Commission to the European Parliament and Council, informing them of the inferences to be drawn from *Achmea*, including the invalidity of intra-EU BITs.[116]  In that communication, the European Commission made it clear that it considered *Achmea* to be as applicable to intra-EU disputes under the ECT as to disputes under intra-EU BITs.  Spain further cites a Declaration by 22 EU Member States to the effect that the ECT's dispute resolution provisions in Article 26 can have no application to intra-EU investment disputes.[117]  In the same

---

CJEU then went on to find that EU law fell within the scope of two of those four categories – not the final category which referred to international law.  In the *Achmea* judgment, the CJEU concluded: "Given the nature and characteristics of EU law . . . , that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States." *Id.* ¶ 41.

[116] Communication from the Commission to the European Parliament and the Council: Protection of Intra-EU Investment, COM (2018) 547 final, at 2-3 & n.6, 26 (Eur. Comm'n July 19, 2018) (Hindelang Decl. Ex. 50).

[117] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection

Declaration, those EU Member States directed their nationals not to initiate arbitration of intra-EU disputes, undertook to inform arbitral tribunals of the legal consequences of *Achmea*, instructed their courts to annul or deny enforcement of intra-EU awards, and urged third-country courts to do likewise.  They also committed themselves to terminating their intra-EU BITs.

125.     In my opinion, these developments are not material to the present case.   The European Commission communication is just another statement of the European Commission's long-held views, expressed through many amicus briefs and elsewhere, on the invalidity of provisions for the arbitration of intra-EU investment disputes.   As for the EU Member States' Declarations, they do not terminate the ECT, nor could they do so.   Termination of, or withdrawal from, the ECT requires an entirely different and formal legal procedure under that treaty. Furthermore, even as a matter purely of EU law, the EU Member States would lack authority to declare the EU's entry into the ECT invalid.   The CJEU has ruled that it has sole power to declare acts of the EU invalid; EU Member State courts cannot make such a ruling.   Yet, in effect, this is what Spain now invites this non-EU Court to do when it argues that the *Achmea* ruling extends to the ECT.

126.     Even if the EU Member States' Declarations did somehow terminate the ECT, NextEra still accepted the ECT standing offer of arbitration prior to this attempted termination – and where parties consent to arbitration under the ICSID Convention, "no party may withdraw its

---

in the European Union (Jan. 15, 2019) (signed by Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, France, Germany, Greece, Ireland, Italy, Latvia, Lithuania, The Netherlands, Poland, Portugal, Romania, Slovakia, Spain and the United Kingdom) (Hindelang Decl. Ex. 52).

consent unilaterally."[118]   The 2019 Declarations cannot invalidate this consent retroactively.[119]

Finally, the EU Member States involved plainly felt obliged to issue that communication due to

the *Achmea* judgment itself and pressure from the European Commission.  They did not do so

wholly of their own accord.  In any event, as the Tribunal concluded in the Decision, neither the

European Commission communication nor the Declaration of 22 EU Member States can have any

greater force and effect than the CJEU judgment that they echo.[120]   Finally, under no circumstance

can they impair internationally the validity of treaty provisions for arbitration of intra-EU disputes

or affect the U.S.'s obligations under the ICSID Convention.

127.    It is noteworthy that six EU Member States issued separate Declarations,[121] which,

while announcing their intention to terminate their intra-EU BITs, expressly refused to infer from

its application to intra-EU BITs that *Achmea* applied equally to the ECT.  These Declarations

stated that "it would be inappropriate, in the absence of a specific judgment on this matter, to

---

[118]  ICSID Convention art. 25(1).

[119]  *See, e.g.*, *Magyar Farming Co. v. Hungary*, No. ARB/17/27, Award ¶ 214 (ICSID 2019) (Ex. 38 hereto) ("Thus, the consent to arbitrate, in the sense of a meeting of the minds, which is perfected by the investor's acceptance of the State's offer to arbitrate expressed in the BIT would not be retroactively invalidated by a subsequent termination of the BIT.  In other words, even if the Tribunal were to regard the 2019 Declarations as an agreement to terminate the BIT, *quod non*, that agreement could not have invalidated the consent to arbitrate because it was entered after the consent was formed.").

[120]  *See* Decision ¶ 354 ("The Tribunal notes that the internal constitutional laws of the EU and its constant changes and interpretations by the CJEU, as the Member States seek to minimize their mutual obligations in another context, are of no relevance for the present Tribunal.").

[121]  *See* Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (Jan. 16, 2019) (signed by Finland, Luxembourg, Malta, Slovenia and Sweden) (Hindelang Decl. Ex. 53); Declaration of the Representative of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (Jan. 16, 2019) (Hindelang Decl. Ex. 54).

express views as regards the compatibility with [EU] law of the intra-EU application of the [ECT]."[122]

128.    In view of the divergent wording of these declarations, the *Rockhopper* tribunal noted that:

> Each of the three declarations are cast in slightly different terms, but none of the three are signed by the representatives of all the EU Member States. Thus, the Declaration [of the 22 member states] cannot be even at an initial level of analysis considered as a common view (insofar as a view might be expressed in those documents) of all the EU Member States. That fact renders it conceptually and legally impossible that the Declaration can be considered within the EU legal order.[123]

129.    I note that the United States District Court for the District of Columbia very recently faced an "*Achmea*" objection. In *Micula v. Romania*, Romania, like Spain here, invoked the *Achmea* judgment in an attempt to invalidate the underlying intra-EU BIT. This Court clearly rejected that effort:

> [I]n resolving the dispute before it, the ICSID arbitral tribunal considered EU law, but it did so for factual context, not as a source of controlling law. Indeed, the tribunal expressly passed on deciding whether "any payment of compensation arising out of this Award would constitute illegal state aid under EU law and render the Award unenforceable within the EU." The tribunal therefore did not decide a question of EU law in a way that implicates the core rationale of *Achmea*.[124]

130.    On that basis, among others, this Court rejected Romania's claim that it lacked subject matter jurisdiction to entertain the action. This Court then proceeded to enforce the Award.

---

[122]  Hindelang Decl. Ex. 53 at 3.

[123]  *Rockhopper* ¶ 179; *see also id.* ¶¶ 180, 195 (noting that the Declaration has no interpretative value, and, even if it had been unanimous it still could not be taken as amending the terms of the ECT or of inserting a "disconnection" clause, particularly since the ECT does not permit reservations to Article 26).

[124]  *Micula v. Gov't of Romania*, No. 17-cv-02332 (APM), 2019 WL 4305533, at *11 (D.D.C. Sept. 11, 2019) (citation omitted), *appeal docketed*, No. 19-7127 (D.C. Cir. Oct. 11, 2019).

### 4.    Spain's "Primacy" Argument is Also Misplaced

131.    Spain and Professor Hindelang invoke, in addition to the autonomy of EU law, a related principle known as the primacy of EU law.  The "primacy principle" states that EU law prevails over any inconsistent EU Member State law, even its constitutional law.[125]  This is clear from the authority that Professor Hindelang cites for this proposition: the CJEU's judgment in the *Simmenthal* case (stating "every national court must, in a case within its jurisdiction, apply [EU] law in its entirety . . . and must accordingly set aside *any provision of national law* which may conflict with it, whether prior or subsequent to the [EU] rule." (emphasis added)).  However, the principle of primacy in EU law, properly understood, has nothing to do with the relationship between EU law and international law, which is the issue at hand.

132.    Primacy is essentially a federalism principle, not unlike the principle of supremacy in U.S. constitutional law.  It does not mean, and cannot mean, that, in the event of conflict between EU law and international law on the international plane, the former prevails.  In short, Spain has transposed the principle of EU primacy from the internal constitutional sphere, where it originated, to the international plane, where it does not belong.

### 5.    Other EU Advisory Opinions Cited by Professor Hindelang are Not Relevant or Applicable

133.    *Achmea* is not the first occasion on which the CJEU has manifested its preoccupation with the autonomy of EU law.  In numerous cases outside the foreign investment realm, the CJEU has rendered formal Opinions disallowing the EU's entry into treaties that

---

[125]    *See, e.g.*, Hindelang Decl. ¶ 17 ("[I]n case of a conflict between a rule created by the EU Member States and EU law, EU law takes precedence and overrides such a rule." (citing *Amministrazione delle Finanze dello Stato v. Simmenthal SpA*, Case 106/77, 1978 E.C.R. 630 (Hindelang Decl. Ex. 17))); *see also* Hindelang Decl. ¶¶ 22-26.

establish courts or tribunals that are in a position to interpret and apply EU law, without capacity to make preliminary references to the CJEU.[126]

134.    Spain and Professor Hindelang refer to these Opinions in their discussion of whether, in their view, the arbitration agreement in this case is compatible with EU law.[127]  In my view, however, the present case is very different from the situations covered in those Opinions. The Opinions to which I refer were rendered by the CJEU pursuant to a treaty provision, TFEU, Article 218(11), expressly authorizing the European Commission to solicit a ruling by the CJEU on the compatibility with EU law of a proposed treaty between the EU and other States.  If the CJEU finds the treaty to be incompatible with EU law, it cannot be concluded.  In other words, the Opinion mechanism is essentially prophylactic.  It keeps the EU from entering into a treaty that it cannot perform without violating EU law.  The treaty therefore never comes into being, and disputes over its compatibility with EU law cannot thereafter arise.

135.    The posture of the present case is altogether different.  Here the treaty in question, the ECT, was signed and ratified many years ago by the EU and the EU Member States.  Therefore, the effect of *Achmea*, as asserted by Spain, is not to prevent the EU's entry into a treaty, but rather to justify, indeed require, violation of a treaty into which the EU and the EU Member States long

---

[126] *See, e.g.*, Opinion 1/91, 1991 E.C.R. I-6099, I-6112 (ECJ Dec. 12, 1991) (Hindelang Decl. Ex. 24) (addressing European Economic Area Agreement); Opinion 1/00, 2002 E.C.R. I-3498, I-3528 (ECJ April 18, 2002) (Hindelang Decl. Ex. 30) (addressing European Common Aviation Area); Opinion 1/09, 2011 E.C.R. I-1142, I-1175 (ECJ March 8, 2011) (Hindelang Decl. Ex. 39) (addressing European and Community Patents Court); Opinion 2/13, ECLI:EU:C:2014:2454 (ECJ Dec. 18, 2014) (Hindelang Decl. Ex. 42) (accession of the EU to the European Convention for the Protection of Human Rights and Fundamental Freedoms).

[127] *See, e.g.*, Hindelang Decl. ¶ 21 ("For example, the jurisprudence of the CJEU establishes that 'an international agreement cannot affect the allocation of powers fixed by the [EU] Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the [CJEU].'" (citation omitted)).

ago entered, without the European Commission ever having sought an Opinion of the CJEU on the ECT's compatibility with EU law. It is in reliance on the ECT that NextEra made its investment in Spain. NextEra, as with all investors from ECT Contracting States, had a legitimate basis to assume that it would be able to avail itself of the ECT in the event an investment dispute with Spain arose.

> (a)  At Bottom, the "Autonomy" Principle is an Internal Law of EU
> Member States, which Cannot Override International law

136.   As explained above,[128] the validity of an international treaty on the international plane is not determined by reference to the internal law of any of the signatory States. However powerful the notion of the "autonomy of the EU legal order" may seem, it is nothing more than a legal principle internal to the EU and to the EU Member States. It is as "internal" as any internal law that a State, in the wording of the VCLT, "may not invoke . . . as justification for its failure to perform a treaty."[129]

137.   The EU may presumably refuse to give domestic effect to its international treaty obligations, in the event of their incompatibility with EU law, but it cannot invoke domestic law to escape its international responsibilities. Not even the constitutional norms of a State operate to negate the obligations that that State has incurred by virtue of its international treaty commitments.[130] If domestic constitutional norms do not free a State of its international law

---

[128] *See supra* ¶ 87.

[129] VCLT art. 27.

[130] *See* Restatement (Fourth) of Foreign Relations Law § 307, reporters' note 4 (2018) ("Under international law, a state cannot invoke a conflict with its domestic law as a basis for invalidating its consent to be bound by a treaty unless the domestic law concerns the 'competence to conclude treaties,' and the violation of that law was 'manifest.'. . . . As a result, if the United States agrees by treaty to do something that would violate an individual constitutional right, it likely would remain bound by international law to fulfill that obligation,

obligations, neither can that State's self-serving pretensions to autonomy do so.  Nothing obliges the EU to enter treaties it considers to be contrary to EU law but, having entered into them, it is bound internationally to respect them.

138.    The autonomy principle is a truly remarkable one.  Its premise is that the CJEU has a monopoly over the interpretation and application of EU law, and no adjudicatory body outside the EU orbit may presume either to interpret or apply it.  To this author's knowledge, there is no other jurisdiction in the world that attempts to bar either the courts of other countries or international tribunals from interpreting or applying its law when pertinent to cases before them. If anything, they are more likely gratified to see their law given effect by the courts of other jurisdictions, despite the risk that their law may on occasion be misinterpreted or misapplied.  In asserting autonomy, so defined, the EU is wholly unique.  Of course, only courts within the EU, notably the CJEU itself, can render *authoritative* interpretations of EU law.  But when foreign courts and international tribunals interpret and apply EU law, they do not even purport to do so authoritatively.  The point is that the CJEU would bar them from interpreting or applying EU law *at all*.

## VIII.   ARTICLE 54 AND FULL FAITH AND CREDIT

139.    I have noted the terms of Article 54 of the ICSID Convention obligating Contracting States to enter an ICSID award as if it were "a final judgment of a court in that State" and, in the context of a federal system, "as if it were a final judgment of the courts of a constituent

---

even though courts in the United States and other government actors will lack the authority to enforce such an obligation." (citing VCLT art. 46)).

state."[131]   Spain rightly points out that U.S. implementing legislation provides for the latter treatment.[132]

140.    Spain claims in this case that, since the U.S. legislation implementing Article 54 has provided that an ICSID award "shall be given the same full faith and credit as if [it] were a final judgment of a court of general jurisdiction of one of the several States,"[133] that this means that the "limitations" on recognition of sister state judgments, as developed in jurisprudence under the Full Faith and Credit clause, should apply here: first, "because Spain did not enter an arbitration agreement with Petitioners and therefore the tribunal lacked jurisdiction to issue any award," and second "because the tribunal exceeded its jurisdiction by issuing state aid."[134]

141.    In my opinion, Spain's understanding of the Full Faith and Credit clause jurisprudence is mistaken, for several fundamental reasons.

142.    Spain's attempt to analogize with the Full Faith and Credit clause jurisprudence draws on the rule as stated by the U.S. Supreme Court that although the Full Faith and Credit clause entitles sister-state judgments to enforcement, a judgment debtor may contest the jurisdiction of the rendering court.[135]  This may be viewed as a "jurisdiction exception" to the Full

---

[131]  ICSID Convention art. 54(1)

[132]  *See* Spain MTD at 36-37 (citing 22 U.S.C. § 1650a(a)).

[133]  22 U.S.C. § 1650a(a).

[134]  Spain MTD at 37.

[135]  *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704-05 (1982); *Williams v. North Carolina*, 325 U.S. 226, 229 (1945).

Faith and Credit clause.  But the "jurisdiction exception," invoked by Spain,[136] is subject to an equally important exception, namely that a judgment debtor may not contest the jurisdiction of the rendering court if it had an opportunity to do so in the proceeding before that court.[137]

143.    Here, Spain's reference to this jurisprudence is self-defeating because it took the opportunity to contest jurisdiction before the Tribunal.  Under Article 41 of the ICSID Convention, any party may contest jurisdiction by filing objections before the Tribunal, and Spain (with the European Commission's support) did exactly that, vigorously contesting jurisdiction.[138]  Having thus advanced its jurisdictional arguments before the Tribunal and lost, Spain's conduct before the ICSID Tribunal is functionally the same as a litigant that contested the sister state court's jurisdiction and lost.  In neither case can the losing party under the Full Faith and Credit clause case law relitigate the matter before the U.S. court that is asked to enforce the resulting award. Thus, although Spain, in my view, is incorrect in arguing that the ECT has no application to intra-EU disputes,[139] this Court has no need to opine on that question.  Under Full Faith and Credit, Spain is foreclosed from relitigating the matter in the enforcement action before this Court.

---

[136] *See* Spain MTD at 38 ("Accordingly, the award cannot be given full faith and credit because Spain has 'disproved' the existence of the putative arbitration agreement upon which the Tribunal purported to exercise jurisdiction.").

[137] *Underwriters Nat'l Assurance*, 455 U.S. at 706-07; *see also Broderick v. Rosner*, 294 U.S. 629, 642-44, 647 (1935).  In *Underwriters National Assurance*, the court ruled that "a judgment is entitled to full faith and credit – even as to questions of jurisdiction – when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment."  *Underwriters Nat'l Assurance*, 455 U.S. at 706 (citation omitted).

[138] *See, e.g.*, Decision ¶¶ 272-357 (analyzing and dismissing Spain's intra-EU jurisdictional objections).

[139] *See supra* ¶¶ 54-67.

144.    The second problem with Spain's reference to the Full Faith and Credit clause is that it pre-supposes that Article 54 of the ICSID Convention gives a national court the power to refuse entry of judgment on grounds of public policy.  And a public policy defense is essentially what Spain invokes when it asserts EU law (such as autonomy or state aid) as a reason to deny enforcement of the present Award.

145.    In fact, the terms of Article 54 (and the drafting history) make plain that Article 54 is not subject to a public policy exception.[140]  The same is true of Full Faith and Credit jurisprudence.[141]  Again the reference to Full Faith and Credit clause jurisprudence is self-defeating: if a U.S. state's public policy is no defense in an action to enforce a sister-state judgment, neither is it a defense in an action to enforce an ICSID award.

## IX.    SPAIN'S STATE AID ARGUMENT

146.    Spain and Professor Hindelang invoke the EU's prohibition on state aid as a further basis for denying enforcement of the present Award, apparently arguing that the Tribunal exceeded its jurisdiction, again rendering an award that is not entitled to Full Faith and Credit.[142]  According to Spain, if this Court enforces the Award, Spain will be required to pay the Award, and that act would in itself amount to payment of a state aid that is illegal under EU law.[143]

---

[140]  *See* Schreuer, *supra* note 14, at 1139.

[141]  *Fauntleroy v. Lum*, 210 U.S. 230, 236-37 (1908).

[142]  *See* Spain MTD at 41 ("By ignoring, and usurping, the [European] Commission's exclusive jurisdiction [to determine whether a given payment constitutes state aid], the tribunal's *ultra vires* award exceeds any jurisdiction it could have under Article 26 of the ECT.  The Award is therefore void and not entitled to full faith and credit."); *see also* Hindelang Decl. ¶¶ 57-60 (asserting that payment of the Award would violate EU law).

[143]  *See* TFEU art. 107(1) ("[A]ny aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain

147.    I see several infirmities in this argument.

148.    First, as has been amply demonstrated above,[144] EU law is not a defense to an international treaty obligation on the international plane.  The EU can no more interpose its state aid law than it can interpose its intra-EU objection or "autonomy" to relieve Spain of the obligations it has incurred under the ECT, to which not only Spain, but also the EU itself, is a party.  And there is no question that Spain has a treaty-based obligation to pay an ICSID award rendered against it and to submit to the jurisdiction of a Contracting State court if enforcement of the award becomes necessary.  If the EU wishes to excuse Spain from compliance with its international treaty obligations, it may only do so as a strictly domestic matter.  It cannot make that obligation disappear internationally or expect the courts of a non-EU Member State, such as the U.S., to prioritize the law of the EU over its own international treaty obligations.

149.    Second, payment of this Award by Spain does not constitute state aid – much less illegal state aid – within the meaning of EU law.  State aid by definition is the conferral by an EU Member State of a benefit on a private actor.  When Spain pays an award rendered against it, it is not conferring a benefit.  It is performing its obligation.  When an EU Member State gives a private party a state aid, it does so gratuitously.  Payment of the Award by Spain is anything but gratuitous.  It is compulsory.

150.    Moreover, the TFEU specifically defines a "state aid" as a grant by a State "which distorts or threatens to distort competition by favouring certain undertakings or the production of

---

undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market.").

[144]  *See supra* ¶¶ 97-132.

certain goods."[145]  Quite clearly, payment by an EU Member State of an award of damages for past harm caused by it does not distort or threaten competition, or otherwise damage the internal market.  If anything, it restores the market to where it should have been.

151.    Case law of the CJEU itself establishes that the payment of compensatory damages by an EU Member State to a private party does not constitute a state aid.  In the case of *Asteris AE v. Greece*[146] the CJEU was faced with the question whether any damages that Greece might be ordered to pay to the plaintiff companies as compensation for harm done to them should be regarded as a state aid within the meaning of EU law.  After noting that the EU's state aid prohibition was concerned only with "State interventions which might have the effect of distorting the normal conditions of trade between Member States,"[147] the Court ruled as follows:

> State aid, that is to say measures of the public authorities favouring certain undertakings or certain products, is fundamentally different in its legal nature from damages which the competent national authorities may be ordered to pay to individuals in compensation for the damage they have caused to those individuals.
>
> . . . [Thus], damages which the national authorities may be ordered to pay to individuals in compensation for damage they have caused to those individuals do not constitute aid within the meaning of [the Treaty].[148]

152.    In a very recent ruling, *European SA v. Commission*,[149] the General Court of the European Union faced a similar question specifically in the investment context.  There, the General

---

[145]  TFEU art. 107(1).

[146]  *Asteris AE v. Greece,* Joined Cases 106-120/87, 1988 E.C.R. 5515 (Ex. 39 hereto).

[147]  *Id.* at 5539.

[148]  *Id.* at 5540.

[149]  *European Food S.A. v. Comm'n*, Joined Cases T-624/15, T-694/15 & T-704/15 (Judgment of the General Court, June 18, 2019) (Ex. 40 hereto).  I note that Professor Hindelang's declaration seeks to relegate this important ruling to one footnote in his opinion, stating only that it "does not change [his] conclusion in any way."  (Hindelang Decl. ¶ 61 n. 8.)  Insofar as Professor Hindelang cites to related decisions in the EU courts, these have now been superseded by this

Court relied on the *Asteris* case and it annulled a European Commission decision which had condemned Romania's payment of an ICSID award as an illegal state aid.[150]  The result in that case ultimately turned entirely on a question of timing: since the Romanian measures in question were taken in 2005, prior to Romania's accession to the EU in 2007, the European Commission lacked competence to make a determination over them.[151]  However, the General Court took the occasion to announce a general rule according to which payment of an award can constitute an illegal state aid only if it compensates for an illegal state aid, i.e., reestablishes the aid, by conferring on the investor the benefits that it would have received under the measure that the EU Member State wrongly withdrew or cancelled.[152]  In the present case, NextEra neither requested nor was granted the promised aid; it was awarded compensation for losses attributable to Spain's wrongful cancellation of the incentive program in breach of the ECT.  Furthermore, in its approach to liability and damages, the Tribunal made clear that it was not replicating original tariffs and premiums that Spain had offered under its former regime for solar plants.  It awarded compensation

---

ruling annulling the European Commission's state aid decision in the *Micula* case.  *See* Hindelang Decl. ¶ 64 (discussing Nacka Tingsrätt [Nacka District Court] 2019-01-23 Ä 2550-1 (Swed.) (Hindelang Decl. Ex. 65); Cour Supérieure de Justice - Cour d'appel [Superior Court of Justice – Court of Appeal] Mar. 21, 2018, No. 71/18 – VII – REF, *State of Romania v. Viorel Micula* (Lux.) (Hindelang Decl. Ex. 57); Cour d'appel [Court of Appeal] Bruxelles, 17e ch. Mar. 12, 2019, Nos. 2016/AR/393 & 2016/AR/394 (Belg.) (Hindelang Decl. Ex. 59). Moreover, these were all rulings by EU Member State courts which were bound to give effect to the European Commission's decision and EU law more generally.  They have no bearing on the treatment of ICSID awards by the courts of countries outside the EU.

[150]  *European Food S.A.* ¶¶ 94, 109.

[151]  *Id.* ¶¶ 65-67, 104.

[152]  *Id.* ¶ 103.

on a different basis, and at a lower amount than that which NextEra's experts had quantified using the original tariffs and premiums.[153]

153.    But even if compensation for the harm caused by cancellation of allegedly illegal state aid could be regarded as the equivalent of an illegal state aid, Spain's argument cannot succeed.  Unless an EU Member State measure *is* an illegal state aid, payment of compensation to an investor for its cancellation *cannot be* one either.  At no point has the European Commission launched an investigation into the legality of the incentive scheme whose cancellation underlies NextEra's claims in this case, much less made a formal determination that that scheme amounted to an illegal state aid.  EU law imposes on the European Commission very strict procedures before it can find that an EU Member State measure constitutes an illegal state aid (*i.e.* aid that is incompatible with the EU internal market),[154] and the European Commission has not even begun to follow those procedures.

---

[153]  Decision ¶¶ 645, 647, 648-650.

[154]  *See* TFEU arts. 107-09.  Article 108(3) of the TFEU provides that if the European Commission "consider[s] that any [Member State] plan is not compatible with the internal market," the following procedure shall apply:

> If, after giving notice to the parties concerned to submit their comments, the Commission finds that aid granted by a State or through State resources is not compatible with the internal market . . . it shall decide that the State concerned shall abolish or alter such aid within a period of time to be determined by the Commission.

> If the State concerned does not comply with this decision within the prescribed time, the Commission or any other interested State may . . . refer the matter to the Court of Justice of the European Union direct.

> On application by a Member State, the Council may, acting unanimously, decide that aid which that State is granting or intends to grant shall be considered to be compatible with the internal market . . . if such a decision is justified by exceptional circumstances.  If, as regards the aid in question, the Commission has already initiated the procedure provided for [here], the fact that the State concerned has

154.    Furthermore, Professor Hindelang conflates payment of an ICSID award with enforcement of an ICSID award.  The difference between the two is an important one in this context, because one of the requirements for a finding of state aid under Article 107 of the TFEU is that the act must be imputable to the EU Member State concerned.  The European Commission acknowledged this well-established principle in its decision in the *Micula* case.[155]  It found that voluntary payment by Romania would be imputable to the state, and it went on to express the view that enforcement of the ICSID award by the Romanian courts would also be imputable to Romania because "*domestic courts of a state and court-appointed executors and bailiffs are to be considered organs of that state.*"[156]  Notably, however, even the European Commission did not go so far as to suggest that an enforcement decision, taken by a court outside of the EU, would be an act attributable to Romania.  Basic logic and principles of attribution lead to the conclusion that a decision by a U.S. District Court recognizing an ICSID award rendered against Spain, and allowing petitioners to seize Spanish assets on the basis of the award, is not an act attributable to Spain.  It is an act of the United States, done pursuant to its obligations under the ICSID Convention.

---

made its application to the Council shall have the effect of suspending that procedure until the Council has made its attitude known.

If, however, the Council has not made its attitude known within three months of the said application being made, the Commission shall give its decision on the case.

TFEU art. 108(2)-(3).

[155] Commission Decision (EU) 2015/1470, 2015 O.J. (L 232) 62 ("For a selective advantage to constitute aid within the meaning of Article 107(1) of the Treaty, it must, inter alia, be imputable to the state." (citing *Deutsche Bahn AG v. Comm'n*, Case T-351/102, 2006 E.C.R. 1047, 1084)) (Ex. 41 hereto).

[156] *Id.* (emphasis added).

155.    Lastly, the question of whether an award arising out of an EU Member State's termination of an incentive scheme would violate the EU state aid law, like foreign sovereign compulsion, is a merits issue; it is not for determination by a court in an action to enforce an award. The impropriety of a judicial inquiry into whether an award or its payment constitutes an illegal state aid, or even a state aid in the first place, is all the more apparent in the case of an ICSID Convention award, which is subject to no substantive judicial review whatsoever on the occasion of its enforcement.[157]

156.    Spain apparently also has an altogether different state-aid-based argument to make, namely that in issuing its Award, the Tribunal somehow encroached upon the European Commission's exclusive authority to determine whether a measure is or is not a state aid.[158]  Of course, this is just another attempt to subordinate Spain's international law obligations to internal EU law.  But the premise of this argument is itself fatally flawed.  The Tribunal never made any determination, or purported to make any determination, of whether the measure taken by Spain constituted a state aid under EU law, much less that any such aid was legal or illegal.  It confined itself, as it was required to, to deciding whether Spain's cancellation of the incentive scheme was or was not a breach of its obligation of fair and equitable treatment under the ECT.  Nothing remotely resembling an encroachment on the European Commission's state aid authority took

---

[157]  *See, e.g.*, *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, Civ. No. 16-1533(ABJ), 2019 WL 2185040, at *4 (D.D.C. May 21, 2019) ("[A]ll [the enforcing court] may do is 'examine the [ICSID] judgment's authenticity and enforce the obligations imposed by the award.'" (citation omitted)).

[158]  *See* Spain MTD at 39 ("Specifically, EU law provides that only the European Commission may authorize Member States to provide state aid . . . .  In other words, European law explicitly prohibits arbitral tribunals from doing so.").

place, even assuming that any such encroachment would justify a refusal to enforce the present Award.

157.    For all these reasons, I consider that enforcement of the Award in this case cannot be defeated on the ground that its eventual payment would constitute an illegal state aid under EU law.

## X.    FOREIGN SOVEREIGN COMPULSION

158.    In this case, Spain invokes so-called foreign sovereign compulsion, a doctrine of U.S. law.  Without opinion on the U.S. law aspects of this submission, I make some observations on Spain's claim that it is compelled by EU law not to pay the Award.

159.    In this case, the sovereign whose compulsion Spain invokes is the European Union of which Spain itself is an EU Member State.  It would be highly anomalous to treat Spain as if it were a private party constrained to "obey" EU law.  As the CJEU reaffirms time and again, EU law, upon its entry into force, automatically becomes an integral part of the national law of each EU Member State.  By invoking EU law as a source of foreign sovereign compulsion, Spain is in effect invoking its own law.  That is a perversion of the foreign sovereign compulsion doctrine, and stunningly self-serving.

160.    In any case, foreign sovereign compulsion is at most a merits – not a jurisdictional – defense.  It cannot be invoked to defeat a U.S. court's subject matter jurisdiction.

161.    But it is not only the nature of the foreign sovereign compulsion defense that places it off-limits in this case.  The ICSID Convention itself does so.  As already noted,[159] under the ICSID Convention, an enforcing court may not revisit issues of liability or defenses thereto.  These

---

[159] *See supra* ¶¶ 29-34.

issues may not even be raised to defeat enforcement of a New York Convention award, none of whose defenses allow it. *A fortiori*, these issues cannot be raised to defeat enforcement of an ICSID award to which there are no defenses at all.

162.    In sum, I consider that Spain's invocation of foreign sovereign compulsion is decidedly misplaced.

## XI.    <u>CONCLUSION</u>

163.    I therefore adhere to the conclusions that appear in the body of this Expert Declaration and are summarized at paragraph 7 above.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 19th day of December, in 2019.


_____

George A. Bermann