

ICSID
CIRDI
CIADI

# History of the ICSID Convention

Documents Concerning the Origin and the Formulation of the
Convention on the Settlement of Investment Disputes
between States and Nationals of Other States

Documents in English

# Volume II-1

International Centre for Settlement of Investment Disputes
Centre International pour le Règlement des Différends Relatifs aux Investissements
Centro Internacional de Arreglo de Diferencias Relativas a Inversiones

# Convention on the Settlement of Investment Disputes between States and Nationals of Other States

# Documents Concerning the Origin and the Formulation of tha Convention

## VOLUME II, PART 1
## DOCUMENTS 1-43



International Centre for Settlement of Investment Disputes
Centre International pour le Règlement des Différends Relatifs aux Investissements
Centro Internacional de Arreglo de Diferencias Ralativas a Inversiones

Washington, D. C., 1968

ICSID PUBLICATION

Reprinted in 2009
Replication of the original 1968 publication

Printed on acid-free paper by Balmar Printing and Graphics,
Washington, D.C., U.S.A.

Copyright © 1968, 2001, 2006, 2009 by ICSID
All rights reserved

Mr. OLSON (Canada) agreed with the Chairman that consent was the keystone of the Convention. It was, however, absent in two important areee of Section 15, viz., in cases of enforcement in the State of the private party and of enforcement in a third State and he wondered whether one could devise e wey of introducing the element of consent in these areas as well, for instance by requesting recognition by those Statea of enforceabiIity at the time the investment wes actually made or at the time the dispute arose or was being heerd.

The CHAIRMAN seid that he was not quite clear where the question of consent was involved. The provisions in question were similar to those contained in e number of existiug treaties on recognition and en-forcement of foreign judgments and foreign awards and differed from tham only inesmuch as they did not grant rights of review to locel courts.

Mr. OLSON (Canada) replied that the issue of consent was involved in the sense that States might be obliged to change their domestic lagis-lation to make allowance for the provisions of Section 15 in a wey that would be in conflict with other principles on which such legislation was founded. He wondered if tha lack of succass in obtaining ratificetions of the treaties referred to by the Chairman might not have been due to the provisions under discussion, and suggested that they should be lightened.

The CHAIRMAN thought that the reletively slow progress in securing widespread acceptance of, for instance, the 1958 New York Convention wee principally due to the conservatism of most lawyers and the lathargic attitude of governments on purely procedural quastions. He explained that the provisions in question were bound up with a number of other innovations made in the draft Convention, and hoped that States which thought the objectives of the Convention important would find it poseible to accept the procedural aspects as well as the subetantiva innovations.

Mr. PALOMO (Guatemala) suggested that, in Section 15, the word "enforce" should be raplaced by the words "shall ba enforceable" or a similar expression, since that Section in its present form would be in conflict not only with local legislation but elso with international Conventions on this matter, like the Bustamante code, under which a State did not have to enforce an award if it conflicted with its public policy. This waa particularly important as an award might heve to ba enforced in a State which was not a party to the dispute, or possibly not even a signatory to the Convention.

Mr. LOWENFELD (United Statea of Americe) suggested thet the Con-vention provide that when a Stete manifested its consent to tha juris-diction of the Center, in any of the ways indicatad in Articla II, Section 2, it might be presumed to hava thereby waived its sovereign immunity in respect of the enforcement of an award.

The CHAIRMAN agreed that the suggeetion might solve the problem, but would run counter to the basic preeumption of the Convention, that Stataa would live up to the obligations which they asaumed thareunder.

Mr. PALOMO (Guatemala) pointed out that in Latin America the inter-nal juridical principlea of a country prevailed. If the provisions of the Convention ware in conflict with those already incorporated in the legislation of the country concerned, such as the Bustamante code, there

- 47 -

might be a contradiction between the internal procedural law of the country, and the terms of the award.

### The meeting rose at 11:35 a.m. and resumed et 11:55 a.m.

Mr. ESPINOSA (Venezuela) supported the suggestion put forward by the experts of Canada and Guatemale. If ths text were amended as suggested, the scope of the provision under study could better be explained to the legislative bodies and governments of the various countries. The question raised by those representatives should be cerefully studied with a view to reaching a satisfactory solution.

Mr. GONZALEZ (Costa Rica) referring to Sections 14 and 15 on enforcement of the award rendered by a tribunal, proposed that in order to resolve the serious problem involved, the text might be emended to read:  (1) "A Contracting Stats is in fact and in law compelled to enforce the award rendered by the Arbitral Tribunal"; and (2) "The Arbitral Tribunal, in rendering the award, should take into account the provisions in force whsrever ths award is to bs enforced." This would avoid conflicts with local laws.

Mr. RATTRAY (Jamaica) said that the mesting ought to give careful consideration to the purpose of Section 15.  Under Articls XI, when a State signed the present Convention it would declare that it had taken all steps necessary to enable it to carry out ell its obligations under the Convention.  This would allow awards to be reciprocally snforced. He found the provisions of Section 15 to be very useful because awards would be recognizsd as final and binding in every Contracting State - subject to the perheps overriding principls of Stete immunity.  It might be worth considering es an exception to that provision some notion of international public policy.

Mr. SUMMERS (Canada) pointed out the prectical difficulties involved in the enforcement of non-pecuniary awards.  For instance, he wondered how an award requiring some action such as training of personnel could be effectively enforced by local courts in the absence of local legislation rsquiring that action.  It ehould also be borne in mind that the partiss, being free to choose arbitrators from outside the Panel, might, with the best of intentions, choose arbitrators who were not of the highest competence and who might render an eward which was difficult to enforce because of its vagueness.

He hoped that the phraseology of the draft Convention would be tightensd up with respect to the whole question of enforcement of awerds.

The CHAIRMAN summarizing the discussion on rscognition end enforcement of awards said that ssveral issues had emerged:  the first was the question whether the doctrine of sovereign immunity should, as hs thought, be preserved; the second the possible distinction to be made between enforceability in the States concsrned in the dispute on the ons hand, and enforcement in a third Stete on ths other; the third issus wes whether snforceability should be general or limited to pecuniary obligetions for which methods of enforcement existsd in every country; and fourthly, whether the rule of enforceability should be subject to some exceptions based on public policy, et least in third States.  Finally, it had also

been suggested that it might be useful to distinguish between recognition of awards as binding and their execution.  Although no very clear conclusions had been reached, on these issues, the discussion had been extremely helpful.  He observed that Section 15 was intended to protect the interests of the host States which while they were themselves internationally bound to comply with the award, might want an effective assurance that the private party would be compelled to do the same.

. Mr. PALOMO (Guatemala) drew attention to the close connection between the provisions of Sections 14 and 15 of Article IV and those of Section 10 of that Article on provisional measures.

With regard to pecuniary obligations, he wondered whether parties having recourse to the Arbitral Tribunal, might be required to post a bond or otherwise guarantee compliance with their respective obligations. That would assure compliance with an award which might not be otherwise enforceable because its provisions were in conflict with domestic public policy.  Even though, as the expert from Jamaica had pointed out, the legislation of each Signatory State would have to be adapted so as to permit enforcement, this might be a long drawn process.

Mr. ARROYO (Panama) referring to the comment made by the representative of Guatemala, considered that bonds or similar guarantees could be furnished only when the two parties were willing to do so, and he failed to see how the defendant could be compelled to furnish such guarantees.

Mr. PALOMO (Guatemala) agreed with the representative of Panama that guarantees could not be furnished without the prior consent of the party, but he thought that they could be required at the time of consent to arbitration.

Mr. ARROYO (Panama) explained that in his own country the investor was required to provide bonds to secure fulfillment of his contract.  The investor, however, had no guarantee in tha event of the State's failure to comply with its obligation.

## Relationship of Arbitration to Other Remedies (Sections 16 - 17)

The CHAIRMAN explained that Section 16 merely contained a rule of interpretation whereby a party in undertaking to go to the Center would be deemed to have chosen those proceedings as the sole method of resolving the dispute.  That provision did not seek to establish any substantive rule on the exhaustion of local remedies, and indeed left the parties entirely free to stipulate that local remedies must be exhausted before recourse to the Center or that there could be a choice between local remedies and recourse to the Center.  However, where a compromis or compromissory clause contained an unqualified undertaking to have recourse to the Center, it should be reasonable to presume that arbitration was to be the sole remedy.

Mr. ARROYO (Panama) supported by Mr. MENESES (Nicaragua) considered that it was impossible to fully understand the meaning of Section 16 without reading the relevant comment. The Articles of the Convention ought to be drafted clearly and categorically and he suggested that both the English and Spanish texts of that Section be revised.

- 58 -

Mr. PEREIRA (Portugal) pointed out that the problem raised by Section 15 was a direct consequence of granting individuals access to an international tribunal. He stressed the fact that it was the chief exception to the principle of consent on which the Convention was based. He saw no analogy between the system proposed by the Convention and similar agreements establishing different degrees of integration in supranational organizations such as the European Economic Community, etc. The enforcement of awards against States and private parties was in both cases difficult. An award against the citizen of a Contracting State ought naturally to be enforceable in his country, but he queried whether any State would be willing to enforce in its territory an award in a dispute which had been rendered between another State and a national of a third State. He suggested that Section 15 be deleted and a provision included in Section 14 covering the execution within a State of awards rendered against its own nationals, which was the most that appeared to him reasonable and practicable.

Mr. MONACO (Italy) said that the execution of awards in each Contracting State should be effected by the classical system of recognition, which would not be immediately effective, but subject to some review by local Courts, or by some system along the lines of those established by the Treaty of Rome although the degree of political integration achieved through that Treaty made any comparison between it and the present draft not entirely valid. The fact that whenever a foreign judgment or award was enforceable in a national jurisdiction, execution proceedings had to follow the national law, would then be a sufficient guarantee for the State in which enforcement was sought.

A separate problem was whether any difference should be allowed between the procedure for the execution of awards against States and those against individuals. It would be dangerous to try and formulate rules dealing with States' immunities and the answer in this case too might be to specify that enforcement in any Contracting State should follow the normal execution procedures of that State.

The CHAIRMAN said that it was essential to find a link between international decisions and their municipal implementation according to the procedural laws of each country concerned. The question, however, was not so much one of procedural method as of limiting the grounds for attacking awards. Those grounds were limited by the Geneva and New York Conventions and the present Convention sought to limit them still further.

Mr. TROLLE (Denmark) said that Section 15 did not appear to him of much practical importance. Investors were more likely to be suing host States than vice versa. The need for the section was almost wholly political and he suggested that the meeting should not go out of its way to look for technical complications which might be created by it. By becoming party to this Convention States would not undertake greater obligations than they had undertaken by acceding to the Geneva and New York Conventions, since most of the grounds for challenging an award under those Conventions were covered by the provisions of Section 13 of the present Convention.

Mr. DEGUEN (France) said that in certain circumstances awards against investors having property in third countries could have serious consequences. If an investor in a foreign country agreed to reinvest part of his profits in his business there, but was later prevented from doing so by domestic

---

[10] Geneva Convention on the Execution of Foreign Arbitral Awards of 1927
[11] United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958

legislation and the host country sought and won a decision against him, in such a case execution of the award might raise issues of considerable practical importance.

Mr. ALLOTT (United Kingdom) said that he was prepared to accept Section 15 provisionally, but observed that opinion at a higher level would have to be taken into account. Parliament would certainly have much to say on the question of principle involved. The acceptance of foreign awards without the right to attack them would be a new departure. The choice before them was between leaning towards international or towards private arbitration; the Convention sought a middle course. He personally felt that the trend towards international arbitration was desirable. Some States might regard the issue as a matter of inspiring confidence which was, indeed, the aim of the whole Convention. He felt therefore that the Section should be accepted regardless of the fact that on paper it appeared a strange innovation. The final result would depend on the quality of the awards given; if the awards were good, they would justify the acceptance of the system.

Mr. AMLIE (Norway) wondered whether the bold innovation proposed in Section 15 was necessary. To the best of his knowledge, such a provision did not appear in any international instruments in which enforcement clauses were usually hedged about by certain standard reservations which ought to suffice for the present purpose. He had in mind the discretionary power usually reserved by States entering into treaties on the reciprocal enforcement of judgments to examine the circumstances in which the award had been given before discharging enforcement obligations, to decide whether, for example, adequate notice had been given to a party before judgment was entered on default; whether enforcement would be contrary to public policy; and to ascertain that the arbitrators were not disqualified. If modified in that manner Section 15, which would require legislative action in his country, might not cause much concern.

The CHAIRMAN pointed out that as stated by the expert from Denmark most if not all the grounds on which execution could be refused were provided for in the clauses relating to remedies within the framework of the Convention.

The present draft was designed to establish a self-contained system as was found in judicial or arbitral proceedings between States under which there would be no recourse to an outside authority against decisions of tribunals or conciliation commissions; it was something midway between commercial and inter-State arbitration as the expert from the United Kingdom had pointed out. Since one of the purposes of the Convention was to give a greater sense of confidence not only to investors but also to capital-importing countries the latter would expect some assurance that compliance with an award made in their favor would be just as automatic as it would be if they lost the case. If a clause were inserted allowing considerations of public policies as grounds for refusal of execution against an investor, it would be necessary to set forth in detail the other corresponding circumstances in which a State could refuse to comply with an award. The interesting example mentioned by the expert from France turned on the issue of whether an investor had been properly authorized by his national authority to enter into an agreement. If he in fact had such authority it would be for the arbitral tribunal to decide whether a change in legislation of the investor's State was an act of the Prince which could be invoked as a ground for non-compliance. It had been pointed out at previous meetings that if provision were made for situations of the type described by the expert from France a reciprocal clause would be needed requiring the Con-

able to refrain from attempting to legislate either positively or nega-
tively in Sections 14 and 15.

Mr. HERNDL (Austria) considered that as the award of the tribunal
was analogous to an award made in commercial arbitral proceedings, the
provisions of the New York Convention should apply in order to avoid
a multiplicity of international rules on the matter.  He thought that
Section 15 if it did not modify existing law on sovereign immunity
would lead to some injustice because the same award could be enforced
in States which allowed enforcement against foreign States but could
not be enforced in States following the opposite rule.

Mr. BERTRAM (Federal Republic of Germany) said that the special
problem of enforcement in third States was of crucial significance;
by a third State he meant a signatory of the Convention which was
neither a party to the proceedings nor the State whose national was a
party to the proceedings.  The consent of the parties to resort to
arbitration or conciliation in a concrete case was one of the funda-
mental principles of the Convention.  He doubted whether the obligation
of a third State to enforce an award within its territory was in harmony
with that principle.

The provision contained in paragraph 7 of the Annex relating to the
Statute of the arbitral tribunal in the OECD draft Convention provided
not only for arbitration between States but also between States and
private individuals and was pertinent to the whole problem of enforcement.
It had been argued by several speakers that the position of the State
in regard to enforcement of awards would remain largely unchanged under
the system envisaged in the draft.  As a consequence, since many munic-
ipal systems were extremely diverse in that regard, enforcement against
a foreign State would often not be possible.  Differences in the status
of the private individual under municipal systems would be of relatively
much less significance and in nearly all instances the judgment of a
foreign national court could be executed directly.  Some guidance could
be sought in the New York Convention on commercial arbitration and
perhaps it might be possible to devise a formula that would lead to
greater uniformity in means of enforcement by limiting the conditions
to those laid down in that Convention.

A provision on annulment had been included in the model rules on
arbitral procedure drawn up by the International Law Commission whereby
the request had to be submitted to the International Court of Justice.
Under the present draft a decision on such a request would have to be
taken by an ad hoc committee drawn from the same Panel of arbitrators.

The self-contained system proposed in the draft, if examined in
the context of validity of awards, might be acceptable.  But this was
less true if it were examined in the light of the enforcement provisions.

In conclusion he thought that Section 15 ought to be carefully
reviewed and some conditions should be provided for the enforcement of
the award along the lines of the New York Convention.

The CHAIRMAN pointed out that the reason why the International
Law Commission's model rules in regard to annulment had not been
followed was that the parties could not present their case to the

- 7 -

Among the characteristic features of voluntary jurisdiction which unfortunately appeared also in the provisions of the draft Convention, was the fact that no detailed definition was given of the types of disputes which would come under the jurisdiction of the proposed International Conciliation and Arbitration Center. The term "dispute of a legal character" given in Article II, Section 1 could give rise to uncertainty, particularly in view of the fact that a State, in the ordinary course of exercising governmental functions, may have to take various broad measures which could affect the interests of foreign investors e.g. measures required to protect the health, morals and welfare of the community, as well as the security of the nation.

The question regarding the law to be applied by an international tribunal had given rise to much controversy in the past and was raised again by Article IV, Section 4 (1). In the ordinary system of international arbitration or adjudication, the fundamental rule was that the tribunal should apply rules of international law deemed applicable to the case before it, in which process it might take cognizance of the national systems of law not so much with a view to determining the dispute itself but rather in order to determine whether there was an applicable general principle of law recognized by civilized nations.

The draft Convention, however, empowered the Arbitral Tribunal to apply the rules of national or international law "as it shall determine to be applicable". While the national law referred to could and should mean none other than the internal law of the State party to the dispute, it could, however, conceivably include the law of the State of the individual investor party to the dispute, or indeed any other national system of law whatsoever. Such a procedure could give rise to strange results. In the light of the general principles of private international law, the nationality of a party could not justifiably be considered so controlling as to necessitate the application of the national law of that party as the proper law governing the dispute.

Passing to the provisions concerning the enforcement of arbitral awards, he said that the obligations entailed by Article IV, Section 15 were extremely wide and were bound to encounter formidable obstacles in practice. In Thailand, an arbitral award could be recognized and enforced only after either party to the arbitral proceedings had made application to a competent court and that court had entered a judgment in consonance with the award. There could be no automatic enforcement of arbitral awards. The provisions of Article IV, Section 15 went far beyond the normal universal practice of States as evidenced in Article III of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

He expressed doubt whether the establishment of facilities for voluntary conciliation and arbitration of investment disputes would do much to improve the investment climate. A viable and reliable system of settling disputes would be of great interest to prospective investors but it was only one of the many factors which would stimulate the flow of investment.

He stressed that the views which he had expressed were not final and should not be considered as committing the Thai Government in any way.

The CHAIRMAN said that in order to conserve the time of the opening session for statements by delegations, he would defer stating

Mr. UL ISLAM (Pakistan) recalling that a State, being a party
to the Convention, was bound directly under it to comply with the award,
while the investor was not, again emphasized his earlier proposal that
States be expressly required to enact legislation for the enforcement of
an award against an investor as if the award were a judgment of its highest
appellate courts.

The CHAIRMAN agreed and said that in his opinion provisions along
the lines of Article 192 of the Rome Treaty would, together with Section
15, give expression to Mr. Ul Islam's idea.

Mr. ABAS (Malaysia) thought that the provisions of Section 15
were adequate and that no more detailed provisions were needed.  That
Section imposed a definite obligation on a State to enforce the award
and if it did not provide the machinery necessary to enable it to do
so, it would be in breach of the Convention.

Mr. GAE (India) said he had reservations regarding the adequacy
of Section 15.  Under general principles of law, the award of an arbitral
tribunal was binding only as between the parties concerned.  Section 15,
however, imposed on every Contracting State the obligation to give effect
to the award as if it were a final judgment of the courts of that State
irrespective of the general law of the State regarding other types of
arbitral awards.

In some countries an internationally binding award could not be
implemented immediately and automatically as was required by Section 15,
and the defendant was entitled to take advantage of any procedural safe-
guards available to him under the law of the State concerned.  In his
view, therefore, express provision ought to be made in Section 15 re-
quiring each Contracting State to enact legislation to enable the award
to become enforceable as a final judgment of its courts, unless such
legislation already existed.  A provision like that in the Treaty of
Rome which read:  "forced execution shall be governed by the rules of
civil procedure in force in the State in whose territory it takes place",
though welcome, would by itself be inadequate in the absence of implementing
local legislation.

Under general principles of municipal law execution of international
arbitral awards was subject to certain exceptions, viz. (i) where the
dispute was not of a kind arbitrable under the law of the State concerned,
and (ii) where enforcement of the award would be contrary to its public
policy.  He would accept these exceptions in relation to awards rendered
pursuant to the Convention.  Similar provisions were already incorporated
in Section 2 of Article V of the Convention on the Recognition and Enforce-
ment of Foreign Arbitral Awards signed at New York on June 10, 1958.

Finally, he suggested the inclusion of more detailed provisions of
steps to be taken to secure recognition or enforcement of the award such as
were contained in Article IV of the New York Convention.  In particular the
award and the agreement to arbitrate, or certified copies thereof, ought
to be submitted together with any application for recognition or enforce-
ment of the award.

The CHAIRMAN agreed with the delegates of India and Pakistan that
Section 15 ought to be elaborated so as to contain provisions requiring
Contracting States to enact appropriate legislation despite the fect

York (1958) Conventions on the recognition of foreign arbitral awards. The Working Paper admittedly went further than those Conventions, by excluding a number of grounds of attack on the award permitted under the earlier Conventions, but this was a difference of degree rather than of kind.

78.     A third group of comments dealt with the effect of Section 15 on existing law with respect to sovereign immunity.  I explained that the drafters had no intention to change that law.  By providing that the award could be enforced as if it were a final judgment of a local court, Section 15 implicitly imported the limitation on enforcement which in most countries existed with respect to enforcement of court decisions against Sovereigns.  However, this point might be made explicit in order to allay the fears expressed by several delegations. One delegation felt that consent to submit a dispute to arbitration should carry with it a waiver of sovereign immunity with respect to the enforcement of the award (II).  Another delegation felt that failure by a State to comply with an award should expose that State to possible sanctions by the Security Council by analogy with Article 94 of the United Nations Charter (I).

79.     A fourth group of comments dealt with the problems which might arise if local procedural law did not provide the type of enforcement measures which might appear to be required in order to give full effect to the award.  The answer given by some delegations, with which I agree, is that, once again on the lines of the Rome Treaty, the Working Paper should provide explicitly that enforcement will be governed by the rules of civil procedure in force in the State in whose territory it takes place.

80.     In addition, the following miscellaneous comments may be mentioned.  Several delegates felt tha need to prevent conflicts between decisions of arbitral tribunals and local law and suggested that exceptions to enforceability ought to be provided for in those cases (II, III).  Some delegations were willing to accept that awards would not be enforceable if they violated the public policy of the country where enforcement was sought, or if they concerned issues which under the law of that country were not arbitrable (II, IV).  One delegation suggested that although awards should be enforceable in all Contracting States, enforcement should first be sought in the States which, or whose nationals, were parties to the proceedings (III).

## Interpretation of Consent to Arbitration (Section 16)

81.     Section 16 attempts to set forth a simple rule of interpretation.  While some delegations had no difficulty in understanding and agreeing with the provision as drafted, several delegations found the provision unintelligible without reference to the comment or read it as reversing the existing rule of international law on the exhaustion of local remedies, which is the opposite of what the drafters intended (II, III, IV).  It is my impression that the intention of the prevision is generally acceptable, but its text (and possibly its location in the Working Paper) need to be reconsidered.