

*Reports of Cases*

OPINION OF ADVOCATE GENERAL
WATHELET
delivered on 19 September 2017 [1] [i]

**Case C-284/16**

**Slowakische Republik**
v
**Achmea BV**

(Request for a preliminary ruling from the Bundesgerichtshof (Federal Court of Justice, Germany))

(Reference for a preliminary ruling — Principles of EU law — Bilateral investment treaty concluded in 1991 between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic and still applicable between the Kingdom of the Netherlands and the Slovak Republic — Compatibility of investor-State dispute settlement mechanism established by an intra-European Union bilateral investment treaty with Articles 18(1), 267 and 344 TFEU)

Table of contents

I. Introduction ............................................................................ 3

II. Legal context .......................................................................... 4

    A. The FEU Treaty ................................................................. 4

    B. The Netherlands-Czechoslovakia BIT ...................................... 4

    C. German law ...................................................................... 7

III. The dispute in the main proceedings and the questions referred for a preliminary ruling ............ 7

IV. Procedure before the Court ...................................................... 10

V. Analysis ............................................................................... 10

    A. Preliminary observations ...................................................... 10

    B. The third question referred for a preliminary ruling ...................... 13

        1. Admissibility ................................................................ 13

1    Original language: French



2. Substance ................................................................................. 14

C. Second question ............................................................................. 18

1. Whether the arbitral tribunals constituted in accordance with Article 8 of the BIT are established by law ....................................................................... 19

2. Whether the arbitral tribunals constituted in accordance with Article 8 of the BIT are permanent ................................................................................ 20

3. Whether the jurisdiction of the arbitral tribunals constituted in accordance with Article 8 of the BIT is compulsory ..................................................................... 22

4. Whether the procedure before the arbitral tribunals constituted in accordance with Article 8 of the BIT is inter partes, whether they apply rules of law in the settlement of the disputes before them and whether the arbitrators are independent and impartial ..................... 23

D. First question ............................................................................... 24

1. Does a dispute between an investor and a Member State, such as that referred to in Article 8 of the BIT, come under Article 344 TFEU? ................................................. 26

2. Does the dispute at issue '[concern] the interpretation or application of the Treaties'? ....... 29

   (a) The jurisdiction of the arbitral tribunal is confined to ruling on breaches of the BIT ... 31

   (b) The scope of the BIT and the legal rules which it introduces are not the same as those EU and FEU Treaties ................................................................ 32

      (1) The scope of the BIT is wider than that of the EU and FEU Treaties .............. 33

      (2) The legal rules of the BIT which have no equivalent in EU law and are not compatible with it ............................................................. 36

         (i) The MFN clause ......................................................... 36

         (ii) The clause whereby the Parties undertake to observe their contractual obligations vis-à-vis the investors of the other Party, the 'umbrella clause' ..... 37

         (iii) The sunset clause ....................................................... 37

         (iv) Recourse to international arbitration as an ISDS mechanism ................. 37

      (3) The overlap between the other provisions of the BIT and certain provisions of the EU and FEU Treaties is only partial ........................................... 38

         (i) The full protection and security of investments ............................ 39

         (ii) The fair and equitable treatment of investments ........................... 39

         (iii) The prohibition of illegal expropriations .................................. 41

3. Having regard to its purpose, does the Netherlands-Czechoslovakia BIT have the effect of undermining the allocation of powers fixed by the EU and FEU Treaties and, therefore, the autonomy of the EU legal system? ...................................................... 42

VI. Conclusion ................................................................................... 48

## I. Introduction

1. The present request for a preliminary ruling was submitted in the context of an action brought before the German courts and seeking annulment of the Final Award of 7 December 2012, made by the Arbitral Tribunal composed of Professor V. Lowe QC (President), Albert Jan van den Berg and V.V. Veeder QC (Arbitrators) and constituted in accordance with the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic ('the Netherlands-Czechoslovakia BIT')[2] and the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL), the Permanent Court of Arbitration (PCA) acting as Registry.[3]

2. This request provides the Court with the first opportunity to express its views on the thorny question of the compatibility of BITs[4] concluded between Member States,[5] and in particular of the investor-State dispute settlement ('ISDS') mechanisms established by those BITs, with Articles 18, 267 and 344 TFEU.

3. The question is of fundamental importance in the light of the 196 intra-EU BITs currently in force[6] and the numerous arbitral procedures between investors and Member States in which the European Commission has intervened as *amicus curiae* in order to support its argument that intra-EU BITs are incompatible with the FEU Treaty, an argument which the arbitral tribunals have systematically rejected as unfounded.[7]

---

2  The acronym BIT stands for 'Bilateral Investment Treaty'.

3  See *Achmea B.V. (formerly known as 'Eureko B.V.')* v *The Slovak Republic* (UNCITRAL PCA Case No 2008-13), Final Award of 7 December 2012, available on the website of the Investment Policy Hub of the United Nations Conference on Trade and Development (UNCTAD) http://investmentpolicyhub.unctad.org/ISDS/Details/323.

4  This type of BIT is known as an 'intra-EU BIT'.

5  The cases that gave rise to the judgments of 3 March 2009, *Commission* v *Austria* (C-205/06, EU:C:2009:118); of 3 March 2009, *Commission* v *Sweden* (C-249/06, EU:C:2009:119); and of 19 November 2009, *Commission* v *Finland* (C-118/07, EU:C:2009:715) concerned BITs concluded between Member States and third countries. The judgment of 15 September 2011, *Commission* v *Slovakia* (C-264/09, EU:C:2011:580), concerned a dispute between an investor from a third country, namely the Swiss Confederation, and the Slovak Republic on the basis of the Energy Charter Treaty, signed in Lisbon on 17 December 1994. Whereas in the first three actions the Court found that there had been a failure to fulfil obligations, it dismissed the last action on the substance.

6  The oldest is the Germany-Greece BIT (1961) and the most recent is the Lithuania-Croatia BIT (2008).

7  I cite here the most important arbitral proceedings between investors and Member States in which the arbitral tribunals have been required to adjudicate on the question of the compatibility with the FEU Treaty of an intra-EU BIT or a multilateral investment treaty (as, for example, the Energy Charter Treaty) to which the European Union and its Member States are parties: *Eastern Sugar B.V.* v *Czech Republic* (UNCITRAL) (Stockholm Chamber of Commerce (SCC) Case No 088/2004), Partial Award of 27 March 2007; *Rupert Joseph Binder* v *Czech Republic* (UNCITRAL) Award on Jurisdiction of 6 June 2007; *Jan Oostergetel & Theodora Laurentius* v *Slovak Republic* (UNCITRAL) Decision on Jurisdiction of 30 April 2010; *AES Summit Generation Limited & AES-Tisza Erömü Kft* v *Hungary* (International Centre for Settlement of Investment Disputes (ICSID) No ARB/07/22) Award of 23 September 2010; *Achmea B.V. (formerly known as Eureko B.V.)* v *Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010 and Final Award of 7 December 2012; *European American Investment Bank AG* v *Slovak Republic* (UNCITRAL) (PCA Case No 2010-17) Award on Jurisdiction of 22 October 2012; *Electrabel S.A.* v *Hungary* (ICSID Case No ARB/07/19) Decision on Jurisdiction, Applicable Law and Liability of 30 November 2012 and Award of 25 November 2015; *Charanne B.V. and Construction Investments S.à.r.l.* v *Kingdom of Spain* (SCC Case No 062/2012) Final Award of 21 January 2016; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l.* v *Kingdom of Spain* (ICSID Case No ARB/13/30) Decision on Jurisdiction of 6 June 2016; *Isolux Infrastructure Netherlands B.V.* v *Kingdom of Spain* (SCC Case V 2013/153) Award of 12 July 2016; *WNC Factoring Ltd* v *Czech Republic* (UNCITRAL) (PCA Case No 2014-34) Award of 22 February 2017; *Anglia Auto Accessories Limited* v *Czech Republic* (SCC Case V 2014/181) Final Award of 10 March 2017; *I.P. Busta and J.P. Busta* v *Czech Republic* (SCC Case V 2015/014) Final Award of 10 March 2017; and *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l.* v *Kingdom of Spain* (ICSID Case No ARB/13/36) Award of 4 May 2017. All the arbitral awards to which I refer in this Opinion are available on the UNCTAD website at http://investmentpolicyhub.unctad.org/ISDS. I shall also refer to arbitral awards made on the basis of BITs between Member States and third countries or even between third countries in so far as the principles of international law apply to all those cases without distinction.

## II. Legal context

### A. The FEU Treaty

4. The first paragraph of Article 18 TFEU provides that 'within the scope of application of the Treaties, and without prejudice to any special provisions contained, any discrimination on grounds of nationality shall be prohibited'.

5. The first to third paragraphs of Article 267 TFEU provide:

'The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:

(a)  the interpretation of the Treaties;

(b)  the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union.

Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.

Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.'

6. Article 344 TFEU provides that 'Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein'.

### B. The Netherlands-Czechoslovakia BIT

7. The Netherlands-Czechoslovakia BIT was concluded on 29 April 1991 and entered into force on 1 October 1992.[8] The Slovak Republic, as successor to the Czech and Slovak Federal Republic, succeeded to the latter's rights and obligations on 1 January 1993 and became a member of the European Union on 1 May 2004.

8. That BIT was concluded in Czech, English and Dutch, the English version being authentic in the event of a difference of interpretation.

9. Article 2 of the BIT provides that 'each Contracting Party shall in its territory promote investments by investors of the other Contracting Party and shall admit such investments in accordance with its provisions of law'.[9]

10. Article 3 of that BIT provides as follows:

'(1) Each Contracting Party shall ensure fair and equitable treatment to the investments of investors of the other Contracting Party and shall not impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal thereof by those investors. [10]

---

8    The text is available in English on UNCTAD'S website at http://investmentpolicyhub.unctad.org/IIA/mostrecent/treaty/2650.

9    This footnote is not relevant to the English version of the Opinion.

10   This footnote is not relevant to the English version of the Opinion.

(2) More particularly, each Contracting Party shall accord to such investments full security and protection which in any case shall not be less than that accorded either to investments of its own investors or to investments of investors of any third State, whichever is more favourable to the investor concerned. [11]

(3) The provisions of this Article shall not be construed so as to oblige either Contracting Party to accord preferences and advantages to investors of the other Contracting Party similar to those accorded to investors of a third State

(a)  by virtue of membership of the former of any existing or future customs union or economic union, or similar institutions, … [12]

(4) Each Contracting Party shall observe any obligation it may have entered into with regard to investment of investors of the other Contracting Party. [13]

(5) If the provisions of law of either Contracting Party or obligations under international law existing at present or established hereafter between the Contracting Parties in addition to the present Agreement contain rules, whether general or specific, entitling investments by investors of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement, such rules shall to the extent that they are more favourable prevail over the present Agreement. [14]'

11. Article 4 provides that 'each Contracting Party shall guarantee that payments related to an investment may be transferred. The transfers shall be made in a freely convertible currency, without undue restriction or delay …'.[15] The free transfer of payments covers, inter alia, profits, interests and dividends.

12. Article 5 provides that 'neither Contracting Party shall take any measures depriving, directly or indirectly, investors of the other Contracting Party of their investments'[16] unless three conditions are complied with, namely the measures are taken in the public interest and under due process of law, they are not discriminatory and they are accompanied by provision for the payment of just compensation. Under that provision, the compensation must represent the genuine value of the investment.

13. Article 8 states:

'(1) All disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall if possible, be settled amicably. [17]

(2) Each Contracting Party hereby consents to submit a dispute referred to in paragraph (1) of this Article, to an arbitral tribunal, if the dispute has not been settled amicably within a period of six months from the date either party to the dispute requested amicable settlement. [18]

---

11  This footnote is not relevant to the English version of the Opinion.
12  This footnote is not relevant to the English version of the Opinion.
13  This footnote is not relevant to the English version of the Opinion.
14  This footnote is not relevant to the English version of the Opinion.
15  This footnote is not relevant to the English version of the Opinion.
16  This footnote is not relevant to the English version of the Opinion.
17  This footnote is not relevant to the English version of the Opinion.
18  This footnote is not relevant to the English version of the Opinion.

(3) The arbitral tribunal referred to in paragraph (2) of this Article will be constituted for each individual case in the following way: each party to the dispute appoints one member of the tribunal and the two members thus appointed shall select a national of a third State as Chairman of the tribunal. Each party to the dispute shall appoint its member of the tribunal within two months, and the Chairman shall be appointed within three months from the date on which the investor has notified the other Contracting Party of his decision to submit the dispute to the arbitral tribunal. [19]

(4) If the appointments have not been made in the abovementioned periods, either party to the dispute may invite the President of the Arbitration Institute of the Chamber of Commerce of Stockholm to make the necessary appointments. If the President is a national of either Contracting Party or if he is otherwise prevented from discharging the said function, the Vice-President shall be invited to make the necessary appointments. If the Vice-President is a national of either Contracting Party or if he too is prevented from discharging the said function, the most senior member of the Arbitration Institute who is not a national of either Contracting Party shall be invited to make the necessary appointments. [20]

(5) The arbitration tribunal shall determine its own procedure applying the [UNCITRAL] arbitration rules … [21]

(6) The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:

– the law in force of the Contracting Party concerned;

– the provisions of this Agreement, and other relevant Agreements between the Contracting Parties;

– the provisions of special agreements relating to the investment;

– the general principles of international law. [22]

(7) The tribunal takes its decision by majority of votes; such decision shall be final and binding upon the parties to the dispute. [23]’.

14. Article 13 provides:

‘(1) The present Agreement … shall remain in force for a period of ten years. [24]

(2) Unless notice of termination has been given by either Contracting Party at least six months before the date of the expiry of its validity, the present Agreement shall be extended tacitly for periods of ten years, each Contracting Party reserving the right to terminate the Agreement upon notice of at least six months before the date of expiry of the current period of validity. [25]

(3) In respect of investments made before the date of the termination of the present Agreement the foregoing Articles thereof shall continue to be effective for a further period of fifteen years from that date. [26]

---

19  This footnote is not relevant to the English version of the Opinion.
20  This footnote is not relevant to the English version of the Opinion.
21  This footnote is not relevant to the English version of the Opinion.
22  This footnote is not relevant to the English version of the Opinion.
23  This footnote is not relevant to the English version of the Opinion.
24  This footnote is not relevant to the English version of the Opinion.
25  This footnote is not relevant to the English version of the Opinion.
26  This footnote is not relevant to the English version of the Opinion.

...'

## C. German law

15. Article 1040 of the Zivilprozessordnung (Code of Civil Procedure), entitled 'Authority of the arbitral tribunal to decide on its own competence', provides:

'(1) The arbitral tribunal may decide on its own competence, and in this context also regarding the existence or the validity of the arbitration agreement. ...

(2) The objection as to a lack of competence of the arbitral tribunal is to be submitted by no later than the time at which the reply to the request for arbitration is made. ...

(3) Where the arbitral tribunal believes it has competence, it shall rule on an objection raised pursuant to paragraph 2 in an interim decision as a matter of principle. ...'

16. Article 1059 of the Code of Civil Procedure, entitled 'Petition for reversal of an arbitral award', states:

'(1) Only a petition for reversal of an arbitral award by a court pursuant to paragraphs 2 and 3 may be filed against an arbitral award.

(2) An arbitral award may be reversed only if

1.  the petitioner asserts, and provides reasons for his assertion, that

    (a) ... the arbitration agreement is invalid under the laws to which the parties have subjected it or, if the parties have not made any determinations in this regard, that it is invalid under German law, or

       ...

2.  the competent national court determines that

       ...

    (b) the recognition or enforcement of the arbitral award will lead to a result contrary to public order....'

## III. The dispute in the main proceedings and the questions referred for a preliminary ruling

17. Achmea B.V. (formerly known as Eureko B.V.) is an undertaking belonging to a Netherlands insurance group.

18. In the context of a reform of its health system, the Slovak Republic opened the Slovak market in 2004 to national and foreign operators offering private sickness insurance services. After being approved as a health sickness body, Achmea established a subsidiary (Union Healthcare) in Slovakia, to which it supplied capital (around EUR 72 million) and through which it offered private sickness insurance.

19. Following a change of government in 2006, the Slovak Republic partly revoked the liberalisation of the sickness insurance market. It first of all prohibited the intervention of insurance brokers, then the distribution of the profits from sickness insurance activities and finally the sale of insurance portfolios. By judgment of 26 January 2011, the Ústavný súd Slovenskej republiky (Constitutional Court of the Slovak Republic) held that the legal ban on the distribution of profits was contrary to the Constitution. By a law reforming sickness insurance, which entered into force on 1 August 2011, the Slovak Republic again authorised the distribution of profits.

20. Being of the view that the legislative measures adopted by the Slovak Republic amounted to breach of Article 3(1) and (2), Article 4 and Article 5 of the Netherlands-Czechoslovakia BIT, Achmea initiated an arbitral procedure against that State in October 2008, in application of Article 8 of the Netherlands-Czechoslovakia BIT, and claimed damages of EUR 65 million.

21. The arbitral tribunal and the parties agreed that the PCA should act as Registry and that the language of the case should be English. By Procedural Order No 1, the arbitral tribunal fixed the place of the arbitration at Frankfurt am Main (Germany).

22. In the context of the arbitral proceedings, the Slovak Republic raised an objection to the jurisdiction of the arbitral tribunal. It claimed that the FEU Treaty governed the same matter as Netherlands-Czechoslovakia BIT and that that BIT should be considered inapplicable or to have terminated in accordance with Articles 30 and 59 of the Vienna Convention on the Law of Treaties of 23 May 1969 ('the Vienna Convention').[27] The Slovak Republic also maintained that, consequently, the arbitration clause in Article 8(2) of that BIT could not be applied, as it was incompatible with the FEU Treaty. In that regard, it adds that the Court of Justice has exclusive jurisdiction over Achmea's claims and that certain provisions of that BIT, such as Article 4, concerning the free transfer of payments, have been held by the Court to be incompatible with the FEU Treaty.[28]

23. By its Award of 26 October 2010 on Jurisdiction, Arbitrability and Suspension, the arbitral tribunal rejected that objection to jurisdiction and declared that it had jurisdiction.[29] The Slovak Republic's action before the German courts seeking reversal of that award did not succeed.

24. By a Final Award of 7 December 2012, the arbitral tribunal held that a part of the measures adopted by the Slovak Republic, namely the ban on the distribution of profits[30] and the ban on transfers,[31] breached Article 3 (fair and equitable treatment) and Article 4 (free transfer of payments) of the BIT and ordered the Slovak Republic to pay Achmea damages of EUR 22.1 million plus interest and the costs of the arbitration and the legal costs incurred by Achmea.[32]

---

27  *United Nations Treaty Series*, vol. 1155, p. 331.

28  See the case-law cited in footnote 5.

29  See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010.

30  According to Law No 530/2007 of 25 October 2007, the profits derived from sickness insurance were to be used for the needs of the country's health scheme. That law was held to be contrary to the Constitution by the Ústavný súd Slovenskej republiky (Constitutional Court of the Slovak Republic), which is why the arbitral tribunal ruled that, contrary to Achmea's contention, the ban on the distribution of profits was not an expropriation of its investment. See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Final Award of 7 December 2012, paragraph 288.

31  Law No 192/2009 of 30 April 2009 had put an end to the possibility for a sickness insurance company to sell its insurance portfolio to another insurance company. In addition, according to that law, where such a company became insolvent, its insurance portfolio was to be transferred to one of the two insurance companies belonging to the State, without consideration.

32  The arbitral tribunal rejected Achmea's argument that the measures taken by the Slovak Republic constituted an expropriation contrary to Article 5 of the BIT.

25. As the place of arbitration was Frankfurt am Main, the Slovak Republic brought an action to have the Final Award reversed before the Oberlandesgericht Frankfurt am Main (Higher Regional Court, Frankfurt am Main, Germany). As that court decided to dismiss the action, the Slovak Republic lodged an appeal on a point of law against that decision before the Bundesgerichtshof (Federal Court of Justice, Germany).

26. In that context, the Slovak Republic maintains that the Final Award should be reversed because it is contrary to public policy and the arbitration agreement that gave rise to the award is also null and void and contrary to public policy. [33]

27. In support of its assertion that the Final Award is contrary to public policy, the Slovak Republic maintains that the arbitral tribunal, being unable to request the Court to give a preliminary ruling under Article 267 TFEU, failed to take account of higher-ranking provisions of EU law on the free movement of capital and breached its rights of defence when it quantified damages.

28. As regards the assertion that the arbitration clause established by Article 8 of the Netherlands-Czechoslovakia BIT is null and void, the Slovak Republic maintains that that agreement is contrary to Articles 267 and 344 TFEU and to the principle of non-discrimination set forth in Article 18 TFEU.

29. Although the Bundesgerichtshof (Federal Court of Justice) does not share the doubts expressed by the Slovak Republic as to the compatibility of Article 8 of the Netherlands-Czechoslovakia BIT with Articles 18, 267 and 344 TFEU, it established that the Court had not yet given a ruling on those issues and that it would be impossible to infer the answer with sufficient certainty from the existing case-law, especially having regard to the position of the Commission, which has intervened in support of the Slovak Republic both during the arbitration at issue and in the annulment proceedings before the German courts.

30. For those reasons, the Bundesgerichtshof (Federal Court of Justice) decided to stay proceedings and to refer the following questions to the Court for a preliminary ruling:

'(1)  Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?

If Question 1 is to be answered in the negative:

(2)  Does Article 267 TFEU preclude the application of such a provision?

If Questions 1 and 2 are to be answered in the negative:

(3)  Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?'

---

[33]  See Article 1059(2)(1)(a) and Article 1059(2)(2)(b) of the Code of Civil Procedure.

## IV. Procedure before the Court

31. The present request for a preliminary ruling was lodged at the Court on 23 May 2016. The Slovak Republic, Achmea, the Czech, Estonian, Greek, Spanish, Cypriot, Hungarian, Netherlands, Austrian, Polish, Romanian and Finnish Governments and the Commission have lodged written observations.

32. A hearing took place on 19 June 2016, at which the Slovak Republic, Achmea, the Czech, German, Estonian, Greek, Spanish, French, Italian, Cypriot, Latvian, Hungarian, Netherlands, Austrian, Polish, Romanian and Finnish Governments and the Commission presented their oral observations.

## V. Analysis

### A. Preliminary observations

33. Before addressing the three questions for a preliminary ruling submitted by the referring court, I should like to make some preliminary observations.

34. The Member States which have intervened in the present case are divided into two groups. The first group consists of the Federal Republic of Germany, the French Republic, the Kingdom of the Netherlands, the Republic of Austria and the Republic of Finland, which are essentially countries of origin of the investors and therefore never or rarely respondents in arbitral proceedings launched by investors: the Kingdom of the Netherlands and the Republic of Finland have never been respondents,[34] the Federal Republic of Germany has been a respondent in three cases[35] and the French Republic[36] and the Republic of Austria have each been a respondent in only a single case.[37]

35. The second group is made up of the Czech Republic, the Republic of Estonia, the Hellenic Republic, the Kingdom of Spain, the Italian Republic, the Republic of Cyprus, the Republic of Latvia, Hungary, the Republic of Poland, Romania and the Slovak Republic. Those States have all been respondents in a number of arbitral proceedings relating to intra-EU investments, the Czech Republic 26 times, the Republic of Estonia three times, the Hellenic Republic three times, the Kingdom of Spain 33 times, the Italian Republic nine times, the Republic of Cyprus three times, the Republic of Latvia twice, Hungary 11 times, the Republic of Poland 11 times, Romania four times and the Slovak Republic nine times.[38]

36. Faced with such economic reality, it is hardly surprising that the Member States in the second group have intervened in support of the argument put forward by the Slovak Republic, which is itself the respondent to the investment arbitration at issue in the present case.

---

34   See statistics available on the website of UNCTAD's Investment Policy Hub, at http://investmentpolicyhub.unctad.org/ISDS.

35   In the pending arbitral procedure *Vattenfall AB and Others v Federal Republic of Germany (II)* (ICSID Case No ARB/12/12), brought by a Swedish investor on the basis of the Energy Charter Treaty, and arbitral procedures which resulted in a settlement, namely *Ashok Sancheti v Federal Republic of Germany*, brought by an Indian investor on the basis of the Germany-India BIT, and *Vattenfall AB and Others v Federal Republic of Germany (I)* (ICSID Case No ARB/09/6), brought by a Swedish investor on the basis of the Energy Charter Treaty.

36   In the pending arbitral procedure *Erbil Serter v French Republic* (ICSID Case No ARB/13/22), brought by a Turkish investor on the basis of the France-Turkey BIT.

37   As regards the Republic of Austria, it is a respondent in the pending arbitration *B.V. Belegging-Maatschappij Far East v Republic of Austria* (ICSID Case No ARB/15/32), brought on the basis of the Austria-Malta BIT.

38   See statistics available on the website of UNCTAD's Investment Policy Hub, at http://investmentpolicyhub.unctad.org/ISDS.

37. It is surprising, on the other hand, that, in the second group, which maintains that intra-EU BITs are incompatible with the EU and FEU Treaties, only the Italian Republic has terminated its intra-EU BITs, with the exception of the Italy-Malta BIT, whereas the other Member States in that group maintain them in force, in whole or in part, thus allowing their own investors to benefit from them. In effect, a large number of investment arbitrations have been launched by investors from those Member States and are often brought against another Member State in the same group.[39]

38. When asked at the hearing why it did not denounce at least the BITs signed with the Member States which, in the present case, maintained, as it did, that those BITs were incompatible with EU law,[40] the Slovak Republic stated that its objective was to ensure that its own investors would not be the victims of discrimination by comparison with investors from other Member States in the Member States with which it would no longer have BITs. However, that intention did not prevent it from terminating its BIT with the Italian Republic. At the same time, its own investors continue to benefit from the BITs concluded with Member States of the same group, as shown, for example, by the arbitral proceedings *Poštová banka, a.s. and Istrokapital SE v Hellenic Republic* (ICSID Case No ARB/13/8).

39. The Commission's argument is also striking.

40. For a very long time, the argument of the EU institutions, including the Commission, was that, far from being incompatible with EU law, BITs were instruments necessary to prepare for the accession to the Union of the countries of Central and Eastern Europe. The Association Agreements between the Union and candidate countries also contained provisions for the conclusion of BITs between Member States and candidate countries.[41]

41. At the hearing, the Commission attempted to explain that change in its position on the incompatibility of BITs with the EU and FEU Treaties, maintaining that the agreements in question were necessary in order to prepare for the accession of the candidate countries. However, if those BITs were justified only during the association period and each party was aware that they would

---

39  See, inter alia, *Indrek Kuivallik v Republic of Latvia* (UNCITRAL), on the basis of the Estonia-Latvia BIT; *UAB E energija v Republic of Latvia* (ICSID Case No ARB/12/33), on the basis of the Lithuania-Latvia BIT; *Spółdzielnia Pracy Muszynianka v Slovak Republic* (UNCITRAL), on the basis of the Poland-Slovakia BIT; *ČEZ a.s. v Republic of Bulgaria* (ICSID Case No ARB/16/24) and *ENERGO-PRO a.s. v Republic of Bulgaria* (ICSID Case No ARB/15/19), on the basis of the Czech Republic-Bulgaria BIT; *Poštová banka, a.s. and Istrokapital SE v Hellenic Republic* (ICSID Case No ARB/13/8), on the basis of the Greece-Slovakia and Greece-Cyprus BITs; *MOL Hungarian Oil and Gas Company plc v Republic of Croatia* (ICSID Case No ARB/13/32), on the basis of the Hungary-Croatia BIT; *Theodoros Adamakopoulos and Others v Republic of Cyprus* (ICSID Case No ARB/15/49), *Cyprus Popular Bank Public Co. Ltd v Hellenic Republic* (ICSID Case No ARB/14/16) and *Marfin Investment Group Holdings S.A. and Others v Republic of Cyprus* (ICSID Case No ARB/13/27), on the basis of the Greece-Cyprus BIT; *WCV Capital Ventures Cyprus Limited and Channel Crossings Limited v Czech Republic* (UNCITRAL), *Forminster Enterprises Limited v Czech Republic* (UNCITRAL) and *WA Investments-Europa Nova Limited v Czech Republic* (UNCITRAL), on the basis of the Czech Republic-Cyprus BIT; *Juvel Ltd and Bithell Holdings Ltd v Republic of Poland* (ICC) and *Seventhsun Holding Ltd and Others v Republic of Poland* (SCC), on the basis of the Cyprus-Poland BIT; *Natland Investment Group NV and Others v Czech Republic* (UNCITRAL), on the basis of, inter alia, the Cyprus-Czech Republic BIT; *Mercuria Energy Group v Republic of Poland* (SCC), on the basis of the energy charter treaty between the Republic of Cyprus and the Republic of Poland; *Vigotop Limited v Hungary* (ICSID Case No ARB/11/22), on the basis of the Cyprus-Hungary BIT; *Impresa Grassetto S.p.A. in liquidation v Republic of Slovenia* (ICSID Case No ARB/13/10), on the basis of the Italy-Slovenia BIT; *Marco Gavazzi and Stefano Gavazzi v Romania* (ICSID Case No ARB/12/25) on the basis of the Italy-Romania BIT, and *Luigiterzo Bosca v Republic of Lithuania* (PCA Case No 2011-05), on the basis of the Italy-Lithuania BIT.

40  The Hellenic Republic, the Kingdom of Spain, the Republic of Latvia, Hungary, the Republic of Poland and Romania.

41  See, inter alia, the first indent of Article 72(2) of the Europe Agreement establishing an association between the European Communities and their Member States, of the one part, and the Republic of Hungary, of the other part, signed in Brussels on 16 December 1991 (OJ 1993 L 347, p. 2); the first indent of Article 73(2) of the Europe Agreement establishing an association between the European Communities and their Member States, of the one part, and the Republic of Poland, of the other part, signed in Brussels on 16 December 1991 (OJ 1993 L 348, p. 2); the second indent of Article 74(2) of the Europe Agreement establishing an association between the European Communities and their Member States, of the one part, and Romania, of the other part, signed in Brussels on 1 February 1993 (OJ 1994 L 357, p. 2); the second indent of Article 74(2) of the Europe Agreement establishing an association between the European Communities and their Member States, of the one part, and the Slovak Republic, of the other part, signed in Luxembourg on 4 October 1993 (OJ 1994 L 359, p. 2); and the second indent of Article 85(2) of the Stabilisation and Association Agreement between the European Communities and their Member States, of the one part, and the Republic of Croatia, of the other part, signed in Luxembourg on 29 October 2001 (OJ 2005 L 26, p. 3).

become incompatible with the EU and FEU Treaties as soon as the third State concerned had become a member of the Union, why did the accession treaties not provide for the termination of those agreements, thus leaving them in uncertainty which has lasted more than 30 years in the case of some Member States and 13 years in the case of many others?

42. In addition, in the European Union, there are no investment treaties solely between market-economy countries and countries which previously had controlled economies[42] or between Member States and candidate countries for accession,[43] as the Commission has suggested.

43. Furthermore, all the Member States and the Union have ratified the Energy Charter Treaty, signed at Lisbon on 19 December 1994.[44] That multilateral treaty on investment in the field of energy operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part,[45] and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing. In that sense, the material provisions for the protection of investments provided for in that Treaty and the ISDS mechanism also operate between Member States. I note that if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible.

44. I would add that the systemic risk which, according to the Commission, intra-EU BITs represent to the uniformity and effectiveness of EU law is greatly exaggerated. UNCTAD's statistics[46] show that out of 62 intra-EU arbitral proceedings which, over a period of several decades, have been closed, the investors have been successful in only 10 cases,[47] representing 16.1% of those 62 cases, a rate significantly below the 26.9% of 'victories' for investors at the global level.[48]

45. The arbitral tribunals have to a large extent allowed the Commission to intervene in arbitrations and to my knowledge in none of those 10 cases was the arbitral tribunal required to review the validity of acts of the Union or the compatibility of acts of the Member States with EU law. In their written observations, several Member States and the Commission have mentioned only a single example, namely the arbitration *Ioan Micula and Others v Romania* (ICSID Case No ARB/05/20), which resulted in an arbitral award that was allegedly incompatible with EU law. Even though that example is in my view not relevant in the present case,[49] the fact that there is only a single example reinforces my opinion that the fear expressed by certain Member States and the Commission of a systemic risk created by intra-EU BITs is greatly exaggerated.

---

42    See, inter alia, the Belgium and Luxembourg-Cyprus, Belgium and Luxembourg-Malta and Cyprus-Malta BITs.

43    See, inter alia, the Cyprus-Malta, Estonia-Latvia, Estonia-Lithuania, Estonia-Poland, Poland-Bulgaria, Poland-Slovakia, Hungary-Slovenia, Hungary-Slovakia, Hungary-Poland, Czech Republic-Bulgaria and Czech Republic-Latvia BITs.

44    See Council and Commission Decision 98/181/EC, ECSC, Euratom of 23 September 1997 on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects (OJ 1998 L 69, p. 1).

45    The Italian Republic recently denounced this Treaty, citing a global examination of the costs resulting from the financial contributions in respect of its participation in a number of international organisations, including the Energy Charter Secretariat, having its seat in Brussels. See https://www.senato.it/application/xmanager/projects/leg17/attachments/documento_evento_procedura_commissione/files/000/002/788/2015__06_03_-_audizione_risposte_senatori_-_VICARI.pdf, p. 7.

46    See its website, at http://investmentpolicyhub.unctad.org/ISDS.

47    See *Eastern Sugar B.V. v Czech Republic* (UNCITRAL) (SCC Case No 088/2004) Partial Award of 27 March 2007; *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Final Award of 7 December 2012; *Les Laboratoires Servier, S.A.S. and Others v Republic of Poland* (PCA) Award of 14 February 2012; *EDF International S.A. v Hungary* (PCA Case) Award of 3 December 2014; *EDF International S.A. v Hungary* (UNCITRAL) Award of 3 December 2014; *Dan Cake (Portugal) S.A. v Hungary* (ICSID Case No ARB/12/9) Decision on Jurisdiction and Liability of 24 August 2015; *Edenred S.A. v Hungary* (ICSID Case No ARB/13/21) Award of 13 December 2016; *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l. v Kingdom of Spain* (ICSID Case No ARB/13/36) Award of 4 May 2017; *Horthel Systems BV and Others v Republic of Poland* (PCA Case No 2014-31) Award issued in 2017; and also *Marco Gavazzi and Stefano Gavazzi v Romania* (ICSID Case No ARB/12/25) Award of 13 July 2017.

48    See UNCTAD statistics, available on its website at http://investmentpolicyhub.unctad.org/ISDS.

49    This was not a dispute arising under an intra-EU BIT, since Romania had not yet acceded to the European Union in 2005, when the arbitration commenced and when the dispute crystallised. Consequently, EU law was not applicable to the facts referred to in that arbitral procedure.

46. Last, it should be pointed out that since the accession of the Slovak Republic to the EU, the Netherlands-Czechoslovakia BIT no longer falls within the scope of Article 351 TFEU.[50]

47. However, that does not mean that that BIT has automatically become void or incompatible with the EU and FEU Treaties. As the Court has held, 'the provisions of a convention between two Member States cannot apply in the relations between those States if they are found to be contrary to the rules of the [FEU] Treaty'.[51] In other words, the provisions of such a convention between Member States are applicable in so far as they are compatible with the EU and FEU Treaties.

48. It is therefore appropriate to consider whether Article 8 of the Netherlands-Czechoslovakia BIT is incompatible with the FEU Treaty and in particular with Articles 18, 267 and 344 TFEU.

**B. The third question referred for a preliminary ruling**

49. I propose to address the three questions in the opposite order from that adopted by the referring court, since there will be no need to answer the first and second questions if Article 8 of the Netherlands-Czechoslovakia BIT constitutes discrimination on the ground of nationality prohibited by Article 18 TFEU.

50. By its third question, the referring court asks, in essence, whether Article 18 TFEU must be interpreted as meaning that it precludes an ISDS mechanism such as that established by Article 8 of the Netherlands-Czechoslovakia BIT which confers on Netherlands investors the right to have recourse to international arbitration against the Slovak Republic, a right not enjoyed by investors from other Member States.

*1. Admissibility*

51. Achmea and the Netherlands, Austrian and Finnish Governments challenge the admissibility of this question, on the ground that it is not relevant to the outcome of the main proceedings, in so far as Achmea does not claim to be the victim of discrimination. On the contrary, if Article 8 of the Netherlands-Czechoslovakia BIT constituted discrimination, Achmea would have benefited from it.

52. To my mind, that plea of inadmissibility must be rejected, since the answer to the third question is necessary in order to assess whether Article 8 of that BIT is compatible with the EU and FEU Treaties.

53. The referring court has before it an action to set aside the Final Award of 7 December 2012 delivered in the arbitral proceedings *Achmea BV (formerly known as Eureko BV) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) on the ground, inter alia, of invalidity of the arbitration clause on which the arbitral tribunal based its jurisdiction. In that sense, it is irrelevant whether Achmea is or is not the victim of discrimination.

---

50  See judgment of 8 September 2009, *Budějovický Budvar* (C-478/07, EU:C:2009:521, paragraphs 97 to 99), which concerned bilateral treaties concluded on 11 June 1976 and 7 June 1979 between the Republic of Austria and the Czechoslovak Socialist Republic. At the time of the facts of the case giving rise to that judgment, the Republic of Austria was already a Member State, whereas the Czech Republic was not, although it acceded to the European Union while the case was pending.

51  Judgment of 20 May 2003, *Ravil* (C-469/00, EU:C:2003:295, paragraph 37). See also, to that effect, judgment of 10 November 1992, *Exportur* (C-3/91, EU:C:1992:420, paragraph 8). That position is consistent with Article 30(3) of the Vienna Convention, according to which 'when all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under Article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty'. See, to that effect, *Electrabel S.A. v Hungary* (ICSID Case No ARB/07/19) decision of 30 November 2012 on jurisdiction, applicable law and liability, paragraphs 4.182 to 4.191.

### 2. Substance

54. As a preliminary point, I note that a number of interveners and the Commission observe that by its third question the referring court should aim not at Article 18 TFEU but at Articles 49 and 63 TFEU, which constitute special rules by reference to Article 18 TFEU.

55. In fact, it is well established that 'Article 18 TFEU is intended to apply independently only to situations governed by EU law for which the Treaty lays down no specific prohibition of discrimination'.[52]

56. However, the ISDS mechanism established by Article 8 of the BIT does not come within the scope *ratione materiae* of either freedom of establishment, or free movement of capital, or any other provision of the FEU Treaty, since EU law does not create remedies that allow individuals to take proceedings against the Member States before the Court.[53]

57. In addition, as I shall explain in points 183 to 198 and 210 to 228 of this Opinion, the scope *ratione materiae* of the BIT goes much further than the limits of freedom of establishment enshrined in Article 49 TFEU and of free movement of capital enshrined in Article 63 TFEU.

58. That is illustrated in the present case where the arbitral tribunal held in its Final Award that by banning the transfer and distribution of profits,[54] the Slovak Republic had breached Articles 3 (fair and equitable treatment) and 4 (free transfer of payments) of the BIT. Whereas Article 4 of the BIT corresponds in essence to Article 63 TFEU, Article 3 of the BIT does not have an equivalent provision in EU law, although it overlaps in part with a number of provisions of EU law.[55]

59. It is therefore necessary to examine the compatibility of Article 8 of the BIT with the general principle of EU law, expressed in Article 18 TFEU, that prohibits discrimination on the ground of nationality.

60. In that regard, the Slovak Republic, the Estonian, Greek, Spanish, Italian, Cypriot, Hungarian, Polish and Romanian Governments and the Commission maintain that the substantive provisions of the BIT, including Article 8, are discriminatory in that they afford, in the present case, preferential treatment to investors from the Kingdom of the Netherlands who have invested in the Slovak Republic, whereas the investors of the Member States which have not concluded a BIT with the Slovak Republic[56] do not benefit from that treatment.[57]

---

52  Judgment of 5 February 2014, *Hervis Sport- és Divatkereskedelmi* (C-385/12, EU:C:2014:47, paragraph 25). See also, to that effect, judgment of 11 March 2010, *Attanasio Group* (C-384/08, EU:C:2010:133, paragraph 37 and the case-law cited).

53  See point 205 of this Opinion.

54  See point 24 of this Opinion.

55  See points 213 to 216 of this Opinion.

56  This argument reinforces the theory that there is no inconsistency between the EU and FEU Treaties and the BIT, which I shall set out in points 174 to 228 of this Opinion, since it means that in principle the legal protection afforded by the BIT to Netherlands investments in Slovakia is greater and therefore additional to the protection afforded to those investors by the EU and FEU Treaties. EU law prohibits discrimination by a Member State against a national of another Member State only in the light of the treatment which the first Member State affords to its own nationals. Conversely, both reverse discrimination and advantages afforded to nationals of another Member State are not referred to in or incompatible with EU law.

57  None of the parties intervening in the present case claims that there is discrimination between foreign and national investors. In my estimation, that difference does not amount to discrimination because it meets the twofold public-interest ground which seeks, on the one hand, to create, in a reciprocal manner, a protective framework for Netherlands investments in Slovakia and Slovak investments in the Netherlands and, on the other, to encourage and promote investments between both those countries. See, to that effect, paragraphs 37 to 40 of Decision No 2017-749-DC of the Conseil Constitutionnel of 31 July 2017, on the Comprehensive Economic and Trade Agreement between Canada, of the one part, and the European Union and its Member States, of the other part (JORF, 18 August 2017, text 1).

61. A preliminary observation must be made on the extent of the alleged discrimination. The Slovak Republic has entered into a BIT with most Member States, namely the Kingdom of Belgium, the Republic of Bulgaria, the Kingdom of Denmark, the Federal Republic of Germany, the Hellenic Republic, the Kingdom of Spain, the French Republic, the Republic of Croatia, the Republic of Latvia, the Grand Duchy of Luxembourg, Hungary, the Republic of Malta, the Kingdom of the Netherlands, the Republic of Austria, the Republic of Poland, the Portuguese Republic, Romania, the Republic of Slovenia, the Republic of Finland, the Kingdom of Sweden and the Kingdom of Great Britain and Northern Ireland. Those BITs are currently in force.

62. Admittedly, investors from those Member States do not come under Article 8 of the Netherlands-Czechoslovakia BIT. However, the BITs which their Member States of origin have concluded with the Slovak Republic all make provision for international arbitration as a method of ISDS. There is therefore no difference in treatment so far as they are concerned.

63. The Slovak Republic also concluded BITs with the Czech Republic and the Italian Republic, but the parties have terminated them.[58] If there is thus a difference in treatment of Czech and Italian investors, that is because their Member States decided to withdraw from them the benefit which the BITs specifically conferred on them.

64. Nonetheless, Estonian, Irish, Cypriot and Lithuanian investors do not benefit from a provision equivalent to Article 8 of that BIT vis-à-vis the Slovak Republic, except for investments in the field of energy, where the Energy Charter Treaty affords them such an opportunity.

65. In my view, even in the case of those investors there is no discrimination prohibited by EU law.

66. The Court has already addressed the question whether discrimination may exist vis-à-vis a national of a Member State engaged in cross-border investment where the host Member State of the investment does not afford him a (fiscal) benefit which it affords to nationals of another Member State on the basis of a bilateral agreement concluded with the latter State.

67. The case that gave rise to the judgment of 5 July 2005, *D.* (C-376/03, EU:C:2005:424)[59] concerned the Netherlands authorities' refusal to grant a wealth tax allowance to a German national who had invested in real property in the Netherlands. Mr D. claimed that there was discrimination in that that benefit was granted to Belgian nationals who had made similar investments in the Netherlands, in application of Articles 24 and 25 of the Convention signed on 19 October 1970 between the Government of the Kingdom of Belgium and the Government of the Kingdom of the Netherlands for the avoidance of double taxation of income and property and for the regulation of certain other taxation matters ('the Netherlands-Belgium DTC').

68. The Court first of all observed that 'the … question asked by the national court is based on the premiss that a non-resident such as Mr D. is not in a situation comparable to that of a resident of the Netherlands. The question is designed to ascertain whether Mr D.'s situation can be compared to that of another non-resident who receives special treatment under a double taxation convention'.[60]

---

58  The question still arises whether, in application of a sunset clause, those BITs continue to have effects on investments made during the period when the BITs were in force.

59  See also, to that effect, judgments of 12 December 2006, *Test Claimants in Class IV of the ACT Group Litigation* (C-374/04, EU:C:2006:773, paragraphs 84 and 88 to 93); of 20 May 2008, *Orange European Smallcap Fund* (C-194/06, EU:C:2008:289, paragraphs 50 and 51); and of 30 June 2016, *Riskin and Timmermans* (C-176/15, EU:C:2016:488, paragraph 31).

60  Paragraph 58 of that judgment.

69. In that regard, the Court held that 'the fact that [the] rights and obligations [created by the Netherlands-Belgium DTC] apply only to persons resident in one of the two Contracting Member States is an inherent consequence of bilateral double taxation conventions. It follows that a taxable person resident in Belgium is not in the same situation as a taxable person resident outside Belgium so far as concerns wealth tax on real property situated in the Netherlands.'[61]

70. The Court then further observed that 'a rule such as that laid down in Article 25(3) of the Belgium-Netherlands Convention cannot be regarded as a benefit separable from the remainder of the Convention, but is an integral part thereof and contributes to its overall balance'.[62]

71. It is clear from that judgment not only that the FEU Treaty does not contain a most favoured nation (MFN) clause like the one contained in that BIT in Article 3(2),[63] but also that there is no discrimination where a Member State does not afford the nationals of another Member State the treatment which it affords, by convention, to the nationals of a third Member State.

72. The fact that the FEU Treaty does not contain an MFN clause is confirmed by the Court's case-law on Article 18 TFEU, according to which '[Article 18 TFEU] requires that persons in a situation governed by [EU] law be placed on a completely equal footing *with nationals of the Member State*'.[64]

73. To my mind, the analogy between the present case and the case that gave rise to the judgment of 5 July 2005, *D*. (C-376/03, EU:C:2005:424) is perfect, since the comparison which the Slovak Republic and the Commission draw also concerns two non-Slovak investors, one of whom (in this instance a Netherlands investor) benefits from the material protection afforded by the BIT while the other does not.

74. In fact, like the Netherlands-Belgium DTC, the BIT is an international treaty, 'the scope [of which] is limited to the natural or legal persons referred to in it',[65] namely natural persons having the nationality of one of the Contracting Parties and legal persons constituted under the law of one of those Contracting Parties.[66]

75. In that sense, the fact that the reciprocal rights and obligations created by the BIT apply only to investors from one of the two Contracting Member States is a consequence inherent in the bilateral nature of BITs. It follows that a non-Netherlands investor is not in the same situation as a Netherlands investor so far as an investment made in Slovakia is concerned.

76. Furthermore, like Article 25(3) of the Netherlands-Belgium DTC to which the Court refers in paragraph 62 of its judgment of 5 July 2005, *D*. (C-376/03, EU:C:2005:424), Article 8 of the BIT is not a benefit separable from the remainder of the BIT, but is an integral part thereof to such an extent that a BIT without an ISDS mechanism would be pointless since it would not achieve its aim, which is to encourage and attract foreign investment.

77. In fact, as the Court held in paragraph 292 of Opinion 2/15 (*Free Trade Agreement with Singapore*), of 16 May 2017 (EU:C:2017:376), the provision of the Free Trade Agreement with the Republic of Singapore which establishes international arbitration as the ISDS mechanism 'cannot be of a purely ancillary nature'. According to consistent arbitral case-law, the right of investors to have

---

61  Paragraph 61 of that judgment.

62  Paragraph 62 of that judgment.

63  See points 200 and 201 of this Opinion.

64  Judgment of 2 February 1989, *Cowan* (186/87, EU:C:1989:47, paragraph 10). Emphasis added. See also, to that effect, judgment of 6 September 2016, *Petruhhin* (C-182/15, EU:C:2016:630, paragraphs 29 to 33), where Mr Petruhhin's situation was compared with that of a national of his host Member State.

65  Judgment of 5 July 2005, *D*. (C-376/03, EU:C:2005:424, paragraph 54).

66  See Article 1(b) of the BIT.

recourse to international arbitration is the most essential element of the BITs, since, in spite of its procedural content, it is in itself an indispensable guarantee that encourages and protects investments.[67] It is hardly surprising, therefore, that the 'old' BITS[68] which do not contain an ISDS mechanism equivalent to Article 8 of that BIT were not particularly useful to investors.

78. The Commission claims, however, that the present case can be distinguished from the case that gave rise to the judgment of 5 July 2005, *D*. (C-376/03, EU:C:2005:424) because of the fiscal subject matter of the latter case.[69]

79. To my mind, that distinction lacks conviction. I observe, first of all, that BITs closely resemble conventions for the avoidance of double taxation in that they are aimed at the same economic activities, both the entry and the exit of capital. A State may attract the entry of foreign capital to its territory by affording a high level of legal protection to the investment in the context of a BIT and also by granting tax advantages.[70] As in conventions for the avoidance of double taxation, which have never been deemed to be incompatible in principle with the EU and FEU Treaties, the reciprocity of the commitments given by the Member States is an essential ingredient of BITs.[71]

80. Contrary to the Commission's contention, moreover, conventions for the avoidance of double taxation between Member States do not have the second indent of Article 293 EC as their legal basis. If that were the case, on what article would they have to base the conventions which they negotiate today, given that Article 293 EC is not to be found in the Treaty of Lisbon?

81. That said, there is nothing to prevent intra-EU BITs being replaced by a single multilateral BIT or an act of the Union, according to the allocation of powers between the Union and its Member States, which would be applicable to investors from all Member States, as the Federal Republic of Germany, the French Republic, the Kingdom of the Netherlands, the Republic of Austria and the Republic of Finland proposed in their 'non-paper' of 7 April 2016.[72]

---

67  See, to that effect, *Emilio Agustín Maffezini v Kingdom of Spain* (ICSID Case No ARB/97/7) Decision of the Tribunal on Objections to Jurisdiction of 25 January 2000, paragraphs 54 and 55; *Gas Natural SDG S.A. v Argentine Republic* (ICSID Case No ARB/03/10) Decision of the Tribunal on Preliminary Questions on Jurisdiction of 17 June 2005, paragraph 31; *Suez, Sociedad General de Aguas de Barcelona S.A. and InterAguas Servicios Integrales del Agua S.A. v Argentine Republic* (ICSID Case No ARB/03/17) Decision on Jurisdiction of 16 May 2006, paragraph 59; *Eastern Sugar B.V. v Czech Republic* (UNCITRAL) (SCC Case No 088/2004) Partial Award of 27 March 2007, paragraphs 165 and 166; *Rupert Joseph Binder v Czech Republic* (UNCITRAL) Award on Jurisdiction of 6 June 2007, paragraph 65; *Jan Oostergetel & Theodora Laurentius v Slovak Republic* (UNCITRAL) Decision on Jurisdiction of 30 April 2010, paragraphs 77 and 78; *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award of on Jurisdiction, Arbitrability and Suspension 26 October 2010, paragraph 264; *WNC Factoring Ltd v Czech Republic* (UNCITRAL) (PCA Case No 2014-34) Award of 22 February 2017, paragraph 300; *Anglia Auto Accessories Limited v Czech Republic* (SCC Case V 2014/181) Final Award of 10 March 2017, paragraph 116; and *I.P. Busta and J.P. Busta v Czech Republic* (SCC Case V 2015/014) Final Award of 10 March 2017, paragraph 116.

68  See, for example, the Germany-Greece BIT (1961), Italy-Malta Bit (1967), Germany-Malta BIT (1974), France-Malta BIT (1976) and Germany-Portugal BIT (1980).

69  The Commission seeks to establish that, unlike the protection of investments, tax matters have remained purely within national jurisdiction, referring in particular to the judgment of 16 July 2009, *Damseaux* (C-128/08, EU:C:2009:471) which, like others, does not prohibit legal double taxation. I note that the purpose of conventions for the avoidance of double taxation is precisely to provide that protection not afforded by the EU and FEU Treaties. The same applies to BITs because EU law intervenes, as regards both the protection of investments and direct taxation, essentially only through provisions on the main freedoms of movement.

70  The Convention between the Kingdom of the Netherlands and the Czechoslovak Socialist Republic for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income and capital, signed at Prague on 4 March 1974, provides 10% withholding tax on dividends, 0% on interest payments and 5% on royalties.

71  The States negotiate in those Conventions a number of items such as, for example, the concept of investment, the application or non-application of the MFN clause to the ISDS mechanism, the presence or absence of a carve-out clause for fiscal measures and the duration of the sunset clause.

72  Available on the Transnational Institute website at https://www.tni.org/files/article-downloads/intra-eu-bits2-18-05_0.pdf. That is what has been done in fiscal matters by means of a number of directives, such as Council Directive 2003/49/EC of 3 June 2003 on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States (OJ 2003 L 157, p. 49), Council Directive 2009/133/EC of 19 October 2009 on the common system of taxation applicable to mergers, divisions, partial divisions, transfers of assets and exchanges of shares concerning companies of different Member States and to the transfer of the registered office of an SE or SCE between Member States (OJ 2009 L 310, p. 34) and Council Directive 2011/96/EU of 30 November 2011 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States (OJ 2011 L 345, p. 8), which in reality are multilateral conventions for the prevention of double taxation rather than harmonisation measures.

82. For those reasons, I propose that the Court's answer to the third question should be that an ISDS mechanism such as that established by Article 8 of the BIT, which confers on Netherlands investors the right to have recourse to international arbitration against the Slovak Republic, does not constitute discrimination on the ground of nationality, prohibited by Article 18 TFEU.

83. Only if the Court agrees with that proposal will it have to examine the first and second questions.

## C. Second question

84. By its second question, the referring court seeks to ascertain whether Article 267 TFEU, as the keystone of the EU judicial system which guarantees the allocation of powers fixed by the EU and FEU Treaties and the autonomy of the EU legal system, precludes the application of a provision such as Article 8 of the Netherlands-Czechoslovakia BIT.

85. I am examining this question before the first question, because I consider that an arbitral tribunal constituted in accordance with Article 8 of the BIT is a court or tribunal within the meaning of Article 267 TFEU, common to two Member States, namely the Kingdom of the Netherlands and the Slovak Republic, and is therefore permitted to request the Court to give a preliminary ruling. That automatically means that there is no incompatibility with Article 344 TFEU, which forms the subject matter of the first question.

86. According to settled case-law, in order for a judicial body to be a 'court or tribunal' for the purposes of Article 267 TFEU, it is necessary to take a number of factors into account, such as 'whether the body is established by law, whether it is permanent, whether its jurisdiction is compulsory, whether its procedure is *inter partes*, whether it applies rules of law and whether it is independent'.[73] In addition, a 'case [must be] pending before it and … it [must be] called upon to give judgment in proceedings intended to lead to a decision of a judicial nature'.[74]

87. On the basis of those criteria, arbitral tribunals are not automatically excluded from the concept of 'court or tribunal of a Member State' within the meaning of Article 267 TFEU. Although the Court has on a number of occasions refused to answer a question for a preliminary ruling referred by arbitrators,[75] it has also declared admissible, on the basis of a case-by-case examination, the questions for a preliminary ruling referred by the arbitral tribunals in the cases that gave rise to the judgments of 17 October 1989, *Handels- og Kontorfunktionærernes Forbund i Danmark* (109/88, EU:C:1989:383) and of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754) and to the order of 13 February 2014, *Merck Canada* (C-555/13, EU:C:2014:92).

88. The last two cases show signs that the admissibility criteria are being opened up to include arbitration between the individual and the State (judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta*, C-377/13, EU:C:2014:1754)[76] and international arbitration (order of 13 February 2014, *Merck Canada*, C-555/13, EU:C:2014:92).[77]

---

73   Judgment of 31 January 2013, *Belov* (C-394/11, EU:C:2013:48, paragraph 38 and the case-law cited). See also, to that effect, judgments of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754, paragraph 23) and of 6 October 2015, *Consorci Sanitari del Maresme* (C-203/14, EU:C:2015:664, paragraph 17).

74   Judgment of 31 January 2013, *Belov* (C-394/11, EU:C:2013:48, paragraph 39 and the case-law cited). See also, to that effect, judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754, paragraph 23).

75   See, inter alia, judgments of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107) and of 27 January 2005, *Denuit and Cordenier* (C-125/04, EU:C:2005:69).

76   This was an arbitration between a taxpayer and the Portuguese Republic concerning a tax matter.

77   This was an arbitration involving pharmaceutical patents, international in the sense that it was initiated by a Canadian company against two Portuguese companies, an English company, a Greek company and a Netherlands company.

89. I shall therefore examine the characteristics of the arbitral tribunals constituted in accordance with Article 8 of the BIT in the light of the criteria set out in point 86 of this Opinion. In my view, all of those criteria are satisfied in this case.[78]

### 1. Whether the arbitral tribunals constituted in accordance with Article 8 of the BIT are established by law

90. Most of the arbitration cases which have been referred to the Court concerned only a particular type of arbitration, namely what is known in the Court's case-law as 'contractual' arbitration, since its legal basis is an arbitration clause in a contract governed by private law.[79]

91. There are other types of arbitration. Apart from the arbitration provided for in Article 272 TFEU, there is arbitration between States on the basis of an international convention[80] or arbitration between private individuals and States, both of these types of arbitration being very different, in terms of whether they are established by law, from arbitration between individuals.

92. In the latter case, the arbitral tribunal derives its jurisdiction not from a law but from an arbitration clause in a contract.

93. That was the case, in particular, of the arbitration that gave rise to the judgment of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107), which concerned a 'pool' contract concluded between a number of private undertakings who agreed, in the context of a joint project for the construction of 13 factory ships for fishing, to share among them all the financial aid which they received from the European Guidance and Guarantee Fund (EAGGF). The arbitral tribunal seised in accordance with that contract had expressed doubts as to the compatibility of the contract with EU law and had requested the Court to give a preliminary ruling on the matter.

94. The Court considered that it had 'no jurisdiction',[81] being of the view that that arbitral tribunal was not a court or tribunal of one of the Member States for the purposes of Article 267 TFEU, for two reasons. In the first place, 'the parties were under no obligation, whether in law or in fact, to refer their disputes to arbitration',[82] since they had opted for that choice when they entered into the contract. In the second place, 'the German public authorities are not involved in the decision to opt for arbitration nor are they called upon to intervene automatically in the proceedings before the arbitrator'.[83]

---

78  See, to that effect, Basedow, J., 'EU Law in International Arbitration: Referrals to the European Court of Justice', 2015, vol. 32(4), *Journal of International Arbitration*, p. 367; Paschalidis, P., 'Arbitral tribunals and preliminary references to the EU Court of Justice', 2016, *Arbitration International*, p. 1; Szpunar, M., 'Referrals of Preliminary Questions by Arbitral Tribunals to the CJEU', published in Ferrari, F. (ed.), *The Impact of EU Law on International Commercial Arbitration*, JurisNet, 2017, pp. 85 to 123.

79  See, inter alia, the cases that gave rise to the judgments of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107); of 25 July 1991, *Rich* (C-190/89, EU:C:1991:319); of 1 June 1999, *Eco Swiss* (C-126/97, EU:C:1999:269); of 27 January 2005, *Denuit and Cordenier* (C-125/04, EU:C:2005:69); of 26 October 2006, *Mostaza Claro* (C-168/05, EU:C:2006:675); of 10 February 2009, *Allianz and Generali Assicurazioni Generali* (C-185/07, EU:C:2009:69); of 13 May 2015, *Gazprom* (C-536/13, EU:C:2015:316); and of 7 July 2016, *Genentech* (C-567/14, EU:C:2016:526).

80  It should be noted that a number of international agreements concluded between Member States provide that the President of the Court is empowered to appoint the arbitrators for disputes between Member States or between a public body and those Member States. See, to that effect, Article 27 of the Agreement between the Government of the French Republic and the Government of the Italian Republic on the construction and functioning of a new Lyon-Turin railway line, signed in Rome on 30 January 2012. In my view, those arbitral tribunals are also courts or tribunals of one of the Member States for the purposes of Article 267 TFEU.

81  To my mind the issue is not one of jurisdiction, but of admissibility.

82  See judgment of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107, paragraph 11). See also, to that effect, judgment of 27 January 2005, *Denuit and Cordenier* (C-125/04, EU:C:2005:69, paragraph 13).

83  See judgment of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107, paragraph 12). See also, to that effect, judgment of 27 January 2005, *Denuit and Cordenier* (C-125/04, EU:C:2005:69, paragraph 13).

95. The fact that the arbitration panel derived its jurisdiction from an arbitration clause in a contract between a consumer and a travel agency was sufficient, in the case that gave rise to the judgment of 27 January 2005, *Denuit and Cordenier* (C-125/04, EU:C:2005:69), to exclude that panel from the concept of 'court or tribunal' within the meaning of Article 267 TFEU, even though the arbitration clause was part of the general conditions imposed by the travel agency and was not negotiable by the consumer.

96. Conversely, it cannot be disputed that an arbitral tribunal constituted and seised in accordance with Article 8 of the BIT is established by law cannot be disputed. It derives its jurisdiction not only from an international treaty but also from the Netherlands and Czechoslovakian statutes ratifying the BIT by virtue of which the BIT became part of the legal orders of those Member States. Unlike in the case that gave rise to the judgment of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107), the involvement of the public authorities in the choice of arbitration and in the arbitral proceedings themselves (since, in this case, the Slovak Republic was the respondent) is obvious.

97. That assessment finds support in the judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754), and the order of 13 February 2014, *Merck Canada* (C-555/13, EU:C:2014:92).

98. The arbitral tribunal that requested the Court to give a preliminary ruling in the case that gave rise to the judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754) satisfied the 'established by law' criterion, since a Portuguese law prescribed arbitration as a means of judicial resolution of tax disputes and conferred general jurisdiction on arbitral tribunals dealing with taxation for assessing the legality of the payment of any tax.[84]

99. Likewise, the Court held that the arbitral tribunal in the case that gave rise to the order of 13 February 2014, *Merck Canada* (C-555/13, EU:C:2014:92) satisfied the 'established by law' criterion, since '[its] jurisdiction … [did] not stem from the will of the parties, but from [Portuguese] Law No 62/2011',[85] which established arbitration as the mechanism for settling disputes involving industrial property rights pertaining to generic and reference medicinal products.

### 2. Whether the arbitral tribunals constituted in accordance with Article 8 of the BIT are permanent

100. International arbitration may be institutional arbitration, in which the proceedings take place before and are administered by an arbitral institution[86] according to its Rules of Procedure and in return for payment, or an ad hoc arbitration in which the parties themselves administer the proceedings without the support of an arbitral institution.

101. It is apparent from paragraphs 25 and 26 of the judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754) and from paragraph 24 of the order of 13 February 2014, *Merck Canada* (C-555/13, EU:C:2014:92) that the 'permanence' criterion does not relate to the composition of the arbitral tribunal as such but to the institutionalisation of arbitration as a dispute settlement method. In other words, it is by reference to the arbitral institution which administers the arbitral proceedings, and not to the arbitral tribunal, the composition of which is ephemeral, that the 'permanence' criterion must be assessed.

---

84  See paragraph 24 of that judgment.
85  See paragraph 19 of that order.
86  See, for example, the PCA in The Hague (Netherlands), the ICSID in Washington DC (United States), the SCC in Sweden, the International Chamber of Commerce (ICC) in Paris (France) and the London Court of International Arbitration (LCIA) (United Kingdom).

102. In that sense, the Court held in paragraph 26 of the judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C‑377/13, EU:C:2014:1754) that 'even though the composition of the trial formations of the Tribunal Arbitral Tributário [(arbitration tribunal dealing with taxation, Portugal)] is ephemeral and their activity ends once they have made their ruling, the fact remains that, as a whole, the Tribunal Arbitral Tributário [(arbitration tribunal dealing with taxation)], as an element of the system referred to, is permanent in nature'. The system to which the Court is referring is the arbitral institution 'Centro de Arbitragem Administrativa' (CAAD) (Centre for Administrative Arbitration, Portugal).

103. Likewise, in paragraph 24 of the order 13 February 2014, *Merck Canada* (C‑555/13, EU:C:2014:92), the Court held that the criterion of permanence was satisfied because the arbitral tribunal 'was established on a legislative basis, … it [had] permanent compulsory jurisdiction and, in addition, … national legislation define[d] and frame[d] the applicable procedural rules', even though it might vary in form, composition and rules of procedure, according to the choice of the parties, and even though it was dissolved after making its decision.

104. In that case, it was clear that the arbitral tribunal was an ad hoc tribunal and that there was no arbitral institution that would ensure its permanence, but the Court inferred permanence from Article 2 of Portuguese Law No 62/2011, which established arbitration as the only means of settling disputes involving industrial property rights pertaining to generic and reference medicinal products.

105. The same conclusion may be drawn as regards the arbitral tribunals constituted and seised in accordance with Article 8 of the BIT, since, as in the cases that gave rise to the judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C‑377/13, EU:C:2014:1754) and the order of 13 February 2014, *Merck Canada* (C‑555/13, EU:C:2014:92), the Kingdom of the Netherlands and the Slovak Republic established arbitration as the means of settling disputes between one of them and an investor from the other State.

106. Other aspects of the institutionalisation of arbitration may also be identified in the BIT.

107. In fact, Article 8 of the BIT confers power to appoint arbitrators on the Stockholm Chamber of Commerce (SCC), which is a permanent arbitral institution, and Article 8(5) makes the UNCITRAL rules applicable to the arbitral proceedings.

108. In addition, the proceedings before the arbitral tribunal involved in the present case took place under the aegis of a permanent arbitral institution. The PCA, established in The Hague and created by the Conventions for the Pacific Settlement of International Disputes concluded at The Hague 1899 and 1907,[87] was designated as the institution acting as Registry by the terms of appointment signed by the PCA and the parties to the main proceedings.

109. Consequently, the 'permanence' criterion also seem to me to be satisfied.

---

87    All of the Member States of the Union are parties to these Conventions. As regards the present case, the Kingdom of the Netherlands has been a Member State of the PCA since it was founded, whereas the Slovak Republic became a Member State of the PCA in 1993.

### 3. Whether the jurisdiction of the arbitral tribunals constituted in accordance with Article 8 of the BIT is compulsory

110. According to a consistent line of decisions, '[the compulsory nature of the jurisdiction] is lacking in contractual arbitration, since the contracting parties are under no obligation, in law or in fact, to refer their disputes to arbitration and the public authorities of the Member State concerned are neither involved in the decision to opt for arbitration nor required to intervene of their own accord in the proceedings before the arbitrator'.[88]

111. It is clearly unsurprising that the Court held that the arbitral tribunals in the cases that gave rise to the judgment of 17 October 1989, *Handels- og Kontorfunktionærernes Forbund i Danmark* (109/88, EU:C:1989:383) and the order of 13 February 2014, *Merck Canada* (C-555/13, EU:C:2014:92) satisfied the 'compulsory jurisdiction' condition, since under Danish law and Portuguese law arbitration was compulsory.

112. In the case that gave rise to the judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754), however, the fact that recourse to arbitration was optional and that the taxpayer had opted for arbitration against the Portuguese Republic when he could have brought proceedings directly before the ordinary courts did not preclude the arbitral tribunal from the concept of a 'court or tribunal of a Member State' within the meaning of Article 267 TFEU.

113. In fact, according to the Court, '[its] decisions [were] binding on parties under Article 24(1) of Decree-Law No 10/2011 [and] its jurisdiction stem[med] directly from the provisions of Decree-Law No 10/2011 and [was] not, as a result, subject to the prior expression of the parties' will to submit their dispute to arbitration … Thus, where the taxpayer applicant submits its dispute to tax arbitration, the [arbitral tribunal] has … compulsory jurisdiction as regards taxation and customs matters'.[89]

114. The same applies to the arbitral tribunals constituted in accordance with Article 8 of the BIT.

115. Article 8(7) of the BIT provides that the decision of an arbitral tribunal constituted in accordance with Article 8 is to be 'final and *binding* upon the parties to the dispute'.[90] There is no doubt that the award made by such an arbitral tribunal is binding on the parties within the meaning of the Court's case-law.

116. In addition, Article 8(2) of the BIT provides that 'each Contracting Party hereby *consents* to submit a dispute [between an investor and the State] to an arbitral tribunal, if the dispute has not been settled amicably within a period of six months from the date either party to the dispute requested amicable settlement'.[91]

---

88   Judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754, paragraph 27). See also, to that effect, judgments of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107), and of 27 January 2005, *Denuit and Cordenier* (C-125/04, EU:C:2005:69, paragraph 13), and order of 13 February 2014, *Merck Canada* (C-555/13, EU:C:2014:92, paragraph 17).

89   Paragraph 29 of that judgment. See also, to that effect, judgment of 6 October 2015, *Consorci Sanitari del Maresme* (C-203/14, EU:C:2015:664, paragraph 23).

90   Emphasis added.

91   Emphasis added.

117. The fact that the investor may choose to bring proceedings, either before the courts of the Member State concerned or before the arbitral tribunal,[92] does not affect the compulsory nature of the jurisdiction of the arbitral tribunal, since that choice was also available to the taxpayer in the case that gave rise to the judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754).

118. As the Slovak Republic gave its prior consent to arbitration, as the Portuguese Republic had done in the case that gave rise to the judgment of 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754), the jurisdiction of the arbitral tribunal established is, in accordance with Article 8(2) of the BIT, binding on that Member State and on the investor.

119. Consequently, the arbitral tribunals constituted in accordance with Article 8 of the BIT also satisfy the 'compulsory jurisdiction' criterion.

### 4. Whether the procedure before the arbitral tribunals constituted in accordance with Article 8 of the BIT is inter partes, whether they apply rules of law in the settlement of the disputes before them and whether the arbitrators are independent and impartial

120. As to whether the procedure before the arbitral tribunals constituted in accordance with Article 8 of the BIT is *inter partes*, it should be noted that, according to Article 8(5), 'the arbitration tribunal shall determine its own procedure applying the arbitration rules of [UNCITRAL]'.[93]

121. Article 15(1) of those rules, in the 1976 version applicable at the time of conclusion of the BIT, stated that 'subject to these Rules, the arbitral tribunal may conduct the arbitration in such manner as it considers appropriate, provided that the parties are treated with equality and *that at any stage of the proceedings each party is given a full opportunity of presenting his case*.[94] That guarantee is reiterated in Article 17(1) of those rules in the 2010 and 2013 versions.

122. Respect for the *inter partes* principle is also ensured by a number of provisions of those rules which relate to the exchange of pleadings, an oral hearing and the closure of hearings, namely Articles 18 to 20, 22, 24, 25 and 29 of the 1976 rules and Articles 20 to 22, 24, 28 and 31 of the rules as amended in 2010 and 2013.

123. As regards the criterion that the arbitral tribunals must apply rules of law, Article 8(6) of the BIT provides that 'the arbitral tribunal shall decide on the basis of the law' and sets out a number of rules of law that the tribunal must take into account. The possibility of adjudicating *ex aequo et bono* is therefore precluded.

124. As regards, last, the 'independence and impartiality' criterion, it has consistently been held that 'the guarantees of independence require rules, particularly as regards the composition of the body and the appointment, length of service and grounds for abstention, rejection and dismissal of its members, in order to dismiss any reasonable doubt in the minds of individuals as to the imperviousness of that

---

92   This BIT does not contain a fork-in-the-road provision according to which when an investor chooses the forum (between the domestic courts of the State concerned or an international arbitral tribunal) his choice becomes irrevocable.

93   The arbitration rules are available on the UNCITRAL website at
     http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/2010Arbitration_rules.html.

94   Emphasis added.

body to external facts and its neutrality with respect to the interests before it … in order to consider that the condition regarding the independence of the body making the reference has been met, the case-law requires, inter alia, that dismissals of members of that body should be determined by express legislative provisions'.[95]

125. I note, first of all, that the Court has not questioned the independence and impartiality of the arbitrators in any of the cases before it and, next, that the UNCITRAL Arbitration Rules guarantee the independence and impartiality of the arbitrators by imposing a clear obligation on them to disclose any circumstances likely to give rise to justifiable doubts as to their impartiality or independence[96] and also by laying down a procedure for challenging arbitrators where such circumstances exist.[97]

126. In the light of the foregoing, the arbitral tribunals established by Article 8 of the BIT are 'courts or tribunals' within the meaning of Article 267 TFEU, but are they also courts or tribunals 'of one of the Member States' within the meaning of that provision?

127. In my view they are.

128. The question of the quality of an international jurisdiction established in the context of an international organisation created by an international treaty between Member States was examined with respect to the Benelux Court in the case that gave rise to the judgment of 4 November 1997, *Parfums Christian Dior* (C-337/95, EU:C:1997:517).

129. In that judgment, the Court held that 'there is no good reason why such a court, common to a number of Member States, should not be able to submit questions to this Court, in the same way as courts or tribunals of any of those Member States'.[98]

130. That is also the case of the arbitral tribunals constituted in accordance with Article 8 of the BIT, since they are established as a dispute settlement mechanism by the Kingdom of the Netherlands and the Slovak Republic.

131. For those reasons, I propose that the Court's answer to the second question should be that Article 267 TFEU must be interpreted as not precluding a provision such as Article 8 of the BIT which allows disputes between investors and States to be settled by an arbitral tribunal which must be regarded as 'a court or tribunal of one of the Member States' within the meaning of Article 267 TFEU.

## D. First question

132. By its first question, the referring court seeks to ascertain whether Article 344 TFEU must be interpreted as meaning that it precludes the application of provisions of intra-EU BITs, such as Article 8 of the Netherlands-Czechoslovakia BIT, which permit the settlement by an arbitral tribunal of disputes between investors and States.

---

95  Judgment of 9 October 2014, *TDC* (C-222/13, EU:C:2014:2265, paragraph 32 and the case-law cited). It should be made clear that, unlike judges, arbitrators do not hold permanent posts. In international arbitration law, there are thus no rules on the removal of arbitrators.

96  See Article 9 of the UNCITRAL Arbitration Rules (1976) and Article 11 of the UNCITRAL Arbitration Rules (as revised in 2010 and 2013).

97  See Articles 10 to 12 of the UNCITRAL Arbitration Rules (1976) and Articles 12 and 13 of the UNCITRAL Arbitration Rules (as revised in 2010 and 2013). See also the International Bar Association (IBA) Guidelines on Conflicts of Interest in International Arbitration (available on the IBA website at http://www.ibanet.org/Publications/publications_IBA_guides_and_free_materials.aspx), which set out the grounds of conflicts of interest that may result in arbitrators being challenged.

98  Paragraph 21. See also, to that effect, judgment of 14 June 2011, *Miles and Others* (C-196/09, EU:C:2011:388, paragraph 40).

133. It should be noted at the outset that if the Court decides, as I propose, that the arbitral tribunals constituted in accordance with Article 8 of the BIT are courts or tribunals of the Member States within the meaning of Article 267 TFEU, they then participate in the dialogue between courts referred to in paragraph 176 of Opinion 2/13 (Accession of the Union to the ECHR) of 18 December 2014 (EU:C:2014:2454) and are required to apply EU law. Consequently, recourse to international arbitration in the conditions prescribed in Article 8 of the Netherlands-Czechoslovakia BIT cannot undermine either Article 344 TFEU or the allocation of powers determined by the EU and FEU Treaties and, accordingly, the autonomy of the EU legal system.

134. In that case, the arbitral tribunals are required — and if they failed to do so their awards would be null and void on the ground that they would be contrary to public policy — to respect the principles set out by the Court in paragraphs 65 to 70 of Opinion 1/09 (Agreement on the creation of a unified patent litigation system) of 8 March 2011 (EU:C:2011:123) and in paragraphs 157 to 176 of Opinion 2/13 (Accession of the Union to the ECHR) of 18 December 2014 (EU:C:2014:2454), including, in particular, the primacy of EU law[99] over the laws of the Member States and over every international commitment given between Member States, the direct effect of a whole range of provisions applicable to their nationals and themselves, mutual trust between them in the recognition of common values on which the Union is based and the full application of and respect for EU law.

135. Furthermore, the non-application or the incorrect application of EU law by the arbitral tribunals created by the Member States would not only render the Member States concerned liable, in accordance with the judgment of 30 September 2003, *Köbler* (C-224/01, EU:C:2003:513) since it was those Member States that created them, but might, as the case may be, lead to a finding of failure to fulfil obligations on the part of the Member States concerned, in accordance with Articles 258 and 259 TFEU.[100]

136. If, however, the Court should find that the arbitral tribunals constituted in accordance with Article 8 of the BIT are not courts or tribunals of the Member States within the meaning of Article 267 TFEU, it would still be necessary to consider whether Article 344 TFEU precludes the application of Article 8 of the BIT and, if appropriate, whether the latter provision is incompatible with the allocation of powers fixed by the EU and FEU Treaties and the autonomy of the EU legal system.

137. In that context, three analyses must be carried out, the second being necessary only if the first is answered in the affirmative and the third being necessary only if the first or second question is answered in the negative:

–   Does a dispute between an investor and a Member State, such as that referred to in Article 8 of the BIT, come under Article 344 TFEU?

–   Does the subject matter of such a dispute allow it to be characterised as a dispute 'concerning the interpretation [and] the application of the Treaties' within the meaning of Article 344 TFEU?

–   Does the BIT, having regard to its purpose, have the effect of undermining the allocation of powers determined by the EU and FEU Treaties and, accordingly, the autonomy of the EU legal system?

---

99   A number of arbitral tribunals adjudicating on disputes between investors/EU nationals and Member States, including the arbitral tribunal involved in the present case, have already recognised the supremacy of EU law. See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award of 26 October 2010 on Jurisdiction, Arbitrability and Suspension, paragraph 289; *Electrabel S.A. v Hungary* (ICSID Case No ARB/07/19) Decision of 30 November 2012 on Jurisdiction, Applicable Law and Liability, paragraphs 4.189 to 4.191; *Charanne B.V. and Construction Investments S.à.r.l. v Kingdom of Spain* (SCC Case No 062/2012) Final Award of 21 January 2016, paragraphs 439 and 443, and *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v Kingdom of Spain* (ICSID Case No ARB/13/30) Decision of 6 June 2016 on Jurisdiction, paragraph 72 (the position would be different if investors were from a third State, see paragraphs 74 to 76).
100   See, to that effect, *Electrabel S.A. v Hungary* (ICSID Case No ARB/07/19) Decision of 30 November 2012 on Jurisdiction, Applicable Law and Liability, paragraphs 4.160 to 4.162.

### 1. Does a dispute between an investor and a Member State, such as that referred to in Article 8 of the BIT, come under Article 344 TFEU?

138. In my view, the answer must be in the negative, for the following reasons.

139. According to Article 344 TFEU, 'Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein'.

140. The Court has often had the opportunity to interpret Article 344 TFEU and to rule on the compatibility of international agreements with that article even in the case of international agreements concluded by the Union and its Member States with third States. [101]

141. According to a consistent line of decisions, 'an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is notably enshrined in Article 344 TFEU, according to which Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein'. [102]

142. According to the Court, Article 344 TFEU provides for 'the obligation devolving on Member States to have recourse to the [EU] judicial system and to respect the Court's exclusive jurisdiction, which is a fundamental feature of that system, [an obligation which] must be understood as a specific expression of Member States' more general duty of loyalty resulting from Article [4(3) TEU]'. [103]

143. It should be noted at the outset that the arbitral tribunal that made the award at issue in the main proceedings carried out a thorough examination of the arguments put forward by the Slovak Republic and the Commission in reliance on Article 344 TFEU. In that regard, it held on the basis of the judgment of 30 May 2006, *Commission* v *Ireland* (C‑459/03, EU:C:2006:345) that disputes between investors and States Parties to the BIT did not come under Article 344 TFEU. [104]

144. The Slovak Republic, supported by several Member States and the Commission, disputes that finding of the arbitral tribunal. In its contention, Article 344 TFEU must be given a broad interpretation which means that it is applicable to disputes between an individual and a Member State, especially in the light of its wording, which, unlike Article 273 TFEU, does not expressly limit its scope to disputes 'between Member States'.

145. I do not agree with that argument.

---

101 See Opinions 1/91 (EEA Agreement — I), of 14 December 1991 (EU:C:1991:490); 1/92 (EEA Agreement — II), of 10 April 1992 (EU:C:1992:189); 2/94 (Accession of the Community to the ECHR), of 28 March 1996 (EU:C:1996:140); 1/09 (Agreement on the creation of a unified patent litigation system), of 8 March 2011 (EU:C:2011:123); and 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454). See also judgment of 30 May 2006, *Commission* v *Ireland* (C‑459/03, EU:C:2006:345).

102 Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 201). See also, to that effect, Opinion 1/91 (EEA Agreement — I), of 14 December 1991 (EU:C:1991:490, paragraph 35), and judgments of 30 May 2006, *Commission* v *Ireland* (C‑459/03, EU:C:2006:345, paragraph 123) and of 3 September 2008, *Kadi and Al Barakaat International Foundation* v *Council and Commission* (C‑402/05 P and C‑415/05 P, EU:C:2008:461, paragraph 282).

103 Judgment of 30 May 2006, *Commission* v *Ireland* (C‑459/03, EU:C:2006:345, paragraph 169).

104 See *Achmea B.V. (formerly known as Eureko B.V.)* v *Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 276. See also, to that effect, *European American Investment Bank AG* v *Slovak Republic* (UNCITRAL) (PCA Case No 2010-17) Award on Jurisdiction of 22 October 2012, paragraphs 248 to 267; *Electrabel S.A.* v *Hungary* (ICSID Case No ARB/07/19) Award on Jurisdiction, Applicable Law and Liability of 30 November 2012, paragraphs 4.150 to 4.152; *Charanne B.V. and Construction Investments S.à.r.l.* v *Kingdom of Spain* (SCC Case No 062/2012) Final Award of 21 January 2016, paragraphs 441 to 445; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l.* v *Kingdom of Spain* (ICSID Case No ARB/13/30) Decision on Jurisdiction of 6 June 2016, paragraph 80; and *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l.* v *Kingdom of Spain* (ICSID Case No ARB/13/36) Award of 4 May 2017, paragraph 204.

146. It is clear from the Court's case-law that disputes between Member States[105] and between Member States and the Union[106] come under Article 344 TFEU. On the other hand, disputes between individuals do not, even if the court called upon to settle them is led to take EU law into account or to apply it.

147. As the Court held with respect to the draft Agreement on the European and Community Patents Court, 'nor can the creation of the [European and Community Patents Court] be in conflict with Article 344 TFEU, given that that article merely prohibits *Member States* from submitting a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties. The jurisdiction which the draft agreement intends to grant to the [European and Community Patents Court] relates only to disputes between individuals in the field of patents'.[107]

148. As regards disputes between individuals and Member States, the Commission observes that the judicial system referred to in Opinion 1/91 (EEA Agreement — I), of 14 December 1991 (EU:C:1991:490), also included actions brought by private persons against the European Free Trade Association (EFTA) Surveillance Authority in the field of competition.[108]

149. However, those actions would not have been brought against a Member State and, in any event, there is no suggestion in any passage in the Opinion of the Court that it found that that particular aspect of the proposed Agreement on the European Economic Area (EEA) was problematic.

150. It should further be emphasised that the Union was to become a party to the agreement referred to in that Opinion and that, consequently, that agreement was to form part of EU law, which is clearly not the case of the BIT in question. Furthermore, as is clear from paragraphs 13 to 29 of that Opinion, the Court was concerned by the existence of a systemic risk created by Article 6 of the draft agreement for homogeneity in the interpretation and application of the law in the EEA[109] and not by the fact that actions brought in the field of competition by individuals against the EFTA Surveillance Authority would have been within the jurisdiction of a court outside the judicial architecture of the European Union.

151. Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454), is of particular importance in that respect, since even though Article 6(2) TEU provides for the accession of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms, signed in Rome on 4 November 1950 ('the ECHR') that accession would be incompatible with Article 344 TFEU if disputes between individuals and the Member States, which are the most typical disputes brought before the European Court of Human Rights, came under that provision.

---

105  See judgment of 30 May 2006, *Commission* v *Ireland* (C-459/03, EU:C:2006:345, paragraph 128).

106  See Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraphs 202 and 205).

107  Opinion 1/09 (Agreement on the creation of a unified patent litigation system), of 8 March 2011 (EU:C:2011:123). Emphasis added.

108  See paragraph 6 of that Opinion.

109  Article 6 of the draft agreement provided that, for the purposes of their implementation and application, the provisions of the agreement should be interpreted in accordance with the case-law of the Court of Justice *prior* to the date of signature of the agreement and relating to the corresponding provisions of the EEC Treaty, the ECSC Treaty and secondary acts, which of course gave rise to a risk of divergences between the case-law of the Court and that of the EEA Court. See Opinion 1/91 (EEA Agreement — I), of 14 December 1991 (EU:C:1991:490, paragraphs 6 and 25 to 29).

152. It was for that reason that, in paragraphs 201 to 214 of that Opinion, the Court examined, from the aspect of Article 344 TFEU, only disputes between Member States and disputes between Member States and the Union,[110] although it was aware that, by acceding to the ECHR, the Union would be bound by the first sentence of Article 34 of the ECHR, which provides that the European Court of Human Rights 'may receive an application from any person, nongovernmental organisation or group of individuals claiming to be the victim of a violation by one of the [Contracting Parties] of the rights set forth in the Convention or the Protocols thereto'.[111]

153. For those reasons, I believe that a dispute between an investor and a Member State, such as that referred to in Article 8 of the BIT, does not come under Article 344 TFEU.

154. That conclusion cannot be affected by the Commission's argument that disputes between investors and Member States are actually disputes between Member States, since by initiating an arbitration procedure against a Member State on the basis of a provision such as Article 8 of the Netherlands-Czechoslovakia BIT, the investor is not exercising a right of his own but a right which that BIT confers on his State of origin.

155. The Commission relies in that respect on two arbitral awards cited in paragraph 81 of its written observations.[112] However, its argument is contradicted by the same arbitral case-law[113] and, in any event, is by no means universally approved.[114]

156. In fact, it is firmly established in international law that the provisions of an international treaty may, on certain conditions, confer rights on individuals.[115] In that sense, a number of arbitral bodies[116] and national courts[117] have held that BITs confer rights directly on investors.[118]

157. That certainly applies to Article 3 of the BIT, which the arbitral tribunal found in the arbitral award at issue in the main proceedings to have been breached, since it expressly mentions investors of the Contracting Parties as being entitled to fair and equitable treatment and to most favoured nation treatment.

---

110  See, in particular, paragraphs 204, 205, 207 and 212.

111  See Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraphs 17 and 18).

112  See *Loewen Group & Raymond L. Loewen v United States of America* (ICSID Case No ARB(AF)/98/3) Award of 26 June 2003, paragraph 233, and *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas Inc. v United Mexican States* (ICSID Case No ARB(AF)/04/05) Award of 21 November 2007, paragraph 178.

113  See *Loewen Group & Raymond L. Loewen v United States of America* (ICSID Case No ARB(AF)/98/3) Award of 26 June 2003, paragraph 223, where the arbitral tribunal recognises that Chapter 11 of the North American Free Trade Agreement (NAFTA) represents a progressive development in international law whereby the individual investor may *make a claim on its own behalf* and *submit the claim* to international arbitration.

114  See Douglas, Z., *The International Law of Investment Claims*, Cambridge University Press, 2009, pp. 17 to 38.

115  Apart from the example of the FEU Treaty and the ECHR, I would mention the Vienna Convention on Consular Relations of 24 April 1963. See, to that effect, judgment of 27 June 2001, the LaGrand case (*Germany v. United States of America*), ICJ, Reports 2001, p. 466, paragraph 78.

116  See, to that effect, *American Manufacturing & Trading Inc. v Republic of Zaïre* (ICSID Case No ARB/93/1) Award of 21 February 1997, paragraph 6.06; *CMS Gas Transmission Company v Republic of Argentina* (ICSID Case No ARB/01/8) Decision of the Tribunal on Objections to Jurisdiction of 17 July 2003, paragraph 45; *Corn Products International, Inc. v United Mexican States* (ICSID Case No ARB(AF)/04/01) Award 15 January 2008, paragraphs 174 to 176; *Cargill Inc. v United Mexican States* (ICSID Case No ARB(AF)05/2) Award of 18 September 2009, paragraphs 424 to 426; and *European American Investment Bank AG v Slovak Republic* (UNCITRAL) (PCA Case No 2010-17) Award on Jurisdiction of 22 October 2012, paragraph 445. See also, to that effect, Burdeau, G., 'Nouvelles perspectives pour l'arbitrage dans le contentieux économique intéressant l'Etat', 1995, *Revue de l'arbitrage*, pp. 3 to 12; Paulsson, J., 'Arbitration Without Privity', 1995, vol. 10, *ICSID Review* — Foreign Investment Law Journal, pp. 232 to 256; Wälde, T., 'Investment Arbitration under the Energy Charter Treaty', 1996, *Arbitration International*, p. 429 and pp. 435 to 437; and Douglas, Z., *The International Law of Investment Claims*, Cambridge University Press, 2009, pp. 32 to 38.

117  See *Occidental Exploration & Production Company v Republic of Ecuador* [2005] EWCA Civ 1116, [2006] QB 432, paragraph 22, where the Court of Appeal (England & Wales) (United Kingdom) describes paragraph 233 of the Award of 26 June 2003 in the arbitration proceedings in *Loewen Group & Raymond L. Loewen v United States of America* (ICSID Case No ARB(AF)/98/3) as 'controversial', adding that it does not agree that that award should be interpreted as meaning that BITs do not confer rights on investors, but only on their State of origin.

118  Indeed, BITs systematically contain arbitration agreements for disputes between the Contracting States (see in this instance Article 10 of the Netherlands-Czechoslovakia BIT). However, to my knowledge no such arbitration has ever taken place since the signature of the first BIT in 1959. That is certainly the case of BITs between Member States.

158. Furthermore, the law applicable to the disputes referred to in Article 8(6) of the BIT[119] is different from the law applicable to disputes between the two States Parties to the BIT, in accordance with Article 10(7) of the BIT.[120]

159. I conclude from the foregoing that a dispute between an investor and a Member State, such as that referred to in Article 8 of the BIT, does not come under Article 344 TFEU, which means that there is no need to ask whether such a dispute 'concern[s] the interpretation or application of the [EU and FEU] Treaties'. In case the Court does not agree with my conclusion on the first point, I shall also analyse that question.

### 2. Does the dispute at issue '[concern] the interpretation or application of the Treaties'?

160. Referring to paragraphs 140, 149 and 151 to 153 of the judgment of 30 May 2006, *Commission* v *Ireland* (C‑459/03, EU:C:2006:345), the referring court considers that the infringement of Article 344 TFEU can be made out only if the objective of the arbitral award at issue is the interpretation and application of the provisions of EU law themselves, which in its view is not the case of the arbitral award at issue in the main proceedings.

161. The Slovak Republic, supported by several Member States, and the Commission disputes the referring court's assessment. It contends that Article 344 TFEU is applicable to a dispute such as the one between Achmea and the Slovak Republic, in that the dispute does indeed concern the interpretation and application of the EU and FEU Treaties, including in the sense of the judgment of 30 May 2006, *Commission* v *Ireland* (C‑459/03, EU:C:2006:345).

162. I do not take that view.

163. Admittedly, in its judgment of 30 May 2006, *Commission* v *Ireland* (C‑459/03, EU:C:2006:345) and in Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454), the Court held that disputes concerned the interpretation and application of the EU and FEU Treaties even if they related to international treaties (namely the United Nations Convention on the Law of the Sea, concluded at Montego Bay on 10 December 1982, and the ECHR, respectively).

164. However, that was the case only because the Union was a party to the agreement in question (the United Nations Convention on the Law of the Sea), which was therefore part of EU law, or because it was envisaged that the Union would accede to the agreement in question (ECHR), which would therefore become part of EU law.

165. In fact, as the Court held in paragraphs 126 and 127 of the judgment of 30 May 2006, *Commission* v *Ireland* (C‑459/03, EU:C:2006:345):

'It has been established that the provisions of the [United Nations] Convention [on the Law of the Sea] in issue in the dispute concerning the MOX plant come within the scope of Community competence which the [EU] exercised by acceding to the Convention, with the result that those provisions form an integral part of the [EU] legal order.

---

119  According to that provision, 'the arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively: the law in force of the Contracting Party concerned; the provisions of this Agreement, and other relevant Agreements between the Contracting Parties; the provisions of special agreements relating to the investment; the general principles of international law'.

120
    'The tribunal shall decide on the basis of the present Agreement and other relevant Agreements between the two Contracting Parties, the general principles of international law, as well as such general rules of law as the tribunal deems applicable. The foregoing provisions shall not prejudice the power of the tribunal to decide the dispute ex aequo et bono if the Parties so agree.'

Consequently, the dispute in this case is indeed a dispute concerning the interpretation or application of the [TFEU] Treaty, within the terms of Article 344 [TFEU].'

166. Likewise, in Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454) the Court held that 'the ECHR would form an integral part of EU law. Consequently, where EU law is at issue, the Court of Justice has exclusive jurisdiction in any dispute between the Member States and between those Member States and the EU regarding compliance with the ECHR'. On that basis, the Court held that the Accession of the Union to the ECHR was liable to affect Article 344 TFEU. [121]

167. However, unlike the agreements at issue in the case that gave rise to the judgment of 30 May 2006, *Commission* v *Ireland* (C-459/03, EU:C:2006:345) and in Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454), the EU is not a party to the BIT, which is therefore not part of EU law, which is the criterion defined in those two decisions of the Court.

168. Consequently, the exclusive jurisdiction of the Court guaranteed by Article 344 TFEU is not affected.

169. That assertion is not affected by the Commission's argument that EU law is part of the law applicable to disputes between investors and the States Parties to the BIT and that in the present case Achmea had claimed that there had been an infringement of EU law in the arbitral proceedings.

170. In that regard, the arbitral tribunal involved in the present case held that 'far from being precluded from considering and applying EU law the Tribunal [wa]s bound to apply it to the extent that it [wa]s part of the applicable law(s), whether under BIT Article 8, German law or otherwise'. [122] It added that the Court had 'a monopoly on the final and authoritative interpretation of EU law'. [123]

171. I would add that an arbitral tribunal constituted in accordance with Article 8 of the BIT may also find it appropriate to apply EU law, in accordance with Article 3(5) of the BIT, which provides, inter alia, that if a Treaty established in future between the Parties [124] contained rules, whether general or specific, entitling investments by investors of the other Contracting Party to a treatment more favourable than that provided for by the BIT, such rules should to the extent that they were more favourable prevail over the BIT. [125]

172. In addition, the EU and FEU Treaties would in any event be part of the rules which the arbitral tribunal should take into account, even in the absence of a provision such as Article 8(6) of the BIT, because that obligation results by default from Article 31(3)(a) and (c) of the Vienna Convention. [126]

---

[121] See paragraphs 205 to 214 of the Opinion.

[122] *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 281. See also, to that effect, *Isolux Infrastructure Netherlands B.V.* v *Kingdom of Spain* (SCC Case V 2013/153) Award of 12 July 2016, paragraph 654.

[123] *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 282.

[124] As, for example, the EU and FEU Treaties.

[125] See, to that effect, concerning a similar provision (Article 16, paragraph 2 of the Energy Charter Treaty), *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l. v Kingdom of Spain* (ICSID Case No ARB/13/36) Award of 4 May 2017, paragraph 202.

[126] According to that provision, for the purposes of the interpretation of a Treaty, it is necessary to taken into account any subsequent agreement between the parties regarding the interpretation of the Treaty or the application of its provisions (in this instance the EU and FEU Treaties) and any relevant rules of international law applicable in the relations between the parties (in this instance EU law).

173. However, the fact that EU law is part of the law applicable to disputes between investors and States in accordance with Article 8(6) of the BIT does not mean that those disputes concern the interpretation and application of the EU and FEU Treaties, for two reasons: in the first place, the jurisdiction of the arbitral tribunal is confined to ruling on breaches of the BIT and, in the second place, the scope of that BIT and the legal rules which it introduces are not the same as those of the EU and FEU Treaties.

### (a) The jurisdiction of the arbitral tribunal is confined to ruling on breaches of the BIT

174. As the arbitral tribunal in the present case observed, 'its jurisdiction is confined to ruling upon alleged breaches of the BIT. The Tribunal does not have jurisdiction to rule on alleged breaches of EU law as such'.[127]

175. The tribunal's role is not to establish whether, by its conduct which is challenged by the investor, the Member State failed to fulfil its obligations under the EU and FEU Treaties or, more generally, EU law. On the contrary, its role is to establish breaches of the BIT by the host State of the investment, EU law being one of the relevant factors to be taken into account when the tribunal assesses the conduct of the State in the light of the BIT.[128]

176. It is in that sense that 'EU law may have a bearing upon the scope of rights and obligations under the BIT in the present case, by virtue of its role as part of the applicable law under BIT Article 8(6) and German law as the *lex loci arbitri*'.[129]

177. Nevertheless, EU law has no impact on the substance of the dispute between Achmea and the Slovak Republic. There is no indication in the two arbitral awards made in the main proceedings that Achmea relied before the arbitral tribunal on acts of EU law with a view to their interpretation and application in the context of proceedings in which it sought to establish that there had been a breach of the provisions of those acts by the Slovak Republic.[130] On the contrary, Achmea claims that the legislative measures adopted by the Slovak Republic in the sickness insurance sector,[131] which do not have their origin or their basis in EU law, breached Articles 3 to 5 of the BIT.

178. Furthermore, as the arbitral tribunal held, neither Achmea nor the Slovak Republic relied on provisions of EU law that might have had an impact on the reasoning or the decision of the tribunal on the substance of their dispute. Its award could not therefore have any impact on questions of EU law.[132]

---

127 *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 290. See also, to that effect, *Isolux Infrastructure Netherlands B.V. v Kingdom of Spain* (SCC Case V 2013/153) Award of 12 July 2016, paragraph 651.

128 See, for example, *Emilio Agustín Maffezini v Kingdom of Spain* (ICSID Case No ARB/97/7) Award of 13 November 2000, paragraphs 65 to 71, where an investor claimed that the Kingdom of Spain had failed to fulfil its obligation to ensure that his investment was given fair and equitable treatment. He maintained that his investment had incurred additional costs in the form of an environmental impact assessment. The arbitral tribunal observed that the obligation to carry out such an assessment arose under EU law and that the Kingdom of Spain had merely ensured that that obligation was fulfilled. It therefore dismissed the investor's claim in that respect.

129 *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 279. In any event, I cannot see why arbitral tribunals should be prohibited from taking EU law into account, given that such a prohibition would preclude them, as the case may be, from interpreting the BIT in conformity with EU law in order to avoid conflicts with the latter.

130 On the other hand, as is clear from paragraph 151 of the judgment of 30 May 2006, *Commission* v *Ireland* (C-459/03, EU:C:2006:345), 'Ireland [had] submitted instruments of Community law to the Arbitral Tribunal for purposes of their interpretation and application in the context of proceedings seeking a declaration that the United Kingdom had breached the provisions of those instruments'.

131 See point 24 of this Opinion.

132 See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Final Award of 7 December 2012, paragraphs 275 and 276.

### (b) The scope of the BIT and the legal rules which it introduces are not the same as those EU and FEU Treaties

179. The Commission's argument, as expressed in its written observations[133] and at the hearing, is based on the premiss that EU law offers investors, in particular through fundamental freedoms and the Charter of Fundamental Rights of the European Union ('the Charter'), full protection in the field of investments.

180. I do not know what the Commission means by 'full protection', but a comparison between the BIT and the EU and FEU Treaties shows that the protection afforded to investments by those Treaties is still a long way from being 'full'. In my view, intra-EU BITS, and more particularly the BIT at issue in the main proceedings, establish rights and obligations which neither reproduce nor contradict the guarantees of the protection of cross-border investments afforded by EU law.[134]

181. The BIT at issue in the main proceedings may be analysed from three aspects. In the first place, its scope is wider than that of the EU and FEU Treaties (1). In the second place, some of the legal rules introduced by the BIT have no equivalent in EU law (2). In the third place, some of its rules overlap in part with EU law without achieving results that are incompatible with the EU and FEU Treaties (3).

182. Before carrying out that analysis, I shall identify the main legal rules contained in the BIT:

– the principle of legality of investment[135] (Article 2);

– fair and equitable treatment (Article 3(1));

– full security and protection (Article 3(2));

– the MFN clause (Articles 3(2) and (3));

– the clause whereby the Parties undertake to observe their contractual obligations vis-à-vis the investors of the other Party, known as the 'umbrella clause'[136] (Article 3(4));

– free transfer of payments (Article 4);

   – prohibition of illegal expropriations (Article 5);

---

[133] See paragraphs 13, 18, 57, 101 and 130 of its written observations.

[134] See also, to that effect, *Eastern Sugar B.V. v Czech Republic* (UNCITRAL) (SCC Case No 088/2004) Partial Award of 27 March 2007, paragraphs 159 to 172; *Rupert Joseph Binder v Czech Republic* (UNCITRAL) Award on Jurisdiction of 6 June 2007, paragraph 63; *Jan Oostergetel & Theodora Laurentius v Slovak Republic* (UNCITRAL) Decision on Jurisdiction of 30 April 2010, paragraphs 74 to 79; *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraphs 245 to 267; *European American Investment Bank AG v Slovak Republic* (UNCITRAL) (PCA Case No 2010-17) Award on Jurisdiction of 22 October 2012, paragraphs 178 to 185; *WNC Factoring Ltd v Czech Republic* (UNCITRAL) (PCA Case No 2014-34) Award of 22 February 2017, paragraphs 298 to 308; *Anglia Auto Accessories Limited v Czech Republic* (SCC Case V 2014/181) Final Award of 10 March 2017, paragraphs 115 and 116; and *I.P. Busta and J.P. Busta v Czech Republic* (SCC Case V 2015/014) Final Award of 10 March 2017, paragraphs 115 and 116.

[135] According to this principle, an investor can enjoy the protection of the BIT only for an investment that complied with the law of the host State at the time when it was made. See, inter alia, *Salini Costruttori S.p.A. and Italstrade S.p.A. v Kingdom of Morocco* (ICSID Case No ARB/00/4) Decision on Jurisdiction of 31 July 2001, paragraph 46, and *Tokios Tokelés v Ukraine* (ICSID Case No ARB/02/18) Decision on Jurisdiction of 29 June 2004, paragraph 84.

[136] Breach of a contract between a State and a foreign investor does not constitute in itself a breach of international law. A clause whereby the host State of the investments has undertaken to observe its contractual obligations vis-à-vis the investors of the other State Party to the BIT therefore has the effect of incorporating the requirement to observe those obligations in the BIT. Consequently, where they consider that there has been a breach of those obligations, investors may benefit from the protection afforded by the BIT, including, in particular, the right to have recourse to international arbitration, which they would have been unable to do in the absence of that clause, as that right does not exist in international law.

– compensation in the event of war, armed conflict, a state of national emergency or other exceptional situations (Article 6);

– subrogation of the insurer to the rights of the investor where the investments are insured against non-commercial risks (Article 7);

– the ISDS mechanism (Article 8);

– the mechanism for the settlement of intra-State disputes (Article 10); and

– the 'sunset' clause [137] (Article 13(3)).

*(1) The scope of the BIT is wider than that of the EU and FEU Treaties*

183. In the absence of express limitation, BITs cover every act or omission of the State which has an impact on a foreign investor and his investment. In that sense, they apply to situations which do not come under the EU and FEU Treaties.

184. The best examples are the mechanism which guarantees the stability of the euro area, criminal law and direct taxation.

185. I thus refer to the arbitral proceedings launched on the basis of the intra-EU BITS, to which the Hellenic Republic and the Republic of Cyprus referred at the hearing, concerning measures which they have adopted in accordance with the conditionality terms defining their ability to provide financial assistance that were fixed in the memoranda of understanding and other instruments negotiated either in the context of the Treaty establishing the European Stability Mechanism (ESM) or the regime that preceded the ESM (namely the European Financial Stability Facility (EFSF)). Those measures come under either the ESM or the competence of the Member States, but not the EU and FEU Treaties, [138] and they cannot therefore be challenged by individuals on the basis of those Treaties on the ground that they are incompatible with EU law.

186. In that sense, the measures adopted by the Greek Government, known by the English title 'Private Sector Involvement' ('PSI') and consisting in essence in the unilateral and retroactive reduction in the value of Government bonds against the will of some bondholders, gave rise to the arbitral proceedings between a Slovak investor and a Cypriot investor, of the one part, and the Hellenic Republic, of the other part. [139] According to those investors, their 'forced' participation in the reduction in value of the bonds provided for in the PSI constituted an indirect expropriation and unjust and inequitable treatment, contrary to the Greece-Czechoslovakia and Greece-Cyprus Bits.

---

137 According to that clause, investments made during the lifetime of the BIT are to continue to benefit from the substantive protection afforded by the BIT, even if it is no longer in force, for an additional period which it lays down. That period begins on the date on which the BIT expires.

138 According to the case-law of the Court, although the specific measures imposed on Member States and defining the conditions applicable to the financial assistance which they had requested in the context of the ESM Treaty must respect EU law, they do not come under EU law. See to that effect judgments of 27 November 2012, *Pringle* (C-370/12, EU:C:2012:756, paragraphs 151, 164, 179 and 180) and of 20 September 2016, *Mallis and Others* v *Commission and ECB* (C-105/15 P to C-109/15 P, EU:C:2016:702, in particular paragraphs 59 and 61). In fact, the memorandum of understanding signed on behalf of the European Stability Mechanism (ESM) by the Commission and the European Central Bank (ECB) is an act of the ESM and as such is not amenable to review by the Courts of the EU. However, the finding that those measures do not come under EU law is not affected by the possibility of claiming damages from the Union in so far as the Commission and the ECB signed that memorandum of understanding, which might constitute a serious infringement of EU law on their part that has caused harm. See, to that effect, judgment of 20 September 2016, *Ledra Advertising and Others* v *Commission and ECB* (C-8/15 P to C-10/15 P, EU:C:2016:701, paragraphs 52 to 55).

139 See *Poštová banka, a.s. and Istrokapital SE v Hellenic Republic* (ICSID Case No ARB/13/8) Award of 9 April 2015, paragraphs 60 to 76.

187. The PSI had been negotiated between the Greek Government and the 'troika' (the Commission, the ECB and the International Monetary Fund (IMF)) and then approved by the Eurogroup.[140] As the Court held, the participation of the Commission and the ECB in the Troika takes place outside the EU and FEU Treaties and the Eurogroup is not a body or office of the Union.[141] There is no such restriction on BITs. They apply to any action taken by the State.

188. The same applies to capital control measures imposed by the Republic de Cyprus during the banking crisis, which form the subject matter of the arbitral proceedings *Theodoros Adamakopoulos and Others v Republic of Cyprus* (ICSID Case No ARB/15/49). At the hearing, the Cypriot Government acknowledged having itself adopted those measures on the basis of Article 65(1) TFEU, which allows — and therefore does not require — Member States to introduce restrictions on the free movement of capital.

189. As the President of the ECB observed, although those measures may be tolerated as a restriction on the free movement of capital by Article 65(1) TFEU, the fact nonetheless remains that they are '*unilateral and sovereign* [national] measures … taken by the Cypriot Parliament, the Cypriot Government and/or the Central Bank of Cyprus'.[142] Although the Member States must exercise their powers in a manner that does not infringe EU law, the BIT may offer helpful protection to investors where the measures coming within the exclusive jurisdiction of the Member States cause them damage without infringing EU law.

190. At the same time, the measures for the stabilisation of the Cypriot banking sector agreed within the framework of the ESM and approved by the Eurogroup entailed breaking up the Laiki Bank, splitting it into a bad bank and a good bank and integrating the good bank into the Trapeza Kyprou Bank.[143] The Laiki Bank was also subject to the measures adopted by the Cypriot Government which, according to its shareholder Marfin Investment Group, entailed increasing the Republic of Cyprus's shareholding in the capital of the Laiki Bank, to its detriment. Criminal proceedings were commenced against officers of the Laiki Bank appointed by Marfin Investment Group and goods belonging to Marfin Investment Group and to its officers were provisionally seized. Taking the view that the measures constituted an indirect expropriation of its investment in the Laiki Bank and arbitrary and discriminatory treatment contrary to the Greece-Cyprus BIT, Marfin Investment Group brought arbitration proceedings against the Republic of Cyprus.[144]

191. It is clear that the dispute at issue in that arbitration does not come within the scope of the EU and FEU Treaties either, both in its criminal part and in its stabilisation part. At the hearing, the Cypriot Government took issue with the arbitral tribunal for having ordered it 'not to issue and not to enforce certain European arrest warrants' against certain Greek nationals, even though the purpose of those warrants was to enable those individuals to participate as witnesses at the hearings before the arbitral tribunal.

---

140  See Eurogroup press release of 21 February 2012.

141  See judgments of 20 September 2016, *Ledra Advertising and Others* v *Commission and ECB* (C-8/15 P to C-10/15 P, EU:C:2016:701, paragraph 52) and of 20 September 2016, *Mallis and Others* v *Commission and ECB* (C-105/15 P to C-109/15 P, EU:C:2016:702, paragraphs 52 to 61).

142  See letter 13 July 2015 from Mr Mario Draghi, President of the ECB, to Mr Sven Giegold, a Member of the European Parliament, available on the ECB's website at https://www.ecb.europa.eu/pub/pdf/other/150714letter_giegold.en.pdf?1a6b3fcf462edc2c155fec04e0f9d475. Emphasis added.

143  These measures do not come under EU law. See judgment of 20 September 2016, *Mallis and Others* v *Commission and ECB* (C-105/15 P to C-109/15 P, EU:C:2016:702).

144  See pending arbitral proceedings in *Marfin Investment Group Holdings S.A., Alexandros Bakatselos and Others v Republic of Cyprus* (ICSID Case No ARB/13/27). See also Press Release of the Legal Service of the Republic of Cyprus, available on the website of its Press and Information Office (http://www.pio.gov.cy/moi/pio/pio2013.nsf/All/4D30C42F4FB53EB7C225802E00436251?OpenDocument&L=G).

192. However, as is apparent from the press release issued by the Legal Service of the Republic of Cyprus, the decision whether or not to issue such arrest warrants comes within the exclusive jurisdiction of the Member States. I therefore fail to see how the decision of the arbitral tribunal would have prevented the Republic of Cyprus from discharging its obligations under the Council Framework Decision 2002/584/JHA of 13 June 2002 on the European arrest warrant and the surrender procedures between Member States,[145] which is aimed in essence at the enforcement in other Member States of the warrants issued by a Member State (in this instance the Republic of Cyprus) and the procedures for surrendering the persons concerned. As for the stay of enforcement of the warrants, that framework decision contains no provisions relating to the enforcement of warrants in the country in which they were issued. In that sense, that question also comes within the exclusive jurisdiction of the Member States. In any event, it is apparent that, at the request of the Attorney General of Cyprus, the arbitral tribunal in question withdrew its decision, thus requiring the Greek nationals concerned to appear before the Cypriot courts, which was the purpose of the European arrest warrants concerned.[146]

193. As regards the field of direct taxation, the BIT is fully applicable. That is not the case of the EU and FEU Treaties, since direct taxation comes within the competence of the Member States, even though when exercising that competence they must comply with EU law.[147] The protection afforded by fundamental freedoms in direct tax matters[148] only includes the prohibition of different treatment of taxpayers in objectively comparable situations or the same treatment of taxpayers in different situations.[149]

194. At the hearing, the Commission referred to the judgment of 5 February 2014, *Hervis Sport- és Divatkereskedelmi* (C-385/12, EU:C:2014:47), although that judgment shows that, contrary to the Commission's argument, EU law does not afford 'comprehensive' protection in investment matters.[150] In fact, it is clear from paragraphs 23 and 30 of that judgment that EU law affords protection only against discrimination in the field to which that judgment relates, namely direct taxation.

195. Furthermore, in accordance with Article 51(1) of the Charter, its provisions are to apply to Member States only when they are implementing EU law. As the Court has held, in so far as the direct taxation measures at issue do not fall within the provisions of the FEU Treaty or the directives relating to taxation, the provisions of the Charter do not apply to them.[151]

---

145 OJ 2002 L 190, p. 1. The Framework Decision defines the offences in respect of which a European arrest warrant may be issued, but it does not mention the other conditions of criminal law that must be complied with in such a procedure, which fall exclusively within the competence of the Member State issuing the arrest warrant.

146 See press article 'Bouloutas and Foros have appeared before the courts' on the website of the newspaper Politis at https://politis.com.cy/article/parousiastikan-sto-dikastirio-mpouloutas-ke-foros.

147 See judgments of 14 February 1995, *Schumacker* (C-279/93, EU:C:1995:31, paragraph 21); of 12 December 2006, *Test Claimants in Class IV of the ACT Group Litigation* (C-374/04, EU:C:2006:773, paragraph 36); and of 10 May 2012, *Santander Asset Management SGIIC and Others* (C-338/11 to C-347/11, EU:C:2012:286, paragraph 14).

148 Except in the rare cases where the FEU Treaty so provides (Articles 110 to 112 TFEU) and where the Union has legislated. For example, I would refer to Directive 2003/49; Directive 2009/133/EC; Council Directive 2011/16/EU of 15 February 2011 on administrative cooperation in the field of taxation and repealing Directive 77/799/EEC (OJ 2011 L 64, p. 1); Council Directive 2011/96; and Council Directive 2015/2060/EU of 10 November 2015 repealing Directive 2003/48/EC on taxation of savings income in the form of interest payouts (OJ 2015 L 301, p. 1). See also, to that effect, Opinion of Advocate General Kokott in *C* (C-122/15, EU:C:2016:65, points 42 to 50). There is nothing to prevent the EU institutions or the Member States, according to the allocation of their powers in the areas concerned, from putting in place a single legal framework for the protection of investments on the entire territory of the Union that would replace BITs.

149 See, to that effect, judgments of 14 November 1995, *Svensson and Gustavsson* (C-484/93, EU:C:1995:379, paragraphs 12 to 19); of 1 April 2014, *Felixstowe Dock and Railway Company and Others* (C-80/12, EU:C:2014:200, paragraphs 20, 21 and 25); of 17 July 2014, *Nordea Bank Danmark* (C-48/13, EU:C:2014:2087, paragraphs 19 and 24); of 3 February 2015, *Commission v United Kingdom* (C-172/13, EU:C:2015:50, paragraphs 21 and 24); and of 24 November 2016, *SECIL* (C-464/14, EU:C:2016:896, paragraph 54).

150 In referring to that judgment, which concerns direct taxation, in order to demonstrate that there is 'comprehensive' protection in investment matters in EU law, the Commission contradicts itself since at the same time it puts forward the argument that the judgment of 5 July 2005, *D.* (C-376/03, EU:C:424), which also concerns the existence of discrimination prohibited by the FEU Treaty in matters of direct taxation, is not relevant to assessing whether Article 8 of the BIT is compatible with Article 18 TFEU because direct taxation falls within the competence of the Member States. See point 78 of this Opinion.

151 See judgment of 2 June 2016, *C* (C-122/15, EU:C:2016:391, paragraphs 28 and 29) and order of 15 April 2015, *Burzio* (C-497/14, EU:C:2015:251, paragraphs 26 to 33).

196. Conversely, the protection afforded to investors by BITs in the field of direct taxation is wider than in EU law in that it covers not only discriminatory tax treatment but also any taxation that would constitute a breach of the guarantees of fair and equitable treatment, MFN treatment, full protection and security and any indirect expropriation in the guise of taxation.[152]

197. For example, a minority shareholder in a company established in another Member State who is expropriated there[153] by means of direct taxation is not protected by the fundamental freedoms guaranteed by the FEU Treaty, since his shareholding does not give him control of the company targeted by the expropriation measures and for that reason is not covered by freedom of establishment. Furthermore, as the tax measures are addressed solely to the company, they would apply to a purely internal situation, which would render the provisions of the FEU Treaty on free movement of capital inapplicable. As the provisions of EU law would not be applicable, the Charter and Article 17 thereof would not apply either.

198. By contrast, as a minority shareholding is a direct investment for the purposes of the BIT, a minority shareholder could benefit in full from Article 5, which prohibits illegal expropriations.[154]

*(2) The legal rules of the BIT which have no equivalent in EU law and are not compatible with it*

199. A number of legal rules of the BIT have no equivalent in EU law. These are the MFN clause, the clause whereby the Parties undertake to observe their contractual obligations, the sunset clause and the ISDS mechanism.

*(i) The MFN clause*

200. Article 3(2) of the BIT establishes the principle that each Contracting Party is to accord to the investments of investors of the other Contracting Party full security and protection which in any case is not to be less than that accorded either to investments of its own investors or to investments of investors of any third State, whichever is more favourable to the investor concerned.

201. Although EU law recognises the principle of national treatment,[155] it does not contain an MFN clause that would allow the nationals of one Member State to benefit in another Member State from treatment which the latter State grants to nationals of a third Member State on the basis of a bilateral agreement.[156]

---

152 See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 251. Concerning expropriation, see, in particular, *Marvin Feldman v Mexican United States* (ICSID Case No ARB(AF)/99/1) Award of 16 December 2002, paragraphs 101 to 107; *EnCana Corporation v Republic of Ecuador* (UNCITRAL) Award of 3 February 2006, paragraphs 173 and 177; and *Occidental Petroleum Corporation and Occidental Exploration and Production Company v Republic of Ecuador* (ICSID Case No ARB/06/11) Award of 5 October 2012, paragraph 455.

153 For further details on the comparison of protection against illegal expropriations between that BIT and the EU and FEU Treaties, see points 217 to 226 of this Opinion.

154 See, to that effect, *Quasar de Valores SICAV S.A. and Others v Russian Federation* (SCC Case No 24/2007) Award of 20 July 2012 and *RosInvestCo UK Ltd v Russian Federation* (SCC Case No V 079/2005) Final Award of 12 September 2010, set aside by the Swedish courts on other grounds.

155 See, in particular, judgment of 21 September 1999, *Saint-Gobain ZN* (C-307/97, EU:C:1999:438, paragraph 59).

156 See points 66 to 72 of this Opinion.

*(ii) The clause whereby the Parties undertake to observe their contractual obligations vis-à-vis the investors of the other Party, the 'umbrella clause'*

202. The 'umbrella clause' contained in Article 3(5) of the BIT has the effect that a breach by the State of a contractual obligation which it has assumed vis-à-vis an investor becomes a breach of the BIT. There is no equivalent in EU law whereby a breach of a contractual obligation would become an infringement of the EU and FEU Treaties.

*(iii) The sunset clause*

203. Unlike Article 13(3) of the BIT, the EU and FEU Treaties do not contain a sunset clause. On the contrary, Article 50(3) TEU provides that 'the Treaties shall cease to apply to the State in question from the date of entry into force of the withdrawal agreement or, failing that, two years after the notification referred to in paragraph 2', unless that period is extended. Consequently, EU nationals will immediately cease to benefit from the protection which EU law affords to their economic activities in the Member State which decides to withdraw from the Union, even if their investments were made during the period when the Treaties were in force in that Member State, and vice versa.

*(iv) Recourse to international arbitration as an ISDS mechanism*

204. Article 8 of the BIT contains the 'standing offer' of the Kingdom of the Netherlands and the Slovak Republic to investors of the other Contracting Party to submit any dispute relating to their investment to international arbitration, in accordance with the UNCITRAL Arbitration Rules, the SCC Arbitration Institute acting as appointing authority.

205. According to the arbitral tribunal dealing with the arbitration at issue in the main proceedings, the right of recourse to international arbitration cannot be equated simply with recourse to the ordinary courts of the State,[157] bearing in mind that the EU and FEU Treaties (like the laws of the Member States) do not establish a remedy equivalent to the ISDS mechanism. Although under the second subparagraph of Article 19(1) TEU Member States are required to provide remedies sufficient to ensure effective legal protection in the fields covered by EU law, the EU and FEU Treaties do not create remedies that would allow individuals to take direct action against Member States before the Court.[158] In addition, the scope of the BIT is wider than that of the EU and FEU Treaties and the BIT therefore also applies where the obligations arising under the second subparagraph of Article 19(1) TEU do not apply.

[157] See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 264. See also, to that effect, *WNC Factoring Ltd v Czech Republic* (UNCITRAL) (PCA Case No 2014-34) Award of 22 February 2017, paragraph 300.
[158] See *Eastern Sugar B.V. v Czech Republic* (UNCITRAL) (SCC Case No 088/2004) Partial Award of 27 March 2007, paragraph 180; *Rupert Joseph Binder v Czech Republic* (UNCITRAL) Award on Jurisdiction of 6 June 2007, paragraph 40; *Jan Oostergetel & Theodora Laurentius v Slovak Republic* (UNCITRAL) Award on Jurisdiction of 30 April 2010, paragraph 77; *WNC Factoring Ltd v Czech Republic* (UNCITRAL) (PCA Case No 2014-34) Award of 22 February 2017, paragraph 299; *Anglia Auto Accessories Limited v Czech Republic* (SCC Case V 2014/181) Final Award of 10 March 2017, paragraph 116; and *I.P. Busta and J.P. Busta v Czech Republic* (SCC Case V 2015/014) Final Award of 10 March 2017, paragraph 116.

206. Furthermore, the arbitral tribunals are the most appropriate fora for the settlement of disputes between investors and States on the basis of the BIT, since the national courts often impose conditions on investors that subject reliance on international law to conditions which in reality are impossible to meet,[159] and time limits which are difficult to reconcile with the timely treatment of cases and the amounts at stake.

207. Consequently, if it did not provide for recourse to international arbitration as the ISDS mechanism, the entire BIT would be devoid of all practical effect. In that regard, the Member States intervening in these proceedings, and the Commission, have not provided a single example of an investor who brought proceedings before the national courts on the basis of the old BITS, which like the Germany-Greece and the Germany-Portugal BITs contain no ISDS mechanisms.

208. It is therefore hardly surprising that the right of investors to have recourse to international arbitration has been recognised in international law on investments as the most essential provision of the BITs, since, beyond its procedural content, it is also in itself a guarantee that encourages and protects investments.[160]

209. The Court confirmed that assessment when it held in paragraph 292 of Opinion 2/15 (Free Trade Agreement with Singapore), of 16 May 2017 (EU:C:2017:376) that the ISDS mechanisms 'cannot be of a purely ancillary nature'.

*(3) The overlap between the other provisions of the BIT and certain provisions of the EU and FEU Treaties is only partial*

210. As regards the other rules providing material protection of investments, namely full protection and security, fair and equitable treatment of investments and the prohibition of illegal expropriations, it should be emphasised that any overlap with EU law is only partial and does not render them incompatible with EU law. On the contrary, like the fundamental freedoms, those rules also encourage the movement of capital between Member States. They are a priori compatible with the internal market.

---

159  See, in particular, Conseil d'État (France), judgment of 21 December 2007, No 280264, where it was held that the stipulations of Article 3 of the Agreement between the Government of the French Republic and the Government of the Democratic and Popular Algerian Republic on the reciprocal encouragement and protection of investments, signed at Algiers on 13 February 1993, create obligations only between the two Signatory States and that private individuals could therefore not rely on them. A parallel may be drawn with the review of the validity of acts of the European Union in the light of international law. See, to that effect, judgment of 21 December 2011, *Air Transport Association of America and Others* (C-366/10, EU:C:2011:864).

160  See *Emilio Agustín Maffezini v Kingdom of Spain* (ICSID Case No ARB/97/7) Decision of the Tribunal on Objections to Jurisdiction of 25 January 2000, paragraphs 54 and 55; *Gas Natural SDG S.A. v Argentine Republic* (ICSID Case No ARB/03/10) Decision of the Tribunal on Preliminary Questions on Jurisdiction of 17 June 2005, paragraph 31; *Suez, Sociedad General de Aguas de Barcelona S.A. and InterAguas Servicios Integrales del Agua S.A. v Argentine Republic* (ICSID Case No ARB/03/17) Decision on Jurisdiction of 16 May 2006, paragraph 60; *Eastern Sugar B.V. v Czech Republic* (UNCITRAL) (SCC Case No 088/2004) Partial Award of 27 March 2007, paragraphs 165 and 166; *Rupert Joseph Binder v Czech Republic* (UNCITRAL) Award on Jurisdiction of 6 June 2007, paragraph 65; *Jan Oostergetel & Theodora Laurentius v Slovak Republic* (UNCITRAL) Award on Jurisdiction of 30 April 2010, paragraphs 77 and 78; *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 264; *WNC Factoring Ltd v Czech Republic* (UNCITRAL) (PCA Case No 2014-34) Award of 22 February 2017, paragraph 300; *Anglia Auto Accessories Limited v Czech Republic* (SCC Case V 2014/181) Final Award of 10 March 2017, paragraph 116; and *I.P. Busta and J.P. Busta v Czech Republic* (SCC Case V 2015/014) Final Award of 10 March 2017, paragraph 116.

### (i) The full protection and security of investments

211. This rule places the State under a positive obligation to take measures to protect investments, which includes the physical protection of the investor and his investment against violent acts on the part of individuals[161] or bodies of the State[162] and the legal protection[163] of the investor and his investment.[164]

212. There is no directly equivalent rule in EU law.[165] Admittedly, the fundamental freedoms may be applicable in the same factual contexts as the guarantee of full protection and security, since they have direct vertical and horizontal effect.[166] However, the contents are different, whether in relation to the physical protection of the investor or the legal protection which includes the State's obligation to ensure that the level of protection and security of investments agreed with foreign investors will not be abolished or reduced in any way whatsoever by a change in its laws or by acts of its administration.[167] There is nothing as specific in EU law.

### (ii) The fair and equitable treatment of investments

213. The fair and equitable treatment of investments is a broad concept which includes the right to a fair trial and the fundamental guarantees of good faith, non-discrimination[168] and proportionality[169] and the concepts of transparency, absence of ambiguity and of unfair treatment, the protection of legitimate expectations and protection against coercion and harassment.[170] Last, the concept of fair and equitable treatment protects the investor against a denial of justice[171] by the national courts.[172]

---

[161] See, inter alia, *Wena Hotels Ltd v Arab Republic of Egypt* (ICSID Case No ARB/98/4) Award of 8 December 2000, paragraph 84, and *Técnicas Medioambientales TECMED S.A. v Mexican United States* (ICSID Case No ARB(AF)/00/2) Award of 29 May 2003, paragraphs 175 to 177.

[162] See, inter alia, *Biwater Gauff (Tanzania) Ltd v United Republic of Tanzania* (ICSID Case No ARB/05/22) Award of 24 July 2008, paragraph 730, and *Eureko B.V. v Republic of Poland* (Ad Hoc Arbitration), Partial Award of 19 August 2005, paragraphs 236 and 237.

[163] See *CME Czech Republic B.V. v Czech Republic* (UNCITRAL) Partial Award of 13 September 2001, paragraph 613, and *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v Argentine Republic* (ICSID Case No ARB/97/3) Award of 20 August 2007, paragraphs 7.4.15 and 7.4.16.

[164] For a more comprehensive analysis, see Schreuer, C., 'Full Protection and Security', 2010, *Journal of International Dispute Settlement*, p. 1.

[165] See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 260.

[166] See, in particular, judgment of 11 December 2007, *International Transport Workers' Federation and Finnish Seamen's Union* (C-438/05, EU:C:2007:772, paragraphs 56 to 59, 62 and 66). The same applies to regulations, but not to directives.

[167] See *Saluka Investments B.V. v Czech Republic* (UNCITRAL) (PCA Case No 2001-04) Partial Award of 17 March 2006, paragraph 484.

[168] The concept of discrimination in international law on investments is similar to that concept in EU law in that it refers to unfavourable treatment of the investor for which there is no reasonable justification. See, to that effect, *Elettronica Sicula S.P.A. (ELSI)*, judgment, ICJ Reports 1989, p. 15, paragraph 122; *Saluka Investments B.V. v Czech Republic* (UNCITRAL) (PCA Case No 2001-04) Partial Award of 17 March 2006, paragraph 460; and *Biwater Gauff (Tanzania) Ltd v United Republic of Tanzania* (ICSID Case No ARB/05/22) Award of 24 July 2008, paragraph 695.

[169] See *MTD Equity Sdn. Bhd. and MTD Chile S.A. v Republic of Chile* (ICSID Case No ARB/01/7), Award of 25 May 2004, paragraph 109; *Saluka Investments B.V. v Czech Republic* (UNCITRAL) (PCA Case No 2001-04) Partial Award of 17 March 2006, paragraphs 303 and 460; *Plama Consortium Limited v Republic of Bulgaria* (ICSID Case No ARB/03/24) Award of 27 August 2008, paragraph 184; and *EDF (Services) Limited v Romania* (ICSID Case No ARB/05/13) Award of 8 October 2009, paragraph 303.

[170] See *Técnicas Medioambientales TECMED S.A. v Mexican United States* (ICSID Case No ARB(AF)/00/2) Award of 29 May 2003, paragraph 154; *Waguih Elie George Siag and Clorinda Vecchi v Arab Republic of Egypt* (ICSID Case No ARB/05/15), Award of 1 June 2009, paragraph 450; and *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v Republic of Kazakhstan* (ICSID Case No ARB/05/16), Award of 29 July 2008, paragraph 609. See also, to that effect, Dolzer, M., and Schreuer, C., *Principles of International Investment Law*, Oxford University Press, 2008, pp. 133 to 149; Yannaca-Small, K., 'Fair and Equitable Treatment Standard', published in Yannaca-Small, K., (ed.), *Arbitration under International Investment Agreements — A Guide to the Key Issues*, Oxford University Press, 2010, p. 385, pp. 393 to 410. See also Opinion 2/15 (*Free trade agreement with Singapore*), 16 May 2017 (EU:C:2017:376, paragraph 89).

[171] The concept of 'denial of justice' in international law encompasses the State's obligation to not administer justice in a manifestly unfair manner. See, to that effect, Paulsson, J., *Denial of Justice in International Law*, Cambridge University Press, 2005, p. 67. That obligation is breached if, for example, the national courts refuse to entertain a suit, if they subject it to undue delay, if they administer justice in a clearly inadequate fashion or even if there is a clear and malicious misapplication of national law. See *Robert Azinian and Others v United Mexican States* (ICSID Case No ARB(AF)/97/2) Award of 1 November 1999, paragraphs 102 and 103.

[172] See *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v Republic of Kazakhstan* (ICSID Case No ARB/05/16), Award of 29 July 2008, paragraph 651, and *Victor Pey Casado and President Allende Foundation v Republic of Chile* (ICSID Case No ARB/98/2) Award of 8 May 2008, paragraphs 653 to 657. See also, to that effect, McLachlan, C., Shore, L., and Weiniger, M., *International Investment Arbitration — Substantive Principles*, Oxford University Press, 2007, p. 227.

214. The points which BITs have in common with a number of principles of EU law, such as the principles of non-discrimination, proportionality and protection of legitimate expectations, and also the rights to sound administration, an effective judicial remedy and an impartial tribunal, are obvious.

215. However, even when taken as a whole, those rules of EU law do not mean that EU law recognises the principle of fair and equitable treatment as such. For example, as a number of arbitral tribunals have held, treatment may be unfair and inequitable even if it covers all economic operators, independently of their nationality or other distinctive characteristics,[173] such as a flat corporate tax. It should be pointed out that, in the arbitral proceedings at issue in the main proceedings, the Slovak Republic agreed that such a tax might be contrary to the fair and equitable treatment required by the BIT even though it is not incompatible with EU law.[174]

216. Another example is the protection against denials of justice, which also includes the clear and malicious misapplication of national law. EU law does not afford comparable protection, since the Courts of the European Union do not have jurisdiction to interpret national law.

*(iii) The prohibition of illegal expropriations*

217. In accordance with Article 5 of the BIT, an expropriation is legal only if it is justified by public interest and is performed under due process of law, is not discriminatory and is accompanied by provision for the payment of just compensation.

218. The overlap with the right to property guaranteed by Article 17(1) of the Charter is obvious.[175] According to that provision, 'no one may be deprived of his or her possessions, except in the public interest and in the cases and under the conditions provided for by law, subject to fair compensation being paid in good time for their loss'.

219. However, that overlap is only partial, since the protection against expropriation afforded by the BITs is wider than that afforded by EU law, from at least two aspects.

220. In the first place, in accordance with Article 51(1) of the Charter, Article 17 is addressed to Member States only when they are implementing Union law. Its application is therefore precluded in other cases. Therefore, although the Commission referred at the hearing to the pending Cases *SEGRO and Horváth* (C-52/16 and C-113/16) as examples of cases in which EU law affords protection against expropriations, that protection is by no means full protection, since it never applies autonomously.[176] On the other hand, the prohibition of illegal expropriations by Article 5 of the BIT is autonomous and binding on the State without restriction.

---

173 See *S.D. Myers Inc. v Canada* (UNCITRAL) Partial Award of 13 November 2000, paragraph 259; *LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc v Argentine Republic* (ICSID Case No ARB/02/1) Decision on Liability of 3 October 2006, paragraph 162; and *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraphs 250 and 251.

174 See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraphs 119 and 251.

175 See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 261.

176 See Opinion of Advocate General Saugmandsgaard Øe in Joined Cases *SEGRO and Horváth* (C-52/16 and C-113/16, EU:C:2017:410, point 121), where he proposes that there is no need to answer the questions relating to Article 17 of the Charter because 'the alleged infringement of [that article] cannot be examined independently of the question of the infringement of the freedoms of movement'. See also, to that effect, judgment of 21 December 2016, *AGET Iraklis* (C-201/15, EU:C:2016:972, paragraph 65).

221. In the second place, the BITs do not protect only against direct expropriations,[177] but also against indirect expropriations, that is to say, regulatory expropriations and the so-called 'creeping expropriations'.[178]

222. The concept of 'indirect expropriation' is more fluid and covers measures of interference, without dispossession, with the right of ownership and of enjoyment of the investment. The arbitral tribunals have established a number of criteria in order to distinguish between an indirect expropriation and the normal use of the State's regulatory power, namely the degree of interference with the right of ownership, the aim and the context of the State measures at issue and whether those measures breach reasonable expectations as to the economic performance of the investment.[179]

223. The same applies to 'creeping expropriations', that is to say, indirect expropriations which take place gradually and are brought about by a series of measures, none of which in itself constitutes an expropriation but the cumulative effect of which is to destroy the value of the investment.[180]

224. The Court's case-law on Article 17 of the Charter is not developed to the same extent. It is therefore by no means certain that it would protect investors against indirect expropriations in a manner comparable to the BITs.

225. In the third place, Article 17 of the Charter provides only for fair compensation, whereas Article 5(c) of the BIT provides that the compensation must represent the *genuine* value of the investment.

226. Last, the Commission does not provide even a single example of a case brought before the Court, either by means of an action for annulment or by way of a request for a preliminary ruling, in which an investor has relied on his right to property against an unlawful expropriation of his investment.[181]

227. Nor does the Commission offer the slightest explanation of how the prohibition of illegal expropriations is incompatible with the EU and FEU Treaties.

228. It follows from the foregoing that the scope of the BIT is wider than that of the EU and FEU Treaties and that the guarantees of the protection of investments introduced by the BIT are different from those afforded in EU law, without being incompatible with EU law. For that reason, a dispute between a Netherlands investor and the Slovak Republic falling under the BIT is not a dispute concerning the interpretation or application of the EU and FEU Treaties.

---

177 'Direct expropriation' means measures of nationalisation or dispossession by formal transfer of title or physical seizure.

178 See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 261. See also, to that effect, judgment of 15 September 2011, *Commission v Slovakia* (C-264/09, EU:C:2011:580, paragraphs 47 to 50), where the Court held that the termination by the Slovak Republic of a contract which it had entered into with a Swiss investor, which was necessary in order to comply with its obligations under Directive 2003/54/EC of the European Parliament and of the Council of 26 June 2003 concerning common rules for the internal market in electricity and repealing Directive 96/92/EC (OJ 2003 L 176, p. 37), might constitute an expropriation within the meaning of Article 6 of the Switzerland-Slovakia BIT.

179 See, to that effect, summary of the relevant international case-law available in Yannaca-Small, K., '"Indirect expropriation" and the "Right to Regulate" in International Investment Law' *OECD Working Papers on International Investment, 2004/04*, pp. 10 to 20.

180 See, for example, *Técnicas Medioambientales TECMED S.A. v United Mexican States* (ICSID Case No ARB(AF)/00/2) Award of 29 May 2003, paragraph 114, and *Generation Ukraine Inc. v Ukraine* (ICSID Case No ARB/00/9) Award of 16 September 2003, paragraph 20.22.

181 At the hearing, the Cypriot Government referred to paragraphs 62 to 76 of the judgment of 20 September 2016, *Ledra Advertising and Others v Commission and ECB*, (C-8/15 P to C-10/15 P, EU:C:2016:701) where the Court ruled only on the question of whether, having signed the memorandum of understanding on behalf of the ESM, the Commission had contributed to a breach of the appellants' right to property guaranteed by Article 17(1) of the Charter. The question of whether the Republic of Cyprus infringed that right was not decided, since in any event the Charter is not applicable to the Member States beyond the implementation of EU law (see paragraph 67 of that judgment).

### *3. Having regard to its purpose, does the Netherlands-Czechoslovakia BIT have the effect of undermining the allocation of powers fixed by the EU and FEU Treaties and, therefore, the autonomy of the EU legal system?*

229. If the Court should find that a dispute such as that between Achmea and the Slovak Republic in the main proceedings is not a dispute concerning the interpretation or application of the Treaties, referred to in Article 344 TFEU, it would then be necessary to consider whether Article 8 of the Netherlands-Czechoslovakia BIT has the effect of undermining the allocation of powers fixed by the Treaties and the autonomy of the EU legal system.[182]

230. I note, first of all, the essential principles referred to in that respect by the Court in paragraphs 65 to 70 of Opinion 1/09 (Agreement on the creation of a unified patent litigation system), of 8 March 2011 (EU:C:2011:123) and in paragraphs 157 to 176 of Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454).

231. It is common ground that the Treaties establishing the European Union established a new legal order, with its own institutions, in favour of which the Member States have limited, in ever-widening areas, their sovereign rights, and the subjects of which are not only the Member States but also their nationals; EU law is characterised by its supremacy over the laws of the Member States and also by the direct effect of a range of provisions applicable to their nationals and to the Member States themselves.[183]

232. The legal order and the judicial system of the Union are based on the fundamental premiss that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, which implies and justifies the existence of mutual trust between the Member States that those values will be recognised and, therefore, that the law of the EU that implements them will be respected.[184]

233. Pursuant to the principle of sincere cooperation, set out in the first subparagraph of Article 4(3) TEU, the Member States are to ensure, in their respective territories, the application of and respect for EU law. Furthermore, pursuant to the second subparagraph of Article 4(3) TEU, the Member States are to take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the Union.[185]

234. In order to ensure the preservation of the specific characteristics and the autonomy of the EU legal order, the Treaties established a judicial system intended to ensure coherence and unity in the interpretation of EU law, which entrusts the national courts and the Court of Justice with the task of ensuring the full application of EU law in all Member States and the judicial protection of the rights which individuals derive from EU law.[186]

---

182 See Opinion 1/09 (Agreement on the creation of a unified patent litigation system), of 8 March 2011 (EU:C:2011:123, paragraphs 63 to 89); Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 183); and Opinion 2/15 (Free Trade Agreement with Singapore), of 16 May 2017 (EU:C:2017:376, paragraph 301).

183 See, to that effect, judgments of 5 February 1963, *van Gend & Loos* (26/62, EU:C:1963:1, p. 12); of 15 July 1964, Costa (6/64, EU:C:1964:66, p. 593); of 17 December 1970, *Internationale Handelsgesellschaft* (11/70, EU:C:1970:114, paragraph 3); Opinions 1/91 (EEA Agreement — I), of 14 December 1991 (EU:C:1991:490, paragraph 21) and 1/09 (Agreement on the creation of a unified patent litigation system), of 8 March 2011 (EU:C:2011:123, paragraph 65); judgment of 26 February 2013, *Melloni* (C-399/11, EU:C:2013:107, paragraph 59); and Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 166).

184 See Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 168).

185 See judgment of 16 July 1998, *Oelmühle and Schmidt Söhne* (C-298/96, EU:C:1998:372, paragraph 23), and Opinions 1/09 (Agreement on the creation of a unified patent litigation system), of 8 March 2011 (EU:C:2011:123, paragraph 68) and 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 173).

186 See Article 19(1) TEU. See also Opinion 1/91 (EEA Agreement — I), of 14 December 1991 (EU:C:1991:490, paragraph 35); judgment of 13 March 2007, *Unibet* (C-432/05, EU:C:2007:163, paragraph 38); and Opinions 1/09 (Agreement on the creation of a unified patent litigation system), of 8 March 2011 (EU:C:2011:123, paragraphs 66 and 68) and 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 173).

235. In that context, 'the judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which, by setting up a dialogue between one court and another, specifically between the Court of Justice and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law …, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties …'. [187]

236. Last, in the exercise of their role as guardians of EU law, the courts of the Member States ensure respect for the rules and principles which derive from the very foundations of the EU legal order, such as the supremacy of EU law, the four fundamental freedoms, citizenship of the Union, the area of freedom, security and justice, competition law and State aid and fundamental rights. [188]

237. To my mind, the opportunity afforded by Article 8 of the BIT to Netherlands and Slovak investors to have recourse to international arbitration does not undermine either the allocation of powers fixed by the EU and FEU Treaties or the autonomy of the EU legal system, even if the Court should decide that the arbitral tribunals constituted in accordance with that article are not courts or tribunals of the Member States within the meaning of Article 267 TFEU.

238. It should first of all be noted that, notwithstanding their binding nature, no arbitral award can be enforced without the assistance of the State, which, in the case of investment arbitration, places its enforcement mechanisms at the disposal of the investor.

239. In the case of Article 8 of the BIT, the awards made by the arbitral tribunals cannot avoid review by the national courts. That review may be carried out in the context of an action to set aside the arbitral award before the courts of the seat of the arbitration or in the context of an objection to a request for recognition and enforcement of the award before the courts of the country in which recognition and enforcement of the award are sought in accordance with the Convention for the Recognition and Enforcement of Foreign Arbitral Awards, signed at New York on 10 June 1958 [189] ('the New York Convention').

240. As the Court has held on a number of occasions, 'if questions of [EU] law are raised in [a contractual] arbitration …, the ordinary courts may be called upon to examine them … in the course of a review of an arbitration award — which may be more or less extensive depending on the circumstances — and which they may be required to effect in case of an appeal or objection, in proceedings for leave to issue execution or by any other method of recourse available under the relevant national legislation'. [190]

---

187   Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 176). See also, to that effect, judgments of 16 January 1974, *Rheinmühlen-Düsseldorf* (166/73, EU:C:1974:3, paragraphs 2 and 3) and of 12 June 2008, *Gourmet Classic* (C-458/06, EU:C:2008:338, paragraph 20), and Opinion 1/09 (Agreement on the creation of a unified patent litigation system), of 8 March 2011 (EU:C:2011:123, paragraph 83).

188   See, to that effect, judgments of 1 June 1999, *Eco Swiss* (C-126/97, EU:C:1999:269, paragraphs 36 to 39); of 28 March 2000, *Krombach* (C-7/98, EU:C:2000:164, paragraph 21); of 3 September 2008, *Kadi and Al Barakaat International Foundation* v *Council and Commission* (C-402/05 P and C-415/05 P, EU:C:2008:461, paragraph 304); and Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 172). For a more comprehensive analysis of the concept of European public order, I refer to my Opinions in cases also relating to arbitral awards, *Gazprom* (C-536/13, EU:C:2014:2414, points 166 to 177) and *Genentech* (C-567/14, EU:C:2016:177, points 55 to 72).

189   *United Nations Treaty Series*, vol. 330, p. 3.

190   Judgment of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107, paragraph 14). See also, to that effect, judgments of 27 April 1994, *Almelo* (C-393/92, EU:C:1994:171, paragraphs 22 and 23) and of 1 June 1999, *Eco Swiss* (C-126/97, EU:C:1999:269, paragraph 32).

241. That assertion forms the basis of the established principle that 'it is for those national courts and tribunals to ascertain whether it is necessary for them to make a reference to the Court under Article [267 TFEU] in order to obtain an interpretation or assessment of the validity of provisions of [EU] law which they may need to apply when reviewing an arbitration award',[191] as those courts and tribunals bear ultimate responsibility for ensuring the uniform application of EU law and compliance with European public policy rules.[192]

242. The Court did not even consider it appropriate to refer expressly to that point in the grounds of its judgments of 13 May 2015, *Gazprom* (C-536/13, EU:C:2015:316) and of 7 July 2016, *Genentech* (C-567/14, EU:C:2016:526) where it directly ruled on the substance of the question which, in each of those cases, sought to ascertain whether the arbitral award at issue was incompatible with EU competition law.

243. In those cases, neither the Member States nor the Commission considered that the competition law issues raised before the arbitrators were not arbitrable or that the arbitration clauses which the private parties had inserted in their contracts were in any way incompatible with EU law.[193]

244. Furthermore, the cases that gave rise to the judgments of 1 June 1999, *Eco Swiss* (C-126/97, EU:C:1999:269) and of 7 July 2016, *Genentech* (C-567/14, EU:C:2016:526) originated in actions for annulment of an arbitral award, where the case that gave rise to the judgment of 13 May 2015, *Gazprom* (C-536/13, EU:C:2015:316) followed an objection to the request for recognition and enforcement of an arbitral award. This shows that, whatever the procedures, the courts and tribunals of the Member States of the Union are able to ensure the uniform interpretation of EU law and compliance with the European public policy rules, whether in a competition matter[194] or in other areas of EU law.

245. The characteristics of the arbitral tribunals constituted in accordance with Article 8 of the BIT, and in particular of the arbitral tribunal involved in the present case, are such that they allow the ordinary courts and tribunals of the Member States to ensure compliance with those principles, as they do in the context of international commercial arbitration.

246. Article 8 of the BIT entrusts the President of the SCC Arbitration Institute, established in a Member State, with the appointment of the arbitrators, if the appointments have not been made within the periods laid down in Article 8(3) of the BIT. It also provides that the UNCITRAL Arbitration Rules are to apply to the arbitral procedures conducted in accordance with that article. According to Article 16 of the 1976 Arbitration Rules, it is for the arbitral tribunal itself to determine the seat of the arbitration and to choose the institution which is to act as Registry, after hearing the parties.[195]

---

191 Judgment of 1 June 1999, *Eco Swiss* (C-126/97, EU:C:1999:269, paragraph 33). See also, to that effect, judgment of 23 March 1982, *Nordsee* (102/81, EU:C:1982:107, paragraph 15).

192 See, to that effect, points 59 to 62 of my Opinion in *Genentech* (C-567/14, EU:C:2016:177).

193 See also, to that effect, judgment of 21 May 2015, *CDC Hydrogen Peroxide* (C-352/13, EU:C:2015:335, paragraphs 57 to 72), where the Court did not follow the point of view which Advocate General Jääskinen expressed in point 124 of his Opinion in *CDC Hydrogen Peroxide* (C-352/13, EU:C:2014:2443), that the reference to arbitration might, as such, hamper the effectiveness of Article 101 TFEU.

194 See judgment of 1 June 1999, *Eco Swiss* (C-126/97, EU:C:1999:269, paragraphs 37 and 40).

195 See *Achmea B.V. (formerly known as Eureko B.V.) v Slovak Republic* (UNCITRAL) (PCA Case No 2008-13) Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, paragraph 16.

247. By its procedural order of 19 March 2009, the arbitral tribunal fixed the seat of the arbitration on the territory of a Member State, namely in Frankfurt am Main. Its award would therefore, in accordance with Article 1059 of the German Code of Civil Procedure, be amenable to an action for annulment before the German courts, which will therefore be able, in that context, to ensure the uniformity of interpretation of EU law and compliance with the European public policy rules. It was in the context of an action of that type that the case came before the referring court and the Court of Justice.

248. In addition, the recognition and enforcement of arbitral awards made by the arbitral tribunals constituted in accordance with Article 8 of the BIT fall within the scope of the New York Convention, to which all the Member States have acceded. In accordance with that convention, the national courts may refuse to recognise and enforce those awards for all the reasons set out in Article V of that convention, including the fact that the arbitral procedure was not in accordance with the agreement of the parties [196] and that recognition or enforcement of the award would be contrary to public policy, [197] including European public policy.

249. Therefore, on the assumption that Achmea attempted to obtain recognition and enforcement of the arbitral award at issue in the present case in another Member State, the courts and tribunals of the requested State would also be responsible for ensuring that the award is not incompatible with EU law.

250. The same applies in the context of an action for annulment as in the present case. The uniformity of application of EU law may be ensured on the basis of a number of reasons, the most relevant of which are the fact that the arbitral procedure was not in accordance with the agreement of the parties and that recognition and enforcement of the award would be contrary to public policy, [198] including European public policy.

251. The Commission also refers to the risk that the seat of an arbitration may potentially be fixed in a third country or that recognition and enforcement of an arbitral award that was incompatible with EU law may be sought in a third country, in which cases the courts and tribunals of the European Union would not be involved and the Court of Justice would therefore never be requested to give a preliminary ruling.

252. The same applies, in the Commission's submission, to the intra-EU BITS which designate the International Centre for Settlement of Investment Disputes (ICSID), established in Washington DC, as the institution acting as Registry in the arbitration. In such a case, the arbitral award would be binding on the parties and could not be subject to any appeal or any other remedy except those provided for in the ICSID Convention. [199] It follows that there would be no legal means that would allow the courts and tribunals of the Member State to review the compatibility of ICSID arbitral award with EU law.

253. While I consider that the Member States should avoid the choice of ICSID in their BITs, the risks referred to by the Commission are, in the present case, purely hypothetical, since the BIT at issue does not designate the ICSID as the institution acting as Registry in the arbitration, the parties chose the PCA in The Hague as the institution performing that role, the arbitral tribunal fixed the seat of the

---

[196] See Article V, paragraph 1(d) of the New York Convention, which might be the case if an arbitral tribunal, contrary to Article 8, paragraph 6, of that BIT, did not take EU law into account.

[197] See Article V, paragraph 2(b) of the New York Convention and judgment of 1 June 1999, *Eco Swiss* (C-126/97, EU:C:1999:269, paragraph 38).

[198] See Article 1059, paragraph 2(1)(d) and (2)(b) of the German Code of Civil Procedure.

[199] See Article 53, paragraph 1, of that Convention. I would observe, however, that those concerns did not prevent the EU institutions from choosing the ICSID as the arbitral institution in Article 9.16 of the EU-Singapore Free Trade Agreement.

arbitration on the territory of a Member State and there has been no request for recognition and enforcement of the arbitral award in any third countries,[200] but an action for annulment of the arbitral award before the courts and tribunals of a Member State, one of which made a reference to the Court for a preliminary ruling.

254. Nor is there any question of the substantive incompatibility of arbitral award with EU law, as the Slovak Republic's arguments before the referring court related only to the compatibility of the dispute settlement mechanism established by Article 8 of the BIT with the EU and FEU Treaties.

255. Accordingly, the effectiveness of the EU judicial system would remain intact even if a Member State were not disposed to challenge the incompatibility of an arbitral award with the EU and FEU Treaties by means of an action for annulment or an objection to the request for recognition and enforcement. In such a situation, Articles 258 and 260 TFEU would allow the Commission to bring an action against that Member State which consented to an arbitral award that was incompatible with EU law.[201]

256. For those reasons, I consider that Article 8 of the BIT does not undermine the allocation of powers fixed by the EU and FEU Treaties and, thus, the autonomy of the EU legal system.

257. That finding is not affected by the argument which a number of Governments and the Commission base on the risk that decisions will be made by the arbitral tribunals that might be incompatible with EU law and also with the principle of mutual trust.

258. That argument applies not only to international investment arbitration but also to international commercial arbitration, since the latter may also lead to awards that are incompatible with EU law and be based on an alleged lack of trust in the courts and tribunals of the Member States. In spite of those risks, the Court has never disputed its validity, although arbitration of questions of EU competition law between individuals is not unknown.[202]

259. If international arbitration between individuals therefore does not undermine the allocation of powers fixed by the EU and FEU Treaties and, accordingly, the autonomy of the EU legal system, even where the State is a party to the arbitral proceedings,[203] I think that the same must apply in the case of international arbitration between investors and States, all the more so because the inevitable presence of the State implies greater transparency[204] and the possibility remains that the State will be required to fulfil its obligations under EU law by means of an action for failure to fulfil obligations on the basis of Articles 258 and 259 TFEU.

260. If the Commission's logic were followed, any arbitration would be liable to undermine the allocation of powers fixed by the EU and FEU Treaties and, accordingly, the autonomy of the EU legal system.

---

200 Even in that hypothetical situation, a risk would genuinely exist only if the respondent Member State in the arbitration had assets on the territory of a third country that did not benefit from the immunity recognised in international law to foreign States. In reality, even if the seat of the arbitration is fixed in a third country or recognition and enforcement of the award are requested in a third country, the investor could not avoid requesting recognition and enforcement of the arbitral award before the courts of the respondent Member State.

201 See *Electrabel S.A. v Hungary* (ICSID Case No ARB/07/19) Decision on Jurisdiction, Applicable Law and Liability of 30 November 2012, paragraphs 4.160 to 4.162.

202 See, to that effect, judgments of 1 June 1999, *Eco Swiss* (C-126/97, EU:C:1999:269) and of 7 July 2016, *Genentech* (C-567/14, EU:C:2016:526), and judgment of the Swiss Federal Court of 8 March 2006, 4P.278/2005 concerning the action to set aside an arbitral award made in Switzerland between two Italian companies on the ground of infringement of EU competition law.

203 See arbitral proceedings between Gazprom and the Lithuanian Minister of Energy, which formed the subject matter of the case that gave rise to the judgment of 13 May 2015, *Gazprom* (C-536/13, EU:C:2015:316).

204 Most awards are public, although that is not the case in international commercial arbitration. It is therefore harder to ascertain whether there has been an infringement of EU law.

261. Nor am I able to see how the arbitral proceedings at issue in the main proceedings would breach the principle of mutual trust, since those proceedings took place only with the consent of the Member States concerned and Achmea's freely expressed choice to use the facility which the Member States offered it.

262. The principle of mutual trust 'requires, particularly with regard to the area of freedom, security and justice, each of those States, save in exceptional circumstances, to consider all the other Member States to be complying with EU law and particularly with the fundamental rights recognised by EU law'.[205]

263. I fail to see the connection between that principle and Article 8 of the BIT. As the Netherlands Government observed at the hearing, international arbitration as an ISDS method does not in any way imply that either the Kingdom of the Netherlands or the Slovak Republic had any doubts as to whether the other party would comply with EU law and the fundamental rights which it recognises.

264. Like all the ISDS mechanisms contained in the BITs, Article 8 of the BIT creates a forum in which the investor may bring an action against the State in order to rely on the rights conferred on him, in public international law, by the BIT, a possibility that would not be open to him without that article.[206]

265. Nor is it certain that an individual would be able to rely on the provisions of an international treaty before the national courts, since those courts automatically exclude that possibility on the ground that treaties do not create rights and obligations between States, or impose conditions of invocability that are more or less strict depending on the case, which do not guarantee individuals the possibility of relying on the provisions of the treaties.[207]

266. Consequently, far from expressing lack of trust in the other Member State's legal system, recourse to international arbitration is the only means of giving full practical effect to the BITs by creating a specialised forum where investors may rely on the rights conferred on them by the BITs.

267. Accordingly, I do not consider that Article 8 of the BIT is inconsistent with the principle of mutual trust.

268. Lastly, I am scarcely convinced by the Commission's argument that the non-existence of BITs between the Member States which founded the European Union, or which acceded to it before 2004, proves that those treaties are based on a lack of mutual trust.

269. In the first place, it is not true that the founding Member States and the Member States which acceded to the Union before 2004 are not linked by agreements similar to BITs other than the EU and FEU Treaties.[208]

270. In the second place, BITs are much less useful between States which are exporters of capital. Thus, to take one example, it may be noted that, according to the most recent statistics, France is not among either the 10 leading countries in receipt of flows of German capital or the 10 leading countries issuing flows of capital to Germany, whereas Poland is in 10th place in terms of flows out of Germany.[209]

---

205  Opinion 2/13 (Accession of the Union to the ECHR), of 18 December 2014 (EU:C:2014:2454, paragraph 191 and the case-law cited).

206  See, to that effect, Bundesverfassungsgericht (Federal Constitutional Court, Germany), order of 8 May 2007 of the Second Senate, 2 BvM 1/03, ECLI:DE:BVerfG:2007:ms20070508.2bvm000103, paragraph 54.

207  See point 206 of this Opinion.

208  See the examples which I gave in points 42 and 43 of this Opinion.

209  See the Note of 1 March 2017 from the Embassy of France in Germany on direct foreign investment in 2014-2015, created on the basis of statistics compiled by UNCTAD and the Bundesbank (German Federal Bank), available at the following internet address: http://www.tresor.economie.gouv.fr/File/434035. See, in particular, Table 5.

271. I therefore wonder whether the absence of BITs between the old Member States is not explained rather by the fact that most of the Member States in that category are significant exporters of capital rather than host countries of investments and in that sense have no real need to conclude BITs among themselves.

272. For those reasons, I consider that the dispute settlement mechanism established by Article 8 of the BIT is compatible with Article 344 TFEU and with the allocation of powers fixed by the EU and FEU Treaties and the autonomy of the EU legal system.

## VI. Conclusion

273. I therefore propose that the Court should answer the questions for a preliminary ruling referred to it by the Bundesgerichtshof (Federal Court of Justice, Germany) as follows:

Articles 18, 267 and 344 TFEU must be interpreted as not precluding the application of an investor/State dispute settlement mechanism established by means of a bilateral investment agreement concluded before the accession of one of the Contracting States to the European Union and providing that an investor from one Contracting State may, in the case of a dispute relating to investments in the other Contracting State, bring proceedings against the latter State before an arbitral tribunal.

i — The wording of paragraphs 178, 197, 255 and 266 and footnote 130 of this document has been modified after it was first put online.