# JOINT COUNCIL OF EUROPE/OECD CONVENTION ON MUTUAL ADMINISTRATIVE ASSISTANCE IN TAX MATTERS

**TABLE OF CONTENTS**

TEXT OF THE CONVENTION ON MUTUAL ADMINISTRATIVE ASSISTANCE IN TAX MATTERS4

PREAMBLE ........................................................................................................................... 4
CHAPTER I SCOPE OF THE CONVENTION ..................................................................... 5
   Article 1 Object of the Convention and persons covered.......................................................... 5
   Article 2 Taxes covered............................................................................................................ 5
CHAPTER II GENERAL DEFINITIONS .............................................................................. 6
   Article 3 Definitions................................................................................................................. 6
CHAPTER III FORMS OF ASSISTANCE ............................................................................ 7
   Section I Exchange of information............................................................................................ 7
   Section II Assistance in recovery ............................................................................................. 9
   Section III Service of documents............................................................................................ 11
CHAPTER IV PROVISIONS RELATING TO ALL FORMS OF ASSISTANCE ................ 12
   Article 18 Information to be provided by the applicant state.................................................. 12
   Article 19 Possibility of declining a request .......................................................................... 12
   Article 20 Response to the request for assistance .................................................................. 12
   Article 21 Protection of persons and limits to the obligation to provide assistance ............. 13
   Article 22 Secrecy ................................................................................................................. 13
   Article 23 Proceedings .......................................................................................................... 14
CHAPTER V SPECIAL PROVISIONS ............................................................................... 14
   Article 24 Implementation of the Convention........................................................................ 14
   Article 25 Language .............................................................................................................. 15
   Article 26 Costs ..................................................................................................................... 15
CHAPTER VI FINAL PROVISIONS .................................................................................. 15
   Article 27 Other international agreement  or arrangements ................................................... 15
   Article 28 Signature and entry into force of the Convention ................................................. 16
   Article 29 Territorial application of the Convention ............................................................. 16
   Article 30 Reservations ......................................................................................................... 16
   Article 31 Denunciation ........................................................................................................ 17
   Article 32 Depositaries and their functions........................................................................... 17

ANNEX A TAXES TO WHICH THE CONVENTION WOULD APPLY ............................................. 19

ANNEX B COMPETENT AUTHORITIES .................................................................................. 19

ANNEX C DEFINITION OF THE WORD "NATIONAL" FOR THE PURPOSE OF THE
CONVENTION .......................................................................................................................... 19

EXPLANATORY REPORT....................................................................................................... 20

   Introduction ........................................................................................................................... 20
   Commentary on the provisions of the Convention ................................................................ 21
      CHAPTER I SCOPE OF THE CONVENTION ................................................................ 21

CHAPTER II GENERAL DEFINITIONS ........................................................................... 25
CHAPTER III FORMS OF ASSISTANCE ........................................................................ 28
CHAPTER IV PROVISIONS RELATING TO ALL FORMS OF ASSISTANCE ............................... 48
    Article 18 Information to be provided by the applicant state.................................................. 48
    Article 19 Possibility of declining a request ...................................................................... 49
    Article 20 Response to the request for assistance ............................................................... 50
    Article 21 Protection of persons and limits to the obligation to provide assistance ................... 50
    Article 22 Secrecy ........................................................................................................ 53
    Article 23 Proceedings .................................................................................................. 56
CHAPTER V SPECIAL PROVISIONS ............................................................................ 58
    Article 24 Implementation of the Convention..................................................................... 58
    Article 25 Language ...................................................................................................... 61
    Article 26 Costs ........................................................................................................... 62
CHAPTER VI FINAL PROVISIONS ................................................................................ 63
    Article 27 Other international agreements or arrangements ................................................... 63
    Article 28 Signature and entry into force of the Convention .................................................. 64
    Article 29 Territorial application of the Convention ............................................................ 64
    Article 30 Reservations .................................................................................................. 64
    Article 31 Denunciation ................................................................................................. 66
    Article 32 Depositaries and their functions........................................................................ 66

### TEXT OF THE CONVENTION
### ON MUTUAL ADMINISTRATIVE ASSISTANCE IN TAX MATTERS

### PREAMBLE

The member states of the Council of Europe and the Member countries of the Organisation for Economic Co-operation and Development (OECD), signatories of this Convention,

Considering that the development of international movement of persons, capital, goods and services - although highly beneficial in itself - has increased the possibilities of tax avoidance and evasion and therefore requires increasing co-operation among tax authorities;

Welcoming the various efforts made in recent years to combat tax avoidance and tax evasion on an international level, whether bilaterally or multilaterally;

Considering that a co-ordinated effort between states is necessary in order to foster all forms of administrative assistance in matters concerning taxes of any kind whilst at the same time ensuring adequate protection of the rights of taxpayers;

Recognising that international co-operation can play an important part in facilitating the proper determination of tax liabilities and in helping the taxpayer to secure his rights;

Considering that fundamental principles entitling every person to have his rights and obligations determined in accordance with a proper legal procedure should be recognised as applying to tax matters in all states and that states should endeavour to protect the legitimate interests of taxpayers, including appropriate protection against discrimination and double taxation;

Convinced therefore that states should not carry out measures or supply information except in conformity with their domestic law and practice, having regard to the necessity of protecting the confidentiality of information, and taking account of international instruments for the protection of privacy and flows of personal data;

Desiring to conclude a convention on mutual administrative assistance in tax matters,

Have agreed as follows:

# CHAPTER I
# SCOPE OF THE CONVENTION

## Article 1
### *Object of the Convention and persons covered*

1.     The Parties shall, subject to the provisions of Chapter IV, provide administrative assistance to each other in tax matters.  Such assistance may involve, where appropriate, measures taken by judicial bodies.

2.     Such administrative assistance shall comprise:

      a.  exchange of information, including simultaneous tax examinations and participation in tax examinations abroad;

      b.  assistance in recovery, including measures of conservancy; and

      c.  service of documents.

3.     A Party shall provide administrative assistance whether the person affected is a resident or national of a Party or of any other state.

## Article 2
### *Taxes covered*

1.     This Convention shall apply:

      a.  to the following taxes:

         i.   taxes on income or profits,

         ii.  taxes on capital gains which are imposed separately from the tax on income or profits,

         iii. taxes on net wealth,

imposed on behalf of a Party; and

      b.  to the following taxes:

         i.   taxes on income, profits, capital gains or net wealth which are imposed on behalf of political subdivisions or local authorities of a Party;

         ii.  compulsory social security contributions payable to general government or to social security institutions established under public law;

iii. taxes in other categories, except customs duties, imposed on behalf of a Party, namely:

    A.   estate, inheritance or gift taxes;

    B.   taxes on immovable property;

    C.   general consumption taxes, such as value-added or sales taxes;

    D.   specific taxes on goods and services such as excise taxes;

    E.   taxes on the use or ownership of motor vehicles;

    F.   taxes on the use or ownership of movable property other than motor vehicles;

    G.   any other taxes;

iv. taxes in categories referred to in sub-paragraph iii above which are imposed on behalf of political subdivisions or local authorities of a Party.

2.      The existing taxes to which the Convention shall apply are listed in Annex A in the categories referred to in paragraph 1.

3.      The Parties shall notify the Secretary General of the Council of Europe or the Secretary General of OECD (hereinafter, referred to as the `depositaries`) of any change to be made to Annex A as a result of a modification of the list mentioned in paragraph 2. Such change shall take effect on the first day of the month following the expiration of a period of three months after the date of receipt of such notification by the depositary.

4.      The Convention shall also apply, as from their adoption, to any identical or substantially similar taxes which are imposed in a Contracting State after the entry into force of the Convention in respect of that Party in addition to or in place of the existing taxes listed in Annex A and, in that event, the Party concerned shall notify one of the depositaries of the adoption of the tax in question.

**CHAPTER II**
**GENERAL DEFINITIONS**

*Article 3*
*Definitions*

1.      For the purposes of this Convention, unless the context otherwise requires:

    a.   the terms "applicant state" and "requested state` mean respectively any Party applying for administrative assistance in tax matters and any Party requested to provide such assistance;

    b.   the term "tax" means any tax or social security contribution to which the Convention applies pursuant to Article 2;

    c.   the term "tax claim" means any amount of tax, as well as interest thereon, related administrative fines and costs incidental to recovery, which are owed and not yet paid;

    d.  the term "competent authority" means the persons and authorities listed in Annex B;

    e.  the term "nationals" in relation to a Party means:

        i.  all individuals possessing the nationality of that Party, and

        ii.  all legal persons, partnerships, associations and other entities deriving their status as such from the laws in force in that Party.

For each Party that has made a declaration for that purpose, the terms used above will be understood as defined in Annex C.

2.      As regards the application of the Convention by a Party, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that Party concerning the taxes covered by the Convention.

3.      The Parties shall notify one of the depositaries of any change to be made to Annexes B and C. Such change shall take effect on the first day of the month following the expiration of a period of three months after the date of receipt of such notification by the depositary in question.


# CHAPTER III
# FORMS OF ASSISTANCE

### *Section I*
### *Exchange of information*

### *Article 4*
### *General provision*

1.      The Parties shall exchange any information, in particular as provided in this section, that is foreseeably relevant to.

    a.  the assessment and collection of tax, and the recovery and enforcement of tax claims, and

    b.  the prosecution before an administrative authority or the initiation of prosecution before a judicial body.

Information which is unlikely to be relevant to these purposes shall not be exchanged under this Convention.

2.      A Party may use information obtained under this Convention as evidence before a criminal court only if prior authorisation has been given by the Party which has supplied the information.  However, any two or more Parties may mutually agree to waive the condition of prior authorisation.

3.      Any Party may, by a declaration addressed to one of the depositaries, indicate that, according to its internal legislation, its authorities may inform its resident or national before transmitting information concerning him, in conformity with Articles 5 and 7.

## Article 5
### Exchange of information on request

1.      At the request of the applicant state, the requested state shall provide the applicant state with any information referred to in Article 4 which concerns particular persons or transactions.

2.      If the information available in the tax files of the requested state is not sufficient to enable it to comply with the request for information, that state shall take all relevant measures to provide the applicant state with the information requested.

## Article 6
### Automatic exchanged of information

With respect to categories of cases and in accordance with procedures which they shall determine by mutual agreement, two or more Parties shall automatically exchange the information referred to in Article 4.

## Article 7
### Spontaneous exchange of information

1.      A Party shall, without prior request, forward to another Party information of which it has knowledge in the following circumstances:

a.      the first mentioned Party has grounds for supposing that there may be a loss of tax in the other Party;

b.      a person liable to tax obtains a reduction in or an exemption from tax in the first-mentioned Party which would give rise to an increase in tax or to liability to tax in the other Party;

c.      business dealings between a person liable to tax in a Party and a person liable to tax in another Party are conducted through one or more countries in such a way that a saving in tax may result in one or the other Party or in both;

d.      a Party has grounds for supposing that a saving of tax may result from artificial transfers of profits within groups of enterprises;

e.      information forwarded to the first-mentioned Party by the other Party has enabled information to be obtained which may be relevant in assessing liability to tax in the latter Party.

2.      Each Party shall take such measures and implement such procedures as are necessary to ensure that information described in paragraph 1 will be made available for transmission to another Party.

*Article 8*
*Simultaneous tax examinations*

1.      At the request of one of them, two or more Parties shall consult together for the purposes of determining cases and procedures for simultaneous tax examinations.  Each Party involved shall decide whether or not it wishes to participate in a particular simultaneous tax examination.

2.      For the purposes of this Convention, a simultaneous tax examination means an arrangement between two or more Parties to examine simultaneously, each in its own territory, the tax affairs of a person or persons in which they have a common or related interest, with a view to exchanging any relevant information which they so obtain.

*Article 9*
*Tax examinations abroad*

1.      At the request of the competent authority of the applicant state, the competent authority of the requested state may allow representatives of the competent authority of the applicant state to be present at the appropriate part of a tax examination in the requested state.

2.      If the request is acceded to, the competent authority of the requested state shall, as soon as possible, notify the competent authority of the applicant state about the time and place of the examination, the authority or official designated to carry out the examination and the procedures and conditions required by the requested state for the conduct of the examination.  All decisions with respect to the conduct of the tax examination shall be made by the requested state.

3.      A Party may inform one of the depositaries of its intention not to accept, as a general rule, such requests as are referred to in paragraph 1. Such a declaration may be made or withdrawn at any time.

*Article 10*
*Conflicting information*

If a Party receives from another Party information about a person's tax affairs which appears to it to conflict with information in its possession, it shall so advise the Party which has provided the information.

**Section II**
**Assistance in recovery**

*Article 11*
*Recovery of tax claims*

1.      At the request of the applicant state the requested state shall, subject to the provisions of Articles 14 and 15, take the necessary steps to recover tax claims of the first-mentioned state as if they were its own tax claims.

2.      The provision of paragraph 1 shall apply only to tax claims which form the subject of an instrument permitting their enforcement in the applicant state and, unless otherwise agreed between the Parties concerned, which are not contested.

However, where the claim is against a person who is not a resident of the applicant state, paragraph 1 shall only apply, unless otherwise agreed between the Parties concerned, where the claim may no longer be contested.

3.      The obligation to provide assistance in the recovery of tax claims concerning a deceased person or his estate is limited to the value of the estate or of the property acquired by each beneficiary of the estate, according to whether the claim is to be recovered from the estate or from the beneficiaries thereof.


*Article 12*
*Measures of conservancy*

At the request of the applicant state, the requested state shall, with a view to the recovery of an amount of tax, take measures of conservancy even if the claim is contested or is not yet the subject of an instrument permitting enforcement.


*Article 13*
*Documents accompanying the request*

1.      The request for administrative assistance under this section shall be accompanied by:

a.   a declaration that the tax claim concerns a tax covered by the Convention and, in the case of recovery, that, subject to paragraph 2 of Article 11, the tax claim is not or may not be contested;

b.   an official copy of the instrument permitting enforcement in the applicant state; and

c.   any other document required for recovery or measures of conservancy.

2.      The instrument permitting enforcement in the applicant state shall, where appropriate and in accordance with the provisions in force in the requested state, be accepted, recognised, supplemented or replaced as soon as possible after the date of the receipt of the request for assistance, by an instrument permitting enforcement in the latter state.


*Article 14*
*Time-limits*

1      Questions concerning any period beyond which a tax claim cannot be enforced shall be governed by the law of the applicant state.  The request for assistance shall give particulars concerning that period.

2.      Acts of recovery carried out by the requested state in pursuance of a request for assistance, which, according to the laws of that state, would have the effect of suspending or interrupting the period mentioned in paragraph 1, shall also have this effect under the laws of the applicant state.  The requested state shall inform the applicant state about such acts.

3.      In any case, the requested state is not obliged to comply with a request for assistance which is submitted after a period of fifteen years from the date of the original instrument permitting enforcement.

*Article 15*
*Priority*

The tax claim in the recovery of which assistance is provided shall not have in the requested state any priority specially accorded to the tax claims of that state even if the recovery procedure used is the one applicable to its own tax claims.

*Article 16*
*Deferral of payment*

The requested state may allow deferral of payment or payment by instalments if its laws or administrative practice permit it to do so in similar circumstances, but shall first inform the applicant state.

**Section III**
**Service of documents**

*Article 17*
*Service of documents*

1.      At the request of the applicant state, the requested state shall serve upon the addressee documents, including those relating to judicial decisions, which emanate from the applicant state and which relate to a tax covered by this Convention.

2.      The requested state shall effect service of documents:

a.   by a method prescribed by its domestic laws for the service of documents of a substantially similar nature;

b.   to the extent possible, by a particular method requested by the applicant state or the closest to such method available under its own laws.

3.      A Party may effect service of documents directly through the post on a person within the territory of another Party.

4.      Nothing in the Convention shall be construed as invalidating any service of documents by a Party in accordance with its laws.

5.      When a document is served in accordance with this article, it need not be accompanied by a translation.  However, where it is satisfied that the addressee cannot understand the language of the document, the requested state shall arrange to have it translated into or a summary drafted in its or one of its official languages.  Alternatively, it may ask the applicant state to have the document either translated into or accompanied by a summary in one of the official languages of the requested state, the Council of Europe or OECD.

# CHAPTER IV
## PROVISIONS RELATING TO ALL FORMS OF ASSISTANCE

*Article 18*
*Information to be provided by the applicant state*

1.      A request for assistance shall indicate where appropriate:

    a.   the authority or agency which initiated the request made by the competent authority;

    b.   the name, address and any other particulars assisting in the identification of the person in respect of whom the request is made;

    c.   in the case of a request for information, the form in which the applicant state wishes the information to be supplied in order to meet its needs;

    d.   in the case of a request for assistance in recovery or measures of conservancy, the nature of the tax claim, the components of the tax claim and the assets from which the tax claim may be recovered;

    e.   in the case of a request for service of documents, the nature and the subject of the document to be served;

    f.   whether it is in conformity with the law and administrative practice of the applicant state and whether it is justified in the light of the requirements of Article 19.

2.      As soon as any other information relevant to the request for assistance comes to its knowledge, the applicant state shall forward it to the requested state.

*Article 19*
*Possibility of declining a request*

The requested state shall not be obliged to accede to a request if the applicant state has not pursued all means available in its own territory, except where recourse to such means would give rise to disproportionate difficulty.

*Article 20*
*Response to the request for assistance*

1.      If the request for assistance is complied with, the requested state shall inform the applicant state of the action taken and of the result of the assistance as soon as possible.

2.      If the request is declined, the requested state shall inform the applicant state of that decision and the reason for it as soon as possible.

3.      If, with respect to a request for information, the applicant state has specified the form in which it wishes the information to be supplied and the requested state is in a position to do so, the requested state shall supply it in the form requested.

*Article 21*
*Protection of persons and limits to the obligation to provide assistance*

1        Nothing in this Convention shall affect the rights and safeguards secured to persons by the laws or administrative practice of the requested state.

2        Except in the case of Article 14, the provisions of this Convention shall not be construed so as to impose on the requested state the obligation:

        a.  to carry out measures at variance with its own laws or administrative practice or the laws or administrative practice of the applicant state;

        b.  to carry out measures which it considers contrary to public policy (ordre public) or to its essential interests;

        c.  to supply information which is not obtainable under its own laws or its administrative practice or under the laws of the applicant state or its administrative practice;

        d.  to supply information which would disclose any trade, business, industrial, commercial or professional secret, or trade process, or information the disclosure of which would be contrary to public policy (ordre public) or to its essential interests;

        e.  to provide administrative assistance if and insofar as it considers the taxation in the applicant state to be contrary to generally accepted taxation principles or to the provisions of a convention for the avoidance of double taxation, or of any other convention which the requested state has concluded with the applicant state;

        f.  to provide assistance if the application of this Convention would lead to discrimination between a national of the requested state and nationals of the applicant state in the same circumstances.

*Article 22*
*Secrecy*

1.        Any information obtained by a Party under this Convention shall be treated as secret in the same manner as information obtained under the domestic laws of that Party, or under the conditions of secrecy applying in the supplying Party if such conditions are more restrictive.

2.        Such information shall in any case be disclosed only to persons or authorities (including courts and administrative or supervisory bodies) involved in the assessment, collection or recovery of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, taxes of that Party. Only the persons or authorities mentioned above may use the information and then only for such purposes. They may, notwithstanding the provisions of paragraph 1, disclose it in public court proceedings or in judicial decisions relating to such taxes, subject to prior authorisation by the competent authority of the supplying Party.  However, any two or more Parties may mutually agree to waive the condition of prior authorisation.

3.        If a Party has made a reservation provided for in sub-paragraph *a* of paragraph 1 of Article 30, any other Party obtaining information from that Party shall not use it for the purpose of a tax in a category subject to the reservation.  Similarly, the Party making such a reservation shall not use information obtained under this Convention for the purpose of a tax in a category subject to the reservation.

13

4.      Notwithstanding the provisions of paragraphs 1, 2 and 3, information received by a Party may be used for other purposes when such information may be used for such other purposes under the laws of the supplying Party and the competent authority of that Party authorises such use.  Information provided by a Party to another Party may be transmitted by the latter to a third Party, subject to prior authorisation by the competent authority of the first-mentioned Party.

*Article 23*
*Proceedings*

1.      Proceedings relating to measures taken under this Convention by the requested state shall be brought only before the appropriate body of that state.

2.      Proceedings relating to measures taken under this Convention by the applicant state, in particular those which, in the field of recovery, concern the existence or the amount of the tax claim or the instrument permitting its enforcement, shall be brought only before the appropriate body of that state.  If such proceedings are brought, the applicant state shall inform the requested state which shall suspend the procedure pending the decision of the body in question.  However, the requested state shall, if asked by the applicant state, take measures of conservancy to safeguard recovery.  The requested state can also be informed of such proceedings by any interested person.  Upon receipt of such information, the requested state shall consult on the matter, if necessary, with the applicant state.

3.      As soon as a final decision in the proceedings has been given, the requested state or the applicant state, as the case may be, shall notify the other state of the decision and the implications which it has for the request for assistance.

**CHAPTER V**
**SPECIAL PROVISIONS**

*Article 24*
*Implementation of the Convention*

1.      The Parties shall communicate with each other for the implementation of this Convention through their respective competent authorities.  The competent authorities may communicate directly for this purpose. and may authorise subordinate authorities to act on their behalf.  The competent authorities of two or more Parties may mutually agree on the mode of application of the Convention among themselves.

2.      Where the requested state considers that the application of this Convention in a particular case would have serious and undesirable consequences, the competent authorities of the requested and of the applicant state shall consult each other and endeavour to resolve the situation by mutual agreement.

3.      A co-ordinating body composed of representatives of the competent authorities of the Parties shall monitor the implementation and development of this Convention, under the aegis of OECD.  To that end, the co-ordinating body shall recommend any action likely to further the general aims of the Convention.  In particular it shall act as a forum for the study of new methods and procedures to increase international co-operation in tax matters and, where appropriate, it may recommend revisions or amendments to the Convention.  States which have signed but not yet ratified, accepted or approved the Convention are entitled to be represented at the meetings of the co-ordinating body as observers.

14

4.      A Party may ask the co-ordinating body to furnish opinions on the interpretation of the provisions of the Convention.

5.      Where difficulties or doubts arise between two or more Parties regarding the implementation or interpretation of the Convention, the competent authorities of those Parties shall endeavour to resolve the matter by mutual agreement.  The agreement shall be communicated to the co-ordinating body.

6.      The Secretary General of OECD shall inform the Parties, and the signatory states which have not yet ratified, accepted or approved the Convention, of opinions furnished by the co-ordinating body according to the provisions of paragraph 4 above and of mutual agreements reached under paragraph 5 above.

*Article 25*
*Language*

        Requests for assistance and answers thereto shall be drawn up in one of the official languages of OECD and of the Council of Europe or in any other language agreed bilaterally between the Contracting States concerned.

*Article 26*
*Costs*

Unless otherwise agreed bilaterally by the Parties concerned:

a.  ordinary costs incurred in providing assistance shall be borne by the requested state;

b.  extraordinary costs incurred in providing assistance shall be borne by the applicant state.

**CHAPTER VI**
**FINAL PROVISIONS**

*Article 27*
*Other international agreement  or arrangements*

1.      The possibilities of assistance provided by this Convention do not limit, nor are they limited by, those contained in existing or future international agreements or other arrangements between the Parties concerned or other instruments which relate to co-operation in tax matters.

2.      Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.

*Article 28*
*Signature and entry into force of the Convention*

1.      This Convention shall be open for signature by the member states of the Council of Europe and the member countries of OECD.  It is subject to ratification, acceptance or approval.  Instruments of ratification, acceptance or approval shall be deposited with one of the depositaries.

2.      This Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date on which five states have expressed their consent to be bound by the Convention in accordance with the provisions of Paragraph l.

3.      In respect of any member state of the Council of Europe or any member country of OECD which subsequently expresses its consent to be bound by it, the Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date of the deposit of the instrument of ratification, acceptance or approval.

*Article 29*
*Territorial application of the Convention*

1.      Each state may, at the time of signature or when depositing its instrument of ratification, acceptance or approval, specify the territory or territories to which this Convention shall apply.

2.      Any state may, at any later date, by a declaration addressed to one of the depositaries, extend the application of this Convention to any other territory specified in the declaration.  In respect of such territory, the Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date of receipt of such declaration by the depositary.

3.      Any declaration made under either of the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn by a notification addressed to one of the depositaries. The withdrawal shall become effective on the first day of the month following the expiration of a period of three months after the date of receipt of such notification by the depositary.

*Article 30*
*Reservations*

1.      Any state may, at the time of signature or when depositing its instrument of ratification, acceptance or approval or at any, later date, declare that it reserves the right:

        a.  not to provide any form of assistance in relation to the taxes of other Parties in any of the categories listed in sub-paragraph b of paragraph 1 of Article 2, provided that it has not included any domestic tax in that category under Annex A of the Convention;

        b.  not to provide assistance in the recovery of any tax claim, or in the recovery of an administrative fine, for all taxes or only for taxes in one or more of the categories listed in paragraph 1 of Article 2;

        c.  not to provide assistance in respect of any tax claim, which is in existence at the date of entry into force of the Convention in respect of that state or, where a reservation has previously been made

16

under subparagraph *a* or *b* above, at the date of withdrawal of such a reservation in relation to taxes in the category in question;

      d.  not to provide assistance in the service of documents for all taxes or only for taxes in one or more of the categories listed in paragraph 1 of Article 2;

      e.  not to permit the service of documents through the post as provided for in paragraph 3 of Article 17.

2.      No other reservation may be made.

3.      After the entry into force of the Convention in respect of a Party, that Party may make one or more of the reservations listed in paragraph 1 which it did not make at the time of ratification, acceptance or approval.  Such reservations shall enter into force on the first day of the month following the expiration of a period of three months after the date of receipt of the reservation by one of the depositaries.

4.      Any Party, which has made a reservation under paragraphs 1 and 3, may wholly or partly withdraw it by means of a notification addressed to one of the depositaries.  The withdrawal shall take effect on the date of receipt of such notification by the depositary in question.

5.      A Party which has made a reservation in respect of a provision of this Convention may not require the application of that provision by any other Party; it may, however, if its reservation is partial, require the application of that provision insofar as it has itself accepted it.

*Article 31*
*Denunciation*

1      Any Party may, at any time, denounce this convention by means of a notification addressed to one of the depositaries.

2.      Such denunciation shall become effective on the first day of the month following the expiration of a period of three months after the date of receipt of the notification by the depositary.

3.      Any Party, which denounces the Convention, shall remain bound by the provisions of Article 22 for as long as it retains in its possession any documents or information obtained under the Convention.

*Article 32*
*Depositaries and their functions*

1.      The depositary with whom an act, notification or communication has been accomplished, shall notify the member states of the Council of Europe and the member countries of OECD of:

      a.  any signature;

      b.  the deposit of any instrument of ratification, acceptance or approval;

      c.  any date of entry into force of this Convention in accordance with the provisions of Articles 28 and 29;

d.  any declaration made in pursuance of the provisions of paragraph 3 of Article 4 or paragraph 3 of Article 9 and the withdrawal of any such declaration;

e.  any reservation made in pursuance of the provisions of Article 30 and the withdrawal of any reservation effected in pursuance of the provisions of paragraph 4 of Article 30;

f.  any notification received in pursuance of the provisions of paragraph 3 or 4 of Article 2, paragraph 3 of Article 3, Article 29 or paragraph 1 of Article 31;

g.  any other act, notification or communication relating to this Convention.

2.      The depositary receiving a communication or making a notification in pursuance of the provisions of paragraph 1 shall immediately inform the other depositary thereof.

In witness whereof the undersigned, being duly authorised thereto, have signed the Convention.

Done at Strasbourg, the 25th day of January 1988, in English and French, both texts being equally authentic, in two copies of which one shall be deposited in the archives of the Council of Europe and the other in the archives of OECD.  The Secretaries General of the Council of Europe and of OECD shall transmit certified copies to each member state of the Council of Europe and to the member countries of OECD.

**ANNEX A**
**TAXES TO WHICH THE CONVENTION WOULD APPLY**

**(Paragraph 2 of Article 2 of the Convention)**

**ANNEX B**
**COMPETENT AUTHORITIES**

**(Paragraph. 1.d of Article 3 of the Convention)**

**ANNEX C**
**DEFINITION OF THE WORD "NATIONAL" FOR THE PURPOSE OF THE CONVENTION**

**(Paragraph 1.e of Article 3 of the Convention)**

**EXPLANATORY REPORT**

### Introduction

1.      The object of this Convention is to promote international co-operation for a better operation of national tax laws, while respecting the fundamental rights of taxpayers.

2.      A measure of co-operation already exists by virtue of various instruments, some bilateral, others multilateral, and the usefulness of these is well recognised.  However, commercial and economic relationships are now so greatly concentrated and diverse that it has been felt necessary to prepare a new instrument both general in scope - that is to say providing for the various possible forms of assistance and covering a broad range of taxes - and multilateral, allowing more effective international co-operation between a large number of states, through the uniform application and interpretation of its provisions.

3.      This instrument is framed so as to provide for all possible forms of administrative co-operation between states in the assessment and collection of taxes, in particular with a view to combating tax avoidance and evasion.  This co-operation ranges from exchange of information to the recovery of foreign tax claims.

4.      The Convention is open to the signature of member states of each of the two international organisations, which have participated in its drafting: namely the Council of Europe and OECD.  Co-operation between these states is greatly facilitated by the, fact that they have legal systems based on similar general principles of justice and law as well as economies that are interrelated.

5.      In this context, the Convention attempts to reconcile the respective legitimate interests of those involved: in particular, the requirements of mutual international assistance in tax assessment and enforcement, respect for special features of national legal systems, the confidential nature of information exchanged between national authorities and the fundamental right of taxpayers.

6.      Taxpayers have especially the right to respect for their privacy and the right to a proper procedure in the determination of their rights and obligations in tax matters, including appropriate protection against discrimination and double taxation.

7.      In applying the Convention, tax authorities will be bound to operate within the framework of national laws.  The Convention specifically ensures that taxpayers' rights under national laws are fully safeguarded.

**Commentary on the provisions of the Convention**

### CHAPTER I
### SCOPE OF THE CONVENTION

*Article 1*
*Object of the Convention and persons covered*

*Paragraph 1*

8.      Article 1 defines the object of the Convention, which is administrative assistance between states in tax matters.  Such assistance comprises all mutual assistance activities in tax matters which can be carried out by the public authorities, including the judicial authorities, and which are not covered by criminal law.  Action by judicial bodies carried out pursuant to criminal law and intended to punish criminal offences committed in the tax fields does, not therefore fall within the scope of application of the present instrument.  Any information or assistance which judicial bodies may need in order to judge and punish criminal offences in tax matters must therefore be obtained under the conventions for mutual assistance in criminal matters.

9.      The present Convention accordingly covers:

i. action by administrative authorities for the assessment and collection of tax and the recovery and enforcement of tax claims, as well as prosecution before an administrative authority and imposition of administrative penalties;

ii. action by judicial bodies to assist the administrative authorities in carrying out the tasks mentioned in the preceding paragraph; in a few states, for example, the judicial authorities alone can oblige witnesses to appear in connection with a tax inquiry or order the seizure of property by decision of the administrative authorities;

iii. the preparation of criminal proceedings in the tax area to be initiated before the judicial bodies.  However, once criminal proceedings have begun before a judicial body, the Convention will not apply, in order to avoid any conflict with the European Convention on Mutual Assistance in Criminal Matters.

10.      The provision of assistance under the Convention is, however, subject to general limitations contained in Chapter N where national provisions preserving taxpayers' rights are safeguarded and where some possibilities of declining requests and limits to the obligation to provide assistance are stated.  Moreover, the legal principle of reciprocity is another element of balance in the implementation of the Convention, since a state cannot ask for a form of assistance that it is not ready to grant to other states.  The same principle of reciprocity is also a factor in the development of mutual assistance; because a state which wishes to draw more benefits from the Convention will be encouraged to offer more extensive assistance to other states.

*Paragraph 2*

11.      Paragraph 2 lists different forms of administrative assistance which the Parties may provide for each other, namely: exchange of information, including simultaneous tax examinations and tax examinations abroad, assistance in recovery, including measures of conservancy and service of documents.

12.      Considered as a whole, these three forms of assistance cover all the significant types of measure which it is envisaged it could be taken by the tax administration of one Party in co-operation in the carrying out of the duties of the tax administration of another Party.  Should new forms of co-operation be found In the future, it is considered that they should be the subject of a separate convention or a protocol to this Convention.  Within the framework of the three forms of assistance mentioned in the paragraph, Parties are free to make use of whatever techniques they feel appropriate for the implementation of the Convention, as described in Chapter Ill: these measures will be covered by the commitment stated in paragraph 1 of the article.

13.      The measures taken may relate to the various stages of the process of taxation: assessment, examination, collection, recovery and enforcement of a tax covered by the Convention.  Thus, the commitment to provide administrative assistance in tax matters may lead one tax administration to take action on behalf of another state at any of these stages of taxation, not only to combat tax evasion but also to ensure the better implementation of tax legislation (including that granting tax relief and to simplify administrative procedures.

14.      In practice, a tax administration will, in most cases, take action only when a request is made by the tax administration of another Party.  However, and essentially in the case of exchange of information, assistance can be provided spontaneously or can be prearranged so that, in certain recognised situations, assistance is provided automatically.

15.      Not all states may be in a position to provide all forms of assistance to other Parties.  Constitutional and other reasons may, for instance, prevent a state from being able to provide some of the forms of assistance listed in paragraph 2. That state will then have to enter a reservation on the Convention.

16.      Indications of the nature and scope of each of these forms of assistance are given in the relevant commentaries on Articles 4 to 17.

*Paragraph 3*

17.      Paragraph 3 deals with the personal scope of the Convention and makes it clear that administrative assistance between Parties is not restricted by the residence or the nationality of the taxpayer or of the other persons involved.  A similar provision, often expressed in different language, is to be found in many double taxation conventions.

18.      If the tax administration of state A requires some assistance in tax matters from state B, it is obviously because it has to assess or reassess, or to collect or recover, a tax due in state A from a person who may, or may not be, a resident or a national of state A. If that person is not subject to tax in state A there is no ground for any assistance in tax matters.

19.      On its side, the tax administration of state B will provide assistance to state A by making use of the powers it possesses under its taxation laws to obtain information, to examine taxpayers' accounts, to recover money and, more generally, to enforce those laws.

20.    The provisions of paragraph 3 are designed to make it clear that a person who is liable to tax in a state cannot prevent that state from requesting assistance from another Contracting State on the grounds that he is not a national, or a resident, of one or other of the two states. He is not prevented by this, however, from contesting a tax claim or enforcement or recovery measures as provided by Article 23.

21.    The following examples show some of the implications of paragraph 3, on the assumption that the whole Convention applies to states A B and C but that states D and E are not Parties to the Convention.

a.    A company in state D has three branches, one in state A, one in state B, and one in state E. The three branches have the same commercial activity but the branch in state E covers the market of state C through an independent third party. States A, B and C can exchange information on prices paid to the company by branches in A and B and to the branch in E by the independent third party in C. They can plan a simultaneous tax examination (see Article 8) of the branches in A and B and of the independent third party in C and, if they agree to do so, they can have foreign tax inspectors of the partners' countries taking part in these examinations.

b.    Some services are rendered to the branch in A directly by the company in D while the same services are rendered to the branch in B by that in E. States A and B can exchange information on the nature and the value of the services so rendered.

c.    The company has a bank account in C. State A knows that unrecorded discounts are refunded through this bank account. State B knows that the resident executives of the company receive additional salaries paid abroad through this bank. Both states A and B can ask state C for confirmation of the facts and the exact amounts paid through the bank.

d.    The company has immovable property in state A which is not part of the business property of the branch in A. It fails to pay the capital gains tax due on the sale of that property. State A can request the assistance of state C in the recovery of its tax claim out of the deposits in the bank, subject of. course to Article 19

22.    Similar examples could be given for an individual, being a national of state E and a resident of state D, who derives taxable income of various kinds from sources in states A and B and owns immovable property in state C where he keeps a bank account.

23.    It would be wrong to assume, however, from these examples, that individuals, companies and other entities have no protection against administrative assistance in tax matters. Such an interpretation would be incorrect, since tax administrations can only take those measures consistent with their domestic laws and with all the guarantees to the taxpayers attached to those measures. In addition, the Convention itself may restrict the use of some measures for the purpose of administrative assistance and grant some special types of protection that go beyond domestic rules, for example, in terms of secrecy. Thus the effect of strengthening co-operation between Parties is not to extend the existing domestic powers of their tax administrations but to improve them by widening the territorial area in which they can be effective.

*Article 2*
*Tax covered*

24.    This multilateral Convention is intended to have very wide scope. It covers all forms of compulsory payments to general government (that is to say to central government, political sub-divisions thereof or local authorities and to social security agencies) with the sole exception of those customs duties

and all other import-export duties and taxes which are covered by the international Convention on mutual administrative assistance for the prevention, investigation and repression of customs offences, prepared under the auspices of the Customs Co-operation Council. Apart from customs duties, it may thus apply to all the levies listed in the annual statistical bulletin `Revenue Statistics of OECD Member Countries", which indicates the scope of the levies covered.

25.     The Convention also covers compulsory social security contributions paid to social security agencies governed by public law, even if the latter do not, strictly speaking, constitute general government departments. What is important in this case is the nature of the contributions, which is identical to that of compulsory social security contributions paid to general government departments, whereas the structure or the method of operation of the agency managing the service in question is immaterial for the purpose of the instrument. On the other hand, compulsory contributions to private law institutions do not as such fall under this instrument even if the said institutions are 'under public inspection. The list of levies actually covered is given in Annex A to the Convention.

*Paragraph 1*

26.     Paragraph 1 lists the main categories of tax covered by the Convention, grouped to take into account the fact that not all countries are able or willing to provide assistance for certain categories of taxes and may enter reservations under Article 30.

27.     The taxes to which the Convention shall apply are grouped together in categories according to the OECD classification, which provides a systematic and internationally agreed classification and which is also the basis of the system of reservations provided for in the text of the Convention. Nevertheless, in view of the object of the instrument, it has been judged desirable to make certain changes in this classification. For example, taxes imposed on behalf of political sub-divisions of the state or of its local authorities have been taken out of the categories in subparagraph b. iii of paragraph 1 and put in an independent category. In addition, given the importance of taxes on the use or ownership of motor vehicles, it has been decided to place these in a special category (category E in sub-paragraph b.iii of paragraph 1), separate from that which groups together similar taxes on other movable property (category F in sub-paragraph b.iii of paragraph 1).

28.     A state must indicate in which categories its taxes are to be classified. This must be done at the latest when that state signs the Convention. When a state changes its tax system or otherwise wishes to change the scope of application of the instrument in its respect by including other taxes or withdrawing taxes from the list provided for in Annex A, it will observe the provisions of paragraph 3 or 4 of the article as the case may be.

29.     A state's decision to include any of its taxes in one or the other of the categories set out in Article 2 must be taken in the light of the objective characteristics of those taxes and not be arbitrary, as it affects the general working of the Convention, notably the application of the principle of reciprocity, the system of reservations and, ultimately, the rights and interests of the other states and taxpayers in general. It is conceivable therefore, in case of doubt as to the nature of a specific tax and its inclusion or non-inclusion in one or the other of the categories in Article 2, that consultations would take place between states and, where necessary, an opinion would be sought from the co-ordinating body provided for in Article 24.

30.     Sub-paragraph a refers to the taxes to which all Parties are committed to apply the Convention, and which consequently cannot be the subject of a reservation under paragraph 1, sub-paragraph a, of Article 30. These are taxes levied at central government level on income or profits, on capital gains or on

net wealth.  They are among the main taxes in most systems as well as those best suited to international mutual assistance.

31.     Sub-paragraph b refers to taxes in respect of which reservations may be entered under paragraph 1, sub-paragraph a, of Article 30, that is to say taxes other than those imposed by central government on income, its capital gains or net wealth.  It accordingly applies to any other taxes levied at central government level and to taxes in all categories imposed by levels of government other than central government.

   *Paragraph 2*

32.     This paragraph links the Convention to Annex A. Annex A details the taxes which are in force in the Contracting States at the date of signature of the Convention and to which the Contracting States wish the Convention to apply.

33.     The taxes of a Contracting State to which the Convention applies appear in Annex A in categories referred to in paragraph 1. These are the taxes in relation to which a Contracting State expects to receive assistance and should not include a tax in respect of which such Contracting State has made a reservation under paragraph 1, sub-paragraph a, of Article 30.

34.     Even if a state does not have any tax in a particular category, it is committed to providing administrative assistance in relation to taxes of other states in that category, unless it makes a reservation under paragraph 1, sub-paragraph a, of Article 30.

   *Paragraph 3*

35.     This paragraph has a twofold aim.  On the one hand, it provides the possibility for each state to modify, after the entry into force of the Convention, the list contained in Annex A either by deleting or by adding taxes provided for in paragraph 1. On the other hand, this paragraph provides for the procedure to be followed in respect of these changes and the time at which they take effect.

   *Paragraph 4*

36.     This paragraph is concerned with the case where national legislation is modified in the sense that identical or substantially similar taxes are added to or replace those listed in Annex A. The state concerned is under the obligation, by virtue of paragraph 4, to notify such changes but the Convention will be applicable to these taxes even before notification.

### CHAPTER II
### GENERAL DEFINITIONS

*Article 3*
*Definitions*

   *Paragraph 1*

37.     This article defines a number of terms used frequently in the Convention.  The definitions of "applicant state" and "requested state" under *a* require no further explanation.

38.      For the sake of simplicity the term "tax" is used throughout the Convention to signify all kinds of taxes (including social security payments) covered by the Convention in accordance with Article 2. As some countries have legal definitions of what constitutes a tax, and as such definitions may exclude other dues covered by the Convention, it was thought necessary to make it absolutely clear, by way of a specific definition (see sub-paragraph b) that the term "tax" comprises all payments listed in Annex A.

39.      It follows from the definition of the term "tax claim" under c, that the assistance is not to be restricted only to the tax proper, including additions and surcharges, but is also to cover interest on overdue tax and costs incurred in recovery.  It is fairly obvious that the assistance should cover additions or surcharges, as these essentially are still taxes, which often have a special purpose and are levied together with another tax, for example income tax, for the sake of convenience.  Whilst interest and costs of recovery are not taxes, there is good reason for including them here, since most countries levy interest on overdue payments and a tax debtor's obligation to reimburse a government for the expenses it has incurred in recovering the tax owed is also generally accepted practice.  It is understood that the term "tax" covers not only the personal obligation of the taxpayer or of the person subjected to social security contributions but also the responsibility of the person (for example employer or payer) who has neglected to withhold at source the tax and/or the social security contribution and/or to pay them to the administration.

40.      When making a request for recovery, the applicant state may state separately the amount of interest due for late payment.  Some states consider that assistance in recovery should be limited to the recovery by the requested state only of interest due up to the date of the request.  Some other states, on the contrary, consider that assistance in recovery should also apply to interest, which becomes due, according to the rules prevailing in the applicant state, up to the date of effective recovery of the tax claim.  The Convention does not favour either of the above approaches.  Accordingly, it leaves it to the Parties to reach agreement, for example on a bilateral basis, on the principles governing the calculation of interest to be recovered.

41.      The Convention also covers administrative fines.  The text of the instrument does not include a definition of administrative fines and the question is governed by domestic law.  An administrative fine is generally deemed to be any penalty the legal basis of which is determined by rules other than those of criminal law.  These fines may be imposed by the administrative authorities and provision is normally made for appeals against decisions in this matter.  It is possible that certain Parties may not wish to provide assistance in respect of such fines.  They must in that case enter a reservation on this point.

42.      The word "owed" in c is designed to make it clear that assistance cannot be requested where the amount of tax is purely speculative.  However, the definition is not intended to require that the amount owed. should be the full amount which may be finally due, and assistance in relation to assessments made on the basis of estimates is not precluded by the Convention.  To do otherwise would create difficulty for assistance under Article 12 (measures of conservancy).  It will, however, be noted under Article 11 that for assistance in recovery the tax claim must be enforceable and not contested in the applicant state, unless otherwise agreed between the states concerned.

43.      Nevertheless, problems may arise if states provide assistance prematurely.  The position of a taxpayer may be prejudiced and requested states may then be exposed to claims for compensation.  For this reason, although the laws of a number of states provide for recovery or conservancy measures to be taken at a very early stage, for example before the tax has been assessed, this possibility has not been

covered in the Convention.  On the other hand, some states have provisions for jeopardy assessments and these assessments[1] are covered by the Convention.

44.     The "competent authorities" are defined in d by means of a formal criterion: designation by states and inclusion in list B annexed to the Convention.  This is because, having regard to the scope of application of the Convention as defined in the instrument (Articles 1 and 4) and the differences between states in the matter of organisation and operation of government departments and the state in general, it is not possible to establish uniform rules in this connection; in some states, for example, the competent authorities will normally be the tax authorities or services, while in other states other bodies may carry out certain tasks in connection with administrative assistance in this area.  Any state may freely decide to change its competent authority/authorities.  If it does so, it is obliged to do what is necessary so as to avoid the change adversely affecting the other Parties or the general application of the Convention.  It should normally notify the change through one of the depositaries, issue directives or instructions for the future conduct of assistance activities in progress and communicate those directives or instructions to the Parties or persons concerned.

45.     The term "nationals" is given a definition in e based on the definition in Article 24, paragraph 2, of the OECD Model Convention on double taxation.  As regards individuals, they must possess the nationality of d Contracting State which may be defined by that state in a declaration to be included in Annex C. As regards legal persons, partnerships and associations, and other entities, the test is that used in the OECD text: they must derive their status as such from the laws in force in the state concerned.

   *Paragraph 2*

46.     This paragraph lays down a general rule of interpretation, giving priority to the specific definitions in the Convention itself, and then to the meaning of the term concerned in the law of the state applying the Convention in the particular case in question, except where the context clearly indicates a different meaning.

   *Paragraph 3*

47.     This paragraph provides for the procedure to be followed in relation to changes in Annexes B (competent authorities) and C (definition of the word "national") and specifies the time at which they enter into force.  It is derived from paragraph 3 of Article 2.

---

1.      That is, the determination of liability which is perhaps provisional but, for the purposes of collection or recovery is not contestable, without regard to the normal procedures for service of notices or appeals, etc., in order to obviate the loss of tax which might result from the delays involved in such procedures. because the taxpayer may, for instance, appear to be about to place himself, or his assets, outside the jurisdiction of the tax authorities.

# CHAPTER III
# FORMS OF ASSISTANCE

*Section 1*
*Exchange of information*

Article 4
General provision

*Paragraph 1*

48.    This article embodies the general obligation for the Parties to exchange any information that is foreseeably relevant to the correct assessment and recovery of taxes, which are due under domestic tax laws insofar as they are covered by this Convention. The binding character of this obligation is set out in Article 1. Exchanges of information are the most immediate form of administrative assistance between tax authorities. Such assistance is desirable for ascertaining and discovering facts, which may be of interest for the correct implementation of the domestic laws of the Parties. This may not only facilitate the enforcement of tax legislation, but also help the taxpayer to secure his entitlements to tax reliefs (for instance by making it easier for him to establish that he is not resident for tax purposes in a particular state, or that he has paid some foreign tax for which double taxation relief is due).

49.    Apart from the 1972 Convention between Denmark, Finland, Iceland, Norway and Sweden on administrative assistance in tax matters (the "Nordic Convention"), the directives adopted by the Council of the European Communities in December 1977 and 1979 (concerning mutual assistance by the competent authorities of the member states) and a few bilateral assistance treaties, the exchange of information between tax administrations was, until now, mainly based on the exchange of information provisions in the double taxation agreements, including those concerning taxes on income and capital as well as those concerning estate and inheritance taxes. Some of these treaties, especially income tax treaties based on the OECD model conventions, not only provided for exchange of information for the purpose of implementing the treaty but also to effect the correct assessment of domestic taxes covered by the, Convention.

50.    The scope of this article is wide. It should therefore assist Parties in combating international tax avoidance and evasion to the widest possible extent. The article makes it clear that the Parties are not at liberty to exchange information, which is unlikely to be relevant for tax purposes.

51.    The five main methods of exchanging information are the following:

    a.  exchange on request, that is to say the furnishing by the requested state of information relating to a particular case to an applicant state which has specifically requested it (see Article 5);

    b.  automatic exchange, that is to say the systematic sending of information concerning specified items of income or capital from one' Party to another (see Article 6);

    c.  spontaneous exchange, that is to say the passing on of information obtained during examination of a taxpayer's affairs or otherwise, which might be of interest to the receiving state (see Article 7);

       d.  simultaneous tax examination, that is to say the furnishing of information obtained in the course of the simultaneous examination in each Party concerned, on the basis of an arrangement between two or more competent authorities, of the tax affairs of a person, or persons in which these states have a common or related interest (see Article 8);

       e.  tax examination abroad, that is to say the obtaining of information through the presence of representatives of the tax administration of the applicant state at an examination of a tax matter in the requested state (see Article 9).

52.     It should be stressed that Article 4 does not restrict the possibilities of exchanging information to the five methods mentioned above.  In  general, the manner in which exchange of information will in the event be effected can be decided upon by the Parties, acting through their competent authorities.  It is not so much the character of the information, which determines the classification under the articles in the Convention, but rather the mechanism through which the information is exchanged.  In some situations, strict differentiation between the different types of exchange mentioned above may well become blurred, for example when competent authorities agree to send all information of a particular kind which may be detected in tax audits, or when a competent authority sends bulk information without prior agreement.  Arrangements for the automatic exchange of information may, in order to maximise effectiveness and minimise cost, limit the items, the length and the volume of information exchanged so that the difference between exchange on request and automatic exchange based on arrangements tends to be less clear-cut in practice.

53.     Simultaneous tax examinations and tax examinations abroad were not mentioned in the commentary on Article 26 of the 1977 OECD Model Convention.  These techniques for exchanging information are, however, within the scope of Article 26.  Similarly, Parties are not prevented from making use of any other advanced technique for this purpose, when their domestic laws so permit, industry-wide exchange programmes or joint auditing.  The emergence of these techniques is closely related to the growing internationalisation of economic life and the resulting necessity for closer co-operation between tax administrations.  Some countries might at present for a number of reasons be unable, or be able only under certain conditions, to participate in the forms of co-operation described in Articles 8 and 9. States may, by virtue of paragraph 3 of Article 9, notify their intention not to accept, in general, the presence of a foreign representative at a tax examination on their territory.

54.     Exchange of information may take place in a variety of ways acceptable to the competent authorities, for instance personal contact, telex or telephone and exchange of magnetic tapes, but when exchange is oral, it is normal to confirm it in writing afterwards.  With a view to speeding up formalities, especially in a field where quick information is necessary, the competent authorities can agree to delegate powers for more direct contacts (for example by telephone).

55.     This Convention covers not only assessment but also collection and recovery.  Without doubt a correct collection and recovery of tax are the desirable consequences of a correct assessment of the amount owed.  If it proves to be very difficult to recover the tax due in the Party which made the assessment, it may be essential to know whether the taxpayer owns assets abroad on which, with the help of the other Party, the tax claim can be recovered.

       *Paragraph 2*

56.     From the information received under the Convention, the tax authorities may in some cases suspect the existence of a criminal offence of a fiscal kind relating to one or more of the taxes covered by the Convention.  Under some systems of law, the authorities are then required to undertake a criminal

prosecution or communicate the file to the prosecuting authorities for action before a criminal court. Once criminal proceedings have begun in this way before a judicial body, this Convention will cease to apply: any additional investigation will have to proceed on the basis of a convention on mutual assistance in criminal matters (see paragraph 9 above). The information leading to the bringing of a prosecution cannot be used as evidence before a criminal court unless the requested state consents. Some states, especially those which refuse any form of mutual judicial assistance for tax offences, may legitimately consider that administrative assistance cannot directly serve as 6 basis for a criminal conviction or that the transmission of information must be surrounded by additional safeguards if their use is envisaged in a prosecution before a criminal jurisdiction, This question of the possibility of seeking a criminal conviction on the basis of information received from abroad must be distinguished from the question of measures designed to prevent any breach, in the framework of judicial proceedings, of the confidentiality such information must enjoy. This subject is covered by Article 22.

In this context, a criminal jurisdiction must be taken to mean any judicial authority empowered to inflict a sanction for a punishable offence.

Two or more Parties may by common agreement renounce generally the requirement of prior authorisation.

### *Paragraph 3*

57.    Some systems of national legislation contain provisions requiring the state to inform the person concerned before information is communicated to another state; other states are contemplating the introduction of a similar practice, either on the occasion of the legislative approval of the multilateral Convention or in the framework of general measures to protect the taxpayer.

Paragraph 3 permits each Party to notify one of the depositaries that its authorities may inform the persons concerned before transmitting information to another Party. The person "concerned" is defined by the provisions of national law; it may be a national or resident of the requested state about whom information is to be supplied to another state in order to enable it to verify or establish its own tax claim on the said national or resident; it may also be a firm operated in the requested state by one of its nationals or residents, from which information is to be 'obtained for communication to another state in order to enable the latter to verify or establish its tax claim on one of its own taxpayers who has a business relationship with the firm operated in the requested state.

### Article 5
### Exchange of information on request

### *Paragraph* 1

58.    As already mentioned in the commentary on Article 4, information exchanged on request will relate to a particular case indicated by the applicant state. Normally, the applicant state needs additional information to check the information supplied by the taxpayer in his return about income from, or assets in, the requested state. In many cases, the information will be requested because the applicant state suspects that the taxpayer did not give the complete or correct facts.

59.    Requests are normally made in writing. However, requests can be expressed orally and confirmed in writing afterwards. In some situations where information is required without delay, for example in cases involving itinerant activities, a request in writing is too cumbersome. In such situations the most efficient solution for the competent authority in the applicant state is to make its request by

telephone or telex.  Normally a request will be addressed to the competent authority of the requested state listed in Annex B but especially in the situation described above, for example in cases of exchange of information to combat tax avoidance or evasion in a special area, it may be useful to authorise a special contact person to act on the competent authority's behalf in the matter (see Article 24).

60.    As set out in the commentary on Article 4, the exchange on request is, with respect to recovery, the most appropriate form of exchange of information.  In, order to be able to recover tax claims in another Party" it may be useful, especially if the taxpayer is resident in the requested state, to know whether he has assets in that state.  A Party may request information irrespective of whether it is in a position to apply for assistance in recovery (for example because the tax claim concerned is being or may be contested).

   *Paragraph 2*

61.    Except in the situations dealt with in Articles 19 and 21, the competent authorities of the requested state will try to find the information requested in domestic tax files, but if the information is not so available, they should utilise all relevant measures authorised for the purpose of that state's tax in order to obtain the information.

62.    Information obtained from one Party may be transmitted by the competent authority of another Party, to a third Party, subject to prior authorisation by the competent authority of the original supplying state (see Article 22 and paragraph 1 7 of the commentaries thereon).


Article 6
Automatic exchange of information

63.    Information which is exchanged automatically is typically bulk information comprising many individual cases of the same type, usually consisting of payments from and tax withheld in the supplying state, where such information is available periodically under that state's own system and can be transmitted automatically on a routine basis.  By exchanging information in an automatic way, compliance is generally improved and fraud can be detected which otherwise would not have come to light.  The aim of the Parties will be to exchange such information in the most efficient way possible having regard to its bulk character.

64.    If such an arrangement and thus the items exchanged, become known to the taxpayers, the standard of compliance may be improved and both the number of cases and the amount of income understated are likely to decrease after some years.  However, there may be ways of maximising effectiveness and minimising costs, for instance by limiting automatic exchange to items where compliance is at its lowest by a rotation of items after some years of exchange and the use of standardised forms (see also paragraphs 67 and 68 below).

65.    This form of exchange of information requires a preliminary agreement between the competent authorities on the procedure to be adopted and on the items covered.  There may in fact be situations where such exchanges may not be very fruitful between particular countries, for example because little bulk information is available in one of them or economic relations between the countries are limited, or because it would involve too great a load on the tax administrations concerned.

66.    Agreement on the items to be exchanged and the procedure to be adopted is a prerequisite, since, in the first place, it would not be very effective to exchange every item which is capable of being exchanged automatically and, in the second place, it is not always necessary for partners to exchange information on the same items of income or with the same frequency under such an agreement.  The

amount and character of the items which are fit for automatic exchange will depend on each state's own domestic administrative systems. Such an agreement may be set up by two or more Parties, pursuant to the provisions of paragraph 1 of Article 24.

67.     Automatic exchange of information is the most obvious field for the use of standardised forms, though they may also be appropriate for the transmission of certain requests or answers. In general, the main advantages of standardisation would be avoidance of the need for translation by the use of standard (number) codes by all the countries concerned for the same items of income or capital, the speeding up of the exchange and a reduction in the workload of the competent authorities, since it would enable the information received to be used directly by case officers. On the other hand, information supplied could be sent directly to other Parties without the need for transcription. By definition, these advantages are achieved only if a large number of countries participate in a standardising exercise. The OECD Committee on Fiscal Affairs has therefore devised a standard form for such automatic exchanges. The states concerned should as far as possible make use of this form when exchanging information automatically between themselves, as recommended by the OECD Council Recommendation of 5 May 1981.

68.     Another possible technique for automatic exchanges would be the exchange of computer tapes, which is already possible between certain countries.


## Article 7
### Spontaneous exchange of information

*Paragraph 1*

69.     Information is exchanged spontaneously when one of the Parties, having obtained information, which it assumes, will be of interest to another Party, passes on this information without the latter having asked for it. Information exchanged spontaneously will often be more effective than information exchanged automatically because it mostly concerns particulars detected and selected by a tax official of the sending state during an audit or investigation (see paragraph 72 below). This kind of exchange differs from the other two in that the information is sent without previous request from the other state and without a prior agreement between the competent authorities on items of income and procedures.

70.     Paragraph 1 sets out the various instances where a Party shall forward to another Party, without prior request, information of which it has knowledge. Such a provision parallels the relevant provisions in the European Communities Directives for mutual assistance between competent authorities in tax matters.

71.     Spontaneous exchange of information does not normally take place in the field of recovery of taxes. However, it might well be useful to supply information spontaneously as a supplement to information exchanged on request relating to a recovery case.

*Paragraph 2*

72.     As the efficiency of spontaneous exchanges very much depends on the initiative of the supplying state, the competent authorities of the latter should take the necessary steps to ensure that information likely to be of interest to the other state is brought to its own attention. While it is the competent authority that is the responsible body in the exchange of information, full use should be made of the knowledge and resources of the whole tax administration when such assistance is rendered.

73.     The Work involved in this form of exchange of information and its ultimate utilisation usually requires a certain administrative effort on both sides, without an initial guarantee that the findings are actually going to be relevant for tax purposes.  For this reason it is advisable to concentrate on the provision of information which seems promising, for example because of its general importance or because of the amount of tax involved.  Information sent spontaneously should be accompanied by any further documentary evidence which is available and which might assist the other state.

Article 8
Simultaneous tax examination

74.     If the Parties concerned co-ordinate their tax examinations of the affairs of a person or persons in which they have a common or related interest, they will be able to obtain the greatest benefit from this exchange of information.  The purpose of Article 8 is to enable them to do this.

75.     This form of co-operation between tax administrations is likely to prove fruitful, in particular, when dealing with transactions between associated enterprises (and determining arm's-length prices).  It can also help to eliminate economic double taxation and to discover arrangements involving tax-haven countries.  Simultaneous tax examinations may also reduce the compliance burden for taxpayers by co-ordinating enquiries from different states' tax authorities and avoiding duplication.

*Paragraph 1*

76.     This paragraph requires the Parties to consult together at the request of one of them to determine cases and procedures for simultaneous tax examinations.  This consultation involves their, respective competent authorities.

77.     The applicant competent authority will inform the others of its choice of potential cases.  The other competent authorities will decide whether to enter into simultaneous tax examination of those cases and may also nominate other cases for consideration.

78.     A simultaneous tax examination will be possible only between competent authorities of Parties, which share an interest, or related interests, in the affairs of the relevant person or persons.  Even if this condition is fulfilled, one of the competent authorities concerned may consider that the operations involved are not substantial enough to justify the procedure.

79.     However, it is to be hoped that the requested competent authority. will be ready to take part in an examination if the applicant competent authority can demonstrate that it is a matter of some importance to it and that, as the case may be, the simultaneous examination may produce information useful to the requested competent authority's own investigations (see also the last two sentences of paragraph 53 of the commentary).

*Paragraph 2*

80.    This paragraph defines what is meant by a simultaneous tax examination.  The subject of the examination is described as "the tax affairs of a person or persons in which they (the Parties) have a common or related interest".  These words may be construed widely.  They comprise the single person resident in one of the Parties who performs activities in another Party or other Parties as well as related persons resident in two or more Parties; and they may also in suitable cases comprise unrelated persons, resident in different Parties who, although not under common control and/or ownership, nevertheless share close trading or other links.

81.    The first case includes individuals resident in the first Party who carry out professional or other activities in the other Parties as well as enterprises resident in one Party which operate through a permanent establishment in the other.

82.    The second and third cases apply principally to companies.  The second case covers multinational enterprises, which carry out intra-group transactions (which may involve tax-haven countries).  The third case will comprise enterprises which, although not related, trade together so closely that information about the affairs of one (for example the prices of goods sold and purchased) would be of use to the authority responsible for the tax affairs of the other.

83.    Once agreement has been reached on implementation of a simultaneous tax examination, the tax administration personnel in charge of the case selected will consider with their counter arts from the other Party or Parties involved their examination plans, the periods (for example tax years) to be covered, possible issues to be developed and target dates.  Once agreement has been reached on the general lines to be followed, officials of each state will separately carry out their examination within their own jurisdiction.

84.    In the case of related enterprises, the responsibility for co-ordinating the examination and exchanges of information will most usefully rest with the competent authority of the Party in which the parent or base company is located.  If a parent company which is involved is resident outside all the participating Parties, the competent authorities of all the Parties involved will together decide which country should. act as co-ordinator.

Article 9
Tax examinations abroad

*I.    Preliminary remarks*

85.    Traditionally exchange of information under double taxation conventions and mutual assistance conventions has been carried out in writing.  A written procedure is necessarily time-consuming and may for that reason be less effective than other less formal procedures.  In certain situations, rapid action on the part of the tax administration is required, for example to combat tax evasion in relation to international hiring out of labour or to itinerant activities.  Further, in order to be able to ascertain a. clear and complete picture of business and other relations between a resident of a Party who is the subject of a tax examination and his foreign associates, it is often of great value to be able to follow at close proximity an examination initiated in the foreign country.  In fact, experience has shown the need to open up the possibility of representatives of the tax authorities being physically present at such tax examinations in another country as are of interest for tax examination in their country.  This article provides for such a possibility.

86.     The decision as to whether the foreign representative may be allowed to be present lies exclusively within the hands of the competent authority of the state where the examination is to take place.

87.     In some states, the foreign representative's presence would be regarded as an infringement of that country's sovereignty or contrary to its policy or procedure.  In other states, such presence is admitted only if the      taxpayer does not object to it.

88.     On the other hand, other countries consider the presence on their territory of a representative of a foreign authority to be acceptable on the condition that the tax examination is carried out strictly in conformity with their law and practice.  Article 9 is drafted with such considerations in mind and is intended to cover the need for such express provisions in international agreements which most states seem to require in order to be able to allow foreign representatives to be present at their tax examinations. Those states which are able to accept that foreign representatives can exercise more extensive authority within their territory than **is** envisaged by this article are free to do so, possibly subject to agreement under paragraph 1 of Article 24.

*II.      Commentary on the provisions of the article*

  *Paragraph 1*

89.     Paragraph 1 sets out the formal rules for initiating a request for attendance.  Like the ordinary exchange of information procedure, which is carried out by correspondence, it stipulates that the request has to be made at the level of the competent authorities.  As far as procedures are concerned, the sequence of events is likely to be the following.  The applicant state will first ask for the information under Article 5. When it is determined that the information is not already available in the requested state, the latter will inform the applicant state that a special examination is necessary and is being considered.  The applicant state would then request, under Article 9, that his representatives be present at the special tax examination.

90.     It may be that a request for attendance will be made at the time the request for information is made, in case the information could only be obtained by means of a special investigation.  In other cases, information received spontaneously could lead a Party to ask permission to be represented at an investigation under way in another Party.

91.     It is understood that this kind of rather far-reaching assistance by a foreign tax authority should not be asked for unless the competent authority of the applicant state is convinced that the examination in the foreign country will contribute to a considerable extent to the solution of a domestic tax case. Furthermore a state should not make a request for attendance in minor cases.  This does not, however, necessarily imply that large amounts of tax have to be involved in the individual case.   Another justification for a request would be the fact that the matter is of prime importance for the solution of other domestic tax cases or that the foreign examination is to be regarded as part of an examination on a large scale embracing domestic enterprises and residents.

92.     It is in the interests of the applicant state to specify, as thoroughly as possible, the motives for the request.  The request should include a clear description of the domestic tax case, which is the basis for it.  This may have been provided already at the time of the initial request for information under Article 5. It should also indicate the special reasons why the physical presence of a representative of the competent authority is important.  If the competent authority of the applicant state wishes the examination to be conducted in a specific manner or at a specified time, such wishes should be stated in the request.

93.    The representative(s) of the competent authority of the applicant state may be present only for the appropriate part of the tax examination. The authorities of the requested state will ensure that this requirement is fulfilled by virtue of the exclusive authority they exercise in respect of the conduct of the tax examination (see paragraph 2 of this article and the related commentary).

*Paragraph 2*

94.    Paragraph 2 makes it clear that the decision as to whether representatives of the foreign competent authorities should. be allowed to be present or not is taken by the competent authority of the requested state.  The fact that the requested state has the decisive power in this respect does not, however, in any way restrict the obligation-on that state to furnish information which may be asked for under Article 5. It is therefore normal that a state declining a request should indicate the reasons by invoking, for instance, Article 19 or 21, or giving other reasons on which its decision is based.

95.    If the request is approved, the competent authority of the requested state is called upon to indicate the time and place of the examination and other particulars considered necessary, such as the authority or official responsible for the examination and any specific conditions stipulated for the conduct of the examination.

96.    All decisions on how the examination is to be carried out have to be taken by the authority or the official of the requested state in charge of the examination.  There should not be any question of exercise of authority in its strict sense by the foreign official.  The examination takes place under the control of the responsible official, who may decide what influence the foreign official may have on the actual conduct of the examination.  The foreign official may be able to co-operate actively (for example, suggest questions). or be restricted to a passive role (being present at the examination).  The foreign official is in any case bound by secrecy under the provisions of Article 22.

*Paragraph 3*

97.    This paragraph provides that states may make known their intention not    to accept, as a general rule, requests made by other states to participate in their tax examinations.  The reason for such a rule is twofold: on the one hand, it obviates the need for states not in favour of such participation to refuse systematically requests made by other states in this connection on the other hand, it makes it possible to avoid the entering of reservations and the rigidity resulting from them.  This provision consequently establishes a system whereby a state may notify all the other member states of the Council of Europe and the member countries of OECD that it is in principle not in favour of arrangements for foreign participation in tax examinations, but does not reject all possibility of co-operation in this area.  The declaration referred to in paragraph 3 may be made or withdrawn at any time, in a similar manner to reservations.

Article 10
Conflicting information

98.    This article is meant as a kind of feedback provision for the exchange of information articles of Section 1.

99.    The situation contemplated here is the following: a Contracting State has received information about a person's tax affairs from another Party under one of the types of exchange mentioned in the section and compares this information with information in its possession.  If it appears that the information received is to a large extent in conflict with the information in its possession, this article obliges the

receiving state to inform the providing state of its findings, in order to enable the latter state to clear this up with its taxpayer. The two states would normally consult with respect to the outcome of this further contact with the taxpayer concerned.

*Section II*
*Assistance in recovery*

General remarks on the scope of Section II

100.    By acceding to the Convention, a state takes upon itself the obligation within certain limits (see Articles 19 and 21), to use the powers it has under its domestic law to recover taxes owed to another Party. As indicated in paragraph 1 of Article 11, the requested state will proceed as if the tax claims concerned, were its own tax claims, except in relation to time-limits which are governed solely by the laws of the applicant state (Article 14), and in relation to priority (Article 15).

101.    Earlier conventions or model conventions on administrative assistance often contained a provision stipulating that no assistance would be lent by the requested state against its own nationals. The present Convention does not follow this line. In the present state of co-operation with each other, member states of the Council of Europe and OECD member countries have little reason for refusing to lend assistance in recovery from their own nationals. On the same line of thinking, the present Convention provides for assistance against any person who has incurred a tax debt in the applicant state, whether he is a resident of a Party, or of a third state (see the commentaries on Article 1, paragraph 3).

102.    Assistance in recovery may include measures not only against the taxpayer but also against any person who, according to the laws of the applicant state, may be liable for payment of the tax (see also the commentaries on paragraph 3 of Article 1). It is the law of the applicant state, which determines who falls within the scope of this provision, and not the law of the requested state. This follows also from paragraph 2 of Article 23, which provides that disputes concerning the existence of the claim shall be brought only before the competent body of the applicant state.

103.    The cases in which persons other than the taxpayer himself, may be liable for the payment of tax vary greatly. It is therefore useful to give examples of the more frequent cases.

104.    The most common situation is that where persons making payments, which have in the hands of the recipient the character of income, must withhold tax from such -payments. Thus, in most countries, employers are obliged to withhold tax from the wages they pay and to hand over the amounts thus withheld to the tax collector as tax due from their employees. Withholding taxes on payments such as dividends, interest and royalties often have the same character.

105.    Secondly, the law may hold both parties to certain contracts or transactions liable to payment of a tax, which is primarily due from one of them in connection with such contracts or transactions. These cases often occur in the field of indirect taxes, of import and export duties and of gift taxes.

106.    Then there are cases in which the liability of one person for payment of taxes owed by other persons **is** a consequence of a special relationship between these persons. Thus, members of a partnership, for example, are often jointly and severally liable for all debts of the partnership, and so any individual partner may have to pay, *inter alia,* the sales tax owed by the partnership.

107.    Finally, there are cases in which persons are held liable for payment of taxes owed by their predecessors.  There are states that hold the owner of immovable property liable for taxes related to such property -which were owed by his legal predecessor in the years before the transfer.

108.    A distinction can be made between the cases referred to in paragraphs 103 to 107 above and cases where the assets are in the possession of a third party.  In the former cases, the person who is liable for the payment of tax is personally liable.  In the latter cases, however, there may be inconvenience for the third party, but his assets are not affected; it is only the assets of the debtor that are seized.  Examples are money or securities deposited with banks.

109.    The present Convention covers assistance in recovery in both categories of case, in order to provide for maximum efficiency in the assistance lent by the requested state.

110.    The cases in which a person is made liable for the payment of another person's tax may vary considerably from one state to another.  In view of paragraph 2.a of Article 21, it might be thought that assistance under the present article may be refused when a person is made liable for the payment of another person's tax under the law of the applicant state but would not be so liable under the law of the requested state.  However, it is not intended that limitations provided for by paragraph 2.a of Article 21 shall apply in this case, since this provision is concerned with recovery measures and not with the basis of liability itself.

111.    Parties, which are not able to provide assistance in recovery, may enter a reservation under paragraph 1.b of Article 30.

Article 11
Recovery of tax claims

*Paragraph 1*

112.    This paragraph is designed to make it clear that, upon a request by a Party, the requested state has to take action to recover taxes owed to the applicant state, provided the tax claim meets the conditions laid down in this section of the Convention.  The paragraph also regulates the way in which the tax claim of the applicant state is to be recovered by the requested state.  The recovery has to take place as if the requested state were recovering a tax claim of its own, except in relation to time limits (Article 14) and priority (Article 15).  In particular where the laws of the requested state in respect of the recovery of tax claims provide for measures taken by judicial bodies, such action is covered by the Convention (see paragraphs 8 and 9 above).

113.    The question may arise as to which procedure the requested state is to follow.  As the Convention covers several kinds of taxes in addition to taxes on income and capital, it is possible that the request concerns a tax, which does not exist in the requested state. However since the applicant state has to indicate the character of the tax in the recovery of which assistance is requested (see paragraph 1.d of Article 18); this should not give rise to serious problems.  The requested state will then follow the procedure applicable to a claim for a tax of its own which is similar to that of the applicant state or any other appropriate procedure if no similar tax exists.

114.    The reference to the procedures of the requested state covers not only its statutory provisions but also the relevant administrative practices.  As the collecting authorities are familiar with these procedures, the extra burden of assistance should not weigh too heavily on the administrative machinery of the requested state.  Particular problems may arise for implementing the provisions of the article, for example

when the cost of recovery exceeds the amount of tax due.  Whilst the applicant state should avoid pursuing small amounts under the Convention, both Contracting States may consult, under the provisions of Article 24, to overcome any difficulty.  They may also agree on minimum amounts to be recovered.

Paragraph 2

115.    This paragraph stipulates the conditions under which a request for assistance in recovery can be made and contains in this respect a double guarantee.  In the first place, the tax claim has to be the subject of an instrument permitting its enforcement in the applicant state.  This provision is aimed at preventing recovery from taking place in the requested state at too early a stage, that is to say before the tax has been assessed.  Recovery of taxes, the amount of which has not yet been determined, can be damaging to the taxpayer and may cause the requested state to run the risk of being held responsible for the consequences of the premature recovery.  Of course, the requested state also has to be able to recover the claim under its domestic law when the request is made.

116.    In the second place, this article requires that the amount of tax due is not contested.  If the tax claim has been contested, assistance can normally be requested only if the contestation has been the subject of a final decision.  Nevertheless, the article provides for the possibility of the Parties agreeing otherwise, in other words seeking recovery without waiting for the appeal proceedings to be concluded.  Such a possibility should make co-operation easier with certain states in, which the taxpayers have extensive rights of appeal and ensure that such appeals, which tend to lengthen the procedure, do not prevent recovery of claims.  The applicant state would none the less be required under its own law to refund to the taxpayer any amount of tax wrongly collected, together with interest and related charges where appropriate, in cases where the taxpayer's appeal is subsequently upheld.

117.    Where a tax claim is made against a person who is not a resident in the applicant state and might consequently be less well informed, this article introduces an additional requirement intended to increase the safeguard for the taxpayer.  It will no longer be sufficient, in order to apply for assistance in recovery, for the claim not to have been contested; it will also be necessary --- unless there is a specific agreement between the Parties on this point --- for no further contestation to be possible.  Thus, in the absence of a particular agreement between the Parties concerned, the remedies available to the taxpayer and to the applicant state respectively for contesting or substantiating the validity of the tax claim must have been exhausted before a request for assistance in recovery is made. But only effective remedies within the framework of the domestic legal system need to be exhausted, that is to say only ordinary means such as appeals and pleas of nullity and not extraordinary means such as the reopening of the case or the setting aside of a judgement that has been obtained.  A claim cannot be regarded as one, which may be contested within the meaning of this provision solely because such possibilities exist.

The agreement of principle between Parties to derogate from the requirements on contesting tax claims is by way of an international arrangement concluded between authorities empowered to commit the state under the internal constitutional order.

118.    Special problems might arise in relation to provisional assessments since they can seldom be contested. These problems do not directly affect paragraph 2, but it might be doubted whether a provisional assessment for the full amount could be regarded as tax actually owed and therefore be considered to be a tax claim as defined in Article 3, since only in the final assessment are all the relevant circumstances taken into account.  The result could, at least in theory, very well be restitution to the taxpayer.  It is clear therefore that states should exercise care in asking for assistance in the recovery of tax charged under provisional assessments.  In such circumstances, it might be more appropriate to ask for measures of conservancy.

119.    The guarantee referred to in paragraph 116 above is based to a certain extent on an administrative practice of states according to which recovery of the contested part of a tax claim is often deferred (although sometimes only after security has been provided by the taxpayer), whereas the uncontested portion has to be paid within the normal time limit.  But in this case, contesting a claim, even in part, may prevent the whole claim from being recovered in the requested state, which provides a further guarantee for the position of the taxpayer.

120.    The Convention tries to provide a reasonable balance between the need for the tax authorities to obtain the amount owed and the desire of the taxpayer to pay no more than he actually owes.  In order to achieve this, Article 12 stipulates that the requested state can take, on request, measures of conservancy for the benefit of the requesting state, even if the tax claim does not promptly with the conditions of paragraph 2 of this article.  More details are given in the commentary on Article 12.

Paragraph 3

121.    The aim of the provisions of paragraph 3 is to limit assistance in recovery from the estate of a deceased person to the value of that estate, so that it will not extend to the personal assets of those entitled to the estate.

122.    For various reasons it is considered reasonable to restrict, to some extent, recovery from an estate or from heirs.  In the first place, there may very well be ignorant of the fact that the deceased person left tax debts in another country.  In itself this is no reason to protect them at the expense of the tax authorities of the applicant state; but it is considered reasonable not to take their personal assets to meet the claim of that state, a risk which becomes greater the more the field of application of the Convention is extended.  Further, the laws of the various states may have different consequences in relation to the responsibility of the heir for the debts of the deceased in the case of unconditional acceptance of an inheritance.  Finally, it may be very difficult for the' successors of a deceased person, who had connections with various countries, to estimate whether the estate will be solvent or insolvent.  Therefore it would appear appropriate to limit the extent of the assistance provided in that context.  At the time of the request, the applicant state should inform the requested state about the limit of the recoverable amount and provide details of the value of the estate or the property acquired by each beneficiary of the estate.

123.    1t may be noted that this paragraph in the first place covers tax claims in the name of the deceased, that is to say, not only taxes established during his lifetime and not paid at the date of death, but also taxes assessed in the name of the estate after that date but in respect of activities exercised (income taxes), capital assets (taxes on net wealth) or for business transactions carried out (turnover tax) before that date as well as estate taxes themselves.

124.    But the provision is also applicable to taxes recoverable from the heirs in cases in which the estate has already been distributed 'at the time that the recovery takes place.  Paragraph 3 stipulates that the amount of tax recovered from each of the persons benefiting from the estate against whom a claim can still be made shall not exceed the value of his portion of the estate.

125.    At first sight, it might appear that if assistance in recovery of a tax claim in respect of a deceased person, for example income tax and turnover tax which are due abroad, coincides with the levying of an estate or inheritance tax, then this could lead in the end to recovery of more than the total value of the estate.  This, however, could only be the case if, in the valuation of the estate or of the acquisitions from it, all the tax debts of the deceased were not taken into account.  If a request for assistance clearly indicates that a foreign tax debt of the deceased has not been taken into account, this would normally justify a reopening of the assessment and so lead to a proportionate reduction in estate taxes.

Article 12
Measures of conservancy

126.    In most states, the law permits the recovery of tax notwithstanding that the claim is contested or may be contested.  However, the possibility of recovery in the requested state may disappear in the period between the date on which the applicant state can itself collect and that on which assistance in recovery can be requested.  In order to safeguard the rights of the applicant state, this paragraph enables it to request the other state to take measures of conservancy, even if it is not yet possible to ask for assistance in recovery.  Such measures could include the seizure or the freezing of assets of the taxpayer before final judgement to guarantee that they will still be there when the enforcement takes place.

127.    This article does not define all the conditions required for the taking of measures of conservancy, as these conditions may vary from one state to another.  The Convention recognises this situation, but lays down one condition which must be complied with in every case, namely the requirement that the amount of the tax be determined beforehand, if only provisionally or partially (see also paragraph 118 above).

128.    As is the case with assistance in recovery, it is clear that in any event a request for measures of conservancy cannot be made before the applicant state itself can take such measures.

129.    The applicant state needs to indicate in each case what stage in the process of assessment or recovery has been reached.  The requested state will then have to consider whether in such a case its laws and administrative practice permit it to take measures of conservancy.

130.    1t may be noticed especially that, insofar as these measures are taken before the start of the recovery procedure proper, they are often taken at a time when the existence or amount of the tax claim may still be contested in the applicant state.  It will be clear that such a challenge does not result in a stay of these measures, the essence of which is precisely that they can be taken pending the result of court or other proceedings in respect of the tax claim.

Article 13
Documents accompanying the request

Paragraph 1

131.    Under this section a tax claim-in respect of which assistance is requested must meet certain conditions which are directed only at the applicant and the requested state.  Article 13 deals with the way in which it is to be ascertained that these conditions are met.

132.    First of all, the applicant state has to declare that the claim relates to a tax to which the Convention applies.  No formal requirements are prescribed for this declaration.  In the case of assistance in recovery, the applicant state must also declare that the claim is not contested or, where it is directed against a- person who is not a resident of that state, that it may not be contested (sub-paragraph a), unless the exception provided for in paragraph 2 of Article 11 applies (see paragraphs 116 to 118 above).

133.    The applicant state is also required to submit with the request for assistance an official copy of the instrument permitting its enforcement in that state as proof of the enforceability of the claim (sub-paragraph b).  The purpose of sub-paragraph b is to furnish the requested state with a document, which can serve as an authorisation for the actions of enforcement it is requested to perform.  The text only refers to the instrument permitting enforcement of the tax claim without further specifying what kind of document is meant.  In fact, it is impossible to be more specific about this instrument in the Convention as this

41

depends on the domestic laws of the applicant state.  This matter is further discussed in the commentary on paragraph 2 of this article.

134.    If other documents are required for the actual recovery or measures of conservancy, according to the laws of the applicant state, an official copy of these documents must also be submitted (sub-paragraph c).

135.    The exact nature of the documents referred to in sub-paragraphs b and c will have to be determined by the competent authorities, for instance under the regulations for the mode of application of the Convention (paragraph 1 of Article 24).  If the tax claim has been contested, subparagraph c requires that a copy of the decision taken must be submitted with the request for assistance.  The applicant state must then also indicate whether further remedies were open after this decision.  If so, it can be said that the claim may not be contested only if the time limits for these legal remedies have elapsed.

Paragraph 2

136.    Where a request for assistance meeting the conditions of the Convention has been received, the requested state will have to take steps to recover the tax claim of the applicant state.  To this end the authorities of the requested state will need an authorisation or an instrument entitling them to undertake measures of enforcement.  It is with this instrument that paragraph 2 is concerned.  The text is designed to make it clear that the aim must be to enable the enforcement in the requested state through administrative channels.  It enumerates ways of doing so.  The Contracting States will have to decide in what way the requested state shall operate its powers of enforcement, as provided for under the last sentence of paragraph 1 of Article 24.

137.    Some states may be able to accept a foreign instrument as permitting enforcement in their own territory.  Other states, however, will not be able to recover the tax claim of the applicant state within their territory without further measures.  These can be of various kinds: the instrument permitting enforcement in the applicant state may have to be recognised in the requested state, or it may have to be supplemented or even replaced by an instrument permitting enforcement in the territory of the requested state.

Article 14
Time-limits

138.    This provision is worded to avoid using terms such as "prescription" or "limitation", which not all legal systems construe identically.  What is envisaged hereunder is the rule of law according to which the debtor can be relieved from enforcement by lapse of time.

Paragraph 1

139.    When a state recovers, under its domestic procedures, taxes owed to another state, the question inevitably arises as to which state's laws are to govern the period beyond which a tax claim cannot be enforced.  On the one hand, the requested state might be reluctant to lend assistance if its relevant period is shorter than that of the applicant state and has expired.  On the other hand, when that period in the applicant state is shorter than in the requested state and has expired, the first state obviously may no longer ask for the assistance of the other; a problem

140.    Where these periods differ in the two states, there are various possible solutions.  One would be to apply the time-limit of the applicant state, another to apply the time-limit of the requested state and a third would be to apply the shorter of these lime-limits.

141.    Conflicting opinions can be held about the solution to be adopted in a convention in this field. One view is that the time-limit (hereafter TL) of the requested state should apply, mainly because of the risk that, if the requested state operates on the basis of different TLs from those which apply in the recovery of its own taxes, the consistency and certainty under its own laws could be undermined. However, another view is that the TL of the applicant state should apply.  The main argument for this solution is that the requested state is providing assistance in the recovery of a claim which has arisen under a different system of law, which undoubtedly governs the creation and the extinction of that claim. Therefore, as long as the right to recover the claim has not been lost by the expiry of the TL under the laws of the applicant state, the claim remains in being and can be recovered.

142.    In this Convention, paragraph 1 provides that questions concerning any period beyond which a claim cannot be enforced shall be governed solely by the laws of the applicant state.  Since these laws, and these laws only, are to be applied, it follows that as long as the validity of the claim has not expired under these laws, this validity may not be affected by the fact that the TL of the requested state has expired.

143.    Quite a different approach would have been to have had no specific rule on this subject in the Convention but to have allowed the requested state to invoke Article 21 and refuse to lend assistance in cases where the TLs in the applicant state are longer than its own.  However, it has been felt preferable that conflicts between the TLs of two states be solved by specific provisions.  Accordingly, paragraph 1 offers a precise solution to the problem.

144.    The second sentence of paragraph 1 obliges the applicant state to give particulars about its TL when making the request; the most important information will normally be the date of expiry of the claim but in some circumstances further details may be useful.

Paragraph 2

145.    A request for assistance in recovery does not affect the possibilities which the applicant state has of suspending or interrupting under its laws the TL specified in paragraph 1 This does not require provisions in the Convention, since paragraph 1 stipulates that the laws of the applicant state govern any question relating to time-limits.

146.    However, the requested state, when recovering the foreign claim according to its own laws and administrative practice, may have to take steps in order to suspend or interrupt that TL and it is not obvious that the steps provided for by its domestic laws would have the effect of suspending or interrupting the TL under the laws of the applicant state.  In order to make the position clear, paragraph 2

43

stipulates that measures by the requested state to suspend or interrupt the TL shall have the same effect under the laws of the applicant state.

147.    It follows that, when measures to this effect are taken. by the requested state, the effect thereof for the applicant state will be the same as if it had taken such measures itself.  For instance, if the requested state has taken a measure on a certain date which would, as a consequence thereof, become the starting-point for a new TL if it were taken in the recovery of its own taxes, the result of paragraph 2 is to provide the applicant state, from that same date, with a new time-limit of the same length as under its own laws.

148.    Since both the applicant and the requested states may suspend or interrupt that period, it is evident that they have to keep each other informed about measures taken to this effect.  In its own interest and as required by paragraph 1, the applicant state will inform the requested. state about its own measures; paragraph 2 obliges the requested state to inform the applicant state about its measures, since the laws of that state govern the TL and it is essential for the applicant state to keep, the position under review in order that its tax claim can still be enforced.

Paragraph 3

149.    Legal systems differ considerably with regard to the length of the period beyond which a claim cannot be enforced.  On account of many states' reluctance to assist in the recovery of long-standing claims, this paragraph provides that there is no obligation to comply with a request for assistance "submitted over fifteen years from the date of the original instrument permitting enforcement".

150.    The fifteen-year period is such, as to avoid an obligation to assist recovery of long-standing claims; yet it is sufficient time for disputes over the existence or the validity of a claim to be settled domestically before assistance is requested under the Convention.  The period runs from the date of the original instrument permitting enforcement.  By "original instrument permitting enforcement" is meant the instrument originally issued, permitting enforcement in the applicant state within the meaning of paragraph 1.b of Article 13 of the Convention.  Legislation in some states requires renewal of the enforcement instrument, in which case the first instrument is the one that counts.  The date of the original instrument is ,easily ascertainable, which makes it to avoid inquiries and conflicts relating to interruptions of the period.

## Article 15
### *Priority*

151.    In order to ensure that they can recover taxes to the fullest possible extent, states generally include in their laws provisions giving their tax claim priority over the claims of other creditors.  This priority becomes apparent if the property of the taxpayer is seized, for instance in the case of bankruptcy. Sometimes special categories of taxes are a prior charge on certain goods, or the laws may provide for a prior charge on immovable property for tax debts in general.

152.    The article provides that the tax claim in the recovery of which assistance is provided shall not have in the requested state any priority specially accorded to the tax claims of that state.  This means that the priorities enjoyed by the requested state for the recovery of its own tax claims are not automatically extended to the tax claims of the applicant state.  There are various reasons for this provision.  First, the residents of a state are by and large well acquainted with the taxes, which their state levies and with the priority that such tax claims enjoy.  It cannot however be expected of residents of a state that they should

also be acquainted with any priorities that tax claims of another state might have.  It would be very unsatisfactory, for creditors in a state if the courses open to them for recovery, already restricted by the priority given to that state's tax claims, were also to be restricted by the priority being given to tax claims of another state.  Other reasons for denying priority to claims of the applicant state in the requested state are to avoid competition between the priorities of the taxes of the two states or the complication of devising special rules for such occasions.

153.    The rule that the applicant state's tax claim must not be given any special priority attaching to the requested state's claims is absolute, applying `even if the recovery procedure used is the one applicable to its own (that is to say the requested state's) tax claims`.  This provides a precaution against giving unjustified priority to the applicant state's tax claims by applying to them rules of procedure normally applicable in the requested state to the latter's own tax claims.

154.    Nevertheless, the article does not limit in any way the possibility for the requested state, as in the case of any other creditor, to obtain security in general law in order to guarantee the tax claim of the applicant state, for example by the registration of a charge on immovable property.

Article 16<br>Deferral of payment

155.    The domestic laws of states contain provisions, which empower the state under certain circumstances to soften the full force of the law concerning recovery of tax claims in particular cases.  Most states will also have developed administrative practices on this point.

156.    This article makes clear what is already implied in paragraph 1 of Article 11, namely that deferral of payment or payment by instalments is permitted where the law or administrative practice of the requested state provides for this.  This provision is not intended to cover cases where a short period of delay is allowed to enable the taxpayer to realise assets to meet the tax claim.  It recognises the essential element of flexibility which most recovery procedures contain in order to deal with cases of genuine financial hardship or of practical difficulties in realising certain assets in the short term; it will normally be in the interest of both the applicant and the requested state to solve this special problem in a fair and practical way.

157.    The requirement, that the requested state is to inform the applicant state before deferral of payment or payment by instalments is allowed, elaborates on the basic provisions of Article 20 (response to the request for assistance) and is meant not only to give the applicant state notice of the proposal but also an opportunity to provide, then or later, information which will show that this concession to the taxpayer is not, in the particular circumstances, justified.  In general, however, once an arrangement is made by the requested state, it should not be disturbed unless there are new and special circumstances, for example, the taxpayer has received substantial further assets or has been found to have concealed assets.

158.    Where there is disagreement between the states on questions of deferral of payment, it has to be remembered that the applicant state has found itself unable to collect its tax anyway and that it is the law and administrative practice of the requested state which predominates in the recovery procedure.  It is of course possible for the applicant state or the requested state (under Article 12) to take measures of conservancy in any suitable case as additional protection when deferral, etc. arrangements -are made with the taxpayer

45

159.    However, when the applicant state is prepared to grant to its taxpayers longer deferral of payment than is provided for under the laws of the requested state, there is no reason for that state to be less lenient than the applicant state *vis-à-vis* the latter's own taxpayer.  The applicant state should indicate at the time of its request whether this is the case.  It should similarly inform the requested state if it decides to suspend the action for a period of time (see commentaries on Article 18).

*Section III*
*Service of documents*

Article 17
Service of documents

Paragraph 1

160.    There are often difficulties for states in serving documents abroad (for example in the case of a tax claim against a non-resident).  The Convention therefore provides for administrative assistance between Contracting States in this area.  Although such assistance may, in principle, be requested at all phases of tax proceedings, assistance in the service of documents as referred to in this article will in practice relate mainly to the assessment phase.  The aim here is to ensure as far as possible that documents such as notices of assessment or reminders actually reach the taxpayer, in order to avoid enforcement steps being taken against a taxpayer who is genuinely ignorant of the tax claim or is merely neglectful. Documents shall be served if required for the activities of the tax authorities or for the protection of taxpayers.  The provision shall be inapplicable to any other circumstances, in particular to audits for non-tax purposes.  As they may mutually agree on the mode of application of this provision, in accordance with Article 24, paragraph 1, of the Convention, the Contracting States may indicate whether they want to be informed of the content of the documents to be served.  Relying upon paragraph 2.b of Article 21, the requested state may object to the service of a document which, in itself or because of its implications, it considers contrary to public policy.

161.    In the great majority of countries, the possibility of recovery does not depend on whether the documents have actually reached the taxpayer Most states have regulations concerning the way in which documents must be brought to the attention of the taxpayer in normal cases.  Often there are also regulations to cover cases in which the taxpayer lives abroad or his address is not known (for example documents are sent via consular missions or posted in public buildings).  Generally, recovery can take place even when it is not certain that the notice to pay or final demand has reached the taxpayer.

162.    For the reasons given in the foregoing paragraph, uncertainty that service of documents has been achieved should not in most cases be a legal obstacle to granting assistance in recovery.  Also, assistance in the service of documents is an additional administrative burden on the requested state.  Therefore, the omission of a provision on this subject would not have seriously weakened the Convention.  Even so, such a provision gives additional protection for the taxpayer, may strengthen the recovery procedure and may itself lead to payment without the need for further assistance.  However, Contracting States which are not able to provide assistance of this kind may enter a reservation under paragraph 1.d of Article 30.

Paragraph 2

163.    This paragraph deals with the procedure to be followed by the requested state in serving the applicant state's documents.  The service of documents will be effected by the requested state as if they were its own documents, that is to say by a method prescribed by its domestic laws for documents of a substantially similar nature (sub-paragraph a).

164.    There are cases, however, where the applicant state has a preference for a certain method of service.  Such' a preference may be expressed when sending the request for assistance.  The requested state shall then effect service of documents accordingly, insofar as the method requested by the applicant state is available under its own laws.  If not, it will make use of the closest method available under its domestic laws (sub-paragraph b).

Paragraph 3

165.    While states may agree to assist each other in this matter, it is clear that this will lead to an increase in the workload as two tax administrations will be involved.  An obvious way of avoiding this extra work is to send directly by post notices of assessment, tax demands or other do amounts to the taxpayer abroad, it being understood that such sending by post cannot always be regarded as equivalent to an official notification -under the laws of the taxing state.  Paragraph 3 provides for such a possibility.

166.    In the majority of countries, the use of their postal service does not seem to present any problems.  However, difficulties arise where a state regards the sending by post of official documents of another state to its residents as an infringement of its sovereignty. It may also be inferred from the Hague Conventions on Civil Procedure that the use of foreign postal services for official notifications cannot be taken for granted.  Hence this specific provision in the Convention.  Contracting States which could' not adhere to such a provision may enter a reservation under paragraph 1.e of Article 30 on the use of their postal services.

Paragraph 4

167.    Convention provides additional means whereby the applicant state may serve its documents. Neither this article nor anything else in the Convention is intended to prevent a Contracting State from using its own procedures for the service of documents in its own territory or in another state, if that is possible under the laws of that other state - or to invalidate the use of such procedures.  This is of special interest to applicant states, which may serve documents in other ways (for example service on a representative of the taxpayer in the territory of that state or service by public notice).  Although such methods of service do not necessarily guarantee that the taxpayer actually receives a notification, their usual effect is that he is deemed to have received it.

Paragraph 5

168.    In some cases, the person on whom the document is served may not understand the language in which it is written.  Paragraph 5 recognises this.  Where the taxpayer has genuine problems in comprehending the language concerned and the competent authority is satisfied that it is so, the paragraph provides a solution which broadly parallels that adopted in Article 7 of the European Convention on the Service Abroad of Documents relating to Administrative Matters.

# CHAPTER IV
## PROVISIONS RELATING TO ALL FORMS OF ASSISTANCE

*Article 18*
*Information to be provided by the applicant state*

Paragraph 1

169.    The requested state must be informed as to the authority in the applicant state, which originally made the request for assistance.  Since the competent authority issuing the request to the other state as a rule is not directly concerned with the practical work as regards the case, this information is useful both to the requested state and to the taxpayer in the Case of recovery.  For the competent authority of the requested state, it facilitates contacts and makes it easier to get complementary information, which may be needed in order to meet the request.  For the taxpayer, it may help for instance to clear up which claim is meant.

170.    The more details the applicant state can provide, the better the information received is likely to be.  The paragraph asks the applicant state to provide the requested state with all the information necessary to determine which person is concerned, that is to say the taxpayer himself or, where relevant, any other person against whom action may be taken in the requested state.

171.    Under sub-paragraph c, the applicant state is given the possibility of indicating the form in which it wishes the information to be supplied; where feasible, the information will be supplied by the requested state in the form requested (see comment under paragraph 3 of Article 20).

172.    The request must also, in the case of a request for assistance in recovery or measures of conservancy, specify the nature and amount of the claim.  This information is necessary to enable the requested state to determine which provisions of its law and administrative practices apply for the recovery or measure of conservancy.  For the same reason, requests for the service of documents must state the nature of the documents to be served.

173.    Also in the case of a request for assistance in recovery or measures of conservancy, the request should give the maximum details of the claim, that is to say, show clearly, as appropriate, the tax itself, interest due in respect of late payment, any administrative fine and the costs already accrued in the applicant state.  This information has explanatory value for the taxpayer and enables the requested state, for example, to allocate partial payment to the different elements of the claim.  The applicant state should also indicate any preferred timetable for recovery or any possibility of deferral of payment under its own laws.

174.    For practical reasons, the request for assistance should mention any known assets out of which the tax claim might be recovered. This could facilitate and accelerate the recovery or measure of conservancy in the requested state and relieve it of the task of having to trace the assets before being able to comply with the request.  If, however, the request concerns a debtor resident in the requested state, that state will be better placed to know the possibilities for recovery or measures of conservancy than the applicant state.  In that case, the applicant state will not be obliged to provide with its request information, which it could only obtain with excessive effort.

175.    Finally, when presenting a request for assistance, the applicant state shall indicate whether the said request is in conformity with its own law and administrative practice and whether all means available

in its own territory have been pursued, in conformity with Article 19.  Should these conditions not be satisfied, the requested state would not be obliged to accede to the request (Articles 1 9 and 2 1).  The object of sub-paragraph f is to enable the requested state, without any investigation of its own into the law and administrative practice of the applicant state or into the possibilities of recovery in the territory of that state, to assess the possible implications of the request, as well as the best ways to handle it.

> Paragraph 2

176.    Obviously the competent authorities of the two states concerned must keep each other informed of any developments regarding the claim or the taxpayer occurring after the request has been made.  In general, the applicant state should do everything in its power to reduce the burden of assistance on the requested state.

### Article 19
### *Possibility of declining a request*

177.    This article opens up a possibility for the requested state to refuse to accede to the request if it considers that the applicant state has not made adequate use of the means available in its own territory.  However, if frequently used, Article 19 would diminish the obligation to provide assistance set out in Article 1.  Therefore, the requested state should use this facility only if it has good grounds for assuming that the applicant state still has convenient means of action within its own territory.

178.    The ground for such a refusal is the extra burden placed on the administrative machinery of the requested state by the request for assistance.  The normal duty of a tax administration is to implement domestic tax laws and a request for assistance from abroad always involves extra work for the tax authority.

179.    In practice, there should be very little use of this article in relation to requests for information or requests for the service of documents: it must ordinarily be assumed that the applicant state has already made use of domestic means and that its request results from the difficulty of obtaining information or of making contact with the taxpayer.

180.    If, however, the requested state does refuse a request on the ground that other means are still available in the applicant state, that state still has the possibility of arguing, under the last part of the article, that the actions it might take would give rise to disproportionate difficulties.  For instance, in the case of examinations, auditing one single supplier in the requested state might lead to the same conclusions as the audit of a large number of buyers in the applicant state.  Or, in the case of assistance in recovery, some assets might only be seized through lengthy proceedings in the applicant state, while there are other assets in the requested state that can be seized more easily.

181.    It can happen that the assistance required creates problems for the requested state.  For instance, the requested state may be placed in a position where, under its own administrative practice, it would not, or would not yet, take steps towards recovery.  In such cases, under paragraph 2.a of Article 21, assistance can be refused or deferred.  But there are less obvious situations where consultation between competent authorities under Article 24 would be the normal preliminary step in arriving at an agreed solution.

*Article 20*
*Response to the request for assistance*

182.    If states agree to provide administrative assistance to each other, it would seem to be implied that they are in normal contact.  But, for the purpose of clarity, this article sets out in specific terms the way in which the requested state could normally be expected to respond to a request for assistance.

Paragraph 1

183.    This paragraph requires the requested state to inform the applicant state of the action taken and the outcome of the assistance as soon as possible.  If the measures taken by the requested state are unlikely to produce results within a short period, it would help the applicant state to know that the request has been acted upon.  The requirement to notify the outcome refers to the obvious point that the requested state is required to notify the applicant state as soon as possible after the examination has been carried out, the measure of conservancy has been taken, the claim has been recovered or the service of documents has taken place, or in the event that it is unable to meet the request, when it is decided not to pursue the matter further.

Paragraph 2

184.    This paragraph requires the requested state also to give reasons if it decides not to provide assistance.  It is important for the applicant state to be informed of the reasons for a refusal not only as a matter of courtesy but also to give it the opportunity to correct or elaborate its request with a view to resubmitting it if that is appropriate.  However, the requested state does not normally have to give every detail of the reasons for declining the request (for example why it considers certain measures as being contrary to public policy).

Paragraph 3

185.    This paragraph stipulates that the information shall be supplied to the applicant state in the form in which the latter wishes it to be supplied.  The object is that the information should be of the greatest use to the state concerned.  This of course presupposes that the applicant state will have indicated beforehand the form in which it wished the information to be supplied (see paragraph 171 above).  The obligation is conditional; it exists only insofar as the requested state "is in a position to do so".

*Article 21*
*Protection of persons*
*and limits to the obligation to provide assistance*

186.    This article is of particular importance in achieving a proper balance between the need to make mutual administrative assistance in tax matters effective and the need to provide safeguards for the taxpayers and also for the requested state where its public policy or its essential interests are concerned.

Paragraph 1

187.    Paragraph 1 states explicitly what is implicit throughout the Convention: that the rights and safeguards of persons under national laws and administrative practices are not reduced in any way by the Convention.

Paragraph 2

188.    Paragraph 2 sets limits to the obligation to provide assistance and may therefore offer further safeguards for the taxpayer. While it is not structured as a mandatory provision under which the requested state must impose the relevant limits in responding to requests, for assistance, some states may wish to operate strictly within these limits. The provision reflects as closely as is possible in this type of convention the principle of reciprocity, which has traditionally governed international co-operation in the form of administrative assistance in tax matters.

189.    The paragraph states first (sub-paragraph a), as a general principle that the requested state is not obliged to carry out measures at variance with its own laws. Nor, since the obligation to provide assistance is further qualified, is the requested state obliged to use powers provided for in its domestic laws but which it does not in practice normally use. Nor is the requested state obliged, even if it can do so under its own law, to exercise powers which the applicant state does not possess in its own territory. Thus, if the applicant state has no domestic power to take measures of conservancy, the requested state could decline to take such measures on its behalf, or if seizure of goods to satisfy a tax claim is not permitted in the applicant state, the requested state is not obliged to seize goods when providing assistance in collection. In short, it is only those powers and practices which the Contracting States have in common which the requested state is obliged to carry out. This rule is important in safeguarding the rights of taxpayers since it prevents the applicant state from making use indirectly, because it has sought assistance, of greater powers than it possesses under its own law. By virtue of this principle, the requested state is at liberty, though not obliged, to refuse to grant assistance.

190.    An exception to this principle is nevertheless made in the field of time-limits for the recovery of tax claims, where it is made clear in Article 14 that the law of the applicant state shall apply. The commentary on Article 14 discussed this question in detail.

191.    Another ground for refusing assistance (sub-paragraph b) is as follows: it is inconceivable that states would be prepared to jeopardise public policy or to endanger any of their essential interests within their own territory for the sake of another state. Sub-paragraph b defines neither the concept of public policy, well known in the legal systems of member states, nor that of "essential interests". It will be for the two states concerned to interpret the latter concept in each particular case. It should be noted that, where this expression refers to the interests of the state, it includes those of persons when the latter have a "national" dimension. Public security and economic interests may accordingly be included in this concept.

192.    It should be noted that the term `measure" used in sub-paragraphs a and b does not refer to the forms of assistance provided for by the Convention (for example, the supply of information to the applicant state) but to the domestic acts which are carried out by the authorities in order to implement these forms of assistance (for example, interviewing witnesses or carrying out searches, etc.).

193.    Sub-paragraph c applies specifically to exchanges of information and provides for safeguards similar to those commented upon in paragraphs 189 and 190 above. Thus, the requested state is not obliged to supply information which is not obtainable under its own laws or in the normal course of its administration nor is it obliged to procure information in a way not open to the applicant state under its own law or in the normal course of that state's administration. As provided in Article 22, the authorities of the applicant state are obliged to observe secrecy in respect of information supplied under the Convention.

194.    Information is regarded as obtainable in the normal course of administration if it is in the possession of the tax authorities or can be obtained by them by following the normal procedure, which may include special investigations, provided that the tax authorities would make similar investigations for their own purposes. It follows that the requested state has to collect the information needed by the other state in the same way as if its own taxes were involved.

195.    The reciprocity provided for in sub-paragraphs a and c of the paragraph establishes a kind of minimum position whereby the requested state is not obliged to do more in providing assistance than the applicant state can do under its domestic law; moreover, the requested state need supply no more information than is the normal practice for that state.  This does not imply that a more extensive assistance is excluded, but that the requested state need not comply with the request. In such a situation, the requested state is at liberty to supply or refuse to supply the requested information.  If it does give the information, the requested state remains completely within the framework of the agreement on the exchange of information, which is laid down in the Convention.

196.    The right to refuse information because of lack of reciprocity could, if the structure of the information system of the treaty partners differed very much, lead to the result that very little information was exchanged.  In order to avoid this undesirable result, a more practical solution would be for the applicant state to make a request even though it was not certain that the requested state would accede to it.  At the same time, the latter state could refrain, as far as possible, from making use of its right of refusal.

197.    A relevant question in the area of exchanges of information is whether and in what way the requested state, when passing the information, may ask for special secrecy requirements to be met in the applicant state.  It may indeed-be preferable in certain cases that the requested state, instead of refusing the information on the grounds of this article, should specify the nature of the information given ("earmarked" information) as well as any special conditions attached to its use (for example, special confidentiality requirements, notification of taxpayers, etc.). This would apply in particular to cases where trade and business secrets are involved.

198.    Sub-paragraph d of the paragraph contains a reservation concerning the disclosure of certain secret information.  Secrets mentioned in this sub-paragraph should not be taken in too wide a sense.  Before invoking this provision, a Contracting State should carefully weigh whether the interests of the taxpayer really justify its application.  Otherwise it is clear that too wide an interpretation would in many cases render ineffective the exchange of information provided for in the Convention.  The observations made in paragraphs 193 to 195 above apply here as well.  The requested state, in protecting the interests of its taxpayers, is given a certain discretion to refuse to give the requested information.

199.    It has been felt necessary also in sub-paragraph to prescribe a limitation with regard to information, which concerns the vital interests of the state itself.  To this end, it is stipulated that Contracting States do not have to supply information the disclosure of which. would be contrary to public policy *(ordre public)* or to their essential interests.

200.    Sub-paragraph e enables a requested state to refuse to provide assistance "if and insofar as it considers the taxation in the applicant state to be contrary to generally accepted taxation principles".  This might be the case, for instance, where the requested state considers that taxation in the applicant state is confiscatory, or where it considers that the taxpayer's punishment for the tax offence would be excessive.

201.    The same sub-paragraph also provides for refusal rights where the requested state considers taxation in the applicant state to be "contrary to the provisions of a convention for the avoidance of double taxation".  It is understood that such a phrase' refers to taxation contrary to such convention rules as rates of withholding, the definition of permanent establishment and the determination of their taxable profits and so on.  The phrase is not intended to refer to all cases of double taxation.  Since income tax conventions do not eliminate all cases of double taxation, assistance should be provided even though it may result in double taxation not contrary to a Convention., It should be noted that cases of this sort may be the subject of consultation between the competent authorities of the Contracting States under paragraph 5 of Article 24.

202.     1t is suggested that consultation between competent authorities' should also take place whenever there is some doubt as to whether the taxation in the applicant state is of such a kind as to justify a refusal under the provisions of sub-paragraph e.

203.     Sub-paragraph f is designed to ensure that the Convention does not result in discrimination between nationals of the requested state- and identically placed nationals of the applicant state.  The taxpayer's nationality as such should not lay him open to inequality of treatment.  This restriction should apply both to procedural matters (differences between the safeguards or remedies available to the taxpayer, f 1 or instance) and to substantive matters, such as the rate of tax applicable.

204.     It should be emphasised again that the grounds for refusal laid down in this paragraph apply, unless otherwise stated, to any request for administrative assistance of any kind.

*Article 22*
*Secrecy*

Paragraph 1

205.     Respect for the confidentiality of information is a corollary of the powers of tax authorities and is necessary to protect the legitimate interests of taxpayers.  Mutual assistance between tax administrations is therefore feasible only if each administration is assured that the other, administration will treat with proper confidence the information, which it obtains in the course of their co-operation.  However, the protection granted to information obtained naturally varies from country to country.  In order to ensure that the information provided by the supplying state is adequately protected from the latter's point of view, the article provides that information obtained under the provisions of the Convention shall be treated as secret in the receiving state in the same manner as information obtained under its domestic laws, or under the conditions of secrecy applying in the supplying state, whichever conditions are stricter.  For the purpose of applying the article, competent authorities should keep themselves informed about the domestic secrecy provisions of other signatory states, either directly or through the co-ordinating body referred to in Article 24.  Sanctions against the violation of such secrecy in either state will be governed by the laws of the state in question.

Paragraph 2

206.     1n order to lay down an additional minimum requirement for this secrecy, the article stipulates further that the information obtained `Shall In any case be disclosed only to persons or authorities (including courts, administrative or supervisory bodies) involved in the assessment, collection or recovery of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, taxes of that state" and also that only the persons or authorities mentioned above may use the information and then only for such purposes".  Bodies responsible for the supervision of the administration of the tax laws of a Party and having the power to look into individual tax cases are considered to be included among the persons or authorities involved in the assessment, collection or recovery of taxes and are subject to the same obligations with respect to tax secrecy.  If the secrecy provisions under the domestic laws of one or both of the Parties are stricter than those in the Convention, this rule will have no consequences.  If the domestic rules of both states are broader, however, the treaty provision will put a restriction on the use of information received from abroad.

207.     As the information obtained may be disclosed to persons and authorities mentioned in paragraph 2, this information may also be communicated to taxpayers or their representatives.  As far as recovery is

concerned, information may be disclosed to any other person from whom the tax is to be recovered, but only insofar as is necessary for the purposes of recovery.

208.    By reason of the variety of taxes covered by the Convention, the circle of authorities to which the secrecy provisions of Article 22 apply is likely to be wider here than is usual, for example under a double taxation convention.  This will be the case wherever some of the taxes, levies or contributions covered under Article 2 are not levied by the tax administration, as commonly defined, but by separate agencies; such agencies will then be covered by the provisions of the article, that is to say as authorities to which a piece of information obtained by the applicant state may be disclosed and which have to treat the information as secret.  In these cases, however, special domestic secrecy requirements may exist (for example for information concerning social security contributions) which may impose more or less strict obligations than domestic tax secrecy rules.'

209.    Where, as a result of information received, the taxable income of a taxpayer is adjusted in the applicant state, that state may have occasion, in accordance with its legislation or regulations, to communicate the amount of taxable income so adjusted to non-tax authorities.  Such communication would not be contrary to the provisions of the article, provided that the information itself, which has been received by the applicant state, is not disclosed.

210.    The fact that information obtained can be communicated to competent persons and authorities does not imply that it may be disclosed freely by them.  These persons and authorities may use it only for the purposes stated in paragraph 2. If they wish to use it at public hearings concerning tax matters, the prior approval of the authority, which supplied the information, must be obtained.  Paragraph 2 does not deal expressly with the question of whether the taxpayer to whom the information has been communicated may quote it during judicial proceedings concerning matters other than tax (for example divorce proceedings).  The question of the judge's power to require information to be obtained in such proceedings is not mentioned either.  In keeping with the spirit of Article 22, however, it follows that the use of this information in both cases should be subject not only to the approval of the taxpayer and of the authority possessing the information, but above all to that of the authority which, supplied it.  Once information is used in public court proceedings or in court decisions and thus rendered public, it is clear that from that moment such information can be quoted from the court files or decisions for other purposes, even as possible evidence.  But this does not require the persons and authorities mentioned in the article themselves to provide the information supplied or allow them to provide on request additional information received.

211.    Before the persons or authorities referred to in paragraph take action, which is likely to lead to a disclosure of the-information in court proceedings or in judicial decisions, the competent authority of the state, which received the information, will check whether the supplying state has any objection to such disclosure.  However, it would be undesirable that such a procedure should hamper the effectiveness of the exchange of information.  Contracting States should therefore allow disclosure of information to courts as freely as possible, particularly when, as is usually the case, no trade or business secret is involved.  With a view to facilitating the use of information, the possibility has been included for two or more states to consult and waive the requirement of prior authorisation.

212.    Except in the special circumstances described in paragraph 4 of the article, the information received by the competent authority of a Party may be used only for the purposes mentioned in paragraph 2 of the article.

Paragraph 3

213.    While the first two paragraphs lay down general rules of secrecy applying to exchanged information, paragraph 3 is designed to protect secrecy in cases where the Parties have made reservations in respect of some taxes.  The purpose of a reservation is to release the state, which makes it from certain obligations under the Convention.  This purpose would not be achieved if other states were to make free use of information received from the state, which has made a reservation, thus disregarding the limitation imposed in the reservation.  Under the present provision, it is therefore forbidden to use information obtained from a state which has made a reservation, provided for in sub-paragraph a of paragraph 1 of Article 30 (taxes other than taxes imposed on behalf of a Contracting State on income, profits, capital gains or net wealth), for the purpose of a tax in the category subject to the reservation.  In some cases, the basis for assessing some taxes (for example income taxes owed to the state) is used as such for assessing other taxes (for example income taxes owed to other authorities) in other cases, the basis used for assessing a tax is the starting-point for determining the basis of other taxes.  In such cases, communication of the basis of the first tax, which has been adjusted in accordance with information obtained from another state, is not a breach of paragraph 3 of the article provided that there is no communication of the information as such.

214.    Similarly, "the state making such reservation shall not use information obtained under this Convention for a tax in a category subject to the reservation".  It is logical that the limitation imposed on other Parties by the state, which has made the reservation, should also apply to the latter.

        Paragraph 4

215.    As indicated above, the information received by a Party may, in general, be used by the persons or authorities mentioned in paragraph 2 of the article only for the purposes set out in that paragraph.  Normally, therefore, that information could not be used for other purposes except by arranging, if this were possible under the laws of the supplying state, for it to be provided under an instrument specially designed for such other purposes (for example, a treaty concerning mutual assistance in judicial matters such as the European Convention on Mutual Assistance in Criminal Matters).  There could be situations in which two Contracting States might agree that this limits undesirably the scope of mutual assistance in this area (for example, where there is no other instrument under which the information could be provided).  Paragraph 4 of the article therefore makes it possible for the information received by a Party to be used for other purposes when such information may be used for such other purposes under the laws of the supplying state and the competent authority of that state authorises such use.

216.    It is, in principle, conceivable that the use of information for purposes other than stated in the Convention could lead to a breach of privacy and clash with the 1981 Convention for the Protection of Individuals with regard to Automatic Processing of Personal Data.  However, the two conditions, that such use must be, possible under the laws of the supplying state and that the competent authority of that state must authorise such use, constitute an adequate safeguard.  It is therefore not necessary to include in the Convention specific provisions in this respect.

217.    As noted in the commentary on Article 5 (see paragraph 62 above), a multilateral convention opens up a number of possibilities for co-operation between more than two states.  There are situations where information obtained by one Party from another would be of interest to a third one.  The second sentence of paragraph 4 opens up the possibility of exchanging information in such cases.  However, in order to avoid a situation where the third Contracting State would thus obtain information which it could not obtain directly, the paragraph provides that the transmission of information from the second to the third Contracting State will be subject to prior authorisation from the Contracting State which originally provided the information.

*Article 23*
*Proceedings*

218.    This article indicates in which state the taxpayer must bring proceedings contesting a measure taken by an authority of the applicant state or of the requested state.  A particular problem arises with regard to paragraph 3 of Article 14, Article 19 and paragraph 2 of Article 21.  These articles confer powers on the authority and the question arises as to whether the individual is entitled to require the authority to exercise them, especially where the failure to exercise a power violates a right guaranteed by the national law, of the authority in question.  The solution to this problem depends on the interpretation of the Convention given by the courts of each state.

Paragraph 1

219.    When a taxpayer wants to resist the recovery of a tax or the enforcement of the tax laws, there are normally two grounds in the laws of a Contracting State on which the tax claim may be resisted. Either the taxpayer can contest the existence or the enforceability of the claim, or he can try to contest the enforcement measures themselves.  Where the claim is established under the laws of one state and the recovery is taking place in another state, the question arises as to which bodies are competent to deal with disputes brought forward by the taxpayer.  As it is obvious that enforcement measures by the requested state may be contested only in that state, paragraph 1 provides that actions directed against the enforcement measures are to be brought only before the competent bodies of the state taking these measures.

Paragraph 2

220.    This paragraph provides that proceedings relating to measures taken by the applicant state, in particular those which concern the existence of the tax claim or the amount of tax claim or the instrument permitting enforcement in the applicant state, shall be brought only before the competent body of the applicant state.  The aim is to place it beyond all -doubt that a taxpayer may not resist recovery in the requested state by disputing in that country, the validity of the instrument issued by the applicant state or by alleging that the amount of the tax claim is erroneous because of payments he has already made.

221.    Since disputes regarding the existence of the amount of the tax claim and the question of whether recovery is permissible are governed by the laws of the applicant state, the competent bodies of that state must resolve them.  Only they are sufficiently acquainted with the tax laws governing the claim to give a property founded `judgement on such questions.  Where the applicant state owes the taxpayer a sum of money any application by the taxpayer for a setoff can be considered as failing within the ambit of the provision.  Such applications must therefore be brought before the competent authority of the applicant state. However, the Convention does not deal with the admissibility of a setoff.

222.    Since paragraph 2 of Article 11 requires the tax claim to be uncontested or incontestable if a request for assistance is to be made, paragraph 2 of this article may seem to be paradoxical.  In addition, assistance in the service of documents should prevent the situation arising in which a taxpayer has failed to contest a tax claim because he was ignorant of its existence.  In spite of this, Parties may, under paragraph 2 of Article 11 (second sentence), have agreed that the tax claim does not need to be uncontested or incontestable for a request for recovery to be made and in some states there is always a possibility of late appeal or of granting a grace period".  The aim of paragraph 2 is only to provide that, whether as a result of a bilateral agreement or whether it concerns a late appeal or an application for a "grace period" or any other action, if it is disputing the amount or the existence of the tax claim, the action

has to be brought before the competent bodies of the applicant state under whose laws the tax claim was initiated.

223.    The applicant state must notify the requested state if the tax claim or the instrument permitting its enforcement is contested.  Upon receipt of the notification, the requested state is, unless otherwise agreed under paragraph 2 of Article 11, obliged to suspend the recovery procedure.  Although the fact that the tax claim is contested does not necessarily result in recovery being suspended under the laws of most states, it is desirable to postpone recovery in the requested state if the claim is being contested.  This provision is intended not just as a safeguard to the taxpayer but also to protect the requested state from an action for damages being brought by the taxpayer.

224.    Contesting the tax claim would be one way in which the taxpayer could postpone recovery as long as possible, to gain time to place his assets out of the reach of the requested state.  To avoid this, the requested state, if asked by the applicant state, shall require the taxpayer to provide security or shall take other measures of conservancy.

225.    The applicant state is not the only party, which may have an interest in informing the requested state that an action has been brought in the applicant state.  In particular, the taxpayer himself may wish to inform the requested state, if only to prevent the damage, which he could suffer if, the applicant state should have failed to give the information itself.  Therefore, this paragraph permits any interested party - that is to say not only the taxpayer but also any other person liable to the payment of the tax - to inform the requested state of such an action.  But, to prevent the possibility of delaying tactics by debtors acting in bad faith, the requested state is not obliged to suspend its recovery measures automatically; it should still consult the applicant state on the matter if this appears necessary, for instance because it has not previously been advised by the applicant state that an action has been brought.

226.    Paragraphs 1 and 2 regulate matters concerning the competence of the courts for most of the actions capable of being brought, but these' provisions do not form a comprehensive regulation for resolving every possible dispute in this field.  In particular, they do not cover actions contesting the application of the Convention itself, whether by the applicant state (actions contesting the request for assistance) or by the requested state (actions contesting the obligation to provide assistance).

Paragraph 3

227.    Paragraph 3 lays down that the applicant state is to inform the requested state of the outcome of the proceedings.  It may be that judgement is given against the applicant state and that the tax claim is set aside in whole or in part.  It is also conceivable that the applicant state and the taxpayer may settle the matter out of court.  All these situations can affect the request for assistance since the basis for this request may cease to exist or the amount may be reduced in consequence of them.  Therefore, the applicant state is to inform the requested state as soon as possible of whether and to what extent it wishes to proceed with its request for assistance.  In the same way, the requested state is to inform the applicant state of the outcome of proceedings instituted in its territory.

# CHAPTER V
# SPECIAL PROVISIONS

*Article 24*
*Implementation of the Convention*

Preliminary remarks

228.    The purpose of this article is twofold. First, it establishes the ways in which the Convention is to be implemented between Parties, that is to say through the channel of competent authorities, which may communicate directly, authorise subordinate authorities to act on their behalf, and settle the practical mode of operation of administrative assistance between themselves by mutual agreement. Secondly, the article provides for the monitoring of the implementation of the Convention through a co-ordinating body set up under the aegis of OECD.

229.    Owing to the multilateral character of this Convention, a co-ordinating body is necessary to supervise its implementation. In a bilateral context, it may be fairly easy to follow up the application and the interpretation of a convention on mutual assistance. A multilateral convention, however, which may be concluded between a number of states, requires a monitoring body which could transmit information among the Parties (see, *inter alia,* paragraph 4 of this article), and encourage the production of uniform solutions to problems in the application and interpretation of the provisions of the Convention.

230.    The co-ordinating body should also be able to assist the Parties by furnishing its opinion on questions of application or interpretation of provisions of the Convention. These questions should in principle be of a general character and not relate to specific disputes that might exist between two Parties; the co-ordinating body is not to be set up as machinery for the settlement of disputes, which must be solved either through mutual agreement between the states concerned (paragraph 5 of this article), or in the framework of other international instruments (for example, the European Convention of 1957 for the Peaceful Settlement of Disputes). In order to act efficiently, the co-ordinating body will need to collect information from the Parties and elsewhere about experience gained in the application and interpretation of conventions on mutual assistance.

231.    By reason of its functions, the co-ordinating body set up under the aegis of OECD should comprise representatives of the authorities in charge of the implementation of the Convention, that is to say the competent authorities of the Parties. States which have signed the Convention and have thus made known their intention of becoming parties to it, even if they have not yet ratified it, shall be entitled to attend meetings of the co-ordinating body as observers.

Paragraph 1

232.    This paragraph establishes the ways in which Parties communicate with each other for the application of the Convention and opens up the possibility of delegation of powers and mutual agreements on the mode of application of the Convention.

233.    In most countries, relations with other countries fall within the competence of the Minister for Foreign Affairs. In principle, therefore, official contacts with foreign countries have to be made through the Ministry of Foreign Affairs and the embassies abroad. This is however not very practical in every case, so, in bilateral relations, other means of contact have often been made possible. The Convention follows this line and provides that the Parties shall communicate with each other through their respective

competent authorities as defined in paragraph 1.d of Article 3 and listed in Annex B, and that such competent authorities shall communicate directly for this purpose.

234.    1n countries where the implementation of tax conventions does not fall exclusively within the competence of the highest tax authorities, some matters, for example the exchange of information, can be delegated to other authorities and this possibility is foreseen in many existing treaties.  In most cases, however, the exchange of information under the double. taxation Convention has been entrusted to a central body.

235.    The existence of a central body in each country for relations with other countries concerning administrative assistance could a so be justified on the grounds that granting such assistance may involve an infringement - in principle - of certain' domestic obligations (for example tax secrecy, which is only waived under the terms and conditions. of the Convention).  The provision of assistance as well as the use of information received under the Convention will leave in many cases a certain margin of judgement for the country concerned, and this is best entrusted to a single, central body.  There are, however, cases, especially for exchanges of information on certain types of activities, where direct and speedy contacts may be the only way to make the assistance effective.  For such cases, the competent authority might wish to agree that certain of their responsibilities may be exercised by subordinate authorities acting on their behalf.

236.    The provision of administrative assistance is regulated only in outline in the Convention.  The precise way in which it is administered and the formalities to be taken into account require further elaboration, which is so closely related to details on the way in which the domestic laws of the Parties are administered, that its regulation is left to consultation between the competent authorities of the Parties.  Such consultation will also enable competent authorities, if they so wish, to agree on the role of their representatives when they exercise authority abroad (see commentary on Article 9) and to settle rules and procedures for direct contacts referred to in paragraph 235 above, for automatic exchanges of information, or any other matter (for example, fixing minimum amounts for cases in which assistance can be requested).

237.    While Parties are free to -select the areas in which they wish to enter into agreements for settling rules and procedures for assistance, these agreements must aim at facilitating the practical operation of the Convention and could not be used as a means to reduce their substantive legal obligations under the Convention.  Safeguards are, of course, provided to the states but are laid down in various other articles of the Convention.

238.    As an example of questions relating to the implementation of the Convention which will have to be negotiated, where necessary, between the states concerned; there may be cases where there are substantial differences between the assistance to be provided or work to be carried out by one state and the assistance or work by the other state.  These problems would have to be settled in the framework of mutual agreements taking into account all the relevant -factors (characteristics of economic relations and trade patterns, structure and working of tax systems and administrative machinery in the states in question, etc.).

239.    Another important matter on which the competent authorities will have to reach an agreement is the way in which the amounts of the claims recovered will be made available to the applicant state, for example, immediate payment, periodical settlements, setoff arrangements, etc.  This is closely connected with the question of what effect fluctuations in rates of exchange of the domestic currencies have on relations between the taxpayer, the applicant state and the requested state.  The basic principle here is thought to be that the applicant state has a claim in its own currency.  A second basic rule would seem to be that neither the requested state nor the applicant state has any claim on the assets of the taxpayer

beyond the amount of the tax owed, plus costs and interest where appropriate. Finally, it should be settled beyond doubt that the taxpayer will be released from the debt after payment of an amount in the currency of the requested state, that is, at the moment of payment, equivalent to the amount of the tax claim.

240.    These principles may perhaps be best implemented if the requested state assumes that the claim is in the currency of the applicant state until such time as recovery takes place. The rate of exchange at the date of recovery then decides the amount in the currency of the requested state that has to be recovered. States could also agree that the claim be converted into the currency of the requested state at the date of the request, but this increases the risks of fluctuations in the rate of exchange. The requested state will have to transfer the amount received to the applicant state regardless of any changes in the exchange rates after the date of recovery. If then the applicant state thus received more or less than its claim, any such difference, positive or negative, should have no consequence for the taxpayer and must, except in special circumstances (such as an undue delay in transferring the sums received), be to the profit or cost of the applicant state.

Paragraph 2

241.    This paragraph deals with situations where the implementation of the Convention. in a particular case might have serious undesirable consequences. It differs from Article 21 insofar as that article provides for cases in which there is a risk of violating a principle of law, a rule of domestic law or an administrative practice, while the situations covered by paragraph 2 of Article 24 are those in which the principles, rules and practices have been complied with, but have consequences which give rise to serious, for example economic or social, difficulties. In such situations, Article 24 imposes a duty of consultation on the states concerned. If no compromise is reached and a disagreement remains, the requested state is not relieved from its duty to apply the Convention.

Paragraph 3

242.    Paragraph 3 gives the co-ordinating body the task of monitoring the implementation and development of the Convention. The co-ordinating body would aim at assisting the Parties in the effective application of the Convention and, where necessary, suggest the introduction into the Convention of such new methods and procedures as could strengthen the effectiveness of the Convention. It may therefore recommend revisions of or modifications to the Convention.

Paragraph 4

243.    This paragraph provides for the co-ordinating body to furnish opinions on questions of interpretation if requested by a Party. The request for an opinion may arise out of both action by the authorities in that state and action or appeals by taxpayers which may draw attention to rules in the Convention which lend themselves to different interpretations. Discussions within the co-ordinating body will help Parties to form an opinion in unforeseen cases or situations. As noted in paragraph 230 above, this should encourage the production of uniform solutions to problems in the interpretation of the Convention, for example as to the generally accepted taxation principles" referred to in paragraph 2.e of Article 21. It should be stressed that the co-ordinating body in this context has only an advisory function. It is, of course, up to the Party asking for advice to decide whether or not it shall argue on the lines of the advice given in a possible dispute with other Parties.

Paragraph 5

244.    This paragraph contains procedural rules for solving questions of application and interpretation of the Convention.  The provisions are dependent on the multilateral character of the Convention and oblige those states who are immediately affected by the problem at stake to try to resolve the matter by mutual agreement.  If they succeed in coming to an agreement, they shall notify the co-ordinating body. When particular taxpayers are concerned, this notification will be made subject to the secrecy provisions of Article 22.

245.    As it is drafted, the paragraph aims at settling any difficulty or eliminating any doubt which might arise, in particular over the interpretation of the provisions of the Convention.  Paragraph 5 provides a framework for a consultation between the Parties for instance, as to whether a tax introduced after the signature of the Convention is identical or substantially similar to those listed in Annex A to the Convention according to paragraph 2 of Article 2 and, accordingly, whether it is covered by the Convention.

246.    In one important respect, the mutual agreement procedure as provided for in this paragraph has a different scope from that stipulated in Article 25 of the 1977 OECD Model Convention.  One of the purposes of Article 25 is to solve individual cases of double taxation, either when one state has not applied the Convention in the right way, or when two states take diverging attitudes on a taxpayer's position (for example in the case of wealth tax, for deduction of debt from the taxpayer's assets).  As the attitudes of the states affect the taxpayer's personal position, he should in this context be given the possibility of initiating a consultation process between the two states.

247.    Under a Convention for mutual assistance, the position is rather different.  Where a taxpayer considers that one state has not acted in accordance with the Convention, he can present his case either in the applicant state if the action concerns the request for assistance, for instance the tax claim or the instrument permitting enforcement, or in the requested state if the action concerns the measures taken there to satisfy the request.  If the requested state has taken measures which are not in accordance with the Convention, the complaint will be met by the state unilaterally, without any need for consultations with the applicant state.  Therefore, it has not been felt necessary to give the taxpayer the possibility of initiating a consultation -procedure between the two states.

Paragraph 6

248.    This paragraph provides that the Secretary General of OECD shall inform all the Parties and signatory states of opinions furnished by the co-ordinating body according to the provisions of paragraph 4 and of mutual agreements reached under paragraph 5. The fact that the agreements reached under paragraph 5 shall be made available by the co-ordinating body to those Parties which have not taken part in the procedure is, of course, not to be understood as in any way binding such states to apply or interpret the Convention in the manner agreed upon.  The agreement reached concerns obviously only those states, which have made the agreement under paragraph 5.

*Article 25*
*Language*

249.    This article deals with the language in which requests for assistance and answers thereto should be drawn up.  In order to avoid practical difficulties, which might hamper or slow down mutual assistance, the principle adopted in this context is to facilitate the task of the Parties by providing maximum

flexibility.  Parties are therefore free to agree on using in their bilateral relations one of the official languages of the Council of Europe and OECD (English or French) or any other language(s) agreed bilaterally.

250.      A related question is whether documents, an official copy of which should be submitted with the request under various provisions of the Convention, have also to be translated into that language.  An obligation of this kind could form an unexpected obstacle to asking for assistance; on the other hand, there is little point in submitting documents in an unknown language.  States could agree bilaterally that the applicant state should provide not only a cop of the documents required but also a synopsis of the document in the agreed language.

251.      The question of whether documents served should be accompanied by a translation is dealt with in paragraph 5 of Article 17.

Article 26
Costs

252.      Although a prosaic one, the problem of cost might be a serious obstacle to administrative assistance, as countries might desist from forwarding important requests for this reason.  The provisions of the article enable the competent authorities to consult each other and agree, on a bilateral basis, on the rules they wish to apply generally, and the procedure to be followed for finding a solution in the most important and costly cases.  Such flexibility is considered to be necessary for a smooth and efficient implementation of the Convention between Parties.

253.      In the absence of any bilateral agreement, whether general or in specific cases, on the sharing of costs, the article provides that ordinary costs incurred by the requested state in providing assistance will not give rise to reimbursement by the applicant state.  These are costs normally incurred by tax authorities for obtaining information or collecting tax for domestic purposes.  This follows the common practice, where a certain degree of reciprocity is assumed.

254.      Extraordinary costs incurred in providing assistance should be borne by the applicant state, unless otherwise agreed bilaterally.  Extraordinary costs are meant to cover, for instance, costs incurred when a particular form of procedure has been used at the request of the applicant state, costs incurred by third parties from which the requested state has obtained the information (for example bank information), or supplementary costs of experts, interpreters, or translators if needed, for example for elucidating the case or translating accompanying documents or damages which the requested state has been obliged to pay to the taxpayer as a result of measures taken on the request of the applicant state.  It is assumed that consultation between the Contracting States concerned would take place in any particular case where extraordinary costs are likely to be involved.

255.      As far as recovery is concerned, the cost is charged as a rule to the debtor, that is to say the taxpayer but, if it cannot be recovered from him, it has to be decided who shall bear it.  The Contracting States could agree that they will charge one another no costs at all or only the costs of say court proceedings or advice from experts.  In this connection, it would be worthwhile for the applicant state, if it is to bear the costs and the costs are likely to be high, to agree in advance to the relevant steps to be taken.  The costs charged to the applicant state could be deducted from the amounts of tax recovered.  The Convention does not prevent the requested state from recovering its own costs.

# CHAPTER VI
# FINAL PROVISIONS

*Article 27*
*Other international agreements or arrangements*

Paragraph 1

256.    As the aim of this Convention is to foster international co-operation in tax matters, it is worthwhile making sure that, when two or more states are parties both to this Convention and to other instruments or arrangements with provisions in this field, the most effective instrument ban be used in any particular situation.  This paragraph therefore provides that "the possibilities of assistance provided by this Convention do not limit, nor are limited by, those contained in existing or future international agreements or other arrangements between Parties, or other instruments which relate to co-operation in tax matters".

257.    According to this principle, the application of this Convention and of other instruments should be considered independently.  More restrictive provisions for assistance in tax matters in other - present or future instruments would not prevail; less restrictive ones, on the other hand, providing for closer or more specific co-operation (for example between neighbouring states) could be used instead of the provisions of the Convention.  In practice, when two states are parties to both the Convention and another instrument, the competent authority of the applicant' state Will request assistance under the instrument likely to be most effective, provided of course that the terms of the request meet all the necessary requirements set for assistance to be granted under that  instrument.  Hence, states are at liberty to choose whichever instrument they think most appropriate to the particular case.  They could not however simultaneously apply more than one instrument to a given case, since each instrument is self-contained, having its own characteristics and aims and its provisions may be incompatible with other instruments.  Article 27 accordingly uses "limit" rather than "affect", since the latter word might have been misconstrued as meaning that the simultaneous application of more than one instrument was possible

258.    The reference to other international agreements, arrangements and instruments is a very wide one.  It refers to bilateral agreements for the avoidance of double taxation or for mutual administrative assistance, as well as to existing multilateral conventions such as the Nordic Convention or the Treaty between Belgium, Luxembourg and the Netherlands on administrative assistance in the recovery of tax claims, concluded on 5 September 1952 in connection with the Benelux Economic Union.  This provision also covers social security agreements, which contain provisions in this field, (for example for the recovery of social security contributions).

Paragraph 2

259.    At the request of the European Economic Community and its member states, the need has arisen to introduce a specific provision regulating the relationships between this Convention and those rules on administrative assistance in tax matters which exist or may exist in the future among the said states.  This is achieved through a general derogation from @ the Convention: the Parties which are -members of the European Economic Community apply in their relations with each other the rules in force in the Community and thus apply the rules deriving from the Convention only insofar as no Community rule exists on the same matter.

*Article 28*
*Signature and entry into force of the Convention*

260.    This article is drafted in conformity with the practice of the Council of Europe. It is explicit and does not call for a commentary.

*Article 29*
*Territorial application of the Convention*

261.    This article is drafted in conformity with the practice of the Council of Europe.  It is explicit and does not call for a commentary.

*Article 30*
*Reservations*

Paragraph 1

262.    The purpose of the Convention is to facilitate the provision of mutual administrative assistance in the field of taxes of any kind, including social security contributions, but excluding customs duties, for which a separate multilateral convention already exists.  However, a state may not, for practical, constitutional or political reasons, be able at the time of signature, to provide to other states the full assistance envisaged by the Convention.  Some states, while able to provide information concerning income, profits, capital gains and net wealth taxes levied at central government level a minimum requirement for acceding to the Convention - may not be able to do so in relation to such taxes imposed by subordinate levels of government or to other particular types of tax.  Similarly, while able to provide assistance in the establishment of liability to tax, they may not be able to do so in the recovery of tax claims or service of documents in relation to all or any particular type of tax.

263.    It would be unfortunate if this limited ability to provide assistance on the part of a state had the consequence, that the state could not sign the Convention at all, and thus could neither benefit from it in any way nor provide any benefit to other states under it.  Article 30 is designed to enable a state to sign the Convention with reservations about the type of tax to be covered and/or the type of assistance to be provided, so that it may limit its participation in the provision of mutual assistance under the Convention to certain taxes or certain forms of assistance. There are limits on what reservations can be made.  Were states able to make whatever reservations they liked, without any restriction, this would detract from the multilateral nature of the Convention, as well as from the principle of reciprocity.  Paragraph 1 therefore, in conjunction with paragraph 2, sets but a system under which states are able to negotiate reservations within stated limits.  This ensures the necessary minimum degree of uniformity of Parties' rights and obligations, facilitating implementation, interpretation and settlement of any disputes; and at the same time gives Parties the degree of flexibility, which they need.

264.    Sub-paragraph a of paragraph 1 provides that a state may reserve the right not to provide assistance in respect of any taxes of other Parties of one or more categories listed in Article 2, paragraph 1.b, provided that state has not included any domestic tax of that category under Annex A of the Convention.

265.    Sub-paragraph a enables a Contracting State to enter reservations about providing administrative assistance of any kind in respect of taxes imposed at levels other than central government on income,

profits, capital gains or net wealth, and in respect of any other kinds of tax, whatever the level of government by which they are imposed.

266.    Sub-paragraph b enables a state to enter reservations for all or any particular kind of tax, in respect of recovery of tax claims, including measures of conservancy.  As noted in the commentary on Article 3 (paragraph 41 above), Parties may wish not to apply the Convention to administrative fines, and the possibility of entering a partial reservation on the recovery of such fines is provided for under sub-paragraph b.

267.    As the Convention applies, in principle, to all enforceable tax claims, including those in existence before the Convention's entry into force, sub-paragraph c enables states to reserve the right not to provide any administrative assistance in respect of tax claims in existence before the said entry into force.  This also applies where reservations made under paragraph 1.a or b are withdrawn.  The present sub-paragraph c is designed to make accession to the Convention easier for states, which might have difficulty providing administrative assistance in respect of claims in existence before its entry into force.  A tax claim is deemed to exist when the tax to which it refers is, in conformity with paragraph 1.c of Article 3, owed and not yet paid at the moment of the entry into force of the Convention.

268.    Under sub-paragraph d, the right may be reserved not to provide assistance in the service of documents, either for all taxes, or for only of taxes of one or more categories.

269.    Sub-paragraph e is designed to meet the special needs of some Contracting States, which, while accepting that they should provide assistance in the service of documents, may not be able to accept that their postal services should be used for a direct service of documents on a person within the territory.

Paragraph 2

270.    This paragraph is complementary to the provisions of paragraph 1 and illustrates the system of negotiated reservations in the Convention, the advantages of which have already been pointed out (see paragraph 263 above).

271.    1t follows from paragraph 2 that reservations must be drafted by following exactly the indications contained in paragraph 1. Thus, it will not be allowed, as to sub-paragraphs *a, b* And d, to make a distinction within the categories existing in Annex A. By contrast, sub-paragraphs b and c allow partial reservation insofar as a state may wish not to give assistance in recovering administrative fines, whereas it is prepared to give it for other elements of the tax claim (principal of the tax, interest and cost of recovery).

Paragraph 3

272.    This provision allows states to make reservations after the entry into force of the Convention.  It aims at making it possible for states to change the extent of their commitments in the light of the operation of the Convention as well as of any repercussions of its application upon their administrations.  Such flexibility should encourage states to adhere to the Convention and to enlarge the assistance they are prepared to give to the other Parties.

Paragraph 4

273.    This paragraph enables reservations to be withdrawn.  If a reservation is withdrawn, then, from the date of receipt of the notification of withdrawal by one depositary, the state making the notification

can be called upon for relevant assistance by other Parties who have not themselves exercised their right to make such a reservation, and it can call upon them for such assistance.

274.         Paragraph 5

275.       Paragraph 5 shows the effects of reservations entered under paragraph 1 or 3. If a state signs with such a reservation, then it may decline to provide assistance in relation to taxes which are the subject of the reservation, or in relation to the form of assistance which is the subject of the reservation.  By the same token, it cannot call for such assistance from the other Parties.

276.       1f a state has entered a reservation against the application of the Convention in respect of a particular category of tax, then information which it supplies cannot be used for the purposes of a tax of that category in the receiving state.  Thus, information supplied by a state, which has entered a reservation against the application of this Convention on social security contributions, cannot be used in the receiving state for the purpose of social security contributions.  This is so notwithstanding the absence of a similar reservation by the receiving state (the general rules about the use of the information supplied are discussed in the commentary on Article 22).

277.       However, even where a Contracting State has entered a general reservation under Article 30 against providing administrative assistance to other Parties for one particular type of tax or one form of assistance, that state is not prevented from providing such assistance in particular cases, if it so wishes.

*Article 31*
*Denunciation*

278.       This article is drafted in conformity with the practice of the Council of Europe.  It is explicit and does not call for a commentary.

*Article 32*
*Depositaries and their functions*

279.       Article 32 lists the functions of the two depositaries of the Convention, the Secretary General of the Council of Europe and the Secretary General of OECD (see paragraph 3 of Article 2).  States are free to address their declarations, notifications or reservations to either depositary.  The depositary with whom a declaration, notification or reservation has been made, shall notify the other member states of the Organisations of it.