**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**CUBE INFRASTRUCTURE FUND SICAV AND OTHERS**
Claimants

and

**KINGDOM OF SPAIN**
Respondent

**ICSID Case No. ARB/15/20**

---

# DECISION ON JURISDICTION, LIABILITY AND PARTIAL DECISION ON QUANTUM

---

***Members of the Tribunal***
Professor Vaughan Lowe, President
The Honourable James Jacob Spigelman
Professor Christian Tomuschat

***Secretary of the Tribunal***
Mr. Marco Tulio Montañés-Rumayor

*Date of dispatch to the Parties:* 19 February 2019

### REPRESENTATION OF THE PARTIES

*Representing Cube Infrastructure Fund SICAV and others:*

Mr. Kenneth R. Fleuriet
Ms. Amy Roebuck Frey
Ms. Héloïse Hervé
*King & Spalding*
12, cours Albert Ier
75008 Paris, France

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
*King & Spalding*
1100 Louisiana, Suite 4000
Houston, Texas 77002
United States of America

Mr. Enrique Molina
*King & Spalding*
1185 Avenue of the Americas
New York, NY 10036
United States of America

Ms. Verónica Romaní Sancho
Mr. Gonzalo Ardila Bermejo
Mr. Luis Gil Bueno
Ms. Inés Vázquez García
*Gómez-Acebo & Pombo*
Castellana, 216
28046 Madrid
Spain

*Representing the Kingdom of Spain*:

Mr. José Manuel Gutiérrez Delgado
Mrs. María José Ruiz Sánchez
Mr. Roberto Fernández Castilla
Mrs. Patricia Froehlingsdorf Nicolás
Mrs. Elena Oñoro Sainz
Mr. Juan Antonio Quesada Navarro
Mrs. Gloria de la Guardia Limeres
Mrs. Ana María Rodríguez Esquivias
Mr. Javier Comerón Herrero
Mrs. Estibaliz Hernández Marquínez
*Abogacía General del Estado*
*The Ministry of Justice of the*
*Government of Spain*
Calle Ayala 5
28001 Madrid
Spain

i

## Table of Contents

I.   **INTRODUCTION AND PARTIES** ................................................................. 1

II.  **PROCEDURAL HISTORY** ....................................................................... 2

III. **FACTUAL BACKGROUND** ..................................................................... 12

IV.  **JURISDICTION** ................................................................................. 13

   A.   THE EU OBJECTION ...................................................................... 15

     The Respondent's Submission .......................................................... 16

     The Claimants' Submission ............................................................. 21

     The Tribunal's Analysis ................................................................ 26

   B.   THE CORPORATE PERSONALITY OBJECTION ................................... 40

   C.   TAXATION .................................................................................. 48

     The Respondent's Submission .......................................................... 49

     The Claimants' Submission ............................................................. 51

     The Tribunal's Analysis ................................................................ 52

V.   **THE MERITS** .................................................................................. 55

   A.   INTRODUCTION ........................................................................... 55

   B.   THE EVOLUTION OF SPANISH RENEWABLE ENERGY POLICY: PART ONE ..................... 57

     Royal Decree 2366/1994 ................................................................ 57

     Law 54/1997 Regarding the Electricity Sector and Royal Decree 2818/1998 ..................... 57

     Royal Decree 436/2004: the 2004 Regime ........................................... 58

     Renewable Energies Plans 2005-2007 ................................................ 60

     Royal Decree 661/2007: the 2007 Regime ........................................... 61

     RD 1578/2008 and the Revision of the 2007 Regime: the 2008 Regime ........................ 67

     The Position at the Time of the PV Investments: The Tribunal's Analysis ..................... 68

   C.   THE EVOLUTION OF SPANISH RENEWABLE ENERGY POLICY: PART TWO ..................... 83

     Directive 2009/28/EC .................................................................... 83

     Royal Decree-Law 6/2009 ............................................................... 85

     Royal Decree 1565/2010 and Royal Decree-Law 14/2010 ............................. 87

     The Position at the Time of the Hydro Investments: The Tribunal's Analysis ................. 89

   D.   THE REFORMS OF 2012-2014 .......................................................... 102

   E.   THE SIGNIFICANCE OF THE 2013-2014 REFORMS: THE TRIBUNAL'S ANALYSIS .......... 109

     The Legal Standards ..................................................................... 109

     Fair and Equitable Treatment ......................................................... 109

     Legitimate Expectations and Fair and Equitable Treatment ....................... 111

What is Required by the Legitimate Expectation? .............................................................. 118

Was There a Breach of Article 10(1) ECT? ...................................................................... 121

The PV Investments ................................................................................................................ 124

The Hydro Investments ......................................................................................................... 125

Other aspects of FET ............................................................................................................. 128

VI. QUANTUM ............................................................................................................................. 132

   A.  THE GENERAL APPROACH TO QUANTIFICATION OF DAMAGES .................................. 135

   B.  THE DAMAGES IN THE PRESENT CASE ....................................................................... 138

   C.  THE PV INVESTMENTS .............................................................................................. 141

     Operating Life ................................................................................................................ 142

     Illiquidity discount ....................................................................................................... 143

     Other Factors .................................................................................................................. 144

     Decision in respect of PV Investments ...................................................................... 144

   D.  THE HYDRO INVESTMENTS ....................................................................................... 144

     Operating Life and Regulatory Risk ........................................................................... 145

     Non-dramatic Change and Regulatory Risk .............................................................. 146

     Quantifying Regulatory Risk ....................................................................................... 147

     Illiquidity Discount ....................................................................................................... 148

     Minority Discount ......................................................................................................... 148

     The Micdos Bonds ........................................................................................................ 149

     Decision in respect of Hydro Investments ................................................................. 153

   E.  SUMMARY ON DAMAGES .......................................................................................... 154

VII.   COSTS ................................................................................................................................ 157

VIII.  DECISIONS ....................................................................................................................... 157

  A.  On Jurisdiction ............................................................................................................. 157

  B.  On Liability ................................................................................................................... 157

  C.  On Damages and Interest ............................................................................................ 157

  D.  On Costs ........................................................................................................................ 158

**Separate and Partial Dissenting Opinion of Prof. Christian Tomuschat**

## TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| 2004 Regime or RD 436/2004 | Respondent's regulatory regime for renewable energy production introduced by Royal Decree 436/2004 dated 12 March 2004 |
| 2007 Regime or RD 661/2007 | Respondent's revised regulatory regime for renewable energy production introduced by Royal Decree 661/2007 dated 25 May 2007 |
| 2008 Regime | Respondent's 2008 Regime for renewable energy production introduced by Royal Decree 1578/2008 dated 26 September 2008 |
| *Achmea* Judgment | Judgment of the Court of Justice of the European Union in Case C-284/16, *Slowakische Republik v. Achmea BV* dated 6 March 2018 |
| Alméras WS 1 | Claimants' First Witness Statement of Mr. Jérôme Alméras dated 6 May 2016 |
| Alméras WS 2 | Claimants' Second Witness Statement of Mr. Jérôme Alméras dated 27 February 2017 |
| Applications | Applications for the Submission of New Documents submitted by each Party on 29 September 2017 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings of 2006 |
| Blue Rain | Six hydro plants in northern Spain, acquired by the Claimants in June 2012 |
| Brattle First Quantum Report | Brattle First Quantum Report dated 9 May 2016 |
| Brattle Second Quantum Report | Brattle Second Quantum Expert Report dated 27 February 2017 |
| Brattle First Regulatory Report | Brattle First Regulatory Report dated 9 May 2016 |
| Brattle Second Regulatory Report | Brattle Second Regulatory Expert Report dated 27 February 2017 |

| | |
|---|---|
| Brattle Memorandum | Brattle Memorandum answering the Tribunal's Questions on Damages per Measure dated 15 January 2018 |
| C-# | Claimants' Exhibits |
| CES | Cube Energy Spain S.L.U. |
| *Charanne v. Spain* | Award rendered in *Charanne B.V. and Construction Investments S.à r.l. v. Kingdom of Spain*, SCC Case No. 062/2012 dated 21 January 2016 |
| CJEU | Court of Justice of the European Union |
| Cl. Comments on *Achmea* and *Novenergia* | Claimants' Comments on the *Achmea* Judgment and the *Novenergia* award dated 3 April 2018 |
| Cl. Comments on *Masdar* | Claimants' Comments on the *Masdar* award dated 1 June 2018 |
| Cl. Mem. | Claimants' Memorial on the Merits dated 9 May 2016 |
| Cl. PHB | Claimants' Post Hearing Brief dated 31 January 2018 |
| Cl. Rej. Jurisdiction | Claimants' Rejoinder on Jurisdiction dated 19 June 2017 |
| Cl. Reply | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction dated 27 February 2017 |
| CL-# | Claimants' Legal Authority |
| CNE | National Energy Commission |
| CHP | Cube Hydro-Power B.V. |
| EC or Commission | European Commission |
| ECJ | European Court of Justice |
| Econ One First Report | Econ One First Report dated 29 July 2016 |
| Econ One Second Report | Econ One Second Report dated 21 April 2017 |

| | |
|---|---|
| ECT | Energy Charter Treaty signed in December 1994 and in force since 16 April 1998 |
| *Eiser v. Spain* | Award rendered in *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, dated 4 May 2017 |
| *Electrabel v. Hungary* | *Electrabel S.A. v. Hungary,* ICSID Case No. ARB/07/19 |
| EU | European Union |
| EU Final Decision | European Commission Final Decision regarding the Spanish State Aid Framework for Renewable Resources dated 10 November 2017 |
| FET | Fair and Equitable Treatment |
| Gambini WS | Claimants' Witness Statement of Mr. Bastien Gambini dated 3 May 2016 |
| GFC | Global Finance Crisis of 2008 |
| Hearing | Hearing on the Merits and Jurisdiction, held 9 October 2017 to 13 October 2017, in the World Bank Group Paris |
| HG | Hidroeléctrica Gormaz S.L. |
| ICJ | International Court of Justice |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| IRR | Internal Rate of Return |
| *Isolux v. Spain* | Award rendered in *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Case No. V 2013/153 dated 17 July 2016 |
| Law 24/2013 | Law 24 enacted on 26 December 2013 regarding the electrical sector |

| | |
|---|---|
| Lisbon Treaty | Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community |
| *Masdar* award | Award rendered in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, dated 16 May 2018 |
| *Micula v. Romania* | Award rendered in *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, dated 11 December 2013 |
| MO IET/1045/2014 | Ministerial Order by the Ministry of Industry, Energy and Tourism dated 20 June 2014 |
| New Regulatory Regime | Regulatory Regime for the electrical sector comprised of RDL 9/2013, Law 24/2013, RD 413/2014 and MO IET/1045/2014 |
| *Novenergia* award | Award rendered in *Novenergia v. Kingdom of Spain*, SCC Case No. 063/2015, dated 15 February 2018 |
| PHBs | Post-Hearing Briefs submitted by each Party dated 31 January 2018 |
| PO1 | Procedural Order No. 1 dated 22 February 2016 |
| Procedural Calendar | Procedural Calendar attached to the PO1 |
| PV | Photovoltaic |
| R-# | Respondent's Exhibits |
| RD | Royal Decree |
| RDL 6/2009 | Royal Decree Law RDL 6/2009 dated 30 April 2009 |
| RD 1565/2010 | Royal Decree 1565/2010 dated 19 November 2010 |
| RDL 14/2010 | Royal Decree-Law 14/2010 dated 23 December 2010 |
| RL-# | Respondent's Legal Authorities |

| | |
|---|---|
| Resp. CM | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 29 July 2016 |
| Resp. Comments on *Achmea* | Respondent's Comments on the *Achmea* Judgment dated 3 April 2018 |
| Resp. Comments on *Masdar* | Respondent's Comments on *Masdar* award dated 1 June 2018 |
| Resp. PHB | Respondent's Post Hearing Brief dated 24 January 2018 |
| Resp. Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 21 April 2017 |
| RPI | Renewable Power Global Holding |
| *Sempra v. Argentina* | Award rendered in *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, dated 28 September 2007 |
| Special Regime | Special Regime for renewable energy production created by Spain with the adoption of Royal Decree 2366/1994 in 9 December 1994 |
| TEU | Treaty on European Union |
| TFEU | Treaty on the Functioning of the European Union |
| TMR | Methodology for the approval or modification of the average or 'reference' tariff |
| Tr. Day [#] [page:line] [Speaker(s)] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on 8 December 2015 |
| TVPEE | Tax on the value of the production of electrical energy |
| VCLT | Vienna Convention on the Law of Treaties |
| VDDR | Legal Due Diligence Report on the Spanish company Renewable Power International |

|  | Holdings, S.A. and some of its Spanish and Portuguese subsidiaries, dated 28 March 2011, prepared at the request of RpGlobal Holding, S.L. by Uría Menéndez |
| *Vestey v. Venezuela* | Award rendered in *Vestey Group Limited v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, dated 15 April 2016 |
| Water Levy | Levy on the use of continental waters for the production of electrical energy |
| *Yukos v. Russia* | Final Award in *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227, dated 18 July 2014 |

## I.  INTRODUCTION AND PARTIES

1.  This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty ("**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("**ICSID Convention**").

2.  The Claimants in this case are Cube Infrastructure Fund SICAV, Cube Energy S.C.A., and Cube Infrastructure Managers S.A. (referred to collectively as "**Cube**"), which are companies incorporated under the laws of the Grand Duchy of Luxembourg; and Demeter 2 FPCI and Demeter Partners S.A. (referred to collectively as "**Demeter**"), which are companies constituted under the laws of the French Republic.[1]

3.  The Respondent in this case is the Kingdom of Spain ("**Spain**" or the "**Respondent**").

4.  France, Luxembourg and Spain are each a Contracting Party to the ECT. The ECT entered into force for Luxembourg and Spain on 16 April 1998, and for France on 27 December 1999.[2] All three States are also Contracting Parties to the ICSID Convention, which entered into force for France on 20 September 1967, for Luxembourg on 29 August 1970, and for Spain on 17 September 1994.[3]

5.  The Claimants and the Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

---

[1] Claimants' Memorial on the Merits dated 9 May 2016 (hereinafter "**Cl. Mem.**"), para. 19.

[2] https://energycharter.org/process/international-energy-charter-2015/overview/

[3] https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx

## II. PROCEDURAL HISTORY

6.    On 16 April 2015, ICSID received a request for arbitration from the Claimants (**"Request"**). The Claimants supplemented their Request by letters of 19 and 29 May 2015.

7.    On 1 June 2015, the Secretary-General of ICSID registered the Request in accordance with Article 36 of the ICSID Convention. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (**"Arbitration Rules"**) and Articles 37 to 40 of the ICSID Convention.

8.    On 3 August 2015, the Parties informed ICSID of their agreement regarding the number of arbitrators and the method of their appointment. Under the Parties' agreement, the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, the presiding arbitrator, to be appointed by agreement of the Parties. If a Party did not appoint an arbitrator or no agreement was reached regarding the appointment of the president of the Tribunal, either Party could request the Secretary-General to appoint, under a ballot procedure, the arbitrator(s) not yet appointed, expressly excluding Article 38 of the ICSID Convention.[4]

9.    On 7 August 2015, following appointment by the Claimants, the Honourable James Jacob Spigelman (a national of Australia) accepted his appointment as arbitrator.

10.   On 31 October 2015, following appointment by the Respondent, Professor Christian Tomuschat (a national of Germany) accepted his appointment as arbitrator.

11.   On 4 December 2015, the Parties informed the Centre of their agreement to appoint Professor Vaughan Lowe (a national of the United Kingdom) as the presiding arbitrator.

---

[4] ICSID letter dated 4 August 2015.

12.    On 8 December 2015, the Secretary-General notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date in accordance with Rule 6(1) of the ICSID Arbitration Rules.  Mr. Marco Tulio Montañés-Rumayor, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

13.    On 5 February 2016, in accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session by teleconference with the Parties.

14.    On 22 February 2016, the Tribunal issued Procedural Order No. 1 (**"PO1"**) recording the agreement of the Parties on procedural matters and the Tribunal's decisions on the disputed issues. PO1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, and that the place of proceeding would be Washington, D.C., United States of America. PO1 also sets out a schedule for the jurisdictional/merits phase of the proceedings (**"Procedural Calendar"**).

15.    On 4 May 2016, the Parties agreed to extend the filing deadline for the Claimants' Memorial on the Merits from 6 May to 9 May 2016.

16.    On 9 May 2016, the Claimants filed their Memorial on the Merits, accompanied by three witness statements of Mr. Bastien Gambini (**"Gambini WS"**), Mr. Jérôme Alméras (**"Alméras WS 1"**), and Mr. José Lozano; two expert reports of The Brattle Group, one on quantum (**"Brattle First Quantum Report"**) and the other regulatory (**"Brattle First Regulatory Report"**); the expert report of Prof. Manuel Aragón Reyes; Exhibits C-1 to C-262; and Legal Authorities CL-1 to CL-94.

17.    On 29 July 2016, the Respondent filed its Counter-Memorial on the Merits and a Memorial on Jurisdiction (**"Resp. CM"**), accompanied by the witness statement of Mr. Carlos Montoya; the expert report of Econ One Research (**"Econ One First Report"**); the expert report of Profs. Pablo Pérez Tremps and Marcos Vaquer Caballería; Exhibits R-1 to R-226; and Legal Authorities RL-1 to RL-68.

3

18.     On 4 August 2016, the Parties agreed to amend the Procedural Calendar.

19.     On 5 August 2016, the Tribunal approved the amendments made to the Procedural Calendar.

20.     On 28 October 2016, in the context of their requests for document production, the Parties agreed to extend the deadline for their "Responses to the Objections to the Production of Documents" until 4 November 2016.

21.     On 4 November 2016, the Parties submitted their "Responses to the Objections to the Production of Documents."

22.     On 30 November 2016, the Tribunal issued Procedural Order No. 2 concerning document production.

23.     On 17 February 2017, the Parties agreed to extend the deadline for the Claimants' Reply Memorial on the Merits and Counter-Memorial on Jurisdiction from 20 February to 27 February 2017.

24.     On 27 February 2017, the Claimants filed their Reply Memorial on the Merits and Counter-Memorial on Jurisdiction (**"Cl. Reply"**), accompanied by the second witness statement of Mr. Jérôme Alméras (**"Alméras WS 2"**); two expert reports by Brattle, the Second Quantum (**"Brattle Second Quantum Report"**) and the Second Regulatory ("**Brattle Second Regulatory Report"**) Reports; Exhibits C-263 to C-303; and Legal Authorities CL-95 to CL-150.

25.     On 14 March 2017, the Parties agreed that the Respondent would file its Rejoinder on the Merits and Reply on Jurisdiction on 20 April 2017, and the Claimants their Rejoinder on Jurisdiction on 19 June 2017.

26.     On 11 April 2017, the Tribunal issued Procedural Order No. 3 concerning document production.

27.     On 18 April 2017, the Parties agreed to extend the deadline for the Respondent's Rejoinder on the Merits and Reply on Jurisdiction.

28.     On 21 April 2017, the Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction (**"Resp. Rejoinder"**), accompanied by the second witness statement of Mr. Carlos Montoya; the second expert report by Econ One (**"Econ One Second Report"**); the second expert report by Profs. Pablo Pérez Tremps and Marcos Vaquer Caballería; Exhibits R-227 to R-353; and Legal Authorities RL-69 to RL-79.

29.     On 19 June 2017, the Claimants filed their Rejoinder on Jurisdiction (**"Cl. Rej. Jurisdiction"**), accompanied by Exhibits C-304 to C-314, and Legal Authorities CL-151 to CL-162.

30.     On 18 September 2017, the Tribunal held a pre-hearing teleconference with the Parties.

31.     On 26 September 2017, further to the pre-hearing teleconference, the Tribunal circulated to the Parties the hearing agenda.

32.     On 29 September 2017, each Party submitted an "Application for the Submission of New Documents" into the record pursuant to Sections 16.3 and 17.5 of PO1 (**"Applications"**).

33.     On 3 October 2017, the Tribunal invited the Parties to comment on each other's Applications.

34.     Also on 3 October 2017, the Respondent confirmed that it did not object to the Claimants' Application.

35.     On 5 October 2017, the Claimants submitted observations on Spain's Application.

36.     On 7 October 2017, the Tribunal decided as follows:

> "The admission of all of the documents mentioned in the applications, except R-0354 – R-0360 (Country Report of Spain) is not opposed. These documents may be introduced forthwith.

The introduction of documents R-0354 – R-0360 (Country Report of Spain) is opposed. Those documents, and also the "Additional Documents" whose admission is sought conditionally by Claimants, are not yet admitted, and no such document may be referred to in the Opening Statement of either Party unless the Parties previously agree to the admission of such a document.

The Tribunal will hear very brief oral submissions on any application for the admission of a document that remains opposed on Monday morning, and will decide whether it may be admitted to the record and referred to in the hearing after the Parties have made their respective Opening Statements."

37. On 6 October 2017, the Tribunal issued Procedural Order No. 4, concerning the organization of the hearing.

38. A hearing on Jurisdiction and the Merits was held in Paris, France, from 9 to 13 October 2017 (**"Hearing"**). The following persons were present at the Hearing:

Tribunal:

| | |
|---|---|
| Prof. Vaughan Lowe QC | President |
| The Honourable James Jacob Spigelman | Arbitrator |
| Prof. Christian Tomuschat | Arbitrator |

ICSID Secretariat:

| | |
|---|---|
| Mr. Marco Tulio Montañés-Rumayor | Secretary of the Tribunal |

For the Claimants:

| | |
|---|---|
| Mr. Kenneth R. Fleuriet | King & Spalding |
| Mr. Reginald R. Smith | King & Spalding |
| Mr. Kevin D. Mohr | King & Spalding |
| Ms. Amy Roebuck Frey | King & Spalding |
| Mr. Enrique J. Molina | King & Spalding |
| Mr. Luis Antonio Gil Bueno | Gómez-Acebo & Pombo |
| Ms. Inés Vázquez García | Gómez-Acebo & Pombo |
| Ms. Beatriz Fernández-Miranda de León | Gómez-Acebo & Pombo |

6

| | |
|---|---|
| Mr. Jérôme Alméras | Cube Infrastructure Managers (CFO) |
| Mr. Rahul Kumar | Cube Infrastructure Managers |
| | (Investment Manager) |

For the Respondent:

| | |
|---|---|
| Mr. Javier Torres Gella | State Attorney's Office |
| Mr. Antolín Fernández Antuña | State Attorney's Office |
| Mr. Javier Castro López | State Attorney's Office |
| Ms. Patricia Froehlingsdorf Nicolás | State Attorney's Office |
| Ms. María José Ruiz Sánchez | State Attorney's Office |
| Mr. Álvaro Navas López | State Attorney's Office |

Court Reporters:

| | |
|---|---|
| Ms. Eliana Da Silva | Spanish Court Reporter |
| Ms. Luciana Sosa | Spanish Court Reporter |
| Mr. Trevor McGowan | English Court Reporter |

Interpreters:

| | |
|---|---|
| Ms. Anna Chapman | English-Spanish Interpreter |
| Ms. Valeria Luna | English-Spanish Interpreter |
| Mr. Jesus Getan Bornn | English-Spanish Interpreter |
| Ms. Sarah Rossi | French-English Interpreter |
| Ms. Eliza Burnham | French-English Interpreter |
| Ms. Gabrielle Baudry-Delanghe | French-English Interpreter |

39.     During the Hearing, the Parties agreed to submit into the record Exhibits C-315 to C-323.

40.     On 29 October 2017, the Tribunal requested the Parties to submit their post-hearing briefs ("**PHBs**") by 19 January 2018.

41.     On 8 January 2018, the Respondent informed the Tribunal and the Claimants that the European Commission ("**EC**") had issued a *Final Decision regarding the Spanish State*

*Aid Framework for Renewable Resourc*es ("**EU Final Decision**"). Pursuant to Section 16.3 of PO1, the Respondent requested the Tribunal to (i) introduce the decision into the record and (ii) comment on such decision in the Parties' PHBs.

42. On 9 January 2018, the Claimants confirmed that they did not object to adding the EU Final Decision into the record and also agreed to address it in their PHB.

43. On 9 January 2018, the Parties agreed to submit their PHBs in English only, by 24 January 2018.

44. On 19 January 2018, the Parties agreed to extend the PHB submission deadline to 31 January 2018.

45. On 30 January 2018, the Claimants requested leave from the Tribunal to introduce new documents into the record pursuant to Section 16.3 of PO1.

46. On 31 January 2018, the Parties simultaneously filed their PHBs.

47. On 1 February 2018, the Respondent requested the Tribunal's leave to comment on the Claimants' request of 30 January 2018.

48. On 5 February 2018, the Tribunal granted the Respondent's request of 8 January 2018 concerning the EU Final Decision. The Tribunal also informed the Parties that the Claimants' request of 30 January 2018, and the Respondent's request of 1 February 2018 were "going to be put to one side until the Parties consulted each other on these requests and revert to the Tribunal with their observations."

49. On 9 February 2018, pursuant to the Tribunal's decision of 5 February 2018, the Respondent introduced into the record the EU Final Decision as Legal Authority RL-80.

50. On 9 February 2018, the Parties informed the Tribunal of their agreement to admit into the record several documents of the Claimants' request of 30 January 2018, as well as documents requested by the Respondent which were cited in the EU Final Decision.

51.    On 15 February 2018, the Tribunal granted leave to the Parties to introduce into the record the agreed-upon documents.

52.    On 9 March 2018, the Tribunal invited the Parties to comment, by 30 March 2018, on the Judgment of the Court of Justice of the European Union ("**CJEU**") in the Case C-284/16, *Slowakische Republik v. Achmea BV* ("***Achmea* Judgment**").[5] The Tribunal also requested the Parties to introduce into the record the award in *Novenergia v. Kingdom of Spain*, SCC Case No. 063/2015 ("***Novenergia* award**")[6] and to submit their comments on it, by 30 March 2018. The Tribunal also invited the Respondent to comment on the Claimants' request of 30 January 2018, by 16 March 2018. Finally, the Tribunal decided to admit into the record certain legal authorities requested by the Parties.

53.    On 12 March 2018, further to the Tribunal's decision of 9 March, the Claimants introduced into the record the following legal authorities: CL-56 (additional pages supplementing the version originally submitted), CL-113 (additional pages supplementing the version originally submitted), CL-165 and CL-166.

54.    On 16 March 2018, the Respondent objected to the remaining documents of Claimants' request of 30 January 2018. The Respondent also requested the Tribunal's leave to introduce into the record several decisions and judgements of the CJEU.

55.    On 20 March 2018, the Tribunal invited the Claimants to submit their comments on the Respondent's request of 16 March 2018.

56.    On 22 March 2018, the Tribunal decided on the remaining documents regarding Claimants' request of 30 January 2018.

57.    On 23 March 2018, the Claimants informed the Tribunal that they would not oppose the Respondent's request of 16 March 2018, "so long as Opinion 2/15 (EU-Singapore Free Trade Agreement) of 16 May 2017, EU:C:2017:376 is also added to the record." On this

---

[5] *Slowakische Republik v. Achmea BV*, CJEU Case C-284/16, Judgment, 6 March 2018, RL-86.

[6] *Novenergia v. Kingdom of Spain*, SCC Case No. 063/2015, Award, 15 February 2018, RL-91, CL-168.

same date, the Respondent agreed to this proposal and informed the Tribunal of the Parties' agreement to extend the deadline for the filing of the Parties' comments on the *Achmea* Judgment and the *Novenergia* award to 3 April 2018.

58.   On 3 April 2018, the Parties filed their submissions on the *Achmea* Judgment and the *Novenergia* award.[7] The Respondent's submission was accompanied by Legal Authorities RL-86 to RL-91, and the Claimants' submission by Legal Authorities CL-167 to CL-169.

59.   On 21 May 2018, the Tribunal requested the Parties to introduce into the record the award in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1 ("**Masdar award**")[8] and to comment on its relevance by 29 May 2018.

60.   On 28 May 2018, the Parties agreed to extend the deadline for their comments on the *Masdar* award until 1 June 2018.

61.   On 1 June 2018, the Parties filed their comments on the *Masdar* award.[9]

62.   On 31 October 2018, the EC filed an application to intervene as a non-disputing party in this case pursuant to Rule 37(2) of the ICSID Arbitration Rules.

63.   On 1 November, the Tribunal decided not to grant the EC's application because "allowing the Commission to intervene at this stage would significantly disrupt the proceedings."

64.   On 12 November 2018, the Tribunal declared the proceeding closed in accordance with Rule 38(1) of the ICSID Arbitration Rules. Also on 12 November 2018, the Tribunal invited the Parties to file their submissions on costs by 3 December 2018 pursuant to Rule 28(2) of the ICSID Arbitration Rules.

---

[7] Claimants' Comments hereinafter will be referred as "**Cl. Comments on *Achmea* and *Novenergia***", while Respondent's Comments hereinafter will be referred as "**Resp. Comments on *Achmea.***"

[8] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, RL-91, CL-170.

[9] Claimants' Comments hereinafter will be referred as "**Cl. Comments on *Masdar***", while Respondent's Comments hereinafter will be referred as "**Resp. Comments on *Masdar***".

65.    On 30 November 2018, the Respondent informed the Tribunal that a technical problem would prevent it from completing its submission on costs by the due date.

66.    On 4 December 2018, the Claimants filed their submission on costs.

67.    On 11 January 2019, the Tribunal decided to reopen the proceeding in accordance with ICSID Rule 38(2) because there was "a need for clarification from the Parties on one specific point." The Tribunal further noted that the reopening "was strictly limited to the purposes of obtaining such necessary clarification and was not an occasion for further submissions from either Party."  The Tribunal concluded that it would request updated submissions on costs from both Parties.

68.    On 25 January 2019, the Respondent requested leave to enter into the record, and file submissions on, the "Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the legal consequences of the judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union." On 28 January 2019 the Tribunal decided not to receive either that Declaration or submissions on it.

## III. FACTUAL BACKGROUND

69.     In the Request for Arbitration, the Claimants produced a chart showing the ownership structure of their investments.[10] That chart is reproduced below.



---

[10] See Annex A to the Request.

70.　　As is evident from that chart, the Claimants' investments are as follows. The Claimant Cube's investment, held via its 100% shareholding in Cube Hydro-Power B.V. ("**CHP**"), a company incorporated in the Netherlands, consists of subsidiaries of Cube Energy Spain S.L.U. ("**CES**"), a Spanish company in which CHP owns 100% of the shares, and subsidiaries of Hidroeléctrica Gormaz S.L. ("**HG**"), a Spanish company in which CHP owns 66.52% of the shares. The Claimant Demeter's investment consists of subsidiaries of HG, in which CHP owns 17.50% of the shares.

71.　　The subsidiaries of CES are three companies each owning a photovoltaic ("**PV**") facility,[11] each held via a subsidiary of Fotosolarium Holding S.L., a Spanish company in which CES holds 81% of the shares.

72.　　There are four Spanish subsidiaries of HG (Hidroeléctrica Fuentermosa S.L., Hidroastur S.A., Renewable Power International S.A. / Minicentrales Dos S.A., and Hidroeléctrica de Xerta S.L.), which between them own sixteen Spanish companies hydroelectric ('**hydro**') facilities[12] in each case directly, with the exception of the Rumblar plant which is owned via a Spanish company in which Hidroeléctrica Fuentermosa S.L. has an 80% interest.

73.　　There is no doubt that these interests are capable of amounting to "investments" within the meaning of Article 1(6) ECT.[13] The precise structure and extent of the Claimants' indirect shareholdings will be considered further in the context of quantum; but for present purposes the summary above is sufficient.

## IV. JURISDICTION

74.　　The basis of jurisdiction asserted in this case by the Claimants is Article 26 ECT and, so far as ICSID is concerned, Article 25 of the ICSID Convention.

---

[11] Puente Génave, Écija and San Martín de Pusa.

[12] Rumblar, Fuentermosa, Gormaz, Murias, Puerto, Olloniego, Requejada, Camporredondo, Flix, Cebolla, Safont, Aldehuela, Higares, Lavaderos, Villaverde and Xerta.

[13] See below para. 181 *et seq.*

75. The Claimants say that as nationals of an ECT Contracting Party with an investment in the territory of another ECT Contracting Party, having consented to ICSID arbitration in their Request filed on 16 April 2015, and Spain having already indicated its consent to ICSID arbitration in Article 26(3) ECT, they have validly given the Tribunal jurisdiction over legal disputes relating to their investment which concern an alleged breach by the Respondent of its obligations under Part III ECT.

76. The Respondent raises three objections to the Tribunal's jurisdiction, which it described as follows:[14]

   i.   Lack of jurisdiction of the Arbitral Tribunal *ratione personae* to rule on the dispute raised by the Claimants due to the absence of investors protected under the ECT. The Claimants are not from the area of another Contracting Party as Luxembourg, France and the Kingdom of Spain are Member States of the European Union. The ECT does not apply to disputes relating to Intra-EU disputes (the 'EU objection');

   ii.  Lack of jurisdiction of the Arbitral Tribunal to hear the Claimants' claim for alleged damages to the photovoltaic and hydroelectric Plants subject to this arbitration, given that the legitimacy for its claim corresponds exclusively to the companies that own such plants, which are not Claimants in this arbitration (the 'corporate personality objection');

   iii. Lack of jurisdiction of the Arbitral Tribunal to hear an alleged breach by the Kingdom of Spain of obligations derived from section (1) of Article 10 of the ECT through the introduction of taxation measures by Act 15/2012: absence of consent from the Kingdom of Spain to submit this matter to arbitration given that, pursuant to Article 21 of the ECT, section (1) of Article 10 of the ECT does not generate obligations regarding taxation measures of the Contracting Parties (the 'taxation objection').

77. We address each in turn.

---

[14] The terminology adopted in the table of contents of Resp. CM.

A.    THE EU OBJECTION

78.    The first preliminary objection is that the Tribunal lacks jurisdiction for the dispute since intra-EU investment disputes fall within the competence of the judicial institutions of the EU. Article 26 ECT presupposes a dispute between a Contracting Party and an Investor from another Contracting Party. This requirement is not met in the instant case since all the States involved are members of the EU and are related to one another within the framework of the internal market for electricity, thus forming some kind of unit. Accordingly, the dividing lines required by Article 26(1) have disappeared in the relationships between the States involved for the purposes of investment protection.[15] It is the view of the Respondent that this unity is confirmed especially by the participation of the EU as "Regional Economic Integration Organization" (REIO) pursuant to Article 1(3) ECT.[16]

79.    Further, the Respondent observes that Article 26(6) ECT directs the Tribunal to decide the dispute not only in accordance with the ECT, but also the "applicable rules and principles of international law." It contends that EU law is one of the standards of international law which the Tribunal is required to apply.[17]

80.    During the course of the proceedings, the CJEU rendered the *Achmea* Judgment on 6 March 2018. The Tribunal invited the Parties on 9 March 2018:

> "to comment on the implications of th[at] Judgment, in particular (but without limitation) in relation to the question of the Tribunal's jurisdiction, and the question of the enforceability of any award that might be made…"

81.    Comments by the two Parties on the *Achmea* Judgment and additionally on the *Novenergia* award were received by the Tribunal on 3 April 2018.

82.    After these comments on the *Achmea* Judgment had been submitted by the Parties, the *Masdar* award was issued on 16 May 2018. That award rejected the argument that the ECT

---

[15] Resp. CM., para. 52.

[16] *Ibid*., paras. 66-73.

[17] *Ibid*., paras. 73-74.

15

dispute settlement procedure had no application in respect of intra-EU disputes. In light of the significance of the *Masdar* award as the first award in an ECT investment case after the *Achmea* Judgment of the CJEU, the Tribunal invited the Parties to submit comments on the *Masdar* award. Both Parties did so, on 1 June 2018.

### The Respondent's Submission

83.    The Respondent relies on the text of Article 26 ECT, to the effect that a dispute between an investor of one Contracting State and another Contracting State in respect of an investment in the territory of the latter is not a dispute between two different States, inasmuch as all the members of the EU form a legal unit.[18] The jurisdictional significance provided for under Article 26 ECT is not emasculated by the suggested reading of this provision. The clause remains applicable for any investment dispute arising between a foreign investor (from a non-EU country) and an EU Contracting State.[19]

84.    Further, for the resolution of any disputes, Article 26(6) ECT stipulates that in addition to the ECT itself, the applicable rules and principles of international law are to be applied as well. The rules established under the EU regime belong to that body of law that enjoys primacy *vis-à-vis* the ECT.[20]

85.    The Respondent invokes the doctrine of the primacy of EU law, applied by the European Court of Justice ("**ECJ**") for many decades[21] and now reflected in the Declaration No. 17 concerning primacy annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon (of 13 December 2007): the rules and principles of EU law prevail in any event over the provisions of the ECT.[22]

---

[18] Resp. Comments on *Achmea*, para. 4.

[19] *Ibid*., paras. 84-100.

[20] *Ibid*., paras. 5-20.

[21] *Flaminio Costa v. E.N.E.L.*, ECJ Case 6/64, Judgment, 15 July 1964.

[22] Resp. CM., paras. 66-74, referring also to *Electrabel S.A. v. Hungary,* ICSID Case No. ARB/07/19 (hereinafter "***Electrabel v. Hungary***"), Decision on Jurisdiction, 30 November 2012, para. 4.191, RL-02

86.   Accordingly, the Respondent submits that it is necessary, in the first place, to enquire whether, under EU law, a particular system for the settlement of investment disputes can be established alongside the dispute settlement procedures available under the Treaty on the Functioning of the European Union ("**TFEU"**). For the Respondent, the situation is not in doubt. The EU legal regime for investments, characterized by free movement of goods, persons, services and capital within the entire territory of the EU member States, provides full protection. This regime covers all the issues related to foreign investments. It permits of no exceptions or derogations. Consequently, it may not be affected, displaced or complemented by any supplementary procedural regime.[23]

87.   As far as procedures are concerned, Article 344 TFEU stipulates explicitly that Member States are prevented from submitting "a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein." Although it is true that the Tribunal is obligated to focus only on any possible violations of the guarantees established under the ECT, any relevant dispute has necessarily to take into account the general framework of the EU regime. Such unavoidable determinations on the scope and meaning of the EU regime are reserved to the ECJ and could not be handled by an arbitral body.[24]

88.   The Respondent submits that the conferral of jurisdictional powers on an arbitral body with regard to legal rules originating from the EU amounts to a violation of obligations under EU law. Articles 267 and 344 TFEU establish the exclusive interpretative competence of the ECJ. In its *Achmea* Judgment the ECJ did not deal only with bilateral investment treaties. In paragraphs 60 and 62 of that ruling, the ECJ speaks in general terms of "international agreements concluded between Member States," hence including also multilateral treaties, like the present one where even the EU itself has become a Contracting Party.

---

[23] *Ibid*., paras. 62, 65.

[24] *Ibid*., para. 75.

89.　According to the jurisprudence of the ECJ, an arbitral body like the Tribunal in the present case cannot be characterized as a "court or tribunal of a Member State." Therefore, determinations of the scope and meaning of any EU rule cannot be reviewed by the ECJ by way of a preliminary ruling pursuant to Article 267 TFEU. In order to preserve the autonomy of the EU legal order, it is therefore a requirement to deny jurisdiction to any arbitral body that would have to rule, in proceedings before it, on matters of EU law. This is the case in the present circumstances since the dispute has its heart in the market freedoms of the TFEU.

90.　The Respondent points out that the *Achmea* Judgment cannot be taken as a surprising new development. It continues a line of reasoning that was already perceptible in the jurisprudence of the ECJ for a long time. In the *Mox Plant* decision of 30 May 2006,[25] the ECJ had stated unambiguously that a separate agreement between States members of the EU cannot affect the allocation of responsibilities defined in the Treaties and, consequently, the autonomy of the Community (today: Union) legal system.[26]

91.　Particular importance is attributed by the Respondent to Opinion 2/13 of the ECJ of 18 December 2014 regarding the planned accession of the EU to the European Convention on Human Rights. In this Opinion, the ECJ reiterates that the autonomy of the EU's legal order would be jeopardized if in proceedings before the European Court of Human Rights binding determinations on the scope and meaning of human rights guarantees under EU law could be made.[27] Consequently, the ECJ requested specific adjustments to the Treaty of Accession (which have not yet taken place).

92.　The Respondent draws attention to the case of *Micula v. Romania*[28] where the EC decided that payment of compensation by Romania to Swedish investors as a consequence of an

---

[25] *Commission of the European Communities v. Ireland*, ECJ Case C-459/03, Judgment, 30 May 2006.

[26] Resp. Comments on *Achmea*, paras. 46-51.

[27] *Ibid*., paras. 54-64,

[28] *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (hereinafter "**Micula v. Romania**"), CL-93.

arbitral award under ICSID rules ordering such payments amounts to State aid incompatible with EU law and must be returned by the beneficiary companies.[29]

93.    In further support of its position, the Respondent refers to the awards in *Electrabel v. Hungary*,[30] *Blusun v. Italy*[31] and *Wirtgen v. Czech Republic*,[32] the latter rendered within the framework of the PCA. According to the Respondent, all of these decisions have recognized the supremacy of EU law. It alleges, furthermore, that the Claimants made their investments in Spain not in reliance on the guaranteed provided by the ECT, but in making use of the market freedoms established under EU law.

94.    For the Respondent the conclusion is inescapable that payments from feed-in tariffs and feed-in premiums are governed by the regime of State aid laid down in Article 107 TFEU and further implemented by Council Directive 2001/77/EC[33] and the Community Guidelines on State Aid for Environmental Protection 2001/C 37/03.[34] Inevitably, therefore, proceedings in the instant case are conducive to the application of these norms for which the ECJ has a monopoly of authoritative interpretation.

95.    Accordingly, the dispute exceeds the scope of the jurisdiction of an arbitral body under Article 26 ECT.[35] The Respondent moreover explains that the rules and principles of EU law are not confined to the norms established under the relevant treaties, but comprise additionally the secondary law enacted by the EU institutions.[36]

---

[29] Commission Decision (EU) 2015/1470, 30 March 2015, OJ 2015, L 232/43.

[30] *Electrabel v. Hungary*, Award, 25 November 2015, RL-48.

[31] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, CL-162.

[32] *Jürgen Wirtgen, Stefan Wirtgen, Gisela Wirtgen and JSW Solar (zwei) GmbH & Co. KG v. Czech Republic*, PCA Case No. 2014-03, Award, 11 October 2017, RL-87.

[33] Official Journal 2001, L 283/33.

[34] Official Journal 2001, C 37/3.

[35] Resp. Comments on *Achmea*, paras. 21-31.

[36] *Ibid.*, paras. 32-37.

96.    Furthermore, the Respondent submits that the Tribunal would have to take account of a common tradition of legitimate expectations that has evolved within the EU on the basis of the national jurisprudence of the Member States. Again, this connection would render it imperative for the Tribunal to rely on EU law sources outside its sphere of competence proper.[37]

97.    In response to the Claimants' submissions, the Respondent contends that the approval by the ECJ of the dispute settlement procedure provided for in the EU-Singapore Free Trade Agreement is irrelevant for the present dispute. The ECJ found that procedure to be compatible with EU law because its subject-matter is confined to the commercial relations between the Contracting Parties which are not related to the internal law of the EU.[38]

98.    By contrast, disputes about investment protection are of a different nature in that the applicable legal regime is intimately connected to the guarantees established under EU law. The fact that the ECJ articulated no objections against the arbitral mechanism in that Free Trade Agreement cannot serve as a precedent for the case pending before the Tribunal.[39] The Respondent concludes by underlining the fact that arbitration clauses in investment protection treaties are susceptible of opening up a wide lacuna in the system of remedies established for the preservation of the uniform interpretation and application of EU law, thus undermining the autonomy of the EU.[40]

99.    The Respondent also drew attention to the factual differences between the situation in the *Masdar* award and that in the present case.[41] On the question of jurisdiction, the comments emphasise that the Court's analysis in the *Achmea* Judgment refers both to bilateral and

---

[37] *Ibid.*, paras. 38-44.

[38] Opinion 2/15, 16 May 2017.

[39] Resp. Comments on *Achmea*, paras. 65-70.

[40] *Ibid.,* paras. 80-83.

[41] Resp. Comments on *Masdar*, paras. 8-27.

multilateral treaties,[42] and submits that the *Masdar* tribunal erred by failing to apply EU law for the resolution of the dispute.[43]

100.    Finally, the Respondent requests the Tribunal to declare its lack of jurisdiction to hear the claims of the Claimants.

### The Claimants' Submission

101.    Regarding the Respondent's first jurisdictional objection, the Claimants point out that the requirements of Article 26 ECT are fully met in the instant case.

102.    The Claimants note that Article 26(6) ECT does not provide for any exception to the clear rule that an investor of a Contracting Party is entitled to bring a claim against another Contracting Party for violation of the guarantees established under the ECT. The relevant conditions are met in the present case since the three States concerned – France, Luxembourg and Spain – are all Contracting Parties; France and Luxembourg being the States of nationality of the Claimants while the investment was realized in Spain.

103.    The Claimants emphasize that Article 16 ECT corroborates their view. Article 16 ECT seeks to maintain the integrity of the ECT system against any attempt of derogation or deviation. According to this clause, with regard to any earlier or later agreement that might differ from the rules of the ECT, the latter shall prevail. Accordingly, the EU-internal doctrine of primacy of Union law lacks any relevance in this regard.[44] The Tribunal established for the settlement of the present dispute is obligated to follow its own constitutional logic which is embodied only in the ECT.

104.    The Claimants rebut the Respondent's argument that the Tribunal lacks jurisdiction inasmuch as any internal EU-dispute about investment protection is connected to the

---

[42] *Ibid.*, paras. 3-5.

[43] *Ibid.*, paras. 6-7.

[44] Cl. Comments on *Achmea* and *Novenergia*, paras. 41-49.

relevant EU regime about economic freedoms and comes therefore necessarily within the purview of the EU's exclusive jurisdiction for such disputes.[45]

105.    There is no inconsistency between the ECT and the EU legal system. Both treaty systems complement one another to the benefit of investors. Regarding Article 344 TFEU, the Claimants observe that this provision in fact does not cover any extraordinary modality of settlement of disputes. There is no dispute about the interpretation or application of the "Treaties" when a case is brought to arbitration where the claimants complain of a violation of their rights under the ECT.[46] They also contend that the interpretative monopoly of the ECJ does not mean that no other judicial or governmental body may apply the rules of EU law.[47]

106.    The Claimants point out that a considerable number of arbitral tribunals have upheld their jurisdiction in respect of intra-EU disputes against challenge by Spain. They refer to *RREEF v. Spain*,[48] *EDF v. Hungary*, where the Swiss Supreme Court found that the ECT proceedings did not interfere with EU jurisdiction;[49] *PV Investors v. Spain*;[50] *Charanne v. Spain*;[51] and *Isolux v. Spain*[52], concluding that not a single tribunal or court has upheld the Spanish position. Additionally, the Claimants emphasize that the voices of Dr. Bruno Poulain and Prof. Jan Kleinsheisterkamp are a minority view.

107.    The Claimants submit that *Masdar*'s conclusions on the "intra-EU" objection to jurisdiction "are consistent with unanimous jurisprudence and there is no reason why the

---

[45] Cl. Reply, paras. 43-72.

[46] *Ibid.*, para. 63.

[47] *Ibid.*, para. 64.

[48] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, paras. 72-75, CL-103.

[49] *Republic of Hungary v. EDF International S.A.*, Swiss Federal Supreme Court Case 4A34/2015, Judgment, 6 October 2015, para. 5.3.2, CL-104.

[50] *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, (Decision on Jurisdiction not public).

[51] *Charanne B.V. and Construction Investments S.à.r.l. v. Kingdom of Spain*, SCC Case No. 062/2012, Award, 21 January 2016, paras. 433-439, CL-96, (hereinafter "*Charanne v. Spain*").

[52] *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Case No. V 2013/153, Award, 17 July 2016, paras. 644-645, CL-95, (hereinafter "*Isolux v. Spain*").

present Tribunal should reach a different decision."[53] It accordingly supports the Claimants' submissions.

108.  With respect to the *Achmea* Judgment, the Claimants note the conclusions formulated by the ECJ in respect of the questions referred to it by the German Bundesgerichtshof in a decision of 6 March 2016:

> "Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."[54]

109.  Though acknowledging that the *Achmea* Judgment deals with matters in some way related to the present dispute, the Claimants contend that it has no legal relevance for it. They insist that for the Tribunal the only relevant jurisdictional basis is the provisions of the ECT, which enjoy full validity.

110.  In the second place, they reiterate that no less than 18 arbitral bodies have affirmed their jurisdiction in investment disputes notwithstanding the EU membership of the respondent parties. Third, the Claimants emphasize the distinction between disputes arising from a bilateral treaty and disputes arising from a treaty like the ECT to which the EU itself is a party. Lastly, they submit that the question whether the enforcement of an award rendered by the present Tribunal may encounter difficulties is a matter of speculation, not to be resolved in the present proceeding at the preliminary stage of jurisdiction.[55]

---

[53] Cl. Comments on *Masdar*, para. 4.

[54] *Achmea* Judgment, para. 62.

[55] Cl. Comments on *Achmea* and *Novenergia*, paras. 10-11.

111.  The Claimants reject the Respondent's thesis that the present dispute is not a dispute where the investors do not belong to "another" State party than the Respondent. They note that the investors have their home in France and in Luxembourg and that the Respondent is a third State, *viz.* Spain. In *Isolux v. Spain*[56] as well as in *Charanne v. Spain*,[57] the argumentation of the respondent was refuted inasmuch as the participation of the EU as Contracting Party does not lead to the disappearance of the own "area" of the States Parties involved in the sense of Article 1(10) ECT.[58]

112.  The Claimants submit that the reference in Article 26(6) ECT to "applicable rules and principles of international law" is confined to the substance of any dispute but does not lead away, through a "back door", from the clear jurisdictional clause established under Article 26 ECT to another jurisdictional mechanism outside the ECT.[59]

113.  The Respondent's interpretation would distort the plain meaning of the clause which clearly states that any emerging disputes are to be settled under the procedural regime set forth by the ECT. It would give primacy to EU law in procedural terms. The formula chosen by the drafters must be understood as referring exclusively, regarding the merits of any dispute, to the general rules of public international law that complement any legal relationship between subjects of international law. Specific treaties like the EU regime cannot prevail against the will of the parties to the ECT to confer exclusive jurisdictional authority to the institutions under the ECT. Given that the ECT is a treaty with a large membership going far beyond the States of the European Union, it seems furthermore inconceivable that a special regime for the members of the European Union might have been envisaged by the drafters. In any event, the text of Article 26 ECT contains not the least trace of such a "disconnection clause."[60]

---

[56] *Isolux v. Spain*, paras. 633-634.

[57] *Charanne v. Spain*, paras. 429, 432.

[58] Cl. Reply, paras. 45-52.

[59] Cl. Comments on *Achmea* and *Novenergia*, paras.16-22.

[60] *Ibid.*, paras. 13-22, 25-31.

114.   The Claimants insist that no ground can be perceived that might justify a denial of jurisdiction under the ECT regime. The substantive rules of the EU investment regime and those established by the ECT do not contradict one another. To be sure, the protection provided by the ECT is more generous and more extensive. EU law lacks the standard of fair and equitable treatment ("**FET**") which under the ECT plays a key role. From the procedural viewpoint, it must be noted that the protective mechanism under the EU law is much less well developed since no procedure exists that would provide an investor with immediate access to an international dispute settlement procedure. However, the regime of EU law does not exclude the grant of a higher degree of protection to individual citizens or corporations.

115.   The Claimants also emphasise that, in his opinion delivered before the ECJ, Advocate-General Wathelet stressed particularly the fact that at the time the ECT was concluded the institutions of the EU did not even consider requesting an advisory opinion from the ECJ about the compatibility of that instrument with the EU Treaty.[61]

116.   The Claimants submit that the *Achmea* Judgment is irrelevant for the present proceedings, inasmuch as the ECJ confined its finding in that pronouncement to BITs concluded bilaterally between EU Member States, explicitly reserving the case of a treaty like the ECT to which the EU itself was a party. Under the BIT that was applicable in the *Achmea* case between Slovakia and the Netherlands, the arbitral tribunal was explicitly tasked with applying, not only the agreements between the parties, but also the law in force in the Contracting Party concerned. This meant that, in the *Achmea* case, the tribunal had been explicitly mandated to apply EU law, without being under the control of the ECJ in respect of the correct interpretation of the relevant EU rules in accordance with Article 267 TFEU. This difference is decisive with regard to the present case. Here the Tribunal had no other mandate than faithfully to apply the rules laid down in the ECT. Thus, no danger can be perceived that the jurisdictional prerogatives of the ECJ might be interfered with.[62]

---

[61] *Ibid.*, paras. 32-40.
[62] *Ibid.*, paras. 52-63.

117.   Lastly, the Claimants submit that the possible difficulties that might hamper the enforcement of any arbitral decision remain essentially speculative since at the present stage it is highly uncertain in what way an award might be enforced. The Claimants posed the reasonable question: "[w]ill *Achmea* have any impact at all on enforcement outside the EU, most notably in the U.S. and the U.K. post-Brexit?"[63] They submitted that the Tribunal should not speculate about enforcement.[64]

### The Tribunal's Analysis

118.   The Tribunal set up to hear the present dispute has its legal foundation in Article 26 ECT and Article 25 of the ICSID Convention. The substantive guarantees invoked by the Claimants are contained in the ECT which, at the same time, determines the basic requirements for jurisdictional settlement. Article 26(1) and (2) ECT provides:

> "(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
>
> (a) to the courts or administrative tribunals of the Contracting Party party to the dispute;
>
> (b) in accordance with any applicable, previously agreed dispute settlement procedure; or
>
> (c) in accordance with the following paragraphs of this Article."

119.   In paragraph 4 of the same provision, modalities for the actual initiation of proceedings have been specified:

---

[63] *Ibid*., para. 64.

[64] *Ibid*., paras. 64-66.

"In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

(a) (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention. …"

120. All the States involved in the present dispute (France and Luxembourg being the States of nationality of the corporations having brought the dispute to the present Tribunal, Spain being the Respondent) have ratified both the ECT and the ICSID Convention and are thus "Contracting Parties" to the two agreements. Pursuant to Article 25 of the ICSID Convention, an arbitral tribunal established under the ICSID regime has jurisdiction over a dispute "which the parties to the dispute consent in writing to submit to the Centre." The Claimants indicated their consent to arbitration in their Request. On the other hand, Spain, the Respondent, gave its consent to arbitration through its ratification of the ECT. Indeed, each ECT Contracting Party consents to arbitration by becoming a party to the ECT (Article 26(3)).

121. The question here is whether the requirements for arbitration as set out in Article 26 ECT are all met.  In the first place, it must be determined whether the present dispute opposes, as provided by Article 26(1) ECT, a Contracting Party to an Investor of another Contracting Party. As pointed out above, the Respondent is of the view that intra-EU disputes are not covered by that clause which must be understood restrictively as encompassing only disputes between a non-EU investor and an EU member State.

122. In order to resolve this divergence of opinions, the Tribunal turns to the general rules of interpretation as laid down in the Vienna Convention on the Law of Treaties ("**VCLT**"). Article 31 VCLT establishes the relevant ground rule. Paragraph 1 provides:

"A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

27

123. This is the test which the Tribunal will rely upon for its elucidation of the meaning and scope of the relevant jurisdictional clause.

124. As a point of departure, the Tribunal simply notes that the words found in Article 26(1) ECT do not differentiate between different classes of Contracting Parties. The text speaks of Contracting Parties in general. If the drafters had seen any need to introduce a distinction between the Contracting Parties, they could have done so. It does not matter, in this regard, what the motives for the unitary model chosen by them were. It may well be that it did not occur to any one of the negotiating delegations that some kind of differentiation might be advisable. Or else one might surmise that the EU, which was the driving force behind the efforts to bring about an international legal instrument for the regulation of the energy market, saw no real chance to have such a discriminatory clause approved by the other partners, in particular those from outside the European Community. In any event, the wording of Article 26(1) ECT is free from any additional words modifying the result that is obtained by a reading in accordance with the ordinary meaning of the terms. Accordingly, the literal meaning leaves no doubts. Following this approach, the regime of Article 26(1) ECT applies to all Contracting Parties. No Contracting Party is excluded from that regime. The only requirement is that the investor must be of another nationality than the State Party charged with a violation of its duties under the ECT.

125. The Tribunal notes that the ECT Contracting Parties did impose certain restrictions on the application of the ECT, and in particular the provisions of Part V ("Dispute Settlement") in order to accommodate the positions of particular States. The Decision attached to Part V ECT reads as follows:[65]

> "In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether

---

[65] See DECISIONS WITH RESPECT TO THE ENERGY CHARTER TREATY (Annex 2 to the Final Act of the European Energy Charter Conference), 1. With respect to the Treaty as a whole, p. 107.

> there is such conflict or as to its extent, Article 16 and Part V of the Energy
> Charter Treaty shall not apply."

126. No such provision was made in order to restrict the application of the ECT to disputes involving the EU or its Member States.

127. It remains to elucidate whether the terms of the treaty in their context or the object and purpose of Article 26(1) ECT suggest a different meaning. The Respondent argues that an implicit disconnection clause must be read into the text. In this regard it relies specifically on Article 26(6) ECT where it is stated:

> "A tribunal established under paragraph (4) shall decide the issues in
> dispute in accordance with this Treaty and applicable rules and principles
> of international law."

128. The Respondent has taken the view that the law of the EU, comprising not only the norms laid down in the treaties themselves but also the rules enacted as secondary law by the EU institutions, comes within the purview of the "applicable rules and principles of international law." Since according to the architecture of the EU legal order, the EU legal rules take precedence over any incompatible rules of whatever other source, the jurisdictional clause would become inapplicable should any inconsistency be found. According to the Respondent's view, EU law shall be handled exclusively by the judicial institutions of the EU itself as provided by Articles 267 and 344 TFEU.

129. The Tribunal is not persuaded by this construction of the ECT. The observer must note that Article 26(6) ECT constitutes an ancillary norm destined to insert the ECT into the general framework of general international law. No specialized international instrument can stand isolated on its own feet. In order to become operational, the lacunae not covered by the treaty itself must be filled in by recourse to the general rules and principles that make up the legal universe of international law. In this regard, Article 26(6) ECT fulfils a highly desirable auxiliary function. One may ask, in this regard, whether it was really necessary to set forth that provision since normally such recourse to general international law is effected without any specific authorization clause. According to Article 31(3)(c) VCLT,

any international agreement must be interpreted in the light of the relevant rules of international law.

130.   To say that EU law is a part of international law and yet has supremacy over other, non-EU components of international law is, in the view of the Tribunal, to mischaracterize EU law and confuse questions belonging to two different legal orders. The EU treaties are, certainly, international agreements of a kind familiar in international law, binding as between the States Parties; but they also function as the constitution of an autonomous community. The rules established by EU secondary legislation are essentially supra-national regulations rather than part of the corpus of international law as such. Similarly, EU law has supremacy *within the EU legal system* over the national laws of the States that are Members of the EU and accordingly subscribe to the EU legal system. But EU law is only one among several regional, and many national, legal systems; and it is international law that regulates relations between these different legal systems. Within the system of international law, EU law does not have supremacy, and has no hierarchical priority over the laws of non-Member States, or over rules of international law, including the ECT. Any such claim to priority would challenge the basis of the ECT as a multilateral treaty, unilaterally asserting for the EU and its Member States a right to be treated differently from all other ECT Contracting Parties. The ECT Contracting Parties could have agreed expressly to give different treatment to the EU and its Member States in relation to the matters relevant to the present dispute;[66] but they did not do so. Indeed, it appears that they were not asked to do so.

131.   One provision in the ECT is directly applicable to this situation. It is Article 16 ECT,[67] which reads as follows:

---

[66] As was done in relation to certain matters not relevant to this dispute. See, *e.g.*, Article 25 ECT ("Economic Integration Agreements") and the various Declarations made by the EU/European Communities in relation to the ECT: < https://energycharter.org/fileadmin/DocumentsMedia/Legal/ECTC-en.pdf>.

[67] Cf. the affirmation of the application of Article 16 ECT in relation to a provision in the 1994 Partnership and Cooperation Agreement in the Letter from the European Communities to Russia, < https://energycharter.org/fileadmin/DocumentsMedia/Legal/ECTC-en.pdf > , p. 62.

"Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,

(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment."

132. Nothing in this Decision does seek to derogate from any provisions of EU law, and the Tribunal does not construe any provision of EU law so as to derogate from the principles set out in Parts III and V or the right to dispute settlement set out in the ECT. Article 16 ECT establishes that the ECT Contracting Parties, including both the Respondent and the EU, did not agree that EU legal rules take precedence over any incompatible rules of whatever other source, and that the ECT jurisdictional clause would become inapplicable should any inconsistency be found. Rather, Article 16(2) ECT establishes that they agreed the contrary.

133. The construction defended by the Respondent is all the less persuasive since it would mean that the explicit clauses of Article 26(1), (2) and (3) ECT would thereby be undermined and deprived of their substance "through a back door", as the Claimants argue. In the elaboration of legal texts, clarity and transparency are guiding criteria. It cannot be assumed that the drafters intended to push aside one of the central pieces of the ECT, the jurisdictional clause of Article 26 ECT, in a clandestine fashion without the open knowledge of the participating nations.

134. It may well be that one of the essential *raisons d'être* of the ECT was the fear, then still not swept away in the Western world, that the newly liberated States of Central and Eastern Europe might fall back under socialist rule, thereby threatening investments effected after

the demise of socialism as a political program in those countries. In fact, the ECT came about in 1994, only a few years after the great changes in Europe. At that time, the EC, the guardian of the integrity of the European Community treaties, saw no obstacle regarding the participation of the EU Member States in the ECT. It could not have overlooked the impact that the ECT would produce as an additional guarantee even with regard to intra-EU disputes. Notwithstanding the clear implications of the then EU Member States' adherence to the ECT, it did not oppose their adherence and accepted the ECT also on its part. This attitude of the Commission was explained by Advocate General Wathelet as follows:

> "For a very long time, the argument of the EU institutions, including the Commission, was that, far from being incompatible with EU law, BITs were instruments necessary to prepare for the accession to the Union of the countries of Central and Eastern Europe. The Association Agreements between the Union and candidate countries also contained provisions for the conclusion of BITs between Member States and candidate countries."[68]

135.  No legal opinion was sought at that time from the ECJ to clarify the legal position. Obviously, all the parties involved, the Commission as well as the Member States, were convinced that no problem of incompatibility could be perceived.

136.  In 2004, with the admission of most of the former socialist States in Central and Eastern Europe to the European Community, a considerable legal consolidation of the regime of investment protection took place. Investments in those "new" countries enjoyed henceforth protection under the market freedoms of the EU. Additional protection like that under the ECT seemed to appear less necessary as from that date.

137.  At that time, in 2004, the EC could have taken the initiative within the ECT to modify the jurisdictional clause of Article 26 ECT by excluding from it all intra-EU disputes or by formalizing a consensus among the EU Member States that the supplementary ECT protection mechanism was not needed any longer and should be abandoned. But it did not

---

[68] Opinion of Advocate General Wathelet, *Slowakische Republik v. Achmea B.V.*, CJEU Case C-284/16, 19 September 2017, para. 40 (hereinafter "**Wathelet Opinion**").

do so. It saw no necessity for putting an end to the special judicial guarantees extended to the investors from the EU Member States by the ECT. This passivity can only be interpreted as implicit recognition of the compatibility of the regime of the ECT with the relevant regulatory scheme of remedies under EU law.

138.    It must be concluded, therefore, that from the viewpoint of Article 26 ECT keeps its full validity *ratione personae*. The wording of Article 26 ECT does not permit of any differentiation as regards the investors authorized to bring a claim to arbitration against another Contracting Party to the ECT.

139.    The explicit reference to the "applicable rules and principles of international law" in Article 26(6) ECT does not deviate from that finding. Article 26(6) ECT is confined to ordering the application of the relevant "interstitial" elements that generally complement the interpretative process in respect of international agreements as stipulated in Article 31(3)(c) VCLT. It does not reverse the clear meaning of the first paragraph of Article 26 ECT.

140.    The question remains to be addressed whether the findings so far obtained must be reviewed in light of the supremacy doctrine that assigns paramount importance to any EU law norm vis-à-vis any other legal norm in the same or a neighbouring field *ratione materiae*. In fact, the three EU Member States concerned in the present case accepted the ECT at a time when that doctrine had already been fully developed.

141.    Does the interpretation of the legal position as explained above from the viewpoint of the ECT have to be abandoned in view of the *Achmea* Judgment of the ECJ? In the *Achmea* case, the ECJ had to address the compatibility of an arbitration procedure provided for in a BIT concluded between two Member States of the EU, without any participation of the EU. According to its holding, the relevant arbitration procedure amounted to an attempt by the States concerned (the Netherlands and the Slovak Republic) to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies which the second subparagraph of Article 19(1) of the Treaty on European Union ("**TEU**") requires

them to establish, the subject matters under the BIT's arbitration system that were at the same time covered by EU law.

142.  When scrutinized closely, the *Achmea* case reveals specificities that make it inapposite as precedent for the present proceedings.

143.  First, it cannot be ignored that in the *Achmea* case the parties had decided to conduct the arbitration proceedings under the regime of arbitration established by the German Code of Civil Procedure (*Zivilprozessordnung*). This choice was made not only in formal terms, but also *in concreto*. The arbitral tribunal located its proceedings in Frankfurt (Main). The two elements of choice eventually led to the involvement first of the Oberlandesgericht Frankfurt (Main) and later the German highest court in civil law matters, the Bundesgerichtshof which, eventually, formulated the questions which the ECJ decided by denying the jurisdiction of the arbitral tribunal. By virtue of this strong territorial link, the proceedings were placed under German jurisdiction (*lex loci arbitri*) and consequently, because EU law is part and parcel of the German legal order, with a hierarchical rank above all other norms of German law, under the jurisdiction of the EU legal order.

144.  The present proceedings have entirely different characteristics. The Tribunal owes its emergence to two international treaties, the ECT and the ICSID Convention, that are not specifically connected to the legal order of one of the States involved. Both instruments are multilateral agreements that have a scope of application *ratione personae* and *ratione territorii* that extends far beyond the boundaries of the EU. The ECT comprises a wide range of States (53 Contracting Parties, among them, *e.g.*, Afghanistan and Australia) while the ICSID Convention has been adhered to by 162 States on a world-wide scale.

145.  The institutions established under these two instruments receive their legitimacy from the consent of all of those States. No single State Party can impose specific requirements under its domestic law on those institutions. An arbitral tribunal under the ECT and the ICSID Convention receives its mandate exclusively from the provisions specified in these instruments.

146.   The present Tribunal has not submitted to the domestic legal order of any one of the three States involved. It has acted in complete conformity with its international status. Its seat is Washington, D.C. (U.S.A.), where the World Bank, ICISID's mother institution, has its seat. Part of the proceedings were conducted in Paris (France), but deliberately at the seat of the World Bank in that city. The Tribunal has consistently operated outside the jurisdiction of any of the three States involved. It has used as the legal foundation of the present proceedings only the international law rules laid down in those two instruments and deriving therefrom.

147.   The findings reached above could only be challenged if it could be established that the three States involved lacked the legal capacity to conclude a treaty for the establishment of an arbitral body acting outside the EU legal order. Yet there is no evidence demonstrating that the three States involved exceeded the limits of their treaty-making power to the detriment of the European Economic Community or the European Community. France became a party to the ICSID Convention on 20 September 1967, Luxembourg on 29 August 1970 and Spain on 17 September 1994. At that time, no objections were raised against the participation of the three States in the ICSID Convention. It has never been alleged that they interfered with competences of the supranational entity that was first called the European Economic Community and later, as from the entry into force of the Maastricht Treaty on 1 November 1993, the European Community.

148.   Similar considerations apply to the ECT. This instrument was signed in a ceremony of common understanding on 17 December 1994 by all three States involved and also by the European Community. The entry into force occurred for the European Union, for Luxembourg and for Spain concurrently on 16 April 1998, while in the case of France some delay occurred (27 December 1999). Obviously, the treaty-making process was based on a high degree of consensus. All the Contracting Parties accepted the text as it stood. In fact, no reservations are allowed to the ECT (Article 46).

149.   If the lack of legal certainty and reliability in respect of private investments had been the only justification for the necessity of a special protective regime, the admission of no less

35

than six former Central and Eastern European States in 2004 could have provided the opportunity to proceed to some appropriate amendment. Yet no such steps were taken. The co-existence of the ECT and the EU regime of investment protection was accepted by all the stakeholders concerned without any reservations.

150. Powers in the field of investment protection by way of international treaties were conferred on the EU by virtue of the Lisbon Treaty (Article 207(1)). Significantly enough, the relevant provision confined itself to allocating those new powers to the EU. Nowhere in the TFEU was it specified what destiny should await the existing BITs as soon as the EU would make use of those powers. If general agreement had existed to the effect that the procedural mechanisms of those BITs were incompatible with the applicable treaty regime the presumed defect could have been remedied easily. But at the Lisbon Conference no such decision was taken. Apparently, the negotiators were of the view that the system of investment protection, as it had evolved over decades, had stood the test of time and should be transformed only step by step in a process without any disturbing ruptures.

151. It is highly significant that the EC did not launch infringement proceedings (Article 258 TFEU) against the EU States parties to bilateral intra-EU BITs as soon as the Lisbon Treaty had entered into force. Only six years later, in June 2015, did it initiate such proceedings against five States (Austria, Netherlands, Romania, Slovakia, Sweden).[69] The EC then attempted to push aside a well-established practice of more than one decade.

152. The ECJ is well aware of the differences between the manifold factual constellations in the relationships between BITs and EU law. In the *Achmea* case, it had to address the situation of a bilateral BIT that had been concluded between two EU Member States. Deliberately, it therefore confined its finding about the incompatibility of an arbitration clause with the system of EU remedies under Articles 267 and 344 TFEU to that specific constellation. In summing up its reasoning, it held:

---

[69] Press Release IP/15/5198.

> "In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above."[70]

153.    The formulations reflecting the essence of the *Achmea* Judgment clearly show that for the ECJ a significant factor was that the Dutch-Slovak BIT had been concluded without any active participation of the EU. The BIT "was concluded not by the EU but by Member States." Thus, the ECJ stresses that the conformity of that BIT could not be examined by the EC as the guardian of legality. In the present circumstances, the legal position is totally different. The EC was associated with the ECT as from its origins. It even was a driving force behind the elaboration of the ECT and its ratification process.[71] By its conduct, the EC established a basis of legitimate expectations which the EU cannot shed at its will.

154.    Under the VCLT, which the ECJ relies upon also for the analysis of the internal relations between the EU Member States, a consistent practice which establishes the agreement of the parties regarding the interpretation of the treaty concerned, constitutes at least an element of the context within which the interpretative process shall operate. Regarding the issue to be resolved here, it is not enough to speak of an element of the context that may be taken into account. As pointed out above, the responsible institutions of the EU, in particular the EC, have for almost two decades communicated the message to the Contracting Parties of the ECT that the ECT constitutes a crucial building block of the regime of investment protection. To withdraw from that position amounts to a breach with the consolidated economic interests benefiting from that protection.

---

[70] *Achmea* Judgment, para. 58.

[71] See *Electrabel v. Hungary*, Decision on Jurisdiction, para. 4.131, fn. 5, RL-02.

155.  As rightly pointed out by Advocate-General Wathelet, the standards enshrined in Article 10 ECT are far more extensive than the level of investment protection under EU rules. The deficit of the EU regime becomes particularly obvious in case of violations of protected assets by way of legislation. Only a few Member States of the EU provide for the direct challenge of legislative measures. Article 19(1) subsection (2) TEU has not yet been generally implemented. And even if a remedy exists through which a domestic statute can be challenged because of an alleged violation of an EU standard – *e.g.* freedom of establishment, or one of the rights under the Charter of Fundamental Rights of the European Union – the procedural intricacies are tremendous. Necessarily, proceedings take a long time and are considerably more burdensome for a claimant than arbitral proceedings where the incriminated measure can be targeted directly. In this regard, Advocate-General Wathelet has delivered persuasive grounds.[72]

156.  It is convenient to address at this point also the question of the relevance of EU law to the merits of this case. The Tribunal recalls that it is constituted under the ICSID Convention, Article 42(1) of which directs tribunals to decide disputes "in accordance with such rules of law as may be agreed by the parties." The action is brought pursuant to Article 26, paragraph (4) ECT of which provides for ICSID arbitration. Article 26(6) ECT stipulates that "[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." That provision embodies the agreement of the Parties on the applicable law. The applicable law is thus international law, and particularly the ECT.

157.  The Tribunal is not directed by the ECT to apply national law or EU law as such, and in that important respect its situation is different from that addressed in the *Achmea* case, where the BIT under consideration expressly stated that the tribunal had to take account of

---

[72] *Wathelet Opinion*, paras. 179 *et seq.*, 205.

the law of the Contracting State,[73] which necessarily meant that it would take account of EU law.

158.    The reference in Article 26(6) ECT to the application of "principles of international law" does not lead to any different result. The reference is to "principles" of international law, not to every rule of international law that might be binding upon an ECT Contracting Party. The natural and ordinary meaning of the phrase is that it refers to the principles of public international law in general, as it applies to relations between any set of States, and not to principles that are peculiar to a sub-system of international law, such as EU law, to which some but by no means all ECT Contracting Parties are subject. Article 26(6) ECT sets out the applicable law for all disputes arising under the ECT, whether or not the dispute involves an EU Member State; and there is no evidence, and it cannot be supposed, that the intention was to apply principles of EU law to all disputes arising under Article 26 ECT. While the EU treaties are of course international agreements made within the framework of, and governed by, public international law, they do not thereby become "principles of international law."

159.    Furthermore, the submissions before us do not suggest that the EU treaties are directly applicable to these proceedings; and while the rules established by EU secondary legislation – such as rules against State aid – are EU law, they plainly cannot be "principles of international law" within the meaning of Article 26(6) ECT.

160.    This Tribunal does not have to apply, or take a decision on any question of, Spanish law or EU law. Under the provisions concerning the applicable law that are binding on this Tribunal, Spanish law and EU law are relevant only as facts in the light of which the rights and duties of the Parties under the ECT and international law are to be determined. Thus,

---

[73] Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic, 29 April 1991, Article 8(6). An important part of the CJEU decision in *Achmea*, which distinguishes it from the present case, is that a tribunal under the BIT could interpret EU law without any possibility of review by the ECJ and that undermined the "autonomy" of EU law (See *e.g.* at 55, 57, 58).

for example, the provisions on EU law concerning State aid are not applied by this Tribunal, nor does the Tribunal make any decision on their interpretation. They are relevant only as part of the factual matrix, and in this case particularly as part of the factual basis for determinations of how the Claimants could expect to be treated in respect of their power plants in Spain.[74]

## B. THE CORPORATE PERSONALITY OBJECTION

161.    Spain expresses this objection in the following terms:

> "Lack of jurisdiction of the Arbitral Tribunal to hear the Claimants' claim for alleged damages to the photovoltaic and hydroelectric Plants subject to this arbitration, given that the legitimacy for its claim corresponds exclusively to the companies that own such plants, which are not Claimants in this arbitration."[75]

162.    Spain further invokes the "*no reflective loss principle to shareholder claims*" in common law jurisdictions.

163.    This issue turns on the indirect nature of the shareholding of the two groups of Claimants - the Cube Claimants and the Demeter Claimants. The Tribunal sets out above[76] a chart showing the ownership structure of the plants. As appears from the chart, the Cube Claimants have an indirect 81% interest in three PV plants. With respect to the hydro plants, the Cube Claimants have an indirect 66.52% interest, and the Demeter Claimants have an indirect 17.50% interest of 100% in 12 hydro plants; 80% in one hydro plant and 25% in three hydro plants.

164.    We note at the outset that Spain accepts that the Claimants could have a legitimate claim for the loss of the value of their shares or other equity interests, but not for the "alleged damage to the photovoltaic and hydraulic plants that are the subject of this arbitration."[77]

---

[74] See paras. 306-307 below.

[75] The terminology adopted in the table of contents of Resp. CM.

[76] See para. 69, above.

[77] Resp. CM, para. 124.

On this basis, as the Claimants observed, the issue raised does not appear to be a jurisdictional objection at all, but rather an issue of quantum. Whether or not the Claimants establish damages on a proper basis is an important issue, but it is not jurisdictional.

165.    That is sufficient to dispose of this objection. Nevertheless, we will consider the jurisdictional objection in the manner that it was advanced by Spain. The focus of the objection is the recognition in international law, and in what Spain calls "advanced legal systems", of the separate legal personalities of corporations. The Claimants cannot recover "damages to the assets"[78] of the plant owning corporations.

166.    Spain submits: "[o]wning a percentage of shares in a company does not mean owning the same percentage of its capital or of its income."[79]

167.    Spain invokes the following provisions of the ICSID Convention and of the ECT in support of the proposition that a shareholder cannot make a claim for losses of the corporation in which it holds shares.

168.    Article 25(1) of the ICSID Convention establishes that:

> "(1) <u>The Centre's jurisdiction will be extended to legal disputes arising directly out of an investment between a Contracting State</u> (or any political subdivision or body of a Contracting State accredited to the Centre by that <u>State) and a national of another Contracting State</u> and that the parties have agreed in writing to refer to the Centre. The consent given by the parties may not be unilaterally withdrawn."[80] (Emphasis added by Spain)

169.    Article 25(2)(b) of the ICSID Convention goes on to say:

> "(2) A "national of another Contracting State" refers to:
>
> (b) Any legal person that, on the date on which the parties gave their consent to the Centre's jurisdiction for the dispute in question, has the nationality of a Contracting State other than the State party in the dispute,

---

[78] *Ibid*., para. 122.
[79] *Ibid.,* para. 129.
[80] *Ibid.*, para. 131.

and <u>legal persons who, taking the nationality of the State party to the dispute on the aforementioned date, the parties have agreed to assign it this character, for the purposes of this Convention, as they are subject to foreign control</u>."[81] (Emphasis added by Spain)

170.     Article 26(7) ECT provides the following:

> "An Investor other than a natural person which has the nationality of a Contracting Party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a 'national of another Contracting State' and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a 'national of another State.'"[82]

171.     Spain contends that these provisions "derive from the general principle of non-recognition of active legitimation of the shareholder to claim for the company's losses."[83]

172.     Article 26(7) ECT, Spain submits, was necessary so that a local company controlled by foreigners could take proceedings for treaty breaches. It further submits that this sub Article would not be necessary if the foreign shareholders could claim for the company's losses.

173.     As the Claimants observe, such a provision was required to permit proceedings by a local subsidiary because, in some jurisdictions, local assets are required by law to be held by a local subsidiary. However, they submit, that says nothing about whether the parent has any rights under the Treaty. The provision gives the group an option to proceed in the name of the local subsidiary, which may be commercially preferable, even if not necessary. The provision was necessary to permit the local company to take proceedings.

174.     The Tribunal is of the view that Article 26(7) ECT was necessary to permit the locally incorporated subsidiary to take proceedings. A provision extending the protection of a treaty does not carry the implication that other clear words in the treaty, which we discuss

---

[81] *Ibid.*, para. 132.
[82] *Ibid.*, para. 133.
[83] *Ibid.*, para. 134.

below, must be read down. The Article does not merely constitute 'recognition' of the general principle for which Spain contends. It has work to do.

175.   Spain invokes the following cases in support of its submissions in this respect:

   i.   *Barcelona Traction, Light and Power Co., Ltd* (Belgium v. Spain), International Court of Justice, Judgment, 5 February 1970, paras. 41, 42, and 44 ("*Barcelona Traction*").

   ii.   *Ahmadou Sadio Diallo* (Republic of Guinea v. Democratic Republic of the Congo), International Court of Justice, Judgment, 30 November 2010.

   iii.   *Olczak v. Poland*, European Court of Human Rights Case No. 30417/96, Final Decision on Admissibility, 7 November 2002.

   iv.   *ST-AD GmbH v. Republic of Bulgaria*, UNCITRAL, PCA Case No. 2011-06, Award on Jurisdiction, 18 February 2013, paras. 278, 282 and 292.

   v.   *Poštová Banka, A.S. and Istrokapital SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award on Jurisdiction, 9 April 2015, para. 245.

   vi.   *Nykomb Synergetics Technology Holding AB (Sweden) v. Latvia*, SCC Case No. 118/2001, Award, 16 December 2003, p. 39.

176.   As Spain contends, each of these cases identifies the separate legal personalities of a corporation and its shareholders. However, in terms of the jurisdictional objection, none of these authorities suggests that the principle of separate legal personality is immutable. Relevantly, none suggest that a treaty cannot make provision that is inconsistent with the principle.

177.   Indeed, as the Claimants note in their Reply[84], the International Court of Justice ("**ICJ**") in *Barcelona Traction* expressly accepted that a treaty could do so, when it said:

   "[I]n the present state of the law, the protection of shareholders requires that recourse be had to treaty stipulations or special agreements directly concluded between the private investor and the State in which the investment is placed. States ever more frequently provide for such protection, in both bilateral and multilateral relations…Indeed, whether in the form of multilateral or bilateral treaties between States, or in that of agreements between States and companies, there has since the Second World War been considerable development in the protection of foreign investments. The instruments in question contain provisions as to jurisdiction and procedure in case of disputes concerning the treatment of investing companies by the States in which they invest capital. Sometimes

---

[84] Cl. Reply, para. 80.

> companies are themselves vested with a direct right to defend their
> interests against States through prescribed procedures. No such instrument
> is in force between the Parties to the present case."

178.    This passage is directly applicable to the ECT. It is unnecessary to set out the full range of other authorities and commentaries which the Claimants invoke. The proposition is clear. The principle of separate legal personality can be altered by treaty, and investment treaties almost always do so.

179.    Spain expresses the principle of separate legal personality in various equivalent ways. To use the final formulation in paragraph 167 of its PHB, the "identification between the legal personality of the shareholder and the legal personality of the company that owns the RE plants is forbidden by all advanced systems of national and international Law."

180.    Spain does not acknowledge that this principle, far from being "forbidden" –a proposition for which it cites no authority– is frequently overridden by national statutes and treaties, as all such principles can be. What is sometimes called "lifting the corporate veil" is also a feature of "advanced legal systems."

181.    The principal focus of the Claimants' case in this respect is the text of the ECT. Article 1(6) ECT provides, relevantly:

> "(6) 'Investment' means every kind of asset, owned or controlled directly
> or indirectly by an Investor and includes:
>
> (a)    tangible and intangible, and movable and immovable, property,
> and any property rights such as leases, mortgages, liens, and pledges;
>
> (b)    a company or business enterprise, or shares, stock, or other forms
> of equity participation in a company or business enterprise, and bonds and
> other debt of a company or business enterprise;
>
> (c)    claims to money and claims to performance pursuant to contract
> having an economic value and associated with an Investment;
>
> (d)    Intellectual Property;

(e)    Returns;

(f)    any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector."

182.  Article 1(6) ECT further provides:

"'Investment' refers to any investment associated with an Economic Activity in the Energy Sector …"

183.  Article 1(5) ECT provides:

"'Economic Activity in the Energy Sector' means any economic activity concerning the … production … or sale of Energy Materials and Products …"

184.  Further, Article 1(8) ECT provides:

"'Make Investments' or 'Making of Investments' means establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity."

185.  It is difficult to envisage a broader definition of the word "Investment." The formulation "asset owned … indirectly" clearly applies to the assets of which the Claimants indirectly hold an interest.

186.  The breadth of this formulation is further expanded by the reference in Article 1(6) ECT of an investment *"associated with"* an Economic Activity, which is further expanded by its own definition in Article 1(5) to such activity *"concerning"* production or sale of energy.

187.  In none of its submissions does Spain ever come to terms with the breadth of the definition of "Investment", and therefore of an "Investor", for purposes of the ECT. Article 10(1) ECT, the principal provision of the ECT in issue, refers to the "conditions for Investors … to make Investments". As noted above, Article 1(8) ECT defines "Make Investments" to include, relevantly, "acquiring all or part of existing Investments."

45

188.   Specifically, Spain ignores the breadth of the concept of "Investment" arising from the express reference to the proposition that ownership or control of *any* asset, can be *indirect.*

189.   For example: "Owning a percentage of shares in a company does not mean owning the same percentage of its capital or of its income."[85]

190.   There is no reference in the Counter-Memorial to the extended definition of Investment.

191.   In its Rejoinder, Spain acknowledges the Claimants' reliance on its "indirect" ownership, but does not address it in terms.

192.   In its PHB, Spain submits that the Claimants are restricted to paragraph (b) of Article 1(6) ECT –namely the "indirect ownership of shares in the local companies." It adds that "this indirect ownership of shares does not give the Claimants the indirect ownership of the assets of the companies"[86] because of the separation of legal personalities.

193.   Spain further contends that: "... the only asset that the Claimants indirectly own and control are shares in the local companies owning the plants."[87]

194.   It reinforces this submission by asserting that the only "Investment" the Claimants 'made,' for proposes of Article 1(8) ECT definition of "Making of Investments" was the acquisition of shares in "companies that indirectly own the PV plants." There was no "investment in the RE plants themselves."[88]

195.   This analysis fails to engage with the full definition of "Investment" in Article 1(6) ECT. The references to shares in paragraph (b) is merely illustrative. It is part of what the chapeau of the sub-Article "includes." The sub-Article's principal formulation is: "every kind of

---

[85] Resp. CM, para. 129.
[86] Resp. PHB, para. 167.
[87] *Ibid*., para. 171.
[88] *Ibid*., para. 175.

asset, owned or controlled directly or indirectly by an Investor." That is also the meaning of the word in Article 1(8) ECT.

196.     Nothing in any of the submissions by Spain gives the appropriate scope to these words, particularly the words "asset" and "indirectly." The Tribunal rejects each of the propositions set out at paragraphs 188-194 above. The assets of the companies operating the PV and hydro plants are all indirectly owned and, all but three hydro plants, are indirectly controlled by the Claimants.

197.     We accept the Claimants' contention that the jurisdictional issue must be determined by the language of the Treaty. The principal of separate legal personality, insofar as it is part of customary international law, or even of the domestic law of "advanced legal systems," is of no relevance to a claim which is governed by the ECT. The word "indirectly" is a complete answer to Spain's corporate personality objection.

198.     Spain responds to the Claimants' reliance on the text by saying that its objection is one of standing, rather than a dispute about the concept of "Investment" as defined. However, the Claimants' standing under the ECT is not a matter of customary international law or of general legal principles. It is governed by the ECT and the ICSID Convention.

199.     There is no issue that the Claimants have the requisite nationality of a Contracting Party for purposes of Article 25 ICSID Convention and Article 1(7) ECT. The relevant issue of standing is determined by the ECT.

200.     The critical words are in Article 26(1) ECT, relevantly:

> "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III …"

201.     It is such a dispute that "the Investor party to the dispute" may submit to arbitration under Article 26(3) ECT. No submission of Spain touches on the characterization of the

Claimants as "Investors" within Article 26 ECT. That is what gives them the requisite standing.

202.   The Tribunal rejects the Second Jurisdictional Objection.


## C.  THE TAXATION OBJECTION

203.   The obligations found in Article 10(1) ECT are subject to a carve-out for taxation. Article 21 ECT provides:

> "(1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.
>
> …
>
> (7) For the purposes of this Article:
>
> (a) The term "Taxation Measure" includes:
>
> (i)     any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and
>
> (ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound."

204.   Subsequent subsections of Article 21 ECT provide for the application of certain Articles to taxation measures of a defined character. There is no exclusion in Article 21 ECT applicable to Article 10(1) ECT. By contrast, Articles 10(2) and 10(7) ECT are the subject of exceptions.

### The Respondent's Submission

205.    Spain contends that both the tax on the value of production of electrical energy (the "**TVPEE**") and the levy on the use of continental waters for the production of electrical energy (the "**Water Levy**") fall within the carve-out. Spain has not agreed to submit such a dispute to arbitration. Nor, does Article 10(1) ECT create any rights in an investor with respect to taxation measures. Accordingly, this Tribunal does not have jurisdiction to hear the Claimants' challenge to these two measures, both introduced by Act 15/2012.

206.    This jurisdictional objection does not apply to the Claimants' reliance on the expropriation provision in Article 13 ECT, with regard to these taxation measures. We discuss the expropriation case below.

207.    The TVPEE is a levy at the rate of 7% on the amount a taxpayer received for the production of electrical energy. The TVPEE is applicable to all forms of electricity production, both renewable and conventional.

208.    The Water Levy is a levy at an annual rate, relevantly for present purposes, of 2.2%, on the economic value of hydroelectricity produced through the use of public domain water. That rate applies to facilities of less than 50 MW, like the facilities in issue in these proceedings.

209.    As set out above, Article 21(7)(a)(i) ECT defines "taxation measure" to include: any provision relating to taxes of the domestic law of the Contracting Party. Spain contends that determining whether an imposition is a "taxation measure", within Article 21 ECT, is a matter for domestic law, not international law. It relies, in particular, on the express reference to the "domestic law of the Contracting Party" in that subparagraph.

210.    Nevertheless, Spain accepts that the meaning of the words may be an issue of international law. It drew the Tribunal's attention to Article 26(6) ECT which provides:

> "Article 26:
>
> …

49

> "(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

211.   Spain contends that, on either approach, both the TVPEE and the Water Levy fall within the tax carve-out. The Tribunal is of the view that the interpretation of the words in the ECT is a matter of international law. Accordingly, we do not further consider the detailed submission from Spain on its domestic law relevant to the interpretation of the word "taxation." However, either approach will lead to the same result.

212.   Spain refers to a number of dictionaries and cases which identify the concept of taxation for purposes of international law. Although expressed in various ways, all these authorities identify a tax as a compulsory exaction of money for public purposes.[89]

213.   The TVPEE has, Spain submits, the requisite characteristics:

   i.      all producers of electricity - whatever its source - are required to pay an amount of money calculated by reference to their production;
   ii.     the money is payable to the State;
   iii.    the revenue so received is included in the Spanish General State Budget;
   iv.     accordingly, it is available to be deployed, with other revenue, for the public purposes of the State;
   v.      by additional provision, Act 15/2012 allocates an amount equivalent to the sum so raised to finance the costs of the electricity system; and
   vi.     by further additional provision by Act 17/2012, the amount so raised will be used to finance the costs of the electricity system "relating to the promotion of renewable energy".

214.   Spain contends that the Water Levy is a tax, for much the same reasons as the TVPEE:

   i.      the Water Levy is imposed by statute, on a defined class of persons, with respect to the use and exploitation of continental waters - an "hydraulic public domain asset";
   ii.     the Water Levy is payable to the State for public purposes;

---

[89] See, for example: *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN3481, Award, 3 February 2006, para. 142, CL-39, RL-27; *Burlington Resources Inv. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, paras. 164-165, CL-160, RL-36.

iii.    the statute provides that 2% of the revenue will be paid to the River Basin Organisms, being public bodies with responsibility for the management and control of the hydraulic public domain;

iv.    the balance of 98% of the revenue is payable to the Public Treasury and is included in the Budget;

v.    accordingly it is available to be deployed, with other revenue, for the public purposes of the State; and

vi.    by further legislative provision, the 98% so raised is allocated for the "protection and improvement of the hydraulic public domain." These objects are further defined by Act 15/2012.

### The Claimants' Submission

215. In their Memorial, the Claimants referred to Law 15/2012 as a "tax", the inverted commas indicating their position, in anticipation of Spain's Counter-Memorial. They submitted that the exaction was not a "tax" but a "simple 7% reduction in the tariff rates guaranteed by RD 661/2007." The Water Levy was applied "despite the fact that producers already had received rights to use water resources and, in many cases, paid a significant fee - a 'canon' - for those rights."[90]

216. The Claimants noted that the TVPEE purports to apply equally to both renewable and conventional production but, they submit, it discriminates against the former. When applied to conventional producers, it applies to the wholesale value of the electricity they produce. However, in the case of renewable producers, it applies to the wholesale value plus the government's incentive payments. Furthermore, when renewable producers received a fixed tariff, they could not pass on the new tax to consumers. The Claimants' PV plants and the hydro plants, which had elected the fixed tariff option, could not pass on the levies.

217. In the context of the measures under consideration, this "discriminatory treatment" could not be regarded as a valid tax. It was another manoeuvre to claw back the incentives. In

---

[90] Cl. Mem., para. 270.

this respect, they note that one of the stated objectives of the measure was to protect the environment whereas, by discriminating against renewables, it does the opposite.

218.    In their Reply, the Claimants addressed Article 21 ECT and submitted that the TVPEE and the Water Levy fall outside the carve-out. That is because they are not *bona fide* taxes." In substance, these measures reduce the remuneration "guaranteed" under RD 661/2007 by 7% and an additional reduction of 2.2% for the hydro facilities.

219.    The Claimants note:

(i)     domestic law may be helpful in determining the meaning of a word like "taxation" in a treaty, but it is not determinative;

(ii)    the funds raised do not form part of the government's general funds but are allocated to reduce the tariff deficit;

(iii)   the purpose is, therefore, to reduce the tariffs that Spanish consumers must pay into the electricity system. This subsidises a commercial transaction and is not a public purpose. (The Claimants address only the allocation of the 7% impost. They do not address the separate imposition of the Water Levy); and

(iv)    the Claimants reiterate their submission about the discriminatory nature of the levy - by its application to all revenue, including incentive tariffs for renewable producers and their inability to pass on the impost. Furthermore, the Water Levy does not apply to conventional producers.

220.    The Claimants restated these points in their Comments on the *Masdar* award, concluding that "these measures cannot be distinguished from a simple reduction of the guaranteed tariff in any meaningful way other than their labels."[91]

**The Tribunal's Analysis**

221.    Each of the two measures has the appearance of being a tax. The critical issue in dispute is whether they are *bona fide* taxation measures. This is a question of treaty interpretation. It is the meaning of the term "taxation measures" in Article 21 ECT that is material. That is a question to be approached on the basis of the principles of international law concerning

---

[91] Cl. Comments on *Masdar*, para. 6.

the interpretation of treaties, and not, for example, upon the basis of an interpretation of EU or any other domestic law.

222.   The Claimants referred to the reasoning in *Yukos v. Russia*,[92] which held that Article 21(1) ECT did not protect the provision under consideration, because it was not "*bona fide* taxation.*"* The Claimants submit that, similarly, neither the TVPEE nor the Water Levy answer that description.

223.   Spain relies on other cases which, it contends, require extraordinary circumstances, such as existed in *Yukos v. Russia,* before a lack of *bona fides* will be found.

224.   The factual basis for the proposition that either measure is not a *bona fide* tax is flimsy. It is essentially an inference to be drawn from the fact that it has the commercial effect of reducing the revenue of the Claimants. However, that is the effect of virtually any tax. There is no proper factual basis for the inference that Spain's motive was to reduce the subsidy.

225.   That is particularly so in the case of the TVPEE, which applies to all forms of generation. The fact that the tax may have a greater effect on renewable producers - by its application to the subsidy, and by the difficulty renewable producers may have in passing on the impost - does not change its character. Let alone is it a basis for drawing an inference of lack of *bona fides*.

226.   The strongest the Claimants' case gets in this respect is when the measure is considered as one of the series of measures in dispute in these proceedings which all have the substantive effect of reducing the value of the subsidy inherent in the tariff for which RD 661/2007 provides. This proposition cuts both ways. The very fact that these other measures were adopted – especially those of 2003-2004 – indicates that Spain had other ways of achieving that objective.

---

[92] *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227, Final Award, 18 July 2014, para. 1407, (hereinafter "***Yukos v. Russia***"), CL-31, RL-73.

227.    We agree with the conclusion of the *Eiser v. Spain* tribunal:

> "[269] … Claimants' allegation of bad faith could be maintained only if
> Spain knew or should have known that the RD 661/2007 tariffs cannot be
> substantially altered, and so knowingly violated its obligations under the
> ECT by adopting Law 15/2012. The evidence is not sufficient to sustain
> this contention …." and;

> "[270] … The present case does not on the facts reach a situation where
> the tax enforcement measures are found to have been used as part of a
> pattern of behaviour aimed at destroying Claimants …"[93]

228.    We note that the *Masdar* tribunal also rejected the argument that the Respondent had acted
in bad faith in imposing the Water Levy and reached the same conclusion.[94]

229.    The Claimants argue more specifically that the categorization of measures as taxes "does
not turn on Spain's intentions and does not require a finding of bad faith;"[95] and they offer
a three-prong test, according to which a "measure may be considered a tax if (i) it is
imposed by law; (ii) upon a class of persons; and (iii) to pay money to the State for public
purposes and without any benefit to the taxpayer."[96] In addition to asserting that Spain's
stated purpose for the measures is "clearly a pretext"[97] – a point which reverts to the
arguments on *bona fides* – the Claimants suggest that the measures were discriminatory
because they had a disproportionate effect on renewable energy producers.[98]

230.    We do not consider that this perspective alters the analysis. The element of bad faith / *bona
fides* has been addressed; and we do not accept that the measures were improperly
discriminatory. All taxation measures apply to defined classes of persons or actions, and
there is no reason why producers of renewable energy should not be treated as a distinct

---

[93] *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No.
ARB/13/36, Award, 4 May 2017, paras. 269-270 (hereinafter "**Eiser v. Spain**"), CL-153.

[94] *Masdar* award, paras. 257-295.

[95] Cl. Comments on *Masdar*, para. 5.

[96] Cl. Rej. Jurisdiction, para. 44.

[97] *Ibid.*, para. 45.

[98] *Ibid.*, paras. 55-58.

class for the purposes of taxation, just as they were treated as members of a distinct class for the purposes of the Special Regime and its attendant benefits.

231. We reject the Claimants' contention that the fact that the 7% levy is recycled into the electricity system - and thereby reduces the tariff deficit - somehow disentitles it from constituting a public purpose. That deficit is a burden on the public finances and a measure that reduces it serve such a purpose. The fact that there could be other means of reducing the deficit - by increasing the cost of electricity to consumers - is a political proposition, devoid of legal content.

232. We note that the Claimants have not made any submissions directly challenging the political purpose of the Water Levy. The recycling of that Water Levy into protection of the hydraulic resources of the State is clearly a public purpose.

233. We uphold Spain's objection to jurisdiction with respect to Act 15/2012.

# V.  THE MERITS

## A.  INTRODUCTION

234. The Claimants in this case say that they made investments in the renewable energy sector – specifically, in photovoltaic electricity generation and in hydroelectric electricity generation – in Spain, in reliance upon representations concerning the level of prices that would be paid for their electricity and the stability of those prices over time.

235. The Claimants emphasize that renewable energy facilities have very high initial costs but that their running costs are low because they use renewable energy sources such as solar, hydraulic and wind power. Calculations of the feasibility of a project are accordingly heavily dependent upon the accuracy with which the prices that they will obtain for the electricity produced over the lifetime of a facility. Uncertainty as to the level and stability of future prices is a major deterrent to investment in the renewable energy sector. The Claimants say that the regulatory regime in place when they made their investments was

designed precisely so as to offer the stability of future prices that was necessary to attract investments in the expansion of renewable energy to which Spain was committed.

236.   The regulatory regime was then changed in a manner inconsistent with the representations that had been made, causing losses to the Claimants' investments.

237.   The Claimants say that the regulatory changes were violations of their right to fair and equitable treatment under the ECT. More particularly, they say that they were entitled to and did rely upon the representations and that the changes were a denial of their legitimate expectations, which constitutes a violation of their right to fair and equitable treatment under Article 10 ECT.

238.   The Claimants assert that they "decided to invest in the PV sector" in April-June 2008.[99] By the end of 2010, Cube had "decided not to make further investments in PV facilities in Spain."[100] The Claimants say that "[a]fter more than a year of considering the more stable hydro sector,"[101] they invested in that sector in 2011-2012. Cube and Demeter invested in ten RPI[102] plants in Spain "in reliance on the guarantees in RD 661" in June 2011,[103] and invested in a further six (the "**Blue Rain**") projects, in which Spanish government entities also held an interest, in June 2012.[104]

239.   On that basis it is clear that the representations on which they relied in making the PV investments are those that occurred prior to June 2008, while the representations on which they relied in making the first ten hydro investments also include those that occurred prior to June 2011, and the representations relevant to the Blue Rain hydro investments include in addition those that occurred prior to June 2012.

---

[99] Cl. PHB, p. 4.

[100] *Ibid.*, p. 34.

[101] *Ibid.*, p. 6.

[102] Renewable Power Global Holding, a group that had developed renewable energy facilities in Spain and other countries (hereinafter "**RPI**").

[103] Cl. PHB, p. 6.

[104] *Id.*

240.    The following paragraphs outline the evolution of Spain's renewable energy regime, on the stability of which the Claimants say that they relied, and consider how far such reliance was protected under the ECT.

B.  **THE EVOLUTION OF SPANISH RENEWABLE ENERGY POLICY: PART ONE**

241.    Prior to 2008, Spain had been attempting to increase greatly the proportion of its energy that is obtained from renewable sources. Among the factors driving this policy were global concern with climate change and the effects of fossil fuels, and the evolving EU policy of fixing targets for Member States relating to the share of energy coming from renewable sources.

### Royal Decree 2366/1994

242.    With the adoption in 1994 of Royal Decree 2366/1994,[105] Spain created a special regime for renewable energy (the "**Special Regime**") which provided for enhanced prices to be paid to producers of renewable energy, but indicated that those prices would be updated and that the regime might be revised after five years, and more generally that there had to be a balance between the return on investments and the avoidance of increased tariffs.[106] It is the changes to this Special Regime that underlie the claims in this case.

### Law 54/1997 Regarding the Electricity Sector and Royal Decree 2818/1998

243.    A major development in energy policy occurred in 1997 when Spain enacted Law 54/1997 regarding the Electricity Sector, which opened up the electricity supply market to competition. The Special Regime applicable under that Law to certain installations for the production of renewable energy provided for the payment to producers of premiums which would have the result that "the price of electricity sold by these installations falls within a

---

[105] RD 2366/1994, R-55.

[106] RD 2366/1994, see Preamble, Articles 12, 14, and Sole final provision on subsequent modifications of parameters or values, R-55.

percentage range of 80 and 90 percent of the average price of electricity." Article 30.4 of the 1997 Law provided that:

> "To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets."

244.    In 1998, Spain adopted Royal Decree 2818/1998,[107] which enabled electricity producers to sell their entire production to distributors for a fixed tariff (often known as a '"**feed in tariff**"), or to sell their electricity on the market and be paid a premium over the market price. The Claimants assert that these arrangements offered an incentive for small-hydro facilities of about 90% of the wholesale electricity price, and for solar PV plants of about 500%.[108] The Respondent points out that the Royal Decree refers to its system of "temporary incentives."[109] The State had the discretion to change the rates periodically; and the Royal Decree provided for four-yearly revisions.[110]

### Royal Decree 436/2004: the 2004 Regime

245.    Spain was not achieving its goals in the expansion of renewable energy, and there was an evident need to encourage the establishment of more renewable energy facilities. Spain revised its regulatory regime in 2004 (the "**2004 Regime**" or "**RD 436/2004**"),[111] introducing new incentives for renewable energy production.

---

[107] C-67, R-67.

[108] Cl. Mem., para. 115.

[109] Resp. CM para. 417, referring to a statement in the Preamble of the Decree.

[110] RD 2818/1998, Article 32, R-67.

[111] C-75, R-69.

246.   RD 436/2004 was intended to "continue down the path first taken by Royal Decree 2818/1998."[112] RD 436/2004 built on RD 1432/2002,[113] which was described as having bestowed "stability … on the whole system" by establishing a methodology for the approval or modification of the average or "reference" tariff (the "**TMR**"), by reference to which tariffs and premiums were calculated.[114]

247.   RD 436/2004 gave producers a choice between selling their entire production to distributors for a fixed tariff and selling their electricity on the market and be paid a premium over the market price. The choice could be made annually; and the regime was open both to new producers and to producers registered under the previous regime. The volume setting out the unofficial English translations of the relevant Spanish legislation, published by Spain's National Energy Commission ("**CNE**")**,** an executive sub-agency within the Ministry of Economy and Competition) in 2006, explained that:

> "Whichever remuneration mechanism is chosen, the Royal Decree guarantees operators of special regime installations fair remuneration for their investments and an equally fair allocation to electricity consumers of the costs that can be attributed to the electricity system although incentives are offered for market participation because this is deemed to be the way to minimise administrative intervention in the setting of electricity prices as well as to better, and more efficiently allocate the system costs especially with respect to deviation (differences) management and the provision of ancillary services."[115]

248.   Most importantly, having tied the fixed tariffs and premiums to the TMR, subject to annual recalculation, and having set different rates for different kinds and sizes of renewable energy production facilities,[116] RD 436/2004 fixed the relevant tariff rates and premiums for the lifetime of each facility, subject to a reduction after 15 years (in the case of hydro plants between 10 MW and 25 MW) or 25 years (in the case of hydro plants of up to 10

---

[112] RD 436/2004, p. 10, C-75.
[113] R-68.
[114] RD 436/2004, p. 10, C-75.
[115] *Ibid*., pp. 10-11.
[116] *Ibid.*, Articles 33 to 39.

MW and all PV plants).[117] This was said by Spain to enable producers to anticipate the prices that they would be paid and to facilitate profitability analyses for new projects.[118]

249.    The operating lifetime of a facility is necessarily somewhat speculative, but the Claimants say that a PV plant "can operate for 30 years or more" and a hydro plant "can operate for much longer – some of Claimants' plants have concessions for 75 years"[119] and the average concession length for the Claimants' hydro plants was close to 45 years.[120]

250.    The tariffs and premiums offered under RD 436/2004 were higher than those offered under the previous regime. They were subject to review in 2006 and every four years thereafter.[121]

**Renewable Energies Plans 2005-2007**

251.    The 2004 Regime did not produce the necessary volume of investment in renewable energy[122] and Spain decided that a further revision of the regulatory regime was necessary. Following the adoption of a new Renewable Energies Plan in 2005[123] and recognition of Spain's continuing need to promote renewable energy,[124] Spain's CNE published a report in 2007 in which it identified certain principles as essential to the success of any revision. The principles included the use of economic incentives that are transparent, stable and predictable for the entire life of a production facility, with any modification in the economic regime applicable only to new facilities, and any retroactive provisions accompanied by appropriate transitional provisions and adequate compensation.[125]

---

[117] *Ibid.*, Articles 36.1 and 36.2.

[118] See Spain's 2005 Progress Report to the European Commission, p. 30, C-74.

[119] Cl. Reply, para. 11.

[120] *Ibid.*, para. 239.

[121] RD 436/2004, Article 40.1, C-75.

[122] See, *e.g.*, C-46, C-85, C-86, C-87.

[123] C-84.

[124] Statement of the Secretary General for Energy before the Congress of Deputies, 8 November 2006, p. 6, C-85.

[125] CNE Report 3/2007, pp. 16-23, C-61.

**Royal Decree 661/2007: the 2007 Regime**

252. In 2007, a revised legal regime was established by Royal Decree 661/2007 (the "**2007 Regime**" or "**RD 661/2007**").[126] This is a key instrument. The Claimants say explicitly that their "legitimate expectations were based on the plain terms of RD 661 itself."[127]

253. The Claimants say that RD 661/2007 had "two crucial hallmarks … (1) its attractive tariff rates that guaranteed a predictable level of profitability for renewable energy investors and (2) a guaranteed duration of those incentives throughout the operating lives of facilities properly registered under the regime."[128]

254. RD 661/2007 classified power producers into various categories:[129] Category a) were producers utilising combined heat and power plants; Category b) were producers using non-consumable renewable energies, with Group b.1 being solar plants, and Sub-Group b.1.1 being PV plants and Sub-Group b.1.2 being thermal solar plants. Group b.4 plants were hydro plants of up to 10 MW, and Group b.5 plants were hydro plants of between 10 MW and 50 MW.[130] All of these were eligible to come under the Special Regime.

255. Designated public authorities could grant recognition of Special Regime status on application by the owners or operators of a facility. Public authority registers for production facilities under the Special Regime were maintained. Registration under the so-called RAIPRE (the *Registro administrativo de instalaciones de producción de energía eléctrica acogidas al regimen especial*) was a necessary requirement for the application of the Special Regime to a facility.[131]

---

[126] C-98, R-71.

[127] Cl. PHB, p. 32.

[128] Cl. Mem., para. 156.

[129] RD 661/2007, Article 2, C-98, R-71.

[130] All of the Claimants' hydro plants had a capacity below 10 MW, apart from Xerta (18.0 MW), Camporredondo (10.0 MW) and Flix (10.0 MW): Brattle First Quantum Report, p. 12, Table 2.

[131] RD 661/2007, Articles 4 to 15, C-98, R-71. Certain facilities already registered under RD 436/2004 were automatically included: see Additional Provision Four and Transitory Provision One.

256.    Proprietors of registered facilities were given the right *inter alia* to "[r]eceive, for the total or partial sale of their net electrical energy generated under any of the options appearing in Article 24.1, the compensation provided in the economic regime set out by this Royal Decree."[132] The "economic regime" is Chapter IV of RD 661/2007. Article 24.1 read as follows:

> "Article 24. Mechanisms for the compensation of the electrical energy produced under the special regime.
>
> 1. In order to sell their net production of electrical energy in full or in part, the proprietors of facilities to which this Royal Decree is applicable should elect one of the following options:
>
> a) Sell the electricity to the system through the transport or distribution grid, receiving for it a regulated tariff, which shall be the same for all scheduling periods expressed in Euro cents per kilowatt/hour.
>
> b) Sell the electricity in the electrical energy production market. In this case the sale price of the electricity shall be the price obtained in the organised market or the price freely negotiated by the proprietor or the representative of the facility, supplemented where appropriate by a premium, in Eurocents per kilowatt/hour."

257.    Proprietors of hydro plants (Sub-Groups b.4 and b.5) thus had a choice, exercisable annually, between a regulated tariff and a market premium. Article 36 RD 661/2007[133] set out the "tariffs and premiums corresponding to facilities in Category b." Existing plants registered under RD 436/2004 could also opt to stay with tariffs under that Decree. RD 661/2007 set a tariff for each of Sub-Groups b.4 and b.5 applicable for the first 25 years of operation of the plant and another tariff, 90% of the former, applicable thereafter. Each group also had a premium set for the first 25 years and a lower premium applicable

---

[132] RD 661/2007, Article 17, C-98, R-71.

[133] The English translation of Article 36 in C-98 and R-71 is incorrect. This Decision is based on the Spanish text in C-98 and R-71.

thereafter. Upper and lower limits were set for the sum of the market price plus the premium.[134]

258.    The owners of three of the Claimants' hydro facilities opted to stay with the market premium option set under RD 436/2004, while seven others opted for fixed tariffs under RD 661/2007, as did a further six Blue Rain plants acquired by the Claimants later. As of 31 December 2012, all sixteen of the Claimants' hydro plants were receiving remuneration specified in RD 661/2007.[135]

259.    PV plants (Sub-Group b.1.1), in contrast, were eligible only for the regulated tariff under Article 24.1.a) RD 661/2007, and not for the market premium option. Article 36 RD 661/2007 divided PV plants into three categories (under 100 kW; 100 kW - 10 MW; 10 MW - 50 MW) and provided for each category a tariff payable for the first 25 years and another tariff, 80% of the former, payable thereafter.

260.    RD 661/2007, in setting tariffs for 25 years and thereafter, implied that the tariffs were fixed for the life of the power facility; and that implication was supported by provisions such as Transitory Provision One, which expressly established a regime for previously registered facilities which applied "for the remainder of the life of the facility."

261.    Tariffs set by RD 661/2007 for PV plants of over 11 kW rose by 82% compared with the 2004 Regime, and those for hydro plants by between 7% and 13%.[136] RD 661/2007 also provided for other incentives, including an "efficiency supplement"[137] and a "reactive energy supplement."[138]

---

[134] RD 661/2007, Articles 27 and 36, C-98, R-71.

[135] Cl. Mem., para. 219.

[136] Press Release RD 661/2007, C-99.

[137] RD 661/2007, Article 28. C-98, R-71.

[138] *Ibid.*, Article 29.

262.    In addition to annual updating with reference to the retail price index,[139] Article 44 RD
661/2007 provided for "updating and review of tariffs, premiums, and supplements."
Article 44.3 RD 661/2007 read as follows:

> "During the year 2010, on sight of the results of the monitoring reports on
> the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010,
> and of the Energy Efficiency and Savings Strategy in Spain (E4), together
> with such new targets as may be included in the subsequent Renewable
> Energies Plan 2011-2020, there shall be a review of the tariffs, premiums,
> supplements and lower and upper limits defined in this Royal Decree with
> regard to the costs associated with each of these technologies, the degree
> of participation of the special regime in covering the demand and its
> impact upon the technical and economic management of the system, and
> a reasonable rate of profitability shall always be guaranteed with reference
> to the cost of money in the capital markets. Subsequently a further review
> shall be performed every four years, maintaining the same criteria as
> previously.
>
> **The revisions to the regulated tariff and the upper and lower limits
> indicated in this paragraph shall not affect facilities for which the deed
> of commissioning shall have been granted prior to 1 January of the
> second year following the year in which the revision shall have been
> performed**." (emphasis added)

263.    Article 44.3 RD 661/2007 thus provided for a mechanism for revising the tariffs and the
upper and lower limits of the "market price + premium" option, but expressly stipulated
that such revisions would not apply to power plants that were already in operation or were
commissioned shortly after the revision. That express stipulation did not extend to the
provisions on the length of time for which the tariffs and upper and lower limits would be
applicable.

264.    It is significant that the possibility of entry into this economic regime was not unlimited.
RD 661/2007 set out "power targets" – the target power-generating capacity – for each
group and sub-group. Article 37 RD 661/2007 set the target for PV at 371 MW, and Article
40 RD 661/2007 set the target for hydro plants up to 10 MW at 2400 MW, in each case
without prejudice to the provisions of Article 36 RD 661/2007 on tariffs and premiums.

---

[139] *Ibid.*, Article 44.1.

Article 22 RD 661/2007 ("Period of maintenance of the regulated tariffs and premiums") provided that as soon as 85% of the power target was reached, a deadline, at least twelve months ahead, would be set by which new facilities would have to register in order to qualify for the Special Regime. There was no provision limiting the number of plants or the capacity that could be registered under the Special Regime prior to this 'closing'. On the other hand, those that did register – and they alone – were to receive the support for which the legislation provided.

265. It is relevant to recall how the regime was characterised at the time. Among the statements cited was the February 2007 report by the CNE on drafts of what became RD 661/2007, which recognised the need for legal security.[140] In addition, there were press reports of references by government representatives of the "legal security" that would result from the new (2007) legal regime for renewable energy producers.[141] Those statements were not couched in absolute terms: for example, the General Secretary of Energy is reported to have said (in relation to wind power producers) that "we would stress that what they can't ask is for nothing ever to change in the future."[142]

266. Nonetheless, the stability of the new regime applicable to renewable energies was emphasised. A Government press release issued on the same day as RD 661/2007 (the "**Press Release**"), having referred to the increased tariffs and premiums under the Royal Decree, stated that:

> "Every 4 years the tariffs will be revised, bearing in mind compliance with the targets set. This will allow an adjustment to the tariffs in line with the new costs and the degree of compliance with the targets. The tariff revisions carried out in the future will not affect those installations already operating. This guarantee affords legal safety to the producer, providing stability to the sector and promoting its development. The new regulations will not be of a retroactive nature. The installations operating before January 1, 2008 may continue to adopt the previous regulations under the fixed tariff option throughout their working life. When they take part in

---

[140] CNE Report 3/2007, C-61. See also C-116.

[141] *E.g.*, C-113.

[142] C-115.

the market, they may maintain their prior regulation until December 31, 2012.

…

The new text, which replaces Royal Decree 436/2004, fits into the energy policy commitment to drive forward the use of clean, native and efficient energies in Spain. The Government commitment to these energy technologies was the reason why the new regulations sought stability over time, which allows businessmen to carry out medium and long-term scheduling as well as a sufficient, fair return that, combined with stability, makes the investment and dedication to this activity attractive.

…

Outlines of the new Royal Decree

The new regulations determine the right to receive special remuneration for the energy produced at the installations included under the special regime, in other words, with power of less than 50 MW, and also those which have power in excess of 50 MW, i.e., cogeneration, those that use renewable energies, or waste.

The new regulations will not be of a retroactive nature. The installations that are operational by January 1, 2008 may continue to adopt the previous regulations under the fixed tariff option throughout their operating life. When they take part in the market, they may maintain their prior regulation until December 31, 2012. These installations may voluntarily opt to abide by this new Royal Decree as from its publication.

It will be in 2010 that the tariffs and premiums set out in the proposal will be revised in accordance with the targets set in the Renewable Energies Plan 2005-2010 and in the Energy Efficiency and Savings Strategy and in line with the new targets included in the following Renewable Energies Plan for the period 2011-2020.

The revisions carried out in the future of the tariffs will not affect those Installations already in operation. This guarantee provides legal safety for the producer, affording stability to the sector and fostering its development."[143]

---

[143] C-99.

267.    There is evidence that the industry considered the regime to be stable. Thus, at the time that Cube was considering investments in PV, EDF Energies Nouvelles S.A. represented that the initial tariff set under RD 661/2007 "is valid for a 25-year period," after which it falls to 80% of that initial tariff.[144] Contemporaneous evidence shows that Cube had a similar understanding.[145] So, too, did PwC, in their financial due diligence report.[146]

268.    As for the question of what the "operating life" of a facility might be – the period after 25 years of operation, for which the "80%" tariff was set – it was noted above[147] that the Claimants had referred to a life of 30 years for PV plants, and significantly longer for hydro plants.

### RD 1578/2008 and the Revision of the 2007 Regime: the 2008 Regime

269.    RD 661/2007 was adopted on 25 May 2007. By August 2007, Spain had reached and passed 85% of its PV capacity target,[148] and in September 2007 it was announced that the Special Regime would close to new PV investments one year later.[149] It was, however, decided to extend the scheme, on different terms.

270.    RD 1578/2008 (the "**2008 Regime**")[150] was adopted on 26 September 2008 in order "to establish an economic regime for facilities generating electric power with photovoltaic technology, to which the regulated tariff rates provided in Article 36 of Royal Decree 661/2007, of 25 May, on the activity of electricity power generation under the special regime, are not applicable because of their date of final registration."[151]

---

[144] Cl. Mem., paras. 222-223, C-191, C-192.

[145] Cl. Mem., para. 224, C-195.

[146] Cl. Mem., paras. 239-240, C-220.

[147] See para. 249, above.

[148]  See RD 1578/2008, Preamble, C-46.

[149] Cl. Mem., para. 12, C-151.

[150] RD 1578/2008, C-46.

[151] *Ibid*., Article 1.

271.    This 2008 Regime differed from that under RD 661/2007 in a number of ways, most notably in having lower price incentives, in fixing them for a maximum of 25 years, and in limiting annual quotas of power capacity eligible for fixed tariffs.[152]

272.    Further regulatory changes, designed to address the growing deficit arising from the electricity price regime, were to follow. At this point, however, it is convenient to interrupt the narrative in order to assess the position of the Claimants' PV facilities, because by 2009 the Claimants had acquired all of their PV facilities but had not yet acquired any of their interests in the hydro facilities.

### The Position at the Time of the PV Investments: The Tribunal's Analysis

#### *The Respondent's Representations*

273.    The key instruments in relation to the PV investments are RD 661/2007 and accompanying statements made by the Respondent. The Government Press Release accompanying RD 661/2007 is particularly important.[153] It was not an election policy document or a statement of an aspirational goal of the Government, but an explanatory statement by the Government as to what the meaning and effect of RD 661/2007 was. It contains various representations, some in very general terms, some in more specific terms. Most significant are the repeated, explicit statements that RD 661/2007 itself had no retroactive effect and that future tariff revisions would have no retroactive effect. It said, for example, that "[t]he tariff revisions carried out in the future will not affect those installations already operating. This guarantee affords legal safety to the producer, providing stability to the sector and promoting its development"[154] and that "[t]he new regulations will not be of a retroactive

---

[152] RD 1578/2008, Article 11. See C-138.

[153] See para. 266, above.

[154] C-99. The original statement ("Las revisiones que se realicen en el futuro de las tarifas no afectarán a las instalaciones ya puestas en marcha. Esta garantía aporta seguridad jurídica para el productor, proporcionando estabilidad al sector y fomentando su desarrollo") is translated slightly differently when it reappears later in the press release: see the quotation in para. 266, above.

nature."[155] It is significant that these are not merely words from a press release. They reflect Article 44.3 RD 661/2007 itself.[156]

274.   It might be said that it is one thing to acknowledge the seriousness of the Government's intention but quite another to treat that serious intention as giving rise to a binding obligation.

275.   The Tribunal starts from the proposition that States can and do give firm undertakings, intending that those undertakings be relied upon and acted upon.[157] Precisely because all legislation is necessarily open to the possibility of change, such statements can give assurances that transcend assurances that are set out or are implicit in legislation. In the context of investment protection, it is as important for States as it is for investors that this possibility of making commitments should exist and that, where such a commitment is shown to have been made, it is respected.

276.   The Tribunal considers that the Respondent made such a commitment in relation to RD 661/2007, and that the commitment was that the regulated tariff regime – the Special Regime – established by that Royal Decree would continue to apply to power plants that opted for that regime and were registered as having been accepted into that regime.

277.   The Press Release that accompanied RD 661/2007 is undoubtedly a statement attributable to the State. It was published on the website of the Ministry of Industry, Energy and Tourism on 25 May 2007, the date on which RD 661/2007 was adopted.[158] That release consisted of the statement of the same date published on the section of the website of the

---

[155] C-99.

[156] See paras. 262–263 above.

[157] The *Nuclear Tests* cases in the International Court of Justice offer an example: see *Nuclear Tests* (*Australia v. France*), ICJ, Judgment, 20 December 1974, I.C.J. Report 1974, pp. 267-8, paras. 43 and 46; *Nuclear Tests* (*New Zealand v. France*), ICJ, Judgment, 20 December 1974, I.C.J. Reports 1974, pp. 472-3, paras. 46 and 49. Cf. Case concerning the *Frontier Dispute* (*Burkina Faso v. Republic of Mali*), ICJ, Judgment, 22 December 1986, I.C.J. Reports 1986, p. 573, para. 39. See also the International Law Commission's Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations, < http://legal.un.org/docs/?path=../ilc/texts/instruments/english/draftarticles/992006.pdf&lang=EF >.

[158] C-99 (Spanish version).

Government of Spain that carries documents from the Council of Ministers,[159] with a short introduction. The commitment is found in words such as "[t]he revisions carried out in the future of the tariffs will not affect those Installations already in operation. This guarantee provides legal safety for the producer, affording stability to the sector and fostering its development"[160] and is buttressed by other references to the stability of the regulatory regime. Significantly, these words reflect the statute itself.

278.    The representation concerning non-retroactivity relates to a matter over which the Respondent has control: that is, the approach that would be adopted in future to reform of the regulatory system. The statement asserted in plain terms that if and when a government decided to engage in regulatory change and tariff adjustments, the changes would be constructed in such a way that installations already in operation are not affected. That constraint – a "grandfathering" provision, of a kind that is not uncommon in regulatory regimes – leaves governments a very wide range of possible responses to future developments, but specifically excludes the possibility of revising the terms applicable to existing facilities.[161]

279.    The 25 May 2007 press statement explains why it has been decided to assert that this particular approach will be maintained. It is in order to provide legal safety, to provide stability to the sector, and to foster its development. The purposes are reasonable and attainable; and the approach announced is a straightforward and completely plausible means of achieving them. There is no reason why the statement of the Council of Ministers should not have been regarded as a serious attempt to address the serious problem of attractive investment in renewable energy, and taken at face value. Moreover, non-retroactivity had been a feature of earlier measures.[162]

---

[159] C-324. See Cl. PHB, p. 4, fn. 20.

[160] C-99.

[161] The Tribunal reads the Minister of Energy's speech before the Congress of Deputies in January 2011, R-308, in this light.

[162] See, *e.g.*, RD 436/2004, Article 40.3: "3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the

280.  We consider it significant that Article 22.1 RD 661/2007 requires that in setting the deadline for registration under the Special Regime, account shall be taken of "the speed of implementation of new facilities and the average duration of the works for a standard project of any technology."

281.  That provision demonstrates a concern that reasonable provision should be made to enable investors in power plants to plan their investments and construct their plants on the basis of the Special Regime established in RD 661/2007, but on an objective basis tied to the average performance, so that more efficient investors would benefit from that protection while less efficient investors would risk being faced with a change in the regime while they brought their projects to a tardy conclusion.

282.  We consider that RD 661/2007 was intended to hold out the promise of a degree of regulatory stability, including price stability, and that it did so. The stipulation of tariffs and premiums payable for 25 years, and thereafter, coupled with the inclusion not only of mechanisms for revising those tariffs and premiums, but also for limiting volatility of the "market premium" option – the "cap and floor" provision in Article 27 RD 661/2007 – and for closing the Special Regime scheme to new entrants once the target for each kind of power plant was nearly reached, all point to a sophisticated, carefully planned and durable regulatory regime designed to attract investments in renewable energy.

283.  Indeed, the legislature made special provision in Article 44.3 RD 661/2007 for amending the tariff regime, prospectively, once Spain's target for renewable energy was achieved. In accordance with that provision, reduced tariffs for future investments had been indicated prior to the Claimants' investment in established and registered facilities.[163]

---

date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums.", C-75, R-69.

[163] See paras. 262–269, above.

## *The Scope of the Representation*

284.  There is disagreement between the Parties over precisely what (if anything) was being "promised." The Respondent argues that the only references in RD 661/2007 to any "guarantee" to owners of facilities are to guarantees of "a reasonable return on their investments"[164] and "a reasonable rate of profitability … with reference to the cost of money in the capital markets,"[165] and that the "reasonable return" was something to be balanced with the "reasonable costs" that were to be secured for consumers.[166] The Respondent argues that if the Claimants have in fact received a reasonable return on their investments, their legitimate expectations will have been fully realised and they can claim no more.[167] The Claimants disagree and argue that as the 2007 Regime applied to all plants in each category the incentive to increase profits by increasing efficiency was an integral part of the system; and there was no suggestion that there was any upper limit to the profits that might be made.[168]

285.  Investment decisions obviously involve consideration not only of the commitment of capital to a project but also of the possibility of the subsequent release of that capital investment. An attractive regime must therefore be addressed to the concerns of both greenfield investors and of brownfield investors such as the Claimants, who invest in plants already constructed by other investors who wish to release and redeploy their capital. The question of the rate of return on the original investment, and the size of that original investment, in the construction of a plant is irrelevant to a brownfield investor: it is the predicted future income flows that are of primary importance to brownfield investors.

286.  The submissions made by the Respondent appear to assume that the computation of a "reasonable return" is concerned only with the return on the original greenfield investment.

---

[164] RD 661/2007, Preamble, Seventh Paragraph, C-98, R-71.

[165] *Ibid*., Article 44.3.

[166] *Ibid.*, Preamble, Seventh Paragraph.

[167] See, *e.g*., Tr., Day 5, p. 54

[168] Cl. Reply, para. 191. The Claimants point to statements that profits of plants might be as high as 20%: Cl. Mem., paras. 163, 164, 185.

That position is also reflected in the quantum evidence presented in its case. However, the sale price to a brownfield investor, such as the Claimants, will reflect the value of the statutory entitlements being conveyed. The legitimate expectations of the purchaser are what determines the transaction price.

287.    The Tribunal does not accept that RD 661/2007 and the accompanying Press Release represented that a "reasonable return" and no more would be guaranteed and maintained. We note that the sole reference in the operative provisions of RD 661/2007 to a "reasonable return" occurs in Article 44.3 RD 661/2007 (quoted in paragraph 262, above) where it appears in the context of a provision on the "review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree." The plain meaning of this provision is that a reasonable return will be guaranteed: but conversely there is no indication that increases resulting from the annual updating of tariffs, premiums and supplements in accordance with Article 44.1 RD 661/2007 could be withheld or reduced if it was considered that a particular plant was earning more than a reasonable return, or that this might result from the four-yearly revisions of the tariffs indicated in Article 44.3 RD 661/2007.

288.    The possibility of lowering the tariffs was, moreover, expressly excluded in the case of those power facilities that were already registered and operating under the Special Regime. Article 44.3 RD 661/2007 stated unequivocally that "[t]he revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed." That approach, excluding the retrospective alteration of the regime applicable to existing facilities registered under the Special Regime, was in line with Spanish practice at the time.

289.    It is true that Article 44.3 RD 661/2007 did not specifically and explicitly exclude the possibility of its repeal by a later law: but, as the Press Release and RD 661/2007 itself stated, retrospective alteration of the regime applicable to existing facilities registered under the Special Regime was excluded, and there is in our view no reason to view that

representation as being subject to the implied qualification that it would remain effective only until the State exercises its undoubted legislative power to override it.  If it were otherwise, it would be practically impossible for a State ever to give an undertaking upon which anyone could rely, or for legitimate expectations ever to arise. Certainly, situations of necessity may arise which, as a matter of international law, would excuse non-compliance with certain undertakings: but the Respondent did not raise the defence of necessity in this case.

290.   Moreover, the non-retrospective approach meshes with the aim of securing a "reasonable return" for investors. The means of implementing the "reasonable return" approach was described by the Respondent in its Counter-Memorial as follows:

> "The same methodology has always been maintained for this purpose. This consisted, and consists of defining, within each technology and according to the state of the art that exists at any given time, different *standard facilities*. Once said standard facilities had been determined, different *benchmarks* were established in each one (cost of investment, operating cost, useful life of the plant, production hours subject to a premium, market price) which permitted said *standard facility* to earn a *reasonable return*, according to the cost of money on the capitals market."[169]

291.   By conceiving the reasonable return as the return made by a hypothetical standard facility, producers that were more efficient than average were enabled to achieve higher than normal profits, while inefficient producers would achieve lower than average profits. The scheme focused on the hypothetical standard facilities: there was no indication that the profitability of any individual facility would be taken into account at any stage.

292.   The guarantee of a "reasonable return" must be interpreted in the context of the prevailing factual circumstances. The returns, actual and projected over the life of a plant, that prevailed at the outset of the operation of RD 661/2007 must be presumed to have been regarded as appropriate for the initial calibration of the tariffs and premiums set in Article 36 RD 661/2007, and must be regarded as reasonable. The Spanish Government's own

---

[169] Resp. CM, para. 18, (italics in the original).

press statement that accompanied the adoption of RD 661/2007 said that the Royal Decree ensured a return of 7% on the highest power PV installations and on hydro installations that opt for the fixed tariff, with between 5% and 9% for hydro plants that opt for the "market premium" model.[170] The impact of the four-yearly tariff reviews that considered the evolution of the market, was specifically identified:

> "Every 4 years the tariffs will be revised, bearing in mind compliance with the targets set. This will allow an adjustment to the tariffs in line with the new costs and the degree of compliance with the targets. The tariff revisions carried out in the future will not affect those installations already operating. This guarantee affords legal safety to the producer, providing stability to the sector and promoting its development. The new regulations will not be of a retroactive nature."[171]

293.    We do not consider that the references in RD 661/2007 to a "reasonable return" were intended to have any application outside the context of reviews of the tariffs and of the upper and lower limits under Article 44.3 RD 661/2007. In particular, we do not consider that the references to a "reasonable return" signified a limit on the profit that a producer could earn from any power facility or group of facilities without suffering a reduction or lower-than-normal increase in tariffs, or that the references provided any basis for changes to the 2007 Regime outside the mechanisms set out in RD 661/2007.

294.    The references to "reasonable returns" in the Press Release that accompanied the adoption of RD 661/2007[172] could not prevail over the actual text of RD 661/2007; but in any event the natural reading of the text of that Press Release is simply that the mechanism under RD 661/2007 would be used to guarantee a "reasonable return" throughout the life of a plant, in the sense that producers could be confident that the returns resulting from the reviews of the tariffs and of the upper and lower limits would not be allowed to fall below a reasonable level.

---

[170] C-99.

[171] *Id.*

[172] *Id.*

295.   This conclusion is not altered by the fact that, as the Claimants' experts put it:

> "Documents provided in this arbitration reveal that the Spanish Ministry of Industry designed the tariff under the Original Regulatory Regime (RD 661/2007) by forecasting investment and operating costs, and production and revenues for a 'standard' installation, and computed the tariff level consistent with investors achieving what it then considered to be a 'reasonable return.'"[173]

296.   Whatever the rationale behind the structure of tariffs and premiums set out in RD 661/2007, the clear representation was that the structure would be maintained in the terms set out in the Royal Decree.

297.   Accordingly, on the crucial question whether producers might expect their remuneration to be held down to a level that produces a "reasonable return" – in other words, that instead of being (as it had been in the 1997 Electric Power Act) a floor or lower limit of remuneration on which a producer could rely,[174] a "reasonable return" represented both the lower and the upper limit of the remuneration that any individual producer was entitled to expect – we do not consider that there was any basis in the Spanish measures for such an expectation. There is no evidence that this interpretation of the term was current prior to the making of the Claimants' investments in PV facilities. The term "reasonable return" understood as a cap on remuneration appears, from the express terms of Spain's legislation, to be a development instituted by the reforms of 2012-2014.[175]

298.   This conclusion by the Tribunal is to be understood in context. It cannot be carried to extremes. Had producers been receiving a rate of return that was obviously grossly excessive in the context of prevailing market conditions and was inexplicable in terms of factors such as the superior efficiency of those producers, it is in principle possible that a

---

[173] Brattle Second Quantum Report, para. 181.

[174] The idea of "reasonable profitability rates" was employed to refer to a scheme built on the idea of an assured minimum return, in the context of early attempts to encourage investment in renewable energy, in Article 27.4.c) and the Eighth transitory provision of the 1997 Electric Power Act: see R-59.

[175] See below, para. 473.

windfall tax might have been justifiable.[176] But the changes in the regulatory regime were an attempt to rebalance the structure and finances of the regulated market for electricity. The changes were not adopted within the framework of taxation, but as retrospective changes in a regulatory system which had been established with the non-retrospective application of changes to existing facilities as one of its cornerstones.

### The Spanish Supreme Court Judgments

299. We note that, as the Respondent pointed out, in 2005 the Supreme Court of the Kingdom of Spain issued a judgment in which it affirmed that "[t]here is no legal obstacle so that the Government, exercising the regulatory power and the broad authorisations that it has in in a highly regulated area such as the electricity sector, might modify a specific remuneration system;"[177] and that in 2006 the same court ruled that:

> "the owners of electrical energy production facilities under the special regime do not have an 'unmodifiable right' to maintain unchanged the way in which the collection of premiums is governed. This regime actually attempts to promote the use of renewable energies by means of an incentivising mechanism which, like any of this kind, is not guaranteed to be retained without modifications in the future… the remuneration system that we examined does not guarantee (…) the owners of facilities under the special regime that a particular level of returns or revenue in relation to those obtained in previous fiscal years shall remain untouched, nor the indefinite continuance of the formulas used to set the premiums."[178]

300. Indeed, this position was confirmed by the Supreme Court in other judgments.[179] These judgments are, however, concerned with the question of legitimate expectations arising out of legal measures that preceded RD 661/2007. While it is true that they are couched in general terms, denying that investors have any vested right under Spanish law to the continuity of established tariffs, they do not address the question of legitimate expectations

---

[176] The Tribunal understands the statements made in the course of debates in the Chamber of Deputies in 2006, C-85, quoted at paragraph 627 of the Resp. CM, in this sense.

[177] Supreme Court, Division 3, Third Chamber, Judgment, 15 December 2005, rec. 73/2004, R-117.

[178] Resp. CM, para. 393. See also Supreme Court, Division 3, Third Chamber, Judgment, 25 October 2006, rec. 12/2005, R-118.

[179] See, *e.g.*, R-119, R-120, R-121, R-122.

arising out of the provisions of RD 661/2007 – notably out of Article 44.3 – as specifically explained by the Government,[180] that assert explicitly and without qualification that changes to tariffs and premiums will not have retroactive effect. RD 661/2007 was an attempt by the Respondent to establish a regime that was more attractive than it its predecessors to investors, and to do so by increasing the stability of the regime. It was enacted precisely in order to alter the expectations that investors had under the earlier regime. Furthermore, the judgments were, of course, focused on the availability of causes of action and remedies under Spanish law, and not on the question of the position under the ECT. We do not regard the judgments as having put the Claimants on notice that the tariffs and premiums established by RD 661/2007 might be reduced or withdrawn contrary to the terms of RD 661/2007 itself.

### *Regulatory Risk*

301.    There is a separate question as to the due diligence that the Claimants undertook in respect of the regulatory risk to the investments in the PV plants. The minutes of the meeting of the Investment Committee in April 2008 record that consideration was given to the possibility of retroactive changes in the tariffs[181] and of changes in the tariffs for new projects,[182] and of future changes in the law.[183] It is said that Cube "made a consultation to Garrigues and to Mr Álvaro Valle, who is a partner of Garrigues. And basically we reflected in the IC [sc., Investment Committee] memo in April 2008 the fact that Garrigues was in the opinion that a regulatory modification without compensation would not be constitutional as per the clause 9.3 of the Spanish Constitution."[184]

302.    It appears that consideration of the regulatory risk relating to the PV investments by Cube's Investment Committee was made on the basis of analyses prepared by Mr. Jérôme Alméras,

---

[180] C-99.

[181] C-197, p. 2.

[182] *Id*.

[183] *Ibid*., p. 3.

[184] Tr. Day 2, p. 114. (Alméras); cf., C-197, p. 2.

who was Investment Director at Cube Infrastructure Managers from 2007-2012 and was Cube's Partner in charge of the Renewable Energy / Environment sector.[185] Mr. Alméras had ten years' experience in the sector in various countries, including experience in structuring finance agreements for projects in developing and implementing renewable energy projects in France. He explained his view of the position regarding PV plants in Spain as follows:

> "Spain's administration appeared to be handling subsidized tariffs in a professional way, as RD 661/2007 was to be replaced, for future photovoltaic projects, by RD 1578/2008, which promised lower tariffs given the progressive cost reduction of photovoltaic panels, thanks to technological progress. Those progressive (and non-retroactive) adjustments of tariffs based on real investment conditions helped ensure the stability of profitability over time between investments made at different points in time, and thus having different investment costs."[186]

303. As to the *modus operandi* in relation to PV plants, he explained that:

> "Prior to the acquisition of each facility we mandated technical, legal, and financial experts in order to assess the investments' risks. We ourselves considered and implemented measures necessary to mitigate those risks (insurance, partnership with experienced industry players, operation and supply agreements that included performance guarantees both at the launching of the facilities and during their useful life, which for a PV facility can be thirty years or more)."[187]

304. While there is no evidence on the record of a detailed written analysis of the regulatory risk to the PV plants, we consider that there is evidence that the Claimants did take professional advice on the matter and took it into consideration in making their investments.

### The Respondent's Right to Regulate its Economy

305. We acknowledge the responsibility of the Spanish State for the proper functioning of its economic system and the welfare of its population. In principle, legislation in the field of

---

[185] Alméras WS 1, paras. 1, 10.

[186] *Ibid.*, para. 17.

[187] Alméras WS 1, para. 21.

the economy can be adapted to changing circumstances, particularly if basic public utilities are in issue. However, after careful reflection, being perfectly aware of the jurisprudence of their Supreme Court, the Spanish authorities decided that the Special Regime for the remuneration of renewable energy should be established for a long duration in order to attract sufficient investment that otherwise could not have been obtained. This was a deliberate decision from which the Respondent cannot move away lightly.

306.    The Respondent presented forceful and detailed arguments that the characterization of Spain's price support scheme as State aid impermissible under EU rules, at least once a "level playing field" for electricity producers had been established, was a factor that should have been taken into account by investors as indicating that the price support scheme might not survive as envisaged.[188] The Tribunal disagrees. The obligations regarding State aid were incumbent upon the Respondent, and investors were entitled to assume that they had been taken into account by the Respondent when drafting its legislation. It was not for the Claimants to second-guess the Respondent's legislature. Moreover, at the time that the investments were made it was not at all clear that the tariff regime should be regarded as State aid, let alone as impermissible State aid. As the Respondent itself noted:

> "Until recently, there were different interpretations as to whether amounts received by producers through invoices paid by consumers ought to be considered State aid. Such doubts of interpretation have been clarified by the Order of 22 October 2014 of the Court of Justice of the European Union…"[189]

307.    We accordingly consider that the provisions of EU law on State aid do not weaken the Claimants' entitlement to rely, at the time that they made their investments, upon the representations made in the Respondent's regulatory scheme.

308.    This conclusion does not imply that Spain had no right to amend RD 661/2007 or that the 2007 Regime was in some sense "petrified." It does, however, imply that the balance struck

---

[188] See especially Resp. CM, paras. 341-346, 994-1006, and 1055; Resp. Rejoinder, paras. 80-84, 280-287, 352, 359, and 445-450; Resp. PHB, paras. 16-39.
[189] Resp. CM, para. 995.

in RD 661/2007 between the interests of consumers and producers of electricity was, and was intended to be, secured by a regime which investors could be sure would not be changed for existing plants registered under the Special Regime except in accordance with the procedures set out in RD 661/2007 – or at least, not changed in a manner that significantly altered the economic balance that existed at the time when an investment made in reliance on RD 661/2007 was made.[190]

309.   The Claimants in this case are professional investors. There is no indication that their investments in the PV or hydro plants were speculative gambles. The Claimants assert that they relied upon the wording of RD 661/2007; and they took advice on regulatory risk, and took a formal decision to make the investment.[191] For several years, the Respondent had been actively encouraging sufficient investment in renewable energy and had become bound under EU law to increase the proportion of its energy derived from renewable sources.[192] RD 661/2007 was explicitly presented as a part of the Respondent's effort to attract sufficient investment in renewable energy to meet its goals. Previous attempts to attract sufficient investment had proved to be insufficiently attractive to draw in the necessary investment. Encouraging new investment involves, as a necessary concomitant of the market system established by Law 54/1997, that the investor can sell that investment on terms no less favourable than those which that investor was entitled to receive if it were to hold onto the facility. Otherwise, it could not receive its true value from an incoming brownfield investor. It would be inconsistent with the Respondent's promotion of the market system and desire to attract investment to establish a disincentive to such a sale.

---

[190] C-115. The Tribunal notes the distinction reflected in the reported remarks of Energy Secretary Nieto and the Wind Business Association in 2006: "The wind producers 'have no cause for concern' as 'there is total legal certainty', stated Nieto who recalled that the ruling by the Council of State has vindicated the Ministry in this regard. 'We would stress that what they can't ask is for nothing ever to change in the future.', he added. The Wind Business Association stated, in turn, that its main claim is to maintain 'the certainty and stability' in terms of remunerations' and not for the Government to raise the premiums. The association recalls that the remuneration level will determine the degree of future development of this energy in Spain." The remarks are consistent, it is understood that there may be some changes, but not radical changes in the fundamental elements of the scheme.

[191] Cl. Mem., paras. 225-229.

[192] See the Report of the 2106th EU Council meeting – Environment – Luxembourg, 16-17 June 1998, paras. 7, and 12, C-56.

310.　In these circumstances, the Tribunal finds that the representations concerning the Special Regime expressed in RD 661/2007, referring in particular to tariffs and premiums and the non-retrospective character of the provisions for their review, were, at the time of its adoption, representations on which the Claimants were intended and entitled to rely.

### The Duration of the Stabilized Regime

311.　There is a question as to the length of time for which the Claimants could properly rely upon those representations. It was noted above[193] that the stipulation in Article 44.3 RD 661/2007 concerning the non-application of reviews of tariffs and upper and lower limits to existing registered facilities, did not expressly extend to the duration of the stability of the tariffs and premiums. The Tribunal does not consider that the duration could properly have been understood to be completely open-ended. It was a commitment intended to enable producers to make their calculations on the basis of reasonable expectations concerning the operational life of facilities. The Tribunal therefore finds that the Claimants were entitled to rely on the maintenance of the relevant tariffs and premiums set out in Article 36 RD 661/2007 throughout the reasonable planned operating life of each power plant. The tariffs and premiums for the first 25 years of operation were set, as were the tariffs and premiums payable "thereafter", *i.e.* for the rest of the operational life of the PV plant in question.

312.　The Brattle Quantum Reports assume a lifetime of 35 years[194] and Econ One Report assumes 30 years.[195] The publications on which Econ One relies are more convincing. Furthermore, Mr. Alméras gave evidence that Cube's internal projections were based on 30 years. He added that it could be more.[196] A possibility is not enough for quantum

---

[193] See para. 263, above.

[194] Brattle First Quantum Report, para. 73; Brattle Second Quantum Report, paras. 245-248.

[195] Econ One First Report, paras. 179-181; Econ One Second Report, paras. 441-444.

[196] Alméras WS 1, paras. 21, 25, and Alméras WS 2, para. 12.

purposes. Brattle provided a sensitivity analysis adjusting for a 30-year period, which we adopt.[197]

313.    This finding is applicable to the Claimants' investments made in 2008 in the Puente Génave, San Martín de Pusa and Écija PV plants, all of which were by August 2008 duly registered under the Special Regime in RD 661/2007.[198] It is also applicable in principle to the investment in the Rambla plant, which had been registered under RD 1578/2008, which was made in November 2009. There is, however, no claim made in this case in respect of Rambla, it having been sold in 2012.[199]

314.    There was, accordingly, a representation by the Respondent that the tariffs set in accordance with RD 661/2007 would be applicable for 30 years to the Puente Génave, San Martín de Pusa and Écija PV plants, and that the tariffs set in accordance with RD 1578/2008 would be applicable for 30 years to the Rambla plant.

## C.  THE EVOLUTION OF SPANISH RENEWABLE ENERGY POLICY: PART TWO

### Directive 2009/28/EC

315.    Having analysed the position at the time when the Claimants' PV investments were made, we resume the account of the evolution of Spanish renewable energy policy, which was constantly developing.

316.    Directive 2009/28/EC was adopted on 23 April 2009.[200] It provided for the establishment of mandatory national targets for EU Member States for energy from renewable sources, and for the use of support schemes, including direct price support schemes using feed-in

---

[197] Brattle Second Quantum Report, Appendix B, Table 16.

[198] Cl. Mem., paras. 227-228.

[199] *Ibid.*, paras. 229 and 231.

[200] Directive 2009/28/EC, RL-17. The Preamble contains a useful summary of the evolution of EU policy on renewable energy prior to that date.

tariffs and premium payments.[201] Spain's target was to move from the 8.7% of energy from renewable sources to 20%, by 2020.[202]

317.  Directive 2009/28/EC envisaged the continuation of support schemes, and provided for the proposal of "adjustments" in the cooperation measures provided for in the Directive that would "neither affect the 20% target [for energy from renewable sources] nor Member States' control over national support schemes and cooperation measures."[203] It also provided for the presentation by the Commission in 2018 of "a Renewable Energy Roadmap for the post-2020 period"[204] and in 2021 of "a report reviewing the application of this Directive" addressing *inter alia* "the effectiveness of the national support schemes."[205] Member States were obliged to implement the Directive by 5 December 2010.[206]

318.  Among the premises on which Directive 2009/28/EC was constructed was the following proposition:

> "that a framework that includes mandatory targets should provide the business community with the long-term stability it needs to make rational, sustainable investments in the renewable energy sector which are capable of reducing dependence on imported fossil fuels and boosting the use of new energy technologies."[207]

---

[201] Directive 2009/28/EC, Preamble, Articles 2, 3 and Annex VI, RL-17.

[202] Directive 2009/28/EC, Annex I, RL-17.

[203] Directive 2009/28/EC, Article 23.8, RL-17.

[204] *Ibid.*, Article 23.9.

[205] *Ibid.*, Article 23.10.

[206] *Ibid.*, Article 27.

[207] *Ibid.*, Preamble, Eighth Paragraph.

### Royal Decree-Law 6/2009

319.    Directive 2009/28/EC was adopted on 23 April 2009. One week later, on 30 April 2009, Spain adopted Royal Decree-Law 6/2009 ("**RDL 6/2009**").[208] The Respondent points out that:

> "In 2009, the impact of the international crisis caused an economic imbalance of the SES [sc. *Spanish Electricity System*]. Consequently, RD-Act 6/2009 was passed, introducing amendments to RD 661/2007 that were not envisaged in its articles. Furthermore, it represented a warning about the need for all system income and expenditure items to be adapted to the new base economic circumstances, always respecting the principle of reasonable return."[209]

320.    The Preamble to RDL 6/2009 included the following statement:

> "The growing tariff deficit, i.e. the difference between that collected from the regulated tariffs set by the government and that which the consumers pay for their regulated supply and from the access tariffs set by the liberalised market, and the real costs associated with these tariffs, is producing serious problems, which in the current context of international financial crisis is profoundly affecting the system. This puts at risk not only the financial situation of companies in the electricity sector, but also the sustainability of that system. This maladjustment is unsustainable and has serious consequences, by deteriorating the security and capacity of the financing of investment needed for the supply of electricity at the levels of quality and security that Spanish society demands.

> To finance this deficit, which has been put on future generations by recognition of the right to charge in the long term, different measures have been adopted, which in the current setup of financial markets have been shown to be insufficient."

321.    That statement pointed clearly to the extraordinary and urgent need for reform to the system in order to secure its sustainability. Subsequent paragraphs in the Preamble of RDL 6/2009, focused specifically on the position of Special Regime facilities:

> "Fourthly, due to its increasing incidence on the tariff deficit, mechanisms are established in regard to the repayment system of installations of the

---

[208] R-57.

[209] Resp. CM, para. 27.

special regime. The trend of these technologies may put at risk the sustainability of the system in the short term, both from the economic point of view and its impact on the electricity tariff, as well as from the technical point of view, compromising the economic feasibility of the installations already finished, whose working depends on the suitable balance between manageable and non-manageable generation. Thus, it has become necessary to adopt a measure of urgency **to guarantee the necessary legal security for those who have made investments, and lays the foundations to establish new economic schemes which afford fulfilment of the intended objectives: the fulfilment of some power targets by technology at a reasonable cost to the consumer and their technological evolution that allow a gradual reduction of their costs and therefore of their competition with the conventional technologies**.

The current regulation of the special scheme does not establish sufficient mechanisms to allow planning of installations of these types of energies, nor the amount or timely distribution of the repayment premiums and therefore the impact on the costs included in the tariff system. The measure provided for in the Royal Decree-Law, by setting up the pre-assignment of payment register, enables the situation described above to be corrected, from the time of its entry into effect. This will enable information to be available within the time periods provided for in the Royal Decree-Law, not only for the currently planned installations, but also that these comply with the conditions for implementation and access to the electricity system with all the legal and regulatory requirements, the volume of power associated with the same, and the impact on the electricity tariff costs and their schedule. **In any case, the rights and expectations of the owners of the installations are respected, setting the precise precautions and providing a transitional scheme needed for the adaptation**." (emphasis added)

322.    Those statements recognize that the regime under RD 661/2007 – that is to say, the regime that was in effect prior to 2009 – was inadequate to cope with economic circumstances. We consider that this evidences the belief of the Respondent in 2009 that its obligations in respect of Special Regime plants did not allow it to make the changes to tariffs and subsidies that it subsequently made under RDL 6/2009 and later legislation.

323.    The operative provisions of RDL 6/2009 included, in Article 1, the following provision:

"1. As of 1st January 2013, the access fees [sc., *i.e.*, consumer tolls, the fees payable by consumers to access electricity] shall be sufficient to satisfy all the costs of the regulated activities without appearing as ex ante deficit. The arising of any economic variance due to non-alignment of costs or real income in regard of those which serve as a base for setting the

86

> access fees in each period shall give way to the access tariffs of the period following that of the appearance of the aforementioned economic variance, which are modified by the amount necessary for their adjustment."

**Royal Decree 1565/2010 and Royal Decree-Law 14/2010**

324.    In 2010, the regulatory regime changed. In November 2010, Royal Decree 1565/2010 ("**RD 1565/2010**")[210] removed the fixed tariffs payable after 25 years. That was a significant variation in the regime established by RD 661/2007 which was not provided for in the procedures established by RD 661/2007.

325.    In December 2010, Royal Decree-Law 14/2010 ("**RDL 14/2010**") set out further "urgent measures for the correction of the tariff deficit in the electricity sector."[211] Those measures included providing for a limitation on the number of operating hours each year for which a facility would be entitled to Special Regime payments and charging producers an 'access fee' for using the network, while guaranteeing a 'reasonable return' to producers and extending the 25 year fixed tariff period for PV to 28 years.[212] The new regime thus maintained the basic framework of a fixed tariff, operative for a fixed term. (The 28-year period was further extended in 2011 to 30 years by Law 2/2011[213]). The Preamble to RDL 14/2010 noted that:

> "…it is deemed reasonable that producers under the special regime also make a contribution to mitigate the additional costs on the system, and such contribution must be proportionate to the characteristics of each technology, to the degree of participation in the generation of such additional costs and to the current extent for compensation, whose reasonable return, nonetheless, is guaranteed. Thus, for the same purpose, there has been Government approval, over recent months, for regulatory measures directed at producers of wind, solar thermal and co-generation electricity."

---

[210] C-129.

[211] R-58.

[212] RDL 14/2010, Preamble and First Additional Provision, R-58, C-102.

[213] Law 2/2011, Final Provision, number forty-four, Two, C-95.

326.   In February 2011, the EU Commissioners for Energy and for Climate Action wrote to the Spanish Minister of Industry, Tourism and Trade, expressing concern at the retroactive effects of RD 1565/2010 and RDL 14/2010. Their letter, dated 22 February 2011, demonstrates both the understanding that the Respondent had, in RD 1565/2010 and RDL 14/2010, made retroactive amendments to the regime established by RD 661/2007 and the opposition to such retroactivity. The letter said:

> "We have been contacted recently by numerous stakeholders, as Energy and Climate Action Commissioners, to express their concern about the changes in the conditions established by Royal Decree 661/2007, of May 25, concerning the photovoltaic solar plants in Spain.
>
> Our understanding is that the conditions of the photovoltaic solar installations in Spain have been modified by Royal Decree 1565/2010, of November 19, that limits the premium to 25-years maximum for each photovoltaic facility, and Royal Decree-Law 14/2010, of December 23, that limits the annual production [benefitting from the premium prices] of photovoltaic solar installations. In particular, the retroactive nature of the latter measure has raised great preoccupation. We wish to inform you of it and express our reserves in relation to these measures. This should be no surprise, if you consider the indications that the Commission made in prior occasions on that matter.
>
> ...
>
> We do not question that the adjustment of the tariffs or the cost reductions [in relation to] technical evolution might be justified or necessary. Nevertheless, we are convinced that those adjustments need to be made while thinking in the future, hence in a predictable manner, instead of having a retroactive effect. It shall not be forgotten that negative consequences for investors' confidence of retroactive changes in the economic conditions of a certain type of renewable facility may spread and produce similar effects in other types of facilities and in other countries, which may lead to the loss of confidence in the domestic and European legislations concerning energy from renewable sources.
>
> Consequently, please do not spare efforts to maintain an energy policy that is stable and predictable and be cautious when studying the measures that affect prior investments. Specially, member states need to guarantee the

respect of EU law principles, included legal certainty and the protection of legitimate confidence/expectations."[214]

327.    It was in 2011 that the Claimants[215] acquired rights to 10 hydro facilities in Spain.[216] They acquired rights to six others in June 2012.

328.    Again, we interrupt the narrative to consider the position at the point when the Claimants made their hydro investments.

### The Position at the Time of the Hydro Investments: The Tribunal's Analysis

#### The Respondent's Representations

329.    The question is: what were the material representations made by the Respondent on which the Claimants were intended to rely, at the point when their hydro investments were made?

330.    The regulatory regime was largely the same as that applicable when the PV investments were made, but with the important difference that the 2010-2011 regulatory changes had by that time been adopted and with retroactive effect. The laws of 2010 and 2011 had demonstrated that the Respondent would at least adjust the periods for which price incentives were payable and the levels of price incentives, if it considered this necessary in order to address the tariff deficit.

331.    Furthermore, the Respondent had demonstrated that it would amend the regulated regime in respect of existing facilities already operating under the Special Regime, in order to address the serious tariff deficit.

332.    On the other hand, the regulatory changes of 2010-2011 had not abolished the Special Regime and had not sought to establish a target 'reasonable rate of return' as the guiding

---

[214] Letter from Günter H. Oettinger (EU Commissioner for the Energy) and Connie Hedegaard (EU Commissioner for Climate Action) to Mr. Miguel Sebastian, Spanish Minister of Industry, Tourism and Trade, of 22 February 2011, C-92.

[215] The distinction between Cube and Demeter is addressed below: see paragraphs 340, 405–406.

[216] Cl. Mem., paras. 33 and 241-242. Seven plants in Portugal were also acquired at this time.

principle for the remuneration regime, in place of the fixed tariffs and premiums for which the Special Regime continued to provide. Those steps were initiated in 2013, with the adoption of RDL 2/2013 and RDL 9/2013, and brought to completion in the measures adopted in June 2014. Furthermore, the retroactive termination of the right under RD 661/2007 to fixed tariffs after 25 years of operation, introduced by RD 1565/2010, was rapidly modified to extend the fixed tariff period to 28, and then to 30 years, after objections from the industry.[217] There were clear indications suggesting that the State was attempting to minimise departures from the original economic equilibrium established by RD 661/2007.

333. In these circumstances, the Tribunal considers that any reasonable investor would have taken a much more cautious view of the extent to which the continuation of the existing legal regime could be relied on, but would not have had reason to expect the complete abandonment of the Special Regime.

334. The Tribunal does not consider that when they made their investments in hydro facilities in 2011 and 2012, the Claimants could reasonably rely on there being no change whatever to the Special Regime applicable to existing facilities. The Special Regime was clearly under so much economic pressure as to be unsustainable as it stood; and adjustments to the Special Regime were to be expected. Realistically, electricity producers must have recognized that there was very considerable pressure to reduce their profits and must have expected that steps in that direction would in fact be taken.

335. There is evidence that at least some of the Claimants' officers thought that significant changes in the regime were possible.[218] The minutes of Cube's Investment Committee meeting of 10 November 2009[219] record a detailed discussion of risks facing the PV investments, including equipment failure, supplier failure, and the sustainability of PV subsidies. One member is recorded as saying that "reiterates that the result is based on

---

[217] Cl. Mem., para. 260, fn. 496.

[218] See Resp. PHB, paras. 116-129 and *passim*.

[219] C-301.

subsidies and that the permanence of these subsidies must be interrogated. These investments are to be monitored 'like milk on a stove.'" On the other hand, it appears that at that meeting it was considered by participants that they could plan on the basis of the maintenance of the 80% subsidy applicable under RD 661/2007 after 25 years.[220] Further, it appears that Cube considered that while "RD 661/2007 protected the hydro investments from regulatory risk", the levels of risk facing PV and hydro facilities were in any event different, the risks to hydro plants being lower.[221]

### *Regulatory Risk*

336. In relation to the Claimants' hydro investments, there is a "Legal Due Diligence Report on the Spanish company Renewable Power International Holdings, S.A. and some of its Spanish and Portuguese subsidiaries", dated 28 March 2011, prepared at the request of RpGlobal Holding, S.L. by Uría Menéndez (also known as the "**VDDR**")[222] and an "Executive Summary" of a review of the Uría Menéndez Report, dated 17 May 2011, prepared by Garrigues "at the request of Cube Infrastructure Fund …, in connection with the potential purchase of shares representing the majority of the share capital of the Spanish company Renewable Power International Holdings, S.A. ("RIPIH")."[223]

337. In relation to regulatory risk, the VDDR does little more than record that "[Spain] MICDOS is registered within the RAIPRE … as owner of each of the ten Mini-Hydros for the purposes of benefitting from the special economic regime existing for power facilities included within the special regime (i.e. power facilities supplied by renewable sources of energy)."[224] The most that can be said is that it raises no concern that there might be a

---

[220] C-301: "RdeM concludes that projects have the identical IRR [Internal Rate of Return] to previous projects and the same upsides. The main difference is the non-renewal of 25-year contracts.  MV points out that those will need to be renewed in an environment, of falling energy prices, but what would be the price?  JA points out that there was no assurance for refurbishment. With the first three parks, it is possible to keep up with up to 80% of the old rate. Either we let it deteriorate, or we do *repowering* but then we lose the premium tariff."

[221] Cl. Mem., paras. 234, 236.

[222] C-221.

[223] C-222.

[224] C-221, para. 3.1.1.

retroactive amendment or repeal of the Special Regime. The Garrigues review refers only to the need for registration of plants with RAIPRE.[225] Again, the most that can be said is that it raises no concern that there might be a retroactive amendment or repeal of the Special Regime.

### *Claimants' Actual Expectation*

338.    Cube's understanding of the position at the time was put in a note to its Investment Committee in December 2010. The note records, under the heading of 'Regulatory Environment', the framework of the Special Regime, as the framework applicable to the hydro plants "for the first 25 yrs and … thereafter."[226] The note states, under the heading 'Regulatory Risk':

> "As per all feed-in tariff systems in general, also the feed in tariff for hydro power plants might in theory come under pressure due to deficit / treasury problems at government levels. However the premium that the hydro feed-in tariff provides on the market prices is much more limited compared to other renewable sources and this, combined with the nature of the hydro power plants, leads us to think that the possibility that tariffs for hydro plants can be dramatically changed are remote. However assuming that the feed in tariff was terminated from today and that the Company would sell at market prices the impact on Cube IRR would be of 1.7%."[227]

339.    That appraisal of the regulatory risk appears to the Tribunal to indicate that Cube acknowledged at the time that the investment in hydro facilities was being considered that there was a real possibility of what it might have called 'non-dramatic' changes in the regulated tariffs for hydro plants, and also a remote possibility of 'dramatic' changes, and that Cube's investment was made on the basis that such a risk was acceptable.

340.    Witness evidence indicates that Demeter, on the other hand, acted on the "hypothesis … that basically, when we invest, the law won't change retroactively" and that "[w]e didn't

---

[225] Review of the "Legal Due Diligence Report on the Spanish company Renewable Power International Holdings, S.A. and some of its Spanish and Portuguese subsidiaries," para. 4.1.1., C-222.

[226] C-218, pp. 6-7.

[227] C-218, p. 17.

consider the fact that this royal decree [sc., RD 661/2007] could be changed retroactively. So, no, we didn't ask for any legal advice on the fact that the royal decree could be changed retroactively."[228] There is no evidence on the record that Demeter actively considered representations made by the Respondent. The evidence points rather to Demeter relying upon Cube's analysis and the due diligence procured by Cube.[229]

### The Legitimate Expectation

341.    We return below[230] to the question of the distinction between the positions of Cube and of Demeter in relation to due diligence, and here address only the question of Cube's legitimate expectation.

342.    The evidence is that Cube had analysed the Special Regime and based its decision to invest on the persistence of that regime "for the first 25 yrs and … thereafter", while accepting a "remote" risk of dramatic change in the regime. That premise was not challenged in such legal due diligence as Cube undertook.

343.    The Tribunal recalls that the Respondent's termination by RD 1565/2010 of the post-25 year fixed tariffs, and the introduction by RDL 14/2010 of a cap on the total operating hours for which fixed tariffs were payable in relation to PV facilities, occurred at around the time that this Cube investment note was prepared and was under consideration. It recalls in particular that the Preamble to RDL 14/2010 explained and emphasised the need "to urgently address the correction of the tariff deficit in the electricity sector" and the need of facilities under the Special Regime to contribute to that effort.

344.    While the Tribunal recognizes that hydro facilities were (unlike PV facilities) not specifically mentioned in RDL 14/2010 and had (unlike solar thermal and wind power facilities)[231] not had their regimes recently modified, that is a point that cuts both ways. It

---

[228] Tr. Day 2, pp. 135, 137 (Gambini).
[229] Tr. Day 2, pp. 145-146 (Gambini).
[230] See paras. 405–406, below.
[231] See RD 1614/2010, R-75; Resp. CM paras. 30, 752-763.

might be said to point to recognition that hydro plants were different and not in urgent need of regulatory reform, or it might be said to indicate that hydro producers were likely to be next in line for regulatory reform.

345.    Press reports at the time pointed to the possibility of wide-ranging reform of the regulatory system. For example, on 22 April 2010, the financial newspaper *Expansión* contained a report which merits quotation in full because of its overview of the situation at that time:

> "Renewable companies at war with the Government over 30 billion euros of subsidy
>
> Renewable energy associations and companies in Spain are mobilising all their artillery against the intentions of the Government to completely review its system of subsidies for these types of facilities.
>
> The Ministry of Industry wants to make a drastic adjustment from 1 July. At stake is about 30 billion euros between this year and 2013.
>
> One of the approaches that the Ministry of Industry is considering is an overall cut in bonuses for all technologies and all facilities, including those that have been operating for years. In other words, retroactively. Faced by this prospect, renewable energy companies listed on the stock market were badly hit yesterday.
>
> Industry sources said yesterday that 'nothing has been decided.' For many companies it is confirmation that a formula is being studied which, if implemented, will completely change the pre-established rules of the game. 'It creates enormous legal uncertainty with unforeseeable consequences', say industry sources, already looking ahead to the courts.
>
> **Turbulent months**
>
> Other industry sources have automatically assumed that 'turbulent months lie ahead.' It will be the total downpour to a storm that comes from afar. The bonuses for green facilities, for the electricity they produce, has been a controversial issue for two years. The Government has modified the legislation several times to try to fit that extra cost into the energy system which has been triggered by the huge development in Spain of green energy, as a result of some very succulent subsidies.
>
> The battle has exploded in recent days. This week it was discovered that bonuses for special regime facilities (monopolised by renewable energy

companies) ran riot in 2009 with 6.215 billion euros (2.2 billion euros more than expected), as published by the newspaper EXPANSIÓN last Tuesday. Green subsidies have ended up unbalancing the accounts of the entire electricity system. Last year there was a gap of more than 4.6 billion between revenue and expenditure, apart from other distortions (many conventional facilities have been shut down because renewables are being given priority).

These imbalances have led to all-out war in the energy sector at a business level. It has been expressed in statements such as that by the heads of Gas Natural this week, arguing that Spain is not such a rich country that it can afford the luxury of bonuses. It occurs at a time when demand has suffered historic declines due to the crisis.

Every company is trying to elbow its way into the generation business, in which there is no longer enough space for everyone. The Ministry of Industry is in the centre of the firing line. All parties blame it for the confusion being created. For example, a government that defines itself as the greenest of all is going to approve incentives for polluting coal while cutting bonuses for renewables. The renewables sector has been using plenty of arguments to counter criticism for the excessive bonuses and other accusations (for example, speculation).

They are now trying to activate a more aggressive front. The various associations (traditionally divided by different business and technological interests), such as Appa, Asif, AEE and AEF, are maintaining contacts for joint lobbying purposes.

Some are demanding urgent meetings with the Government asking them to clarify the matter by sending letters to Industry and the Prime Minister's office.

**Regional consultations**

Alarm bells rang last week when some associations found out that the Government has been unofficially consulting Industry advisers from different autonomous regions on how to deal with a widespread cut in bonuses. Various formulas are possible, such as reducing the amount to be received or limiting the years of the subsidy.

**Turning the screw**

**Two years under the microscope**

95

For two years now, the Government has been trying to sort out renewables, to prevent them from running riot. Attracted by the succulent bonuses, the special regime grew in five years from 17,480 to 30,700 megawatts.

**The sun burns**

The adjustment began with photovoltaics, which between 2007 and 2008 saw a five-fold increase.

**Those without papers**

In 2009, the Ministry of Industry devised a system to limit new facilities, with pre-allocation. Anyone that did not have their papers in order would not have a facility licence.

**Roadmap**

Pre-allocation collapsed. The Ministry of Industry was giving out licences gradually until at the end of 2009 it established a "roadmap" for 2010-2013, with a limit of around 10,000 new megawatts.

**Zurbano adjustment**

The Executive launched the idea of an adjustment in its proposed anti-crisis pact, which it then tried to execute in the Zurbano decree. It is now negotiated with the political parties. It understood that the bonuses were out of control and unsustainable.

**Forecasts do not help**

The bonuses to renewable companies in 2009 exceeded by 2.2 billion the 4 billion programmed. And even exceeded the budget for 2010 (5.9 billion). The roadmap considers almost 30 billion for 2010 to 2013. This amount is what is now at stake in the war of the renewables. Apart from how much, it also matters how the cut will be made. One formula is a reduction in the 15-25 years that the facilities have the fixed bonus for."[232]

---

[232] R-316 (bold for the subtitles in the original). The translation in Resp. Rejoinder, para. 772 is slightly different. The 'Zurbano decree' is RDL 6/2010.

346.    Another example, from the digital newspaper *Suelo Solar* on 23 April 2010, said that "the Government is studying the retroactivity of photovoltaic premiums" and that it was possible that reductions in the PV premiums might be retroactively reduced.[233]

347.    An important distinction was made between two possible interpretations of "retroactivity." On 7 May 2010, it was reported in *El Mundo* that the Minister of Industry, Mr. Miguel Sebastián, had opened a dialogue with renewable energy industry leaders, in which reference was made to the tariff deficit and the need for a "cutback on premiums which is still to be defined." It was reported that the Minister said that "any aid already collected from when this technology began operation will not have to be returned" and that this statement "partially calmed the fear of retroactivity potentially being applied to the sector."[234] We understand this to indicate that retroactivity in the sense of an obligation to repay premiums already received was ruled out by the Minister, but retroactivity in the sense of the application of reduced premiums to plants already operating was not.

348.    The Tribunal notes, however, that the specific representation that there would be no retroactive revisions to the regulated tariff and the upper and lower limits affecting facilities operating under the Special Regime (as were the Claimants' plants) had not been abandoned at this time. As is explained in the following section, the abandonment came only when the new regime was introduced, based on the principles that a 'reasonable rate of return,' determined by the Respondent, would be ensured for all producers, with those who have already "attained their reasonable level of profitability" receiving a "compensation to investment equal to zero."[235]

349.    We consider that the position at the end of 2010 concerning the stability of the Special Regime was uncertain. Industry campaigns against "retroactive" reforms[236] and governmental responses had not produced a definite solution for the tariff deficit or a

---

[233] Article from the Suelo Solar newspaper: *NO TO THE RETROACTIVITY OF PHOTOVOLTAIC PREMIUMS*, 23 April 2010, R-246. See also Resp. Rejoinder, para. 774.

[234] El Mundo, Industry insists: 'green' premiums must be cut, 7 May 2010, R-287.

[235] Order IET/1045/2014, Preamble, R-86.

[236] See Resp. Rejoinder, para. 771, R-246.

definitive position on the scope of any retroactivity; but it was clearly understood that retroactive reforms were under consideration by the Government.

350.    The Tribunal considers that, in the face of clear indications in RDL 14/2010 and other instruments and reports published at around that time that it was necessary to modify the Special Regime for electricity tariffs in order to address the continuing tariff deficit, an investor making an investment in 2011 or 2012 in Spanish hydro facilities could not reasonably rely upon an expectation that the tariffs set under RD 661/2007 would remain unchanged for the operating life of existing facilities registered under the Special Regime.

351.    The Tribunal notes, moreover, the statement in the note to Cube's Investment Committee that "assuming that the feed in tariff was terminated from today and that the Company would sell at market prices the impact on Cube IRR would be of 1.7%."[237] That statement appears to the Tribunal to indicate that Cube itself was prepared to invest notwithstanding the acknowledged risk of adverse changes in the regulatory regime, even though it reported in its December 2010 Quarterly Report that in the light of retroactive tariff cuts of "up to 30 percent" for PV plants it was putting further acquisitions of PV plants on hold.[238] This indicates that Cube itself did not actually rely upon there being no change in the Special Regime.

352.    The crucial question is, what (if any) changes could properly have been regarded by the Claimants as having been ruled out by the Respondent's representations, viewed in the light of the 2010-2011 reforms? In broad terms, the Claimants take the view that any change that reduced the cash flows that they expected on the basis of RD 661/2007 as amended up to March 2011, when Law 2/2011[239] was adopted, was ruled out. The Respondent takes the view that the Claimants could rely on nothing other than the assurance of a reasonable rate of return on their investment.

---

[237] C-218, p. 17.
[238] R-309.
[239] C-95.

353.   In practical terms, the majority of the Tribunal considers that changes that should reasonably have been anticipated by an investor in 2011-2012 include changes to the following: the duration of price support; the range of different premiums made available; the precise structuring of the Special Regime, including the links to specific price indexes; and, within limits, adjustments in the overall amount of the price support payable. Such changes, however, stop short of a radical alteration of the foundations of the regime that was then in place.

354.   The majority of the Tribunal considers that radical change in the nature of the Special Regime applicable to hydro plants already in operation under the Special Regime, amounting to an abandonment of the commitment to stability given in RD 661/2007, could not have been anticipated in 2010. The majority of the Tribunal considers that in light of the representations made by the Respondent, the Claimants were entitled to rely, when they made their hydro investments, upon the fundamental characteristics of the Special Regime remaining in place. Those fundamental characteristics were that the regime applicable to hydro plants already operating under the Special Regime was based on fixed tariffs applicable to the actual output of each facility, up to its reasonable planned capacity, for a period of approximately the same order as that provided for in RD 661/2007. A majority of the Tribunal agrees with the reasoning in *Eiser v. Spain* that the FET standard in the ECT protects investors against the fundamental changes constituted by the changes of 2013-2014.[240]

355.   That conclusion is subject to two important caveats. First, the right to rely upon the maintenance of those characteristics must be understood in the context of the ECT, which establishes that right. Investors are not given the right to insist that any particular arrangements for remuneration are in fact maintained in operation and actually applied to them: their right is the right not to be injured as a result of changes in those arrangements. The changes must therefore be examined carefully in order to determine what effect they

---

[240] *Eiser v. Spain*, paras. 363 and 382-401.

had and what damage, if any, they actually caused to the Claimants' investments. It is possible that there might be a radical change in the regime which in fact produces no harmful effects on investors. The practical implications of this distinction between what could and what could not have been anticipated, and of the need to assess the impact of the changes upon the Claimants' investments, are addressed further in the section of this Decision dealing with quantum issues.

356.    The second caveat is that the regulatory changes that had already been made prior to the Claimants' investments in the hydro plants were a very clear signal that regulatory change of some sort was coming. While the representations concerning the non-retroactivity of changes in respect of facilities already in operation under the Special Regime remained, there was evidently a climate of change.

357.    The prospect of change affected what investors had a right to expect in two distinct ways. It affected the range of variables that could be expected to remain stable. Investors were never entitled to expect that the regulatory regime would remain completely unchanged; but by 2010, it had become clear that there were likely to be significant changes in the regime that could have a material impact upon the financial position of the operators of renewable power plants. The prospect of change also affected the degree of confidence that could reasonably be placed in the stability of even the fundamental characteristics of the Special Regime. Though the original assurances concerning the stability of RD 661/2007 had not yet been repudiated, retroactive change was known to be under consideration by the Government, and it appears that only the retroactive 'claw-back' of premium payments already made had been expressly ruled out by the Government in its comments at this time. That must have weakened confidence in the stability of the regulatory regime. These effects must be reflected in the application of a substantial discount to the value of investments made at that time, to take account of regulatory risk. This is a matter that we analyse further in the section on quantum.

358.    As for the question of the period for which this attenuated stability could be expected, the Tribunal does not consider that any investor in 2011-2012 could reasonably rely upon the

stability of the Special Regime under RD 661/2007 for the entire operating life of a hydro plant, in particular in circumstances where (as here) the unsustainability of the overall regulatory regime as it stood was notorious. The Fuentermosa plant, for example, started operating in 1992 under a 75-year concession that is set to end in 2067: but no reasonable investor in 2011-2012 could reasonably have relied upon the Special Regime remaining unchanged for a further half-century. All of the hydro plants in question were operating over concessions that started between 1985 and 2001, and which end between 2016 and 2067.[241]

359. In this respect the Claimants' hydro plants, which began operation at various times between 1985 and 2001, are in a different position from the PV plants. The provisions in RD 661/2007 were designed to attract new investment into a developing technology, to be made within a year or two of the Royal Decree and were focused upon the expected operational life of a typical PV plant. The provisions concerning hydro plants were also meant to encourage investment in that form of renewable energy but were applied so as to benefit existing plants of various ages. It must have been supposed that, in the case of at least some plants, the Special Regime would cease to apply before the end of the relevant concession or, if that were different, before the end of the operational life of the plant. On the other hand, the fact that Article 36 RD 661/2007 set out tariffs and premiums payable for small hydro plants both for the "first 25 years" and also "thereafter" indicated the order of the duration for which the essential features of the Special Regime were expected to remain in place. This, too, is a matter that we analyse further in the section on quantum.

360. The majority of the Tribunal accordingly concludes that at the time that the Claimants made their investments in the hydro facilities in Spain, they were entitled to rely on the expectation that a regime based on fixed tariffs applicable to the actual output of each facility, up to its reasonable planned capacity, would remain applicable to its hydro facilities for a period of approximately the same order as that provided for in RD 661/2007.

---

[241] Brattle First Quantum Report, Table 2, p. 12.

## D. THE REFORMS OF 2012-2014

361. Spain's attempts to create a sustainable regime for the regulation of electricity production continued. In 2012, Law 15/2012 imposed a new 7% tax on electricity production and a levy on the use of inland waters for the generation of hydroelectricity.[242] This is regarded by the Claimants as "indistinguishable from a simple 7% reduction in the tariff rates guaranteed by RD 661/2007."[243]

362. The Tribunal has concluded that tax measures fall outside its jurisdiction, but has considered whether Article 21(1) ECT, which provides that "nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures," necessarily precludes consideration of the impact of tax measures as a fact, so that they might be taken into account in deciding whether, for example, a reduction in the net income of an investor is so great as to support a finding that the investor has not been treated in a fair and equitable manner. The Tribunal considers that Article 21(1) ECT requires it to take no account whatever of the impact of Taxation Measures within the meaning of the ECT. It accordingly eliminates the tax and the levy imposed under Law 15/2012 from its considerations.

363. On 1 February 2013, RDL 2/2013 was adopted.[244] Its aim was later described as follows:

> "This Royal Decree-Law 2/2013, of the 1st of February, amended … Royal Decree 661/2007 of 25 May, which regulates the field of the production of electricity under special regime, in order to ensure a reasonable rate of return for these facilities and avoid, at the same time, an over-compensation that would fall on the other actors in the field of electricity."[245]

---

[242] C-40, R-3.

[243] Cl. Mem., para. 268.

[244] R-63, C-83.

[245] RDL 9/2013, Preamble, R-64.

364.   RDL 2/2013 de-linked tariffs from the consumer price index set by RD 661/2007 and removed the 'market premium' option for Special Regime facilities, allowing only the regulated tariff option as an alternative to the sale of electricity in the open market.

365.   In July 2013, RDL 9/2013 was enacted.[246] The Preamble to RDL 9/2013 explained the evolution of Spain's regulatory policy in relation to electricity in considerable detail. It noted that:

> "Between the years 2004 and 2012, the revenue of the electricity system due to consumer toll fees increased by 122%, while the increase of the regulated costs of the system during this period has been 197%. Among the cost headings that have contributed the most to the increase are the special regime premiums and the annuities of accumulated deficits, headings that have been multiplied by six and nine respectively in that period.
>
> …
>
> These figures give testimony of the unsustainable nature of the deficit of the electricity sector and the need to adopt urgent measures of an immediate effect that would put an end to this situation.
>
> …
>
> Measures related to the amendment of the remuneration scheme for special regime facilities and for the transport and distribution fields are adopted as a matter of urgency due to the need to reduce the costs of the system immediately in order to start the correction of imbalances at the time, thus avoiding the chance of a new imbalance at the end of the year, between the system's revenue and costs."

366.   The "measures related to the amendment of the remuneration scheme for special regime facilities" included the repeal of RD 661/2007 and the abolition of the Special Regime and its replacement with a "new remuneration regime for renewable energy."[247] RDL 9/2013

---

[246] R-64.

[247] The description used in the Preamble to Law 24/2013, R-47.

was later described as having laid down "the foundation for a new compensation scheme,"[248] but did not itself establish a complete new regime.

367.    Further steps to address the tariff deficit were adopted in Law 24 enacted on 26 December 2013 regarding the Electrical sector ("**Law 24/2013**");[249] and in 2014, a completely new regime was established by RD 413/2014[250] and Order IET/1045/2014 from the Ministry of Industry, Energy and Tourism ( "**MO IET/1045/2014**").[251] RDL 9/2013, Law 24/2013, RD 413/2014 and MO IET/1045/2014 together make up what is known as the "**New Regulatory Regime**."

368.    The Preamble to Law 24/2013 is a piece of evidence of considerable value. It again recalled, in detail and with candour, the evolution of Spain's regulatory regime for electricity, noting the "annual imbalances between the income and costs of the electrical system which has brought about the appearance of a structural deficit," which was caused by "the excessive growth of certain costs' items owing to energy policy decisions without ensuring their correlative income from the system … exacerbated by the lack of growth in electrical demand, essentially the consequence of the economic crisis." It observed that:

> "This imbalance has reached the point where the accumulated debt of the electrical system is currently in excess of twenty-six billion Euros, the structural deficit of the system stands at ten billion per annum and the failure to correct the imbalance has introduced the risk of the bankruptcy of the electrical system."[252]

369.    In a passage that acknowledged that in the past producers had been able to "trust the maintenance of the parameters" of the regulatory system, the Preamble to Law 24/2013 stated, in relation to the new remuneration regime that it was establishing, that:

> "The widespread awareness of the tariff deficit situation and the consequent threat to the very feasibility of the electrical system has led to

---

[248] Ministry of Industry, Energy and Tourism, Order IET/1045/2014, 16 June 2014, Preamble, R-86.
[249] R-47.
[250] C-90.
[251] C-179.
[252] Law 24/2013, Preamble, R-47.

the need to make major changes to the remuneration regime for regulated activities. In view of the progressive deterioration in the sustainability of the electrical system, the legal entities in the latter could no longer legitimately trust the maintenance of the parameters which had degenerated into the situation described and any diligent operator could anticipate the need for these changes.

For activities with regulated remuneration, the Law reinforces and clarifies the principles and criteria for establishing the remuneration regimes to which end the necessary costs will be considered to carry out activity by an efficient, well-managed company through the application of homogeneous criteria throughout Spain. These economic regimes will allow appropriate returns to be obtained with regard to the activity risk."[253]

370. Law 24/2013 accordingly introduced a range of measures, including provision for the deferral of payments to producers in order to balance annual accounts, in anticipation of the establishment of a new regime. The Claimants contend that the very fact that these measures were taken by means of a Law, rather than a Royal Decree, constitutes recognition that the regime which was being implemented represented a significant change from the previous regime.

371. The new regime was established primarily by RD 413/2014, of 6 June 2014. Its Preamble recalled Spain's successive amendments to its regulatory regime and, in a frank admission that none of the previous amendments had succeeded in producing the sustainable regime at which each had aimed, noted that:

"Although, considering the circumstances existing at each moment in time, these provisions permitted the achievement of the purposes for which they were introduced, it cannot be overlooked that the forecasts prevailing when they were adopted were soon surpassed as a result of the highly favourable support framework. This circumstance, together with the fact that the costs of technology were gradually falling, made it necessary to make a series of amendments to the regulatory framework in order to guarantee both the principle of reasonable return and the financial sustainability of the system itself.

…

---

[253] *Id.*

The measures adopted between 2009 and 2011 proved insufficient for fulfilling their intended aims and the regulatory framework was found to be suffering from certain failings—which remained uncorrected despite the huge effort made to adapt the regulation—seriously compromising the system's financial sustainability. This situation led to the adoption of Royal Decree-Act 1/2012, of 27th January, which suspended the remuneration pre-allocation procedures and withdrew financial incentives for new facilities generating electrical energy through cogeneration or from renewable energy sources or waste, and Royal-Decree Law 2/2013, of 1st February, on urgent measures for the electricity system and the financial sector, which, among other measures, amended Royal Decree 661/2007, of 25th May, eliminating the "market price plus premium" option applicable to certain technologies and establishing tariff-based remuneration for all special regime facilities, while at the same time modifying the criteria for updating the remuneration of regulated activities in the electricity system."[254]

372.     RD 413/2014 asserted that both RDL 9/2013 and Law 24/2013:

"embrace one of the fundamental principles set forth in Article 30.4 of Act 54/1996, of 27th November, since its original wording—to wit, that the remuneration frameworks must allow these kinds of facilities to cover the costs required to compete in the market on an equal footing with other technologies and obtain reasonable returns from the activity as a whole."[255]

373.     It is, nonetheless, plain that the measures adopted in and after 2013 were seen as a clear break with the previous regulatory regime. While they might have shared a common goal, in the creation of a stable market for affordable electricity and the encouragement of production from renewable sources, the principle underlying the regimes was quite different. The Special Regime's fixed support offered to producers for a specified period was replaced by the concept of a limited "reasonable return."

374.     RD 413/2014 explained the basis of the New Regulatory Regime as follows:

"Under this new framework, in addition to the remuneration earned by selling energy at market rates, facilities may also receive specific remuneration throughout their regulatory useful lives. This specific remuneration comprises an amount per unit of installed capacity, intended to cover any investment costs incurred by a standard facility that cannot

---

[254] RD 413/2014, Preamble, R-80.
[255] *Id.*

be recovered through the sale of its energy on the market, known as 'compensation for investments;' and an amount linked to operations, intended to cover any difference between a standard facility's operating costs and the revenue generated from its participation in the energy production market, known as 'compensation for operations.'

The compensation for investments and compensation for operations applicable to a standard facility are to be calculated based on standard revenues from the sale of energy valued at market rates, standard operating costs required to perform the activity and the standard value of the initial investment—all three standard values established on the basis of an efficient, well-managed company. …

The compensation for investments—and, where applicable, the compensation for operations—aims to cover the higher costs incurred by facilities that produce electricity from renewable energy, high-efficiency cogeneration and waste, so that they may compete on an equal footing with other technologies and obtain a reasonable return by reference to the standard facility applicable in each case.

Moreover, the concept of 'reasonable return' on a project is introduced into the regulatory framework. In line with legal scholarship on this matter in recent years, reasonable return is set as a pre-tax return approximately equal to the average yield on ten-year government bonds in the secondary market for the 24-month period leading up to the month of May of the year prior to the commencement of a given regulatory period, increased by a spread."[256]

375.    The details of the New Regulatory Regime were amplified in MO IET/1045/2014.[257] The significance of the MO was explained in its Preamble:

"By means of this order, the change of compensation model applicable to renewable energy, cogeneration and waste is completed and the system is definitely provided with financial stability, while ensuring the facilities' reasonable profitability. These facilities shall continue to receive income additional to the market to the end of their useful lives provided that this profitability has not been attained. This order is also of major importance because it provides for regulatory useful life and quantifies the amount of the initial investment, which are both non-revisable parameters.

---

[256] *Id*.

[257] R-86.

…

> Once facilities exceed regulatory useful life, they shall no longer receive
> compensation to investment or compensation to operation. Those facilities
> that have attained their reasonable level of profitability, despite the fact
> that they are within their regulatory useful life, shall receive a
> compensation to investment equal to zero and shall maintain their
> retribution to operation during their regulatory useful life, as the case may
> be."

376. MO IET/1045/2014 established a complex regime for compensation. In essence, calculations related to over 1500 hypothetical 'standard installations' of different kinds and ages, which represented groups, to one of which each actual facility was allocated. The imputed investment cost and operating costs, and other factors such as the estimated current and future operating costs, estimated hours of operation, estimated market prices of electricity and net asset value of the facility, are all taken into account in order to calculate the costs and revenues in €/MWh for each year of the facility's existence. The reasonable rate of return was initially set at 7.398%,[258] based on historic yields of 10-year Spanish treasury bonds.

377. The New Regulatory Regime provided for six-year 'regulatory periods' after which investment incentives are to be reviewed, and three-year 'regulatory half-periods' after which investment incentives are to be reviewed.

378. These measures, RDL 9/2013, Law 24/2013, RD 413/2014 and MO IET/1045/2014, together established the framework of the New Regulatory Regime. The critical detail was supplied by RD 413/2014 and MO IET/1045/2014, adopted on 10 and 20 June 2014 respectively.

379. This brief summary of the main features of the New Regulatory Regime is very far from comprehensive; but it is sufficient for the purposes of this Decision.

---

[258] R-86, p. 96.

E.  THE SIGNIFICANCE OF THE 2013-2014 REFORMS: THE TRIBUNAL'S ANALYSIS

380.    In this section of the Decision, the Tribunal considers whether, in light of what it has found to be the legitimate expectations of the Claimants in respect of the PV and the hydro investments, the regulatory reforms of 2013-2014 amounted to a violation of the Claimants' rights under the ECT.

### The Legal Standards

381.    We begin by considering the applicable legal standards. Article 10(1) ECT reads as follows:

> "Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."[259]

382.    It is convenient to focus initially upon the "commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment."

### Fair and Equitable Treatment

383.    The Claimants point to the express duty under Article 10(1) ECT, an operative provision of the ECT, to "create stable, equitable, favourable and transparent conditions for Investors."[260] They claim that a denial of their legitimate expectations constitutes a breach

---

[259] Contracting Parties may decide not to allow investors to submit to arbitration any dispute arising out of the last sentence of Article 10(1), concerning the observance of 'any obligations' that they have entered into. Spain has not done so.

[260] Cl. Mem., para. 370, fn. 625.

of their right to fair and equitable treatment under Article 10(1) ECT. They emphasize the formula adopted by the tribunal in *Micula v. Romania*:

> "There must be a promise, assurance or representation attributable to a competent organ or representative of the state, which may be explicit or implicit. The crucial point is whether the state, through statements or conduct, has contributed to the creation of a reasonable expectation, in this case, a representation of regulatory stability. It is irrelevant whether the state in fact wished to commit itself; it is sufficient that it acted in a manner that would reasonably be understood to create such an appearance. The element of reasonableness cannot be separated from the promise, assurance or representation, in particular if the promise is not contained in a contract or is otherwise stated explicitly. Whether a state has created a legitimate expectation in an investor is thus a factual assessment …"[261]

384.    Other awards cited by the Claimants have referred to factors such as the need for reliance on the representation.[262]

385.    The Respondent, on the other hand, submits that particular attention should be paid to awards made under the ECT, such as *Charanne v. Spain*,[263] rather than to awards based on specific agreements or on BITs. It emphasizes the need for a diligent analysis of the regulatory framework prior to making an investment;[264] and it submits that there must be "specific commitments made to an investor that the regulations in force will remain unchanged"[265] and that the investor's expectations must be objectively reasonable and justified.[266] Quoting *Charanne v. Spain*, it says that "in the absence of a specific commitment an investor cannot have a legitimate expectation that existing rules will not be modified."[267]

---

[261] *Micula v. Romania*, para. 669, CL-93.

[262] *E.g.*, *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, para. 331, CL-57; *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, paras. 117-118, CL-46; *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, para. 377, CL-50.

[263] *Charanne v. Spain*.

[264] Resp. CM, paras. 1090-1099, citing *Charanne v. Spain*, paras. 495 and 505, RL-49.

[265] Resp. CM, para. 1100.

[266] *Ibid.*, paras. 1099-1118.

[267] *Ibid.*, para. 1103, quoting *Charanne v. Spain*, para. 499, RL-49.

**Legitimate Expectations and Fair and Equitable Treatment**

386.    The Tribunal notes that the ECT does not protect legitimate expectations as such. It is not argued that there is a distinct established concept or doctrine of legitimate expectations, applicable as a measure of the compatibility of conduct with the FET standard but independently of the FET standard. That said, the concept of legitimate expectations is familiar in the context of analyses of claims of breaches of FET provisions and it is convenient to use that concept here.

387.    The material provision is Article 10(1) ECT, which sets out the right to Fair and Equitable Treatment; and it is only in so far as the negation of expectations constitutes unfair or inequitable treatment that there can be a breach of this provision in the ECT. The fact that an investor's expectations have been defeated will not necessarily imply that there has been a breach of the FET standard.

388.    The Tribunal does not consider it necessary that a specific commitment be made to each individual claimant in order for a legitimate expectation to arise. At least in the case of a highly-regulated industry, and provided that the representations are sufficiently clear and unequivocal, it is enough that a regulatory regime be established with the overt aim of attracting investments by holding out to potential investors the prospect that the investments will be subject to a set of specific regulatory principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely; and to the extent that those expectations are objectively reasonable, they give rise to legitimate expectations when investments are in fact made in reliance upon them.

389.    The paradigmatic case is that of a new investor constructing a new facility which will remain subject to the regime for the whole of its operational life, and it is natural that assurances concerning the stability of regulatory regimes should be made in this context, by assuring stability for a certain fixed or renewable period or for the operational life of a facility. But investment is not confined to paradigmatic cases; and in particular, the ECT

does not confine its protection to such paradigmatic cases. Investors may choose or need to realise their investments by selling facilities that they have constructed. It is to be expected that investments will change hands and that the possibility of later sale is an important factor in the initial decision to make an investment. If a facility is sold, the presumption must be that, unless stipulated otherwise, any promised stability extends to the new owner of the facility. It is notable in this respect that Article 10 ECT refers to the "commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment." The ECT explicitly protects investments and not simply investors. It is in this light that representations made by States that are intended to create expectations upon which investors will rely must be appraised.

390. RD 661/2007 created such expectations. The Tribunal has found, in respect of the PV plants, that:

> "… Claimants were entitled to rely on the maintenance of the relevant tariffs and premiums set out in Article 36 RD 661/2007 throughout the reasonable planned operating life of each power plant. The tariffs and premiums for the first 25 years of operation were set, as were the tariffs and premiums payable "thereafter", *i.e.* for the rest of the operational life of the PV plant in question."[268]

391. In relation to the hydro investments, the Tribunal has found that there was a reasonable expectation (i) that there would be no 'dramatic changes' in the Special Regime and in particular (ii) that remuneration to a particular producer or in respect of a particular plant operating under the Special Regime would not be fixed or reduced so that it made no more than what Respondent deemed a 'reasonable rate of profitability.'[269]

392. As was explained above, the difference between the two findings arises from the fact that the hydro investments were made later than the PV investments, and in the meantime RD 1565/2010 and RDL 14/2010 had given clear indications that the original regime

---

[268] See para. 311, above.
[269] See paras 339, 348, 354-360, above.

established by RD 661/2007 would not be maintained unchanged, and that the changes would make the regime less favourable, and less secure, for Special Regime producers.

393.   An expectation is more than a hope. It must be justified, rational and reasonable. In cases where, as here, an expectation is created by the establishment of a regulatory regime, justification will often be found in the form of legal due diligence reports containing a thorough legal analysis of the provisions and an identification of regulatory risks. But the Tribunal considers that the essence of the requirement that an expectation be justified lies in the need for it to be based upon a proper and thorough understanding of the nature and scope of the representation that is relied upon: precisely how that understanding is obtained is a matter of secondary significance.

### *The Need for Due Diligence*

394.   In the present case, the Claimants assert that due diligence was conducted,[270] but the Respondent questions its adequacy. The Tribunal agrees that the documentary evidence of detailed legal analysis by external legal advisors acting on behalf of the Claimants is very thin.[271] The position in relation to the PV investments[272] and the hydro investments[273] was described above. In essence, there is no record of detailed legal advice affirming that there is no regulatory risk, though there are uncontested assertions of oral discussions of the point, and the legal advice that is in the record does not cast doubt upon the stability or the duration of the Special Regime established by RD 661/2007.

395.   The question is whether in these circumstances an investor which considers that amendment significant or repeal of a regulatory regime with retroactive effect is so remote a possibility as to be a negligible risk can claim to have a legitimate expectation whose

---

[270] Cl. Mem., para. 225, C-196; Cl. Reply, paras. 29-34, 317-319, 328-329.

[271] The Claimants' account of the investment process occurs in the Cl. Mem., paras. 232-250, and in the witness evidence of Messrs. Alméras and Gambini, given in their respective witness statements and orally at Day Two of the Hearing.

[272] See paras. 301-304, above.

[273] See paras. 336-337, above.

denial by the Respondent may constitute a breach of the duty of Fair and Equitable treatment. In other words, were the Claimants entitled to rely upon the representations made by the Respondent, without having specific written legal advice affirming that the regulatory regime could not be significantly changed retroactively? We consider the significance of reliance further below.

396.    After careful consideration, the majority of the Tribunal considers that the right to rely upon the representations made in this case do not depend on there being evidence of any particular form or scale of legal due diligence by external advisors.[274] If the Claimants have addressed the question of regulatory stability, and sought expert advice, and reached an understanding of the significance of the representations made by the Respondent that was in fact accurate, their entitlement to rely upon that understanding does not depend upon evidence that their understanding was provided or confirmed on every point by external counsel, nor does it depend upon evidence of a detailed written legal due diligence report upon the revocability of the regulatory regime. Whether an investor's initial assumptions about the legal position, based on its reading of the law and of any associated official statements, (a) is correct and not contradicted by the legal reports that address the question of regulatory stability, or (b) is incorrect (or non-existent) and changes when the correct position is revealed by legal reports, does not affect the investor's entitlement to rely upon official representations, provided that the investor has given careful consideration to the legal position and has acted in reliance upon representations by the State concerning the stability of the regulatory regime.

397.    We emphasise that no investor is entitled to assume that the regulatory regime in place at the time that its investment is made will continue to remain in force. States have the sovereign right to amend their legislation. But States also have the right, and the legal power, to make representations as to the future treatment of investments in such a manner as to create expectations that cannot be defeated without violating a duty of Fair and

---

[274] One witness argued that the regulatory regime was designed not only for big investors but also for small investors who might put €10,000 or €20,000 into a small PV plant, and that small investors would not "make a due diligence regarding the constitutionality of regulatory change. It is impossible.": Tr. Day 2, pp. 115-116.

Equitable Treatment. In this case, the Respondent held out the assurance of the stability of specific regulatory provisions as an inducement to invest in the renewable energy sector, and was not free to walk away from that assurance at will. Investors were entitled to rely upon that assurance of stability as a firm commitment.

398.    In the present case, the majority of the Tribunal considers that the evidence is that Cube made an appraisal of the regulatory regime and based the calculations underlying its decisions to invest, in respect of both the PV and the hydro facilities, upon the understanding that the Special Regime would not be significantly amended or abolished retroactively, in respect of plants already registered and operating under the Special Regime.

399.    In order to prove that a claim to a legitimate expectation is not justified, it will normally be necessary to show either that a claimant's understanding of the representation relied upon was incorrect, or that while the understanding was correct it was not reasonable to place any reliance upon the representation.

400.    In the present case, the essence of the Respondent's argument is that while the Respondent had at each stage the intention of maintaining the stability of the legal regime introduced at that stage and always sought to ensure a reasonable return for electricity producers, all legal regimes are always subject to change. It says that the Claimants should have recognized that fact from the outset. That is, of course, true in the sense that any sovereign legislature may amend or revoke any law, by virtue of its sovereign authority. But that observation misses the point. Here we have found that the Respondent indicated in RD 661/2007 that it was committing itself, in certain limited respects and for a certain limited time, not to exercise its undoubted power to amend the law. The question then is, does such an indication have any value, or must it be regarded as something that a State can freely revoke, without any liability to investors for any damage that might be caused by such revocation, if and when it feels a need to do so?

401.    The Tribunal, by a majority, considers that the Claimants' reliance on the representation[275] was justified, for four reasons. First, the text of RD 661/2007 was itself clear and specific. The representations could be read by all, in a text with the force of law, accompanied by an explanatory preamble. Second, those representations were emphasised by their clear and specific restatement in the Government Press Release issued on the same day as RD 661/2007.[276] Claimants were professional investors, used to evaluating risk, and did in fact procure legal advice from Spanish counsel, even though no detailed written opinion was filed in these proceedings. Third, the Respondent has not shown that any more exhaustive legal analysis would have produced any different understanding of the Spanish measures. Fourth, the significance of the Respondent's representations as to the stability of RD 661/2007 is ultimately not a matter of Spanish law but of international law, operating in the context of Article 10(1) ECT.

402.    The majority of the Tribunal therefore considers that the Claimants were justified in relying upon the Respondent's commitment to stability as it appeared from a careful and informed reading of the Spanish regulatory measures.

403.    The reasonableness of the expectation in this case is established by the fact that, apart from the point made above concerning the revocability of all legislation (a possibility excluded in this case by the terms of the Respondent's representation), there is no reason to regard the meaning attached to the representation, as committing the Respondent to making only non-retroactive amendments to the regime, as being inherently improbable or questionable.

404.    If, for example, there had been a promise to pay a specified fixed subsidy, without any provision for adjustments for inflation, etc., for the whole of the operating life of a facility, no matter how antiquated and inefficient the facility might become, it might not be reasonable to take the promise at face value, no matter how clear the wording might be. To read an exaggerated promise into a text on the basis that the text did not set out any express limitations or qualifications may be unreasonable. But in the present case, RD 661/2007

---

[275] We return below to the crucial question of the scope of the expectation.
[276] See paras. 266, 273, 277, above.

did set out limitations and qualifications and provided for the revision of the regime that it established. It was a complex, sophisticated regime designed to be stable; and it was reasonable for the Claimants to expect stability from it and to act in reliance upon it.

### *Cube and Demeter's Due Diligence*

405.    There is a distinction between Cube and Demeter, to which the Respondent draws attention.[277] Cube specifically considered the possibility of retroactive regulatory change and explored it, at least orally, both internally in its Investment Committee[278] and with external Spanish lawyers.[279] There is evidence that it considered the position under Spanish law and arrived at a considered conclusion that there was a negligible risk of the retroactive amendment of the regulatory regime.[280] As was noted above,[281] however, the evidence is that Demeter itself undertook no due diligence, but relied upon Cube's analysis and the due diligence procured by Cube.

406.    The Tribunal has considered whether in these circumstances it might be said that Demeter did not rely upon representations made by the Respondent, but rather on assurances given by Cube, and that Demeter is accordingly not entitled to invoke the 'legitimate expectations' argument in the context of its right to Fair and Equitable Treatment. The Tribunal considers that this question depends upon the specific facts of the case. If a co-claimant is so closely engaged and involved in the decision to invest that the investment can properly be regarded as a joint venture between the co-claimants, it is in the view of the Tribunal not necessary that each claimant should have been individually addressed by the representations or that each claimant should individually have conducted its own due diligence. These are matters that can reasonably be allocated to one or more of the co-claimants to perform on behalf of all others. That is, in our view, the position in the present

---

[277] Resp. PHB, paras. 123-126.
[278] Tr. Day 2, pp. 77-82 (Alméras).
[279] Tr. Day 2, pp. 117-122 (Alméras).
[280] Tr. Day 2, pp. 77-81 (Alméras).
[281] See para. 340, above.

case; and Demeter can rely upon the Respondent's representations to the same extent as Cube.

### *What is Required by the Legitimate Expectation?*

407. The conclusion that the Claimants were entitled to rely upon the representations made by the Respondent in this case, so that departure from the representations is in principle not consistent with the duty of fair and equitable treatment, does not end the analysis. 'Reliance' is not a black-and-white issue: other questions must be addressed. The next question is what degree of departure from the representations will constitute a breach of the FET provision.

### *To What Extent May Stabilized Regimes be Amended?*

408. Stability is not the same as petrification. The Tribunal certainly does not regard every deviation from the original scheme established by RD 661/2007 as a violation of the duty of fair and equitable treatment under Article 10 ECT. Put another way, investors have no right to insist that the system of remuneration remain unchanged. It is the responsibility of the State to organize appropriately a sector that is fundamental for the entire economy. The right not to be harmed by reversals of commitments on which investors were entitled to place reliance does not imply a right to the petrification of the entire system that manages the remuneration. The protection of investors means protection of their financial interests, and that can be achieved in different ways.

409. A government has a clear duty to act in the public interest and to react as best it can to developments that demand a change in governmental policies that, for whatever reason, become unsustainable. But the duty to react as best it can requires that a government act in accordance with the legal commitments that it has made and the obligations that bind it. In this case, the scope for government action was circumscribed by the Respondent's obligations under the ECT, including its duty under Article 10(1) ECT to accord fair and equitable treatment to the Claimants' investments.

118

410.    The duty to accord fair and equitable treatment entailed an obligation not to defeat the basic expectations that had been created by the Respondent specifically in order to encourage the investments necessary to implement its policy on renewable energy.

411.    This obligation certainly does not require the maintenance by the Respondent of every aspect or every detail of the regulatory regime which existed when the Claimants made their investments. There can be no question of requiring a State to 'petrify' its laws,[282] even if the 'grandfathering' of investments – their exclusion from prospective regulatory changes adopted for all new investments – is one way in which legitimate expectations may be satisfied. As it was put in the *Saluka* case:

> "No investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged. In order to determine whether frustration of the foreign investor's expectations was justified and reasonable, the host State's legitimate right subsequently to regulate domestic matters in the public interest must be taken into consideration as well."[283]

412.    The obligation does, however, require that where the Respondent represented that certain provisions would be maintained for a certain time, those provisions either are maintained for that time or are adjusted in a manner that does not significantly alter the fundamental economic basis of investments made in reliance on that representation.

413.    This approach is well established in the jurisprudence. As it was put in one case, "treatment by the State should 'not affect the basic expectations that were taken into account by the foreign investor to make the investment.'"[284]

---

[282] See Resp. CM, para. 1086.

[283] *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, PCA Case No. 2001-04, Partial Award, 17 March 2006, para. 305, CL-52.

[284] *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award, 3 November 2008, para. 173, itself citing earlier jurisprudence, CL-14.

*The Effect of Regulatory Change on Quantum*

414. The identification of the threshold at which a departure from the representations constitutes a breach of the FET provision is one aspect of the matter. But it does not follow that once the threshold is identified, all other questions of the degree of reliance are extinguished. Both Parties have proceeded on the basis that in assessing the damages that flow from any breach, a discount is to be applied in order to take account of 'regulatory risk' and 'country risk'; and they have discussed the impact of developments in the regulatory regime upon the quantification of that risk. The Tribunal agrees with this approach and considers it further below, in the section of the Decision dealing with quantum.

415. It is, however, convenient to address one aspect of the matter at this point because, as the Claimants observe,[285] it sits at the boundary between quantum and liability. This is the Respondent's argument that because the original Special Regime was economically unsustainable, the changes made by the New Regulatory Regime in fact improved, rather than harmed, the interests of the Claimants and the value of their investments.[286]

416. The Tribunal does not accept the Respondent's argument. It may be the case that the New Regime – and, indeed, each individual regulatory change made between 2007 and 2014 – appeared at the time of its adoption to have established a regime that was more likely than its predecessor to be sustainable. It would, indeed, be remarkable if any regulatory change had been made that was patently likely to worsen the situation that existed immediately prior to its adoption. The simple fact that the Respondent was addressing the question of sustainability was, no doubt, welcome. But that is not the relevant question. What is important is the comparison between, on the one hand, the level of risk at the time when the Claimants made their investments in reliance on the terms of the then-existing Special Regime, before that regime had been acknowledged to be unsustainable, and, on the other hand, the level of risk after the adoption of the changes.

---

[285] Brattle Second Quantum Report, para. 264.
[286] Econ One Second Report, paras. 287-303.

417.    The Tribunal notes further that the submissions on sustainability are based on the assumption that the financing of electricity is a closed system. That is only the case because the State has decided that it be so. That choice does not mean that obligations assumed by the State in respect of that system can only be met from within it. Further, as the Claimants have pointed out, an option within the system would have been an increase in the charges to consumers of electricity. In the circumstances, that may not have been considered to be politically feasible or economically desirable.

418.    The Tribunal considers that fact that the Respondent had demonstrated a willingness to change provisions in what had been presented as a 'stable' regime must be presumed to have increased to some degree the risk of regulatory change. While the amended regime might be more sustainable than the unamended regime (and in that sense more economically 'stable'), as long as all the Respondent's calculations and predictions were correct, the fact remains that when a commitment to stability for facilities already operating under the Special Regime is abandoned and significant changes are made to the economic position of those facilities, confidence in the representations that the existing regulatory framework will remain unchanged must be weakened. Economic stability is achieved by departing from the commitment to the stability of the regulatory regime. The net effect of these changes is a matter to which we return in the context of quantum.

### Was There a Breach of Article 10(1) ECT?

419.    In November 2010, RD 1565/2010 terminated the fixed tariffs applicable after the initial 25-year period under RD 661/2007. Though a plain variation of the regime that existed when the Claimants made their PV investments, that variation would take effect only many years later. Indeed, the initial period was subsequently extended, first to 28 and then to 30 years.[287] The Tribunal regards it as an adjustment, rather than a repudiation, of the economic basis on which the investment was made and does not consider it to be a violation of Article 10 ECT.

---

[287] Cl. Mem., para. 260, fn. 496.

420. Similarly, while the cap introduced by RDL 14/2010 on the number of operating hours for which PV facilities were entitled to fixed tariffs undoubtedly affected their profitability, the Tribunal considers it to be a measure within the range of adjustments that a reasonable investor must be prepared to accept and accommodate. The Tribunal considers that it, too, was not a violation of Article 10 ECT.

421. Nonetheless, the Tribunal considers that the regulatory changes of 2010 were clear signals of the continuing vulnerability of the Special Regime, and that a reasonable investor would have regarded them as affecting the probability of departures – both 'dramatic' departures and lesser adjustments – from the existing regime. That effect is to be taken into account when considering the discount to be applied in order to take account of 'regulatory risk' and 'country risk'.

422. The 7% tax on electricity production and the Water Levy, both introduced by Law 15/2012, are measures excluded from the scope of this arbitration by Article 21 ECT, as was noted above.[288]

423. The Tribunal considers that the changes made by RDL 2/2013, including the withdrawal of the 'market premium' option and the revision of the link with the inflation adjustment index, were in themselves insufficient to constitute a breach of Article 10 ECT. The changes left enough of the economic basis established by RD 661/2007 intact for it to not to violate the FET standard, or the essence of the commitments to stability made to investors.

424. The Tribunal has considered whether the regulatory changes made up to and including RDL 2/2013 can be regarded as a breach of Article 10 ECT if they are considered together, rather than individually. While it is evident that by early 2013 the Special Regime was under very great strain and was likely to undergo even more significant changes, in the view of the Tribunal, the enactment of RDL 2/2013 does not mark the decisive break with the earlier regime even when considered together with the legislative measures that

---

[288] See paras. 233, 362, above.

preceded it. Fixed tariffs remained available, albeit for a limited time and subject to limits on annual production and tied to a different inflation index.

425.   In contrast, RDL 9/2013, adopted in July 2013, marks the beginning of a radical and decisive break with the earlier regime. It ultimately both abolished the 2007 Regime and marked a shift to a policy based not upon tariffs and premiums fixed for long periods but upon the concept of the "reasonable rate of return" and a "reasonable return" over the lifetime of a plant. That change was completed with the adoption in June 2014 of RD 413/2014 and MO IET/1045/2014.

426.   The 2007 Regime had, it is true, already been considerably modified; and the New Regulatory Regime established in 2013-2014 had 'stability' as one of its explicit goals. The Respondent was clearly trying to find a sustainable balance between the interests of electricity consumers and electricity producers.

427.   Nonetheless, the Tribunal considers that there was move away from a regime based on what were at the time of the investments 'promised' tariffs and premiums, to a regime based on capped 'reasonable returns', and that this move represented a fundamental change in the economic basis of the relationship between the State and the Claimants. It agrees with the view that the regulatory changes of 2013-2014 constituted "what economists call 'a mid-stream switch in the regulatory paradigm.' A 'regulatory paradigm' is the set of rules that establish a broad playing field in which investors incur particular risks in exchange for the possibility of associated returns. A 'mid-stream switch' refers to the introduction of new rules that fundamentally change the risk and return profiles for investments that were created under the original paradigm and that are still in use."[289]

428.   While either of those regulatory paradigms might be said to be in itself reasonable and fair, the Tribunal considers that an unanticipated shift from one to the other in the face of an express statement that the tariff regime applicable to existing plants registered under the Special Regime would not be withdrawn, and after investments had been made with a view

---

[289] Brattle First Regulatory Report, para. 179.

to profitability over a long term, steps over the line drawn in Article 10 ECT and constitutes unfair and inequitable treatment.

429.  As to the date of the breach, the Tribunal considers that it is appropriate to identify that date with the time when the new regime presaged by RDL 9/2013 was given concrete form by RD 413/2014 and MO IET/1045/2014, adopted respectively on 10 and 20 June 2014. The date of the breach is thus 20 June 2014.

430.  If the regime established by RD 661/2007 had made provision for the possibility of such a change, it is unlikely that subsequent developments could have given cause for complaint. The Tribunal finds nothing inherently improper in the Respondent's conduct: it is the pursuit of that course of conduct in the face of earlier assurances that gives rise to the breach of the ECT.

431.  This is an occasion where, as the Respondent itself recognized,[290] good intentions and sensible planning were overtaken by unforeseen developments in the market – the reductions in demand for electricity and the unexpectedly enthusiastic take-up for the incentives offered to renewable energy producers. While the decision that the pain of the miscalculation should be shared among consumers and producers may be perfectly reasonable in abstract terms, the Tribunal considers that in this case it takes insufficient account of the significance of the need to deliver on the inducements that had been offered to investors.

### The PV Investments

432.  Applying this reasoning first to the Claimants' PV investments, accordingly the Tribunal finds that in relation to the PV facilities, the Respondent's abandonment in RDL 2/2013 and subsequent measures of the tariffs that had been fixed in accordance with RD 661/2007 constitutes a violation of its obligations under the ECT.

---

[290] See para. 371, above.

433.    The conclusion summarized in the previous paragraph is applicable only to the Claimants' investments in the Puente Génave, San Martín de Pusa and Écija PV facilities, all of which had been made under the 2007 Regime during the course of 2008. No claim is made in respect of the investment in the Rambla PV facility, acquired by Cube in November 2009[291] but sold in April 2012.[292]

434.    In respect of the three PV facilities to which this conclusion applies, the Claimants are in principle entitled to recover the losses that are shown to have been caused by the Respondent's replacement of the 2007 Regime of fixed tariffs and premiums with the 2013-2014 'reasonable rate of return' regime. The question of quantum is considered below.[293]

### The Hydro Investments

435.    The position of the hydro investments is different because they were made later. In December 2010, the Claimants appraised the market for hydroelectric power.[294] In April 2011, Cube's Investment Committee approved the acquisition in partnership with Demeter of 17 small hydro facilities, of which ten were located in Spain, from RPI.[295]

436.    The Claimants made their investments in those ten hydro plants in May 2011.[296] In June 2012, they acquired through RPI interests in six more hydro plants in northern Spain referred to as the Blue Rain plants, formerly held by a subsidiary of Energias de Portugal S.A.[297] All of the hydro plants were registered with the RAIPRE for the purpose of benefitting from the Special Regime.

---

[291] Cl. Mem., para. 229.

[292] *Ibid*., para. 231.

[293] See Section VI, Quantum.

[294] Cl. Mem., paras. 235-237, C-218, C-220, C-221, C-222.

[295] Cl. Mem., paras. 232, 242, C-224.

[296] Cl. Mem., para. 243.

[297] *Ibid*., para. 244.

437.    The Tribunal considers that the situation had changed by May 2011 and/or by June 2012, so that the Claimants were not entitled to rely upon the maintenance of the 2007 Regime in respect of their hydro investments in the same way that they were in respect of their PV investments. It will be recalled that, by the time that the investments were made, Directive 2009/28/EC, RDL 6/2009, RD 1565/2010, RD 1614/2010, RDL 14/2010 and Law 2/2011 had been enacted.[298]

438.    The Claimants assert that "the legal diligence raised no concerns regarding retroactive abrogation or modification of the economic regime under RD 661/2007, and the only risks discussed related to new technological specifications and toll access fees."[299]

439.    The Tribunal does not find in the legal due diligence reports cited by the Claimants, or in the witness statements cited by the Claimants,[300] or in the review made by the Spanish law firm Garrigues at the request of Cube of the vendor's due diligence,[301] any specific analyses of the stability of the regulatory regime or of Spain's energy policy. The Claimants' confidence in the regime at the time that it made its hydro investments appears to have been based essentially upon Cube's own researches into the position and the absence of any concerns raised in the various diligence reports.

440.    Nonetheless, for the reasons explained above,[302] the majority of the Tribunal considers that the Claimants made their hydro investments on the basis of a legitimate expectation as to the stability of the regime. That expectation was, however, narrower in scope and less well-defined, and less firm, than the expectation on which the PV investments were based. It was limited to the expectation that there would be no 'dramatic' or 'fundamental' change in the Special Regime. The Tribunal understands a 'dramatic change' to be a change in the

---

[298] See paras. 299-300, 315-326, above.

[299] Cl. Mem., para. 247, citing legal due diligence reports at C-234 and C-235. The English translations cover only a small part of the texts of these exhibits, but the Tribunal has consulted the full Spanish text.

[300] Alméras WS 1, para. 28; Gambini WS, paras. 10 and 12.

[301] Review of the "Legal Due Diligence Report on the Spanish company Renewable Power International Holdings, S.A. and some of its Spanish and Portuguese subsidiaries", 17 May 2011, C-222.

[302] See paras. 396, 405-406, above.

regime that materially alters, over the long term, the tariffs or premiums receivable by a producer so as to materially affect the economic balance of the project upon which the producer had relied when the investment was made.

441.    While the Respondent's commitment was made initially in RD 661/2007 and the Claimants made their hydro investments four years later, in 2011, the regulatory changes made prior to the hydro investments did not amount to a repudiation of the basic regime established by RD 661/2007. The majority of the Tribunal accordingly considers that the Claimants were still entitled to rely upon the maintenance of a regime under which remuneration to a particular plant or producer operating under the Special Regime would not cease or be capped once the plant or producer had made what the Respondent deemed a reasonable return on its investment.[303]

442.    For the reasons given above,[304] the Tribunal finds that this expectation was defeated by the reforms of 2013-2014, in breach of the Claimants rights under Article 10(1) ECT. The Tribunal also recalls here its conclusion in paragraphs 416-418, above, that the changes made by the measures adopted in 2013-2014 did not operate to benefit the Claimants by reducing the regulatory risk, but must be presumed to have increased that risk by demonstrating that the Respondent was prepared to make significant retroactive changes to aspects of the regulatory regime that had been presented as unchangeable. The Respondent's account of the changes[305] adduces evidence that the New Regulatory Regime was regarded as more likely to survive than the original Special Regime, whose unsustainability had been demonstrated by 2013-2014, but not that the representations as to its stability were more likely to be adhered to than the representations in RD 661/2007.

---

[303] See para. 354, above.

[304] See para. 427, above.

[305] Econ One Second Report, paras. 287-299.

### Other aspects of FET

443.    The Claimants presented their case primarily in terms of the duty under Article 10(1) ECT to accord at all times fair and equitable treatment to investments of investors. In addition, the claims referred to a lack of transparency and consistency in the treatment of their investments, and to a lack of good faith.[306]

444.    The Tribunal notes that the claims concerning a lack of transparency and consistency, while pleaded separately,[307] are not alleged to have given rise to any distinct losses. Those claims are subsumed within the Tribunal's analysis of legitimate expectations.

445.    The Claimants submitted that "the [FET] standard includes the general principle recognised in international law that the contracting parties must act in good faith, although bad faith on the part of the State is not required for its violation."[308]

446.    It is undoubtedly true that the fact that an action was taken in good faith does not mean that the action cannot constitute a breach of the FET standard. A denial of legitimate expectations, for example, may breach the FET standard even if it results from a regulatory measure taken in good faith. But a claim that a respondent violated the FET standard simply by virtue of its lack of good faith cannot be sustained without demonstrating the existence of bad faith, for example by showing that the actions in question were taken for an improper motive. The Tribunal finds no evidence whatever that Spain acted in bad faith. All the evidence points to it making strenuous and diligent efforts to resolve the tariff deficit, albeit unsuccessfully and in a manner that defeated the Claimants' legitimate expectations. The Tribunal dismisses that part of the Claimants' case that is based on a lack of good faith.

---

[306] Cl. Mem., Chapter VI.A.2 and VI.A.3.

[307] Cl. Mem., paras. 401-410; Cl. Reply, paras. 489-496; Tr. Day 5, pp. 191-193; Cl. PHB, pp. 9-10.

[308] Cl. Mem., para. 412, fn. 686, citing *Biwater Gauff (Tanzania) v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, para. 602, CL-70.

447. The Claimants also referred to other obligations under Article 10(1) ECT, notably (a) the prohibition against unreasonable or discriminatory measures that impair the management, maintenance, use, enjoyment, or disposal of investments, and (b) requirement to observe any obligations that Spain entered into with an investment or an investor.[309]

### *Impairment*

448. The prohibition against unreasonable or discriminatory measures is located not in the second sentence of Article 10(1) ECT, dealing with FET, but in the third sentence dealing with impairment. The Tribunal finds no evidence whatever that the Spanish measures violated the prohibition on discriminatory treatment. We reject the Claimants' contention that the measures were discriminatory because they applied to renewable sources of electricity and not to other sources. The entire point of the Special Regime, of which the Claimants were and remain a beneficiary, was to discriminate precisely in that way. The Claimants cannot be heard to complain that such discrimination continued. The measures in question were general legislative measures that did not discriminate against the Claimants or their investments, compared with other investors in PV or hydro plants.

449. Similarly, the Tribunal finds no evidence that the Spanish measures were unreasonable, except in so far as they breached the assurances given by Spain. That claim is properly to be regarded as falling within the claim based on legitimate expectations and the FET standard, and need not be considered further.

450. The Claimants' argument that "Spain's choice to unreasonably target renewable energy investors was a politically motivated endeavor to avoid raising prices for end-consumers of electricity,"[310] even if correct, would not establish that the measures were either discriminatory or unreasonable. The 'choice' is, on the face of it, a reasonable public policy

---

[309] Cl. Mem., para. 45.
[310] Cl. Reply, para. 501.

choice; and the means for its implementation did not discriminate against the Claimants or their investments.

451.   The Tribunal accordingly dismisses the claim that the Respondent violated the prohibition against unreasonable or discriminatory measures that impair the management, maintenance, use, enjoyment, or disposal of investments.

### *Umbrella Clause*

452.   On a plain reading, the reference in Article 10(1) ECT – the 'umbrella clause' – to "any obligations it has <u>entered into with an Investor or an Investment of an Investor</u>"[311] (emphasis added) points to a specific engagement entered into by an ECT Contracting Party with a specific claimant or a specific group of claimants. The Tribunal does not consider general legislative measures to be engagements of this kind. It agrees with the approach adopted in the *Charanne v. Spain* case:

> "Even if RD 661/2007 and 1578/2008 were addressed to a limited group of investors, that does not turn them into commitments specifically addressed to each of those investors. Having a specific scope does not mean that the disputed provisions lose the general nature that characterizes any legislative or regulatory measure. Turning a regulatory provision, due to the limited number of persons that may be subject thereto, into a specific commitment entered into by the State towards each and every one of those persons would be an excessive limitation of the capacity of States to regulate the economy according to the public interest."[312]

453.   Following the approach in the *Charanne v. Spain* award,[313] the Tribunal does not regard the registration of the various facilities with RAIPRE as itself constituting an implied engagement between the Respondent and the Claimants or their investments such as would engage the obligation in the final sentence of Article 10(1) ECT. It was an administrative

---

[311] In the French text, "les obligations qu'elle a contractées vis-à-vis d'un investisseur ou à l'égard des investissements d'un investisseur;" in Spanish, "las obligaciones que haya contraído con los inversores o con las inversiones de los inversores."

[312] *Charanne v. Spain*, para. 493, RL-49 ; cf., *Isolux v. Spain*, paras. 771-772, RL-75.

[313] *Charanne v. Spain*, para. 510, RL-49.

130

measure required by law in order that facilities could benefit from the Special Regime, and to publicise the list of those that were qualified to do so.[314] The Tribunal accepts the Claimants' submission in their Comments on the *Masdar* award that the combination of pre-registration and registration procedures that occurred and was regarded as significant in the *Masdar* case was a consequence of the particular and different circumstances of the *Masdar* investors.[315]

454. The claim based on Article 10(1) ECT, final sentence, is accordingly dismissed.

### *Expropriation*

455. The Claimants also asserted that the Respondent had violated the prohibition on expropriation in Article 13 ECT.[316] They argue that:

> "Spain's modification and subsequent abrogation of RD 661 clearly expropriated Claimants' 'investments.' Whether viewed as 'property rights,' 'claims to money,' or 'rights conferred by law,' Claimants' investments under the RD 661 regime were taken by Spain."[317]

456. It is no doubt possible in theory to divide up an investment project into the discrete property rights that together constitute the investment project; and it is possible that each of those component property rights may itself constitute a separate 'investment,' defined as "every kind of asset," as is the case in Article 1(6) ECT. But where each alleged interference with an individual property right has already been considered in the context of a claim based on breach of the standards in Article 10 ECT, it is hard to see that any purpose is served by making a further determination on the question whether it also constitutes an expropriation in violation of Article 13 ECT.

457. The Tribunal has considered whether an overlapping claim based on Article 13 ECT could lead to any different outcome in this case, whether in terms of liability, quantum or

---

[314] Resp. Comments on *Masdar*, para. 11.

[315] Cl. Comments on *Masdar*, para. 12.

[316] See Cl. Mem., paras. 452-469; Cl. Reply, paras. 533-550.

[317] Cl. Mem., para. 464.

otherwise. It sees no such possibility. Consequently, and in accordance with the principle of judicial economy, it finds it unnecessary to decide on this aspect of the Claimants' case.

### *The defence of necessity*

458.   The Claimants addressed a possible 'defence of necessity' in their pleadings.[318] The Respondent has clearly asserted that "at no time has it invoked the 'state of necessity.'"[319] It is not necessary to consider this point further.

## VI. QUANTUM

459.   The Tribunal has found that Spain's reforms of 2013-2014 defeated the Claimants' legitimate expectations in relation to (i) their PV investments and (ii) their hydro investments, in breach of the FET standard in Article 10(1) ECT. The Tribunal starts from the well-established proposition that the function of an award of damages is to compensate for damage caused by internationally wrongful acts, in so far as such damage is not made good by restitution. In the familiar words of the *Chorzów Factory* case:

> "reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it—such are the principles which should serve to determine the amount of compensation due for an act contrary to international law."[320]

460.   The Parties argued the case in terms of compensation as the appropriate remedy. The Tribunal agrees that it was correct for them to do so.[321] The Respondent has the right to determine its own regulatory regime. Restitution, in the sense of an order to the Respondent

---

[318] Cl. Reply, Chapter IV.F.

[319] Resp. Rejoinder, para. 1152.

[320] *Case Concerning the Factory at Chorzów*, PCIJ, Judgment No. 13, 13 September 1928, (1928) PCIJ Rep. Series A, No. 17, p. 47, CL-21. Cf., Article 31(1) of the ILC Articles on State Responsibility.

[321] As have other tribunals. See, *e.g.*, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Award, 25 July 2007, para. 87.

to restore at least the main bases of the original regulatory framework in relation to the Claimants, is beyond the proper scope of the powers of the Tribunal and is moreover plainly materially impossible and disproportionately burdensome. Compensation is the appropriate form of redress in the present case.

461.    The reparation due is the amount that wipes out the consequences of the illegal act. In response to a question from the Tribunal, the Respondent submits that in the present case "only losses that exceed those that would have flowed from changes to the regime consistent with the ECT were to be compensated."[322] In other words, the Claimants' 'losses' are to be calculated not by reference to a hypothetical situation in which the Respondent made no changes to the regulatory regime, but to a hypothetical situation in which the Respondent had taken a range of measures that would have been consistent with the FET standard but which would have impacted adversely on the value of the Claimants' investments.

462.    The Claimants state that they are:

> "not aware of any investment treaty cases that award damages based on the difference between the losses actually incurred as a result of the State's illegal actions and the losses that would have been incurred had the State enacted some different, hypothetical measure that did not violate international law. Such an exercise typically would involve a large degree of speculation about what such an alternative 'legal' regulation might have been."[323]

463.    The Claimants nonetheless offered a calculation of losses "that exceed those that would have flowed from a regulation that maintained the rate of return that Spain deemed reasonable when it enacted RD 661."[324]

464.    The Tribunal's task is to estimate the damages actually caused by the violation of the Respondent's obligations under the ECT, and in order to do so it considers that it must

---

[322] Resp. PHB, para. 237.
[323] Cl. PHB, p. 59.
[324] *Ibid.*, p. 60.

have regard to the realities of the situation, as other tribunals have done.[325] Losses are not to be assessed by reference to a notional situation in which no regulatory changes are ever made, because it is wholly unreasonable to suppose that this situation could ever have occurred. The scale of the tariff deficit was such that some adjustment to the regulatory regime for electricity pricing was practically inevitable.

465.     On the other hand, it is not for the Tribunal to second-guess the Government of Spain, or to construct a notional regulatory system that reduces the Special Regime premiums (perhaps at the expense of other electricity producers, or consumers) as far as appears possible in line with the obligations under Article 10 ECT. Like the *Sempra v. Argentina* tribunal, this Tribunal must take account of the realities of the situation as the result "not … of a sophisticated equation but of a reasonable estimate."[326]

466.     The appropriate way to factor in these realities is by the application of a discount to the estimate of what the value of the investments would have been if the Special Regime under RD 661/2007 had remained in force unchanged. The discount takes account of the risk of the abandonment of the terms of RD 661/2007, including the possibility of those terms being replaced by terms less favourable than the terms of RD 661/2007. This approach – the inclusion of regulatory risk in the computation of damages – was addressed by experts of both Parties.

467.     Both Parties' experts agreed that the appropriate approach is to adjust projected cash flows to take account of regulatory risk, rather than adding an element to the discount rate that is applied in order to take account of systematic or market risks.[327] The discount for regulatory risk differs as between the PV and the hydro investments, reflecting the increased risk that

---

[325] *E.g.*, Sempra Energy International v. Argentine Republic, ICSID Case No. ARB/02/16, Award, 28 September 2007, paras. 436-444, CL-85, (hereinafter "*Sempra v. Argentina*"); *American Manufacturing & Trading, Inc. v. Republic of Zaire*, ICSID Case No. ARB/93/1, Award, 21 February 1997, para. 7.14, CL-120.

[326] *Sempra v. Argentina*, para. 444.

[327] Brattle First Quantum Report, para. 86; Brattle Second Quantum Report, para. 21; Econ One Second Report, para. 260.

was evident at the time when the hydro investments were made, as compared with the risk when the PV investments were made.

468.    The Tribunal proceeds to consider the quantification of losses on the basis of these principles.

## A.  THE GENERAL APPROACH TO QUANTIFICATION OF DAMAGES

469.    The Claimants and the Respondent differ fundamentally on the general approach to quantification of damages. Apart from their fundamentally different approaches to the question of quantum, there are also many points of disagreement between the Parties respective experts, and criticisms of each other's methodology and assumptions. In so far as these more detailed matters are relevant to the analysis, these differences are referred to below.

470.    As to the fundamental approach, the Claimants argue that the discounted cash flow ("**DCF**") method should be used to calculate the value of cash flows lost, and the consequent diminution in the value of the Claimants' investments, as a result of the Respondent's alleged breaches of the ECT.[328] Their experts, the Brattle Group, adopt a three-step approach to the determination of damages. First, they take a valuation date of June 2014 (when the key parameters of the new regime were specified in RD 413/2014 and MO IET/1045/2014) and calculate cash flows in an 'Actual' scenario based on actual historical financial data for the Claimants' PV and hydro plants. They compare this with the 'But For' Scenario, which calculates the cash flows that would reasonably have been anticipated in the absence of the disputed measures adopted in 2010-2014.[329] The second step is to estimate the fair market values of the Claimants' investments as of June 2014 under the Actual and But For scenarios, using a DCF analysis.[330] The third step calculates interest due from June 2014 until the date of the Award.[331] Brattle then uses different

---

[328] See Brattle First Regulatory Report, para. 285; Brattle First Quantum Report, paras. 6-23.
[329] Brattle First Quantum Report, para. 10.
[330] *Ibid.*, para. 11.
[331] *Ibid.*, para. 17.

approaches to perform a number of 'reality checks' on the figures resulting from its three-step process.

471.    The Respondent argues from the premise that the consistent aim of the Spanish regulatory regimes in question has been to secure a reasonable rate of return for investors and that the Claimants cannot have expected – and hence cannot have lost – anything more.[332] It argues that the DCF approach is not appropriate in the present case and that an approach based on the costs of the assets in question plus a reasonable return on those costs should be applied instead.[333] This argument is supported by the Respondent's experts, Econ One, who argue that a cost-based method should be used to determine the internal rate of return ("**IRR**") on the plants.

472.    Econ One state that "[f]rom an economic perspective, the correct way to establish whether the Measures have had an economic impact on the Plants is to determine whether the return that the Plants can be expected to yield after the enactment of the Measures is lower than the reasonable return for renewable energy projects."[334] They "find that the IRR for the PV Plants after the enactment of the Measures is higher than the reasonable rate of return for renewable energy projects" and therefore conclude "that the Measures have not had a negative impact on the PV Plants."[335] The Respondent's experts reach the same conclusion in respect of the hydro plants.[336]

473.    The Tribunal does not accept that the cost-based approach, calculating a reasonable rate of return on the amount initially invested, is appropriate in the present context. The 2013-2014 change of the regulatory regime so as to introduce the concept of a reasonable rate of return as a cap on support under the regulatory regime, in place of the fixed tariffs and premiums for which the Special Regime had provided, is one of the measures at the very heart of the complaint in this case; and the Tribunal has found that this amendment

---

[332] Resp. CM, paras. 1299-1306.

[333] *Ibid*., paras. 1306, 1315-1329.

[334] Econ One First Report, para. 103.

[335] Resp. Rejoinder, para. 1339.

[336] *Ibid*., para. 1338; Econ One Second Report, paras. 12-15.

constituted such a fundamental change in the economic basis on which the investments were made – a 'mid-stream switch in the regulatory paradigm' – as to amount to a defeat of the Claimants' legitimate expectations in breach of the FET standard in Article 10 ECT.

474.　The Parties made submissions on the reasoning of the majority in the *Masdar* award. The tribunal in that case accepted the DCF approach propounded by the claimants' expert there, which was The Brattle Group, as in these proceedings. The alternative IRR approach by the expert for Spain in that case, a different expert but with the same basic approach as Econ One, was rejected. We agree with the reasoning of the majority in the *Masdar* award.[337]

475.　We emphasise one fundamental feature of the Econ One analysis on which Spain relied in respect of quantum, as in other respects. The calculations are all based on the original cost of the investment by the greenfield investor. Econ One concludes that there has been a "reasonable return" on that investment. However, most of that "return" was received by the previous owners, not by the Claimants. The ECT protects brownfield investors for the actual investment they made. Econ One's approach is not appropriate for application to the Claimants' investment.

476.　Furthermore, the Tribunal is not persuaded by the Respondent's arguments that the various regulatory changes positively benefited the Claimants.[338] Those arguments are based on the premise that if the IRR for a project is "higher than the reasonable rate of return for renewable energy projects,"[339] that indicates a benefit to the Claimants. The Tribunal has rejected that premise and rejected the submission that the regime applicable under RD 661/2007 was based on the principle that investors should receive a 'reasonable rate of return' and no more. To the extent that the Claimants were caused loss by the change to the New Regulatory Regime, that change constitutes a breach of the duty of fair and

---

[337] *Masdar* award, paras. 567-587.
[338] Resp. CM, paras. 1306 and 1330-1333.
[339] Econ One First Report, para. 11.

equitable treatment set out in Article 10 ECT, and the Respondent is in principle liable to compensate the Claimants for that loss.

477.    Thus, the Tribunal has decided that the 'harm' sustained by the Claimants must be identified (in broad terms) by comparing the cash flows that the Claimants were entitled reasonably to expect under RD 661/2007 with the cash flows that they may reasonably expect under the New Regulatory Regime. The Tribunal has identified 20 June 2014 as the date of the breach of Article 10 ECT.[340]

478.    The Tribunal is conscious of the need for caution in applying the DCF method, advocated by the Claimants, to which the *Rusoro v. Venezuela* award (quoted by the Respondent) drew attention.[341] Nonetheless, it considers that this method, now well established in the practice of international investment tribunals, is appropriate in the present case.[342] The Claimants' analysis focuses on the performance of specific plants which had an operating history, even if relatively short, in a highly-regulated industry; and it addresses the specific impact of the disputed measures in terms of the loss of cash flows to those plants. The essence of the dispute lies in the claim to compensation representing the difference between the cash flows that could reasonably be expected under the old regime pursuant to RD 661/2007 and those under the New Regulatory Regime. Both regimes had set out detailed formulas, applicable for many years, which provide a basis from which reasonable expectations of cash flows can be estimated.

## B.  THE DAMAGES IN THE PRESENT CASE

479.    The Claimants' total damages claim amounts to **€74.08 million**, being €11.14 million claimed by Cube in respect of the PV investments, plus €49.83 million claimed by Cube

---

[340] See para. 429, above.

[341] *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016, paras. 758-760, RL-69. Quoted in Resp. Rejoinder, para. 1350.

[342] The Tribunal notes that the DCF method was applied with the approval of the majority in the *Masdar* award, paras. 564-587.

and €13.11 million claimed by Demeter (a total of €62.94 million) in respect of the hydro investments.[343]

480.    That claim was based on the premise that damages were recoverable for the adverse impact on the Claimants' investments of each of the disputed Spanish measures from 2010 onwards.[344]

481.    The Tribunal has, however, decided that the taxation measures lie outside the Tribunal's jurisdiction, and neither they nor their effect on losses sustained by the Claimants can be taken into account.

482.    The Tribunal has also decided that none of the other, non-tax, measures adopted prior to July 2013 constitute a breach of the Claimants' rights under the ECT, and that the changes set out in RDL 9/2013 are to be regarded as having been implemented as of 20 June 2014 when those changes were given effect by RD 413/2014 and MO IET 1045/2014. The part of the claim attributable to those earlier measures, adopted prior to RDL 9/2013, must therefore also be rejected.

483.    The Claimants have claimed for loss of cash flows that they expected, on the basis of RD 661/2007, to flow from fixed tariffs and from market premiums. Those cash flows can be valued by the DCF method, giving a value to the investments as of June 2014 on the basis (a) of the continuation of the Claimants' legitimate expectations regarding the continuation of the 'old' Special Regime established by RD 661/2007 (the 'But For Scenario') and, alternatively, (b) of the New Regulatory Regime introduced in June 2014 (the 'Actual Scenario'). The difference between the amount received in the 'But For Scenario' and the 'Actual Scenario' is the loss for which the Claimants are in principle entitled to reparation.

---

[343] Cl. Reply, para. 631, Table 1; Brattle Memorandum answering the Tribunal's Questions on Damages per Measure dated 15 January 2018 ("**Brattle Memorandum**").
[344] The claims are based on measures beginning with RD 1565/2010 and RDL 14/2010: see Cl. PHB, pp. 49-50.

484.    In the Brattle Memorandum accompanying the Claimants' PHB, Brattle separated out the effect of the various measures and submitted that "after accounting for the measures before July 2013, the New Regulatory Regime still accounts for more than 60% of the total damages, or **€45.66 million**," of which approximately €3.85 million is attributable to PV investments and approximately €41.8 million to hydro investments.[345]

485.    In its PHB, the Respondent made "full reservation to respond to new damages calculations if Brattle and/or Claimants try to introduce into the record the separate and individual impact of the different disputed measures."[346] In fact, the Tribunal had asked each Party to address that question in its post-hearing brief. The Respondent responded to the Tribunal's question in its PHB dated 24 January 2018. The Claimants and Brattle did so in their PHB dated 31 January 2018 and the accompanying Memorandum addressed by Brattle to the Claimants' counsel and dated 15 January 2018.

486.    The Claimants claimed for the adverse economic impact of the Respondent's successive measures amending RD 661/2007. The Respondent based its case on the proposition that the Claimants were at no stage entitled to more than a reasonable return, which it says has in fact resulted from the regulatory regime at all times.[347] It argued further that the New Regulatory Regime had actually improved the position of the Claimants and conferred a benefit upon them.

487.    The Parties' respective responses concerning quantum reflected these fundamentally different approaches. The Claimants calculated the incremental detrimental effect of each successive measure, while the Respondent responded on the basis that the successive measures had benefitted the Claimants.

---

[345] Brattle Memorandum, paras. 4-6 (emphasis added). The Tribunal has taken the figure of €3.85 million from paragraph 6 of that report. It notes that the figure of €4.1 million is given in Figure 2 of the Claimants' PHB, p. 51, which is based on a less detailed breakdown of the pre-2013 regulatory changes.

[346] Resp. PHB, para. 190.

[347] Resp. CM, paras. 1299-1314.

488. The Tribunal broadly accepts the approach in the Claimants' PHB. However, certain matters in dispute on the detail of the Brattle computations require resolution by the Tribunal. Most of the differences arise from the fact that Econ One proceeds on the basis that the fundamental starting point is the receipt of a reasonable return on the original greenfield investment. We have rejected that approach.

489. In the case of both the PV and hydro investments, the Tribunal has decided that the 'harm' sustained by the Claimants is to be identified by comparing the cash flows that the Claimants were entitled reasonably to expect under the regime established by RD 661/2007 and the cash flows that they may reasonably expect under the New Regulatory Regime.

## C. The PV Investments

490. In relation to the PV investments, the Tribunal has found that the Claimants had a legitimate expectation that the tariffs set in accordance with RD 661/2007 would be applicable for 30 years to the Puente Génave, San Martín de Pusa and Écija PV plants.[348] In respect of the three PV facilities to which this conclusion applies, the Claimants are in principle entitled to recover the losses that are shown to have been caused by the Respondent's replacement of the 2007 Regime of fixed tariffs and premiums with the 2013-2014 New Regulatory Regime.

491. The Parties' respective experts disagree over certain very specific methodological matters, detailed in their respective rebuttal reports on quantum.[349] With one exception, the Tribunal does not consider that they are likely materially to affect the calculation of appropriate

---

[348] See para. 314, above.

[349] See Econ One Second Report, paras. 394-452, and Brattle Second Quantum Report, paras. 219-291. The other issues between the experts include the discount rate, risk adjustments for revenue, discount for illiquidity and discount for lack of control. Econ One's analysis applies to both the PV and hydro plants (See Econ One Second Report, paras. 445-447).

compensation due in respect of the PV investments. As the Brattle Second Quantum Report said, "[t]he only material disagreement relates to the useful lifetime of the projects."[350]

### Operating Life

492.    The Claimants' calculations for PV investments assumed an operating life of 35 years,[351] whereas the Tribunal has found that the legitimate expectation of stability of the regime under RD 661/2007 was limited to 30 years, after which electricity would be sold at market pool prices. The Respondent's calculations also were based on a 30-year life for the PV investments.

493.    The Brattle Second Quantum Report assessed the impact on the quantum of damages of the difference between assumptions concerning operating lifetimes. It estimated that about €2.87 million of the €11.14 million in the initial PV claim was contributed by assuming that the operating life of a PV plant was 35 years rather than 30 years.[352] That sum includes the damages flowing from all of the disputed measures, and not only those from July 2013 onwards in respect of which the Respondent has been found liable. It appears to represent just under one quarter of the damages attributable to PV in the initial claim.

494.    In their Memorandum accompanying the Claimants' PHB, the Claimants' experts estimated the damages caused to the PV investments by the measures from July 2013 onwards at roughly €3.85 million.[353] It is necessary, however, to reduce that sum in order to reflect the shorter operating life that the Tribunal has found appropriate.

495.    Absent a precise calculation in the Parties' submissions, in the interests of efficient disposal of these proceedings, the Tribunal will adopt a figure based on the proportionate adjustment for this factor in Brattle's Second Quantum Report. Euro 2.87 million is about 25% of

---

[350] Brattle Second Quantum Report, para. 225.

[351] *Ibid*., paras. 175 and 242-248.

[352] *Ibid*., para. 281 and Figure 14.

[353] Brattle Memorandum , para. 6.

€11.14 million. A deduction of 25% of the adjusted claim of €3.85 million brings the damages, on this basis, down to €2.89 million.

### Illiquidity discount

496.   The Parties' respective quantum experts recognised that a discount was appropriate because of the fact that these assets would take longer to sell than other assets, with the risks attendant on delay. Brattle computed the discount as 18% in both the Actual and the But For Scenarios. Econ One accepted that computation for the Actual (Prevailing) scenario but calculated a 22% discount in the But For Scenario.[354]

497.   The 22% figure is based on the Brattle assumptions, except that Econ One assumes the assets would take nine months to sell, rather than the six months assumed by Brattle. That appears to us to be marginally preferable, because it is based on the time it took to sell the RPI hydro interests to Cube in this case.

498.   However, as damages are computed on the basis of the difference between the Actual and the But For Scenarios, the relevant issue is whether there is a difference between them. Econ One's evidence is based, in part, on the fact that a number of what it called "yield companies" acquired renewable assets in Spain after 2013, thereby increasing liquidity. [355]

499.   We see no basis for concluding that there was any increase in liquidity, merely because some companies bought these assets after the changes. As is well known, interest in renewables was growing rapidly in all markets over those years. In any event, Cube and Demeter, could equally be classified as yield companies. More significantly, these proceedings arise from the fact that there were too many investors under the Special Regime. If anything, the inference available is that liquidity would have been greater under the But For Scenario.

---

[354] Econ One First Report, paras. 221-230; Econ One Second Report, paras. 307-317.
[355] Econ One Second Report, para. 309.

500.    The Respondent also contended that there would be an increase in liquidity because the system would be perceived as sustainable and predictable, in part because the tariff deficit would be eliminated. In the light of our finding that investors in the PV plants had a reasonable expectation that the But For Scenario was stable, based on the assurances given by Spain, we see no reason to differentiate the two scenarios in this regard. This factor accordingly does not affect our determination of the damages due.

### Other Factors

501.    The Tribunal has also considered whether this figure needs further adjustment in the light of the Respondent's submissions concerning other factors such as regulatory risk but has decided that no such adjustment is necessary.

### Decision in respect of PV Investments

502.    The Tribunal accordingly decides that it will award €2.89 million in respect of losses caused to the PV investments by the Respondent's measures adopted in breach of Article 10 ECT.

### D. THE HYDRO INVESTMENTS

503.    The majority of the Tribunal concluded that at the time that the Claimants made their investments in the hydro facilities in Spain, which had already been registered under the Special Regime with RAIPRE, they had a legitimate expectation that the fundamental characteristics of the regime based on fixed tariffs applicable to the actual output of each facility, up to its reasonable planned capacity, would remain applicable to its hydro facilities for a period of approximately the same order as that provided for in RD 661/2007.[356] One member of the Tribunal considers that the position of the Special Regime at the time that the hydro investments were made was, because of the tariff deficit, so unstable that investors could not properly have relied upon the continuation of the Special

---

[356] See paras. 360, 440, above.

Regime, and that the Claimants are accordingly not entitled to any damages in respect of the impact of the disputed measures upon the hydro investments.[357]

504.    As in the case of the PV investments, the Tribunal has determined that the breach was constituted by the measures that together established the New Regulatory Regime, *i.e.*, RDL 9/2013, Law 24/2013, RD 413/2014 and MO IET/1045/2014. Earlier measures did not breach the ECT. The Claimants claim €62.94 million for the injury to the hydro investments, of which €41.8 million is claimed in respect of the later measures constituting the New Regulatory Regime.

### Operating Life and Regulatory Risk

505.    The Claimants' PHB estimate of approximately €41.8 million as the damages arising out of the measures adopted from July 2013 onwards and due in respect of the hydro investments[358] is based on the assumption that the hydro facilities continue in operation for the remaining term of their respective concessions.[359] The durations of the hydro concessions range from 25 to 75 years and the average is about 45 years.[360] Cube and Demeter spreadsheets for 2013 and 2014 compute the value of the hydro plants on the basis of revenue projections for 40+ years.[361]

506.    The Tribunal noted above[362] that the focus in RD 661/2007 on the operational life of the new technology of PV plants then being constructed occurred in a different context from the treatment of the (significantly longer) operational life of existing plants using established hydroelectric technology. In this respect, the Claimants' hydro plants, which began operation at various times between 1985 and 2001, under concessions that are set to

---

[357] See Separate and Partial Dissenting Opinion of Professor Christian Tomuschat, para. 26.

[358] Cl. PHB, p. 50; Brattle Memorandum, para. 5.

[359] Brattle First Quantum Report, para. 73.

[360] The durations of the hydro concessions are tabulated in the Brattle First Regulatory Report, p. 158, Table 15 (Appendix J). and in Brattle First Quantum Report, p. 12, Table 2. They range from 25 to 75 years and the average is about 45 years.

[361] Brattle First Quantum Report, Exhibit BQR 47.

[362] See para. 359, above.

end between 2016 and 2067, are in a different position from the PV plants. The Tribunal does not consider that an investor could reasonably have expected the Special Regime applicable to each hydro plant for the whole of the concession period, or the whole of its operating life, if that were different.

507. The Tribunal considers that this aspect of the Claimants' claim should be addressed, not by calculating a notional shorter operating life for each hydro plant, for the whole of which the essential features of the Special Regime could be expected to remain stable, but rather by applying to the valuation a discount for regulatory risk[363] – that is, what the Tribunal considers to be the apprehension that a reasonable investor would have had, at the time when the Claimants made their hydro investments, that the feed-in tariff / 'market price + premium' framework would be abandoned in respect of existing facilities registered under the Special Regime and replaced with a radically different regulatory regime. That regulatory risk discount is to be applied to the projected cash flows, as the Parties' experts agree.[364]

508. This adjustment is of a different order of magnitude to the 5-year adjustment we have made above for the PV plants. We note that the *Masdar* tribunal faced a similar issue, albeit with a different technology (namely Concentrated Solar Power or thermo-solar plants) involving different regulatory incidents. The quantum calculation in the Brattle Report in the *Masdar* case was based on a 40-year life, and the *Masdar* tribunal determined that the appropriate life was 25 years. This reduced the discounted revenue loss from €179 million to €132 million. The difference in the present case is likely to be similarly substantial.

**Non-dramatic Change and Regulatory Risk**

509. The Tribunal also found that 'non-dramatic' changes in the price support regime were foreseeable (and indeed were in fact foreseen by the Claimants) when the hydro

---

[363] See para. 466, above.

[364] See paras. 466-467, above.

investments were made.[365] Such changes, including modifications in the period for which price support was provided and in the exact levels of support, could have had an impact on the value of the investments without infringing Article 10 ECT. Again, it is not possible to be precise in identifying and quantifying the effects of such changes, but a reasonable estimate must be made in the same way that an investor would have taken this possibility into account in valuing the investment when it was made. This, too, is a factor that the Tribunal considers should be addressed by way of the discount to be applied in respect of regulatory risk.

### Quantifying Regulatory Risk

510.    The critical difference between the experts on the discount for regulatory risk was that Brattle proceeded on the basis that, by reason of the disputed measures, that risk was greater in the "Actual Scenario" (which Econ One called the "Prevailing Scenario") than in the "But For Scenario." The Brattle position is that once a government acts in this way, investors will trust it less. The Econ One position assumes that, because the Government's was acting in order to restore the finances of the electricity sector, further intervention became less likely after the Government intervention and regulatory risk is accordingly reduced. Thus, Brattle sees the disputed measures as inflicting harm on the hydro investments, whereas Econ One sees them as conferring a benefit.

511.    The Tribunal does not accept that the regulatory changes of 2013-2014 conferred a net benefit on investors.[366] Investors are not so sanguine about government behaviour as Econ One suggests. Those changes were so radical that investor trust was affected. Contemporary commentary by risk-estimating organisations such as Moody's confirms that that is what occurred.[367] We agree with the reasons of the majority in *Masdar* award[368] for coming to the same conclusion.

---

[365] See the evidence quoted in para. 335, above.

[366] See para. 476, above.

[367] See Brattle Second Quantum Report, para. 261.

[368] *Masdar* award, paras. 640-641.

512.    The Tribunal agrees with Econ One's view that the changes of 2013-2014 did have the effect of reducing the risk in the Actual Scenario. The hydro investments (unlike the PV investments) had been made at a time and in circumstances where there was cause to be less than fully confident that the stability of the Special Regime under RD 661/2007 would be maintained. Unlike the PV plants, the representation on which investors were entitled to rely in 2011-2012 does not extend to the entire working life of the plants: and it is limited to radical changes. The 2013-2014 changes offered the prospect of a more stable regime for electricity pricing and, in consequence, less pressure to amend the regime further. The Tribunal considers that the Actual Scenario for hydro investments was less rosy and the But For Scenario less bleak, than the Claimants' experts have assumed – although not to the extent that risk is lower in the Actual than in the But For Scenario as the Respondent contends.

513.    The Respondent argued that if the Claimants were awarded damages, those damages should be reduced by the application of an illiquidity discount and a minority discount, and to take account of the position of certain bonds issued in connection with the hydro assets.

### Illiquidity Discount

514.    The question of an illiquidity discount was considered above, in the context of the PV investments. The Tribunal concluded that no illiquidity discount is called for. For the same reasons, the Tribunal does not consider than an illiquidity discount should be applied to the claims in respect of the hydro investments.

### Minority Discount

515.    The Respondent argues that a discount should be applied to Demeter's minority interest in the hydro plants because it lacks control over them and is worth less for that reason.[369] We accept Brattle's contention that if a minority discount is applicable at all, that must mean

---

[369] Econ One Second Report, para. 318.

that Cube (as majority shareholder) is entitled to a control premium.[370] In a context where the two Claimants come before the Tribunal acting in unison, it is appropriate to assume that the two effects, if relevant, will cancel each other out for quantum purposes. The Tribunal does not consider that a minority discount should be applied.

### The Micdos Bonds

516.    The Claimants' investments in hydro were made through the acquisition of shares in Renewable Power International S.A., which is the parent company of Minicentrales Dos S.A. ("**Micdos**"), which holds the hydro plants.[371] The hydro plants under the Micdos entity were subject to two debt instruments. First, a 2000 Bond for 28 years with a face value of €72.4 million. Secondly, a 2004 Bond for 30 years with a face value of €122 million.[372] The Respondent argued that a decline in the value of the bonds, which the Claimants said was due to the disputed measures, conferred a benefit of around €44.5 million on the Claimants, which must be offset against any damages.[373]

517.    Originally, the Claimants sought to dramatize the impact of the disputed measure by asserting that the "Micdos equity was wiped out."[374] This assertion was based on the proposition that the face value of the bonds was greater than reduced enterprise value of Micdos, as a separate entity. In an equally dramatic riposte, the Respondent asserted that the decline in value of the bonds was a benefit to the Claimants which offsets any damages to equity holders[375] and is to be deducted from the claimed damages because the Claimants could buy back the bonds at less than face value and thus reduce their debt.

518.    Each of these propositions depends on the assumption that the entire decline in the value of the Micdos bonds was due to the amendments to the legislative scheme. The Tribunal

---

[370] Brattle Second Quantum Report, para. 278.

[371] Econ One First Report, paras. 21-26.

[372] Cl. Reply, para. 378 fn. 513.

[373] Econ One Second Report, para. 372.

[374] Tr. Day 5, p. 32.

[375] Tr. Day 5, pp. 77-80.

rejects that assumption. The overwhelming, if not sole, cause of the decline was the impact of the Global Financial Crisis of 2008 ("**GFC**").

519.    In response to Brattle First Quantum Report, which placed the emphasis on the effect of the disputed measures, Econ One correctly pointed out that the value of the bonds had declined before the disputed measures were adopted.[376] Brattle later accepted that this decline was an effect of the GFC, which impacted all Spanish related debt. It also affected the viability of Monoline insurers, so that the decline was to a significant extent due also to the lower credit rating of the insurers.[377] Econ One noted the two Micdos bonds were originally rated Aaa, as so many were prior to 2008. In 2009, they were downgraded to Ba3 and B3 respectively. Indeed, one of the insurers filed for bankruptcy in 2011 and Moody's had withdrawn the rating.[378]

520.    Brattle sought to find some support in the precise timing of the disputed measures and changes in the market value of the Micdos bonds. They noted that occasions when Spanish bond prices rose whereas, contrary to their earlier relationship, Micdos bond prices continued to fall. This, Brattle contended coincided with the disputed measures. Econ One presents evidence that there was no such relationship between yields on Spanish bonds and on Micdos bonds.[379]

521.    We are unimpressed by the attempt at precision in this respect. Given the force and longevity of the financial crisis, and the efforts by central banks throughout the world to ameliorate its effects, we find it difficult to separate the effect on the value of the bonds of the legislative changes in dispute before us and of the GFC. The former may have had some effect, as the measures significantly affected the cash flow of the hydro plants.

---

[376] Econ One First Report, paras. 83-86.

[377] *Ibid.*, para. 85; Econ One Second Report, paras. 151-153.

[378] Econ One First Report, para. 85; Econ One Second Report, paras. 338, 345.

[379] Econ One Second Report, paras. 349-350.

Nevertheless, we have no basis for concluding that the group, or Micdos separately, was ever in danger of insolvency.

522.    In their First Report, Econ One noted that the Brattle approach was to deduct the market value of debt from the value of the plants to the Claimants because the face value would overstate damages.[380] Econ One makes a number of criticisms of the valuation approach. In particular, it states that the effect of Brattle's calculation is to attribute the whole of the decline in the value of the debt to the equity holders. It submits that that is a problem for the bond holders. Cube could, buy back the debt and, indeed computed the effect of doing so in 2014.[381]

523.    That computation, adopted by the Respondent, was based on the "market price" of the bonds at the valuation date, June 2014. In their Second Quantum Report, Brattle pointed out that there was not much of a market:

> "Our DCF model in the Actual scenario predicted the decline in the trading price of the bond. Our DCF model estimated an asset value for Micdos of €134 million, equivalent to 84 cents per € of outstanding face value. Econ One suggests that the 17 cent difference between the 84 cents per € of outstanding face value predicted by our model and the actual trading price of 67 cents per € should represent an offset to damages. It believes that Cube and Demeter could buy back the Micdos bonds in the market for 67 cents per € and then enjoy the 17 cent gain relative to our valuation.
>
> The 17 cent valuation gain is an illusion, created by Econ One's failure to compare like-with-like. It compared our asset value estimate before discounts for liquidity with the traded price of the Micdos bonds. Trading in the Micdos bonds is sporadic and relatively illiquid. Prices often flat-line for many days at a time. Even the available price information is relatively uncertain, displaying significant differences across pricing sources. As a result, the traded bond prices will inherently incorporate a liquidity discount much as we apply when valuing the equity interest of Cube and Demeter.
>
> In contrast, the asset-value from the First Brattle Quantum Report did not include a liquidity discount, since we considered and applied a liquidity discount when valuing Cube's and Demeter's equity interests. Consistent

---

[380] Econ One First Report, paras. 188-189.
[381] *Ibid*., paras. 195-196.

comparison would therefore require us to apply a comparable liquidity discount to our estimate of the asset value, before comparison with the traded bond prices. The 17 cent difference observed by Econ One actually amounts to only 20% of our asset value, and as such is slightly larger than the 18% illiquidity discount we apply when valuing the equity of Cube and Demeter, and smaller than the 22% discount applied by Econ One in its DCF analysis.

We therefore conclude that there is no reason to subtract from damages the 17 cent difference between our asset value estimate (pre-liquidity discount) and the traded price of the bonds."[382]

524.    In its Second Report, Econ One criticised Brattle's change of position, but addressed this analysis in the following way: "[g]enerally, discounts for liquidity are applied only to equity." If it applies, however, Econ One accepts that it would affect both the But For and Actual Scenarios about equally.[383] It went on to note that in fact, since their first report, RPI made an offer to purchase the Micdos bonds at 65 cents per Euro for the 2000 bond and 53 cents per Euro for the 2004 bond. The offers were not accepted. Negotiations were continuing.[384]

525.    The conclusion Econ One reaches is particularly significant. It continues to disagree with Brattle that the decline in the market value of the Micdos debt is entirely attributable to the disputed measures. However, Econ One argues that if the Brattle position is accepted, it must also be accepted that the decline should be offset against the damages, as it is a loss suffered by the bond holders to the potential benefit of the equity investors. Econ One states that the offset would be €53 million which, adjusted for the Claimants' 84% equity share, would produce an offset of about €44.5 million against the damages computed by Brattle.[385]

526.    With respect to quantum, this issue turns on whether there is a difference in the But For Scenario and the Actual (Prevailing) Scenario, with respect to the valuation of the Micdos debt. There may have been. However, in the circumstances of the GFC, that was a relatively

---

[382] Brattle Second Quantum Report, paras. 157-160.

[383] Econ One Second Report, paras. 365-366.

[384] *Ibid.*, para. 369.

[385] *Ibid.*, para. 372.

minor consideration. Furthermore, for the reasons quoted above from Brattle Second Quantum Report, the actual market price of the bonds at the valuation date is an inaccurate number to use. Indeed, attempting to buy back the whole bond issue, at the valuation date, which the Respondent assumes, would undoubtedly have increased the price and also, by definition, overcome any illiquidity discount. Furthermore, there is no evidence that either Micdos itself or the group was at risk of insolvency. Indeed, under the bond terms, Micdos retained a substantial amount of cash in a Debt Service Reserve Account to meet its payment obligations. Finally, we note that there is a market for distressed debt by investors who are more patient than others.

527.    The contribution, if any, of the disputed measures to the discount on the Micdos bonds at June 2014 is simply not known. To calculate the effect, the Tribunal would have to make an upward adjustment of the price from a buy back. It has no basis for doing so. Furthermore, this must be combined with the absence of evidence that Micdos, or the group, was insolvent and adjust for the Reserve Account cash.

528.    We are unable to conclude that the disputed measures made a material contribution to the decline in the value of the bonds. We have no basis for computing such an effect, if any. In these circumstances, we find that there was no difference between the But For and Actual Scenarios in this regard.

### Decision in respect of Hydro Investments

529.    Accordingly, the Tribunal decides by a majority that, in order to compensate for the injury to the hydro investments caused by the Respondent's measures adopted in breach of Article 10 ECT, the Claimants shall be paid a sum in damages. The amount of the discount for regulatory risk – or the 'revenue haircut', as the Claimants' experts called it – is to be estimated by the Tribunal, in the same way that it is estimated by investors when deciding whether or not to make an investment. In the judgement of the Tribunal, a reasonable approximation to the effect of these factors for the purposes of the quantum of damages will be achieved if the difference between the projected cash flows under the But For and

the Actual Scenarios, calculated on the basis that the date of the breach is 20 June 2014 and that measures adopted up to and including RDL 2/2013 (1 February 2013) do not violate the ECT, and as set out in Brattle First and Second Quantum Reports, is reduced by forty per cent (40%).

### E.  SUMMARY ON DAMAGES

530.    The Tribunal decides unanimously that the Claimants are entitled by way of damages €2.89 million in respect of losses caused to the PV investments.

531.    The Tribunal decides by a majority that the Claimants are entitled by way of damages a sum in respect of losses caused to the hydro investments, calculated by reducing by forty per cent (40%) the difference between the projected cash flows under the But For and the Actual Scenarios underlying the Claimants' computation in its Post-Hearing Brief of €41.8 million in damages for post-June 2013 measures.

532.    Subject to our above analysis, in order to implement the decision in the previous paragraph, the Tribunal directs Brattle and Econ One, as the experts for the two Parties, to submit a joint report computing the reduced losses in respect of the hydro investments on the basis of the assumptions and methodology used in the Brattle Reports that are on the record, except that the 40% discount decided upon by the Tribunal is to be applied.  Both experts may comment upon the method of making this new computation, but no further submissions are to be made in relation to the assumptions and methodology adopted in the reports and submissions that are already on the record before the Tribunal. If the two experts are unable to agree upon the computation, they are each to append to the joint report a concise note identifying precisely the points on which they disagree and the reasons for the disagreement, and indicating the mathematical impact of the disagreement upon the sums computed.

533.    The joint report referred to in the previous paragraph is to be submitted to the Tribunal within thirty days of the date of this Decision. The Tribunal will thereafter issue an Award

incorporating this Decision and confirming (or, in the event of disagreement between the experts, deciding upon) the precise amount awarded in respect of the hydro investments.

## F. INTEREST

534.    The valuation date is 20 June 2014. Interest is payable on the amount that will be awarded in order to ensure full reparation for the injury caused. The Claimants request an order for "pre- and post-award compound interest at the highest lawful rate from the Date of Assessment until Spain's full and final satisfaction of the Award."[386]

535.    The Claimants' experts Brattle say,[387] and the Respondent's experts Econ One agree,[388] that "[w]hile investors can hope to earn high rates on risky investments, it is not reasonable to anticipate earning a higher rate unless the investor also incurs the associated risk."

536.    Brattle argues that, for the period after 20 June 2014 when compensation has been due, the Claimants have in effect been exposed to the same risks as investors who have loaned money to Spain and that the applicable interest rate should therefore be the rate at which Spain borrows money on the market.[389] Econ One objects that this rate includes a premium over the risk-free rate to compensate for the *ex ante* risk of sovereign default;[390] and it submits that in the present case, where the claim is made in Euros, the six-month or one-year Euro Interbank Offered Rate ('EURIBOR') appropriately approximates the risk-free rate.[391] Brattle agrees that "[p]ublished Euribor rates provide a better estimate of the risk-free rate."[392]

---

[386] Cl. Reply, para. 632.

[387] Brattle First Quantum Report, para. 169.

[388] Econ One First Report, para. 326.

[389] Brattle First Quantum Report, para. 171.

[390] Econ One First Report, para. 330; Econ One Second Report, para. 457.

[391] Econ One Second Report, paras. 459-460.

[392] Brattle First Quantum Report, para. 92.

537.  The Tribunal agrees with the *Vestey* tribunal, which said that "[t]he function of reparation is to compensate the victim for its actual losses. It is not to reward it for risks which it does not bear."[393] The Parties did not argue that different principles should govern the payment of pre- and post-award interest and the Tribunal does not consider that its task of awarding reparation requires any such distinction to be drawn.

538.  For these reasons, the Tribunal considers that the EURIBOR rate is the appropriate rate at which interest on the damages payable under this Decision and the Award that the Tribunal will render as explained in paragraph 533 above should be computed. Other tribunals have fixed interest rates to six-monthly bond rates, compounded semi-annually,[394] and the Tribunal considers this to be the appropriate measure.

539.  The Tribunal accordingly decides that interest shall be payable on the amount that it has decided will be awarded, computed at the six-month EURIBOR rate compounded semi-annually, from 20 June 2014 up to the date of payment.

540.  In order to implement the decision in the previous paragraph, the Tribunal directs Brattle and Econ One, as the experts for the two Parties, to submit a joint report computing the amount of interest payable. If the two experts are unable to agree upon the computation, they are each to append to the joint report a concise note identifying precisely the points on which they disagree and the reasons for the disagreement, and indicating the mathematical impact of the disagreement upon the sums computed.

541.  The joint report referred to in the previous paragraph is to be submitted to the Tribunal within thirty days of the date of this Decision. The Tribunal will thereafter issue an Award, as explained in paragraph 532 above, confirming (or, in the event of disagreement between the experts, deciding upon) the precise amount awarded in respect of interest.

---

[393] *Vestey Group Limited v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, 15 April 2016 ("***Vestey v. Venezuela***"), para. 440, Econ One Second Report, Exhibit EO-152. Quoted in Econ One Second Report, para. 458.

[394] *Vestey v. Venezuela*, para. 446, Econ One Second Report, Exhibit EO-152, referring also to other awards.

## VII.   COSTS

542.   The Parties are to submit updated statements on their costs, and concise submissions on the allocation of costs within thirty days of the date of this Decision.

## VIII.   DECISIONS

For the reasons set forth above, the Tribunal decides as follows:

### A.   ON JURISDICTION

543.   The Tribunal decides unanimously that the Respondent's jurisdictional objection on questions concerning taxation measures within the meaning of Article 21 ECT is upheld. All other jurisdictional objections are dismissed.

### B.   ON LIABILITY

544.   The Tribunal decides unanimously that the Respondent breached the Claimants' right under Article 10 ECT to fair and equitable treatment in respect of their investments in PV plants. All other claims in respect of the PV plants are dismissed unanimously.

545.   The Tribunal decides by a majority that the Respondent breached the Claimants' right under Article 10 ECT to fair and equitable treatment in respect of their investments in hydro plants. All other claims in respect of the hydro plants are dismissed.

### C.   ON DAMAGES AND INTEREST

546.   The Tribunal decides unanimously that the Claimants are entitled by way of damages €2.89 million in respect of losses caused to the PV investments. Interest shall be payable on the sum awarded computed at the six-month EURIBOR rate compounded semi-annually, from 20 June 2014 up to the date of payment.

547.   The Tribunal decides by a majority that the Claimants are entitled by way of damages a sum in respect of losses caused to the hydro investments, calculated by reducing by forty

157

per cent (40%) the difference between the projected cash flows under the But For and the Actual Scenarios underlying the Claimants' computation in its Post-Hearing Brief of €41.8 million in damages for post-June 2013 measures. Interest shall be payable on the sum awarded, computed at the six-month EURIBOR rate compounded semi-annually, from 20 June 2014 up to the date of payment.

### D. ON COSTS

548.   The Tribunal decides unanimously that

    (a)    Each Party shall bear its own costs incurred in preparing the reports directed in paragraphs 532 and 540 above; and

    (b)    Reserves for the Award its decision on the other costs in this case.

The Honourable
James Jacob Spigelman
Arbitrator

Professor Christian Tomuschat
Arbitrator
*Subject to the attached separate and
partial dissenting opinion*

Professor Vaughan Lowe
President of the Tribunal

159

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**CUBE INFRASTRUCTURE FUND SICAV AND OTHERS**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/15/20**

---

**Separate and Partial Dissenting Opinion**

Professor Christian Tomuschat

---

1.    I concur to a large extent with my two colleagues who support the majority decision. Unfortunately, I am not able to share their views entirely. It is common ground between the three arbitrators that the issue of legitimate expectations is determinative for the assessment as to whether fair and equitable treatment (FET) was granted to the Claimants according to Article 10(1) ECT.

2.    The three arbitrators also see the necessity of drawing a distinction between the different types of investment the Claimants have made.

3.    When in 2008 the Claimants bought the PV installations, they could with a high degree of certainty assume that the tariffs established for the sale of electric energy from renewable sources would remain stable for the entire period of time indicated in RDL 661/2007. In 2007, the Spanish Government had affirmed through the press release of 25 May 2007 accompanying that Decree that investors could trust that the tariffs indicated in the Decree would not be affected by any new regulation with "retroactive" effect, as specifically provided for in Article 44(3) of the Decree itself. At that time, no serious concerns had arisen as yet as to whether such a promise could be maintained in the long run by the host country.

4.    RDL 661/2007 was not specifically addressed to the Claimants. It was an act of general legislation subject to the general power of the law-making bodies of the Respondent to change the applicable legal rules according to the prevailing interests of the national community. As rightly pointed out in the Decision, the Spanish Supreme Court has consistently held, although not specifically with regard to RDL 661/2007, that no investor has a right to the unrestricted maintenance of a legal instrument providing for premiums under a subsidized remuneration system.[1] In the full knowledge of this jurisprudence, the Spanish Government specified in the press release of 25 May 2007, published on the website of the Ministry of Industry, Energy and Tourism and therefore not an accidental product of some press officer, that the indications in RDL 661/2007 concerning the modalities of the tariff regime would not be changed during the whole length of that period and could therefore be fully trusted. That representation came therefore within the scope of

---

[1] Decision, para. 299.

Article 10(1) ECT, engendering legitimate expectations as long as the essential features of the factual situation remained unchanged.

5.   Although the text of Article 44(3) RDL 661/2007 and of the accompanying letter refers only to the regulated tariff and not to its duration, it must be interpreted as extending also to the relevant length of time. Any other perusal of the words would clearly undermine the indication of non-retroactivity.

6.   The Claimants' investments in the PV sector, made one year after the enactment of RDL 661/2007, enjoy therefore without any restriction the protection granted by Article 10(1) ECT.

7.   When some years later, in 2011 and 2012, the Claimants enlarged their investment in the sector of renewable energy, acquiring installations for the production of hydro energy, the conditions of the electricity regime in Spain had changed significantly. To be sure, RDL 661/2007 was still in force. But some of its elements had been changed outside the review procedure provided for under its Article 44(3). Thus, it became clear that the amendment procedure provided for in Article 44(3) was not the only path that could be embarked upon for a modification of the legal regime of RDL 661/2007.

8.   It should first of all be reiterated that in 2009 the deficit in the electricity system had reached critical major dimensions to which attention was drawn in the Preamble of RD 6/2009:

> "The growing tariff deficit, i.e. the difference between that collected from the regulated tariffs set by the government and that which the consumers pay for their regulated supply and from the access tariffs set by the liberalised market, and the real costs associated with these tariffs, is producing serious problems, which in the current context of international financial crisis is profoundly affecting the system. This puts at risk not only the financial situation of companies in the electricity sector, but also the sustainability of that system. This maladjustment is unsustainable and has serious consequences, by deteriorating the security and capacity of the financing of investment needed for the supply of electricity at the levels of quality and security that Spanish society demands."

2

9.     It was clear as from that moment that the system needed some re-equilibration. It stands to reason that in principle, even in a regulated sector of the economy, the production costs must in principle be covered by the consumers. In order to halt a rising gap, two solutions can be found. Either the consumer prices have to be raised or the production costs lowered.[2]

10.     In order to put a halt to the increasing deficit, some provisional measures were enacted by RD 6/2009 which constituted a first attempt to overcome the financial difficulties but did not yet go the heart of the problem, the structural deficit between revenues and expenditure.[3]

11.     One year later, in November 2010, RD 1565/2010 removed the fixed tariffs payable after 25 years. This was the first significant curtailment of the original regime introduced by RDL 661/2007.

12.     In December 2010, RDL 14/2010 set out further "urgent measures for the correction of the tariff deficit in the electricity sector."[4] Those measures included providing for a limitation on the number of operating hours each year for which a facility would be entitled to Special Regime payments, and charging producers an 'access fee' for using the network, while guaranteeing a 'reasonable return' to producers and extending the 25 year fixed tariff period for PV to 28 years as a kind of compensation for the reduction of the number of operating hours.

13.     In the Preamble to RDL 14/2010, it was openly stated that the financial burden for the maintenance of the indicated tariffs had become exceedingly onerous and that accordingly measures had to be taken affecting both the producers and the consumers (increase of their access tariffs). Notwithstanding the measures taken, a reasonable return on the investments would remain guaranteed.[5]

14.     These new regulations must have put on alert every investor. The three legislative acts officially recognized that the original scheme under RDL 661/2007 was at the brink of

---

[2] Some years later, in 2013, the deficit had attained truly frightening dimensions, Decision, para. 368.

[3] Decision, para. 323.

[4] RDL 14/2010, R-58.

[5] Decision, para. 325.

failure. The majority opinion acknowledges indeed that the different measures introduced in 2009 and 2010 were indicative of such grave disturbances in the financial regime of the sector of renewable energies that investors could not "reasonably rely on there being no change whatever to the Special Regime applicable to existing facilities."[6]

15.   Indeed, Claimants' Investment Committee was aware of the threatening regulatory risk as pointed out by the majority opinion, which aptly refers to the opinion voiced in the Committee that the ongoing developments had to be observed like "milk on a stove."[7] In other words, the heavy regulatory risk was clearly perceived.

16.   It is true that the EC warned Spain by a letter of 22 February 2011 (joint action by the EU Commissioners for Energy and for Climate Action) of the negative effects of the retroactive amendment of the regime of RDL 661/2007 by RD 1565/2010 and RDL 14/2010. However, this was just an opinion that had no direct effect on the Respondent's legislation and did not identify any other measures appropriate for dealing with the tariff deficit. Moreover, it has not been shown by Claimants that in taking their decisions they relied on the letter of 22 February 2011.

17.   The measures determined by the Spanish Government and in particular the grounds publicized for their justification were so plainly reflective of an economic situation which had become unbearable that regarding the hydro sector the investors could not have any legitimate trust that the regime of RDL 661/2007 would be implemented for its full duration as originally planned in 2007. In particular, they could not ignore the fact that the Government, whose main concern must be to safeguard the welfare of its people, had to undertake serious efforts with a view to establishing a fair and equitable balance between the interests of the producers of electric energy from renewable sources and the interests of its consumers, not only the Spanish industry but the entire Spanish society. It is inherent in such a system of reciprocity that both sides are required to concede some sacrifices if major maladjustments arise.

---

[6] *Ibid.*, para. 334.

[7] *Ibid.*, para. 335.

18. The four grounds adduced by the majority decision in order to show that, notwithstanding the economic pressure threatening the viability of the finances of the electricity system, the reliance of the Claimants on the continuity of the regime under RDL 661/2007 was justified[8] holds little persuasive power.

19. First, it is true that the text of RDL 661/2007 was "clear and specific." Yet since the issuance of that Decree four years had passed during which, as publicly announced by the Spanish Government, the deficit in the system had accumulated continuously. Time had begun to dismantle the original factual framework.

20. Second, the fact that the Claimants were professional investors tells the observer nothing about the diligence they applied in the instant case. Indeed, they handled the matter lightly by not even requesting a written report. They were clearly negligent in assessing the regulatory risks inherent in their planned investment decisions.

21. Third, the contention that more exhaustive legal analysis would probably not have led to another result amounts to pure speculation and grants too easily a blessing to a major management failure.

22. Fourth, it cannot be disputed that the significance of the Respondent's representations as to the stability of RDL 661/2007 is ultimately not a matter of Spanish law but of international law, operating in the context of Article 10(1) ECT. However, the factual circumstances obtaining in the host country determine whether legitimate expectations have arisen for an investor. In this regard, the legal position is fundamentally different between the two types of investments. Through the legislative measures taken in 2009 and 2010, it had become clear that the financial stability of the electricity system was in erosion and that emergency measures were necessary to save it from collapse.

23. Eventually, it must be noted that departures from the regime of RDL 661/2007 did not mean that the investors were totally deprived of any guarantee. From the very start of the Special Regime of energy from renewable sources, the Spanish legislature had confirmed that

---

[8] *Ibid*., para. 401.

investors should enjoy "reasonable profitability" of their investments.[9] The reasonable return on investments became also a key element of the regime established by RDL 661/2007.[10] Likewise the later enactments stress the concept of "reasonable return" as a leitmotiv. There can be no doubt that this concept was not meant to operate as an upper limit on gains to be made in operating installations for the production of energy from renewable sources. But it served as a general reminder that the Special Regime had a specific purpose: on the one hand to ensure provision of an appropriate amount of electric energy through a (somewhat) regulated market mechanism, on the other hand to ensure for producers an adequate profitability. Investors knew that they were invited to contribute to an economic welfare program supposed to benefit all parties involved in a delicate balance.

24.  The guarantee of a reasonable return could not be dislodged by the new regime that was subsequently introduced in 2012-2014.[11] It has been acknowledged by the majority Decision that the Respondent made strenuous efforts to maintain that guarantee notwithstanding the replacement of a system based on volume of production by a system based on capacity. This was indeed a fundamental change. However, given the fact that the investors could not trust in the continuity of the regime of RDL 661/2007, the Claimants could have a right to compensation under Article 10(1) ECT only if it could be demonstrated that the new regime must be deemed to be in violation of the guarantee of a reasonable return.

25.  In general, an investor cannot be deemed to have a vested right to the continuity of the administrative system according to which a promised advantage will be provided to it. The guarantee given is a guarantee of economic value. In what form the relevant advantage shall be granted is a matter to be determined primarily by the host State. Therefore, only if it could be shown that the transformation of the system went so far as to call into question the guarantee of a reasonable return would the Claimants have a claim to compensation pursuant to the general rules of responsibility. According to my analysis of the facts, that demonstration has not been made.

---

[9]  Law 54/1997, Article 30(4)(c), Exhibit R-59.
[10] Preamble, para. 7, Exhibit R-71.
[11] Decision, paras. 361-379.

26.    Therefore, according to my assessment the Claimants are not entitled to claim compensation for the damage they allegedly suffered in relation to their hydro activities through the introduction of the new regime in 2012-2014.

27.    Apart from my diverging views in respect of the claims asserted with regard to the hydro installations, I agree with the Decision. In particular, I support the considerations on jurisdiction and admissibility as well as the observations regarding the merits of the claims related to the PV installations.

_____

Prof. Christian Tomuschat