**SCC Arbitration V (2015/095)**

**Seat of Arbitration: Stockholm, Sweden**

**Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR, and NovEnergia II Italian Portfolio SA**
Claimants

**v.**

**The Italian Republic**
Respondent

Final Award

*Members of the Tribunal*
Mr. David R. Haigh, Q.C., Arbitrator
Professor Giorgio Sacerdoti, Arbitrator
Professor William W. Park, Presiding Arbitrator

*Secretary of the Tribunal*
Mr. Jeremy M. Bloomenthal

**TABLE OF CONTENTS**

Representation of the Parties ...................................................................................................... 4
Glossary ........................................................................................................................................ 5
Key Written and Oral Pleadings ................................................................................................. 7
Principal Tribunal Decisions and Orders .................................................................................. 8
Witnesses and Experts ................................................................................................................. 9
I.    Introduction ........................................................................................................................ 11
    A.    The Parties and Counsel ............................................................................................... 11
        1.    Claimants .............................................................................................................. 11
        2.    Respondent ........................................................................................................... 12
        3.    Intervening Third Party ...................................................................................... 13
    B.    The Arbitral Tribunal ................................................................................................... 13
    C.    Brief Summary of the Dispute ..................................................................................... 13
        1.    Background ............................................................................................................ 13
        2.    Applicable Arbitration Rules ............................................................................... 14
        3.    Place of Arbitration .............................................................................................. 14
        4.    Language of the Arbitration ................................................................................ 14
II.   Procedural History ............................................................................................................. 15
III.  Factual Background ............................................................................................................ 29
    A.    Introduction ................................................................................................................... 29
    B.    EU Initiatives and Italian Legislation ........................................................................ 29
    C.    The *Conto Energia* Decrees ......................................................................................... 30
    D.    Tariff Recognition Letters and GSE Agreements ...................................................... 35
    E.    Minimum Guaranteed Prices under Off-Take Regime ............................................. 35
    F.    The Claimants' Investments ......................................................................................... 36
        1.    NovEnergia's and NIP's solar investments in Italy .......................................... 36
        2.    Greentech's solar investments in Italy ................................................................ 38
    G.    The Disputed Measures ................................................................................................ 40
        1.    The Spalma-incentivi Decree ............................................................................... 40
        2.    Modification of Minimum Guaranteed Price Scheme ...................................... 43
        3.    Cancellation of ISTAT Inflation Adjustment .................................................... 43
        4.    Administrative Fee and Imbalance Costs ........................................................... 45
        5.    2015 Italian Constitutional Court Decision regarding "Robin Hood" Tax ... 46
        6.    Re-classification of PV Plants as Immovable and Movable Property ............ 48
IV.   Relief Requested ................................................................................................................. 49
    A.    Claimants' request for relief ......................................................................................... 49
    B.    Respondent's request for relief .................................................................................... 50
V.    The Tribunal's Analysis ..................................................................................................... 52
    A.    Overview ......................................................................................................................... 52
        1.    Summary of Conclusions ..................................................................................... 52
        2.    Applicable Law ..................................................................................................... 53
        3.    Key Treaty Provisions .......................................................................................... 54
    B.    Jurisdiction ..................................................................................................................... 56
        1.    Formal Requirements ........................................................................................... 56
        2.    Objections under Article 21 of the ECT ............................................................. 67

      3.     "Intra-EU" Jurisdictional Objections ........................................................ 76

      4.     The *Achmea* Decision and post-*Achmea* Matters regarding Intra-EU Objection ...... 108

  C.   Merits ...................................................................................................... 121

      1.     Tariff Reductions under the *Spalma-incentivi* Decree ............................... 122

      2.     Payment Term Change under the *Spalma-incentivi* Decree........................... 141

      3.     Modification of Minimum Guaranteed Price Scheme ............................... 143

      4.     Cancellation of ISTAT Inflation Adjustment............................................. 151

      5.     Administrative Fee and Imbalance Costs .................................................. 155

  D.   Damages ................................................................................................. 160

      1.     Introduction ............................................................................................. 160

      2.     The "Full Compensation" Standard ......................................................... 161

      3.     Assumptions and Method of Quantifying Full Compensation.................... 163

      4.     Conclusion................................................................................................ 168

      5.     Interest ..................................................................................................... 169

  E.   Costs ...................................................................................................... 170

      1.     Claimants' Submissions on Costs ............................................................ 170

      2.     Respondent's Submissions on Costs ........................................................ 171

      3.     Tribunal's Findings on Costs ................................................................... 172

VI. Disposition ................................................................................................ 175

## Representation of the Parties

*Representing Claimants*

Mr. Kenneth R. Fleuriet
Ms. Amy Roebuck Frey
Ms. Magali Garin
Ms. Elena Mitu
Ms. Héloïse Hervé
King & Spalding LLP
12, cours Albert 1er
75008 Paris, France

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002, U.S.A.

Mr. Christopher S. Smith
King & Spalding LLP
1180 Peachtree St NE
Atlanta, Georgia 30309, U.S.A.

Mr. Carlo Montella
Dr. Cristina Martorana
Ms. Anna Spano
Mr. Alberto Tedeschi
Ms. Daria Buonfiglio
Orrick, Herrington & Sutcliffe LLP
Corso G. Matteotti, 10
Milan 20121, Italy

Ms. Pina Lombardi
Ms. Claudia Romano
Orrick, Herrington & Sutcliffe LLP
Piazza della Croce Rossa, 2
Rome 00161, Italy

*Representing Respondent*

Avv. Gabriella Palmieri
Avv. Giacomo Aiello
Avv. Pasquale Puciarello
Avv. Sergio Fiorentino
Avv. Paolo Grasso
Avv. Pietro Garofoli
Avvocatura Generale dello Stato
Via dei Portoghesi, 12
00186 Rome, Italy

Prof. Avv. Maria Chiara Malaguti
External Counsel to the Legal Service of
the Ministry of Foreign Affairs
Piazzale della Farnesina
00135 Rome, Italy

Dott. Giuseppe Stuppia
Legal Service of the Ministry of Foreign
Affairs
Piazzale della Farnesina
00135 Rome, Italy

# Glossary

| | |
|---|---|
| AEEG | Authority for Electrical Energy and Gas (*Autorità per l'Energia Elettrica ed il Gas*) |
| Claimants | Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR, and NovEnergia II Italian Portfolio SA |
| *Conto I* | Ministerial Decree No. 18908 of 28 July 2005 of the Ministry of Productive Activities, as integrated and amended by Ministerial Decree No. 20998 of 6 February 2006 of the Ministry of Productive Activities. |
| *Conto II* | Ministerial Decree of 19 February 2007 from the Ministry of Economic Development |
| *Conto III* | Ministerial Decree of 6 August 2010 from the Ministry of Economic Development |
| *Conto IV* | Ministerial Decree of 5 May 2011 from the Ministry of Economic Development and the Ministry of Environment, Land and Sea |
| *Conto V* | Ministerial Decree of 5 July 2012 from the Ministry of Economic Development and the Ministry of Environment, Land and Sea |
| Directive 2001/77/EC | Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market |
| Directive 2009/28/EC | Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable energy sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC |
| EC | European Commission |
| ECT | Energy Charter Treaty |
| EU | European Union |
| FET | Fair and Equitable Treatment |
| Greentech | Greentech Energy Systems A/S |
| GSE | *Gestore dei Servizi Energetici* (formerly, *Gestore della rete di trasmissione nazionale Spa* ("GRTN")) |
| Lisbon Treaty | Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community, |

| | |
|---|---|
| | signed at Lisbon, 13 December 2007 |
| MGP Scheme | Off-take regime providing for minimum guaranteed prices, as provided in Law no. 239 of 23 August 2004, AEEG Resolution no. 34/2005, and AEEG Resolution no. 280/2007 |
| NIP | NovEnergia II Italian Portfolio SA |
| NovEnergia | NovEnergia II Energy & Environment (SCA) SICAR |
| PV | photovoltaic |
| Respondent | The Italian Republic |
| Romani Decree | Legislative Decree No. 28/2011 of 3 March 2011 |
| *Salva Alcoa* decree | Law Decree No. 105 of 8 July 2010, converted into law by Law No. 129 of 13 August 2010 |
| SCC | Arbitration Institute of the Stockholm Chamber of Commerce |
| SCC Rules | Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (in force as of 1 January 2010) |
| *Spalma-incentivi* Decree | Law Decree No. 91/2014 of 24 June 2014 |
| TAR | Regional Administrative Tribunal (*Tribunale Amministrativo Regionale*) |
| TEU | Treaty on European Union |
| TFEU | Treaty on the Functioning of the European Union |
| Vienna Convention or VCLT | Vienna Convention on the Law of Treaties, 23 May 1969 |

## Key Written and Oral Pleadings

Initial

- Request for Arbitration (7 July 2015)
- Answer to the Request for Arbitration (15 September 2015)

Jurisdiction, Bifurcation Request, and Merits

- Statement of Claim (4 April 2016)
- Statement of Defense (15 September 2016)
- Claimants' Objections to Respondent's Requests for Bifurcation and Suspension (10 October 2016)
- Respondent's Reply to Claimants' Objections on Bifurcation and Suspension (17 October 2016)
- Claimants' Rejoinder to Respondent's Reply on Bifurcation and Suspension (21 October 2016)
- Claimants' Reply Memorial (16 December 2016)
- Respondent's Rejoinder Memorial (27 March 2017)
- Hearings on Jurisdiction, Merits, and Quantum (26-30 June 2017)
- Claimants' Comments on the *Achmea* Decision (22 March 2018)
- Respondent's Comments on the *Achmea* Decision (22 March 2018)
- Claimants' Comments on the *Masdar* Award (6 July 2018)
- Respondent's Comments on the *Masdar* Award (6 July 2018)
- Claimants' Comments on the *Antin* and *Antaris* Awards (20 July 2018)
- Respondent's Comments on the *Antin* and *Antaris* Awards (20 July 2018)
- Claimants' Observations on the EC's 19 July 2018 Communication (8 August 2018)
- Respondent's Observations on the EC's 19 July 2018 Communication (8 August 2018)

Intervention of European Commission

- EC's Application for Leave to Intervene as a Non-Disputing Party (21 December 2016)
- Claimants' Response to the EC's Application to Intervene as a Non-Disputing Party (6 January 2017)
- Respondent's Position on the Application of the EC for Leave to Intervene as a Non-Disputing Party (9 January 2017)
- *Amicus Curiae* Brief of the EC (28 April 2017)
- Claimants' Observations on the EC's *Amicus Curiae* Brief (28 May 2017)
- Respondent's Observations on the EC's *Amicus Curiae* Brief (28 May 2017)

**Principal Tribunal Decisions and Orders**

Procedural Orders in Chronological Order

- Procedural Order No. 1 (27 January 2016, adjusted on 20 July 2016)
- Order on Bifurcation and Suspension (31 October 2016)
- Order on EC Intervention and Renewed Bifurcation Request (17 January 2017)

## Witnesses and Experts

**Witnesses on Behalf of Claimants**

1. Mr. Gabriele Bartolucci (1 April 2016)
2. Mr. Ottavio Lavaggi (30 March 2016)
3. Mr. Bernardo Lucena
   a. First Statement (1 April 2016)
   b. Second Statement (16 December 2016)
4. Mr. Diego Percopo (1 April 2016) (*by video with telephone back-up*)
5. Mr. Alessandro Reitelli (31 March 2016)
6. Ms. Lucia Segni (31 March 2016)
7. Mr. Francesco Vittori
   a. First Statement (1 April 2016)
   b. Second Statement (16 December 2016)

**Experts on Behalf of Claimants**

1. Professor Antonio d'Atena
   a. First Expert Report (21 March 2016)
   b. Second Expert Report (24 October 2016)
2. Mr. Richard Edwards
   a. First Expert Report (4 April 2016)
   b. Second Expert Report (15 December 2016)
   c. Supplemental Letter (22 June 2017)
3. Dr. Boaz Moselle and Dr. Dora Grunwald
   a. First Expert Report (4 April 2016)
   b. Second Expert Report (16 December 2016)

**Witnesses on Behalf of Respondent**

1. Mr. Daniele Bacchiocchi
   a. First Statement (15 September 2016)
   b. Second Statement (27 March 2017)
2. Mr. Luca Miraglia

a. First Statement (15 September 2016)

b. Second Statement (24 March 2017)

**Experts on Behalf of Respondent**

1. Professors Enrico Laghi, Mauro Paoloni and Corrado Gatti

    a. First Expert Report (14 September 2016)

    b. Second Expert Report (27 March 2017)

    c. Supplemental Letter (28 June 2017)

2. Professors Giovanni Serges and Vincenzo Zeno-Zencovich

    a. First Expert Report (14 September 2016)

    b. Second Expert Report (24 March 2017)

Pursuant to the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (in force as of 1 January 2010), the Arbitral Tribunal constituted in the present case hereby renders this Final Award.

## I.    Introduction

### A.  The Parties and Counsel

#### 1.  Claimants

1. Greentech Energy Systems A/S ("Greentech") is a company incorporated under the laws of the Kingdom of Denmark, with its corporate address at Frederiksborggade 15, 3 Floor, DK – 1360 Copenhagen K, Denmark.

2. NovEnergia II Energy & Environment (SCA) SICAR ("NovEnergia") is a company incorporated under the laws of the Grand Duchy of Luxembourg, with its corporate address at 28 Boulevard Royal, L-2449 Luxembourg.

3. NovEnergia II Italian Portfolio SA ("NIP") is a company incorporated under the laws of the Grand Duchy of Luxembourg, with its corporate address at 28 Boulevard Royal, L-2449 Luxembourg.  NovEnergia owns a 97.6% interest in NIP and 100% of the voting shares of NIP.[1]

4. Greentech, NovEnergia, and NIP are collectively referred to as the "Claimants".

5. During the proceedings, Claimants were represented by King & Spalding and Orrick, Herrington & Sutcliffe, as set forth below:

    Mr. Kenneth R. Fleuriet
    Ms. Amy Roebuck Frey
    Ms. Héloïse Hervé
    King & Spalding LLP
    12 Cours Albert 1er
    75008 Paris, France

    Mr. Reginald R. Smith
    Mr. Kevin D. Mohr
    King & Spalding LLP

---

[1] Statement of Claim, p. 8, n.6.

1100 Louisiana, Suite 4000
Houston, Texas 77002, USA

Mr. Christopher S. Smith
King & Spalding LLP
1180 Peachtree St NE
Atlanta, Georgia 30309, U.S.A.

Mr. Carlo Montella
Ms. Cristina Martorana
Ms. Anna Spano
Ms. Daria Buonfiglio
Mr. Alberto Tedeschi
Orrick, Herrington & Sutcliffe LLP
Corso G. Matteotti, 10
20121 Milano, Italy

Ms. Pina Lombardi
Orrick, Herrington & Sutcliffe LLP
Piazza della Croce Rossa, 2
00161 Roma, Italy

## 2.  Respondent

6.  The respondent is The Italian Republic ("Italy" or "Respondent").

7.  During the proceedings, Respondent was represented by:

Avvocatura Generale dello Stato
Via dei Portoghesi
00186 - Roma (I)

Avv. Gabriella Palmieri
Avv. Sergio Fiorentino
Avv. Paolo Grasso
Avv. Giacomo Aiello

Supported by:
Prof. Avv. Maria Chiara Malaguti
External Counsel to
the Legal Service of the
Ministry of Foreign Affairs

8.  Claimants and Respondent shall be referred to collectively as the "Parties."

### 3.  Intervening Third Party

9.  The European Commission, which intervened as a non-disputing party in the proceedings, was represented by Mr. Steven Noë, Mr. Tim Maxian Rusche, and Ms. Petra Nemeckova, members of the Legal Service of the European Commission.

## B.  The Arbitral Tribunal

10. The members of the Arbitral Tribunal ("Tribunal") are:

Professor William W. Park
Boston University Law Faculty
765 Commonwealth Avenue
Boston, Massachusetts 02215, USA

Mr. David R. Haigh, Q.C.
525 8th Avenue S.W.  #2400
Calgary, Alberta T2P 1G1, Canada

Professor Giorgio Sacerdoti
Via Monte Napoleone 20
20121 Milano, Italy

## C.  Brief Summary of the Dispute

### 1.  Background

11. The present dispute arises out of investments by NovEnergia, NIP and Greentech in Italian companies owning a total of 134 PV plants located in Italy.  The investments were made during the period from 2008 to 2013.  Claimants allege that they were induced to make those investments *inter alia* by Italian legislation, regulatory decrees, and contractual provisions that provided financial incentives. Foremost among those measures were the *Conto Energia* decrees providing for incentive tariff premiums (fees added to the market price) lasting for a twenty-year period starting from each PV plant's connection to the grid and execution of an agreement with the *Gestore dei Servizi Energetici* (GSE).  Thereafter, beginning in 2012, Italy implemented a series of measures that allegedly diminished the value of the incentives and culminated in Law Decree No. 91/2014 of 24 June 2014 (the "*Spalma-incentivi* Decree"), which allegedly harmed Claimants and their respective investments.

13

12. Claimants alleged that Italy accorded their investments unfair and inequitable treatment, failed to observe obligations entered into with respect to their investments, and unlawfully impaired their investments through unreasonable or discriminatory measures, in breach of Article 10(1) of the Energy Charter Treaty ("ECT").[2]  Claimants requested declaratory relief and damages in the amount of EUR 25.06 million.[3]

13. Respondent raised jurisdictional objections, chief among which was that the ECT is not applicable to investment disputes between EU investors and an EU Member State.  The EC, as a non-disputing intervening party, has echoed the "intra-EU disputes" objection.  As to the merits, Respondent asked that the Tribunal find that the ECT was not breached and that Claimants' requests for declaratory relief and damages be rejected.  Respondent's arguments are addressed below.

## 2.  Applicable Arbitration Rules

14. These proceedings have been conducted in accordance with the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (in force as of 1 January 2010) (the "SCC Rules"), supplemented by the First Procedural Order dated 27 January 2016 (adjusted 20 July 2016) ("First Procedural Order").

## 3.  Place of Arbitration

15. As confirmed by the SCC in its letter dated 22 October 2015, the seat of the arbitration was fixed as Stockholm, Sweden.

16. Oral hearings were held in Paris, France, in accordance with the Tribunal's discretion to hold hearings in a place other than the seat of the arbitration under Article 20(2) of the SCC Rules and in agreement with the Parties.

## 4.  Language of the Arbitration

17. The Tribunal determined that the procedural language of the arbitration was English, pursuant to Article 21(1) of the SCC Rules.

---

[2] Energy Charter Treaty, adopted on 17 December 1994, CEX-1.
[3] Richard Edwards Supplemental Expert Report, 22 June 2017, p. 7, Table 7.

## II.    Procedural History

18. On 7 July 2015, the Claimants filed a Request for Arbitration with the SCC pursuant to Article 2 of the SCC Rules seeking to institute arbitral proceedings under Article 26(4)(c) of the ECT, which provides that an Investor may submit certain disputes meeting the requirements of Article 26 to an "arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce."

19. On 15 September 2015, the Respondent filed its Answer to the Request for Arbitration.

20. In their Request for Arbitration, dated 7 July 2015, the Claimants appointed David R. Haigh, Q.C. as a co-arbitrator.[4]

21. By letter dated 9 October 2015, Respondent appointed Professor Giorgio Sacerdoti as a co-arbitrator.

22. The Parties agreed that the chairperson of the Arbitral Tribunal ("Tribunal") would be jointly selected by the co-arbitrators, subject to agreement by the Parties.

23. By letter dated 12 November 2015, the two co-arbitrators jointly appointed Professor William W. Park as chairman of the Tribunal and the SCC confirmed his appointment on 16 November 2015.

24. By letter dated 18 November 2015, the SCC confirmed that it had referred the case file to the Tribunal.

25. On 19 December 2015, the Tribunal requested that the two sides submit comments by 15 January 2016 on (i) the Tribunal's jurisdiction to order that restrictions beyond those contained in the SCC Rules be put in place regarding the making of public statements, and (ii) the reasons why such additional restrictions should, or should not, be ordered.

26. On 21 January 2016, the Tribunal held a telephone conference during which the Parties discussed organizational matters, including the Parties' positions regarding confidentiality.

---

[4] Request for Arbitration dated 7 July 2015, ¶ 81.

27. On 27 January 2016, the Tribunal issued the First Procedural Order setting forth a procedural calendar providing for two rounds of pre-hearing memorials in which the Parties were required to submit all evidence (factual exhibits, legal authorities, witness statements, and expert reports) upon which they wished to rely. After considering the Parties' proposals regarding confidentiality, the Tribunal adopted the following provisions in the First Procedural Order:

> XIV. Confidentiality
> 54. The Tribunal confirms the confidentiality obligations included in Article 46 of the SCC Rules and the law of the chosen seat in Sweden.
> 55. In declining to impose broader confidentiality stipulations at this time, the Tribunal remains open to consideration of more focused confidentiality provisions which, for example, might protect particular classes of documents.

28. In the First Procedural Order, the Tribunal determined that any decision regarding bifurcation of the procedure into jurisdictional and merits phases would be decided following submission of the first round of memorials, and after consultation with the Parties.[5]

29. On 1 April 2016, Claimants filed their Statement of Claim according to Article 24 of the SCC Rules.

30. By letter dated 21 April 2016, the Tribunal requested that the time for rendering the final awarded be extended. On 26 April 2016, the SCC granted an extension until 29 December 2017.

31. On 20 July 2016, the Tribunal issued an amended First Procedural Order.[6]

32. On 15 September 2016, Respondent filed its Statement of Defense according to Article 24 of the SCC Rules.

33. In its Statement of Defense, Respondent requested that the Tribunal bifurcate the proceedings into separate jurisdictional and merits phases, requesting that the Tribunal decide upon its jurisdiction first.[7] In the alternative, Respondent requested that the Tribunal suspend the arbitral proceedings pending a decision by

---

[5] First Procedural Order dated 27 January 2016, ¶ 9.

[6] First Procedural Order dated 27 January 2016, adjusted 20 July 2016.

[7] Statement of Defense, ¶ 35.

the Italian Constitutional Court regarding Article 26 of the *Spalma-incentivi* Decree.[8]

34. On 10 October 2016, Claimants submitted Objections to Respondent's Requests for Bifurcation and Suspension.

35. On 17 October 2016, Respondent submitted its Reply to Claimants' Objections regarding bifurcation and suspension.

36. On 21 October 2016, Claimants submitted their Rejoinder to Respondent's Reply on Bifurcation and Suspension.

37. By an order dated 31 October 2016, the Tribunal, upon consideration of the Parties' submissions, decided neither to bifurcate nor to suspend the proceedings.

38. On 16 December 2016, Claimants submitted their Reply Memorial.

39. By email on 21 December 2016, the EC submitted to the Tribunal an Application of the EC for Leave to Intervene as a Non-Disputing Party in these proceedings.

40. On 24 December 2016, the Tribunal acknowledged receipt of the EC's application and invited the Parties to provide observations on the EC's application by 6 January 2017.

41. On 6 January 2017, Claimants submitted their comments on the EC's application for leave to intervene as a non-disputing party.

42. On 9 January 2017, Respondent submitted its comments on the EC's application for leave to intervene as a non-disputing party. The Respondent's submission of 9 January 2017 reiterated the Respondent's request to bifurcate the proceedings.

43. By an order dated 17 January 2017, the Tribunal granted leave for the EC to intervene on a limited basis. The EC was permitted to file a written *amicus curiae* submission, without oral presentation at hearings, without having access to the

---

[8] Statement of Defense, ¶ 36.

evidentiary record in the arbitration, and without causing any delay in the hearings fixed for June 2017.  The Parties and the EC were directed to confer directly in order to propose a mutually acceptable timetable for the EC's intervention and the Parties' observations and to submit by 27 January 2017 a joint progress report on their efforts to agree upon a timetable.  The Tribunal, considering Respondent's additional request for bifurcation in its 9 January 2017 submission, again weighed all of the relevant factors, including the EC's intervention, and declined to order a bifurcation of the proceedings.

44. By email exchanges on 26 January 2017, the Parties confirmed their agreement on a time table for submission of the EC's *amicus curiae* brief and the Parties' respective comments.  According to that agreement, the EC was to submit its *amicus curiae* brief by 28 April 2017, but not before Respondent had submitted its Rejoinder Memorial, and the Claimants and Respondent were to submit their observations on the EC's submissions simultaneously on 28 May 2017.

45. On 21 March 2017, the Tribunal suggested that the Parties liaise among themselves to provide a joint and consolidated electronic file including all substantive submissions organized by (i) pleadings, (ii) exhibits, (iii) witness statements, (iv) expert reports, and (v) legal authorities, informing the parties that the Tribunal would later discuss with the Parties the preparation of a common hard copy for the hearings and a core bundle of key exhibits.

46. On 23 March 2017, the EC suggested to the Tribunal that the Parties make available to the EC their respective lists of legal authorities already submitted in the proceedings, so that the EC could limit its submission of new authorities to only those not yet submitted by the Parties.

47. On 23 March 2017, the Tribunal acknowledged receipt of the EC's suggestion regarding the lists of legal authorities and invited the Parties to express their observations on the matter.  The Tribunal proposed that the Parties, subject to their mutual agreement, may submit a common list of legal authorities to the EC.

48. On 27 March 2017, Respondent submitted its Rejoinder Memorial.

49. On 10 April 2017, pursuant to paragraph 25 of the First Procedural Order,[9] Claimants designated the following fact and expert witnesses of Respondent whom Claimants wished to examine at the hearing:

---

[9] First Procedural Order dated 27 January 2016, adjusted 20 July 2016, ¶25.

- Professors Enrico Laghi, Mauro Paoloni and Corrado Gatti (quantum experts)
- Professors Giovanni Serges and Vicenzo Zeno-Zencovich (Italian law experts)
- Mr. Daniele Bacchiocchi (witness)
- Mr. Luca Miraglia (witness)

50. On 10 April 2017, pursuant to paragraph 25 of the First Procedural Order,[10] Respondent designated the following fact and expert witnesses of Claimants whom Respondent wished to examine at the hearing:

- Professor Antonio d'Atena (legal expert)
- Mr. Richard Edwards (quantum expert)
- Dr. Boaz Moselle and Dr. Dora Grunwald (regulatory experts)
- Mr. Alessandro Reitelli (witness)
- Mr. Bernardo Lucena (witness)
- Mr. Diego Percopo (witness)
- Mr. Francesco Vittori (witness)
- Mr. Gabriele Bartolucci (witness)
- Ms. Lucia Segni (witness)
- Mr. Ottavio Lavaggi (witness)

51. On 28 April 2017, the EC submitted an *amicus curiae* brief, with 31 annexes thereto, regarding jurisdictional issues.

52. On 28 May 2017, Claimants submitted their observations in response to the EC's *amicus curiae* brief, as well as an updated legal authority index.

53. By email of 29 May 2017, the Tribunal invited the Parties to confer on proposed hearing protocols regarding, *inter alia*, (i) time allocation, (ii) witness presentation, (iii) confirmation of arrangements for a court reporter and interpretation, and (iv) the Parties' expectations on the scope of cross-examination, and to provide a joint draft proposal for protocols by 5 June 2017.

54. By email of 30 May 2017, the Tribunal reminded the Parties that the First Procedural Order required submission of a joint agenda for the pre-hearing conference by 1 June 2017, but in light of the time limit for submitting proposed hearing protocols, the Tribunal requested that the joint agenda also be submitted

---

[10] First Procedural Order dated 27 January 2016, adjusted 20 July 2016, ¶25.

by 5 June 2017.  Also on 30 May 2017, the Tribunal invited Respondent to comment on the status of its observations regarding the EC's *amicus curiae* brief, which were due on 28 May 2017.

55. On 30 May 2017, in response to the Tribunal's query regarding the status of Respondent's observations on the EC's submission, Respondent commented that "the position of the Commission largely coincide with that of Italy and consequently the Respondent feels no need to further elaborate on individual points."

56. By letter of 6 June 2017, Claimants requested leave to introduce into the case record the Italian Court of Cassation Decision (no. 10411) of 27 April 2017 and the *Pubblico Ministero*/Procurer General's brief submitted on 20 September 2016.

57. By email of 7 June 2017, the Tribunal invited Respondent to comment on Claimants' request by 18:00 CET on 12 June 2017.

58. On 8 June 2017, the Tribunal held a pre-hearing call with representatives of the Parties.

59. By letter of 12 June 2017, Respondent submitted its observations on Claimants' request for leave to introduce into the case record the Italian Court of Cassation Decision (no. 10411) of 27 April 2017 and the *Pubblico Ministero*/Procurer General's brief submitted on 20 September 2016, objecting to admission of the latter into the record.

60. By email of 12 June 2017, Claimants proposed a sequence for presentation of Claimants' witnesses and confirmed that Claimants would not require Professor Enrico Laghi to appear to give testimony.  Claimants confirmed that their respective instructing representatives to attend the hearings would be Mr. Ottavio Lavaggi for NovEnergia and Mr. Alessandro Reitelli for Greentech.

61. By order of 13 June 2017, the Tribunal confirmed that, as agreed by the Parties, Professor Enrico Laghi would not appear at the hearings.  Additionally, the Tribunal ordered that fact witnesses, other than instructing representatives and experts who may be present in the hearing room at all times, be allowed to remain in the hearing room only after providing their oral testimony.  Further, the Tribunal ordered that Respondent designate its instructing representative by close of business on 21 June 2017, and invited Respondent to propose a sequence for

presentation of its witnesses by 19 June 2017.  Finally, the Tribunal noted that both sides had agreed to admit the Italian Court of Cassation decision (No. 10411) of 27 April 2017, and decided to defer its decision on whether to admit the report of the *Pubblico Ministero*/Procurer General until having a discussion with counsel on the first day of the hearings.

62. By email of 19 June 2017, Respondent designated Mr. Daniele Bacchiocchi as its instructing representative and submitted a proposed sequence for presentation of its witnesses.

63. On 20 June 2017, Respondent provided the Tribunal and the Claimants with a letter from Respondent's expert, Professor Giovanni Serges, stating that Professor Serges would not attend the hearing due to other professional commitments. Professor Serges had been scheduled for examination at the hearing on 30 June 2018.

64. From 26 to 30 June 2017, the Tribunal held a hearing at the ICC Hearing Centre on 112 avenue Kléber, in Paris, France.  Attending the hearing were:

Tribunal Members

- Prof. William W. Park, Chairman of the Tribunal
- Mr. David R. Haigh, Q.C., Arbitrator
- Prof. Giorgio Sacerdoti, Arbitrator

Appearing on behalf of the Claimants

- Mr. Kenneth R. Fleuriet, King & Spalding
- Ms. Amy Roebuck Frey, King & Spalding
- Mr. Reginald R. Smith, King & Spalding
- Mr. Kevin D. Mohr, King & Spalding
- Ms. Magali Garin, King & Spalding
- Ms. Elena Mitu, King & Spalding
- Ms. Cristina Martorana, Orrick, Herrington & Sutcliffe LLP
- Mr. Alberto Tedeschi, Orrick, Herrington & Sutcliffe LLP

Claimants' Witnesses

- Mr. Ottavio Lavaggi (instructing representative for NovEnergia)
- Mr. Alessandro Reitelli (instructing representative for Greentech)
- Mr. Gabriele Bartolucci
- Mr. Bernardo Lucena
- Mr. Diego Percopo (by video)
- Mr. Francesco Vittori

Claimants' Experts

- Mr. Richard Edwards, FTI Consulting LLP (quantum)
- Dr. Boaz Moselle, FTI Consulting LLP (regulatory)
- Dr. Dora Grunwald, FTI Consulting LLP (regulatory)

Appearing on behalf of the Respondent

- Avv. Giacomo Aiello, Avvocatura Generale dello Stato
- Avv. Pasquale Puciarello, Avvocatura Generale dello Stato
- Avv. Prof. Maria Chiara Malaguti, External Counsel to the Legal Service of the Ministry of Foreign Affairs

Respondent's Witnesses

- Mr. Daniele Bacchiocci, GSE (instructing representative for Respondent)
- Mr. Luca Miraglia, GSE

Other Attendees for Respondent

- Avv. Marta Capriulo, GSE
- Dr. Valerio Venturi, GSE

Respondent's Experts

- Prof. Mauro Paoloni (quantum)
- Prof. Corrado Gatti (quantum)

Court Reporter

- Ms. Claire Hill, Claire Hill Realtime Reporting Limited

Interpreters

- Ms. Delfina Genchi
- Ms. Anna Collins
- Ms. Enrica Dal Santo

65. The Parties did not at any time during the proceedings request leave to file post-hearing briefs. At the hearing, the Tribunal did note on the record that it might later ask further questions of the Parties as such questions might arise during deliberations.[11]

66. On 23 October 2017, the SCC confirmed that Jeremy M. Bloomenthal had been appointed as an administrative secretary of the Tribunal.

67. By letter of 4 December 2017, the Tribunal requested that the date for rendering the final award be extended until 30 May 2018.  On 5 December 2017, the SCC invited the Parties to comment on the Tribunal's request by 8 December 2017.  On 5 December 2017, in separate responses to the SCC's letter, Respondent and Claimants stated that they had no objections to the proposed extension.  By letter of 6 December 2017, the SCC granted an extension until 30 May 2018 for the Tribunal to render the final award.

68. On 6 March 2018, the ECJ issued a judgment in the case of *Slovak Republic v. Achmea*,[12] the outcome of litigation discussed by the Parties in their submissions on bifurcation and jurisdiction and, in particular, the Respondent's prior request to suspend the present arbitration pending the ECJ's decision.  On 7 March 2018, the Tribunal invited the Parties to comment on any impact that the ECJ's *Slovak Republic v. Achmea* decision might have on the present arbitration.  The Tribunal fixed a time limit of fourteen (14) days from the date of the Tribunal's communication for the Parties to make submissions by simultaneous exchange.

69. On 12 March 2018, Claimants requested that the Tribunal admit to the record the CJEU Advocate General's Opinion of 19 September 2017 on Case C-284/16.  On 12 March 2018, acknowledging receipt of Claimants' request, the Tribunal and

---

[11] Transcript, Day 4, 244:20-23; Day 5, 1:25-2:3.

[12] Judgment of 6 March 2018, *Slowakische Republik v. Achmea B.V.*, European Court of Justice (Grand Chamber), Case C-284/16, CLA-194.

invited Respondent to comment on Claimants' request by no later than close of business (CET) on 16 March 2018.  On 14 March 2018, after receiving on that day Respondent's comment on Claimants' request, the Tribunal admitted the Advocate General's Opinion into the record.

70. Concerning the Parties' comments on the 6 March 2018 CJEU decision in *Achmea*, on 15 March 2018, Claimants requested leave to submit a very limited number of additional legal authorities to respond to specific issues.  On 16 March 2018, the Tribunal confirmed that each side would be allowed to "attach key legal authorities essential to proper understanding of that CJEU decision and its relevance for the current proceedings."

71. On 23 March 2018, the SCC transmitted to the Tribunal simultaneously the respective submissions of Claimants and Respondent dated 22 March 2018 concerning the impact of the *Achmea* decision.  The Parties' submissions were timely, as the Tribunal's invitation of 7 March 2018 to file submissions was received after midnight on 8th March, C.E.T., hence the last day to submit their observations was on 22nd March.

72. By letter dated 17 April 2018, the Tribunal requested that the SCC extend the time for rendering the final award in light of the Parties' submissions on the *Achmea* decision.  On 20 April 2018, the SCC granted an extension until 30 June 2018.

73. On 25 May 2018, Ms. Claire Hill, the court reporter for the June 2017 hearing, communicated with the Tribunal in relation to an unpaid invoice issued to Respondent for Respondent's portion of the hearing transcription fees.

74. On 28 May 2018, the Tribunal directed the Parties to comment within seven calendar days on the SCC Secretariat's suggestion that, if the Respondent refuses to pay the invoice, the SCC pay the invoice and claim the cost as an expense after the award has been rendered.

75. On 4 June 2018, Claimants commented that they did not object to the SCC's suggested course of action, barring an indication from Respondent that payment would be immediately forthcoming.

76. Respondent did not provide any comments in response to the Tribunal's direction of 28 May 2018.

77. On 4 June 2018, Claimants sought leave to introduce into the record the 16 May 2018 award in *Masdar Solar & Wind Cooperatief v. Spain*,[13] proposing that the Parties be permitted to submit comments not exceeding five pages within one or two weeks' time.  Claimants asserted that introduction of the *Masdar* award was appropriate because:

> 1) the *Masdar* tribunal directly addresses the subject of the parties' submissions on *Achmea* dated 22 March 2018, 2) the *Masdar* award post-dates those submissions, and 3) the *Masdar* award is the only ECT award (to date) that has addressed the relevance (or lack thereof) of the ECJ's *Achmea* decision to an ECT arbitration….

78. On 5 June 2018, the Tribunal invited Respondent to comment by 12 June 2018 on Claimants' request concerning the *Masdar* award.

79. By email on 12 June 2018, Respondent stated that it agreed with the proposal to introduce the *Masdar* award and requested leave to comment on the merits in addition to the jurisdictional aspects on which it understood Claimants wished to make comments.  Respondent stated that it would need more than five pages in which to make its comments and that the two-week time limit proposed would be insufficient in light of its obligations in other cases.

80. On 13 June 2018, the Tribunal acknowledged Respondent's agreement with Claimants' request for leave to introduce and submit comments on the *Masdar* award.  The Tribunal, noting the divergence between Claimants and Respondent as to the timing, length, and scope of the comments, directed counsel to confer immediately and file a joint proposal not later than 18 June 2018.  The Tribunal also reminded Respondent of the Tribunal's earlier request for attention to the unpaid portion of fees for Ms. Claire Hill, the court reporter.

81. On 15 June 2018, Claimants stated that the Parties had conferred on the timing, length, and scope of their proposed comments, and had agreed to simultaneously submit on 6 July 2018 comments not limited in scope and not to exceed fifteen pages.  Later that same day, the Tribunal approved the Parties' agreement regarding submissions on the *Masdar* award, subject to Respondent confirming its agreement to those conditions.

82. Also on 15 June 2018, the Tribunal requested that the SCC extend the time for rendering the final award in light of the Parties' intention to file new submissions

---

[13] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, CLA-197.

on 6 July.  On 18 June 2018, the SCC granted an extension until 31 August 2018 to render the award.

83. On 6 July 2018, the Parties submitted their respective comments on the *Masdar* award.

84. On 9 July 2018, Respondent objected to Claimants' reference, in their comments on the *Masdar* award, to an award in *Antin Infrastructure Services Luxembourg et al. v. Spain*, and requested leave to comment on the *Antin* award and also on the award in *Antaris Solar et al. v. Czech Republic*.[14]

85. Also on 9 July 2018, the Tribunal wrote to the Parties, provisionally granting Respondent leave to comment on the *Antin* award within ten days thence, subject to a principled objection from Claimants.

86. On 11 July 2018, Claimants responded to Respondent's objections regarding the *Antin* award and to Respondent's request to submit comments on the *Antin* and *Antaris* awards.  Claimants expressed the view that further submissions were not necessary and would risk prolonging the case indefinitely, as other awards involving renewable energy investments were likely to be rendered soon. Claimants proposed, if further comments were to be allowed, that they be submitted simultaneously on 20 July 2018, and that the proceedings be closed thereafter.

87. On 13 July 2018, the Tribunal granted each side the opportunity to file simultaneously, at 15:00 Central European Time on 20 July 2018, its final set of comments touching on the *Antin* and *Antaris* awards.  The Tribunal directed that no further submissions would be allowed after that filing, "absent special permission from the Tribunal on an application submitted for good cause shown."

88. On 20 July 2018, the Parties submitted their respective comments regarding the *Antin* and *Antaris* awards.

---

[14] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018; *Antaris Solar et al. v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018.

89. On 24 July 2018, Respondent sought leave to introduce into the record the EC's Communication of 19 July 2018 on protection of intra-EU investment,[15] which Respondent asserted it had been unable to submit earlier. According to Respondent, the Communication is material to the arbitration because it:

> … articulat[es] on protection of rights of EU investors when making investments within the European Union to be compared to investment protection ensured by international investment treaties, as well as the implications of the ECJ *Achmea* decision for the interpretation of the ECT (Press release (IP/18/4528).

Also, according to Respondent:

> The European Commission is the guardian of EU treaties and consequently this document is of extreme relevance in the assessment of issues such as the relationships between the EU treaties and the ECT, and interpretation of Article 16 ECT.

90. On 29 July 2018, in response to Respondent's request, the Tribunal invited the Parties to submit simultaneously any observations on the EC's 19 July 2018 Communication and its admission in this case, directing the Parties to coordinate the precise timing and modality of their simultaneous submissions. The Tribunal noted that Section 31 of the First Procedural Order only allows admission of additional evidence on an exceptional basis and at the Tribunal's discretion. Further, the Tribunal noted that its 13 July 2018 direction strictly limited any further submissions by the Parties after their comments on the *Antin* and *Antaris* awards. Accordingly, the Tribunal ordered:

> Following these simultaneous observations no further submissions shall be made or documents admitted absent an extraordinary and exceptional showing of good cause.

91. On 1 August 2018, the Tribunal requested that the SCC extend the time for rendering the final award, in light of submissions filed by the Parties on 6 July and 20 July, submissions expected to be filed in August regarding the EC's Communication of 19 July 2018 (COM(2018) 547/2), and the need for the Tribunal to consider and address the Parties' views prior to rendering its award.

---

[15] Communication from the Commission to the European Parliament and the Council, Protection of intra-EU investment, Brussels, 19 July 2018, COM(2018) 547/2.

Also on 1 August 2018, the SCC granted the Tribunal's request, fixing the time for rendering the award as 31 October 2018.

92. By email of 7 August 2018, Claimants informed the Tribunal of the Parties' agreement that each side would file comments, limited to two pages, regarding the EC's 19 July 2018 Communication, by submitting their respective comments to the SCC on 8 August 2018.  Claimants requested that the SCC transmit the submissions to the Tribunal after receiving both sets of comments.

93. By email of 9 August 2018, the SCC transmitted to the Tribunal the Parties' respective comments, dated 8 August 2018, regarding the EC's 19 July 2018 Communication.

94. On 3 October 2018, the EC wrote to the Tribunal stating *inter alia* that "the Commission would be available to up-date its written observations in the light of judgment of the European Court of Justice in Case C-284/16 Achmea v Slovak Republic, and in particular to set out its view on the consequences of that judgment for pending arbitration cases based on the Energy Charter Treaty."

95. By letter dated 16 October 2018, the SCC transmitted to the Parties the Tribunal's proposal to extend the time for rendering the final award, to which both sides expressed that they had no objection.

96. By letter dated 19 October 2018, the SCC fixed the date for rendering the award as 2 January 2019.

97. By an Order dated 16 October 2018, the Tribunal decided not to admit additional observations from the EC regarding the ECJ's judgment in *Achmea v. Slovak Republic*, noting that the Parties had already filed multiple observations addressing the ECJ's judgment and that, as such, additional observations would not be helpful.

98. Also on 16 October 2018, the Tribunal directed each side to file a cost submission by simultaneous exchange on 25 October 2018, and each side to file a response to the other side's cost submission by simultaneous exchange on 5 November 2018. The Tribunal further directed that, "Upon the Tribunal's receipt of the response cost submissions, the proceedings will be closed pursuant to Article 34 of the 2010 SCC Arbitration Rules."

99. On 25 October 2018, Claimants filed their cost submission. Respondent filed its cost submission on 29 October 2018.

100.    On 5 November 2018, Claimant filed a response on cost submissions.  On 9 November 2018, Respondent confirmed that it had no objection to Claimants' statement of costs, and filed a further comment on certain payment difficulties.

101.    Being satisfied that the Parties have had a reasonable opportunity to present their cases, the Tribunal, on 10 November 2018 declared the proceedings closed pursuant to the SCC Rules.

102.    On 7 December 2018, the SCC determined the costs of the arbitration, discussed below further.

## III.    Factual Background

### A.  Introduction

103.    This section provides a brief background and summary of the regulatory framework in force when the investments were made; a description of Claimants' investments; and a summary of the legal measures from 2012 to 2015 on which Claimants' claims are based.

104.    Except where the context shows otherwise, the facts summarized below are not disputed by the Parties, although the Parties differ as to their legal significance and consequences.

### B.  EU Initiatives and Italian Legislation

105.    In 1998, Italy signed the Kyoto Protocol to the United Nations Framework Convention on Climate Change and committed to reduce carbon dioxide emissions by 8% by the end of 2012.[16]

106.    On 27 September 2001, the European Parliament and Council enacted Directive 2001/77/EC, requiring Member States to "take appropriate steps to encourage greater consumption of electricity produced from renewable energy sources…."[17]  The Directive listed reference values by which the Member States were supposed to adopt "national indicative targets" for the consumption of

---

[16] Statement of Claim, ¶ 55.

[17] Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market, Article 3.1, CEX-33, referring to the Kyoto Protocol.

renewable energy to be achieved by 2010. The reference values for the European Community and Italy were 22% and 25%, respectively.[18]

107.     Italy implemented Directive 2001/77/EC by enacting Legislative Decree No. 387 on 29 December 2003, which provided that specific criteria to promote solar energy would be set forth in ministerial decrees adopted by the Minister of Productive Activities in consultation with the Ministry of Environment and Protection of Natural Resources.[19]

108.     Legislative Decree No. 387 provided that the criteria established through the implementing decrees must not impose any new costs on the state budget.[20]  It also provided that incentives "[f]or electricity produced by photovoltaic conversion of solar energy [shall] provide for a specific rate with decreasing amount and duration, such as to ensure a fair return on the costs of investment and operation."[21]  The "decreasing amount" of the incentive rates was related to the anticipated operational cost reductions as PV technology improved.[22]

## C. The *Conto Energia* Decrees

109.     In 2005, pursuant to Legislative Decree No. 387, Italy initiated a system by which qualified PV facility operators received incentive payments for each unit of electricity generated, which were paid in addition to the wholesale electricity prices which those operators received. This was effected through a series of so-called "*Conto Energia*" (Energy Account) ministerial decrees. The incentive tariffs were structured as a premium that accrued in addition to the market prices received by PV operators, although this framework was somewhat modified under the fifth *Conto Energia* decree, discussed below. Each of the *Conto Energia* decrees expressly provided that the tariff premiums, once granted, would be paid for a twenty-year period commencing from the date of a PV plant's entry into operation.

110.     Since Legislative Decree No. 387 did not allow the costs of incentives to be borne by the state, those costs were passed on to electricity consumers through electricity bills.[23]  The AEEG (Authority for Electrical Energy and Gas) collected those fees from consumers to cover the incentive tariff costs. The GSE was the

---

[18] Directive 2001/77/EC, 27 September 2001, Annex, CEX-33.

[19] Legislative Decree No. 387, 29 December 2003, *Implementation of Directive 2001/77/EC on the promotion of electricity produced from renewable energy sources in the domestic electricity market*, Art. 7.1, CEX-36.

[20] Legislative Decree No. 387, Art. 7(2), CEX-26.

[21] Legislative Decree No. 387, Art. 7.2(d), CEX-26, quoted in Statement of Defense, ¶ 258.

[22] Statement of Claim, ¶ 72; Statement of Defense, ¶¶ 255, 257.

[23] Statement of Claim, ¶ 75; Statement of Defense, ¶ 606.

state-owned company responsible for paying the incentive tariffs to electricity producers under the *Conto Energia* decrees.[24]

111.    The GSE confirmed the right to a specific tariff rate by means of a letter to the person or company holding the project rights to a PV facility, as well as by a contract entered into with the person or company.  Contracts between the GSE and the owners of PV facilities became effective on the date when the PV facility entered into operation.[25]

112.    The first *Conto Energia* decree, which applied to eligible PV facilities under 1 MW in capacity, was enacted on 28 July 2005 (as amended in 2006, "*Conto* I").[26] *Conto* I, prior to its amendment in 2006, set a national target for total PV capacity of 300 MW, which was raised to 1000 MW in 2006.[27]

113.    *Conto* I provided for eligible PV facilities to receive fixed incentive premiums for a twenty-year period.  PV facilities receiving authorization under *Conto* I in 2005 and 2006 received tariff premiums within the ranges below, while those qualifying after 2006 received slightly lower rates.

- EUR 0.445 per kWh for plants between 1 kW and 20 kW;
- EUR 0.460 per kWh for plants between 20 kW and 50 kW; and
- EUR 0.490 per kWh for plants between 50 kW and 1 MW.[28]

114.    *Conto* I (prior to the 2006 amendment) provided for tariffs to be adjusted upward for inflation according to the ISTAT (Italian National Statistics Institute) index.[29]  The inflation adjustment was revoked in the 2006 amendment to *Conto* I,[30] and subsequent *Conto Energia* decrees did not provide for an ISTAT inflation adjustment.

---

[24] Statement of Claim, ¶ 75.

[25] See, e.g., Agreement No. B02B0411117706 for the Recognition of Tariffs for Photovoltaic Plants Pursuant to Decrees M.A.P. 28.7.2005, 6.2.2006 and A.E.E.G. Resolutions no. 188/05 and no. 40/06. CEX-63; see also Statement of Claim, ¶ 80; Statement of Defense, ¶ 283.

[26] Ministerial Decree No. 18908 of the Ministry of Productive Activities, 28 July 2005, published in the Italian Official Gazette no. 181 of 5 August 2005, CEX-39A.  *Conto* I was integrated and amended by Ministerial Decree No. 20998 of the Ministry of Productive Activities, 6 February 2006, published in the Italian Official Gazette no. 38 of 15 February 2006, CEX-39B.

[27] *Conto* I, Art. 1.1, CEX-39B.

[28] Statement of Claim, ¶¶ 77-78; *Conto* I, Arts. 5(2)(a)-(b), 6(2)(a)-(b), and 6(3)(a)-(b), CEX-39A.

[29] *Conto* I (prior to amendment), Art. 6(6), CEX-39A.

[30] *Conto* I, Arts. 4(1) and 8(1), CEX-39B; see also Statement of Claim, ¶¶ 257-260; Statement of Defense, ¶¶ 419-420.

115.    Under *Conto* I, a PV operator seeking to obtain incentive tariffs was required to submit a formal request.  After receiving a provisional authorization, the developer had to commence and complete construction and connect to the grid within a certain time limits – no later than twenty-four months from the authorization to grid connection.[31]

116.    By the summer of 2006, 387 MW of new PV capacity had been accepted under *Conto* I and further applications under *Conto* I were suspended until March 2007 due to the capacity threshold for 2006 being already met.[32]

117.    The second *Conto Energia* decree ("*Conto* II") was enacted on 19 February 2007.[33]  *Conto* II eliminated the preliminary authorization phase that existed under *Conto* I and instead provided that PV producers could apply for the incentive benefits upon entry into operation of their facilities.[34]  *Conto* II provided for an increased capacity threshold, permitting facilities over 1 MW to apply for incentive tariffs, and a cumulative installed capacity of 1,200 MW.[35]

118.    Under *Conto* II, eligible PV facilities could obtain incentive tariffs at rates that varied depending upon certain criteria, including the facility's nominal capacity and size, and when the facility entered into operation.  The rates were lower than those under *Conto* I.  Facilities entering into operation prior to 31 December 2008 received a slightly higher rate than those which entered into operation between 1 January 2009 and 31 December 2010.[36]

119.    The period of eligibility for *Conto* II was extended by the so-called "Salva Alcoa" decree, which enabled PV plants built by 31 December 2010 and entering into operation by 30 June 2011 to benefit from the *Conto* II incentives.[37]

---

[31] *Conto* I (prior to amendment), Art. 8(3) and 8(6), CEX-39A; <u>see also</u> Statement of Claim, ¶ 79.

[32] Statement of Claim, ¶ 87.

[33] Ministerial Decree of 19 February 2007, *Criteria and procedures for the promotion of the production of electricity through the photovoltaic conversion of solar energy, in implementation of article 7 of legislative decree no. 387, 29 December 2003*, published in the Italian Official Gazette no. 45 of 23 February 2007 ("*Conto* II"), CEX-65.

[34] Statement of Claim, ¶ 89.

[35] *Conto* II, Art. 13(1), CEX-65.

[36] *Conto* II, Art. 6(1), 6(2), CEX-65.

[37] Law Decree No. 105 of 8 July 2010, converted into law by Law No. 129 of 13 August 2010, Art. 1-septies ("*Salva Alcoa* decree"), REX-66 and CEX-67.

120.     On 23 April 2009, during the time when PV facilities began receiving incentive tariffs under *Conto* II, the European Parliament and Council enacted Directive 2009/28/EC on the promotion of the use of energy from renewable sources.[38]  Directive 2009/28/EC set mandatory national targets for each EU Member State for renewable energy production, setting forth a target for Italy of 17% of its gross energy consumption to derive from renewable energy sources by 2020.[39]

121.     The third *Conto Energia* decree ("*Conto* III") was enacted on 6 August 2010.[40]  Under *Conto* III, eligible PV facilities entering into operation by 31 December 2011 could obtain tariff premiums ranging from EUR 0.251 per kWh to EUR 0.362 per kWh, with plants entering into operation in 2012 and 2013 receiving a somewhat reduced rate.[41]  Qualification of new PV facilities under *Conto* III was available until the threshold of 3,000 MW in cumulative installed capacity was reached, although facilities that entered into operation within fourteen months of the date when the threshold was reached could also receive the tariffs.[42]

122.     Italy implemented Directive 2009/28/EC by issuing Legislative Decree 28 of 3 March 2011, referred to as the "Romani Decree".[43]  The Romani Decree implemented various changes, *inter alia*, a shorter qualifying period for *Conto* III tariffs, requiring eligible plants to enter into operation by 31 May 2011 instead of 31 December 2013, the original cut-off date.[44]  In connection with the modified qualifying period, the Ministry of Economic Development was to establish revised incentive tariffs for PV plants entering into operation after 31 May 2011, resulting in the fourth *Conto Energia* decree.[45]  The Romani Decree also required that future incentive tariff decrees take into account cost reductions already achieved for PV technology and the level of incentives being offered in other EU countries.[46]

---

[38] Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable energy sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, CEX-127.

[39] Directive 2009/28/EC, Recitals ¶¶ 13-14, Art. 3, and Annex I, CEX-127.

[40] Decree of 6 August 2010, from the Ministry of Economic Development and the Ministry of Environment, Land and Sea, published in the Italian Official Gazette no. 197 of 24 August 2010, CEX-145.

[41] *Conto* III, Art. 8, CEX-145.

[42] *Conto* III, Arts. 3(2), 3(6), CEX-145.

[43] Legislative Decree No. 28/2011, CEX-165.

[44] Legislative Decree No. 28/2011, Art. 25(9), CEX-165.

[45] Legislative Decree No. 28/2011, Art. 25(10), CEX-165.

[46] Legislative Decree No. 28/2011, Art. 25(10), CEX-165.

123.    The fourth *Conto Energia* decree ("*Conto* IV") was enacted on 5 May 2011.[47] *Conto* IV provided that eligible PV plants entering into operation between 31 May 2011 and 31 December 2016 could qualify for incentive tariffs lasting for a twenty-year period according to rates set forth therein.[48]

124.    *Conto* IV instituted measures to limit the increasing costs of the incentive tariff programs, including by setting caps on total program costs for semester, precluding approval of further PV facilities within a semester once the threshold had been reached.[49]  Additionally, *Conto* IV set a national target of 23,000 MW of cumulative installed capacity, which was said to correspond to an annual cost for the incentives of between EUR 6 billion and EUR 7 billion.[50]

125.    The fifth and final *Conto Energia* decree ("*Conto* V") was enacted on 5 July 2012 and entered into force on 27 August 2012.[51]  The preamble to *Conto* V references positive progress toward meeting Italy's mandatory national target of 17% under Directive 2009/28/EC.[52]  *Conto* V provided that it would cease to apply thirty days after the AEEG issued a resolution stating that Italy had added EUR 700 million to the total cost of the incentive tariffs program, amounting to a total cost of EUR 6.7 billion per year.[53]  Thus, as the AEEG issued the resolution on 6 June 2013, the tariffs provided for under *Conto* V became unavailable to new PV facilities after 6 July 2013.[54]

126.    As mentioned above, *Conto* V provided for a somewhat altered structure of tariff incentives, intended to reduce costs to end-consumers.  PV plants up to 1 MW could qualify for an "all-inclusive tariff" consisting of the price of the electricity, the value of the incentive premium, plus a further specific tariff for self-consumed energy.[55]  PV plants over 1 MW received a fluctuating amount based on the difference, if positive, between the "all-inclusive tariff" and the "hourly zonal price".[56]

---

[47] Decree of 5 May 2011, from the Ministry of Economic Development and the Ministry of Environment, Land and Sea, published in the Italian Official Gazette no. 109 of 12 May 2011, CEX-169.

[48] *Conto* IV, Art. 1(2), 12(1), 12(2), Annex 5, CEX-169.

[49] *Conto* IV, Art. 4, CEX-169.

[50] *Conto* IV, Art. 1(2), CEX-169.

[51] Decree of 5 July 2012 from the Minister of Economic Development and the Minister of the Environment, Land and Sea, published in the Italian Official Gazette no. 159 of 7 July 2012, CEX-195.

[52] *Conto* V, preamble at p. 2, CEX-195.

[53] *Conto* V, Art. 1(5), CEX-195.

[54] AEEG Resolution 250/2013 dated 6 June 2013, CEX-268.

[55] *Conto* V, Art. 5(1), CEX-195.

[56] *Conto* V, Art. 5(1), CEX-195.

### D.  Tariff Recognition Letters and GSE Agreements

127.    Each PV operator receiving incentives under the *Conto Energia* framework first received confirmation of its right to a specific tariff in a letter from the GSE ("Tariff Recognition Letter"), which expressly stated that the tariff would remain constant for a twenty-year period.  An example of the wording in a Tariff Recognition Letter under *Conto* II is as follows:

> With reference to the photovoltaic plant named [name of the relevant plant], we hereby communicate the admission to the incentive tariff under Ministerial Decree 19 February 2007, equal to 0.3460 euro/kWh. (…) The tariff will be recognized for a twenty year period(…) the tariff is constant (…) for all the twenty year period.[57]

128.    Afterward, the operator would enter into a contract with the GSE.  These agreements ("GSE Agreements") set forth the specific tariff incentive rate that the PV operator would receive and the specific dates comprising a twenty-year period during which the incentive would be paid.  The relevant contractual wording was substantively the same in GSE Agreements under *Conto* I, *Conto* II, *Conto* III and *Conto* IV, and the present dispute does not concern PV facilities granted incentives under *Conto* V.  As an example of the relevant wording, one GSE Agreement under *Conto* III provided:

> The tariff to be granted to the photovoltaic plant [Ferrante] pursuant to this Agreement is equal to 0.3140 €/kWh and is constant in current currency". (...) This Agreement is effective as of 29 April 2011 and will expire on 28 April 2031.[58]

### E.  Minimum Guaranteed Prices under Off-Take Regime

129.    In addition to feed-in tariff premiums under the *Conto Energia* decrees, Legislative Decree No. 387 also established an "off-take regime" whereby the GSE directly purchased electricity from certain smaller renewable energy producers at minimum guaranteed prices ("MGP Scheme").[59]  The MGP Scheme

---

[57] GSE Incentive Tariff Recognition Letter for Soleto PV facility, dated November 8, 2011, CEX–253B.

[58] GSE Agreement for the PV operator, AB Energia S.R.L. regarding the Ferrante solar facility, Arts. 2, 10, CEX-461.

[59] Legislative Decree No. 387, 29 December 2003, *Implementation of Directive 2001/77/EC on the promotion of electricity produced from renewable energy sources in the domestic electricity market*, Art. 13(3)(4), CEX-36; Law no. 239 of 23 August 2004, *Riordano del settore energetico, nonché delega al Governo per il riassetto delle disposizioni vigenti in materia di energia*, Italian OJ 13 September 2004, n. 215, Art. 1(41), CEX-217/REX-35.

was designed to ensure economic survival and minimum remuneration of smaller facilities, regardless of the trend of market prices, since those facilities were considered to have higher relative operating costs. Under the MGP Scheme, PV plants with a capacity below 1 MW received either a certain minimum guaranteed price or the market wholesale price, whichever was greater. The minimum guaranteed prices were introduced by AEEG Resolution no. 34 in 2005,[60] which was replaced by Resolution no. 280 in 2007.[61] PV plants eligible for the off-take regime could also benefit from tariff incentives under the first four *Conto Energia* decrees.

130. Further, similar to the GSE Agreements under the *Conto Energia* decrees, PV producers that participated in the MGP Scheme entered into contracts with the GSE. Those contracts had a one-year term that was subject to automatic renewal, with terms and conditions set by the AEEG.

## F. The Claimants' Investments

131. Except where noted otherwise, the account of Claimants' investments below has not been contested by Respondent.

### 1. NovEnergia's and NIP's solar investments in Italy

132. In late 2008, NovEnergia and NIP started to develop PV projects in Italy, encouraged by Italy's enactment of the *Conto Energia* decrees, which they viewed as providing returns that were "attractive, but not excessive" and "stable and predictable."[62]

133. NovEnergia and NIP invested in fifty-two PV projects in Italy during the time period from 2010 to 2013, which they still held as of 1 January 2015.[63] Fifty of those investments were structured as an equity holding in an Italian joint venture company, Holding Fotovoltaica S.p.a. ("HFV"), incorporated on 6 April 2009. NIP acquired 49.75% of the shares of HFV. Novenergia Italia S.p.A., a subsidiary of NovEnergia and NIP, acquired 0.25% of the shares of HFV, meaning that NovEnergia cumulatively owned 50% of the shares of HFV.[64] Two independent

---

[60] AEEG Resolution no. 34/2005, CEX-218

[61] AEEG Resolution no. 280/2007, CEX-220.

[62] Ottavio Lavaggi Witness Statement dated 30 March 2016, ¶ 9.

[63] Statement of Claim, ¶ 158; Claimants' Opening Presentation, slide 217; Expert Report of Richard Edwards, FTI Consulting, 4 April 2016, Table 1-2, p. 3.

[64] Novenergia Italia S.p.A. was incorporated by NovEnergia on 13 November 2007, became 100%-owned by NIP on 27 March 2009, and changed its name to Novenergia Italia S.r.l. on 21 December 2011. Statement of Claim, ¶ 154 n. 271.

Italian joint venture partners, F2i Energie Rinnovabili S.r.l.[65] and Tisol S.r.l., acquired, respectively, 49.75% and 0.25% of the HFV shares.

134.    Each of the PV facilities acquired by HFV was either already receiving incentive tariffs or was eligible to receive them under the *Conto Energia* decrees.[66] Some of those facilities also benefitted from minimum guaranteed prices under the off-take regime.[67] HFV acquired those facilities over the course of 2010, 2011, 2012, and 2013.

135.    In addition to the fifty PV projects held through HFV, NovEnergia and NIP invested directly in two PV projects, which were eligible to receive incentives under *Conto* IV and minimum guaranteed prices under the off-take regime.[68] In 2010, NIP directly acquired 90% of Solar Barocco S.r.l., an Italian company owning a 990 kW PV plant, and acquired the remaining 10% later that year. NIP also developed, through Novenergia Italia S.r.l., the 998.4 kW "La Quercia" PV plant.

136.    Through the various acquisitions and investments mentioned above, at the time this arbitration commenced, NovEnergia and NIP held a 100% interest in two PV plants, a 50% interest in twenty-one PV plants, and a 40% interest in twenty-nine PV plants, all of which benefitted from the *Conto Energia* regime's incentives and some of which received minimum guaranteed prices under the off-take regime. The total combined capacity of those plants exceeded 90 MW. In acquiring and developing those fifty-two plants, NovEnergia and NIP invested more than EUR 175 million.

137.    NovEnergia's and NIP's investments are summarized in Table 1-2 of the Expert Report of Richard Edwards, FTI Consulting, 4 April 2016, as provided below:

### Table 1-2: Relevant companies owned by NIP, 1 January 2015

| Company | NIP's shareholding | Number of PV plants owned | Total generation capacity of plants (MW) |
|---|---|---|---|

---

[65] F2i Energie Rinnovabili S.r.l. is a subsidiary of F2i SGR, S.p.A., the Italian "local partner" that NovEnergia decided to work with partly due to its access to credit. See Lavaggi WS, ¶¶ 14-15.

[66] Statement of Claim, ¶ 160.

[67] Statement of Claim, ¶¶ 172-173, 177, 180, 186-187, 192.

[68] Statement of Claim, ¶ 210.

| Castellaneta Solar S.r.l. | 50.0% | 2 | 14.0 |
|---|---|---|---|
| Solenergy S.r.l. | 50.0% | 2 | 10.4 |
| Solar Energy Italia 7 S.r.l. | 50.0% | 1 | 9.5 |
| Venusia S.r.l. | 50.0% | 1 | 8.0 |
| Solar Life Energy S.r.l. | 50.0% | 3 | 7.1 |
| Alma Bruca S.r.l. | 40.0% | 12 | 5.9 |
| Alma Sybaris S.r.l. | 40.0% | 12 | 5.9 |
| Soleto Cittá del Sole S.r.l. | 50.0% | 1 | 4.9 |
| Akralux S.r.l. | 50.0% | 1 | 4.4 |
| HFV Salentina S.r.l. | 50.0% | 4 | 4.0 |
| HFV Montenero S.r.l. | 50.0% | 1 | 3.5 |
| HFV Pinciana S.r.l. | 50.0% | 2 | 3.2 |
| Pontenure Solar S.r.l. | 50.0% | 1 | 2.8 |
| Alma Lao S.r.l. | 40.0% | 5 | 2.6 |
| San Marco Solar S.r.l. | 50.0% | 2 | 2.0 |
| Solar Barocco S.r.l. | 100.0% | 1 | 1.0 |
| La Quercia S.r.l. | 100.0% | 1 | 1.0 |
| **Total** | | **52** | **90.4** |

138.    Claimants alleged that, after initiating the present arbitration, NovEnergia and F2i Energie Rinnovabili S.r.l. carried out a demerger procedure which resulted in a different ownership structure of the above investments, but preserved NovEnergia's right to claim for harm suffered by its investments when the Request for Arbitration was filed.[69]  Respondent has, however, contested this account, questioning which assets NovEnergia has ceased to own.[70]  Apparently, for some companies in which NovEnergia previously held a 50% shareholding, it no longer has any shareholding, and for other companies, its shareholding has increased to 100%.[71]

## 2.  Greentech's solar investments in Italy

139.    Greentech acquired investments in the Italian PV sector through its 2011 merger with GWM Renewable Energy I S.A., an entity in the renewable energy division of a Luxembourg-based financial company, GWM Group.  GWM Renewable Energy I S.A. held Italian PV plant assets through its wholly-owned Italian subsidiary, GWM Renewable S.p.A.  In the merger transaction, GWM Renewable Energy I S.A. received shares of Greentech stock in exchange for the

---

[69] Statement of Claim, ¶ 212 n. 410; Lavaggi WS, ¶¶ 24-25.
[70] Rejoinder, ¶ 141; Transcript, Day 2, 11:22 -12:21 (Malaguti).
[71] Transcript, Day 4, 160:1-13 (Gatti).

entire share capital of GWM Renewable S.p.A., which held a portfolio of seventy-five Italian PV plants.[72]  Greentech's acquisition was encouraged by the existence of the *Conto Energia* tariffs obtained by PV plants within that portfolio.[73]

140.    While the bulk of Greentech's Italian PV plants were acquired through the 2011 merger, Greentech acquired additional Italian PV plants in 2012 and 2013.

141.    As a result of investing more than EUR 131 million in the merger and later acquisitions, Greentech held 100% ownership in eighty-two PV plants in Italy as of 1 January 2015, with a combined capacity exceeding 31 MW.  Each of Greentech's PV plants benefitted from feed-in tariff premiums under one of the first four *Conto Energia* decrees.  Eighty of Greentech's PV plants were eligible for minimum guaranteed prices under the off-take regime.[74]

142.    Greentech's investments are summarized in Table 1-1 of the Expert Report of Richard Edwards, FTI Consulting, 4 April 2016, as provided below:

### Table 1-1: Relevant companies owned by Greentech, 1 January 2015

| Company | Number of PV plants owned | Total generation capacity of plants (MW) |
|---|---|---|
| AB Energia S.r.l | 3 | 2.9 |
| Cerveteri Energia S.r.l. | 1 | 8.7 |
| GP Energia S.r.l., which owns PV plants and: | 6 | 4.6 |
| De Stern 12 S.r.l. | 1 | 9.8 |
| Epre S.r.l. | 2 | 1.0 |
| Solar Utility Salento S.r.l. | 1 | 1.0 |
| Solar Prometheus, which itself owns: | | |
| Bosco Solar S.r.l. | 18 | 0.8 |
| Giova Solar S.r.l. | 29 | 1.3 |
| Valle Solar S.r.l. | 17 | 0.7 |
| Lux Solar S.r.l. | 4 | 0.2 |

---

[72] Contribution Agreement between GWM Renewable Energy I S.A. and Greentech Energy Systems A/S, recitals (C), (E), CEX-419; Statement of Claim, ¶¶ 217-218.

[73] See Greentech 2011 Annual Report, p. 26, CEX-425 (noting that the "solar tariff systems" applied in Italy were higher than subsidies for wind power); Gabriele Bartolucci Witness Statement dated 1 April 2016, ¶ 13.

[74] Claimants' Opening Presentation, slide 218-219; Expert Report of Richard Edwards, FTI Consulting, 4 April 2016, Table 1-1, p. 2.

| Total | 82 | 31.0 |
|---|---|---|

## G. The Disputed Measures

### 1. The Spalma-incentivi Decree

143.    With *Conto* V reaching its target annual cost of EUR 6.7 billion in July 2013, Italy took steps to reduce the electricity cost burden on consumers attributable to the incentive programs.  On 23 December 2013, Italy enacted Law Decree No. 145/2013, referred to as the "*Destinazione Italia*" law decree.[75]  The *Destinazione Italia* law decree provided two options for PV plant producers: i) to continue to receive the *Conto Energia* incentives at the same rate for the remainder of the twenty-year period, but to foreclose the possibility of receiving additional incentives thereafter; or ii) to accept reductions to the *Conto Energia* incentives, but to receive them for seven additional years, for a total of twenty-seven years.[76]  This constituted Italy's attempt to re-modulate the incentive mechanisms on a voluntary basis.

144.    On 24 June 2014, Italy enacted Law Decree No. 91/2014, known as the "*Spalma-incentivi* Decree", pursuant to which the tariffs previously granted to PV facilities over 200 kW according to the five *Conto Energia* decrees were modified as from 1 January 2015.[77]

### a.  Changes to Incentive Tariff Amount and Duration

145.    Article 26(3) of the *Spalma-incentivi* Decree provided that producers would have a choice from among three options for the method of calculating new tariffs that would apply to PV facilities.  Should the PV plant owner not make an election by 30 November 2014, Option C (described below) would apply.[78]

- Under Option A, Italy would pay a new, reduced incentive tariff over twenty-four years (commencing from the PV plant's entry into operation), instead of the

---

[75] Law Decree No. 145/2013, 23 December 2013, *Interventi urgenti di avvio del piano "Destinazione Italia", per il contenimento delle tariffe elettriche e del gas, per l'internazionalizzazione, lo sviluppo e la digitalizzazione delle imprese, nonché misure per la realizzazione di opere pubbliche ed EXPO 2015*, converted into law by Law No. 9/2014 of 21 February 2014, CEX-560.

[76] Law Decree No. 145/2013, Art. 1(3)(b), CEX-560.

[77] Law Decree No. 91/2014, 24 June 2014, converted into law by Law No. 116/2014 of 11 August 2014, Art. 26(3), CEX-553.

[78] Law Decree No. 91/2014, Art. 26(3)(a), CEX-553.

original twenty-year term.  The level of reduction was based on how many years remained in the original twenty-year period, according to the following table:[79]

| Residual incentivizing period (Years) | Percentage of reduction of the incentive |
|---|---|
| 12 | 25% |
| 13 | 24% |
| 14 | 22% |
| 15 | 21% |
| 16 | 20% |
| 17 | 19% |
| 18 | 18% |
| above 19 | 17% |

For example, if the PV producer at that time had fifteen years remaining under the applicable *Conto Energia* decree, then the producer would receive the incentives for nineteen more years at a rate reduced by 21%

- Under Option B, the original twenty-year period would be the same.  The tariff rate would be reduced between 2015 and 2019, then increased in subsequent years according to percentages established by decree of the Ministry of Economic Development.  The relevant decree was adopted on 17 October 2014.[80]

- Under Option C, the twenty-year disbursement period would be maintained, but the tariff rate would be reduced by a fixed percentage based on a PV plant's nominal capacity: a 6% reduction for plants with a nominal capacity between 200 kW and 500 kW; a 7% reduction for plants with a nominal capacity between 500

---

[79] Law Decree No. 91/2014, table in Annex 2, p. 85, CEX-553.

[80] Ministerial Decree 17 October 2014, specifying mode for the restructuring of tariffs for electricity produced by PV plants, pursuant to Art. 26(3)(b) of *Spalma-incentivi* Decree, REX-33.

On 27 October 2014, the GSE published on its website the tables containing the value of the remodulation coefficients (1-Xi) to be multiplied by the previous incentive amounts (I old):

- for the years 2015-2019 the values range from 68.61% of the original tariff, for PV plants having 11 years remaining under the original *Conto* scheme, to 90.30%, for PV plants having 19 years or more remaining under the original *Conto* scheme.

- during the last 5 years of the residual contracted incentive period, the tariff values range from 131.39% of the original tariff, for PV plants having 11 years under the original *Conto* scheme, to 109.70% of the original tariff, for PV plants having 19 years or more under the original *Conto* scheme.

See GSE, Tables reshaping values of coefficient ("*Tabelle contenenti i valori dei coefficienti di rimodulazione (1-Xi) da moltiplicare ai previgenti incentivi (I old) sulla base di quanto previsto dall'Allegato 1 del DM 17/10/2014 nel caso di scelta dell'opzione b) individuata dall'art. 26 comma 3 Legge 11 agosto 2014, n. 116*"), published on GSE's Website on 27 October 2014, CEX-333.

kW and 900 kW; and an 8% reduction for plants with a nominal capacity over 900 kW.[81]


### b. Changes to Disbursement Mechanism

146.     In addition to changing the *Conto Energia* incentive tariffs, the *Spalma-incentivi* Decree altered the way in which they were disbursed. According to Claimants, before the *Spalma-incentivi* Decree, incentive tariffs were paid based on actual electricity generated monthly.[82]  Claimants' quantum expert, Mr. Edwards, stated that tariffs for a given month would be paid at the end of the second month thereafter.  For example, the incentive tariff for electricity generated in January would be paid at the end of March.[83]

147.     Article 26(2) of the *Spalma-incentivi* Decree specified that, as from the second half of 2014, the GSE would pay tariffs in constant monthly installments based upon 90% of a plant's estimated yearly average production of electricity.  The balance adjustment payment, based on actual production, would be paid by 30th June of the following year. [84]

148.     According to Respondent, the GSE defined the disbursement methods under Article 26(2) with approval by the Ministry of Economic Development by Decree of 16 October 2014.[85]  Respondent states that the advance installment was an estimate based on each PV plant's production in the prior year, and that where historical data from the entire prior year was not available, a regional average was to be used.[86]

149.     In addition to modifying the amount, duration, and disbursement mechanism of the incentive tariffs, the *Spalma-incentivi* Decree repealed and replaced the

---

[81] Law Decree No. 91/2014, Art. 26(3)(c), CEX-553.

[82] See Statement of Claim, ¶ 311, citing *Conto* I: AEEG Resolution no. 188/2005, art. 4, CEX-38 and *Conto* I GSE Agreement, art. 3, CEX-63; for *Conto* II: AEEG Resolution no. 90/2007, Annex A, art, 8, CEX-335; "*Guida al II Conto energia – ed.5*", Section 9, CEX-92; *Conto* II GSE Agreement, art. 3, CEX-73; for *Conto* III: AEEG Resolution no. 181/2010, Annex A, Article 11, CEX-348; "*Guida alla richiesta degli incentivi per gli impiantifotovoltaici – D.M. 6 agosto 2010*", Section 11, CEX-159; *Conto* III GSE Agreement, art. 4, CEX-140; for *Conto* IV: *Conto* IV GSE Agreement, art. 4 (in relation to plants above 20 kW), CEX-358; for *Conto* V: "*Regole applicative per l'iscrizione ai registri e per l'accesso alle tariffe incentivanti – DM 5 luglio 2012*", art. 5.8; *Conto* V GSE Agreement, art. 6 (in relation to plants above 20 kW), CEX-370.

[83] See Expert Report of Richard Edwards, 4 April 2016, ¶ 3.26.

[84] Law Decree No. 91/2014, Art. 26(2), CEX-553.

[85] Statement of Defense, ¶ 328, citing Ministerial Decree 16 October 2014, Approval of operating procedures for the disbursement by the GSE of tariffs for electricity produced by PV plants, in implementation of Article 26, paragraph 2 of the Law Decree No 91 of 24 June 2014, converted, with modifications, into Law No 116 of 11 August 2014, Italian OJ n. 248 of 24 October, REX-32.

[86] Statement of Defense, ¶ 331.

administrative fee provided for under Article 10(4) of *Conto* V, basing the new fee solely on the PV plant's capacity, instead of its effective output of energy.[87]  The new fee ranged from EUR 1.20 per kW (for plants above 1 MW of capacity) to EUR 2.20 per kW (for plants between 3 and 6 kW of capacity) and was payable annually by off-setting incentive tariff payments due under GSE Agreements.[88]

## 2.   Modification of Minimum Guaranteed Price Scheme

150.    From 2011 until 2013, the MGP Scheme underwent a review and consultation process, with the AEEG requesting data from electricity producer associations and from the *Politecnico di Milano*, which produced a report in July 2013.[89]  Italy modified the MGP Scheme at the end of 2013.  On 31 October 2013, the AEEG issued a consultation document that proposed to define the minimum guaranteed prices based on the average operating costs of renewable energy facilities, plus 8%.[90]  For PV facilities, the minimum guaranteed price would be approximately EUR 37.8 per MWh produced.  Then, on 19 December 2013, the AEEG issued Resolution No. 618/2013/R/EFR ("Resolution 618"), establishing a minimum guaranteed price of EUR 38.9 per MWh.[91]  Resolution 618 also reduced the cap on eligible electricity generation from 2 million kWh per year to 1.5 million kWh per year.[92]

151.    On 23 December 2013, under the *Destinazione Italia* law decree (discussed above), PV facilities over 100 kWh in capacity that were receiving *Conto Energia* tariffs were excluded from the MGP Scheme.[93]  Only plants not exceeding 100 kWh in capacity could still obtain both the minimum prices and the *Conto Energia* tariffs.

## 3.   Cancellation of ISTAT Inflation Adjustment

---

[87] Law Decree No. 91/2014, Art. 25, CEX-553; and Decree of the Minister of Economic Development, 24 December 2014, Annex 1, Section 1, CEX-592.

[88] GSE Note, "*Modalità operative per il riconoscimento delle tariffe a copertura dei costi sostenuti dal GSE per il sostegno alle fonti rinnovabili e all'efficienza energetica*" published on the GSE website on 13 May 2015, section 2, at 3-4, CEX-590.

[89] *Costi di produzione di energia elettrica da fonti rinnovabili, Rapporto commissionato da AEEG al Politecnico di Milano - Dipartimento di Energia*, July 2013, Annex 1 to 486/2013/R/EFR, REX-39.

[90] AEEG, Document for public consultation no. 486, 31 October 2013, at 10, CEX-201.

[91] AEEG Resolution No. 618/2013/R/EFR, 19 December 2013, CEX-558.

[92] AEEG Resolution No. 618/2013/R/EFR, 19 December 2013, CEX-558.

[93] Law Decree No. 145/2013, 23 December 2013, converted into law by Law No. 9/2014 of 21 February 2014, Art. 1(2), CEX-560.

152.    As described above, *Conto* I, as originally implemented in 2005, included an inflation adjustment according to the ISTAT index.[94]  The inflation adjustment was, however, revoked in 2006 pursuant to an amendment to *Conto* I.[95]  Subsequent *Conto Energia* decrees did not provide for an inflation adjustment.

153.    The revocation measure was contested by several PV producers in 2006 in the Regional Administrative Tribunal ("TAR") of Lombardia, which issued decisions in three separate, unconsolidated cases.  The TAR declared the measure null and void as violating a general prohibition of retroactive legal acts and general principles of legal certainty and protection of the legitimate expectations of citizens.[96]

154.    The GSE appealed the three TAR decisions in 2007, one of which was affirmed by the *Consiglio di Stato* in April 2008.[97]  However, when the second case came before the *Consiglio di Stato*, it referred the matter to the plenary session of the court, which held in February 2012 that the cancellation of the inflation adjustment was valid and had no retroactive effect.[98]  The third appeal concluded in 2013 with a result consistent with that of 2012.[99]

155.    The GSE issued several communications, the significance of which is disputed by the Parties, during and after the appellate proceedings.  In 2009, the GSE issued a press release, informing the market of its decision not to seek repayment of the ISTAT adjustments paid until that time.[100]  On 26 March 2013, the GSE issued a press release stating that the *Consiglio di Stato* had upheld the cancellation of ISTAT adjustments and stating that the GSE would no longer provide ISTAT-adjusted tariffs.[101]  In March 2015, the GSE announced that it would claim reimbursement of ISTAT adjustment amounts granted since 2005 by offsetting past payments against future payment of *Conto* I tariffs.  In 2016, the

---

[94] *Conto* I (prior to amendment), Art. 6(6), CEX-39A.

[95] *Conto* I, integrated and amended by Ministerial Decree No. 20998 of the Ministry of Productive Activities, 6 February 2006, Arts. 4(1) and 8(1), CEX-39B.

[96] Decisions of the TAR Lombardia, Sez. IV, 10 November 2006, nos. 2124, 2125, and 2126, CEX-554C, CEX-554B, CEX-554A.

[97] Decision of the TAR Lombardia of 10 November 2006, no. 2125, CEX-554B; Decision of the *Consiglio di Stato* 1435/2008, CEX-555.

[98] Decision of TAR Lombardia of 10 November 2006, no. 2126, CEX-554A; Decision of the *Consiglio di Stato* 9/2012, REX-44.

[99] Decision of TAR Lombardia of 10 November 2006, no. 2124, CEX-554C; Decision of the *Consiglio di Stato* 3990/2013, CEX-167.

[100] GSE Website, "*Conto Energia: Aggiornamento Tariffe Incentivanti Fotovoltaico – Anno 2009*", 29 January 2009, REX-46.

[101] GSE Website, "*Aggiornamento ISTAT tariffe DM 28 luglio 2005*", 26 March 2013, CEX-557.

GSE notified PV producers of the amounts of overpayments that the GSE planned to recover.

### 4. Administrative Fee and Imbalance Costs

156.    One feature of *Conto* V was a new requirement that, starting from 1 January 2013, all PV producers receiving incentive tariffs pursuant to any of the five *Conto Energia* decrees pay an annual administrative fee.[102]  The administrative fee – fixed at EUR 0.00005 per kWh – was intended to cover the GSE's management, audit, and control costs.[103]

157.    *Conto* V expressly permitted the administrative fee to be collected by means of an offset, according to a method determined by the GSE.[104]  The GSE implemented its collection by offsetting the administrative fee from the GSE's first payment of incentive tariffs to each producer in a given year.[105]

158.    As noted above, the *Spalma-incentivi* Decree repealed and replaced the administrative fee provided for under Article 10(4) of *Conto* V, basing the new fee solely on the PV plant's capacity, instead of its effective output of energy. According to Claimants, the new fee ranged from EUR 1.20 per kW (for plants above 1 MW of capacity) to EUR 2.20 per kW (for plants between 3 and 6 kW of capacity) and was payable annually by off-setting incentive tariff payments due under GSE Agreements.[106]

159.    An additional requirement coming into effect on 1 January 2013, but not stemming from the *Conto Energia* decrees, was the requirement that PV producers pay imbalance costs, i.e., costs attributable to the failure to make accurate projections of the amounts of electricity capacity that would be injected into the electricity grid.  Before that date, non-renewable energy producers were required to project the amount of electricity that they would inject into the grid, pursuant to AEEG Resolution 111/06 of 9 June 2006 ("Resolution 111"),[107] which enabled Terna (the Italian grid operator) to balance electricity supply with demand. Producers deviating from their injection schedules were required to pay imbalance

---

[102] *Conto* V, Art. 10(4), CEX-195.

[103] *Conto* V, Art. 10(4), CEX-195.

[104] *Conto* V, Art. 10(4), 10(6), CEX-195.

[105] GSE, Website "Conto V," 2013, at 5, CEX-552.

[106] Statement of Claim, ¶ 312, citing GSE Note, "*Modalità operative per il riconoscimento delle tariffe a copertura dei costi sostenuti dal GSE per il sostegno alle fonti rinnovabili e all'efficienza energetica*" published on the GSE website on 13 May 2015, section 2, at 3-4, CEX-590.

[107] Annex A to Resolution 111/06, Art. 14, CEX-561.

costs.[108]  PV producers were effectively exempt from paying imbalance costs under Resolution 111.[109]  Their exemption was ended by Resolution 281/2012/R/EFR of 5 July 2012 ("Resolution 281").[110]

160.    Some renewable energy producers challenged Resolution 281 and Resolution 493 in the Italian administrative court, and first-instance decisions in their favor were upheld on appeal before the *Consiglio di Stato* on 9 June 2014.[111]  The *Consiglio di Stato* determined that the two resolutions were discriminatory because they failed to differentiate among programmable and non-programmable energy sources.  As a result of that decision, it is undisputed by the Parties that the GSE reimbursed renewable energy producers which had already paid imbalance costs under Resolution 281.[112]

161.    On 23 October 2014, the AEEG issued Resolution 522/2014/R/EEL ("Resolution 522"), which again imposed imbalance costs on renewable energy producers.[113]  Although Respondent asserts that Claimants have not stated whether they paid sums requested under Resolution 522, Claimants assert that renewable energy producers have been paying these imbalance costs since 1 January 2015.[114]

### 5.  2015 Italian Constitutional Court Decision regarding "Robin Hood" Tax

162.    In 2008, Italy enacted a windfall profits tax, nicknamed the "Robin Hood" tax, which applied to oil, gas, and other traditional energy companies, excluding PV, biomass, and wind energy producers from its scope.[115]  The corporate income tax

---

[108] Annex A to Resolution 111/06, Arts. 39, 40, CEX-561.

[109] See Statement of Claim, ¶ 277, citing Annex A to Resolution 111/06, Art. 40(6), CEX-561 (asserting that, "AEEG Resolution 111/06 stated that for "non-programmable" or "non-schedulable" renewable energy plants – which includes photovoltaic facilities – the imbalance costs would be equal to the sales price of energy ("*prezzo di valorizzazione delle offerte di vendita*") accepted on the day-ahead market, which is typically equal to zero for photovoltaic facilities, because they have no marginal costs."); Statement of Defense, ¶ 388 (asserting that, "until the end of 2012, the imbalance cost for non-programmable production units was set as equal to the hourly zonal price, with the full residual share allocated to the end consumer.").

[110] AEEG Resolution 281/2012/R/EFR, 5 July 2012, CEX-562.  According to Claimants, and not contested by Respondent, the method by which imbalance costs were implemented for renewable energy producers was set forth in Resolution 493/2012/R/EFR of 22 November 2012, CEX-563.  See Statement of Claim, ¶ 278.

[111] Decision of *Consiglio di Stato*, Sez. VI, 9 June 2014, ruling no. 2936 (affirming rulings nos. 1613/2013, 1614/2013, 1615/2013 and 1616/2013 of TAR Lombardia), CEX-564.

[112] Statement of Claim, ¶ 279; Statement of Defense, ¶ 393.

[113] AEEG Resolution 522/2014/R/EEL, 23 October 2014, CEX-566.

[114] Statement of Defense, ¶ 171; Statement of Claim, ¶ 280.

[115] Law Decree No. 112/2008, Art. 81(16), 25 June 2008, converted into law by Law No. 133/2008, 6 August 2008, CEX-567.

rate for companies with an annual gross income over EUR 25 million was increased from 27.5% to 33%,[116] then to 34% in 2009.[117]

163.    In August 2011, renewable energy producers were no longer exempt from the Robin Hood tax.  Producers with an annual gross income over EUR 10 million and taxable income over EUR 1 million became subject to the tax, and the tax rate was increased to 38%.[118]

164.    In June 2013, the scope of the Robin Hood tax was extended to cover companies with annual gross income of over EUR 3 million and taxable income of over EUR 300,000.[119]  As a result, according to Claimants, their PV plants become subject to the Robin Hood tax.[120]

165.    On 11 February 2015, the Italian Constitutional Court rendered a decision concerning the constitutionality of the Robin Hood tax.[121]  The Parties' respective interpretations of the decision differ.  Claimants assert that the decision declared the extension of the Robin Hood tax to PV plants unconstitutional.[122]  Respondent asserts that the decision found the tax to have failed to respect "the principle of equality in contributive capacity, whereas considering its extension to renewable energy producers perfectly legitimate".[123]  In any event, the decision was applied on a going-forward basis (*ex nunc*), rather than from the date of the extension (*ex tunc*), and Italy did not reimburse Claimants for the sums previously collected under the Robin Hood tax.[124]

166.    Claimants assert that although they consider the extension of the Robin Hood tax to PV plants to have been unlawful, their claim is not based on the alleged unlawfulness of the tax measure.[125]  Instead, they argue, they "are only contesting

---

[116] *Ibid.*

[117] Law No. 99/2009, 23 July 2009, CEX-568.

[118] Law Decree No. 138/2011, 13 August 2011, converted into law by Law No. 148, 14 September 2011, Art. 7.1(a), 7.1(c), 7.3, CEX-572.

[119] Law Decree No. 69/2013, 21 June 2013, converted into law by Law No. 98 of 9 August 2013, Art. 5.1, CEX-576.

[120] Statement of Claim, ¶ 289.

[121] Decision No. 10/2015 of the Italian Constitutional Court, 11 February 2015, CEX-305.

[122] Statement of Claim, ¶ 291; Reply, ¶ 104.

[123] Statement of Defense, ¶ 447; Rejoinder, ¶ 91.

[124] Decision No. 10/2015 of the Italian Constitutional Court, 11 February 2015, ¶ 8, CEX-305; see also, Circular No. 18/E, 28 April 2015, at 6, CEX-581 (which Claimants allege required payment of the Robin Hood tax for renewable energy producers in 2014).

[125] Reply, ¶ 104.

whether the application of Italy's court decision on a going-forward basis (*ex nunc*) rather than an application that would deem the measure invalid from inception (*ex tunc*) was fair and in accordance with the ECT."[126]  Claimants assert that Italy's alleged failure to compensate them violated the FET clause because it constituted inconsistent, unfair treatment that was not in good faith, and was an arbitrary, unreasonable measure that impaired their investments.[127]  Furthermore, they assert that the measure violated the "effective means" clause of Article 10(12) ECT.[128]

### 6.  Re-classification of PV Plants as Immovable and Movable Property

167.    Claimants assert that, since at least 2007, PV plants have been classified by the Italian Revenue Agency as "movable property".[129]  According to Claimants, in 2013, Italy re-classified most PV plants as immovable property, pursuant to Circular No. 36/E of 19 December 2013.[130]

168.    Claimants contend that the re-classification had several effects on PV plants. First, it reduced PV plants' depreciation rate to a maximum of 4% per year, previously maintained at 9%, which increased PV plant owners' taxable income.[131]  Also, it entailed that Claimants' PV plants would pay greater amounts of IMU charges and TASI charges than they had paid prior to Circular No. 36/E.[132]

169.    In late 2015, Italy introduced a new rule for classification of immovable property, providing that, as of 1 January 2016, the value of immovable property would be calculated without including the value of certain elements of the

---

[126] *Ibid.*

[127] Statement of Claim, ¶¶ 294, 364, 373, 381.

[128] Reply, ¶ 418.

[129] Statement of Claim, ¶ 295, citing Circular No. 46/E, 19 July 2007, Section 9.3(b), at 27, Section 9.2.1.2(b), at 21-22, and Section 9.4, at 29, CEX-582; Circular No. 38/E, 11 April 2008, Section 1.5.1, at 23-24, CEX-583; Circular No. 38/E, 23 June 2010, Section 1.8(a), at 9-10, CEX-584.

[130] Circular No. 36/E, 19 December 2013, Section 2.1, at 9-10, and Section 3.1.2, at 16, CEX-585 (cited by Respondent as *Agenzia delle Entrate*, Circolar No 36E/2013, Annex 1, "*PV Plants – Cadastral and fiscal features*", REX-16).

[131] Statement of Claim, ¶ 298, citing Circular No. 36/E, 19 December 2013, Section 2.1, at 9-10, and Section 3.1.2, at 16, CEX-585.

[132] Legislative Decree No. 23/2011, 14 March 2011, CEX-586; Law No. 147/2013, 27 December 2013 (2014 Budget Law), Arts. 1.639 and 1.669, CEX-587.  According to Claimants, the IMU charge is a municipal charge on buildings and the TASI charge covers municipal services such as road maintenance and public lighting.  See Statement of Claim, ¶ 298.

structure.[133]  According to Claimants, this rule substantially reduced the portions of PV plants deemed to be immovable property.[134]

170.     According to Claimants, Italy has not reimbursed Claimants for amounts they assert that Italy wrongfully collected, notwithstanding Italy's re-classification of PV facilities.[135]  Claimants contend that the failure of Italy to reimburse them is a violation of the ECT.  Claimants assert, in particular, that Italy's failure to reimburse them for the allegedly mistaken classification of PV facilities as immovable property between 2013 and 2016 violated the FET clause because it constituted arbitrary, inconsistent, unfair treatment that was not in good faith, and was an unreasonable measure that impaired their investments.[136]

## IV.    Relief Requested

### A.  Claimants' request for relief

171.     Claimants requested that the Tribunal render an Award granting the following relief:

- a declaration that the Tribunal has jurisdiction over this dispute;
- a declaration that Italy has violated the Energy Charter Treaty and international law with respect to Claimants' investments;
- compensation to Claimants for all damages they have suffered, as set forth in Claimants' submissions and as may be further developed and quantified in the course of this proceeding;
- all costs of this proceeding, including (but not limited to) Claimants' attorneys' fees and expenses, the fees and expenses of Claimants' experts, and the fees and expenses of the Tribunal and the SCC;
- pre-award and post-award compound interest at the highest lawful rate from the Date of Assessment until Italy's full and final satisfaction of the Award; and
- any other relief the Tribunal deems just and proper.[137]

---

[133] Law No. 208/2015, 28 December 2015, *Disposizioni per la formazione del bilancio annuale e pluriennale dello Stato* (*Legge di Stabilità 2016*), Italian OJ n. 302 of 30 December 2015, Art. 1.21, CEX-314.

[134] Statement of Claim, ¶ 300.

[135] Statement of Claim, ¶ 301.

[136] Statement of Claim, ¶¶ 364, 373, 381; Reply, ¶¶ 406-414.

[137] Reply, ¶ 497.

## B. Respondent's request for relief

172.    Respondent requested that the Tribunal render an Award granting the following relief:

- Decline jurisdiction to decide, as the ECT does not cover intra-EU disputes.
- Alternatively, decline jurisdiction over the totality of claims, since i) some of the attacked measures are exempted under Article 21 ECT, ii) the requirement of unconditional consent under Article 26 ECT is not satisfied as some other measures have been challenged in domestic courts, and iii) no amicable solution has been attempted for some further measures.
- Equally, decline jurisdiction as for application of the umbrella clause in the light of the exclusivity forum choice contained in the GSE Conventions.
- In a further alternative, decline admissibility of protection of the Claimants' alleged interests since these are barred from seeking relief, as: i) they had already addressed domestic courts for the same matters challenged here, and iii) these latter did not seek amicable solution for a number of claims.
- Suspend these proceedings until the Court of Justice of the European Union adopts its decision on the ACHMEA case under Article 19 of the SCC 2010 Arbitration Rules.[138]

173.    In the alternative, should the Tribunal determine that it has jurisdiction and that the claims are admissible, Respondent requested the following relief:

- Declare, on the merits, that the Respondent did not violate Article 10(1) ECT, first and second sentence, since it did not fail to grant fair and equitable treatment to the Claimants' investment.
- Equally, declare, on the merits, that the Respondent did not violate Article 10(1) ECT, fourth sentence, either, since it always adopted reasonable and nondiscriminatory measures to affect Claimants' investment.
- Finally declare, on the merits, that Article 10(1) ECT, last sentence (the so-called "umbrella clause") does not apply in the case at stake, or, alternatively, that the Respondent did not violate it neither through statutory or regulatory measures, nor the GSE Conventions.
- Consequently, declare that no compensation is due.[139]

---

[138] Rejoinder, ¶ 554.
[139] Rejoinder, ¶ 555.

174.    Further, if the Tribunal determines that any of Claimants' claims is valid, Respondent requested the following relief:

- Declare that damages were not adequately proved.
- In addition, declare that both the methods for calculation, and calculation itself of damages proposed by the Claimants are inappropriate and erroneous. This should also include factual incorrectness of figures.
- Order the Claimants to pay the expenses incurred by the Italian Republic in connection with these proceedings, including professional fees and disbursements, and to pay the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the SSC, in accordance with Articles 43 and 44 of SCC 2010 Arbitration Rules.[140]

---

[140] Rejoinder, ¶ 556.

## V.    The Tribunal's Analysis

### A.  Overview

#### 1.  Summary of Conclusions

175.    For the reasons set forth below, the Tribunal concludes that it possesses jurisdiction under the ECT with respect to all of the Claimants' claims except for those concerning Italy's measures relating to the Robin Hood tax and the classification of PV facilities as movable or immovable, which fall outside the scope of the Tribunal's jurisdiction as they concern "Taxation Measures" under ECT Article 21.

176.    Respondent raised several formal objections, asserting that (i) Claimants have already initiated action in the Italian courts, (ii) Claimants failed properly to request amicable settlement prior to initiating this arbitration, and (iii) Claimants are precluded from having recourse to international arbitration based on the forum selection clauses in the GSE Agreements.  The Tribunal, for reasons discussed below, rejects these objections.

177.    Also, Respondent objected that the substantive investment protections and investor-state arbitration provisions of the ECT do not apply to disputes involving an investor having the nationality of an EU Member State against an EU Member State, referred to as "intra-EU disputes".  For reasons discussed below, the Tribunal concludes that Respondent's objections are not well founded.  Nor, as explained below, does the ECJ's decision in *Slovak Republic v. Achmea*,[141] hereinafter referred to as the "*Achmea* Decision", have any impact on the Tribunal's conclusion.  Although the Tribunal in forming its conclusions has considered all of the Parties' arguments and grounds as well as those of the EC in its *amicus curiae* brief, the Tribunal addresses in this Award only the main arguments.

178.    The Tribunal notes that Respondent and the EC contended that the Tribunal must either find that it lacks jurisdiction or, alternatively, stay the proceedings pending the ECJ's decision in *Achmea*.  The Tribunal was not, however, persuaded that a stay would be appropriate.  Further, since the ECJ issued its decision in *Achmea* and the Parties have had opportunities to comment on the decision's possible impact on this arbitration, the Respondent's and the EC's respective proposals for a stay are moot and therefore not addressed in this Award.

---

[141] Judgment of 6 March 2018, *Slowakische Republik v. Achmea B.V.*, European Court of Justice (Grand Chamber), Case C-284/16, CLA-194.

179.   With respect to the merits of the claims remaining within the Tribunal's jurisdiction, the Tribunal concludes as follows:

(a) Regarding the incentive tariff reduction under the *Spalma-incentivi* Decree, a majority of the Tribunal (Messrs. Haigh and Park) finds that this measure undermined Claimants' legitimate expectations, failed to treat Claimants' investments transparently and consistently, and thus violated the FET clause.  That majority also finds that the incentive tariff reduction portion of the Decree violated the impairment clause and breached the obligation set forth in the last sentence of ECT Article 10(1) (the "umbrella clause").

(b)  Regarding the tariff payment term change under the *Spalma-incentivi* Decree, cancellation of the ISTAT inflation adjustment, and imposition of administrative fees and imbalance costs, the Tribunal finds that these measures did not violate the FET clause, the impairment clause, or the umbrella clause.  Regarding modification of minimum guaranteed prices, a majority of the Tribunal (Messrs. Sacerdoti and Park) finds that this measure did not violate the FET clause, the impairment clause, or the umbrella clause.

180.   Set forth below are the law applicable to the dispute and the key treaty provisions on which the Tribunal relies.

## 2.   Applicable Law

181.   Article 22 of the SCC Rules provides that the Tribunal "shall decide the merits of the dispute on the basis of the law(s) or rules of law agreed upon by the parties."

182.   As confirmed in the Tribunal's jurisdictional findings below, the Parties have consented to submit the present dispute to arbitration under the SCC Rules pursuant to Article 26(4)(c) of the ECT.

183.   Article 26(6) of the ECT provides that "[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

184.   Accordingly, this dispute shall be decided in accordance with the ECT and such rules and principles of international law as may be applicable.  As to whether "applicable rules and principles of international law" in Article 26(6) ECT should be interpreted as including EU law, the Tribunal addresses this question in its jurisdictional analysis below.

### 3.  Key Treaty Provisions

185.    ECT Article 26 sets forth the dispute resolution clause, providing, in relevant part, as follows:

(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

(3)(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b)        (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

(ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

(c) A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

[…]

(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

186.    ECT Article 10(1) imposes the following host-state responsibilities with respect to the standard of treatment of foreign investors.

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

187.    ECT Article 21(1) excludes certain "taxation measures" from the scope of measures with respect to which rights or obligations are created under the ECT, providing as follows:

> Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

> ECT Article 21(7)(a) provides a definition of "Taxation Measures:

> The term "Taxation Measure" includes:
> (i)   any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and
> (ii)  any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

188.    ECT Article 16(2).

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
> […]
> (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.

## B. Jurisdiction

### 1. Formal Requirements

#### a. Parties and Nature of Dispute

189.    As a preliminary matter, ECT Article 26(1) requires that Respondent is a Contracting Party to the ECT and that Claimants are qualified "Investors of another Contracting Party", i.e., have a nationality different from that of Respondent.

190.    The following matters are uncontested.  The Republic of Italy is a Contracting Party to the ECT, which entered into force for Italy on 16 April 1998.[142] NovEnergia and NIP are both companies duly established under the laws of the Grand Duchy of Luxembourg, for which the ECT entered into force on 16 April 1998.[143]  Greentech is a company duly established under the laws of the Kingdom of Denmark, for which the ECT entered into force on 16 April 1998.[144]

191.    The ECT defines a protected "Investor" as "a company or other organisation organised in accordance with the law applicable in that Contracting Party."[145]

---

[142] Italy signed the ECT on 17 December 1994, ratified it on 5 December 1997, and deposited its instrument of ratification on 16 December 1997.  See excerpt from Energy Charter website, CEX-9.  Although Italy notified its withdrawal from the ECT, which Claimants assert took effect in January 2016 (see Reply, ¶ 53 n. 5.), such withdrawal does not affect the Tribunal's jurisdiction in the present arbitration in light of the ECT's sunset clause, providing that the ECT continues to apply for twenty years from the date when such notice takes effect.

[143] Luxembourg signed the ECT on 17 December 1994, ratified it on 7 February 1997, and deposited its instrument of ratification on 27 November 1997.  See excerpts from Energy Charter website, CEX-11.

[144] Denmark signed the ECT on 17 December 1994, ratified it on 22 August 1997, and deposited its instrument of ratification on 16 December 1997.  See excerpts from Energy Charter website, CEX-10.

[145] ECT, Art. 1(7)(a)(ii), CEX-1.

Accordingly, NovEnergia and NIP are Investors with respect to Luxembourg and Greentech is an Investor with respect to Denmark.

192.    As described above (Part III – Factual Background), Claimants acquired and developed a number of PV facilities and acquired certain rights in Italy. Respondent has not contested that Claimants' investments fall within the meaning of "Investments" under ECT Article 1(6), including the following, as quoted from the Statement of Claim.

> (i) tangible and intangible property and property rights, including various photovoltaic facilities; (ii) shares and equity participation in Italian companies and photovoltaic facilities, as well as debt obligations with respect to those companies and facilities; (iii) rights to returns, claims to money, and claims to performance pursuant to contracts having economic value related to the photovoltaic facilities and related investments; (iv) rights conferred by law, specifically, the rights to fixed incentive tariffs conferred through various *Conto Energia* decrees and rights to guaranteed minimum prices granted in Italy's "off-take" regime; and (v) rights conferred by licenses, permits, and contracts, including rights to incentive tariffs for electricity produced by their photovoltaic facilities and guaranteed minimum prices granted in Italy's "off-take" regime.[146]

193.    ECT Article 26 covers disputes "which concern an alleged breach of an obligation of [a Contracting Party] under Part III" of the ECT.[147]  The present dispute concerns alleged violations by Italy of obligations under ECT Article 10(1), including the obligation to accord fair and equitable treatment, the obligation not to impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment, or disposal of investments, and the obligation to observe obligations entered into with an Investor or an Investment. The present dispute thus falls within the subject matter described in ECT Article 26(1).

### b.  Consent to Arbitration ("fork-in-the-road" objection)

194.    Claimants expressed their consent to SCC arbitration under ECT Article 26(4)(c) by filing the Request for Arbitration on 7 July 2015.[148]

---

[146] Statement of Claim, ¶ 38.

[147] ECT, Art. 26(1), CEX-1.

[148] Request for Arbitration, 7 July 2015; ECT, Art. 26(4)(c), CEX-1.

195.    Respondent, however, contends that the conditions for finding it to have provided "unconditional consent to the submission of a dispute to international arbitration" under Article 26(3)(a) are not fulfilled.[149]  ECT Article 26(2)-(3) provides:

(2)  If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a)  to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b)  in accordance with any applicable, previously agreed dispute settlement procedure; or

(c)  in accordance with the following paragraphs of this Article.

(3)  (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b)   (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

(ii)  For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

196.    Respondent, as a Contracting Party "listed in Annex ID", asserts that Claimants have "previously submitted the dispute" (Art. 26(3)(b)(i)) "to the courts or administrative tribunals of the Contracting Party party to the dispute" (Art. 26(2)(a)) by filing claims in Italian administrative courts on the same or similar matters as addressed in this arbitration.[150]

197.    Respondent contends that several Italian administrative court actions were brought by parties, including companies owned by Claimants, regarding the measures at issue in this arbitration, including the *Spalma-incentivi* Decree.[151]

---

[149] ECT, Art. 26(3)(a), CEX-1.

[150] Statement of Defense, ¶¶ 172-184.

[151] Statement of Defense, ¶¶ 175-180.

According to Respondent, claimants in those actions asserted violations of the Italian Constitution, the ECHR, the ECT, and certain EU directives.[152] Respondent argues that a proper application of Article 26(3)(b)(i) would "focus on the real substance of the underlying rights as opposed to the form of the legal action".[153] Alternatively, argues Respondent, the "triple-identity test" (identity of parties, cause of action, and object of the dispute) would be met here, since the domestic cases were instituted by Claimants' subsidiaries, the "measures at stake are exactly the same as in these proceedings", and the grounds include alleged violations of ECT Article 10.[154]

198.    In response, Claimants assert that they have not commenced domestic litigation in Italy and are not participating in any domestic Italian case.[155] While Claimants concede that certain companies previously owned by NovEnergia and NIP did file some of the cases Respondent refers to, Claimants assert that none of Greentech's subsidiaries did so.[156]

199.    For the reason above, Claimants argue that the Italy cannot satisfy the first element of the triple-identity test, namely, that the previously filed domestic action and the subsequent arbitration claim involve the same parties.[157] Also, according to Claimants, "the vast majority of tribunals have held that the parties to both disputes must be strictly identical" to satisfy the triple-identity test.[158]

---

[152] Statement of Defense, ¶ 175, 179-180, citing Case N. 15359/2014, *Assorinnovabili and others*, Order by TAR Lazio of 24 June 2015 to refer the issue of constitutionality of Article 26 of the *Spalma-incentivi* Decree to the Italian Constitutional Court, REX-21; *Akralux srl v MISE, GSE and AEEG*, TAR [Administrative Regional Tribunal ] Lazio (A), *Alma Bruca srl v MISE, GSE and AEEG*, TAR Lazio (B), *Alma Lao srl v MISE, GSE and AEEG*, TAR Lazio (C), *Alma Sybaris srl v MISE, GSE and AEEG*, TAR Lazio (D), *San Marco Solar srl v MISE, GSE and AEEG*, TAR Lazio (E), *Solar Energy Italia 7 , Solar Energy Italia 7 srl v MISE, GSE and AEEG*, TAR Lazio (f), *Soleto Città del Sole srl v MISE, GSE and AEEG*, TAR Lazio (G), *Venusia srl v. MISE, GSE and AEEG*, TAR Lazio (H), REX-22; *San Marco Solar srl v. GSE, MISE and Ministry for the Environment*, TAR Lazio (A), REX-23.:

[153] Statement of Defense, ¶ 181.

[154] Statement of Defense, ¶ 182.

[155] Reply, ¶ 128.

[156] Reply, ¶ 130.

[157] Reply, ¶ 129.

[158] Reply, ¶ 131, citing *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Objections to Jurisdiction of 17 July 2003, ¶¶ 19, 80, CLA-115; *Enron v. Argentina*, ICSID Case No. ARB/01/3, Decision on Jurisdiction of 14 January 2004, ¶¶ 21, 98, CLA-116; *Champion Trading Co. et al. v. Egypt*, ICSID Case No. ARB/02/9, Decision on Jurisdiction of 21 October 2003, ¶¶ 1, 3.4.3, CLA-117; *Azurix Corp. v. Argentina*, ICSID Case No. ARB/01/12, Decision on Jurisdiction of 9 December 2003, ¶¶ 21, 37, 90, CLA-118; *Pan American Energy LLC & BP Argentina Exploration Company v. Argentina*, ICSID Case No. ARB/04/8, Decision on Preliminary Objections of 27 July 2006, ¶¶ 12, 140, 155, CLA- 119.

200.    Regarding the argument that a possible alignment of interests between the local companies and Claimants should bar Claimants from seeking relief under the ECT, Claimants argue that such an alignment of interest is irrelevant and cannot be presumed to exist.[159]  Furthermore, Claimants assert, the ECT, unlike NAFTA, does not require companies in which a claimant holds interests to waive domestic remedies.[160]  Claimants refer to prior investment arbitration awards allegedly affirming investors' right to pursue treaty claims despite pending domestic proceedings by their local subsidiaries.[161]

201.    Claimants refers to Italy's "fork-in-the-road" declaration, stating that where a domestic claim is pending but not yet decided, the Investor may elect to withdraw the domestic claim "by procedural or lateral renouncement" and pursue arbitration.[162]  Thus, Claimants argue, even if they were parties in the domestic cases, which they deny, that would not prevent them from pursuing arbitration.

202.    As for the contention that the "similarity" of the domestic suits to this arbitration bars Claimants from pursuing the latter, Claimants make two arguments.  First, it would be "fundamentally unfair" to apply such an analysis, since Claimants – not party to the domestic lawsuits – cannot comment meaningfully on their scope and Italy's description of the facts would need to be accepted at face value.[163]  Second, this arbitration covers a broader scope of Italian measures than the domestic suits and concerns application of the ECT and international law.[164]  Although Italy has asserted that the ECT was invoked in the domestic lawsuits, this occurred in only some of them, and Italy has not demonstrated that an Italian court can rule on the basis of the ECT or international law in a case involving domestic parties.[165]

203.    In its Rejoinder, Respondent first argues that Claimants, while showing evidence of a demerger, did not prove that this ended their ownership of the companies in the domestic litigation.  Further, since the demerger occurred after the arbitration commenced, the conditions for Respondent's unconditional consent

---

[159] Reply, ¶¶ 130-131.

[160] Reply, ¶ 132.

[161] Reply, ¶ 133.

[162] Reply, ¶ 134, citing Energy Charter Secretariat Transparency Document: Policies, Practices and Conditions of Contracting Parties Listed in Annex ID Not Allowing an Investor to Resubmit the Same Dispute to International Arbitration at a Later Stage as Provided by Contracting Parties (in accordance with Article 26(3)(b)(ii) of the Energy Charter Treaty), at 32, CEX-312.

[163] Reply, ¶ 135.

[164] Reply, ¶ 136.

[165] Reply, ¶ 137.

were not fulfilled.[166]  Second, Respondent argues for a "more flexible interpretative approach" toward the identity of parties, but even under a stricter approach, Respondent asserts that the companies in the domestic suits and NovEnergia "should be considered as the same party".[167]  Respondent argues that this follows from the fact that NovEnergia controls those local companies but would itself lack standing to participate in the administrative cases.[168]  Third, Respondent argues that it is unfair if a decision by the Italian Constitutional Court, which "addresses the compatibility of the *Spalma-incentivi* Decree with both EU law and the ECHR", does not bar the parties to the domestic law proceedings from raising the same claims in this arbitration, asserting that those domestic parties are "materially" the same as Claimants here.[169]

204.    Having reviewed the Parties' arguments, the Tribunal has not been persuaded to adopt a non-literal interpretation of ECT Article 26(3)(b)(i), which provides, "[t]he Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b)."  The term, "Investor", is unambiguous.  In the context of Article 26, sub-paragraph (1) of which refers to "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former", the Italian subsidiaries of Claimants in this arbitration cannot be understood to be "Investors" but are, instead, to be treated as "Investments" which are located "in the Area of" Italy.

205.    Given that Respondent has not shown that Claimants have previously submitted the present dispute to Italian courts or administrative tribunals, there is no ground to deny, based on a fork-in-the-road argument, that Italy has given its unconditional consent pursuant to ECT Article 26(3)(a).  Accordingly, the Tribunal rejects Respondent's objection.

### c.  Request for Amicable Settlement

206.    ECT Article 26(1) provides that disputes falling within its scope "shall, if possible, be settled amicably" and, under Article 26(2), "[i]f such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution: … (c) in accordance with the following paragraphs of this Article."

---

[166] Rejoinder, ¶¶ 141-142.
[167] Rejoinder, ¶¶ 143-144.
[168] Rejoinder, ¶ 142.
[169] Rejoinder, ¶¶ 148-149.

207.    On 7 November 2014, Greentech sent a letter to Italy notifying it of a dispute regarding alleged violations of the ECT by Italy and offering to settle the dispute amicably.[170]  On 15 December 2014, NovEnergia and NIP sent a letter to Italy notifying it of a dispute regarding alleged violations of the ECT by Italy and offering to settle the dispute amicably.[171]  Claimants filed the present arbitration on 7 July 2015.  It is not contested that Italy did not respond to Claimants' letters.

208.    Respondent contends that the Request for Arbitration and Statement of Claim asserted new ECT claims regarding the following measures which, Respondent contends, must be considered to fall outside the scope of the letters of 7 November 2014 and 15 December 2014:[172]

- The GSE's request in March or April 2015 for reimbursement of inflation-adjusted amounts of tariff incentives received under *Conto* I;[173]

- The GSE's adoption in May 2015 of technical rules regarding modifications to PV plants, including an obligation to notify the GSE of certain modifications;[174]

- Italian Constitutional Court Decision No. 10 of 11 February 2015 declaring the Robin Hood tax unconstitutional, with application *ex nunc*;[175] and

- Rules pursuant to Law No. 208/2015, which from 1 January 2016 reduced the portions of PV plants deemed immovable, and the allegedly unfair decision of Italy not to compensate for prior classification.[176]

209.    According to Respondent, Claimants' assertion that these measures relate to the "same subject matter" as the dispute submitted in their 2014 letters relies on such a broad interpretation of subject matter that "anything [that] happened in Italy after they built their plants would fit into these proceedings…."[177]  For example, regarding the Italian Constitutional Court Decision on the Robin Hood tax and the effect of Law No. 208/2015 on classification of PV plants as immovable property, Respondent asserts that these allegedly "fiscal provisions of

---

[170] Letter from Greentech to Italy, 7 November 2014, CEX-12.

[171] Letter from NovEnergia and NIP to Italy, 15 December 2014, CEX-13.

[172] Statement of Defense, ¶¶ 206-215.

[173] Statement of Defense, ¶¶ 207-209, citing Request for Arbitration, ¶¶ 57-58, and Statement of Claim, ¶¶ 257-262.

[174] Statement of Defense, ¶¶ 210-211, citing Request for Arbitration, ¶¶ 59-61.  See also Rejoinder, ¶ 158 n. 62; Reply, ¶ 148.  Claimants asserted in their Reply that, since the rules had not yet been adopted at that time, they would refrain from making a claim based on this measure but reserved the right to do so later.

[175] Statement of Defense, ¶ 212, citing Request for Arbitration, ¶ 43, and Statement of Claim, ¶¶ 293-294.

[176] Statement of Defense, ¶ 214-215, citing Statement of Claim, ¶¶ 300-301.

[177] Rejoinder, ¶ 159.

a general nature" do not fall within "the same subject matter as claims against renewable energy support schemes."[178]

210.    Claimants, on the other hand, contend that their 2014 letters were broadly drafted, discussed the dispute in detail, and were submitted to Respondent more than six months before filing the arbitration.[179] According to Claimants, the measures that Italy objects to on this basis concern the same subject matter as the dispute submitted.[180] Claimants argue that one must distinguish a "measure" from a "dispute" and that the requirement is only to submit the "dispute" to the counterparty rather than to identify every measure.[181]

211.    Claimants refer to decisions of several investment arbitration tribunals holding that the requirement to submit a dispute for amicable settlement prior to commencing arbitration does not require a complete or detailed notice.[182] Furthermore, according to Claimants, a party may bring additional claims which relate to the same subject matter.[183] Claimants refer to an ECT case under the SCC rules, *AMTO v. Ukraine*, which stated the following in regard to ECT Article 26(2):

> A party can request amicable settlement of a dispute without identifying any ECT claims, and an Investor may have good reason not to formulate claims at this stage…
> […]
> In the subsequent Request for Arbitration the Investor was free to frame its claim as it wished, provided they related to the same dispute….[184]

212.    Claimants argue that it would be procedurally inefficient and unfair to halt the proceedings when they are already at an advanced stage, to require Claimants to file new notice letters in a separate arbitration, or to suspend these proceedings pending a renewed notice period.[185] They also contend that Italy suffers no prejudice from inclusion of these claims, to which Italy had ample time to respond

---

[178] Rejoinder, ¶ 160.

[179] Reply, ¶ 146.

[180] Reply, ¶¶ 148-149.

[181] Reply, ¶¶ 152, 158.

[182] *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, ¶ 339, CLA-34; *Salini Costruttori S.pA and Italstrade S.p.A v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 16 July 2001, ¶ 20, CLA-122.

[183] *Tenaris S.A. and Talta Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26, Award, 29 January 2016, ¶ 245, CLA-123.

[184] *Limited Liability Company AMTO v. Ukraine*, SCC Arb. No. 080/2005, Award, 26 March 2008, ¶ 55, CLA-53.

[185] Reply, ¶ 162.

after receiving notice in Claimants' submissions.[186]  Under the circumstances, Claimants contend that their position is supported by both arbitral tribunals and by scholarly writing affirming that a notice or amicable settlement requirement is generally a "procedural" rather than "jurisdictional" matter, which may be waived.[187]

213.    The Tribunal considers Claimants' 2014 letters sufficiently detailed and broad to notify and request amicable settlement of the present dispute pursuant to ECT Article 26(1)-(2).  Each measure objected to by Respondent relates to the same subject matter as other measures referred to in the letters, namely, Italy's treatment of Claimants' PV investments.  The Tribunal's conclusion is consistent with decisions by other tribunals, including under the ECT, flatly rejecting a formalistic approach toward the notice of dispute, which need not be exhaustive.  In the present case, there is no doubt that Claimants gave timely and adequate notice and requested amicable settlement by their 2014 letters.  The objection is therefore denied.

### d.  Dispute settlement clauses in GSE Agreements

214.    Respondent asserts that the Tribunal lacks jurisdiction because the GSE Agreements and minimum guaranteed price contracts contain exclusive forum selection clauses that refer disputes to Italian court.[188]  The forum selection clauses provide as follows:

> For any dispute arising out of, or in any way related to the interpretation and/or execution of this Convention and the acts it refers to, the Parties agree on the exclusive jurisdiction of the Court of Rome.[189]

215.    According to Respondent, a contractual forum selection clause prevails over an investment treaty's arbitration provision, unless the treaty expressly overrides the forum selection clause.[190]  Respondent asserts that the ECT does not expressly override contractual forum selection clauses but instead expressly accommodates

---

[186] Reply, ¶¶ 158, 162, 164-165.

[187] Reply, ¶¶ 159-161.

[188] Statement of Defense, ¶¶ 186-189.

[189] GSE Agreement under *Conto* V, Art. 15, CEX-370, providing, "*Per qualsiasi controversia derivante o comunque connessa all'interpretazione e/o esecuzione della presente convenzione e degli atti dalla stessa richiamati, le Parti convengono la competenza esclusiva del Foro di Roma.*"  Identical wording appears in a minimum guaranteed prices contract, Art. 16, REX-24, and Respondent asserts that all contracts contain "[t]he same language … with no material difference".  Statement of Defense, ¶ 187 n. 69.

[190] Statement of Defense, ¶ 190.

them, noting that ECT Article 26(2)(b) allows submission of disputes to "any applicable, previously agreed dispute settlement procedure".[191]  Respondent also contends that the wording, "subject only to subparagraphs (b) and (c)" in Article 26(3) means there is no "unconditional consent" to international arbitration where such an exclusive forum selection clause exists.[192]  Respondent suggests that the wording of the above forum selection clause is broad enough to cover disputes under the ECT.[193]

216.    Respondent asserts that the *SGS v. Philippines* tribunal considered that exclusive jurisdiction clauses in contracts prevail over dispute settlement provisions in investment treaties, because the latter are general provisions that presumably do not override "specific provisions of particular contracts, freely negotiated between the parties" and because such treaties are intended to "support and supplement, not to override or replace the actually negotiated investment arrangements made between the investor and the host State."[194]  According to Respondent, the *SGS v. Philippines* tribunal's view was followed by the tribunal in *BIVAC v. Paraguay*.[195]

217.    Further, Respondent quotes from a decision in the *Aguas del Tunari v. Bolivia* arbitration, regarding the possibility of an investor's waiver of its right to arbitration under a treaty and the extent to which an exclusive forum selection clause might effect a waiver.[196]  In this context, Respondent asserts that "we cannot underestimate that investors, including the Claimants, have indeed addressed the administrative Court of Rome to have the GSE Conventions and the relevant regulatory acts annulled because of inconsistency, *inter alia*, with the ECT."[197]

---

[191] Statement of Defense, ¶ 191.

[192] Statement of Defense, ¶ 191.

[193] Statement of Defense, ¶ 192, stating, "Moreover, the scope of the clause is not limited to issues raised exclusively under Italian law. On the opposite, the cases brought to the Italian administrative court against the two MISE decrees implementing the *Spalma-incentivi* that were described under II.3.A. (above, § 175) called the GSE as a defendant in the trial on the basis of the Conventions and founded their claims – as stated above – also on the ECT."

[194] Statement of Defense, ¶¶ 193-194, citing ICSID Case No. ARB/02/06, *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004, ¶ 141, RLA-4.

[195] Statement of Defense, ¶ 197, citing ICSID Case No. ARB/07/9, *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC B.V. v. Republic of Paraguay*, Decision on Objections to Jurisdiction, 29 May 2009, ¶¶ 142-158, RLA-6.

[196] ICSID Case No. ARB/02/3, *Aguas del Tunari S.A. v. Republic of Bolivia*, Decision on Respondent's Objections to Jurisdiction, 21 October 2005, ¶¶ 118-119, RLA-5.

[197] Statement of Defense, ¶ 196.

218.     Claimants offer two main arguments in response to Respondent's contentions. First, Claimants state that they themselves are not parties to the GSE Agreements and, as such, would lack standing to pursue claims under the GSE Agreements in the courts of Rome.[198]  This, according to Claimants, distinguishes the present case from the *SGS v. Philippines* and *BIVAC v. Paraguay* cases, where the claimants were parties to contracts with the respondent states.[199]  Also, Claimants contend, the forum selection clause in the GSE Agreements cannot be characterized as a "previously agreed dispute settlement procedure" between Claimants and Italy under ECT Article 26(2).[200]

219.     Second, Claimants characterize the present arbitration as not relating to claims for breach of contract, but about alleged violations of obligations under the ECT, with the GSE Agreements only serving as evidence of the alleged treaty violations.[201]  Claimants assert that *SGS v. Philippines*, *BIVAC v. Paraguay*, and the *ad hoc* committee decision in *Vivendi* support the position that a forum selection clause in a contract between the claimant and the host state will not deprive a tribunal of jurisdiction where the "the fundamental basis of the claim is a treaty laying down an independent standard by which the conduct of the parties is to be judged…."[202]

220.     The Tribunal begins by noting that Claimants are not party to the GSE Agreements.  Thus, regardless of the wide scope of the forum selection clause in those agreements which Respondent alleges, Claimants do not appear to have standing to assert claims for breach of contract in Italian court and Respondent has not stated otherwise.  It is clear also that Claimants are not making a claim for breach of contract in the present arbitration.  Claimants have claimed for violations of the ECT and international law.  Given the foregoing, the issue faced by the *SGS v. Philippines* and *BIVAC v. Paraguay* tribunals, of distinguishing a contract claim from a treaty claim, does not arise here.  The Tribunal thus denies Respondent's objection based on the forum selection clauses in the GSE Agreements and minimum guaranteed price contracts.

221.     The Tribunal notes that, as Claimants are not party to the GSE Agreements, the forum selection clause therein could not constitute an "applicable, previously

---

[198] Reply, ¶¶ 140-141.

[199] Reply, ¶ 141.

[200] Reply, ¶ 140.

[201] Reply, ¶ 142.

[202] ICSID Case No. ARB/07/9, *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC B.V. v. Republic of Paraguay*, Decision on Objections to Jurisdiction, 29 May 2009, ¶¶ 127, RLA-6, citing *Compania de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 101, CLA-121.

agreed dispute settlement procedure" under ECT Article 26(2)(b). Article 26(2) applies only to the "Investor party to the dispute". While Claimants are parties to the present dispute, the Italian companies that executed GSE Agreements are not. The ability of Italian companies not party to this dispute to sue under the GSE Agreements does not convert the forum selection clause therein to an "applicable, previously agreed dispute settlement procedure" with respect to Claimants.

### 2. Objections under Article 21 of the ECT

#### a. Non-reimbursement of Robin Hood Tax Payments

##### (i) Respondent's Position

222.     Regarding the Robin Hood tax's extension to certain PV plants, Respondent asserts that it was "unequivocally" a taxation measure, citing the Italian Constitutional Court's own statement: "[u]ndisputed is the fiscal nature of the tax, since the tax on corporate income [TARES] is a direct tax … constituting a compulsory levy based on an economically significant parameter, and connected to the public spending…."[203]

223.     Respondent also asserts that by claiming that the application of the Constitutional Court's decision *ex nunc* instead of *ex tunc* was not legitimate, Claimants are in fact claiming that the tax was wrongfully imposed and Italy refused to compensate them for those payments.[204] Respondent asserts that this would "go back to the evaluation of the substance of the Robin Hood Tax and become *de facto* a claim on the taxation measure."[205]

224.     Accordingly, argues Respondent, Claimants' claim is against a "Taxation Measure" under ECT Article 21, and falls outside the Tribunal's jurisdiction.

##### (ii)     Claimants' Position

225.     Claimants draw a distinction between, on one hand, claiming that the Robin Hood tax's extension to PV plants was wrongful and, on the other hand, claiming that the Italian Constitutional Court decision to apply its ruling on a going-forward

---

[203] Statement of Defense, ¶¶ 154-155, citing Italian Constitutional Court Decision No. 131, 27 May 2015, REX-15.
[204] Rejoinder, ¶ 92.
[205] Rejoinder, ¶ 92.

basis was wrongful.[206]  In Claimants' own words, they "are only contesting whether the application of Italy's court decision on a going-forward basis (*ex nunc*) rather than an application that would deem the measure invalid from inception (*ex tunc*) was fair and in accordance with the ECT."[207]  Also, at the hearing, Claimants' counsel asserted, "our claim is that the court in Italy fundamentally was unfair and inequitable by declaring a measure unconstitutional but then saying, 'We'll only apply this ruling going forward, and for the two years you have paid these unconstitutional Robin Hood taxes you won't get a refund', so it's about the court decision and the court's handling of the future versus the past.  It's not about the taxation measure itself."[208]

### (iii)    Tribunal Analysis

226.    ECT Article 21(1) (first sentence) provides:

> Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.

227.    The Tribunal is asked to decide whether the Italian Constitutional Court's decision, the meaning of which is itself contested by the Parties,[209] violates the ECT, noting that Claimants contend that their grievance is that the court itself applied its decision *ex nunc* rather than *ex tunc*.  If, however, the Tribunal were to find that the court's application of its ruling violated the ECT, the Tribunal would need to determine whether the damages claimed by Claimants are to be awarded.  The damages sought are the same amounts they have alleged were "wrongfully collected from them" during the 2013-2015 period.[210]  For the Tribunal to award compensatory damages for the Constitutional Court's application of its decision *ex nunc*, which allegedly wrongfully failed to order reimbursement of taxes "wrongfully collected", would appear to "create rights or impose obligations with respect to Taxation Measures" of Italy.  In this instance, the Tribunal does not consider the distinction between the court's decision on the Robin Hood tax and

---

[206] Reply, ¶ 100.

[207] Reply, ¶ 104.

[208] Transcript, Day 5, 61:23-62:5 (Fleuriet).

[209] As described *supra*, Claimants assert that the court's decision declared the extension of the Robin Hood tax to PV plants unconstitutional.  Respondent asserts that the decision found the tax to have failed to respect "the principle of equality in contributive capacity, whereas considering its extension to renewable energy producers perfectly legitimate".

[210] See Statement of Claim, ¶ 292 (stating that that Italian Constitution Court considered the tax to have been "wrongfully collected from them"); Expert Report of Richard Edwards, 4 April 2016, ¶ 3.17 (Table 3-1), summarizing "the total annual amount of Robin Hood Tax paid in the period from 2013 to 2015 by the NovEnergia and Greentech Plants (no amounts were paid prior to 2013)".

the Robin Hood tax itself to be a meaningful one.  Accordingly, the Tribunal concludes that Claimants' claims relating to the Robin Hood tax under Article 10(1) and 10(12) of the ECT are outside the Tribunal's jurisdiction.

### b.  Re-classification of PV Plants as Immovable and Movable Property

#### (i) Respondent's Position

228.    Respondent asserts that the re-classification of PV plants from movable to immovable property was "unequivocally" a taxation measure.[211]  Alternatively, Respondent argues, the re-classification was "ancillary" to a taxation measure by defining the latter's scope.[212]  Respondent asserts that the subject of Claimants' grievance is "not the definition of the plants as immovable as such, but the consequence of that definition, which takes their assets to be subject to taxation."[213]

229.    Therefore, according to Respondent, the re-classification of PV plants as immovable property was a taxation measure falling outside the Tribunal's jurisdiction under ECT Article 21.

#### (ii)    Claimants' Position

230.    Claimants rebut Respondent's Article 21 objection, arguing that "the only relevance [Claimants'] claim has to taxes is the fact that immovable property is subject to certain charges (IMU and TASI) whereas movable property is not."[214]  Claimants state that they "are not contesting the application of those taxes."[215]  Thus, they argue, the Tribunal's exercise of jurisdiction would not "create rights or impose obligations with respect to Taxation Measures".

#### (iii)    Tribunal Analysis

231.    The Parties have not contested that the IMU and TASI charges are Taxation Measures under ECT Article 21.  The issue is whether the Tribunal, if it were to find that the re-classification of PV plants violated or did not violate the ECT, would "create rights or impose obligations with respect to Taxation Measures."

---

[211] Statement of Defense, ¶ 154.
[212] Statement of Defense, ¶ 159.
[213] Statement of Defense, ¶ 159.
[214] Reply, ¶ 105.
[215] Reply, ¶ 105.

232.    If, for example, the Tribunal were to find that the re-classification violated the ECT, the Tribunal would need to determine whether to award the damages Claimants are seeking.  The damages asserted by Claimants are, as described by Claimants' quantum expert, for the additional amounts of IMU and TASI charges paid in respect of years 2013 to 2015.[216]

233.    In light of the above, whether Claimants' claim is that a measure changing the scope of applicability of a Taxation Measure or a Taxation Measure itself violates Article 10(1) of the ECT, the damages Claimants seek are for the amount they allegedly overpaid in respect of the Taxation Measure.  Thus, awarding damages for the overpayment would "create rights or impose obligations with respect to Taxation Measures".  The Tribunal therefore concludes that Claimants' claim regarding re-classification of PV plants as immovable property falls outside the Tribunal's jurisdiction pursuant to ECT Article 21.

### c.  Administrative Fee

#### (i) Respondent's Position

234.    According to Respondent, "Taxation Measures" under Article 21 are equivalent to "fiscal measures" (or "*tributi*") under Italian law, falling into three categories: "*imposta* (tax), *tassa* (fee) and *contributo* (contribution)…."[217] Despite the use of "*imposte*" in the Italian version of Article 21(7)(a)(i), Respondent opposes an interpretation that limits "Taxation Measures" to meaning "*imposta*" under Italian law, noting that Article 21(7)(a) uses the word "includes", which Respondent interprets as introducing a non-exhaustive list.[218]  Additionally, Respondent asserts that a narrow meaning of "*imposte*" or "*misure fiscali*" would create a risk that exceptions to Article 21, e.g., for expropriation claims under Article 13, are construed too narrowly, thus failing to protect investors. Respondent thus asserts that Taxation Measures should include a wider range of measures than those encompassed by "*imposte*".[219]

235.    Regarding prior arbitral decisions dealing with the topic of taxation measures under BITs and the ECT, Respondent interprets their significance differently from Claimants.  Respondent argues, *inter alia*, that the standard for a "taxation law" set forth in *Murphy v. Ecuador* would be satisfied by the administrative fee, as it is a mandatory levy, imposed for public purposes on a class of persons, and there is

---

[216] Expert Report of Richard Edwards, 4 April 2016, ¶¶ 5.52, 5.66 (Table 5-16); Second Expert Report of Richard Edwards, 15 December 2016, ¶ 5.51 (Table 5-4).
[217] Statement of Defense, ¶¶ 147-149.
[218] Rejoinder, ¶ 116.
[219] Rejoinder, ¶¶ 115, 118.

no direct benefit to the taxpayer.[220]  Denying Claimants' argument that the administrative fee was intended to cover a specific service, namely, the GSE's management, monitoring and verification tasks, rather than to raise general revenue, Respondent asserts that the fee was imposed on "all operators whose plants can be subject to auditing and investigation", regardless of which *Conto Energia* decree the operator's plant might fall under.[221]

236.    Referring to domestic Italian law, Respondent interprets two decisions by the Italian Constitutional Court regarding certain charges on public utilities or services.[222]  According to Respondent, in Decision 335/2008, regarding a tariff for sewer and water treatment services, the Court found that the measure was not a fiscal measure, based on a "synallagma" or reciprocity between the amounts paid and the services provided.[223]  On the other hand, in Decision 238/2009, regarding a charge for municipal waste services, Respondent asserts that the Court found that it was a fiscal measure.[224]  According to Respondent, the Court considered there to be "no synallagmatic relationship" as the charge was payable based on the kind of house owned rather than the services received, and the citizen could not refuse to pay just by declining the service.[225]  Respondent asserts that the administrative fee meets the standard for a fiscal measure set forth in the court decisions, since the fee is mandatory, is related to quantities of incentivized electricity produced, is established annually, and is not related to an identifiable specific service actually received by the PV producer.[226]

237.    Respondent also argues that since consumers also paid a portion of the GSE's costs through "Component A3" of their electricity bills, which Respondent construes as a fiscal measure, this charge must also be deemed a fiscal measure in respect of PV producers.[227]

238.    Finally, in rebuttal of Claimants' arguments that administrative fees would not be subject to Italian tax courts or subject to double-taxation treaties, Respondent argues that this is circular reasoning.  If, Respondent asserts, the administrative fee is found to be a fiscal measure, then it will be subject to the tax court jurisdiction,

---

[220] Rejoinder, ¶¶ 122-124, citing *Murphy Exploration & Production Company – International v. The Republic of Ecuador*, Partial Final Award, 6 May 2016, ¶ 159, CLA-102.

[221] Rejoinder, ¶ 124.

[222] Rejoinder, ¶¶ 132-137.

[223] Rejoinder, ¶ 132, citing Italian Constitutional Court, Decision No. 335/2008, 10 October 2008, CLA-142.

[224] Rejoinder, ¶¶ 134-135, citing Italian Constitutional Court, decision No. 238/2009, 10 June 2009, REX-13/CLA-148.

[225] Rejoinder, ¶¶ 134-135.

[226] Statement of Defense, ¶ 162; Rejoinder, ¶¶ 136-137.

[227] Statement of Defense, ¶ 163.

and if they are not covered by a treaty, that will be simply because of a matter of a narrow definition used in the treaty.[228]

    **(ii)**    **Claimants' Position**

239.    Claimants construe Article 21 as having a narrower scope, noting that the official Italian version of the ECT defines Taxation Measures by reference to "*imposte*".[229]  Also, when it comes to characterizing the nature of the disputed measures, Claimants consider that although Italian law is relevant, stating that "the domestic characterization of a disputed measure may be helpful in ascertaining its nature", domestic legal notions are not determinative of the meaning of taxation measures in a treaty.[230]

240.    Claimants next refer to arbitral decisions explaining the general notion of taxation measures under BITs as well as the ECT, as measures imposed on classes of persons, having the public purpose of raising general revenue for the State, and not providing a direct benefit to the taxpayer.[231]  Claimants note that one tribunal looked to the "plain text" of the provision imposing the contested measure and the constitutional framework in which it was enacted.[232]  The tribunal in the *Yukos* arbitration considered that only "*bona fide* taxation measures" fall within ECT Article 21.[233]

241.    Claimants assert that, under their interpretation of Taxation Measures, the administrative fee was not such a measure, because it was intended to cover a specific service – the GSE's management, monitoring and verification tasks – rather than to raise general revenue for Italy.[234]  They assert that the administrative

---

[228] Rejoinder, ¶¶ 131, 138.

[229] Reply, ¶¶ 109-110, quoting (with emphases added) the Italian version of Article 21(7)(a), providing:

    *Ai fini del presented articolo:*

    *a)*  *Il termine "misura fiscale" comprende:*

      *i)*  *Qualsiasi disposizione sulle* imposte *della legge nazionale della Parte contraente o di una suddivisione politica di essa o di una sua autorità locale; e*

      *ii)*  *Qualsiasi disposizione sulle* imposte *di quasiasi convenzione per evitare una doppia imposizione e di qualsiasi accordo o intesa internazionale cui è vincolata la Parte contraente.*

[230] Reply, ¶ 111.

[231] Reply, ¶¶ 113-115, citing *Murphy Exploration & Production Company – International v. The Republic of Ecuador*, Partial Final Award, 6 May 2016, ¶ 159, CLA-102; *Occidental Petroleum Corporation, Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012, CLA-108; *Yukos Universal Ltd. v. Russian Federation*, Award, 18 July 2014, ¶ 1407, CLA-110.

[232] *Occidental Petroleum Corporation, Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012, ¶¶ 492-495, CLA-108.

[233] *Yukos Universal Ltd. v. Russian Federation*, Award, 18 July 2014, ¶ 1407, CLA-110

[234] Reply, ¶¶ 117, 122, citing *Conto* V, Art. 10.4, CEX-195.

fee is never referred to as a "tax" (*imposte*) in the provisions introducing the fee, but is instead referred to as a contribution (*contributo*) to the GSE in *Conto* V, and as an additional tariff (*tariffe*) owed to the GSE under Law Decree No. 91/2014.[235] They also contend that Italian tax authorities had no role in "enacting, imposing, or collecting" the fee.[236]  Nor, according to Claimants, does the administrative fee correspond to the definition of "*imposte*" under Italian law, since that notion also refers to "contribut[ion] to the general public expenditure" and being "not related to any specific benefit, service, or activity provided by public institutions".[237]

242.    As an additional ground asserted by Claimants for their position, they assert that administrative fees are outside the scope of measures subject to Italian tax court jurisdiction.  This is because, Claimants assert, the fee is intended to cover the GSE's service costs and is also subject to VAT.[238]  Finally, Claimants argue, double-taxation treaties include a definition of the "*imposte*" covered by those treaties but Claimants assert they "are not aware" of any such treaty that includes administrative fees (or a similar fee) in that definition.[239]

### (iii)    Tribunal Analysis

243.    The Tribunal has considered the Parties' respective submissions regarding Respondent's Article 21 jurisdictional objection to the administrative fee measure under *Conto* V.  Taking into account the various considerations raised by the Parties, the Tribunal finds that the administrative fee does not constitute a Taxation Measure and affirms its jurisdiction to decide the claims asserted by Claimants.

244.    In reaching this conclusion, the Tribunal need not determine whether Respondent's broad interpretation or Claimants' narrower interpretation of Taxation Measures is correct.  Characterizing relationships as "synallagmatic" or "reciprocal" provides a useful way to distinguish a tax from another form of charge, in the sense that the latter notion ("charge") implicates a more direct reciprocity of payment for services.  In this connection, the  Tribunal notes that the administrative fee was established specifically to cover the GSE's costs of managing the incentive programs from which PV producers benefited.  This suggests a degree of reciprocity.  The Tribunal also notes that Respondent does not deny that the GSE paid value added taxes (VAT) on amounts received from PV producers, and that the fee was not collected for the general revenue of Italy.

---

[235] Reply, ¶¶ 118-119.

[236] Reply, ¶ 118.

[237] Reply, ¶ 121.

[238] Reply, ¶ 125.

[239] Reply, ¶ 126.

Taken together, these factors indicate that the administrative fee is not a Taxation Measure under the ECT.

### d.  Imbalance Costs

#### (i) Respondent's Position

245.    After setting forth its general interpretation of "Taxation Measures" under Article 21 (summarized above), Respondent proceeds to argue that the imbalance costs charged to PV producers constituted a Taxation Measure.  Respondent first discusses the measure in relation to what it construes as an "ordinary" notion of taxation measures, then in relation to Italian law.

246.    A taxation measure, under the ordinary notion described by Respondent, "is a matter related to the imposition of a liability on classes of persons to pay money to the State for public purposes and without any direct benefit to the taxpayer."[240] Respondent asserts that the imbalance costs measure is compatible with this interpretation, stating that "[i]t is absolutely uncontroversial that fiscal measures can also address the costs of specific services…."[241]

247.    Respondent, applying the above notion to imbalance costs, asserts: the imbalance costs measures were "mandatory, do not correspond to an identifiable specific service obtained from Terna that would qualify reciprocal obligations, and are connected to the public spending by linking to the dispatching activities of Terna and on the guarantee of the security of the system."[242]

248.    Turning to Italian law, Respondent repeats the arguments it made regarding the GSE's administrative fee, citing to Italian Constitutional Court decisions.[243] Respondent asserts that imbalance costs are, like a charge for municipal waste services, a fiscal measure, since the PV producer may not refuse to pay the charges simply by not utilizing the services.[244]  Referring to Terna's monopoly, Respondent asserts that the payment of imbalance costs to Terna would be

---

[240] Rejoinder, ¶ 122, quoting *Murphy Exploration & Production Company – International v. The Republic of Ecuador*, Partial Final Award, 6 May 2016, ¶ 159, CLA-102.

[241] Rejoinder, ¶ 124 n. 50.

[242] Statement of Defense, ¶ 171; Rejoinder, ¶ 125.

[243] Rejoinder, ¶¶ 132-135.

[244] Rejoinder, ¶ 136.

considered "material tributes" or "factual tributes" under Italian law and hence a fiscal measure.[245]

### (ii)    Claimants' Position

249.    Similar to Claimants' argument regarding the GSE administrative fee, Claimants argue that the imbalance costs were not intended to increase the State's revenues, but instead to place some of the costs of the electricity dispatching services on PV producers.[246]  Next, Claimants assert, Italy's tax authorities were not involved in "enacting, imposing, or collecting" the imbalance costs, and Italy never characterized these costs as a "tax" prior to this arbitration.[247]  Instead, the AEEG imposed the costs through Resolution 281 and Resolution 522, which allegedly referred to the imbalance costs as "compensations" but never as "taxes".[248]

250.    Next, Claimants assert that even if a purely domestic Italian law test were applied, the imbalance costs would not constitute "taxes" ("*imposte*"), since these relate to the specific services that Terna provides.[249]  Claimants argue that an official definition published on the AEEG's website characterizes imbalance costs as "network and dispatching services", rather than as "taxes".[250]  Furthermore, since the imbalance costs are, according to Claimants, subject to corporate income tax and VAT, this implies that they are non-fiscal in nature and would not be subject to Italian tax court jurisdiction.[251]  Finally, just as Claimants argued regarding administrative fees, double-taxation treaties include a definition of the "*imposte*" covered by those treaties.  Claimants assert they "are not aware" of any such treaty that includes imbalance costs (or a similar fee) in that definition.[252]

### (iii)    Tribunal Analysis

251.    Having considered the Parties' submissions and arguments, the Tribunal is not persuaded that imbalance costs payable by PV producers pursuant to AEEG Resolution 281 and AEEG Resolution 522 constitute a Taxation Measure under ECT Article 21.  The Tribunal thus affirms its jurisdiction to decide the claims asserted by Claimants.

---

[245] Statement of Defense, ¶ 167; Rejoinder, ¶ 137.

[246] Reply, ¶ 117.

[247] Reply, ¶ 118.

[248] Reply, ¶¶ 118-119.

[249] Reply, ¶¶ 120-122.

[250] Reply, ¶ 123.

[251] Reply, ¶¶ 124-125.

[252] Reply, ¶ 126.

252.    In reaching this conclusion, the Tribunal notes that the imbalance costs relate to electricity dispatching services, an identified service, and thus are not allocated to the State's general revenue.  Further, Respondent did not deny Claimants' assertion that corporate income taxes and VAT were paid on amounts received from PV producers, that the AEEG did not categorize imbalance costs under the category of "taxes" but instead categorized them as "network and dispatching services", and that Italy has not otherwise treated imbalance costs as a tax.  Taken together, these factors minimize the significance of Respondent's assertion that the mandatory nature of the charges make them similar to charges for municipal waste services, which themselves might not constitute a Taxation Measure under the ECT.

### 3.    "Intra-EU" Jurisdictional Objections

#### a.  Respondent's Position

253.    As summarized below, Respondent contends that Article 26 of the ECT does not apply to disputes initiated by an investor from one EU Member State against a different EU Member State.  Such "intra-EU disputes", Respondent argues, were never intended to fall within the scope of Article 26, as the ECT's language and context show.[253]  Alternatively, Respondent argues that even if the ECT originally applied to intra-EU disputes, that was no longer true after adoption of the Lisbon Treaty.[254]  Further, Respondent argues that the nature of the EU legal system and, in particular, Article 344 of the TFEU preclude intra-EU disputes under the ECT.

#### (i) Argument based on Contracting Parties' original intention

254.    Respondent's main argument for an original intention to exclude intra-EU disputes under the ECT is based on the ECT's conflicts provision (Article 16) and on other provisions of the ECT and related documents (e.g., the 1991 European Energy Charter), which Respondent interprets as showing the establishment of a "more favourable" regime for EU Member States that is separate from that available to non-EU parties to the ECT.

255.    Respondent refers to ECT Article 16, which provides:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international

---

[253] Statement of Defense, ¶¶ 44-69.
[254] Statement of Defense, ¶¶ 80-140.

agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,

(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment.[255]

256.    According to Respondent, under sub-paragraph (1) of Article 16, the ECT's investment protection and investor-state dispute settlement provision will not derogate from a separate international agreement that is "more favourable" to the investor.

257.    As a next step, Respondent seeks to establish that when the ECT was concluded, there was an international agreement that was more favourable to EU investors that prevails over the ECT, and hence over Article 26.

258.    Thus, Respondent refers to Article 25 which, in pertinent part, provides:

The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.[256]

259.    According to Respondent, Article 25 reflects the recognition that EU Member States need not extend to third states that are ECT Contracting Parties the "preferential treatment" that EU Member States accord one another.  Respondent concludes that Article 25 shows that such preferential treatment between EU Member States "prevails" over the ECT, applying the "more favourable" conflict rule of Article 16.[257]

---

[255] ECT, Art. 16, CEX-1.

[256] ECT, Art. 25(1), CEX-1.

[257] Statement of Defense, ¶¶ 50, 52; Rejoinder, ¶¶ 72-75.

260.    Next, invoking the ECT's context and purpose, Respondent refers to two documents relating to the ECT – a Decision and a Declaration appended to the ECT – which refer to conditions whereby investors not party to an "Economic Integration Agreement" can obtain treatment thereunder.  Decision No. 5 relating to Article 24(4)(a) and Article 25 provides:

> An Investment of an Investor referred to in Article 1(7)(a)(ii), of a Contracting Party which is not party to an EIA or a member of a free-trade area or a customs union, shall be entitled to treatment accorded under such EIA, free-trade area or customs union, provided that the Investment:
>
> (a) has its registered office, central administration or principal place of business in the Area of a party to that EIA or member of that free-trade area or customs union; or
>
> (b) in case it only has its registered office in that Area, has an effective and Continuous link with the economy of one of the parties to that EIA or member of that free-trade area or customs union.[258]

261.    Declaration No. 5 with respect to ECT Article 25 provides:

> The European Communities and their Member States recall that, in accordance with article 58 of the Treaty establishing the European Community:
>
> a) companies or firms formed in accordance with the law of a Member State and having their registered office, central administration or principal place of business within the Community shall, for the right of establishment pursuant to Part Three, Title III, Chapter 2 of the Treaty establishing the European Community, be treated in the same way as natural persons who are nationals of Member States; companies or firms which only have their registered office within the Community must, for this purpose, have an effective and continuous link with the economy of one of the Member States;
>
> (b) "companies and firms" means companies or firms constituted under civil or commercial law, including co-operative societies, and other legal persons governed by public or private law, save for those which are non-profitmaking.
>
> The European Communities and their Member States further recall that:
>
> Community law provides for the possibility to extend the treatment described above to branches and agencies of companies or firms not established in one of the Member States; and that, the application of

---

[258] Decision No. 5 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference), CEX-1.

> Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities.[259]

262.     In Respondent's view, the above Decision and Declaration "cannot but confirm the intention of the Contracting Parties to cover only situations external to the EU."[260]  From this, the Respondent asserts that if a non-EU investor became entitled to the treatment owed among EU investors, then it would obtain the dispute resolution mechanisms available in the EU and would thereby relinquish the "double protection" afforded by ECT Article 26.[261]

263.     As further contextual grounds for its position, Respondent refers to the preamble to the 1991 European Energy Charter, mentioning the EU's internal energy market; ECT Article 2, stating that the ECT is established "in accordance with the objectives and principles of the Charter"; and certain EU Directives and a Commission Proposal for a Council Directive pre-dating the ECT's adoption, as allegedly demonstrating the intention of the EU and Member States to "regulate intra-EU situations exclusively within the Internal Market rules" and to establish their own dispute resolution procedure.[262]  In particular, Article 26 of the Commission Proposal provided, "Member States shall establish a dispute resolution procedure by which the parties can settle disputes on matters covered by this Directive."[263]

264.     Respondent also asserts in support of its position a general practice of the EU and its Member States, beginning from the *Electrabel* case, of objecting to the jurisdiction of arbitral tribunals in intra-EU disputes brought pursuant to the ECT.[264]

### (ii)     Argument based on adoption of Lisbon Treaty

---

[259] Declaration No. 5 of Final Act of the European Energy Charter Conference, CEX-1; see Statement of Defense, ¶¶ 58-60.

[260] Statement of Defense, ¶ 57.

[261] Statement of Defense, ¶ 57.

[262] Statement of Defense, ¶ 64, citing ECT Art. 2; Concluding Document of the Hague Conference on the European Energy Charter, signed at The Hague on 17 December 1991, CEX-1; EU Directive 90/547/EEC on the transit of electricity through transmission grids; EU Directive 91/296/EEC on the transit of natural gas through grids; Commission Proposal for a Council Directive, COM (91)548 final, OJ No C65 of 14 March 1992, p. 4, REX-3.

[263] Commission Proposal for a Council Directive, COM (91) 548 final, OJ No C65 of 14 March 1992, Art. 26, REX-3.

[264] Statement of Defense, ¶¶ 66-68.

265.    As an argument in the alternative, Respondent contends that the 2007 Lisbon Treaty was a legitimate *inter se* agreement among the EU Member States that modified their rights and obligations and removed intra-EU disputes from the scope of ECT Article 26.[265]

266.    To establish the legitimacy of the alleged *inter se* agreement modifying the ECT, Respondent contends that the Lisbon Treaty is a "successive treat[y] relating to the same subject-matter" as the ECT, falling within Article 30 of the Vienna Convention on the Law of Treaties ("VCLT"), and that this *inter se* modification complies with VCLT Article 41.[266]

267.    Respondent asserts that the ECT and Lisbon Treaty relate to the same subject matter because they "factually cover the same situation of an investor entering a foreign market in the hope of not being unduly discriminated or frustrated in its investment, as well as being duly protected by fair judicial or quasi-judicial mechanisms against misuse of power."[267]  Next, Respondent provides two alternative interpretations of VCLT Article 30, both of which allegedly result in EU law prevailing over provisions of the ECT.

268.    First, Respondent refers to VCLT Article 30(2), providing, "[w]hen a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail."[268]  Respondent asserts that ECT Article 16 falls directly within VCLT Article 30(2), as Article 16 "specifies that [the ECT] is subject to" a treaty "more favourable" than it with regard to provisions under ECT Parts III and V.  The Lisbon Treaty, Respondent argues, provides "a more developed and articulated legal system" whose "protection of EU nationals against the acts of a Member State … cannot even be compared to" the ECT's level of protection.[269]  Further, according to Respondent, EU law protects "legitimate expectations" and is "much more advanced" than the ECT with respect to investment law.[270]  Therefore, Respondent argues, the ECT's investor-state arbitration provisions are prevailed over by dispute resolution systems available under EU law.

---

[265] Treaty of Lisbon amending the Treaty on European Union and the Treaty establishing the European Community, signed at Lisbon, 13 December 2007, REX-4.

[266] Vienna Convention on the Law of Treaties, concluded on 23 May 1969, Art. 30(1), CLA-3

[267] Statement of Defense, ¶ 83.

[268] Statement of Defense, ¶ 85.

[269] Statement of Defense, ¶ 87; Rejoinder, ¶¶ 72-75.

[270] Rejoinder, ¶¶ 72, 74.

269.    Second, alternatively, Respondent asserts that the application of VCLT Article 30(4) produces the same result.  As Respondent argues, Article 30(4) refers to situations where "the parties to the later treaty do not include all the parties to the earlier one."  This would apply to the ECT and Lisbon Treaty because, Respondent argues, the parties to the Lisbon Treaty do not include all of the ECT parties (namely, the non-EU parties).  Article 30(4)(a) then refers back to Article 30(3), so that, with regard to EU Member States, "the earlier treaty [namely, the ECT] applies only to the extent that its provisions are compatible with those of the later treaty [namely, the Lisbon Treaty]."[271]

270.    In connection with lack of compatibility between the ECT and the Lisbon Treaty, Respondent asserts that, upon the Lisbon Treaty's adoption, the previously shared competence among the EU and its Member States with respect to foreign direct investment ("FDI") was modified, allocating to the EU exclusive competence to conclude agreements with third parties on FDI issues.[272]

271.    Finally, VCLT Article 30(5) states that it is "without prejudice to article 41", which describes conditions for *inter se* modification of multilateral treaties.  Respondent argues that the Lisbon treaty was a "perfectly legitimate" modification of the ECT as between EU Member States,[273] which complied with sub-paragraph (b) of VCLT Article 41(1), providing in relevant part,

> 1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
> […]
> (b) The modification in question is not prohibited by the treaty and:
> (i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
> (ii) Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

272.    With respect to sub-paragraph (b)(i), Respondent argues that the Lisbon Treaty did not affect non-EU Contracting Parties, which retained their rights under ECT Article 26.[274]  As for sub-paragraph (b)(ii), Respondent asserts that the modifications did not relate to an ECT provision "derogation from which is incompatible with the effective execution of the object and purpose" of the ECT

---

[271] Statement of Defense, ¶ 89.

[272] Statement of Defense, ¶¶ 73-76.

[273] Statement of Defense, ¶ 92.

[274] Statement of Defense, ¶ 94.

as a whole, because non-EU Contracting Parties retained their rights under Article 26.[275]  Respondent asserts, "[o]utside the Union, the ECT is fully applicable, and investors of non-EU Contracting Parties have no obstacle to claim the application of the ECT through article 26 ECT."[276]

### (iii)    Respondent's further intra-EU dispute objections

273.    In further support of its intra-EU jurisdiction objection, Respondent also makes the following comments.

274.    First, seeking to buttress its argument that EU law provides a "more favourable" regime than the ECT, Respondent asserts that EU law protects "the whole investment life cycle" for EU investors, based on laws regarding the freedom of establishment and free movement of capital.[277]  In this connection, Respondent mentions that EU investors may take legal recourse against Member States in the courts and obtain preliminary rulings from the ECJ under Article 267 TFEU, thus ensuring the consistent application of EU law.[278]  According to Respondent, litigation in the EU courts provides "access to justice" and "predictability and rule of law".[279]

275.    Next, Respondent asserts that application of the ECT to intra-EU dispute "supports discrimination", stating as follows:

> It is undeniable that giving only to some EU investors the right to have recourse to an arbitration mechanism against an EU Member State as an additional opportunity to recourse to national courts would seriously jeopardize such principle. However, if we apply international agreements like the ECT also to intra-EU disputes we do support discrimination.[280]

---

[275] Statement of Defense, ¶¶ 94-97.

[276] Statement of Defense, ¶ 96.

[277] Statement of Defense, ¶¶ 116-125.

[278] Statement of Defense, ¶ 132.  Treaty on the Functioning of the European Union, Article 267 allows "any court or tribunal of a Member State" to seek a preliminary ruling on "(a) the interpretation of the Treaties; (b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union….", REX-1C

[279] Rejoinder, ¶ 73 (Respondent states that "recourse to an international arbitration against a State is an extremely efficient and protective solution for investors in a situation where local courts would easily discriminate the foreign investor or permit the State to escape its liabilities" but asserts that "[w]ithin the EU, this need for special protection does not have the same urgency.  On the opposite, because of the EU, citizens can now benefit of similar protection all around Europe.")

[280] Statement of Defense, ¶ 79.

276.    Furthermore, anticipating arguments made more thoroughly by the European Commission in its *Amicus Curiae* submission, Respondent briefly argues that TFEU Article 344 prohibits Member States from submitting a dispute concerning interpretation or application of the EU treaties to any dispute settlement method not provided for in those treaties.[281]  Respondent considers that an arbitral tribunal is not a "court or tribunal of a Member State" under TFEU Article 267 and thus cannot refer questions to the ECJ.[282]  Since, in Respondent's view, the ECT is part of EU law, it is inconsistent with Article 344 for an EU investor to seek relief from an arbitral tribunal, but an EU investor may instead petition an Italian court for possible relief under the ECT.[283]

277.    Finally, Respondent, seeking to rebut Claimants' contention that "unanimous case law confirms the ECT's application to intra-EU disputes", argues that the arbitral awards cited by Claimants are insufficient to prove Claimants' contention, considering that other cases involving similar issues are still pending and none of the cases decided thus far has addressed all of the same legal issues involved in this arbitration.[284]

**b.  The European Commission's *Amicus Curiae* Brief**

278.    The EC's argument, in outline, is that the ECT created no obligations among EU Member States.  Alternatively, if the ECT did create certain obligations among them, those did not include any investment protection or investor-state dispute settlement obligations contained in ECT Part III and Article 26.  Finally, if ECT Article 26 were applicable between EU investors and EU Member States, this would conflict with the Treaty on the Functioning of the European Union (TFEU), requiring resolution in the TFEU's favor by means of "harmonious interpretation" or applicable rules on conflict of laws.[285]

**(i) Arguments against intra-EU obligations under the ECT**

279.    The EC's first set of arguments contend that the ECT's text, in its ordinary meaning pursuant to VCLT Article 31, implies that EU Member States never offered to arbitrate with EU investors.[286]  The EC asserts that the ECT's definitions, voting provision, and a declaration of the EU pursuant to ECT Article

---

[281] Statement of Defense, ¶ 133-135.

[282] Statement of Defense, ¶ 135.

[283] Statement of Defense, ¶¶ 135, 140.

[284] Rejoinder, ¶¶ 80-82 (citing Claimants' Statement of Claim, ¶¶ 68-76).

[285] *Amicus Curiae* Brief of the European Commission, 28 April 2017 ("Amicus Brief"), ¶ 9.

[286] Amicus Brief, ¶¶ 15-30.

26(3)(b)(ii) (its "fork-in-the-road" declaration) demonstrate an understanding by the Contracting Parties that the EU Member States had transferred certain "competences" to the EU, pursuant to treaties establishing the EU.[287] From these texts, the EC concludes that EU investors are barred from arbitrating against Member States under the ECT.

280.    The EC's review of definitions begins with the term "Regional Economic Integration Organization" ("REIO"), defined at ECT Article 1(3) as an organization to which states have "transferred competence over certain matters a number of which are governed by [the ECT]", and used in other definitions (namely, "Contracting Party" and "Area").[288] The term "Contracting Party", defined at ECT Article 1(2), may refer to either a state or an REIO for which the ECT is in force. Pursuant to ECT Article 1(10), "Area" may refer to the territory of a state that is a Contracting Party, or to an REIO, whose "Area" comprises the "Areas of the member states of such Organisation, . . ." Noting that the definition of "Area" refers to "provisions contained in the agreement establishing that Organization", the EC concludes that the ECT recognizes that relationships among the EU Member States parties to the ECT are governed by EU treaties.[289] The EC asserts that, according to its interpretation of "Area", an EU investor's investments in Italy would not be an "investment in the area of another Contracting Party, but in the area of the same Contracting Party", because all EU investors are located in the same "Area".[290]

281.    Next, the EC observes that ECT Article 36(7) provides that the REIO, when it votes, has the number of votes equal to the number of member states that are Contracting Parties, but that the REIO and Member States will not vote together on the same matters. The EC suggests that this, together with the definition of REIO, means that the EU and Member States may each vote on matters falling within their respective competences.[291]

282.    Additionally, the statement from the EU submitted pursuant to ECT Article 26(3)(b)(ii) provides that the Communities and Member States will, when necessary, determine which of them is the respondent in "arbitration proceedings initiated by an Investor of another Contracting Party."[292] The EC asserts that the

---

[287] Amicus Brief, ¶¶ 17, 18, 20, 29.

[288] ECT, Art. 1(2), 1(10).

[289] Amicus Brief, ¶ 20.

[290] Amicus Brief, ¶ 21.

[291] Amicus Brief, ¶ 17.

[292] Statement of the Council and Commission on 17.11.97 pursuant to ECT Article 26(3)(b)(ii) (Annex EC-1).

words "another" here implies that no arbitration could be initiated against the EU or the Member States by an EU investor.[293]

283.    The EC's second line of reasoning invokes the ECT's context, object, and purpose to support its contention that the ECT did not create *inter se* obligations between the Member States, asserting that the EU had a central role in negotiating the ECT, and that the Charter of Paris and the European Energy Charter, mentioned in the preamble to the ECT, "refer to the special role and status of the Union".[294]  The EC suggests that, when the ECT was negotiated, the EU and Member States "acted throughout the negotiations like one single block and with one voice (that of the Commission)."[295]  The EC cites scholarly writing to argue that this "single block" approach is similar to how the EU and Member States negotiated the WTO agreement, and reflects "the objective of the Community negotiators to create rights and obligations only between the Community and its Member States on the one hand and one or more third states on the other."[296]

284.    Further, the EC notes that, as a backdrop to the ECT's adoption, the 1990 summit leading to the *Charter of Paris for a New Europe* and the 1991 European Energy Charter, mentioned in the ECT's preamble, expressed a policy of unity and the goal of completing the EU's internal energy market.[297]  The EC takes the position that the EU's objective in concluding the ECT was to "create an international framework for cooperation in the energy sector between the European Communities, on the one hand, and Russia, the CIS and the countries of Central and Eastern Europe, on the other hand" and not to "influence [the EU's] internal energy policy."[298]

285.    From the above context, object, and purpose, the EC concludes that the ECT's Contracting Parties "understood … that – although in theory a possibility – the EU Member States did not intend to create *inter se* obligations between them."[299]

---

[293] Amicus Brief, ¶ 29.

[294] Amicus Brief, ¶¶ 31-32.

[295] Amicus Brief, ¶ 38.

[296] Amicus Brief, ¶ 36, quoting Pieter Jan Kuijper, *The Conclusion and Implementation of the Uruguay Round Results by the European Community*, (1995) 6 European Journal of International Law, issue 1, pp. 222-244, Annex EC-3.

[297] Amicus Brief, ¶¶ 40-41.

[298] Amicus Brief, ¶¶ 43-44, citing Johann Basedow, *The European Union's international investment policy: Explaining intensifying Member State cooperation in international investment regulation* (PhD thesis, The London School of Economics and Political Science 2014), p. 160, Annex EC-4.

[299] Amicus Brief, ¶ 47.

286.    As an additional ground for denying the existence of intra-EU obligations under the ECT, the EC contends that a "disconnection clause" is not required in order to exclude obligations among EU Member States that are parties to a multilateral treaty.[300]  According to the EC, arbitral tribunals that have confirmed jurisdiction over intra-EU ECT claims in light of the absence of a disconnection clause have relied upon Professor Christian Tietje's views, which the EC contends are not supported by other scholars or by treaty practice.[301]  The EC contends that, in the context of multilateral treaties to which the EU and Member States are parties, a disconnection clause is only required where the application of EU law instead of the multilateral treaty would be inconsistent with Article 41(1)(b) of the VCLT.[302]  The EC concludes that a disconnection clause is not required in the ECT to comply with Article 41(1)(b), and also asserts that disconnection clauses have generally been used in international treaties where the EU could not become a contracting party.[303]

### (ii)    Argument against intra-EU application of ECT Parts III and V

287.    In the alternative, the EC argues that even if the Member States had entered into certain *inter se* obligations under the ECT, those obligations would only cover areas for which they retained external competence, and would exclude the ECT's investment protection and investor-state dispute settlement provisions.[304]

288.    First, the EC advances a principle of international law, expressed as "liability follows competence", whereby international obligations and liability among an international organization and its member states are allocated according to special rules of the organization itself and not necessarily shared between the organization and its member states.[305]  This principle, asserts the EC, has been recognized in the International Law Commission's 2011 Draft Articles on the Responsibility of International Organizations ("DARIO"), WTO panel reports, and a decision of the International Tribunal for the Law of the Sea.[306]  The EC asserts that the principle applies to the EU and the Member States.[307]

289.    Next, the EC asserts that the EU possesses "exclusive external competence to conclude agreements with one or more third countries or international

---

[300] Amicus Brief, ¶¶ 48-53.

[301] Amicus Brief, ¶¶ 48-53.

[302] Amicus Brief, ¶ 50, quoting VCLT, Art. 41(1)(b).

[303] Amicus Brief, ¶¶ 50, 52.

[304] Amicus Brief, ¶ 55.

[305] Amicus Brief, ¶¶ 55, 60.

[306] Amicus Brief, ¶¶ 57-59.

[307] Amicus Brief, ¶ 60.

organisations" regarding foreign direct investment and areas affecting or altering the scope of common internal EU rules.[308]  Further, the EC asserts that a comprehensive body of EU legislation covers the internal energy market, ensuring freedom of establishment and free movement of capital, backed by a complete system of national courts and judicial remedies.[309]  Thus, according to the EC, for Member States to conclude an investment protection treaty creating obligations among themselves "might affect common rules or alter their scope" and thus interfere with the EU's exclusive competence under TFEU Article 3(2).[310]  The Member States' "shared competence" with the EU under TFEU Article 2(2) only applies within a Member State's territory, according to the EC.[311]  Therefore, the EC concludes, in light of the ECJ's decision in *Pringle*, Member States are prohibited from concluding an agreement that provides for substantive investor protections or investor-state arbitration.[312]

290.    The EC concludes that since ECT Part III and Article 26 are within the EU's external competence, the EU – but not the Member States – is bound by those provisions under international law.[313]

### (iii)    Argument that EU law prevails over conflicting ECT provisions

291.    The EC argues that both the substantive and investor-state arbitration provisions of the ECT would, if applied among EU Member States, conflict with EU law.  According to the EC, the EU reaffirmed its position that TFEU Articles 267 and 344 conflict with such an interpretation when it signed the International Energy Charter in 2015, attaching a Declaration by the EU.[314]  The EU's Declaration provides:

> It is declared that, due to the nature of the EU internal legal order, the text in Title II, Heading 4, of the International Energy Charter on dispute settlement mechanisms cannot be construed so as to mean that any such mechanisms would become applicable in relations between the European Union and its Member States, or between the said Member States, on the basis of that text.[315]

---

[308] Amicus Brief, ¶¶ 62-63, citing TFEU, Art. 3(2).

[309] Amicus Brief, ¶¶ 68-78.

[310] Amicus Brief, ¶ 81.

[311] Amicus Brief, ¶ 82.

[312] Amicus Brief, ¶ 83, citing ECJ judgment in *Pringle*, C-370/12, EU:C:2012:756, ¶¶100-101.

[313] Amicus Brief, ¶ 91.

[314] Amicus Brief, ¶ 116.

[315] Declaration by the European Commission on behalf of the EU, Annex EC-18, available at <https://energycharter.org/fileadmin/DocumentsMedia/Legal/EU_IEC_Declaration.pdf>.

292.    Regarding investment protection provisions, the EC asserts that there is "a risk of conflict on substance" between the ECT and EU law.  This is because, according to the EC, if the Member States had entered into obligations *inter se* when they concluded the ECT, this would conflict with the EU's exclusive competence under TFEU Article 3(2).[316]

293.    With respect to dispute settlement, the EC asserts that the ECT's provisions on investor-state arbitration also conflict with the TFEU, drawing attention to the below provisions:

ECT Article 26(6): an arbitral tribunal shall render a decision "in accordance with this Treaty and applicable rules and principles of international law."

ECT Article 26(8): a decision rendered by the tribunal "shall be final and binding upon the parties to the dispute."

TFEU Article 344: "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."

TFEU Article 267: the ECJ has jurisdiction to make preliminary rulings on issues concerning "the interpretation of the Treaties" and "a court or tribunal of a Member State" may or must refer such issues to the ECJ.

294.    The EC construes "applicable rules and principles of international law" in ECT Article 26(6) as incorporating EU law, but asserts that an arbitral tribunal does not constitute "a court or tribunal of a Member State" under TFEU Article 267 and thus may not refer issues to the ECJ for a preliminary ruling.  Additionally, Article 344 TFEU encompasses, according to the EC, not only disputes between Member States and EU institutions, but also investor-state disputes.[317]  Therefore, the EC concludes, an arbitral tribunal constituted under the ECT to decide an intra-EU dispute would issue final and binding decisions on matters of EU law without having the ability to refer questions of EU law to the ECJ for a preliminary ruling.  The EC asserts that this would,

violate Articles 267 and 344 TFEU, because that new dispute settlement system is outside the complete system created by those

---

[316] Amicus Brief, ¶¶ 96-97.

[317] Amicus Brief, ¶¶ 113-115.

articles, and, in particular, does not have the possibility or the obligation to refer preliminary questions to the ECJ pursuant to Article 267 TFEU.[318]

295.    According to the EC, the possibility of court annulment proceedings at the arbitral seat is insufficient to avoid the alleged conflict between the ECT and the TFEU, because the reliance upon an annulment mechanism "transposes case-law from the field of commercial arbitration to the field of investment arbitration".[319] The EC contends that commercial and investment arbitration differ in three ways: first, states are constrained when legislating in the public international law sphere and "may not limit the scope of application of Article 267 TFEU", whereas private parties enjoy contractual autonomy;[320] second, investment arbitration concerns the behavior of a State acting as a public authority, not contractual rights;[321] and third, investment treaty tribunals may determine that the seat of the arbitration is outside the EU, thus circumventing the supervisory authority of a *juge d'appui* to refer questions to the ECJ.[322]

296.    In light of the alleged conflict between the ECT and the EU treaties described above, the EC asserts that the Tribunal is required to resolve the conflict by applying either TFEU Article 351 or both Article 41(1)(b) and Article 30(4)(a) of the VCLT.[323]  Under either alternative, according to the EC, EU law prevails.

297.    According to the EC, TFEU Article 351 renders ECT Part III and Article 26 inapplicable as among EU Member States.  TFEU Article 351 provides:

The rights and obligation arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of this Treaty.

To the extent that such agreements are not compatible with this Treaty, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.

---

[318] Amicus Brief, ¶ 102.

[319] Amicus Brief, ¶ 104.

[320] Amicus Brief, ¶ 110.

[321] Amicus Brief, ¶ 111.

[322] Amicus Brief, ¶ 112.

[323] Amicus Brief, ¶ 126.

In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under this Treaty by each Member State form an integral part of the establishment of the Community and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States.[324]

298.    According to the EC, since TFEU Article 351, first paragraph, expresses a "*pacta sunt servanda* guarantee" that prior agreements between Member States and third states shall not be affected by the TFEU's provisions but does not express such a guarantee with respect to prior agreements among Member States themselves, this implies by "*a contrario* reasoning" that prior agreements among Member States are superseded by the TFEU in case of any inconsistency.[325]  The EC cites ECJ case-law in support of this position with respect to certain multilateral treaties other than the ECT.[326]  The EC concludes that if TFEU Article 351 is applied as a conflict rule, Part III and Article 26 of the ECT would become inapplicable between EU Member States.[327]

299.    As an alternative argument, the EC contends that if VCLT Articles 41(1)(b) and 30(4)(a) were applied to resolve a conflict between the ECT and EU law, Part III and Article 26 of the ECT would also be superseded.[328]  The EC (similar to Respondent) asserts that the conditions of VCLT Article 41(1)(b) would be met even if ECT Part III and Article 26 were rendered inapplicable as between EU Member States, as this would not affect the enjoyment of those provisions by non-EU Member States.  Furthermore, asserts the EC, the "effective execution of the object and purpose of the [ECT] as a whole" would not be affected, since non-EU Member States would still be able to bring investor-state arbitrations.[329]

300.    VCLT Article 30 governs the application of successive treaties relating to the same subject matter.  According to the EC, VCLT Article 30(4)(a) applies to the ECT (as an earlier treaty) and the EU Treaties of Amsterdam, Nice and Lisbon (the later treaties), and since the parties to the latter treaties do not include all the parties to the earlier one, then, "as between States Parties to both treaties the same

---

[324] Treaty establishing the European Community, Article 307 (now Article 351 TFEU).

[325] Amicus Brief, ¶ 128.

[326] Amicus Brief, ¶ 128, citing Judgment of 7 July 2005, *Commission v. Austria*, C-147/03, EU:C:2005:427, ¶ 58; Judgment of 6 April 1995, *RTE v. Commission*, C-241/91, P and C-242/91, ¶ 84 (concerning the Berne Convention); Judgment of 27 February 1962, *Commission v. Italy*, 10/61, EU:C:1962:2, p. 10 (concerning agreements concluded under the auspices of the GATT).

[327] Amicus Brief, ¶ 130.

[328] Amicus Brief, ¶ 132.

[329] Amicus Brief, ¶ 134.

rule applies as in paragraph 3."[330]  Therefore, VCLT Article 30(3) is to be applied as between the EU Member States, with the result that "the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty."[331]  Thus, asserts the EC, the ECT applies only where its provisions are compatible with the Treaties of Amsterdam, Nice and Lisbon.[332]  Applying the EC's earlier reasoning about inconsistency between EU law and intra-EU investor-state arbitration under the ECT, the EC concludes that Part III and Article 26 of the ECT are not applicable.

### c.  Claimants' Position

### (i) Arguments in response to Respondent's objections

301.    Claimants counter the Respondent's "intra-EU" jurisdictional objections with arguments based on (i) the ECT's explicit terms, (ii) a line of consistent arbitral decisions, and (iii) the rules of treaty interpretation.[333]

302.    Regarding the ECT's explicit terms, Claimants assert that EU investors are authorized to bring claims in international arbitration against EU Contracting Parties, as Article 26 provides for dispute settlement "between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in an Area of the former."[334]  Claimants argue that this is clear from the lack of any exception in the ECT for certain Contracting Parties, noting that Italy, Denmark and Luxembourg are all Contracting Parties, and none made any exception to the applicability of Article 26 upon ratification.  Claimants also note that ECT Article 46 precludes reservations, providing, "[n]o reservations may be made to this Treaty."[335]

303.    Claimants also note the absence of any express or implied "disconnection clause" in the ECT, arguing that the EU and the Member States, during negotiations for the ECT in which the EC itself played a key role, could have sought to include a disconnection clause but chose not to do so.[336]  Claimants assert that disconnection clauses have been included in other treaties to make

---

[330] Amicus Brief, ¶ 137.

[331] Amicus Brief, ¶ 136.

[332] Amicus Brief, ¶ 140.

[333] Reply, ¶ 50.

[334] Reply, ¶ 52; citing ECT, Art. 26, CEX-1.

[335] Reply, ¶ 53; citing ECT, Art. 46, CEX-1.

[336] Reply, ¶ 54.

certain provisions inapplicable as between EU Member States.[337]  Claimants also cite scholarly writing to reinforce its view that no form of disconnection clause is present in the ECT.[338]

304.    Claimants next challenge Respondent's application of ECT Article 16 which, according to Respondent, implies that the EU treaties prevail over allegedly incompatible provisions of the ECT because the EU treaties are "more favourable" to EU investors.   Claimants dispute the latter assumption, arguing that, since EU law does not provide that EU investors may refer disputes against Member States to international arbitration whereas the ECT does so provide, the ECT contains more favourable provisions.[339]  According to Claimants, "Article 16 cannot be used to deny a benefit that the ECT affords to investors."[340]

305.    In response to Respondent's construal of ECT Article 25 as recognizing a preferential treatment among EU Member States that need not be extended to non-EU investors by virtue of most favoured nation treatment and "prevails" over the ECT, Claimants counter that Article 25 is silent about the standards of treatment and dispute resolution mechanisms available in an intra-EU context.[341]

306.    Further, regarding the Declaration pertaining to Article 25 whereby Member States may extend favorable treatment under EU law to "branches and agencies of companies or firms not established in one of the Member States", Claimants assert that the Declaration, like Article 25 itself, lacks relevance to whether the ECT is applicable to intra-EU disputes.[342]

307.    Claimants conclude their rebuttal to Respondent's textual and contextual arguments by referring to the documents and instruments executed temporally near the ECT's conclusion.

---

[337] Reply, ¶ 54 n. 6.

[338] Reply, ¶ 54 n. 6, citing T. Roe and M. Happold, *Settlement of Investment Disputes Under the Energy Charter Treaty*, 2011, p. 91, CLA-93; C. Tietje, *The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs. EU Member States*, Beiträge zum Transnationalen Wirtschaftsrecht, 1 September 2008, p. 11, CLA-94; G. Coop, *Energy Dispute Resolution: Investment Protection, Transit and the Energy Charter Treaty*, 2011, p. 178, CLA-95.

[339] Reply, ¶ 59.

[340] Reply, ¶ 58.

[341] Reply, ¶ 62.

[342] Reply, ¶ 62 n. 12.

308.    According to Claimants, Decision No. 5 pertaining to Article 24(4)(a) and 25, appended to the ECT, merely states that EU Contracting Parties must afford non-EU investments with business activities within the EU the same treatment as investments of EU investors.[343]  Claimant concludes that Decision No. 5 does not prohibit EU investors in any way from having recourse to arbitration against an EU Member State.[344]

309.    Regarding the European Energy Charter and ECT Article 2, both raised by Respondent, Claimants argue that these "do not create a distinction between the European internal market and the adoption of the ECT" and cannot be understood to establish a "regime" different from the ECT.  Additionally, Claimants argue that the dispute resolution mechanism mentioned in the Commission Proposal for a Council Directive, adopted by Directive 96/92/EC, was not intended to resolve intra-EU disputes regarding foreign investment, but instead was aimed at disputes "relating to the contracts, negotiations, and refusal of access or refusal to purchase."[345]

310.    As Claimants' second line of argument, Claimants refer to several ECT awards that have expressly denied any exception for intra-EU disputes to arbitration under Article 26, denied the existence of any disconnection clause in the ECT, and rejected the notion that the TFEU and the ECT are incompatible.[346] According to Claimants, two of those awards have not been made public.[347] Further, Claimants refer to several awards under bilateral investment treaties (BITs) that have also rejected intra-EU objections of the sort raised by Respondent and the EC.[348]

---

[343] Reply, ¶ 61.

[344] Reply, ¶ 61.

[345] Reply, ¶¶ 65-66, citing Directive 96/92/EC of the European Parliament and of the Council, 19 December 1996, CEX-26.

[346] *Electrabel S.A. v. Republic of Hungary* (ICSID Case No. ARB/07/19), Award of 25 November 2015, ¶ 4.164, CLA-91, quoted at Reply, ¶ 70.  Claimant also cites to *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), Decision on Jurisdiction of 6 June 2016, ¶¶ 72-75, 82, 84-85, CLA-92; *EDF v. Hungary* (award not public, but discussed in *Republic of Hungary v. EDF International S.A.*, Swiss Federal Supreme Court Case 4A_34/2015, Judgment of 6 October 2015, ¶ 5.3.2., CLA-90); *The PV Investors v. Kingdom of Spain* (PCA Case No. 2012-14).

[347] *EDF v. Hungary*; *The PV Investors v. Kingdom of Spain* (PCA Case No. 2012-14), cited at Reply, ¶¶ 73-74 and notes 27-29.

[348] Reply, ¶ 75, citing *Achmea B.V. (formerly Eureko) v. Slovakia* (PCA Case No. 2008-13), Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010; *OLG Frankfurt, 18 December 2014, Az: 26 Sch 3/13, Beschluss*, CLA-97; *Binder v. Czech Republic* (UNCITRAL), Award on Jurisdiction of 6 June 2007, CLA-98; *Eastern Sugar B.V. v. Czech Republic* (SCC Case No. 088/2004), Partial Award of 27 March 2007, CLA-99.  The Tribunal notes, in passing, that although Claimants cited to an Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010 in *Achmea v. Slovakia* and referred to that Award as "CLA-96", CLA-96 in fact contains an Award on

311.    As their third line of argument vis-à-vis Respondent's intra-EU jurisdictional objection, Claimants rebut Respondent's secondary argument, that the ECT became inapplicable to intra-EU disputes upon the Lisbon Treaty's adoption. Claimants argue that, contrary to Respondent's view, Article 30 of the Vienna Convention is not applicable, and even if it were, the supposed modification of the ECT would violate Article 41 of the VCLT.  Additionally, Claimants interpret ECT Article 16 so that the Lisbon Treaty's adoption does not render the ECT inapplicable in intra-EU disputes.

312.    Claimants argue that the ECT and the Lisbon Treaty cannot be validly construed under Article 30 of the VCLT so as to limit certain ECT provisions. First, Claimants contend that Article 30, which determines "the rights and obligations of States parties to successive treaties relating to the same subject-matter", does not apply to the ECT and the Lisbon Treaty, since the two treaties address different subject matters.[349]  Claimants base their contention on scholarly writing and on ECT and BIT awards in an intra-EU context, asserting that the right to commence international arbitration under a treaty is not the same as the right to bring litigation before a national court or the European Court of Justice.[350]

313.    Next, according to Claimants, even if the ECT and Lisbon Treaty did relate to the "same subject-matter", their provisions are not incompatible.[351]  Claimants quote extensively from BIT and ECT awards denying that the arbitration of intra-EU disputes is inconsistent with EU law.  Claimants cite *Electrabel* for the proposition that an arbitral tribunal's application of EU law does not infringe the ECJ's interpretative "monopoly" over EU law.[352]  Claimants also view the substantive and procedural rights available under BITs and the ECT as merely exceeding – but not conflicting with – the rights available under EU and national

---

Jurisdiction and Admissibility dated 20 May 2014 from a different arbitration brought by Achmea against the Slovak Republic.

[349] Reply, ¶ 79, citing VCLT Art. 30(1), REX-2.

[350] Reply, ¶ 79; citing T. Fecák, *Chapter 5: Intra-EU International Investment Agreements, in International Investment Agreements and EU Law*, Kluwer L. Int'l, 2016, pp. 467-468, CLA-106; *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, CLA-15; *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, CLA-71; *Electrabel S.A. v. Republic of Hungary* (ICSID Case No. ARB/07/19), Award of 25 November 2015, ¶ 4.176, CLA-91; *Eastern Sugar B.V. v. Czech Republic* (SCC Case No. 088/2004), Partial Award of 27 March 2007 ¶ 159, CLA-99; *Achmea B.V. (formerly Eureko) v. Slovakia* (PCA Case No. 2008-13), Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010.

[351] Reply, ¶¶ 80, 83-85, citing VCLT, Art. 30(3), 30(4)(a), REX-2.

[352] Reply, ¶ 81, citing *Electrabel S.A. v. Republic of Hungary* (ICSID Case No. ARB/07/19), Award of 25 November 2015, ¶¶ 4.146-4.147, CLA-91.

law.[353]  Additionally, Claimants assert that arbitration does not conflict with the principle of mutual trust between EU countries.[354]  Thus, Article 30(3) of the Vienna Convention, providing that "the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty", could not apply to the relationship between the ECT and the later-concluded Lisbon Treaty.[355]

314.    Claimants also argue that Article 41 of the Vienna Convention, setting conditions for a valid *inter se* agreement to modify a multilateral treaty by two or more parties thereto, would preclude any "de-activation" of the ECT as between EU Member States through the Lisbon Treaty.[356]  Claimants assert that an interpretation of the Lisbon Treaty that eliminated EU investors' right of recourse to international arbitration "would be incompatible with the object and purpose of the ECT, which is to promote foreign energy investments by ensuring investors' rights to arbitration."[357]

315.    In response to Respondent's argument that the Lisbon Treaty prevails over the ECT in accordance with ECT Article 16, Claimants argue that Respondent have failed specifically to demonstrate that the Lisbon Treaty "offers more favorable provisions than the right of investor to access arbitration (Part V of the ECT) and the substantive protections afforded investments in Part III of the ECT."[358]  Claimants assert that the right to international arbitration is "fundamental to the ECT", citing arbitral case law and scholarly writing, and remark that Respondent has not referred to any provision of the Lisbon Treaty that is more favorable to investors than ECT Article 26.[359]

**(ii)    Observations on the EC's *Amicus Curiae* brief**

---

[353] Reply, ¶¶ 82-84, citing *Achmea B.V. (formerly Eureko) v. Slovakia* (PCA Case No. 2008-13), Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010, ¶¶ 245, 281-82]; *Binder v. Czech Republic* (UNCITRAL), Award on Jurisdiction of 6 June 2007, ¶¶ 63, 65-66, CLA-98.

[354] Reply, ¶ 85, citing *Eastern Sugar B.V. v. Czech Republic* (SCC Case No. 088/2004), Partial Award of 27 March 2007 ¶¶ 159, 168-171, CLA-99.

[355] Reply, ¶ 86.

[356] Reply, ¶ 87.

[357] Reply, ¶ 89.

[358] Reply, ¶ 94.

[359] Reply, ¶¶ 95-96, citing *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005, ¶ 141 (quoting Thomas Wälde), CLA-101; see also C. Tietje, *The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs. EU Member States*, Beiträge zum Transnationalen Wirtschaftsrecht, 1 September 2008, pp. 12-13, CLA-94; *Charanne B.V. and Construction Investments S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award of 21 January 2016, ¶ 435, CLA-89.

316.    According to Claimants, the EC's contention that the ECT has not created obligations between EU Member States is contradicted by the ECT's explicit text and *travaux préparatoires*.[360]  Claimants refer, in the first instance, to ECT Article 26, observing that it contains no restriction on investors from certain Contracting Parties pursuing arbitration against a Contracting Party.[361]

317.    Next, Claimants contest the EC's assertion that a "disconnection clause" can be inferred from the ECT's provisions and related instruments, including the definitions of "REIO" and "Area" (ECT Articles 1(3) and 1(10)), a voting provision for REIOs (ECT Article 36(7)), and a fork-in-the-road declaration by the EU pursuant to ECT Article 26(3)(b)(ii).[362]  Claimants state that although the ECT's defined terms acknowledge that certain Contracting Parties belong to regional organizations, a disconnection clause cannot thereby be inferred.[363]

318.    Regarding Article 36(7), which provides that an REIO "shall not exercise its right to vote if its member states exercise theirs, and vice versa", Claimants argue that this should be interpreted as preserving EU Member States' autonomy in exercising rights as ECT Contracting Parties, not as placing them in a subordinate position vis-à-vis the EU.[364]  In this vein, ECT Article 44(3) explains that ratification of the ECT by the EU as an REIO will not be counted in addition to those deposited by the REIO's member states.[365]

319.    Regarding the EU's fork-in-the-road declaration under ECT Article 26(3)(b)(ii), relating to the determination of the proper respondent, Claimants deny that it addresses "who can and cannot bring arbitration claims."[366]  The relevant paragraph provides:

> The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an investor of another Contracting Party. In such cases, upon request of the investor, the Communities and the Member States concerned will make such determination within a period of 30 days. *(This is without prejudice to the right of the*

---

[360] Claimants' Observations on Amicus Brief, ¶ 10.

[361] Claimants' Observations on Amicus Brief, ¶ 11.

[362] Statement of the Council and Commission on 17.11.97 pursuant to ECT Article 26(3)(b)(ii) (Annex EC-1).

[363] Claimants' Observations on Amicus Brief, ¶¶ 16-17, 20.

[364] Claimants' Observations on Amicus Brief, ¶ 21.

[365] Claimants' Observations on Amicus Brief, ¶ 21.  Claimants cite to Article 44(2), but apparently intended to cite to Article 44(3).

[366] Claimants' Observations on Amicus Brief, ¶¶ 16-17.

*investor to initiate proceedings against both the Communities and
their Member States).*[367]

320.    Claimants construe the words "another Contracting Party" in the first sentence
as having the same meaning as it has in ECT Article 26(1), which may refer to
either EU Member States or non-EU Member States that are ECT Contracting
Parties.[368]

321.    Claimants then turn to the ECT's historical context and original policy
objectives as described by the EC in light of the European Energy Charter.
Claimants argue that the EC lacks support for its assertion that it was "never
intended that the ECT should influence [the EU's] internal energy policy".[369]
Claimants assert that the part of Johann Basedow's doctoral thesis that the EC
cited does not support the EC's contention.[370]  Further, Claimants argue that Dr.
Basedow's doctoral thesis shows that the EU's stance during ECT negotiations
was opposed to carve-outs for certain signatories that the EC seeks to establish.[371]

322.    As additional context, Claimants cast doubt upon the EC's contention, by way
of analogy to the WTO treaties, that EU Member States have a practice of not
undertaking *inter se* obligations and always negotiate multilateral treaties with the
EU as "one single block".[372]  Claimants pose as a counterexample a WTO dispute
brought by Denmark against the EU.[373]

323.    Further relating to the context and interpretation of the ECT, Claimants allude
to the EC's Declaration dated 20 May 2015 on behalf of the EU in relation to the
International Energy Charter, arguing that the EC has effectively "admitted" that

---

[367] Statement of the Council and Commission on 17.11.97 pursuant to ECT Article 26(3)(b)(ii), third para. (Annex EC-1) (italics in original).

[368] Claimants' Observations on Amicus Brief, ¶ 17.

[369] Claimants' Observations on Amicus Brief, ¶ 22, quoting Amicus Brief, ¶ 44.

[370] Johann Basedow, *The European Union's international investment policy Explaining intensifying Member State cooperation in international investment regulation* (PhD thesis, The London School of Economics and Political Science 2014), p. 160, Annex EC-4.

[371] Claimants' Observations on Amicus Brief, ¶ 22, citing Basedow, pp. 149-150.

[372] Amicus Brief, ¶¶ 36-38.

[373] Claimants' Observations on Amicus Brief, ¶¶ 18-19, citing Claim by Denmark on behalf of the Faroe Islands against the European Union regarding Measures on Atlanto-Scandian Herring and Northeast Atlantic Mackerel, initiated on 4 November 2013.

"something more" is needed to exclude intra-EU disputes from the ECT's dispute settlement mechanisms.[374]

324.     Claimants also assert that arbitral awards and scholarly writing, most of which was referenced in their Reply Memorial, support their position.  Claimants refer, additionally, to ECT and BIT awards post-dating their Reply Memorial that have similarly rejected intra-EU jurisdictional objections.[375]  Claimants also seek to bolster support for the *Charanne* and *RREEF Infrastructure* awards, which Claimants contend were based on the ECT's clear terms and on Christian Tietje's article, which Claimants assert is consistent with other scholarly writings cited in the Reply Memorial.[376]

325.     Claimants next turn to the EC's contentions that the Member States lacked competence to enter into the ECT's investment protection and dispute resolution provisions, and therefore Respondent lacked international capacity to consent to, and be accountable for, such obligations.

326.     First, Claimants deny the EC's assertion that the EU had or acquired exclusive competence over investment protection and dispute resolution mechanisms.[377]  According to Claimants, the EU gained exclusive competence over "foreign direct investment", one facet of the EU's "common commercial policy", when the Lisbon Treaty came into force in 2009, but lacked exclusive competence in 1998 when the ECT came into force.[378]  Second, the ECJ's 16 May 2017 opinion allegedly confirms that the EU and Member States possess shared competence over non-direct investments and investor-state dispute settlement.[379]  Claimants allege that "non-direct investments" include "a number of categories of covered Investments as defined in Article 1(6) of the ECT".[380]  Therefore, Claimants argue, even after the TFEU's adoption, Member States still retain competence to conclude treaties implicating *inter se* obligations.[381]

---

[374] Claimants' Observations on Amicus Brief, ¶ 23 n. 38.

[375] Claimants' Observations on Amicus Brief, ¶¶ 5, 14 and n. 5, citing *Eiser Infrastructure Ltd. et al. v. Spain*, Award of 4 May 2017, CLA-184.  *Anglia Auto Accessories Limited v. The Czech Republic*, SCC Arbitration Case V 2014/181, Award, 10 March 2017, CLA-188; *I.P. Busta & J.P. Busta v. The Czech Republic*, SCC Arbitration Case V 2015/014, Award, 10 March 2017, CLA-189; *WCN Factoring Ltd v. The Czech Republic*, PCA Case No. 2014-34, Award, 22 February 2017, CLA-190.

[376] Claimants' Observations on Amicus Brief, ¶ 14.

[377] Claimants' Observations on Amicus Brief, ¶¶ 24-25, 30; Amicus Brief, ¶ 62.

[378] Claimants' Observations on Amicus Brief, ¶ 30, referring to TFEU Art. 3(1)(c) and 206.

[379] Claimants' Observations on Amicus Brief, ¶ 31, citing ECJ Opinion 2/15, dated 16 May 2017, ¶¶ 255, 290-293, CLA-192.

[380] Claimants' Observations on Amicus Brief, ¶ 31.

[381] Claimants' Observations on Amicus Brief, ¶ 31.

327.   Claimants also deny the relevance of TFEU Article 3(2), which allegedly affirms the EU's exclusive competence over international agreements that "may affect common [EU] rules or alter their scope" and dispute the significance of the *Pringle* decision.[382]  First, the ECT came into force in 1998, before the adoption of TFEU Article 3(2).  Second, the EU, during ECT negotiations, was within its competence and also well placed to prevent Member States from acting outside their competence, e.g., by including a disconnection clause.  Third, the *Pringle* decision found no incompatibility with EU law where a Member State concluded a treaty that did not jeopardize EU rules or frustrate the EU's exercise of its competences.[383]  Claimants assert that the ECT does not impede EU objectives or threaten the ECJ's authority on EU law, but instead "establishes an additional layer or protection for investors".[384]

328.   In connection with the above arguments regarding competences, Claimants contend that Member States' capacity to be bound by a treaty cannot depend upon the "EU's internal distribution of competences", nor may a state "invoke the provisions of its internal law as justification for its failure to perform a treaty."[385]

329.   Claimants next seek to counter the EC's argument that, since intra-EU obligations under the ECT would conflict with TFEU Articles 267 and 344, the Tribunal should find that EU law supersedes the inconsistent ECT provisions pursuant to VCLT Articles 30 and 41 or TFEU Article 351.  Claimants' arguments here parallel their responses to Italy's intra-EU objections.

330.   Claimants first address the premise of VCLT Article 30, that the ECT's investor-state arbitration provisions are inconsistent with the TFEU.  Claimants assert that TFEU Article 267 is inapplicable, as there is no issue involving interpretation of EU law. [386]  Furthermore, according to Claimants, even if there were an issue of EU law, then the Svea Court of Appeal, the Swedish court competent to hear a motion to set aside this Award, would have the ability to request a preliminary ruling from the ECJ, thus allegedly satisfying Article 267.[387]  Claimants contest the EC's assertion that investment arbitrations and commercial

---

[382] Claimants' Observations on Amicus Brief, ¶ 32, citing to ECJ, Judgment in *Pringle*, C-370/12, EU:C:2012:756.

[383] Claimants' Observations on Amicus Brief, ¶ 34.

[384] Claimants' Observations on Amicus Brief, ¶¶ 34-35.

[385] Claimants' Observations on Amicus Brief, ¶¶ 26-27 and n. 42, citing VCLT Article 27.

[386] Claimants' Observations on Amicus Brief, ¶ 40.

[387] Claimants' Observations on Amicus Brief, ¶ 40.

arbitrations are different in any relevant sense and note that the EC incorrectly asserted that the present case is an ICSID case.[388]

331.    As for TFEU Article 344, preventing Member States from "submit[ting] a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein", Claimants assert that it is inapplicable here, as it only encompasses disputes involving Member States or EU institutions, not investor-state disputes.[389]  Claimants also assert that the phrase "of the Treaties" refers to the TFEU and the Treaty on the European Union (TEU), which does not include the ECT.[390]  According to Claimants, there is no risk of a conflict with Article 344 in this case, because there is no need to interpret EU law at all, and the possibility of the Tribunal taking EU law into account when interpreting non-EU law would not conflict with Article 344.[391]  Claimants cite to the *Electrabel* award for the view that the ECJ recognizes that its "exclusive jurisdiction does not prevent numerous other courts and arbitral tribunals from applying EU law", concluding that even if the Tribunal takes EU law into account, there is no conflict with TFEU Article 344.[392]

332.    Claimants argue that even if VCLT Article 30 were applicable, an *inter se* modification of the ECT that excluded investor-state arbitration would violate VCLT Article 41 because it would be incompatible with the ECT's "object and purpose…, which is to promote foreign energy investments in part by ensuring investors' rights to arbitration."[393]

333.    In response to the EC's contention that TFEU Article 351, by omitting to refer to agreements between Member States, implies that such agreements could be superseded by EU law, Claimants argue that the ECT is not within the temporal scope of Article 351, which refers to agreements "concluded before 1 January 1958 or, for acceding States, before the date of their accession."[394]  Further, Claimants note that Article 351 refers to agreements "between one or more Member States on the one hand, and one or more third countries on the other",

---

[388] Claimants' Observations on Amicus Brief, ¶ 40 and n. 70-71.

[389] Claimants' Observations on Amicus Brief, ¶¶ 41-42.

[390] Claimants' Observations on Amicus Brief, ¶ 42.

[391] Claimants' Observations on Amicus Brief, ¶ 42 and n. 75.

[392] Claimants' Observations on Amicus Brief, ¶ 43, quoting *Electrabel S.A., v. Republic of Hungary* (ICSID Case No. ARB/07/19), Award of 25 November 2015, ¶ 4.147, CLA-91.

[393] Claimants' Observations on Amicus Brief, ¶ 51.

[394] Claimants' Observations on Amicus Brief, ¶ 40 and n. 71.

whereas the ECT is an agreement between all Member States as well as the EU, and thus may not fall within the scope of Article 351.[395]

334.    Finally, just as in their response to Italy's application of ECT Article 16, Claimants assert that Article 16 requires that parts III and V of the ECT prevail over any conflicting treaty that offers less favorable rights. Claimants assert that the ability to pursue arbitration in a neutral forum is more favorable to investors than pursuing litigation in the Italian domestic courts.[396]

### d. Tribunal Analysis

335.    As a preliminary matter, the Tribunal notes the significant overlap between Respondent's submissions and the EC's *Amicus* brief on the Respondent's intra-EU jurisdictional objection. Their arguments are not, however, identical. Nonetheless, Respondent declined to submit observations with respect to the EC's *Amicus* brief, communicating by e-mail on 30 May 2017 that, "the position of the Commission largely coincide with that of Italy and consequently the Respondent feels no need to further elaborate on individual points." Accordingly, while the Tribunal has considered each of the arguments expressed by Respondent and the EC, given their extensive overlap, the Tribunal focuses on the main strands of argument.

336.    As explained below, the Tribunal finds the arguments for the intra-EU jurisdictional objection unpersuasive. Further, for reasons explained in Part V.B.4. of this Award, the European Court of Justice's decision in *Achmea*, and other legal authorities and positions expressed thereafter, do not lead to a different result.

### (i) Alleged *ab initio* intention to exclude intra-EU disputes

337.    The Tribunal has considered Respondent's contention that the ECT was intended, *ab initio*, to exclude intra-EU disputes, and concludes that Respondent cannot be correct, as is clear from the ECT itself and a consistent line of arbitral jurisprudence.

338.    As is clear from the text of the ECT, there is no express provision excluding intra-EU disputes. Furthermore, the Tribunal finds that the ECT does not contain any implied "disconnection clause". Had the EU and Member States sought to

---

[395] Claimants' Observations on Amicus Brief, ¶ 40 and n. 71.

[396] Claimants' Observations on Amicus Brief, ¶ 54.

exclude intra-EU disputes from the scope of the substantive and procedural protections under ECT Parts III and V, the Tribunal concludes that they would have done so by means of an express exclusion. The Tribunal is not persuaded otherwise by the textual and contextual references cited by Respondent and the EC.

339.   For example, Respondent suggests that ECT Articles 16 and 25 show an intention to preclude the application of Article 26 to intra-EU disputes.[397] Respondent mentions Article 16, expressing that investors and investments will benefit from the "more favourable" provision in case of conflict between an earlier or later treaty whose terms relate to ECT Parts III or V. Respondent also notes that Italy, Denmark and Luxembourg entered into the EU treaties before the ECT, which Respondent claims address the same subject matter as the latter. Further, Respondent asserts that the EU treaties provide superior forms of investment protection and dispute resolution compared with those provided for under the ECT. Respondent refers to ECT Article 25, expressing that EU Member States need not extend the "preferential treatment" that they owe one another to third states, as suggesting that a more favorable regime applies as between EU Member States.[398]

340.   The Tribunal is not persuaded that the EU treaties offer EU investors a more favorable treatment with respect to either substantive protections or dispute resolution compared to the treatment accorded under ECT Parts III and V. Of particular relevance here is that investor-State arbitration is not provided for by the EU treaties. The Tribunal considers that Claimants correctly assert that "Article 16 cannot be used to deny a benefit that the ECT affords to investors."[399]

341.   Furthermore, although EU Member States may accord each other preferential treatment pursuant to ECT Article 25, this in itself does not demonstrate that the EU treaties provide for a dispute resolution method more favorable to investors and investments than ECT Article 26. The Tribunal therefore does not consider ECT Article 25 to be relevant to the interpretation of Article 16. Respondent does not explain how court litigation against a host state in the host state's courts could be more favourable to investors than investor-State arbitration before a neutral arbitral tribunal independent of the host state. Thus, the Tribunal concludes that an application of ECT Article 16 to the respective dispute resolution methods provided for under EU law and under ECT Article 26 would result in the latter prevailing over the former.

---

[397] Statement of Defense, ¶¶ 48-52.

[398] Statement of Defense, ¶¶ 48-50.

[399] Reply, ¶ 58.

342.    The Tribunal also notes that arbitral jurisprudence has rejected the notion that the ECT contains an "implicit disconnection clause" that would exclude intra-EU disputes from application of ECT Article 26, holding that any exclusion for intra-EU disputes would have to be made expressly.[400]  As aptly put by the tribunal in *RREEF Infrastructure v. Spain*:

> [W]hen the very essence of a treaty to which the EU is a party is at issue, … then precisely because the EU is a party to the treaty a formal warning that EU law would prevail over the treaty, such as that contained in a disconnection clause, would have been required under international law.

> This follows from the basic public international law principle of *pacta sunt servanda*. If one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself. The attempt to construe an implicit clause into Article 26 of the ECT is untenable, given that that article already contains express exceptions to the *"unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article"* that had been agreed amongst the States Party.[401]

343.    That the lack of an express carve-out for intra-EU disputes implies the absence of such an exclusion is shown by the existence of certain specific exceptions.  This was well explained by the tribunal in *Eiser Infrastructure v. Spain*:

> Treaty law and practice provide familiar mechanisms for treaty makers wishing to limit or exclude application of particular provisions in particular situations. These were known and used in the ECT's texts, including by the predecessor to the European Union and its member countries. The treaty includes multiple limiting decisions and understandings, such as those providing that the treaty

---

[400] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶¶ 81-87, CLA-92; *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 186, CLA-184; *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, 15 February 2018, ¶ 454, CLA-195; *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 215, CLA-198.

[401] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶¶ 84-85, CLA-92 (internal citations omitted).

concerning Spitsbergen prevails over inconsistent provisions of the ECT in case of a conflict and limiting the scope of the treaty to "Economic Activities in the Energy Sector." In like vein, the European Communities and the Russian Federation agreed that trade in nuclear materials should be regulated by separate bilateral arrangements. Yet the EEC sought no similar clarifying provisions regarding what Respondent now contends is a major exclusion in the ECT's coverage. Respondent contends that no such express exclusion was included in the ECT because, for reasons analyzed below, it was obviously not required. The Tribunal is not persuaded.[402]

### (ii)    Alleged *inter se* modification of ECT by the Lisbon Treaty

344.    The Tribunal has considered Respondent's alternative contention that, even if the ECT did not originally preclude intra-EU disputes, the adoption of the Lisbon Treaty in 2007 was a legitimate *inter se* agreement whereby EU Member States removed intra-EU disputes from the scope of ECT Article 26.  Respondent's arguments rely on Articles 30 and 41 of the VCLT.  As explained below, the Tribunal is not persuaded by Respondent's arguments that the Lisbon Treaty modified the ECT as between EU Member States.

345.    Article 30 of the VCLT, titled "Application of Successive Treaties Relating to the Same Subject-Matter", provides as follows:

> 1.  Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.
> 2.  When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.
> 3.  When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.
> 4.  When the parties to the later treaty do not include all the parties to the earlier one:
> (*a*)  As between States parties to both treaties the same rule applies as in paragraph 3;
> (*b*)  As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.

---

[402] *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 187, CLA-184 (internal citations omitted).

> 5.   Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.

346.    As a preliminary matter, the Tribunal is not persuaded that VCLT Article 30 is applicable to the ECT and the Lisbon Treaty at all, insofar as Respondent has not demonstrated that the ECT and the Lisbon Treaty are "successive treaties relating to the same subject-matter", as VCLT Article 30(1) would require.  The Tribunal's position here is consistent with that of the *Electrabel* tribunal in finding that the ECT and EU law do not have the same subject matter.[403]  Nonetheless, even if the ECT and the Lisbon Treaty were related to the same subject matter, the Tribunal could not conclude from Respondent's arguments based on VCLT Articles 30(2) and 30(4) that the Tribunal lacks jurisdiction.

347.    As regards VCLT Article 30(2), Respondent suggests that this provision encompasses ECT Article 16, as Article 16 "specifies that [the ECT] is subject to" a treaty "more favourable" than it with regard to provisions under ECT Parts III and V.  Respondent, asserting that the Lisbon Treaty is more favorable to investors than the ECT, concludes that the Lisbon Treaty prevails over the ECT in those respects.[404]

348.    The Tribunal considers that Respondent's interpretation does not accord with the meaning of VCLT Article 30(2).  ECT Article 16 does not "specify" that the ECT is subject to "an earlier or later treaty", nor does it refer to any particular treaty at all.  Article 16 instead expresses a more general mechanism whereby a treaty with more favorable provisions is to apply.  Thus, irrespective of whether the Lisbon Treaty provided more favorable or less favorable terms than the ECT, which is a question that could be addressed in the context of ECT Article 16 (and without reference to VCLT Article 30(2)), Article 16 is not the kind of treaty provision described by VCLT Article 30(2).  Accordingly, the Tribunal rejects Respondent's argument regarding VCLT Article 30(2).

349.    With respect to VCLT Article 30(4)(a), which refers to Article 30(3), Respondent contends that "between EU Member States the ECT would only apply to the extent that its provisions are compatible with those of EU law."[405]

---

[403] *Electrabel S.A. v. Republic of Hungary* (ICSID Case No. ARB/07/19), Award of 25 November 2015, ¶ 4.176, CLA-91.

[404] Statement of Defense, ¶¶ 85-88.

[405] Statement of Defense, ¶ 89.

Respondent states that application of the ECT in an intra-EU context conflicts with EU law based on the Lisbon Treaty's re-allocation of external competences regarding certain matters.[406]

350.    The Tribunal finds no inconsistency, however, between the ECT and EU law, in accord with prior ECT jurisprudence.[407]  The Tribunal here refers to the contention by Respondent and the EC that the ECT and TFEU Article 344 are in conflict.  TFEU Article 344 provides that EU member states "undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."  The Tribunal considers that Claimants are correct in their assertion that Article 344 relates to disputes involving Member States or EU institutions, not investor-State disputes.[408]  Nor does the present arbitration concern the interpretation or application of the EU treaties, but instead concerns rights and obligations under the ECT.  Thus, the Tribunal finds no inconsistency between the ECT and TFEU Article 344.

351.    Accordingly, as there is no conflict with EU law, if the Tribunal were to apply VCLT Article 30(4)(a), referring to Article 30(3), the Tribunal would conclude that the ECT applies to its full extent, not limited in any way by EU law.

352.    Accordingly, the Tribunal rejects Respondent's objections to the applicability of the ECT in an intra-EU context.   Even if Article 30(4)(a) of the VCLT were applicable, it would be "without prejudice to Article 41" of the VCLT, as provided in Article 30(5) of the Treaty, requiring the Tribunal to consider whether the Lisbon Treaty's alleged modification of the ECT, as between the EU Contracting Parties, conflicts with Article 41 of the VCLT.

353.    Article 41 of the VCLT, titled "Agreements to Modify Multilateral Treaties Between Certain of the Parties Only", provides as follows:

> 1.  Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
> (a) The possibility of such a modification is provided for by the treaty; or
> (b) The modification in question is not prohibited by the treaty and:

---

[406] Statement of Defense, ¶¶ 74, 90.

[407] *Electrabel S.A. v. Republic of Hungary* (ICSID Case No. ARB/07/19), Award of 25 November 2015, ¶¶ 4.146, 4.167, 4.172, CLA-91.

[408] Claimants' Observations on Amicus Brief, ¶¶ 41-42.

> (i) Does not affect the enjoyment by the other parties of their
> rights under the treaty or the performance of their obligations;
> (ii) Does not relate to a provision, derogation from which is
> incompatible with the effective execution of the object and
> purpose of the treaty as a whole.
>
> 2.   Unless in a case falling under paragraph l(a) the treaty
> otherwise provides, the parties in question shall notify the other
> parties of their intention to conclude the agreement and of the
> modification to the treaty for which it provides.

354.    Respondent and the EC both argued that "de-activating" the ECT's investment protection and dispute resolution provisions by *inter se* modification pursuant to the Lisbon Treaty would not violate VCLT Article 41(1)(b)(ii) because it would not "be incompatible with the effective execution of the object and purpose of the treaty as a whole."[409]  Although the positon of the Respondent and the EC remains somewhat unclear on this matter, they seem to  rely, on the premise that non-EU investors could still invoke the ECT's investment protection and dispute resolution provisions, which is more relevant to Article 41(1)(b)(i), addressing the "enjoyment by the other parties of their rights under the treaty".[410]  Claimants, in turn, assert that eliminating the possibility to pursue investor-State arbitration would frustrate the ECT's "object and purpose … to promote foreign energy investments by ensuring investors' rights to arbitration."[411]  In this connection, the Tribunal has not been persuaded by the reasoning of the Respondent and the EC in relation to VCLT 41(1)(b)(ii).  Rather, their reasoning  seems more relevant to Article 41(1)(b)(i).  On the other hand, the Tribunal does not find it necessary to determine whether suppression of ECT Article 26 in relation to EU investors would be "incompatible with the effective execution of the object and purpose of the treaty [i.e., the ECT] as a whole" under Article 41(1)(b)(ii), since it has already found that Article 30(4)(a) of the VCLT is not applicable in the present context.

355.    The EC raised an additional argument based on TFEU Article 351 to the effect that it suggests that prior agreements among Member States are superseded by the TFEU in case of any inconsistency.[412]  Claimants observed, in this connection, that Article 351 refers to "agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession", and therefore that the ECT is outside the relevant temporal scope.  The Tribunal agrees with Claimants, and also notes that Article 351 refers to incompatibility between the earlier agreement and the TFEU.  The Tribunal, having found no inconsistency between the ECT and TFEU, concludes that TFEU Article 351 is inapplicable here.

---

[409] Statement of Defense, ¶ 96; Amicus Brief, ¶ 134.

[410] *Id.*

[411] Reply, ¶ 89.

[412] Amicus Brief, ¶ 128.

### 4. The *Achmea* Decision and post-*Achmea* Matters regarding Intra-EU Objection

#### a. Invitation to File Observations

356.    As noted in the Procedural History (Part II of this Award), on 6 March 2018, the European Court of Justice issued its judgment in the case of *Slovak Republic v. Achmea* (the "*Achmea* Decision", as defined above).[413]  Shortly thereafter, the Tribunal invited the Parties to submit observations on any impact that the *Achmea* Decision might have on the present arbitration.  The Tribunal received observations from both sides on 23 March 2018.

357.    Following the Parties' submissions on the *Achmea* Decision, the Tribunal accepted the filing of observations by both sides regarding three subsequent items of possible relevance to the *Achmea* Decision and other aspects of this dispute.  As detailed in the Procedural History, both sides simultaneously submitted observations:

- on 6 July 2018, regarding the 16 May 2018 award in *Masdar Solar & Wind Cooperatief v. Spain*;[414]

- on 20 July 2018, regarding the 15 June 2018 award in *Antin Infrastructure Services Luxembourg et al. v. Spain* and the 2 May 2018 award in *Antaris Solar et al. v. Czech Republic*;[415] and

- on 8 August 2018, regarding the EC's 19 July 2018 Communication on protection of intra-EU investment.[416]

358.    The below summaries and analysis of submissions on the *Achmea* Decision and post-*Achmea* developments focus on issues relating to the intra-EU jurisdictional objection.  However, the Parties' submissions on post-*Achmea* developments extend beyond those issues, discussing the merits of the substantive

---

[413] Judgment of 6 March 2018, *Slowakische Republik v. Achmea B.V.*, European Court of Justice (Grand Chamber), Case C-284/16, CLA-194.  The Tribunal has noted a variance in citation to *Achmea*, sometimes with reference to ECJ (European Court of Justice), sometimes CJEU (Court of Justice of the European Union).  Our understanding is that the CJEU is a judicial institution seated in Luxembourg comprised of two different courts, the Court of Justice (with one judge from each EU country) which addresses inter alia requests for rulings from national courts, and the General Court, which rules on actions for annulment brought by individuals and companies.

[414] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, CLA-197.

[415] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018; *Antaris Solar et al. v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018.

[416] Communication from the Commission to the European Parliament and the Council, Protection of intra-EU investment, Brussels, 19 July 2018, COM(2018) 547/2.

claims under ECT Article 10(1) and the Taxation Measures exclusion under ECT Article 21. The Parties' submissions on the impact of the post-*Achmea* developments on these latter issues are not addressed in this section.

### b. Claimants' Observations on *Achmea* Decision

359.    Claimants submit that the *Achmea* Decision lacks any relevance to the present arbitration for four main reasons.

360.    First, Claimants assert that the Tribunal's jurisdiction is exclusively grounded in ECT Article 26, whose express requirements are met in the present case, and thus the Tribunal must exercise its jurisdiction and proceed to render an award on the merits.[417]  Claimants cite recent ECT arbitral awards affirming that approach when faced with similar intra-EU objections.[418]  According to Claimants, the reference in ECT Article 26(6) to "this Treaty and applicable rules and principles of international law" does not support an interpretation whereby EU law enters into the Tribunal's jurisdictional analysis through the "back door", given the ECT's clear and explicit jurisdictional requirements.  Claimants assert that such an interpretation has been flatly rejected by other tribunals and is unsupported by principles of treaty interpretation under the VCLT.[419]  One reason for not finding that Article 26(6) incorporates EU law is, according to Claimants, that the ECT is a multilateral instrument to which many non-EU Member States are Contracting Parties.[420]

361.    Second, according to Claimants, the *Achmea* Decision does nothing to upset recent arbitral jurisprudence, which has rejected any interpretation of the ECT expressly or impliedly excluding intra-EU disputes from the ECT's scope,[421] and has found, in parallel with scholarly writings, that the ECT and EU law neither conflict with one another nor share the same subject matter.[422]  Further supporting

---

[417] Claimants' Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 13-15.

[418] *Id.*, ¶¶ 17-19, citing *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, 15 February 2018, ¶ 461, CLA-195; *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 199, CLA-184.

[419] Claimants' Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 17, 20.

[420] *Id.*, ¶ 22.

[421] Claimants' Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 25-31, citing *Charanne B.V. & Construction Investments S.a.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016, ¶ 437, CLA-89; *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶¶ 187, 189, CLA-184; and *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶¶ 84-85, CLA-92.

[422] Claimants' Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 32-40, citing *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14 (decision on jurisdiction not public), CLA-103; *EDF International S.A. v. Republic of Hungary*, UNCITRAL (award not public), CLA-90; *RREEF Infrastructure (G.P.) Limited and RREEF*

an absence of any conflict, Claimants invoke Advocate General Wathelet's opinion in the *Achmea* case, stating that the EC could not "offer the slightest explanation of how the prohibition of illegal expropriation [under the Netherlands-Slovakia BIT] is incompatible with the EU and FEU Treaties."[423]  In the present arbitration, Claimants assert, they have not submitted any claims based on EU law, but only claims based on provisions of the ECT and under public international law.[424]

362.    Further, Claimants argue, even if the ECT and EU law were to conflict, which Claimants deny, then ECT Article 16 would prevail over conflicting provisions of EU law, including the ECJ's interpretation of Articles 267 and 344 of the TFEU in the *Achmea* Decision.[425]  Under Article 16(2), Claimants assert, no provision of any prior or subsequent agreement involving the Contracting Parties may derogate from any provision of the ECT that is more favourable to the Investor or Investment, including international arbitration under ECT Article 26.[426] Claimants submit that the ECJ's prior jurisprudence considers a right to recourse to international arbitration to be "the most essential element of the BITs" and "an indispensable guarantee that encourages and protects investments."[427]

363.    Third, Claimants argue that even if the *Achmea* Decision is relevant to disputes under certain BITs, there are two different aspects that distinguish it from the present arbitration.  First, the *Achmea* Decision concerned an arbitration provision of an intra-EU BIT to which the EU is not a party.  According to Claimants, the ECJ expressly limited the application of the *Achmea* Decision to cases involving "a provision [for investor-state arbitration] in an international

---

*Pan-European Infrastructure Two Lux S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, CLA-92; *Charanne B.V. & Construction Investments S.a.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016, CLA-89; *Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC V2013/153, 17 July 2016, ¶¶ 462, 464, CLA-195; *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, RLA-16; *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, CLA-184; *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, 15 February 2018, CLA-195; Christian Tietje, *The Applicability of the Energy Charter Treaty in ICSID arbitration of EU Nationals vs. EU Member States*, Beiträge zum Transnationalen Wirtschaftsrecht, September 1, 2008, at 12-13, CLA-94; and Maja Smrkolj, *The Use of 'Disconnection Clauses' in International Treaties: What Does It Tell Us About the EC/EU as an Actor in the Sphere of Public International Law?*, Max Planck Society for the Advancement of the Sciences – Max Planck Institute for Comparative Public Law and International Law (14 May 2008) at 10, CLA-178.

[423] Opinion of Advocate General Wathelet, *Slowakische Republik v. Achmea B.V.*, Case C-284/16, 19 September 2017, CLA-196.

[424] Claimants' Comments on the *Achmea* Decision, 22 March 2018, ¶ 40.

[425] *Id.*, ¶¶ 43, 47, 49.

[426] *Id.*, ¶ 43.

[427] *Id.*, ¶ 45, quoting Opinion of 16 May 2017, *Case 2/15*, European Court of Justice, CLA-192.

agreement concluded <u>between Member States</u> ...”[428] and cases involving “an agreement which was concluded <u>not by the EU</u> but by the Member States.”[429] Similarly, the ECJ held in another case that an investor-state dispute under the EU-Singapore Free Trade Agreement could be resolved through international arbitration, as long as both the EU and the Member States approved of this option.[430] Thus, Claimants assert, the EU’s participation as a Contracting Party to the ECT is one key difference between this case and that addressed by the *Achmea* Decision.

364. A second aspect that differs, according to Claimants, is that the ECJ’s decision relied on the governing law clause of the Netherlands-Slovakia BIT, containing two provisions absent from ECT Article 26(6).[431] Claimants argue that the ECJ’s concern was that the Netherlands-Slovakia BIT referred to “the law in force of the Contracting Party concerned” and “other relevant Agreements between the Contracting Parties”, which could implicate the application of EU law. Claimants submit that the ECT’s governing law clause, requiring decision “in accordance with this Treaty and applicable rules and principles of international law”, does not implicate the interpretation or application of EU law.[432]

365. Fourth, Claimants submit that any potential impact of the *Achmea* Decision on the enforcement of the award in this arbitration is currently unknown, “likely to be minimal to nonexistent”, and in any case irrelevant to the Tribunal’s mandate.[433] Claimants cite *Micula v. Romania*, in which the tribunal chose not to address arguments regarding enforceability based on matters of EU law that might arise after rendering the award.[434]

   c. **Respondent’s Observations on *Achmea* Decision**

366. Respondent submits that the *Achmea* Decision “confirms the lack of jurisdiction of arbitral tribunals under Article 26 ECT in intra-EU investment disputes.”[435] This is because, Respondent argues, the ECJ concluded that an offer

---

[428] Claimants’ Comments on the *Achmea* Decision, 22 March 2018, ¶ 53, quoting *Achmea* Decision, ¶ 62 (emphasis added by Claimants), CLA-194.

[429] Claimants’ Comments on the *Achmea* Decision, 22 March 2018, ¶ 54, quoting *Achmea* Decision, ¶ 58 (emphasis added by Claimants), CLA-194.

[430] Claimants’ Comments on the *Achmea* Decision, 22 March 2018, ¶ 55.

[431] Claimants’ Comments on the *Achmea* Decision, 22 March 2018, ¶ 57.

[432] Claimants’ Comments on the *Achmea* Decision, 22 March 2018, ¶ 62.

[433] Claimants’ Comments on the *Achmea* Decision, 22 March 2018, ¶ 65.

[434] Claimants’ Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 65-66, citing *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶¶ 330, 340-341, CLA-15.

[435] Respondent’s Comments on the *Achmea* Decision, 22 March 2018, ¶ 3.

of arbitration from a Member State to an EU investor under the ECT would "violate[] Articles 267 and 344 TFEU and the general principle of autonomy of the Union Law" and thus be incompatible with EU law.[436] Respondent's reasoning, briefly summarized below, to some extent repeats its earlier submissions on jurisdiction.

367.    On one hand, Respondent argues that EU law is part of international law, concluding that the reference to "applicable rules and principles of international law" in ECT Article 26(6) would require a tribunal to apply EU law in an intra-EU dispute under the ECT.[437] Further, an ECT investor-state tribunal cannot, according to Respondent, make a preliminary reference to the ECJ under Article 267 TFEU, given the ECJ's position expressed in the *Achmea* Decision.[438] Thus, asserts Respondent, the ECT established a "mechanism for settling investment disputes that is not capable of ensuring the proper application and full effectiveness of EU law."[439]

368.    Respondent suggests that the facts and circumstances of the *Achmea* Decision do not differ in any relevant way from the present case, according no significance to the EU's role as Contracting Party to the ECT.[440] In Respondent's view, what is relevant is the bilateral offer to arbitrate "that Italy assumed towards Luxembourg investors", which it alleges is "exactly identical to the situation of Article 8 of the Slovak-Dutch BIT that was before the Court of Justice in *Achmea*."[441] Respondent refers to commentary published shortly after issuance of the *Achmea* Decision that it considers to support its interpretation.[442] Respondent also asserts that, even if an award is rendered outside the EU or under ICSID rules, the *Achmea* Decision implies that such awards still conflict with EU law.[443]

---

[436] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 7-8.

[437] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 4-5 and n. 2, citing *Electrabel v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 Nov. 2012, ¶¶ 4.120, 4.122, 4.124, CLA-36; Trevor Hartley, *International Law and the Law of the European Union – A Reassessment*, British Yearbook of International Law, 72, 2001, pp. 1-35; Marcus Burgstaller, *European Law and Investment Treaties*, 26 Journal of International Arbitration (2009), p. 191.

[438] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 18-19, 26-31.

[439] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶ 32.

[440] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 13-15.

[441] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 11, 14-15.

[442] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶ 12, citing Steffan Hindelang, *The Limited Immediate Effects of CJEU's Achmea Judgement*, Verfassungsblog, 9 March 2018, available at <https://verfassungsblog.de/the-limited-immediate-effects-of-cjeus-achmea-judgement/>, RLA-019.

[443] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶ 44.

369.    Respondent asserts that the Opinion of Advocate General Wathelet filed with the ECJ on 19 September 2017 is superseded by the *Achmea* Decision and thus irrelevant.[444]  Respondent also suggests that the Advocate General's Opinion relies incorrectly on the assumption that arbitral tribunals are able to make preliminary references to the ECJ under TFEU Article 267.[445]

370.    Further, Respondent suggests that an ECT award in an intra-EU scenario could not be enforced without the EC's authorization.  Respondent submits that this is "evidence of the institutional conflict that application of the ECT to intra-EU disputes would cause".[446]

### d.  The Parties' Comments on post-*Achmea* Developments

#### (i) The *Masdar* award

371.    Claimants assert that the *Masdar* award is of critical importance as, allegedly, the first ECT award rendered since the *Achmea* Decision.[447]  Claimants contend that the *Masdar* award confirms their view that the *Achmea* Decision is irrelevant to investor-State disputes under the ECT, noting that the EU is an ECT Contracting Party.[448]  Claimants place emphasis on the following passage from the *Masdar* award:

> The *Achmea* Judgment is of limited application – first, and specifically, to the Agreement on encouragement and reciprocal protection of investment between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic and, second, in a more general perspective, to any "*provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic.*" The ECT is not such a treaty. Thus, the *Achmea* Judgment does not take into consideration, and thus it cannot be applied to, multilateral treaties, such as the ECT, to which the EU itself is a party.[449]

---

[444] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶ 39.

[445] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶¶ 41-42.

[446] Respondent's Comments on the *Achmea* Decision, 22 March 2018, ¶ 45.

[447] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 2.

[448] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 2.

[449] Masdar award, ¶ 679, CLA-197 (internal citation omitted), quoted in Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 3.

372.    According to Claimants, the above passage confirms a distinction which Claimants allege that the *Achmea* Decision has drawn, between intra-EU BITs "concluded not by the EU but by Member States", on one hand, and multilateral treaties to which the EU is a party, on the other.[450]  Claimants state that the *Masdar* award adopted the reasoning of Advocate General Wathelet in his Opinion, that "…if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty [the ECT] with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible."[451]  Further, according to Claimants, the *Masdar* award interpreted the *Achmea* Decision as not having rejected Advocate General Wathelet's opinion but instead as being "simply silent on the subject of the ECT."[452]

373.    Claimants further submit that the *Masdar* award rejected several variants of intra-EU objections.  First, Claimants interpret the *Masdar* award as supporting their position that the ECT's text contains nothing that precludes intra-EU disputes.[453]  Specifically, Claimants refer to a paragraph from an unpublished award in the *PV Investors v. Spain* arbitration, quoted in the *Masdar* award.[454]  According to that paragraph, Claimants submit, the presence in the ECT of a provision on potential conflict with the Svalbard Treaty, a treaty less significant than the EU treaties, suggests that if the EU had desired to exclude intra-EU disputes from the ECT's scope, it had methods to do so.[455]

374.    Claimants interpret the *Masdar* award as rejecting the view that TFEU Article 344 precludes intra-EU arbitration, instead joining a number of other cases finding that the ECT and EU law do not conflict.[456]  Finally, Claimants interpret the *Masdar* award as confirming that the ECT is more favorable to investors than EU law because the ECT provides for the possibility of investor-State arbitration and thus, under ECT Article 16, prevails over EU law to the extent of any inconsistency between them.[457]

375.    Respondent, for its part, submits that the *Masdar* award is not only irrelevant, as it concerned different circumstances from those involved here, but also

---

[450] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 4.

[451] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 5, quoting Opinion of Advocate General Wathelet, *Slowakische Republik v. Achmea B.V.*, Case C-284/16, 19 September 2017, ¶ 43, CLA-196.

[452] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 5, quoting the Masdar award, ¶ 682.

[453] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 8.

[454] *Id.*, citing *Masdar* Award, ¶ 311, quoting *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, ¶ 183, Decision on Jurisdiction (not public).

[455] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 8.

[456] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 9, citing Masdar award, ¶ 340.

[457] Claimants' Comments on the Masdar Award, 6 July 2018, ¶ 10.

incorrectly interpreted the *Achmea* Decision and the Opinion of Advocate General
Wathelet, and thus reached an incorrect result on jurisdiction.[458]  Respondent
suggests, additionally, that the *Masdar* award is not binding on the present
tribunal, unlike the *Achmea* Decision.[459]

376.    In relation to the *Masdar* award's interpretation of the *Achmea* Decision,
Respondent states that the *Masdar* tribunal was incorrect in interpreting the ECJ's
reasoning as being inapplicable to multilateral treaties like the ECT.[460]
Respondent submits several different grounds for its interpretation of the *Achmea*
Decision's reasoning as being applicable to the ECT.  First, Respondent relies on a
literal interpretation of the *Achmea* Decision, arguing that the ECT falls within the
description of "an international agreement concluded between Member States
under which an investor from one of those Member States may, in the event of a
dispute concerning investments in the other Member State, bring proceedings
against the latter Member State before an arbitral tribunal whose jurisdiction that
Member State has undertaken to accept", even if the ECT also counts the EU as a
Contracting Party.[461]

377.    Further, Respondent argues, the characteristics discussed by the ECJ, such as
the autonomy of EU law, the finality of investor-State arbitral awards, and the
inability of arbitral tribunals to make preliminary references to the ECJ under
TFEU Article 267, apply as much to multilateral as to bilateral treaties, which
Respondent asserts was misunderstood by the *Masdar* tribunal.[462]  Thus,
Respondent argues, the ECT's arbitration provision would be incompatible with
EU law, as it would not ensure the "full effectiveness of EU law".[463]

378.    Next, Respondent contends that the *Masdar* award mischaracterizes the
*Achmea* Decision as not addressing (and thereby not denying) the Opinion of
Advocate General Wathelet, which the *Masdar* tribunal considers to have drawn a
distinction between the investor-State arbitration provisions of bilateral treaties
and those of multilateral treaties.[464]  Respondent argues, instead, that paragraph 57

---

[458] Respondent's Comments on the Masdar Award, 6 July 2018, ¶¶ 1, 6, 28

[459] Respondent's Comments on the Masdar Award, 6 July 2018, ¶ 39.

[460] Respondent's Comments on the Masdar Award, 6 July 2018, ¶¶ 6, 36.

[461] Respondent's Comments on the Masdar Award, 6 July 2018, ¶¶ 7-8, quoting *Achmea* Decision, ¶ 31.

[462] Respondent's Comments on the Masdar Award, 6 July 2018, ¶¶ 6-17.

[463] Respondent's Comments on the Masdar Award, 6 July 2018, ¶¶ 17-18, citing *Achmea* Decision, ¶ 56.

[464] Respondent's Comments on the Masdar Award, 6 July 2018, ¶ 25.

of the *Achmea* Decision is the ECJ's response to Advocate General Wathelet's Opinion.[465]  Respondent concludes:

> The ECJ recognizes that international Courts (*not* arbitral tribunals) can be established in mixed agreements <u>as far as this does not affect the autonomy of the EU and its legal order</u>. The situation is different in the case of an arbitral tribunal....[466]

379.    Respondent also asserts that the *Masdar* Award relied heavily on the Opinion of Advocate General Wathelet but that the latter was an "extremely shaky authority", since it had been rejected by the ECJ.[467]  In addition, Respondent contends, the alleged "silence" by the ECJ regarding the alleged distinction drawn by Advocate General Wathelet has no significance, given that the ECJ has no obligation to address the views of Advocates General.[468]

### (ii)    The *Antin* and *Antaris* awards

380.    Claimants argue that the *Antin* award is consistent with other awards that have addressed, and rejected, the intra-EU objection, such as the *Charanne* and *Eiser* awards.[469]  According to Claimants, the *Antin* tribunal found that satisfaction of the requirements of ECT Article 26 suffices for establishing the tribunal's jurisdiction, declining to find any exclusion in the ECT for intra-EU disputes.[470] Claimants refer to language in the *Antin* award stating that "[s]uch an exclusion would have to be express and clear" and stating that Spain had not persuaded the tribunal that the ECT contained such an exclusion.[471]

381.    Claimants conclude that since the jurisdictional requirements of ECT Article 26 are met in the present case, the Tribunal should, like the tribunal in *Antin*, reject Italy's arguments in support of its intra-EU objection.[472]

382.    In regard to the *Antaris* award, Claimants do not address any relevance it might have in relation to the Achmea Decision or any matters relating to the intra-

---

[465] Respondent's Comments on the Masdar Award, 6 July 2018, ¶ 20.

[466] Respondent's Comments on the Masdar Award, 6 July 2018, ¶ 21 (Respondent's emphases).

[467] Respondent's Comments on the Masdar Award, 6 July 2018, ¶¶ 26, 33.

[468] Respondent's Comments on the Masdar Award, 6 July 2018, ¶ 29.

[469] Claimants' Comments on the *Antin* and *Antaris* Awards, 20 July 2018, ¶¶ 2, 4.

[470] Claimants' Comments on the *Antin* and *Antaris* Awards, 20 July 2018, ¶ 3.

[471] Claimants' Comments on the *Antin* and *Antaris* Awards, 20 July 2018, ¶ 3.

[472] Claimants' Comments on the *Antin* and *Antaris* Awards, 20 July 2018, ¶ 5.

EU objection, instead focusing on its relevance to substantive claims and Respondent's jurisdictional objection based on ECT Article 21.

383.    Respondent's observations on the *Antin* and *Antaris* awards do not address the *Achmea* Decision or any other matters relating to jurisdiction, but instead focus on the potential relevance of those awards to the substantive claims.

### (iii)    The EC's 19 July 2018 Communication

384.    According to Claimants, the EC's 19 July 2018 Communication to the EU Parliament and the Council incorrectly interprets the significance of the *Achmea* Decision.[473]  Claimants assert that the EC is wrong to claim that the *Achmea* Decision invalidates the investor-State arbitration provision of all intra-EU BITs.[474]  According to Claimants, the *Achmea* Decision depended on the specific governing law clause of the BIT in that case and does not apply to the ECT, which has a different governing law provision and includes the EU as a Contracting Party.[475]  Claimants deny the EC's position that the ECT must not be applied to intra-EU disputes, alluding to their earlier comments on the *Achmea* Decision.[476]

385.    Claimants also deny the EC Communication's claim that, based on the *Achmea* Decision, national courts must annul any award rendered under an intra-BIT and terminate their intra-EU BITs.[477]

386.    Respondent states that the EC Communication is a non-binding instrument of EU law that proclaims the EC's policy stance and is important for "assessing the content of EU treaties provisions to compare these with other commitments by Member States under other international treaties such as the ECT…."[478]  The EC Communication, Respondent asserts, is an "authoritative interpretation" that confirms Respondent's view that the *Achmea* Decision extends to the intra-EU application of ECT Article 26 and that the EU's role as an ECT Contracting Party is not relevant in that regard.[479]

---

[473] Claimants' Observations on the EC's 19 July 2018 Communication, 8 August 2018, p. 1.

[474] Claimants' Observations on the EC's 19 July 2018 Communication, 8 August 2018, p. 1.

[475] Claimants' Observations on the EC's 19 July 2018 Communication, 8 August 2018, p. 1.

[476] Claimants' Observations on the EC's 19 July 2018 Communication, 8 August 2018, p. 2.

[477] Claimants' Observations on the EC's 19 July 2018 Communication, 8 August 2018, p. 2.

[478] Respondent's Observations on the EC's 19 July 2018 Communication, 8 August 2018, ¶ 2.

[479] Respondent's Observations on the EC's 19 July 2018 Communication, 8 August 2018, ¶¶ 3, 5.

387.    Respondent also asserts that the EC Communication provides an analysis of EU law that shows that the EU treaties protect investments in the EU under terms more favorable than those of the ECT.[480]  Respondent suggests that the application of ECT Article 16 should therefore result in EU law superseding the ECT in intra-EU investment disputes, and that enabling protection under both EU law and the ECT may lead to forum shopping and double recovery.[481]  Respondent concludes that the EC Communication strongly supports Respondent's intra-EU jurisdictional objection.[482]

### e.   Tribunal Analysis

388.    In connection with its jurisdiction to decide this dispute, the Tribunal has considered the Parties' submissions on the *Achmea* Decision,[483] including their references to the Opinion of Advocate General Wathelet filed with the ECJ on 19 September 2017,[484] as well as their submissions on certain matters after the issuance of the *Achmea* Decision.[485]

389.    The underlying dispute arose out of an investment in Slovakia, made by a Dutch insurance group, which had challenged the reversal of certain measures to liberalize the health insurance market in the Slovak Republic.  The challenge was brought pursuant to Article 8 of the 1992 Bilateral Investment Treaty between the Netherlands and Czechoslovakia (as it then was).

390.    The Dutch claimant (Achmea) opted (as permitted under the BIT) for arbitration pursuant to the UNCITRAL Rules, before an arbitral tribunal seated in Frankfurt, administered by the Stockholm Chamber of Commerce.  A EUR 22 million award in favor of Achmea was challenged in an unsuccessful annulment action before a court in Frankfurt, with appeal to the German BGH (Bundesgerichtshof).

---

[480] Respondent's Observations on the EC's 19 July 2018 Communication, 8 August 2018, ¶¶ 6-8.

[481] Respondent's Observations on the EC's 19 July 2018 Communication, 8 August 2018, ¶¶ 7, 9.

[482] Respondent's Observations on the EC's 19 July 2018 Communication, 8 August 2018, ¶ 10.

[483] Claimants' Comments on the *Achmea* Decision, 22 March 2018; Respondent's Brief Considerations on the *Achmea* Judgment by the CJUE, 22 March 2018.

[484] Opinion of Advocate General Wathelet, *Slowakische Republik v. Achmea B.V.*, Case C-284/16, 19 September 2017, CLA-196.

[485] Claimants' Comments on the Masdar Award, 6 July 2018; Respondent's Comments on the Masdar Award, 6 July 2018; Claimants' Comments on the *Antin* and *Antaris* Awards, 20 July 2018; Respondent's Comments on the *Antin* and *Antaris* Awards, 20 July 2018; Claimants' Observations on the EC's 19 July 2018 Communication, 8 August 2018; Respondent's Observations on the EC's 19 July 2018 Communication, 8 August 2018.

391.    The host state, Slovakia, contended that the arbitration provisions of the BIT were incompatible with certain provisions of the Treaty on the Functioning of the European Union (TFEU), discussed below.

392.    Although the arbitral tribunal did not purport to apply European Union Law, the BGH referred to the ECJ the issue of whether the BIT had been incompatible with EU law.  In its decision, the ECJ addressed the effect of two provisions in the TFEU: (i) Article 344, which provides that EU member states "undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein," and (ii) Article 267, providing *inter alia* that the ECJ "shall have jurisdiction to give preliminary rulings concerning: (a) the interpretation of the Treaties; (b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union."[486]

393.    The bottom line of the ECJ analysis was a ruling which in the English text reads as follows:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[487]

394.    In passing, the Tribunal notes that the French text of that holding reads with greater flexibility.  The English employs the verb "to preclude" which might imply that the TFEU imposes some supervening illegality that renders investor-state arbitration *per se* invalid. In contrast, the French text uses the verb "*s'opposer*" which carries a notion of tension or incompatibility (as between the TFEU and BIT arbitration) rather than supervening illegality:  "*Les articles 267 et 344 TFUE doivent être interprétés en ce sens qu'ils s'opposent à une disposition [aux termes de laquelle un investisseur peut] introduire une procédure ...devant un tribunal arbitral.*"

---

[486] In light of its rulings on Articles 267 and 344, the ECJ found it unnecessary to answer a third question referred by the German BGH, related to Article 18 of the TFEU, which provides, "Within the scope of application of the Treaties, and without prejudice to any special provisions contained therein, any discrimination on grounds of nationality shall be prohibited."

[487] *Achmea* Decision, ¶ 62 (ruling), CLA-194.

395.    Having carefully considered the ECJ decision in *Achmea*, the Tribunal concludes that the decision has no preclusive effect such as to remove its jurisdiction over the present dispute.

396.    First, the Tribunal's jurisdiction in the present proceedings derives from Article 26 of the ECT, not an intra-European BIT.  This Tribunal agrees with the other arbitral tribunals that have held ECT jurisdiction satisfied by the terms of Article 26 notwithstanding objections based on the character of a dispute as between an EU investment and an EU host state.[488]

397.    Second, no difference in result can be derived from the choice of law provision in the ECT Article 26(6), which states that an investor-state arbitral tribunal "shall decide the issues in dispute in accordance with this Treaty [ECT] and applicable rules and principles of international law."   In the context of the arbitral jurisdiction created by the ECT, reference to "international law" cannot be stretched to include EU law, absent doing violence to the text which would be impermissible under the Vienna Convention on the Law of Treaties, which in Article 31(1) provides that a treaty "shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose."  In that connection, the ECT contains its clear requirement of a decision under "principles of international law" which must in context refer to public international law, not EU law.  The Tribunal has not been called upon to apply EU law, since Claimants asserted breaches of the ECT and international law, but not of EU law.

398.    Third, the ECJ in *Achmea* was careful to confine its ruling to agreements "concluded between Member States"[489], thereby leaving open the possibility of dispute resolution pursuant to international agreements that are not "intra-EU" in the sense of being concluded by Member States as among themselves.[490]  In this connection, the Tribunal notes that the ECT includes the EU as a signatory, along with 25 states which are not EU members, as well as the 28 EU members.

399.    The items on which the Parties have commented after the *Achmea* Decision, where relevant, support the Tribunal's reasoning.  In particular, the *Masdar* award supports the Tribunal's finding that the *Achmea* Decision does not apply to a treaty to which the EU and various non-EU Member States are contracting parties,

---

[488] *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶¶ 179-207, CLA-184; *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, 15 February 2018, ¶¶ 449-466, CLA-195.

[489] *Achmea* Decision, ¶ 62.

[490] *Achmea* Decision, ¶¶ 57-58.

and which does not require a tribunal to apply EU law pursuant to a governing law provision.[491]

400.    The Tribunal notes that the *Antin* and *Antaris* awards, issued after the *Achmea* Decision, did not address the latter's potential significance.  This is understandable since the *Antin* tribunal had closed proceedings on 26 February 2018, prior to issuance of the *Achmea* Decision on 6 March 2018 and subsequent request by Spain to reopen the proceedings.[492]  The *Antaris* tribunal denied the Czech Republic's request to admit the *Achmea* Decision on the ground that the Czech Republic had expressly waived its EU-related jurisdictional objections.[493]

401.    Although the *Antin* award did not comment on the *Achmea* Decision, the Tribunal nonetheless considers the *Antin* award as reinforcing the Tribunal's analysis and conclusions regarding Respondent's intra-EU objections, for the reasons Claimants provide.[494]  As the Parties have not commented, however, on the *Antaris* award's potential relevance to intra-EU jurisdictional objections or the *Achmea* Decision, such matter is not for the Tribunal to address.

402.    With respect to the EC Communication of 19 July 2018, the Tribunal does not agree with Respondent's contention that this instrument "gives an authoritative interpretation of the scope of *Achmea* since it does so as the guardian of the European Union".[495]  Both sides acknowledge that the EC Communication is not a binding legal instrument.[496]  Even if the EC Communication were authoritative in respect of interpretation of the European Court of Justice's decisions regarding EU law, the Tribunal is not constituted pursuant to EU law nor does it interpret or apply EU law.

403.    For the reasons already expressed, the Tribunal does not consider that the *Achmea* Decision has any preclusive effect on the Tribunal's jurisdiction in the present dispute.

## C.  Merits

---

[491] See *Masdar* award, ¶¶ 678-683.

[492] *Antin* award, ¶¶ 55-58.

[493] *Antaris* award, ¶ 73.

[494] Claimants' Comments on the *Antin* and *Antaris* Awards, 20 July 2018, ¶¶ 2-5.

[495] Respondent's Observations on the EC's 19 July 2018 Communication, 8 August 2018, ¶ 5.

[496] Claimants' Observations on the EC's 19 July 2018 Communication, 8 August 2018, p. 1; Respondent's Observations on the EC's 19 July 2018 Communication, 8 August 2018, ¶ 2.

### 1. Tariff Reductions under the *Spalma-incentivi* Decree

#### a. Claimants' Position

404.    Claimants argue that the reduction in tariff levels under Law Decree No. 91/2014, the *Spalma-incentivi* Decree,[497] violated their legitimate expectations and thus breached the FET clause of the ECT.

405.    Claimants emphasize "legitimate expectations" as the main pillar of their tripartite argument that Italy violated the FET clause of the ECT, with the notions of transparency and consistency comprising the second pillar, and good faith serving as the third pillar.[498]  According to Claimants, each of these notions provides a freestanding basis for relief under the FET clause.[499]  Moreover, although a number of other alleged FET breaches have been cited (such as requirements to pay retroactive administrative fees and imbalance costs, cancellation of inflation adjustment for certain facilities, and modification of the minimum price guarantee scheme, discussed *infra*),[500] the reduction of the *Conto Energia* tariff levels under the *Spalma-incentivi* Decree serves to underpin the principal line of reasoning, given that this measure had the greatest financial impact on Claimants' investments.[501]

406.    With respect to FET obligations, Claimants contend that the "legitimate expectations" standard serves to discourage frustration of the basic expectations and assumptions relied on by the foreign investor in making its investment, as long as such expectations remain reasonable and legitimate.[502]  Obviously, the "expectations" under consideration would be those related to governmental measures, not ordinary commercial and financial risks.

---

[497] Law Decree No. 91/2014, enacted on 24 June 2014, converted into law by Law No. 116 of 11 August 2014 (CEX-553), and implemented by two Decrees of the Ministry of Infrastructures and Economic Development ("MISE") dated 16 and 17 October 2014.  See Statement of Claim, ¶ 305; Reply, ¶ 279; Statement of Defense, ¶ 175.

[498] See Statement of Claim, pp. 129-146; Reply, pp. 109-115; Transcript, Day 1, at 109:23-110:4 (legitimate expectations), Transcript, Day 1, at 123:22-128:25 (transparency and consistency); Transcript, Day 1, at 126:17-18 (good faith).

[499] Statement of Claim, ¶ 331.

[500] See Statement of Claim, ¶¶ 351, 354.

[501] See, e.g., Second Expert Report of Richard Edwards, 15 December 2016, ¶ 5.51 (Table 5-4).

[502] Reply, ¶ 312 (citing *Walter Bau AG v. Thailand*, UNCITRAL Ad Hoc Tribunal, Award, 1 July 2009, IIC 429, ¶ 11.5 (citing *Biwater Gauff (Tanzania) v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶ 602)).

407.    Claimants refer to the *Parkerings* case as accurately setting forth the standard for determining the types of scenarios in which an investor's legitimate expectations can be said to arise:

(i)     when an investor received an explicit promise or guarantee from a government body as to a particular legal or regulatory provision;

(ii)    when the investor received implicit promises or guarantees that it then took into account in making its investment; or

(iii)   absent such assurances or representations, the circumstances surrounding the investment were such as to give rise to a legitimate expectation.[503]

408.    According to Claimants, the evidence shows that organs and officials of the Italian Republic made explicit promises or guarantees, as well as "informal" or implicit assurances, that the incentive tariff rates granted under each of the *Conto Energia* ministerial decrees would remain the same for twenty (20) years.[504]  Thus Italy created conditions whereby photovoltaic investors formed legitimate expectations that the incentive tariff rates would remain constant for two decades. Claimants identify multiple categories of regulations, documents, statements, policies, and behavior on which their expectations were based, including the following:

(i)     the *Conto Energia* decrees, each of which specified certain tariff rates for a twenty-year period;[505]

(ii)    the GSE Agreements, which also specified certain tariff rates for certain PV facilities for a twenty-year period;[506]

(iii)   the GSE letters informing PV operators of their eligibility under particular *Conto Energia* decrees;[507]

(iv)    declarations of and publications by Italian national and regional authorities and officials regarding the *Conto Energia* regime;[508] and

(v)     the declared purposes and policies underlying the *Conto Energia* regime.[509]

---

[503] *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007, ¶ 331.  Cited in Statement of Claim, ¶ 334; Transcript, Day 1, at 100:11-13.

[504] Statement of Claim, ¶¶ 336-355; Reply, ¶¶ 174, 193-202.

[505] See, e.g., *Conto* I, 28 July 2005, CEX-39.

[506] See, e.g., sample GSE agreement under *Conto* II, CEX-73 (especially Articles 2 and 8 thereof).

[507] See, e.g., sample tariff recognition letter under *Conto* II, CEX-375A (reproduced in Claimants' Hearing Presentation, Slide 42).

[508] See, e.g., 2007 statement of the Minister for the Environment, Land and Sea, CEX-78 (cited at Statement of Claim, ¶ 348 n. 657).

[509] See, e.g., Favorable opinion of the Productive Activities Committee (Commissione X) on the scheme of Legislative Decree no. 387/2003 of 11 November 2003, CEX-362, (stating that increasing renewable energy production was an "absolute priority") (cited at Statement of Claim, ¶ 346 n. 653).

409.    Claimants point to *Conto* II as one example from the *Conto Energia* regulatory scheme that explicitly assured investors of a constant tariff rate.  For example, Article 6(1) of *Conto* II provides, "[t]he tariff identified on the basis of [the] table [inserted at the end of Article 6(1)] is awarded for a period of twenty years commencing from the date of entry into operation of the plant and shall remain constant in current currency for the entire twenty year period."  Also, Article 6(2) of *Conto* II (relating to PV plants that become operational after those referred to in Article 6(1)) provides, "[t]he value of the tariff shall remain constant in legal tender for the aforementioned twenty-year period."[510]

410.    As an additional illustration, Claimants cite Article 2 of the GSE Agreement made pursuant to *Conto* II with Martano Solenergy (a NovEnergia/NIP investment).  That agreement provides, "[f]or a 20-year period as of 9 February 2011, the incentive tariff, in regular installments in the applicable currency, to be recognized to the photovoltaic plant mentioned in this Agreement, is equal to 0,3460 Euro/kWh…."[511]  That excess (or supplemental) tariff would be earned over the normal market rate.

411.    Given the varied types of express assurances made by Italy, its state organs or officials, Claimants argue for a paradigm case of a host state causing investors reasonably to form expectations that a regulatory regime will remain constant for a fixed period.[512]  Claimants compare their circumstances to the facts of the *Micula v. Romania* case, in which the tribunal found that Romania created legitimate expectations by offering a ten-year tax holiday to investors in certain parts of Romania, but revoking them after only four-and-a-half years.[513]  Considering that, in *Micula,* there was no specific contractual arrangement like the GSE Agreements, Claimants argue that their case presents an even stronger showing of legitimate expectations.[514]  In *Micula*, on one hand, there were regulations and eligibility letters.  Here, on the other hand, there are *Conto Energia* decrees, authorization letters, and GSE Agreements.

412.    Similar to their comparison with *Micula*, Claimants argue for a *jurisprudence constante* in which ECT tribunals have held Spain liable for modifying renewable energy incentives in a context allegedly providing fewer grounds to form legitimate expectations than available to Claimants here.[515]  According to

---

[510] *Conto* II, 19 February 2007 (CEX-65 EN), Arts. 6.1, 6.2.

[511] CEX-254 EN (free partial translation) (cited at Statement of Claim, ¶ 166 n. 295).

[512] See, e.g., Statement of Claim, ¶ 355; Transcript, Day 1, at 65.

[513] *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013.

[514] Statement of Claim, ¶¶ 340-342; Transcript, Day 1, at 103.

[515] Claimants' Comments on the *Masdar* Award, ¶ 12.

124

Claimants, in the *Masdar* case, discussed *supra* in relation to jurisdiction, the tribunal unanimously held that Spain had made a specific commitment that claimants' plants would benefit from certain incentives throughout their operating lives.[516]  Claimants note that the Spanish incentives framework at issue in *Masdar* involved, first, letters from the Spanish Ministry confirming each plant's eligibility to obtain the incentive tariffs, and second, final certificates of registration that confirmed that plants were entitled to participate in the specific feed-in tariff scheme provided in a Spanish decree.[517]

413.    According to Claimants, Italy's commitments to PV investors are "significantly stronger and more specific" than those which the *Masdar* tribunal found Spain to have made.[518]  First, whereas the Spanish tariff scheme registrations and Ministry letters refer back to the general regulation setting forth the applicable tariffs, the GSE letters state the exact tariff rate applicable to each plant, down to the thousandth of a Euro cent per kW/hour.[519]  Second, the GSE letters state that the tariff will be constant for twenty years, whereas the Spanish regulations do not provide for a specific time period or refer to a constant rate.[520]  Additionally, Spain did not use contracts under its incentive regime, whereas each eligible PV producer benefitting from the *Conto Energia* regime entered into GSE Agreements providing for an exact tariff rate, fixed for twenty years.[521]

414.    Claimants allege that they would not have made the investments at issue without having received assurances of stability.[522]  In support of this point, Claimants refer to articles written by international law firms, consulting firms, and banks suggesting that such reliance was reasonable under the circumstance prevailing at the times leading up to their investments.[523]

415.    Each of the options under the *Spalma-incentivi* Decree (options A, B and C), according to Claimants, "significantly reduced the value of the incentives that Italy had promised to pay photovoltaic producers for twenty years".[524]  In that manner, the *Spalma-incentivi* Decree violated the express terms of the *Conto*

---

[516] Claimants' Comments on the *Masdar* Award, ¶ 13, discussing *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, CLA-197.

[517] Claimants' Comments on the *Masdar* Award, ¶ 13, citing *Masdar*, ¶¶ 518-520, CLA-197.

[518] Claimants' Comments on the *Masdar* Award, ¶ 14.

[519] Claimants' Comments on the *Masdar* Award, ¶ 15.

[520] Claimants' Comments on the *Masdar* Award, ¶ 15.

[521] Claimants' Comments on the *Masdar* Award, ¶ 16.

[522] See Statement of Claim, ¶¶ 150-151, 248.

[523] See Statement of Claim, ¶ 125 and n. 227; Reply, ¶ 201.

[524] Statement of Claim, ¶ 306.

*Energia* decrees, the GSE Agreements, and other specific assurances that the tariff rates would remain constant for a twenty-year period.[525]

416.    Claimants argue that the parties to the ECT accepted limitations on their power to modify legislation governing investments, at least insofar as the legislation generated legitimate expectations of stability by giving explicit assurances of the type described above.[526]  Accordingly, Claimants argue that Italy's clear assurances effectively waived any right to regulate insofar as the subsequent exercise of sovereign prerogative would defeat the expectations that investors had formed based on those assurances.[527]  According to Claimants, "[i]t is common ground in investment treaty jurisprudence that when an investor's expectations are based on explicit assurances from the State – as in the present case – the State has accepted limitations on its right to regulate in ways that undermine those assurances."[528]

417.    As noted above, in addition their legitimate expectations argument, Claimants argue that the tariff reductions violated the FET clause by failing "to encourage and create stable, equitable, favourable, and transparent conditions for investors", pursuant to the first sentence of ECT Article 10(1).  Specifically, Claimants assert, the tariff reductions under the *Spalma-incentivi* Decree undermined the transparent and consistent conditions created by the Italian incentive scheme, including the *Conto Energia* decrees, which had "enabled Claimants to know from the outset the revenues their facilities would earn".[529]

418.    Claimants also contend that Italy violated the FET standard by failing to treat Claimants investments in good faith, citing prior investment tribunals for the notion that good faith conduct is implicit in the fair and equitable treatment standard.[530]  Broadly, Claimants argue that for Italy to receive the full benefits of Claimants' PV investments while not providing Claimants with the benefits under the *Conto Energia* regime as originally promised was not in good faith.[531]  According to Claimants, the purported rationale for the tariff reductions, namely,

---

[525] Statement of Claim, ¶ 313.

[526] Statement of Claim, ¶ 332.

[527] Statement of Claim, ¶ 332; Reply, ¶ 204.

[528] Reply, ¶ 204 (citing *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, ¶¶ 119, 309).

[529] Statement of Claim, ¶¶ 356-361.

[530] Statement of Claim, ¶¶ 366-367, citing *Sempra Energy International v. Argentina*, ICSID Case No. ARB/02/16, Award, 28 September 2007, ¶¶ 298-299, CLA-38; and *CME v. Czech Republic*, UNCITRAL, Partial Award, 13 September 2001, ¶ 156, CLA-40.

[531] Statement of Claim, ¶ 368.

to reduce the costs of electricity bills for end-consumers, was not a "good faith reason or excuse". Instead, assert Claimants, it was an illegitimate political decision to re-allocate the costs from end-consumers to PV producers after the latter had already paid for the bulk of their investments up front and were effectively trapped in Italy.[532]

419.    Aside from their FET arguments, Claimants contend that the reductions violated the ECT's impairment clause and umbrella clause (the third and fifth sentences of Article 10(1), respectively). The Tribunal notes, however, that these arguments merely serve to buttress Claimants' main argument based on legitimate expectations under FET. Thus, they are only briefly summarized below.

420.    Claimants argue that the tariff reductions under the *Spalma-incentivi* Decree violated the impairment clause (ECT Article 10(1), third sentence), providing that, "no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal." Essentially, Claimants contend that the tariff reductions were "unreasonable" because they contravened various long-term guarantees and assurances by Italy and were not the outcome of a rational decision-making process that balanced Italy's interests with the burdens on investors.[533] Instead, the tariff reductions were the result of "the political whim of a new administration".[534]

421.    Furthermore, argue Claimants, a measure's "reasonableness" must be interpreted from the investor's perspective at the time of its decision to invest, instead of what the state later considered to be reasonable based on policy.[535] Claimants elaborate further in the Reply, that "the reason must be justified in light of Italy's duty to protect investors and encourage investment, as enshrined in the ECT."[536] However, in this case, according to Claimants, Italy failed to consider the financial impact on PV investors.[537]

422.    Finally, Claimants argue that the tariff reductions under the *Spalma-incentivi* Decree violated the umbrella clause (ECT Article 10(1), fifth sentence), providing that, "[e]ach Contracting Party shall observe any obligations it has entered into

---

[532] Statement of Claim, ¶¶ 368-369.

[533] Statement of Claim, ¶¶ 378-380.

[534] Statement of Claim, ¶ 380.

[535] Statement of Claim, ¶ 379; Reply, ¶ 335, citing *BG Group Plc. v. The Republic of Argentina*, UNCITRAL, Final Award, 24 December 2007, ¶¶ 342, 344, CLA-44.

[536] Reply, ¶ 335.

[537] Statement of Claim, ¶ 380.

with an Investor or an Investment of an Investor of any other Contracting Party." According to Claimants, Italy entered into, but failed to observe, "contractual, legislative, and regulatory obligations with regard to Claimants and their investments".[538]  Claimants base their broad understanding of the types of obligations encompassed by the ECT's umbrella clause on prior ECT awards, scholarly writing on the ECT, and other (non-ECT) investment treaty decisions.[539]  Claimants also assert that the umbrella clause's breadth is shown by the use of the word "any" in the phrase "shall observe any obligations".[540]  Referring to this broad understanding, Claimants contend that the *Conto Energia* decrees, GSE letters, and GSE Agreements whereby Italy undertook to pay specific tariff rates for a twenty-year period constituted obligations subject to the ECT's umbrella clause.[541]

423.    In response to Respondent's argument that the phrase, "entered into", implies coverage of only contractual obligations, Claimants refer to the writing of an arbitration practitioner who asserts that the phrase does not exclude commitments made by legislation or decree, and a dictionary entry defining the phrase as to "to undertake to bind oneself by (an agreement or other commitment)".[542]

424.    Further, Claimants rebut Respondent's argument that the GSE Agreements are not the type of contracts falling within the umbrella clause.  Claimants essentially argue that the nature of the GSE Agreements under Italian law is irrelevant, since the GSE Agreements "are direct evidence of a binding obligation Italy entered into to pay specified tariff rates to Claimants' facilities for twenty years."[543]  Claimants refer to the first opinion of Professor D'Atena, their expert on Italian law, stating

---

[538] Statement of Claim, ¶ 390; Reply, ¶ 356.

[539] Statement of Claim, ¶¶ 383-389, citing, e.g., *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V064/2008, Partial Award on Jurisdiction and Liability, 2 September 2009, ¶ 257, CLA-52; *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 186, CLA-47; *Limited Liability Company Amto v. Ukraine*, Arbitration No. 080/2005, Final Award, 26 March 2008, ¶ 110, CLA-53; *Khan Resources Inc., Khan Resources B.V. and Cauc Holding Company Ltd. v. the Government of Mongolia and Monatom Co., Ltd.* (PCA Case No. 2011-09), Award, 2 March 2015, ¶ 366, CLA-54; *LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶¶ 169, 174, CLA-18; T.W. Wälde, *Energy Charter Treaty-Based Investment Arbitration*, Transnational Dispute Management (TDM), Vol. 1, issue 3 (2004), at 7, CLA-45.

[540] Statement of Defense, ¶¶ 382-385; Reply, ¶¶ 340-341.

[541] Statement of Claim, ¶ 391.

[542] Reply, ¶ 342, citing Craig S. Miles, *Where's My Umbrella? An "Ordinary Meaning" Approach to Answering Three Key Questions That Have Emerged from the "Umbrella Clause" Debate*, in Investment Treaty Arbitration and International Law (Vol. 1, 2009), CLA-136; and the English Oxford Dictionary, available at <https://en.oxforddictionaries.com/definition/enter_into>.

[543] Reply, ¶ 355.

that a contract's nature as "accessory" or otherwise does not prevent it from imposing binding obligations.[544]

### b. Respondent's Position

425.    According to Respondent, the reasonableness and proportionality of the *Spalma-incentivi* Decree are a defense to what would otherwise constitute a violation of legitimate expectations.

426.    Respondent's view is that the "legitimacy" of an expectation cannot be determined by considering only the legislative framework when the investor made its investment, since that would equate to requiring the state to "freeze its own normative activity".[545]  Respondent points to the absence of any "freezing clause" in Article 10(1) of the ECT.[546]  Thus, Respondent argues that the meaning of "legitimate", as applied to an investor's expectations, must accord "due relevance to the sovereign right of States to progress their legislation."[547]

427.    Respondent does not, however, take the view that a host state has unlimited power to change its laws.[548]  Instead, while evolution of the law is to be expected, what is prohibited is a state acting "unfairly, unreasonably or inequitably in the exercise of its legislative power."[549]

428.    Respondent proceeds by arguing that the *Spalma-incentivi* Decree did not run afoul of these restrictions, but merely "reshape[d]" the benefits of the *Conto Energia* decrees and was "reasonable, proportionate and consistent with the overall framework surrounding the Conto Energia Regimes."[550]  The *Spalma-incentivi* Decree was reasonable, argues Respondent, because it balanced the need for PV incentives with the need to avoid over-compensating PV investors and the need to protect consumers from high costs.[551]  It was proportionate because the main structure of the *Conto Energia* regime was preserved.  Investors were

---

[544] Reply, ¶ 355, citing First Independent Expert Opinion of Professor Antonio D'Atena, 21 March 2016, at 27-28.

[545] Statement of Defense, ¶ 529.

[546] Statement of Defense, ¶¶ 530, 531.

[547] Statement of Defense, ¶ 526.

[548] Statement of Defense, ¶ 598.

[549] Statement of Defense, ¶¶ 540-541, citing *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007, ¶ 332.

[550] Statement of Defense, ¶¶ 595, 602 (underlining in the original).

[551] Statement of Defense, ¶ 613.

offered multiple options for accepting the amended structure, and it had a "limited impact on the PV investors."[552]

429.    In its Rejoinder, Respondent clarifies its view as to the "reasonableness" of the *Spalma-incentivi* Decree: first, Claimants profited "above that fair remuneration that the system was there to guarantee…"; second, the "re-modulation was necessary to re-equilibrate the system and equalize it to reduce its excessive social burden…"; and finally, the measure only affected Claimants "to a limited extent…."[553]

430.    In this context, Respondent construes both reasonableness and proportionality so as to de-emphasize the importance of the losses suffered by Claimants. Respondent instead sees the relevant question as whether the *Spalma-incentivi* Decree was "reasonable and proportionate to [its] aim."[554]  Respondent emphasizes the flexibility allowed the investor in giving it a choice of three options, arguing that the measure should also have been foreseen by investors due to the *Destinazione Italia* Decree.[555]

431.    Respondent also draws a connection between the *Salva Alcoa* decree, which extended the period of eligibility for *Conto* II tariffs, and the alleged reasonableness and proportionality of the *Spalma-incentivi* Decree's tariff reductions.[556]  According to Respondent, Claimants gained an additional EUR 18 million from the *Salva Alcoa* decree, greater than the amount that they allegedly lost due to the *Spalma-incentivi* Decree.[557]  Respondent argues that even if it is acknowledged that Claimants suffered damages due to unpredictable regulatory changes under the *Spalma-incentivi* Decree, the benefits Claimants received due to the "equally unexpected extension of the second Energy Account" should also be considered."[558]

432.    In a further line of argument, Respondent states that the *Conto Energia* decrees were not to be taken as strictly unchangeable, given the wider context of Italian "primary" legislation, including Legislative Decree no. 387/2003,

---

[552] Statement of Defense, ¶ 614.

[553] See Rejoinder, ¶¶ 252, 260.

[554] Rejoinder, ¶ 264.

[555] See Rejoinder, ¶¶ 265-266, 269-273.

[556] Rejoinder, ¶ 254.

[557] Statement of Defense, ¶ 496; Rejoinder, ¶ 254.

[558] Statement of Defense, ¶ 496.

Legislative Decree no. 28/2011, and the EU directives.[559]  As Respondent
mentions, Article 7(2)(d) of Legislative Decree no. 387/2003 required that the
incentive tariffs be fixed so as to "ensure an equitable remuneration of the costs of
investment and operation"[560]  Furthermore, Respondent contends that the *Conto
Energia* decrees are not "autonomous primary legislative sources, but secondary
regulations" and "find their own validity, limits and interpretative criteria …
within the primary sources on which they are based."[561]  Respondent asserts,
moreover, that the Italian Constitutional Court confirmed these points in a
decision allegedly affirming the *Spalma-incentivi* Decree's validity.[562]

433.    Next, Respondent counters Claimants' arguments based on consistency and
transparency, good faith, the impairment clause, and the umbrella clause, as
briefly summarized below.

434.    With respect to the standards of consistency and transparency which
Claimants assert are related under the FET standard, Respondent submits that the
arbitral jurisprudence cited by Claimants does not support the existence of an
autonomous duty of consistency or of a duty of consistency deriving from the
transparency obligation.[563]  Although Respondent denies there is an autonomous
duty of consistency under the FET standard, Respondent acknowledges that
"consistency may have a certain relevance" in the assessment of the legitimacy of
a host state's conduct in regard to investors' expectations.[564]  With respect to
transparency, on the other hand, Respondent asserts that Claimants' actual
arguments for breach of the transparency standard effectively reduce to legitimate
expectations arguments, allegedly raising doubt as to an autonomous duty of
transparency.[565]

435.    As for the duty to act in good faith, Respondent asserts that Claimants'
arguments simply reproduce their arguments alleging a violation of legitimate
expectations.[566]  Respondent, in turn, points back to its assertions from the
legitimate expectations context, to the effect that the *Spalma-incentivi* Decree was
reasonable in light of the legitimate policy goal of maintaining a sustainable

---

[559] Statement of Defense, ¶¶ 600-615.

[560] Statement of Defense, ¶¶ 601, 604.

[561] Rejoinder, ¶ 315.

[562] Rejoinder, ¶ 315; see also Rejoinder, ¶¶ 30-32, referring to Italian Constitutional Court, decision no.
16/2017 of 7 December 2016 (decision released on 24 January 2017), REX-58.

[563] Statement of Defense, ¶¶ 662-670.

[564] Statement of Defense, ¶ 671.

[565] Statement of Defense, ¶ 683.

[566] Statement of Defense, ¶¶ 698, 701.

system of incentives.[567]  Respondent also disagrees on whether "lack of good faith" must entail "bad faith.[568]

436.    In rebuttal to Claimants' impairment clause argument, Respondent asserts there the impairment clause has "substantial overlap" with the FET standard, and that Claimants' impairment clause argument is substantially the same as their legitimate expectations argument.[569]  Further, Respondent submits that the meaning of the phrase, "impair by unreasonable or discriminatory measures", differs from that suggested by Claimants.  According to Respondent, the notion of "impair" requires a "significant" impairment, a higher degree than "any negative impact or effect", as Claimants submit is required.[570]

437.    According to Respondent's interpretation of an "unreasonable" measure, "at the core of the assessment of reasonableness lies the regulatory power of the State and its correct exercise in relation to a matter of public interest."[571]  Respondent proposes to apply the two-part notion of an "unreasonable" measure described in the *AES v. Hungary* case.[572]  According to this notion, first, the tribunal would consider whether there is a "rational policy" in the sense of a policy "taken by a state following a logical (good sense) explanation and with the aim or addressing a public interest matter".[573]  Second, the question is whether there is a "appropriate correlation" between the measure and the policy such that the State's act is "reasonable".[574]  Respondent concludes its rebuttal by referring back to the justifications offered in the FET context, in particular, the "overall framework of PV Italian and EU legislation".[575]

438.    Respondent does not directly address whether it views the reasonableness inquiry as including consideration of a party's expectations.  In response to Claimants' assertion that "Italy ignores the legal analysis that requires the question of reasonableness to be measured against the expectations of the parties to the

---

[567] Statement of Defense, ¶ 703.

[568] Statement of Defense, ¶ 692; Rejoinder, ¶ 341.

[569] Statement of Defense, ¶ 712; Rejoinder, ¶ 344.

[570] Statement of Defense, ¶ 718; Rejoinder, ¶ 345.

[571] Statement of Defense, ¶ 721.

[572] Statement of Defense, ¶ 720, citing *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, CLA-71.

[573] Statement of Defense, ¶ 720, citing *AES v. Hungary*, § 10.3.8.

[574] Statement of Defense, ¶ 720, citing *AES v. Hungary*, § 10.3.9.

[575] Statement of Defense, ¶ 727; Rejoinder, ¶ 348.

[treaty]…",[576] Italy states, "[o]n this point, the Respondent simply refers to its broad argumentation as for the issue of legitimate expectations."[577]

439.    As to whether the *Spalma-incentivi* Decree was discriminatory, as Claimants submit in their Reply, because "it only applied to PV investors while Italy maintained or increased support to other renewable energy and traditional energy providers",[578] Respondent contends that the question of discriminatory treatment would require comparison of the development of PV production and technology with other renewable energy sources.[579]  According to Respondent, PV energy faced different circumstances, and thus required its own system of economic incentives.[580]

440.    Regarding the umbrella clause, Respondent makes a number of arguments in support of its position that "obligations" cannot be understood to include statutory or regulatory obligations, but only contractual obligations.[581]  According to Respondent, arbitral tribunals have not generally accepted the inclusion of statutory or regulatory obligations under the umbrella clause, highlighting the *Al-Bahloul* case.[582]  Respondent takes the view that the *Conto Energia* decrees were general and did not target any specific type of investors.[583]

441.    Respondent focuses also on the umbrella clause's literal interpretation, asserting that the words "entered into" refer only to contractual obligations.[584]  Had regulatory commitments been intended, Respondent suggests the drafters might have used the phrase, "any obligations owed to an Investor".[585]  Respondent submits, additionally, that "entered into with" implies an activity of negotiation between two parties, since "entered into" is followed by "with".[586]  Beyond a literal interpretation, Respondent makes contextual arguments as well, asserting *inter alia* that since the FET clause already addresses legislative obligations, it would be duplicative for the umbrella clause also to cover those obligations.[587]

---

[576] Reply, ¶ 335.

[577] Rejoinder, ¶ 349.

[578] Reply, ¶ 336.

[579] Rejoinder, ¶ 350.

[580] Rejoinder, ¶ 351.

[581] Statement of Defense, ¶ 730.

[582] *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V064/2008, Partial Award on Jurisdiction and Liability, 2 September 2009, CLA-52.

[583] Rejoinder, ¶ 369.

[584] Statement of Defense, ¶¶ 743-747.

[585] Statement of Defense, ¶ 747.

[586] Rejoinder, ¶ 360.

[587] Statement of Defense, ¶¶ 749-752.

Instead, says Italy, the FET and umbrella clause should be understood to "deal respectively with two different kinds of state obligations (regulatory and contractual)."[588]  Thus, according to Respondent, the *Conto Energia* decrees do not constitute relevant obligations under the umbrella clause.

442.    Respondent next argues that the GSE Agreements are a special type of contract that is not covered by the umbrella clause.  According to Respondent, the umbrella clause is intended to cover contracts negotiated with a foreign investor that are not otherwise covered by an investment treaty and which the umbrella clause is intended to "internationalize" for the investor's protection.[589]  The GSE Agreements, on the other hand, are asserted to be "merely accessory contracts ('*contratti accessori*' or '*accessivi*'), which simply transpose legal provisions" that originate in the *Conto Energia* decrees.[590]  In its Rejoinder, Respondent calls attention to the 7 December 2016 Italian Constitutional Court decision, which allegedly confirmed the "accessory" nature of the GSE Agreements, and stated as follows:

> [T]he agreements entered into with the GSE cannot be interpreted as contracts intended for the exclusive benefit of the operator – which should be entitled to see initial conditions unchanged, for twenty years, even if the technological conditions deeply mutate -, but constitute instruments of regulation, aimed at achieving the objective of incentivization of certain energy sources in balance with other sources of renewable energy, as well as with minimal sacrifice for users, who also bear its economic burden.[591]

443.    In its Rejoinder, Respondent submits, in response to Claimants' contention that a GSE Agreement is binding regardless of what type of contract it is:

> [R]ules are binding under the contract, but the public power may unilaterally modify its conditions by modifying the authoritative act it complements.  Consequently, for what of relevance here, the contract itself cannot give rise to autonomous obligations as for matters such as maintenance of fixed tariffs.[592]

444.    Finally, in the alternative, Respondent argues that even if the GSE Agreements are found to be covered by umbrella clause, Claimants have not proved that they

---

[588] Rejoinder, ¶ 363.

[589] Statement of Defense, ¶¶ 756-757; Rejoinder, ¶ 379.

[590] Statement of Defense, ¶¶ 756-757; Rejoinder, ¶ 379.

[591] Italian Constitutional Court, decision no. 16/2017 of 7 December 2016 (decision released on 24 January 2017), § 8.3, REX-58.

[592] Rejoinder, ¶ 381.

were breached.  According to Respondent, Claimants do not assert a direct violation of those contracts by the GSE, which was party to the contracts.[593] Instead, says Respondent, Claimants are effectively challenging regulatory acts by Italy, which was not a party to the contracts and had no obligations thereunder.[594] Respondent also asserts that the *Salva-Alcoa* decree should be taken into account in determining whether Italy fulfilled its obligations regarding fixed tariff rates, submitting that the *Salva-Alcoa* decree was to Claimants' benefit.[595]

### c.  Tribunal Analysis

445.    Article 10(1) of the ECT begins with a duty for each contracting state to encourage "stable, equitable, favourable and transparent" conditions for investors to make investments, and then provides as follows:

> Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.[596]

446.    With respect to legitimate expectations, a majority of the Tribunal concludes that Claimants have put forward the more persuasive position.

447.    At the time of investing, Claimants had been led to believe, reasonably, that the incentive tariffs would remain the same as promised in the *Conto Energia* decrees, GSE letters and GSE Agreements throughout a twenty-year period.

448.    Respondent has not provided any persuasive reason to conclude that despite entitlement to the incentive tariffs, an investor, when making the investment, should not expect the tariffs to remain constant.  While the investor might need to live with some minor adjustments, nothing alerted the Claimants that they would need to accept changes of the magnitude imposed by the *Spalma-incentivi* Decree.

449.    When Claimants invested in the PV facilities, they received assurances which were not subject to any reservation of a discretion to change the rate of return as effected by the *Spalma-incentivi* Decree.

450.    While Italy submitted that its "right to regulate" must be balanced against the need to protect investors' legitimate expectations,[597] such arguments appear to

---

[593] Statement of Defense, ¶¶ 760-761.

[594] Statement of Defense, ¶¶ 763-764.

[595] Rejoinder, ¶¶ 389-392.

[596] ECT, Art. 10(1) (first and second sentences).

miss the point in this context. The repeated and precise assurances to specific investors amounted to guarantees that the tariffs would remain fixed for two decades. Italy effectively waived its right to reduce the value of the tariffs.

451.    The better view must be that Italy's assurances constituted non-waivable guarantees. The majority of the Tribunal does not deny that Italy faced "a situation of economic difficulty", as Professor Sacerdoti writes in his dissenting opinion. However, none of the circumstances evidenced in this case reach the level of *force majeure*. The right of Respondent to change the tariffs does not arise under the present circumstances, given that the justification for changes relate simply to alleged compensation to the service provider and the marginal cost to consumers.

452.    Host states certainly retain the sovereign prerogative to amend their laws. However, if the state gives an investor express assurances that no amendment would occur, the investor must be fairly compensated if those assurances are violated. By way of example, in *Total v. Argentina*, the tribunal appears to have denied that balancing was relevant where the state had purported to make contractual, bilateral or similar undertakings, which were "binding in [their] own right".[598] Further, in the *Parkerings* case, the tribunal found that the host State's right to amend the law is limited when there is an "agreement, in the form of a stabilization clause or otherwise".[599] Claimants refer to these cases in their Reply and, as mentioned above, Respondent approvingly cites to the standard described in *Parkerings*.[600]

453.    Given the specificity of the assurances Italy offered (*Conto Energia* decrees, statements and conduct of Italian officials, and individual GSE letters and GSE Agreements), those assurances bear the hallmarks of (borrowing the *Parkerings* tribunal's language) "an agreement, in the form of a stabilisation clause or otherwise." Italy thus crossed a threshold such that the reduction of the incentive tariffs by the *Spalma-incentivi* Decree defeated Claimants' legitimate expectations. The majority of the Tribunal notes that while some of Italy's specific assurances remain relevant to both the present analysis and the umbrella clause, analyzed separately below, such assurances play a different role in relation to the standards under fair and equitable treatment and under the umbrella clause. Professor Sacerdoti in his dissenting opinion expresses the view that with respect to the FET standard, Italy did not undertake any "obligation" to refrain from

---

[597] Statement of Defense, ¶ 526.

[598] *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 121, CLA-4.

[599] *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007, ¶332, CLA-14.

[600] Reply, ¶¶ 315-322; Statement of Defense, ¶ 534 n. 247 and ¶ 540.

modifying the *Conto Energia* regime.  In contrast, the majority considers that the combined weight of the evidence shows that Italy did indeed undertake such obligations, relevant to the first two sentences of ECT Article 10(1).  In this connection, Italy gave assurances giving rise to legitimate expectations on the part of Claimants, and did so irrespective of any other duties in regard to the umbrella clause.

454.    Moreover, a balancing of the regulatory right against the host state's assurances implicates a reasonable and valid policy justification for the changes.  The primary justification Italy has offered for reducing the tariffs refers to the electricity costs to consumers, including households.[601]  However, the decree expressly stated that it was "intended to reduce electricity rates for customers of medium voltage and low voltage electricity with more than 16.5 kW power available, other than residential customers and public lighting."[602]  Further, Claimants pointed to data showing that electricity costs to consumers have decreased approximately 2-4% as a result of the *Spalma-incentivi* Decree.[603]  A majority of the Tribunal is not persuaded by Respondent's alleged justifications for the *Spalma-incentivi* Decree.

455.    In sum, a majority of the Tribunal finds that the *Spalma-incentivi* Decree undermined Claimants' legitimate expectations and therefore violated the FET clause.

456.    Given Claimants' success on the merits of their legitimate expectations claim in regard to the incentive tariff reduction, no additional damages can be derived by proving a breach of the other FET sub-standards (namely, consistency and transparency, and good faith) or, similarly, the impairment clause and umbrella clause.  Nevertheless, for the sake of providing a fuller analysis of the reasoning of a majority of the Tribunal, the following brief observations can be made with respect to each standard.

457.    With respect to the duty to provide transparent and consistent conditions for investments, under ECT Article 10(1), a majority of the Tribunal would find that Italy violated these obligations by enacting the incentive tariff reduction under the *Spalma-incentivi* Decree.  In doing so, it is unnecessary to delve into whether

---

[601] Statement of Defense, ¶ 508 (Claimants assert that "…the *Spalma-incentivi* Decree is one of a package of measures to reduce the energy costs for SMEs and households. Such a target was considered by the Italian Government to be necessary for the competitiveness of (in particular, micro and small size) enterprises and to help families in an especially difficult economic context.  The overall estimated saving of these measures is of 2.7 million euros, 1.7 of which to the benefit of SMEs").

[602] Law Decree No. 91/2014, 24 June 2014, converted into law by Law No. 116/2014 of 11 August 2014, Art. 23(1), CEX-553.

[603] Reply, ¶¶ 258-259. See also Transcript, Day 1, at 156-159; Claimants' Hearing Presentation Slides 188-190.

these notions constitute obligations that are "autonomous" from the broader FET standard, as to which Respondent expressed doubt. Respondent acknowledged that "consistency may have a certain relevance" to the legitimate expectations inquiry and that Claimants' argument for violation of the "transparency" standard largely echoes their legitimate expectations argument.[604] Importantly, a duty of "transparency" is expressly required by Article 10(1) (first sentence), providing:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.

458.    A majority of the Tribunal considers that the tariff modifications effected by the *Spalma-incentivi* Decree could not reasonably have been foreseen at the time of Claimants' investments, made in reliance on the framework of fixed tariffs for twenty years set forth in the *Conto Energia* decrees, GSE Agreements, and GSE letters. A majority of the Tribunal would thus find that the *Spalma-incentivi* Decree constituted a failure by Respondent to "encourage and create … transparent conditions for Investors of other Contracting Parties…."

459.    Regarding the principle of good faith, both sides concur that, in some sense, good faith is closely linked to, or underlies, the FET standard.[605] They apparently differ, however, on the meaning of this principle, particularly on whether a violation would require evidence of "bad faith". Respondent contends that bad faith is implicated by the "autonomous" notion of the good faith principle that Respondent ascribes to Claimants.[606] Claimants, on the other hand, assert that bad faith is not required.[607] Claimants do state, however, that good faith means "honesty" or a "sincere intention to deal fairly with others", referring to an American legal encyclopedia.[608]

460.    With this interpretative question as a backdrop, Claimants argue that Italy breached the principle of good faith, allegedly, by (i) deciding to retain the benefits of Claimants' PV investments, while denying Claimants the benefits promised to them; (ii) modifying the incentives after Claimants had "sunk" costs by investing in PV facilities, knowing that the investors were "trapped" in Italy;

---

[604] Statement of Defense, ¶ 671.

[605] Statement of Claim, ¶ 366; Statement of Defense, ¶ 687.

[606] Statement of Defense, ¶ 692; Rejoinder, ¶ 341.

[607] Statement of Claim, ¶ 367 n. 687, citing *Biwater Gauff (Tanzania) v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶ 602, CLA-39.

[608] Statement of Claim, ¶ 367 and n. 686, citing West's Encyclopedia of American Law, 2d ed. (2008), The Gale Group, Inc.

and (iii) disingenuously proclaiming that the policy reasons behind the *Spalma-incentivi* Decree were to reduce costs to consumers and thus assure the sustainability of the incentives programs.[609]  According to Claimants' interpretation of good faith as "honesty" and a "sincere intention to deal fairly with others", a lack of good faith would logically mean dishonesty and insincere intentions, whether or not it implies "bad faith", as Claimants deny.  The Tribunal does not, however, find evidence to conclude that Italy's decision to issue the *Spalma-incentivi* Decree involved dishonesty or insincerity, nor does the Tribunal consider that there is evidence to impute bad faith to Italy.  Thus, according to either side's interpretation of the principle of good faith, the Tribunal does not consider that the *Spalma-incentivi* Decree violated the good faith principle based upon the evidence presented.

461.    Both sides appear to have a different appreciation of the impairment clause, in several respects.  First, on the degree of impairment required for a successful claim, Respondent submits that the impairment must be "significant", rather than merely "any negative impact or effect".[610]  A majority of the Tribunal notes, however, that the third sentence of ECT Article 10(1) provides, "no Contracting Party shall in any way impair…" (emphasis added).  Had the drafters not included the words "in any way" in the clause, a majority of the Tribunal might be persuaded to agree with Respondent's interpretation.  In any event, it is not necessary to take a position on this matter of interpretation, given that the negative impact of the tariff reduction on Claimants' investments is, in the Tribunal majority's view, significant in terms of the quantum of damages attributable to the measure.

462.    Second, the interpretation of "unreasonable… measures" is interpreted differently by Claimants and Respondent.  Respondent's position, essentially, is that a measure is not "unreasonable", provided that there exists a rational public purpose for the measure, combined with a reasonable manner of effecting that purpose.  Claimants, on the other hand, insist that the inquiry should be more inclusive, considering the perspective of the treaty parties or the investor, as to whether a measure is reasonable.  The Tribunal majority, in line with its conclusion on legitimate expectations, is inclined to agree that the interests of investors must be considered in determining whether a measure is reasonable.  In light of that interpretation, a majority of the Tribunal concludes that the tariff reduction was an "unreasonable measure" that impaired Claimants' investments.  Accordingly, the Tribunal majority finds that the tariff reduction under the *Spalma-incentivi* Decree breached the ECT's impairment clause.  The Tribunal majority considers, on the other hand, that Claimants have not adequately proved

---

[609] Statement of Claim, ¶¶ 368-369.
[610] Statement of Defense, ¶ 718; Rejoinder, ¶ 345.

that the *Spalma-incentivi* Decree was a discriminatory measure that disproportionately affected PV producers.

463.    In his dissenting opinion, Professor Sacerdoti expresses that the word "impairment" itself implies both a quantitative and qualitative aspect that undermines the "legal security" of an investment.  The Tribunal majority does not, however, concur with its esteemed colleague in this regard.  As a matter of interpretation of ECT Article 10(1) (third sentence), which refers to the impairment of the "management, maintenance, use, enjoyment or disposal" of investments, a negative impact on an investment's legal security is not necessarily implicated by a breach of the impairment clause.  It is sufficient to find that an investment's "enjoyment" or "disposal" would be in some way impaired by a 6-8% reduction in value, without the investment's legal standing or security necessarily being undermined.

464.    With respect to Claimants' umbrella clause claim, a majority of the Tribunal finds that the incentive tariff reduction under the *Spalma-incentivi* Decree involved a failure by Italy to observe its obligations to Claimants and to their investments.  After reflecting on the arguments of both sides, the Tribunal majority is inclined to interpret "obligations" referred to in the ECT's umbrella clause as sufficiently broad to encompass not only contractual duties but also certain legislative and regulatory instruments that are specific enough to qualify as commitments to identifiable investments or investors.

465.    Respondent has admitted that the GSE Agreements themselves constitute binding obligations, although they may be unilaterally modified by legislative or regulatory action of the Italian government.  However, even to the extent the GSE Agreements may be deemed mere "accessory contracts" that mirror the underlying regulations set forth in the *Conto Energia* decrees, the GSE Agreements must not be viewed in isolation from the GSE authorization letters and *Conto Energia* decrees.

466.    The Tribunal majority instead finds that, taken as a whole, the *Conto Energia* decrees, the GSE letters, and the GSE Agreements, amounted to obligations "entered into with" specific PV operators.  Those obligations were sufficiently specific, setting forth specific tariff rates for a fixed duration of twenty years. Accordingly, whether any of the *Conto Energia* decrees, GSE letters, or GSE Agreements would, in isolation, be covered by the ECT's umbrella clause is not the relevant question here, given that each of Claimants' investments received benefits pursuant to all three types of "obligations".

467.    The majority of the Tribunal notes the distinction drawn by Professor Sacerdoti in his dissenting opinion between GSE Agreements that were originally entered into with foreign-owned PV operators and GSE Agreements that were originally entered into with Italian-owned PV operators that only later became owned by a foreign investor, namely Claimants.  According to Professor Sacerdoti, the latter category of PV operators would not be covered by the ECT's umbrella clause.  This is because, in his view, the words "entered into with an Investor or an Investment of an Investor of any other Contracting Party" entails that an investor or investment must have been, respectively, from another Contracting Party or owned by an investor from another Contracting Party *at the specific time* when the obligation was "entered into".  The majority of the Tribunal observes that this distinction was not raised by either side in this arbitration, nor would it facilitate a correct understanding of the umbrella clause.  In the majority's view, this distinction is incompatible with an appropriately broad interpretation of the umbrella clause aimed at ensuring adequate protection of foreign investors.  There is, moreover, no hint of such a temporal dimension in the plain wording of the ECT's umbrella clause.

## 2.  Payment Term Change under the *Spalma-incentivi* Decree

### a.  Claimants' Position

468.    Claimants assert that as a result of the modified incentive tariff payment scheme under Article 26(2) of the *Spalma-incentivi* Decree, the 10% adjustment payments would not be received until at least four months, and as much as fifteen months, later than those amounts would have been paid under the original *Conto Energia* regime.[611]  According to Claimants, these delays reduced their cash flows.[612]  Claimants' counsel stated at the hearing that the "change in the timing of the receipt of the payments … had a harmful effect."[613]

---

[611] Expert Report of Richard Edwards, 4 April 2016, ¶ 3.26 n. 54 ("Payment relating to electricity generated in January would have been due at the end of March, but instead will be paid at the end of June fifteen months later.  Payment relating to December would usually have been paid at the end of the following February, but instead will be paid at the end of June four months later.").  See also Second Expert Report of Richard Edwards, 15 December 2016, ¶ 5.46 ("My understanding of the IT Payment Term Change is that 10% of the Incentive Tariff revenue is now settled at the end of June of the following calendar year (i.e. between 6 and 17 months after the period to which it relates), rather than two months after as is the case for the remaining 90% of the revenue and as was the case for 100% of the revenue before the change.").

[612] Statement of Claim, ¶ 311.

[613] Transcript, Day 1, 177:18-25 (Mohr).

469.    In response to Respondent's quantum experts, Claimants' quantum expert asserts that this measure "constitute[s] a deterioration in payment terms" and does not "introduce any improvements to payment terms".[614]

**b.  Respondent's Position**

470.    Respondent asserts that the purpose of Article 26(2) of the *Spalma-incentivi* Decree was to avoid making incorrect payments to producers, including both overpayments and underpayments.[615]  Also, according to Respondent, the measure provided other "improvements and benefits to the operators", including "substantial correspondence between advance payment and actual output", a "reduction in the number of rectification[s]", and "stability of financial flows".[616]

471.    In terms of its benefit to Italy, Respondent asserts that this measure also yielded an "[e]stimated savings of EUR 600 million one-off year 2015…."[617]

472.    Respondent also asserts that the harmful effects on Claimants are minimal:

> [T]he possible postponement of the payment of the incentive up to the adjustment time has an effect on the cash flows of the manufacturer only in the first year of the mechanism, as in the following years both the advance of the current year and the adjustment of the previous year will be paid.[618]

473.    According to Respondent's quantum experts, this measure represents "a normal fine-tuning that inevitably occur[s] in prolonged and dynamic relationship" and "completely lacks of materiality".[619]  They also assert that "the average payment terms for PV plants with a nominal capacity not lower than 20 kW appears to be improved, instead of getting worse."[620]

**c.  Tribunal Analysis**

---

[614] Second Expert Report of Richard Edwards, 15 December 2016, ¶¶ 2.16, 5.12.

[615] Statement of Defense, ¶ 329.

[616] Statement of Defense, ¶ 333.

[617] Statement of Defense, ¶ 323.

[618] Statement of Defense, ¶ 323.

[619] First Experts' Report of Professors Laghi, Paoloni, and Gatti, § 5.3.2.

[620] *Ibid.*

474.    In Claimants' substantive arguments regarding the *Spalma-incentivi* Decree, Claimants focus on changes to the duration and amount of tariffs pursuant to Options A, B and C under Article 26(3) thereof.  Their legal arguments – under FET, the impairment clause, and the umbrella clause – do not address how the change in payment terms under Article 26(2) of the *Spalma-incentivi* Decree and its implementing regulation would violate those standards.  On the other hand, as one of eight "Principal Regulatory Changes" repeatedly listed by Claimants and their quantum expert, Claimants clearly imply that the payment term change, whether alone or in combination with other measures, violated one or more of those treaty standards.  This is evident from statements in Claimants' written submissions, reports and oral testimony by their quantum expert, and remarks of counsel and presentation slides displayed at the hearing.

475.    Respondent, in turn, has raised various arguments in defense of the payment term change, asserting, *inter alia*, that it was a "fine-tuning" measure that reduced inaccuracies and improved efficiency in disbursement of tariff adjustments, resulted in cost savings for Italy, and had only a minimal negative impact on (and in some instances improved) Claimants' cash flows.  Respondent and its experts assert there is no legal basis for relief relating to this measure.

476.    Although the payment term change measure receives much more oblique treatment by the Parties than the other seven measures, it nonetheless comes before the Tribunal to decide and is not disposed of by the Tribunal's other conclusions regarding other measures.

477.    Given Claimants' failure to provide any clear argument as to why the payment term change might have breached the ECT or international law, the Tribunal finds that there is no basis to grant relief for the losses allegedly resulting from it.  In passing, the Tribunal notes that Claimants did not allege, let alone prove, that organs of the Italian Republic offered explicit or implicit promises or guarantees that changes of the type encompassed by the payment term change would not be made.  Thus, even though Claimants considered this measure unfavorable to their investments, Claimants have not argued or alleged any ground for a legitimate expectations claim.  Based on the foregoing, the Tribunal therefore denies Claimants' request for relief in relation to Article 26(2) of the *Spalma-incentivi* Decree.

## 3.  Modification of Minimum Guaranteed Price Scheme

### a.  Claimants' Position

478.    Claimants allege they were harmed by a drastic modification of the MGP Scheme beginning from 2014.  They allege that from 2008 through 2013, PV plants with a capacity less than 1 MW had received minimum guaranteed prices ranging from EUR 72.2 per MWh to EUR 105.8 per MWh, which increased, on average, every year.[621]  However, from 2014 onward, Italy set the minimum guaranteed price at EUR 38.9 per MWh and excluded plants over 100 kW in capacity and plants benefitting from the *Conto Energia* incentive tariffs.[622]

479.    Claimants assert that under the amended MGP Scheme, all of NovEnergia's plants that previously benefitted from the MGP Scheme became ineligible for the program.[623]  Further, they assert that 12 of the 80 plants of Greentech that benefitted from the MGP Scheme became ineligible for the program.[624]

480.    As summarized below, Claimants assert violations of several standards falling under the FET clause, including the legitimate expectations, transparency and consistency, and good faith standards.  Claimants additionally assert violations of the impairment clause and umbrella clause.

481.    Claimants assert that they formed legitimate expectations that Italy would ensure the economic survival, regardless of market conditions, of PV plants under 1 MW in capacity, which had relatively high operating costs, and would pay a certain remuneration under the MGP Scheme to ensure their profitability.[625]  Claimants state the following grounds for their expectations:

- Italy's goal of protecting PV facilities under 1 MW was reflected in legislative and regulatory acts, including AEEG Resolution no. 280/2007.[626]
- From 2008 through 2013, the AEEG established minimum guaranteed prices ranging from EUR 72 to EUR 106 per MWh of electricity produced, suggesting a "six-year-long course of dealing by Italy" offering rates well above market rates.[627]

---

[621] Reply, ¶ 358.

[622] Reply, ¶ 358.

[623] Reply, ¶ 358 n. 321 (stating, "[o]riginally, 38 out of the 52 NovEnergia plants benefitted from the MGP Scheme….").

[624] Reply, ¶ 358 n. 321; Hearing Presentation of Dr. Boaz Moselle and Dr. Dora Grunwald, 28 June 2017, p. 10.

[625] Statement of Claim, ¶ 328; Reply, ¶ 357.

[626] Statement of Claim, ¶ 352, citing Document for consultation proposing a regime for the "ritiro," 20 October 2004, CEX-216; Law No. 62, 18 April 2005, Art. 15(1)(f), CEX-37; AEEG Resolution no. 280/2007, CEX-220.

[627] Statement of Claim, ¶¶ 266, 353; Reply, ¶ 373, 379.

- The AEEG resolution establishing the prices provided for annual revision and adjustment for inflation.[628]
- Each eligible PV facility had a contract with the GSE providing for prices to be set each year to ensure facilities' survival "even in case the market price were to fall significantly."[629]

482.    Claimants assert that Italy's modifications to the MGP Scheme, pursuant to AEEG Resolution 618 of 19 December 2013 and the *Destinazione Italia* law decree issued on 23 December 2013, defeated their legitimate expectations, breaching the FET clause.[630]

483.    Claimants also assert that Italy engaged in inconsistent and non-transparent treatment in two ways, breaching the FET clause.  First, claimants argue, the six-year course of dealing in which Italy provided minimum guaranteed prices in the range of EUR 72 to EUR 106 per MWh (above the market price) was followed by a sharp reduction to a below-market price of EUR 38.9 for 2014.[631]  Second, purporting to show an inconsistency between two governmental bodies, Claimants assert that the AEEG set prices for 2014 at a below-market rate, then the Italian government enacted a law eliminating minimum guaranteed prices for PV facilities receiving *Conto* tariffs.[632]

484.    As for the good faith standard under FET, Claimants assert that although Italy was aware of the need to ensure survival of small PV plants, it nonetheless "substantially and arbitrarily reduced the prices and then effectively ended the regime for Claimants and other investors."[633]

485.    Next, Claimants assert that the "many assurances and commitments Italy had provided" previously regarding minimum guaranteed prices and the consistent six-year course of dealing made it unreasonable to reduce and then essentially end access to those prices.  This, Claimants argue, violates the impairment clause.[634]

486.    Finally, Claimants argue that Italy breached the ECT's umbrella clause by promising – in law, regulation, and contract – to support small PV facilities and

---

[628] Statement of Claim, ¶ 353.

[629] Statement of Claim, ¶ 354.

[630] Statement of Claim, ¶ 354; Reply, ¶ 377.

[631] Statement of Claim, ¶ 363; Reply, ¶¶ 377, 379.

[632] Statement of Claim, ¶ 363.

[633] Statement of Claim, ¶ 372.

[634] Statement of Claim, ¶, 381; Reply, ¶ 377.

shield them from market changes.[635]  The contracts were subject to automatic renewal each year and should have reflected increased prices each year.[636] Further, Claimants assert that Italy breached its obligations by reducing the prices to only 60% of the market price and eliminating the possibility for most plants (including Claimants' plants) to participate in the off-take regime.[637]

487.    In response to Italy's argument that the modifications were justified by the reduced operating costs of smaller PV facilities in the years leading up to 2013, Claimants assert that the data that Italy relied upon – namely, a 2013 report from *Politecnico di Milano* – was incomplete and unclear.[638]  According to Claimants' regulatory experts,

> Overall, it is not possible to determine a general decreasing trend in operating costs, as the data points provided by Politecnico for different years are for different plant sizes and thus not directly comparable. Further, given that the goal of this exercise was to assess operating cost trends, a relatively small sample size (of 16 plants if the data points represent individual plants) would not be likely to yield results that would be broadly applicable to all plants under 1 MW.[639]

488.    Additionally, Claimants assert that the methodology used by the *Politecnico*'s report only covers a portion of the real operational costs of the Claimants' PV facilities, failing to include costs of land rent, various professional service fees, agency fees, imbalance costs, administrative fees, and the Robin Hood tax.[640] Claimants further argue that the minimum guaranteed prices established by Italy for 2014 would not cover the only plants that remained eligible for the MGP Scheme, and accordingly, the modified scheme lacked any rational basis.[641]

489.    Claimants also rebut Respondent's assertion[642] that a reduction in operating costs justified the decision to limit eligibility for the MGP Scheme to plants under 100 kW and not benefiting from the *Conto Energia* incentives.[643]  Claimants assert that the lower capacity threshold was an arbitrary restriction that was not justified by the operating costs data, and that the inability to participate in both

---

[635] Statement of Claim, ¶ 393.

[636] Statement of Claim, ¶ 393.

[637] Statement of Claim, ¶ 394.

[638] Reply, ¶ 362.

[639] Reply, ¶ 363, quoting Second FTI Regulatory Report, ¶ 5.11.

[640] Reply, ¶ 365.

[641] Reply, ¶¶ 368-369.

[642] See, e.g., Statement of Defense, ¶ 656 (stating that "operational costs had been sharply decreased….").

[643] Reply, ¶ 371.

forms of incentives deprived the MGP Scheme of any ability to fulfil its purpose of ensuring the survival of small PV plants, since the minimum guaranteed prices were not sufficient to cover operating costs.[644]

### b. Respondent's Position

490.    Respondent contends that Claimants lacked any basis to form legitimate expectations regarding either the amount of the minimum prices under the MGP Scheme or their availability over time.[645]  Respondent asserts that, on the contrary, Italy made "no affirmation regarding the duration or the amount of the favourable regime of minimum prices…."[646]

491.    As a preliminary point, Respondent argues that the primary legislation establishing the off-take regime, Legislative Decree 387/03 and Law 39/2004, does not provide specific assurances regarding prices or their duration.  Instead, Respondent asserts that this legislation merely delegated to the AEEG the power to establish such regulations.[647]  According to Respondent, since the AEEG sets minimum prices annually, without any range or limits provided in AEEG Resolution no. 280/2007, this is "*per se* sufficient to exclude any expectation" as to how such power is exercised.[648]

492.    Next, Respondent makes three rebuttals to Claimants' arguments regarding alleged legitimate expectations of maintaining prices.  First, referring to the Preamble of AEEG Resolution no. 280/2007, stating an objective "to ensure the economic survival of smaller plants, even in case the market prices were to fall significantly", Respondent asserts that the wording does not support an expectation of profitability, but merely survival of PV plants.[649]

493.    Second, Respondent contends that the six-year trend of high minimum prices from 2008 to 2013 could not create an expectation that those prices would be maintained.  Respondent asserts that Claimants made their investments in the 2008-2010 time frame, which would not be a sufficient amount of time to assert their reliance on such a trend and, in any case, most of the trend occurred after

---

[644] Reply, ¶ 372.

[645] Statement of Defense, ¶ 621.

[646] Statement of Defense, ¶ 622.

[647] Statement of Defense, ¶¶ 624-629.

[648] Statement of Defense, ¶ 629; Rejoinder, ¶ 418.

[649] Statement of Defense, ¶¶ 631-632; Rejoinder, ¶ 419.

Claimants made their investments, so it could not inform their expectations.[650] Respondent argues that if the AEEG's power to set prices was limited to following such a trend, those limits would have been provided by law.[651] Respondent also quotes from a provision of Annex A to Resolution no. 280/2007 as a foundation for its assertion that it was never ruled out that prices might be set below the market prices.[652] Furthermore, asserts Respondent, the prices set from 2008 to 2013 were known to be temporary.[653]

494.    Third, Respondent asserts that when Claimants made their investments, there was no assurance as to an inflation adjustment of the minimum prices. Although there was an inflation adjustment under AEEG Resolution 34/2005, Respondent asserts that the 2007 AEEG Resolution replaced this by giving the AEEG power to set a yearly determination of prices, which was the status when Claimants began their investments.[654]

495.    Finally, Respondent argues that Claimants lacked any legitimate expectation that PV plants would be eligible to receive both the minimum guaranteed prices and *Conto Energia* incentives. Respondent asserts that there is no basis to infer that both benefits would be offered merely because they were offered cumulatively in the past.[655]

496.    As a next step, Respondent argues that even if, for the sake of argument, Claimants had formed legitimate expectations, these were not undermined by Italy's measures with respect to the level of minimum prices. Respondent begins with Resolution 618 of 2013, which set the 2014 minimum prices lower than before, arguing that the measure was reasonable and consistent with the purpose of the MGP Scheme.[656] Since the off-take regime under AEEG Resolution no. 280/2007 sought, according to Respondent, to "ensure the economic survival of smaller plants", the assurance of a basic remuneration covering operational costs under Resolution 618 of 2013 was consistent with this purpose.[657] Respondent

---

[650] Statement of Defense, ¶¶ 636-637; Rejoinder, ¶ 421.

[651] Statement of Defense, ¶ 637.

[652] Statement of Defense, ¶¶ 638-639, citing Resolution no. 280/2007, Annex A, Art. 7(4), providing, "if, at the end of each calendar year, the product between the guaranteed minimum price and the amount of electricity referred to them is less than the product between the prices referred to in Article 6 and the same amount of electricity, the GSE recognizes, as adjustment, the prices referred to in Article 6."

[653] Statement of Defense, ¶ 373.

[654] Statement of Defense, ¶¶ 640-643.

[655] Statement of Defense, ¶¶ 644-646.

[656] Statement of Defense, ¶¶ 648-649.

[657] Statement of Defense, ¶¶ 649-650.

also contends that Resolution 618 of 2013 complied with the broader legal framework, requiring merely that the AEEG exercise power by "making reference to" market conditions, which Respondent asserts the AEEG did.[658]  The broader legal framework did not, according to Respondent, imply that minimum prices must remain stable over time.[659]

497.    Respondent next turns to Law Decree 145/2013, which allegedly reduced the possibility for PV plants to obtain both incentive tariffs and minimum prices. Respondent asserts that the decision was made reasonably, based on the sharply decreasing operational costs and increasing costs to consumers, and did not conflict with any relevant rule.[660]  Respondent argues that the purpose of protecting "smaller plants" enunciated in Resolution no. 280/2007 was preserved by the 2013 law, since plants under 100 kWh retained the benefits of both incentive measures.[661]

498.    With respect to Claimants' allegations that modifications of the MGP Scheme breached the FET clause's consistency and transparency standard and good faith standard, Respondent reiterates its position that those claims do not constitute autonomous standards under the FET clause.  For the sake of argument, however, Respondent asserts that the 2013 modifications were consistent with the primary legislation establishing the off-take regime and prior AEEG resolutions and therefore were not arbitrary.[662]  Respondent also rebuts Claimants' assertion that it violated the impairment clause, referring to its prior arguments in defense of FET claims.[663]

499.    In response to Claimants' allegation that the changes to the MGP Scheme were drastic and unexpected, Respondent asserts that the changes legislated at the end of 2013 were the result of a long analysis and consultation period dating back to 2011.[664]  Respondent defends the report of the *Politecnico di Milano* and the process by which it was prepared, in which data was provided by the market participants themselves.[665]

---

[658] Statement of Defense, ¶¶ 653-654.

[659] Rejoinder, ¶¶ 427-428.

[660] Statement of Defense, ¶¶ 655-656.

[661] Statement of Defense, ¶ 657.

[662] Statement of Defense, ¶¶ 672, 708; Rejoinder, ¶¶ 423-434.

[663] Statement of Defense, ¶ 727.

[664] Statement of Defense, ¶ 373.

[665] Rejoinder, ¶¶ 399-400.

### c.  Tribunal Analysis

500.    A majority of the Tribunal finds that modification of the MGP Scheme did not violate Article 10(1) of the ECT, namely, the FET's legitimate expectations, consistency/transparency and good faith standards, the impairment clause, or the umbrella clause.

501.    Regarding the claim based on legitimate expectations, a majority of the Tribunal has not been persuaded that Claimants formed such expectations that, after 2013, they would continue to receive minimum prices at levels similar to those which they received from 2008 to 2013.  In the view of a majority of the Tribunal, it was not demonstrated that Italy made any explicit or implicit assurance that would warrant such expectations.  Nor, in the majority's view, could the Preamble to Resolution no. 280 of 2007, mentioning prices "to ensure the economic survival of smaller plants, even in case the market prices were to fall significantly", without more, suffice to engender legitimate expectations, given that the power to set prices annually remained with the AEEG.

502.    As for the second aspect of Claimants' legitimate expectations argument, concerning the limitation on PV plants eligible to receive minimum guaranteed prices and the decision to restrict most plants from obtaining both the *Conto Energia* tariffs and the minimum prices, a majority of the Tribunal also finds that legitimate expectations were not formed.  In the view of a majority of the Tribunal, a position need not be taken on whether the stated purpose of the MGP Scheme was undermined by the restrictions Italy put into effect in 2014, since the Tribunal majority is not persuaded that limiting the number of plants eligible for the MGP Scheme, in the absence of assurances that a wider applicability would be maintained, contravenes any legitimate expectations of Claimants.  Accordingly, the Tribunal finds, by a majority, that Italy's modifications of the MGP Scheme, under AEEG Resolution 618 of 19 December 2013 and the *Destinazione Italia* law decree issued on 23 December 2013, did not constitute breaches of legitimate expectations.

503.    Next, with respect to Claimants' assertion that Italy sharply reduced the minimum prices under the MGP Scheme after 2013, and that the AEEG's and Italian government's respective decrees at that time were inconsistent, a majority of the Tribunal finds that these measures did not involve inconsistent and non-transparent treatment violating the FET clause.  In so finding, the Tribunal majority notes that the AEEG had requested a report from the *Politecnico di Milano*, issued in July 2013, and a consultation document was issued later in 2013, of which Claimants did not deny they were aware.  There is no evidence that investors were treated inconsistently, or that the laws were opaque or

arbitrary, notwithstanding a change in the regulations occurring toward the end of 2013 and the beginning of 2014. Also, in the view of a majority of the Tribunal, given that the *Destinazione Italia* law decree narrowed the scope of eligible PV plants, this was rather more consistent than inconsistent with the reduced minimum guaranteed prices announced four days earlier under AEEG Resolution 618 of 19 December 2013.

504.    As for an alleged violation of the good faith standard under FET, a majority of the Tribunal notes that Italy undertook a consultation process and procured the *Politecnico di Milano*'s report prior to modifying the MGP Scheme. In the majority's view, Claimants have given no evidence that these modifications were done "arbitrarily", as they assert. Accordingly, a majority of the Tribunal finds that there was not a breach of the good faith standard constituting a breach of the FET clause.

505.    Regarding Claimants' assertion of a breach of the impairment clause, for the same reasons noted above with respect to FET, a majority of the Tribunal finds that reducing the minimum prices and excluding plants above 1 KWh was not an unreasonable or discriminatory measure with respect to Claimants' investment.

506.    Finally, a majority of the Tribunal finds that modifications to the MGP Scheme did not breach the umbrella clause. In the majority's view, even if Italy had incurred an obligation – through law, regulation, or contract – to support small PV facilities and protect them from market changes, that obligation was of a general nature not taking the form of a guarantee not to modify the regulations governing the MGP Scheme. Claimants did not contest that the MGP Scheme regulations and contracts were subject to the AEEG's power to set prices with reference to market conditions. Given that a consultative process was undertaken and market data were considered, even if those actions were insufficiently thorough in Claimants' view, a majority of the Tribunal is unable to find that the rather vague obligations to which Italy might have been subject were violated. Further, there was no guarantee that contracts would be renewed or that the terms of renewed contracts would be the same as those of prior contracts. Accordingly, the Tribunal, by a majority, denies Claimants' umbrella clause claim with respect to minimum guaranteed prices.

## 4.  Cancellation of ISTAT Inflation Adjustment

### a.  Claimants' Position

507.    Claimants assert that Respondent's treatment of the ISTAT inflation adjustments for tariff premiums under *Conto* I violated Claimants' legitimate

expectations, displayed inconsistency and lack of transparency, and constituted bad faith, thus infringing the ECT's FET clause.[666]  Additionally, they assert that the measure violated the ECT's impairment clause and umbrella clause.[667]

508.    Claimants contend that when they started investing in the Italian PV sector, Italy viewed the 2006 cancellation of the *Conto* I inflation adjustment as illegitimate, as clearly expressed in the 2008 decision of the *Consiglio di Stato*.[668]  According to Claimants, the *Consiglio di Stato*'s decision found the measure "(i) a substantial modification of the express terms of *Conto* I; (ii) a measure with retroactive effects since it applied to facilities that had already entered into operation and had been granted tariffs under *Conto* I; and (iii) a violation of investors' legitimate expectations who had relied on certain support regime conditions when developing their financial and investment plans."[669]  Claimants also assert that the GSE continued to pay the inflation-adjusted tariffs throughout that time.[670]

509.    Claimants characterize the GSE as sharply reversing course in 2015 when it informed operators that no further inflation adjustments would be paid and those paid previously would be offset against further *Conto* I tariffs.[671]  In response to Respondent's counter-argument that the GSE issued a notification in 2009 allegedly putting operators on notice of the "temporary" or "conditional" status of the 2008 decision of the *Consiglio di Stato*,[672] Claimants interpret that notification as, on the contrary, confirming the validity of that decision and assuring continued availability of the ISTAT-adjusted tariffs.[673]

510.    Claimants also assert that only when they notified Italy in 2015 of their intention to commence international arbitration did the GSE start a procedure to seek reimbursement, suggesting that Italy's timing "speaks volumes".[674]

511.    Claimants seek to rebut Respondent's argument that the 2006 amendment was justified by Legislative Decree no. 387,[675] requiring that tariffs "progressively

---

[666] Statement of Claim, ¶¶ 351, 362, 372.

[667] Statement of Claim, ¶¶ 381, 392.

[668] Reply, ¶¶ 385-386, citing Decision of the *Consiglio di Stato* 1435/2008, CEX-555.

[669] Reply, ¶ 385.

[670] Reply, ¶ 389.

[671] Reply, ¶¶ 390-391.

[672] GSE Communication of 26 January 2009, GSE Website, REX-46.

[673] Reply, ¶¶ 388-389.

[674] Reply, ¶ 391.

[675] Legislative Decree No. 387, 29 December 2003, *Implementation of Directive 2001/77/EC on the promotion of electricity produced from renewable energy sources in the domestic electricity market*, CEX-36.

decrease" over time.[676]  According to Claimants, the tariffs already met that requirement without the amendment, since tariff rates decreased based upon the date when PV facilities entered into operation.[677]  Additionally, Claimants argue that the elimination of inflation adjustments based on Legislative Decree no. 387 could not have been expected by investors, since Italy itself did not have that interpretation when *Conto* I was originally issued.[678]

512.    Claimants contend that they formed legitimate expectations based on the explicit terms of *Conto* I, GSE Agreements referring to *Conto* I tariffs, the administrative court decisions of 2006 and 2008, and the continued payment of inflation-adjusted tariffs until 2015.[679]  They claim that Italy undermined those expectations by the allegedly inconsistent and non-transparent treatment accorded by Italian courts and the GSE. [680]  They also claim that Italy violated the ECT's umbrella clause because cancellation of the inflation adjustment breached the obligations which Italy entered into in relation to *Conto* I facilities pursuant to the GSE Agreements.[681]

**b.  Respondent's Position**

513.    Respondent argues that Claimants did not have a legitimate expectation of receiving the ISTAT adjustment under *Conto* I because they began investing in the Italian PV sector in 2008, after the 2006 amendment to *Conto* I.[682]  Respondent concludes that Claimants must have been aware of the 2006 decree revoking the inflation adjustments.[683]  In support of its contention, Respondent notes that a GSE Agreement from 2009 refers to the 2006 amendment of *Conto* I.[684]

514.    Next, Respondent contends that the "overall judicial history invoked by the Claimants is the best argument to deny the existence of a legitimate expectation" of continued inflation adjustments.[685]  Respondent recounts that the first case appealed to the *Consiglio di Stato* upheld the TAR's decision regarding the 2006 amendment to *Conto* I, but the second case brought before the *Consiglio di Stato* was referred to the court's Plenary Session, whose function is to prevent judicial

---

[676] Reply, ¶ 395.

[677] *Ibid.*

[678] Reply, ¶ 396.

[679] Reply, ¶ 397.

[680] Reply, ¶¶ 396-397.

[681] Reply, ¶ 397.

[682] Statement of Defense, ¶¶ 575-576; Rejoinder, ¶ 439.

[683] Statement of Defense, ¶ 576.

[684] Statement of Defense, ¶ 577, citing CEX-63.

[685] Statement of Defense, ¶ 580.

conflicts.[686]  A third decision of the TAR was also brought before the *Consiglio di Stato*.  According to Respondent, the *Consiglio di Stato*'s decision in favor of annulment in one case does not prevent that court from reaching a different result in a later case regarding the annulled rule.[687]  Given that two of the appeals were pending when Claimants made their investments, Respondent asserts that Claimants could not have had any basis to form a legitimate expectation of receiving the inflation adjustment.[688]

515.    Additionally, in response to Claimants' contention that the GSE's 2009 press release reported on the 2008 decision of the *Consiglio di Stato*, gave no hint about the pending appeals, and indicated that the GSE would not "claw back" inflation-adjusted tariffs already paid, Respondent argues that the 2009 press release was of minimal importance, since the pending appeals were a "notorious fact" that would put a PV investor on notice that the 2008 decision might be reversed.[689]

516.    Finally, Respondent denies that the 2012 decision of the *Consiglio di Stato* was, in Claimants' words, "obviously unlawful".  According to Respondent, the 2012 decision held that revocation of the *Conto* I inflation adjustment was legitimate and necessary to reflect the requirement under Legislative Decree no. 387 that the tariffs be of "decreasing amount".[690]  Respondent contends that the meaning of the 2008 decision was not that the revocation of inflation adjustments was invalid *per se*, but that the revocation merely lacked an adequate motivation.[691]  Accordingly, Respondent argues, the content of the 2008 decision of the *Consiglio di Stato* precluded the legitimate expectation that Claimants assert.

c.   **Tribunal Analysis**

517.    Without denying that the inflation adjustment may have been a factor that Claimants considered when they invested in the Italian PV sector,[692] the Tribunal finds, however, that the circumstances do not establish a breach of ECT Article 10(1).

---

[686] Statement of Defense, ¶¶ 582-583.

[687] Statement of Defense, ¶ 583.

[688] Statement of Defense, ¶¶ 584, 586; Rejoinder, ¶ 439.

[689] Rejoinder, ¶¶ 444-446.

[690] Statement of Defense, ¶ 588.

[691] Statement of Defense, ¶ 590.

[692] See, e.g., Bernardo Lucena Second Witness Statement dated 16 December 2016, ¶ 3, stating that NovEnergia's financial modeling took as an assumption that the *Conto* I tariffs would be adjusted for inflation.

518.    In reaching this conclusion, the Tribunal takes into consideration that two appeals were pending in the *Consiglio di Stato* regarding the legitimacy of the amendment to *Conto* I at the time when Claimants made their investments.  The Tribunal considers that the GSE's 2009 press release, while relevant to the question of legitimate expectations, is not dispositive, since reasonable persons might have differed concerning its interpretation.  In that connection, the GSE's practice of continuing to pay the inflation-adjusted tariffs during the pending appeals but then changing course after the appeals had concluded might have been confusing to an investor.  That, however, is not conducive to a finding of legitimate expectations.

519.    The Tribunal finds it unnecessary to consider the merits of the 2012 decision of the Plenary Session of the *Consiglio di Stato*, in particular, as to whether the availability of ISTAT-adjusted *Conto* I tariffs was consistent with the provision under Legislative Decree no. 387 that tariffs be of a "decreasing amount".  The issue here is not, of course, whether the *Consiglio di Stato* arrived at correct decisions.

520.    As for Claimants' assertion that Italy violated the "transparency" standard of ECT Article 10(1) (first sentence) because of allegedly inconsistent treatment by different State bodies, the Tribunal finds that the evidence does not establish that such treatment was inconsistent.  It appears, instead, that the GSE did ultimately conform with the jurisprudence of the *Consiglio di Stato*.  Finally, regarding an alleged breach of the umbrella clause, the fact that GSE Agreements for PV plants receiving *Conto* I tariffs referred to the amended *Conto* I decree suggests that Respondent did not enter into an obligation to pay the inflation adjustments.[693]

## 5.  Administrative Fee and Imbalance Costs

### a.  Claimants' Position

521.    Claimants contend that the administrative fees and imbalance costs charged to PV producers beginning from 1 January 2013 violated the FET clause, impairment clause, and umbrella clause.

522.    Regarding FET, Claimants assert that the administrative fee, imposed retroactively on all PV producers receiving *Conto* incentives, and the imbalance costs, for which PV producers lost their exemption, in effect reduced the value of their incentive tariffs.  These measures, Claimants assert, undermined the

---

[693] See, e.g., GSE Agreement for PV operator Giova Solar S.R.L., CEX-63.

legitimate expectations engendered by Respondent's explicit guarantee of fixed rates, expressed in the *Conto* decrees, verbal declarations of Italian government officials, Italy's conduct, and the GSE Agreements.[694]

523.    Claimants also contend that these measures violated the standards of transparency and  consistency, as well as good faith, under the FET clause.[695] They assert that the GSE's management expenses and the costs of adding substantial PV capacity to the grid are "the types of costs inherent in an incentive support regime" and were entirely foreseeable to Italy.[696]  Therefore, Italy should have informed investors from the beginning if those costs would be allocated to PV producers, such as by apportioning those costs in the *Conto Energia* decrees.[697]  Moreover, for four years from 2008 to 2012, such costs were not imposed on PV producers.[698]  Thus, according to Claimants, shifting those costs to PV producers "midstream" – specifically, after they had invested in the Italian PV sector – was non-transparent, inconsistent, and indicative of a lack of good faith.[699]

524.    Regarding the impairment clause, Claimants assert that the two measures were unreasonable for the reasons described above.[700]  Additionally, Claimants rebut Respondent's assertion that it was reasonable for PV investors to bear the costs because they were the main beneficiaries of the *Conto Energia* decrees, arguing that the public was the main beneficiary, as reflected in the fact that the incentive schemes were designed so that end-users covered the costs.[701]  Furthermore, Claimants contend that the alleged harm to their investments caused by the measures was admitted by Italy.[702]  Accordingly, Claimants argue that Italy breached the impairment clause.[703]

525.    Regarding the umbrella clause, Claimants assert that imposing both administrative fees and imbalance costs "fundamentally changed the economic framework enshrined in the GSE Contracts that govern each of Claimants' PV plants" and therefore breached Italy's obligations under the GSE Agreements.[704]

---

[694] Reply, ¶¶ 432-433.

[695] Reply, ¶¶ 434-435.

[696] Reply, ¶¶ 422, 425, 429, 434.

[697] Reply, ¶ 434.

[698] Reply, ¶ 435.

[699] Statement of Claim, ¶¶ 351, 361, 372; Reply, ¶¶ 422, 425, 435.

[700] Reply, ¶ 437.

[701] Reply, ¶ 428.

[702] Reply, ¶ 430, citing Statement of Defense, ¶ 413.

[703] Statement of Claim, ¶ 381; Reply, ¶ 437.

[704] Reply, ¶ 436; <u>see also</u> Statement of Claim, ¶ 392.

**b. Respondent's Position**

526.    Respondent essentially makes three arguments in response to Claimants regarding an alleged violation of their legitimate expectations.

527.    First, Respondent argues that Italy made informed policy choices in creating the administrative fee measure and allocating imbalance costs to PV producers. Regarding administrative fees, Respondent asserts that it was "appropriate and fair" that those receiving feed-in tariffs contribute to covering the costs of managing the incentive scheme, as stated in the 22nd recital of *Conto* V and reflected in Article 25 of the *Spalma-incentivi* Decree.[705]  Respondent also asserts that the GSE's costs were increasing due to its expanded role in monitoring the incentive schemes.[706]  Regarding imbalance costs, Respondent asserts that the exemption previously available "could no longer be deemed acceptable in the light of the huge development of non-programmable renewable energy sources power plants [..., which] led to a continuous increase in costs allocated to the generality of energy users."[707]

528.    Second, Italy gave no assurance to PV producers that they would not be required to pay administrative fees or imbalance costs, as acknowledged by Claimants in their Reply.[708]  Respondent contends that the alleged guarantee of a "fixed, stable, and foreseeable revenue stream for twenty years" and the silence of the *Conto Energia* decrees regarding imbalance costs (and silence of the first four *Conto* decrees regarding administrative fees) were not an assurance that fees and costs would not be charged for "emerging costs".[709]  To suggest otherwise would "transform the FET clause into a general freezing clause of State regulatory Activity."[710]  Respondent argues that the common understanding of FET does not imply that incentive regimes are completely non-modifiable.[711]

529.    Third, Respondent argues that the administrative fee entailed only "an extremely modest loss for each producer", imposed less than half of the GSE's total costs on PV producers, and was implemented in the most efficient manner by

---

[705] Statement of Defense, ¶¶ 408, 410, 412, citing Law Decree No. 91/2014, 24 June 2014, converted into law by Law No. 116/2014 of 11 August 2014, Article 25(1), CEX-553.

[706] Statement of Defense, ¶¶ 411, 559.

[707] Statement of Defense, ¶ 389.

[708] Statement of Defense, ¶ 567; Rejoinder, ¶ 513, citing Claimants' Reply, ¶ 434.

[709] Statement of Defense, ¶ 562; Rejoinder, ¶ 514.

[710] Statement of Defense, ¶ 562; Rejoinder, ¶ 514.

[711] Statement of Defense, ¶¶ 559, 563-564; Rejoinder, ¶ 516.

way of an off-set rather than creating a new payment method.[712]  Respondent also contends that the measure was not retroactive, stating that Article 10(4) of *Conto* V "only applied to the future, starting on 1 January 2013."[713]  As for the imbalance costs, Respondent challenges the assumption that Claimants' revenues were reduced.[714]  Further, Respondent asserts that Claimants conceded that they were reimbursed by the GSE after the *Consiglio di Stato*'s June 2014 decision.[715]

530.    According to Respondent, Claimants' arguments that the administrative fee and imbalance costs measures breached the transparency and consistency, and good faith, standards and the impairment clause under ECT Article 10(1) derive from Claimants' legitimate expectations arguments, and are thus subject to the same defenses.[716]  Notwithstanding the alleged overlap, Respondent contends that the administrative fee and imbalance costs measures were transparent, having been set forth and published by written rule, and that there is no evidence of bad faith by the Italian authorities.[717]

531.    Regarding the umbrella clause, Respondent first asserts that it is not relevant in this case, because the umbrella clause does not cover non-contractual obligations, and also because the GSE Agreements are mere "accessory contracts", which were, in any case, not breached.[718]  As for Respondent's specific defense to the claim that the administrative fee and imbalance costs breached the umbrella clause by violating the GSE Agreements, Respondent asserts that the GSE Agreements were silent regarding administrative fees and imbalance costs, and thus that there were no obligations that Respondent failed to observe.[719]

c.  **Tribunal Analysis**

532.    As a preliminary matter, the Tribunal notes that although the administrative fee and imbalance costs measures were described separately in the Statement of Claim, the Parties later grouped together their respective argumentation regarding the two measures.[720]  The Tribunal, having considered each measure individually, finds it efficient to address both measures under one heading.

---

[712] Statement of Defense, ¶¶ 413-414, 560 n. 260, 561; Rejoinder, ¶ 519.

[713] Statement of Defense, ¶ 416.

[714] Statement of Defense, ¶ 386.

[715] Statement of Defense, ¶ 393, quoting Claimants' Statement of Claim, ¶ 279.

[716] Statement of Defense, ¶¶ 524-525, 683-686, 701, 704-705, 727; Rejoinder, ¶¶ 522, 528.

[717] Rejoinder, ¶¶ 524-525.

[718] Statement of Defense, ¶¶ 730, 756, 759.

[719] Rejoinder, ¶ 530.

[720] See e.g., Reply, ¶¶ 421-438; Rejoinder, ¶¶ 503-531.

533.    The Tribunal is mindful of Claimants' assertion that the administrative fee and imbalance costs are "the types of costs inherent in an incentive support regime" and were foreseeable.[721]  In the words of NovEnergia's witness, Bernardo Lucena:

> The additional administrative and imbalance costs were foreseeable consequences to the system of adding significant renewable generating capacity, and we believed that the original incentive framework took those costs into consideration in setting the tariffs promised to PV facilities.[722]

534.    The Tribunal notes, however, Claimants' acknowledgment that "neither the *Conto Energia* decrees nor the GSE Contracts expressly stated that administrative fees and imbalance costs would be zero."[723]

535.    Further, as to the impact of these measures, Claimants asserted that the administrative fee and imbalance costs did not directly change the incentive tariff rates granted to PV facilities but instead altered the "general economic framework".[724]

536.    The foreseeability of the administrative fees and imbalance costs raises the question not only whether Respondent undertook the measures in a transparent, good faith manner, but also whether Claimants' assertions of legitimate expectations are justified.  Upon consideration of the Parties' arguments, the Tribunal finds that the foreseeability of the costs, the silence regarding those costs in the *Conto Energia* decrees and GSE Agreements, and absence of a direct effect of those costs on the *Conto* tariffs collectively weigh against the conclusion that Claimants had a legitimate expectation that such costs would not be imposed on PV producers.  The Tribunal finds that a breach of the principle of good faith by Respondent is not demonstrated based upon the implementation of the administrative fees and imbalance costs measures after Claimants had already developed or acquired PV facilities.

537.    For the same reasons, the Tribunal is not persuaded by Claimants' impairment clause claim.  It has not been established that the administrative fee or the imbalance costs were an unreasonable measure that impaired Claimants'

---

[721] Reply, ¶¶ 422, 434.

[722] Lucena Second WS, ¶ 4, quoted in Reply, ¶ 430.

[723] Reply, ¶ 434.

[724] Reply, ¶¶ 431-432.

investments.  Regarding the administrative fee, the Tribunal takes into consideration in this context the policy grounds Italy invoked for its decision to allocate a portion of the GSE's costs to investors.[725]  The Tribunal has not been persuaded that those grounds were unreasonable or that the method of collecting the fee was unreasonable.  As for the imbalance costs, the Tribunal notes Claimants' assertion that they were reimbursed for imbalance charges as a result of Resolution 281.[726]  The Tribunal is not persuaded that Claimants' investments were impaired by the imbalance costs measure, nor that this measure was unreasonable.  Accordingly, the Tribunal concludes that the administrative fee and imbalance costs measures did not breach the impairment clause.

538.    Finally, with respect to the umbrella clause, the Tribunal observes from its reasoning above that Claimants were never assured that an administrative fee and imbalance costs would not be charged, and the GSE Agreements did not so provide.  It cannot be inferred based on Claimants' arguments that the GSE Agreements contained an implied provision excluding such measures.  Accordingly, the Tribunal finds that the umbrella clause was not breached by those measures.

## D. Damages

### 1. Introduction

539.    In light of the Tribunal's conclusions on liability, the discussion of damages below is limited to those issues that are relevant to the incentive tariff reduction under the *Spalma-incentivi* Decree.  Therefore, quantum issues that relate only to one of the other disputed measures, such as the assessment of historical losses, need not be addressed.

540.    Claimants have requested full compensation identified as the diminution in the fair market value of their investments caused by Italy's measures and calculated by means of the discounted cash flow (DCF) method.[727]  Claimants' quantum expert, Mr. Edwards of FTI Consulting (FTI), calculates the quantum of damages owed to Claimants as "the difference between: (a) the value that the Claimants' investments in Italy would have had if Italy had not introduced the measures that Claimants contend in this arbitration violated the ECT (the "Counterfactual Position"); and (b) the value of those investments after the introduction of those measures (the "Actual Position")."[728]  The Counterfactual Position relevant for

---

[725] Statement of Defense, ¶¶ 408, 410, 412.

[726] Statement of Claim, ¶ 279.

[727] Reply, ¶ 456.

[728] Statement of Claim, ¶ 406; Expert Report of Richard Edwards, 4 April 2016, ¶ 4.3.

present purposes assumes the incentive tariff rate before the *Spalma-incentivi* Decree, whereas the Actual Position assumes the reduction (according to Option A, B, or C) introduced by the *Spalma-incentivi* Decree.[729]

541.    Claimants' DCF models calculate the enterprise value of each of their operating companies as of the valuation date, in the Counterfactual Position and the Actual Position, thus implicating two DCF calculations.[730]  According to Claimants, the losses for each company are adjusted based upon Claimants' effective shareholding for the companies they do not wholly own.[731]

542.    According to Claimants' expert, Greentech, NovEnergia and NIP suffered losses from the incentive tariff reduction ("IT Decrease") under the *Spalma-incentivi* Decree, as follows:[732]

| Regulatory Measure | Greentech's losses | NovEnergia's and NIP's losses |
|---|---|---|
| IT Decrease | EUR 7.4 million | EUR 4.5 million |

543.    Respondent contends that the standard of "full compensation" is not appropriate in the present case and, instead, that damages should be "equitably reduce[d]" for several reasons.[733]  Further, Respondent contends that even if the Tribunal finds that damages are owed, Claimants' assumptions and calculations are incorrect.[734]  In particular, Respondent argues that the concept of fair market value and the DCF method are inappropriate in this case.[735]  Respondent's quantum experts, Professors Laghi, Paoloni, and Gatti made various objections to FTI's damages model, and submitted purported corrections to FTI's valuation.

## 2.  The "Full Compensation" Standard

544.    According to Claimants, since this case does not involve a lawful expropriation under ECT Article 13, the standard of compensation set forth therein

---

[729] Statement of Claim, ¶ 411.

[730] Statement of Claim, ¶ 412.

[731] Statement of Claim, ¶¶ 412-414.

[732] Supplemental Letter of Richard Edwards, 22 June 2017, Schedule 1, Table 1: Revised estimates of the Claimants' losses by each Principal Regulatory Change (EUR millions).  Mr. Edward estimated somewhat higher losses in the Second FTI Quantum Report, Table 5-4, and in the First FTI Quantum Report, Table 5-16.

[733] Statement of Defense, ¶¶ 771-782.

[734] Statement of Defense, ¶¶ 768-769.

[735] Statement of Defense, ¶¶ 785-793.

is not applicable.[736]  Instead, Claimants contend that the full compensation standard, first established in the 1928 *Chorzów Factory* case, applies here.[737]

545.    The PCIJ, in *Chorzów Factory*, stated that "reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[738] According to Claimants, numerous tribunals have applied the full compensation standard to non-expropriatory treaty violations, including breach of the FET and other standards.[739]

546.    Respondent appears to acknowledge the general validity of the principle of full compensation stated in in *Chorzów Factory*, but contends that the phrase, "as far as possible", forming part of the principle, limits its effect and refers "to the discretionary power of international tribunals to assess all the circumstances of the case".[740]  Respondent contends that a number of contextual factors should lead the Tribunal to reduce any damage award to Claimants, stating as follows:

> In the case at stake, the Tribunal should necessarily consider the general and regulatory character of Italian measures, the absence of any fraudulent intent whatsoever, the fundamental public purpose characterizing each of the measures.  Accordingly, it should equitably reduce the amount of compensation (if any) from the full value of damages.[741]

547.    As additional factors which Respondent considers as justifying a reduction in damages, Respondent first suggests that Claimants were contributorily negligent, investing at a time when the regulatory risk was not negligible.[742]  Respondent also contends that if the Tribunal finds that the *Salva Alcoa* decree's extension of the *Conto* II eligibility period is not relevant to Respondent's liability, the

---

[736] Statement of Claim, ¶ 396.

[737] Statement of Claim, ¶¶ 396-397, citing *Case Concerning Factory at Chorzów (Germany v. Poland)*, Judgment 13, PCIJ, 13 September 1928 (1928 PCIJ, Series A. No. 17), CLA-59 ("*Chorzów Factory*").

[738] *Chorzów Factory* at 47.

[739] Statement of Claim, ¶ 400, citing *AAPL v. Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990, ¶¶ 87-88, CLA-62; Reply, ¶ 447, citing *CMS v. Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005, CLA-30; *Gemplus S.A. and Talsud S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/04/4, Award 16 June 2010, ¶ 12-52, CLA-151; *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Annulment Decision, 1 September 2009, § 332, CLA-64; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, ¶ 238, CLA-61.

[740] Statement of Defense, ¶ 773; Rejoinder, ¶ 535.

[741] Statement of Defense, ¶ 780; see also Rejoinder, ¶ 536.

[742] Statement of Defense, ¶¶ 472-473, 782 n. 388;

Tribunal should take *Salva Alcoa* into consideration by offsetting Claimants' losses by the benefits allegedly accruing to Claimants from the *Salva Alcoa*.[743]

548.    The Tribunal agrees with Claimants that, absent an applicable treaty provision on damages, the *Chorzów Factory* "full compensation" standard is the appropriate starting point for quantum assessment.  The Tribunal finds that this general standard applies to FET, umbrella clause, and other treaty violations, and is therefore not limited to cases of expropriation.  The Tribunal does not agree that the words, "as far as possible", in any way suggest that a tribunal should weigh various contextual or equitable factors to award damages below the level of full compensation.  On the contrary, that phrase means that a tribunal must do whatever it can to ensure that full compensation is granted and the injured party is made whole.

### 3.  Assumptions and Method of Quantifying Full Compensation

#### a.  Fair Market Value

549.    The Parties appear not to agree on whether the appropriate standard for assessing full compensation in this case is the diminution in the fair market value of Claimants' investments as a result of Respondent's violation of ECT Article 10(1).

550.    Claimants contend that the diminution in fair market value is the appropriate standard.[744]  Respondent objects to an approach based on fair market value, asserting that it is appropriate only in cases of expropriation or "substantial deprivation of investors' rights", neither of which has occurred here, according to Respondent.[745]  Further, Respondent denies any "consistent practice in international tribunals" on fair market value in relation to FET breaches.[746]

551.    Claimants respond by attributing a simple misunderstanding to Respondent, clarifying that Claimants are not requesting the "full fair market value of their investments", but rather "the *diminution* in the fair market value".[747]  Further, Claimants contend that Respondent fails to offer an alternative measure of damages, noting, however, that Respondent's experts refer to the "quantification

---

[743] Rejoinder, ¶¶ 539-540.

[744] Statement of Claim, ¶ 404.

[745] Statement of Defense, ¶¶ 786-788.

[746] Rejoinder, ¶ 547.

[747] Reply, ¶ 456.

of specific harms" by applying a "lost profits" approach.[748]  Claimants submit that Respondent's approach would result in the same or higher damages than Claimants estimated, as "[i]n general …, the present value of lost profits should equal the diminution in market value calculated using a DCF approach."[749]

552.    The Tribunal is not persuaded that Respondent has proposed a genuine alternative to Claimants' approach that provides a discernible difference.  Further, the Tribunal is not convinced of a lack of consistent practice among international tribunals on whether to apply a standard of diminution in fair market value in cases of FET breach.  Accordingly, the Tribunal finds it appropriate to calculate the diminution in fair market value of the affected investments, as proposed by Claimants.

## b.  DCF Method

553.    A second matter on which the Parties differ is whether DCF is the appropriate method to calculate the diminution in fair market value of Claimants' investments.  According to Claimants, "FTI uses the DCF method to calculate the loss in the value of the Claimants' investments from the future impact (after the Date of Assessment) of the challenged measures ('Future Losses')."[750]

554.    Claimants submit that the DCF method is appropriate because PV plants have a relatively predictable performance, in that all of the electricity produced can be sold, subject to prices that are mostly known and costs that are generally predictable.[751]  Claimants also argue that DCF enables the specific characteristics of certain assets or companies (such as a plant's specific tariff rate or productivity level) and the effect of regulatory changes to be reflected in the value assessment.[752]  Additionally, Claimants assert that the DCF method is widely used outside the litigation context by various parties involved in the solar PV sector.[753]

---

[748] Reply, ¶ 457, citing First Report of Professors Laghi, Paoloni, and Gatti, § 5.1.2., and Second Expert Report of Richard Edwards, 15 December 2016, ¶ 3.9.

[749] Reply, ¶¶ 457-458, citing Second Expert Report of Richard Edwards, 15 December 2016, ¶ 3.10.

[750] Statement of Claim, ¶ 408.

[751] Statement of Claim, ¶ 408; Reply, ¶ 462.

[752] Statement of Claim, ¶ 408.

[753] Statement of Claim, ¶ 408; Reply, ¶ 463.

555.    Respondent first objects to application of the DCF method on the basis that it would grant Claimants excessive remuneration.[754]  According to Respondent, the assessment of damages should reflect the "reduced costs of energy and, more generally, changed circumstances surrounding the PV market and industry."[755]  Also, Respondent asserts that "[i]nvestment tribunals are not willing to follow the DCF method in case of FET violation."[756]

556.    Next, Respondent asserts that DCF is highly speculative, because it "monetizes future cash flows."[757]  Respondent states that "[t]his point is particularly exacerbated in the present case because the future cash flow is constituted, at least with respect to damages caused by the *Spalma-incentivi* Decree, by Government incentives, having – as noted above – a gratuity nature…"[758]

557.    In relation to Respondent's objections, which Claimants contend merely reiterate Respondent's liability arguments instead of assessing quantum, Claimants respond that the *Conto Energia* decrees "promised specific fixed tariffs, not a vague return to be determined retroactively in Italy's discretion" and the incentive tariffs were not "gratuitous", but essential to Claimants' investment decision.[759]  Further, Claimants submit that the decreasing cost of PV technology does not benefit existing PV plants.[760]

558.    Claimants respond to Respondent's assertion about the use of DCF by investment tribunals by noting a recent study by PriceWaterhouseCoopers allegedly showing that international arbitration tribunals have applied DCF and other income-based valuation methods in 69% of cases, and by citing several investment arbitration awards supporting the application of DCF.[761]  Claimants submit that since their plants have been operational for several years, the application of DCF is not speculative or uncertain, as it might be in the case of new investments.[762]

---

[754] Statement of Defense, ¶ 791, citing First Experts' Report of Professors Laghi, Paoloni, and Gatti, § 4.3.2 (stating that DCF may lead to "an overvaluation of assets largely due to the unrealistic estimates of the discount rate, which is too low"); Rejoinder, ¶ 549.

[755] Statement of Defense, ¶ 789.

[756] Statement of Defense, ¶ 789 n. 393.

[757] Statement of Defense, ¶ 790; Rejoinder, ¶ 551.

[758] Statement of Defense, ¶ 790.

[759] Reply, ¶ 461.

[760] Reply, ¶ 461.

[761] Reply, ¶ 464, citing Second Expert Report of Richard Edwards, 15 December 2016, ¶ 3.20.

[762] Reply, ¶ 464.

559.    Claimants also assert that the valuation identified by Respondent's quantum experts as alternatives to income-based approaches – namely, a comparative method, a cost-based method, and an asset-based method[763] – are either highly unsuited for the present case, or are indirectly based on the DCF method.[764]  A comparative valuation method, which assesses a company's value by referring to arms' length transactions in similar companies, is not apt, according to Claimants, to provide accurate results.  First, the compared assets are unlikely to reflect the specific characteristics of Claimants' assets.  Second, it is hard to obtain reliable information on transactions, and obtaining an approximate value of assets would not enable the calculation of a precise valuation.[765]

560.    Regarding the cost-based method proposed by the Respondent, Claimants argue that an asset's replacement value is "not necessarily linked to its profit-generating potential", particularly where, as in the case of solar PV assets, the replacement cost is continuously decreasing.[766]  Additionally, Claimants assert, the cost-based method does not reflect the impact of the challenged measures, since replacement cost is not determined by the tariffs a PV plant is eligible to receive.[767]

561.    Lastly, as for the asset-based method, which determines the value of a business by subtracting total liabilities from total assets, the assets are generally provided in a company's financial statements based on historical costs.  This subjects them to the same issues as the cost-based method described above.  If, however, the asset is valuated based on "fair value", then a different method is needed, typically the DCF method.  In any event, according to Claimants, a second valuation reflecting the Counterfactual Position would still be needed.[768]

562.    The Tribunal, having considered the objections and alternatives raised by Respondent to Claimants' submissions, finds that the DCF method is appropriate and should be applied in the damages assessment in this case.  The Tribunal notes that solar PV facilities, as Claimants argued, have a relatively predictable performance, involve foreseeable costs, and in the present case benefited from incentive tariffs that were set in advance.  The Tribunal is also not persuaded of

---

[763] First Experts' Report of Professors Laghi, Paoloni, and Gatti, § 4.3.1 (stating that DCF may lead to "an overvaluation of assets largely due to the unrealistic estimates of the discount rate, which is too low")

[764] Reply, ¶ 465.

[765] Reply, ¶ 466.

[766] Reply, ¶ 467.

[767] Reply, ¶ 467.

[768] Reply, ¶ 468.

the existence of any general reluctance on the part of international tribunals to apply DCF to breaches such as those found to have occurred in the present case.

### c.   Valuation Date and Discount Rate

563.    Claimants propose to define the valuation date, or date of assessment, as 1 January 2015, which they consider appropriate since it is the effective date of the *Spalma-incentivi* Decree, the "final and most significant measure that Claimants challenge".[769]  Claimants cite an investor-state award that fixed the valuation date as the date of the measure causing "the most serious damages", where various measures occurred over a period of years.[770]  Accordingly, Claimants instructed FTI to quantify damages with the assumption of 1 January 2015 as the valuation date.[771]

564.    Respondent referred to the opinion of their quantum experts, who expressed the view that 1 January 2015 was inappropriate because "[a]rbitrators request to have a complete and exhaustive knowledge of the relevant market developments up to the date of adjudication" and because it results in a backward-looking assessment of historical losses from the disputed measures that took effect before the valuation date.[772]

565.    The Tribunal finds that, for the reasons expressed by Mr. Edwards, 1 January 2015 is the appropriate valuation date.[773]  That date coincides with the effective date of the *Spalma-incentivi* Decree's modification of the incentive tariffs.  Given that the incentive tariff reduction under the *Spalma-incentivi* Decree is the only measure that Claimants have successfully proved to have constituted a violation of the ECT, and that Respondent's quantum experts' criticisms regarding the proposed date of assessment do not relate solely to the *Spalma-incentivi* Decree (but rather relate to the measures for which historical losses would have existed at that date), the Tribunal considers that the valuation date proposed by Claimants is appropriate.

566.    As for the discount rate to be applied, Claimants' expert, Mr. Edwards, assumed a weighted average cost of capital ("WACC") of 5%.[774]  Respondent's quantum experts, Professors Laghi, Paoloni and Gatti, raised several objections to

---

[769] Statement of Claim, ¶ 407.

[770] Reply, ¶ 475 n. 423, citing *Enron Corporation Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶ 405, CLA-17.

[771] Transcript, Day 4, 9:14-15 (Edwards).

[772] First Experts' Report of Professors Laghi, Paoloni, and Gatti, § 5.1.3-5.1.4.

[773] Transcript, Day 4, 9:17-10:1 (Edwards).

[774] Statement of Claim, ¶ 410; Expert Report of Richard Edwards, 4 April 2016, Appendix 4.1.9 – 4.1.10.

the WACC applied by Mr. Edwards, asserting that a range of 6.30% to 7.63% was more appropriate.[775]

567.    Respondent's quantum experts criticize Mr. Edwards' application of a single WACC over the entire time horizon of the investments as inappropriate, arguing that the investments are unlikely to be stable over time, and that Claimants' investments/companies vary too greatly in size and other characteristics.[776] Respondent's experts also argue that basing the risk-free rate on the yield on 10-year bonds issued by the German government at the date of assessment is improper, not only because, they assert, the Italian risk-free rate should be applied but also because an estimate derived from a monthly average – rather than a point in time – is more reliable.[777]  Their other main criticism appears to be that Mr. Edwards underestimated the market-risk premium, which they assert should be between 5.4% and 8.6%.[778]

568.    With respect to the objection to applying the yield on 10-year German government bonds, Mr. Edwards suggests that Professors Laghi, Paoloni and Gatti have merely misunderstood his assumptions.[779]  Mr. Edwards argues that Respondent's experts would, by applying the yield on Italian government bonds, double-count the general macroeconomic risk of an equity investment in Italy, because Mr. Edwards' model already reflects that risk in the country risk premium included in his calculation of the cost of equity.[780]  As regards Mr. Edwards' market risk premium that Respondent's experts assert is too low, Mr. Edwards refers to several authors and academics in support of his 5.0% figure, including the authorities referenced by Respondents' experts.[781]

569.    Upon consideration of the opinions of both sides' quantum experts, the Tribunal finds that the assumptions underlying Mr. Edwards' application of a WACC of 5% are reasonable and appropriate.  The Tribunal is not persuaded by the criticisms by Professors Laghi, Paoloni and Gatti in this regard.

## 4.  Conclusion

---

[775] First Experts' Report of Professors Laghi, Paoloni, and Gatti, § 5.1.8.2.

[776] *Ibid.*

[777] *Ibid.*

[778] *Ibid.*

[779] Second Expert Report of Richard Edwards, ¶ 2.14.

[780] Second Expert Report of Richard Edwards, ¶¶ 4.41-4.42.

[781] Second Expert Report of Richard Edwards, ¶¶ 4.43-4.54.

570.    In the view of the Tribunal majority, damages for Respondent's breach of the FET standard, impairment clause, and umbrella clause under ECT Article 10(1) amount to €11.9 million plus interest, with €7.4 million awarded to Greentech and €4.5 million awarded to NovEnergia.

## 5.  Interest

571.    Claimants request an award of pre-award and post-award compound interest "at the highest lawful rate from the Date of Assessment until the date Italy pays the award in full".[782] They also state that they claim an "international commercial rate", such as 6-month average LIBOR plus 2 percent per year, or annual LIBOR, would be appropriate.[783]

572.    Further, Claimants request that any award of interest require compound interest, arguing that compound interest is the generally accepted standard in international investment arbitrations.[784] Claimants assert, on one hand, that a grant of compound ensures that an injured party is restored fully to the position it would have been in had the breach not occurred, which would not be achieved by simple interest.[785] Further, Claimants assert that compound interest prevents unjust enrichment of the party committing the breach, since it prevents the breaching party to benefit from the equivalent of an "interest-free loan" by paying only simple interest.[786] Finally, Claimants argue that compound interest promotes efficiency by eliminating a possible incentive for a respondent to delay arbitral proceedings.[787]

573.    Respondent submits that pre-award interest should not be granted, and that only post-award interest is appropriate.[788] Respondent submits that since "the very most part of supposed damages concern future events (such as the future incentives to be granted by Italy)", interest running only from the date of the award is appropriate.[789]

---

[782] Statement of Claim, ¶ 416; see also Reply, ¶ 497.

[783] Statement of Claim, ¶ 416, citing *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, ¶ 348, CLA-31; *Enron Corporation Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case. No. ARB/01/3, Award, 22 May 2007, ¶ 452, CLA-17; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, ¶ 250, CLA-61.

[784] Statement of Claim, ¶¶ 417-425.

[785] Statement of Claim, ¶¶ 417, 421-423, 425.

[786] Statement of Claim, ¶ 424.

[787] Statement of Claim, ¶ 422.

[788] Statement of Defense, ¶ 800.

[789] Statement of Defense, ¶ 800.

574.    Regarding the manner of calculating interest, Respondent asserts that only simple interest, if any, should be granted, arguing that it is less speculative, reflects the circumstances of the case, the damages occurred very recently, and Claimants received substantial benefits from the incentive schemes.[790]

575.    Having considered the Parties' opposing positions with respect to pre-award interest, the Tribunal is not persuaded by Respondent's proposal that the Tribunal deny pre-award interest to Claimants.  Although the bulk of the damages flowing from the tariff reduction under the *Spalma-incentivi* Decree may be in the future, the principle of full compensation is incompatible with a decision that deliberately omits compensation for harms occurring in the past simply because they constitute a smaller portion of the damages.

576.    As for the issue of whether simple or compound interest is appropriate, Respondent has failed to supply any authority supporting its view that simple interest would be appropriate in this case.  This contrasts with the extensive set of authorities presented by Claimants, including investor-state arbitration awards and scholarly writings, weighted decisively in favor of awards of compound interest.

577.    Based on the foregoing, a majority of the Tribunal concludes that the damages for which Respondent is liable under this award shall accrue interest starting from the Date of Assessment until the date of this award at the rate of annual LIBOR plus 2% per annum, compounded annually.  Further, a majority of the Tribunal concludes that interest starting from the date of this award until the date when Respondent fully compensates Claimants shall accrue at the rate of annual LIBOR plus 2% per annum, compounded annually.

## E.  Costs

### 1.  Claimants' Submissions on Costs

578.    According to their 25 October 2018 submission, Claimants seek an award of all costs, fees, and expenses incurred in this arbitration, in the total amount of EUR 3,294,535.57.  Claimants provide the below summary in their costs submission, with a detailed breakdown in Annex A thereto.

- Legal fees of King & Spalding in the amount of EUR 1,224,996.50.

- Legal fees of Orrick, Herrington & Sutcliffe in the amount of EUR 614,004.53.

- Expert fees and expenses of FTI Consulting in the amount of EUR 725,702.63.

---

[790] Statement of Defense, ¶¶ 801-803.

- Expert fees and expenses of Prof. Antonio D'Atena in the amount of EUR 50,000.00.

- Claimants' costs and expenses in the amount of EUR 201,831.91.

- Payments to the SCC for registration, advance on costs, and an additional advance on costs in the amount of EUR 478,000.00.

579.    Claimants argue that Article 44 of the SCC Rules endorses the "loser pays" rule whereby an unsuccessful party must reimburse the costs and expenses of the successful party.[791]  Claimants argue that even if they do not prevail in respect of all of their claims, they may still be regarded as the successful party and entitled to a full award of costs.[792]

580.    According to Claimants, the Tribunal should take into account that Respondent repeatedly failed to pay its portion of the arbitration costs, and Claimants had to pay more than eighty percent of the Respondent's advances on costs requested by the SCC.[793]  Claimants also note that Respondent did not pay its share of the court reporter's fees for the evidentiary hearing.[794]

## 2.  Respondent's Submissions on Costs

581.    According to Respondent's 29 October 2018 submission, Respondent incurred a total of EUR 862,485.88 in costs, which Respondent summarized as follows:

- Legal fees in the amount of EUR 664,823.00.

- Expenses and Expert expenses in the amount of EUR 60,000.00.

- Attendance at hearing in the amount of EUR 20,000.00.[795]

582.    Respondent contends that it is entitled to reimbursement for the above costs because it "did not violate the ECT or international law by any means and its regulatory action has always been legitimate and justified by reasons of public policy."[796]

---

[791] Claimants' Submission on Costs, ¶ 4.

[792] *Id.*, ¶ 5 and n. 4, citing *Gemplus S.A., SLP S.A., Gemplus Industrial S.A. de C.V. v. The United Mexican States*, ICSID Case No. ARB(AF)/04/3, Award, 16 June 2010, ¶ 17-20, CLA-151; *PSEG Global et al. v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, ¶ 352, CLA-31.

[793] Claimants' Submission on Costs, ¶ 7.

[794] Claimants' Submission on Costs, Annex A, n. 6.

[795] The Tribunal notes that the sum of the three amounts listed above equals EUR 744,823.00, not EUR 862,485.88 as Respondent asserts.

[796] Respondent's Submission on Costs.

583.   Concerning Respondent's share of the advance on the costs of the arbitration and the share of court reporter's fees that Respondent had not yet paid, on 12 November 2018, after the formal close of proceedings, Respondent wrote to the SCC with members of the Tribunal in copy, requesting to receive an invoice from the SCC which Respondent stated that it would endeavor to pay.  Respondent wrote as follows:

> Upon reception, we will immediately send the invoice for costs by SCC at the time of the award to the relevant Administration for payment, that should include all expenses incurred for the completion of the procedure while, parcelized payment of separate invoices by third parties providing individual services would be more problematic, since that would require prior acceptance, most often following a sort of bid for comparative offers for the same services.

584.   On 13 November 2018, Respondent wrote to clarify that the invoice it was requesting should "represent the last tranche of payment of administrative costs concerning the procedure, up to its closing and the rendering of the award, so that the administrations will definitively settle all outstanding payment requests."

### 3.  Tribunal's Findings on Costs

585.   Pursuant to Article 43 of the SCC Rules, the costs of the arbitration consist of (i) the fees of the arbitral tribunal, (ii) the administrative fee of the SCC, and (iii) the expenses of the arbitral tribunal and the SCC. Unless otherwise agreed by the parties, the arbitral tribunal shall, at the request of a party, apportion the costs of the arbitration between the parties, having regard to the outcome of the case and other relevant circumstances. The parties are jointly and severally liable to the arbitrators and to the SCC for the costs of the arbitration.

586.   On 7 December 2018, the Board of the SCC determined the costs of the arbitration as follows:

- The costs for the chairman of the Tribunal, Professor William W. Park, amount to EUR 152,500 (fees), EUR 5,975 (expenses), and EUR 3,500 (per diem allowance).

- The costs for co-arbitrator, Mr. David R. Haigh, Q.C., amount to EUR 91,500 (fees), EUR 5,293 (expenses), and EUR 5,500 (per diem allowance).

- The costs for co-arbitrator, Professor Giorgio Sacerdoti, amount to EUR 91,500 plus any Value Added Tax due (fees), EUR 2,768 (expenses), and EUR 5,000 (per diem allowance).

- The costs for the administrative secretary, Mr. Jeremy M. Bloomenthal, amount to EUR 24,221 and US$ 2,325 (fees).

- The costs of the SCC amount to EUR 38,600 (administrative fee), EUR 52,257 (Expenses, as reimbursed for the Tribunal), and EUR 11,865 (court reporter's invoice paid on behalf of Respondent).

587.    In a communication to the SCC on 8 December 2018, the Tribunal noted the potential overlap of items related to expenses (included both for SCC and for arbitrators) and the uncertainty of whether Respondent had ever paid its share of the court reporter's fees.  In a communication from the SCC on 9 December 2018, the SCC clarified that Respondent had not paid its share of the court reporter's fee within the deadline of 5 December 2018 set by the SCC.  The SCC also clarified that out of a total amount paid by the parties of EUR 570,000, Claimants had paid EUR 478,000 and Respondent had paid EUR 92,000.  On 12 December, pursuant to further questions from the Tribunal, the SCC indicated that there was a surplus on the account of EUR 46,000, being the Claimants' payment of half of the Respondent's additional advances, later paid by the Respondent, but never reimbursed to Claimants.

588.    The Tribunal has noted that Value Added Tax must be added to the above amounts where applicable.

589.    Additionally, pursuant to Article 44 of the SCC Rules, the arbitral tribunal may in the final award upon the request of a party, order one party to pay any reasonable costs incurred by another party, including costs for legal representation, having regard to the outcome of the case and other relevant circumstances.

590.    The Parties have not agreed on the apportionment of the costs of the arbitration and have instead left this determination to the Tribunal.

591.    In the circumstances of the present case, Claimants have successfully established Respondent's liability with respect to the incentive tariff reduction pursuant to the *Spalma-incentivi* Decree, which was Claimant's largest claim in terms of the amount of damages attributable to it.  Claimants have also prevailed in regard to the quantum of damages attributable to this claim.  Respondent, in turn, was unsuccessful in its main jurisdictional objections and repeated bifurcation requests.

592.    The Tribunal notes that Respondent did not timely pay its share of the advance on costs in the required amounts and that Respondent did not pay its share of the court reporter's fees in accordance with the Tribunal's First Procedural Order and repeated reminders to that effect.  The Tribunal also notes that Respondent has invoked its domestic rules regarding procurement as a reason for not paying

administrative costs.   Finally, the Tribunal notes that Respondent, after close of proceedings, stated that it would make its best efforts to pay its share of the costs.

593.    Accordingly, having regard to the outcome of the case and other relevant circumstances, the Tribunal concludes that it is fair that Respondent should bear the full costs of the arbitration under Article 43 of the SCC Rules, including the amount of EUR 478,000.00 paid by Claimants.  The Tribunal also concludes that fairness requires that Respondent bear one half of the other arbitration-related expense of Claimants, including legal fees, expert fees and costs, and other costs and expenses, in accordance with Article 44 of the SCC Rules (the "other costs"). Those "other costs" amount to EUR 3,294,535.57 less EUR 478,000 for a net amount of EUR 2,816,535.57, of which half would be EUR 1,408,268 when rounded to the nearest Euro.

## VI.    Disposition

594.    For the reasons set forth in this Final Award, the Tribunal decides as follows:

(a) The Tribunal affirms its jurisdiction under the ECT and the SCC Rules with respect to Claimants' claims, except those derived from taxation measures excluded under ECT Article 21, namely the "Robin Hood Tax" and classification of PV facilities as immovable property.

(b) Through incentive tariff reduction provisions of Article 26(3) of the *Spalma-incentivi* Decree (Law Decree No. 91/2014 converted into Law 116/2014), Respondent failed to accord fair and equitable treatment (FET) to Claimants, impaired Claimants' investments by unreasonable measures, and failed to observe obligations entered into with respect to relevant investments of Claimants, in breach of obligations under Article 10(1) of the ECT.  With respect to these findings, the Tribunal reached its decision by a majority.

(c) Respondent did not breach its obligations under Article 10(1) of the ECT by introducing and applying to Claimants' investments the modifications of the minimum guaranteed price scheme, the tariff payment term change, administrative fees and imbalance costs, or by having cancelled the ISTAT inflation adjustment.  With respect to the minimum guaranteed price scheme, the Tribunal reached its decision by a majority.

(d) As compensation for the damages caused to Claimants by the breaches listed above, Respondent shall pay EUR 7.4 million to Greentech and EUR 4.5 million to NovEnergia and NIP, amounting in total to EUR 11.9 million in favor of Claimants.

(e) Respondent shall pay Claimants interest on the sums awarded from 1 January 2015 (the date of the *Spalma-incentivi* Decree) at the annual LIBOR rate plus 2% per annum, compounded annually.

(f) Respondent shall reimburse Claimants for the entirety of their contribution to the costs of the arbitration, in an amount of EUR 478,000.

(g) Respondent shall reimburse Claimants for one half (50%) of their legal and related expenses in the amount of EUR 1,408,268.

Mr. David R. Haigh, Q.C.
Arbitrator

Professor Giorgio Sacerdoti
Arbitrator
*Subject to attached separate opinion*

Professor William W. Park
Presiding Arbitrator

Stockholm, Sweden

Date: 23 December 2018

176