SCC ARBITRATION V (2015/150)

IN THE MATTER OF AN ARBITRATION UNDER THE ENERGY CHARTER TREATY AND THE
ARBITRATION RULES OF THE ARBITRATION INSTITUTE OF THE STOCKHOLM CHAMBER
OF COMMERCE (2010)

In the arbitration proceeding between

**(1) FORESIGHT LUXEMBOURG SOLAR 1 S.À.R.L.**
**(2) FORESIGHT LUXEMBOURG SOLAR 2 S.À.R.L.**
**(3) GREENTECH ENERGY SYSTEMS A/S**
**(4) GWM RENEWABLE ENERGY I S.P.A.**
**(5) GWM RENEWABLE ENERGY II S.P.A.**

Claimants

-and-

**THE KINGDOM OF SPAIN**

Respondent

---

**FINAL AWARD**

---

**Members of the Tribunal**
Dr Michael Moser, Chairperson
Prof Dr Klaus Michael Sachs, Co-Arbitrator
Dr Raúl Emilio Vinuesa, Co-Arbitrator

**Administrative Secretary to the Tribunal**
Mr Paul Barker

**Date**
14 November 2018

## REPRESENTATION OF THE PARTIES

Counsel for Claimants:

**King & Spalding**

Mr. Kenneth R. Fleuriet
Ms. Amy Roebuck Frey

12, cours Albert Ier
75008 Paris
France

Mr. Reginald R Smith
Mr. Kevin D Mohr

1100 Louisiana, Suite 4000
Houston, Texas 77002
USA

**Gómez-Acebo & Pombo**

Ms. Verónica Romaní Sancho
Mr. Gonzalo Ardila Bermejo
Mr. Luis Gil Bueno
Ms. Inés Vázquez García

Satellana, 216
28046 Madrid
Spain

Counsel for Respondent:

**Abogacía General del Estado-Dirección del Servicio Jurídico del Estado**

Don Fernando Irurzun
Don Diego Santacruz
Don Javier Torres
Doña Monica Moraleda
Doña Amaia Rivas
Don Antolín Fernandez
Doña Elena Oñoro
Doña Esther de Benito
Doña Ana María Rodriguez

C/ Ayala nº 4, 28001
Madrid
España

**TABLE OF CONTENTS**

I.      INTRODUCTION AND PARTIES ................................................................. 1
II.     PROCEDURAL HISTORY ........................................................................... 2
     A.     The Request and Constitution of the Tribunal ..................................... 2
     B.     First Procedural Conference ................................................................ 4
     C.     The Parties' Written Submissions and Procedural Applications .......... 4
     D.     The Non-Disputing Party Application ................................................... 5
     E.     The Oral Procedure ............................................................................ 6
     F.     The Post-Hearing Procedure .............................................................. 8
III.    THE ENERGY CHARTER TREATY ......................................................... 10
IV.    FACTUAL BACKGROUND ....................................................................... 11
     A.     Overview .......................................................................................... 11
     B.     Regulatory Framework ..................................................................... 15
           (1)    *Hierarchy of regulatory measures under Spanish law*.............. 15
           (2)    *Evolution of Spain's renewable energy regulatory framework prior to the disputed measures* ................................................... 15
           (i)     *Law 54/1997*.................................................................... 15
           (ii)    *Royal Decree 2818/1998*.................................................. 16
           (iii)   *2000-2010 Renewable Energies Promotion Plan (1999 PER)*. 16
           (iv)   *Royal Decree 436/2004* .................................................. 17
           (v)    *Renewable Energies Plan 2005-2010 (2005 PER)* ................. 18
           (vi)   *Royal Decree 661/2007*.................................................. 18
           (vii)   *Royal Decree 1578/2008*................................................. 22
           (viii)   *Spain's PV capacity following enactment of RD 61/2007*........ 22
     C.     Claimants' Investments .................................................................... 22
           (1)    *Madridejos*................................................................... 23
           (2)    *La Castilleja*................................................................. 24
           (3)    *Fotocampillos* ............................................................... 25
           (4)    *Consequences of GWM's takeover of Greentech* ................... 25
     D.     Spain's tariff deficit and the sustainability of the Spanish electricity system .............................................................................................. 26
     E.     The Disputed Measures.................................................................... 29
           (i)     *RD 1565/2010* ................................................................ 29
           (ii)    *RDL 14/2010* .................................................................. 29
           (iii)   *Law 15/2012*.................................................................. 29
           (iv)   *RDL 2/2013* ................................................................... 30
           (v)    *RDL 9/2013* ................................................................... 30
           (vi)   *Law 24/2013, RD 413/2014 and MO IET/1045/2014* ............... 31
     F.     Claimants' sale of the PV plants ....................................................... 33

G.      Spanish Domestic Court Decisions ................................................... 34

V.      REQUESTS FOR RELIEF ............................................................... 35

A.      Claimants' Request for Relief ............................................. 35

B.      Respondent's Request for Relief ......................................... 35

VI.     JURISDICTION ............................................................................. 36

A.      First Objection: The Intra-EU Objection .............................. 36

(1)   *The Parties' Positions* ......................................... *37*

(2)   *The Tribunal's Analysis* ....................................... *47*

B.      Second Objection: The TVPEE Claim .................................. 53

(1)   *The Parties' Positions* ......................................... *53*

(2)   *The Tribunal's Analysis* ....................................... *58*

VII.    LIABILITY ................................................................................... 60

A.      Overview .......................................................................... 60

B.      Applicable Law ................................................................. 62

C.      Fair and Equitable Treatment under Article 10(1) ECT ........ 62

(1)   *The Parties' Positions* ......................................... *63*

(2)   *The Tribunal's Analysis* ....................................... *83*

D.      The Claimants' Further Alleged Breaches of Article 10(1) ECT ......... 98

(1)   *The Parties' Positions* ......................................... *99*

(2)   *The Tribunal's Analysis* ..................................... *102*

E.      Expropriation under Article 13 ECT ................................... 103

(1)   *The Parties' Positions* ....................................... *103*

(2)   *The Tribunal's Analysis* ..................................... *105*

VIII.   DAMAGES ................................................................................. 107

A.      Applicable Standard ........................................................ 107

B.      Quantum of Compensation .............................................. 109

(1)   *The Parties' Positions* ....................................... *109*

(2)   *The Tribunal's Analysis* ..................................... *119*

IX.     COSTS ...................................................................................... 138

(1)   *The Parties' Positions* ....................................... *138*

(2)   *The Tribunal's Analysis* ..................................... *139*

X.      AWARD ..................................................................................... 141

## I.     INTRODUCTION AND PARTIES

1.     This case concerns a dispute submitted to the Arbitration Institute of the Stockholm Chamber of Commerce (**SCC**) on the basis of the Energy Charter Treaty (**ECT**), which entered into force on 16 April 1998 for Luxembourg, Italy, Denmark and the Kingdom of Spain.

2.     The claimants are:

   (a)     Foresight Luxembourg Solar 1 S.à.r.l. (**Foresight 1**) and Foresight Luxembourg Solar 2 S.à.r.l. (**Foresight 2**), which are private limited liability companies (société à responsabilité limitée) incorporated under the laws of Luxembourg, under the registration numbers B0146200 and B0151603, respectively;[1]

   (b)     GWM Renewable Energy I S.p.A. (**GWM I**), a public company duly incorporated under the laws of Italy and listed in the commercial register in Rome under the registration number RM – 1305360,[2] and GWM Renewable Energy II S.p.A., which was originally incorporated under the laws of Italy and listed in the commercial register in Rome under the registration number RM – 1305410 but has since the filing of the Request for Arbitration changed its form into a limited liability company known as GWM Renewable Energy II S.r.l. (**GWM II**).[3]  On 30 June 2014, GWM I owned 71% of GWM II; and

   (c)     Greentech Energy Systems A/S (**Greentech**), a publicly-listed company duly incorporated under the laws of Denmark and listed in the Danish commercial register under the registration number 36696915.[4] On 30 June 2014, GWM II owned 71% of Greentech.[5]

---

[1]     C-2, Registration Certificate of Foresight Luxembourg Solar 1 S.à.r.l. in the Luxembourg Commercial Register, 14 October 2015; C-3, Registration Certificate of Foresight Luxembourg Solar 2 S.à.r.l. in the Luxembourg Commercial Register, 14 October 2015.  Foresight 1 and Foresight 2 are owned by Foresight European Solar Fund LP, which is a fund of Foresight Group LLP, a London-based investment manager.

[2]     C-5, Registration Certificate of GWM Renewable Energy I S.p.A. in the Rome Commercial Register, 4 May 2015; C-6, Registration Certificate of GWM Renewable Energy II S.p.A. in the Rome Commercial Register, 4 May 2015.

[3]     C-184, GWM Renewable Energy II S.r.l. Entry in the Italian Business Register, 24 May 2016. The change in corporate form was carried out instead of the contemplated dissolution of GWM II.  SoC, ¶ 7, n.6.  GWM I was named as a Claimant in this arbitration to claim as successor-in-interest in the event that GWM II was dissolved. Since that did not occur, GWM I's claims and interests in this arbitration are pursued through GWM II.

[4]     C-4, Registration Certificate of Greentech Energy Systems A/S in the Danish Commercial Register, 13 November 2014.

[5]     Request for Arbitration, 2 November 2015, ¶ 38, Annex A.

        (Foresight 1, Foresight 2, GWM I, GWM II, and Greentech, together: **Claimants**)

3.      The Respondent is the Kingdom of Spain (**Spain** or **Respondent**).

4.      The dispute concerns legislative and regulatory measures enacted by Spain relating to the renewable energy sector in that country.

## II.    PROCEDURAL HISTORY

5.      The Tribunal sees no need to recapitulate the entirety of the correspondence with counsel for the Parties over the course of these proceedings. All procedural orders have been reduced to writing and no useful purpose would be served by reproducing or summarizing them in this section of the Award. The key procedural events in the course of this arbitration are set out below.

### A.    The Request and Constitution of the Tribunal

6.      The Claimants commenced these proceedings by Request for Arbitration dated 2 November 2015.

7.      In their Request for Arbitration, the Claimants invoked Article 26 of the ECT, which provides as follows:

**ARTICLE 26**

**SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY**

(1)    Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2)    If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
    (a)    to the courts or administrative tribunals of the Contracting Party to the dispute;
    (b)    in accordance with any applicable, previously agreed dispute settlement procedure; or
    (c)    in accordance with the following paragraphs of this Article.

(3)    (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

    (b)    (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

2

(ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

(c)    A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).

(4)    In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

[…]

(c)    an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

[…]

(6)    A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

8.    The Claimants confirmed their consent to arbitration under the ECT and submitted their dispute to the Arbitration Institute of the Stockholm Chamber of Commerce (**SCC**) in accordance with Article 26(4)(c) of the ECT.

9.    Accordingly, the procedural rules of this arbitration are the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce, adopted by the SCC and in force as of 1 January 2010 (**SCC Rules**).

10.    On 3 December 2015, the Respondent served the Claimants with its Answer to the Request for Arbitration.

11.    The Tribunal is composed of Dr Michael Moser, appointed by the SCC as Chairperson pursuant to Article 13 of the SCC Rules; Professor Dr Klaus Sachs, appointed by the Claimants; and Dr Raúl Emilio Vinuesa, appointed by the Respondent.

12.    On 15 February 2016, the SCC determined pursuant to Article 20 of the SCC Rules that the seat of the arbitration is Stockholm, Sweden.  In accordance with Article 20(2) of the SCC Rules, the Parties have agreed to hold hearings in Paris, France.

13.    On 5 May 2016, the First Session of the Arbitral Tribunal was held.

14.    On 21 November 2017, Mr Paul Barker was appointed Administrative Secretary to the Tribunal with the agreement of the Parties.

### B.    First Procedural Conference

15.    On 5 May 2016, the First Procedural Conference was convened by the Tribunal with representatives of the Parties via teleconference.

16.    Following the First Procedural Conference, on 10 May 2016, the Chairperson, on behalf of the Tribunal, issued Procedural Order No. 1 (**PO1**), which records inter alia: the general procedural rules for the arbitration; the Procedural Timetable and provisional dates for the hearing; the procedural rules applicable to written submissions, document production, non-expert evidence and expert evidence for all hearings; and the logistical arrangements for the hearing.

17.    PO1 also established that the Parties have agreed that English and Spanish are the procedural languages of the arbitration.

### C.    The Parties' Written Submissions and Procedural Applications

18.    On 30 September 2016, the Claimants submitted their Statement of Claim (**SoC**), accompanied by: (i) the Witness Statements of Mr Alessandro Reitelli (**Reitelli 1st**), Mr Federico Giannandrea (**Giannandrea 1st**), Mr Gabriele Bartolucci (**Bartolucci 1st**), and Mr Jamie Richards (**Richards 1st**), respectively; and (ii) the Expert Reports of Professor Manuel Aragón Reyes (**Aragón 1st**), Dr Boaz Moselle and Dr Dora Grunwald (**Moselle/Grunwald 1st**), Mr Richard Edwards (**Edwards 1st**), and Mr Jaume Margarit (**Margarit 1st**), respectively.

19.    On 17 February 2017, the Respondent submitted its Counter-Memorial on the Merits and Memorial on Jurisdictional Objections (**Counter-Memorial/Jurisdictional Memorial**), accompanied by: (i) the Witness Statement of Mr Carlos Montoya (**Montoya 1st**); and (ii) the Expert Reports of BDO (**BDO 1st**), and of Professors Dr. Pablo Pérez Tremps and Dr. Marcos Váquer Caballería (**Tremps/Váquer 1st**), respectively.

20.    On 21 April 2017, the Parties submitted their respective document production requests to the Tribunal in the form of Redfern Schedules.

21.    On 4 May 2017, the Tribunal issued Procedural Order No. 2 containing the Tribunal's Ruling on Requests for Document Production.

22.    On 2 June 2017, the Parties produced documents as ordered by the Tribunal.

23.    On 21 July 2017, the Claimants submitted their Reply Memorial on the Merits and Counter-Memorial on Jurisdiction (**Reply/Counter-Memorial**), accompanied by: (i) the Second Witness Statements of Mr Alessandro Reitelli (**Reitelli 2nd**), Mr Federico Giannandrea (**Giannandrea 2nd**), Mr Gabriele Bartolucci (**Bartolucci 2nd**), and Mr Jamie Richards (**Richards 2nd**), respectively; and (ii) the Second Expert Reports of Professor Manuel Aragón Reyes (**Aragón 2nd**), Dr Boaz Moselle and Dr Dora Grunwald (**Moselle/Grunwald 2nd**), Mr Richard Edwards (**Edwards 2nd**), and Mr Jaume Margarit (**Margarit 2nd**), respectively.

24.    On 1 November 2017, the Respondent submitted its Rejoinder on the Merits and Reply on Jurisdiction (**Rejoinder/Reply**), accompanied by: (i) the Second Witness Statement of Mr Carlos Montoya (**Montoya 2nd**); and (ii) the Second Expert Reports of BDO (**BDO 2nd**), and of Professors Dr Pablo Pérez Tremps and Dr Marcos Váquer Caballería (**Tremps/Váquer 2nd**), respectively.  In its Rejoinder and Reply, the Respondent withdrew one of the jurisdictional objections made in its Counter-Memorial/Jurisdictional Memorial concerning the Claimants' claim for damages.[6]

25.    On 10 November 2017, the Claimants submitted their Rejoinder on Jurisdiction (**Rejoinder on Jurisdiction**).

26.    On 18 January 2018, the Tribunal issued Procedural Order No. 3 concerning the organization of the oral hearing.

### D.    The Non-Disputing Party Application

27.    On 3 March 2017, the European Commission (**Commission**) applied to the Tribunal for leave to intervene as a non-disputing party (**Commission's Application**).

28.    On 7 March 2017, the Tribunal invited the Parties to comment on the Commission's Application by 17 March 2017.

---

[6]    Rejoinder/Reply, n.1.

29. On 17 March 2017, the Claimants submitted their Response to the Commission's Application and the Respondent submitted its Observations on the Commission's Application, respectively.

30. On 27 March 2017, the Tribunal issued its Decision on the Commission's Application for Leave to Intervene as a Non-Disputing Party, granting the Commission leave to file a written amicus curiae submission and denying the Commission leave to present its views at any oral hearing.

31. On 29 June 2017, the Tribunal granted the Commission's request to file an amicus curiae brief on issues of jurisdiction in the arbitration.

32. On 20 July 2017, the Commission filed its amicus curiae brief (**Amicus Brief**).

### E.     The Oral Procedure

33. On 22-26 January 2018, the Hearing on Jurisdiction and Merits (**Hearing**) was held at the ICC's hearing facility in Paris.

34. The following persons were present at the Hearing:

**Tribunal**

| | |
|---|---|
| Dr. Michael Moser | President |
| Prof. Dr. Klaus Michael Sachs | Co-Arbitrator |
| Dr. Raúl Emilio Vinuesa | Co-Arbitrator |

**Administrative Secretary to the Tribunal**

Mr. Paul Barker

**For the Claimants**

*Counsel:*

| | |
|---|---|
| Mr. Kenneth R. Fleuriet | King & Spalding |
| Mr. Reginald R. Smith | King & Spalding |
| Mr. Kevin D. Mohr | King & Spalding |
| Ms. Héloïse Hervé | King & Spalding |
| Mr. Enrique J. Molina | King & Spalding |
| Ms. Isabel San Martin | King & Spalding |
| Mr. Antoine Weber | King & Spalding |
| Mr. Luis Antonio Gil Bueno | Gómez-Acebo & Pombo |
| Ms. Inés Vázquez García | Gómez-Acebo & Pombo |

Ms. Beatriz Fernández-Miranda de León     Gómez-Acebo & Pombo

*Parties:*
Mr. Jamie Richards                         Foresight Group, Partner
Mr. Federico Giannandrea                   Foresight Group, Partner
Mr. Gabriele Bartolucci                    GWM Group and Greentech Energy
                                           Systems A/S, General Counsel
Mr. Alessandro Reitelli                    Greentech Energy Systems A/S, CEO


*Witnesses:*
Mr. Jamie Richards                         Foresight Group, Partner
Mr. Gabriele Bartolucci                    GWM Group and Greentech Energy
                                           Systems A/S, General Counsel
*Experts:*
Mr. Jaume Margarit                         Independent    Consultant,    formerly
                                           Director of Renewable Energy at the
                                           IDAE
Dr. Manuel Aragón Reyes                    Autonomous    University    of    Madrid
                                           (Professor of Constitutional Law)
Dr. Boaz Moselle                           Cornerstone Research
Dr. Dora Grunwald                          FTI Consulting
Mr. Richard Edwards                        FTI Consulting
Mr. Joel Franks                            FTI Consulting
Ms. Kristina Danilova                      FTI Consulting
Mr. Jose Alzate                            FTI Consulting


## For the Respondent

*Counsel:*
Diego Santacruz Descartín                  Abogacía General del Estado
Antolín Fernández Antuña                   Abogacía General del Estado
Elena Oñoro Sáinz                          Abogacía General del Estado
Mónica Moraleda Saceda                     Abogacía General del Estado
Yago Fernández Badía                       Abogacía General del Estado
Patricia Iglesias Rey                      Abogacía General del Estado


*Parties:*
Raquel Vázquez Meco                        Instituto para la Diversificación y Ahorro
                                           Energético
*Witness:*
Carlos Montoya Rasero                      Instituto para la Diversificación y Ahorro
                                           Energético

*Experts:*
Professor Dr. Pablo Pérez Tremps           Universidad Carlos III de Madrid
Professor Dr. Marcos Váquer Caballería     Universidad Carlos III de Madrid

| | |
|---|---|
| Eduardo Pérez Ruíz | BDO |
| Javier Espel | BDO |
| David Mitchell | BDO |
| Susan Blower | BDO |
| Manuel Alejandro Vargas | BDO |

35.    The following persons were examined during the Hearing:

| | |
|---|---|
| Mr. Jamie Richards | Foresight Group, Partner |
| Mr. Gabriele Bartolucci | GWM Group and Greentech Energy Systems A/S, General Counsel |
| Mr. Jaume Margarit | Independent Consultant, formerly Director of Renewable Energy at the IDAE |
| Dr. Manuel Aragón Reyes | Autonomous University of Madrid (Professor of Constitutional Law) |
| Dr. Boaz Moselle | Cornerstone Research |
| Dr. Dora Grunwald | FTI Consulting |
| Mr. Richard Edwards | FTI Consulting |
| Mr. Carlos Montoya Rasero | Instituto para la Diversificación y Ahorro Energético |
| Professor Dr. Pablo Pérez Tremps | Universidad Carlos III de Madrid |
| Professor Dr. Marcos Váquer Caballería | Universidad Carlos III de Madrid |
| Mr. Eduardo Pérez Ruíz | BDO |
| Mr. David Mitchell | BDO |

36.    On 6 April 2018, the Claimant submitted the Hearing transcripts with corrections agreed by the Parties.

**F.    The Post-Hearing Procedure**

37.    On the final day of the Hearing, the Tribunal directed that the Parties simultaneously exchange post-hearing briefs on 18 May 2018 and reply post-hearing briefs on 8 June 2018.  The Tribunal further directed the Parties to simultaneously exchange costs submissions on 22 June 2018.

38.    On 2 February 2018, further to discussions between the Parties and the Tribunal at the conclusion of the Hearing on 26 January 2018, the Claimants made an application to the Tribunal in respect of (i) calculations requested of BDO during cross examination at the Hearing; and (ii) new calculations submitted in slide 36 of BDO's presentation at the Hearing.  On 9 February 2018, the Respondent submitted comments on the Claimants' application, in

which the Respondent raised objections to the Claimants' requests. On 14 February 2018, the Tribunal directed the Respondent to provide the Claimant with the information and calculations requested but denied the Claimants' request that BDO slide 36 be excluded from the record.

39.    On 5 April 2018, the Respondent wrote to the Tribunal requesting that the final judgment of the Court of Justice of the European Union in *Slowakische Republik v Achmea* BV dated 6 March 2018 (**Achmea**) be entered into the record and that the Parties be permitted to make comments on the judgment in their post-hearing brief.[7]  On 12 April 2018, the Claimants wrote to the Tribunal confirming their agreement to enter the *Achmea* judgment into the record on condition that the recent ECT award in *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain* (**Novenergia**) also be entered into the record.[8]  On 18 April 2018, the Tribunal admitted the new cases into the record.

40.    On 18 May 2018, the Parties exchanged post-hearing briefs (**Claimants' PHB** and **Respondent's PHB**, respectively).  The Respondent also submitted BDO's responses to the Claimants' questions pursuant to the Tribunal's order of 14 February 2018 (**Supplemental BDO Report**).  In their cover letter submitting their post-hearing brief, the Claimants notified the Tribunal that the award in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (**Masdar**), which addresses the *Achmea* judgment, had been made public earlier that same day.[9]  The Claimants stated their intention to address the *Masdar* award in their reply post-hearing brief.

41.    On 13 June 2018, the Parties exchanged reply post-hearing briefs (**Claimants' Reply PHB** and **Respondent's Reply PHB**, respectively).

42.    On 14 June 2018, the Respondent wrote to the Tribunal to complain that the Claimants' submissions in their reply post-hearing brief on the *Masdar* award amounted to "ambush" in violation of PO1.  On 19 June 2018, the Claimants wrote to the Tribunal, pointing out inter alia that they had in their cover letter of 18 May 2018 given the Respondent notice of their intention to address the *Masdar* award.  On 22 June 2018, the Tribunal wrote to the Parties stating that

---

[7]    CL-184/RL-96, European Court of Justice (Grand Chamber), *Slowakische Republik v. Achmea B.V.*, ECJ Case C-284/16, Preliminary Ruling, 6 Mar. 2018.

[8]    CL-185, *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award.

[9]    CL-189, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award.

the *Masdar* award is admitted into the record and granting the Respondent until 25 June 2018 to submit brief comments on the *Masdar* award.

43.     On 21 June 2018, the Respondent wrote to the Tribunal alleging that the Claimants had violated PO1 by disclosing information regarding the Respondent's document production in this arbitration to the law firm Allen & Overy, who act as counsel for investors in other renewables arbitrations against Spain.  On 26 June 2018, the Claimants wrote to the Tribunal to deny that they had violated PO1 or any other applicable rule.  On 28 June 2018, the Tribunal wrote to the Parties stating that it had noted the points advanced and had decided to make no order.

44.     On 25 June 2018, the Respondent submitted its Comments on the *Masdar* award.

45.     On 27 June 2018, the Parties submitted their costs submissions to the Tribunal.

46.     On 27 June 2018, the Respondent wrote to the Tribunal requesting that the Claimants provide additional information as to their costs submission.

47.     On 6 July 2018, the Claimants wrote to the Tribunal stating that they had provided the necessary information in relation to their legal fees and requesting that the Tribunal deny the Respondent's request of 27 June 2018.

48.     On 13 July 2018, the Tribunal wrote to the Parties stating that the issue of costs would be dealt with in the Final Award.  The Tribunal declined to make any further order at that time.

49.     On 19 October 2018, the Tribunal declared the proceeding closed.

## III.    THE ENERGY CHARTER TREATY

50.     The ECT was signed in December 1994 and entered into force in April 1998. The ECT has been signed or acceded to by fifty-two states (including Luxembourg, Italy, Denmark and Spain), the European Union (**EU**) and Euratom.

51.     The Energy Charter Secretariat's Guide summarizes the ECT's purpose in the following way:

> According to Article 2 of the ECT, the purpose of the Treaty is to establish a legal framework in order to promote long-term cooperation in the energy field,

10

based on complementarities and mutual benefits, in accordance with the objectives and principles of the Energy Charter. It is a milestone in international energy cooperation. By creating a stable, comprehensive and nondiscriminatory legal foundation for cross-border energy relations, the ECT reduces political risks associated with economic activities in transition economies. It creates an economic alliance between countries with different cultural, economic and legal backgrounds, but all united in their commitment to achieve the following common goals:

- To provide open energy markets, and to secure and diversify energy supply;
- To stimulate cross-border investment and trade in the energy sector;
- To assist countries in economic transition in the development of their energy strategies and of an appropriate institutional and legal framework for energy, and in the improvement and modernisation of their energy industries.[10]

## IV. FACTUAL BACKGROUND

52. The Tribunal will begin by summarizing the factual background to this dispute, including the applicable Spanish legal framework, the Claimants' investments in Spain, and the disputed measures.

### A. Overview

53. The Claimants' claims concern certain legislative and regulatory measures introduced by Spain since 2007 to support investment in renewable electricity generation. The measures were intended to enable Spain to meet national and EU level targets for electricity generation from renewable energy. In particular, Directive 2001/77/EC of the European Parliament and Council of 27 September 2001 (**Directive 2001/77/EC**) set Spain an indicative target for electricity energy generation from renewables at 29.4% of total electricity consumption by 2010.[11] Pursuant to Directive 2009/28/EC of the European Parliament and Council of 23 April 2009 (**Directive 2009/20/EC**), this indicative target was later replaced by a mandatory target for renewable energy consumption set at 20% of Spain's total energy consumption by 2020.[12] These EU directives were transposed by Spain into its domestic law; as a Member State of the EU, Spanish law is rooted in fundamental criteria established by EU law.[13] The

---

[10]   CL-171, Energy Charter Secretariat, the Energy Charter Treaty – A Reader's Guide, 2002, p.9.
[11]   C-57, Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market ("Directive 2001/77/EC").
[12]   RL-17, Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and repealing Directives 2001/77/CE and 2003/30/EC.
[13]   Tr. Day 2, 117:22-23.

broader context of the EU's and Spain's measures was the international effort to reduce greenhouse gas emissions, most notably in the Kyoto Protocol 1997, pursuant to which signatories, including the EU and Spain, accepted ambitious targets for emissions reductions.

54.    Between 8 May 2009 and 7 May 2010,[14] the Claimants acquired Spanish companies that operated three solar photovoltaic (**PV**) facilities registered under Royal Decree 661/2007 (**RD 661/2007**),[15] a renewables support scheme enacted by Spain to achieve its renewable electricity target under Directive 2001/77/EC.  Two salient features of RD 661/2007 were that it established fixed Feed in Tariffs (**FiTs**) for qualifying PV facilities – ostensibly to be paid for the lifetime of the facility – and priority of access and dispatch to the electricity grid.

55.    It is important to appreciate that RD 661/2007 was a regulatory instrument and therefore subordinate as a matter of Spanish law to the relevant Act of Parliament (**Law**) that established the general regulatory framework for the Spanish electricity system (**SES**).  That was Law 54/1997, which liberalized the SES and updated the parameters of Spain's legal regime, both for conventional energy generation (termed the "**Ordinary Regime**") and for renewable energy production and supply (the "**Special Regime**").[16]  The RD 661/2007 support scheme operated within the broad framework established by Law 54/1997.  Of particular relevance to the Parties' dispute, Law 54/1997 also provided that investors under the Special Regime would receive a "reasonable rate[] of return with regard to the cost of money in the capital markets".[17]  However, Law 54/1997 did not specify what this reasonable rate of return should be.  That was left to regulations like RD 661/2007.

56.    RD 661/2007 succeeded in attracting significant investment in renewables; within just four months of its enactment, installed PV capacity reached 85% of the target set by RD 661/2007.[18]  But RD 661/2007 also coincided with – and indeed exacerbated – a widening gap between regulated electricity access charges (i.e. the amount retail customers paid for their electricity) and the

---

[14]    Claimants' Opening Presentation, slide 85.
[15]    C-98, Royal Decree 661/2007 of 25 May 2007, regulating the activity of electrical energy generation by means of renewable facilities ("RD 661/2007").
[16]    C-66, Law 54/1997, of 27 November 1997, on the Electric Power Sector ("Law 54/1997").
[17]    C-66, Law 54/1997, Art. 30.4.
[18]    SoC, ¶ 191.

regulated costs of the SES (which includes the costs of renewables support schemes). This shortfall is known as the "tariff deficit".

57. The Claimants take issue with a number of measures that were subsequently enacted by Spain, purportedly to eliminate the tariff deficit. The Claimants contend that these measures materially reduced the returns on their investments. In particular, between 2010 and 2013, Spain modified the incentives available to PV facilities registered under RD 661/2007. Then, in 2013-2014, Spain repealed and replaced RD 661/2007 with what the Claimants term the "New Regulatory Regime", which inter alia replaced the fixed FiTs for PV facilities with remuneration designed to achieve a "reasonable rate of return" for a "standard plant" of the relevant type, as defined by Spain. The "reasonable rate of return" was initially set by Spain at the ten-year average of Spanish Government bond yields plus 3%, which was 7.398% (pre-tax). However, the Respondent contends that the New Regulatory Regime in fact maintained the essential characteristics of RD 661/2007, including the payment of a "subsidy" and priority of access to the grid.

58. The key measures at issue in this arbitration are summarized in the following table:

|  | Legislation | Measure | Date |
|---|---|---|---|
| **Renewables support scheme in which Claimants' PV facilities were enrolled** | RD 661/2007[19] | For registered PV facilities, established inter alia: (i) fixed FiTs that were not linked to market rate movements; (ii) targets for installed PV capacity; and (iii) priority grid access.<br><br>Closed to new entrants on 29 September 2008.<br><br>RD 661/2007 was replaced on 26 September 2008 by **RD 1578/2008**, which established new, lower FiTs and annual capacity quotas for PV facilities registered after 29 September 2008. | 25 May 2007 |
| **Disputed measures modifying incentives under** | RD 1565/2010[20] | Duration of RD 661/2007 FiTs reduced from lifetime of PV facility to 25 years (subsequently extended to 28 years by RDL 14/2010 and to 30 years by Law 2/2011). | 19 November 2010 |

---

[19]   C-66, Law 54/1997.
[20]   C-129, Royal Decree 1565/2010, of 19 November 2010, regulating and amending certain aspects related to the activity of generating electricity under the special regime ("RD 1565/2010").

| RD 661/2007 (and under RD 1578/2008) | RDL 14/2010[21] | Imposes cap on annual production (operating hours) for which PV facilities entitled to receive FiTs.<br><br>Introduces access toll of 0.5 €/MWh for electricity fed into the grid. | 23 December 2010 |
|---|---|---|---|
| | Law 15/2012[22] | Introduction of 7% tax on electricity generation revenue. | 27 December 2012 |
| | RDL 2/2013[23] | Changes inflation index used to update FiTs annually from the general CPI to CPI at constant taxes excluding unprocessed food and energy products. | 1 February 2013 |
| Disputed measures repealing and replacing RD 661/2007 (and RD 1578/2008) support scheme<br><br>Described by Claimants as the "New Regulatory Regime" | RDL 9/2013[24] | Repeals the RD 661/2007 and RD 1578/2008 support schemes.<br><br>Nevertheless, RD 661/2007 and RD 1578/2008 remuneration schemes remained in place pending elaboration in June 2014 of the "New Regulatory Regime" (see RD 413/2014 and MO 1045/2014 below).<br><br>However, all remuneration paid between July 2013 and June 2014 under RD 661/2007 and RD 1578/2010 schemes was made subject to claw-back under the New Regulatory Regime. | 12 July 2013 |
| | Law 24/2013[25] | Reforms regulatory framework. Explicitly recognizes the "principle of economic sustainability" of the SES. | 26 December 2013 |
| | RD 413/2014; MO 1045/2014[26] | Replaces FiT for PV facilities registered under RD 661/2007 and RD 1578/2008 with remuneration at a "reasonable rate of return" applicable to the relevant type of "standard plant", based on the 10-year average of Spanish Government bond yields plus 3% (initially, 7.398% pre-tax). | 6 June 2014; 16 June 2014 |

60.    The background facts pertaining to these measures, as well as the broader regulatory framework, are discussed in greater specificity under sub-sections B and D below.

---

[21]    C-102, Royal Decree-Law 14/2010, of 23 December 2010, establishing urgent measures for the correction of the tariff deficit of the electricity sector ("RDL 14/2010").

[22]    C-40, Law 15/2012, of 27 December 2012, on tax measures for energy sustainability ("Law 15/2012").

[23]    C-83, Royal Decree-Law 2/2013, of 1 February 2013, on urgent measures in the electricity system and in the financial sector ("RDL 2/2013").

[24]    C-91, Royal Decree-Law 9/2013, of 12 July 2013, enacting urgent measures to ensure the financial stability of the electricity system ("RDL 9/2013").

[25]    C-180, Law 24/2013, of 26 December 2013, on the Electric Sector ("Law 24/2013").

[26]    C-90, Royal Decree 413/2014, of 6 June 2014, regulating the activity of electrical power generation by means of renewable energy, cogeneration and waste sources ("RD 413/2014"); C-179, Ministerial Order IET/1045/2014, of 16 June 2014, approving the remuneration parameters of standard facilities applicable to certain facilities of electrical power generation by means of renewable energy, cogeneration and waste sources ("MO 1045").

### B.    Regulatory Framework

#### (1)    Hierarchy of regulatory measures under Spanish law

61.    The SES is regulated under Spanish law by the following instruments, in order of hierarchy: (i) the Spanish Constitution of 1978; (ii) Acts of the Spanish Parliament; (iii) Royal Decree-Laws, which have the force of an Act and may be enacted by the Government in situations of extraordinary need or urgency; (iv) Royal Decrees, which are regulations issued by the Government pursuant to powers granted by an Act; (v) Ministerial Orders, which are issued by ministerial departments (such as the Ministry of Industry, Energy and Tourism) to implement Royal Decrees; and (vi) Resolutions, which are issued by Government to also implement Royal Decrees.  Finally, in the context of the SES, there are renewable energy plans, which are regulatory standard-setting instruments drawn up by the regulator.

#### (2)    Evolution of Spain's renewable energy regulatory framework prior to the disputed measures

62.    Spain has a longstanding commitment to the promotion of renewable energy. In 1994, Spain enacted RD 2366/1994 creating the Special Regime, which is the name given to Spain's legal framework for qualifying renewable energy facilities.[27]

63.    The Tribunal summarizes below the relevant key legislative and regulatory developments that occurred prior to the disputed measures, from Spain's liberalization of its electricity market in late 1997 to the enactment of the RD 661/2007 support scheme under which the Claimants' PV facilities were registered.

#### (i)    Law 54/1997

64.    In November 1997, Spain enacted Law 54/1997 to transpose into Spanish law EU Directive 96/92/EC on the internal market in electricity.  To that end, Law 54/1997 liberalized Spain's electricity sector – particularly energy generation (production) and supply – and also committed Spain to produce 12% of its total energy demand from renewables by 2010.[28]

---

[27]    R-55, Royal Decree 2366/1994, 9 December 1994.
[28]    C-66, Law 54/1997, Preamble ¶¶ 4-5, 16th Transitory Provision.

65.     Law 54/1997 established the essential characteristics of Spain's regulatory framework governing the electricity sector, as well as the limits of the regulatory power of the Spanish government.[29]  Notwithstanding the creation of a free market system, Law 54/1997 provided that incentives would be offered in order to promote investment in renewable energy facilities. Specifically, Law 54/1997 provided that remuneration of electricity producers under the Special Regime would be supplemented by a "premium" that would be established in subsequent regulations so as to achieve "reasonable rates of return with regard to the cost of money in the capital market."[30]

66.     In order to achieve its 12% renewables target by 2010, Law 54/1997 called for the drawing up of a renewable energies promotion plan that would be taken into account in the setting of the premiums for renewable energy producers.[31]

(ii)     Royal Decree 2818/1998

67.     In December 1998, Spain enacted Royal Decree 2818/1998 to implement the specific parameters of Law 54/1997 applicable to the Special Regime, including a remuneration framework whereby renewable electricity producers could elect to receive either: (i) a FiT for each kWh produced; (ii) or a premium to the market price of the energy produced.[32]  RD 2818/1998 did not prescribe specific levels of remuneration for an individual facility.

(iii)     2000-2010 Renewable Energies Promotion Plan (1999 PER)

68.     Pursuant to the requirement under Law 54/1997, in December 1999 a renewable energies promotion plan for the 2000-2010 period (**1999 PER**) was prepared by the Institute for Energy Diversification and Savings (**IDAE**), an agency of the Spanish government.  The plan proposed that a remuneration scheme be developed through regulations in order to meet the EU's indicative target that Spain produce 12% of its total energy demand from renewables by 2010.  On 30 December 1999, the plan was approved by Spain's Council of Ministers.

---

[29]     Hr. Day 1, 157:14-18.
[30]     C-66, Law 54/1997, Art. 30.4.
[31]     C-66, Law 54/1997, 16th Transitory Provision.
[32]     C-67, Royal Decree 2818/1998.

(iv)     Royal Decree 436/2004

69.     On 27 September 2001, the European Parliament and Council adopted Directive 2001/77/EC, which set Spain an indicative target for renewable energy generation at 29.4% of total electricity consumption by 2010.

70.     However, the RD 2818/1998 support scheme failed to attract a sufficient level of investment in renewable energy for Spain to meet its targets.  By 2004, Spain had achieved only 56.2% of its 2006 objective for renewable electricity production, and only 28.4% of its target for 2010.[33]

71.     In February 2003, the Renewable Energies' Producers Association (**APPA**), which represents over 500 Spanish renewable energy companies, published a report that recommended improvements to the RD 2818/1998 support scheme. APPA recommended that: (i) incentives for certain technologies, including solar PV, be increased in order to guarantee an adequate return on investment; and (ii) incentives be explicitly guaranteed for the life of the investment.[34]

72.     In April 2003, Spain's energy regulator, the National Energy Commission (**CNE**), likewise concluded that it was necessary to increase remuneration and also to guarantee incentives throughout the facilities' useful life, in order to encourage sufficient investment and hit Spain's renewables targets.[35]

73.     In March 2004, Spain enacted RD 436/2004, a new renewables support scheme that addressed several perceived shortcomings of RD 2818/1998.  The purpose of RD 436/2004 as articulated in its preamble was to provide "security and stability" and to establish a "long-lasting, objective, transparent regulatory framework" in order to promote investment in renewable electricity generation.[36]

74.     Like RD 2818/1998, RD 436/2004 gave eligible electricity producers the option to elect to receive either: (i) a FiT; or (ii) the market price plus an incentive for

---

[33]     C-74, Kingdom of Spain, Report on the Achievement of National Indicative Targets for Renewable Electricity Consumption in 2010 ("2005 Progress Report"), March 2006.

[34]     C-70, Renewable Energy Producers Association (APPA), Report Introduction to Remuneration Schemes of Renewable Energy in the EU. The Vision of Producers, February 2003.

[35]     C-63, Luis Jesús Sánchez de Tembleque and Gonzalo Sáenz de Miera, The Regulation of Renewable Energy, in Treaty for the Electricity Sector, 2009; C-232, CNE Report: Proposed methodology for the revision of premiums and prices under the special regime, 2 April 2003.

[36]     C-75, Royal Decree 436/2004, Preamble, Eighth Paragraph.

participating in the market and premium.[37]  RD 436/2004 also continued to guarantee that producers would receive a "reasonable remuneration".[38]

75.    In order to incentivize investors, RD 436/2004 revised the rate scale for FiTs, premiums and incentives.  For example, PV facilities of 100kW or smaller received an almost 95% increase in FiT rates.[39]  However, the FiT rates were not fixed but were set as percentages of the "Average Electricity Tariff" (**AET**), which was an index determined annually by Spain based on a complex set of variables affecting the cost of the electricity system, including the cost of the renewables support scheme itself.  Spain only subsequently realised that the linking of the FiTs to this index created a "feedback loop" whereby growth in renewable energy generation led to an increase in the AET, which in turn led to an increase in the FiTs even if the cost per kWh produced did not increase.[40]

76.    Notably, RD 436/2004 introduced a provision that any future revisions to the FiTs, premiums and incentives would not apply to facilities already registered and in operation under the support scheme.[41]

(v)    Renewable Energies Plan 2005-2010 (2005 PER)

77.    In August 2005, a Renewable Energies Plan for the period 2005-2010 (**2005 PER**) prepared by IDAE was approved by the Council of Ministers.  The 2005 PER revised the 1999 PER and acknowledged the insufficient growth of Spain's renewable electricity capability.[42]  In order to meet Spain's target of 29.4% share of renewables in total electricity consumption by 2010 in light of a projected growth in energy demand, the 2005 PER increased Spain's installed PV capacity target for 2010 from 144 MW to 400 MW.[43]  The 2005 PER also projected that PV electricity generation would require €1.875 billion in total capital investment, of which amount nearly 80% would be debt financed.[44]

(vi)    Royal Decree 661/2007

78.    Like RD 2818/1998 before it, RD 436/2004 failed to attract the level of investment in renewable energy necessary for Spain to meet its 2010 targets.

---

[37]    C-75, Royal Decree 436/2004, Art. 22.
[38]    C-75, Royal Decree 436/2004, Preamble, Seventh Paragraph.
[39]    SoC, ¶ 137.
[40]    Moselle/Grunwald 2nd, ¶ 6.9; Moselle/Grunwald Presentation, slide 22.
[41]    C-75, Royal Decree 436/2004, Arts. 40.2, 40.3.
[42]    C-84, Summary of Renewable Energy Plan 2005-2010 ("2005 PER Summary"), August 2005.
[43]    This was subsequently revised down to 371 MW in RD 661/2007.
[44]    C-84, Summary of Renewable Energy Plan 2005-2010 ("2005 PER Summary"), pp. 56-58.

The shortfall in PV investment was pronounced; whereas the 2005 PER targeted a PV capacity of 400 MW by 2010, Spain's installed PV capacity as of 2006 was 84 MW.[45]

79.    Consequently, Spain decided to reform the RD 436/2004 support scheme.  In February 2007, the CNE published a report on the draft regulations that would later become RD 661/2007.  The CNE observed inter alia that economic incentives were necessary to promote the development of renewables and that "[i]n certain cases, differentiated incentives are justified that lead to higher returns, so that the objectives set in the planning can be achieved."[46]  The CNE also called for the draft regulations to be amended to include "sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the entire life of the facilities…."[47]

80.    On 27 May 2007, Spain enacted the new regulation, RD 661/2007, which repealed and replaced RD 436/2004.

81.    RD 661/2007 introduced several changes to the incentives available to qualifying renewable electricity producers under the Law 54/1997 general regulatory framework.  Unlike the RD 2818/1998 and RD 436/2004 support schemes, PV facilities registered under RD 661/2007 were entitled only to a FiT and were not given the option to receive a premium.  But whereas incentives under RD 436/2004 were based on the AET index – which was determined annually by Spain – RD 661/2007 fixed the FiT in absolute numbers (c€/kWh), based on the facility's total electricity generation capacity, for the whole life of a facility.

82.    Annex V of RD 661/2007 contains the following table setting out the FITs offered to qualifying PV facilities ("Category b 1.1"), sub-grouped by power output of the facility.

---

[45]    C-80, Kingdom of Spain, Report of the Kingdom of Spain on the Degree of Fulfillment of the National Indicative Targets for Renewable Electricity Consumption in 2010 – Year 2006 ("2006 Progress Report"), pp. 12, 17.

[46]    C-61, CNE Report 3/2007, 17 February 2007.

[47]    C-61, CNE Report 3/2007, 17 February 2007.

Tabla 3

| Grupo | Subgrupo | Potencia | Plazo | Tarifa regulada c€/kWh |
|---|---|---|---|---|
| b.1 | b.1.1 | P≤100 kW | primeros 25 años | 44,0381 |
| | | | a partir de entonces | 35,2305 |
| | | 100 kW<P≤10 MW | primeros 25 años | 41,7500 |
| | | | a partir de entonces | 33,4000 |
| | | 10<P≤50 MW | primeros 25 años | 22,9764 |
| | | | a partir de entonces | 18,3811 |

83.    For each sub-group, there is a fixed FiT that applies for the first 25 years of a PV facility's operations which is then reduced to 80% of the original tariff for the remaining life of the facility.   The fixed FiT would be adjusted annually for inflation based on the Consumer Price Index.[48]  RD 661/2007 does not explain the methodology by which the fixed FiTs are arrived at.

84.    For PV facilities with a power output of between 100 kW and 10 MW, the fixed FiT rate in RD 661/2007 represented an almost 82% increase as compared to the corresponding FiT under RD 436/2004.[49]  However, the value of FiTs for PV facilities producing less than 100 kW or more than 10 MW of power remained virtually unchanged under RD 661/2007.[50]

85.    RD 661/2007 also granted renewable producers, including PV facilities, priority of dispatch and grid access, meaning that they could sell and transmit electricity whenever it was produced.[51]

86.    RD 661/2007 provided that Spain would review the fixed FiT rates in 2010 and every four years thereafter.  Like RD 436/2004, RD 661/2007 required that any revisions to the FiT rates would guarantee a reasonable rate of return by reference to the cost of money in the capital markets and would not apply to facilities already enrolled in the support scheme.  In full, the relevant provision of RD 661/2007, Article 44.3, reads as follows:

> During the year 2010, [in view] of the results of the monitoring reports on the degree of fulfillment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and

---

[48]    C-98, RD 661/2007, Arts. 29, 44.1.
[49]    C-99, Press Release for RD 661/2007, 17 May 2005; Margarit 1st, p.26.
[50]    Margarit 1st, p.26.
[51]    C-98, RD 661/2007, Article 17(e), Annex XI.3.

20

lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the [S]pecial [R]egime in covering the demand, and its impact on the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.

The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.[52]

87.    Likewise, in a press announcement on RD 661/2007, Spain stated that:

The tariff revisions carried out in the future will not affect those installations already operating. This guarantee affords legal safety to the producer, providing stability to the sector and promoting its development. The new regulations will not be of a retroactive nature.[53]

88.    In order to receive the fixed FIT under the RD 661/2007 support scheme, PV facilities were required to obtain a "Final Commissioning Certificate" and be registered in the regional Administrative Registry for Special Regime Generation Facilities (**RAIPRE**).[54]

89.    Although the Respondent denies that it engaged in a campaign to attract foreign investment in renewable facilities covered by RD 661/2007, the Respondent did in fact conduct a number of roadshows for investors around the world in which its representatives promoted the stability and potential profitability of the RD 661/2007 support scheme.[55]

90.    In any event, private investors responded enthusiastically to RD 661/2007. In September 2007, four months after enactment, Spain hit 85% of the target set

---

[52]    C-98, RD 661/2007, Art. 44.3.
[53]    C-99, Press Release RD 661/2007.
[54]    C-98, RD 661/2007, Art. 14, 17(c).
[55]    C-124, INTERES Invest in Spain, Press Release, Major Spanish Presence at CIFIT, 9 September 2007; C-125, INTERES Invest in Spain, Press Release, INTERES Unveils the Opportunities Available in the Spanish Wind Power Sector for Foreign Investors at the Husumwind (Germany) International Trade Fair," 18 September 2007; C-126, Manuela García (INVEST IN SPAIN, Investor Service Manager), Presentation, Opportunities in the Renewable Energy in Spain, presented in Graz (Austria), 15 November 2007, slide 2; C-107, Javier Peón Torre (CNE, Counselor), Presentation, Legal Aspects of Renewable Energy, presented at the "V Edicion del Curso ARIAE de Regulacion Energética," sponsored by ARIAE, CNE and Spain's Agency of International Cooperation-Ministry of Foreign Affairs, in Cartagena de Indias (Colombia), 19-23 November 2007; C-127, Carlos Solé and José Miguel Unsión (Directors of the CNE), Presentation, Models for Pricing of Renewable Generation: The International Experience, presented in "Generación Renovable ARESEP" at San José de Costa Rica (Costa Rica), 22 April 2008 (slide 27 "Rates and premiums in force in the implementation: throughout the service life of the installation."); C-128, Carlos Solé Martín (CNE, Electricity Director), Presentation – International Renewable Energy Regulation. The Spanish Case, presented in Eilat (Israel), December 2008.

in RD 661/2007 to have 371 MW of installed PV capacity by 2010.[56]  Reaching this threshold triggered the twelve-month sunset clause under RD 661/2007, pursuant to which RD 661/2007 closed to entrants not registered by 29 September 2008.[57]

### (vii)     Royal Decree 1578/2008

91.     On 26 September 2008, Spain enacted RD 1578/2008, which created a new support scheme for PV facilities that were not registered by the deadline for enrollment under RD 661/2007.[58]  RD 1578/2008 retained the essential features of RD 661/2007 but reduced the FiTs available to PV facilities. RD 1578/2008 did not affect the incentives offered to those PV facilities already registered under RD 661/2007.

### (viii)     Spain's PV capacity following enactment of RD 61/2007

92.     Spain far surpassed the target specified in RD 661/2007, which had been to achieve an installed PV capacity of 371 MW by 2010.  Between 2006 and 2007, Spain's installed PV capacity in fact increased from approximately 167 MW to 690 MW.  By 2008, it had grown to over 3,000 MW.[59]  In 2008, Spain accounted for half of all the solar power installed globally.[60]

93.     By 2010, Spain had achieved an aggregate installed PV capacity of over 3,960 MW.[61]  This meant that renewable energy supplied 13.2% of Spain's total energy consumption and 29.2% of its electricity, close to Spain's 2010 target of 29.4%.[62]

## C.     Claimants' Investments

94.     The Claimants' investments were comprised of three PV plants: (i) Madridejos, an 8 MW PV plant, acquired by Foresight 1 in May 2009; (ii) La Castilleja, a

---

[56]     C-151, Resolution of the General Secretariat Energy Establishing Deadline Under art. 22 of RD 661/2007, 27 September 2007.

[57]     Id.

[58]     C-46, Royal Decree 1578/2008, 26 September 2008, Art 2.

[59]     C-137, IDAE, Report, Evolution of the Electric Power in Renewable Energy – Statistical Report, December 2015.

[60]     C-141, Elisabeth Rosenthal, Press Article, "Solar Industry Learns Lessons in Spanish Sun," The New York Times, 3 August 2010.

[61]     C-137, IDAE, Report, Evolution of the Electric Power in Renewable Energy – Statistical Report, December 2015;

[62]     C-132, Kingdom of Spain (Ministry of Industry, Energy and Tourism, IDAE), Progress report on the promotion and use of energy from renewable sources as established in article 22 of Directive 2009/28/EC – SPAIN (Years 2009 and 2010) ("2009-2010 Progress Report"), at 2.

9.8 MW PV plant, in which Foresight 2 and GMW II jointly invested in March 2010; and (iii) Fotocampillos, a 1.8 MW PV project comprised of eighteen 100 kW plants, in which GWM II invested in May 2010.

95. As discussed further below, in August 2011, GMW II contributed its interests in La Castilleja and Fotocampillos to Greentech and became a parent company of Greentech.[63] As of 30 June 2014, Greentech was a direct owner of the La Castilleja operating company (together with Foresight 2) and the sole direct owner of Fotocampillos. GWM I and GWM II are indirect owners of the La Castilleja and Fotocampillos operating companies through GWM II's shareholding in Greentech.[64]

96. The Spanish operating companies that the Claimants invested in and the PV plants that each company owned as of 30 June 2014 is set out in the following diagram from the First Expert Report of Mr Richard Edwards of FTI:[65]



*(1)    Madridejos*

97. On 28 August 2008, Madridejos received its registration under RD 661/2007.

98. Madridejos was constructed and developed by BP Solar, one of the world's largest solar power companies, and Acacia Instalaciones Fotovoltaicas S.L. (**Acacia**), a Spanish company.  Acacia was owned by Santander Investments

---

[63]    C-188, Contribution Agreement Between GWM Renewable Energy I S.A. and Greentech Energy Systems A/S, 5 May 2011; C-225, Closing Memorandum, 11 August 2011.

[64]    Hr. Day 1, 51:6-8.

[65]    Edwards 1st, Figure 3-2.  The operating companies were: Acacia Instalaciones Fotovoltaicas S.L ("**Acacia**"); Global Litator S.L. ("**Global Litator**"); Fotocampillos 01 to 18 S.L. and Lux Sol Malaga S.L.U. (the "**Fotocampillos Companies**").

S.A. (**Santander**), an investment fund organized within the Spanish Santander Group.

99.    Foresight learned from BP Solar that Santander was looking to sell its interest in the Madridejos project.  Foresight retained PricewaterhouseCoopers (**PwC**) and Landwell Abogados y Asesores Fiscales (**Landwell**) to conduct due diligence of the potential acquisition.  Foresight also developed a valuation model to forecast the project's returns over a 36-year period based on the tariffs under RD 661/2007.  Following this due diligence, Foresight decided to acquire Madridejos.

100.    On 8 May 2009, Foresight I purchased Acacia for over €9.3 million, thereby acquiring 100% of Madridejos.  In their representations and warranties, the sellers guaranteed that "[Acacia] has entered into all the necessary contracts in order to buil[d], exploit and maintain the PV Plant according to…Spanish law, [e]specially…Royal Decree 661/2007, of May 25."[66]

101.    On 20 November 2009, Foresight I transferred its entire Acacia shareholding to its wholly owned Dutch subsidiary, Foresight Netherlands Solar 1 B.V..

> *(2)    La Castilleja*

102.    On 25 September 2008, La Castilleja received its RAIPRE registration under RD 661/2007.

103.    La Castilleja was originally owned by Magtel Redes de Telecomunicaciones S.A.U., a Spanish company.  At the time of the Claimants' acquisition, the facility was operated by La Castilleja Energía S.L.U.

104.    Foresight decided to jointly invest in La Castilleja with GWM II with whom Foresight had become acquainted through its work in Italy.  Foresight and GWM retained PwC, Landwell and Garrigues to conduct due diligence on the project.

105.    The Claimants describe the acquisition process in the following terms:

> On March 18, 2010, Foresight 2 purchased a 49.97225% stake in a Spanish company that would serve as the joint venture with GWM, called Global Litator S.L., while GWM II purchased the remaining 50.03775% interest. The same day, Global Litator S.L. bought La Castilleja Energía S.L.U. Then, on March

---

[66]    C-196, Share Purchase Agreement Between Santander Investment S.A. and Capital Riesgo Global SCR (Sellers) and Foresight Luxembourg Solar 1 S.à.r.l. (Buyer), 8 May 2009, p.109.

26, 2010, La Castilleja Energía S.L.U. exercised the option under its lease agreement to purchase the La Castilleja facility for over €58 million. Thus, as of March 26, 2010, Foresight 2 and GWM jointly owned 100% of La Castilleja through Global Litator S.L.[67]

106.  Foresight's acquisition costs for La Castilleja were approximately €6.35 million and GWM's acquisition costs were approximately €6.3 million.[68]

### (3) Fotocampillos

107.  On 20 May 2008, the Fotocampillos PV project received their RAIPRE registrations.

108.  The Fotocampillos park was developed by a company called Abantia Sol de Málaga S.L., financed with a €12 million loan from the Spanish bank Caja de Ahorros del Mediterráneo.[69]

109.  The Claimants describe the acquisition process in the following terms:

> To carry out the acquisition, on May 3, 2010, the subsidiary of what is now Claimant GWM II – GWM Renewable Energy S.p.A. – made a capital contribution of over €10 million to Lux Energía, acquiring a 61.35% ownership interest in that company. Then, on May 7, 2010, Lux Energía purchased the project companies that owned and managed the Fotocampillos facilities. Thus, as of May 8, 2010, through its wholly owned subsidiary GWM Renewable Energy S.p.A., GWM II held a 61.35% interest in Fotocampillos.[70]

110.  In January 2011, GWM became the 100% owner of the Fotocampillos PV project when its subsidiary GWM Renewable Energy S.p.A acquired Lux Energía.[71]

111.  GWM's acquisition costs for Fotocampillos were approximately €3.8 million.[72]

### (4) Consequences of GWM's takeover of Greentech

112.  On 11 August 2011, GWM II acquired Greentech, a renewable energy company listed on the Nordic stock exchange.[73] As a result of the acquisition,

---

[67]  SoC, ¶ 238.
[68]  Claimants' PHB, n.174.
[69]  C-214, Loan Agreement Between Abantia Sol de Málaga S.L. (Debtor) and Caja de Ahorros del Mediterráneo (Creditor), 21 September 21 2007.
[70]  SoC, ¶ 245.
[71]  C-210, Framework Agreement Between GWM Renewable Energy S.p.A., Lux Energy Ltd., Lux Energia Solar S.L., Mr. Benjamin James Ernest Guest, Albarreal Solar Nueva Energia S.L.U., "The Santas," and Mr. Emilio Mera Díaz, 28 January 2011, p.29; C-218, Deed for the Reduction of Share Capital of the Company, 18 March 2011, p.4; C-219, Official Bulletin of the Commercial Register of Spain, May 9, 2011 (Lux Energía also changed its name to GWM Renewable Energy Spain S.L.).
[72]  Claimants' PHB, n.174.
[73]  SoC, n. 449; C-225, Closing Memorandum, 11 August 2011.

25

GWM II contributed its solar portfolio to Greentech, including its 50.03% interest in La Castilleja and its 100% interest in Fotocampillos.[74]

113.    Consequently, the Claimants contend that the interests of GWM II and Greentech in this arbitration are coextensive.[75]

### D.    Spain's tariff deficit and the sustainability of the Spanish electricity system

114.    After enacting RD 661/2007, Spain became increasingly concerned by its growing "tariff deficit", which is the difference between the regulated costs of the SES, on the one hand, and revenues from regulated electricity prices paid by consumers, on the other.  In short, the SES did not generate enough revenue to cover the costs of FiTs and other remuneration.

115.    Spain's tariff deficit was attributable to several factors.  These include the fact that actual electricity consumption in Spain fell below forecasts in the 2005 PER as a result of the global financial crisis and subsequent recession in Spain.[76] However, the tariff deficit had in fact emerged several years earlier and is not therefore exclusively the product of the financial crisis.

116.    As illustrated by the following chart taken from the first report of Drs Moselle and Grunwald of FTI, Spain's annual tariff deficit first materialized in 2000 and subsequently grew to over €6 billion for the year 2008, before returning to surplus in 2014:[77]

---

[74]    C-225, Closing Memorandum.
[75]    Hr. Day 1, 51:6-12.
[76]    BDO 1st, ¶ 410.
[77]    Moselle/Grunwald 1st, Fig. 7-1.



Figure 7-1: Annual Electricity Tariff Deficit (2000-2014)

117. On an accumulated basis, Spain's tariff deficit exceeded €40 billion by 2013 (approximately 4% of GDP), an increase of 271% from 2007, when the accumulated deficit stood at approximately €10.8 billion.[78]

118. In April 2009, Spain enacted Royal Decree-Law 6/2009 (**RDL 6/2009**), which adopted certain measures to address the tariff deficit. The preamble to RDL 6/2009 explains that:

> The increasing tariff deficit [...]is causing serious problems which in the current context of international financial crisis, is profoundly affecting the system and endangering, not only the financial situation of the companies in the electricity sector, but the system's sustainability itself. This imbalance is unsustainable and has serious consequences by deteriorating the security and investment financing capacity necessary to supply electricity in the quality and safety levels demanded by Spanish society. [...] by its increasing incidence on the tariff deficit, mechanisms are established with regard to the remuneration system of the facilities under the special regime. The trends followed by these technologies could put at risk in the short term, the sustainability of the system, both from the economic point of view due to their impact on the electricity tariff, and from a technical point of view, further compromising the economic viability of the already completed facilities, whose operation depends on the proper balance between manageable and non-manageable generation. [79]

---

[78]    BDO 1st, ¶ 270; BDO Presentation, slide 12.
[79]    R-57, Royal Decree-Act 6/2009, 30 April 2009.

119.  In addition to RDL 6/2009, Spain adopted several other measures addressed to the tariff deficit, including those discussed in the following section on the disputed measures in this arbitration.

120.  The tariff deficit became a political issue in Spain.  In his inaugural speech on 19 December 2011, the newly elected prime minister of Spain, Mariano Rajoy, stated:

> Another essential structural reform concerns our energy system.  Energy policy must aim to pursue an adequate balance between its objectives: competitiveness, security of supply and environmental impacts […].  Energy is a key factor in the competitiveness of Spanish companies.  It is important for us to realise Spain has a major energy problem, especially in the electricity sector, with an annual deficit in excess of 3,000 million Euros, and an accrued tariff deficit of more than 22,000 million.
>
> Electricity tariffs for domestic consumers are the third most expensive in Europe, and the fifth highest for industrial consumers.
>
> […] If reforms are not made, the imbalances will be unsustainable, and increases in prices and tariffs will place Spain at the greatest disadvantage in terms of energy costs in the entire developed world.  We must therefore introduce policies based on putting a break on and reducing the average costs of the system, take decisions without demagoguery, employ all the technologies available, without exception, and regulate with the competitiveness of our economy as our prime objective.[80]

121.  In March 2012, the CNE published a report in response to a request from the Security of State for Energy to propose regulatory adjustment measures to address the tariff deficit.  The CNE report stated that:

> [T]he current situation is unsustainable.  The introduction of regulatory measures, as requested by the document of the [Secretary of State for Energy], is called for with immediate effect in the short term, in order to eliminate the deficit of the system, mitigate the cost of funding the yet unsecuritised debt and clearly define the access costs that will be assumed by electricity customers, in order to determine their access tariffs in a satisfactory and stable manner.[81]

122.  Among the short-term measures proposed by the CNE was the removal of annual CPI indexing for FiTs, and the elimination of FiTs at the end of the economic (or useful) life of a facility (as opposed to its operating life).[82]

123.  On 20 July 2012, as part of an EU financial assistance package relating to the financial crisis in Spain, the Respondent signed a Memorandum of

---

[80]  R-169, Transcript of the speech of Mariano Rajoy in the session of investiture as president of the Government, Congress of Deputies, 19 December 2011.
[81]  R-105, Report of the National Energy Commission (CNE), 7 March 2012.
[82]  R-105, Report of the National Energy Commission (CNE), pp. 30, 81.

Understanding with the Eurogroup in which the Respondent committed to take measures to address the tariff deficit.[83]

### E.    The Disputed Measures

#### (i)    RD 1565/2010

124.    In November 2010, Spain enacted Royal Decree 1565/2010, which cancelled the right of PV facilities to receive the FiTs specified in RD 661/2007 after the first 25 years of their operation.[84]

125.    However, in response to criticism, Spain subsequently extended the cut-off to 28 years in RDL 14/2010, and then to 30 years in Law 2/2011.[85]

#### (ii)    RDL 14/2010

126.    In December 2010, Spain enacted Royal Decree-Law 14/2010, which concerned urgent measures to address the tariff deficit.[86]

127.    RDL 14/2010 capped the annual operating hours (i.e. the total quantity of electricity produced) for which PV facilities could receive FiTs under RD 661/2007 and RD 1578/2008.[87]  The actual operating hour limit depended on the type of PV technology and geographic location.[88]  PV facilities in locations with higher solar radiation had a higher cap.  Once a PV facility hit the applicable cap, additional electricity could only be sold at market prices.

128.    RDL 14/2010 also established a new 0.5 EU/MWh "access toll" on all electricity a producer delivered to the grid.

#### (iii)    Law 15/2012

129.    In December 2012, Spain enacted Law 15/2012, which introduced a 7% "energy production value tax" on all revenues (including FiT revenues) derived from the production of electricity (**TVPEE**).[89]

---

[83]    RL-67, Memorandum of Understanding signed with the European Union, 20 July 2012.
[84]    C-129, Royal Decree 1565/2010
[85]    C-102, Royal Decree-Law 14/2010; C-95, Law 2/2011.
[86]    C-102, RDL 14/2010.
[87]    C-102, RDL 14/2010, First Additional Provisional.
[88]    C-102, RDL 14/2010.
[89]    C-40, Law 15/2012, Arts.1, 8.

*(iv)    RDL 2/2013*

130.    In February 2013, Spain enacted Royal Decree-Law 2/2013, which introduced an "amended CPI" that excluded prices changes in food, energy products and certain tax effects for the purposes of calculating annual FiT inflation revisions under RD 661/2007 (and RD 1578/2008).[90]   Initially, the amended CPI was lower than the general CPI.  However, from late 2014, the amended CPI was higher than the general CPI.[91]

*(v)    RDL 9/2013*

131.    In July 2013, Spain enacted RDL 9/2013, concerning the tariff deficit and "urgent measures to guarantee the financial stability of the electricity system".[92] RDL 9/2013 abolished the RD 661/2007 and RD 1578/2008 support schemes – including the FiT regime – and authorized the government to approve a new legal framework for renewable energy production.

132.    Pursuant to Article 1(2) RDL 9/2013, Article 30.4 of Law 54/1997 was modified as follows:

> 4. Additionally, and in the terms set forth in the regulations by royal decree of the Board of Ministers, for the compensation of the sale of generated energy valued at market price, the facility can receive a specific compensation composed of one period by unit of installed power that covers, when applicable, the investment costs of a typical facility that cannot be recovered by the sale of energy and one period of operation that covers, in any case, the difference between the exploitation costs and the income for the market share of said typical facility.
>
> For the calculation of said specific remuneration, the following aspects shall be considered, taking into account a standard facility throughout its legal service life, according to the activity performed by an efficient, well-managed business:
>
> a) The standard income for the sale of generated energy valued at the price of the production market.
> b) The standard exploitation cost.
> c) The standard value of the initial investment.
>
> To these effects, in no case, will the costs and investments that come determined by norms or administrative actions that are not applicable in all the Spanish territory be considered. In the same manner, only those costs and investments are taken into account that respond exclusively to the electrical energy production activity.
>
> As a consequence of the peculiar characteristics of the electrical systems internal and external to the Iberian peninsula, specific type installations can be exceptionally defined for each one of them.

---

[90]    C-83, Royal Decree-Law 2/2013.
[91]    Moselle/Grunwald 1st, ¶ 6.49.
[92]    C-91, Royal Decree-Law 9/2013.

> This compensation regime will not surpass the minimum level necessary to cover the costs that will allow the installations to compete on an equal level with the rest of the technologies in the marketplace and that permit the possibility of obtaining a reasonable profit in reference to the installation type in each applicable case. Notwithstanding the foregoing, the compensating regime can also exceptionally incorporate an investment and execution incentive within a determined period of time when its installation supposes a significant cost reduction in the insular and extra-peninsular systems.

> This reasonable profitability will be based, before taxes, on the average yield in the secondary market of the Obligations of the State to ten years applying the adequate differential.[93]

133.   The gist of the new framework envisaged by RDL 9/2013 – the precise details of which were left to subsequent legislation and regulations – was that all renewable energy facilities would be required to sell electricity on the wholesale market; instead of FiTs, producers would receive the market price plus remuneration designed to achieve a "reasonable rate of return" for a "standard" facility over a defined regulatory life.[94]  RDL 9/2013 set the target rate of return at 300 points above the ten-year average yield of Spanish government ten-year bonds.[95]

134.   RDL 9/2013 provided that PV facilities would temporarily continue to receive remuneration under the RD 661/2007 and RD 1578/2008 support schemes until the new legal framework was enacted.  However, any such payments would be subject to a "true-up" adjustment (or claw back) once the new framework was in force.[96]

               *(vi)*      *Law 24/2013, RD 413/2014 and MO IET/1045/2014*

135.   In December 2013, Spain enacted Law 24/2013 to implement the new renewable energies framework envisaged by RDL 9/2013.  Law 24/2013 eliminated the distinction between the Ordinary and Special Regimes that had prevailed under Law 54/1997.[97]  Law 24/2013 further provided that remuneration under the new renewables support scheme would be "compatible with the economic stability of the electric system" and would:

> "not exceed the minimum level required to cover the costs which allow the production installations from sources of renewable energies … to compete on an equal footing with the other technologies on the market and which allows a

---

[93]   C-91, RDL 9/2013, Art. 1(2).
[94]   C-91, RDL 9/2013.
[95]   C-91, RDL 9/2013, Preamble II at 6-9 and First Derogatory Provision.
[96]   C-91, RDL 9/2013, Third Transitory Provision.
[97]   C-180, Law 24/2013, Preamble.

fair return to be obtained pertaining to the standard installation applicable in each case".[98]

136.    Following the enactment of the new general framework for renewables under Law 24/2013, a new support scheme was established by RD 413/2014 and supplemented by Ministerial Order IET/1045/2014 (**MO 1045**), which detailed precisely how remuneration for PV facilities would be calculated.

137.    In sum, remuneration of renewable energy facilities under the new support scheme was comprised of:

   (a)    Market remuneration from the sale of electricity in the wholesale market (€/MWh); and

   (b)    "specific remuneration", which was based on "standard" not actual costs of a PV facility and consisted of:

      (i)    an "operating incentive" (or "Return on operation"), calculated per unit of electricity produced (€/MWh), to compensate facilities for operating expenses not covered by the wholesale price of electricity; and

      (ii)    an "investment incentive" (or "Return on investment"), calculated per unit of installed capacity (€/MWh), to enable investors to cover their investment (capital) costs and receive a "reasonable rate of return" over a defined regulatory life, which was set at 30 years for PV facilities.  The "reasonable rate of return" prescribed by Spain was initially the 10-year average of Spanish 10-year treasury bonds, plus 300 basis points, which was 7.398% pre-tax for 2013-2018.[99]

138.    The formula for calculating the "specific remuneration" that a PV facility would receive was published in MO 1045, a 1,761-page document that sets the "remuneration parameters" for 1,517 different "standard facilities", including 578 different "standard" PV facilities.

139.    Pursuant to MO 1045, each PV facility was assigned one of 578 "standard" facility codes (known as "IT codes") on the basis of several factors, including

---

[98]    C-180, Law 24/2013, Art. 7.  The Respondent's translation (R-47) uses the term "reasonable return" rather than "fair return".
[99]    C-91, RDL 9/2013, Art. 1.2; C-90, RD 413/2014, Art. 11; C-179, MO 1045, Art. 5.1.

technology type, capacity, date of installation and location.[100]  Within each IT code, MO 1045 sets out the parameters of compensation applicable to that standard facility, including: an imputed investment cost; estimated current operating costs; estimated future operating costs; estimated hours of operation; estimated daily and intraday market prices of electricity; and net asset value of the facility.[101]

140.    MO 1045 also set a minimum operating hours threshold for a PV facility to receive the operating incentive and investment incentive, as well as a maximum operating hours threshold to receive the operating incentive.[102]

141.    The parameters used to set the operating incentive were subject to revision every three years.  The parameters for the investment incentive and the level of the "reasonable rate of return" were subject to revision every six years.[103] Although the initial target reasonable rate of return (7.398% pre-tax) was based on the ten-year average yield of ten-year Spanish treasury bonds, the periodic review would be based on a two-year average of the ten-year bond, taking into account "the cyclical state of the economy, the electricity demand and an appropriate remuneration."[104]

### F.    Claimants' sale of the PV plants

142.    On    6    November    2015,    Foresight    1's    subsidiary, Foresight Netherlands Solar 1 B.V., sold the Madridejos project to a third party, Vela Energy Holdings, for €4.2 million.[105]

143.    On 26 July 2016, Greentech acquired Foresight 2's 49.97% shareholding in Global Litator, the owner of La Castilleja, for €3.8 million.[106]    Greentech thereby became the sole owner of La Castilleja.

---

[100]    C-179, MO 1045, Preamble.
[101]    Edwards 1st, ¶ 3.33.
[102]    C-179, MO 1045, at 46558-46580.
[103]    C-180, Law 24/2013, Art. 14.4.
[104]    C-180, Law 24/2013, Art. 14.4.
[105]    Edwards 2nd, ¶¶ 3.69, 4.36; RE-15, Share Sale and Purchase Agreement of Acacia, August 2015.
[106]    Edwards 2nd, ¶¶ 3.70, 4.37; RE-203, Greentech's Share Sale and Purchase Agreement of Foresight's stake in Global Litator, July 2016.

144.    On 28 September 2016, Greentech sold its 100% shareholding in the Fotocampillos project to a third party, Vela Energy Holdings, for €2.9 million.[107]

### G.    Spanish Domestic Court Decisions

145.    In Spain, it is the courts that control the exercise of regulatory power by the Executive branch.[108]

146.    The Respondent has entered into the record over one hundred judgments of the Spanish Supreme Court concerning the Special Regime support schemes.

147.    Of those, the following seven judgments pre-date the Claimants' investments:

   (a)    15 December 2005, concerning a challenge to the application of RD 436/2004 to facilities under RD 2366/1994 or RD 2818/1998;[109]

   (b)    25 October 2006[110] and 20 March 2007,[111] concerning a challenge to an amendment to RD 2818/1998;

   (c)    9 October 2007, concerning a challenge to RD 1454/2005;[112]

   (d)    9 December 2009, concerning a challenge to articles 28, 45.4 and 5 of RD 661/2007;[113]

   (e)    3 December 2009, concerning a challenge to Transitory Provision No. 1 of RD 661/2007.[114]

148.    Since the Claimants' made their investments, the Spanish courts have issued several decisions concerning the changes to the RD 661/2007 support scheme.

---

[107]    Greentech also received an additional payment of €0.4 million to settle intercompany balances and a tax payment.  Edwards 2nd, ¶ 4.41; RE-336: Greentech's Share Sale and Purchase Agreement of Fotocampillos Companies, September 2016.
[108]    R-5, Spanish Constitution, 1978, Art. 106.
[109]    C-240, Improved translation of Judgment of Supreme Court (R-117): Ruling of the Third Chamber of the Supreme Court, 15 December 2005.
[110]    R-118, Ruling of the Third Chamber of the Supreme Court, 25 October 2006.
[111]    C-241, Improved translation of Judgment of the Supreme Court (R-119): Ruling of the Third Chamber of the Supreme Court, 20 March 2007.
[112]    C-242, Improved translation of Judgment of the Supreme Court (R-120): Ruling of the Third Chamber of the Supreme Court, 9 October 2007.
[113]    R-122, Ruling of the Third Chamber of the Supreme Court, 9 December 2009.
[114]    C-237, Improved translation of Judgment of the Supreme Court (R-121): Ruling of the Third Chamber of the Supreme Court, 3 December 2009.

149.  On 17 December 2015, the Spanish Constitutional Court ruled that the New
      Regulatory Regime was valid and neither violated investors' legitimate
      expectations, nor had prohibited retroactive effect as a matter of Spanish
      law.[115]

150.  On 12 July 2016, the Spanish Supreme Court rejected a challenge to
      RD 413/2014 and MO 1045/2014, stating:

> It is not possible to counter the support through subsidies for renewable energy
> generation and the defence of the system's financial sustainability, when the
> latter is a necessary condition for the very survival thereof, since it is senseless
> to design a support system for these technologies that is financially
> unsustainable and, accordingly, is not economically viable in the medium and
> long term.[116]

## V.    REQUESTS FOR RELIEF

### A.    Claimants' Request for Relief

151.  The Claimant seeks the following relief:[117]

- a declaration that the Tribunal has jurisdiction under the ECT to adjudicate all
  of Claimants' claims, thereby rejecting Respondent's jurisdictional objections
  in full;

- a declaration that Spain has violated Part III of the ECT and international law
  with respect to Claimants' investments;

- compensation to Claimants for all damages they have suffered as set forth in
  their Memorial on the Merits and in their Reply Memorial on the Merits and as
  may be further developed and quantified during the course of this proceeding;

- all costs of this proceeding, including (but not limited to) Claimants' attorneys'
  fees and expenses, the fees and expenses of Claimants' experts, and the fees
  and expenses of the Tribunal and the SCC;

- pre- and post-award compound interest at the highest lawful rate from the Date
  of Assessment until Spain's full and final satisfaction of the Award; and

- any other relief the Tribunal deems just and proper.

### B.    Respondent's Request for Relief

152.  The Respondent seeks the following relief:[118]

> a) Declare that it holds no jurisdiction to hear the complaints of the Claimant
> or, if appropriate, the inadmissibility thereof, in accordance with section III of
> this Memorial, on Jurisdictional Objections;

---

[115]  R-136, Ruling of the Constitutional Court, 17 December 2015.
[116]  R-113, Ruling of the Supreme Court, 12 July 2016.
[117]  Reply, p.299.
[118]  Rejoinder/Reply, ¶ 1252.

b) In the alternative, in the event that the Arbitral Tribunal considers it does have jurisdiction to hear the present dispute, that it dismisses all the Claimant's [sic] claims on the merits, due to the fact that the Kingdom of Spain has not in any way failed to comply with the ECT, in accordance with sections IV and V of this Memorial, on the Facts and the Merits of the Case, respectively;

c) In the alternative, dismiss all claims for compensation of the Claimant as Claimant is not entitled to compensation in accordance with section VI of this Memorial; and

d) Order that the Claimant pays all costs and expenses arising from this arbitration, including administrative expenses and SCC fees, as well as the fees of the legal representation of the Kingdom of Spain, its experts and advisers, and any other costs or expenses that may have incurred, all of which include a reasonable interest rate from the date these costs are incurred until the date of their actual payment.

## VI.    JURISDICTION

153.    The Respondent has raised two objections to the Tribunal's jurisdiction.

### A.    First Objection: The Intra-EU Objection

154.    The Respondent's first objection to jurisdiction is that the ECT does not apply to so-called "intra-EU" disputes, such as the present case, where the Claimants are nationals of EU Member States and the Respondent is also an EU Member State.

155.    There are several distinct aspects to the Respondent's "intra-EU" objection, including:

(a)    The interpretation of Article 26(1) ECT, which limits the Tribunal's jurisdiction to disputes "between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former…";

(b)    The question of whether or not, in the event of a conflict, EU law prevails over the ECT by virtue of Article 26(6) ECT, which provides that the Tribunal "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law"; and

(c)    The question of whether or not the ECT in fact conflicts with EU law, in particular as regards (1) the submission of an "intra-EU" investor-State dispute under the ECT to international arbitration rather than to the domestic courts of the EU, and (2) EU rules governing State aid.

### (1)  The Parties' Positions

#### a.  Respondent's Position

##### (i)    Overview

156.   The Respondent contends that the Tribunal does not have jurisdiction over "intra-EU" disputes because the ECT is incompatible with applicable EU law, specifically (i) as regards investor-State arbitration, and (ii) EU rules on State aid.

157.   There are several elements to the Respondent's jurisdictional objection, including that: (i) there is not a dispute "between a Contracting Party and an Investor of another Contracting Party" for the purposes of Article 26(1) ECT because the EU is a Contracting Party and the Claimants are also EU nationals; (ii) pursuant to Article 267 of the Treaty on the Functioning of the EU (**TFEU**) (the procedure for preliminary reference from EU Member State courts to the Court of Justice of the EU (**CJEU**)) and Article 344 TFEU (enshrining the autonomy of the EU legal system), the interpretation of EU law is the exclusive preserve of the EU judicial system, which does not include arbitral tribunals constituted under investment treaties;[119] (iii) the Tribunal must interpret the ECT in accordance with applicable EU law pursuant to Article 26(6) ECT; (iv) the Tribunal is required to apply EU law because the subject matter of this dispute concerns a support scheme that qualified as State aid under EU law; (v) in the event of a conflict, EU law prevails over express provisions of the ECT; (vi) there is such a conflict in the present case because (a) EU law forbids EU Member States from arbitrating disputes with EU investors, and also (b) an award of damages by the Tribunal would be contrary to EU State aid rules, and the Tribunal may not interfere with the judicial competence of the EU; and (vii) the only interpretation of Article 26(1) ECT that is compatible with EU law is one that precludes an EU investor from bringing an ECT arbitration against an EU Member State.

158.    The Respondent relies on the final judgment issued on 6 March 2018 by the CJEU in the *Achmea* case (***Achmea* Judgment**),[120] which the Respondent contends confirms that intra-EU disputes under the ECT are precluded by

---

[119]    RL-1, Treaty on the Functioning of the EU ("TFEU").
[120]    RL-96, *Achmea* Judgment.

binding EU law.  The Respondent also notes that enforcement of the *Novenergia v. Spain* award in the Svea Court has been suspended pending annulment based on the *Achmea* Judgment.[121]

### (ii)    Article 26(1) ECT

159.    The Respondent contends that the Claimants are not protected investors under the ECT because the dispute is not "between a Contracting Party and an Investor of another Contracting Party" for the purposes of Article 26(1) ECT.

160.    The Respondent does not deny that Luxembourg, Denmark, Italy and Spain all individually ratified the ECT as Contracting Parties in their own right.  However, the Respondent contends that the Claimants are not protected investors "of another Contracting Party" because: (1) the Claimants are nationals of Luxembourg, Denmark and Italy, which are EU Member States; (2) the Respondent, Spain, is also an EU Member State; and (3) the EU is itself a Contracting Party to the ECT.

161.    The Respondent contends that its interpretation of Article 26(1) ECT is consistent with the object and purpose of the ECT.  In this regard, the Respondent contends that the ECT was intended, following the fall of the Berlin Wall, to promote East/West cooperation between regions of Europe that had been divided by the Iron Curtain; the ECT's investment protections were never intended to operate within EU Member States.

162.    The Respondent also relies on the fact that the definition of "Contracting Party" under Article 1(2) ECT includes "Regional Economic Integration Organisations" (**ORIE**), which are in turn defined at Article 1(3) ECT as:

> an organisation constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.

163.    The Respondent submits that the EU is the only ORIE that is a Contracting Party to the ECT.  Accordingly, the Respondent contends, Article 1(3) ECT (and Article 1(10) defining the "Area" of an ORIE) demonstrates that the ECT was not intended to interfere with matters over which contracting States have transferred competence to the EU, including investor protection.

---

[121]    Respondent's PHB, ¶ 15.

*(iii)    Primacy of EU law*

164.    The Respondent submits that the "essential principle of which the objection to the jurisdiction of the Arbitral Tribunal is raised by the Kingdom of Spain" is "the principle of primacy of EU law".[122]

165.    The Respondent contends that the following provisions and declarations in the ECT establish the primacy of EU law over the ECT:

(a)    Article 16 ECT, pursuant to which a more favourable provision to an investor or investment in another treaty between two or more Contracting Parties concerning the same subject matter prevails over the ECT;

(b)    Article 25 ECT, which provides that:

> (1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.
>
> (2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalising, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame.

(c)    The European Community's declaration to Article 25 ECT, which states:

> […] the application of Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities.

(d)    Article 36(7) ECT, which states that, in respect of decisions taken by the Charter Conference, a REIO shall have the number of votes equal to the number of its member States that are Contracting Parties; and

(e)    Article 26(6) ECT, which states that an investor-State arbitral tribunal established under the ECT "shall decide the issues in dispute in

---

[122]    Rejoinder/Reply, ¶ 72.

accordance with this Treaty and applicable rules and principles of international law", which the Respondent contends includes EU law.

### (iv)    EU law prevails over conflicting provisions of ECT

166.    The Respondent contends that there is a conflict between the ECT and EU law because EU law does not permit arbitration under the ECT between an EU investor and an EU Member State. In this situation, the Respondent contends that EU law must prevail over the ECT.

167.    In particular, the Respondent contends that Article 26(6) ECT requires the Tribunal to apply EU law as the "applicable rules and principles of international law". This in turn directs the Tribunal to Article 344 TFEU, which provides that:

> Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.[123]

168.    According to the Respondent, EU Member States are therefore prohibited by Article 344 TFEU from submitting to ECT arbitration any matters relating to the EU internal market in electricity, over which the Respondent has transferred its sovereignty to the EU.

169.    Further, the Respondent contends that the Tribunal may not interfere with the competencies of the CJEU.

170.    As far as the Respondent is concerned, the EU has its own intra-EU system of investor protection that is preferential to the protection conferred by the ECT and any BIT. Further still, the Claimants enjoy the full protection of EU law, and should be pursuing their claim in the courts of the EU.

### (v)    CJEU's Achmea Judgment

171.    The Respondent submits that *Achmea* Judgment is fully applicable to the present dispute and confirms that the Respondent's "intra-EU objection" to jurisdiction should be upheld.

172.    In particular, the Respondent contends that the *Achmea* Judgment precludes an investor from an EU Member State from bringing arbitration proceedings against another EU Member State under the ECT.

---

[123]    RL-1, TFEU, Article 344.

173.  The Respondent relies on the CJEU's ruling that:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[124]

174.  The Respondent contends that the ECT is such an "international agreement concluded between Member States" and the effect of the *Achmea* Judgment is not limited to disputes under bilateral investment agreements.

175.  The Respondent contends that the Tribunal must apply EU law to this dispute because EU law is "international law" for the purposes of Article 26(6) ECT, the governing law clause of the Treaty, which provides that the Tribunal "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law".  In particular, the Respondent contends, the Tribunal must give effect to the EU Treaties, the Decision of the European Commission concerning Spain's renewables support scheme and State aid dated 10 November 2017 (**EC State Aid Decision**),[125] and the *Achmea* Judgment.

### b.  Claimants' Position

#### (i)  Overview

176.  The Claimants submit that the Tribunal has jurisdiction over so-called "intra-EU disputes".  The Claimants rely primarily on the language of Article 26(1) ECT, which provides for the settlement of disputes "between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in an Area of the former."  The Claimants contend that these jurisdictional requirements are satisfied here because they are nationals of Contracting Parties to the ECT and the Respondent is also a Contracting Party.  In accordance with the rules of treaty interpretation, there is no need for the

---

[124]  CL-184/RL-96, *Achmea* Judgment, Ruling.
[125]  RL-97, European Commission, Decision on State aid SA.40348 (2015/NN), 10 November 2017 (**EC State Aid Decision**).

Tribunal to look beyond the unambiguous language of Article 26(1) ECT in deciding this issue.

177.    In any event, the Claimants reject the Respondent's contentions that EU law grants "preferential" investment protections or that there is any conflict between the ECT and EU law such that EU law would prevail over the ECT's investor-State dispute settlement mechanism.

178.    The Claimants further rely on the unanimous practice of twenty investment treaty tribunals considering this issue, all of which have concluded that the ECT applies to intra-EU disputes.

179.    Finally, the Claimants reject the CJEU's *Achmea* Judgment as irrelevant to the present dispute.  The Claimants rely on the recent ECT award in *Masdar v. Spain*, which found the *Achmea* Judgment to be inapplicable to ECT cases.[126]

(ii)    *Article 26(1) ECT*

180.    The Claimants contend that the Tribunal must exercise jurisdiction over this dispute according to the clear terms of Article 26(1) ECT because Spain is a Contracting Party to the ECT and the Claimants are nationals of "another" Contracting Party (Luxembourg, Denmark and Italy, respectively).

181.    The Claimants contend that it is irrelevant that the EU is also a Contracting Party to the ECT: the present dispute is against Spain, not the EU.

182.    The Claimants reject the Respondent's contention that Article 26(6) ECT requires the Tribunal to apply EU law to this dispute.  Rather, the Claimants contend, the reference to international law in Article 26(6) ECT requires the Tribunal to apply the ECT according to its provisions, as well as in accordance with the applicable rules of public international law, but not the regional law of the EU.  In sum, Article 26(6) ECT is not a "back door" for the application of another set of legal rules outside the Treaty.

183.    The Claimants further contend that the case law on this issue is unanimous, consistent and definitive in finding that the ECT applies to intra-EU disputes.[127] For example, the Claimants contend that the tribunal in *Eiser v. Spain* rejected

---

[126]    CL-189, *Masdar*, ¶ 679.
[127]    Claimants' PHB, ¶ 24.

exactly the same arguments that the Respondent now advances in this case. In *Eiser*, the tribunal stated that:

> …Respondent's arguments do not justify disregarding the ECT's ordinary meaning in order to exclude a potentially significant body of claims. It is a fundamental rule of international law that treaties are to be interpreted in good faith. As a corollary, treaty makers should be understood to carry out their function in good faith, and not to lay traps for the unwary with hidden meanings and sweeping implied exclusions.
>
> […] The Tribunal finds nothing ambiguous or obscure in the interpretation of Article 26 [of the ECT], so recourse to supplementary means of interpretation is not required, or even permitted.
>
> Even were the circumstances to warrant recourse to supplementary means of interpretation, Respondent has not offered evidence to document its characterization of the [EU Member States'] supposed negotiating objective in the ECT negotiations. Of perhaps greater significance, there is no evidence showing that any such objective was shared by all [EU Member States], or was communicated to and accepted by the other parties to the treaty.[128]

### (iii)    No disconnection clause excluding "intra-EU" claims

184.   The Claimants reject the Respondent's contention that EU Member States either did not have the competence or did not intend to enter into obligations as between themselves when they ratified the ECT.  The Claimants contend that the absence of a "disconnection clause" is fatal to the Respondent's position.  Whereas a disconnection clause has been included in certain treaties to make them, in whole or in part, inapplicable between EU Member States,[129] there is no such provision in the ECT.

185.   Further, even if a disconnection clause could be implied, the Claimants rely on the conclusion of the tribunal in *Charanne v. Spain*, which held that there was no need to consider the disconnection issue because "there is no conflict between the [ECT and the TFEU]…no contradiction exists in this case between the ECT and EU law."[130]

### (iv)    No conflict with EU law

186.   The Claimants contend that the Respondent mischaracterizes both the principle of EU "primacy" and Article 25 ECT.  The Claimants contend that the "primacy" issue is not relevant because it only arises where an EU Member

---

[128]   CL-170, *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶¶ 186, 206.

[129]   CL-134, Various European conventions and treaties.

[130]   CL-92/RL-49,*Charanne B.V. and Construction Investments v. Kingdom of Spain*, SCC Arb. No. V 062/2012, Award, 21 January 2016, ¶ 433.

State enacts a measure that conflicts with existing EU law.  The Claimants deny that Article 25 ECT explicitly recognizes the primacy of EU law.  Rather, the Claimants contend that Article 25 ECT could only apply to the treatment that Spain must accord to nationals outside the EU.

187.    The Claimants deny that there is any conflict in the present case between the ECT and EU law.  In particular, the Claimants contend that the ECT and EU law do not share the same subject matter and, crucially, EU law does not afford investors a right to international arbitration.  Moreover, the Claimants contend there is no need to interpret EU law to resolve the dispute because the Claimants' claims are based exclusively on the ECT.  Indeed, the Claimants have not submitted any claims of violation of EU law in this arbitration.  Rather, the Claimants seek compensation for Spain's alleged violations of its obligations under the ECT.

188.    The Claimants rely inter alia on the award in *Eiser v. Spain*, where the tribunal stated:

> The Tribunal's jurisdiction is derived from the express terms of the ECT, a binding treaty under international law. The Tribunal is not an institution of the European legal order, and is not subject to the requirements of that legal order. However, the Tribunal need not address the possible consequences that might arise in case of a conflict between its role under the ECT and the European legal order, because no such conflict has been shown to exist.[131]

189.    The Claimants also rely on the CJEU Advocate General's observation in his opinion in the *Achmea* case, where he stated that the EC could not "offer the slightest explanation of the how the prohibition of illegal expropriation [under the Netherlands-Slovakia BIT] is incompatible with the EU and FEU Treaties."[132]

190.    Even assuming a conflict between the ECT and EU law existed, the Claimants contend that the ECT would prevail over EU law.  The Claimants rely on Article 16 ECT, which provides that:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III [Investment Promotion and Protection] or V [Dispute Settlement] of [the ECT],

---

[131]    CL-170, *Eiser*, ¶ 199.
[132]    CL-181, Opinion of Advocate General Wathelet, *Slowakische Republik v. Achmea B.V.*, Case C-284/16, 19 Sept. 2017, ¶ 227.

(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement, and

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favorable to the Investor or Investment.

191.   The Claimants further rely on the following analysis of Article 16(2) ECT by the *Eiser* tribunal:

> To the extent that provisions of European law may in some manner provide protections more favorable to Investors or Investments than those under the ECT, Article 16(2) makes clear that they do not detract from or supersede other ECT provisions, in particular the right to dispute settlement under ECT Part V. By its terms, Article 16 assures Investors or their Investments the greatest protection available under either the ECT or the other agreement. Thus, an agreement covered by Article 16(2) may improve upon particular protections available to Investors or their Investments, but it cannot lessen rights or protections under the ECT that are in other respects more favorable.[133]

192.   The Claimants contend that the upshot of Article 16 ECT is that EU law would only take priority over the dispute settlement provision in the ECT *if* EU law afforded the Claimants a "more favourable" dispute settlement mechanism. However, the Claimants contend that their right to investor-State arbitration under the ECT is in fact more favourable than pursuing remedies under EU law, which would first require them to litigate in Spain's courts.

193.   Thus, Article 26 ECT, and in particular the Claimants' right to international arbitration under the ECT, trumps EU law that allegedly may be in conflict with the ECT.

194.   The Claimants also reject the Respondent's interpretation of Article 344 TFEU. Quoting the provision, the Claimants contend that Article 344 TFEU only prevents EU Member States from "submit[ting] a dispute concerning the interpretation or application of the [Treaty on the European Union (**TEU**) and TFEU] to any method of settlement other than those provided for therein".[134] Article 344 TFEU is therefore inapplicable because the Claimants have not invoked either the TEU or TFEU in this arbitration.

195.   The Claimants also reject the Respondent's arguments that the ECT conflicts with EU State aid law.  Further, the Claimants contend that the EC State Aid Decision is irrelevant to the Respondent's jurisdictional objection (as well as

---

[133]   CL-170, *Eiser*, ¶ 202.

[134]   RL-1, TFEU, Article 344.

the Claimants' legitimate expectations claim).  The Claimants rely on the *Novenergia* award, which decided that the EC State Aid Decision was irrelevant to Spain's "intra-EU" jurisdictional objection in that case because it concerned breaches of the ECT, not EU law.[135]

### (v)   The CJEU's Achmea Judgment

196.   The Claimants contend that the CJEU's *Achmea* Judgment is irrelevant to the present dispute, for four principal reasons: (i) the literal jurisdictional requirements of Article 26(1) and (2) ECT, which is the exclusive basis for the Tribunal's jurisdiction, are met, and therefore the Tribunal must conclude that it has jurisdiction to hear the dispute; (ii) the CJEU's *Achmea* Judgment has no impact on the reasoning of the known investment treaty awards to have considered this issue, all of which have unanimously rejected the "intra-EU" objection; (iii) even if relevant, the CJEU's *Achmea* Judgment is clearly distinguishable because (a) the decision concerns an intra-EU BIT "concluded between Member States",[136] whereas by contrast the ECT is a multilateral investment treaty to which the EU is a Contracting Party, and (b) unlike Article 8(6) of the Netherlands-Slovakia BIT at issue in *Achmea* (which required that tribunal to apply the domestic law of the host State or other relevant agreements between the contracting parties to the BIT), the governing law clause of the ECT (Article 26(6)) does not permit the Tribunal to interpret or apply EU law, so it does not matter that the Tribunal is not a "tribunal or court" that can refer questions of EU law to the CJEU pursuant to Article 267 TFEU; and (iv) the theoretical future impact (if any) of the CJEU's *Achmea* Judgment on the Claimants' ability to enforce an award in certain EU jurisdictions is not a relevant factor for the Tribunal in determining this issue.

### (vi)   Masdar v. Spain

197.   The Claimants rely on the decision of the ECT tribunal in *Masdar v. Spain*, which is the first award rendered by an ECT tribunal since the CJEU's *Achmea* Judgment.  The Claimants contend that the *Masdar* tribunal rejected the same arguments on the "intra-EU" objection that the Respondent puts forward in this case.  In sum, the Claimants submit that there is no reason why the Tribunal should reach a different decision to the *Masdar* tribunal, which concluded that

---

[135]   CL-185, *Novenergia*, ¶ 465
[136]   CL-184/RL-96, *Achmea* Judgment, ¶ 62.

"the *Achmea* Judgment has no bearing upon the present case" because "it does not take into consideration, and thus it cannot be applied to, multilateral treaties, such as the ECT, to which the EU itself is a party".[137]

### (2) The Tribunal's Analysis

198.  The crux of this jurisdictional objection is the question of whether or not the dispute settlement clause under Article 26 ECT excludes disputes between Investors of EU Member States, on the one hand, and a Contracting Party to the ECT that is an EU Member State, on the other.  The Respondent contends that the Tribunal must look beyond the plain language of Article 26 ECT, which contains no such exclusion on its face.  Ultimately, the Respondent's position is that Article 26 ECT should be read as excluding arbitration of "intra-EU" investor-State disputes because EU law forbids it.

199.  The Tribunal takes the opportunity here to comment that the European Commission has submitted a clear and helpful Amicus Brief addressing this issue.  The Tribunal has carefully considered the Commission's submissions.  However, since the Commission is not a party to these proceedings, and both Parties elected not to directly comment on the Commission's brief or any part thereof,[138] the Tribunal's analysis below deals only with the Claimants' and the Respondent's submissions on this issue.

200.  The Tribunal turns to the interpretation of Article 26 ECT, which provides in relevant part as follows:

> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months [...] the Investor party to the dispute may choose to submit it for resolution:
> [...]
> (c) in accordance with the following paragraphs of this Article.
>
> (3) (a) [...] each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. [...]

201.  As any other treaty provision, the text of Article 26 ECT must be interpreted in accordance with the normal canons of treaty interpretation contained in

---

[137]    CL-189, *Masdar*, ¶ 679.
[138]    Hr. Day 1, 152:7-153:10.

Article 31 and 32 of the Vienna Convention on the Law of Treaties (**VCLT**), which provide as follows:

> Article 31. GENERAL RULE OF INTERPRETATION
>
> 1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.
>
> 2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:
>
>> (a) Any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;
>>
>> (b) Any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.
>
> 3. There shall be taken into account, together with the context:
>
>> (a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;
>>
>> (b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;
>>
>> (c) Any relevant rules of international law applicable in the relations between the parties.
>
> 4. A special meaning shall be given to a term if it is established that the parties so intended.
>
> Article 32. SUPPLEMENTARY MEANS OF INTERPRETATION
>
> Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:
>
> (a) Leaves the meaning ambiguous or obscure; or
> (b) Leads to a result which is manifestly absurd or unreasonable.

202. In short, Article 31 VCLT is the primary rule of treaty interpretation. In limited circumstances, the Tribunal may have regard to the supplementary means of interpretation under Article 32 VCLT.

203. Accordingly, the Tribunal begins the interpretative exercise by considering the ordinary meaning of the ECT's terms, their context, and the object and purpose of the ECT. Pursuant to Article 31(2) VCLT, "t[h]e context for the purpose of the interpretation of a treaty shall comprise […] the text, including its preamble and annexes […]."

204.   The Tribunal must also interpret the text of the ECT in accordance with Article 31(3)(c) VCLT, which requires that "[a]ny relevant rules of international law applicable in the relations between the parties" shall be taken into account together with the context.

205.   The Tribunal considers that the context of Article 26 ECT includes:

(a)    Article 1(2) ECT, which defines "Contracting Party" as "a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force.";

(b)    Article 1(7)(a)(ii) ECT, which defines "Investor" of a Contracting Party as "a company or other organization organized in accordance with the law applicable in that Contracting Party.";

(c)    Article 10(1) ECT, by which Contracting Parties to the ECT promise to accord certain international standards of treatment, including fair and equitable treatment, to "Investments of Investors of other Contracting Parties"; and

(d)    Article 13 ECT, which establishes the requirements of a lawful expropriation by a Contracting Party of "Investments of Investors of a Contracting Party in the Area of any other Contracting Party".

206.   The purpose of the ECT is expressly set out under Article 2 ECT, which provides as follows:

> This Treaty establishes a legal framework in order to promote longterm cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.

207.   The ECT does not contain a disconnect clause.  Further, the Tribunal can discern no attempt in the ECT's provisions to carve out "intra-EU" investor-State disputes from the protections afforded by the treaty.

208.   It follows that the provisions of Article 26 ECT should be given their ordinary meaning in accordance with Article 31 VCLT.

209.   The Respondent does not contest that the Claimants are nationals of Luxembourg, Denmark, and Italy.  In the Tribunal's opinion, the Claimants are

therefore Investors of "another" Contracting Party to the ECT for the purposes of Article 26(1) ECT.

210. Likewise, the Tribunal has no doubt that the Respondent, being "a state…which has consented to be bound by this Treaty and for which this Treaty is in force", falls within the definition of "Contracting Party" under Article 1(7)(a)(ii) ECT.[139]

211. Article 26(1) ECT requires that a dispute between a Contracting Party and an Investor must relate to "an Investment of the latter in the Area of the former".[140] Article 1(10) ECT defines "Area" as "the territory under [a Contracting Party's] sovereignty…".[141] Again, the Tribunal considers that this requirement is clearly met.

212. Following the textual approach to interpretation under Article 31 VCLT, the Tribunal would therefore conclude that it has jurisdiction over the Parties' dispute under the plain language of Article 26(1) ECT.

213. Further, the Tribunal considers that there is no need to resort to supplementary means of interpretation under Article 32 VCLT. Indeed, there is nothing ambiguous or obscure in Article 26(1) ECT, nor is the Tribunal's conclusion from the text that it has jurisdiction a manifestly absurd or unreasonable result.

214. For completeness, the Tribunal shall nevertheless briefly dispose of the Respondent's submissions based on the "primacy" of EU law over allegedly inconsistent provisions of the ECT.

215. The Respondent primarily relies on Article 25 ECT, which concerns Economic Integration Agreements. Yet there is plainly nothing in the language of Article 25 ECT on the subject of the primacy of EU law. The Tribunal accordingly rejects this submission.

216. Additionally, the Respondent contends that the Tribunal must apply applicable rules of EU law pursuant to Article 26(6) ECT. The Respondent contends that such applicable rules of EU law include a prohibition on ECT arbitration

---

[139]  C-1, ECT, Art. 1.
[140]  C-1, ECT, Art. 26.
[141]  C-1, ECT, Art. 1(10).

between EU investors and an EU Member State. This prohibition allegedly overrides the plain meaning of Article 26(1) ECT.

217. The Respondent also contends that there is a conflict between EU law and the ECT because the Tribunal is being asked to rule upon a regulatory regime that constitutes State aid under EU law. The Respondent places significant weight on the EC State Aid Decision dated 10 November 2017.[142] The Respondent contends inter alia that the EC State Aid Decision stands for the proposition that any award by the Tribunal in this arbitration ordering the Respondent to pay compensation would constitute State aid, which the Tribunal does not have the competence to authorize as it falls within the exclusive competence of the EC.

218. The Tribunal is not persuaded by the Respondent's submissions on the "primacy" of EU law. Contrary to the Respondent's contention, Article 26(6) ECT applies to the merits of the case and not to jurisdiction. The Tribunal must determine its jurisdiction exclusively in accordance with the jurisdictional requirements of the ECT. As the *Eiser v. Spain* tribunal held:

> The Tribunal's jurisdiction is derived from the express terms of the ECT, a binding treaty under international law. The Tribunal is not an institution of the European legal order, and it is not subject to the requirements of this legal order.[143]

219. Accordingly, the Tribunal decides that EU law is not relevant to the question of the Tribunal's jurisdiction and the Respondent's jurisdictional objection based on the "primacy" of EU law must be rejected.

220. As regards the *Achmea* Judgment, the Tribunal considers that it is irrelevant to the Respondent's jurisdictional objection. The Tribunal agrees with the following analysis of the *Masdar* tribunal:

> 679. The *Achmea* Judgment is of limited application – first, and specifically, to the Agreement on encouragement and reciprocal protection of investment between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic and, second, in a more general perspective, to any "provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic." The ECT is not such a treaty. Thus, the *Achmea* Judgment does not take into

---

[142]    RL-97, EC State Aid Decision.
[143]    CL-170, *Eiser*, ¶ 199.

consideration, and thus it cannot be applied to, multilateral treaties, such as the ECT, to which the EU itself is a party.

680. The conclusion of the Tribunal is in line with the Opinion of Advocate General Wathelet delivered on 19 September 2017 in *Achmea*. […]

681. With specific reference to the ECT, the Advocate General made the following statement:

> "*That multilateral treaty on investment in the field of energy [the ECT] operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing. In that sense, **the material provisions for the protection of investments provided for in that Treaty and the ISDS mechanism also operate between Member States. I note that if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible**.*" (Emphasis added)

682. Had the CJEU seen it necessary to address the distinction drawn by the Advocate General between the ISDS provisions of the ECT and the investment protection mechanisms to be found in bilateral investment treaties made between Member States within the ambit of its ruling, it had the opportunity to do so. In fact, the Tribunal notes that the CJEU did not address this part of the Advocate General's Opinion, much less depart from, or reject, it. The *Achmea* Judgment is simply silent on the subject of the ECT. The Tribunal respectfully adopts the Advocate General's reasoning on this matter, and it relies in particular upon the observation in the final sentence cited above from his Opinion.[144]

221. Finally, the Tribunal observes that it is not aware of a single award that has found "intra-EU" disputes to be excluded from the scope of Article 26(1) ECT. By contrast, the Claimants led the Tribunal to eighteen awards in which jurisdiction over intra-EU investment treaty disputes has been upheld.[145] Since

---

[144] C-189, *Masdar*, ¶¶ 679-682 [emphasis in original].

[145] CL-107, *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 Mar. 2007; CL-106, *Binder v. Czech Republic*, UNCITRAL, Award on Jurisdiction, 6 June 2007; CL-179, *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, UNCITRAL, Decision on Jurisdiction, Apr. 30, 2010; CL-104, *Achmea B.V. (formerly Eureko) v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 Oct. 2010; CL-178, European American *Investment Bank AG (EURAM) v. Slovak Republic*, UNCITRAL, Award on Jurisdiction, 22 Oct. 2012; CL-20, *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 Dec. 2013; CL-188, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14 (decision on jurisdiction not public), see Luke Eric Peterson & Zoe Williams, Spain Solar Claims Update: Jurisdictional Ruling Comes Down in an ICSID Case, As a Pair of Awards Loom—And Two More ECT Arbitrations Get Underway, IA REPORTER, July 4, 2016; CL-93, *Electrabel S.A. v. Republic of Hungary*, ICSID Case no. ARB/07/19, Award, Nov. 25, 2015; *EDF International S.A. v. Republic of Hungary*, UNCITRAL (award not public), see CL-103; CL-102, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016; CL-92, *Charanne B.V. & Construction Investments S.a.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, 21 Jan. 2016; CL-138, *Isolux Infrastructure Netherlands B.V. v. Kingdom of Spain*, SCC V2013/153, 17 July 2016; CL-180, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 Dec. 2016; CL-137, *WNC Factoring Ltd. v. Czech Republic*, UNCITRAL, PCA Case No. 2014-34, Award, 22 Feb. 2017; *I.P. Busta & J.P. Busta v. Czech Republic*, SCC Case V 2015/014, Final Award, Mar. 10, 2017, CL-136; CL-135, *Anglia Auto Accessories Ltd. v. Czech Republic*, SCC Case V 2014/181,

the Hearing, at least two more published awards (*Novenergia v. Spain* and *Masdar v. Spain*) have reached the same conclusion.[146]  As the foregoing discussion has demonstrated, the Tribunal finds no reason to depart from these awards, in particular those arising from cases involving similar or identical issues.

222.    Accordingly, the Respondent's first jurisdictional objection is dismissed.

### B.    Second Objection: The TVPEE Claim

223.    In this arbitration, one of the Claimants' claims is that the Respondent breached Article 10(1) ECT when it introduced a 7% tax on the value of the production of electrical energy (**TVPEE**) under Law 15/2012.  The Respondent objects that it has not consented to submit to arbitration any claims under Article 10(1) ECT relating to "Taxation Measures", pursuant to the carve-out in Article 21(1) ECT.

224.    Consequently, the Respondent contends that the Tribunal does not have jurisdiction to hear the Claimants' claim that the introduction of the TVPEE is a breach of Article 10(1) ECT.  However, the Respondent does not contest jurisdiction in respect of the Claimants' separate claim that the TVPEE violated Article 13 ECT on expropriation, as Article 13 ECT is expressly exempt from the carve-out.

### (1)  The Parties' Positions

### a.  Respondent's Position

### (i)    Overview

225.    The Respondent submits that Article 21 ECT contains a general exclusion of taxation measures from the scope of application of the ECT, and that none of the claw-backs under Article 21(2) to (5) ECT are applicable.  Accordingly, the Respondent contends that the Tribunal is barred from hearing the claim that Spain breached its obligations under Article 10(1) ECT through the introduction of the TVPEE, which is a bona fide "Taxation Measure" for the purposes of Article 21 ECT.

---

Final Award, 10 Mar. 2017; CL-170, *Eiser Infrastructure Ltd. and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017.
[146]    CL-185, *Novenergia*; CL-189, *Masdar*.

(ii)    *Article 21 ECT*

226.    The Respondent contends that there is no doubt that the TVPEE is a "tax[] of the domestic law of the Contract Party" and therefore meets the definition of "Taxation Measure" in Article 21(7)(a)(i) ECT.

227.    Specifically, the Respondent submits that Law 15/2012 is a national law of the Kingdom of Spain, approved by the Spanish Parliament pursuant to its Constitutional authority to impose taxes through law and in accordance with the ordinary legislative procedure under Spanish law.

228.    In determining this point, the Respondent contends that the Tribunal should have regard to the pronouncements of Spain's courts and domestic bodies,[147] as well as decisions at the international level pursuant to Article 26(6) ECT. The Respondent contends that these decisions demonstrate that the TVPEE is a tax both as a matter of domestic law and also under international law.[148]

229.    Further, as a matter of international investment law, the Respondent contends that a tax has the following characteristics: (i) the tax is established by law; (ii) the law imposes an obligation on a class of people; (iii) such obligation implies paying money to the state; and (iv) the tax is for public purposes.[149]  The Respondent contends that these defining characteristics are met by the TVPEE.  In particular, the Respondent contends that the TVPEE is established by Law 15/2012, which imposes an obligation on all persons who produce and incorporate electricity (both conventional and renewable) into the SES, and the revenue raised from the TVPEE is included in the General State Budgets for the financing of public expenditure.[150]

---

[147]    RL-79, *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of of the ad hoc Committee, 5 June 2007, ¶ 97.

[148]    Rejoinder/Reply, ¶¶ 99-115.

[149]    RL-27, *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006, ¶ 142; RL-33, *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, ¶ 174; RL-3, *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction of 2 June 2010, ¶¶ 164-165.

[150]    Rejoinder/Reply, ¶ 110.

(iii)     *Bona fide taxation measure*

230.    The Respondent rejects the Claimants' contention that the TVPEE is not a "bona fide" taxation measure and is therefore outside of the scope of Article 21 ECT.

231.    The Respondent contends that the Claimants' reliance on *Yukos v Russian Federation* is misplaced.  The Respondent contends that the tribunal's finding in *Yukos* that the carve-out under Article 21(1) ECT applied only to bona fide taxes was limited to the "extraordinary circumstances" of that case, where the purpose of the taxation measure was "entirely unrelated" to the purpose of raising general revenue for the State, namely "the destruction of a company or the elimination of a political opponent".[151]  The Respondent contends that such extraordinary circumstances are clearly not present in this case.

232.    The Respondent contends that an economic analysis of the taxation measure is unnecessary.  The Respondent relies on *EnCana v Ecuador*, where the tribunal stated:

> The question whether something is a tax measure is primarily a question of its legal operation, not its economic effect.[…] The economic impacts or effects of tax measures may be unclear and debatable; nonetheless a measure is a taxation measure if it is part of the regime for the imposition of a tax.[152]

233.    In any event, the Respondent contends that such an analysis reveals the TVPEE to be a bona fide taxation measure that was not designed to reduce the tariffs paid to renewable plants.

234.    The Respondent also contends that the Claimants consider the TVPEE to be a bona fide tax, as demonstrated by the fact the Claimants have referred the issue of whether or not the TVPEE is expropriatory to the competent Spanish tax authority pursuant to Article 21(5)(b)(i) ECT.[153]

235.    Finally, the Respondent refers to the awards in *Isolux* and *Eiser*, in which both tribunals declared that they lacked jurisdiction to hear claims for breach of Article 10(1) ECT arising out of introduction of the TVPEE.[154]

---

[151]    RL-80, *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. AA 227, Final Award, 18 July 2014, ¶ 1407.

[152]    RL-27, *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006, ¶ 142.

[153]    R-333, Claimants' letter to the Spanish tax authorities, 2 December 2015.

[154]    RL-83, *Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain* (SCC Arbitration V2013/153), Award, 12 July 2016, ¶¶ 717-741; CL-170, *Eiser*, ¶¶ 250-272.

### b. Claimants' Position

#### (i)    Overview

236.  The Claimants submit that the Tribunal has jurisdiction over this claim because the TVPEE is not a "Taxation Measure" for the purposes of the carve-out in Article 21 ECT.  In particular, the Claimants contend that the TVPEE is not a bona fide tax of general application but is in fact unfair, arbitrary and a disguised reduction to the tariffs that the Respondent promised to investors in renewable electricity facilities.

237.  Accordingly, the Claimants contend that the Tribunal has jurisdiction to determine whether or not the TVPEE breached Article 10(1) ECT.

#### (ii)    Article 21 ECT

238.  The Claimants contend that Article 21 ECT does not exclude the application of Article 10 ECT to the TVPEE because the TVPEE is not a "bona fide tax".

239.  The Claimants rely inter alia on the award in *Yukos v. Russian Federation*, where the tribunal held that:

> [T]he carve-out of Article 21(1) can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose…cannot qualify for the exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).[155]

> […]

> Since the claw-back in Article 21(5) of the ECT relates only to expropriations under Article 13 of the ECT, a State could, simply by labelling a measure as "taxation", effectively avoid the control of that measure under the ECT's other protection standards. It would seem difficult to reconcile such an interpretation with the purpose of Part III of the ECT.[156]

240.  In the absence of a definition of "taxes" in the ECT, the Claimants contend that the Tribunal must "look behind the label" in order to determine whether a purported tax falls within the scope of Article 21 ECT.

241.  In this regard, the Claimants contend that the measure's status as a tax under domestic law is not dispositive.  Still, the Claimants question the conformity of

---

[155]  CL-70, *Yukos Universal Ltd. V. Russian Federation*, Final Award, July 18, 2014, ¶ 1407.
[156]  Id., ¶ 1433.

the TVPEE with Spanish law. Specifically, the Claimants contend that Spain's Supreme Court has raised doubts regarding the constitutionality of the measure and has referred the question of its compatibility with EU law to the CJEU.[157] The Claimants further contend that regulations and declarations of fiscal authorities relied on by the Respondent have no bearing on the lawfulness of the measure. The Claimants submit that the validity of the TVPEE under Spanish law therefore remains unsettled.

242. In any event, the Claimants contend that whether or not the TVPEE is considered to be a valid tax as a matter of Spanish law is not determinative of this point. The Claimants rely on several awards in which tribunals have developed legal tests to help determine whether a measure qualifying as a tax under domestic law is a "tax" for the purposes of an investment treaty.[158]

### (iii)    Bona fide tax measure

243. The Claimants cite Wälde and Kolo that a purported tax "can constitute a 'velvet' revocation of contractually conceded investment incentives, and it can be escalated up to the level of what is the economic equivalence of a direct expropriation."[159]

244. The Claimants submit the TVPEE does not have the characteristics of a bona fide tax. In order to assess whether or not a measure is a bona fide tax, the Claimants contend that the Tribunal should focus on three issues:[160] (i) is it imposed by law?; (ii) is it imposed on broad classes of persons?; and (iii) does it raise money for the State treasury to be used for public purposes?

245. Although the TVPEE is imposed by law, the Claimants contend that the measure does not satisfy the other two requirements because: (i) it applies to revenues including incentive tariffs, rather than profits or the wholesale value of electricity generation, and therefore applies disproportionately to incentive revenues that only renewable producers received (i.e. renewable facilities paid

---

[157]    C-260, Auto TS 2955/2014, June 14, 2016; C-261, Auto TS 2554/2014, June 14, 2016.

[158]    CL-165, *Quasar de Valors SICAV S.A. et al. v. Russian Federation*, SCC Case No. 24/2007, Award, July 20, 2012, ¶ 179; CL-70, *Yukos Universal Ltd. v. Russian Federation*, PCA Case No. AA227, Award, July 18, 2014, ¶ 1407; CL-55, *EnCana Corp. v. Republic of Ecuador*, LCIA Case No. UN3481, Award, Feb. 3, 2006, ¶ 142; CL-167, *Murphy v. Ecuador*, ¶ 159; CL-169, *Occidental Petroleum Corporation, Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 Oct. 2012.

[159]    CL-168, Thomas Wälde & Abba Kolo: Investor-State Disputes: The Interface Between Treaty-Based International Investment Protection and Fiscal Sovereignty, at 426.

[160]    CL-55, *EnCana Corp. v. Republic of Ecuador*, LCIA Case No. UN3481, Award, 3 Feb. 2006, ¶ 142.

a higher "tax" on the same amount of electricity production than conventional electricity facilities); and (ii) it does not raise general revenue for the State but is syphoned into the electricity system in order to reduce the regulated tariffs that electricity consumers pay into the system to cover costs such as the tariffs.

246. The Claimants seek to distinguish the awards in *Isolux*, *Eiser* and *Masdar* on the grounds that they focused on Spain's alleged bad faith intent, whereas the Claimants submit that the proper test is the legal and economic effect of the measure, which is not taxation but a reduction of incentives so that electricity consumers will not have to pay for them.

### (2)  The Tribunal's Analysis

247. The Tribunal upholds the Respondent's jurisdictional objection that the Tribunal does not have jurisdiction to hear the Claimants' claim that the introduction of the TVPEE in Law 15/2012 amounted to a breach of Article 10(1) ECT.

248. The Tribunal reaches this conclusion on the basis of the unambiguous language of Article 21 ECT, which like many investment treaties contains an express general "carve-out" of taxation measures from the application of the ECT's protections for investors.

249. The relevant provision is Article 21(1) ECT, which provides that:

> Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[161]

250. This general exclusion, or carve-out, under Article 21(1) ECT is subject to the following claw-backs under Article 21(2) to (5) ECT:

> (2)  Article 7(3) shall apply to Taxation Measures other than those on income or on capital, except that such provision shall not apply to: […]
>
> (3)  Article 10 (2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to: […]
>
> (4)  Article 29(2) to (8) shall apply to Taxation Measures other than those on income or on capital.
>
> (5) (a) Article 13 shall apply to taxes. […]

---

[161]    C-1, ECT, Art. 21(1).

251.    None of these claw-backs are relevant to this jurisdictional objection, a point not contested by the Parties.  (Pursuant to the exception at Article 21(5) ECT, the Parties agree that the Tribunal has jurisdiction to hear the claim that Law 15/2012 violated Article 13 ECT on expropriation.)

252.    This jurisdictional objection therefore turns on the meaning of the term "Taxation Measure", which is defined under Article 21(7)(a) ECT as:

> (i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

> (ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

253.    The ECT does not define the term "taxes" itself.

254.    The Claimants do not contest that the ECT limits certain claims relating to "Taxation Measures".  Rather, the Claimants' case essentially is that the TVPEE does not fall within the definition of "Taxation Measure" because it is not really a tax at all, but a disguised reduction in the FiTs that the Claimants' PV facilities were eligible to receive under RD 661/2007.

255.    The Parties broadly agreed that, in looking "behind the label" to assess whether or not a taxation measure is truly what it says it is, the Tribunal should consider whether the measure: (i) is imposed by law; (ii) imposes an obligation on a broad class of persons; and (iii) entails the payment of money to the State for public purposes.

256.    The Tribunal finds that these characteristics are present in this case.  In particular, the Spanish Constitutional Court confirmed in its judgment of 6 November 2014 that the TVPEE is a tax and is in conformity with the Spanish Constitution.[162]  The Tribunal observes that the lower Spanish courts and the Spanish General Directorate of Taxes have all treated the TVPEE as a valid tax under Spanish law.[163]  The Tribunal also has regard to the decision of the

---

[162]    R-18, Judgment of the Constitutional Court, 183/2014, 6 November 2014.
[163]    R-9, Judgment of the Spanish National Court, 2 June 2014; R-10, Judgment of the National Court, 2 June 2014; R-11, Judgment of the Spanish National Court, 30 June 2014; R-16, Response of the General Directorate of Taxes, 23 December 2014.

European Commission's General Directorate on Taxation and Customs Union (TAXUD) confirming that the TVPEE is a tax in conformity with EU law.[164]

257.    In seeking to distinguish this case from *Isolux*, *Eiser* and *Masdar*, where tribunals found they had no jurisdiction over Article 10(1) ECT claims concerning the TVPEE, the Claimants suggest that the Tribunal should not analyze the Respondent's subjective intent but its legal and economic effect.[165]

258.    However, the Tribunal has already found that the TVPEE is a tax as a matter of both Spanish and EU law.  Further, the Tribunal agrees with the finding in the award in *EnCana v. Ecuador* that the economic analysis of a measure should not displace a finding that a measure is a tax as a matter of law.[166]

259.    Moreover, the Tribunal observes that the Claimants' argument that the Article 21(1) ECT carve-out can only apply to bona fide taxation measures is founded primarily on the award in *Yukos Universal v. Russian Federation*, which was itself premised on the factual finding that Russia had sought to destroy the Yukos oil company for political reasons.  Even if the Tribunal were to interpret Article 21(1) ECT as applying only to "bona fide" tax measures (which the Tribunal does not decide), the Claimants have not proven such bad faith on the part of the Respondent.

260.    In conclusion, the Tribunal finds that the TVPEE is a "Taxation Measure" for the purposes of Article 21(1) ECT.  Accordingly, the Tribunal does not have jurisdiction over the Claimants' claim that the introduction of the TVPEE in Law 15/2012 amounted to a breach of Article 10(1) ECT.

## VII.    LIABILITY

### A.    Overview

261.    The Claimants contend that the Respondent violated Article 10(1) ECT – specifically: (i) the fair and equitable treatment ("**FET**") standard, (ii) the non-impairment standard, and (iii) the requirement to observe obligations entered into with an Investor (the so-called "umbrella clause") – and Article 13 ECT

---

[164]    R-25, Record file of EU Pilot 5526/13/TAXU.
[165]    Claimants' Opening Presentation, slide 107; Claimants' Reply PHB, ¶ 5-6.
[166]    RL-27, *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006, ¶ 142.

concerning unlawful expropriation and measures having equivalent effect, when it enacted the disputed measures.

262.   On the basis of the Parties' respective submissions, the Tribunal considers that the issues to be decided on liability are as follows:

    (a)   Fair and equitable treatment (Article 10(1) ECT):

        (i)   Factually, did Spain incentivize the Claimants to invest when it enacted the tariff regime under RD 661/2007?

        (ii)   Did the Claimants have legitimate expectations that the tariff regime under RD 661/2007 would not change?

        (iii)   Did Spain subsequently abrogate the RD 661/2007 regime? If so, was this:

            (1)   a breach of the Claimants' legitimate expectations?

            (2)   a failure to treat the Claimants' investments transparently and consistently?

            (3)   a failure to act in good faith towards the Claimants' investments?

    (b)   Impairment: Whether Spain impaired the Claimants' investments through unreasonable or discriminatory measures, in violation of the non-impairment standard under Article 10(1) ECT?

    (c)   Umbrella clause: Whether the Respondent violated the ECT's umbrella clause under Article 10(1) ECT when it retroactively amended and then abrogated the RD 661/2007 tariff regime?

    (d)   Expropriation: Whether the Claimants' investments were unlawfully expropriated under Article 13 ECT as a result of the changes to the regulatory framework after RD 661/2007?

263.   The Tribunal has had the benefit of a full exchange of written pleadings and submissions addressing each of these issues. For the avoidance of doubt, even if not specifically mentioned in the summary of the Parties' submissions in the following sections of the Award, all of the Parties' submissions and arguments have been carefully considered by the Tribunal in reaching its decisions.

### B.    Applicable Law

264.    The Tribunal is bound to decide the merits of this dispute in accordance with:

(a)    Article 22(1) of the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce in force since 1 January 2010 (the "**Rules**"), which provides that the Arbitral Tribunal "shall decide the merits of the dispute on the basis of the law(s) or rules of law agreed upon by the parties"; and

(b)    Article 26(6) ECT, which provides that: "The Tribunal shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of International Law."

### C.    Fair and Equitable Treatment under Article 10(1) ECT

265.    The fair and equitable treatment (**FET**) obligation is contained in Article 10(1) ECT, which provides in full that:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

266.    The Claimants contend that:

> Spain violated its duty of fair and equitable treatment in at least three distinct ways: 1) by violating Claimants' legitimate expectation of fixed tariffs for all the electricity produced by their photovoltaic facilities for the lives of those facilities; 2) by failing to treat Claimants' investments transparently and consistently; and 3) by failing to act in good faith towards Claimants' investments.[167]

267.    Further to the Tribunal's directions to the Parties at the conclusion of the Hearing,[168] the Tribunal has distilled the Parties' submissions on the FET claim into four issues:

---

[167]    SoC, ¶ 349.
[168]    Tr. Day 5, 203:11-18; 206:6-11.

(a)    Factually, did Spain incentivize the Claimants to invest when it enacted the tariff regime under RD 661/2007?

(b)    Did the Claimants have legitimate expectations that the tariff regime under RD 661/2007 would not change?

(c)    Did Spain subsequently abrogate the regime?

(d)    If so, was this:

   (i)    a breach of the Claimants' legitimate expectations?;

   (ii)    a failure to treat the Claimants' investments transparently and consistently?; and/or

   (iii)    a failure to act in good faith towards the Claimants' investments?

### (1)  The Parties' Positions

### a.  Claimants' Position

*(i) Factually, did Spain incentivize the Claimants to invest when it enacted the tariff regime under RD 661/2007?*

268.    The Claimants contend that Spain:

> exercised its regulatory power to incentivize renewable energy investments by granting fixed tariffs and deliberately relinquishing its discretion to reduce those tariffs for existing (already built) plants, because Spain needed and wanted to induce massive investment in its renewable energy sector. [169]

269.    In particular, the Claimants contend that they were incentivized to invest by the explicit terms of RD 661/2007 and by certain roadshows, statements and promises of high-ranking Spanish representatives reinforcing that RD 661/2007 offered stability and an attractive and predictable level of profitability for renewable energy investors.

270.    The Claimants contend that RD 661/2007 expressly established fixed FiTs (indexed to inflation) that would be paid for the lifetime of a PV plant, established priority of access and dispatch to the grid, and, crucially, guaranteed that Spain would not in future alter the benefits for an existing (already built) PV facility properly registered under RD 661/2007.[170]  FiTs would be reviewed four years after enactment, but any future revisions would not affect the FiTs guaranteed to existing PV facilities already in operation.

---

[169]    Claimants' Opening Presentation, slide 3.
[170]    SoC, ¶ 9.

271.    The legal framework for the RD 661/2007 support scheme was provided by Law 54/1997, which aimed to reduce electricity costs through market mechanisms and instructed the regulator to set above-market FiTs in order to meet Spain's renewable energy targets, taking into account many different factors.   These factors included a "reasonable rate of return", which the Claimants contend was neither intended to be a cap nor a target for incentives.[171]

272.    The Claimants contend that the incentives in RD 661/2007 were necessary for Spain to attract sufficient investment to meet its ambitious EU and international environmental targets for renewable energy production.   By contrast, the support schemes enacted by Spain in 1998 (RD 2818/1998) and 2004 (RD 436/2004) had failed to attract sufficient investment for Spain to meet its targets because they had not offered fixed or stable FiTs.  Spain finally "got it right" when it enacted RD 661/2007.[172]

273.    The Claimants contend that rational investors would not have constructed PV facilities without government support because of the capital-intensive nature of PV investments.  Approximately 90% of the total installed costs of a PV facility are upfront capital costs incurred in constructing the facility.[173]  In the case of the Claimants' PV facilities, that figure was 92%.[174]  These costs are sunk upon completion and will never decrease for the existing PV facility in question.  By contrast, operating costs are relatively low (approximately 8% of total installed costs).[175]  Moreover, the up-front cost of constructing PV facilities was higher than the price of electricity, and the average cost of constructing a PV facility decreased with technological advances over time, meaning that a rational investor would always delay investing in the knowledge that a PV facility would cost less to build in future.[176]  Thus, the Claimants contend, stable and predictable incentives were necessary in order to encourage investment in PV facilities by mitigating the capital-intensive and high cost nature of such investment.

---

[171]    Hr. Day 1, 11:23.
[172]    Hr. Day 1, 7:2.
[173]    Moselle/Grunwald 1st, ¶ 5.30.
[174]    Hr. Day 1, 14:23-24.
[175]    Moselle/Grunwald 1st, Figure 5-2.
[176]    Hr. Day 1, 15:8-16:19.

274.   The Claimants contend that Spain "very aggressively promoted the transparency, stability and non-retroactivity" of the RD 661/2007 support scheme.[177]  The Claimants rely inter alia on the following:

(a)   a press release accompanying RD 661/2007, in which Spain stated:

> It will be in 2010 that the tariffs and premiums set out in the proposal will be revised in accordance with the targets set in the Renewable Energies Plan 2005–2010 and in the Energy Efficiency and Savings Strategy and in line with the new targets included in the following Renewable Energies Plan for the period 2011–2020.
>
> The revisions carried out in the future of the tariffs will not affect those Installations already in operation. This guarantee provides legal safety for the producer, affording stability to the sector and fostering its development.
>
> [...]
>
> Every 4 years the tariffs will be revised, bearing in mind compliance with the targets set.  This will allow an adjustment to the tariffs in line with the new costs and the degree of compliance with the targets.  The tariff revisions carried out in the future will not affect those installations already operating.  This guarantee affords legal safety to the producer, providing stability to the sector and promoting its development.[178]

(b)   assurances of "legal security" and "stable remuneration" by senior Spanish officials;[179]

(c)   CNE presentations promoting Article 44.3 RD 661/2007 as a guarantee that FiTs would not be retroactively changed for existing facilities;[180]

(d)   CNE, IDAE and INVEST IN SPAIN "roadshows" held to promote RD 661/2007 across the globe, in which returns of "between 8 and 11%" and "sometimes even up to 20%" were touted;[181]

---

[177]   Hr. Day 1, 7:11-12.

[178]   C-99, Press Release 661/2007.

[179]   C-103, Joan Clos i Matheu Before the Senate, 9 October 2007.

[180]   C-130, Carlos Solé Martín, CNE Director of Electricity, The New Regulatory Framework for Renewable Energy in Spain, June 18, 2007, slide 8; C-128, Carlos Solé, CNE Director of Electricity, International Renewable Energy Regulation. The Spanish Case, Presentation, Eilat (Israel), Dec. 2008, slide 33; C-107, Javier Peón Torre (CNE, Counselor), Presentation, Legal Aspects of Renewable Energies, presented at the "V Edicion del Curso ARIAE de Regulacion Energética," 19-23 Nov. 2007, slides 96, 113; C-127, Carlos Solé and José Miguel Unsión (Directors of the CNE), Presentation, 22 Apr. 2008, slide 27.

[181]   See, e.g., C-107, Javier Peón Torre (CNE, Counselor), Presentation Legal Aspects of Renewable Energy , presented at the "V Edicion del Curso ARIAE de Regulacion Energética," sponsored by ARIAE, CNE and Spain's Agency of International Cooperation-Ministry of Foreign Affairs, in Cartagena de Indias (Colombia), November 19-23, 2007, at 96, 106 ("Economic incentives constitute an instrument of energy and environmental policy (sufficient for a reasonable profitability but … incentives that obtain a profitability higher

275.    The Claimants also rely on the finding of the ECT tribunal in *Novenergia v. Spain*, which concerned the same measures as in the present case, that Spain made "a number of relevant statements or assurances" that "were indeed aimed at incentivizing companies to invest heavily in the Spanish electricity sector", and "[a] considerable number of RE companies…invested in reliance on these statements and assurances."[182]

276.    In sum, the Claimants contend that they were offered an extraordinary degree of security through the combination of: (i) a perfectly known price (since the FiT was fixed) and (ii) inflation-indexed adjustments, together with (iii) the guarante of continued support throughout the entire life of each PV facility, and (iv) the guarantee of no retroactive effect of future revisions.

277.    Further, with the comfort of fixed, long-term FiTs – which comprised 80-90% of a PV facility's revenue – the Claimants were able to secure financing for their investments.  The Claimants contend that they conducted due diligence and were advised by prominent counsel and experts with no caveats that they were eligible for the fixed FiTs under RD 661/2007.[183]

278.    The Claimants contend that, in reliance on the guarantees in RD 661/2007, as well as the representations of Spanish officials, they acquired and developed three PV projects: Madridejos (acquired by Foresight I in May 2009), La Castilleja (acquired by Foresight 2 and GWM in March 2010), and Fotocampillos (acquired by GWM II in May 2010; contributed to Greentech in August 2011).  All three were registered in the Administrative Registry for Special Regime Generation Facilities (**RAIPRE**) (see paragraph 88 above), at which point the Claimants contend that the right to receive the FiTs stipulated in RD 661/2007 vested.  The Claimants' PV facilities initially received the RD 661/2007 FiTs.

---

than that reasonable are justified)"); C-130, Carlos Solé Martín (CNE, Energy Director), Presentation, The New Regulatory Framework for Renwable Energy in Spain , presented at the IX Latin American Meeting of Energy Regulators, in Madrid, June 18, 2007, slide 7; C-120, Jaume Margarit, Renewable Energies (Director of the IDAE), Presentation, Economic Aspects of Development of Renewable Energy. Investment Costs, Profitability and Incentives of Solar Thermo-Electric Technology (Madrid) , in  Jornada sobre Perspectiva Actual y Evolución de las Energías Renovables en España organized by the CNE in Madrid, December 11, 2007, slide 15.

[182]    CL-185, *Novenergia*, ¶¶ 666-67.

[183]    SoC, ¶ 237.

279.    More generally, the Claimants contend that RD 661/2007 was a great success and resulted in approximately €18 billion being invested into Spain's renewable energy sector between 2007 and 2009,[184] thereby transforming Spain's PV sector into a global leader. Spain subsequently enacted a similar, albeit scaled back, FiT support scheme under RD 1578/2008.

### (ii) Did the Claimants have legitimate expectations that the tariff regime under RD 661/2007 would not change?

280.    The Claimants submit that the protection of legitimate expectations is a well-established component of the FET standard.[185]

281.    The Claimants contend that their legitimate expectations that they would receive the precise FiTs specified in RD 661/2007 over the lifetime of their PV facilities are based primarily on the unequivocal terms of RD 661/2007, specifically:

(a)    The right to receive incentives "for the total of partial sale of the net electricity generated" pursuant to Article 17;

(b)    The right to fixed incentives pursuant to Article 36, as follows:

PV facilities under 100 kW – Fixed FiTs of 44.0381 c€ per kWh of electricity produced for the first 25 years of the facilities' operation (and fixed tariffs of 35.2305 c€ per kWh of electricity produced for the remaining life of the facilities);

PV facilities between 100 kW and 10 MW – Fixed FiTs of 41.75 c€ per kWh of electricity produced for the first 25 years of the facilities' operation (and fixed tariffs of 33.4 c€ per kWh of electricity produced for the remaining life of the facilities).

(c)    The right to have those FiTs updated "on an annual basis using as a reference the increase in the CPI" pursuant to Article 44.1;

(d)    The guarantee against any other revisions to the FiTs granted to existing plants pursuant to Article 44.3, which provides:

The revisions to the regulated tariff and the upper and lower limits [under the premium option] indicated in this section shall not affect facilities for which the deed of commissioning shall have been granted

---

[184]    Hr. Day 1, 7:20-21.
[185]    SoC, ¶ 351.

> prior to January 1 of the second year following the year in which the revision shall have been performed.

282. Further, the Claimants contend that their legitimate expectations that the tariff regime under RD 661/2007 would not change are also based on: (i) the fact that, under Spanish law, registration in the RAIPRE "transformed RD 661/2007's offering of incentives to a specific, identifiable class of investors into an individual (plant-specific) right to a certain incentive tariff recognized by Spain"; [186] (ii) the context in which Spain enacted RD 661/2007, which established a clear, straightforward and stable legal framework to incentivize renewable investment after earlier support schemes had failed; (iii) roadshows, statements and promises of high-ranking Spanish representatives and offices, including by the Council of Ministers in its announcement accompanying RD 661/2007; (iv) advice from Spanish lawyers; and (v) the fact that international banks were willing to provide financing on favourable terms based on predictable cash flows under the RD 661/2007 regime.[187]

283. The Claimants submit that their legitimate expectations are supported by the findings of the *Novenergia v. Spain* tribunal, which found that, "RD 661/2007 was so adamantly clear that its understanding by common readers did not require a particularly sophisticated analysis", and that the 2005 PER, RD 661/2007, RD 436/2004 and Spanish Supreme Court cases could not have:

> given the Claimant the expectation that a 'reasonable rate of return' would be limited to 7%, that stability and predictability could not be expected in the SES, that the Special Regime could be abolished, or any of the other arguments that the Respondent appears to make.[188]

284. Applying the approach of the *Novenergia* tribunal, the Claimants contend that the date of investment for the purposes of the ECT is 8 May 2009, when the first of the Claimants' investments was made by Foresight.[189] However, the Claimants contend that the majority of the Respondent's evidence purportedly demonstrating that the Claimants should have expected changes to the RD 661/2007 incentives in fact post-dates the Claimants' investments. For example, only seven of the hundreds of Spanish Supreme Court decisions between 2005 and 2012 relied on by the Respondent were rendered before the

---

[186] Claimants' Opening Presentation, slide 68.
[187] SoC, ¶ 379.
[188] CL-185, *Novenergia*, ¶ 674.
[189] CL-185, ¶ 539.

Claimants made their investments between 8 May 2009 and 7 May 2010,[190] and none of those cases involved the RD 661/2007 support scheme, nor considered the effect of a clause precluding future changes to incentive rates for existing PV facilities (such as that in Article 44.3 of RD 661/2007).[191]  In sum, the Claimants contend that there was no indication at the time the investments were made that the Respondent would or could reduce incentives for existing PV facilities.

285.   Moreover, the Claimants contend that, at the time they made their investment, neither the Respondent nor the EC asserted that payment of FiTs under RD 661/2007 constituted State aid under EU law.  The Claimants submit that the EC State Aid Decision dated 11 November 2017 relied on by the Respondent – concerning the lawfulness of the New Regulatory Regime under EU State aid law – does not assess the RD 661/2007 support scheme and is therefore irrelevant to the question of the Claimants' legitimate expectations.[192]

*(iii) Did Spain subsequently abrogate the RD 661/2007 regime?*

286.   The Claimants contend that Spain, having met its renewable energy targets for 2010, subsequently reneged on the guarantees of stability and non-retroactivity under RD 661/2007 and began cutting the incentives granted to existing PV facilities, including the Claimants' three facilities.

287.   In particular, the Claimants contend that:

(a)     In November 2010, Spain reduced the duration of the RD 661/2007 FiTs from the lifetime of the PV facility to 25 years (RD 1565/2010, subsequently extended to 28 years by RDL 14/2010 and to 30 years by Law 2/2011);

(b)     In December 2010, Spain reduced the effective FiT rates for the Claimants' PV facilities by 24% in 2011-2012 through the introduction of an "emergency" operating hour cap on PV production,[193] and also imposed a 0.5€/MWh "access toll" on all electricity delivered to the grid (RDL 14/2010).

---

[190]   Claimants' Opening Presentation, slide 184.
[191]   Claimants' Reply ¶¶ 256-263, 416-419; Claimants' Opening Presentation, slides 184-190; Hr. Day 1, 118:22-126:25; Claimants' Reply PHB, n.55.
[192]   RL-97, EC State Aid Decision.
[193]   SoC, ¶ 266.

(c)     In December 2012, Spain introduced a 7% "tax" on the production of electricity (Law 15/2012).

(d)     In February 2013, Spain amended the inflation index used to annually update FiTs under RD 661/2007 (RDL 2/2013).

(e)     Finally, between July 2013 and June 2014, Spain enacted the New Regulatory Regime, which abolished the fixed FiT support schemes under RD 661/2007 and RD 1578/2008 and replaced them with far less valuable incentives under a result-orientated regime that engineered remuneration to achieve a "reasonable rate of return" for a "standard facility" initially set at the ten-year average of Spanish Government bond yields plus 3% (7.938% pre-tax).

288.    The Claimants further contend that the New Regulatory Regime implemented major structural changes in comparison to RD 661/2007, including: (i) the change from a "regulated return" to an "at risk" regulatory framework; [194] (ii) stricter targets to earn the target rate of return, in particular an increase in operating hours and electricity production that a PV facility must achieve to obtain the target return;[195] (iii) the change in the FiT incentive structure from a production payment (a fixed €/MWh FiT, with no limit on production) to a payment based mainly on plant capacity, and the introduction of a cap on production incentives at the maximum operating hours;[196] (iv) reduction in the reasonable return on investments by setting it at 7.398% pre-tax for 2013-2018 (5.9% after-tax, compared with 7%-9.5% after-tax under RD 661/2007); [197] (v) introduction of a mechanism to retroactively "clawback" profits earned prior to the New Regulatory Regime by reducing remuneration earned in 2013-2018, so as to ensure PV facilities earn a return around the new 7.398% pre-tax target over their entire regulatory lives;[198] (vi) cut the duration that incentives would be paid from the lifetime of a PV facility to 30 years;[199] and (vii) changed the allocation of interest rate risk.[200]

289.    The Claimants contend that the Respondent's decision to cut renewable incentives, rather than set electricity prices at levels sufficient to cover total

---

[194]    SoC, ¶ 300.
[195]    FTI Regulatory Presentation, slide 28.
[196]    FTI Regulatory Presentation, slides 7-8; Claimants' Opening Statement, slide 115.
[197]    FTI Regulatory Presentation, slide 10; Claimants' Opening Statement, slide 113.
[198]    FTI Regulatory Presentation, slide 12; Claimants' Opening Statement, slide 111.
[199]    FTI Regulatory Presentation, slide 7; Claimants' Opening Statement, slide 95.
[200]    FTI Regulatory Presentation, slide 13; Claimants' Opening Statement, slide 118.

electricity costs, was a political choice taken with full knowledge that Spain would be liable to compensate investors. The Claimants cite an article in the *El Mundo* newspaper dated 8 October 2014, which reported that:

> …[T]he Government estimates that … if all arbitrations are resolved against Spain, the impact for the state would be €1.2 billion…. In the [Energy Ministry] they believe that this number is 'minor' if [it is] compared with the savings for the electricity consumer due to the latest reforms on the remuneration of renewable [energy] and cogeneration.[201]

290. The Claimants contend that Spain's abrupt regulatory about-face severely harmed the Claimants' investments. In particular, Spain's measures: (i) reduced the revenues and cash flows that had been promised under RD 661/2007, thereby also shortening the economic life of the Claimants' investments; (ii) increased working capital requirements; (iii) increased the risk of default and insolvency; (iv) increased exposure to changes in market prices, interest rates, and operating costs; and (v) increased regulatory risk.

291. The Claimants' quantum expert calculates that the disputed measures reduced the revenues of the Claimants' PV facilities by approximately 23% (or €150 million) over their lifetimes.[202]

292. On 6 November 2015, Foresight 1's subsidiary, Foresight Netherlands Solar 1 B.V., sold the Madridejos project for €4.2 million, compared to the over €9 million it had originally paid to acquire Madridejos.[203] As part of its mitigation strategy, in July 2016 Greentech acquired Foresight 2's 49.97% share of La Catilleja for €3.8 million, and has thereby become sole owner of that project.[204] On 28 September 2016, Greentech sold its equity the Fotocampillos project for €2.9 million.[205]

### *(iv) Was there a breach of the Claimants' legitimate expectations?*

293. The Claimants submit that the Respondent violated their legitimate expectations when it: imposed a limit on the annual operating hours for which PV facilities could receive FiTs (RD 14/2010); further reduced the effective tariff rate through the introduction of a 7% tax on the production of electricity (Law 15/2012) and by de-linking tariff adjustments from the CPI (RDL 2/2013), and

---

[201] C-252B, "350 challenges against the cut to renewable energy in Spain," *El Mundo*, 8 Oct. 2014.
[202] Edwards 1st, ¶ 2.1.
[203] Edwards 2nd, ¶ 4.36; RE-15, Share Sale and Purchase Agreement of Acacia, August 2015.
[204] Edwards 2nd, ¶ 4.37; RE-203, Greentech's Share Sale and Purchase Agreement of Foresight's stake in Global Litator, July 2016.
[205] Edwards 2nd, ¶ 4.41; RE-336, Greentech's Share Sale and Purchase Agreement of Fotocampillos Companies, September 2016.

then ultimately replaced the guaranteed FiTs with an arbitrarily defined "reasonable rate of return" when it repealed and replaced RD 661/2007 with the New Regulatory Regime (RDL 9/2013; Law 24/2013; RD 413/2014; MO 1045/2014).

294.    The Claimants contend that these measures violated Spain's obligations under RD 661/2007, as summarized below:

| Measure | Violation | Relevant RD 661/2007 provision |
|---|---|---|
| 2010 Operating Hours Restrictions (RDL 14/2010) | Spain's obligation to pay incentives on all electricity an eligible PV facility could produce | Article 17 |
| 2012 TVPEE (Law 15/2012) | Spain's obligation to pay fixed incentives for the lifetime of PV facility operation | Article 36 |
| 2013 Change in CPI inflation index (RDL 2/2013) | Spain's obligation to adjust RD 661/2007 incentives according to the CPI | Article 44.1 |
| 2013-2014 "New Regulatory Regime" (RDL 9/2013; Law 24/2013; RD 413/2014; MO 1045/2014) | Spain's obligation to pay fixed incentive rates for the lifetime of PV facility operation | Article 36 |

295.    The Claimants submit that there is "a critical distinction to be made in this case between existing, already built plants versus future PV plants".[206]    The Claimants recognize that Spain could always change the FiTs for new or future PV facilities.    However, the Claimants contend that Spain may not, without breaching its obligations under the ECT, change FiTs for existing, already built PV facilities.[207]

296.    The Claimants deny that the awards in *Charanne v. Spain* and *Isolux v. Spain*, in which both tribunals found that investors did not have legitimate expectations that Spain would not change the RD 661/2007 support scheme,[208] are relevant to the present case.    The Claimants criticize and seek to distinguish the

---

[206]    Hr. Day 1, 6:9-11.
[207]    Hr. Day 1, 37:2-14.
[208]    Claimants' Reply, ¶¶ 434-455; CL-92/RL-49, *Charanne*; RL-83, *Isolux*.

72

Charanne and Isolux awards on a number of grounds, including that Charanne concerns only the 2010 measures and the claimant in Isolux did not invest until 2012, after Spain had already enacted changes to RD 661/2007.

297.  In the alternative, the Claimants submit that, even if they did not have a legitimate expectation of stability regarding the precise FiTs in RD 661/2007, Spain's enactment of the New Regulatory Regime still violates the FET standard because it is, to quote the tribunal in Eiser v. Spain, a "fundamental change to the regulatory regime in a manner that does not take account of the circumstances of existing investments made in reliance on the prior regime."[209] The Claimants also rely on the finding of the ECT tribunal in Novenergia v. Spain that Spain violated the ECT by implementing the New Regulatory Regime, which the Novenergia tribunal found "radically", "unexpectedly", and "drastically" altered the RD 661/2007 support scheme, fell "outside the acceptable range of legislative and regulatory behavior", and "entirely transformed and altered the legal and business environment under which the investment was decided and made".[210]

298.  However, the Claimants contend that it is unnecessary for the Tribunal to apply the "fundamental change" standard – or to engage in any balancing exercise that seeks to evaluate whether or not Spain's modifications to the regulatory regime were appropriate – because there was, to quote Eiser, a "specific assurance giving rise to a legitimate expectation of stability" in Article 44.3 of RD 661/2007.[211]

> (v) Was there a failure to treat the Claimants' investments transparently and consistently?

299.  The Claimants contend that the Respondent also violated the FET standard by failing to treat the Claimants' investments transparently and consistently, which the Claimants submit is a distinct component of the ECT's FET clause.[212]

300.  The Claimants submit that a State's duty of transparency "requires both the absence of any ambiguity or opacity in its treatment of investments, and that the legal framework that will apply to an investment be readily apparent."[213]

---

[209]  CL-170, Eiser, ¶ 363.
[210]  CL-185, Novenergia. ¶ 695.
[211]  CL-170, Eiser, ¶ 363.
[212]  SoC, ¶ 379.
[213]  Claimants' PHB, ¶ 102.

The Claimants contend that none of the changes enacted by the Respondent subsequent to the Claimants' investments can be traced to the legal framework under which they invested.

301.   Moreover, the Claimants contend that the New Regulatory Regime is plainly inconsistent with the regime under which the Claimants invested. Indeed, Spain repealed Law 54/1997, which provided the overarching legal framework under which the RD 661/2007 support scheme operated, so that it could enact the New Regulatory Regime.

302.   In short, the Claimants contend, the Respondent "has made the investment environment entirely uncertain and future remuneration impossible to predict."[214]

303.   Further, the Claimants contend that the Respondent's pleaded case on legitimate expectations – that RD 661/2007 did not mean what it plainly said when it guaranteed specific FiTs for the life of a facility, that RD 661/2007 did not mean what Spanish officials repeatedly said it said, and that RD 661/2007 did not mean what sophisticated investors and lenders believed it said – is "essentially a damning confession on the subject of transparency (as well as consistency and good faith)".[215]

>*(vi) Was there a failure to act in good faith towards the Claimants' investments?*

304.   The Claimants contend that the Respondent violated the FET standard by failing to treat the Claimants' investments in good faith, which the Claimants submit is a distinct component of the ECT's FET clause.[216]

305.   The Claimants contend that the Respondent's conduct was not in good faith because it: (i) cut the FiTs after reaping the benefit of new PV capacity and in the knowledge that the majority of investors' costs in PV facilities was sunk at the time of investment; and (ii) used the Claimants and other renewable energy investors as a "scapegoat" for its tariff deficit.[217]

---

[214]   SoC, ¶ 387.
[215]   Reply, ¶ 469.
[216]   CL-18, RUDOLF DOLZER & CHRISTOPH SCHREUER, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW 145 (2d ed. 2012); CL-33, *Sempra Energy Int'l v. Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 Sept. 2007, ¶¶ 298-299; CL-34, *Biwater Gauff (Tanzania) v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶ 602.
[217]   Claimants' PHB, ¶ 111.

### b. Respondent's Position

> *(i) Factually, did Spain incentivize the Claimants to invest when it enacted the tariff regime under RD 661/2007?*

306.  The Respondent admits that RD 661/2007 was one of the incentives it offered for renewable energy investors at the time the Claimants made their investments.[218]

307.  However, the Respondent contends that it never guaranteed that the Claimants' PV plants would receive a fixed FiT throughout their operating lives. Rather, Article 30.4 RD 661/2007 guaranteed only a "reasonable rate of return" assessed by reference to returns in the capital markets.  The Respondent accepts that the press release accompanying RD 661/2007 did state that future revisions to the FiTs would not affect PV facilities that had already been commissioned, but the Respondent contends that this statement concerned revisions within the framework of Article 44 RD 661/2007.[219]  As Mr Váquer, the Respondent's expert on Spanish law, stated at the Hearing, the press release "doesn't say a thing about the possibility of having [RD 661/2007] being repealed afterwards.  It only speaks about revisions carried out under that particular royal decree."[220]

308.  Further, the Respondent contends that RD 661/2007 did not offer more stability than RD 436/2004 and was actually intended to correct windfall profits generated under the RD 436/2004 support scheme, and to reverse the tariff deficit so as to ensure the sustainability of the SES.  Indeed, the Respondent contends that RD 661/2007 actually *reduced* remuneration for all PV facilities under 100kWh, which in 2009 were 99% of all PV facilities in Spain.[221]

309.  Moreover, the Respondent contends that the fact that RD 661/2007 amended the RD 436/2004 support scheme is fatal to the Claimants' theory that they were guaranteed fixed FiTs for the lifetime of their PV facilities.  The Respondent contends that this reflects the reality that the RD 436/2004 and RD 661/2007 support schemes were merely regulations that could not as a matter of Spanish law petrify the legal framework under Law 54/1997.  The Respondent also rejects the Claimants' reliance on the supposed guarantee

---

[218]   Respondent's PHB, ¶ 25.
[219]   Respondent's PHB, ¶ 57.
[220]   Hr. Day 4, 106:12-15.
[221]   Montoya 2nd, ¶ 31.

under Article 44.3 of RD 661/2007.  Rather, the Respondent contends that Article 44.3 RD 661/2007 is very similar to Article 40.3 RD 436/2004, which did not prevent the changes to FiTs and other aspects of the support scheme subsequently introduced by RD 661/2007.

310.    The Respondent also denies that it conducted an "aggressive campaign" to attract foreign investment under RD 661/2007.

311.    The Respondent contends that the Claimants misrepresent the alleged assurances of Spanish officials.  The Claimants knew – or would have known, had they conducted proper due diligence of the strategically important and highly regulated SES – that they were entitled only to a reasonable rate of return under Law 54/1997, which provided the regulatory framework for the RD 661/2007 support scheme.  Further, the Claimants' reliance on the purported stabilization clause in Article 44.3 RD 661/2007 is completely misplaced.  No diligent investor could have believed that existing regulations could never be adapted to changing economic circumstances or technical developments.  Indeed, prior to the enactment of RD 661/2007, there were a number of regulatory changes to the renewable energy support schemes that were introduced under Law 54/1997.

312.    The Respondent also contends that the Claimants have not provided any evidence supporting their claim that they acquired a right to the payment of future FiTs in respect of all the energy their PV facilities might produce, for the whole operating life of those PV facilities, without any possible limit.

> *(ii) Did the Claimants have legitimate expectations that the tariff regime under RD 661/2007 would not change?*

313.    The Respondent submits that the Claimants did not have legitimate expectations that the tariff regime under RD 661/2007 would not change during the entire life of the PV facilities registered thereunder.

314.    The Respondent contends that it did not make any specific commitment to the Claimants, without which the Respondent submits there can be no legitimate expectation that a general regulatory framework will remain unchanged.[222]  The Respondent submits that the Claimants' position effectively requires the regulatory framework to be "petrified" at the time an investment is made,

---

[222]    CL -180, *Blusun v. Republic of Italy*, ¶ 372.

contrary to the position under Spanish law, EU State aid law, and the Parties' rights and obligations under the ECT.

315.    The Respondent contends that the Claimants never commissioned legal due diligence on the specific issue of whether or not the tariff regime could be changed, as admitted by Mr Jamie Richards, a partner of Foresight Group, at the Hearing.[223]  The Respondent contends that such legal due diligence would have revealed that there was no basis for the Claimants to objectively and reasonably expect the regulatory framework to be "petrified".  The Respondent further contends that the Claimants' expectations were not reasonable or justified in light of the information regarding regulatory risk that the Claimants knew, or should as a diligently informed investor have known, at the time of their investments.

316.    The Respondent contends that the following factors demonstrate that the Claimants could not have had legitimate expectations that the tariff regime would not change.

317.    First, the Respondent contends that the evolution of the Spanish support schemes demonstrated to the Claimants that the regulatory regime could be changed.  In particular, the Respondent relies on the fact that RD 436/2004 was modified by RD 661/2007 – notwithstanding Article 40.3 RD 436/2004, which is similar to the supposed "guarantee" language in Article 44.3 RD 661/2007 relied on by the Claimants – as well as the Fifth Additional Provision of RD 1578/2008, which expressly provided for revision to FiTs of existing facilities in 2012.[224]

318.    Second, the Respondent submits that it is significant to the issue of legitimate expectations that the Claimants invested in a strategic and highly regulated sector.  In particular, the Respondent contends that any diligent investor would have been aware that the Respondent was required to balance investor and consumer interests pursuant to the legal and regulatory framework. The Respondent refers to the preamble to RD 661/2007, which provides:

> The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997, of 27 November, on the Electricity Sector, guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an

---

[223]    PHB, ¶ 64; Tr. Day 2, Day 2, 82:1-17.
[224]    R-72, RD 1578/2008, Fifth Additional Provision.

> assignment of the costs attributable to the electricity system which is also
> reasonable, […].[225]

319. The Respondent further explains that the SES is based on two basic principles:
sustainability and reasonable return.  In accordance with the principle of
hierarchy under Spanish law, RD 661/2007 operated within the regulatory
framework established by Law 54/1997, which subordinates the payment of
renewable electricity subsidies to the need to ensure the financial sustainability
of the SES.[226]  The Respondent contends that since 2006 it has warned
investors that returns must be proportional to consumers' bills.[227]  The
Respondent further contends that RD 661/2007, RD 1578/2008, CNE
Report 30/2008, RDL 6/2009, and Law 2/2011 all emphasized the need to
ensure the sustainability of the SES.[228]

320. Third, the Respondent contends that a reasonable investor would have known
that the incentives under RD 661/2007 could be amended as a matter of
Spanish law, as interpreted by the Spanish Supreme Court.[229]  The
Respondent contends that the Supreme Court has confirmed in its judgments
that the Respondent's power to make regulatory changes to renewable
electricity support schemes is limited only to ensuring that investors have: (i) a
reasonable rate of return; (ii) priority of access to the grid; and (iii) priority of
dispatch to the grid.[230]  The Respondent contends there is no material
difference in the jurisprudence dated prior to and after the Claimants'
investments.[231]  Moreover, before the Claimants invested the limits of the
Respondent's regulatory power under Article 30.4 of Law 54/1997 had been
clearly established in the Supreme Court's decision of 25 October 2006.[232]  The
Respondent relies inter alia on the decision of the Spanish Supreme Court
dated 9 December 2009 concerning a challenge to RD 661/2007, in which the
court stated:

> [The claimant] does not pay enough attention to the case law of this Chamber
> specifically referred to with regard to the principles of legitimate expectation
> and non-retroactivity applied to the successive incentives' regimes for
> electricity generation. This involves the considerations set out in our decision

---

[225] RD 661/2007, Preamble, R-71.
[226] Rejoinder/Reply, ¶¶ 168-170.
[227] See, e.g., R-224, Appearance of the Secretary General of Energy, Ignasi Nieto Magaldi, before the Congress of Deputies, 8 November 2006.
[228] Rejoinder/Reply, ¶ 30, 273(x), 292, 513; Counter-Memorial, ¶ 502.
[229] Rejoinder/Reply, ¶¶ 181-189; Counter-Memorial, ¶ 13.
[230] Respondent's PHB, ¶ 142;
[231] Respondent's PHB, ¶ 80.
[232] R-117, Ruling of the Third Chamber of the Supreme Court, 15 December 2005.

dated October 25, 2006 and repeated in that issued on March 20, 2007, inter alia, about the legal situation of the owners of electrical energy production installations under a special regime to whom it is not possible to acknowledge for the future an "unmodifiable right " to the maintenance unchanged of the remuneration framework approved by the holder of the regulatory authority provided that the stipulations of the Law on the Electricity Sector are respected in terms of the reasonable return on investments.[233]

321.   Fourth, the Respondent contends that the payment of FiTs under RD 661/2007 was a subsidy intended only to create a level playing field between conventional and renewable energy producers. The Claimants could not therefore expect to receive a higher FiT than necessary to compensate for the difference between the cost of producing renewable electricity and the market price.

322.   Fifth, the level of subsidy was set on the basis of assumptions and forecasts regarding macroeconomic circumstances but was also subject to ensuring the overall sustainability of the SES. The Claimants could not therefore have had a legitimate expectation that FiTs would not change in the event a change of macroeconomic circumstances impaired the sustainability of the SES.

323.   Relatedly, the Respondent also relies on the EC State Aid Decision dated 11 November 2017, which concerns whether or not the New Regulatory Regime that replaced RD 661/2007 and RD 1578/2008 constituted unlawful State aid under EU law.

324.   The Respondent contends that the EC State Aid Decision stands for five propositions. First, the RD 661/2007 support scheme constitutes State aid under EU law, which requires that subsidies are constantly monitored in to order to ensure that they are always proportionate from an economic perspective to the State's policy goal of promoting renewable energy. Second, under EU law there is no right of an investor to State aid generally or to a specific structure or level of support. Third, the RD 661/2007 support scheme was not authorized by the European Commission, meaning that its lawfulness under EU State aid rules was not determined. Fourth, the Claimants, as recipients of State aid, could not have had legitimate expectations that the un-notified State aid, i.e. RD 661/2007, was either lawful or would not be modified. Fifth, the European Commission is the only authority with the competence to

---

[233]   R-122, Judgment of the Third Chamber of the Supreme Court, 9 December 2009, Point of Law 6, p.4.

decide the lawfulness of State aid; it follows that the Tribunal does not have the competence to authorize the granting of State aid.[234]

325.    Sixth, the Respondent relies on the fact that certain of the Claimants' contracts relating to the Claimants' acquisitions of the PV facilities contain provisions acknowledging the possibility of regulatory changes.[235]

### (iii) Did Spain subsequently abrogate the RD 661/2007 regime?

326.    The Respondent contends that it has not in fact abrogated the support scheme for PV electricity producers, from either an economic or legal perspective. The Respondent admits that the disputed measures have introduced some changes but maintains that the essential nature of the renewables regime has remained unchanged, specifically the granting of a subsidy, priority of market access and dispatch, and a reasonable rate of return of 7.398% pre-tax (6.39% post-tax) that was well above the market weighted average cost of capital (**WACC**) (6.89% pre-tax[236]).[237]  There has been no negative impact on the Claimants' investments as a result of the disputed measures.

327.    The Respondent contends that fixed FiTs were never guaranteed under RD 661/2007 and it permissibly made changes to incentives in response to changing circumstances.  The economic situation in Spain by the time of the Claimants' investments in 2009-2010 was completely different from that which had prevailed when RD 661/2007 was enacted.  As a result of the financial crisis, electricity demand fell to 2005 levels.[238]  Whereas the Respondent had intended the FiTs to yield a 7% rate of return,[239] investors in PV facilities ended up receiving excessive remuneration resulting in a rate of return of more than 9%.[240]  This negatively impacted the economic sustainability of the SES.

328.    In order to address this situation, the Respondent did two things.  First, it increased the access tariffs paid by Spanish electricity consumers to among

---

[234]   The Respondent also contends that any award by the Tribunal in this arbitration ordering the Respondent to pay compensation would itself constitute State aid, and such an award would therefore have to be authorized by the European Commission.  Hr. Day 2, 127:4-21; Respondent's PHB, ¶ 217.

[235]   C-196, Purchase Agreement for shares in Acacia Instalaciones Fotovoltaicas S.L., 8 May 2009, p.111.

[236]   BDO 1st, Table 23.

[237]   Hr. Day 1, 205:8-11; BDO 2nd, Table 23.

[238]   Hr. Day 1, 164:3-4.

[239]   R-92, 2005 PER, p.274; BDO 2nd, ¶ 155.

[240]   R-91, Evaluation of Spanish Renewable Energy Plan, 2005-2010, April 2011, pp.74, 75; Hr. Day 1, 201:4-6.

the highest in Europe, representing an 81% increase between 2004 and 2011.[241] Second, between 2010 and 2014, the Respondent enacted the disputed measures to restore the economic sustainability of the SES.

329.  From an economic perspective, the Respondent contends that the disputed measures maintain the essence of the RD 661/2007 support scheme that the Claimants invested under.  In particular, the Respondent contends that the Claimants have received up to 88% of their revenues from FiTs,[242] and have received a reasonable rate of return of 8.6% pre-tax.[243] According to the Respondent's primary valuation methodology, the Claimants have not suffered any loss as a result of the disputed measures.[244] The Claimants' PV facilities will generate enough cash-flows to recover investment costs, operating costs, and to obtain a reasonable return that is above the benchmark market return (WACC (6.89% pre-tax)[245]) and the reasonable return established by the Respondent (7.398% pre-tax[246]).  More generally, the Spanish PV sector has received government subsidies in the amount of €64.2 billion.[247]

330.  From a legal perspective, the Respondent contends that the New Regulatory Regime maintains the essential features of the RD 661/2007 support scheme under which the Claimants invested, namely a reasonable rate of return with reference to the cost of money in the capital markets, guarantee of priority of access to grid and priority of dispatch, all in accordance with EU State aid law.

*(iv) Was there a breach of the Claimants' legitimate expectations?*

331.  The Respondent submits that, given the absence of a specific commitment of stability, the Claimants did not at the time they made their investments have legitimate expectations that RD 661/2007 would not be amended, nor did they have legitimate expectations that their PV facilities would receive a guaranteed fixed FiT throughout the plants' operating lives.  Accordingly, the Respondent contends that there has been no breach of the Claimants' legitimate expectations.

---

[241]  Rejoinder, ¶ 1147.
[242]  Hr. Day 5, 30:7-20; Respondent's Opening Presentation, slide 108.
[243]  Respondent's Quantum Presentation, slide 34; Hr. Day 1, 165:3-13.
[244]  BDO 1st, ¶ 54.
[245]  BDO 1st, Table 23.
[246]  BDO 1st, ¶ 414.
[247]  R-51, Regulatory Impact Analysis Memorandum, 12 June 2014, p. 100.

332.  The Respondent contends that the *Eiser*, *Novenergia* and *Masdar* cases against Spain were wrongly decided.[248]  The Respondent submits that the Tribunal should follow the *Charanne* and *Isolux* awards in finding that the Claimants did not have legitimate expectations that their incentives would never be changed and there was no violation of the FET standard.[249]

333.  In any event, the Respondent contends that the disputed measures were reasonable and proportionate, and are therefore non-compensable regulatory measures.[250]  The measures were reasonable because they were inter alia addressed to the rational policy of ensuring the economic sustainability of the SES, which is the guiding principle of the regulatory framework.  The SES had become unsustainable because of: (i) a fall in energy demand as a result of the financial crisis; (ii) an increase in tariffs paid by Spanish consumers, which were amongst the highest in the EU; (iii) over-remuneration in the renewables sector resulting in windfall profits; and (iv) an increasing tariff deficit.  The Respondent contends that the measures are proportionate because they reduced the economic burden to consumers of delivering a sustainable electricity system while renewable energy investors continued to have priority of access and dispatch, and received a reasonable rate of return of approximately 7.398% pre-tax.  Moreover, the disputed measures were totally in accordance with EU State aid law.

### (v) Was there a failure to treat the Claimants' investments transparently and consistently?

334.  The Respondent contends that it acted transparently and consistently as regards the Claimants' investments.

335.  The Respondent submits that there cannot be a breach of the transparency obligation when it was notorious that regulatory changes could be made, as demonstrated by the evolution of the renewables support schemes enacted by Spain and the jurisprudence of the Supreme Court.

336.  In any event, the Respondent contends that the disputed measures followed the established procedures and maintained the essential nature of the regulatory framework under which the Claimants invested, in particular: a

---

[248]  CL-170, *Eiser*; CL-185, *Novenergia*; CL-189, *Masdar*.
[249]  CL-92/RL-49, *Charanne*; RL-83, *Isolux*.
[250]  CL-180, *Blusun v. Republic of Italy*, ¶ 372.

subsidy, priority of market access and dispatch, and a reasonable rate of return in accordance with the cost of money on the capital markets.  The Respondent denies that the contested measures were retroactive.  In fact, the Respondent contends, the disputed measures apply to future rights only, as provided in RDL 9/2013.[251]

337.    The Respondent submits that the duty of consistency does not require the regulatory framework to be petrified or frozen absent a specific commitment to an investor by the host State.  The Respondent contends that the disputed measures were consistent with the guiding principles of the regulatory framework, namely sustainability and a reasonable rate of return.

### (vi) Was there a failure to act in good faith towards the Claimants' investments?

338.    The Respondent contends that it has acted in good faith at all times towards the Claimants' investments.  Moreover, the Respondent contends that the fact that the Claimants' failed to conduct adequate due diligence so as to understand the regulatory framework does not support a finding of bad faith on the part of the Respondent.

339.    Further, the Respondent contends that the disputed measures were adopted in good faith and were non-discriminatory.  The Respondent submits that the disputed measures were ultimately the consequence of the severe economic crisis in Europe from 2009-2014, including a resulting fall in energy demand, and the need to correct the tariff deficit.  The Respondent further contends that, in accordance with the basic principles of sustainability and reasonable return, it is not required to elevate the interests of foreign investors above other considerations.  In any event, the Claimants have in fact received a reasonable rate of return.

### (2) The Tribunal's Analysis

340.    This case raises the important question of the circumstances in which a State will be found to have violated its obligations under the ECT as a consequence of the exercise by that State of its inherent right to regulate in the public interest.

---

[251]    Rejoinder/Reply, ¶ 622; R-47, Act 24/2013, 26 December 2013, Third Final Provision.

341.   The Tribunal's first task is to determine the content of the FET obligation, including the question of whether or not the duties of transparency/consistency and good faith are stand-alone obligations under Article 10(1) ECT or form part of the assessment of the Claimants' legitimate expectations.  The Tribunal shall then apply that standard to the facts of this case.

### (i)     The FET Standard

342.   The Tribunal turns first to the construction of the obligation to accord fair and equitable treatment, which is set out under Article 10(1) ECT and provides in relevant part as follows:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.

343.   As any other treaty provision, the text of Article 10(1) ECT must be interpreted in accordance with the normal canons of treaty interpretation contained in the VCLT.

344.   Article 31 VCLT, the primary rule of treaty interpretation, provides that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."   In limited circumstances, the Tribunal may if necessary have regard to the supplementary means of interpretation under Article 32 VCLT.

345.   Accordingly, the Tribunal begins the interpretative exercise by considering the ordinary meaning of the ECT's terms, their context, and the object and purpose of the ECT.  Pursuant to Article 31(2) VCLT, "t[h]e context for the purpose of the interpretation of a treaty shall comprise […] the text, including its preamble and annexes […]."

346.   The Tribunal must also interpret the text of the ECT in accordance with Article 31(3)(c) VCLT, which requires that "[a]ny relevant rules of international law applicable in the relations between the parties" shall be taken into account together with the context.

347.   Article 2 ECT states that the "Purpose of the Treaty" is as follows:

> This Treaty establishes a legal framework in order to promote longterm cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.

348. As regards the ECT's object and purpose, the Claimants cite *An Introduction to the Energy Charter Treaty*, which states that the ECT's "fundamental aim" is "to strengthen the rule of law on energy issues".[252]  Citing the preamble and Article 2 ECT, the Claimants further submit that two overarching purposes of the ECT are to "catalyze economic growth" through investment and trade and in energy and to establish "a legal framework to promote long-term cooperation" between States and investors.[253]

349. The Respondent submits that the "main objective" of the ECT is "to create an efficient energy market based on the principle of non-discrimination and price formation according to market rules."[254]  The Respondent contends that the Claimants' assertion of a right to a guaranteed fixed FiT – which the Respondent considers to be tantamount to the assertion of a right to a specific amount of State aid – is incompatible with the ECT's objective of creating an efficient market.[255]

350. The Tribunal agrees with the *Eiser* tribunal that the purpose of the ECT is to ensure that national legal frameworks are "stable, transparent, and compliant with international legal standards."[256]  Accordingly, the FET standard must be interpreted in this context.

351. Indeed, the Tribunal considers that it is well established that legal stability is part of the FET standard under the ECT.[257]

352. Further, the Tribunal considers that it is widely accepted that the protection of an investor's legitimate expectations is one of the most important components of the FET standard.[258]  The Tribunal agrees with the Claimants that a State's

---

[252]  C-1, ECT, An Introduction to the Energy Charter Treaty.
[253]  C-1, ECT, Preamble, Art. 2.
[254]  Rejoinder/Reply, ¶¶ 998, 1133.
[255]  Rejoinder/Reply, ¶ 1006.
[256]  CL-170, *Eiser*, ¶ 379.
[257]  CL-128, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 173; CL-170, *Eiser*, ¶ 381.
[258]  CL-93, *Electrabel S.A. v. Hungary*, ICSID No. ARB/07/19, Award of 25 November 2015, ¶ 7.75; CL-13, *EDF (Services) Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award, Oct. 8, 2009, ¶ 216; CL-14, *Saluka v. Czech Republic*, UNCITRAL-PCA, Partial Award, Mar. 17, 2006, ¶ 302; CL-15, *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, May 29, 2003, ¶ 154; CL-16, *Waste Management v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, Apr. 30, 2004, ¶ 98; CL-17, *Occidental Exploration and Production Co.*

duty under the FET standard to ensure a stable legal and regulatory framework "arises when the State has generated 'legitimate expectations' of such stability on the part of investors".[259]

353.    As the *Micula v. Romania* tribunal stated, in order for an investor to have such a legitimate expectation:

> There must be a promise, assurance or representation attributable to a competent organ or representative of the state, which may be explicit or implicit. The crucial point is whether the state, through statements or conduct, has contributed to the creation of a reasonable expectation, in this case, a representation of regulatory stability. It is irrelevant whether the state in fact wished to commit itself; it is sufficient that it acted in a manner that would reasonably be understood to create such an appearance. The element of reasonableness cannot be separated from the promise, assurance or representation, in particular if the promise is not contained in a contract or is otherwise stated explicitly. Whether a state has created a legitimate expectation in an investor is thus a factual assessment which must be undertaken in consideration of all the surrounding circumstances.[260]

354.    An investor's expectations of legal stability must be reasonable and objective. As the *Plama Consortium v. Bulgaria* tribunal held:

> the ECT does not protect investors against any and all changes in the host country's laws. Under the fair and equitable treatment standard the investor is only protected if (at least) reasonable and justifiable expectations were created in that regard.[261]

355.    Likewise, the *Charanne v. Spain* tribunal held:

> A finding that there has been a violation of investor's expectations must be based on an objective standard or analysis, as the mere subjective belief that could have had the investor at the moment of making of the investment is not sufficient. Moreover, the application of the principle accordingly depends on whether the expectation has been reasonable in the particular case with relevance to representations possibly made by the host State to induce the investment.[262]

356.    It is also well-established that there are limits to the legal stability that an investor can legitimately expect.  In the absence of a specific commitment to the investor by the host State, the investor cannot expect the legal or regulatory framework to be frozen.  In such circumstances, a host State has space to

---

*v. Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, July 1, 2004, ¶ 183; CL-18, Rudolph Dolzer & Christoph Schreuer, Principles of International Investment Law (2d ed. 2012), at 145-149.

[259]    SoC, ¶ 350.

[260]    CL-20, *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 Dec. 2013, ¶ 669.

[261]    CL-41/RL-34, *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008.

[262]    CL-92/RL-49, *Charanne*, ¶ 495.

reasonably modify the legal or regulatory framework without breaching an investor's legitimate expectations of stability.

357.    As the *Micula v. Romania* tribunal held:

> [T]he fair and equitable treatment standard does not give a right to regulatory stability per se. The state has a right to regulate, and investors must expect that the legislation will change, absent a stabilization clause or other specific assurance giving rise to a legitimate expectation of stability.[263]

358.    Similarly, the *AES v. Hungary* tribunal held:

> The stable conditions that the ECT mentions relate to the framework within which the investment takes place. Nevertheless, it is not a stability clause. A legal framework is by definition subject to change as it adapts to new circumstances day by day and a state has the sovereign right to exercise its powers which include legislative acts. Therefore, to determine the scope of the stable conditions that a state has to encourage and create is a complex task given that it will always depend on the specific circumstances that surround the investor's decision to invest and the measures taken by the state in the public interest.[264]

359.    However, the Tribunal agrees with the *Eiser v. Spain* and *Novenergia v. Spain* tribunals that the FET standard in the ECT protects investors from a radical or fundamental change in the legal or regulatory framework under which the investments are made.[265]    As the *Eiser* tribunal stated:

> Taking account of the context and of the ECT's object and purpose, the Tribunal concludes that Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments. This does not mean that regulatory regimes cannot evolve. Surely they can… However, the Article 10(1) obligation to accord fair and equitable treatment means that regulatory regimes cannot be radically altered as applied to existing investments in ways that deprive investors who invested in reliance on those regimes of their investment's value.[266]

360.    The next question for the Tribunal is whether the obligation of transparency and consistency, and the obligation of good faith, are stand-alone obligations under Article 10(1) ECT that should be determined separately, or whether they form part of the obligation to respect the legitimate expectations of an investor.

361.    As for the obligation of transparency and consistency, the Tribunal agrees with the findings of the tribunals in *Plama v. Bulgaria*, *Charanne v. Spain, Isolux v.*

---

[263]    CL-20, *Micula*, ¶ 666.
[264]    RL-39, *AES Summit Generation Limited and AES-Tisza Er.mü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22), Award of 23 September 2010, ¶¶ 9.3.29-9.3.30.
[265]    CL-185, *Novenergia*, ¶ 654; CL-170, *Eiser* ¶ 382.
[266]    CL-170, *Eiser*, ¶ 382.

*Spain*, and *Novenergia v. Spain* that this is not an independent obligation.[267] Rather, the obligation of transparency and consistency is "simply an illustration of the obligation to respect the investor's legitimate expectations through the FET standard."[268]

362.    Likewise, the Tribunal considers that the obligation of good faith is a component of legitimate expectations.  Accordingly, the Tribunal shall consider the Parties' submissions on good faith as part of its assessment of the Claimants' legitimate expectations.

363.    Finally, this case raises the issue of Spain's right to regulate in the public interest.  As the *Philip Morris v. Uruguay* tribunal held:

> It is common ground in the decisions of more recent investment tribunals that the requirements of legitimate expectations and legal stability as manifestations of the FET standard do not affect the State's rights to exercise its sovereign authority to legislate and to adapt its legal system to changing circumstances.[269]

364.    However, as *Eiser* and the cases cited above demonstrate, the right to regulate must be subject to limitations if investor protections are not to be rendered meaningless.  As the *ADC v. Hungary* tribunal held:

> 423. [...] while a sovereign State possesses the inherent right to regulate its domestic affairs, the exercise of such right is not unlimited and must have its boundaries. [...] [T]he rule of law, which includes treaty obligations, provides such boundaries. Therefore, when a State enters into a bilateral investment treaty like the one in this case, it becomes bound by it and the investment-protection obligations it undertook therein must be honoured rather than be ignored by a later argument of the State's right to regulate.
>
> 424. The related point made by the Respondent that by investing in a host State, the investor assumes the 'risk' associated with the State's regulatory regime is equally unacceptable to the Tribunal. It is one thing to say that an investor shall conduct its business in compliance with the host State's domestic laws and regulations. It is quite another to imply that the investor must also be ready to accept whatever the host State decides to do to it. In the present case, had the Claimants ever envisaged the risk of any possible depriving measures, the Tribunal believes that they took that risk with the legitimate and reasonable expectation that they would receive fair treatment and just compensation and not otherwise.[270]

---

[267]    CL-185, *Novenergia*, ¶ 568; CL-92/RL-49, *Charanne*, ¶ 477; RL-83, *Isolux*, ¶¶ 764-766; CL-41/RL-34, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 173.

[268]    CL-185, *Novenergia*, ¶ 646.

[269]    RL-87, *Philip Morris v. Uruguay*, ¶ 422.

[270]    CL-76, *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶¶ 423-424.

(ii)    Did the Claimants have legitimate expectations that the tariff regime under RD 661/2007 would not change?

365.    The Tribunal has decided that the Claimants did not have legitimate expectations that they would receive the precise FiT specified in RD 661/2007 for the entire lifetime of their PV plants.  However, the Tribunal, does find that the Claimants had the legitimate expectation that the legal and regulatory framework would not be fundamentally and abruptly altered, thereby depriving investors of a significant part of their projected revenues.

366.    The Claimants contend that Article 44.3 RD 661/2007 is a specific assurance giving rise to a legitimate expectation that the Claimants would receive fixed FiTs for the lifetime of their PV plants.  The Tribunal is not persuaded.  The Tribunal agrees with the finding in *Eiser* that RD 661/2007 did not give investors "immutable economic rights that could not be altered by changes in the regulatory regime".[271]

367.    The Tribunal notes that the *Masdar* tribunal's finding of the existence of a specific commitment is distinguishable because in that case the claimant sought and received specific clarification from Spain that their facilities would receive the RD 661/2007 FiTs throughout their operating lives.[272]

368.    The Tribunal considers that, in the absence of specific commitments guaranteeing the immutability of the legal framework, it is difficult to assume that a reasonable investor would not have expected any regulatory changes to RD 661/2007 at all.

369.    First, remuneration under the Special Regime had been regularly amended prior to the enactment of RD 661/2007.  Indeed, prior to the Claimants' making their investments, Spain had modified the regime when it enacted RD 2818/1998, RD 436/2004, RD 661/2007 itself, and RD 1578/2008.

370.    Second, again prior to the Claimants' investments, the Spanish Supreme Court had rejected challenges to these modifications and denied that investors had a

---

[271]    CL-170, *Eiser*, ¶ 363.
[272]    CL-189, *Masdar*, ¶¶ 512-522.

vested right to specific subsidies. For example, in December 2005, the Supreme Court stated that:

> There is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration […] Producers do not have an unmodifiable right that the economic scheme which regulates modifications to premiums will stay the same. Said regime is not [a] guarantee to remain unaltered in the future.[273]

371. And in October 2006, the Supreme Court held that:

> electricity producers under the special regime do have an "unalterable right" to remain in an unchanged economic regime governing the collection of premiums. The scheme is, in fact, to encourage the use of renewable energy through an incentive mechanism, like all of this genre, and cannot be guaranteed to remain unchanged in the future.[274]

372. In its judgment dated 3 December 2009 concerning the interpretation of Article 40.3 RD 436/2004 – a clause similar to Article 44.3 RD 661/2007 – the Spanish Supreme Court held that:

> Ultimately, it shall be considered that the claim that the Administration be sentenced to update the tariffs for 2007, applying the updating methodology resulting from Royal Decree 436/2004, or from Royal Decree 661/2007, must be rejected, since the criterion of not raising the values of the regulated tariff for photovoltaic technology installations is justified in that the profitability of the generation activity from this technology was higher than that considered as sufficient and reasonable remuneration.[275]

373. This judgment was rendered after the Claimants' investment in Madridejos, but before their investments in La Castilleja and Fotocampillos.

374. After the 3 December 2009 judgment, the Majority of the Tribunal considers that a diligent investor might have been in a position to foresee the possibility of regulatory changes altering RD 661/2007.

375. As the *Charanne* tribunal held:

> Although decisions of the Spanish courts are not binding on the Arbitral Tribunal, they remain relevant as factual elements to verify that an investor could not, at the time of the disputed investment, have the reasonable

---

[273] R-117, Judgment of the Supreme Court, 15 December 2005.
[274] R-118, Judgment of the Supreme Court, 25 October 2006.
[275] Respondent's Reply PHB, ¶ 24.

expectation that in the absence of a specific commitment the regulation would not be modified throughout the life of the plants.[276]

376. The Tribunal also agrees with the *Charanne* tribunal that:

> 503. In this case, the Claimants could not have the legitimate expectation that the regulatory framework laid down by RD 661/2007 and RD 1578/2008 would remain unchanged during the entire lifespan of their plants. Accepting such an expectation would, in fact, amount to freezing the regulatory framework applicable to eligible plants, even though the circumstances may change [...] The Arbitration Tribunal cannot accept such a conclusion.
>
> 504. The conclusion drawn by the Tribunal, i.e. that in the absence of a specific commitment the Claimants could not reasonably expect that the applicable regulatory framework provided in RD 661/2007 and RD 1578/2008 would remain unchanged, is backed by case law from the highest courts in Spain. Prior to the investment, these courts had clearly established the principle that domestic law could modify the regulations in force.
>
> 505. [...] in the present case, the Arbitration Tribunal considers that the Claimants could have easily foreseen the possibility that the regulatory framework was going to be modified [...]. Indeed, the Spanish Law left wide open the possibility of modifying the remuneration scheme applicable to photovoltaic energy. [...]
>
> 511. Therefore, the Tribunal concludes that the Claimants could not have the reasonable expectation that RD 661/2007 and RD 1578/2008 were not going to be modified during the lifespan of their facilities.[277]

377. However, the Tribunal is of the view that the Claimants had legitimate expectations that the regulatory framework would not be fundamentally and abruptly changed, depriving them of a significant part of their projected revenues, as opposed to merely modified. In this regard, the Tribunal also agrees with the *Charanne v. Spain* tribunal that:

> [A]n investor has the legitimate expectation that, when modifying the regulation under which it made the investment, the State will not act unreasonably, contrary to the public interest, or in a disproportionate manner.[278]

378. The Claimants' legitimate expectation that the remuneration and benefits their PV facilities received would not be radically changed were based foremost on the express language of RD 661/2007, which sets out fixed FiTs to be paid for entire operating life of a PV facility.[279] This expectation was reinforced by statements of Spanish officials emphasizing the stability of the remuneration regime for PV facilities registered under RD 661/2007 and promoting the possibility of returns for investors well above 7%.[280] Further, the Majority of the

---

[276]  CL-92/RL-49, *Charanne*, ¶ 508.
[277]  CL-92/RL-49, *Charanne*, ¶¶ 504-508.
[278]  CL-92/RL-49, *Charanne*, ¶ 514.
[279]  C-98, RD 661/2007, Arts. 17, 36, 44.1, 44.3,
[280]  *See* SoC, ¶¶ 164, 188, 368; Claimants' Opening Presentation, slides 70-78.

Tribunal considers that a reasonable investor would not have interpreted the Spanish Supreme Court jurisprudence concerning modifications to earlier support schemes as a warning that Spain had the power to abrogate RD 661/2007 and replace it with a radically different support scheme. Ultimately, the Majority of the Tribunal arrives at the same conclusion as the *Novenergia v. Spain* tribunal that investors such as the Claimants could not have expected that:

> a 'reasonable rate of return' would be limited to 7%, that stability and predictability could not be expected in the SES, [or] that the Special Regime could be abolished...[281]

379. The Respondent contends that the Claimants could not have had such legitimate expectations because they failed to conduct proper legal due diligence that would have confirmed the Respondent's power to replace RD 661/2007 with the New Regulatory Regime. Indeed, none of the due diligence reports submitted by the Claimants contain an analysis of the Spanish legal framework surrounding RD 661/2007.[282] However, the Claimant contends that the Garrigues Abogados law firm confirmed that RD 661/2007 assured stability and long-term remuneration throughout the whole life of the Claimants' PV plants. In particular, the Claimants rely on a "Note on the Economic Regime of Application to [La Castilleja]" produced by Garrigues dated 14 January 2010, which states:

> The stability of the economic system provided under the RD 661/2007 for electricity producers in the special regime is guaranteed by system updates and reviews of the tariffs, premiums, and incentives provided in Article 44.[283]

380. The Respondent contends that this language does not say that the support scheme under RD 661/2007 cannot be modified.[284] In the Tribunal's view, the Garrigues report is in fact rather vague on the issue. Nevertheless, the Majority of the Tribunal considers that it is reasonable for an investor to assume that its

---

[281] CL-185, *Novenergia*, ¶ 674.
[282] C-203, Garrigues Abogados y Asesores Tributarios Due Diligence Report, 14 January 2010; C-253, Garrigues Abogados y Asesores Tributarios Legal Addendum, 11 March 2009; C-203, Garrigues Abogados y Asesores Tributarios Due Diligence Report, 11 March 2009; C-194, Madridejos: Landwell Abogados/PWC Legal Due Diligence Report, 25 March 2009; C-204, La Castilleja: Landwell Abogados/PWC Legal Executive Summary Report, 13 November 2009; C-212, Fotocampillos: Rodl & Partners Legal and Tax Due Diligence, May 2010; C-198, Legal Due Diligence Report of Watson, Farley and Williams, 30 November 2009; C-212, Legal and Tax Due Diligence Report of Rödl & Partner, May 2010.
[283] C-203, Garrigues Abogados y Asesores Tributarios Due Diligence Report, 14 January 2010, p. 2.
[284] Hr. Day 2, 35:9-18.

legal advisors would have raised a red flag had they detected any risk of fundamental change to the regulatory regime.

381.    Finally, the Respondent has placed particular reliance on the EC's Decision on State Aid dated 10 November 2017 concerning Spain's renewables support scheme and EU State aid rules.[285]  This point can, however, be disposed of swiftly.   The EC State Aid Decision concerns the lawfulness of the New Regulatory Regime under EU State aid law.  The Commission concludes that the New Regulatory Regime was not unlawful but that Spain wrongly failed to notify the Commission before implementing it.[286]  However, the Majority of the Tribunal considers that the decision makes no assessment of the RD 661/2007 support scheme, under which the Claimants made their investment. Accordingly, the Majority of the Tribunal concludes that EC State Aid Decision has no bearing on the issue of the Claimants' legitimate expectations of regulatory stability at the time of their investment.

>    *(iii)    Did Spain subsequently abrogate the RD 661/2007 regime? If so, did Spain breach the Claimants' legitimate expectations?*

382.    The Tribunal now turns to the issue of whether or not the Respondent breached the Claimants' legitimate expectations when it enacted the disputed measures. As explained above, the Tribunal considers that the obligation of transparency and consistency, and the obligation of good faith, form part of the Claimants' legitimate expectations.    The Parties' submissions on transparency/consistency and good faith have therefore been considered as part of the Tribunal's assessment of the Claimants' legitimate expectations.

383.    The Tribunal is cognizant of the fact that the ECT tribunals in *Charanne*, *Isolux*, *Eiser*, *Novenergia* and *Masdar* have also considered the disputed measures.[287] The Tribunal is not bound by any of those decisions and must reach its own decision on the claims at issue in this arbitration.  That said, the awards are clearly relevant to the Tribunal's analysis of the factual issue of whether or not Spain abrogated the RD 661/2007 support scheme, as well as the legal question of whether, if such an abrogation occurred, this amounts to a violation of the Claimants' legitimate expectations.  Before turning to these questions, the Tribunal shall therefore briefly consider the conclusions of the *Charanne*,

---

[285]    RL-97, EC State Aid Decision, 10 November 2017.
[286]    Id., pp. 18, 33.
[287]    CL-92/RL-49, *Charanne*; RL-83, *Isolux*; CL-170, *Eiser*; CL-185, *Novenergia*; CL-189, *Masdar*.

*Isolux*, *Eiser*, *Novenergia* and *Masdar* tribunals as regards the disputed measures and the FET standard under Article 10(1) ECT.

384.    In *Charanne*, the tribunal found that RD 1565/2010 and RD 14/2010 did not violate the FET standard because the claimants could not have had a legitimate expectation that the regulatory framework "is not to be modified at any time to adapt to the needs of the market and to the public interest".[288]   However, the *Charanne* tribunal was not called upon to assess the measures subsequently enacted by Spain that established the New Regulatory Regime.   In *Isolux*, the tribunal also found no breach of the FET standard, albeit on the basis that by the time the claimant in that case had invested in June 2012, the regulatory regime had already been modified and no reasonable investor could have had the expectation that the framework would not be modified in future.[289]

385.    By contrast, the *Eiser*, *Novenergia*, and *Masdar* cases are factually and legally more apposite to the present case because they concern the effect of the New Regulatory Regime on investments made before Spain started to enact the disputed measures in 2010.   The tribunals in those cases agreed with the *Charanne* tribunal that RD 1565/2010 and RD 14/2010 did not violate the FET standard under Article 10(1) ECT.    However, the *Eiser* and *Novenergia* tribunals went on to conclude that the New Regulatory Regime violated the Claimants' legitimate expectations of stability because it amounted to a fundamental or radical change to the legal and regulatory framework.[290]   In *Masdar*, the tribunal concluded that the New Regulatory Regime violated the claimant's legitimate expectations, based on specific commitments by Spain in that case that the benefits granted by RD 661/2007 would remain unaltered.[291]

386.    The Tribunal's own assessment of RD 1565/2010, RDL 14/2010 and RD 2/2013 concurs with that of the tribunals in *Charanne*, *Isolux*, *Eiser*, and *Novenergia*.

387.    RD 1565/2010 reneged on the promise under RD 661/2007 to pay FiTs for the entire operating life of a PV facility.   However, FiTs were still to be paid for the first 25 years and this was extended to 30 years in Law 2/2011.[292]

---

[288]    CL-92/RL-49, *Charanne*, ¶ 510.
[289]    RL-83, *Isolux*, ¶ 787.
[290]    CL-170, *Eiser*, ¶ 363; CL-185, *Novenergia*, ¶ 697.
[291]    C-189, *Masdar*, ¶ 521.
[292]    C-102, RDL 14/2010; C-95, Law 2/2011.

RDL 14/2010 capped the annual operating hours for which PV facilities could receive FiTs and imposed a 0.5 €//MWh "access toll" on all electricity a producer delivered to the grid.[293]  RD 2/2013 introduced an "amended CPI" that excluded prices changes in food, energy products and certain tax effects for the purposes of calculating annual FiT inflation revisions under RD 661/2007.[294]

388.    As explained above, the Tribunal considers that the Claimants had a legitimate expectation that the regulatory framework would not be fundamentally and abruptly altered so as to deprive investors of a significant part of their projected revenues.  The Claimants did not, however, have a legitimate expectation that there would be no regulatory changes to RD 661/2007 at all.  In the Tribunal's view, none of the changes enacted by RD 1565/2010, RDL 14/2010 or RD 2/2013 meet the threshold requirement of a fundamental change to the regulatory framework.    Accordingly, the Tribunal finds that neither RD 1565/2010, RDL 14/2010 nor RD 2/2013 breached the FET standard.

389.    The Tribunal now turns to the New Regulatory Regime that was introduced by Spain pursuant to RDL 9/2013, Law 24/2013, RD 413/2014 and MO 1045/2014.  The Tribunal recalls that RDL 9/2013 was enacted in July 2013 as an emergency measure to address Spain's worsening tariff deficit. RDL 9/2013 repealed the RD 661/2007 support scheme and authorized the government to approve a new legal framework for renewable energy production.    The precise details of the New Regulatory Regime were subsequently fleshed out in December 2013 by Law 24/2013 – which created the new legal framework that eliminated the distinction between the Ordinary and Special Regimes that had prevailed under Law 54/1997 – and was finally settled in June 2014 by RD 413/2014 and MO 1045/2014, which established the new support scheme that replaced RD 661/2007.  The new support scheme was applied retrospectively to PV facilities, such as the Claimants' investments, that had originally benefitted from the RD 661/2007 support scheme.

390.    In the Majority of the Tribunal's view, the Respondent abrogated RD 661/2007 and replaced it with a new support scheme under RD 413/2014 and MO 1045/2014 pursuant to an entirely new legal and regulatory framework under Law 24/2013.  This New Regulatory Regime did not merely modify the fixed FiTs promised to investors under RD 661/2007.  Rather, it introduced a

---

[293]    C-102, RDL 14/2010, first transitory provision.
[294]    C-83, RDL 2/2013.

number of fundamental changes to the support scheme for the Claimants' PV plants.

391.    First, the Respondent switched the support scheme from an "at risk" model to a "regulated return" model.  As the Claimants' regulatory experts Dr Moselle and Dr Grunwald explain:

> By switching from an "at risk" model to a "regulated return" model, Spain has exposed investors to an asymmetric risk. Under the "at risk" model, if their project was unsuccessful (for example, there were cost over-runs, delays, or poor operating performance) then they were fully exposed to the outcome, so they bore the downside risk. However, firms that bore those risks and managed to establish efficient operating plants would then enjoy a reward in the form of the tariffs provided for under [RD 661/2007]. Investors viewed the expected reward, assuming a successful project, as sufficient to outweigh the costs and risks involved in investment (else they would not have chosen to invest).
>
> [...]
>
> However, had they enjoyed foresight as to the actions the Government would later take, they would have had entirely different expectations. ...[Under the New Regulatory Regime,] [I]nvestors in a "standard solar PV plant" would have expected that if their project was successful then they would earn a pre-tax return of at most 7.398% (which in itself was lower than the pre-tax return of around 10%-11% that we estimate the same hypothetical "standard plant" would have achieved under [RD 661/2007]); but inefficiency or ill fortune could mean a negative return (while extraordinary efficiency would generally not be rewarded with a higher return than 7.398%). In other words, with foresight they would have known that they faced an asymmetric risk arising from their potential returns having a relatively low cap, but not a floor.[295]

392.    Second, the Respondent reduced the "reasonable rate of return" of a PV facility from between 7% and 9.5% post-tax under RD 661/2007 to 7.398% pre-tax (5.9% post-tax) under the New Regulatory Regime.[296]

393.    Third, the Respondent raised the bar for a "standard plant" to earn the target return under the New Regulatory Regime.  Whereas the 2005 PER assumed that a standard plant under 100kW would have an investment cost of 5,700 €/kWp, 1,250 operating hours per year, and a regulatory life of 25 years, MO 1045 assumed an investment cost of 6,350 €/kWp, 1,648 operating hours per year, and a regulatory life of 30 years.[297]   As the Claimants' counsel explained at the Hearing, "under the new regulatory regime, you have to produce more electricity for five years longer in order to earn a target return

---

[295]    Moselle/Grunwald 1st, ¶¶ 2.25-2.26.
[296]    FTI Regulatory Presentation, slide 10; Claimants' Opening Statement, slide 113.
[297]    FTI Regulatory Presentation, slide 28.

that is 2 percentage points lower than it used in setting RD 661 on its own case".[298]

394.    Fourth, the Respondent changed the remuneration structure so that payments were based mainly on plant capacity rather than a fixed €/MWh FiT for all production. As well as paying most incentives based on capacity rather than production, the New Regulatory Regime also capped all payments with a "maximum operating hours" cut off.[299]

395.    Fifth, the New Regulatory Regime introduced a retroactive "claw back" of returns a PV facility had earned above 7.398% pre-tax per year prior to 2013, in order to achieve an average return in line with the new target of approximately 7.398% pre-tax over the entire regulatory lives of the PV facility.[300]

396.    Finally, the Respondent replaced the guaranteed fixed remuneration (indexed only to inflation) under RD 661/2007 with remuneration under the New Regulatory Regime that now varies with changes in market interest rates. Specifically, the New Regulatory Regime initially used a 10-year historical average of Spanish bond yields between 2003 and 2013 to arrive at the 7.398% rate of return of a "standard plant". However, from 2019, future updates to the "reasonable rate of return" will be based on 2-year historical averages. Dr Moselle and Dr Grunwald opine that the Respondent initially used the 10-year average to average out the effect of higher rates in 2011-2013, and by switching to a 2-year average for future updates will therefore exclude from the rate of return calculation the higher rate observed between 2011 and 2013.[301] The value of an asset that generates a fixed stream of revenue will rise and fall inversely with market interest rates. Under RD 661/2007, the Claimants bore the risk that interest rates would go up, and they therefore entered into swaps to fix interest rates on their project debt. Since the Claimants made their investments, however, market interest rates have fallen. Under the New Regulatory Regime, investors get no benefit from this fall in interest rates.

397.    As the Tribunal has explained in the context of its findings in respect of RD 1565/2010, RDL 14/2010, and RDL 2/2013, sophisticated investors like the

---

298    Hr. Day 1, 76:14-18.
299    Moselle/Grunwald 2nd, ¶ 61; Edwards 1st, Appendix 5-1.
300    FTI Regulatory Presentation, slide 12; Claimants' Opening Statement, slide 111.
301    Moselle/Grunwald 1st, ¶ 6.64.

Claimants should have reasonably expected that RD 661/2007 could be modified, "but within foreseeable limits".[302]  For the Majority of the Tribunal, this was not the case with the New Regulatory Regime, which as the *Eiser* tribunal held was an "unprecedented and wholly different regulatory approach, based on wholly different premises" that amounted to a "total and unreasonable change".  The Majority of the Tribunal also agrees with the *Novenergia* tribunal that the measures that enacted the New Regulatory Regime were "radical and unexpected".[303]

398.    The Majority of the Tribunal concludes that the Respondent's enactment of the New Regulatory Regime constituted a fundamental change to the legal and regulatory framework that crossed the line from a non-compensable regulatory measure to a compensable breach of the FET standard in the ECT. Accordingly, the Majority of the Tribunal concludes that RDL 9/2013, Law 24/2013, RD 413/2014 and MO 1045/2013 violated the FET standard as set out in Article 10(1) ECT.

### D.    The Claimants' Further Alleged Breaches of Article 10(1) ECT

399.    The Majority of the Tribunal has found the Respondent liable for a breach of Article 10(1) ECT for failure to accord fair and equitable treatment to the Claimants.  In addition to the FET claim, the Claimants have raised two further claims under Article 10(1) ECT: (i) the Respondent impaired the Claimants' investments through unreasonable or discriminatory measures (**Impairment Clause**); and (ii) the Respondent failed to observe obligations it entered into with the Claimants (**Umbrella Clause**).

400.    In *Novenergia*, the Stockholm-seated tribunal stated that:

> Under the rationale of procedural economy it is generally accepted that an arbitral tribunal does not need to address claims and issues that are already implied in those that are essential to its decision. This has been the view adopted by other arbitral tribunals seized with the task of resolving claims of multiple breaches of applicable investment treaties. Nevertheless, the Claimant's prayers for relief are phrased in a manner that obliges a tribunal seated in Stockholm, Sweden to rule on each request. Mindful of the decision on the Respondent's breach of the FET standard above and of procedural economy, the Tribunal's reasons as regards the Claimant's remaining grounds for breach under Article 10(1) of the ECT will be brief.[304]

---

[302]    CL-170, *Eiser*, ¶ 364.
[303]    CL-170, *Eiser*, ¶¶ 363, 365; CL-185, *Novenergia*, ¶ 695.
[304]    CL-185, *Novenergia*, ¶ 713.

401.   The present case differs from *Novenergia* because the Claimants have not particularized their request for relief to include their separate claims under Article 10(1) ECT.  Rather, the Claimants seek "a declaration that Spain has violated Part III of the ECT and international law with respect to Claimants' investments".[305]

402.   However, in their post-hearing brief, the Claimants submit that if the Tribunal determines that only the New Regulatory Regime violated the FET standard, then the Tribunal must also consider whether the earlier disputed measures (RD 1565/2010 and RD 14/2010) violated the Impairment Clause and Umbrella Clause.[306]  The Respondent contends that the Tribunal is required by the SCC Rules to determine each claim.[307]

403.   The Tribunal considers that the proper approach in the present case is that adopted by the tribunal in *Novenergia*.  Accordingly, in the following section, the Tribunal shall briefly address the two remaining Article 10(1) ECT claims.

### (1)  The Parties' Positions

### a.  Claimants' Position

#### (i) Impairment Clause

404.   The Claimants submit that the Respondent impaired their investment through unreasonable or discriminatory measures (or both), in violation of the Impairment Clause in Article 10(1) ECT, which prohibits contracting host States from "impair[ing] by unreasonable or discriminatory measures" the "management, maintenance, use, enjoyment or disposal" of an investment. The Claimants submit that the term "impairment" means "any negative impact or effect".[308]  Further, the Claimants submit that the Impairment Clause sets a low threshold for the requisite impact on an investment.[309]

405.   The Claimants contend that the disputed measures violated the impairment Clause because they inflicted harm on the Claimants' investment without serving a legitimate purpose (or "rational policy"[310]).  In particular, the Claimants contend that, although the disputed measures addressed the tariff deficit, they

---

[305]   SoC, ¶ 471.
[306]   Claimants' PHB, ¶ 140.
[307]   Respondent's PHB, ¶ 182.
[308]   SoC, ¶ 396.
[309]   Id.
[310]   Reply, ¶ 476.

did so in a manner that was unnecessary, arbitrary, disproportionate in impact on renewable energy investors, and caused such investors financial harm. The Claimants contend that the disputed measures also violated the Impairment Clause because they violated fundamental principles of non-retroactivity and non-discrimination by singling-out renewable energy investors.

### (ii) Umbrella Clause

406.    The Claimants submit that the Respondent violated the Umbrella Clause in Article 10(1) ECT when it retroactively amended and then abrogated the RD 661/2007 support scheme by which the Respondent had entered into a number of binding legislative and regulatory obligations with regard to the Claimants and their investment, including the obligation to pay fixed FiTs for the lifetime of the PV facilities.

407.    The Umbrella Clause provides that "[e]ach contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."   The Claimants contend that the ECT's umbrella clause is "famously broad" and covers legislative acts such as RD 661/2007.[311]   In particular, the Claimants rely on the express obligations to pay FiTs in Articles 17, 36 and 44 RD 661/2007.   Further, the Claimants contend that the Respondent's obligation to pay the RD 661/2007 FiTs was further enshrined in the RAIPRE registrations, which specifically cross-referenced the FiT categories in Article 36 RD 661/2007.

### b.  Respondent's Position

### (i) Impairment Clause

408.    The Respondent denies that it has impaired the Claimants' investment through unreasonable or discriminatory measures.

409.    The Respondent contends that the disputed measures were reasonable, proportionate and non-discriminatory.  In particular, the Respondent contends that the disputed measures:

    (a)    were adopted in furtherance of a rational policy in the public interest, namely re-establishing the economic sustainability of the SES – as required by the applicable legislation – following the fall in electricity

---

[311]   SoC, ¶ 405.

demand during the financial crisis, the rise in consumer prices, over-remuneration in the renewable energy sector, and an increasing tariff deficit that amounted to 4% of Spain's GDP in 2013,[312] and had placed an excessive burden on Spanish consumers through an 81% increase in electricity bills between 2004 and 2011;[313]

(b)    were proportionate and successful in eliminating the tariff deficit, as conceded by the Claimants' regulatory expert Dr Moselle;[314]

(c)    did not discriminate between Spanish and foreign investors, and required the burden to be shared by all stakeholders, including Spanish taxpayers;[315]

(d)    were consistent with the legitimate expectations of investors in a highly subsidized sector, and delivered a reasonable rate of return to investors generally of 7.398%, and to the Claimants specifically of 8.6% pre-tax;[316]

(e)    were accepted by most domestic and foreign investors, as demonstrated by the fact that the New Regulatory Regime attracted more than €5,000 million investment in 2015;[317]

(f)    were approved by the EC, International Monetary Fund and International Energy Agency in 2015 and 2016.[318]

*(ii) Umbrella Clause*

410.    The Respondent denies that it has breached the Umbrella Clause.    In particular, the Respondent contends that a general regulation of *erga omnes* character such as RD 661/2007 does not fall within the scope of the Umbrella Clause because there was no specific commitment agreed with an investor or their investment.    The Respondent submits that the predominant view under international investment law is that the umbrella clause term "entered into" – which is found in Article 10(1) ECT – requires the host State to have assumed

---

[312]    BDO 1st, ¶ 270.
[313]    Rejoinder, ¶ 1147.
[314]    Respondent's PHB, ¶ 169; Hr. Day 5, 39:22-40:8.
[315]    Counter-Memorial, ¶ 1181; Respondent's PHB, ¶¶ 166-167.
[316]    Spain's PHB, ¶ 179; BDO 2nd, ¶ 43.
[317]    R-209, 'Boom' of operations in the renewable sector after the reform", *El Mundo*, 22 July 2015.
[318]    Counter-Memorial, ¶¶ 991-1000.

specific bilateral obligations through an express and individualized commitment to a certain investor or investment; an umbrella clause cannot elevate domestic laws to the level of the treaty or convert them into promises.[319]

411.    The Respondent contends that it did not assume obligations vis-à-vis the Claimants under RD 661/2007.  The Respondent relies on the finding of the tribunal in the *Charanne* award that there was no specific commitment entered into by Spain towards the claimants in that case under the RD 661/2007 and RD 1578/2008 regulatory frameworks.[320]  The Respondent further relies on *Isolux*, in which the tribunal held that the ECT's umbrella clause did not apply to RD 661/2007 and RD 1578/2008 because they were not expressly designed to seek foreign investment and "a regulation aimed at both domestic and foreign investors cannot, due to its general character, generate obligations only for the first ones…".[321]  The Respondent also submits that such a commitment to maintain unchanging FiTs is not permitted under EU State aid rules.[322]

## (2)  The Tribunal's Analysis

### (i) Impairment Clause

412.    In the Tribunal's view, the standard of protection in the Impairment Clause is part of or at least linked to the same standard set out in the FET Clause.  Moreover, the factual and legal basis of the Claimants' claim under the Impairment Clause is the same as the Claimants' FET claim.  This being so, the Majority of the Tribunal has concluded that it has nothing further to add to its decision on the Claimants' FET claim above.  Accordingly, the Majority of the Tribunal determines that it is unnecessary to reach on a separate determination of the Claimants' claim under the Impairment Clause, which has been effectively disposed of by the Majority of the Tribunal's decision of the Claimants' FET claim.

### (ii) Umbrella Clause

413.    In the Tribunal's view, the obligation on the Respondent under Article 10(1) ECT to "observe any obligations it has entered into with an Investor or an Investment of an Investor" applies to a specific commitment

---

[319]    Rejoinder/Reply, ¶¶ 1167-1178.
[320]    CL-92/RL-49, *Charanne*, ¶¶ 494, 504, 505.
[321]    RL-83, *Isolux*, ¶¶ 768-772.
[322]    Respondent's PHB, ¶ 177.

rather than a general regulatory act.[323]  The Tribunal has concluded that the Respondent did not make such a specific commitment to the Claimants. Neither the terms of RD 661/2007, nor the registrations of the Claimants' PV facilities in the RAIPRE, amount to an obligation entered into by Spain with the Claimants for the purposes of Article 10(1) ECT.  Accordingly, the Claimants' claim under the Umbrella Clause is dismissed.

## E.    Expropriation under Article 13 ECT

### (1)  The Parties' Positions

#### a.  Claimants' Position

414.  The Claimants contend that the Respondent's "progressive erosion" of their rights under RD 661/2007, and the subsequent abrogation of the regime altogether, amount to an unlawful indirect expropriation of the Claimants' investment under Article 13 ECT.[324]

415.  The Claimants contend that the Respondent has expropriated their "Investments" under the ECT, namely the future right under RD 661/2007 to receive guaranteed FiTs (i.e. moneys and returns) for the lifetime of their PV Plants' operations.  The Claimants submit that their investment may be viewed as "property rights", "claims to money", or "any right conferred by law", which all fall within the definition of "Investments" under the ECT.[325]  The Claimants also appear to contend that their investment includes "returns".[326]

416.  In particular, the Claimants contend that following measures were expropriatory:

> (i)    In 2010, the Respondent retroactively cancelled the right of the Claimants' PV facilities to receive the RD 661/2007 FiT after Year 25 (later extended to Year 30) (RD 1565/2010), and imposed operating hour limitations on Claimants' PV facilities (RDL 14/2010);

---

[323]    CL-180, *Blusun*, ¶  372; RL-49, *Charanne*, ¶¶ 493, 510-511.
[324]    Claimants' PHB, ¶ 130.
[325]    C-1, ECT, Art. 1.
[326]    Claimants' PHB, ¶ 135.

(ii)  In 2012, the Respondent imposed a 7% purported "tax" on electricity production that reduced the revenues (including tariff revenues) of the Claimants' PV facilities (Law 15/2012);

(iii)  In 2013, the Respondent replaced the CPI with a lower index for the purpose of adjusting RD 661/2007 FiTs annually for inflation (RDL 2/2013);

(iv)  In 2013/2014, the Respondent abrogated RD 661/2007 in its entirety when it enacted the New Regulatory Regime (Law 24/2013, RD 413/2014, MO 1045/2014).

417.  The Claimants contend that the cumulative effect of the Respondent's measures was to substantially deprive the Claimants of the value of their investment, specifically almost the entire equity value (83%[327]) in their PV facilities, thus constituting a "taking" under Article 13(1) ECT.[328]  The Claimants further contend that tribunals have found a "substantial *interference*" with the control or the economic value of an investment to constitute a "substantial deprivation".[329]

418.  The Claimants contend that the Tribunal should not follow the *Charanne* award because it did not properly consider the issue of indirect ownership of the right to FiTs guaranteed by RD 661/2007, and only considered measures adopted by the Respondent in 2010.

### b.  Respondent's Position

419.  The Respondent denies that it has expropriated the Claimants' investment.

420.  First, the Respondent contends that the Claimants do not have the acquired right under Spanish law to receive the RD 661/2007 FiTs in future, as confirmed by the Respondent's expert Professor Váquer at the Hearing.[330]  Since the Claimants do not have this right, the Respondent contends that such future returns are not an asset "owned or controlled directly or indirectly by an Investor" for the purposes of Article 1(6) ECT.  The Respondent submits that

---

[327]  Edwards 2nd, ¶ 6.3.
[328]  Edwards 1st, Table 7-1, Table 7-2.
[329]  Claimants' PHB, ¶ 131.
[330]  Claimants' PHB, ¶ 180; Hr. Day 4, 77:20-78:5.

the Tribunal should adopt the conclusions on the *Charanne* tribunal on this point.[331]

421. Second, the Respondent contends that the Claimants' only protected investment is their shareholding in the PV facilities, and the disputed measures have not caused a substantial deprivation in the value of these shares.

422. Third, even assuming the Claimants' investment suffered harm, there is no requirement under the ECT or international investment law to compensate the Claimants because the contested measures were enacted in good faith and in accordance with due process pursuant to the Respondent's police power to regulate the energy sector in the public interest, and were non-discriminatory, reasonable and proportionate to the objective of resolving the tariff deficit and re-establishing the economic balance of the SES.

### (2) The Tribunal's Analysis

423. The Tribunal has determined that the Respondent did not expropriate the Claimants' investment and has not therefore violated Article 13 ECT.

424. Article 13(1) ECT provides in relevant part as follows:

> 1. Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:
>
>> (a) for a purpose which is in the public interest;
>> (b) not discriminatory;
>> (c) carried out under due process of law; and
>> (d) accompanied by the payment of prompt, adequate and effective compensation.
>
> […]

425. The definition of "Investments" is to be found under Article 1(6) ECT:

> every kind of asset, owned or controlled directly or indirectly by an Investor and includes:
> (a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;
> (b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;
> (c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;
> (d) Intellectual Property;

---

[331]    CL-92/RL-49, *Charanne*, ¶¶ 458-459.

(e) Returns;
(f) any right conferred by law or contract or by virtue of any licenses and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

426.   The Tribunal considers that the Claimants invested in shares in the holding companies that owned the PV facilities.  The Claimants' investment therefore falls under the definition at Article 1(6)(b) ECT.

427.   This case does not concern a nationalization or direct expropriation because the Claimants have not been deprived of legal title to the PV facilities as a result of the disputed measures.  Rather, the Claimants' claim under Article 13 ECT concerns "measures having effect equivalent to nationalization or expropriation", i.e. an indirect or de facto expropriation, of the Claimants' alleged right to receive the full value of the RD 661/2007 FiTs over the entire operating lives of their PV facilities.

428.   The Claimants contend that 83% of the value of their equity investment in the companies that own the PV facilities has been destroyed as a result of the disputed measures.[332] This, the Claimants submit, amounts to a substantial deprivation, or "substantial interference", and thus constitutes an expropriation of their investment.

429.   The Claimants are correct that the standard for expropriation requires a substantial deprivation of the use, benefit, or value of the investment.[333] However, the Tribunal agrees with the Respondent that the Claimants are still the "untouched" owners of the PV facilities.  The Respondent contends that these PV facilities continue to earn returns of 8.6% pre-tax under the New Regulatory Regime.[334]  The Claimants contest the Respondent's calculation, but still report an internal rate of return (**IRR**) of 5.5% post-tax.[335]

430.   The Majority of the Tribunal accepts that the Claimants have suffered serious financial losses as a result of the disputed measures.  But this is not enough to

---

[332]   Claimants' PHB, ¶ 116.
[333]   SoC, ¶ 427; See, e.g., CL-15, *Técnicas Medioambentales Tecmed S.A. v. United Mexican States*, Award, 29 May 2003;  CL-53, *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, Award, 12 Apr. 2002 ¶ 114; CL-35, *CME Czech Rep. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 13 Sept. 2001 §§ 604-5; CL-66, Christoph Schreuer, The Concept of Expropriation Under the ECT and Other Investment Protection Treaties,  in INVESTMENT ARBITRATION AND THE ENERGY CHARTER TREATY 126-133 (Clarisse Ribeiro ed., 2006).
[334]   Spain's PHB, ¶ 179.
[335]   Edwards 2nd, p. 96, Table A3-6-3.

sustain an expropriation claim.  The Tribunal recalls the finding of the *Charanne* tribunal that:

> For a measure to be considered as equivalent to an expropriation, its effects must be of such a significance that it could be considered that the investor has been deprived, in whole or in part, of its investment. A simple decrease in the value of the shares constituting the investment cannot constitute an indirect expropriation, unless the loss of value is such that it can be considered equivalent to a deprivation of property.[336]

431.    In the Tribunal's view, the disputed measures did not substantially deprive the Claimants' of the value, use or enjoyment of their investment.  Accordingly, the Claimants' claim under Article 13 ECT is dismissed.

## VIII.    DAMAGES

### A.    Applicable Standard

432.    The Tribunal, by a majority, has found that the Respondent violated its obligation under Article 10(1) ECT to accord fair and equitable treatment to the Claimants' investments.  Unlike Article 13 ECT concerning expropriation, the ECT does not set out a standard of compensation for breaches of Article 10(1) ECT.  The Tribunal therefore looks to customary international law for the applicable standard of compensation.

433.    Under international law, a State is required to make full reparation for the damage caused by a treaty breach or other internationally wrongful act.

434.    The principle of full reparation was articulated by the Permanent Court of International Justice (**PCJ**) in the *Chorzów Factory* case.  The PCJ stated that:

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[337]

---

[336]    CL-92/RL-49, *Charanne*, ¶ 465.
[337]    CL-75, Case Concerning Factory at Chorzów (Germany v. Poland), Judgment 13, PCIJ, Sept. 13, 1928 (1928 PCIJ, Series A. No.17), at 74.

435.   The principle articulated by the PCJ in *Chorzów* is reflected in Article 31 of the International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts, which provides that:

> 1. The responsible State is under an obligation to make full reparation for the injury caused by the inter- nationally wrongful act.
> 2. Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State.[338]

436.   The Tribunal further considers that the principle of full reparation is generally accepted in international investment law.  As the tribunal in *Vivendi II* observed:

> [b]ased on these principles, and absent limiting terms in the relevant treaty, it is generally accepted today that, regardless of the type of investment, and regardless of the nature of the illegitimate measure, the level of damages awarded in international investment arbitration is supposed to be sufficient to compensate the affected party fully and to eliminate the consequences of the state's action.[339]

437.   The Tribunal also agrees with the Annulment Committee in *Azurix v. Argentina* that, "for breaches of BIT obligations other than the expropriation clause, the Tribunal has a discretion in determining the approach to damages".[340]  The Tribunal considers that this statement is equally applicable to the ECT.

438.   In conclusion, the Tribunal, by a majority, has decided that the Claimants are in principle entitled to full compensation for Spain's violation of Article 10(1) ECT.  The Tribunal shall now turn to the Parties' respective submissions on quantum.

---

[338]   CL-175, International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts, 28 January 2002.

[339]   CL-78, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award II, 20 August 2007, ¶ 8.2.7.

[340]   CL-79, *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic, 1 Sept 2009, ¶ 332.

**B.    Quantum of Compensation**

**(1)  The Parties' Positions**

**a.  Claimants' Position**

*(i) Overview*

439.    The Claimants seek damages for the diminution in the market value of their investments in the three PV facilities as a result of the disputed measures.

440.    The Claimants' quantum expert, Mr Richard Edwards of FTI, uses a discounted cash flow (**DCF**) method to assess the impact of hypothetical lost revenue caused by the disputed measures on the market value of the Claimants' investments in the PV facilities.

441.    On this basis, the Claimants claim total losses before interest of €58.2 million. The Claimants also claim interest on these losses based alternatively on the Respondent's or the Claimants' cost of borrowing, as detailed below.

*(ii) Claimants' DCF methodology*

442.    The Claimants explain the valuation methodology of their quantum expert as follows:

> As set out in the FTI Quantum Report, FTI calculates the quantum of compensation that Spain owes to Claimants in respect of their three solar plants based on the difference between: (a) the market value that Claimants' investments in Spain would have had if Spain had not introduced the challenged measures, based on the Discounted Cash Flow ("DCF") method (the "Counterfactual Position"); and (b) the market value of those investments after the introduction of the challenged measures, as reflected by the proceeds that the Claimants actually received (or expect to receive) from completed or imminent sales of the investments in arms' length transactions (the "Actual Position").  The specific investments that FTI values are the Claimants' equity interests in and shareholder loans to the operating companies that owned those three PV plants in Spain.[341]

443.    At the Claimants' instruction, FTI has assessed the impact of the disputed measures as of 30 June 2014 (**Date of Assessment**), at which time Foresight and Greentech owned and operated the Madridejos, La Castilleja and Fotocampillos plants.  The Claimants submit that this is an appropriate Date of Assessment because it is the end of the quarter shortly after the Respondent had enacted RD 413/2014 on 10 June 2014 and published MO 1045 on 20

---

[341]    SoC, ¶ 449 [emphasis added].

June 2014, at which point the full impact of the disputed measures was known to the market.

444.   FTI's assessment of the Claimants' losses is the difference in his opinion between the market value of their investments on the Date of the Assessment as they actually were after the Respondent had enacted the disputed measures (**Actual Position**), and as they would hypothetically have been had the disputed measures not have been made (**Counterfactual Position**).

445.   For the Actual Position, FTI uses the actual prices at which the Claimants sold their entire interests in the three plants in 2015 and 2016, as these sales were all arm's length transactions.  Adjusting for (i) cash injections that the Claimants made into the companies after the Date of Assessment, and (ii) the passage of time, FTI arrives at an equity value of €12.2 million (€6.8 million in respect of Foresight's investment and €5.4 million in respect of GWM/Greentech's investment).  (For the purposes of a "sanity check" on the valuation in the Actual Position, FTI also ran a calculation using a simplified DCF approach that resulted in a slightly higher valuation that would have reduced the Claimants' ultimate losses by €3 million, or approximately 5%.[342])

446.   For the Counterfactual Position, FTI's valuation is based on a forecast of operational cash flows of the PV facilities.  FTI assumes that the Claimants succeed on their claim as pleaded, which is to say that the Claimants' PV facilities were entitled to receive the full FiTs set out under RD 661/2007.

447.   FTI calculates that the disputed measures reduced the revenues of the Claimants' PV facilities by approximately 23%. [343]  Put another way, the Claimants' PV facilities would have earned more than €150 million in additional revenue over their lifetimes had the disputed measures not been enacted.[344] The following chart taken from Mr Edwards' First Expert Report illustrates FTI's forecast of the actual and counterfactual revenues (in € millions) of the Claimants' three PV plants over their assumed 35-year operating lives:[345]

---

[342]   Day 5, 57:19-22.
[343]   Edwards 1st, ¶ 2.1.
[344]   Edwards Presentation, slide 18.
[345]   Edwards 1st, Figure 2-1.

448. Pursuant to the DCF methodology, FTI discounted the forecasted cash flows using a cost of capital of 5.5% based on the weighted average cost of capital (WACC) of the Claimants' PV facilities.[346] From this, FTI calculates that the total equity value of the Claimants' investment interests in the operating companies in the Counterfactual Position is €70.4 million (€44.3 million representing Foresight's ownership and €26.1 million representing GWM/Greentech's interest).

449. To arrive at the final calculation of loss, FTI subtracts the value of each of the Claimants' investments in the Actual Position from the hypothetical value of those investments in the Counterfactual Position. FTI's final calculation of total loss in respect of both Foresight and GWM/Greentech is €58.2 million, broken down as follows:[347]



---

[346] Edwards 1st, ¶ 6.29.

[347] Edwards 1st, Table 7-1; Edwards 2nd, Table 6-4.

**Table 7-1: Foresight's loss on the Spanish Plants (EUR millions)**

| Company | Counterfactual Position [A] | Actual Position [B] | Loss [C]=[A]−[B] |
|---|---|---|---|
| Acacia | 25.8 | 3.8 | 22.1 |
| Global Litator | 18.5 | 3.1 | 15.4 |
| Fotocampillos Companies | 0.0 | 0.0 | 0.0 |
| Total | 44.3 | 6.8 | 37.5 |

Source: Tables 5-3 and 6-12.

**Table 6-4: Greentech's loss on the Spanish Plants before interest (EUR millions)**

| Company | Counterfactual Position [A] | Actual Position [B] | Loss [C]=[A]−[B] |
|---|---|---|---|
| Acacia | 0.0 | 0.0 | 0.0 |
| Global Litator | 18.5 | 3.1 | 15.4 |
| Fotocampillos Companies | 7.6 | 2.4 | 5.2 |
| Total | 26.1 | 5.4 | 20.7 |

Source: Appendix 5-1b.

450.    Mr Edwards opines that this loss represents a 29% fall in enterprise value of the Claimants' PV facilities and an 83% decrease in the value of the Claimants' equity in their investments. [348]

451.    The Claimants contend that the DCF approach has been strongly endorsed by several tribunals considering the same disputed measures enacted by Spain.[349] In Mr Edwards' opinion, the DCF method is appropriate in this case because the future cash flows of PV facilities are very predictable.[350] In particular, the price at which electricity is sold is clearly defined under RD 661/2007, annual electricity production is largely predictable notwithstanding weather fluctuations, and operating costs are also relatively predictable as well as being relatively small.

452.    The Claimants submit that their damages claim corresponds to losses attributable to all of the disputed measures. The Claimants reject as groundless the Respondent's contentions that the Claimants have not satisfied their burden of proof because they did not separately quantify damages for each disputed

---

[348]    Edwards 2nd, ¶ 6.3.
[349]    CL-170, Eiser, ¶ 465; CL-185, *Novenergia*, ¶ 818; CL-189, *Masdar*, ¶¶ 581-87.
[350]    Hr. Day 4, 157:15-20.

measure, or that the Claimants should have separately quantified losses based on different liability theories, such as FET and expropriation.[351]

453.    The Claimants also request that the Tribunal award pre- and post-award compound interest at the highest lawful rate from the Date of Assessment until the date that the Respondent pays the award in full.

454.    At the Claimants' instruction, FTI submitted two alternative interest calculations on the Claimants' losses from the Date of Assessment until January 2018, calculated using either the Respondent's cost of borrowing (Spanish 5-year government bonds) or the Claimants' cost of borrowing (Claimants' cost of debt).    Foresight's total loss including interest amounts to between €38.1 million or €41.4 million, and Greentech's total loss including interest amounts to between €21.0 million or €22.8 million.[352]

*(iii) Rebuttals to Respondent's calculations*

455.    Mr Edwards identifies three (or possibly four) different approaches used by the Respondent's quantum expert, BDO, to assess the Claimants' losses on their investments in the PV facilities.

456.    In summary, Mr Edwards offers the following critiques of BDO's approaches:

(a)    Regulatory asset base (**RAB**) method (BDO assesses no loss to the Claimants[353]): Mr Edwards criticises this approach because it assumes that the Claimants do not prevail on liability, i.e. BDO assumes that the Claimants were only ever entitled to earn a "reasonable rate of return", which is the Respondent's case, and that the Respondent was therefore not obliged to ensure that the fixed FiTs under RD 661/2007 were paid to the Claimants' PV facilities.    Moreover, Mr Edwards opines that BDO makes two further assumptions "that render all of its discussions and calculations utterly irrelevant".[354]    First, BDO assumes that the RABs of Claimants' PV facilities are the same in the Actual Position and Counterfactual Position.    Second, BDO assumes that the valuation multiple would be the same in both the Actual and Counterfactual positions.    At the Hearing, Mr Edwards opined that: "If you're simply

---

[351]    Claimants' Reply PHB, ¶¶ 51-52; Hr. Day 5, 52:18-19.
[352]    Hr. Day 4, 162:8-22.
[353]    BDO 1ˢᵗ, ¶ 258.
[354]    Hr. Day 4, 164:17-18.

going to assume that the value of the two assets is the same in both scenarios, then of course losses are nil. The whole exercise is utterly redundant."[355]

(b)     DCF method assuming a reasonable rate of return (BDO assess a €1.2 million gain by the Claimants[356]): Mr Edwards criticizes BDO's approach because it assumes that the Claimants were only entitled to earn a "reasonable rate of return", and not the FiTs under RD 661/2007. Mr Edwards considers that BDO has reverse-engineered FiTs that deliver a return equal to the cost of capital over the life of the Claimants' PV facilities so as to conclude that the Claimants' losses are nil;

(c)     DCF method with premium for risk of system collapse (BDO assesses the impact as ranging from a loss of €18 million to a gain of €5 million depending on the assumptions used[357]): Mr Edwards opines that the difference between the Parties' respective DCF calculations is largely attributable to: (i) BDO's assumption that the Claimants' PV facilities would receive the RD 661/2007 FiTs for only the first 30 years of their operating life; and (ii) BDO's discount of the counterfactual cash flows to reflect the risk of system collapse under the weight of the tariff deficit, i.e. the Respondent being unable to pay the RD 661/2007 FiTs.[358] Mr Edwards considers this discount (which reduces damages by around 60%, from €44.7 million to €18.1 million[359]) to be inappropriate, because inter alia the Claimants' case is that the Respondent had to ensure payment of the FiTs, and the default risk cannot be materially higher in the Counterfactual Position as the disputed measures did not materially affect the Spanish economy in the Actual Position.

(d)     Rate of return (BDO assesses no loss[360]): Mr Edwards offers a critique of an apparent fourth valuation method proposed by BDO that asserts the actual IRRs (8.6% pre-tax) of the Claimants' PV facilities exceed the rate of return of 7.398% pre-tax offered under the New Regulatory

---

[355]    Hr. Day 4, 165: 6-9.
[356]    BDO 1st, ¶ 309.
[357]    BDO 2nd, Table 21.
[358]    Edwards 2nd, ¶¶ 2.20-2.22.
[359]    C's Reply PHB, ¶ 48; compare Supplemental BDO Report dated 18 May 2018, ¶ 27 with BDO 2nd, ¶ 244.
[360]    BDO 2nd, ¶ 246.

Regime, and therefore the Claimants suffered no loss.[361]  Mr Edwards opines that the IRRs are materially inflated because BDO has artificially lowered investment costs and reduced operating costs; the IRRs in the Actual Position are in fact 5.5% post-tax.[362]  Again, Mr Edwards opines that BDO's approach also incorrectly assumes that Spain did not have to pay the FiTs under RD 661/2007.

### b.  Respondent's Position

#### (i) Overview

457.  The Respondent rejects the Claimants' damages claim.

458.  Even if the Tribunal finds liability on the merits, the Respondent contends that the Claimants' damages claim must be denied because the Claimants have failed to discharge their burden of proof.  The Respondent relies on the following statement of the *Gemplus v. Mexico* tribunal:

> Burden of Proof: Under international law and the BITs, the Claimants bear the overall burden of proving the loss founding their claims for compensation. If that loss is found to be too uncertain or speculative or otherwise unproven, the Tribunal must reject these claims, even if liability is established against the Respondent …[363]

459.  The Respondent's quantum expert, BDO, opines that the Claimants' valuation method based on DCF is flawed because it fails to consider the main structural features of the SES (sustainability and reasonable return) in the context of the tariff deficit that existed at the time of the disputed measures, and is highly speculative.  By contrast, BDO relies primarily on a RAB-based approach to conclude that the value of the Claimants' investments did not change as a result of the disputed measures because the PV facilities' returns in the long run will tend to a reasonable return required by the capital markets in both actual and but-for scenarios.[364]  According to BDO's calculations, the disputed measures allowed the Claimants to recover their cost of investment and receive a reasonable return on their investments.  Moreover, BDO opines that the PV facilities' actual value and but-for value are significantly higher than their book

---

[361]  Day 4, 175:2-8.
[362]  C's Reply PHB, ¶ 27; Edwards 2nd, p. 96, Table A3-6-3.
[363]  RL-90, *Gemplus, S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4, Award, 16 June 2010, ¶¶ 12-56.
[364]  Hr. Day 5, 120:4-14.

value. Accordingly, BDO concludes that the Claimants' PV facilities cannot have suffered losses.

460.    The Respondent also rejects the Claimants' claim for interest. In the event that the Tribunal awards interest, however, the Respondent submits that the 5-year Spanish Government bond yield is the appropriate interest rate because it reflects a "risk-free" rate.

### (ii) Critique of Claimants' DCF methodology

461.    First of all, the Respondent submits that the Claimants' use of the DCF method is inappropriate because it is inherently speculative. The Respondent cites Ripinksy on *Damages in International Investment Law*, which states in part that:

> [T]he future is uncertain and looking into the future requires one to make numerous assumptions and subjective choices regarding future market conditions, sales, costs, additional capital requirements, currency fluctuations, rates of inflation, levels of risk, etc. The end-result is thus inherently somewhat speculative. This explains why litigating parties' experts frequently produce DCF valuations with diverging results. Noting this tendency, Stauffer has warned against a 'Cinderella effect', that is, overvaluation of assets by claimants in their DCF valuations.[365]

462.    The Respondent also contends that the Claimants' valuation is based on the mistaken premise that the FiTs under RD 661/2007 would remain frozen in future. As a result, FTI's assessment of loss fails to take account of the regulatory risk that Spain might exercise its power to change the FiTs,[366] and of the fact that the Claimants invested at a time of "high regulatory risk".[367]

463.    In BDO's opinion, the valuation approach of the Claimants' expert, FTI, fails to consider: (i) the main structural features of the SES, namely the principles of sustainability and reasonable return; and (ii) the fact that there was a structural imbalance at the relevant time that threatened the sustainability of the SES. Moreover, BDO opine that FTI's valuation approach is "highly speculative, and therefore unreliable, due to the high level of uncertainty and subjectivity of methodologies, assumptions and parameters used".[368]  BDO consider that FTI's operating assumptions, such as production, useful life and discount rate, have a strong impact on his final damages calculation.[369] For example, BDO

---

[365]    RL-57, Damages in International Investment Law, Sergey Ripinsky with Kevin Williams, British Institute of International and Comparative Law (BIICL), 2008, pp. 200-201.
[366]    Hr. Day 5, 50:5-51:5.
[367]    Claimants' PHB, ¶ 227.
[368]    Hr. Day 5, 112:22-24.
[369]    Hr. Day 5, 116:18-21.

challenge the basis for FTI's assumption that the useful life of the Claimants' PV plants is 35 years.  In BDO's opinion, the model should assume no more than 30 years, based on the fact that the 2005 PER assumes a useful life of 25 years, the annual accounts of the Claimants' PV facilities do not foresee a useful life over 30 years, and the impairment tests run for the Claimants' PV facilities also assume a useful life of 30 years.[370]

464.    Other methodological criticisms offered by BDO include that FTI's valuation approaches lack a "reality check" (i.e. additional support to compare how reasonable the results obtained are),[371] and that FTI inconsistently uses a DCF method in the Counterfactual Position at the same time as using an arm's length transaction valuation method in the Actual Position, which results in a €3 million lower valuation in the Actual Position than would be using a DCF method.[372]

465.    The Respondent raises a number of other criticisms of the Claimants' valuation, including that FTI's Date of Assessment is disconnected from the date of the disputed measures, and that FTI does not consider the individual impact of each disputed measure sequentially.[373]

466.    BDO also criticize FTI's alternative calculation that, like BDO, assumes a reasonable rate of return rather than fixed FiTs.  BDO's criticisms include that FTI  wrongly assumes 8% or 9% returns when RD 661/2007 in fact established a post-tax target return of 7% for a standard installation.[374]

467.    The Respondent also contends that the principles of assessment used by the Claimants are appropriate to an expropriation claim, but that compensation for breaches of other ECT standards such as FET requires the Tribunal to reach an equitable outcome.  The Respondent relies on the commentary to Article 36 of the International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts, which states:

> As to the appropriate heads of compensable damage and the principles of assessment to be applied in quantification, these will vary, depending upon the content of particular primary obligations, an evaluation of the

---

[370]    BDO 1st, ¶ 458.
[371]    BDO 2nd, ¶ 178; Hr. Day 5, 61:18-21.
[372]    Hr. Day 5, 57:11-14.
[373]    Hr. Day 5, 53:8-16.
[374]    BDO 2nd, ¶¶ 155-156.

respective behaviour of the parties and, more generally, a concern to reach an equitable and acceptable outcome.[375]

468.  In this regard, the Respondent submits that it is relevant to achieving such an "equitable outcome" that the Claimants' PV Plants are in fact highly profitable today thanks to the subsidies they receive from Spain. The Respondent also focuses on the amounts that the Claimants actually invested in the PV Plants. In particular, the Respondent contends that the Claimants' compensation claim (for between approximately €59 million and €64 million) is disproportionate because the Claimants only invested €25.8 million to acquire their interests in the three PV facilities at issue.[376]

*(iii) Respondent's valuations*

469.  BDO's preferred approach to valuing the Claimants' investments is a RAB-based method that takes account of the SES principles of sustainability and reasonable return.[377] BDO opine that, under the reasonable return principle, long-term returns will tend to follow returns required by the capital markets. Accordingly, BDO assumes that the market value of a PV plant will be closely related to the efficient investment cost, or RAB.

470.  BDO concludes that the value of the Claimants' investments does not change as a result of the disputed measures. In BDO's opinion:

> 254. Given that the regulatory value is estimated considering the cost of efficient market investment, this value can also be assumed to be the regulatory value in the But-for scenario. Likewise, the multiple to be applied should be similar in the But-for and Actual scenarios given that it should reflect the fact that returns obtained should approximate the return demanded by the market.
>
> 255. Our conclusion that the multiple over the value of a regulated asset will be similar in each scenario that arises starts from the premise that the return to be obtained by efficient producers, regardless of the specific regulatory regime of application, will tend to resemble the return required by capital markets. Therefore, this multiple will be similar in both scenarios due to the adjustment mechanisms of the system itself.
>
> 256. Such adjustment mechanisms would have focused on the measures under consideration or on other measures of any other nature (by adjusting the

---

[375]  CL-175, International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts, 28 January 2002, Article 36, Commentary 7.

[376]  The Claimants submit that Foresight's acquisition costs were approximately €9.3 million for Madridejos and €6.35 million for La Castilleja, and GWM/Greentech's acquisition costs were approximately €6.3 million for La Castilleja and €3.8 million for Fotocampillos. Claimants' PHB, n.174.

[377]  Hr. Day 5, 119:3-7.

118

premiums, eliminating them, etc.), so that the return to be obtained by the producers of renewable energy would have been adjusted to the market return.

257. Therefore, the flows of a But-for scenario like those of the Actual scenario, in one way or another, must also tend to obtain the return demanded by the capital markets.[378]

471.   In addition to the primary valuation based on RAB, BDO submitted alternative calculations using the following different methodologies:

(a)   Alternative calculation following the DCF methodology and based on SES principles: Using the DCF methodology, BDO assumes that in the Counterfactual Position investors will always obtain returns close to the market return (or "reasonable return").  The result is that the value of the Claimants' investments is €1.2 million higher in the Actual Position.[379]

(b)   Alternative calculation based on FTI's primary valuation approach: BDO adjusts the assumptions in Mr Edwards' model, particularly the discount rate in the Counterfactual Position and the useful life of the Claimants' PV plants.  The impact ranges from a loss of €18 million to an increase in value of €5 million.[380]

(c)   Alternative calculation based on FTI's alternative valuation approach: BDO adjusts the assumptions in Mr Edwards' model, particularly the actual value base (standard), the useful life of the Claimants' PV plants and the Counterfactual Position discount rate.  The impact ranges from a loss of €10 million to a loss of €2 million.[381]

472.   The Respondent contends that a RAB-based approach is frequently used in regulated industry sectors, as well as the renewable energy industry, and is more reliable than the DCF approach preferred by the Claimants' expert.

### (2)   The Tribunal's Analysis

473.   The Claimants seek damages of €58.2 million, which they contend represents the diminution in the fair market value of their equity in the PV facilities as a result of all the disputed measures combined.

---

378   BDO 1st, ¶¶ 254-257.
379   BDO 1st, Table 24.
380   BDO 2nd, Table 19, Table 21; BDO Quantum Presentation, slide 46.
381   BDO 2nd, Table 16; BDO Quantum Presentation, slide 47.

474. As will be further elaborated upon below, the Majority of the Tribunal has decided that the Claimants' approach to calculating damages, which employs the DCF method to model the present value of lost cash flows resulting from the disputed measures, is an appropriate basis for determining the quantum of compensation that should be awarded to the Claimants for the Respondent's violation of Article 10(1) ECT.

475. The Tribunal shall begin its analysis by considering the Parties' submissions on the appropriate valuation method, before turning to the Claimants' assessment of damages and the Respondent's criticisms thereof.

*(i) Valuation Method*

476. The Parties do not agree on the appropriate valuation method.  The Claimants consider that an income-based valuation, using the DCF method to calculate the hypothetical market value of the Claimants' investments had Spain not introduced the disputed measures, is appropriate. [382]   The Respondent contends that the DCF method is inappropriate because it is too speculative.[383]  The Respondent instead proposes an asset-based valuation.

477. The Majority of the Tribunal disagrees with the Respondent's objections to the use of the DCF method in this case, which concerns the future financial performance of PV assets with up to five years of operating history.  As the tribunal in *Novenergia*, which also concerned investments in PV facilities,[384] stated:

> [T]he DCF-valuation is based on fundamental principles of economic and finance and is regarded by many as the preferred method for valuation of income-earning assets. The DCF-method is widely supported in professional literature, but more importantly, the method has been broadly accepted by numerous arbitral tribunals as "the only method which can accurately track value through time" and "the preferred method of calculating damages in cases involving the appropriation of or fundamental impairment of going concerns".  In the words of the *CMS v. Argentina* tribunal: "DCF techniques have been universally adopted, including by numerous arbitral tribunals, as an appropriate method for valuing business assets".[385]

478. Indeed, the DCF method is routinely used in the PV industry because of the predictability of PV facilities.  As Mr Edwards of FTI, the Claimants' expert, stated:

---

[382]   Edwards 2nd, ¶¶ 2.16-2.19.
[383]   Counter-Memorial, ¶ 1268.
[384]   CL-185, *Novenergia*, ¶ 2.
[385]   CL-185, *Novenergia*, ¶ 818.

> Assuming a stable regulatory regime, I consider that the operational and financial performance of PV plants is relatively predictable once they have been operational for a period sufficient to establish the efficiency of the equipment. As I note in my First Report, unlike many businesses, PV plants registered under RD 661 can sell all that they produce for a price (or revenue) that is highly predictable. In other words, they are not subject to the competitive risks that most businesses face. The weather does vary from year to year, but electricity production tends to follow a fairly predictable pattern […]. Costs are also relatively predictable and relatively small in comparison to capital costs and revenues – PV plants do not have to acquire raw materials or feedstock, and the most significant costs (operations and maintenance) are typically governed by multiyear contracts.[386]

479. Mr Edwards also explained that:

> [T]he DCF method is widely used to assess the value of PV plants in Spain. I have worked on a number of matters (both contentious and not) that involved assessing the value of PV plants in Spain. In every matter the primary, and often the only, method used to value PV plants by the parties involved (including lenders, investors, and third party valuation advisors) is DCF. For example:
>
> (1) Foresight uses the DCF method for assessing the value of the assets in the Foresight European Solar Fund for its investors, which Madridejos and La Castilleja were part of;
>
> (2) Greentech uses the DCF method in its impairment testing of the Spanish Plants, which is reviewed and approved by Greentech's auditors;
>
> (3) Foresight relied upon the DCF method when acquiring its investments in the Spanish Plants; and
>
> (4) other investors in the industry, including companies such as EDF Energies Nouvelles, also use DCF in their impairment testing.[387]

480. Further, the Majority of the Tribunal agrees with the Claimants that the DCF method is appropriate in this case, because: "the future performance of operating solar PV plants is relatively predictable (i.e., they can sell all of the electricity they produce at prices and costs that are known or can be forecast with a high degree of confidence for a significant period of time)."[388]

481. The Majority of the Tribunal's conclusion that the DCF approach is appropriate is not undermined by the "sensitivity analysis" performed by BDO that results in a reduction of €55 million to FTI's loss assessment. In its assessment, BDO increased the discount rate from 5.5% to 7.5%, reduced production forecasts by 15%, and reduced the useful life of the Claimants' PV facilities from 35 to 30

---

[386]  Edwards 2nd, ¶ 3.35.
[387]  Edwards 2nd, ¶ 3.43.
[388]  SoC, ¶ 451.

years.[389]  The Majority of the Tribunal agrees with FTI that "it is not surprising that significant changes to the inputs of a model can result in significant changes to the outputs".[390]  The Majority of the Tribunal has confidence in FTI's general approach and considers the model to be reliable.  Nevertheless, the Tribunal shall consider later in this section the reasonableness of the assumptions used by FTI, and whether any adjustments should be made.

482.  As for the "Regulated Asset Base" (RAB) approach favoured by the Respondent's expert BDO, the Majority of the Tribunal is not persuaded that this is more appropriate in the particular circumstances of this case than the DCF valuation method.  Moreover, the Majority of the Tribunal does not have confidence in BDO's overall approach to its RAB valuation, which is based on the efficient construction cost.

483.  In particular, the Majority of the Tribunal is not convinced by BDO's assumptions that: (i) the RAB  of each of the Claimants' PV facilities would have been the same in the Actual Position and the Counterfactual Position; and (ii) the applicable EV/RAB multiples applied to value the Claimants' three PV facilities would also have been similar in the Actual Position and the Counterfactual Position.[391]  It would appear that BDO's conclusion that the disputed measures have not caused any loss to the Claimants' investments necessarily follows from their assumption that, in both the Counterfactual and Actual Positions, the Claimants' PV facilities were only ever entitled to a regulated rate of return that fluctuated with interest rates.

484.  As Mr Edwards opines:

> BDO's ingoing assumption that investors were only ever entitled to receive a return similar to the return they have received and will receive under the current regime means that the values of the Spanish Plants would not have been higher in the Counterfactual Position than they actually are. This is because investors would (or should) have expected returns to be regulated in ways similar to the steps actually taken by Spain. By assumption, therefore, losses are nil.[392]

485.  This assumption is incompatible with the Majority of the Tribunal's findings that the  RD 661/2007 support scheme, under which the Claimants' invested, offered fixed FiTs.  In fact, compensation only subsequently became linked to the concept of a reasonable return rather than a fixed FiT when the Respondent

---

[389]    BDO 1st, ¶¶ 312-315.
[390]    FTI 2nd, ¶ 3.40.
[391]    BDO 1st, ¶¶ 254-258.
[392]    FTI 2nd, ¶ 2.11.

repealed and replaced RD 661/2007 with the New Regulatory Regime.  The Majority of the Tribunal agrees with FTI that:

> Given these assumptions [that the RABs and RAB multiples are the same in the Counterfactual Position and Actual Position], it is obvious that BDO will conclude that the value of the plants is the same in both Positions, and assess the losses as nil. It is irrelevant what the RABs of the plants are, or what multiple of RAB ought to apply.
>
> By assuming that Spain was entitled to limit returns to a "reasonable" level that varies over time, and that the current regime does this, the outcome of this calculation is pre-determined.[393]

486.    In sum, the Majority of the Tribunal is not persuaded by the Respondent's RAB valuation approach.  The Majority of the Tribunal shall instead assess damages in this case on the basis of the Parties' valuations derived from the DCF method, which is the more appropriate approach in this case.

### (ii) FTI's primary DCF valuation

487.    The Majority of the Tribunal considers that the Claimants' primary DCF model is an appropriate method for calculating the Claimants' damages in the particular circumstances of this case.  Further, the Majority of the Tribunal considers that the Claimants' primary DCF model is comprehensive and its methodology is robust.  For the reasons to be discussed, the Majority of the Tribunal is not persuaded that BDO's DCF models should be preferred.  The Majority of the Tribunal shall therefore use the Claimants' primary DCF model and the assumptions contained therein as a baseline for valuing the Claimants' loss.  In the exercise of its broad discretion in matters of quantum, the Majority of the Tribunal shall then consider whether or not any adjustments should be made to the Claimants' valuation in light of the Respondent's criticisms thereof.

488.    The Claimants' primary valuation of the impact of the disputed measures on their investments is the difference between (a) the hypothetical market value of the Claimants' equity interests in and shareholder loans to the operating companies that owned the three PV facilities had the disputed measures not been enacted (Counterfactual Position), based on a model of future cash flows of each PV facility constructed using the DCF method; and (b) the market value

---

[393]    FTI 2nd, ¶¶ 3.17-3.18.

of the Claimants' investments after the introduction of the disputed measures (Actual Position).

489.    The Date of Assessment is 30 June 2014, which is the end of the quarter in which the New Regulatory Regime was finalized by RD 413/2014 (enacted on 10 June 2014) and MO 1045 (enacted on 20 June 2014).  In the Majority of the Tribunal's view, this is an appropriate date to use, as it corresponds to the time when the definitive terms of the New Regulatory Regime became known to the market.

490.    The Claimants contend that:

> FTI calculates the value of the three solar PV projects in the Counterfactual Position under the regulatory framework enacted in RD 661/2007, assuming that Spain never enacted the challenged measures.  This is a very straightforward DCF calculation because the companies were legally entitled to sell all of their electricity production at the tariff rates guaranteed in the regulations. Thus, FTI's DCF model in the Counterfactual Position entails only a few material projections, which themselves can be estimated with a high degree of reliability, including:
>
> - Electricity Production: FTI projects future electricity production based on each company's average historical production in each full year from 2011 through the end of 2014.  FTI then applies a degradation factor of 0.5% per annum to account for future declines in the efficiency of the solar panels, which is consistent with Spain's own assumptions regarding future panel performance in MO-1045;
> - Inflation: Under RD 661/2007, the tariffs were to be adjusted annually based on the Spanish CPI (less 0.25% until 2012 and 0.5% thereafter). FTI projects future inflation in the near term (through 2019) based on forecasts published by the International Monetary Fund, and in the longer term based on the European Central Bank's inflation target;
> - Operating life: FTI projects that Claimants' plants will continue to operate, and thus continue to receive the tariffs and complements guaranteed by RD 661/2007, for 35 years from inception. A useful life expectancy of 35 years is supported by a study published by the European Commission in 2011, and the Claimants also expected their facilities to operate for at least 30 to 40 years;
> - Operating costs: FTI projects future operating costs based on the companies' historical costs and forward-looking budgets (excluding the access toll imposed by Royal Decree 14/2010 and the 7% energy tax imposed by Law 15/2012, because those are disputed measures), which FTI projects to grow with inflation; and
> - Income tax: FTI projects future corporate income tax based on the tax code in effect as of the Date of Assessment (incorporating future changes to the tax code that had been announced as of the Date of Assessment).[394]

491.    The Claimants' expert then discounted these future cash flows to present value on the Date of Assessment based on the Claimants' PV facilities' WACC of

---

[394]    SoC, ¶ 453.

5.5%.[395]   From this, FTI estimates that the loss in value of the Claimants' investments to be €58.2 million.[396]

492.   For the Actual Position, FTI used the arms' length sales prices of the Claimants' PV facilities.   On 6 November 2015, Foresight 1's subsidiary, Foresight Netherlands Solar 1 B.V., sold the Madridejos project for €4.2 million.[397]  In July 2016, Greentech became the sole owner of La Catilleja when it acquired Foresight 2's 49.97% shareholding in Global Litator, the owner of La Catilleja, for €3.8 million.[398]  On 28 September 2016, Greentech sold its 100% shareholding in the Fotocampillos project for €3.3 million, of which €2.9 million represented consideration for Greentech's equity.[399]   The Claimants contend that these prices, adjusted to reflect the value on the Date of Assessment, are a good indicator of the actual market value of those investments at the time of sale.[400]

*(iii) BDO's first DCF valuation*

493.   The Tribunal now turns to the Respondent's valuations using the DCF method, and the critiques raised by the Respondent of the Claimants' primary DCF model.

494.   In its first report, the Respondent's expert, BDO, submitted a DCF valuation which arrives at the surprising result that the disputed measures, despite reducing the incentives paid to the Claimants' PV facilities, actually led to an increase in the value of the Claimants' investments of approximately €1.2 million, compared with FTI's estimate of €58.2 million.[401]

---

[395]   FTI Quantum 1st, ¶ 6.29.
[396]   Edwards 1st, Table 7-1; Edwards 2nd, Table 6-4.
[397]   Edwards 2nd, ¶ 4.36; RE-15, Share Sale and Purchase Agreement of Acacia, August 2015.
[398]   Edwards 2nd, ¶ 4.37; RE-203, Greentech's Share Sale and Purchase Agreement of Foresight's stake in Global Litator, July 2016.
[399]   Edwards 2nd, ¶ 4.41; RE-336: Greentech's Share Sale and Purchase Agreement of Fotocampillos Companies, September 2016.
[400]   FTI Quantum 1st, ¶¶ 5.8, 5.11-5.13; SoC, ¶ 457.
[401]   BDO 1st, ¶ 309.

495.    Mr Edwards of FTI submitted the following illustration of the impact of BDO's different assumptions on his calculation of loss in his first report:[402]



496.    As can be seen in FTI's illustration above, the difference between FTI's and BDO's calculations is largely explained by the fact that BDO assumes that the Claimants were only entitled in the Counterfactual Position to a "reasonable rate of return" that would fluctuate with interest rates, rather than the fixed FiTs specified in RD 661/2007.[403]  Indeed, this assumption accounts for €34 million (58%) of the difference between BDO's and FTI's valuations.[404]

497.    As Mr Edwards states, "BDO's assessment of loss does not assume that the Claimants were entitled to the FiTs as set out in RD 661. Instead, it assumes that Spain was entitled to amend the regulatory regime as long as the Claimants were able to earn what Spain deems to be a 'reasonable rate of return' on their investments."[405]

498.    In BDO's opinion, however, the Counterfactual Position must: "take into account the adjustments required to ensure that the project returns for producers of renewable energy tends to approach the returns demanded by the market," because it should "take into consideration that the premiums

---

[402]    Edwards 2nd, Figure 5-1.
[403]    Counter-Memorial, ¶ 1268.
[404]    Edwards 2nd, ¶ 5.4.
[405]    Edwards 2nd, ¶ 2.5.

(subsidies) to be received by operators in the renewable energy sector from the date of analysis should not make it possible to obtain returns in excess of reasonable returns."[406]

499.    BDO's first DCF calculation not only assumes that investors were only ever entitled to a "reasonable return" but also that the target return in the Counterfactual Position is lower than in the Actual Position.[407]  At the Hearing, Mr Edwards stated:

> So what does that mean? That means that BDO has essentially said, "You were only ever entitled to earn less than you're currently entitled to earn, and I'm going to work out what the value of your plants would have been with some depressed feed-in tariffs that deliver a lower return, and I'm going to compare it to what your plants are actually worth assuming a higher rate of return". So once again, by assuming or by establishing that the appropriate rate of return is lower than the rate of return implicit in the current regime, by definition, the value of the plants is lower. Again, they didn't really have to do any of the DCF modelling to establish that conclusion. They could simply have said: investors were only ever entitled to earn a reasonable rate of return, that rate of return is lower than the current return, so they've lost nothing. I mean, it's an obvious conclusion based on the ingoing assumptions a second time.[408]

500.    Almost all (97%) of the remaining difference between FTI's €58.2 million and BDO's €1.2 million valuation is attributable to: (i) BDO using a higher equity value of the Claimants' investments in the Actual Position (€16 million (27%) of the difference);[409] and (ii) BDO excluding damages for losses prior to the Date of Assessment, i.e. losses resulting from the disputed measures prior to the New Regulatory Regime, e.g. the hours cap (RD 14/2010) and TVPEE (Law 15/2012) (€8 million (13.5%) of the difference).[410]

*(iv) BDO's revised DCF calculations*

501.    FTI's calculation of a €58.2 million loss in the value of the Claimants' investments is based on a DCF method that assumes the Claimants' PV facilities would have received the RD 661/2007 FiTs for their entire operating life.   In its second report, the Respondent's expert BDO submitted an alternative DCF-derived valuation based on FTI's approach to counterfactual revenues but assuming that the Claimants' PV facilities would receive the RD 661/2007 FiTs for only the first 30 years of their operating life.  The resulting

---

[406]    BDO 1st, ¶ 280-281.
[407]    Day 4, 166:25-167:4.
[408]    Day 4, 167:5-22.
[409]    Edwards 2nd, ¶ 5.4.
[410]    Edwards 2nd, ¶ 5.4.

impact on the value of the Claimants' investment ranged from a loss of €18 million to a gain of €5 million.[411]

502.  As Mr Edwards explained at the Hearing, the difference between FTI's valuation and BDO's alternative valuation is mainly attributable to three major differences of assumption.[412]

503.  First, FTI assumes that the PV facilities have an operating life of 35 years whereas BDO does not project cash flows beyond 30 years.[413]  BDO's assumption reduces FTI's estimate of loss by €11 million.

504.  Second, BDO assumes a corporate income tax rate of 30% whereas FTI assumes it was reduced to 28% in 2015 and 25% in 2016.[414]  BDO's assumption reduces FTI's estimate of loss by €5 million.

505.  The third and most significant difference is the much higher discount rate used by BDO, which reduces FTI's calculation of damages by around 60%, from €44.7 million to €18.1 million.[415]

> *(v) Tribunal's analysis of the differences between FTI's model and BDO's models*

506.  The Majority of the Tribunal is satisfied that FTI's DCF model is generally appropriate and should therefore provide the baseline for the Tribunal's assessment of damages in this case.  However, the Majority of the Tribunal shall now consider whether the particular assumptions used by FTI are reasonable, or should be modified to reflect BDO's criticisms.

507.  In his second report, FTI's Mr Edwards opined that the differences between FTI's primary valuation and BDO's first DCF valuation were attributable to: (i) counterfactual revenue forecasts; (ii) the value of the PV facilities in the Actual Position; (iii) operative life of the PV facilities; (iv) historical losses; and (v) corporate tax rate.  In response to BDO's supplemental report after the Hearing, the Claimants contend that, when BDO adopts a similar counterfactual revenue forecast to FTI's using RD 661/2007 FiTs rather than a "reasonable

---

[411]  BDO 2nd, Table 21.
[412]  Day 4, 168:11-12.
[413]  Day 4, 168:13-24; Edwards 2nd, ¶¶ 4.32 – 4.33, 5.24.
[414]  Edwards 2nd, ¶¶ 4.32 – 4.33, 5.24.
[415]  Compare Supplemental BDO Report dated May 18, 2018, ¶ 27 with BDO 2nd, ¶ 244.

return", the main difference between the Parties' estimates is due to the regulatory risk discount used by BDO.[416]

508. The Tribunal now turns to the Parties' submissions on these points.

<u>Counterfactual revenue forecasts</u>

509. FTI's primary DCF valuation forecasts revenues as a product of production (which is based on average historical production) and fixed RD 661/2007 FiTs for 35 years (which are forecast by updating the historical FiTs published by the Ministry of Industry, Energy and Tourism by CPI (less a factor)).[417] By contrast, BDO's first DCF valuation assumes that the revenues generated by the Claimants' PV facilities would only give a set return on investment.[418] This accounts for €34 million of the €59 million difference between the experts' estimates of loss in their first reports.[419]

510. The Majority of the Tribunal considers that the assumption in FTI's primary model, also adopted in BDO's revised DCF model, that the Claimants' PV facilities would receive the RD 661/2007 FiTs, is appropriate. This assumption is consistent with the Majority's finding on liability that the Respondent abrogated the RD 661/2007 support scheme when it introduced the New Regulatory Regime, in violation of Article 10(1) ECT.

511. Accordingly, the Majority of the Tribunal disregards BDO's first DCF model, which assumes that the Claimants were only ever entitled to a regulated rate of return linked to the capital markets. The Majority of the Tribunal therefore also disregards FTI's alternative DCF valuation that forecasts counterfactual revenues based on a reasonable rate of return rather than fixed FiTs under RD 661/2007.[420] The Majority of the Tribunal shall give further consideration to BDO's second DCF model, which assumes RD 661/2007 FiTs, in its discussion below of the discount rate.

---

[416] Claimants' PHB, ¶ 48.
[417] Edwards 2nd, ¶ 5.6.
[418] BDO 1st, ¶¶ 280, 281.
[419] Edwards 2nd, ¶ 5.5.
[420] Edwards 2nd, ¶ 2.3.

Actual value of PV facilities

512.    FTI uses the arm's length sales of the Claimants' three PV facilities in 2015 and 2016 to assess the market value in the Actual Position of the Claimants' equity holdings.[421]  BDO does not agree with this approach.  Instead, BDO uses the DCF method to arrive at an equity value of the Claimants' PV facilities in the Actual Position of €28.5 million.[422]  BDO's approach results in a €16 million reduction of the losses estimated by FTI.[423]

513.    The Majority of the Tribunal considers that the arm's length transactions are the best measure of market value in the Actual Position.  The Majority also lacks confidence in BDO's approach, as there is a lack of consistency between BDO's DCF estimate (€28.5 million) and RAB estimate of €17.4 million of the equity value of the Claimants' investments.[424]

Operating life

514.    FTI assumes that the PV facilities have a 35-year operating life, based on an European Commission study of the market for recycling PV panels, which estimates that PV panels should operate for 30 to 40 years.[425]  FTI also notes inter alia the statement of Mr Jamie Edwards of Foresight that: "there is no reason to expect a well-built and well maintained solar plant will experience a sudden drop in production or catastrophic failure."[426]

515.    In their second report, BDO perform an alternative DCF valuation that forecasts RD 661/2007 FiTs for 30 years.  BDO considers a 30-year useful life to be appropriate based on the assumptions in the 2005 PER, which established the FiTs under RD 661/2007, as well as the annual accounts and impairment tests of the Claimants' PV facilities.[427]

---

[421]    On 6 November 2015, Foresight 1's subsidiary, Foresight Netherlands Solar 1 B.V., sold the Madridejos project for €4.2 million.  Edwards 2nd, ¶ 4.36; RE-15, Share Sale and Purchase Agreement of Acacia, August 2015. In July 2016, Greentech acquired Foresight 2's 49.97% shareholding in Global Litator, the owner of La Catilleja, for €3.8 million.  Edwards 2nd, ¶ 4.37; RE-203, Greentech's Share Sale and Purchase Agreement of Foresight's stake in Global Litator, July 2016.  On 28 September 2016, Greentech sold its 100% shareholding in the Fotocampillos project for €2.9 million. Edwards 2nd, ¶ 4.41; RE-336: Greentech's Share Sale and Purchase Agreement of Fotocampillos Companies, September 2016.
[422]    BDO 1st, Table 24.
[423]    Edwards 2nd, ¶ 5.18.
[424]    BDO 1st, Table 14.
[425]    Edwards 2nd, ¶ 4.31; Edwards 1st, ¶ 6.5; RE-219, Study on photovoltaic panels supplementing the impact assessment for a recast of the WEEE Directive, European Commission, 14 April 2011, p.13.
[426]    Edwards 2nd, ¶ 4.32; Richards 2nd, ¶ 18.
[427]    BDO 2nd, ¶ 332; BDO 1st, ¶ 458.

516.  In response, in FTI's second report, Mr Edwards amended his model to assume a useful life of 30 years, which reduces FTI's assessment of loss by approximately €11.2 million.[428]

517.  The Tribunal observes that neither FTI nor BDO are experts on the useful life of PV facilities.  Based on the evidence in the record, the Majority of the Tribunal considers that BDO's assumption of a useful operating life of 30 years is more reasonable than FTI's assumption of 35 years.  Accordingly, the Majority of the Tribunal shall reduce its award of damages by €11.2 million to reflect the difference between FTI's and BDO's operating life assumptions.

Historical losses

518.  FTI opines that the disputed measures have affected cash flows of the Claimants' PV facilities since the start of 2011.[429]  However, BDO has not undertaken an analysis of the impact of the disputed measures before the Date of Assessment (30 June 2014).[430]  This is because BDO's DCF methodology for establishing the market value of the Claimants' PV facilities in the Counterfactual Position "entails establishing the premium needed from 2014 onwards for the Photovoltaic Plants to obtain project returns during the 30-year useful life at the level of returns required by the capital[] markets."[431]

519.  The Majority of the Tribunal observes that FTI has not provided a break-down of historical losses caused by each disputed measure individually.  But FTI has calculated that the additional cash flows that the Claimants' PV facilities would have received in the Counterfactual Position prior to the Date of Assessment amounted to €8 million.[432]  Moreover, as part of the analysis of the discrepancy between FTI's primary DCF valuation and BDO's first DCF calculation, FTI opined that €8 million of the difference was attributable to BDO having assumed no losses "[f]or the period prior to the introduction of the current regulatory regime".[433]

520.  The issue of historical losses is particularly relevant because the Majority of the Tribunal has decided that the Respondent did not "cross the line" and violate

---

[428]  Edwards 2nd, ¶ 4.32.
[429]  Edwards 2nd, ¶ 6.32.
[430]  BDO 2nd, ¶ 225.
[431]  BDO 2nd, ¶ 226.
[432]  Edwards 1st, Table 6-10; Edwards 2nd, n. 39.
[433]  Edwards 2nd, ¶¶ 2.37, 5.4, 5.21.

the FET standard under Article 10(1) ECT until June 2014 when, as the *Eiser* tribunal also concluded, "the prior regulatory regime was definitely replaced by an entirely new regime".[434]  As in *Eiser*, any award of damages by the Tribunal must exclude the effects of the disputed measures prior to the New Regulatory Regime on market value of the Claimants' investments.[435]  The Majority of the Tribunal shall dispose of this issue as part of its overall assessment of losses, which is set out at the end of this section.

### Corporate tax rates

521.    At the Date of Assessment, the Spanish corporate tax rate was 30%.[436]  BDO's DCF model assumes that the tax rate on cash flows earned by the Claimants' PV facilities remains at 30%.  However, FTI's model takes account of the expectation at the Date of Assessment that the corporate tax rate would be reduced to 28% in 2015 and 25% in 2016.[437]  BDO's assumption of a consistent 30% rate reduces FTI's estimate of loss by €5 million.[438]

522.    BDO acknowledges that the corporate income tax rate was in fact reduced in November 2014, which is shortly after the Date of Assessment.[439]  On balance, the Majority of the Tribunal consider FTI's assumption to be reasonable.

### Spanish Electricity Sector risk

523.    Whereas the Claimants contend that the disputed measures increased the regulatory risk in the Actual Position, the Respondent contends that regulatory risk actually decreased in the Actual Position and was higher in the Counterfactual Position because, in BDO's opinion:

> [I]n a But-for scenario under which no control measures are applied and facing an uncontrolled increase in the deficit, it is indisputable that premiums to renewable energies would be reduced and, what's more, significantly.

---

[434]    CL-170, *Eiser*, ¶ 458.
[435]    CL-170, *Eiser*, ¶ 458.
[436]    Edwards 1st, ¶ 6.25.
[437]    Edwards 2nd, ¶¶ 4.32 – 4.33, 5.24; Edwards 1st, 6.25; RE-239: Fiscal reform, Government of Spain, 20 June 2014; Exhibit RE-240: Spain to cut taxes in bid to boost economic recovery, FT website, 20 June 2014.
[438]    Edwards 2nd, ¶ 5.24.
[439]    BDO 2nd, ¶ 242; BDO-92, Law 27/2014.

> Evidently, having rebalanced the Spanish Electricity System, this risk has been reduced significantly.[440]

524.    BDO further opines that, in a Counterfactual Position without the disputed measures, "an investor would have required a significant risk premium before investing in the energy sector in Spain."[441]  BDO therefore adds a premium to the cost of capital that FTI uses to discount future cash flows in the Counterfactual Position to reflect this apparent risk that the SES would have become unsustainable and the RD 661/2007 FiTs would therefore not have been paid in the Counterfactual Position.

525.    The Majority of the Tribunal cannot accept this contention.  To do so would require the Tribunal to conclude that Spain would not have been able to fund the payment of the RD 661/2007 FiTs but for the disputed measures.  But as FTI opines, the disputed measures have not in fact materially impacted the Spanish economy.[442]  As the *Masdar* tribunal held:

> Respondent offered no valid explanation as to why regulatory risk would decrease in the Actual scenario and increase in the But For scenario, other than that the financial sustainability of the Spanish electricity system was at risk prior to the enactment of the Disputed Measures and that, as evidenced by rating agencies, this risk decreased once the measures were enacted. As Claimant's expert testified at the Hearing, this reasoning is flawed. Accepting Accuracy's premise would require assuming that the Disputed Measures were Respondent's only way to address the tariff deficit and that they did not only contribute to the sustainability of the Spanish electricity system but to the overall improvement in government finances that Respondent has experienced since 2012.[443]

526.    The Majority of the Tribunal also agrees with the *Novenergia* tribunal's assessment that:

> [I]t cannot be correct to assume a higher risk in a scenario where the regulatory framework of the RE sector would have remained stable and RD 661/2007 would have continued to remain in force as originally implemented. The facts of the case show that under the Special Regime, the Respondent managed to attract numerous investors to the tune of billions of euros, indicating that the risk was considered low. Conversely, under the Specific Regime, it is not reasonable to conclude that the risk is lower, especially considering that the current remuneration system is subject to periodic reviews and the turmoil that they have caused.[444]

---

[440]    BDO 2nd, ¶ 205.
[441]    BDO 1st, ¶ 273.
[442]    FTI 2nd, ¶ 4.15.
[443]    C-189, *Masdar*, ¶¶ 578, 607.
[444]    CL-185, *Novenergia*, ¶ 832.

527.    In sum, the Majority of the Tribunal is satisfied that FTI's approach to regulatory risk is more reasonable than BDO's, and that FTI's discount rate of 5.5% should not be increased.

528.    In response to the Claimants' cross-examination at the Hearing and subsequent written request, [445] BDO submitted a supplemental report containing a revised DCF model.  This revised model was based on BDO's second DCF model, which assumes that the Claimants' PV facilities would receive RD 661/2007 FiTs for 30 years and includes a 5.74% regulatory risk premium as part of the discount rate applied in the Counterfactual Position.[446]  As requested by the Claimants, however, in its revised model BDO reduced the risk premium from 574 basis points to 0 basis points.[447]

529.    In the Majority of the Tribunal's view, the revised model from BDO demonstrates that the difference between the experts' valuations when RD 661/2007 FiTs are assumed is largely attributable to the regulatory risk discount used by BDO.  When the regulatory risk discount in the Counterfactual Position is removed, damages in BDO's model are reduced by around 60%, from €44.7 million to €18.1 million.[448]

*(vi) Tribunal's assessment of loss*

530.    The Tribunal now arrives at its final assessment of the Claimants' loss.  As the *Eiser* tribunal stated, "in a case of such scope and complexity damages cannot be determined with mechanical precision."[449]  That being said, the Majority of the Tribunal is confident that FTI's primary DCF model is fundamentally sound and requires only limited adjustment.  Further, the Majority of the Tribunal considers that the Claimants have satisfied their burden of proof.

531.    In addition to its criticisms of FTI's methodology and assumptions, the Respondent has also raised more general objections to the Claimants' damages claim.

---

[445]    See *supra* ¶ 38.
[446]    BDO 2nd, ¶ 238.
[447]    Supplemental BDO Report, 18 May 2018, ¶ 6.
[448]    C's Reply PHB, ¶ 48; compare Supplemental BDO Report dated 18 May 2018, ¶ 27 with BDO 2nd, ¶ 244.
[449]    CL-170, *Eiser*, ¶ 473.

532.    First, the Respondent contends that the Claimants should not be awarded any compensation because their PV facilities are "today highly profitable thanks to the subsidies provided by the disputed measures, despite having low market, production and cost risks."[450]  In particular, the Respondent contends that the Claimants have received a reasonable IRR of 8.6% pre-tax on their PV facilities, which the Respondent contends compares favourably with the WACC of the renewable sector between 2013 and 2016.[451]  The Claimants contest the Respondent's calculation, and submit that the IRRs in the Actual Position for the Claimants' PV facilities is 5.5% post-tax, which the Claimants contend is materially below the 7% post-tax IRR that the Respondent claims was considered a reasonable return when it set the RD 661/2007 FiTs.[452]

533.    The Tribunal need not resolve this particular disagreement between the Parties.  In the Majority of the Tribunal's view, the Respondent's criticism that the Claimants' PV facilities may still generate a profit under the New Regulatory Regime misses the point that the purpose of damages is to eliminate the consequences of the Respondent's breach of Article 10(1) ECT.  The Majority of the Tribunal has assessed these damages based on FTI's primary DCF valuation, subject to the adjustments that the Majority of the Tribunal has made.  On this basis, the Majority of the Tribunal is entirely satisfied that the Claimants are in a worse position under the New Regulatory Regime than they would have been had the Respondent not abrogated the RD 661/2007 regime.  The Claimants are therefore entitled to compensation for the Respondent's breach of Article 10(1) ECT.

534.    Second, the Respondent contends that the Claimants' claim for €58.2 million in compensation is disproportionate because the Claimants only invested €25.8 million to acquire their PV facilities.[453]  Recognizing that the amount historically invested is not directly relevant to a DCF valuation, the Respondent submits that this sum is nevertheless relevant to assess the reasonableness of a DCF outcome.[454]

---

[450]    Respondent's PHB, ¶ 235.
[451]    Respondent's PHB, ¶¶ 109-110; BDO 2nd, Table 23; Respondent's Opening Presentation on Fundamental Facts, slide 142.
[452]    C's Reply PHB, ¶ 27; Edwards 2nd, p. 96, Table A3-6-3.
[453]    Claimants' PHB, n. 174.
[454]    Respondent's PHB, ¶ 102.

535.   The Majority of the Tribunal agrees with the *Eiser* tribunal that the amount invested can act as a "reality check" on the reasonableness of a damages assessment.[455]  In the Majority of the Tribunal's view, however, the difference between the Claimants' quantum claim and the amounts they invested is reasonable in the circumstances of this case.  In particular, the Majority of the Tribunal considers that the relevant comparison is the value of the Claimants' equity at the time of the Respondent's breach, rather than at the time the Claimants originally made their investment, which was several years earlier.  The Majority of the Tribunal accepts the Claimants' contention that the value of their equity "appreciated substantially between acquisition [in 2009-2010] and 2014, but for the disputed measures, as a result of declining interest rates, a reduction in the corporate tax rate, and strong plant performance."[456]  The Majority of the Tribunal does not consider the Claimants' quantum claim to be disproportionate.

536.   The Tribunal has concluded that the disputed measures that preceded the New Regulatory Regime did not violate the ECT.  It is therefore necessary to exclude those earlier measures (RD 1565/2010, RDL 14/2010, RDL 2/2013) from the assessment of the Claimants' losses, which have been calculated as of the Date of Assessment, 30 June 2014.  The Tribunal has also held it does not have jurisdiction over Law 15/2012 concerning the TVPEE, so this measure must be excluded for the Tribunal's assessment too.

537.   Unhelpfully, the Claimants did not provide a breakdown of the individual impact of each of the disputed measures.[457]  The Majority of the Tribunal has therefore decided to exclude all historical losses from the Claimants' damages claim to reflect the fact that the disputed measures preceding the New Regulatory Regime did not breach Article 10(1) ECT.  This means that the Claimants' valuation of losses shall be reduced by €8 million, which is the amount by which the Claimants' losses are reduced when FTI's primary DCF valuation is modified to exclude losses prior to the Date of Assessment.[458]

538.   The Majority of the Tribunal recognizes that the exclusion of all historical losses may include certain losses prior to the Date of Assessment that are attributable

---

[455]   CL-170, *Eiser*, ¶ 474.
[456]   Claimants' PHB, ¶ 156.
[457]   Day 5, 52:6-19.
[458]   Edwards 2nd, ¶¶ 2.37, 5.4, 5.21.

to the retroactive effect of the New Regulatory Regime. However, to the extent that the Claimants receive less than full compensation as a result of the exclusion of historical losses, this is a direct consequence of the Claimants' decision, acknowledged at the Hearing,[459] not to provide a break-down of losses caused by each disputed measure individually, or caused by the New Regulatory Regime in isolation.

539. Finally, as discussed above, the Majority of the Tribunal has also decided to reduce the Claimants' valuation of losses by a further €11.2 million to reflect the assumption of a 30-year useful operating life of the Claimants' PV facilities, as opposed to the 35-year assumption in FTI's primary model.

540. Accordingly, the Majority of the Tribunal determines that the Claimant is entitled to an award of compensation in the amount of €39 million.

### (vii) Interest

541. In their request for relief, the Claimants seek "pre- and post-award compound interest at the highest lawful rate from the Date of Assessment until Spain's full and final satisfaction of the Award".[460]

542. The Claimants have submitted two alternative interest claims, calculated using either the Respondent's cost of borrowing (5-year Spanish government bonds (0.4% to 1.4%)) or the Claimants' cost of borrowing (Claimants' cost of debt (3.5% to 4.5%)).[461]

543. The Respondent contends that the 5-year Spanish government bond yield is the appropriate interest rate because it reflects a "risk-free" rate. The Respondent also contends that the Tribunal should not award post-award interest at a higher rate than pre-award interest.[462]

544. The Tribunal observes that Article 10(1) ECT is silent on the awarding of interest. Looking to investment treaty arbitration practice, the Majority of the Tribunal is satisfied that interest should be awarded as part of the compensation for the damages that the Claimants have suffered. As the *Asian Agriculture Products v. Sri Lanka* tribunal stated, "interest becomes an integral

---

[459]   Hr. Day 5, 52:18-19.
[460]   Reply, p.299.
[461]   Edwards 2nd, ¶ 7.7, Table 7-1, Table 7-2.
[462]   Rejoinder on Merits, ¶ 1246.

part of the compensation itself, and should run consequently from the date when the State's international responsibility became engaged."[463]  Further, the Majority of the Tribunal considers that compound interest is the generally-accepted standard in international investment arbitration.[464]

545.   Having considered the Parties' submissions, the Majority of the Tribunal adopts the same approach as the tribunals in *Eiser* and *Masdar*, which awarded both pre- and post-award interest, compounded monthly, but at a lower rate pre-award, in order to "facilitate prompt payment".[465]

546.   Accordingly, the Majority of the Tribunal decides that the Respondent shall pay interest from the Date of Assessment, 30 June 2014, to the date of this Award at the rate of 1.4%, compounded monthly.  From the date of this Award, the Majority of the Tribunal decides that the Respondent shall pay interest at 3.5%, compounded monthly, until payment has been made.

## IX.   COSTS

### (1)  The Parties' Positions

#### a.  Claimants' Costs

547.   The Claimants request that the Tribunal order the Respondent to pay the entirety of costs, fees and expenses incurred by the Claimants in the arbitration.

548.   The Claimants submitted the following summary of costs, fees and expenses incurred in the arbitration:

(a)   Legal fees:

(i)   King & Spalding: US$ 2,979,236.50.

(ii)   Gómez-Acebo & Pombo: €2,124,211.40.

(b)   Expert Fees & Expenses:

(i)   FTI Consulting: €796,069.53.

(ii)   Prof. Manuel Aragón Reyes: €66,703.33.

---

[463]   CL-77, *Asian Agricultural Products Ltd. v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990, ¶ 114.

[464]   See, e.g., CL-78, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award II, 20 Aug. 2007, ¶¶ 9.2.6.

[465]   C-189, *Masdar*, ¶ 665; CL-170, *Eiser*, ¶ 478.

  (iii) Mr. Jaume Margarit: €40,859.21.

 (c) Claimants' Costs & Expenses: €197,578.05.

 (d) SCC Payments: €270,000.00.

549. The Claimants' total costs, fees and expenses amount to:

 (a) €3,495,421.52; and

 (b) US$2,979,236.50.

### b. Respondent's Costs

550. The Respondent requests the Tribunal to order the Claimants to pay all the Respondent's costs and expenses in the arbitration.

551. The Respondent submitted the following summary of costs and expenses incurred in the arbitration:

 (a) Advance on Costs to SCC: €270,000.

 (b) Expert Fees:

  (i) BDO: €571,232.95.

  (ii) Profs. Pablo Pérez Tremps and Marcos Váquer Caballería: €19,403.11.

 (c) Translation Services: €31,744.95.

 (d) Editing Services: €23,446.94.

 (e) Courier Services: €3,376.86.

 (f) Travelling Expenses: €13,748.50.

 (g) Hearing Expenses: €55,450.24.

 (h) Legal Fees: €490,890.00.

552. The Respondent's total costs and expenses amount to €1,479,273.55.

### (2) The Tribunal's Analysis

553. Pursuant to Article 43(1) of the SCC Rules, the Costs of the Arbitration consist of: (i) the Fees of the Arbitral Tribunal; (ii) the Administrative Fee; and (iii) the expenses of the Arbitral Tribunal and the SCC.

554.    Article 43(5) of the Rules provides that:

> Unless otherwise agreed by the parties, the Arbitral Tribunal shall, at the request of a party, apportion the Costs of the Arbitration between the parties, having regard to the outcome of the case and other relevant circumstances.

555.    Pursuant to Article 43(6) of the Rules, the parties are jointly and severally liable to the arbitrators and to the SCC to pay the Costs of the Arbitration.

556.    On 29 October 2018, the Board of the SCC set the Costs of the Arbitration as follows:

(a)    The fees and expenses of Dr Michael Moser, Chairperson, amount to €154,500 (fees), €7,862.87 (expenses), and €7,721.39 (per diem allowance), in total €170,084.26.[466]

(b)    The fees and expenses of Professor Dr Klaus Michael Sachs, Co-Arbitrator, amount to €92,700 (fees), €868.95 (expenses), and US$6,000 (per diem allowance), in total €93,568.95 and US$6,000.

(c)    The fees and expenses of Dr Raúl Emilio Vinuesa, Co-Arbitrator, amount to €92,700 (fees), US$5,159.83 (expenses), and US$7,200 (per diem allowance), in total €92,700 and US$12,359.83.

(d)    The Administrative Fee of the SCC amounts to €48,600 and compensation for expenses €15,584.26, in total €64,184.26.

557.    Value Added Tax must be added to the above amounts where applicable.

558.    Further, Article 44 of the Rules provides that:

> Unless otherwise agreed by the parties, the Arbitral Tribunal may in the final award upon the request of a party, order one party to pay any reasonable costs incurred by another party, including costs for legal representation, having regard to the outcome of the case and other relevant circumstances.

559.    Each Party respectively seeks full reimbursement of their costs, fees and expenses from the other Party. Given the Parties' opposing positions on this issue, the Tribunal must therefore decide how to apportion costs.

560.    The Majority of the Tribunal has decided that the Respondent is liable to pay the entire Cost of the Arbitration and the reasonable costs incurred by the

---

[466]    Dr Moser's expenses and per diem allowance have been reimbursed in advance by the SCC. For the purposes of calculating the total Costs of the Arbitration, these sums (€7,862.87 (expenses); €7,721.39 (per diem allowance)) are accounted for solely as expenses of the SCC, as set out in paragraph 556(d).

140

Claimants. The Claimants have substantially prevailed in their claim on the merits and were also successful in defeating the Respondent's primary jurisdictional objection, which was briefed at length during the proceedings.

561. For these reasons, the Majority of the Tribunal considers it appropriate to award to the Claimants the amount of €3,900,374.73 and US$2,997,596.33, which includes the entire Cost of the Arbitration as determined by the SCC in the amount of €404,953.21 and US$18,359.83.

## X.    AWARD

562. For the reasons stated in the body of this Award, the Tribunal decides:

(a)    The Tribunal has jurisdiction under the ECT and the SCC Rules to adjudicate the Claimants' claims, save that the Tribunal upholds the Respondent's objection to jurisdiction with respect to the TVPEE under Law 15/2012;

(b)    By a majority, the Respondent has violated Article 10(1) ECT;

(c)    By a majority, the Respondent shall pay to the Claimants damages assessed at €39,000,000.00;

(d)    By a majority, pursuant to Articles 43 and 44 of the SCC Rules, the Respondent shall pay to the Claimants the Cost of the Arbitration and the reasonable costs incurred by the Claimants in the amount of €3,900,374.73 and US$2,997,596.33. Value Added Tax must be added pursuant to Article 43 of the SCC Rules if applicable.

(e)    By a majority, the Respondent shall pay interest on the sum awarded in (c) from 30 June 2014 to the date of this Award at the rate of 1.4%, compounded monthly, and from the date of this Award until payment has been made at the rate of 3.5%, compounded monthly;

(f)    All other claims are dismissed.

A dissenting opinion by Co-Arbitrator Dr Raúl Emilio Vinuesa is attached hereto.

A party may bring an action to amend the award within three months from the date when the party received the award. This action should be brought before the Svea Court of Appeal in Stockholm.

A party may bring an action against the award regarding the decision on the fee(s) of the arbitrator(s) within three months from the date when the party received the award. This action should be brought before the Stockholm District Court.

Made in Stockholm, Sweden

Date:  /4  November 2018


_____

Prof Dr Klaus Michael Sachs
Co-Arbitrator


_____

Dr Raúl Emilio Vinuesa
Co-Arbitrator
(Subject to the attached
Dissenting Opinion)


_____

Dr Michael Moser
Chairperson

**Partial Dissenting Opinion**
**Co- Arbitrator Raúl E. Vinuesa**

**I regret to dissent with my distinguished colleagues in reference to the applicable law to the merits of the present dispute. I also disagree with the Majority of the Tribunal conclusions concerning Claimants due diligence. Furthermore, I could not agree with the Majority of the Tribunal conclusions regarding Respondent's liability.**

## I.   APPLICABLE LAW TO THE MERITS OF THE DISPUTE

1.   Article 26(6) ECT provides that: "The Tribunal shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of International Law". As already stated by the Tribunal "…the provisions of Article 26 ECT should be given their ordinary meaning in accordance with Article 31 of the VCLT". [1]

2.   The Tribunal has also affirmed that "…Contrary to the Respondent's contention, Article 26(6) ECT applies to the merits of the case and not to jurisdiction…"[2]

3.   Claimants alleged that EU law could not be considered as international law under Article 26 ECT.[3] They also alleged that the EU law is not applicable to the merits because all claims in this arbitration are submitted based on ECT provisions.[4]

4.   First of all, there is no reason to alleged that EU Law could not be considered as international law. In that sense, following *Electrabel S.A. v. Hungary*, the tribunal concluded, "…EU law is international law because it is rooted in international treaties"[5]; EU law "…forms part of the rules and principles of international law applicable to the Parties' dispute under Article 26(6) ECT".[6]

5.   Second, the applicable law to the merits does not depend on Claimants' or Respondent's will. In the present case, the applicable law to the merits of the dispute has been pre-

---

[1] Award, ¶ 208.

[2] *Ibid.*

[3] Claimants Post-Hearing Brief, May 18, 2018, ¶ 17 *et ss*.

[4] *Id*, at ¶ 40.

[5] RL-02, ¶ 4.120.

[6] *Ibid.* ¶ 4.190

1

determined by Contracting Parties to ECT as expressed in Article 26(6).

6.    The Tribunal could not ignore the law it has to apply in accordance with art. 26(6) of ECT only because Claimants claimed that alleged violations only concern a violation of ECT. Claimants do not have the right to imposed restrictions on the applicable law to decide the merits.

7.    Quoting the *Novenergia* tribunal[7], Claimants assume a false presumption taking for granted that the present dispute does not concern matters, which are governed by EU law. Considering that State aid under EU law has been argued by Respondent as part of the applicable law under article 26(6)[8]; the Majority of the Tribunal could not avoid dealing with Respondent's allegations concerning the application of EU law in this arbitration.

8.    In *Electrabel v. Hungary,* the tribunal stated, "…In the Tribunals' view, the ECT and the EC Treaty share the same broad objective in combating anti-competitive conduct. One of the obligations undertaken by States under ECT was to protect investors, but another was to combat anti-competitive conduct, as provided in Article 6 ECT."[9]

9.    *Electrabel* also stated that: "For all these reasons, the Tribunal concludes that the objectives of the ECT and EU law were and remained similar as regards anti-competitive conduct, including unlawful State aid. Foreign investors in EU Member States, including Hungary, cannot have acquired any legitimate expectations that the ECT would necessary shield their investments from the effects of EU law as regards anti-competitive conduct."[10]

10.    EU law and ECT are part of international law. Both legal systems have ruled on investment protection. When in a particular case there is an overlap, it should *prima facie* be understood that the ECT and EU rules are compatible and/or complementary to each other. If there is an incompatibility in the application of one or the other, international law has its own principles to settle such conflicts.

11.    The possibility of conflicts between ECT and EU law allows presuming that the content and scope of their particular rules, when referring to the same subject matter, may generate

---

[7] *Novenergia II – Energy & Environment (SCA), SICAR v Kingdom of Spain,* SCC Arb. 2015/063, Final Award, Feb. 15, 2018 ¶¶ 460, 465. CL-185.

[8] Respondent's Post Hearing Brief, 18 May 2018, ¶ 186 *et ss.*

[9] *Electrabel S.A. v. Hungary,* (ICSID Case No ARB/07/19) Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 4.137, RL-2.

[10] *Ibid.* ¶ 4.141.

contradictions. But, taking into account that legal certainty and legitimate expectations are part of general principles of law under EU law, there is no real chance for contradiction within the context of FET under ECT with general principles of law as applied under EU law.

12. Therefore, EU Law, being part of rules and principles of international law, should be applied to the merits of the present dispute.

13. Following *Electrabel* tribunal, it could be concluded that: "In summary, from whatever perspective the relationship between the ECT and EU law is examined, the Tribunal concludes that EU law would prevail over ECT in case of any material inconsistence: and the Tribunal has concluded that non exists for the purpose of deciding the Parties dispute in this arbitration".[11]

14. From *Electrabel* conclusions, it could be confirmed that the ECT and EU Law did not have a predetermined hierarchy between them within the literal context of Article 26(6).

15. In case of incompatibilities, the very content of the rules in conflict would determine the criteria to be followed in order to decide which law must be applied to the particular situation.

16. Finally, as an independent argument[12], Claimants alleged that Article 16 ECT prevents the terms of another treaty from being construed as to derogate from more favourable rights of investors or their investments under Parts III or V ECT.

17. Article 16 ECT is not a reassurance for investors to deny the right to regulate of the European Commission of the EU or its Member States. EC Decision on State aid of 10 November 2017 is the manifestation of a public policy binding on Member States, and all other subjects subordinated to the European Union treaty system. Article 16 ECT could not be alleged as to circumvent an obligation binding on EU Member States, as well as on Claimants as subject to EU law.

18. The EC Decision overrules the application of Article 16 ECT, due to the fact that it is a special rule by which the EC has determined the legality of Spain's new regulatory measures, the same measures that have been challenged by Claimants.

---

[11] *Ibid.* ¶ 4.191.

[12] Claimants Post-Hearing Brief, May 18, 2018, Part IV, STATE AID, at ¶ 42 *et ss.*

19.   The EC Decision has applied the principles of legal certainty and legitimate expectations within the context of a general public policy concerning State Aid. The Majority of the Tribunal has disregarded the content and scope of the EC Decision. They have not even question the possibility of a conflict between FET principles under ECT with general principles of law as applied by EU law.

20.   The Majority of the Tribunal, when dealing with fair and equitable treatment under Article 10(1) ECT, overlooks to assess its compatibility with EU law in order to determine if there was a conflict between the laws applicable to the merits of the dispute under Article 26(6) ECT.

21.   Whereas, it is reasonable to depart from a fair legal presumption in favour of a full harmonization and compatibility of general principles of law, including legitimate expectations as part of FET under ECT as well as under EU law; and whereas, EU law is part of the law to be applied to the merits of this arbitration: I dissent with the Majority of the Tribunal's omission of a substantial part of the law it was obliged to observe in conformity to Article 26(6) ECT.

22.   In the consideration of the above, I disagree with the Majority of the Tribunal conclusion that "...EC State Aid Decision has no bearing on the issue of Claimants' legitimate expectations of regulatory stability at the time of their investment"[13] The Majority based its conclusion considering that the EC Decision "...makes no assessment of the RD 661/2007 support scheme, under which Claimants made their investment".[14]  The Majority is wrong with the above reasoning.

23.   From the mere analysis of the EC Decision dated 10 November 2017, it follows that the Commission has made a comprehensive assessment of RD 661/2017.

24.   The EC Decision has concluded that Spain's New Regulatory Regime was in conformity with EU law.  On the basis of that conclusion, "...The Commission has assessed the compensation that facilities receive under the scheme over the entire lifetime. For existing facilities, this includes the payments received under the premium economic scheme. On the basis of the aforementioned assessment, it has decided not to raise objections to the aid on the grounds that it is compatible with the internal market pursuant to Article 107(3) (c)

---

[13] Award, ¶381.

[14] *Ibid.*

4

TFEU."[15]

25.  The EC Decision has also confirmed that "the scheme replaces and supersedes the premium economic scheme ('regímen económico primado'), which was governed by Royal Decrees 661/2007 and1578/2008. Payments under the premium economic scheme are covered by the decision in order to assess proportionality, i.e. the absence of overcompensation".[16] On that line, the Decision referred to the premium economic scheme regulated by RD 661/2007[17] reconfirming that "...the scheme supersedes and fully replaces the premium economic scheme whose awards are absorbed." [18]

26.  The Majority of the Tribunal has not taken into account that under EU law, "A measure constitutes State aid within the meaning of Article 107(1) TFEU if it is granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods [...] in so far as it affects trade between Member States". [19]

27.  The reason of EC Decision is based on the confirmation that State aid has been ruled and applied as part of a public policy within EU law. State aid granted without EC Commission authorization is illegal. No legitimate expectations with regard to illegal State aid could be recognized under EU law.

28.  In the present case, Claimants have not even complied with an adequate due diligence concerning the consequences of relying on an illegal State aid.

29.  The EC Decision concluded that the New Regulatory Regime was not unlawful. As a consequence of the above, Claimants' claim that the New Regulatory Regime is illegal, is fatally defeated.

30.  Considering that Spain has in fact abrogated RD 661/2007 and replaced it with a new regime, does not allow Claimants to automatically presume that the new regime violates a

---

[15] RL-97, EC Decision on State Aid SA.40348 (2015/NN)-Spain, at pg. 33, CONCLUSION (Spanish version)

[16] *Ibid.* ¶ (4).

[17] RL-97, at ¶ (54).

[18] RL-97, See also ¶ (50) and ¶ (109) on registration of existing facilities; ¶ (35)(g) on pre-tax reasonable rate of return for existing facilities, EC Decision on State Aid SA.40348 (2015/NN)-Spain.

[19] *Ibid.* ¶ (83).

fair and equitable treatment as recognized under international law, including ECT and EU law.

31.    In that context, "a reasonable rate of return" as determined through the new regime and guaranteed by Spanish legislation, has been assessed by EC Decision: "The commission has verified that the aid does not exceed what is required to recover the initial investment costs and the relevant operational costs, plus a margin of reasonable rate of return, based on the past and estimated costs and market prices (7.503% before tax for new facilities and 7,398 % for existing facilities. The rates appear to be in line with the rates of return of renewable energy and high efficiency cogeneration projects recently approved by the Commission and does not lead to overcompensation. During the regular revisions of the compensation parameters, the payments to which each beneficiary is entitled in the future are calculated to ensure a reasonable rate of return...."[20]

32.    The EC also confirmed that, "In the present decision, the Commission has assessed the measure notified by Spain (see section 2.1). It has therefore assessed whether existing installations receive overcompensation for their entire period of life and has found that on the basis of the total payments received under both schemes (the specific remuneration scheme and the premium economic scheme) that is not the case, as explained above in section 3.4.4. As Spain has decided to replace the premium economic scheme with the notified aid measure it is not relevant for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not." [21]

33.    The Majority of the Tribunal conclusions that investors, such as Claimants, could not have expected that a reasonable rate of return would be limited to 7% or that the Special Regime could be abolish [22] are not supported by the evidence. Under the domestic legal regime at the time that Claimants invested in Spain, the State promise to secure a reasonable rate of return did not depend upon the investors' expectations, but on an objective criteria defined by Law 54 of 1997: "...a reasonable rate of return with regard to the cost of money in the

---

[20] *Ibid.*, at¶ (120)

[21] *Ibid.*, ¶ (156).

[22] Award, ¶378, citing *Novenergia*, ¶ 674.

capital market".[23]

34. The Majority of the Tribunal also omitted to take into consideration that, in accordance with the case-law of the European Court of Justice, a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission.[24]

35. Taking into account that subjects of the EU legal order include not only the EU Members, but also their nationals[25]; the European Court has found that a diligent businessman should normally be able to determine whether that procedure [*EC Commission procedures on State aid authorizations*] has been followed or not. [26]

36. For all the previous reasons, I am convinced that the EC Decision of 10 November 2017 has recognized and affirmed relevant legal issues that clearly determined the proper standing of RD 661/2007 in relation to State aid. The simple reading of that EC Decision confirmed that an assessment of RD 661/2007 support scheme has been properly done.

37. Claimants' claims main objectives are based on the illegality of new measures affecting RD 661/2007. As the European Commission has already considered (Decision on State Aid of 10 November 2017) that the challenged new measures are legal measures within the EU law, it follows that such modification is not unlawful.

38. For all previous reasons, I could not agree with the conclusion of the Majority of the Tribunal that "…that EC State Aid Decision has no bearing on the issue of the Claimants' legitimate expectations of regulatory stability at the time of the investment."[27]

## II.    LACK OF CLAIMANTS DUE DILIGENCE

39. I also disagree with the Majority of the Tribunal conclusions on "due diligence" as performed by Claimants at the time they made their investment.

40. Claimants, as sophisticated investors, have fail to command an adequate due diligence

---

[23] C-66. Law 54/1997, Article 30.4.

[24] EC Decision on State Aid SA.40348 (2015/NN)-Spain, at ¶ (83).

[25] Conf. ECJ Judgment in *Van Gend en Loos v. Administratie der Belastingen*, C-26/62, EU:C:1963: ¶ 3.

[26] EC Decision on State Aid SA.40348 (2015/NN)-Spain, at Note 64: Case C-24/95, EU:C: 1997:163: ¶ 25.

[27] *Ibid.*, ¶ (381) *in fine*.

exercise concerning Spanish Law and EU law on State aid. There is no question that due diligence is a prerequisite for the viability of a legitimate expectation's claim.

41. The evidence confirmed that Claimants failed to procure an adequate due diligence assessment, concerning not only the evolution of Spanish performance on State aid and on State's subsidies, but also on the content and scope of EC regulations. Moreover, considering that Claimants have invested in such a highly regulated activity, as the one they have invested.

42. Taking into account that none of the due diligence reports submitted by the Claimants contain an analysis of the Spanish legal framework surrounding RD 661/2007, the Tribunal has confirmed that, "…In the Tribunal's view, the Garrigues report is in fact rather vague on the issue…"[28]. To my understanding, the above Majority of the Tribunal assumption, could not reasonable allow to conclude that Claimants behaved diligently.

43. Claimants never commissioned a due diligence assessment on Spanish legal system. They also have ignored that subsidies to renewables were incentives subject to State aid under UE law. Under EU Law, subsidies to renewables constitute State aid.[29]

44. Evidence shows that they have commissioned no due diligence on Spanish as well as on EU law.    At the Hearing, Claimants witnesses acknowledged that the Garrigues memorandums regarding Castilleja Project, were not commissioned by Claimants but by the seller of the projects to the Claimants.[30]

45. Taking into account the evidence produced during the present proceedings, I could not share the inference made by the Majority of the Tribunal that, "…Nevertheless, the Tribunal considers that It is reasonable for an investor to assume that its legal advisors would have raised a red flag had they detected any risk of fundamental change to the regulatory regime."[31]

46. On the same line of reasoning, I could not share the Majority of the Tribunal assumption that "…Further the Tribunal considers that a reasonable investor would have not interpreted the Spanish Supreme Court jurisprudence concerning modifications to early

---

[28] Award, ¶ 380.

[29] RL-1. Treaty on the Functioning of the EU, Articles 107 and 108.

[30] Hearing Transcript, Day 2, pdf page 89, page 86, lines 10 to 22, Cross examination of Mr. Richards.

[31] Award, ¶380 *in fine.*

support schemes as a warning that Spain had the power to abrogate RD 661/2007 and replaced it with a radically different support scheme…"[32]

47.  The above assumptions are mere speculations without legal support. Therefore, Claimants' have not proved that they complied with an adequate due diligence process as to justify the reasonability of their alleged legitimate expectations.

48.  From 2005 and on, Spanish courts' constant jurisprudence have established a clear legal framework assuming that "…Producers do not have an unmodifiable right that the economic scheme which regulates modifications to premiums will stay the same…".[33] Since them, Spanish courts have constantly referred to Law 54 of 1997 in order to assure that any regulatory modification on the electricity sector, would guaranty a reasonable rate of return to producers.  In the present case, it has been proved that the Claimants' investments continue to obtain a reasonable rate of return as established under the legal framework in force at the time the investments were made.

49.  Spanish Supreme Court has confirmed that, "Companies that freely decide to enter a market such as electricity generation under the special regime, knowing that it is largely dependent on the setting of economic incentives by public authorities, are or should be aware that they may be modified within legal guidelines by those same authorities. One of the "regulatory risks" to which they submit and which they must take into account is precisely the variations of parameters for premium or incentives, something which, the electricity sector limits, as previously discussed, but does not preclude"[34]

50.  Whereas, the constant jurisprudence of Spanish Courts has clearly determined the general legal framework of electricity generation under special regime, there is no reasonable justification for Claimants' negligent behaviour. As the *Blusun* tribunal has confirmed: "…investors like anyone else have access to independent advise. If it avoids outright misrepresentation, the Government does not offer warranties in that regard."[35]



51.  Therefore, I could not agree with the Majority of the Tribunal's assumptions concerning Claimants' due diligence oversights and omissions.

---

[32] *Ibid.*, ¶ 378.

[33] R-117 Judgment of the Supreme Court, 15 December 2005

[34] R-118. Spanish Supreme Court Judgment of 25 October 2006.

[35] *Blusun v. Republic of Italy*, ¶ 329 (d), CL-180,

52. In conclusion, and for all the above reasons, I dissent with the Majority of the Tribunal with the law as applied to the merits, with the Majority of Tribunal conclusions on Claimants due diligence and as a consequence of that, I disagree with the Majority of the Tribunal findings on Respondent's liability.

53. Furthermore, and in conformity with the essential principle contained in the classic notion of an illegal act[36]; in the present case, the inexistence of a violation attributable to Respondent, determines the inexistence of an obligation to repair hypothetical damages. As a consequence, of the above, I dissent with arguments and conclusions of the Majority of the Tribunal in respect of the allocations of damages, interests and costs to Respondent.

Buenos Aires, 30 October 2018.

Raúl Emilio Vinuesa

Co-arbitrator

---

[36] CL-75, Case concerning Factory of Chorzów (Germany v. Poland), Judgment 13, PCIJ, September 13, 1928 (1928 PCIJ, Series A. No 17), at 74.