**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**STADTWERKE MÜNCHEN GMBH, RWE INNOGY GMBH, AND OTHERS**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/15/1**

---

# AWARD

---

***Members of the Tribunal***
Professor Jeswald W. Salacuse, President
Professor Kaj Hobér
Professor Zachary Douglas QC

***Secretary of the Tribunal***
Mr. Marco Tulio Montañés-Rumayor

*Date of dispatch to the Parties:* 2 December 2019

**REPRESENTATION OF THE PARTIES**

*Representing Stadtwerke München GmbH,*
*RWE Innogy GmbH, and others*:

Ms. Marie Stoyanov
Mr. Antonio Vázquez-Guillén
Ms. Virginia Allan
Mr. David Ingle
Ms. Agustina Álvarez Olaizola
Mr. Pablo Torres
Mr. Alexandre Fichaux
Mr. Tomasz Hara
Ms. Stephanie Hawes
Mr. Gonzalo Jiménez-Blanco
Allen & Overy LLP
Pedro de Valdivia, 10
28006 Madrid
Spain

and

Mr. Jeffrey Sullivan
Gibson Dunn & Crutcher LLP
Telephone House
2-4 Temple Avenue
London EC4Y 0HB
United Kingdom

*Representing the Kingdom of Spain*:


Mr. José Manuel Gutiérrez Delgado
Ms. María José Ruiz Sánchez
Mr. Pablo Elena Abad
Mr. Rafael Gil Nievas
Mr. Alberto Torró Molés
Mr. Luis Vacas Chalfoun
Ms. Elena Oñoro Sainz
Mr. Juan Antonio Quesada Navarro
Ms. Gloria de la Guardia Limeres
Ms. Ana María Rodríguez Esquivias
Mr. Javier Comerón Herrero
Ms. Eugenia Cediel Bruno
Mr. Roberto Fernández Castilla
Ms. Patricia Froehlingsdorf Nicolás
Ms. Estibaliz Hernández Marquínez
Mr. Javier Torres Gella
Mrs. Amaia Rivas Kortazar
Mr. Antolín Fernández Antuña
Mr. Javier Castro López
Mr. Álvaro Navas López
Mrs. Mónica Moraleda Saceda

Abogacía General del Estado
Dpto. Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
Spain

TABLE OF CONTENTS

I.   INTRODUCTION AND PARTIES                                              1

II.  PROCEDURAL HISTORY                                                    1

   A. Commencement of the Arbitration ...............................................................1

   B. Tribunal's Constitution ..............................................................................2

   C. Tribunal's Preliminary Matters and the Parties' Pleadings ...................3

   D. European Commission's Application to Intervene ...............................5

   E. The Hearing on Jurisdiction and the Merits.....................................7

   F. Post-Hearing Matters ...............................................................................9

III. THE FACTS OF THE DISPUTE                                             13

   A. Background ...............................................................................................13

   B. Spain's Creation of a Legal Framework for Renewable Energy Production.....................14

      (1) Law 54/1997 ...................................................................................... 14

      (2) The Hierarchy of Norms in the Spanish Legal System...................16

      (3) Royal Decree 2818/1998.................................................................. 16

      (4) Royal Decree 436/2004.................................................................... 17

      (5) The 2005-2010 Renewable Energy Plan.........................................19

      (6) Royal Decree Law 7/2006 ............................................................... 20

      (7) Royal Decree 661/2007.................................................................... 21

   C. The Claimants' Investment ....................................................................23

   D. Spain's Alteration of the Legal Framework Applicable to Renewable Energy Production .27

      (1) Law 15/2012 ...................................................................................... 28

      (2) Royal Decree Law 2/2013 ............................................................... 28

      (3) Royal Decree Law 9/2013 ............................................................... 29

      (4) Law 24/2013 ...................................................................................... 29

      (5) Royal Decree 413/2014.................................................................... 30

IV. THE PARTIES' REQUESTS FOR RELIEF                                     31

V.  JURISDICTION                                                         33

   A. The Intra-EU Objection ..........................................................................34

      (1) The Parties' Positions ...................................................................... 34

         a.  The Respondent's Position ....................................................... 34

b. The Claimants' Position ........................................................... 38

**(2)** The Tribunal's Analysis ........................................................... 41

B. The Taxation Objection ...............................................................51

**(1)** The Parties' Positions ........................................................... 51

a. The Respondent's Position.................................................... 51

b. The Claimants' Position .................................................... 55

**(2)** The Tribunal's Analysis ........................................................... 57

**VI.LIABILITY**                                                                    **63**

A. Applicable Law .......................................................................63

B. The Claimants' Claims ...............................................................64

**(1)** First Claim: Failure to Provide Stable, Equitable, Favourable and Transparent Conditions for Investors ........................................................... 65

a. The Parties' Positions ....................................................... 65

(i)    The Claimants' Position........................................... 65

(ii)   The Respondent's Position ...................................... 67

b. The Tribunal's Analysis ..................................................... 69

c. The Tribunal's Conclusion on the Claimants' First Claim .................. 71

**(2)** Second Claim: Failure to Accord the Claimants' Investment Fair and Equitable Treatment ........................................................... 71

a. The Parties' Positions ....................................................... 71

(i)    The Claimants' Position........................................... 71

(ii)   The Respondent's Position ...................................... 81

b. The Tribunal's Analysis ..................................................... 90

(i)    Failure to Create and Maintain a Stable Regulatory Regime for Investment . 90

(ii)   Frustration of the Claimants' Legitimate and Reasonable Expectations ........ 93

(iii)  Failure to Act Transparently ................................... 110

(iv)   Failure to Enact Reasonable Measures ........................ 113

(v)    Failure to Take Proportionate Measures ...................... 116

(vi)   Conclusion on the Second Claim ............................... 127

**(3)** Third Claim: Impairment of the Claimants' Investment by Unreasonable Measures . 127

a. The Parties' Positions ....................................................... 127

(i)    The Claimants' Position........................................... 127

(ii)   The Respondent's Position ...................................... 128

b. The Tribunal's Analysis ..................................................... 129

**(4)** Fourth Claim: Failure of Spain to Observe Obligations it Has Entered Into With the Claimants or Their Investments .................................................................................... 130

    a. The Parties' Positions ................................................................................ 130

      (i)   The Claimants' Position.................................................................. 130

      (ii)  The Respondent's Position ............................................................ 133

    b. The Tribunal's Analysis ............................................................................ 135

**VII. COSTS**                                                  **137**

  A.   The Claimants' Cost Submission.................................................................138

  B.   The Respondent's Cost Submission.............................................................138

  C.   The Costs of the Proceeding .......................................................................139

  D.   The Tribunal's Decision on Costs................................................................139

**VIII. AWARD**                                                  **144**

**TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| 1997 Electricity Law | Law 54/1997 of 27 November 1997 |
| 2005-2010 Energy Plan or Energy Plan | The Renewable Energy Plan in Spain 2005-2010 |
| 2010 Press Release | Press release issued by the Government recording what the Claimants characterized as the July 2010 Agreement to refrain from making retrospective changes to the RD 661/2007 economic regime |
| 2011 Resolution | Resolution by the Directorate General for Energy Policy and Mines in respect of the Andasol 3 Plant dated 2 February 2011 |
| *Achmea* Judgment | Judgment of the European Court of Justice dated 6 March 2018, in *Slovak Republic v. Achmea BV*, Case No. C-284/16, ECLI:EU:C:2018:158 |
| *AES Summit v. Hungary* award | Award rendered in *AES Summit Generation Limited and AES Tisza Eromu Kft. v. The Republic of Hungary,* ICSID Case No. ARB/07/23 dated 23 September 2010 |
| *Antin v. Spain* award | Award rendered in Antin *Infrastructure Services Luxembourg S.à.r.l and Antin Energia Termosolar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/13/31 dated 15 June 2018 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings of 2006 |
| Brattle First Quantum Report | First Brattle's Damages Expert Report dated 8 July 2016 |
| Brattle First Regulatory Report | First Brattle's Regulatory Expert Report dated 8 July 2016 |
| Brattle Second Quantum Report | Brattle's Rebuttal Damages Expert Report dated 21 March 2017 |
| Brattle Second Regulatory Report | Brattle's Rebuttal Regulatory Expert Report dated 21 March 2017 |

| C-[#] | Claimants' Exhibit |
|---|---|
| *Charanne v. Spain* award | Award rendered in *Charanne B.V. and Construction Investment S.A.R.L. v. The Kingdom of Spain*, SCC Arbitration V 062/2012 dated 21 January 2016 |
| CJEU or Court of Justice | Court of Justice of the European Union |
| Cl. Reply on *Achmea* | Claimants' Responsive Submission on the *Achmea* Judgment dated 23 April 2018 |
| CL-[#] | Claimants' Legal Authority |
| Claimants' Rejoinder | Claimants' Rejoinder on Jurisdiction dated 3 July 2017 |
| CNE | *"Comisión Nacional de Energía"*, the Spanish National Energy Commission |
| CNMC | "*Comisión Nacional de los Mercados y la Competencia*", the National Markets and Competition Commission |
| Counter-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 4 October 2016 |
| CPI | Consumer Price Index |
| CSP | Concentrated Solar Power |
| Dutch-Slovak BIT | Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic of 1992 |
| EC Decision | European Commission's Decision on the Spanish State Aid Framework for Renewable Sources dated 10 November 2017 |
| EC or Commission | European Commission |
| EC's Application | European Commission's Application for Leave to Intervene as a Non-Disputing Party dated 16 January 2017 |

| | |
|---|---|
| EC's Communication | EC's Communication on the Protection of intra-EU Investment, COM (2018) 547/2 of July 2018 |
| EC's Request for Reconsideration | EC's Request to Alter Procedural Order No. 3 submitted on 9 March 2017 |
| Econ One First Report | First Econ One Research Inc. Expert Report dated 4 October 2016 |
| Econ One Second Report | Second Econ One Research Inc. Expert Report dated 19 May 2017 |
| ECT | Energy Charter Treaty signed in December 1994 and in force since 16 April 1998 |
| FET | Fair and Equitable Treatment |
| FIT | Feed-in Tariffs |
| Hearing | Hearing on Jurisdiction and the Merits held on 31 July – 5 August 2017 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| IDAE | *Instituto para la Diversificación y Ahorro de la Energía* |
| Institution Rules | ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings |
| IRR | Internal Rate of Return |
| *Isolux v. Spain* award | Award rendered in *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Arbitration SCC V2013/153 dated 12 July 2016 |
| June 2014 Order | Ministerial Order IET/1045/2014 of 16 June 2014 |
| Marquesado | Marquesado Solar S.L. |

| | |
|---|---|
| *Masdar v. Spain* award | Award rendered in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1 dated 16 May 2018 |
| Memorial | Claimants' Memorial on the Merits dated 8 July 2016 |
| Ministry | Ministry of Industry, Tourism and Commerce |
| New Regime | New Regime put in place under RDL 9/2013 and Law 24/2013 |
| *Novenergia II v. Spain* award | Final award rendered in *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain* dated 15 February 2018 |
| *Occidental v. Ecuador* award | Award rendered in *Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN3467 dated 1 July 2004 |
| Ordinary Regime | Regime applicable to non-renewable energy producers |
| *Plama v. Bulgaria* award | Award rendered in *Plama Consortium Limited v. The Republic of Bulgaria*, ICSID Case No. ARB/03/24 dated 27 August 2008 |
| PO1 | Procedural Order No. 1 dated 16 March 2016, concerning procedural matters |
| PO3 | Procedural Order No. 3 dated 2 March 2017, concerning the EC's Application |
| R-[#] | Respondent's Exhibit |
| RAIPRE | Administrative Registry of Production Installations in the Special Regime (in Spanish) |
| RD 2818/1998 | Royal Decree 2818/1998 issued by the Spanish Government on 23 December 1998 |
| RD 413/2014 | Royal Decree 413/2014 issued by the Spanish Government on 6 June 2014 |

| | |
|---|---|
| RD 436/2004 | Royal Decree 436/2004 issued by the Spanish Government on 12 March 2004 |
| RD 661/2007 | Royal Decree 661/2007 issued by the Spanish Government on 25 May 2007 |
| RDL 2/2013 | Royal Decree Law issued by the Spanish Government on 2 February 2013 |
| RDL 6/2009 | Royal Decree Law 6/2009 issued by the Spanish Government on 30 April 2009 |
| RDL 7/2006 | Royal Decree Law issued by the Spanish Government on 23 June 2006 |
| RDL 9/2013 | Royal Decree Law issued by the Spanish Government on 12 July 2013 |
| RDLs | Royal Decree Laws |
| RDs | Royal Decrees |
| REIO | Regional Economic Integration Organization |
| Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 22 May 2017 |
| Reply | Claimants' Reply the Merits and Counter-Memorial on Jurisdiction dated 21 March 2017 |
| Request for Reconsideration | European Commission's Request to Alter Procedural Order No. 3 dated 9 March 2017 |
| Resp. Comments on *Achmea* | Respondent's Comments on the *Achmea* Judgment dated 3 April 2018 |
| Resp. PHB | Respondent's Post Hearing Brief dated 12 October 2017 |
| RfA | Request for Arbitration from Stadtwerke München GmbH, RWE Innogy GmbH, and others, against Spain dated 19 December 2014 |
| RL-[#] | Respondent's Legal Authority |
| *Saluka v. Czech Republic* award | Partial Award rendered in *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL dated 17 March 2006 |

| Special Payment | "Specific remuneration" for qualifying installations under the New Regime |
|---|---|
| Special Regime | Regime applicable to qualified producers using renewable energy |
| SWM | Stadtwerke München GmbH |
| *Tecmed v. Mexico* award | Award rendered in *Técnicas Medioambientales Tecmed S.A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2 dated 29 May 2003 |
| TFEU | Treaty on the Functioning of the European Union |
| TMR | Methodology for the approval or modification of the Average Reference Tariff |
| Transcript Day [#]/ [page number/lines] | Transcript of the Hearing |
| Tribunal | Arbitral Tribunal constituted on 16 December 2015 |
| VCLT | Vienna Convention of the Law of Treaties |

## I.     INTRODUCTION AND PARTIES

1.   This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty ("**ECT**"), which entered into force with respect to Spain and Germany on 16 April 1998, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("**ICSID Convention**"), which entered into force with respect to Spain on 17 September 1994 and Germany on 18 May 1969.

2.   The Claimants are (1) Stadtwerke München GmbH ("**SWM**"); (2) RWE Innogy GmbH; (3) Rheinenergie AG; (4) AS 3 Beteiligungs GmbH; (5) Ferrostaal Industrial Projects GmbH; (6) Ferranda GmbH; (7) Andasol Fonds GmbH & Co. KG; (8) Andasol 3 Kraftwerks GmbH; and (9) Marquesado Solar S.L. (together, the "**Claimants**"). The Claimants are private limited liability companies incorporated under the laws of Germany, except for Marquesado Solar S.L. ("**Marquesado**"), which is incorporated under the laws of Spain. SWM, AS 3 Beteiligungs GmbH, and Andasol 3 Kraftwerks GmbH own the entire share capital of Marquesado. RWE Innogy GmbH, Rheinenergie AG, Ferrostaal Industrial Projects GmbH, and Andasol Fonds GmbH & Co. KG, have indirect debt interests and equity participations in Marquesado.

3.   The Respondent is the Kingdom of Spain ("**Spain**" or the "**Respondent**").

4.   The Claimants and the Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

## II.     PROCEDURAL HISTORY

### A.   COMMENCEMENT OF THE ARBITRATION

5.   On 29 December 2014, ICSID received a Request for Arbitration, which was supplemented on 7 January 2015, from SWM, RWE Innogy GmbH, and others, against Spain ("**RfA**"). The RfA concerned the Claimants' investments in a concentrated solar power installation

1

in southern Spain for the production and sale of electricity and a series of acts and omissions by Spain allegedly in violation of Spain's obligations toward such investments under the ECT and international law.

6.    On 7 January 2015, the Secretary-General of ICSID registered the RfA in accordance with Article 36 of the ICSID Convention and Rules 6 and 7 of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings ("**Institution Rules**"). In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of the Institution Rules, noting that the Claimants had suggested a method for appointing arbitrators in its RfA.

### B. TRIBUNAL'S CONSTITUTION

7.    On 25 March 2015, the Claimants, in a letter to ICSID reporting that the Parties had not been able to agree on a method for the appointment of arbitrators, invoked Article 37(2)(b) of the ICSID Convention, according to which the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the President of the Tribunal, appointed by agreement of the parties.

8.    On 26 March 2015, the Centre informed the Parties that the Tribunal was to be constituted in accordance with Article 37(2)(b) of the ICSID Convention.

9.    On 15 April 2015, following appointment by the Claimants, Professor Kaj Hobér, a national of Sweden, accepted his appointment as arbitrator.

10.    On 20 May 2015, following appointment by the Respondent, Professor Zachary Douglas, a national of Australia, accepted his appointment as arbitrator.

11.    On 3 June 2015, the Parties informed the Centre of their agreement concerning the appointment of the President of the Tribunal. Under their agreement, the Parties would first try to agree on a President of the Tribunal. In case of disagreement, either Party could ask the Centre to initiate a ballot procedure. Finally, in case the ballot procedure did not result in a mutually agreeable candidate, the Secretary-General would appoint the President of the Tribunal.

12.    On 29 September 2015, the Parties, unable to agree on a President, requested the Centre to initiate the ballot procedure for the appointment of the President of the Tribunal. On 24 November 2015, the Secretary-General of ICSID sent the Parties ballots to complete and return by 3 December 2015. On 4 December 2015, the Centre informed the Parties that the ballot did not result in a mutually agreeable candidate.

13.    On 4 December 2015, the Secretary-General of ICSID, following the Parties' agreed upon procedure, therefore proposed Professor Jeswald W. Salacuse, a national of the United States of America, as the President of the Tribunal.

14.    On 16 December 2015, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings ("**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. The Tribunal is thus composed of Professor Jeswald W. Salacuse, a national of the United States of America, President, appointed by the Secretary-General; Professor Kaj Hobér, a national of Sweden, appointed by the Claimants; and Professor Zachary Douglas, a national of Australia, appointed by the Respondent. Mr. Marco Tulio Montañés-Rumayor, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

## C. TRIBUNAL'S PRELIMINARY MATTERS AND THE PARTIES' PLEADINGS

15.    In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 16 March 2016, by teleconference. During the session, the Parties confirmed their agreement that the Tribunal had been properly constituted in accordance with the relevant provisions of the ICSID Convention and the ICSID Arbitration Rules and that they did not have any objections in this respect. The Parties also agreed on a number of procedural matters concerning the proceedings in the case.

16.    On 28 March 2016, the Tribunal issued Procedural Order No. 1 ("**PO1**") recording the agreement of the Parties on the aforementioned procedural matters and the decision of the Tribunal on disputed issues. PO1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be

3

English and Spanish, and that the place of proceeding would be Washington D.C., United States of America. PO1 also sets out a schedule for the jurisdictional/merits phase of the proceedings, attached to the Order as Annex A.

17. In accordance with PO1, the Claimants filed their Memorial on the Merits on 8 July 2016 ("**Memorial**"), accompanied by the witness statements of Dr. Klaus Lesker, Mr. Christian Beltle, Mr. Dieter Hassel, Mr. Hans Bünting, and Mr. Martin Riffeser; the Brattle Group's Damages ("**Brattle First Quantum Report**") and Regulatory ("**Brattle First Regulatory**") Expert Reports; Factual Exhibits C-1 to C-177; and Legal Authorities CL-1 to CL-94.

18. On 4 October 2016, the Respondent filed its Counter-Memorial on the Merits and a Memorial on Jurisdiction ("**Counter-Memorial**") accompanied by the witness statement of Mr. Carlos Montoya; the Econ One Research Inc. Expert Report ("**Econ One First Report**"); Factual Exhibits R-1 to R-247; and Legal Authorities RL-1 to RL-67. Its Counter-Memorial raised two specific objections to the Tribunal's jurisdiction in this case. First that the Claimants were not protected investors under the ECT, and second that the 7% levy enacted by Spain's Law/15/2012 was a 'Taxation Measure' under the ECT and, therefore, a matter that according to ECT Article 21 did not create obligations under the ECT.

19. On 20 December 2016, the Parties filed a Joint Document Production Application with its corresponding Redfern Schedules in accordance with Sections 15.2.3.3 and 15.3 of PO1. On 9 February 2017, the Parties agreed to modify the procedural calendar, extending the deadlines of further submissions. On 16 February 2017, the Tribunal issued Procedural Order No. 2 concerning the Parties' Joint Document Production Application of 20 December 2016.

20. On 21 March 2017, the Claimants filed a Reply on the Merits and a Counter-Memorial on Jurisdiction ("**Reply**") accompanied by the second witness statements of Dr. Klaus Lesker, Mr. Christian Beltle and Mr. Martin Riffeser; Brattle's Rebuttal Damages ("**Brattle Second Quantum Report**") and Regulatory ("**Brattle Second Regulatory Report**")

Expert Reports; Renovetec's Useful Life Expert Report; Factual Exhibits C-178 to C-273; and Legal Authorities CL-95 to CL-161.

21.  On 22 May 2017, the Respondent filed its Rejoinder on the Merits and a Reply on Jurisdiction ("**Rejoinder**") accompanied by the second witness statement of Mr. Carlos Montoya; the witness statement of Mr. Daniel Lacalle; the expert report of Prof. Jorge Servert; the second expert report by Econ One ("**Econ One Second Report**"); Factual Exhibits R-248 to R-519; and Legal Authorities RL-69 to RL-93.

22.  On 3 July 2017, the Claimants filed a Rejoinder on Jurisdiction ("**Rejoinder Jurisdiction**") accompanied by Factual Exhibits C-274 to C-276, and Legal Authorities CL-162 to CL-178.

### D.  EUROPEAN COMMISSION'S APPLICATION TO INTERVENE

23.  Meanwhile, on 16 January 2017, the European Commission ("**EC**" or "**Commission**") filed an Application for Leave to Intervene as a Non-Disputing Party ("**EC's Application**") pursuant to ICSID Arbitration Rule 37(2). The EC's Application was "limited to the question whether…the Arbitral Tribunal has jurisdiction to hear the case."[1] The Application requested the following from the Tribunal: i) to grant the EC leave to intervene in the case as non-disputing party; ii) to set a deadline for the EC to file a written *amicus curiae* submission on the jurisdictional questions it raises; iii) to allow the EC access to the documents filed in the case; and iv) to grant the EC leave to present its views at an oral hearing.

24.  On 18 January 2017, the Tribunal invited the Parties to provide their comments on the EC's Application. The Parties submitted their comments on 31 January 2017. The Claimants' response asked the Tribunal "…to reject the Commission's Application to intervene in any form in the present proceeding." Alternatively, if the Tribunal should grant the EC leave to intervene, the Claimants requested the Tribunal to i) order the EC to give an undertaking on costs; ii) order the EC to provide an undertaking that neither the EC nor any other European authority will oppose or take any action that impedes the execution or

---

[1]    EC Application, para. 3.

enforcement of any award rendered by the Tribunal; iii) deny the Commission access to the documents and pleadings in the case and reject the EC's request to attend the hearing; and iv) limit the EC's submission to ten pages to be filed within ten days. The Respondent, on the other hand, asked the Tribunal to grant what the EC requested in its Application, specifically that the EC be permitted to intervene in the current case and file an *amicus curiae* submission, that the EC be granted access to all documents in the case, and that the EC be granted the right to attend and present its views at the hearing in the case.

25.      After due deliberation, on 2 March 2017, the Tribunal issued Procedural Order No. 3 ("**PO3**"), granting the EC's Application; however, cognizant of the requirements of ICSID Arbitration Rule 37(2) that such intervention "…not disrupt the proceeding or unduly burden or unfairly prejudice either party…," the Tribunal imposed certain conditions on such intervention, including a maximum limitation on the length, format and date of the EC's *amicus curiae* submission and "…that the EC undertakes in writing within seven days of the issuance of this Procedural Order, and on terms satisfactory to the Tribunal and the Parties, that the EC will bear any costs arising from its intervention, including but not limited to, reasonable institutional and Tribunal costs, which the Tribunal in the exercise of its discretion deems appropriate."[2]

26.      On 9 March 2017, the EC filed a Request to Alter PO3 ("**EC's Request for Reconsideration**"), specifically with respect to the obligation of providing an undertaking on costs. Thereafter, on 13 March 2017, the Tribunal invited the Parties to comment on the EC's Request for Reconsideration.

27.      On 16 March 2017, the EC filed an "*Amicus Curiae* Brief" within the prescribed deadline of PO3.

28.      On 17 March 2017, the Claimants filed observations on the EC's Request for Reconsideration, but the Respondent did not file any observations on such request.

29.      On 24 March 2017, the Tribunal denied the EC's Request for Reconsideration, and invited it to provide the cost undertaking required by PO3. However, on 27 March 2017, the EC

---

[2]     PO3, para. 15.

informed the Tribunal that it could not provide the cost undertaking specified pursuant to PO3. Thereafter, on 11 April 2017, the Tribunal informed the Parties by letter that: "the EC's submission of March 16, 2017 should not be part of the record of this proceeding. As such, the Tribunal will not consider the submission nor transmit it to the Parties for their comments."

### E.  THE HEARING ON JURISDICTION AND THE MERITS

30.    On 4 July 2017, the Tribunal held a pre-hearing teleconference with the Parties after which, on 13 July 2017, it sent to the Parties a communication concerning the organization of the hearing ("**Hearing Agenda**").

31.    On 15 July 2017, the Claimants requested the submission of new documents into the record.

32.    On 18 July 2017, the Respondent submitted its comments to the Claimants' request of 15 July 2017. On the same date, each party submitted its proposal on the Hearing Agenda.

33.    On 19 July 2017, the Tribunal issued the Hearing Agenda. On this same date, the Claimants submitted their reply on the Respondent's comments of 18 July 2017.

34.    A hearing on Jurisdiction and the Merits was held in Paris, France, from 31 July to 5 August 2017 ("**Hearing**") at the offices of the International Bank for Reconstruction and Development. The following persons were present at the Hearing:

*Tribunal*:
| | |
|---|---|
| Prof. Jeswald W. Salacuse | President |
| Prof. Kaj Hobér | Arbitrator |
| Prof. Zachary Douglas QC | Arbitrator |

*ICSID Secretariat*:
| | |
|---|---|
| Mr. Marco Tulio Montañés-Rumayor | Secretary of the Tribunal |

*For the Claimants*:
| | |
|---|---|
| Mr. Jeffrey Sullivan | Allen & Overy LLP |
| Ms. Marie Stoyanov | Allen & Overy LLP |
| Mr. Antonio Vázquez-Guillén | Allen & Overy LLP |
| Mr. Antonio Jiménez-Blanco | Allen & Overy LLP |

| | |
|---|---|
| Ms. Virginia Allan | Allen & Overy LLP |
| Mr. David Ingle | Allen & Overy LLP |
| Mr. Alexandre Fichaux | Allen & Overy LLP |
| Mr. Tomasz Hara | Allen & Overy LLP |
| Ms. Stephanie Hawes[3] | Allen & Overy LLP |
| Ms. Agustina Álvarez | Allen & Overy LLP |
| Mr. Pablo Torres | Allen & Overy LLP |
| Mr. Gonzalo Jiménez-Blanco | Allen & Overy LLP |
| Mr. Jérémie Toussaint | Allen & Overy LLP |
| Mr. Bernhard Fackler | Stadtwerke München GmbH (SWM) |
| Mr. Stefan Meichsner | Stadtwerke München GmbH (SWM) |
| Mr. Reinhard Bellwinkel | Ferrostaal Industrial Projects GmbH (Ferrostaal) |
| Ms. Deborah Wehle | Ferrostaal Industrial Projects GmbH (Ferrostaal) |
| Ms. Jutta Dissen | Innogy (RWE) |
| Mr. Gunnar Helberg | Innogy (RWE) |
| Mr. Thomas Mertens | RheinEnergie AG (RheinEnergie) |

*For the Respondent*:

| | |
|---|---|
| Ms. Amaia Rivas Kortazar | Abogacía General del Estado |
| Mr. Antolín Fernández Antuña | Abogacía General del Estado |
| Ms. Mónica Moraleda Saceda | Abogacía General del Estado |
| Mr. Roberto Fernández Castilla | Abogacía General del Estado |
| Ms. Patricia Froehlingsdorf Nicolas | Abogacía General del Estado |
| Ms. Raquel Vázquez Meco | IDAE |

*Court Reporters*:

| | |
|---|---|
| Mr. Paul Pelissier | Spanish Court Reporter |
| Ms. Luciana Sosa | Spanish Court Reporter |
| Mr. Trevor McGowan | English Court Reporter |

*Interpreters*:

| | |
|---|---|
| Mr. Jesus Getan Bornn | English-Spanish interpreter |
| Mr. Marc Viscovi | English-Spanish interpreter |
| Ms. Amalia Thaler – de Klemm | English-Spanish interpreter |
| Ms. Barbara Conte | English-German interpreter |
| Ms. Brigitte Schneider | English-German interpreter |
| Ms. Karin Walker | English-German interpreter |

35.    During the Hearing, the following persons were examined:

*On behalf of the Claimants*:

| | |
|---|---|
| Mr. Hans Büntig | Innogy (RWE) |

---

[3]    No longer with Allen & Overy LLP.

| | |
|---|---|
| Mr. Klaus Lesker | Ferrostaal Industrial Projects GmbH (Ferrostaal) |
| Mr. Dieter Hassel | RheinEnergie AG (RheinEnergie) |
| Mr. Christian Beltle | Andasol 3 Kraftwerks GmbH (A3K) |
| Mr. Martin Riffeser | Stadtwerke München GmbH (SWM) |
| Mr. Carlos Lapuerta | The Brattle Group |
| Ms. Denisa Mackova | The Brattle Group |
| Mr. Jose Antonio García | The Brattle Group |
| Mr. John Stirzaker | The Brattle Group |
| Mr. Richard Caldwell | The Brattle Group |
| Mr. Santiago García Garrido | Renovetec Ingenieria |

*On behalf of the Respondent*:

| | |
|---|---|
| Mr. Carlos Montoya Rasero | IDAE |
| Mr. Daniel Lacalle | Econ One Research Inc. |
| Mr. Jordan Heim | Econ One Research Inc. |
| Mr. Ivan Lopez | Econ One Research Inc. |
| Mr. Juan Riveros | Econ One Research Inc. |
| Mr. Jorge Servert | Sta-Solar |

### F.  POST-HEARING MATTERS

36.  On 12 October 2017, the Parties filed simultaneous post-hearing briefs.

37.  On 21 November 2017, the Parties sent to ICSID the agreed revisions to the Hearing transcripts.

38.  At the time that this case was progressing, various other arbitral cases and European Union ("**EU**") processes relating to Spain's renewable energy regulations and policies were also in course in other, separate fora. As these other cases reached a conclusion subsequent to the end of the Hearing, the Parties in this case sought to introduce evidence of such results into the record of this case. In fact, they did so on eight separate occasions, relying on Section 16.3 of PO1, which provides:

> "16.3. Neither party shall be permitted to submit additional or responsive documents after the filing of its respective last written submission, unless the Tribunal determines that exceptional circumstances exist based on a reasoned written request (that shall not include the content of the document) followed by observations from the other party."

39.  The first such occasion took place on 23 November 2017, when Spain requested leave from the Tribunal to introduce into the record the European Commission's Decision on the

Spanish State Aid Framework for Renewable Sources ("**EC Decision**"), in which the EC determined the compatibility of the Spanish scheme with European Union law. After receiving comments by each of the Parties, the Tribunal decided to grant the Respondent's request to introduce the EC Decision into the record on 11 December 2017, while inviting the Parties to make further comments on the EC Decision, which the Parties did.

40.    The second request to introduce new evidence into the record took place on 13 February 2018, when Spain requested leave from the Tribunal to introduce into the record the award in *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen, JSW Solar (zwei) GmbH & Co. KG v. The Czech Republic* case, dated 11 October 2017, but which was made public on 28 January 2018. After inviting and receiving comments from the Parties on this request, the Tribunal decided on 2 March 2018 to grant the Respondent's request, and on the same date Respondent introduced this award into the record as Legal Authority RL-95, while inviting the Parties to submit simultaneous comments on that award by 9 March 2018.

41.    The third request to introduce new evidence into the record came on 6 March 2018, when the Claimants requested leave from the Tribunal to introduce into the record the final award in *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain* dated 15 February 2018 ("***Novenergia II v. Spain* award**"). On 21 March 2018, the Parties agreed to introduce the *Novenergia II v. Spain* award into the record and to file simultaneously a single round of submissions by 3 April 2018.

42.    The fourth request took place on 8 March 2018, when the Respondent requested leave from the Tribunal to enter into the record the Judgment of the Court of Justice of the European Union ("**CJEU**") dated 6 March 2018, in *Slovak Republic v. Achmea BV*, Case No. C-284/16, ECLI:EU:C:2018:158 ("***Achmea* Judgment**"). On 14 March 2018, the Tribunal issued its decision regarding the Respondent's request on the *Achmea* Judgment. Noting that the Claimants were not opposed to the inclusion of the *Achmea* Judgement into the record, the Tribunal decided to grant the Respondent's request. The Tribunal also invited the Parties to file (i) a first round of submissions by 30 March 2018, and (ii) a second round of reply submissions by 23 April 2018.

43.     The fifth request to introduce new evidence into the record came on 30 May 2018, when the Claimants requested leave from the Tribunal to introduce into the record the award dated 16 May 2018 rendered in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1 ("***Masdar v. Spain* award").** The Tribunal invited the Parties to comment on the relevance of the *Masdar v. Spain* award as follows: a first round of comments to be filed simultaneously by 9 July 2018, and a second round of reply comments be filed simultaneously by 16 July 2018. The Parties subsequently filed comments according to this procedure. On 16 July 2018, the Tribunal granted the Claimants' request to enter the *Masdar v. Spain* award into the record.

44.     The sixth request took place on 10 August 2018, when the Claimants requested leave from the Tribunal to introduce into the record the award dated 15 June 2018 rendered in *Antin Infrastructure Services Luxembourg S.à.r.l and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31 ("***Antin v. Spain* award").** On 17 August 2018, the Respondent asserted that if the Tribunal were to grant the Claimants' request, it should also "allow for the introduction of the Respondent's request for rectification of the *Antin v. Spain* award, the decision on rectification and any subsequent annulment request, into the record." On 5 September 2018, the Tribunal invited the Parties to file simultaneous submissions on the relevance of the *Antin v. Spain* award and the Respondent's request for rectification of such award by 17 September 2018. Upon agreement of the Parties, the Parties' submissions were received by the Tribunal on 24 September 2018. The *Antin v. Spain* award was introduced into the record as Legal Authority CL-181 and RL-99, and the Respondent's request for rectification of the *Antin v. Spain* award as Legal Authority RL-100.

45.     The seventh request to introduce new evidence into the record came on 18 September 2018, when the Claimants requested leave from the Tribunal to introduce into the record the "Decision on the Achmea Issue" dated 31 August 2018, rendered in *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12 ("**Decision on the Achmea Issue**"). On 24 September 2018, the Respondent informed the Tribunal that it would not object to the Claimants' request if allowed to introduce into the record the EC's "Communication on the Protection of intra-EU Investment, COM (2018) 547/2" of July

2018 ("**EC's Communication**"). On 28 September 2018, the Tribunal granted the Claimants' request and invited the Claimants to comment on the Respondent's request regarding the EC's Communication. After receiving the Claimants' observations, on 22 October 2018, the Tribunal granted the Respondent's request. On 5 November 2018, as agreed to by the Parties, each Party filed comments on the Decision on the Achmea Issue and the EC's Communication. The Decision on the Achmea Issue was introduced into the record as Legal Authority RL-101 and CL-182, and the EC's Communication was introduced into the record as Legal Authority RL-102.

46.     The eighth and final request took place on 28 January 2019, when the Respondent requested leave from the Tribunal to introduce into the record the "Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union." On 1 February 2019, the Claimants submitted their comments objecting to the Respondent's request. The Claimants further noted that if the Tribunal was minded to admit the request, they should be allowed to introduce into the record: (i) the "Declaration of the Representatives of the Governments of the Member States, of 16 January 2019, on the enforcement of the Judgment of the Court of Justice in *Achmea* and on investment protection in the European Union" signed by the Representatives of the Governments of Finland, Luxembourg, Malta, Slovenia and Sweden; and (ii) the "Declaration of the Representative of the Government of Hungary, of 16 January 2019, on the legal consequences of the Judgment of the Court of Justice in *Achmea* and on investment protection in the European Union", signed by Hungary. On 8 February 2019, the Tribunal denied the Respondent's request of 28 January 2019.

47.     In response to the Tribunal's request, the Claimants and the Respondent submitted their statements of costs on 1 and 4 March 2019, respectively.

48.     On 3 June 2019, the Tribunal declared the proceedings closed in accordance with ICSID Arbitration Rule 38(1).

49.     On 30 September 2019, the Tribunal extended the 120-day period after the closure of the proceeding by a further 60 days, in accordance with ICSID Arbitration Rule 46.

## III.    THE FACTS OF THE DISPUTE

### A. BACKGROUND

50.    This dispute has its distant origins in the efforts by Spain, both as a sovereign state and as a member of the EU, to increase its generation of energy from renewable sources, notably the sun among others, and to reduce its dependence on fossil fuels for the production of electricity. It was hoped that the pursuit of such a fundamental change would have at least three positive social and economic effects: a) a reduction in green-house gases in the atmosphere and thereby a diminished impact on climate change; b) a reduced dependence by Spain on the importation of fossil fuels; and c) a stimulus to investment, employment and regional development.

51.    Certain international developments in the 1990's added stimuli to this effort, notably the 1992 United Nations Framework Convention on Climate Change,[4] which established generalized international commitments to undertake actions to reduce climate change. This would then be followed in 1997 by the Kyoto Protocol,[5] requiring the EU and its Member States to reduce greenhouse gas emissions by setting obligatory emissions targets.

52.    In furtherance of its obligations under the Kyoto Protocol, the EU adopted "Directive 2001/77/EC of the European Parliament and of the Council on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market,"[6] which established binding targets for the consumption of renewable energy within EU and encouraged Member States to adopt economic incentives to attract investments in renewable energy power-generation projects. The Preamble of the Directive clearly stated the justification for this major policy initiative: "The promotion of electricity produced

---

[4]    C-18, United Nations Framework Convention on Climate Change, 1771 United Nations Treaty Series 107; Senate Treaty Document No. 102-38; United Nations Document A/AC.237/18 (Part II)/Add.1; 31 International Legal Materials 849 (1992), 9 May 1992 (entered into force on 21 March 1994).

[5]    C-19, Kyoto Protocol to the United Nations Framework Convention on Climate Change, United Nations Document FCCC/CP/1997/7/Add.1, 10 December 1997; 37 International Legal Materials 22 (1998), 11 December 1997 (entered into force on 16 February 2005).

[6]    C-20, Directive 2001/77/EC of The European Parliament and of the Council of 27 September 2001 on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market, Official Journal of the European Communities Series L 283 (entered into force on 27 October 2001).

from renewable energy sources is a high Community priority … for reasons of security and diversification of energy supply, of environmental protection, and of social and economic cohesion."[7]

53.    Yet another important and relevant multilateral initiative of the 1990's to foster cooperation in the energy sector was the Energy Charter Treaty,[8] concluded by approximately fifty states in 1994, including the Kingdom of Spain and the European Communities (later the European Union), and entering into force in 1998. In stating its purpose, Article 2 of the ECT provided: "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter."[9] According to its Preamble, one of the factors motivating the parties to conclude the treaty was their wish "…to implement the basic concept of the European Energy Charter initiative which is to catalyse economic growth by means of measures to liberalize investment and trade in energy;…" In addition, Article 19 on "Environmental Aspects" set out various general obligations with respect to the environment, including that the Contracting Parties shall "…have particular regard to Improving Energy Efficiency, to developing and using renewable energy sources, to promoting the use of cleaner fuels and to employing technologies and technological means that reduce pollution…"[10]

**B.  SPAIN'S CREATION OF A LEGAL FRAMEWORK FOR RENEWABLE ENERGY PRODUCTION**

**(1) Law 54/1997**

54.    In response to its international obligations, directives from the EU, and its own national interests, Spain began to create a legal framework to encourage and regulate the production of electricity from renewable sources. A first step in that process was the enactment by the Spanish Parliament of Law 54/1997 of 27 November 1997, on the Electricity Sector ("**1997**

---

[7]    *Id.*, para. 2.

[8]    C-1, ECT.

[9]    *Id.*, Art. 2.

[10]   *Id.*, Art. 19(1)(d).

**Electricity Law**"),[11] which sought "a gradual liberalisation of the market,"[12] permitting and encouraging the development of private investment in the energy sector. Prior to that time, the production of electrical energy in Spain had been largely a State function.

55.  To encourage the production of electricity from renewable sources, the 1997 Electricity Law established two legal regimes: the ordinary regime ("**Ordinary Regime**"*)* applicable to non-renewable producers and the special regime ("**Special Regime**"*)* to qualified electricity producers using renewable sources of energy. It directed that "[T]he payment regime for electricity production facilities under the special regime shall be supplemented by the earning of a premium…" so as to achieve "reasonable rates of return with respect to the cost of money on the capital market."[13] Accordingly, Article 30(4) of the 1997 Electricity Law provided for the determination of "the premiums, the voltage level of electricity delivered to the network must be considered, along with the actual contribution to the improvement of the environment, primary energy savings and energy efficiency, the economically justifiable production of usable heat, and the investment costs that have been incurred, for the purpose of achieving reasonable rates of return with respect to the cost of money on the capital market."[14]

56.  Recognizing the additional costs of producing electricity from renewable sources of energy, Spain legally authorized for the first time in the 1997 Electricity Law the payment of a subsidy above the wholesale price of electricity to qualified renewable producers, which include installations whose "…installed power capacity…does not exceed 50 MW…" and relying on "… non-consumable renewable energy, biomass or any kind of biofuel when used as primary energy…"[15]. The 1997 Electricity Law did not specify the precise amount of the premium to be paid to producers covered by the Special Regime, which was left to determination by the Government using the various criteria enumerated

---

11    C-31, 1997 Electricity Law  (published on 28 November 1997).

12    *Id*., Preamble.

13    *Id*., Art. 30(4).

14    *Id*. ("Para la determinación de las primas se tendrá en cuenta el nivel de tensión de entrega de la energía a la red, la contribución efectiva a la mejora del medio ambiente, al ahorro de energía primaria y a la eficiencia energética, y los costes de inversión en que se haya incurrido, al efecto de conseguir unas tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales").

15    *Id*., Art. 27.

in Article 30(4) of the Law. The specific remuneration schemes for the implementation of this provision were established by successive regulations over the next fifteen years.

57.    The 1997 Electricity Law did make clear, however, that Spain had a national goal of increasing the production of electricity from renewable resources and that producers of renewable energy would be entitled to a reasonable rate of return. Toward this end, it directed the Government to prepare a renewable energy plan that would enable Spain to cover at least 12% of its total energy needs from renewable sources by 2010.[16]

### (2) The Hierarchy of Norms in the Spanish Legal System

58.    The Spanish legal system, like that of many countries, is based on a hierarchy of legal norms. The Spanish Constitution is supreme. Subordinate to the Constitution are laws (*leyes*) enacted by Parliament, like the 1997 Electricity Law. Royal Decree Laws ("**RDLs**") are decrees promulgated by the Government to meet emergency conditions which have immediate effect but require parliamentary approval.[17] Royal Decrees ("**RDs**") are instruments promulgated by Ministerial Orders in the exercise of regulatory powers created by laws or decree laws approved by Parliament. Royal Decrees are implemented by Ministerial Orders and Resolutions. Within this context, subsequent regulations on the renewable energy production would be based upon, draw their authority from, or refer to the 1997 Electricity Law.

### (3) Royal Decree 2818/1998

59.    On 23 December 1998, the Spanish Government issued Royal Decree 2818/1998 ("**RD 2818/1998**").[18] This was the first regulatory development of the 1997 Electricity Law and according to its Preamble was aimed at establishing a "temporary incentive system …for installations where such is necessary in order to assume a competitive position in a free

---

[16]    *Id*., Sixteen Transitional Provision.

[17]    C-26/R-35, Constitution of Spain of 27 December 1978, Art. 86.1, p. 38: "In case of extraordinary and urgent need, the Government may issue temporary legislative provisions which shall take the form of decree-laws and which may not affect the legal system of the basic State institutions, the rights, duties and freedoms contained in Part 1, the system of the Self-governing Communities, or the general electoral law."

[18]    C-46/R-80, RD 2818/1998 of 23 December 1998, on electricity production installations supplied by renewable energy, waste or cogeneration (published on 30 December 1998).

market context."[19] This regulation provided that renewable energy generators qualifying under the Special Regime had the right to connect to and supply electricity to the national grid, and that renewable energy installations would sell electricity either under a regulated tariff or at a premium paid on top of the wholesale market price.[20] The specific tariff to be paid depended on various factors, including the nature of the technology used, and for hydroelectric and wind technologies it was updated by the Government on an annual basis.[21] RD 2818/1998 also provided for periodic reviews of the premiums every four years according to (a) changes in the price of electricity in the market, (b) participations of these facilities in the coverage of demand, and (c) their impact on the technical management of the system.[22]

### (4) Royal Decree 436/2004

60.    The 2001 European Union Renewable Energy Plan, which set goals for Member States to attain with respect to the generation of energy from renewable sources and encouraged Member States to provide state subsidies and to create stable environments for investment in the renewable sector, prompted the Spanish Government to take additional steps to create a legal framework that would encourage renewable energy investment.

61.    Toward this end, on 12 March 2004, the Spanish Government issued Royal Decree 436/2004 ("**RD 436/2004**"), "…establishing the methodology for the updating and systematisation of the legal and economic regime for electric power production in the special regime." [23] The Preamble and Article 1 of the Royal Decree stated its objective as follows:

> "The purpose of this Royal Decree is to unify the legislation developing and implementing the 1997 Electricity [Law] with respect to electricity production under the special regime, and in particular concerning the economic arrangements for those installations. The intention is, therefore, to continue down the path first taken by Royal Decree 2818/1998…on the

---

[19]    *Id*., Preamble.

[20]    *Id*., Arts. 26 and 28.

[21]    *Id*., Art. 28(2).

[22]    *Id*., Art. 32.

[23]    C-53/ R-82, RD 436/2004 of 12 March 2004 (published on 27 March 2004).

generation of electricity by facilities supplied by renewable energy resources or sources, waste or cogeneration. This time, however, there is the added advantage of being able to take advantage of the stability bestowed on the whole system at large by Royal Decree 1432/2002, dated December 27th, establishing the methodology for the approval or modification of the average or reference tariff, to provide those who have decided or will decide in the near future to opt for the special regime with a durable, objective and transparent framework."[24]

62.     At the same time, the Preamble makes clear that the Spanish Government desired that the effect of the new Royal Decree would be to foster increased investment in the renewable sector. It stated "…there is no doubt that the security and stability offered by this new methodology to calculate the special regime remuneration should help it to foster investment in this [sic] kinds of plants…"[25]

63.     Under this Royal Decree, in case the facility operated in the Special Regime, its owner had the free choice between (i) selling its production or surplus electricity to the distribution system and receiving compensation consisting of a regulated tariff or (ii) selling their production directly to the market and receiving the market price plus an incentive for participating in the market and a premium, in case the facility was entitled to it.[26] These were two manifestations of the principle of market price plus premium which had been set up in the 1997 Electricity Law. RD 436/2004 stipulated that the premium would be calculated as a percentage of the yearly average tariff paid by all electricity consumers, which was itself set by reference to market prices.[27] It also provided that every installation operating in the Special Regime would, apart from the premium stipulated, receive a supplement for reactive power, to be set as a percentage of each year's average or benchmark electricity tariff.[28]

---

[24]   *Id*., Preamble, p.10.

[25]   *Id*., p.11.

[26]   *Id*. Art. 22.

[27]   *Id*., Art. 24(1) ("The premium referred to in Article 22.1.b) shall consist of a percentage of each year's average or reference electricity tariff defined in Article 2 of Royal Decree 1432/2002, dated December 27, and published in the Royal Decree setting the electricity tariff").

[28]   *Id*., Art. 26 ("1. Every installation covered under the special regime, by virtue of the scope of this Royal Decree irrespective of the sale option chose in article 22, shall receive a supplement for reactive power. This supplement is set as a percentage of each year's average or benchmark electricity tariff defined in article 2 of Royal Decree 1432/2002, dated December 27, and published in the Royal Decree setting the electricity tariff, in line with the

64.    The calculation of the premium under this Royal Decree consisted of a multiple of the Average Reference Tariff ("**TMR**") which had been previously set up by RD 1432/2002 for the determination of the selling price of electricity to consumers.

### (5) The 2005-2010 Renewable Energy Plan

65.    The *Renewable Energy Plan in Spain 2005-2010,* ("**2005-2010 Energy Plan**" or "**Energy Plan**"),[29] prepared by the *Instituto para la Diversificación y Ahorro de la Energía* ("**IDAE**"), maintained the Spanish Government's commitment to cover at least 12% of the total energy consumption with renewable sources in 2010, and incorporated two objectives indicated for 2010 – 29.4% of electricity generation with renewables and 5.75% of biofuels for transportation – adopted under the 2005-2010 Energy Plan.[30]

66.    In order to determine the cost of achieving its implementation targets, the 2005-2010 Energy Plan applied the following methodology:

> "Taking the proposed energy objectives as a starting point, financing requirements were determined for each technology on the basis of their financial performance, defining several standard projects for the calculation of model.
>
> These standard projects have been characterized by technical parameters relative to their size, equivalent operating hours, unit costs, implementation periods, service life, operation costs and maintenance and sales costs for the final energy unit. Likewise, some assumptions for funding have been applied, as well as a series of measures and financial aid, designed according to the requirements of each technology." [31]

67.    While the 2005-2010 Energy Plan acknowledged that the premiums offered by RD 436/2004 had stimulated new projects,[32] it envisioned a total expenditure for the

---

category, group or subgroup to which the installation belongs, in accordance with the provisions of section 3 of this chapter IV and with the time period during which the energy is delivered. That percentage is laid down in Annex V").

[29]    C-34, Ministry of Industry, Tourism and Commerce & IDAE, "Renewable Energy Plan in Spain 2005 –2010", dated August 2005.

[30]    *Id.*, p. 7.

[31]    R-101, Spain Renewable Energy Plan 2005-2010, pp. 280; 281 to 283.

[32]    C-48, Ministry of Industry, Tourism and Commerce & IDAE, "Summary of the Spanish Renewable Energy Plan 2005-2010" dated August 2005, p. 26.

development of all types of energy during the stated five-year period of approximately 23 billion EUR, of which 4.7 billion EUR or 20% would be provided by developers and 18.2 billion EUR or 77% would be financed from debt financing. It stated:

> "It is therefore essential to place the various technologies in a position where they are sufficiently profitable to be attractive to investors and to facilitate access to bank loans. It is in this context, for the reasons already cited, that public aid is required as it represents an essential factor in stimulating the growth of the various renewable energy sectors."[33]

68.    The principal type of public aid identified as necessary for the generation of electricity from renewable sources was the payment of a premium by the state electricity system to purchase this type of electricity. The Energy Plan noted however that:

> "In the case of the premiums paid for electricity generated from renewable sources, although these are obviously the outcome of a public decision within the competencies of national government, the cost of this measure falls on electricity consumers through the electricity tariff."[34]

69.    In order to ensure the profitability of projects using different technologies and to assist them in ensuring an appropriate finance package, the 2005-2010 Energy Plan made several technical-financial assumptions and determined - among such assumptions - that the project type profitability would be calculated based on maintaining an internal rate of return ("**IRR**") close to 7%, measured in a common currency and for each project type, for own resources (before financing) and after tax.[35]

### (6) Royal Decree Law 7/2006

70.    On 23 June 2006, the Spanish Government issued Royal Decree Law 7/2006 ("**RDL 7/2006**") "adopting urgent measures in the energy sector."[36] As highlighted in its Preamble, this Royal Decree Law was enacted to address inefficiencies in the remuneration system governed by RD 436/2004 caused mainly as a result of the link between the

---

[33]    *Id.*, p. 58.

[34]    *Id.*

[35]    C-34, Ministry of Industry, Tourism and Commerce & IDAE, "Renewable Energy Plan in Spain 2005 –2010", dated August 2005, pp. 273-274.

[36]    C-57; RDL 7/2006 of 23 June 2006 (published on 24 June 2006).

premiums to the TMR. This was explained in the report that preceded the adoption of this Royal Decree Law as follows:

> "Furthermore, in order to avoid increasing the remuneration for these facilities in the current regulatory framework, it is necessary to urgently exclude from the application of the reviews the prices, premiums, incentives and tariffs stipulated in Royal Decree 436/2004 of 12 March, before the first review of the tariff is carried out in July 2006, until the review of the remuneration regime has been realized."[37]

71.    RDL 7/2006 essentially did two things: 1) it "froze" the subsidies to the renewable energy sector until a new remuneration regime could be developed[38] and 2) it gave priority of access to the grid to renewable producers, allowing them to sell their electricity output in preference to non-renewable energy producers.[39] This Royal Decree Law also announced the remuneration scheme to be later introduced by Royal Decree 661/2007.[40]

### (7) Royal Decree 661/2007

72.    On 25 May 2007, the Spanish Government issued Royal Decree 661/2007 ("**RD 661/2007**") "regulating the activity of electricity production under the special regime."[41] The basic aim of these reforms was to create a more transparent legal and regulatory framework. As noted in the Preamble of this regulation, the experience accumulated during the application of RD 2818/1998 and RD 436/2004 made it clear that certain technical aspects needed to be regulated in order to contribute to the growth of technologies operating in the Special Regime, while maintaining the security of the electrical system, ensuring the quality of the supply and minimizing the restrictions on the production of renewable energy.[42] In particular, the regulator considered it necessary to de-link the remuneration of the Special Regime from the TMR, guaranteeing "the owners of special regime installations a reasonable return for their investments, and the consumers of

---

[37]    R-202, Supporting Report of Royal Decree Law, stipulating urgent measures in the energy sector, p. 4.

[38]    C-57; RDL 7/2006, Art. 1.

[39]    *Id.*, Art.1; Second Transitional Provision.

[40]    *Id.*

[41]    C-21, RD 661/2007, published on 26 May 2007.

[42]    *Id.*, Preamble.

electricity an assignment of the costs attributable to the electricity system which is also reasonable."[43]

73.     The purposes of RD 661/2007 were, as stated in its first article as follows:

>   "to establish a legal and financial framework for the business of the production of electrical energy under the special regime in replacement of Royal Decree 436/2004, of 12 March, establishing the methodology for updating and systematisation of the legal and economic framework of the activity of the production of electrical energy under the special regime by a new regulation for the activity of the production of electrical energy under the special regime."[44]

74.     The following are the main characteristics of this regulation. First, RD 661/2007 maintained the right, provided for in RD 436/2004, of production facilities operating under the Special Regime to choose one of two types of "feed-in tariffs" ("**FIT**"), that is, the amount to be paid to them for each unit of electricity that they fed into the state grid. The two types were 1) selling electricity at a fixed tariff per unit of production that included a pre-determined renewable energy premium, referred to as the "Fixed Tariff Option" or 2) selling electricity directly on the day-ahead market or the futures market, or through a bilateral contract, and receiving the negotiated price plus a premium, subject to floors and caps, referred to as the "Premium Tariff Option."[45] The installation had to make a choice between the two for at least a year and inform the appropriate state authority at least one month before the choice was to take effect.[46] It further introduced upper and lower limits for the sum of the hourly price in the daily market, plus a reference premium.[47]

75.     In line with the 2005-2010 Energy Plan, the regulatory impact report for RD 661/2007 stated that: "The regulated tariff has been calculated for the purpose of guaranteeing a return of between 7% and 8% depending on the technology."[48]

---

[43]   *Id.*

[44]   *Id.*, Art. 1, Purpose, (a).

[45]   *Id.*, Art. 24(1).`

[46]   *Id.*, Art.24(4).

[47]   *Id.*, Art. 36.

[48]   R-65, Memorandum on the Draft Royal Decree Regulating the Activity of Energy Production under the Special Regime and Certain Installations of Assimilated Technologies, under the Ordinary Regime, p. 1.

76.     Second, RD 661/2007 established a mechanism to update the fixed tariff, the premium, and the upper and lower limits, in order to account for inflation. Thus, Article 44(1) of RD 661/2007 provided that these elements would be updated pursuant to the Consumer Price Index ("**CPI**") less 25 basis points (or 50 basis points after 31 December 2012). This inflation-adjusting mechanism applied to all installations, irrespective of the date on which the installation started to operate.

77.     Third, it maintained the "priority of connection and of discharge of the energy produced"[49] to installations operating in the Special Regime, thereby assuring that all the production of a qualified installation could be introduced into the grid in accordance with the established tariff.

78.     Finally, RD 661/2007 allowed a qualified installation to use natural gas to generate up to 15% of its production, a privilege that enabled it to maintain normal output in times of low sunshine, for example on exceptionally cloudy days.[50]

## C.  THE CLAIMANTS' INVESTMENT

79.     The Claimants in this case built and operated the Andasol 3 Plant, an electrical generation facility located in Aldeire, in the Spanish province of Granada in Andalusia, southern Spain, an area offering some of the highest and prolonged levels of solar irradiation in the EU. Commissioned in November 2011, the Andasol 3 Plant has the capacity to generate 182 million kWh of electricity a year, which according to the Claimants would supply the needs of approximately half a million people and save some 150,000 tonnes of $CO_2$ when compared to a coal-fired power plant.[51]

80.     The Andasol 3 Plant uses an advanced form of technology known as concentrated solar power ("**CSP**"), also called "thermosolar." CSP plants may be designed in different ways, but generally they involve arrays of trough-shaped, parabolic mirrors or reflectors which focus the sun's rays onto horizontal tubes running through them carrying special oil or

---

49   C-21, RD 661/2007, Annex XI.
50   *Id*., Art. 2.
51   Memorial, para. 166.

fluid. By means of a heat transfer system, the thermal energy thus generated is then transferred to a steam circuit. The steam delivered through this circuit drives a turbine that in turn drives a generator, which produces electricity. The process of electricity generation in a solar plant is broadly similar to that employed in a conventional coal or gas-fired electric generation plant, except that the heat used to create steam comes from CSP, not burning gas or coal. The Andasol 3 Plant is one of the largest CSP installations in Europe: it has an area of 497,040m$^2$ and uses 204,288 parabolic mirrors.[52]

81.    One of the challenges in employing solar technology to generate electricity is the intermittent nature of sunshine at a plant's location because of nightfall and overcast days, resulting in discontinuities in energy supply. To solve this problem, some CSP plants include mechanisms for storing heat and then using this heat supply when sunlight is not available to produce steam for electricity generation. The Andasol 3 Plant included such a storage mechanism in the form of a state of the art system of molten salt storage tanks which hold 30,000 tonnes of a special blend of salts.[53] The storage system conserves the thermal energy harnessed during the day to continue to operate the plant during the night, allowing for up to 24-hour operation. Since the salts freeze at 238ºC, an event that would render the storage system permanently irremediable, it is vital to have an adequate supply of energy to maintain the storage tanks, as well as the heat transfer system, at a sufficiently high temperature regardless of weather conditions. For this purpose, the Andasol 3 Plant relies on natural gas.[54]

82.    The Andasol 3 Plant is wholly owned by Marquesado, a private limited company incorporated under the laws of Spain. The Claimants directly or indirectly own all the equity of Marquesado.[55] Unlike many infrastructure projects which are usually heavily leveraged with debt, sometimes of the non-recourse variety, the capital structure of the Andasol 3 Plant has virtually no bank loans. Instead its funds are derived from its

---

[52]    *Id.*, para. 168.

[53]    *Id.*, para. 170.

[54]    *Id.*, para. 172.

[55]    *Id.*, para. 2.

24

shareholders, since, according to the Claimants, potential lenders viewed the novelty of its thermosolar technology as a risk that made such financing too expensive or unobtainable.[56]

83.  SWM, incorporated in Germany, owns 48.91% of Marquesado. The other shareholders are AS3 Beteiliugungs GmbH (25.09%), Ferranda GmbH (13%), and AS3 Kraftwerks (13%). The shareholders of AS3 Beteiliugungs GmbH are RWE Innogy GmbH (51%) and RheinEnergie AG (49%). AS3 Kraftwerks is 100% owned by Andasol Fonds GmbH & Co KG. Ferranda GmbH is 100% owned by Ferrostaal Industrial Projects GmbH. All entities, except for Marquesado, are incorporated in Germany.[57]

84.  The Claimants, it is alleged, invested a total of 345 million EUR to develop and build the Andasol 3 Plant.[58] Based on statements and evidence offered by the Claimants[59] but not challenged by the Respondent, the Tribunal finds that the Claimants made their investment in the Andasol 3 Plant on 28 October 2009. As will be seen later in this Award, this date is important, among other reasons, for determining the Claimants' legitimate and reasonable expectations at the time they made their investment.

85.  The Claimants state that they took this investment risk based on their separate due diligence evaluations that Spain's existing legal framework, supported by communications from governmental and regulatory authorities, assured the investors a sufficient cash flow over the life of the Andasol 3 Plant to yield an adequate return to justify the investment they had made. It appears that during the development stage of the project the Claimants were in contact with Spanish governmental authorities and had registered their intention to build the Andasol 3 Plant as required by Spanish regulations. According to the Claimants, throughout this process, the Spanish Government assured them that if the Andasol 3 Plant became operational, Marquesado would be paid the Special Regime tariff specified in the

---

[56]  *Id.*, para. 189.

[57]  *Id.*, paras. 1-6.

[58]  *Id.*, paras. 7 and 409.

[59]  *See* Memorial, para. 215. "SWM, RWE and RheinEnergie formally made their investment in Marquesado by way of a Share Purchase Agreement, dated 28 October 2009. To ensure the right to receive the FIT, their investment was made conditional on the Andasol 3 Plant obtaining Pre-Registration within the deadline set out in RDL 6/2009." *See* also Exhibit C-82, Sale and Purchase Agreement entered into between Solanda, SWM, AS3B, SMAG and Ferrostaal, dated 28 October 2009. *Ibid.*, Clause 6.1.1. *See* Memorial, Part.II-5.4 ("The Investors Commit to Investment in the Andasol Plant").

law for the electricity it produced. For example, on 10 February 2011, in response to a request from Marquesado, the Ministry of Industry, Tourism and Commerce ("**Ministry**") issued a resolution ("**2011 Resolution**") confirming that the Andasol 3 Plant under the regime in place at the time of the resolution had the right to receive the following fixed tariff for all the electricity it produced: a) for the first 25 years of operation, a Fixed Tariff of 29.0916 EUR cent/kWh or a Premium of 27.4312 EUR cent/kWh (subject to lower and upper caps of 37.1483 EUR cent/kWh and 27.4353 EUR cent/kWh respectively), and b) from year 26 onwards, a Fixed Tariff of 23.2731 EUR cent/kWh or a Premium of 21.9449 EUR cent/kWh, subject to the same aforementioned lower and upper caps.[60]

86.    Moreover, in various public statements, different Spanish agencies promoted the stability of the Spanish regime for renewable energy. For example, in a public report on its activity, the *Comisión Nacional de Energía* ("**CNE**" in Spanish), the predecessor of the National Markets and Competition Commission ("**CNMC**" in Spanish) which was an advisory board collaborating with the Government in energy matters, stated that there "would [not be] future changes in the remuneration of plants in operation and preregistered plants."[61]

87.    The Regime created by RD 661/2007 appears to have been extremely effective in developing the renewable sector. According to one report offered in evidence in this case, "…by 2012 Spain had more CSP capacity than any other country in the world, with a total of 1,950 MW. By the end of 2013 Spain had about 2,300 MW …"[62]

88.    Indeed, in 2012, the Spanish Government ministry responsible for energy development reviewed positively the results of its efforts, and particularly the legal framework it had chosen to bring them about:

> "Over the last decade, especially since 2005, renewable energies have made an ever increasing contribution in Spain, driven by a regulatory framework that has promoted development through stability. One of the

---

[60]    C-22, Ministry of Industry, Tourism and Commerce, Resolution by the Director General for Energy Policy and Mines in respect of the Andasol 3 Plant, dated 10 February 2011, p. 4

[61]    C-108, CNE, Report, "Spanish Energy Regulator's Annual Report to the European Commission", dated 22 July 2011, p. 18.

[62]    Brattle First Regulatory Report, para. 97.

keys to understanding the Spanish renewables success story is the support system that was selected…

Based on experience, it can be concluded that choosing the right economic support model is critical to successfully developing a renewable electricity generation system.  Spain chose to support the sales price of renewable electricity by establishing…[a] scheme commonly known as a feed-in tariff, [which] is basically the same as that used in countries such as Germany or Denmark, which, along with Spain, have also successfully rolled out renewable energies.

These feed-in tariffs are justified by the strategic and environmental benefits offered by renewables and aim to guarantee reasonable returns on investments while learning curves and economies of scale gradually enable the various technologies to become competitive with conventional sources."[63]

D.  **Spain's Alteration of the Legal Framework Applicable to Renewable Energy Production**

89.    In early 2012, Spain began a process of taking steps to alter its legal framework for the encouragement and regulation of renewable energy production. The thrust of these measures was to reduce the amount of compensation that producers of electricity through renewable sources of energy would receive for the electricity they sold to Spanish governmental entities. The stated impetus for this apparent change in policy was to address the "tariff deficit" that Spain's public finances were experiencing. This expression referred to the financial situation of the electricity system whereby its costs, including the payments it made for electricity provided by privately owned generating facilities, exceeded the revenues it earned from consumers of electricity. While the 1997 Electricity Law required the Government to manage the system in such a way that its costs and revenues would balance, in 2012 the Government of Spain, instead of increasing the retail tariff that it charged electricity consumers, decided to introduce an amendment to the remuneration scheme for the installations operating in the Special Regime. Its first significant action in this regard was the passage of Law 15/2012, effective 1 January 2013.[64]

---

[63]    C-111, Ministry of Industry, Tourism and Commerce, "Panorama", Renewables Made in Spain Website (last accessed on 23 September 2012).

[64]    C-24, Law 15/2012 of 27 December 2012.

### (1) Law 15/2012

90.  As stated in its Preamble, the objective behind Law 15/2012 was to harmonize the Spanish tax system with an efficient and respectful use of the environment.[65] In this context, Article 1 of Law 15/2012 introduced a levy on the value of the production of electricity and its incorporation into the electricity system. Law 15/2012 did not distinguish for the purpose of the implemented levy between the production of energy by installations registered in the Ordinary or Special Regime. Law 15/2012, moreover, modified Article 30 of the 1997 Electricity Law by limiting the right of installations in the Special Regime to a premium in respect of renewable energy and thus depriving installations from receiving premiums in respect of energy produced using natural gas.[66]

### (2) Royal Decree Law 2/2013

91.  On 1 February 2013, the Spanish Government issued Royal Decree Law 2/2013 ("**RDL 2/2013**"),[67] reducing the amount of the premium to which installations registered in the Special Regime had a right under RD 661/2007 to 0.0 EUR cent/kWh,[68] while maintaining the regulated tariff, which was the second option for generators covered by the Special Regime. It was explained in the General Provisions of RDL 2/2013 that this amendment was introduced with the double objective of guaranteeing a reasonable rate of return to facilities in the Special Regime, while avoiding at the same time over-remuneration.[69] RDL 2/2013 further introduced amendments to the mechanism for updating the premiums. In this respect, it will be remembered that RD 661/2007 had provided a mechanism that updated the FIT according to inflation indexed with reference to Spain's CPI. RDL 2/2013 replaced that index with a new one, the Spanish "CPI at constant taxes excluding unprocessed foods or energy products."[70]

---

[65]  *Id.*, Preamble.

[66]  *Id.*, First Final Provision, adding Section 7 to Article 30 of the 1997 Electricity Law.

[67]  C-25, RDL 2/2013, concerning urgent measures within the electricity system and the financial sector, dated 1 February 2013.

[68]  *Id.*, Art. 2.

[69]  *Id.*, General Provisions.

[70]  *Id.*, Art. 1.

### (3) Royal Decree Law 9/2013

92.     A few months later, the Spanish Government made further amendments to the remuneration system applicable to the renewable energy sector in Spain. On 12 July 2013 it issued Royal Decree Law 9/2013 ("**RDL 9/2013**"),[71] which amended Article 30(4) of the 1997 Electricity Law. Under RDL 9/2013, the remuneration of installations producing renewable energy would be composed by the revenue derived from the market participation and an additional remuneration which would cover the investment costs of an efficient and well-run company.[72] According to the Preamble of this RDL, the remuneration scheme would "make it possible for renewable, co-generation and waste energy installations to cover the costs needed to compete in the market on an equal level with other technologies and to obtain a reasonable return."[73]

### (4) Law 24/2013

93.     On 27 December 2013, Spain adopted Law 24/2013, which superseded the 1997 Electricity Law. Law 24/2013 abolished the distinction between the Ordinary and Special Regimes in the 1997 Electricity Law and replaced it with a specific remuneration to be paid to renewable energy producing installations, which would be reviewed periodically.[74] For the approval and monitoring of the specific remuneration, a specific remuneration register was created under the Ministry.[75] In the General Provisions of Law 24/2013, the legislator explained that the 1997 Electricity Law had failed in guaranteeing the financial balance of the system, as it lacked the necessary flexibility to cope with significant changes to the electricity system or economic trends.[76]

---

[71]   C-27, RDL 9/2013, by which urgent measures are adopted to guarantee the financial stability of the electricity system, 12 July 2013.

[72]   *Id.*, Art. 1. Modification of Law 54/1997 of 27 November, concerning the Electricity Sector.

[73]   *Id.*, Preamble and Art. 1.

[74]   C-28, Law 24/2013 on the Electricity Sector of 26 December 2013 (published on 27 Decemebr 2013), Art. 14.4 and 14.7.

[75]   *Id.*, Art. 27.

[76]   *Id.*, General Provisions.

**(5) Royal Decree 413/2014**

94.    The following year, in 2014, Spain adopted Royal Decree 413/2014 ("**RD 413/2014**"),[77] which provides for a regulatory regime intended to guarantee installations with a reasonable return, calculated for a standard facility and in reference to the activity of an "efficient and well-managed" plant. This amendment attempted to ensure that the higher costs of an inefficient company would not be taken into consideration in the application of the EU state aid rules concerning compensation granted for the provisions of general economic interest.[78] While the concept of a reasonable return was to be linked to the performance of a standard facility, the rate of return could be greater in circumstances where the specific facility is able to out-perform its associated standard facility.[79] This Royal Decree provides for the rights and obligations of installations producing electricity from renewable energy sources, cogeneration and waste,[80] including the specific remuneration that the installations would be entitled to earn a reasonable rate of return.[81] Some details of the new regime, however, were left to the Government regulators who subsequently articulated them in Ministerial Order IET/1045/2014 of 16 June 2014 ("**June 2014 Order**").[82] This Ministerial Order sets out the remuneration parameters for "standard installations" to be applied for the calculation of the specific remuneration for the production of electricity from renewable energy sources, cogeneration and waste, where such facilities were either receiving premium payments under RDL 9/2013,[83] or which

---

[77]    C-29, RD 413/2014 of 6 June 2014, regulating the production of electricity from renewable energy sources, cogeneration and wastes (published on 10 June 2014).

[78]    R-261, Report on the Draft Royal Decree Which Regulates the Production Activity of Electricity from Renewable Energy, Cogeneration and Waste, by the Technical General Secretary of the Ministry of Industry Energy and Tourism, dated 9 January 2014, p. 5.

[79]    *Id.*, p. 7.

[80]    C-29, RD 413/2014, Arts. 5-7.

[81]    *Id.*, Art. 11.

[82]    C-30, Order IET/1045/2014 of 16 June 2014, approving the remuneration parameters of standard installations that apply to specific installations for the production of electricity from renewable energy sources, co-generation and wastes.

[83]    *Id.*, Art. 3.

complied with the requirements to receive such payments under RD 413/2014 and Law 24/2013.[84]

95.    The Claimants allege that the measures taken by Spain to amend the regulatory and legal framework on which they said to have relied in making their investment have substantially harmed their investments in Marquesado, the company that owns the Andasol 3 Plant.[85] According to the Claimants, Spain's measures have substantially reduced the free cash flow to Marquesado, thus significantly diminishing the value of the Plant, Marquesado's principal asset, and the Claimants' individual investments, as well as the profits that the Claimants had expected to make from their investments.[86] The Claimants argue that prior to Spain's effort to dismantle the special regime for renewable energy, their investment was valued at 536 million EUR. By 2014, after the contested measures, the Claimants estimated that the value of their investment had fallen to 261 million EUR.[87] As a result, viewing Spain's actions as violations of Spain's commitments to investors under the ECT, the Claimants have brought this action to obtain redress for the alleged injuries they have sustained as a result of Spain's measures.


## IV.    THE PARTIES' REQUESTS FOR RELIEF

96.    In their Memorial, the Claimants stated their request to the Tribunal for relief as follows:

> "The Claimants request the following relief:
>
> (a) a declaration that the Respondent has violated Article 10 of the ECT;
>
> (b) an order that the Respondent make full reparation to the Claimants for the injury to its investments arising out of Spain's violation of the ECT and international law, such full reparation being in the form of:
>
> > (i) full restitution to the Claimants by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered prior to the reinstatement of the prior regime; or

---

[84]    *Id.*, Art. 4.
[85]    Memorial, 39.
[86]    *Id.*, para. 332.
[87]    *Id.*, para. 331.

(ii) paying the Claimants compensation for all losses suffered as a result of Spain's breaches of the ECT; and

(iii) in any event:

A. paying the Claimants pre-award interest at a rate of 1.16% compounded monthly; and

B. paying post-award interest, compounded monthly at a rate to be determined by the Tribunal on the amounts awarded until full payment thereof; and

(c) paying the Claimants the costs of this arbitration on a full indemnity basis, including all expenses that the Claimants have incurred or will incur in respect of the fees and expenses of the arbitrators, ICSID, legal counsel and experts; and

(d) any other relief the Tribunal may deem appropriate in the circumstances."[88]

97.    The Claimants also reserved their rights to amend or supplement their Memorial and to request such additional, alternative or different relief as may be appropriate. In their further submissions,[89] the Claimants repeated their request for relief as set out in the Memorial and also asked the Tribunal to dismiss all of Spain's jurisdictional objections.

98.    Spain, in its Counter-Memorial, requested the following of the Tribunal:

"In light of the arguments expressed herein, the Kingdom of Spain respectfully requests the Arbitral Tribunal to:

a)    To declare its lack of jurisdiction over the claims of the Claimants or, if applicable, the inadmissibility of said claims.

b)    To dismiss all the claims of the Claimant on the merits because the Kingdom of Spain has not breached the ECT in any way, in accordance with section III of this Document, on the substance of the matter.

c)    Secondarily, to dismiss all the Claimant's claims for damages as said claims are not entitled to compensation, in accordance with section IV of this Document; and

d)    Order the Claimant to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees and the fees of the legal representatives of the Kingdom of Spain, their

---

[88]    Memorial, para. 595 (numbering as shown in the original document).
[89]    *See* Reply, para. 855. *See also* Rejoinder on Jurisdiction, para. 100.

> experts and advisors, as well as any other cost or expense that has been
> incurred, all of this including a reasonable rate of interest from the date
> on which these costs are incurred until the date of their actual
> payment."[90]

99.    Spain also reserved the right to supplement, modify or complement these allegations and
present any and all additional arguments that may be necessary in accordance with the
ICSID Convention, the ICSID Arbitration Rules, procedural orders and the directives of
the Tribunal.[91] In its further submissions,[92] Spain repeated its request for relief as set out
in its Counter-Memorial.

100.   The Parties' respective positions on the above-mentioned requests are discussed in the
sections that follow. The Tribunal affirms that it has considered fully the Parties' arguments
in their written and oral submissions. The fact that a given argument might not be referred
to expressly in the brief summary of the Parties' positions included in this Award should
not be considered as an indication that the Tribunal has not considered the argument.


## V.    JURISDICTION

101.   The Respondent has raised two specific objections to the jurisdiction of the Tribunal in this
case. The first, which was sometimes referred to in the proceedings as 'the intra-EU
objection,' is that the Tribunal lacks *ratione personae* jurisdiction to hear this dispute
because the Claimants lack the quality of being protected investors under the ECT since
they are not from "another Contracting Party" as Article 26(1) of the ECT requires. The
Respondent asserts that since Germany and Spain are Member States of the EU and since
the EU is itself a Contracting Party of the ECT, German investors are not from "another
Contracting Party" as required by the jurisdictional provisions of the ECT.

102.   The Respondent's second jurisdictional objection, which one may call 'the taxation
objection,' is that the Tribunal lacks jurisdiction to hear an alleged breach by Spain of
Article 10(1) of the ECT through the introduction of the 7% levy imposed by Law 15/2012

---

[90]    Counter-Memorial, para. 1341.

[91]    *Id.*, para. 1342.

[92]    *See* Reply, para. 1563.

since pursuant to Article 21 of the ECT, the ECT does not generate obligations regarding 'Taxation Measures' of the Contracting Parties.

103.    The Tribunal will consider the validity of these two jurisdictional objections individually.

## A. THE INTRA-EU OBJECTION

### (1) The Parties' Positions

#### a. The Respondent's Position

104.    The Respondent contends that the plain language of Article 26(1), which states the conditions necessary for a tribunal under the ECT to have jurisdiction over the parties in dispute between an investor and an ECT Contracting Party, bars the Claimants from bringing an arbitral proceeding against Spain. Specifically, paragraph (1) of Article 26 of the ECT, which is entitled, "Settlement of Disputes Between and Investor and a Contracting Party," provides:

> "Article 26 - Settlement of Disputes Between an Investor and a Contracting Party
>
> (1) Disputes between a Contracting Party and an Investor of another Contracting Parting relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably."

105.    If such disputes cannot be settled amicable, paragraphs (2) and (3) of Article 26 provide that "such disputes"—that is, disputes that meet the requirements of paragraph (1)—may at the election of the investor be settled by international arbitration.

106.    The basic thrust of the Respondent's objection to the jurisdiction of this Tribunal is that since Spain and Germany are both EU Members, and moreover since the EU in its own capacity is a Contracting Party of the ECT, the Claimants, all of whom are investors "of Germany," are not "Investors of another Contracting Party," as is required by Article 26(1) of the ECT. The Respondent points to the specific language of Article 1(2) of the ECT, which defines "Contracting Party" to mean "… a state or a Regional Economic Integration Organization which has consented to be bound by …" the ECT. Further, it points to the fact that Article 1(3) states that "Regional Economic Integration Organization" means an

organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty...." Noting that the EU Member States have transferred competence of various energy matters, including the development of an internal EU electricity market, to EU authorities, the Respondent asserts that the EU is clearly a Contracting Party under the terms of the Treaty. In fact, it is the only Regional Economic Integration Organization ("**REIO**") to be an ECT Contracting Party. Thus, the Respondent argues that since the Claimants are entities organized under German law and since Germany is a member of the EU, the Claimants are not of "another Contracting Party" as Article 26(1) of the ECT requires and thus do not satisfy that Article's jurisdictional requirements.[93]

107.    The Respondent seeks to buttress its argument by pointing to the fact that EU law provides a system of investor protection superior to that afforded by the ECT and that in joining the EU the Member States have accepted that the EU system will govern their investment relations to the exclusion of other conflicting protective arrangements. Indeed, Article 344 of the Treaty on the Functioning of the European Union ("**TFEU**") provides that: "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein." The dispute in this case concerns the EU internal market for electricity. The Respondent asserts that Spain, Germany, and the other EU members, by ratifying the TFEU, have agreed to forego ICSID arbitration with respect to disputes relating to that Internal Market. [94]

108.    The Respondent also points to the special status of SWM. As an entity wholly owned by organs of the Federal Republic of Germany, it is part of an EU Member State. Article 344 of TFEU prevents an EU Member State from invoking dispute resolution processes against another EU member other than those specified in EU law. According to the Respondent, this Tribunal should respect that agreement by the two Contracting Parties, Spain and Germany.[95]

---

[93]    Counter-Memorial, paras. 52-62.

[94]    *Id.*, paras. 63-71.

[95]    *Id.*, paras. 91-106.

109.    Finally, the Respondent argues that to allow arbitration under the ECT between EU
Member States and investors from other EU Member States would distort the original
purpose of the ECT. At the time of the conclusion of the ECT, the EU states had developed
a comprehensive and effective system of investment protection. The intent of the ECT
negotiators was not to undermine or replace that system with something less effective.
Their fundamental purpose was to extend through treaty making to other emerging
economies a higher level of protection than that currently existing in those economies.

110.    In support of its arguments advocating the application of an intra-European bar to ECT
claims between a EU member and investors of another EU state, the Respondent, following
the Hearing, entered two relevant documents into the record. The first is the EC Decision,[96]
in which the Commission, while affirming the legality of Spain's legal regime for the
development of renewable energy, states that: "The Commission considers that any
provision that provides for investor-State arbitration between two Member States is
contrary to Union law;"[97] and that "[i]n any event, there is also on substance no violation
of the fair and equitable treatment provisions."[98]

111.    The second document is the *Achmea* Judgment rendered on 6 March 2018. Shortly
thereafter on 8 March 2018, the Respondent requested leave from the Tribunal to enter into
the record the *Achmea* Judgment. With no opposition from the Claimants, the Tribunal
granted the request.[99]

112.    In the *Achmea* case, Dutch investors brought an investor-state proceeding against the
Slovak Republic under an Agreement on Encouragement and Reciprocal Protection of
Investments between the Kingdom of the Netherlands and the Czech and Slovak Federative
Republic (the "**Dutch-Slovak BIT**"), to which the Slovak Republic acceded after the
dissolution of the Federative Republic. By an award of 7 December 2012, the arbitral
tribunal ordered the Slovak Republic to pay Achmea damages in the principal amount of
EUR 22.1 million. The Slovak Republic brought an action to set aside that arbitral award

---

[96]    RL-94, EC Decision.

[97]    *Id*., para. 160.

[98]    *Id*., para. 164.

[99]    RL-97, *Achmea* Judgment.

before the Oberlandesgericht Frankfurt am Main (Higher Regional Court, Frankfurt am Main, Germany). When that court dismissed the action, the Slovak Republic appealed on a point of law against the dismissal to the Bundesgerichtshof (Federal Court of Justice, Germany), which in turn referred the matter to the European Court of Justice, asking for a preliminary ruling on whether the award was compatible with European Community Law.

113. The CJEU ruled as follows:

> "Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."[100]

114. According to the Respondent, the arbitration clause in the ECT fulfills the requirements set out in *Achmea* to be considered by this Tribunal as incompatible with EU law, and as a consequence the Tribunal should decline jurisdiction to hear this case. The Respondent maintains that this dispute must be characterized as an intra-EU dispute, requiring the interpretation and application of EU law.[101] The Respondent contends that this result is imposed by Article 26(6) of the ECT, according to which "a tribunal established under paragraph (4) shall decide the issues in dispute with accordance with this Treaty and applicable rules and principles of international law" and that EU law is international law, to be applied in preference over any other international or national law.[102] According to the Respondent, whilst *Achmea* concerned a dispute decided on the basis of a bilateral investment treaty, it is nevertheless relevant to a dispute under the ECT because the reasoning of the Court of Justice in *Achmea* relies upon the nature and characteristics of the arbitral jurisdiction confronted with the principle of autonomy of EU law.[103] The Respondent notes in particular that in declaring that Article 8 of the Dutch-Slovak BIT was

---

[100]  *Id.*, para. 31.

[101]  Respondent's Comments on the *Achmea* Judgment, dated 3 April 2018 ("**Resp. Comments on *Achmea***"), paras. 28-31.

[102]  *Id.*, paras. 8-9; Respondent's Reply on the *Achmea* Judgment, dated 23 April 2018, para. 7.

[103]  Resp. Comments on *Achmea*, para. 25.

incompatible with Articles 267 and 344 of the TFEU, the Court of Justice considered i) that the arbitral tribunal was not part of the judicial system, ii) that it was not able to be classified as a court or tribunal "of a Member State" within the terms of Article 267 TFEU, and was thus unable to make reference to the Court of Justice for a preliminary ruling and iii) that the decision rendered by the arbitral tribunal is final with limited scope for judicial review.[104]According to the Respondent, these requirements are fulfilled in the present case.[105]

115.   Lastly, the Respondent argues that in this case three additional reasons further support its position:

> "The EU Law is especially relevant for this dispute, since the claim refers to the payment of a compensation that derives from a supporting scheme, which the EC has qualified as State Aid;
>
> Article 6(1) ECT states a binding rule for the Contracting Parties which affects to EU Rules on competition…;
>
> In accordance to Article 10(8) ECT, 'any dispute concerning subsidies…. shall be reserved for the supplementary treaty in paragraph 4', which has not been approved as of today."[106]

### b.   The Claimants' Position

116.   The Claimants reject the intra-EU jurisdictional objection. They assert that they fully satisfy the jurisdictional conditions required by Article 26 of the ECT as investors covered by the ECT and that they are entitled to bring an arbitral proceeding against an ECT Contracting Party on grounds that such Party has violated the Treaty protections guaranteed to them. They argue that there is nothing in the text of the ECT to indicate that intra-EU disputes are excluded from the ECT's scope of protection. They also argue that no evidence exists to support the contention that ECT Contracting Parties had a subjective intention to depart in any way from the clear provisions of the ECT and to treat differently intra-EU disputes from other ECT disputes.

---

[104]   *Id*., para. 22.

[105]   *Id*., paras. 24-32.

[106]   *Id*., para. 28.

117.    The Claimants buttress their position by arguing that no arbitral tribunal has accepted the existence of the intra-EU objection as a bar to jurisdiction in ECT investor-state disputes. They state: "Every single investment-treaty arbitral tribunal that has considered the issue has concluded that the 'intra-EU' nature of the dispute does not preclude its jurisdiction."[107] They also point to the fact that as of March 2017 a total of 10 cases had considered and rejected arguments similar to those raised by the Respondent in support of its intra-EU objection and that three of those cases had been brought against Spain.

118.    The Claimants contend that they have fully complied with the jurisdictional requirements of Article 26 of the ECT. First, Spain is a "Contracting Party" of the ECT in that it is, according to Article 1 (2) "…a state or Regional Economic Integration Organization which has consented to be bound by [the] Treaty and for which the Treaty is in force."

119.    Second, all the Claimants are "Investors of another Contracting Party," as those terms are used by Article 26 of the ECT. Under Article 1(7)(a)(ii), an Investor of a Contracting Party means "a company or other organization organized in accordance with the law applicable in that Contracting Party." Except for Marquesado, all the Claimants are incorporated under the laws of Germany, which is an ECT Contracting Party. Marquesado is a company organized under the law of Spain; however, Article 26(7) of the ECT provides:

> "An Investor other than a natural person which has the nationality of a Contracting Party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a 'national of another Contracting State' and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a 'national of another State.'"

120.    Marquesado is totally controlled by German nationals; consequently, for purposes of the ICSID Convention, it is to be treated as a "Investor of another Contracting Party."

121.    Finally, the Claimants reject Spain's contention that SWM, whose ultimate owner is a German state entity, may not bring an arbitral claim against another Contracting State. They argue that the text of the ECT contains no exception to the effect that a private

---

[107]    Reply, para. 118.

company whose owner is a state entity may not benefit from ECT protections and that SWM clearly comes within the ECT definition of "Investor" since it is "a company or other organization organized in accordance with the law applicable in that Contracting Party…"-- in this case, the law of Germany.

122.    As to the Respondent's arguments in respect of the *Achmea* case, the Claimants contest the relevance of such decision for the purpose of this case on several grounds. First, the Respondent's allegation on the prevalence of EU law over the ECT is moot, as no conflict exists between these two legal regimes.  The Claimants rely upon the decisions rendered by the *Novenergia II v. Spain* and *Charanne v. Spain* tribunals in this respect.[108] Second, there is no need in the present case to apply EU law as it is common ground between the Parties that RD 661/2007 was in compliance with EU State Aid Law.[109] Third, even on the Respondent's case, the *Achmea* Judgment does not apply in the present case, as this would ignore the distinction made by the Court of Justice itself between an agreement which was not concluded by the EU, and an agreement to which the EU is a Contracting Party.[110] In particular, the Claimants refer to the finding in *Achmea* that: "an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law."[111] The Claimants also argue that since this Tribunal is not required to apply EU law, the prerequisites allegedly established by the Court of Justice in *Achmea*, in respect of the application or interpretation of EU law or the possibility of requesting a preliminary ruling from the Court of Justice, are irrelevant for the purposes of this case. Lastly, and along similar lines, the Claimants note that since EU law is not applicable to the present dispute, the three additional reasons adduced by the Respondent for the application of the *Achmea* Judgment are equally inapposite.[112]

---

[108]    Claimants' Responsive Submission on the *Achmea* Judgment, dated 23 April 2018 ("**Cl. Reply on *Achmea***"), paras. 3-8.

[109]    *Id*., para. 13.

[110]    *Id*., para. 17.

[111]    *Id*., citing RL-97, *Achmea* Judgment, para. 57.

[112]    Cl. Reply on *Achmea*, para. 20.

**(2) The Tribunal's Analysis**

123.    The Respondent argues that Article 26(1) of the ECT implies the exclusion of any case where an investor of an EU State has a dispute with an EU State. According to the Respondent, the Claimants are not from an "Area" of "another Contracting Party" since both Germany and the Respondent are Member States of the EU. The Respondent further argues that Article 26(6) of the ECT prevents arbitration between an EU investor and an EU Member State, as such would be against EU law – in particular against Article 344 of the TFEU, which prevails over the ECT.[113]

124.    The core of Respondent's intra-EU objection to the Tribunal's jurisdiction concerns the interpretation of Article 26 of the ECT. The relevant section of this provision reads as follows:

> "Article 26: Settlement of Disputes Between an Investor and a Contracting Party
>
> (1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably."

125.    To resolve this jurisdictional objection, the Tribunal must make its own analysis and interpretation of that Article and in doing so must be guided by the relevant provisions of the Vienna Convention of the Law of Treaties ("**VCLT**"), the most important of which for purposes of this case are VCLT Articles 31 and 32. They provide as follows:

> "Article 31
>
> General Rule of Interpretation
>
> 1.    A Treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.
>
> 2.    The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

---

[113]    Counter-Memorial, paras. 81-91.

(a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

(b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3.  There shall be taken into account, together with the context:

(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) any relevant rules of international law applicable in the relations between the parties.

4.  A special meaning shall be given to a term if it is established that the parties so intended."


"Article 32

Supplementary Means of Interpretation

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, on order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a)  leaves the meaning ambiguous or obscure; or

(b)  leads to a result which is manifestly absurd or unreasonable."

126.  A dispute for the purposes of Article 26(1) must involve a "Contracting Party" to the ECT and "an Investor of another Contracting Party." Article 1(2) of the ECT defines a Contracting Party as "…a state or Regional Economic Integration Organization which has consented to be bound by [the] Treaty and for which the Treaty is in force", while an "Investor" is defined according to Article 1(7) of the ECT, with respect to a Contracting Party as "i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law; ii) a company or other organization organized in accordance with the law applicable in that Contracting Party". The word "another" in Article 26(1) potentially has one of two ordinary meanings:

1) "an *additional* person or thing of the same type as one already mentioned" or 2) "a *different* person or thing from one already mentioned."[114] In the present case, the term "another Contracting Party" would mean a Contracting Party different from the Contracting Party mentioned at the beginning of Article 26(1) of the ECT. Thus, in a case in which Spain is a Respondent, the complaining Investor must not be an Investor of Spain but of a different Contracting Party. For an Investor to be "of" a particular Contracting Party, that Investor, if it is "a company or other organization," must, according to Article 1(7)(a)(ii) of the ECT, be "…organized in accordance with the law applicable in that Contracting Party." The ordinary meaning of the word "organize," particularly in relation to companies and enterprises, is to "establish" or "to form."[115]

127.    In the present case, it has been clearly proven that all the Claimants, except for Marquesado, have been organized, that is, established under the laws of Germany. Marquesado was organized under the laws applicable to Spain: however, as noted above, a company which is controlled by "Investors of another Contracting State" is to be considered as an Investor of that State. Thus, despite the fact that Marquesado has been organized under the laws of Spain, it can be considered, by virtue of the fact that is controlled by German investors, an investor of "another Contracting State."

128.    The operative word in Article 26(1) is "organized," not "operating under" or "functioning under" a particular State's law. While it is true that all the Claimants by virtue of conducting their activities within the EU are therefore operating to some degree under EU law, they were not created or organized under EU law, but under the laws of Germany or, in Marquesado's case, of Spain. Thus, it cannot be said that, for purpose of Article 26(1) of the ECT, they are Investors of the EU, as well as of Germany.

129.    Both Spain and Germany are Contracting Parties to the ECT and so is the EU, as a REIO. It should also be noted that contrary to what it is argued by the Respondent, the text of the

---

[114]    THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3rd Edition 1996) p. 76; *See* also WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (1981), vol. I, p. 89.

[115]    *Id.*, vol. II, p. 1590.

ECT makes no distinction among Contracting Parties. Nor does the ECT expressly carve out disputes between an investor of an EU State and another EU State from the consent to arbitral jurisdiction in Article 26(1).[116] The Respondent has, moreover, failed to rely upon any supplementary means of interpretation to show that the signatories to the ECT had this intention.

130. Moreover, the Tribunal finds no merit in the Respondent's arguments that the EU system confers particular protection upon EU national investors that is preferential to the protection conferred by the ECT,[117] and that such prevalence is reflected in the literal interpretation, context and purpose of the ECT.[118] The Respondent bases its argument in the interpretation of Articles 1(2), 1(3), 1(10), 25 and 26 of the ECT and on the *Achmea* Judgment of the Court of Justice of the European Union.

131. First, Articles 1(2), 1(3) and 1(10) of the ECT recognize the possibility of an REIO to become a Contracting Party to the ECT. Article 1(2) includes REIOs in the definition of Contracting Party, while Article 1(10) defines the meaning of an "Area" of a REIO for the purposes of the ECT. Article 1(3) provides the definition of a REIO. While it is true that the EU remains the only REIO to have become a Contracting Party to the ECT, nothing in these provisions indicate that prevalence should be given to the European system of protection over the system envisaged by the Contracting Parties, including the EU, in the ECT. While it is true that the inclusion of REIOs in Article 1(2) of the ECT confirms that the members of a REIO can transfer competence over certain matters to the REIO,[119] it cannot be concluded from this alone that the EU Member States when signing the ECT in 1994 have transferred competence for the adjudication of energy disputes under the ECT to the EU. An express stipulation to that effect would be necessary.

---

[116]   Counter-Memorial, para. 53.

[117]   *Id.*, paras. 63-71.

[118]   *Id.*, para. 72.

[119]   C-1, ECT, Article 1(3): "…an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters."

132.    Second, the Tribunal is equally unpersuaded by the Respondent's reliance on Article 25 of the ECT to support its position.[120] This provision simply eliminates the possibility of Contracting Parties that are not parties to an Economic Integration Agreement to benefit from the treatment conferred between the parties to such agreement. It does not mandate the prevalence of the EU protection system in respect of the ECT. As such, this provision is inapposite for the present discussion.

133.    Third, the Tribunal is not persuaded by the Respondent's argument that SWM should be equated to the Federal Republic of Germany in the light of Article 344 of the TFEU, and thus the dispute be dismissed as submitted by the Republic of Germany.[121] According to the Respondent, the fact that SWM is a company controlled and owned by the City Council of Munich entails that this case was filed by the Republic of Germany against the Kingdom of Spain, falling within the prohibition of Article 344 of the TFEU,[122] which reads as follows:

> "Article 344
>
> Member States undertake not to submit a dispute concerning the interpretation or the application of the Treaties to any method of settlement other than those provided for therein."

134.    While it is common ground between the Parties that SWM is a company controlled and fully owned by the Council of the City of Munich, this does not result in assimilating SWM to the Republic of Germany. All this entails is that SWM is a State-owned entity because the sole shareholder is the State. The Tribunal observes that the ECT does not provide that companies owned by States are to be treated differently from companies owned by private individuals and entities.  SWM falls squarely within the definition of "Investor …with respect to Contracting Party" since it was organized in accordance with the law of a Contracting Party, that is, in accordance with the law of Germany. As a G.m.b.H., SWM is clearly a "company" as that term is understood in Germany. Even if that were not the

---

[120]    Counter-Memorial, para. 78.

[121]    Counter-Memorial, para. 81; Rejoinder, paras. 150-152; 165-168.

[122]    Counter-Memorial, paras. 93-106; Rejoinder, paras. 149-151.

case, the fact that SWM is an organization is sufficient to bring it within the ECT's definition of an "Investor."

135.    Further, Article 344 of the TFEU only applies to disputes between Member States of the EU, and not between individual or corporate investors and a Member State (even where the corporate investor is state-owned). The scope of the obligation assumed by Member States in Article 344 of the TFEU is different from the obligation in Article 26(1) of the ECT. As explained by Article 1(2) of the TFEU, the "Treaties" referred to in Article 344 of the TFEU are the TFEU itself and the Treaty of the European Union. It is in respect of such treaties, and not others, such as the ECT, that the Member States are prevented from having recourse to a method of dispute settlement different from those provided by the TFEU.

136.    Finally, the Respondent invokes Article 26(6) of the ECT to support its jurisdictional objection. According to the Respondent, this provision prevents an EU investor from bringing arbitration proceedings against an EU Member State as this would be contrary to EU law, which is applicable international law.[123] The Respondent refers in particular to Articles 267 and 344 of the TFEU and to the *Achmea* Judgment.[124]

137.    The Tribunal notes that contrary to what the Respondent argues, the law applicable to the jurisdiction of this Tribunal is not prescribed by Article 26(6) of the ECT but by Articles 26(1)-(5), which confer jurisdiction upon the Tribunal. Article 26(6) of the ECT does not, therefore, assist the Respondent in demonstrating the superiority of EU law or its protection system over the ECT for the purposes of deciding this jurisdictional objection. Article 26(6) governs the law applicable to the merits of the dispute; this is clear from the wording of this provision: "a tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." A "dispute" is defined in Article 26(1): "an alleged breach of an obligation of [a Contracting Party] under Part III." Part III of the ECT contains the substantive standards of protections, while the dispute resolution provision can be found in Part V of the ECT ("Dispute

---

[123]    Counter-Memorial, para. 81.

[124]    *Id*., para. 82.

Settlement"). EU law, and in particular Articles 267 and 344 of the TFEU as interpreted in *Achmea*, does not, therefore, govern this Tribunal's jurisdiction by virtue of Article 26(6) of the ECT.

138.    That is not to say that EU law is irrelevant to the assessment of the Tribunal's jurisdiction. The Tribunal agrees with the Respondent that EU law, including the findings of the CJEU in the *Achmea* case, can be characterized as international law for the purposes of Article 31(3)(c) of the VCLT and thus can be taken into account in the interpretation of Article 26(1) of the ECT. However, the Tribunal's analysis of Articles 267 and 344 of the TFEU as interpreted in *Achmea* does not support the Respondent's position on Article 26(1) of the ECT.

139.    The preliminary ruling of the CJEU rendered in the *Achmea* case concerned an award issued by an arbitral tribunal established on the basis of the Dutch-Slovak BIT." Article 8 of this treaty provides:

> "Article 8
>
> 1.    All disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall if possible, be settled amicably.
>
> 2.    Each Contracting Party hereby consents to submit a dispute referred to in paragraph (1) of this Article, to an arbitral tribunal, if the dispute has not been settled amicably within a period of six months from the date either party to the dispute requested amicable settlement.
>
> 3.    The arbitral tribunal referred to in paragraph (2) of this Article will be constituted for each individual case in the following way: each party to the dispute appoints one member of the tribunal and the two members thus appointed shall select a national of a third State as Chairman of the tribunal. Each party to the dispute shall appoint its member of the tribunal within two months, and the Chairman shall be appointed within three months from the date on which the investor has notified the other Contracting Party of his decision to submit the dispute to the arbitral tribunal.
>
> 4.    If the appointments have not been made in the above mentioned periods, either party to the dispute may invite the President of the Arbitration Institute of the Chamber of Commerce of Stockholm to make the necessary

appointments. If the President is a national of either Contracting Party or if he is otherwise prevented from discharging the said function, the Vice-President shall be invited to make the necessary appointments. If the Vice-President is a national of either Contracting Party of he too is prevented from discharging the said function, the most senior member of the Arbitration Institute who is not a national of either Contracting Party shall be invited to make the necessary appointments.

5. The arbitration tribunal shall determine its own procedure applying the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).

6. The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:

- the law in force of the Contracting Party concerned;

- the provisions of this Agreement, and other relevant Agreements between the Contracting Parties;

- the provisions of special agreements relating to the investment;

- the general principles of international law.

7. The tribunal takes its decision by majority of votes; such decision shall be final and binding upon the parties to the dispute."

140.    During the arbitral proceedings, the Slovak Republic raised an objection to the jurisdiction of the tribunal and argued that as a result of its accession to the EU, recourse to an arbitral tribunal under the basis of Article 8(2) was precluded by EU law. This objection was rejected by the tribunal in its decision of 26 October 2010 and, on 7 December 2012, the tribunal rendered its award on the merits by which the Slovak Republic was ordered to pay Achmea damages in the principal amount of EUR 22.1 million. The Slovak Republic brought an action to set aside the award before the Overlandesgericht Frankfurt am Main (Higher Regional Court, Frankfurt), which was dismissed, and then the Slovak Republic appealed to the German Bundesgerichtshof (Federal Supreme Court). It is within this context that the Bundesgerichtshof decided to stay its proceedings and to refer the following questions to the Court of Justice for a preliminary ruling:

"1. Does Article 344 of the TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?

If Question 1 is to be answered in the negative:

2. Does Article 267 TFEU preclude the application of such a provision?

If Questions 1 and 2 are to be answered in the negative:

3. Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?"[125]

141.   The Court of Justice responded to Questions 1 and 2 in the following terms (it declined to deal with Question 3):

"Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."[126]

142.   As is clear from the above excerpt, the Court of Justice did not consider the position of a tribunal constituted on the basis of the ECT.  Its sole concern was the position of a tribunal constituted on the basis of a bilateral investment treaty between two Member States of the EU (here the Netherlands and the Slovak Republic). This is clear not only from the manner in which the questions referred to by the *Bundesgerichtshof* to the Court of Justice were framed, but also by the use of the term "such as" in the conclusion of the Court of Justice in the above excerpt. Had the Court of Justice intended to expand its conclusions beyond a tribunal of such particular characteristics, it would have chosen another formulation to do so. Article 26 of the ECT cannot be assimilated to Article 8 of the Dutch-Slovak BIT, and

---

[125]   RL-97, *Achmea* Judgment, para. 23.

[126]   *Id.*, para. 31.

thus understood to be a provision "such as" the one included in the Dutch-Slovak BIT, as the ECT is not a bilateral treaty concluded between two Member States of the EU, but a multilateral treaty to which not only EU Member States and the EU itself are Contracting Parties but also other States outside the EU.  It is a "mixed agreement."[127]

143.    The above is confirmed by the explicit distinction made by the Court of Justice between arbitral tribunals established on the basis of investment treaties between EU Member States, on the one hand, and courts or tribunals adjudicating disputes on the basis of a treaty to which the EU is itself a contracting party, on the other. According to the Court of Justice:

> "It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected (see, to that effect, Opinion 1/91 (EEA Agreement – I) of 14 December 1991, EU: C:1991:490, paragraphs 40 and 70; Opinion 1/09 (Agreement creating a unified patent litigation system) of 8 March 2011, EU:C:2011:123, paragraphs 74 and 76; and Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:204:2454 paragraphs 182 and 183).
>
> In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States."[128]

144.    Furthermore, in Article 16 of the ECT the Contracting Parties have agreed that no prior or subsequent treaties entered into with each other shall be construed as derogating from rights provided for in Part III or Part V of the ECT:

---

[127]    *See* along the same lines, CL-182, *Vattenfall AB et al v. the Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, dated 31 August 2018, para. 162.

[128]    RL-97, *Achmea* Judgment, paras. 57-58.

"Article 16

Relation to Other Agreements

Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,

(1) Nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) Nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment."

145.  The Tribunal has already concluded that Article 344 of the TFEU does not concern the subject matter of Article 26 in Part V of the ECT.[129] However, even if the Respondent's case on this issue were to be accepted, and such provisions considered as conflicting with each other, Article 16 of the ECT would mandate the resolution of the conflict in favour of the ECT. This is so because Article 26 of the ECT provides an investor of a Contracting Party with the right to submit its dispute to adjudication before an arbitral tribunal, whereas Article 344 of the TFEU does not. Article 26 is thus "more favourable to the Investor" within the terms of Article 16 of the ECT.

146.  For these reasons, the Tribunal finds that it has jurisdiction over the Parties in this case and it therefore rejects the Respondent's intra-EU objection to its jurisdiction.

## B.  THE TAXATION OBJECTION

### (1) The Parties' Positions

#### a.  The Respondent's Position

147.  The Claimants contend that Law 15/2012 of 27 December 2012 on Tax Measures for Energy Sustainability was among the measures enacted by Spain that violated the

---

[129]  *See* above, para. 135.

Claimants' rights under the ECT, more precisely under Article 10(1) of the ECT.[130] The Respondent submits that it has not consented to the arbitration of such claims, and that the Tribunal therefore has no jurisdiction over them.[131] It argues that under the ECT, a Contracting Party's consent to arbitration is limited to disputes concerning an alleged breach of its obligations under Part III of the ECT and that Article 21(1) of the ECT, with certain narrow exceptions, precludes the imposition of obligations on the Contracting Parties' Taxation Measures.[132] According to the Respondent, such exceptions do not include Article 10(1) of the ECT.

148. Article 21(1) of the ECT states:

> "Article 21
>
> Taxation
>
> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency."

149. The Respondent argues that the exceptions to the principle of exclusion of taxation measures from the scope of obligations under the ECT are sections (2) to (5) of Article 21 of the ECT, which are not invoked by the Claimants in reference to the measures imposed by Law 15/2012. Sections (2) to (5) of Article 21 of the ECT read as follows:

> "(2) Article 7(3) shall apply to Taxation Measures other than those on income or on capital, except that such provisions shall not apply (…).
>
> (3) Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to (…)
>
> (4) Article 29(2) to (6) shall apply to Taxation Measures other than those on income or on capital.
>
> (5) (a) Article 13 shall apply to taxes."

---

[130]  Memorial, para. 471.

[131]  Counter-Memorial, paras. 124; 142-148; Rejoinder, paras. 170-247.

[132]  Counter-Memorial, paras. 126-127; 149.

150. The Respondent argues that this provision precludes arbitration by this Tribunal of the Claimants' claim that Law 15/2012 violates the Claimants' rights under the ECT because the levy imposed by Law 15/2012 is a Taxation Measure, within the terms of Article 21(7) of the ECT. This article provides:

> "Article 21(7)
>
> Taxation
>
> For the purposes of this Article:
>
> (a) The term "Taxation Measure" includes:
>
> (i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and
>
> (ii) any provision related to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound."

151. According to the Respondent, Article 21(7)(a)(i) provides that the law governing the determination of whether a measure falls within the above definition is the domestic law of the Contracting Party, although it accepts that there are reasons to accept a reference to international law for such purposes.[133] The Respondent argues that regardless of which of these interpretations is adopted by this Tribunal, the levy imposed by Law 15/2012 qualifies as a Taxation Measure.

152. First, the Respondent argues that the provisions on the 7% levy imposed by Law 15/2012 are provisions relating to a tax under the domestic law of Spain.[134] According to the Respondent, the levy imposed by Law 15/2012 is a direct tax on the performance of the activities of production and incorporation into the Spanish system of electrical energy, as defined by Article 1 of the Law itself, falling within the definition of taxes and its different types in Spanish Law 58/2003 on General Taxation.[135] The Respondent contends that Law 15/2012 imposes an obligation of payment upon a broad category of persons, namely

---

[133] Counter-Memorial, paras. 164-171.

[134] Counter-Memorial, paras. 180-193; Rejoinder, paras. 181-193.

[135] Counter-Memorial, paras. 181-182.

anyone who produces and incorporates electrical energy into the Spanish electricity system, whether those electrical production facilities use conventional or renewable energy sources,[136] and explains that the tax base of this levy consists of the total amount that the taxpayer is to receive for the production of electrical energy and its incorporation into the electricity system, measured by a power plant's busbars, at each facility, in the taxable period.[137] Lastly, the Respondent invokes decisions rendered by the Spanish Constitutional Court, the highest authority for the interpretation of the Spanish Constitution, where Law 15/2012 was held to be constitutional.[138]

153.   Second, the Respondent argues that the levy imposed by Law 15/2012 is a tax under international law.[139] The Respondent invokes several decisions rendered by different arbitral tribunals where a tax measure has been defined by international law,[140] and summarizes the characteristics of a tax measure elaborated by such tribunals as follows: i) established by law, ii) imposing an obligation on a class of people, and iii) the content of the imposed obligation implies paying money to the State for public purposes.[141] According to the Respondent the levy imposed by Law 15/2012 fulfils such characteristics as i) it was established by Spanish law, ii) imposes the obligation to pay to anyone who performs the activities of production and incorporation of electrical energy into the Spanish system, and iii) tax payers are required to make payments in relation to this levy to the State in accordance with Article 10 of the Law 15/2012, payment to be considered as an income of the Spanish State.[142] The Respondent moreover refers to the closing of the EU pilot procedure 5526/13/TAXU, where according to the Respondent its nature as a tax has been confirmed. [143]

---

[136]   *Id*., para. 206.

[137]   *Id*., para. 183.

[138]   Counter-Memorial, paras. 190-193; Rejoinder, para. 182.

[139]   Counter-Memorial, paras. 194-233; Rejoinder, paras. 188-191.

[140]   Counter-Memorial, paras. 200-202.

[141]   *Id*., para. 203; Rejoinder, para. 190.

[142]   Counter-Memorial, paras. 205-218; Rejoinder, para.191.

[143]   Counter-Memorial, paras. 219 *et seq*.

154.    The Respondent therefore concludes that both according to Spanish domestic law and international law, the levy introduced by Law 15/2012 meets all of the elements of a legitimate 'Taxation Measure' under the ECT, and that it is therefore outside of the scope of this Tribunal's subject matter jurisdiction.

### b. *The Claimants' Position*

155.    The Claimants argue that the 7% levy imposed by Law 15/2012 is not a measure covered by the tax carve-out in the ECT and that therefore the Tribunal should reject Spain's objection to its jurisdiction on this ground.[144] Rather, in the Claimants' view, the levy is a "…backdoor tariff cut labelled as 'a tax' to scale back even further the incentives provided under RD 661/2007, in violation of Spain's obligations under the ECT."[145]

156.    The Claimants argue that the exception to jurisdiction specified in Article 21 of the ECT applies only to *bone fide* tax measures, urging that good faith is a basic principle of treaty interpretation, as shown by Article 31(1) of the VCLT, and a basic principle governing the performance of treaties as reflected by Article 26 of the VCLT and extensive international jurisprudence and scholarly commentary.[146] According to the Claimants, Spain cannot avoid its obligation of good faith by simply labelling as a "tax" an illegitimate tariff reduction that would otherwise contravene Spain's ECT obligations.[147] In the Claimants' view, the centrality of the principle of good faith requires: (1) the Tribunal to interpret Article 21 of the ECT in good faith; (2) the observance by Spain of its obligations under the ECT in good faith (which requires Spain not to take steps to undermine them or to frustrate the purpose of the ECT); and (3) Spain must exercise its rights under the ECT in good faith.[148] According to the Claimants, it follows that Tax Measures must be *bona fide*.[149] In support of its position, the Claimants cite cases where States have used their taxation power to punish or abuse foreign investors and were found to have thereby

---

[144]    Reply, para. 176.

[145]    *Id*., para. 177.

[146]    *Id*., paras. 179-180.

[147]    *Id*., para. 181.

[148]    *Id*., para. 185.

[149]    *Id*.

violated international law. One such example was the *Yukos* case in which the tribunal held that the taxes imposed were part of a "punitive campaign" against the investor, not a *bone fide* tax levied in good faith.[150]

157.    The Claimants argue that a decision on whether governmental actions are *bone fide* is to be determined not by the labels that a government gives to those actions but by that government's conduct.[151] According to the Claimants, an evaluation of a government's conduct must begin with an analysis of the State's pattern of conduct in its totality and then with a determination of whether the conduct is *bona fide* on the balance of probabilities.[152] In particular, the Claimants argue that the Tribunal must determine whether the implementation of the 7% levy is "more consistent with" the conclusion that it forms part of a scheme to deprive the Claimants of their rights under RD 661/2007 in violation of what the Claimants define as the stabilization provision provided in that Decree.[153]

158.    According to the Claimants, it can be concluded from Spain's conduct that the 7% levy is not a real tax measure. The Claimants refer in this respect to the fact that the money raised by the levy goes to the State Budget, and then returns to the electricity system.[154] The Claimants also refer to the context for the adoption of Law 15/2012,[155] which was the implementation of an important set of reforms for the electricity sector[156] aimed at achieving the financial sustainability of the electricity system, which was running at a significant deficit.[157] The Claimants contend that the effect of the imposition of the 7% levy was equivalent to a tariff cut or a reduction in the amount of the incentives the renewable energy installations were entitled to,[158] and that statements by the Spanish

---

[150]    *Id*. paras. 197, 199.
[151]    *Id*., paras. 196-201.
[152]    *Id*., para. 196.
[153]    *Id*., para. 198.
[154]    *Id*., para. 202.
[155]    *Id*., paras. 204-213.
[156]    *Id*., para. 205.
[157]    *Id*., para. 206.
[158]    *Id*., para. 208.

Government have confirmed that such was the intent of the measure.[159] The Claimants also note that by the time the 7% levy was introduced, the Respondent was aware that such a measure could provoke further ECT claims, and argue that the Respondent has consciously framed the measure as a tax to avail itself of the ECT carve-out.[160]

159.    The Claimants further argue that the 7% levy does not fall equally on all electricity producers, as submitted by the Respondent, but that the measure is particularly harmful to those in the renewable energy sector.[161] According to the Claimants, the levy is therefore discriminatory in nature. The Claimants contend that whereas conventional operators deliver their electricity directly to the consumer and can therefore pass the additional costs incurred by the 7% levy on to the consumer, facilities like the Andasol 3 Plant in the renewable sector cannot do the same since they are obligated to sell their output to the government-run electricity system.[162] The Claimants further contend that the discriminatory nature of the measure is revealed when it is considered in relation to its purported aim.[163]

160.    According to the Claimants, because the 7% levy imposed by Law 15/2012 was not a *bone fide* tax measure, the Claimants assert that it does not meet the requirement for the jurisdictional exception set forth in Article 21 of the ECT; therefore, the Claimants argue that issues relating to the 7% levy and its compliance with Article 10 of the ECT fall squarely within the jurisdiction of the Tribunal. They therefore urge the Tribunal to reject the Respondent's objection to jurisdiction.

**(2) The Tribunal's Analysis**

161.    Article 21 of the ECT creates an exception to jurisdiction with respect to Taxation Measures. Article 21(7) seeks to define Taxation Measures by stating that "'Taxation Measure' includes: … (1) any provision relating to taxes of the domestic law of the Contracting Party…" The interpretation of the term "Taxation Measure" raises certain

---

[159]  *Id.*, para. 209.

[160]  *Id.*, paras. 212-213.

[161]  *Id.*, para. 214.

[162]  *Id.*, para. 215.

[163]  *Id.*, para. 219.

complexities. First, it is important to note at the outset that Taxation Measures may be broader, or at least different, in scope than the word "taxes." For one thing, the word "includes" could be interpreted to imply that the term as used in the ECT encompasses other elements in addition to those enumerated after that word. For another, the use of the term "Taxation Measures," rather than simply "taxes," could also be interpreted to mean that the term includes measures that are not strictly taxes in the usual sense.

162.    Setting aside this problem for the moment, it is important first to determine whether the levy imposed by Law 15/2012 is a "tax" as that word is understood in Article 21(7) of the ECT. If it is a "tax," then that levy clearly falls within the meaning of the term "Taxation Measure." To undertake that task, the Tribunal, following the provisions of Article 31(1) of the VCLT, must first look to the "ordinary meaning…" of the word "tax." Dictionaries are one source of such ordinary meanings.

163.    Among general dictionaries, the Oxford English Dictionary defines a tax as "[a] compulsory contribution to the support of government, levied on persons, property, income, commodities, transactions, etc., now at fixed rates, mostly proportional to the amount on which the contribution is levied."[164] The American Heritage Dictionary of the English Language defines tax as: "1. A contribution for the support of a government required of persons, groups, or businesses within the domain of that government."[165] The authoritative French dictionary Larousse defines "impôt" as a "[p]rélèvement effectué d'autorité et à titre définitif sur les ressources ou sur les biens des individus ou des collectivités, et payé en argent pour subvenir aux dépenses d'intérêt général de l'État ou des collectivités locales."[166]

164.    With respect to specialized dictionaries, legal dictionaries offer similar definitions to those found in more general dictionaries. Thus, *Black's Law Dictionary* (9th) defines a tax as: "A

---

[164] Tax, n.1, OXFORD ENGLISH DICTIONARY, http://www.oed.com/view/Entry/198260?rskey=1uJ5uk&result=1#eid (last visited 11 Mar 2018).

[165] Tax, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 5TH (2018), https://ahdictionary.com/word/search.html?q=tax (last visited 11 Mar 2018).

[166] Definitions: impôt, DICTIONNAIRE DE FRANÇAIS LAROUSSE, http://www.larousse.fr/dictionnaires/francais/impôt/41974?q=impôt#41879 (last visited 11 Mar 2018).

charge, usu. monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue. - Most broadly, the term embraces all governmental impositions on the person, property, privileges, occupations, and enjoyment of the people, and includes duties, imposts, and excises. Although a tax is often thought of as being pecuniary in nature, it is not necessarily payable in money."[167] In *Ballentine's Law Dictionary* (3rd), one finds this definition: "A forced burden, charge, exaction, imposition, or contribution assessed in accordance with some reasonable rule of apportionment by authority of a sovereign state upon the persons or property within its jurisdiction to provide public revenue for the support of the government, the administration of the law, or the payment of public expenses. Any payment exacted by the state or its municipal subdivisions as a contribution toward the cost of maintaining governmental functions, where the special benefit derived from their performance is merged in the general benefit."[168] *A Dictionary of Law* (8th), finally, defines tax as "[a] compulsory contribution to the state's funds. It is levied either directly on the taxpayer by means of income tax, capital gains tax, inheritance tax, and corporation tax; or indirectly through tax on purchases of goods and services (see value-added tax) and through various kinds of duty, e.g. road tax, stamp duties, and duties on betting and gaming."[169]

165.    Finally, some definitions from the economic field may also be of interest. In the Dictionary of Economics (3rd), the definition given for a tax is "[a] payment compulsorily collected from individuals or firms by a government (central, state, or local) or by the functional equivalent of a government."[170]

166.    At least three basic elements of a tax emerge from these definitions: 1) a compulsory payment obligation, 2) imposed by the state on a defined class of persons, and 3) to generate

---

[167]  BLACK'S LAW DICTIONARY, STANDARD NINTH EDITION, 1594 (Bryan A. Garner & Henry Campbell Black eds., 9th ed. 2009).

[168]  BALLENTINE'S LAW DICTIONARY, WITH PRONUNCIATIONS, 1255–1256 (James A. Ballentine & William S. Anderson eds., 3rd ed. 1969).

[169]  Tax, A DICTIONARY OF LAW (8TH ED.) (2015), http://www.oxfordreference.com/search?q=tax&searchBtn=Search&isQuickSearch=true (last visited 11 Mar 2018).

[170]  John Black, Nigar Hashimzade & Gareth Myles, DICTIONARY OF ECONOMICS (3RD ED) (2009), http://www.oxfordreference.com/view/10.1093/acref/9780199237043.001.0001/acref-9780199237043 (last visited 11 Mar 2018).

revenues for the State to be used for public purposes. Article 21(7) of the ECT makes it clear, however, that for a tax to be a Taxation Measure, it must be also be imposed under the law of the Contracting Party. Thus, one may conclude that for a tax to be a Taxation Measure under the ECT four elements must be present 1) a compulsory payment obligation, 2) imposed by government according to the Contracting Party's law, 3) on a defined class of persons and 4) that generates governmental revenues for a public purpose. The levy imposed by Law 15/2012 certainly fits this definition.

167.    The Claimants, however, assert that for a tax to be a Taxation Measure it must have one additional element: it must be *bona fide*. That requirement appears nowhere in the ECT or in the "ordinary meanings" that the Tribunal has gleaned from various dictionaries. It must also be said that the Claimants have not given the Tribunal a very precise definition of the term "*bona fide*."

168.    The Claimants in their pleadings argue that the obligation of good faith (*bona fide*) derives from Article 31(1) of the VCLT which provides that "…a treaty shall be interpreted in good faith…"[171] That provision, of course, says nothing about a government's obligation of good faith in imposing taxes.

169.    The context of Article 21 of the ECT is a Contracting Party's power to tax. In this connection, one must bear in mind that the power to tax is a fundamental sovereign right that belongs to all governments; a sovereign right they have wide discretion in exercising. Moreover, the power to tax is fundamental to the power to govern since it provides governments with the necessary means to carry out their governmental functions. As a result, all governments jealously protect the power to tax and strongly resist any external limitations on it. The negotiators of the ECT sought to protect their power to tax from such external constraints by specifically exempting Taxation Measures from their obligations owed to protected investors by negotiating and agreeing to a separate and specific provision to that effect. The last sentence of Article 21(1) underscores the importance that the Contracting Parties attached to it. It states: "In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the

---

[171]    Reply, para. 179.

inconsistency." It is a recognition that governments have superior obligations to provide for the public good and that meeting those obligations will depend on a wide variety of complex circumstances that no one, including treaty negotiators, can predict. As a result, governments must be left free to use their discretion as they see fit to do so.

170.    The Claimants are no doubt correct that there must be some limitations on a Contracting State's power to tax in international law. These limitations in customary international law are that a tax cannot be confiscatory or discriminatory. It is precisely these limitations that are endorsed in Article 21 of the ECT, in relation to Article 10(2) and (7) and to Article 13 of the ECT. This Tribunal has no mandate to graft further limitations on the Contracting States' taxation powers that are not reflected in the text of the ECT itself.

171.    The Tribunal concludes that the 7% levy imposed by Law 15/2012 falls within the jurisdictional carve-out in Article 21 of the ECT as it meets the definition of a "tax."

172.    For the sake of completeness, the Tribunal's interpretation of Article 21 of the ECT is confirmed by the preparatory work of the ECT for the purposes of Article 32 of the VCLT. Thus, in his report on the ECT negotiations, Craig S. Bamberger, Chair of the Legal Advisory Committee, a panel of some 20 lawyers from different countries participating in the Conference that negotiated the ECT, wrote the following in relation to Article 21:

> "This article was negotiated essentially among Finance Ministries whose objectives included defensive ones such as avoiding both MFN treatment under the ECT of their bilateral tax treaty concessions and dispute resolution under the ECT with regard to their tax settlement agreements with taxpayers. The article did not experience meaningful Conference review in its final form, and due to its overriding paragraph (1) exclusion, it may have unanticipated limiting effects on rights and obligations under other provisions of the Treaty."[172]

173.    Thus it seems that in the ECT negotiations, the Contracting Parties left the negotiation of that Article's provision to officials in their ministries of finance, a group of persons who by position and inclination would resist as far as possible any limitations on their countries' power to tax. In reviewing this context, one sees that the Contracting Parties to the ECT

---

[172]   CL-62, Craig S. Bamberger, "An Overview of the Energy Charter Treaty" in T. W. Walde, ed., The Energy Charter *Treaty: An East-West Gateway for Investment and Trade* 24 (1996).

may have wanted to create "…a legal framework in order to promote long-term cooperation in the energy field…", as Article 2 stipulates, but they did not want to do so in any way that would limit their power to tax.

174.    It is true that on occasion governments may abuse their power to tax in order to injure an investor for political reasons or to seize its property to satisfy the corrupt ambitions of a country's rulers. That indeed may have been the situation in the *Yukos* cases that the Claimants cited; however, there is no evidence in the record of this case that similar circumstances existed in Spain at the time it enacted Law 15/2012. Indeed the Claimants have failed to demonstrate a pattern of conduct on the part of the Respondent that could justify such a conclusion, and no such inference can be made from the mere fact that the 7% levy was adopted as a part of a broader package of measures intended to restore the financial sustainability of the Spanish electricity system. Facing a difficult financial situation, and in application of the governing principles in the 1997 Electricity Law, the Spanish Government legitimately exercised its right to impose a tax on all producers of electricity so as to obtain state revenues to address a public purpose: redressing a serious budgetary imbalance that it believed would have dire consequences for the country. That decision to tax may have been wise or unwise, but it was a legitimate and *bona fide* exercise of governmental power. It was not specially aimed at the Claimants in particular or indeed foreign investors in general. It applied to all generators of electricity. Moreover, it did not frustrate or nullify the fundamental purposes of the ECT. The 7% levy imposed by Law 15/2012 was therefore a legitimate Taxation Measure as defined by Article 21 of the ECT.

175.    The Tribunal therefore decides to accept the Respondent's objection to jurisdiction, rejects the Claimants' objections on this score, and decides that it has no jurisdiction to determine whether the tax imposed by Law 15/2012 violates Spain's obligations to the Claimants' investment under the ECT. It is worth noting that the tribunals in the recent decisions of

*Eiser v. Spain*[173] and *Isolux v. Spain*[174] both found that the tax in question fell within the exception of Article 21of the ECT and was therefore a matter outside their jurisdiction.

176. Since the Tribunal has no jurisdiction on this matter, the Claimants' alleged injuries resulting from the tax imposed by Law 15/2012 may not in any way be included in any damages that may be awarded to the Claimants for other ECT violations, if any, in this case.

## VI.    LIABILITY

### A.    APPLICABLE LAW

177. Article 26(6) of the ECT requires that this Tribunal "decide the issues in dispute in accordance with [the ECT] and applicable rules and principles of international law."

178. In this arbitration the Tribunal must determine whether the Respondent's actions violated its commitments to the Claimants under the ECT. A statement of those commitments may be found in Article 10 of the ECT, which is entitled "Promotion, Protection, and Treatment of Investments."

179. Paragraph 1 of Article 10 states the fundamental treatment that ECT Contracting Parties owe to investors and investments covered by the ECT:

> "Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international

---

[173]  CL-178, *Eiser Infrastructure Limited and Energia Solar S.a.r.L., v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017.

[174]  RL-77, *Isolux v. Spain* award.

> law, including treaty obligations. Each Contracting Party shall observe any
> obligations it has entered into with an Investor or an Investment of an
> Investor of any other Contracting Party."

180.    These commitments on the treatment of investors and investments are similar in substance to those found in many other investment treaties. What is different about the legal commitments on investor treatment in the ECT is not substantive but structural. Whereas most investment treaties state individual commitments in separate treaty articles, the drafters of the ECT have chosen to consolidate them into a single paragraph within a single article, Article 10(1) of the ECT.

181.    National law, and in particular Spanish law as the law of the host State of the Claimants' investment, is not extraneous to the determination that the Tribunal must make in respect of the issues in dispute. For example, the central question in this case of whether the Claimants had a legitimate expectation that the legal and regulatory framework would be immutable for the duration of their investment cannot be resolved without an assessment of the national law that created and implemented that legal and regulatory framework. Article 10 of the ECT and international law supply the test for international responsibility, but some of the data points for the application of the test are derived from national law.

### B.  THE CLAIMANTS' CLAIMS

182.    The Claimants allege that the Respondent's measures violate four specific commitments embodied in Article 10(1) of the ECT. They are as follows:

> (1.)    Spain through its actions and measures has failed to provide the Claimants stable, equitable, favourable and transparent conditions for investors;

> (2.)    Spain through its actions and measures has failed to accord, at all times, to the Claimants' investments, fair and equitable treatment ("**FET**");

> (3.)    Spain through its actions and measures has failed to refrain from impairing the Claimants' investments by unreasonable measures; and

(4.) Spain has failed to observe obligations it had entered into with the Claimants or their investments.[175]

183.    The Tribunal will now proceed to examine each of the four claims.

### (1) First Claim: Failure to Provide Stable, Equitable, Favourable and Transparent Conditions for Investors

#### a.   *The Parties' Positions*

##### (i)    The Claimants' Position

184.    The Claimants argue that the obligation to provide investors "long-term stability and transparency…is at the heart of the ECT obligation contained in the first sentence of Article 10(1)"[176] and that Spain, through its actions and measures, has totally failed to provide it to the Claimants. The Claimants contend that an historical examination of the evolution of the Energy Charter underscores the importance that the ECT negotiators attached to the need to create a stable and transparent legal regime for investment. In particular, the Claimants note that the negotiators were heavily influenced by the 1991 European Energy Charter Treaty, one of whose fundamental objectives was the establishment of "a stable, transparent legal framework for foreign investments."[177]

185.    The Claimants assert that the ECT, unlike the usual BIT, has been specifically designed to encourage investment in the energy sector and that the ECT negotiators recognized that energy investments in particular require a stable and transparent legal regime because of three special characteristics.[178] First, energy development projects require extremely large amounts of capital. Second, investors must usually wait for extended periods of time to gain a return on their investments in energy projects. And third, the operational time horizons for most energy projects are extremely long. According to the Claimants, the ECT negotiators took account of these special characteristics in designing a special treaty framework for energy investment that seeks to limit the regulatory discretion of host

---

[175]    *See* Memorial, para. 412.

[176]    *Id.*, para. 441.

[177]    *Id.*, para. 415.

[178]    *Id.*

governments to a greater extent than does the usual BIT. According to the Claimants, by entering into the ECT, Spain accepted limitations on its regulatory power, in particular of its ability to fundamentally alter the regulatory framework applicable to the Claimants' investments or to subject those investments to significant periods of legal uncertainty.[179] The Claimants contend that Spain, through its statements and actions of the CNE, recognized these factors and the importance of a stable and transparent legal framework when it created a regulatory framework for its renewable energy sector and that it was the existence of such factors that led the Claimants to invest in Marquesado and build the Andasol 3 Plant.[180]

186.    Having been encouraged to invest approximately 345 million EUR to build a modern solar energy plant by Spain's promise of a stable and transparent legal regime, the Claimants allege that they were then subjected to "the classic 'bait and switch'"[181] and made to endure a "regulatory rollercoaster ride"[182] as the Spanish Government over a two year period rapidly enacted a series of unexpected measures, discussed earlier in this Award, that had the effect of depriving the Claimants of much, if not most, of the expected benefits of their investment and of creating a legal framework for the Claimants' energy investment that was neither stable nor transparent but clearly violated the requirements of Article 10(1) of the ECT.

187.    The Claimants submit that Article 10(1) also requires ECT Member States to establish transparent conditions of investment, which the Claimants define as "conduct…free from ambiguity and uncertainty,"[183] relying on the following statement made by the *Tecmed v. Mexico* tribunal:

> "The foreign investor expects the host State to act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor, so that it may know beforehand any and all rules and regulations that will govern its investments, as well as the goals of the

---

[179]   *Id*., para. 417.

[180]   *Id*., para. 419.

[181]   *Id*., paras. 426-427.

[182]   *Id*., para. 427.

[183]   *Id*., para. 479.

relevant policies and administrative practices or directives, to be able to plan its investment and comply with such regulations."[184]

188.    The measures considered by the Claimants to have curtailed their right to stable conditions for their investment are the following:

- The imposition of a 7% levy on electricity produced and fed into the national grid during a calendar year, including all generators, both conventional and renewable;[185]

- The alleged deprivation by Law 15/2012 of Andasol 3 Plant's right to receive FITs for the electricity it produced using a secondary fuel (such as gas) in combination with solar energy;[186]

- The alleged deprivation of the premium option to Marquesado as a result of the enactment of RDL 2/2013;[187]

- The replacement of the annual adjustment index based on the Spanish CPI for updating the premium to be received by Andasol 3 to account for inflation with a new and – according to the Claimants – unfamiliar index, which according to the Claimants was lower than the CPI during the period in which it was in force;[188]

- Different measures implemented by the RDL 9/2014, such as i) the repeal of RD 661/2007 and ii) the announcement of the implementation of a new regime for the renewable energy power generation installations, which, according to the Claimants was "radically different" from the framework established by the RD 661/2007.[189]

(ii)    The Respondent's Position

189.    The Respondent rejects the claim that it has failed to provide the Claimants stable conditions for investment as required by Article 10(1) of the ECT. It argues, first, that the notion of "stable conditions for investment" does not mean that the relevant laws may not

---

[184]    *Id.*, citing CL-23, *Técnicas Medioambientales Tecmed S. A. v. The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003 ("***Tecmed v. Mexico* award**"), para. 154.

[185]    *See* Memorial, para. 428.

[186]    *Id.*, para. 429.

[187]    *Id.*, para. 430.

[188]    *Id.*, para. 431.

[189]    *Id.*, para. 432.

be changed and that, on the contrary, ECT host States have the right to adopt macroeconomic measures in a non-abusive way to meet changing circumstances.[190]

190. In support of its position, it cites two arbitral cases *Plama v. Bulgaria*[191] and *AES Summit v. Hungary,*[192] both of which held that Article 10(1) of the ECT does not protect an investor against any and all changes in a country's legal system after the investment is made.

191. The Respondent argues that it has made no specific promises to the Claimants through a contract or other representation to either freeze or not to change its legislation in any way. In particular, the Respondent submits that neither Article 44(3) of RD 661/2007, nor Article 4 of RD 1614/2010 contained a specific commitment to freeze a specific remuneration regime.[193] Even though certain regulations may have changed after the Claimants had made their investment, the Respondent submits that it maintained the essential nature of the regulatory framework in which the Claimants invested, limiting itself to perfect the framework created by the 1997 Electricity Law.[194] It asserts that such essential characteristics of the remuneration model for solar plants include: (i) the priority of access and dispatch; (ii) the objective of giving the investor a reasonable rate of return; (iii) a legal structure in order to achieve that objective: market price plus subsidy; (iv) the concept of cost-effectiveness; (v) fixing subsidies on the basis of the standards set for different types of facilities; (vi) a dynamism inherent to a system based on the principle of a reasonable rate of return; and (vii) the provision for a reasonable rate of return.[195] According to the Respondent, all of these characteristics remained part of the compensation system throughout the relevant period and notwithstanding the regulatory adjustments that were made.

---

[190] Counter-Memorial, para. 1151.

[191] *Id.*, paras. 1150-1151, citing RL-34, *Plama Consortium Limited v. The Republic of Bulgaria*, ICSID Case no. ARB/03/24, Award, 27 August 2008 ("***Plama v. Bulgaria* award**"), paras. 173; 219.

[192] Counter-Memorial, para. 1152, RL-39, *AES Summit Generation Limited and AES Tisza Eromu Kft. v. The Republic of Hungary,* ICSID Case no. ARB/07/23, Award, 23 September 2010 ("***AES Summit v. Hungary* award**").

[193] Counter-Memorial, para. 1154.

[194] *Id.*, para. 1160.

[195] Rejoinder, para. 1376.

### b. *The Tribunal's Analysis*

192.    The Claimants argue that the Respondent has breached Article 10(1) of the ECT by failing to provide stability in the legal framework applicable to renewable energy in Spain as a result of the many changes that Spain made to that framework during the period 2012-2014.  It is noted that this claim is brought by the Claimants separately from their claim for the breach of FET under Article 10(1) of the ECT.

193.    In order to evaluate this claim, the Tribunal must first define the meaning of the words "stable conditions… to make investments", and particularly the meaning of "stable." In accordance with Article 31 of the VCLT, this inquiry should begin with a consideration of "…the ordinary meaning to be given to the term[s]…" "stable" in the treaty in the light of the object and purpose of the ECT. Although neither Party did so in its pleadings, a search for the "ordinary meaning" of words usually begins with dictionary definitions and an analysis of meaning. The Oxford English Dictionary defines "stable" as "not likely to give way or overturn; firmly fixed." Webster's Third International Dictionary states that stable means "firmly established; not easily moved, shaken, or overthrown." The American Heritage Dictionary refers to it as "resistant to change of position or condition."

194.    The word "stable" is derived from the Latin word "stablis" and the French "stare" which mean "to stand." Thus, the basic focus of the word refers to the quality of not changing a thing's basic position or place, but it does admit of change in other respects. This feature of the definition thus raises the question of how much change may a thing endure before one may say that it is not stable. Transposing that question to this case, one may ask how much a State may change the conditions of investment before it is possible for a tribunal to declare that the conditions for investment in that State are not stable. Neither the ECT text nor arbitral cases applying it provide an answer to that question or even offer a guide or methodology for answering it.

195.    In this respect, there is a fundamental question that one must ask in order to address this first treaty claim: does the first sentence of Article 10(1) of the ECT create enforceable rights in covered investors or is this first sentence merely guidance or a directive to the

69

==Contracting Parties as to the type of legislative regime they are to create in order to facilitate investment in the energy sector?== Subsequent sentences in Article 10(1) of the ECT refer to specific actions that a State may not take against protected investments. It is a State's violation of those obligations that results in liability to investors. In other words, the first sentence of Article 10(1) does not contain an independent obligation whose breach would be actionable by investors of the Contracting Parties, and Spain's measures should instead be considered under the scope of the standard of fair and equitable treatment in Article 10(1) of the ECT, and in particular of the protection of the Claimants' legitimate expectations. As the *Plama v. Bulgaria* tribunal explained, "stable and equitable conditions are clearly part of the fair and equitable standard under the ECT."[196]

196. A provision analogous to the first sentence of Article 10(1) of the ECT may be found in BITs that provide terms similar to the following: "…each Contracting Party shall encourage and promote favourable conditions for investors of the other Contracting Party to make investments in its territory."[197] In *White Industries Australia Limited v. India*,[198] in which the claimant sought to hold India liable for its alleged failure to create favourable conditions for its investment, the tribunal found no cases or arbitral decisions in support of such a claim and that "…commentators seem to agree that such provisions in BITs do not give rise to substantive rights."[199] It therefore held that the language of the Australia-India BIT was far too general to support the specific obligations that India was alleged to have toward the claimants.

197. In the present case, the Tribunal is faced with a treaty provision of an equivalent degree of generality. The ECT in the first sentence of Article 10(1) directs the Contracting States to "encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area." That sentence provides no specific directions on the particular elements that such conditions are to embody. Instead,

---

[196]  RL-0034, *Plama v. Bulgaria* award, paras. 173; 219.

[197]  Article 3(1) Agreement Between the Government of Australia and the Government of the Republic of India on the Promotion and Protection of Investments, New Delhi, 26 February 1999, available at https://www.italaw.com/sites/default/files/laws/italaw6021.pdf

[198]  *See White Industries Australia Limited v. The Republic of India*, UNCITRAL, Final Award, 30 November 2011, available at https://www.italaw.com/sites/default/files/case-documents/ita0906.pdf

[199]  *Id.*, para. 9.2.7.

those directions come in the next clause: "[s]uch conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment."

### c.   The Tribunal's Conclusion on the Claimants' First Claim

198.   Consequently, the Tribunal concludes that the first sentence of Article 10(1) is far too general to create enforceable definite rights of investors against Contracting Parties. The Tribunal therefore rejects the Claimants first claim and will assess the Respondent's measures in the light of the other standards analyzed below.

### (2) Second Claim: Failure to Accord the Claimants' Investment Fair and Equitable Treatment

#### a.   The Parties' Positions

##### (i)    The Claimants' Position

199.   The Claimants assert that Spain through its actions and measures has failed to accord to the Claimants' investments at all times fair and equitable treatment as Article 10(1) of the ECT requires. They argue that a promise of FET is a standard of protection commonly found in investment treaties and that the FET standard in the ECT has been recognized as being an independent and autonomous standard, additional to the international minimum standard under customary international law.[200]

200.   The Claimants argue that the FET standard under the ECT has a specific meaning that needs to be discerned through treaty interpretation, in application of Articles 31 and 32 of the VCLT.[201] Claimants support this approach to identifying the content of the FET standard by reference to decisions rendered by other investment tribunals.[202] According to

---

[200]   Memorial, para. 443; Reply, para. 81.

[201]   Memorial, para. 444.

[202]   *Id.*, paras. 447-449, referring to: CL-23, *Tecmed v. Mexico* award, para. 156; CL-25, *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, para. 113; CL-26, *Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN3467, Award, 1 July 2004 ("***Occidental v. Ecuador* award**"), para. 183; CL-30, *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006 (***Saluka v. Czech Republic* award**"), para. 286; CL-31, *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, award, 14 July 2006, para.

the Claimants, an analysis of such cases reveals that the non-cumulative criteria against which tribunals have typically evaluated a State's conduct in applying the FET standard include:

> "(a) whether the host State breached the investor's reasonable and legitimate expectations when the investment was made;
>
> (b) whether the State failed to provide a stable and predictable legal and business framework in relation to the investment [footnote omitted];
>
> (c) whether the State's conduct was transparent;
>
> (d) whether the State acted in an arbitrary or unreasonable manner; and
>
> (e) whether the actions of the State were disproportionate."[203]

201.    In the instant case, the Claimants argue that Spain has breached its obligations under the FET standard in a number of ways.  Specifically, the Claimants assert that:

> "(a) Spain adopted measures that frustrated the Claimants' legitimate expectations;
>
> (b) Spain failed to provide a stable and predictable business and legal framework for the Claimants' investments;
>
> (c) Spain's conduct has not been transparent;
>
> (d) Spain's measures are unreasonable; and
>
> (e) Spain's measures are disproportionate."[204]

202.    A summary of the Claimants' arguments with respect to each of these allegations now follows.

---

360; CL-35, *Siemens A.G. v. The Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007, para. 290; and CL-48, *Joseph Charles Lemire v. The Republic of Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 21 January 2010, para. 262.

[203]  Memorial, para. 450.

[204]  *Id.*, para. 452.

a)     Spain adopted measures that frustrated the Claimants' legitimate expectations.

203.    The Claimants argue that it is a well-established principle of international investment law, as enunciated by numerous arbitral decisions, that treatment by the host State should not "affect the basic expectations that were taken into account by the foreign investor to make the investment."[205] In particular, they assert that the FET standard requires the host State to protect the investor's legitimate expectations based on the legal framework at the time of the investment and on "any undertakings and representations made explicitly or implicitly by the host State."[206]

204.    According to the Claimants, a central feature of the State's obligation to ensure FET for investments is the general principle that the State must not frustrate a foreign investor's reasonable and legitimate expectations on which that investor relied at the time it made its investment.[207] The Claimants argue that while this does not mean that a host State must completely freeze its regulatory regime, it does mean that, by entering into the ECT, Spain accepted limitations on its power to fundamentally alter the regulatory framework applicable to the Claimants' investments, particularly in ways that would be unfair, unreasonable and inequitable, including by undermining an investor's legitimate expectations.[208] Consequently, according to the Claimants, Spain cannot under the ECT simply dispense unilaterally with the entire legal framework it has put in place to attract investments into its renewable sector (and on the strength of which the Claimants made their investments in Spain). Instead, it is required to honor the legitimate expectations of, and meet its commitments with respect to, foreign investors such as the Claimants.[209]

205.    The Claimants contend that a particularly important element of legitimate expectations is the protection from State actions that threaten the stability of the legal and business

---

[205]  *Id.*, para. 453.

[206]  *Id.*

[207]  *Id.,* para. 454.

[208]  *Id.*, para. 455.

[209]  *Id.*

framework upon which an investor reasonably relied in making its investment.[210] The Claimants support this position by reference to the award rendered in *CMS v. Argentina*, where the tribunal held that "there can be no doubt … that a stable legal and business environment is an essential element of fair and equitable treatment."[211] Similarly, the Claimants rely on *Occidental v. Ecuador*, for the proposition that "[t]he stability of the legal and business framework is … an essential element of fair and equitable treatment."[212]

206.    In the present case, the Claimants assert that the framework applicable to renewable energy under the RD 661/2007 led the Claimants to invest in and develop the Andasol 3 Plant and that their expectations were twofold: (a) those regarding the nature, amount and duration of the subsidy offered under RD 661/2007; and (b) those with respect to the stability of the RD 661/2007 economic regime.[213]

207.    First, regarding the nature, amount and duration of the subsidy, the Claimants contend that at the time they invested in the Andasol 3 Plant they expected that once the plant was finally registered with the Spanish authorities:

> (i)    Marquesado would have a choice between selling electricity at a Fixed Tariff or at the Premium, with the amounts that were set out in Article 36 of RD 661/2007;
>
> (ii)   the subsidy would apply to all of the electricity produced, without any limitations on production;
>
> (iii)  the plant would be entitled to receive the subsidy during its entire operational life;
>
> (iv)   the Andasol 3 Plant would be employing equipment that uses natural gas to produce electricity, and the electricity using natural gas would be subsidized, within the threshold limitations set out in RD 661/2007;
>
> (v)    the Andasol 3 Plant would have priority of dispatch; and

---

[210]   *Id.*, para. 456.

[211]   CL-27, *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005, para. 274.

[212]   CL-026, *Occidental v. Ecuador* award, para. 183.

[213]   Memorial, para. 462.

> (vi) the subsidy would be subject to inflation adjustments, in the terms
> provided in RD 661/2007.[214]

208.   Second, regarding the stability of the regime the Claimants argue that they had expected that any future changes to RD 661/2007 would only apply prospectively, *i.e.* to new installations, while existing installations would remain unaffected.[215]

209.   Indeed, according to the Claimants, Spain had explicitly promised that the economic regime for qualifying Special Regime installations would remain stable under RD 661/2007, through a stabilization commitment in Article 44(3) of the said decree.[216] The Claimants submit that such stability commitment was core to their expectations and that without the subsidy, the Claimants would have never invested in the Spanish CSP sector.[217]

210.   The Claimants further argue that their expectations were legitimate and reasonable for several reasons. First, the Claimants submit that the subsidies upon which they allegedly relied at the time of making their investment had been offered under a "Royal Decree" issued by the Spanish Government (RD 661/2007) providing the very specific tariffs that would apply to the Andasol 3 Plant.  In particular, the Claimants submit that Article 36 specified the FIT and Premium that Marquesado would receive for 25 years and thereafter. Second, according to the Claimants, Article 44(3) provided a commitment not to change that FIT or Premium for existing installations. Third, the RD 661/2007 economic regime was part of a wider international and domestic policy to develop renewable energy power-generation infrastructure. Fourth, the Claimants conducted a due diligence process which they allege confirmed that the Andasol 3 Plant would be subject to the RD 661/2007 economic regime, for the operational lifetime of the installations. Lastly, the Claimants contend that the compensation scheme that Spain put in place was sufficiently attractive to encourage the necessary investments in projects, such as the Andasol 3 Plant.[218]

---

[214]   *See* Memorial, para. 463.

[215]   *Id.*

[216]   *Id.* para. 464.

[217]   *Id.*

[218]   *Id.*, para. 465.

211.    The Claimants contend that, after having established its Special Regime for renewable energy by individual legislative and regulatory acts, the Spanish Government systematically and repeatedly reinforced their commitments in various communications, both oral and written, including a signed 2011 Resolution, confirming that the Andasol 3 Plant had the right to receive the specific Fixed Tariffs and Premiums for all the electricity produced and by Spain's active campaign to promote investments in the Spanish renewable energy sector.[219] According to the Claimants, in this resolution, the Spanish Government confirmed that the Andasol 3 Plant would be subject to the RD 661/2007 economic regime (as amended by RD 1614/2010) specifying the exact FITs that the Andasol 3 Plant would receive for the entire operational lifetime of the installations.[220] The Claimants argue that all of Spain's actions to encourage investment in the renewable energy sector created expectations in the investors that ultimately led them to invest around 350 million EUR to build and operate the Andasol 3 Plant.

212.    The Claimants further argue that their legitimate expectations in the economic regime governed by RD 661/2007 were confirmed and enhanced by the Respondent's active campaign to promote investments in renewable energy and refer to promotional advertising materials used during presentations in Germany designed to attract foreign investments in Spain,[221] and to a press release issued by the Government recording what the Claimants characterized as the July 2010 Agreement to refrain from making retrospective changes to the RD 661/2007 economic regime ("**2010 Press Release**").[222] Lastly, the Claimants refer to the enactment of RD 1614/2010 and to the 2011 Resolution.[223]

213.    Beginning in 2012, and through a process extending over two years and comprising a succession of measures, the Claimants contend that Spain frustrated their legitimate expectations and dismantled entirely the legal and business framework under which their

---

[219]    *Id.*

[220]    *Id.*

[221]    *Id.*

[222]    *Id.,* para. 466.

[223]    Memorial, paras. 254, 467, referring to C-22, Ministry of Industry, Tourism and Commerce, Resolution by the Director General for Energy Policy and Mines in respect of the Andasol 3 Plant, dated 10 February 2011.

investments were made.  Specifically, the Claimants argue that such measures include the following.

214.    First, Spain's withdrawal of the subsidies for electricity production using natural gas under Law 15/2012. According to the Claimants, this measure frustrated their expectations under RD 661/2007 that the Andasol 3 Plant would be entitled to subsidies for all the electricity it produced, including the electricity produced using natural gas, subject to the limitation of 12% or 15% (as the case may be) provided in RD 661/2007.[224]

215.    Second, Spain's introduction of the 7% levy under Law 15/2012 on electricity production. The Claimants contend that this measure is no more than a disguised and unjustified cut of the subsidies to which they were entitled and that it frustrates their expectations of the level of subsidies the Andasol 3 Plant would be entitled to under RD 661/2007.[225]

216.    Third, the Government's elimination of the Premium under RDL 2/2013. The Claimants argue that this measure frustrates their expectations under RD 661/2007 to choose between selling at a Fixed Tariff or at the market prices plus a Premium.[226]

217.    Fourth, the Government's replacement under RDL 2/2013 of the CPI-linked updating mechanism for the FIT by a lower index than the CPI. According to the Claimants, this measure departs from their expectations that the FIT would be updated during the life of the plant to reflect variations of the general CPI.[227]

218.    Fifth, Spain's enactment of RDL 9/2013 in July 2013 introduced, according to the Claimants, a substantially less favorable regime for the remuneration of electricity, including renewable electricity, and violated the basic foundations upon which the Claimants made their investments in the first place.[228]

---

[224]    Memorial, para. 471(a).

[225]    *Id*., para. 471(b).

[226]    *Id*., para. 471(c).

[227]    *Id*., para. 471(d).

[228]    *Id*., para. 471(e).

b)      Spain Breached its Obligation of Fair and Equitable Treatment by Failing to Provide a Stable and Predictable Regulatory Regime

219.    The Claimants argue that Spain has not only breached its express obligation to create stable conditions for Marquesado under the first sentence of Article 10(1) of the ECT, as discussed above,[229] but that Spain's obligation to provide a stable legal environment is an essential element of the FET standard, which is contained in the second sentence of Article 10(1).[230] According to the Claimants, stability cannot exist in a situation where the law changes continuously and endlessly[231] and Spain's conduct from December 2012 onward violates any notion of a stable and predictable environment for the Claimants' investments amounting to a breach of Spain's FET obligation to provide a stable legal and business framework.[232]

c)      Spain Breached its Obligation of Fair and Equitable Treatment by Failing to Act Transparently

220.    Relying on the *Tecmed v. Mexico* award, the Claimants assert that the FET standard requires that a State's conduct toward investors and its legal environment be transparent and "… free from ambiguity."[233] Contrary to the requirements of the FET standard, the Claimants argue that Spain dismantled the RD 661/2007 economic regime in a manner that was not transparent in several respects.

221.    First, according to the Claimants, RDL 9/2013 not only wiped out the investment regime for the Claimants' investments but was followed by a transitory regime of more than 11 months during which the Government gave no indication regarding the precise remuneration that any qualifying plants would be entitled to.[234]

222.    Second, the Claimants argue that neither RD 413/2014 nor the June 2014 Order provided a transparent analysis explaining the underlying criteria or calculations behind the Special

---

[229] *See* Section VI (B)(1).

[230] *Id.*, para. 476.

[231] *Id.*, para. 477.

[232] *Id.*, para. 478.

[233] *Id.*, para. 479, citing CL-23, *Tecmed v. Mexico* award.

[234] *Id.*, para. 483(a).

Payment (including how the standard costs of the standard installation were calculated), or whether there will be any future updates of the economic regime.[235]

223.    Third, the Claimants contend that the calculation of the Special Payment by reference to a standard installation creates further uncertainties as Spain retains the discretion to alter many of the parameters of a standard installation, every three or six years.[236]

224.    Fourth, according to the Claimants, the lack of visibility and predictability is aggravated by the fact that under RDL 9/2013 and Law 24/2013 (the "**New Regime**"), the Government retains the right to review the Special Payment in order to make sure that the prevailing yield on ten-year Spanish bonds plus a spread continues to apply.[237]

225.    Finally, the Claimants contend that the New Regime does not provide any clear indication as to the timeframe during which the remuneration for installed capacity (which is in theory aimed to compensate for investments made in the installations) will apply.[238]

> d)    Spain Breached its obligation of Fair and Equitable Treatment by adopting Unreasonable Measures

226.    The Claimants assert that the fair treatment of investors demands that the measures enacted by a State be reasonable. Citing *Saluka v. Czech Republic*, they argue that a determination of whether a State's conduct has been reasonable requires a showing that the conduct "bears a reasonable relationship to rational policies."[239] According to the Claimants, in order for Spain's challenged measures to be considered reasonable, Spain must first identify a rational policy goal and then show that the measures taken were reasonable, *i.e.* reasonably correlated, or appropriately tailored, to addressing that policy goal with due regard for the consequences imposed on foreign investors such as the Claimants.[240] The Claimants argue that Spain is unable to meet this standard of showing that its measures are reasonable.

---

[235]    *Id*., para. 483(b).

[236]    *Id*., para. 483(c).

[237]    *Id*., para. 483(d).

[238]    *Id*., para. 483(e).

[239]    *Id*., para. 484, citing CL-30, *Saluka v. Czech Republic* award, para. 307.

[240]    Memorial, para. 485.

227.    The Claimants argue that Spain's justifications of the contested measures as needed to deal with the overcapacity of the renewable energy infrastructure and the so-called tariff deficit should be rejected by the Tribunal as in both cases such problems are the result of Spain's own regulatory decisions, and the burden of fixing them cannot be attributed to foreign investors protected under the ECT, such as the Claimants, in violation of their reasonable and legitimate expectations.[241]

e)    Spain Breached Its Obligation of Fair and Equitable Treatment by Adopting Disproportionate Measures

228.    According to the Claimants, the requirement of proportionality is well established in international law and has been applied in the investment treaty context.[242] The Claimants argue that for a measure to be considered as proportionate, there must be a reasonable relationship between the burden imposed on the foreign investor and the aim sought to be realized by the State measure.[243]

229.    The Claimants consider that since CSP plants only played a limited role in the accumulation of the tariff deficit, imposing retroactive changes to the subsidies and ultimately wiping out the entire RD 661/2007 economic regime is not a suitable or proportionate solution to address this problem.[244] According to the Claimants, instead of adopting less harmful measures to address the issue of the tariff deficit, Spain chose to violate international law by unreasonably enacting measures that dramatically altered the investment framework it had promised to CSP investors and on which the Claimants had legitimately relied at the time they made their investments.[245] The Claimants further submit that even if Spain's measures were deemed to be suitable and necessary to achieve the aims pursued, their effect on the Claimants' investments has been so harmful that they cannot be considered to be proportionate.[246]

---

[241]    *Id.*, para. 486.

[242]    *Id.*, para. 493.

[243]    *Id.*

[244]    *Id.*, para. 494.

[245]    *Id.*, para. 497.

[246]    *Id.*, para. 499.

(ii)    The Respondent's Position

230.    The Respondent rejects the Claimants' contention that Spain has violated its obligation under the ECT to afford FET to the Claimants and their investments. While the Respondent agrees with the Claimants that the standard of protection of the ECT should be analyzed in accordance with the common meaning of the terms of the ECT in their context, and in the light of the objective and purpose of the ECT,[247] it disagrees that the FET standard in the ECT is additional to the international minimum standard under customary international law,[248] and refers to several decisions in support of its position.[249]

231.    In undertaking that task of analyzing the FET standard under the ECT, the Respondent points to Article 10(1) of the ECT which states that each ECT Contracting Party has an obligation to "…encourage and create stable, equitable, favourable and transparent conditions for…" investment. The Respondent argues that the main objective of the ECT is to enable investors to invest in "energy activities without discrimination on the grounds of the investor's nationality" [250] for the implementation of a free market. The Respondent consequently submits that its principal obligation under the ECT is to grant national treatment to investors from other ECT States. According to the Respondent, the obligation in Article 10(1) of the ECT refers to the moment in which the investment is made and that absent the signing of a supplementary treaty envisaged by the drafters of the ECT, it remains soft law.[251] It is the Respondent's theory that the obligations in the second and third paragraphs of Article 10 of the ECT can be best characterized as obligations of "best efforts" applicable to the investment-making conditions, and that once the investment is made, the Contracting Parties' obligation under the ECT is "national treatment."[252]

---

[247]    Counter-Memorial, para. 1010.

[248]    *Id*., para. 1048.

[249]    *Id*., paras. 1049-1052.

[250]    *Id*., para. 1016 (emphasis in the original).

[251]    *Id*., paras. 1017-1018.

[252]    *Id*., paras. 1019-1020.

232.    The Respondent concludes from the above that when Article 10(1) of the ECT obliges investments to be granted a "treatment no less favourable than that required by international law," it envisages the minimum standard of protection guaranteed by international law.[253]

233.    The Respondent further argues that, in the absence of a specific commitment of stability, an investor cannot have the expectation that a regulatory framework such as the one in focus in this case will not be amended.[254] It also states that the ECT does not in any way interfere with Spain's right to regulate the energy sector on a non-discriminatory basis, to require it to "freeze" existing regulations once made, or to "grandfather" investors who have invested under those regulations. In short, the ECT is not intended as a sort of insurance policy that regulations once made will not be changed later on.[255]

234.    In arguing that it has treated the Claimants fairly and equitably, the Respondent adopts the framework employed by the Claimants with respect to the elements of the FET standard. According to the Claimants, a State violates its obligation to accord fair and equitable treatment to a treaty-protected investor or investment when it has done any of the following: (a) fails to provide a stable and predictable regulatory regime; (b) frustrates the reasonable and legitimate expectations of investors; (c) violates its duty of transparency; or (d) adopts abusive, unreasonable, or disproportionate measures affecting the investment.[256] The Respondent argues that none of its actions meet these criteria and that therefore it has not violated the FET standard.

    a)    The Respondent Has Provided the Claimants a Stable and Predictable Regulatory Regime

235.    In response to the Claimants' arguments, the Respondent submits, first of all, that the notion of "stable conditions for investment" does not mean that the relevant laws may not

---

[253]   *Id.*, para. 1021; Rejoinder, para. 1239.

[254]   Counter-Memorial, para. 1030; Rejoinder, para. 1245.

[255]   Counter-Memorial, paras. 1034; 1037-1038.

[256]   Memorial, para. 450; Counter-Memorial, Section J. It is noted though that the Respondent addresses each of these obligations in a slightly different order than the Claimants and follows the order established in Article 10(1) of the ECT, although substantially addresses each of these obligations. *See* Counter-Memorial, para. 1053.

be changed and that, on the contrary, ECT host States have the right to adopt macroeconomic measures in a non-abusive way to meet changing circumstances.[257] It points out that neither Article 44.3 of RD 661/2007, nor Article 4 of RD 1614/2010 contained a specific commitment to freeze a specific remuneration regime. Nor did the 2011 Resolution, which simply communicates to Marquesado the remunerative conditions in force at the time of that resolution.[258]

236.   The Respondent further contends that even though certain regulations may have changed after the Claimants had made their investment, the system as a whole remained stable in that its essential characteristics were maintained.[259] It argues that the remuneration model for solar plants has the following essential characteristics: (i) the priority of access and dispatch; (ii) the objective of giving the investor a reasonable rate of return; (iii) a legal structure in order to achieve that objective (market price plus subsidy); (iv) the concept of cost-effectiveness; (v) fixing subsidies on the basis of the standards set for different standard facilities; (vi) a dynamism inherent in a system based on the principle of a reasonable rate of return; and (vii) the provision for a reasonable rate of return.[260] The Respondent asserts that all of these characteristics remained part of the compensation scheme after the changes made by Spain.

237.   The Respondent also submits that it has respected the duty to create stable conditions in relation to the Claimants' investment.[261] In response to the claim that it failed to provide stable conditions for investment, Spain has offered the defenses discussed earlier in this Award.[262] It argues that the requirement of stability does not demand that it freeze its legal system once an investment has been made and that despite subsequent changes in the law the basic requirements of the renewable energy regulatory system have remained

---

[257]   *Id*., para. 1151.
[258]   *Id*., para. 1154.
[259]   *Id*., paras. 1158-1165.
[260]   *Id*., para. 1165.
[261]   *Id*., paras. 1148-1180.
[262]   *See* Section VI(2)(ii)(a), above.

unchanged. In addition to relying on the *Plama v. Bulgaria* case, noted above, it also finds support for its position in *AES Summit v. Hungary*:

> "The stable conditions that the ECT mentions relate to the framework within which the investment takes place. Nevertheless, it is not a stability clause. A legal framework is by definition subject to change as it adapts to new circumstances day by day and a state has the sovereign right to exercise its powers which include legislative acts."[263]

238.  The Respondent further contends that in any case, Spain has fulfilled its duty to create and keep "stable conditions" for the Claimants' investment, and that such conditions are found in the 1997 Electricity Law.[264] According to the Respondent, the challenged measures have been adopted respecting the central principle that governed the Claimants' investment under such legislation: a reasonable rate of return calculated to ensure that the standard facilities could achieve a return of "about 7% during their useful lives."[265] The Respondent submits that it has created and granted stable conditions to the Claimants in accordance with the ECT standard, as the contested measures maintained the essential nature of the regulatory framework created with the 1997 Electricity Law[266] and that none of the measures implemented were of retroactive application.[267]

b)  The Respondent Has Not Frustrated the Claimants' Legitimate and Reasonable Expectations in Making their Investments in the Andasol 3 Plant

239.  The Respondent does not contest the notion that a State may not deny a protected investor FET under the ECT by frustrating that investor's reasonable and legitimate expectations in making an investment. It explains however that based on arbitral precedent, an investor's expectations must meet certain specified criteria to qualify as "legitimate expectations" for purposes of the ECT.

---

[263]  RL-39, *AES Summit v. Hungary* award, para. 9.3.29.

[264]  Counter-Memorial, para. 1158.

[265]  *Id*.

[266]  *Id*., para. 1160.

[267]  *Id*., paras. 1166-1170.

240.    According to the Respondent, such criteria include: 1) at the time that the investment was made, the investor must know the applicable regulatory framework applicable to its investment and its functioning,[268] 2) the appropriate governmental authority must make specific commitments to the investor that the regulation in force will remain immutable; and 3) the investor's expectations must be reasonable and justified.[269]

241.    As to the first requirement, the Respondent argues that tribunals need to analyze the knowledge of the investor about the general regulatory framework at the time of making its investment.[270] The Respondent contends in this respect that the Claimants failed to conduct proper due diligence prior to making their investment. The Claimants did not, according to the Respondent, undertake a diligent analysis of the applicable legal framework in a highly regulated sector such as energy and that, among other deficiencies, the due diligence reports that were commissioned by the Claimants did not examine the regulatory framework applicable to their investment in Spain, but rather considered isolated aspects of this framework such as the process of pre-registration imposed by RDL-6/2009.[271] According to the Respondent, from the lack of due diligence it can be concluded that their alleged expectations cannot be deemed to be real and objective.

242.    Regarding the second requirement, the Respondent further argues that the Claimants' claim for breach of FET in respect of their legitimate expectations should fail as no specific commitments have been made by Spain in respect of the immutability of the framework of RD 661/2007 in favor of renewable energy facilities.[272] In this respect, the Respondent submits that neither RD 436/2004, RD 661/2007, RDL 6/2009 nor RD 1614/2010 contain a guarantee or promise to stabilize or freeze its framework in favor of the Claimants or its investments.[273] The Respondent supports its position with reference to the award rendered

---

[268]  *Id.*, paras. 1057-1061.

[269]  *Id.*, para. 1082.

[270]  *Id.*, paras. 1057-1061.

[271]  *Id.*, paras. 1065-1080.

[272]  *Id.*, paras. 1084-1089.

[273]  *Id.,* para. 1084.

by the *Charanne v. Spain* tribunal, who declared the non-existence of a specific commitment in the legal framework in place in 2007 and 2008 in Spain.[274]

243.  Finally, and in respect of the third requirement, the Respondent submits that the Claimants' expectations are not reasonable or justified.[275] According to the Respondent, this is so as the regulatory framework in place at the time of the Claimants' investment, was governed by three essential principles:

- the principle of regulatory and the result of legally stipulated regulation creation procedures;

- the principle of economic sustainability; and

- the principle of a reasonable rate of return.[276]

244.  These principles constituted the objective legitimate expectations of a diligent investor.[277] Spain maintains that the regulatory framework in place at the time the Claimants made their investment allowed for changes in relation to existing facilities, by maintaining the principle of a reasonable return at all times within the framework of a sustainable Spanish electricity system.[278]

245.  The Respondent further submits that the Claimants' expectations are not reasonable in respect of the alleged statements made by Spain.[279] Such statements are: (i) the 2010 Press Release, which announced the alleged "agreement" with the Ministry and Protermosolar; (ii) the 2011 Resolution, (iii) the pre-registration and final registration in the Administrative Registry of Production Installations in the Special Regime ("**RAIPRE**" in Spanish); and,

---

[274]  *Id.*, paras. 1085-1086. *See* also RL-49, *Charanne B.V. and Construction Investment S.A.R.L. v. The Kingdom of Spain,* SCC Arbitration V 062/2012, Final Award, 21 January 2016 ("***Charanne v. Spain* award**").

[275]  *Id.*, paras. 1090-1146.

[276]  *Id.*, para. 1095.

[277]  *Id.*, para. 1096.

[278]  *Id.*, para. 1097.

[279]  *Id.*, paras. 1103-1124.

(iv) several presentations made by the CNE and the Government's State Company for the Promotion and Attraction of Foreign Investment, also known as "**InvestInSpain.**"[280]

246.    First, the Respondent explains in this respect that the 2010 Press Release and referred to by the Claimants as basis of their legitimate expectations involves a general communication reflecting the consensus between the Government and the wind and thermosolar sectors in relation to essential aspects of RD 1614/2010 and cannot be considered as an assumption of commitments in respect of the Claimants.[281]

247.    Second, the Respondent further notes that the 2011 Resolution also invoked by the Claimants cannot generate expectations as to the immutability of the regulatory framework as it was restricted to reporting on the regime applicable to the Andasol 3 Plant at the time it was issued.[282]

248.    Third, the Respondent further argues that pre-registration and final registration in the RAIPRE, also referred to by the Claimants as basis of their legitimate expectations, are no more than an administrative requirement for facilities to qualify for the Special Regime.[283]

249.    Fourth, the Respondent contends that the informational presentations made by the CNE and InvestinSpain were only intended to confirm the framework applicable to renewable energy in Spain and submits, referring to the findings made by the *Charanne v. Spain* tribunal, that the same are not specific enough to generate an expectation regarding the immutability of RD 661/2007 and RD 1578/2008.[284]

250.    Finally, and for the reasons explained above, the Respondent argues that none of the documents submitted by the Claimants resulting from the analysis of the applicable

---

[280]    *Id.*
[281]    Counter-Memorial, para. 1104.
[282]    *Id.*, para. 1109.
[283]    *Id.*, para. 1112.
[284]    *Id.*, paras. 1120-1123.

framework to their investment can serve as a basis for their legitimate expectations claims.[285]

251.    In conclusion, the Respondent argues that the Claimants' alleged legitimate expectations are unreasonable in relation to the regulatory framework in place at the time when the investment was made, that such alleged expectations are not supported by statements made by Spain, and finally that the documents submitted by the Claimants themselves contradict their alleged legitimate expectations.[286]

c)    The Respondent has acted in a transparent manner

252.    The Respondent also submits that it has acted in a transparent manner with respect to the Claimants and their investments.[287] According to the Respondent, under the ECT the Contracting Parties are not obliged to ensure the absolute predictability of the framework applicable to an investment, as such would require the freezing of the legislation.[288] The Respondent moreover submits that the facts of this case show that i) it had made no specific commitment to the Claimants to maintain the regulatory system governed by RD 661/2007 unchanged; ii) Spain announced the implementation of reforms in 2009, as the crisis motivating such reforms was alluded to in the Preambles of RDL 6/2009, the Report on RD 1614/2010 and RDL 14/2010; iii) Spain has followed the procedures required by law to implement all measures adopted since 2009; and iv) the measures passed by the Respondent should be considered as a predictable and dynamic system guaranteeing a reasonable rate of return for renewable energy projects.[289] To counter the Claimants' assertion that the Government took 11 months to develop the remuneration parameters announced in RDL 9/2013 and that investors were left in the dark during that time as to the

---

[285]    *Id*., paras. 1125-1146.

[286]    *Id*., para. 1147.

[287]    *Id*., paras. 1181-1186.

[288]    *Id*., para. 1182.

[289]    *Id*., para. 1185.

payments they would receive in the future, the Respondent claims that the Government circulated drafts of proposed regulation to all concerned parties and received comments.[290]

> d)    The Respondent's acts were not abusive or disproportionate

253.   The Respondent also argues that that the adopted measures are neither abusive, nor exorbitant or disproportionate.[291] The Respondent submits that the Claimants' evaluation of the purposes behind the measures omits consideration of the international financial crisis that prompted a drop in electricity demand, a rise in consumer tariffs, over-remuneration in the Spanish electricity system and forecasts of a tariff deficit.[292] According to the Respondent, the measures adopted were announced as of 2009 and were designed to address the unsustainability of the Spanish electricity system.[293] Moreover, the Respondent submits that the measures were accepted by most domestic and foreign investors.[294]

> e)    The Respondent's measures are not irrational or discriminatory

254.   The Respondent finally submits that its measures pass the tests applied by tribunals to assess whether they are irrational or discriminatory according to the ECT's objectives and standards,[295] and refers to the decisions rendered in the *EDF v. Romania* and the *AES Summit v. Hungary* cases.  In this respect it submits that the measures had legitimate aims, were adopted in full observance of the law and due process and for the reasons stated by them.[296] The Respondent further submits that the measures are rational and meet the objective of a public economic policy; that is, correcting the micro-economic imbalance in favor of guaranteeing the sustainability of the Spanish electricity system.[297] According to the Respondent, the adopted measures allowed investors to achieve a reasonable rate of

---

[290]   *Id.*, para. 1185(iii).
[291]   *Id.*, paras. 1187-1240.
[292]   *Id.*, para. 1190.
[293]   *Id.*, paras. 1204-1210.
[294]   *Id.*, paras. 1211-1215.
[295]   *Id.*, paras. 1216-1218.
[296]   *Id.*, para. 1220.
[297]   *Id.*, paras. 1223-1231.

return of 7.398%, guaranteeing a "level playing field"[298] in a reasonable and proportionate manner.

255. In sum, the Respondent contends that Spain has fully complied with the FET standards under the ECT in its treatment of the Claimants' investments and that the Tribunal should reject the Claimants' arguments on this score.

### b. The Tribunal's Analysis

256. In the present case, the Parties have submitted that the FET standard of protection in the ECT is comprised of five essential obligations which they have derived from previous decisions of arbitral tribunals.[299] The Tribunal will adopt this framework as agreed by the Parties. The five obligations identified by the Parties as giving content to the FET standard in the ECT are as follows: (i) the obligation to afford the investor a stable regulatory regime; (ii) the obligation not to frustrate the investor's legitimate and reasonable expectations arising at the time of making the investment; (iii) the obligation to act transparently towards an ECT-protected investor or investment; (iv) the obligation to avoid taking unreasonable, abusive or discriminatory actions; and finally, (v) the obligation to avoid taking disproportionate actions. Taking this common framework between the Parties as a starting point, the Tribunal will now consider whether the Respondent's actions and measures in this case violated any of these five obligations.

(i)    Failure to Create and Maintain a Stable Regulatory Regime for Investment

257. The stability of the host Contracting Party's legal framework applicable to investments in energy is explicitly referred to in the first sentence of Article 10(1) of the ECT, which the Tribunal has already considered in Section VI(1)(b) of this Award, and is further understood by the Parties as an obligation of the Contracting Parties falling within the broader concept of FET. Within this particular context, just as a merchant who makes a contract or agreement with the intent not to perform would normally be considered to be

---

[298]   *Id*., paras. 1237; 1240.

[299]   Memorial, para. 450; Counter-Memorial, Section J. It is noted though that the Respondent addresses each of these obligations in a slightly different order than the Claimants and follows the order established in Article 10(1) of the ECT, although substantially addresses each of these obligations. *See* Counter-Memorial, para. 1053.

acting unfairly, a Government deliberately inducing a foreign company to invest by promising certain benefits which it intended to cancel once the investment had been made might also be found to be acting unfairly, and thus to violate the FET standard of protection in an applicable investment treaty. Thus, even though the Tribunal has found that Spain did not violate the provisions of the first sentence of Article 10(1) of the ECT, it is still theoretically possible to find that Spain's numerous changes in the regulatory system constituted a violation of its ECT obligation to treat the investor fairly and equitably.

258.   The Claimants have asserted in their pleadings that by creating a legal framework which provided for subsidies to renewable energy installations, Spain has induced the Claimants to invest in the Andasol 3 Plant and that, once the plant had been built, it totally dismantled the regulatory system with the objective of substantially reducing the compensation due for the electricity produced by the Andasol 3 Plant.[300] By doing so, Spain has - according to the Claimants - engaged in a "classic 'bait and switch.'"[301] The Tribunal disagrees with such characterization of the events that are at the heart of this dispute. A classic "bait and switch" is a stratagem, often fraudulent or illegal in nature, whereby a person offers or advertises goods or services at an apparent bargain price with the intention of substituting inferior or more expensive goods and services once a buyer becomes committed. The Claimants have offered no evidence in this case demonstrating that Spain has indeed undertaken and developed its solar energy policy and related regulation with the intention to modify it drastically once the desired investment was made. On the contrary, the Tribunal believes that Spain undertook the effort in good faith and that only when the negative consequences of such regulation were evident, it modified it so as to eliminate such consequences. This is clear from the preambles of the regulations and reports accompanying those regulations after 2006, where the Spanish Government highlights the need to address the imbalances that the compensation scheme had produced in the Spanish electricity system, in a delicate time of international economic crisis. There is no evidence on the record that Spain had an ulterior motive for the reforms that is not reflected on the face of these documents.

---

[300]   Memorial, paras. 418-441.

[301]   *Id.*, para. 426.

259.    Dealing with the fiscal imbalances of its policy on renewable energy was the clear intent of the Government when it adopted RDL 7/2006, as explained in the report that preceded this RD,[302] and even of RD 661/2007, in force at the time the Claimants made their investment, when the Spanish Government amended the methodology by de-linking the calculation of the premium to be paid to installations in the Special Regime from the TMR.[303] The need for reform was only exacerbated in 2012 when the consequences of the tariff deficit in Spain became more acute. RDL 2/2013 was adopted within this particular context as Spain's attempt to guarantee a reasonable rate of return for installations producing renewable energy while preserving the sustainability of the system, and thus avoiding over-remuneration.[304] In short, the Tribunal considers that the story of the development of solar energy policy is not a classic case of "bait and switch" but a classic case of what the sociologist Robert Merton has called "the law of unintended consequences."[305]

260.    The law of unintended consequences, a frequent phenomenon in policy making, reflects the fact that purposeful actions, undertaken with good intentions, such as encouraging solar energy development, sometimes result in undesirable outcomes. When that happens policy makers often take what they perceive as necessary corrective actions to remedy the situation, which is exactly what happened in Spain as government policy makers perceived that Spain's solar energy policy was having negative unintended consequences on its public finances. While the Claimants may have found that those corrective actions had unpleasant consequences for their energy business, the Tribunal does not believe that by changing its regulatory system during the period of 2012-2014, Spain failed to provide the investors a stable regulatory system and thereby violated its obligation to treat their investments fairly and equitably.

261.    Moreover, Spain had not committed itself to refrain from modification of the regulatory framework governing renewable energy at the time the Claimants invested in Spain. On

---

[302]    *See* Section III(B)(6).

[303]    *See* Section III(B)(7); C-21,RD 661/2007, Preamble.

[304]    C-25, RDL 2/2012, , General Provisions.

[305]    Robert K. Merton, "The Unanticipated Consequences of Purposive Social Action" 1 *American Sociological Review* 894-904 (1936); Robert K. Merton, *On Social Structure and Science* (1996 University of Chicago Press).

the contrary, the regulatory history of RD 661/2007 should have put the Claimants on notice that future modifications were likely. Spain had clearly retained its sovereign right to enact new laws and regulations and to amend or cancel those in force at the time the investment was made. Moreover, as it is clear from the preambles of the introduced amendments and laws, the changes in the framework applicable to renewable energy were introduced to protect the public interest, and particularly the sustainability of the Spanish electricity system.[306]

262.    Taking into consideration the circumstances surrounding the changes in the regulatory system for solar energy, the Tribunal concludes that Spain did not fail to provide the Claimants a stable legal framework and it therefore rejects the Claimants argument of an ECT violation on that score.

(ii)    Frustration of the Claimants' Legitimate and Reasonable Expectations

263.    Investor expectations are fundamental to the investment process. It is the investor's expectations as to the rewards and risks of a contemplated investment that crucially influence the investor's decision to invest or not to invest. The actions of host State governments through their laws, regulations, policy statements and contracts, among others, often influence the investment expectations of investors that cause them to invest. Thus, when a State that has created certain investor expectations through its laws, regulations, or other acts that has caused the investor to invest, it is often considered unfair for a State to take subsequent actions that fundamentally deny or frustrate those expectations and cause disappointed investors to seek compensation by invoking investment treaties, like the ECT, in which States have promised investors "fair and equitable treatment."

264.    The FET standard in the ECT does not, however, protect the investor from any and all changes that a government can introduce into its legislation. As concluded in the previous section, it does not protect it against the changes introduced to safeguard the public interest to address a change of circumstances, nor does it protect the investor who unreasonably

---

[306]    *See* along these lines, *Charanne v. Spain* award, paras. 500 *et seq.*

and unjustifiably expects that the host government will introduce no amendments will to the legislation governing the investment.[307] In the absence of a specific commitment contractually assumed by a State to freeze its legislation in favor of an investor, when an investor argues – as is the case here – that such expectation is rooted, among others, in the host State's legislation, the Tribunal is required to conduct an objective examination of the legislation and the facts surrounding the making of the investment to assess whether a prudent and experienced investor could have reasonably formed a legitimate and justifiable expectation of the immutability of such legislation. For such an expectation to be reasonable, it must also arise from a rigorous due diligence process carried out by the investor.

265.    In this case, the Claimants argue that they were induced to make their investment by RD 661/2007, and that they legitimately expected that the nature, amount and duration of the subsidy offered by this RD would be maintained by Spain along the entire lifespan of their installation Andasol 3 Plant.[308] In their Memorial, the Claimants assert four legitimate expectations that they say were violated by the Respondent:

> "First… the Investors relied on the express confirmation by the Government that the Plant, once fully registered, would be entitled to the RD 661/2007 FIT..."[309]
>
> "Secondly, in July 2010, Spain reached an agreement (the July 2010 Agreement) with the CSP (and wind) industry association that implied short-term limits on their production hours and a short-term reduction in the applicable tariffs in order to guarantee the applicability in the long term of the RD 661/2007 tariffs."[310]
>
> "Thirdly, in December 2010, Spain passed Royal Decree 1614/2010 (RD 1614/2010), which was the result of the July 2010 Agreement and which re-confirmed the long-term application of the RD 661/2007 tariffs for existing installations."[311]
>
> "Fourthly, on 2 February 2011, Spain issued a resolution addressed to Marquesado (the 2011 Resolution) confirming that the Andasol 3 Plant

---

[307]  CL-045, *Plama v. Bulgaria* award.

[308]  Memorial, para. 419.

[309]  *Id.*, para. 24.

[310]  *Id.*, para. 25.

[311]  *Id.*, para. 26.

> qualified under the RD 661/2007 economic regime. In particular, pursuant to the 2011 Resolution, the Government committed itself to provide the RD 661/2007 FITs for all of the electricity produced by the Andasol 3 Plant."[312]

266.   The Claimants also appear to rely on the registration of Andasol 3 Plant under RDL 6/2009 in the Pre-Assignment Registry on 11 December 2009 and the subsequent registration with the RAIPRE on 27 April 2012 as either an independent basis for a legitimate expectation with respect to the freezing of the remuneration scheme under RD 661/2007 or the confirmation of an existing commitment from the Spanish Government to the same.[313]

267.   Spain, in response, maintains that the only legitimate expectation on the part of the Claimants was to a reasonable rate of return.[314]

268.   It is the task of this Tribunal to determine whether the Claimants' asserted expectations about the immutability of the remuneration system applicable to the Andasol 3 Plant are reasonable and legitimate, and thus provide a valid basis for the Claimants' claim of breach of the FET standard. The Tribunal will proceed to examine the following instruments and acts invoked by the Claimants as providing a basis for their expectations:

   (i) Article 44(3) of RD 661/2007

   (ii) Agreement of July 2010

   (iii) RD 1614/2010

   (iv) 2011 Resolution

   (v) Pre-registration under RDL 6/2009 and registration with the RAIPRE

---

[312]   *Id.*, para. 27.

[313]   *Id.*, paras. 211, 213.

[314]   Counter-Memorial, para. 336, Resp. PHB, para. 87.

a)   Article 44(3) of RD 661/2007

269.   This is the principal instrument invoked by the Claimants. Article 44(3) reads:

> "In 2010, in view of the results of the follow up reports on the extent to which the Renewable Energy Plan for 2005-2010 and the Energy Savings and Efficiency Plan for Spain (E4) have been achieved, as well as the new objectives included in the next Renewable Energy Plan for 2011-2020, tariffs, premiums, additional payments, and lower and upper thresholds set out in this royal decree will be reviewed, taking into account the costs associated with each of these technologies, the degree of participation of the special regime in meeting demand and its impact on the technical and economic management of the system, guaranteeing reasonable returns with reference to the cost of money on capital markets. Every four years thereafter a new adjustment will be carried out using the above criteria.
>
> The adjustment to the regulated tariff and the lower and upper threshold referred to in this section will not affect the facilities for which the start-up document was issued before January 1 of the second year in which the adjustment was implemented."[315]

270.   According to the Claimants, Article 44(3) contained a commitment that further tariffs revisions would not affect installations registered under RD 661/2007.[316] The Claimants argued that Article 44(3) protected duly registered, existing CSP installations from the type of changes introduced in 2012 and 2013 through the disputed measures.[317] This provision was characterized by the Claimants as a grandfathering clause protecting them against retroactive changes.[318]

271.   It is important to consider first the legislative background to RD 661/2007 to provide the context for this specific provision.

272.   RD 661/2007 was issued in furtherance of the 1997 Electricity Law. RD 661/2007 thus records in its Preamble: "The economic framework in the present Royal Decree develops the principles set forth in Law 54/1997, of 27 November, on the Electricity Sector."[319]

---

[315] C-21.

[316] Memorial, para. 124.

[317] *Id*.

[318] Reply, paras. 279; 289.

[319] C-21, RD 661/2007, p. 2.

273.  As noted earlier in this Award, the 1997 Electricity Law was the legal foundation of the Spanish regulatory system for electricity production at the time the Claimants made their investment.[320] It is the umbrella legislation for RD 661/2007. A Royal Decree Regulation is subordinate to Laws and Royal Decree Laws, which, in turn, are subordinate to the Constitution. A Royal Decree Regulation (referred to simply as "Royal Decrees") cannot contradict Laws or Royal Decree Laws.[321] In Spanish legal practice, a Law enacted by the Spanish Parliament contains the general principles regulating the subject matter in question, whereas the detailed provisions giving effect to those general principles are set out in subsequent Royal Decrees promulgated by the Executive Government. In the present case, RD 661/2007 was promulgated by the Ministry.

274.  Chapter II of the 1997 Electricity Law creates the "Special regime for electricity production" that applies, *inter alia*, to solar electricity production. Article 30 of Chapter II is entitled "Obligations and rights applicable to energy producers operating under the special regime" and contains the following provisions relating to the remuneration of energy producers:

> "3. The remunerative regime applicable to electrical energy producing plants operating under the special regime shall be adjusted pursuant to provisions outlined in sub-section 1 of article 16 for electrical energy producers.
>
> 4. The payment regime for electricity production facilities under the special regime <u>shall be supplemented by the earning of a premium, under the terms set by regulation</u>, in the following cases:
>
> a)  Facilities referred to in letter a) of section 1 of article 27 [which includes solar plants such as those operated by the Claimants]
>
> […]

---

[320]  *See* <u>Section III(B)(1)</u> above.

[321]  R-56, Organic Law 6/1985, of 1 July, on the Judiciary, Article 6 ("The Judges and the Courts shall not apply regulations or any other provision contrary to the Constitution, the law or the principle of normative hierarchy").

> To determine the premiums, the voltage level of electricity delivered to the network must be considered, along with the actual contribution to improvement of the environment, primary energy savings and energy efficiency, the economically justifiable production of usable heat, and the investment costs that have been incurred, for the purpose of achieving reasonable rates of return with respect to the cost of money on the capital market."[322]

275. The underlined passages in Article 30(4) of the 1997 Electricity Law are important. First, it is envisaged that the premium to which energy producers are entitled will be established under the terms set by regulations (i.e. Royal Decrees). Hence the 1997 Electricity Law does not itself establish the terms of the premium: consistent with Spanish legislative practice the precise terms of the premium are to be fixed in subordinate legislation in the form of Royal Decrees. Second, the overriding principle for the determination of the premium is to achieve "reasonable rates of return" by taking into account, *inter alia*, the investment costs that have been incurred and the cost of money in the capital market. Any Royal Decree giving effect to this provision would have to calculate the premium consistently with this overriding principle.

276. RD 661/2007, which is the regulation upon which the Claimants rely for their expectation of a stabilized regime for the calculation of their premium, was preceded by RD 2818/1998, RD 436/2004 and RDL 7/2006. This legislative history demonstrates that the terms of the premium envisaged in Article 30(4) of the 1997 Electricity Law would be fixed by regulations as promulgated from time to time.

277. The text of Article 44(3) of RD 661/2007 is almost identical to the previous Article 40(3) of RD 436/2004.[323] And yet, Article 40(3) of RD 436/2004 could not have produced legal stabilization because it was repealed and replaced by RD 661/2007. Furthermore, the Spanish Supreme Court specifically rejected the argument that RD 436/2004 created a stabilized regime immune to revision in its Judgment of 25 October 2006. In that case, the appellants contended that RD 2351/2004, which changed the system for calculating the

---

[322]   C-31, 1997 Electricity Law, Article 30 [Emphasis added].

[323]   R-82, Article 40(3): "The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above [*sic*] and shall not have a backdated effect on any previous tariffs and premiums.".

premiums under RD 436/2004 violated the principles of legal certainty, legitimate expectations and good faith contrary to Article 9.3 of the Spanish Constitution. After noting that the amendments did not violate Article 30 of the 1997 Electricity Law (the appellants had not submitted otherwise), the Supreme Court dismissed this argument, stating:

> "Companies that freely decide to enter a market such as electricity generation under the special regime, knowing that is largely dependent on the setting of economic incentives by public authorities, are or should be aware that they may be modified within legal guidelines, by those same authorities."[324]

278.  This Supreme Court Judgment was a matter of public record at the time that the Claimants invested in Spain. A reasonable and prudent investor would have known of this decision, understood it implications for a contemplated investment, and adjusted expectations accordingly.

279.  Returning to RD 661/2007, the Preamble of that regulation sets out the reasons for the modification of the Special Regime:

> "The modification of the economic and legal framework which regulates the special regime existing to date has become necessary for various reasons. First of all, the growth seen in the special regime over recent years tied to the experience accumulated during the application of Royal Decree 2818/1998, of 23 December and Royal Decree 436/2004, of 12 March, has shown the need to regulate certain technical aspects in order to contribute to the growth of those technologies, while maintaining the security of the electrical system and ensuring the quality of supply, and minimising the restrictions on the production of electricity generated in this manner.  In view of the behaviour of the prices in the market, where certain variables which were not considered in the cited compensation system for the special regime have, over recent times, acquired greater importance, the economic regime established by Royal Decree 4126/2004 of 12 March make it necessary to modify the compensation system and de-link it from the Mean Electricity Tariff, or Reference Tariff, which has been used to date."[325]

280.  It was, therefore, manifest from the text of RD 661/2007 itself that the decision to promulgate RD 661/2007 and to rescind the earlier Royal Decrees establishing the premium payable under the special regime established by the 1997 Electricity Law resulted

---

[324]  R-120, Judgement from the Spanish Supreme Court of 25 October 2006, p. 4.
[325]  C-21, RD 661/2007, pp. 1-2.

from changes in the market variables for calculating the premium. The changes introduced by RD 661/2007 were considered necessary to recalibrate the calculation of the premium to ensure that the principles underlying the remuneration for energy producers under the special regime in the 1997 Electricity Law were respected. This is also made explicit in the text of RD 661/2007:

> "The economic framework in the present Royal Decree develops the principles set forth in Law 54/1997, of 27 November, on the Electricity Sector, and guarantees the owners of special regime installations a reasonable return for their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable..."[326]

281.   As a result of the foregoing, an investor who had engaged in an appropriate due diligence of the Spanish regulatory framework for electricity production from renewable sources would have been aware of the following factors:

(1.)   The umbrella legislation, the 1997 Electricity Law, required the premium to be calculated in order to generate a reasonable rate of return;

(2.)   The 1997 Electricity Law also envisaged that the terms of the premium would be established by regulations;

(3.)   Several regulations preceded RD 661/2007 and their promulgation, amendment and/or repeal was justified by the Ministry as necessary to give effect to changing market conditions for the calculation of the premium;

(4.)   The Supreme Court had specifically rejected an argument to the effect that a provision in the earlier RD 436/2004 that purported to disapply the modifications to the calculation of the premium introduced by that Royal Decree to existing installations resulted in the immutability of RD 436/2004. The Supreme Court held that the disapplication only had effect so long as RD 436/2004 itself was not amended or repealed;

---

[326]   *Id.*, p. 2.

(5.) In the Preamble to RD 661/2007, the Ministry justified the promulgation of the Royal Decree as necessary in order to take into account changing market conditions and to preserve the principle of a reasonable rate of return set out in the 1997 Electricity Law.

282. Against that background, it would have been unreasonable for the Claimants to have interpreted Article 44(3) of RD 661/2007 as constituting a stabilized regime for the calculation of the premium that would be impervious to any future modification regardless of a change in the market conditions. In addition to the factors set out above, such an interpretation would have contradicted core principles of Spanish law:

(1.) The Ministry in promulgating a Royal Decree cannot bind the Spanish Parliament not to amend and/or repeal a Law. It was always open to the Spanish Parliament to amend and/or repeal the 1997 Electricity Law in respect of the calculation of the premium under the Special Regime, which would have had the effect of abrogating the Royal Decrees promulgated on the basis of the 1997 Electricity Law;

(2.) The Ministry in promulgating RD 661/2007 could not have included provisions that contradicted the 1997 Electricity Law. As the overriding principle for the calculation of the premium in Article 30(4) of the 1997 Electricity Law was the guarantee of a reasonable rate of return, if the application of the specific provisions of RD 661/2007 had the effect of generating an unreasonable rate of return for energy producers then those provisions would be invalid; and

(3.) Article 17 of RD 661/2007, entitled "Rights of producers under the special regime" is the provision that confers the right to be remunerated in accordance with the economic regime set out in RD 661/2007 (in particular, subsection (c) of Article 17). Article 17 commences with the following text: "Without prejudice to the provisions of Article 30.2 of Law 54/1997, of 27 November, the proprietors of production facilities under the special regime shall enjoy the following

rights…"[327] This confirms that Article 30 of the 1997 Electricity Law is controlling and that the terms of remuneration under the Special Regime as fixed by RD 661/2007 cannot be inconsistent with Article 30 of the 1997 Electricity Law.

283. The Claimants interpret the second paragraph of Article 44(3) of RD 661/2007 as achieving the stabilization: "The adjustment to the regulated tariff and the lower and upper threshold referred to in this section will not affect the facilities for which the start-up document was issued before January 1 of the second year in which the adjustment was implemented."[328] In light of the materials already referred to, this provision could only be reasonably interpreted as limited to the adjustment procedure set out in the first paragraph of Article 44(3): indeed, that reference is made explicit in the text itself. If the adjustment procedure in the first paragraph of Article 44(3) itself were to be amended or repealed, then the non-retroactive application provision in the second paragraph of Article 44(3) would cease to have any effect.

284. The Claimants also rely on various other documents to support their assertion that Spain made a commitment to them of stable remuneration for Andasol 3. The Claimants argue that PowerPoint presentations emanating from different Spanish agencies, such as the CNE and InvestInSpain,[329] evidenced Spain's clear and unambiguous statements on the stability of the RD 661/2007 regime and were intended to attract investors in renewable energies to Spain.[330]

---

[327] Id., p. 23.

[328] Id., Article 44(3), p. 46; Memorial, para. 141; Reply, para. 296.

[329] Memorial, paras. 153-156; Reply, paras. 68-69, 277, 283- 288. Documents relied on by the Claimants are: C-64, CNE, PowerPoint Presentation, "Legal and Regulatory Framework for the Renewable Energy Sector" dated 29 October 2008; C-65, CNE, PowerPoint Presentation, "Renewable Energy Regulation in Spain" dated February 2010; C-144, CNE, PowerPoint Presentation, "Renewable Energies: A Case Study in Spain" (Cartagena de Indias), dated 9-13 February 2009; C-145, CNE, PowerPoint Presentation, "Renewable Energy Regulation" (Barcelona), dated February 2009; and C-67, Ministry of Industry, Tourism and Commerce & Invest in Spain, "Opportunities in Renewable Energy in Spain", dated November 2008.

[330] Memorial, para. 157.

285.   The CNE was an advisory board collaborating with the Government in energy matters by issuing non-binding reports on energy matters.[331] The CNE was not empowered to enact rules or regulations on energy issues in Spain.[332] A reasonable investor would have understood the authority of CNE and would not have relied upon the PowerPoint presentations to the extent that the Investors claimed.

286.   InvestInSpain is, as explained by the Claimants, a private enterprise, wholly owned by the Secretariat of the State for Trade (*Insituto Español de Comercio Exterior*), and overseen by the Ministry of the Economic Affairs and Competitiveness.[333] Its powers are restricted to attracting foreign investment projects to Spain, positioning Spain internationally, promoting an improved business climate and regulatory business environment in Spain and facilitating the collaboration between foreign investors and Spanish development and expansion of activities in Spain.[334]

287.   It is clear that an investor cannot reasonably rely on PowerPoint presentations from Spanish agencies with no regulatory powers to base their expectations in relation to the legal regime for investments in Spain. Legitimate expectations must be grounded in the law and not based upon promotional literature about what the law says.

b)   Agreement of July 2010

288.   The Claimants also purport to have relied on an "agreement" between solar energy producers and the Government of Spain in respect of the stability of the incentives created for the existing facilities in operation in July 2010.[335]

289.   The only evidential basis for this argument is the 2010 Press Release from the Ministry, the first paragraph of which reads:

---

[331]   R-63, Law 3/2013 of 4 June on the creation of the CNMC.

[332]   R-35, Art. 97 of the Spanish Constitution.

[333]   Memorial, fn. 206.

[334]   C-66, InvestinSpain website, "About us" section.

[335]   Memorial, paras. 26, 250-256.

> "The Ministry of Industry, Tourism, and Trade has reached agreements with the wind power and solar thermal trade associations, the Wind Power Business Association (AEE) and Protermosolar, respectively, for the revision of the regulatory frameworks for the production of electricity with these technologies."[336]

290.   As this quotation indicates, the process that resulted in this "agreement" was in fact consultations leading to the enactment of new regulations (*i.e.* a Royal Decree). These consultations are required by law.[337] Thus, at the end of the 2010 Press Release, it is stated: "The Ministry of Industry, Tourism and Trade will immediately start the proceedings that allow the content of the agreements to transfer into regulation."[338] Any informal agreements reached during such a consultation process do not have any legal significance in Spanish law unless and until they are enacted. Article 4 of RD 1614/2010 does not, therefore, take the Claimants' case on stabilization any further. It is also strictly irrelevant in any event as it was subsequent to the Claimants' investment in Spain in October 2009 and therefore could not have been a factor in shaping the Claimants' expectations at the time they made their investment in Andasol 3.

c)   RD 1614/2010

291.   The regulation that was ultimately adopted following the consultations was RD 1614/2010. The Claimants rely upon Article 4 of that Royal Decree as reflecting the agreements reached in relation to the stability of the regime for calculating the premium. This provision reads as follows:

---

[336]   C-146, Ministry of Industry, Tourism and Commerce, Press Release announcing agreement on economic framework with CSP and wind sectors, dated 2 July 2010, p. 1.

[337]   R-59, Law 50/1997, of 27 November, on the Government's Legislative Initiative, Article 24 ("On the procedure for drafting regulations… c) Once the text of a provision that affects the legitimate rights and interests of citizens has been drafted, they shall be given the opportunity to examine it for a reasonable period of time of no fewer than fifteen business days, whether directly or through the legally recognized associations that bring them together or represent them, and whose purposes are directly related to the subject matter of the provision. The decision regarding the procedure chosen to provide the opportunity for public examination by interested members of the public shall be duly explained in the dossier by the agency that agrees to open the public examination. Furthermore, and when the nature of the provision makes this advisable, it shall also be submitted for the public's information for the stated period of time.").

[338]   C-146, 2010 Press Release p. 2.

> "For solar thermoelectric technology facilities that fall under Royal Decree 661/2007 of 25 May, revisions of tariffs, premiums and upper and lower limits referred to in article 44.3 of the aforementioned Royal Decree, shall not affect facilities registered definitively in the Administrative Registry of production facilities entitled to the special regime that is maintained by the Directorate-General for Energy and Mining Policy as of 7 May 2009, nor those that were to have been registered in the Remuneration Pre-assignment Registry under the fourth transitional provision of Royal Decree-Law 6/2009 of 30 April, and that meet the obligation envisaged in its article 4.8, extended until 31 December 2013 for those facilities associated to phase 4 envisaged in the Agreement of the Council of Ministers of 13 November 2009."[339]

292.    It is also plain from the introduction to RD 1614/2010 that the Ministry continued to act upon the premise that the regulations fixing the premium as envisaged by the 1997 Electricity Law would continue to be updated and refined to take into account the changing market conditions:

> "[T]he support regime… must adapt, while ensuring the legal security of investments and the principle of fair return, to the dynamic reality of the learning curves of the different technologies and to the technical constraints that arise due to the increased penetration of such technologies in the generation "mix", to thus maintain a necessary and adequate support that is consistent with market conditions and with the strategic objectives in the area of energy and to contribute to the transfer to society of the profit from the suitable development of these technologies."[340]

293.    Article 4 of RD 1614/2010 does not, therefore, support the Claimants' case on stabilization. Moreover, like the Agreement of July 2010, it is also strictly irrelevant in any event as it was subsequent to the Claimants' investment in Spain in October 2009 and therefore could not have influenced their expectations at the time they made their investment.

d)    2011 Resolution

294.    The Claimants also characterize the 2011 Resolution[341] as giving rise to a specific commitment on the immutability of the regime for calculating the premium in

---

[339]   C-107, Royal Decree 1614/2010 of 7 December 2010, regulating and modif[ying] certain aspects relating to the production of electricity based on photovoltaic solar and wind technology (published on 8 December 2010), p. 6.

[340]   *Id*., p. 1

[341]   C-22, 2011 Resolution.

RD 661/2007,[342] although in their Post-Hearing Brief it is described in terms of a "confirmation"[343] of the Claimants' expectation grounded in RD 661/2007.

295.    The 2011 Resolution was addressed to Marquesado, the owner of the Andasol 3 Plant and was in response to a letter sent by Marquesado on 2 December 2010 in which it is requested, *inter alia*, that "the remuneration conditions for the plant throughout its operating life be communicated."[344] The response to this request in the 2011 Resolution did exactly what was requested, stating:

> "… in virtue of the provisions of Section 1 of the Fifth Temporary Provision of Royal Decree-Law 6/2009, dated 30 April, the remuneration applicable to the plant is made up of rates, premiums, upper and lower limits, and addenda established in Royal Decree 661/2007, dated 25 May, and updated annually by Ministerial Order by the Ministry, the values in force starting on 1 January 2011 being as follows […]"[345]

296.    This text cannot reasonably be interpreted as a promise of stabilization of the remuneration conditions throughout the lifetime of the Plant as submitted by the Claimants: all that is communicated is the remuneration rate currently in force. In any event, the 2011 Resolution was issued after the Claimants invested in Spain and therefore could not have influenced the Claimants' expectations at the time they made their investment.

e)    Pre-registration under Royal Decree Law 6/2009 and registration with the RAIPRE

297.    Royal Decree Law 6/2009 was enacted as a measure to reduce the tariff deficit as the Preamble makes clear:

> "The growing tariff deficit, that is to say, the difference between revenue from the regulated tariffs that are set by the Administration and that consumers pay for their regulated supply and from the access tariffs that are set in the liberalised market and the real costs associated with these tariffs, is causing serious problems which, in the current context of international financial crisis, is having a profound effect on the system and

---

[342]    Memorial, para. 255; Reply, paras. 331-339.

[343]    Claimants' PHB, paras. 52, 77-79.

[344]    C-106, Letter of Waiver for the entrance into operation… and request for the resolution for the communication of the economic regime applicable during the installantions' operational, dated 2 December 2010, p. 2.

[345]    C-22, 2011 Resolution, p. 4.

> placing at risk not only the financial situation of companies that make up the Electricity Industry, but also the very sustainability of the system. This imbalance is unsustainable and has serious consequences, as it undermines the security and the capacity to fund the investments needed for the supply of electricity at the levels of quality and security that Spanish society requires."[346]

298.   The purpose behind the "Remuneration Pre-assignment Registry Mechanism for special regime facilities" established in Article 4 is also set out in the Preamble to RDL 6/2009:

> "The current regulation of the special regime does not establish sufficient mechanisms to make it possible to plan facilities that use this type of energy, nor indeed the amount and the distribution over time of the remuneration premiums and therefore the impact on costs that are attributed to the tariff system. The measure envisaged in the Royal Decree-Law, by creating the Remuneration Pre-assignment Registry, makes it possible to correct the situation described above from the very moment of its coming into effect. It will make it possible to know within the deadlines envisaged in the Royal Decree-Law, the facilities that are not only currently projected but which meet the conditions for start-up and for accessing the electricity system with all legal and statutory requirements, the volume of power associated with them and the impact on the costs of the electricity tariff and its calendar. In any event, the rights and expectations of the owners of the facilities are respected, with the necessary caution being exercised and the necessary transitional regime for adaption being envisaged."[347]

299.   In accordance with this objective, Article 4(2) states that registration in the "Pre-assignment Registry" will be a condition precedent for access to the "economic regime established in Royal Decree 661/2007, of 25 May, regulating the production of electricity under a special regime."[348]

300.   The text of RDL 6/2009 makes it clear that the purpose behind the "Pre-assignment Registry" was to create a further obstacle for access to the remuneration provisions for the Special Regime set out in RD 661/2007. This was to enable the Spanish Government to make plans and projections for regulating energy produced in accordance with the Special Regime in order to take steps to reduce the tariff deficit. There is no basis in the text of RDL 6/2009 for inferring that registration in the "Pre-assignment Registry" would have

---

[346]   C-189, Royal Decree Law 6/2009, of 30 April 2009, which adopted certain measures within the Energy Industry and approved the discount rate ("**RDL 6/2009**"), Preamble, p. 1.

[347]   *Id.*, Preamble, p.4.

[348]   *Id.*, Art. 4(2).

the result of conferring more extensive rights than already existed under RD 661/2007 and hence RDL 6/2009 cannot be the source of an independent expectation of a stabilized remuneration regime or confirmation of the same. In any event, here too, the registration occurred after the Claimants had invested in Spain and therefore could not have influenced their expectations at the time they made their investment.

301.    The Claimants further rely upon the RAIPRE registration and in particular on Article 17(c) of RD 661/2007 and Article 4.8 of RDL 6/2009.[349]

302.    Article 17 of RD 661/2007 is entitled "Rights of producers under the special regime" and reads:

> "Without prejudice to the provisions of Article 30.2 of Law 54/1997, of 27 November, the proprietors of production facilities under the special regime shall enjoy the following rights:
>
> […]
>
> c) Receive, for the total or partial sale of their net electrical energy generated under any of the options appearing in Article 24.1, the compensation provided in the economic regime set out by this Royal Decree.  The right to receive the regulated tariff, or if appropriate the premium, shall be subject to final registration of the facility in the Register of production facilities under the special regime of the General Directorate of Energy Policy and Mines, prior to the final date set out in Article 22."[350]

303.    Article 17(c) must also be read alongside Article 9 "Public authority register of production facilities under the special regime" and Article 14 of RD 661/2007 "Effects of registration." Article 9 reads, in relevant part:

> "In order to ensure appropriate monitoring of the special regime and in particular in order to ensure the management and control of the receipt of the regulated tariffs, the premiums and supplements, both in respect of the categories, groups, and sub-groups, the installed power, and where applicable the date of entry into service, and in respect of the evolution of the electrical energy produced, the energy sold to the grid, the primary energy employed, the useful heat produced, and the primary energy saving achieved, facilities for the production of electrical energy under the special regime shall be subject to compulsory registration in Section Two of the

---

[349]    Memorial, para. 213, Reply, paras. 304; 306.
[350]    C-21, RD 661/2007.

> Public Authority Register of facilities for the production of electrical energy indicated in Article 21.4 of Law 54/1997, which is a part of the Ministry of Industry, Tourism, and Trade […]"[351]

304.    Article 14 of RD 661/2007 reads:

> "The status of facility under the special regime shall have effect as from the date of the decision to grant such status, issued by the competent authority.  Notwithstanding, the final registration of the facility in the Public Authority Register of production facilities under the special regime shall be a necessary requirement for the application of the economic regime regulated under this Royal Decree to such facility, with effect from the first day of the month following the date of the final deed of entry into service of the facility."[352]

305.    The other provision relied upon by the Claimants is Article 4(8) of RDL 6/2009 which reads:

> "Facilities registered in the Remuneration Pre-assignment Registry shall have a maximum deadline of thirty six months from the date of notification thereof, to be definitively registered in the Special Regime Production Facilities Administrative Registry maintained by the relevant body and to begin the sale of energy, otherwise the economic right associated with inclusion in the Remuneration Pre-assignment Registry shall be withdrawn."[353]

306.    These provisions make the right to receive the remuneration set out in RD 661/2007 contingent upon the registration of the facility; they do not purport to create additional rights to a stabilized regime for remuneration under RD 661/2007. Article 4(8) of RDL 6/2009 simply states that any rights acquired by virtue of registration in the Remuneration Pre-assignment Registry will be withdrawn if the facility is not registered in a timely manner in the Special Regime Production Facilities Administrative Registry. Once again, and in any event, the registration in the RAIPRE occurred after the Claimants had invested in Spain.

307.    Finally, it should be emphasized, as noted above, that no contract existed between Spain and the Andasol 3 Plant, governing the Plant's provision of electricity to state entities

---

[351]  *Id.*

[352]  *Id.*

[353]  C-189, RDL 6/2009.

controlling the national grid. Such a contract, generally known as a Power Purchase Agreement ("**PPA**"), is not uncommon in power projects like the one in the present case.[354] PPAs between a foreign-financed power project and a state entity normally stipulate in specific terms the pricing and operational conditions for the provision of power to the national grid and also the processes to be followed to change those pricing and operational conditions during the life of the PPA. The purpose of such PPAs from the investor's point of view is to reduce the regulatory risk that the investor would otherwise bear. Knowing that they do not have a PPA for protection and that such agreements are not uncommon in the power sector, reasonable investors would not have had expectations, as they might have had with a PPA, that Spain's regulatory regime was immutable. Governments not only create expectations by the actions they take but also by the action they do not take.

f)    The Tribunal's Conclusion on FET Violation Claim on Grounds of Frustrated Expectations

308.    In light of the foregoing, the Tribunal finds that none of the documents cited by the Claimants support the conclusion that the Spanish authorities granted the Andasol 3 Plant a guarantee of stable remuneration, not subject to reduction, for the electricity it produced. It also finds that a prudent investor, having conducted an appropriate due diligence, would not have reasonably formed an expectation of a legally stable income stream for the life of the Andasol 3 Plant. The Tribunal concludes that the Claimants asserted expectations were not reasonable or legitimate and therefore rejects their claim that the Respondent has failed to treat their investment fairly and equitably under Article 10(1) of the ECT.

(iii)    Failure to Act Transparently

309.    The Claimants have also argued that the Respondent has violated the FET standard by failing to act transparently.[355] The Claimants submit that this standard requires from a State

---

[354] Where a government agency enters into an arrangement for a private power company to establish a power plant and sell on the power to the government agency, the public agency typically enters into a PPA." World Bank Group, Power Purchase Agreements (PPAs) and Energy Purchase Agreements (EPAs) available at https://ppp.worldbank.org/public-private-partnership/sector/energy/energy-power-agreements/power-purchase-agreements

[355] Memorial, paras. 479-483.

the prompt publication of its laws, regulations, judicial decisions and administrative rulings of general application pertaining to or affecting investments.[356]

310.    The Claimants point to the fact that the Spanish Government took 11 months to develop the remuneration parameters announced in RDL 9/2013 and that the investors were left in the dark during that time as to the payments they would receive in the future as an example of Spain's failure to act transparently.[357] The Respondent contests Claimants' characterization of the so-called transparency obligation under the ECT, and submits that the Claimants are equating such obligation with an obligation to guarantee full predictability of the regulatory framework of a State during an investment, which is not provided for under the ECT.[358] The Respondent submits that it has never made a commitment to freeze its regulatory framework and that all amendments introduced or announced since 2009, were made in consultation with the relevant associations operating in the industry.[359]

311.    Article 10(1) of the ECT requires the Contracting States to "…encourage and create …transparent conditions for Investors of other Contracting Parties to make Investments in its Area." The word transparent is derived from the French roots of the word "transparere" which means to show through. The Tribunal considers that a finding of lack of transparency sufficient to constitute a violation of Article 10(1) of the ECT must be manifested in a continuing pattern of non-transparent actions by a government over time, and that such a continuing pattern was not proven in this case.

312.    In particular, the Claimants have not succeeded in proving that the changes introduced in the system of renewable energy were not publicly announced or can be characterized as a pattern of non-transparent actions. As previously noted by the Tribunal, the Preamble of RDL 7/2006, in force at the time the Claimants made their investment, anticipated that Spain was seeking to introduce measures to rebalance the compensation regime for

---

[356]  *Id*., para. 482.

[357]  *Id*., para. 483(a).

[358]  Counter-Memorial, paras. 1182-1183.

[359]  *Id*., para. 1185.

facilities producing renewable energy, particularly those arising from the methodology used by RD 436/2004.[360] The need to implement a compensation scheme that would contribute to the growth of technologies operating in the Special Regime, while maintaining the sustainability and security of the Spanish electricity system was also one of the objectives of RD 661/2007, a key regulation – according to Claimants – at the moment of making their investment.[361] Spain attempted, as it is clear from the record, different methodologies to address what it considered to be an imbalance in the compensation framework for installations producing renewable energy, which culminated in the enactment of a series of measures as of 2012, particularly with the adoption of RDL 2/2013, RDL 9/2013 and Law 24/2013 – the measures challenged by the Claimants. All measures adopted by the Respondent were regularly published and made available to investors.

313.  As already noted, the Claimants further allege that they were deprived of information regarding the remuneration that the Andasol 3 Plant was entitled to during the eleven months that the Respondent took for the adoption of RDL 9/2013. RDL 9/2013 adopted a new compensation scheme applicable to installations producing renewable energy whereby the reasonable rate of return to be provided to installations producing renewable energy would no longer be calculated in accordance with the cost of money on the capital markets but instead by reference to the secondary market for ten-year State bonds at a differential of 300 basis points.[362] Given the complexity associated with the elaboration of such a compensation scheme, a period of eleven months is not, in the Tribunal's estimation, outside the bounds of reasonable administrative practice.

314.  Further, and as concluded by previous tribunals, the length of time it takes to legislate is not a conclusive factor in determining whether the legislation is foreseeable, particularly in democratic States legislating on issues of public interest, where different stakeholders

---

[360]  *See* Section III(B)(4) above.
[361]  *See* Section III(B)(7) above.
[362]  R-24, RDL 9/2013, p. 7.

need to be consulted.[363] In the present case, the Government of Spain consulted various associations and specialists on the appropriate differential to be applied while calculating the reasonable rate of return that installations were entitled to by reference to ten-year State bonds. A proposal was received in this respect by the Government in 2009 by the Association of Enterprises in Renewable Energies ("APPA" in Spanish),[364] and the issue was considered by Deloitte in an expert report dated May 2011.[365] It is only reasonable that the design of a compensation scheme that required input from such organizations would require a period of 11 months.

315.    As result of the foregoing considerations, the Tribunal concludes that no pattern of non-transparent actions can be inferred from the Respondent's adopted measures, and that, on the contrary, the adoption of RDL 9/2013 was transparent and involved preliminary reports and consultations and discussions with different stakeholders. Thus, the Tribunal rejects the Claimants' argument that the Respondent has treated the Claimants' investment unfairly by not acting transparently.

(iv)    Failure to Enact Reasonable Measures

316.    The Claimants argue that the Respondent has violated its duty to treat the investors fairly and equitably because its actions have been unreasonable.[366] Drawing on the decisions rendered in *Saluka v. Czech Republic* and *Micula v. Romania*, the Claimants submit that a determination of whether a State's conduct has been reasonable requires a showing that the conduct "bears a reasonable relationship to some rational policy" and that the pursuit of such rational policy must take into account the consequences imposed on investors.[367] The Claimants then go on to assert that the measures adopted by the Respondent do not satisfy this test and submit that the reduction of the compensation paid to the Andasol 3 Plant was

---

[363]    RL-37, *Philip Morris Asia Limited v. The Commonwealth of Australia*, PCA Case No. 2012-12, Award on Jurisdiction and Admissibility, 17 December 2015, para. 567.

[364]    R-168, Presentation of the Draft Bill on Renewable Energy by the Association of Renewable Energy Producers (APPA by its Spanish acronym) and Greenpeace on 21 May 2009 to the Ministry of Industry, Tourism and Commerce, Article 23.4.

[365]    R-17, Expert Report Deloitte, dated 23 May 2011, p. 55.

[366]    Memorial, paras. 484-492.

[367]    *Id.*, para. 484.

an unreasonable measure to address the tariff deficit and the overcapacity of the renewable energy infrastructure. The Claimants argue that both of these problems are to be attributed to Spain's own misjudgment and making and that the burden of fixing them cannot be shifted to investors.[368]

317.    The Tribunal does not agree with the Claimants' argument on this point. First, it does not agree with the Claimants' definition of "reasonable" because it is too narrow. Rather, drawing on the dictionary definition of "reasonable" and in keeping with the interpretation rules of the VCLT, the Tribunal believes it is more appropriate to define a reasonable action as "an action within the bounds of reason."[369] From that perspective and considering the process by which the Spanish authorities arrived at a decision to reduce the rates paid for solar electricity, it cannot be said that its measures were outside the bounds of reason. They were certainly not irrational.

318.    The Tribunal further adopts the analysis of the tribunal in *AES Summit v. Hungary*, which held:

> "There are two elements that require to be analyzed to determine whether a state's act was unreasonable: the existence of a rational policy; and the reasonableness of the act of the state in relation to the policy.
>
> A rational policy is taken by a state following a logical (good sense) explanation and with the aim of addressing a public interest matter.
>
> (…) a challenged measure must also be reasonable. That is, there needs to be an appropriate correlation between the state's public policy objective and the measure adopted to achieve it. This has to do with the nature of the measure and the way it is implemented."[370]

319.    In the present case, the premiums were paid from Spain's State budget where taxes were technically an income and thus amending the compensation scheme in order to avoid

---

[368]   *Id*., paras. 487-492.

[369]   WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1892 (1981).

[370]   RL-39, *AES Summit v. Hungary* award, para. 10.3.7-10.3.9. This criterion was followed in RL-48, *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, para. 179 and RL-49, *Charanne v. Spain* award, paras. 513-514.

remuneration in excess of the reasonable rate of return seems to be reasonably correlated to the public policy objective and it clearly addresses a matter of public interest.

320.    Second, the Claimants' allegation fails under their own test. The amendment of the regime governing renewable energy in Spain, as the Claimants themselves explain, was motivated by Spain's need to address the financial deficit in Spain.[371] The manner in which this objective was achieved by Spain was by modifying the compensation methodology to address instances where installations producing renewable energy were compensated in excess of a reasonable rate of return. The excess remuneration and its impact on the tariff deficit were assessed by the Government in one of its Cabinet meetings in its Decision on the "Draft Act on State Budget for 2013", which approved the "Spanish Economic Policy Strategy: Balance Sheet and Structural Reforms for the Forthcoming Half-Year."[372] In this document, the Spanish Government considered measures to address the tariff deficit permanently and announced the implementation of measures in the renewable energy sector to do so.[373] Spain, exercising its constitutional powers as a democratic State, adopted several measures to deal with the tariff deficit, and it had a right to do so. Various segments of the population would be negatively affected, as they often are in times of significant policy change, but the Government was certainly not required to exempt the investors from those policies because the investors, according to the Claimants, were not responsible for the problem.

321.    The Claimants argue that the Spanish authorities could have solved the problem of the tariff deficit merely by increasing the price of electricity charged to consumers.[374] This may be true. However, since Spain had already increased the consumer price by over 80% during the period 2003-2009 and since Spanish electricity consumer rates were among the highest in Europe, the Government sought another policy solution which was the adjustment of the subsidy it paid to producers of renewable energy. The Spanish Government chose a policy solution that sought to protect the interests of the consumers while requiring producers to

---

[371]    Memorial, para. 486; Reply, para. 605.

[372]    R-104, Spanish Economic Policy Strategy: Balance Sheet and Structural Reforms for the Forthcoming Half-Year, Government of Spain, dated 27 September 2012, Section C.8, pp. 57-58.

[373]    *Id*.

[374]    Memorial, para. 501(c).

bear additional costs of maintaining the electrical system of which they were also beneficiaries. While that solution may have been objectionable to producers, one cannot say that it was unreasonable. It is also the case that the reforms bore a reasonable relationship to the objective of reducing the tariff deficit.

322.    The Tribunal therefore rejects the Claimants' argument that Spain's measures were not rational or reasonable and that Spain therefore failed to treat the investors fairly and equitably.

(v)    Failure to Take Proportionate Measures

323.    The Claimants also assert that the Respondent violated the FET standard because its measures were "disproportionate."[375] Referring to the award rendered by the *Tecmed v. Mexico* tribunal, the Claimants submit that for a measure to be proportionate there must exist a reasonable relationship between the burden imposed on the foreign investor and the aim sought to be realized by the State measure.[376] In this case, the Claimants argue that the challenged measures fail to meet this standard for three reasons. First, the additional remuneration paid under RD 661/2007 to installations in the Special Regime played a limited role in the tariff deficit.[377] Second, there were other less harmful measures to investors to address the tariff deficit than the ones the Spanish Government chose.[378] And third, the impact of the challenged measures on the Claimants was disproportionate in that its effect was to destroy one-half of the value of the Claimants' investment.[379]

324.    The word "proportionate" appears nowhere in the ECT nor do the Claimants offer an analytical definition of the term or an analysis of how tribunals have applied that term in the past.

---

[375]    *Id*., paras. 493-499.

[376]    *Id*., para. 493.

[377]    *Id*., paras. 494-495.

[378]    *Id*., paras. 496-498.

[379]    *Id*., para. 499.

325.  Assuming that proportionality is a consideration under the FET standard under the ECT, it is equally problematic that the Claimants have not offered the Tribunal an operational means of determining when a measure is proportionate and when it is disproportionate. The word proportionate is normally used to describe a relationship, often in quantitative terms, between the whole of an entity or situation and a part of that whole.[380] The word "disproportionate" is vague and highly subjective. It implies a value judgement as to appropriateness of the part being examined and in relation to the whole. Thus, the Claimants seem to be saying that measures taken by Spain are out of proportion to the problem that they are designed to solve. In essence, the Claimants are arguing that the Spain's measures are unreasonable. It is another way of making the argument that the Claimants have made in the preceding sections of this Award.

326.  The Tribunal has previously decided that the measures taken by Spain are reasonable.[381] The result does not change by reframing the issue as one of proportionality.

327.  Having already assessed the general reasonableness and proportionality of the measures, the Tribunal will nonetheless consider whether the impact upon the Claimants' investment specifically was reasonable or proportionate through an assessment of the rate of return earned by the Claimants' investment before and after the disputed measures. As has been set out previously in this Award, a fundamental premise of the 1997 Electricity Law is that investors in renewable energy production should earn a reasonable rate of return.

328.  The Parties have relied upon different documents to establish what the reasonable rate of return was considered to be at the time the Claimants invested in Spain in October 2009.

329.  The Claimants rely upon the "Report on the Draft of the Royal Decree whereby Electricity Production under the Special Regimen and for Certain Facilities with Similar Technologies under the Ordinary Regimen is Regulated"[382] of the Ministry (The draft Royal Decree is what became RD 661/2007). The Claimants maintain that the Report anticipates a reasonable rate of return of a 9.5% IRR. In fact, the 9.5% figure is stated to be an average

---

[380]  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981).

[381]  *See* paras. 300 *et seq.*, *supra*.

[382]  Reply, paras. 830-839, citing C-206; Claimants' PHB, para.100.

figure between two outer limits along a spectrum of what could be considered to be reasonable for those installations which select the market option:

> "The proposed value of the regulated tariff provides a rate of return (IRR in current Euros, with equity after taxes and at 25 years) of 8%.
>
> For the market option, a premium is proposed that ensures a project IRR of 9.5% for the typical 25-year case, with a minimum of 7.6% and a maximum of 11% in the band limits." [383]

330.    A reason for taking the market option was to benefit from the upside of positive market factors (and thus potentially achieve the maximum IRR of 11%) but of course this carried the risk of being exposed to negative market factors as well. This document can only thus be interpreted as providing a range of reasonable rates of return within the range of 7.6% to 11%. If this were not the case, there would not have been any real benefit of selecting the regulated tariff which guaranteed a fixed rate of 8%. As the Preamble to RD 661/2007 states:

> "This new system protects the owner when revenues derived from the market price are excessively low and eliminates the premium when the market price is sufficiently high to ensure that their costs are covered, eliminating irrationalities in the remuneration of the technologies, the costs of which are not directly related to oil prices on the international markets." [384]

331.    It was conceded by the Claimants' expert, Mr. Lapuerta, that the Report of the Ministry upon which they now rely was not in the public domain at the time the Claimants made their investment and was not known within the community of CSP investors. [385]

332.    Another document, relied upon by the Claimants, is the 2005-2010 Energy Plan. [386] This document was in the public domain at the time the Claimants invested in Spain and is referred to in the Preamble of RD 661/2007. This study was in fact commissioned as a "revision of the Spanish Renewable Energies Plan 2000-2010 in force to date," [387] which

---

[383] C-206, p. 16.

[384] C-21.

[385] Transcript Day 4, p. 38, ll. 10-14; Transcript Day 4, p. 139, ll. 2-5.

[386] C-34.

[387] C-34, p. 4.

had established a return for projects of all technologies amounting to "7%, with own capital, before financing and after tax."[388]

333.    The 2005-2010 Energy Plan in section 4.2 entitled "Economic-Financial Analysis of the Investment Plan" provides as follows:

> "The analysis tries to balance the application of resources so that ROI levels make it attractive relative to other alternatives in an equivalent sector, in terms of profitability, risks and liquidity, and always attempting to optimise available public resources.
>
> The technical- financial assumptions and hypotheses employed for the calculation and analysis of the resulting scenario, and for the generality of each standard project, are the following:
>
> […]
>
> Return on Project Type: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in legal tender and for each standard project, around 7%, on equity (before financing) and after taxes."[389]

334.    A further document in the public domain leading up to the promulgation of RD 661/2007 was the CNE Report 3/2007 "Regarding the Proposed Royal Decree Regulating Electricity Generation in the Special Regime and Specific Technological Facilities Equivalent to the Ordinary Regime."[390] It appears from the introduction to the Report "[o]n 29 November 2006, the General Minister of Energy sent the cited proposed Royal Decree [*i.e.* a draft of RD 661/2007] to the NEC for them to issue a mandatory report." [391] That report estimates the rate of return for the "regulated tariff sale option" under the draft report in respect of fixed photovoltaic as 7.6%.[392] In relation to the "market option," the CNE stated:

> "[I]t is considered that the cap and floor should be calculated so that they are symmetrical with the market remuneration (sum of the regulated tariff plus the economic incentive), as a two point-variation in rate of return

---

[388]    R-292, Energy Context and Future Outlook of the Plan, Chapter 2, Renewable Energy Promotion Plan 2000-2010, p. 12.

[389]    R-101, 2005-2010 Plan for Renewable Energies in Spain, pp. 273-274.

[390]    R-110.

[391]    R-110, p. 2.

[392]    R-110, p. 53.

above and below the rate of return forecast for the market.  This will ensure maintenance of a suitable rate of return in the market option."[393]

335.  Finally, the Claimants' own contemporaneous documents estimated a rate of return in a range from 7.5% to 8%.[394]

336.  The following table was provided by the Respondent's expert to provide a snapshot of the different rates of return for renewable energy projects as discussed in contemporaneous documents in Spain and Germany:[395]

| Date (1) | Description (2) | Reference Rate of Return (3) |
|---|---|---|
| December 1999 | Spanish 2000 Renewable Energy Promotion Plan | 7% |
| August 2005 | Spanish 2005-2010 Renewable Energy Promotion Plan | 7% |
| October 2007, 2008, and 2009 | Spanish Electricity Market Operator, OMEL, Presentation to APEX (Association of Power Exchanges) Conference | Average 7% |
| March 2009 | Statement from a member of the German Bundestag | 5-7% |
| May 2011 | Deutsche Bank - German Feed in Tariff for PV (Solar) | 5-7% |
| November 2012 | Heinrich Böll Foundation - "Energy Transition" Report on Germany | 5-7% |
| June 2013 | Renewables International Magazine - Onshore wind in Germany | 5-7% |

---

[393]  R-110, pp. 29, 57.

[394]  R-492, 16th Meeting of the Participation Committee of RheinEnergie AG on 11 March 2009 ("The investment of RheinEnergie AG amounts to 48.8 million euro with a total return on equity after tax of 7.55% in the base case"); R-497, Filing to the Köln council the project Andasol 3, 20 March 2009 ("On the basis of technical inspection reports, which were commissioned by RWE, and extensive talks with RWE Innogy GmbH, a model of economic efficiency was developed, which has an overall return of 7.5% in the base case after tax (IRR)"); R-505, Investment Proposal by RheinEnergie, "Andasol 3 project: Possibility of acquiring a 12.3% share (indirectly) in a 50 MW solar thermal power plant in Spain, in the province of Granada" dated 26 February 2009 ("In accordance with the resolution made by the Management Board on 5 January 2009, a detailed assessment of the participation offer of RWE Innogy at the solar thermal plant Andasol 3 was carried out. On the basis of technical inspection reports, which were commission by RWE, and extensive talks with RWE Innogy GmbH, E, K, F and S developed a model of economic efficiency, which has an overall return of 7.5% after tax (IRR) in the base case."); EO-122, Andasol Fonds Investment Prospectus ("Projected  Return: 8,00% p.a. return on committed capital excluding share premium [issue surcharge] for limited partners and 7.52% p.a. return on committed capital including share premium [issue surcharge] (each expressed before capital gains tax).").

[395]  Econ One First Report, Section IV.B.

337.   It can be concluded from the documents publicly available at the time the Claimants made their investment that the reasonable rate of return was around 7% post-tax, prior financing.

338.   It is common ground among the Parties that facilities registered under the Special Regime following the implementation of the disputed measures are entitled to an IRR of 7.4% pre-tax.[396] There is disagreement, however, as to how this rate translates into a post-tax figure. The Claimants' expert considers that the post-tax IRR is 5.9%.[397] The Respondent's expert says it is 7%.[398] The difference is attributable to a disagreement on the effective corporate tax rate applicable to companies in the renewable energy sector. More specifically, the disagreement is about the effective discounted rate after the financing of the projects is taken into account as this allows for deductions to be made to the taxable base. The Claimants' expert has assumed a tax rate of 18.4%,[399] whereas the Respondent—around 6%.[400]

339.   The Claimants' figure is provided in a single footnote in Brattle's Second Expert Report, where it is stated: "The equivalent after-tax return depends on the particular profile of depreciation at each asset. The effective tax rate is 18.4% for Marquesado, assuming a 40-year useful lifetime."[401] No supporting evidence is provided for this figure and it is clear that the Claimants have not discharged their burden of proof in this respect.

340.   It is, moreover, inappropriate to consider the effective tax rate for one particular facility in determining a reasonable rate of return for the whole sector. What is significant is the general corporate tax rates for companies operating in the renewable energy sector in Spain based upon the general financial structures used by the companies involved. The Spanish

---

[396]   Transcript Day 1, p. 139, ll. 6-10 (Stoyanov); Transcript Day 1, p. 145, ll. 7-11 (Sullivan); Transcript Day 2, p. 12, ll. 13-17 (Sullivan); Transcript Day 5, p. 199, ll. 5-15 (Flores).
[397]   Brattle Second Quantum Report, para. 54.
[398]   Econ One Second Report, para. 94.
[399]   Brattle Second Quantum Report, fn. 31.
[400]   Econ One Second Report, para. 93.
[401]   Brattle Second Quantum Report, fn. 31.

Government undoubtedly made its projections on the basis of industry norms rather than with a specific facility in mind.

341.    Looking at the renewable energy sector generally, according to the Claimants' expert:

> "In practice, most shareholders tend to supply only a portion of the total capital necessary to construct and operate renewable projects, including CSP projects. They often seek to raise a portion of the capital in the form of third-party debt … [a] typical financial structure for a CSP project involves non-recourse or limited recourse project financing for about 80% of its total initial capital costs."[402]

342.    The Respondent's expert agrees with this and adds that as a result of this high leverage, corporate taxes are reduced because the interest on debt is tax-deductible.[403] Both Parties' experts acknowledge that Spain also allows companies to deduct interest on shareholder loans from their taxable income.[404]

343.    The Respondent's expert calculates an effective discounted tax rate of around 6% for companies operating in the renewable energy sector, using a report by KPMG for the British Department of Energy and Climate Change for some of its assumptions.[405] The Respondent's expert calculates that with an effective discounted tax rate of 6%, a 7% post-tax rate of return is equivalent to approximately 7.4% on a pre-tax basis, which is the rate of return currently provided under the disputed measures. The Claimants' expert did not undertake an equivalent analysis.

344.    The question is then what the Claimants' rate of return is after the disputed measures. During the opening submissions at the Hearing, the Respondent referred to its calculation for the Andasol 3 Plant's current pre-tax IRR as being 8.12%. The Claimant did not address its own calculation in opening submissions. This elicited the following question from the Tribunal to one of the Claimants' witnesses, Mr. Hassler, CFO of RheinEnergie AG:

---

[402]   Brattle First Regulatory Report, para. 63.

[403]   Econ One Second Report, para. 91.

[404]   Brattle First Quantum Report, para. 118; Econ One Second Report, para. 91.

[405]   Econ One Second Report, para. 93. The figure in "Backup Fig 6" of the spreadsheet at EO-111, which provides the supporting calculations for this section of the report, appears to be 5.8% rather than 6%.

"Q: …There's a figure of 8.12% that we've seen as the internal rate of return that's currently being generated by the project. Is that a figure that you agree with or have calculated, or have you calculated a different figure?

A. Today we assume, with the devaluation of current capital costs which would be slightly lower -- but I cannot really remember the precise figure, but it's not much lower than the figure that you've just stated.

So if you look at it the other way round, this is based on German principles: you would have an analysis without looking at Spanish accounting standards. I'm not really au fait with them, I'm not really an expert on those. I can just look at the German side of things.

So that the capital costs would be taken into account when calculating this figure."[406]

345.    Despite Mr. Hassler's confirmation that 8.12% was close to the real IRR currently being achieved by the Andasol 3 Plant, the Parties' experts differed significantly on the issue for two principal reasons. First, there was a disagreement on whether the actual initial investment costs should be used (as suggested by the Claimants' expert) or the reasonable initial investment costs (as proposed by the Respondent's expert). Second, there was disagreement as to whether the disruptions that occurred at the Andasol 3 Plant should be taken into account (the Claimants' expert rejects this as relevant contrary to the Respondent's expert). Adopting the Claimants' expert's position on these two points of disagreement, together with its figure for the effective tax rate, results in a (post-tax) IRR of 4.8% for the Andasol 3 Plant.[407]

346.    Higher initial investment costs correspond to a lower IRR. The Claimants' expert uses the actual investment costs of the Andasol 3 Plant of EUR 391.7 million.[408] The Respondent's expert considers that it is impermissible to use this figure because the Claimants have incurred excessive costs in the construction of the Andasol 3 Plant as a result of related party transactions.[409] The Claimants conceded that Andasol 1, 2 and 3 are almost identical in design and very similar in their storage capacities and yet the cost for each was

---

[406]    Transcript Day 2, p. 131, ll. 4-19 (Douglas/Hassler).
[407]    Brattle Second Damages Report, para. 144.
[408]    Brattle Second Damages Report, Table 4.
[409]    Econ One First Report, paras. 92-93; Econ One Second Report, paras. 18-22.

EUR 301.8 million, EUR 302.4 million and EUR 346.1 million respectively (the Respondent's expert actually gives a figure of EUR 392.7 million for the Andasol 3 Plant).[410]

347. There is some evidence of a possible transfer pricing arrangements as between some of the shareholders of Marquesado. The Spanish law firm, Garrigues, had warned RWE Innogy GMBH in its Tax Due Diligence Report of 17 October 2008 that:

> "Concerning the services rendered by the shareholder of MS, Generaciones Especiales I, SL ("GENESA") and Solar Millenium AG ("SMAG") to MS, in an overall amount of approximately 11,060,000 EUR, there is lack of evidences to support, in case of an eventual Tax Inspection, that these services have been effectively rendered by the aforementioned companies to MS.

> Until now, notwithstanding the lack of own personnel or material resources in MS, this lack of documentation has not created any tax contingency for Corporate Income Tax purposes, as MS has not yet deducted these expenses, but has only capitalized them as a higher cost of the assets under work. However, once MS starts to amortize these expenses, if there are no evidences supporting that the services have been actually rendered, the amortization and corresponding deduction could be questioned.

> Please note that the fact that the charges made by each shareholder reflect their share in the company (e.g. as if they were a hidden dividend distribution) gives the Spanish tax authorities an additional argument as to the non-deductibility of these payments.

> […]

> In addition, and regarding transfer pricing issues, beside the service agreement mentioned above, MS is part of several contracts with other related entities, and in some of which (e.g. the EPC agreement), as advanced in the legal DD report, MS might be adopting a position that would not be adopted before a third party.

> It should be noted that the tax authorities may decide whether or not to review the value agreed upon between related parties (and in practice they are usually reviewing them), but once they perform such a review and, if the value resulting from it differs from the value reported by the taxpayer, the adjustment "to market value" will be obligatory for the tax inspectors, regardless of the sign (positive or negative) of the adjustment.

---

[410] Memorial, paras. 185; 244; Transcript Day 2, p. 153, ll. 14-20 (Riffeser).

> In this sense, it should be pointed out as a possible contingency, the non-adequacy of some intercompany agreements to the arm's length principle. A quantification of this issue, however, falls out of the scope of the review."[411]

348. Likewise, in its Legal Due Diligence Report of 6 October 2008, the same law firm noted the following:

> "[W]e have been provided with a promotion services agreement of the project "Andasol 3" by virtue of which the Company shall pay SOLAR MILLENIUM AG the amount of EUR 7,000,000 for rendering of certain services in connection with the development of the Andasol 3 Project. However, this agreement sets forth a change of control provision by virtue of which the Company shall be entitled to terminate the agreement if SOLAR MILLENIUM AG sold its participations in the Company to a company that is not an entity within its group of companies and such sale and transfer makes SOLAR MILLENIUM AG reduces its stake in MS below 30%. In this event, SOLAR MILLENIUM AG shall pay MS an amount equal to 1% of the pending works to be executed.
>
> Additionally, we have been provided with a promotion services agreement entered into by the Company and GENERACIONES ESPECIALES, S.L. with similar terms that was terminated by virtue of the public deed of sale and purchase by SOLAR MILLENIUM, AG of the shares of MS owned by GENERACIONES ESPECIALES I, S.L. dated 28th March 2008. We have no evidence that GENERACIONES ESPECIALES, S.L. has paid the 1% compensation to the Company for the termination of the agreement."[412]

349. Marquesado's shareholder SWM was also warned about excessive costs in relation to the Andasol 3 Plant by the law firm CMS Alibiñana & Suárez de Lezo in January 2009:

> "Regarding promotinal [sic] services agreement and credit lines, there would be an issue of transfer pricing in case the prices were not agreed at arms' lenght [sic] basis between Marquesado Solar, S.L. and Solar Millenium AG and Generaciones Especiales 1, S.L."[413]

350. The Claimants' expert dismisses the relevance of these findings on the basis that the Spanish tax authorities did not question the expenses in question.[414] The failure of the

---

[411] C-97, Tax Due Diligence Report Prepared for RWE Innogy GmbH on Marquesado Solar, S.L.U. "Andasol 3" Project prepared by Garrigues, 17 October 2008, pp. 7-8.

[412] C-96, Legal Due Diligence Report Prepared for RWE Innogy GmbH on Marquesado Solar, S.L. "Andasol 3" Project prepared by Garrigues, of 6 October 2008, p. 9.

[413] C-94, Presentation on the Andasol 3 Project prepared by CMS Albiñana & Suárez de Lezo, 26 January 2009, slide 15.

[414] Brattle Second Damages Report, para. 240.

Spanish tax authorities to challenge the amortization of certain expenses said to have been incurred in relation to the Andasol 3 Plant is one thing; the issue of whether or not the entire sum of the actual stated construction costs for the Andasol 3 Plant should be included in determining whether a reasonable rate of return is currently being realized by the Andasol 3 Plant is something altogether different.

351.    The Spanish regulator used the concept of a "standardized facility" making its projections for a reasonable rate of return both in respect of the remuneration regime under RD 661/2007 and under the disputed measures and hence if costs were unreasonably excessive at a particular facility they would not be taken into account for these purposes.

352.    It also appears to be common ground that the Andasol 3 Plant suffered operational disruptions amounting to 328 days between 2012 and 2013 caused by problems with a steam turbine at the facility. The Respondent's expert considers that this disruption must be taken into account for the calculation of the Andasol 3 Plant's long term IRR, whereas the Claimants' expert rejects this.

353.    In conclusion, Mr. Hassler, CFO of RheinEnergie AG, was the Claimants' witness who was best placed to know what their current rate of return is after the disputed measures. His testimony was that the current rate of return is "slightly lower"[415] than the 8.12% calculated by the Respondent's expert. The Claimants have the burden of proof to establish what their current rate of return is. They have not discharged that burden and yet this could have been a relatively simple calculation based upon the audited accounts for their Andasol 3 Plant.  It is certainly reasonable to infer that the Claimants are currently achieving a rate of return in excess of 7% post tax.

354.    The foregoing analysis demonstrates that in absolute terms, Spain's contested measures were proportionate in that that they did not have a significant negative effect on the Claimants' investment. However, the concept of disproportionate, as used by the Claimants also seems to call for a *relative* analysis, that is, a determination whether there exists a reasonable *relationship* between the burden placed on the foreign investor by the contested

---

[415]   Transcript Day 2, p. 131, ll. 4-19 (Douglas/Hassler).

measures and the aim sought to be realized by those same State measures. In the present case, the aim sought to be realized by Spain in adopting the contested measures was to protect the solvency and stability of the public electricity system. It is undeniable that such State aim was vitally important to the public welfare of Spain. In order to achieve that aim, Spain adopted an approach of "shared sacrifice," that is, that those benefiting from the system should contribute to its continued operation and financial stability. With respect to the present case, the Claimants were required to forego a modest amount of revenue for the sake of preserving the electricity system. Thus, the aim, the method and the effect of the State measures were reasonable. From a relative perspective, one may therefore conclude that the burden on the Claimants was reasonably proportionate to the aim and purpose of the measures contested by them. The Claimants' argument that Spain's measures were not "proportionate" is therefore rejected.

355.    Thus, even in the premise that reasonableness or proportionality should be determined by reference to the impact upon the Claimants' investment, the Tribunal finds that Spain did not fail to accord the Claimants' investment fair and equitable treatment.

### (vi)    Conclusion on the Second Claim

356.    On the basis of the foregoing, the Tribunal concludes that Spain has not violated its obligation under the ECT to accord the Claimants fair and equitable treatment.

### (3) Third Claim: Impairment of the Claimants' Investment by Unreasonable Measures

#### a.    *The Parties' Positions*

##### (i)    The Claimants' Position

357.    The Claimants submit that the Respondent has violated its obligation to refrain from impairing investments through "unreasonable measures" pursuant to Article 10(1) of the ECT. The Claimants argue that it would suffice to show that Spain's adverse measures are either unreasonable or discriminatory to establish a breach of Article 10(1)[416] and contend

---

[416]   Memorial, para. 500.

that a breach of this obligation results in a simultaneous breach of the FET standard since no action of the host State can be fair or equitable if it is unreasonable or discriminatory.[417]

358. In developing their case, the Claimants rely primarily on the award rendered in the *Saluka v. Czech Republic* case, which describes the standard of reasonableness in this context as requiring that the "State's conduct bears a reasonable relationship to some rational policy."[418] Thus, as with the FET standard described above, the Claimants argue that Spain must show that its measures were: (a) taken in pursuance of a rational policy goal; and (b) carefully tailored to achieve that goal. The Claimants' arguments on this point were the same as the ones made in arguing that Spain has violated the FET standard because its measures were unreasonable.[419]

359. In support of their position, the Claimants submit that the Spanish Supreme Court has issued several judgments and two sets of interim measures finding that Spain's failure to comply with the requirements of RDL 6/2009 was a clear violation of Spanish law.[420] Moreover, according to the Claimants, the measures have certainly "impaired" the Claimants' investments since Spain's actions have wiped out 50% of the fair market value of the Claimants' investment interests in Marquesado.[421]

360. Therefore, the Claimants submit that in addition to a violation of the FET standard under the ECT, Spain's actions violate its obligation under Article 10(1) of the ECT to refrain from impairing the Claimants' investments by unreasonable and discriminatory measures.

        (ii)     The Respondent's Position

361. The Respondent rejects the Claimants' assertions that the measures taken by the Spanish Government were not rational. It argues that the measures were reasonable and

---

[417] *Id.*

[418] *Id.*, para. 501 citing, *Saluka v. Czech Republic* award , para. 460.

[419] *See* Section VI(B)(2)(i)(d) above.

[420] Memorial, para. 502.

[421] *Id.*, para. 503.

proportionate, as they guarantee the Claimants a reasonable rate of return.[422] In response to the Claimants' contention that the tariff deficit could have been resolved by increasing the charges to consumers, Spain points out that the reform affected all interested parties, including producers, distributors, and consumers, and that the energy sector reform to rebalance the Spanish electricity system was comprehensive in scope, affecting all operators and after having increased consumer tariffs by 81% between 2003 and 2012.[423] The Respondent submits that the reasonable rate of return offered to standard facilities by the Spanish model is 7.398% before tax and that the IRR of the Andasol 3 Plant is 8.12%.[424]

362.    The Respondent further points to the fact that the 2016 award in *Isolux v. Spain* [425] ruled directly on the reasonableness of Spain's measures and held it to be reasonable because they had a legitimate purpose of protecting the consumer.[426] In that case, the tribunal stated:

> "In this case, the measures adopted by the Kingdom of Spain can be criticised considering that others, praised by the National Energy Commission (CNE), would have been preferable and more favourable for the Claimant. If true, this would not be sufficient to conclude that the measures adopted were "exorbitant" or unreasonable according to the meaning in the ECT. The conduct of the State was a rational policy which, like it or not, was to protect the consumer. (...)"[427]

### b. *The Tribunal's Analysis*

363.    The third sentence of Article 10(1) of the ECT reads as follows:

> "Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal."

364.    In its above-discussed application of the FET standard, the Tribunal determined that Spain's measures were reasonable and did not violate Article 10(1) in that regard. The

---

[422]  Rejoinder, paras. 1413-1421.

[423]  *Id.*, para. 1414.

[424]  *Id.*, para. 1416.

[425]  RL-77, *Isolux v. Spain* award.

[426]  Rejoinder, paras. 1420-1421.

[427]  *Isolux v. Spain* award, para. 823. (Emphasis added)

Tribunal considers that while the above reference to "unreasonable or discriminatory measures" creates a free-standing obligation, it is merely the obverse of the requirement of reasonableness embedded in the concept of FET. This being so, the earlier analysis by this Tribunal of whether the Respondent's measures are to be considered as reasonable within the FET standard equally applies to determining whether Spain enacted unreasonable measures as prohibited by the third sentence of Article 10(1) of the ECT.[428] For reasons of judicial economy, there is no need to repeat the Tribunal's considerations here. The Tribunal holds that Spain's measures were reasonable and it therefore rejects the Claimants' claim based on the third sentence of Article 10(1) of the ECT.

### (4) Fourth Claim: Failure of Spain to Observe Obligations it Has Entered Into With the Claimants or Their Investments

#### a. *The Parties' Positions*

##### (i)    The Claimants' Position

365.    Finally, the Claimants submit that the Respondent has breached the umbrella clause in the final sentence of Article 10(1) of the ECT providing that: "Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party." According to the Claimants, the words "any obligations" in the last sentence of Article 10(1) of the ECT are to be interpreted broadly to include all types of obligations, contractual and non-contractual.[429] They note that under international law, States may enter into binding legal obligations with investors through the adoption of general legislation and that the power of States to assume binding legal obligations through their unilateral acts has been affirmed by the International Court of Justice on several occasions.[430] It is the Claimants' case that legislation passed by the Respondent establishing a framework applicable to renewable energy, and in particular RD 661/2007,

---

[428]    *See* Section III(B)(2)(iii)(d) above.

[429]    Memorial, para. 505.

[430]    *Id.*, citing CL-3, *Nuclear Tests* (*Australia v. France*), ICJ Rep 1974, Judgment, 20 December 1974, p. 253; CL-2, *Case concerning the Temple of Preah Vihear* (*Cambodia v. Thailand*), ICJ Rep 1961, Preliminary Objections, Judgment, 26 May 1961, p. 17; and CL-6, *Case Concerning the Frontier Dispute* (*Burkina Faso v. Republic of Mali*), ICJ Rep 1986, Judgment, 22 December 1986, p. 554.

RD 1614/2010 and the 2011 Resolution are thus covered by the scope of the umbrella clause in the last sentence of Article 10(1) of the ECT. In their Reply, the Claimants further refer to the RAIPRE certificate issued to the Andasol 3 Plant as a further commitment by the Respondent falling within the scope of the umbrella clause in Article 10(1) of the ECT.[431]

366.    The Claimants submit that with the enactment of RD 661/2007 (and in particular Article 44(3)) and the issuance of the 2011 Resolution, the Respondent expressly recognized the application of the FIT under RD 661/2007 (as amended by RD 1614/2010) to Marquesado, for the entire operational lifetime of the Andasol 3 Plant.[432] According to the Claimants, Spain introduced legislation that violated the Government's commitments under the 2011 Resolution and, ultimately, withdrew the entire RD 661/2007 economic regime for both future and existing installations.[433]

367.    The Claimants contend that Spain's obligations towards the Claimants can further be traced to the Government's 2010 Press Release, recording the July 2010 Agreement, whereby the Ministry agreed with the CSP industry to limit the FIT and delay the date on which qualifying plants could otherwise start supplying electricity to the grid (*i.e.* thereby delaying the date on which the installations would commence receiving the FIT).[434] According to the Claimants, in exchange for those concessions, the Government agreed to recognize the application of the RD 661/2007 economic regime and the stabilization of the FIT.[435]

368.    The Claimants state that a Draft 2010 Decree was released in early November 2010, confirming the terms of the July 2010 Agreement. The Draft 2010 Decree was followed by a letter requesting confirmation of the application of the FIT for the entire operational lifetime of the installations.[436] In particular, by a letter of 2 December 2010, Marquesado

---

[431]    Reply, paras. 637, 662.
[432]    Memorial, para. 512.
[433]    *Id.*
[434]    *Id.*, para. 513.
[435]    *Id.*
[436]    *Id.*, para. 514.

waived its right to supply electricity to the grid until 1 July 2011 and requested the Ministry to confirm that the FIT would apply, subject to the limitations provided in the Draft 2010 Decree,[437] for the "operational lifetime" of the installations.

369.    Once the Draft 2010 Decree was put in the form of approved legislation (RD 1614/2010), the Government issued the 2011 Resolution which was addressed directly to Marquesado. The Claimants argue that under the 2011 Resolution, Spain confirmed that the Andasol 3 Plant would be subject to the RD 661/2007 economic regime (as amended by RD 1614/2010) specifying and rendering the exact premium that the Andasol 3 Plant would receive for the entire operational lifetime of the installations.[438] According to the Claimants, the 2011 Resolution constitutes a "favourable administrative act" which means that it is binding on the Government, and can only be revoked under very limited circumstances, if the resolution is null and void.[439] The Claimants submit that under Spanish law, while the Government retains the discretionary power to modify certain domestic legislation, this is not the case for administrative acts such as the 2011 Resolution. Unless such resolutions are formally revoked, they continue to be binding on the Government.[440]

370.    The Claimants consider that the Government's express commitments to Marquesado under the 2011 Resolution were in line with the stability commitments in RD 661/2007 and RD 1614/2010.[441] The Claimants submit that Article 44(3) of the RD 661/2007 contained a stabilization commitment, a provision which contemplated adjustments to the premiums paid to installations operating in the Special Regime every four years after 2010, but also that any such adjustments would be prospective only, not affecting installations that had obtained a commissioning certificate prior to 1 January 2012.[442] Similarly, the Claimants argue that Article 4 of RD 1614/2010 contained a stabilization commitment and interpret

---

[437]    *Id*., para. 515.
[438]    C-22, 2011 Resolution.
[439]    Memorial, para. 518.
[440]    *Id*.
[441]    *Id*., para. 517.
[442]    *Id*.

this provision as reflecting Spain's intention to guarantee that any revisions to the premiums pursuant to Article 44(3) of RD 661/2007 would not affect duly registered, existing installations.[443]

371.    The certificate issued by the RAIPRE concerning the registration of the Andasol 3 Plant, by which it was informed that it had obtained classification in the "economic regime [under] RD 661/2007 Regulated tariff" has also been characterized by the Claimants as a favorable administrative act binding Spain in respect of the Claimants.[444] The Claimants argue that this is a commitment *vis-à-vis* the investor.[445]

372.    In the light of the above, the Claimants ask the Tribunal to conclude that by passing a series of laws and regulations which modified the RD 661/2007 legal and economic regime to existing installations, including the Andasol 3 Plant, Spain has breached its repeated commitments under RD 661/2007, RD 1614/2010 and the 2011 Resolution, in violation of the umbrella clause in Article 10(1) of the ECT.

(ii)    The Respondent's Position

373.    The Respondent rejects the Claimants' assertion that it has violated the umbrella clause found in the last sentence of Article 10(1) of the ECT.[446] It advances three reasons in support of its position.

374.    First, the Respondent contends that the Claimants' argument goes against the literal sense of the umbrella clause in Article 10(1) of the ECT and that the Respondent's actions on which the Claimants base their case are not "obligations" covered by this provision.[447] Taking a more restrictive view of the term *"obligations"* than do the Claimants, the Respondent notes that the words "any obligations" in the umbrella clause are modified by the words "…entered into", which require, according the Respondent, the assumption by

---

[443]    *Id.*
[444]    Reply, para. 662.
[445]    *Id.*
[446]    Counter-Memorial, paras. 1241-1282.
[447]    *Id.*, paras. 1244-1251.

the Contracting State of specific obligations regarding a certain investor or a certain investment.[448] According to the Respondent, this excludes general legislation from the scope of the umbrella clause in Article 10(1) of the ECT.

375.  The Respondent then reasons that the only way in which a State can "enter" obligations with an investor of another Contracting Party or with its investment is (a) either through a bilateral relationship with that investor or its investment, or (b) through a unilateral act specifically aimed at that foreign investor or its investment, which implies the establishment of a specific or direct relationship (what the Respondent calls "*vis-à-vis*" relationship).[449] In support of this interpretation, the Respondent relies on various legal authorities, including the *Isolux v. Spain* award which held that, for the umbrella clause to apply, it is necessary that the obligation in question be specifically contracted with the foreign investor or with its investment.[450]

376.  Second, the Respondent submits that it has not entered into an obligation "*vis-à-vis*" the Claimants either under RD 661/2007 or RD 1614/2010, or the "agreement" of 2 July 2010. According to the Respondent, even the Claimants recognize that any undertakings assumed were assumed by Spain "with the wind and thermoelectric producers" as a whole, and not with the Claimants or their investment in particular.[451] It moreover argues that while the 2011 Resolution specifically targeted the Andasol 3 Plant, it was restricted to communicating to the Plant the applicable regime in force and that in respect of such communication it is not a favorable administrative act but merely an informational action.[452]

377.  Moreover, according to the Respondent, the alleged agreement of 2 July 2010 was not an agreement at all and did not create obligations protected by the umbrella clause,[453] and the

---

[448]  *Id.*, para. 1247.
[449]  *Id.*, paras. 1252-1260; Rejoinder, paras. 1445-1447.
[450]  Rejoinder, para. 1435; Counter-Memorial, paras. 1252, 1253, 1256 and 1258, discussing other legal authorities.
[451]  Counter-Memorial, para. 1274.
[452]  *Id.*, para. 1280; Rejoinder paras. 1466-1472.
[453]  Rejoinder, paras. 1453-1460.

RAIPRE certificates only reveal the registration of facilities in an administrative registry, not generating any specific obligation or commitment.[454]

378.    The Respondent's third reason for denying liability under the umbrella clause is that even if the Tribunal were to conclude that some commitment covered by the umbrella clause was made *vis-à-vis* the Claimants, none of the disputed measures in this arbitration represent a breach of the obligations that Spain could have assumed under the legislation applicable to the CSP plants, because this legislation obliges them only to give investors a "reasonable rate of return" and the new measures imposed by Spain guarantee the Claimants a profitability of around 7.398%.[455]

### b.    The Tribunal's Analysis

379.    The last sentence of Article 10(1) of the ECT, the umbrella clause, states: "Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party." With respect to this case, the Tribunal must decide a threshold question: does the last sentence of Article 10(1) of the ECT apply to all types of obligations undertaken by Spain, however created, as the Claimants contend, or only to contractual obligations or obligations made *vis-à-vis* a specific investor or investment, as the Respondent argues?

380.    A literal reading of this sentence, and particularly of the words "entered into with an Investor," leads one to conclude that the ECT negotiators intended the umbrella clause to cover only contractual obligations or contractual-like arrangements, that is to say obligations assumed specifically in respect of a particular individual or legal person. The words "enter into" are normally used to refer to the process of making contracts with other persons. They would not usually be used to refer to non-contractual like obligations assumed by governments in their regulations or legislators in respect of their laws with effect either *erga omnes* or in respect of an objectively defined group of beneficiaries. In those latter situations, one would be more likely to refer to the government or legislature

---

[454]    *Id.*, paras. 1461-1465.
[455]    *Id.*, paras. 1473-1480.

"assuming" a general obligation in respect of a beneficiary, rather than "entering into" an obligation with someone.

381.    The above interpretation is strengthened by the consideration of the texts of this provision in the other authentic languages of the ECT. The Spanish and French versions of the last sentence of Article 10(1), both of which, according to Article 50 of the ECT, are equally authentic with the ECT's other four authentic languages, read as follows:

> "Toda Parte Contratante cumplirá las obligaciones que haya contraído con los inversores o con las inversiones de los inversores de cualquier otra Parte Contratante."

> "Chaque partie contractante respecte les obligations qu'elle a contractées vis-à-vis d'un investisseur ou à l'égard des investissements d'un investisseur d'une autre partie contractante."

382.    The use of the words "*contraído*" in the Spanish version and "*contractées*" in the French version, both of which mean "contracted," confirm that the obligations governed by the umbrella clause, under Article 10(1) of the ECT, are only those arising from contracts or contract-like relationships. This interpretation has been further confirmed by the ECT "Reader's Guide" produced by the Energy Charter Secretariat, which explains that the umbrella clause "covers any contract that a host country has concluded with a subsidiary of the foreign investor in the host country, or a contract between the host country and the parent company of the subsidiary."[456]

383.    It is uncontested between the Parties that there is no contract between the Claimants and the Respondent concerning the Claimants' investment in Spain. The Claimants have invested in Spain in accordance with the 1997 Electricity Law, RD 661/2007 and RD 1614/2012, which regulate the compensation scheme for installations operating in the Special Regime. These regulations are of general application for those operating in the Spanish electricity system and while the Respondent has assumed certain privileges conferred upon a defined group of persons while they were in force, they cannot be considered as having been entered into in respect of a specific investment or investor or

---

[456]    RL-53, The Energy Charter Treaty: A Reader's Guide, Energy Charter Secretariat, p. 26.

having created rights *vis-à-vis* the Claimants in particular. As the Tribunal previously concluded, the July 2010 Agreement cannot, moreover, be considered as a contract or contract-like obligation assumed by the Respondent.[457] This document is no more that the result of a process of consultation, required by Spanish law,[458] with no legal binding force by itself.[459] The Tribunal has further concluded that the registration of the Andasol 3 Plant in the RAIPRE did not create any rights besides those granted – to all qualifying installations – by the RD 661/2007.[460] Lastly, as the Tribunal has already concluded, the 2011 Resolution is no more than a communication to the Andasol 3 Plant of the remuneration rate applicable to it at the time it was issued, creating no further rights in respect of the Claimants.[461] This being so, the above documents or acts by the Respondent remain outside of the scope of the umbrella clause in Article 10(1) of the ECT.

384.    As a result of the foregoing, the Tribunal concludes that the umbrella clause in the last sentence of Article 10(1) of the ECT applies only to contractual obligations and contractual-like obligations and that since none of the alleged obligations advanced by the Claimants arise from contracts or have been entered into by Spain *vis-à-vis* the Claimants, none of them are governed by the umbrella clause. As a result, the Tribunal rejects the Claimants' fourth claim that the Respondent has failed to observe obligations under Article 10(1) of the ECT.

## VII.    COSTS

385.    The Tribunal will present the respective arguments of the Claimants (A) and of the Respondent (B) and summarize the costs of the proceeding (C), before deciding on the costs and expenses of the proceeding (D).

---

[457]    *See* Section VI(B)(2)(iii)(b)(b) above.

[458]    R-59, Law 50/1997 of 27 November, Article 24.

[459]    *See* para. 285 above.

[460]    *See* Section VI(B)(2)(iii)(b)(e) above.

[461]    *See* Section VI(B)(2)(iii)(b)(d) above.

## A. THE CLAIMANTS' COST SUBMISSION

386.    In its submission on costs, the Claimants request that the Tribunal grant an award pursuant to Article 61(2) of the ICSID Convention ordering that Spain bear all the Claimants' costs and expenses related to this arbitration in the amount of EUR 4,983,290.55.[462] That amount is composed of the following items: 1) Legal fees and related disbursements: EUR 3,873,042.02; 2) Expert witness costs: EUR 628,795.15; 3) the Claimants' disbursements[463] incurred in connection with the proceedings: EUR 29,876.78; 4) the ICSID lodging fee: USD 25,000[464]; and 5) ICSID advance payments: USD 499,820.[465]

387.    While acknowledging that the Tribunal has very broad discretion with respect to the allocation of costs both in terms of the procedural costs and the costs incurred by the Parties, the Claimants argue that because of the Respondent's treaty violations, in the event that the Claimants ultimately prevail in this arbitration, they are entitled to their costs on a full indemnity basis.[466]

## B. THE RESPONDENT'S COST SUBMISSION

388.    In its submission on costs, the Respondent asks the Tribunal to order the Claimants to pay all its costs and expenses related to this arbitration, an amount alleged to total EUR 3,314,841.24. Individual cost items include the following:[467] 1) Legal fees: EUR 2,289,980; 2) Experts and witnesses: EUR 551,205.12; 3) Translations: EUR 40,760.52; 4) Editing and printing: EUR 4,549.44; 5) Courier services: EUR 2,231.34; 6) Travel expenses: EUR 16,031.33; and 7) ICSID advance payments: USD 499,802.[468]

---

[462]  The Claimants' Cost Submission, paras. 22, 10, 12, 15 and 16.

[463]  According to their Cost Submission, these disbursements include costs incurred by members of the management of the Claimants and of the Claimants' internal legal counsel for travel and accomodation expenses.

[464]  According to their Cost Submission, the lodging fee was in EUR 19,827.16.

[465]  According to their Cost Submission, the three advance payments were as follows: (i) USD 150,000 (EUR 141, 592.99), (ii) USD 150,000 (EUR 127,664.45); and (iii) USD 200,000 (EUR 162,492.00). The total advance payments were EUR 431,749.44.

[466]  The Respondent's Cost Submission, paras. 19, 21.

[467]  The Respondent's Cost Submission, paras. 18, 17, 11-16.

[468]  According to its Cost Submission, the Respondent's advance payments to ICSID amount to EUR 438,651.54.

## C.  THE COSTS OF THE PROCEEDING

389.  The costs of the proceedings, including fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses are as follows:

| CONCEPT | AMOUNT IN [USD] |
|---|---|
| **Arbitrators' fees and expenses** | |
| Prof. Jeswald W. Salacuse | 255,013.99 |
| Prof. Kaj Hobér | 110,985.00 |
| Prof. Zachary Douglas QC | 166,112.78 |
| **ICSID's administrative fees** | 148,000.00 |
| **Direct expenses**[469] | 189,292.76 |
| **Total** | **869,404.53** |

390.  The above costs have been paid out of the advances made by the Parties in equal parts.[470]

## D.  THE TRIBUNAL'S DECISION ON COSTS

391.  Article 61(2) of the ICSID Convention, which is the Convention's only reference to arbitral costs, provides as follows:

> "In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

392.  A rudimentary analysis of this text reveals three principles. First, the Tribunal is fully empowered by the Convention to assess expenses incurred by the Parties and to allocate such arbitration expenses among the Parties to the arbitration. Second, such assessible arbitration expenses are of three types: a) fees and expenses of the members of the tribunal; b) expenses incurred by the parties in connection with the proceedings; and c) charges for the use of ICSID facilities. All of the expense items claimed in each of the Party's

---

[469]  This amount includes expenses related to meetings, stenographic and translation services, and expenses related with courier services of this Award (courier, printing, among others).

[470]  ICSID will provide a detailed final statement of the case account to the Parties. The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

submissions, noted above, fall into one of these three categories and are therefore fully within the powers of this Tribunal to assess and allocate. Third, Article 61(2) offers no rule or guidance to the Tribunal as to how to allocate and assess such expenses to the individual parties in the arbitration.

393.    The Tribunal therefore has very broad, indeed unfettered discretion, to determine how the costs of an arbitration proceeding are to be borne by individual parties. In their pleadings on costs, both the Claimants and the Respondent have acknowledged this principle in identical terms. The Claimants' cost submission, affirms:

> "The ECT is silent on the issue of how the costs of the resolution of any dispute are to be allocated. The Tribunal therefore has a very broad discretion with respect to the allocation of costs both in terms of the procedural costs and the costs incurred by the parties. The exercise of the Tribunal's discretion is entirely unfettered, especially with respect to legal expenses. The ICSID Arbitration Rules neither explicitly favour a specific approach, nor elucidate which criteria a tribunal should consider as relevant in ruling on the allocation of costs."[471]

394.    Similarly, the Respondent's cost submission states:

> "The Tribunal therefore has a very broad discretion with respect to the allocation of costs both in terms of the procedural costs and the costs incurred by the parties. The exercise of the Tribunal's discretion is entirely unfettered (especially with respect to legal expenses); and the ICSID Arbitration Rules neither explicitly favour a specific approach, nor do they elucidate the criteria a tribunal should consider as relevant in ruling on the allocation of costs in investment treaty arbitration."[472]

395.    ICSID Arbitration Rule 28 affirms that the Tribunal has unlimited latitude to allocate the costs of an arbitral proceedings to individual parties as the Tribunal sees fit. It states:

---

[471]   Claimants' Cost Submission, para. 19.

[472]   Respondent's Cost Submission, para. 21.

"Rule 28

Cost of Proceeding

(1) Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:

(a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre;

(b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties.

(2) Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding."

396.    The ECT provisions on investor-State dispute settlement are silent on the allocation of costs; however, Article 27(3)(j) of the ECT on the Settlement of Disputes between Contracting Parties establish a presumption that the expenses of interstate arbitrations under the ECT are to be born equally by the disputing parties. It states:

"(j)    The expenses of the tribunal, including the remuneration of its members, shall be borne in equal shares by the Contracting Parties to the dispute. The tribunal may, however, at its discretion direct that a higher proportion of the costs be paid by one of the Contracting Parties to the dispute."

397.    This treaty provision, of course has no application to the present case. However, the fact the ECT sought to limit the discretion of arbitrators to apportion costs in interstate disputes, but made no mention of similar limitations in investor-State arbitration, sustains the inference that the ECT Contracting Parties did not intend to establish rules on cost allocation in investor-State cases, allowing other applicable rules on costs, like those in the ICSID Convention and Arbitration Rules, to apply in appropriate cases.

398.  ICSID's awards and decisions offer little guidance on allocating costs. According to Christoph Schreuer, "[t]he practice of ICSID tribunals in apportioning costs is neither clear nor uniform."[473] Although he wrote that statement in 2009, developments in ICSID investor-State arbitration since that time have by no means led to greater clarity or uniformity. The reason appears to be that cost allocation in particular instances depends crucially on the facts of the cases and the ways in which the parties' counsel have litigated them. The wide variety of fact situations and litigation practices has contributed to a variety of results with respect of the allocation of arbitration costs.

399.  The aim of a tribunal in allocating costs is to reach a fair result in the individual case. In the present case, the Tribunal has concluded that Spain's measures challenged by the Claimants did not violate the ECT or international law. Spain adopted those measures in the public interest in order to protect a vital public service. It has also defended them in the public interest in these proceedings, but in order to do so it has had to expend over EUR 3.3 million in this case alone, a not insignificant sum. In view of the length and complexity of this case, such amount is not unreasonable. Indeed, its reasonableness is supported by the fact that the Claimants incurred costs and expenses of EUR 4,983,290.55, some 50% more than Spain spent in its defense (*i.e.* EUR 1,668,499.31).

400.  The amount that Spain must spend in litigation becomes staggering when one considers that it is facing numerous other ECT cases requiring it to defend the very same measures challenged in the present case. Those cases are of course separate and distinct from the present case. But the overall financial burden that they place on the Respondent is nevertheless relevant in determining a fair result on cost allocation in individual cases.

401.  Now that Spain has prevailed on the merits in this case, the Tribunal is faced with the question of whether Spain alone should bear the costs of its defense or whether the Claimants should in some measure pay a portion of or all those costs. The Claimants instituted the arbitration and pursued it vigorously. They have been the driving force behind

---

[473]  THE ICSID CONVENTION: A COMMENTARY, Christoph Schreuer, (2nd edition), p. 1229.

the process. Now that they have failed in their effort, it is only fair that they pay a portion or all of the costs it forced Spain to incur in what has been a fruitless effort.

402.    To determine the precise amount of Spain's cost that the Claimants must bear, one may examine the various issues in the case to determine the ones where the Claimants failed to prevail. Issues have a direct impact on costs. While not all issues have the same importance or require the same amount of time to resolve, as a general matter the amount of arbitration costs are roughly related to the number of issues addressed. As the number of issues in a case increases, so too does the amount of time and attention that legal counsel and arbitrators must devote to them. Time devoted by counsel and arbitrators directly influence the amount of fees they are paid, and counsel and arbitrator fees are usually the largest cost items in any investor-State case.

403.    The present case considered and resolved six issues: four merits issues raised by the Claimants (lack of stable investment conditions; FET; unreasonable measures; and failure to observe obligations) and two jurisdictional objections raised by the Respondent (the intra-EU objection and the taxation objection). The Respondent prevailed on five of the six issues. Thus, the Respondent won 83.33% of the issues. It would therefore be fair to require the Claimants to compensate the Respondent for 83.33% of the latter's (i) legal fees and related expenses ("Defense Expenses") and (ii) costs of the proceeding.

404.    First, the Respondent's total Defense Expenses are EUR 2,876,189.70.[474] On the basis of the foregoing, the Tribunal concludes that the Claimants shall pay the Respondent 83.33% of the Respondent's Defense Expenses, an amount equaling EUR 2,396,728.88.

405.    Second, the Respondent's total costs of the proceeding are USD 434,702.27.[475] On the basis of the foregoing, the Tribunal concludes that the Claimants shall pay the Respondent 83.33% of the latter's costs of the proceeding, an amount equaling USD 362,237.40.

---

[474]    *See* para. 388 above. This amount excludes the ICSID advance payments of USD 499,802.

[475]    This amount was calculated by dividing the total costs of the proceeding of USD 869,404.53 (*see* Table in para. 389 above) by two.

406.    Finally, in its submission on costs, the Respondent asked the Tribunal to order the Claimants to pay all costs incurred by the Respondent, "*all of this including a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment.*"[476] Because the Tribunal adopted an issues approach to allocating costs, it finds that the inclusion of interest on such gross amounts is neither feasible or appropriate as it would be if the Tribunal were able to calculate interest on specific amounts of costs items and the dates on which they were incurred. The Tribunal, invoking its above-described broad discretion with respect to the allocation of costs, has therefore decided not to award interest on costs prior to the date of this Award.

## VIII.    AWARD

407.    For the reasons set forth above, the Tribunal decides as follows:

(1)    Unanimously, that the Tribunal has jurisdiction over the Parties in this case. It also has jurisdiction to judge the Claimants' claims with the exception that it has no jurisdiction to determine whether the tax imposed by Law 15/2012 violates Spain's obligations to the Claimants' investment under the ECT.

(2)    By a majority, the Tribunal rejects the Claimants' claim that the Respondent has violated Article 10 of the ECT by failing to provide the Claimants with stable, equitable, favourable and transparent conditions for their investment;

(3)    By a majority, the Tribunal rejects the Claimants' claim that the Respondent has violated Article 10 of the ECT by failing to accord the Claimants' investment fair and equitable treatment;

(4)    By a majority, the Tribunal rejects the Claimants' claim that the Respondent has violated Article 10 of the ECT by impairing the Claimants' investment as a result of unreasonable measures;

---

[476]    Respondent's Cost Submission, para. 10 (italics in the original).

(5)    By a majority, the Tribunal rejects the Claimants' claim that the Respondent has violated Article 10 of the ECT by failing to observe obligations that it has entered into with the Claimants or their investments;

(6)    By a majority, the Tribunal orders the Claimants to pay the Respondent EUR 2,396,728.88 regarding the Respondent's Defense Expenses; and

(7)    By a majority, the Tribunal orders the Claimants to pay the Respondent USD 362,237.40 regarding the Respondent's costs of the proceeding.

(8)    On the above amounts, compound interest shall accrue from the date of this Award for each amount at a rate equal to the average rate of the six-month U.S. Treasury bills prevailing on such initial date, and thereafter at the subsequent six-month average interest rates of six-month U.S. Treasury bills prevailing in each following six-month periods, until payment by the Claimants.    Such interest shall be compounded semi-annually.

Prof. Kaj Hobér
Arbitrator
Subject to the attached dissenting opinion

20 NOV 2019

Prof. Zachary Douglas
Arbitrator

8 NOV 2019

Prof. Jeswald W. Salacuse
President of the Tribunal

1 NOV 2019

146

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**STADTWERKE MÜNCHEN GMBH, RWE INNOGY GMBH, AND OTHERS**
Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/15/1**

---

# Dissenting Opinion
# Professor Kaj Hobér

---

1.      I agree with my co-arbitrators as far as jurisdiction is concerned. I do not, however, agree with them concerning liability.

2.      For the reasons set out below, I find that the Respondent has breached the Fair and Equitable Treatment (FET) standard enshrined in Article 10(1) of the ECT. As a consequence, the Claimants are in my view entitled to full compensation for any damages caused by such breach.

3.      I preface my analysis by restating the obvious, *viz.*, that it is based on the particular facts, evidence and arguments presented by the Parties in this arbitration. Also, factually similar cases are different. They differ, *inter alia*, in the manner in which they are presented by counsel and in the manner in which witnesses and experts testify and are cross-examined.

4.      The core liability issue in this arbitration is whether the Respondent, by introducing the measures challenged by the Claimants, has violated the FET standard in Article 10(1) of the ECT.

5.      The Claimants have also relied on other standards of protection in Article 10(1) of the ECT. I do not deal separately with these standards of protection, largely because in my opinion they overlap with, and form part of, the FET standard. This does not relate to the so-called umbrella clause in the last sentence of Article 10(1). I do not need to – and I do not – express a view on this provision.

6.      The FET standard is laid down in the second sentence of Article 10(1). That sentence refers back to the first sentence - "such conditions" in the second sentence refers to the conditions mentioned in the first sentence – which stipulates that Contracting Parties shall "encourage and create stable, equitable favorable and transparent conditions for Investors of Other Contracting Parties to make investments in its Area" as such term is defined in the ECT. Whilst it could perhaps be argued that that the first sentence of Article 10(1) is not a separately enforceable obligation under Article 26 of the ECT, it does constitute "context" in the meaning of Article 31(1) of the Vienna Convention on the Law of Treaties for purposes of interpreting the FET standard in the second sentence of Article 10(1).

7.    It follows, in my view, that the FET standard in the ECT must be interpreted as including stable and equitable conditions for investors. It is thus a reasonable and legitimate expectation among investors that a Contracting Party will provide fundamental stability with respect to the main characteristics of the legal and regulatory regime which existed at the time when the investor made his investment. Under the FET standard in Article 10(1), it is indeed the obligation of a Contracting Party to do so.

8.    Needless to say, this does not mean that the legal and regulatory regime existing at the time when the investment was made cannot be changed. A Contracting Party, acting as a host State, retains the power to regulate its economy, including making amendments and changes to the legal and regulatory regime, unless it has agreed not to do so.

9.    Most experienced and sophisticated investors – the record shows that the Claimants fall into this category – understand and expect that changes and amendments will be made in the legal and regulatory framework during the lifetime of their investment. As matter of general principle, however, the reasonable and legitimate expectations of investors do not include fundamental and radical changes to the legal and regulatory regime existing at the time when the investment was made.

10.    A legitimate expectation is not a hope. It is more than a hope, but does not need to be based on a guarantee or a promise or on any other commitment. Legitimate expectations are usually formed on the basis of the legal and regulatory framework in the host State existing at the time of the investment in combination with statements by and conduct of the host State and its representatives concerning the legal and regulatory framework, as well as concerning the investment in question. The present case is no exception.

11.    The Claimants made their investment based on the regulatory regime launched by RD 661/2007. The legal and financial analyses performed by the Claimants, and by financial institutions and investors involved in the project, as well as by retained consultants, were based on this regulatory regime. In addition to the expectations created by the RD 661/2007 regime itself, representatives of Spain made statements and presentations which explained the benefits of investing in the Spanish renewable sector at

the time. Such statements and representations form part of the Claimants' legitimate expectations in this dispute.

12.   The Claimants have among other things referred to a press release by the Ministry of Industry, Energy and Tourism in May 2007 announcing RD 661/2007 and explaining the stability of the new regime. The Claimants have also referred to and relied on reports from the CNE from 2007 and 2008 emphasizing the stability and predictability of the RD 661/2007 regime. In addition, the Claimants have referred to presentations made by CNE in October 2008 and in February 2009 and to presentations by the InvestinSpain agency in November 2008 referring, *inter alia*, to regulatory stability.

13.   The Claimants have furthermore relied on a resolution by the Ministry of Industry, Tourism and Commerce –by the Director General for Energy Policy and Mines – in December 2010 concerning the Claimants' investment, i.e. the Andasol 3 power Plant, confirming that the Plant would be subject to the RD/661/2007 regime and specifying the feed in tariffs that the Plant would receive for the entire operational life of the installations.

14.   Based on the foregoing, i.e. the RD 661/2007 regime itself and the statements of and conduct by representatives of Spain, I find that the Claimants' reasonable expectations at the time of their investment were that there would not be any fundamental and radical changes to the RD 661/2007 regime and that the Claimants relied on these expectations when making their investments.

15.   Spain has argued that the only legitimate expectation that the Claimants could have had was to obtain a "reasonable rate of return" on their investments. I do not agree.

16.   Determining whether the FET standard in Article 10(1) of the ECT has been breached, including whether the legitimate expectations of investors have been frustrated, involves the balancing of the State's regulatory interest in relation to the legitimate expectations of investors. In performing this balancing exercise, the economic effect of the measures challenged by the Claimants is but one of several factors to take into account to wit to be analyzed primarily in relation to the quantum of damages to be granted to investors. In

addition, the statements by and conduct of representatives of Spain mentioned above were not about a "reasonable return", but rather about regulatory certainty and stability.

17. The remaining question to be addressed then is whether the measures challenged by the Claimants did bring about a radical and fundamental change in the legal and regulatory framework existing at the time when the Claimants made their investment. In my view the short answer is yes.

18. Observing the principle of judicial economy, I focus on RDL 9/2013, which was the straw that broke the camel's back.

19. The regime introduced by RD 661/2007 had been modified over the years, essentially between 2010 and the beginning of 2013. Modifications of the regulatory regime were thus not unknown. Royal Decree Law (RDL) 9/2013 adopted in July 2013, and subsequent enactments in 2013 and 2014, however, introduced a fundamental and radical break with the RD 661/2017 regime and eventually abolished that regime. RDL 9/2013 was supplemented by RD 413/2014 and MO IET/1045/2014 adopted in June 2014.

20. The changes introduced by RDL 9/2013 were substantial. Power plants were, for example, to be paid on the basis of capacity and on regulators' estimates of the hypothetical capital and operating costs per unit of generating capacity of a hypothetical standard installation of the type concerned and not on the basis of electricity produced; the regulated feed-in-tariffs were abolished; remuneration was no longer to be paid for the life of the plants but was limited to 25 years; indexation of tariffs was no longer tied to the CPI; payment for electricity generated through natural gas as a support fuel was restricted.

21. The new regulatory system was based on very different assumptions compared to the RD 661/2007 regime in that it was based on the hypothetical costs of a hypothetical efficient plant – in other words, ignoring actual costs, such as servicing of loans, and other financial costs, as well as actual efficiencies of specific plants - as determined by the regulator, all of it seemingly intended significantly to reduce subsidies to existing plants. The standards of the new system were then applied retroactively to all existing facilities, including the Claimants'.

22. The new regulatory system was stated to apply only with respect to future remuneration. It does, however, subtract past remuneration, i.e. remuneration due under the previous system, from future remuneration. In that sense the new system has retroactive effect since it claws back past remuneration already earned by investors, including the Claimants.

23. The new regime introduced by RDL 9/2013, and subsequent measures, fundamentally and radically changed the regime existing at the time when the Claimants made their investments. The Claimants' reasonable and legitimate expectations were thereby frustrated and denied. This constitutes a violation of the FET standard laid down in Article 10(1) of the ECT.

24. As mentioned above, the Claimants are entitled to full compensation for any damages caused by the violation of the FET standard. Being in the minority, however, it is not meaningful for me to embark on an analysis and discussion of the compensation which in my view is due to the Claimants.

_____
Professor Kaj Hobér

20 NOV 2019

6