# JUDGMENT OF THE COURT
## 1 June 1999 *

In Case C-126/97,

REFERENCE to the Court under Article 177 of the EC Treaty (now Article 234 EC) by the Hoge Raad der Nederlanden (Netherlands) for a preliminary ruling in the proceedings pending before that court between

**Eco Swiss China Time Ltd**

and

**Benetton International NV**

on the interpretation of Article 85 of the EC Treaty (now Article 81 EC),

THE COURT,

composed of: G.C. Rodríguez Iglesias, President, P.J.G. Kapteyn, J.-P. Puissochet, G. Hirsch and P. Jann (Presidents of Chambers), G.F. Mancini, J.C. Moi-

---

* Language of the case: Dutch.

I - 3079

tinho de Almeida (Rapporteur), C. Gulmann, J.L. Murray, D.A.O. Edward, H. Ragnemalm, L. Sevón and M. Wathelet, Judges,

Advocate General: A. Saggio,

Registrar: H. von Holstein, Deputy Registrar,

after considering the written observations submitted on behalf of:

— Eco Swiss China Time Ltd, by P.V.F. Bos and M.M. Slotboom, of the Rotterdam Bar, and S.C. Conway, Attorney-at-Law admitted to the District of Columbia and Illinois Bar,

— Benetton International NV, by I. Van Bael and P. L'Ecluse, of the Brussels Bar, and H.A. Groen, of The Hague Bar,

— the Netherlands Government, by M.A. Fierstra, Deputy Legal Adviser in the Ministry of Foreign Affairs, acting as Agent,

— the French Government, by K. Rispal-Bellanger, Head of the Subdirectorate for International Economic Law and Community Law in the Legal Affairs Directorate of the Ministry of Foreign Affairs, and R. Loosli-Surrans, Chargé de Mission in the same directorate, acting as Agents,

— the Italian Government, by Professor U. Leanza, Head of the Contentious Diplomatic Affairs Department in the Ministry of Foreign Affairs, acting as Agent, assisted by I.M. Braguglia, Avvocato dello Stato,

— the United Kingdom Government, by J.E. Collins, Assistant Treasury Solicitor, acting as Agent, assisted by V.V. Veeder QC,

— the Commission of the European Communities, by C.W.A. Timmermans, Deputy Director-General, W. Wils and H. van Vliet, of its Legal Service, acting as Agents,

having regard to the Report for the Hearing,

after hearing the oral observations of Eco Swiss China Time Ltd, represented by P.V.F. Bos, L.W.H. van Dijk and M. van Empel, of the Brussels Bar; of Benetton International NV, represented by H.A. Groen and I. Van Bael; of the Netherlands Government, represented by M.A. Fierstra; of the French Government, represented by R. Loosli-Surrans; of the Italian Government, represented by I.M. Braguglia; of the United Kingdom Government, represented by S. Boyd QC and P. Stanley, Barrister; and of the Commission, represented by C.W.A. Timmermans, W. Wils and H. van Vliet, at the hearing on 7 July 1998,

after hearing the Opinion of the Advocate General at the sitting on 25 February 1999,

gives the following

## Judgment

1   By order of 21 March 1997, received at the Court on 27 March 1997, the Hoge Raad der Nederlanden (Supreme Court of the Netherlands) referred to the Court for a preliminary ruling under Article 177 of the EC Treaty (now Article 234 EC) five questions on the interpretation of Article 85 of the EC Treaty (now Article 81 EC).

2   Those questions have been raised in proceedings brought by Benetton International NV ('Benetton') for stay of enforcement of an arbitration award ordering it to pay damages to Eco Swiss China Time Ltd ('Eco Swiss') for breach of a licensing agreement concluded with the latter, on the ground that the award in question was contrary to public policy within the meaning of Article 1065(1)(e) of the Wetboek van Burgerlijke Rechtsvordering (hereinafter referred to as 'the Code of Civil Procedure') by virtue of the nullity of the licensing agreement under Article 85 of the Treaty.

**The national legislation**

3   Article 1050(1) of the Code of Civil Procedure provides:

'No appeal shall lie from an arbitration award to a higher arbitration tribunal unless otherwise agreed by the parties'.

4   Article 1054(1) of the Code states:

'In making their awards, arbitration tribunals shall apply rules of law'.

5   Article 1059 of the Code provides:

'1. An arbitration award, whether complete or partial, shall not acquire the force of *res judicata* unless it is a final award. It shall acquire that force from the date on which it is made.

2. However, where, in accordance with the agreement between the parties, an appeal may be made to a higher arbitration tribunal against a complete or partial final award, that award shall acquire the force of *res judicata* as from the date on which the time-limit for appealing expires or, if an appeal is lodged, from the date on which the decision is given in the appeal proceedings, if and in so far as that decision upholds the award appealed against.'

6   As regards judicial review of arbitration awards, Article 1064 of the Code of Civil Procedure provides:

'1. An action contesting (a) a final arbitration award, whether complete or partial, against which no appeal may be made to a higher arbitration tribunal or (b) a final arbitration award, whether complete or partial, made on appeal to a higher arbitration tribunal may be brought only by way of an application for annulment or a *request-civiel* in accordance with the provisions of this section.

2. An application for annulment shall be made to the Rechtbank, at the registry of which the original of the award must be lodged pursuant to Article 1058(1).

3. A party may lodge an application for annulment as soon as the award has acquired the force of *res judicata*. The right to bring an action shall expire three months after the date of lodgement of the award at the registry of the Rechtbank. However, where the award, endorsed with an order for its enforcement, is served on the other party to the proceedings, that party may, notwithstanding the expiry of the period of three months referred to in the previous sentence, lodge an application for annulment within three months from the date of such service.

4. An application may be lodged for annulment of an interim arbitration award only together with the application for annulment of the complete or partial final arbitration award.

...'.

7    Article 1065 of the Code provides:

'1. Annulment may be ordered only on one or more of the following grounds:

(a) there is no valid arbitration agreement;

(b) the arbitration tribunal has been constituted in breach of the applicable rules;

(c) the arbitration tribunal has failed to comply with its terms of reference;

(d) the award has not been signed or does not state the reasons on which it is based, contrary to the provisions of Article 1057;

(e) the award or the manner in which it has been made is contrary to public policy or accepted principles of morality.

...

4. An award may not be annulled on the ground referred to in paragraph 1(c) above if the party pleading that ground took part in the proceedings without raising it in those proceedings despite having been aware that the arbitration tribunal was failing to comply with its terms of reference.'

8   Finally, Article 1066(1) and (2) of the Code of Civil Procedure provides that an application for annulment does not operate to stay enforcement of the award, but the court seised of such an application may, if a stay is justified and at the request of either party, order a stay of enforcement pending a definitive decision on the application for annulment. An application for a stay must be based on the existence of a reasonable prospect that the arbitration award will be annulled.

**The main proceedings**

9   On 1 July 1986 Benetton, a company established in Amsterdam, concluded a licensing agreement for a period of eight years with Eco Swiss, established in Kowloon (Hong Kong), and Bulova Watch Company Inc. ('Bulova'), established in Wood Side (New York). Under that agreement, Benetton granted Eco Swiss the right to manufacture watches and clocks bearing the words 'Benetton by Bulova', which could then be sold by Eco Swiss and Bulova.

10  Article 26.A of the licensing agreement provides that all disputes or differences arising between the parties are to be settled by arbitration in conformity with the rules of the Nederlands Arbitrage Instituut (Netherlands Institute of Arbitrators) and that the arbitrators appointed are to apply Netherlands law.

11  By letter of 24 June 1991, Benetton gave notice of termination of the agreement with effect from 24 September 1991, three years before the end of the period originally provided for. Arbitration proceedings were instituted between Benetton, Eco Swiss and Bulova in relation to the termination of the agreement.

12  In their award of 4 February 1993, entitled 'Partial Final Award' (hereinafter 'the PFA'), lodged at the registry of the Rechtbank (District Court) te 's-Gravenhage on the same date, the arbitrators directed *inter alia* that Benetton should compensate Eco Swiss and Bulova for the damage which they had suffered as a result of Benetton's termination of the licensing agreement.

13  When the parties failed to come to agreement on the quantum of damages to be paid by Benetton to Eco Swiss and Bulova, the arbitrators on 23 June 1995 made an award entitled 'Final Arbitral Award' (hereinafter 'the FAA'), which was lodged at the registry of the Rechtbank on 26 June 1995, ordering Benetton to pay USD 23 750 000 to Eco Swiss and USD 2 800 000 to Bulova by way of compensation for the damage suffered by them. By order of the President of the Rechtbank of 17 July 1995, leave was given to enforce the FAA.

14  On 14 July 1995, Benetton applied to the Rechtbank for annulment of the PFA and the FAA on the ground, *inter alia*, that those arbitration awards were contrary to public policy by virtue of the nullity of the licensing agreement under Article 85 of the Treaty, although during the arbitration proceedings neither the parties nor the arbitrators had raised the point that the licensing agreement might be contrary to that provision.

15  The Rechtbank dismissed that application by decision of 2 October 1996, whereupon Benetton appealed to the Gerechtshof (Regional Court of Appeal) te 's-Gravenhage, before which the case is pending.

16  By application lodged at the registry of the Rechtbank on 24 July 1995 Benetton also requested that court to stay enforcement of the FAA and, in the alternative, to order Eco Swiss to provide security.

17   By order of 19 September 1995 the Rechtbank allowed only the alternative claim.

18   Benetton lodged an appeal against that decision. By order of 28 March 1996 the Gerechtshof essentially allowed the primary claim.

19   The Gerechtshof took the view that Article 85 of the Treaty is a provision of public policy within the meaning of Article 1065(1)(e) of the Code of Civil Procedure, infringement of which may result in annulment of an arbitration award.

20   However, the Gerechtshof considered that, in the proceedings before it for stay of enforcement, it was unable to examine whether a partial final award such as the PFA was in conformity with Article 1065(1)(e) of the Code of Civil Procedure, since Benetton had not lodged an application for annulment within three months after the lodging of that award at the registry of the Rechtbank, as required by Article 1064(3) of the Code of Civil Procedure.

21   Nevertheless, the Gerechtshof took the view that it was able to examine the FAA in relation to Article 1065(1)(e), particularly as regards the effect of Article 85(1) and (2) of the Treaty on the assessment of damage, since to award compensation for damage flowing from the wrongful termination of the licensing agreement would amount to enforcing that agreement, whereas it was, at least in part, void under Article 85(1) and (2) of the Treaty. The agreement in question enabled the parties to operate a market-sharing arrangement, since Eco Swiss could no longer sell watches and clocks in Italy and Bulova could no longer do so in the other countries which were then Member States of the Community. As Benetton and Eco Swiss acknowledge, the licensing agreement was not notified to the Commission and is not covered by a block exemption.

22   The Gerechtshof considered that, in the procedure for annulment, the FAA could be held to be contrary to public policy, and therefore decided to grant the application for a stay in so far as it related to the FAA.

23   Eco Swiss brought proceedings in cassation before the Hoge Raad against the decision of the Gerechtshof and Benetton lodged a cross-appeal.

24   The Hoge Raad observes that an arbitration award is contrary to public policy within the meaning of Article 1065(1)(e) of the Code of Civil Procedure only if its terms or enforcement conflict with a mandatory rule so fundamental that no restrictions of a procedural nature should prevent its application. It states that, in Netherlands law, the mere fact that, because of the terms or enforcement of an arbitration award, a prohibition laid down in competition law is not applied is not generally regarded as being contrary to public policy.

25   However, referring to the judgment in Joined Cases C-430/93 and C-431/93 *Van Schijndel and Van Veen* v *SPF* [1995] ECR I-4705, the Hoge Raad wonders whether the position is the same where, as in the case now before it, the provision in question is a rule of Community law. The Hoge Raad infers from that judgment that Article 85 of the Treaty is not to be regarded as a mandatory rule which is so fundamental that no restrictions of a procedural nature should prevent it from being observed.

26   Moreover, since it is not disputed that the question whether the licensing agreement might be void under Article 85 of the Treaty was not raised in the course of the arbitration proceedings, the Hoge Raad considers that the arbitrators would have gone beyond the ambit of the dispute if they had inquired into and ruled on that question. In such a case, their award would have been open to annulment pursuant to Article 1065(1)(c) of the Code of Civil Procedure, because they would have failed to comply with their terms of

reference. Furthermore, according to the Hoge Raad, the parties themselves could not have raised the question of the possible nullity of the licensing agreement for the first time in the context of the proceedings for annulment.

27  The Hoge Raad states that such rules of procedure are justified by the general interest in having an effectively functioning arbitration procedure and that they are no less favourable to application of rules of Community law than to application of rules of national law.

28  However, the Hoge Raad is uncertain whether the principles laid down by the Court in *Van Schijndel and Van Veen*, cited above, also apply to arbitrators, particularly since, according to the judgment in Case 102/81 *Nordsee* v *Reederei Mond* [1982] ECR 1095, an arbitration tribunal constituted pursuant to an agreement under private law, without State intervention, is not to be regarded as a court or tribunal for the purposes of Article 177 of the Treaty and cannot therefore make references for a preliminary ruling under that article.

29  The Hoge Raad explains that, under Netherlands procedural law, where arbitrators have settled part of a dispute by an interim award which is in the nature of a final award, that award has the force of *res judicata* and, if annulment of that interim award has not been sought in proper time, the possibility of applying for annulment of a subsequent arbitration award proceeding upon the interim award is restricted by the principle of *res judicata*. However, the Hoge Raad is uncertain whether Community law precludes the Gerechtshof from applying such a procedural rule where, as in the present case, the subsequent arbitration award, the annulment of which has been applied for in proper time, proceeds upon an earlier arbitration award.

30  In those circumstances, the Hoge Raad der Nederlanden decided to stay proceedings and to refer the following questions to the Court for a preliminary ruling:

'(1) To what extent is the ruling of the Court of Justice in Joined Cases C-430/93 and C-431/93 *Van Schijndel and Van Veen* v *SPF* [1995] ECR I-4705 applicable by analogy if, in a dispute concerning a private law agreement brought before arbitrators and not before the national courts, the parties make no reference to Article 85 of the EC Treaty and, according to the rules of national procedural law applicable to them, the arbitrators are not at liberty to apply those provisions of their own motion?

(2) If the court considers that an arbitration award is in fact contrary to Article 85 of the EC Treaty, must it, on that ground and notwithstanding the rules of Netherlands procedural law set out in paragraphs 4.2 and 4.4 above [according to which a party may claim annulment of an arbitration award only on a limited number of grounds, one ground being that an award is contrary to public policy, which generally does not cover the mere fact that through the terms or enforcement of an arbitration award no effect is given to a prohibition laid down by competition law], allow a claim for annulment of that award if the claim otherwise complies with statutory requirements?

(3) Notwithstanding the rules of Netherlands procedural law set out in paragraph 4.5 above [according to which arbitrators must not go outside the ambit of disputes and must keep to their terms of reference], is the court also required to allow such a claim if the question of the applicability of Article 85 of the EC Treaty remained outside the ambit of the dispute in the arbitration proceedings and the arbitrators therefore made no determination in that regard?

(4) Does Community law require the rules of Netherlands procedural law set out in paragraph 5.3 above [according to which an interim arbitration award

I - 3090

that is in the nature of a final award acquires the force of *res judicata* and is open to appeal only within a period of three months following lodgement of the award at the registry of the Rechtbank] to be disapplied if this is necessary in order to examine, in proceedings for annulment of a subsequent arbitration award, whether an agreement which an interim arbitration award having the force of *res judicata* has held to be valid may nevertheless be void because it conflicts with Article 85 of the EC Treaty?

(5) Or, in a case such as that described in Question 4, is it necessary to refrain from applying the rule that, in so far as an interim arbitration award is in the nature of a final award, annulment of that award may not be sought simultaneously with that of the subsequent arbitration award?'

**The second question**

31  By its second question, which is best examined first, the referring court is asking essentially whether a national court to which application is made for annulment of an arbitration award must grant such an application where, in its view, that award is in fact contrary to Article 85 of the Treaty although, under domestic procedural rules, it may grant such an application only on a limited number of grounds, one of them being inconsistency with public policy, which, according to the applicable national law, is not generally to be invoked on the sole ground that, because of the terms or the enforcement of an arbitration award, effect will not be given to a prohibition laid down by domestic competition law.

32  It is to be noted, first of all, that, where questions of Community law are raised in an arbitration resorted to by agreement, the ordinary courts may have to examine those questions, in particular during review of the arbitration award, which may be more or less extensive depending on the circumstances and which they are obliged to carry out in the event of an appeal, for setting aside, for leave to

enforce an award or upon any other form of action or review available under the relevant national legislation (*Nordsee*, cited above, paragraph 14).

33    In paragraph 15 of the judgment in *Nordsee*, the Court went on to explain that it is for those national courts and tribunals to ascertain whether it is necessary for them to make a reference to the Court under Article 177 of the Treaty in order to obtain an interpretation or assessment of the validity of provisions of Community law which they may need to apply when reviewing an arbitration award.

34    In this regard, the Court had held, in paragraphs 10 to 12 of that judgment, that an arbitration tribunal constituted pursuant to an agreement between the parties is not a 'court or tribunal of a Member State' within the meaning of Article 177 of the Treaty since the parties are under no obligation, in law or in fact, to refer their disputes to arbitration and the public authorities of the Member State concerned are not involved in the decision to opt for arbitration nor required to intervene of their own accord in the proceedings before the arbitrator.

35    Next, it is in the interest of efficient arbitration proceedings that review of arbitration awards should be limited in scope and that annulment of or refusal to recognise an award should be possible only in exceptional circumstances.

36    However, according to Article 3(g) of the EC Treaty (now, after amendment, Article 3(1)(g) EC), Article 85 of the Treaty constitutes a fundamental provision which is essential for the accomplishment of the tasks entrusted to the Community and, in particular, for the functioning of the internal market. The importance of such a provision led the framers of the Treaty to provide expressly, in Article 85(2) of the Treaty, that any agreements or decisions prohibited pursuant to that article are to be automatically void.

37  It follows that where its domestic rules of procedure require a national court to grant an application for annulment of an arbitration award where such an application is founded on failure to observe national rules of public policy, it must also grant such an application where it is founded on failure to comply with the prohibition laid down in Article 85(1) of the Treaty.

38  That conclusion is not affected by the fact that the New York Convention of 10 June 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, which has been ratified by all the Member States, provides that recognition and enforcement of an arbitration award may be refused only on certain specific grounds, namely where the award does not fall within the terms of the submission to arbitration or goes beyond its scope, where the award is not binding on the parties or where recognition or enforcement of the award would be contrary to the public policy of the country where such recognition and enforcement are sought (Article V(1)(c) and (e) and II(b) of the New York Convention).

39  For the reasons stated in paragraph 36 above, the provisions of Article 85 of the Treaty may be regarded as a matter of public policy within the meaning of the New York Convention.

40  Lastly, it should be recalled that, as explained in paragraph 34 above, arbitrators, unlike national courts and tribunals, are not in a position to request this Court to give a preliminary ruling on questions of interpretation of Community law. However, it is manifestly in the interest of the Community legal order that, in order to forestall differences of interpretation, every Community provision should be given a uniform interpretation, irrespective of the circumstances in which it is to be applied (Case C-88/91 *Federconsorzi* [1992] ECR I-4035, paragraph 7). It follows that, in the circumstances of the present case, unlike *Van Schijndel and Van Veen*, Community law requires that questions concerning the interpretation of the prohibition laid down in Article 85(1) of the Treaty should be open to examination by national courts when asked to determine the validity of an arbitration award and that it should be possible for those questions to be referred, if necessary, to the Court of Justice for a preliminary ruling.

41   The answer to be given to the second question must therefore be that a national court to which application is made for annulment of an arbitration award must grant that application if it considers that the award in question is in fact contrary to Article 85 of the Treaty, where its domestic rules of procedure require it to grant an application for annulment founded on failure to observe national rules of public policy.

The first and third questions

42   In view of the reply given to the second question, there is no need to answer the first and third questions.

The fourth and fifth questions

43   By its fourth and fifth questions, which can be examined together, the referring court is asking essentially whether Community law requires a national court to refrain from applying domestic rules of procedure according to which an interim arbitration award which is in the nature of a final award and in respect of which no application for annulment has been made within the prescribed time-limit acquires the force of *res judicata* and may no longer be called in question by a subsequent arbitration award, even if this is necessary in order to examine, in proceedings for annulment of the subsequent award, whether an agreement which the interim award held to be valid in law is nevertheless void under Article 85 of the Treaty.

44   According to the relevant domestic rules of procedure, application for annulment of an interim arbitration award which is in the nature of a final award may be made within a period of three months following the lodging of that award at the registry of the court having jurisdiction in the matter.

I - 3094

45  Such a period, which does not seem excessively short compared with those prescribed in the legal systems of the other Member States, does not render excessively difficult or virtually impossible the exercise of rights conferred by Community law.

46  Moreover, domestic procedural rules which, upon the expiry of that period, restrict the possibility of applying for annulment of a subsequent arbitration award proceeding upon an interim arbitration award which is in the nature of a final award, because it has become *res judicata*, are justified by the basic principles of the national judicial system, such as the principle of legal certainty and acceptance of *res judicata*, which is an expression of that principle.

47  In those circumstances, Community law does not require a national court to refrain from applying such rules, even if this is necessary in order to examine, in proceedings for annulment of a subsequent arbitration award, whether an agreement which the interim award held to be valid in law is nevertheless void under Article 85 of the Treaty.

48  The answer to be given to the fourth and fifth questions must therefore be that Community law does not require a national court to refrain from applying domestic rules of procedure according to which an interim arbitration award which is in the nature of a final award and in respect of which no application for annulment has been made within the prescribed time-limit acquires the force of *res judicata* and may no longer be called in question by a subsequent arbitration award, even if this is necessary in order to examine, in proceedings for annulment of a subsequent arbitration award, whether an agreement which the interim award held to be valid in law is nevertheless void under Article 85 of the Treaty.

## Costs

49    The costs incurred by the Netherlands, French, Italian and United Kingdom Governments and by the Commission, which have submitted observations to the Court, are not recoverable. Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court.

On those grounds,

## THE COURT,

in answer to the questions referred to it by the Hoge Raad der Nederlanden by order of 21 March 1997, hereby rules:

1. A national court to which application is made for annulment of an arbitration award must grant that application if it considers that the award in question is in fact contrary to Article 85 of the EC Treaty (now Article 81 EC), where its domestic rules of procedure require it to grant an application for annulment founded on failure to observe national rules of public policy.

2. Community law does not require a national court to refrain from applying domestic rules of procedure according to which an interim arbitration award which is in the nature of a final award and in respect of which no application

for annulment has been made within the prescribed time-limit acquires the force of *res judicata* and may no longer be called in question by a subsequent arbitration award, even if this is necessary in order to examine, in proceedings for annulment of a subsequent arbitration award, whether an agreement which the interim award held to be valid in law is nevertheless void under Article 85 of the Treaty.

Rodríguez Iglesias   Kapteyn   Puissochet

Hirsch   Jann

Mancini   Moitinho de Almeida   Gulmann

Murray   Edward

Ragnemalm   Sevón   Wathelet

Delivered in open court in Luxembourg on 1 June 1999.

R. Grass   G.C. Rodríguez Iglesias

Registrar   President