**This text is made public exclusively for information purposes. The text is the outcome of the legal review conducted by the Canadian Government and the European Commission and will be translated and thereafter subject to completion of the internal approval processes in Canada and the European Union.**

**The text presented in this document is not binding under international law and will only become so after the entry into force of the Agreement.**

*     *     *

COMPREHENSIVE ECONOMIC AND TRADE AGREEMENT (CETA)<br>BETWEEN CANADA, OF THE ONE PART,<br>AND THE EUROPEAN UNION<br>[AND ITS MEMBER STATES,

THE KINGDOM OF BELGIUM,

THE REPUBLIC OF BULGARIA,

THE CZECH REPUBLIC,

THE KINGDOM OF DENMARK,

THE FEDERAL REPUBLIC OF GERMANY,

THE REPUBLIC OF ESTONIA,

IRELAND,

THE HELLENIC REPUBLIC,

THE KINGDOM OF SPAIN,

THE FRENCH REPUBLIC,

THE REPUBLIC OF CROATIA,

THE ITALIAN REPUBLIC,

THE REPUBLIC OF CYPRUS,

THE REPUBLIC OF LATVIA,

THE REPUBLIC OF LITHUANIA,

THE GRAND DUCHY OF LUXEMBOURG,

HUNGARY,

THE REPUBLIC OF MALTA,

THE KINGDOM OF THE NETHERLANDS,

THE REPUBLIC OF AUSTRIA,

THE REPUBLIC OF POLAND,

THE PORTUGUESE REPUBLIC,

ROMANIA,

THE REPUBLIC OF SLOVENIA,

THE SLOVAK REPUBLIC,

THE REPUBLIC OF FINLAND,

THE KINGDOM OF SWEDEN,

THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND],

OF THE OTHER PART,

hereafter jointly referred to as the "Parties",

**resolve to:**

**FURTHER** strengthen their close economic relationship and build upon their respective rights and obligations under the *Marrakesh Agreement Establishing the World Trade Organization*, done on 15 April 1994, and other multilateral and bilateral instruments of cooperation;

**CREATE** an expanded and secure market for their goods and services through the reduction or elimination of barriers to trade and investment;

**ESTABLISH** clear, transparent, predictable and mutually-advantageous rules to govern their trade and investment;

AND,

**REAFFIRMING** their strong attachment to democracy and to fundamental rights as laid down in the Universal Declaration of Human Rights, done at Paris on 10 December 1948, and sharing the view that the proliferation of weapons of mass destruction poses a major threat to international security;

**RECOGNISING** the importance of international security, democracy, human rights and the rule of law for the development of international trade and economic cooperation;

**RECOGNISING** that the provisions of this Agreement preserve the right of the Parties to regulate within their territories and the Parties' flexibility to achieve legitimate policy objectives, such as public health, safety, environment, public morals and the promotion and protection of cultural diversity;

**AFFIRMING** their commitments as parties to the UNESCO *Convention on the Protection and Promotion of the Diversity of Cultural Expressions*, done at Paris on 20 October 2005, and recognising that states have the right to preserve, develop and implement their cultural policies, to support their cultural industries for the purpose of strengthening the diversity of cultural expressions, and to preserve their cultural identity, including through the use of regulatory measures and financial support;

**RECOGNISING** that the provisions of this Agreement protect investments and investors with respect to their investments, and are intended to stimulate mutually-beneficial business activity, without undermining the right of the Parties to regulate in the public interest within their territories;

**REAFFIRMING** their commitment to promote sustainable development and the development of international trade in such a way as to contribute to sustainable development in its economic, social and environmental dimensions;

**ENCOURAGING** enterprises operating within their territory or subject to their jurisdiction to respect internationally recognised guidelines and principles of corporate social responsibility, including the OECD Guidelines for Multinational Enterprises, and to pursue best practices of responsible business conduct;

**IMPLEMENTING** this Agreement in a manner consistent with the enforcement of their respective labour and environmental laws and that enhances their levels of labour and environmental protection, and building upon their international commitments on labour and environmental matters;

**RECOGNISING** the strong link between innovation and trade, and the importance of innovation to future economic growth, and affirming their commitment to encourage the expansion of cooperation in the area of innovation, as well as the related areas of research and development and science and technology, and to promote the involvement of relevant public and private sector entities;

**HAVE AGREED** as follows:

# CHAPTER ONE

## GENERAL DEFINITIONS AND INITIAL PROVISIONS

### SECTION A
### *General definitions*

*Article 1.1*

### Definitions of general application

For the purposes of this Agreement and unless otherwise specified:

**administrative ruling of general application** means an administrative ruling or interpretation that applies to all persons and fact situations that fall generally within its ambit and that establishes a norm of conduct but does not include:

    (a)    a determination or ruling made in an administrative or quasi-judicial proceeding that applies to a particular person, good or service of the other Party in a specific case; or

    (b)    a ruling that adjudicates with respect to a particular act or practice;

**Agreement on Agriculture** means the *Agreement on Agriculture*, contained in Annex 1A to the WTO Agreement;

**agricultural good** means a product listed in Annex 1 to the Agreement on Agriculture;

**Anti-dumping Agreement** means the *Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994*, contained in Annex 1A to the WTO Agreement;

**CETA contact points** means the contact points established under Article 26.5 (CETA contact points);

**CETA Joint Committee** means the CETA Joint Committee established under Article 26.1 (The CETA Joint Committee);

**CPC** means the provisional Central Product Classification as set out in Statistical Office of the United Nations, Statistical Papers, Series M, N° 77, *CPC prov*, 1991;

**cultural industries** means persons engaged in:

    (a)    the publication, distribution or sale of books, magazines, periodicals or newspapers in print or machine-readable form, except when printing or typesetting any of the foregoing is the only activity;

    (b)    the production, distribution, sale or exhibition of film or video recordings;

    (c)    the production, distribution, sale or exhibition of audio or video music recordings;

    (d)    the publication, distribution or sale of music in print or machine-readable form; or

(e)     radio-communications in which the transmissions are intended for direct reception by the general public, and all radio, television and cable broadcasting undertakings and all satellite programming and broadcast network services;

**customs duty** means a duty or charge of any kind imposed on or in connection with the importation of a good, including a form of surtax or surcharge imposed on or in connection with that importation, but does not include:

(a)     a charge equivalent to an internal tax imposed consistently with Article 2.3 (National treatment);

(b)     a measure applied in accordance with the provisions of Articles VI or XIX of the GATT 1994, the Anti-dumping Agreement, the SCM Agreement, the Safeguards Agreement, or Article 22 of the DSU; or

(c)     a fee or other charge imposed consistently with Article VIII of the GATT 1994;

**Customs Valuation Agreement** means the *Agreement on Implementation of Article VII of the General Agreement on Tariffs and Trade 1994*, contained in Annex 1A to the WTO Agreement;

**days** means calendar days, including weekends and holidays;

**DSU** means the *Understanding on Rules and Procedures Governing the Settlement of Disputes*, contained in Annex 2 to the WTO Agreement;

**enterprise** means an entity constituted or organised under applicable law, whether or not for profit, and whether privately or governmentally owned or controlled, including a corporation, trust, partnership, sole proprietorship, joint venture or other association;

**existing** means in effect on the date of entry into force of this Agreement;

**GATS** means the *General Agreement on Trade in Services*, contained in Annex 1B to the WTO Agreement;

**GATT 1994** means the *General Agreement on Tariffs and Trade 1994*, contained in Annex 1A to the WTO Agreement;

**goods of a Party** means domestic products as these are understood in the GATT 1994 or such goods as the Parties may decide, and includes originating goods of that Party;

**Harmonized System** (HS) means the *Harmonized Commodity Description and Coding System*, including its General Rules of Interpretation, Section Notes, Chapter Notes and subheading notes;

**heading** means a four-digit number or the first four digits of a number used in the nomenclature of the HS;

**measure** includes a law, regulation, rule, procedure, decision, administrative action, requirement, practice or any other form of measure by a Party;

**national** means a natural person who is a citizen as defined in Article 1.2, or is a permanent resident of a Party;

**originating** means qualifying under the rules of origin set out in the Protocol on Rules of Origin and Origin Procedures;

5

**person** means a natural person or an enterprise;

**person of a Party** means a national or an enterprise of a Party;

**preferential tariff treatment** means the application of the duty rate under this Agreement to an originating good pursuant to the tariff elimination schedule;

**Safeguards Agreement** means the *Agreement on Safeguards*, contained in Annex 1A to the WTO Agreement;

**sanitary or phytosanitary measure** means a measure referred to in Annex A, paragraph 1 of the *SPS Agreement*;

**SCM Agreement** means the *Agreement on Subsidies and Countervailing Measures*, contained in Annex 1A to the WTO Agreement;

**service supplier** means a person that supplies or seeks to supply a service;

**SPS Agreement** means the *Agreement on the Application of Sanitary and Phytosanitary Measures*, contained in Annex 1A to the WTO Agreement;

**state enterprise** means an enterprise that is owned or controlled by a Party;

**subheading** means a six-digit number or the first six digits of a number used in the nomenclature of the HS;

**tariff classification** means the classification of a good or material under a chapter, heading or subheading of the HS;

**tariff elimination schedule** means Annex 2-A (Tariff elimination);

**TBT Agreement** means the *Agreement on Technical Barriers to Trade*, contained in Annex 1A to the WTO Agreement;

**territory** means the territory where this Agreement applies as set out under Article 1.3;

**TRIPS Agreement** means the *Agreement on Trade-Related Aspects of Intellectual Property Rights*, contained in Annex 1C to the WTO Agreement;

**Vienna Convention on the Law of Treaties** means the *Vienna Convention on the Law of Treaties*, done at Vienna on 23 May 1969;

**WTO** means the World Trade Organization; and

**WTO Agreement** means the *Marrakesh Agreement Establishing the World Trade Organization*, done on 15 April 1994.

## *Article 1.2*

### Party-specific definitions

For the purposes of this Agreement, unless otherwise specified:

**citizen** means:

(a)    for Canada, a natural person who is a citizen of Canada under Canadian legislation;

(b)    for the European Union, a natural person holding the nationality of a Member State; and

**central government** means:

(a)     for Canada, the Government of Canada; and

(b)     for the European Union, the European Union or the national governments of its Member States;

### Article 1.3

### Geographical scope of application

Unless otherwise specified, this Agreement applies:

(a)     for Canada, to:

    (i)     the land territory, air space, internal waters, and territorial sea of Canada;

    (ii)    the exclusive economic zone of Canada, as determined by its domestic law, consistent with Part V of the *United Nations Convention on the Law of the Sea*, done at Montego Bay on 10 December 1982 ("UNCLOS"); and,

    (iii)   the continental shelf of Canada, as determined by its domestic law, consistent with Part VI of UNCLOS;

(b)     for the European Union, to the territories in which the Treaty on European Union and the Treaty on the Functioning of the European Union are applied and under the conditions laid down in those Treaties. As regards the provisions concerning the tariff treatment of goods, this Agreement shall also apply to the areas of the European Union customs territory not covered by the first sentence of this subparagraph.

### SECTION B

### Initial provisions

### Article 1.4

### Establishment of a free trade area

The Parties hereby establish a free trade area in conformity with Article XXIV of GATT 1994 and Article V of the GATS.

### Article 1.5

### Relation to the WTO Agreement and other agreements

The Parties affirm their rights and obligations with respect to each other under the WTO Agreement and other agreements to which they are party.

### Article 1.6

### Reference to other agreements

When this Agreement refers to or incorporates by reference other agreements or legal instruments in whole or in part, those references include:

(a)     related annexes, protocols, footnotes, interpretative notes and explanatory notes; and

(b)     successor agreements to which the Parties are party or amendments that are binding on the Parties, except where the reference affirms existing rights.

### Article 1.7

### Reference to laws

When this Agreement refers to laws, either generally or by reference to a specific statute, regulation or directive, the reference is to the laws, as they may be amended, unless otherwise indicated.

### Article 1.8

### Extent of obligations

1.      Each Party is fully responsible for the observance of all provisions of this Agreement.

2.      Each Party shall ensure that all necessary measures are taken in order to give effect to the provisions of this Agreement, including their observance at all levels of government.

### Article 1.9

### Rights and obligations relating to water

1.      The Parties recognise that water in its natural state, including water in lakes, rivers, reservoirs, aquifers and water basins, is not a good or a product. Therefore, only Chapters Twenty-Two (Trade and Sustainable Development) and Twenty-Four (Trade and Environment) apply to such water.

2.      Each Party has the right to protect and preserve its natural water resources. Nothing in this Agreement obliges a Party to permit the commercial use of water for any purpose, including its withdrawal, extraction or diversion for export in bulk.

3.      If a Party permits the commercial use of a specific water source, it shall do so in a manner consistent with this Agreement.

### Article 1.10

### Persons exercising delegated governmental authority

Unless otherwise specified in this Agreement, each Party shall ensure that a person that has been delegated regulatory, administrative or other governmental authority by a Party, at any level of government, acts in accordance with the Party's obligations as set out under this Agreement in the exercise of that authority.

# CHAPTER TWO

## NATIONAL TREATMENT AND MARKET ACCESS FOR GOODS

*Article 2.1*

### Objective

The Parties shall progressively liberalise trade in goods in accordance with the provisions of this Agreement over a transitional period starting from the entry into force of this Agreement.

*Article 2.2*

### Scope

This Chapter applies to trade in goods of a Party, as defined in Chapter 1 (General Definitions and Initial Provisions), except as otherwise provided in this Agreement.

*Article 2.3*

### National treatment

1.    Each Party shall accord national treatment to the goods of the other Party in accordance with Article III of the GATT 1994. To this end Article III of the GATT 1994 is incorporated into and made part of this Agreement.

2.    Paragraph 1 means, with respect to a government in Canada other than at the federal level, or a government of or in a Member State of the European Union, treatment no less favourable than that accorded by that government to like, directly competitive or substitutable goods of Canada or the Member State, respectively.

3.    This Article does not apply to a measure, including a measure's continuation, prompt renewal or amendment, in respect of Canadian excise duties on absolute alcohol, as listed under tariff item 2207.10.90 in Canada's Schedule of Concessions (Schedule V) annexed to the *Marrakesh Protocol to the General Agreement on Tariffs and Trade,* done on 15 April 1994 (the "Marrakesh Protocol"), used in manufacturing under provisions of the *Excise Act, 2001,* S.C. 2002, c. 22.

*Article 2.4*

### Reduction and elimination of customs duties on imports

1.    Each Party shall reduce or eliminate customs duties on goods originating in either Party in accordance with the tariff elimination schedules in Annex 2-A. For the purposes of this Chapter, "originating" means originating in either Party under the rules of origin set out in the Protocol on Rules of Origin and Origin Procedures.

2.    For each good, the base rate of customs duties to which the successive reductions under paragraph 1 are to be applied shall be that specified in Annex 2-A.

3.    For goods that are subject to tariff preferences as listed in a Party's tariff elimination schedule in Annex 2-A, each Party shall apply to originating goods of the other Party

9

the lesser of the customs duties resulting from a comparison between the rate calculated in accordance with that Party's Schedule and its applied Most-Favoured-Nation ("MFN") rate.

4.    On the request of a Party, the Parties may consult to consider accelerating and broadening the scope of the elimination of customs duties on imports between the Parties. A decision of the CETA Joint Committee on the acceleration or elimination of a customs duty on a good shall supersede any duty rate or staging category determined pursuant to the Parties' Schedules in Annex 2-A for that good when approved by each Party in accordance with its applicable legal procedures.

## Article 2.5

### Restriction on duty drawback, duty deferral and duty suspension programs

1.    Subject to paragraphs 2 and 3, a Party shall not refund, defer or suspend a customs duty paid or payable on a non-originating good imported into its territory on the express condition that the good, or an identical, equivalent or similar substitute, is used as a material in the production of another good that is subsequently exported to the territory of the other Party under preferential tariff treatment pursuant to this Agreement.

2.    Paragraph 1 does not apply to a Party's regime of tariff reduction, suspension or remission, either permanent or temporary, if the reduction, suspension or remission is not expressly conditioned on the exportation of a product.

3.    Paragraph 1 does not apply until three years after the date of entry into force of this Agreement.

## Article 2.6

### Duties, taxes or other fees and charges on exports

A Party may not adopt or maintain any duties, taxes or other fees and charges imposed on, or in connection with, the export of a good to the other Party, or any internal taxes or fees and charges on a good exported to the other Party, that is in excess of those that would be imposed on those goods when destined for internal sale.

## Article 2.7

### Standstill

1.    Upon the entry into force of this Agreement a Party may not increase a customs duty existing at entry into force, or adopt a new customs duty, on a good originating in the Parties.

2.    Notwithstanding paragraph 1, a Party may:

(a)    modify a tariff outside this Agreement on a good for which no tariff preference is claimed under this Agreement;

(b)    increase a customs duty to the level established in its Schedule in Annex 2-A following a unilateral reduction; or

(c)    maintain or increase a customs duty as authorised by this Agreement or any agreement under the WTO Agreement.

3.    Notwithstanding paragraphs 1 and 2, only Canada may apply a special safeguard pursuant to Article 5 of the WTO Agreement on Agriculture. A special safeguard may only be applied with respect to goods classified in items with the notation "SSG" in Canada's Schedule included in Annex 2-A. The use of this special safeguard is limited to imports not subject to tariff preference and, in the case of imports subject to a tariff rate quota, to imports over the access commitment.

*Article 2.8*

**Temporary suspension of preferential tariff treatment**

1.    A Party may temporarily suspend, in accordance with paragraphs 2 through 5, the preferential tariff treatment under this Agreement with respect to a good exported or produced by a person of the other Party if the Party:

(a)    as a result of an investigation based on objective, compelling and verifiable information, makes a finding that the person of the other Party has committed systematic breaches of customs legislation in order to obtain preferential tariff treatment under this Agreement; or

(b)    makes a finding that the other Party systematically and unjustifiably refuses to cooperate with respect to the investigation of breaches of customs legislation under Article 6.13.4 (Cooperation), and the Party requesting cooperation, based on objective, compelling and verifiable information, has reasonable grounds to conclude that the person of the other Party has committed systematic breaches of customs legislation in order to obtain preferential tariff treatment under this Agreement.

2.    A Party that has made a finding referred to in paragraph 1 shall:

(a)    notify the customs authority of the other Party and provide the information and evidence upon which the finding was based;

(b)    engage in consultations with the authorities of the other Party with a view to achieving a mutually acceptable resolution that addresses the concerns that resulted in the finding; and

(c)    provide written notice to that person of the other Party that includes the information that is the basis of the finding.

3.    If the authorities have not achieved a mutually acceptable resolution after 30 days, the Party that has made the finding shall refer the issue to the Joint Customs Cooperation Committee.

4.    If the Joint Customs Cooperation Committee has not resolved the issue after 60 days, the Party that has made the finding may temporarily suspend the preferential tariff treatment under this Agreement with respect to that good of that person of the other Party. The temporary suspension does not apply to a good that is already in transit between the Parties on the day that the temporary suspension comes into effect.

5.    The Party applying the temporary suspension under paragraph 1 shall only apply it for a period commensurate with the impact on the financial interests of that Party

resulting from the situation responsible for the finding made pursuant to paragraph 1, to a maximum of 90 days. If the Party has reasonable grounds based on objective, compelling and verifiable information that the conditions that gave rise to the initial suspension have not changed after the expiry of the 90 day period, that Party may renew the suspension for a further period of no longer than 90 days. The original suspension and any renewed suspensions are subject to periodic consultations within the Joint Customs Cooperation Committee.

## Article 2.9

### Fees and other charges

1.  In accordance with Article VIII of GATT 1994, a Party shall not adopt or maintain a fee or charge on or in connection with importation or exportation of a good of a Party that is not commensurate with the cost of services rendered or that represents an indirect protection to domestic goods or a taxation of imports or exports for fiscal purposes.

2.  For greater certainty, paragraph 1 does not prevent a Party from imposing a customs duty or a charge set out in paragraphs (a) through (c) of the definition of customs duty under Article 1.1 (Definitions of general application).

## Article 2.10

### Goods re-entered after repair or alteration

1.  For the purposes of this Article, repair or alteration means any processing operation undertaken on goods to remedy operating defects or material damage and entailing the re-establishment of goods to their original function or to ensure their compliance with technical requirements for their use, without which the goods could no longer be used in the normal way for the purposes for which they were intended. Repair or alteration of goods includes restoration and maintenance but does not include an operation or process that:

    (a)  destroys the essential characteristics of a good or creates a new or commercially different good;

    (b)  transforms an unfinished good into a finished good; or

    (c)  is used to substantially change the function of a good.

2.  Except as provided in footnote 1, a Party shall not apply a customs duty to a good, regardless of its origin, that re-enters its territory after that good has been temporarily exported from its territory to the territory of the other Party for repair or alteration, regardless of whether such repair or alteration could be performed in the territory of the Party from which the good was exported for repair or alteration.[1]

---

[1]  For the following goods of HS Chapter 89, regardless of their origin, that re-enter the territory of Canada from the territory of the European Union, and are registered under the *Canada Shipping Act*, Canada may apply to the value of repair or alteration of such goods, the rate of customs duty for such goods in accordance with its Schedule included in Annex 2-A (Tariff Elimination): 8901.10.10, 8901.10.90, 8901.30.00, 8901.90.10, 8901.90.91, 8901.90.99,

3.    Paragraph 2 does not apply to a good imported in bond, into free trade zones, or in similar status, that is then exported for repair and is not re-imported in bond, into free trade zones, or in similar status.

4.    A Party shall not apply a customs duty to a good, regardless of its origin, imported temporarily from the territory of the other Party for repair or alteration.

*Article 2.11*

**Import and export restrictions**

1.    Except as otherwise provided in this Agreement, a Party shall not adopt or maintain any prohibition or restriction on the importation of any good of the other Party or on the exportation or sale for export of any good destined for the territory of the other Party, except in accordance with Article XI of the GATT 1994. To this end Article XI of the GATT 1994 is incorporated into and made a part of this Agreement.

2.    If a Party adopts or maintains a prohibition or restriction on the importation from or exportation to a third country of a good, that Party may:

    (a)    limit or prohibit the importation from the territory of the other Party of a good of that third country; or

    (b)    limit or prohibit the exportation of a good to that third country through the territory of the other Party.

3.    If a Party adopts or maintains a prohibition or restriction on the importation of a good from a third country, the Parties, at the request of the other Party, shall enter into discussions with a view to avoiding undue interference with or distortion of pricing, marketing or distribution arrangements in the other Party.

4.    This Article does not apply to a measure, including that measure's continuation, prompt renewal or amendment, in respect of the following:

    (a)    the export of logs of all species. If a Party ceases to require export permits for logs destined for a third country, that Party will permanently cease requiring export permits for logs destined for the other Party;

    (b)    for a period of three years following the entry into force of this Agreement, the export of unprocessed fish pursuant to Newfoundland and Labrador's applicable legislation;

    (c)    Canadian excise duties on absolute alcohol, as listed under tariff item 2207.10.90 in Canada's Schedule of Concessions annexed to the Marrakesh Protocol (Schedule V), used in manufacturing under the provisions of the Excise Act, 2001, S.C. 2002, c. 22; and

    (d)    The importation of used vehicles into Canada that do not conform to Canada's safety and environmental requirements.

---

8904.00.00, 8905.20.19, 8905.20.20, 8905.90.19, 8905.90.90, 8906.90.19, 8906.90.91, 8906.90.99.

*Article 2.12*

**Other provisions related to trade in goods**

Each Party shall endeavour to ensure that a product of the other Party that has been imported into and lawfully sold or offered for sale in any place in the territory of the importing Party may also be sold or offered for sale throughout the territory of the importing Party.

*Article 2.13*

**Committee on trade in goods**

1.    The functions of the Committee on Trade in Goods established under Article 26.2.1 (a) (Committees) include:

(a)    promoting trade in goods between the Parties, including through consultations on accelerating tariff elimination under this Agreement and other issues as appropriate;

(b)    recommending to the CETA Joint Committee a modification of or an addition to any provision of this Agreement related to the Harmonized System; and

(c)    promptly addressing issues related to movement of goods through the Parties' ports of entry.

2.    The Committee on Trade in Goods may present to the CETA Joint Committee draft decisions on the acceleration or elimination of a customs duty on a good.

3.    The Committee on Agriculture established under Article 26.2.1 (a) (Committees) shall:

(a)    meet within 90 days of a request by a Party;

(b)    provide a forum for the Parties to discuss issues related to agricultural goods covered by this Agreement; and

(c)    refer to the Committee on Trade in Goods any unresolved issue under subparagraph (b).

4.    The Parties note the cooperation and exchange of information on agriculture issues under the annual Canada-European Union Agriculture Dialogue, as established in letters exchanged on 14 July 2008. As appropriate, the Agriculture Dialogue may be used for the purpose of paragraph 3.

# CHAPTER THREE

## TRADE REMEDIES

### SECTION A

#### *Anti-dumping and countervailing measures*

*Article 3.1*

**General provisions concerning anti-dumping and countervailing measures**

1.   The Parties reaffirm their rights and obligations under Article VI of GATT 1994, the Anti-dumping Agreement and the SCM Agreement.

2.   The Protocol on Rules of Origin and Origin Procedures shall not apply to antidumping and countervailing measures.

*Article 3.2*

**Transparency**

1.   Each Party shall apply anti-dumping and countervailing measures in accordance with the relevant WTO requirements and pursuant to a fair and transparent process.

2.   A Party shall ensure, after an imposition of provisional measures and, in any case, before a final determination is made, full and meaningful disclosure of all essential facts under consideration which form the basis for the decision whether to apply final measures. This is without prejudice to Article 6.5 of the Anti-Dumping Agreement and Article 12.4 of the SCM Agreement.

3.   Provided it does not unnecessarily delay the conduct of the investigation, each interested party in an anti-dumping or countervailing investigation[2] shall be granted a full opportunity to defend its interests.

*Article 3.3*

**Consideration of public interest and lesser duty**

1.   Each Party's authorities shall consider information provided in accordance with the Party's law as to whether imposing an anti-dumping or countervailing duty would not be in the public interest.

2.   After considering the information referred to in paragraph 1, the Party's authorities may consider whether the amount of the anti-dumping or countervailing duty to be imposed shall be the full margin of dumping or amount of subsidy or a lesser amount, in accordance with the Party's law.

### SECTION B

#### *Global safeguard measures*

---

[2]      For the purpose of this Article, **interested parties** are defined as per Article 6.11 of the Anti-Dumping Agreement and Article 12.9 of the SCM Agreement.

*Article 3.4*

**General provisions concerning global safeguard measures**

1.    The Parties reaffirm their rights and obligations concerning global safeguard measures under Article XIX of GATT 1994 and the Safeguards Agreement.

2.    The Protocol on Rules of Origin and Origin Procedures shall not apply to global safeguard measures.

*Article 3.5*

**Transparency**

1.    At the request of the exporting Party, the Party initiating a safeguard investigation or intending to adopt provisional or definitive global safeguard measures shall immediately provide:

   (a)    the information referred to in Article 12.2 of the Safeguards Agreement, in the format prescribed by the WTO Committee on Safeguards;

   (b)    the public version of the complaint filed by the domestic industry, where relevant; and

   (c)    a public report setting forth the findings and reasoned conclusions on all pertinent issues of fact and law considered in the safeguard investigation. The public report shall include an analysis that attributes injury to the factors causing it and set out the method used in defining the global safeguard measures.

2.    When information is provided under this Article, the importing Party shall offer to hold consultations with the exporting Party in order to review the information provided.

*Article 3.6*

**Imposition of definitive measures**

1.    A Party adopting global safeguard measures shall endeavour to impose them in a way that least affects bilateral trade.

2.    The importing Party shall offer to hold consultations with the exporting Party in order to review the matter referred to in paragraph 1. The importing Party shall not adopt measures until 30 days have elapsed since the date the offer to hold consultations was made.

*SECTION C*

***General provisions***

*Article 3.7*

**Exclusion from dispute settlement**

This Chapter is not subject to Chapter Twenty-Nine (Dispute Settlement).

16

# CHAPTER FOUR

## TECHNICAL BARRIERS TO TRADE

### *Article 4.1*

#### Scope and definitions

1.  This Chapter applies to the preparation, adoption, and application of technical regulations, standards, and conformity assessment procedures that may affect trade in goods between the Parties.

2.  This Chapter does not apply to:

    (a)  purchasing specifications prepared by a governmental body for production or consumption requirements of governmental bodies; or

    (b)  a sanitary or phytosanitary measure as defined in Annex A of the SPS Agreement.

3.  Except where this Agreement, including the incorporated provisions of the TBT Agreement pursuant to Article 4.2, defines or gives a meaning to a term, the general terms for standardisation and conformity assessment procedures shall normally have the meaning given to them by the definition adopted within the United Nations system and by international standardising bodies taking into account their context and in the light of the object and purpose of this Chapter.

4.  References in this Chapter to technical regulations, standards, and conformity assessment procedures include amendments thereto, and additions to the rules or the product coverage thereof, except amendments and additions of an insignificant nature.

5.  Article 1.8.2 (Extent of obligations) does not apply to Articles 3, 4, 7, 8 and 9 of the TBT Agreement, as incorporated into this Agreement.

### *Article 4.2*

#### Incorporation of the TBT Agreement

1.  The following provisions of the TBT Agreement are hereby incorporated into and made part of this Agreement:

    (a)  Article 2 (Preparation, Adoption and Application of Technical Regulations by Central Government Bodies);

    (b)  Article 3 (Preparation, Adoption and Application of Technical Regulations by Local Government Bodies and Non-Governmental Bodies);

    (c)  Article 4 (Preparation, Adoption and Application of Standards);

    (d)  Article 5 (Procedures for Assessment of Conformity by Central Government Bodies);

(e)     Article 6 (Recognition of Conformity Assessment by Central Government Bodies), without limiting a Party's rights or obligations under the Protocol on the Mutual Acceptance of the Results of Conformity Assessment, and the Protocol on the Mutual Recognition of the Compliance and Enforcement Programme Regarding Good Manufacturing Practices for Pharmaceutical Products;

(f)     Article 7 (Procedures for Assessment of Conformity by Local Government Bodies);

(g)     Article 8 (Procedures for Assessment of Conformity by Non-Governmental Bodies);

(h)     Article 9 (International and Regional Systems);

(i)     Annex 1 (Terms and their Definitions for the Purpose of this Agreement); and

(j)     Annex 3 (Code of Good Practice for the Preparation, Adoption and Application of Standards).

2.     The term "Members" in the incorporated provisions shall have the same meaning in this Agreement as it has in the TBT Agreement.

3.     With respect to Articles 3, 4, 7, 8 and 9 of the TBT Agreement, Chapter Twenty-Nine (Dispute Settlement) can be invoked in cases where a Party considers that the other Party has not achieved satisfactory results under these Articles and its trade interests are significantly affected. In this respect, such results shall be equivalent to those as if the body in question were a Party.

*Article 4.3*

**Cooperation**

The Parties shall strengthen their cooperation in the areas of technical regulations, standards, metrology, conformity assessment procedures, market surveillance or monitoring and enforcement activities in order to facilitate trade between the Parties, as set out in Chapter Twenty-One (Regulatory Cooperation). This may include promoting and encouraging cooperation between the Parties' respective public or private organisations responsible for metrology, standardisation, testing, certification and accreditation, market surveillance or monitoring and enforcement activities; and, in particular, encouraging their accreditation and conformity assessment bodies to participate in cooperation arrangements that promote the acceptance of conformity assessment results.

*Article 4.4*

**Technical regulations**

1.     The Parties undertake to cooperate to the extent possible, to ensure that their technical regulations are compatible with one another. To this end, if a Party expresses an interest in developing a technical regulation equivalent or similar in scope to one that exists in or is being prepared by the other Party, that other Party shall, on request, provide to the Party, to the extent practicable, the relevant information, studies and data upon which it has relied in the preparation of its technical regulation, whether adopted or being developed. The Parties recognise that

18

it may be necessary to clarify and agree on the scope of a specific request, and that confidential information may be withheld.

2. A Party that has prepared a technical regulation that it considers to be equivalent to a technical regulation of the other Party having compatible objective and product scope may request that the other Party recognise the technical regulation as equivalent. The Party shall make the request in writing and set out detailed reasons why the technical regulation should be considered equivalent, including reasons with respect to product scope. The Party that does not agree that the technical regulation is equivalent shall provide to the other Party, upon request, the reasons for its decision.

*Article 4.5*

**Conformity assessment**

The Parties shall observe the Protocol on the mutual acceptance of the results of conformity assessment, and the Protocol on the mutual recognition of the compliance and enforcement programme regarding good manufacturing practices for pharmaceutical products.

*Article 4.6*

**Transparency**

1. Each Party shall ensure that transparency procedures regarding the development of technical regulations and conformity assessment procedures allow interested persons of the Parties to participate at an early appropriate stage when amendments can still be introduced and comments taken into account, except where urgent problems of safety, health, environmental protection or national security arise or threaten to arise. Where a consultation process regarding the development of technical regulations or conformity assessment procedures is open to the public, each Party shall permit persons of the other Party to participate on terms no less favourable than those accorded to its own persons.

2. The Parties shall promote closer cooperation between the standardisation bodies located within their respective territories with a view to facilitating, among other things, the exchange of information about their respective activities, as well as the harmonisation of standards based on mutual interest and reciprocity, according to modalities to be agreed by the standardisation bodies concerned.

3. Each Party shall endeavour to allow a period of at least 60 days following its transmission to the WTO Central Registry of Notifications of proposed technical regulations and conformity assessment procedures for the other Party to provide written comments, except where urgent problems of safety, health, environmental protection or national security arise or threaten to arise. A Party shall give positive consideration to a reasonable request to extend the comment period.

4. If a Party receives comments on its proposed technical regulation or conformity assessment procedure from the other Party, it shall reply in writing to those comments before the technical regulation or conformity assessment procedure is adopted.

5. Each Party shall publish or otherwise make publicly available, in print or electronically, its responses or a summary of its responses, to significant comments it

receives, no later than the date it publishes the adopted technical regulation or conformity assessment procedure.

6.    Each Party shall, upon request of the other Party, provide information regarding the objectives of, legal basis and rationale for, a technical regulation or conformity assessment procedure, that the Party has adopted or is proposing to adopt.

7.    A Party shall give positive consideration to a reasonable request from the other Party, received prior to the end of the comment period following the transmission of a proposed technical regulation, to establish or extend the period of time between the adoption of the technical regulation and the day upon which it is applicable, except where the delay would be ineffective in fulfilling the legitimate objectives pursued.

8.    Each Party shall ensure that its adopted technical regulations and conformity assessment procedures are publicly available on official websites.

9.    If a Party detains at a port of entry a good imported from the territory of the other Party on the grounds that the good has failed to comply with a technical regulation, it shall, without undue delay, notify the importer of the reasons for the detention of the good.

*Article 4.7*

**Management of the Chapter**

1.    The Parties shall cooperate on issues covered by this Chapter. The Parties agree that the Committee on Trade in Goods, established under Article 26.2.1(a) shall:

(a)    manage the implementation of this Chapter;

(b)    promptly address an issue that a Party raises related to the development, adoption or application of standards, technical regulations or conformity assessment procedures;

(c)    on a Party's request, facilitate discussion of the assessment of risk or hazard conducted by the other Party;

(d)    encourage cooperation between the standardisation bodies and conformity assessment bodies of the Parties;

(e)    exchange information on standards, technical regulations, or conformity assessment procedures including those of third parties or international bodies where there is a mutual interest in doing so;

(f)    review this Chapter in the light of developments before the WTO Committee on Technical Barriers to Trade or under the TBT Agreement, and, if necessary, develop recommendations to amend this Chapter for consideration by the CETA Joint Committee;

(g)    take other steps that the Parties consider will assist them to implement this Chapter and the TBT Agreement and to facilitate trade between the Parties; and

(h)    report to the CETA Joint Committee on the implementation of this Chapter, as appropriate.

2.      If the Parties are unable to resolve a matter covered under this Chapter through the Committee on Trade in Goods, upon request of a Party, the CETA Joint Committee may establish an *ad hoc* technical working group to identify solutions to facilitate trade. If a Party does not agree with a request from the other Party to establish a technical working group, it shall, on request, explain the reasons for its decision. The Parties shall lead the technical working group.

3.      When a Party has requested information, the other Party shall provide the information, pursuant to the provisions of this Chapter, in print or electronically within a reasonable period of time. The Party shall endeavour to respond to each request for information within 60 days.

# CHAPTER FIVE

## SANITARY AND PHYTOSANITARY MEASURES

### *Article 5.1*

### Definitions

1.    For the purposes of this Chapter, the following definitions apply:

   (a)    the definitions in Annex A of the SPS Agreement;

   (b)    the definitions adopted under the auspices of the Codex Alimentarius Commission (the "Codex");

   (c)    the definitions adopted under the auspices of the World Organisation for Animal Health (the "OIE");

   (d)    the definitions adopted under the auspices of the *International Plant Protection Convention* (the "IPPC");

   (e)    protected zone for a specified regulated harmful organism means an officially defined geographical area in the European Union in which that organism is not established in spite of favourable conditions for its establishment and its presence in other parts of the European Union; and

   (f)    a competent authority of a Party means an authority listed in Annex 5-A.

2.    Further to paragraph 1, the definitions under the SPS Agreement prevail to the extent that there is an inconsistency between the definitions adopted under the auspices of the Codex, the OIE, the IPPC and the definitions under the SPS Agreement.

### *Article 5.2*

### Objectives

The objectives of this Chapter are to:

(a)    protect human, animal and plant life or health while facilitating trade;

(b)    ensure that the Parties' sanitary and phytosanitary ("SPS") measures do not create unjustified barriers to trade; and

(c)    further the implementation of the SPS Agreement.

### *Article 5.3*

### Scope

This Chapter applies to SPS measures that may, directly or indirectly, affect trade between the Parties.

### *Article 5.4*

### Rights and obligations

The Parties affirm their rights and obligations under the SPS Agreement.

*Article 5.5*

**Adaptation to regional conditions**

1.    With respect to an animal, animal product and animal by-product:

(a)    the Parties recognise the concept of zoning and they have decided to apply this concept to the diseases listed in Annex 5-B;

(b)    if the Parties decide on principles and guidelines to recognise regional conditions, they shall include them in Annex 5-C;

(c)    for the purpose of sub-paragraph (a), the importing Party shall base its sanitary measure applicable to the exporting Party whose territory is affected by a disease listed in Annex 5-B on the zoning decision made by the exporting Party, provided that the importing Party is satisfied that the exporting Party's zoning decision is in accordance with the principles and guidelines that the Parties set out in Annex 5-C, and is based on relevant international standards, guidelines, and recommendations. The importing Party may apply any additional measure to achieve its appropriate level of sanitary protection;

(d)    if a Party considers that it has a special status with respect to a disease not listed in Annex 5-B, it may request recognition of that status. The importing Party may request additional guarantees for imports of live animals, animal products, and animal by-products appropriate to the agreed status recognised by the importing Party, including the special conditions identified in Annex 5-E; and

(e)    the Parties recognise the concept of compartmentalisation and agree to cooperate on this matter.

2.    With respect to a plant and plant product:

(a)    when the importing Party establishes or maintains its phytosanitary measure, it shall take into account, among other things, the pest status of an area, such as a pest-free area, pest-free place of production, pest-free production site, an area of low pest prevalence and a protected zone that the exporting Party has established; and

(b)    if the Parties decide on principles and guidelines to recognise regional conditions, they shall include them in Annex 5-C.

*Article 5.6*

**Equivalence**

1.    The importing Party shall accept the SPS measure of the exporting Party as equivalent to its own if the exporting Party objectively demonstrates to the importing Party that its measure achieves the importing Party's appropriate level of SPS protection.

2.    Annex 5-D sets out principles and guidelines to determine, recognise, and maintain equivalence.

3.    Annex 5-E sets out:

(a)    the area for which the importing Party recognises that an SPS measure of the exporting Party is equivalent to its own; and

(b)    the area for which the importing Party recognises that the fulfilment of the specified special condition, combined with the exporting Party's SPS measure, achieves the importing Party's appropriate level of SPS protection.

4.    For the purposes of this Chapter, Article 1.7 (Reference to laws) applies subject to this Article, Annex 5-D and the General Notes under Annex 5-E.

*Article 5.7*

**Trade conditions**

1.    The importing Party shall make available its general SPS import requirements for all commodities. If the Parties jointly identify a commodity as a priority, the importing Party shall establish specific SPS import requirements for that commodity, unless the Parties decide otherwise. In identifying which commodities are priorities, the Parties shall cooperate to ensure the efficient management of their available resources. The specific import requirements should be applicable to the total territory of the exporting Party.

2.    Pursuant to paragraph 1, the importing Party shall undertake, without undue delay, the necessary process to establish specific SPS import requirements for the commodity that is identified as a priority. Once these specific import requirements are established, the importing Party shall take the necessary steps, without undue delay, to allow trade on the basis of these import requirements.

3.    For the purpose of establishing the specific SPS import requirements, the exporting Party shall, at the request of the importing Party:

(a)    provide all relevant information required by the importing Party; and

(b)    give reasonable access to the importing Party to inspect, test, audit and perform other relevant procedures.

4.    If the importing Party maintains a list of authorised establishments or facilities for the import of a commodity, it shall approve an establishment or facility situated in the territory of the exporting Party without prior inspection of that establishment or facility if:

(a)    the exporting Party has requested such an approval for the establishment or facility, accompanied by the appropriate guarantees; and

(b)    the conditions and procedures set out in Annex 5-F are fulfilled.

5.    Further to paragraph 4, the importing Party shall make its lists of authorised establishments or facilities publicly available.

6.    A Party shall normally accept a consignment of a regulated commodity without pre-clearance of the commodity on a consignment basis, unless the Parties decide otherwise.

7.    The importing Party may require that the relevant competent authority of the exporting Party objectively demonstrate, to the satisfaction of the importing Party, that the import requirements may be fulfilled or are fulfilled.

8.    The Parties should follow the procedure set out in Annex 5-G on the specific import requirements for plant health.

## Article 5.8

### Audit and verification

1.    For the purpose of maintaining confidence in the implementation of this Chapter, a Party may carry out an audit or verification, or both, of all or part of the control programme of the competent authority of the other Party. A Party shall bear its own costs associated with the audit or verification.

2.    If the Parties decide on principles and guidelines to conduct an audit or verification, they shall include them in Annex 5-H. If a Party conducts an audit or verification, it shall do so in accordance with any principles and guidelines in Annex 5-H.

## Article 5.9

### Export certification

1.    When an official health certificate is required to import a consignment of live animals or animal products, and if the importing Party has accepted the SPS measure of the exporting Party as equivalent to its own with respect to such animals or animal products, the Parties shall use the model health attestation prescribed in Annex 5-I for such certificate, unless the Parties decide otherwise. The Parties may also use a model attestation for other products if they so decide.

2.    Annex 5-I sets out principles and guidelines for export certification, including electronic certification, withdrawal or replacement of certificates, language regimes and model attestations.

## Article 5.10

### Import checks and fees

1.    Annex 5-J sets out principles and guidelines for import checks and fees, including the frequency rate for import checks.

2.    If import checks reveal non-compliance with the relevant import requirements, the action taken by the importing Party must be based on an assessment of the risk involved and not be more trade-restrictive than required to achieve the Party's appropriate level of sanitary or phytosanitary protection.

3.    Whenever possible, the importing Party shall notify the importer of a non-compliant consignment, or its representative, of the reason for non-compliance, and provide them with an opportunity for a review of the decision. The importing Party shall consider any relevant information submitted to assist in the review.

4.    A Party may collect fees for the costs incurred to conduct frontier checks, which should not exceed the recovery of the costs.

## Article 5.11

### Notification and information exchange

1.    A Party shall notify the other Party without undue delay of a:

    (a)    significant change to pest or disease status, such as the presence and evolution of a disease listed in Annex 5-B;

    (b)    finding of epidemiological importance with respect to an animal disease, which is not listed in Annex 5-B, or which is a new disease; and

    (c)    significant food safety issue related to a product traded between the Parties.

2.    The Parties endeavour to exchange information on other relevant issues including:

    (a)    a change to a Party's SPS measure;

    (b)    any significant change to the structure or organisation of a Party's competent authority;

    (c)    on request, the results of a Party's official control and a report that concerns the results of the control carried out;

    (d)    the results of an import check provided for in Article 5.10 in case of a rejected or a non-compliant consignment; and

    (e)    on request, a risk analysis or scientific opinion that a Party has produced and that is relevant to this Chapter.

3.    Unless the Joint Management Committee decides otherwise, when the information referred to in paragraph 1 or 2 has been made available via notification to the WTO's Central Registry of Notifications or to the relevant international standard-setting body, in accordance with its relevant rules, the requirements in paragraphs 1 and 2, as they apply to that information, are fulfilled.

## *Article 5.12*

### **Technical consultations**

If a Party has a significant concern with respect to food safety, plant health, or animal health, or an SPS measure that the other Party has proposed or implemented, that Party may request technical consultations with the other Party. The Party that is the subject of the request should respond to the request without undue delay. Each Party shall endeavour to provide the information necessary to avoid a disruption to trade and, as the case may be, to reach a mutually acceptable solution.

## *Article 5.13*

### **Emergency SPS measures**

1.    A Party shall notify the other Party of an emergency SPS measure within 24 hours of its decision to implement the measure. If a Party requests technical consultations to address the emergency SPS measure, the technical consultations must be held within 10 days of the notification of the emergency SPS measure. The Parties shall consider any information provided through the technical consultations.

2.    The importing Party shall consider the information that was provided in a timely manner by the exporting Party when it makes its decision with respect to a

consignment that, at the time of adoption of the emergency SPS measure, is being transported between the Parties.

*Article 5.14*

**Joint Management Committee for Sanitary and Phytosanitary Measures**

1.  The Joint Management Committee for Sanitary and Phytosanitary Measures (the "Joint Management Committee"), established under Article 26.2.1(d), comprises regulatory and trade representatives of each Party responsible for SPS measures.

2.  The functions of the Joint Management Committee include:

    (a)  to monitor the implementation of this Chapter, to consider any matter related to this Chapter and to examine all matters which may arise in relation to its implementation;

    (b)  to provide direction for the identification, prioritisation, management and resolution of issues;

    (c)  to address any request by a Party to modify an import check;

    (d)  at least once a year, to review the annexes to this Chapter, notably in the light of progress made under the consultations provided for under this Agreement. Following its review, the Joint Management Committee may decide to amend the annexes to this Chapter. The Parties may approve the Joint Management Committee's decision, in accordance with their respective procedures necessary for the entry into force of the amendment. The decision enters into force on a date agreed by the Parties;

    (e)  to monitor the implementation of a decision referred to in subparagraph (d), above, as well as the operation of measures referred to under subparagraph (d) above;

    (f)  to provide a regular forum to exchange information that relates to each Party's regulatory system, including the scientific and risk assessment basis for an SPS measure; and

    (g)  to prepare and maintain a document that details the state of discussions between the Parties on their work on recognition of the equivalence of specific SPS measures.

3.  The Joint Management Committee may, among other things:

    (a)  identify opportunities for greater bilateral engagement, including enhanced relationships, which may include an exchange of officials;

    (b)  discuss at an early stage, a change to, or a proposed change to, an SPS measure being considered;

    (c)  facilitate improved understanding between the Parties on the implementation of the SPS Agreement, and promote cooperation between the Parties on SPS issues under discussion in multilateral fora, including the WTO Committee on Sanitary and Phytosanitary Measures and international standard-setting bodies, as appropriate; or

(d)    identify and discuss, at an early stage, initiatives that have an SPS component, and that would benefit from cooperation.

4.    The Joint Management Committee may establish working groups comprising expert-level representatives of the Parties, to address specific SPS issues.

5.    A Party may refer any SPS issue to the Joint Management Committee. The Joint Management Committee should consider the issue as expeditiously as possible.

6.    If the Joint Management Committee is unable to resolve an issue expeditiously, it shall, at the request of a Party, report promptly to the CETA Joint Committee.

7.    Unless the Parties decide otherwise, the Joint Management Committee shall meet and establish its work programme no later than 180 days following the entry into force of this Agreement, and its rules of procedure no later than one year after the entry into force of this Agreement.

8.    Following its initial meeting, the Joint Management Committee shall meet as required, normally on an annual basis. The Joint Management Committee may decide to meet by videoconference or teleconference, and it may also address issues out of session by correspondence.

9.    The Joint Management Committee shall report annually on its activities and work programme to the CETA Joint Committee.

10.    Upon entry into force of this Agreement, each Party shall designate and inform the other Party, in writing, of a contact point to coordinate the Joint Management Committee's agenda and to facilitate communication on SPS matters.

# CHAPTER SIX

## CUSTOMS AND TRADE FACILITATION

### *Article 6.1*

### Objectives and principles

1. The Parties acknowledge the importance of customs and trade facilitation matters in the evolving global trading environment.

2. The Parties shall, to the extent possible, cooperate and exchange information, including information on best practices, to promote the application of and compliance with the trade facilitation measures in this Agreement.

3. Measures to facilitate trade shall not hinder mechanisms to protect a person through effective enforcement of and compliance with a Party's law.

4. Import, export and transit requirements and procedures shall be no more administratively burdensome or trade restrictive than necessary to achieve a legitimate objective.

5. Existing international trade and customs instruments and standards shall be the basis for import, export and transit requirements and procedures, except if these instruments and standards would be an inappropriate or ineffective means for the fulfilment of the legitimate objective pursued.

### *Article 6.2*

### Transparency

1. Each Party shall publish or otherwise make available, including through electronic means, its legislation, regulations, judicial decisions and administrative policies relating to requirements for the import or export of goods.

2. Each Party shall endeavour to make public, including on the internet, proposed regulations and administrative policies relating to customs matters and to provide interested persons an opportunity to comment prior to their adoption.

3. Each Party shall designate or maintain one or more contact points to address inquiries by interested persons concerning customs matters and make available on the internet information concerning the procedures for making such inquiries.

### *Article 6.3*

### Release of goods

1. Each Party shall adopt or maintain simplified customs procedures for the efficient release of goods in order to facilitate trade between the Parties and reduce costs for importers and exporters.

2. Each Party shall ensure that these simplified procedures:

   (a) allow for the release of goods within a period of time no longer than that required to ensure compliance with its law;

(b)  allow goods, and to the extent possible controlled or regulated goods, to be released at the first point of arrival;

(c)  endeavour to allow for the expeditious release of goods in need of emergency clearance;

(d)  allow an importer or its agent to remove goods from customs' control prior to the final determination and payment of customs duties, taxes, and fees. Before releasing the goods, a Party may require that an importer provide sufficient guarantee in the form of a surety, a deposit, or some other appropriate instrument; and

(e)  provide for, in accordance with its law, simplified documentation requirements for the entry of low-value goods as determined by each Party.

3.  Each Party, in its simplified procedures, may require the submission of more extensive information through post-entry accounting and verifications, as appropriate.

4.  Each Party shall allow for the expedited release of goods and, to the extent possible and if applicable, shall:

(a)  provide for advance electronic submission and processing of information before physical arrival of goods to enable their release upon arrival, if no risk has been identified or if no random checks are to be performed; and

(b)  provide for clearance of certain goods with a minimum of documentation.

5.  Each Party shall, to the extent possible, ensure that its authorities and agencies involved in border and other import and export controls cooperate and coordinate to facilitate trade by, among other things, converging import and export data and documentation requirements and establishing a single location for one-time documentary and physical verification of consignments.

6.  Each Party shall ensure, to the extent possible, that its import and export requirements for goods are coordinated to facilitate trade, regardless of whether these requirements are administered by an agency or on behalf of that agency by the customs administration.

*Article 6.4*

**Customs valuation**

1.  The Customs Valuation Agreement governs customs valuation applied to reciprocal trade between the Parties.

2.  The Parties shall cooperate with a view to reaching a common approach to issues relating to customs valuation.

*Article 6.5*

**Classification of goods**

The classification of goods in trade between the Parties under this Agreement is set out in each Party's respective tariff nomenclature in conformity with the Harmonized System.

*Article 6.6*

**Fees and charges**

Each Party shall publish or otherwise make available information on fees and charges imposed by a customs administration of that Party, including through electronic means. This information includes the applicable fees and charges, the specific reason for the fee or charge, the responsible authority, and when and how payment is to be made. A Party shall not impose new or amended fees and charges until it publishes or otherwise makes available this information.

*Article 6.7*

**Risk management**

1.  Each Party shall base its examination, release and post-entry verification procedures on risk assessment principles, rather than requiring each shipment offered for entry to be examined in a comprehensive manner for compliance with import requirements.

2.  Each Party shall adopt and apply its import, export and transit requirements and procedures for goods on the basis of risk management principles and focus compliance measures on transactions that merit attention.

3.  Paragraphs 1 and 2 do not preclude a Party from conducting quality control and compliance reviews that can require more extensive examinations.

*Article 6.8*

**Automation**

1.  Each Party shall use information technologies that expedite its procedures for the release of goods in order to facilitate trade, including trade between the Parties.

2.  Each Party shall:

    (a)  endeavour to make available by electronic means customs forms that are required for the import or export of goods;

    (b)  allow, subject to its law, those customs forms to be submitted in electronic format; and

    (c)  if possible, through its customs administration, provide for the electronic exchange of information with its trading community.

3.  Each Party shall endeavour to:

    (a)  develop or maintain fully interconnected single window systems to facilitate a single, electronic submission of the information required by customs and non-customs legislation for cross-border movements of goods; and

    (b)  develop a set of data elements and processes in accordance with the World Customs Organization ("WCO") Data Model and related WCO recommendations and guidelines.

4.  The Parties shall endeavour to cooperate on the development of interoperable electronic systems, including taking account of the work at the WCO, in order to facilitate trade between the Parties.

*Article 6.9*

**Advance rulings**

1.      Each Party shall issue, upon written request, advance rulings on tariff classification in accordance with its law.

2.      Subject to confidentiality requirements, each Party shall publish, for example on the internet, information on advance rulings on tariff classification that is relevant to understand and apply tariff classification rules.

3.      To facilitate trade, the Parties shall include in their bilateral dialogue regular updates on changes in their respective laws and implementation measures regarding matters referred to in paragraphs 1 and 2.

*Article 6.10*

**Review and appeal**

1.      Each Party shall ensure that an administrative action or official decision taken in respect of the import of goods is reviewable promptly by judicial, arbitral, or administrative tribunals or through administrative procedures.

2.      The tribunal or official acting pursuant to those administrative procedures shall be independent of the official or office issuing the decision and shall have the competence to maintain, modify or reverse the determination in accordance with the Party's law.

3.      Before requiring a person to seek redress at a more formal or judicial level, each Party shall provide for an administrative level of appeal or review that is independent of the official or the office responsible for the original action or decision.

4.      Each Party shall grant substantially the same right of review and appeal of determinations of advance rulings by its customs administration that it provides to importers in its territory to a person that has received an advance ruling pursuant to Article 6.9.

*Article 6.11*

**Penalties**

Each Party shall ensure that its customs law provides that penalties imposed for breaches to it be proportionate and non-discriminatory and that the application of these penalties does not result in unwarranted delays.

*Article 6.12*

**Confidentiality**

1.      Each Party shall, in accordance with its law, treat as strictly confidential all information obtained under this Chapter that is by its nature confidential or that is provided on a confidential basis, and shall protect that information from disclosure that could prejudice the competitive position of the person providing the information.

2.     If the Party receiving or obtaining the information referred to in paragraph 1 is required by its law to disclose the information, that Party shall notify the Party or person who provided that information.

3.     Each Party shall ensure that the confidential information collected under this Chapter shall not be used for purposes other than the administration and enforcement of customs matters, except with the permission of the Party or person that provided that confidential information.

4.     A Party may allow information collected under this Chapter to be used in administrative, judicial or quasi-judicial proceedings instituted for failure to comply with customs-related laws implementing this Chapter. A Party shall notify the Party or person that provided the information in advance of such use.

*Article 6.13*

**Cooperation**

1.     The Parties shall continue to cooperate in international *fora*, such as the WCO, to achieve mutually-recognised goals, including those set out in the WCO Framework of Standards to Secure and Facilitate Global Trade.

2.     The Parties shall regularly review relevant international initiatives on trade facilitation, including the Compendium of Trade Facilitation Recommendations developed by the United Nations Conference on Trade and Development and the United Nations Economic Commission for Europe, to identify areas where further joint action would facilitate trade between the Parties and promote shared multilateral objectives.

3.     The Parties shall cooperate in accordance with the Agreement between Canada and the *European Community on Customs Cooperation and Mutual Assistance in Customs Matters*, done at Ottawa on 4 December 1997 (the "Canada-EU Customs Cooperation Agreement").

4.     The Parties shall provide each other with mutual assistance in customs matters in accordance with the Canada-EU Customs Cooperation Agreement, including matters relating to a suspected breach of a Party's customs legislation, as defined in that agreement, and to the implementation of this Agreement.

*Article 6.14*

**Joint Customs Cooperation Committee**

1.     The Joint Customs Cooperation Committee, which is granted authority to act under the auspices of the CETA Joint Committee as a specialised committee pursuant to Article 26.2.1 (c) (Specialised committees), shall ensure the proper functioning of this Chapter and the Protocol on Rules of Origin and Origin Procedures, as well as Article 20.43 (Scope of border measures) and Article 2.8 (Temporary suspension of preferential tariff treatment). The Joint Customs Cooperation Committee shall examine issues arising from their application in accordance with the objectives of this Agreement.

2.    For matters covered by this Agreement, the Joint Customs Cooperation Committee shall comprise representatives of the customs, trade, or other competent authorities as each Party deems appropriate.

3.    Each Party shall ensure that its representatives in Joint Customs Cooperation Committee meetings have an expertise that corresponds to the agenda items. The Joint Customs Cooperation Committee may meet in a specific configuration of expertise to deal with rules of origin or origin procedures matters either as the Joint Customs Cooperation Committee-Rules of Origin or the Joint Customs Cooperation Committee-Origin Procedures.

4.    The Joint Customs Cooperation Committee may formulate resolutions, recommendations, or opinions and present draft decisions to the CETA Joint Committee that it considers necessary for the attainment of the common objectives and sound functioning of the mechanisms established in this Chapter and the Protocol on Rules of Origin and Origin Procedures, as well as Article 20.43 (Scope of border measures) and Article 2.8 (Temporary suspension of preferential tariff treatment).

# CHAPTER SEVEN

## SUBSIDIES

### *Article 7.1*

#### Definition of a subsidy

1.  For the purposes of this Agreement, a **subsidy** means a measure related to trade in goods, which fulfils the conditions set out in Article 1.1 of the SCM Agreement.

2.  A subsidy is subject to this Chapter only if it is specific within the meaning of Article 2 of the SCM Agreement.

### *Article* 7.2

#### Transparency

1.  Every two years, each Party shall notify the other Party of the following with respect to any subsidy granted or maintained within its territory:

    (a)  the legal basis of the subsidy;

    (b)  the form of the subsidy; and

    (c)  the amount of the subsidy or the amount budgeted for the subsidy.

2.  Notifications provided to the WTO under Article 25.1 of the SCM Agreement are deemed to meet the requirement set out in paragraph 1.

3.  At the request of the other Party, a Party shall promptly provide information and respond to questions pertaining to particular instances of government support related to trade in services provided within its territory.

### *Article* 7.3

#### Consultations on subsidies and government support in sectors other than agriculture and fisheries

1.  If a Party considers that a subsidy, or a particular instance of government support related to trade in services, granted by the other Party is adversely affecting, or may adversely affect its interests, it may express its concerns to the other Party and request consultations on the matter. The responding Party shall accord full and sympathetic consideration to that request.

2.  During consultations, a Party may seek additional information on a subsidy or particular instance of government support related to trade in services provided by the other Party, including its policy objective, its amount, and any measures taken to limit the potential distortive effect on trade.

3.  On the basis of the consultations, the responding Party shall endeavour to eliminate or minimise any adverse effects of the subsidy, or the particular instance of government support related to trade in services, on the requesting Party's interests.

4.      This Article does not apply to subsidies related to agricultural goods and fisheries products, and is without prejudice to Articles 7.4 and 7.5.

### Article 7.4

### Consultations on subsidies related to agricultural goods and fisheries products

1.      The Parties share the objective of working jointly to reach an agreement:

   (a)    to further enhance multilateral disciplines and rules on agricultural trade in the WTO; and

   (b)    to help develop a global, multilateral resolution to fisheries subsidies.

2.      If a Party considers that a subsidy, or the provision of government support, granted by the other Party, is adversely affecting, or may adversely affect, its interests with respect to agricultural goods or fisheries products, it may express its concerns to the other Party and request consultations on the matter.

3.      The responding Party shall accord full and sympathetic consideration to that request and will use its best endeavours to eliminate or minimise the adverse effects of the subsidy, or the provision of government support, on the requesting Party's interests with regard to agricultural goods and fisheries products.

### Article 7.5

### Agriculture export subsidies

1.      For the purposes of this Article:

   (a)    **export subsidy** means an export subsidy as defined in Article 1(e) of the Agreement on Agriculture; and

   (b)    **full elimination of a tariff** means, where tariff quotas exist, the elimination of either the in-quota or over-quota tariff.

2.      A Party shall not adopt or maintain an export subsidy on an agricultural good that is exported, or incorporated in a product that is exported, to the territory of the other Party after the other Party has fully eliminated the tariff, immediately or after the transitional period, on that agricultural good in accordance with Annex 2-A (Tariff Elimination), including its Tariff Schedules.

### Article 7.6

### Confidentiality

When providing information under this Chapter, a Party is not required to disclose confidential information.

### Article 7.7

### Exclusion of subsidies and government support for audio-visual services and cultural industries

Nothing in this Agreement applies to subsidies or government support with respect to audio-visual services for the European Union and to cultural industries for Canada.

### Article 7.8

### Relationship with the WTO Agreement

The Parties reaffirm their rights and obligations under Article VI of GATT 1994, the SCM Agreement and the Agreement on Agriculture.

### Article 7.9

### Dispute settlement

Articles 7.3 and 7.4 of this Chapter are not subject to the dispute settlement provisions of this Agreement.

# CHAPTER EIGHT

## INVESTMENT

*SECTION A*

***Definitions and scope***

*Article 8.1*

**Definitions**

For the purposes of this Chapter:

**activities carried out in the exercise of governmental authority** means activities carried out neither on a commercial basis nor in competition with one or more economic operators;

**aircraft repair and maintenance services** means activities undertaken on an aircraft or a part of an aircraft while it is withdrawn from service and do not include so-called line maintenance;

**airport operation services** means the operation or management, on a fee or contract basis, of airport infrastructure, including terminals, runways, taxiways and aprons, parking facilities, and intra-airport transportation systems. For greater certainty, airport operation services do not include the ownership of, or investment in, airports or airport lands, or any of the functions carried out by a board of directors. Airport operation services do not include air navigation services;

**attachment** means the seizure of property of a disputing party to secure or ensure the satisfaction of an award;

**computer reservation system services** means the supply of a service by computerised systems that contain information about air carriers' schedules, availability, fares and fare rules, through which reservations can be made or tickets may be issued;

**confidential or protected information** means:

(a)    confidential business information; or

(b)    information which is protected against disclosure to the public;

      (i)    in the case of information of the respondent, under the law of the respondent;

      (ii)    in the case of other information, under a law or rules that the Tribunal determines to be applicable to the disclosure of such information;

**covered investment** means, with respect to a Party, an investment:

(a)    in its territory;

(b)    made in accordance with the applicable law at the time the investment is made;

(c)    directly or indirectly owned or controlled by an investor of the other Party; and

(d)    existing on the date of entry into force of this Agreement, or made or acquired thereafter;

**disputing party** means the investor that initiates proceedings pursuant to Section F or the respondent. For the purposes of Section F and without prejudice to Article 8.14, an investor does not include a Party;

**disputing parties** means both the investor and the respondent;

**enjoin** means an order to prohibit or restrain an action;

**enterprise** means an enterprise as defined in Article 1.1 (Definitions of general application) and a branch or representative office of an enterprise;

**ground handling services** means the supply of a service on a fee or contract basis for: ground administration and supervision, including load control and communications; passenger handling; baggage handling; cargo and mail handling; ramp handling and aircraft services; fuel and oil handling; aircraft line maintenance, flight operations and crew administration; surface transport; or catering services. Ground handling services do not include security services or the operation or management of centralised airport infrastructure, such as baggage handling systems, de-icing facilities, fuel distribution systems, or intra-airport transport systems;

**ICSID** means the International Centre for Settlement of Investment Disputes;

**ICSID Additional Facility Rules** means the *Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the International Centre for Settlement of Investment Disputes*;

**ICSID Convention** means the *Convention on the Settlement of Investment Disputes between States and Nationals of other States,* done at Washington on 18 March 1965;

**intellectual property rights** means copyright and related rights, trademark rights, rights in geographical indications, rights in industrial designs, patent rights, rights in layout designs of integrated circuits, rights in relation to protection of undisclosed information, and plant breeders' rights; and, if such rights are provided by a Party's law, utility model rights. The CETA Joint Committee may, by decision, add other categories of intellectual property to this definition;

**investment** means every kind of asset that an investor owns or controls, directly or indirectly, that has the characteristics of an investment, which includes a certain duration and other characteristics such as the commitment of capital or other resources, the expectation of gain or profit, or the assumption of risk. Forms that an investment may take include:

(a)      an enterprise;

(b)      shares, stocks and other forms of equity participation in an enterprise;

(c)      bonds, debentures and other debt instruments of an enterprise;

(d)      a loan to an enterprise;

(e)      any other kind of interest in an enterprise;

(f)      an interest arising from:

      (i)      a concession conferred pursuant to the law of a Party or under a contract, including to search for, cultivate, extract or exploit natural resources,

      (ii)      a turnkey, construction, production or revenue-sharing contract; or

(iii)   other similar contracts;

(g)      intellectual property rights;

(h)      other moveable property, tangible or intangible, or immovable property and related rights;

(i)      claims to money or claims to performance under a contract.

For greater certainty, **claims to money** does not include:

(i)      claims to money that arise solely from commercial contracts for the sale of goods or services by a natural person or enterprise in the territory of a Party to a natural person or enterprise in the territory of the other Party.

(ii)     the domestic financing of such contracts; or

(iii)    any order, judgment, or arbitral award related to sub-subparagraph (i) or (ii).

Returns that are invested shall be treated as investments. Any alteration of the form in which assets are invested or reinvested does not affect their qualification as investment;

**investor** means a Party, a natural person or an enterprise of a Party, other than a branch or a representative office, that seeks to make, is making or has made an investment in the territory of the other Party;

For the purposes of this definition, an **enterprise of a Party** is:

(a)      an enterprise that is constituted or organised under the laws of that Party and has substantial business activities in the territory of that Party; or

(b)      an enterprise that is constituted or organised under the laws of that Party and is directly or indirectly owned or controlled by a natural person of that Party or by an enterprise mentioned under paragraph (a);

**locally established enterprise** means a juridical person that is constituted or organised under the laws of the respondent and that an investor of the other Party owns or controls directly or indirectly;

**natural person** means:

(a)      in the case of Canada, a natural person who is a citizen or permanent resident of Canada; and

(b)      in the case of the European Union, a natural person having the nationality of one of the Member States of the European Union according to their respective laws, and, for Latvia, also a natural person permanently residing in the Republic of Latvia who is not a citizen of the Republic of Latvia or any other state but who is entitled, under laws and regulations of the Republic of Latvia, to receive a non-citizen's passport.

A natural person who is a citizen of Canada and has the nationality of one of the Member States of the European Union is deemed to be exclusively a natural person of the Party of his or her dominant and effective nationality.

A natural person who has the nationality of one of the Member States of the European Union or is a citizen of Canada, and is also a permanent resident of the other Party, is deemed to be exclusively a natural person of the Party of his or her nationality or citizenship, as applicable;

40

**New York Convention** means the *United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* done at New York on 10 June 1958;

**non-disputing Party** means Canada, if the European Union or a Member State of the European Union is the respondent, or the European Union, if Canada is the respondent;

**respondent** means Canada or, in the case of the European Union, either the Member State of the European Union or the European Union pursuant to Article 8.21;

**returns** means all amounts yielded by an investment or reinvestment, including profits, royalties and interest or other fees and payments in kind;

**selling and marketing of air transport service** means opportunity for the air carrier concerned to sell and market freely its air transport services including all aspects of marketing such as market research, advertising and distribution, but does not include the pricing of air transport services or the applicable conditions;

**third party funding** means any funding provided by a natural or legal person who is not a party to the dispute but who enters into an agreement with a disputing party in order to finance part or all of the cost of the proceedings either through a donation or grant, or in return for remuneration dependent on the outcome of the dispute.

**Tribunal** means a tribunal established under Article 8.27 or 8.43;

**UNCITRAL Arbitration Rules** means the arbitration rules of the United Nations Commission on International Trade Law;

**UNCITRAL Transparency Rules** means the *UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration*;

*Article 8.2*

### Scope

1.    This Chapter applies to a measure adopted or maintained by a Party in its territory[3] relating to:

(a)    an investor of the other Party;

(b)    a covered investment; and

(c)    with respect to Article 8.5, any investments in its territory.

2.    With respect to the establishment or acquisition of a covered investment,[4] Sections B and C do not apply to a measure relating to:

---

[3]    For greater certainty, the obligations of this Chapter apply to the Exclusive Economic Zones and Continental Shelves, as provided in the *United Nations Convention on the Law of the Sea*, done at Montego Bay on 10 December 1982:
(a) of Canada as referred to in Article 1.3(a) (Geographical scope of application); and
(b) to which the Treaty on European Union and the Treaty on the Functioning of the European Union are applied as referred to in Article 1.3(b) (Geographical scope of application).

[4]    For greater certainty, a Party may maintain measures with respect to the establishment or acquisition of a covered investment and continue to apply such measures to the covered investment after it has been established or acquired.

(a)    air services, or related services in support of air services and other services supplied by means of air transport[5], other than:

    (i)    aircraft repair and maintenance services;

    (ii)    the selling and marketing of air transport services;

    (iii)    computer reservation system (CRS) services;

    (iv)    ground handling services;

    (v)    airport operation services; or

(b)    activities carried out in the exercise of governmental authority.

3.    For the European Union, Sections B and C do not apply to a measure with respect to audio-visual services. For Canada, Sections B and C do not apply to a measure with respect to cultural industries.

4.    Claims may be submitted by an investor under this Chapter only in accordance with Article 8.18, and in compliance with the procedures set out in Section F. Claims in respect of an obligation set out in Section B are excluded from the scope of Section F. Claims under Section C with respect to the establishment or acquisition of a covered investment are excluded from the scope of Section F. Section D applies only to a covered investment and to investors in respect of their covered investment.

5.    This Chapter does not affect the rights and obligations of the Parties under the *Agreement on Air Transport between Canada and the European Community and its Member States*, done at Brussels on 17 December 2009 and Ottawa on 18 December 2009.

*Article 8.3*

**Relation to other chapters**

1.    This Chapter does not apply to measures adopted or maintained by a Party to the extent that the measures apply to investors or to their investments covered by Chapter Thirteen (Financial Services).

2.    A requirement by a Party that a service supplier of the other Party post a bond or other form of financial security as a condition for supplying a service in its territory does not of itself make this Chapter applicable to measures adopted or maintained by the Party relating to the supply of that cross-border service. This Chapter applies to measures adopted or maintained by the Party relating to the posted bond or financial security to the extent that such bond or financial security is a covered investment.

*SECTION B*

**Establishment of investments**

---

[5]    These services include services when an aircraft is being used to carry out specialised activities in sectors including agriculture, construction, photography, surveying, mapping, forestry, observation and patrol, or advertising, if the specialised activity is provided by the person that is responsible for the operation of the aircraft.

*Article 8.4*

**Market access**

1.     A Party shall not adopt or maintain with respect to market access through establishment by an investor of the other Party, on the basis of its entire territory or on the basis of the territory of a national, provincial, territorial, regional or local level of government, a measure that:

(a)    imposes limitations on:

(i)    the number of enterprises that may carry out a specific economic activity whether in the form of numerical quotas, monopolies, exclusive suppliers or the requirement of an economic needs test;

(ii)    the total value of transactions or assets in the form of numerical quotas or the requirement of an economic needs test;

(iii)    the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of quotas or the requirement of an economic needs test;[6]

(iv)    the participation of foreign capital in terms of maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment; or

(v)    the total number of natural persons that may be employed in a particular sector or that an enterprise may employ and who are necessary for, and directly related to, the performance of economic activity in the form of numerical quotas or the requirement of an economic needs test; or

(b)    restricts or requires specific types of legal entity or joint venture through which an enterprise may carry out an economic activity.

2.     For greater certainty, the following are consistent with paragraph 1:

(a)    a measure concerning zoning and planning regulations affecting the development or use of land, or another analogous measure;

(b)    a measure requiring the separation of the ownership of infrastructure from the ownership of the goods or services provided through that infrastructure to ensure fair competition, for example in the fields of energy, transportation and telecommunications;

(c)    a measure restricting the concentration of ownership to ensure fair competition;

(d)    a measure seeking to ensure the conservation and protection of natural resources and the environment, including a limitation on the availability, number and scope of concessions granted, and the imposition of a moratorium or ban;

---

[6]    Sub-subparagraphs 1(a) (i), (ii) and (iii) do not cover measures taken in order to limit the production of an agricultural good.

(e)   a measure limiting the number of authorisations granted because of technical or physical constraints, for example telecommunications spectrum and frequencies; or

(f)   a measure requiring that a certain percentage of the shareholders, owners, partners, or directors of an enterprise be qualified or practice a certain profession such as lawyers or accountants.

*Article 8.5*

**Performance requirements**

1.   A Party shall not impose, or enforce the following requirements, or enforce a commitment or undertaking, in connection with the establishment, acquisition, expansion, conduct, operation, and management of any investments in its territory to:

(a)   export a given level or percentage of a good or service;

(b)   achieve a given level or percentage of domestic content;

(c)   purchase, use or accord a preference to a good produced or service provided in its territory, or to purchase a good or service from natural persons or enterprises in its territory;

(d)   relate the volume or value of imports to the volume or value of exports or to the amount of foreign exchange inflows associated with that investment;

(e)   restrict sales of a good or service in its territory that the investment produces or provides by relating those sales to the volume or value of its exports or foreign exchange earnings;

(f)   transfer technology, a production process or other proprietary knowledge to a natural person or enterprise in its territory; or

(g)   supply exclusively from the territory of the Party a good produced or a service provided by the investment to a specific regional or world market.

2.   A Party shall not condition the receipt or continued receipt of an advantage, in connection with the establishment, acquisition, expansion, management, conduct or operation of any investments in its territory, on compliance with any of the following requirements:

(a)   to achieve a given level or percentage of domestic content;

(b)   to purchase, use or accord a preference to a good produced in its territory, or to purchase a good from a producer in its territory;

(c)   to relate the volume or value of imports to the volume or value of exports or to the amount of foreign exchange inflows associated with that investment; or

(d)   to restrict sales of a good or service in its territory that the investment produces or provides by relating those sales to the volume or value of its exports or foreign exchange earnings.

3.      Paragraph 2 does not prevent a Party from conditioning the receipt or continued receipt of an advantage, in connection with an investment in its territory, on compliance with a requirement to locate production, provide a service, train or employ workers, construct or expand particular facilities, or carry out research and development in its territory.

4.      Subparagraph 1(f) does not apply if the requirement is imposed or the commitment or undertaking is enforced by a court, administrative tribunal or competition authority to remedy a violation of competition laws.

5.      The provisions of:

(a)     subparagraphs 1(a), (b) and (c), and 2(a) and (b), do not apply to qualification requirements for a good or service with respect to participation in export promotion and foreign aid programs;

(b)     this Article does not apply to procurement by a Party of a good or service purchased for governmental purposes and not with a view to commercial resale or with a view to use in the supply of a good or service for commercial sale, whether or not that procurement is "covered procurement" within the meaning of Article 19.2 (Scope and coverage).

6.      For greater certainty, subparagraphs 2(a) and (b) do not apply to requirements imposed by an importing Party relating to the content of a good necessary to qualify for preferential tariffs or preferential quotas.

7.      This Article is without prejudice to World Trade Organization commitments of a Party.

## SECTION C

### *Non-discriminatory treatment*

### *Article 8.6*

### National treatment

1.      Each Party shall accord to an investor of the other Party and to a covered investment, treatment no less favourable than the treatment it accords, in like situations to its own investors and to their investments with respect to the establishment, acquisition, expansion, conduct, operation, management, maintenance, use, enjoyment and sale or disposal of their investments in its territory.

2.      The treatment accorded by a Party under paragraph 1 means, with respect to a government in Canada other than at the federal level, or, with respect to a government of or in a Member State of the European Union, treatment no less favourable than the most favourable treatment accorded, in like situations, by that government to investors of that Party in its territory and to investments of such investors.

*Article 8.7*

**Most-favoured-nation treatment**

1.      Each Party shall accord to an investor of the other Party and to a covered investment, treatment no less favourable than the treatment it accords in like situations, to investors of a third country and to their investments with respect to the establishment, acquisition, expansion, conduct, operation, management, maintenance, use, enjoyment and sale or disposal of their investments in its territory.

2.      For greater certainty, the treatment accorded by a Party under paragraph 1 means, with respect to a government in Canada other than at the federal level, or, with respect to a government of or in a Member State of the European Union, treatment accorded, in like situations, by that government to investors in its territory, and to investments of such investors, of a third country.

3       Paragraph 1 does not apply to treatment accorded by a Party providing for recognition, including through an arrangement or agreement with a third country that recognises the accreditation of testing and analysis services and service suppliers, the accreditation of repair and maintenance services and service suppliers, as well as the certification of the qualifications of or the results of or work done by those accredited services and service suppliers.

4.      For greater certainty, the "treatment" referred to in paragraphs 1 and 2 does not include procedures for the resolution of investment disputes between investors and states provided for in other international investment treaties and other trade agreements. Substantive obligations in other international investment treaties and other trade agreements do not in themselves constitute "treatment", and thus cannot give rise to a breach of this Article, absent measures adopted or maintained by a Party pursuant to those obligations.

*Article 8.8*

**Senior management and boards of directors**

A Party shall not require that an enterprise of that Party, that is also a covered investment, appoint to senior management or board of director positions, natural persons of any particular nationality.

*SECTION D*

***Investment protection***

*Article 8.9*

**Investment and regulatory measures**

1.   For the purpose of this Chapter, the Parties reaffirm their right to regulate within their territories to achieve legitimate policy objectives, such as the protection of public health, safety, the environment or public morals, social or consumer protection or the promotion and protection of cultural diversity.

2.   For greater certainty, the mere fact that a Party regulates, including through a modification to its laws, in a manner which negatively affects an investment or interferes with an investor's expectations, including its expectations of profits, does not amount to a breach of an obligation under this Section.

3.   For greater certainty, a Party's decision not to issue, renew or maintain a subsidy:

    (a)   in the absence of any specific commitment under law or contract to issue, renew, or maintain that subsidy; or

    (b)   in accordance with any terms or conditions attached to the issuance, renewal or maintenance of the subsidy,

does not constitute a breach of the provisions of this Section.

4.   For greater certainty, nothing in this Section shall be construed as preventing a Party from discontinuing the granting of a subsidy[7] or requesting its reimbursement where such measure is necessary in order to comply with international obligations between the Parties or has been ordered by a competent court, administrative tribunal or other competent authority[8], or requiring that Party to compensate the investor therefor.

*Article 8.10*

**Treatment of investors and of covered investments**

1.   Each Party shall accord in its territory to covered investments of the other Party and to investors with respect to their covered investments fair and equitable treatment and full protection and security in accordance with paragraphs 2 through 6.

2.   A Party breaches the obligation of fair and equitable treatment referenced in paragraph 1 if a measure or series of measures constitutes:

    (a)   denial of justice in criminal, civil or administrative proceedings;

    (b)   fundamental breach of due process, including a fundamental breach of transparency, in judicial and administrative proceedings;

---

[7]   In the case of the European Union, "subsidy" includes "state aid" as defined in its law.
[8]   In the case of the European Union, "competent authority" is the European Commission, in accordance with Article 108 of the Treaty on the Functioning of the European Union.

(c)    manifest arbitrariness;

(d)    targeted discrimination on manifestly wrongful grounds, such as gender, race or religious belief;

(e)    abusive treatment of investors, such as coercion, duress and harassment; or

(f)    a breach of any further elements of the fair and equitable treatment obligation adopted by the Parties in accordance with paragraph 3 of this Article.

3.    The Parties shall regularly, or upon request of a Party, review the content of the obligation to provide fair and equitable treatment. The Committee on Services and Investment, established under Article 26.2.1(b) (Specialised committees), may develop recommendations in this regard and submit them to the CETA Joint Committee for decision.

4.    When applying the above fair and equitable treatment obligation, a Tribunal may take into account whether a Party made a specific representation to an investor to induce a covered investment, that created a legitimate expectation, and upon which the investor relied in deciding to make or maintain the covered investment, but that the Party subsequently frustrated.

5.    For greater certainty, "full protection and security" refers to the Party's obligations relating to the physical security of investors and covered investments.

6.    For greater certainty, a breach of another provision of this Agreement, or of a separate international agreement does not establish a breach of this Article.

7.    For greater certainty, the fact that a measure breaches domestic law does not, in and of itself, establish a breach of this Article. In order to ascertain whether the measure breaches this Article, a Tribunal must consider whether a Party has acted inconsistently with the obligations in paragraph 1.

*Article 8.11*

**Compensation for losses**

Notwithstanding Article 8.15.5(b), each Party shall accord to investors of the other Party, whose covered investments suffer losses owing to armed conflict, civil strife, a state of emergency or natural disaster in its territory, treatment no less favourable than that it accords to its own investors or to the investors of a third country, whichever is more favourable to the investor concerned, as regards restitution, indemnification, compensation or other settlement.

*Article 8.12*

**Expropriation**

48

1.      A Party shall not nationalise or expropriate a covered investment either directly, or indirectly through measures having an effect equivalent to nationalisation or expropriation ("expropriation"), except:

  (a)    for a public purpose;

  (b)    under due process of law;

  (c)    in a non-discriminatory manner; and

  (d)    on payment of prompt, adequate and effective compensation.

  For greater certainty, this paragraph shall be interpreted in accordance with Annex 8-A.

2.      The compensation referred to in paragraph 1 shall amount to the fair market value of the investment at the time immediately before the expropriation or the impending expropriation became known, whichever is earlier. Valuation criteria shall include going concern value, asset value including the declared tax value of tangible property, and other criteria, as appropriate, to determine fair market value.

3.      The compensation shall also include interest at a normal commercial rate from the date of expropriation until the date of payment and shall, in order to be effective for the investor, be paid and made transferable, without delay, to the country designated by the investor and in the currency of the country of which the investor is a national or in any freely convertible currency accepted by the investor.

4.      The affected investor shall have the right, under the law of the expropriating Party, to a prompt review of its claim and of the valuation of its investment, by a judicial or other independent authority of that Party, in accordance with the principles set out in this Article.

5.      This Article does not apply to the issuance of compulsory licences granted in relation to intellectual property rights, to the extent that such issuance is consistent with the TRIPS Agreement.

6.      For greater certainty, the revocation, limitation or creation of intellectual property rights, to the extent that these measures are consistent with the TRIPS Agreement and Chapter Twenty (Intellectual Property), do not constitute expropriation. Moreover, a determination that these measures are inconsistent with the TRIPS Agreement or Chapter Twenty (Intellectual Property) does not establish an expropriation.

*Article 8.13*

**Transfers**

1.      Each Party shall permit all transfers relating to a covered investment to be made without restriction or delay in a freely convertible currency and at the market rate of exchange applicable on the date of transfer. Such transfers include:

(a)    contributions to capital, such as principal and additional funds to maintain, develop or increase the investment;

(b)    profits, dividends, interest, capital gains, royalty payments, management fees, technical assistance and other fees, or other forms of returns or amounts derived from the covered investment;

(c)    proceeds from the sale or liquidation of the whole or a part of the covered investment;

(d)    payments made under a contract entered into by the investor or the covered investment, including payments made pursuant to a loan agreement;

(e)    payments made pursuant to Articles 8.11 and 8.12;

(f)    earnings and other remuneration of foreign personnel working in connection with an investment; and

(g)    payments of damages pursuant to an award issued under Section F.

2.    A Party shall not require its investors to transfer, or penalise its investors for failing to transfer, the income, earnings, profits or other amounts derived from, or attributable to, investments in the territory of the other Party.

3.    Nothing in this Article shall be construed to prevent a Party from applying in an equitable and non-discriminatory manner and not in a way that would constitute a disguised restriction on transfers, its laws relating to:

(a)    bankruptcy, insolvency or the protection of the rights of creditors;

(b)    issuing, trading or dealing in securities;

(c)    criminal or penal offences;

(d)    financial reporting or record keeping of transfers when necessary to assist law enforcement or financial regulatory authorities; and

(e)    the satisfaction of judgments in adjudicatory proceedings.

## Article 8.14

### Subrogation

If a Party, or an agency of a Party, makes a payment under an indemnity, guarantee or contract of insurance that it has entered into in respect of an investment made by one of its investors in the territory of the other Party, the other Party shall recognise that the Party or its agency shall be entitled in all circumstances to the same rights as those of the investor in respect of the investment. These rights may be exercised by the Party or an agency of the Party, or by the investor if the Party or an agency of the Party thereof so authorises.

## SECTION E

### Reservations and exceptions

*Article 8.15*

**Reservations and exceptions**

1.    Articles 8.4 through 8.8 do not apply to:

    (a)    an existing non-conforming measure that is maintained by a Party at the level of:

        (i)    the European Union, as set out in its Schedule to Annex I;

        (ii)    a national government, as set out by that Party in its Schedule to Annex I;

        (iii)    a provincial, territorial, or regional government, as set out by that Party in its Schedule to Annex I; or

        (iv)    a local government.

    (b)    the continuation or prompt renewal of a non-conforming measure referred to in subparagraph (a); or

    (c)    an amendment to a non-conforming measure referred to in subparagraph (a) to the extent that the amendment does not decrease the conformity of the measure, as it existed immediately before the amendment, with Articles 8.4 through 8.8.

2.    Articles 8.4 through 8.8 do not apply to a measure that a Party adopts or maintains with respect to a sector, subsector or activity, as set out in its Schedule to Annex II.

3.    Without prejudice to Articles 8.10 and 8.12, a Party shall not adopt a measure or series of measures after the date of entry into force of this Agreement and covered by its Schedule to Annex II, that require, directly or indirectly an investor of the other Party, by reason of nationality, to sell or otherwise dispose of an investment existing at the time the measure or series of measures become effective.

4.    In respect of intellectual property rights, a Party may derogate from Articles 8.5.1(f), 8.6, and 8.7 if permitted by the TRIPS Agreement, including any amendments to the TRIPS Agreement in force for both Parties, and waivers to the TRIPS Agreement adopted pursuant to Article IX of the WTO Agreement.

5.    Articles 8.4, 8.6, 8.7 and 8.8 do not apply to:

    (a)    procurement by a Party of a good or service purchased for governmental purposes and not with a view to commercial resale or with a view to use in the supply of a good or service for commercial sale, whether or not that procurement is "covered procurement" within the meaning of Article 19.2 (Scope and coverage); or

    (b)    subsidies, or government support relating to trade in services, provided by a Party.

*Article 8.16*

**Denial of benefits**

A Party may deny the benefits of this Chapter to an investor of the other Party that is an enterprise of that Party and to investments of that investor if:

(a)     an investor of a third country owns or controls the enterprise; and

(b)     the denying Party adopts or maintains a measure with respect to the third country that:

      (i)     relates to the maintenance of international peace and security; and

      (ii)    prohibits transactions with the enterprise or would be violated or circumvented if the benefits of this Chapter were accorded to the enterprise or to its investments.

*Article 8.17*

**Formal requirements**

Notwithstanding Articles 8.6 and 8.7, a Party may require an investor of the other Party, or its covered investment, to provide routine information concerning that investment solely for informational or statistical purposes, provided that those requests are reasonable and not unduly burdensome. The Party shall protect confidential or protected information from any disclosure that would prejudice the competitive position of the investor or the covered investment. This paragraph does not prevent a Party from otherwise obtaining or disclosing information in connection with the equitable and good faith application of its laws.

*SECTION F*

***Resolution of investment disputes between investors and states***

*Article 8.18*

**Scope**

1.     Without prejudice to the rights and obligations of the Parties under Chapter Twenty-Nine (Dispute Settlement), an investor of a Party may submit to the Tribunal constituted under this Section a claim that the other Party has breached an obligation under:

      (a)     Section C, with respect to the expansion, conduct, operation, management, maintenance, use, enjoyment and sale or disposal of its covered investment; or

      (b)     Section D:

where the investor claims to have suffered loss or damage as a result of the alleged breach.

2.     Claims under subparagraph 1(a) with respect to the expansion of a covered investment may be submitted only to the extent the measure relates to the existing business operations of a covered investment and the investor has, as a result, incurred loss or damage with respect to the covered investment.

3.     For greater certainty, an investor may not submit a claim under this Section if the investment has been made through fraudulent misrepresentation, concealment, corruption, or conduct amounting to an abuse of process.

4.     A claim with respect to restructuring of debt issued by a Party may only be submitted under this Section in accordance with Annex 8-B.

5.     A Tribunal constituted under this Section shall not decide claims that fall outside of the scope of this Article.

*Article 8.19*

**Consultations**

1.     A dispute should as far as possible be settled amicably. Such a settlement may be agreed at any time, including after the claim has been submitted pursuant to Article 8.23. Unless the disputing parties agree to a longer period, consultations shall be held within 60 days of the submission of the request for consultations pursuant to paragraph 4.

2.     Unless the disputing parties agree otherwise, the place of consultation shall be:

(a)    Ottawa, if the measures challenged are measures of Canada;

(b)    Brussels, if the measures challenged include a measure of the European Union; or

(c)    the capital of the Member State of the European Union, if the measures challenged are exclusively measures of that Member State.

3.     The disputing parties may hold the consultations through videoconference or other means where appropriate, such as in the case where the investor is a small or medium-sized enterprise.

4.     The investor shall submit to the other Party a request for consultations setting out:

(a)    the name and address of the investor and, if such request is submitted on behalf of a locally established enterprise, the name, address and place of incorporation of the locally established enterprise;

(b)    if there is more than one investor, the name and address of each investor and, if there is more than one locally established enterprise, the name, address and place of incorporation of each locally established enterprise;

(c)    the provisions of this Agreement alleged to have been breached;

(d)    the legal and the factual basis for the claim, including the measures at issue; and

(e)    the relief sought and the estimated amount of damages claimed.

The request for consultations shall contain evidence establishing that the investor is an investor of the other Party and that it owns or controls the investment including, if applicable, that it owns or controls the locally established enterprise on whose behalf the request is submitted.

5.    The requirements of the request for consultations set out in paragraph 4 shall be met with sufficient specificity to allow the respondent to effectively engage in consultations and to prepare its defence.

6.    A request for consultations must be submitted within:

(a)    three years after the date on which the investor or, as applicable, the locally established enterprise, first acquired or should have first acquired, knowledge of the alleged breach and knowledge that the investor or, as applicable, the locally established enterprise, has incurred loss or damage thereby; or

(b)    two years after an investor or, as applicable, the locally established enterprise, ceases to pursue claims or proceedings before a tribunal or court under the law of a Party, or when such proceedings have otherwise ended and, in any event, no later than 10 years after the date on which the investor or, as applicable, the locally established enterprise, first acquired or should have first acquired knowledge of the alleged breach and knowledge that the investor has incurred loss or damage thereby.

7.    A request for consultations concerning an alleged breach by the European Union or a Member State of the European Union shall be sent to the European Union.

8.    In the event that the investor has not submitted a claim pursuant to Article 8.23 within 18 months of submitting the request for consultations, the investor is deemed to have withdrawn its request for consultations and, if applicable, its notice requesting a determination of the respondent, and shall not submit a claim under this Section with respect to the same measures. This period may be extended by agreement of the disputing parties.

*Article 8.20*

**Mediation**

1.    The disputing parties may at any time agree to have recourse to mediation.

2.    Recourse to mediation is without prejudice to the legal position or rights of either disputing party under this Chapter and is governed by the rules agreed to by the disputing parties including, if available, the rules for mediation adopted by the Committee on Services and Investment pursuant to Article 8.44.3(c).

3.    The mediator is appointed by agreement of the disputing parties. The disputing parties may also request that the Secretary-General of ICSID appoint the mediator.

4.      The disputing parties shall endeavour to reach a resolution of the dispute within 60 days from the appointment of the mediator.

5.      If the disputing parties agree to have recourse to mediation, Articles 8.19.6 and 8.19.8 shall not apply from the date on which the disputing parties agreed to have recourse to mediation to the date on which either disputing party decides to terminate the mediation. A decision by a disputing party to terminate the mediation shall be transmitted by way of a letter to the mediator and the other disputing party.

*Article 8.21*

**Determination of the respondent for disputes with the European Union or its Member States**

1.      If the dispute cannot be settled within 90 days of the submission of the request for consultations, the request concerns an alleged breach of the Agreement by the European Union or a Member State of the European Union and the investor intends to submit a claim pursuant to Article 8.23, the investor shall deliver to the European Union a notice requesting a determination of the respondent.

2.      The notice under paragraph 1 shall identify the measures in respect of which the investor intends to submit a claim.

3.      The European Union shall, after having made a determination, inform the investor as to whether the European Union or a Member State of the European Union shall be the respondent.

4.      In the event that the investor has not been informed of the determination within 50 days of delivering its notice requesting such determination:

   (a)    if the measures identified in the notice are exclusively measures of a Member State of the European Union, the Member State shall be the respondent.

   (b)    if the measures identified in the notice include measures of the European Union, the European Union shall be the respondent.

5.      The investor may submit a claim pursuant to Article 8.23 on the basis of the determination made pursuant to paragraph 3, and, if no such determination has been communicated to the investor, on the basis of the application of paragraph 4.

6.      If the European Union or a Member State of the European Union is the respondent, pursuant to paragraph 3 or 4, neither the European Union, nor the Member State of the European Union may assert the inadmissibility of the claim, lack of jurisdiction of the Tribunal or otherwise object to the claim or award on the ground that the respondent was not properly determined pursuant to paragraph 3 or identified on the basis of the application of paragraph 4.

7.    The Tribunal shall be bound by the determination made pursuant to paragraph 3 and, if no such determination has been communicated to the investor, the application of paragraph 4.

*Article 8.22*

**Procedural and other requirements for the submission of a claim to the Tribunal**

1.    An investor may only submit a claim pursuant to Article 8.23 if the investor:

(a)    delivers to the respondent, with the submission of a claim, its consent to the settlement of the dispute by the Tribunal in accordance with the procedures set out in this Section;

(b)    allows at least 180 days to elapse from the submission of the request for consultations and, if applicable, at least 90 days to elapse from the submission of the notice requesting a determination of the respondent;

(c)    has fulfilled the requirements of the notice requesting a determination of the respondent;

(d)    has fulfilled the requirements related to the request for consultations;

(e)    does not identify a measure in its claim that was not identified in its request for consultations;

(f)    withdraws or discontinues any existing proceeding before a tribunal or court under domestic or international law with respect to a measure alleged to constitute a breach referred to in its claim; and

(g)    waives its right to initiate any claim or proceeding before a tribunal or court under domestic or international law with respect to a measure alleged to constitute a breach referred to in its claim.

2.    If the claim submitted pursuant to Article 8.23 is for loss or damage to a locally established enterprise or to an interest in a locally established enterprise that the investor owns or controls directly or indirectly, the requirements in subparagraphs 1(f) and (g) apply both to the investor and the locally established enterprise).

3.    The requirements of subparagraphs 1(f) and (g) and paragraph 2 do not apply in respect of a locally established enterprise if the respondent or the investor's host state has deprived the investor of control of the locally established enterprise, or has otherwise prevented the locally established enterprise from fulfilling those requirements.

4.    Upon request of the respondent, the Tribunal shall decline jurisdiction if the investor or, as applicable, the locally established enterprise fails to fulfil any of the requirements of paragraphs 1 and 2.

5.    The waiver provided pursuant to subparagraph 1(g) or paragraph 2 as applicable shall cease to apply:

(a)    if the Tribunal rejects the claim on the basis of a failure to meet the requirements of paragraph 1 or 2 or on any other procedural or jurisdictional grounds;

(b)    if the Tribunal dismisses the claim pursuant to Article 8.32 or Article 8.33; or

(c)    if the investor withdraws its claim, in conformity with the applicable rules under Article 8.23.2, within 12 months of the constitution of the division of the Tribunal.

### Article 8.23

### Submission of a claim to the Tribunal

1.    If a dispute has not been resolved through consultations, a claim may be submitted under this Section by:

(a)    an investor of a Party on its own behalf; or

(b)    an investor of a Party, on behalf of a locally established enterprise which it owns or controls directly or indirectly.

2.    A claim may be submitted under the following rules:

(a)    the ICSID Convention and Rules of Procedure for Arbitration Proceedings;

(b)    the ICSID Additional Facility Rules if the conditions for proceedings pursuant to paragraph (a) do not apply;

(c)    the UNCITRAL Arbitration Rules; or

(d)    any other rules on agreement of the disputing parties.

3.    In the event that the investor proposes rules pursuant to subparagraph 2(d), the respondent shall reply to the investor's proposal within 20 days of receipt. If the disputing parties have not agreed on such rules within 30 days of receipt, the investor may submit a claim under the rules provided for in subparagraph 2(a), (b) or (c).

4.    For greater certainty, a claim submitted under subparagraph 1(b) shall satisfy the requirements of Article 25(1) of the ICSID Convention.

5.    The investor may, when submitting its claim, propose that a sole Member of the Tribunal should hear the claim. The respondent shall give sympathetic consideration to that request, in particular if the investor is a small or medium-sized enterprise or the compensation or damages claimed are relatively low.

6.    The rules applicable under paragraph 2 that are in effect on the date that the claim or claims are submitted to  the Tribunal under this Section, subject to the specific rules set out in this Section and supplemented by rules adopted pursuant to Article 8.44.3(b).

7.    A claim is submitted for dispute settlement under this Section when:

(a)   the request under Article 36(1) of the ICSID Convention is received by the Secretary-General of ICSID;

(b)   the request under Article 2 of Schedule C of the ICSID Additional Facility Rules is received by the Secretariat of ICSID;

(c)   the notice under Article 3 of the UNCITRAL Arbitration Rules is received by the respondent; or

(d)   the request or notice initiating proceedings is received by the respondent in accordance with the rules agreed upon pursuant to subparagraph 2(d).

8.   Each Party shall notify the other Party of the place of delivery of notices and other documents by the investors pursuant to this Section. Each Party shall ensure this information is made publicly available.

## Article 8.24

### Proceedings under another international agreement

Where a claim is brought pursuant to this Section and another international agreement and:

(a)   there is a potential for overlapping compensation; or

(b)   the other international claim could have a significant impact on the resolution of the claim brought pursuant to this Section,

the Tribunal shall, as soon as possible after hearing the disputing parties, stay its proceedings or otherwise ensure that proceedings brought pursuant to another international agreement are taken into account in its decision, order or award.

## Article 8.25

### Consent to the settlement of the dispute by the Tribunal

1.   The respondent consents to the settlement of the dispute by the Tribunal in accordance with the procedures set out in this Section.

2.   The consent under paragraph 1 and the submission of a claim to the Tribunal under this Section shall satisfy the requirements of:

(a)   Article 25 of the ICSID Convention and Chapter II of the ICSID Additional Facility Rules regarding written consent of the disputing parties; and,

(b)   Article II of the New York Convention for an agreement in writing.

*Article 8.26*

**Third party funding**

1.    Where there is third party funding, the disputing party benefiting from it shall disclose to the other disputing party and to the Tribunal the name and address of the third party funder.

2.    The disclosure shall be made at the time of the submission of a claim, or, if the financing agreement is concluded or the donation or grant is made after the submission of a claim, without delay as soon as the agreement is concluded or the donation or grant is made.

*Article 8.27*

**Constitution of the Tribunal**

1.    The Tribunal established under this Section shall decide claims submitted pursuant to Article 8.23.

2.    The CETA Joint Committee shall, upon the entry into force of this Agreement, appoint fifteen Members of the Tribunal. Five of the Members of the Tribunal shall be nationals of a Member State of the European Union, five shall be nationals of Canada[9] and five shall be nationals of third countries.

3.    The CETA Joint Committee may decide to increase or to decrease the number of the Members of the Tribunal by multiples of three. Additional appointments shall be made on the same basis as provided for in paragraph 2.

4.    The Members of the Tribunal shall possess the qualifications required in their respective countries for appointment to judicial office, or be jurists of recognised competence. They shall have demonstrated expertise in public international law. It is desirable that they have expertise in particular, in international investment law, in international trade law and the resolution of disputes arising under international investment or international trade agreements.

5.    The Members of the Tribunal appointed pursuant to this Section shall be appointed for a five-year term, renewable once.  However, the terms of seven of the 15 persons appointed immediately after the entry into force of the Agreement, to be determined by lot, shall extend to six years. Vacancies shall be filled as they arise. A person appointed to replace a Member of the Tribunal whose term of office has not expired shall hold office for the remainder of the predecessor's term. In principle, a Member of the Tribunal serving on a division of the Tribunal when his or her term expires may continue to serve on the division until a final award is issued.

---

[9]    Either Party may instead propose to appoint up to five Members of the Tribunal of any nationality. In this case, such Members of the Tribunal shall be considered to be nationals of the Party that proposed his or her appointment for the purposes of this Article.

6.    The Tribunal shall hear cases in divisions consisting of three Members of the Tribunal, of whom one shall be a national of a Member State of the European Union, one a national of Canada and one a national of a third country. The division shall be chaired by the Member of the Tribunal who is a national of a third country.

7.    Within 90 days of the submission of a claim pursuant to Article 8.23, the President of the Tribunal shall appoint the Members of the Tribunal composing the division of the Tribunal hearing the case on a rotation basis, ensuring that the composition of the divisions is random and unpredictable, while giving equal opportunity to all Members of the Tribunal to serve.

8.    The President and Vice-President of the Tribunal shall be responsible for organisational issues and will be appointed for a two-year term and shall be drawn by lot from among the Members of the Tribunal who are nationals of third countries. They shall serve on the basis of a rotation drawn by lot by the Chair of the CETA Joint Committee. The Vice-President shall replace the President when the President is unavailable.

9.    Notwithstanding paragraph 6, the disputing parties may agree that a case be heard by a sole Member of the Tribunal to be appointed at random from the third country nationals. The respondent shall give sympathetic consideration to a request from the claimant to have the case heard by a sole Member of the Tribunal, in particular where the claimant is a small or medium-sized enterprise or the compensation or damages claimed are relatively low. Such a request shall be made before the constitution of the division of the Tribunal.

10.    The Tribunal may draw up its own working procedures.

11.    The Members of the Tribunal shall ensure that they are available and able to perform the functions set out under this Section.

12.    In order to ensure their availability, the Members of the Tribunal shall be paid a monthly retainer fee to be determined by the CETA Joint Committee.

13.    The fees referred to in paragraph 12 shall be paid equally by both Parties into an account managed by the ICSID Secretariat. In the event that one Party fails to pay the retainer fee the other Party may elect to pay.  Any such arrears by a Party will remain payable, with appropriate interest.

14.    Unless the CETA Joint Committee adopts a decision pursuant to paragraph 15, the amount of the fees and expenses of the Members of the Tribunal on a division constituted to hear a claim, other than the fees referred to in paragraph 12,  shall be those determined pursuant to Regulation 14(1) of the Administrative and Financial Regulations of the ICSID Convention in force on the date of the submission of the claim and allocated by the Tribunal among the disputing parties in accordance with Article 8.39.5.

15.   The CETA Joint Committee may, by decision, transform the retainer fee and other fees and expenses into a regular salary, and decide applicable modalities and conditions.

16.   The ICSID Secretariat shall act as Secretariat for the Tribunal and provide it with appropriate support.

17.   If the CETA Joint Committee has not made the appointments pursuant to paragraph 2 within 90 days from the date that a claim is submitted for dispute settlement, the Secretary General of ICSID shall, at the request of either disputing party appoint a division consisting of three Members of the Tribunal, unless the disputing parties have agreed that the case is to be heard by a sole Member of the Tribunal. The Secretary General of ICSID shall make the appointment by random selection from the existing nominations. The Secretary-General of ICSID may not appoint as chair a national of either Canada or a Member State of the European Union unless the disputing parties agree otherwise.

*Article 8.28*

**Appellate Tribunal**

1.   An Appellate Tribunal is hereby established to review awards rendered under this Section.

2.   The Appellate Tribunal may uphold, modify or reverse a Tribunal's award based on:

   (a) errors in the application or interpretation of applicable law;

   (b) manifest errors in the appreciation of the facts, including the appreciation of relevant domestic law;
   (c) the grounds set out in Article 52(1) (a) through (e) of the ICSID Convention, in so far as they are not covered by paragraphs (a) and (b).

3.   The Members of the Appellate Tribunal shall be appointed by a decision of the CETA Joint Committee at the same time as the decision referred to in paragraph 7.

4.   The Members of the Appellate Tribunal shall meet the requirements of Articles 8.27.4 and comply with Article 8.30.

5.   The division of the Appellate Tribunal constituted to hear the appeal shall consist of three randomly appointed Members of the Appellate Tribunal.

6.      Articles 8.36 and 8.38 shall apply to the proceedings before the Appellate Tribunal.

7.      The CETA Joint Committee shall promptly adopt a decision setting out the following administrative and organisational matters regarding the functioning of the Appellate Tribunal:

>       (a) administrative support;
>
>       (b) procedures for the initiation and the conduct of appeals, and procedures for referring issues back to the Tribunal for adjustment of the award, as appropriate;
>
>       (c) procedures for filling a vacancy on the Appellate Tribunal and on a division of the Appellate Tribunal constituted to hear a case;
>
>       (d) remuneration of the Members of the Appellate Tribunal;
>
>       (e) provisions related to the costs of appeals;
>
>       (f) the number of Members of the Appellate Tribunal; and
>
>       (g) any other elements it determines to be necessary for the effective functioning of the Appellate Tribunal.

8.      The Committee on Services and Investment shall periodically review the functioning of the Appellate Tribunal and may make recommendations to the CETA Joint Committee.  The CETA Joint Committee may revise the decision referred to in paragraph 7, if necessary.

9.      Upon adoption of the decision referred to in paragraph 7:

>       (a)  a disputing party may appeal an award rendered pursuant to this Section to the Appellate Tribunal within 90 days after its issuance;
>
>       (b) a disputing party shall not seek to review, set aside, annul, revise or initiate any other similar procedure as regards an award under this Section;
>
>       (c) an award rendered pursuant to Article 8.39  shall not be considered final and no action for enforcement of an award may be brought until either:
>
>> (i) 90 days from the issuance of the award by the Tribunal has elapsed and no appeal has been initiated;
>>
>> (ii) an initiated appeal has been rejected or withdrawn; or
>>
>> (iii) 90 days have elapsed from an award by the Appellate Tribunal and the Appellate Tribunal has not referred the matter back to the Tribunal;

(d)      a final award by the Appellate Tribunal shall be considered as a final award for the purposes of Article 8.41; and

(e)        Article 8.41.3 shall not apply.


*Article 8.29*

**Establishment of a multilateral investment tribunal and appellate mechanism**

The Parties shall pursue with other trading partners the establishment of a multilateral investment tribunal and appellate mechanism for the resolution of investment disputes. Upon establishment of such a multilateral mechanism, the CETA Joint Committee shall adopt a decision providing that investment disputes under this Section will be decided pursuant to the multilateral mechanism and make appropriate transitional arrangements.


*Article 8.30*

**Ethics**


1.        The Members of the Tribunal shall be independent. They shall not be affiliated with any government.[10] They shall not take instructions from any organisation, or government with regard to matters related to the dispute. They shall not participate in the consideration of any disputes that would create a direct or indirect conflict of interest. They shall comply with the International Bar Association Guidelines on Conflicts of Interest in International Arbitration or any supplemental rules adopted pursuant to Article 8.44.2. In addition, upon appointment, they shall refrain from acting as counsel or as party-appointed expert or witness in any pending or new investment dispute under this or any other international agreement.


2.        If a disputing party considers that a Member of the Tribunal has a conflict of interest, it shall send to the President of the International Court of Justice a notice of challenge to the appointment. The notice of challenge shall be sent within 15 days of the date on which the composition of the division of the Tribunal has been communicated to the disputing party, or within 15 days of the date on which the relevant facts came to its knowledge, if they could not have reasonably been known at the time of composition of the division. The notice of challenge shall state the grounds for the challenge.


3.        If, within 15 days from the date of the notice of challenge, the challenged Member of the Tribunal has elected not to resign from the division, the President of the International Court of Justice shall, after hearing the disputing parties and after providing the Member of the Tribunal an opportunity to submit any observations, issue a decision within 45 days of receipt of the notice of challenge and notify the disputing parties and the other Members of the division. A vacancy resulting from the disqualification or resignation of a Member of the Tribunal shall be filled promptly.

---

[10]        For greater certainty, the fact that a person receives remuneration from a government does not in itself make that person ineligible.

4.      Upon a reasoned recommendation from the President of the Tribunal, or on their joint initiative, the Parties, by decision of the CETA Joint Committee, may remove a Member from the Tribunal where his or her behaviour is inconsistent with the obligations set out in paragraph 1 and incompatible with his or her continued membership of the Tribunal.

### *Article 8.31*

### **Applicable law and interpretation**

1.      When rendering its decision, the Tribunal established under this Section shall apply this Agreement as interpreted in accordance with the *Vienna Convention on the Law of Treaties*, and other rules and principles of international law applicable between the Parties.

2.      The Tribunal shall not have jurisdiction to determine the legality of a measure, alleged to constitute a breach of this Agreement, under the domestic law of the disputing Party. For greater certainty, in determining the consistency of a measure with this Agreement, the Tribunal may consider, as appropriate, the domestic law of the disputing Party as a matter of fact. In doing so, the Tribunal shall follow the prevailing interpretation given to the domestic law by the courts or authorities of that Party and any meaning given to domestic law by the Tribunal shall not be binding upon the courts or the authorities of that Party.

3.      Where serious concerns arise as regards matters of interpretation that may affect investment, the Committee on Services and Investment may, pursuant to Article 8.44.3(a), recommend to the CETA Joint Committee the adoption of interpretations of this Agreement. An interpretation adopted by the CETA Joint Committee shall be binding on a Tribunal established under this Section. The CETA Joint Committee may decide that an interpretation shall have binding effect from a specific date.

### *Article 8.32*

### **Claims manifestly without legal merit**

1.      The respondent may, no later than 30 days after the constitution of the division of the Tribunal, and in any event before its first session, file an objection that a claim is manifestly without legal merit.

2.      An objection shall not be submitted under paragraph 1 if the respondent has filed an objection pursuant to Article 8.33.

3.      The respondent shall specify as precisely as possible the basis for the objection.

4.      On receipt of an objection pursuant to this Article, the Tribunal shall suspend the proceedings on the merits and establish a schedule for considering such an objection consistent with its schedule for considering any other preliminary question.

5.      The Tribunal, after giving the disputing parties an opportunity to present their observations, shall at its first session or promptly thereafter, issue a decision or award stating the grounds therefor. In doing so, the Tribunal shall assume the alleged facts to be true.

6.      This Article shall be without prejudice to the Tribunal's authority to address other objections as a preliminary question or to the right of the respondent to object, in the course of the proceeding, that a claim lacks legal merit.

## *Article 8.33*

### Claims unfounded as a matter of law

1.      Without prejudice to a Tribunal's authority to address other objections as a preliminary question or to a respondent's right to raise any such objections at an appropriate time, the Tribunal shall address and decide as a preliminary question any objection by the respondent that, as a matter of law, a claim, or any part thereof, submitted pursuant to Article 8.23 is not a claim for which an award in favour of the claimant may be made under this Section, even if the facts alleged were assumed to be true.

2.      An objection under paragraph 1 shall be submitted to the Tribunal no later than the date the Tribunal fixes for the respondent to submit its counter-memorial.

3.      If an objection has been submitted pursuant to Article 8.32, the Tribunal may, taking into account the circumstances of that objection, decline to address, under the procedures set out in this Article, an objection submitted pursuant to paragraph 1.

4.      On receipt of an objection under paragraph 1, and, if appropriate, after rendering a decision pursuant to paragraph 3, the Tribunal shall suspend any proceedings on the merits, establish a schedule for considering the objection consistent with any schedule it has established for considering any other preliminary question, and issue a decision or award on the objection stating the grounds therefor.

## *Article 8.34*

### Interim measures of protection

A Tribunal may order an interim measure of protection to preserve the rights of a disputing party or to ensure that the Tribunal's jurisdiction is made fully effective, including an order to preserve evidence in the possession or control of a disputing party or to protect the Tribunal's jurisdiction. A Tribunal shall not order attachment or enjoin the application of the measure alleged to constitute a breach referred to in Article 8.23. For the purposes of this Article, an order includes a recommendation.

## *Article 8.35*

### Discontinuance

If, following the submission of a claim under this Section, the investor fails to take any steps in the proceeding during 180 consecutive days or such periods as the disputing parties may agree, the investor is deemed to have withdrawn its claim and to have discontinued the proceeding. The Tribunal shall, at the request of the respondent, and after notice to the disputing parties, in an order take note of the discontinuance. After the order has been rendered the authority of the Tribunal shall lapse.

## Article 8.36

### Transparency of proceedings

1.      The UNCITRAL Transparency Rules, as modified by this Chapter, shall apply in connection with proceedings under this Section.

2.      The request for consultations, the notice requesting a determination of the respondent, the notice of determination of the respondent, the agreement to mediate, the notice of intent to challenge a Member of the Tribunal, the decision on challenge to a Member of the Tribunal and the request for consolidation shall be included in the list of documents to be made available to the public under Article 3(1) of the UNCITRAL Transparency Rules.

3.      Exhibits shall be included in the list of documents to be made available to the public under Article 3(2) of the UNCITRAL Transparency Rules.

4.      Notwithstanding Article 2 of the UNCITRAL Transparency Rules, prior to the constitution of the Tribunal, Canada or the European Union as the case may be shall make publicly available in a timely manner relevant documents pursuant to paragraph 2, subject to the redaction of confidential or protected information. Such documents may be made publicly available by communication to the repository.

5.      Hearings shall be open to the public. The Tribunal shall determine, in consultation with the disputing parties, the appropriate logistical arrangements to facilitate public access to such hearings. If the Tribunal determines that there is a need to protect confidential or protected information, it shall make the appropriate arrangements to hold in private that part of the hearing requiring such protection.

6.      Nothing in this Chapter requires a respondent to withhold from the public information required to be disclosed by its laws. The respondent should apply those laws in a manner sensitive to protecting from disclosure information that has been designated as confidential or protected information.

## Article 8.37

### Information sharing

1.      A disputing party may disclose to other persons in connection with the proceedings, including witnesses and experts, such unredacted documents as it considers necessary in the course of proceedings under this Section. However, the disputing

party shall ensure that those persons protect the confidential or protected information contained in those documents.

2.     This Agreement does not prevent a respondent from disclosing to officials of, as applicable, the European Union, Member States of the European Union and sub-national governments, such unredacted documents as it considers necessary in the course of proceedings under this Section. However, the respondent shall ensure that those officials protect the confidential or protected information contained in those documents.

*Article 8.38*

**Non-disputing Party**

1.     The respondent shall, within 30 days after receipt or promptly after any dispute concerning confidential or protected information has been resolved, deliver to the non-disputing Party:

(a)     a request for consultations, a notice requesting a determination of the respondent, a notice of determination of the respondent, a claim submitted pursuant to Article 8.23, a request for consolidation, and any other documents that are appended to such documents;

(b)     on request:

(i)     pleadings, memorials, briefs, requests and other submissions made to the Tribunal by a disputing party;

(ii)     written submissions made to the Tribunal pursuant to Article 4 of the UNCITRAL Transparency Rules;

(iii)     minutes or transcripts of hearings of the Tribunal, if available; and

(iv)     orders, awards and decisions of the Tribunal; and

(c)     on request and at the cost of the non-disputing Party, all or part of the evidence that has been tendered to the Tribunal, unless the requested evidence is publicly available.

2.     The Tribunal shall accept or, after consultation with the disputing parties, may invite, oral or written submissions from the non-disputing Party regarding the interpretation of the Agreement. The non-disputing Party may attend a hearing held under this Section.

3.     The Tribunal shall not draw any inference from the absence of a submission pursuant to paragraph 2.

4.     The Tribunal shall ensure that the disputing parties are given a reasonable opportunity to present their observations on a submission by the non-disputing Party to this Agreement.

*Article 8.39*

**Final award**

1.    If the Tribunal makes a final award against the respondent, the Tribunal may only award, separately or in combination:

> (a)    monetary damages and any applicable interest;

> (b)    restitution of property, in which case the award shall provide that the respondent may pay monetary damages representing the fair market value of the property at the time immediately before the expropriation, or impending expropriation became known, whichever is earlier, and any applicable interest in lieu of restitution, determined in a manner consistent with Article 8.12.

2.    Subject to paragraphs 1 and 5, if a claim is made under Article 8.23.1(b):

> (a)    an award of monetary damages and any applicable interest shall provide that the sum be paid to the locally established enterprise;

> (b)    an award of restitution of property shall provide that restitution be made to the locally established enterprise;

> (c)    an award of costs in favour of the investor shall provide that it is to be made to the investor; and

> (d)    the award shall provide that it is made without prejudice to a right that a person, other than a person which has provided a waiver pursuant to Article 8.22, may have in monetary damages or property awarded under a Party's law.

3.    Monetary damages shall not be greater than the loss suffered by the investor or, as applicable, the locally established enterprise, reduced by any prior damages or compensation already provided. For the calculation of monetary damages, the Tribunal shall also reduce the damages to take into account any restitution of property or repeal or modification of the measure.

4.    The Tribunal shall not award punitive damages.

5.    The Tribunal shall order that the costs of the proceedings be borne by the unsuccessful disputing party. In exceptional circumstances, the Tribunal may apportion costs between the disputing parties if it determines that apportionment is appropriate in the circumstances of the claim. Other reasonable costs, including costs of legal representation and assistance, shall be borne by the unsuccessful disputing party, unless the Tribunal determines that such apportionment is unreasonable in the circumstances of the claim. If only parts of the claims have been successful the costs shall be adjusted, proportionately, to the number or extent of the successful parts of the claims.

6.    The CETA Joint Committee shall consider supplemental rules aimed at reducing the financial burden on claimants who are natural persons or small and medium-sized

enterprises. Such supplemental rules may, in particular, take into account the financial resources of such claimants and the amount of compensation sought.

7.      The Tribunal and the disputing parties shall make every effort to ensure the dispute settlement process is carried out in a timely manner. The Tribunal shall issue its final award within 24 months of the date the claim is submitted pursuant to Article 8.23. If the Tribunal requires additional time to issue its final award, it shall provide the disputing parties the reasons for the delay.

*Article 8.40*

**Indemnification or other compensation**

A respondent shall not assert, and a Tribunal shall not accept a defence, counterclaim, right of setoff, or similar assertion, that an investor or, as applicable, a locally established enterprise, has received or will receive indemnification or other compensation pursuant to an insurance or guarantee contract in respect of all or part of the compensation sought in a dispute initiated pursuant to this Section.

*Article 8.41*

**Enforcement of awards**

1.      An award issued pursuant to this Section shall be binding between the disputing parties and in respect of that particular case.

2.      Subject to paragraph 3, a disputing party shall recognise and comply with an award without delay.

3.      A disputing party shall not seek enforcement of a final award until:

(a)      in the case of a final award issued under the ICSID Convention:

(i)      120 days have elapsed from the date the award was rendered and no disputing party has requested revision or annulment of the award; or

(ii)     enforcement of the award has been stayed and revision or annulment proceedings have been completed.

(b)      in the case of a final award under the ICSID Additional Facility Rules the UNCITRAL Arbitration Rules, or any other rules applicable pursuant to Article 8. 23.2(d):

(i)      90 days have elapsed from the date the award was rendered and no disputing party has commenced a proceeding to revise, set aside or annul the award; or

(ii)   enforcement of the award has been stayed and a court has dismissed or allowed an application to revise, set aside or annul the award and there is no further appeal.

4.    Execution of the award shall be governed by the laws concerning the execution of judgments or awards in force where the execution is sought.

5.    A final award issued pursuant to this Section is an arbitral award that is deemed to relate to claims arising out of a commercial relationship or transaction for the purposes of Article I of the New York Convention.

6.    For greater certainty, if a claim has been submitted pursuant to Article 8.23.2(a), a final award issued pursuant to this Section shall qualify as an award under Section 6 of the ICSID Convention.

### *Article 8.42*

### **Role of the Parties**

1.    A Party shall not bring an international claim, in respect of a claim submitted pursuant to Article 8.23, unless the other Party has failed to abide by and comply with the award rendered in that dispute.

2.    Paragraph 1 shall not exclude the possibility of dispute settlement under Chapter Twenty-Nine (Dispute Settlement) in respect of a measure of general application even if that measure is alleged to have breached this Agreement as regards a specific investment in respect of which a claim has been submitted pursuant to Article 8.23 and is without prejudice to Article 8.38.

3.    Paragraph 1 does not preclude informal exchanges for the sole purpose of facilitating a settlement of the dispute.

### *Article 8.43*

### **Consolidation**

1.    When two or more claims that have been submitted separately pursuant to Article 8.23 have a question of law or fact in common and arise out of the same events or circumstances, a disputing party or the disputing parties, jointly, may seek the establishment of a separate division of the Tribunal pursuant to this Article and request that such division issue a consolidation order ("request for consolidation").

2.    The disputing party seeking a consolidation order shall first deliver a notice to the disputing parties it seeks to be covered by this order.

3.    If the disputing parties notified pursuant to paragraph 2 have reached an agreement on the consolidation order to be sought, they may make a joint request for the establishment of a separate division of the Tribunal and a consolidation order pursuant to this Article. If the disputing parties notified pursuant to paragraph 2 have

not reached agreement on the consolidation order to be sought within 30 days of the notice, a disputing party may make a request for the establishment of a separate division of the Tribunal and a consolidation order pursuant to this Article.

4.   The request shall be delivered, in writing, to the President of the Tribunal and to all the disputing parties sought to be covered by the order, and shall specify:

   (a)   the names and addresses of the disputing parties sought to be covered by the order;

   (b)   the claims, or parts thereof, sought to be covered by the order; and

   (c)   the grounds for the order sought.

5.   A request for consolidation involving more than one respondent shall require the agreement of all such respondents.

6.   The rules applicable to the proceedings under this Article are determined as follows:

   (a)   if all of the claims for which a consolidation order is sought have been submitted to dispute settlement under the same rules pursuant to Article 8.23, these rules shall apply;

   (b)   if the claims for which a consolidation order is sought have not been submitted to dispute settlement under the same rules:

      (i)   the investors may collectively agree on the rules pursuant to Article 8.23.2; or

      (ii)   if the investors cannot agree on the applicable rules within 30 days of the President of the Tribunal receiving the request for consolidation, the UNCITRAL Arbitration Rules shall apply.

7.    The President of the Tribunal shall, after receipt of a consolidation request and in accordance with the requirements of Article 8.27.7 constitute a new division ( "consolidating division") of the Tribunal which shall have jurisdiction over some or all of the claims, in whole or in part, which are the subject of the joint consolidation request.8.   If, after hearing the disputing parties, a consolidating division is satisfied that claims submitted pursuant to Article 8.23 have a question of law or fact in common and arise out of the same events or circumstances, and consolidation would best serve the interests of fair and efficient resolution of the claims including the interest of consistency of awards, the consolidating division of the Tribunal may, by order, assume jurisdiction over some or all of the claims, in whole or in part.

9.   If a consolidating division of the Tribunal has assumed jurisdiction pursuant to paragraph 8, an investor that has submitted a claim pursuant to Article 8.23 and whose claim has not been consolidated may make a written request to the Tribunal that it be included in such order provided that the request complies with the requirements set out in paragraph 4. The consolidating division of the Tribunal shall grant such order where it is satisfied that the conditions of paragraph 8 are met and that granting such a request would not unduly burden or unfairly prejudice the

disputing parties or unduly disrupt the proceedings. Before consolidating division of the Tribunal issues that order, it shall consult with the disputing parties.

10. On application of a disputing party, a consolidating division of the Tribunal established under this Article, pending its decision under paragraph 8, may order that the proceedings of a Tribunal appointed under Article 8.27,7 be stayed unless the latter Tribunal has already adjourned its proceedings.

11. A Tribunal appointed under Article 8.27,7 shall cede jurisdiction in relation to the claims, or parts thereof, over which a consolidating division of the Tribunal established under this Article has assumed jurisdiction.

12. The award of a consolidating division of the Tribunal established under this Article in relation to those claims, or parts thereof, over which it has assumed jurisdiction is binding on a Tribunal appointed under  Article 8.27,7 as regards those claims, or parts thereof.

13. An investor may withdraw a claim under this Section that is subject to consolidation and such claim shall not be resubmitted pursuant to Article 8.23. If it does so no later than 15 days after receipt of the notice of consolidation, its earlier submission of the claim shall not prevent the investor's recourse to dispute settlement other than under this Section.

14. At the request of an investor, a consolidating division of the Tribunal may take such measures as it sees fit in order to preserve the confidential or protected information of that investor in relation to other investors. Those measures may include the submission of redacted versions of documents containing confidential or protected information to the other investors or arrangements to hold parts of the hearing in private.

*Article 8.44*

**Committee on Services and Investment**

1. The Committee on Services and Investment shall provide a forum for the Parties to consult on issues related to this Chapter, including:

   (a)  difficulties which may arise in the implementation of this Chapter;

   (b)  possible improvements of this Chapter, in particular in the light of experience and developments in other international *fora* and under the Parties' other agreements.

2. The Committee on Services and Investment shall, on agreement of the Parties, and after completion of their respective internal requirements and procedures, adopt a code of conduct for the Members of the Tribunal to be applied in disputes arising out of this Chapter, which may replace or supplement the rules in application, and may address topics including:

(a)    disclosure obligations;

(b)    the independence and impartiality of the Members of the Tribunal; and

(c)    confidentiality.

The Parties shall make best efforts to ensure that the code of conduct is adopted no later than the first day of the provisional application or entry into force of this Agreement, as the case may be, and in any event no later than two years after such date.

3.    The Committee Services and Investment may, on agreement of the Parties, and after completion of their respective internal requirements and procedures:

(a)    recommend to the CETA Joint Committee the adoption of interpretations of this Agreement pursuant to Article 8.31.3;

(b)    adopt and amend rules supplementing the applicable dispute settlement rules, and amend the applicable rules on transparency. These rules and amendments are binding on a Tribunal established under this Section;

(c)    adopt rules for mediation for use by disputing parties as referred to in Article 8.20;

(d)    recommend to the CETA Joint Committee the adoption of any further elements of the fair and equitable treatment obligation pursuant to Article 8.10.4; and

(e)    make recommendations to the CETA Joint Committee on the functioning of the Appellate Tribunal pursuant to Article 8.28.8.

*Article 8.45*

**Exclusion**

The dispute settlement provisions of this Section and of Chapter Twenty-Nine (Dispute Settlement) do not apply to the matters referred to in Annex 8-C.

# CHAPTER NINE

## CROSS-BORDER TRADE IN SERVICES

*Article 9.1*

### Definitions

For the purposes of this Chapter:

**aircraft repair and maintenance services** means activities undertaken on an aircraft or a part of an aircraft while it is withdrawn from service and do not include so-called line maintenance;

**airport operation services** means the operation or management, on a fee or contract basis, of airport infrastructure, including terminals, runways, taxiways and aprons, parking facilities, and intra-airport transportation systems. For greater certainty, airport operation services do not include the ownership of, or investment in, airports or airport lands, or any of the functions carried out by a board of directors. Airport operation services do not include air navigation services;

**computer reservation system services** means the supply of a service by computerised systems that contain information about air carriers' schedules, availability, fares and fare rules, through which reservations can be made or tickets may be issued;

**cross-border trade in services** or **cross-border supply of services** means the supply of a service:

(a)        from the territory of a Party into the territory of the other Party; or

(b)        in the territory of a Party to the service consumer of the other Party,

but does not include the supply of a service in the territory of a Party by a person of the other Party.

**ground handling services** means the supply of a service on a fee or contract basis for: ground administration and supervision, including load control and communications; passenger handling; baggage handling; cargo and mail handling; ramp handling and aircraft services; fuel and oil handling; aircraft line maintenance, flight operations and crew administration; surface transport; or catering services. Ground handling services do not include security services or the operation or management of centralised airport infrastructure, such as baggage handling systems, de-icing facilities, fuel distribution systems, or intra-airport transport systems;

**selling and marketing of air transport services** means opportunities for the air carrier concerned to sell and market freely its air transport services including all aspects of marketing such as market research, advertising and distribution, but do not include the pricing of air transport services or the applicable conditions;

**services supplied in the exercise of governmental authority** means any service that is not supplied on a commercial basis, or in competition with one or more service suppliers;

*Article 9.2*

**Scope**

1.    This Chapter applies to a measure adopted or maintained by a Party affecting cross-border trade in services by a service supplier of the other Party, including a measure affecting:

   (a)    the production, distribution, marketing, sale, and delivery of a service;

   (b)    the purchase of, use of, or payment for, a service; and,

   (c)    the access to and use of, in connection with the supply of a service, services which are required to be offered to the public generally.

2.    This Chapter does not apply to a measure affecting:

   (a)    services supplied in the exercise of governmental authority;

   (b)    for the European Union, audio-visual services;

   (c)    for Canada, cultural industries;

   (d)    financial services as defined in Article 13.1 (Definitions);

   (e)    air services, related services in support of air services and other services supplied by means of air transport[11], other than:

      (i)    aircraft repair and maintenance services;

      (ii)    the selling and marketing of air transport services;

      (iii)    computer reservation system (CRS) services;

      (iv)    ground handling services;

      (v)    airport operation services;

   (f)    procurement by a Party of a good or service purchased for governmental purposes, and not with of a view to commercial resale or with a view to use in the supply of a good or service for commercial sale, whether or not that procurement is "covered procurement" within the meaning of Article 19.2.2 (Scope and coverage); or

   (g)    a subsidy, or other government support relating to cross-border trade in services, provided by a Party.

3.    This Chapter does not affect the rights and obligations of the Parties under the *Agreement on Air Transport between Canada and the European Community and its Member States*, done at Brussels on 17 December 2009 and Ottawa on 18 December 2009.

4.    This Chapter does not impose an obligation on a Party with respect to a national of the other Party seeking access to its employment market, or employment on a

---

[11]    These services include services when an aircraft is being used to carry out specialised activities in sectors including agriculture, construction, photography, surveying, mapping, forestry, observation and patrol, or advertising, if the specialised activity is provided by the person that is responsible for the operation of the aircraft.

permanent basis in its territory, or confer any right on that national with respect to that access or employment.

## *Article 9.3*

### **National treatment**

1.  Each Party shall accord to service suppliers and services of the other Party treatment no less favourable than that it accords, in like situations, to its own service suppliers and services.

2.  For greater certainty, the treatment accorded by a Party pursuant to paragraph 1 means, with respect to a government in Canada other than at the federal level, or, with respect to a government of or in a Member State of the European Union, treatment no less favourable than the most favourable treatment accorded, in like situations, by that government to its own service suppliers and services.

## *Article 9.4*

### **Formal requirements**

Article 9.3 does not prevent a Party from adopting or maintaining a measure that prescribes formal requirements in connection with the supply of a service, provided that such requirements are not applied in a manner which would constitute a means of arbitrary or unjustifiable discrimination. These measures include requirements:

(a)  to obtain a licence, registration, certification, or authorisation in order to supply a service or as a membership requirement of a particular profession, such as requiring membership in a professional organisation or participation in collective compensation funds for members of professional organisations;

(b)  for a service supplier to have a local agent for service or maintain a local address;

(c)  to speak a national language or hold a driver's licence; or

(d)  that a service supplier:

   (i)  post a bond or other form of financial security;

   (ii)  establish or contribute to a trust account;

   (iii)  maintain a particular type and amount of insurance;

   (iv)  provide other similar guarantees; or

   (v)  provide access to records.

## *Article 9.5*

### **Most-favoured-nation treatment**

1.  Each Party shall accord to service suppliers and services of the other Party treatment no less favourable than that it accords, in like situations, to service suppliers and services of a third country.

2.  For greater certainty, the treatment accorded by a Party pursuant to paragraph 1 means, with respect to a government in Canada other than at the federal level, or,

with respect to a government of or in a Member State of the European Union, the treatment accorded, in like situations, by that government in its territory to services or service suppliers of a third country.

3.    Paragraph 1 does not apply to treatment accorded by a Party under an existing or future measure providing for recognition, including through an arrangement or agreement with a third country that recognises the accreditation of testing and analysis services and service suppliers, the accreditation of repair and maintenance services and service suppliers, as well as the certification of the qualifications of, or the results of, or work done by, those accredited services and service suppliers.

## *Article 9.6*

### **Market access**

A Party shall not adopt or maintain, on the basis of its entire territory or on the basis of the territory of a national, provincial, territorial, regional or local level of government, a measure that imposes limitations on:

(a)    the number of service suppliers, whether in the form of numerical quotas, monopolies, exclusive service suppliers or the requirement of an economic needs test;

(b)    the total value of service transactions or assets in the form of numerical quotas or the requirement of an economic needs test; or

(c)    the total number of service operations or the total quantity of service output expressed in terms of designated numerical units in the form of quotas or the requirement of an economic needs test.

## *Article 9.7*

### **Reservations**

1.    Articles 9.3, 9.5 and 9.6 do not apply to:

(a)    an existing non-conforming measure that is maintained by a Party at the level of:

(i)    the European Union, as set out in its Schedule to Annex I;

(ii)    a national government, as set out by that Party in its Schedule to Annex I;

(iii)    a provincial, territorial, or regional government, as set out by that Party in its Schedule to Annex I; or

(iv)    a local government.

(b)    the continuation or prompt renewal of a non-conforming measure referred to in subparagraph (a); or

(c)    an amendment to a non-conforming measure referred to in subparagraph (a) to the extent that the amendment does not decrease the conformity of the measure, as it existed immediately before the amendment, with Articles 9.3, 9.5, and 9.6.

2.      Articles 9.3, 9.3, and 9.6 do not apply to a measure that a Party adopts or maintains with respect to a sector, subsector or activity, as set out in its Schedule to Annex II.

*Article 9.8*

**Denial of benefits**

A Party may deny the benefits of this Chapter to a service supplier of the other Party that is an enterprise of that Party and to services of that service supplier if:

(a)     a service supplier of a third country owns or controls the enterprise; and

(b)     the denying Party adopts or maintains a measure with respect to the third country that:

    (i)     relates to maintenance of international peace and security; and

    (ii)    prohibits transactions with the enterprise or would be violated or circumvented if the benefits of this Chapter were accorded to the enterprise.

# CHAPTER TEN

## TEMPORARY ENTRY AND STAY OF NATURAL PERSONS FOR BUSINESS PURPOSES

*Article 10.1*

### Definitions

For the purposes of this Chapter:

**contractual services suppliers** means natural persons employed by an enterprise of one Party that have no establishment in the territory of the other Party and that have concluded a *bona fide* contract (other than through an agency as defined by CPC 872) to supply a service to a consumer of the other Party that requires the presence on a temporary basis of its employees in the territory of the other Party in order to fulfil the contract to supply a service;

**enterprise** means an "enterprise" as defined in Article 8.1 (Definitions);

**independent professionals** means natural persons engaged in the supply of a service and established as self-employed in the territory of a Party who have no establishment in the territory of the other Party and who have concluded a *bona fide* contract (other than through an agency as defined by CPC 872) to supply a service to a consumer of the other Party that requires the presence of the natural person on a temporary basis in the territory of the other Party in order to fulfil the contract to supply a service;

**key personnel** means business visitors for investment purposes, investors, or intra-corporate transferees:

    (a)   **business visitors for investment purposes** means natural persons working in a managerial or specialist position who are responsible for setting up an enterprise but who do not engage in direct transactions with the general public and do not receive remuneration from a source located within the territory of the host Party;

    (b)   **investors** means natural persons who establish, develop, or administer the operation of an investment in a capacity that is supervisory or executive, and to which those persons or the enterprise employing those persons has committed, or is in the process of committing, a substantial amount of capital; and

    (c)   **intra-corporate transferees** means natural persons who have been employed by an enterprise of a Party or have been partners in an enterprise of a Party for at least one year and who are temporarily transferred to an enterprise (that may be a subsidiary, branch, or head company of the enterprise of a Party) in the territory of the other Party. This natural person must belong to one of the following categories:

        (i)   **senior personnel** means natural persons working in a senior position within an enterprise who:

            (A)   primarily direct the management of the enterprise or direct the enterprise, or a department or sub-division of the enterprise; and

      (B)   exercise wide latitude in decision making, which may include having the authority to personally recruit and dismiss or to take other personnel actions (such as promotion or leave authorisations), and

          (I)   receive only general supervision or direction principally from higher level executives, the board of directors, or stockholders of the business or their equivalent; or

          (II)   supervise and control the work of other supervisory, professional or managerial employees and exercise discretionary authority over day-to-day operations; or

(ii)   **specialists** means natural persons working in an enterprise who possess:

      (A)   uncommon knowledge of the enterprise's products or services and its application in international markets; or

      (B)   an advanced level of expertise or knowledge of the enterprise's processes and procedures such as its production, research equipment, techniques, or management.

In assessing such expertise or knowledge, the Parties will consider abilities that are unusual and different from those generally found in a particular industry and that cannot be easily transferred to another natural person in the short-term. Those abilities would have been obtained through specific academic qualifications or extensive experience with the enterprise; or

(iii)   **graduate trainees** means natural persons who:

      (A)   possess a university degree; and

      (B)   are temporarily transferred to an enterprise in the territory of the other Party for career development purposes, or to obtain training in business techniques or methods; and

**natural persons for business purposes** means key personnel, contractual services suppliers, independent professionals, or short-term business visitors who are citizens of a Party.

*Article 10.2*

**Objectives and scope**

1.    This Chapter reflects the preferential trading relationship between the Parties as well as the mutual objective to facilitate trade in services and investment by allowing temporary entry and stay to natural persons for business purposes and by ensuring transparency in the process.

2.    This Chapter applies to measures adopted or maintained by a Party concerning the temporary entry and stay into its territory of key personnel, contractual services suppliers, independent professionals and short-term business visitors. This Chapter shall not apply to measures affecting natural persons seeking access to the employment market of a Party, nor shall it apply to measures regarding citizenship, residence, or employment on a permanent basis.

3.    Nothing in this Chapter shall prevent a Party from applying measures to regulate the entry of natural persons into, or their temporary stay in, its territory, including those measures necessary to protect the integrity of, and to ensure the orderly movement of natural persons across its borders, provided that such measures are not applied in such a manner as to nullify or impair the benefits accruing to any Party under the terms of this Chapter. The sole fact of requiring a visa for natural persons of a certain country and not for those of others shall not be regarded as nullifying or impairing benefits under this Chapter.

4.    To the extent that commitments are not taken in this Chapter, all other requirements of the laws of the Parties regarding entry and stay continue to apply, including those concerning period of stay.

5.    Notwithstanding the provisions of this Chapter, all requirements of the Parties' laws regarding employment and social security measures shall continue to apply, including regulations concerning minimum wages as well as collective wage agreements.

6.    This Chapter does not apply to cases where the intent or effect of the temporary entry and stay is to interfere with or otherwise affect the outcome of a labour or management dispute or negotiation, or the employment of natural persons who are involved in such dispute or negotiation.

*Article 10.3*

**General obligations**

1.    Each Party shall allow temporary entry to natural persons for business purposes of the other Party who otherwise complies with the Party's immigration measures applicable to temporary entry, in accordance with this Chapter.

2.    Each Party shall apply its measures relating to the provisions of this Chapter in accordance with Article 10.2.1, and, in particular, shall apply those measures so as to avoid unduly impairing or delaying trade in goods or services or the conduct of investment activities under this Agreement.

3.    Each Party shall ensure that any fees for processing applications for temporary entry is reasonable and commensurate with the costs incurred.

*Article 10.4*

**Provision of information**

1.    Further to Chapter Twenty-Seven (Transparency), and recognising the importance to the Parties of transparency of temporary entry information, each Party shall, no later than 180 days after the date of entry into force of this Agreement, make available to the other Party explanatory material regarding the requirements for temporary entry under this Chapter that enables business persons of the other Party to be acquainted with those requirements.

2.    If a Party collects and maintains data relating to temporary entry by category of business persons under this Chapter, the Party shall make this data available to the

other Party on request, in accordance with its law related to privacy and data protection.

*Article 10.5*

**Contact points**

1.    The Parties hereby establish the following contact points:

(a)    in the case of Canada:

Director

Temporary Resident Policy

Immigration Branch

Citizenship and Immigration Canada

(b)    in the case of the European Union:

Director-General

Directorate General for Trade

European Commission

(c)    in the case of the Member States of the European Union, the contact points listed in Annex 10-A or their respective successors.

2.    The contact points for Canada and the European Union, and as appropriate the contact points for Member States of the European Union, shall exchange information pursuant to Article 10.4 and shall meet as required to consider matters pertaining to this Chapter, such as:

(a)    the implementation and administration of this Chapter, including the practice of the Parties in allowing temporary entry;

(b)    the development and adoption of common criteria as well as interpretations for the implementation of this Chapter;

(c)    the development of measures to further facilitate temporary entry of business persons; and

(d)    recommendations to the CETA Joint Committee concerning this Chapter.

*Article 10.6*

**Obligations in other chapters**

1.    This Agreement does not impose an obligation on a Party regarding its immigration measures, except as specifically identified in this Chapter and in Chapter Twenty-Seven (Transparency).

2.    Without prejudice to any decision to allow temporary entry to natural persons of the other Party within the terms of this Chapter, including the length of stay permissible pursuant to such an allowance:

(a) Articles 9.3 (National treatment) and 9.6 (Market access), subject to Articles 9.4 (Formal requirements) and 9.2 (Scope) but not Article 9.2.2(d), are incorporated into and made part of this Chapter and apply to the treatment of natural persons for business purposes present in the territory of the other Party under the categories of:

(i) key personnel; and

(ii) contractual services suppliers, and independent professionals for all sectors listed in Annex 10-E; and

(b) Article 9.5 (Most-favoured-nation treatment), subject to Articles 9.4 (Formal requirements) and 9.2 (Scope) but not Article 9.2.2(d), is incorporated into and made part of this Chapter and applies to the treatment of natural persons for business purposes present in the territory of the other Party under the categories of:

(i) key personnel, contractual services suppliers, and independent professionals; and

(ii) short-term business visitors, as set out in Article 10.9.

3. For greater certainty, paragraph 2 applies to the treatment of natural persons for business purposes present in the territory of the other Party and falling within the relevant categories and who is supplying financial services, as defined in Article 13.1 (Definitions) of Chapter Thirteen (Financial Services). Paragraph 2 does not apply to measures relating to the granting of temporary entry to natural persons of a Party or of a third country.

4. If a Party has set out a reservation in its Schedule to Annex I, II or III, the reservation also constitutes a reservation to paragraph 2, to the extent that the measure set out in or permitted by the reservation affects the treatment of natural persons for business purposes present in the territory of the other Party.

*Article 10.7*

**Key personnel**

1. Each Party shall allow the temporary entry and stay of key personnel of the other Party subject to the reservations and exceptions listed in Annex 10-B.

2. Each Party shall not adopt or maintain limitations on the total number of key personnel of the other Party allowed temporary entry, in the form of a numerical restriction or an economic needs test.

3. Each Party shall allow the temporary entry of business visitors for investment purposes without requiring a work permit or other prior approval procedure of similar intent.

4. Each Party shall allow the temporary employment in its territory of intra-corporate transferees and investors of the other Party.

5. The permissible length of stay of key personnel is as follows:

(a)    intra-corporate transferees (specialists and senior personnel): the lesser of three years or the length of the contract, with a possible extension of up to 18 months at the discretion of the Party granting the temporary entry and stay[12];

(b)    intra-corporate transferees (graduate trainees): the lesser of one year or the length of the contract;

(c)    investors: one year, with possible extensions at the discretion of the Party granting the temporary entry and stay;

(d)    business visitors for investment purposes: 90 days within any six month period[13].

*Article 10.8*

**Contractual services suppliers and independent professionals**

1.    In accordance with Annex 10-E, each Party shall allow the temporary entry and stay of contractual services suppliers of the other Party, subject to the following conditions:

(a)    the natural persons must be engaged in the supply of a service on a temporary basis as employee of an enterprise which has obtained a service contract for a period not exceeding 12 months. If the service contract is longer than 12 months, the commitments in this Chapter only apply for the initial 12 months of the contract;

(b)    the natural persons entering the territory of the other Party must be offering those services as an employee of the enterprise supplying the services for at least the year immediately preceding the date of submission of an application for entry into the territory of the other Party and must possess, at the date of the submission, at least three years of professional experience[14] in the sector of activity that is the subject of the contract;

(c)    the natural persons entering the territory of the other Party must possess,

(i)    a university degree or a qualification demonstrating knowledge of an equivalent level;[15] and

(ii)    professional qualifications, if this is required to practice an activity pursuant to the law, regulations, or requirements of the Party where the service is supplied;

(d)    the natural persons must not receive remuneration for the provision of services other than the remuneration paid by the enterprise employing the contractual services suppliers during their stay in the territory of the other Party;

---

[12]    The length of stay permitted under this Chapter may not be taken into consideration in the context of an application for citizenship in a Member State of the European Union.

[13]    This is without prejudice to the rights granted to Canada under bilateral visa waivers by Member States of the European Union

[14]    The professional experience must have been obtained after having reached the age of majority.

[15]    If the degree or qualification has not been obtained in the Party where the service is supplied, that Party may evaluate whether it is equivalent to a university degree required in its territory. The Parties shall apply Annex 10-C, subject to the reservations in Annex 10-E, for the purposes of assessing such equivalence.

(e)    the temporary entry and stay accorded under this Article relate only to the supply of a service which is the subject of the contract. Entitlement to utilise the professional title of the Party where the service is provided may be granted, as required, by the relevant authority as defined in Article 11.1 (Definitions), through a Mutual Recognition Agreement ("MRA") or otherwise; and

(f)    the service contract must comply with the laws, regulations, and other legal requirements of the Party where the contract is executed.[16]

2.    In accordance with Annex 10-E, each Party shall allow the temporary entry and stay of independent professionals of the other Party, subject to the following conditions:

(a)    the natural persons must be engaged in the supply of a service on a temporary basis as self-employed persons established in the other Party and must have obtained a service contract for a period not exceeding 12 months. If the service contract is longer than 12 months, the commitments in this Chapter shall only apply for the initial 12 months of the contract;

(b)    the natural persons entering the territory of the other Party must possess, at the date of submission of an application for entry into the other Party, at least six years professional experience in the sector of activity which is the subject of the contract;

(c)    the natural persons entering the territory of the other Party must possess,

(i)    a university degree or a qualification demonstrating knowledge of an equivalent level;[17] and

(ii)    professional qualifications, if this is required to practice an activity pursuant to the laws, or requirements of the Party where the service is supplied;

(d)    the temporary entry and stay accorded under the provisions of this Article relate only to the supply of a service which is the subject of the contract. Entitlement to utilise the professional title of the Party where the service is provided may be granted, as required, by the relevant authority as defined in Article 11.1 (Definitions), through an MRA or otherwise; and

(e)    the service contract must comply with the laws and other legal requirements of the Party where the contract is executed.

3.    Unless otherwise specified in Annex 10-E, a Party shall not adopt or maintain a limitation on the total number of contractual services suppliers and independent professionals of the other Party allowed temporary entry, in the form of numerical restrictions or an economic needs test.

4.    The length of stay of contractual services supplier or independent professionals is for a cumulative period of not more than 12 months, with extensions possible at the

---

[16]    For greater certainty, the natural person must be engaged by the enterprise for the fulfilment of the services contract pursuant to which temporary entry is sought.

[17]    If the degree or qualification was not obtained in the Party where the service is supplied, that Party may evaluate whether it is equivalent to a university degree required in its territory. The Parties shall apply Annex 10-C, subject to the reservations in Annex 10-E, for the purposes of assessing such equivalence.

discretion of the Party, in any 24 month period or for the duration of the contract, whichever is less.

*Article 10.9*

**Short-term business visitors**

1.    In accordance with Annex 10-B, a Party shall allow the temporary entry and stay of short-term business visitors of the other Party for the purposes of carrying out the activities listed in Annex 10-D, provided that the short-term business visitors:

    (a)    are not engaged in selling a good or a service to the general public;

    (b)    do not on their own behalf receive remuneration from a source located within the Party where the short-term business visitors are staying temporarily; and

    (c)    are not engaged in the supply of a service in the framework of a contract concluded between an enterprise that has no commercial presence in the territory of the Party where the short-term visitors for business purposes are staying temporarily, and a consumer in that territory, except as provided in Annex 10-D.

2.    Each Party shall allow temporary entry of short-term business visitors without the requirement of a work permit or other prior approval procedures of similar intent.

3.    The maximum length of stay of short-term business visitors is 90 days in any six-month period.[18]

*Article 10.10*

**Review of commitments**

Within five years following the entry into force of this Agreement, the Parties shall consider updating their respective commitments under Articles 10.7 through 10.9.

---

[18]    This is without prejudice to the rights granted under bilateral visa waivers by Member States of the European Union.

# CHAPTER ELEVEN

## MUTUAL RECOGNITION OF PROFESSIONAL QUALIFICATIONS

*Article 11.1*

### Definitions

For the purposes of this Chapter:

**jurisdiction** means the territory of Canada, and each of its provinces and territories, or the territory of each of the Member States of the European Union, in so far as this Agreement applies in these territories in accordance with Article 1.3 (Geographical scope of application);

**negotiating entity** means a person or body of a Party entitled or empowered to negotiate an agreement on the mutual recognition of professional qualifications ("MRA");

**professional experience** means the effective and lawful practice of a service;

**professional qualifications** means the qualifications attested by evidence of formal qualification and/or professional experience;

**relevant authority** means an authority or body, designated pursuant to legislative, regulatory or administrative provisions to recognise qualifications and authorise the practice of a profession in a jurisdiction; and

**regulated profession** means a service, the practice of which, including the use of a title or designation, is subject to the possession of specific qualifications by virtue of legislative, regulatory or administrative provisions.

*Article 11.2*

### Objectives and scope

1.     This Chapter establishes a framework to facilitate a fair, transparent and consistent regime for the mutual recognition of professional qualifications by the Parties and sets out the general conditions for the negotiation of MRAs.

2.     This Chapter applies to professions which are regulated in each Party, including in all or some Member States of the European Union and in all or some provinces and territories of Canada.

3.     A Party shall not accord recognition in a manner that would constitute a means of discrimination in the application of its criteria for the authorisation, licensing or certification of a service supplier, or that would constitute a disguised restriction on trade in services.

4.     An MRA adopted pursuant to this Chapter shall apply throughout the territories of the European Union and Canada.

*Article 11.3*

### Negotiation of an MRA

1.   Each Party shall encourage its relevant authorities or professional bodies, as appropriate, to develop and provide to the Joint Committee on Mutual Recognition of Professional Qualifications ("MRA Committee") established under Article 26.2.1(b) joint recommendations on proposed MRAs.

2.   A recommendation shall provide an assessment of the potential value of an MRA, on the basis of criteria such as the existing level of market openness, industry needs, and business opportunities, for example, the number of professionals likely to benefit from the MRA, the existence of other MRAs in the sector, and expected gains in terms of economic and business development. In addition, it shall provide an assessment as to the compatibility of the licensing or qualification regimes of the Parties and the intended approach for the negotiation of an MRA.

3.   The MRA Committee shall, within a reasonable period of time, review the recommendation with a view to ensuring its consistency with the requirements of this Chapter. If these requirements are satisfied, the MRA Committee shall establish the necessary steps to negotiate and each Party shall inform its respective relevant authorities of these steps.

4.   The negotiating entities shall thereafter pursue the negotiation and submit a draft MRA text to the MRA Committee.

5.   The MRA Committee will thereafter review the draft MRA to ensure its consistency with this Agreement.

6.   If in the view of the MRA Committee the MRA is consistent with this Agreement, the MRA Committee shall adopt the MRA by means of a decision, which is conditional upon subsequent notification to the MRA Committee by each Party of the fulfilment of its respective internal requirements. The decision becomes binding on the Parties upon that notification to the MRA Committee by each Party.

*Article 11.4*

**Recognition**

1.   The recognition of professional qualifications provided by an MRA shall allow the service supplier to practice professional activities in the host jurisdiction, in accordance with the terms and conditions specified in the MRA.

2.   If the professional qualifications of a service supplier of a Party are recognised by the other Party pursuant to an MRA, the relevant authorities of the host jurisdiction shall accord to this service supplier treatment no less favourable than that accorded in like situations to a like service supplier whose professional qualifications have been certified or attested in the Party's own jurisdiction.

3.   Recognition under an MRA cannot be conditioned upon:

(a)   a service supplier meeting a citizenship or any form of residency requirement; or

(b)   a service supplier's education, experience or training having been acquired in the Party's own jurisdiction.

*Article 11.5*

**Joint Committee on Mutual Recognition of Professional Qualifications**

The MRA Committee responsible for the implementation of Article 11.3 shall:

(a)     be composed of and co-chaired by representatives of Canada and the European Union, which must be different from the relevant authorities or professional bodies referred to in Article 11.3.1. A list of those representatives shall be confirmed through an exchange of letters;

(b)     meet within one year after this Agreement enters into force, and thereafter as necessary or as decided;

(c)     determine its own rules of procedure;

(d)     facilitate the exchange of information regarding laws, regulations, policies and practices concerning standards or criteria for the authorisation, licensing or certification of regulated professions;

(e)     make publicly available information regarding the negotiation and implementation of MRAs;

(f)     report to the CETA Joint Committee on the progress of the negotiation and implementation of MRAs; and

(g)     as appropriate, provide information and complement the guidelines set out in Annex 11-A.

*Article 11.6*

**Guidelines for the negotiation and conclusion of MRAs**

As part of the framework to achieve mutual recognition of qualifications, the Parties set out in Annex 11-A non-binding guidelines with respect to the negotiation and conclusion of MRAs.

*Article 11.7*

**Contact points**

Each Party shall establish one or more contact points for the administration of this Chapter.

# CHAPTER TWELVE

## DOMESTIC REGULATION

*Article 12.1*

### Definitions

For the purposes of this Chapter:

**authorisation** means the granting of permission to a person to supply a service or to pursue any other economic activity;

**competent authority** means any government of a Party, or non-governmental body in the exercise of powers delegated by any government of a Party, that grants an authorisation;

**licensing procedures** means administrative or procedural rules, including for the amendment or renewal of a licence, that must be adhered to in order to demonstrate compliance with licensing requirements;

**licensing requirements** means substantive requirements, other than qualification requirements, that must be complied with in order to obtain, amend or renew an authorisation;

**qualification procedures** means administrative or procedural rules that must be adhered to in order to demonstrate compliance with qualification requirements; and

**qualification requirements** means substantive requirements relating to competency that must be complied with in order to obtain, amend or renew an authorisation.

*Article 12.2*

### Scope

1.      This Chapter applies to a measure adopted or maintained by a Party relating to licensing requirements, licensing procedures, qualification requirements, or qualification procedures that affect:

     (a)      the cross-border supply of services as defined in Article 9.1 (Definitions);

     (b)      the supply of a service or pursuit of any other economic activity, through commercial presence in the territory of the other Party, including the establishment of such commercial presence; and

     (c)      the supply of a service through the presence of a natural person of the other Party in the territory of the Party, in accordance with Article 10.6.2 (Obligations in other chapters).

2.      This Chapter does not apply to licensing requirements, licensing procedures, qualification requirements, or qualification procedures:

     (a)      pursuant to an existing non-conforming measure maintained by a Party as set out in its Schedule to Annex I; or

     (b)      relating to one of the following sectors or activities:

(i)    for Canada, cultural industries and, as set out in its Schedule to Annex II, social services, aboriginal affairs, minority affairs, gambling and betting services, and the collection, purification, and distribution of water; and

(ii)   for the European Union, audio-visual services and, as set out in its Schedule to Annex II, health, education, and social services, gambling and betting services,[19] and the collection, purification, and distribution of water.

## Article 12.3

### Licensing and qualification requirements and procedures

1.    Each Party shall ensure that licensing requirements, qualification requirements, licensing procedures, or qualification procedures it adopts or maintains are based on criteria that preclude the competent authority from exercising its power of assessment in an arbitrary manner.

2.    The criteria referred to in paragraph 1 shall be:

(a)    clear and transparent;

(b)    objective; and

(c)    established in advance and made publicly accessible.

3.    The Parties recognise that the exercise of statutory discretion conferred on a minister with respect to a decision on the granting of an authorisation in the public interest is not inconsistent with sub-paragraph 2(c), provided that it is exercised consistently with the object of the applicable statute and not in an arbitrary manner, and that its exercise is not otherwise inconsistent with this Agreement.

4.    Paragraph 3 does not apply to licensing requirements, or qualification requirements for a professional service.

5.    Each Party shall ensure that an authorisation is granted as soon as the competent authority determines that the conditions for the authorisation have been met, and once granted, that the authorisation enters into effect without undue delay, in accordance with the terms and conditions specified therein.

6.    Each Party shall maintain or institute judicial, arbitral, or administrative tribunals or procedures that provide for, at the request of an affected investor or service supplier, as defined in Articles 8.1 (Definitions) and 9.1 (Definitions), a prompt review of, and if justified, appropriate remedies for, administrative decisions affecting the supply of a service or the pursuit of any other economic activity. If such procedures are not independent of the agency entrusted with the administrative decision concerned, each Party shall ensure that the procedures are applied in a way that provides for an objective and impartial review.

7.    Each Party shall ensure that licensing procedures or qualification procedures it adopts or maintains are as simple as possible, and do not unduly complicate or delay the supply of a service, or the pursuit of any other economic activity.

---

[19]    With the exception of Malta.

8.    An authorisation fee that an applicant may incur in relation to its application for an authorisation shall be reasonable and commensurate with the costs incurred, and shall not in itself restrict the supply of a service or the pursuit of any other economic activity.

9.    Authorisation fees do not include payments for auction, the use of natural resources, royalties, tendering or other non-discriminatory means of awarding concessions, or mandated contributions to provide a universal service.

10.   Each Party shall ensure that licensing procedures, or qualification procedures used by the competent authority and decisions of the competent authority in the authorisation process are impartial with respect to all applicants. The competent authority should reach its decisions in an independent manner and in particular should not be accountable to any person supplying a service or pursuing any other economic activity for which the authorisation is required.

11.   If specific time periods for authorising applications exist, an applicant shall be allowed a reasonable period for the submission of an application. The competent authority shall initiate the processing of an application without undue delay. If possible, applications should be accepted in electronic format under similar conditions of authenticity as paper submissions.

12.   Authenticated copies should be accepted, if considered appropriate, in place of original documents.

13.   Each Party shall ensure that the processing of an authorisation application, including reaching a final decision, is completed within a reasonable timeframe from the submission of a complete application. Each Party should establish the normal timeframe for the processing of an application.

14.   At the request of an applicant, a Party's competent authority shall provide, without undue delay, information concerning the status of the application.

15.   If an application is considered incomplete, a Party's competent authority shall, within a reasonable period of time, inform the applicant, identify the additional information required to complete the application, and provide the applicant an opportunity to correct deficiencies.

16.   If a Party's competent authority rejects an application, it shall inform the applicant in writing and without undue delay. Upon request of the applicant, the Party's competent authority shall also inform the applicant of the reasons the application was rejected and of the timeframe for an appeal or review against the decision. An applicant should be permitted, within reasonable time limits, to resubmit an application.

# CHAPTER THIRTEEN

## FINANCIAL SERVICES

*Article 13.1*

### Definitions

For the purposes of this Chapter:

**cross-border financial service supplier of a Party** means a person of a Party that is engaged in the business of supplying a financial service within the territory of the Party and that seeks to supply or supplies a financial service through the cross-border supply of that service;

**cross-border supply of financial services** or **cross-border trade in financial services** means the supply of a financial service:

(a)      from the territory of a Party into the territory of the other Party; or

(b)      in the territory of a Party by a person of that Party to a person of the other Party;

but does not include the supply of a service in the territory of a Party by an investment in that territory;

**financial institution** means a supplier that carries out one or more of the operations defined as being financial services in this Article, if the supplier is regulated or supervised in respect of the supply of those services as a financial institution under the law of the Party in whose territory it is located, including a branch in the territory of the Party of that financial service supplier whose head offices are located in the territory of the other Party;

**financial institution of the other Party** means a financial institution, including a branch, located in the territory of a Party that is controlled by a person of the other Party;

**financial service** means a service of a financial nature, including insurance and insurance-related services, banking and other financial services (excluding insurance), and services incidental or auxiliary to a service of a financial nature. Financial services include the following activities:

(a)      insurance and insurance-related services

      (i)      direct insurance (including co-insurance):

           (A)    life; or

           (B)    non-life;

      (ii)     reinsurance and retrocession;

      (iii)    insurance intermediation, such as brokerage and agency; or

      (iv)    services auxiliary to insurance, such as consultancy, actuarial, risk assessment, and claim settlement services; and

(b)      banking and other financial services (excluding insurance):

      (i)      acceptance of deposits and other repayable funds from the public;

(ii)  lending of all types, including consumer credit, mortgage credit, factoring, and financing of commercial transactions;

(iii)  financial leasing;

(iv)  all payment and money transmission services, including credit, charge and debit cards, travellers cheques, and bankers drafts;

(v)  guarantees and commitments;

(vi)  trading for own account or for account of customers, whether on an exchange, in an over-the-counter market or otherwise, the following:

    (A)  money market instruments (including cheques, bills or certificates of deposits);

    (B)  foreign exchange;

    (C)  derivative products including futures and options;

    (D)  exchange rate and interest rate instruments, including products such as swaps and forward rate agreements;

    (E)  transferable securities; or

    (F)  other negotiable instruments and financial assets, including bullion;

(vii)  participation in issues of all kinds of securities, including underwriting and placement as agent (whether publicly or privately), and supply of services related to such issues;

(viii)  money broking;

(ix)  asset management, such as cash or portfolio management, all forms of collective investment management, pension fund management, custodial, depository, and trust services;

(x)  settlement and clearing services for financial assets, including securities, derivative products, and other negotiable instruments;

(xi)  provision and transfer of financial information, and financial data processing and related software; or

(xii)  advisory, intermediation and other auxiliary financial services on all the activities listed in sub-sub-paragraphs (i) through (xi), including credit reference and analysis, investment and portfolio research and advice, and advice on acquisitions and on corporate restructuring and strategy;

**financial service supplier** means a person of a Party that is engaged in the business of supplying a financial service within the territory of that Party but does not include a public entity;

**investment** means "investment" as defined in Article 8.1 (Definitions), except that for the purposes of this Chapter, with respect to "loans" and "debt instruments" referred to in that Article:

(a)  a loan to or debt instrument issued by a financial institution is an investment in that financial institution only if it is treated as regulatory capital by the Party in whose territory the financial institution is located; and

(b)    a loan granted by or debt instrument owned by a financial institution, other than a loan to or debt instrument of a financial institution referred to in subparagraph (a), is not an investment;

for greater certainty,

(c)    Chapter Eight (Investment) applies to a loan or debt instrument to the extent that it is not covered in this Chapter; and

(d)    a loan granted by or a debt instrument owned by a cross-border financial service supplier, other than a loan to or debt instrument issued by a financial institution, is an investment for the purposes of Chapter Eight (Investment) if that loan or debt instrument meets the criteria for investments set out in Article 8.1 (Definitions);

**investor** means "investor" as defined in Article 8.1 (Definitions);

**new financial service** means a financial service that is not supplied in the territory of a Party but that is supplied in the territory of the other Party and includes any new form of delivery of a financial service or the sale of a financial product that is not sold in the Party's territory;

**person of a Party** means "person of a Party" as defined in Article 1.1 (Definitions of general application) and, for greater certainty, does not include a branch of an enterprise of a third country;

**public entity** means:

(a)    a government, a central bank or a monetary authority of a Party or any entity owned or controlled by a Party, that is principally engaged in carrying out governmental functions or activities for governmental purposes, but does not include an entity principally engaged in supplying financial services on commercial terms; or

(b)    a private entity that performs functions normally performed by a central bank or monetary authority when exercising those functions; and

**self-regulatory organisation** means a non-governmental body, including any securities or futures exchange or market, clearing agency, other organisation or association, that exercises its own or delegated regulatory or supervisory authority over financial service suppliers or financial institutions.

*Article 13.2*

**Scope**

1.    This Chapter applies to a measure adopted or maintained by a Party relating to:

(a)    financial institutions of the other Party;

(b)    an investor of the other Party, and an investment of that investor, in a financial institution in the Party's territory; and

(c)    cross-border trade in financial services.

2.    For greater certainty, the provisions of Chapter Eight (Investment) apply to:

(a)    a measure relating to an investor of a Party, and an investment of that investor, in a financial service supplier that is not a financial institution; and

(b)    a measure, other than a measure relating to the supply of financial services, relating to an investor of a Party or an investment of that investor in a financial institution.

3.    Articles 8.10 (Treatment of investors and of covered investments), 8.11 (Compensation for losses), 8.12 (Expropriation), 8.13 (Transfers), 8.14 (Subrogation), 8.16 (Denial of benefits), and 8.17 (Formal requirements) are incorporated into and made a part of this Chapter.

4.    Section F of Chapter Eight (Resolution of investment disputes between investors and states) is incorporated into and made a part of this Chapter solely for claims that a Party has breached Articles 13.3, or 13.4 with respect to the expansion, conduct, operation, management, maintenance, use, enjoyment, and sale or disposal of a financial institution or an investment in a financial institution, or Articles 8.10 (Treatment of investors and of covered investments), 8.11 (Compensation for losses), 8.12 (Expropriation), 8.13 (Transfers), or 8.16 (Denial of benefits).

5.    This Chapter does not apply to a measure adopted or maintained by a Party relating to:

(a)    activities or services forming part of a public retirement plan or statutory system of social security; or

(b)    activities or services conducted for the account of the Party, with the guarantee or using the financial resources of the Party, including its public entities,

except that this Chapter applies to the extent that a Party allows activities or services referred to in subparagraph (a) or (b) to be conducted by its financial institutions in competition with a public entity or a financial institution.

6.    Chapter Twelve (Domestic Regulation) is incorporated into and made a part of this Chapter. For greater certainty, Article 12.3 (Licensing and qualification requirements and procedures) applies to the exercise of statutory discretion by the financial regulatory authorities of the Parties.

7.    The provisions of Chapter Twelve (Domestic Regulation) incorporated into this Chapter under paragraph 6 do not apply to licensing requirements, licensing procedures, qualification requirements or qualification procedures:

(a)    pursuant to a non-conforming measure maintained by Canada, as set out in its Schedule to Annex III-A;

(b)    pursuant to a non-conforming measure maintained by the European Union, as set out in its Schedule to Annex I, to the extent that such measure relates to financial services; and

(c)    as set out in Article 12.2.2(b) (Scope), to the extent that such measure relates to financial services.

*Article 13.3*

**National treatment**

1.  Article 8.6 (National treatment) is incorporated into and made a part of this Chapter and applies to treatment of financial institutions and investors of the other Party and their investments in financial institutions.

2.  The treatment accorded by a Party to its own investors and investments of its own investors under paragraphs 1 and 2 of Article 8.6 (National treatment) means treatment accorded to its own financial institutions and investments of its own investors in financial institutions.

## Article 13.4

### Most-favoured-nation treatment

1.  Article 8.7 (Most-favoured-nation treatment) is incorporated into and made a part of this Chapter and applies to treatment of financial institutions and investors of the other Party and their investments in financial institutions.

2.  The treatment accorded by a Party to investors of a third country and investments of investors of a third country under paragraphs 1 and 2 of Article 8.7 (Most-favoured-nation treatment) means treatment accorded to financial institutions of a third country and investments of investors of a third country in financial institutions.

## Article 13.5

### Recognition of prudential measures

1.  A Party may recognise a prudential measure of a third country in the application of a measure covered by this Chapter. That recognition may be:

    (a)  accorded unilaterally;

    (b)  achieved through harmonisation or other means; or

    (c)  based upon an agreement or arrangement with the third country.

2.  A Party according recognition of a prudential measure shall provide adequate opportunity to the other Party to demonstrate that circumstances exist in which there are or will be equivalent regulation, oversight, implementation of regulation and, if appropriate, procedures concerning the sharing of information between the Parties.

3.  If a Party recognises a prudential measure under subparagraph 1(c) and the circumstances described in paragraph 2 exist, the Party shall provide adequate opportunity to the other Party to negotiate accession to the agreement or arrangement, or to negotiate a comparable agreement or arrangement.

## Article 13.6

### Market access

1.  A Party shall not adopt or maintain, with respect to a financial institution of the other Party or with respect to market access through establishment of a financial institution by an investor of the other Party, on the basis of its entire territory or on the basis of the territory of a national, provincial, territorial, regional, or local level of government, a measure that:

(a)  imposes limitations on:

    (i)  the number of financial institutions, whether in the form of numerical quotas, monopolies, exclusive service suppliers or the requirement of an economic needs test;

    (ii)  the total value of financial service transactions or assets in the form of numerical quotas or the requirement of an economic needs test;

    (iii)  the total number of financial service operations or the total quantity of financial services output expressed in terms of designated numerical units in the form of quotas or the requirement of an economic needs test;

    (iv)  the participation of foreign capital in terms of maximum percentage limit on foreign shareholding in financial institutions or the total value of individual or aggregate foreign investment in financial institutions; or

    (v)  the total number of natural persons that may be employed in a particular financial services sector or that a financial institution may employ and who are necessary for, and directly related to, the performance of a specific financial service in the form of numerical quotas or the requirement of an economic needs test; or

(b)  restricts or requires specific types of legal entity or joint venture through which a financial institution may perform an economic activity.

2.  Article 8.4.2 (Market access) is incorporated into and made a part of this Article.

3.  For greater certainty:

(a)  a Party may impose terms, conditions, and procedures for the authorisation of the establishment and expansion of a commercial presence provided that they do not circumvent the Party's obligation under paragraph 1 and are consistent with the other provisions of this Chapter; and

(b)  this Article does not prevent a Party from requiring a financial institution to supply certain financial services through separate legal entities if, under the law of the Party, the range of financial services supplied by the financial institution may not be supplied through a single entity.

### *Article 13.7*

### **Cross-border supply of financial services**

1.  Articles 9.3 (National treatment), 9.4 (Formal requirements), and 9.6 (Market access) are incorporated into and made a part of this Chapter and apply to treatment of cross-border financial service suppliers supplying the financial services specified in Annex 13-A.

2.  The treatment accorded by a Party to its own service suppliers and services under Article 9.3.2 (National treatment) means treatment accorded to its own financial service suppliers and financial services.

3.  The measures that a Party shall not adopt or maintain with respect to service suppliers and services of the other Party under Article 9.6 (Market access) means

measures relating to cross-border financial service suppliers of the other Party supplying financial services.

4. Article 9.5 (Most-favoured-nation treatment) is incorporated into and made a part of this Chapter and applies to treatment of cross-border financial service suppliers of the other Party.

5. The treatment accorded by a Party to service suppliers and services of a third country under Article 9.5 (Most-favoured-nation treatment) means treatment accorded to financial service suppliers of a third country and financial services of a third country.

6. Each Party shall permit a person located in its territory, and a national wherever they are located, to purchase a financial service from a cross-border financial service supplier of the other Party located in the territory of that other Party. This obligation does not require a Party to permit such suppliers to do business or solicit in its territory. Each Party may define "doing business" and "solicitation" for the purposes of this Article, in conformity with paragraph 1.

7. For the financial services specified in Annex 13-A, each Party shall permit a cross-border financial service supplier of the other Party, on request or notification to the relevant regulator, where required, to supply a financial service through any new form of delivery, or to sell a financial product that is not sold in the Party's territory where the first Party permits its own financial service suppliers to supply such a service or to sell such a product under its law in like situations.

## Article 13.8

### Senior management and boards of directors

A Party shall not require that a financial institution of the other Party appoint to senior management or board of director positions, natural persons of any particular nationality.

## Article 13.9

### Performance requirements

1. The Parties shall negotiate disciplines on performance requirements such as those contained in Article 8.5 (Performance requirements) with respect to investments in financial institutions.

2. If, after three years of entry into force of this Agreement, the Parties have not agreed to such disciplines, upon request of a Party, Article 8.5 (Performance requirements) shall be incorporated into and made a part of this Chapter and shall apply to investments in financial institutions. For this purpose, "investment" in Article 8.5 (Performance requirements) means "investment in a financial institution in its territory".

3. Within 180 days following the successful negotiation by the Parties on the performance requirement disciplines pursuant to paragraph 1, or following a Party's request for incorporation of Article 8.5 (Performance requirements) into this Chapter pursuant to paragraph 2, as the case may be, each Party may amend its Schedule as required. Any amendment must be limited to the listing of reservations for existing measures that do not conform with the performance requirements obligation under

this Chapter, for Canada in Section A of its Schedule to Annex III and for the European Union in its Schedule to Annex I. Article 13.10.1 shall apply to such measures with respect to the performance requirement disciplines negotiated pursuant to paragraph 1, or Article 8.5 (Performance requirements) as incorporated into this Chapter pursuant to paragraph 2, as the case may be.

*Article 13.10*

**Reservations and exceptions**

1.    Articles 13.3, 13.4, 13.6, and 13.8 do not apply to:

(a)    an existing non-conforming measure that is maintained by a Party at the level of:

(i)    the European Union, as set out in its Schedule to Annex I;

(ii)    a national government, as set out by Canada in Section A of its Schedule to Annex III or the European Union in its Schedule to Annex I;

(iii)    a provincial, territorial, or regional government, as set out by Canada in Section A of its Schedule to Annex III or the European Union in its Schedule to Annex I; or

(iv)    a local government;

(b)    the continuation or prompt renewal of a non-conforming measure referred to in subparagraph (a); or

(c)    an amendment to a non-conforming measure referred to in subparagraph (a) to the extent that the amendment does not decrease the conformity of the measure, as it existed immediately before the amendment, with Articles 13.3, 13.4, 13.6, or 13.8.

2.    Article 13.7 does not apply to:

(a)    an existing non-conforming measure that is maintained by a Party at the level of:

(i)    the European Union, as set out in its Schedule to Annex I;

(ii)    a national government, as set out by Canada in Section A of its Schedule to Annex III or the European Union in its Schedule to Annex I;

(iii)    a provincial, territorial, or regional government, as set out by Canada in Section A of its Schedule to Annex III or the European Union in its Schedule to Annex I; or

(iv)    a local government;

(b)    the continuation or prompt renewal of a non-conforming measure referred to in sub-paragraph (a); or

(c)    an amendment to a non-conforming measure referred to in sub-paragraph (a) to the extent that the amendment does not decrease the conformity of the measure, as it existed upon the entry into force of this Agreement, with Article 13.7.

3.    Articles 13.3, 13.4, 13.6, 13.7, and 13.8 do not apply to a measure that Canada adopts or maintains with respect to financial services as set out in Section B of its Schedule to Annex III, or to a measure that the European Union adopts or maintains with respect to financial services as set out in its Schedule to Annex II.

4.    If a Party has set out a reservation to Articles 8.4 (Market access), 8.5 (Performance requirements), 8.6 (National treatment), 8.7 (Most-favoured-nation treatment), 8.8 (Senior management and boards of directors), 9.3 (National treatment), 9.5 (Most-favoured-nation treatment), or 9.6 (Market access) in its Schedule to Annex I or II, the reservation also constitutes a reservation to Articles 13.3, 13.4, 13.6, 13.7, or 13.8, or to any discipline on performance requirements negotiated pursuant to Article 13.9.1 or incorporated into this Chapter pursuant to Article 13.9.2, as the case may be, to the extent that the measure, sector, sub-sector or activity set out in the reservation is covered by this Chapter.

5.    A Party shall not adopt a measure or series of measures after the date of entry into force of this Agreement that are covered by Section B of Canada's Schedule to Annex III, or by the Schedule to Annex II of the European Union and that require, directly or indirectly, an investor of the other Party, by reason of nationality, to sell or otherwise dispose of an investment existing at the time the measure or series of measures became effective.

6.    In respect of intellectual property rights, a Party may derogate from Articles 13.3 and 13.4, and from any discipline on technology transfer in relation to performance requirements negotiated pursuant to Article 13.9.1 or incorporated into this Chapter pursuant to Article 13.9.2, as the case may be, if the derogation is permitted by the TRIPS Agreement, including waivers to the TRIPS Agreement adopted pursuant to Article IX of the WTO Agreement.

7.    Articles 13.3, 13.4, 13.6, 13.7, 13.8, and 13.9 do not apply to:

(a)    procurement by a Party of a good or service purchased for governmental purposes and not with a view to commercial resale or with a view to use in the supply of a goods or service for commercial sale, whether or not that procurement is "covered procurement" within the meaning of Article 19.2 (Scope and coverage); or

(b)    subsidies, or government support relating to trade in services, provided by a Party.

*Article 13.11*

**Effective and transparent regulation**

1.    Each Party shall ensure that all measures of general application to which this Chapter applies are administered in a reasonable, objective, and impartial manner.

2.    Each Party shall ensure that its laws, regulations, procedures, and administrative rulings of general application with respect to any matter covered by this Chapter are promptly published or made available in such a manner as to enable an interested person and the other Party to become acquainted with them. To the extent possible, each Party shall:

(a)    publish in advance any such measures that it proposes to adopt;

(b)     provide an interested person and the other Party a reasonable opportunity to comment on these proposed measures; and

(c)     allow reasonable time between the final publication of the measures and the date they become effective.

For the purposes of this Chapter, these requirements replace those set out in Article 27.1 (Publication).

3.      Each Party shall maintain or establish appropriate mechanisms to respond within a reasonable period of time to an inquiry from an interested person regarding measures of general application covered by this Chapter.

4.      A regulatory authority shall make an administrative decision on a completed application of an investor in a financial institution, a cross-border financial service supplier, or a financial institution of the other Party relating to the supply of a financial service within a reasonable period of time that is justified by the complexity of the application and the normal period of time established for the processing of the application. For Canada, such a reasonable time period is 120 days. The regulatory authority shall promptly notify the applicant of the decision. If it is not practicable for a decision to be made within a reasonable period of time, the regulatory authority shall promptly notify the applicant and endeavour to make the decision as soon as possible. For greater certainty, an application is not considered complete until all relevant hearings are held and the regulatory authority has received all necessary information.

## Article 13.12

### Self-regulatory organisations

If a Party requires a financial institution or a cross-border financial service supplier of the other Party to be a member of, participate in, or have access to, a self-regulatory organisation to supply a financial service in or into the territory of that Party, or grants a privilege or advantage when supplying a financial service through a self-regulatory organisation, then the requiring Party shall ensure that the self-regulatory organisation observes the obligations of this Chapter.

## Article 13.13

### Payment and clearing systems

Under terms and conditions that accord national treatment, each Party shall grant a financial service supplier of the other Party established in its territory access to payment and clearing systems operated by a Party, or by an entity exercising governmental authority delegated to it by a Party, and access to official funding and refinancing facilities available in the normal course of ordinary business. This Article does not confer access to a Party's lender of last resort facilities.

## Article 13.14

### New financial services

1.  Each Party shall permit a financial institution of the other Party to supply any new financial service that the first Party would permit its own financial institutions, in like situations, to supply under its law, on request or notification to the relevant regulator, if required.

2.  A Party may determine the institutional and juridical form through which the new financial service may be supplied and may require authorisation for the supply of the service. If authorisation is required, a decision shall be made within a reasonable period of time and the authorisation may only be refused for prudential reasons.

3.  This Article does not prevent a financial institution of a Party from applying to the other Party to consider authorising the supply of a financial service that is not supplied within either Party's territory. That application is subject to the law of the Party receiving the application and is not subject to the obligations of this Article.

### Article 13.15

### Transfer and processing of information

1.  Each Party shall permit a financial institution or a cross-border financial service supplier of the other Party to transfer information in electronic or other form, into and out of its territory, for data processing if processing is required in the ordinary course of business of the financial institution or the cross-border financial service supplier.

2.  Each Party shall maintain adequate safeguards to protect privacy, in particular with regard to the transfer of personal information. If the transfer of financial information involves personal information, such transfers should be in accordance with the legislation governing the protection of personal information of the territory of the Party where the transfer has originated.

### Article 13.16

### Prudential carve-out

1.  This Agreement does not prevent a Party from adopting or maintaining reasonable measures for prudential reasons, including:

    (a)  the protection of investors, depositors, policy-holders, or persons to whom a financial institution, cross-border financial service supplier, or financial service supplier owes a fiduciary duty;

    (b)  the maintenance of the safety, soundness, integrity, or financial responsibility of a financial institution, cross-border financial service supplier, or financial service supplier; or

    (c)  ensuring the integrity and stability of a Party's financial system.

2.  Without prejudice to other means of prudential regulation of cross-border trade in financial services, a Party may require the registration of cross-border financial service suppliers of the other Party and of financial instruments.

3.      Subject to Articles 13.3 and 13.4, a Party may, for prudential reasons, prohibit a particular financial service or activity. Such a prohibition shall not apply to all financial services or to a complete financial services sub-sector, such as banking.

## *Article 13.17*

### **Specific exceptions**

1.      This Agreement does not apply to measures taken by a public entity in pursuit of monetary or exchange rate policies. This paragraph does not affect a Party's obligations under Articles 8.5 (Performance requirements), 8.13 (Transfers), or 13.9.

2.      This Agreement does not require a Party to furnish or allow access to information relating to the affairs and accounts of individual consumers, cross-border financial service suppliers, financial institutions, or to any confidential information which, if disclosed, would interfere with specific regulatory, supervisory, or law enforcement matters, or would otherwise be contrary to public interest or prejudice legitimate commercial interests of particular enterprises.

## *Article 13.18*

### **Financial Services Committee**

1.      The Financial Services Committee established under Article 26.2.1(f) (Committee) shall include representatives of authorities in charge of financial services policy with expertise in the field covered by this Chapter. For Canada, the Committee representative is an official from Finance Canada or its successor.

2.      The Financial Services Committee shall decide by mutual consent.

3.      The Financial Services Committee shall meet annually, or as it otherwise decides, and shall:

   (a)    supervise the implementation of this Chapter;

   (b)    carry out a dialogue on the regulation of the financial services sector with a view to improving mutual knowledge of the Parties' respective regulatory systems and to cooperate in the development of international standards as illustrated by the Understanding on the dialogue on the regulation of the financial services sector contained in Annex 13-B; and

   (c)    implement Article 13.21.

## *Article 13.19*

### **Consultations**

1.      A Party may request consultations with the other Party regarding any matter arising under this Agreement that affects financial services. The other Party shall give sympathetic consideration to the request.

2.      Each Party shall ensure that when there are consultations pursuant to paragraph 1 its delegation includes officials with the relevant expertise in the area covered by this Chapter. For Canada this means officials of Finance Canada or its successor.

*Article 13.20*

**Dispute settlement**

1.      Chapter Twenty-Nine (Dispute Settlement) applies as modified by this Article to the settlement of disputes arising under this Chapter.

2.      If the Parties are unable to agree on the composition of the arbitration panel established for the purposes of a dispute arising under this Chapter, Article 29.7 (Composition of the arbitration panel) applies. However, all references to the list of arbitrators established under Article 29.8 (List of arbitrators) shall be understood to refer to the list of arbitrators established under this Article.

3.      The CETA Joint Committee may establish a list of at least 15 individuals, chosen on the basis of objectivity, reliability, and sound judgement, who are willing and able to serve as arbitrators. The list shall be composed of three sub-lists: one sub-list for each Party and one sub-list of individuals, who are not nationals of either Party, to act as chairpersons. Each sub-list shall include at least five individuals. The CETA Joint Committee may review the list at any time and shall ensure that the list conforms with this Article.

4.      The arbitrators included on the list must have expertise or experience in financial services law or regulation or in the practice thereof, which may include the regulation of financial service suppliers. The arbitrators acting as chairpersons must also have experience as counsel, panellist, or arbitrator in dispute settlement proceedings. Arbitrators shall be independent, serve in their individual capacity, and shall not take instructions from any organisation or government. They shall comply with the Code of Conduct in Annex 29-B (Code of conduct).

5.      If an arbitration panel finds that a measure is inconsistent with this Agreement and the measure affects:

(a)     the financial services sector and any other sector, the complaining Party may suspend benefits in the financial services sector that have an effect equivalent to the effect of the measure in the Party's financial services sector; or

(b)     only a sector other than the financial services sector, the complaining Party shall not suspend benefits in the financial services sector.

*Article 13.21*

**Investment disputes in financial services**

1.      Section F of Chapter Eight (Resolution of investment disputes between investors and states) applies, as modified by this Article and Annex 13-B, to:

(a)     investment disputes pertaining to measures to which this Chapter applies and in which an investor claims that a Party has breached Articles 8.10 (Treatment of investors and of covered investments), 8.11 (Compensation for losses), 8.12 (Expropriation), 8.13 (Transfers), 8.16 (Denial of benefits), 13.3, or 13.4; or

(b)     investment disputes commenced pursuant to Section F of Chapter Eight (Resolution of investment disputes between investors and states) in which Article 13.16.1 has been invoked.

2.    In the case of an investment dispute under sub-paragraph 1(a), or if the respondent invokes Article 13.16.1 within 60 days of the submission of a claim to the Tribunal under Article 8.22 (Submission of a claim to the Tribunal), a division of the Tribunal shall be composed, in accordance with Article 8.27.7 from the list established under Article 13.20.3. If the respondent invokes Article 13.16.1 within 60 days of the submission of a claim, with respect to an investment dispute other than under subparagraph 1(a), the period of time applicable to the composition of a division of the Tribunal under Article 8.27.7 (Constitution of the Tribunal) commences on the date the respondent invokes Article 13.16.1. If the CETA Joint Committee has not made the appointments pursuant to Article 8.27.2 within the period of time provided in Article 8.27.17, either disputing party may request that the Secretary-General of the International Centre for Settlement of Investment Disputes ("ICSID") select the Members of the Tribunal from the list established under Article 13.20. If the list has not been established under Article 13.20 on the date the claim is submitted pursuant to Article 8.23, the Secretary-General of ICSID shall select the Members of the Tribunal from the individuals proposed by one or both of the Parties in accordance with Article 13.20.

3.    The respondent may refer the matter in writing to the Financial Services Committee for a decision as to whether and, if so, to what extent the exception under Article 13.16.1 is a valid defence to the claim. This referral shall not be made later than the date the Tribunal fixes for the respondent to submit its counter-memorial. If the respondent refers the matter to the Financial Services Committee under this paragraph the periods of time or proceedings referred to in Section F of Chapter Eight (Resolution of investment disputes between investors and states) are suspended.

4.    In a referral under paragraph 3, the Financial Services Committee or the CETA Joint Committee, as the case may be, may make a joint determination as to whether and to what extent Article 13.16.1 is a valid defence to the claim. The Financial Services Committee or the CETA Joint Committee, as the case may be, shall transmit a copy of the joint determination to the investor and the Tribunal, if constituted. If the joint determination concludes that Article 13.16.1 is a valid defence to all parts of the claim in their entirety, the investor is deemed to have withdrawn its claim and the proceedings are discontinued in accordance with Article 8.35 (Discontinuance). If the joint determination concludes that Article 13.16.1 is a valid defence to only parts of the claim, the joint determination is binding on the Tribunal with respect to those parts of the claim. The suspension of the periods of time or proceedings described in paragraph 3 then no longer apply and the investor may proceed with the remaining parts of the claim.

5.    If the CETA Joint Committee has not made a joint determination within three months of referral of the matter by the Financial Services Committee, the suspension of the periods of time or proceedings referred to in paragraph 3 no longer apply and the investor may proceed with its claim.

6.    At the request of the respondent, the Tribunal shall decide as a preliminary matter whether and to what extent Article 13.16.1 is a valid defence to the claim. Failure of the respondent to make that request is without prejudice to the right of the respondent to assert Article 13.16.1 as a defence in a later phase of the proceedings. The

Tribunal shall draw no adverse inference from the fact that the Financial Services Committee or the CETA Joint Committee has not agreed on a joint determination in accordance with Annex13-B.

# CHAPTER FOURTEEN

## INTERNATIONAL MARITIME TRANSPORT SERVICES

*Article 14.1*

**Definitions**

For the purposes of this Chapter:

**customs clearance services** or **customs house brokers' services** means the carrying out, on a fee or contract basis, of customs formalities concerning import, export or through transport of cargo, irrespective of whether these services are the main or secondary activity of the service provider;

**container station and depot services** means the storage, stuffing, stripping or repair of containers and making them available for shipment, whether in port areas or inland;

**door-to-door or multimodal transport operation** means the transport of cargo under a single transport document, that uses more than one mode of transport and involves an international sea-leg;

**feeder services** means the pre- and onward transportation by sea of international cargo, including containerised, break bulk and dry or liquid bulk cargo, between ports located in the territory of a Party. For greater certainty, in respect of Canada, feeder services may include transportation between sea and inland waters, where inland waters means those defined in the *Customs Act*, R.S.C. 1985, c.1;

**international cargo** means cargo transported by sea-going vessels between a port of a Party and a port of the other Party or of a third country, or between a port of one Member State of the European Union and a port of another Member State of the European Union;

**international maritime transport services** means the transport of passengers or cargo by a sea-going vessel between a port of one Party and a port of the other Party or of a third country, or between a port of one Member State of the European Union and a port of another Member State of the European Union, as well as direct contracting with suppliers of other transport services to ensure door-to-door or multimodal transport operations, but not the supply of such other transport services;

**international maritime transport service suppliers** means

(a)   an enterprise of a Party, as defined in Article 1.1 (Definitions of general application), and a branch of any such entity; or

(b)   an enterprise, as defined in Article 1.1 (Definitions of general application), of a third country owned or controlled by nationals of a Party, if its vessels are registered in accordance with the legislation of that Party and flying the flag of that Party; or

(c)   a branch of an enterprise of a third country with substantive business operations in the territory of a Party, that is engaged in the supply of international maritime transport services. For greater certainty, Chapter Eight (Investment) does not apply to such a branch;

**maritime agency services** means the representation, as an agent, within a given geographic area, of the business interests of one or more shipping lines or shipping companies, for the following purposes:

(a)  marketing and sales of maritime transport and related services, from quotation to invoicing, issuance of bills of lading on behalf of the companies, acquisition and resale of the necessary related services, preparation of documentation, and provision of business information; and

(b)  acting on behalf of the companies in organising the call of the vessel or taking control of cargo when required;

**maritime auxiliary services** means maritime cargo handling services, customs clearance services, container station and depot services, maritime agency services, maritime freight forwarding services, and storage and warehousing services;

**maritime cargo handling services** means the performance, organisation and supervision of:

(a)  the loading or discharging of cargo to or from a vessel,

(b)  the lashing or unlashing of cargo, and

(c)  the reception or delivery and safekeeping of cargo before shipment or after discharge,

by stevedoring or terminal operator companies, but does not include work performed by dock labour, when this workforce is organised independently of stevedoring or terminal operator companies;

**maritime freight forwarding services** means the organisation and monitoring of shipments on behalf of shippers, through the supply of such services as the arrangement of transport and related services, consolidation and packing of cargo, preparation of documentation and provision of business information;

**storage and warehousing services** means storage services of frozen or refrigerated goods, bulk storage services of liquids or gases, and other storage or warehousing services.

*Article 14.2*

**Scope**

1.  This Chapter applies to a measure adopted or maintained by a Party relating to the supply of international maritime transport services.[20] For greater certainty, such measure is also subject to Chapters Eight (Investment) and Nine (Cross-Border Trade in Services), as applicable.

2.  For greater certainty, further to Articles 8.6 (National treatment), 8.7 (Most-favoured-nation treatment), 9.3 (National treatment), and 9.5 (Most-favoured-nation treatment), a Party shall not adopt or maintain a measure in respect of:

---

[20]  This Chapter does not apply to fishing vessels as defined under a Party's law.

109

(a)    a vessel supplying an international maritime transport service and flying the flag of the other Party;[21] or

(b)    an international maritime transport service supplier of the other Party,

that accords treatment that is less favourable than that accorded by that Party in like situations to its own vessels or international maritime service suppliers or to vessels or international maritime service suppliers of a third country with regard to:

(a)    access to ports;

(b)    the use of infrastructure and services of ports such as towage and pilotage;

(c)    the use of maritime auxiliary services as well as the imposition of related fees and charges;

(d)    access to customs facilities; or

(e)    the assignment of berths and facilities for loading and unloading.[22]

### Article 14.3

### Obligations

1.    Each Party shall permit the international maritime transport service suppliers of the other Party to re-position owned or leased empty containers that are carried on a non-revenue basis between the ports of that Party.

2.    A Party shall permit the international maritime transport service suppliers of the other Party to supply feeder services between the ports of that Party.

3.    A Party shall not adopt or maintain a cargo-sharing arrangement with a third country concerning any international maritime transport services, including dry and liquid bulk and liner trades.

4.    A Party shall not adopt or maintain a measure that requires all or part of any international cargo to be transported exclusively by vessels registered in that Party or owned or controlled by nationals of that Party.

5.    A Party shall not adopt or maintain a measure that prevents international maritime transport service suppliers of the other Party from directly contracting with other transport service suppliers for door-to-door or multimodal transport operations.

### Article 14.4

### Reservations

1.    Article 14.3 does not apply to:

(a)    an existing non-conforming measure that is maintained by a Party at the level of :

---

[21]    For the purposes of this Chapter for the European Union, flying the flag of a Party means flying the flag of a Member State of the European Union.

[22]    This paragraph does not apply to vessels or international maritime transport service suppliers that are subject to the *Agreement on Port State Measures to Prevent, Deter and Eliminate Illegal, Unreported and Unregulated Fishing*, done in Rome on 22 November 2009.

      (i)     the European Union, as set out in its Schedule to Annex I;

      (ii)    a national government, as set out by that Party in its Schedule to Annex I;

      (iii)   a provincial, territorial or regional government, as set out by that Party in its Schedule to Annex I; or

      (iv)   a local government.

    (b)    the continuation or prompt renewal of a non-conforming measure referred to in subparagraph (a); or

    (c)    an amendment to a non-conforming measure referred to in subparagraph (a) to the extent that the amendment does not decrease the conformity of the measure, as it existed immediately before the amendment, with Article 14.3.

2.    Article 14.3 does not apply to a measure that a Party adopts or maintains with respect to sectors, subsectors or activities, as set out in its Schedule to Annex II.

# CHAPTER FIFTEEN

## TELECOMMUNICATIONS

*Article 15.1*
### Definitions

For the purposes of this Chapter:

**contribution link** means a link for the transmission of sound or television broadcasting signals to a programme production centre;

**cost-oriented** means based on cost and may involve different cost methodologies for different facilities or services;

**enterprise** means an "enterprise" as defined in Article 8.1 (Definitions);

**essential facilities** means facilities of a public telecommunications transport network or service that:

    (a)    are exclusively or predominantly supplied by a single or a limited number of suppliers; and

    (b)    cannot feasibly be economically or technically substituted in order to supply a service;

**interconnection** means linking suppliers providing public telecommunications transport networks or services in order to allow the users of one supplier to communicate with the users of another supplier and to access services supplied by another supplier;

**intra-corporate communications** means telecommunications through which an enterprise communicates within the enterprise or with or among its subsidiaries, branches and, subject to a Party's law, affiliates, but does not include commercial or non-commercial services that are supplied to enterprises that are not related subsidiaries, branches or affiliates, or that are offered to customers or potential customers. For the purposes of this definition, "subsidiaries", "branches" and, where applicable, "affiliates" are as defined by each Party;

**leased circuits** means telecommunications facilities between two or more designated points that are set aside for the dedicated use of or availability to a particular customer or other users of the customer's choice;

**major supplier** means a supplier which has the ability to materially affect the terms of participation, having regard to price and supply in the relevant market for public telecommunications transport networks or services, as a result of:

    (a)    control over essential facilities; or

    (b)    use of its position in the market;

**network termination point** means the physical point at which a user is provided with access to a public telecommunications transport network;

**number portability** means the ability of end-users of public telecommunications transport services to retain, at the same location, the same telephone numbers without impairment of quality, reliability or convenience when switching between suppliers of like public

telecommunications transport services;

**public telecommunications transport network** means the public telecommunications infrastructure that permits telecommunications between and among defined network termination points;

**public telecommunications transport service** means a telecommunications transport service that a Party requires, explicitly or in effect, to be offered to the public generally that involves the real-time transmission of customer-supplied information between two or more points without any end-to-end change in the form or content of the customer's information. This service may include, among other things, voice telephone services, packet-switched data transmission services, circuit-switched data transmission services, telex services, telegraph services, facsimile services, private leased circuit services and mobile and personal communications services and systems;

**regulatory authority** means the body responsible for the regulation of telecommunications;

**telecommunications services** means all services consisting of the transmission and reception of signals by any electromagnetic means but does not include the economic activity consisting of the provision of content by means of telecommunications; and

**user** means an enterprise or natural person using or requesting a publicly available telecommunications service.

### Article 15.2

### Scope

1.    This Chapter applies to a measure adopted or maintained by a Party relating to telecommunications networks or services, subject to a Party's right to restrict the supply of a service in accordance with its reservations as set out in its Schedule to Annexes I and II.

2.    This Chapter does not apply to a measure of a Party affecting the transmission by any means of telecommunications, including broadcast and cable distribution, of radio or television programming intended for reception by the public. For greater certainty, this Chapter applies to a contribution link.

3.    This Chapter does not:

    (a)    require a Party to authorise a service supplier of the other Party to establish, construct, acquire, lease, operate or supply telecommunications networks or services, other than as specifically provided in this Agreement; or

    (b)    require a Party, or require a Party to compel a service supplier, to establish, construct, acquire, lease, operate or supply telecommunications networks or services not offered to the public generally.

### Article 15.3

### Access to and use of public telecommunications transport networks or services

1.    A Party shall ensure that enterprises of the other Party are accorded access to and use of public telecommunications transport networks or services on reasonable and non-discriminatory terms and conditions, including with respect to quality, technical

standards and specifications.[23] The Parties shall apply this obligation, among other things, as set out in paragraphs 2 through 6.

2. Each Party shall ensure that enterprises of the other Party have access to and use of any public telecommunications transport network or service offered within or across its borders, including private leased circuits, and to this end shall ensure, subject to paragraphs 5 and 6, that these enterprises are permitted to:

   (a) purchase or lease, and attach terminal or other equipment which interfaces with the public telecommunications transport network;

   (b) connect private leased or owned circuits with public telecommunications transport networks and services of that Party or with circuits leased or owned by another enterprise;

   (c) use operating protocols of their choice; and

   (d) perform switching, signalling, and processing functions.

3. Each Party shall ensure that enterprises of the other Party may use public telecommunications transport networks and services for the movement of information in its territory or across its borders, including for intra-corporate communications of these enterprises, and for access to information contained in data bases or otherwise stored in machine-readable form in the territory of either Party.

4. Further to Article 28.3 (General exceptions), and notwithstanding paragraph 3, a Party shall take appropriate measures to protect:

   (a) the security and confidentiality of public telecommunications transport services; and

   (b) the privacy of users of public telecommunications transport services,

   subject to the requirement that these measures are not applied in a manner that would constitute a means of arbitrary or unjustifiable discrimination or a disguised restriction on trade.

5. Each Party shall ensure that no condition is imposed on access to and use of public telecommunications transport networks or services other than as necessary to:

   (a) safeguard the public service responsibilities of suppliers of public telecommunications transport networks or services, in particular their ability to make their networks or services available to the public generally;

   (b) protect the technical integrity of public telecommunications transport networks or services; or

   (c) ensure that service suppliers of the other Party do not supply services limited by the Party's reservations as set out in its Schedule to Annexes I or II.

6. Provided that they satisfy the criteria in paragraph 5, conditions for access to and use of public telecommunications transport networks or services may include:

   (a) restrictions on resale or shared use of these services;

---

[23]    **non-discriminatory** means treatment no less favourable than that accorded to any other enterprise when using like public telecommunications transport networks or services in like situations.

(b)   a requirement to use specified technical interfaces, including interface protocols, for connection with such networks or services;

(c)   requirements, where necessary, for the inter-operability of these services;

(d)   type approval of terminal or other equipment that interfaces with the network and technical requirements relating to the attachment of that equipment to the networks;

(e)   restrictions on connection of private leased or owned circuits with these networks or services or with circuits leased or owned by another enterprise; and

(f)   notification, registration and licensing.

## *Article 15.4*

### Competitive safeguards on major suppliers

1.   Each Party shall maintain appropriate measures to prevent suppliers that, alone or together, are a major supplier from engaging in or continuing anti-competitive practices.

2.   The anti-competitive practices referred to in paragraph 1 include:

(a)   engaging in anti-competitive cross-subsidisation;

(b)   using information obtained from competitors with anti-competitive results; and

(c)   not making available to other service suppliers, on a timely basis, technical information about essential facilities and commercially relevant information which are necessary for them to supply services.

## *Article 15.5*

### Access to essential facilities

1.   Each Party shall ensure that a major supplier in its territory makes available its essential facilities, which may include, among other things, network elements, operational support systems or support structures, to suppliers of telecommunications services of the other Party on reasonable and non-discriminatory terms and conditions and cost-oriented rates.

2.   Each Party may determine, in accordance with its laws, those essential facilities required to be made available in its territory.

## *Article 15.6*

### Interconnection

1.   Each Party shall ensure that a major supplier in its territory provides interconnection:

(a)   at any technically feasible point in the network;

(b)   under non-discriminatory terms, conditions, including technical standards and specifications, and rates;

(c)    of a quality no less favourable than that provided for its own like services or for like services of non-affiliated service suppliers or of its subsidiaries or other affiliates;

(e)    in a timely fashion, on terms, conditions, (including technical standards and specifications) and cost-oriented rates that are transparent, reasonable, having regard to economic feasibility, and sufficiently unbundled so that a supplier need not pay for network components or facilities that it does not require for the services to be supplied; and

(f)    upon request, at points in addition to the network termination points offered to the majority of users, subject to charges that reflect the cost of construction of necessary additional facilities.

2.    A supplier that is authorised to supply telecommunications services has the right to negotiate a new interconnection agreement with other suppliers of public telecommunications transport networks and services. Each Party shall ensure that major suppliers are required to establish a reference interconnection offer or negotiate interconnection agreements with other suppliers of telecommunications networks and services.

3.    Each Party shall ensure that suppliers of public telecommunications transport services that acquire information from another such supplier during the process of negotiating interconnection arrangements use that information solely for the purpose for which it was supplied and respect at all times the confidentiality of information transmitted or stored.

4.    Each Party shall ensure that the procedures applicable for interconnection to a major supplier shall be made publicly available.

5.    Each Party shall ensure that a major supplier makes publicly available either its interconnection agreements or reference interconnection offer if it is appropriate.

*Article 15.7*

**Authorisation to supply telecommunications services**

Each Party should ensure that the authorisation to supply telecommunications services, wherever possible, is based upon a simple notification procedure.

*Article 15.8*

**Universal service**

1.    Each Party has the right to define the kind of universal service obligations it wishes to maintain.

2.    Each Party shall ensure that any measure on universal service that it adopts or maintains is administered in a transparent, objective, non-discriminatory and competitively neutral manner. Each Party shall also ensure that any universal service obligation it imposes is not more burdensome than necessary for the kind of universal service that the Party has defined.

3.    All suppliers should be eligible to ensure universal service. If a supplier is to be designated as the supplier of a universal service, the Parties shall ensure that the selection is made through an efficient, transparent and non-discriminatory mechanism.

*Article 15.9*

**Scarce resources**

1.    Each Party shall administer its procedures for the allocation and use of scarce resources, including frequencies, numbers and rights of way, in an objective, timely, transparent and non-discriminatory manner.

2.    Notwithstanding Articles 8.4 (Market access) and 9.6 (Market access), a Party may adopt or maintain a measure that allocates and assigns spectrum and that manages frequencies. Accordingly, each Party retains the right to establish and apply its spectrum and frequency management policies that may limit the number of suppliers of public telecommunications transport services. Each Party also retains the right to allocate frequency bands taking into account present and future needs.

3.    Each Party shall make the current state of allocated frequency bands publicly available but shall not be required to provide detailed identification of frequencies allocated for specific government use.

*Article 15.10*

**Number portability**

Each Party shall ensure that suppliers of public telecommunications transport services in its territory provide number portability on reasonable terms and conditions.

*Article 15.11*

**Regulatory authority**

1.    Each Party shall ensure that its regulatory authority is legally distinct and functionally independent from any supplier of telecommunications transport networks, services or equipment, including if a Party retains ownership or control of a supplier of telecommunications transport networks or services.

2.    Each Party shall ensure that its regulatory authority's decisions and procedures are impartial with respect to all market participants and are administered in a transparent and timely manner.

3.    Each Party shall ensure that its regulatory authority is sufficiently empowered to regulate the sector, including by ensuring that it has the power to:

(a)    require suppliers of telecommunications transport networks or services to submit any information the regulatory authority considers necessary for the administration of its responsibilities; and

(b)    enforce its decisions relating to the obligations set out in Articles 15.3 through 15.6 through appropriate sanctions that may include financial penalties, corrective orders or the suspension or revocation of licences.

*Article 15.12*

**Resolution of telecommunication disputes**

Recourse to regulatory authorities

1.    Further to Articles 27.3 (Administrative proceedings) and 27.4 (Review and appeal), each Party shall ensure that:

(a)    enterprises have timely recourse to its regulatory authority to resolve disputes with suppliers of public telecommunications transport networks or services regarding the matters covered in Articles 15.3 through 15.6 and that, under the law of the Party, are within the regulatory authority's jurisdiction. As appropriate, the regulatory authority shall issue a binding decision to resolve the dispute within a reasonable period of time.

(b)    suppliers of telecommunications networks or services of the other Party requesting access to essential facilities or interconnection with a major supplier in the Party's territory have, within a reasonable and publicly specified period of time, recourse to a regulatory authority to resolve disputes regarding the appropriate terms, conditions and rates for interconnection or access with that major supplier.

Appeal and review of regulatory authority determinations or decisions

2.    Each Party shall ensure that an enterprise whose interests are adversely affected by a determination or decision of a regulatory authority may obtain review of the determination or decision by an impartial and independent judicial, quasi-judicial or administrative authority, as provided in the law of the Party. The judicial, quasi-judicial or administrative authority shall provide the enterprise with written reasons supporting its determination or decision. Each Party shall ensure that these determinations or decisions, subject to appeal or further review, are implemented by the regulatory authority.

3.    An application for judicial review does not constitute grounds for non-compliance with the determination or decision of the regulatory authority unless the relevant judicial authority stays this determination or decision.

*Article 15.13*

**Transparency**

1.    Further to Articles 27.1 (Publication) and 27.2 (Provision of information), and in addition to the other provisions in this Chapter relating to the publication of information, each Party shall make publicly available:

(a)    the responsibilities of a regulatory authority in an easily accessible and clear form, in particular where those responsibilities are given to more than one body;

(b)    its measures relating to public telecommunications transport networks or services, including:

(i)    regulations of its regulatory authority, together with the basis for these regulations;

118

       (ii)    tariffs and other terms and conditions of services;

       (iii)   specifications of technical interfaces;

       (iv)   conditions for attaching terminal or other equipment to the public telecommunications transport networks;

       (v)    notification, permit, registration, or licensing requirements, if any; and

   (c)    information on bodies responsible for preparing, amending and adopting standards-related measures.

### *Article 15.14*

### Forbearance

The Parties recognise the importance of a competitive market to achieve legitimate public policy objectives for telecommunications services. To this end, and to the extent provided in its law, each Party may refrain from applying a regulation to a telecommunications service when, following analysis of the market, it is determined that effective competition is achieved.

### *Article 15.15*

### Relation to other chapters

If there is any inconsistency between this Chapter and another Chapter, this Chapter prevails to the extent of the inconsistency.

# CHAPTER SIXTEEN

## ELECTRONIC COMMERCE

### *Article 16.1*

### Definitions

For the purposes of this Chapter:

**delivery** means a computer program, text, video, image, sound recording or other delivery that is digitally encoded; and

**electronic commerce** means commerce conducted through telecommunications, alone or in conjunction with other information and communication technologies.

### *Article 16.2*

### Objective and scope

1.    The Parties recognise that electronic commerce increases economic growth and trade opportunities in many sectors and confirm the applicability of the WTO rules to electronic commerce. They agree to promote the development of electronic commerce between them, in particular by cooperating on the issues raised by electronic commerce under the provisions of this Chapter.

2.    This Chapter does not impose an obligation on a Party to allow a delivery transmitted by electronic means except in accordance with the Party's obligations under another provision of this Agreement.

### *Article 16.3*

### Customs duties on electronic deliveries

1.    A Party shall not impose a customs duty, fee, or charge on a delivery transmitted by electronic means.

2.    For greater certainty, paragraph 1 does not prevent a Party from imposing an internal tax or other internal charge on a delivery transmitted by electronic means, provided that the tax or charge is imposed in a manner consistent with this Agreement.

### *Article 16.4*

### Trust and confidence in electronic commerce

Each Party should adopt or maintain laws, regulations or administrative measures for the protection of personal information of users engaged in electronic commerce and, when doing so, shall take into due consideration international standards of data protection of relevant international organisations of which both Parties are a member.

### *Article 16.5*

### General provisions

Considering the potential of electronic commerce as a social and economic development tool, the Parties recognise the importance of:

(a)    clarity, transparency and predictability in their domestic regulatory frameworks in facilitating, to the maximum extent possible, the development of electronic commerce;

(b)    interoperability, innovation and competition in facilitating electronic commerce; and

(c)    facilitating the use of electronic commerce by small and medium sized enterprises.

## *Article 16.6*

### **Dialogue on electronic commerce**

1.    Recognising the global nature of electronic commerce, the Parties agree to maintain a dialogue on issues raised by electronic commerce, which will address, among other things:

    (a)    the recognition of certificates of electronic signatures issued to the public and the facilitation of cross-border certification services;

    (b)    the liability of intermediary service suppliers with respect to the transmission, or the storage of information;

    (c)    the treatment of unsolicited electronic commercial communications; and

    (d)    the protection of personal information and the protection of consumers and businesses from fraudulent and deceptive commercial practices in the sphere of electronic commerce.

2.    The dialogue in paragraph 1 may take the form of exchange of information on the Parties' respective laws, regulations, and other measures on these issues, as well as sharing experiences on the implementation of such laws, regulations and other measures.

3.    Recognising the global nature of electronic commerce, the Parties affirm the importance of actively participating in multilateral *fora* to promote the development of electronic commerce.

## *Article 16.7*

### **Relation to other chapters**

In the event of an inconsistency between this Chapter and another chapter of this Agreement, the other chapter prevails to the extent of the inconsistency.

# CHAPTER SEVENTEEN

## COMPETITION POLICY

*Article 17.1*

### Definitions

For the purposes of this Chapter:

**anti-competitive business conduct** means anti-competitive agreements, concerted practices or arrangements by competitors, anti-competitive practices by an enterprise that is dominant in a market, and mergers with substantial anti-competitive effects; and,

**service of general economic interest** means, for the European Union, a service that cannot be provided satisfactorily and under conditions, such as price, objective quality characteristics, continuity, and access to the service, consistent with the public interest, by an undertaking operating under normal market conditions. The operation of a service of general economic interest must be entrusted to one or more undertakings by the state by way of a public service assignment that defines the obligations of the undertakings in question and of the state.

*Article 17.2*

### Competition policy

1.     The Parties recognise the importance of free and undistorted competition in their trade relations. The Parties acknowledge that anti-competitive business conduct has the potential to distort the proper functioning of markets and undermine the benefits of trade liberalisation.

2.     The Parties shall take appropriate measures to proscribe anti-competitive business conduct, recognising that such measures will enhance the fulfilment of the objectives of this Agreement.

3.     The Parties shall cooperate on matters relating to the proscription of anti-competitive business conduct in the free trade area in accordance with the Agreement between the *European Communities and the Government of Canada Regarding the Application of their Competition Laws*, done at Bonn on 17 June 1999.

4.     The measures referred to in paragraph 2 shall be consistent with the principles of transparency, non-discrimination, and procedural fairness. Exclusions from the application of competition law shall be transparent. A Party shall make available to the other Party public information concerning such exclusions provided under its competition law.

*Article 17.3*

### Application of competition policy to enterprises

1.      A Party shall ensure that the measures referred to in Article 17.2.2 apply to the Parties to the extent required by its law.

2.      For greater certainty:

(a)      in Canada, the *Competition Act*, R.S.C. 1985, c. C-34 is binding on and applies to an agent of Her Majesty in right of Canada, or of a province, that is a corporation, in respect of commercial activities engaged in by the corporation in competition, whether actual or potential, with other persons to the extent that it would apply if the agent were not an agent of Her Majesty. Such an agent may include state enterprises, monopolies, and enterprises granted special or exclusive rights or privileges; and

(b)      in the European Union, state enterprises, monopolies, and enterprises granted special rights or privileges are subject to the European Union's rules on competition. However, enterprises entrusted with the operation of services of general economic interest or having the character of a revenue-producing monopoly are subject to these rules, in so far as the application of these rules does not obstruct the performance, in law or in fact, of the particular tasks assigned to them.

## Article 17.4

### Dispute settlement

Nothing in this Chapter shall be subject to any form of dispute settlement pursuant to this Agreement.

# CHAPTER EIGHTEEN

## STATE ENTERPRISES, MONOPOLIES, AND
## ENTERPRISES GRANTED SPECIAL RIGHTS OR PRIVILEGES

*Article 18.1*

### Definitions

For the purposes of this Chapter:

**covered entity** means:

(a)     a monopoly;

(b)     a supplier of a good or service, if it is one of a small number of goods or services suppliers authorised or established by a Party, formally or in effect, and the Party substantially prevents competition among those suppliers in its territory;

(c)     any entity to which a Party has granted, formally or in effect, special rights or privileges to supply a good or service, substantially affecting the ability of any other enterprise to supply the same good or service in the same geographical area under substantially equivalent conditions, and allowing the entity to escape, in whole or in part, competitive pressures or market constraints;[24] or

(d)     a state enterprise;

**designate** means to establish or authorise a monopoly, or to expand the scope of a monopoly to cover an additional good or service;

**in accordance with commercial considerations** means consistent with customary business practices of a privately held enterprise in the relevant business or industry; and

**non-discriminatory treatment** means the better of national treatment and most-favoured-nation treatment as set out in this Agreement.

*Article 18.2*

### Scope

1.     The Parties confirm their rights and obligations under Articles XVII:1 through XVII:3 of the GATT 1994, the *Understanding on the Interpretation of Article XVII of the General Agreement on Tariffs and Trade 1994*, and Articles VIII:1 and VIII:2 of GATS, all of which are hereby incorporated into and made part of this Agreement.

2.     This Chapter does not apply to the procurement by a Party of a good or service purchased for governmental purposes and not with a view to commercial resale or with a view to use in the supply of a good or service for commercial sale, whether or

---

[24]     For greater certainty, the granting of a licence to a limited number of enterprises in allocating a scarce resource through objective, proportional and non-discriminatory criteria is not in and of itself a special right.

not that procurement is a "covered procurement" within the meaning of Article 19.2 (Scope and coverage).

3.      Articles 18.4 and 18.5 do not apply to the sectors set out in Article 8.2 (Scope) and Article 9.2 (Scope).

4       Articles 18.4 and 18.5 do not apply to a measure of a covered entity if a reservation of a Party, taken against a national treatment or most-favoured nation treatment obligation, as set out in that Party's Schedule to Annex I, II, or III, would be applicable if the same measure had been adopted or maintained by that Party.

## Article 18.3

### State enterprises, monopolies and enterprises granted special rights or privileges

1.      Without prejudice to the Parties' rights and obligations under this Agreement, nothing in this Chapter prevents a Party from designating or maintaining a state enterprise or a monopoly or from granting an enterprise special rights or privileges.

2.      A Party shall not require or encourage a covered entity to act in a manner inconsistent with this Agreement.

## Article 18.4

### Non-discriminatory treatment

1.      Each Party shall ensure that in its territory a covered entity accords non-discriminatory treatment to a covered investment, to a good of the other Party, or to a service supplier of the other Party in the purchase or sale of a good or service.

2.      If a covered entity described in paragraphs (b) through (d) of the definition of "covered entity" in Article 18.1 acts in accordance with Article 18.5.1, the Party in whose territory the covered entity is located shall be deemed to be in compliance with the obligations set out in paragraph 1 in respect of that covered entity.

## Article 18.5

### Commercial considerations

1.      Each Party shall ensure that a covered entity in its territory acts in accordance with commercial considerations in the purchase or sale of goods, including with regard to price, quality, availability, marketability, transportation, and other terms and conditions of purchase or sale, as well as in the purchase or supply of services, including when such goods or services are supplied to or by an investment of an investor of the other Party.

2.      Provided that a covered entity's conduct is consistent with Article 18.4 and Chapter Seventeen (Competition Policy), the obligation contained in paragraph 1 does not apply:

        (a)     in the case of a monopoly, to the fulfilment of the purpose for which the monopoly has been created or for which special rights or privileges have been granted, such as a public service obligation or regional development; or,

(b)    in the case of a state enterprise, to the fulfilment of its public mandate.

# CHAPTER NINETEEN

## GOVERNMENT PROCUREMENT

*Article 19.1*

**Definitions**

For the purposes of this Chapter:

**commercial goods or services** means goods or services of a type generally sold or offered for sale in the commercial marketplace to, and customarily purchased by, non-governmental buyers for non-governmental purposes;

**construction service** means a service that has as its objective the realisation by whatever means of civil or building works, based on Division 51 of the United Nations Provisional Central Product Classification (CPC);

**electronic auction** means an iterative process that involves the use of electronic means for the presentation by suppliers of either new prices, or new values for quantifiable non-price elements of the tender related to the evaluation criteria, or both, resulting in a ranking or re-ranking of tenders;

**in writing** or **written** means any worded or numbered expression that can be read, reproduced and later communicated. It may include electronically transmitted and stored information;

**limited tendering** means a procurement method whereby the procuring entity contacts a supplier or suppliers of its choice;

**measure** means any law, regulation, procedure, administrative guidance or practice, or any action of a procuring entity relating to a covered procurement;

**multi-use list** means a list of suppliers that a procuring entity has determined satisfy the conditions for participation in that list, and that the procuring entity intends to use more than once;

**notice of intended procurement** means a notice published by a procuring entity inviting interested suppliers to submit a request for participation, a tender, or both;

**offset** means any condition or undertaking that encourages local development or improves a Party's balance-of-payments accounts, such as the use of domestic content, the licensing of technology, investment, counter-trade and similar action or requirement;

**open tendering** means a procurement method whereby all interested suppliers may submit a tender;

**person** means "person" as defined in Article 1.1 (Definitions of general application);

**procuring entity** means an entity covered under Annexes 19-1, 19-2 or 19-3 of a Party's Market Access Schedule for this Chapter;

**qualified supplier** means a supplier that a procuring entity recognises as having satisfied the conditions for participation;

**selective tendering** means a procurement method whereby only qualified suppliers are invited by the procuring entity to submit a tender;

**services** includes construction services, unless otherwise specified;

**standard** means a document approved by a recognised body that provides for common and repeated use, rules, guidelines or characteristics for goods or services, or related processes and production methods, with which compliance is not mandatory. It may also include or deal exclusively with terminology, symbols, packaging, marking or labelling requirements as they apply to a good, service, process or production method;

**supplier** means a person or group of persons that provides or could provide goods or services; and

**technical specification** means a tendering requirement that:

> (a)   lays down the characteristics of a good or a service to be procured, including quality, performance, safety and dimensions, or the processes and methods for their production or provision; or
>
> (b)   addresses terminology, symbols, packaging, marking or labelling requirements, as they apply to a good or a service.

*Article 19.2*

**Scope and coverage**

*Application of this Chapter*

1.   This Chapter applies to any measure relating to a covered procurement, whether or not it is conducted exclusively or partially by electronic means.

2.   For the purposes of this Chapter, covered procurement means procurement for governmental purposes:

> (a)   of a good, a service, or any combination thereof:
>
> > (i)   as specified in each Party's Annexes to its Market Access Schedule for this Chapter; and
> >
> > (ii)   not procured with a view to commercial sale or resale, or for use in the production or supply of a good or a service for commercial sale or resale;
>
> (b)   by any contractual means, including: purchase; lease; and rental or hire purchase, with or without an option to buy;
>
> (c)   for which the value, as estimated in accordance with paragraphs 6 through 8, equals or exceeds the relevant threshold specified in a Party's Annexes to its Market Access Schedule for this Chapter, at the time of publication of a notice in accordance with Article 19.6;
>
> (d)   by a procuring entity; and
>
> (e)   that is not otherwise excluded from coverage in paragraph 3 or a Party's Annexes to its Market Access Schedule for this Chapter.

3.   Except as otherwise provided in a Party's Annexes to its Market Access Schedule for this Chapter, this Chapter does not apply to:

> (a)   the acquisition or rental of land, existing buildings or other immovable property or the rights thereon;

128

(b)    non-contractual agreements or any form of assistance that a Party provides, including cooperative agreements, grants, loans, equity infusions, guarantees and fiscal incentives;

(c)    the procurement or acquisition of fiscal agency or depository services, liquidation and management services for regulated financial institutions or services related to the sale, redemption and distribution of public debt, including loans and government bonds, notes and other securities;

(d)    public employment contracts;

(e)    procurement conducted:

(i)    for the specific purpose of providing international assistance, including development aid;

(ii)    under the particular procedure or condition of an international agreement relating to the stationing of troops or relating to the joint implementation by the signatory countries of a project; or

(iii)    under the particular procedure or condition of an international organisation, or funded by international grants, loans or other assistance if the applicable procedure or condition would be inconsistent with this Chapter.

4.    A procurement subject to this Chapter shall be all procurement covered by the Market Access Schedules of Canada and the European Union, in which each Party's commitments are set out as follows:

(a)    in Annex 19-1, the central government entities whose procurement is covered by this Chapter;

(b)    in Annex 19-2, the sub-central government entities whose procurement is covered by this Chapter;

(c)    in Annex 19-3, all other entities whose procurement is covered by this Chapter;

(d)    in Annex 19-4, the goods covered by this Chapter;

(e)    in Annex 19-5, the services, other than construction services, covered by this Chapter;

(f)    in Annex 19-6, the construction services covered by this Chapter;

(g)    in Annex 19-7, any General Notes; and

(h)    in Annex 19-8, the means of publication used for this Chapter.

5.    If a procuring entity, in the context of covered procurement, requires a person not covered under a Party's Annexes to its Market Access Schedule for this Chapter to procure in accordance with particular requirements, Article 19.4 shall apply *mutatis mutandis* to such requirements.

*Valuation*

6.    In estimating the value of a procurement for the purpose of ascertaining whether it is a covered procurement, a procuring entity shall:

129

(a)  neither divide a procurement into separate procurements nor select or use a particular valuation method for estimating the value of a procurement with the intention of totally or partially excluding it from the application of this Chapter; and

(b)  include the estimated maximum total value of the procurement over its entire duration, whether awarded to one or more suppliers, taking into account all forms of remuneration, including:

   (i)  premiums, fees, commissions and interest; and

   (ii)  if the procurement provides for the possibility of options, the total value of such options.

7.  If an individual requirement for a procurement results in the award of more than one contract, or in the award of contracts in separate parts ("recurring contracts") the calculation of the estimated maximum total value shall be based on:

(a)  the value of recurring contracts of the same type of good or service awarded during the preceding 12 months or the procuring entity's preceding fiscal year, adjusted, if possible, to take into account anticipated changes in the quantity or value of the good or service being procured over the following 12 months; or

(b)  the estimated value of recurring contracts of the same type of good or service to be awarded during the 12 months following the initial contract award or the procuring entity's fiscal year.

8.  In the case of procurement by lease, rental or hire purchase of a good or a service, or procurement for which a total price is not specified, the basis for valuation shall be:

(a)  in the case of a fixed-term contract:

   (i)  if the term of the contract is 12 months or less, the total estimated maximum value for its duration; or

   (ii)  if the term of the contract exceeds 12 months, the total estimated maximum value, including any estimated residual value;

(b)  if the contract is for an indefinite period, the estimated monthly instalment multiplied by 48; and

(c)  if it is not certain whether the contract is to be a fixed-term contract, sub-paragraph (b) shall be used.

*Article 19.3*

**Security and general exceptions**

1.  Nothing in this Chapter shall be construed to prevent a Party from taking any action or from not disclosing any information that it considers necessary for the protection of its essential security interests relating to the procurement:

(a)  of arms, ammunition[25] or war material;

(b)  or to procurement indispensable for national security; or

---

[25]    The expression "ammunition" in this Article is considered equivalent to the expression "munitions".

     (c)    for national defence purposes.

2.    Subject to the requirement that such measures are not applied in a manner that would constitute a means of arbitrary or unjustifiable discrimination between Parties where the same conditions prevail or a disguised restriction on international trade, nothing in this Chapter shall be construed to prevent a Party from imposing or enforcing measures:

     (a)    necessary to protect public morals, order or safety;

     (b)    necessary to protect human, animal or plant life or health;

     (c)    necessary to protect intellectual property; or

     (d)    relating to goods or services of persons with disabilities, of philanthropic institutions or of prison labour.

*Article 19.4*

**General principles**

*Non-Discrimination*

1.    With respect to any measure regarding covered procurement, each Party, including its procuring entities, shall accord immediately and unconditionally to the goods and services of the other Party and to the suppliers of the other Party offering such goods or services, treatment no less favourable than the treatment the Party, including its procuring entities, accords to its own goods, services and suppliers. For greater certainty, such treatment includes:

     (a)    within Canada, treatment no less favourable than that accorded by a province or territory, including its procuring entities, to goods and services of, and to suppliers located in, that province or territory; and

     (b)    within the European Union, treatment no less favourable than that accorded by a Member State or a sub-central region of a Member State, including its procuring entities, to goods and services of, and suppliers located in, that Member State or sub-central region, as the case may be.

2.    With respect to any measure regarding covered procurement, a Party, including its procuring entities, shall not:

     (a)    treat a locally established supplier less favourably than another locally established supplier on the basis of the degree of foreign affiliation or ownership; or

     (b)    discriminate against a locally established supplier on the basis that the goods or services offered by that supplier for a particular procurement are goods or services of the other Party.

*Use of Electronic Means*

3.    When conducting covered procurement by electronic means, a procuring entity shall:

     (a)    ensure that the procurement is conducted using information technology systems and software, including those related to authentication and encryption

131

of information, that are generally available and interoperable with other generally available information technology systems and software; and

(b)    maintain mechanisms that ensure the integrity of requests for participation and tenders, including establishment of the time of receipt and the prevention of inappropriate access.

*Conduct of Procurement*

4.    A procuring entity shall conduct covered procurement in a transparent and impartial manner that:

(a)    is consistent with this Chapter, using methods such as open tendering, selective tendering and limited tendering;

(b)    avoids conflicts of interest; and

(c)    prevents corrupt practices.

*Rules of Origin*

5.    For the purposes of covered procurement, a Party shall not apply rules of origin to goods or services imported from or supplied from the other Party that are different from the rules of origin the Party applies at the same time in the normal course of trade to imports or supplies of the same goods or services from the same Party.

*Offsets*

6.    With regard to covered procurement, a Party, including its procuring entities, shall not seek, take account of, impose or enforce any offset.

*Measures Not Specific to Procurement*

7.    Paragraphs 1 and 2 shall not apply to: customs duties and charges of any kind imposed on, or in connection with, importation; the method of levying such duties and charges; other import regulations or formalities and measures affecting trade in services other than measures governing covered procurement.

*Article 19.5*

**Information on the procurement system**

1.    Each Party shall:

(a)    promptly publish any law, regulation, judicial decision, administrative ruling of general application, standard contract clause mandated by law or regulation and incorporated by reference in notices or tender documentation and procedure regarding covered procurement, and any modifications thereof, in an officially designated electronic or paper medium that is widely disseminated and remains readily accessible to the public; and

(b)    provide an explanation thereof to the other Party, on request.

2.    Each Party shall list, in Annex 19-8 of its Market Access Schedule:

(a)    the electronic or paper media in which the Party publishes the information described in paragraph 1;

(b)    the electronic or paper media in which the Party publishes the notices required by Articles 19.6, 19.8.7 and 19.15.2; and

(c)    the website address or addresses where the Party publishes:

(i)    its procurement statistics pursuant to Article 19.15.5; or

(ii)    its notices concerning awarded contracts pursuant to Article 19.15.6.

3.    Each Party shall promptly notify the Committee on Government Procurement of any modification to the Party's information listed in Annex 19-8.

*Article 19.6*

**Notices**

*Notice of Intended Procurement*

1.    For each covered procurement a procuring entity shall publish a notice of intended procurement, except in the circumstances described in Article 19.12.

All the notices of intended procurement shall be directly accessible by electronic means free of charge through a single point of access subject to paragraph 2. The notices may also be published in an appropriate paper medium that is widely disseminated and those notices shall remain readily accessible to the public, at least until expiration of the time-period indicated in the notice.

The appropriate paper and electronic medium is listed by each Party in Annex 19-8.

2.    A Party may apply a transitional period of up to 5 years from the date of entry into force of this Agreement to entities covered by Annexes 19-2 and 19-3 that are not ready to participate in a single point of access referred to in paragraph 1. Those entities shall, during such transitional period, provide their notices of intended procurement, if accessible by electronic means, through links in a gateway electronic site that is accessible free of charge and listed in Annex 19-8.

3.    Except as otherwise provided in this Chapter, each notice of intended procurement shall include:

(a)    the name and address of the procuring entity and other information necessary to contact the procuring entity and obtain all relevant documents relating to the procurement, and their cost and terms of payment, if any;

(b)    a description of the procurement, including the nature and the quantity of the goods or services to be procured or, if the quantity is not known, the estimated quantity;

(c)    for recurring contracts, an estimate, if possible, of the timing of subsequent notices of intended procurement;

(d)    a description of any options;

(e)    the time-frame for delivery of goods or services or the duration of the contract;

(f)    the procurement method that will be used and whether it will involve negotiation or electronic auction;

(g)   if applicable, the address and any final date for the submission of requests for participation in the procurement;

(h)   the address and the final date for the submission of tenders;

(i)   the language or languages in which tenders or requests for participation may be submitted, if they may be submitted in a language other than an official language of the Party of the procuring entity;

(j)   a list and brief description of any conditions for participation of suppliers, including any requirements for specific documents or certifications to be provided by suppliers in connection therewith, unless such requirements are included in tender documentation that is made available to all interested suppliers at the same time as the notice of intended procurement;

(k)   if, pursuant to Article 19.8, a procuring entity intends to select a limited number of qualified suppliers to be invited to tender, the criteria that will be used to select them and, if applicable, any limitation on the number of suppliers that will be permitted to tender; and

(l)   an indication that the procurement is covered by this Chapter.

*Summary Notice*

4.   For each case of intended procurement, a procuring entity shall publish a summary notice that is readily accessible, at the same time as the publication of the notice of intended procurement, in English or French. The summary notice shall contain at least the following information:

(a)   the subject-matter of the procurement;

(b)   the final date for the submission of tenders or, if applicable, any final date for the submission of requests for participation in the procurement or for inclusion on a multi-use list; and

(c)   the address from which documents relating to the procurement may be requested.

*Notice of Planned Procurement*

5.   Procuring entities are encouraged to publish in the appropriate electronic, and, if available, paper medium listed in Annex 19-8 as early as possible in each fiscal year a notice regarding their future procurement plans ("notice of planned procurement"). The notice of planned procurement shall also be published in the single point of access site listed in Annex 19-8, subject to paragraph 2. The notice of planned procurement should include the subject-matter of the procurement and the planned date of the publication of the notice of intended procurement.

6.   A procuring entity covered under Annexes 19-2 or 19-3 may use a notice of planned procurement as a notice of intended procurement provided that the notice of planned procurement includes as much of the information referred to in paragraph 3 as is available to the entity and a statement that interested suppliers should express their interest in the procurement to the procuring entity.

*Article 19.7*

**Conditions for participation**

1.    A procuring entity shall limit any conditions for participation in a procurement to those that are essential to ensure that a supplier has the legal and financial capacities and the commercial and technical abilities to undertake the relevant procurement.

2.    In establishing the conditions for participation, a procuring entity:

    (a)    shall not impose the condition that, in order for a supplier to participate in a procurement, the supplier has previously been awarded one or more contracts by a procuring entity of a Party;

    (b)    may require relevant prior experience if essential to meet the requirements of the procurement; and

    (c)    shall not require prior experience in the territory of the Party to be a condition of the procurement.

3.    In assessing whether a supplier satisfies the conditions for participation, a procuring entity:

    (a)    shall evaluate the financial capacity and the commercial and technical abilities of a supplier on the basis of that supplier's business activities both inside and outside the territory of the Party of the procuring entity; and

    (b)    shall base its evaluation on the conditions that the procuring entity has specified in advance in notices or tender documentation.

4.    If there is supporting evidence, a Party, including its procuring entities, may exclude a supplier on grounds such as:

    (a)    bankruptcy;

    (b)    false declarations;

    (c)    significant or persistent deficiencies in performance of any substantive requirement or obligation under a prior contract or contracts;

    (d)    final judgments in respect of serious crimes or other serious offences;

    (e)    professional misconduct or acts or omissions that adversely reflect on the commercial integrity of the supplier; or

    (f)    failure to pay taxes.

*Article 19.8*

**Qualification of suppliers**

*Registration Systems and Qualification Procedures*

1.    A Party, including its procuring entities, may maintain a supplier registration system under which interested suppliers are required to register and provide certain information.

2.    Each Party shall ensure that:

(a)     its procuring entities make efforts to minimise differences in their qualification procedures; and

(b)     if its procuring entities maintain registration systems, the entities make efforts to minimise differences in their registration systems.

3.     A Party, including its procuring entities, shall not adopt or apply a registration system or qualification procedure with the purpose or the effect of creating unnecessary obstacles to the participation of suppliers of the other Party in its procurement.

*Selective Tendering*

4.     If a procuring entity intends to use selective tendering, the entity shall:

(a)     include in the notice of intended procurement at least the information specified in Article 19.6.3(a), (b), (f), (g), (j), (k) and (l) and invite suppliers to submit a request for participation; and

(b)     provide, by the commencement of the time-period for tendering, at least the information in Article 19.6.3(c), (d), (e), (h) and (i) to the qualified suppliers that it notifies as specified in Article 19.10.3(b).

5.     A procuring entity shall allow all qualified suppliers to participate in a particular procurement, unless the procuring entity states in the notice of intended procurement any limitation on the number of suppliers that will be permitted to tender and the criteria for selecting the limited number of suppliers.

6.     If the tender documentation is not made publicly available from the date of publication of the notice referred to in paragraph 4, a procuring entity shall ensure that those documents are made available at the same time to all the qualified suppliers selected in accordance with paragraph 5.

*Multi-Use Lists*

7.     A procuring entity may maintain a multi-use list of suppliers, provided that a notice inviting interested suppliers to apply for inclusion on the list is:

(a)     published annually; and

(b)     if published by electronic means, made available continuously,

in the appropriate medium listed in Annex 19-8.

8.     The notice provided for in paragraph 7 shall include:

(a)     a description of the goods or services, or categories thereof, for which the list may be used;

(b)     the conditions for participation to be satisfied by suppliers for inclusion on the list and the methods that the procuring entity will use to verify that a supplier satisfies the conditions;

(c)     the name and address of the procuring entity and other information necessary to contact the entity and obtain all relevant documents relating to the list;

(d)    the period of validity of the list and the means for its renewal or termination, or if the period of validity is not provided, an indication of the method by which notice will be given of the termination of use of the list; and

(e)    an indication that the list may be used for procurement covered by this Chapter.

9.    Notwithstanding paragraph 7, if a multi-use list will be valid for three years or less, a procuring entity may publish the notice referred to in paragraph 7 only once, at the beginning of the period of validity of the list, provided that the notice:

(a)    states the period of validity and that further notices will not be published; and

(b)    is published by electronic means and is made available continuously during the period of its validity.

10.    A procuring entity shall allow suppliers to apply at any time for inclusion on a multi-use list and shall include on the list all qualified suppliers within a reasonably short time.

11.    If a supplier that is not included on a multi-use list submits a request for participation in a procurement based on a multi-use list and all required documents, within the time-period provided for in Article 19.10.2, a procuring entity shall examine the request. The procuring entity shall not exclude the supplier from consideration in respect of the procurement on the grounds that the entity has insufficient time to examine the request, unless, in exceptional cases, due to the complexity of the procurement, the entity is not able to complete the examination of the request within the time-period allowed for the submission of tenders.

*Procuring Entities of Annex 19-2 and Annex 19-3*

12.    A procuring entity covered under Annexes 19-2 or 19-3 may use a notice inviting suppliers to apply for inclusion on a multi-use list as a notice of intended procurement, provided that:

(a)    the notice is published in accordance with paragraph 7 and includes the information required under paragraph 8, as much of the information required under Article 19.6.3 as is available and a statement that it constitutes a notice of intended procurement or that only the suppliers on the multi-use list will receive further notices of procurement covered by the multi-use list; and

(b)    the entity promptly provides to suppliers that have expressed an interest in a given procurement to the entity, sufficient information to permit them to assess their interest in the procurement, including all remaining information required in Article 19.6.3, to the extent such information is available.

13.    A procuring entity covered under Annexes 19-2 or 19-3 may allow a supplier that has applied for inclusion on a multi-use list in accordance with paragraph 10 to tender in a given procurement, if there is sufficient time for the procuring entity to examine whether the supplier satisfies the conditions for participation.

*Information on Procuring Entity Decisions*

14.    A procuring entity shall promptly inform any supplier that submits a request for participation in a procurement or application for inclusion on a multi-use list of the procuring entity's decision with respect to the request or application.

15.　　　If a procuring entity rejects a supplier's request for participation in a procurement or application for inclusion on a multi-use list, ceases to recognise a supplier as qualified, or removes a supplier from a multi-use list, the entity shall promptly inform the supplier and, on request of the supplier, promptly provide the supplier with a written explanation of the reasons for its decision.

*Article 19.9*

**Technical specifications and tender documentation**

*Technical Specifications*

1.　　　A procuring entity shall not prepare, adopt or apply any technical specification or prescribe any conformity assessment procedure with the purpose or the effect of creating unnecessary obstacles to international trade.

2.　　　In prescribing the technical specifications for the goods or services being procured, a procuring entity shall, if appropriate:

(a)　　set out the technical specification in terms of performance and functional requirements, rather than design or descriptive characteristics; and

(b)　　base the technical specification on international standards, if they exist; otherwise, on national technical regulations, recognised national standards or building codes.

3.　　　If design or descriptive characteristics are used in the technical specifications, a procuring entity should indicate, if appropriate, that it will consider tenders of equivalent goods or services that demonstrably fulfil the requirements of the procurement by including words such as "or equivalent" in the tender documentation.

4.　　　A procuring entity shall not prescribe technical specifications that require or refer to a particular trademark or trade name, patent, copyright, design, type, specific origin, producer or supplier, unless there is no other sufficiently precise or intelligible way of describing the procurement requirements and provided that, in such cases, the entity includes words such as "or equivalent" in the tender documentation.

5.　　　A procuring entity shall not seek or accept, in a manner that would have the effect of precluding competition, advice that may be used in the preparation or adoption of any technical specification for a specific procurement from a person that may have a commercial interest in the procurement.

6.　　　For greater certainty, a Party, including its procuring entities, may prepare, adopt or apply technical specifications to promote the conservation of natural resources or protect the environment, provided that it does so in accordance with this Article.

*Tender Documentation*

7.　　　A procuring entity shall make available to suppliers tender documentation that includes all information necessary to permit suppliers to prepare and submit responsive tenders. Unless already provided in the notice of intended procurement, such documentation shall include a complete description of:

(a)  the procurement, including the nature and the quantity of the goods or services to be procured or, if the quantity is not known, the estimated quantity and any requirements to be fulfilled, including any technical specifications, conformity assessment certification, plans, drawings or instructional materials;

(b)  any conditions for participation of suppliers, including a list of information and documents that suppliers are required to submit in connection with the conditions for participation;

(c)  all evaluation criteria the entity will apply in the awarding of the contract, and, unless price is the sole criterion, the relative importance of that criteria;

(d)  if the procuring entity will conduct the procurement by electronic means, any authentication and encryption requirements or other requirements related to the submission of information by electronic means;

(e)  if the procuring entity will hold an electronic auction, the rules, including identification of the elements of the tender related to the evaluation criteria, on which the auction will be conducted;

(f)  if there will be a public opening of tenders, the date, time and place for the opening and, if appropriate, the persons authorised to be present;

(g)  any other terms or conditions, including terms of payment and any limitation on the means by which tenders may be submitted, such as whether on paper or by electronic means; and

(h)  any dates for the delivery of goods or the supply of services.

8.  In establishing any date for the delivery of goods or the supply of services being procured, a procuring entity shall take into account such factors as the complexity of the procurement, the extent of subcontracting anticipated and the realistic time required for production, de-stocking and transport of goods from the point of supply or for supply of services.

9.  The evaluation criteria set out in the notice of intended procurement or tender documentation may include, among others, price and other cost factors, quality, technical merit, environmental characteristics and terms of delivery.

10.  A procuring entity shall promptly:

(a)  make available tender documentation to ensure that interested suppliers have sufficient time to submit responsive tenders;

(b)  provide, on request, the tender documentation to any interested supplier; and

(c)  reply to any reasonable request for relevant information by any interested or participating supplier, provided that such information does not give that supplier an advantage over other suppliers.

*Modifications*

11.  If, prior to the award of a contract, a procuring entity modifies the criteria or requirements set out in the notice of intended procurement or tender documentation provided to participating suppliers, or amends or reissues a notice or tender documentation, it shall transmit in writing all such modifications or amended or re-issued notice or tender documentation:

(a)  to all suppliers that are participating at the time of the modification, amendment or re-issuance, if such suppliers are known to the entity, and in all other cases, in the same manner as the original information was made available; and

(b)  in adequate time to allow such suppliers to modify and re-submit amended tenders, as appropriate.

*Article 19.10*

**Time-periods**

*General*

1.    A procuring entity shall, consistent with its own reasonable needs, provide sufficient time for suppliers to prepare and submit requests for participation and responsive tenders, taking into account such factors as:

(a)  the nature and complexity of the procurement;

(b)  the extent of subcontracting anticipated; and

(c)  the time necessary for transmitting tenders by non-electronic means from foreign as well as domestic points if electronic means are not used.

These time-periods, including any extension of the time-periods, shall be the same for all interested or participating suppliers.

*Deadlines*

2.    A procuring entity that uses selective tendering shall establish that the final date for the submission of requests for participation shall not, in principle, be less than 25 days from the date of publication of the notice of intended procurement. If a state of urgency duly substantiated by the procuring entity renders this time-period impracticable, the time-period may be reduced to not less than 10 days.

3.    Except as provided for in paragraphs 4, 5, 7 and 8, a procuring entity shall establish that the final date for the submission of tenders shall not be less than 40 days from the date on which:

(a)  in the case of open tendering, the notice of intended procurement is published; or

(b)  in the case of selective tendering, the entity notifies suppliers that they will be invited to submit tenders, whether or not it uses a multi-use list.

4.    A procuring entity may reduce the time-period for tendering established in accordance with paragraph 3 to not less than 10 days if:

(a)  the procuring entity has published a notice of planned procurement as described in Article 19.6.5 at least 40 days and not more than 12 months in advance of the publication of the notice of intended procurement, and the notice of planned procurement contains:

(i)   a description of the procurement;

(ii)  the approximate final dates for the submission of tenders or requests for participation;

140

      (iii)   a statement that interested suppliers should express their interest in the procurement to the procuring entity;

      (iv)   the address from which documents relating to the procurement may be obtained; and

      (v)   as much of the information that is required for the notice of intended procurement under Article 19.6.3, as is available;

(b)   the procuring entity, for contracts of a recurring nature, indicates in an initial notice of intended procurement that subsequent notices will provide time-periods for tendering based on this paragraph; or

(c)   a state of urgency duly substantiated by the procuring entity renders the time-period for tendering established in accordance with paragraph 3 impracticable.

5.    A procuring entity may reduce the time-period for tendering established in accordance with paragraph 3 by five days for each one of the following circumstances:

(a)   the notice of intended procurement is published by electronic means;

(b)   all the tender documentation is made available by electronic means from the date of the publication of the notice of intended procurement; and

(c)   the entity accepts tenders by electronic means.

6.    The use of paragraph 5, in conjunction with paragraph 4, shall in no case result in the reduction of the time-period for tendering established in accordance with paragraph 3 to less than 10 days from the date on which the notice of intended procurement is published.

7.    Notwithstanding any other provision in this Article, if a procuring entity purchases commercial goods or services, or any combination thereof, it may reduce the time-period for tendering established in accordance with paragraph 3 to not less than 13 days, provided that it publishes by electronic means, at the same time, both the notice of intended procurement and the tender documentation. In addition, if the entity accepts tenders for commercial goods or services by electronic means, it may reduce the time-period established in accordance with paragraph 3 to not less than 10 days.

8.    If a procuring entity covered under Annexes 19-2 or 19-3 has selected all or a limited number of qualified suppliers, the time-period for tendering may be fixed by mutual agreement between the procuring entity and the selected suppliers. In the absence of agreement, the period shall not be less than 10 days.

*Article 19.11*

**Negotiation**

1.    A Party may provide for its procuring entities to conduct negotiations with suppliers:

(a)   if the entity has indicated its intent to conduct negotiations in the notice of intended procurement required under Article 19.6.3; or

(b) if it appears from the evaluation that no tender is obviously the most advantageous in terms of the specific evaluation criteria set out in the notice of intended procurement or tender documentation.

2. A procuring entity shall:

(a) ensure that any elimination of suppliers participating in negotiations is carried out in accordance with the evaluation criteria set out in the notice of intended procurement or tender documentation; and

(b) if negotiations are concluded, provide a common deadline for the remaining participating suppliers to submit any new or revised tenders.

*Article 19.12*

**Limited tendering**

1. Provided that it does not use this provision for the purpose of avoiding competition among suppliers or in a manner that discriminates against suppliers of the other Party or protects domestic suppliers, a procuring entity may use limited tendering and may choose not to apply Articles 19.6 through 19.8, paragraphs 7 through 11 of Article 19.9, and Articles 19.10, 19.11, 19.13 and 19.14 under any of the following circumstances:

(a) if:

(i) no tenders were submitted or no suppliers requested participation;

(ii) no tenders that conform to the essential requirements of the tender documentation were submitted;

(iii) no suppliers satisfied the conditions for participation; or

(iv) the tenders submitted have been collusive,

provided that the requirements of the tender documentation are not substantially modified;

(b) if the goods or services can be supplied only by a particular supplier and no reasonable alternative or substitute goods or services exist for any of the following reasons:

(i) the requirement is for a work of art;

(ii) the protection of patents, copyrights or other exclusive rights; or

(iii) due to an absence of competition for technical reasons;

(c) for additional deliveries by the original supplier of goods or services that were not included in the initial procurement if a change of supplier for such additional goods or services:

(i) cannot be made for economic or technical reasons such as requirements of interchangeability or interoperability with existing equipment, software, services or installations procured under the initial procurement; and

      (ii)    would cause significant inconvenience or substantial duplication of costs for the procuring entity;

(d)    only when strictly necessary if, for reasons of extreme urgency brought about by events unforeseeable by the procuring entity, the goods or services could not be obtained in time using open tendering or selective tendering;

(e)    for goods purchased on a commodity market;

(f)    if a procuring entity procures a prototype or a first good or service that is developed at its request in the course of, and for, a particular contract for research, experiment, study or original development. Original development of a first good or service may include limited production or supply in order to incorporate the results of field testing and to demonstrate that the good or service is suitable for production or supply in quantity to acceptable quality standards, but does not include quantity production or supply to establish commercial viability or to recover research and development costs;

(g)    for purchases made under exceptionally advantageous conditions that only arise in the very short term in the case of unusual disposals such as those arising from liquidation, receivership or bankruptcy, but not for routine purchases from regular suppliers; or

(h)    if a contract is awarded to a winner of a design contest provided that:

      (i)    the contest has been organised in a manner that is consistent with the principles of this Chapter, in particular relating to the publication of a notice of intended procurement; and

      (ii)    the participants are judged by an independent jury with a view to a design contract being awarded to a winner.

2.    A procuring entity shall prepare a report in writing on each contract awarded under paragraph 1. The report shall include the name of the procuring entity, the value and kind of goods or services procured and a statement indicating the circumstances and conditions described in paragraph 1 that justified the use of limited tendering.

## Article 19.13

### Electronic auctions

If a procuring entity intends to conduct a covered procurement using an electronic auction, the entity shall provide each participant, before commencing the electronic auction, with:

(a)    the automatic evaluation method, including the mathematical formula, that is based on the evaluation criteria set out in the tender documentation and that will be used in the automatic ranking or re-ranking during the auction;

(b)    the results of any initial evaluation of the elements of its tender if the contract is to be awarded on the basis of the most advantageous tender; and

(c)    any other relevant information relating to the conduct of the auction.

## Article 19.14

### Treatment of tenders and awarding of contracts

143

*Treatment of Tenders*

1.      A procuring entity shall receive, open and treat all tenders under procedures that guarantee the fairness and impartiality of the procurement process, and the confidentiality of tenders.

2.      A procuring entity shall not penalise any supplier whose tender is received after the time specified for receiving tenders if the delay is due solely to mishandling on the part of the procuring entity.

3.      If a procuring entity provides a supplier with an opportunity to correct unintentional errors of form between the opening of tenders and the awarding of the contract, the procuring entity shall provide the same opportunity to all participating suppliers.

*Awarding of Contracts*

4.      To be considered for an award, a tender shall be submitted in writing and shall, at the time of opening, comply with the essential requirements set out in the notices and tender documentation and be from a supplier that satisfies the conditions for participation.

5.      Unless a procuring entity determines that it is not in the public interest to award a contract, the entity shall award the contract to the supplier that the entity has determined to be capable of fulfilling the terms of the contract and that, based solely on the evaluation criteria specified in the notices and tender documentation, has submitted:

        (a)     the most advantageous tender; or

        (b)     if price is the sole criterion, the lowest price.

6.      If a procuring entity receives a tender with a price that is abnormally lower than the prices in other tenders submitted, it may verify with the supplier that it satisfies the conditions for participation and is capable of fulfilling the terms of the contract.

7.      A procuring entity shall not use options, cancel a procurement or modify awarded contracts in a manner that circumvents the obligations under this Chapter.

## Article 19.15

### Transparency of procurement information

*Information Provided to Suppliers*

1.      A procuring entity shall promptly inform participating suppliers of the entity's contract award decisions and, on the request of a supplier, shall do so in writing. Subject to Articles 19.6.2 and 19.6.3, a procuring entity shall, on request, provide an unsuccessful supplier with an explanation of the reasons why the entity did not select its tender and the relative advantages of the successful supplier's tender.

*Publication of Award Information*

2.      Not later than 72 days after the award of each contract covered by this Chapter, a procuring entity shall publish a notice in the appropriate paper or electronic medium listed in Annex 19-8. If the entity publishes the notice only in an electronic medium,

the information shall remain readily accessible for a reasonable period of time. The notice shall include at least the following information:

(a)    a description of the goods or services procured;

(b)    the name and address of the procuring entity;

(c)    the name and address of the successful supplier;

(d)    the value of the successful tender or the highest and lowest offers taken into account in the award of the contract;

(e)    the date of award; and

(f)    the type of procurement method used, and in cases where limited tendering was used in accordance with Article 19.12, a description of the circumstances justifying the use of limited tendering.

*Maintenance of Documentation, Reports and Electronic Traceability*

3.    Each procuring entity shall, for a period of at least three years from the date it awards a contract, maintain:

(a)    the documentation and reports of tendering procedures and contract awards relating to covered procurement, including the reports required under Article 19.12; and

(b)    data that ensure the appropriate traceability of the conduct of covered procurement by electronic means.

*Collection and Reporting of Statistics*

4.    Each Party shall collect and report to the Committee on Government Procurement statistics on its contracts covered by this Chapter. Each report shall cover one year and be submitted within two years of the end of the reporting period, and shall contain:

(a)    for Annex 19-1 procuring entities:

(i)    the number and total value, for all such entities, of all contracts covered by this Chapter;

(ii)    the number and total value of all contracts covered by this Chapter awarded by each such entity, broken down by categories of goods and services according to an internationally recognised uniform classification system; and

(iii)    the number and total value of all contracts covered by this Chapter awarded by each such entity under limited tendering;

(b)    for Annexes 19-2 and 19-3 procuring entities, the number and total value of contracts covered by this Chapter awarded by all such entities, broken down by Annex; and

(c)    estimates for the data required under sub-paragraphs (a) and (b), with an explanation of the methodology used to develop the estimates, if it is not feasible to provide the data.

5.      If a Party publishes its statistics on an official website, in a manner that is consistent with the requirements of paragraph 4, the Party may, instead of reporting to the Committee on Government Procurement, provide a link to the website, together with any instructions necessary to access and use such statistics.

6.      If a Party requires notices concerning awarded contracts, pursuant to paragraph 2, to be published electronically and if such notices are accessible to the public through a single database in a form permitting analysis of the covered contracts, the Party may, instead of reporting to the Committee on Government Procurement, provide a link to the website, together with any instructions necessary to access and use such data.

## Article 19.16

### Disclosure of information

*Provision of Information to Parties*

1.      On request of the other Party, a Party shall provide promptly any information necessary to determine whether a procurement was conducted fairly, impartially and in accordance with this Chapter, including information on the characteristics and relative advantages of the successful tender. In cases where release of the information would prejudice competition in future tenders, the Party that receives the information shall not disclose it to any supplier, except after consulting with, and obtaining the consent of, the Party that provided the information.

*Non-Disclosure of Information*

2.      Notwithstanding any other provision of this Chapter, a Party, including its procuring entities, shall not provide to any particular supplier information that might prejudice fair competition between suppliers.

3.      Nothing in this Chapter shall be construed to require a Party, including its procuring entities, authorities and review bodies, to disclose confidential information if disclosure:

   (a)    would impede law enforcement;

   (b)    might prejudice fair competition between suppliers;

   (c)    would prejudice the legitimate commercial interests of particular persons, including the protection of intellectual property; or

   (d)    would otherwise be contrary to the public interest.

## Article 19.17

### Domestic review procedures

1.      Each Party shall provide a timely, effective, transparent and non-discriminatory administrative or judicial review procedure through which a supplier may challenge:

   (a)    a breach of the Chapter; or

   (b)    if the supplier does not have a right to challenge directly a breach of the Chapter under the domestic law of a Party, a failure to comply with a Party's measures implementing this Chapter,

arising in the context of a covered procurement, in which the supplier has, or has had, an interest. The procedural rules for all challenges shall be in writing and made generally available.

2.    In the event of a complaint by a supplier, arising in the context of covered procurement in which the supplier has, or has had, an interest, that there has been a breach or a failure as referred to in paragraph 1, the Party of the procuring entity conducting the procurement shall encourage the entity and the supplier to seek resolution of the complaint through consultations. The entity shall accord impartial and timely consideration to any such complaint in a manner that is not prejudicial to the supplier's participation in ongoing or future procurement or its right to seek corrective measures under the administrative or judicial review procedure.

3.    Each supplier shall be allowed a sufficient period of time to prepare and submit a challenge, which in no case shall be less than 10 days from the time when the basis of the challenge became known or reasonably should have become known to the supplier.

4.    Each Party shall establish or designate at least one impartial administrative or judicial authority that is independent of its procuring entities to receive and review a challenge by a supplier arising in the context of a covered procurement.

5.    If a body other than an authority referred to in paragraph 4 initially reviews a challenge, the Party shall ensure that the supplier may appeal the initial decision to an impartial administrative or judicial authority that is independent of the procuring entity whose procurement is the subject of the challenge.

6.    Each Party shall ensure that a review body that is not a court shall have its decision subject to judicial review or have procedures that provide that:

(a)    the procuring entity shall respond in writing to the challenge and disclose all relevant documents to the review body;

(b)    the participants to the proceedings ("participants") shall have the right to be heard prior to a decision of the review body being made on the challenge;

(c)    the participants shall have the right to be represented and accompanied;

(d)    the participants shall have access to all proceedings;

(e)    the participants shall have the right to request that the proceedings take place in public and that witnesses may be presented; and

(f)    the review body shall make its decisions or recommendations in a timely fashion, in writing, and shall include an explanation of the basis for each decision or recommendation.

7.    Each Party shall adopt or maintain procedures that provide for:

(a)    rapid interim measures to preserve the supplier's opportunity to participate in the procurement. Such interim measures may result in suspension of the procurement process. The procedures may provide that overriding adverse consequences for the interests concerned, including the public interest, may be taken into account when deciding whether such measures should be applied. Just cause for not acting shall be provided in writing; and

(b) corrective action or compensation for the loss or damages suffered, which may be limited to either the costs for the preparation of the tender or the costs relating to the challenge, or both, if a review body determines that there has been a breach or a failure as referred to in paragraph 1.

8. Not later than ten years after the entry into force of this Agreement, the Parties will take up negotiations to further develop the quality of remedies, including a possible commitment to introduce or maintain pre-contractual remedies.

## Article 19.18

### Modifications and rectifications to coverage

1. A Party may modify or rectify its Annexes to this Chapter.

*Modifications*

2. When a Party modifies an Annex to this Chapter, the Party shall:

(a) notify the other Party in writing; and

(b) include in the notification a proposal of appropriate compensatory adjustments to the other Party to maintain a level of coverage comparable to that existing prior to the modification.

3. Notwithstanding sub-paragraph 2(b), a Party need not provide compensatory adjustments if:

(a) the modification in question is negligible in its effect; or

(b) the modification covers an entity over which the Party has effectively eliminated its control or influence.

4. If the other Party disputes that:

(a) an adjustment proposed under sub-paragraph 2(b) is adequate to maintain a comparable level of mutually agreed coverage;

(b) the modification is negligible in its effect; or

(c) the modification covers an entity over which the Party has effectively eliminated its control or influence under sub-paragraph 3(b),

it must object in writing within 45 days of receipt of the notification referred to in sub-paragraph 2(a) or be deemed to have accepted the adjustment or modification, including for the purposes of Chapter 29 (Dispute Settlement).

*Rectifications*

5. The following changes to a Party's Annexes shall be considered a rectification, provided that they do not affect the mutually agreed coverage provided for in this Agreement:

(a) a change in the name of an entity;

(b) a merger of two or more entities listed within an Annex; and

(c) the separation of an entity listed in an Annex into two or more entities that are all added to the entities listed in the same Annex.

6.      In the case of proposed rectifications to a Party's Annexes, the Party shall notify the other Party every two years, in line with the cycle of notifications provided for under the Agreement on Government Procurement, contained in Annex 4 of the WTO Agreement, following the entry into force of this Agreement.

7.      A Party may notify the other Party of an objection to a proposed rectification within 45 days from having received the notification. If a Party submits an objection, it shall set out the reasons why it believes the proposed rectification is not a change provided for in paragraph 5 of this Article, and describe the effect of the proposed rectification on the mutually agreed coverage provided for in the Agreement. If no such objection is submitted in writing within 45 days after having received the notification, the Party shall be deemed to have agreed to the proposed rectification.

*Article 19.19*

**Committee on Government Procurement**

1.      The Committee on Government Procurement, established under Article 26.2.1(e), is to be composed of representatives from each Party and shall meet, as necessary, for the purpose of providing the Parties the opportunity to consult on any matters relating to the operation of this Chapter or the furtherance of its objectives, and to carry out other responsibilities as may be assigned to it by the Parties.

2.      The Committee on Government Procurement shall meet, upon request of a Party, to:

   (a)   consider issues regarding public procurement that are referred to it by a Party;

   (b)   exchange information relating to the public procurement opportunities in each Party;

   (c)   discuss any other matters related to the operation of this Chapter; and

   (d)   consider the promotion of coordinated activities to facilitate access for suppliers to procurement opportunities in the territory of each Party. These activities may include information sessions, in particular with a view to improving electronic access to publicly-available information on each Party's procurement regime, and initiatives to facilitate access for small and medium-sized enterprises.

3.      Each Party shall submit statistics relevant to the procurement covered by this Chapter, as set out in Article 19.15, annually to the Committee on Government Procurement.

# CHAPTER TWENTY

## INTELLECTUAL PROPERTY

### SECTION A

### *General Provisions*

### *Article 20.1*

### **Objectives**

The objectives of this Chapter are to:

(a)     facilitate the production and commercialisation of innovative and creative products, and the provision of services, between the Parties; and

(b)     achieve an adequate and effective level of protection and enforcement of intellectual property rights.

### *Article 20.2*

### **Nature and scope of obligations**

1.     The provisions of this Chapter complement the rights and obligations between the Parties under the TRIPS Agreement.

2.     Each Party shall be free to determine the appropriate method of implementing the provisions of this Agreement within its own legal system and practice.

3.     This Agreement does not create any obligation with respect to the distribution of resources as between enforcement of intellectual property rights and enforcement of law in general.

### *Article 20.3*

### **Public health concerns**

1.     The Parties recognise the importance of the *Doha Declaration on the TRIPS Agreement and Public Health ("Doha Declaration")*, adopted on 14 November 2001 by the WTO Ministerial Conference. In interpreting and implementing the rights and obligations under this Chapter, the Parties shall ensure consistency with this Declaration.

2.     The Parties shall contribute to the implementation of and respect the *Decision of the WTO General Council of 30 August 2003* on Paragraph 6 of the *Doha Declaration*, as well as the *Protocol amending the TRIPS Agreement*, done at Geneva on 6 December 2005.

### *Article 20.4*

### **Exhaustion**

This Chapter does not affect the freedom of the Parties to determine whether and under what conditions the exhaustion of intellectual property rights applies.

*Article 20.5*

**Disclosure of information**

This Chapter does not require a Party to disclose information that would otherwise be contrary to its law or exempt from disclosure under its law concerning access to information and privacy.

*SECTION B*

***Standards Concerning Intellectual Property Rights***

*Article 20.6*

**Definition**

For the purposes of this Section:

**pharmaceutical product** means a product including a chemical drug, biologic drug, vaccine or radiopharmaceutical, that is manufactured, sold or represented for use in:

(a)    making a medical diagnosis, treating, mitigating or preventing disease, disorder, or abnormal physical state, or its symptoms, or

(b)    restoring, correcting, or modifying physiological functions.

Sub-section A

**Copyright and related rights**

*Article 20.7*

**Protection granted**

1.    The Parties shall comply with the following international agreements:

(a)    Articles 2 through 20 of the *Berne Convention for the Protection of Literary and Artistic Works*, done at Paris on 24 July 1971;

(b)    Articles 1 through 14 of the *WIPO Copyright Treaty*, done at Geneva on 20 December 1996;

(c)    Articles 1 through 23 of the *WIPO Performances and Phonograms Treaty*, done at Geneva on 20 December 1996; and

(d)    Articles 1 through 22 of the *International Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organisations*, done at Rome on 26 October 1961.

2.    To the extent permitted by the treaties referred to in paragraph 1, this Chapter shall not restrict each Party's ability to limit intellectual property protection that it accords to performances to those performances that are fixed in phonograms.

*Article 20.8*

**Broadcasting and communication to the public**

151

1.  Each Party shall provide performers the exclusive right to authorise or prohibit the broadcasting by wireless means and the communication to the public of their performances, except where the performance is itself already a broadcast performance or is made from a fixation.

2.  Each Party shall ensure that a single equitable remuneration is paid by the user if a phonogram published for commercial purposes, or a reproduction of such phonogram, is used for broadcasting by wireless means or for any communication to the public, and to ensure that this remuneration is shared between the relevant performers and phonogram producers. Each Party may, in the absence of an agreement between the performers and producers of phonograms, lay down the conditions as to the sharing of this remuneration between them.

*Article 20.9*

**Protection of technological measures**

1.  For the purposes of this Article, **technological measures** means any technology, device, or component that, in the normal course of its operation, is designed to prevent or restrict acts, in respect of works, performances, or phonograms, that are not authorised by authors, performers or producers of phonograms, as provided for by the law of a Party. Without prejudice to the scope of copyright or related rights contained in the law of a Party, technological measures shall be deemed effective where the use of protected works, performances, or phonograms is controlled by authors, performers or producers of phonograms through the application of a relevant access control or protection process, such as encryption or scrambling, or a copy control mechanism, that achieves the objective of protection.

2.  Each Party shall provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors, performers or producers of phonograms in connection with the exercise of their rights in, and that restrict acts in respect of, their works, performances, and phonograms, which are not authorised by the authors, the performers or the producers of phonograms concerned or permitted by law.

3.  In order to provide the adequate legal protection and effective legal remedies referred to in paragraph 2, each Party shall provide protection against at least:

    (a)  to the extent provided by its law:

        (i)  the unauthorised circumvention of an effective technological measure carried out knowingly or with reasonable grounds to know; and

        (ii)  the offering to the public by marketing of a device or product, including computer programs, or a service, as a means of circumventing an effective technological measure; and

    (b)  the manufacture, importation, or distribution of a device or product, including computer programs, or provision of a service that:

        (i)  is primarily designed or produced for the purpose of circumventing an effective technological measure; or

(ii)    has only a limited commercially significant purpose other than circumventing an effective technological measure.

4.    Under paragraph 3, the term "to the extent provided by its law" means that each Party has flexibility in implementing sub-paragraphs (a)(i) and (ii).

5.    In implementing paragraphs 2 and 3, a Party shall not be obliged to require that the design of, or the design and selection of parts and components for, a consumer electronics, telecommunications, or computing product provide for a response to any particular technological measure, so long as the product does not otherwise contravene that Party's measures implementing these paragraphs. The intention of this provision is that this Agreement does not require a Party to mandate interoperability in its law: there is no obligation for the information communication technology industry to design devices, products, components, or services to correspond to certain technological measures.

6.    In providing adequate legal protection and effective legal remedies pursuant to paragraph 2, a Party may adopt or maintain appropriate limitations or exceptions to measures implementing the provisions of paragraphs 2 and 3. The obligations set forth in paragraphs 2 and 3 are without prejudice to the rights, limitations, exceptions, or defences to copyright or related rights infringement under the law of a Party.

*Article 20.10*

**Protection of rights management information**

1.    For the purposes of this Article, **rights management information** means:

(a)    information that identifies the work, the performance, or the phonogram; the author of the work, the performer of the performance, or the producer of the phonogram; or the owner of any right in the work, performance, or phonogram;

(b)    information about the terms and conditions of use of the work, performance, or phonogram; or

(c)    any numbers or codes that represent the information described in (a) and (b) above;

when any of these items of information is attached to a copy of a work, performance, or phonogram, or appears in connection with the communication or making available of a work, performance, or phonogram to the public.

2.    To protect electronic rights management information, each Party shall provide adequate legal protection and effective legal remedies against any person knowingly performing, without authority, any of the following acts knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any copyright or related rights:

(a)    to remove or alter any electronic rights management information; or

(b)    to distribute, import for distribution, broadcast, communicate, or make available to the public copies of works, performances, or phonograms, knowing that electronic rights management information has been removed or altered without authority.

153

3.    In providing adequate legal protection and effective legal remedies pursuant to paragraph 2, a Party may adopt or maintain appropriate limitations or exceptions to measures implementing paragraph 2. The obligations set forth in paragraph 2 are without prejudice to the rights, limitations, exceptions, or defences to copyright or related rights infringement under the law of a Party.

*Article 20.11*

**Liability of intermediary service providers**

1.    Subject to the other paragraphs of this Article, each Party shall provide limitations or exceptions in its law regarding the liability of service providers, when acting as intermediaries, for infringements of copyright or related rights that take place on or through communication networks, in relation to the provision or use of their services.

2.    The limitations or exceptions referred to in paragraph 1:

(a)    shall cover at least the following functions:

(i)    hosting of the information at the request of a user of the hosting services;

(ii)    caching carried out through an automated process, when the service provider:

(A)    does not modify the information other than for technical reasons;

(B)    ensures that any directions related to the caching of the information that are specified in a manner widely recognised and used by industry are complied with; and

(C)    does not interfere with the use of technology that is lawful and widely recognised and used by the industry in order to obtain data on the use of the information; and

(iii)    mere conduit, which consists of the provision of the means to transmit information provided by a user, or the means of access to a communication network; and

(b)    may also cover other functions, including providing an information location tool, by making reproductions of copyright material in an automated manner, and communicating the reproductions.

3.    The eligibility for the limitations or exceptions referred to in this Article may not be conditioned on the service provider monitoring its service, or affirmatively seeking facts indicating infringing activity.

4.    Each Party may prescribe in its domestic law, conditions for service providers to qualify for the limitations or exceptions in this Article. Without prejudice to the above, each Party may establish appropriate procedures for effective notifications of claimed infringement, and effective counter-notifications by those whose material is removed or disabled through mistake or misidentification.

5.    This Article is without prejudice to the availability in the law of a Party of other defences, limitations and exceptions to the infringement of copyright or related rights. This Article shall not affect the possibility of a court or administrative

authority, in accordance with the legal system of a Party, of requiring the service provider to terminate or prevent an infringement.

### *Article 20.12*

### Camcording

Each Party may provide for criminal procedures and penalties to be applied in accordance with its laws and regulations against a person who, without authorisation of the theatre manager or the holder of the copyright in a cinematographic work, makes a copy of that work or any part thereof, from a performance of the work in a motion picture exhibition facility open to the public.

### Sub-section B

### Trademarks

### *Article 20.13*

### International agreements

Each Party shall make all reasonable efforts to comply with Articles 1 through 22 of the *Singapore Treaty on the Law of Trademarks*, done at Singapore on 27 March 2006, and to accede to the *Protocol Relating to the Madrid Agreement Concerning the International Registration of Marks*, done at Madrid on 27 June 1989.

### *Article 20.14*

### Registration procedure

Each Party shall provide for a system for the registration of trademarks in which reasons for the refusal to register a trademark are communicated in writing to the applicant, who will have the opportunity to contest that refusal and to appeal a final refusal to a judicial authority. Each Party shall provide for the possibility of filing oppositions either against trademark applications or against trademark registrations. Each Party shall provide a publicly available electronic database of trademark applications and trademark registrations.

### *Article 20.15*

### Exceptions to the rights conferred by a trademark

Each Party shall provide for the fair use of descriptive terms, including terms descriptive of geographical origin, as a limited exception to the rights conferred by a trademark. In determining what constitutes fair use, account shall be taken of the legitimate interests of the owner of the trademark and of third parties. Each Party may provide other limited exceptions, provided that these exceptions take account of the legitimate interests of the owner of the trademark and of third parties.

### Sub-section C

### Geographical Indications

*Article 20.16*

**Definitions**

For the purposes of this Sub-section:

**geographical indication** means an indication which identifies an agricultural product or foodstuff as originating in the territory of a Party, or a region or locality in that territory, where a given quality, reputation or other characteristic of the product is essentially attributable to its geographical origin; and

**product class** means a product class listed in Annex 20-C.

*Article 20.17*

**Scope**

This Sub-section applies to geographical indications identifying products falling within one of the product classes listed in Annex 20-C.

*Article 20.18*

**Listed geographical indications**

For the purposes of this Sub-section:

(a)     the indications listed in Part A of Annex 20-A are geographical indications which identify a product as originating in the territory of the European Union or a region or locality in that territory; and

(b)     the indications listed in Part B of Annex 20-A are geographical indications which identify a product as originating in the territory of Canada or a region or locality in that territory.

*Article 20.19*

**Protection for geographical indications listed in Annex 20-A**

1     Having examined the geographical indications of the other Party, each Party shall protect them according to the level of protection set out in this Sub-section.

2.     Each Party shall provide the legal means for interested parties to prevent:

(a)     the use of a geographical indication of the other Party listed in Annex 20-A for a product that falls within the product class specified in Annex 20-A for that geographical indication and that either:

(i)     does not originate in the place of origin specified in Annex 20-A for that geographical indication; or

(ii)     does originate in the place of origin specified in Annex 20-A for that geographical indication but was not produced or manufactured in accordance with the laws and regulations of the other Party that would apply if the product were for consumption in the other Party;

(b)     the use of any means in the designation or presentation of a good that indicates or suggests that the good in question originates in a geographical area other

than the true place of origin in a manner which misleads the public as to the geographical origin of the good; and

(c) any other use which constitutes an act of unfair competition within the meaning of Article 10bis of the *Paris Convention for the Protection of Industrial Property* (1967) done at Stockholm on 14 July 1967.

3. The protection referred to in sub-paragraph 2(a) shall be provided even where the true origin of the product is indicated or the geographical indication is used in translation or accompanied by expressions such as "kind", "type", "style", "imitation" or the like.

4. Each Party shall provide for enforcement by administrative action, to the extent provided for by its law, to prohibit a person from manufacturing, preparing, packaging, labelling, selling or importing or advertising a food commodity in a manner that is false, misleading or deceptive or is likely to create an erroneous impression regarding its origin.

5. In accordance with paragraph 4, each Party will provide for administrative action in respect of complaints related to the labelling of products, including their presentation, in a manner that is false, misleading or deceptive or is likely to create an erroneous impression regarding their origin.

6. The registration of a trademark which contains or consists of a geographical indication of the other Party listed in Annex 20-A shall be refused or invalidated, *ex officio* if a Party's legislation so permits or at the request of an interested party, with respect to a product that falls within the product class specified in Annex 20-A for that geographical indication and that does not originate in the place of origin specified in Annex 20-A for that geographical indication.

7. There shall be no obligation under this Sub-section to protect geographical indications which are not or cease to be protected in their place of origin, or which have fallen into disuse in that place. If a geographical indication of a Party listed in Annex 20-A ceases to be protected in its place of origin or falls into disuse in that place, that Party shall notify the other Party and request cancellation.

*Article 20.20*

**Homonymous geographical indications**

1. In the case of homonymous geographical indications of the Parties for products falling within the same product class, each Party shall determine the practical conditions under which the homonymous indications in question will be differentiated from each other, taking into account the need to ensure equitable treatment of the producers concerned and that consumers are not misled.

2. If a Party, in the context of negotiations with a third country, proposes to protect a geographical indication identifying a product originating in the third country, if that indication is homonymous with a geographical indication of the other Party listed in Annex 20-A and if that product falls within the product class specified in Annex 20-A for the homonymous geographical indication of the other Party, the other Party shall be informed and be given the opportunity to comment before the geographical indication becomes protected.

*Article 20.21*

**Exceptions**

1.  Notwithstanding Articles 20.19.2 and 20.19.3, Canada shall not be required to provide the legal means for interested parties to prevent the use of the terms listed in Part A of Annex 20-A and identified by one asterisk[26] when the use of such terms is accompanied by expressions such as "kind", "type", "style", "imitation" or the like and is in combination with a legible and visible indication of the geographical origin of the product concerned.

2.  Notwithstanding Articles 20.19.2 and 20.19.3, the protection of the geographical indications listed in Part A of Annex 20-A and identified by one asterisk[27] shall not prevent the use in the territory of Canada of any of these indications by any persons, including their successors and assignees, who made commercial use of those indications with regard to products in the class of "cheeses" preceding the date of 18 October 2013.

3.  Notwithstanding Articles 20.19.2 and 20.19.3, the protection of the geographical indication listed in Part A of Annex 20-A and identified by two asterisks shall not prevent the use of this indication by any persons, including their successors and assignees, who made commercial use of this indication with regard to products in the class of "fresh, frozen and processed meats" for at least five years preceding the date of 18 October 2013. A transitional period of five years from the entry into force of this Article, during which the use of the above indication shall not be prevented, shall apply to any other persons, including their successors and assignees, who made commercial use of those indications with regard to products in the class of "fresh, frozen and processed meats", for less than five years preceding the date of 18 October 2013.

4.  Notwithstanding Articles 20.19.2 and 20.19.3, the protection of the geographical indications listed in Part A of Annex 20-A and identified by three asterisks shall not prevent the use of those indications by any persons, including their successors and assignees, who made commercial use of those indications with regard to products in the classes of "dry-cured meats" and "cheeses", respectively, for at least ten years preceding the date of 18 October 2013. A transitional period of five years from the entry into force of this Article, during which the use of the above indications shall not be prevented, shall apply to any other persons, including their successors and assignees, who made commercial use of those indications with regard to products in the class of "dry-cured meats" and "cheeses", respectively, for less than ten years preceding the date of 18 October 2013.

5.  If a trademark has been applied for or registered in good faith, or if rights to a trademark have been acquired through use in good faith, in a Party before the applicable date set out in paragraph 6, measures adopted to implement this Sub-section in that Party shall not prejudice the eligibility for or the validity of the registration of the trademark, or the right to use the trademark, on the basis that the trademark is identical with, or similar to, a geographical indication.

6.  For the purposes of paragraph 5 the applicable date is:

---

[26]    For greater certainty, this paragraph applies equally to the term "Feta".
[27]    For greater certainty, this paragraph applies equally to the term "Feta".

(a)  in respect of a geographical indication listed in Annex 20-A on the date of signing of this Agreement, the date of coming into force of this Sub-section; or

(b)  in respect of a geographical indication added to Annex 20-A after the date of signing of this Agreement pursuant to Article 20.22, the date on which the geographical indication is added.

7.  If a translation of a geographical indication is identical with or contains within it a term customary in common language as the common name for a product in the territory of a Party, or if a geographical indication is not identical with but contains within it such a term, the provisions of this Sub-section shall not prejudice the right of any person to use that term in association with that product in the territory of that Party.

8.  Nothing shall prevent the use in the territory of a Party, with respect to any product, of a customary name of a plant variety or an animal breed, existing in the territory of that Party as of the date of entry into force of this Sub-section.

9.  A Party may provide that any request made under this Sub-section in connection with the use or registration of a trademark must be presented within five years after the adverse use of the protected indication has become generally known in that Party or after the date of registration of the trademark in that Party provided that the trademark has been published by that date, if such date is earlier than the date on which the adverse use became generally known in that Party, provided that the geographical indication is not used or registered in bad faith.

10.  The provisions of this Sub-section shall not prejudice the right of any person to use, in the course of trade, that person's name or the name of that person's predecessor in business, except where such name is used in such a manner as to mislead the public.

11.  (a)  The provisions of this Sub-section shall not prejudice the right of any person to use, or to register in Canada a trademark containing or consisting of, any of the terms listed in Part A of Annex 20-B; and

(b)  Sub-paragraph (a) does not apply to the terms listed in Part A of Annex 20-B in respect of any use that would mislead the public as to the geographical origin of the goods.

12.  The use in Canada of the terms listed in Part B of Annex 20-B shall not be subject to the provisions of this Sub-section.

13.  An assignment as referred to in paragraphs 2 through 4 does not include the transfer of the right to use a geographical indication on its own.

*Article 20.22*

**Amendments to Annex 20-A**

1.  The CETA Joint Committee, established under Article 26.1 (The CETA Joint Committee), acting by consensus and on a recommendation by the CETA Committee on Geographical Indications, may decide to amend Annex 20-A by adding geographical indications or by removing geographical indications which have ceased to be protected or have fallen into disuse in their place of origin.

2.      A geographical indication shall not in principle be added to Part A of Annex 20-A, if it is a name that on the date of the signing of this Agreement is listed in the relevant Register of the European Union with a status of "Registered", in respect of a Member State of the European Union.

3.      A geographical indication identifying a product originating in a particular Party shall not be added to Annex 20-A:

(a)    if it is identical to a trademark that has been registered in the other Party in respect of the same or similar products, or to a trademark in respect of which in the other Party rights have been acquired through use in good faith and an application has been filed in respect of the same or similar products;

(b)    if it is identical to the customary name of a plant variety or an animal breed existing in the other Party; or

(c)    if it is identical with the term customary in common language as the common name for such product in the other Party.

*Article 20.23*

**Other protection**

The provisions of this Sub-section are without prejudice to the right to seek recognition and protection of a geographical indication under the relevant law of a Party.

Sub-section D

**Designs**

*Article 20.24*

**International agreements**

Each Party shall make all reasonable efforts to accede to the *Geneva Act of the Hague Agreement Concerning the International Registration of Industrial Designs*, done at Geneva on 2 July 1999.

*Article 20.25*

**Relationship to copyright**

The subject matter of a design right may be protected under copyright law if the conditions for this protection are met. The extent to which, and the conditions under which, such a protection is conferred, including the level of originality required, shall be determined by each Party.

Sub-section E

**Patents**

*Article 20.26*

**International agreements**

160

Each Party shall make all reasonable efforts to comply with Articles 1 through 14 and Article 22 of the *Patent Law Treaty,* done at Geneva on 1 June 2000.

*Article 20.27*

***Sui generis* protection for pharmaceuticals**

1.  For the purposes of this Article:

    **basic patent** means a patent which protects a product as such, a process to obtain a product or an application of a product, and which has been designated by the holder of a patent that may serve as a basic patent, as the basic patent for the purpose of the granting of *sui generis* protection; and

    **product** means the active ingredient or combination of active ingredients of a pharmaceutical product.

2.  Each Party shall provide a period of *sui generis* protection in respect of a product that is protected by a basic patent in force at the request of the holder of the patent or his successor in title, provided the following conditions have been met:

    (a)  an authorisation has been granted to place the product on the market of that Party as a pharmaceutical product (referred to as "marketing authorisation" in this Article);

    (b)  the product has not already been the subject of a period of *sui generis* protection; and

    (c)  the marketing authorisation referred to in sub-paragraph (a) is the first authorisation to place the product on the market of that Party as a pharmaceutical product.

3.  Each Party may:

    (a)  provide a period of *sui generis* protection only if the first application for the marketing authorisation is submitted within a reasonable time limit prescribed by that Party; and

    (b)  prescribe a time limit of no less than 60 days from the date on which the first marketing authorisation was granted for the submission of the request for the period of *sui generis* protection. However, where the first marketing authorisation is granted before the patent is granted, each Party will provide a period of at least 60 days from the grant of the patent during which the request for a period of protection under this Article may be submitted.

4.  In the case where a product is protected by one basic patent, the period of *sui generis* protection shall take effect at the end of the lawful term of that patent.

    In the case where a product is protected by more than one patent that may serve as a basic patent, a Party may provide for only a single period of *sui generis* protection, which takes effect at the end of the lawful term of the basic patent,

    (a)  in the case where all the patents that may serve as a basic patent are held by the same person, selected by the person requesting the period of *sui generis* protection; and

161

(b)    in the case where the patents that may serve as a basic patent are not held by the same person and this gives rise to conflicting requests for the *sui generis* protection, selected by agreement between the patent holders.

5.    Each Party shall provide that the period of *sui generis* protection be for a period equal to the period which elapsed between the date on which the application for the basic patent was filed and the date of the first marketing authorisation, reduced by a period of five years.

6.    Notwithstanding paragraph 5 and without prejudice to a possible extension of the period of *sui generis* protection by a Party as an incentive or a reward for research in certain target populations, such as children, the duration of the *sui generis* protection may not exceed a period of two to five years, to be established by each Party.

7.    Each Party may provide that the period of *sui generis* protection shall lapse:

(a)    if the *sui generis* protection is surrendered by the beneficiary; or

(b)    if any prescribed administrative fees are not paid.

Each Party may reduce the period of *sui generis* protection commensurate with any unjustified delays resulting from the inactions of the applicant after applying for the market authorisation, when the holder of the basic patent is the applicant for market authorisation or an entity related to it.

8.    Within the limits of the protection conferred by the basic patent, the *sui generis* protection shall extend only to the pharmaceutical product covered by the marketing authorisation and for any use of that product as a pharmaceutical product that has been authorised before the expiry of the *sui generis* protection. Subject to the preceding sentence, the *sui generis* protection shall confer the same rights as conferred by the patent and shall be subject to the same limitations and obligations.

9.    Notwithstanding paragraphs 1 through 8, each Party may also limit the scope of the protection by providing exceptions for the making, using, offering for sale, selling or importing of products for the purpose of export during the period of protection.

10.    Each Party may revoke the *sui generis* protection on grounds relating to invalidity of the basic patent, including if that patent has lapsed before its lawful term expires or is revoked or limited to the extent that the product for which the protection was granted would no longer be protected by the claims of the basic patent, or on grounds relating to the withdrawal of the marketing authorisation or authorisations for the respective market, or if the protection was granted contrary to the provisions of paragraph 2.

*Article 20.28*

**Patent linkage mechanisms relating to pharmaceutical products**

If a Party relies on "patent linkage" mechanisms whereby the granting of marketing authorisations (or notices of compliance or similar concepts) for generic pharmaceutical products is linked to the existence of patent protection, it shall ensure that all litigants are afforded equivalent and effective rights of appeal.

Sub-section F

**Data Protection**

162

*Article 20.29*

**Protection of undisclosed data related to pharmaceutical products**

1.      If a Party requires, as a condition for authorising the marketing of pharmaceutical products that utilise new chemical entities[28] (referred to as "authorisation" in this Article) the submission of undisclosed test or other data necessary to determine whether the use of those products is safe and effective, the Party shall protect such data against disclosure, if the origination of such data involves considerable effort, except where the disclosure is necessary to protect the public or unless steps are taken to ensure that the data are protected against unfair commercial use.

2.      Each Party shall provide that for data subject to paragraph 1 that are submitted to the Party after the date of entry into force of this Agreement:

    (a)    no person other than the person who submitted them may, without the latter's permission, rely on such data in support of an application for an authorisation during a period of not less than six years from the date on which the Party granted authorisation to the person that produced the data for authorisation; and

    (b)    a Party shall not grant an authorisation to any person who relies on such data during a period of not less than eight years from the date on which the Party granted the authorisation to the person that produced the data for the authorisation, unless the person that produced these data provides permission.

    Subject to this paragraph, there shall be no limitation on either Party to implement abbreviated authorisation procedures for such products on the basis of bioequivalence and bioavailability studies.

*Article 20.30*

**Protection of data related to plant protection products**

1.      Each Party shall determine safety and efficacy requirements before authorising the placing on the market of a plant protection product (referred to as "authorisation" in this Article).

2.      Each Party shall provide a limited period of data protection for a test or study report submitted for the first time to obtain an authorisation. During such period, each Party shall provide that the test or study report will not be used for the benefit of any other person aiming to obtain an authorisation, except when the explicit consent of the first authorisation holder is proved.

3.      The test or study report should be necessary for the authorisation or for an amendment of an authorisation in order to allow the use on other crops.

4.      In each Party, the period of data protection shall be at least ten years starting at the date of the first authorisation in that Party with respect to the test or study report supporting the authorisation of a new active ingredient and data supporting the concurrent registration of the end-use product containing the active ingredient. The

---

[28]    For greater certainty, with respect to data protection, a "chemical entity" in Canada includes a biologic or radiopharmaceutical which is regulated as a new drug under the Food and Drug Regulations of Canada.

duration of protection may be extended in order to encourage the authorisation of low-risk plant protection products and minor uses.

5.    Each Party may also establish data protection requirements or financial compensation requirements for the test or study report supporting the amendment or renewal of an authorisation.

6.    Each Party shall establish rules to avoid duplicative testing on vertebrate animals. Any applicant intending to perform tests and studies involving vertebrate animals should be encouraged to take the necessary measures to verify that those tests and studies have not already been performed or initiated.

7.    Each Party should encourage each new applicant and each holder of the relevant authorisations to make every effort to ensure that they share tests and studies involving vertebrate animals. The costs of sharing such test and study reports shall be determined in a fair, transparent and non-discriminatory way. An applicant is only required to share in the costs of information that the applicant is required to submit to meet the authorisation requirements.

8.    The holder or holders of the relevant authorisation shall have a right to be compensated for a fair share of the costs incurred by them in respect of the test or study report that supported such authorisation by an applicant relying on such test and study reports to obtain an authorisation for a new plant protection product. Each Party may direct the parties involved to resolve any issue by binding arbitration administered under its law.

Sub-section G

**Plant Varieties**

*Article 20.31*

**Plant varieties**

Each Party shall co-operate to promote and reinforce the protection of plant varieties on the basis of the 1991 Act of the *International Convention for the Protection of New Varieties of Plants*, done at Paris on 2 December 1961.

*SECTION C*

*Enforcement of Intellectual Property Rights*

*Article 20.32*

**General obligations**

1.    Each Party shall ensure that procedures for the enforcement of intellectual property rights are fair and equitable, and are not unnecessarily complicated or costly, nor entail unreasonable time-limits or unwarranted delays. These procedures shall be applied in such a manner as to avoid the creation of barriers to legitimate trade and to provide for safeguards against their abuse.

2.      In implementing the provisions of this Section, each Party shall take into account the need for proportionality between the seriousness of the infringement, the interests of third parties, and the applicable measures, remedies and penalties.

3.      Articles 20.33 through 20.42 relate to civil enforcement.

4.      For the purposes of Articles 20.33 through 20.42, unless otherwise provided, **intellectual property rights** means all categories of intellectual property that are the subject of Sections 1 through 7 of Part II of the TRIPS Agreement.

### *Article 20.33*

### **Entitled applicants**

Each Party shall recognise as persons entitled to seek application of the procedures and remedies referred to in Articles 20.34 through 20.42:

(a)      the holders of intellectual property rights in accordance with the provisions of its law;

(b)      all other persons authorised to use those rights, if those persons are entitled to seek relief in accordance with its law;

(c)      intellectual property collective rights management bodies that are regularly recognised as having a right to represent holders of intellectual property rights, if those bodies are entitled to seek relief in accordance with its law; and

(d)      professional defence bodies that are regularly recognised as having a right to represent holders of intellectual property rights, if those bodies are entitled to seek relief in accordance with its law.

### *Article 20.34*

### **Evidence**

Each Party shall ensure that, in the case of an alleged infringement of an intellectual property right committed on a commercial scale, the judicial authorities shall have the authority to order, if appropriate and following an application, the production of relevant information, as provided for in its law, including banking, financial or commercial documents under the control of the opposing party, subject to the protection of confidential information.

### *Article 20.35*

### **Measures for preserving evidence**

1.      Each Party shall ensure that, even before the commencement of proceedings on the merits of the case, the judicial authorities may, on application by an entity that has presented reasonably available evidence to support its claims that its intellectual property right has been infringed or is about to be infringed, order prompt and effective provisional measures to preserve relevant evidence in respect of the alleged infringement, subject to the protection of confidential information.

2.      Each Party may provide that the measures referred to in paragraph 1 include the detailed description, with or without the taking of samples, or the physical seizure of the alleged infringing goods, and, in appropriate cases, the materials and implements

used in the production or distribution of these goods and the documents relating thereto. The judicial authorities shall have the authority to take those measures, if necessary without the other party being heard, in particular where any delay is likely to cause irreparable harm to the right holder or where there is a demonstrable risk of evidence being destroyed.

### Article 20.36

### Right of information

Without prejudice to its law governing privilege, the protection of confidentiality of information sources or the processing of personal data, each Party shall provide that, in civil judicial proceedings concerning the enforcement of intellectual property rights, its judicial authorities shall have the authority, upon a justified request of the right holder, to order the infringer or the alleged infringer, to provide to the right holder or to the judicial authorities, at least for the purpose of collecting evidence, relevant information as provided for in its applicable laws and regulations that the infringer or alleged infringer possesses or controls. This information may include information regarding any person involved in any aspect of the infringement or alleged infringement and regarding the means of production or the channels of distribution of the infringing or allegedly infringing goods or services, including the identification of third persons alleged to be involved in the production and distribution of those goods or services and of their channels of distribution.

### Article 20.37

### Provisional and precautionary measures

1. Each Party shall provide that its judicial authorities have the authority to order prompt and effective provisional and precautionary measures, including an interlocutory injunction, against a party, or where appropriate, against a third party over whom the relevant judicial authority exercises jurisdiction, to prevent an infringement of an intellectual property right from occurring, and in particular, to prevent infringing goods from entering into the channels of commerce.

2. Each Party shall provide that its judicial authorities have the authority to order the seizure or other taking into custody of the goods suspected of infringing an intellectual property right so as to prevent their entry into or movement within the channels of commerce.

3. Each Party shall provide that, in the case of an alleged infringement of an intellectual property right committed on a commercial scale, the judicial authorities may order, in accordance with its law, the precautionary seizure of property of the alleged infringer, including the blocking of its bank accounts and other assets. To that end, the judicial authorities may order the communication of relevant bank, financial or commercial documents, or access to other relevant information, as appropriate.

### Article 20.38

### Other remedies

1. Each Party shall ensure that the judicial authorities may order, at the request of the applicant and without prejudice to any damages due to the right holder by reason of

the infringement, and without compensation of any sort, the definitive removal from the channels of commerce, or the destruction, of goods that they have found to be infringing an intellectual property right. Each Party shall ensure that the judicial authorities may order, if appropriate, destruction of materials and implements predominantly used in the creation or manufacture of those goods. In considering a request for such remedies, the need for proportionality between the seriousness of the infringement and the remedies ordered, as well as the interests of third parties, shall be taken into account.

2.    Each Party shall ensure that the judicial authorities have the authority to order that the remedies referred to in paragraph 1 shall be carried out at the expense of the infringer, unless particular reasons are invoked for not doing so.

## Article 20.39

### Injunctions

1.    Each Party shall provide that, in civil judicial proceedings concerning the enforcement of intellectual property rights, its judicial authorities have the authority to issue an order against a party to desist from an infringement, and among other things, an order to that party, or, where appropriate, to a third party over whom the relevant judicial authority exercises jurisdiction, to prevent infringing goods from entering into the channels of commerce.

2.    Notwithstanding the other provisions of this Section, a Party may limit the remedies available against use by government, or by third parties authorised by government, without the use of authorisation of the right holders to the payment of remuneration provided that the Party complies with the provisions of Part II of the TRIPS Agreement specifically addressing such use. In other cases, the remedies under this Section shall apply or, where these remedies are inconsistent with a Party's law, declaratory judgments and adequate compensation shall be available.

## Article 20.40

### Damages

1.    Each Party shall provide that:

(a)    in civil judicial proceedings, its judicial authorities have the authority to order the infringer who knowingly or with reasonable grounds to know, engaged in infringing activity of intellectual property rights to pay the right holder:

(i)    damages adequate to compensate for the injury the right holder has suffered as a result of the infringement; or

(ii)    the profits of the infringer that are attributable to the infringement, which may be presumed to be the amount of damages referred to in paragraph (i); and

(b)    in determining the amount of damages for infringements of intellectual property rights, its judicial authorities may consider, among other things, any legitimate measure of value that may be submitted by the right holder, including lost profits.

2.    As an alternative to paragraph 1, a Party's law may provide for the payment of remuneration, such as a royalty or fee, to compensate a right holder for the unauthorised use of the right holder's intellectual property.

### Article 20.41

### Legal costs

Each Party shall provide that its judicial authorities, where appropriate, have the authority to order, at the conclusion of civil judicial proceedings concerning the enforcement of intellectual property rights, that the prevailing party be awarded payment by the losing party of legal costs and other expenses, as provided for under that Party's law.

### Article 20.42

### Presumption of authorship or ownership

1.    For the purposes of civil proceedings involving copyright or related rights, it is sufficient for the name of an author of a literary or artistic work to appear on the work in the usual manner in order for that author to be regarded as such, and consequently to be entitled to institute infringement proceedings, unless there is proof to the contrary. Proof to the contrary may include registration.

2.    Paragraph 1 shall apply *mutatis mutandis* to the holders of related rights with regard to the protected subject matter of such rights.

### SECTION D

### Border Measures

### Article 20.43

### Scope of border measures

1.    For the purposes of this Section:

**counterfeit geographical indication goods** means any goods under Article 20.17 falling within one of the product classes listed in Annex 20-C, including packaging, bearing without authorisation, a geographical indication which is identical to the geographical indication validly registered or otherwise protected in respect of such goods and which infringes the rights of the owner or right holder of the geographical indication in question under the law of the Party in which the border measure procedures are applied;

**counterfeit trademark goods** means any goods, including packaging, bearing, without authorisation, a trademark which is identical to the trademark validly registered in respect of such goods, or which cannot be distinguished in its essential aspects from such a trademark, and which infringes the rights of the owner of the trademark in question under the law of the Party in which the border measures procedures are applied;

**export shipments** means shipments of goods which are to be taken from the territory of a Party to a place outside that territory, excluding shipments in customs transit and transhipments;

168

**import shipments** means shipments of goods brought into the territory of a Party from a place outside that territory, while those goods remain under customs control, including goods brought into the territory to a free zone or customs warehouse, but excludes shipments in customs transit and transhipments;

**pirated copyright goods** means any goods which are copies made without the consent of the right holder or person duly authorised by the right holder in the country of production and which are made directly or indirectly from an article where the making of that copy would have constituted an infringement of a copyright or a related right under the law of the Party in which the border measure procedures are applied;

**shipments in customs transit** means shipments of goods that enter the territory of a Party from a place outside that territory and are authorised by customs authorities for transport under continuous customs control from an office of entry to an office of exit, for the purpose of exiting the territory. Shipments in customs transit that are subsequently approved for removal from customs control without exiting the territory are considered to be import shipments; and

**transhipments** means shipments of goods that are transferred under customs control from the importing means of transport to the exporting means of transport within the area of one customs office which is the office of both importation and exportation.

2. The references to the infringement of intellectual property rights in this Section shall be interpreted as referring to instances of counterfeit trademark goods, pirated copyright goods or counterfeit geographical indication goods.

3. It is the understanding of the Parties that there shall be no obligation to apply the procedures set forth in this Section to goods put on the market in another country by or with the consent of the right holder.

4. Each Party shall adopt or maintain procedures with respect to import and export shipments under which a right holder may request its competent authorities to suspend the release of, or detain, goods suspected of infringing an intellectual property right.

5. Each Party shall adopt or maintain procedures with respect to import and export shipments under which its competent authorities may act on their own initiative to temporarily suspend the release of, or detain, goods suspected of infringing an intellectual property right, in order to provide an opportunity to right holders to formally request assistance under paragraph 4.

6. Each Party may enter into an arrangement with one or more third countries to establish common security customs clearance procedures. Goods cleared pursuant to the terms of the common customs procedures of such an arrangement shall be deemed to be in compliance with paragraphs 4 and 5, provided the Party concerned retains the legal authority to comply with these paragraphs.

7. Each Party may adopt or maintain the procedures referred to in paragraphs 4 and 5 with respect to transhipments and shipments in customs transit.

8. Each Party may exclude from the application of this Article small quantities of goods of a non-commercial nature contained in travellers' personal luggage or small quantities of goods of a non-commercial nature sent in small consignments.

*Article 20.44*

**Application by the right holder**

1.    Each Party shall provide that its competent authorities require a right holder who requests the procedures described in Article 20.43 to provide adequate evidence to satisfy the competent authorities that, under the law of the Party providing the procedures, there is *prima facie* an infringement of the right holder's intellectual property right, and to supply sufficient information that may reasonably be expected to be within the right holder's knowledge to make the suspect goods reasonably recognisable by the competent authorities. The requirement to provide sufficient information shall not unreasonably deter recourse to the procedures described in Article 20.43.

2.    Each Party shall provide for applications to suspend the release of, or to detain, goods suspected of infringing an intellectual property right listed in Article 20.43, under customs control in its territory. The requirement to provide for such applications is subject to the obligations to provide procedures referred to in Articles 20.43.4 and 20.43.5. The competent authorities may provide for such applications to apply to multiple shipments. Each Party may provide that, at the request of the right holder, the application to suspend the release of, or to detain, suspect goods may apply to selected points of entry and exit under customs control.

3.    Each Party shall ensure that its competent authorities inform the applicant within a reasonable period whether they have accepted the application. Where its competent authorities have accepted the application, they shall also inform the applicant of the period of validity of the application.

4.    Each Party may provide that, where the applicant has abused the procedures described in Article 20.43, or where there is due cause, its competent authorities have the authority to deny, suspend, or void an application.

*Article 20.45*

**Provision of information from the right holder**

Each Party shall permit its competent authorities to request a right holder to supply relevant information that may reasonably be expected to be within the right holder's knowledge to assist the competent authorities in taking the border measures referred to in this Section. Each Party may also allow a right holder to supply such information to its competent authorities.

*Article 20.46*

**Security or equivalent assurance**

1.    Each Party shall provide that its competent authorities have the authority to require a right holder who requests the procedures described in Article 20.43 to provide reasonable security or equivalent assurance sufficient to protect the defendant and the competent authorities and to prevent abuse. Each Party shall provide that such security or equivalent assurance shall not unreasonably deter recourse to these procedures.

2.  Each Party may provide that such security may be in the form of a bond conditioned to hold the defendant harmless from any loss or damage resulting from any suspension of the release of, or detention of, the goods in the event the competent authorities determine that the goods are not infringing. A Party may, only in exceptional circumstances or pursuant to a judicial order, permit the defendant to obtain possession of suspect goods by posting a bond or other security.

*Article 20.47*

**Determination as to infringement**

Each Party shall adopt or maintain procedures by which its competent authorities may determine, within a reasonable period after the initiation of the procedures described in Article 20.43, whether the suspect goods infringe an intellectual property right.

*Article 20.48*

**Remedies**

1.  Each Party shall provide that its competent authorities have the authority to order the destruction of goods following a determination referred to in Article 20.47 that the goods are infringing. In cases where such goods are not destroyed, each Party shall ensure that, except in exceptional circumstances, such goods are disposed of outside the channels of commerce, in such a manner as to avoid any harm to the right holder.

2.  In respect of counterfeit trademark goods, the simple removal of the trademark unlawfully affixed shall not be sufficient, other than in exceptional cases, to permit release of the goods into the channels of commerce.

3.  Each Party may provide that its competent authorities have the authority to impose administrative penalties following a determination referred to in Article 20.47 that the goods are infringing.

*Article 20.49*

**Specific cooperation in the area of border measures**

1.  Each Party agrees to cooperate with the other Party with a view to eliminating international trade in goods infringing intellectual property rights. For this purpose, each Party shall establish contact points in its administration and be ready to exchange information on trade in infringing goods. Each Party shall, in particular, promote the exchange of information and cooperation between its customs authorities and those of the other Party with regard to trade in goods infringing intellectual property rights.

2.  The cooperation referred to in paragraph 1 may include exchanges of information regarding mechanisms for receiving information from rights holders, best practices, and experiences with risk management strategies, as well as information to aid in the identification of shipments suspected of containing infringing goods.

3.  The cooperation under this Section shall be conducted consistent with relevant international agreements that are binding on both Parties. The Joint Customs Cooperation Committee referred to in Article 6.14 (Joint Customs Cooperation

Committee) will set the priorities and provide for the adequate procedures for cooperation under this Section between the competent authorities of the Parties.

*SECTION E*

***Co-operation***

*Article 20.50*

**Co-operation**

1.      Each Party agrees to co-operate with the other Party with a view to supporting the implementation of the commitments and obligations undertaken under this Chapter. Areas of co-operation include exchanges of information or experience on the following:

(a)      the protection and enforcement of intellectual property rights, including geographical indications; and

(b)      the establishment of arrangements between their respective collecting societies.

2.      Pursuant to paragraph 1, each Party agrees to establish and maintain an effective dialogue on intellectual property issues to address topics relevant to the protection and enforcement of intellectual property rights covered by this Chapter, and any other relevant issue.

# CHAPTER TWENTY-ONE

## REGULATORY COOPERATION

*Article 21.1*

### Scope

This Chapter applies to the development, review and methodological aspects of regulatory measures of the Parties' regulatory authorities that are covered by, among others, the TBT Agreement, the SPS Agreement, the GATT 1994, the GATS, and Chapters Four (Technical Barriers to Trade), Five (Sanitary and Phytosanitary Measures), Nine (Cross-Border Trade in Services), Twenty-Two (Trade and Sustainable Development), Twenty-Three (Trade and Labour) and Twenty-Four (Trade and Environment).

*Article 21.2*

### Principles

1.  The Parties reaffirm their rights and obligations with respect to regulatory measures under the TBT Agreement, the SPS Agreement, the GATT 1994 and the GATS.

2.  The Parties are committed to ensure high levels of protection for human, animal and plant life or health, and the environment in accordance with the TBT Agreement, the SPS Agreement, the GATT 1994, the GATS, and this Agreement.

3.  The Parties recognise the value of regulatory cooperation with their relevant trading partners both bilaterally and multilaterally. The Parties will, whenever practicable and mutually beneficial, approach regulatory cooperation in a way that is open to participation by other international trading partners.

4.  Without limiting the ability of each Party to carry out its regulatory, legislative and policy activities, the Parties are committed to further develop regulatory cooperation in light of their mutual interest in order to:

    (a)  prevent and eliminate unnecessary barriers to trade and investment;

    (b)  enhance the climate for competitiveness and innovation, including by pursuing regulatory compatibility, recognition of equivalence, and convergence; and

    (c)  promote transparent, efficient and effective regulatory processes that support public policy objectives and fulfil the mandates of regulatory bodies, including through the promotion of information exchange and enhanced use of best practices.

5.  This Chapter replaces the Framework on Regulatory Co-operation and Transparency between the Government of Canada and the European Commission, done at Brussels on 21 December 2004, and governs the activities previously undertaken in the context of that Framework.

6.  The Parties may undertake regulatory cooperation activities on a voluntary basis. For greater certainty, a Party is not required to enter into any particular regulatory cooperation activity, and may refuse to cooperate or may withdraw from cooperation. However, if a Party refuses to initiate regulatory cooperation or withdraws from

cooperation, it should be prepared to explain the reasons for its decision to the other Party.

*Article 21.3*

**Objectives of regulatory cooperation**

The objectives of regulatory cooperation include to:

(a)    contribute to the protection of human life, health or safety, animal or plant life or health and the environment by:

  (i)    leveraging international resources in areas such as research, pre-market review and risk analysis to address important regulatory issues of local, national and international concern; and

  (ii)    contributing to the base of information used by regulatory departments to identify, assess and manage risks;

(b)    build trust, deepen mutual understanding of regulatory governance and obtain from each other the benefit of expertise and perspectives in order to:

  (i)    improve the planning and development of regulatory proposals;

  (ii)    promote transparency and predictability in the development and establishment of regulations;

  (iii)    enhance the efficacy of regulations;

  (iv)    identify alternative instruments;

  (v)    recognise the associated impacts of regulations;

  (vi)    avoid unnecessary regulatory differences; and

  (vii)    improve regulatory implementation and compliance;

(c)    facilitate bilateral trade and investment in a way that:

  (i)    builds on existing cooperative arrangements;

  (ii)    reduces unnecessary differences in regulation; and

  (iii)    identifies new ways of working for cooperation in specific sectors; or

(d)    contribute to the improvement of competitiveness and efficiency of industry in a way that:

  (i)    minimises administrative costs whenever possible;

  (ii)    reduces duplicative regulatory requirements and consequential compliance costs whenever possible; and

  (iii)    pursues compatible regulatory approaches including, if possible and appropriate, through:

    (A)    the application of regulatory approaches which are technology-neutral; and

    (B)    the recognition of equivalence or the promotion of convergence.

174

*Article 21.4*

**Regulatory cooperation activities**

The Parties endeavour to fulfil the objectives set out in Article 21.3 by undertaking regulatory cooperation activities that may include:

(a)    engaging in ongoing bilateral discussions on regulatory governance, including to:

    (i)    discuss regulatory reform and its effects on the Parties' relationship;

    (ii)    identify lessons learned;

    (iii)    explore, if appropriate, alternative approaches to regulation; and

    (iv)    exchange experiences with regulatory tools and instruments, including regulatory impact assessments, risk assessment and compliance and enforcement strategies;

(b)    consulting with each other, as appropriate, and exchanging information throughout the regulatory development process. This consultation and exchange should begin as early as possible in that process;

(c)    sharing non-public information to the extent that this information may be made available to foreign governments in accordance with the applicable rules of the Party providing the information;

(d)    sharing proposed technical or sanitary and phytosanitary regulations that may have an impact on trade with the other Party at the earliest stage possible so that comments and proposals for amendments may be taken into account;

(e)    providing, upon request by the other Party, a copy of the proposed regulation, subject to applicable privacy law, and allow sufficient time for interested parties to provide comments in writing;

(f)    exchanging information about contemplated regulatory actions, measures or amendments under consideration, at the earliest stage possible, in order to:

    (i)    understand the rationale behind a Party's regulatory choices, including the instrument choice, and examine the possibilities for greater convergence between the Parties on how to state the objectives of regulations and how to define their scope. The Parties should also address the interface between regulations, standards and conformity assessment in this context; and

    (ii)    compare methods and assumptions used to analyse regulatory proposals, including, when appropriate, an analysis of technical or economic practicability and the benefits in relation to the objective pursued of any major alternative regulatory requirements or approaches considered. This information exchange may also include compliance strategies and impact assessments, including a comparison of the potential cost-effectiveness of the regulatory proposal to that of major alternative regulatory requirements or approaches considered;

(g)    examining opportunities to minimise unnecessary divergences in regulations through means such as:

    (i)    conducting a concurrent or joint risk assessment and a regulatory impact assessment if practicable and mutually beneficial;

(ii)  achieving a harmonised, equivalent or compatible solution; or

(iii)  considering mutual recognition in specific cases;

(h)  cooperating on issues that concern the development, adoption, implementation and maintenance of international standards, guides and recommendations;

(i)  examining the appropriateness and possibility of collecting the same or similar data about the nature, extent and frequency of problems that may potentially give rise to regulatory action when it would expedite making statistically significant judgments about those problems;

(j)  periodically comparing data collection practices;

(k)  examining the appropriateness and the possibility of using the same or similar assumptions and methodologies that the other Party uses to analyse data and assess the underlying issues to be addressed through regulation in order to:

(i)  reduce differences in identifying issues; and

(ii)  promote similarity of results;

(l)  periodically comparing analytical assumptions and methodologies;

(m)  exchanging information on the administration, implementation and enforcement of regulations, as well as on the means to obtain and measure compliance;

(n)  conducting cooperative research agendas in order to:

(i)  reduce duplicative research;

(ii)  generate more information at less cost;

(iii)  gather the best data;

(iv)  establish, when appropriate, a common scientific basis;

(v)  address the most pressing regulatory problems in a more consistent and performance-oriented manner; and

(vi)  minimise unnecessary differences in new regulatory proposals while more effectively improving health, safety and environmental protection;

(o)  conducting post-implementation reviews of regulations or policies;

(p)  comparing methods and assumptions used in those post-implementation reviews;

(q)  when applicable, making available to each other summaries of the results of those post-implementation reviews;

(r)  identifying the appropriate approach to reduce adverse effects of existing regulatory differences on bilateral trade and investment in sectors identified by a Party, including, when appropriate, through greater convergence, mutual recognition, minimising the use of trade and investment distorting regulatory instruments, and the use of international standards, including standards and guides for conformity assessment; or

(s)  exchanging information, expertise and experience in the field of animal welfare in order to promote collaboration on animal welfare between the Parties.

176

*Article 21.5*

**Compatibility of regulatory measures**

With a view to enhancing convergence and compatibility between the regulatory measures of the Parties, each Party shall, when appropriate, consider the regulatory measures or initiatives of the other Party on the same or related topics. A Party is not prevented from adopting different regulatory measures or pursuing different initiatives for reasons including different institutional or legislative approaches, circumstances, values or priorities that are particular to that Party.

*Article 21.6*

**The Regulatory Cooperation Forum**

1.  A Regulatory Cooperation Forum ("RCF") is established, pursuant to Article 26.2.1(h) (Specialised committees), to facilitate and promote regulatory cooperation between the Parties in accordance with this Chapter.

2.  The RCF shall perform the following functions:

    (a)  provide a forum to discuss regulatory policy issues of mutual interest that the Parties have identified through, among others, consultations conducted in accordance with Article 21.8;

    (b)  assist individual regulators to identify potential partners for cooperation activities and provide them with appropriate tools for that purpose, such as model confidentiality agreements;

    (c)  review regulatory initiatives, whether in progress or anticipated, that a Party considers may provide potential for cooperation. The reviews, which will be carried out in consultation with regulatory departments and agencies, should support the implementation of this Chapter; and

    (d)  encourage the development of bilateral cooperation activities in accordance with Article 21.4 and, on the basis of information obtained from regulatory departments and agencies, review the progress, achievements and best practices of regulatory cooperation initiatives in specific sectors.

3.  The RCF shall be co-chaired by a senior representative of the Government of Canada at the level of a Deputy Minister, equivalent or designate, and a senior representative of the European Commission at the level of a Director General, equivalent or designate, and shall comprise relevant officials of each Party. The Parties may by mutual consent invite other interested parties to participate in the meetings of the RCF.

4.  The RCF shall:

    (a)  adopt its terms of reference, procedures and work-plan at its first meeting after the entry into force of this Agreement;

    (b)  meet within one year from the date of entry into force of this Agreement and at least annually thereafter, unless the Parties decide otherwise; and

    (c)  report to the CETA Joint Committee on the implementation of this Chapter, as appropriate.

*Article 21.7*

**Further cooperation between the Parties**

1.  Pursuant to Article 21.6.2(c) and to enable monitoring of forthcoming regulatory projects and to identify opportunities for regulatory cooperation, the Parties shall periodically exchange information of ongoing or planned regulatory projects in their areas of responsibility. This information should include, if appropriate, new technical regulations and amendments to existing technical regulations that are likely to be proposed or adopted.

2.  The Parties may facilitate regulatory cooperation through the exchange of officials pursuant to a specified arrangement.

3.  The Parties endeavour to cooperate and to share information on a voluntary basis in the area of non-food product safety. This cooperation or exchange of information may in particular relate to:

    (a)  scientific, technical, and regulatory matters, to help improve non-food product safety;

    (b)  emerging issues of significant health and safety relevance that fall within the scope of a Party's authority;

    (c)  standardisation related activities;

    (d)  market surveillance and enforcement activities;

    (e)  risk assessment methods and product testing; and

    (f)  coordinated product recalls or other similar actions.

4.  The Parties may establish reciprocal exchange of information on the safety of consumer products and on preventive, restrictive and corrective measures taken. In particular, Canada may receive access to selected information from the European Union RAPEX alert system, or its successor, with respect to consumer products as referred to in Directive 2001/95/EC of the European Parliament and of the Council of 3 December 2001 on general product safety. The European Union may receive early warning information on restrictive measures and product recalls from Canada's consumer product incident reporting system, known as RADAR, or its successor, with respect to consumer products as defined in the *Canada Consumer Product Safety Act*, S.C. 2010, c. 21 and cosmetics as defined in the *Food and Drugs Act*, R.S.C. 1985, c. F-27. This reciprocal exchange of information shall be done on the basis of an arrangement setting out the measures referred to under paragraph 5.

5.  Before the Parties conduct the first exchange of information provided for under paragraph 4, they shall ensure that the Committee on Trade in Goods endorse the measures to implement these exchanges. The Parties shall ensure that these measures specify the type of information to be exchanged, the modalities for the exchange and the application of confidentiality and personal data protection rules.

6.  The Committee on Trade in Goods shall endorse the measures under paragraph 5 within one year from the date of entry into force of this Agreement unless the Parties decide to extend the date.

7.    The Parties may modify the measures referred to in paragraph 5. The Committee on Trade in Goods shall endorse any modification to the measures.

## Article 21.8

### Consultations with private entities

In order to gain non-governmental perspectives on matters that relate to the implementation of this Chapter, each Party or the Parties may consult, as appropriate, with stakeholders and interested parties, including representatives from academia, think-tanks, non-governmental organisations, businesses, consumer and other organisations. These consultations may be conducted by any means the Party or Parties deem appropriate.

## Article 21.9

### Contact points

1.    The contact points for communication between the Parties on matters arising under this Chapter are:

   (a)    in the case of Canada, the Technical Barriers and Regulations Division of the Department of Foreign Affairs, Trade and Development, or its successor; and

   (b)    in the case of the European Union, the International Affairs Unit of the Directorate-General for Internal Market, Industry, Entrepreneurship and SMEs, European Commission, or its successor.

2.    Each contact point is responsible for consulting and coordinating with its respective regulatory departments and agencies, as appropriate, on matters arising under this Chapter.

# CHAPTER TWENTY-TWO

## TRADE AND SUSTAINABLE DEVELOPMENT

*Article 22.1*

### Context and objectives

1.   The Parties recall the Rio Declaration on Environment and Development of 1992, the Agenda 21 on Environment and Development of 1992, the Johannesburg Declaration on Sustainable Development of 2002 and the Plan of Implementation of the World Summit on Sustainable Development of 2002, the Ministerial Declaration of the United Nations Economic and Social Council on Creating an environment at the national and international levels conducive to generating full and productive employment and decent work for all, and its impact on sustainable development of 2006, and the ILO Declaration on Social Justice for a Fair Globalisation of 2008. The Parties recognise that economic development, social development and environmental protection are interdependent and mutually reinforcing components of sustainable development, and reaffirm their commitment to promoting the development of international trade in such a way as to contribute to the objective of sustainable development, for the welfare of present and future generations.

2.   The Parties underline the benefit of considering trade-related labour and environmental issues as part of a global approach to trade and sustainable development. Accordingly, the Parties agree that the rights and obligations under Chapters Twenty-Three (Trade and Labour) and Twenty-Four (Trade and Environment) are to be considered in the context of this Agreement.

3.   In this regard, through the implementation of Chapters Twenty-Three (Trade and Labour) and Twenty-Four (Trade and Environment), the Parties aim to:

   (a)   promote sustainable development through the enhanced coordination and integration of their respective labour, environmental and trade policies and measures;

   (b)   promote dialogue and cooperation between the Parties with a view to developing their trade and economic relations in a manner that supports their respective labour and environmental protection measures and standards, and to upholding their environmental and labour protection objectives in a context of trade relations that are free, open and transparent;

   (c)   enhance enforcement of their respective labour and environmental law and respect for labour and environmental international agreements;

   (d)   promote the full use of instruments, such as impact assessment and stakeholder consultations, in the regulation of trade, labour and environmental issues and encourage businesses, civil society organisations and citizens to develop and implement practices that contribute to the achievement of sustainable development goals; and

(e)     promote public consultation and participation in the discussion of sustainable development issues that arise under this Agreement and in the development of relevant law and policies.

*Article 22.2*

**Transparency**

The Parties stress the importance of ensuring transparency as a necessary element to promote public participation and making information public within the context of this Chapter, in accordance with the provisions of this Chapter and Chapter Twenty-Seven (Transparency) as well as Articles 23.6 (Public information and awareness) and 24.7 (Public information and awareness).

*Article 22.3*

**Cooperation and promotion of trade supporting sustainable development**

1.      The Parties recognise the value of international cooperation to achieve the goal of sustainable development and the integration at the international level of economic, social and environmental development and protection initiatives, actions and measures. Therefore, the Parties agree to dialogue and consult with each other with regard to trade-related sustainable development issues of common interest.

2.      The Parties affirm that trade should promote sustainable development. Accordingly, each Party shall strive to promote trade and economic flows and practices that contribute to enhancing decent work and environmental protection, including by:

(a)     encouraging the development and use of voluntary schemes relating to the sustainable production of goods and services, such as eco-labelling and fair trade schemes;

(b)     encouraging the development and use of voluntary best practices of corporate social responsibility by enterprises, such as those in the OECD Guidelines for Multinational Enterprises, to strengthen coherence between economic, social and environmental objectives;

(c)     encouraging the integration of sustainability considerations in private and public consumption decisions; and

(d)     promoting the development, the establishment, the maintenance or the improvement of environmental performance goals and standards.

3.      The Parties recognise the importance of addressing specific sustainable development issues by assessing the potential economic, social and environmental impacts of possible actions, taking account of the views of stakeholders. Therefore, each Party commits to review, monitor and assess the impact of the implementation of this Agreement on sustainable development in its territory in order to identify any need for action that may arise in connection with this Agreement. The Parties may carry out joint assessments. These assessments will be conducted in a manner that is adapted to the practices and conditions of each Party, through the respective participative processes of the Parties, as well as those processes set up under this Agreement.

*Article 22.4*

**Institutional mechanisms**

1. The Committee on Trade and Sustainable Development, established under Article 26.2.1(g) (Specialised committees), shall be comprised of high level representatives of the Parties responsible for matters covered by this Chapter and Chapters Twenty-Three (Trade and Labour) and Twenty-Four (Trade and Environment). The Committee on Trade and Sustainable Development shall oversee the implementation of those Chapters, including cooperative activities and the review of the impact of this Agreement on sustainable development, and address in an integrated manner any matter of common interest to the Parties in relation to the interface between economic development, social development and environmental protection. With regard to Chapters Twenty-Three (Trade and Labour) and Twenty-Four (Trade and Environment), the Committee on Trade and Sustainable Development can also carry out its duties through dedicated sessions comprising participants responsible for any matter covered, respectively, under these Chapters.

2. The Committee on Trade and Sustainable Development shall meet within the first year of the entry into force of this Agreement, and thereafter as often as the Parties consider necessary. The contact points referred to in Articles 23.8 (Institutional mechanisms) and 24.13 (Institutional mechanisms) are responsible for the communication between the Parties regarding the scheduling and the organisation of those meetings or dedicated sessions.

3. Each regular meeting or dedicated session of the Committee on Trade and Sustainable Development includes a session with the public to discuss matters relating to the implementation of the relevant Chapters, unless the Parties decide otherwise.

4. The Committee on Trade and Sustainable Development shall promote transparency and public participation. To this end:

   (a) any decision or report of the Committee on Trade and Sustainable Development shall be made public, unless it decides otherwise;

   (b) the Committee on Trade and Sustainable Development shall present updates on any matter related to this Chapter, including its implementation, to the Civil Society Forum referred to in Article 22.5. Any view or opinion of the Civil Society Forum shall be presented to the Parties directly, or through the consultative mechanisms referred to in Articles 23.8.3 (Institutional mechanisms) and 24.13 (Institutional mechanisms). The Committee on Trade and Sustainable Development shall report annually on the follow-up to those communications;

   (c) the Committee on Trade and Sustainable Development shall report annually on any matter that it addresses pursuant to Article 24.7.3 (Public information and awareness) or Article 23.8.4 (Institutional mechanisms).

*Article 22.5*

**Civil Society Forum**

1. The Parties shall facilitate a joint Civil Society Forum composed of representatives of civil society organisations established in their territories, including participants in the consultative mechanisms referred to in Articles 23.8.3 (Institutional mechanisms) and 24.13 (Institutional mechanisms), in order to conduct a dialogue on the sustainable development aspects of this Agreement.

2. The Civil Society Forum shall be convened once a year unless otherwise agreed by the Parties. The Parties shall promote a balanced representation of relevant interests, including independent representative employers, unions, labour and business organisations, environmental groups, as well as other relevant civil society organisations as appropriate. The Parties may also facilitate participation by virtual means.

# CHAPTER TWENTY-THREE

## TRADE AND LABOUR

### Article 23.1

### Context and objectives

1. The Parties recognise the value of international cooperation and agreements on labour affairs as a response of the international community to economic, employment and social challenges and opportunities resulting from globalisation. They recognise the contribution that international trade could make to full and productive employment and decent work for all and commit to consulting and cooperating as appropriate on trade-related labour and employment issues of mutual interest.

2. Affirming the value of greater policy coherence in decent work, encompassing core labour standards, and high levels of labour protection, coupled with their effective enforcement, the Parties recognise the beneficial role that those areas can have on economic efficiency, innovation and productivity, including export performance. In this context, they also recognise the importance of social dialogue on labour matters among workers and employers, and their respective organisations, and governments, and commit to the promotion of such dialogue.

### Article 23.2

### Right to regulate and levels of protection

Recognising the right of each Party to set its labour priorities, to establish its levels of labour protection and to adopt or modify its laws and policies accordingly in a manner consistent with its international labour commitments, including those in this Chapter, each Party shall seek to ensure those laws and policies provide for and encourage high levels of labour protection and shall strive to continue to improve such laws and policies with the goal of providing high levels of labour protection.

### Article 23.3

### Multilateral labour standards and agreements

1. Each Party shall ensure that its labour law and practices embody and provide protection for the fundamental principles and rights at work which are listed below. The Parties affirm their commitment to respect, promote and realise those principles and rights in accordance with the obligations of the members of the International Labour Organization (the "ILO") and the commitments under the ILO Declaration on Fundamental Principles and Rights at Work and its Follow-up of 1998 adopted by the International Labour Conference at its 86th Session:

    (a) freedom of association and the effective recognition of the right to collective bargaining;

    (b) the elimination of all forms of forced or compulsory labour;

    (c) the effective abolition of child labour; and

(d)    the elimination of discrimination in respect of employment and occupation.

2.    Each Party shall ensure that its labour law and practices promote the following objectives included in the ILO Decent Work Agenda, and in accordance with the ILO Declaration on Social Justice for a Fair Globalization of 2008 adopted by the International Labour Conference at its 97th Session, and other international commitments:

(a)    health and safety at work, including the prevention of occupational injury or illness and compensation in cases of such injury or illness;

(b)    establishment of acceptable minimum employment standards for wage earners, including those not covered by a collective agreement; and,

(c)    non-discrimination in respect of working conditions, including for migrant workers.

3.    Pursuant to sub-paragraph 2(a), each Party shall ensure that its labour law and practices embody and provide protection for working conditions that respect the health and safety of workers, including by formulating policies that promote basic principles aimed at preventing accidents and injuries that arise out of or in the course of work, and that are aimed at developing a preventative safety and health culture where the principle of prevention is accorded the highest priority. When preparing and implementing measures aimed at health protection and safety at work, each Party shall take into account existing relevant scientific and technical information and related international standards, guidelines or recommendations, if the measures may affect trade or investment between the Parties. The Parties acknowledge that in case of existing or potential hazards or conditions that could reasonably be expected to cause injury or illness to a person, a Party shall not use the lack of full scientific certainty as a reason to postpone cost-effective protective measures.

4.    Each Party reaffirms its commitment to effectively implement in its law and practices in its whole territory the fundamental ILO Conventions that Canada and the Member States of the European Union have ratified respectively. The Parties shall make continued and sustained efforts to ratify the fundamental ILO Conventions if they have not yet done so. The Parties shall exchange information on their respective situations and advances regarding the ratification of the fundamental as well as priority and other ILO Conventions that are classified as up to date by the ILO.

## Article 23.4

### Upholding levels of protection

1.    The Parties recognise that it is inappropriate to encourage trade or investment by weakening or reducing the levels of protection afforded in their labour law and standards.

2.    A Party shall not waive or otherwise derogate from, or offer to waive or otherwise derogate from, its labour law and standards, to encourage trade or the establishment, acquisition, expansion or retention of an investment in its territory.

3.    A Party shall not, through a sustained or recurring course of action or inaction, fail to effectively enforce its labour law and standards to encourage trade or investment.

*Article 23.5*

## Enforcement procedures, administrative proceedings and review of administrative action

1. Pursuant to Article 23.4, each Party shall promote compliance with and shall effectively enforce its labour law, including by:

    (a) maintaining a system of labour inspection in accordance with its international commitments aimed at securing the enforcement of legal provisions relating to working conditions and the protection of workers which are enforceable by labour inspectors; and

    (b) ensuring that administrative and judicial proceedings are available to persons with a legally recognised interest in a particular matter who maintain that a right is infringed under its law, in order to permit effective action against infringements of its labour law, including appropriate remedies for violations of such law.

2. Each Party shall, in accordance with its law, ensure that the proceedings referred to in sub-paragraph 1(b) are not unnecessarily complicated or prohibitively costly, do not entail unreasonable time limits or unwarranted delays, provide injunctive relief, if appropriate, and are fair and equitable, including by:

    (a) providing defendants with reasonable notice when a procedure is initiated, including a description of the nature of the proceeding and the basis of the claim;

    (b) providing the parties to the proceedings with a reasonable opportunity to support or defend their respective positions, including by presenting information or evidence, prior to a final decision;

    (c) providing that final decisions are made in writing and give reasons as appropriate to the case and based on information or evidence in respect of which the parties to the proceeding were offered the opportunity to be heard; and

    (d) allowing the parties to administrative proceedings an opportunity for review and, if warranted, correction of final administrative decisions within a reasonable period of time by a tribunal established by law, with appropriate guarantees of tribunal independence and impartiality.

*Article 23.6*

## Public information and awareness

1. In addition to its obligations under Article 27.1 (Publication), each Party shall encourage public debate with and among non-state actors as regards the development and definition of policies that may lead to the adoption of labour law and standards by its public authorities.

2. Each Party shall promote public awareness of its labour law and standards, as well as enforcement and compliance procedures, including by ensuring the availability of information and by taking steps to further the knowledge and understanding of workers, employers and their representatives.

*Article 23.7*

**Cooperative activities**

1.     The Parties commit to cooperate to promote the objectives of this Chapter through actions such as:

    (a)     the exchange of information on best practices on issues of common interest and on relevant events, activities, and initiatives;

    (b)     cooperation in international fora that deal with issues relevant for trade and labour, including in particular the WTO and the ILO;

    (c)     the international promotion and the effective application of fundamental principles and rights at work referred to in Article 23.3.1, and the ILO Decent Work Agenda;

    (d)     dialogue and information-sharing on the labour provisions in the context of their respective trade agreements, and the implementation thereof;

    (e)     the exploration of collaboration in initiatives regarding third parties; and

    (f)     any other form of cooperation deemed appropriate.

2.     The Parties will consider any views provided by representatives of workers, employers, and civil society organisations when identifying areas of cooperation, and carrying out cooperative activities.

3.     The Parties may establish cooperative arrangements with the ILO and other competent international or regional organisations to draw on their expertise and resources to achieve the objectives of this Chapter.

*Article 23.8*

**Institutional mechanisms**

1.     Each Party shall designate an office to serve as the contact point with the other Party for the implementation of this Chapter, including with regard to:

    (a)     cooperative programmes and activities in accordance with Article 23.7;

    (b)     the receipt of submissions and communications under Article 23.9; and

    (c)     information to be provided to the other Party, the Panels of Experts and the public.

2.     Each Party shall inform the other Party, in writing, of the contact point referred to in paragraph 1.

3.     The Committee on Trade and Sustainable Development established under Article 26.2.1(g) (Specialised committees) shall, through its regular meetings or dedicated sessions comprising participants responsible for matters covered under this Chapter:

    (a)     oversee the implementation of this Chapter and review the progress achieved under it, including its operation and effectiveness; and

    (b)     discuss any other matter within the scope of this Chapter.

4.  Each Party shall convene a new or consult its domestic labour or sustainable development advisory groups, to seek views and advice on issues relating to this Chapter. Those groups shall comprise independent representative organisations of civil society in a balanced representation of employers, unions, labour and business organisations, as well as other relevant stakeholders as appropriate. They may submit opinions and make recommendations on any matter related to this Chapter on their own initiative.

5.  Each Party shall be open to receive and shall give due consideration to submissions from the public on matters related to this Chapter, including communications on implementation concerns. Each Party shall inform its respective domestic labour or sustainable development advisory groups of those communications.

6.  The Parties shall take into account the activities of the ILO so as to promote greater cooperation and coherence between the work of the Parties and the ILO.

## Article 23.9

### Consultations

1.  A Party may request consultations with the other Party regarding any matter arising under this Chapter by delivering a written request to the contact point of the other Party. The Party shall present the matter clearly in its request, identify the questions at issue and provide a brief summary of any claims under this Chapter. Consultations must commence promptly after a Party delivers a request for consultations.

2.  During consultations, each Party shall provide the other Party with sufficient information in its possession to allow a full examination of the matters raised, subject to its law regarding confidential personal and commercial information.

3.  If relevant, and if both Parties consent, the Parties shall seek the information or views of any person, organisation or body, including the ILO, that may contribute to the examination of the matter that arises.

4.  If a Party considers that further discussion of the matter is required, that Party may request that the Committee on Trade and Sustainable Development be convened to consider the matter by delivering a written request to the contact point of the other Party. The Committee on Trade and Sustainable Development shall convene promptly and endeavour to resolve the matter. If appropriate, it shall seek the advice of the Parties' domestic labour or sustainable development advisory groups through the consultative mechanisms referred to in Article 23.8.

5.  Each Party shall make publicly available any solution or decision on a matter discussed under this Article.

## Article 23.10

### Panel of Experts

1.  For any matter that is not satisfactorily addressed through consultations under Article 23.9, a Party may, 90 days after the receipt of a request for consultations under Article 23.9.1, request that a Panel of Experts be convened to examine that matter, by delivering a written request to the contact point of the other Party.

2.      Subject to the provisions of this Chapter, the Parties shall apply the Rules of Procedure and Code of Conduct set out in Annexes 29-A and 29-B, unless the Parties decide otherwise.

3.      The Panel of Experts is composed of three panellists.

4.      The Parties shall consult with a view to reaching an agreement on the composition of the Panel of Experts within 10 working days of the receipt by the responding Party of the request for the establishment of a Panel of Experts. Due attention shall be paid to ensuring that proposed panellists meet the requirements set out in paragraph 7 and have the expertise appropriate to the particular matter.

5.      If the Parties are unable to decide on the composition of the Panel of Experts within the period of time specified in paragraph 4, the selection procedure set out in paragraphs 3 through 7 of Article 29.7 (Composition of the arbitration panel) applies in respect of the list established in paragraph 6.

6.      The Committee on Trade and Sustainable Development shall, at its first meeting after the entry into force of this Agreement, establish a list of at least nine individuals chosen for their objectivity, reliability and sound judgment, who are willing and able to serve as panellists. Each Party shall name at least three individuals to the list to serve as panellists. The Parties shall also name at least three individuals who are not nationals of either Party and who are willing and able to serve as chairperson of a Panel of Experts. The Committee on Trade and Sustainable Development shall ensure that the list is always maintained at this level.

7.      The experts proposed as panellists must have specialised knowledge or expertise in labour law, other issues addressed in this Chapter, or in the resolution of disputes arising under international agreements. They must be independent, serve in their individual capacities and not take instructions from any organisation or government with regard to the matter in issue. They must not be affiliated with the government of either Party, and must comply with the Code of Conduct referred to in paragraph 2.

8.      Unless the Parties decide otherwise, within five working days of the date of the selection of the panellists, the terms of reference of the Panel of Experts are as follows:

   *"to examine, in the light of the relevant provisions of Chapter Twenty-Three (Trade and Labour), the matter referred to in the request for the establishment of the Panel of Experts, and to deliver a report, in accordance with Article 23.10 (Panel of Experts) of Chapter Twenty-Three (Trade and Labour), that makes recommendations for the resolution of the matter."*

9.      In respect of matters related to multilateral agreements as set out in Article 23.3, the Panel of Experts should seek information from the ILO, including any pertinent available interpretative guidance, findings or decisions adopted by the ILO.[29]

10.     The Panel may request and receive written submissions or any other information from persons with relevant information or specialised knowledge.

---

[29]     The Parties shall apply this provision in accordance with rule 42 of the Rules of Procedure for Arbitration set out in Annex 29-A.

11.     The Panel of Experts shall issue to the Parties an interim report and a final report setting out the findings of fact, its determinations on the matter including as to whether the responding Party has conformed with its obligations under this Chapter and the rationale behind any findings, determinations and recommendations that it makes. The Panel of Experts shall deliver to the Parties the interim report within 120 days after the last panellist is selected, or as otherwise decided by the Parties. The Parties may provide comments to the Panel of Experts on the interim report within 45 days of its delivery. After considering these comments, the Panel of Experts may reconsider its report or carry out any further examination that it considers appropriate. The Panel of Experts shall deliver the final report to the Parties within 60 days of the submission of the interim report. Each Party shall make the final report publicly available within 30 days of its delivery.

12.     If the final report of the Panel of Experts determines that a Party has not conformed with its obligations under this Chapter, the Parties shall engage in discussions and shall endeavour, within three months of the delivery of the final report, to identify appropriate measures or, if appropriate, to decide upon a mutually satisfactory action plan. In these discussions, the Parties shall take into account the final report. The responding Party shall inform in a timely manner its labour or sustainable development advisory groups and the requesting Party of its decision on any actions or measures to be implemented**.** Furthermore, the requesting Party shall inform in a timely manner its labour or sustainable development advisory groups and the responding Party of any other action or measure it may decide to take, as a follow-up to the final report, to encourage the resolution of the matter in a manner consistent with this Agreement. The Committee on Trade and Sustainable Development shall monitor the follow-up to the final report and the recommendations of the Panel of Experts. The labour or sustainable development advisory groups of the Parties and the Civil Society Forum may submit observations to the Committee on Trade and Sustainable Development in this regard.

13.     If the Parties reach a mutually agreed solution to the matter following the establishment of a Panel of Experts, they shall notify the Committee on Trade and Sustainable Development and the Panel of Experts of that solution. Upon that notification, the panel procedure shall be terminated.

### *Article 23.11*

### **Dispute resolution**

1.     For any dispute that arises under this Chapter, the Parties shall only have recourse to the rules and procedures provided in this Chapter.

2.     The Parties shall make every attempt to arrive at a mutually satisfactory resolution of a dispute. At any time, the Parties may have recourse to good offices, conciliation, or mediation to resolve that dispute.

3.     The Parties understand that the obligations included under this Chapter are binding and enforceable through the procedures for the resolution of disputes provided in Article 23.10. Within this context, the Parties shall discuss, through the meetings of the Committee on Trade and Sustainable Development, the effectiveness of the implementation of the Chapter, policy developments in each Party, developments in

international agreements, and views presented by stakeholders, as well as possible reviews of the procedures for the resolution of disputes provided for in Article 23.10.

4.      In the case of disagreement under paragraph 3, a Party may request consultations according to the procedures established in Article 23.9 in order to review the provisions for the resolution of disputes provided for in Article 23.10, with a view to reaching a mutually agreed solution to the matter.

5.      The Committee on Trade and Sustainable Development may recommend to the CETA Joint Committee modifications to relevant provisions of this Chapter, in accordance with the amendment procedures established in Article 30.2 (Amendments).

# CHAPTER TWENTY-FOUR

## TRADE AND ENVIRONMENT

### *Article 24.1*

### Definition

For the purposes of this Chapter:

**environmental law** means a law, including a statutory or regulatory provision, or other legally binding measure of a Party, the purpose of which is the protection of the environment, including the prevention of a danger to human life or health from environmental impacts, such as those that aim at:

(a)     the prevention, abatement or control of the release, discharge, or emission of pollutants or environmental contaminants,

(b)     the management of chemicals and waste or the dissemination of information related thereto, or

(c)     the conservation and protection of wild flora or fauna, including endangered species and their habitats, as well as protected areas,

but does not include a measure of a Party solely related to worker health and safety, which is subject to Chapter Twenty-Three (Trade and Labour), or a measure of a Party the purpose of which is to manage the subsistence or aboriginal harvesting of natural resources.

### *Article 24.2*

### Context and objectives

The Parties recognise that the environment is a fundamental pillar of sustainable development and recognise the contribution that trade could make to sustainable development. The Parties stress that enhanced cooperation to protect and conserve the environment brings benefits that will:

(a)     promote sustainable development;

(b)     strengthen the environmental governance of the Parties;

(c)     build upon international environmental agreements to which they are party; and

(d)     complement the objectives of this Agreement.

### *Article 24.3*

### Right to regulate and levels of protection

The Parties recognise the right of each Party to set its environmental priorities, to establish its levels of environmental protection, and to adopt or modify its laws and policies accordingly and in a manner consistent with the multilateral environmental agreements to which it is party and with this Agreement. Each Party shall seek to ensure that those laws and policies provide for and encourage high levels of environmental protection, and shall strive to continue to improve such laws and policies and their underlying levels of protection.

*Article 24.4*

**Multilateral environmental agreements**

1.  The Parties recognise the value of international environmental governance and agreements as a response of the international community to global or regional environmental problems and stress the need to enhance the mutual supportiveness between trade and environment policies, rules, and measures.

2.  Each Party reaffirms its commitment to effectively implement in its law and practices, in its whole territory, the multilateral environmental agreements to which it is party.

3.  The Parties commit to consult and cooperate as appropriate with respect to environmental issues of mutual interest related to multilateral environmental agreements, and in particular, trade-related issues. This commitment includes exchanging information on:

    (a)  the implementation of multilateral environmental agreements, to which a Party is party;

    (b)  on-going negotiations of new multilateral environmental agreements; and

    (c)  each Party's respective views on becoming a party to additional multilateral environmental agreements.

4.  The Parties acknowledge their right to use Article 28.3 (General exceptions) in relation to environmental measures, including those taken pursuant to multilateral environmental agreements to which they are party.

*Article 24.5*

**Upholding levels of protection**

1.  The Parties recognise that it is inappropriate to encourage trade or investment by weakening or reducing the levels of protection afforded in their environmental law.

2.  A Party shall not waive or otherwise derogate from, or offer to waive or otherwise derogate from, its environmental law, to encourage trade or the establishment, acquisition, expansion or retention of an investment in its territory.

3.  A Party shall not, through a sustained or recurring course of action or inaction, fail to effectively enforce its environmental law to encourage trade or investment.

*Article 24.6*

**Access to remedies and procedural guarantees**

1.  Pursuant to the obligations in Article 24.5:

    (a)  each Party shall, in accordance with its law, ensure that its authorities competent to enforce environmental law give due consideration to alleged violations of environmental law brought to its attention by any interested persons residing or established in its territory; and

    (b)  each Party shall ensure that administrative or judicial proceedings are available to persons with a legally recognised interest in a particular matter or who

maintain that a right is infringed under its law, in order to permit effective action against infringements of its environmental law, including appropriate remedies for violations of such law.

2.  Each Party shall, in accordance with its domestic law, ensure that the proceedings referred to in sub-paragraph 1(b) are not unnecessarily complicated or prohibitively costly, do not entail unreasonable time limits or unwarranted delays, provide injunctive relief if appropriate, and are fair, equitable and transparent, including by:

(a)  providing defendants with reasonable notice when a proceeding is initiated, including a description of the nature of the proceeding and the basis of the claim;

(b)  providing the parties to the proceeding with a reasonable opportunity to support or defend their respective positions, including by presenting information or evidence, prior to a final decision;

(c)  providing that final decisions are made in writing and give reasons as appropriate to the case and based on information or evidence in respect of which the parties to the proceeding were offered the opportunity to be heard; and

(d)  allowing the parties to administrative proceedings an opportunity for review and, if warranted, correction of final administrative decisions within a reasonable period of time by a tribunal established by law, with appropriate guarantees of tribunal independence and impartiality.

## Article 24.7

### Public information and awareness

1.  In addition to Article 27.1 (Publication), each Party shall encourage public debate with and among non-state actors as regards the development and definition of policies that may lead to the adoption of environmental law by its public authorities.

2.  Each Party shall promote public awareness of its environmental law, as well as enforcement and compliance procedures, by ensuring the availability of information to stakeholders.

3.  Each Party shall be open to receive and shall give due consideration to submissions from the public on matters related to this Chapter, including communications on implementation concerns. Each Party shall inform its respective civil society organisations of those communications through the consultative mechanisms referred to in Article 24.13.5.

## Article 24.8

### Scientific and technical information

1.  When preparing and implementing measures aimed at environmental protection that may affect trade or investment between the Parties, each Party shall take into account relevant scientific and technical information and related international standards, guidelines, or recommendations.

2.     The Parties acknowledge that where there are threats of serious or irreversible damage, the lack of full scientific certainty shall not be used as a reason for postponing cost-effective measures to prevent environmental degradation.

## *Article 24.9*

### Trade favouring environmental protection

1.     The Parties are resolved to make efforts to facilitate and promote trade and investment in environmental goods and services, including through addressing the reduction of non-tariff barriers related to these goods and services.

2.     The Parties shall, consistent with their international obligations, pay special attention to facilitating the removal of obstacles to trade or investment in goods and services of particular relevance for climate change mitigation and in particular trade or investment in renewable energy goods and related services.

## *Article 24.10*

### Trade in forest products

1.     The Parties recognise the importance of the conservation and sustainable management of forests for providing environmental functions and economic and social opportunities for present and future generations, and of market access for forest products harvested in accordance with the law of the country of harvest and from sustainably managed forests.

2.     To this end, and in a manner consistent with their international obligations, the Parties undertake to:

   (a)     encourage trade in forest products from sustainably managed forests and harvested in accordance with the law of the country of harvest;

   (b)     exchange information, and if appropriate, cooperate on initiatives to promote sustainable forest management, including initiatives designed to combat illegal logging and related trade;

   (c)     promote the effective use of the *Convention on International Trade in Endangered Species of Wild Fauna and Flora*, done at Washington on 3 March 1973, with regard to timber species considered at risk; and

   (d)     cooperate, where appropriate, in international *fora* that deal with the conservation and sustainable management of forests.

3.     The Parties shall discuss the subjects referred to in paragraph 2, in the Committee on Trade and Sustainable Development or in the Bilateral Dialogue on Forest Products referred to in Chapter Twenty-Five (Bilateral Dialogues and Cooperation), in accordance with their respective spheres of competence.

## *Article 24.11*

### Trade in fisheries and aquaculture products

1.     The Parties recognise the importance of the conservation and the sustainable and responsible management of fisheries and aquaculture and their contribution to

providing environmental, economic and social opportunities for present and future generations.

2.    To this end, and in a manner consistent with their international obligations, the Parties undertake to:

(a)    adopt or maintain effective monitoring, control and surveillance measures, such as observer schemes, vessel monitoring schemes, transhipment control, inspections at sea, port state control, and associated sanctions, aimed at the conservation of fish stocks and the prevention of overfishing;

(b)    adopt or maintain actions and cooperate to combat illegal, unreported and unregulated ("IUU") fishing, including, where appropriate, the exchange of information on IUU activities in their waters and the implementation of policies and measures to exclude IUU products from trade flows and fish farming operations;

(c)    cooperate with, and where appropriate in, regional fisheries management organisations in which the Parties are either members, observers, or cooperating non-contracting parties, with the aim of achieving good governance, including by advocating for science-based decisions and for compliance with those decisions in these organisations; and

(d)    promote the development of an environmentally responsible and economically competitive aquaculture industry.

*Article 24.12*

**Cooperation on environment issues**

1.    The Parties recognise that enhanced cooperation is an important element to advance the objectives of this Chapter, and commit to cooperate on trade-related environmental issues of common interest, in areas such as:

(a)    the potential impact of this Agreement on the environment and ways to enhance, prevent, or mitigate such impact, taking into account any impact assessment carried out by the Parties;

(b)    activity in international *fora* dealing with issues relevant for both trade and environmental policies, including in particular the WTO, the OECD, the United Nations Environment Programme, and multilateral environmental agreements;

(c)    the environmental dimension of corporate social responsibility and accountability, including the implementation and follow-up of internationally recognised guidelines;

(d)    the trade impact of environmental regulations and standards as well as the environmental impact of trade and investment rules including on the development of environmental regulations and policy;

(e)    trade-related aspects of the current and future international climate change regime, as well as domestic climate policies and programmes relating to mitigation and adaptation, including issues relating to carbon markets, ways to address adverse effects of trade on climate, as well as means to promote energy

efficiency and the development and deployment of low-carbon and other climate-friendly technologies;

(f)    trade and investment in environmental goods and services, including environmental and green technologies and practices; renewable energy; energy efficiency; and water use, conservation and treatment;

(g)    cooperation on trade-related aspects of the conservation and sustainable use of biological diversity;

(h)    promotion of life-cycle management of goods, including carbon accounting and end-of-life management, extended producer-responsibility, recycling and reduction of waste, and other best practices;

(i)    improved understanding of the effects of economic activity and market forces on the environment; and

(j)    exchange of views on the relationship between multilateral environmental agreements and international trade rules.

2.    Cooperation further to paragraph 1 shall take place through actions and instruments that may include technical exchanges, exchanges of information and best practices, research projects, studies, reports, conferences and workshops.

3.    The Parties will consider views or input from the public and interested stakeholders for the definition and implementation of their cooperation activities, and they may involve such stakeholders further in those activities, as appropriate.

*Article 24.13*

**Institutional mechanisms**

1.    Each Party shall designate an office to serve as contact point with the other Party for the implementation of this Chapter, including with regard to:

(a)    cooperative programmes and activities in accordance with Article 24.12;

(b)    the receipt of submissions and communications under Article 24.7.3; and

(c)    information to be provided to the other Party, the Panel of Experts, and the public.

2.    Each Party shall inform the other Party, in writing, of the contact point referred to in paragraph 1.

3.    The Committee on Trade and Sustainable Development established under Article 26.2.1(g) (Specialised committees) shall, through its regular meetings or dedicated sessions comprising participants responsible for matters covered under this Chapter:

(a)    oversee the implementation of this Chapter and review the progress achieved under it;

(b)    discuss matters of common interest; and

(c)    discuss any other matter within the scope of this Chapter as the Parties jointly decide.

4.     The Parties shall take into account the activities of relevant multilateral environmental organisations or bodies so as to promote greater cooperation and coherence between the work of the Parties and these organisations or bodies.

5.     Each Party shall make use of existing, or establish new, consultative mechanisms, such as domestic advisory groups, to seek views and advice on issues relating to this Chapter. These consultative mechanisms shall comprise independent representative organisations of civil society in a balanced representation of environmental groups, business organisations, as well as other relevant stakeholders as appropriate. Through such consultative mechanisms, stakeholders may submit opinions and make recommendations on any matter related to this Chapter on their own initiative.

### Article 24.14

### Consultations

1.     A Party may request consultations with the other Party regarding any matter arising under this Chapter by delivering a written request to the contact point of the other Party. The Party shall present the matter clearly in the request, identify the questions at issue, and provide a brief summary of any claims under this Chapter. Consultations must commence promptly after a Party delivers a request for consultations.

2.     During consultations, each Party shall provide the other Party with sufficient information in its possession to allow a full examination of the matters raised, subject to its law regarding the protection of confidential or proprietary information.

3.     If relevant, and if both Parties consent, the Parties shall seek the information or views of any person, organisation, or body, including the relevant international organisation or body, that may contribute to the examination of the matter at issue.

4.     If a Party considers that further discussion of the matter is required, that Party may request that the Committee on Trade and Sustainable Development be convened to consider the matter by delivering a written request to the contact point of the other Party. The Committee on Trade and Sustainable Development shall convene promptly and endeavour to resolve the matter. If appropriate, it shall seek the advice of the Parties' civil society organisations through the consultative mechanisms referred to in Article 24.13.5.

5.     Each Party shall make publicly available any solution or decision on a matter discussed under this Article.

### Article 24.15

### Panel of Experts

1.     For any matter that is not satisfactorily addressed through consultations under Article 24.14, a Party may, 90 days after the receipt of the request for consultations under Article 24.14.1, request that a Panel of Experts be convened to examine that matter, by delivering a written request to the contact point of the other Party.

2.      Subject to the provisions of this Chapter, the Parties shall apply the Rules of Procedure and Code of Conduct set out in Annexes 29-A and 29-B, unless the Parties decide otherwise.

3.      The Panel of Experts is composed of three panellists.

4.      The Parties shall consult with a view to reaching an agreement on the composition of the Panel of Experts within 10 working days of the receipt by the responding Party of a request for the establishment of a Panel of Experts. Due attention shall be paid to ensuring that proposed panellists meet the requirements set out in paragraph 7 and have the expertise appropriate to the particular matter.

5.      If the Parties are unable to decide on the composition of the Panel of Experts within the period of time specified in paragraph 4, the selection procedure set out in paragraphs 3 through 7 of Article 29.7 (Composition of the arbitration panel) applies in respect of the list established in paragraph 6.

6.      The Committee on Trade and Sustainable Development shall, at its first meeting after the entry into force of this Agreement, establish a list of at least nine individuals chosen for their objectivity, reliability, and sound judgment, who are willing and able to serve as panellists. Each Party shall name at least three individuals to the list to serve as panellists. The Parties shall also name at least three individuals who are not nationals of either Party and who are willing and able to serve as chairperson of a Panel of Experts. The Committee on Trade and Sustainable Development shall ensure that the list is always maintained at this level.

7.      The experts proposed as panellists must have specialised knowledge or expertise in environmental law, issues addressed in this Chapter, or in the resolution of disputes arising under international agreements. They must be independent, serve in their individual capacities and not take instructions from any organisation or government with regard to the matter in issue. They must not be affiliated with the governments of either Party, and must comply with the Code of Conduct referred to in paragraph 2.

8.      Unless the Parties otherwise decide, within five working days of the date of the selection of the panellists, the terms of reference of the Panel of Experts are as follows:

*"to examine, in the light of the relevant provisions of Chapter Twenty-Four (Trade and Environment), the matter referred to in the request for the establishment of the Panel of Experts, and to deliver a report in accordance with Article 24.15 (Panel of Experts) of Chapter Twenty-Four (Trade and Environment), that makes recommendations for the resolution of the matter"*

9.      In respect of matters related to multilateral environmental agreements as set out in Article 24.4, the Panel of Experts should seek views and information from relevant bodies established under these agreements, including any pertinent available interpretative guidance, findings, or decisions adopted by those bodies.[30]

10.     The Panel of Experts shall issue to the Parties an interim report and a final report setting out the findings of fact, its determinations on the matter, including as to

---

[30]    The Parties shall apply this provision in accordance with rule 42 of the Rules of Procedure for Arbitration set out in Annex 29-A.

whether the responding Party has conformed with its obligations under this Chapter and the rationale behind any findings, determinations and recommendations that it makes. The Panel of Experts shall deliver to the Parties the interim report within 120 days after the last panellist is selected, or as otherwise decided by the Parties. The Parties may provide comments to the Panel of Experts on the interim report within 45 days of its delivery. After considering these comments, the Panel of Experts may reconsider its report or carry out any further examination that it considers appropriate. The Panel of Experts shall deliver the final report to the Parties within 60 days of the submission of the interim report. Each Party shall make the final report publicly available within 30 days of its delivery.

11.     If the final report of the Panel of Experts determines that a Party has not conformed with its obligations under this Chapter, the Parties shall engage in discussions and shall endeavour, within three months of the delivery of the final report, to identify an appropriate measure or, if appropriate, to decide upon a mutually satisfactory action plan. In these discussions, the Parties shall take into account the final report. The responding Party shall inform, in a timely manner, its civil society organisations, through the consultative mechanisms referred to in Article 24.13.5, and the requesting Party of its decision on any action or measure to be implemented. The Committee on Trade and Sustainable Development shall monitor the follow-up to the final report and the recommendations of the Panel of Experts. The civil society organisations, through the consultative mechanisms referred to in Article 24.13.5, and the Civil Society Forum may submit observations to the Committee on Trade and Sustainable Development in this regard.

12.     If the Parties reach a mutually agreed solution to the matter following the establishment of a Panel of Experts, they shall notify the Committee on Trade and Sustainable Development and the Panel of Experts of that solution. Upon that notification, the panel procedure shall be terminated.

## Article 24.16

### Dispute resolution

1.      For any dispute that arises under this Chapter, the Parties shall only have recourse to the rules and procedures provided for in this Chapter.

2.      The Parties shall make every attempt to arrive at a mutually satisfactory resolution of a dispute. At any time, the Parties may have recourse to good offices, conciliation, or mediation to resolve that dispute.

# CHAPTER TWENTY-FIVE

## BILATERAL DIALOGUES AND COOPERATION

### *Article 25.1*

### Objectives and principles

1.   Building upon their well-established partnership and shared values, the Parties agree to facilitate cooperation on issues of common interest, including through:

    (a)   strengthening bilateral cooperation on biotechnology through the Dialogue on Biotech Market Access Issues;

    (b)   fostering and facilitating bilateral dialogue and exchange of information on issues related to trade in forest products through the Bilateral Dialogue on Forest Products;

    (c)   endeavour to establish and maintain effective cooperation on raw materials issues through the Bilateral Dialogue on Raw Materials; and

    (d)   encouraging enhanced cooperation on science, technology, research and innovation issues.

2.   Unless otherwise provided in this Agreement, bilateral dialogues shall take place without undue delay at the request of either Party or of the CETA Joint Committee. The dialogues shall be co-chaired by representatives of Canada and the European Union. The meeting schedules and agendas shall be determined by agreement between the co-chairs.

3.   The co-chairs of a bilateral dialogue shall inform the CETA Joint Committee of the schedules and agendas of any bilateral dialogue sufficiently in advance of meetings. The co-chairs of a bilateral dialogue shall report to the CETA Joint Committee on the results and conclusions of a dialogue as appropriate or on request by the CETA Joint Committee. The creation or existence of a dialogue shall not prevent either Party from bringing any matter directly to the CETA Joint Committee.

4.   The CETA Joint Committee may decide to change or undertake the task assigned to a dialogue or dissolve a dialogue.

5.   The Parties may engage in bilateral cooperation in other areas under this Agreement on consent of the CETA Joint Committee.

### *Article 25.2*

### Dialogue on Biotech Market Access Issues

1.   The Parties agree that cooperation and information exchange on issues in connection with biotechnology products are of mutual interest. Such cooperation and exchange of information shall take place in the bilateral dialogue on agricultural biotech market access issues of mutual interest which was established by the Mutually Agreed Solution reached on 15 July 2009 between Canada and the European Union following the WTO dispute *European Communities – Measures Affecting the*

*Approval and Marketing of Biotech Products* WT/DS292. The bilateral dialogue covers any relevant issue of mutual interest to the Parties, including:

(a) biotechnology product approvals in the territory of the Parties as well as, where appropriate, forthcoming applications for product approvals of commercial interest to either side;

(b) the commercial and economic outlook for future approvals of biotechnology products;

(c) any trade impact related to asynchronous approvals of biotechnology products or the accidental release of unauthorised products, and any appropriate measures in this respect;

(d) any biotech-related measures that may affect trade between the Parties, including measures of Member States of the European Union;

(e) any new legislation in the field of biotechnology; and

(f) best practices in the implementation of legislation on biotechnology.

2. The Parties also note the importance of the following shared objectives with respect to cooperation in the field of biotechnology:

(a) to exchange information on policy, regulatory and technical issues of common interest related to biotechnology products, and, in particular, information on their respective systems and processes for risk assessments for decision-making on the use of genetically modified organisms;

(b) to promote efficient science-based approval processes for biotechnology products;

(c) to cooperate internationally on issues related to biotechnology, such as low level presence of genetically modified organisms; and

(d) to engage in regulatory cooperation to minimise adverse trade impacts of regulatory practices related to biotechnology products.

*Article 25.3*

**Bilateral Dialogue on Forest Products**

1. The Parties agree that bilateral dialogue, cooperation and exchange of information and views on relevant laws, regulations, policies and issues of importance to the production, trade, and consumption of forest products are of mutual interest. The Parties agree to carry out this dialogue, cooperation and exchange in the Bilateral Dialogue on Forest Products, including:

(a) the development, adoption and implementation of relevant laws, regulations, policies and standards, and testing, certification and accreditation requirements and their potential impact on trade in forest products between the Parties;

(b) initiatives of the Parties related to the sustainable management of forests and forest governance;

(c) mechanisms to assure the legal or sustainable origin of forest products;

(d)    access for forest products to the Parties or other markets;

(e)    perspectives on multilateral and plurilateral organisations and processes in which they participate, which seek to promote sustainable forest management or combat illegal logging;

(f)    issues referred to in Article 24.10 (Trade in forest products); and

(g)    any other issue related to forest products as agreed upon by the Parties.

2.    The Bilateral Dialogue on Forest Products shall meet within the first year of the entry into force of this Agreement, and thereafter in accordance with Article 25.1.2.

3.    The Parties agree that discussions taking place in the Bilateral Dialogue on Forest Products can inform discussions in the Committee on Trade and Sustainable Development.

## Article 25.4

### Bilateral Dialogue on Raw Materials

1.    Recognising the importance of an open, non-discriminatory and transparent trading environment based on rules and science, the Parties endeavour to establish and maintain effective cooperation on raw materials. For the purposes of this cooperation, raw materials include, but are not limited to, minerals, metals and agricultural products with an industrial use.

2.    The Bilateral Dialogue on Raw Materials covers any relevant issue of mutual interest, including:

(a)    to provide a forum of discussion on cooperation in the field of raw materials between the Parties, to contribute to market access for raw material goods and related services and investments and to avoid non-tariff barriers to trade for raw materials;

(b)    to enhance mutual understanding in the field of raw materials with a view to exchange information on best-practices and on the Parties' regulatory policies vis-à-vis raw materials;

(c)    to encourage activities that support corporate social responsibility in accordance with internationally-recognised standards such as the OECD Guidelines for Multinational Enterprises and the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas; and

(d)    to facilitate, as appropriate, consultation on the Parties' positions in multilateral or plurilateral *fora* where issues related to raw materials may be raised and discussed.

## Article 25.5

### Enhanced cooperation on science, technology, research and innovation

1.   The Parties acknowledge the interdependence of science, technology, research and innovation, and international trade and investment in increasing industrial competitiveness and social and economic prosperity.

2.   Building upon this shared understanding, the Parties agree to strengthen their cooperation in the areas of science, technology, research and innovation.

3.   The Parties shall endeavour to encourage, develop and facilitate cooperative activities on a reciprocal basis in support of, or supplementary to the *Agreement for Scientific and Technological Cooperation between the European Community and Canada*, done at Halifax on 17 June 1995. The Parties agree to conduct these activities on the basis of the following principles:

   (a)   the activities are of mutual benefit to the Parties;

   (b)   the Parties agree on the scope and parameters of the activities; and

   (c)   the activities should take into account the important role of the private sector and research institutions in the development of science, technology, research and innovation, and the commercialisation of goods and services thereof.

4.   The Parties also recognise the importance of enhanced cooperation in science, technology, research and innovation, such as activities initiated, developed or undertaken by a variety of stakeholders, including the Canadian federal government, the Canadian Provinces and Territories, the European Union and its Member States.

5.   Each Party shall encourage, in accordance with its law, the participation of the private sector, research institutions and civil society within its territory in activities to enhance cooperation.

# CHAPTER TWENTY-SIX

## ADMINISTRATIVE AND INSTITUTIONAL PROVISIONS

### *Article 26.1*
### CETA Joint Committee

1.    The Parties hereby establish the CETA Joint Committee comprising representatives of the European Union and representatives of Canada. The CETA Joint Committee shall be co-chaired by the Minister for International Trade of Canada and the Member of the European Commission responsible for Trade, or their respective designees.

2.    The CETA Joint Committee shall meet once a year or at the request of a Party. The CETA Joint Committee shall agree on its meeting schedule and its agenda.

3.    The CETA Joint Committee is responsible for all questions concerning trade and investment between the Parties and the implementation and application of this Agreement. A Party may refer to the CETA Joint Committee any issue relating to the implementation and interpretation of this Agreement, or any other issue concerning trade and investment between the Parties.

4.    The CETA Joint Committee shall:

    (a)    supervise and facilitate the implementation and application of this Agreement and further its general aims;

    (b)    supervise the work of all specialised committees and other bodies established under this Agreement;

    (c)    without prejudice to Chapters Eight (Investment), Twenty-Two (Trade and Sustainable Development), Twenty-Three (Trade and Labour), Twenty-Four (Trade and Environment), and Twenty-Nine (Dispute Settlement), seek appropriate ways and methods of preventing problems that might arise in areas covered by this Agreement, or of resolving disputes that may arise regarding the interpretation or application of this Agreement;

    (d)    adopt its own rules of procedure;

    (e)    make decisions as set out in Article 26.3; and

    (f)    consider any matter of interest relating to an area covered by this Agreement.

5.    The CETA Joint Committee may:

    (a)    delegate responsibilities to the specialised committees established pursuant to Article 26.2;

    (b)    communicate with all interested parties including private sector and civil society organisations;

    (c)    consider or agree on amendments as provided in this Agreement;

    (d)    study the development of trade between the Parties and consider ways to further enhance trade relations between the Parties;

(e)    adopt interpretations of the provisions of this Agreement, which shall be binding on tribunals established under Section F of Chapter Eight (Resolution of investment disputes between investors and states) and Chapter Twenty-Nine (Dispute Settlement);

(f)    make recommendations suitable for promoting the expansion of trade and investment as envisaged in this Agreement;

(g)    change or undertake the tasks assigned to specialised committees established pursuant to Article 26.2 or dissolve any of these specialised committees;

(h)    establish specialised committees and bilateral dialogues in order to assist it in the performance of its tasks; and

(i)    take such other action in the exercise of its functions as decided by the Parties.

*Article 26.2*

**Specialised committees**

1.    The following specialised committees are hereby established, or in the case of the Joint Customs Cooperation Committee referred to in paragraph (c), is granted authority to act under the auspices of the CETA Joint Committee:

(a)    the Committee on Trade in Goods, which addresses matters concerning trade in goods, tariffs, technical barriers to trade, the Protocol on the mutual acceptance of the results of conformity assessment and intellectual property rights related to goods. At the request of a Party, or upon a reference from the relevant specialised committee, or when preparing a discussion in the CETA Joint Committee, the Committee on Trade in Goods may also address matters arising in the area of rules of origin, origin procedures, customs and trade facilitation and border measures, sanitary and phytosanitary measures, government procurement, or regulatory cooperation, if this facilitates the resolution of a matter that cannot otherwise be resolved by the relevant specialised committee. The Committee on Agriculture, the Committee on Wines and Spirits, and the Joint Sectoral Group on Pharmaceuticals shall also be established under and report to the Committee on Trade in Goods;

(b)    the Committee on Services and Investment, which addresses matters concerning cross-border trade in services, investment, temporary entry, electronic commerce, and intellectual property rights related to services. At the request of a Party, or upon a reference from the relevant specialised committee, or when preparing a discussion in the CETA Joint Committee, the Committee on Services and Investment may also address matters arising in the area of financial services or government procurement if this facilitates the resolution of a matter that cannot otherwise be resolved by the relevant specialised committee.

A Joint Committee on Mutual Recognition of Professional Qualifications shall be established under and report to the Committee on Services and Investment;

(c)    the Joint Customs Cooperation Committee (JCCC), established under the 1998 *Agreement between the European Community and Canada on Customs*

*Cooperation and Mutual Assistance in Customs Matters*, done at Ottawa on 4 December 1997, which addresses matters under this Agreement concerning rules of origin, origin procedures, customs and trade facilitation, border measures and temporary suspension of preferential tariff treatment;

(d)  the Joint Management Committee on Sanitary and Phytosanitary Measures, which addresses matters concerning sanitary and phytosanitary measures;

(e)  the Committee on Government Procurement, which addresses matters concerning government procurement;

(f)  the Financial Services Committee, which addresses matters concerning financial services;

(g)  the Committee on Trade and Sustainable Development, which addresses matters concerning sustainable development;

(h)  the Regulatory Cooperation Forum, which addresses matters concerning regulatory cooperation; and

(i)  the CETA Committee on Geographical Indications, which addresses matters concerning geographical indications.

2.  The specialised committees established pursuant to paragraph 1 shall operate according to the provisions of paragraphs 3 through 5.

3.  The remit and tasks of the specialised committees established pursuant to paragraph 1 are further defined in the relevant Chapters and Protocols of this Agreement.

4.  Unless otherwise provided under this Agreement, or if the co-chairs decide otherwise, the specialised committees shall meet once a year. Additional meetings may be held at the request of a Party or of the CETA Joint Committee. They shall be co-chaired by representatives of Canada and the European Union. The specialised committees shall set their meeting schedule and agenda by mutual consent. They shall set and modify their own rules of procedures, if they deem it appropriate. The specialised committees may propose draft decisions for adoption by the CETA Joint Committee, or take decisions when this Agreement so provides.

5.  Each Party shall ensure that when a specialised committee meets, all the competent authorities for each issue on the agenda are represented, as each Party deems appropriate, and that each issue can be discussed at the adequate level of expertise.

6.  The specialised committees shall inform the CETA Joint Committee of their schedules and agenda sufficiently in advance of their meetings and shall report to the CETA Joint Committee on results and conclusions from each of their meetings. The creation or existence of a specialised committee does not prevent a Party from bringing any matter directly to the CETA Joint Committee.

## *Article 26.3*

### Decision making

1.  The CETA Joint Committee shall, for the purpose of attaining the objectives of this Agreement, have the power to make decisions in respect of all matters when this Agreement so provides.

2.    The decisions made by the CETA Joint Committee shall be binding on the Parties, subject to the completion of any necessary internal requirements and procedures, and the Parties shall implement them. The CETA Joint Committee may also make appropriate recommendations.

3.    The CETA Joint Committee shall make its decisions and recommendations by mutual consent.

*Article 26.4*

**Information sharing**

When a Party submits to the CETA Joint Committee or any specialised committee established under this Agreement information considered as confidential or protected from disclosure under its laws, the other Party shall treat that information as confidential.

*Article 26.5*

**CETA contact points**

1.    Each Party shall promptly appoint a CETA contact point and notify the other Party within 60 days following the entry into force of this Agreement.

2.    The CETA contact points shall:

    (a)    monitor the work of all institutional bodies established under this Agreement, including communications relating to successors to those bodies;

    (b)    coordinate preparations for committee meetings;

    (c)    follow up on any decisions made by the CETA Joint Committee, as appropriate;

    (d)    except as otherwise provided in this Agreement, receive all notifications and information provided pursuant to this Agreement and, as necessary, facilitate communications between the Parties on any matter covered by this Agreement;

    (e)    respond to any information requests pursuant to Article 27.2 (Provision of information); and

    (f)    consider any other matter that may affect the operation of this Agreement as mandated by the CETA Joint Committee.

3.    The CETA contact points shall communicate as required.

*Article 26.6*

**Meetings**

1.    Meetings referred to in this Chapter should be in person. Parties may also agree to meet by videoconference or teleconference.

2.    The Parties shall endeavour to meet within 30 days after a Party receives a request to meet by the other Party.

# CHAPTER TWENTY-SEVEN

## TRANSPARENCY

### *Article 27.1*

### Publication

1.  Each Party shall ensure that its laws, regulations, procedures and administrative rulings of general application respecting any matter covered by this Agreement are promptly published or made available in such a manner as to enable interested persons and the other Party to become acquainted with them.

2.  To the extent possible, each Party shall:

    (a)  publish in advance any such measure that it proposes to adopt; and

    (b)  provide interested persons and the other Party a reasonable opportunity to comment on such proposed measures.

### *Article 27.2*

### Provision of information

1.  At the request of the other Party, a Party shall, to the extent possible, promptly provide information and respond to questions pertaining to any existing or proposed measure that materially affects the operation of this Agreement.

2.  Information provided under this Article is without prejudice as to whether the measure is consistent with this Agreement.

### *Article 27.3*

### Administrative proceedings

To administer a measure of general application affecting matters covered by this Agreement in a consistent, impartial and reasonable manner, each Party shall ensure that its administrative proceedings applying measures referred to in Article 27.1 to a particular person, good or service of the other Party in a specific case:

(a)  whenever possible, provide reasonable notice to a person of the other Party who is directly affected by a proceeding, in accordance with domestic procedures, when a proceeding is initiated, including a description of the nature of the proceeding, a statement of the legal authority under which the proceeding is initiated and a general description of the issues in controversy;

(b)  provide a person referred to in sub-paragraph (a) a reasonable opportunity to present facts and arguments in support of its position prior to any final administrative action, when permitted by time, the nature of the proceeding, and the public interest; and

(c)  are conducted in accordance with its law.

*Article 27.4*

**Review and appeal**

1.    Each Party shall establish or maintain judicial, quasi-judicial or administrative tribunals or procedures for the purpose of the prompt review and, if warranted, correction of final administrative actions regarding matters covered by this Agreement. Each Party shall ensure that its tribunals are impartial and independent of the office or authority entrusted with administrative enforcement and that they do not have any substantial interest in the outcome of the matter.

2.    Each Party shall ensure that, in any tribunals or procedures referred to in paragraph 1, the parties to the proceeding are provided with the right to:

    (a)    a reasonable opportunity to support or defend their respective positions; and

    (b)    a decision based on the evidence and submissions of record or, if required by its law, the record compiled by the administrative authority.

3.    Each Party shall ensure, subject to appeal or further review as provided in its law, that such decisions are implemented by and govern the practice of the offices or authorities with respect to the administrative action at issue.

*Article 27.5*

**Cooperation on promoting increased transparency**

The Parties agree to cooperate in bilateral, regional and multilateral *fora* on ways to promote transparency in respect of international trade and investment.

# CHAPTER TWENTY-EIGHT

## EXCEPTIONS

*Article 28.1*
### Definitions

For the purposes of this Chapter:

**residence** means residence for tax purposes;

**tax convention** means a convention for the avoidance of double taxation or other international taxation agreement or arrangement; and

**tax** and **taxation measure** includes an excise duty, but does not include:

(a)     a customs duty as defined in Article 1.1 (General definitions), and

(b)     a measure listed in exceptions (b) or (c)in the definition of "customs duty" in Article 1.1 (General definitions).

*Article 28.2*
### Party-specific definitions

For the purposes of this Chapter:

**competition authority** means:

(a)     for Canada, the Commissioner of Competition or a successor notified to the other Party through the CETA contact points; and

(b)     for the European Union, the Commission of the European Union with respect to its responsibilities pursuant to the competition laws of the European Union;

**competition laws** means:

(a)     for Canada, the *Competition Act*, R.S.C. 1985, c. C-34; and

(b)     for the European Union, Articles 101, 102 and 106 of the *Treaty on the Functioning of the European Union*, of 13 December 2007, Council Regulation (EC) No. 139/2004 of 20 January 2004 on the control of concentrations between undertakings, and their implementing regulations or amendments; and

**information protected under its competition laws** means:

(a)     for Canada, information within the scope of Section 29 of the *Competition Act*, R.S.C. 1985, c. C-34; and

(b)     for the European Union, information within the scope of Article 28 of Council Regulation (EC) No. 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty or Article 17 of Council Regulation (EC) No. 139/2004 of 20 January 2004 on the control of concentrations between undertakings.

*Article 28.3*

**General exceptions**

1.  For the purposes of Article 30.8.5 (Termination, suspension or incorporation of other existing agreements), Chapters Two (National Treatment and Market Access for Goods), Five (Sanitary and Phytosanitary Measures), and Six (Customs and Trade Facilitation), the Protocol on rules of origin and origin procedures and Sections B (Establishment of investment) and C (Non-discriminatory treatment) of Chapter Eight (Investment), Article XX of the GATT 1994 is incorporated into and made part of this Agreement. The Parties understand that the measures referred to in Article XX (b) of the GATT 1994 include environmental measures necessary to protect human, animal or plant life or health. The Parties understand that Article XX(g) of the GATT 1994 applies to measures for the conservation of living and non-living exhaustible natural resources.

2.  For the purposes of Chapters Nine (Cross-Border Trade in Services), Ten (Temporary Entry and Stay of Natural Persons for Business Purposes), Twelve (Domestic Regulations), Thirteen (Financial Services), Fourteen (International Maritime Transport Services), Fifteen (Telecommunications), Sixteen (Electronic Commerce), and Sections B (Establishment of investments) and C (Non-discriminatory treatment) of Chapter Eight (Investment), subject to the requirement that such measures are not applied in a manner which would constitute a means of arbitrary or unjustifiable discrimination between the Parties where like conditions prevail, or a disguised restriction on trade in services, nothing in this Agreement shall be construed to prevent the adoption or enforcement by a Party of measures necessary:

    (a)  to protect public security or public morals or to maintain public order;[31]

    (b)  to protect human, animal or plant life or health;[32] or

    (c)  to secure compliance with laws or regulations which are not inconsistent with the provisions of this Agreement including those relating to:

        (i)  the prevention of deceptive and fraudulent practices or to deal with the effects of a default on contracts;

        (ii)  the protection of the privacy of individuals in relation to the processing and dissemination of personal data and the protection of confidentiality of individual records and accounts; or

        (iii)  safety.

*Article 28.4*

**Temporary safeguard measures with regard to capital movements and payments**

1.  Where, in exceptional circumstances, capital movements and payments, including transfers, cause or threaten to cause serious difficulties for the operation of the

---

[31] The public security and public order exceptions may be invoked only where a genuine and sufficiently serious threat is posed to one of the fundamental interests of society.

[32] The Parties understand that the measures referred to in sub-paragraph (b) include environmental measures necessary to protect human, animal or plant life or health.

economic and monetary union of the European Union, the European Union may impose safeguard measures that are strictly necessary to address such difficulties for a period not to exceed 180 days.

2.    Measures imposed by the European Union pursuant to paragraph 1 shall not constitute a means of arbitrary or unjustified discrimination in respect of Canada or its investors compared to a third country or its investors. The European Union shall inform Canada forthwith and present, as soon as possible, a schedule for the removal of such measures.

*Article 28.5*

**Restrictions in case of serious balance of payments and external financial difficulties**

1.    Where Canada or a Member State of the European Union that is not a member of the European Monetary Union experiences serious balance-of-payments or external financial difficulties, or threat thereof, it may adopt or maintain restrictive measures with regard to capital movements or payments, including transfers.

2.    Measures referred to in paragraph 1 shall:

(a)    not treat a Party less favourably than a third country in like situations;

(b)    be consistent with the Articles of the *Agreement of the International Monetary Fund*, done at Bretton Woods on 22 July 1945, as applicable;

(c)    avoid unnecessary damage to the commercial, economic and financial interests of a Party;

(d)    be temporary and phased out progressively as the situation specified in paragraph 1 improves and shall not exceed 180 days. If extremely exceptional circumstances arise such that a Party seeks to extend such measures beyond a period of 180 days, it will consult in advance with the other Party regarding the implementation of any proposed extension.

3.    In the case of trade in goods, a Party may adopt restrictive measures in order to safeguard its balance-of-payments or external financial position. Such measures shall be in accordance with the GATT 1994 and the Understanding on Balance of Payment Provisions of the GATT 1994, contained in Annex 1A to the WTO Agreement.

4.    In the case of trade in services, a Party may adopt restrictive measures in order to safeguard its balance-of-payments or external financial position. Such measures shall be in accordance with the GATS.

5.    A Party that adopts or maintains a measure referred to in paragraph 1 shall promptly notify the other Party and provide, as soon as possible, a schedule for their removal.

6.    Where the restrictions are adopted or maintained under this Article, consultations between the Parties shall be held promptly in the CETA Joint Committee, if such consultations are not otherwise taking place in a forum outside of this Agreement. The consultations held under this paragraph shall assess the balance-of-payments or external financial difficulty that led to the respective measures, taking into account, among other things, such factors as:

(a)    the nature and extent of the difficulties;

(b)     the external economic and trading environment; or

(c)     the availability of alternative corrective measures.

7.     The consultations pursuant to paragraph 6 shall address the compliance of any restrictive measures with paragraphs 1 through 4. The Parties shall accept all findings of statistical and other facts presented by the International Monetary Fund ("IMF") relating to foreign exchange, monetary reserves, balance-of-payments, and their conclusions shall be based on the assessment by the IMF of the balance-of-payments and the external financial situation of the Party concerned.

## Article 28.6

### National security

Nothing in this Agreement shall be construed:

(a)     to require a Party to furnish or allow access to information if that Party determines that the disclosure of this information would be contrary to its essential security interests; or

(b)     to prevent a Party from taking an action that it considers necessary to protect its essential security interests:

(i)     connected to the production of or traffic in arms, ammunition and implements of war and to such traffic and transactions in other goods and materials, services and technology undertaken, and to economic activities, carried out directly or indirectly for the purpose of supplying a military or other security establishment;[33]

(ii)     taken in time of war or other emergency in international relations; or

(iii)     relating to fissionable and fusionable materials or the materials from which they are derived; or

(c)     prevent a Party from taking any action in order to carry out its international obligations for the purpose of maintaining international peace and security.

## Article 28.7

### Taxation

1.     Nothing in this Agreement shall be construed to prevent a Party from adopting or maintaining any taxation measure that distinguishes between persons who are not in the same situation, in particular with regard to their place of residence or with regard to the place where their capital is invested.

2.     Nothing in this Agreement shall be construed to prevent a Party from adopting or maintaining any taxation measure aimed at preventing the avoidance or evasion of taxes pursuant to its tax laws or tax conventions.

---

[33]     The expression "traffic in arms, ammunition and implements of war" in this Article is equivalent to the expression "trade in arms, munitions and war material".

3.      This Agreement does not affect the rights and obligations of a Party under a tax convention. In the event of inconsistency between this Agreement and a tax convention, that convention prevails to the extent of the inconsistency.

4.      Nothing in this Agreement or in any arrangement adopted under this Agreement shall apply:

   (a)    to a taxation measure of a Party that provides a more favourable tax treatment to a corporation, or to a shareholder of a corporation, on the basis that the corporation is wholly or partly owned or controlled, directly or indirectly, by one or more investors who are residents of that Party;

   (b)    to a taxation measure of a Party that provides an advantage relating to the contributions made to, or income of, an arrangement providing for the deferral of, or exemption from, tax for pension, retirement, savings, education, health, disability or other similar purposes, conditional on a requirement that that Party maintains continuous jurisdiction over such arrangement;

   (c)    to a taxation measure of a Party that provides an advantage relating to the purchase or consumption of a particular service, conditional on a requirement that the service be provided in the territory of that Party;

   (d)    to a taxation measure of a Party that is aimed at ensuring the equitable and effective imposition or collection of taxes, including a measure that is taken by a Party in order to ensure compliance with the Party's taxation system;

   (e)    to a taxation measure that provides an advantage to a government, a part of a government, or a person that is directly or indirectly owned, controlled or established by a government;

   (f)    to an existing non-conforming taxation measure not otherwise covered in paragraphs 1, 2 and 4(a) through (e), to the continuation or prompt renewal of such a measure, or an amendment of such a measure, provided that the amendment does not decrease its conformity with the provisions of this Agreement as it existed immediately before the amendment.

5.      For greater certainty, the fact that a taxation measure constitutes a significant amendment to an existing taxation measure, takes immediate effect as of its announcement, clarifies the intended application of an existing taxation measure, or has an unexpected impact on an investor or covered investment, does not, in and of itself, constitute a violation of Article 8.10 (Treatment of investors and of covered investments).

6.      Articles 8.7 (Most-favoured-nation treatment), 9.4 (Most-favoured-nation treatment) and 13.4 (Most-favoured-nation treatment) do not apply to an advantage accorded by a Party pursuant to a tax convention.

7.      (a)    Where an investor submits a request for consultations pursuant to Article 8.19 (Consultations) claiming that a taxation measure breaches an obligation under Sections C (Non-discriminatory treatment) or D (Investment protection) of Chapter Eight (Investment), the respondent may refer the matter for consultation and joint determination by the Parties as to whether:

         (i)    the measure is a taxation measure;

      (ii)   the measure, if it is found to be a taxation measure, breaches an obligation under Sections C (Non-discriminatory Treatment) or D (Investment Protection) of Chapter Eight (Investment); or

      (iii)  there is an inconsistency between the obligations in this Agreement that are alleged to have been breached and those of a tax convention.

(b)   A referral pursuant to subparagraph (a) cannot be made later than the date the Tribunal fixes for the respondent to submit its counter-memorial. Where the respondent makes such a referral the time periods or proceedings specified in Section F (Resolution of investment disputes between investors and states) of Chapter Eight (Investment) shall be suspended. If within 180 days from the referral the Parties do not agree to consider the issue, or fail to make a joint determination, the suspension of the time periods or proceedings shall no longer apply and the investor may proceed with its claim.

(c)   A joint determination by the Parties pursuant to subparagraph (a) shall be binding on the Tribunal.

(d)   Each Party shall ensure that its delegation for the consultations to be conducted pursuant to subparagraph (a) shall include persons with relevant expertise on the issues covered by this Article, including representatives from the relevant tax authorities of each Party. For Canada, this means officials from the Department of Finance.

8.    For greater certainty,

(a)   **taxation measure of a Party** means a taxation measure adopted at any level of government of a Party; and

(b)   for measures of a sub-national government, **resident of a Party**, means either resident of that sub-national jurisdiction or resident of the Party of which it forms a part.

*Article 28.8*

**Disclosure of information**

1.    This Agreement does not require a Party to furnish or allow access to information which, if disclosed, would impede law enforcement or the disclosure of which is prohibited or restricted under its law.

2.    In the course of a dispute settlement procedure under this Agreement,

(a)   a Party is not required to furnish or allow access to information protected under its competition laws; and

(b)   a competition authority of a Party is not required to furnish or allow access to information that is privileged or otherwise protected from disclosure.

*Article 28.9*

**Exceptions applicable to culture**

The Parties recall the exceptions applicable to culture as set out in the relevant provisions of Chapters Seven (Subsidies), Eight (Investment), Nine (Cross-Border Trade in Services), Twelve (Domestic Regulation) and Nineteen (Government Procurement).

*Article 28.10*

**WTO waivers**

If a right or obligation in this Agreement duplicates one under the WTO Agreement, the Parties agree that a measure in conformity with a waiver decision adopted by the WTO pursuant to Article IX of the WTO Agreement is deemed to be also in conformity with the duplicated provision in this Agreement.

# CHAPTER TWENTY-NINE

## DISPUTE SETTLEMENT

### SECTION A

### *Initial provisions*

### Article 29.1

### Cooperation

The Parties shall, at all times, endeavour to agree on the interpretation and application of this Agreement, and shall make every attempt through cooperation and consultations to arrive at a mutually satisfactory resolution of any matter that might affect its operation.

### Article 29.2

### Scope

Except as otherwise provided in this Agreement, this Chapter applies to any dispute concerning the interpretation or application of the provisions of this Agreement.

### Article 29.3

### Choice of forum

1.    Recourse to the dispute settlement provisions of this Chapter is without prejudice to recourse to dispute settlement under the WTO Agreement or under any other agreement to which the Parties are party.

2.    Notwithstanding paragraph 1, if an obligation is equivalent in substance under this Agreement and under the WTO Agreement, or under any other agreement to which the Parties are party, a Party may not seek redress for the breach of such an obligation in the two fora. In such case, once a dispute settlement proceeding has been initiated under one agreement, the Party shall not bring a claim seeking redress for the breach of the substantially equivalent obligation under the other agreement, unless the forum selected fails, for procedural or jurisdictional reasons, other than termination under paragraph 20 of Annex 29-A, to make findings on that claim.

3.    For the purposes of paragraph 2:

  (a)    dispute settlement proceedings under the WTO Agreement are deemed to be initiated by a Party's request for the establishment of a panel under Article 6 of the DSU;

  (b)    dispute settlement proceedings under this Chapter are deemed to be initiated by a Party's request for the establishment of an arbitration panel under Article 29.6; and

  (c)    dispute settlement proceedings under any other agreement are deemed to be initiated by a Party's request for the establishment of a dispute settlement panel or tribunal in accordance with the provisions of that agreement.

4.    Nothing in this Agreement shall preclude a Party from implementing the suspension of obligations authorised by the WTO Dispute Settlement Body. A Party may not invoke the WTO Agreement to preclude the other Party from suspending obligations pursuant to this Chapter.

## SECTION B

### Consultations and mediation

### Article 29.4

### Consultations

1.    A Party may request in writing consultations with the other Party regarding any matter referred to in Article 29.2.

2.    The requesting Party shall transmit the request to the responding Party, and shall set out the reasons for the request, including the identification of the specific measure at issue and the legal basis for the complaint.

3.    Subject to paragraph 4, the Parties shall enter into consultations within 30 days of the date of receipt of the request by the responding Party.

4.    In cases of urgency, including those involving perishable or seasonal goods, or services that rapidly lose their trade value, consultations shall commence within 15 days of the date of receipt of the request by the responding Party.

5.    The Parties shall make every attempt to arrive at a mutually satisfactory resolution of the matter through consultations. To this end, each Party shall:

(a)    provide sufficient information to enable a full examination of the matter at issue;

(b)    protect any confidential or proprietary information exchanged in the course of consultations as requested by the Party providing the information; and

(c)    make available the personnel of its government agencies or other regulatory bodies who have expertise in the matter that is the subject of the consultations.

6.    Consultations are confidential and without prejudice to the rights of the Parties in proceedings under this Chapter.

7.    Consultations shall take place in the territory of the responding Party unless the Parties agree otherwise. Consultations may be held in person or by any other means agreed to by the Parties.

8.    A Party's proposed measure may be the subject of consultations under this Article but may not be the subject of mediation under Article 29.5 or the dispute settlement procedures under Section C.

### Article 29.5

### Mediation

The Parties may have recourse to mediation with regard to a measure if the measure adversely affects trade and investment between the Parties. Mediation procedures are set out in Annex 29-C.

## SECTION C

### Dispute settlement procedures and compliance

Sub-section A

### Dispute settlement procedures

*Article 29.6*

### Request for the establishment of an arbitration panel

1.    Unless the Parties agree otherwise, if a matter referred to in Article 29.4 has not been resolved within:

(a)    45 days of the date of receipt of the request for consultations; or

(b)    25 days of the date of receipt of the request for consultations for matters referred to in Article 29.4.4,

the requesting Party may refer the matter to an arbitration panel by providing its written request for the establishment of an arbitration panel to the responding Party.

2.    The requesting Party shall identify in its written notice the specific measure at issue and the legal basis for the complaint, including an explanation of how such measure constitutes a breach of the provisions referred to in Article 29.2.

*Article 29.7*

### Composition of the arbitration panel

1.    The arbitration panel shall be composed of three arbitrators.

2.    The Parties shall consult with a view to reaching an agreement on the composition of the arbitration panel within 10 working days of the date of receipt by the responding Party of the request for the establishment of an arbitration panel.

3.    In the event that the Parties are unable to agree on the composition of the arbitration panel within the time frame set out in paragraph 2, either Party may request the Chair of the CETA Joint Committee, or the Chair's delegate, to draw by lot the arbitrators from the list established under Article 29.8. One arbitrator shall be drawn from the sub-list of the requesting Party, one from the sub-list of the responding Party and one from the sub-list of chairperson. If the Parties have agreed on one or more of the arbitrators, any remaining arbitrator shall be selected by the same procedure in the applicable sub-list of arbitrators. If the Parties have agreed on an arbitrator, other than the chairperson, who is not a national of either Party, the chairperson and other arbitrator shall be selected from the sub-list of chairpersons.

4.    The Chair of the CETA Joint Committee, or the Chair's delegate, shall select the arbitrators as soon as possible and normally within five working days of the request referred to in paragraph 3 by either Party. The Chair, or the Chair's delegate, shall give a reasonable opportunity to representatives of each Party to be present when lots are drawn. One of the chairpersons can perform the selection by lot alone if the other chairperson was informed about the date, time and place of the selection by lot and did not accept to participate within five working days of the request referred to in paragraph 3.

5.    The date of establishment of the arbitration panel shall be the date on which the last of the three arbitrators is selected.

6.    If the list provided for in Article 29.8 is not established or if it does not contain sufficient names at the time a request is made pursuant to paragraph 3, the three arbitrators shall be drawn by lot from the arbitrators who have been proposed by one or both of the Parties in accordance with Article 29.8.1.

7.    Replacement of arbitrators shall take place only for the reasons and according to the procedure set out in paragraphs 21 through 25 of Annex 29-A.

## *Article 29.8*

### **List of arbitrators**

1.    The CETA Joint Committee shall, at its first meeting after the entry into force of this Agreement, establish a list of at least 15 individuals, chosen on the basis of objectivity, reliability and sound judgment, who are willing and able to serve as arbitrators. The list shall be composed of three sub-lists: one sub-list for each Party and one sub-list of individuals who are not nationals of either Party to act as chairpersons. Each sub-list shall include at least five individuals. The CETA Joint Committee may review the list at any time and shall ensure that the list conforms with this Article.

2.    The arbitrators must have specialised knowledge of international trade law. The arbitrators acting as chairpersons must also have experience as counsel or panellist in dispute settlement proceedings on subject matters within the scope of this Agreement. The arbitrators shall be independent, serve in their individual capacities and not take instructions from any organisation or government, or be affiliated with the government of any of the Parties, and shall comply with the Code of Conduct in Annex 29-B.

## *Article 29.9*

### **Interim panel report**

1.    The arbitration panel shall present to the Parties an interim report within 150 days of the establishment of the arbitration panel. The report shall contain:

(a)    findings of fact; and

(b)    determinations as to whether the responding Party has conformed with its obligations under this Agreement.

2.    Each Party may submit written comments to the arbitration panel on the interim report, subject to any time limits set by the arbitration panel. After considering any such comments, the arbitration panel may:

(a)    reconsider its report; or

(b)    make any further examination that it considers appropriate.

3.    The interim report of the arbitration panel shall be confidential.

*Article 29.10*

**Final panel report**

1.    Unless the Parties agree otherwise, the arbitration panel shall issue a report in accordance with this Chapter. The final panel report shall set out the findings of fact, the applicability of the relevant provisions of this Agreement and the basic rationale behind any findings and conclusions that it makes. The ruling of the arbitration panel in the final panel report shall be binding on the Parties.

2.    The arbitration panel shall issue to the Parties and to the CETA Joint Committee a final report within 30 days of the interim report.

3.    Each Party shall make publicly available the final panel report, subject to paragraph 39 of Annex 29-A.

*Article 29.11*

**Urgent proceedings**

In cases of urgency, including those involving perishable or seasonal goods, or services that rapidly lose their trade value, the arbitration panel and the Parties shall make every effort to accelerate the proceedings to the greatest extent possible. The arbitration panel shall aim at issuing an interim report to the Parties within 75 days of the establishment of the arbitration panel, and a final report within 15 days of the interim report. Upon request of a Party, the arbitration panel shall make a preliminary ruling within 10 days of the request on whether it deems the case to be urgent.

Sub-section B

**Compliance**

*Article 29.12*

**Compliance with the final panel report**

The responding Party shall take any measure necessary to comply with the final panel report. No later than 20 days after the receipt of the final panel report by the Parties, the responding Party shall inform the other Party and the CETA Joint Committee of its intentions in respect of compliance.

*Article 29.13*

**Reasonable period of time for compliance**

1.    If immediate compliance is not possible, no later than 20 days after the receipt of the final panel report by the Parties, the responding Party shall notify the requesting Party and the CETA Joint Committee of the period of time it will require for compliance.

2.    In the event of disagreement between the Parties on the reasonable period of time in which to comply with the final panel report, the requesting Party shall, within 20 days of the receipt of the notification made under paragraph 1 by the responding Party, request in writing the arbitration panel to determine the length of the reasonable period of time. Such request shall be notified simultaneously to the other

222

Party and to the CETA Joint Committee. The arbitration panel shall issue its ruling to the Parties and to the CETA Joint Committee within 30 days from the date of the request.

3. The reasonable period of time may be extended by mutual agreement of the Parties.

4. At any time after the midpoint in the reasonable period of time and at the request of the requesting Party, the responding Party shall make itself available to discuss the steps it is taking to comply with the final panel report.

5. The responding Party shall notify the other Party and the CETA Joint Committee before the end of the reasonable period of time of measures that it has taken to comply with the final panel report.

### Article 29.14

### Temporary remedies in case of non-compliance

1. If:

   (a) the responding Party fails to notify its intention to comply with the final panel report under Article 29.12 or the time it will require for compliance under Article 29.13.1;

   (b) at the expiry of the reasonable period of time, the responding Party fails to notify any measure taken to comply with the final panel report; or

   (c) the arbitration panel on compliance referred to in paragraph 6 establishes that a measure taken to comply is inconsistent with that Party's obligations under the provisions referred to in Article 29.2,

   the requesting Party shall be entitled to suspend obligations or receive compensation. The level of the nullification and impairment shall be calculated starting from the date of notification of the final panel report to the Parties.

2. Before suspending obligations, the requesting Party shall notify the responding Party and the CETA Joint Committee of its intention to do so, including the level of obligations it intends to suspend.

3. Except as otherwise provided in this Agreement, the suspension of obligations may concern any provision referred to in Article 29.2 and shall be limited at a level equivalent to the nullification or impairment caused by the violation.

4. The requesting Party may implement the suspension 10 working days after the date of receipt of the notification referred to in paragraph 2 by the responding Party, unless a Party has requested arbitration under paragraphs 6 and 7.

5. A disagreement between the Parties concerning the existence of any measure taken to comply or its consistency with the provisions referred to in Article 29.2 ("disagreement on compliance"), or on the equivalence between the level of suspension and the nullification or impairment caused by the violation ("disagreement on equivalence"), shall be referred to the arbitration panel.

6. A Party may reconvene the arbitration panel by providing a written request to the arbitration panel, the other Party and the CETA Joint Committee. In case of a disagreement on compliance, the arbitration panel shall be reconvened by the

requesting Party. In case of a disagreement on equivalence, the arbitration panel shall be reconvened by the responding Party. In case of disagreements on both compliance and on equivalence, the arbitration panel shall rule on the disagreement on compliance before ruling on the disagreement on equivalence.

7.    The arbitration panel shall notify its ruling to the Parties and to the CETA Joint Committee accordingly:

   (a)    within 90 days of the request to reconvene the arbitration panel, in case of a disagreement on compliance;

   (b)    within 30 days of the request to reconvene the arbitration panel, in case of a disagreement on equivalence;

   (c)    within 120 days of the first request to reconvene the arbitration panel, in case of a disagreement on both compliance and equivalence.

8.    The requesting Party shall not suspend obligations until the arbitration panel reconvened under paragraphs 6 and 7 has delivered its ruling. Any suspension shall be consistent with the arbitration panel's ruling.

9.    The suspension of obligations shall be temporary and shall be applied only until the measure found to be inconsistent with the provisions referred to in Article 29.2 has been withdrawn or amended so as to bring it into conformity with those provisions, as established under Article 29.15, or until the Parties have settled the dispute.

10.    At any time, the requesting Party may request the responding Party to provide an offer for temporary compensation and the responding Party shall present such offer.

*Article 29.15*

**Review of measures taken to comply after the suspension of obligations**

1.    When, after the suspension of obligations by the requesting Party, the responding Party takes measures to comply with the final panel report, the responding Party shall notify the other Party and the CETA Joint Committee and request an end to the suspension of obligations applied by the requesting Party.

2.    If the Parties do not reach an agreement on the compatibility of the notified measure with the provisions referred to in Article 29.2 within 60 days of the date of receipt of the notification, the requesting Party shall request in writing the arbitration panel to rule on the matter. Such request shall be notified simultaneously to the other Party and to the CETA Joint Committee. The final panel report shall be notified to the Parties and to the CETA Joint Committee within 90 days of the date of submission of the request. If the arbitration panel rules that any measure taken to comply is in conformity with the provisions referred to in Article 29.2, the suspension of obligations shall be terminated.

*SECTION D*

**General Provisions**

*Article 29.16*

**Rules of procedure**

224

Dispute settlement procedure under this Chapter shall be governed by the rules of procedure for arbitration in Annex 29-A, unless the Parties agree otherwise.

### Article 29.17

### General rule of interpretation

The arbitration panel shall interpret the provisions of this Agreement in accordance with customary rules of interpretation of public international law, including those set out in the *Vienna Convention on the Law of Treaties*. The arbitration panel shall also take into account relevant interpretations in reports of Panels and the Appellate Body adopted by the WTO Dispute Settlement Body.

### Article 29.18

### Rulings of the arbitration panel

The rulings of the arbitration panel cannot add to or diminish the rights and obligations provided for in this Agreement.

### Article 29.19

### Mutually agreed solutions

The Parties may reach a mutually agreed solution to a dispute under this Chapter at any time. They shall notify the CETA Joint Committee and the arbitration panel of any such solution. Upon notification of the mutually agreed solution, the arbitration panel shall terminate its work and the proceedings shall be terminated.

# CHAPTER THIRTY

## FINAL PROVISIONS

### *Article 30.1*

### Integral parts of this Agreement

The protocols, annexes, declarations, joint declarations, understandings and footnotes to this Agreement constitute integral parts thereof.

### *Article 30.2*

### Amendments

1.      The Parties may agree, in writing, to amend this Agreement. An amendment shall enter into force after the Parties exchange written notifications certifying that they have completed their respective applicable internal requirements and procedures necessary for the entry into force of the amendment, or on the date agreed by the Parties.

2.      Notwithstanding paragraph 1, the CETA Joint Committee may decide to amend the protocols and annexes of this Agreement. The Parties may approve the CETA Joint Committee's decision in accordance with their respective internal requirements and procedures necessary for the entry into force of the amendment. The decision shall enter into force on a date agreed by the Parties. This procedure shall not apply to amendments to Annexes I, II and III and to amendments to the annexes of Chapters Eight (Investment), Nine (Cross-Border Trade in Services), Ten (Temporary Entry and Stay of Natural Persons for Business Purposes) and Thirteen (Financial Services), except for Annex 10-A (List of Contact Points of the Member States of the European Union).

### *Article 30.3*

### Preference utilisation

For a period of 10 years after the entry into force of this Agreement, the Parties shall exchange quarterly figures at the tariff line level for HS Chapters 1 through 97, on imports of goods from the other Party that are subject to MFN-applied tariff rates and tariff preferences under this Agreement. Unless the Parties decide otherwise, this period will be renewed for five years and may be subsequently extended by them.

### *Article 30.4*

### Current account

The Parties shall authorise, in freely convertible currency and in accordance with Article VIII of the *Articles of the Agreement of the International Monetary Fund* done at Bretton Woods on 22 July 1944, any payments and transfers on the current account of the balance of payments between the Parties.

*Article 30.5*

**Movement of capital**

The Parties shall consult each other with a view to facilitating the movement of capital between them by continuing to implement their policies regarding the liberalisation of the capital and financial account, and by supporting a stable and secure framework for long term investment.

*Article 30.6*

**Private rights**

1.     Nothing in this Agreement shall be construed as conferring rights or imposing obligations on persons other than those created between the Parties under public international law, nor as permitting this Agreement to be directly invoked in the domestic legal systems of the Parties.

2.     A Party shall not provide for a right of action under its domestic law against the other Party on the ground that a measure of the other Party is inconsistent with this Agreement.

*Article 30.7*

**Entry into force and provisional application**

1.     The Parties shall approve this Agreement in accordance with their respective internal requirements and procedures.

2.     This Agreement shall enter into force on the first day of the second month following the date the Parties exchange written notifications certifying that they have completed their respective internal requirements and procedures or on such other date as the Parties may agree.

3.     (a)     The Parties may provisionally apply this Agreement from the first day of the month following the date on which the Parties have notified each other that their respective internal requirements and procedures necessary for the provisional application of this Agreement have been completed or on such other date as the Parties may agree.

       (b)     If a Party intends not to provisionally apply a provision of this Agreement, it shall first notify the other Party of the provisions that it will not provisionally apply and shall offer to enter into consultations promptly. Within 30 days of the notification, the other Party may either object, in which case this Agreement shall not be provisionally applied, or provide its own notification of equivalent provisions of this Agreement, if any, that it does not intend to provisionally apply. If within 30 days of the second notification, an objection is made by the other Party, this Agreement shall not be provisionally applied.

       The provisions that are not subject to a notification by a Party shall be provisionally applied by that Party from the first day of the month following the later notification, or on such other date as the Parties may agree, provided the Parties have exchanged notifications under sub-paragraph(a).

(c)    A Party may terminate the provisional application of this Agreement by written notice to the other Party. Such termination shall take effect on the first day of the second month following that notification.

(d)    If this Agreement, or certain provisions of this Agreement, is provisionally applied, the Parties shall understand the term "entry into force of this Agreement" as meaning the date of provisional application. The CETA Joint Committee and other bodies established under this Agreement may exercise their functions during the provisional application of this Agreement. Any decisions adopted in the exercise of their functions will cease to be effective if the provisional application of this Agreement is terminated under subparagraph (c).

4.    Canada shall submit notifications under this Article to the General Secretariat of the Council of the European Union or its successor. The European Union shall submit notifications under this Article to Canada's Department of Foreign Affairs, Trade and Development or its successor.

*Article 30.8*

**Termination, suspension or incorporation of other existing agreements**

1.    The agreements listed in Annex 30-A shall cease to have effect, and shall be replaced and superseded by this Agreement. Termination of the agreements listed in Annex 30-A shall take effect from the date of entry into force of this Agreement.

2.    In the event of the provisional application of Chapter Eight (Investment) in accordance with Article 30.7.3(a), the agreements listed in Annex 30-A, as well as the rights and obligations derived therefrom shall be suspended as of the date of provisional application. In the event the provisional application is terminated, the suspension of the agreements listed in Annex 30-A shall cease.

3.    Notwithstanding paragraphs 1 and 2, a claim may be submitted under an agreement listed in Annex 30-A in accordance with the rules and procedures established in the agreement if:

(a)    the treatment that is object of the claim was accorded when the agreement was not suspended or terminated; and

(b)    no more than three years have elapsed since the date of suspension or termination of the agreement.

4.    Notwithstanding paragraphs 1 and 2, if the provisional application of this Agreement is terminated and this Agreement does not enter into force, a claim may be submitted under Section F of Chapter Eight (Investment) within a period no longer than three years following the date of termination of the provisional application, regarding any matter arising during the provisional application of this Agreement, in accordance with the rules and procedures established in this Agreement.

5.    The *Agreement between the European Economic Community and Canada concerning Trade and Commerce in Alcoholic Beverages*, done at Brussels on 28 February 1989, as amended, (the "1989 Alcoholic Beverages Agreement") and the *Agreement between the European Community and Canada on Trade in Wines and Spirit Drinks*, done at Niagara-on-the-Lake on 16 September 2003 (the "2003 Wines

and Spirit Drinks Agreement") are incorporated into and made part of this Agreement, as amended by Annex 30-B.

6.   The provisions of the 1989 Alcoholic Beverages Agreement or the 2003 Wines and Spirit Drinks Agreement, as amended and incorporated into this Agreement, prevail to the extent that there is an inconsistency between the provisions of those agreements and any other provision of this Agreement.

7.   The *Agreement on Mutual Recognition between the European Community and Canada* (the "*Agreement on Mutual Recognition*"), done at London on 14 May 1998, shall be terminated from the date of entry into force of this Agreement. In the event of provisional application of Chapter Four (Technical Barriers to Trade) in accordance with Article 30.7.3(a), the *Agreement on Mutual Recognition*, as well as the rights and obligations derived therefrom, shall be suspended as of the date of provisional application. In the event the provisional application is terminated, the suspension of the *Agreement on Mutual Recognition* shall cease.

8.   The Parties recognise the achievements that have been accomplished under the *Agreement between the European Community and the Government of Canada on sanitary measures to protect public and animal health in respect of trade in live animals and animal products*, done at Ottawa on 17 December 1998 (the "*Veterinary Agreement*") and confirm their intention to continue this work under this Agreement. The *Veterinary Agreement* shall be terminated from the date of entry into force of this Agreement. In the event of provisional application of Chapter Five (Sanitary and Phytosanitary Measures) in accordance with Article 30.7.3(a), the *Veterinary Agreement*, as well as the rights and obligations derived therefrom, shall be suspended as of the date of provisional application. In the event the provisional application is terminated, the suspension of the *Veterinary Agreement* shall cease.

9.   The definition of "entry into force of this Agreement" in Article 30.7.3(d) shall not apply to this Article.

*Article 30.9*

**Termination**

1.   A Party may denounce this Agreement by giving written notice of termination to the General Secretariat of the Council of the European Union and the Department of Foreign Affairs, Trade and Development Canada, or their respective successors. This Agreement shall be terminated 180 days after the date of that notice. The Party giving a notice of termination shall also provide the CETA Joint Committee with a copy of the notice.

2.   Notwithstanding paragraph 1, in the event that this Agreement is terminated, the provisions of Chapter Eight (Investment) shall continue to be effective for a period of 20 years after the date of termination of this Agreement in respect of investments made before that date. This paragraph shall not apply in the case of provisional application of this Agreement.

*Article 30.10*

**Accession of new Member States of the European Union**

1.  The European Union shall notify Canada of any request made by a country to accede to the European Union.

2.  During the negotiations between the European Union and the country seeking accession, the European Union shall:

    (a)  provide, upon the request of Canada, and to the extent possible, any information regarding any matter covered by this Agreement; and

    (b)  take into account any concerns expressed by Canada.

3.  The European Union shall notify Canada of the entry into force of any accession to the European Union.

4.  Sufficiently in advance of the date of accession of a country to the European Union, the CETA Joint Committee shall examine any effects of the accession on this Agreement and shall decide on any necessary adjustment or transition measures.

5.  Any new Member State of the European Union shall accede to this Agreement from the date of its accession to the European Union by means of a clause to that effect in the act of accession to the European Union. If the act of accession to the European Union does not provide for the automatic accession of the European Union Member State to this Agreement, the European Union Member State concerned shall accede to this Agreement by depositing an act of accession to this Agreement with the General Secretariat of the Council of the European Union and the Department of Foreign Affairs, Trade and Development Canada, or their respective successors.

*Article 30.11*

**Authentic texts**

This Agreement is drawn up in duplicate in the Bulgarian, Croatian, Czech, Danish, Dutch, English, Estonian, Finnish, French, German, Greek, Hungarian, Italian, Latvian, Lithuanian, Maltese, Polish, Portuguese, Romanian, Slovak, Slovenian, Spanish, and Swedish languages, each version being equally authentic.

## ANNEX 2-A

### TARIFF ELIMINATION

1.  For the purposes of this Annex including each Party's Schedule to this Annex, Year 1 means the period of time beginning on the date of entry into force of this Agreement and ending on December 31 of the same calendar year that this Agreement enters into force. Year 2 shall begin on the January 1 following the date of entry into force of this Agreement, with each subsequent tariff reduction taking effect on January 1 of each subsequent year.

2.  Except as otherwise provided in this Annex, the Parties shall eliminate all customs duties on originating goods, of Chapters 1 through 97 of the Harmonized System that provide for a most-favoured-nation ("MFN") rate of customs duty, imported from the other Party upon the date of entry into force of this Agreement.

3.  For originating goods from the other Party set out in each Party's Schedule to this Annex, the following staging categories apply to the elimination of customs duties by each Party pursuant to Article 2.4:

    (a)  duties on originating goods provided for in the items in staging category A in a Party's Schedule shall be duty-free on the date this Agreement enters into force;

    (b)  duties on originating goods provided for in the items in staging category B in a Party's Schedule shall be removed in four equal stages beginning on the date this Agreement enters into force, and such goods shall be duty-free, effective January 1 of year 4;

    (c)  duties on originating goods provided for in the items in staging category C in a Party's Schedule shall be removed in six equal stages beginning on the date this Agreement enters into force, and such goods shall be duty-free, effective January 1 of year 6;

    (d)  duties on originating goods provided for in the items in staging category D in a Party's Schedule shall be removed in eight equal stages beginning on the date this Agreement enters into force, and such goods shall be duty-free, effective January 1 of year 8.

    For greater certainty, when the European Union applies a customs duty for the items 1001 11 00, 1001 19 00, high quality common wheat of items ex 1001 91 90, and ex 1001 99 00, 1002 10 00 and 1002 90 00, at a level and in a manner so that the duty-paid import price for a specified cereal will not be greater than the effective intervention price, or if there is a modification of the current system, the effective support price, increased by 55 per cent as set out in Commission Regulation (EC) No 642/2010 of 20 July 2010 on rules of application (cereal sector import duties) of Council Regulation (EC) No 1234/2007[34], the European Union shall apply the tariff elimination staging category towards any calculated duty that would be applied as per the above regulation, as follows:

---

[34] OJEU L 187, 21.7.2010, p. 5.

| Year | Applied Duty |
|------|--------------|
| 1 | 87.5% of the duty calculated as per EC Reg. 642/2010 |
| 2 | 75% of the duty calculated as per EC Reg. 642/2010 |
| 3 | 62.5% of the duty calculated as per EC Reg. 642/2010 |
| 4 | 50% of the duty calculated as per EC Reg. 642/2010 |
| 5 | 37.5% of the duty calculated as per EC Reg. 642/2010 |
| 6 | 25% of the duty calculated as per EC Reg. 642/2010 |
| 7 | 12.5% of the duty calculated as per EC Reg. 642/2010 |
| 8 and each subsequent year | 0% of the duty calculated as per EC Reg. 642/2010 (duty-free) |

(e) duties on originating goods provided for in the items in staging category S in a Party's Schedule shall be removed in three equal stages beginning on the fifth anniversary of the date of entry into force of this Agreement, and these goods shall be duty-free, effective January 1 of year 8;

(f) the *ad valorem* component of the customs duties on originating goods provided for in the items in staging category "AV0+EP" in a Party's Schedule shall be eliminated upon the date of entry into force of this Agreement; the tariff elimination shall apply to the *ad valorem* duty only; the specific duty resulting from the entry price system applicable for these originating goods shall be maintained; and

(g) duties on originating goods provided for in the items in staging category E in a Party's Schedule are exempt from tariff elimination.

4. The base rate for determining the interim staged rate of customs duty for an item shall be the MFN customs duty rate applied on 9 June 2009.

5. For the purpose of the elimination of customs duties in accordance with Article 2.4, interim staged rates shall be rounded down at least to the nearest tenth of a percentage point or, if the rate of duty is expressed in monetary units, at least to the nearest 0.001 of the official monetary unit of the Party.

Tariff Rate Quotas

6. For the administration in Year 1 of each tariff rate quota established under this Agreement, the Parties shall calculate the volume of that tariff rate quota by discounting the prorated volume corresponding to the period running between January 1 and the date of entry into force of the Agreement. This calculated in-quota quantity shall be made available on the date this Agreement enters into force.

Processed shrimps transitional tariff rate quota

7. (a) Originating goods in the following aggregate quantities and provided for in items with the notation "TQShrimps" in the European Union's Schedule to this Annex and listed in sub-paragraph (d) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes)[35] |
|---|---|
| 1 through to 7 | 23,000 |

(b) The European Union shall:

  (i) administer this tariff rate quota on a first-come first-served basis;

  (ii) administer this tariff rate quota on a calendar year basis with the full in-quota quantity to be made available on January 1 of each year; and

  (iii) not impose any end-use restriction on the imported good as a condition of the application for or use of this tariff rate quota.

(c) Prepared or preserved shrimps and prawns exported from Canada under Section B of Appendix 1 (Origin Quotas) to Annex 1 (Product Specific Rules of Origin) of the Protocol on Rules of Origin and Origin Procedures shall not be imported into the European Union under this tariff rate quota.

(d) Sub-paragraphs (a) and (b) apply to processed shrimps classified in the following tariff lines: 1605 29 00, 1605 21 90, ex 0306 16 10, ex 0306 17 10, ex 0306 26 10, and ex 0306 27 10, excluding in immediate packings of a net content not exceeding 2 kg.

Frozen cod transitional tariff rate quota

8. (a) Originating goods in the following aggregate quantities and provided for in items with the notation "TQCod" in the European Union's Schedule to this Annex and listed in sub-paragraph (c) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes)[36] |
|---|---|
| 1 through to 7 | 1,000 |

(b) The European Union shall:

  (i) administer this tariff rate quota on a first-come first-served basis;

  (ii) administer this tariff rate quota on a calendar year basis with the full in-quota quantity to be made available on January 1 of each year; and

  (iii) not impose any specific end-use restriction on the imported good as a condition of the application for or use of this tariff rate quota.

(c) This paragraph applies to frozen cod, classified in tariff lines 0304 71 90 and 0304 79 10

Low and Medium Quality Common Wheat transitional tariff rate quota

9. (a) Originating goods in the following aggregate quantities and provided for in items with the notation "TQCW" in the European Union's Schedule to this

---

[35] Expressed in net weight.
[36] Expressed in net weight.

Annex and listed in sub-paragraph (d) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes) |
|------|-------------------------------------------|
| 1 through to 7 | 100,000 |

(b)    The European Union shall administer this tariff rate quota in accordance with the terms of Commission Regulation (EC) No. 1067/2008 of 30 October 2008.

(c)    The above aggregate duty-free quantities shall include, beginning in year 1, the 38,853 tonne allocation to Canada as set out in Commission Regulation (EC) No. 1067/2008.

(d)    This paragraph applies to common wheat of a quality, other than high quality, classified in tariff lines ex 1001 91 90 and ex 1001 99 00.

Sweetcorn Tariff Rate Quota

10.    (a)    Originating goods in the following aggregate quantities and provided for in items with the notation "TQSC" in the European Union's Schedule to this Annex and listed in sub-paragraph (c) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes[37]) |
|------|-----------------------------------------------|
| 1 | 1,333 |
| 2 | 2,667 |
| 3 | 4,000 |
| 4 | 5,333 |
| 5 | 6,667 |
| 6 and each subsequent year | 8,000 |

(b)    The European Union shall:

    (i)    administer this tariff rate quota on a first-come first-served basis; and

    (ii)    administer this tariff rate quota on a calendar year basis with the full in-quota quantity to be made available on January 1 of each year.

(c)    This paragraph applies to the following tariff lines: 0710 40 00 (only available during the time period leading up to the elimination of duties for such good as per the staging category applicable to this item in the European Union's Schedule to this Annex) and 2005 80 00.

Bison Tariff Rate Quota

11.    (a)    Originating goods in the following aggregate quantities and provided for in items with the notation "TQB3" in the European Union's Schedule to this

---

[37]    Expressed in net weight.

Annex and listed in sub-paragraph (d) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes – Carcass Weight Equivalent) |
|---|---|
| 1 and each subsequent year | 3,000 |

(b)   When calculating quantities imported, the conversion factors specified in paragraph 21 shall be utilized to convert Product Weight to Carcass Weight Equivalent.

(c)   The European Union shall:

   (i)   administer this tariff rate quota on a first-come first-served basis; and

   (ii)   administer this tariff rate quota on a calendar year basis with the full in-quota quantity to be made available on January 1 of each year.

(d)   This paragraph applies to bison classified in the following tariff lines: ex 0201 10 00, ex 0201 20 20, ex 0201 20 30, ex 0201 20 50, ex 0201 20 90, ex 0201 30 00, ex 0202 10 00, ex 0202 20 10, ex 0202 20 30, ex 0202 20 50, ex 0202 20 90, ex 0202 30 10, ex 0202 30 50, ex 0202 30 90, ex 0206 10 95, ex 0206 29 91, ex 0210 20 10, ex 0210 20 90, ex 0210 99 51, ex 0210 99 59

Fresh or Chilled Beef and Veal Tariff Rate Quota

12.   (a)   Originating goods in the following aggregate quantities and provided for in items with the notation "TQB1" in the European Union's Schedule to this Annex and listed in sub-paragraph (f) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes – Carcass Weight Equivalent) |
|---|---|
| 1 | 5,140 |
| 2 | 10,280 |
| 3 | 15,420 |
| 4 | 20,560 |
| 5 | 25,700 |
| 6 and each subsequent year | 30,840 |

(b)   The aggregate annual duty-free quantities in the table above shall be increased, beginning in year 1, by 3,200 metric tonnes product weight (4,160 metric tonnes carcass weight equivalent) resulting from the application of Council Regulation (EC) No 617/2009 of 13 July 2009 opening an autonomous tariff quota for imports of high-quality beef.

(c)   When calculating quantities imported, the conversion factors specified in paragraph 21 shall be utilized to convert Product Weight to Carcass Weight Equivalent.

(d) The European Union shall administer this tariff rate quota, including the additional quantities as outlined in sub-paragraph (b), either through an import licensing system as outlined in the Declaration on Tariff Rate Quota Administration or as otherwise agreed to between the Parties.

(e) Notwithstanding sub-paragraph (d), paragraphs 19 and 20 shall apply to this paragraph.

(f) This paragraph applies to beef and veal classified in the following tariff lines:

ex 0201 10 00, ex 0201 20 20, ex 0201 20 30, ex 0201 20 50, ex 0201 20 90, ex 0201 30 00 and ex 0206 10 95.

Frozen or Other Beef and Veal Tariff Rate Quota

13. (a) Originating goods in the following aggregate quantities and provided for in items with the notation "TQB2" in the European Union's Schedule to this Annex and listed in sub-paragraph (e) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes – Carcass Weight Equivalent) |
| --- | --- |
| 1 | 2,500 |
| 2 | 5,000 |
| 3 | 7,500 |
| 4 | 10,000 |
| 5 | 12,500 |
| 6 and each subsequent year | 15,000 |

(b) When calculating quantities imported, the conversion factors specified in paragraph 21 shall be utilized to convert Product Weight to Carcass Weight Equivalent.

(c) The European Union shall administer this tariff rate quota either through an import licensing system as outlined in the Declaration on Tariff Rate Quota Administration or as otherwise agreed to between the Parties.

(d) Notwithstanding sub-paragraph (c), paragraphs 19 and 20 shall apply.

(e) This paragraph applies to beef and veal classified in the following tariff lines:

ex 0202 10 00, ex 0202 20 10, ex 0202 20 30, ex 0202 20 50, ex 0202 20 90, ex 0202 30 10, ex 0202 30 50, ex 0202 30 90, ex 0206 29 91, ex 0210 20 10, ex 0210 20 90, ex 0210 99 51 and ex 0210 99 59.

High Quality Fresh, Chilled and Frozen Meat of Bovine Animals Tariff Rate Quota

14. Originating goods that are exported from Canada and are imported into the European Union through the European Union's existing WTO tariff quota for high quality fresh, chilled and frozen meat of bovine animals covered by CN tariff headings ex 0201 and ex 0202 and for products covered by CN tariff lines ex 0206 10 95 and ex 0206 29 91 of 11,500 tonnes product weight, as set out in Commission Implementing

Regulation (EU) No 593/2013 of 21 June 2013, shall be duty-free on the date this Agreement enters into force.

Pork Tariff Rate Quota

15.    (a)    Originating goods in the following aggregate quantities and provided for in items listed with the notation "TQP" in the European Union's Schedule to this Annex and listed in sub-paragraph (f) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes – Carcass Weight Equivalent) |
|---|---|
| 1 | 12,500 |
| 2 | 25,000 |
| 3 | 37,500 |
| 4 | 50,000 |
| 5 | 62,500 |
| 6 and each subsequent year | 75,000 |

   (b)    The aggregate annual duty-free quantities in the table above shall be increased, beginning in year 1, by 4,624 metric tonnes product weight (5,549 metric tonnes carcass weight equivalent) pursuant to the volume established in the European Union's Canada-specific WTO tariff quota for pig-meat.

   (c)    When calculating quantities imported, the conversion factors specified in paragraph 21 shall be utilized to convert Product Weight to Carcass Weight Equivalent.

   (d)    The European Union shall administer this tariff rate quota, including the additional quantities from the European Union's Canada-specific WTO tariff quota for pig-meat as outlined in sub-paragraph (b), either through an import licensing system as outlined in the Declaration on Tariff Rate Quota Administration or as otherwise agreed to between the Parties.

   (e)    Notwithstanding sub-paragraph (d), paragraphs 19 and 20 shall apply to this paragraph.

   (f)    This paragraph applies to the following tariff lines:

   0203 12 11, 0203 12 19, 0203 19 11, 0203 19 13, 0203 19 15, 0203 19 55, 0203 19 59, 0203 22 11, 0203 22 19, 0203 29 11, 0203 29 13, 0203 29 15, 0203 29 55, 0203 29 59, 0210 11 11, 0210 11 19, 0210 11 31, and 0210 11 39.

Cheese Tariff Rate Quota

16.    (a)    Originating goods in the following aggregate quantities and provided for in items with the notation "TRQ Cheese" in Canada's Schedule to this Annex and listed in sub-paragraph (d) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes[38]) |
|---|---|
| 1 | 2,667 |
| 2 | 5,333 |
| 3 | 8,000 |
| 4 | 10,667 |
| 5 | 13,333 |
| 6 and each subsequent year | 16,000 |

(b)   Canada shall administer this tariff rate quota either through an import licensing system as outlined in the Declaration on Tariff Rate Quota Administration or as otherwise agreed to between the Parties.

(c)   Notwithstanding sub-paragraph (b), paragraphs 19 and 20 shall apply to this paragraph.

(d)   This paragraph applies to the following tariff lines:

0406.10.10,  0406.20.11,  0406.20.91,  0406.30.10,  0406.40.10,  0406.90.11, 0406.90.21,  0406.90.31,  0406.90.41,  0406.90.51,  0406.90.61,  0406.90.71, 0406.90.81, 0406.90.91, 0406.90.93, 0406.90.95, and 0406.90.98.

Industrial Cheese Tariff Rate Quota

17.   (a)   Originating goods in the following aggregate quantities and provided for in items with the notation "TRQ Industrial Cheese" in Canada's Schedule to this Annex and listed in sub-paragraph (d) shall be duty-free in the years specified below:

| Year | Aggregate Annual Quantity (Metric Tonnes[39]) |
|---|---|
| 1 | 283 |
| 2 | 567 |
| 3 | 850 |
| 4 | 1,133 |
| 5 | 1,417 |
| 6 and each subsequent year | 1,700 |

(b)   Canada shall administer this tariff rate quota either through an import licensing system as outlined in the Declaration on Tariff Rate Quota Administration or as otherwise agreed to between the Parties.

(c)   Notwithstanding sub-paragraph (b), paragraphs 19 and 20 shall apply to this paragraph.

---

[38]   Expressed in net weight.
[39]   Expressed in net weight.

(d)    This paragraph applies to industrial cheese, which means cheese used as ingredients for further food processing (secondary manufacturing) imported in bulk (not for retail sale), classified in the following tariff lines:

ex 0406.10.10, ex 0406.20.11, ex 0406.20.91, ex 0406.30.10, ex 0406.40.10, ex 0406.90.11, ex 0406.90.21, ex 0406.90.31, ex 0406.90.41, ex 0406.90.51, ex 0406.90.61, ex 0406.90.71, ex 0406.90.81, ex 0406.90.91, ex 0406.90.93, ex 0406.90.95, and ex 0406.90.98.

WTO Cheese Tariff Rate Quota

18.    Canada shall reallocate, beginning in year 1 of this Agreement, 800 tonnes of Canada's 20,411,866 kilogram WTO Tariff Rate Quota for cheese to the European Union.

Under-fill mechanism

19.    With respect to the tariff rate quotas set out in paragraphs 12, 13, 15, 16, and 17:

(a)    If a tariff rate quota is under-filled, defined as less than 75 per cent of the annual aggregate quantity actually imported into the Party under the tariff rate quota in a given year, the Parties shall meet, upon the request of a Party, in the framework of the Committee on Agriculture established under Article 26.2.1 (a) (Committees) in order to promptly address the underlying causes of the under-fill or any other questions affecting the smooth operation of the tariff rate quota.

(b)    If a tariff rate quota is under-filled, defined as less than 75 per cent of the annual aggregate quantity actually imported into the Party under the tariff rate quota in a given year for three consecutive years, and where such under-fill is not linked to scarce supply or demand of the relevant product, the administration of the quota for the following year(s) shall be made on a first-come first-served basis. To demonstrate scarce supply or demand, a Party shall clearly demonstrate on a quantifiable basis that either adequate supply to fill the tariff rate quota is not available in the country of export or that the tariff rate quota quantity could not be consumed in the importing market. If the Parties disagree on the reasons leading to under-fill, the matter shall be subject to binding arbitration at the request of a Party.

(c)    If subsequent to the under-fill referred to in (b), there is full use of the tariff rate quota, defined as 90 per cent or more of the annual aggregate quantity actually imported into the Party under the tariff rate quota in a given year for two consecutive years, the Parties may consider returning to a licencing system following consultations between the Parties on the necessity and opportunity of such reversion and on the features of such licencing system.

Review clause

20.    (a)    With respect to the tariff rate quotas set out in paragraphs 12, 13, 15, 16, and 17, both at the mid-term and at the end of the phase-in period of any of these tariff rate quotas, or at any other time upon motivated request of a Party, the Parties shall review the operation of the relevant tariff rate quota administration system in light notably of its effectiveness in ensuring quota utilisation, market

conditions, and administrative burdens associated with the system for the economic operators and for the Parties.

(b)    With respect to the tariff rate quotas set out in paragraphs 16 and 17, the review referred to in sub-paragraph (a) shall also include the allocation method allowing for new entrants.

(c)    With respect to the tariff rate quotas set out in paragraphs 12, 13, and 15, the review referred to in sub-paragraph (a) shall also include the consequences of any tariff rate quota administration modalities agreed with a third country for the same products in the framework of other trade negotiations involving the Parties and would include the possibility of providing the option to the exporting Party of transitioning to the approach agreed to in another agreement. The conditions of competition in North America will be a necessary part of the review.

Conversion Factors

21.    With respect to the tariff rate quotas set out in paragraphs 11, 12, 13, and 15, the following conversion factors shall be utilized to convert Product Weight to Carcass Weight Equivalent:

(a)    <u>Tariff Rate Quotas set out in paragraphs 11, 12 and 13:</u>

| Tariff Line | Tariff Line Description (for illustrative purposes only) | Conversion Factor |
|---|---|---|
| 0201 10 00 | Carcases or half-carcases of bovine animals, fresh or chilled | 100% |
| 0201 20 20 | "Compensated" quarters of bovine animals with bone in, fresh or chilled | 100% |
| 0201 20 30 | Unseparated or separated forequarters of bovine animals, with bone in, fresh or chilled | 100% |
| 0201 20 50 | Unseparated or separated hindquarters of bovine animals, with bone in, fresh or chilled | 100% |
| 0201 20 90 | Fresh or chilled bovine cuts, with bone in (excl. carcases and half-carcases, "compensated quarters", forequarters and hindquarters) | 100% |
| 0201 30 00 | Fresh or chilled bovine meat, boneless | 130% |
| 0206 10 95 | Fresh or chilled bovine thick and thin skirt (excl. for manufacture of pharmaceutical products) | 100% |
| 0202 10 00 | Frozen bovine carcases and half-carcases | 100% |

| Tariff Line | Tariff Line Description (for illustrative purposes only) | Conversion Factor |
|---|---|---|
| 0202 20 10 | Frozen "compensated" bovine quarters, with bone in | 100% |
| 0202 20 30 | Frozen unseparated or separated bovine forequarters, with bone in | 100% |
| 0202 20 50 | Frozen unseparated or separated bovine hindquarters, with bone in | 100% |
| 0202 20 90 | Frozen bovine cuts, with bone in (excl. carcases and half-carcases, "compensated" quarters, forequarters and hindquarters) | 100% |
| 0202 30 10 | Frozen bovine boneless forequarters, whole or cut in max. 5 pieces, each quarter in 1 block; "compensated" quarters in 2 blocks, one containing the forequarter, whole or cut in max. 5 pieces, and the other the whole hindquarter, excl. the tenderloin, in one piece | 130% |
| 0202 30 50 | Frozen bovine boneless crop, chuck and blade and brisket cuts | 130% |
| 0202 30 90 | Frozen bovine boneless meat (excl. forequarters, whole or cut into a maximum of five pieces, each quarter being in a single block "compensated" quarters in two blocks, one of which contains the forequarter, whole or cut into a maximum of five pieces, and the other the whole hindquarter, excl. the tenderloin, in one piece) | 130% |
| 0206 29 91 | Frozen bovine thick and thin skirt (excl. for manufacture of pharmaceutical products) | 100% |
| 0210 20 10 | Meat of bovine animals, salted, in brine, dried or smoked, with bone in | 100% |
| 0210 20 90 | Boneless meat of bovine animals, salted, in brine, dried or smoked | 135% |
| 0210 99 51 | Edible thick skirt and thin skirt of bovine animals, salted, in brine, dried or smoked | 100% |
| 0210 99 59 | Edible offal of bovine animals, salted, in brine, dried or smoked (excl. thick skirt and thin skirt) | 100% |

(b)    Tariff Rate Quota set out in paragraph 15:

| Tariff Line | Tariff Line Description (for illustrative purposes only) | Conversion Factor |
|---|---|---|

| Tariff Line | Tariff Line Description (for illustrative purposes only) | Conversion Factor |
|---|---|---|
| 0203 12 11 | Fresh or chilled with bone in, domestic swine hams and cuts thereof | 100% |
| 0203 12 19 | Fresh or chilled with bone in, domestic swine shoulders and cuts thereof | 100% |
| 0203 19 11 | Fresh or chilled fore-ends and cuts thereof of domestic swine | 100% |
| 0203 19 13 | Fresh or chilled loins and cuts bone-in thereof of domestic swine | 100% |
| 0203 19 15 | Fresh or chilled bellies "streaky" and cuts thereof of domestic swine | 100% |
| 0203 19 55 | Fresh or chilled boneless meat of domestic swine (excl. bellies and cuts thereof) | 120% |
| 0203 19 59 | Fresh or chilled meat of domestic swine, with bone in (excl. carcases and half-carcases, hams, shoulders and cuts thereof, and fore-ends, loins, bellies and cuts thereof) | 100% |
| 0203 22 11 | Frozen bone-in hams and cuts thereof of domestic swine | 100% |
| 0203 22 19 | Frozen bone-in shoulders and cuts thereof of domestic swine | 100% |
| 0203 29 11 | Frozen fore-ends and cuts thereof of domestic swine | 100% |
| 0203 29 13 | Frozen loins and cuts thereof of domestic swine, with bone in | 100% |
| 0203 29 15 | Frozen bellies "streaky" and cuts thereof of domestic swine | 100% |
| 0203 29 55 | Frozen boneless meat of domestic swine (excl. bellies and cuts thereof) | 120% |
| 0203 29 59 | Frozen meat of domestic swine, with bone in (excl. carcases and half-carcases, hams, shoulders and cuts thereof, and fore-ends, loins, bellies and cuts thereof) | 100% |
| 0210 11 11 | Domestic swine hams and cuts thereof, salted or in brine, with bone in | 100% |
| 0210 11 19 | Domestic swine shoulders and cuts thereof, salted or in brine, with bone in | 100% |

| Tariff Line | Tariff Line Description (for illustrative purposes only) | Conversion Factor |
|---|---|---|
| 0210 11 31 | Domestic swine hams and cuts thereof, dried or smoked, with bone in | 120% |
| 0210 11 39 | Domestic swine shoulders and cuts thereof, dried or smoked, with bone in | 120% |

## ANNEX 2-A

## Tariff Schedule of Canada

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0105.11.22 | Broilers for domestic production: Over access commitment | 238% but not less than 30.8¢ each | E | SSG |
| 0105.94.92 | Other: Over access commitment | 238% but not less than $1.25/kg | E | SSG |
| 0105.99.12 | Turkeys: Over access commitment | 154.5% but not less than $1.60/kg | E | SSG |
| 0207.11.92 | Other: Over access commitment | 238% but not less than $1.67/kg | E | SSG |
| 0207.12.92 | Other: Over access commitment | 238% but not less than $1.67/kg | E | SSG |
| 0207.13.92 | Other: Over access commitment, bone in | 249% but not less than $3.78/kg | E | SSG |
| 0207.13.93 | Other: Over access commitment, boneless | 249% but not less than $6.74/kg | E | SSG |
| 0207.14.22 | Livers: Over access commitment | 238% but not less than $6.45/kg | E | SSG |
| 0207.14.92 | Other: Over access commitment, bone in | 249% but not less than $3.78/kg | E | SSG |
| 0207.14.93 | Other: Over access commitment, boneless | 249% but not less than $6.74/kg | E | SSG |
| 0207.24.12 | Canner pack: Over access commitment | 154.5% but not less than $2.11/kg | E | SSG |
| 0207.24.92 | Other: Over access commitment | 154.5% but not less than | E | SSG |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| | | $1.95/kg | | |
| 0207.25.12 | Canner pack: Over access commitment | 154.5% but not less than $2.11/kg | E | SSG |
| 0207.25.92 | Other: Over access commitment | 154.5% but not less than $1.95/kg | E | SSG |
| 0207.26.20 | Over access commitment, bone in | 165% but not less than $2.94/kg | E | SSG |
| 0207.26.30 | Over access commitment, boneless | 165% but not less than $4.82/kg | E | SSG |
| 0207.27.12 | Livers: Over access commitment | 154.5% but not less than $4.51/kg | E | SSG |
| 0207.27.92 | Other: Over access commitment, bone in | 165% but not less than $2.94/kg | E | SSG |
| 0207.27.93 | Other: Over access commitment, boneless | 165% but not less than $4.82/kg | E | SSG |
| 0209.90.20 | Fat of fowls of the species *Gallus domesticus*, over access commitment | 249% but not less than $6.74/kg | E | SSG |
| 0209.90.40 | Fat of turkeys, over access commitment | 165% but not less than $4.82/kg | E | SSG |
| 0210.99.12 | Meat of poultry: Of fowls of the species *Gallus domesticus*, over access commitment, bone in | 249% but not less than $5.81/kg | E | SSG |
| 0210.99.13 | Meat of poultry: Of fowls of the species *Gallus domesticus*, over access commitment, boneless | 249% but not less than $10.36/kg | E | SSG |
| 0210.99.15 | Meat of poultry: Of turkeys, over access commitment, bone in | 165% but not less than $3.67/kg | E | SSG |
| 0210.99.16 | Meat of poultry: Of turkeys, over access commitment, boneless | 165% but not less than | E | SSG |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| | | $6.03/kg | | |
| 0401.10.20 | Over access commitment | 241% but not less than $34.50/hl | E | SSG |
| 0401.20.20 | Over access commitment | 241% but not less than $34.50/hl | E | SSG |
| 0401.40.20 | Over access commitment | 292.5% but not less than $2.48/kg | E | SSG |
| 0401.50.20 | Over access commitment | 292.5% but not less than $2.48/kg | E | SSG |
| 0402.10.20 | Over access commitment | 201.5% but not less than $2.01/kg | E | SSG |
| 0402.21.12 | Milk: Over access commitment | 243% but not less than $2.82/kg | E | SSG |
| 0402.21.22 | Cream: Over access commitment | 295.5% but not less than $4.29/kg | E | SSG |
| 0402.29.12 | Milk: Over access commitment | 243% but not less than $2.82/kg | E | SSG |
| 0402.29.22 | Cream: Over access commitment | 295.5% but not less than $4.29/kg | E | SSG |
| 0402.91.20 | Over access commitment | 259% but not less than 78.9¢/kg | E | SSG |
| 0402.99.20 | Over access commitment | 255% but not less than 95.1¢/kg | E | SSG |
| 0403.10.20 | Over access commitment | 237.5% but not less than 46.6¢/kg | E | SSG |
| 0403.90.12 | Powdered buttermilk: Over access commitment | 208% but not less than | E | SSG |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| | | $2.07/kg | | |
| 0403.90.92 | Other: Over access commitment | 216.5% but not less than $2.15/kg | E | SSG |
| 0404.10.22 | Powdered whey: Over access commitment | 208% but not less than $2.07/kg | E | SSG |
| 0404.10.90 | Other | 11% | C | |
| 0404.90.20 | Over access commitment | 270% but not less than $3.15/kg | E | SSG |
| 0405.10.20 | Over access commitment | 298.5% but not less than $4.00/kg | E | SSG |
| 0405.20.20 | Over access commitment | 274.5% but not less than $2.88/kg | E | SSG |
| 0405.90.20 | Over access commitment | 313.5% but not less than $5.12/kg | E | SSG |
| 0406.10.10 | Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.10.20 | Over access commitment | 245.5% but not less than $4.52/kg | E | SSG |
| 0406.20.11 | Cheddar and Cheddar types: Within access commitment | 2.84¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.20.12 | Cheddar and Cheddar types: Over access commitment | 245.5% but not less than $3.58/kg | E | SSG |
| 0406.20.91 | Other: Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| | | | | Cheese |
| 0406.20.92 | Other: Over access commitment | 245.5% but not less than $5.11/kg | E | SSG |
| 0406.30.10 | Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.30.20 | Over access commitment | 245.5% but not less than $4.34/kg | E | SSG |
| 0406.40.10 | Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.40.20 | Over access commitment | 245.5% but not less than $5.33/kg | E | SSG |
| 0406.90.11 | Cheddar and Cheddar types: Within access commitment | 2.84¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.12 | Cheddar and Cheddar types: Over access commitment | 245.5% but not less than $3.53/kg | E | SSG |
| 0406.90.21 | Camembert and Camembert types: Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.22 | Camembert and Camembert types: Over access commitment | 245.5% but not less than $5.78/kg | E | SSG |
| 0406.90.31 | Brie and Brie types: Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0406.90.32 | Brie and Brie types: Over access commitment | 245.5% but not less than $5.50/kg | E | SSG |
| 0406.90.41 | Gouda and Gouda types: Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.42 | Gouda and Gouda types: Over access commitment | 245.5% but not less than $4.23/kg | E | SSG |
| 0406.90.51 | Provolone and Provolone types: Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.52 | Provolone and Provolone types: Over access commitment | 245.5% but not less than $5.08/kg | E | SSG |
| 0406.90.61 | Mozzarella and Mozzarella types: Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.62 | Mozzarella and Mozzarella types: Over access commitment | 245.5% but not less than $3.53/kg | E | SSG |
| 0406.90.71 | Swiss/Emmental and Swiss/Emmental types: Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.72 | Swiss/Emmental and Swiss/Emmental types: Over access commitment | 245.5% but not less than $4.34/kg | E | SSG |
| 0406.90.81 | Gruyère and Gruyère types: Within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.82 | Gruyère and Gruyère types: Over access commitment | 245.5% but not less than $5.26/kg | E | SSG |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0406.90.91 | Other: Havarti and Havarti types, within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.92 | Other: Havarti and Havarti types, over access commitment | 245.5% but not less than $4.34/kg | E | SSG |
| 0406.90.93 | Other: Parmesan and Parmesan types, within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.94 | Other: Parmesan and Parmesan types, over access commitment | 245.5% but not less than $5.08/kg | E | SSG |
| 0406.90.95 | Other: Romano and Romano types, within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.96 | Other: Romano and Romano types, over access commitment | 245.5% but not less than $5.15/kg | E | SSG |
| 0406.90.98 | Other: Other, within access commitment | 3.32¢/kg | A | TRQ Cheese, TRQ Industrial Cheese |
| 0406.90.99 | Other: Other, over access commitment | 245.5% but not less than $3.53/kg | E | SSG |
| 0407.11.12 | Hatching, for broilers: Over access commitment | 238% but not less than $2.91/dozen | E | SSG |
| 0407.11.92 | Other: Over access commitment | 163.5% but not less than 79.9¢/dozen | E | SSG |
| 0407.21.20 | Over access commitment | 163.5% but not less than 79.9¢/dozen | E | SSG |
| 0407.90.12 | Of the fowls of the species *Gallus domesticus*: Over access commitment | 163.5% but not less than | E | SSG |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| | | 79.9¢/dozen | | |
| 0408.11.20 | Over access commitment | $6.12/kg | E | SSG |
| 0408.19.20 | Over access commitment | $1.52/kg | E | SSG |
| 0408.91.20 | Over access commitment | $6.12/kg | E | SSG |
| 0408.99.20 | Over access commitment | $1.52/kg | E | SSG |
| 0603.11.00 | Roses | 10.5% | B | |
| 0603.13.10 | Cymbidium | 16% | B | |
| 0603.13.90 | Other | 12.5% | B | |
| 0603.14.00 | Chrysanthemums | 8% | B | |
| 1003.10.12 | For malting purposes: Over access commitment | 94.5% | C | |
| 1003.90.12 | For malting purposes: Over access commitment | 94.5% | C | |
| 1107.10.12 | Whole: Over access commitment | $157.00/tonne | C | |
| 1107.10.92 | Other: Over access commitment | $160.10/tonne | C | |
| 1107.20.12 | Whole: Over access commitment | $141.50/tonne | C | |
| 1108.13.00 | Potato starch | 10.5% | C | |
| 1517.10.20 | Over access commitment | 82.28¢/kg | E | SSG |
| 1517.90.22 | Substitutes for butter: Over access commitment | 218% but not less than $2.47/kg | E | SSG |
| 1601.00.22 | Of fowls of the species *Gallus domesticus*, other than in cans or glass jars: Other than spent fowl, over access commitment | 238% | E | SSG |
| 1601.00.32 | Of turkeys, other than in cans or glass jars: Over access commitment | 154.5% | E | SSG |
| 1602.20.22 | Paste, of fowls of the species *Gallus domesticus*, not in cans or glass jars: Over access commitment | 238% | E | SSG |
| 1602.20.32 | Paste, of turkeys, not in cans or glass jars: Over access commitment | 154.5% | E | SSG |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 1602.31.13 | Prepared meals: Other, over access commitment, bone in | 169.5% but not less than $3.76/kg | E | SSG |
| 1602.31.14 | Prepared meals: Other, over access commitment, boneless | 169.5% but not less than $6.18/kg | E | SSG |
| 1602.31.94 | Other: Other, over access commitment, bone in | 165% but not less than $3.67/kg | E | SSG |
| 1602.31.95 | Other: Other, over access commitment, boneless | 165% but not less than $6.03/kg | E | SSG |
| 1602.32.13 | Prepared meals: Other, over access commitment, bone in | 253% but not less than $5.91/kg | E | SSG |
| 1602.32.14 | Prepared meals: Other, over access commitment, boneless | 253% but not less than $10.54/kg | E | SSG |
| 1602.32.94 | Other: Other, over access commitment, bone in | 249% but not less than $5.81/kg | E | SSG |
| 1602.32.95 | Other: Other, over access commitment, boneless | 249% but not less than $10.36/kg | E | SSG |
| 1701.91.90 | Other | $30.86/tonne | S | |
| 1701.99.90 | Other | $30.86/tonne | S | |
| 1806.20.22 | Chocolate ice cream mix or ice milk mix: Over access commitment | 265% but not less than $1.15/kg | E | SSG |
| 1806.90.12 | Chocolate ice cream mix or ice milk mix: Over access commitment | 265% but not less than $1.15/kg | E | SSG |
| 1901.20.12 | In packages of a weight not exceeding 11.34 kg each: Containing more than 25% by weight of butterfat, not put up for retail sale, over access commitment | 246% but not less than $2.85/kg | E | SSG |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 1901.20.22 | In bulk or in packages of a weight exceeding 11.34 kg each: Containing more than 25% by weight of butterfat, not put up for retail sale, over access commitment | 244% but not less than $2.83/kg | E | SSG |
| 1901.90.32 | Food preparations of goods of headings 04.01 to 04.04, containing more than 10% but less than 50% on a dry weight basis of milk solids: Ice cream mixes or ice milk mixes, over access commitment | 267.5% but not less than $1.16/kg | E | SSG |
| 1901.90.34 | Food preparations of goods of headings 04.01 to 04.04, containing more than 10% but less than 50% on a dry weight basis of milk solids: Other, not put up for retail sale, over access commitment | 250.5% but not less than $2.91/kg | E | SSG |
| 1901.90.52 | Food preparations of goods of headings 04.01 to 04.04, containing 50% or more on a dry weight basis of milk solids: Ice cream mixes or ice milk mixes, over access commitment | 267.5% but not less than $1.16/kg | E | SSG |
| 1901.90.54 | Food preparations of goods of headings 04.01 to 04.04, containing 50% or more on a dry weight basis of milk solids: Other, not put up for retail sale, over access commitment | 250.5% but not less than $2.91/kg | E | SSG |
| 2105.00.92 | Other: Over access commitment | 277% but not less than $1.16/kg | E | SSG |
| 2106.90.32 | Milk, cream or butter substitutes and preparations suitable for use as butter substitutes: Milk, cream or butter substitutes, containing 50% or more by weight of dairy content, over access commitment | 212% but not less than $2.11/kg | E | SSG |
| 2106.90.34 | Milk, cream or butter substitutes and preparations suitable for use as butter substitutes: Preparations, containing more than 15% by weight of milk fat but less than 50% by weight of dairy content, suitable for use as butter substitutes, over access commitment | 212% but not less than $2.11/kg | E | SSG |
| 2106.90.52 | Egg preparations: Over access commitment | $1.45/kg | E | SSG |
| 2106.90.94 | Other: Containing 50% or more by weight of dairy content, over access | 274.5% but not less than | E | SSG |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| | commitment | $2.88/kg | | |
| 2202.90.43 | Beverages containing milk: Other, containing 50% or more by weight of dairy content, not put up for retail sale, over access commitment | 256% but not less than $36.67/hl | E | SSG |
| 2309.90.32 | Complete feeds and feed supplements, including concentrates: Containing 50% or more by weight in the dry state of non-fat milk solids, over access commitment | 205.5% but not less than $1.64/kg | E | SSG |
| 3502.11.20 | Over access commitment | $6.12/kg | E | SSG |
| 3502.19.20 | Over access commitment | $1.52/kg | E | SSG |
| 8702.10.10 | For the transport of 16 or more persons, including the driver | 6.1% | C | |
| 8702.10.20 | For the transport of ten to 15 persons, including the driver | 6.1% | C | |
| 8702.90.10 | For the transport of 16 or more persons, including the driver | 6.1% | C | |
| 8702.90.20 | For the transport of ten to 15 persons, including the driver | 6.1% | C | |
| 8703.21.90 | Other | 6.1% | C | |
| 8703.22.00 | Of a cylinder capacity exceeding 1,000 cc but not exceeding 1,500 cc | 6.1% | D | |
| 8703.23.00 | Of a cylinder capacity exceeding 1,500 cc but not exceeding 3,000 cc | 6.1% | D | |
| 8703.24.00 | Of a cylinder capacity exceeding 3,000 cc | 6.1% | D | |
| 8703.31.00 | Of a cylinder capacity not exceeding 1,500 cc | 6.1% | D | |
| 8703.32.00 | Of a cylinder capacity exceeding 1,500 cc but not exceeding 2,500 cc | 6.1% | D | |
| 8703.33.00 | Of a cylinder capacity exceeding 2,500 cc | 6.1% | D | |
| 8703.90.00 | Other | 6.1% | C | |
| 8704.21.90 | Other | 6.1% | B | |
| 8704.22.00 | g.v.w. exceeding 5 tonnes but not exceeding 20 tonnes | 6.1% | B | |
| 8704.23.00 | g.v.w. exceeding 20 tonnes | 6.1% | B | |

| Tariff Item | Description | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 8704.31.00 | g.v.w. not exceeding 5 tonnes | 6.1% | B | |
| 8704.32.00 | g.v.w. exceeding 5 tonnes | 6.1% | B | |
| 8901.10.10 | Of dimensions exceeding a length of 294.13 m and a beam of 32.31 m | 25% | D | |
| 8901.10.90 | Other | 25% | D | |
| 8901.30.00 | Refrigerated vessels, other than those of subheading 8901.20 | 25% | B | |
| 8901.90.10 | Open vessels | 15% | B | |
| 8901.90.91 | Other: Of dimensions exceeding a length of 294.13 m and a beam of 32.31 m | 25% | B | |
| 8901.90.99 | Other: Other | 25% | B | |
| 8904.00.00 | Tugs and pusher craft. | 25% | D | |
| 8905.20.19 | Drilling platforms: Other | 20% | B | |
| 8905.20.20 | Production platforms | 25% | B | |
| 8905.90.19 | Drill-ships, drilling barges and floating drilling rigs: Other | 20% | B | |
| 8905.90.90 | Other | 25% | B | |
| 8906.90.19 | Open vessels: Other | 15% | B | |
| 8906.90.91 | Other: Of dimensions exceeding a length of 294.13 m and a beam of 32.31 m | 25% | B | |
| 8906.90.99 | Other: Other | 25% | B | |

**Tariff Schedule of the European Union**

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0105 11 91 | ---- Laying stocks | 52 €/1 000 p/st | E | |
| 0105 11 99 | ---- Other | 52 €/1 000 p/st | E | |
| 0105 94 00 | -- Fowls of the species *Gallus domesticus* | 20.9 €/100 kg/net | E | |
| 0105 99 30 | --- Turkeys | 23.8 €/100 kg/net | E | |
| 0201 10 00 | - Carcases and half-carcases | 12.8 + 176.8 €/100 kg/net | E | TQB1, TQB3 |
| 0201 20 20 | -- 'Compensated' quarters | 12.8 + 176.8 €/100 kg/net | E | TQB1, TQB3 |
| 0201 20 30 | -- Unseparated or separated forequarters | 12.8 + 141.4 €/100 kg/net | E | TQB1, TQB3 |
| 0201 20 50 | -- Unseparated or separated hindquarters | 12.8 + 212.2 €/100 kg/net | E | TQB1, TQB3 |
| 0201 20 90 | -- Other | 12.8 + 265.2 €/100 kg/net | E | TQB1, TQB3 |
| 0201 30 00 | - Boneless | 12.8 + 303.4 €/100 kg/net | E | TQB1, TQB3 |
| 0202 10 00 | - Carcases and half-carcases | 12.8 + 176.8 €/100 kg/net | E | TQB2, TQB3 |
| 0202 20 10 | -- 'Compensated' quarters | 12.8 + 176.8 €/100 kg/net | E | TQB2, TQB3 |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0202 20 30 | -- Unseparated or separated forequarters | 12.8 + 141.4 €/100 kg/net | E | TQB2, TQB3 |
| 0202 20 50 | -- Unseparated or separated hindquarters | 12.8 + 221.1 €/100 kg/net | E | TQB2, TQB3 |
| 0202 20 90 | -- Other | 12.8 + 265.3 €/100 kg/net | E | TQB2, TQB3 |
| 0202 30 10 | -- Forequarters, whole or cut into a maximum of five pieces, each quarter being in a single block; 'compensated' quarters in two blocks, one of which contains the forequarter, whole or cut into a maximum of five pieces, and the other, the hindquarter, excluding the tenderloin, in one piece | 12.8 + 221.1 €/100 kg/net | E | TQB2, TQB3 |
| 0202 30 50 | -- Crop, chuck-and-blade and brisket cuts | 12.8 + 221.1 €/100 kg/net | E | TQB2, TQB3 |
| 0202 30 90 | -- Other | 12.8 + 304.1 €/100 kg/net | E | TQB2, TQB3 |
| 0203 12 11 | ---- Hams and cuts thereof | 77.8 €/100 kg/net | E | TQP |
| 0203 12 19 | ---- Shoulders and cuts thereof | 60.1 €/100 kg/net | E | TQP |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0203 19 11 | ---- Fore-ends and cuts thereof | 60.1 €/100 kg/net | E | TQP |
| 0203 19 13 | ---- Loins and cuts thereof, with bone in | 86.9 €/100 kg/net | E | TQP |
| 0203 19 15 | ---- Bellies (streaky) and cuts thereof | 46.7 €/100 kg/net | E | TQP |
| 0203 19 55 | ----- Boneless | 86.9 €/100 kg/net | E | TQP |
| 0203 19 59 | ----- Other | 86.9 €/100 kg/net | E | TQP |
| 0203 22 11 | ---- Hams and cuts thereof | 77.8 €/100 kg/net | E | TQP |
| 0203 22 19 | ---- Shoulders and cuts thereof | 60.1 €/100 kg/net | E | TQP |
| 0203 29 11 | ---- Fore-ends and cuts thereof | 60.1 €/100 kg/net | E | TQP |
| 0203 29 13 | ---- Loins and cuts thereof, with bone in | 86.9 €/100 kg/net | E | TQP |
| 0203 29 15 | ---- Bellies (streaky) and cuts thereof | 46.7 €/100 kg/net | E | TQP |
| 0203 29 55 | ----- Boneless | 86.9 €/100 kg/net | E | TQP |
| 0203 29 59 | ----- Other | 86.9 €/100 kg/net | E | TQP |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0205 00 80 | - Frozen | 5.1 | B | |
| 0206 10 95 | --- Thick skirt and thin skirt | 12.8 + 303.4 €/100 kg/net | E | TQB1, TQB3 |
| 0206 29 91 | ---- Thick skirt and thin skirt | 12.8 + 304.1 €/100 kg/net | E | TQB2, TQB3 |
| 0206 80 91 | --- Of horses, asses, mules and hinnies | 6.4 | B | |
| 0206 90 91 | --- Of horses, asses, mules and hinnies | 6.4 | B | |
| 0207 11 10 | --- Plucked and gutted, with heads and feet, known as '83% chickens' | 26.2 €/100 kg/net | E | |
| 0207 11 30 | --- Plucked and drawn, without heads and feet but with necks, hearts, livers and gizzards, known as '70% chickens' | 29.9 €/100 kg/net | E | |
| 0207 11 90 | --- Plucked and drawn, without heads and feet and without necks, hearts, livers and gizzards, known as '65% chickens', or otherwise presented | 32.5 €/100 kg/net | E | |
| 0207 12 10 | --- Plucked and drawn, without heads and feet but with necks, hearts, livers and gizzards, known as '70% chickens' | 29.9 €/100 kg/net | E | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0207 12 90 | --- Plucked and drawn, without heads and feet and without necks, hearts, livers and gizzards, known as '65% chickens', or otherwise presented | 32.5 €/100 kg/net | E | |
| 0207 13 10 | ---- Boneless | 102.4 €/100 kg/net | E | |
| 0207 13 20 | ----- Halves or quarters | 35.8 €/100 kg/net | E | |
| 0207 13 30 | ----- Whole wings, with or without tips | 26.9 €/100 kg/net | E | |
| 0207 13 40 | ----- Backs, necks, backs with necks attached, rumps and wing-tips | 18.7 €/100 kg/net | E | |
| 0207 13 50 | ----- Breasts and cuts thereof | 60.2 €/100 kg/net | E | |
| 0207 13 60 | ----- Legs and cuts thereof | 46.3 €/100 kg/net | E | |
| 0207 13 70 | ----- Other | 100.8 €/100 kg/net | E | |
| 0207 13 91 | ---- Livers | 6.4 | E | |
| 0207 13 99 | ---- Other | 18.7 €/100 kg/net | E | |
| 0207 14 10 | ---- Boneless | 102.4 €/100 kg/net | E | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0207 14 20 | ----- Halves or quarters | 35.8 €/100 kg/net | E | |
| 0207 14 30 | ----- Whole wings, with or without tips | 26.9 €/100 kg/net | E | |
| 0207 14 40 | ----- Backs, necks, backs with necks attached, rumps and wing-tips | 18.7 €/100 kg/net | E | |
| 0207 14 50 | ----- Breasts and cuts thereof | 60.2 €/100 kg/net | E | |
| 0207 14 60 | ----- Legs and cuts thereof | 46.3 €/100 kg/net | E | |
| 0207 14 70 | ----- Other | 100.8 €/100 kg/net | E | |
| 0207 14 91 | ---- Livers | 6.4 | E | |
| 0207 14 99 | ---- Other | 18.7 €/100 kg/net | E | |
| 0207 24 10 | --- Plucked and drawn, without heads and feet but with necks, hearts, livers and gizzards, known as '80% turkeys' | 34 €/100 kg/net | E | |
| 0207 24 90 | --- Plucked and drawn, without heads and feet and without necks, hearts, livers and gizzards, known as '73% turkeys', or otherwise presented | 37.3 €/100 kg/net | E | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0207 25 10 | --- Plucked and drawn, without heads and feet but with necks, hearts, livers and gizzards, known as '80% turkeys' | 34 €/100 kg/net | E | |
| 0207 25 90 | --- Plucked and drawn, without heads and feet and without necks, hearts, livers and gizzards, known as '73% turkeys', or otherwise presented | 37.3 €/100 kg/net | E | |
| 0207 26 10 | ---- Boneless | 85.1 €/100 kg/net | E | |
| 0207 26 20 | ----- Halves or quarters | 41 €/100 kg/net | E | |
| 0207 26 30 | ----- Whole wings, with or without tips | 26.9 €/100 kg/net | E | |
| 0207 26 40 | ----- Backs, necks, backs with necks attached, rumps and wing-tips | 18.7 €/100 kg/net | E | |
| 0207 26 50 | ----- Breasts and cuts thereof | 67.9 €/100 kg/net | E | |
| 0207 26 60 | ------ Drumsticks and cuts of drumsticks | 25.5 €/100 kg/net | E | |
| 0207 26 70 | ------ Other | 46 €/100 kg/net | E | |
| 0207 26 80 | ----- Other | 83 €/100 kg/net | E | |
| 0207 26 91 | ---- Livers | 6.4 | E | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0207 26 99 | ---- Other | 18.7 €/100 kg/net | E | |
| 0207 27 10 | ---- Boneless | 85.1 €/100 kg/net | E | |
| 0207 27 20 | ----- Halves or quarters | 41 €/100 kg/net | E | |
| 0207 27 30 | ----- Whole wings, with or without tips | 26.9 €/100 kg/net | E | |
| 0207 27 40 | ----- Backs, necks, backs with necks attached, rumps and wing-tips | 18.7 €/100 kg/net | E | |
| 0207 27 50 | ----- Breasts and cuts thereof | 67.9 €/100 kg/net | E | |
| 0207 27 60 | ------ Drumsticks and cuts thereof | 25.5 €/100 kg/net | E | |
| 0207 27 70 | ------ Other | 46 €/100 kg/net | E | |
| 0207 27 80 | ----- Other | 83 €/100 kg/net | E | |
| 0207 27 91 | ---- Livers | 6.4 | E | |
| 0207 27 99 | ---- Other | 18.7 €/100 kg/net | E | |
| 0210 11 11 | ----- Hams and cuts thereof | 77.8 €/100 kg/net | E | TQP |
| 0210 11 19 | ----- Shoulders and cuts thereof | 60.1 €/100 kg/net | E | TQP |
| 0210 11 31 | ----- Hams and cuts thereof | 151.2 €/100 kg/net | E | TQP |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0210 11 39 | ----- Shoulders and cuts thereof | 119 €/100 kg/net | E | TQP |
| 0210 20 10 | -- With bone in | 15.4 + 265.2 €/100 kg/net | E | TQB2, TQB3 |
| 0210 20 90 | -- Boneless | 15.4 + 303.4 €/100 kg/net | E | TQB2, TQB3 |
| 0210 92 91 | ---- Meat | 130 €/100 kg/net | B | |
| 0210 92 92 | ---- Offal | 15.4 | B | |
| 0210 92 99 | ---- Edible flours and meals of meat or meat offal | 15.4 + 303.4 €/100 kg/net | D | |
| 0210 99 10 | ---- Of horses, salted, in brine or dried | 6.4 | B | |
| 0210 99 21 | ----- With bone in | 222.7 €/100 kg/net | D | |
| 0210 99 29 | ----- Boneless | 311.8 €/100 kg/net | D | |
| 0210 99 31 | ---- Of reindeer | 15.4 | B | |
| 0210 99 39 | ---- Other | 130 €/100 kg/net | B | |
| 0210 99 51 | ----- Thick skirt and thin skirt | 15.4 + 303.4 €/100 kg/net | E | TQB2, TQB3 |
| 0210 99 59 | ----- Other | 12.8 | E | TQB2, TQB3 |
| 0210 99 79 | ------ Other | 6.4 | B | |
| 0210 99 85 | ----- Other | 15.4 | B | |
| 0210 99 90 | --- Edible flours and meals of meat or meat offal | 15.4 + 303.4 €/100 kg/net | D | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0304 71 90 | --- Other | 7.5 | D | TQCod |
| 0304 79 10 | --- Fish of the species *Boreogadus saida* | 7.5 | D | TQCod |
| 0305 43 00 | -- Trout (*Salmo trutta, Oncorhynchus mykiss, Oncorhynchus clarki, Oncorhynchus aguabonita, Oncorhynchus gilae, Oncorhynchus apache* and *Oncorhynchus chrysogaster*) | 14 | D | |
| ex 0305 72 00 (see note 2) | -- Fish heads, tails and maws | 13 | D | |
| ex 0305 79 00 (see note 2) | -- Other | 13 | D | |
| 0306 12 05 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0306 12 10 | ---- Whole | 6 | B | |
| 0306 12 90 | ---- Other | 16 | B | |
| 0306 14 05 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 8 | D | |
| 0306 14 90 | ---- Other | 7.5 | B | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| ex 0306 16 10 (see note 3) | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | D | TQShrimps |
| ex 0306 17 10 (see note 3) | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | D | TQShrimps |
| 0306 22 30 | ---- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0306 24 10 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 8 | D | |
| ex 0306 26 10 (see note 3) | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | D | TQShrimps |
| ex 0306 27 10 (see note 3) | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | D | TQShrimps |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0307 19 10 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0307 29 05 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0307 39 05 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | D | |
| 0307 49 05 | --- Smoked, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0307 59 05 | --- Smoked, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0307 60 10 | -- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0307 79 10 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0307 89 10 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0307 99 10 | --- Smoked, whether in shell or not, whether or not cooked before or during the smoking process, not otherwise prepared | 20 | C | |
| 0407 11 00 | -- Of fowls of the species *Gallus domesticus* | 35 €/1 000 p/st | E | |
| 0407 19 19 | ---- Other | 35 €/1 000 p/st | E | |
| 0407 21 00 | -- Of fowls of the species *Gallus domesticus* | 30.4 €/100 kg/net | E | |
| 0407 29 10 | --- Of poultry, other than of fowls of the species *Gallus domesticus* | 30.4 €/100 kg/net | E | |
| 0407 90 10 | -- Of poultry | 30.4 €/100 kg/net | E | |
| 0408 11 80 | --- Other | 142.3 €/100 kg/net | E | |
| 0408 19 81 | ---- Liquid | 62 €/100 kg/net | E | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0408 19 89 | ---- Other, including frozen | 66.3 €/100 kg/net | E | |
| 0408 91 80 | --- Other | 137.4 €/100 kg/net | E | |
| 0408 99 80 | --- Other | 35.3 €/100 kg/net | E | |
| 0702 00 00 | Tomatoes, fresh or chilled | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0707 00 05 | - Cucumbers | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0709 91 00 | -- Globe artichokes | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0709 93 10 | --- Courgettes | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0710 40 00 | - Sweetcorn | 5.1 + 9.4 €/100 kg/net | D | TQSC |
| 0805 10 20 | -- Sweet oranges, fresh | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0805 20 10 | -- Clementines | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0805 20 30 | -- Monreales and satsumas | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0805 20 50 | -- Mandarins and wilkings | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0805 20 70 | -- Tangerines | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0805 20 90 | -- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0805 50 10 | -- Lemons (*Citrus limon*, *Citrus limonum*) | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0806 10 10 | -- Table grapes | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0808 10 80 | -- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0808 30 90 | -- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0809 10 00 | - Apricots | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0809 21 00 | -- Sour cherries (*Prunus cerasus*) | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0809 29 00 | -- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0809 30 10 | -- Nectarines | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 0809 30 90 | -- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 0809 40 05 | -- Plums | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 1001 11 00 | -- Seed | 148 €/t | D | |
| 1001 19 00 | -- Other | 148 €/t | D | |
| 1001 91 90 | --- Other | 95 €/t | D | TQCW |
| 1001 99 00 | -- Other | 95 €/t | D | TQCW |
| 1002 10 00 | - Seed | 93 €/t | D | |
| 1002 90 00 | - Other | 93 €/t | D | |
| 1003 90 00 | - Other | 93 €/t | D | |
| 1004 10 00 | - Seed | 89 €/t | D | |
| 1004 90 00 | - Other | 89 €/t | D | |
| 1108 11 00 | -- Wheat starch | 224 €/t | D | |
| 1108 12 00 | -- Maize (corn) starch | 166 €/t | D | |
| 1108 13 00 | -- Potato starch | 166 €/t | D | |
| 1108 14 00 | -- Manioc (cassava) starch | 166 €/t | D | |
| 1108 19 10 | --- Rice starch | 216 €/t | D | |
| 1108 19 90 | --- Other | 166 €/t | D | |
| 1604 14 21 | ----- In vegetable oil | 24 | D | |
| 1604 14 26 | ------ Fillets known as 'loins' | 24 | D | |
| 1604 14 28 | ------ Other | 24 | D | |
| 1604 14 31 | ----- In vegetable oil | 24 | D | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 1604 14 36 | ------ Fillets known as 'loins' | 24 | D | |
| 1604 14 38 | ------ Other | 24 | D | |
| 1604 14 41 | ----- In vegetable oil | 24 | D | |
| 1604 14 46 | ------ Fillets known as 'loins' | 24 | D | |
| 1604 14 48 | ------ Other | 24 | D | |
| 1604 14 90 | --- Bonito (*Sarda spp.*) | 25 | D | |
| 1604 20 70 | --- Of tuna, skipjack or other fish of the genus *Euthynnus* | 24 | D | |
| 1605 10 00 | - Crab | 8 | D | |
| 1605 21 90 | --- Other | 20 | D | TQShrimps |
| 1605 29 00 | -- Other | 20 | D | TQShrimps |
| 1605 30 90 | -- Other | 20 | C | |
| 1605 51 00 | -- Oysters | 20 | C | |
| 1605 52 00 | -- Scallops, including queen scallops | 20 | C | |
| 1605 53 10 | --- In airtight containers | 20 | D | |
| 1605 53 90 | --- Other | 20 | D | |
| 1605 54 00 | -- Cuttlefish and squid | 20 | C | |
| 1605 55 00 | -- Octopus | 20 | C | |
| 1605 56 00 | -- Clams, cockles and arkshells | 20 | C | |
| 1605 57 00 | -- Abalone | 20 | C | |
| 1605 58 00 | -- Snails, other than sea snails | 20 | C | |
| 1605 59 00 | -- Other | 20 | C | |
| 1701 12 10 | --- For refining | 33.9 €/100 kg/net | D | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 1701 12 90 | --- Other | 41.9 €/100 kg/net | D | |
| 1701 13 10 | --- For refining | 33.9 €/100 kg/net | D | |
| 1701 13 90 | --- Other | 41.9 €/100 kg/net | D | |
| 1701 14 10 | --- For refining | 33.9 €/100 kg/net | D | |
| 1701 14 90 | --- Other | 41.9 €/100 kg/net | D | |
| 1701 91 00 | -- Containing added flavouring or colouring matter | 41.9 €/100 kg/net | D | |
| 1701 99 10 | --- White sugar | 41.9 €/100 kg/net | D | |
| 1701 99 90 | --- Other | 41.9 €/100 kg/net | D | |
| 2005 80 00 | - Sweetcorn (*Zea mays var.saccharata*) | 5.1 + 9.4 €/100 kg/net | E | TQSC |
| 2009 61 10 | --- Of a value exceeding € 18 per 100 kg net weight | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 2009 69 19 | ---- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 2009 69 51 | ----- Concentrated | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 2009 69 59 | ----- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 2204 30 92 | ---- Concentrated | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 2204 30 94 | ---- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 2204 30 96 | ---- Concentrated | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 2204 30 98 | ---- Other | See Annex 2 of Commission Implementing Regulation (EU) No 1101/2014 (p. 679-718) | AV0+EP | |
| 8702 10 11 | --- New | 16 | C | |
| 8702 10 19 | --- Used | 16 | C | |
| 8702 10 91 | --- New | 10 | C | |
| 8702 10 99 | --- Used | 10 | C | |
| 8702 90 11 | ---- New | 16 | C | |
| 8702 90 19 | ---- Used | 16 | C | |
| 8702 90 31 | ---- New | 10 | C | |
| 8702 90 39 | ---- Used | 10 | C | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 8702 90 90 | -- With other engines | 10 | C | |
| 8703 21 10 | --- New | 10 | C | |
| 8703 22 10 | --- New | 10 | D | |
| 8703 22 90 | --- Used | 10 | D | |
| 8703 23 11 | ---- Motor caravans | 10 | D | |
| 8703 23 19 | ---- Other | 10 | D | |
| 8703 23 90 | --- Used | 10 | D | |
| 8703 24 10 | --- New | 10 | D | |
| 8703 24 90 | --- Used | 10 | D | |
| 8703 31 10 | --- New | 10 | D | |
| 8703 31 90 | --- Used | 10 | D | |
| 8703 32 11 | ---- Motor caravans | 10 | D | |
| 8703 32 19 | ---- Other | 10 | D | |
| 8703 32 90 | --- Used | 10 | D | |
| 8703 33 11 | ---- Motor caravans | 10 | D | |
| 8703 33 19 | ---- Other | 10 | D | |
| 8703 33 90 | --- Used | 10 | D | |
| 8703 90 10 | -- With electric motors | 10 | C | |
| 8703 90 90 | -- Other | 10 | C | |
| 8704 21 10 | --- Specially designed for the transport of highly radioactive materials (Euratom) | 3.5 | B | |
| 8704 21 31 | ----- New | 22 | B | |
| 8704 21 39 | ----- Used | 22 | B | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| 8704 21 91 | ----- New | 10 | B | |
| 8704 21 99 | ----- Used | 10 | B | |
| 8704 22 10 | --- Specially designed for the transport of highly radioactive materials (Euratom) | 3.5 | B | |
| 8704 22 91 | ---- New | 22 | B | |
| 8704 22 99 | ---- Used | 22 | B | |
| 8704 23 10 | --- Specially designed for the transport of highly radioactive materials (Euratom) | 3.5 | B | |
| 8704 23 91 | ---- New | 22 | B | |
| 8704 23 99 | ---- Used | 22 | B | |
| 8704 31 10 | --- Specially designed for the transport of highly radioactive materials (Euratom) | 3.5 | B | |
| 8704 31 31 | ----- New | 22 | B | |
| 8704 31 39 | ----- Used | 22 | B | |
| 8704 31 91 | ----- New | 10 | B | |
| 8704 31 99 | ----- Used | 10 | B | |
| 8704 32 10 | --- Specially designed for the transport of highly radioactive materials (Euratom) | 3.5 | B | |
| 8704 32 91 | ---- New | 22 | B | |
| 8704 32 99 | ---- Used | 22 | B | |

| Tariff Item (CN2015) | CN2015 Description (see note 1) | Base Rate | Staging Category | Note |
|---|---|---|---|---|
| Note 1: | the scope of products in this list being determined by CN codes as they exist in Commission Implementing Regulation (EU) No 1101/2014 | | | |
| Note 2: | ex 0305 72 00 and ex 0305 79 00 - only of trout as specified in CN code 0305 43 00 | | | |
| Note 3: | ex 0306 16 10, ex 0306 17 10, ex 0306 26 10 and ex 0306 27 10 - excluding in immediate packings of a net content not exceeding 2 kg | | | |

## ANNEX 2-B

**Declaration of the Parties concerning tariff rate quota administration**

*SECTION A*

***Declaration concerning European Union administration for beef and veal, and pork tariff rate quotas under this Agreement***

1.    The general principle is that tariff rate quota administration should be as conducive to trade as possible. More specifically, it must not impair or nullify the market access commitments negotiated by the Parties; it must be transparent, predictable, minimise transactional costs for traders, maximise fill rates and aim to avoid potential speculation.

**Structure of the import licensing system**

**Quarterly sub-periods with carryover between periods for unused tariff rate quota quantities**

2.    In each of the four quarters of the marketing year, 25 per cent of the annual tariff rate quota quantity will be made available for licence applications.

3.    Any quantities remaining available at the end of one quarter will be automatically rolled over into the subsequent quarter until the end of the marketing year.

**Application period for import licences**

4.    An application for an import licence will be accepted up to 45 calendar days preceding the beginning of each quarter and an import licence shall be issued no less than 30 calendar days before the quarter begins.

5.    If demand for licences during the application period exceeds the quantities available for that quarter, licences will be allocated on a pro-rated basis.

6.    If the available quantity for any quarter is not fully allocated during the application period, the remaining quantity will be made available for eligible applicants to apply for on demand for the rest of that quarter. Import licences will be issued automatically on demand until the available quantity has been fully subscribed for that period.

**Validity of licences**

7.    An import licence is valid:

(a)    from the date of issue or the date of the beginning of the quarter for which the import licence is issued, whichever is later; and

(b)    for five months from the applicable date in subparagraph (a) or until the end of the marketing year, whichever comes first.

8.    Import licences may be used at any European Union customs entry point and for multiple shipments.

**Eligibility criteria**

9.     The eligibility criteria and allocation method should result in the quotas going to those persons that are most likely to use it and must not create barriers to imports.

10.    During the application period, eligible applicants shall include historical importers of beef, bison or veal for beef and veal imports and historical importers of beef, bison, veal or pork for pork imports.

11.    In any quarter following the application period when licences are made available on demand, the eligibility criteria for applicants will be expanded to include wholesalers and accredited meat processors.

### Securities

### Securities tied to import licence applications

12.    A security of not more than 95 euro (€) per tonne of beef and 65 euro (€) per tonne of pork will be lodged with the application for a licence.

### Transfer of licence and corresponding security

13.    Licences are not transferable.

### Return of licence and corresponding security

14.    Unused licence quantities may be returned before expiration and up to four months prior to the end of the marketing year. Each licence holder may return up to 30 per cent of their individual licence quantity. When such a quantity is returned, 60 per cent of the corresponding security is released.

15.    All returned quantities will be immediately made available to other eligible applicants to apply for on demand for the rest of that quarter, and will be rolled over to subsequent quarters if not requested.

### Release of security and release of full security when 95 per cent of imports occur

16.    Securities shall be proportionally released each time actual imports have taken place.

17.    Once 95 per cent of an importer's individual licence quantity is actually imported the full security shall be released.

*SECTION B*

**Declaration concerning Canada's administration for cheese tariff rate quotas under this Agreement**

1.  The general principle is that tariff rate quota administration should be as conducive to trade as possible. More specifically, it must not impair or nullify the market access commitments negotiated by the Parties; it must be transparent, predictable, minimise transactional costs for traders, maximise fill rates and aim to avoid potential speculation.

2.  The eligibility criteria and allocation method should result in the quotas going to those persons that are most likely to use it and must not create barriers to imports.

**Structure of the import licensing system**

3.  The annual tariff rate quota quantity will be allocated each year among eligible applicants.

4.  The tariff rate quota allocation method will allow for new entrants each year. During the phase-in period from Year 1 to Year 5, at least 30 per cent of the tariff rate quota will be available to new entrants every year. After the end of the phase-in period from Year 6 and in subsequent years, at least 10 percent of the tariff rate quota quantity will be available for new entrants.

5.  The tariff rate quota quantity will be allocated on a calendar year basis. Applications from all interested parties will be received and processed according to the provisions of the Understanding on Tariff Rate Quota Administration Provisions of Agricultural Products, as defined in Article 2 of the Agreement on Agriculture, Ministerial Decision WT/MIN(13)/39, 7 December 2013, with a period of four to six weeks to submit applications. Imports will be able to start from the first day of the year.

6.  In the event that the tariff rate quota is not fully allocated following the application process in paragraph 3, available quantities will immediately be offered to eligible applicants in proportion to their allocation, or on demand if quantities still remain after the first offer.

**Eligibility criteria**

7.  To be eligible, an applicant shall be, at a minimum, a resident of Canada and be active in the Canadian cheese sector regularly during the year.

8.  During the phase-in period from Year 1 to Year 5, a new entrant shall be an eligible applicant who is not an allocation holder under Canada's cheese tariff rate quota under the WTO.

9.  After the end of the phase-in period, from Year 6 and in subsequent years, a new entrant shall be an eligible applicant who is not an allocation holder under Canada's cheese tariff rate quota under the WTO or did not receive an allocation of the tariff rate quotas under this Agreement in the preceding year.

10. A new entrant shall be considered as such for a period of three years.

11. Once an applicant is no longer considered to be a new entrant, the applicant shall be treated the same as all other applicants.

12.    Canada may consider limiting the size of allocations to a specific percentage if it is deemed necessary to foster a competitive, fair, and balanced import environment.

### Use of import allocations and import permits

13.    A tariff rate quota allocation shall be valid for one quota year or, if issued after the beginning of the quota year, for the remainder of the quota year.

14.    To ensure that imports are aligned with domestic market conditions and to minimise barriers to trade, an allocation holder will normally be free to use its allocation to import any product covered by the tariff rate quota at any time during the year.

15.    On the basis of its allocation, an importer will submit an import permit request for each shipment of product covered by the tariff rate quota that the importer seeks to import into Canada. Import permits are normally issued automatically upon request through the electronic permitting system of the Government of Canada. Under current policies, import permits may be requested up to 30 days before the planned date of entry and are valid for a period of five days before and 25 days from the date of entry.

16.    Permits are not transferable.

17.    An import permit may be amended or cancelled.

18.    A transfer of allocations may be authorised.

19.    An allocation holder that uses less than 95 per cent of its allocation in any one year may be subject to an under-utilisation penalty in the following year, in which it will receive an allocation that reflects the actual level of use of the previous allocation. An allocation holder affected by an under-utilisation penalty will be advised prior to the final allocation of the tariff rate quota.

20.    An allocation holder may return an unused quantity of their allocation up to a specified date. Returned quantities will be considered used for the purpose of the application of the under-utilisation penalty. Chronic returns may be penalised.

21.    Returned quantities will normally be made available to interested allocation holders who have not returned any unused quantity of their allocation the day after the return deadline. If quantities remain after that, they may be offered to other interested third parties.

22.    The return deadline will be set at a date that is early enough to give sufficient time for use of the returned quantities, while being late enough to allow allocation holders to establish their import needs until the end of the year, possibly near the middle of the quota year.

# ANNEX 4-A

## COOPERATION IN THE FIELD OF MOTOR VEHICLE REGULATIONS

### Article 1

### Objectives and purpose

1.     The Parties note the cooperation between Canada and the European Commission in the area of science and technology.

2.     The Parties affirm their joint commitment to improve vehicle safety and environmental performance, and to the harmonisation efforts pursued under the framework of the *1998 Global Agreement administered by the World Forum for the Harmonization of Vehicle Regulations (WP.29)* (the "*1998 Global Agreement*") of the United Nations Economic Commission for Europe ("UNECE").

3.     The Parties note their commitment to enhance their efforts in the area of regulatory cooperation under this Chapter and Chapter Twenty-One (Regulatory Cooperation).

4.     The Parties recognise the right of each Party to determine its desired level of health, safety, and environmental and consumer protection.

5.     The Parties desire to enhance cooperation and to increase the efficient use of resources in matters that relate to motor vehicle technical regulations, in a manner that does not compromise each Party's ability to fulfill its responsibilities.

6.     The purpose of this Annex is to strengthen cooperation and communication, including the exchange of information, on motor vehicle safety and environmental performance research activities related to the development of new technical regulations or related standards, to promote the application and recognition of the Global Technical Regulations under the framework of the *1998 Global Agreement* and possible future harmonisation, between the Parties, concerning improvements and other developments in the areas of motor vehicle technical regulations or related standards.

### Article 2

### Areas of cooperation

The Parties shall endeavour to share information and cooperate on activities in the following areas:

(a)     the development and establishment of technical regulations or related standards;

(b)     the post-implementation reviews of technical regulations or related standards;

(c)     the development and dissemination of information for consumer use related to motor vehicle regulations or related standards;

(d)     the exchange of research, information and results linked to the development of new vehicle safety regulations or related standards, and advanced emission reduction and electric vehicle technologies; and

(e)     the exchange of available information on the identification of safety-related or emission-related defects and non-compliance with technical regulations.

## Article 3

### Forms of cooperation

The Parties shall endeavour to maintain an open and ongoing dialogue in the area of motor vehicle technical regulations or related standards. To this end, the Parties shall endeavour to:

(a)     meet at least annually (including meetings held on the margins of WP.29 Sessions), by video-conference or, if directly, on an alternating basis in Canada and in the European Union;

(b)     share information about domestic and international programmes and agendas, including planning of research programmes linked to the development of new technical regulations or related standards;

(c)     contribute jointly to encourage and promote greater international harmonisation of technical requirements through multilateral fora, such as the 1998 Global Agreement, including through cooperation in the planning of initiatives in support of such activities;

(d)     share and discuss research and development plans on motor vehicle safety and environmental technical regulations or related standards;

(e)     conduct joint analyses, develop methodologies and approaches, as mutually beneficial, practical and convenient, to assist and facilitate the development of motor vehicle technical regulations or related standards; and

(f)     develop additional provisions for cooperation.

## Article 4

### Canada's incorporation of United Nations Regulations

1.     The Parties acknowledge that Canada has incorporated, with the adaptations that it considered necessary, technical regulations contained in United Nations Regulations into its *Motor Vehicle Safety Regulations*, C.R.C., c. 1038, as listed in Annex 4-A-1.

2.     Canada maintains its right to modify its law, including by amending or revising which United Nations Regulations are incorporated into its law, or the manner in which or the extent to which these Regulations are incorporated into its law. Before introducing such changes, Canada shall inform the European Union and, upon request, shall be prepared to provide information on the rationale for these changes. Canada shall continue to recognise the relevant United Nations Regulations, unless doing so would provide for a lower level of safety than the amendments introduced, or would compromise North American integration.

3.     The Parties shall engage in technical consultations with a view to determining, no later than three years after the entry into force of this Agreement, whether the technical regulations contained in the United Nations Regulations, listed in Annex 4-A-2, should also be incorporated into Canada's *Motor Vehicle Safety Regulations*, with any adaptations Canada considers necessary. These technical regulations should

be incorporated, unless doing so would provide for a lower level of safety than the Canadian regulations or would compromise North American integration.

4.     The Parties shall also engage in further technical consultations to determine whether other technical regulations should be included in Annex 4-A-2.

5.     Canada shall establish and maintain a list of technical regulations contained in United Nations Regulations that are incorporated into Canada's *Motor Vehicle Safety Regulations*. Canada shall make that list publicly available.

6.     In an effort to promote regulatory convergence, the Parties shall exchange information, to the extent practicable, on their respective technical regulations related to motor vehicle safety.

### Article 5

### Positive consideration of the other Party's technical regulations

When a Party develops a new technical regulation for motor vehicles and their parts, or when it modifies an existing one, it shall consider the technical regulations of the other Party, including those established under the framework of the UNECE *World Forum for the Harmonization of Vehicle Regulations (WP.29)*. A Party shall provide, at the request of the other Party, an explanation on the extent to which it considered the technical regulations of that other Party when it developed its new technical regulations.

### Article 6

### Cooperation with the United States of America

The Parties recognise their mutual interest to cooperate with the United States of America in the field of motor vehicle technical regulations. If the European Union and the United States conclude an agreement or an arrangement on the harmonisation of their respective technical regulations related to motor *vehicles*, the Parties shall cooperate with a view to determining whether they should conclude a similar agreement or arrangement.

### ANNEX 4-A-1

### List referred to in Article 4.1 of Annex 4-A

| United Nations Regulation | Title of United Nations Regulation | Canadian Regulation into which the United Nations Regulation is incorporated, in whole or in part | Title of Canadian Regulation into which the United Nations Regulation is incorporated, in whole or in part |
|---|---|---|---|
| No. 98 | Uniform provisions concerning the approval of motor vehicle headlamps equipped with gas-discharge light sources | CMVSS 108* | Lighting System and Retroreflective Devices |

| No. 112 | Uniform provisions concerning the approval of motor vehicle headlamps emitting an asymmetrical passing-beam or a driving-beam or both and equipped with filament lamps and/or LED modules | CMVSS 108* | Lighting System and Retroreflective Devices |
|---|---|---|---|
| No. 113 | Uniform provisions concerning the approval of motor vehicle headlamps emitting a symmetrical passing-beam or a driving-beam or both and equipped with filament, gas-discharge light sources or LED modules | CMVSS 108* | Lighting System and Retroreflective Devices |
| No. 51 | Uniform provisions concerning the approval of motor vehicles having at least four wheels with regard to their noise emissions | CMVSS 1106* | Noise Emissions |
| No. 41 | Uniform provisions concerning the approval of motor cycles with regard to noise | CMVSS 1106* | Noise Emissions |
| No. 11 | Uniform provisions concerning the approval of vehicles with regard to door latches and door retention components | CMVSS 206* | Door Locks and Door Retention Components |
| No. 116 (immobilizer only) | Uniform technical prescriptions concerning the protection of motor vehicles against unauthorized use (Immobilizer only) | CMVSS 114* | Theft Protection and Rollaway Prevention |
| No. 42 | Uniform provisions concerning the approval of vehicles with regard to their front and rear protective devices (bumpers etc) | CMVSS 215* | Bumpers |
| No. 78 | Uniform provisions concerning the approval of vehicles of categories L1, L2, L3, L4 and L5 with regard to braking | CMVSS 122* | Motorcycle Brake Systems |
| No. 8 | Uniform provisions concerning the approval of motor vehicles headlamps emitting an | CMVSS 108* | Lighting System and Retroreflective Devices |

| | asymmetrical passing beam or a driving beam or both an equipped with halogen filament lamps (H1, H2, H3, HB3, HB4, H7, H8, H9, HIR1, HIR2 and/or H11) | | |
|---|---|---|---|
| No. 20 | Uniform provisions concerning the approval of motor vehicles headlamps emitting an asymmetrical passing beam or a driving beam or both and equipped with halogen filament lamps (H4 lamps) | CMVSS 108* | Lighting System and Retroreflective Devices |
| No. 31 | Uniform provisions concerning the approval of power-driven vehicle's halogen sealed-beam headlamps (HSB) emitting an European asymmetrical passing-beam or a driving-beam or both | CMVSS 108* | Lighting System and Retroreflective Devices |
| No. 57 | Uniform provisions concerning the approval of headlamps for motor cycles and vehicles treated as such | CMVSS 108* | Lighting System and Retroreflective Devices |
| No. 72 | Uniform provisions concerning the approval of motor cycle headlamps emitting an asymmetrical passing beam and a driving beam and equipped with halogen lamps (HS1 lamps) | CMVSS 108* | Lighting System and Retroreflective Devices |
| No. 13H (electronic stability control only) | Uniform provisions concerning the approval of passenger cars with regard to braking (electronic stability control only) | CMVSS 126 | Electronic Stability Control Systems |
| No. 60 | Uniform provisions concerning the approval of two-wheeled motor cycles and mopeds with regard to driver-operated controls including the identification of controls, tell-tales and indicators | CMVSS 123 | Motorcycle Controls and Displays |
| No. 81 | Uniform provisions concerning the approval of rear-view mirrors of two-wheeled power-driven vehicles with or without side car, | CMVSS 111 | Mirrors |

| | with regard to the mounting of rear-view mirrors on handlebars | | |
|---|---|---|---|

*As the regulation read on 13 February 2013.

### ANNEX 4-A-2

### List referred to in Article 4.3 of Annex 4-A

| United Nations Regulation | Title of United Nations Regulation |
|---|---|
| No. 12 | Uniform provisions concerning the approval of vehicles with regard to the protection of the driver against the steering mechanism in the event of impact |
| No. 17 | Uniform provisions concerning the approval of vehicles with regard to the seats, their anchorages and any head restraints |
| No. 43 | Uniform provisions concerning the approval of safety glazing materials and their installation on vehicles |
| No. 48 | Uniform provisions concerning the approval of vehicles with regard to the installation of lighting and light-signalling devices |
| No. 87 | Uniform provisions concerning the approval of daytime running lamps for power-driven vehicles |
| No. 53 | Uniform provisions concerning the approval of category L3 vehicles with regard to the installation of lighting and light-signalling devices |
| No. 116 | Uniform technical prescriptions concerning the protection of motor vehicles against unauthorized use |
| No. 123 | Uniform provisions concerning the approval of adaptive front-lighting systems (AFS) for motor vehicles |

## ANNEX 5-A

### COMPETENT AUTHORITIES

Competent authorities of the European Union

1.  Control is shared between the national Services of the Member States and the European Commission. In this respect, the following applies:

    (a)  for exports to Canada, the Member States are responsible for the control of the production circumstances and requirements, including statutory inspections or audits and issuing health certification attesting to the agreed SPS measures and requirements;

    (b)  for imports from Canada, the Member States are responsible for the control of the compliance of the imports with the European Union's import conditions; and

    (c)  the European Commission is responsible for the overall coordination, inspection or audits of control systems and the necessary measures, including legislative action to ensure uniform application of standards and requirements of this Agreement.

Competent authorities of Canada

2.  The following are responsible for the application of SPS measures with respect to domestically produced, exported and imported animals and animal products, plants and plant products, and for issuing health certificates attesting to the agreed SPS measures unless otherwise noted:

    (a)  the Canadian Food Inspection Agency (the "CFIA");

    (b)  the Department of Health, as appropriate; or

    (c)  a successor entity notified to the other Party.

### ANNEX 5-B

## REGIONAL CONDITIONS

Diseases for which regionalisation decisions may be taken:

*Diseases*

1.     Foot-and-mouth disease

2.     Vesicular stomatitis

3.     Swine vesicular disease

4.     Rinderpest

5.     Peste des petits ruminants

6.     Contagious bovine pleuropneumonia

7.     Lumpy skin disease

8.     Rift Valley fever

9.     Bluetongue

10.    Sheep pox and goat pox

11.    African horse sickness

12.    African swine fever

13.    Classical swine fever

14.    Notifiable avian influenza

15.    Newcastle disease

16.    Venezuelan equine encephalomyelitis

17.    Epizootic haemorrhagic disease

*Aquatic Diseases*

The Parties may discuss the list of aquatic diseases on the basis of the OIE International Aquatic Animal Health Code.

## **ANNEX 5-C**

**PROCESS OF RECOGNITION OF REGIONAL CONDITIONS**

*Animal diseases*

To be agreed at a later stage.

*Plant pests*

To be agreed at a later stage.

## ANNEX 5-D

## GUIDELINES TO DETERMINE, RECOGNISE AND MAINTAIN EQUIVALENCE

**Determination and Recognition of Equivalence**

To be agreed at a later stage.

**Maintenance of Equivalence**

1.      If a Party intends to adopt, modify, or repeal an SPS measure in an area for which it has made a recognition of equivalence as set out in Article 5.6.3(a) or a recognition described in Article 5.6.3(b), that Party should:

   (a)      evaluate whether the adoption, modification or repeal of that SPS measure may affect the recognition; and

   (b)      notify the other Party of its intention to adopt, modify, or repeal that SPS measure, and of the evaluation under paragraph (a). The notification should take place at an early appropriate stage, when amendments can still be introduced and comments taken into account.

2.      If a Party adopts, modifies, or repeals an SPS measure in an area for which it has made a recognition, the importing Party should continue to accept the recognition of equivalence as set out in Article 5.6.3(a) or the recognition described in Article 5.6.3(b), as the case may be, in that area until it has communicated to the exporting Party whether special conditions must be met, and if so, provided the special conditions to the exporting Party. The importing Party should consult with the exporting Party to develop these special conditions.

## **ANNEX 5-E**

RECOGNITION OF SANITARY AND PHYTOSANITARY MEASURES

General Notes

1. If a Party modifies an SPS measure listed in this Annex, the modified SPS measure applies to imports from the other Party, taking into account paragraph 2 of Annex 5-D.  For updated SPS measures, refer to the legislative publications of each Party.

2.  If an importing Party determines that a special condition listed in this Annex is no longer necessary, that Party shall notify the other Party in accordance with Article 26.5 that it will no longer apply that special condition to imports from the other Party.

3.  For greater certainty, an SPS measure of an importing Party that is not otherwise referenced in this Annex or a measure of an importing Party that is not an SPS measure applies, as appropriate, to imports from the other Party.

**Section A**

**Sanitary Measures**

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| Semen | | | | | | |
| Cattle | | | | | | |

| Animal health | Directive 88/407 | - *Health of Animals Act*, S.C. 1990, c. 21<br><br>- *Health of Animals Regulations*, C.R.C., c. 296 | Semen collection centre clinically free of paratuberculosis | - *Health of Animals Act*<br><br>- *Health of Animals Regulations*<br><br>- CFIA, Disease Control Manual of Procedures, s. 15, Artificial Insemination Program | Directive 88/407 | 1. Enzootic bovine leucosis: (serum) Enzyme-linked immunosorbent assay ("ELISA")<br><br>In addition, when possible, the uterine dam of the prospective donor bull should be subjected to an ELISA test for enzootic bovine leucosis, subsequent to the weaning of the prospective donor, with negative results.<br><br>This test of the uterine dam is required to export semen to the Member States of the European Union when semen is collected from a donor bull before reaching 24 months of age, and a negative result to an ELISA test is required after reaching that age. This test is not required when the prospective donor bull originates from a Canada Health Accredited Herd for Enzootic bovine leucosis; and,<br><br>2. Infectious bovine rhinotracheitis: (serum) ELISA<br><br>The semi-annual testing for infectious bovine rhinotracheitis of all resident animals must be performed at infectious bovine rhinotracheitis-negative facilities that are approved for export to the European Union. Only infectious bovine rhinotracheitis-negative facilities are allowed to export semen to the European Union. |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| **Embryos** | | | | | | |
| **In vivo derived bovine** | | | | | | |
| Animal health | Directive 89/556 | - *Health of Animals Act* <br> - *Health of Animals Regulations*, Part XIII | | - *Health of Animals Act - Health of Animals  Regulations* <br> - CFIA Embryo Export Approval Program | Directive 89/556 <br> Decisions 2006/168 2007/240 | 1. The donor females spent the six months immediately prior to the collection within Canada in no more than two herds: <br><br> (a)   which, according to official findings, were free from tuberculosis; <br><br> (b)   which, according to official findings, were free from |

| | | | | | | brucellosis; |
|---|---|---|---|---|---|---|
| | | | | | | (c)   which were free from enzootic bovine leucosis or in which no animal showed clinical signs of enzootic bovine leucosis during the previous three years; and |
| | | | | | | (d)   in which no bovine animal showed clinical signs of infectious bovine rhinotracheitis/infectious pustular vulvovaginitis during the previous 12 months; |
| | | | | | | 2.  There was no outbreak of epizootic haemorrhagic disease within 10 kilometers of where the donor female is located during the 30 days prior to collection; and, |
| | | | | | | 3.  The semen is collected and stored in collection centres or stored in storage centres approved by the CFIA, or the semen is collected and stored in collection centres or stored in storage centres approved by the competent authority of a third country that is approved to export semen to the European Union, or the semen is exported from European Union. |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| **Fresh meat** | | | | | | |
| **Ruminants, equidae, porcine, poultry, farmed game from deer, rabbit and ratite** | | | | | | |
| Public health | Regulations 852/2004 853/2004 854/2004 2073/2005 2015/1375 | - *Meat Inspection Act*, R.S.C. 1985, c. 25 (1st Supp.) - *Meat Inspection Regulations, 1990*, S.O.R./90-288 - *Food and Drugs Act*, R.S.C., 1985, c. F-27 - *Food and Drugs Regulations*, C.R.C., c. | 1. Compliance with Canadian rules on transmissible spongiform encephalopathy; 2. Prolonged delayed evisceration not permitted; 3. Compliance with microbiological food safety criteria of the importing Party; | - *Meat Inspection Act* - *Meat Inspection Regulations* - *Food and Drugs Act* - *Food and Drugs Regulations* | Regulations 852/2004 853/2004 854/2004 2073/2005 2015/1375 | See Appendix A |

| | | 8 | 4. Porcine meat intended for processing in ready-to-eat product is tested or frozen in accordance with the Commission Regulation (EC) No 2015/1375;  5. Blood is collected using a closed blood collection method; and,  6. Meat derived from animals slaughtered under emergency slaughter procedures is not eligible for trade. | | | |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |

## Meat products

**Ruminants, equidae, pigs, poultry and farmed game**

| Public Health | Regulation 852/2004 853/2004 854/2004 2073/2005 | *- Meat Inspection Act*<br>*- Meat Inspection Regulations*<br>*- Food and Drugs Act*<br>*- Food and Drugs Regulations* | 1. Fresh meat used to make the products complies with applicable special conditions, excluding special condition 4 when the finished product is treated by heat to a temperature sufficient to destroy *Trichinella*;<br><br>2. Compliance with product standards of the importing Party; and,<br><br>3. Compliance with microbiological food safety criteria of the importing Party. | *- Meat Inspection Act*<br>*- Meat Inspection Regulations*<br>*- Food and Drugs Act*<br>*- Food and Drugs Regulations* | Regulations 852/2004 853/2004 854/2004 2073/2005 | 1. Fresh meat used to make the products complies with applicable special conditions, excluding Appendix A special condition 6(a) when the finished product is treated by heat to a temperature sufficient to destroy *Trichinella*;<br><br>2. Compliance with product standards of the importing Party; and,<br><br>3. Compliance with microbiological food safety criteria of the importing Party. |

## Minced meat, meat preparations

**Ruminants, equidae, pigs, poultry and farmed game**

| Public Health | Regulations 852/2004 853/2004 | *- Meat Inspection Act*<br>*- Meat Inspection* | 1. Fresh meat used to make the products complies with applicable special conditions;<br><br>2. Compliance with product | *- Meat Inspection Act*<br>*- Meat Inspection Regulations* | Regulations 852/2004 853/2004 | (i) Fresh meat used to make the products complies with applicable special conditions;<br><br>(ii) Compliance with product |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 854/2004<br><br>2073/2005 | *Regulations*<br><br>*- Food and Drugs Act*<br><br>*- Food and Drugs Regulations* | standards of the importing Party; and,<br><br>3. Compliance with microbiological food safety criteria of the importing Party. | *- Food and Drugs Act*<br><br>*- Food and Drugs Regulations* | 854/2004<br><br>2073/2005 | standards of the importing Party; and,<br><br>(iii) Compliance with microbiological food safety criteria of the importing Party. |

**Processed animal proteins for human consumption**

**Ruminants, equidae, pigs, poultry and farmed game**

| Public health | Regulation<br>852/2004<br><br>853/2004<br><br>854/2004 | *- Meat Inspection Act*<br><br>*- Meat Inspection Regulations*<br><br>*- Food and Drugs Act*<br><br>*- Food and Drugs Regulations* | 1. Fresh meat used to make the products complies with applicable special conditions, excluding special condition 4 when the finished product is treated by heat to a temperature sufficient to destroy *Trichinella*; and<br><br>2. Compliance with product standards of the importing Party. | *- Meat Inspection Act*<br><br>*- Meat Inspection Regulations*<br><br>*- Food and Drugs Act*<br><br>*- Food and Drugs Regulations* | Regulations<br>852/2004<br><br>853/2004<br><br>854/2004 | 1. Fresh meat used to make the products complies with applicable special conditions, excluding Appendix A special condition 6(a) when the finished product is treated by heat to a temperature sufficient to destroy *Trichinella*; and,<br><br>2. Compliance with product standards of the importing Party. |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| **Rendered animal fat intended for human consumption** | | | | | | |
| **Ruminants, equidae,  pigs, poultry and  farmed game** | | | | | | |
| Public health | Regulation 852/2004 853/2004 854/2004 | *- Meat Inspection Act* *- Meat Inspection Regulations* *-  Food and Drugs Act* *- Food and Drugs Regulations* | 1. Fresh meat used to make the products complies with applicable special conditions, excluding special condition 4; and, 2. Compliance with product standards of the importing Party. | *- Meat Inspection Act* *- Meat Inspection Regulations* *-  Food and Drugs Act* *- Food and Drugs Regulations* | Regulations 852/2004 853/2004 854/2004 | 1. Fresh meat used to make the products complies with applicable special conditions, excluding Appendix A special condition 6(a); and, 2. Compliance with product standards of the importing Party. |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | **SPS measure(s) of the European Union** | **SPS measure(s) of Canada** | **Special condition(s)** | **SPS measure(s) of Canada** | **SPS measure(s) of the European Union** | **Special condition(s)** |
| **Animal casings for human consumption** | | | | | | |
| **Cattle, sheep, goats and pigs** | | | | | | |
| Public health | Regulations 852/2004 853/2004 854/2004 | *- Meat Inspection Act* *- Meat Inspection Regulations* *- Food and Drugs Act* *- Food and Drugs Regulations* | Compliance with Canadian rules on transmissible spongiform encephalopathy | *- Meat Inspection Act* *- Meat Inspection Regulations* *- Food and Drugs Act* *- Food and Drugs Regulations* | Regulations 852/2004 853/2004 854/2004 | Compliance with European Union rules on transmissible spongiform encephalopathy |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| **Fishery products and live bivalve molluscs** | | | | | | |
| Fish and fishery products for human consumption | | | | | | |

| Public Health | Regulations 852/2004 853/2004 854/2004 2073/2005 2074/2005 | - *Fish Inspection Act*, R.S.C. 1985, c. F-12 <br><br> - *Fish Inspection Regulations*, C.R.C., c. 802 <br><br> - *Food and Drugs Act* <br><br> - *Food and Drugs Regulations* | Smoked fish packed in hermetically sealed containers that are not frozen contain a salt level not less than 9 per cent (water phase method). <br><br> The Canadian and European Union systems are deemed to provide an equivalent level of protection with respect to microbiological requirements. However, the microbiological criteria used by Canada and the European Union for end product monitoring differ in some aspects. For exported products, it is the responsibility of the exporter to ensure that the products meet the food safety criteria of the importing country. | - *Fish Inspection Act* <br><br> - *Fish Inspection Regulations* <br><br> - *Food and Drugs Act* <br><br> - *Food and Drugs Regulations* | Regulations 852/2004 853/2004 854/2004 2073/2005 2074/2005 | The Canadian and European Union systems are deemed to provide an equivalent level of protection with respect to microbiological requirements. However, the microbiological criteria used by Canada and the European Union for end product monitoring differ in some aspects. For exported products, it is the responsibility of the exporter to ensure that the products meet the food safety criteria of the importing country. |
|---|---|---|---|---|---|---|
| **Deheaded eviscerated fish for human consumption** | | | | | | |
| Animal Health | Directive 2006/88 | - *Health of Animals Act* <br><br> - *Health of Animals Regulations*, Part XVI <br><br> - *Reportable Disease Regulations*, S.O.R./91-2 | | - *Health of Animals Act* <br><br> - *Health of Animals Regulations*, Part XVI | Directive 2006/88 Regulation 1251/2008 | |
| **Live bivalve molluscs for human consumption, including echinoderms, tunicates and marine gastropods** | | | | | | |

309

| Public health | Regulations 852/2004 853/2004 854/2004 2074/2005 | - *Fish Inspection Act* - *Fish Inspection Regulations* - *Food and Drugs Act* - *Food and Drugs Regulations* | The Canadian and European Union systems are deemed to provide an equivalent level of protection with respect to microbiological requirements. However, the microbiological criteria used by Canada and the European Union for end product monitoring differ in some aspects. For exported products, it is the responsibility of the exporter to ensure that the products meet the food safety criteria of the importing country. | - *Fish Inspection Act* - *Fish Inspection Regulations* - *Management of Contaminated Fisheries Regulations*, S.O.R./90-351- *Food and Drugs Act* - *Food and Drugs Regulations* | Regulations 852/2004 853/2004 854/2004 2074/2005 | Live bivalve molluscs are monitored for diarrheic shellfish poison toxins on a risk-based level  The Canadian and European Union systems are deemed to provide an equivalent level of protection with respect to microbiological requirements. However, the microbiological criteria used by Canada and the European Union for end product monitoring differ in some aspects. For exported products, it is the responsibility of the exporter to ensure that the products meet the food safety criteria of the importing country. |
|---|---|---|---|---|---|---|
| **Fish caught under the authority of a recreational fishing licence from Canada** | | | | | | |
| Public health | | | | - *Fish Inspection Act* - *Fish Inspection Regulations* | Regulations 852/2004 853/2004 854/2004 2073/2005 | For fish caught under the authority of a recreational fishing licence from Canada with the name of the importer, the following conditions apply:  1. The fish was caught in Canadian fisheries waters on the dates while the licence is valid, in accordance with Canadian regulations on sport fishing and that possession limits have been respected; |

| | | | | | | 2. The fish has been eviscerated under appropriate hygiene and preservation measures;<br><br>3. The fish is not a toxic species nor a species that may contain biotoxins; and,<br><br>4. The fish is introduced into the European Union within one month following the last date of validity of the recreational fishing licence and is not intended to be marketed.  A copy of the recreational fishing licence is attached to the accompanying document. |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |

**Milk and milk products for human consumption**

**Pasteurized or cheeses from not pasteurised (or low heat treated) and raw milk maturated for at least 60 days**

| Public health | Regulation 852/2004 853/2004 854/2004 | - *Health of Animals Act* <br> - *Health of Animals Regulations*, s. 34 <br> - *Food and Drugs Act- Food and Drugs Regulations*, Part B, Division 8 <br> - *Canada Agricultural Products Act*, R.S.C 1985, c. 20 (4th Supp.) <br> - *Dairy Products Regulations*, S.O.R./79-840 | The Canadian and European Union systems are deemed to provide an equivalent level of protection with respect to microbiological requirements. However, the microbiological criteria used by Canada and the European Union for end product monitoring differ in some aspects.  For exported products, it is the responsibility of the exporter to ensure that the products meet the food safety criteria of the importing country. | - *Food and Drugs Act* <br> - *Food and Drugs Regulations*, Part B, Division B <br> - *Canada Agricultural Products Act* <br> - *Dairy Products Regulations* | Decision 2011/163 Regulation 852/2004 853/2004 854/2004 605/2010 | 1. Canada to evaluate Hazard Analysis Critical Control Point ("HACCP") systems of establishments which are not Food Safety Enhancement Program ("FSEP")-HACCP recognized to ensure they are operating under HACCP principles; and, <br><br> 2. Two signatures are required on the export certificate: animal health attestations are signed by an official veterinarian; and public health related attestations are signed by an official inspector. <br><br> The Canadian and European Union systems are deemed to provide an equivalent level of protection with respect to microbiological requirements.  However, the microbiological criteria used by Canada and the European Union for end product monitoring differ in some aspects.  For exported products, it is the responsibility of the exporter to ensure that the products meet the food safety criteria of the importing country. |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | **SPS measure(s) of the European Union** | **SPS measure(s) of Canada** | **Special condition(s)** | **SPS measure(s) of Canada** | **SPS measure(s) of the European Union** | **Special condition(s)** |
| **Animal casings not for human consumption** | | | | | | |
| **Pigs** | | | | | | |
| Animal Health | Regulation 1069/2009 | *- Health of Animals Act*<br>*- Health of Animals Regulations*, Part IV | | | | |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| **Bones, horns and hooves (except meals) and their products not for human consumption** | | | | | | |
| Animal health | | | | - *Health of Animals Act* <br> - *Health of Animals Regulations* | Regulation 1069/2009 | Certificate as per Decision 97/534 |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| **Blood and blood products not intended for human consumption** | | | | | | |
| **Ruminant** | | | | | | |
| Animal health | Regulation 1069/2009 | - *Health of Animals Act*<br>- *Health of Animals Regulations*, Part IV and Part XIV<br>- *Feeds Act*, R.S.C. 1985, c. F-9<br>- *Feeds Regulations*, 1983, S.O.R./83-593 | Compliance with Canadian rules on transmissible spongiform encephalopathy | | | |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| **Apiculture products not for human consumption** | | | | | | |
| Animal Health | Regulation 1069/2009 | - *Health of Animals Act*<br><br>- *Health of Animals Regulations*, Part VI | Product subjected to treatment, for example freeze drying, irradiation, or vacuum packaging. | - *Health of Animals Act*<br><br>- *Health of Animals Regulations*<br><br>- Bee Products Directive<br><br>TAHD-DSAT-IE-2001-3-6, January 5, 2011 | Regulation 1069/2009 | 1. Bee products used for animal or human feed or industrial use are not restricted; and<br><br>2. Bee products used for bee feeding are treated. |

| | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| **SPS Area** | | | | | | |
| | **SPS measure(s) of the European Union** | **SPS measure(s) of Canada** | **Special condition(s)** | **SPS measure(s) of Canada** | **SPS measure(s) of the European Union** | **Special condition(s)** |
| **Wool, feathers and hair** | | | | | | |
| **Wool** | | | | | | |
| Animal health | Regulation 1069/2009 | *- Health of Animals Act*<br><br>*- Health of Animals Regulations*, Part IV | Certificate of origin | *- Health of Animals Act*<br><br>*- Health of Animals Regulations* | Regulation 1069/2009 | |
| **Pig bristle** | | | | | | |

| Animal health | Regulation 1069/2009 | - *Health of Animals Act* <br><br> - *Health of Animals Regulations*, Part IV | Certificate of origin | - *Health of Animals Act* <br><br> - *Health of Animals Regulations* | Regulation 1069/2009 | |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | SPS measure(s) of the European Union | SPS measure(s) of Canada | Special condition(s) | SPS measure(s) of Canada | SPS measure(s) of the European Union | Special condition(s) |
| **Shell eggs and egg products intended for human consumption** | | | | | | |

| Animal health | Directives 90/539 2002/99 | - *Health of Animals Act* <br> - *Health of Animals Regulations*, Part III and Part IV (for shell eggs and egg products) | 1. Statement of origin; and, <br> 2. Veterinary certification | *Egg Products – Import Procedures*, AHPD-DSAE-IE-2001-5-3, December 20, 1995 | Directives 90/539 2002/99 | |

| SPS Area | Exports from the European Union to Canada | | | Exports from Canada to the European Union | | |
|---|---|---|---|---|---|---|
| | **SPS measure(s) of the European Union** | **SPS measure(s) of Canada** | **Special condition(s)** | **SPS measure(s) of Canada** | **SPS measure(s) of the European Union** | **Special condition(s)** |
| **Horizontal issues** | | | | | | |
| Listing of establishments | Regulation 2004/852 2004/853 | - *Meat Inspection Act* <br> - *Meat Inspection* | Listing required for fresh meat and meat products | - *Meat Inspection Act* <br> - *Meat Inspection Regulations* | Regulation 2004/852 2004/853 | The following conditions apply to all animals and animal product commodities with public health recognition where a list of |

| | 2004/854 | *Regulations*<br><br>*- Fish Inspection Act*<br><br>*- Fish Inspection Regulations*<br><br>*- Canada Agricultural Products Act*<br><br>*- Dairy Products Regulations* | | *- Fish Inspection Act*<br><br>*- Fish Inspection Regulations*<br><br>*- Canada Agricultural Products Act*<br><br>*- Dairy Products Regulations* | 2004/854 | establishments is required:<br><br>1. Lists of Canadian establishments and plants are entered into the TRACES system by Canada; and,<br><br>2. Canada provides guarantees that the establishments fulfil the conditions as laid down in this Chapter, in its entirety.<br><br>The European Union updates and publishes the list of establishments without undue delay. |

| Water | Directive 98/83 | - *Canada Agricultural Products Act*<br><br>- *Dairy Products Regulations*<br><br>- *Fish Inspection Act*<br><br>- *Fish Inspection Regulations*<br><br>- *Food and Drugs Act*<br><br>- *Food and Drugs Regulations*<br><br>- *Meat Inspection Act*<br><br>- *Meat Inspection Regulations* | | - *Canada Agricultural Products Act*<br><br>- *Dairy Products Regulations*<br><br>- *Fish Inspection Act*<br><br>- *Fish Inspection Regulations*<br><br>- *Food and Drugs Act*<br><br>- *Food and Drugs Regulations*<br><br>- *Meat Inspection Act*<br><br>- *Meat Inspection Regulations* | Directive 98/83 | |

APPENDIX A:

**SPECIAL CONDITIONS WITH RESPECT TO CERTAIN EXPORTS FROM CANADA TO THE EUROPEAN UNION**

1. Compliance with European Union rules on transmissible spongiform encephalopathy;

2. Shrouds not to be used on carcasses;

3. Compliance with European Union rules on decontamination;

4. Compliance with microbiological testing for export to Finland and Sweden as laid down in the Commission Regulation (EC) No 1688/2005.

5. Ante-mortem inspection

Routine ante-mortem inspection procedures apply provided a CFIA veterinarian is present on premises when ante-mortem inspection is conducted on animals intended to be slaughtered for export to the European Union;

6. Post-mortem inspection

(a) Pork:

in accordance with the Commission Implementing Regulation (EC) No 2015/1375:

(i) skeletal muscle is tested for Trichinella by using a validated digestion method approved by the CFIA in a CFIA laboratory or a laboratory certified by the CFIA for that purpose; or,

(ii)    skeletal muscle is submitted to cold treatment by using a treatment approved by the CFIA;

(b) Bovine over 6 weeks old:

(i) liver: incision of the gastric surface and at the base of the caudate lobe to examine the bile ducts;

(ii) head: two incisions in the external masseters parallel to the mandible;

(c) Domestic solipeds;

in accordance with the Commission Implementing Regulation (EC) No 2015/1375, skeletal muscle is tested for Trichinella by using a validated digestion method approved by the CFIA in a CFIA laboratory or a laboratory certified by the CFIA for that purpose;

(d) Farmed game - wild boar:

in accordance with the Commission Implementing Regulation (EC) No 2015/1375, skeletal muscle is tested for Trichinella by using a validated digestion method approved by the CFIA in a CFIA laboratory or a laboratory certified by the CFIA for that purpose;

7. Regular check on general hygiene:

in addition to Canadian operational and preoperational sanitation requirements, the products testing requirements for E. coli and Salmonella for the United States of America (USA) as is written in Annex T: Testing for Escherichia coli (E. coli) in Slaughter Establishments and Annex U: USDA Performance Standards for Salmonella of USA section of Chapter 11 of the CFIA's Meat Hygiene Manual of Procedures are implemented; and

8. Compliance with microbiological food safety criteria of the importing Party.

322

**Section B**

**Phytosanitary Measures**

To be agreed at a later stage.

## ANNEX-5-F

### APPROVAL OF ESTABLISHMENTS OR FACILITIES

The conditions and procedures for the purpose of Article 5.7.4(b) are as follows:

(a)    the import of the product has been authorised, if so required, by the competent authority of the importing Party;

(b)    the establishment or facility concerned has been approved by the competent authority of the exporting Party;

(c)    the competent authority of the exporting Party has the authority to suspend or withdraw the approval of the establishment or facility; and

(d)    the exporting Party has provided relevant information requested by the importing Party.

324

## ANNEX 5-G

## PROCEDURE RELATED TO SPECIFIC IMPORT REQUIREMENTS FOR PLANT HEALTH

A key objective of this procedure is that the importing Party establishes and maintains, to the best of its ability, a list of regulated pests for commodities where a phytosanitary concern exists in its territory.

1.    If the Parties jointly identify a specific commodity as a priority, the importing Party should establish a preliminary list of pests for that commodity, within a period of time determined by the Parties, once it receives from the exporting Party:

   (a)    information on the pest status in the territory of the exporting Party that relates to the pests regulated by at least one of the Parties; and

   (b)    information on the pest status of other pests occurring in its territory based on international databases and other available sources.

2.    The preliminary list of pests of an importing Party may include pests that are already regulated in its territory. It may also include potential quarantine pests for which the importing Party may require a pest risk analysis should a commodity be confirmed as a priority in accordance with paragraph 3.

3.    For a commodity:

   (a)    for which a preliminary list of pests has been established pursuant to paragraph 2;

   (b)    which the Parties confirm is a priority; and

   (c)    for which the exporting Party has provided all relevant information required by the importing Party,

   the importing Party should undertake the steps necessary to establish its regulated pest list as well as the specific import requirements for that commodity.

4.    If the importing Party provides for more than one phytosanitary measure to meet the specific import requirements for a specific commodity, the competent authority of the exporting Party should communicate to the competent authority of the importing Party which measure or measures it will use as the basis for certification.

## **ANNEX 5-H**

### **PRINCIPLES AND GUIDELINES TO CONDUCT AN AUDIT OR VERIFICATION**

To be agreed at a later stage.

## ANNEX 5-I

## EXPORT CERTIFICATION

Model attestation for health certificates for animals and animal products

1.    Official health certificates shall cover consignments of products being traded between the Parties.

Health attestations

2.    Equivalence agreed: Model health attestation to be used (equivalence for measures or certification systems). Refer to Annex 5-E;

"The [insert product] herein described, complies with the relevant [European Union/Canada] (*) SPS measure(s) and requirement(s) which have been recognised as equivalent to the [Canada/European Union] (*) SPS measure(s) and requirement(s) as prescribed in Annex 5-E of the Canada-European Union Comprehensive Economic and Trade Agreement [and the special condition(s) as set out in Annex 5-E](*).

* Delete as appropriate."

3.    Until certificates on the basis of equivalence have been adopted, existing certification shall continue to be used.

Official languages for certification

4.    (a)    For import into the European Union, the certificate must be drawn up in at least one of the official languages of the Member State of the border inspection post of introduction of the consignment into the European Union; and

(b)    for import into Canada, the certificate must be drawn up in one of the official languages of Canada.

Means of certification

5.    The exchange of original certificate information may occur by a paper-based system or a secure method of electronic data transmission that offers an equivalent certification guarantee. The exporting Party may elect to provide electronic official certification if the importing Party has determined that equivalent security guarantees are being provided, including the use of a digital signature and a non-repudiation mechanism. The importing Party's agreement for the exclusive use of electronic certification can either be recorded through correspondence in one of the annexes to this Chapter or by correspondence in accordance with Article 5.14.8.

6.    The European Union may set out its import certificates for live animals and animal products from Canada with an equivalence status referred to in Annex 5-E in Trade and Control Export System ("TRACES").

## ANNEX 5-J

## IMPORT CHECKS AND FEES

*SECTION A*

**Frequencies of checks**

The Parties may modify any frequency rate, within their responsibilities, as appropriate, taking into account the nature of checks applied by the exporting Party prior to export, the importing Party's past experience with products imported from the exporting Party, progress made toward the recognition of equivalence, or as a result of other actions or consultations provided for in this Agreement.

Table 1 – Frequencies of frontier checks on consignments of live animals, animal products and animal by-products

| Type of frontier check | Normal rate as referred to in Article 5.10.1 |
|---|---|
| **1. Documentary and identity** <br> Each Party performs documentary and identity checks on all consignments | |
| **2. Physical Checks** | |
| *Live animals* | 100% |
| *Semen, embryos or ova* | 10% |
| *Animal products for human consumption* <br><br> Fresh meat including offal, and products of the bovine, ovine, caprine, porcine and equine species defined in Council Directive 92/5/EEC <br><br> Whole eggs <br><br> Lard and rendered fats <br><br> Animal casings <br><br> Gelatin <br><br> Poultry meat and poultry meat products <br><br> Rabbit meat, game meat (wild/farmed) and products <br><br> Milk and milk products <br><br> Egg products <br><br> Honey <br><br> Bone and bone products <br><br> Meat preparations and minced meat <br><br> Frogs' legs and snails | 10% |

| | |
|---|---|
| *Animal products not for human consumption* | 10% |
| Lard and rendered fats | |
| Animal casings | |
| Milk and milk products | |
| Gelatin | |
| Bone and bone products | |
| Hides and skins ungulates | |
| Game trophies | |
| Processed petfood | |
| Raw material for the manufacture of petfood | |
| Raw material, blood, blood products, glands and organs for pharmaceutical or technical use | |
| Processed animal protein (packaged) | |
| Bristles, wool, hair and feathers | |
| Horns, horn products, hooves and hoof products | |
| Apiculture products | |
| Hatching eggs | |
| Manure | |
| Hay and straw | |

| | |
|---|---|
| *Processed animal protein not for human consumption (bulked)* | 100 % for six consecutive consignments (as per Commission Regulation (EU) No 142/2011 implementing Regulation (EC) No 1069/2009), if these consecutive tests prove negative, random sampling shall be reduced to 20 % of subsequent bulk consignments from the same source. If one of these random sampling proves positive, the competent authority must sample each consignment from the same source until six consecutive tests again prove negative. |
| *Live bivalve molluscan shellfish* | 15% |
| *Fish and fishery products for human consumption*<br>Fish products in hermetically sealed containers intended to render them stable at ambient temperatures, fresh and frozen fish, dry fisheries products, salted fisheries products, or dry and salted fisheries products<br><br>Other fishery products | 15% |
| Live crustaceans or fresh headed and degutted fish without other manual processing | 2% |

For the purposes of this Annex, "consignment" means a quantity of products of the same type, covered by the same health certificate or document, conveyed by the same means of transport, consigned by a single consignee and originating from the same exporting Party or part of that Party.

*SECTION B*

**Fees**

To be agreed at a later stage.

## ANNEX 8-A

## EXPROPRIATION

The Parties confirm their shared understanding that:

1.    Expropriation may be direct or indirect:

(a)    direct expropriation occurs when an investment is nationalised or otherwise directly expropriated through formal transfer of title or outright seizure; and

(b)    indirect expropriation occurs if a measure or series of measures of a Party has an effect equivalent to direct expropriation, in that it substantially deprives the investor of the fundamental attributes of property in its investment, including the right to use, enjoy and dispose of its investment, without formal transfer of title or outright seizure.

2.    The determination of whether a measure or series of measures of a Party, in a specific fact situation, constitutes an indirect expropriation requires a case-by-case, fact-based inquiry that takes into consideration, among other factors:

(a)    the economic impact of the measure or series of measures, although the sole fact that a measure or series of measures of a Party has an adverse effect on the economic value of an investment does not establish that an indirect expropriation has occurred;

(b)    the duration of the measure or series of measures of a Party;

(c)    the extent to which the measure or series of measures interferes with distinct, reasonable investment-backed expectations; and

(d)    the character of the measure or series of measures, notably their object, context and intent.

3.    For greater certainty, except in the rare circumstance when the impact of a measure or series of measures is so severe in light of its purpose that it appears manifestly excessive, non-discriminatory measures of a Party that are designed and applied to protect legitimate public welfare objectives, such as health, safety and the environment, do not constitute indirect expropriations.

## <u>ANNEX 8-B</u>

## **PUBLIC DEBT**

1. For the purposes of this Annex,

**negotiated restructuring** means the restructuring or rescheduling of debt of a Party that has been effected through

> (a) a modification or amendment of debt instruments, as provided for under their terms, including, their governing law, or

> (b) a debt exchange or other similar process in which the holders of no less than 75 per cent of the aggregate principal amount of the outstanding debt subject to restructuring have consented to such debt exchange or other process; and

**governing law** of a debt instrument means a jurisdiction's laws applicable to that debt instrument.

2. No claim that a restructuring of debt of a Party breaches an obligation under Sections C and D may be submitted to, or if already submitted continue under Section F if the restructuring is a negotiated restructuring at the time of submission, or becomes a negotiated restructuring after such submission, except for a claim that the restructuring violates Article 8.6 or 8.7.

3. Notwithstanding Article 8.22.1(b) and subject to paragraph 2, an investor of a Party may not submit a claim under Section F that a restructuring of debt of a Party breaches an obligation under Sections C and D (other than Article 8.6 or 8.7)[40] unless 270 days have elapsed from the date of submission by the claimant of the written request for consultations pursuant to Article 8.19.

4. For greater certainty, **debt of a Party** means a debt instrument of any level of government of a Party.

---

[40] For greater certainty, mere differences in treatment accorded by a Party to certain investors or investments on the basis of legitimate policy objectives in the context of a debt crisis or threat thereof, including those differences in treatment resulting from eligibility for debt restructuring, do not amount to a breach of Article 8.6 or 8.7.

## <u>ANNEX 8-C</u>

### EXCLUSIONS FROM DISPUTE SETTLEMENT

A decision by Canada following a review under the *Investment Canada Act*, R.S.C. 1985, c. 28 (1st Supp.), regarding whether or not to permit an investment that is subject to review, is not subject to the dispute settlement provisions under Section F, or to Chapter Twenty-Nine (Dispute Settlement). For greater certainty, this exclusion is without prejudice to the right of a Party to have recourse to Chapter Twenty-Nine (Dispute Settlement) with respect to the consistency of a measure with a Party's reservations, as set out in the Party's Schedule to Annexes I, II or III, as appropriate.

## <u>ANNEX 8-D</u>

### JOINT DECLARATION CONCERNING ARTICLE 8.12.6

Mindful that investor-State dispute settlement tribunals are meant to enforce the obligations referred to in Article 8.18.1, and are not an appeal mechanism for the decisions of domestic courts, the Parties recall that the domestic courts of each Party are responsible for the determination of the existence and validity of intellectual property rights. The Parties further recognise that each Party shall be free to determine the appropriate method of implementing the provisions of this Agreement regarding intellectual property within their own legal system and practice. The Parties agree to review the relation between intellectual property rights and investment disciplines within three years after entry into force of this Agreement or at the request of a Party. Further to this review and to the extent required, the Parties may issue binding interpretations to ensure the proper interpretation of the scope of investment protection under this Agreement in accordance with the provisions of Article 8.31.3.

## ANNEX 8-E

## JOINT DECLARATION ON ARTICLES 8.16, 9.7, AND 29.6

With respect to Articles 8.16, 9.7 (Denial of benefits) and 29.6 (National security), the Parties confirm their understanding that measures that are "related to the maintenance of international peace and security" include the protection of human rights.

## ANNEX 8-F

### DECLARATION BY CANADA ON THE *INVESTMENT CANADA ACT*

Canada will increase the threshold for review under the *Investment Canada Act*, R.S.C. 1985, c. 28 (1st Supp.) ("ICA") to CAD $1.5 billion once this Agreement is implemented.

Any future amendments to the ICA would be subject to the requirement that such amendments could not decrease the conformity of the ICA with the investment obligations of this Agreement.

As set out in Canada's ICA reservation (Annex I-C-1), the higher threshold will apply to an acquisition of a Canadian enterprise by an investor of the European Union that is not a state enterprise. The determination of whether the acquirer is an investor of the European Union would be based on whether a national of the European Union controls the acquirer in law, or in the absence of a majority ownership, whether nationals of the European Union control the acquirer in fact such as through the ownership of voting interests or through the nationality of members of the board of directors. Moreover, enterprises of the European Union that are controlled by nationals from Canada's existing Free Trade Agreement partners with which Canada has taken investment commitments would also benefit from the higher threshold.

Canada will amend its ICA to provide for the changes necessary for the higher review threshold stated above upon the entry into force of this Agreement.

# ANNEX 9-A

## UNDERSTANDING ON NATIONAL TREATMENT WITH RESPECT TO THE CROSS-BORDER SUPPLY OF SERVICES

1.  The European Union and Canada share the following understanding with respect to the application of Article 9.3 to treatment accorded by a provincial or territorial government in Canada, or by a government of or in a Member State of the European Union with respect to the cross-border supply of services as defined in Article 9.1or the supply of a service by a natural person of a Party in the territory of the other Party.

2.  Pursuant to Article 9.3, treatment "no less favourable than the most favourable treatment accorded, in like situations, by that government to its own service suppliers and services" does not apply to a person of the other Party, or to a service supplied by this person if:

    (a)  in the case of Canada, a provincial or territorial government of Canada accords more favourable treatment to a service supplier which is a person of another provincial or territorial government of Canada, or to a service supplied by this supplier; and

    (b)  in the case of the European Union:

         (i)  a government of a Member State of the European Union accords more favourable treatment to a service supplier which is a person of another Member State or to a service supplied by this supplier;

         (ii) a regional government of a Member State of the European Union accords more favourable treatment to a service supplier which is a person of another regional government of that Member State, or to a service supplied by this supplier; and

    (c)  the more favourable treatment referred to in subparagraphs (a) and (b) is accorded pursuant to specific mutual rights and obligations applicable between these governments.

3.  For the European Union, paragraph 2 includes in particular treatment accorded pursuant to the *Treaty on the Functioning of the European Union*, done at Lisbon on 13 December 2007 in respect of the free movement of persons and services, as well as to treatment accorded by any measure adopted pursuant to that Treaty. A government of or in a Member State of the European Union may accord more favourable treatment pursuant to the *Treaty on the Functioning of the European Union* to those natural persons who are nationals of another Member State of the European Union, or to enterprises formed in accordance with the law of another Member State of the European Union and having their registered office, central administration or principal place of business within the European Union, and to the services supplied by these natural persons or enterprises.

4.  For Canada, paragraph 2 includes in particular treatment accorded pursuant to the Canadian Agreement on Internal Trade ("AIT") as well as to treatment accorded by any measure adopted pursuant to the AIT and from regional agreements on the free movement of persons and services. A provincial or territorial government in Canada

337

may accord a more favourable treatment pursuant to the AIT and these regional agreements to those natural persons who are residents in the territory of a party to the AIT or regional agreement or to enterprises formed in accordance with the law of a party to the AIT or regional agreement that have their registered office, central administration or principal place of business within Canada, and to the services supplied by these natural persons and enterprises.

## ANNEX 9-B

**UNDERSTANDING ON NEW SERVICES NOT CLASSIFIED IN THE UNITED NATIONS PROVISIONAL CENTRAL PRODUCT CLASSIFICATION (CPC), 1991**

1.  The Parties agree that Chapter Twelve (Domestic Regulation) and Articles 9.3, 9.5, and 9.6 do not apply to a measure relating to a new service that cannot be classified in the CPC 1991.

2.  To the extent possible, each Party shall notify the other Party prior to adopting a measure inconsistent with Chapter Twelve (Domestic Regulation), and Articles 9.3, 9.5, and 9.6 with respect to a new service, as referred to in paragraph 1.

3.  At the request of a Party, the Parties shall enter into negotiations to incorporate the new service into the scope of this Agreement.

4.  For greater certainty, paragraph 1 does not apply to an existing service that could be classified in the CPC 1991, but that could not previously be supplied on a cross-border basis due to lack of technical feasibility.

## **ANNEX 9-C**

### **UNDERSTANDING ON COURIER SERVICES**

1.    The Parties share the following understanding with respect to the application of Articles 8.2.2(a) and 9.2.2(e).

2.    The Parties confirm that courier services are covered by Chapters Eight (Investment) and Nine (Cross-Border Trade in Services), subject to applicable reservations as set out in the Parties' Schedules to Annexes I and II. For greater certainty, the treatment offered to courier services under Chapters Eight and Nine does not include the grant of air traffic rights for courier service suppliers. These rights are subject to the *Agreement on Air Transport between Canada and the European Community and its Member States*, done at Brussels on 17 December 2009 and Ottawa on December 18, 2009.

## ANNEX 10-A

**LIST OF CONTACT POINTS OF THE MEMBER STATES OF THE EUROPEAN UNION**

For the purposes of this Annex, the abbreviations are as defined in paragraph 8 of Annex 10-E.

**AT**

For residence and visa issues:

> Department III/4 - Residence, Civil Status and Citizenship Matters
>
> Federal Ministry of the Interior

For labour market issues:

> EU labour market laws and international affairs of labour market laws
>
> Federal Ministry for Labour, Social Affairs and Consumer Protection

**BE**

Direction générale Potentiel économique

Politique Commerciale

**BG**

Director of International labour migration and mediation

Employment Agency

**CY**

Director of Civil Registry and Migration Department

Ministry of Interior

**CZ**

Ministry of Industry and Trade

Department of Common Trade Policy and International Economic Organisations

**DE**

CETA Advisor

Canadian German Chamber of Industry and Commerce Inc.

**DK**

Danish Agency for Labour Market and Recruitment

Ministry of Employment

**EE**

Head of Migration- and Border Policy Department

Estonian Ministry of the Interior

**EL**

Directorate for Justice, Home Affairs & Schengen issues

Ministry of Foreign Affairs

**ES**

Ministry of Employment and Social Security

**FI**

Immigration Unit, Section for employed persons

Finnish Immigration Service

**FR**

Direction générale des étrangers en France (DGEF).

Ministère de l'Intérieur

**HR**

Head of Trade Policy Department

Ministry of Foreign and European Affairs

**HU**

Department for Trade Policy and Global Economy

Ministry of Foreign Affairs

**IE**

Immigration and Citizenship Policy Division

Irish Naturalisation & Immigration Service

**IT**

DG Trade Policy

Ministry for Economic Development

**LT**

International Economic Organizations Division

External Economic Relations Department

Ministry of Foreign Affairs of the Republic of Lithuania

**LU**

Bureau des Passeports, Visas et Légalisations

Ministry of Foreign Affairs

**LV**

Office of Citizenship and Migration Affairs of Latvia

**MT**

Director Citizenship and Expatriate Affairs

Citizenship and Expatriate Affairs Department

Ministry for Home Affairs & National Security

**NL**

Directorate General for Foreign Economic Relations

Ministry of Foreign Affairs

**PT**

Directorate General for Consular Affairs and Portuguese Communities

Ministry of Foreign Affairs

**PL**

Department of Trade Policy

Ministry of Economy

**RO**

Unit for Residence/Staying UE, SEE Citizens and Third Country – Migration Directorate

General Inspectorate for Immigration (GII)

**SE**

National Board of trade

Ministry of Justice, Division for Migration and Asylum Policy

**SI**

Migration Policy and Legislation Division

Migration Office

Internal Administrative Affairs, Migration and Naturalization Directorate

Ministry of the Interior

**SK**

Aliens Police Department

Bureau of Border and Aliens Police of Presidium of the Police Force

Trade Policy Department

Ministry of Economy

**UK**

Head of Migration Policy

Immigration and Border Policy Directorate

Home Office

## ANNEX 10-B

**RESERVATIONS AND EXCEPTIONS APPLYING IN SPECIFIC MEMBER STATES OF THE EUROPEAN UNION FOR KEY PERSONNEL AND SHORT-TERM BUSINESS VISITORS**

1.    Articles 10.7 and 10.9 do not apply to any existing non-conforming measure listed in this Annex, to the extent of the non-conformity.

2.    A measure listed in this Annex may be maintained, continued, promptly renewed, or amended, provided that the amendment does not decrease the conformity of the measure with Articles 10.7 or 10.9, as it existed immediately before the amendment.[41]

3.    Business visitors for investment purposes

| All sectors | **AT:** Business visitor needs to be employed by an enterprise other than a non-profit organisation, otherwise: Unbound. |
|---|---|
| | **CZ**: Business visitor for investment purposes needs to be employed by an enterprise other than a non-profit organisation, otherwise: Unbound. |
| | **SK**: Business visitor for investment purposes needs to be employed by an enterprise other than a non-profit organisation, otherwise: Unbound. Work permit required, including economic needs test. |
| | **UK:** Permissible length of stay: up to 90 days in any twelve month period. Business visitor needs to be employed by an enterprise other than a non-profit organisation, otherwise: Unbound. |

4.    Investors

| All sectors | **AT**: Economic needs test. |
|---|---|
| | **CZ, SK**: Work permit, including economic needs test, required in case of investors employed by an enterprise. |
| | **DK**: Maximum stay of 90 days within any six month period. If investors wish to establish a business in Denmark as self-employed, a work permit is required. |
| | **FI**: Investors need to be employed by an enterprise other than a non-profit organisation, in a position of middle or top management. |
| | **HU**: Maximum length of stay 90 days where the investor is not employed by an enterprise in Hungary. Economic needs test required where the investor is employed by an enterprise in Hungary. |
| | **IT**: Economic needs test required where the investor is not employed by an enterprise. |
| | **LT, NL, PL**: the category of investors is not recognised with regard to natural persons representing the investor. |
| | **LV**: For pre-investment phase maximum length of stay is limited to 90 days within any six months period. Extension in post-investment phase to one year, subject to |

---

[41]    This paragraph does not apply to UK reservations.

345

| | criteria in national legislation such as field and amount of investment made. |
|---|---|
| | **UK**: The category of investors is not recognised: Unbound. |

### 5.    Intra-corporate transferees (specialists and senior personnel)

| All sectors | **BG**: The number of foreign natural persons employed within a Bulgarian enterprise may not exceed ten per cent of the average annual number of citizens of the European Union employed by the respective Bulgarian enterprise. Where less than 100 persons are employed, the number may, subject to authorisation, exceed ten per cent. |
|---|---|
| | **AT, CZ, SK, UK**: Intra-corporate transferees need to be employed by an enterprise other than a non-profit organisation, otherwise: Unbound. |
| | **FI**: Senior personnel needs to be employed by an enterprise other than a non-profit organisation. |
| | **HU**: Natural persons who have been a partner in an enterprise do not qualify to be transferred as intra-corporate transferees. |

### 6.    Intra-corporate transferees (graduate trainees)

| All sectors | **AT, CZ, FR, DE, ES, HU, SK**: The training which is to be delivered as a result of the transfer of a graduate trainee to an enterprise must be linked to the university degree which has been obtained by the graduate trainee. |
|---|---|
| | **BG, HU**: Economic needs test. |
| | **CZ, FI, SK, UK**: Graduate trainee needs to be employed by an enterprise other than a non-profit organisation, otherwise: Unbound. |

### 7.    Short-term business visitors

| All activities in Annex 10-D | **DK, HR**: Work permit, including economic needs test, required in case the short-term business visitor provides a service in the territory of Denmark or Croatia, respectively. |
|---|---|
| | **LV**: Work permit required for operations/activities to be performed on the basis of a contract. |
| | **SK**: In case of providing a service in the territory of Slovakia, a work permit, including economic needs test, is required beyond seven days in a month or 30 days in calendar year. |
| | **UK**: The category of short-term business visitors is not recognised: Unbound. |
| Research and Design | **AT**: Work permit, including economic needs test, required, except for research activities of scientific and statistical researchers. |
| | **NL**: Work permit required, including economic needs test. |
| Marketing research | **AT**: Work permit required, including economic needs test. Economic needs test is waived for research and analysis activities for up to seven days in a month or 30 |

| | |
|---|---|
| | days in a calendar year. University degree required.<br><br>**NL:** Work permit required, including economic needs test. |
| **Trade Fairs and Exhibitions** | **AT:** Work permit, including economic needs test, required for activities beyond seven days in a month or 30 days in a calendar year. |
| **After-Sales or After-Lease Service** | **AT:** Work permit required, including economic needs test. Economic needs test is waived for persons training workers to perform services and possessing uncommon knowledge.<br><br>**CZ**: Work permit is required beyond seven days in a month or 30 days in calendar year.<br><br>**FI:** Depending on the activity, a residence permit may be required.<br><br>**SE:** Work permit required, except for (i) people who participate in training, testing, preparation or completion of deliveries, or similar activities within the framework of a business transaction, or (ii) fitters or technical instructors in connection with urgent installation or repair of machinery for up to two months, in the context of an emergency. No economic needs test performed. |
| **Commercial Transactions** | **AT**: Work permit, including economic needs test, required for activities beyond seven days in a month or 30 days in a calendar year.<br><br>**FI**: The person needs to be providing services as an employee of an enterprise located in the territory of the other Party.<br><br>**NL:** Work permit required, including economic needs test. |
| **Tourism personnel** | **NL**: Work permit required, including economic needs test.<br><br>**FI**: The person needs to be providing services as an employee of an enterprise located in the territory of the other Party.<br><br>**PL:** Unbound.<br><br>**SE:** Work permit required, except for drivers and staff of tourist buses. No economic needs test performed. |
| **Translation and Interpretation** | **AT, NL**: Work permit required, including economic needs test.<br>**PL:** Unbound. |

## ANNEX 10-C

## EQUIVALENT QUALIFICATIONS FOR ENGINEERING TECHNOLOGISTS AND SCIENTIFIC TECHNOLOGISTS

For the purpose of this Agreement:

(a)     for engineering technologists (CPC 8672, and 8673): completion of a three year post-secondary degree from an officially recognised institution in engineering technology is considered equivalent to a university degree; and

(b)     for scientific technologists (CPC 881, 8671, 8674, 8676, 851, 852, 853, 8675, and 883): completion of a three year post-secondary degree from an officially recognised institution in the disciplines of agriculture, architecture, biology, chemistry, physics, forestry, geology, geophysics, mining and energy is considered equivalent to a university degree.

## <u>ANNEX 10-D</u>

## ACTIVITIES OF SHORT-TERM BUSINESS VISITORS

(a)    **meetings and consultations**: natural persons attending meetings or conferences, or engaged in consultations with business associates;

(b)    **research and design**: technical, scientific and statistical researchers conducting independent research or research for an enterprise located in the territory of the other Party;

(c)    **marketing research**: market researchers and analysts conducting research or analysis for an enterprise located in the territory of the other Party;

(d)    **training seminars**: personnel of an enterprise who enter the territory of the other Party to receive training in techniques and work practices who are employed by companies or organisations in that Party, provided that the training received is confined to observation, familiarisation and classroom instruction only;

(e)    **trade fairs and exhibitions**: personnel attending a trade fair for the purpose of promoting their company or its products or services;

(f)    **sales**: representatives of a supplier of services or goods taking orders or negotiating the sale of services or goods or entering into agreements to sell services or goods for that supplier, but not delivering goods or supplying services themselves. Short-term business visitors do not engage in making direct sales to the general public;

(g)    **purchasing**: buyers purchasing goods or services for an enterprise, or management and supervisory personnel, engaging in a commercial transaction carried out in the territory of the other Party;

(h)    **after-sales or after-lease service**: installers, repair and maintenance personnel, and supervisors, possessing specialized knowledge essential to a seller's contractual obligation, performing services or training workers to perform services, pursuant to a warranty or other service contract incidental to the sale or lease of commercial or industrial equipment or machinery, including computer software, purchased or leased from an enterprise located outside the territory of the Party into which temporary entry is sought, throughout the duration of the warranty or service agreement;

(i)    **commercial transactions**: management and supervisory personnel and financial services personnel (including insurers, bankers and investment brokers) engaging in a commercial transaction for an enterprise located in the territory of the other Party;

(j)    **tourism personnel**: tour and travel agents, tour guides or tour operators attending or participating in conventions or accompanying a tour that has begun in the territory of the other Party; and

(k)    **translation and interpretation**: translators or interpreters performing services as employees of an enterprise located in the territory of the other Party.

## ANNEX 10-E

## SECTORAL COMMITMENTS ON CONTRACTUAL SERVICE SUPPLIERS AND INDEPENDENT PROFESSIONALS

1.      Each Party shall allow the supply of services in its territory by contractual services suppliers or independent professionals of the other Party through the presence of natural persons, in accordance with Article 10.8, for the sectors listed in this Annex, and subject to the relevant limitations.

2.      The list of reservations is composed of the following elements:

    (a)     the first column indicates the sector or sub-sector in which the reservation applies; and

    (b)     the second column describes the applicable limitations.

3.      For Canada, sectoral commitments apply to occupations listed under level "0" and "A" of Canada's National Occupational Classification ("NOC").

4.      In addition to the list of reservations in this Annex, each Party may adopt or maintain a measure relating to qualification requirements, qualification procedures, technical standards, licensing requirements or licensing procedures that does not constitute a limitation within the meaning of Article 10.8. These measures, which include requirements to obtain a licence, obtain recognition of qualifications in regulated sectors or to pass specific examinations, such as language examinations, even if not listed in this Annex, apply in any case to contractual services suppliers or independent professionals of the Parties.

5.      For the European Union, in the sectors where an economic needs test is applied, the main criteria is the assessment of the relevant market situation in the Member State of the European Union or the region where the service is provided, including with respect to the number of, and the impact on, existing services suppliers.

6.      The European Union takes commitments with respect to Article 10.8 differentiated by its Member States, as set out in the list of reservations included in this Annex.

7.      The rights and obligations that arise from this Annex have no self-executing effect and confer no rights directly on natural or juridical persons.

8.      The following abbreviations are used in the list of reservations included in this Annex:

    AT     Austria

    BE     Belgium

    BG     Bulgaria

    CY     Cyprus

    CZ     Czech Republic

    DE     Germany

DK   Denmark

EE   Estonia

ES   Spain

EU   European Union, including all its Member States

FI   Finland

FR   France

EL   Greece

HR   Croatia

HU   Hungary

IE   Ireland

IT   Italy

LV   Latvia

LT   Lithuania

LU   Luxembourg

MT   Malta

NL   The Netherlands

PL   Poland

PT   Portugal

RO   Romania

SK   Slovak Republic

SI   Slovenia

SE   Sweden

UK   United Kingdom


CAN Canada


CSS: Contractual Service Suppliers

IP: Independent Professionals

9.     Article 10.8.1 applies to the following sectors or sub-sectors:

(a)  Legal advisory services in respect of public international law and foreign law[42]

(b)  Accounting and bookkeeping services

(c)  Taxation advisory services

(d)  Architectural services and urban planning and landscape architectural services

(e)  Engineering services and integrated engineering services

(f)  Medical and dental services

(g)  Veterinary services

(h)  Midwives services

(i)  Services provided by nurses, physiotherapists and paramedical personnel

(j)  Computer and related services

(k)  Research and development services

(l)  Advertising services

(m)  Market research and opinion polling

(n)  Management consulting services

(o)  Services related to management consulting

(p)  Technical testing and analysis services

(q)  Related scientific and technical consulting services

(r)  Mining

(s)  Maintenance and repair of vessels

(t)  Maintenance and repair of rail transport equipment

(u)  Maintenance and repair of motor vehicles, motorcycles, snowmobiles and road transport equipment

(v)  Maintenance and repair of aircrafts and parts thereof

(w)  Maintenance and repair of metal products, of (non-office) machinery, of (non-transport and non-office) equipment and of personal and household goods

(x)  Translation and interpretation services

(y)  Telecommunication services

(z)  Postal and courier services

(aa)  Construction and related engineering services

---

[42]    A reservation for legal services described in Annexes I or II by a Member State for *'domestic law'* as covering *'EU and Member State law'* applies to this Annex.

(bb)  Site investigation work

(cc)  Higher education services

(dd)  Services relating to agriculture, hunting and forestry

(ee)  Environmental services

(ff)  Insurance and insurance related services advisory and consulting services

(gg)  Other financial services advisory and consulting services

(hh)  Transport advisory and consulting services

(ii)  Travel agencies and tour operators' services

(jj)  Tourist guides services

(kk)  Manufacturing advisory and consulting services

10.    Article 10.8.2 applies to the following sectors or sub-sectors:

(a)   Legal advisory services in respect of public international law and foreign law[43]

(b)   Architectural services and urban planning and landscape architectural services

(c)   Engineering services and integrated engineering services

(d)   Computer and related services

(e)   Research and development services

(f)   Market research and opinion polling

(g)   Management consulting services

(h)   Services related to management consulting

(i)   Mining

(j)   Translation and interpretation services

(k)   Telecommunication services

(l)   Postal and courier services

(m)   Higher education services

(n)   Insurance related services advisory and consulting services

(o)   Other financial services advisory and consulting services

(p)   Transport advisory and consulting services

(q)   Manufacturing advisory and consulting services

---

[43]    A reservation for legal services described in Annexes I or II by a Member State for *'domestic law'* as covering *'EU and Member State law'* applies to this Annex.

11.     **List of reservations**

| Sector or sub-sector | Description of reservations |
|---|---|
| EU - ALL SECTORS | **Length of stay**<br><br>In **AT, UK:** Maximum stay for CSS and IP shall be for a cumulative period of not more than six months in any 12 month period or for the duration of the contract, whichever is less.<br><br>In **LT**: Maximum stay for CSS and IP shall be for a period of six months renewable once for an additional period of six months, or for the duration of the contract, whichever is less.<br><br>In **BE, CZ, MT, PT**: Maximum stay for CSS and IP shall be for a period of not more than 12 consecutive months or for the duration of the contract, whichever is less.<br><br>**Technologists**<br>Annex 10-C applies to the **EU** with the exception of: **AT, DE, EL, ES, HU, IT, LT, NL, PT, SK, UK**.<br><br>In **CY**: Annex 10-C applies only with regard to technologists active in sub-sectors CPC 8676, 851, 852, 853, and 883.<br><br>In **FI**: Economic needs test.<br><br>In **FR:** Annex 10-C applies only with regard to technologists active in sub-sector CPC 86721.<br><br>In **PL**: Technologist must possess as a minimum a degree equivalent to bachelor's degree. |
| CAN – ALL SECTORS | **Technologists**<br>**CAN**: Annex 10-C applies. |
| **Legal advisory services in respect of public international law and foreign law**<br><br>(part of CPC 861) | CSS:<br><br>In **AT, BE, CY, DE, EE, EL, ES, FR, HR, IE, IT, LU, NL, PL, PT, SE, UK**: None.<br><br>In **BG, CZ, DK, FI, HU, LT, LV, MT, RO, SI, SK**: Economic needs test.<br><br>**CAN:** None.<br><br>IP: |

| Sector or sub-sector | Description of reservations |
|---|---|
| | In **AT, CY, DE, EE, FR, HR, IE, LU, LV, NL, PL, PT, SE, UK**: None.<br><br>In **BE, BG, CZ, DK, EL, ES, FI, HU, IT, LT, MT, RO, SI, SK**: Economic needs tests.<br><br>**CAN:** None. |
| **Accounting and bookkeeping services**<br><br>(CPC 86212 other than "auditing services", 86213, 86219 and 86220) | CSS:<br><br>In **AT, BE, CY, DE, EE, ES, HR, IE, IT, LU, NL, PL, PT, SI, SE, UK**: None.<br><br>In **BG, CZ, DK, EL, FI, FR, HU, LT, LV, MT, RO, SK**: Economic needs test.<br><br>**CAN:** None.<br><br><br>IP:<br><br>**EU:** Unbound.<br><br>**CAN:** Unbound. |
| **Taxation advisory services**<br><br>(CPC 863)[44] | CSS:<br><br>In **AT, BE, CY, DE, EE, ES, FR, HR, IE, IT, LU, NL, PL, SI, SE, UK**: None.<br><br>In **BG, CZ, DK, EL, FI, HU, LT, LV, MT, RO, SK**: Economic needs test.<br><br>In **PT**: Unbound.<br><br>**CAN**: None.<br><br><br>IP:<br><br>**EU:** Unbound.<br><br>**CAN:** Unbound. |
| **Architectural services**<br><br>and<br><br>**Urban planning and landscape** | CSS:<br><br>In **BE, CY, EE, ES, EL, FR, HR, IE, IT, LU, MT, NL, PL, PT, SI, SE,** |

---

[44]     Does not include legal advisory and legal representational services on tax matters, which are under legal advisory services in respect of public international law and foreign law.

| Sector or sub-sector | Description of reservations |
|---|---|
| **architectural services**<br><br>(CPC 8671 and 8674) | UK: None.<br><br>In **FI**: None, except: The natural person must demonstrate that he or she possesses special knowledge relevant to the service being supplied.<br><br>In **BG, CZ, DE, HU, LT, LV, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>In **AT**: Urban planning services only, where: Economic needs test.<br><br>**CAN**: None.<br><br><br>IP:<br><br>In **CY, DE, EE, EL, FR, HR, IE, LU, LV, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **FI**, None, except: The natural person must demonstrate that he or she possesses special knowledge relevant to the service being supplied.<br><br>In **BE, BG, CZ, DK, ES, HU, IT, LT, RO, SK**: Economic needs test.<br><br>In **AT**: Urban planning services only, where: Economic needs test.<br><br>**CAN**: None. |
| **Engineering services**<br><br>and<br><br>**Integrated engineering services**<br><br>(CPC 8672 and 8673) | CSS:<br><br>In **BE, CY, EE, ES, EL, FR, HR, IE, IT, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **FI**: None, except: The natural person must demonstrate that he or she possesses special knowledge relevant to the service being supplied.<br><br>In **BG, CZ, DE, LT, LV, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>In **AT**: Planning services only, where: Economic needs test.<br><br>In **HU**: Economic needs test.<br><br>**CAN**: None.<br><br><br>IP:<br><br>In **CY, DE, EE, EL, FR, HR, IE, LU, LV, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **FI**: None, except: The natural person must demonstrate that he or she possesses special knowledge relevant to the service being supplied.<br><br>In **BE, BG, CZ, DK, ES, IT, LT, RO, SK**: Economic needs test. |

| Sector or sub-sector | Description of reservations |
|---|---|
| | In **AT**: Planning services only, where: Economic needs test. In **HU**: Economic needs test. **CAN**: None. |
| **Medical (including psychologists) and dental services** (CPC 9312 and part of 85201) | CSS: In **SE**: None. In **CY, CZ, DE, DK, EE, ES, IE, IT, LU, MT, NL, PL, PT, RO, SI**: Economic needs test. In **FR**: Economic needs test, except for psychologists, where: Unbound. In **AT**: Unbound, except for psychologists and dental services, where: Economic needs test. In **BE, BG, EL, FI, HR, HU, LT, LV, SK, UK**: Unbound. **CAN**: Unbound.  IP: **EU:** Unbound. **CAN:** Unbound. |
| **Veterinary services** (CPC 932) | CSS: In **SE**: None. In **CY, CZ, DE, DK, EE, EL, ES, FI, FR, IE, IT, LT, LU, MT, NL, PL, PT, RO, SI**: Economic needs test. In **AT, BE, BG, HR, HU, LV, SK, UK**: Unbound. **CAN**: Unbound.  IP: **EU:** Unbound. **CAN:** Unbound. |
| **Midwives services** (part of CPC 93191) | CSS: |

| Sector or sub-sector | Description of reservations |
|---|---|
| | In **SE**: None. |
| | In **AT, CY, CZ, DE, DK, EE, EL, ES, FR, IE, IT, LT, LV, LU, MT, NL, PL, PT, RO, SI:** Economic needs test. |
| | In **BE, BG, FI, HR, HU, SK, UK**: Unbound. |
| | **CAN:** Unbound. |
| | <u>IP</u>: |
| | **EU:** Unbound. |
| | **CAN:** Unbound. |
| **Services provided by nurses, physiotherapists and paramedical personnel**<br><br>(part of CPC 93191) | <u>CSS</u>:<br><br>In **SE**: None. |
| | In **AT, CY, CZ, DE, DK, EE, EL, ES, FR, IE, IT, LT, LV, LU, MT, NL, PL, PT, RO, SI**: Economic needs test. |
| | In **BE, BG, FI, HR, HU, SK, UK**: Unbound. |
| | **CAN**: Unbound. |
| | <u>IP</u>:<br>**EU:** Unbound. |
| | **CAN:** Unbound. |
| **Computer and related services**<br>(CPC 84) | <u>CSS</u>:<br><br>In **BE, CY, DE, EE, EL, ES, FR, HR, IE, IT, LU, LV, MT, NL, PL, PT, SI, SE, UK:** None. |
| | In **FI**: None, except: The natural person must demonstrate that he or she possesses special knowledge relevant to the service being supplied. |
| | In **AT, BG, CZ, HU, LT, RO, SK:** Economic needs test. |
| | In **DK:** Economic needs test except for CSS stays of up to three months. |
| | **CAN**: None. |
| | <u>IP</u>:<br><br>In **CY, DE, EE, EL, FR, IE, LU, LV, MT, NL, PL, PT, SI, SE, UK:** |

| Sector or sub-sector | Description of reservations |
|---|---|
| | None. |
| | In **FI**: None, except: The natural person must demonstrate that he or she possesses special knowledge relevant to the service being supplied. |
| | In **AT, BE, BG, CZ, DK, ES, HU, IT, LT, RO, SK:** Economic needs test. |
| | In **HR**: Unbound. |
| | **CAN**: None. |
| **Research and development Services**<br><br>(CPC 851, 852 excluding psychologists services[45], and 853) | CSS:<br><br>**EU except in SE**: A hosting agreement with an approved research organisation is required[46].<br><br>**EU** except in **CZ, DK, SK**: None<br><br>In **CZ, DK, SK**: Economic needs test.<br><br>**CAN**: None.<br><br><br>IP:<br><br>**EU except in SE**: A hosting agreement with an approved research organisation is required[47].<br><br>**EU** except in **BE, CZ, DK, IT, SK**: None<br><br>In **BE, CZ, DK, IT, SK:** Economic needs test.<br><br>**CAN**: None. |
| **Advertising**<br><br>(CPC 871) | CSS:<br><br>In **BE, CY, DE, EE, ES, FR, HR, IE, IT, LU, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, DK, EL, FI, HU, LT, LV, MT, RO, SK**: Economic needs test. |

---

[45]    Part of CPC 85201, which is under medical and dental services.

[46]    For all Member States of the European Union except UK and DK, the approval of the research organisation and the hosting agreement must meet the conditions set pursuant to EU Directive 2005/71/EC of 12 October 2005.

[47]    For all Member States of the European Union except the UK and DK, the approval of the research organisation and the hosting agreement must meet the conditions set pursuant to EU Directive 2005/71/EC of 12 October 2005.

| Sector or sub-sector | Description of reservations |
|---|---|
| | **CAN:** None.<br><br>IP:<br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Market research and opinion polling**<br>(CPC 864) | CSS:<br>In **BE, CY, DE, EE, ES, FR, IE, IT, LU, NL, PL, SE, UK**: None.<br>In **AT, BG, CZ, DK, EL, FI, HR, LV, MT, RO, SI, SK**: Economic needs test.<br>In **PT**: None, except for public opinion polling services (CPC 86402), where: Unbound.<br>In **HU, LT**: Economic needs test, except for public opinion polling services (CPC 86402), where: Unbound.<br>**CAN**: None.<br><br>IP:<br>In **CY, DE, EE, FR, IE, LU, NL, PL, SE, UK**: None.<br>In **AT, BE, BG, CZ, DK, EL, ES, FI, HR, IT, LV, MT, RO, SI, SK**: Economic needs test.<br>In **PT**: None, except for public opinion polling services (CPC 86402), where: Unbound.<br>In **HU, LT**: Economic needs test, except for public opinion polling services (CPC 86402), where: Unbound.<br>**CAN**: None. |
| **Management consulting services**<br>(CPC 865) | CSS:<br>In **BE, CY, DE, EE, EL, ES, FI, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br>In **AT, BG, CZ, HU, LT, RO, SK**: Economic needs test.<br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br>**CAN**: None. |

| Sector or sub-sector | Description of reservations |
|---|---|
| | <u>IP</u>:<br><br>In **CY, DE, EE, EL, FI, FR, IE, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BE, BG, CZ, DK, ES, HR, HU, IT, LT, RO, SK**: Economic needs test.<br><br>**CAN**: None. |
| **Services related to management consulting**<br><br>(CPC 866) | <u>CSS</u>:<br><br>In **BE, CY, DE, EE, EL, ES, FI, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, LT, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>In **HU**: Economic needs test, except for arbitration and conciliation services (CPC 86602), where: Unbound.<br><br>**CAN**: None.<br><br><u>IP</u>:<br><br>In **CY, DE, EE, EL, FI, FR, IE, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BE, BG, CZ, DK, ES, HR, IT, LT, RO, SK**: Economic needs test<br><br>In **HU**: Economic needs test, except for arbitration and conciliation services (CPC 86602), where: Unbound.<br><br>**CAN**: None. |
| **Technical testing and analysis services**<br><br>(CPC 8676) | <u>CSS</u>:<br><br>In **BE, CY, DE, EE, EL, ES, FR, HR, IE, IT, LU, NL, PL, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, FI, HU, LT, LV, MT, PT, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>**CAN**: None.<br><br><u>IP</u>:<br><br>**EU:** Unbound. |

| Sector or sub-sector | Description of reservations |
|---|---|
| | **CAN:** Unbound. |
| **Related scientific and technical consulting services**<br><br>(CPC 8675) | <u>CSS:</u><br><br>In **BE, CY, EE, EL, ES, HR, IE, IT, LU, NL, PL, SI, SE, UK**: None.<br><br>In **AT, CZ, DE, DK, FI, HU, LT, LV, MT, PT, RO, SK**: Economic needs test.<br><br>In **DE**: None, except for publicly appointed surveyors, where: Unbound.<br><br>In **FR**: None, except for "surveying" operations relating to the establishment of property rights and to land law, where: Unbound.<br><br>In **BG**: Unbound.<br><br>**CAN**: None.<br><br><br><u>IP:</u><br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Mining** (CPC 883, advisory and consulting services only) | <u>CSS:</u><br><br>In **BE, CY, DE, EE, EL, ES, FI, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, HU, LT, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>**CAN**: None.<br><br><br><u>IP:</u><br>In **CY, DE, EE, EL, FI, FR, HR, IE, LV, LU, MT, NL, PT, SI, SE, UK**: None.<br><br>In **AT, BE, BG, CZ, DK, ES, HU, IT, LT, PL, RO, SK**: Economic needs test.<br><br>**CAN**: None. |
| **Maintenance and repair of vessels**<br><br>(part of CPC 8868) | <u>CSS:</u> |

| Sector or sub-sector | Description of reservations |
|---|---|
| | In **BE, CY, EE, EL, ES, FR, HR, IT, LV, LU, NL, PL, PT, SI, SE, UK**: None<br><br>In **AT, BG, CZ, DE, DK, FI, HU, IE, LT, MT, RO, SK**: Economic needs test.<br><br>**CAN**: None, except for Managers, where: Unbound.<br><br><br>IP:<br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Maintenance and repair of rail transport equipment**<br><br>(part of CPC 8868) | CSS:<br><br>In **BE, CY, EE, EL, ES, FR, HR, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, DE, DK, FI, HU, IE, LT, RO, SK**: Economic needs test.<br>**CAN**: None, except for Managers, where: Unbound.<br><br><br>IP:<br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Maintenance and repair of motor vehicles, motorcycles, snowmobiles and road transport equipment**<br>(CPC 6112, 6122, part of 8867 and part of 8868) | CSS:<br>In **BE, CY, EE, EL, ES, FR, HR, IT, LV, LU, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, DE, DK, FI, HU, IE, LT, MT, RO, SK**: Economic needs test.<br>**CAN**: None, except for Managers, where: Unbound.<br><br><br>IP:<br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Maintenance and repair of aircraft** | |

| Sector or sub-sector | Description of reservations |
|---|---|
| **and parts thereof**<br><br>(part of CPC 8868) | CSS:<br><br>In **BE, CY, EE, EL, ES, FR, HR, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, DE, DK, FI, HU, IE, LT, RO, SK**: Economic needs test.<br><br>**CAN**: None, except for Managers, where: Unbound.<br><br><br>IP:<br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Maintenance and repair of metal products, of (non office) machinery, of (non transport and non office) equipment and of personal and household goods** [48]<br><br>(CPC 633, 7545, 8861, 8862, 8864, 8865 and 8866) | CSS:<br><br>In **BE, CY, EE, EL, ES, FR, HR, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, DE, DK, HU, IE, LT, RO, SK**: Economic needs test.<br><br>In **FI**: Unbound, except in the context of an after-sales or after-lease contract, where: the length of stay is limited to six months; for maintenance and repair of personal and household goods (CPC 633): Economic needs test.<br><br>**CAN**: None, except for Managers in Utilities, where: Unbound.<br><br><br>IP:<br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Translation and interpretation services**<br><br>(CPC 87905, excluding official or certified activities) | CSS:<br><br>In **BE, CY, DE, EE, EL, ES, FR, HR, IT, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, DK, FI, HU, IE, LT, LV, RO, SK**: Economic needs test.<br><br>**CAN**: None. |

---

[48]    Maintenance and repair services of office machinery and equipment including computers (CPC 845) are under computer services.

| Sector or sub-sector | Description of reservations |
|---|---|
| | IP:<br><br>In **CY, DE, EE, FR, LU, LV, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BE, BG, CZ, DK, EL, ES, FI, HU, IE, IT, LT, RO, SK**: Economic needs test.<br><br>In **HR**: Unbound.<br><br>**CAN**: None. |
| **Telecommunication services** (CPC 7544, advisory and consulting services only) | CSS:<br><br>In **BE, CY, DE, EE, EL, ES, FI, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, HU, LT, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>**CAN**: None, except for Managers, where: Unbound.<br><br><br>IP:<br><br>In **CY, DE, EE, EL, FI, FR, HR, IE, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BE, BG, CZ, DK, ES, HU, IT, LT, RO, SK**: Economic needs test.<br><br>**CAN**: None, except for Managers, where: Unbound. |
| **Postal and courier services** (CPC 751, advisory and consulting services only) | CSS:<br><br>In BE, **CY, DE, EE, EL, ES, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, FI, HU, LT, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>**CAN**: None, except for Managers, where: Unbound.<br><br><br>IP:<br><br>In **CY, DE, EE, EL, FR, HR, IE, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BE, BG, CZ, DK, ES, FI, HU, IT, LT, RO, SK**: Economic needs test. |

| Sector or sub-sector | Description of reservations |
|---|---|
| | **CAN**: None, except for Managers, where: Unbound. |
| **Construction and related engineering services**<br><br>(CPC 511, 512, 513, 514, 515, 516, 517 and 518. BG: CPC 512, 5131, 5132, 5135, 514, 5161, 5162, 51641, 51643, 51644, 5165 and 517) | <u>CSS:</u><br><br>**EU:** Unbound except in **BE, CZ, DK, ES, FR, NL** and **SE**.<br><br>In **BE, DK, ES, NL, SE:** None.<br><br>In **CZ**: Economic needs test.<br><br>In **FR**: Unbound, except for technicians, where: the work permit is delivered for a period not exceeding six months. Compliance with an economic needs test is required.<br><br>**CAN**: None, except for Managers, where: Unbound.<br><br><br><u>IP:</u><br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Site investigation work**<br><br>(CPC 5111) | <u>CSS:</u><br><br>In **BE, CY, DE, EE, EL, ES, FR, HR, IE, IT, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, FI, HU, LT, LV, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>**CAN**: None.<br><br><br><u>IP:</u><br>**EU:** Unbound.<br>**CAN:** Unbound. |
| **Higher education services**<br><br>(CPC 923) | <u>CSS:</u><br><br>**EU** except in **LU, SE**: Unbound.<br><br>In **LU**: Unbound, except for university professors, where: None.<br><br>In **SE**: None, except for publicly funded and privately funded educational |

| Sector or sub-sector | Description of reservations |
|---|---|
| | services suppliers with some form of State support, where: Unbound.<br><br>**CAN**: Unbound.<br><br><br>IP:<br><br>**EU** except in **SE**: Unbound.<br><br>In **SE**: None, except for publicly funded and privately funded educational services suppliers with some form of State support, where: Unbound.<br><br>**CAN**: Unbound. |
| **Agriculture, hunting and forestry** (CPC 881, advisory and consulting services only) | CSS:<br><br>**EU** except in **BE, DE, DK, ES, FI, HR** and **SE** : Unbound<br><br>In **BE, DE, ES, HR, SE**: None<br><br>In **DK**: Economic needs test.<br><br>In **FI**: Unbound, except for advisory and consulting services relating to forestry, where: None.<br><br>**CAN**: None.<br><br><br>IP:<br><br>**EU:** Unbound.<br><br>**CAN:** Unbound. |
| **Environmental services**<br><br>(CPC 9401, 9402, 9403, 9404, part of 94060, 9405, part of 9406 and 9409) | CSS:<br><br>In **BE, CY, EE, ES, FI, FR, HR, IE, IT, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, DE, DK, EL, HU, LT, LV, RO, SK**: Economic needs test.<br><br>**CAN**: None.<br><br><br>IP:<br><br>**EU:** Unbound.<br><br>**CAN:** Unbound. |

| Sector or sub-sector | Description of reservations |
|---|---|
| **Insurance and insurance related services** (advisory and consulting services only) | CSS: <br><br> In BE, **CY, DE, EE, EL, ES, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None. <br><br> In **AT, BG, CZ, FI, LT, RO, SK**: Economic needs test. <br><br> In **DK**: Economic needs test except for CSS stays of up to three months. <br><br> In **HU**: Unbound. <br><br><br> **CAN**: None. <br><br> IP: <br><br> In **CY, DE, EE, EL, FR, HR, IE, LV, LU, MT, NL, PT, SI, SE, UK**: None. <br><br> In **AT, BE, BG, CZ, DK, ES, FI, IT, LT, PL, RO, SK**: Economic needs test. <br><br> In **HU**: Unbound. <br> **CAN**: None. |
| **Other financial services** (advisory and consulting services only) | CSS: <br><br> In BE, **CY, DE, ES, EE, EL, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None. <br><br> In **AT, BG, CZ, FI, LT, RO, SK**: Economic needs test. <br><br> In **DK**: Economic needs test, except for CSS that stays of up to three months. <br><br> In **HU**: Unbound. <br> **CAN**: None. <br><br><br> IP: <br><br> In **CY, DE, EE, EL, FR, HR, IE, LV, LU, MT, PT, SI, SE, UK**: None. <br><br> In **AT, BE, BG, CZ, DK, ES, FI, IT, LT, NL, PL, RO, SK**: Economic needs test. <br><br> In **HU**: Unbound. |

| Sector or sub-sector | Description of reservations |
|---|---|
| | **CAN**: None. |
| **Transport** (CPC 71, 72, 73, and 74, advisory and consulting services only) | CSS: In **CY, DE, EE, EL, ES, FI, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None. In **AT, BG, CZ, HU, LT, RO, SK**: Economic needs test. In **DK**: Economic needs test, except for CSS stays of up to three months. In **BE**: Unbound. **CAN**: None, except for Managers, where: Unbound. IP: In **CY, DE, EE, EL, FI, FR, HR, IE, LV, LU, MT, NL, PT, SI, SE, UK**: None. In **AT, BG, CZ, DK, ES, HU, IT, LT, RO, SK**: Economic needs test. In **PL:** Economic needs test, except for air transport, where: None. In **BE**: Unbound. **CAN**: None, except for Managers, where: Unbound. |
| **Travel agencies and tour operators services** (including tour managers[49]) (CPC 7471) | CSS: In **AT, CY, CZ, DE, EE, ES, FR, HR, IT, LU, NL, PL, SI, SE, UK**: None. In **BG, EL, FI, HU, LT, LV, MT, PT, RO, SK**: Economic needs test. In **DK**: Economic needs test, except for CSS stays of up to three months. In **BE, IE**: Unbound, except for tour managers, where: None. **CAN**: None. IP: **EU:** Unbound. **CAN:** Unbound. |

---

[49]     Services suppliers whose function is to accompany a tour group of a minimum of 10 persons, without acting as guides in specific locations.

| Sector or sub-sector | Description of reservations |
|---|---|
| **Tourist guides services**<br><br>(CPC 7472) | CSS:<br><br>In **SE, UK**: None.<br><br>In **AT, BE, BG, CY, CZ, DE, DK, EE, FI, FR, EL, HU, IE, IT, LV, LU, MT, NL, RO, SK, SI**: Economic needs test.<br><br>In **ES, HR, LT, PL, PT**: Unbound.<br><br>**CAN**: None.<br><br><br>IP:<br>**EU**: Unbound.<br>**CAN**: Unbound. |
| **Manufacturing** (CPC 884, and 885, advisory and consulting services only) | CSS:<br><br>In BE, **CY, DE, EE, EL, ES, FI, FR, HR, IE, IT, LV, LU, MT, NL, PL, PT, SI, SE, UK**: None.<br><br>In **AT, BG, CZ, HU, LT, RO, SK**: Economic needs test.<br><br>In **DK**: Economic needs test, except for CSS stays of up to three months.<br><br>**CAN**: None, except for Managers, where: Unbound.<br><br><br>IP:<br><br>In **CY, DE, EE, EL, FI, FR, HR, IE, LV, LU, MT, NL, PT, SI, SE, UK**: None.<br><br>In **AT, BE, BG, CZ, DK, ES, HU, IT, LT, PL, RO, SK**: Economic needs test.<br><br>**CAN**: None, except for Managers, where: Unbound. |

## ANNEX 10-F

## UNDERSTANDING ON SPOUSES OF INTRA-CORPORATE TRANSFEREES

1.  For the Member States of the European Union that are subject to the application of the existing Directive 2014/66/EU of the European Parliament and of the Council of 15 May 2014 on the conditions of entry and residence of third-country nationals in the framework of an intra-corporate transfer ("ICT Directive"), the European Union shall extend to spouses of Canadian citizens who are intra-corporate transferees to the European Union, the right of temporary entry and stay equivalent to that granted to spouses of intra-corporate transferees under the ICT Directive; and

2.  Canada shall extend to spouses of citizens of the European Union who are intra-corporate transferees to Canada treatment that is equivalent to the treatment granted to spouses of Canadian citizens who are intra-corporate transferees in the Member State of origin of the European Union intra-corporate transferee.

## ANNEX 11-A

## GUIDELINES FOR MRAs

**Introduction**

This Annex contains guidelines to provide practical guidance to facilitate the negotiation of MRAs with respect to regulated professions. These guidelines are non-binding and they do not modify or affect the rights and obligations of a Party under this Agreement.

**Definitions**

For the purposes of this Annex:

**adaptation period** means a period of supervised practice, possibly accompanied by further training, of a regulated profession in the host jurisdiction under the responsibility of a qualified person. This period of supervised practice shall be subject to an assessment. The detailed rules governing the adaptation period, its assessment and the professional status of the person under supervision shall be set out, as appropriate, in the host jurisdiction's law;

**aptitude test** means a test limited to the professional knowledge of applicants, made by the relevant authorities of the host jurisdiction with the aim of assessing the ability of applicants to pursue a regulated profession in that jurisdiction; and

**scope of practice** means an activity or group of activities covered by a regulated profession.

**Form and Content of the MRA**

This Section sets out various issues that may be addressed in a negotiation and, if so agreed, included in final MRAs. It outlines elements that might be required of foreign professionals seeking to benefit from an MRA.

1.      Participants

The parties to the MRA should be clearly stated.

2.      Purpose of the MRA

The purpose of the MRA should be clearly stated.

3.      Scope of the MRA

The MRA should set out clearly:

    (a)    the scope of the MRA, in terms of the specific professional titles and activities which it covers;

    (b)    who is entitled to use the professional titles concerned;

    (c)    whether the recognition mechanism is based on formal qualifications, a licence obtained in the jurisdiction of origin, or on some other requirement; and

    (d)    whether the MRA allows temporary or permanent access to the profession concerned.

4.      Mutual Recognition Provisions

The MRA should clearly specify the conditions to be met for the recognition of qualifications in each jurisdiction and the level of equivalence agreed.

The following four-step process should be considered to simplify and facilitate the recognition of the qualifications.

**Four-Step Process for the Recognition of Qualifications**

Step One: Verification of Equivalency

The negotiating entities should verify the overall equivalence of the scopes of practice or qualifications of the regulated profession in their respective jurisdictions.

The examination of qualifications should include the collection of all relevant information pertaining to the scope of practice rights related to a legal competency to practice or to the qualifications required for a specific regulated profession in the respective jurisdictions.

Consequently, the negotiating entities should:

(a)    identify activities or groups of activities covered by the scope of practice rights of the regulated profession; and

(b)    identify the qualifications required in each jurisdiction. These may include the following elements:

(i)     the minimum level of education required, for example, entry requirements, length of study and subjects studied;

(ii)    the minimum level of experience required, for example, location, length and conditions of practical training or supervised professional practice prior to licensing, or the framework of ethical and disciplinary standards;

(iii)   examinations passed, especially examinations of professional competency;

(iv)   the extent to which qualifications from one jurisdiction are recognised in the other jurisdiction; and

(v)    the qualifications which the relevant authorities in each jurisdiction are prepared to recognise, for instance, by listing particular diplomas or certificates issued, or by reference to particular minimum requirements to be certified by the relevant authorities of the jurisdiction of origin, including whether the possession of a certain level of qualification would allow recognition for some activities of the scope of practice but not others (level and length of education, major educational focuses, overall subjects and areas).

There is an overall equivalence between the scope of practice rights or the qualifications of the regulated profession if there are no substantial differences in this regard between jurisdictions.

Step Two: Evaluation of Substantial Differences

There exists a substantial difference in the scope of qualifications required to practice a regulated profession, in cases of:

    (a)    important differences in the essential knowledge; or

    (b)    significant differences in the duration or content of the training between the jurisdictions.

There exists a substantial difference in the scope of practice if:

    (a)    one or more professional activities do not form part of the corresponding profession in the jurisdiction of origin;

    (b)    these activities are subject to specific training in the host jurisdiction; and,

    (c)    the training for these activities in the host jurisdiction covers substantially different matters from those covered by the applicant's qualification.

Step Three: Compensatory Measures

If the negotiating entities determine that there is a substantial difference in the scope of practice rights or of qualifications between the jurisdictions, they may determine compensatory measures to bridge the gap.

A compensatory measure may take the form of, among other things, an adaptation period or, if required, an aptitude test.

Compensatory measures should be proportionate to the substantial difference which they seek to address. The negotiating entities should also evaluate any practical professional experience obtained in the jurisdiction of origin to see whether this experience is sufficient to remedy, in whole or in part, the substantial difference in the scope of practice rights or qualifications between the jurisdictions, prior to determining a compensatory measure.

Step Four: Identification of the Conditions for Recognition

Once the assessment of the overall equivalency of the scopes of practice rights or qualifications of the regulated profession is completed, the negotiating entities should specify in the MRA:

    (a)    the legal competency required to practice the regulated profession;

    (b)    the qualifications for the regulated profession;

    (c)    whether compensatory measures are necessary;

    (d)    the extent to which professional experience may compensate for substantial differences;

    (e)    a description of any compensatory measure, including the use of any adaptation period or aptitude test.

5.    Mechanisms for Implementation

The MRA should state:

(a)    the rules and procedures to be used to monitor and enforce the provisions of the agreement;

(b)    the mechanisms for dialogue and administrative co-operation between the parties to the MRA; and

(c)    the means for individual applicants to address any matters arising from the interpretation or implementation of the MRA.

As a guide to the treatment of individual applicants, the MRA should include details on:

(a)    the point of contact for information on all issues relevant to the application, for example, the name and address of the relevant authorities, licensing formalities, information on additional requirements which need to be met in the host jurisdiction;

(b)    the duration of the procedures for the processing of applications by the relevant authorities of the host jurisdiction;

(c)    the documentation required of applicants and the form in which it should be presented;

(d)    acceptance of documents and certificates issued in the host jurisdiction in relation to qualifications and licensing;

(e)    the procedures of appeal to or review by the relevant authorities.

The MRA should also include the following commitments by the relevant authorities:

(a)    requests about the licensing and qualification requirements and procedures will be promptly dealt with;

(b)    adequate time will be provided for applicants to complete the requirements of the application process and of any appeal to or review by the relevant authorities;

(c)    exams or tests will be arranged with reasonable frequency;

(d)    fees for applicants seeking to take advantage of the terms of the MRA will be commensurate with the costs incurred by the host jurisdiction; and

(e)    information will be supplied on any assistance programmes in the host jurisdiction for practical training, and any commitments of the host jurisdiction in that context.

6.    <u>Licensing and Other Provisions in the Host Jurisdiction</u>

If applicable, the MRA should also set out the means by which, and the conditions under which, a licence is obtained following the determination of eligibility, and what a licence entails, for example, a licence and its contents, membership of a professional body, use of professional or academic titles. Any licensing requirements other than qualifications should be explained, including requirements relating to:

(a)    having an office address, maintaining an establishment or being a resident;

(b)    language skills;

     (c)    proof of good character;

     (d)    professional indemnity insurance;

     (e)    compliance with host jurisdiction's requirements for use of trade or firm names; and

     (f)    compliance with host jurisdiction ethics, for example, independence and good conduct.

To ensure transparency, the MRA should include the following details for each host jurisdiction:

     (a)    the relevant law to be applied, for example, regarding disciplinary action, financial responsibility or liability;

     (b)    the principles of discipline and enforcement of professional standards, including disciplinary jurisdiction and any consequential effects on practicing professional activities;

     (c)    the means for the ongoing verification of competence; and

     (d)    the criteria for, and procedures relating to, revocation of the registration.

## 7.    Revision of the MRA

If the MRA includes terms under which the MRA can be reviewed or revoked, the details should be clearly stated.

## 8.    Transparency

The Parties should:

     (a)    make publicly available the text of MRAs which have been concluded; and,

     (b)    notify each other of any modifications to qualifications that may affect the application or implementation of an MRA. If possible, a Party should be given an opportunity to comment on the modifications of the other Party.

## ANNEX 13-A

## CROSS-BORDER TRADE IN FINANCIAL SERVICES

**Schedule of Canada**

Insurance and insurance-related services

1.      Article 13.7.1 applies to the cross-border supply of or trade in financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)     insurance of risks relating to:

(i)      maritime transport, commercial aviation and space launching and freight, including satellites, with this insurance to cover: the goods being transported, the vehicle transporting the goods, or liability deriving from that transport; and

(ii)     goods in international transit;

(b)     reinsurance and retrocession;

(c)     services auxiliary to insurance as described in subparagraph (iv) of the definition of insurance and insurance-related services in Article 13.1; and

(d)     insurance intermediation, such as brokerage and agency, of insurance risks related to the services listed in sub-paragraphs (a) and (b).

Banking and other financial services (excluding insurance)

2.      Article 13.7.1 applies to the cross-border supply of or trade in financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)     the provision and transfer of financial information, and financial data processing and related software, as described in subparagraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1; and

(b)     advisory, and other auxiliary financial services as described in subparagraph (xii) of the definition of banking and other financial services (excluding insurance) in Article 13.1, but excluding intermediation as described in that subparagraph.

Portfolio Management Services

3.      Article 13.7.1 applies to the cross-border supply or trade in financial services, as defined in sub-paragraphs (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to the supply of the following services to a collective investment scheme located in its territory:

377

(a)  investment advice; and

(b)  portfolio management services, excluding:

(i)  custodial services;

(ii)  trustee services; or

(iii)  execution services.

4.  For the purposes of this commitment, portfolio management means managing portfolios in accordance with mandates given by clients on a discretionary client-by-client basis if such portfolios include one or more financial instruments.

5.  A collective investment scheme means investment funds or fund management companies regulated or registered under relevant securities laws and regulations. Notwithstanding paragraph 3, Canada may require a collective investment scheme located in Canada to retain ultimate responsibility for the management of the collective investment scheme or the funds that it manages.

6.  Reservations for non-conforming measures set out by Canada in its Schedule to Annex III do not apply to paragraphs 3 through 5.

**Schedule of the European Union (applicable to all Member States of the European Union unless otherwise indicated)**

Insurance and insurance-related services

1.      With the exception of **CY, EE**, **LV**, **LT**, **MT** and **PL**[50], Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

   (a)   insurance of risks relating to:

      (i)    maritime transport, commercial aviation and space launching and freight, including satellites, with this insurance to cover: the goods being transported, the vehicle transporting the goods, or liability deriving from that transport; and

      (ii)   goods in international transit;

   (b)   reinsurance and retrocession;

   (c)   services auxiliary to insurance as described in sub-paragraph (iv) of the definition of insurance and insurance-related services in Article 13.1; and

   (d)   insurance intermediation, such as brokerage and agency, of insurance risks related to the services listed in sub-paragraphs (a) and (b).

2.      For **CY**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

   (a)   direct insurance services (including co-insurance) for the insurance of risks relating to:

      (i)    maritime transport, commercial aviation and space launching and freight, including satellites, with this insurance to cover: the goods being transported, the vehicle transporting the goods, or liability deriving from that transport; and

      (ii)   goods in international transit;

   (b)   insurance intermediation;

   (c)   reinsurance and retrocession; and

   (d)   services auxiliary to insurance as described in sub-paragraph (iv) of the definition of insurance and insurance-related services in Article 13.1.

---

[50]    The abbreviations used in this Annex are defined in paragraph 8 of the Headnote to Annex I (Reservations for Existing Measures and Liberalisation Commitments).

3.  For **EE**, Article 13.7.1. applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)  direct insurance (including co-insurance);

(b)  reinsurance and retrocession;

(c)  insurance intermediation; and

(d)  services auxiliary to insurance as described in sub-paragraph (iv) of the definition of insurance and insurance-related services in Article 13.1.

4.  For **LV** and **LT**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)  insurance of risks relating to:

(i)  maritime transport, commercial aviation and space launching and freight, including satellites, with this insurance to cover: the goods being transported, the vehicle transporting the goods, or liability deriving from that transport; and

(ii)  goods in international transit;

(b)  reinsurance and retrocession; and

(c)  services auxiliary to insurance as described in sub-paragraph (iv) of the definition of insurance and insurance-related services in Article 13.1.

5.  For **MT**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)  insurance of risks relating to:

(i)  maritime transport, commercial aviation and space launching and freight, including satellites, with this insurance to cover: the goods being transported, the vehicle transporting the goods, or liability deriving from that transport; and

(ii)  goods in international transit;

(b)  reinsurance and retrocession; and

(c)  services auxiliary to insurance as described in sub-paragraph (iv) of the definition of insurance and insurance-related services in Article 13.1.

6.  For **PL**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)  insurance of risks relating to goods in international trade; and

(b)   reinsurance and retrocession of risks relating to goods in international trade.

Banking and other financial services (excluding insurance and insurance-related services)

7.    With the exception of **BE, CY, EE**, **LV, LT**, **MT, SI** and **RO**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)   the provision and transfer of financial information, and financial data processing and related software, as described in sub-paragraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1; and

(b)   advisory and other auxiliary financial services relating to banking and other financial services, as described in sub-paragraph (xii) of the definition of banking and other financial services (excluding insurance) in Article 13.1, but not intermediation as described in that sub-paragraph.

8.    For **BE**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)   the provision and transfer of financial information, and financial data processing and related software, as described in sub-paragraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1.

9.    For **CY**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)   the trading for own account or for the account of customers, whether on an exchange, in an over-the-counter market or otherwise, of transferrable securities;

(b)   the provision and transfer of financial information, and financial data processing and related software, as described in sub-paragraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1; and

(c)   advisory and other auxiliary financial services relating to banking and other financial services, as described in sub-paragraph (xii) of the definition of banking and other financial services (excluding insurance) in Article 13.1, but not intermediation as described in that sub-paragraph.

10.   For **EE** and **LT**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)   acceptance of deposits;

(b)   lending of all types;

(c)   financial leasing;

(d)   all payment and money transmission services;

(e)    guarantees and commitments;

(f)    trading for own account or for account of customers, whether on an exchange or in an over-the-counter market;

(g)    participation in issues of all kinds of securities, including underwriting and placement as agent, whether publicly or privately, and supply of services related to such issues;

(h)    money broking;

(i)    asset management, such as cash or portfolio management, all forms of collective investment management, custodial, depository and trust services;

(j)    settlement and clearing services for financial assets, including securities, derivative products, and other negotiable instruments;

(k)    the provision and transfer of financial information, and financial data processing and related software, as described in sub-paragraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1; and

(l)    advisory and other auxiliary financial services relating to banking and other financial services, as described in sub-paragraph (xii) of the definition of banking and other financial services (excluding insurance) in Article 13.1, but not intermediation as described in that sub-paragraph.

11.    For **LV**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)    participation in issues of all kinds of securities, including underwriting and placement as agent, whether publicly or privately, and supply of services related to such issues;

(b)    the provision and transfer of financial information, and financial data processing and related software, as described in sub-paragraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1; and

(c)    advisory and other auxiliary financial services relating to banking and other financial services, as described in sub-paragraph (xii) of the definition of banking and other financial services (excluding insurance) in Article 13.1, but not intermediation as described in that sub-paragraph.

12.    For **MT**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)    the acceptance of deposits;

(b)    lending of all types;

(c)   the provision and transfer of financial information, and financial data processing and related software, as described in sub-paragraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1; and

(d)   advisory and other auxiliary financial services relating to banking and other financial services, as described in sub-paragraph (xii) of the definition of banking and other financial services (excluding insurance) in Article 13.1, but not intermediation as described in that sub-paragraph.

13.   For **RO**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)   acceptance of deposits;

(b)   lending of all types;

(c)   guarantees and commitments;

(d)   money broking;

(e)   the provision and transfer of financial information, and financial data processing and related software, as described in sub-paragraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1; and

(f)   advisory, and other auxiliary financial services relating to banking and other financial services, as described in sub-paragraph (xii) of the definition of banking and other financial services (excluding insurance) in Article 13.1, but not intermediation as described in that sub-paragraph.

14.   For **SI**, Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article 13.1, with respect to:

(a)   lending of all types;

(b)   the acceptance of guarantees and commitments from foreign credit institutions by domestic legal entities and sole proprietors;

(c)   the provision and transfer of financial information, and financial data processing and related software, as described in sub-paragraph (xi) of the definition of banking and other financial services (excluding insurance) in Article 13.1; and

(d)   advisory and other auxiliary financial services relating to banking and other financial services, as described in sub-paragraph (xii) of the definition of banking and other financial services (excluding insurance) in Article 13.1, but not intermediation as described in that sub-paragraph.

Portfolio Management Services

15.   Article 13.7.1 applies to the cross-border supply of financial services, as defined in sub-paragraph (a) of the definition of cross-border supply of financial services in Article

383

13.1, with respect to portfolio management services to a European Union professional client located in the European Union, by a Canadian financial institution organised in Canada following a transitional period of four years from the entry into force of this Agreement. For greater certainty, this commitment is subject to the European Union prudential regulatory regime including equivalence assessment[51];

16.    For the purposes of this commitment:

(a)    portfolio management means managing portfolios in accordance with mandates given by clients on a discretionary client-by-client basis where such portfolios include one or more financial instruments;

(b)    portfolio management services do not include:

(i)    custodial services;

(ii)    trustee services; or

(ii)    execution services; and

(c)    in the European Union professional clients are those defined under point 1, letter e) of Section I of Annex II of Directive 2004/39/EC of 21 April 2004 on markets in financial instruments.

---

[51]    This means that once the European Commission has adopted the equivalence decision related to portfolio management and a Canadian financial institution has satisfied other European Union prudential requirements, this financial institution may provide discretionary portfolio management services to a European Union professional client without being established in the European Union. Furthermore, measures of Member States of the European Union restricting or prohibiting cross-border portfolio management including reservations in its Schedules to Annexes I and II shall no longer apply to this commitment.

384

## ANNEX 13-B

## UNDERSTANDING ON THE APPLICATION OF ARTICLES 13.16.1 AND 13.21

The Parties recognise that prudential measures strengthen domestic financial systems, encourage sound, efficient and robust institutions, markets and infrastructure, and promote international financial stability by facilitating better-informed lending and investment decisions, improving market integrity and reducing the risks of financial distress and contagion.

As a result, the Parties have agreed to a prudential carve-out in Article 13.16.1 allowing the Parties to adopt or maintain measures for prudential reasons, and have provided a role for the Financial Services Committee, established pursuant to Article 26.2.1(f), in determining whether, and if so, to what extent the prudential carve out applies in investment disputes in financial services pursuant to Article 13.21.

**Process relating to Article 13.21**

1.   The Financial Services Committee, in its role in investment disputes pursuant to Article 13.21, shall decide whether and, if so, to what extent the prudential carve-out is a valid defence to a claim.

2.   The Parties undertake to act in good faith. Each Party shall present its position to the Financial Services Committee within 60 days of the referral to the Financial Services Committee.

3.   If the non-disputing Party notifies the Financial Services Committee within the 60 day period in paragraph 2 that it has launched an internal determination process on this matter, the period of time referred to in paragraph 2 is suspended until that Party notifies the Financial Services Committee of its position. A suspension beyond six months is considered as a breach of the good faith undertaking.

4.   If the respondent does not provide its position to the Financial Services Committee within the period of time referred to in paragraph 2, the suspension of the periods of time or proceedings referred to in Article 13.21.3 no longer applies and the investor may proceed with its claim.

5.   If the Financial Services Committee is unable to adopt a decision on a joint determination within 60 days in relation to a specific investor-state dispute concerning a prudential measure, the Financial Services Committee shall refer the matter to the CETA Joint Committee[52]. This period of 60 days commences from the moment the Financial Services Committee receives the positions of the Parties pursuant to paragraph 2.

6.   The joint determination of the Financial Services Committee or of the CETA Joint Committee is binding on the Tribunal only in the dispute in question. The joint

---

[52]   Each Party shall ensure that its representation in the CETA Joint Commission for this purpose includes financial services authorities.

determination does not constitute a binding precedent for the Parties with respect to the scope and application of the prudential carve-out or other terms of this Agreement.

7.    Unless the CETA Joint Committee decides otherwise, if the CETA Joint Committee does not reach an agreement within three months of a referral of the matter by the Financial Services Committee pursuant to paragraph 5, each Party shall make its position available to the Tribunal that arbitrates the dispute in question. The Tribunal shall take into account this record in reaching a decision.

**High level principles**

8.    The Parties agree that the application of Article 13.16.1 by the Parties and by tribunals should be guided by the following principles, which are not exhaustive:

(a)    Party may determine its own appropriate level of prudential regulation. Specifically, a Party may establish and enforce measures that provide a higher level of prudential protection than those set out in common international prudential commitments;

(b)    relevant considerations in determining whether a measure meets the requirements of Article 13.16.1 include the extent to which a measure may be required by the urgency of the situation and the information available to the Party at the time when the measure was adopted;

(c)    given the highly specialised nature of prudential regulation, those applying these principles shall defer to the highest degree possible to regulations and practices in the Parties' respective    jurisdictions and to    the    decisions    and    factual determinations, including risk assessments, made by financial regulatory authorities;

(d)    (i)    except as provided in subparagraph (ii), a measure is deemed to meet the requirements of Article 13.16.1 if it:

(A)    has a prudential objective; and

(B)    is not so severe in light of its purpose that it is manifestly disproportionate to the attainment of its objective; and

(ii)    a measure that otherwise meets the requirements of subparagraph (i) does not meet the requirements of Article 13.16.1 if it is a disguised restriction on foreign investment or an arbitrary or unjustifiable discrimination between investors in like situations;

(e)    provided that a measure is not applied in a manner which would constitute a means of arbitrary or unjustifiable discrimination between investors in like situations, or a disguised restriction on foreign investment, that measure is deemed to meet the requirements of Article 13.16.1 if it is:

(i)    in line with international prudential commitments that are common to the Parties;

386

(ii) in pursuance of the resolution of a financial institution that is no longer viable or likely to be no longer viable;

(iii) in pursuance of the recovery of a financial institution or the management of a financial institution under stress; or

(iv) in pursuance of the preservation or the restoration of financial stability, in response to a system-wide financial crisis.

**Periodic Review**

9.  The Financial Services Committee may, by consent of both Parties, amend this Understanding at any time. The Financial Services Committee should review this Understanding at least every two years.

In this context, the Financial Services Committee may develop a common understanding on the application of Article 13.16.1, on the basis of the dialogue and discussions held in the Committee in relation to specific disputes and mindful of international prudential commitments that are common to the Parties.

ANNEX 13-C

**UNDERSTANDING ON THE DIALOGUE ON THE REGULATION OF THE FINANCIAL SERVICES SECTOR**

The Parties reaffirm their commitment to strengthening financial stability. The dialogue on the regulation of the financial services sector within the Financial Services Committee shall be based on the principles and prudential standards agreed at the multilateral level. The Parties undertake to focus the discussion on issues with cross-border impact, such as cross-border trade in securities (including the possibility of taking further commitments on portfolio management), the respective frameworks for covered bonds and for collateral requirements in reinsurance, and to discuss issues related to the operation of branches.

## ANNEX 19-1

## Central government entities

Unless otherwise specified, this Chapter covers procurement by entities listed in this Annex, subject to the following thresholds:

**Thresholds:**

| | |
|---|---|
| Goods | SDR 130,000 |
| Services | SDR 130,000 |
| Construction Services | SDR 5,000,000 |

When entities listed in this Annex conduct procurement for activities listed in Section B of Annex 19-3, the thresholds set out in that section apply.

**List of Entities**

1.      Atlantic Canada Opportunities Agency

2.      Canada Border Services Agency

3.      Canada Emission Reduction Incentives Agency

4.      Canada Employment Insurance Commission

5.      Canada Industrial Relations Board

6.      Canada Revenue Agency

7.      Canada School of Public Service

8.      Canadian Centre for Occupational Health and Safety

9.      Canadian Environmental Assessment Agency

10.     Canadian Food Inspection Agency

11.     Canadian Forces Grievance Board

12.     Canadian Grain Commission

13.     Canadian Human Rights Commission

14.     Canadian Human Rights Tribunal

15.     Canadian Institutes of Health Research

16.     Canadian Intergovernmental Conference Secretariat

17.     Canadian International Trade Tribunal

18.     Canadian Northern Economic Development Agency

19.     Canadian Nuclear Safety Commission

20.     Canadian Polar Commission

21.     Canadian Radio-television and Telecommunications Commission

22.     Canadian Space Agency

23.     Canadian Transportation Accident Investigation and Safety Board

24.     Canadian Transportation Agency

25.     Copyright Board

26.     Correctional Service of Canada

27.     Courts Administration Service

28.     Department of Agriculture and Agri-Food

29.     Department of Canadian Heritage

30.     Department of Citizenship and Immigration

31.     Department of Employment and Social Development

32.     Department of Finance

33.     Department of Fisheries and Oceans

34.     Department of Foreign Affairs, Trade and Development

35.     Department of Health

36.     Department of Indian Affairs and Northern Development

37.     Department of Industry

38.     Department of Justice

39.     Department of National Defence

40.     Department of Natural Resources

41.     Department of Public Safety and Emergency Preparedness

42.     Department of Public Works and Government Services

43.     Department of the Environment

44.     Department of Transport

45.     Department of Veterans Affairs

46.     Department of Western Economic Diversification

47.     Director of Soldier Settlement

48.     Director, The Veterans' Land Act

49.     Economic Development Agency of Canada for the Regions of Quebec

50.     Federal Economic Development Agency for Southern Ontario

51.     Financial Consumer Agency of Canada

52.     Immigration and Refugee Board

53.     Indian Residential Schools Truth and Reconciliation Commission

54.     Library and Archives of Canada

55.     Military Police Complaints Commission

56.     National Battlefields Commission

57.     National Energy Board

58.     National Farm Products Council

59.     National Film Board

60.     Parole Board of Canada

61.     National Research Council of Canada

62.     Natural Sciences and Engineering Research Council

63.     Northern Pipeline Agency

64.     Office of Infrastructure of Canada

65.     Office of the Auditor General

66.     Office of the Chief Electoral Officer

67.     Office of the Commissioner for Federal Judicial Affairs

68.     Office of the Commissioner of Lobbying

69.     Office of the Commissioner of Official Languages

70.     Office of the Communications Security Establishment Commissioner

71.     Office of the Co-ordinator, Status of Women

72.     Office of the Correctional Investigator of Canada

73.     Office of the Director of Public Prosecutions

74.     Office of the Governor General's Secretary

75.     Office of the Public Sector Integrity Commissioner

76.     Office of the Superintendent of Financial Institutions

77.     Office of the Information Commissioner of Canada

78.     Office of the Privacy Commissioner of Canada

79.     Parks Canada Agency

80.     Patented Medicine Prices Review Board

81.     Privy Council Office

82.     Public Health Agency of Canada

83.     Public Service Commission

84.     Public Service Labour Relations and Employment Board

85.     Registrar of the Supreme Court of Canada

86.     Registry of the Competition Tribunal

87.     Registry of the Public Servants Disclosure Protection Tribunal

88.     Registry of the Specific Claims Tribunal

89.     Royal Canadian Mounted Police

90.     Royal Canadian Mounted Police External Review Committee

91.     Royal Canadian Mounted Police Public Complaints Commission

92.     Security Intelligence Review Committee

93.     Shared Services Canada

94.     Social Sciences and Humanities Research Council

95.     Statistics Canada

96.     Transportation Appeal Tribunal of Canada

97.     Treasury Board of Canada Secretariat

98.     Veterans Review and Appeal Board

***Notes to Canada's Annex 19-1***

1.      For the Canadian Space Agency, the procurement of covered goods and services is limited to those related to satellite communications, earth observation and global navigation satellite systems. This commitment is in effect for a five-year period following the entry into force of this Agreement. The calculation of the five-year period includes the period of provisional application, if any. Before the end of the five-year period, Canada may notify the European Union that it is removing the temporary commitment. The notification takes effect at the end of the five-year period. If Canada does not provide such notification, the temporary commitment will become permanent.

2.      Article 19.18 of this Chapter does not apply to the possible removal of the temporary commitment in this Note.

## ANNEX 19-2

### Sub-central government entities

Unless otherwise specified, this Chapter covers procurement by entities listed in this Annex, subject to the following thresholds.

**Thresholds:**

| | |
|---|---|
| Goods | SDR 200,000 |
| Services | SDR 200,000 |
| Construction Services | SDR 5,000,000 |

When entities listed in this Annex conduct procurement for activities listed in Section B of Annex 19-3, the thresholds set out in that section apply.

**List of entities:**

1. **ALBERTA**

   1.1   This Annex includes all:

   1.   departments, ministries, agencies, boards, councils, committees, commissions and similar agencies of government;

   2.   regional, local, district or other forms of municipal government; and

   3.   school boards and publicly-funded academic, health and social service entities.

   1.2   This Annex does not include:

   1.   Legislative Assembly
   2.   Legislative Assembly Office
   3.   Office of the Auditor General
   4.   Office of the Chief Electoral Officer
   5.   Office of the Ethics Commissioner
   6.   Office of the Information and Privacy Commissioner
   7.   Office of the Ombudsman

2. **BRITISH COLUMBIA**

   2.1   This Annex includes all:

   1.   ministries, agencies, boards, councils, committees, commissions and similar agencies of government;

   2.   regional, local, district or other forms of municipal government; and

   3.   school boards and publicly-funded academic, health and social service entities.

   2.2.   This Annex does not include the Legislative Assembly and its independent offices.

3. **MANITOBA**

   3.1   This Annex includes all:

393

1.   departments, boards, commissions, committees and similar agencies of government;

2.   municipalities, municipal organisations; and

3.   school boards and publicly-funded academic, health and social service entities.

## 4.   NEW BRUNSWICK

4.1   This Annex includes the following departments, secretariats and agencies:

1.   Aboriginal Affairs Secretariat
2.   Agriculture, Aquaculture and Fisheries
3.   Ambulance New Brunswick Inc.
4.   Aquarium and Marine Center of New Brunswick
5.   Office of the Attorney General
6.   Child and Youth Advocate
7.   Education and Early Childhood Development
8.   Efficiency New Brunswick
9.   Elections New Brunswick
10.  Energy and Mines
11.  Environment and Local Government
12.  Executive Council Office
13.  FacilicorpNB Ltd.
14.  Farm Products Commission
15.  Finance
16.  Forest Protection Limited
17.  Health
18.  Horizon Health Network (Regional Health Authority)
19.  Justice
20.  Labour and Employment Board
21.  Natural Resources
22.  New Brunswick Arts Board
23.  New Brunswick Emergency Measures Organization
24.  New Brunswick Energy & Utilities Board
25.  New Brunswick Forest Products Commission
26.  New Brunswick Health Council
27.  New Brunswick Human Rights Commission
28.  New Brunswick Insurance Board
29.  New Brunswick Internal Services Agency
30.  New Brunswick Lotteries Commission
31.  New Brunswick Museum
32.  New Brunswick Police Commission
33.  New Brunswick Public Libraries
34.  Office of Human Resources
35.  Office of the Auditor General
36.  Office of the Commissioner of Official Languages
37.  Office of the Comptroller
38.  Office of the Consumer Advocate for Insurance
39.  Office of the Leader of the Opposition

40.  Office of the Lieutenant-Governor
41.  Office of the Premier
42.  Office of the Public Trustee
43.  Ombudsman
44.  Population Growth Secretariat
45.  Post-Secondary Education, Training and Labour
46.  Premier's Council on the Status of Disabled Persons
47.  Public Safety
48.  Vitalité (Regional Health Authority)
49.  Senior and Healthy Aging Secretariat
50.  Social Development
51.  Government Services
52.  Tourism, Heritage and Culture
53.  Transportation
54.  Village Historique Acadien
55.  Workplace Health, Safety and Compensation Commission

4.2    District Education Councils

1.  All District Education Councils

4.3    Universities

1.  Mount Allison University
2.  St. Thomas' University
3.  Université de Moncton
4.  The University of New Brunswick

4.4    Community Colleges

1.  Collège communautaire du Nouveau-Brunswick (CCNB)
2.  New Brunswick Community College (NBCC)

4.5    Regional Solid Waste Commissions

1.  Commission de gestion déchets de Kent
2.  Commission de gestion des déchets solides de la Péninsule acadienne
3.  Commission des Déchets Solides / Nepisiguit-Chaleur Solid Waste Commission
4.  Fredericton Region Solid Waste Commission
5.  Fundy Region Solid Waste Commission
6.  Kings County Region Solid Waste Commission
7.  La Commission de gestion enviro ressources du Nord-Ouest
8.  Northumberland Solid Waste Commission
9.  Restigouche Solid Waste Corporation
10.  Southwest Solid Waste Commission
11.  Valley Solid Waste Commission
12.  Westmorland-Albert Solid Waste Corporation

4.6    Wastewater Commissions

1.  Fredericton Area Pollution Control Commission
2.  Greater Moncton Sewerage Commission

4.7    Municipalities and Municipal Organisations (does not include municipal energy entities)

1.    City of Bathurst
2.    City of Campbellton
3.    City of Dieppe
4.    City of Edmundston
5.    City of Fredericton
6.    City of Miramichi
7.    City of Moncton
8.    City of Saint John

## 5.    **NEWFOUNDLAND AND LABRADOR**

5.1    This Annex includes all:

1.    departments, boards, commissions;

2.    municipalities, municipal organisations; and

3.    school boards and publicly-funded academic, health and social service entities.

5.2    This Annex does not include the Legislative Assembly.

## 6.    **NORTHWEST TERRITORIES**

6.1    This Annex includes all:

1.    ministries, agencies;

2.    municipalities; and

3.    school boards and publicly-funded academic, health and social service entities.

6.2    This Annex does not include the Legislative Assembly.

## 7.    **NOVA SCOTIA**

7.1    This Annex includes all public sector entities as defined in the *Public Procurement Act*, S.N.S. 2011, c. 12, except:

1.    any listed intergovernmental or privatised governmental unit if the Province does not own or control a majority of it;

2.    any entity listed or described in Section A of Annex 19-3, whether as an inclusion or exclusion;

3.    Emergency Health Services (a division of the Department of Health) in respect of ground ambulance-related procurement, for Emergency Health Care purposes;

4.    Sydney Tar Ponds Agency;

5.    Nova Scotia Lands Inc.; and

6.    Harbourside Commercial Park.

## 8.    **NUNAVUT**

396

8.1   This Annex includes all:

    1.   ministries, agencies;

    2.   municipalities, municipal organisations; and

    3.   school boards and publicly-funded academic, health and social service entities.

8.2   This Annex does not include the Legislative Assembly.

## 9.   ONTARIO

9.1   This Annex includes all:

    1.   provincial ministries and classified agencies but does not include energy agencies, agencies of a commercial or industrial nature, and Ontario Infrastructure and Lands Corporation;

    2.   school boards and publicly-funded academic, health and social service entities; and

    3.   municipalities but does not include municipal energy entities.

9.2   This Annex does not include the Offices of the Legislative Assembly.

## 10.   PRINCE EDWARD ISLAND

10.1   This Annex includes all:

    1.   departments, agencies;

    2.   municipalities; and

    3.   school boards and publicly-funded academic, health and social service entities.

## 11.   QUÉBEC

11.1   This Annex includes all:

    1.   departments, governmental agencies; and

    2.   para-public organisations.

"**Governmental agencies**" means the bodies set out in subparagraphs (2) through (4) of the first paragraph of section 4 of the *Act Respecting Contracting by Public Bodies*, C.Q.L.R. c. C-65.1, including the Agence du revenu du Québec, and the persons set out in the second paragraph of that section, with the exception of the bodies and persons mentioned in section 5 of the Act.

"**Para-public organisations**" means the municipalities, the municipal organisations, and the bodies set out in subparagraphs (5) and (6) of the first paragraph of section 4 of the *Act Respecting Contracting by Public Bodies,* including the legal persons or other entities owned or controlled by one or several para-public organisations.

## 12.   SASKATCHEWAN

12.1   This Annex includes all:

    1.   ministries, agencies, Treasury Board Crown corporations, boards, commissions;

2.  municipalities; and

3.  school boards and publicly-funded academic, health and social service entities.

## 13.  **YUKON**

13.1  This Annex includes:

Departments

1.  Department of Community Services
2.  Department of Economic Development
3.  Department of Education
4.  Department of Energy, Mine and Resources
5.  Department of Environment
6.  Department of Finance
7.  Department of Health and Social Services
8.  Department of Highways and Public Works
9.  Department of Justice
10.  Department of Tourism and Culture
11.  Executive Council Office
12.  Public Service Commission
13.  Women's Directorate
14.  French Language Services Directorate

Agencies

1.  Yukon Worker's Compensation Health & Safety Board

# ANNEX 19-3

## Other entities

### Section A

Unless otherwise specified, this Chapter covers procurement by entities listed in Section A of this Annex, subject to the following thresholds:

**Thresholds:**

| | |
|---|---|
| Goods | SDR 355,000 |
| Services | SDR 355,000 |
| Construction Services | SDR 5,000,000 |

When conducting procurement for activities listed in Section B, the thresholds set out in that section apply.

**List of entities**

1. **FEDERAL ENTITIES**

    1.1    This Annex includes all Crown corporations within the meaning of Part X of the *Financial Administration Act* (FAA) R.S.C. 1985, c. F-11, which are accountable to Parliament under section 88 of the FAA.

2. **ALBERTA**

    2.1    This Annex includes all:

    1.    Crown corporations, government-owned commercial enterprises, and other entities that are owned by the Government of Alberta through ownership interest; and

    2.    corporations or entities owned or controlled by a regional, local, district or other form of municipal government covered under Annex 19-2.

3. **BRITISH COLUMBIA**

    3.1    This Annex includes all:

    1.    Crown corporations, government-owned commercial enterprises, and other entities that are owned by the Government of British Columbia through ownership interest; and

    2.    corporations or entities owned or controlled by one or more municipal governments.

4. **MANITOBA**

    4.1    This Annex includes all provincial Crown corporations, except:

    1.    Manitoba Public Insurance Corporation
    2.    Venture Manitoba Tours Limited

5. **NEW BRUNSWICK**

    5.1    This Annex includes the following Crown corporations:

    1.    Kings Landing Corporation
    2.    New Brunswick Credit Union Deposit Insurance Corporation

3.    New Brunswick Highway Corporation
4.    New Brunswick Housing Corporation
5.    New Brunswick Investment Management Corporation
6.    New Brunswick Liquor Corporation
7.    New Brunswick Municipal Finance Corporation
8.    New Brunswick Research and Productivity Council
9.    Opportunities New Brunswick
10.    Financial and Consumer Services Commission
11.    Regional Development Corporation
12.    Service New Brunswick

## 6.    NEWFOUNDLAND AND LABRADOR

6.1    This Annex includes all provincial Crown Corporations other than:

1.    Nalcor Energy and all its existing and future subsidiaries and affiliates, except for Newfoundland and Labrador Hydro.

2.    Research & Development Corporation of Newfoundland and Labrador and any subsidiary thereof.

## 7.    NORTHWEST TERRITORIES

7.1    This Annex includes all territorial Crown corporations.

## 8.    NOVA SCOTIA

8.1    This Annex includes any entity designated as a government business enterprise pursuant to the *Finance Act*, S.N.S. 2010, c. 2, and the *Public Procurement Act*, except any listed intergovernmental or privatised governmental unit under the *Provincial Finance Act* if the Province does not own or control a majority of it.

## 9.    NUNAVUT

9.1    This Annex includes all territorial Crown corporations.

## 10.    ONTARIO

10.1    This Annex includes all provincial and municipal government-owned entities of a commercial or industrial nature.

10.2    This Annex does not include energy entities except for Hydro One and Ontario Power Generation.

## 11.    PRINCE EDWARD ISLAND

11.1    This Annex includes all provincial Crown corporations except: Innovation PEI

## 12.    QUÉBEC

12.1    This Annex includes government enterprises and legal persons or other entities that are owned or controlled by one or several of these enterprises, which are not in competition with the private sector.

12.2    **Government enterprise** means a body set out in section 7 of the *Act Respecting Contracting by Public Bodies.*

## 13.    SASKATCHEWAN

13.1  This Annex includes all provincial Crown corporations, corporations owned or controlled by one or more municipal governments and the Saskatchewan Liquor and Gaming Authority.

## 14.  YUKON

This Annex includes all Government Corporations within the meaning of the *Corporate Governance Act*, R.S.Y. 2002, c. 45, except:

(a)  Yukon Development Corporation

### Notes to Canada's Section A of Annex 19-3

1.  This Annex does not cover procurement in respect of the intervention activities of the Canada Deposit Insurance Corporation or its subsidiaries, or procurements by any subsidiary created in respect of such intervention activities.

2.  This Annex does not cover procurement by the Canada Lands Company Limited or its subsidiaries for the development of real property for commercial sale or resale.

3.  Ontario Power Generation reserves the right to accord a preference to tenders that provide benefits to the province, such as favouring local sub-contracting, in the context of procurements relating to the construction or maintenance of nuclear facilities or related services. A selection criterion of benefits to the province in the evaluation of tenders shall not exceed 20 per cent of total points.

4.  This Chapter does not cover procurement for the production, transmission and distribution of renewable energy, other than hydro-electricity, by the province of Ontario as set out in the *Green Energy Act*, S.O. 2009, c. 12, Sch. A.

### Section B

The following thresholds apply to procurement by procuring entities in Annexes 19-1 and 19-2 and Section A of 19-3, which have as one of their core activities any of those referred to below or any combination thereof:

1.  Provision of airport or other terminal facilities to air carriers;

2.  Provision or operation of networks providing a service to the public in the field of transport by railway, automated systems, tramway, trolley bus, bus or cable;

3.  Provision of maritime or inland port or other terminal facilities to carriers by sea or inland waterway;

4.  Provision or operation of fixed networks intended to provide a service to the public in connection with the production, transport or distribution of drinking water and treatment of wastewater, or the supply of drinking water to such networks;

5.  Provision or operation of fixed networks intended to provide a service to the public in connection with the production, transport or distribution of electricity, or the supply of electricity to such networks; or

6.  Provision or operation of fixed networks intended to provide a service to the public in connection with the production, transport or distribution of gas or heat, or the supply of gas or heat to such networks.

### Thresholds:

| | |
|---|---|
| Goods | SDR 400,000 |
| Services | SDR 400,000 |
| Construction Services | SDR 5,000,000 |

### *Notes to Canada's Section B of Annex 19-3*

1.  This Chapter does not cover procurement by procuring entities for the activities listed in Section B above when exposed to competitive forces in the market concerned.

2.  This Chapter does not cover procurement by procuring entities for the activities listed in Section B:

    (a)  for the purchase of water, energy, or fuels for the production of energy;

    (b)  for the pursuit of such activities outside of Canada; or

    (c)  for purposes of re-sale or hire to third parties, provided that the procuring entity enjoys no special or exclusive right to sell or hire the subject of such contracts and other entities are free to sell or hire it under the same conditions as the procuring entity.

3.  This Chapter does not cover procurements by procuring entities for the purposes of exploitation of a geographical area for the purpose of exploring for or extracting oil, gas, coal, or other solid fuels.

## ANNEX 19-4

### Goods

1.      Unless otherwise specified, this Chapter covers all goods.

2.      Subject to the application of Article 19.3.1, with respect to procurement by the Department of National Defence, the Royal Canadian Mounted Police, the Department of Fisheries and Oceans for the Canadian Coast Guard, the Canadian Air Transport Security Authority, and provincial and municipal police forces, this Chapter covers only the goods described in any of the Federal Supply Classifications (FSC) listed below:

| FSC | 22. | Railway equipment |
|-----|-----|-------------------|
| FSC | 23. | Motor vehicles, trailers and cycles (except buses in 2310; and, except military trucks and trailers in 2320 and 2330 and tracked combat, assault and tactical vehicles in 2350 and wheeled combat, assault and tactical vehicles in 2350 formerly classified in 2320) |
| FSC | 24. | Tractors |
| FSC | 25. | Vehicular equipment components |
| FSC | 26. | Tires and tubes |
| FSC | 29. | Engine accessories |
| FSC | 30. | Mechanical power transmission equipment |
| FSC | 32. | Woodworking machinery and equipment |
| FSC | 34. | Metal working machinery |
| FSC | 35. | Service and trade equipment |
| FSC | 36. | Special industry machinery |
| FSC | 37. | Agricultural machinery and equipment |
| FSC | 38. | Construction, mining, excavating and highway maintenance equipment |
| FSC | 39. | Materials handling equipment |
| FSC | 40. | Rope, cable, chain and fittings |
| FSC | 41. | Refrigeration and air conditioning equipment |
| FSC | 42. | Fire fighting, rescue and safety equipment (except 4220: Marine lifesaving and diving equipment; and 4230: Decontaminating and impregnating equipment) |
| FSC | 43. | Pumps and compressors |
| FSC | 44. | Furnace, steam plant, drying equipment and nuclear reactors |
| FSC | 45. | Plumbing, heating and sanitation equipment |

| | | |
|---|---|---|
| FSC | 46. | Water purification and sewage treatment equipment |
| FSC | 47. | Pipe, tubing, hose and fittings |
| FSC | 48. | Valves |
| FSC | 49. | Maintenance and repair shop equipment |
| FSC | 52. | Measuring tools |
| FSC | 53. | Hardware and abrasives |
| FSC | 54. | Prefabricated structures and scaffolding |
| FSC | 55. | Lumber, millwork, plywood and veneer |
| FSC | 56. | Construction and building materials |
| FSC | 61. | Electric wire and power and distribution equipment |
| FSC | 62. | Lighting fixtures and lamps |
| FSC | 63. | Alarm and signal systems (except 6350: Security detection systems related to security screening) |
| FSC | 65. | Medical, dental and veterinary equipment and supplies |
| FSC | 66. | Instruments and laboratory equipment (except 6615: Automatic pilot mechanisms and airborne Gyro components; 6635: Physical properties testing and inspection related to security screening; and 6665: Hazard detecting instruments and apparatus) |
| FSC | 67. | Photographic equipment |
| FSC | 68. | Chemicals and chemical products |
| FSC | 69. | Training aids and devices |
| FSC | 70. | General purpose automatic data processing equipment, software, supplies and support equipment (except 7010: Automatic Data Processing Equipment (ADPE) configurations) |
| FSC | 71. | Furniture |
| FSC | 72. | Household and commercial furnishings and appliances |
| FSC | 73. | Food preparation and serving equipment |
| FSC | 74. | Office machines, text processing system and visible record equipment |
| FSC | 75. | Office supplies and devices |
| FSC | 76. | Books, maps and other publications (except 7650: drawings and specifications) |
| FSC | 77. | Musical instruments, phonographs and radios |
| FSC | 78. | Recreational and athletic equipment |

| FSC | 79. | Cleaning equipment and supplies |
| FSC | 80. | Brushes, paints, sealers and adhesives |
| FSC | 81. | Containers, packaging and packing supplies |
| FSC | 85. | Toiletries |
| FSC | 87. | Agricultural supplies |
| FSC | 88. | Live animals |
| FSC | 91. | Fuels, lubricants, oils and waxes |
| FSC | 93. | Nonmetallic fabricated materials |
| FSC | 94. | Nonmetallic crude materials |
| FSC | 96. | Ores, minerals and their primary products |
| FSC | 99. | Miscellaneous |

### Notes to Canada's Annex 19-4

1.  For the Provinces of Ontario and Québec, this Note applies to the procurement of mass transit vehicles. A mass transit vehicle refers to a street car, bus, trolley bus, subway car, passenger rail car or locomotive for subway or rail system used for public transportation.

    (a)  Procuring entities in the provinces of Ontario and Québec, when purchasing mass transit vehicles, may, in accordance with the terms of this Chapter, require that the successful bidder contracts up to 25 per cent of the contract value in Canada.

    (b)  Any lowering of such percentage of contract value decided by the Government of Canada or the province of Ontario or the province of Québec, as a result of an international agreement or in domestic law, regulation or policy, will replace the abovementioned percentage of 25 per cent on a permanent basis under this Chapter for that province and for the category of mass transit vehicle to which such new percentage applies. When applying this note, the provinces of Ontario and Québec must treat European Union bidders no less favourably than Canadian or other third country bidders.

    (c)  The term "value" refers to the eligible costs in the procurement of mass transit vehicles for components, sub-components and raw materials produced in Canada, including labour or other related services such as after-sale and maintenance services, as determined in the tender. It also includes all costs related to a final assembly of the mass transit vehicle in Canada. It will be for the bidder to determine which part of the contract value will be fulfilled through the use of Canadian acquired value. However, the province of Québec may require that final assembly takes place in Canada.

    (d)  Final assembly:

        (i)  Final assembly of a bus includes:

      (A)   installation and interconnection of the engine, transmission, axles, including the brake system;

      (B)   installation and interconnection of heating and air conditioning systems;

      (C)   installation of pneumatic, electrical and door systems;

      (D)   installation of passenger seats and handrails;

      (E)   installation of thedestination sign;

      (F)   installation of the wheelchair access ramp; and

      (G)   final inspection, road tests and preparation for delivery.

   (ii)   Final assembly of a train includes:

      (A)   installation and connection of the ventilation, heating and air conditioning system;

      (B)   installation and connection of bogie frames, suspension, axles and differential;

      (C)   installation and connection of propulsion engines, propulsion control and auxiliary power;

      (D)   installation and connection of braking control, braking equipment and air brake compressors;

      (E)   installation and connection of communication system, on-board information and remote monitoring system; and

      (F)   inspection, verification of all installation and interconnection work and fixed-point testing to verify all functions.

(e)   The eligible costs must provide reasonable flexibility for a successful bidder to source the contract value on competitive terms from Canadian suppliers, including price and quality. Contracts may not be split with the purpose of restricting the choice of eligible costs by the bidder.

(f)   The procuring entities must indicate the existence of such conditions clearly and objectively in both tender notices and contract documents.

(g)   The application of this paragraph will be revisited five years after entry into force of this Agreement.

(h)   The application of this paragraph will be revisited with a view to reduce its inconsistency with the provisions of this Chapter in the event that the United States of America permanently lowers its local content restrictions applicable to transit vehicles (rolling stock) below 25 per cent for local and state contracting authorities.

2.   For the Province of Prince Edward Island, this Annex does not cover procurement of construction materials that are used for highway construction and maintenance.

3.   For the Province of Québec, this Annex does not cover procurement of the following goods by Hydro-Québec (identified in accordance with the HS): HS 7308.20; HS

8406; HS 8410; HS 8426; HS 8504; HS 8535; HS 8536; HS 8537; HS 8544; HS 8705.10; HS 8705.20; HS 8705.90; HS 8707; HS 8708; HS 8716.39; or HS 8716.40.

4.  For the Province of Manitoba, this Annex does not cover procurement of the following goods by Manitoba Hydro Electric Board:

(a)  Textiles – fire retardant clothing and other work apparel;

(b)  Prefabricated buildings;

(c)  Bridges, bridge sections, towers and lattice masts, or iron or steel;

(d)  Steam turbines and other vapour turbines; hydraulic turbines and water wheels; gas turbines other than turbo-jets and turbo-propellers;

(e)  Electrical transformers, static converters and inductors;

(f)  Electricity distribution or control apparatus;

(g)  Parts of electricity distribution or control apparatus;

(h)  Co-axial cable and other co-axial electrical conductors;

(i)  Other electric conductors, for a voltage exceeding 1000V;

(j)  Gates;

(k)  Woodpoles and crossarms; or

(l)  Generators.

## ANNEX 19-5

### Services

1.    Unless otherwise specified, this Chapter covers the services specified in paragraph 2 and 3. The subject matter of construction services is addressed in Annex 19-6. The services listed in this Annex and Annex 19-6 are identified in accordance with the CPC.

2.    This Annex covers procurement of the following services by central entities covered in Annex 19-1 and Section A of Annex 19-3:

| | |
|---|---|
| 861 | Legal services (advisory services of foreign and international law only) |
| 862 | Accounting, auditing and book-keeping services |

3.    This Annex covers procurement of the following services by entities covered in Annexes 19-1 and 19-2, and Section A of 19-3:

| CPC Reference | Description |
|---|---|
| 633 | Repair services of personal and household goods |
| 7512 | Commercial courier services (including multi-modal) |
| 7523 | Electronic data interchange (EDI) |
| 7523 | Electronic mail |
| 7523 | Enhanced/value-added facsimile services, including store and forward, store and retrieve Code and protocol conversion |
| 7523 | On-line information and data base retrieval |
| 7523 | Voice mail |
| 822 | Real estate services on a fee or contract basis |
| 841 | Consultancy services related to the installation of computer hardware |
| 842 | Software implementation services, including systems and software consulting services, systems analysis, design, programming and maintenance services |
| 843 | Data processing services, including processing, tabulation and facilities management services |
| 843 | On-line information and/or data processing (including transaction |

|  | processing) |
|---|---|
| 844 | Data base services |
| 845 | Maintenance and repair services of office machinery and equipment including computers |
| 849 | Other computer services |
| 86501 | General management consulting services |
| 86503 | Marketing management consulting services |
| 86504 | Human resources management consulting services |
| 86505 | Production management consulting services |
| 866 | Services related to management consulting (except 86602 Arbitration and conciliation services) |
| 8671 | Architectural services |
| 8672 | Engineering services |
| 8673 | Integrated engineering services (excluding 86731 Integrated engineering services for transportation infrastructure turnkey projects) |
| 8674 | Urban planning and landscape architectural services |
| 8676 | Technical testing and analysis services including quality control and inspection (except with reference to FSC 58 and transportation equipment) |
| 874 | Building-cleaning services |
| 8861 to 8864 and 8866 | Repair services incidental to metal products, machinery and equipment |
| 94 | Sewage and refuse disposal, sanitation and similar services |

### *Notes to Canada's Annex 19-5:*

1.    This Chapter does not cover procurement of the following:

   (a)    all services, with reference to those goods purchased by the Department of National Defence, the Royal Canadian Mounted Police, the Department of Fisheries and Oceans for the Canadian Coast Guard, the Canadian Air Transport Security Authority, and provincial and municipal police forces which are not covered by Annex 19-4; and

   (b)    services procured in support of military forces located overseas.

409

2.   This Chapter does not apply to instruments of monetary policy, exchange rates, public debt, reserve management or other policies involving transactions in securities or other financial instruments, in particular transactions by the contracting authorities to raise money or capital. Accordingly, this Chapter does not apply to contracts relating to the issue, purchase, sale or transfer of securities or other financial instruments. Central bank services are also excluded.

3.   For procuring entities included in Annex 19-2, the thresholds will be SDR 355,000 when an entity procures consulting services regarding matters of a confidential nature, the disclosure of which could reasonably be expected to compromise government confidences, cause economic disruption or similarly be contrary to public interest.

4.   For the Province of Québec, this Annex does not cover procurement from a non-profit organisation with respect to urban planning, as well as resulting plans and specifications preparation and works management, provided that the non-profit organisation respects, for its procurement, the procuring entity's obligations under this Chapter.

5.   For the Province of Québec, this Annex does not cover procurement of the following services by Hydro-Québec (identified in accordance with the CPC):

      84 – Computer and related services

      86724 – Engineering design services for the construction of civil engineering works

      86729 – Other engineering services.

6.   For the Province of Manitoba, this Annex does not cover procurement of services by Manitoba Hydro Electric Board.

## ANNEX 19-6

### Construction services

1.    Unless otherwise specified, this Chapter covers all construction services identified in Division 51 of the CPC.

2.    Construction services contracts awarded by entities in Annexes 19-1 and 19-2, and Section A of Annex 19-3, which involve, as complete or partial consideration, any grant to the supplier of the construction service, for a specified period of time, of temporary ownership or a right to control and operate the civil or building work resulting from such contract, and demand payment for the use of such work for the duration of the contract, are subject only to the following provisions: Articles 19.1, 19.2, 19.4, 19.5, 19.6 (except for subparagraphs 3 (e) and (l)), 19.15 (except for paragraphs 3 and 4) and 19.17.

3.    This Chapter does not include construction services contracts as described in paragraph 2 that are awarded by procuring entities when carrying out activities listed in Section B of Annex 19-3.

### Notes to Canada's Annex 19-6

1.    For central government entities in Annex 19-1, this Annex includes dredging services, and dredging services that are incidental to construction services contracts, subject to the following requirements:

   (a)    the vessel or other floating plant equipment used in the supply of the dredging services:

      (i)    is of Canadian or European Union make or manufacture; or

      (ii)    has been predominantly modified in Canada or the European Union and has been owned by a person located in Canada or the European Union for at least a year prior to the submission of the tender by the bidder; and

   (b)    the vessel must be registered in:

      (i)    Canada; or

      (ii)    a Member State of the European Union and have been granted a temporary licence under the *Coasting Trade Act*, S.C. 1992, c. 31. The temporary license will be granted to the European Union vessel, subject to applicable non-discretionary requirements.[53] The requirement that a temporary licence will only be issued if there is no Canadian duty or non-duty paid vessel available will not be applied to the application for that temporary licence.

2.    The Province of Québec reserves the right to adopt or maintain any measure favouring local outsourcing in the case of construction services contracts awarded by Hydro-Québec. For greater certainty, such measure would in no case be a condition for the participation or qualification of suppliers.

---

[53]    For greater certainty, the *Coasting Trade Act* does not impose nationality requirements on crew members.

3.      For the Province of Manitoba, this Annex does not cover procurement of construction services by Manitoba Hydro Electric Board.

# ANNEX 19-7

## General notes

1.    This Chapter does not cover procurement:

   (a)    in respect of shipbuilding and repair, including related architectural and engineering services, for central entities in Annex 19-1 and Section A of Annex 19-3; and for sub-central entities in British Columbia, Manitoba, Newfoundland and Labrador, New Brunswick, Nova Scotia, Prince Edward Island, and Québec covered by Annex 19-2 and Section A of Annex 19-3;

   (b)    in respect of agricultural goods made in furtherance of agricultural support programs or human feeding programs;

   (c)    of transportation services that form a part of, or are incidental to, a procurement contract;

   (d)    in relation to an international crossing between Canada and another country, including the design, construction, operation or maintenance of the crossing as well as any related infrastructure;

   (e)    between subsidiaries or affiliates of the same entity, or between an entity and any of its subsidiaries or affiliates, or between an entity and a general, limited or special partnership in which the entity has a majority or controlling interest; and

   (f)    of goods purchased for representational or promotional purposes, or of services or construction services purchased for representational or promotional purposes outside the province, in respect of the provinces of Alberta, British Columbia, Newfoundland and Labrador, Nova Scotia, Prince Edward Island, Québec and Saskatchewan;

   (g)    of services contracts, excluding construction services contracts, which grant to a supplier the right to provide and exploit a service to the public as complete or partial consideration for the delivery of a service under a procurement contract;

   (h)    for the acquisition, development, production or co-production of programme material by broadcasters and contracts for broadcasting time;

   (i)    by Québec entities of works of art from local artists or to procurement by any municipality, academic institution or school board of other provinces and territories with respect to cultural industries. For the purpose of this paragraph, works of art includes specific artistic works to be integrated into a public building or a site;

   (j)    by procuring entities included in Annexes 19-1 and 19-2, and Section A of Annex 19-3 in connection with activities in the fields of drinking water, energy, transport and the postal sector, unless such contracts are covered by Section B of Annex 19-3;

   (k)    subject to the Northwest Territories Business Incentive Policy; and

   (l)    subject to the Nunavummi Nangminiqaqtunik Ikajuuti Policy (NNI Policy).

2.    This Chapter does not apply to:

(a)   any measure adopted or maintained with respect to Aboriginal peoples, nor to set asides for aboriginal businesses; existing aboriginal or treaty rights of any of the Aboriginal peoples of Canada protected by section 35 of the Constitution Act, 1982 are not affected by this Chapter; and

(b)   any measure adopted or maintained by Québec with respect to cultural industries.

3.    For greater certainty, this Chapter shall be interpreted in accordance with the following:

(a)   procurement in terms of Canadian coverage is defined as contractual transactions to acquire goods or services for the direct benefit or use of the government. The procurement process is the process that begins after an entity has decided on its requirement and continues through to and including contract award;

(b)   where a contract to be awarded by an entity is not covered by this Chapter, Canada's Annexes to its Market Access Schedule shall not be construed to cover any good or service component of that contract;

(c)   any exclusion that is related either specifically or generally to central or sub-central entities or enterprises covered by Annexes 19-1 or 19-2, or Section A of Annex 19-3 will also apply to any successor entity or entities, enterprise or enterprises, in such a manner as to maintain the value of the coverage of Canada's Annexes to its Market Access Schedule for this Chapter;

(d)   services covered by this Chapter are subject to Canada's exclusions from and reservations to Chapters Eight (Investment), Nine (Cross-Border Trade in Services) and Thirteen (Financial Services);

(e)   this Chapter does not cover procurement by a procuring entity on behalf of another entity where the procurement would not be covered by this Chapter if it were conducted by the other entity itself; and

(f)   this Chapter does not cover procurement by a procuring entity from a government entity.

4.    Regional Economic Development

(a)   the provinces and territories of Manitoba, Newfoundland and Labrador, New Brunswick, Nova Scotia, Northwest Territories, Nunavut, Prince Edward Island, or Yukon may derogate from this Chapter in order to promote regional economic development, without providing undue support to monopolistic activities.

(b)   any procurement qualifying for a derogation pursuant to this Note shall:

(i)    be of a total value estimated at CAD$ one million, or less; and

(ii)   support small firms or employment opportunities in non-urban areas.

(c)   if the procurement meets the requirement of paragraph (b)(ii) but its total value exceeds CAD$ one million, the value of the part of the contract that would be affected by the derogation would not exceed CAD$ one million.

(d)    each province or territory listed under paragraph (a) may not derogate pursuant to this Note more than ten times per year.

(e)    a procurement shall not qualify for a derogation pursuant to this Note if it is funded by the federal government.

(f)    a procurement qualifying for a derogation pursuant to this Note shall be notified at least 30 days prior to the signing of a procurement contract, accompanied by:

    (i)    the details of the circumstances justifying a derogation pursuant to this Note;

    (ii)    the information regarding the area where the procurement is expected to provide regional economic benefits, and, if made available, the name of the supplier; and

    (iii)    an explanation of the conformity of the procurement with the requirements of this Note.

**ANNEX 19-8**

**Publication media**

**Section A:**

Electronic or paper media utilised for the publication of laws, regulations, judicial decisions, administrative rulings of general application, standard contract clauses, and procedures regarding government procurement covered by this Chapter pursuant to Article 19.5

1. **CANADA**

    1.1   Government entities and Crown corporations:

        1.   Laws and regulations:

            (a)   Statutes of Canada: http://laws.justice.gc.ca/

            (b)   Canada Gazette: http://www.gazette.gc.ca

        2.   Judicial decisions:

            (a)   Supreme Court Judgments: http://scc.lexum.org/decisia-scc-csc/scc-csc/scc-csc/en/2013/nav_date.do

            (b)   Federal Court Reports: http://reports.fja-cmf.gc.ca/eng/index.html

            (c)   Federal Court of Appeal http://www.fca-caf.gc.ca

            (d)   Canadian International Trade Tribunal: http://www.citt-tcce.gc.ca

        3.   Administrative rulings and procedures:

            (a)   Government Electronic Tendering System (GETS): https://buyandsell.gc.ca/

            (b)   Canada Gazette http://www.gazette.gc.ca

            (c)   Contracting Policy: http://www.tbs-sct.gc.ca/pol/doc-eng.aspx?id=14494&section=text

2. **PROVINCES AND TERRITORIES**

    2.1   Alberta

        1.   Laws and regulations:

            (a)   Alberta Acts, Regulations and Codes: http://www.qp.alberta.ca/Laws_Online.cfm

            (b)   Alberta Gazette: http://www.qp.alberta.ca/Alberta_Gazette.cfm

        2.   Judicial decisions:

            (a)   Alberta Justice – Alberta Courts: http://www.albertacourts.ab.ca/index.php?p=169

        3.   Administrative rulings:

            (a)   http://www.canlii.org/en/ab/

    2.2   British Columbia

        1.   Laws and regulations:

     (a)   http://www.bclaws.ca/

2.   Judicial decisions:

     (a)   http://www.courts.gov.bc.ca/index.aspx

3.   Administrative rulings and procedures:

     (a)   http://www.courts.gov.bc.ca/index.aspx

2.3  Manitoba

1.   Laws and regulations:

     (a)   Manitoba Gazette : http://web2.gov.mb.ca/laws/index.php

2.   Judicial decisions:

     (a)   http://www.manitobacourts.mb.ca/

3.   Administrative rulings and procedures:

     (a)   http://www.gov.mb.ca/tenders

4.   Municipalities, municipal organisations:

     (a)   City of Winnipeg: http://www.winnipeg.ca/matmgt/info.stm

     (b)   City of Brandon: http://brandon.ca/search?q=procurement; and http://brandon.ca/purchasing-and-tenders/conducting-business-with-purchasing services?highlight=WyJwcm9jdXJlbWVudCJd

     (c)   City of Thompson: http://www.thompson.ca/index.aspx?page=96

     (d)   City of Steinbach: http://www.steinbach.ca/home

(e)   City of Portage La Prairie: http://www.city.portage-la-prairie.mb.ca5. Publicly-funded academic, health, and social service entities:

     (a)   Red River College: http://www.rrc.ca/

     (b)   Regional Health Authorities of Manitoba: http://www.rham.mb.ca/rhampp.html

     (c)   University of Brandon: https://www.brandonu.ca/finance/faculty-staff-resources/purchasing-department/; and https://www.brandonu.ca/vp-finance/files/Purchasing-Manual-revised-October-2012.pdf

     (d)   University College of the North: https://www.ucn.ca/defaulted.aspx

     (e)   University of Manitoba: http://www.umanitoba.ca/admin/governance/governing_documents/financial/392.html

     (f)   University of Winnipeg http://www.uwinnipeg.ca/index/cms-filesystem-action/pdfs/admin/policies/purchasing%20procedures%2004-01-13.pdf

     (g)   Winnipeg Regional Health Authority: http://www.wrha.mb.ca/about/busopp/contracting.php

6. School boards:

    (a)    Beautiful Plains: http://www.beautifulplainssd.ca/

    (b)    Border Land: http://www.blsd.ca/Board/boardpolicies/Pages/default.aspx

    (c)    Division scolaire franco-manitobaine: https://www.dsfm.mb.ca/SiteWeb2010/documents/La%20CSFM/Directives%202012/ADM%20-%20administration/ADM%2019%20Appel%20d_offres.pdf

    (d)    Evergreen: http://www.esd.ca/Parents-and-Community/Documents/Administration%20Manual/5%20-%20Business%20Administration/5.130%20Purchasing%20Procedure.pdf

    (e)    Flin Flon: http://www.ffsd.mb.ca/pdf/policies/POLICY7~2.PDF

    (f)    Fort La Bosse: http://www.flbsd.mb.ca/division-info/policies#sectiond

    (g)    Frontier http://www.frontiersd.mb.ca/governance/policy/SitePages/Section%20D%20-%20Business%20Administration.aspx; and http://www.frontiersd.mb.ca/governance/policy/Documents/Section%20D%20-%20Business%20Administration/D.3.B%20Tenders%20(Policy%20and%20Regulation).pdf

    (h)    Garden Valley: http://www.gvsd.ca/images/PDF/Policies/POLICY_MANUAL_1.pdf

    (i)    Hanover: http://hsd.ca/board/division-policies/

    (j)    Interlake: http://www.isd21.mb.ca/

    (k)    Kelsey: http://www.ksd.mb.ca

    (l)    Lakeshore: http://www.lakeshoresd.mb.ca/regulations-and-procedures

    (m)    Lord Selkirk: http://www.lssd.ca/division/policy_documents/pdfs/B-16%20Purchasing.pdf

    (n)    Louis Riel: https://www.lrsd.net/leadership/administrative-guidelines/

    (o)    Manitoba Institute of Trade and Technology (formerly Winnipeg Tech. College): www.mitt.ca

    (p)    Mountain View: http://www.mvsd.ca/governance.cfm?subpage=435

(q) Mystery Lake: http://www.mysterynet.mb.ca/images/stories/Docs/boardpolicyRevMay2015.pdf

(r) Park West: http://www.pwsd.ca/Policies/Section%205/Section%205.html

(s) Pembina Trails: http://www.pembinatrails.ca/community/divisionalpolicies/html

(t) Pine Creek: http://www.pinecreeksd.mb.ca/section-d-fiscal-management.html

(u) Portage la Prairie: http://www.plpsd.mb.ca/board-and-governance/policies/d

(v) Prairie Rose: http://www.prsdmb.ca/policies-d/

(w) Prairie Spirit : https://sites.google.com/a/prspirit.org/prairie-spirit-5/division/policy-manual

(x) Public Schools Finance Board: http://www.edu.gov.mb.ca/k12/finance/

(y) Red River Valley: http://rrvsd.ca/wp-content/uploads/2015/09/DJB-Purchasing-Procedures.pdf

(z) River East Transcona: http://www.retsd.mb.ca/yourretsd/Policies/Documents/DJB.pdf

(aa) Rolling River: http://www.rrsd.mb.ca/governance/PolicyManual/Pages/default.aspx

(bb) Seine River : http://www.srsd.mb.ca/PolMan/DJ_REG.pdf

(cc) Seven Oaks: http://www.7oaks.org/News/Pages/Tenders.aspx

(dd) Southwest Horizon: http://www.shmb.ca/images/stories/Administrative-Manual/Section2/purchasing%20procedures.pdf

(ee) St. James-Assiniboia: http://polmanual.sjsd.net/?p=Section D - Fiscal Management/

(ff) Sunrise: http://www.sunrisesd.ca/OperationalDepartments/Pages/default.aspx

(gg) Swan Valley: http://www.svsd.ca/svsd/policiesnum.htm

(hh) Turtle Mountain: http://www.tmsd.mb.ca/procedures/D/D-10.pdf

(ii) Turtle River: http://trsd32.mb.ca/TRSD/PDF's/TRSDPolicies/Administration.pdf

(jj) Western: http://www.westernsd.mb.ca/index.php?option=com_phocadownlo

ad&view=category&id=61:section-d-fiscal-management&Itemid=73#

(kk)  Whiteshell: http://www.sdwhiteshell.mb.ca/

(ll)  Winnipeg: https://www.winnipegsd.ca/Pages/Bids-and-Tenders.aspx

7.  Crown corporations:

(a)  Manitoba Hydro:
https://www.hydro.mb.ca/selling_to_mh/selling_index.shtml?WT.mc_id=2030

(b)  Manitoba Liquor and Lotteries: www.merx.com; and www.winnipegconstruction.ca (construction only)

2.4  New Brunswick

1.  Laws and regulations:

(a)  New Brunswick Acts and Regulations:
http://www2.gnb.ca/content/gnb/en/departments/attorney_general/acts_regulations.html

(b)  The Royal Gazette:
http://www2.gnb.ca/content/gnb/en/departments/attorney_general/royal_gazette/content/

2.  Judicial decisions:

(a)  The New Brunswick Reports:
http://www.mlb.nb.ca/html/canadian-case-law-search.php; and https://www.canlii.org/en/nb/

(b)  Dominion Law Reports: http://www.carswell.com/product-detail/dominion-law-reports-4th-series/

(c)  Supreme Court Reports: http://www.scc-csc.gc.ca/

(d)  National Reporter: http://www.mlb.nb.ca/site/catalog/nr.htm

3.  Administrative Rulings and Procedures:

(a)  New Brunswick Opportunities Network: http://www.gnb.ca/tenders

(b)  Réseau de possibilités d'affaires du Nouveau-Brunswick: http://www.gnb.ca/soumissions.

2.5  Newfoundland and Labrador

1.  Laws and regulations:

(a)  http://www.gpa.gov.nl.ca

2.  Judicial decisions:

(a)  http://www.gpa.gov.nl.ca

3.  Administrative rulings and procedures:

(a)  http://www.gpa.gov.nl.ca

2.6    Northwest Territories

    1.    Laws and regulations:

        (a)    http://www.contractregistry.nt.ca/Public/PublicHome.asp

    2.    Judicial decisions:

        (a)    http://www.contractregistry.nt.ca/Public/PublicHome.asp

    3.    Administrative rulings and procedures:

        (a)    http://www.contractregistry.nt.ca/Public/PublicHome.asp

2.7    Nova Scotia

    1.    Laws and regulations:

        (a)    Office of the Legislative Counsel: http://nslegislature.ca

        (b)    The Registry of Regulations http://www.gov.ns.ca/just/regulations/ and

             http://www.gpa.gov.nl.ca

    2.    Judicial decisions:

        (a)    The Courts of Nova Scotia: http://www.courts.ns.ca/

    3.    Administrative rulings and procedures:

        (a)    http://www.novascotia.ca/tenders/

2.8    Nunavut

    1.    Laws and regulations:

        (a) http://www.justice.gov.nu.ca/apps/authoring/dspPage.aspx?page=STATUTES+AND+REGULATIONS+PAGE

    2.    Judicial decisions:

        (a)    http://www.canlii.org/en/nu/

    3.    Administrative rulings and procedures:

        (a)    NNI Contracting Appeals Board Annual Report: http://nni.gov.nu.ca/documents

        (b)    GN Policies and Procedures on procurement practices are available at: http://www.gov.nu.ca/sites/default/files/files/Procurement%20Procedures.pdf and

             http://www.gpa.gov.nl.ca

2.9    Ontario

    1.    Laws and regulations:

        (a)    Statutes and Regulations of Ontario: http://www.ontario.ca/laws

        (b)    The Ontario Gazette: http://www.ontario.ca/ontario-gazette

    2.    Judicial decisions:

       (a)   http://www.ontariocourts.ca/decisions_index/en/

3.   Administrative rulings and procedures:

       (a)   http://www.doingbusiness.mgs.gov.on.ca/

4.   School boards and publicly-funded academic, health and social service entities; municipalities; and all provincial and municipal government-owned entities of a commercial or industrial nature:

       (a)   http://www.marcan.net/en/on/index.php

5.   Hydro One:

       http://www.hydroone.com/DoingBusiness/Pages/default.aspx

6.   Ontario Power Generation: http://www.opg.com/working-with-opg/suppliers/supply-chain/Pages/Become%20a%20Supplier.aspx

2.10  Prince Edward Island

   1.   Laws and regulations:

       (a)   http://www.gov.pe.ca/law/regulations/index.php3

       (b)   The Royal Gazette of Prince Edward Island

   2.   Judicial decisions:

       (a)http://www.gov.pe.ca/courts/supreme/index.php3?number=1000150&lang=E

   3.   Administrative rulings and procedures:

       (a)   http://www.gov.pe.ca/finance/index.php3?number=1041973

2.11  Québec

   1.   Laws and regulations:

       (a)   Publications du Québec: http://www3.publicationsduquebec.gouv.qc.ca/loisreglements.fr.html

       (b)   Gazette officielle du Québec : http://www3.publicationsduquebec.gouv.qc.ca/gazetteofficielle.fr.htm

   2.   Judicial decisions:

       (a)   Annuaire de jurisprudence et de doctrine du Québec

       (b)   Jurisprudence Express (J.E.)

       (c)   Jugements.qc.ca: http://www.jugements.qc.ca/

   3.   Administrative rulings and procedures:

       (a)   Publications du Québec: http://www3.publicationsduquebec.gouv.qc.ca/loisreglements.fr.html

(b)   Gazette officielle du Québec:
http://www3.publicationsduquebec.gouv.qc.ca/gazetteofficielle.fr.html

(c)   Site internet du Secrétariat du Conseil du trésor :
http://www.tresor.gouv.qc.ca/fr/faire-affaire-avec-letat/les-marches-publics/)http://www.gpa.gov.nl.ca

2.12   Saskatchewan

1.   Laws and regulations:

(a)   Queen's Printer: http://www.publications.gov.sk.ca

2.   Judicial decisions:

(a)   Queen's Bench: http://www.sasklawcourts.ca

3.   Administrative rulings and procedures:

(a)   SaskTenders: www.sasktenders.ca

2.13   Yukon

1.   Laws and regulations:

(a)   http://www.gov.yk.ca/legislation/index.html

2.   Judicial decisions:

(a)   http://www.yukoncourts.ca/

3.   Administrative rulings and procedures:

(a)   http://www.hpw.gov.yk.ca/selling/bidchallenge.html

**Section B:**

Electronic or paper media utilised for the publication of notices required by Articles 19.6, 19.8.7 and 19.15.2 pursuant to Article 19.5

**1.   CANADA**

1.1   Government entities and Crown corporations:

1.   Government Electronic Tendering System (GETS):
https://buyandsell.gc.ca/procurement-data/tenders

2.   MERX, Cebra Inc.: http://www.merx.ca

**2.   PROVINCES AND TERRITORIES**

2.1   Alberta

1.   Alberta Purchasing Connection: http://www.purchasingconnection.ca

2.2   British Columbia

1.   BC Bid: http://www.bcbid.gov.bc.ca

2.3   Manitoba

1.   Provincial:

(a)   http://www.gov.mb.ca/tenders

423

2.      Municipalities, municipal organisations:

   (a)    City of Winnipeg: http://www.winnipeg.ca/matmgt/bidopp.asp

   (b)    City of Brandon: http://brandon.ca/purchasing-a-tenders

   (c)    City of Steinbach:
          http://www.steinbach.ca/city_services/tender_opportunities/

   (d)    City of Portage La Prairie: http://www.city-
          plap.com/main/category/opportunities/; and
          http://www.rfp.ca/organization/City-of-Portage-la-Prairie

   (e)    City of Thompson: http://www.thompson.ca/index.aspx?page=229

3.      Publicly-funded academic, health and social services entities:

   (a)    University of Manitoba:
          http://umanitoba.ca/admin/financial_services/purch/bid_opportuniti
          es.html; and https://www.biddingo.com/

   (b)    University of Winnipeg: https://www.merx.com/

   (c)    University of Brandon: http://www.rfp.ca/organization/Brandon-
          University

   (d)    Red River College: www.merx.com

   (e)    University College of the North: www.merx.com

   (f)    Winnipeg Regional Health Authority:
          http://www.wrha.mb.ca/about/busopp/bids.php

   (g)    Regional Health Authorities of Manitoba:
          www.healthprocanada.com; and www.biddingo.com

4.      School boards:

   (a)    Beautiful Plains: http://www.beautifulplainssd.ca/

   (b)    Border Land: http://www.blsd.ca/About/tenders/Pages/default.aspx

   (c)    Brandon: https://www.bsd.ca/Division/tenders/Pages/default.aspx

   (d)    Division scolaire franco-manitobaine: www.MERX.com

   (e)    Evergreen: http://www.esd.ca/Programs/Pages/Maintenance-and-
          Transportation.aspx

   (f)    Flin Flon: http://www.ffsd.mb.ca

   (g)    Fort La Bosse: http://www.flbsd.mb.ca/

   (h)    Frontier:
          http://www.frontiersd.mb.ca/resources/Pages/bidopportunities.aspx

   (i)    Garden Valley: http://www.gvsd.ca

   (j)    Hanover: www.merx.com

   (k)    Interlake: http://www.isd21.mb.ca/request_for_proposals.html

   (l)    Kelsey: http://www.ksd.mb.ca

(m)  Lord Selkirk: http://www.lssd.ca/(n)    Lakeshore: www.merx.com

(o)  Louis Riel: www.merx.com

(p)  Mountain View: http://www.mvsd.ca/index.cfm

(q)  Mystery Lake: http://www.mysterynet.mb.ca

(r)  Park West: http://www.pwsd.ca/home.html

(s)  Pembina Trails: http://www.pembinatrails.ca/board_administration/open_tenders.html

(t)  Pine Creek: http://www.pinecreeksd.mb.ca

(u)  Portage la Prairie: http://www.plpsd.mb.ca/

(v)  Prairie Rose: http://www.prsdmb.ca/

(w)  Prairie Spirit: https://sites.google.com/a/prspirit.org/prairie-spirit-5/employment/tenders-and-rfp

(x)  Red River Valley: http://rrvsd.ca/

(y)  River East Transcona: www.merx.com

(z)  Rolling River: http://www.rrsd.mb.ca/governance/PolicyManual/Pages/default.aspx

(aa)  Seine River: http://www.srsd.mb.ca/

(bb)  Seven Oaks: http://www.7oaks.org/News/Pages/Tenders.aspx; and www.merx.com

(cc)  Southwest Horizon: http://www.shmb.ca/

(dd)  St. James-Assiniboia: www.merx.com

(ee)  Sunrise: http://www.sunrisesd.ca/OperationalDepartments/Purchasing/Proposals%20and%20Tenders/Pages/default.aspx

(ff)  Swan Valley: http://www.svsd.ca/

(gg)  Turtle Mountain: http://www.tmsd.mb.ca

(hh)  Turtle River: http://trsd32.mb.ca

(ii)  Western: http://www.westernsd.mb.ca/

(jj)  Whiteshell: http://www.sdwhiteshell.mb.ca/

(kk)  Winnipeg: https://www.winnipegsd.ca/Pages/Bids-and-Tenders.aspx

(ll)  Manitoba Institute of Trades and Technology (formerly Winnipeg Tech. College): www.mitt.ca

(mm) Public Schools Finance Board:
http://www.plansource.ca/Portals/61984/spr/wca.htm

5. Crown corporations:

(a) Manitoba Hydro:

http://www.merx.com/English/Nonmember.asp?WCE=Show&TAB=3&PORTAL=MERX&State=1&hcode=ZnHb9N%2fychQhquB6o2pU2g%3d%3d

(b) Manitoba Liquor and Lotteries: www.merx.com; and www.winnipegconstruction.ca (construction only)

2.4 New Brunswick

1. New Brunswick Opportunities Network: https://nbon-rpanb.gnb.ca/welcome?language=En

2. Réseau de possibilités d'affaires du Nouveau-Brunswick: http://www.gnb.ca/soumissions

2.5 Newfoundland and Labrador

1. Information available on Internet homepage, Government Purchasing Agency: http://www.gpa.gov.nl.ca/index.html

2.6 Northwest Territories

1. Contract Registry: http://www.contractregistry.nt.ca/Public/PublicHome.asp

2.7 Nova Scotia

1. Procurement Services : http://www.novascotia.ca/tenders/

2.8 Nunavut

1. http://www.nunavuttenders.ca/

2.9 Ontario

1. https://ontariotenders.bravosolution.com/esop/nac-host/public/web/login.html

2. School boards and publicly-funded academic, health and social service entities; Municipalities; and all provincial and municipal government-owned entities of a commercial or industrial nature:

(a) http://www.marcan.net/en/on/index.php

3. Hydro One: http://www.hydroone.com/DoingBusiness/Pages/default.aspx

4. Ontario Power Generation: http://www.opg.com/working-with-opg/suppliers/supply-chain/Pages/Become%20a%20Supplier.aspx

2.10 Prince Edward Island

1. http://www.gov.pe.ca/finance/index.php3?number=1041973

2.11 Québec

1.  Procurement notices (Article 19.6), requests for qualification, the names of suppliers that are selected in the context of a delivery order contract or a task order contract, and information that relates to awards (Article 19.15.2) are published by SEAO, the electronic tendering system approved by the Government of Québec (http://www.seao.ca).

2.  In Québec, according to the regulations, a multi-purpose list can be used only in the context of a procedure to qualify a supplier (Article 19.8.7).

2.12 Saskatchewan

1.  SaskTenders: www.sasktenders.ca

2.13 Yukon

1.  http://www.gov.yk.ca/tenders/tms.html

2.  http://www.hpw.gov.yk.ca/tenders/index.html

**Section C:**

Website address or addresses where Parties publish procurement statistics pursuant to Article 19.15.5 and notices concerning awarded contracts pursuant to Article 19.15.6

1.  **CANADA**

    1.1  Government entities and Crown corporations:

        1.  Purchasing Activity Report: http://www.tbs-sct.gc.ca/pubs_pol/dcgpubs/con_data/siglist-eng.asp

        2.  Government Electronic Tendering System (GETS): https://buyandsell.gc.ca/

2.  **PROVINCES AND TERRITORIES**

    2.1  Alberta

        1.  http://www.purchasingconnection.ca

    2.2  British Columbia

        1.  http://www.bcbid.gov.bc.ca

    2.3  Manitoba

        1.  http://www.gov.mb.ca/tenders

        2.  http://www.merx.com

    2.4  New Brunswick

        1.  http://www.gnb.ca/tenders

        2.  http://www.gnb.ca/soumissions

    2.5  Newfoundland and Labrador

        1.  http://www.gpa.gov.nl.ca

    2.6  Northwest Territories

        1.  http://www.contractregistry.nt.ca/Public/PublicHome.asp

2.7　Nova Scotia

    1.　http://www.novascotia.ca/tenders/

2.8　Nunavut

    1.　http://www.nunavuttenders.ca/

    2.　http://www.gov.nu.ca/eia/programs-services/information-businesses

2.9　Ontario

    1.　http://www.doingbusiness.mgs.gov.on.ca/

2.10　Prince Edward Island

    1.　http://www.gov.pe.ca/finance/index.php3?number=1041973

2.11　Québec

    1.　Statistiques sur les acquisitions gouvernementales: http://www.tresor.gouv.qc.ca/faire-affaire-avec-letat/publications/statistiques-sur-les-acquisitions-gouvernementales/

    2.　Avis concernant les marchés adjugés Système électronique d'appel d'offres approuvé par le gouvernement du Québec SEAO (http://www.seao.ca)

2.12　Saskatchewan

    1.　www.sasktenders.ca

2.13　Yukon

    1.　http://www.gov.yk.ca/tenders/tms.html

    2.　http://www.hpw.gov.yk.ca/registry/

MARKET ACCESS SCHEDULE OF THE EUROPEAN UNION

## ANNEX 19-1

**Central government entities which procure in accordance with the provisions of the Chapter**

Goods

Specified in Annex 19-4

Thresholds     SDR 130,000

Services

Specified in Annex 19-5

Thresholds     SDR 130,000

Construction services and works concessions

Specified in Annex 19-6

Thresholds     SDR 5,000,000

## Section A: European Union entities

1.      The Council of the European Union

2.      The European Commission

3.      European External Action Service (EEAS)

## Section B: The central government contracting authorities of European Union Member States

(Note: this list is exhaustive)

### BELGIUM

| **1.      Services publics fédéraux:** | **1.      Federale Overheidsdiensten:** |
|---|---|
| SPF Chancellerie du Premier Ministre | FOD Kanselarij van de Eerste Minister |
| SPF Personnel et Organisation | FOD Kanselarij Personeel en Organisatie |
| SPF Budget et Contrôle de la Gestion | FOD Budget en Beheerscontrole |
| SPF Technologie de l'Information et de la Communication (Fedict) | FOD Informatie- en Communicatietechnologie (Fedict) |
| SPF Affaires étrangères, Commerce extérieur et Coopération au Développement | FOD Buitenlandse Zaken, Buitenlandse Handel en Ontwikkelingssamenwerking |
| SPF Intérieur | FOD Binnenlandse Zaken |
| SPF Finances | FOD Financiën |
| SPF Mobilité et Transports | FOD Mobiliteit en Vervoer |
| SPF Emploi, Travail et Concertation sociale | FOD Werkgelegenheid, Arbeid en sociaal overleg |

| | |
|---|---|
| SPF Sécurité Sociale et Institutions publiques de Sécurité Sociale | FOD Sociale Zekerheid en Openbare Instellingen van sociale Zekerheid |
| SPF Santé publique, Sécurité de la Chaîne alimentaire et Environnement | FOD Volksgezondheid, Veiligheid van de Voedselketen en Leefmilieu |
| SPF Justice | FOD Justitie |
| SPF Economie, PME, Classes moyennes et Energie | FOD Economie, KMO, Middenstand en Energie |
| Ministère de la Défense | Ministerie van Landsverdediging |
| Service public de programmation Intégration sociale, Lutte contre la pauvreté Et Economie sociale | Programmatorische Overheidsdienst Maatschappelijke Integratie, Armoedsbestrijding en sociale Economie |
| Service public fédéral de Programmation Développement durable | Programmatorische federale Overheidsdienst Duurzame Ontwikkeling |
| Service public fédéral de Programmation Politique scientifique | Programmatorische federale Overheidsdienst Wetenschapsbeleid |

**2.    Régie des Bâtiments:**    **2.    Regie der Gebouwen:**

| | |
|---|---|
| Office national de Sécurité sociale | Rijksdienst voor sociale Zekerheid |
| Institut national d'Assurance sociales Pour travailleurs indépendants | Rijksinstituut voor de sociale Verzekeringen der Zelfstandigen |
| Institut national d'Assurance Maladie-Invalidité; Office national des Pensions | Rijksinstituut voor Ziekte- en Invaliditeitsverzekering; Rijksdienst voor Pensioenen |
| Caisse auxiliaire d'Assurance Maladie-Invalidité | Hulpkas voor Ziekte-en Invaliditeitsverzekering |
| Fond des Maladies professionnelles | Fonds voor Beroepsziekten |
| Office national de l'Emploi | Rijksdienst voor Arbeidsvoorziening |
| La Poste[54] | De Post[2] |

# BULGARIA

1.    Администрация на Народното събрание (Administration of the National Assembly)

2.    Администрация на Президента (Administration of the President)

3.    Администрация на Министерския съвет (Administration of the Council of Ministers)

4.    Конституционен съд (Constitutional Court)

5.    Българска народна банка (Bulgarian National Bank)

6.    Министерство на външните работи (Ministry of Foreign Affairs)

7.    Министерство на вътрешните работи (Ministry of the Interior)

---

[54]    Postal activities as per act of 24 December 1993.

8.  Министерство на извънредните ситуации (Ministry of Emergency Situations)

9.  Министерство на държавната администрация и административната реформа (Ministry of State Administration and Administrative Reform)

10. Министерство на земеделието и храните (Ministry of Agriculture and Food)

11. Министерство на здравеопазването (Ministry of Health)

12. Министерство на икономиката и енергетиката (Ministry of Economy and Energy)

13. Министерство на културата (Ministry of Culture)

14. Министерство на образованието и науката (Ministry of Education and Science)

15. Министерство на околната среда и водите (Ministry of Environment and Water)

16. Министерство на отбраната (Ministry of Defence)

17. Министерство на правосъдието (Ministry of Justice)

18. Министерство на регионалното развитие и благоустройството (Ministry of Regional Development and Public Works)

19. Министерство на транспорта (Ministry of Transport)

20. Министерство на труда и социалната политика (Ministry of Labour and Social Policy)

21. Министерство на финансите (Ministry of Finance)

22. държавни агенции, държавни комисии, изпълнителни агенции и други държавни институции, създадени със закон или с постановление на Министерския съвет, които имат функции във връзка с осъществяването на изпълнителната власт (state agencies, state commissions, executive agencies and other state authorities established by law or by Council of Ministers' decree having a function relating to the exercise of executive power):

23. Агенция за ядрено регулиране (Nuclear Regulatory Agency)

24. Държавна комисия за енергийно и водно регулиране (Energy and Water State Regulatory Commission)

25. Държавна комисия по сигурността на информацията (State Commission on Information Security)

26. Комисия за защита на конкуренцията (Commission for Protection of Competition)

27. Комисия за защита на личните данни (Commission for Personal Data Protection)

28. Комисия за защита от дискриминация (Commission for Protection Against Discrimination)

29. Комисия за регулиране на съобщенията (Communications Regulation Commission)

30. Комисия за финансов надзор (Financial Supervision Commission)

31. Патентно ведомство на Република България (Patent Office of the Republic of Bulgaria)

32.  Сметна палата на Република България (National Audit Office of the Republic of Bulgaria)

33.  Агенция за приватизация (Privatization Agency)

34.  Агенция за следприватизационен контрол (Agency for Post-privatization Control)

35.  Български институт по метрология (Bulgarian Institute for Metrology)

36.  Държавна агенция "Архиви (State Agency "Archives")

37.  Държавна агенция "Държавен резерв и военновременни запаси" (State Agency "State Reserve and War-Time Stocks")

38.  Държавна агенция за бежанците (State Agency for Refugees)

39.  Държавна агенция за българите в чужбина (State Agency for Bulgarians Abroad)

40.  Държавна агенция за закрила на детето (State Agency for Child Protection)

41.  Държавна агенция за информационни технологии и съобщения (State Agency for Information Technology and Communications)

42.  Държавна агенция за метрологичен и технически надзор (State Agency for Metrological and Technical Surveillance)

43.  Държавна агенция за младежта и спорта (State Agency for Youth and Sports)

44.  Държавна агенция по туризма (State Agency for Tourism)

45.  Държавна комисия по стоковите борси и тържища (State Commission on Commodity Exchanges and Market-places)

46.  Институт по публична администрация и европейска интеграция (Institute of Public Administration and European Integration)

47.  Национален статистически институт (National Statistical Institute)

48.  Агенция "Митници" (Customs Agency)

49.  Агенция за държавна и финансова инспекция (Public Financial Inspection Agency)

50.  Агенция за държавни вземания (State Receivables Collection Agency)

51.  Агенция за социално подпомагане (Social Assistance Agency)

52.  Държавна агенция "Национална сигурност" (State Agency "National Security")

53.  Агенция за хората с увреждания (Agency for Persons with Disabilities)

54.  Агенция по вписванията (Registry Agency)

55.  Агенция по енергийна ефективност (Energy Efficiency Agency)

56.  Агенция по заетостта (Employment Agency)

57.  Агенция по геодезия, картография и кадастър (Geodesy, Cartography and Cadastre Agency)

58.  Агенция по обществени поръчки (Public Procurement Agency)

59.  Българска агенция за инвестиции (Bulgarian Investment Agency)

60.  Главна дирекция "Гражданска въздухоплавателна администрация" (General Directorate "Civil Aviation Administration")

61.  Дирекция за национален строителен контрол (Directorate for National Construction Supervision)

62.  Държавна комисия по хазарта (State Commission on Gambling)

63.  Изпълнителна агенция "Автомобилна администрация" (Executive Agency "Automobile Administration")

64.  Изпълнителна агенция "Борба с градушките" (Executive Agency "Hail Suppression")

65.  Изпълнителна агенция "Българска служба за акредитация" (Executive Agency "Bulgarian Accreditation Service")

66.  Изпълнителна агенция "Главна инспекция по труда" (Executive Agency "General Labour Inspectorate")

67.  Изпълнителна агенция "Железопътна администрация" (Executive Agency "Railway Administration")

68.  Изпълнителна агенция "Морска администрация" (Executive Agency "Maritime Administration")

69.  Изпълнителна агенция "Национален филмов център" (Executive Agency "National Film Centre")

70.  Изпълнителна агенция "Пристанищна администрация" (Executive Agency "Port Administration")

71.  Изпълнителна агенция "Проучване и поддържане на река Дунав" (Executive Agency "Exploration and Maintenance of the Danube River")

72.  Фонд "Републиканска пътна инфраструктура" (National Infrastructure Fund)

73.  Изпълнителна агенция за икономически анализи и прогнози (Executive Agency for Economic Analysis and Forecasting)

74.  Изпълнителна агенция за насърчаване на малките и средни предприятия (Executive Agency for Promotion of Small and Medium Enterprises)

75.  Изпълнителна агенция по лекарствата (Executive Agency on Medicines)

76.  Изпълнителна агенция по лозата и виното (Executive Agency on Vine and Wine)

77.  Изпълнителна агенция по околна среда (Executive Environment Agency)

78.  Изпълнителна агенция по почвените ресурси (Executive Agency on Soil Resources)

79.  Изпълнителна агенция по рибарство и аквакултури (Executive Agency on Fisheries and Aquaculture)

80.  Изпълнителна агенция по селекция и репродукция в животновъдството (Executive Agency for Selection and Reproduction in Animal Husbandry)

81.  Изпълнителна агенция по сортоизпитване, апробация и семеконтрол (Executive Agency for Plant Variety Testing, Field Inspection and Seed Control)

82.   Изпълнителна агенция по трансплантация (Transplantation Executive Agency)

83.   Изпълнителна агенция по хидромелиорации (Executive Agency on Hydromelioration)

84.   Комисията за защита на потребителите (Commission for Consumer Protection)

85.   Контролно-техническата инспекция (Control Technical Inspectorate)

86.   Национална агенция за приходите (National Revenue Agency)

87.   Национална ветеринарномедицинска служба (National Veterinary Service)

88.   Национална служба за растителна защита (National Service for Plant Protection)

89.   Национална служба по зърното и фуражите (National Grain and Feed Service)

90.   Държавна агенция по горите (State Forestry Agency)

91.   Висшата атестационна комисия (Higher Attestation Commission)

92.   Национална агенция за оценяване и акредитация (National Evaluation and Accreditation Agency)

93.   Националната агенция за професионално образование и обучение (National Agency for Vocational Education and Training)

94.   Национална комисия за борба с трафика на хора (Bulgarian National Anti-Trafficking Commission)

95.   Дирекция "Материално-техническо осигуряване и социално обслужване" на Министерство на вътрешните работи (Directorate "Material-technical Ensuring and Social Service" at the Ministry of the Interior)

96.   Дирекция "Оперативно издирване" на Министерство на вътрешните работи (Directorate "Operative Investigation" at the Ministry of the Interior)

97.   Дирекция "Финансово-ресурсно осигуряване" на Министерство на вътрешните работи (Directorate "Financial and Resource Ensuring" at the Ministry of the Interior)

98.   Изпълнителна агенция "Военни клубове и информация" (Executive Agency "Military Clubs and Information")

99.   Изпълнителна агенция "Държавна собственост на Министерството на отбраната" (Executive Agency "State Property at the Ministry of Defence")

100.  Изпълнителна агенция "Изпитвания и контролни измервания на въоръжение, техника и имущества"(Executive Agency "Testing and Control Measurements of Arms, Equipment and Property")

101.  Изпълнителна агенция "Социални дейности на Министерството на отбраната" (Executive Agency "Social Activities at the Ministry of Defence")

102.  Национален център за информация и документация (National Center for Information and Documentation)

103.  Национален център по радиобиология и радиационна защита (National Centre for Radiobiology and Radiation Protection)

104.  Национална служба "Полиция" (National Office "Police")

105.  Национална служба "Пожарна безопасност и защита на населението" (National Office "Fire Safety and Protection of the Population")

106.  Национална служба за съвети в земеделието (National Agricultural Advisory Service)

107.  Служба "Военна информация" (Military Information Service)

108.  Служба "Военна полиция" (Military Police)

109.  Авиоотряд 28 (Airsquad 28)

## CZECH REPUBLIC

1.  Ministerstvo dopravy (Ministry of Transport)

2.  Ministerstvo financí (Ministry of Finance)

3.  Ministerstvo kultury (Ministry of Culture)

4.  Ministerstvo obrany (Ministry of Defence)

5.  Ministerstvo pro místní rozvoj (Ministry for Regional Development)

6.  Ministerstvo práce a sociálních věcí (Ministry of Labour and Social Affairs)

7.  Ministerstvo průmyslu a obchodu (Ministry of Industry and Trade)

8.  Ministerstvo spravedlnosti (Ministry of Justice)

9.  Ministerstvo školství, mládeže a tělovýchovy (Ministry of Education, Youth and Sports)

10.  Ministerstvo vnitra (Ministry of the Interior)

11.  Ministerstvo zahraničních věcí (Ministry of Foreign Affairs)

12.  Ministerstvo zdravotnictví (Ministry of Health)

13.  Ministerstvo zemědělství (Ministry of Agriculture)

14.  Ministerstvo životního prostředí (Ministry of the Environment)

15.  Poslanecká sněmovna PČR (Chamber of Deputies of the Parliament of the Czech Republic)

16.  Senát PČR (Senate of the Parliament of the Czech Republic)

17.  Kancelář prezidenta (Office of the President)

18.  Český statistický úřad (Czech Statistical Office)

19.  Český úřad zeměměřičský a katastrální (Czech Office for Surveying, Mapping and Cadastre)

20.  Úřad průmyslového vlastnictví (Industrial Property Office)

21.  Úřad pro ochranu osobních údajů (Office for Personal Data Protection)

22.  Bezpečnostní informační služba (Security Information Service)

23.  Národní bezpečnostní úřad (National Security Authority)

24.  Česká akademie věd (Academy of Sciences of the Czech Republic)

25. Vězeňská služba (Prison Service)

26. Český báňský úřad (Czech Mining Authority)

27. Úřad pro ochranu hospodářské soutěže (Office for the Protection of Competition)

28. Správa státních hmotných rezerv (Administration of the State Material Reserves)

29. Státní úřad pro jadernou bezpečnost (State Office for Nuclear Safety)

30. Energetický regulační úřad (Energy Regulatory Office)

31. Úřad vlády České republiky (Office of the Government of the Czech Republic)

32. Ústavní soud (Constitutional Court)

33. Nejvyšší soud (Supreme Court)

34. Nejvyšší správní soud (Supreme Administrative Court)

35. Nejvyšší státní zastupitelství (Supreme Public Prosecutor's Office)

36. Nejvyšší kontrolní úřad (Supreme Audit Office)

37. Kancelář Veřejného ochránce práv (Office of the Public Defender of Rights)

38. Grantová agentura České republiky (Grant Agency of the Czech Republic)

39. Státní úřad inspekce práce (State Labour Inspection Office)

40. Český telekomunikační úřad (Czech Telecommunication Office)

41. Ředitelství silnic a dálnic ČR (ŘSD) (Road and Motorway Directorate of the Czech Republic)

## DENMARK

1. Folketinget — The Danish Parliament Rigsrevisionen — The National Audit Office

2. Statsministeriet — The Prime Minister's Office

3. Udenrigsministeriet — Ministry of Foreign Affairs

4. Beskæftigelsesministeriet — Ministry of Employment
5 styrelser og institutioner — 5 agencies and institutions

5. Domstolsstyrelsen — The Court Administration

6. Finansministeriet — Ministry of Finance
5 styrelser og institutioner — 5 agencies and institutions

7. Forsvarsministeriet — Ministry of Defence
5 styrelser og institutioner — 5 agencies and Institutions

8. Ministeriet for Sundhed og Forebyggelse — Ministry of the Interior and Health
Adskillige styrelser og institutioner, herunder Statens Serum Institut — Several agencies and institutions, including Statens Serum Institut

9. Justitsministeriet — Ministry of Justice
Rigspolitichefen, anklagemyndigheden samt 1 direktorat og et antal styrelser — Commissioner of Police, 1 directorate and a number of agencies

10. Kirkeministeriet — Ministry of Ecclesiastical Affairs

      10 stiftsøvrigheder — 10 diocesan authorities

11.      Kulturministeriet — Ministry of Culture
      4 styrelser samt et antal statsinstitutioner — A Department and a number of institutions

12.      Miljøministeriet — Ministry of the Environment
      5 styrelser — 5 agencies

13.      Ministeriet for Flygtninge, Invandrere og Integration — Ministry of Refugee, Immigration and Integration Affairs
      1 styrelse — 1 agency

14.      Ministeriet for Fødevarer, Landbrug og Fiskeri — Ministry of Food, Agriculture and Fisheries
      4 direktorater og institutioner — 4 directorates and institutions

15.      Ministeriet for Videnskab, Teknologi og Udvikling — Ministry of Science, Technology and Innovation
      Adskillige styrelser og institutioner, Forskningscenter Risø og Statens uddannelsesbygninger — Several agencies and institutions, including Risoe National Laboratory and Danish National Research and Education Buildings

16.      Skatteministeriet — Ministry of Taxation
      1 styrelse og institutioner — 1 agency and several institutions

17.      Velfærdsministeriet — Ministry of Welfare
      3 styrelser og institutioner — 3 agencies and several institutions

18.      Transportministeriet — Ministry of Transport
      7 styrelser og institutioner, herunder Øresundsbrokonsortiet — 7 agencies and institutions, including Øresundsbrokonsortiet

19.      Undervisningsministeriet — Ministry of Education
      3 styrelser, 4 undervisningsinstitutioner og 5 andre institutioner — 3 agencies, 4 educational establishments, 5 other institutions

20.      Økonomi- og Erhvervsministeriet — Ministry of Economic and Business Affairs
      Adskillige styrelser og institutioner — Several agencies and institutions

21.      Klima- og Energiministeriet — Ministry for Climate and Energy
      3 styrelser og institutioner — 3 agencies and institutions

## GERMANY

| No. | English | German |
|---|---|---|
| 1. | Federal Foreign Office | Auswärtiges Amt |
| 2. | Federal Chancellery | Bundeskanzleramt |
| 3. | Federal Ministry of Labour and Social Affairs | Bundesministerium für Arbeit und Soziales |
| 4. | Federal Ministry of Education and Research | Bundesministerium für Bildung und Forschung |
| 5. | Federal Ministry for Food, Agriculture and Consumer Protection | Bundesministerium für Ernährung, Landwirtschaft und Verbraucherschutz |
| 6. | Federal Ministry of Finance | Bundesministerium der Finanzen |

| 7. | Federal Ministry of the Interior (civil goods only) | Bundesministerium des Innern |
|---|---|---|
| 8. | Federal Ministry of Health | Bundesministerium für Gesundheit |
| 9. | Federal Ministry for Family Affairs, Senior Citizens, Women and Youth | Bundesministerium für Familie, Senioren, Frauen und Jugend |
| 10. | Federal Ministry of Justice | Bundesministerium der Justiz |
| 11. | Federal Ministry of Transport, Building and Urban Affairs | Bundesministerium für Verkehr, Bau und Stadtentwicklung |
| 12. | Federal Ministry of Economic Affairs and Technology | Bundesministerium für Wirtschaft und Technologie |
| 13. | Federal Ministry for Economic Co-operation and Development | Bundesministerium für wirtschaftliche Zusammenarbeit und Entwicklung |
| 14. | Federal Ministry of Defence | Bundesministerium der Verteidigung |
| 15. | Federal Ministry of Environment, Nature Conservation and Reactor Safety | Bundesministerium für Umwelt, Naturschutz und Reaktorsicherheit |

## ESTONIA

1.  Vabariigi Presidendi Kantselei (Office of the President of the Republic of Estonia)

2.  Eesti Vabariigi Riigikogu (Parliament of the Republic of Estonia)

3.  Eesti Vabariigi Riigikohus (Supreme Court of the Republic of Estonia)

4.  Riigikontroll (The State Audit Office of the Republic of Estonia)

5.  Õiguskantsler (Legal Chancellor)

6.  Riigikantselei (The State Chancellery)

7.  Rahvusarhiiv (The National Archives of Estonia)

8.  Haridus- ja Teadusministeerium (Ministry of Education and Research)

9.  Justiitsministeerium (Ministry of Justice)

10.  Kaitseministeerium (Ministry of Defence)

11.  Keskkonnaministeerium (Ministry of Environment)

12.  Kultuuriministeerium (Ministry of Culture)

13.  Majandus- ja Kommunikatsiooniministeerium (Ministry of Economic Affairs and Communications)

14.  Põllumajandusministeerium (Ministry of Agriculture)

15.  Rahandusministeerium (Ministry of Finance)

16.  Siseministeerium (Ministry of Internal Affairs)

17.  Sotsiaalministeerium (Ministry of Social Affairs)

18.  Välisministeerium (Ministry of Foreign Affairs)

19.  Keeleinspektsioon (The Language Inspectorate)

20.     Riigiprokuratuur (Prosecutor's Office)

21.     Teabeamet (The Information Board)

22.     Maa-amet (Estonian Land Board)

23.     Keskkonnainspektsioon (Environmental Inspectorate)

24.     Metsakaitse- ja Metsauuenduskeskus (Centre of Forest Protection and Silviculture)

25.     Muinsuskaitseamet (The Heritage Board)

26.     Patendiamet (Patent Office)

27.     Tehnilise Järelevalve Amet (The Estonian Technical Surveillance Authority)

28.     Tarbijakaitseamet (The Consumer Protection Board)

29.     Riigihangete Amet (Public Procurement Office)

30.     Taimetoodangu Inspektsioon (The Plant Production Inspectorate)

31.     Põllumajanduse Registrite ja Informatsiooni Amet (Agricultural Registers and Information Board)

32.     Veterinaar- ja Toiduamet (The Veterinary and Food Board)

33.     Konkurentsiamet (The Estonian Competition Authority)

34.     Maksu –ja Tolliamet (Tax and Customs Board)

35.     Statistikaamet (Statistics Estonia)

36.     Kaitsepolitseiamet (The Security Police Board)

37.     Kodakondsus- ja Migratsiooniamet (Citizenship and Migration Board)

38.     Piirivalveamet (National Board of Border Guard)

39.     Politseiamet (National Police Board)

40.     Eesti Kohtuekspertiisi ja Instituut (Forensic Service Centre)

41.     Keskkriminaalpolitsei (Central Criminal Police)

42.     Päästeamet (The Rescue Board)

43.     Andmekaitse Inspektsioon (Estonian Data Protection Inspectorate)

44.     Ravimiamet (State Agency of Medicines)

45.     Sotsiaalkindlustusamet (Social Insurance Board)

46.     Tööturuamet (Labour Market Board)

47.     Tervishoiuamet (Health Care Board)

48.     Tervisekaitseinspektsioon (Health Protection Inspectorate)

49.     Tööinspektsioon (Labour Inspectorate)

50.     Lennuamet (Estonian Civil Aviation Administration)

51.     Maanteeamet (Estonian Road Administration)

52.     Veeteede Amet (Maritime Administration)

53.    Julgestuspolitsei (Central Law Enforcement Police)

54.    Kaitseressursside Amet (Defence Resources Agency)

55.    Kaitseväe Logistikakeskus (Logistics Centre of Defence Forces)

**GREECE**

1.    Υπουργείο Εσωτερικών (Ministry of Interior)

2.    Υπουργείο Εξωτερικών (Ministry of Foreign Affairs)

3.    Υπουργείο Οικονομίας και Οικονομικών (Ministry of Economy and Finance)

4.    Υπουργείο Ανάπτυξης (Ministry of Development)

5.    Υπουργείο Δικαιοσύνης (Ministry of Justice)

6.    Υπουργείο Εθνικής Παιδείας και Θρησκευμάτων (Ministry of Education and Religion)

7.    Υπουργείο Πολιτισμού (Ministry of Culture)

8.    Υπουργείο Υγείας και Κοινωνικής Αλληλεγγύης (Ministry of Health and Social Solidarity)

9.    Υπουργείο Περιβάλλοντος, Χωροταξίας και Δημοσίων Έργων (Ministry of Environment, Physical Planning and Public Works)

10.    Υπουργείο Απασχόλησης και Κοινωνικής Προστασίας (Ministry of Employment and Social Protection)

11.    Υπουργείο Μεταφορών και Επικοινωνιών (Ministry of Transport and Communications)

12.    Υπουργείο Αγροτικής Ανάπτυξης και Τροφίμων (Ministry of Rural Development and Food)

13.    Υπουργείο Εμπορικής Ναυτιλίας, Αιγαίου και Νησιωτικής Πολιτικής (Ministry of Mercantile Marine, Aegean and Island Policy)

14.    Υπουργείο Μακεδονίας- Θράκης (Ministry of Macedonia and Thrace)

15.    Γενική Γραμματεία Επικοινωνίας (General Secretariat of Communication)

16.    Γενική Γραμματεία Ενημέρωσης (General Secretariat of Information)

17.    Γενική Γραμματεία Νέας Γενιάς (General Secretariat for Youth)

18.    Γενική Γραμματεία Ισότητας (General Secretariat of Equality)

19.    Γενική Γραμματεία Κοινωνικών Ασφαλίσεων (General Secretariat for Social Security)

20.    Γενική Γραμματεία Απόδημου Ελληνισμού (General Secretariat for Greeks Living Abroad)

21.    Γενική Γραμματεία Βιομηχανίας (General Secretariat for Industry)

22.    Γενική Γραμματεία Έρευνας και Τεχνολογίας (General Secretariat for Research and Technology)

23.    Γενική Γραμματεία Αθλητισμού (General Secretariat for Sports)

24.    Γενική Γραμματεία Δημοσίων Έργων (General Secretariat for Public Works)

25.    Γενική Γραμματεία Εθνικής Στατιστικής Υπηρεσίας Ελλάδος (National Statistical Service)

26.    Εθνικό Συμβούλιο Κοινωνικής Φροντίδας (National Welfare Council)

27.    Οργανισμός Εργατικής Κατοικίας (Workers' Housing Organisation)

28.    Εθνικό Τυπογραφείο (National Printing Office)

29.    Γενικό Χημείο του Κράτους (General State Laboratory)

30.    Ταμείο Εθνικής Οδοποιίας (Greek Highway Fund)

31.    Εθνικό Καποδιστριακό Πανεπιστήμιο Αθηνών (University of Athens)

32.    Αριστοτέλειο Πανεπιστήμιο Θεσσαλονίκης (University of Thessaloniki)

33.    Δημοκρίτειο Πανεπιστήμιο Θράκης (University of Thrace)

34.    Πανεπιστήμιο Αιγαίου (University of Aegean)

35.    Πανεπιστήμιο Ιωαννίνων (University of Ioannina)

36.    Πανεπιστήμιο Πατρών (University of Patras)

37.    Πανεπιστήμιο Μακεδονίας (University of Macedonia)

38.    Πολυτεχνείο Κρήτης (Polytechnic School of Crete)

39.    Σιβιτανίδειος Δημόσια Σχολή Τεχνών και Επαγγελμάτων (Sivitanidios Technical School)

40.    Αιγινήτειο Νοσοκομείο (Eginitio Hospital)

41.    Αρεταίειο Νοσοκομείο (Areteio Hospital)

42.    Εθνικό Κέντρο Δημόσιας Διοίκησης (National Centre of Public Administration)

43.    Οργανισμός Διαχείρισης Δημοσίου Υλικού (A.E. Public Material Management Organisation)

44.    Οργανισμός Γεωργικών Ασφαλίσεων (Farmers' Insurance Organisation)

45.    Οργανισμός Σχολικών Κτιρίων (School Building Organisation)

46.    Γενικό Επιτελείο Στρατού (Army General Staff)

47.    Γενικό Επιτελείο Ναυτικού (Navy General Staff)

48.    Γενικό Επιτελείο Αεροπορίας (Airforce General Staff)

49.    Ελληνική Επιτροπή Ατομικής Ενέργειας (Greek Atomic Energy Commission)

50.    Γενική Γραμματεία Εκπαίδευσης Ενηλίκων (General Secretariat for Further Education)

51.    Υπουργείο Εθνικής Άμυνας (Ministry of National Defence)

52.    Γενική Γραμματεία Εμπορίου (General Secretariat of Commerce)

53.    Ελληνικά Ταχυδρομεία Hellenic Post (EL. TA)

## SPAIN

Presidencia de Gobierno

Ministerio de Asuntos Exteriores y de Cooperación

Ministerio de Justicia

Ministerio de Defensa

Ministerio de Economía y Hacienda

Ministerio del Interior

Ministerio de Fomento

Ministerio de Educación y Ciencia

Ministerio de Industria, Turismo y Comercio

Ministerio de Trabajo y Asuntos Sociales

Ministerio de Agricultura, Pesca y Alimentación

Ministerio de la Presidencia

Ministerio de Administraciones Públicas

Ministerio de Cultura

Ministerio de Sanidad y Consumo

Ministerio de Medio Ambiente

Ministerio de Vivienda

## FRANCE

**1.      Ministères**

Services du Premier ministre

Ministère chargé de la santé, de la jeunesse et des sports

Ministère chargé de l'intérieur, de l'outre-mer et des collectivités territoriales

Ministère chargé de la justice

Ministère chargé de la défense

Ministère chargé des affaires étrangères et européennes

Ministère chargé de l'éducation nationale

Ministère chargé de l'économie, des finances et de l'emploi

Secrétariat d'Etat aux transports

Secrétariat d'Etat aux entreprises et au commerce extérieur

Ministère chargé du travail, des relations sociales et de la solidarité

Ministère chargé de la culture et de la communication

Ministère chargé du budget, des comptes publics et de la fonction publique

Ministère chargé de l'agriculture et de la pêche

Ministère chargé de l'enseignement supérieur et de la recherche

Ministère chargé de l'écologie, du développement et de l'aménagement durables

Secrétariat d'Etat à la fonction publique

Ministère chargé du logement et de la ville

Secrétariat d'Etat à la coopération et à la francophonie

Secrétariat d'Etat à l'outre-mer

Secrétariat d'Etat à la jeunesse et aux sports et de la vie associative

Secrétariat d'Etat aux anciens combattants

Ministère chargé de l'immigration, de l'intégration, de l'identité nationale et du co-développement

Secrétariat d'Etat en charge de la prospective et de l'évaluation des politiques publiques

Secrétariat d'Etat aux affaires européennes

Secrétariat d'Etat aux affaires étrangères et aux droits de l'homme

Secrétariat d'Etat à la consommation et au tourisme

Secrétariat d'Etat à la politique de la ville

Secrétariat d'Etat à la solidarité

Secrétariat d'Etat en charge de l'emploi

Secrétariat d'Etat en charge du commerce, de l'artisanat, des PME, du tourisme et des services

Secrétariat d'Etat en charge du développement de la région-capitale

Secrétariat d'Etat en charge de l'aménagement du territoire

**2.      Établissements publics nationaux**

Académie de France à Rome

Académie de marine

Académie des sciences d'outre-mer

Académie des technologies

Agence Centrale des Organismes de Sécurité Sociale (A.C.O.S.S.)

Agences de l'eau

Agence de biomédecine

Agence pour l'enseignement du français à l'étranger

Agence française de sécurité sanitaire des aliments

Agence française de sécurité sanitaire de l'environnement et du travail

Agence Nationale de l'Accueil des Etrangers et des migrations

Agence nationale pour l'amélioration des conditions de travail (ANACT)

Agence nationale pour l'amélioration de l'habitat (ANAH)

Agence Nationale pour la Cohésion Sociale et l'Egalité des Chances

Agence pour la garantie du droit des mineurs

Agence nationale pour l'indemnisation des français d'outre-mer (ANIFOM)

Assemblée permanente des chambres d'agriculture (APCA)

Bibliothèque nationale de France

Bibliothèque nationale et universitaire de Strasbourg

Caisse des Dépôts et Consignations

Caisse nationale des autoroutes (CNA)

Caisse nationale militaire de sécurité sociale (CNMSS)

Caisse de garantie du logement locatif social

Casa de Velasquez

Centre d'enseignement zootechnique

Centre d'études de l'emploi

Centre hospitalier national des Quinze-Vingts

Centre international d'études supérieures en sciences agronomiques (Montpellier Sup Agro)

Centre des liaisons européennes et internationales de sécurité sociale

Centre des Monuments Nationaux

Centre national d'art et de culture Georges Pompidou

Centre national des arts plastiques

Centre national de la cinématographie

Institut national supérieur de formation et de recherche pour l'éducation des jeunes handicapés et les enseignements adaptés

Centre National d'Etudes et d'expérimentation du machinisme agricole, du génie rural, des eaux et des forêts (CEMAGREF)

Ecole nationale supérieure de Sécurité Sociale

Centre national du livre

Centre national de documentation pédagogique

Centre national des œuvres universitaires et scolaires (CNOUS)

Centre national professionnel de la propriété forestière

Centre National de la Recherche Scientifique (C.N.R.S)

Centres d'éducation populaire et de sport (CREPS)

Centres régionaux des œuvres universitaires (CROUS)

Collège de France

Conservatoire de l'espace littoral et des rivages lacustres

Conservatoire National des Arts et Métiers

Conservatoire national supérieur de musique et de danse de Paris

Conservatoire national supérieur de musique et de danse de Lyon

Conservatoire national supérieur d'art dramatique

Ecole centrale de Lille

Ecole centrale de Lyon

École centrale des arts et manufactures

École française d'archéologie d'Athènes

École française d'Extrême-Orient

École française de Rome

École des hautes études en sciences sociales

Ecole du Louvre

École nationale d'administration

École nationale de l'aviation civile (ENAC)

École nationale des Chartes

École nationale d'équitation

Ecole Nationale du Génie de l'Eau et de l'environnement de Strasbourg

Écoles nationales d'ingénieurs

Ecole nationale d'ingénieurs des industries des techniques agricoles et alimentaires de Nantes

Écoles nationales d'ingénieurs des travaux agricoles

École nationale de la magistrature

Écoles nationales de la marine marchande

École nationale de la santé publique (ENSP)

École nationale de ski et d'alpinisme

École nationale supérieure des arts décoratifs

École nationale supérieure des arts et industries textiles Roubaix

Ecole nationale supérieure des arts et techniques du théâtre

Écoles nationales supérieures d'arts et métiers

École nationale supérieure des beaux-arts

École nationale supérieure de céramique industrielle

École nationale supérieure de l'électronique et de ses applications (ENSEA)

Ecole Nationale Supérieure des Sciences de l'information et des bibliothécaires

Écoles nationales vétérinaires

École nationale de voile

Écoles normales supérieures

École polytechnique

École de viticulture — Avize (Marne)

Etablissement national d'enseignement agronomique de Dijon

Établissement national des invalides de la marine (ENIM)

Établissement national de bienfaisance Koenigswarter

Fondation Carnegie

Fondation Singer-Polignac

Haras nationaux

Hôpital national de Saint-Maurice

Institut français d'archéologie orientale du Caire

Institut géographique national

Institut National des Appellations d'origine

Institut national des hautes études de sécurité

Institut de veille sanitaire

Institut National d'enseignement supérieur et de recherche agronomique et agroalimentaire de Rennes

Institut National d'Etudes Démographiques (I.N.E.D)

Institut National d'Horticulture

Institut National de la jeunesse et de l'éducation populaire

Institut national des jeunes aveugles — Paris

Institut national des jeunes sourds — Bordeaux

Institut national des jeunes sourds — Chambéry

Institut national des jeunes sourds — Metz

Institut national des jeunes sourds — Paris

Institut national de physique nucléaire et de physique des particules (I.N.P.N.P.P)

Institut national de la propriété industrielle

Institut National de la Recherche Agronomique (I.N.R.A)

Institut National de la Recherche Pédagogique (I.N.R.P)

Institut National de la Santé et de la Recherche Médicale (I.N.S.E.R.M)

Institut national d'histoire de l'art (I.N.H.A.)

Institut National des Sciences de l'Univers

Institut National des Sports et de l'Education Physique

Instituts nationaux polytechniques

Instituts nationaux des sciences appliquées

Institut national de recherche en informatique et en automatique (INRIA)

Institut national de recherche sur les transports et leur sécurité (INRETS)

Institut de Recherche pour le Développement

Instituts régionaux d'administration

Institut des Sciences et des Industries du vivant et de l'environnement (Agro Paris Tech)

Institut supérieur de mécanique de Paris

Institut Universitaires de Formation des Maîtres

Musée de l'armée

Musée Gustave-Moreau

Musée du Louvre

Musée du Quai Branly

Musée national de la marine

Musée national J.-J.-Henner

Musée national de la Légion d'honneur

Musée de la Poste

Muséum National d'Histoire Naturelle

Musée Auguste-Rodin

Observatoire de Paris

Office français de protection des réfugiés et apatrides

Office National des Anciens Combattants et des Victimes de Guerre (ONAC)

Office national de la chasse et de la faune sauvage

Office National de l'eau et des milieux aquatiques

Office national d'information sur les enseignements et les professions (ONISEP)

Office universitaire et culturel français pour l'Algérie

Palais de la découverte

Parcs nationaux

Universités

**3.        Institutions, autorités et juridictions indépendantes**

Présidence de la République

Assemblée Nationale

Sénat

Conseil constitutionnel

Conseil économique et social

Conseil supérieur de la magistrature

Agence française contre le dopage

Autorité de contrôle des assurances et des mutuelles

Autorité de contrôle des nuisances sonores aéroportuaires

Autorité de régulation des communications électroniques et des postes

Autorité de sûreté nucléaire

Comité national d'évaluation des établissements publics à caractère scientifique, culturel et professionnel

Commission d'accès aux documents administratifs

Commission consultative du secret de la défense nationale

Commission nationale des comptes de campagne et des financements politiques

Commission nationale de contrôle des interceptions de sécurité

Commission nationale de déontologie de la sécurité

Commission nationale du débat public

Commission nationale de l'informatique et des libertés

Commission des participations et des transferts

Commission de régulation de l'énergie

Commission de la sécurité des consommateurs

Commission des sondages

Commission de la transparence financière de la vie politique

Conseil de la concurrence

Conseil supérieur de l'audiovisuel

Défenseur des enfants

Haute autorité de lutte contre les discriminations et pour l'égalité

Haute autorité de santé

Médiateur de la République

Cour de justice de la République

Tribunal des Conflits

Conseil d'Etat

Cours administratives d'appel

Tribunaux administratifs

Cour des Comptes

Chambres régionales des Comptes

Cours et tribunaux de l'ordre judiciaire (Cour de Cassation, Cours d'Appel, Tribunaux d'instance et Tribunaux de grande instance)

**4.        Autre organisme public national**

Union des groupements d'achats publics (UGAP)

Agence Nationale pour l'emploi (A.N.P.E)

Autorité indépendante des marchés financiers

Caisse Nationale des Allocations Familiales (CNAF)

Caisse Nationale d'Assurance Maladie des Travailleurs Salariés (CNAMS)

Caisse Nationale d'Assurance-Vieillesse des Travailleurs Salariés (CNAVTS)

## CROATIA

Hrvatski sabor (Croatian Parliament)

Predsjednik Republike Hrvatske (President of the Republic of Croatia)

Ured predsjednika Republike Hrvatske (Office of the President of the Republic of Croatia)

Ured predsjednika Republike Hrvatske po prestanku obnašanja dužnosti (Office of the President of the Republic of Croatia after the expiry of the term of office)

Vlada Republike Hrvatske (Government of the of the Republic of Croatia)

uredi Vlade Republike Hrvatske (Offices of the Government of the Republic of Croatia)

Ministarstvo gospodarstva (Ministry of Economy)

Ministarstvo regionalnoga razvoja i fondova Europske unije (Ministry of Regional Development and EU Funds)

Ministarstvo financija (Ministry of Finance)

Ministarstvo obrane (Ministry of Defence)

Ministarstvo vanjskih i europskih poslova (Ministry of Foreign and European Affairs)

Ministarstvo unutarnjih poslova (Ministry of the Interior)

Ministarstvo pravosuđa (Ministry of Justice)

Ministarstvo uprave (Ministry of Public Administration)

Ministarstvo poduzetništva i obrta (Ministry of Entrepreneurship and Crafts)

Ministarstvo rada i mirovinskog sustava (Ministry of Labour and Pension System)

Ministarstvo pomorstva, prometa i infrastrukture (Ministry of Maritime Affairs, Transport and Infrastructure)

Ministarstvo poljoprivrede (Ministry of Agriculture)

Ministarstvo turizma (Ministry of Tourism)

Ministarstvo zaštite okoliša i prirode (Ministry of Environmental and Nature Protection)

Ministarstvo graditeljstva i prostornoga uređenja (Ministry of Construction and Physical Planning)

Ministarstvo branitelja (Ministry of Veterans' Affairs)

Ministarstvo socijalne politike i mladih (Ministry of Social Policy and Youth)

Ministarstvo zdravlja (Ministry of Health)

Ministarstvo znanosti, obrazovanja i sporta (Ministry of Science, Education and Sports)

Ministarstvo kulture (Ministry of Culture)

državne upravne organizacije (State administrative organisations)

uredi državne uprave u županijama (County state administration offices)

Ustavni sud Republike Hrvatske (Constitutional Court of the Republic of Croatia)

Vrhovni sud Republike Hrvatske (Supreme Court of the Republic of Croatia)

sudovi (Courts)

Državno sudbeno vijeće (State Judiciary Council)

državna odvjetništva (State attorney's offices)

Državnoodvjetničko vijeće (State Prosecutor's Council)

pravobraniteljstva (Ombudsman's offices)

Državna komisija za kontrolu postupaka javne nabave (State Commission for the Supervision of Public Procurement Procedures)

Hrvatska narodna banka (Croatian National Bank)

državne agencije i uredi (State agencies and offices)

Državni ured za reviziju (State Audit Office)

## IRELAND

1.      President's Establishment

2.      Houses of the Oireachtas — [Parliament]

3.      Department of the Taoiseach — [Prime Minister]

4.      Central Statistics Office

5.      Department of Finance

6.      Office of the Comptroller and Auditor General

7.      Office of the Revenue Commissioners

8.      Office of Public Works

9.      State Laboratory

10.     Office of the Attorney General

11.     Office of the Director of Public Prosecutions

12.    Valuation Office

13.    Commission for Public Service Appointments

14.    Office of the Ombudsman

15.    Chief State Solicitor's Office

16.    Department of Justice, Equality and Law Reform

17.    Courts Service

18.    Prisons Service

19.    Office of the Commissioners of Charitable Donations and Bequests

20.    Department of the Environment, Heritage and Local Government

21.    Department of Education and Science

22.    Department of Communications, Energy and Natural Resources

23.    Department of Agriculture, Fisheries and Food

24.    Department of Transport

25.    Department of Health and Children

26.    Department of Enterprise, Trade and Employment

27.    Department of Arts, Sports and Tourism

28.    Department of Defence

29.    Department of Foreign Affairs

30.    Department of Social and Family Affairs

31.    Department of Community, Rural and Gaeltacht — [Gaelic speaking regions] Affairs

32.    Arts Council

33.    National Gallery


# ITALY

**I.    Purchasing bodies:**

1.    Presidenza del Consiglio dei Ministri (Presidency of the Council of Ministers)

2.    Ministero degli Affari Esteri (Ministry of Foreign Affairs)

3.    Ministero dell'Interno (Ministry of Interior)

4.    Ministero della Giustizia e Uffici giudiziari (esclusi i giudici di pace) (Ministry of Justice and the Judicial Offices (other than the *giudici di pace*)

5.    Ministero della Difesa (Ministry of Defence)

6.    Ministero dell'Economia e delle Finanze (Ministry of Economy and Finance)

7.    Ministero dello Sviluppo Economico (Ministry of Economic Development)

8.    Ministero del Commercio internazionale (Ministry of International Trade)

9.    Ministero delle Comunicazioni (Ministry of Communications)

10.    Ministero delle Politiche Agricole e Forestali (Ministry of Agriculture and Forest Policies)

11.    Ministero dell'Ambiente e Tutela del Territorio e del Mare (Ministry of Environment, Land and Sea)

12.    Ministero delle Infrastrutture (Ministry of Infrastructure)

13.    Ministero dei Trasporti (Ministry of Transport)

14.    Ministero del Lavoro e delle politiche sociali e della Previdenza sociale (Ministry of Labour, Social Policy and Social Security)

15.    Ministero della Solidarietà sociale (Ministry of Social Solidarity)

16.    Ministero della Salute (Ministry of Health)

17.    Ministero dell' Istruzione dell' università e della ricerca (Ministry of Education, University and Research)

18.    Ministero per i Beni e le Attività culturali comprensivo delle sue articolazioni periferiche (Ministry of Heritage and Culture, including its subordinated entities)

**II.    Other National public bodies:**

CONSIP (Concessionaria Servizi Informatici Pubblici)[55]

## CYPRUS

1.    (a)    Προεδρία και Προεδρικό Μέγαρο (Presidency and Presidential Palace)

    (b)    Γραφείο Συντονιστή Εναρμόνισης (Office of the Coordinator for Harmonisation)

2.    Υπουργικό Συμβούλιο (Council of Ministers)

3.    Βουλή των Αντιπροσώπων (House of Representatives)

4.    Δικαστική Υπηρεσία (Judicial Service)

5.    Νομική Υπηρεσία της Δημοκρατίας (Law Office of the Republic)

6.    Ελεγκτική Υπηρεσία της Δημοκρατίας (Audit Office of the Republic)

7.    Επιτροπή Δημόσιας Υπηρεσίας (Public Service Commission)

8.    Επιτροπή Εκπαιδευτικής Υπηρεσίας (Educational Service Commission)

9.    Γραφείο Επιτρόπου Διοικήσεως (Office of the Commissioner for Administration (Ombudsman))

10.    Επιτροπή Προστασίας Ανταγωνισμού (Commission for the Protection of Competition)

11.    Υπηρεσία Εσωτερικού Ελέγχου (Internal Audit Service)

12.    Γραφείο Προγραμματισμού (Planning Bureau)

---

[55]    Acts as the central purchasing entity for all the Italian public administration.

13.     Γενικό Λογιστήριο της Δημοκρατίας (Treasury of the Republic)

14.     Γραφείο Επιτρόπου Προστασίας Δεδομένων Προσωπικού Χαρακτήρα (Office of the Personal Character Data Protection Commissioner)

15.     Γραφείο Εφόρου Δημοσίων Ενισχύσεων (Office of the Commissioner for the Public Aid)

16.     Αναθεωρητική Αρχή Προσφορών (Tender Review Body)

17.     Υπηρεσία Εποπτείας και Ανάπτυξης Συνεργατικών Εταιρειών (Cooperative Societies´ Supervision and Development Authority)

18.     Αναθεωρητική Αρχή Προσφύγων (Refugees' Review Body)

19.     Υπουργείο Άμυνας (Ministry of Defence)

20.     (a)    Υπουργείο Γεωργίας, Φυσικών Πόρων και Περιβάλλοντος (Ministry of Agriculture, Natural Resources and Environment)

          (b)    Τμήμα Γεωργίας (Department of Agriculture)

          (c)    Κτηνιατρικές Υπηρεσίες (Veterinary Services)

          (d)    Τμήμα Δασών (Forest Department)

          (e)    Τμήμα Αναπτύξεως Υδάτων (Water Development Department)

          (f)    Τμήμα Γεωλογικής Επισκόπησης (Geological Survey Department)

          (g)    Μετεωρολογική Υπηρεσία (Meteorological Service)

          (h)    Τμήμα Αναδασμού (Land Consolidation Department)

          (i)    Υπηρεσία Μεταλλείων (Mines Service)

          (j)    Ινστιτούτο Γεωργικών Ερευνών (Agricultural Research Institute)

          (k)    Τμήμα Αλιείας και Θαλάσσιων Ερευνών (Department of Fisheries and Marine Research)

21.     (a)    Υπουργείο Δικαιοσύνης και Δημόσιας Τάξεως (Ministry of Justice and Public Order)

          (b)    Αστυνομία (Police)

          (c)    Πυροσβεστική Υπηρεσία Κύπρου (Cyprus Fire Service)

          (d)    Τμήμα Φυλακών (Prison Department)

22.     (a)    Υπουργείο Εμπορίου, Βιομηχανίας και Τουρισμού (Ministry of Commerce, Industry and Tourism)

          (b)    Τμήμα Εφόρου Εταιρειών και Επίσημου Παραλήπτη (Department of Registrar of Companies and Official Receiver)

23.     (a)    Υπουργείο Εργασίας και Κοινωνικών Ασφαλίσεων (Ministry of Labour and Social Insurance)

          (b)    Τμήμα Εργασίας (Department of Labour)

          (c)    Τμήμα Κοινωνικών Ασφαλίσεων (Department of Social Insurance)

          (d)    Τμήμα Υπηρεσιών Κοινωνικής Ευημερίας (Department of Social Welfare Services)

          (e)    Κέντρο Παραγωγικότητας Κύπρου (Productivity Centre Cyprus)

(f)    Ανώτερο Ξενοδοχειακό Ινστιτούτο Κύπρου (Higher Hotel Institute Cyprus)

(g)    Ανώτερο Τεχνολογικό Ινστιτούτο (Higher Technical Institute)

(h)    Τμήμα Επιθεώρησης Εργασίας (Department of Labour Inspection)

(i)    Τμήμα Εργασιακών Σχέσεων (Deperment of Labour Relations)

24.    (a)    Υπουργείο Εσωτερικών (Ministry of the Interior)

(b)    Επαρχιακές Διοικήσεις (District Administrations)

(c)    Τμήμα Πολεοδομίας και Οικήσεως (Town Planning and Housing Department)

(d)    Τμήμα Αρχείου Πληθυσμού και Μεταναστεύσεως (Civil Registry and Migration Department)

(e)    Τμήμα Κτηματολογίου και Χωρομετρίας (Department of Lands and Surveys)

(f)    Γραφείο Τύπου και Πληροφοριών (Press and Information Office)

(g)    Πολιτική Άμυνα (Civil Defence)

(h)    Υπηρεσία Μέριμνας και Αποκαταστάσεων Εκτοπισθέντων (Service for the care and rehabilitation of displaced persons)

(i)    Υπηρεσία Ασύλου (Asylum Service)

25.    Υπουργείο Εξωτερικών (Ministry of Foreign Affairs)

26.    (a)    Υπουργείο Οικονομικών (Ministry of Finance)

(b)    Τελωνεία (Customs and Excise)

(c)    Τμήμα Εσωτερικών Προσόδων (Department of Inland Revenue)

(d)    Στατιστική Υπηρεσία (Statistical Service)

(e)    Τμήμα Κρατικών Αγορών και Προμηθειών (Department of Government Purchasing and Supply)

(f)    Τμήμα Δημόσιας Διοίκησης και Προσωπικού (Public Administration and Personnel Department)

(g)    Κυβερνητικό Τυπογραφείο (Government Printing Office)

(h)    Τμήμα Υπηρεσιών Πληροφορικής (Department of Information Technology Services)

27.    Υπουργείο Παιδείας και Πολιτισμού (Ministry of Education and Culture)

28.    (a)    Υπουργείο Συγκοινωνιών και Έργων (Ministry of Communications and Works)

(b)    Τμήμα Δημοσίων Έργων (Department of Public Works)

(c)    Τμήμα Αρχαιοτήτων (Department of Antiquities)

(d)    Τμήμα Πολιτικής Αεροπορίας (Department of Civil Aviation)

(e)    Τμήμα Εμπορικής Ναυτιλίας (Department of Merchant Shipping)

(f)    Τμήμα Ταχυδρομικών Υπηρεσιών (Postal Services Department)

(g)    Τμήμα Οδικών Μεταφορών (Department of Road Transport)

(h)    Τμήμα Ηλεκτρομηχανολογικών Υπηρεσιών (Department of Electrical and Mechanical Services)

(i)     Τμήμα Ηλεκτρονικών Επικοινωνιών (Department of Electronic Telecommunications)

29.   (a)    Υπουργείο Υγείας (Ministry of Health)

(b)    Φαρμακευτικές Υπηρεσίες (Pharmaceutical Services)

(c)    Γενικό Χημείο (General Laboratory)

(d)    Ιατρικές Υπηρεσίες και Υπηρεσίες Δημόσιας Υγείας (Medical and Public Health Services)

(e)    Οδοντιατρικές Υπηρεσίες (Dental Services)

(f)    Υπηρεσίες Ψυχικής Υγείας (Mental Health Services)

# LATVIA

**A)    Ministrijas, īpašu ministru sekretariāti un to padotībā esošās iestādes (Ministries, secretariats of ministers for special assignments, and their subordinate institutions):**

1.    Aizsardzības ministrija un tās padotībā esošās iestādes (Ministry of Defence and subordinate institutions)

2.    Ārlietu ministrija un tas padotībā esošās iestādes (Ministry of Foreign Affairs and subordinate institutions)

3.    Ekonomikas ministrija un tās padotībā esošās iestādes (Ministry of Economics and subordinate institutions)

4.    Finanšu ministrija un tās padotībā esošās iestādes (Ministry of Finance and subordinate institutions)

5.    Iekšlietu ministrija un tās padotībā esošās iestādes (Ministry of the Interior Affairs and subordinate institutions)

6.    Izglītības un zinātnes ministrija un tās padotībā esošās iestādes (Ministry of Education and Science and subordinate institutions)

7.    Kultūras ministrija un tas padotībā esošās iestādes (Ministry of Culture and subordinate institutions)

8.    Labklājības ministrija un tās padotībā esošās iestādes (Ministry of Welfare and subordinate institutions)

9.    Satiksmes ministrija un tās padotībā esošās iestādes (Ministry of Transport and subordinate institutions)

10.   Tieslietu ministrija un tās padotībā esošās iestādes (Ministry of Justice and subordinate institutions)

11.   Veselības ministrija un tās padotībā esošās iestādes (Ministry of Health and subordinate institutions)

12.   Vides aizsardzības un reģionālās attīstības ministrija un tās padotībā esošās iestādes (Ministry of Environmental Protection and Regional Development and subordinate institutions)

13. Zemkopības ministrija un tās padotībā esošās iestādes (Ministry of Agriculture and subordinate institutions)

14. Īpašu uzdevumu ministra sekretariāti un to padotībā esošās iestādes (Ministries for Special Assignments and subordinate institutions)

**B)    Citas valsts iestādes (Other state institutions):**

1. Augstākā tiesa (Supreme Court)

2. Centrālā vēlēšanu komisija (Central Election Commission)

3. Finanšu un kapitāla tirgus komisija (Financial and Capital Market Commission)

4. Latvijas Banka (Bank of Latvia)

5. Prokuratūra un tās pārraudzībā esošās iestādes (Prosecutor's Office and institutions under its supervision)

6. Saeimas un tās padotībā esošās iestādes (The Parliament and subordinate institutions)

7. Satversmes tiesa (Constitutional Court)

8. Valsts kanceleja un tās pārraudzībā esošās iestādes (State Chancellery and institutions under its supervision)

9. Valsts kontrole (State Audit Office)

10. Valsts prezidenta kanceleja (Chancellery of the State President)

11. Citas valsts iestādes, kuras nav ministriju padotībā (Other state institutions not subordinate to ministries):

-    Tiesībsarga birojs (Office of the Ombudsman)

-    Nacionālā radio un televīzijas padome (National Broadcasting Council)

Other state institutions


# LITHUANIA

Prezidentūros kanceliarija (Office of the President)

Seimo kanceliarija (Office of the Seimas)

Seimui atskaitingos institucijos: (Institutions Accountable to the Seimas)

Lietuvos mokslo taryba (Science Council)

Seimo kontrolierių įstaiga (The Seimas Ombudsmen's Office)

Valstybės kontrolė (National Audit Office)

Specialiųjų tyrimų tarnyba (Special Investigation Service)

Valstybės saugumo departamentas (State Security Department)

Konkurencijos taryba (Competition Council)

Lietuvos gyventojų genocido ir rezistencijos tyrimo centras (Genocide and Resistance Research Centre)

Vertybinių popierių komisija (Lithuanian Securities Commission)

Ryšių reguliavimo tarnyba (Communications Regulatory Authority)

Nacionalinė sveikatos taryba (National Health Board)

Etninės kultūros globos taryba (Council for the Protection of Ethnic Culture)

Lygių galimybių kontrolieriaus tarnyba (Office of Equal Opportunities Ombudsperson)

Valstybinė kultūros paveldo komisija (National Cultural Heritage Commission)

Vaiko teisių apsaugos kontrolieriaus įstaiga (Children's Rights Ombudsman Institution)

Valstybinė kainų ir energetikos kontrolės komisija (State Price Regulation Commission of Energy Resources)

Valstybinė lietuvių kalbos komisija (State Commission of the Lithuanian Language)

Vyriausioji rinkimų komisija (Central Electoral Committee)

Vyriausioji tarnybinės etikos komisija (Chief Commission of Official Ethics)

Žurnalistų etikos inspektoriaus tarnyba (Office of the Inspector of Journalists' Ethics)


Vyriausybės kanceliarija (Office of the Government)

Vyriausybei atskaitingos institucijos (Institutions Accountable to the Government)

Ginklų fondas (Weaponry Fund)

Informacinės visuomenės plėtros komitetas (Information Society Development Committee)

Kūno kultūros ir sporto departamentas (Department of Physical Education and Sports)

Lietuvos archyvų departamentas (Lithuanian Archives Department)

Mokestinių ginčų komisija (Commission on Tax Disputes)

Statistikos departamentas (Department of Statistics)

Tautinių mažumų ir išeivijos departamentas (Department of National Minorities and Lithuanians Living Abroad)

Valstybinė tabako ir alkoholio kontrolės tarnyba (State Tobacco and Alcohol Control Service)

Viešųjų pirkimų tarnyba (Public Procurement Office)

Valstybinė atominės energetikos saugos inspekcija (State Nuclear Power Safety Inspectorate)

Valstybinė duomenų apsaugos inspekcija (State Data Protection Inspectorate)

Valstybinė lošimų priežiūros komisija (State Gaming Control Commission)

Valstybinė maisto ir veterinarijos tarnyba (State Food and Veterinary Service)

Vyriausioji administracinių ginčų komisija (Chief Administrative Disputes Commission)

Draudimo priežiūros komisija (Insurance Supervisory Commission)

Lietuvos valstybinis mokslo ir studijų fondas (Lithuanian State Science and Studies Foundation)

Konstitucinis Teismas (Constitutional Court)

Lietuvos bankas (Bank of Lithuania)

Aplinkos ministerija (Ministry of Environment)

Įstaigos prie Aplinkos ministerijos (Institutions under the Ministry of Environment)

Generalinė miškų urėdija (Directorate General of State Forests)

Lietuvos geologijos tarnyba (Geological Survey of Lithuania)

Lietuvos hidrometeorologijos tarnyba (Lithuanian Hydrometereological Service)

Lietuvos standartizacijos departamentas (Lithuanian Standards Board)

Nacionalinis akreditacijos biuras (Lithuanian National Accreditation Bureau)

Valstybinė metrologijos tarnyba (State Metrology Service)

Valstybinė saugomų teritorijų tarnyba (State Service for Protected Areas)

Valstybinė teritorijų planavimo ir statybos inspekcija (State Territory Planning and construction Inspectorate)

Finansų ministerija (Ministry of Finance)

Įstaigos prie Finansų ministerijos (Institutions under the Ministry of Finance)

Muitinės departamentas (Lithuania Customs)

Valstybės dokumentų technologinės apsaugos tarnyba (Service of Technological Security of State Documents)

Valstybinė mokesčių inspekcija (State Tax Inspectorate)

Finansų ministerijos mokymo centras (Training Centre of the Ministry of Finance)

Krašto apsaugos ministerija (Ministry of National Defence)

Įstaigos prie Krašto apsaugos ministerijos (Institutions under the Ministry of National Defence)

Antrasis operatyvinių tarnybų departamentas (Second Investigation Department)

Centralizuota finansų ir turto tarnyba (Centralised Finance and Property Service)

Karo prievolės administravimo tarnyba (Military Enrolment Administration Service)

Krašto apsaugos archyvas (National Defence Archives Service)

Krizių valdymo centras (Crisis Management Centre)

Mobilizacijos departamentas (Mobilisation Department)

Ryšių ir informacinių sistemų tarnyba (Communication and Information Systems Service)

Infrastruktūros plėtros departamentas (Infrastructure Development Department)

Valstybinis pilietinio pasipriešinimo rengimo centras (Civil Resistance Centre)

Lietuvos kariuomenė (Lithuanian Armed Forces)

Krašto apsaugos sistemos kariniai vienetai ir tarnybos (Military Units and Services of the National Defence System)

Kultūros ministerija (Ministry of Culture)

Įstaigos prie Kultūros ministerijos (Institutions under the Ministry of Culture)

Kultūros paveldo departamentas (Department for the Lithuanian Cultural Heritage)

Valstybinė kalbos inspekcija (State Language Commission)

Socialinės apsaugos ir darbo ministerija (Ministry of Social Security and Labour)

Įstaigos prie Socialinės apsaugos ir darbo ministerijos (Institutions under the Ministry of Social Security and Labour)

Garantinio fondo administracija (Administration of Guarantee Fund)

Valstybės vaiko teisių apsaugos ir įvaikinimo tarnyba (State Child Rights Protection and Adoption Service)

Lietuvos darbo birža (Lithuanian Labour Exchange)

Lietuvos darbo rinkos mokymo tarnyba (Lithuanian Labour Market Training Authority)

Trišalės tarybos sekretoriatas (Tripartite Council Secretoriat)

Socialinių paslaugų priežiūros departamentas (Social Services Monitoring Department)

Darbo inspekcija (Labour Inspectorate)

Valstybinio socialinio draudimo fondo valdyba (State Social Insturance Fund Board)

Neįgalumo ir darbingumo nustatymo tarnyba (Disability and Working Capacity Establishment Service)

Ginčų komisija (Disputes Commission)

Techninės pagalbos neįgaliesiems centras (State Centre of Compensatory Technique for the Disabled)

Neįgaliųjų reikalų departamentas (Department of the Affairs of the Disabled)

Susisiekimo ministerija (Ministry of Transport and Communications)

Įstaigos prie Susisiekimo ministerijos (Institutions under the Ministry of Transport and Communications)

Lietuvos automobilių kelių direkcija (Lithuanian Road Administration)

Valstybinė geležinkelio inspekcija (State Railway Inspectorate)

Valstybinė kelių transporto inspekcija (State Road Transport Inspectorate)

Pasienio kontrolės punktų direkcija (Border Control Points Directorate)

Sveikatos apsaugos ministerija (Ministry of Health)

Įstaigos prie Sveikatos apsaugos ministerijos (Institutions under the Ministry of Health)

Valstybinė akreditavimo sveikatos priežiūros veiklai tarnyba (State Health Care Accreditation Agency)

Valstybinė ligonių kasa (State Patient Fund)

Valstybinė medicininio audito inspekcija (State Medical Audit Inspectorate)

Valstybinė vaistų kontrolės tarnyba (State Medicines Control Agency)

Valstybinė teismo psichiatrijos ir narkologijos tarnyba (Lithuanian Forensic Psychiatry and Narcology Service)

Valstybinė visuomenės sveikatos priežiūros tarnyba (State Public Health Service)

Farmacijos departamentas (Department of Pharmacy)

Sveikatos apsaugos ministerijos Ekstremalių sveikatai situacijų centras (Health Emergency Centre of the Ministry of Health)

Lietuvos bioetikos komitetas (Lithuanian Bioethics Committee)

Radiacinės saugos centras (Radiation Protection Centre)

Švietimo ir mokslo ministerija (Ministry of Education and Science)

Įstaigos prie Švietimo ir mokslo ministerijos (Institutions under the Ministry of Education and Science)

Nacionalinis egzaminų centras (National Examination Centre)

Studijų kokybės vertinimo centras (Centre for Quality Assessment in Higher Education)

Teisingumo ministerija (Ministry of Justice)

Įstaigos prie Teisingumo ministerijos (Institutions under the Ministry of Justice)

Kalėjimų departamentas (Department of Imprisonment Establishments)

Nacionalinė vartotojų teisių apsaugos taryba (National Consumer Rights Protection Board)

Europos teisės departamentas (European Law Department)

Ūkio ministerija (Ministry of Economy)

Įstaigos prie Ūkio ministerijos (Institutions under the Ministry of Economy)

Įmonių bankroto valdymo departamentas (Enterprise Bankruptcy Management Department)

Valstybinė energetikos inspekcija (State Energy Inspectorate)

Valstybinė ne maisto produktų inspekcija (State Non Food Products Inspectorate)

Valstybinis turizmo departamentas (Lithuanian State Department of Tourism)

Užsienio reikalų ministerija (Ministry of Foreign Affairs)

Diplomatinės atstovybės ir konsulinės įstaigos užsienyje bei atstovybės prie tarptautinių organizacijų (Diplomatic Missions and Consular as well as Representations to International Organisations)

Vidaus reikalų ministerija (Ministry of the Interior)

Įstaigos prie Vidaus reikalų ministerijos (Institutions under the Ministry of the Interior)

Asmens dokumentų išrašymo centras (Personalisation of Identity Documents Centre)

Finansinių nusikaltimų tyrimo tarnyba (Financial Crime Investigation Service)

Gyventojų registro tarnyba (Residents' Register Service)

Policijos departamentas (Police Department)

Priešgaisrinės apsaugos ir gelbėjimo departamentas (Fire-Prevention and Rescue Department)

Turto valdymo ir ūkio departamentas (Property Management and Economics Department)

Vadovybės apsaugos departamentas (VIP Protection Department)

Valstybės sienos apsaugos tarnyba (State Border Guard Department)

Valstybės tarnybos departamentas (Civil Service Department)

Informatikos ir ryšių departamentas (IT and Communications Department)

Migracijos departamentas (Migration Department)

Sveikatos priežiūros tarnyba (Health Care Department)

Bendrasis pagalbos centras (Emergency Response Centre)

Žemės ūkio ministerija (Ministry of Agriculture)

Įstaigos prie Žemės ūkio ministerijos (Institutions under the Ministry of Agriculture)

Nacionalinė mokėjimo agentūra (National Paying Agency)

Nacionalinė žemės tarnyba (National Land Service)

Valstybinė augalų apsaugos tarnyba (State Plant Protection Service)

Valstybinė gyvulių veislininkystės priežiūros tarnyba (State Animal Breeding Supervision Service)

Valstybinė sėklų ir grūdų tarnyba (State Seed and Grain Service)

Žuvininkystės departamentas (Fisheries Department)

Teismai (Courts)

Lietuvos Aukščiausiasis Teismas (The Supreme Court of Lithuania)

Lietuvos apeliacinis teismas (The Court of Appeal of Lithuania)

Lietuvos vyriausiasis administracinis teismas (The Supreme Administrative Court of Lithuania);

Apygardų teismai (County courts)

Apygardų administraciniai teismai (County administrative courts)

Apylinkių teismai (District courts)

Nacionalinė teismų administracija (National Courts Administration)

Generalinė prokuratūra (The Prosecutor's Office)

Kiti centriniai valstybinio administravimo subjektai (institucijos, įstaigos, tarnybos) (Other Central Public Administration Entities (institutions, establishments, agencies)

- Muitinės kriminalinė tarnyba (Customs Criminal Service)

- Muitinės informacinių sistemų centras (Customs Information Systems Centre)

- Muitinės laboratorija (Customs Laboratory)

- Muitinės mokymo centras (Customs Training Centre)

## LUXEMBOURG

1.  Ministère d'Etat

2.  Ministère des Affaires Etrangères et de l'Immigration

    Ministère des Affaires Etrangères et de l'Immigration: Direction de la Défense (Armée)

3.  Ministère de l'Agriculture, de la Viticulture et du Développement Rural
    Ministère de l'Agriculture, de la Viticulture et du Développement Rural: Administration des Services Techniques de l'Agriculture

4.  Ministère des Classes moyennes, du Tourisme et du Logement

5.  Ministère de la Culture, de l'Enseignement Supérieur et de la Recherche

6.  Ministère de l'Economie et du Commerce extérieur

7.  Ministère de l'Education nationale et de la Formation professionnelle
    Ministère de l'Education nationale et de la Formation professionnelle: Lycée d'Enseignement Secondaire et d'Enseignement Secondaire Technique

8.  Ministère de l'Egalité des chances

9.  Ministère de l'Environnement
    Ministère de l'Environnement: Administration de l'Environnement

10. Ministère de la Famille et de l'Intégration
    Ministère de la Famille et de l'Intégration: Maisons de retraite

11. Ministère des Finances

12. Ministère de la Fonction publique et de la Réforme administrative
    Ministère de la Fonction publique et de la Réforme administrative: Service Central des Imprimés et des Fournitures de l'Etat – Centre des Technologies de l'informatique de l'Etat

13. Ministère de l'Intérieur et de l'Aménagement du territoire
    Ministère de l'Intérieur et de l'Aménagement du territoire: Police Grand-Ducale Luxembourg – Inspection générale de Police

14. Ministère de la Justice
    Ministère de la Justice: Etablissements Pénitentiaires

15. Ministère de la Santé
    Ministère de la Santé: Centre hospitalier neuropsychiatrique

16. Ministère de la Sécurité sociale

17.     Ministère des Transports

18.     Ministère du Travail et de l'Emploi

19.     Ministère des Travaux publics
        Ministère des Travaux publics: Bâtiments Publics – Ponts et Chaussées

## HUNGARY

Nemzeti Erőforrás Minisztérium (Ministry of National Resources)

Vidékfejlesztési Minisztérium (Ministry of Rural Development)

Nemzeti Fejlesztési Minisztérium (Ministry of National Development)

Honvédelmi Minisztérium (Ministry of Defence)
Közigazgatási és Igazságügyi Minisztérium (Ministry of Public Administration and Justice)

Nemzetgazdasági Minisztérium (Ministry for National Economy)

Külügyminisztérium (Ministry of Foreign Affairs)

Miniszterelnöki Hivatal (Prime Minister's Office)

Belügyminisztérium, (Ministry of Internal Affairs)

Központi Szolgáltatási Főigazgatóság (Central Services Directorate)

## MALTA

1.      Ufficċju tal-Prim Ministru (Office of the Prime Minister)

2.      Ministeru għall-Familja u Solidarjeta' Soċjali (Ministry for the Family and Social Solidarity)

3.      Ministeru ta' l-Edukazzjoni Zghazagh u Impjieg (Ministry for Education Youth and Employment)

4.      Ministeru tal-Finanzi (Ministry of Finance)

5.      Ministeru tar-Riżorsi u l-Infrastruttura (Ministry for Resources and Infrastructure)

6.      Ministeru tat-Turiżmu u Kultura (Ministry for Tourism and Culture)

7.      Ministeru tal-Ġustizzja u l-Intern (Ministry for Justice and Home Affairs)

8.      Ministeru għall-Affarijiet Rurali u l-Ambjent (Ministry for Rural Affairs and the Environment)

9.      Ministeru għal Għawdex (Ministry for Gozo)

10.     Ministeru tas-Saħħa, l-Anzjani u Kura fil-Kommunita' (Ministry of Health, the Elderly and Community Care)

11.     Ministeru ta' l-Affarijiet Barranin (Ministry of Foreign Affairs)

12.     Ministeru għall-Investimenti, Industrija u Teknologija ta' Informazzjoni (Ministry for Investment, Industry and Information Technology)

13.     Ministeru għall-Kompetittivà u Komunikazzjoni (Ministry for Competitiveness and Communications)

14.     Ministeru għall-Iżvilupp Urban u Toroq (Ministry for Urban Development and Roads)

15.     L-Uffiċċju tal-President (Office of the President)

16.     Uffiċċju ta 'l-iskrivan tal-Kamra tad-Deputati (Office of the Clerk of the House of Representatives)

<strong>THE NETHERLANDS</strong>

MINISTERIE VAN ALGEMENE ZAKEN — (MINISTRY OF GENERAL AFFAIRS)

–     Bestuursdepartement — (Central policy and staff departments)

–     Bureau van de Wetenschappelijke Raad voor het Regeringsbeleid — (Advisory Council on Government Policy)

–     Rijksvoorlichtingsdienst: — (The Netherlands Government Information Service)

MINISTERIE VAN BINNENLANDSE ZAKEN EN KONINKRIJKSRELATIES — (MINISTRY OF THE INTERIOR)

–     Bestuursdepartement — (Central policy and staff departments)

–     Centrale Archiefselectiedienst (CAS) — (Central Records Selection Service)

–     Algemene Inlichtingen- en Veiligheidsdienst (AIVD) — (General Intelligence and Security Service)

–     Agentschap Basisadministratie Persoonsgegevens en Reisdocumenten (BPR) — (Personnel Records and Travel Documents Agency)

–     Agentschap Korps Landelijke Politiediensten — (National Police Services Agency)

MINISTERIE VAN BUITENLANDSE ZAKEN — (MINISTRY OF FOREIGN AFFAIRS)

–     Directoraat-generaal Regiobeleid en Consulaire Zaken (DGRC) — (Directorate-general for Regional Policy and Consular Affairs)

–     Directoraat-generaal Politieke Zaken (DGPZ) — (Directorate-general for Political Affairs)

–     Directoraat-generaal Internationale Samenwerking (DGIS) — (Directorate-general for International Cooperation)

–     Directoraat-generaal Europese Samenwerking (DGES) — (Directorate-general for European Cooperation)

–     Centrum tot Bevordering van de Import uit Ontwikkelingslanden (CBI) — (Centre for the Promotion of Imports from Developing Countries)

–     Centrale diensten ressorterend onder S/PlvS — (Support services falling under the Secretary-general and Deputy Secretary-general)

–     Buitenlandse Posten (ieder afzonderlijk) — (the various Foreign Missions)

MINISTERIE VAN DEFENSIE — (MINISTRY OF DEFENCE)

–     Bestuursdepartement — (Central policy and staff departments)

- Commando Diensten Centra (CDC) — (Support Command)
- Defensie Telematica Organisatie (DTO) — (Defence Telematics Organisation)
- Centrale directie van de Defensie Vastgoed Dienst — (Defence Real Estate Service, Central Directorate)
- De afzonderlijke regionale directies van de Defensie Vastgoed Dienst — (Defence Real Estate Service, Regional Directorates)
- Defensie Materieel Organisatie (DMO) — (Defence Material Organisation)
- Landelijk Bevoorradingsbedrijf van de Defensie Materieel Organisatie — (National Supply Agency of the Defence Material Organisation)
- Logistiek Centrum van de Defensie Materieel Organisatie — (Logistic Centre of the Defence Material Organisation)
- Marinebedrijf van de Defensie Materieel Organisatie — (Maintenance Establishment of the Defence Material Organisation)
- Defensie Pijpleiding Organisatie (DPO) — (Defence Pipeline Organisation)

MINISTERIE VAN ECONOMISCHE ZAKEN — (MINISTRY OF ECONOMIC AFFAIRS)

- Bestuursdepartement — (Central policy and staff departments)
- Centraal Planbureau (CPB) — (Netherlands Bureau for Economic Policy Analyses)
- Bureau voor de Industriële Eigendom (BIE) — (Industrial Property Office)
- SenterNovem — (SenterNovem – Agency for sustainable innovation)
- Staatstoezicht op de Mijnen (SodM) — (State Supervision of Mines)
- Nederlandse Mededingingsautoriteit (NMa) — (Netherlands Competition Authority)
- Economische Voorlichtingsdienst (EVD) — (Netherlands Foreign Trade Agency)
- Agentschap Telecom — (Radiocommunications Agency)
- Kenniscentrum Professioneel & Innovatief Aanbesteden, Netwerk voor Overheidsopdrachtgevers (PIANOo) — (Professional and innovative procurement, network for contracting authorities)
- Regiebureau Inkoop Rijksoverheid — (Coordination of Central Government Purchasing)
- Octrooicentrum Nederland — (Netherlands Patent Office)
- Consumentenautoriteit — (Consumer Authority)

MINISTERIE VAN FINANCIËN — (MINISTRY OF FINANCE)

- Bestuursdepartement — (Central policy and staff departments)
- Belastingdienst Automatiseringscentrum — (Tax and Custom Computer and Software Centre)
- Belastingdienst — (Tax and Customs Administration)

–    De afzonderlijke Directies der Rijksbelastingen — (the various Divisions of the Tax and Customs Administration throughout the Netherlands)

–    Fiscale Inlichtingen- en Opsporingsdienst (incl. Economische Controle dienst (ECD) — (Fiscal Information and Investigation Service (the Economic Investigation Service included)

–    Belastingdienst Opleidingen — (Tax and Customs Training Centre)

–    Dienst der Domeinen — (State Property Service)

MINISTERIE VAN JUSTITIE — (MINISTRY OF JUSTICE)

–    Bestuursdepartement — (Central policy and staff departments)

–    Dienst Justitiële Inrichtingen — (Correctional Institutions Agency)

–    Raad voor de Kinderbescherming — (Child Care and Protection Agency)

–    Centraal Justitie Incasso Bureau — (Central Fine Collection Agency)

–    Openbaar Ministerie — (Public Prosecution Service)

–    Immigratie en Naturalisatiedienst — (Immigration and Naturalisation Service)

–    Nederlands Forensisch Instituut — (Netherlands Forensic Institute)

–    Dienst Terugkeer & Vertrek — (Repatriation and Departure Agency)

MINISTERIE VAN LANDBOUW, NATUUR EN VOEDSELKWALITEIT — (MINISTRY OF AGRICULTURE, NATURE AND FOOD QUALITY)

–    Bestuursdepartement — (Central policy and staff departments)

–    Dienst Regelingen (DR) — (National Service for the Implementation of Regulations (Agency))

–    Agentschap Plantenziektenkundige Dienst (PD) — (Plant Protection Service (Agency))

–    Algemene Inspectiedienst (AID) — (General Inspection Service)

–    Dienst Landelijk Gebied (DLG) — (Government Service for Sustainable Rural Development)

–    Voedsel en Waren Autoriteit (VWA) — (Food and Consumer Product Safety Authority)

MINISTERIE VAN ONDERWIJS, CULTUUR EN WETENSCHAPPEN — (MINISTRY OF EDUCATION, CULTURE AND SCIENCE)

–    Bestuursdepartement — (Central policy and staff departments)

–    Inspectie van het Onderwijs — (Inspectorate of Education)

–    Erfgoedinspectie — (Inspectorate of Heritage)

–    Centrale Financiën Instellingen — (Central Funding of Institutions Agency)

–    Nationaal Archief — (National Archives)

–    Adviesraad voor Wetenschaps- en Technologiebeleid — (Advisory Council for Science and Technology Policy)

–    Onderwijsraad — (Education Council)

–     Raad voor Cultuur — (Council for Culture)

## MINISTERIE VAN SOCIALE ZAKEN EN WERKGELEGENHEID — (MINISTRY OF SOCIAL AFFAIRS AND EMPLOYMENT)

–     Bestuursdepartement — (Central policy and staff departments)

–     Inspectie Werk en Inkomen — (the Work and Income Inspectorate)

–     Agentschap SZW- (SZW Agency)

## MINISTERIE VAN VERKEER EN WATERSTAAT — (MINISTRY OF TRANSPORT, PUBLIC WORKS AND WATERMANAGEMENT)

–     Bestuursdepartement — (Central policy and staff departments)

–     Directoraat-Generaal Transport en Luchtvaart — (Directorate-general for Transport and Civil Aviation)

–     Directoraat-generaal Personenvervoer — Directorate-general for Passenger Transport)

–     Directoraat-generaal Water — (Directorate-general of Water Affairs)

–     Centrale diensten — (Central Services)

–     Shared services Organisatie Verkeer en Watersaat — (Shared services Organisation Transport and Water management) (new organisation)

–     Koninklijke Nederlandse Meteorologisch Instituut KNMI — (Royal Netherlands Meteorological Institute)

–     Rijkswaterstaat, Bestuur — (Public Works and Water Management, Board)

–     De afzonderlijke regionale Diensten van Rijkswaterstaat — (Each individual regional service of the Directorate-general of Public Works and Water Management)

–     De afzonderlijke specialistische diensten van Rijkswaterstaat — (Each individual specialist service of the Directorate-general of Public Works and Water Management)

–     Adviesdienst Geo-Informatie en ICT — (Advisory Council for Geo-information and ICT)

–     Adviesdienst Verkeer en Vervoer (AVV) – (Advisory Council for Traffic and Transport)

–     Bouwdienst – (Service for Construction)

–     Corporate Dienst — (Corporate Service)

–     Data ICT Dienst — (Service for Data and IT)

–     Dienst Verkeer en Scheepvaart — (Service for Traffic and Ship Transport)

–     Dienst Weg- en Waterbouwkunde (DWW) — (Service for Road and Hydraulic Engineering)

–     Rijksinstituut voor Kust en Zee (RIKZ) — (National Institute for Coastal and Marine Management)

–     Rijksinstituut voor Integraal Zoetwaterbeheer en Afvalwaterbehandeling (RIZA) — (National Institute for Sweet Water Management and Water Treatment)

–     Waterdienst — (Service for Water)

–     Inspectie Verkeer en Waterstaat, Hoofddirectie — (Inspectorate Transport and Water Management, Main Directorate)

–     Port state Control

–     Directie Toezichtontwikkeling Communicatie en Onderzoek (TCO) — (Directorate of Development of Supervision of Communication and Research)

–     Toezichthouder Beheer Eenheid Lucht — (Management Unit "Air")

–     Toezichthouder Beheer Eenheid Water — (Management Unit "Water")

–     Toezichthouder Beheer Eenheid Land — (Management Unit "Land")

**MINISTERIE VAN VOLKSHUISVESTING, RUIMTELIJKE ORDENING EN MILIEUBEHEER — (MINISTRY FOR HOUSING, SPATIAL PLANNING AND THE ENVIRONMENT)**

–     Bestuursdepartement — (Central policy and staff departments)

–     Directoraat-generaal Wonen, Wijken en Integratie — (Directorate General for Housing, Communities and Integration)

–     Directoraat-generaal Ruimte — (Directorate General for Spatial Policy)

–     Directoraat-general Milieubeheer — (Directorate General for Environmental Protection)

–     Rijksgebouwendienst — (Government Buildings Agency)

–     VROM Inspectie — (Inspectorate)

**MINISTERIE VAN VOLKSGEZONDHEID, WELZIJN EN SPORT — (MINISTRY OF HEALTH, WELFARE AND SPORTS)**

–     Bestuursdepartement — (Central policy and staff departments)

–     Inspectie Gezondheidsbescherming, Waren en Veterinaire Zaken — (Inspectorate for Health Protection and Veterinary Public Health)

–     Inspectie Gezondheidszorg — (Health Care Inspectorate)

–     Inspectie Jeugdhulpverlening en Jeugdbescherming — (Youth Services and Youth Protection Inspectorate)

–     Rijksinstituut voor de Volksgezondheid en Milieu (RIVM) — (National Institute of Public Health and Environment)

–     Sociaal en Cultureel Planbureau — (Social and Cultural Planning Office)

–     Agentschap t.b.v. het College ter Beoordeling van Geneesmiddelen — (Medicines Evaluation Board Agency)

**TWEEDE KAMER DER STATEN-GENERAAL — (SECOND CHAMBER OF THE STATES GENERAL)**

**EERSTE KAMER DER STATEN-GENERAAL — (FIRST CHAMBER OF THE STATES GENERAL)**

**RAAD VAN STATE — (COUNCIL OF STATE)**

**ALGEMENE REKENKAMER — (NETHERLANDS COURT OF AUDIT)**

**NATIONALE OMBUDSMAN — (NATIONAL OMBUDSMAN)**

KANSELARIJ DER NEDERLANDSE ORDEN — (CHANCELLERY OF THE NETHERLANDS ORDER)

KABINET DER KONINGIN — (QUEEN'S CABINET)
RAAD VOOR DE RECHTSPRAAK EN DE RECHTBANKEN — (JUDICIAL MANAGEMENT AND ADVISORY BOARD AND COURTS OF LAW)

# AUSTRIA

**A/    Present coverage of entities**

1.    Bundeskanzleramt (Federal Chancellery)

2.    Bundesministerium für europäische und internationale Angelegenheiten (Federal Ministry for european and international Affairs)

3.    Bundesministerium für Finanzen (Federal Ministry of Finance)

4.    Bundesministerium für Gesundheit (Federal Ministry of Health)

5.    Bundesministerium für Inneres (Federal Ministry of Interior)

6.    Bundesministerium für Justiz (Federal Ministry of Justice)

7.    Bundesministerium für Landesverteidigung und Sport (Federal Ministry of Defence and Sport)

8.    Bundesministerium für Land- und Forstwirtschaft, Umwelt und Wasserwirtschaft (Federal Ministry for Agriculture and Forestry, the Environment and Water Management)

9.    Bundesministerium für Arbeit, Soziales und Konsumentenschutz (Federal Ministry for Employment, Social Affairs and Consumer Protection)

10.    Bundesministerium für Unterricht, Kunst und Kultur (Federal Ministry for Education, Art and Culture)

11.    Bundesministerium für Verkehr, Innovation und Technologie (Federal Ministry for Transport, Innovation and Technology)

12.    Bundesministerium für Wirtschaft, Familie und Jugend (Federal Ministry for Economic Affairs, Family and Youth)

13.    Bundesministerium für Wissenschaft und Forschung (Federal Ministry for Science and Research)

14.    Bundesamt für Eich- und Vermessungswesen (Federal Office for Calibration and Measurement)

15.    Österreichische Forschungs- und Prüfzentrum Arsenal Gesellschaft m.b.H (Austrian Research and Test Centre Arsenal Ltd)

16.    Bundesanstalt für Verkehr (Federal Institute for Traffic)

17.    Bundesbeschaffung G.m.b.H (Federal Procurement Ltd)

18.    Bundesrechenzentrum G.m.b.H (Federal Data Processing Centre Ltd)

**B/**     **All other central public authorities including their regional and local sub-divisions provided that they do not have an industrial or commercial character.**

## POLAND

1.     Kancelaria Prezydenta RP (Chancellery of the President)

2.     Kancelaria Sejmu RP (Chancellery of the Sejm)

3.     Kancelaria Senatu RP (Chancellery of the Senate)

4.     Kancelaria Prezesa Rady Ministrów (Chancellery of the Prime Minister)

5.     Sąd Najwyższy (Supreme Court)

6.     Naczelny Sąd Administracyjny (Supreme Administrative Court)

7.     Sądy powszechne - rejonowe, okręgowe i apelacyjne (Common Court of Law - District Court, Regional Court, Appellate Court)

8.     Trybunał Konstytucyjny (Constitutional Court)

9.     Najwyższa Izba Kontroli (Supreme Chamber of Control)

10.     Biuro Rzecznika Praw Obywatelskich (Office of the Human Rights Defender)

11.     Biuro Rzecznika Praw Dziecka (Office of the Children's Rigths Ombudsman)

12.     Biuro Ochrony Rządu (Government Protection Bureau)

13.     Biuro Bezpieczeństwa Narodowego (The National Security Office)

14.     Centralne Biuro Antykorupcyjne (Central Anticorruption Bureau)

15.     Ministerstwo Pracy i Polityki Społecznej (Ministry of Labour and Social Policy)

16.     Ministerstwo Finansów (Ministry of Finance)

17.     Ministerstwo Gospodarki (Ministry of Economy)

18.     Ministerstwo Rozwoju Regionalnego (Ministry of Regional Development)

19.     Ministerstwo Kultury i Dziedzictwa Narodowego (Ministry of Culture and National Heritage)

20.     Ministerstwo Edukacji Narodowej (Ministry of National Education)

21.     Ministerstwo Obrony Narodowej (Ministry of National Defence)

22.     Ministerstwo Rolnictwa i Rozwoju Wsi (Ministry of Agriculture and Rural Development)

23.     Ministerstwo Skarbu Państwa (Ministry of the State Treasury)

24.     Ministerstwo Sprawiedliwości (Ministry of Justice)

25.     Ministerstwo Transportu, Budownictwa i Gospodarki Morskiej (Ministry of Transport, Construction and Maritime Economy)

26.     Ministerstwo Nauki i Szkolnictwa Wyższego (Ministry of Science and Higher Education)

27.     Ministerstwo Środowiska (Ministry of Environment)

28.    Ministerstwo Spraw Wewnętrznych (Ministry of Internal Affairs)

29.    Ministrestwo Administracji i Cyfryzacji (Ministry of Administration and Digitisation)

30.    Ministerstwo Spraw Zagranicznych (Ministry of Foreign Affairs)

31.    Ministerstwo Zdrowia (Ministry of Health)

32.    Ministerstwo Sportu i Turystyki (Ministry of Sport and Tourism)

33.    Urząd Patentowy Rzeczypospolitej Polskiej (Patent Office of the Republic of Poland)

34.    Urząd Regulacji Energetyki (The Energy Regulatory Authority of Poland)

35.    Urząd do Spraw Kombatantów i Osób Represjonowanych (Office for Military Veterans and Victims of Repression)

36.    Urząd Transportu Kolejowego (Office for Railroad Transport)

37.    Urząd Dozoru Technicznego (Office of Technical Inspection)

38.    Urząd Rejestracji Produktów Leczniczych, Wyrobów Medycznych i Produktów Biobójczych (The Office for Registration of Medicinal Products, Medical Devices and Biocidal Products)

39.    Urząd do Spraw Cudzoziemców (Office for Foreigners)

40.    Urząd Zamówień Publicznych (Public Procurement Office)

41.    Urząd Ochrony Konkurencji i Konsumentów (Office for Competition and Consumer Protection)

42.    Urząd Lotnictwa Cywilnego (Civil Aviation Office)

43.    Urząd Komunikacji Elektronicznej (Office of Electronic Communication)

44.    Wyższy Urząd Górniczy (State Mining Authority)

45.    Główny Urząd Miar (Main Office of Measures)

46.    Główny Urząd Geodezji i Kartografii (The Main Office of Geodesy and Cartography)

47.    Główny Urząd Nadzoru Budowlanego (The General Office of Building Control)

48.    Główny Urząd Statystyczny (Main Statistical Office)

49.    Krajowa Rada Radiofonii i Telewizji (National Broadcasting Council)

50.    Generalny Inspektor Ochrony Danych Osobowych (Inspector General for the Protection of Personal Data)

51.    Państwowa Komisja Wyborcza (State Election Commission)

52.    Państwowa Inspekcja Pracy (National Labour Inspectorate)

53.    Rządowe Centrum Legislacji (Government Legislation Centre)

54.    Narodowy Fundusz Zdrowia (National Health Fund)

55.    Polska Akademia Nauk (Polish Academy of Science)

56.     Polskie Centrum Akredytacji (Polish Accreditation Centre)

57.     Polskie Centrum Badań i Certyfikacji (Polish Centre for Testing and Certification)

58.     Polska Organizacja Turystyczna (Polish National Tourist Office)

59.     Polski Komitet Normalizacyjny (Polish Committee for Standardisation)

60.     Zakład Ubezpieczeń Społecznych (Social Insurance Institution)

61.     Komisja Nadzoru Finansowego (Polish Financial Supervision Authority)

62.     Naczelna Dyrekcja Archiwów Państwowych (Head Office of State Archives)

63.     Kasa Rolniczego Ubezpieczenia Społecznego (Agricultural Social Insurance Fund)

64.     Generalna Dyrekcja Dróg Krajowych i Autostrad (The General Directorate of National Roads and Motorways)

65.     Główny Inspektorat Ochrony Roślin i Nasiennictwa (The Main Inspectorate for the Inspection of Plant and Seeds Protection)

66.     Komenda Główna Państwowej Straży Pożarnej (The National Headquarters of the State Fire-Service)

67.     Komenda Główna Policji (Polish National Police)

68.     Komenda Główna Straży Granicxnej (The Chief Boarder Guards Command)

69.     Główny Inspektorat Jakości Handlowej Artykułów Rolno-Spożywczych (The Main Inspectorate of Commercial Quality of Agri-Food Products)

70.     Główny Inspektorat Ochrony Środowiska (The Main Inspectorate for Environment Protection)

71.     Główny Inspektorat Transportu Drogowego (Main Inspectorate of Road Transport)

72.     Główny Inspektorat Farmaceutyczny (Main Pharmaceutical Inspectorate)

73.     Główny Inspektorat Sanitarny (Main Sanitary Inspectorate)

74.     Główny Inspektorat Weterynarii (The Main Veterinary Inspectorate)

75.     Agencja Bezpieczeństwa Wewnętrznego (Internal Security Agency)

76.     Agencja Wywiadu (Foreign Intelligence Agency)

77.     Agencja Mienia Wojskowego (Agency for Military Property)

78.     Wojskowa Agencja Mieszkaniowa (Military Real Estate Agency)

79.     Agencja Restrukturyzacji i Modernizacji Rolnictwa (Agency for Restructuring and Modernisation of Agriculture)

80.     Agencja Rynku Rolnego (Agriculture Market Agency)

81.     Agencja Nieruchomości Rolnych (Agricultural Property Agency)

82.     Państwowa Agencja Atomistyki (National Atomic Energy Agency)

83.     Polska Agencja Żeglugi Powietrznej (Polish Air Navigation Services Agency)

84.     Polska Agencja Rozwiązywania Problemów Alkoholowych (State Agency for Prevention of Alcohol Related Problems)

85.    Agencja Rezerw Materiałowych (The Material Reserves Agency)

86.    Narodowy Bank Polski (National Bank of Poland)

87.    Narodowy Fundusz Ochrony Środowiska i Gospodarki Wodnej (The National Fund for Environmental Protection and Water Management)

88.    Państwowy Fundusz Rehabilitacji Osób Niepełnosprawnych (National Disabled Persons Rehabilitation Fund)

89.    Instytut Pamięci Narodowej - Komisja Ścigania Zbrodni Przeciwko Narodowi Polskiemu (National Remembrance Institute - Commission for Prosecution of Crimes Against the Polish Nation)

90.    Rada Ochrony Pamięci Walk i Męczeństwa (The Committee of Protection of Memory of Combat and Martyrdom)

91.    Służba Celna Rzeczypospolitej Polskiej (Customs Service of the Republic of Poland)

92.    Państwowe Gospodarstwo Leśne "Lasy Państwowe" (State Forest Enterprise Lasy Państwowe")

93.    Polska Agencja Rozwoju Przedsiębiorczości (Polish Agency for Enterprise Development)

94.    Samodzielne Publiczne Zakłady Opieki Zdrowotnej, jeśli ich organem założycielskim jest minister, centralny organ administracji rządowej lub wojewoda (Public Autonomous Health Care Management Units established by minister, central government unit or voivoda).

## PORTUGAL

1.    Presidência do Conselho de Ministros (Presidency of the Council of Ministers)

2.    Ministério das Finanças (Ministry of Finance)

3.    Ministério da Defesa Nacional (Ministry of Defence)

4.    Ministério dos Negócios Estrangeiros e das Comunidades Portuguesas (Ministry of Foreign Affairs and Portuguese Communities)

5.    Ministério da Administração Interna (Ministry of Internal Affairs)

6.    Ministério da Justiça (Ministry of Justice)

7.    Ministério da Economia (Ministry of Economy)

8.    Ministério da Agricultura, Desenvolvimento Rural e Pescas (Ministry of Agriculture, Rural Development and Fishing)

9.    Ministério da Educação (Ministry of Education)

10.    Ministério da Ciência e do Ensino Superior (Ministry of Science and University Education)

11.    Ministério da Cultura (Ministry of Culture)

12.    Ministério da Saúde (Ministry of Health)

13.    Ministério do Trabalho e da Solidariedade Social (Ministry of Labour and Social Solidarity)

14.    Ministério das Obras Públicas, Transportes e Habitação (Ministry of Public Works, Transports and Housing)

15.    Ministério das Cidades, Ordenamento do Território e Ambiente (Ministry of Cities, Land Management and Environment)

16.    Ministério para a Qualificação e o Emprego (Ministry for Qualification and Employment)

17.    Presidença da Republica (Presidency of the Republic)

18.    Tribunal Constitucional (Constitutional Court)

19.    Tribunal de Contas (Court of Auditors)

20.    Provedoria de Justiça (Ombudsman)

# ROMANIA

Administraţia Prezidenţială (Presidential Administration)

Senatul României (Romanian Senate)

Camera Deputaţilor (Chamber of Deputies)

Inalta Curte de Casaţie şi Justiţie (Supreme Court)

Curtea Constituţională (Constitutional Court)

Consiliul Legislativ (Legislative Council)

Curtea de Conturi (Court of Accounts)

Consiliul Superior al Magistraturii (Superior Council of Magistracy)

Parchetul de pe lângă Inalta Curte de Casaţie şi Justiţie (Prosecutor's Office Attached to the Supreme Court)

Secretariatul General al Guvernului (General Secretariat of the Government)

Cancelaria primului ministru (Chancellery of the Prime Minister)

Ministerul Afacerilor Externe (Ministry of Foreign Affairs)

Ministerul Economiei şi Finanţelor (Ministry of Economy and Finance)

Ministerul Justiţiei (Ministry of Justice)

Ministerul Apărării (Ministry of Defense)

Ministerul Internelor şi Reformei Administrative (Ministry of Interior and Administration Reform)

Ministerul Muncii, Familiei şi Egalităţii de Sanse (Ministry of Labor and Equal Opportunities)

Ministerul pentru Intreprinderi Mici şi Mijlocii, Comerţ, Turism şi Profesii Liberale (Ministry for Small and Medium Sized Enterprises, Trade, Tourism and Liberal Professions)

Ministerul Agriculturii și Dezvoltării Rurale (Ministry of Agricultural and Rural Development)

Ministerul Transporturilor (Ministry of Transport)

Ministerul Dezvoltării, Lucrărilor Publice și Locuinței (Ministry of Development, Public Works and Housing)

Ministerul Educației Cercetării și Tineretului (Ministry of Education, Research and Youth)

Ministerul Sănătății Publice (Ministry of Public Health)

Ministerul Culturii și Cultelor (Ministry of Culture and Religious Affairs)

Ministerul Comunicațiilor și Tehnologiei Informației (Ministry of Communications and Information Technology)

Ministerul Mediului și Dezvoltării Durabile (Ministry of Environment and Sustainable Development)

Serviciul Român de Informații (Romanian Intelligence Service)

Serviciul Român de Informații Externe (Romanian Foreign Intelligence Service)

Serviciul de Protecție și Pază (Protection and Guard Service)

Serviciul de Telecomunicații Speciale (Special Telecommunication Service)

Consiliul Național al Audiovizualului (The National Audiovisual Council)

Consiliul Concurenței (CC) (Competition Council)

Direcția Națională Anticorupție (National Anti-corruption Department)

Inspectoratul General de Poliție (General Inspectorate of Police)

Autoritatea Națională pentru Reglementarea și Monitorizarea Achizițiilor Publice (National Authority for Regulation and Monitoring Public Procurement)

Consiliul Național de Soluționare a Contestațiilor (National Council for Solving the Contests)

Autoritatea Națională de Reglementare pentru Serviciile Comunitare de Utilități Publice (ANRSC) (National Authority for Regulating Community Services Public Utilities)

Autoritatea Națională Sanitară Veterinară și pentru Siguranța Alimentelor (Sanitary Veterinary and Food Safety National Authority)

Autoritatea Națională pentru Protecția Consumatorilor (National Authority for Consumer Protection)

Autoritatea Navală Română (Romanian Naval Authority)

Autoritatea Feroviară Română (Romanian Railway Authority)

Autoritatea Rutieră Română (Romanian Road Authority)

Autoritatea Națională pentru Protecția Drepturilor Copilului-și Adopție (National Authority for the Protection of Child Rights and Adoption)

Autoritatea Națională pentru Persoanele cu Handicap (National Authority for Disabled Persons)

Autoritatea Națională pentru Tineret (National Authority for Youth)

Autoritatea Naţională pentru Cercetare Stiinţifica (National Authority for Scientific Research)

Autoritatea Naţională pentru Comunicaţii (National Authority for Communications)

Autoritatea Naţională pentru Serviciile Societăţii Informaţionale (National Authority for Informational Society Services)

Autoritatea Electorală Permanente (Permanent Electoral Authority)

Agenţia pentru Strategii Guvernamentale (Agency for Governmental Strategies)

Agenţia Naţională a Medicamentului (National Medicines Agency)

Agenţia Naţională pentru Sport (National Agency for Sports)

Agenţia Naţională pentru Ocuparea Forţei de Muncă (National Agency for Employment)

Agenţia Naţională de Reglementare în Domeniul Energiei (National Authority for Electrical Energy Regulation)

Agenţia Română pentru Conservarea Energiei (Romanian Agency for Power Conservation)

Agenţia Naţională pentru Resurse Minerale (National Agency for Mineral Resources)

Agenţia Română pentru Investiţii Străine (Romanian Agency for Foreign Investment)

Agenţia Naţională a Funcţionarilor Publici (National Agency of Public Civil Servants)

Agenţia Naţională de Administrare Fiscală (National Agency of Fiscal Administration)

Agenţia de Compensare pentru Achiziţii de Tehnică Specială (Agency For Offsetting Special Technique Procurements)

Agenţia Naţională Anti-doping (National Anti-Doping Agency)

Agenţia Nucleară (Nuclear Agency)

Agenţia Naţională pentru Protecţia Familiei (National Agency for Family Protection)

Agenţia Naţională pentru Egalitatea de Sanse între Bărbaţi şi Femei (National Authority for Equality of Chances between Men and Women)

Agenţia Naţională pentru Protecţia Mediului (National Agency for Environmental Protection)

Agenţia naţională Antidrog (National Anti-drugs Agency)

## SLOVENIA

1.    Predsednik Republike Slovenije (President of the Republic of Slovenia)

2.    Državni zbor (The National Assembly)

3.    Državni svet (The National Council)

4.    Varuh človekovih pravic (The Ombudsman)

5.    Ustavno sodišče (The Constitutional Court)

6.    Računsko sodišče (The Court of Audits)

7.    Državna revizijska komisja (The National Review Commission)

8.    Slovenska akademija znanosti in umetnosti (The Slovenian Academy of Science and Art)

9.　　　Vladne službe (The Government Services)

10.　　Ministrstvo za finance (Ministry of Finance)

11.　　Ministrstvo za notranje zadeve (Ministry of Internal Affairs)

12.　　Ministrstvo za zunanje zadeve (Ministry of Foreign Affairs)

13.　　Ministrstvo za obrambo (Ministry of Defence)

14.　　Ministrstvo za pravosodje (Ministry of Justice)

15.　　Ministrstvo za gospodarstvo (Ministry of the Economy)

16.　　Ministrstvo za kmetijstvo, gozdarstvo in prehrano (Ministry of Agriculture, Forestry and Food)

17.　　Ministrstvo za promet (Ministry of Transport)

18.　　Ministrstvo za okolje, prostor in energijo (Ministry of Environment, Spatial Planning and Energy)

19.　　Ministrstvo za delo, družino in socialne zadeve (Ministry of Labour, Family and Social Affairs)

20.　　Ministrstvo za zdravje (Ministry of Health)

21.　　Ministrstvo za visoko šolstvo, znanost in tehnogijo (Ministry of Higher Education, Science and Technology)

22.　　Ministrstvo za kulturo (Ministry of Culture)

23.　　Ministerstvo za javno upravo (Ministry of Public Administration)

24.　　Vrhovno sodišče Republike Slovenije (The Supreme Court of the Republic of Slovenia)

25.　　Višja sodišča (Higher Courts)

26.　　Okrožna sodišča (District Courts)

27.　　Okrajna sodišča (County Courts)

28.　　Vrhovno tožilstvo Republike Slovenije (The Supreme Prosecutor of the Republic of Slovenia)

29.　　Okrožna državna tožilstva (Districts' State Prosecutors)

30.　　Družbeni pravobranilec Republike Slovenije (Social Attorney of the Republic of Slovenia)

31.　　Državno pravobranilstvo Republike Slovenije (National Attorney of the Republic of Slovenia)

32.　　Upravno sodišče Republike Slovenije (Administrative Court of the Republic of Slovenia)

33.　　Senat za prekrške Republike Slovenije (Senat of Minor Offenses of the Republic of Slovenia)

34.　　Višje delovno in socialno sodišče v Ljubljani (Higher Labour and Social Court)

35.　　Delovna in sodišča (Labour Courts)

36.     Upravne note (Local Administrative Units)

## SLOVAKIA

Ministries and other central government authorities referred to as in Act No. 575/2001 Coll. on the structure of activities of the Government and central state administration authorities in wording of later amendments:

Ministerstvo hospodárstva Slovenskej republiky (Ministry of Economy of the Slovak Republic)

Ministerstvo financií Slovenskej republiky (Ministry of Finance of the Slovak Republic)

Ministerstvo dopravy, výstavby a regionálneho rozvoja Slovenskej republiky (Ministry of Transport, Construction and Regional Development of the Slovak Republic)

Ministerstvo pôdohospodárstva a rozvoja vidieka Slovenskej republiky (Ministry of Agriculture and Rural Development of the Slovak Republic)

Ministerstvo vnútra Slovenskej republiky (Ministry of Interior of the Slovak Republic)

Ministerstvo obrany Slovenskej republiky (Ministry of Defence of the Slovak Republic)

Ministerstvo spravodlivosti Slovenskej republiky (Ministry of Justice of the Slovak Republic)

Ministerstvo zahraničných vecí Slovenskej republiky (Ministry of Foreign Affairs of the Slovak Republic)

Ministerstvo práce, sociálnych vecí a rodiny Slovenskej republiky (Ministry of Labour, Social Affairs and Family of the Slovak Republic)

Ministerstvo životného prostredia Slovenskej republiky (Ministry of Environment of the Slovak Republic)

Ministerstvo školstva, vedy, výskumu a športu Slovenskej republiky (Ministry of Education, Science, Research and Sport of the Slovak Republic)

Ministerstvo kultúry Slovenskej republiky (Ministry of Culture of the Slovak Republic)

Ministerstvo zdravotníctva Slovenskej republiky (Ministry of Health Service of the Slovak Republic)

Úrad vlády Slovenskej republiky (The Government Office of the Slovak Republic)

Protimonopolný úrad Slovenskej republiky (Antimonopoly Office of the Slovak Republic)

Štatistický úrad Slovenskej republiky (Statistical Office of the Slovak Republic)

Úrad geodézie, kartografie a katastra Slovenskej republiky (The Office of Land Surveyor, Cartography and Cadastre of the Slovak Republic)

Úrad jadrového dozoru Slovenskej republiky (Nuclear Regulatory Authority of the Slovak Republic)

Úrad pre normalizáciu, metrológiu a skúšobníctvo Slovenskej republiky (Slovak Office of Standards, Metrology and Testing)

Úrad pre verejné obstarávanie (The Office for Public Procurement)

Úrad priemyselného vlastníctva Slovenskej republiky (Industrial Property Office of the Slovak Republic)

Správa štátnych hmotných rezerv Slovenskej republiky (The Administration of State Material Reserves of the Slovak Republic)

Národný bezpečnostný úrad (National Security Authority)

Kancelária Prezidenta Slovenskej republiky (The Office of the President of the Slovak Republic)

Národná rada Slovenskej republiky (National Council of the Slovak Republic)

Ústavný súd Slovenskej republiky (Constitutional Court of the Slovak Republic)

Najvyšší súd Slovenskej republiky (Supreme Court of the Slovak Republic)

Generálna prokuratúra Slovenskej republiky (Public Prosecution of the Slovak Republic)

Najvyšší kontrolný úrad Slovenskej republiky (Supreme Audit Office of the Slovak Republic)

Telekomunikačný úrad Slovenskej republiky (Telecommunications Office of the Slovak Republic)

Poštový úrad (Postal Regulatory Office)

Úrad na ochranu osobných údajov (Office for Personal Data Protection)

Kancelária verejného ochrancu práv (Ombudsman's Office)

Úrad pre finančný trh (Office for the Finance Market)

## FINLAND

OIKEUSKANSLERINVIRASTO – JUSTITIEKANSLERSÄMBETET (OFFICE OF THE CHANCELLOR OF JUSTICE)

LIIKENNE- JA VIESTINTÄMINISTERIÖ – KOMMUNIKATIONSMINISTERIET (MINISTRY OF TRANSPORT AND COMMUNICATIONS)

Viestintävirasto – Kommunikationsverket (Finnish Communications Regulatory Authority)

Ajoneuvohallintokeskus AKE – Fordonsförvaltningscentralen AKE (Finnish Vehicle Administration)

Ilmailuhallinto – Luftfartsförvaltningen (Finnish Civil Aviation Authority)

Ilmatieteen laitos – Meteorologiska institutet (Finnish Meterological Institute)

Merenkulkulaitos – Sjöfartsverket (The Finnish Maritime Administration)

Merentutkimuslaitos – Havsforskningsinstitutet (Finnish Institute of Marine Research)

Ratahallintokeskus RHK – Banförvaltningscentralen RHK (Rail Administration)

Rautatievirasto – Järnvägsverket (Finnish Railway Agency)

Tiehallinto – Vägförvaltningen (Road Administration)

MAA- JA METSÄTALOUSMINISTERIÖ – JORD- OCH SKOGSBRUKSMINISTERIET (MINISTRY OF AGRICULTURE AND FORESTRY)

Elintarviketurvallisuusvirasto – Livsmedelssäkerhetsverket (Finnish Food Safety Authority)

Maanmittauslaitos – Lantmäteriverket (National Land Survey of Finland)

Maaseutuvirasto – Landsbygdsverket (The Countryside Agency)

OIKEUSMINISTERIÖ – JUSTITIEMINISTERIET (MINISTRY OF JUSTICE)

Tietosuojavaltuutetun toimisto – Dataombudsmannens byrå (Office of the Data Protection Ombudsman)

Tuomioistuimet – domstolar (Courts of Law)

Korkein oikeus – Högsta domstolen (Supreme Court)

Korkein hallinto-oikeus – Högsta förvaltningsdomstolen (Supreme Administrative Court)

Hovioikeudet – hovrätter (Courts of Appeal)

Käräjäoikeudet – tingsrätter (District Courts)

Hallinto-oikeudet – förvaltningsdomstolar (Administrative Courts)

Markkinaoikeus – Marknadsdomstolen (Market Court)

Työtuomioistuin – Arbetsdomstolen (Labour Court)

Vakuutusoikeus – Försäkringsdomstolen (Insurance Court)

Kuluttajariitalautakunta – Konsumenttvistenämnden (Consumer Complaint Board)

Vankeinhoitolaitos – Fångvårdsväsendet (Prison Service)

HEUNI – Yhdistyneiden Kansakuntien yhteydessä toimiva Euroopan kriminaalipolitiikan instituutti – HEUNI – Europeiska institutet för kriminalpolitik, verksamt i anslutning till Förenta Nationerna (the European Institute for Crime Prevention and Control)

Konkurssiasiamiehen toimisto – Konkursombudsmannens byrå (Office of Bankrupcy Ombudsman)

Oikeushallinnon palvelukeskus – Justitieförvaltningens servicecentral (Legal Management Service)

Oikeushallinnon tietotekniikkakeskus – Justitieförvaltningens datateknikcentral (Legal Administrative Computing Center)

Oikeuspoliittinen tutkimuslaitos (Optula) – Rättspolitiska forskningsinstitutet (Legal Policy Institute)

Oikeusrekisterikeskus – Rättsregistercentralen (Legal Register Centre)

Onnettomuustutkintakeskus – Centralen för undersökning av olyckor (Accident Investigation Board)

Rikosseuraamusvirasto – Brottspåföljdsverket (Criminal sanctions Agency)

Rikosseuraamusalan koulutuskeskus – Brottspåföljdsområdets utbildningscentral (Training Institute for Prison and Probation Services)

Rikoksentorjuntaneuvosto Rådet för brottsförebyggande (National Council for Crime Prevention)

Saamelaiskäräjät – Sametinget (The Saami Parliament)

Valtakunnansyyttäjänvirasto – Riksåklagarämbetet (the Office of the Prosecutor General)

OPETUSMINISTERIÖ – UNDERVISNINGSMINISTERIET (MINISTRY OF EDUCATION)

Opetushallitus – Utbildningsstyrelsen (National Board of Education)

Valtion elokuvatarkastamo – Statens filmgranskningsbyrå (Finnish Board of Film Classification)

PUOLUSTUSMINISTERIÖ – FÖRSVARSMINISTERIET (MINISTRY OF DEFENCE)

Puolustusvoimat – Försvarsmakten (Finnish Defence Forces)

SISÄASIAINMINISTERIÖ – INRIKESMINISTERIET (MINISTRY OF THE INTERIOR)

Keskusrikospoliisi – Centralkriminalpolisen (Central Criminal Police)

Liikkuva poliisi – Rörliga polisen (National Traffic Police)

Rajavartiolaitos – Gränsbevakningsväsendet (Frontier Guard)

Suojelupoliisi – Skyddspolisen (Police protection)

Poliisiammattikorkeakoulu – Polisyrkeshögskolan (Police College)

Poliisin tekniikkakeskus – Polisens teknikcentral (Police Technical Centre)

Pelastusopisto – Räddningsverket (Emergency Services)

Hätäkeskuslaitos – Nödcentralsverket (Emergency Response Centre)

Maahanmuuttovirasto – Migrationsverket (Immigration Authority)

Sisäasiainhallinnon palvelukeskus – Inrikesförvaltningens servicecentral (Interior Management Service)

Helsingin kihlakunnan poliisilaitos – Polisinrättningen i Helsingfors (Helsinki Police Department)

Valtion turvapaikanhakijoiden vastaanottokeskukset – Statliga förläggningar för asylsökande (Reception centres for Asylum Seekers)

SOSIAALI- JA TERVEYSMINISTERIÖ – SOCIAL- OCH HÄLSOVÅRDSMINISTERIET (MINISTRY OF SOCIAL AFFAIRS AND HEALTH)

Työttömyysturvalautakunta – Besvärsnämnden för utkomstskyddsärenden (Unemployment Appeal Board)

Sosiaaliturvan muutoksenhakulautakunta – Besvärsnämnden för socialtrygghet (Appeal Tribunal)

Lääkelaitos – Läkemedelsverket (National Agency for Medicines)

Terveydenhuollon oikeusturvakeskus – Rättsskyddscentralen för hälsovården (National Authority for Medicolegal Affairs)

Säteilyturvakeskus – Strålsäkerhetscentralen (Finnish Centre for Radiation and Nuclear Safety)

Kansanterveyslaitos – Folkhälsoinstitutet (National Public Health Institute)

Lääkehoidon kehittämiskeskus ROHTO – Utvecklingscentralen för läkemedelsbe-handling (Centre for Pharmacotherapy Development ROHTO)

Sosiaali- ja terveydenhuollon tuotevalvontakeskus – Social- och hälsovårdens produkttill-synscentral (the National Product Control Agency's SSTV)

Sosiaali- ja terveysalan tutkimus- ja kehittämiskeskus Stakes – Forsknings- och utvecklingscentralen för social- och hälsovården Stakes (Health and Social Care Research and Development Center STAKES)

## TYÖ- JA ELINKEINOMINISTERIÖ – ARBETS- OCH NÄRINGSMINISTERIET (MINISTRY OF EMPLOYMENT AND THE ECONOMY)

Kuluttajavirasto – Konsumentverket (Finnish Consumer Agency)

Kilpailuvirasto – Konkurrensverket (Finnish Competition Authority)

Patentti- ja rekisterihallitus – Patent- och registerstyrelsen (National Board of Patents and Registration)

Valtakunnansovittelijain toimisto – Riksförlikningsmännens byrå (National Conciliators' Office)

Työneuvosto – Arbetsrådet (Labour Council)

Energiamarkkinavirasto − Energimarknadsverket (Energy Market Authority)

Geologian tutkimuskeskus – Geologiska forskningscentralen (Geological Survey of Finland)

Huoltovarmuuskeskus – Försörjningsberedskapscentralen (The National Emergency Supply Agency)

Kuluttajatutkimuskeskus – Konsumentforskningscentralen (National Consumer Research Center)

Matkailun edistämiskeskus (MEK) – Centralen för turistfrämjande (Finnish Tourist Board)

Mittatekniikan keskus (MIKES) – Mätteknikcentralen (Centre for Metrology and Accrediattion)

Tekes - teknologian ja innovaatioiden kehittämiskeskus −Tekes - utvecklingscentralen för teknologi och innovationer (Finnish Funding Agency for Technology and Innovation)

Turvatekniikan keskus (TUKES) – Säkerhetsteknikcentralen (Safety Technology Authority)

Valtion teknillinen tutkimuskeskus (VTT) – Statens tekniska forskningscentral (VTT Technical Research Centre of Finland)

Syrjintälautakunta – Nationella diskrimineringsnämnden (Discrimination Tribunal)

Vähemmistövaltuutetun toimisto – Minoritetsombudsmannens byrå (Office of the Ombudsman for Minorities)

## ULKOASIAINMINISTERIÖ – UTRIKESMINISTERIET (MINISTRY FOR FOREIGN AFFAIRS)

## VALTIONEUVOSTON KANSLIA – STATSRÅDETS KANSLI (PRIME MINISTER'S OFFICE)

## VALTIOVARAINMINISTERIÖ – FINANSMINISTERIET (MINISTRY OF FINANCE)

Valtiokonttori – Statskontoret (State Treasury)

Verohallinto – Skatteförvaltningen (Tax Administration)

Tullilaitos – Tullverket (Customs)

Tilastokeskus – Statistikcentralen (Statistics Finland)

Valtiontaloudellinen tutkimuskeskus – Statens ekonomiska forskiningscentral (Government Institute for Economic Research)

Väestörekisterikeskus – Befolkningsregistercentralen (Population Register Centre)

YMPÄRISTÖMINISTERIÖ – MILJÖMINISTERIET (MINISTRY OF ENVIRONMENT)

Suomen ympäristökeskus - Finlands miljöcentral (Finnish Environment Institute)

Asumisen rahoitus- ja kehityskeskus – Finansierings- och utvecklingscentralen för boendet (The Housing Finance and Development Centre of Finland)

VALTIONTALOUDEN TARKASTUSVIRASTO – STATENS REVISIONSVERK (NATIONAL AUDIT OFFICE)

## SWEDEN

| | |
|---|---|
| Royal Academy of Fine Arts | Akademien för de fria konsterna |
| National Board for Consumer Complaints | Allmänna reklamationsnämnden |
| Labour Court | Arbetsdomstolen |
| Swedish Employment Services | Arbetsförmedlingen |
| National Agency for Government Employers | Arbetsgivarverk, statens |
| National Institute for Working Life | Arbetslivsinstitutet |
| Swedish Work Environment Authority | Arbetsmiljöverket |
| Swedish Inheritance Fund Commission | Arvsfondsdelegationen |
| Museum of Architecture | Arkitekturmuseet |
| National Archive of Recorded Sound and Moving Images | Ljud och bildarkiv, statens |
| The Office of the Childrens' Ombudsman | Barnombudsmannen |
| Swedish Council on Technology Assessment in Health Care | Beredning för utvärdering av medicinsk metodik, statens |
| Royal Library | Kungliga Biblioteket |
| National Board of Film Censors | Biografbyrå, statens |
| Dictionary of Swedish Biography | Biografiskt lexikon, svenskt |
| Swedish Accounting Standards Board | Bokföringsnämnden |
| Swedish Companies Registration Office | Bolagsverket |
| National Housing Credit Guarantee Board | Bostadskreditnämnd, statens (BKN) |
| National Housing Board | Boverket |
| National Council for Crime Prevention | Brottsförebyggande rådet |
| Criminal Victim Compensation and Support Authority | Brottsoffermyndigheten |

| | |
|---|---|
| National Board of Student Aid | Centrala studiestödsnämnden |
| Data Inspection Board | Datainspektionen |
| Ministries (Government Departments) | Departementen |
| National Courts Administration | Domstolsverket |
| National Electrical Safety Board | Elsäkerhetsverket |
| Swedish Energy Markets Inspectorate | Energimarknadsinspektionen |
| Export Credits Guarantee Board | Exportkreditnämnden |
| Swedish Fiscal Policy Council | Finanspolitiska rådet |
| Financial Supervisory Authority | Finansinspektionen |
| National Board of Fisheries | Fiskeriverket |
| National Institute of Public Health | Folkhälsoinstitut, statens |
| Swedish Research Council for Environment | Forskningsrådet för miljö, areella näringar och samhällsbyggande, Formas |
| National Fortifications Administration | Fortifikationsverket |
| National Mediation Office | Medlingsinstitutet |
| Defence Material Administration | Försvarets materielverk |
| National Defence Radio Institute | Försvarets radioanstalt |
| Swedish Museums of Military History | Försvarshistoriska museer, statens |
| National Defence College | Försvarshögskolan |
| The Swedish Armed Forces | Försvarsmakten |
| Social Insurance Office | Försäkringskassan |
| Geological Survey of Sweden | Geologiska undersökning, Sveriges |
| Geotechnical Institute | Geotekniska institut, statens |
| The National Rural Development Agency | Glesbygdsverket |
| Graphic Institute and the Graduate School of Communications | Grafiska institutet och institutet för högre kommunikations- och reklamutbildning |
| The Swedish Broadcasting Commission | Granskningsnämnden för Radio och TV |
| Swedish Government Seamen's Service | Handelsflottans kultur- och fritidsråd |
| Ombudsman for the Disabled | Handikappombudsmannen |
| Board of Accident Investigation | Haverikommission, statens |
| Courts of Appeal (6) | Hovrätterna (6) |
| Regional Rent and Tenancies Tribunals (12) | Hyres- och arendenämnder (12) |

| | |
|---|---|
| Committee on Medical Responsibility | Hälso- och sjukvårdens ansvarsnämnd |
| National Agency for Higher Education | Högskoleverket |
| Supreme Court | Högsta domstolen |
| National Institute for Psycho-Social Factors and Health | Institut för psykosocial miljömedicin, statens |
| National Institute for Regional Studies | Institut för tillväxtpolitiska studier |
| Swedish Institute of Space Physics | Institutet för rymdfysik |
| International Programme Office for Education and Training | Internationella programkontoret för utbildningsområdet |
| Swedish Migration Board | Migrationsverket |
| Swedish Board of Agriculture | Jordbruksverk, statens |
| Office of the Chancellor of Justice | Justitiekanslern |
| Office of the Equal Opportunities Ombudsman | Jämställdhetsombudsmannen |
| National Judicial Board of Public Lands and Funds | Kammarkollegiet |
| Administrative Courts of Appeal (4) | Kammarrätterna (4) |
| National Chemicals Inspectorate | Kemikalieinspektionen |
| National Board of Trade | Kommerskollegium |
| Swedish Agency for Innovation Systems | Verket för innovationssystem (VINNOVA) |
| National Institute of Economic Research | Konjunkturinstitutet |
| Swedish Competition Authority | Konkurrensverket |
| College of Arts, Crafts and Design | Konstfack |
| College of Fine Arts | Konsthögskolan |
| National Museum of Fine Arts | Nationalmuseum |
| Arts Grants Committee | Konstnärsnämnden |
| National Art Council | Konstråd, statens |
| National Board for Consumer Policies | Konsumentverket |
| National Laboratory of Forensic Science | Kriminaltekniska laboratorium, statens |
| Prison and Probation Service | Kriminalvården |
| National Paroles Board | Kriminalvårdsnämnden |
| Swedish Enforcement Authority | Kronofogdemyndigheten |
| National Council for Cultural Affairs | Kulturråd, statens |

| | |
|---|---|
| Swedish Coast Guard | Kustbevakningen |
| National Land Survey | Lantmäteriverket |
| Royal Armoury | Livrustkammaren/Skoklosters slott/ Hallwylska museet |
| National Food Administration | Livsmedelsverk, statens |
| The National Gaming Board | Lotteriinspektionen |
| Medical Products Agency | Läkemedelsverket |
| County Administrative Courts (24) | Länsrätterna (24) |
| County Administrative Boards (24) | Länsstyrelserna (24) |
| National Government Employee and Pensions Board | Pensionsverk, statens |
| Market Court | Marknadsdomstolen |
| Swedish Meteorological and Hydrological Institute | Meteorologiska och hydrologiska institut, Sveriges |
| Modern Museum | Moderna museet |
| Swedish National Collections of Music | Musiksamlingar, statens |
| Swedish Agency for Disability Policy Coordination | Myndigheten för handikappolitisk samordning |
| Swedish Agency for Networks and Cooperation in Higher Education | Myndigheten för nätverk och samarbete inom högre utbildning |
| Commission for state grants to religious communities | Nämnden för statligt stöd till trossamfun |
| Museum of Natural History | Naturhistoriska riksmuseet |
| National Environmental Protection Agency | Naturvårdsverket |
| Scandinavian Institute of African Studies | Nordiska Afrikainstitutet |
| Nordic School of Public Health | Nordiska högskolan för folkhälsovetenskap |
| Recorders Committee | Notarienämnden |
| Swedish National Board for Intra Country Adoptions | Myndigheten för internationella adoptionsfrågor |
| Swedish Agency for Economic and Regional Growth | Verket för näringslivsutveckling (NUTEK) |
| Office of the Ethnic Discrimination Ombudsman | Ombudsmannen mot etnisk diskriminering |
| Court of Patent Appeals | Patentbesvärsrätten |
| Patents and Registration Office | Patent- och registreringsverket |

| | |
|---|---|
| Swedish Population Address Register Board | Personadressregisternämnd statens, SPAR-nämnden |
| Swedish Polar Research Secretariat | Polarforskningssekretariatet |
| Press Subsidies Council | Presstödsnämnden |
| The Council of the European Social Fund in Sweden | Rådet för Europeiska socialfonden i Sverige |
| The Swedish Radio and TV Authority | Radio- och TV-verket |
| Government Offices | Regeringskansliet |
| Supreme Administrative Court | Regeringsrätten |
| Central Board of National Antiquities | Riksantikvarieämbetet |
| National Archives | Riksarkivet |
| Bank of Sweden | Riksbanken |
| Parliamentary Administrative Office | Riksdagsförvaltningen |
| The Parliamentary Ombudsmen | Riksdagens ombudsmän, JO |
| The Parliamentary Auditors | Riksdagens revisorer |
| National Debt Office | Riksgäldskontoret |
| National Police Board | Rikspolisstyrelsen |
| National Audit Bureau | Riksrevisionen |
| Travelling Exhibitions Service | Riksutställningar, Stiftelsen |
| National Space Board | Rymdstyrelsen |
| Swedish Council for Working Life and Social Research | Forskningsrådet för arbetsliv och socialvetenskap |
| National Rescue Services Board | Räddningsverk, statens |
| Regional Legal-aid Authority | Rättshjälpsmyndigheten |
| National Board of Forensic Medicine | Rättsmedicinalverket |
| Sami (Lapp) School Board | Sameskolstyrelsen och sameskolor |
| Sami (Lapp) Schools | |
| National Maritime Administration | Sjöfartsverket |
| National Maritime Museums | Maritima museer, statens |
| Swedish Commission on Security and Integrity Protection | Säkerhets- och intregritetsskyddsnämnden |
| Swedish Tax Agency | Skatteverket |
| National Board of Forestry | Skogsstyrelsen |
| National Agency for Education | Skolverk, statens |

| | |
|---|---|
| Swedish Institute for Infectious Disease Control | Smittskyddsinstitutet |
| National Board of Health and Welfare | Socialstyrelsen |
| National Inspectorate of Explosives and Flammables | Sprängämnesinspektionen |
| Statistics Sweden | Statistiska centralbyrån |
| Agency for Administrative Development | Statskontoret |
| Swedish Radiation Safety Authority | Strålsäkerhetsmyndigheten |
| Swedish International Development Cooperation Authority | Styrelsen för internationellt utvecklings- samarbete, SIDA |
| National Board of Psychological Defence and Conformity Assessment | Styrelsen för psykologiskt försvar |
| Swedish Board for Accreditation | Styrelsen för ackreditering och teknisk kontroll |
| Swedish Institute | Svenska Institutet, stiftelsen |
| Library of Talking Books and Braille Publications | Talboks- och punktskriftsbiblioteket |
| District and City Courts (97) | Tingsrätterna (97) |
| Judges Nomination Proposal Committee | Tjänsteförslagsnämnden för domstolsväsendet |
| Armed Forces' Enrolment Board | Totalförsvarets pliktverk |
| Swedish Defence Research Agency | Totalförsvarets forskningsinstitut |
| Swedish Board of Customs | Tullverket |
| Swedish Tourist Authority | Turistdelegationen |
| The National Board of Youth Affairs | Ungdomsstyrelsen |
| Universities and University Colleges | Universitet och högskolor |
| Aliens Appeals Board | Utlänningsnämnden |
| National Seed Testing and Certification Institute | Utsädeskontroll, statens |
| Swedish National Road Administration | Vägverket |
| National Water Supply and Sewage Tribunal | Vatten- och avloppsnämnd, statens |
| National Agency for Higher Education | Verket för högskoleservice (VHS) |
| Swedish Agency for Economic and Regional Development | Verket för näringslivsutveckling (NUTEK) |
| Swedish Research Council | Vetenskapsrådet' |
| National Veterinary Institute | Veterinärmedicinska anstalt, statens |

| | |
|---|---|
| Swedish National Road and Transport Research Institute | Väg- och transportforskningsinstitut, statens |
| National Plant Variety Board | Växtsortnämnd, statens |
| Swedish Prosecution Authority | Åklagarmyndigheten |
| Swedish Emergency Management Agency | Krisberedskapsmyndigheten |
| Board of Appeals of the Manna Mission | Överklagandenämnden för nämndemannauppdrag |

## UNITED KINGDOM

Cabinet Office

      Office of the Parliamentary Counsel

Central Office of Information

Charity Commission

Crown Estate Commissioners (Vote Expenditure Only)

Crown Prosecution Service

Department for Business, Enterprise and Regulatory Reform

      Competition Commission

      Gas and Electricity Consumers' Council

      Office of Manpower Economics

Department for Children, Schools and Families

Department of Communities and Local Government

      Rent Assessment Panels

Department for Culture, Media and Sport

      British Library

      British Museum

      Commission for Architecture and the Built Environment

      The Gambling Commission

      Historic Buildings and Monuments Commission for England (English Heritage)

      Imperial War Museum

      Museums, Libraries and Archives Council

      National Gallery

      National Maritime Museum

      National Portrait Gallery

      Natural History Museum

      Science Museum

Tate Gallery

Victoria and Albert Museum

Wallace Collection

Department for Environment, Food and Rural Affairs

Agricultural Dwelling House Advisory Committees

Agricultural Land Tribunals

Agricultural Wages Board and Committees

Cattle Breeding Centre

Countryside Agency

Plant Variety Rights Office

Royal Botanic Gardens, Kew

Royal Commission on Environmental Pollution

Department of Health

Dental Practice Board

National Health Service Strategic Health Authorities

NHS Trusts

Prescription Pricing Authority

Department for Innovation, Universities and Skills

Higher Education Funding Council for England

National Weights and Measures Laboratory

Patent Office

Department for International Development

Department of the Procurator General and Treasury Solicitor

Legal Secretariat to the Law Officers

Department for Transport

Maritime and Coastguard Agency

Department for Work and Pensions

Disability Living Allowance Advisory Board

Independent Tribunal Service

Medical Boards and Examining Medical Officers (War Pensions)

Occupational Pensions Regulatory Authority

Regional Medical Service

Social Security Advisory Committee

Export Credits Guarantee Department

Foreign and Commonwealth Office

        Wilton Park Conference Centre

Government Actuary's Department

Government Communications Headquarters

Home Office

        HM Inspectorate of Constabulary

House of Commons

House of Lords

Ministry of Defence

        Defence Equipment & Support

        Meteorological Office

Ministry of Justice

        Boundary Commission for England

        Combined Tax Tribunal

        Council on Tribunals

        Court of Appeal - Criminal

        Employment Appeals Tribunal

        Employment Tribunals

        HMCS Regions, Crown, County and Combined Courts (England and Wales)

        Immigration Appellate Authorities

        Immigration Adjudicators

        Immigration Appeals Tribunal

        Lands Tribunal

        Law Commission

        Legal Aid Fund (England and Wales)

        Office of the Social Security Commissioners

        Parole Board and Local Review Committees

        Pensions Appeal Tribunals

        Public Trust Office

        Supreme Court Group (England and Wales)

        Transport Tribunal

The National Archives

National Audit Office

National Savings and Investments

National School of Government

Northern Ireland Assembly Commission

Northern Ireland Court Service

    Coroners Courts

    County Courts

    Court of Appeal and High Court of Justice in Northern Ireland

    Crown Court

    Enforcement of Judgements Office

    Legal Aid Fund

    Magistrates' Courts

    Pensions Appeals Tribunals

Northern Ireland, Department for Employment and Learning

Northern Ireland, Department for Regional Development

Northern Ireland, Department for Social Development

Northern Ireland, Department of Agriculture and Rural Development

Northern Ireland, Department of Culture, Arts and Leisure

Northern Ireland, Department of Education

Northern Ireland, Department of Enterprise, Trade and Investment

Northern Ireland, Department of the Environment

Northern Ireland, Department of Finance and Personnel

Northern Ireland, Department of Health, Social Services and Public Safety

Northern Ireland, Office of the First Minister and Deputy First Minister

Northern Ireland Office

    Crown Solicitor's Office

    Department of the Director of Public Prosecutions for Northern Ireland

    Forensic Science Laboratory of Northern Ireland

    Office of the Chief Electoral Officer for Northern Ireland

    Police Service of Northern Ireland

    Probation Board for Northern Ireland

    State Pathologist Service

Office of Fair Trading

Office for National Statistics

> National Health Service Central Register

Office of the Parliamentary Commissioner for Administration and Health Service Commissioners

Paymaster General's Office

Postal Business of the Post Office

Privy Council Office

Public Record Office

HM Revenue and Customs

> The Revenue and Customs Prosecutions Office

Royal Hospital, Chelsea

Royal Mint

Rural Payments Agency

Scotland, Auditor-General

Scotland, Crown Office and Procurator Fiscal Service

Scotland, General Register Office

Scotland, Queen's and Lord Treasurer's Remembrancer

Scotland, Registers of Scotland

The Scotland Office

The Scottish Ministers

> Architecture and Design Scotland
>
> Crofters Commission
>
> Deer Commission for Scotland
>
> Lands Tribunal for Scotland
>
> National Galleries of Scotland
>
> National Library of Scotland
>
> National Museums of Scotland
>
> Royal Botanic Garden, Edinburgh
>
> Royal Commission on the Ancient and Historical Monuments of Scotland
>
> Scottish Further and Higher Education Funding Council
>
> Scottish Law Commission
>
> Community Health Partnerships
>
> Special Health Boards
>
> Health Boards

The Office of the Accountant of Court

High Court of Justiciary

Court of Session

HM Inspectorate of Constabulary

Parole Board for Scotland

Pensions Appeal Tribunals

Scottish Land Court

Sheriff Courts

Scottish Police Services Authority

Office of the Social Security Commissioners

The Private Rented Housing Panel and Private Rented Housing Committees

Keeper of the Records of Scotland

The Scottish Parliamentary Body Corporate

HM Treasury

Office of Government Commerce

United Kingdom Debt Management Office

The Wales Office (Office of the Secretary of State for Wales)

The Welsh Ministers

Higher Education Funding Council for Wales

Local Government Boundary Commission for Wales

The Royal Commission on the Ancient and Historical Monuments of Wales

Valuation Tribunals (Wales)

Welsh National Health Service Trusts and Local Health Boards

Welsh Rent Assessment Panels

### *Notes to the European Union's Annex 1*

1. The procurement by procuring entities covered under this Annex of good or service components of procurements which are not themselves covered by this Chapter shall not be considered as covered procurement.

2. "Contracting authorities of European Union Member States" includes any subordinated entity of any contracting authority of an European Union Member State provided it does not have separate legal personality.

3. As far as procurement by entities in the field of defence and security is concerned, only non-sensitive and non-warlike materials contained in the list attached to Annex 19-4 are covered.

## ANNEX 19-2

**Sub-central government entities which procure in accordance with the provisions of the Chapter**

### Section A: All regional or local contracting authorities

1.      All contracting authorities of the administrative units as defined by Regulation 1059/2003 – NUTS Regulation.

2.      For the purposes of this Chapter, 'regional contracting authorities' shall be understood as contracting authorities of the administrative units falling under NUTS 1 and 2, as referred to by Regulation 1059/2003 – NUTS Regulation.

3.      For the purposes of this Chapter, 'local contracting authorities' shall be understood as contracting authorities of the administrative units falling under NUTS 3 and smaller administrative units, as referred to by Regulation 1059/2003 – NUTS Regulation.

Goods
Specified in Annex 19-4
Thresholds                                    SDR 200,000

Services
Specified in Annex 19-5
Thresholds                                    SDR 200,000

Construction services and works concessions
Specified in Annex 19-6
Thresholds                                    SDR 5,000,0000

### Section B: All contracting authorities which are bodies governed by public law as defined by European Union procurement directive

Goods
Specified in Annex 19-4
Thresholds - for hospitals, schools, universities,
and entities providing social services (housing,
social insurance, day care), that are bodies
governed by public law:                       SDR 200,000

for other entities:                           SDR 355,000

Services
Specified in Annex 19-5
Thresholds       for hospitals, schools, universities,
and entities providing social services (housing,
social insurance, day care), that are bodies
governed by public law:                       SDR 200,000

for other entities:                           SDR: 355,000

Construction services and works concessions
Specified in Annex 19-6
Thresholds                                    SDR 5,000,000

A "**body governed by public law**" means any body:

(a)    established for the specific purpose of meeting needs in the general interest, not having an industrial or commercial character;

(b)    having legal personality; and

(c)    financed, for the most part, by the State, or regional or local authorities, or other bodies governed by public law, or subject to management supervision by those bodies, or having an administrative, managerial or supervisory board; more than half of whose members are appointed by the State, regional or local authorities or by other bodies governed by public law.

***Notes to the European Union's Annex 19-2***

1.    The procurement by procuring entities covered under this Annex of good or service components of procurement which are not themselves covered by this Chapter shall not be considered as covered procurement.

2.    The European Union stands ready to cover easily identifiable categories of bodies governed by public law in Annex 19-2 (active in areas such as social services or libraries) under a lower threshold (SDR 200,000) if Canada demonstrates that the same threshold applies to the same types of entities in Canada.

## ANNEX 19-3

### Utilities which procure in accordance with the provisions of this Chapter

Goods
Specified in Annex 19-4
Thresholds                            SDR 400,000

Services
Specified in Annex 19-5
Thresholds                            SDR 400,000

Construction services and works concessions
Specified in Annex 19-6
Thresholds                            SDR 5,000,000

All contracting entities whose procurement is covered by the European Union utilities directive which are contracting authorities (for example, those covered under Annexes 19-1 and 19-2) or public undertakings[56] and which have as one of their activities any of those referred to below or any combination thereof:

(a)     the provision or operation of fixed networks intended to provide a service to the public in connection with the production, transport or distribution of drinking water or the supply of drinking water to such networks;[57]

(b)     the provision or operation of fixed networks intended to provide a service to the public in connection with the production, transport or distribution of electricity, gas, and heat, or the supply of electricity, gas and heat to such networks;

(c)     the provision or operation of networks[58] providing a service to the public in the field of transport by urban railway, automated systems, tramway, trolley bus, bus or cable[59];

(d)     the provision or operation of networks providing a service to the public in the field of transport by railways.

*Notes to the European Union's Annex 19-3*

---

[56]     According to the European Union utilities directive, a public undertaking is any undertaking over which the contracting authorities may exercise directly or indirectly a dominant influence by virtue of their ownership of it, their financial participation therein, or the rules which govern it.
        A dominant influence on the part of the contracting authorities shall be presumed when these authorities, directly or indirectly, in relation to an undertaking:
        (a) hold the majority of the undertaking's subscribed capital;
        (b) control the majority of the votes attaching to shares issued by the undertaking; or
        (c) can appoint more than half of the undertaking's administrative, management or supervisory body.

[57]     For greater certainty, it is noted that if and where such networks include the disposal and treatment of sewage, that part of the operation shall also be covered.

[58]     As regards transport services, a network shall be considered to exist where the service is provided under operating conditions laid down by a competent authority of an European Union Member State, such as conditions on the routes to be served, the capacity to be made available or the frequency of the service.

[59]     For the procurement of mass transit vehicles, Canadian bidders must be treated no less favourably than European Union bidders or other third country bidders. A mass transit vehicle refers to a street car, bus, trolley bus, subway car, light rail car or passenger locomotive for subway or light rail used for public transportation.

1.	Contracts awarded for the pursuit of an activity listed above when exposed to competitive forces in the market concerned are not covered by this Agreement.

2.	This Chapter shall not apply to contracts awarded by procuring entities covered under this Annex:

	(a)	for the purchase of water and for the supply of energy or of fuels for the production of energy;

	(b)	for purposes other than the pursuit of their activities as listed in this Annex or for the pursuit of such activities in a non-European Economic Area country;

	(c)	for purposes of re-sale or hire to third parties, provided that the procuring entity enjoys no special or exclusive right to sell or hire the subject of such contracts and other entities are free to sell or hire it under the same conditions as the procuring entity.

3.	The supply of drinking water or electricity to networks which provide a service to the public by a procuring entity other than a contracting authority shall not be considered as an activity within the meaning of subparagraphs (a) or (b) of this Annex where:

	(a)	the production of drinking water or electricity by the entity concerned takes place because its consumption is necessary for carrying out an activity other than that referred to in subparagraphs (a) to (d) of this Annex; and

	(b)	supply to the public network depends only on the entity's own consumption and has not exceeded 30 per cent of the entity's total production of drinking water or energy, having regard to the average for the preceding three years, including the current year.

4.	The supply of gas or heat to networks which provide a service to the public by a contracting entity other than a contracting authority shall not be considered a relevant activity within the meaning of subparagraph (b) of this Annex where:

	(a)	the production of gas or heat by the entity concerned is the unavoidable consequence of carrying out an activity other than those referred to in subparagraphs (a) to (d) of this Annex; and

	(b)	supply to the public network is aimed only at the economic exploitation of such production and amounts to not more than 20 per cent of the entity's turnover having regard to the average for the preceding three years, including the current year.

5.	(a)	Provided that the conditions in subparagraph (b) are met, this Chapter shall not apply to contracts awarded:

		(i)	by a procuring entity to an affiliated undertaking[60]; or

		(ii)	by a joint venture, formed exclusively by a number of procuring entities for the purpose of carrying out activities within the meaning of subparagraphs (a) to (d) of this Annex, to an undertaking which is affiliated with one of these procuring entities.

---

[60]	"**affiliated undertaking**" means any undertaking the annual accounts of which are consolidated with those of the procuring entity in accordance with the requirements of Council Directive 83/349/EEC on consolidated accounts, or in case of entities not subject to that Directive, any undertaking over which the procuring entity may exercise, directly or indirectly, a dominant influence, or which may exercise a dominant influence over the procuring entity, or which, in common with the procuring entity, is subject to the dominant influence of another undertaking by virtue of ownership, financial participation, or the rules which govern it.

(b)    Subparagraph (a) shall apply to services or supplies contracts provided that at least 80 per cent of the average turnover of the affiliated undertaking with respect to services or supplies for the preceding three years derives respectively from the provision of such services or supplies to undertakings with which it is affiliated.[61]

6.    This Chapter shall not apply to contracts awarded:

(a)    by a joint venture, formed exclusively by a number of procuring entities for the purposes of carrying out activities within the meaning of subparagraphs (a) to (d) of this Annex, to one of these procuring entities; or

(b)    by a procuring entity to such a joint venture of which it forms part, provided that the joint venture has been set up to carry out the activity concerned over a period of at least three years and the instrument setting up the joint venture stipulates that the procuring entities, which form it, will be part thereof for at least the same period.

7.    This Chapter shall not apply to procurements by procuring entities covered by this Annex for the purpose of activities relating to the exploitation of a geographical area for the purpose of exploring for, or extracting of, oil, gas, coal or other solid fuels.

---

[61]    When, because of the date on which an affiliated undertaking was created or commenced activities, the turnover is not available for the preceding three years, it will be sufficient for that undertaking to show that the turnover referred to in this paragraph is credible, in particular by means of business projections.

# ANNEX 19-4

## Goods

1. This Chapter will apply to the procurement of all goods procured by the entities listed in Annexes 19-1 through 19-3, unless otherwise specified in this Chapter.

2. This Chapter covers only the supplies and equipment that are described in the Chapters of the Combined Nomenclature (CN) specified below and that are purchased by Ministries of Defence in Belgium, Bulgaria, Czech Republic, Denmark, Germany, Estonia, Greece, Spain, France, Ireland, Italy, Cyprus, Latvia, Lithuania, Luxembourg, Hungary, Malta, the Netherlands, Austria, Poland, Portugal, Romania, Slovenia, Slovakia, Finland, Sweden and the United Kingdom that are covered by the Agreement:

| | |
|---|---|
| Chapter 25: | Salt, sulphur, earths and stone, plastering materials, lime and cement |
| Chapter 26: | Metallic ores, slag and ash |
| Chapter 27: | Mineral fuels, mineral oils and products of their distillation, bituminous substances, mineral waxes |
| | except:<br>ex 27.10: special engine fuels |
| Chapter 28: | Inorganic chemicals, organic and inorganic compounds of precious metals, of rare-earth metals, of radio-active elements and isotopes |
| | except:<br>ex 28.09: explosives<br>ex 28.13: explosives<br>ex 28.14: tear gas<br>ex 28.28: explosives<br>ex 28.32: explosives<br>ex 28.39: explosives<br>ex 28.50: toxic products<br>ex 28.51: toxic products<br>ex 28.54: explosives |
| Chapter 29: | Organic chemicals |
| | except:<br>ex 29.03: explosives<br>ex 29.04: explosives<br>ex 29.07: explosives<br>ex 29.08: explosives<br>ex 29.11: explosives<br>ex 29.12: explosives<br>ex 29.13: toxic products<br>ex 29.14: toxic products<br>ex 29.15: toxic products<br>ex 29.21: toxic products |

ex 29.22: toxic products
ex 29.23: toxic products
ex 29.26: explosives
ex 29.27: toxic products
ex 29.29: explosives

Chapter 30:      Pharmaceutical products

Chapter 31:      Fertilizers

Chapter 32:      Tanning and dyeing extracts, tannings and their derivatives, dyes, colours, paints and varnishes, putty, fillers and stoppings, inks

Chapter 33:      Essential oils and resinoids, perfumery, cosmetic or toilet preparations

Chapter 34:      Soap, organic surface-active agents, washing preparations, lubricating preparations, artificial waxes, prepared waxes, polishing and scouring preparations, candles and similar articles, modelling pastes and 'dental waxes'

Chapter 35:      Albuminoidal substances, glues, enzymes

Chapter 37:      Photographic and cinematographic goods

Chapter 38:      Miscellaneous chemical products

                 except:
                 ex 38.19: toxic products

Chapter 39:      Artificial resins and plastic materials, cellulose esters and ethers, articles thereof

Chapter 40:      Rubber, synthetic rubber, factice, and articles thereof

                 except:
                 ex 40.11: bullet-proof tyres

Chapter 41:      Raw hides and skins (other than fur skins) and leather

Chapter 42:      Articles of leather, saddlery and harness, travel goods, handbags and similar containers, articles of animal gut (other than silk-worm gut)

Chapter 43:      Furskins and artificial fur, manufactures thereof

Chapter 44:      Wood and articles of wood, wood charcoal

Chapter 45:      Cork and articles of cork

Chapter 46:      Manufactures of straw of esparto and of other plaiting materials, basket ware and wickerwork

501

| | |
|---|---|
| Chapter 47: | Paper-making material |
| Chapter 48: | Paper and paperboard, articles of paper pulp, of paper or of paperboard |
| Chapter 49: | Printed books, newspapers, pictures and other products of the printing industry, manuscripts, typescripts and plans |
| Chapter 65: | Headgear and parts thereof |
| Chapter 66: | Umbrellas, sunshades, walking-sticks, whips, riding-crops and parts thereof |
| Chapter 67: | Prepared feathers and down and articles made of feathers or of down, artificial flowers, articles of human hair |
| Chapter 68: | Articles of stone, of plaster, of cement, of asbestos, of mica and of similar materials |
| Chapter 69: | Ceramic products |
| Chapter 70: | Glass and glassware |
| Chapter 71: | Pearls, precious and semi-precious stones, precious metals, rolled precious metals, and articles thereof; imitation jewellery |
| Chapter 73: | Iron and steel and articles thereof |
| Chapter 74: | Copper and articles thereof |
| Chapter 75: | Nickel and articles thereof |
| Chapter 76: | Aluminium and articles thereof |
| Chapter 77: | Magnesium and beryllium and articles thereof |
| Chapter 78: | Lead and articles thereof |
| Chapter 79: | Zinc and articles thereof |
| Chapter 80: | Tin and articles thereof |
| Chapter 81: | Other base metals employed in metallurgy and articles thereof |
| Chapter 82: | Tools, implements, cutlery, spoons and forks, of base metal, parts thereof |
| | except:<br>ex 82.05: tools<br>ex 82.07: tools, parts |

Chapter 83:          Miscellaneous articles of base metal

Chapter 84:          Boilers, machinery and mechanical appliances, parts thereof

except:
ex 84.06: engines
ex 84.08: other engines
ex 84.45: machinery
ex 84.53: automatic data-processing machines
ex 84.55: parts of machines under heading No 84.53
ex 84.59: nuclear reactors

Chapter 85:          Electrical machinery and equipment, parts thereof

except:
ex 85.13: telecommunication equipment
ex 85.15: transmission apparatus

Chapter 86:          Railway and tramway locomotives, rolling-stock and parts thereof; railway and tramway tracks fixtures and fittings, traffic signalling equipment of all kinds (not electrically powered)

except:
ex 86.02: armoured locomotives, electric
ex 86.03: other armoured locomotives
ex 86.05: armoured wagons
ex 86.06: repair wagons
ex 86.07: wagons

Chapter 87:          Vehicles, other than railway or tramway rolling-stock, and parts thereof

except:
ex 87.08: tanks and other armoured vehicles
ex 87.01: tractors
ex 87.02: military vehicles
ex 87.03: breakdown lorries
ex 87.09: motorcycles
ex 87.14: trailers

Chapter 89:          Ships, boats and floating structures

except:
ex 89.01 A: warships

Chapter 90:          Optical, photographic, cinematographic, measuring, checking, precision, medical and surgical instruments and apparatus, parts thereof

except:
ex 90.05: binoculars
ex 90.13: miscellaneous instruments, lasers
ex 90.14: telemeters

ex 90.28: electrical and electronic measuring instruments
ex 90.11: microscopes
ex 90.17: medical instruments
ex 90.18: mechano-therapy appliances
ex 90.19: orthopaedic appliances
ex 90.20: X-ray apparatus

Chapter 91:     Manufacture of watches and clocks

Chapter 92:     Musical instruments, sound recorders or reproducers, television image and sound recorders or reproducers, parts and accessories of such articles

Chapter 94:     Furniture and parts thereof, bedding, mattresses, mattress supports, cushions and similar stuffed furnishings

except:
ex 94.01 A: aircraft seats

Chapter 95:     Articles and manufactures of carving or moulding material

Chapter 96:     Brooms, brushes, powder-puffs and sieves

Chapter 98:     Miscellaneous manufactured articles

## ANNEX 19-5

### Services

Of the Universal List of Services, as contained in document MTN.GNS/W/120, the following services are included:

| Service | CPC Reference |
|---|---|
| Repair services of personal and household goods | 633 |
| Commercial courier services (including multi-modal) | 7512 |
| Electronic data interchange (EDI)<br><br>Electronic mail<br><br>Enhanced/value-added facsimile services, including store and forward, store and retrieve Code and protocol conversion<br><br>On-line information and data base retrieval<br><br>Voice mail | 7523 |
| Real estate services on a fee or contract basis | 822 |
| Consultancy services related to the installation of computer hardware | 841 |
| Software implementation services, including systems and software consulting services, systems analysis, design, programming and maintenance services | 842 |
| Data processing services, including processing, tabulation and facilities management services<br><br>On-line information and/or data processing (including transaction processing) | 843 |
| Data base services | 844 |
| Maintenance and repair services of office machinery and equipment including computers | 845 |
| Other computer services | 849 |
| General management consulting services | 86501 |
| Marketing management consulting services | 86503 |
| Human resources management consulting services | 86504 |
| Production management consulting services | 86505 |
| Services related to management consulting (except arbitration and conciliation services) | 866 |
| Architectural services | 8671 |
| Engineering services | 8672 |
| Integrated engineering services (excluding 86731 Integrated engineering services for transportation infrastructure turnkey projects) | 8673 |
| Urban planning and landscape architectural services | 8674 |
| Technical testing and analysis services including quality control and inspection (except with reference to FSC 58 and transportation equipment) | 8676 |

| Building-cleaning services | 874 |
|---|---|
| Repair services incidental to metal products, machinery and equipment | 8861 to 8864, and 8866 |
| Sewage and refuse disposal, sanitation and similar services | 94 |

***Notes to the European Union's Annex 19-5***

1.   For procuring entities covered under Annex 19-2, the thresholds will be SDR 355,000 when an entity procures consulting services regarding matters of a confidential nature, the disclosure of which could reasonably be expected to compromise government confidences, cause economic disruption or similarly be contrary to public interest.

2.   This Chapter does not apply to services which entities have to procure from another entity pursuant to an exclusive right established by a published law, regulation or administrative provision.

3.   The European Union stands ready, should the ongoing revision of European Union legislation on public procurement result in a widening of the scope of services and services concessions covered by that legislation, to take up negotiations with Canada in view of extending the mutual coverage of services and services concessions of this Chapter.

## ANNEX 19-6

### Construction services and works concessions

**Section A: Construction services**

*Definition*:

A construction services contract is a contract which has as its objective the realisation by whatever means of civil or building works, in the sense of Division 51 of the CPC.

*List of Division 51, CPC*:

All services listed in Division 51.

**Section B: Works concessions**

Works concessions contracts, when awarded by entities listed in Annexes 19-1 and 19-2, are subject only to Articles 19.1, 19.2, 19.4, 19.5, 19.6 (except subparagraphs 3 (e) and (l)), 19.15 (except paragraphs 3 and 4) and 19.17 of the Chapter.

## ANNEX 19-7

### General Notes

1.    This Chapter shall not apply to:

    (a)    (i)    procurement of agricultural products made in furtherance of agricultural support programmes and human feeding programmes (for example food aid, including urgent relief aid); and

        (ii)    procurement for the acquisition, development, production or co-production of programme material by broadcasters and contracts for broadcasting time;

    (b)    contracts awarded by procuring entities covered under Annexes 19-1 and 19-2 in connection with activities in the fields of drinking water, energy, transport and the postal sector, unless covered under Annex 19-3;

    (c)    procurement related to shipbuilding and maintainance by

        (i)    procuring entities covered under Annex 19-3;

        (ii)    bodies governed by public law covered under Annex 19-2; and

        (iii)    local contracting authorities covered in Section B of Annex 19-2 (identified therein as administrative units NUTS 3 and smaller); or

    (d)    goods and services that are procured by a covered entity internally or that are supplied by one covered entity to another.

2.    In respect of the Åland Islands, the special conditions of Protocol No 2 on the Åland Islands to the Treaty of Accession of Finland to the European Union shall apply.

3.    The European Union will provide to Canadian suppliers access to pre-contractual remedies under Article 19.17 of this Chapter for the first ten years after the entry into force of this Agreement. Thereafter the access of Canadian suppliers to pre-contractual remedies will be made dependent on the outcome of the negotiations provided for under Article 19.17.8.

## ANNEX 19-8

## Publication Media

**Section A:**

Electronic or paper media utilised for the publication of laws, regulations, judicial decisions, administrative rulings of general application, standard contract clauses, and procedures regarding government procurement covered by this Agreement pursuant to Article 19.5:

1.    **BELGIUM**

    1.1    Laws, royal regulations, ministerial regulations, ministerial circulars:

        1.    le Moniteur Belge

    1.2    Jurisprudence:

        1.    Pasicrisie

2.    **BULGARIA**

    2.1    Laws and Regulations:

        1.    Държавен вестник (State Gazette)

    2.2    Judicial decisions:

        1.    http://www.sac.government.bg

    2.3    Administrative rulings of general application and any procedure:

        1.    http://www.aop.bg

        2.    http://www.cpc.bg.

3.    **CZECH REPUBLIC**

    3.1    Laws and Regulations:

        1.    Collection of Laws of the Czech Republic

    3.2    Rulings of the Office for the Protection of Competition:

        1.    Collection of Rulings of the Office for the Protection of Competition

4.    **DENMARK**

    4.1.    Laws and regulations:

        1.    Lovtidende

    4.2    Judicial decisions:

        1.    Ugeskrift for Retsvaesen

    4.3    Administrative rulings and procedures:

        1.    Ministerialtidende

    4.4    Rulings by the Danish Complaints Board for Public Procurement:

        1.    Kendelser fra Klagenævnet for Udbud

5.    **GERMANY**

    5.1    Legislation and regulations:

       1.     Bundesgesetzblatt

       2.     Bundesanzeiger

5.2    Judicial Decisions:

       1.     Entscheidungsammlungen     des:     Bundesverfassungsgerichts; Bundesgerichtshofs; Bundesverwaltungsgerichts Bundesfinanzhofs sowie der Oberlandesgerichte

**6.**     **ESTONIA**

6.1    Laws, regulations and administrative rulings of general application:

       1.     Riigi Teataja - http://www.riigiteataja.ee

6.2    Procedures regarding government procurement:

       1.     https://riigihanked.riik.ee

**7.**     **IRELAND**

7.1    Legislation and regulations:

       1.     Iris Oifigiuil (Official Gazette of the Irish Government).

**8.**     **GREECE**

8.1    Epishmh efhmerida eurwpaikwn koinothtwn (Government Gazette of Greece)

**9.**     **SPAIN**

9.1    Legislation:

       1.     Boletin Oficial des Estado

9.2    Judicial rulings:

       1.     No official publication

**10.**    **FRANCE**

10.1   Legislation:

       1.     Journal Officiel de la République française

10.2   Jurisprudence:

       1.     Recueil des arrêts du Conseil d'État

10.3   Revue des marchés publics

**11.**    **CROATIA**

11.1   Narodne novine - http://www.nn.hr

**12.**    **ITALY**

12.1   Legislation:

       1.     Gazzetta Ufficiale

12.2   Jurisprudence:

       1.     No official publication

**13.**    **CYPRUS**

13.1   Legislation:

       1.     Επίσημη Εφημερίδα της Δημοκρατίας (Official Gazette of the Republic)

13.2  Judicial decisions:

    1.    Αποφάσεις Ανωτάτου Δικαστηρίου 1999 - Τυπογραφείο της Δημοκρατίας (Decisions of the Supreme High Court - Printing Office)

**14.  <u>LATVIA</u>**

14.1  Legislation:

    1.    Latvijas vēstnesis (Official Newspaper)

**15.  <u>LITHUANIA</u>**

15.1  Laws, regulations and administrative provisions:

    1.    Teisės aktų registras (Register of Legal Acts)

15.2  Judicial decisions, jurisprudence:

    1.    Bulletin of the Supreme Court of Lithuania "Teismų praktika"

    2.    Bulletin of the Supreme Administrative Court of Lithuania "Administracinių teismų praktika"

**16.  <u>LUXEMBOURG</u>**

16.1  Legislation:

    1.    Memorial

16.2  Jurisprudence:

    1.    Pasicrisie

**17.  <u>HUNGARY</u>**

17.1  Legislation:

    1.    Magyar Közlöny (Official Journal of the Republic of Hungary)

17.2  Jurisprudence:

    1.    Közbeszerzési Értesítő - a Közbeszerzések Tanácsa Hivatalos Lapja (Public Procurement Bulletin - Official Journal of the Public Procurement Council)

**18.  <u>MALTA</u>**

18.1  Legislation:

    1.    Government Gazette

**19.  <u>NETHERLANDS</u>**

19.1  Legislation:

    1.    Nederlandse Staatscourant or Staatsblad

19.2  Jurisprudence:

    1.    No official publication

**20.  <u>AUSTRIA</u>**

20.1  Legislation:

    1.    Österreichisches Bundesgesetzblatt

    2.    Amtsblatt zur Wiener Zeitung

20.2  Judicial decisions:

    1.    Entscheidungen des Verfassungsgerichtshofes, Verwaltungsgerichtshofes,Obersten Gerichtshofes, der Oberlandesgerichte, des Bundesverwaltungsgerichtes und der Landesverwaltungsgerichte - http://ris.bka.gv.at/Judikatur/

**21.**    **POLAND**

21.1  Legislation:

    1.    Dziennik Ustaw Rzeczypospolitej Polskiej (Journal of Laws – Republic of Poland)

21.2  Judicial decisions, jurisprudence:

    1.    "Zamówienia publiczne w orzecznictwie. Wybrane orzeczenia zespołu arbitrów i Sądu Okręgowego w Warszawie" (Selection of judgments of arbitration panels and Regional Court in Warsaw)

**22.**    **PORTUGAL**

22.1  Legislation:

    1.    Diário da República Portuguesa 1a Série A e 2a série

22.2  Judicial Publications:

    1.    Boletim do Ministério da Justiça

    2.    Colectânea de Acordos do Supremo Tribunal Administrativo

    3.    Colectânea de Jurisprudencia Das Relações

**23.**    **ROMANIA**

23.1  Laws and Regulations:

    1.    Monitorul Oficial al României (Official Journal of Romania)

23.2  Judicial decisions, administrative rulings of general application and any procedure:

    1.    http://www.anrmap.ro

**24.**    **SLOVENIA**

24.1  Legislation:

    1.    Official Gazette of the Republic of Slovenia

24.2  Judicial decisions:

    1.    No official publication

**25.**    **SLOVAKIA**

25.1  Legislation:

    1.    Zbierka zakonov (Collection of Laws)

25.2  Judicial decisions:

    1.    No official publication

**26.**    **FINLAND**

26.1  Suomen Säädöskokoelma - Finlands Författningssamling (The Collection of the Statutes of Finland)

**27.**    **SWEDEN**

27.1  Svensk Författningssamling (Swedish Code of Statutes)

**30.    UNITED KINGDOM**

28.1  Legislation:

1.    HM Stationery Office

28.2  Jurisprudence:

1.    Law Reports.

28.3  "Public Bodies":

1.    HM Stationery Office

## Section B:

Electronic or paper media utilised for the publication of notices required by Articles 19.6, 19.8.7 and 19.15.2 pursuant to Article 19.5:

**1.    BELGIUM**

1.1  Official Journal of the European Union

1.2  Le Bulletin des Adjudications

1.3  Other publications in the specialized press

**2.    BULGARIA**

2.1  Official Journal of the European Union

2.2  Държавен вестник (State Gazette) - http://dv.parliament.bg

2.3  Public Procurement Register - http://www.aop.bg

**3.    CZECH REPUBLIC**

3.1  Official Journal of the European Union

**4.    DENMARK**

4.1  Official Journal of the European Union

**5.    GERMANY**

5.1  Official Journal of the European Union

**6.    ESTONIA**

6.1  Official Journal of the European Union

**7.    IRELAND**

7.1  Official Journal of the European Union

7.2  Daily Press: "Irish Independent", "Irish Times", "Irish Press", "Cork Examiner"

**8.    GREECE**

8.1  Official Journal of the European Union

8.2  Publication in the daily, financial, regional and specialized press

**9.    SPAIN**

9.1  Official Journal of the European Union

10.    **<u>FRANCE</u>**

    10.1   Official Journal of the European Union

    10.2   Bulletin officiel des annonces des marchés publics

11.    **<u>CROATIA</u>**

    11.1   Official Journal of the European Union

    11.2   Elektronički oglasnik javne nabave Republike Hrvatske (Electronic Public Procurement Classifieds of the Republic of Croatia)

12.    **<u>ITALY</u>**

    12.1   Official Journal of the European Union

13.    **<u>CYPRUS</u>**

    13.1   Official Journal of the European Union

    13.2   Official Gazette of the Republic

    13.3   Local Daily Press

14.    **<u>LATVIA</u>**

    14.1   Official Journal of the European Union

    14.2   Latvijas vēstnesis (Official newspaper)

15.    **<u>LITHUANIA</u>**

    15.1   Official Journal of the European Union

    15.2   Centrinė viešųjų pirkimų informacinė sistema (Central Portal of Public Procurement)

    15.3   Information supplement "Informaciniai pranešimai" to the Official Gazette ("Valstybės žinios") of the Republic of Lithuania.

16.    **<u>LUXEMBOURG</u>**

    16.1   Official Journal of the European Union

    16.2   Daily Press

17.    **<u>HUNGARY</u>**

    17.1   Official Journal of the European Union

    17.2   Közbeszerzési Értesítő - a Közbeszerzések Tanácsa Hivatalos Lapja (Public Procurement Bulletin - Official Journal of the Public Procurement Council)

18.    **<u>MALTA</u>**

    18.1   Official Journal of the European Union

    18.2   Government Gazette

19.    **<u>NETHERLANDS</u>**

    19.1   Official Journal of the European Union

20.    **<u>AUSTRIA</u>**

20.1  Official Journal of the European Union

20.2  Amtsblatt zur Wiener Zeitung

**21.    POLAND**

21.1  Official Journal of the European Union

21.2  Biuletyn Zamówień Publicznych (Public Procurement Bulletin)

**22.    PORTUGAL**

22.1  Official Journal of the European Union.

**23.    ROMANIA**

23.1  Official Journal of the European Union

23.2  Monitorul Oficial al României (Official Journal of Romania)

23.3  Electronic System for Public Procurement - http://www.e-licitatie.ro

**24.    SLOVENIA**

24.1  Official Journal of the European Union

24.2  Portal javnih naročil - http://www.enarocanje.si/?podrocje=portal

**25.    SLOVAKIA**

25.1  Official Journal of the European Union

25.2  Vestnik verejneho obstaravania (Journal of Public Procurement)

**26.    FINLAND**

26.1  Official Journal of the European Union

26.2  Julkiset hankinnat Suomessa ja ETA-alueella, Virallisen lehden liite (Public Procurement in Finland and at the EEA-area, Supplement to the Official Gazette of Finland)

**27.    SWEDEN**

27.1  Official Journal of the European Union

**28.    UNITED KINGDOM**

28.1  Official Journal of the European Union

**Section C:**

Website address or addresses where Parties publish procurement statistics pursuant to Article 19.15.5 and notices concerning awarded contracts pursuant to Article 19.15.6:

1.    Notices concerning awarded contracts by entities listed in Annexes 19-1 through 19-3 of the European Union's Market Access Schedule are published on the Official Journal of the European Union, online version, Tenders Electronic Daily - http://ted.europa.eu

## ANNEX 20-A

### Part A

### Geographical Indications Identifying a Product Originating in the European Union

| Indication | Transliteration (for information purposes only) | Product Class | Place of Origin (Territory, Region or Locality) |
|---|---|---|---|
| České pivo | | beer | Czech Republic |
| Žatecký Chmel | | hops | Czech Republic |
| Bayerisches Bier | | beer | Germany |
| Münchener Bier | | beer | Germany |
| Hopfen aus der Hallertau | | hops | Germany |
| Nürnberger Bratwürste** | | fresh, frozen and processed meats | Germany |
| Nürnberger Rostbratwürste | | fresh, frozen and processed meats | Germany |
| Schwarzwälder Schinken | | fresh, frozen and processed meats | Germany |
| Aachener Printen | | confectionery and baked products | Germany |
| Nürnberger Lebkuchen | | confectionery and baked products | Germany |
| Lübecker Marzipan | | confectionery and baked products | Germany |
| Bremer Klaben | | confectionery and baked products | Germany |
| Hessicher Handkäse | | cheeses | Germany |
| Hessicher Handkäs | | cheeses | Germany |
| Terttnanger Hopfen | | hops | Germany |

| | | | |
|---|---|---|---|
| Spreewälder Gurken | | fresh and processed vegetable products | Germany |
| Danablu | | cheeses | Denmark |
| Ελιά Καλαμάτας | Elia Kalamatas | table and processed olives | Greece |
| Μαστίχα Χίου | Masticha Chiou | confectionery and baked products | Greece |
| Φέτα* | Feta | cheeses | Greece |
| Ελαιόλαδο Καλαμάτας | Kalamata olive oil | oils and animal fats | Greece |
| Ελαιόλαδο Κολυμβάρι Χανίων Κρήτης | Kolymvari Chanion Kritis Olive Oil | oils and animal fats | Greece |
| Ελαιόλαδο Σητείας Λασιθίου Κρήτης | Sitia Lasithiou Kritis Olive oil | oils and animal fats | Greece |
| Ελαιόλαδο Λακωνία | Olive Oil Lakonia | oils and animal fats | Greece |
| Κρόκος Κοζάνης | Krokos Kozanis | spices | Greece |
| Κεφαλογραβιέρα | Kefalograviera | cheeses | Greece |
| Γραβιέρα Κρήτης | Graviera Kritis | cheeses | Greece |
| Γραβιέρα Νάξου | Graviera Naxou | cheeses | Greece |
| Μανούρι | Manouri | cheeses | Greece |
| Κασέρι | Kasseri | cheeses | Greece |
| Φασόλια Γίγαντες Ελέφαντες Καστοριάς | Fassolia Gigantes Elefantes Kastorias | fresh and processed vegetable products | Greece |
| Φασόλια Γίγαντες Ελέφαντες Πρεσπών | Fassolia Gigantes Elefantes Prespon Florinas | fresh and processed vegetable products | Greece |
| Κονσερβολιά Αμφίσσης | Konservolia | table and processed | Greece |

| | Amfissis | olives | |
|---|---|---|---|
| Λουκούμι Γεροσκήπου | Loukoumi Geroskipou | confectionery and baked products | Cyprus |
| Baena | | oils and animal fats | Spain |
| Sierra Mágina | | oils and animal fats | Spain |
| Aceite del Baix Ebre-Montsía | | oils and animal fats | Spain |
| Oli del Baix Ebre-Montsía | | oils and animal fats | Spain |
| Aceite del Bajo Aragón | | oils and animal fats | Spain |
| Antequera | | oils and animal fats | Spain |
| Priego de Córdoba | | oils and animal fats | Spain |
| Sierra de Cádiz | | oils and animal fats | Spain |
| Sierra de Segura | | oils and animal fats | Spain |
| Sierra de Cazorla | | oils and animal fats | Spain |
| Siurana | | oils and animal fats | Spain |
| Aceite de Terra Alta | | oils and animal fats | Spain |
| Oli de Terra Alta | | oils and animal fats | Spain |
| Les Garrigues | | oils and animal fats | Spain |
| Estepa | | oils and animal fats | Spain |
| Guijuelo | | fresh, frozen and processed meats | Spain |
| Jamón de Huelva | | fresh, frozen and processed meats | Spain |
| Jamón de Teruel | | fresh, frozen and processed meats | Spain |
| Salchichón de Vic | | fresh, frozen and processed meats | Spain |

| | | | |
|---|---|---|---|
| Llonganissa de Vic | | fresh, frozen and processed meats | Spain |
| Mahón-Menorca | | cheeses | Spain |
| Queso Manchego | | cheeses | Spain |
| Cítricos Valencianos | | fresh and processed fruits and nuts | Spain |
| Cîtrics Valancians | | fresh and processed fruits and nuts | Spain |
| Jijona | | confectionery and baked products | Spain |
| Turrón de Alicante | | confectionery and baked products | Spain |
| Azafrán de la Mancha | | spices | Spain |
| Comté | | cheeses | France |
| Reblochon | | cheeses | France |
| Reblochon de Savoie | | cheeses | France |
| Roquefort | | cheeses | France |
| Camembert de Normandie | | cheeses | France |
| Brie de Meaux | | cheeses | France |
| Emmental de Savoie | | cheeses | France |
| Pruneaux d'Agen | | fresh and processed fruits and nuts | France |
| Pruneaux d'Agen mi-cuits | | fresh and processed fruits and nuts | France |
| Huîtres de Marennes-Oléron | | fresh, frozen and processed fish products | France |
| Canards à foie gras du Sud-Ouest : Chalosse | | fresh, frozen and processed meats | France |

| | | | |
|---|---|---|---|
| Canards à foie gras du Sud-Ouest: Gascogne | | fresh, frozen and processed meats | France |
| Canards à foie gras du Sud-Ouest : Gers | | fresh, frozen and processed meats | France |
| Canards à foie gras du Sud-Ouest : Landes | | fresh, frozen and processed meats | France |
| Canards à foie gras du Sud-Ouest : Périgord | | fresh, frozen and processed meats | France |
| Canards à foie gras du Sud-Ouest : Quercy | | fresh, frozen and processed meats | France |
| Jambon de Bayonne*** | | dry-cured meats | France |
| Huile d'olive de Haute-Provence | | oils and animal fats | France |
| Huile essentielle de lavande de Haute-Provence | | essential oils | France |
| Morbier | | cheeses | France |
| Epoisses | | cheeses | France |
| Beaufort*** | | cheeses | France |
| Maroilles | | cheeses | France |
| Marolles | | cheeses | France |
| Munster * | | cheeses | France |
| Munster Géromé | | cheeses | France |
| Fourme d'Ambert | | cheeses | France |
| Abondance | | cheeses | France |
| Bleu d'Auvergne | | cheeses | France |
| Livarot | | cheeses | France |
| Cantal | | cheeses | France |
| Fourme de Cantal | | cheeses | France |

| | | | |
|---|---|---|---|
| Cantalet | | cheeses | France |
| Petit Cantal | | cheeses | France |
| Tomme de Savoie | | cheeses | France |
| Pont - L'Evêque | | cheeses | France |
| Neufchâtel | | cheeses | France |
| Chabichou du Poitou | | cheeses | France |
| Crottin de Chavignol | | cheeses | France |
| Saint-Nectaire | | cheeses | France |
| Piment d'Espelette | | spices | France |
| Lentille verte du Puy | | fresh and processed vegetable products | France |
| Aceto balsamico Tradizionale di Modena | | vinegar | Italy |
| Aceto balsamico di Modena | | vinegar | Italy |
| Cotechino Modena | | fresh, frozen and processed meats | Italy |
| Zampone Modena | | fresh, frozen and processed meats | Italy |
| Bresaola della Valtellina | | fresh, frozen and processed meats | Italy |
| Mortadella Bologna | | fresh, frozen and processed meats | Italy |
| Prosciutto di Parma | | dry-cured meats | Italy |
| Prosciutto di S. Daniele | | dry-cured meats | Italy |
| Prosciutto Toscano | | dry-cured meats | Italy |
| Prosciutto di Modena | | dry-cured meats | Italy |
| Provolone Valpadana | | cheeses | Italy |

| Taleggio | | cheeses | Italy |
|---|---|---|---|
| Asiago* | | cheeses | Italy |
| Fontina* | | cheeses | Italy |
| Gorgonzola* | | cheeses | Italy |
| Grana Padano | | cheeses | Italy |
| Mozzarella di Bufala Campana | | cheeses | Italy |
| Parmigiano Reggiano | | cheeses | Italy |
| Pecorino Romano | | cheeses | Italy |
| Pecorino Sardo | | cheeses | Italy |
| Pecorino Toscano | | cheeses | Italy |
| Arancia Rossa di Sicilia | | fresh and processed fruits and nuts | Italy |
| Cappero di Pantelleria | | fresh and processed fruits and nuts | Italy |
| Kiwi Latina | | fresh and processed fruits and nuts | Italy |
| Lenticchia di Castelluccio di Norcia | | fresh and processed vegetable products | Italy |
| Mela Alto Adige | | fresh and processed fruits and nuts | Italy |
| Südtiroler Apfel | | fresh and processed fruits and nuts | Italy |
| Pesca e nettarina di Romagna | | fresh and processed fruits and nuts | Italy |
| Pomodoro di Pachino | | fresh and processed vegetable products | Italy |
| Radicchio Rosso di Treviso | | fresh and processed vegetable products | Italy |
| Ricciarelli di Siena | | confectionery and | Italy |

| | | baked products | |
|---|---|---|---|
| Riso Nano Vialone Veronese | | cereals | Italy |
| Speck Alto Adige | | fresh, frozen and processed meats | Italy |
| Südtiroler Markenspeck | | fresh, frozen and processed meats | Italy |
| Südtiroler Speck | | fresh, frozen and processed meats | Italy |
| Veneto Valpolicella | | oils and animal fats | Italy |
| Veneto Euganei e Berici | | oils and animal fats | Italy |
| Veneto del Grappa | | oils and animal fats | Italy |
| Culatello di Zibello | | fresh, frozen and processed meats | Italy |
| Garda | | fresh, frozen and processed meats | Italy |
| Lardo di Colonnata | | fresh, frozen and processed meats | Italy |
| Szegedi téliszalámi | | fresh, frozen and processed meats | Hungary |
| Szegedi szalámi | | fresh, frozen and processed meats | Hungary |
| Tiroler Speck | | fresh, frozen and processed meats | Austria |
| Steirischer Kren | | fresh and processed vegetable products | Austria |
| Steirisches Kürbiskernöl | | oilseeds | Austria |
| Queijo S. Jorge | | cheeses | Portugal |
| Azeite de Moura | | oils and animal fats | Portugal |
| Azeites de Trás-os- | | oils and animal fats | Portugal |

| Montes | | | |
|---|---|---|---|
| Azeite do Alentejo Interior | | oils and animal fats | Portugal |
| Azeites da Beira Interior | | oils and animal fats | Portugal |
| Azeites do Norte Alentejano | | oils and animal fats | Portugal |
| Azeites do Ribatejo | | oils and animal fats | Portugal |
| Pêra Rocha do Oeste | | fresh and processed fruits and nuts | Portugal |
| Ameixa d'Elvas | | fresh and processed fruits and nuts | Portugal |
| Ananás dos Açores / S. Miguel | | fresh and processed fruits and nuts | Portugal |
| Chouriça de carne de Vinhais | | fresh, frozen and processed meats | Portugal |
| Linguiça de Vinhais | | fresh, frozen and processed meats | Portugal |
| Chouriço de Portalegre | | fresh, frozen and processed meats | Portugal |
| Presunto de Barrancos | | fresh, frozen and processed meats | Portugal |
| Queijo Serra da Estrela | | cheeses | Portugal |
| Queijos da Beira Baixa | | cheeses | Portugal |
| Queijo de Castelo Branco | | cheeses | Portugal |
| Queijo Amarelo da Beira Baixa | | cheeses | Portugal |
| Queijo Picante da Beira Baixa | | cheeses | Portugal |

| | | | |
|---|---|---|---|
| Salpicão de Vinhais | | fresh, frozen and processed meats | Portugal |
| Gouda Holland | | cheeses | Netherlands |
| Edam Holland | | cheeses | Netherlands |
| Kalix Löjrom | | fresh, frozen and processed fish products | Sweden |
| Magiun de prune Topoloveni | | fresh and processed fruits and nuts | Romania |

**Part B**

**Geographical Indications Identifying a Product Originating in Canada**

| Indication | Transliteration (For information purposes only) | Product Class | Place of Origin (Territory, Region or Locality) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**ANNEX 20-B**

**Terms Referred to in Articles 20.19.11 and 20.19.12**

**Part A**

*Valencia Orange*

*Orange Valencia*

*Valencia*

*Black Forest Ham*

*Jambon Forêt Noire*

*Tiroler Bacon*[62]

*Bacon Tiroler*[2]

*Parmesan*

*Bavarian Beer*

*Bière Bavaroise*

*Munich Beer*

*Bière Munich*

*St. George Cheese*

*Fromage St-George[s]*

**Part B**

*The term "comté" in association with food products when used to refer to a county (for example "Comté du Prince-Edouard"; "Prince Edward County"; "Comté de Prescott-Russell"; "Prescott-Russell County").*

*The term "Beaufort" in association with cheese products, produced in the proximity of the geographical place called "Beaufort range", Vancouver Island, British Columbia.*

---

[62]     The use of spelling variations in English or French shall be permitted, including "Tyrol", "Tiroler", "Tyroler", and "Tirolien".

## ANNEX 20-C

### Product Classes

1.   **fresh, frozen and processed meats** means products falling under Chapter 2 and heading 16.01 or 16.02 of the Harmonized System.

2.   **dry-cured meats** means dry cured meat products falling under Chapter 2 and heading 16.01 or 16.02 of the Harmonized System.

3.   **hops** means products falling under heading 12.10 of the Harmonized System;

4.   **fresh, frozen and processed fish products** means products falling under Chapter 3 and heading 16.03, 16.04 or 16.05 of the Harmonized System;

5.   **butter** means products falling under heading 04.05 of the Harmonized System;

6.   **cheeses** means products falling under heading 04.06 of the Harmonized System;

7.   **fresh and processed vegetable products** means products containing vegetables falling under Chapter 7 and Chapter 20 of the Harmonized System;

8.   **fresh and processed fruits and nuts** means products containing fruits falling under Chapter 8 and 20 of the Harmonized System;

9.   **spices** means products falling under Chapter 9 of the Harmonized System;

10.  **cereals** means products falling under Chapter 10 of the Harmonized System;

11.  **products of the milling industry** means products falling under Chapter 11 of the Harmonized System;

12.  **oilseeds** means products falling under Chapter 12 of the Harmonized System;

13.  **beverages from plant extracts** means products falling under heading 13.02 of the Harmonized System;

14.  **oils and animal fats** means products falling under Chapter 15 of the Harmonized System;

15.  **confectionery and baked products** means products falling under heading 17.04, 18.06, 19.04, or 19.05 of the Harmonized System;

16.  **pasta** means products falling under heading 19.02 of the Harmonized System;

17.  **table and processed olives** means products falling under heading 20.01 or 20.05 of the Harmonized System;

18.  **mustard paste** means products falling under sub-heading 2103.30 of the Harmonized System;

19.  **beer** means products falling under heading 22.03 of the Harmonized System;

20.  **vinegar** means products falling under heading 22.09 of the Harmonized System;

21.  **essential oils** means products falling under heading 33.01 of the Harmonized System.

## ANNEX 29-A

## RULES OF PROCEDURE FOR ARBITRATION

Definitions and general provisions

1.    For this Chapter and under these Rules:

**adviser** means a natural person retained by a Party to advise or assist that Party in connection with the arbitration proceeding;

**arbitration panel** means a panel established under Article 29.7;

**arbitrator** means a member of an arbitration panel established under Article 29.7;

**assistant** means a natural person who, under the terms of appointment of an arbitrator conducts research for or provides assistance to the arbitrator;

**day** means a calendar day, unless otherwise specified;

**legal holiday** means every Saturday and Sunday and any other day designated by a Party as a holiday for the purposes of these rules;

**representative of a Party** means an employee or any natural person appointed by a government department or agency or any other public entity of a Party who represents the Party for the purposes of a dispute under this Agreement;

**responding Party** means the Party that is alleged to be in violation of the provisions referred to in Article 29.2; and

**requesting Party** means any Party that requests the establishment of an arbitration panel under Article 29.6;

2.    The responding Party shall be in charge of the logistical administration of the arbitration proceedings, in particular the organisation of hearings, unless otherwise agreed. However, the Parties shall bear equally the administrative expenses of the arbitration proceedings as well as the remuneration and all travel, lodging and general expenses of the arbitrators and their assistants.

Notifications

3.    Unless agreed otherwise, the Parties and the arbitration panel shall transmit a request, notice, written submission or other document by email, with a copy submitted on the same day by facsimile transmission, registered post, courier, delivery against receipt or any other means of telecommunication that provides a record of its sending. Unless proven otherwise, an email message shall be deemed to be received on the same date of its sending.

4.    When communicating in writing, a Party shall provide an electronic copy of its communications to the other Party and to each of the arbitrators.

5.    Minor errors of a clerical nature in a request, notice, written submission or other document related to the arbitration proceeding may be corrected by delivery of a new document clearly indicating the changes.

6.    If the last day for delivery of a document falls on an official holiday or rest day in Canada or in the European Union, the document may be delivered on the next

business day. No documents, notifications or requests of any kind shall be deemed to be received on a legal holiday.

7.    Depending on the provisions under dispute, all requests and notifications addressed to the CETA Joint Committee in accordance with this Chapter shall also be copied to the other relevant institutional bodies.

Commencing the arbitration

8.    Unless the Parties agree otherwise, they shall meet the arbitration panel within seven working days of its establishment in order to determine such matters that the Parties or the arbitration panel deem appropriate, including the remuneration and expenses to be paid to the arbitrators, which shall be in accordance with WTO standards. Remuneration for each arbitrator's assistant shall not exceed 50 per cent of the total remuneration of that arbitrator. Arbitrators and representatives of the Parties may take part in this meeting via telephone or video conference.

9.    (a)    Unless the Parties agree otherwise, within five working days of the date of the establishment of the arbitration panel, the terms of reference of the arbitration panel shall be:

*"to examine, in the light of the relevant provisions of the Agreement, the matter referred to in the request for establishment of the arbitration panel, to rule on the compatibility of the measure in question with the provisions referred to in Article 29.2 and to make a ruling in accordance with Articles 29.10, 29.17 and 29.18."*

(b)    The Parties shall notify the agreed terms of reference to the arbitration panel within three working days of their agreement.

(c)    The arbitration panel may rule on its own jurisdiction.

Initial submissions

10.    The requesting Party shall deliver its initial written submission no later than 10 days after the date of establishment of the arbitration panel. The responding Party shall deliver its written counter-submission no later than 21 days after the date of delivery of the initial written submission.

Working of arbitration panels

11.    The chairperson of the arbitration panel shall preside over all meetings. An arbitration panel may delegate to the chairperson authority to make administrative and procedural decisions.

12.    Hearings shall take place in person. Unless otherwise provided in this Chapter and without prejudice to paragraph 30, the arbitration panel may conduct its other activities by any means, including telephone, facsimile transmissions or computer links.

13.    Only arbitrators may take part in the deliberations of the arbitration panel, but the arbitration panel may permit its assistants to be present at its deliberations.

14.    The drafting of any ruling shall remain the exclusive responsibility of the arbitration panel and must not be delegated.

530

15.  Findings, determinations and recommendations of the arbitration panel under Articles 29.9 and 29.10 should be made by consensus, but if consensus is not possible then by a majority of its members.

16.  Arbitrators may not issue separate opinions on matters not unanimously agreed.

17.  Where a procedural question arises that is not covered by the provisions of Chapter Twenty-Nine (Dispute Settlement), the arbitration panel, after consulting with the Parties, may adopt an appropriate procedure that is compatible with those provisions and that ensures equal treatment between the Parties.

18.  If the arbitration panel considers that there is a need to modify any time limit applicable in the proceedings or to make any other procedural or administrative adjustment as may be required for the fairness or efficiency of the proceedings, it shall inform the Parties in writing of the reasons for the modification or adjustment and of the period or adjustment needed. The arbitration panel may adopt such modification or adjustment after having consulted the Parties.

19.  Any time limit referred to in this Chapter and in this Annex may be modified by mutual consent of the Parties. Upon request of a Party, the arbitration panel may modify the time limits applicable in the proceedings.

20.  The arbitration panel shall suspend its work:

(a)  at the request of the requesting Party for a period specified in the request but not to exceed 12 consecutive months, and shall resume its work at the request of the requesting Party; or

(b)  after it has issued its interim report or in the case of a proceeding on a disagreement on equivalence under Article 29.14 or a proceeding under Article 29.15, only upon the request of both Parties for a period specified in the request, and shall resume its work at the request of either Party.

If there is no request for the resumption of the arbitration panel's work by the end of the period specified in the request for suspension, the proceeding shall be terminated. The termination of the arbitration panel's work is without prejudice to the rights of the Parties in another proceeding on the same matter under Chapter Twenty-Nine (Dispute Settlement).

Replacement

21.  If an arbitrator is unable to participate in the proceeding, withdraws, or must be replaced, a replacement shall be selected in accordance with Article 29.7.3.

22.  Where a Party considers that an arbitrator does not comply with the requirements of the code of conduct of Annex 29-B ("Code of Conduct") and for this reason must be replaced, that Party shall notify the other Party within 15 days from the time it came to know of the circumstances underlying the arbitrator's non-compliance with the Code of Conduct.

23.  Where a Party considers that an arbitrator other than the chairperson does not comply with the requirements of the Code of Conduct, the Parties shall consult and, if they so agree, replace the arbitrator and select a replacement following the procedure set out in Article 29.7.3.

If the Parties fail to agree on the need to replace an arbitrator, any Party may request that such matter be referred to the chairperson of the arbitration panel, whose decision shall be final.

If, pursuant to such a request, the chairperson finds that an arbitrator does not comply with the requirements of the Code of Conduct, she or he shall draw a new arbitrator by lot from the names on the list referred to in Article 29.8.1 and on which the original arbitrator was included. If the original arbitrator was chosen by the Parties pursuant to Article 29.7, the replacement shall be drawn by lot from the individuals proposed by the requesting Party and by the responding Party under Article 29.8.1. The selection of the new arbitrator shall be made within five working days of the date of the submission of the request to the chairperson of the arbitration panel.

24. Where a Party considers that the chairperson of the arbitration panel does not comply with the requirements of the Code of Conduct, the Parties shall consult and, if they so agree, shall dismiss the chairperson and select a replacement following the procedure set out in 29.7.3.

If the Parties fail to agree on the need to replace the chairperson, any Party may request that such matter be referred to the two remaining arbitrators. The decision by the arbitrators on the need to replace the chairperson shall be final.

If the arbitrators decide that the chairperson does not comply with the requirements of the Code of Conduct, they shall draw a new chairperson by lot among the remaining names on the list referred to in Article 29.8.1. The selection of the new chairperson shall be made within five working days of the date of the submission of the request referred to in this paragraph.

If the arbitrators cannot reach a decision within 10 days of the matter being referred to them, the procedure set out in Article 29.7 shall apply.

25. The arbitration proceedings shall be suspended for the period taken to carry out the procedure provided for in paragraphs 21 through 24.

## Hearings

26. The chairperson shall fix the date and time of the hearing in consultation with the Parties and the other arbitrators, and confirm this in writing to the Parties. This information shall also be made publicly available by the Party in charge of the logistical administration of the proceeding, subject to paragraph 39.

27. Unless the Parties agree otherwise, the hearing shall be held in Brussels if the requesting Party is Canada and in Ottawa if the requesting Party is the European Union.

28. As a general rule there should be only one hearing. The arbitration panel may on its own initiative or on the request of a Party convene one additional hearing when the dispute involves issues of exceptional complexity. No additional hearing shall be convened for the procedures established under Articles 29.14 and 29.15, except in the case of a disagreement on compliance and equivalence.

29. All arbitrators shall be present during the entirety of the hearing.

30. The following persons may attend the hearing, irrespective of whether the proceeding is open to the public or not:

(a)    representatives of the Parties;

(b)    advisers to the Parties;

(c)    administrative staff, interpreters, translators and court reporters; and

(d)    arbitrators' assistants.

Only the representatives of and advisers to the Parties may address the arbitration panel.

31.    No later than five working days before the date of a hearing, each Party shall deliver to the arbitration panel and to the other Party a list of the names of persons who will make oral arguments or presentations at the hearing on behalf of that Party and of other representatives or advisers who will be attending the hearing.

32.    The arbitration panel shall conduct the hearing in the following manner, ensuring that the requesting Party and the responding Party are afforded equal time:

*Argument*

(a)    argument of the requesting Party

(b)    argument of the responding Party

*Rebuttal Argument*

(a)    reply of the requesting Party

(b)    counter-reply of the responding Party

33.    The arbitration panel may direct questions to either Party at any time during the hearing.

34.    The arbitration panel, after having received the comments of the Parties, shall issue to the Parties a final transcript of each hearing.

35.    Each Party may deliver to the arbitrators and to the other Party a supplementary written submission concerning any matter that arose during the hearing within 10 working days of the date of the hearing.

Questions in writing

36.    The arbitration panel may at any time during the proceeding address questions in writing to one or both Parties. Each of the Parties shall receive a copy of any questions put by the arbitration panel.

37.    Each Party shall also provide the other Party with a copy of its written response to the questions of the arbitration panel. Each Party shall be given the opportunity to provide written comments on the other Party's reply within five working days of the date of receipt.

Transparency and confidentiality

38.    Subject to paragraph 39, each Party shall make its submissions publicly available and, unless the Parties decide otherwise, the hearings of the arbitration panel shall be open to the public.

39.    The arbitration panel shall meet in closed session when the submission and arguments of a Party contain confidential business information. The Parties shall

maintain the confidentiality of the arbitration panel hearings when they are held in closed session. Each Party and its advisers shall treat as confidential any information submitted by the other Party to the arbitration panel which that Party has designated as confidential. Where a Party's submission to the arbitration panel contains confidential information, that Party shall also provide, within 15 days, a non-confidential version of the submission that could be disclosed to the public.

### *Ex parte* contacts

40.    The arbitration panel shall not meet or contact a Party in the absence of the other Party.

41.    No arbitrator may discuss any aspect of the subject-matter of the proceeding with a Party or the Parties in the absence of the other arbitrators.

### Information and technical advice

42.    Upon the request of a disputing Party, or on its own initiative, the arbitration panel may seek information and technical advice from any person or body that it deems appropriate, subject to any terms and conditions agreed by the Parties. Any information obtained in this manner must be disclosed to each Party and submitted for their comments.

### *Amicus curiae* submissions

43.    Non-governmental persons established in a Party may submit amicus curiae briefs to the arbitration panel in accordance with the following paragraphs.

44.    Unless the Parties agree otherwise within five days of the date of the establishment of the arbitration panel, the arbitration panel may receive unsolicited written submissions, provided that they are made within 10 days of the date of the establishment of the arbitration panel, and in no case longer than 15 typed pages, including any annexes, and that they are directly relevant to the issue under consideration by the arbitration panel.

45.    The submission shall contain a description of the person making the submission, whether natural or legal, including the nature of that person's activities and the source of that person's financing, and specify the nature of the interest that that person has in the arbitration proceeding. It shall be drafted in the languages chosen by the Parties in accordance with paragraphs 48 and 49.

46.    The arbitration panel shall list in its ruling all the submissions it has received that conform to the above rules. The arbitration panel shall not be obliged to address in its ruling the arguments made in such submissions. The arbitration panel shall submit to the Parties for their comments any submission it obtains.

### Urgent cases

47.    In cases of urgency referred to in Article 29.11, the arbitration panel, after consulting the Parties, shall adjust the time limits referred to in these rules as appropriate and shall notify the Parties of such adjustments.

### Working language for the proceeding, translation and interpretation

48.    During the consultations referred to in Article 29.7.2, and no later than the meeting referred to in paragraph 8, the Parties shall endeavour to agree on a common working language for the proceeding before the arbitration panel.

49.    If the Parties are unable to agree on a common working language, each Party shall arrange for and bear the costs of the translation of its written submissions into the language chosen by the other Party. The responding Party shall arrange for the interpretation of oral submissions into the languages chosen by the Parties.

50.    Arbitration panel rulings shall be issued in the language or languages chosen by the Parties.

51.    Any costs incurred for translation of an arbitration panel ruling into the language or languages chosen by the Parties shall be borne equally by the Parties.

52.    A Party may provide comments on the accuracy of the translation of any translated version of a document drawn up in accordance with these rules.

## Calculation of time limits

53.    All time limits set out in this Chapter and in this Annex including the limits for the arbitration panels to notify their rulings, shall be counted in calendar days from the day following the act or fact to which they refer, unless otherwise specified.

54.    Where, by reason of the application of paragraph 6, a Party receives a document on a date other than the date on which this document is received by the other Party, any period of time that is calculated on the basis of the date of receipt of that document shall be calculated from the last date of receipt of that document.

## Other procedures

55.    The time limits set out in these Rules of Procedure shall be adjusted in line with the special time limits provided for the adoption of a ruling by the arbitration panel in the proceedings under Articles 29.14 and 29.15.

56.    In the event that the original arbitration panel, or some of its arbitrators, are unable to reconvene for the proceedings established under Article 29.14 and 29.15, the procedure set out in Article 29.7 shall apply. The time limit for the notification of the ruling shall be extended by 20 days.

## ANNEX 29-B

## CODE OF CONDUCT FOR ARBITRATORS AND MEDIATORS

### Definitions

1.  For this Chapter and under this Code of Conduct:

    **assistant** means a person who, under the terms of appointment of an arbitrator, conducts, researches or provides assistance to the arbitrator;

    **candidate** means an individual whose name is on the list of arbitrators referred to in Article 29.8 and who is under consideration for selection as an arbitrator under Article 29.7;

    **mediator** means a person who conducts a mediation in accordance with Article 29.5;

    **arbitrator** means a member of an arbitration panel established under Article 29.7;

    **proceeding**, unless otherwise specified, means an arbitration proceeding;

    **staff**, in respect of an arbitrator, means persons under the direction and control of the arbitrator, other than assistants.

### Responsibilities of candidates and arbitrators

2.  Every candidate and arbitrator shall avoid impropriety and the appearance of impropriety, shall be independent and impartial, shall avoid direct and indirect conflicts of interests and shall observe high standards of conduct so that the integrity and impartiality of the dispute settlement mechanism is preserved. Former arbitrators must comply with the obligations established in paragraphs 16 through 19.

### Disclosure obligations

3.  Prior to confirmation of her or his selection as an arbitrator under this Chapter, a candidate shall disclose any interest, relationship or matter that is likely to affect her or his independence or impartiality or that might reasonably create an appearance of impropriety or bias in the proceeding. To this end, a candidate shall make all reasonable efforts to become aware of such interests, relationships and matters.

4.  Without limiting the generality of the foregoing, candidates shall disclose the following interests, relationships and matters:

    (1)  any financial interest of the candidate:

        (a)  in the proceeding or in its outcome, and

        (b)  in an administrative proceeding, a domestic court proceeding or another panel or committee proceeding that involves issues that may be decided in the proceeding for which the candidate is under consideration;

    (2)  any financial interest of the candidate's employer, partner, business associate or family member:

        (a)  in the proceeding or in its outcome, and

        (b)  in an administrative proceeding, a domestic court proceeding or another panel or committee proceeding that involves issues that may be decided in the proceeding for which the candidate is under consideration;

(3)  any past or existing financial, business, professional, family or social relationship with the interested parties in the proceeding, or their counsel, or such relationship involving a candidate's employer, partner, business associate or family member; and

(4)  public advocacy or legal or other representation concerning an issue in dispute in the proceeding or involving the same matters.

5.  A candidate or arbitrator shall communicate matters concerning actual or potential violations of this Code of Conduct to the CETA Joint Committee for consideration by the Parties.

6.  Once selected, an arbitrator shall continue to make all reasonable efforts to become aware of interests, relationships or matters referred to in paragraph 3 and shall disclose them. The disclosure obligation is a continuing duty which requires an arbitrator to disclose such interests, relationships or matters that may arise during all stages of the proceeding. The arbitrator shall disclose such interests, relationships or matters by informing the CETA Joint Committee promptly, in writing, for consideration by the Parties.

### Duties of arbitrators

7.  Upon selection an arbitrator shall be available to perform and shall perform her or his duties thoroughly and expeditiously throughout the course of the proceeding, and with fairness and diligence.

8.  An arbitrator shall consider only those issues raised in the proceeding and necessary for a ruling and shall not delegate this duty to any other person.

9.  An arbitrator shall take all appropriate steps to ensure that her or his assistant and staff are aware of, and comply with, paragraphs 2 through 6, and 17 through 19.

10.  An arbitrator shall not engage in *ex parte* contacts concerning the proceeding.

### Independence and impartiality of arbitrators

11.  An arbitrator shall avoid creating an appearance of bias and shall not be influenced by self-interest, outside pressure, political considerations, public clamour, loyalty to a Party, or fear of criticism.

12.  An arbitrator shall not, directly or indirectly, incur any obligation or accept any benefit that would in any way interfere, or appear to interfere, with the proper performance of her or his duties.

13.  An arbitrator may not use her or his position on the arbitration panel to advance any personal or private interests and shall avoid actions that may create the impression that others are in a special position to influence her or him.

14.  An arbitrator may not allow financial, business, professional, family or social relationships or responsibilities to influence her or his conduct or judgement.

15.  An arbitrator must avoid entering into any relationship or acquiring any financial interest that is likely to affect her or his impartiality or that might reasonably create an appearance of impropriety or bias.

### Obligations of former arbitrators

16.    All former arbitrators must avoid actions that may create the appearance that they were biased in carrying out their duties or derived advantage from the decision or ruling of the arbitration panel.

## Confidentiality

17.    No arbitrator or former arbitrator shall at any time disclose or use any non-public information concerning a proceeding or acquired during a proceeding except for the purposes of that proceeding and shall not, in any case, disclose or use any such information to gain personal advantage or advantage for others or to adversely affect the interest of others.

18.    An arbitrator shall not disclose an arbitration panel ruling or parts thereof prior to its publication in accordance with this Chapter.

19.    An arbitrator or former arbitrator shall not at any time disclose the deliberations of an arbitration panel, or any member's view.

## Expenses

20.    Each arbitrator shall keep a record and render a final account of the time devoted to the procedure and of her or his expenses as well as the time and expenses of her or his assistant.

## Mediators

21.    This Code of Conduct applies, *mutatis mutandis*, to mediators.

# ANNEX 29-C

## RULES OF PROCEDURE FOR MEDIATION

*Article 1*

### Objective

Further to Article 29.5, the objective of this Annex is to facilitate the finding of a mutually agreed solution through a comprehensive and expeditious procedure with the assistance of a mediator.

*SECTION A*

### Mediation proceeding

*Article 2*

### Initiation of the proceeding

1.  A Party may request, at any time, that the Parties enter into a mediation proceeding. Such request shall be addressed to the other Party in writing. The request shall be sufficiently detailed to present clearly the concerns of the requesting Party and shall:

    (a)  identify the specific measure at issue;

    (b)  provide a statement of the alleged adverse effects that the requesting Party believes the measure has, or will have, on trade or investment between the Parties; and

    (c)  explain how the requesting Party considers that those effects are linked to the measure.

2.  The mediation proceeding may only be initiated by mutual consent of the Parties. When a Party requests mediation pursuant to paragraph 1, the other Party shall give good faith consideration to the request and reply in writing within 10 days of receiving it.

*Article 3*

### Selection of the mediator

1.  Upon the start of the mediation proceeding, the Parties shall agree on a mediator, if possible, no later than 15 days after the receipt of the reply to the request for mediation.

2.  A mediator shall not be a citizen of either Party, unless the Parties agree otherwise.

3.  The mediator shall assist, in an impartial and transparent manner, the Parties in bringing clarity to the measure and its possible trade effects, and in reaching a mutually agreed solution. Further to paragraph 21 of Annex 29-B, the Code of Conduct of Arbitrators and Mediators applies to mediators. Paragraphs 3 through 7 and 48 through 54 of the Rules of Procedure for Arbitration in Annex 29-A shall also apply, *mutatis mutandis*.

*Article 4*

**Rules of procedure for mediation**

1.     Within 10 days after the appointment of the mediator, the Party requesting the mediation procedure shall present, in writing, a detailed description of the problem to the mediator and to the other Party, in particular of the operation of the measure at issue and its trade effects. Within 20 days after the date of delivery of this submission, the other Party may provide, in writing, its comments to the description of the problem. Either Party may include in its description or comments any information that it deems relevant.

2.     The mediator may decide on the most appropriate way of bringing clarity to the measure concerned and its possible trade-related impact. In particular, the mediator may organise meetings between the Parties, consult the Parties jointly or individually, seek the assistance of or consult with relevant experts[63] and stakeholders and provide any additional support requested by the Parties. However, before seeking the assistance of or consulting with relevant experts and stakeholders, the mediator shall consult with the Parties.

3.     The mediator may offer advice and propose a solution for the consideration of the Parties which may accept or reject the proposed solution or may agree on a different solution. However, the mediator may not advise or comment on the consistency of the measure at issue with this Agreement.

4.     The procedure shall take place in the territory of the Party to which the request was addressed, or, by mutual consent of the Parties, in any other location or by any other means.

5.     The Parties shall endeavour to reach a mutually agreed solution within 60 days from the appointment of the mediator. Pending a final agreement, the Parties may consider possible interim solutions, especially if the measure relates to perishable goods.

6.     The solution may be adopted by means of a decision of the CETA Joint Committee. Mutually agreed solutions shall be made publicly available. However, the version disclosed to the public may not contain any information that a Party has designated as confidential.

7.     On request of the Parties, the mediator shall issue to the Parties, in writing, a draft factual report, providing a brief summary of the measure at issue in the proceeding, the procedure followed and any mutually agreed solution reached as the final outcome of the proceeding, including possible interim solutions. The mediator shall provide the Parties 15 days to comment on the draft report. After considering the comments of the Parties submitted within the period, the mediator shall submit, in writing, a final factual report to the Parties within 15 days. The factual report shall not include any interpretation of this Agreement.

8.     The proceeding shall be terminated:

---

[63]     A Party may not object to an expert being consulted in a dispute settlement proceeding under this Chapter or under the WTO Agreement solely on the ground that the expert has been consulted under this paragraph.

(a)  by the adoption of a mutually agreed solution by the Parties, on the date of adoption.

(b)  by a written declaration of the mediator, after consulting with the Parties, that further efforts at mediation would be to no avail;

(c)  by a written declaration of a Party after exploring mutually agreed solutions under the mediation proceeding and after having considered any advice and proposed solutions by the mediator. Such declaration may not be issued before the period set out in Article 4.5 has expired; or

(d)  at any stage of the procedure by mutual agreement of the Parties.

*SECTION B*

**Implementation**

*Article 5*

**Implementation of a mutually agreed solution**

1.  Where the Parties have agreed to a solution, each Party shall take the measures necessary to implement the mutually agreed solution within the agreed timeframe.

2.  The implementing Party shall inform the other Party in writing of any steps or measures taken to implement the mutually agreed solution.

*SECTION C*

**General provisions**

*Article 6*

**Confidentiality and relationship to dispute settlement**

1.  Unless the Parties agree otherwise, and without prejudice to Article 4.6, all stages of the proceeding, including any advice or proposed solution, are confidential. However, any Party may disclose to the public that mediation is taking place. The obligation of confidentiality does not extend to factual information already existing in the public domain.

2.  The mediation proceeding is without prejudice to the Parties' rights and obligations under the provisions on Dispute Settlement in this Agreement or any other agreement.

3.  Consultations are not required before initiating the mediation proceeding. However, a Party should normally avail itself of the other relevant cooperation or consultation provisions in this Agreement before initiating the mediation proceeding.

4.  A Party shall not rely on or introduce as evidence in other dispute settlement proceedings under this Agreement or any other agreement, nor shall an arbitration panel take into consideration:

(a)  positions taken by the other Party in the course of the mediation proceeding or information gathered under Article 4.2;

(b)     the fact that the other Party has indicated its willingness to accept a solution to the measure subject to mediation; or

(c)     advice given or proposals made by the mediator.

5.      A mediator may not serve as a panellist in a dispute settlement proceeding under this Agreement or under the WTO Agreement involving the same matter for which she or he has been a mediator.

### Article 7

### Time limits

Any time limit referred to in this Annex may be modified by mutual consent between the Parties.

### Article 8

### Costs

1.      Each Party shall bear its costs of participation in the mediation proceeding.

2.      The Parties shall share jointly and equally the costs of organisational matters, including the remuneration and expenses of the mediator. Remuneration of the mediator shall be in accordance with that of the chairperson of an arbitration panel in paragraph 8 of Annex 29-A.

### Article 9

### Review

Five years after the date of entry into force of this Agreement, the Parties shall consult each other on the need to modify the mediation mechanism in light of the experience gained and the development of any corresponding mechanism in the WTO.

## ANNEX 30-A

## LIST OF BILATERAL INVESTMENT TREATIES BETWEEN CANADA AND MEMBER STATES OF THE EUROPEAN UNION

*Agreement between the Government of the Republic of Croatia and the Government of Canada for the Promotion and Protection of Investments*, done at Ottawa on 3 February 1997.

*Agreement between the Czech Republic and Canada for the Promotion and Protection of Investments*, done at Prague on 6 May 2009.

*Agreement between the Government of the Republic of Hungary and the Government of Canada for the Promotion and Reciprocal Protection of Investments*, done at Ottawa on 3 October 1991.

*Agreement between the Government of the Republic of Latvia and the Government of Canada for the Promotion and Protection of Investments*, done at Riga on 5 May 2009.

*Exchange of Notes between the Government of Canada and the Government of the Republic of Malta Constituting an Agreement Relating to Foreign Investment Insurance*, done at Valletta on 24 May 1982.

*Agreement between the Government of the Republic of Poland and the Government of Canada for the Promotion and Reciprocal Protection of Investments*, done at Warsaw on 6 April 2009.

*Agreement between the Government of Romania and the Government of Canada for the Promotion and Reciprocal Protection of Investments*, done at Bucharest on 8 May 2009.

*Agreement between the Slovak Republic and the Government of Canada for the Promotion and Protection of Investments*, done at Bratislava on 20 July 2010.

## ANNEX 30-B

## AMENDMENTS TO THE 1989 ALCOHOLIC BEVERAGES AGREEMENT AND THE 2003 WINES AND SPIRIT DRINKS AGREEMENT

### SECTION A

Article 1 of the 1989 Alcoholic Beverages Agreement, as amended by Annex VIII to the 2003 Wines and Spirit Drinks Agreement, shall have the following definition added:

""competent authority" means a government or commission, board or other governmental agency of a Party that is authorised by law to control the sale of wines and distilled spirits."

### SECTION B

Article 2.2(b) of the 1989 Alcoholic Beverages Agreement, as amended by Annex VIII to the 2003 Wines and Spirit Drinks Agreement, is replaced with:

"(b) requiring off site private wine store outlets in Ontario and British Columbia to sell only wines produced by Canadian wineries. The number of these off site private wine store outlets authorised to sell only wines produced by Canadian wineries in these provinces shall not exceed 292 in Ontario and 60 in British Columbia."

### SECTION C

Article 4 of the 1989 Alcoholic Beverages Agreement, as amended by Annex VIII to the 2003 Wines and Spirit Drinks Agreement, is replaced with:

"Article 4

Commercial Treatment

1. Competent authorities shall, in exercising their responsibilities for the purchase, distribution and retail sale of products of the other Party, adhere to the provisions of GATT Article XVII concerning State trading enterprises, in particular to make any such decisions solely in accordance with commercial considerations and shall afford the enterprises of the other Party adequate opportunity, in accordance with customary business practice, to compete for participation in such purchases.

2. Each Party shall take all possible measures to ensure that an enterprise that has been granted a monopoly in the trade and sale of wines and spirit drinks within its territory does not use its monopoly position to engage, either directly or indirectly, including through its dealings with its parent, subsidiaries or other enterprises with common ownership, in the sale of wine and spirit drinks in a market outside the territory where the enterprise has a monopoly position that causes an anti-competitive effect causing an appreciable restriction of competition in that market."

### SECTION D

Article 4a of the 1989 Alcoholic Beverages Agreement, as amended by Annex VIII to the 2003 Wines and Spirit Drinks Agreement, is replaced with:

"4a – Pricing

1.    Competent authorities of the Parties shall ensure that any mark-up, cost of service or other pricing measure is non-discriminatory, applies to all retail sales and is in conformity with Article 2.

2.    A cost of service differential may be applied to products of the other Party only in so far as it is no greater than the additional costs necessarily associated with the marketing of products of the other Party, taking into account additional costs resulting from, *inter alia*, delivery methods and frequency.

3.    Each Party shall ensure that a cost of service is not applied to a product of the other Party on the basis of the value of the product.

4.    The cost of service differential shall be justified in line with standard accounting procedures by independent auditors on the basis of an audit completed on the request of the other Party within one year of the entry into force of the 2003 Wines and Spirit Drinks Agreement and thereafter on request of that Party at intervals of not less than four years. The audits shall be made available to either Party within one year of a request being made.

5.    Competent authorities shall update cost of service differential charges, as required, to reflect the commitment made in subparagraph 4a(2).

6.    Competent authorities shall make available applicable cost of service differential charges through publicly accessible means, such as their official website.

7.    Competent authorities shall establish a contact point for questions and concerns originating from the other Party with respect to cost of service differential charges. A Party will respond to a request from the other Party in writing within 60 days of the receipt of the request."

*SECTION E*

The 1989 Alcoholic Beverages Agreement, as amended by Annex VIII to the 2003 Wines and Spirit Drinks Agreement, is modified by adding Article 4b:

"Article 4b

Blending Requirements

Neither Party may adopt or maintain any measure requiring that distilled spirits imported from the territory of the other Party for bottling be blended with any distilled spirits of the importing Party."

*SECTION F*

The 2003 Wines and Spirit Drinks Agreement shall be amended as follows:

(a)    Article 27.3 (Joint Committee), first indent, is replaced with "adopting amendments to the Annexes of this Agreement by means of a decision by the Joint Committee."

(b)    Title VIII (Dispute settlement) is deleted;

(c)    The last two sentences of Article 8.1 (Objection procedure) are replaced with "A Contracting Party may seek consultations as provided under Article 29.4 (Consultations) of the Canada-European Union Comprehensive Economic and

Trade Agreement ("CETA"). If the consultations fail to resolve the matter, a Contracting Party may notify, in writing, the other Contracting Party of its decision to refer the issue to arbitration under Articles 29.6 through 29.10 of CETA."

(d)    Article 9.2 (Modification of Annex I), is replaced with: "By way of derogation from paragraph 1, if a Contracting Party has invoked the objection procedure provided for in Article 8 (Objection procedure), the Contracting Parties shall act in accordance with the outcome of the consultations, unless the matter is referred to the arbitration procedure under Articles 29.6 through 29.10 of CETA, in which case:

(e)    When Articles 29.6 through 29.10 of CETA are applied in the course of the procedure referred to in Article 9.2 of the 2003 Wines and Spirit Drinks Agreement, they shall apply *mutatis mutandis*."

### ANNEX 30-C

### JOINT DECLARATION ON WINES AND SPIRITS

The Parties acknowledge the effort and progress that has been made on Wines and Spirits in the context of the negotiations of this Agreement. These efforts have led to mutually agreed solutions on a number of issues of high importance.

The Parties agree to discuss through the appropriate mechanisms, without delay and in view to find mutually agreed solutions, any other issue of concern related to Wines and Spirits, and notably the desire of the European Union to seek the elimination of the differentiation of provincial mark-ups applied on domestic wines and wines bottled in Canada in private wine outlets.

At the end of the fifth year following the entry into force of this Agreement, the Parties agree to review the progress made on the elimination of the differentiation referred to in the previous paragraph, based on the examination of all developments in the sector, including the consequences of any granting to third countries of a more favourable treatment in the framework of other trade negotiations involving Canada.

## ANNEX 30-D

## JOINT DECLARATION OF THE PARTIES ON COUNTRIES THAT HAVE ESTABLISHED A CUSTOMS UNION WITH THE EUROPEAN UNION

1.    The European Union recalls the obligations of the countries that have established a customs union with the European Union to align their trade regime to that of the European Union, and for certain of them, to conclude preferential agreements with countries that have preferential agreements with the European Union.

2.    In this context, Canada shall endeavour to start negotiations with the countries which,

    (a)    have established a customs union with the European Union, and

    (b)    whose products do not benefit from the tariff concessions under this Agreement,

with a view to conclude a comprehensive bilateral agreement establishing a free trade area in accordance with the relevant WTO Agreement provisions on goods and services, provided that those countries agree to negotiate an ambitious and comprehensive agreement comparable to this Agreement in scope and ambition. Canada shall endeavour to start negotiations as soon as possible with a view to have such an agreement enter into force as soon as possible after the entry into force of this Agreement.

**Protocol on rules of origin and origin procedures**

*SECTION A*

***GENERAL PROVISIONS***

*Article 1*

**Definitions**

For the purposes of this Protocol:

**aquaculture** means the farming of aquatic organisms, including fish, molluscs, crustaceans, other aquatic invertebrates and aquatic plants, from seedstock such as eggs, fry, fingerlings and larvae, by intervention in the rearing or growth processes to enhance production, such as regular stocking, feeding, or protection from predators;

**classified** means the classification of a product under a particular heading or subheading of the HS;

**customs authority** means any governmental authority that is responsible under the law of a Party for the administration and application of customs laws or, for the EU, where provided for, the competent services of the European Commission;

**customs value** means the value as determined in accordance with the Customs Valuation Agreement;

**determination of origin** means a determination as to whether a good qualifies as an originating good in accordance with this Protocol;

**exporter** means an exporter located in the territory of a Party;

**identical originating products** means products that are the same in all respects, including physical characteristics, quality, and reputation, irrespective of minor differences in appearance that are not relevant to a determination of origin of those products under this Protocol;

**importer** means an importer located in the territory of a Party;

**material** means any ingredient, component, part, or product that is used in the production of another product;

**net weight of non-originating material** means the weight of the material as it is used in the production of the product, not including the weight of the material's packaging;

**net weight of the product** means the weight of a product not including the weight of packaging. In addition, if the production includes a heating or drying operation, the net weight of the product may be the net weight of all materials used in its production, excluding water of heading 22.01 added during production of the product;

549

**producer** means a person who engages in any kind of working or processing including such operations as growing, mining, raising, harvesting, fishing, trapping, hunting, manufacturing, assembling, or disassembling a product;

**product** means the result of production, even if it is intended for use as a material in the production of another product;

**production** means any kind of working or processing, including such operations as growing, mining, raising, harvesting, fishing, trapping, hunting, manufacturing, assembling, or disassembling a product;

**transaction value or ex-works price of the product** means the price paid or payable to the producer of the product at the place where the last production was carried out, and must include the value of all materials. If there is no price paid or payable or if it does not include the value of all materials, the transaction value or ex-works price of the product:

(a)     must include the value of all materials and the cost of production employed in producing the product, calculated in accordance with generally accepted accounting principles; and

(b)     may include amounts for general expenses and profit to the producer that can be reasonably allocated to the product.

Any internal taxes which are, or may be, repaid when the product obtained is exported are excluded. If the transaction value or ex-works price of the product includes costs incurred subsequent to the product leaving the place of production, such as transportation, loading, unloading, handling, or insurance, those costs are to be excluded; and

**value of non-originating materials** means the customs value of the material at the time of its importation into a Party, as determined in accordance with the Customs Valuation Agreement. The value of the non-originating material must include any costs incurred in transporting the material to the place of importation, such as transportation, loading, unloading, handling, or insurance. If the customs value is not known or cannot be ascertained, the value of non-originating materials will be the first ascertainable price paid for the materials in the European Union or in Canada.

*SECTION B*

***RULES OF ORIGIN***

*Article 2*

**General requirements**

1.     For the purposes of this Agreement, a product is originating in the Party where the last production took place if, in the territory of a Party or in the territory of both of the Parties in accordance with Article 3, the product:

(a)     has been wholly obtained within the meaning of Article 4;

(b)     has been produced exclusively from originating materials; or

(c)    has undergone sufficient production within the meaning of Article 5.

2.    Except as provided for in paragraphs 8 and 9 of Article 3, the conditions set out in this Protocol relating to the acquisition of originating status must be fulfilled without interruption in the territory of one or both of the Parties.

*Article 3*

**Cumulation of origin**

1.    A product that originates in a Party is considered originating in the other Party when used as a material in the production of a product in that other Party.

2.    An exporter may take into account production carried out on a non-originating material in the other Party for the purposes of determining the originating status of a product.

3.    Paragraphs 1 and 2 do not apply if the production carried out on a product does not go beyond the operations referred to in Article 7 and the object of this production, as demonstrated on the basis of a preponderance of evidence, is to circumvent financial or fiscal legislation of the Parties.

4.    If an exporter has completed an origin declaration for a product referred to in paragraph 2, the exporter must possess a completed and signed supplier's statement from the supplier of the non-originating materials used in the production of the product.

5.    A supplier's statement may be the statement set out in Annex 3 or an equivalent document that contains the same information describing the non-originating materials concerned in sufficient detail for their identification.

6.    If a supplier's statement referred to in paragraph 4 is in electronic format, it does not need to be signed, provided that the supplier is identified to the satisfaction of the customs authorities in the Party where the supplier's statement was completed.

7.    A supplier's statement applies to a single invoice or multiple invoices for the same material that is supplied within a period that does not exceed 12 months from the date set out in the supplier's statement.

8.    Subject to paragraph 9, if, as permitted by the WTO Agreement, each Party has a free trade agreement with the same third country, a material of that third country may be taken into consideration by the exporter when determining whether a product is originating under this Agreement.

9.    Each Party shall apply paragraph 8 only if equivalent provisions are in force between each Party and the third country and upon agreement by the Parties on the applicable conditions.

10.    Notwithstanding paragraph 9, if each Party has a free trade agreement with the United States, and upon agreement by both Parties on the applicable conditions, each Party shall apply paragraph 8 when determining whether a product of Chapter 2 or 11, heading 16.01 through 16.03, Chapter 19, heading 20.02 or 20.03, or subheading 3505.10 is originating under this Agreement.

*Article 4*

**Wholly obtained products**

1.    The following products shall be considered as wholly obtained in a Party:

(a)    mineral products and other non-living natural resources extracted or taken from there;

(b)    vegetables, plants, and plant products harvested or gathered there;

(c)    live animals born and raised there;

(d)    products obtained from live animals there;

(e)    products from slaughtered animals born and raised there;

(f)    products obtained by hunting, trapping, or fishing conducted there, but not beyond the outer limits of the Party's territorial sea;

(g)    products of aquaculture raised there;

(h)    fish, shellfish, and other marine life taken beyond the outer limits of any territorial sea by a vessel;

(i)    products made aboard factory ships exclusively from products referred to in subparagraph (f);

(j)    mineral products and other non-living natural resources, taken or extracted from the seabed, subsoil, or ocean floor of:

(i)    the exclusive economic zone of Canada or the European Union's Member States, as determined by domestic law and consistent with Part V of the *United Nations Convention on the Law of the Sea*, done at Montego Bay on 10 December 1982 ("UNCLOS");

(ii)    the continental shelf of Canada or the European Union's Member States, as determined by domestic law and consistent with Part VI of UNCLOS; or

(iii)    the Area as defined in Article 1(1) of UNCLOS,

by a Party or a person of a Party, provided that that Party or person of a Party has rights to exploit such seabed, subsoil, or ocean floor;

(k)    raw materials recovered from used products collected there, provided that these products are fit only for such recovery;

552

(l)    components recovered from used products collected there, provided that these products are fit only for such recovery, when the component is:

    (i)    incorporated into another product; or

    (ii)   further produced resulting in a product with a performance and life expectancy equivalent or similar to those of a new product of the same type;

(m)   products, at any stage of production, produced there exclusively from products specified in subparagraphs (a) through (j).

2.    For the purpose of subparagraphs 1(f) and (g), the following conditions apply to the vessel or factory ship:

(a)    the vessel or factory ship must be:

    (i)    registered in a Member State of the European Union or in Canada; or

    (ii)   listed in Canada, if such vessel:

        (A)   immediately prior to its listing in Canada, is entitled to fly the flag of a Member State of the European Union and must sail under that flag; and

        (B)   fulfills the conditions of sub-subparagraphs 2(b)(i) or 2(b)(ii);

    (iii)  the vessel or factory ship must be entitled to fly the flag of a Member State of the European Union or of Canada and must sail under that flag; and

(b)    with respect to the European Union, the vessel or factory ship must be:

    (i)    at least 50 per cent owned by nationals of a Member State of the European Union; or

    (ii)   owned by companies that have their head office and their main place of business in a Member State of the European Union, and that are at least 50 per cent owned by a Member State of the European Union, public entities or nationals of those States; or

(c)    with respect to Canada, the vessel or factory ship must take the fish, shellfish, or other marine life under the authority of a Canadian fishing licence. Canadian fishing licences include Canadian commercial fishing licences and Canadian aboriginal fishing licences issued to aboriginal organisations. The holder of the Canadian fishing licence must be:

    (i)    a Canadian national;

    (ii)   an enterprise that is no more than 49 per cent foreign owned and has a commercial presence in Canada;

(iii)  a fishing vessel owned by a person referred to in sub-subparagraph (i) or (ii) that is registered in Canada, entitled to fly the flag of Canada and must sail under that flag; or

(iv)  an aboriginal organisation located in the territory of Canada. A person fishing under the authority of a Canadian aboriginal fishing licence must be a Canadian national.

## Article 5

### Sufficient production

1.  For the purpose of Article 2, products that are not wholly obtained are considered to have undergone sufficient production when the conditions set out in Annex 5 are fulfilled.

2.  If a non-originating material undergoes sufficient production, the resulting product shall be considered as originating and no account shall be taken of the non-originating material contained therein when that product is used in the subsequent production of another product.

## Article 6

### Tolerance

1.  Notwithstanding Article 5.1, and except as provided in paragraph 3, if the non-originating materials used in the production of a product do not fulfil the conditions set out in Annex 5, the product shall be considered an originating product provided that:

    (a)  the total value of those non-originating materials does not exceed 10 per cent of the transaction value or ex-works price of the product;

    (b)  any of the percentages given in Annex 5 for the maximum value or weight of non-originating materials are not exceeded through the application of this paragraph; and

    (c)  the product satisfies all other applicable requirements of this Protocol.

2.  Paragraph 1 does not apply to products wholly obtained in a Party within the meaning of Article 4. If the rule of origin specified in Annex 5 requires that the materials used in the production of a product be wholly obtained, the tolerance provided for in paragraph 1 applies to the sum of these materials.

3.  Tolerance for textile and apparel products of Chapter 50 through 63 of the HS shall be determined in accordance with Annex 1.

4.  Paragraphs 1 through 3 are subject to Article 8(c).

*Article* 7

**Insufficient production**

1.    Without prejudice to paragraph 2, the following operations are insufficient to confer origin on a product, whether or not the requirements of Articles 5 or 6 are satisfied:

    (a)    operations exclusively intended to preserve products in good condition during storage and transport;[64]

    (b)    breaking-up or assembly of packages;

    (c)    washing, cleaning, or operations to remove dust, oxide, oil, paint, or other coverings from a product;

    (d)    ironing or pressing of textiles or textile articles of Chapter 50 through 63 of the HS;

    (e)    simple painting or polishing operations;

    (f)    husking, partial or total bleaching, polishing, or glazing of cereals or rice of Chapter 10 that does not result in a change of chapter;

    (g)    operations to colour or flavour sugar of heading 17.01 or 17.02; operations to form sugar lumps of heading 17.01; partial or total grinding of crystal sugar of heading 17.01;

    (h)    peeling, stoning, or shelling of vegetables of Chapter 7, fruits of Chapter 8, nuts of heading 08.01 or 08.02 or groundnuts of heading 12.02, if these vegetables, fruits, nuts, or groundnuts remain classified within the same chapter;

    (i)    sharpening, simple grinding, or simple cutting;

    (j)    simple sifting, screening, sorting, classifying, grading, or matching;

    (k)    simple packaging operations, such as placing in bottles, cans, flasks, bags, cases, boxes, or fixing on cards or boards;

    (l)    affixing or printing marks, labels, logos, and other like distinguishing signs on the products or their packaging;

    (m)    mixing of sugar of heading 17.01 or 17.02 with any material;

    (n)    simple mixing of materials, whether or not of different kinds; simple mixing does not include an operation that causes a chemical reaction as defined in the notes to Chapter 28 or 29 of Annex 5;

---

[64]    Preserving operations such as chilling, freezing, or ventilating are considered insufficient within the meaning of subparagraph (a), whereas operations such as pickling, drying, or smoking that are intended to give a product special or different characteristics are not considered insufficient.

(o)   simple assembly of parts of articles to constitute a complete article of Chapter 61, 62, or 82 through 97 of the HS or disassembly of complete articles of Chapter 61, 62, or 82 through 97 into parts;

(p)   a combination of two or more operations specified in subparagraphs (a) to (o); and

(q)   slaughter of animals.

2.    In accordance with Article 3, all production carried out in the European Union and in Canada on a product is considered when determining whether the production undertaken on that product is insufficient within the meaning of paragraph 1.

3.    For the purpose of paragraph 1, an operation shall be considered simple when neither special skills, nor machines, apparatus, or tools especially produced or installed for those operations are required for their performance or when those skills, machines, apparatus, or tools do not contribute to the product's essential characteristics or properties.

### *Article* 8

### Unit of classification

For the purpose of this Protocol:

(a)   the tariff classification of a particular product or material shall be determined according to the HS;

(b)   when a product composed of a group or assembly of articles or components is classified pursuant to the terms of the HS under a single heading or subheading, the whole shall constitute the particular product; and

(c)   when a shipment consists of a number of identical products classified under the same heading or subheading of the HS, each product shall be considered separately.

### *Article* 9

### Packaging and packing materials and containers

1.    If, under General Rule 5 of the HS, packaging is included with the product for classification purposes, it is considered in determining whether all the non-originating materials used in the production of the product satisfy the requirements set out in Annex 5.

2.    Packing materials and containers in which a product is packed for shipment shall be disregarded in determining the origin of that product.

*Article 10*

**Accounting segregation of fungible materials or products**

1. (a) If originating and non-originating fungible materials are used in the production of a product, the determination of the origin of the fungible materials does not need to be made through physical separation and identification of any specific fungible material, but may be determined on the basis of an inventory management system; or

   (b) if originating and non-originating fungible products of Chapter 10, 15, 27, 28, 29, heading 32.01 through 32.07, or heading 39.01 through 39.14 of the HS are physically combined or mixed in inventory in a Party before exportation to the other Party, the determination of the origin of the fungible products does not need to be made through physical separation and identification of any specific fungible product, but may be determined on the basis of an inventory management system.

2. The inventory management system must:

   (a) ensure that, at any time, no more products receive originating status than would have been the case if the fungible materials or fungible products had been physically segregated;

   (b) specify the quantity of originating and non-originating materials or products, including the dates on which those materials or products were placed in inventory and, if required by the applicable rule of origin, the value of those materials or products;

   (c) specify the quantity of products produced using fungible materials, or the quantity of fungible products, that are supplied to customers who require evidence of origin in a Party for the purpose of obtaining preferential treatment under this Agreement, as well as to customers who do not require such evidence; and

   (d) indicate whether an inventory of originating products was available in sufficient quantity to support the declaration of originating status.

3. A Party may require that an exporter or producer within its territory that is seeking to use an inventory management system pursuant to this Article obtain prior authorisation from that Party in order to use that system. The Party may withdraw authorisation to use an inventory management system if the exporter or producer makes improper use of it.

4. For the purpose of paragraph 1, "fungible materials" or "fungible products" means materials or products that are of the same kind and commercial quality, with the same technical and physical characteristics, and which cannot be distinguished from one another for origin purposes.

*Article 11*

**Accessories, spare parts and tools**

Accessories, spare parts, and tools delivered with a product that form part of its standard accessories, spare parts, or tools, that are not invoiced separately from the product and which quantities and value are customary for the product, shall be:

(a)     taken into account in calculating the value of the relevant non-originating materials when the rule of origin of Annex 5 applicable to the product contains a percentage for the maximum value of non-originating materials; and

(b)     disregarded in determining whether all the non-originating materials used in the production of the product undergo the applicable change in tariff classification or other requirements set out in Annex 5.

*Article 12*

**Sets**

1.     Except as provided in Annex 5, a set, as referred to in General Rule 3 of the HS, is originating provided that:

(a)     all of the set's component products are originating; or

(b)     when the set contains a non-originating component product, at least one of the component products or all of the packaging material and containers for the set is originating; and

(i)     the value of the non-originating component products of Chapter 1 through 24 of the Harmonized System does not exceed 15 per cent of the transaction value or ex-works price of the set;

(ii)     the value of the non-originating component products of Chapter 25 through 97 of the HS does not exceed 25 per cent of the transaction value or ex-works price of the set; and

(iii)     the value of all of the set's non-originating component products does not exceed 25 per cent of the transaction value or ex-works price of the set.

2.     The value of non-originating component products is calculated in the same manner as the value of non-originating materials.

3.     The transaction value or ex-works price of the set shall be calculated in the same manner as the transaction value or ex-works price of the product.

*Article 13*

**Neutral elements**

558

For the purpose of determining whether a product is originating, it is not necessary to determine the origin of the following which might be used in its production:

(a)     energy and fuel;

(b)     plant and equipment;

(c)     machines and tools; or

(d)     materials which do not enter and which are not intended to enter into the final composition of the product.

## *Article 14*

### **Transport through a third country**

1.     A product that has undergone production that satisfies the requirements of Article 2 shall be considered originating only if, subsequent to that production, the product:

(a)     does not undergo further production or any other operation outside the territories of the Parties, other than unloading, reloading, or any other operation necessary to preserve it in good condition, to transport the product to the territory of a Party; and

(b)     remains under customs control while outside the territories of the Parties.

2.     The storage of products and shipments or the splitting of shipments may take place where carried out under the responsibility of the exporter or of a subsequent holder of the products and the products remain under customs control in the country or countries of transit.

## *Article 15*

### **Returned originating products**

If an originating product exported from a Party to a third country returns, it shall be considered as non-originating, unless it can be demonstrated to the satisfaction of the customs authorities that the returning product:

(a)     is the same as that exported; and

(b)     has not undergone any operation beyond that necessary to preserve it in good condition.

## *Article 16*

### **Sugar**

1.     If a rule of origin requires that the net weight of non-originating sugar used in production not exceed a specified threshold, the product satisfies this condition

if the total net weight of all mono-saccharides and di-saccharides contained in the product, or in the materials used in production, does not exceed this threshold.

2. The product also satisfies the condition in paragraph 1 if the threshold is not exceeded by the net weight of non-originating sugar classified in heading 17.01 or subheading 1702.30 through 1702.60 or 1702.90 other than malto-dextrin, chemically pure maltose, or "colouring" caramel, as described in the explanatory notes to heading 17.02, when used as such in the production of:

   (a) the product; and

   (b) the non-originating sugar-containing materials classified in subheading 1302.20, 1704.90, 1806.10, 1806.20, 1901.90, 2101.12, 2101.20, 2106.90, and 3302.10 that are used as such in the production of the product. Alternatively, the net weight of all mono-saccharides and di-saccharides contained in any of these sugar-containing materials may also be used. If the net weight of the non-originating sugar used in the production of these sugar containing or the net weight of mono-saccharides and di-saccharides contained in these sugar-containing materials is not known, the total net weight of these materials used as such in production must apply.

3. The net weight of any non-originating sugar as referred to in paragraph 2 may be calculated on a dry weight basis.

4. For the purpose of the rules of origin for heading 17.04 and 18.06, the value of non-originating sugar refers to the value of the non-originating material referred to in paragraph 2 that is used in production of the product.

*Article 17*

**Net cost**

1. For the purpose of this Article, the following definitions apply, in addition to those set out in Article 1:

   **motor vehicle** means a product of subheading 8703.21 through 8703.90;

   **net cost** means total cost minus sales promotion, marketing and after-sales service costs, royalty, shipping and packing costs, and non-allowable interest cost that are included in the total cost;

   **non-allowable interest cost** means interest costs incurred by a producer that exceed 700 basis points above the applicable national government interest rate identified for comparable maturities;

   **royalty** means payments of any kind, including payments under technical assistance or similar agreements, made as consideration for the use or right to use any copyright, literary, artistic, or scientific work, patent, trademark, design,

model, plan, secret formula or process, excluding those payments under technical assistance or similar agreements that can be related to specific services such as:

(a)  personnel training, without regard to where it is performed; and

(b)  if performed in the territory of one or both of the Parties, engineering, tooling, die-setting, software design and similar computer services, or other services;

**sales promotion, marketing, and after-sales service costs** means the following costs related to sales promotion, marketing, and after-sales service:

(a)  sales and marketing promotion; media advertising; advertising and market research; promotional and demonstration materials; exhibits; sales conferences, trade shows and conventions; banners; marketing displays; free samples; sales, marketing and after-sales service literature (product brochures, catalogues, technical literature, price lists, service manuals and sales aid information); establishment and protection of logos and trademarks; sponsorships; wholesale and retail restocking charges; entertainment;

(b)  sales and marketing incentives; consumer, retailer or wholesaler rebates; merchandise incentives;

(c)  salaries and wages; sales commissions; bonuses; benefits (for example, medical, insurance, and pension); travelling and living expenses; and membership and professional fees for sales promotion, marketing, and after-sales service personnel;

(d)  recruiting and training of sales promotion, marketing, and after-sales service personnel, and after-sales training of customers' employees, if those costs are identified separately for sales promotion, marketing, and after-sales service of products on the financial statements or cost accounts of the producer;

(e)  product liability insurance;

(f)  office supplies for sales promotion, marketing, and after-sales service of products, if those costs are identified separately for sales promotion, marketing, and after-sales service of products on the financial statements or cost accounts of the producer;

(g)  telephone, mail, and other communications, if those costs are identified separately for sales promotion, marketing, and after-sales service of products on the financial statements or cost accounts of the producer;

(h)  rent and depreciation of sales promotion, marketing, and after-sales service offices and distribution centres;

(i)      property insurance premiums, taxes, cost of utilities, and repair and maintenance of sales promotion, marketing, and after-sales service offices and distribution centres, where such costs are identified separately for sales promotion, marketing, and after-sales service of products on the financial statements or cost accounts of the producer; and

(j)      payments by the producer to other persons for warranty repairs;

**shipping and packing costs** means the costs incurred in packing a product for shipment and shipping the product from the point of direct shipment to the buyer, excluding costs of preparing and packaging the product for retail sale; and

**total cost** means all product costs, period costs and other costs incurred in relation to the production of a product in Canada when:

(a)      **product costs** means those costs that are associated with the production of a product and include the value of materials, direct labour costs, and direct overhead.

(b)      **period costs** means those costs other than product costs that are expensed in the period in which they are incurred, including selling expenses and general and administrative expenses.

(c)      **other costs** means all costs recorded on the books of the producer that are not product costs or period costs.

2.      For the purpose of calculating the net cost of a product under Table D.1 (Annual Quota Allocation for Vehicles Exported from Canada to the European Union) in Annex 5-A , the producer of the product may:

(a)      calculate the total cost incurred with respect to all products produced by that producer, subtract any sales promotion, marketing and after-sales service costs, royalty, shipping and packing costs, and non-allowable interest cost that is included in the total cost of all those products, and then reasonably allocate the resulting net cost of those products to the product;

(b)      calculate the total cost incurred with respect to all products produced by that producer, reasonably allocate the total cost to the product, and then subtract any sales promotion, marketing and after-sales service costs, royalty, shipping and packing costs and non-allowable interest cost that is included in the portion of the total cost allocated to the product; or

(c)      reasonably allocate each cost that forms part of the total cost incurred by that producer with respect to the product so that the aggregate of these costs does not include any sales promotion, marketing and after-sales service costs, royalty, shipping and packing costs, or non-allowable interest cost.

3.      For the purpose of calculating the net cost of a product under paragraph 1, the producer may average its calculation over its fiscal year using any one of the

562

following categories, on the basis of either all motor vehicles produced by that producer in the category or only those motor vehicles in the category that are produced by that producer and exported to the territory of the other Party:

(a)    the same model line of motor vehicles in the same class of vehicles produced in the same plant in the territory of a Party;

(b)    the same model line of motor vehicles produced in the same plant in the territory of a Party;

(c)    the same model line of motor vehicles produced in the territory of a Party;

(d)    the same class of motor vehicles produced in the same plant in the territory of a Party; or

(e)    any other category as the Parties may decide.

*SECTION C*

***ORIGIN PROCEDURES***

*Article 18*

**Proof of origin**

1.    Products originating in the European Union, on importation into Canada, and products originating in Canada, on importation into the European Union, benefit from preferential tariff treatment of this Agreement on the basis of a declaration ("origin declaration").

2.    The origin declaration is provided on an invoice or any other commercial document that describes the originating product in sufficient detail to enable its identification.

3.    The different linguistic versions of the text of the origin declaration are set out in Annex 2.

*Article 19*

**Obligations regarding exportations**

1.    An origin declaration as referred to in Article 18.1 shall be completed:

(a)    in the European Union, by an exporter in accordance with the relevant European Union legislation; and

(b)    in Canada, by an exporter in accordance with Part V of the *Customs Act*, R.S.C., 1985, c. 1 (2nd Supp.).

2.    The exporter completing an origin declaration shall at the request of the customs authority of the Party of export submit a copy of the origin declaration and all appropriate documents proving the originating status of the products concerned,

563

including supporting documents or written statements from the producers or suppliers, and fulfil the other requirements of this Protocol.

3.      An origin declaration shall be completed and signed by the exporter unless otherwise provided.

4.      A Party may allow an origin declaration to be completed by the exporter when the products to which it relates are exported, or after exportation if the origin declaration is presented in the importing Party within two years after the importation of the products to which it relates or within a longer period of time if specified in the laws of the importing Party.

5.      The customs authority of the Party of import may allow the application of an origin declaration to multiple shipments of identical originating products that take place within a period of time that does not exceed 12 months as set out by the exporter in that declaration.

6.      An exporter that has completed an origin declaration and becomes aware or has reason to believe that the origin declaration contains incorrect information shall immediately notify the importer in writing of any change affecting the originating status of each product to which the origin declaration applies.

7.      The Parties may allow the establishment of a system that permits an origin declaration to be submitted electronically and directly from the exporter in the territory of a Party to an importer in the territory of the other Party, including the replacement of the exporter's signature on the origin declaration with an electronic signature or identification code.

## *Article 20*

### Validity of the origin declaration

1.      An origin declaration shall be valid for 12 months from the date it was completed by the exporter, or for such longer period of time as provided by the Party of import. The preferential tariff treatment may be claimed, within this validity period, to the customs authority of the Party of import.

2.      The Party of import may accept an origin declaration submitted to its customs authority after the validity period referred to in paragraph 1 for the purpose of preferential tariff treatment in accordance with that Party's laws.

## *Article 21*

### Obligations regarding importations

1.      For the purpose of claiming preferential tariff treatment, the importer shall:

(a)  submit the origin declaration to the customs authority of the Party of import as required by and in accordance with the procedures applicable in that Party;

(b)  if required by the customs authority of the Party of import, submit a translation of the origin declaration; and

(c)  if required by the customs authority of the Party of import, provide for a statement accompanying or forming a part of the import declaration, to the effect that the products meet the conditions required for the application of this Agreement.

2.  An importer that becomes aware or has reason to believe that an origin declaration for a product to which preferential tariff treatment has been granted contains incorrect information shall immediately notify the customs authority of the Party of import in writing of any change affecting the originating status of that product and pay any duties owing.

3.  When an importer claims preferential tariff treatment for a good imported from the territory of the other Party, the importing Party may deny preferential tariff treatment to the good if the importer fails to comply with any requirement under this Protocol.

4.  A Party shall, in conformity with its laws, provide that, if a product would have qualified as an originating product when it was imported into the territory of that Party but the importer did not have an origin declaration at the time of importation, the importer of the product may, within a period of time of no less than three years after the date of importation, apply for a refund of duties paid as a result of the product not having been accorded preferential tariff treatment.

## *Article* 22

### Proof related to transport through a third country

Each Party, through its customs authority, may require an importer to demonstrate that a product for which the importer claims preferential tariff treatment was shipped in accordance with Article 14 by providing:

(a)  carrier documents, including bills of lading or waybills, indicating the shipping route and all points of shipment and transhipment prior to the importation of the product; and

(b)  when the product is shipped through or transhipped outside the territories of the Parties, a copy of the customs control documents indicating to that customs authority that the product remained under customs control while outside the territories of the Parties.

*Article 23*

**Importation by instalments**

Each Party shall provide that if dismantled or non-assembled products within the meaning of General Rule 2(a) of the HS falling within Sections XVI and XVII or heading 7308 and 9406 of the HS are imported by instalments at the request of the importer and on the conditions set out by the customs authority of the Party of import, a single origin declaration for these products shall be submitted, as required, to that customs authority upon importation of the first instalment.

*Article 24*

**Exemptions from origin declarations**

1.     A Party may, in conformity with its laws, waive the requirement to present an origin declaration as referred to in Article 21, for low value shipments of originating products from another Party and for originating products forming part of the personal luggage of a traveller coming from another Party.

2.     A Party may exclude any importation from the provisions of paragraph 1 when the importation is part of a series of importations that may reasonably be considered to have been undertaken or arranged for the purpose of avoiding the requirements of this Protocol related to origin declarations.

3.     The Parties may set value limits for products referred to in paragraph 1, and shall exchange information regarding those limits.

*Article 25*

**Supporting documents**

The documents referred to in Article 19.2, may include documents relating to the following:

(a)     the production processes carried out on the originating product or on materials used in the production of that product;

(b)     the purchase of, the cost of, the value of, and the payment for the product;

(c)     the origin of, the purchase of, the cost of, the value of, and the payment for all materials, including neutral elements, used in the production of the product; and

(d)     the shipment of the product.

*Article 26*

**Preservation of records**

1.     An exporter that has completed an origin declaration shall keep a copy of the origin declaration, as well as the supporting documents referred to in Article 25, for three years after the completion of the origin declaration or for a longer period of time as the Party of export may specify.

2.     If an exporter has based an origin declaration on a written statement from the producer, the producer shall be required to maintain records in accordance with paragraph 1.

3.     When provided for in laws of the Party of import, an importer that has been granted preferential tariff treatment shall keep documentation relating to the importation of the product, including a copy of the origin declaration, for three years after the date on which preferential treatment was granted, or for a longer period of time as that Party may specify.

4.     Each Party shall permit, in accordance with that Party's laws, importers, exporters, and producers in its territory to maintain documentation or records in any medium, provided that the documentation or records can be retrieved and printed.

5.     A Party may deny preferential tariff treatment to a product that is the subject of an origin verification when the importer, exporter, or producer of the product that is required to maintain records or documentation under this Article:

    (a)     fails to maintain records or documentation relevant to determining the origin of the product in accordance with the requirements of this Protocol; or

    (b)     denies access to those records or documentation.


*Article 27*

**Discrepancies and formal errors**

1.     The discovery of slight discrepancies between the statements made in the origin declaration and those made in the documents submitted to the customs authorities for the purpose of carrying out the formalities for importing the products shall not, because of that fact, render the origin declaration null and void if it is established that this document corresponds to the products submitted.

2.     Obvious formal errors such as typing errors on an origin declaration shall not cause this document to be rejected if these errors do not create doubts concerning the correctness of the statements made in the document.

*Article 28*

**Cooperation**

1.    The Parties shall cooperate in the uniform administration and interpretation of this Protocol and, through their customs authorities, assist each other in verifying the originating status of the products on which an origin declaration is based.

2.    For the purpose of facilitating the verifications or assistance referred to in paragraph 1, the customs authorities of the Parties shall provide each other, through the European Commission, with addresses of the responsible customs authorities.

3.    It is understood that the customs authority of the Party of export assumes all expenses in carrying out paragraph 1.

4.    It is further understood that the customs authorities of the Parties will discuss the overall operation and administration of the verification process, including forecasting of workload and discussing priorities. If there is an unusual increase in the number of requests, the customs authorities of the Parties will consult to establish priorities and consider steps to manage the workload, taking into consideration operational requirements.

5.    With respect to products considered originating in accordance with Article 3, the Parties may cooperate with a third country to develop customs procedures based on the principles of this Protocol.

*Article 29*

**Origin verification**

1.    For the purpose of ensuring the proper application of this Protocol, the Parties shall assist each other, through their customs authorities, in verifying whether products are originating and ensuring the accuracy of claims for preferential tariff treatment.

2.    A Party's request for an origin verification concerning whether a product is originating or whether all other requirements of this Protocol are fulfilled shall be:

    (a)    based on risk assessment methods applied by the customs authority of the Party of import, which may include random selection; or

    (b)    made when the Party of import has reasonable doubts about whether the product is originating or whether all other requirements of this Protocol have been fulfilled.

3.    The customs authority of the Party of import may verify whether a product is originating by requesting, in writing, that the customs authority of the Party of export conduct a verification concerning whether a product is originating. When requesting a verification, the customs authority of the Party of import shall provide the customs authority of the Party of export with:

    (a)    the identity of the customs authority issuing the request;

    (b)    the name of the exporter or producer to be verified;

    (c)    the subject and scope of the verification; and

    (d)    a copy of the origin declaration and, where applicable, any other relevant documentation.

4.    When appropriate, the customs authority of the Party of import may request, pursuant to paragraph 3, specific documentation and information from the customs authority of the Party of export.

5.    A request made by the customs authority of the Party of import pursuant to paragraph 3 shall be provided to the customs authority of the Party of export by certified or registered mail or any other method that produces a confirmation of receipt by that customs authority.

6.    The customs authority of the Party of export shall proceed to the origin verification. For this purpose, the customs authority may, in accordance with its laws, request documentation, call for any evidence, or visit the premises of an exporter or a producer to review the records referred to in Article 25 and observe the facilities used in the production of the product.

7.    If an exporter has based an origin declaration on a written statement from the producer or supplier, the exporter may arrange for the producer or supplier to provide documentation or information directly to the customs authority of the Party of export upon that Party's request.

8.    As soon as possible and in any event within 12 months after receiving the request referred to in paragraph 4, the customs authority of the Party of export shall complete a verification of whether the product is originating and fulfils the other requirements of this Protocol, and shall:

    (a)    provide to the customs authority of the Party of import, by certified or registered mail or any other method that produces a confirmation of receipt by that customs authority, a written report in order for it to determine whether the product is originating or not, and that contains:

        (i)    the results of the verification;

        (ii)    the description of the product subject to verification and the tariff classification relevant to the application of the rule of origin;

       (iii)  a description and explanation of the production sufficient to support the rationale concerning the originating status of the product;

       (iv)  information on the manner in which the verification was conducted; and

       (v)  where appropriate, supporting documentation; and

  (b)  subject to its laws, notify the exporter of its decision concerning whether the product is originating.

9.    The period of time referred to in paragraph 8 may be extended by mutual consent of the customs authorities concerned.

10.    Pending the results of an origin verification conducted pursuant to paragraph 8, or consultations under paragraph 13, the customs authority of the Party of import, subject to any precautionary measures it deems necessary, shall offer to release the product to the importer.

11.    If the result of an origin verification has not been provided in accordance with paragraph 8, the customs authority of the importing Party may deny preferential tariff treatment to a product if it has reasonable doubt or when it is unable to determine whether the product is originating.

12.    If there are differences in relation to the verification procedures of this Article or in the interpretation of the rules of origin in determining whether a product qualifies as originating, and these differences cannot be resolved through consultations between the customs authority requesting the verification and the customs authority responsible for performing the verification, and if the customs authority of the importing Party intends to make a determination of origin that is inconsistent with the written report provided under paragraph 8(a) by the customs authority of the exporting Party, the importing Party shall notify the exporting Party within 60 days of receiving the written report.

13.    At the request of either Party, the Parties shall hold and conclude consultations within 90 days from the date of the notification referred to in paragraph 12 to resolve those differences. The period of time for concluding consultations may be extended on a case by case basis by mutual written consent between the Parties. The customs authority of the importing Party may make its determination of origin after the conclusion of these consultations. The Parties may also seek to resolve those differences within the Joint Customs Cooperation Committee referred to in Article 34.

14.    In all cases, the settlement of differences between the importer and the customs authority of the Party of import shall be under the law of the Party of import.

15.    This Protocol does not prevent a customs authority of a Party from issuing a determination of origin or an advance ruling relating to any matter under consideration by the Joint Customs Cooperation Committee or the Committee on

Trade in Goods established under Article 26.2(a) (Committees) or from taking any other action that it considers necessary, pending a resolution of the matter under this Agreement.

## *Article 30*

### Review and appeal

1. Each Party shall grant substantially the same rights of review and appeal of determinations of origin and advance rulings issued by its customs authority as it provides to importers in its territory, to any person who:

   (a) has received a determination on origin in the application of this Protocol; or

   (b) has received an advance ruling pursuant to Article 33.1.

2. Further to Articles 27.4 (Administrative proceedings) and 27.5 (Review and appeal), each Party shall provide that the rights of review and appeal referred to in paragraph 1 include access to at least two levels of appeal or review including at least one judicial or quasi-judicial level.

## *Article 31*

### Penalties

Each Party shall maintain measures imposing criminal, civil or administrative penalties for violations of its laws relating to this Protocol.

## *Article 32*

### Confidentiality

1. This Protocol does not require a Party to furnish or allow access to business information or to information relating to an identified or identifiable natural person, the disclosure of which would impede law enforcement or would be contrary to that Party's law protecting business information and personal data and privacy.

2. Each Party shall maintain, in conformity with its law, the confidentiality of the information collected pursuant to this Protocol and shall protect that information from disclosure that could prejudice the competitive position of the person providing the information. If the Party receiving or obtaining the information is required by its laws to disclose the information, that Party shall notify the person or Party who provided that information.

3. Each Party shall ensure that the confidential information collected pursuant to this Protocol shall not be used for purposes other than the administration and

enforcement of determination of origin and of customs matters, except with the permission of the person or Party who provided the confidential information.

4.    Notwithstanding paragraph 3, a Party may allow information collected pursuant to this Protocol to be used in any administrative, judicial, or quasi-judicial proceedings instituted for failure to comply with customs related laws implementing this Protocol. A Party shall notify the person or Party who provided the information in advance of such use.

5.    The Parties shall exchange information on their respective law concerning data protection for the purpose of facilitating the operation and application of paragraph 2.

*Article 33*

**Advance rulings relating to origin**

1.    Each Party shall, through its customs authority, provide for the expeditious issuance of written advance rulings in accordance with its law, prior to the importation of a product into its territory, concerning whether a product qualifies as an originating product under this Protocol.

2.    Each Party shall adopt or maintain procedures for the issuance of advance rulings, including a detailed description of the information reasonably required to process an application for a ruling.

3.    Each Party shall provide that its customs authority:

    (a)    may, at any time during the course of an evaluation of an application for an advance ruling, request supplemental information from the person requesting the ruling;

    (b)    issue the ruling within 120 days from the date on which it has obtained all necessary information from the person requesting the advance ruling; and

    (c)    provide, to the person requesting the advance ruling, a full explanation of the reasons for the ruling.

4.    When an application for an advance ruling involves an issue that is the subject of:

    (a)    a verification of origin;

    (b    a review by, or appeal to, a customs authority; or

    (c)    a judicial or quasi-judicial review in the customs authority's territory;

the customs authority, in accordance with its laws, may decline or postpone the issuance of the ruling.

5.      Subject to paragraph 7, each Party shall apply an advance ruling to importations into its territory of the product for which the ruling was requested on the date of its issuance or at a later date if specified in the ruling.

6.      Each Party shall provide, to any person requesting an advance ruling, the same treatment as it provided to any other person to whom it issued an advance ruling, provided that the facts and circumstances are identical in all material respects.

7.      The Party issuing an advance ruling may modify or revoke an advance ruling:

    (a)    if the ruling is based on an error of fact;

    (b)    if there is a change in the material facts or circumstances on which the ruling is based;

    (c)    to conform with an amendment of Chapter Two (National Treatment and Market Access for Goods), or this Protocol; or

    (d)    to conform with a judicial decision or a change in its law.

8.      Each Party shall provide that a modification or revocation of an advance ruling is effective on the date on which the modification or revocation is issued, or on a later date if specified in the ruling, and shall not be applied to importations of a product that have occurred prior to that date, unless the person to whom the advance ruling was issued has not acted in accordance with its terms and conditions.

9.      Notwithstanding paragraph 8, the Party issuing the advance ruling may, in conformity with its law, postpone the effective date of a modification or revocation for no more than six months.

10.     Subject to paragraph 7, each Party shall provide that an advance ruling remains in effect and is honoured.

*Article 34*

**Committee**

The Joint Customs Cooperation Committee ("JCCC"), granted authority to act under the auspices of the CETA Joint Committee as a specialised committee pursuant to Article 26.2.1 (Committees) may review this Protocol and recommend amendments to its provisions to the CETA Joint Committee. The JCCC shall endeavour to decide upon:

(a)    the uniform administration of the rules of origin, including tariff classification and valuation matters relating to this Protocol;

(b)    technical, interpretative, or administrative matters relating to this Protocol; or

(c)    the priorities in relation to origin verifications and other matters arising from origin verifications.

573

## ANNEX 1

## TOLERANCE FOR TEXTILE AND APPAREL PRODUCTS

1.    For the purpose of this Annex, the following definitions apply:

**natural fibres** means fibres other than artificial or synthetic fibres that have not been spun. Natural fibres include waste, and, unless otherwise specified, include fibres which have been carded, combed or otherwise processed, but not spun. Natural fibres include horsehair of heading 05.11, silk of heading 50.02 through 50.03, wool-fibres and fine or coarse animal hair of heading 51.01 through 51.05, cotton fibres of heading 52.01 through 52.03, and other vegetable fibres of heading 53.01 through 53.05;

**textile pulp, chemical materials, and paper-making materials** means materials, not classified in Chapter 50 through 63, which can be used to manufacture artificial, synthetic or paper fibres or yarns; and

**man-made staple fibres** means synthetic or artificial filament tow, staple fibres or waste, of heading 55.01 through 55.07.

2.    For greater certainty, non-originating materials of Chapter 1 through 49 or 64 through 97, including materials that contain textiles, may be disregarded for the purpose of determining whether all the non-originating materials used in the production of a product of Chapter 50 through 63 satisfies the applicable rule of origin set out in Annex 5.

3.    Subject to paragraph 7, if the non-originating materials used in the production of a product of Chapter 50 through 63 do not fulfil the conditions set out in Annex 5, the product is nonetheless an originating product provided that:

(a)    the product is produced using two or more of the basic textile materials listed in Table 1;

(b)    the net weight of non-originating basic textile materials listed in Table 1 does not exceed 10 per cent of the net weight of the product; and

(c)    the product satisfies all other applicable requirements of this Protocol.

4.    Subject to paragraph 7, in the case of a product of Chapter 50 through 63 produced using one or more basic textile materials listed in Table 1, and non-originating yarn made of polyurethane segmented with flexible segments of polyether, the product is nonetheless an originating product provided that:

(a)    the weight of the non-originating yarn made of polyurethane segmented with flexible segments of polyether does not exceed 20 per cent of the weight of the product; and

(b)    the product satisfies all other applicable requirements of this Protocol.

574

5.   Subject to paragraph 7, in the case of a product of Chapter 50 through 63 produced using one or more basic textile materials listed in Table 1 and non-originating strip consisting of a core of aluminium foil or of a core of plastic film whether or not coated with aluminium powder, of a width not exceeding 5 mm, sandwiched by means of a transparent or coloured adhesive between two layers of plastic film, the product is nonetheless an originating product provided that:

(a)   the weight of the non-originating strip consisting of a core of aluminium foil or of a core of plastic film whether or not coated with aluminium powder, of a width not exceeding 5 mm, sandwiched by means of a transparent or coloured adhesive between two layers of plastic film does not exceed 30 per cent of the weight of the product; and

(b)   the product satisfies all other applicable requirements of this Protocol.

6.   Subject to paragraph 7, if the non-originating materials used in the production of a product of Chapter 61 through 63 do not fulfil the conditions set out in Annex 5, the product is nonetheless an originating product provided that:

(a)   the non-originating materials are classified in a heading other than that of the product;

(b)   the value of the non-originating materials does not exceed 8 per cent of the transaction value or ex-works price of the product; and

(c)   the product satisfies all other applicable requirements of this Protocol.

This paragraph does not apply to non-originating materials used in the production of linings or interlinings of a product of Chapter 61 through 63.

7.   The tolerance provided for in paragraphs 2 through 6 does not apply to non-originating materials used in the production of a product if those materials are subject to a rule of origin that includes a percentage for their maximum value or weight.

Table 1 – Basic textile materials

| |
|---|
| 1. silk |
| 2. wool |
| 3. coarse animal hair |
| 4. fine animal hair |
| 5. horsehair |
| 6. cotton |
| 7. paper-making materials and paper |

8. flax

9. true hemp

10. jute and other textile bast fibres

11. sisal and other textile fibres of the genus Agave

12. coconut, abaca, ramie, and other vegetable textile fibres

13. synthetic man-made filaments

14. artificial man-made filaments

15. current-conducting filaments

16. synthetic man-made staple fibres of polypropylene

17. synthetic man-made staple fibres of polyester

18. synthetic man-made staple fibres of polyamide

19. synthetic man-made staple fibres of polyacrylonitrile

20. synthetic man-made staple fibres of polyimide

21. synthetic man-made staple fibres of polytetraflouroethylene

22. synthetic man-made staple fibres of poly(phenylene sulphide)

23. synthetic man-made staple fibres of poly(vinyl chloride)

24. other synthetic man-made staple fibres

25. artificial man-made staple fibres of viscose

26. other artificial man-made staple fibres

27. yarn made of polyurethane segmented with flexible segments of polyether, whether or not gimped

28. yarn made of polyurethane segmented with flexible segments of polyester, whether or not gimped

29. a material of heading 56.05 (metallised yarn) incorporating strip consisting of a core of aluminium foil or of a core of plastic film whether or not coated with aluminium powder, of a width not exceeding 5 mm, sandwiched by means of a transparent or coloured adhesive between two layers of plastic film

30. any other material of heading 56.05

# ANNEX 2

## TEXT OF THE ORIGIN DECLARATION

The origin declaration, the text of which is given below, must be completed in accordance with the footnotes. However, the footnotes do not have to be reproduced.

(Period: from_____ to _____ [1]

The exporter of the products covered by this document (customs authorisation No ...[2] declares that, except where otherwise clearly indicated, these products are of ...[3] preferential origin.

……………………………………………………….............................................[4]

(Place and date)

..……………………………………………………….............................................[5]

(Signature and printed name of the exporter)

---

[1]    When the origin declaration is completed for multiple shipments of identical originating products within the meaning of Article 19.5, indicate the period of time for which the origin declaration will apply. The period of time must not exceed 12 months. All importations of the product must occur within the period indicated. Where a period of time is not applicable, the field can be left blank.

[2]    For EU exporters: When the origin declaration is completed by an approved or registered exporter the exporter's customs authorisation or registration number must be included. A customs authorisation number is required only if the exporter is an approved exporter. When the origin declaration is not completed by an approved or registered exporter, the words in brackets must be omitted or the space left blank.

For Canadian exporters: The exporter's Business Number assigned by the Government of Canada must be included. Where the exporter has not been assigned a business number, the field may be left blank.

[3]    "Canada/EU" means products qualifying as originating under the rules of origin of the Canada-European Union Comprehensive Economic and Trade Agreement. When the origin declaration relates, in whole or in part, to products originating in Ceuta and Melilla, the exporter must clearly indicate the symbol "CM".

[4]    These indications may be omitted if the information is contained on the document itself.

[5]    Article 19.3 provides an exception to the requirement of the exporter's signature. Where the exporter is not required to sign, the exemption of signature also implies the exemption of the name of the signatory.

### Bulgarian version

(Период: от _____до_____ [1])

Износителят на продуктите, обхванати от този документ (митническо разрешение № … [2]), декларира, че освен когато е отбелязано друго, тези продукти са с/със … преференциален произход [3].

### Spanish version

(Período comprendido entre el _____y el_____ [1])

El exportador de los productos incluidos en el presente documento (autorización aduanera n° … [2]) declara que, salvo indicación en sentido contrario, estos productos gozan de un origen preferencial. … [3].

### Czech version

(Období: od _____do_____ [1])

Vývozce výrobků uvedených v tomto dokumentu (číslo povolení … [2]) prohlašuje, že kromě zřetelně označených, mají tyto výrobky preferenční původ v … [3]..

### Danish version

(Periode: fra _____til_____ [1])

Eksportøren af varer, der er omfattet af nærværende dokument, (toldmyndighedernes tilladelse nr. … [2]), erklærer, at varerne, medmindre andet tydeligt er angivet, har præferenceoprindelse i … [3].

### German version

(Zeitraum: von _____ bis _____ [1])

Der Ausführer (ermächtigter Ausführer; Bewilligungs-Nr. … [2]) der Waren, auf die sich dieses Handelspapier bezieht, erklärt, dass diese Waren, soweit nicht anderes angegeben, präferenzbegünstigte … [3] Ursprungswaren sind.

### Estonian version

(Ajavahemik: alates _____ kuni _____ [1])

Käesoleva dokumendiga hõlmatud toodete eksportija (tolliameti kinnitus nr. … [2]) deklareerib, et need tooted on … [3] sooduspäritoluga, välja arvatud juhul, kui on selgelt näidatud teisiti.

### Greek version

(Περίοδος: από _____έως_____ [1])

Ο εξαγωγέας των προϊόντων που καλύπτονται από το παρόν έγγραφο (άδεια τελωνείου υπ' αριθ. … [2]) δηλώνει ότι, εκτός εάν δηλώνεται σαφώς άλλως, τα προϊόντα αυτά είναι προτιμησιακής καταγωγής … [3].

### English version

(Period: from _____ to _____ [1])

The exporter of the products covered by this document (customs authorisation No…[2]) declares that, except where otherwise clearly indicated, these products are of …[3] preferential origin.

### French version

(Période: du _____ au _____ [1])

L'exportateur des produits couverts par le présent document (autorisation douanière n° ...[2]) déclare que, sauf indication claire du contraire, ces produits ont l'origine préférentielle ... [3]).

### Croatian version

(Razdoblje: od _____ do _____ [1])

Izvoznik proizvoda obuhvaćenih ovom ispravom (carinsko ovlaštenje br. ... [2]) izjavljuje da su, osim ako je drukčije izričito navedeno, ovi proizvodi ... [3] preferencijalnog podrijetla.

### Italian version

(Periodo: dal _____ al _____ [1])

L'esportatore delle merci contemplate nel presente documento (autorizzazione doganale n. ...[2]) dichiara che, salvo indicazione contraria, le merci sono di origine preferenziale ...[3].

### Latvian version

(Laikposms: no _____ līdz _____ [1])

Šajā dokumentā (muitas atļauja Nr. …[2]) norādīto produktu eksportētājs deklarē, ka šiem produktiem ir …[3] preferenciāla izcelsme, ja vien nav skaidri minēts citādi.

### Lithuanian version

(Laikotarpis: nuo _____ iki _____ [1])

Šiame dokumente išvardintų prekių eksportuotojas (muitinės liudijimo Nr. …[2]) deklaruoja, kad, jeigu kitaip nenurodyta, tai yra …[3] preferencinės kilmės prekės..

### Hungarian version

(Időszak: _____ -tól _____ -ig[1])

A jelen okmányban szereplő áruk exportőre (vámfelhatalmazási szám: …[2]) kijelentem, hogy eltérő egyértelmű jelzés hiányában az áruk preferenciális …[3] származásúak.

### Maltese version

(Perjodu: minn _____ sa _____ [1])

L-esportatur tal-prodotti koperti b'dan id-dokument (awtorizzazzjoni tad-dwana nru. …[2]) jiddikjara li, hlief fejn indikat b'mod ċar li mhux hekk, dawn il-prodotti huma ta' oriġini preferenzjali …[3].

### Dutch version

(Periode: van _____ tot en met _____[1])

De exporteur van de goederen waarop dit document van toepassing is (douanevergunning nr. …[2]), verklaart dat, behoudens uitdrukkelijke andersluidende vermelding, deze goederen van preferentiële oorsprong zijn uit …[3].

### Polish version

(Okres: od _____do_____[1])

Eksporter produktów objętych tym dokumentem (upoważnienie władz celnych nr …[2]) deklaruje, że z wyjątkiem gdzie jest to wyraźnie określone, produkty te mają …[3] preferencyjne pochodzenie.

### Portuguese version

(Período: de _____a_____[1])

O abaixo assinado, exportador dos produtos cobertos pelo presente documento (autorização aduaneira n.º …[2]), declara que, salvo expressamente indicado em contrário, estes produtos são de origem preferencial ...[3].

### Romanian version

(Perioada: de la _____până la_____[1])

Exportatorul produselor care fac obiectul prezentului document (autorizația vamală nr. …[2]) declară că, exceptând cazul în care în mod expres este indicat altfel, aceste produse sunt de origine preferențială …[3].

### Slovenian version

(Obdobje: od _____do_____[1])

Izvoznik blaga, zajetega s tem dokumentom (pooblastilo carinskih organov št …[2]), izjavlja, da, razen če ni drugače jasno navedeno, ima to blago …[3] preferencialno poreklo.

### Slovak version

(Obdobie: od _____do_____[1])

Vývozca výrobkov uvedených v tomto dokumente (číslo colného povolenia …[2]) vyhlasuje, že pokiaľ nie je jasne uvedené inak, majú tieto výrobky preferenčný pôvod v …[3].

### Finnish version

580

( _____ ja _____välinen aika[1])

Tässä asiakirjassa mainittujen tuotteiden viejä (tullin lupa n:o ...[2]) ilmoittaa, että nämä tuotteet ovat, ellei toisin ole selvästi merkitty, etuuskohteluun oikeutettuja ... alkuperätuotteita [3].

### Swedish version

(Period: från _____ till_____ [1])

Exportören av de varor som omfattas av detta dokument (tullmyndighetens tillstånd nr ...[2]) försäkrar att dessa varor, om inte annat tydligt markerats, har förmånsberättigande ursprung i ... [3].

## ANNEX 3

## SUPPLIER'S STATEMENT FOR NON-ORIGINATING MATERIALS USED IN THE PRODUCTION OF NON-ORIGINATING PRODUCTS

Statement:

I, the undersigned, supplier of the products covered by the annexed document, declare that:

(a)    The following materials which do not originate in the European Union/in Canada[1] have been used in the European Union/in Canada to produce the following supplied non-originating products.

(b)    Any other materials used in the European Union/in Canada to produce these products originate there.

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Description of non-originating product(s) supplied | HS tariff classification of non-originating product(s) supplied | Value of non-originating product(s) supplied[2] | Description of non-originating material(s) used | HS tariff classification of non-originating material(s) used | Value of non-originating materials used[2] |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  | Total: |  |  | Total: |

I undertake to make available any further supporting documents required.

……………………………………………………………………………………………………………
(Place and Date)

……………………………………………………………………………………………………………
(Name and position, name and address of company)

……………………………………………………………………………………………………………
(Signature)

_____

(1)    Strikethrough the Party not applicable, as the case may be

(2)    For each non-originating product supplied and non-originating material used, specify the value per unit of the products and materials described in columns 3 and 6, respectively.

582

# ANNEX 4

## MATTERS APPLICABLE TO CEUTA AND MELILLA

1.   For the purpose of this Protocol, in the case of the European Union, the term "Party" does not include Ceuta and Melilla.

2.   Products originating in Canada, when imported into Ceuta and Melilla, shall in all respects be subject to the same customs regime, including preferential tariff treatment, as that which is applied to products originating in the customs territory of the European Union under *Protocol 2 of the Act of Accession of the Kingdom of Spain and the Portuguese Republic to the European Communities*. Canada shall apply to imports of products covered by this Agreement and originating in Ceuta and Melilla the same customs regime, including preferential tariff treatment, as that which is applied to products imported from and originating in the European Union.

3.   The rules of origin applicable to Canada under this Protocol shall apply in determining the origin of products exported from Canada to Ceuta and Melilla. The rules of origin applicable to the European Union under this Protocol shall apply in determining the origin of products exported from Ceuta and Melilla to Canada.

4.   The provisions of this Protocol concerning the issuance, use and subsequent verification of origin shall apply to products exported from Canada to Ceuta and Melilla and to products exported from Ceuta and Melilla to Canada.

5.   The provisions on cumulation of origin of this Protocol shall apply to the import and export of products between the European Union, Canada and Ceuta and Melilla.

6.   For the purposes mentioned in paragraphs 2, 3, 4 and 5, Ceuta and Melilla shall be regarded as a single territory.

7.   The Spanish customs authorities shall be responsible for the application of this Annex in Ceuta and Melilla.

# ANNEX 5

## PRODUCT-SPECIFIC RULES OF ORIGIN

**Introductory Notes to Annex 5**

1.  This Annex sets out the conditions required for a product to be considered originating within the meaning of Article 5 (Sufficient Production).

2.  The following definitions apply:

    **chapter** means a chapter of the Harmonized System;

    **heading** means any four-digit number, or the first four digits of any number, used in the Harmonized System;

    **section** means a section of the Harmonized System; and

    **subheading** means any six-digit number, or the first six digits of any number, used in the Harmonized System.

3.  The product-specific rule of origin, or set of rules of origin, that applies to a product classified in a particular heading, subheading, or group of headings or subheadings is set out immediately adjacent to that heading, subheading, or group of headings or subheadings.

4.  Unless otherwise specified, a requirement of a change in tariff classification or any other condition set out in a product-specific rule of origin applies only to non-originating material.

5.  Section, chapter, heading, or subheading notes, where applicable, are found at the beginning of each new section, chapter, heading, or subheading. These notes must be read in conjunction with the product-specific rules of origin for the applicable section, chapter, heading, or subheading and may impose further conditions on, or provide an alternative to, the product-specific rules of origin.

6.  Unless otherwise specified, reference to weight in a product-specific rule of origin means the net weight, which is the weight of a material or a product not including the weight of packaging as set out in the definitions of "net weight of non-originating material" and "net weight of the product" in Article 1 (Definitions) of this Protocol.

7.  A reference to non-originating sugar in a product-specific rule of origin means the non-originating material referred to in Article 16 (Sugar) of this Protocol.

8.  If a product-specific rule of origin requires:

    (a)  a change from any other chapter, heading, or subheading, or a change to product $x$[65] from any other chapter, heading, or subheading, only non-originating material classified in a chapter, heading, or subheading other than that of the product may be used in the production of the product;

    (b)  a change from within a heading or subheading, or from within any one of these headings or subheadings, non-originating material classified within the heading or subheading may be used in the production of the product, as well as non-

---

[65] In these notes product $x$ or tariff provision $x$ denotes a specific product or tariff provision, and $x$ per cent denotes a specific percentage.

originating material classified in a chapter, heading, or subheading other than that of the product;

(c)    a change from any heading or subheading outside a group, only non-originating material classified outside the group of headings or subheadings may be used in the production of the product;

(d)    that a product is wholly obtained, the product must be wholly obtained within the meaning of Article 4 (Wholly Obtained Products). If a shipment consists of a number of identical products classified under tariff provision $x$, each product shall be considered separately;

(e)    production in which all the material of tariff provision $x$ used is wholly obtained, all of the material of tariff provision $x$ used in production of the product must be wholly obtained within the meaning of Article 4 (Wholly Obtained Products);

(f)    a change from tariff provision $x$, whether or not there is also a change from any other chapter, heading or subheading, the value of any non-originating material that satisfies the change in tariff classification specified in the phrase commencing with the words "whether or not" is not considered when calculating the value of non-originating materials. If two or more product-specific rules of origin are applicable to a heading, subheading, or group of headings or subheadings, the change in tariff classification specified in this phrase reflects the change specified in the first rule of origin;

(g)    that the value of non-originating materials of tariff provision $x$ does not exceed $x$ per cent of the transaction value or ex-works price of the product, only the value of the non-originating material specified in this rule of origin is considered when calculating the value of non-originating materials. The percentage for the maximum value of non-originating materials as set out in this rule of origin may not be exceeded through the use of Article 6 (Tolerance);

(h)    that the value of non-originating materials classified in the same tariff provision as the final product does not exceed $x$ per cent of the transaction value or ex-works price of the product, non-originating material classified in a tariff provision other than that of the product may be used in the production of the product. Only the value of the non-originating materials classified in the same tariff provision as the final product is considered when calculating the value of non-originating materials. The percentage for the maximum value of non-originating materials as set out in this rule of origin may not be exceeded through the use of Article 6 (Tolerance);

(i)    that the value of all non-originating materials does not exceed $x$ per cent of the transaction value or ex-works price of the product, the value of all non-originating materials is considered when calculating the value of non-originating materials. The percentage for the maximum value of non-originating materials as set out in this rule of origin may not be exceeded through the use of Article 6 (Tolerance); and

(j)    that the net weight of non-originating material of tariff provision $x$ used in production does not exceed $x$ per cent of the net weight of the product, the

specified non-originating materials may be used in the production of the product, provided that it does not exceed the specified percentage of the net weight of the product in accordance with the definition of "net weight of the product" in Article 1. The percentage for the maximum weight of non-originating material as set out in this rule of origin may not be exceeded through the use of Article 6 (Tolerance).

9.      The product-specific rule of origin represents the minimum amount of production required on non-originating material for the resulting product to achieve originating status. A greater amount of production than that required by the product-specific rule of origin for that product also confers originating status.

10.     If a product-specific rule of origin provides that a specified non-originating material may not be used, or that the value or weight of a specified non-originating material cannot exceed a specific threshold, these conditions do not apply to non-originating material classified elsewhere in the Harmonized System.

11.     In accordance with Article 5 (Sufficient Production), when a material obtains originating status in the territory of a Party and this material is further used in the production of a product for which origin is being determined, no account will be taken of any non-originating material used in the production of that material. This applies whether or not the material has acquired originating status inside the same factory where the product is produced.

12.     The product-specific rules of origin set out in this Annex also apply to used products.

586

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Section I** | **Live Animals; Animal Products** |
| **Chapter 1**<br><br>01.01-01.06 | **Live animals**<br><br>All animals of Chapter 1 are wholly obtained. |
| **Chapter 2**<br><br>02.01-02.10 | **Meat and edible meat offal**<br><br>Production in which all the material of Chapter 1 or 2 used is wholly obtained. |
| **Chapter 3**<br><br><br><br><br><br><br>03.01-03.08 | **Fish and crustaceans, molluscs and other aquatic invertebrates**<br><br>*Note:*<br>*Aquaculture products of Chapter 3 will only be considered as originating in a Party if they are raised in the territory of that Party from non-originating or originating seedstock such as eggs, fry, fingerlings or larvae.*<br><br>Production in which all the material of Chapter 3 used is wholly obtained. |
| **Chapter 4**<br><br><br>04.01<br><br><br><br><br><br>0402.10 | **Dairy produce; birds' eggs; natural honey; edible products of animal origin, not elsewhere specified or included**<br><br>A change from any other chapter, except from dairy preparations of subheading 1901.90 containing more than 10 per cent by dry weight of milk solids, provided that all the material of Chapter 4 used is wholly obtained.<br><br>A change from any other chapter, except from dairy preparations of subheading 1901.90 containing more than 10 per cent by dry weight of milk solids, provided that:<br><br>(a) all the material of Chapter 4 used is wholly obtained, and<br><br>(b) the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 0402.21-0402.99 | A change from any other chapter, except from dairy preparations of subheading 1901.90 containing more than 10 per cent by dry weight of milk solids, provided that:<br><br>(a) all the material of Chapter 4 used is wholly obtained, and<br><br>(b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 04.03-04.06 | A change from any other chapter, except from dairy preparations of subheading 1901.90 containing more than 10 per cent by dry weight of milk solids, provided that:<br><br>(a) all the material of Chapter 4 used is wholly obtained, and<br><br>(b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 04.07-04.10 | Production in which:<br><br>(a) all the material of Chapter 4 used is wholly obtained; and<br><br>(b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| **Chapter 5** | **Products of animal origin, not elsewhere specified or included** |
| 0501.00-0511.99 | A change from within any one of these subheadings or any other subheading. |
| **Section II** | **Vegetable Products**<br><br>*Note:*<br>*Agricultural and horticultural products grown in the territory of a Party shall be treated as originating in the territory of that Party even if grown from seed, bulbs, rootstock, cuttings, slips, grafts, shoots, buds or other live parts of plants imported from a non-Party.* |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 6** | **Live trees and other plants; bulbs, roots and the like; cut flowers and ornamental foliage** |
| 06.01-06.04 | Production in which all the material of Chapter 6 used is wholly obtained. |
| **Chapter 7** | **Edible vegetables and certain roots and tubers** |
| 07.01-07.09 | Production in which all the material of Chapter 7 used is wholly obtained. |
| 0710.10-0710.80 | Production in which all the material of Chapter 7 used is wholly obtained. |
| 0710.90 | A change from any other subheading, provided that: |
| | A. the net weight of non-originating asparagus, beans, broccoli, cabbage, carrots, cauliflower, courgettes, cucumbers, gherkins, globe artichokes, mushrooms, onions, peas, potatoes, sweet corn, sweet peppers and tomatoes of Chapter 7 used in production does not exceed 20 per cent of the net weight of the product, and |
| | B. the net weight of non-originating vegetables of Chapter 7 used in production does not exceed 50 per cent of the net weight of the product. |
| 07.11 | Production in which all the material of Chapter 7 used is wholly obtained. |
| 0712.20-0712.39 | Production in which all the material of Chapter 7 used is wholly obtained. |
| 0712.90 | A change to mixtures of dried vegetables from single dried vegetables from within this subheading or any other subheading, provided that: |
| | (a) the net weight of non-originating cabbage, carrots, courgettes, cucumbers, gherkins, globe artichokes, mushrooms, potatoes, sweet corn, sweet peppers, tomatoes and turnips of Chapter 7 used in production does not exceed 20 per cent of the net weight of the product, and |
| | (b) the net weight of non-originating vegetables of Chapter 7 used in production does not exceed 50 per cent of the net weight of the product; |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | or |
| | For any other product of subheading 0712.90, production in which all the material of Chapter 7 used is wholly obtained. |
| 07.13-07.14 | Production in which all the material of Chapter 7 used is wholly obtained. |
| **Chapter 8** | **Edible fruits and nuts; peel of citrus fruit or melons** |
| 08.01-08.10 | Production in which all the material of Chapter 8 used is wholly obtained. |
| 08.11 | Production in which: |
| | (a) all the material of Chapter 8 used is wholly obtained, and |
| | (b) the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product. |
| 08.12 | Production in which all the material of Chapter 8 used is wholly obtained. |
| 0813.10-0813.40 | Production in which all the material of Chapter 8 used is wholly obtained. |
| 0813.50 | A change from any other subheading, provided that: |
| | (a) the net weight of non-originating almonds, apples, apricots, bananas, cherries, chestnuts, citrus fruit, figs, grapes, hazelnuts, nectarines, peaches, pears, plums and walnuts of Chapter 8 used in production does not exceed 20 per cent of the net weight of the product, |
| | (b) the net weight of non-originating fruits and nuts other than almonds, apples, apricots, bananas, brazil nuts, carambola, cashew apples, cashew nuts, cherries, chestnuts, citrus fruit, coconuts, figs, grapes, guava, hazelnuts, jackfruit, lychees, macadamia nuts, mangoes, mangosteens, nectarines, papaws (papaya), passion fruit, peaches, pears, pistachios, pitahaya, plums, tamarinds or walnuts of Chapter 8 used in production does not exceed 50 per cent of the net weight of the product, and |
| | (c) the net weight of non-originating fruits and nuts of Chapter 8 used in production does not exceed 80 per cent of the net weight of the |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | product. |
| 08.14 | Production in which all the material of Chapter 8 used is wholly obtained. |
| **Chapter 9** | **Coffee, tea, maté and spices** |
| 0901.11-0901.90 | A change from any other subheading. |
| 0902.10-0910.99 | A change from within any one of these subheadings or any other subheading. |
| **Chapter 10** | **Cereals** |
| 10.01-10.08 | All the cereals of Chapter 10 are wholly obtained. |
| **Chapter 11** | **Products of the milling industry; malt; starches; inulin; wheat gluten** |
| 11.01-11.09 | Production in which all the material of heading 07.01, subheading 0710.10, Chapter 10 or 11, or heading 23.02 or 23.03 used is wholly obtained. |
| **Chapter 12** | **Oil seeds and oleaginous fruits; miscellaneous grains, seeds and fruit; industrial or medicinal plants; straw and fodder** |
| 12.01-12.07 | A change from any other heading. |
| 12.08 | A change from any other chapter. |
| 12.09-12.14 | A change from any other heading. |
| **Chapter 13** | **Lac; gums, resins and other vegetable saps and extracts** |
| 1301.20-1301.90 | A change from within any one of these subheadings or any other subheading. |
| 1302.11-1302.39 | A change from within any one of these subheadings or any other subheading, provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 14** | **Vegetable plaiting materials; vegetable products not elsewhere specified or included** |
| 1401.10-1404.90 | A change from within any one of these subheadings or any other subheading. |
| **Section III** | **Animal or Vegetable Fats and Oils and their Cleavage Products; Prepared Edible Fats; Animal or Vegetable Waxes** |
| **Chapter 15** | **Animal or vegetable fats and oils and their cleavage products; prepared edible fats; animal or vegetable waxes** |
| 15.01-15.04 | A change from any other heading. |
| 15.05 | A change from within any one of these subheadings or any other subheading. |
| 15.06 | A change from any other heading. |
| 15.07-15.08 | A change from any other chapter. |
| 15.09-15.10 | Production in which all the olive oils of heading 15.09 or 15.10 are wholly obtained. |
| 15.11-15.15 | A change from any other chapter. |
| 1516.10 | A change from any other heading. |
| 1516.20 | A change from any other chapter. |
| 15.17 | A change from any other heading, except from heading 15.07 through 15.15, subheading 1516.20 or heading 15.18.<br><br>*Note:*<br><br>*For the purposes of the rule of origin for heading 15.18 which references insoluble impurity content, this content is to be measured using American Oil Chemists' Society method Ca 3a-46.* |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 15.18 | A change to single vegetable fats or oils or their fractions from any other chapter; <br><br> or <br><br> A change to inedible mixtures of animal or vegetable fats or oils or their fractions, or preparations thereof, containing 0.15 per cent or less by net weight of insoluble impurities from within this heading or any other heading, provided that the production reduces the insoluble impurity content; <br><br> or <br><br> A change to any other product of heading 15.18 from any other heading. |
| 15.20 | A change from within this heading or any other heading. |
| 15.21-15.22 | A change from any other heading. |
| **Section IV** | **Prepared Foodstuffs; Beverages, Spirits and Vinegar; Tobacco and Manufactured Tobacco Substitutes** |
| **Chapter 16** | **Preparations of meat, of fish or of crustaceans, molluscs or other aquatic invertebrates** |
| 16.01-16.02 | A change from any other chapter, except from Chapter 2. |
| 16.03 | A change from any other chapter, except from Chapter 2 or 3. |
| 16.04-16.05 | A change from any other chapter, except from Chapter 3. |
| **Chapter 17** | **Sugars and sugar confectionary** |
| 17.01 | A change from any other heading. |
| 17.02 | A change from any other heading, except from subheading 1701.91 or |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | 1701.99, provided that the net weight of non-originating material of heading 11.01 through 11.08, subheading 1701.11 or 1701.12 or heading 17.03 used in production does not exceed 20 per cent of the net weight of the product. |
| 17.03 | A change from any other heading. |
| 17.04 | A change from any other heading, provided that: <br><br> (a)   (i) the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product; or <br><br>    (ii) the value of non-originating sugar used in production does not exceed 30 per cent of the transaction value or ex-works price of the product; and <br><br> (b) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |
| **Chapter 18** | **Cocoa and cocoa preparations** |
| 18.01-18.02 | A change from any other heading. |
| 1803.10-1803.20 | A change from any other subheading. |
| 18.04-18.05 | A change from any other heading. |
| 18.06 | A change from any other heading, provided that: <br><br> (a)   (i) the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product; or <br><br>    (ii) the value of non-originating sugar used in production does not exceed 30 per cent of the transaction value or ex-works price of the product, and <br><br> (b) the net weight of non-originating material of Chapter 4 used in |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | production does not exceed 20 per cent of the net weight of the product. |
| **Chapter 19** | **Preparations of cereals, flour, starch or milk; pastrycooks' products** |
| 19.01 | A change from any other heading, provided that:<br><br>(a) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product,<br><br>(b) the net weight of non-originating sugar used in production does not exceed 30 per cent of the net weight of the product,<br><br>(c) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(d) the net weight of non-originating sugar and non-originating material of Chapter 4 used in production does not exceed 40 per cent of the net weight of the product. |
| 1902.11-1902.19 | A change from any other heading, provided that:<br><br>(a) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product,<br><br>(b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(c) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the weight of the net weight of the product. |
| 1902.20 | A change from any other heading, provided that:<br><br>(a) the net weight of non-originating material of Chapter 2, 3 or 16 used |

595

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | in production does not exceed 20 per cent of the net weight of the product, |
| | (b) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product, |
| | (c) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and |
| | (d) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |
| 1902.30-1902.40 | A change from any other heading, provided that: |
| | (a) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product, |
| | (b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and |
| | (c) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |
| 19.03 | A change from any other heading, provided that: |
| | (a) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product, and |
| | (b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 1904.10-1904.20 | A change from any other heading, provided that: |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | (a) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product, |
| | (b) the net weight of non-originating sugar used in production does not exceed 30 per cent of the net weight of the product, |
| | (c) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product, and |
| | (d) the net weight of non-originating sugar and non-originating material of Chapter 4 used in production does not exceed 40 per cent of the net weight of the product. |
| 1904.30 | A change from any other heading, provided that: |
| | (a) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product, and |
| | (b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 1904.90 | A change from any other heading, provided that: |
| | (a) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product, |
| | (b) the net weight of non-originating sugar used in production does not exceed 30 per cent of the net weight of the product, |
| | (c) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product, and |
| | (d) the net weight of non-originating sugar and non-originating material |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 19.05 | of Chapter 4 used in production does not exceed 40 per cent of the net weight of the product.<br><br>A change from any other heading, provided that:<br><br>(a) the net weight of non-originating material of heading 10.06 or 11.01 through 11.08 used in production does not exceed 20 per cent of the net weight of the product,<br><br>(b) the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product,<br><br>(c) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(d) the net weight of non-originating sugar and non-originating material of Chapter 4 used in production does not exceed 50 per cent of the net weight of the product. |
| **Chapter 20** | **Preparations of vegetables, fruit, nuts or other parts of plants** |
| 20.01 | A change from any other heading. |
| 20.02-20.03 | A change from any other heading, in which all the material of Chapter 7 used is wholly obtained. |
| 20.04-20.05 | A change from any other heading. |
| 20.06 | A change to preparations of blueberries, cherries, cranberries, loganberries, raspberries, Saskatoon berries or strawberries from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 60 per cent of the net weight of the product; or<br><br>A change to any other product of heading 20.06 from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 2007.10-2007.91 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 2007.99 | A change to jams, fruit jellies, fruit spreads or fruit butters from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 60 per cent of the net weight of the product; or<br><br>A change to any other product of subheading 2007.99 from any other heading provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product.<br><br>*Note:*<br><br>*For the purposes of the rules of origin for preparations of blueberries, cherries, cranberries, loganberries, raspberries, Saskatoon berries or strawberries of heading 20.08, the net weight of the product may be the net weight of all material used in production of the product excluding the net weight of water of heading 22.01 that is added during the production of the product. The net weight of any fruit used in production may be the net weight of the fruit whether or not frozen or cut but not further processed.* |
| 2008.11-2008.19 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product. |
| 2008.20-2008.50 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 2008.60 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 60 per cent of the net weight of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 2008.70 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 2008.80 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 60 per cent of the net weight of the product. |
| 2008.91 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 2008.93 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 60 per cent of the net weight of the product. |
| 2008.97 | A change to mixtures containing blueberries, cherries, cranberries, loganberries, raspberries, Saskatoon berries or strawberries from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 60 per cent of the net weight of the product; or

A change to any other product of subheading 2008.97 from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product. |
| 2008.99 | A change to preparations of blueberries, loganberries, raspberries, or Saskatoon berries from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 60 per cent of the net weight of the product; or

A change to any other product of subheading 2008.99 from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 20 percent of the net weight of the product. |
| 2009.11-2009.79 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | net weight of the product. |
| 2009.81 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product. |
| 2009.89 | A change from any other heading, provided that the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| 2009.90 | A change to mixtures containing blueberry juice, cranberry juice, elderberry juice, loganberry juice or Saskatoon berry juice from any other subheading, except from non-originating blueberry juice, cranberry juice, elderberry juice, loganberry juice or Saskatoon berry juice of heading 20.09, provided that: <br><br> (a) the net weight of non-originating juice of heading 20.09 in single strength form used in production does not exceed 40 per cent of the net weight of the product, and <br><br> (b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product; or <br><br> A change to any other product of subheading 2009.90 from any other heading, provided that net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product. |
| **Chapter 21** | **Miscellaneous edible preparations** |
| 2101.11-2101.30 | A change from any other subheading, provided that: <br><br> (a) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and <br><br> (b) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 2102.10-2102.30 | A change from any other subheading. |
| 2103.10 | A change from any other subheading, provided that:<br><br>(a) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(b) the net weight of non-originating material of heading 04.07 through 04.10 used in production does not exceed 20 per cent of the net weight of the product. |
| 2103.20 | A change to tomato ketchup or barbeque sauce from any other subheading, provided that:<br><br>(a) the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product,<br><br>(b) the net weight of non-originating material of heading 04.07, 04.08 or 04.10 used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(c) the net weight of non-originating sugar and non-originating material of heading 04.07, 04.08 or 04.10 used in production does not exceed 50 per cent of the net weight of the product; or<br><br>A change to any other product of subheading 2103.20 from any other subheading, provided that<br><br>(a) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(b) the net weight of non-originating material of heading 04.07 through 04.10 used in production does not exceed 20 per cent of the net weight of the product. |
| 2103.30 | A change from any other subheading, provided that: |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 2103.90 | (a) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(b) the net weight of non-originating material of heading 04.07 through 04.10 used in production does not exceed 20 per cent of the net weight of the product.<br><br>*Note:*<br><br>*For the purposes of the rule of origin for subheading 2103.90, mixed condiments and mixed seasonings are food preparations that may be added to a food in order to enhance or impart flavour during the food's manufacture or preparation before it is served, or after the food has been served.*<br><br>A change to barbeque sauce, fruit-based sauces, mixed condiments or mixed seasonings from any other subheading, provided that:<br><br>(a) the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product,<br><br>(b) the net weight of non-originating material of heading 04.07, 04.08 or 04.10 used in production does not exceed 20 per cent of the net weight of the product, and<br><br>the net weight of non-originating sugar and non-originating material of heading 04.07, 04.08 or 04.10 used in production does not exceed 50 per cent of the net weight of the product; or<br><br>A change to any other product of subheading 2103.90 from any other subheading, provided that:<br><br>(a) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(b) the net weight of non-originating material of heading 04.07 through 04.10 used in production does not exceed 20 per cent of the net |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 2104.10-2105.00 | weight of the product.<br><br>A change from any other subheading, provided that:<br><br>(a) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(b) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |
| 21.06 | A change from any other heading, provided that:<br><br>(a) the net weight of non-originating sugar used in production does not exceed 40 per cent of the net weight of the product, and<br><br>(b) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |
| **Chapter 22** | **Beverages, spirits and vinegar** |
| 22.01 | A change from any other heading. |
| 2202.10 | A change from any other heading, provided that:<br><br>(a) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and<br><br>(b) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |
| 2202.90 | A change to beverages containing milk from any other heading, except from heading 04.01 through 04.06 or dairy preparations of subheading 1901.90 containing more than 10 per cent by dry weight of milk solids, provided that:<br><br>(a) the net weight of non-originating sugar used in production does not |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
|  | exceed 20 per cent of the net weight of the product, and |
|  | (b) the net weight of non-originating material of heading 04.07 through 04.10 used in production does not exceed 20 per cent of the net weight of the product; or |
|  | A change to any other product of subheading 2202.90 from any other heading, provided that: |
|  | (a) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and |
|  | (b) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |
| 22.03 | A change from any other heading. |
| 22.04 | A change from any other heading, except from subheading 0806.10, 2009.61 or 2009.69, heading 22.07 or 22.08. |
| 22.05-22.06 | A change from any other heading. |
| 22.07-22.09 | A change from any other heading outside this group, except from heading 22.04. |
| **Chapter 23** | **Residues and waste from the food industries; prepared animal fodder** |
| 23.01 | A change from any other heading. |
| 23.02 | A change from any other heading, provided that the net weight of non-originating material of Chapter 10 used in production does not exceed 20 per cent of the net weight of the product. |
| 2303.10 | A change from any other heading, provided that the net weight of non-originating material of Chapter 10 used in production does not exceed 20 per cent of the net weight of the product. |
| 2303.20-2303.30 | A change from any other heading. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 23.04-23.08 | A change from any other heading. |
| 23.09 | A change from any other heading, except from Chapter 2 or 3, provided that: <br><br> (a) the net weight of non-originating material of Chapter 10 or 11 used in production does not exceed 20 per cent of the net weight of the product, <br><br> (b) the net weight of non-originating sugar used in production does not exceed 20 per cent of the net weight of the product, and <br><br> (c) the net weight of non-originating material of Chapter 4 used in production does not exceed 20 per cent of the net weight of the product. |
| **Chapter 24** | **Tobacco and manufactured tobacco substitutes** <br><br> *Note:* <br><br> *Agricultural and horticultural products grown in the territory of a Party shall be treated as originating in the territory of that Party even if grown from seed, bulbs, rootstock, cuttings, slips, grafts, shoots, buds or other live parts of plants imported from a non-Party.* |
| 24.01 | Production in which all the material of heading 24.01 used is wholly obtained. |
| 2402.10 | A change from any other heading, provided that the net weight of non-originating material of Chapter 24 used in production does not exceed 30 per cent of the net weight of all the material of Chapter 24 used in the production of the product. |
| 2402.20 | A change from any other heading, except from subheading 2403.10, provided that the net weight of the material of heading 24.01 that is wholly obtained is at least 10 per cent by net weight of all the material of Chapter 24 used in the production of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 2402.90 | A change from any other heading, provided that the net weight of non-originating material of Chapter 24 used in production does not exceed 30 per cent of the net weight of all the material of Chapter 24 used in the production of the product. |
| 24.03 | A change from any other heading, provided that the net weight of non-originating material of Chapter 24 used in production does not exceed 30 per cent of the net weight of all the material of Chapter 24 used in the production of the product. |
| **Section V** | **Mineral Products** |
| **Chapter 25** | **Salt; sulphur; earths and stone; plastering materials; lime and cement** |
| 25.01-25.03 | A change from any other heading. |
| 2504.10-2504.90 | A change from within any one of these subheadings or any other subheading. |
| 25.05-25.14 | A change from any other heading. |
| 2515.11-2516.90 | A change from within any one of these subheadings or any other subheading. |
| 25.17 | A change from any other heading. |
| 2518.10-2520.20 | A change from within any one of these subheadings or any other subheading. |
| 25.21-25.23 | A change from any other heading. |
| 2524.10-2525.30 | A change from within any one of these subheadings or any other subheading. |
| 25.26-25.29 | A change from any other heading. |
| 2530.10-2530.90 | A change from within any one of these subheadings or any other subheading. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 26** | **Ores, slag and ash** |
| 26.01-26.21 | A change from any other heading. |
| **Chapter 27** | **Mineral fuels, mineral oils and products of their distillation; bituminous substances; mineral waxes** |
| 27.01-27.09 | A change from within any one of these headings or any other heading. |
| 27.10 | A change from within this heading or any other heading, except from biodiesel of subheading 3824.90 or heading 38.26. |
| 27.11-27.16 | A change from within any one of these headings or any other heading. |
| **Section VI** | **Products of the Chemical or Allied Industries** |
| **Chapter 28** | **Inorganic chemicals; organic or inorganic compounds of precious metals, of rare-earth metals, of radioactive elements or of isotopes** |
| | *Note 1:* |
| | *A product of this Chapter is an originating product if it is the result of any one of the following:* |
| | a) *an applicable change in tariff classification specified in the rules of origin of this Chapter;* |
| | b) *a chemical reaction as described in Note 2 below; or* |
| | c) *purification as described in Note 3 below.* |
| | *Note 2: Chemical reaction and change of chemical abstract service number* |
| | *A product of this Chapter shall be treated as an originating product if it is the result of a chemical reaction and that chemical reaction results in a change of Chemical Abstract Service (CAS) number.* |
| | *For purposes of this Chapter, a "chemical reaction" is a process (including a biochemical process) that results in a molecule with a new structure by breaking intramolecular bonds and by forming new* |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | *intramolecular bonds or by altering the spatial arrangement of atoms in a molecule.* |
| | *The following are not considered to be chemical reactions for the purposes of determining whether a product is originating:*<br>   *a) dissolution in water or in another solvent;*<br>   *b) the elimination of solvents, including solvent water; or*<br>   *c) the addition or elimination of water of crystallization.* |
| | ***Note 3: Purification***<br>*A product of this Chapter that is subject to purification shall be treated as an originating product provided that the purification occurs in the territory of one or both of the Parties and results in the elimination of not less than 80 per cent of the impurities.* |
| | ***Note 4: Separation prohibition***<br>*A product that meets the applicable change in tariff classification in the territory of one or both of the Parties as a result of the separation of one or more materials from a man-made mixture shall not be treated as an originating product unless the isolated material underwent a chemical reaction in the territory of one or both of the Parties.* |
| 2801.10-2853.00 | A change from any other subheading; or<br><br>A change from within any one of these subheadings, whether or not there is also a change from any other subheading, provided that the value of non-originating materials classified in the same subheading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| **Chapter 29** | **Organic Chemicals**<br><br>***Note 1:***<br>*A product of this Chapter is an originating product if it is the result of any one of the following:*<br>   *a) an applicable change in tariff classification specified in the rules of origin of this Chapter;*<br>   *b) a chemical reaction as described in Note 2 below; or*<br>   *c) purification as described in Note 3 below.* |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | ***Note 2: Chemical reaction and change of chemical abstract service number*** <br><br> *A product of this Chapter shall be treated as an originating product if it is the result of a chemical reaction and that chemical reaction results in a change of Chemical Abstract Service (CAS) number.* <br><br> *For purposes of this Chapter, a "chemical reaction" is a process (including a biochemical process) that results in a molecule with a new structure by breaking intramolecular bonds and by forming new intramolecular bonds or by altering the spatial arrangement of atoms in a molecule.* <br><br> *The following are not considered to be chemical reactions for the purposes of determining whether a product is originating:* <br> *a) dissolution in water or in another solvent;* <br> *b) the elimination of solvents, including solvent water; or* <br> *c) the addition or elimination of water of crystallization.* <br><br> ***Note 3: Purification*** <br><br> *A product of this Chapter that is subject to purification shall be treated as an originating product provided that the purification occurs in the territory of one or both of the Parties and results in the elimination of not less than 80 per cent of the impurities.* <br><br> ***Note 4: Separation prohibition*** <br><br> *A product that meets the applicable change in tariff classification in the territory of one or both of the Parties as a result of the separation of one or more materials from a man-made mixture shall not be treated as an originating product unless the isolated material underwent a chemical reaction in the territory or one or both of the Parties.* |
| 2901.10-2942.00 | A change from any other subheading; or <br><br> A change from within any one of these subheadings, whether or not there is also a change from any other subheading, provided that the value of non-originating materials classified in the same subheading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 30** | **Pharmaceutical products** |
| 3001.20-3005.90 | A change from within any one of these subheadings or any other subheading. |
| 3006.10-3006.60 | A change from within any one of these subheadings or any other subheading. |
| 3006.70-3006.92 | A change from any other subheading. |
| **Chapter 31** | **Fertilisers** |
| 31.01 | A change from within this heading or any other heading. |
| 31.02 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3103.10-3104.90 | A change from within any one of these subheadings or any other subheading. |
| 31.05 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| **Chapter 32** | **Tanning or dyeing extracts; tannins and their derivatives; dyes, pigments and other colouring matter; paints and varnishes; putty and other mastics; inks** |
| 3201.10-3210.00 | A change from within any of these subheadings or any other subheading. |
| 32.11-32.12 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3213.10 | A change from any other heading; or

A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 3213.90 | A change from any other heading; or

A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 32.14-32.15 | A change from any other heading; or

A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| **Chapter 33** | **Essential oils and resinoids; perfumery, cosmetic or toilet preparations** |
| 3301.12-3301.90 | A change from any other subheading; or

A change from within any one of these subheadings, whether or not there is also a change from any other subheading, provided that the value of non-originating materials classified in the same subheading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3302.10 | A change from any other heading, provided that the weight of non-originating material of heading 17.01 or 17.02 does not exceed 20 per cent of the net weight of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 3302.90 | A change from any other heading. |
| 33.03 | A change from any other heading; or |
|  | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 33.04-33.07 | A change from any other heading; or |
|  | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| **Chapter 34** | **Soap, organic surface-active agents, washing preparations, lubricating preparations, artificial waxes, prepared waxes, polishing or scouring preparations, candles and similar articles, modelling pastes, "dental waxes" and dental preparations with a basis of plaster** |
| 3401.11-3401.20 | A change from any other heading; or |
|  | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3401.30 | A change from any other heading, except from subheading 3402.90; or |
|  | A change from within this heading, whether or not there is also a change from any other heading except subheading 3402.90, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3402.11-3402.19 | A change from any other subheading; or |
|  | A change from within any one of these subheadings, whether or not there is also a change from any other subheading, provided that the value of non-originating materials classified in the same subheading as the final |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3402.20 | A change from any other subheading, except from subheading 3402.90. |
| 3402.90 | A change from any other subheading; or |
| | A change from within this subheading, whether or not there is also a change from any other subheading, provided that the value of non-originating materials of this subheading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3403.11-3405.90 | A change from any other subheading. |
| 34.06 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 34.07 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that: |
| | (a) at least one of the component products of the set is originating; and |
| | (b) the value of the non-originating component products of this heading does not exceed 50 per cent of the transaction value or ex-works price of the set. |
| **Chapter 35** | **Albuminoidal substances; modified starches; glues; enzymes** |
| 35.01-35.02 | A change from any other heading, except from Chapter 2 through 4; or |
| | A change from Chapter 2 through 4, whether or not there is also a change from any other heading, provided that the value of non-originating materials of Chapter 2 through 4 does not exceed 40 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 35.03 | A change from any other heading, except from Chapter 2 other than swine skin or Chapter 3 other than fish skin; or |
| | A change from Chapter 2 other than swine skin or Chapter 3 other than fish skin, whether or not there is also a change from any other heading, swine skin of Chapter 2 or fish skin of Chapter 3, provided that the value of non-originating materials of Chapter 2 other than swine skin or Chapter 3 other than fish skin does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| 35.04 | A change to milk protein substances from any other heading, except from Chapter 4 or dairy preparations of subheading 1901.90 containing more than 10 per cent by dry weight of milk solids; |
| | A change to any other product of heading 35.04 from any other heading, except from non-originating material of Chapter 2 through 4 or heading 11.08; or |
| | A change to any other product of heading 35.04 from Chapter 2 through 4 or heading 11.08, whether or not there is also a change from any other heading, provided that the value of non-originating materials of Chapter 2 through 4 or heading 11.08 does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| 35.05 | A change from any other heading, except from heading 11.08; or |
| | A change from heading 11.08, whether or not there is also a change from any other heading, provided that the value of non-originating materials of heading 11.08 does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| 35.06-35.07 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 40 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 36** | **Explosives; pyrotechnic products; matches; pyrophoric alloys; certain combustible preparations** |
| 36.01-36.06 | A change from any other heading; or

A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| **Chapter 37** | **Photographic or cinematographic goods** |
| 37.01 | A change from any other heading; or

A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 37.02 | A change from any other heading, except from heading 37.01. |
| 37.03-37.06 | A change from any other heading; or

A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3707.10-3707.90 | A change from any other subheading. |
| **Chapter 38** | **Miscellaneous chemical products** |
| 38.01-38.02 | A change from any other heading; or

A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 38.03 | A change from within this heading or any other heading. |
| 38.04 | A change from any other heading. |
| 3805.10 | A change to purified sulphate turpentine from any other subheading, or from raw spirits of sulphate turpentine as a result of purification by distillation; or |
| | A change to any other product of subheading 3805.10 from any other subheading. |
| 3805.90 | A change from any other subheading. |
| 3806.10-3806.90 | A change from any other subheading. |
| 38.07 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 3808.50-3808.99 | A change from any other subheading. |
| 3809.10 | A change from any other heading, except from heading 10.06 or 11.01 through 11.08; or |
| | A change from heading 10.06 or 11.01 through 11.08, whether or not there is also a change from any other heading, provided the value of non-originating materials of heading 10.06 or 11.01 through 11.08 does not exceed 20 per cent of the weight of the product. |
| 3809.91-3809.93 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 38.10 | A change from any other heading; or |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3811.11-3811.90 | A change from any other subheading. |
| 38.12 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 38.13-38.14 | A change from any other heading. |
| 3815.11-3815.90 | A change from any other subheading. |
| 38.16-38.19 | A change from any other heading. |
| 38.20 | A change from any other heading, except from subheading 2905.31 or 2905.49; or |
| | A change from subheading 2905.31 or 2905.49, whether or not there is also a change from any other heading, provided that the value of non-originating materials of subheading 2905.31 or 2905.49 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 38.21-38.22 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3823.11-3823.70 | A change from any other subheading. |
| 3824.10-3824.50 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
|  | from any other heading, provided that the value of non-originating materials of this heading does not exceed 20 per cent of the transaction value or ex-works price of the product. |
| 3824.60 | A change from any other subheading except from heading 11.01 through 11.08, 17.01, 17.02 or subheading 2905.44; or |
|  | A change from heading 11.01 through 11.08, 17.01, 17.02 or subheading 2905.44, whether or not there is also a change from any other subheading, provided that the weight of non-originating material of heading 11.01 through 11.08, 17.01, 17.02 or subheading 2905.44 does not exceed 20 per cent of the net weight of the product. |
| 3824.71-3824.83 | A change from any other heading. |
| 3824.90 | A change to biodiesel from any other heading, provided that the biodiesel is transesterified in the territory of a Party; |
|  | A change to products containing ethanol from any other heading, except from ethanol of heading 22.07 or subheading 2208.90; or |
|  | A change to any other product of subheading 3824.90 from any other heading. |
| 38.25 | A change from any other heading. |
| 38.26 | A change from any other heading, provided that the biodiesel is transesterified in the territory of a Party. |
| **Section VII** | **Plastics and Articles Thereof; Rubber and Articles Thereof** |
| **Chapter 39** | **Plastics and articles thereof** |
| 39.01-39.15 | A change from any other heading; or |
|  | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product; or |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
|  | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the net weight of non-originating material classified in the same heading as the final product does not exceed 50 per cent of the net weight of the product. |
| 39.16-39.26 | A change from any other heading. |
| **Chapter 40** | **Rubber and articles thereof** |
| 40.01-40.11 | A change from any other heading. |
| 4012.11-4012.19 | A change from any other subheading. |
| 4012.20-4012.90 | A change from any other heading. |
| 40.13-40.16 | A change from any other heading. |
| 40.17 | A change from within this heading or any other heading. |
| **Section VIII** | **Raw Hides and Skins, Leather, Furskins and Articles Thereof; Saddlery and Harness; Travel Goods, Handbags and Similar Containers; Articles of Animal Gut (Other Than Silk-Worm Gut)** |
| **Chapter 41** | **Raw hides and skins (other than furskins) and leather** |
| 41.01-41.03 | A change from any other heading. |
| 4104.11-4104.19 | A change from any other heading. |
| 4104.41-4104.49 | A change from any other subheading. |
| 4105.10 | A change from any other heading. |
| 4105.30 | A change from any other subheading. |
| 4106.21 | A change from any other heading. |
| 4106.22 | A change from any other subheading. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 4106.31 | A change from any other heading. |
| 4106.32 | A change from any other subheading. |
| 4106.40 | A change from within this subheading or any other subheading. |
| 4106.91 | A change from any other heading. |
| 4106.92 | A change from any other subheading. |
| 41.07-41.13 | A change from any other heading, except from subheading 4104.41, 4104.49, 4105.30, 4106.22, 4106.32 or 4106.92; or<br><br>A change from subheading 4104.41, 4104.49, 4105.30, 4106.22, 4106.32 or 4106.92, whether or not there is also a change from any other heading, provided that materials of subheading 4104.41, 4104.49, 4105.30, 4106.22, 4106.32 or 4106.92 undergo a retanning operation in the territory of a Party. |
| 41.14-41.15 | A change from any other heading. |
| **Chapter 42** | **Articles of leather; saddlery and harness; travel goods, handbags and similar containers; articles of animal gut (other than silk-worm gut)** |
| 42.01-42.06 | A change from any other heading. |
| **Chapter 43** | **Furskins and artificial fur; manufactures thereof** |
| 43.01 | A change from any other heading. |
| 4302.11-4302.30 | A change from any other subheading. |
| 43.03-43.04 | A change from any other heading. |
| **Section IX** | **Wood and Articles of Wood; Wood Charcoal; Cork and Articles of Cork; Manufactures of Straw, of Esparto or of Other Plaiting Materials; Basketware and Wickerwork** |
| **Chapter 44** | **Wood and articles of wood; wood charcoal** |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 44.01-44.21 | A change from any other heading. |
| **Chapter 45** | **Cork and articles of cork** |
| 45.01-45.04 | A change from any other heading. |
| **Chapter 46** | **Manufactures of straw, of esparto or of other plaiting materials; basketware and wickerwork** |
| 46.01-46.02 | A change from any other heading. |
| **Section X** | **Pulp of Wood or of Other Fibrous Cellulosic Material; Recovered (Waste and Scrap) Paper or Paperboard; Paper and Paperboard and Articles Thereof** |
| **Chapter 47** | **Pulp of wood or of other fibrous cellulosic material; recovered (waste and scrap) paper or paperboard** |
| 47.01-47.07 | A change from any other heading. |
| **Chapter 48** | **Paper and paperboard; articles of paper pulp, of paper or of paperboard** |
| 48.01-48.09 | A change from any other heading. |
| 4810.13-4811.90 | A change from any other subheading. |
| 48.12-48.23 | A change from any other heading. |
| **Chapter 49** | **Printed books, newspapers, pictures and other products of the printing industry; manuscripts, typescripts and plans** |
| 49.01-49.11 | A change from any other heading. |
| **Section XI** | **Textiles and Textile Articles** |
| **Chapter 50** | **Silk** |
| 50.01-50.02 | A change from any other heading. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 50.03 | A change from within this heading or any other heading. |
| 50.04-50.06 | Spinning of natural fibres or extrusion of man-made fibres, accompanied by spinning or twisting. |
| 50.07 | Spinning of natural or man-made staple fibres, extrusion of man-made filament yarn or twisting, in each case accompanied by weaving; |
| | Weaving accompanied by dyeing; |
| | Yarn dyeing accompanied by weaving; or |
| | Printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| **Chapter 51** | **Wool, fine or coarse animal hair; horsehair yarn and woven fabric** |
| 51.01-51.05 | A change from any other heading. |
| 51.06-51.10 | Spinning of natural fibres or extrusion of man-made fibres accompanied by spinning. |
| 51.11-51.13 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving; |
| | Weaving accompanied by dyeing; |
| | Yarn dyeing accompanied by weaving; or |
| | Printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| **Chapter 52** | **Cotton** |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 52.01-52.03 | A change from any other heading. |
| 52.04-52.07 | Spinning of natural fibres or extrusion of man-made fibres accompanied by spinning. |
| 52.08-52.12 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving; Weaving, accompanied by dyeing or coating; Yarn dyeing accompanied by weaving; or Printing, accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| **Chapter 53** | **Other vegetable textile fibres; paper yarn and woven fabrics of paper yarn** |
| 53.01-53.05 | A change from any other heading. |
| 53.06-53.08 | Spinning of natural fibres or extrusion of man-made fibres accompanied by spinning. |
| 53.09-53.11 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving; Weaving, accompanied by dyeing or coating; Yarn dyeing accompanied by weaving; or Printing, accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 54** | **Man-made filaments** |
| 54.01-54.06 | Extrusion of man-made fibres accompanied, if necessary, by spinning or spinning of natural fibres. |
| 54.07-54.08 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving;<br><br>Weaving, accompanied by dyeing or coating;<br><br>Twisting or texturing, accompanied by weaving provided that the value of the non-twisted or non-textured yarns used does not exceed 47.5 per cent of the transaction value or ex-works price of the product; or<br><br>Printing, accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| **Chapter 55** | **Man-made staple fibres** |
| 55.01-55.07 | Extrusion of man-made fibres. |
| 55.08-55.11 | Spinning of natural fibres or extrusion of man-made fibres accompanied by spinning. |
| 55.12-55.16 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving;<br><br>Weaving, accompanied by dyeing or coating;<br><br>Yarn dyeing accompanied by weaving; or<br><br>Printing, accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 56** | **Wadding, felt and non-wovens; special yarns; twine, cordage, ropes and cables and articles thereof** |
| 56.01 | A change from any other chapter. |
| 5602.10 | Extrusion of man-made fibres accompanied by fabric formation, however polypropylene filament of heading 54.02, polypropylene fibres of heading 55.03 or 55.06, or polypropylene filament tow of heading 55.01, of which the denomination in all cases of a single filament or fibre is less than 9 decitex may be used, provided that their total value does not exceed 40 per cent of the transaction value or ex-works price of the product; or<br><br>Fabric formation alone in the case of felt made from natural fibres. |
| 5602.21-5602.90 | Extrusion of man-made fibres accompanied by fabric formation; or<br><br>Fabric formation alone in the case of other felt made from natural fibres. |
| 56.03 | Extrusion of man-made fibres or use of natural fibres, accompanied by nonwoven techniques including needle punching. |
| 5604.10 | A change from any other heading. |
| 5604.90<br>-Rubber thread (textile covered) | Production from rubber thread or cord, not textile covered. |
| -Other | Spinning of natural fibres or extrusion of man-made fibres accompanied by spinning. |
| 56.05 | A change from any other heading, except from yarn of heading 50.04 through 50.06, 51.06 through 51.10, 52.04 through 52.07, 53.06 through 53.08, 54.01 through 54.06 or 55.09 through 55.11;<br><br>Extrusion of man-made fibres accompanied by spinning, or spinning of natural or man-made staple fibres. |
| 56.06 | A change from any other heading, except from yarn of heading 50.04 through 50.06, 51.06 through 51.10, 52.04 through 52.07, 53.06 through 53.08, 54.01 through 54.06 or 55.09 through 55.11; |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | Extrusion of man-made fibres accompanied by spinning, or spinning of natural or man-made staple fibres; <br><br> Spinning accompanied by flocking; or <br><br> Flocking accompanied by dyeing. |
| 56.07 | A change from any other heading, except from yarn of heading 50.04 through 50.06, 51.06 through 51.10, 52.04 through 52.07, 53.06 through 53.08, 54.01 through 54.06 or 55.09 through 55.11; <br><br> Extrusion of man-made fibres accompanied by spinning or spinning of natural fibres; or <br><br> Flocking, accompanied by dyeing or printing. |
| 56.08 | Extrusion of man-made fibres accompanied by spinning or spinning of natural fibres; or <br><br> Flocking, accompanied by dyeing or printing. |
| 56.09 | A change from any other heading, except from yarn of heading 50.04 through 50.06, 51.06 through 51.10, 52.04 through 52.07, 54.01 through 54.06 or 55.09 through 55.11; <br><br> Extrusion of man-made fibres accompanied by spinning or spinning of natural fibres; or <br><br> Flocking, accompanied by dyeing or printing. |
| **Chapter 57** | **Carpets and other textile floor coverings** <br><br> ***Note:*** *For products of this Chapter jute fabric may be used as a backing.* |
| 57.01-57.05 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving; <br><br> Production from coir yarn, sisal yarn or jute yarn; <br><br> Flocking, accompanied by dyeing or printing; |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | Tufting, accompanied by dyeing or printing; or |
| | Extrusion of man-made fibres accompanied by non-woven techniques including needle punching, however polypropylene filament of heading 54.02, polypropylene fibres of heading 55.03 or 55.06, or polypropylene filament tow of heading 55.01, of which the denomination in all cases of a single filament or fibre is less than 9 decitex, may be used, provided that their total value does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| **Chapter 58** | **Special woven fabrics; tufted textile fabrics; lace; tapestries; trimmings; embroidery**<br><br>*Note: For products of heading 58.11, the materials used to produce wadding must be extruded in the territory of one or both of the Parties.* |
| 58.01-58.04 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving;<br><br>Weaving, accompanied by dyeing, flocking or coating;<br><br>Flocking, accompanied by dyeing or printing;<br><br>Yarn dyeing accompanied by weaving; or<br><br>Printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 58.05 | A change from any other heading. |
| 58.06-58.09 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving or fabric formation;<br><br>Weaving or fabric formation, accompanied by dyeing, flocking or coating;<br><br>Flocking, accompanied by dyeing or printing; |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | Yarn dyeing, accompanied by weaving or fabric formation; or |
| | Printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 58.10 | Production in which the value of all the materials used does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 58.11 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving, knitting or non-woven process; |
| | Weaving, knitting or non-woven process, in each case accompanied by dyeing, flocking or coating; |
| | Flocking, accompanied by dyeing or printing; |
| | Yarn dyeing, accompanied by weaving, knitting or non-woven process; or |
| | Printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| **Chapter 59** | **Impregnated, coated, covered or laminated textile fabrics; textile articles of a kind suitable for industrial use** |
| 59.01 | Weaving, knitting or a non-woven process, in each case accompanied by dyeing, flocking or coating; or |
| | Flocking, accompanied by dyeing or printing. |
| 59.02 -Containing not more than 90 per | Weaving, knitting or a non-woven process. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| cent by weight of textile materials | |
| -Other | Extrusion of man-made fibres accompanied by weaving, knitting or a non-woven process. |
| 59.03 | Weaving, knitting or a non-woven process, in each case accompanied by dyeing or coating; or |
| | Printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 59.04 | Weaving, knitting or a non-woven process, in each case accompanied by dyeing or coating. |
| 59.05 -Impregnated, coated, covered or laminated with rubber, plastics or other materials | Weaving, knitting or a non-woven process, in each case accompanied by dyeing or coating. |
| -Other | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by weaving, knitting or a non-woven process; |
| | Weaving, knitting or a non-woven process, in each case accompanied by dyeing or coating; or |
| | Printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the ex-works price of the product. |
| 59.06 | |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| -Knitted or crocheted fabrics | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by knitting;<br><br>Knitting, accompanied by dyeing or coating; or<br><br>Dyeing of yarn of natural fibres accompanied by knitting. |
| -Other fabrics made of synthetic filament yarn, containing more than 90 per cent by weight of textile materials | Extrusion of man-made fibres accompanied by weaving, knitting or a non-woven process. |
| -Other | Weaving, or knitting or a non-woven process, in each case accompanied by dyeing or coating; or<br><br>Dyeing of yarn of natural fibres accompanied by weaving, knitting or forming. |
| 59.07 | A change from any other chapter, except from fabric of heading 50.07, 51.11 through 51.13, 52.08 through 52.12, 53.10, 53.11, 54.07, 54.08, 55.12 through 55.16, 56.02, 56.03, Chapter 57, heading 58.03, 58.06, 58.08 or 60.02 through 60.06;<br><br>Weaving, accompanied by dyeing, flocking or coating;<br><br>Flocking, accompanied by dyeing or printing; or<br><br>Printing, accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 59.08<br>-Incandescent gas mantles, impregnated | Production from tubular knitted gas-mantle fabric. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| -Other | A change from any other heading. |
| 59.09-59.11 -Polishing discs or rings other than of felt of heading 5911 | Weaving, knitting or a non-woven process. |
| -Woven fabrics, of a kind commonly used in papermaking or other technical uses, felted or not, whether or not impregnated or coated, tubular or endless with single or multiple warp or weft, or flat woven with multiple warp or weft of heading 59.11 -Other | Spinning of natural or of man-made staple fibres, in each case accompanied by weaving or knitting; or Weaving, knitting or a non-woven process, in each case accompanied by dyeing or coating, provided that only one or more of the following materials are used: -coir yarn, -yarn of polytetrafluoroethylene, -yarn, multiple, of polyamide, coated impregnated or covered with a phenolic resin, -yarn of synthetic textile fibres of aromatic polyamides, obtained by polycondensation of m-phenylenediamine and isophthalic acid, -monofil of polytetrafluoroethylene, -yarn of synthetic textile fibres of poly(p-phenylene terephthalamide), -glass fibre yarn, coated with phenol resin and gimped with acrylic yarn, -copolyester monofilaments of a polyester, a resin of terephthalic acid, 1,4-cyclohexanediethanol and isophthalic acid. Extrusion of man-made filament yarn or spinning of natural or man-made staple fibres, in each case accompanied by weaving, knitting or a non-woven process; or Weaving, knitting or a non-woven process, in each case accompanied by dyeing or coating. |
| **Chapter 60** | **Knitted or crocheted fabrics** |
| 60.01-60.06 | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by knitting; Knitting, accompanied by dyeing, flocking or coating; Flocking, accompanied by dyeing or printing; |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | Dyeing of yarn of natural fibres accompanied by knitting; or<br><br>Twisting or texturing, accompanied by knitting provided that the value of the non-twisted or non-textured yarns used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| **Chapter 61** | **Articles of apparel and clothing accessories, knitted or crocheted** |
| 61.01-61.17<br>-Obtained by sewing together or otherwise assembling, two or more pieces of knitted or crocheted fabric which have been either cut to form or obtained directly to form | Knitting or crocheting and making-up (including cutting). |
| -Other (knit to shape products) | Spinning of natural or man-made staple fibres or extrusion of man-made filament yarn, in each case accompanied by knitting or crocheting; or<br><br>Dyeing of yarn of natural fibres accompanied by knitting or crocheting. |
| **Chapter 62** | **Articles of apparel and clothing accessories, not knitted or crocheted** |
| 62.01 | Weaving accompanied by making-up (including cutting); or<br><br>Making-up preceded by printing, accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.02<br>-Women's, or girls' clothing, | Weaving accompanied by making-up (including cutting); or |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| embroidered | Production from unembroidered fabric, provided that the value of the unembroidered fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| -Other | Weaving accompanied by making-up (including cutting); or |
| | Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.03 | Weaving accompanied by making up (including cutting); or |
| | Making up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.04 -Women's, or girls' clothing, embroidered | Weaving accompanied by making up (including cutting); or |
| | Production from unembroidered fabric, provided that the value of the unembroidered fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| -Other | Weaving accompanied by making up (including cutting); or |
| | Making up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.05 | Weaving accompanied by making up (including cutting); or |
| | Making up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.06 -Women's, or girls' clothing, embroidered | Weaving accompanied by making-up (including cutting); or Production from unembroidered fabric, provided that the value of the unembroidered fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| -Other | Weaving accompanied by making-up (including cutting); or Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.07-62.08 | Weaving accompanied by making-up (including cutting); or Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.09 -Women's, or girls' clothing, embroidered | Weaving accompanied by making-up (including cutting); or Production from unembroidered fabric, provided that the value of the unembroidered fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| -Other | Weaving accompanied by making-up (including cutting); or Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.10 -Fire-resistant equipment of fabric covered with foil of aluminised polyester | Production from yarn; or Production from uncoated fabric, provided that the value of the uncoated fabric used does not exceed 40 per cent of the ex-works price of the product. |
| -Other | Weaving or other fabric formation process, accompanied by making-up (including cutting); or Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.11 -Women's, or girls' clothing, embroidered | Weaving accompanied by making-up (including cutting); or Production from unembroidered fabric, provided that the value of the unembroidered fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| -Other | Weaving accompanied by making-up (including cutting); or Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.12 | Knitting or weaving, accompanied by making-up (including cutting); or Making-up preceded by printing accompanied by at least two preparatory |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.13-62.14<br>-Embroidered | Weaving accompanied by making-up (including cutting);<br><br>Production from unembroidered fabric, provided that the value of the unembroidered fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product; or<br><br>Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| -Other | Weaving accompanied by making-up (including cutting); or<br><br>Making-up preceded by printing accompanied by at least two preparatory finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.15 | Weaving accompanied by making-up (including cutting); or<br><br>Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.16<br>-Fire-resistant equipment of fabric covered | Production from yarn; or<br><br>Production from uncoated fabric, provided that the value of the uncoated |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| with foil of aluminised polyester | fabric used does not exceed 40 per cent of the ex-works price of the product. |
| -Other | Weaving accompanied by making-up (including cutting); or |
| | Making-up preceded by printing accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerising, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the unprinted fabric used does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 62.17 -Embroidered | Weaving accompanied by making-up (including cutting); or |
| | Production from unembroidered fabric, provided that the value of the unembroidered fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| -Fire-resistant equipment of fabric covered with foil of aluminised polyester | Weaving accompanied by making-up (including cutting); or |
| | Coating provided that the value of the uncoated fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product accompanied by making-up (including cutting). |
| -Interlinings for collars and cuffs, cut out | Production from materials of any heading, except that of the product, and in which the value of all the non-originating materials used does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| -Other | Weaving accompanied by making-up (including cutting). |
| **Chapter 63** | **Other made up textile articles; sets; worn clothing and worn textile articles; rags** |
| 63.01-63.04 -Of felt, of nonwovens | Extrusion of man-made fibres or use of natural fibres, in each case accompanied by a non-woven process including needle punching and making-up (including cutting). |
| -Other, embroidered | Weaving or knitting, accompanied by making-up (including cutting); or |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| -Other, not embroidered | Production from unembroidered fabric, provided that the value of the unembroidered fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product.<br><br>Weaving or knitting, accompanied by making-up (including cutting). |
| 63.05 | Extrusion of man-made fibres or spinning of natural or man-made staple fibres, in each case accompanied by weaving or knitting and making-up (including cutting); or<br><br>Extrusion of man-made fibres or use of natural fibres, in each case accompanied by any non-woven techniques including needle punching and making-up (including cutting). |
| 63.06<br>-Of nonwovens | Extrusion of man-made fibres or use of natural fibres, in each case accompanied by any non-woven techniques including needle punching. |
| -Other | Weaving accompanied by making-up (including cutting); or<br><br>Coating, provided that the value of the uncoated fabric used does not exceed 40 per cent of the transaction value or ex-works price of the product, accompanied by making-up (including cutting). |
| 63.07 | Production in which the value of non-originating materials used does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| 63.08 | A change from any other chapter, provided that either the fabric or the yarn meets the rule of origin that would be applicable if the fabric or yarn were classified alone. |
| 63.09 | A change from any other heading. |
| 63.10 | A change from any other heading. |
| **Section XII** | **Footwear, Headgear, Umbrellas, Sun Umbrellas, Walking-Sticks, Seat-Sticks, Whips, Riding-Crops and Parts Thereof; Prepared Feathers and Articles Made Therewith; Artificial Flowers; Articles of Human Hair** |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 64** | **Footwear, gaiters and the like; parts of such articles** |
| 64.01-64.05 | A change from any other heading, except from assemblies of uppers affixed to inner soles or to other sole components of heading 6406. |
| 64.06 | A change from any other heading. |
| **Chapter 65** | **Headgear and parts thereof** |
| 65.01-65.07 | A change from any other heading. |
| **Chapter 66** | **Umbrellas, sun umbrellas, walking-sticks, seat-sticks, whips, riding-crops and parts thereof** |
| 66.01-66.03 | A change from any other heading. |
| **Chapter 67** | **Prepared feathers and down and articles made of feathers or of down; artificial flowers; articles of human hair** |
| 67.01 | A change to articles of feather or down from within this heading or any other heading; or |
| | A change to any other product of heading 67.01 from any other heading. |
| 67.02-67.04 | A change from any other heading. |
| **Section XIII** | **Articles of Stone, Plaster, Cement, Asbestos, Mica or Similar Materials; Ceramic Products; Glass and Glassware** |
| **Chapter 68** | **Articles of stone, plaster, cement, asbestos, mica or similar materials** |
| 68.01-68.02 | A change from any other heading. |
| 68.03 | A change from within this heading or any other heading. |
| 68.04-68.11 | A change from any other heading. |
| 6812.80-6812.99 | A change from any other subheading. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 68.13 | A change from any other heading. |
| 6814.10-6814.90 | A change from within any one of these subheadings or any other subheading. |
| 68.15 | A change from any other heading. |
| **Chapter 69** | **Ceramic products** |
| 69.01-69.14 | A change from any other heading. |
| **Chapter 70** | **Glass and glassware** |
| 70.01-70.05 | A change from any other heading. |
| 70.06 | A change from within this heading or any other heading. |
| 70.07-70.08 | A change from any other heading. |
| 7009.10 | A change from any other subheading. |
| 7009.91-7009.92 | A change from any other heading. |
| 70.10 | A change from any other heading; or<br><br>A change to cut glassware from uncut glassware of heading 70.10, whether or not there is also a change from any other heading, provided that the value of the non-originating uncut glassware does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 70.11 | A change from any other heading. |
| 70.13 | A change from any other heading; or<br><br>A change to cut glassware from uncut glassware of heading 70.13, whether or not there is also a change from any other heading, provided that the value of the non-originating uncut glassware does not exceed 50 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 70.14-70.18 | A change from any other heading. |
| 7019.11-7019.40 | A change from any other heading. |
| 7019.51 | A change from any other subheading, except from subheading 7019.52 through 7019.59. |
| 7019.52-7019.90 | A change from any other subheading. |
| 70.20 | A change from any other heading. |
| **Section XIV** | **Natural or Cultured Pearls, Precious or Semi-Precious Stones, Precious Metals, Metals Clad with Precious Metal and Articles Thereof; Imitations Jewellery; Coin** |
| **Chapter 71** | **Natural or cultured pearls, precious or semi-precious stones, precious metals, metals clad with precious metal, and articles thereof; imitation jewellery; coin** |
| 71.01 | A change from any other heading. |
| 7102.10 | A change from any other heading. |
| 7102.21-7102.39 | A change from any other subheading, except from subheading 7102.10. |
| 7103.10-7104.90 | A change from any other subheading. |
| 71.05 | A change from any other heading. |
| 7106.10-7106.92 | A change from any other subheading; or |
|  | A change from within any one of these subheadings, whether or not there is also a change from another subheading, provided that the non-originating materials classified in the same subheading as the final product undergo electrolytic, thermal or chemical separation or alloying. |
| 71.07 | A change from within this heading or any other heading. |
| 7108.11-7108.20 | A change from any other subheading; or |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | A change from within any one of these subheadings, whether or not there is also a change from another subheading, provided that the non-originating materials classified in the same subheading as the final product undergo electrolytic, thermal or chemical separation or alloying. |
| 71.09 | A change from within this heading or any other heading. |
| 7110.11-7110.49 | A change from any other subheading; or |
| | A change from within any one of these subheadings, whether or not there is also a change from another subheading, provided that the non-originating materials classified in the same subheading as the final product undergo electrolytic, thermal or chemical separation or alloying. |
| 71.11 | A change from within this heading or any other heading. |
| 71.12-71.15 | A change from any other heading. |
| 71.16-71.17 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 71.18 | A change from any other heading. |
| **Section XV** | **Base Metals and Articles of Base Metal** |
| **Chapter 72** | **Iron and steel** |
| 72.01-72.07 | A change from any other heading. |
| 72.08-72.17 | A change from any heading outside this group. |
| 72.18 | A change from any other heading. |
| 72.19-72.23 | A change from any heading outside this group. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 72.24 | A change from any other heading. |
| 72.25-72.29 | A change from any heading outside this group. |
| **Chapter 73** | **Articles of iron or steel** |
| 73.01-73.03 | A change from any other heading. |
| 7304.11-7304.39 | A change from any other heading. |
| 7304.41 | A change from any other subheading. |
| 7304.49-7304.90 | A change from any other heading. |
| 73.05-73.06 | A change from any other heading. |
| 7307.11-7307.19 | A change from any other heading. |
| 7307.21-7307.29 | A change from any other heading, except from forged blanks of heading 72.07; or<br><br>A change from forged blanks of heading 72.07, whether or not there is also a change from any other heading, provided that the value of the non-originating forged blanks of heading 72.07 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 7307.91-7307.99 | A change from any other heading. |
| 73.08 | A change from any other heading, except from subheading 7301.20; or<br><br>A change from subheading 7301.20, whether or not there is also a change from any other heading, provided that the value of non-originating materials of subheading 7301.20 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 73.09-73.14 | A change from any other heading. |
| 73.15 | A change from any other heading; or<br><br>A change from within this heading, whether or not there is also a change |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 73.16-73.20 | A change from any other heading. |
| 73.21 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 73.22-73.23 | A change from any other heading. |
| 73.24 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 73.25-73.26 | A change from any other heading. |
| **Chapter 74** | **Copper and articles thereof** |
| 74.01-74.02 | A change from any other heading. |
| 7403.11-7403.29 | A change from any other subheading. |
| 74.04-74.19 | A change from any other heading. |
| **Chapter 75** | **Nickel and articles thereof** |
| 75.01-75.08 | A change from any other heading. |
| **Chapter 76** | **Aluminium and articles thereof** |
| 7601.10-7601.20 | A change from within any one of these subheadings or any other |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | subheading. |
| 76.02-76.06 | A change from any other heading. |
| 76.07 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 76.08-76.16 | A change from any other heading. |
| **Chapter 78** | **Lead and articles thereof** |
| 7801.10 | A change from any other subheading. |
| 7801.91-7801.99 | A change from any other heading. |
| 78.02-78.06 | A change from any other heading. |
| **Chapter 79** | **Zinc and articles thereof** |
| 79.01-79.07 | A change from any other heading. |
| **Chapter 80** | **Tin and articles thereof** |
| 80.01-80.07 | A change from any other heading. |
| **Chapter 81** | **Other base metals; cermets; articles thereof** |
| 8101.10-8113.00 | A change from any other subheading. |
| **Chapter 82** | **Tools, implements, cutlery, spoons and forks, of base metal; parts thereof of base metal** |
| | *Note: Handles of base metal used in the production of a product of this chapter shall be disregarded in determining the origin of that product.* |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 82.01-82.04 | A change from any other heading; or<br><br>A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8205.10-8205.70 | A change from any other heading; or<br><br>A change from within this heading, except from subheading 8205.90, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading, other than subheading 8205.90 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8205.90 | A change from any other heading;<br><br>A change to anvils, portable forges, hand or pedal-operated grinding wheels from within this heading, except from a set of subheading 8205.90, whether or not there is also a change from any other heading, provided that the value of the non-originating materials of this heading, other than a set of subheading 8205.90, does not exceed 50 per cent of the transaction value or ex-works price of the product; or<br><br>A change to a set from any other product of this heading, whether or not there is also a change from any other heading, provided that the value of the non-originating component products of this heading does not exceed 25 per cent of the transaction value or ex-works price of the set. |
| 82.06 | A change from any other heading, except from heading 82.02 through 82.05; or<br><br>A change from heading 82.02 through 82.05, whether or not there is also a change from any other heading, provided that the value of the non-originating component products of heading 82.02 through 82.05 does not exceed 25 per cent of the transaction value or ex-works price of the set. |
| 8207.13 | A change from any other heading, except from heading 82.09; or<br><br>A change from subheading 8207.19 or heading 82.09, whether or not there is also a change from any other heading, provided that the value of |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | non-originating materials of subheading 8207.19 or heading 82.09 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8207.19-8207.90 | A change from any other heading; or |
| | A change from within any one of these subheadings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same subheading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 82.08-82.10 | A change from any other heading. |
| 8211.10 | A change from any other heading; or |
| | A change from subheading 8211.91 through 8211.95, whether or not there is also a change from any other heading, provided that the value of the non-originating component products of subheading 8211.91 through 8211.93 does not exceed 25 per cent of the transaction value or ex-works price of the set. |
| 8211.91-8211.93 | A change from any other heading; or |
| | A change from subheading 8211.94 or 8211.95, whether or not there is also a change from any other heading, provided that the value of non-originating materials of subheading 8211.94 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8211.94-8211.95 | A change from any other heading. |
| 82.12-82.13 | A change from any other heading. |
| 8214.10 | A change from any other heading. |
| 8214.20 | A change from any other heading; or |
| | A change to a set of subheading 8214.20 from within this subheading, whether or not there is also a change from any other heading, provided that the value of the non-originating component products of subheading 8214.20 does not exceed 25 per cent of the transaction value or ex-works |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | price of the set. |
| 8214.90 | A change from any other heading. |
| 8215.10-8215.20 | A change from any other heading; or |
| | A change from subheading 8215.91 through 8215.99, whether or not there is also a change from any other heading, provided that the value of the non-originating component products of heading 8215.91 through 8215.99 does not exceed 25 per cent of the transaction value or ex-works price of the product. |
| 8215.91-8215.99 | A change from any other heading. |
| **Chapter 83** | **Miscellaneous articles of base metal** |
| 8301.10-8301.50 | A change from any other heading; or |
| | A change from subheading 8301.60, whether or not there is also a change from any other heading, provided that the value of non-originating materials of subheading 8301.60 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8301.60-8301.70 | A change from any other heading. |
| 8302.10-8302.30 | A change from any other heading. |
| 8302.41 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8302.42-8302.50 | A change from any other heading. |
| 8302.60 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 83.03-83.04 | A change from any other heading. |
| 83.05 | A change from any other heading; or |
| | A change from subheading 8305.90, whether or not there is also a change from any other heading, provided that the value of non-originating materials of subheading 8305.90 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 83.06 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 83.07 | A change from any other heading. |
| 83.08 | A change from any other heading; or |
| | A change from subheading 8308.90, whether or not there is also a change from any other heading, provided that the value of non-originating materials of subheading 8308.90 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 83.09-83.10 | A change from any other heading. |
| 83.11 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Section XVI** | **Machinery and Mechanical Appliances; Electrical Equipment; Parts Thereof; Sound Recorders and Reproducers, Television Image and Sound Recorders and Reproducers, And Parts and Accessories of Such Articles** |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| **Chapter 84** | **Nuclear reactors, boilers, machinery and mechanical appliances; parts thereof** |
| 84.01-84.12 | A change from any other heading; or<br><br>A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8413.11-8413.82 | A change from any other subheading. |
| 8413.91-8413.92 | A change from any other heading. |
| 84.14-84.15 | A change from any other heading; or<br><br>A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8416.10-8417.90 | A change from any other subheading. |
| 84.18-84.22 | A change from any other heading; or<br><br>A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8423.10-8426.99 | A change from any other subheading. |
| 84.27 | A change from any other heading except from heading 84.31; or<br><br>A change from heading 84.31, whether or not there is also a change from any other heading, provided that the value of non-originating materials of heading 84.31 does not exceed 50 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 8428.10-8430.69 | A change from any other subheading. |
| 84.31 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8432.10-8442.50 | A change from any other subheading. |
| 84.43 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8444.00-8449.00 | A change from any other subheading. |
| 84.50-84.52 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8453.10-8454.90 | A change from any other subheading. |
| 84.55 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 84.56-84.65 | A change from any other heading, except from heading 84.66; or |
| | A change from within any one of these headings or heading 84.66, whether or not there is also a change from any other heading, provided |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | that the value of non-originating materials classified in the same heading as the final product or heading 84.66 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 84.66 | A change from any other heading. |
| 84.67-84.68 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8469.00-8472.90 | A change from any other subheading. |
| 84.73 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8474.10-8479.90 | A change from any other subheading. |
| 84.80-84.83 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8484.10-8484.20 | A change from any other subheading. |
| 8484.90 | A change from any other subheading, provided the value of the non-originating component products does not exceed 25 per cent of the transaction value or ex-works price of the set. |
| 84.86 | A change from any other heading; or |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
|  | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8487.10-8487.90 | A change from any other subheading. |
| **Chapter 85** | **Electrical machinery and equipment and parts thereof; sound recorders and reproducers, television image and sound recorders and reproducers, and parts and accessories of such articles** |
| 85.01-85.02 | A change from any other heading, except from heading 85.03; or |
|  | A change from within any one of these headings or heading 85.03, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product or heading 85.03 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 85.03-85.16 | A change from any other heading; or |
|  | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8517.11-8517.62 | A change from any other subheading. |
| 8517.69-8517.70 | A change from any other heading; or |
|  | A change from within heading 85.17, whether or not there is also a change from any other heading, provided that the value of non-originating materials of heading 85.17 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 85.18 | A change from any other heading; or |
|  | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | value or ex-works price of the product. |
| 85.19-85.21 | A change from any other heading, except heading 85.22; or<br><br>A change from 85.22, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in heading 85.22 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 85.22 | A change from any other heading; or<br><br>A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 85.23 | A change from any other heading. |
| 85.25 | A change from within this heading or any other heading, provided that the value of all non-originating materials does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| 85.26-85.28 | A change from any other heading, except from heading 85.29; or<br><br>A change from heading 85.29, whether or not there is also a change from any other heading, provided that the value of non-originating materials of heading 85.29 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 85.29 | A change from any other heading; or<br><br>A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8530.10-8530.90 | A change from any other subheading. |
| 85.31 | A change from any other heading; or<br><br>A change from within this heading, whether or not there is also a change |

655

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 8532.10-8534.00 | A change from any other subheading. |
| 85.35-85.37 | A change from any other heading, except from heading 85.38; or |
| | A change from heading 85.38, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in heading 85.38 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 85.38-85.48 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Section XVII** | **Vehicles, Aircraft, Vessels and Associated Transport Equipment** |
| **Chapter 86** | **Railway or tramway locomotives, rolling-stock and parts thereof; railway or tramway track fixtures and fittings and parts thereof; mechanical (including electro-mechanical) traffic signalling equipment of all kinds** |
| 86.01-86.06 | A change from any other heading, except from heading 86.07; or |
| | A change from heading 86.07, whether or not there is also a change from any other heading, provided that the value of non-originating materials of heading 86.07 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 86.07 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 86.08-86.09 | A change from any other heading. |
| **Chapter 87** | **Vehicles other than railway or tramway rolling-stock, and parts and accessories thereof** |
| 87.01 | Production in which the value of all non-originating materials used does not exceed 45 per cent of the ex-works price or transaction value of the product. [66] |
| 87.02 | Production in which the value of all non-originating materials used does not exceed 45 per cent of the ex-works price or transaction value of the product. [67] |
| 87.03 | Production in which the value of all non-originating materials used does not exceed 50 per cent of the ex-works price or transaction value of the product. [68] |
| 87.04 | Production in which the value of all non-originating materials used does not exceed 45 per cent of the ex-works price or transaction value of the product. [69] |
| 87.05 | Production in which the value of all non-originating materials used does not exceed 45 per cent of the ex-works price or transaction value of the product. [70] |

[66]    The Parties agree to apply cumulation with the United States according to the following provisions: Provided that there is a Free Trade Agreement in force between each Party and the United States consistent with the Parties' WTO obligations and the Parties reach agreement on all the applicable conditions, any material of Chapter 84, 85, 87 or 94 of the Harmonized System originating in the United States used in the production of this product in Canada or the European Union will be considered as originating. Without prejudice to the outcome of the free trade negotiations between the European Union and the United States, the discussions on the applicable conditions will include consultations to ensure consistency between the calculation method agreed between the European Union and the United States and the method applicable under this Agreement for this product, if necessary.

Accordingly the above rule of origin will cease to apply one year following the entry into application of such cumulation and the following rule of origin shall apply instead:

Production in which the value of all non-originating materials used does not exceed 40per cent of the ex-works price or transaction value of the product.

The application of cumulation and of the new rule of origin will be published in the European Union Official Journal for information purposes.

[67]    See footnote 3.

[68]    This rule of origin will cease to apply seven years after the entry into force of this Agreement. The following rule of origin shall apply instead:

Production in which the value of all non-originating materials used does not exceed 45 per cent of the ex-works price or transaction value of the product.

Notwithstanding the foregoing, and subject to any applicable conditions agreed upon by the Parties, the following rule of origin shall apply when the cumulation provided for in Annex 5-A: Section D – Vehicles, Note 1 enters into application:

Production in which the value of all non-originating materials used does not exceed 40 per cent of the ex-works price or transaction value of the product.

[69]    See footnote 3.

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 87.06 | A change from any other heading, except from heading 84.07, 84.08 or 87.08; or<br><br>A change from within this heading, heading 84.07, 84.08 or 87.08, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading or heading 84.07, 84.08 or 87.08 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 87.07 | A change from any other heading, except from heading 87.08; or<br><br>A change from within this heading or heading 87.08, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading or heading 87.08 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 87.08 | A change from any other heading; or<br><br>A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 87.09 | A change from any other heading; or<br><br>A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 87.10-87.11 | A change from any other heading. |
| 87.12 | A change from any other heading, except from 87.14; or<br><br>A change from heading 87.14, whether or not there is also a change from any other heading, provided that the value of non-originating materials of heading 87.14 does not exceed 50 per cent of the transaction value or ex-works price of the product. |

70    See footnote 3.

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 87.13 | A change from any other heading. |
| 87.14-87.16 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Chapter 88** | **Aircraft, spacecraft, and parts thereof** |
| 88.01 | A change from any other heading. |
| 88.02-88.05 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Chapter 89** | **Ships, boats and floating structures** |
| 89.01-89.06 | A change from any other chapter; or |
| | A change from within this chapter, whether or not there is also a change from any other chapter, provided that the value of non-originating materials of Chapter 89 does not exceed 40 per cent of the transaction value or ex-works price of the product. |
| 89.07-89.08 | A change from any other heading. |
| **Section XVIII** | **Optical, Photographic, Cinematographic, Measuring, Checking, Precision, Medical or Surgical Instruments and Apparatus; Clocks and Watches; Musical Instruments; Parts and Accessories Thereof** |
| **Chapter 90** | **Optical, photographic, cinematographic, measuring, checking, precision, medical or surgical instruments and apparatus; parts and accessories thereof** |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 90.01 | A change from any other heading. |
| 90.02 | A change from any other heading, except from heading 90.01; or |
| | A change from within this heading or heading 90.01, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading or heading 90.01 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 90.03-90.33 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Chapter 91** | **Clocks and watches and parts thereof** |
| 91.01-91.07 | A change from any other heading, except from heading 91.08 through 91.14; or |
| | A change from heading 91.08 through 91.14, whether or not there is also a change from any other heading, provided that the value of non-originating materials of heading 91.08 through 91.14 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 91.08-91.14 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Chapter 92** | **Musical instruments; parts and accessories of such articles** |
| 92.01-92.08 | A change from any other heading, except from heading 92.09; or |
| | A change from heading 92.09, whether or not there is also a change from any other heading, provided that the value of non-originating materials of |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 92.09 | heading 92.09 does not exceed 50 per cent of the transaction value or ex-works price of the product.<br><br>A change from any other heading; or<br><br>A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Section XIX** | **Arms and Ammunition; Parts and Accessories Thereof** |
| **Chapter 93** | **Arms and ammunition; parts and accessories thereof** |
| 93.01-93.04 | A change from any other heading, except from heading 93.05; or<br><br>A change from heading 93.05, whether or not there is also a change from any other heading, provided that the value of non-originating materials of heading 93.05 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 93.05-93.07 | A change from any other heading; or<br><br>A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Section XX** | **Miscellaneous Manufactured Articles** |
| **Chapter 94** | **Furniture; bedding, mattresses, mattress supports, cushions and similar stuffed furnishings; lamps and lighting fittings, not elsewhere specified or included; illuminated signs, illuminated name-plates and the like; prefabricated buildings** |
| 94.01-94.06 | A change from any other heading; or<br><br>A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| **Chapter 95** | **Toys, games and sports requisites; parts and accessories thereof** |
| 95.03-95.05 | A change from any other heading; or<br><br>A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 9506.11-9506.29 | A change from any other heading; or<br><br>A change from within any one of these subheadings or any other subheading, whether or there is also a change from any other heading, provided that the value of non-originating materials classified in the same subheading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 9506.31 | A change from any other heading; or<br><br>A change from subheading 9506.39, whether or not there is also a change from any other heading, provided that the value of non-originating materials of subheading 9506.39 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 9506.32-9506.99 | A change from any other heading; or<br><br>A change from within any one of these subheadings or any other subheading, whether or not there is also a change from any other subheading, provided that the value of non-originating materials classified in the same subheading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 95.07-95.08 | A change from any other heading. |
| **Chapter 96** | **Miscellaneous manufactured articles** |
| 9601.10-9602.00 | A change from within any one of these subheadings or any other |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| | subheading. |
| 96.03-96.04 | A change from any other heading. |
| 96.05 | A change from any other heading, provided that the value of the non-originating component products does not exceed 25 per cent of the transaction value or ex-works price of the set. |
| 96.06-96.07 | A change from any other heading; or |
| | A change from within any one of these headings, whether or not there is also a change from any other heading, provided that the value of non-originating materials classified in the same heading as the final product does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 9608.10-9608.40 | A change from any other heading; or |
| | A change from within this heading, except from subheading 9608.50, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading other than subheading 9608.50 does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 9608.50 | A change from any other heading; or |
| | A change from subheading 9608.10 through 9608.40 or 9608.60 through 9608.99, whether or not there is also a change from any other heading, provided that the value of the non-originating component products of subheading 9608.10 through 9608.40 or 9608.60 through 9608.99 does not exceed 25 per cent of the transaction value or ex-works price of the set. |
| 9608.60-9608.99 | A change from any other heading; or |
| | A change from within this heading, except from subheading 9608.50, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading other than subheading 9608.50 does not exceed 50 per cent of the transaction value or ex-works price of the product. |

| Harmonized System classification | Product specific rule for sufficient production pursuant to Article 5 |
|---|---|
| 96.09 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 96.10-96.12 | A change from any other heading. |
| 96.13 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 96.14 | A change from within this heading or any other heading. |
| 96.15 | A change from any other heading; or |
| | A change from within this heading, whether or not there is also a change from any other heading, provided that the value of non-originating materials of this heading does not exceed 50 per cent of the transaction value or ex-works price of the product. |
| 96.16-96.18 | A change from any other heading. |
| 96.19 | A change from any other heading. |
| **Section XXI** | **Works of Art, Collectors' Pieces and Antiques** |
| **Chapter 97** | **Works of art, collectors' pieces and antiques** |
| 97.01-97.06 | A change from any other heading. |

## ANNEX 5-A

## ORIGIN QUOTAS AND ALTERNATIVES TO THE PRODUCT-SPECIFIC RULES OF ORIGIN IN ANNEX 5

**Common Provisions**

1.    Annex 5-A applies to the products identified in the following Sections:

   (a)    Section A: Agricultural Products

   (b)    Section B: Fish and Seafood

   (c)    Section C: Textiles and Apparel

   (d)    Section D: Vehicles

2.    For the products listed in the tables within each Section, the corresponding rules of origin are alternatives to those set out in Annex 5 – Product-Specific Rules of Origin, within the limits of the applicable annual quota.

3.    The importing Party shall manage the origin quotas on a first-come first-served basis and shall calculate the quantity of products entered under these origin quotas on the basis of that Party's imports.

4.    All exports under the origin quotas must make reference to Annex 5-A. The Parties shall not count any products against the annual origin quota without such reference.

5.    Canada shall notify the European Union if any Canadian-issued documentation requirements are established for:

   (a)    products exported from Canada under the applicable origin quota; or

   (b)    products imported into Canada under the applicable origin quota.

6.    If the European Union receives notification pursuant to paragraph 5(a), the European Union shall allow for only those products accompanied by such documentation to claim the preferential tariff treatment based on the alternative rule of origin specified in Annex 5-A.

7.    The Parties shall administer the origin quotas on a calendar year basis with the full in-quota quantity to be made available on January 1st of each year. For the administration of these origin quotas in Year 1, the Parties shall calculate the quota volumes of these origin quotas by discounting the volume corresponding to the period running between the 1st of January and the date of entry into force of the Agreement.

8.    With respect to the European Union, any quantities referred to in this Annex shall be managed by the European Commission, which shall take all administrative actions it deems advisable for their efficient management in respect of the applicable legislation of the European Union.

9.    The Parties shall consult as needed to ensure that Annex 5-A is administered effectively and shall cooperate in the administration of Annex 5-A. The Parties shall consult to discuss possible modifications to Annex 5-A.

10.    Additional provisions, such as review or growth of the origin quotas, are provided separately for each Section.

**Section A – Agriculture**

*Table A.1 – Annual Quota Allocation for High-Sugar Containing*[71] *Products Exported from Canada to the European Union*[72]

| Harmonized System classification | Product description | Sufficient production | Annual quota for exports from Canada into the European Union (metric tonnes, net weight) |
|---|---|---|---|
| ex 1302.20 | Pectic substances, pectinates and pectates, containing added sugar of subheading 1701.91 through 1701.99 | A change from within this subheading or any other subheading, except from subheading 1701.91 through 1701.99. | 30,000 |
| ex 1806.10 | Cocoa powder, containing added sugar of subheading 1701.91 through 1701.99 | A change from any other subheading, except from subheading 1701.91 through 1701.99. | |
| ex 1806.20 | Preparations containing added sugar of subheading 1701.91 through 1701.99 for the preparation of chocolate beverages | A change from within this subheading or any other subheading, except from subheading 1701.91 through 1701.99. | |
| ex 2101.12 | Preparations with a basis of extracts, essences or concentrates of coffee or with a basis of coffee containing added sugar of subheading 1701.91 through 1701.99 | A change from any other subheading, except from subheading 1701.91 through 1701.99. | |
| ex 2101.20 | Preparations with a basis of extracts, essences or concentrates of tea or maté, or with a basis of tea or maté containing added sugar of subheading 1701.91 through 1701.99 | A change from within this subheading or any other subheading, except from subheading 1701.91 through 1701.99. | |
| ex 2106.90 | Food preparations containing added sugar of subheading 1701.91 through 1701.99 | A change from within this subheading or any other subheading, except from | |

---

[71] The products, to which Table A.1 applies, must contain 65 per cent or more by net weight of added cane or beet sugar of subheading 1701.91 through 1701.99. All the cane or beet sugar must have been refined in Canada.

[72] With regard to the products to which Table A.1 applies, it is understood that the sufficient production included in this column provides for production beyond the insufficient production provided in Article 7.

| | | subheading 1701.91 through 1701.99. | |
|---|---|---|---|

### *Review and Growth Provisions Related to Table A.1*

1.    The Parties shall review the origin quota level at the end of every five year period for the first three consecutive five year periods following the entry into force of this Agreement.

2.    At the end of each five year period for the first three consecutive five year periods following the entry into force of this Agreement, the origin quota volume in Table A.1 will be increased by 20 per cent of the volume set in the previous period, provided that:

    (a)    in any one year during the first five year period the fill-rate is at least 60 per cent;

    (b)    in any one year during the second five year period the fill-rate is at least 70 per cent; and

    (c)    in any one year during the third five year period the fill-rate is at least 80 per cent.

3.    Any increase in the origin quota volume will be implemented in the first quarter of the subsequent calendar year.

4.    This review will be conducted by the Committee on Agriculture. At the end of the review, if applicable, the Parties shall notify each other in writing of an increase in the origin quota under paragraph 2 and the date on which the increase applies under paragraph 3. The Parties shall ensure that an increase in the origin quota and the date it becomes applicable are publicly available.

*Table A.2 – Annual Quota Allocation for Sugar Confectionery and Chocolate Preparations Exported from Canada to the European Union*

| Harmonized System classification | Product description | Sufficient production | Annual quota for exports from Canada into the European Union (metric tonnes, net weight) |
|---|---|---|---|
| 17.04 | Sugar confectionery (including white chocolate), not containing cocoa | A change from any other heading. | 10,000 |
| 1806.31 | Chocolate and other food preparations containing cocoa, in blocks, slabs or bars, filled, weighing no more than 2 kilograms | A change from any other subheading, provided that the change is the result of more than packaging. | |
| 1806.32 | Chocolate and other food preparations containing cocoa, in blocks, slabs or bars, not filled, weighing no more than 2 kilograms | | |
| 1806.90 | Chocolate and other food preparations containing cocoa other than those of subheading 1806.10 through 1806.32 | | |

*Review and Growth Provisions Related to Table A.2*

1. The Parties shall review the origin quota in Table A.2 at the end of every five year period following the entry into force of this Agreement, provided that in any one year during the previous 5 year period, the origin quota fill-rate is at least 60 per cent.

2. The review will be conducted with a view to increasing the volume based on the examination of all relevant factors, in particular the fill rate, growth in Canadian exports to the world, growth in total European Union imports, and any other significant trends in trade of the products to which the origin quota applies.

3. The rate of increase in the origin quota will be established for the subsequent period of five years, and will not be greater than 10 per cent of the volume set in the previous period.

4. This review will be conducted by the Committee on Agriculture. Any recommendation of the Committee on Agriculture to increase the origin quota volume shall be submitted to the CETA Joint Committee for a decision in accordance with Article 30.2.2.

*Table A.3 – Annual Quota Allocation for Processed Foods Exported from Canada to the European Union*

| Harmonized System classification | Product description | Sufficient production | Annual quota for exports from Canada into the European Union (metric tonnes net weight) |
|---|---|---|---|
| 19.01 | Malt extract; food preparations of flour, groats, meal, starch or malt extract, not containing cocoa or containing less than 40 per cent by weight of cocoa calculated on a totally defatted basis, not elsewhere specified or included; food preparations of goods of heading 04.01 through 04.04, not containing cocoa or containing less than 5 per cent by weight of cocoa calculated on a totally defatted basis, not elsewhere specified or included | A change from any other heading. | 35,000 |
| ex 1902.11 | Uncooked pasta, not stuffed or otherwise prepared, containing eggs and rice | A change from any other heading. | |
| ex 1902.19 | Uncooked pasta, not stuffed or otherwise prepared, other, containing rice | | |
| ex 1902.20 | Stuffed pasta, whether or not cooked or otherwise prepared, containing rice | | |
| ex 1902.30 | Other pasta, containing rice | | |
| 1904.10 | Prepared foods obtained by the swelling or roasting of cereals or cereal products (for example, corn flakes) | A change from any other heading; or | |
| 1904.20 | Prepared foods obtained from unroasted cereal flakes or from mixtures of unroasted | A change from within this | |

| | | |
|---|---|---|
| | cereal flakes and roasted cereal flakes or swelled cereals | heading, whether or not there is also a change from any other heading, provided that the weight of the non-originating materials of this heading does not exceed 30 per cent of either the net weight of the product or the net weight of all material used in production. |
| 1904.90 | Prepared foods other than those of subheading 1904.10 through 1904.30 | A change from any other heading. |
| 19.05 | Bread, pastry, cakes, biscuits and other bakers' wares, whether or not containing cocoa; communion wafers, empty cachets of a kind suitable for pharmaceutical use, sealing wafers, rice paper and similar products | A change from any other heading. |
| 2009.81 | Cranberry juice | A change from any other heading. |
| ex 2009.89 | Cranberry juice and blueberry juice | A change from any other heading. |
| 2103.90 | Other sauces and preparations therefor, other mixed condiments and mixed seasonings | A change from any other heading. |
| ex 2106.10 | Protein concentrates and textured protein substances, not containing added sugar of subheading 1701.91 through 1701.99 or containing less than 65 per cent by net weight of added sugar of subheading 1701.91 through 1701.99 | A change from any other subheading; or  A change from within the same subheading, whether or not there is also a change from any other subheading, provided that the net weight of non-originating material from within that subheading does not exceed 30 per cent of either the net weight of the product or the net weight of all material used in production. |
| ex 2106.90 | Other food preparations not elsewhere specified or included, not containing added sugar of subheading 1701.91 through 1701.99 or | |

| | containing less than 65 per cent by net weight of added sugar of subheading 1701.91 through 1701.99 | | |
|---|---|---|---|

***Review and Growth Provisions Related to Table A.3***

1.    The Parties shall review the origin quota in Table A.3 at the end of every five year period following the entry into force of this Agreement, provided that in any one year during the previous five year period, the origin quota fill-rate is at least 60 per cent.

2.    The review will be conducted with a view to increasing the volume based on the examination of all relevant factors, in particular the fill-rate, growth in Canadian exports to the world, growth in total European Union imports, and any other significant trends in trade of the products to which the origin quota applies.

3.    The rate of increase in the origin quota will be established for the subsequent period of five years, and will not be greater than 10 per cent of the volume set in the previous period.

4.    This review will be conducted by the Committee on Agriculture. Any recommendation of the Committee on Agriculture to increase the origin quota volume shall be submitted to the CETA Joint Committee for a decision in accordance with Article 30.2.2.

***Table A.4 – Annual Quota Allocation for Dog and Cat Food Exported from Canada to the European Union***

| Harmonized System classification | Product description | Sufficient production | Annual quota for exports from Canada into the European Union (metric tonnes, net weight) |
|---|---|---|---|
| 2309.10 | Dog or cat food, put up for retail sale | A change from subheading 2309.90 or any other heading, except from dog or cat food of subheading 2309.90. | 60,000 |
| ex 2309.90 | Dog or cat food, not put up for retail sale | A change from within this subheading or any other heading, except from dog or cat food from within this subheading. | |

***Review and Growth Provisions Related to Table A.4***

1.      The Parties shall review the origin quota in Table A.4 at the end of every five year period following the entry into force of this Agreement, provided that in any one year during the previous five year period, the origin quota fill-rate is at least 60 per cent.

2.      The review will be conducted with a view to increasing the volume based on the examination of all relevant factors, in particular the fill-rate, growth in Canadian exports to the world, growth in total European Union imports, and any other significant trends in trade of the products to which the origin quota applies.

3.      The rate of increase in the origin quota will be established for the subsequent period of five years, and will not be greater than 10 per cent of the volume set in the previous period.

4.      This review will be conducted by the Committee on Agriculture. Any recommendation of the Committee on Agriculture to increase the origin quota volume shall be submitted to the CETA Joint Committee for a decision in accordance with Article 30.2.2.

## Section B – Fish and Seafood

***Table B.1 – Annual Quota Allocation for Fish and Seafood Exported from Canada to the European Union***

| Harmonized System classification | Product description | Annual quota for exports from Canada into the European Union (metric tonnes, net weight) | Sufficient production |
|---|---|---|---|
| ex 0304.83 | Frozen fillets of halibut, other than *Reinhardtius hippoglossoides* | 10 | A change from any other heading.[73] |
| ex 0306.12 | Cooked and frozen lobster | 2,000 | A change from any other subheading. |
| 1604.11 | Prepared or preserved salmon | 3,000 | A change from any other chapter. |
| 1604.12 | Prepared or preserved herring | 50 | |
| ex 1604.13 | Prepared or preserved sardines, sardinella and brisling or sprats, excluding *Sardina pilchardus* | 200 | |
| ex 1605.10 | Prepared or preserved crab, other than *Cancer pagurus* | 44 | |
| 1605.21-1605.29 | Prepared or preserved shrimps and prawns | 5,000 | |
| 1605.30 | Prepared and preserved lobster | 240 | |

*Growth Provisions Related to Table B.1*

1.      For each of the products listed in Table B.1, if more than 80 per cent of an origin quota assigned to a product is used during a calendar year, the origin quota allocation will be increased for the following calendar year. The increase will be 10 per cent of the origin quota assigned to the product in the previous calendar year. The growth provision will apply for the first time after the expiry of the first complete calendar year following the entry into force of the Agreement and will be applied for four consecutive years in total.

2.      Any increase in the origin quota volume will be implemented in the first quarter of the subsequent calendar year. The importing Party shall notify the Party of export in writing if the condition in paragraph 1 is met, and if so, the increase in the origin quota and the date on which the increase is applicable. The Parties shall ensure that the increased origin quota and the date on which it becomes applicable are publicly available.

---

[73]    With regard to the rule of origin for products of subheading 0304.83, it is understood that the production is beyond the insufficient production provided in Article 7.

*Review Provision Related to Table B.1*

After the completion of the third calendar year following the entry into force of this Agreement, at the request of a Party, the Parties will engage in a discussion on possible revisions to this Section.

### Section C – Textiles and Apparel

*Table C.1 – Annual Quota Allocation for Textiles Exported from Canada to the European Union*

| Harmonized System classification | Product description | Annual quota for exports from Canada into the European Union (kilograms net weight, unless otherwise specified) | Sufficient production |
|---|---|---|---|
| 5107.20 | Yarn of combed wool, not put up for retail sale, containing less than 85 per cent by weight of wool | 192,000 | A change from any other heading. |
| 5205.12 | Cotton yarn not elsewhere specified or included, 85 per cent or more by weight of cotton, not put up for retail sale, single uncombed yarn, over 14 nm but not over 43 nm | 1,176,000 | A change from any other heading. |
| 5208.59 | Woven fabrics of cotton, 85 per cent or more cotton by weight, printed, other than plain weave, not elsewhere specified or included, weighing not over 200 g/m2 | 60,000 m² | A change from any other heading. |
| 5209.59 | Woven fabrics of cotton, 85 per cent or more cotton by weight, printed, other than plain weave, not elsewhere specified or included, weighing over 200 g/m2 | 79,000 m² | |
| 54.02 | Synthetic filament yarn (other than sewing thread), not put up for retail sale, including synthetic monofilaments of less than 67 decitex | 4,002,000 | A change from any other heading. |

675

| | | | |
|---|---|---|---|
| 5404.19 | Synthetic monofilament of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm, not elsewhere specified or included | 21,000 | |
| 54.07 | Woven fabrics of synthetic filament yarn, including woven fabrics obtained from materials of heading 54.04 | 4,838,000 m² | A change from any other heading; or<br><br>Printing or dyeing, accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerizing, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the non-originating fabric does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 5505.10 | Waste (including noils, yarn waste and garnetted stock), of synthetic fibres | 1,025,000 | A change from any other heading. |
| 5513.11 | Woven fabrics of polyester staple fibres, under 85 per cent (wt.) Of such fibres, unbleached or bleached, plain weave, mixed mainly or solely with cotton, not over 170 g/m2 | 6,259,000 m² | A change from any other heading. |
| 56.02 | Felt, whether or not impregnated, coated, covered or laminated | 583,000 | A change from any other chapter. |
| 56.03 | Nonwovens (of textile materials), whether or not impregnated, coated, covered or laminated | 621,000 | |
| 57.03 | Carpets and other textile floor coverings, tufted, whether or not made-up | 196,000 m² | |
| 58.06 | Narrow woven fabrics, other than goods of heading 58.07 (other than labels, badges and similar articles, in the piece etc.); narrow fabrics consisting of warp without weft assembled by means of an adhesive | 169,000 | A change from any other heading. |

| | | | |
|---|---|---|---|
| 5811.00 | Quilted textile products in the piece (one or more layers assembled with padding by stitching etc.), other than embroidery of heading 58.10 | 12,000 m² | A change from any other heading. |
| 59.03 | Textile fabrics impregnated, coated, covered or laminated with plastics, other than those of heading 59.02 | 1,754,000 m² | A change from any other chapter, provided that the value of the non-originating fabric does not exceed 60 per cent of the transaction value or ex-works price of the product. |
| 5904.90 | Floor coverings, consisting of a coating or covering applied on a textile backing, whether or not cut to shape, excluding linoleum | 24,000 m² | |
| 59.06 | Rubberized textile fabrics, other than those of heading 59.02 | 450,000 | |
| 5907.00 | Textile fabrics otherwise impregnated, coated or covered; painted canvas being theatrical scenery, studio back-cloths or the like | 2,969,000 m² | |
| 59.11 | Textile products and articles for specified technical uses | 173,000 | |
| 60.04 | Knitted or crocheted fabrics of a width exceeding 30 cm, containing by weight 5 per cent or more elastomeric yarn or rubber thread, other than those of heading 60.01 | 25,000 | A change from any other heading; or<br><br>Printing or dyeing, accompanied by at least two preparatory or finishing operations (such as scouring, bleaching, mercerizing, heat setting, raising, calendering, shrink resistance processing, permanent finishing, decatising, impregnating, mending and burling), provided that the value of the non-originating fabric does not exceed 47.5 per cent of the transaction value or ex-works price of the product. |
| 60.05 | Warp knit fabrics (including those made on galloon knitting machines), other than those of heading 60.01 to 60.04 | 16,000 | |
| 60.06 | Knitted or crocheted fabrics, not elsewhere specified or included | 24,000 | |
| 63.06 | Tarpaulins, awnings, sunblinds, tents, sails for boats, sailboards or landcraft, and camping goods, of textile materials | 124,000 | A change from any other chapter. |
| 63.07 | Made-up articles of textile materials, not elsewhere specified or included | 503,000 | |

677

$m^2$ = metres squared

*Table C.2 – Annual Quota Allocation for Apparel Exported from Canada to the European Union*

| Harmonized System classification | Product description | Annual quota for exports from Canada into the European Union (units, unless otherwise specified) | Sufficient production[74] |
|---|---|---|---|
| 6101.30 | Men's or boys' overcoats, car coats, capes, cloaks, anoraks, ski-jackets, and similar articles of manmade fibres, knitted or crocheted | 10,000 | A change from any other chapter, provided that the product is both cut (or knit to shape) and sewn or otherwise assembled in the territory of a Party; or A change to a good knit to shape, for which no sewing or other assembly is required, from any other chapter. |
| 6102.30 | Women's or girls' overcoats, car coats, capes, cloaks, anoraks, ski-jackets and similar articles of manmade fibres, knitted or crocheted | 17,000 | |
| 61.04 | Women's or girls' suits, ensembles, suit-type jackets, blazers, dresses, skirts, divided skirts, trousers, etc. (no swimwear), knitted or crocheted | 535,000 | |
| 6106.20 | Women's or girls' blouses and shirts of manmade fibres, knitted or crocheted | 44,000 | |
| 6108.22 | Women's or girls' briefs and panties of manmade fibres, knitted or crocheted | 129,000 | |
| 6108.92 | Women's or girls' negligees, bathrobes, dressing gowns and similar articles of manmade fibres, knitted or crocheted | 39,000 | |
| 6109.10 | T-shirts, singlets and other vests, of cotton, knitted or crocheted | 342,000 | |
| 6109.90 | T-shirts, singlets and other vests, of textile materials not elsewhere specified or included, knitted or crocheted | 181,000 | |
| 61.10 | Jerseys, pullovers, cardigans, waistcoats and similar articles, knitted or crocheted | 478,000 | |
| 6112.41 | Women's or girls' swimwear of synthetic fibres, knitted or crocheted | 73,000 | |

---

[74] With regard to the products to which Table C.2 applies, it is understood that the sufficient production included in this column provides for production beyond the insufficient production provided for in Article 7.

| 61.14 | Garments not elsewhere specified or included, knitted or crocheted | 90,000 kilograms | |
| 61.15 | Pantyhose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example stockings for varicose veins) and footwear without applied soles, knitted or crocheted | 98,000 kilograms | |
| 62.01 | Men's or boys' overcoats car coats, capes, cloaks, anoraks (including ski-jackets), windcheaters, wind-jackets and similar articles, not knitted or crocheted, other than those of heading 6203 | 96,000 | |
| 62.02 | Women's or girls' overcoats, car coats, capes, cloaks, anoraks (including ski-jackets), windcheaters, wind-jackets and similar articles, not knitted or crocheted, other than those of heading 6204 | 99,000 | |
| 62.03 | Men's or boys' suits, ensembles, jackets, blazers, trousers, bib and brace overalls, breeches and shorts (other than swimwear), not knitted or crocheted | 95,000 | |
| 62.04 | Women's or girls' suits, ensembles, jackets, blazers, dresses, skirts, divided skirts, trousers, bib and brace overalls, breeches and shorts (other than swimwear), not knitted or crocheted | 506,000 | |
| 62.05 | Men's or boys' shirts, not knitted or crocheted | 15,000 | |
| 62.06 | Women's or girls' blouses, shirts and shirt-blouses, not knitted or crocheted | 64,000 | |
| 6210.40 | Men's or boys' garments, made up of fabrics of heading 59.03, 59.06 or 59.07, not elsewhere specified or included, not knitted or crocheted | 68,000 kilograms | |
| 6210.50 | Women's or girls' garments, made up of fabrics of heading 59.03, 59.06 or 59.07, not elsewhere specified or included, not knitted or crocheted | 30,000 kilograms | |
| 62.11 | Track suits, ski-suits and swimwear, other garments not elsewhere specified or included, not knitted or crocheted | 52,000 kilograms | |
| 6212.10 | Brassieres, whether or not knitted or crocheted | 297,000 | |

| 6212.20 | Girdles and panty girdles, whether or not knitted or crocheted | 32,000 | |
| 6212.30 | Corselettes, whether or not knitted or crocheted | 40,000 | |
| 6212.90 | Braces, suspenders, garters and similar articles and parts thereof, whether or not knitted or crocheted | 16,000 kilograms | |

*Table C.3 – Annual Quota Allocation for Textiles Exported from the European Union to Canada*

| Harmonized System classification | Product description | Annual quota for exports from the European Union into Canada (kilograms, unless otherwise specified) | Sufficient production |
|---|---|---|---|
| 5007.20 | Woven fabrics containing 85 per cent or more by weight of silk or of silk waste other than noil silk | 83,000 m$^2$ | Weaving. |
| 5111.30 | Woven fabrics containing predominantly, but less than 85 per cent by weight of carded wool or carded fine animal hair, mixed mainly or solely with man-made staple fibres | 205,000 m$^2$ | Weaving. |
| 51.12 | Woven fabrics of combed wool or of combed fine animal hair | 200,000 | Weaving. |
| 5208.39 | Woven fabrics of cotton, containing 85 per cent or more cotton by weight and weighing not more than 200 g/m², dyed, excluding those in three-thread or four-thread twill, which includes cross twill, and plain woven fabrics | 116,000 m$^2$ | Weaving. |
| 5401.10 | Sewing thread of synthetic filaments, whether or not put up for retail sale | 18,000 | Extrusion of man-made filament yarn whether or not accompanied by spinning; or<br><br>Spinning. |
| 5402.11 | Synthetic filament yarn, not put up for retail sale, high tenacity yarn of aramids | 504,000 | Extrusion of man-made filament yarn whether or not accompanied by spinning; or<br><br>Spinning. |
| 54.04 | Synthetic monofilament of 67 decitex or more and with a | 275,000 | Extrusion of man-made filament yarn whether or not |

| | | | |
|---|---|---|---|
| | cross sectional dimension of no more than 1 mm; strip and the like, (for example, artificial straw), of synthetic textile material, with an apparent width of no more than 5 mm | | accompanied by spinning; or<br><br>Spinning. |
| 54.07 | Woven fabrics of synthetic filament yarn, including woven fabrics obtained from materials of heading 5404 | 636,000 | Weaving. |
| 56.03 | Nonwovens, whether or not impregnated, coated, covered or laminated, not elsewhere specified or included | 1,629,000 | Any non-woven process including needle punching. |
| 5607.41 | Binder or baler twine, of polyethylene or polypropylene | 813,000 | Any non-woven process including needle punching. |
| 5607.49 | Twine, cordage, ropes and cables of polyethylene or polypropylene, whether or not plaited or braided and whether or not impregnated, coated, covered or sheathed with rubber or plastics (excluding binder or baler twine) | 347,000 | Any non-woven process including needle punching. |
| 5702.42 | Carpets and other floor coverings, of man-made textile materials, woven, not tufted or flocked, of pile construction, made up (excluding kelem, schumacks, karamanie and similar hand-woven rugs) | 187,000 m² | Weaving; or<br><br>Use of any non-woven process including needle punching. |
| 5703.20 | Carpets and other floor coverings, of nylon or other polyamides, tufted whether or not made up | 413,000 m² | Weaving; or<br><br>Use of any non-woven process including needle punching. |
| 5704.90 | Carpets and other floor coverings, of felt, not tufted or flocked, whether or not made-up (excluding floor tiles with an area of no more than 0,3 m² | 1,830,000 | Weaving; or<br><br>Use of any non-woven process including needle punching. |
| 59.03 | Textile fabrics impregnated, coated, covered or laminated with plastics (excluding tyre cord fabric of high-tenacity | 209,000 | Weaving; or<br><br>Coating, flocking, laminating |

| | yarn of nylon or other polyamides, polyesters or viscose rayon) | | or metalising, in each case accompanied by at least two other main preparatory finishing operations (such as calendering, shrinking resistance processing) confer origin provided that at least 52.5 per cent value was added based on ex-work price of product |
|---|---|---|---|
| 5904.10 | Linoleum, whether or not cut to shape | 61,000 m$^2$ | Weaving; or<br><br>Coating, flocking, laminating or metalizing, in each case accompanied by at least two other main preparatory finishing operations (such as calendering, shrinking resistance processing) confer origin provided that at least 52.5 per cent value was added based on ex-work price of product. |
| 5910.00 | Transmission or conveyor belts or belting, of textile material, whether or not impregnated, coated, covered or laminated with plastics, or reinforced with metal or other material | 298,000 | Manufacturing from yarn or waste fabrics or rags of headings 6310;<br><br>Weaving; or<br><br>Coating, flocking, laminating or metalising, in each case accompanied by at least two other main preparatory finishing operations (such as calendering, shrinking resistance processing) confer origin provided that at least 52.5 per cent value was added based on ex-work price of product. |
| 59.11 | Textile products and articles, for technical uses, specified in note 7 to chapter 59 | 160,000 | Manufacturing from yarn or waste fabrics or rags of headings 6310; |

| | | | Weaving; or |
|---|---|---|---|
| | | | Coating, flocking, laminating or metalising, in each case accompanied by at least two other main preparatory finishing operations (such as calendering, shrinking resistance processing) confer origin provided that at least 52.5 per cent value was added based on ex-work price of product. |
| 6302.21 | Bed linen, printed, of cotton, not knitted or crocheted | 176,000 | Cutting of fabric and making up; or<br><br>Use of any non-woven process including needle punching accompanied by making up (including cutting). |
| 6302.31 | Bed linen (other than printed) of cotton, not knitted or crocheted | 216,000 | Cutting of fabric and making up;<br><br>Use of any non-woven process including needle punching accompanied by making up (including cutting);or<br><br>Making up preceded by printing. |
| 6302.91 | Toilet linen and kitchen linen of cotton (excluding of terry towelling or similar terry fabrics) floor-cloths, polishing-cloths, dish-cloths and dusters | 20,000 | Use of any non-woven process including needle punching accompanied by making up(including cutting);<br><br>Cutting of fabric and making up; or<br><br>Making up preceded by printing. |

*Table C.4 – Annual Quota Allocation for Apparel Exported from the European Union to Canada*

| Harmonized System classification | Product description | Annual quota for exports from the European Union into Canada (units, unless otherwise specified) | Sufficient production[75] |
|---|---|---|---|
| 6105.10 | Men's or boys' shirts of cotton, knitted or crocheted (excluding nightshirts, t-shirts, singlets and other vests) | 46,000 | Cutting of fabric and making up. |
| 61.06 | Women's or girls' blouses, shirts and shirt-blouses, knitted or crocheted (excluding t-shirts and vests) | 126,000 | Cutting of fabric and making up. |
| 61.09 | T-shirts, singlets and other vests, knitted or crocheted | 722,000 | Cutting of fabric and making up. |
| 61.10 | Jerseys, pullovers, cardigans, waistcoats and similar articles, knitted or crocheted (excluding wadded waistcoats) | 537,000 | Cutting of fabric and making up; or

Knitting to shape for products for which no sewing or other assembly is required. |
| 61.14 | Other garments not elsewhere specified or included, knitted or crocheted | 58,000 kilograms | Cutting of fabric and making up; or

Knitting to shape for products for which no sewing or other assembly is required. |
| 6115 | Pantyhose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins) and footwear | 1,691,000 pairs | Cutting of fabric and making up; or

Knitting to shape for products |

---

[75]     With regard to the products to which Table C.4 applies, it is understood that the sufficient production included in this column provides for production beyond the insufficient production provided for in Article 7.

| | without applied soles, knitted or crocheted (excluding for babies) | | for which no sewing or other assembly is required. |
|---|---|---|---|
| 6202.11 | Women's or girls' overcoats, raincoats, carcoats, capes, cloaks and similar articles of wool or fine animal hair, not knitted or crocheted | 15,000 | Cutting of fabric and making up. |
| 6202.93 | Women's or girls' anoraks, windcheaters, wind jackets and similar articles, of man-made fibres (not knitted or crocheted) | 16,000 | Cutting of fabric and making up. |
| 6203.11 | Men's or boys' suits of wool or fine animal hair | 39,000 | Cutting of fabric and making up. |
| 6203.12-6203.49 | Men's or boys' suits (excluding wool or fine animal hair), ensembles, jackets, blazers, trousers, bib and brace overalls, breeches and shorts (excluding knitted or crocheted, and swimwear) | 281,000 | Cutting of fabric and making up. |
| 62.04 | Women's or girls' suits, ensembles, jackets, blazers, dresses, skirts, divided skirts, trousers, bib and brace overalls, breeches and shorts (excluding knitted or crocheted and swimwear) | 537,000 | Cutting of fabric and making up. |
| 6205.20 | Men's or boys' shirts of cotton, not knitted or crocheted | 182,000 | Cutting of fabric and making up. |
| 62.10 | Garments made up of fabrics of heading 5602, 5603, 5903, 5906 or 5907 (excluding knitted or crocheted, and babies' garments) | 19,000 | Cutting of fabric and making up. |
| 62.11 | Tracksuits, ski suits, swimwear and other garments, not elsewhere specified (excluding knitted or crocheted) | 85,000 kilograms | Cutting of fabric and making up. |
| 62.12 | Brassieres, girdles, corsets, braces, suspenders, garters and similar articles and parts thereof, of all types of textile materials, whether or not elasticated, including knitted or crocheted (excluding belts and corselets made entirely of rubber) | 26,000 dozens | Cutting of fabric and making up. |

*Growth Provisions Related to Tables C.1, C.2, C.3 and C.4*

1.    For each of the products listed in Tables C.1, C.2, C.3 and C.4, if more than 80 per cent of an origin quota assigned to a product is used during a calendar year, the origin quota allocation will be increased for the following calendar year. The increase will be 3 per cent of the origin quota assigned to the product in the previous calendar year. The growth provision will apply for the first time after the expiry of the first complete calendar year following the entry into force of the Agreement. The annual origin quota allocations may be increased during a period of up to ten years.

2.    Any increase in the origin quota volume will be implemented in the first quarter of the subsequent calendar year. The importing Party shall notify the Party of export in writing if the condition in paragraph 1 is met, and if so, the increase in the origin quota and the date on which the increase is applicable. The Parties shall ensure that the increased origin quota and the date on which it becomes applicable are publicly available.

*Review Provision Related to Tables C.1, C.2, C.3 and C4*

At the request of a Party, the Parties shall meet to revise the product coverage quantities of the quota allocations based on developments in the relevant markets and sectors. The Parties may recommend revisions to the Committee on Trade in Goods.

**Section D – Vehicles**

*Table D.1 – Annual Quota Allocation for Vehicles Exported from Canada to the European Union*

| Harmonized System classification | Product description | Sufficient production | Annual quota for exports from Canada into the European Union (units) |
|---|---|---|---|
| 8703.21 | Other vehicles, with spark-ignition internal combustion reciprocating piston engine: of a cylinder capacity not exceeding 1,000 cc | Production in which the value of all non-originating materials used does not exceed: | 100,000 |
| 8703.22 | Other vehicles, with spark-ignition internal combustion reciprocating piston engine: of a cylinder capacity exceeding 1,000 cc but not exceeding 1,500 cc | | |
| 8703.23 | Other vehicles, with spark-ignition internal combustion reciprocating piston engine: of a cylinder capacity exceeding 1,500 cc but not exceeding 3,000 cc | (a) 70 per cent of the transaction value or ex-works price of the product; or | |
| 8703.24 | Other vehicles, with spark-ignition internal combustion reciprocating piston engine: of a cylinder capacity exceeding 3,000 cc | | |
| 8703.31 | Other vehicles, with compression-ignition internal combustion piston engine (diesel or semi-diesel): of a cylinder capacity not | (b) 80 per cent | |

690

| | exceeding 1,500 cc | of the net cost of the product. | |
|---|---|---|---|
| 8703.32 | Other vehicles, with compression-ignition internal combustion piston engine (diesel or semi-diesel): of a cylinder capacity exceeding 1,500 cc but not exceeding 2,500 cc | | |
| 8703.33 | Other vehicles, with compression-ignition internal combustion piston engine (diesel or semi-diesel): of a cylinder capacity exceeding 2,500 cc | | |
| 8703.90 | Other | | |

*Note 1*

*The Parties agree to apply cumulation with the United States according to the following provisions:*

*Provided that there is a Free Trade Agreement in force between each Party and the United States consistent with the Parties' WTO obligations and the Parties reach agreement on all the applicable conditions, any material of Chapter 84, 85, 87 or 94 of the Harmonized System originating in the United States used in the production of a product of 8703.21 through 8703.90 of the Harmonized System in Canada or the European Union will be considered as originating. Without prejudice to the outcome of the free trade negotiations between the European Union and the United States, the discussions on the applicable conditions will include consultations to ensure consistency between the calculation method agreed between the European Union and the United States and the method applicable under this Agreement for products of Chapter 87, if necessary.*

*Accordingly Table D.1 will cease to apply one year following the entry into application of such cumulation.*

*The application of cumulation and deletion of Note 1 will be published in the European Union Official Journal for information purposes.*

*Review Provision*

*If seven years after entry into force of the Agreement, cumulation with the United States has not yet entered into force, upon the request of a Party, both Parties shall meet to review these provisions.*

*Alternative Product-Specific Rules of Origin for Products of 87.02*

*For products of heading 87.02 exported from Canada to the European Union, the following rule of origin applies as an alternative to the rule of origin provided in Annex 5:*

*A change from any other heading, except from heading 87.06 through 87.08; or*

*A change from within this heading or heading 87.06 through 87.08, whether or not there is a change from any other heading, provided that the value of non-originating materials of this heading or heading 87.06 through 87.08 does not exceed 50 per cent of the transaction value or ex-works price of the product.*

*This rule of origin will apply to the enterprises located in Canada and their successors and assigns producing products of heading 87.02 in Canada, as of the conclusion of negotiations*

691

*on 1 August 2014.*

**Note 2**

*The Parties agree to apply cumulation with the United States according to the following provisions:*

*Provided that there is a Free Trade Agreement in force between each Party and the United States consistent with the Parties' WTO obligations and the Parties reach agreement on all the applicable conditions, any material of Chapter 84, 85, 87 or 94 of the Harmonized System originating in the United States used in the production of a product of 87.02 of the Harmonized System in Canada or the European Union will be considered as originating.*

*Accordingly, the alternative Product-Specific Rules of Origin for products of 87.02 will cease to apply one year following the entry into application of such cumulation.*

*The application of cumulation and deletion of Note 2 will be published in the European Union Official Journal for information purposes.*

# ANNEX 6

## JOINT DECLARATION CONCERNING RULES OF ORIGIN FOR TEXTILES AND APPAREL

1.    Under this Agreement, trade in textiles and apparel between the Parties is based on the principle that double transformation confers origin, as reflected in Annex 1 (Product-specific rules of origin) of the Protocol on rules of origin and origin procedures.

2.    Nevertheless, for a number of reasons, including the absence of a negative cumulative effect on the producers of the EU, the Parties agree to derogate from paragraph 1 by providing for limited, reciprocal origin quotas for textiles and apparel. These origin quotas are expressed in terms of volumes classified by product category, and includes considering dyeing as equivalent to printing, for a limited and clearly identified range of product categories.

3.    The Parties affirm that these origin quotas, which are exceptional, will be applied in strict adherence to the Protocol on rules of origin and origin procedures.

# ANNEX 7

## JOINT DECLARATIONS CONCERNING THE PRINCIPALITY OF ANDORRA AND THE REPUBLIC OF SAN MARINO

### JOINT DECLARATION CONCERNING THE PRINCIPALITY OF ANDORRA

1.  Products originating in the Principality of Andorra falling within Chapters 25 to 97 of the Harmonized System shall be accepted by Canada as originating in the European Union within the meaning of this Agreement, provided that the customs union established by Council Decision 90/680/EEC of 26 November 1990 on the conclusion of an agreement in the form of an exchange of letters between the European Economic Community and the Principality of Andorra remains in force.

2.  The Protocol on rules of origin and origin procedures shall apply *mutatis mutandis* for the purpose of defining the originating status of products referred to in paragraph 1 of this Joint Declaration.

### JOINT DECLARATION CONCERNING THE REPUBLIC OF SAN MARINO

1.  Products originating in the Republic of San Marino shall be accepted by Canada as originating in the European Union within the meaning of this Agreement, provided that these products are covered by the *Agreement on Cooperation and Customs Union between the European Economic Community and the Republic of San Marino*, done at Brussels on 16 December 1991, and that the latter remains in force.

2.  The Protocol on rules of origin and origin procedures shall apply *mutatis mutandis* for the purpose of defining the originating status of the products referred to in paragraph 1 of this Joint Declaration.

**Protocol on the mutual acceptance of the results of conformity assessment**

*Article 1*

**Definitions**

Except as otherwise provided, the definitions contained in Annex 1 to the TBT Agreement apply to this Protocol. However, the definitions contained in the sixth edition of the ISO/IEC Guide 2: 1991 General Terms and Their Definitions Concerning Standardization and Related Activities do not apply to this Protocol. The following additional definitions also apply:

**accreditation** means third-party attestation related to a conformity assessment body conveying formal demonstration of its competence to carry out specific conformity assessment tasks;

**accreditation body** means an authoritative body that performs accreditation[76];

**attestation** means the issuing of a statement based on a decision following review, that fulfilment of specified technical requirements has been demonstrated;

**Canadian technical regulation** means a technical regulation of Canada's national government or of one or more of its provinces and territories;

**conformity assessment** means a process to determine whether relevant requirements in technical regulations have been fulfilled. For the purpose of this Protocol, conformity assessment does not include accreditation;

**conformity assessment body** means a body that performs conformity assessment activities including calibration, testing, certification and inspection;

**Decision 768/2008/EC** means Decision 768/2008/EC of the European Parliament and of the Council of 9 July 2008 on a common framework for the marketing of products, and repealing Council Decision 93/465/EEC;

**European Union technical regulation** means a technical regulation of the European Union and any measure adopted by a Member State implementing a Directive of the European Union;

**in-house body** means a conformity assessment body that performs conformity assessment activities for the entity of which it forms a part, such as, in the case of the European Union and its Member States, an accredited in-house body fulfilling the requirements in Article R21 of Annex I to Decision 768/2008/EC or the corresponding requirements in a successor instrument;

**legitimate objective** has the same meaning as under Article 2.2 of the TBT Agreement;

**Mutual Recognition Agreement** means the *Agreement on Mutual Recognition between the European Community and Canada*, done at London on 14 May 1998;

**third-party conformity assessment** means conformity assessment that is performed by a person or body that is independent of the person or organization that provides the product, and of user interests in that product;

---

[76]     The authority of an accreditation body is generally derived from government.

**third-party conformity assessment body** means a conformity assessment body that performs third-party conformity assessments.

### Article 2

### Scope and exceptions

1.  This Protocol applies to those categories of goods listed in Annex 1 for which a Party recognises non-governmental bodies for the purpose of assessing conformity of goods with that Party's technical regulations.

2.  Within three years of the entry into force of this Agreement, the Parties shall consult with a view to broadening the scope of application of this Protocol by modifying Annex 1, to include additional categories of goods for which a Party has recognised non-governmental bodies for the purpose of assessing conformity of those goods with that Party's technical regulations on or before the entry into force of this Agreement. Priority categories of goods for consideration are set out in Annex 2.

3.  The Parties shall give positive consideration to making this Protocol applicable to additional categories of goods which may become subject to third-party conformity assessment by recognised non-governmental bodies pursuant to technical regulations adopted by a Party after the date of entry into force of this Agreement. To that end, the Party shall promptly notify the other Party, in writing, of any such technical regulation that is adopted after the entry into force of this Agreement. If the other Party expresses an interest in including a new category of goods in Annex 1 but the notifying Party does not agree to it, the notifying Party shall provide to the other Party, upon request, the reasons that justify its refusal to expand the scope of the Protocol.

4.  If the Parties decide in accordance with paragraphs 2 or 3 to include additional categories of goods in Annex 1, they shall request the Committee on Trade in Goods, pursuant to Article 18(c), to make recommendations to the CETA Joint Committee to amend Annex 1.

5.  This Protocol does not apply:

    (a)  to sanitary and phytosanitary measures as defined in Annex A to the SPS Agreement;

    (b)  to purchasing specifications prepared by a governmental body for production or consumption requirements of that body;

    (c)  to activities performed by a non-governmental body on behalf of a market surveillance or enforcement authority for post-market surveillance and enforcement, except as provided for in Article 11;

    (d)  if a Party has delegated exclusive authority to a single non-governmental body to assess conformity of goods with that Party's technical regulations;

    (e)  to agricultural goods;

    (f)  to the assessment of aviation safety, whether or not it is covered under the Agreement on Civil Aviation Safety between Canada and the European Community, done at Prague on 6 May 2009; and

(g) to the statutory inspection and certification of vessels other than recreational craft.

6. This Protocol does not require the recognition or acceptance by a Party that the other Party's technical regulations are equivalent to its own.

7. This Protocol does not limit the ability of a Party to prepare, adopt, apply or amend conformity assessment procedures in accordance with Article 5 of the TBT Agreement.

8. This Protocol does not affect or modify the laws or obligations in the territory of a Party applicable to civil liability.

*Article 3*

**Recognition of conformity assessment bodies**

1. Canada shall recognise a conformity assessment body established in the European Union as competent to assess conformity with specific Canadian technical regulations, under conditions no less favourable than those applied for the recognition of conformity assessment bodies established in Canada, provided that the following conditions are met:

   (a) the conformity assessment body is accredited, by an accreditation body recognised by Canada, as competent to assess conformity with those specific Canadian technical regulations; or

   (b) (i) the conformity assessment body established in the European Union is accredited, by an accreditation body that is recognised pursuant to Article 12 or Article 15, as competent to assess conformity with those specific Canadian technical regulations;

       (ii) the conformity assessment body established in the European Union is designated by a Member State of the European Union in accordance with the procedures set out in Article 5;

       (iii) there are no unresolved objections pursuant to Article 6;

       (iv) the designation made in accordance with the procedures set out in Article 5 is not withdrawn by a Member State of the European Union; and

       (v) after the expiry of the 30 day period of time referred to in Article 6.1 or 6.2, the conformity assessment body established in the European Union continues to meet all the conditions described in Article 5.5.

2. The European Union shall recognise a third-party conformity assessment body established in Canada as competent to assess conformity with specific European Union technical regulations, under conditions no less favourable than those applied for the recognition of third-party conformity assessment bodies established in the European Union, provided that the following conditions are met:

   (a) (i) the conformity assessment body is accredited, by an accreditation body appointed by one of the Member States of the European Union, as competent to assess conformity with those specific European Union technical regulations;

      (ii)   the third-party conformity assessment body established in Canada is designated by Canada in accordance with the procedures set out in Article 5;

      (iii)  there are no unresolved objections pursuant to Article 6;

      (iv)  the designation made in accordance with the procedures set out Article 5 is not withdrawn by Canada; and

      (v)   after the expiry of the 30 day period of time referred to in Article 6.1 or 6.2, the third-party conformity assessment body established in Canada continues to meet all the conditions described in Article 5.2;or

(b)   (i)    the third-party conformity assessment body established in Canada is accredited, by an accreditation body that is recognised pursuant to Article 12 or 15 , as competent to assess conformity with those specific European Union technical regulations;

      (ii)   the third-party conformity assessment body established in Canada is designated by Canada in accordance with the procedures set out in Article 5;

      (iii)  there are no unresolved objections pursuant to Article 6;

      (iv)  the designation made in accordance with the procedures set out Article 5 is not withdrawn by Canada; and

      (v)   after the expiry of the 30 day period of time referred to in Article 6.1 or 6.2, the third-party conformity assessment body established in Canada continues to meet all the conditions described in Article 5.2.

3.     Each Party shall maintain and publish a list of recognised conformity assessment bodies which includes the scope for which each body is recognised. The European Union shall assign an identification number to conformity assessment bodies established in Canada that are recognised under this Protocol, and shall list those conformity assessment bodies in the information system of the European Union, namely the New Approach Notified and Designated Organisations ("NANDO") or a successor system.

## Article 4

### Accreditation of conformity assessment bodies

The Parties recognise that a conformity assessment body should seek accreditation from an accreditation body that is in the territory in which the conformity assessment body is established, provided that that accreditation body has been recognised pursuant to Article 12 or 15 as able to grant the specific accreditation sought by the conformity assessment body. If there is no accreditation body in the territory of a Party that is recognised pursuant to Article 12 or 15 as able to grant a specific accreditation sought by a conformity assessment body established in the territory of that Party, then:

(a)    each Party shall take such reasonable measures as may be available to it to ensure that accreditation bodies in its territory accredit conformity assessment bodies established in the territory of the other Party under conditions no less favourable than those applied to conformity assessment bodies established in its territory;

(b)    a Party shall not adopt or maintain measures which limit the ability of accreditation bodies in its territory to accredit, or discourage those accreditation bodies from accrediting, on conditions no less favourable than those applied for the accreditation of conformity assessment bodies established in the recognizing Party's territory, conformity assessment bodies established in the territory of the other Party;

(c)    a Party shall not adopt or maintain measures requiring or encouraging accreditation bodies in its territory to apply conditions for the accreditation of conformity assessment bodies in the territory of the other Party that are less favourable than those applied for the accreditation of conformity assessment bodies in its territory.

## *Article 5*

### Designation of conformity assessment bodies

1.    A Party shall designate a conformity assessment body by notifying the contact point of the other Party and sending to that contact point the information described in Annex 3. The European Union shall allow Canada to use the European Union's electronic notification tool for those purposes.

2.    Canada shall only designate a conformity assessment body that meets the following conditions and shall take reasonable measures to ensure that the conditions continue to be met:

(a)    the conformity assessment body meets the requirements set out in Article R17 of Annex I to Decision 768/2008/EC, or the corresponding requirements in successor instruments, except that establishment under national law is interpreted as meaning Canadian law for the purposes of this Protocol; and

(b)    (i)    the conformity assessment body is accredited, by an accreditation body appointed by a Member State of the European Union, as competent to assess conformity with the European Union technical regulations for which the conformity assessment body is being designated; or

(ii)    the conformity assessment body is accredited, by an accreditation body established in Canada that is recognised pursuant to Articles 12 or 15, as competent to assess conformity with the European Union technical regulations for which the conformity assessment body is being designated.

3.    The Parties shall deem the applicable requirements of Article R17 of Annex I to Decision 768/2008/EC to be met when the conformity assessment body is accredited pursuant to either procedure described in subparagraph 2(b) and if the accreditation body requires, as a condition for granting the accreditation, that the conformity assessment body meet requirements equivalent to the applicable requirements of Article R17 of Annex I to Decision 768/2008/EC or the corresponding requirements in successor instruments.

4.    If the European Union considers revising the requirements set out in Article R17 of Annex I to Decision 768/2008/EC, it shall consult Canada at the earliest stage of, and throughout, the review process with a view to ensuring that conformity assessment bodies in the territory of Canada continue to meet any revised requirements on no

less favourable conditions than conformity assessment bodies in the territory of the European Union.

5.    A Member State of the European Union shall only designate a conformity assessment body that meets the following conditions and shall take reasonable measures to ensure that the conditions continue to be met:

(a)    the conformity assessment body is established in the territory of the Member State; and

(b)    (i)    the conformity assessment body is accredited, by an accreditation body recognised by Canada, as competent to assess conformity with the Canadian technical regulations for which the conformity assessment body is being designated; or

(ii)    the conformity assessment body is accredited, by an accreditation body established in the European Union that has been recognised pursuant to Article 12 or 15, as competent to assess conformity with the Canadian technical regulations for which the conformity assessment body is being designated.

6.    A Party may refuse to recognise a conformity assessment body that does not meet the conditions in paragraph 2 or 5, as the case may be.

### Article 6

### Objections to the designation of conformity assessment bodies

1.    A Party may object to the designation of a conformity assessment body, within 30 days of the notification by the other Party pursuant to Article 5.1, if:

(a)    the Party which designated the conformity assessment body failed to provide the information described in Annex 3; or

(b)    the Party has reasons to believe that the conformity assessment body that is designated does not meet the conditions described in Article 5.2 or 5.5.

2.    Following any subsequent transmission of information by the other Party, a Party may object within 30 days of the receipt of that information, if the information remains insufficient to demonstrate that the designated conformity assessment body meets the conditions described in Article 5.2 or 5.5.

### Article 7

### Challenges to designations of conformity assessment bodies

1.    A Party which has recognised a conformity assessment body under this Protocol may challenge the competence of that conformity assessment body if:

(a)    the Party which designated the conformity assessment body failed to take the actions required by Article 11.3, following a notification by the other Party of the non-conformity with applicable technical regulations of a product that had been assessed as being in conformity with these technical regulations by that conformity assessment body; or

(b)   the Party has reasons to believe that the results of conformity assessment activities performed by that conformity assessment body do not provide sufficient assurances that the products assessed by that body as conforming with applicable technical regulations are in fact in conformity with these technical regulations.

2.   A Party which challenges the competence of a recognised conformity assessment body under this Protocol shall immediately notify the Party which designated the conformity assessment body of the challenge, and provide the reasons for the challenge.

3.   A Party that:

(a)   has challenged the competence of a recognised conformity assessment body under this Protocol; and

(b)   has well-founded reasons to believe that the products assessed to be in conformity with applicable technical regulations by that conformity assessment body may fail to conform to its technical regulations,

may refuse to accept the results of that conformity assessment body's conformity assessment activities until the challenge is resolved or the recognising Party has ceased to recognise the conformity assessment body in accordance with paragraph 5.

4.   The Parties shall cooperate and make reasonable efforts to resolve the challenge promptly.

5.   Without prejudice to paragraph 3, the recognising Party may cease to recognise the conformity assessment body whose competence is challenged if:

(a)   the Parties resolve the challenge by concluding that the recognising Party has raised valid concerns as to the competence of the conformity assessment body;

(b)   the Party which designated the conformity assessment body failed to complete the actions required by Article 11.3 within 60 days after being notified pursuant to subparagraph 1(a); or

(c)   the recognising Party objectively demonstrates to the other Party that the results of conformity assessment activities performed by that conformity assessment body do not provide sufficient assurance that the products assessed by it as conforming with the applicable technical regulations are in fact in conformity with these technical regulations; and

(d)   the challenge has not been resolved within 120 days after the Party that had designated the conformity assessment body has been notified of the challenge pursuant to paragraph 1.

*Article 8*

**Withdrawals of conformity assessment bodies**

1.   A Party shall withdraw the designation, or modify the scope of the designation, as appropriate, of a conformity assessment body it has designated if the Party becomes aware that:

(a)   the conformity assessment body's scope of accreditation has been reduced;

701

(b)    the conformity assessment body's accreditation lapses;

(c)    the conformity assessment body no longer meets the other conditions described in Article 5.2 or 5.5; or

(d)    the conformity assessment body is no longer willing, or is otherwise no longer competent or able, to assess conformity within the scope for which it was designated.

2.    A Party shall notify the other Party, in writing, of a withdrawal or modification of the scope of a designation under paragraph 1.

3.    When a Party withdraws the designation or modifies the scope of the designation of a conformity assessment body owing to concerns about the competence or the continued fulfilment by that conformity assessment body of the requirements and responsibilities to which it is subject under Article 5, it shall communicate the reasons for its decision in writing to the other Party.

4.    When communicating with the other Party, a Party shall indicate the date as of which it considers that any of the conditions or concerns enumerated under paragraphs 1 or 3 may have applied to the conformity assessment body.

5.    Without prejudice to Article 7.5, the recognising Party may immediately cease to recognise a conformity assessment body as competent if:

(a)    the conformity assessment body's accreditation lapses;

(b)    the conformity assessment body voluntarily withdraws its recognition;

(c)    the designation of the conformity assessment body is withdrawn pursuant to this Article;

(d)    the conformity assessment body ceases to be established in the territory of the other Party; or

(e)    the recognising Party ceases to recognise the accreditation body that accredited the conformity assessment body pursuant to Article 13 or 14.

## Article 9

### Acceptance of the results of conformity assessment by recognised conformity assessment bodies

1.    A Party shall accept the results of conformity assessment activities performed by conformity assessment bodies established in the other Party's territory which the Party recognises in accordance with Article 3 under conditions no less favourable than those applied to the results of conformity assessment activities performed by recognised conformity assessment bodies in its territory. The Party shall accept these results regardless of the nationality and location of the supplier or manufacturer, or of the country of origin of the product for which the conformity assessment activities are performed.

2.    If a Party has ceased to recognise a conformity assessment body established in the territory of the other Party, it may cease to accept the results of conformity assessment activities performed by that conformity assessment body from the date when it ceased to recognise that conformity assessment body. Unless the Party has

reasons to believe that the conformity assessment body established in the territory of the other Party was not competent to assess conformity of products with the technical regulations of the Party prior to the date when the Party ceased to recognise that conformity assessment body, the Party shall continue to accept the results of conformity assessment activities performed by that conformity assessment body prior to the date when the Party ceased to recognise the conformity assessment body, even though the products may have been placed on the market of the Party after that date.

## Article 10

### Acceptance of results of conformity assessment by in-house bodies established in Canada

1.  The European Union shall accept the results of conformity assessment activities performed by an accredited in-house body established in Canada under conditions no less favourable than those applied to the results of conformity assessment activities performed by an accredited in-house body established in the territory of one of the Member States of the European Union, provided that:

    (a)  the in-house body established in Canada is accredited, by an accreditation body that has been appointed by one of the Member States of the European Union, as competent to assess conformity with those technical regulations; or

    (b)  the in-house body established in Canada is accredited, by an accreditation body that has been recognised pursuant to Article 12 or 15 as competent to assess conformity with those technical regulations.

2.  If, at the date of entry into force of this Agreement, Canada has no conformity assessment procedure providing for conformity assessment activities to be performed by in-house bodies and after the date of entry into force of this Agreement, Canada considers developing conformity assessment procedures providing for conformity assessment activities to be performed by in-house bodies, it shall consult the European Union at the earliest stage of, and throughout the rule-making process with a view to ensuring that in-house bodies established in the European Union can meet any requirements laid down in those provisions on no less favourable conditions than in-house bodies established in Canada.

3.  Results pursuant to paragraphs 1 and 2 shall be accepted regardless of the country of origin of the product for which the conformity assessment activities were performed.

## Article 11

### Market surveillance, enforcement and safeguards

1.  Except for customs procedures, a Party shall ensure that activities performed by market surveillance or enforcement authorities for the inspection or verification of conformity with applicable technical regulations for products assessed by a recognised conformity assessment body established in the territory of the other Party or an in-house body which meets the conditions of Article 10, are conducted under conditions no less favourable than those conducted with respect to products assessed by conformity assessment bodies in the territory of the recognising Party. The Parties shall co-operate as necessary in the conduct of these activities.

2.  If a product's placement or use on the market could compromise the fulfilment of a legitimate objective, a Party may adopt or maintain measures with respect to that product provided that they are consistent with this Agreement. These measures can include withdrawing the product from the market, prohibiting its placement or use on the market or restricting its movement on the market. A Party that adopts or maintains such measures shall promptly inform the other Party and, at the request of the other Party, provide its reasons for adopting or maintaining these measures.

3.  A Party shall, upon receipt of a written complaint by the other Party, which must be supported by evidence, that products assessed by a conformity assessment body that the Party designated do not comply with applicable technical regulations:

    (a)  promptly seek additional information from the designated conformity assessment body, its accreditation body and relevant operators when necessary;

    (b)  investigate the complaint; and

    (c)  provide the other Party with a written reply to the complaint.

4.  A Party may take the actions in paragraph 3 through an accreditation body.

*Article 12*

**Recognition of accreditation bodies**

1.  A Party ("recognising Party") may, in accordance with the procedure described under paragraphs 2 and 3, recognise an accreditation body established in the territory of the other Party ("nominating Party") as competent to accredit conformity assessment bodies as, themselves, competent to assess conformity with the relevant technical regulations of the recognising Party.

2.  The nominating Party may request that the other Party recognise an accreditation body established on its territory as competent by providing a notification to the recognising Party that includes the following information regarding that accreditation body ("nominated accreditation body"):

    (a)  its name, address and contact details;

    (b)  evidence that its authority is derived from the government;

    (c)  whether it acts on a non-commercial and non-competitive basis;

    (d)  evidence of its independence from the conformity assessment bodies it assesses and from commercial pressures, in order to ensure that no conflicts of interest with conformity assessment bodies occur;

    (e)  evidence that it is organised and operated so as to safeguard the objectivity and impartiality of its activities and the confidentiality of the information it obtains;

    (f)  evidence that each decision relating to the attestation of competence of conformity assessment bodies is taken by a competent person different from those who carry out the assessment;

    (g)  the scope for which its recognition is requested;

    (h)  evidence of its competence to accredit conformity assessment bodies within the scope for which its recognition is requested, referring to applicable

international standards, guides and recommendations, and applicable European or Canadian standards, technical regulations and conformity assessment procedures;

(i)   evidence of its internal procedures to ensure efficient management and appropriate internal controls, including the procedures in place for documenting the duties, responsibilities and authorities of personnel who can affect the quality of the assessment as well as the attestation of competence;

(j)   evidence of the number of competent personnel at its disposal, which should be sufficient for the proper performance of its tasks, and of the procedures in place for monitoring the performance and competence of the personnel involved in the accreditation process;

(k)   whether or not it is appointed for the scope for which its recognition is requested in the territory of the nominating Party;

(l)   evidence of its status as a signatory to the International Laboratory Accreditation Cooperation ("ILAC") or International Accreditation Forum ("IAF") multilateral recognition arrangements and to any related regional recognition arrangements; and

(m)   any other information that the Parties may decide is necessary.

3.   The Parties recognise that differences may exist between their respective standards, technical regulations and conformity assessment procedures. When such differences exist, the recognising Party may seek to satisfy itself that the nominated accreditation body is competent to accredit conformity assessment bodies as competent to assess conformity with the relevant technical regulations of the recognising Party. The recognising Party may satisfy itself based on the following:

(a)   an arrangement establishing cooperation between the European and Canadian accreditation systems;

or, in the absence of such an arrangement,

(b)   a cooperation arrangement between the nominated accreditation body and an accreditation body recognised as competent by the recognising Party.

4.   Pursuant to a request made under paragraph 2, and subject to paragraph 3, a Party shall recognise a competent accreditation body established in the territory of the other Party under conditions no less favourable than those applied to the recognition of accreditation bodies established in its territory.

5.   The recognising Party shall respond in writing within 60 days to a request made under paragraph 2, and provide the following information in its response:

(a)   that it recognises the nominating Party's accreditation body as competent to accredit conformity assessment bodies for the scope proposed;

(b)   that it will recognise the nominating Party's accreditation body as competent to accredit conformity assessment bodies for the scope proposed following necessary legislative or regulatory amendments. Such a response must include an explanation of the amendments required and an estimate of the period of time required for the entry into force of the amendments;

(c)    that the nominating Party failed to provide the information described in paragraph 2. Such a response must include a statement of what information is missing; or

(d)    that it does not recognise the nominated accreditation body as competent to accredit conformity assessment bodies for the scope proposed. Such a statement must be justified in an objective and reasoned manner, and state explicitly the conditions under which recognition would be granted.

6.    Each Party shall publish the names of the accreditation bodies of the other Party that it recognises, and for each accreditation body, the scope of the technical regulations for which it recognises that accreditation body.

## Article 13

### Cessation of the recognition of accreditation bodies

If an accreditation body that is recognised by a Party pursuant to Article 12 ceases to be a signatory of a multilateral or regional arrangement referred to in subparagraph (l) of Article 12.2 or of a cooperation arrangement of the type described in Article 12.3, the recognising Party may cease to recognise that accreditation body as competent, as well as any conformity assessment bodies recognised on the basis that they were accredited solely by that accreditation body.

## Article 14

### Challenges to the recognition of accreditation bodies

1.    Without prejudice to Article 13, the recognising Party may challenge the competence of an accreditation body that it has recognised under subparagraphs (a) or (b) of Article 12.5 on the grounds that the accreditation body is no longer competent to accredit conformity assessment bodies as, themselves, competent to assess conformity with the relevant technical regulations of the recognising Party. The recognising Party shall immediately notify the nominating Party of the challenge and shall justify its reasons in an objective and reasoned manner.

2.    The Parties shall cooperate and make reasonable efforts to promptly resolve the challenge. If a cooperation arrangement referred to in Article 12.3 exists, the Parties shall ensure that the European and Canadian accreditation systems or bodies, referred to in Article 12.3, seek to resolve the challenge on behalf of the Parties.

3.    The recognising Party may cease to recognise the nominated accreditation body whose competence is challenged and any conformity assessment bodies recognised on the basis that they were accredited solely by that accreditation body if:

(a)    the Parties, including through the European and Canadian accreditation systems, resolve the challenge by concluding that the recognising Party has raised valid concerns as to the competence of the nominated accreditation body; or

(b)    the recognising Party objectively demonstrates to the other Party that the accreditation body is no longer competent to accredit conformity assessment

bodies as, themselves, competent to assess conformity with the relevant technical regulations of the recognising Party; and

(c)  the challenge has not been resolved within 120 days after the nominating Party has been notified of the challenge.

## *Article 15*

### Recognition of accreditation bodies in the areas of telecommunications and electromagnetic compatibility

1.  For technical regulations related to telecommunications terminal equipment, information technology equipment, apparatus used for radio communication, and electromagnetic compatibility, from the date of entry into force of this Protocol, the accreditation bodies recognised by:

(a)  Canada, include:

(i)  for test laboratories, any national accreditation body of a Member State of the European Union that is a signatory to the ILAC multilateral recognition arrangement; and

(ii)  for certification bodies, any national accreditation body of a Member State of the European Union that is a signatory to the IAF multilateral recognition arrangement;

(b)  the European Union, include the Standards Council of Canada, or its successor.

## *Article 16*

### Transition from the Mutual Recognition Agreement

The Parties agree that a conformity assessment body which had been designated under the Mutual Recognition Agreement is automatically a recognised conformity assessment body under this Protocol, on the date of entry into force of this Agreement.

## *Article 17*

### Communication

1.  Each Party shall identify contact points responsible for communications with the other Party related to any matter arising under this Protocol.

2.  The contact points may communicate by electronic mail, video-conferencing or other means on which they decide.

## *Article 18*

### Management of this Protocol

For the purposes of this Protocol, the functions of the Committee on Trade in Goods established under Article 26.2.1 (a) (Committees) include:

(a)  managing the implementation of this Protocol;

(b)  addressing any matter that a Party may raise related to this Protocol;

(c)      developing recommendations for amendments to this Protocol for consideration by the CETA Joint Committee;

(d)      taking any other step that the Parties consider will assist them in implementing this Protocol; and

(e)      reporting to the CETA Joint Committee on the implementation of this Protocol, as appropriate.

## ANNEX 1

### PRODUCT COVERAGE

(a)     Electrical and electronic equipment, including electrical installations and appliances, and related components;

(b)     Radio and telecommunications terminal equipment;

(c)     Electromagnetic compatibility (EMC);

(d)     Toys;

(e)     Construction products;

(f)     Machinery, including parts, components, including safety components, interchangeable equipment, and assemblies of machines;

(g)     Measuring instruments;

(h)     Hot-water boilers, including related appliances;

(i)     Equipment, machines, apparatus, devices, control components, protection systems, safety devices, controlling devices and regulating devices, and related instrumentation and prevention and detection systems for use in potentially explosive atmospheres (ATEX equipment);

(j)     Equipment for use outdoors as it relates to noise emission in the environment; and

(k)     Recreational craft, including their components.

## ANNEX 2

## PRIORITY CATEGORIES OF GOODS FOR CONSIDERATION FOR INCLUSION IN ANNEX 1 PURSUANT TO ARTICLE 1.2

(a)     Medical devices including accessories;

(b)     Pressure equipment, including vessels, piping, accessories and assemblies;

(c)     Appliances burning gaseous fuels, including related fittings;

(d)     Personal protective equipment;

(e)     Rail systems, subsystems and interoperability constituents; and

(f)     Equipment placed on board a ship

## ANNEX 3

## INFORMATION TO BE INCLUDED AS PART OF A DESIGNATION

The information that a Party must provide when designating a conformity assessment body is as follows:

(a)     in all cases:

    (i)     the scope of designation (not to exceed that body's scope of accreditation);

    (ii)     the accreditation certificate and the related scope of accreditation;

    (iii)     the body's address and contact information; and

(b)     when a Member State of the European Union designates a certification body, except for in regards to the technical regulations described in Article 15:

    (i)     the certification body's registered certification mark, including the qualifying statement[77]; and

(c)     when a Member State of the European Union designates a conformity assessment body in regards to technical regulations described in Article 15:

    (i)     in the case of a certification body:

        (A)     its unique identifier[78];

        (B)     an application for recognition signed by the body in accordance with CB-01 (Requirements for Certification Bodies), or its successor; and

        (C)     a cross reference checklist completed by the body with evidence that it meets the applicable recognition criteria in accordance with CB-02 (Recognition Criteria, and Administrative and Operational Requirements Applicable to Certification Bodies (CB) for the Certification of Radio Apparatus to Industry Canada's Standards and Specifications), or its successor; and

    (ii)     in the case of a testing laboratory:

        (A)     its unique identifier; and

        (B)     an application for recognition signed by the body in accordance with REC-LAB (Procedure for the Recognition of Designated Foreign Testing Laboratories by Industry Canada), or its successor; and

(d)     any other information as may be jointly decided upon by the Parties.

---

[77]     The qualifying statement normally takes the form of a small "c" placed beside the certification body's registered certification mark to indicate that a product conforms with applicable Canadian technical regulations.

[78]     A unique six-character identifier comprised of two letters (usually the ISO 3166 country code) followed by four numbers.

**Protocol on the mutual recognition of the compliance and enforcement programme regarding good manufacturing practices for pharmaceutical products**

*Article 1*

**Definitions**

1.　　For the purposes of this Protocol:

**certificate of GMP compliance** means a certificate issued by a regulatory authority attesting to the compliance of a manufacturing facility with Good Manufacturing Practices (GMP);

**equivalent authority** means a regulatory authority of a Party that is recognised as an equivalent authority by the other Party;

**manufacturing** includes fabrication, packaging, re-packaging, labelling, testing and storage;

**medicinal product or drug** means any product qualifying as a drug under the *Food and Drugs Act*, R.S.C., 1985, c. F-27 or qualifying as a medicinal product, whether it is a finished, intermediate or an investigational product or an active substance under the applicable legislation of the European Union;

**on-site evaluation** means a product-specific evaluation conducted in the context of a marketing application for a medicinal product or drug at the site of manufacture to assess the conformity of the premises where the medicinal product or drug is manufactured, the conformity of the process, conditions and control of manufacture with the information submitted, and to address any outstanding issues from the evaluation of the marketing application; and

**regulatory authority** means an entity in a Party that has the legal right, under the law of the Party, to supervise and control medicinal products or drugs within that Party.

2.　　Unless specified otherwise, where this Protocol refers to inspections, these references do not include on-site evaluations.

*Article 2*

**Objective**

The objective of this Protocol is to strengthen the cooperation between the authorities of the Parties in ensuring that medicinal products and drugs meet appropriate quality standards through the mutual recognition of certificates of GMP compliance.

*Article 3*

**Product scope**

This Protocol applies to all medicinal products or drugs to which GMP requirements apply in both Parties, as set out in Annex 1.

*Article 4*

**Recognition of regulatory authorities**

1.    The procedure for evaluating the equivalency of a new regulatory authority listed in Annex 2 shall be conducted in accordance with Article 12.

2.    Each Party shall ensure that a list of regulatory authorities that it recognises as equivalent, including any modifications, is publicly available.

*Article 5*

**Mutual recognition of certificates of GMP compliance**

1.    A Party shall accept a certificate of GMP compliance issued by an equivalent regulatory authority of the other Party, in conformity with paragraph 3, as demonstrating that the manufacturing facility, that is covered by the certificate and located in the territory of either Party, complies with the good manufacturing practices identified in the certificate.

2.    A Party may accept a certificate of GMP compliance issued by an equivalent regulatory authority of the other Party with respect to a manufacturing facility outside the territory of the Parties, in conformity with paragraph 3. A Party may determine the terms and conditions upon which it chooses to accept the certificate.

3.    A certificate of GMP compliance must identify:

   (a)    the name and address of the manufacturing facility;

   (b)    the date on which the equivalent regulatory authority that issued the certificate last inspected the manufacturing facility;

   (c)    the manufacturing processes and if relevant, medicinal products or drugs and dosage forms for which the facility is in compliance with good manufacturing practices; and

   (d)    the validity period of the certificate of GMP compliance.

4.    If an importer, an exporter or a regulatory authority of a Party requests a certificate of GMP compliance for a manufacturing facility that is certified by an equivalent authority of the other Party, the other Party shall ensure that the equivalent regulatory authority issues a certificate of GMP compliance:

   (a)    within 30 calendar days of the date on which the certifying authority received the request for the certificate, if a new inspection is not required; and

   (b)    within 90 calendar days of the date on which the certifying authority received the request for the certificate, if a new inspection is required, and the manufacturing facility passes the inspection.

*Article 6*

**Other recognition of certificates of GMP compliance**

1.    A Party may accept a certificate of GMP compliance with respect to a medicinal product or drug that is not included in paragraph 2 of Annex 1.

2.    A Party that accepts a certificate under paragraph 1 may determine the terms and conditions under which it will accept the certificate.

## Article 7

### Acceptance of batch certificates

1.    A Party shall accept a batch certificate issued by a manufacturer without re-control of that batch at import provided that:

   (a)   the products in the batch were manufactured in a manufacturing facility that has been certified as compliant by an equivalent regulatory authority;

   (b)   the batch certificate is consistent with the Content of the Batch Certificate for Medicinal Products of the *Internationally Harmonized Requirements for Batch Certification*; and

   (c)   the batch certificate is signed by the person responsible for releasing the batch for sale or supply.

2.    Paragraph 1 does not affect a Party's right to conduct official batch release.

3.    The person responsible for releasing the batch:

   (a)   of the finished medicinal product for sale or supply for manufacturing facilities in the European Union, must be a "qualified person" as defined in Article 48 of Directive 2001/83/EC and Article 52 of Directive 2001/82/EC; or

   (b)   for sale or supply of a drug for manufacturing facilities in Canada, is the person in charge of the quality control department as provided for by the *Food and Drugs Regulations*, C.R.C., c. 870, Part C, Division 2, section C.02.014.

## Article 8

### On-site evaluation

1.    A Party has the right to conduct its own on-site evaluation of a manufacturing facility that has been certified as compliant by an equivalent regulatory authority of the other Party.

2.    A Party, prior to conducting an on-site evaluation under paragraph 1, shall notify the other Party in writing and inform that other Party of the scope of the on-site evaluation. The Party shall endeavour to notify the other Party in writing at least 30 days before a proposed on-site evaluation, but may provide less notice in urgent situations. The other Party has the right to join the on-site evaluation conducted by the Party.

## Article 9

### Inspections and on-site evaluations at the request of a Party

1.    At the request of a Party, the other Party shall inspect a facility involved in the manufacturing process of a medicinal product or drug that is being imported into the territory of the requesting Party in order to verify that the facility is in compliance with good manufacturing practices.

2.  At the request of a Party, the other Party may conduct an on-site evaluation based on the assessment of data contained in a product submission dossier. The Parties may exchange relevant product information with respect to a request to conduct an on-site evaluation in accordance with Article 14.

## *Article 10*

### Safeguards

1.  A Party has the right to conduct its own inspection of a manufacturing facility that has been certified as compliant by an equivalent regulatory authority of the other Party. Recourse to this right should be an exception from the normal practice of the Party.

2.  A Party, prior to conducting an inspection under paragraph 1, shall notify the other Party in writing and shall inform the other Party of the reasons for conducting its own inspection. The Party shall endeavour to notify the other Party in writing at least 30 days before a proposed inspection, but may provide less notice in urgent situations. The other Party has the right to join the inspection conducted by the Party.

## *Article 11*

### Two-way alert programme and information sharing

1.  A Party shall, pursuant to the two-way alert programme under the GMP Administrative Arrangement referred to in Article 15.3:

    (a)  ensure that a restriction, suspension or withdrawal of a manufacturing authorisation that could affect the protection of public health is communicated from the relevant regulatory authority in its territory to the relevant regulatory authority in the territory of the other Party; and

    (b)  if relevant, proactively notify the other Party in writing of a confirmed report of a serious problem relating to a manufacturing facility in its territory, or as identified through an on-site evaluation or inspection in the territory of the other Party, including a problem related to quality defects, batch recalls, counterfeited or falsified medicinal products or drugs, or potential serious shortages.

2.  A Party shall, as part of the components of the information sharing process under the GMP Administrative Arrangement referred to in Article 15.3:

    (a)  respond to a special request for information, including a reasonable request for an inspection report or an on-site evaluation report; and

    (b)  ensure that, at the request of the other Party or of an equivalent authority of the other Party, an equivalent authority within its territory provides relevant information.

3.  A Party shall provide the other Party, through written notification, contact points for each equivalent authority in its territory.

*Article 12*

**Equivalence of new regulatory authorities**

1.  A Party ("requesting Party") may request that a regulatory authority in its territory that is not recognised as equivalent to regulatory authorities in the other Party ("evaluating Party"), be evaluated to determine whether it should be recognised as equivalent. Upon receiving the request, the evaluating Party shall conduct an evaluation pursuant to the procedure for evaluating new regulatory authorities under the GMP Administrative Arrangement referred to in Article 15.3.

2.  The evaluating Party shall evaluate the new regulatory authority by applying the components of a GMP compliance programme under the Administrative Arrangement referred to in Article 15.3. The components of a GMP compliance programme must include such elements as legislative and regulatory requirements, inspections standards, surveillance systems and a quality management system.

3.  If, upon completion of its evaluation, the evaluating Party determines that the new regulatory authority is equivalent, it shall notify the requesting Party in writing that it recognises the new regulatory authority as equivalent.

4.  If, upon completion of its evaluation, the evaluating Party determines that the new regulatory authority is not equivalent, the evaluating Party shall provide to the requesting Party a written justification demonstrating that it has well-founded reasons for not recognising that the new regulatory authority is equivalent. At the request of the requesting Party, the Joint Sectoral Group on Pharmaceuticals ("Joint Sectoral Group") referred to in Article 15 shall consider the evaluating Party's refusal to recognise the new regulatory authority as equivalent, and may provide recommendations to assist both Parties to resolve the matter.

5.  If, upon completion of its evaluation, the evaluating Party determines that the new regulatory authority is only equivalent for a more limited scope than that proposed by the requesting Party, the evaluating Party shall provide to the requesting Party a written justification demonstrating that it has well-founded reasons to determine that the new regulatory authority is only equivalent for the more limited scope. At the request of the requesting Party, the Joint Sectoral Group shall consider the evaluating Party's refusal to recognise the new regulatory authority as equivalent, and may provide recommendations to assist both Parties to resolve the matter.

6.  A regulatory authority recognised as equivalent under the *Agreement on Mutual Recognition Between the* European *Community and Canada*, done at London on 14 May 1998, is recognised as equivalent under this Agreement from its entry into force.

*Article 13*

**Equivalence maintenance programme**

1.  The Joint Sectoral Group shall develop an equivalence maintenance programme under the GMP Administrative Arrangement referred to in Article 15.3 to maintain the equivalence of the regulatory authorities. The Parties shall act in accordance with this programme when deciding whether to change the equivalence status of a regulatory authority.

2.     If the equivalence status of a regulatory authority changes, a Party may re-evaluate that regulatory authority. Any re-evaluation must be undertaken pursuant to the procedure set out in Article 12. The scope of re-evaluation shall be limited to the elements that caused the change of the equivalence status.

3.     The Parties shall exchange all the necessary information to ensure that both Parties remain confident that equivalent regulatory authorities are in fact equivalent.

4.     A Party shall inform the other Party before adopting changes to its technical guidance or regulations relating to good manufacturing practices.

5.     A Party shall inform the other Party of any new technical guidance, inspection procedures or regulations relating to good manufacturing practices.

## *Article 14*

### Confidentiality

1.     A Party shall not publicly disclose non-public and confidential technical, commercial or scientific information, including trade secrets and proprietary information that it has received from the other Party.

2.     A Party may disclose the information referred to in paragraph 1 if it deems such disclosure necessary to protect public health and safety. The other Party shall be consulted prior to disclosure.

## *Article 15*

### Management of the Protocol

1.     The Joint Sectoral Group, established under Article 26.2.1(a) (Committees), is composed of representatives from both Parties.

2.     The Joint Sectoral Group shall establish its composition and determine its rules and procedures.

3.     The Joint Sectoral Group shall conclude a GMP Administrative Arrangement to facilitate the effective implementation of this Protocol. The GMP Administrative Arrangement shall include:

    (a)    the terms of references of the Joint Sectoral Group;

    (b)    the two-way alert programme;

    (c)    the list of contact points responsible for matters arising under this Protocol;

    (d)    the components of the information sharing process;

    (e)    the components of a good manufacturing practices compliance programme;

    (f)    the procedure for evaluating new Regulatory authorities; and

    (g)    the equivalence maintenance programme.

4.     The Joint Sectoral Group may modify the GMP Administrative Arrangement if it considers it necessary.

5.      At the request of the Parties, the Joint Sectoral Group shall review the Annexes to this Protocol, and shall develop recommendations for amendments to these Annexes for consideration by the CETA Joint Committee.

6.      Pursuant to paragraph 5, the Joint Sectoral Group shall review the operational scope of medicinal products or drugs under paragraph 2 of Annex 1, with a view to including those medicinal products or drugs listed in paragraph 1 of Annex 1.

7.      The Parties shall establish the GMP Administrative Arrangement upon entry into force of the Agreement. This Arrangement is not subject to the provisions of Chapter Twenty-Nine (Dispute Settlement).

*Article 16*

**Fees**

1.      For the purposes of this Article, a fee includes a cost-recovery measure such as a user fee, a regulatory charge or an amount set under a contract.

2.      A Party shall have the right to determine a fee applicable to manufacturing facilities in its territory, including fees related to issuing certificates of GMP compliance and fees related to inspections or on-site evaluations.

3.      The fees charged to a manufacturing facility in case of an inspection or on-site evaluation conducted by a Party at the request of the other Party must be consistent with paragraph 2.

# ANNEX 1

## MEDICINAL PRODUCTS OR DRUGS

**Scope of medicinal products or drugs**

1.  This Protocol applies to the following medicinal products or drugs as defined in the legislation of the Parties referred to in Annex 3, provided that the GMP requirements and compliance programmes of both Parties, with respect to these medicinal products or drugs, are equivalent:

    (a)  human pharmaceuticals including prescription and non-prescription medicinal products or drugs and medicinal gases;

    (b)  human biologicals including immunologicals, stable medicinal products derived from human blood or human plasma, and biotherapeutics;

    (c)  human radiopharmaceuticals;

    (d)  veterinary pharmaceuticals, including prescription and non-prescription medicinal products or drugs, and pre-mixes for the preparation of veterinary medicated feeds;

    (e)  veterinary biologicals;

    (f)  if appropriate, vitamins, minerals, herbal remedies and homeopathic medicinal products;

    (g)  active pharmaceutical ingredients;

    (h)  intermediate products and bulk pharmaceuticals (for example, bulk tablets);

    (i)  products intended for use in clinical trials or investigational medicinal products; and

    (j)  advanced therapy medicinal products.

**Operational scope of medicinal products or drugs**

2.  Further to paragraph 1, the GMP requirements and compliance programmes of both Parties are equivalent for the following medicinal products or drugs:

    (a)  human pharmaceuticals including prescription and non-prescription medicinal products or drugs and medicinal gases;

    (b)  human biologicals including immunologicals and biotherapeutics;

    (c)  human radiopharmaceuticals;

    (d)  veterinary pharmaceuticals, including prescription and non-prescription medicinal products or drugs, and pre-mixes for the preparation of veterinary medicated feeds;

    (e)  intermediate products and bulk pharmaceuticals;

(f)    products intended for use in clinical trials or investigational medicinal products; manufactured by the manufacturers holding a manufacturing authorisation or establishment licence; and

(g)    vitamins, minerals and herbal remedies, homeopathic medicinal products (known in Canada as natural health products) manufactured by manufacturers holding a manufacturing authorisation or establishment licence, in the case of Canada.

## ANNEX 2

## REGULATORY AUTHORITIES

The Parties recognise the following entities, or their successors notified by a Party to the Joint Sectoral Group, as their respective regulatory authorities:

For the European Union:

| Country | For medicinal products for human use | For medicinal products for veterinary use |
|---|---|---|
| **Belgium** | Federal agency for medicines and health products / Federaal Agentschap voor geneesmiddelen en gezondheidsproducten/ Agence fédérale des médicaments et produits de santé | See responsible authority for human medicinal products |
| **Czech Republic** | State Institute for Drug Control / Státní ústav pro kontrolu léčiv (SÚKL) | Institute for State Control of Veterinary Biologicals andMedicaments/ Ústav pro státní kontrolu veterinárních biopreparátů a léčiv (ÚSKVBL) |
| **Republic of Croatia** | Agency for Medicinal Products and Medical Devices / Agencija za lijekove i medicinske proizvode (HALMED) | Ministry of Agriculture, Veterinary and Food Safety Directorate / Ministarstvo Poljoprivrede, Uprava za veterinarstvo i sigurnost hrane |
| **Denmark** | Danish Health and Medicines Authority / Laegemiddelstyrelsen | See responsible authority for human medicinal products |
| **Germany** | Federal Institute for Drugs and Medical Devices / | Federal Office for Consumer Protection and |

| | | |
|---|---|---|
| | Bundesinstitut für Arzneimittel und Medizinprodukte (BfArM)<br><br>Paul-Ehrlich-Institute (PEI), Federal Institute for Vaccines and Biomedicines / Paul-Ehrlich-Institut (PEI) Bundesinstitut für Impfstoffe und biomedizinische Arzneimittel | Food Safety /<br><br>Bundesamt für Verbraucherschutz und Lebensmittelsicherheit (BVL)<br><br>Federal Ministry of Food and Agriculture, Bundesministerium für Ernährung und Landwirtschaft |
| **Estonia** | State Agency of Medicines / Ravimiamet | See responsible authority for human medicinal products |
| **Greece** | National Organisation for Medicines /<br><br>Ethnikos Organismos Farmakon (EOF) - (ΕΘΝΙΚΟΣ ΟΡΓΑΝΙΣΜΟΣ ΦΑΡΜΑΚΩΝ)) | See responsible authority for human medicinal products |
| **Spain** | Spanish Agency of Medicines and Medical Devices /<br><br>Agencia Española de Medicamentos y Productos Sanitários | See responsible authority for human medicinal products |
| **France** | French National Agency for Medicines<br><br>Health Products Safety<br><br>Agence nationale de sécurité du médicament et des produits de santé (ANSM) | French agency for food, environmental and occupational health safety- *National Agency for Veterinary Medicinal Products/*<br><br>Agence Nationale de Sécurité Sanitaire de l'alimentation, de l'environnement et du travail-Agence Nationale du Médicament Vétérinaire (Anses-ANMV) |

| | | |
|---|---|---|
| **Ireland** | Health Products Regulatory Authority (HPRA) | See responsible authority for human medicinal products |
| **Italy** | *Italian Medicines Agency /* Agenzia Italiana del Farmaco | *Direction General for Animal Health and Veterinary Medicinal Products*<br><br>Ministero della Salute, Direzione Generale della Sanità Animale e dei Farmaci Veterinari |
| **Cyprus** | Ministry of Health - Pharmaceutical Services /<br><br>Φαρμακευτικές Υπηρεσίες, Υπουργείο Υγείας | Ministry of Agriculture, Rural Development and Environment-<br><br>Veterinary Services /<br><br>Κτηνιατρικές Υπηρεσίες-Υπουργείο Γεωργίας, Αγροτικής Ανάπτυξης και Περιβάλλοντος |
| **Latvia** | State Agency of Medicines /<br><br>Zāļu valsts aģentūra | Assessment and Registration Department of the Food and Veterinary Service/Pārtikas un veterinārā dienesta Novērtēšanas un reģistrācijas departaments |
| **Lithuania** | State Medicines Control Agency /<br><br>Valstybinė maisto ir veterinarijos tarnyba | State Food and Veterinary Service /<br><br>Valstybinės maisto ir veterinarijo tarnyba |
| **Luxembourg** | Minìstere de la Santé, Division de la Pharmacie et des Médicaments | See responsible authority for human medicinal products |
| **Hungary** | National Institute of Pharmacy /<br><br>Országos Gyógyszerészeti Intézet (OGYI) | National Food Chain Safety Office, Directorate of Veterinary Medicinal Products / Nemzeti Élelmiszerlánc-biztonsági Hivatal, |

| | | Állatgyógyászati Termékek Igazgatósága (ÁTI) |
|---|---|---|
| **Malta** | Medicines Regulatory Authority | Veterinary Medicines and Animal Nutrition section VMANS) (Veterinary Regulation Directorate (VRD) within<br><br>The Veterinary and Phytosanitary Regulation Department (VPRD) |
| **Netherlands** | Healthcare Inspectorate / Inspectie voor de Gezondheidszorg (IGZ) | Medicines Evaluation Board /<br><br>Bureau Diergeneesmiddelen, College ter Beoordeling van Geneesmiddelen (CBG)/ |
| **Austria** | Austrian Agency for Health and Food Safety /<br><br>Österreichische Agentur für Gesundheit und Ernährungssicherheit GmbH | See responsible authority for human medicinal products |
| **Poland** | The Main Pharmaceutical Inspectorate /<br><br>Główny Inspektorat Farmaceutyczny (GIF) / | See responsible authority for human medicinal products |
| **Portugal** | National Authority of Medicines and Health Products /<br><br>INFARMED, I.P<br><br>Autoridade Nacional do Medicamento e Produtos de Saúde, I.P | General Directorate of Food and Veterinary / DGAV - Direção Geral de Alimentação e Veterinária (PT) |
| **Slovenia** | Agency for Medicinal Products and Medical | See responsible authority for human medicinal |

| | | |
|---|---|---|
| | Devices of the Republic of Slovenia / Javna agencija Republike Slovenije za zdravila in medicinske pripomočke (JAZMP) | products |
| **Slovak Republic (Slovakia)** | State Institute for Drug Control / Štátny ústav pre kontrolu liečiv (ŚÚKL) | Institute for State Control of Veterinary Biologicals and Medicaments / Ústav štátnej kontroly veterinárnych biopreparátov a liečiv (USKVBL) |
| **Finland** | Finnish Medicines Agency / Lääkealan turvallisuus- ja kehittämiskeskus (FIMEA) | See responsible authority for human medicinal products |
| **Sweden** | Medical Products Agency / Läkemedelsverket | See responsible authority for human medicinal products |
| **United Kingdom** | Medicines and Healthcare products Regulatory Agency | Veterinary Medicines Directorate |
| **Bulgaria** | Bulgarian Drug Agency / изпълнителна агенция по лекарствата | Bulgarian Food Safety Agency / Българска агенция по безопасност на храните |
| **Romania** | National Agency for Medicines and Medical Devices / Agenţia Naţională a Medicamentului şi a Dispozitivelor Medicale | National Sanitary Veterinary and Food Safety Authority / Autoritatea Naţională Sanitară Veterinară şi pentru Siguranţa Alimentelor |

For Canada:

| | Health Canada | Health Canada |
|---|---|---|
| | | |

## ANNEX 3

## APPLICABLE LEGISLATION

For the European Union:

Directive 2001/83/EC of the European Parliament and of the Council of 6 November 2001 on the Community code relating to medicinal products for human use;

Directive 2001/82/EC of the European Parliament and of the Council of 6 November 2001 on the Community code relating to veterinary medicinal products;

Directive 2001/20/EC of European Parliament and of the Council of 4 April 2001 on the approximation of the laws, regulations and administrative provisions of the Member States relating to the implementation of good clinical practice in the conduct of clinical trials on medicinal products for human use;

Regulation (EU) 536/2014 of 16 April 2014 on clinical trials on medicinal products for human use, and repealing Directive 2001/20/EC;

Commission Directive 2003/94/EC of 8 October 2003 laying down the principles and guidelines of good manufacturing practice in respect of medicinal products for human use and investigational medicinal products for human use;

Commission Directive 91/412/EEC of 23 July 1991 laying down the principles and guidelines of good manufacturing practice for veterinary medicinal products;

Commission delegated Regulation (EU) 1252/2014 of 28 May 2014 of the European Parliament and of the Council with regard to principles and guidelines of good manufacturing practice for active substances for medicinal products for human use;

Current version of the Guide to good manufacturing practices contained in volume IV of Rules governing medicinal products in the European Union and compilation of the community procedures on inspections and exchange of information;

For Canada:

*Food and Drugs Act*, R.S.C., 1985, c. F-27.

# ANNEX I

## Headnote

### Reservations for existing measures and liberalisation commitments

1.  The Schedule of a Party to this Annex sets out, under Articles 8.14 (Reservations and exceptions), 9.7 (Reservations), 14.4 (Reservations), and, for the European Union, Article 13.10 (Reservations and exceptions), the reservations taken by that Party with respect to existing measures that do not conform with obligations imposed by:

    (a)  Articles 8.6 (National treatment), 9.3 (National treatment) or, for the European Union, Article 13.3 (National treatment);

    (b)  Articles 8.7 (Most-favoured-nation treatment), 9.5 (Most-favoured-nation treatment) or, for the European Union, Article 13.4 (Most-favoured-nation treatment);

    (c)  Articles 8.4 (Market access), 9.6 (Market access) or, for the European Union, Article 13.6 (Market access);

    (d)  Article 8.5 (Performance requirements);

    (e)  Article 8.8 (Senior management and boards of directors) or, for the European Union, Article 13.8 (Senior management and boards of directors);

    (f)  For the European Union, Article 13.7 (Cross-border supply of financial services); or

    (g)  Article 14.3 (Obligations);

    and, in certain cases, sets out commitments for immediate or future liberalisation.

2.  The reservations of a Party are without prejudice to the rights and obligations of the Parties under the GATS.

3.  Each reservation sets out the following elements:

    (a)  **Sector** refers to the general sector in which the reservation is taken;

    (b)  **Sub-Sector** refers to the specific sector in which the reservation is taken;

    (c)  **Industry Classification** refers, where applicable, to the activity covered by the reservation according to the CPC, ISIC rev 3.1, or as expressly otherwise described in a Party's reservation;

    (d)  **Type of Reservation** specifies the obligation referred to in paragraph 1 for which a reservation is taken;

    (e)  **Level of Government** indicates the level of government maintaining the measure for which a reservation is taken;

    (f)  **Measures** identifies the laws or other measures, as qualified, where indicated, by the **Description** element, for which the reservation is taken. A measure cited in the **Measures** element:

        (i)  means the measure as amended, continued or renewed as of the date of entry into force of this Agreement;

(ii)   includes any subordinate measure adopted or maintained under the authority of and consistent with the measure; and

(iii)   includes:

(A)   for a European Union Directive, any laws or other measures which implement the Directive at Member State level; and

(B)   for Canada, any laws or other measures at the national or sub-national level that implement agreements between the federal government and the provinces and territories; and

(g)   **Description** sets out the non-conforming aspects of the existing measure for which the reservation is taken. It may also set out commitments for liberalisation.

4.   In the interpretation of a reservation, all elements of the reservation shall be considered. A reservation shall be interpreted in the light of the relevant obligations of the Chapters, against which the reservation is taken. To the extent that:

(a)   the **Measures** element is qualified by a liberalisation commitment from the **Description** element, the **Measures** element as so qualified shall prevail over all other elements; and

(b)   the **Measures** element is not so qualified, the **Measures** element shall prevail over other elements, unless a discrepancy between the **Measures** element and the other elements considered in their totality is so substantial and material that it would be unreasonable to conclude that the **Measures** element prevails, in which case the other elements shall prevail to the extent of that discrepancy.

5.   Where a Party maintains a measure that requires that a service supplier be a natural person, citizen, permanent resident or resident of its territory as a condition to the supply of a service in its territory, a reservation for that measure taken with respect to cross-border trade in services shall operate as a reservation with respect to investment, to the extent of that measure.

6.   A reservation for a measure that requires a service supplier be a natural person, citizen, permanent resident, or resident of its territory as a condition to the supply of a financial service in its territory taken with respect to Article 13.7 (Cross-border supply of financial services) shall operate as a reservation with respect to Articles 13.3 (National treatment), 13.4 (Most-favoured-nation treatment), 13.6 (Market access), and 13.8 (Senior management and boards of directors), e extent of that to th .measure.

7.   For the purposes of this Annex, including each Party's Schedule to this Annex:

**ISIC rev 3.1** means the International Standard Industrial Classification of all Economic Activities as set out in Statistical Office of the United Nations, Statistical Papers, Series M, N° 4, *ISIC rev 3.1*, 2002.

8.   The following abbreviations are used in the European Union's Schedule to this Annex:

AT   Austria

BE   Belgium

729

BG   Bulgaria

CY   Cyprus

CZ   Czech Republic

DE   Germany

DK   Denmark

EU   European Union

ES   Spain

EE   Estonia

FI   Finland

FR   France

EL   Greece

HR   Croatia

HU   Hungary

IE   Ireland

IT   Italy

LV   Latvia

LT   Lithuania

LU   Luxembourg

MT   Malta

NL   Netherlands

PL   Poland

PT   Portugal

RO   Romania

SK   Slovakia

SI   Slovenia

SE   Sweden

UK   United Kingdom

**Schedule of Canada - Federal**

**Reservations applicable in Canada
(applicable in all Provinces and Territories)**

**Reservation I-C-1**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>Performance requirements<br>National treatment<br>Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | *Investment Canada Act*, R.S.C. 1985, c. 28 (1st Supp.)<br>*Investment Canada Regulations*, S.O.R./85-611 |
| **Description:** | **Investment** |

1. Except as set out in paragraphs 3 and 7, the Director of Investments will review a direct "acquisition of control", as defined in the *Investment Canada Act*, of a Canadian business by an investor of the European Union if the value of the Canadian business is not less than CAD $1.5 billion, adjusted in accordance with the applicable methodology in January of each subsequent year as set out in the *Investment Canada Act*.

2. Notwithstanding the definition of "investor" in Article 8.1 (Definitions), only investors who are nationals of the European Union or entities controlled by nationals of the European Union as provided for in the *Investment Canada Act* may benefit from the higher review threshold.

3. The higher threshold in paragraph 1 does not apply to a direct acquisition of control by a state-owned enterprise of a Canadian business. Such acquisitions are subject to review by the Director of Investments if the value of the Canadian business is not less than CAD $369 million in 2015, adjusted in accordance with the applicable methodology in January of each subsequent year as set out in the *Investment Canada Act*.

4. An investment subject to review under the *Investment Canada Act* may not be implemented unless the Minister

responsible for the *Investment Canada Act* advises the applicant that the investment is likely to be of net benefit to Canada. This determination is made in accordance with six factors described in the Act, summarised as follows:

(a)  the effect of the investment on the level and nature of economic activity in Canada, including the effect on employment, on the use of parts, components and services produced in Canada and on exports from Canada;

(b)  the degree and significance of participation by Canadians in the investment;

(c)  the effect of the investment on productivity, industrial efficiency, technological development and product innovation in Canada;

(d)  the effect of the investment on competition within an industry in Canada;

(e)  the compatibility of the investment with national industrial, economic and cultural policies, taking into consideration industrial, economic and cultural policy objectives enunciated by the government or legislature of a province likely to be significantly affected by the investment; and

(f)  the contribution of the investment to Canada's ability to compete in world markets.

5.  In making a net benefit determination, the Minister, through the Director of Investments, may review plans under which the applicant demonstrates the net benefit to Canada of the proposed acquisition. An applicant may also submit undertakings to the Minister in connection with a proposed acquisition that is the subject of review. In the event of noncompliance with an undertaking by an applicant, the Minister may seek a court order directing compliance or any other remedy authorised under the *Investment Canada Act*.

6.  A non-Canadian who establishes or acquires a Canadian business, other than those that are subject to review, as described above, must notify the Director of Investments.

7.  The review thresholds set out in paragraphs 1 and 3, do not apply to an acquisition of a cultural business.

8.  In addition, the specific acquisition or establishment of a new business in designated types of business activities relating to Canada's cultural heritage or national identity, which are normally notifiable, may be subject to review if the Governor in Council authorises a review in the public

732

interest.

9. An indirect "acquisition of control" of a Canadian business by an investor of the European Union other than a cultural business is not reviewable.

10. Notwithstanding Article 8.5 (Performance requirements), Canada may impose a requirement or enforce a commitment or undertaking in connection with the establishment, acquisition, expansion, conduct, operation, or management of any investment of an investor of the European Union or of a third country for the transfer of technology, production process or other proprietary knowledge to a national or enterprise, affiliated to the transferor, in Canada in connection with the review of an acquisition of an investment under the *Investment Canada Act*.

11. Except for requirements, commitments or undertakings relating to technology transfer as set out in paragraph 10 of this reservation, Article 8.5 (Performance requirements) applies to requirements, commitments or undertakings imposed or enforced under the *Investment Canada Act*.

12. For the purposes of this reservation, a "non-Canadian" means an individual, government or agency thereof or an entity that is not Canadian; and "Canadian" means a Canadian citizen or permanent resident, a government in Canada or agency thereof, or a Canadian-controlled entity as described in the *Investment Canada Act*.

733

**Reservation I-C-2**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment<br>Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | As set out in the **Description** element |
| **Description:** | **Investment** |

1. Canada or a province or territory, when selling or disposing of its equity interests in, or the assets of, an existing government enterprise or an existing governmental entity, may prohibit or impose limitations on the ownership of such interests or assets and on the ability of owners of such interests or assets to control a resulting enterprise by investors of the European Union or of a third country or their investments. With respect to such a sale or other disposition, Canada or a province or territory may adopt or maintain a measure relating to the nationality of senior management or members of the board of directors.

2. For the purposes of this reservation:

   (a) a **measure** maintained or adopted after the date of entry into force of this Agreement that, at the time of sale or other disposition, prohibits or imposes a limitation on the ownership of equity interests or assets or imposes a nationality requirement described in this reservation is an existing measure; and

   (b) **government enterprise** means an enterprise owned or controlled through ownership interests by Canada or a province or territory, and includes an enterprise established after the date of entry into force of this Agreement solely for the purposes of selling or disposing of equity interests in, or the assets of, an existing state enterprise or governmental entity.

**Reservation I-C-3**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | National |
| **Measures:** | *Canada Business Corporations Act*, R.S.C. 1985, c. C-44<br>*Canada Business Corporations Regulations, 2001*, S.O.R./2001-512<br>*Canada Cooperatives Act*, S.C. 1998, c. 1<br>*Canada Cooperatives Regulations,* S.O.R./99-256 |
| **Description:** | **Investment** |

1. A corporation may place constraints on the issue, transfer and ownership of shares in a federally incorporated corporation. The object of those constraints is to permit a corporation to meet Canadian ownership or control requirements, under certain laws set out in the *Canada Business Corporations Regulations, 2001*, in sectors where Canadian ownership or control is required as a condition to receive licences, permits, grants, payments or other benefits. In order to maintain certain Canadian ownership levels, a corporation is permitted to sell shareholders' shares without the consent of those shareholders, and to purchase its own shares on the open market.

2. The *Canada Cooperatives Act* provides that constraints may be placed on the issue or transfer of investment shares of a cooperative to persons not resident in Canada, to permit cooperatives to meet Canadian ownership requirements to obtain a licence to carry on a business, to become a publisher of a Canadian newspaper or periodical or to acquire investment shares of a financial intermediary and in sectors where ownership or control is a required condition to receive licences, permits, grants, payments and other benefits. Where the ownership or control of investment shares would adversely affect the ability of a cooperative to maintain a level of Canadian ownership or control, the *Canada Cooperatives Act* provides for the limitation of the number of investment shares that may be owned or for the prohibition of the ownership of investment shares.

3. For the purposes of this reservation **Canadian** means "Canadian" as defined in the *Canada Business Corporations Regulations, 2001* or in the *Canada Cooperatives Regulations*.

**Reservation I-C-4**

**Sector:**                         All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**            National treatment
                                    Senior management and boards of directors

**Level of Government:**            National

**Measures:**                       *Canada Business Corporations Act*, R.S.C. 1985, c. C-44
                                    *Canada Business Corporations Regulations, 2001*, S.O.R./2001-512
                                    *Canada Cooperatives Act*, S.C. 1998, c. 1
                                    *Canada Cooperatives Regulations*, S.O.R./99-256
                                    *Canada Corporations Act*, R.S.C. 1970, c. C-32
                                    Special Acts of Parliament incorporating specific companies

**Description:**                    **Investment**

1. The *Canada Business Corporations Act* requires, for most federally incorporated corporations, that 25 per cent of directors be resident Canadians and, if such corporations have fewer than four directors, at least one director must be a resident Canadian. As provided in the *Canada Business Corporations Regulations, 2001*, a simple majority of resident Canadian directors is required for corporations in the following sectors: uranium mining; book publishing or distribution; book sales, if the sale of books is the primary part of the corporation's business; and film or video distribution. Similarly, corporations that, by an Act of Parliament or Regulation, are individually subject to minimum Canadian ownership requirements are required to have a majority of resident Canadian directors.

2. For the purposes of the *Canada Business Corporations Act*, **resident Canadian** means an individual who is a Canadian citizen ordinarily resident in Canada, a Canadian citizen who is not ordinarily resident in Canada who is a member of a class set out in the *Canada Business Corporations Regulations, 2001*, or a "permanent resident" as defined in the *Immigration and Refugee Protection Act*, S.C. 2001, c. 27, other than a permanent resident who has been ordinarily resident in Canada for more than one year after becoming eligible to apply for Canadian citizenship.

3.  In the case of a holding corporation, not more than one-third of the directors need to be resident Canadians if the earnings in Canada of the holding corporation and its subsidiaries are less than five per cent of the gross earnings of the holding corporation and its subsidiaries.

4.  The *Canada Cooperatives Act* requires that not less than two-thirds of the directors be members of the cooperative. At least 25 per cent of directors of a cooperative must be resident in Canada; if a cooperative has only three directors, at least one director must be resident in Canada.

5.  For the purposes of the *Canada Cooperatives Act*, a **resident of Canada** is defined in the *Canada Cooperatives Regulations* as an individual who is a Canadian citizen and who is ordinarily resident in Canada; a Canadian citizen who is not ordinarily resident in Canada and who is a member of a class set out in the *Canada Cooperatives Regulations*, or a "permanent resident" as defined in the *Immigration and Refugee Protection Act,* other than a permanent resident who has been ordinarily resident in Canada for more than one year after becoming eligible to apply for Canadian citizenship.

738

## Reservation I-C-5

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | *Citizenship Act*, R.S.C. 1985, c. C-29 |
| | *Foreign Ownership of Land Regulations*, S.O.R./79-416 |
| **Description:** | **Investment** |

1. The *Foreign Ownership of Land Regulations* are made pursuant to the *Citizenship Act* and the *Agricultural and Recreational Land Ownership Act,* R.S.A. 1980, c. A-9. In Alberta, an ineligible person or foreign owned or controlled corporation may only hold an interest in controlled land consisting of a maximum of two parcels containing, in the aggregate, a maximum of 20 acres.

2. For the purposes of this reservation:

**ineligible person** means:

   (a) a natural person who is not a Canadian citizen or permanent resident;

   (b) a foreign government or foreign government agency; or

   (c) a corporation incorporated in a country other than Canada; and

**controlled land** means land in Alberta, but does not include:

   (a) land of the Crown in right of Alberta;

   (b) land within a city, town, new town, village or summer village; and

   (c) mines or minerals.

**Reservation I-C-6**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | National |

**Measures:**   *Air Canada Public Participation Act*, R.S.C. 1985, c. 35 (4th Supp.)
*Canadian Arsenals Limited Divestiture Authorization Act*, S.C. 1986, c. 20
*Eldorado Nuclear Limited Reorganization and Divestiture Act*, S.C. 1988, c. 41
*Nordion and Theratronics Divestiture Authorization Act*, S.C. 1990, c. 4

**Description:**   **Investment**

1. A "non-resident" or "non-residents" may not own more than a specified percentage of the voting shares of the corporation to which each Act applies. For some companies the restrictions apply to individual shareholders, while for others the restrictions may apply in the aggregate. If there are limits on the percentage that an individual Canadian investor can own, these limits also apply to non-residents. The restrictions are as follows:

   Air Canada: 25 per cent in the aggregate;
   Cameco Limited (formerly Eldorado Nuclear Limited): 15 per cent per non-resident natural person, 25 per cent in the aggregate;
   Nordion International Inc.: 25 per cent in the aggregate;
   Theratronics International Limited: 49 per cent in the aggregate; and
   Canadian Arsenals Limited: 25 per cent in the aggregate.

2. For the purposes of this reservation, **non-resident** includes:

   (a) a natural person who is not a Canadian citizen and not ordinarily resident in Canada;

   (b) a corporation incorporated, formed or otherwise organised outside Canada;

(c) the government of a foreign State or a political subdivision of a government of a foreign State, or a person empowered to perform a function or duty on behalf of such a government;

(d) a corporation that is controlled directly or indirectly by a person or an entity referred to in subparagraphs (a) through (c);

(e) a trust:

    (i) established by a person or an entity referred to in subparagraphs (b) through (d), other than a trust for the administration of a pension fund for the benefit of natural persons the majority of whom are resident in Canada; or

    (ii) in which a person or an entity referred to in subparagraphs (a) through (d) has more than 50 per cent of the beneficial interest; and

(f) a corporation that is controlled directly or indirectly by a trust referred to in sub-paragraph (e).

**Reservation I-C-7**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | National |
| **Measures:** | *Export and Import Permits Act*, R.S.C. 1985, c. E-19 |
| **Description:** | **Cross-Border Trade in Services** |

Only a natural person ordinarily resident in Canada, an enterprise with its head office in Canada or a branch office in Canada of a foreign enterprise may apply for and be issued an import or export permit or transit authorisation certificate for a good or related service subject to controls under the *Export and Import Permits Act*.

**Reservation I-C-8**

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment<br>Most-favoured-nation treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | |
| **Description:** | **Cross-Border Trade in Services and Investment** |

1.  Canada reserves the right to maintain a measure with respect to the provision of social services not otherwise reserved under its Reservation II-C-9 in respect of social services.

2.  This reservation against most-favoured-nation treatment does not apply to the provision of private education services.

**Reservation I-C-9**

| | |
|---|---|
| **Sector:** | Communication services |
| **Sub-Sector:** | Telecommunications transport networks and services radiocommunications |
| **Industry Classification:** | CPC 752 |
| **Type of Reservation:** | Market access<br>National treatment<br>Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | *Telecommunications Act*, S.C. 1993, c. 38<br>*Canadian Telecommunications Common Carrier Ownership and Control Regulations*, S.O.R./94-667<br>*Radiocommunications Act*, R.S.C. 1985, c. R-2<br>*Radiocommunication Regulations*, S.O.R./96-484 |
| **Description:** | **Investment** |

1.  Foreign investment in facilities-based telecommunications service suppliers is restricted to a maximum, cumulative total of 46.7 per cent voting interest, based on 20 per cent direct investment and 33.3 per cent indirect investment.

2.  Facilities-based telecommunications service suppliers must be controlled in fact by Canadians.

3.  At least 80 per cent of the members of the board of directors of facilities-based telecommunications service suppliers must be Canadians.

4.  Notwithstanding the restrictions described above:

    (a) foreign investment is allowed up to 100 per cent for suppliers conducting operations under an international submarine cable licence;

    (b) mobile satellite systems of a foreign service supplier may be used by a Canadian service supplier to provide services in Canada;

    (c) fixed satellite systems of a foreign service supplier may be used to provide services between points in Canada and all points outside Canada;

(d)    foreign investment is allowed up to 100 per cent for suppliers conducting operations under a satellite authorisation; and

(e)    foreign investment is allowed up to 100 per cent for facilities-based telecommunications service suppliers that have revenues, including those of its affiliates, from the supply of telecommunications services in Canada representing less than 10 per cent of the total telecommunications services revenues in Canada.

**Reservation I-C-10**

| | |
|---|---|
| **Sector:** | Transport services |
| **Sub-Sector:** | Customs brokers<br>Other supporting and auxiliary transport services |
| **Industry Classification:** | CPC 749 |
| **Type of Reservation:** | Market access<br>National treatment<br>Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | *Customs Act*, R.S.C. 1985, c. 1 (2nd Supp.)<br>*Customs Brokers Licensing Regulations*, S.O.R./86-1067 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

To be a licenced customs broker in Canada:

(a) a natural person must be a Canadian national;

(b) a corporation must be incorporated in Canada with a majority of its directors being Canadian nationals; and

(c) a partnership must be composed of persons who are Canadian nationals, or corporations incorporated in Canada with a majority of their directors being Canadian nationals.

## Reservation I-C-11

| | |
|---|---|
| **Sector:** | Distribution services |
| **Sub-Sector:** | Duty free shops |
| **Industry Classification:** | CPC 631, 632 (limited to duty-free shops) |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | National |
| **Measures:** | *Customs Act*, R.S.C. 1985, c. 1 (2nd Supp.)<br>*Duty Free Shop Regulations*, S.O.R./86-1072 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  To be a licenced duty free shop operator at a land border crossing in Canada, a natural person must:

    (a) be a Canadian national;

    (b) be of good character;

    (c) be principally resident in Canada; and

    (d) have resided in Canada for at least 183 days of the year preceding the year of application for the licence.

2.  To be a licenced duty free shop operator at a land border crossing in Canada, a corporation must:

    (a) be incorporated in Canada; and

    (b) have all of its shares beneficially owned by Canadian nationals who meet the requirements of paragraph 1.

**Reservation I-C-12**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Examination services relating to the export and import of cultural property |
| | Museum services except for historical sites and buildings (limited to cultural property examination services) |
| **Industry Classification:** | CPC 96321, 87909 (limited to cultural property examination services) |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | National |
| **Measures:** | *Cultural Property Export and Import Act*, R.S.C. 1985, c. C-51 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  Only a resident of Canada or an institution in Canada may be designated as an expert examiner of cultural property for the purposes of the *Cultural Property Export and Import Act*.

2.  For the purposes of this reservation:

 (a) **institution** means an entity that is publicly owned and operated solely for the benefit of the public, that is established for educational or cultural purposes and that conserves objects and exhibits them; and

 (b) **resident of Canada** means a natural person who is ordinarily resident in Canada, or a corporation that has its head office in Canada or maintains an establishment in Canada to which employees employed in connection with the business of the corporation ordinarily report for work.

**Reservation I-C-13**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Patent agents<br>Patent agents providing legal advisory and representation services |
| **Industry Classification:** | CPC 8921 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | *Patent Act*, R.S.C. 1985, c. P-4<br>*Patent Rules*, S.O.R./96-423 |
| **Description:** | **Cross-Border Trade in Services** |

To represent a person in the prosecution of a patent application or in other business before the Patent Office, a patent agent must be resident in Canada and registered by the Patent Office.

**Reservation I-C-14**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Trade-mark agents<br>Trade-mark agents providing legal advisory and representation services in statutory procedures |
| **Industry Classification:** | CPC 8922 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | *Trade-marks Act*, R.S.C. 1985, c. T-13<br>*Trade-marks Regulations*, S.O.R./96-195 |
| **Description:** | **Cross-Border Trade in Services** |

To represent a person in the prosecution of an application for a trade-mark or in other business before the Trade-marks Office, a trade-mark agent must be resident in Canada and registered by the Trade-marks Office.

**Reservation I-C-15**

| | |
|---|---|
| **Sector:** | Energy (oil and gas) |
| **Sub-Sector:** | Crude petroleum and natural gas industries<br>Services incidental to mining |
| **Industry Classification:** | CPC 120, 883 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | *Canada Petroleum Resources Act*, R.S.C. 1985, c. 36 (2nd Supp.)<br>*Territorial Lands Act*, R.S.C. 1985, c. T-7<br>*Federal Real Property and Federal Immovables Act*, S.C. 1991, c. 50<br>*Canada-Newfoundland Atlantic Accord Implementation Act*, S.C. 1987, c. 3<br>*Canada-Nova Scotia Offshore Petroleum Resources Accord Implementation Act*, S.C. 1988, c. 28 |
| **Description:** | **Investment** |

1. This reservation applies to production licences issued for "frontier lands" and "offshore areas" (areas not under provincial jurisdiction) as defined in the applicable measures.

2. A person who holds an oil and gas production licence or shares therein must be a corporation incorporated in Canada.

## Reservation I-C-16

| | |
|---|---|
| **Sector:** | Energy (oil and gas) |
| **Sub-Sector:** | Crude petroleum and natural gas industries<br>Services incidental to mining |
| **Industry Classification:** | CPC 120, 883 |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | National |

**Measures:** *Canada Oil and Gas Production and Conservation Act*, R.S.C. 1985, c. O-7, as amended by the *Canada Oil and Gas Operations Act*, S.C. 1992, c. 35

*Canada - Nova Scotia Offshore Petroleum Resources Accord Implementation Act*, S.C. 1988, c. 28

*Canada - Newfoundland Atlantic Accord Implementation Act*, S.C. 1987, c. 3

Measures implementing the Canada-Yukon Oil and Gas Accord, including the *Canada-Yukon Oil and Gas Accord Implementation Act*, 1998, c.5, s. 20 and the *Oil and Gas Act*, RSY 2002, c. 162

Measures implementing the Northwest Territories Oil and Gas Accord, including implementing measures that apply to or are adopted by Nunavut as the successor territories to the former Northwest Territories

Measures implementing the Canada-Quebec Gulf of St. Lawrence Petroleum Resources Accord

**Description:** **Investment and Cross-Border Trade in Services**

1. Under the *Canada Oil and Gas Operations Act*, a "benefits plan" must be approved by the Minister in order to be authorised to proceed with an oil and gas development project.

2. A **benefits plan** means a plan for the employment of Canadians and for providing Canadian manufacturers, consultants, contractors and service companies with a full and fair opportunity to participate on a competitive basis in the supply of goods and services used in proposed work or activity referred to in the benefits plan.

3. The benefits plan contemplated by the *Canada Oil and Gas Operations Act* permits the Minister to impose on the

752

applicant an additional requirement to ensure that disadvantaged individuals or groups have access to training and employment opportunities or can participate in the supply of goods and services used in proposed work referred to in the benefits plan.

4. Provisions continuing those set out in the *Canada Oil and Gas Operations Act* are included in laws which implement the Canada-Yukon Oil and Gas Accord.

5. Provisions continuing those set out in the *Canada Oil and Gas Operations Act* will be included in laws or regulations to implement accords with various provinces and territories, including implementing legislation by provinces and territories (for example, the Northwest Territories Oil and Gas Accord, the Canada-Quebec Gulf of St. Lawrence Petroleum Resources Accord, and the New Brunswick Oil and Gas Accord). For the purposes of this reservation these accords and implementing legislation shall be deemed, once concluded, to be existing measures.

6. The *Canada-Nova Scotia Offshore Petroleum Resources Accord Implementation Act* and the *Canada-Newfoundland Atlantic Accord Implementation Act* have the same requirement for a benefits plan but also require that the benefits plan ensures that:

   (a) the corporation or other body submitting the plan establishes in the applicable province an office where appropriate levels of decision-making are to take place, prior to carrying out work or an activity in the offshore area;

   (b) expenditures be made for research and development to be carried out in the province, and for education and training to be provided in the province; and

   (c) first consideration be given to goods produced or services provided from within the province, where those goods or services are competitive in terms of fair market price, quality and delivery.

7. The Boards administering the benefits plan under these Acts may also require that the plan include provisions to ensure that disadvantaged individuals or groups, or corporations owned or cooperatives operated by them, participate in the supply of goods and services used in proposed work or activity referred to in the plan.

753

8.   In addition, Canada may impose a requirement or enforce a commitment or undertaking for the transfer of technology, a production process or other proprietary knowledge to a person of Canada in connection with the approval of development projects under the applicable Acts.

**Reservation I-C-17**

| | |
|---|---|
| **Sector:** | Energy (oil and gas) |
| **Sub-Sector:** | Crude petroleum and natural gas industries<br>Services incidental to mining |
| **Industry Classification:** | CPC 120, 883 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | National |
| **Measures:** | *Canada-Newfoundland Atlantic Accord Implementation Act*, S.C. 1987, c. 3<br>*Hibernia Development Project Act*, S.C. 1990, c. 41 |
| **Description:** | **Investment** |

1. Under the *Hibernia Development Project Act*, Canada and the Hibernia Project Owners may enter into agreements. Those agreements may require the Project Owners to undertake to perform certain work in Canada and Newfoundland and to use their best efforts to achieve specific Canadian and Newfoundland target levels in relation to the provisions of a "benefits plan" required under the *Canada-Newfoundland Atlantic Accord Implementation Act*. "Benefits plans" are further described in Canada's Reservation I-C-16.

2. In addition, Canada may, in connection with the Hibernia Project, impose a requirement or enforce a commitment or undertaking for the transfer of technology, a production process or other proprietary knowledge to a national or enterprise in Canada.

**Reservation I-C-18**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Uranium mines<br>Services incidental to mining |
| **Industry Classification:** | CPC 883 |
| **Type of Reservation:** | National treatment<br>Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | *Investment Canada Act*, R.S.C. 1985, c. 28 (1st Supp.)<br>*Investment Canada Regulations*, S.O.R./85-611<br>*Non-Resident Ownership Policy in the Uranium Mining Sector*, 1987 |

**Description:**          **Investment**

1. Ownership by "non-Canadians", as defined in the *Investment Canada Act*, of a uranium mining property is limited to 49 per cent at the stage of first production. Exceptions to this limit may be permitted if it can be established that the property is in fact "Canadian controlled", as defined in the *Investment Canada Act*.

2. Exemptions from the *Non-Resident Ownership Policy in the Uranium Mining Sector* are permitted, subject to approval of the Governor in Council, only in cases where Canadian participants in the ownership of the property are not available. Investments in properties by non-Canadians, made prior to December 23, 1987 and that are beyond the permitted ownership level, may remain in place. No increase in non-Canadian ownership is permitted.

3. In considering a request for an exemption from the Policy from an investor of the European Union, Canada will not require that it be demonstrated that a Canadian partner cannot be found.

## Reservation I-C-19

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing |
| **Industry Classification:** | CPC 862 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | *Bank Act*, S.C. 1991, c. 46<br>*Insurance Companies Act*, S.C. 1991, c. 47<br>*Cooperative Credit Associations Act*, S.C. 1991, c. 48<br>*Trust and Loan Companies Act*, S.C. 1991, c. 45 |
| **Description:** | **Cross-Border Trade in Services** |

1. Banks are required to have a firm of accountants to be auditors of the bank. A firm of accountants must be qualified as set out in the *Bank Act*. Among the qualifications required is that two or more members of the firm must be ordinarily resident in Canada and that the member of the firm jointly designated by the firm and the bank to conduct the audit must be ordinarily resident in Canada.

2. An insurance company, a cooperative credit association, and a trust or loan company require an auditor who can either be a natural person or a firm of accountants. An auditor of such an institution must be qualified as set out in the *Insurance Companies Act*, the *Cooperative Credit Associations Act* or the *Trust and Loan Companies Act*. If a natural person is appointed to be the auditor of such a financial institution, among the qualifications required is that the person must be ordinarily resident in Canada. If a firm of accountants is appointed to be the auditor of such a financial institution, the member of the firm jointly designated by the firm and the financial institution to conduct the audit must be ordinarily resident in Canada.

## Reservation I-C-20

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Air transport services (passenger and freight)<br>"Specialty air services" (as set out in the **Description** element below)<br>Courier services |
| **Industry Classification:** | CPC 73, 7512, "specialty air services" (as set out in the **Description** element below) |
| **Type of Reservation:** | Market access<br>National treatment<br>Senior management and board of directors |
| **Level of Government:** | National |
| **Measures:** | *Canada Transportation Act*, S.C. 1996, c. 10<br>*Aeronautics Act*, R.S.C. 1985, c. A-2<br>*Canadian Aviation Regulations*, S.O.R./96-433:<br>    Part II, Subpart 2 - "Aircraft Markings and Registration";<br>    Part IV "Personnel Licensing and Training"; and<br>    Part VII "Commercial Air Services" |
| **Description:** | **Investment** |

1. The *Canada Transportation Act,* in section 55, defines "Canadian" in the following manner:

2. "... 'Canadian' means a Canadian citizen or a permanent resident within the meaning of subsection 2(1) of the *Immigration and Refugee Protection Act*, a government in Canada or an agent of such a government or a corporation or other entity that is incorporated or formed under the laws of Canada or a province, that is controlled in fact by Canadians and of which at least seventy-five per cent, or such lesser percentage as the Governor in Council may by regulation specify, of the voting interests are owned and controlled by Canadians…"

3. Regulations made under the *Aeronautics Act* incorporate by reference the definition of "Canadian" found in the *Canada Transportation Act*. These Regulations require that a Canadian operator of commercial air services operate Canadian-registered aircraft. These Regulations require an operator to be Canadian in order to obtain a Canadian Air Operator Certificate and to qualify to register aircraft as

"Canadian".

4.  Only Canadians may provide the following commercial air transportation services:

    (a)  domestic services (air services between points, or from and to the same point, in the territory of Canada, or between a point in the territory of Canada and a point not in the territory of another country);

    (b)  scheduled international services (scheduled air services between a point in the territory of Canada and a point in the territory of another country) where those services have been reserved to Canadian carriers under existing or future air services agreements;

    (c)  non-scheduled international services (non-scheduled air services between a point in the territory of Canada and a point in the territory of another country) where those services have been reserved to Canadian carriers under the *Canada Transportation Act*; and

    (d)  specialty air services include aerial mapping, aerial surveying, aerial photography, forest fire management, fire-fighting, aerial advertising, glider towing, parachute jumping, aerial construction, heli-logging, aerial inspection, aerial surveillance, flight training, aerial sightseeing and aerial crop spraying.

5.  No foreign individual is qualified to be the registered owner of a Canadian-registered aircraft.

6.  Further to the *Canadian Aviation Regulations*, a corporation incorporated in Canada, but that does not meet the Canadian ownership and control requirements, may only register an aircraft for private use where a significant majority of use of the aircraft (at least 60 per cent) is in Canada.

7.  The *Canadian Aviation Regulations* also have the effect of limiting foreign-registered private aircraft registered to non-Canadian corporations to be present in Canada for a maximum of 90 days per twelve-month period. The foreign-registered private aircraft shall be limited to private use, as would be the case for Canadian-registered aircraft requiring a private operating certificate.

**Reservation I-C-21**

**Sector:** Transport

**Sub-Sector:** Aircraft repair and maintenance services
Ground handling services (line maintenance only) as defined in the Chapters on Cross-Border Trade in Services and Investment

**Industry Classification:** "Aircraft repair and maintenance services" and "ground handling service" (line maintenance only), as defined in Articles 8.1 (Investment - Definitions) and 9.1 (Cross-Border Trade in Services)

**Level of Government:** National

**Type of Reservation:** National treatment
Market access

**Measures:** *Aeronautics Act*, R.S.C. 1985, c. A-2
*Canadian Aviation Regulations*, S.O.R./96-433:
　　Part IV "Personnel Licensing and Training";
　　Part V "Airworthiness";
　　Part VI "General Operating and Flight Rules"; and
　　Part VII "Commercial Air Services"

**Description:** **Cross-Border Trade in Services**

Aircraft and other aeronautical product repair, overhaul or maintenance activities (including line maintenance) required to maintain the airworthiness of Canadian-registered aircraft and other aeronautical products must be performed by persons meeting Canadian aviation regulatory requirements (that is, approved maintenance organisations and aircraft maintenance engineers). Certifications are not provided for persons located outside Canada, except sub-organisations of approved maintenance organisations that are located in Canada.

**Reservation I-C-22**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Scheduled and non-scheduled passenger and freight transportation by road, including courier services. |
| **Industry Classification:** | CPC 7121, 7122, 7123, 7512 |
| **Level of Government:** | National |
| **Type of Reservation:** | National treatment<br>Market access |
| **Measures:** | *Motor Vehicle Transport Act*, R.S.C. 1985, c. 29 (3rd Supp.), as amended by S.C. 2001, c. 13.<br>*Canada Transportation Act*, S.C. 1996, c. 10<br>*Customs Tariff*, S.C. 1997, c. 36 |
| **Description:** | **Cross-Border Trade in Services** |

**Cross-Border Trade in Services**

Only persons of Canada using Canadian-registered and either Canadian-built or duty-paid trucks or buses, may provide truck or bus services between points in the territory of Canada.

**Reservation I-C-23**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Water transport services (passengers and freight) by sea-going and non-sea-going vessels<br>Supporting and other services for water transport, Construction for waterways, harbors, dams and other water works<br>Any other commercial marine activity undertaken from a vessel |
| **Industry Classification:** | CPC 721, 722, 745, 5133, 5223, and any other commercial marine activity undertaken from a vessel |
| **Level of Government:** | National |
| **Type of Reservation:** | National treatment<br>Market access<br>Obligations |
| **Measures:** | *Canada Shipping Act, 2001*, S.C. 2001, c. 26 |

**Description:**      **Investment, Cross-Border Trade in Services, and International Maritime Transport Services**

1. To register a vessel in Canada, the owner of that vessel or the person who has exclusive possession of that vessel must be:

   (a) a Canadian citizen or a permanent resident" within the meaning of subsection 2(1) of the *Immigration and Refugee Protection Act*,

   (b) a corporation incorporated under the law of Canada or a province or territory; or

   (c) when the vessel is not already registered in another country, a corporation incorporated under the laws of a country other than Canada if one of the following is acting with respect to all matters relating to the vessel, namely:

        (i) a subsidiary of the corporation that is incorporated under the law of Canada or a province or territory;

        (ii) an employee or director in Canada of any branch office of the corporation that is carrying on business in Canada; or

762

        (iii) a ship management company incorporated under the law of Canada or a province or territory.

2. A vessel registered in a foreign country which has been bareboat chartered may be listed in Canada for the duration of the charter while the vessel's registration is suspended in its country of registry, if the charterer is:

    (a) a Canadian citizen or permanent resident, as defined in subsection 2(1) of the *Immigration and Refugee Protection Act*; or

    (b) a corporation incorporated under the law of Canada or a province or territory.

**Reservation I-C-24**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Water transport services (passengers and freight) by sea-going and non-sea-going vessels<br>Supporting and other services for water transport, Construction for waterways, harbors, dams and other water works<br>Any other commercial marine activity undertaken from a vessel |
| **Industry Classification:** | CPC 721, 722, 745, 5133, 5223, and any other commercial marine activity undertaken from a vessel |
| **Level of Government:** | National |
| **Type of Reservation:** | National treatment<br>Market access<br>Obligations |
| **Measures:** | *Canada Shipping Act, 2001*, S.C. 2001, c. 26<br>*Marine Personnel Regulations*, S.O.R./2007-115 |

**Description:**

**Cross-Border Trade in Services, and International Maritime Transport Services**

Masters, mates, engineers and certain other seafarers must hold a certificate granted by the Minister of Transport as a requirement of service on Canadian registered vessels. These certificates may be granted only to Canadian citizens or permanent residents.

**Reservation I-C-25**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Pilotage and berthing services |
| **Industry Classification:** | CPC 74520 |
| **Level of Government:** | National |
| **Type of Reservation:** | National treatment<br>Market access<br>Obligations |
| **Measures:** | *Pilotage Act*, R.S.C. 1985, c. P-14<br>*General Pilotage Regulations*, S.O.R./2000-132<br>*Atlantic Pilotage Authority Regulations*, C.R.C. c. 1264<br>*Laurentian Pilotage Authority Regulations*, C.R.C. c. 1268<br>*Great Lakes Pilotage Regulations*, C.R.C. c. 1266<br>*Pacific Pilotage Regulations*, C.R.C. c. 1270 |
| **Description:** | **Cross-Border Trade in Services, and International Maritime Transport Services** |

Subject to Canada's Reservation II-C-15, a licence or a pilotage certificate issued by the relevant regional Pilotage Authority is required to provide pilotage services in the compulsory pilotage waters of the territory of Canada. Only a Canadian citizen or permanent resident may obtain a licence or pilotage certificate. A permanent resident of Canada who has been issued a pilot's licence or pilotage certificate must become a Canadian citizen within five years of receipt of that licence or pilotage certificate in order to retain it.

**Reservation I-C-26**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Transportation services by sea-going and non-sea-going vessels |
| **Industry Classification:** | CPC 721, 722 |
| **Level of Government:** | National |
| **Type of Reservation:** | Most-favoured-nation treatment<br>Obligations |
| **Measures:** | *Coasting Trade Act*, S.C. 1992, c. 31 |
| **Description:** | **Cross-Border Trade in Services, and International Maritime Transport Services** |

The prohibitions under the *Coasting Trade Act*, set out in Canada's Reservation II-C-14, do not apply to any vessel that is owned by the Government of the United States of America, when used solely for the purpose of transporting goods owned by the Government of the United States of America from the territory of Canada to supply Distant Early Warning sites.

**Reservation I-C-27**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Scheduled or non-scheduled passenger transportation by road |
| **Industry Classification:** | CPC 7121, 7122 |
| **Level of Government:** | National |
| **Type of Reservation:** | Market access<br>National treatment |
| **Measures:** | *Motor Vehicle Transport Act*, R.S.C. 1985, c. 29 (3rd Supp.), as amended by S.C. 2001, c. 13 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Provincial agencies have been delegated authority to permit persons to provide extra-provincial (inter-provincial and cross-border) bus services in their respective provinces and territories on the same basis as local bus services. Most provincial agencies permit the provision of local bus services on the basis of a public convenience and necessity test.

**Reservation I-C-28**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | All transportation sub-sectors |
| **Industry Classification:** | CPC 7 |
| **Level of Government:** | National |
| **Type of Reservation:** | Market access |
| **Measures:** | *Canada Transportation Act*, S.C. 1996, c. 10 |
| **Description:** | **Investment** |

Pursuant to the *Canada Transportation Act*, any proposed transaction that involves a transportation undertaking that raises issues with respect to the public interest as it relates to national transportation as determined by the Minister requires approval by the Governor in Council.

**Reservation I-C-29**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Postal services, mail transportation by any mode of transport. |
| **Industry Classification:** | CPC 71124, 71235, 7321, 7511 |
| **Level of Government:** | National |
| **Type of Reservation:** | Market access |
| **Measures:** | *Canada Post Corporation Act,* R.S.C. 1985, c. C-10<br>*Letter Definition Regulations,* S.O.R./83-481 |

**Description:**    **Investment and Cross-Border Trade in Services**

The sole and exclusive privilege of collecting, transmitting and delivering "letters" within Canada, as defined in the *Letter Definition Regulations* is reserved for the postal monopoly.

For greater certainty, activities relating to the sole and exclusive privilege may also be restricted, including the issuance of postage stamps and the installation, erection or relocation in a public place of a mail receptacle or device to be used for the collection, delivery or storage of mail.

**Schedule of Canada – Provincial and Territorial**
**Reservations applicable in Alberta**

**Reservation I-PT-1**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting<br>Auditing and bookkeeping services |
| **Industry Classification:** | CPC 862 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Regulated Accounting Profession Act***,** R.S.A. 2000, c. R-12<br>*Certified General Accountants Regulation*, Alta. Reg. 176/2001<br>*Certified Management Accountants Regulation*, Alta. Reg. 177/2001<br>*Chartered Accountants Regulation,* Alta. Reg. 178/2001 |
| **Description:** | **Cross-Border Trade in Services** |

An applicant for registration as a regulated member must provide proof of Canadian citizenship or proof of having been lawfully admitted to and entitled to work in Canada. Each office in Alberta of a registrant engaged in a public accounting practice shall be under the personal charge and management of a member who shall normally be accessible to meet the needs of clients during such times as the office is open to the public.

**Reservation I-PT-2**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Veterinary Profession Act*, R.S.A. 2000, c. V-2<br>*General Regulation*, Alta. Reg. 44/86 |
| **Description:** | **Cross-Border Trade in Services** |

Only Canadian citizens or persons lawfully admitted into and entitled to work in Canada may be approved for registration by the Registration Committee, upon production of satisfactory evidence to this effect.

**Reservation I-PT-3**

| | |
|---|---|
| **Sector:** | Real estate |
| **Sub-Sector:** | Real estate services involving own or leased property or on a fee or contract basis |
| **Industry Classification:** | CPC 821, 822, 81331 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Real Estate Act*, R.S.A. 2000, c. R-5 |
| **Description:** | **Cross-Border Trade in Services** |

Service suppliers are authorised through a brokerage which must maintain a registered business office in the Province.  The registered business office must be: the location from which the person conducts business; under the control of the service supplier; and the location of the records required to be maintained by the Act.

**Reservation I-PT-4**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Land surveying |
| **Industry Classification:** | CPC 8675 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Land Surveyors Act*, R.S.A. 2000, c. L-3 |
| **Description:** | **Investment** |
| | Services that are provided through a corporation, commercial presence must take the form of a surveyor's corporation. |

**Reservation I-PT-5**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107, 643, 88411 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Gaming and Liquor Act*, R.S.A. 2000, c. G-1<br>*Gaming and Liquor Regulation,* Alta. Reg. 143/96<br>Alberta Gaming and Liquor Commission Board Policies |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The above measures permit Alberta to control the manufacture, import, sale, purchase, possession, storage, transportation, use and consumption of liquor, including through permits and licences that may include citizenship, residency and other limitations on the establishment, operation and provision of these activities.

**Reservation I-PT-6**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Land<br>Services incidental to agriculture |
| **Industry Classification:** | CPC 8811 (other than rental of agricultural equipment with operator), 531 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Provincial Parks Act*, R.S.A. 2000, c. P-35<br>*Provincial Parks (Dispositions) Regulations*, Alta. Reg. 241/77<br>*Provincial Parks (General) Regulation,* Alta. Reg. 102/85<br>*Dispositions and Fees Regulation*, Alta. Reg. 54/2000<br>*Special Areas Disposition Regulation*, Alta. Reg. 137/2001<br>*Declaration Regulation*, Alta. Reg. 195/2001<br>*Forest Reserves Regulation*, Alta. Reg. 42/2005 |
| **Description:** | **Investment**<br><br>Dispositions of Crown land, including within provincial parks are limited to residents of Alberta who are Canadian citizens or permanent residents within the meaning of the *Immigration and Refugee Protection Act*, S.C. 2001, c. 27. |

**Reservation I-PT-7**

| | |
|---|---|
| **Sector:** | Hunting |
| **Sub-Sector:** | Services incidental to hunting<br>Own-account hunting guides<br>Other cultural services |
| **Industry Classification:** | CPC 0297, 8813, 96419, 9633 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Wildlife Act*, R.S.A. 2000, c. W-10<br>*Wildlife Regulation*, Alta. Reg. 143/97 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Citizenship or permanent residency requirements may be imposed as a condition for designations, permits or licences relating to guiding and outfitting for wildlife hunting. Citizenship or permanent residency requirements may also be imposed as a condition for permits or licences for zoo-keeping, taxidermy, tanning, fur dealing or fur management.

**Reservation I-PT-8**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport services<br>Passenger transportation |
| **Industry Classification:** | CPC 7121, 7122 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Motor Transport Act,* R.S.A. 2000, c. M-21<br>*Motor Vehicle Administration Act,* R.S.A. 2000, M-23 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A public convenience and needs test may be imposed prior to approving a licence to provide interurban bus transport and non-scheduled/scheduled services, including applying some or all of the following criteria: adequacy of current levels of service; market conditions establishing the requirement for expanded service; effect of new entrants on public convenience, including the continuity and quality of service, and the fitness, willingness and ability of the applicant to provide proper service.

**Reservation I-PT-9**

**Sector:**                        All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**           National treatment
                                   Performance requirements

**Level of Government:**           Provincial – Alberta

**Measures:**                      Industrial benefits policy

**Description:**                   **Investment and Cross-Border Trade in Services**

Performance requirements may be imposed on applicants (such as a first consideration being given to service suppliers from within Alberta or Canada, if competitive in terms of price and quality) in the case of all large scale projects requiring Industrial Development, Forest Management, Oil Sands, Power Plant or Gas Plant and Coal Development Permits.

**Reservation I-PT-10**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Business Corporations Act***,** R.S.A. 2000, c. B-9<br>*Business Corporations Regulation*, Alta. Reg. 118/2000<br>*Companies Act*, R.S.A. 2000, c. C-21<br>*Cooperatives Act*, S.A. 2001, c. C-28.1<br>*Partnership Amendment Act*, R.S.A. 2000 (Supp.), c. P-25<br>*Societies Act*, R.S.A. 2000, c. S-14 |
| **Description:** | **Investment** |

1. At least 25 per cent of the directors of an Alberta corporation must be resident Canadians.

2. For the purposes of these measures, "resident Canadian" means an individual who is:

   (a) a Canadian citizen ordinarily resident in Canada;

   (b) a Canadian citizen, not ordinarily resident in Canada, who is a member of a prescribed class of persons; or

   (c) a permanent resident within the meaning of the *Immigration and Refugee Protection Act*, S.C. 2001, c. 27 and ordinarily resident in Canada.

**Reservation I-PT-11**

**Sector:**                        All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**           Market access
                                   National treatment

**Level of Government:**           Provincial – Alberta

**Measures:**                      *Land Titles Act*, R.S.A. 2000, c. L-4
                                   *Agricultural and Recreational Land Ownership Act*, R.S.A. 2000, c. A-9
                                   *Regulations Respecting the Ownership of Agricultural and Recreational Land in Alberta*, Alta. Reg. 160/79
                                   *Public Lands Act*, R.S.A. 2000, c. P-40

**Description:**                   **Investment**

                                   Public lands cannot be sold to:

(a) a person who is not a Canadian citizen or a permanent resident as defined in the *Immigration and Refugee Protection Act,* S.C. 2001, c. 27;

(b) a corporation that is not a Canadian corporation; or

(c) a person or corporation acting as a trustee for a person who is not a Canadian citizen or a permanent resident as defined in the *Immigration and Refugee Protection Act*, or for a corporation that is not a Canadian corporation.

**Reservation I-PT-12**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access<br>National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Gaming and Liquor Act*, R.S.A. 2000, c. G-1<br>*Horse Racing Alberta Act*, RSA 2000, c. H-11.3<br>*Gaming and Liquor Regulation*, Alta. Reg. 143/1996<br>Alberta Gaming and Liquor Commission Board Policies |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The above measures permit Alberta to regulate and authorise services, suppliers of services, manufacturing, suppliers of materials, operations and repairs relating to lottery schemes, gaming terminals, games of chance, races, bingo and casinos, and similar activities including through permits and licences that may include citizenship, residency and other limitations on the establishment, operation and provision of these activities.

**Reservation I-PT-13**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to animal husbandry |
| **Industry Classification:** | CPC 8812 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Stray Animals Act*, R.S.A. 2000, c. S-20<br>*Horse Capture Regulation*, Alta. Reg. 59/94 |
| **Description:** | **Cross-Border Trade in Services** |

Only a Canadian citizen or a person lawfully admitted into Canada for permanent residence may apply for, obtain or hold a licence to capture, bait, chase, pursue, follow after or on the trail of or stalk horses on public land in Alberta designated for the licenced capture of horses.

**Reservations applicable in British Columbia**

**Reservation I-PT-14**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging products |
| **Industry Classification:** | CPC 03 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Forest Act,* R.S.B.C. 1996, c. 157 |
| **Description:** | **Investment** |

All timber harvested from provincial land must be either used in the Province or manufactured within the Province into other goods. However, the Province may authorise an exemption to this requirement if the timber is surplus to the requirements of processing facilities in the Province, if it cannot be processed economically near the harvesting area and cannot be transported economically to another facility in the Province, or if an exemption would prevent waste or improve the utilisation of the wood.

**Reservation I-PT-15**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | CPC 8611 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Evidence Act,* R.S.B.C. 1996, c. 124 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A person must be a Canadian citizen or a permanent resident to be appointed as a commissioner for taking affidavits.

**Reservation I-PT-16**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting, auditing and bookkeeping |
| **Industry Classification:** | CPC 862 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Accountants (Certified General) Act,* R.S.B.C. 1996. c. 2 |
| | *Accountants (Chartered) Act*, R.S.B.C. 1996, c. 3 |
| | *Accountants (Management) Act,* R.S.B.C. 1996, c. 4 |

**Description:**     **Investment**

Accounting offices must be under the management of a resident of British Columbia.

**Reservation I-PT-17**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |

**Industry Classification:**

**Type of Reservation:**     National treatment
Senior management and boards of directors

**Level of Government:**     Provincial – British Columbia

**Measures:**     *Cooperative Association Act,* S.B.C. 1999, c. 28
*Society Act*, R.S.B.C. 1996, c. 433

**Description:**     **Investment**

1.  Under the *Cooperative Association Act*, the majority of directors of an association incorporated under the Act must be resident Canadians and at least one director must be resident in the Province.

2.  Under the *Society Act*, at least one director of a society incorporated under the Act must be resident in the Province.

**Reservation I-PT-18**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Lawyers and notaries |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Notaries Act*, R.S.B.C. 1996, c. 334 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Only Canadian citizens or permanent residents of Canada may be certified as a notary public in British Columbia. The *Notaries Act* puts limitations on the ability of notaries to provide services through a notary corporation. Trust funds must be held by regulated provincial or federal financial institutions.

**Reservation I-PT-19**

| | |
|---|---|
| **Sector:** | Tourism |
| **Sub-Sector:** | Services incidental to hunting (hunting guides; outfitters; angling guides)<br>Services incidental to fishing<br>Travel agency, tour operator and tourist guides |
| **Industry Classification:** | CPC 8813, 882, 96419 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Wildlife Act*, R.S.B.C. 1996, c. 488 |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Only Canadian citizens or permanent residents of Canada are eligible to be issued guide outfitter and angling guide licences. |

**Reservation I-PT-20**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Other professional services<br>Forestry and logging products<br>Services incidental to forestry and logging |
| **Industry Classification:** | CPC Other, 03, 8814 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Foresters Act,* S.B.C. 2003, c. 19 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

In order to obtain registration as a professional forester, at least 24 months of relevant work experience must first be gained in British Columbia. In some cases, professional foresters already registered in other Canadian jurisdictions are exempt from this requirement.

**Reservation I-PT-21**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Services incidental to manufacturing<br>Christmas tree permits<br>Log salvage permits<br>Woodlot licences |
| **Industry Classification:** | CPC 03, 8814 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Forest Act,* R.S.B.C. 1996, c. 157 |
| **Description:** | **Investment** |

1.  Only Canadian citizens, permanent residents, or a corporation controlled by persons who are Canadian citizens or permanent residents of Canada, may be granted a Christmas tree permit.

2.  Only Canadian citizens or landed immigrants may apply for log salvage permits.

3.  Only Canadian citizens, permanent residents, or a corporation, other than a society, that is controlled by persons who are Canadian citizens or permanent residents may apply for woodlot licences.

4.  Proximity of private residence from the proposed woodlot licence, and distance and size of private land to be included in the proposed woodlot are two of the criteria used to award a licence.

**Reservation I-PT-22**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging |
| **Industry Classification:** | CPC 03 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Forest Act*, R.S.B.C. 1996, c. 157 |

**Description:**    **Investment**

1.  Only the following entities may enter into a community forest agreement:

   (a)  A society incorporated under the *Society Act,* R.S.B.C. 1996, c.433;

   (b)  An association as defined in the *Cooperative Association Act*, S.B.C. 1999, c. 28;

   (c)  A corporation, if the corporation is established by or under an enactment, or registered as an extra-provincial company under the *Business Corporations Act*, S.B.C. 2002, c. 57;

   (d)  A partnership, if the partnership is comprised of municipalities or regional districts, societies, associations, companies or extra-provincial companies, or a combination of the foregoing; or

   (e)  A municipality or regional district.

2.  Community forest agreements may be directly awarded.

**Reservation I-PT-23**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Products of agriculture<br>Horticulture and market gardening<br>Services incidental to agriculture (other than rental of agricultural equipment with operator)<br>Services incidental to animal husbandry |
| **Industry Classification:** | CPC 01, 8811 (other than rental of agricultural equipment with operator), 8812 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Range Act,* S.B.C. 2004, c. 71 |
| **Description:** | **Investment**<br><br>An applicant who can demonstrate local presence shall be given preference in the granting of grazing licences and permits. |

**Reservation I-PT-24**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging |
| **Industry Classification:** | CPC 03 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Forest Act*, R.S.B.C. 1996, c. 157 |
| **Description:** | **Investment** |

An applicant may be required to commit to the establishment of a manufacturing facility to qualify for a forest licence.

**Reservation I-PT-25**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging |
| **Industry Classification:** | CPC 03 |
| **Type of Reservation:** | Market access<br>National treatment<br>Performance requirements |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Forest Act,* R.S.B.C. 1996, c. 157 |
| **Description:** | **Investment** |

The granting of a community salvage licence is limited to specific groups, notably societies and cooperative associations, for purposes such as providing social and economic benefits to British Columbia, contributing to government revenues, providing opportunities for achieving a range of community objectives, including employment and other social, environmental and economic benefits, encouraging cooperation within the community and among stakeholders, providing for the use of qualifying timber, and other factors that the Minister or a person authorised by the Minister specifies in the invitation or advertising.

**Reservation I-PT-26**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging |
| **Industry Classification:** | CPC 03 |
| **Type of Reservation:** | Market access<br>Performance requirements |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Forest Act,* R.S.B.C. 1996, c. 157 |
| **Description:** | **Investment** |

Only a limited number of restricted forest licences are granted. The granting of such licences may be subject to performance requirements, including the requirement to own or lease processing facilities in the Province.

**Reservation I-PT-27**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment<br>Performance requirements |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Land Act,* R.S.B.C. 1996, c. 245<br>Ministry of Forest and Range Policy - Grazing Lease Policy dated November 15, 2004 |
| **Description:** | **Investment** |

1. The *Land Act* restricts Crown grants to Canadian citizens and to permanent residents. Crown land may also be granted in some circumstances to a government corporation, municipality, regional district, hospital board, university, college, board of education, francophone education authority as defined in the *School Act,* R.S.B.C. 1996, c. 412, other government related body or to the South Coast British Columbia Transportation Authority continued under the *South Coast British Columbia Transportation Authority Act*, S.B.C. 1998, c. 30, or any of its subsidiaries.

2. Only Canadian citizens may hold grazing lease tenures. Performance requirements are imposed on companies as a condition for the granting of grazing lease tenures.

**Reservation I-PT-28**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fish and other fishing products<br>Services incidental to fishing<br>Land |
| **Industry Classification:** | CPC 04, 531, 882 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Fisheries Act,* R.S.B.C. 1996, c. 149<br>*Land Act*, R.S.B.C. 1996, c. 245 |
| **Description:** | **Investment** |

Only a citizen or permanent resident of Canada is entitled to a Crown grant for aquaculture operations, unless the person's application for a disposition of Crown land was allowed prior to May 1, 1970.

**Reservation I-PT-29**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Services incidental to fishing<br>Wholesale trade services |
| **Industry Classification:** | CPC 04, 62112, 62224, 882 |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Fisheries Act*, R.S.B.C. 1996, c. 149<br>*Commercial Fisheries and Mariculture: A Policy for the 1980s* |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Residency, citizenship and performance requirements may be imposed as a condition of licensing to undertake the harvesting of fish, marine plants or wild oysters, or to undertake fish processing, buying or brokering. Offshore processing or processing at sea is limited to fishermen who process their own catches and if the fish species cannot be economically processed in existing shore based facilities.

**Reservation I-PT-30**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport services<br>Passenger transportation |
| **Industry Classification:** | CPC 7121, 7122 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Passenger Transportation Act,* S.B.C. 2004, c. 39<br>*Motor Vehicle Act,* R.S.B.C. 1996, c. 318 |

**Description:**    **Investment**

1. The *Passenger Transportation Act* requires a person to obtain a passenger transportation licence from the Passenger Transportation Board to provide taxi or intercity bus services in British Columbia. The Board may approve an application for a licence if the Board considers that:

    (a)    there is a public need for the service;

    (b)    the applicant is "fit and proper" and capable of providing the service; and

    (c)    the application, if granted, would promote sound economic conditions in the passenger transportation business in British Columbia.

2. The Passenger Transportation Board has the power to impose terms and conditions on a licence. If the licence is to include an authorisation to operate motor vehicles as intercity buses, the terms and conditions of the licence include routes and minimum route frequencies for that operation. If the licence is to include an authorisation to operate motor vehicles as passenger directed vehicles (such as taxis and limousines), the terms and conditions of the licence include fleet size, rates and geographic operating area.

### Reservation I-PT-31

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport services: public transit |
| **Industry Classification:** | CPC 7121, 7122 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *British Columbia Transit Act,* R.S.B.C. 1996, c. 38 <br> *South Coast British Columbia Transportation Authority Act,* S.B.C. 1998, c. 30 |

**Description:**  **Investment**

1.  British Columbia Transit is a Crown corporation with the exclusive authority to plan, acquire, and construct public passenger transportation systems that support regional growth strategies, official community plans and the economic development of the transit service areas in all areas of British Columbia, except the transportation service region supported by the South Coast British Columbia Transportation Authority.

2.  The South Coast British Columbia Transportation Authority has exclusive authority to provide a regional transportation system for all municipalities and rural areas located in the Greater Vancouver Regional District that moves people and goods, and supports the regional growth strategy, provincial and regional environmental objectives (including air quality and greenhouse gas emission reduction objectives), and the economic development of the transportation service region.

**Reservation I-PT-32**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *BC Hydro Public Power Legacy and Heritage Contract Act,*<br>S.B.C. 2003. c. 86<br>*Clean Energy Act,* S.B.C. 2010, c. 22<br>*Utilities Commission Act,* R.S.B.C. 1996, c. 473<br>*Hydro and Power Authority Act,* R.S.B.C. 1996, c. 212 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  In British Columbia, electric utilities operate as regulated monopoly distributors of electricity within the area they service.

2.  British Columbia Hydro and Power Authority ("BC Hydro") is a Crown corporation that owns most of the generation, transmission and distribution facilities in British Columbia. BC Hydro receives differential treatment under provincial law and is exempted from British Columbia Utilities Commission review in some instances. BC Hydro is prohibited from disposing of (including by way of sale) any of its heritage assets, unless they are no longer used or useful.

3.  Subject to direction from the Lieutenant Governor in Council, rates for the sale of electricity within the Province are regulated by the British Columbia Utilities Commission.

**Reservation I-PT-33**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Free miner |
| **Industry Classification:** | CPC 8675 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Mineral Tenure Act,* R.S.B.C. 1996, c. 292 |
| **Description:** | **Cross-Border Trade in Services** |

To obtain a free miner certificate a person must be a resident of Canada for at least 183 days in each calendar year, or be authorised to work in Canada, or be a Canadian corporation or a partnership consisting of qualified individuals or Canadian corporations.

**Reservations applicable in Manitoba**

**Reservation I-PT-34**

| | |
|---|---|
| **Sector:** | Community and personal services |
| **Sub-Sector:** | Funeral<br>Cremation and undertaking services |
| **Industry Classification:** | CPC 9703 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Prearranged Funeral Services Act*, C.C.S.M. c. F-200 |
| **Description:** | **Cross-Border Trade in Services** |

Anyone supplying prearranged funeral plans, on a for-profit basis, must have a licence. Only a person who regularly carries on the business of supplying funeral services and maintains an establishment in Manitoba for this purpose may apply for such a licence. Prearranged funeral plans can only be offered through the establishment associated with the licence.

**Reservation I-PT-35**

| | |
|---|---|
| **Sector:** | Service of membership organizations |
| **Sub-Sector:** | Legal documentation and certification |
| **Industry Classification:** | CPC 8613, 95910 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Marriage Act*, C.C.S.M. c. M-50<br>Policy Respecting Residency or Citizenship of Appointees |
| **Description:** | **Cross-Border Trade in Services** |

Under *The Marriage Act*, the Minister responsible may appoint a person as a marriage commissioner for the Province, or any part thereof specified by the Minister, and that person may solemnize ceremonies of marriage in accordance with the tenor of the appointment. The Minister may afford preferential treatment to Canadian citizens or permanent residents of Manitoba.

**Reservation I-PT-36**

| | |
|---|---|
| **Sector:** | Education |
| **Sub-Sector:** | Other education services |
| **Industry Classification:** | CPC 9290 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Manitoba Registered Music Teachers' Association Incorporation Act*, R.S.M. 1990, c. 100 |
| **Description:** | **Cross-Border Trade in Services** |

No person may be admitted as a member of the Manitoba Registered Music Teachers' Association and thus use the title "Registered Music Teacher", unless that person can demonstrate six months' prior residence in Manitoba.

**Reservation I-PT-37**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Community Development Bonds Act*, C.C.S.M. c. C-160 |
| **Description:** | Investment |

1. All directors of a community development bond corporation must be residents of Manitoba. Incorporators of the corporation must be residents of the municipality in which the corporation's head office is located or of a municipality nearby.

2. If the Government of Manitoba has provided a guarantee of the bond, only eligible bondholders may call on the guarantee. Eligible bondholders are those with a connection to Manitoba or Canada when they purchased the bond: for example, individuals resident in Manitoba, a Manitoba corporation established under the *Canada Business Corporations Act,* R.S.C., 1985, c. C-44, a corporation with a head office in Manitoba, a trust if the majority of trustees or beneficiaries are residents in Manitoba, or a Manitoba municipality.

3. The proceeds raised from the issue of community development bonds must be invested in "eligible businesses". These are corporations or co-operatives:

   (a) incorporated under *The Corporations Act*, C.C.S.M., c. C225 or the *Canada Business Corporations Act* or *The Co-operatives Act,* C.C.S.M., c. C223, as the case may be;

   (b) that carry on or are about to carry on business, on a for-profit basis, in Manitoba; and

   (c) the Manitoba assets of which are (or will be, when the entity commences business) be controlled by persons resident in Manitoba (among other tests not involving a

Manitoba presence or control or ownership by Manitoba residents).

**Reservation I-PT-38**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Agricultural land<br>Forest and other wooded land |
| **Industry Classification:** | CPC 531 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Farm Lands Ownership Act*, C.C.S.M. c. F-35 |
| **Description:** | **Investment** |

Only individuals who are citizens of Canada or permanent residents of Canada within the meaning of the *Immigration and Refugee Protection Act,* S.C. 2001, c. 27 ("eligible individuals"), corporations, trusts, partnerships or other business entities entirely owned by active or retired farmers or eligible individuals, or a combination of these, governments (municipal and provincial) or government agencies, or qualified immigrants who are entitled and intend to become eligible individuals within two years after acquiring the farm land, may own more than 40 acres of Manitoba farmland.

**Reservation I-PT-39**

**Sector:**                          All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**             National treatment
                                     Performance requirements

**Level of Government:**             Provincial – Manitoba

**Measures:**                        *The Labour-sponsored Venture Capital Corporations Act*,
                                     C.C.S.M. c. L-12
                                     *The Corporations Act*, C.C.S.M. c. C-225

**Description:**                     Investment

1.    Labour-sponsored Venture Capital Corporations are required to invest in active businesses (with assets valued at less than CAD $50 million) of which at least 50 per cent of the full-time employees are employees employed in Manitoba, or if at least 50 per cent of employees' wages and salaries are attributable to services rendered in Manitoba by the employees.

2.    The corporations must be registered under the Act, and only corporations that have been incorporated under *The Corporations Act* may apply to be registered. This means that at least 25 per cent of the corporation's directors must be residents of Canada (or at least one, where there are three or fewer directors), pursuant to *The Corporations Act*.

**Reservation I-PT-40**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Cooperatives Act*, C.C.S.M. c. C-223 |
| **Description:** | **Investment** |

A majority of directors of a cooperative must be resident in Canada. For a directors' meeting of a co-operative to be properly constituted, a majority of the directors at the meeting must be residents in Canada. A director who is a resident of Canada but not present at the meeting can approve the business transacted at a meeting, if the requisite majority would have been present had that director been present. The managing director of a co-operative must be resident in Canada.

**Reservation I-PT-41**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Agricultural land<br>Forest and other wooded land<br>Crown land leases and permits<br>Services incidental to agriculture<br>Services incidental to animal husbandry |
| **Industry Classification:** | CPC 531, 8811 (other than rental of agricultural equipment with operator), 8812 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Crown Lands Act*, C.C.S.M. c. C-340<br>*Agricultural Crown Land Leases Regulation*, 168/2001<br>*Agricultural Crown Land Grazing and Hay Permits Regulation*, 288/88 |
| **Description:** | **Investment** |

1.  To be eligible to obtain a forage lease of agricultural Crown lands, the tenant must be a Canadian citizen or have landed Canadian immigrant status, and a resident of Manitoba. If the tenant is a partnership or forage co-operative, every partner or member, as the case may be, must be a Canadian citizen or have landed Canadian immigrant status and must be a resident of Manitoba. If the tenant is a corporation, every shareholder must be a Canadian citizen or have landed Canadian immigrant status, and be a resident of Manitoba, and the corporation must be registered to carry on business in Manitoba.

2.  A grazing permit or hay permit on agricultural Crown lands may only be granted to a person who is ordinarily resident in or near where the land described in the permit is situated.

**Reservation I-PT-42**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Agricultural land<br>Forest and other wooded land<br>Recreational and other open land |
| **Industry Classification:** | CPC 531, 533 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Crown Lands Act*, C.C.S.M. c. C-340<br>Policy respecting allocation, sale and lease of cottage lots and development of commercial establishments in provincial parks and on other Crown land |
| **Description:** | **Investment** |
| | The Minister may afford preferential treatment to Manitoba residents over non-residents in the allocation, sale and lease of cottage lots and development of commercial establishments in provincial parks and on other Crown land. |

**Reservation I-PT-43**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Services incidental to fishing<br>Wholesale trade services |
| **Industry Classification:** | CPC 04, 62224, 882 |
| **Type of Reservation:** | Market access<br>National treatment<br>Performance requirements |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Fisheries Act*, C.C.S.M. c. F-90<br>*Fishing Licensing Regulation*, Man. Reg. 124/97<br>Policy respecting the allocation of commercial fishing licences |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  Unless otherwise authorised by regulation or by the Freshwater Fish Marketing Corporation (the "Corporation"), or in certain limited circumstances, no person is permitted to sell or purchase fish caught in Manitoba for delivery in Manitoba except through the Corporation.

2.  The Minister has full discretion to issue commercial fishing licences and to place conditions on the licences. The current Policy specifies that commercial fishing licences are to be allocated, re-allocated and renewed according to the value of the benefits generated, in order of priority, to:

    (a)  local;

    (b)  regional; and

    (c)  provincial economies.

**Reservation I-PT-44**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Land surveyors |
| **Industry Classification:** | CPC 8675 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Land Surveyors Act*, C.C.S.M. c. L-60 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  A "Manitoba land surveyor" must be a natural person. Manitoba land surveyors are not permitted to provide land surveying services through a corporation. Commercial presence of a Manitoba land surveyor must take the form of a sole proprietorship or partnership.

2.  A surveyor who practiced land surveying in Manitoba and subsequently became the citizen or subject of a foreign country must be re-naturalised in accordance with the provisions of the *Citizenship Act* R.S.C., 1985, c. C-29 prior to resuming practice in Manitoba.

**Reservation I-PT-45**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal advisory and representation services |
| **Industry Classification:** | CPC 8612 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Legal Profession Act*, C.C.S.M. c. L-107 |
| **Description:** | **Cross-Border Trade in Services** |

The provision of legal services to the public in Manitoba, concerning Manitoba laws, by inter-jurisdictional law firms is permissible only if, among other things, the firm maintains an office in Manitoba and in at least one other Canadian or foreign jurisdiction, and if at least one member of the firm is entitled to, and does, practice law principally in Manitoba.

**Reservation I-PT-46**

| | |
|---|---|
| **Sector:** | Wholesale trade |
| **Sub-Sector:** | Pharmaceutical and medical goods |
| **Industry Classification:** | CPC 62251 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Hearing Aid Act,* C.C.S.M. c. H-38 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The Hearing Aid Board has the authority to certify hearing aid dealers and to prescribe preferential access to, and preferential conditions on, applicants for certification resident in Manitoba or Canada.

**Reservation I-PT-47**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Passenger transit systems |
| **Industry Classification:** | CPC 71213, 71223 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Highway Traffic Act*, C.C.S.M. c. H-60 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The Manitoba Transport Board may limit the number of certificates granted to public passenger motor carriers on public roads in Manitoba. The Board may limit new public passenger motor carriers from entering the public service vehicle market or require motor carriers to take on less profitable routes if it considers public availability of the service to be essential.

**Reservation I-PT-48**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting, auditing and bookkeeping services |
| **Industry Classification:** | CPC 862 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Chartered Accountants Act*; C.C.S.M. c. C-70 <br> *The Certified General Accountants Act*, C.C.S.M. c. C-46 <br> *The Certified Management Accountants Act*, C.C.S.M. c. C-46.1 <br> *The Corporations Act*, C.C.S.M. c. C-225 |

**Description:**     **Investment**

The first three Acts cited above indicate that an accounting, auditing, and bookkeeping corporation cannot be issued a corporate permit to offer services in Manitoba, unless incorporated under *The Corporations Act*. This means that at least 25 per cent of the corporation's directors must be residents of Canada (or at least one, if there are three or fewer directors).

**Reservation I-PT-49**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 8621 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Chartered Accountants Act*, C.C.S.M. c. C-70<br>*The Certified General Accountants Act*, C.C.S.M. c. C-46<br>*The Certified Management Accountants Act*, C.C.S.M. c.A-46.1<br>*The Addictions Foundation Act,* C.C.S.M. c.A-60<br>*The Convention Centre Act,* S.M. 1988-89 c. 39 amended<br>*The Crown Corporations Public Review and Accountability Act,* C.C.S.M. c. C-336 amended<br>*The Insurance Act,* C.C.S.M. c. 140<br>*The Municipal Act,* C.C.S.M. c. M-225<br>*The Northern Affairs Act,* C.C.S.M. c. N-100 amended<br>*The Public Schools Act,* C.C.S.M c. P-250 amended<br>*The Trustee Act,* C.C.S.M c. T-160 amended<br>*The City of Winnipeg Charter,* S.M. 2002, c. 39 amended<br>*The Concordia Hospital Incorporation Act*, R.S.M. 1990, c. 39<br>*The Hudson Bay Mining Employees' Health Association Incorporation Act*, R.S.M. 1990, c. 68<br>*The Investors Syndicate Limited Incorporation Act*, R.S.M. 1990, c. 77<br>*The Mount Carmel Clinic Act*, R.S.M. 1990, c. 120<br>*L'Œuvre des bourses du Collège de Saint-Boniface Incorporation Act*, R.S.M. 1990, c. 132<br>*The Seven Oaks General Hospital Incorporation Act,* R.S.M. 1990, c. 180<br>*The United Health Services Corporation Incorporation Act*, R.S.M. 1990, c. 201<br>*The Winnipeg Art Gallery Incorporation Act*, R.S.M. 1990, c. 216<br>*The Winnipeg Clinic Incorporation Act*, R.S.M. 1990, c. 220 |
| **Description:** | **Investment and Cross-Border Trade in Services**<br><br>The above listed Acts require that auditing services be performed by a person who is authorised to practice as an accountant under either *The Chartered Accountants Act*, *The Certified General Accountants Act* or *The Certified Management Accountants Act*. |

**Reservation I-PT-50**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Corporations Act*, C.C.S.M. c. C-225 |
| **Description:** | **Investment** |

At least 25 per cent of a corporation's directors must be residents of Canada (or at least one, if there are three or fewer directors). Directors must not transact business at a meeting of directors unless at least 25 per cent of the directors present are residents of Canada (or if there are only three directors, at least one of the directors present is a resident of Canada). If the directors delegate any of their powers to a managing director or to a committee, the managing director or a majority of the members of the committee, as the case may be, must be a resident or residents of Canada.

**Reservation I-PT-51**

| | |
|---|---|
| **Sector:** | Hunting |
| **Sub-Sector:** | Services incidental to hunting |
| | Hunting, fishing and trapping industries |
| | Tourist guide agencies |
| | Own-account hunting |
| **Industry Classification:** | CPC 7472, 8813, 96419 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | Provincial – Manitoba |

**Measures:**  *The Wildlife Act*, C.C.S.M. c. W-130
*Allocation of Hunting Licences Regulation*, Man. Reg. 77/2006
*Captive Wild Animal Regulation*, Man. Reg. 23/98
*Exotic Wildlife Regulation*, Man. Reg. 78/99
*General Hunting Regulation*, Man. Reg. 351/87
*Hunting Dogs Regulation*, Man. Reg. 79/95
*Hunting Seasons and Bag Limits Regulation*, Man. Reg. 165/91
*Miscellaneous Licences and Permits Regulation*, Man. Reg. 53/2007
*Trapping Areas and Zones Regulation,* Man. Reg. 149/2001
*Hunting Guides Regulation*, Man. Reg. 110/93
*Manitoba Trapping Guide 2011/2012*
*The Resource Tourism Operators Act,* C.C.S.M. c. R119.5

**Description:**  **Investment and Cross-Border Trade in Services**

Pursuant to the above Acts and Regulations the Minister, and the Administrator appointed by the Minister, has the discretion to issue permits or licences required under the Acts to a person, subject to such terms and conditions as the Minister or Administrator considers advisable, and to make regulations ancillary to the foregoing. The Regulations may prescribe preferential access to permits and licences, and preferential conditions on such permits and licences, for residents of Manitoba or Canada.

**Reservation I-PT-52**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Products of agriculture<br>Services incidental to agriculture |
| **Industry Classification:** | CPC 01, 8811(other than rental of agricultural equipment with operator) |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Wild Rice Act*, C.C.S.M. c. W-140 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Only persons who have been resident in Manitoba for at least one year are entitled to apply for a licence, permit, load slip or export certificate under this Act.

**Reservation I-PT-53**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging products<br>Services incidental to manufacturing |
| **Industry Classification:** | CPC 0311, 0312, 8843 |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Forest Act*, C.C.S.M. c. F-150<br>*Forest Use and Management Regulation*, Man. Reg. 227/88R |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Pursuant to the above Act and Regulation, the Minister is responsible for regulating all forestry matters in accordance with the Act and Regulation, and has the discretion to make grants or issue permits or licences required under the Act to a person, subject to such terms and conditions as the Minister considers advisable. Timber cutting rights must be granted in a way that the Minister believes secures the maximum benefit for Manitoba's forestry industry. Manitoba residents or Canadian citizens may be given preference if such grants are made or permits or licences are issued.

**Reservation I-PT-54**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Passenger road transport (taxicabs) |
| **Industry Classification:** | CPC 71221 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Taxicab Act*, C.C.S.M. c. T-10<br>*The Highway Traffic Act*, C.C.S.M. c. H-60 |

**Description:**   **Investment and Cross-Border Trade in Services**

1. *The Taxicab Act* requires all persons seeking to operate a taxi or carry on a taxi business to apply for and obtain a taxicab business licence from the Taxicab Board. The Board has the power to impose terms and conditions on a taxicab business licence it issues. In deciding whether or not to grant a licence, the Board must apply tests of "public convenience" and "necessity in respect of the number of taxicabs required in The City of Winnipeg".

2. *The Highway Traffic Act* requires all persons seeking to operate a taxi across municipal boundaries to apply for and obtain a certificate from the Motor Transport Board. The Board has the power to impose terms and conditions on a certificate it issues. In deciding whether or not to grant a certificate, the Board must consider if the existing facilities for transportation are insufficient or that the public convenience will be promoted by the establishment or continuance from year to year of the proposed transportation service.

**Reservation I-PT-55**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Products of agriculture<br>Live animals and animal products<br>Meats and dairy products<br>Other food products n.e.c.<br>Services incidental to agriculture |
| **Industry Classification:** | CPC 01, 02, 21, 22, 239, 8811 (other than rental of agricultural equipment with operator) |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Farm Products Marketing Act*, C.C.S.M. c. F-47<br>*Dairy Farmers of Manitoba Marketing Plan Regulation*, Man. Reg. 89/2004<br>*Manitoba Egg and Pullet Producers Marketing Plan Regulation*, Man. Reg. 70/2005<br>*Manitoba Chicken Broiler Producers Marketing Plan Regulation*, Man. Reg. 246/2004<br>*Manitoba Turkey Producers Marketing Plan Regulation*, Man. Reg. 38/2004<br>*Manitoba Vegetable Producers Marketing Plan Regulation*, Man. Reg. 117/2009<br>*The Milk Prices Review Act,* C.C.S.M. c. M-130 |
| **Description:** | **Investment and Cross-Border Trade in Services**<br><br>The boards and commissions under the above measures may afford preferences to permanent residents of Manitoba or Canadian citizens. |

**Reservation I-PT-56**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electrical power |
| **Industry Classification:** | CPC 17, 887 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Manitoba Hydro Act*, C.C.S.M. c. H-190 |
| | *The Public Utilities Board Act*, C.C.S.M. c. P-280 |
| | *The Water Power Act*, C.C.S.M. c. W-60 |
| | *The Environment Act*, C.C.S.M. c. E-125 |
| | *The Crown Corporations Public Review and Accountability Act*, C.C.S.M. c. C336 |

**Description:**     **Investment and Cross-Border Trade in Services**

1.     The above measures, among other things, permit the Government of Manitoba or Manitoba Hydro to:

   (a)   regulate, and issue various licences, authorisations or approvals relating to the generation, transmission, distribution, importation, exportation and supply and sale of electricity, if generated from renewable energy sources or from other goods, forces or sources from which it is possible to generate electricity;

   (b)   regulate the development, construction or maintenance of power plants, generating stations, substations, transmission lines, transmission towers and other facilities or structures or equipment required in connection with any of the activities set out in paragraph (a); and

   (c)   transfer or grant real property or interests in real property in Manitoba, or transfer personal property or interests in personal property, in connection with any of the activities set out in paragraphs (a) or (b).

2.     Without limiting the generality of the foregoing, these measures may involve discrimination in favour of Manitoba residents or entities formed in accordance with the laws of Canada (and having a place of business in Manitoba).

**Reservation I-PT-57**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Liquor and Gaming Control Act*, C.C.S.M. c. L-160<br>*The Corporations Act*, C.C.S.M. c. C-225 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The Liquor and Gaming Control Authority of Manitoba has the discretion to grant licences to sell alcoholic beverages. If the applicant is an individual, the licence may only be issued to an adult natural person who is a Canadian citizen or has permanent residence status and resides in Canada. If the applicant is a partnership, all of its members must meet this requirement. If the applicant is a corporation, it must be incorporated or authorised to carry on its business in Manitoba under Manitoba law. If the applicant is incorporated under Manitoba law, 25 per cent of the corporation's directors must be residents of Canada (or at least one, if there are three or fewer directors).

**Reservation I-PT-58**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Liquor and Gaming Control Act*, C.C.S.M. c.G-5<br>*The Manitoba Liquor and Lotteries Corporation Act*, C.C.S.M. c. L-210<br>*The Manitoba Horse Racing Commission Act*, C.C.S.M. c. H-90<br>*Rules of Thoroughbred Racing and Commission Directives*, 2011<br>*Rules of Standardbred Racing and Commission Directives*, 2010<br>*Commission Quarterhorse Directives*, 2011<br>*Pari-Mutuel Betting Supervision Regulations*, SOR 91-365 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Gaming Activities by Charitable and Religious Organisations, Fairs and Exhibitions and Concession and Amusement Operators

1.  Charitable and religious organisations, fairs and exhibitions and concession and amusement operators may not carry on gaming activities in Manitoba unless they are licenced to do so by the Liquor and Gaming Control Authority of Manitoba or by another body authorised by Manitoba. The Liquor and Gaming Control Authority has discretion to issue these licences subject to such terms and conditions as it considers advisable, and may afford preferential treatment to applicants with a presence in Manitoba.

2.  No one may become an employee of The Manitoba Liquor and Lotteries Corporation or of a Manitoba gaming operator, or regularly be in a premises in Manitoba if the gaming activity is taking place for the purpose of providing a gaming service, unless they have been registered for this purpose by the Liquor and Gaming Control Authority. The Liquor and Gaming Control Authority has discretion to register a person, subject to such terms and conditions as it considers advisable, and may afford preferential treatment to Canadian citizens or permanent residents of Manitoba.

3.  No proprietor, business entity or association may become a

Manitoba gaming operator, a Manitoba video lottery terminal siteholder, a Manitoba lottery ticket retailer or a supplier of gaming supplies or gaming services in Manitoba unless they have been registered for this purpose by the Liquor and Gaming Control Authority. The Liquor and Gaming Control Authority has discretion to register a proprietor, business entity or association, subject to such terms and conditions as it considers advisable, and may afford preferential treatment to Canadian citizens or permanent residents of Manitoba or to business entities or associations with a presence in Manitoba.

Gaming Activities – Lottery Schemes

4.   Only the Government of Manitoba is authorised to conduct and manage lottery schemes in Manitoba that fall outside the authority of the Liquor and Gaming Control Authority or other bodies authorised to issue licences to conduct and manage lottery schemes in Manitoba. Manitoba conducts and manages lottery schemes within Manitoba through The Manitoba Liquor and Lotteries Corporation, as agent for Manitoba. Manitoba also conducts and manages lottery schemes in Manitoba and one or more other Canadian jurisdictions in co-operation with the governments of those other jurisdictions through Western Canada Lottery Corporation and Interprovincial Lottery Corporation. The Manitoba Liquor and Lotteries Corporation, Western Canada Lottery Corporation and Interprovincial Lottery Corporation are collectively referred to as the "Corporations".

5.   Manitoba and the Corporations may afford preferential treatment to Canadian citizens or permanent residents of Manitoba or to business entities with a presence in Manitoba in connection with any of the foregoing activities.

Horse Racing and Betting

6.   No one may operate a race track or a pari-mutuel betting theatre or act as a concessionaire on a race track or in a betting theatre in Manitoba unless they are licenced to do so by the Horse Racing Commission. The Commission has discretion to issue licences to any person or business entity, subject to such terms and conditions as it considers advisable, and may afford preferential treatment to Canadian citizens or permanent residents of Manitoba or business entities with an office in Manitoba.

**Reservations applicable in New Brunswick**

**Reservation I-PT-59**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Agricultural, forest and other wooded land<br>Forestry and logging products |
| **Industry Classification:** | CPC 03, 531 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Crown Lands and Forest Act,* S.N.B. 1980, c. C-38.1 |
| **Description:** | **Investment** |
| | Subject to certain exceptions every licence or permit authorising the cutting of Crown timber shall be granted on condition that all timber cut thereunder must be processed in New Brunswick into lumber, pulp or other wood products. |

**Reservation I-PT-60**

| | |
|---|---|
| **Sector:** | Mining |
| **Sub-Sector:** | Mining<br>Quarrying and oil well industries |
| **Industry Classification:** | CPC 11, 12, 13, 14, 15, 16 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Mining Act*, S.N.B. 1985, c. M-14.1 |
| **Description:** | **Investment** |

**Investment**

If required to do so by the Minister at the time a mining lease is granted or at any time thereafter, a lessee shall process or further process in the Province any minerals mined in the Province under the mining lease.

**Reservation I-PT-61**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services |
| | Wholesale trade services |
| | Retailing services (liquor, wine and beer, liquor wine and beer stores) |
| | Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | National treatment |
| | Performance requirements |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Liquor Control Act,* R.S.N.B. 1973, c. L-10 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The New Brunswick Liquor Commission ("ANBL") is a Government of New Brunswick Crown agency that is the sole importer and wholesaler, retailer, and distributor of alcoholic beverages in New Brunswick. The above measures permit New Brunswick to regulate and authorise the importation, purchase, production, distribution, supply, marketing and sale of alcoholic beverages in New Brunswick. The ANBL sets, at its discretion, performance requirements that must be met or exceeded in order for the importation, distribution and retail relationship to continue with any given supplier be they domestic or international.

2. The ANBL reserves the right to preferentially promote and market locally produced alcoholic beverage products.

**Reservations applicable in Newfoundland and Labrador**

**Reservation I-PT-62**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Crude petroleum and natural gas |
| **Industry Classification:** | CPC 120, 7112, 71232, 7131, 7422, 8675, 883, 887 |
| **Type of Reservation:** | Market access (CPC 71232 and 7422 only)<br>National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Canada-Newfoundland and Labrador Atlantic Accord Implementation Newfoundland and Labrador Act,* R.S.N.L. 1990, c. C-2<br>*Canada-Newfoundland Atlantic Accord – February 11, 1985*<br>*Energy Corporation Act,* S.N.L. 2007, c. E-11.01<br>*Petroleum and Natural Gas Act,* RSNL 1990, c. P-10 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The above measures permit the Government of Newfoundland and Labrador to regulate and issue various authorisations relating to the exploration, production, extraction, development and transportation of hydrocarbons, and the granting of exclusive rights to operate hydrocarbon distribution systems and storage facilities, including, related hydrocarbon pipelines, marine distribution, transshipment facilities and transport services. Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, limitations on market access, imposition of performance requirements or discrimination in favour of residents of Newfoundland and Labrador or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive operations within Newfoundland and Labrador.

**Reservation I-PT-63**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Electric Power Control Act*, *1994*, S.N.L. 1994, c. E-5.1<br>*Energy Corporation Act*, S.N.L. 2007, c. E-11.01<br>*Energy Corporation of Newfoundland and Labrador Water Rights Act*, S.N.L. 2008, c. E-11.02<br>*Hydro Corporation Act, 2007*, SNL 2007, c. H-17<br>*Lower Churchill Development Act*, RSNL 1990, c. L-27<br>*Lands Act, SNL 1991*, *c. 36*<br>*Water Resources Act SNL 2002*, *c. W-401* |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  The above measures, among other things, permit the Government of Newfoundland and Labrador to:

    (a) regulate and issue various authorisations relating to the production, generation, development, transmission (including system control), distribution, delivery, supply and exportation of electricity, and provide for the construction and maintenance of related facilities;

    (b) provide for the granting of the lands or waters within the domain of the Province for a good, source or force of energy from which it is possible to produce electricity, including the installation of wind turbines and hydroelectric developments; and

    (c) set and modify rates for electricity.

2.  Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favour of residents of Newfoundland and Labrador or entities established in accordance with the

laws of Canada or a province or territory thereof and having a place of business and substantive operations within Newfoundland and Labrador.

**Reservation I-PT-64**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Wood in the rough<br>Products of wood, cork, straw and plaiting materials<br>Forestry and logging products<br>Pulp, paper and paper products<br>Manufacture of wood and of products of wood and cork, except furniture and manufacture of articles of straw<br>Plaiting materials on a fee or contract basis |
| **Industry Classification:** | CPC 031, 31, 321, 88430 |
| **Type of Reservation:** | Market access (CPC 31 only)<br>National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Forestry Act*, R.S.N.L. 1990, c. F-23<br>*Forest Protection Act*, R.S.N.L. 1990, c. F-22<br>*Plant Protection Act*, R.S.N.L. 1990, c. P-16 |
| **Description:** | **Investment** |

The above measures allow the Government of Newfoundland and Labrador to regulate and issue various authorisations relating to the production, extraction and development of forestry resources and related products within the Province. Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, limitations on market access, imposition of performance requirements or discrimination in favour of residents of Newfoundland and Labrador or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive operations within Newfoundland and Labrador.

**Reservation I-PT-65**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Products of agriculture<br>Forestry and fishing<br>Wholesale trade services of agriculture raw materials and live animals<br>Services incidental to agriculture, hunting and forestry<br>Services incidental to fishing |
| **Industry Classification:** | CPC 01, 021, 029, 04, 21, 22, 6221, 62224, 881 (other than rental of agricultural equipment with operator and 8814), 882 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Farm Products Corporation Act,* R.S.N.L. 1990, c. F-5<br>*Natural Products Marketing Act,* R.S.N.L. 1990, c. N-2<br>*Poultry and Poultry Products Act,* R.S.N.L. 1990, c. P-18 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The above measures allow the Government of Newfoundland and Labrador to regulate and issue various authorisations relating to the production and marketing of agricultural and food products and the marketing of fish products and wild fur within the Province, including measures related to the supply management of dairy, eggs and poultry products. Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, the imposition of performance requirements or discrimination in favour of residents of Newfoundland and Labrador or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive operations within Newfoundland and Labrador.

**Reservation I-PT-66**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fish and other fishing products<br>Prepared and preserved fish<br>Wholesale trade services of fisheries products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 212, 62224, 882 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Fisheries Act,* S.N.L. 1995, c. F-12.1<br>*Aquaculture Act*, R.S.N.L. 1990, c. A-13<br>*Fish Inspection Act,* R.S.N.L. 1990, c. F-12<br>*Fishing Industry Collective Bargaining Act,* R.S.N.L. 1990, c. F-18<br>*Fish Processing Licensing Board Act,* S.N.L. 2004, c. F-12.01<br>*Professional Fish Harvesters Act,* S.N.L. 1996, c. P-26.1<br>*Lands Act*, S.N.L. 1991, c. 36<br>*Water Resources Act*, S.N.L. 2002 c. W-4.01 |
| **Description:** | **Investment**<br><br>The above measures allow the Government of Newfoundland and Labrador to regulate and issue various authorisations relating to the production, processing or marketing of fish and aquaculture fish products, including the transfer, delivery or transmission of marine products by fish harvesters, aquaculturalists and subsequent purchasers. These measures provide for the imposition of performance requirements in certain circumstances. |

## Reservation I-PT-67

**Sector:**               All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**   National treatment
                          Senior management and boards of directors

**Level of Government:**   Provincial – Newfoundland and Labrador

**Measures:**             *Corporations Act,* R.S.N.L 1990 c. C-36

**Description:**          **Investment**

1.  At least 25 per cent of the directors of all corporations incorporated under the *Corporations Act* must be resident Canadians, except:

    (a)  a corporate body that was incorporated under *The Companies Act* and was continued under the *Corporation Act*, and maintains the same proportion of non-resident directors after January 1, 1987 that it had before January 1, 1987; or

    (b)  a corporation that earns no income in Canada.

2.  Directors of a corporation incorporated under the *Corporations Act* must not transact a business at a meeting of directors unless at least 25 per cent of directors present are resident Canadians, except if a resident Canadian director who is unable to be present approves, in writing or by telephone or other communications facilities, of the business transacted, and at least 25 per cent of the directors at the meeting would have been resident Canadian had that director been present.

**Reservation I-PT-68**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Surface surveying services |
| **Industry Classification:** | CPC 86753 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Land Surveyors Act, 1991,* S.N.L. 1991, c. C-37 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Canadian permanent residency is required for the issuance of a certificate of authorisation to a firm, a partnership or corporate body to practice surveying within the Province.

**Reservation I-PT-69**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Private investigation and security services |
| **Industry Classification:** | CPC 873 |
| **Type of Reservation:** | Market access<br>National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Private Investigation and Security Services Act*, R.S.N.L. 1990, c.P-24 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The holder of a licence to carry on the business of private investigation or security services agency must be a citizen or permanent resident of Canada, and the manager of such business must ordinarily reside in Canada.

2. A majority of the board of directors must be permanent residents of Canada.

**Reservation I-PT-70**

| | |
|---|---|
| **Sector:** | Tourism |
| **Sub-Sector:** | Services incidental to hunting, tourist guide agencies<br>Own-account hunting |
| **Industry Classification:** | CPC 7472, 8813, 96419 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Wild Life Act*, R.S.N.L. 1990 c.W-8 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. Non-residents of the Province must employ licenced guides while undertaking certain licenced hunting activities within the Province.

2. Non-residents of the Province are not permitted to obtain certain types of licences, and are required to obtain non-resident licences to undertake certain fishing activities within the Province.

3. Canadian residency is required in order to obtain registration as a guide.

**Reservation I-PT-71**

| | |
|---|---|
| **Sector:** | Land |
| **Sub-Sector:** | Recreational and other open land |
| **Industry Classification:** | CPC 5330 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Lands Act*, S.N.L. 1991, c. 36<br>Policy Directive FT. 004 (Amendment 1), 2001 |
| **Description:** | **Investment** |

Only permanent residents of the Province are eligible to receive residential cottage licences for Crown land.

**Reservation I-PT-72**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Railroad transportation services |
| **Industry Classification:** | CPC 711 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Rail Service Act, 2009*, S.N.L. 2009, c. R-1.2 |
| **Description:** | **Investment** |

A person seeking to purchase, operate or construct a rail service within the Province must first obtain Provincial approval. This approval may be granted on terms and conditions the Province considers appropriate. Without limiting the generality of the foregoing, this approval may involve discretionary decisions based on various factors, including the imposition of performance requirements.

**Reservation I-PT-73**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Other land transportation services |
| **Industry Classification:** | CPC 712 |
| **Type of Reservation:** | Market access<br>Performance requirements |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Aquaculture Act*, R.S.N.L. 1990, c. A-13<br>*Fisheries Act*, S.N.L. 1995, c. F-12.1<br>*Fish Inspection Act*, R.S.N.L. 1990, c. F-12<br>*Liquor Corporation Act*, R.S.N.L. 1990, c. L-19<br>*Liquor Control Act*, R.S.N.L. 1990, c. L-18<br>*Motor Carrier Act*, R.S.N. 1990, c. M-19<br>*Professional Fish Harvesters Act*, S.N.L. 1996, c. P-26.1 |

**Description:**          **Investment**

Public convenience and needs tests are applied to passenger transportation and to some subsectors of freight transportation within the Province. The criteria relating to approval include: the adequacy of current levels of service, market conditions establishing the requirement for the expanded service, the effect of new entrants on public convenience, and the fitness, willingness and ability of the applicant to provide proper service. Performance requirements may be imposed.

**Reservation I-PT-74**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Labour Relations Act,* R.S.N.L. 1990, c. L-1 |
| **Description:** | **Investment** |

The above measure allows the Lieutenant Governor in Council of Newfoundland and Labrador to issue Special Project Orders. Without limiting the generality of the foregoing, these Orders may involve discretionary decisions based on various factors and limitations on or linkages to investment or market access, imposition of performance requirements or discrimination in favour of residents of Newfoundland and Labrador or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive operations within Newfoundland and Labrador.

**Reservation I-PT-75**

**Sector:**                    Recreational, cultural, sporting and associated services

**Sub-Sector:**                Gambling and betting
                               Services incidental to manufacturing of metal products, machinery and equipment

**Industry Classification:**   CPC 8844, 885, 96492

**Type of Reservation:**       Market access (CPC 8844 and 885 only)
                               National treatment
                               Performance requirements
                               Senior management and boards of directors

**Level of Government:**       Provincial – Newfoundland and Labrador

**Measures:**                  *Lotteries Act*, S.N.L. 1991, c. 53

**Description:**               **Investment and Cross-Border Trade in Services**

1.    The above measure permits the Government of Newfoundland and Labrador to regulate and issue various authorisations relating to services, suppliers of services, manufacturing, suppliers of materials, operations and repairs relating to lotteries, lottery schemes, amusement machines, video lottery machines, games of chance, races, betting theatres, bingo casinos and promotional contests.

2.    Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, limitations on market access, imposition of performance requirements or discrimination in favour of residents of Newfoundland and Labrador or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive operations within Newfoundland and Labrador.

**Reservation I-PT-76**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107, 643 and 88411 |
| **Type of Reservation:** | Market access<br>National treatment<br>Performance requirements |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Liquor Corporation Act*, R.S.N.L. 1990, c. L-19<br>*Liquor Control Act*, R.S.N.L. 1990, c. L-18 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  The above measures permit the Government of Newfoundland and Labrador to regulate and issue various authorisations relating to the production, distribution, supply, sale, and marketing of alcoholic beverages.

2.  The Newfoundland Liquor Corporation operates as a monopoly responsible for the distribution, supply, transport, sale and marketing of alcoholic beverages.

3.  Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, limitations on market access, imposition of performance requirements or discrimination in favour of residents of Newfoundland and Labrador or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive operations within Newfoundland and Labrador.

**Reservation I-PT-77**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services (notaries) |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Notaries Public Act,* R.S.N.L. 1990 c. N-5 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Only a Canadian citizen that is resident in the Province is eligible to become a notary public for the Province.

**Reservations applicable in the Northwest Territories**

**Reservation I-PT-78**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services (notaries public) |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Territorial – Northwest Territories |
| **Measures:** | *Evidence Act*, R.S.N.W.T. 1988, c. E-8, s. 79 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A person who seeks appointment as a notary public must reside in the Northwest Territories and be either a citizen of Canada or a person who has the status of a permanent resident of Canada.

**Reservation applicable in Nova Scotia**

**Reservation I-PT-79**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting services |
| **Industry Classification:** | CPC 862 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Certified General Accountants Act*, S. N.S. 1998, c. 10<br>*Certified Management and Accountants of Nova Scotia Act*, S.N.S. 2005, c. 35<br>*Public Accountants Act*, R.S.N.S. 1989, c. 369<br>*Chartered Accountants Act*, S.N.S. 1994, c. 14 |
| **Description:** | **Cross-Border Trade in Services** |

Only residents of Canada are eligible to be licenced to practice as a public accountant in Nova Scotia and to use the designation "Public Accountant".

**Reservation I-PT-80**

| | |
|---|---|
| **Sector:** | Tourism and recreational services |
| **Sub-Sector:** | Service incidental to hunting<br>Tour guide agencies<br>Own-account hunting |
| **Industry Classification:** | CPC 7472, 8813, 96419 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Wildlife Act*, R.S.N.S. 1989, c. 504 |
| **Description:** | **Cross-Border Trade in Services**<br><br>Only Nova Scotia residents are eligible to receive a fur harvesters' or moose hunting licence. Non-residents may be subject to supervision by a qualified guide while hunting or fishing in designated rivers. |

### Reservation I-PT-81

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Highway freight transport |
| **Industry Classification:** | CPC 7123 |
| **Type of Reservation:** | Market access<br>Performance requirements |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *The Public Utilities Act,* R.S., c. 380, s. 1 |
| **Description:** | **Investment** |

Public convenience and needs tests are applied to some sub-sectors of freight transportation within the Province. The criteria relating to approval include the adequacy of current levels of service, market conditions establishing the requirement for the expanded service, the effect of new entrants on public convenience, and the fitness, willingness and ability of the applicant to provide proper service. Performance requirements may be imposed.

**Reservation I-PT-82**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Interurban motor bus transport and scheduled services |
| **Industry Classification:** | CPC 7121 |
| **Type of Reservation:** | Market access<br>Performance requirements |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Public Utilities Act*, R.S.N.S. 1989, c. 380 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Licencing of new entrants to this service is subject to public convenience and needs tests which includes: the examination of the adequacy of current levels of service; market conditions establishing the requirement for expanded service; the effect of new entrants on public convenience, including the continuity and quality of service; and the fitness, willingness and ability of the applicant to provide proper service. Performance requirements may be imposed.

**Reservation I-PT-83**

| | |
|---|---|
| **Sector:** | Land |
| **Sub-Sector:** | Other land |
| **Industry Classification:** | CPC 539 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Land Titles Clarification Act*, R.S.N.S. 1989, c. 250 |
| **Description:** | **Investment** |

An applicant who claims land in a land titles clarification area based on historical adverse possession must be a resident of Nova Scotia.

**Reservation I-PT-84**

| | |
|---|---|
| **Sector:** | Credit and collection services |
| **Sub-Sector:** | Credit reporting and collection agency services |
| | Consumer reporting agencies |
| **Industry Classification:** | CPC 87901, 87902, 87909 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Consumer Creditors' Conduct Act,* R.S.N.S., c. 91 |
| | *Consumer Protection Act,* R.S.N.S., c. 92 |
| | *Consumer Reporting Act,* R.S.N.S., c. 93 |
| | *Consumer Services Act,* R.S.N.S., c. 94 |
| | *Direct Sellers Licensing and Regulation Act,* R.S.N.S. 1989, c. 129 |

**Description:**    **Investment and Cross-Border Trade in Services**

1.  Whether as an individual or partnership, an applicant for registration as a consumer reporting agency must be a Canadian citizen or lawfully admitted to Canada and ordinarily resident. A corporate applicant must be incorporated in Canada and registered to do business in Nova Scotia. A consumer reporting agency, whether an individual, partnership, or corporation, shall operate from the fixed place of business in Nova Scotia, that shall be open to the public during normal business hours.

2.  Credit Reporting and Collection Agency Services must be supplied through a commercial presence.

3.  Permanent residency is required to provide Consumer Agents Services

4.  A licence application requires an address for service in Nova Scotia with direct sellers maintaining a permanent place of business in Nova Scotia.

**Reservation I-PT-85**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107, 643, 88411 |
| **Type of Reservation:** | Market access<br>National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Liquor Control Act*, R.S.N.S. 1989, c. 260 |

**Description:**     **Investment and Cross-Border Trade in Services**

1. The above measure allows the Province, through the monopoly of the Nova Scotia Liquor License Corporation, to regulate and issue various authorisations relating to the purchase, importation, possession, delivery and sale of liquor and merchandise.

2. Without limiting the generality of the foregoing, this measure may involve discretionary decisions based on various factors, limitations on market access, imposition of performance requirements or discrimination in favour of residents of Nova Scotia or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business activities with Nova Scotia.

**Reservation I-PT-86**

| | |
|---|---|
| **Sector:** | Community and personal services |
| **Sub-Sector:** | Religious organizations |
| **Industry Classification:** | CPC 95910 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Solemnization of Marriage Act*, R.S.N.S. 1989, c. 436 |
| **Description:** | **Cross-Border Trade in Services** |

Only Nova Scotia residents may be registered as a person authorised to perform marriages.

**Reservation I-PT-87**

| | |
|---|---|
| **Sector:** | Mining |
| **Sub-Sector:** | Mining, quarrying, and oil well industries |
| **Industry Classification:** | CPC 11, 12, 13, 14, 15, 16, 883 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Mineral Resources Act*, S.N.S. 1990, c. 18 |
| **Description:** | **Investment** |

1. Except for testing, no person shall remove from the Province to a place outside of Canada for processing an output from a mine in the Province without first obtaining the consent of the Minister.

2. A penalty equal to three times the royalty an operator would otherwise be required to pay may be ordered for failure to obtain consent.

3. Differential royalties also apply for mine output processed outside Nova Scotia.

**Reservation I-PT-88**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting<br>Services incidental to manufacturing |
| **Industry Classification:** | CPC 8844, 885, 96492 |
| **Type of Reservation:** | Market access (only to CPC 8844 and 885)<br>National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Gaming Control Act*, S.N.S. 1994-95, c .4 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The above measure allows the Province to regulate and issue various authorisations relating to services, suppliers of services, manufacturing, suppliers of materials, operations and repairs relating to lotteries, lottery schemes, amusement machines, video lottery machines, games of chance, races, betting theatres, bingo casinos and promotional contest.

2. Without limiting the generality of the foregoing, these measures may involve discretionary decision based on various factors, limitations on market access, imposition of performance requirements or discrimination in favour of residents of Nova Scotia or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business activities with Nova Scotia.

**Reservation I-PT-89**

| | |
|---|---|
| **Sector:** | Community and personal services |
| **Sub-Sector:** | Funeral, cremation and undertaking services |
| **Industry Classification:** | CPC 9703 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Embalmers and Funeral Directors Act*, R.S.N.S., c. 144 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  The Minister has power to refuse to issue or re-issue a licence in respect of a funeral home for any reasonable cause.

2.  The regulation provides that a person applying for an apprentice embalmer's licence must have completed one of two courses of study in Nova Scotia. If a person has completed a course of study in a jurisdiction other than Nova Scotia, the Board has the discretion not to approve or accept the course of study.

**Reservation I-PT-90**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Crude oil and natural gas |
| **Industry Classification:** | CPC 120, 7112, 71232, 7131, 7422, 8675, 883, 887 |
| **Type of Reservation:** | Market access (CPC 71232 and 7422 only)<br>National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Canada-Nova Scotia Offshore Petroleum Resources Accord Implementation (Nova Scotia) Act*, S.N.S. 1987, c. 3<br>*Crown Lands Act*, R.S.N.S.1989, c. 114<br>*Gas Distribution Act*, S.N.S. 1997, c. 4<br>*Offshore Petroleum Royalty Act*, S.N.S. 1987, c. 9<br>*Petroleum Resources Act*, R.S.N.S. 1989, c. 342<br>*Petroleum Resources Removal Permit Act*, S.N.S. 1999, c. 7<br>*Pipeline Act*, R.S.N.S. 1989, c. 345<br>*Public Utilities Act*, R.S.N.S. 1989, c. 380 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  The Government of Nova Scotia regulates and issues various authorisations relating to the exploration, production, extraction, processing, development and transportation of hydrocarbons, and the granting of exclusive rights to operate hydrocarbon distribution systems and storage facilities, including related hydrocarbon pipelines, marine distribution, transshipment facilities and transport services.

2.  The granting of authorisations may involve discretionary decisions based on various factors, limitations on market access, imposition of performance requirements or discrimination in favour of residents of Nova Scotia or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business activities with Nova Scotia.

**Reservation I-PT-91**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fish and other fishing products<br>Prepared and preserved fish<br>Wholesale trade services of fisheries products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 212, 62224, 882 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Fisheries and Coastal Resources Act*, R.S.N.S. 1996, c. 25<br>*Fisheries Organizations Support Act*, S.N.S., 1995-96, c.6 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The above measures allow the Province to regulate and issue various authorisations relating to the production, processing or marketing of fish and aquaculture fish products, including the transfer, delivery or transmission of marine products by fish harvesters, aquaculturalists and subsequent purchasers.

2. Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favour of residents of Nova Scotia or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business activities with Nova Scotia.

**Reservation I-PT-92**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Products of wood, cork, straw and plaiting materials<br>Forestry and logging products<br>Pulp, paper and paper products<br>Manufacture of wood and of products of wood and cork, except furniture and manufacture of articles of straw<br>Plaiting materials on a fee or contract basis |
| **Industry Classification:** | CPC 031, 31, 321, 88430 |
| **Type of Reservation:** | Market access (CPC 31 only)<br>National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Crown Lands Act*, R.S.N.S. 1989, c. 114<br>*Forests Act*, R.S.N.S, 1989, c. 179<br>*Primary Forests Products Marketing Act*, R.S.N.S. 1989, c. 355 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  The above measures allow the Province to regulate and issue various authorisations relating to the production, extraction and development of forestry resources and related products within the Province.

2.  Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, limitations on market access imposition of performance requirements or discrimination in favour of residents of Nova Scotia or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business activities with Nova Scotia.

**Reservation I-PT-93**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Products of agriculture<br>Forestry and fishing<br>Wholesale trade services of agriculture raw materials and live animals<br>Services incidental to agriculture, hunting and forestry<br>Services incidental to fishing |
| **Industry Classification:** | CPC 01, 021, 029, 04, 21, 22, 6221, 881 (other than rental of agricultural equipment with operator and 8814), 882 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Natural Products Act*, R.S.N.S. 1989, c. 308<br>*Dairy Industry Act*, S.N.S. 2000, c. 24<br>*Agriculture and Rural Credit Act*, R.S.N.S., 1989, c. 7<br>*Agriculture and Marketing Act*, R.S.N.S., c. 6 |

**Description:**     **Investment and Cross-Border Trade in Services**

1.  The above measures allow the Province to regulate and issue various authorisations relating to the production and marketing of agricultural and food products and fish products within the Province, including measures related to the supply management of dairy, eggs and poultry products.

2.  Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favor of residents of Nova Scotia or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business activities with Nova Scotia.

**Reservation I-PT-94**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity |
| | Services incidental to energy distribution |
| **Industry Classification:** | CPC 17, 887 |
| **Type of Reservation:** | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Crown Lands Act*, R.S.N.S., 1989, c. 114 |
| | *Electricity Act*, S.N.S. 2004, c. 25 |
| | *Nova Scotia Power Privatization Act*, S.N.S., 1992, c.8 |
| | *Nova Scotia Power Reorganization (1998) Act*, S.N.S. 1998, c. 19 |
| | *Public Utilities Act*, R.S.N.S., 1989, c. 380 |
| | *Renewable Electricity Regulations*, O.I.C. 2010-381 (October 12, 2010), N.S. Reg. 155/2010 |

**Description:**  **Investment and Cross-Border Trade in Services**

1.  The above measures, among other things, permit the Government of Nova Scotia to:

    (a)  regulate and issue various authorisations relating to the production, development, operation and maintenance of generation, transmission (including system control), distribution, delivery, importation, exportation and supply of electricity, including electricity generated by renewable energy sources;

    (b)  provide for the granting of lands or waters within the Province for any good, source or force of energy from which it is possible to produce electricity, including the installation of wind turbines and hydroelectric developments; and

    (c)  Set and modify electricity rates, including feed-in tariffs.

2.  Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or

discrimination in favour of residents of Nova Scotia or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business activities with Nova Scotia.

**Reservations applicable in Nunavut**

**Reservation I-PT-95**

| | |
|---|---|
| **Sector:** | Tourism, agriculture |
| **Sub-Sector:** | Other – services incidental to hunting<br>Hunting, fishing and trapping industries<br>Tourist guide agencies (wilderness tourism)<br>Own-account hunting<br>Live animals<br>Hides, skins and furskins |
| **Industry Classification:** | CPC 021, 0297, 7472, 8813, 96419 |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | Territorial - Nunavut |
| **Measures:** | *Wildlife Act*, S. Nu. 2003, c. 26, s. 113 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

In the allocation of a dealer's licence, guiding licence, fur farm licence, game farm licence, tanning licence or taxidermy licence, preference shall be given to an applicant who had made his or her principal residence in the Nunavut Settlement Area for at least 18 continuous months prior to the submission of his or her application. Preference will also be given to applications that will likely provide direct benefits to the Nunavut economy, in particular through employment of local human and economic resources.

**Reservation I-PT-96**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services (notaries public) |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Territorial - Nunavut |
| **Measures:** | *Evidence Act*, R.S.N.W.T. 1988, c. E-8, s. 79 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Every person who seeks appointment as a notary public must reside in Nunavut and be either a citizen of Canada or a person who has the status of a permanent resident of Canada.

**Reservations applicable in Ontario**

**Reservation I-PT-97**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Business Corporations Act*, R.S.O. 1990, c. B.16, ss. 118(3), 126(2), and 45(1)(b)<br>Special Acts of the Legislature incorporating specific companies |
| **Description:** | Investment |

1. At least 25 per cent of directors of corporations (other than non-resident corporation) must be resident Canadians. If fewer than four directors, at least one must be a resident Canadian. Majority of directors' meetings must be held in Canada each year.

2. Constraints may be placed on the transfer and ownership of shares in corporations. Corporations may sell shareholders' shares without their consent and purchase shares to qualify for certain benefits that are based on minimum Canadian ownership requirements.

**Reservation I-PT-98**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to manufacturing |
| **Industry Classification:** | CPC 884, 885 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Technical Standards and Safety Act, 2000,* S.O. 2000, c. 16 *Upholstered and Stuffed Articles*, O. Reg. 218/01 ss. 8, and 17 |

**Description:**

**Cross-Border Trade in Services**

Except for a second-hand article, no person shall sell or offer for sale an upholstered or stuffed article that has not been manufactured by a manufacturer licenced in Ontario or manufactured in a designated jurisdiction.

871

**Reservation I-PT-99**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access<br>National treatment<br>Performance requirements |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Gaming Control Act, 1992*, S.O. 1992, c. 24<br>General O. Reg. 78/12<br>Order in Council 1413/08, ss. 3(b) and 16(i) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Ontario regulates gaming assistants and suppliers of services and equipment relating to lottery schemes, including games of chance, betting, bingos, casinos and promotional contests, including through provincial monopolies. Proceeds must be used to provide direct benefits to Ontario residents.

**Reservation I-PT-100**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Collection agents |
| **Industry Classification:** | CPC 87902 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Collection and Debt Settlement Services Act*, R.S.O. 1990, c. C-14<br>*General*, R.R.O. 1990, Reg. 74, ss. 12(2)(a), and19.1 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  Only Canadian citizens, permanent residents or persons ordinarily resident in Canada are eligible to be registered as collection agents and to engage in collection agency business in Ontario.

2.  A corporation must be incorporated under Canadian legislation (federal or provincial) to carry on business of collection agencies in Ontario. Exemptions under the Act and regulation are provided for not-for-profit credit counselling services.

## Reservation I-PT-101

**Sector:**        Business services

**Sub-Sector:**        Real estate services on a fee or contract basis
Real estate services involving own or leased property

**Industry Classification:**        CPC 821, 822

**Type of Reservation:**        Market access
National treatment

**Level of Government:**        Provincial - Ontario

**Measures:**        *Real Estate and Business Brokers Act, 2002,* S.O. 2002, c. 30, Sched. C
*General,* O. Reg. 567/05 para.2 of ss. 4(1) and ss. 24(1)

**Description:**        **Cross-Border Trade in Services**

Real estate services must be supplied through a commercial presence in Ontario.

**Reservation I-PT-102**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Wine products |
| **Industry Classification:** | CPC 242 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Wine Content and Labelling Act,* S.O 2000, c. 26, Sched. P *Content of Wine,* O. Reg. 659/00 |

**Description:**          **Investment**

A winery in Ontario may sell wine manufactured from a blend of imported and domestic grape products with a minimum of 25 per cent Ontario grape content per bottle.

## Reservation I-PT-103

| | |
|---|---|
| **Sector:** | Tourism |
| **Sub-Sector:** | Travel agency, tour operator and tourist guide services |
| **Industry Classification:** | CPC 7471 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Travel Industry Act, 2002,* S.O. 2002, c. 30, Sched. D, s. 4(1)<br>*General*, O. Reg. 26/05, s. 5, and ss.10(1) |

**Description:**   **Cross-Border Trade in Services**

1. An individual must be a Canadian resident to register as a travel agent and travel wholesaler in Ontario.

2. Registrants may carry on business only if their permanent place of business is in Ontario.

## Reservation I-PT-104

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Products of agriculture<br>Services incidental to agriculture |
| **Industry Classification:** | CPC 01, 8811 (other than rental of agricultural equipment with operator) |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Wild Rice Harvesting Act*, R.S.O., 1990, c. W. 7, ss.1 and 3(2) |
| **Description:** | **Cross-Border Trade in Services** |

A person seeking to harvest wild rice on Crown lands must obtain a licence. Only those who have resided in Ontario for 12 consecutive months immediately preceding the application are eligible for a licence.

**Reservation I-PT-105**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Land surveying (cadastral surveying) |
| **Industry Classification:** | CPC 86753 |
| **Type of Reservation:** | National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Surveyors Act*, R.S.O. 1990, c. S.29, ss. 3(6), 5(1), 12(1), 14(2) and (3)<br>*General*, O. Reg. 1026, s. 23 |

**Description:**     **Investment and Cross-Border Trade in Services**

1.   Only a resident of Canada may obtain a licence to conduct cadastral surveying. Only Canadian citizens can serve as councillors of the Association of Ontario Land Surveyors ("AOLS")

2.   A corporation must primarily offer professional survey services and 50 per cent of the board of directors must be members of the AOLS in order to obtain a Certificate of Authorization to offer cadastral surveying services. If the corporation offers cadastral surveying at least one director or full time employee must be licenced by the AOLS.

**Reservation I-PT-106**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to hunting |
| **Industry Classification:** | CPC 8813 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Fish and Wildlife Conservation Act*, S.O. 1997, c. 41, s.1(1) *Hunting,* O.Reg. 665/98, s. 37 |
| **Description:** | **Cross-Border Trade in Services** |

Only a resident may be issued a licence for taking of bullfrogs for sale or barter. A resident is a permanent resident or has his or her primary residence in Ontario and has resided in Ontario for six months of the preceding 12 months.

**Reservation I-PT-107**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to hunting |
| **Industry Classification:** | CPC 8813 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Fish and Wildlife Conservation Act*, S.O. 1997, c. 41, s. 1(1) *Trapping,* O. Reg. 667/98, s. 11(1) |

**Description:**      **Cross-Border Trade in Services**

Only a Canadian citizen or an Ontario resident may be issued a licence to hunt or trap fur-bearing animals. An Ontario resident is defined as a person having his or her primary residence in Ontario and has resided in Ontario for six of the 12 months preceding application for a licence.

**Reservation I-PT-108**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Sporting services<br>Services incidental to hunting |
| **Industry Classification:** | CPC 9641, 8813 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Fish and Wildlife Conservation Act*, S.O. 1997, c. 41<br>*Hunting,* O. Reg. 665/98, s. 12<br>Ontario Hunter Education Program Standards, Wildlife Policy Section, 2006 |
| **Description:** | **Cross-Border Trade in Services** |
| | Only Ontario residents are eligible to be appointed to instruct hunting education courses. |

**Reservation I-PT-109**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to hunting |
| **Industry Classification:** | CPC 8813 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Fish and Wildlife Conservation Act*, S.O. 1997, c. 41, ss. 1(1), and 32 <br> *Hunting,* O. Reg. 665/98, ss. 94 and 95 |

**Description:**   **Cross-Border Trade in Services**

To be eligible for a licence to act as a guide for hunting in the Territorial District of Rainy River and for migratory bird hunting on Lake St. Clair, an applicant must be an Ontario or Canadian resident. A resident is a person having resided in Ontario for six consecutive months immediately preceding application for a licence.

**Reservation I-PT-110**

| | |
|---|---|
| **Sector:** | Distribution services |
| **Sub-Sector:** | Wholesale trade services of fisheries products |
| **Industry Classification:** | CPC 62224 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Freshwater Fish Marketing Act*, R.S.O. 1990, c. F.33 |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | No person is permitted to control the buying or selling of fish in Ontario except as authorised in the relevant Act. |

**Reservation I-PT-111**

**Sector:**                          Forestry

**Sub-Sector:**                      Logs of coniferous wood
                                     Logs of non-coniferous wood
                                     Manufacture of wood and of products of wood and cork, except
                                     furniture
                                     Manufacture of articles of straw
                                     Plaiting materials, on a fee or contract basis

**Industry Classification:**         CPC 0311, 0312, 8843

**Type of Reservation:**             Market access
                                     Performance requirements

**Level of Government:**             Provincial - Ontario

**Measures:**                        *Crown Forest Sustainability Act*, S.O. 1994, c. 25, ss. 30 and 34
                                     *General,* O. Reg. 167/95

**Description:**                     Investment

                                     1.  Forest resource licences that authorise the harvesting of
                                         Crown trees are subject to the condition that all trees
                                         harvested shall be manufactured in Canada into lumber,
                                         pulp, or other products.

                                     2.  Forest resource licences are issued in respect of specific
                                         areas of land. As such there are limits to the number of
                                         licences issued.

                                     3.  The Minister may amend a forest resource licence in
                                         accordance with Regulation 167/95, which requires the
                                         submission of a forest management plan relating to social
                                         and economic objectives. The needs and benefits of the local
                                         communities will be given priorities into the planning effort
                                         and objective setting and achievement before broader non-
                                         local communities.

**Reservation I-PT-112**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Veterinarians Act*, R.S.O. 1990, c. V. 3<br>*General,* O. Reg. 1093/90 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Only a Canadian citizen or permanent resident, or another status under the *Immigration and Refugee Protection Act*, S.C. 2001, c. 27, consistent with the class of licence for which the application is made, is eligible to be licenced to practice veterinary medicine in Ontario.

**Reservation I-PT-113**

| | |
|---|---|
| **Sector:** | Distribution services |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Livestock Medicines Act*, R.S.O. 1990, c. L.-23<br>*General,* O. Reg. 730/90 |
| **Description:** | **Cross-Border Trade in Services** |

Only persons with an established place of business in Ontario are eligible to be licenced to sell livestock medicine in Ontario.

Licences may be issued to sellers who have established a temporary place of business at events such as races and agricultural fairs or shows.

**Reservation I-PT-114**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services (legal documentation and certification services) |
| **Industry Classification:** | CPC 86130 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Notaries Act*, R.S.O. 1990, c. N.6, s. 2(1) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Canadian citizenship is required to be appointed a notary public in Ontario for a person who is not a barrister or solicitor.

**Reservation I-PT-115**

| | |
|---|---|
| **Sector:** | Ores and minerals, electricity, gas and water |
| **Sub-Sector:** | Natural gas<br>Electrical energy |
| **Industry Classification:** | CPC 120, 17, 334, 713, 887 |
| **Type of Reservation:** | Market access<br>National treatment<br>Performance requirements |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Ontario Energy Board Act,* S.O. 1998, c. 15, Sched. B<br>*Electricity Act,* S.O. 1998, c. 15, Sched. A<br>*Green Energy Act,* S.O. 2009, c. 12, Sched. A<br>*Green Energy and Green Economy Act, 2009,* S.O. 2009, c. 12<br>*Municipal Franchises Act,* R.S.O. 1990, c. M-55 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.   The Government of Ontario and its energy authorities, entities, and agencies, including, Independent Electricity System Operator, Ontario Power Generation Inc., Hydro One Inc. and the Ontario Energy Board, and their successors or assigns, may permit one or more persons or entities to establish or expand pipelines and electricity and gas infrastructure or to produce, transmit, distribute, conserve, manage (demand and load), store, sell, retail or market energy (including electricity, natural gas or renewable energy) in any region in Ontario including on corridor lands. Further, the Government of Ontario or one of its energy authorities, the Ontario Energy Board, or its successors or assigns, may regulate the rates, storage, standards or services provided by energy producers, distributors, transmitters, sellers, retailers, marketers and storage companies in Ontario.

2.   Without limiting the generality of the foregoing, measures and actions taken by Ontario and energy authorities, entities, and agencies mentioned above and their successors or assigns, may involve discretionary decisions, based on factors that may afford preferential treatment in favour of:

(a)    residents of Ontario; or

888

    (b)    entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business in Ontario.

3.    For greater certainty, any enterprise formed in accordance with the laws of Ontario and having a place of business in Ontario, shall be treated in the same manner as an enterprise that is a resident of Ontario.

**Reservation I-PT-116**

| | |
|---|---|
| **Sector:** | Mining |
| **Sub-Sector:** | Metal ores, other minerals<br>Manufacture of basic metals on a fee or contract basis |
| **Industry Classification:** | CPC 14, 16, 8851 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Mining Act*, R.S.O. 1990, c. M.14, 1990, s. 91 |
| **Description:** | **Investment** |

All ores or minerals raised or removed from lands, claims or mining rights in Ontario must be treated and refined in Canada to yield refined metal or other product suitable for direct use in the arts without further treatment, unless the Lieutenant Governor in Council exempts any lands, claims or mining rights from the operation of this requirement.

**Reservation I-PT-117**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Interurban transportation |
| **Industry Classification:** | CPC 71213 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Public Vehicles Act*, R.S.O 1990, c. P-54 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The issuance of operating licences for public vehicles is subject to a necessity and convenience test administered by the Ontario Transport Highway Board.

**Reservation I-PT-118**

| | |
|---|---|
| **Sector:** | Educational services |
| **Sub-Sector:** | Driver certification services |
| **Industry Classification:** | CPC 9290 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Highway Traffic Act*, R.S.O. 1990, c. H.8, s. 32 (5) Issuance of driver's licence, endorsements<br>*Drivers' Licences*, O. Reg. 340/94<br>*Licences for Driving Instructors and Driving School,* O. Reg. 473/07<br>Driver Certification Program Policy<br>Beginner Driver Education Program<br>School Bus Driver Improvement Course |
| **Description:** | **Cross-Border Trade in Services** |

To be eligible for a licence to deliver driver education and training programs in Ontario, including the Driver Certification Program, the School Bus Driver Improvement Course, and the Beginner Driver Education Program, an applicant must own or lease premises in Ontario that serve as the driving school's office and classrooms.

### Reservation I-PT-119

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Co-operative Corporations Act*, R.S.O. 1990, c. C. 35, ss. 14(1) and 85 (3) |
| **Description:** | Investment |

1.   A majority of directors of every co-operative shall be resident Canadians.

2.   Co-operative corporations must have a head office in Ontario

**Reservation I-PT-120**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Liquor Control Act*, R.S.O. 1990, c. L. 18<br>*General,* O. Reg. 717/90<br>*Alcohol and Gaming Regulation and Public Protection Act*, R.S.O. 1996, c. 26, Sched.<br>*Assignment of Powers and Duties,* O. Reg. 141/01<br>Registrar of the Alcohol and Gaming Commission of Ontario policies and practices |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The above measures permit Ontario to regulate and authorise the importation, purchase, production, distribution, supply, marketing and sale of alcoholic beverages in Ontario and to conduct these activities, including through provincial monopolies. Beer may only be sold in authorised government stores.

2. The Registrar of Alcohol and Gaming authorises Ontario wine, spirits and beer manufacturers to operate stores for the sale of their own wine, spirits and beer, respectively. The Alcohol and Gaming Commission of Ontario also authorises only The Beer Store for the sale of domestic and import beer.

## Reservation I-PT-121

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Agricultural land, forest and other wooded land |
| **Industry Classification:** | CPC 5310 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Municipal Act*, S.O 2001, c. 25, s. 308.1<br>*Assessment Act*, R.S.O. 1990, c. A.31, s. 7<br>*General*, O. Reg. 282/98 |

**Description:**        **Investment**

Farm land and managed forest land owned by a Canadian citizen or a person lawfully admitted to Canada for permanent residence, or by a corporation whose voting rights are more than 50 per cent controlled by Canadian citizens or persons lawfully admitted to Canada for permanent residence, are subject to reduced property taxes.

**Reservation I-PT-122**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 862 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Credit Unions and Caisses Populaires Act*, S.O 1994, c. 11, s.160 |
| **Description:** | **Cross-Border Trade in Services** |

An individual or firm of accountants is qualified to be an auditor of a credit union if the individual is ordinarily resident in Canada.

## Reservation I-PT-123

| | |
|---|---|
| **Sector:** | Service of membership organizations |
| **Sub-Sector:** | Legal documentation and certification |
| **Industry Classification:** | CPC 8613, 95910 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *The Marriage Act*, R.S.O 1990, c. M.3, ss.11 and 20 |
| **Description:** | **Cross-Border Trade in Services** |

Ontario reserves the right to restrict the category of persons eligible to issue marriage licences, including on the basis of residence, and to require that a person registered under the Act to solemnise marriage must be an Ontario resident or have a parish or pastoral charge in whole or in part in Ontario.

**Reservation I-PT-124**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Products of agriculture<br>Forestry and fishing<br>Wholesale trade services of agriculture raw materials and live animals<br>Services incidental to agriculture, hunting and forestry<br>Services incidental to fishing |
| **Industry Classification:** | CPC 01, 021, 029, 04, 21, 22, 881 (other than rental of agricultural equipment with operator and 8814), 882 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Farm Products Marketing Act*, R.S.O., c. F-9<br>*Milk Act*, R.S.O. 1990, c. M. 12 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The above measures allow the Province to regulate and issue various authorisations relating to the production and marketing of agricultural and food products within the Province, including measures related to the supply management of dairy, eggs and poultry products.

2. Without limiting the generality of the foregoing, measures and actions taken by Ontario and entities, and agencies mentioned above, may involve discretionary decisions, based on factors that may afford preferential treatment in favour of:

    (a) residents of Ontario; or

    (b) entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business in Ontario.

**Reservation I-PT-125**

| | |
|---|---|
| **Sector:** | Trade services |
| **Sub-Sector:** | Sale, maintenance and repair services of motor vehicles |
| **Industry Classification:** | CPC 611, 612 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Ontario |
| **Measures:** | *Motor Vehicle Dealers Act*, S.O. 2002, c. 30, Sched. B |
| **Description:** | **Cross-Border Trade in Services** |

A motor vehicle dealer must be registered and operate only from a place authorised in the dealer's registration. The authorised place must be in Ontario.

**Reservations applicable in Prince Edward Island**

**Reservation I-PT-126**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Architectural services |
| **Industry Classification:** | CPC 8671 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Architects Acts*, R.S.P.E.I. 1988, c. A-18.1<br>Architects Association of Prince Edward Island By-laws |
| **Description:** | **Investment** |

A non-resident proprietorship, partnership or corporation applying for a certificate of practice to practice architecture in Prince Edward Island shall have at least two-thirds of the partners, principals or directors of the partnership or corporation be architects; and not less than the majority of issued shares of each class of voting shares of the corporation are beneficially owned by and registered in the name of architects.

**Reservation I-PT-127**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Insurance and real estate agent industries |
| **Industry Classification:** | CPC 821, 822 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Real Estate Trading Act*, R.S.P.E.I. 1988, R -2 |
| **Description:** | **Cross-Border Trade in Services** |

To sell real estate, a natural person must hold a Prince Edward Island real estate licence. The Registrar shall not issue a licence to an individual unless the individual is a citizen of Canada or has the status of permanent resident of Canada.

**Reservation I-PT-128**

| | |
|---|---|
| **Sector:** | Distribution services |
| **Sub-Sector:** | Retail sales of motor fuel |
| **Industry Classification:** | CPC 613 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Petroleum Products Act*, R.S.P.E.I. 1988, P-5.1 |
| **Description:** | **Investment** |

When issuing a licence with respect to the operation of an outlet operated by a retailer, the Commission shall consider the public interest, convenience and necessity by applying such criteria as the Commission may from time to time consider advisable.

**Reservation I-PT-129**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Prince Edward Island Lands Protection Act*, R.S.P.E.I. 1988, L-5<br>Fees Regulations and Lands Identification Regulations |
| **Description:** | **Investment** |

1. Non-resident persons must make application to acquire more than five acres of land or land having a shore frontage of more than 165 feet and receive permission from the Lieutenant Governor in Council. Shore frontage includes, but is not restricted to, land adjacent to oceans, rivers, lakes, ponds, and swamps.

2. The Government of Prince Edward Island issues permits to non-resident persons under the Act and may impose more onerous conditions including, that the land be identified under the land identification program for agricultural use or non-development use.

3. Only residents of Prince Edward Island are eligible for a property tax rebate on non-commercial real property.

### Reservation I-PT-130

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Consumer credit reporting |
| **Industry Classification:** | CPC 87901 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Consumer Reporting Act*, R.S.P.E.I. 1988, C-20 |
| **Description:** | **Cross-Border Trade in Services** |

Every consumer reporting agency registered under the Act shall operate from a fixed place of business in Prince Edward Island.

**Reservation I-PT-131**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Legal Profession Act*, 1992 c. 39, R.S.P.E.I. 1988, L-6.1 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

To be eligible for admission to the Law Society of Prince Edward Island and practice law**,** an individual must be a Canadian citizen or a permanent resident of Canada.

**Reservation I-PT-132**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Products of agriculture |
| | Live animals and animal products |
| | Meats |
| | Dairy products |
| | Food products n.e.c. |
| **Industry Classification:** | CPC 01, 02, 21, 22, 239, 6221, 62112 |
| **Type of Reservation:** | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Natural Products Marketing Act,* R.S.P.E.I., 1988, N-3 |
| | *Dairy Industry Act,* R.S.P.E.I., 1988, D-1 |
| | *Agricultural Products Standards Act,* R.S.P.E.I., 1988, A-9 |
| | *Dairy Producers Act,* R.S.P.E.I., 1988, D-2 |
| | *Agricultural Insurance Act,* R.S.P.E.I., 1988, A-8.2 |
| | *Animal Health and Protection Act*, R.S.P.E.I., A-11.1 |
| | *Grain Elevators Corporation Act*, R.S.P.E.I., 1993, c.8 |
| | *Plant Health Act,* R.S.P.E.I., 1990, c.45 |

**Description:**    **Investment and Cross-Border Trade in Services**

1.  The above measures allow Prince Edward Island to regulate and issue authorisations on a matter relating to marketing, including the buying, selling, packing grading, storing, processing, shipping for sale or storage, promoting, researching and offering for sale, in respect of, but not limited to: poultry, eggs, dairy, hogs, cattle, potatoes and turkeys, and including the production and transport to carry out the objects of these Acts.

2.  Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favour of residents of Prince Edward Island or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business operations within Prince Edward Island.

**Reservation I-PT-133**

| | |
|---|---|
| **Sector:** | Fisheries and aquaculture |
| **Sub-Sector:** | Wholesale trade of fishery products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 62224, 882 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Fisheries Act*, R.S.P.E.I. 1988 F-13.01<br>*Fish Inspection Act*, R.S.P.E.I. 1988 F-13<br>*Certified Fisheries Organizations Support Act*, R.S.P.E.I. 1988 C-2.1<br>*Natural Products Marketing Act,* R.S.P.E.I., 1988, N-3 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The above measures allow Prince Edward Island to regulate and issue authorisations on a matter relating to resources and products of the fishery, including: maintenance and development of the resources of the fishery; fish buying and processing; and any other matter or thing in order to give full effect to the objects of these Acts.

2. Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favour of residents of Prince Edward Island or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business operations within Prince Edward Island.

**Reservation I-PT-134**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity, oil and natural gas<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 17, 120, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Energy Corporation Act,* R.S.P.E.I. 1988, E-7<br>*Renewable Energy Act,* R.S.P.E.I. 2004, C-16<br>*Oil and Natural Gas Act,* R.S.P.E.I. 1988, O-5<br>*Electric Power Act,* R.S.PE.I. 1988, E-4 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  The above measures allow Prince Edward Island to regulate and issue authorisations on a matter relating to energy and energy systems, oil and natural gas, and renewable energy sources including: the generation, accumulation, transmission, distribution, supply, purchase, utilisation and disposal of energy; the drilling of wells and the production and conservation of oil and natural gas; and generally for carrying out any of the purposes or provisions of these Acts.

2.  Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favour of residents of Prince Edward Island or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business operations within Prince Edward Island.

**Reservation I-PT-135**

| | |
|---|---|
| **Sector:** | Agriculture, forestry and fisheries products |
| **Sub-Sector:** | Forestry and logging products<br>Services incidental to forestry and logging |
| **Industry Classification:** | CPC 03, 8814 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Forest Management Act,* R.S.P.E.I. 1988, F-14<br>*Public Forest Council Act,* R.S.P.E.I. 2001, C-48 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The above measures allow Prince Edward Island to regulate and issue authorisations on a matter relating to forest products, including: the conservation, protection, harvesting, extraction and sale of forest products; issuing of licences, certification of forest producers; importation of plants or plant materials; fees and other charges; and generally for carrying out the provisions of the Acts.

2. Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favour of residents of Prince Edward Island or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business operations within Prince Edward Island.

**Reservation I-PT-136**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture of alcoholic beverages. |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Liquor Control Act*, R.S.P.E.I. 1988 L-14 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.     The Prince Edward Island Liquor Control Commission ("PEILCC") is a Government of Prince Edward Island Crown agency that is the sole importer and controls the purchase, distribution and sale of alcoholic beverages in Prince Edward Island. The PEILCC operates warehouse, office facilities, and Licensee Distribution Centre. The commission supplies and administers the operations of retail liquor stores and Licensee Distribution Centre.

2.     Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favour of residents of Prince Edward Island or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business operations within Prince Edward Island.

**Reservation I-PT-137**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Prince Edward Island |
| **Measures:** | *Lotteries Commission Act*, R.S.P.E.I. 1988, L-17 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.     The Prince Edward Island Lotteries Commission is authorised under the Act to develop, organise, undertake, conduct and manage lottery schemes, pari-mutuel betting systems, and internet based gaming on behalf of the government of the Province or the governments of other provinces that have any agreement with this Province respecting any such lottery schemes or pari-mutuel betting systems.

2.     Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, imposition of performance requirements or discrimination in favour of residents of Prince Edward Island or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business and substantive business operations within Prince Edward Island.

Reservations applicable in Québec

**Reservation I-PT-138**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Québec |

**Measures:**    *An Act respecting the acquisition of farm land by non-residents*, C.Q.L.R., c. A-4.1
*Regulation respecting the declaration of non-resident status in the application for registration of the acquisition of farm land*; C.Q.L.R., c. A-4.1, r. 1
*Regulation respecting an application for authorization and the information and documents required for the application*, C.Q.L.R., chapter A-4.1, r. 2
*Regulation respecting the tariff of duties, fees, costs made under the Act respecting the acquisition of farm land by non-residents*, C.Q.L.R., c. A-4.1, r. 3
*An Act respecting the preservation of agricultural land and agricultural activities*, C.Q.L.R., c. P-41.1, and regulations
*An Act respecting the lands in the domain of the State*, C.Q.L.R., c. T-8.1
*Regulation respecting the sale, lease and granting of immovable rights on lands in the domain of the State*, C.Q.L.R., c. T-8.1, r. 7

**Description:**    **Investment**

1.    Direct or indirect acquisition of farm land by non-residents of Québec must be authorised by the *Commission de protection du territoire agricole du Québec*. When it receives an application for authorisation by non-residents of Québec, the Commission takes into consideration the possible uses of the land for agricultural purposes and the economic consequences thereof.

2.    No person may, in a designated agricultural region, use a lot for any purpose other than agriculture without the authorisation of the Commission, which takes into

912

consideration specific socio-economics factors when rendering a decision.

3.  Québec residents are given priority in the purchase or lease of land in the domain of the State.

**Reservation I-PT-139**

| | |
|---|---|
| **Sector:** | Agriculture, forestry and fisheries |
| **Sub-Sector:** | Products of agriculture |
| | Horticulture and market gardening |
| | Live animals and animal products |
| | Wood in the rough |
| | Fish and other fishing products |
| | Meat, fish, fruits, vegetables, oils and fats |
| | Dairy products |
| | Grain mill products |
| | Starches and starch products |
| | Other food products |
| | Services incidental to agriculture |
| | Services incidental to animal husbandry |
| | Services incidental to fishing |
| **Industry Classification:** | CPC 01, 02, 031, 04, 21, 22, 23, 8811 (other than rental of agricultural equipment with operator), 8812, 882 |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *Professional Syndicates Act*, C.Q.L.R., c. S-40 |
| | *An Act respecting the marketing of agricultural, food and fish products*, C.Q.L.R., c. M-35.1 |
| | *Règlement des producteurs d'œufs d'incubation sur le contingentement*, C.Q.L.R., c.M-35.1, r. 223 |
| | *Règlement sur les quotas des producteurs d'œufs de consommation du Québec*, C.Q.L.R., c. M-35.1, r. 239 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.   Joint plans for the production and marketing of agricultural products and producers marketing boards may be administered by professional syndicates. Only Canadian citizens may ask to form a professional syndicate and be members of its administrative council.

2.   Only Canadian citizens may have access to the reserve for new hatching egg producers, are eligible to certain programs and can benefit from eggs quotas transfers outside of the centralised system.

**Reservation I-PT-140**

| | |
|---|---|
| **Sector:** | Agriculture, forestry and fisheries |
| **Sub-Sector:** | Fish products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 882 |
| **Type of Reservation:** | Performance requirements |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *Marine Products Processing Act,* C.Q.L.R., c. T-11.01 |
| **Description:** | **Investment** |

The Minister may, by regulation, prescribe the minimum processing standards with which an operator must comply for the preparation or canning of a marine product. The standards may vary according to the marine product.

### Reservation I-PT-141

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Cultural goods and property |
| **Industry Classification:** | CPC 963 |
| **Type of Reservation:** | National treatment<br>Market access |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *Cultural Heritage Act,* C.Q.L.R., c. P-9.002 |
| **Description:** | **Investment** |

1. A heritage cultural property may include a heritage document, immovable, object or site. After obtaining the opinion of the *Conseil du patrimoine culturel*, the Minister of Culture and Communications may classify all or part of any heritage property the knowledge, protection, enhancement or transmission of which is in the public interest.

2. Authorisation from the Minister is required when a person, natural or legal, wishes to sell or give away a classified heritage document or object to a government or department or agency of a government, other than the *Gouvernement du Québec*, a natural person who is not a Canadian citizen or permanent resident or to a legal person that does not have a principal place of business in Québec. Classified heritage property in the domain of the State may not be sold, conveyed by emphyteusis or given away without the Minister's authorisation. In other cases of alienation, prior written notice is required.

**Reservation I-PT-142**

| | |
|---|---|
| **Sector:** | Community, social and personal services |
| **Sub-Sector:** | Funeral, cremation and undertaking services |
| **Industry Classification:** | CPC 9703 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting medical laboratories, organ and tissue conservation and the disposal of human bodies*, C.Q.L.R., c. L-0.2 |
| | *Regulation respecting the application of the Act respecting medical laboratories, organ and tissue conservation and the disposal of human bodies,* C.Q.L.R., c. L-0.2, r. 1 |
| | *An Act respecting prearranged funeral services and sepultures*, C.Q.L.R., c. A-23.001 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    A natural person seeking a permit to act as a funeral director, on his or her behalf or for a legal person, partnership or an association having its head office in Québec, must have resided in Québec for at least 12 months preceding the request.

2.    A person seeking a permit to practise embalming, cremation or thanatopraxy is not subject to the requirement to reside in Québec provided that he or she resides in Canada.

### Reservation I-PT-143

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Taxi services |
| **Industry Classification:** | CPC 71221 |
| **Type of Reservation:** | National treatment<br>Market access |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting transportation services by taxi*, C.Q.L.R., c. S-6.01<br>*Taxi Transportation Regulation*, C.Q.L.R., c. S-6.01, r. 3,<br>*Highway Safety Code*, C.Q.L.R., c. C-24.2<br>*Regulation respecting road vehicle registration*, C.Q.L.R., c. C-24.2, r. 29 |

| | |
|---|---|
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. For a taxi owner's permit to be issued, assigned or transferred from the Commission des transports du Québec, a natural person must be a Canadian citizen or permanent resident. To be issued a taxi driver's permit by the *Société de l'assurance automobile du Québec*, a natural person must be a Canadian citizen or permanent resident.

2. There is a limit of 20 taxi owner's permits per person.

**Reservation I-PT-144**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Interurban special transportation<br>Transportation of other freight |
| **Industry Classification:** | CPC 71214, 71239 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *Highway Safety Code*, C.Q.L.R., c. C-24.2<br>*Regulation respecting road vehicle registration*, C.Q.L.R., c. C-24.2, r. 29 |
| **Description:** | **Cross-Border Trade in Services** |

Under the International Registration Plan ("IRP"), carriers only pay registration fees once, to the base jurisdiction, which in turn ensures travel for duly licenced vehicles in other jurisdictions. This system of apportionable fees works on the basis of the distance travelled in each jurisdiction. An IRP registration certificate is recognised by Canadian provinces and United States of America's states. An apportioned registration will only be granted to a person having a place of business in Québec and where at least one of its vehicles accrues kilometres.

**Reservation I-PT-145**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Bus transport |
| **Industry Classification:** | CPC 71211, 71212, 71213, 71214, 71222 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *Transport Act*, C.Q.L.R., c. T-12 |
| | *Bus Transportation Regulation*, C.Q.L.R., c.T-12, r. 16 |

**Description:**  **Investment and Cross-Border Trade in Services**

In issuing bus transportation permits, the *Commission des Transports du Québec* may apply criteria of public need in the territory to be served. It may also consider if the issuance of the permit requested by the applicant is not likely to entail the disappearance of any other bus transport service or appreciably affect the quality thereof.

**Reservation I-PT-146**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transportation |
| **Industry Classification:** | CPC 71231, 71232, 71233, 71234 |
| **Type of Reservation:** | National treatment<br>Market access<br>Performance requirements |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting the Ministère des Transports*, C.Q.L.R., c. M-28<br>*Transport Act*, C.Q.L.R., c. T-12<br>*Regulation respecting the brokerage of bulk trucking services*, C.Q.L.R., c. T-12, r. 4<br>*An Act respecting owners, operators and drivers of heavy vehicles*, C.Q.L.R., c. P-30.3 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The Minister of Transport determines the conditions that a heavy-vehicle operator located outside of Québec but in the territory of a party to the Agreement on Internal Trade must meet to register in the bulk trucking register. The total number of registration allowed is limited. A heavy-vehicle operator located outside of Québec has to maintain its principal establishment outside of Québec and its registration cannot be transferred.

2. Participation in the performance of a road construction, repair or maintenance work contract awarded by the Minister of Transport, is limited to small bulk trucking enterprises that subscribe to the brokerage service of an association holding a brokerage permit, for a minimum of 50 per cent of the transportation required that has to be offered to the brokerage permit holder. Bulk trucking enterprises that are not registered into the register will only have access to the remaining 50 per cent of the transportation needed if the brokerage permit holder accepts the offer to transport 50 per cent of the transportation required.

3. To obtain a brokerage permit, a non-profit legal person or a cooperative shall demonstrate that it represents at least

921

35 per cent of the operators of heavy-vehicles that are registered in the bulk trucking register and that have its principal establishment in the zone for which the permit is applied for. An operator shall subscribe for brokerage services in the brokerage zone where he or she has his or her principal establishment or in the zone determined by regulation.

**Reservation I-PT-147**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Maritime transport |
| **Industry Classification:** | CPC 72211 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting the Société des Traversiers du Québec*, C.Q.L.R., c. S-14<br>*Transport Act*, C.Q.L.R., c. T-12 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The *Commission des Transports du Québec* shall issue or transfer a permit for the transport of passengers by water to a person who applies therefor on the form used by the Commission, if it considers that the person establishes the real and urgent necessity for an additional service for each of the ships to be used, if applicable, where he or she offers passengers a ferry service competing with another ferry service.

2. No person may be a member of the board of directors unless he is domiciled in Québec.

**Reservation I-PT-148**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Sporting and other recreational services |
| **Industry Classification:** | CPC 964 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting safety in sports*, C.Q.L.R., c. S-3.1<br>*Regulation respecting combat sports*, C.Q.L.R., c. S-3.1, r. 11<br>*Regulation respecting combat sports licensing*, C.Q.L.R., c. S-3.1, r. 7 |
| **Description:** | **Cross-Border Trade in Services**<br><br>With respect to professional combat sport, a person who is not domiciled in Canada cannot obtain a yearly referee's or judge's permit but may obtain a permit valid for a specific sports event. |

**Reservation I-PT-149**

| | |
|---|---|
| **Sector:** | Travel agency, tour operator and tourist guide services |
| **Sub-Sector:** | Travel agencies<br>Tour operation services |
| **Industry Classification:** | CPC 7471 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *Travel Agents Act*, C.Q.L.R., c. A-10<br>*Regulation respecting travel agents*, C.Q.L.R., c. A-10, r. 1 |
| **Description:** | **Cross-Border Trade in Services** |

A natural person applying for a travel agent licence on his or her own account must establish and maintain a principal establishment in Québec. The association, partnership or person on whose behalf the licence is applied for must establish and maintain a principal establishment in Québec. A principal establishment is an establishment in which the operations of the licencee are principally performed.

**Reservation I-PT-150**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment<br>Market access<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *Cooperatives Act*, C.Q.L.R., c. C-67.2<br>*Regulation under the Cooperatives Act,* C.Q.L.R., c. C-67.2, r. 1 |
| **Description:** | **Investment** |

1.   The *Cooperatives Act* places constraints on the issue, transfer and ownership of shares. Membership of the cooperative is subject to the member actually using the services offered by the cooperative and to the cooperative's ability to provide him with them. The *Cooperatives Act* also stipulates that every member of the cooperative or representative of a legal person or partnership that is a member may be a director. The head office of a cooperative, a federation or a confederation must at all times be located in Québec.

2.   A cooperative, a federation or a confederation must carry on with its members a proportion of its total business according to a percentage determined by government regulation. In the case of a solidarity cooperative, this proportion is calculated separately for the members who are users of the cooperative and for those who are workers of the cooperative.

**Reservation I-PT-151**

| | |
|---|---|
| **Sector:** | Agriculture, forestry and fisheries |
| **Sub-Sector:** | Forestry and logging products<br>Products of wood, cork, straw and plaiting materials<br>Pulp, paper and paper products |
| **Industry Classification:** | CPC 031, 31, 32 |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting the Ministère des Ressources Naturelles et de la Faune*, C.Q.L.R., c. M-25.2<br>*Sustainable Forest Development Act*, C.Q.L.R., c. A-18.1 |
| **Description:** | **Investment** |

1. All timber harvested in the domain of the State, including biomass volumes, must be completely processed in Québec. However, the Government may, on the conditions it determines, authorise the shipment outside Québec of incompletely processed timber from the domain of the State if it appears to be contrary to the public interest to do otherwise.

2. The Minister may take measures for the development of lands or forest resources in the domain of the State that are under his or her authority in order to encourage regional development or implement any other related policy.

**Reservation I-PT-152**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Horse racing |
| **Industry Classification:** | CPC 02113, 96492 |
| **Type of Reservation:** | National treatment<br>Market access |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting racing*, C.Q.L.R., c. C-72.1<br>*Rules respecting the breeding of Québec Standardbred race horses*, C.Q.L.R., c. C-72.1, r. 6<br>*Rules respecting Certification*, C.Q.L.R., c. C-72.1, r. 1<br>*Rules respecting betting houses*, CQLR, c. C-72.1, r. 8<br>*Rules respecting Standardbred horse racing*, C.Q.L.R., c. C-72.1, r. 3<br>*Regulation respecting betting horses, C.*Q.L.R., c. C-72.1, r.7 |

**Description:**    **Investment and Cross-Border Trade in Services**

1.    Only a Canadian citizen may apply for a licence to operate a race track, a licence to hold races or a licence to operate a betting house.

2.    A person who applies for registration of a Standardbred stallion with the *Régie des alcools, des courses et des jeux* ("RACJ") must be a resident of Québec for at least 183 days.

3.    Only a Québec race horse, as defined in the *Rules respecting the breeding of Québec Standardbred race horses*, can be entitled to a privilege or advantage.

**Reservation I-PT-153**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting the Société des loteries du Québec*, C.Q.L.R., c. S-13.1<br>*An Act respecting the Régie des alcools des courses et des jeux,* C.Q.L.R. chapter R-6.1<br>*An Act respecting lotteries, publicity contests and amusement machines*, C.Q.L.R., c. L-6<br>*Lottery Scheme Rules*, C.Q.L.R., c. L-6, r. 12<br>*Rules respecting amusement machines*, C.Q.L.R., c. L-6, r. 2<br>*Rules respecting publicity contests*, C.Q.L.R., c. L-6, r. 6<br>*Rules respecting video lottery machines*, C.Q.L.R., c. L-6, r. 3<br>*Bingo Rules*, C.Q.L.R., c. L-6, r. 5 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  A person who applies for a licence to operate a lottery scheme must be a Canadian citizen or, in the case of a company or corporation, have an office in Québec.

2.  A person who wishes to obtain an amusement machine operator's licence or merchant licence must be a Canadian citizen and in the case of a corporation, must be headquartered or have its principal establishment in Canada and have an office in Québec.

3.  With regard to video lottery machines operated somewhere other than in a government casino, *Régie des alcools, des courses et des jeux* ("RACJ") may take Canadian citizenship or residence into account when making rules to determine the conditions for obtaining prescribed licences as well as operating standards, restrictions, or prohibitions. The RACJ may determine the conditions of player participation, or standards, restrictions, or prohibitions related to promotion, advertising, or educational programs pertaining to video lottery machines, which may only

apply, in full or in part, to certain categories of individuals.

4.    With respect to bingo, projects for which a charitable or religious organization applies for an in-hall, media, or recreational bingo licence must be carried out entirely in Québec. Individuals or companies that apply for a bingo supplier's licence must have an establishment in Québec.

5.    No person may be a member of the board of directors unless he is domiciled in Québec.

**Reservation I-PT-154**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services<br>Beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting the Société des alcools du Québec*, C.Q.L.R., c. S-13<br>*Regulation respecting cider and other apple-based alcoholic beverages*, C.Q.L.R., c. S-13, r. 4<br>*Regulation respecting wine and other alcoholic beverages made or bottled by holders of a wine maker's permit*, C.Q.L.R., c. S-13, r. 7<br>*Regulation respecting alcoholic beverages made and bottled by holders of a distiller's permit*, C.Q.L.R., c. S-13, r. 3<br>*Regulation respecting the terms of sale of alcoholic beverages by holders of a grocery permit*, C.Q.L.R., c. S-13, r. 6<br>*An Act respecting offences relating to alcoholic beverages*, C.Q.L.R., c. I-8.1<br>*An Act respecting liquor permits,* C.Q.L.R., c. P-9.1<br>*Regulation respecting liquor permits,* C.Q.L.R., c. P-9.1, r. 5 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. The *Société des alcools du Québec* operates as a monopoly responsible for the importation, distribution, supply, transport, sale, trade and marketing of alcoholic beverages.

2. No person may be a member of the board of directors unless he or she is domiciled in Québec.

931

**Reservation I-PT-155**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services<br>Beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access<br>National treatment<br>Performance requirements |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting the Société des alcools du Québec*, C.Q.L.R., c. S-13<br>*Regulation respecting the terms of sale of alcoholic beverages by holders of a grocery permit*, C.Q.L.R., c. S-13, r. 6<br>*An Act respecting offences relating to alcoholic beverages*, C.Q.L.R., c. I-8.1 |

**Description:**         **Investment and Cross-Border Trade in Services**

1. Only those who own an establishment in Québec may obtain a beer distributor's, brewer's, distiller's, wine maker's, cider maker's, warehouse, small-scale production or small-scale beer producer's permit.

2. Holders of a distiller's permit may only sell the products they produce or bottle to *Société des alcools du Québec* ("SAQ"), unless they ship such products outside Québec.

3. Holders of a small-scale production permit may sell the alcoholic beverages they produce on their production premises.

**Reservation I-PT-156**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services<br>Beverages<br>Hotel and restaurant services |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107, 641, 642, 643 |
| **Type of Reservation:** | Market access<br>National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting liquor permits,* C.Q.L.R., c. P-9.1<br>*Regulation respecting liquor permits*, C.Q.L.R., c. P-9.1, r. 5<br>*Regulation respecting the terms of sale of alcoholic beverages by holders of a grocery permit*, C.Q.L.R., c. S-13, r. 6 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. To obtain a liquor permit under the *Act respecting liquor permits*, persons who are not Canadian citizens must have been residing in Québec as a permanent resident of Canada, unless they apply for a reunion permit or "Man and His World" permit as authorised representatives of a government, country, Province, or State.

2. Companies or corporations not listed on a Canadian stock exchange may obtain a permit to sell alcohol only if all their partners or directors and shareholders who hold ten per cent or more of shares with full voting rights are Canadian citizens or have been residing in Québec as a permanent resident of Canada.

3. For certain product categories, marketing is carried out by holders of a grocery licence issued by the *Régie des alcools, des courses et des jeux* ("RACJ"). Grocers must buy authorised alcoholic beverages from an authorised distributor.

4. Liquor permit applicants who are not Canadian citizens must prove that they have lived in Québec for at least one year. If an applicant is a company or corporation not listed

on a Canadian stock exchange, it must prove, for each of its partners or directors and shareholders who own 10 per cent or more of shares with full voting rights and are not Canadian citizens that they have lived in Québec for at least one year.

5.  The person entrusted to manage the establishment for a holder of a permit authorising the sale or service of alcoholic beverages for consumption on a premise must have a Canadian social insurance number.

6.  With regard to reunion permits to sell alcohol, when the proceeds of an event are to be used for the purposes of a non-profit corporation other than the permit applicant, the non-profit corporation must have an establishment in Québec.

**Reservation I-PT-157**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act Respecting the Régie de l'énergie*, C.Q.L.R., c. R-6.01<br>*Hydro-Québec Act,* C.Q.L.R., c. H-5 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. Québec (including through the *Régie de l'énergie* and Hydro-Québec) may fix, determine and modify rates, tariffs, prices and other conditions relating to the production, purchase, transportation, transmission, supply, distribution, and sale of electric power.

2. Without limiting the generality of the foregoing, these measures may involve discretionary decisions based on various factors, the imposition of performance requirements or discrimination in favor of residents of Québec or entities established in accordance with the laws of Canada or a province or territory thereof and having a place of business or substantive business operations within Québec.

935

**Reservation I-PT-158**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *An Act respecting the exportation of electric power*, C.Q.L.R., c. E-23<br>*An Act Respecting the Régie de l'énergie*, C.Q.L.R, c. R-6.01 |

**Description:**  **Investment and Cross-Border Trade in Services**

1.  Hydro-Québec, municipal electric power systems, and private electric power systems are holders of exclusive electric power distribution rights.

2.  The exportation of electric power from Québec is prohibited. The *Gouvernement du Québec* may nevertheless authorise, by order, on the conditions and in the cases it determines, a contract for the exportation of electric power from Québec.

3.  Contracts relating to the exportation of electric power by Hydro-Québec, including wheeling under a transportation service agreement, must be submitted to the Government for authorisation in the cases determined by the Government and are subject to such conditions as the Government may then determine.

**Reservation I-PT-159**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Real estate services involving own or leased property<br>Real estate services on a fee or contract basis |
| **Industry Classification:** | CPC 821, 822 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial - Québec |
| **Measures:** | *Real Estate Brokerage Act*, C.Q.L.R., c. C-73.2 |
| **Description:** | **Cross-Border Trade in Services** |

The *Real Estate Brokerage Act* imposes residency requirements to brokers and agencies. Therefore, a broker must have an establishment in Québec. In the case of a broker who acts on behalf of an agency, the broker's establishment is the agency's establishment. An agency must have an establishment in Québec.

**Reservations applicable in Sasketchewan**

**Reservation I-PT-160**

| | |
|---|---|
| **Sector:** | Sale, maintenance and repair of motor vehicles and motorcycles |
| **Sub-Sector:** | Wholesale trade services<br>Retail sales of motor vehicles including automobiles and other road vehicles |
| **Industry Classification:** | CPC 61111, 61112 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Motor Dealers Act*, R.S.S. 1978, c. M-22<br>*The Motor Dealers Regulations*, R.R.S. c. M-22 Reg. 1 |
| **Description:** | **Cross-Border Trade in Services**<br><br>No licence as a motor vehicle dealer shall be granted unless the applicant for the licence maintains in the Province a place of business satisfactory to the registrar and from which he or she conducts his or her business, or a portion of his or her business, as a dealer. |

**Reservation I-PT-161**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to fishing |
| **Industry Classification:** | CPC 882 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Fisheries Act (Saskatchewan), 1994*, c. F-16.1<br>*The Fisheries Regulations*, c. F-16.1 Reg. 1<br>Commercial Fishing Licensee Eligibility Requirements, Policy Number 3420.02<br>Commercial Fishing Co-operatives, Policy Number F & W 2003.2<br>Commercial Net Fishing Licence Eligibility Requirements Guidelines |
| **Description:** | **Investment and Cross-Border Trade in Services**<br><br>Only a Saskatchewan resident is eligible to obtain a commercial fishing licence. Licences may be restricted to residents of the region of a local fishery. |

**Reservation I-PT-162**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Legal Profession Act, 1990*, S.S. 1990-91, c. L-10.1<br>Rules of the Law Society of Saskatchewan |

**Description:**  **Investment and Cross-Border Trade in Services**

1. Only Canadian citizens or permanent residents of Canada are eligible for membership in the Law Society of Saskatchewan as a student of law or lawyer. Only members of the Law Society of Saskatchewan holding a subsisting certificate of practice can practice law in Saskatchewan.

2. A person who has engaged in the active practice of law in another jurisdiction of Canada may, upon meeting certain conditions, be admitted as a member without having met the normal requirements. Occasional appearance memberships are available only to persons who are Canadian citizens or permanent residents of Canada and who are qualified to practice law in another jurisdiction of Canada.

**Reservation I-PT-163**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Notaries Public Act*, R.S.S. 1978, c. N-8<br>*The Commissioners for Oaths Act*, R.S.S. 1978, c. C-16 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Only Canadian citizens residing within Saskatchewan can be appointed a notary public for Saskatchewan.

2.    Only Canadian citizens can be appointed as a commissioner for oaths in and for Saskatchewan.

**Reservation I-PT-164**

| | |
|---|---|
| **Sector:** | Tourism |
| **Sub-Sector:** | Other – services incidental to hunting<br>Services incidental to fishing<br>Tourist guide agencies<br>Own-account hunting |
| **Industry Classification:** | CPC 7472, 8813, 8820, 96419 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Wildlife Act, 1998*, S.S. c. W-13.12<br>*The Wildlife Regulations*, c. W13.1 Reg. 1<br>*The Outfitter and Guide Regulations, 2004*, c. N-3.1 Reg. 3 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A person who wishes to hold an outfitter's licence must be a Saskatchewan resident and have a head office in Saskatchewan.

**Reservation I-PT-165**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Real estate services involving own or leased property<br>Real estate services on a fee or contract basis |
| **Industry Classification:** | CPC 8210, 822 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Real Estate Act*, S.S. 1995, c. R-1.3<br>The Real Estate Commission policies and bylaws |
| **Description:** | **Cross-Border Trade in Services** |

A brokerage and person named in a certificate of registration as a brokerage must have an office in Saskatchewan and is required to maintain trust accounts in a financial institution in Saskatchewan for the deposit of all money received in connection with trades in real estate.

**Reservation I-PT-166**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to hunting<br>Tourist guide agencies<br>Own-account hunting |
| **Industry Classification:** | CPC 7472, 8813, 96419 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Wildlife Act, 1998*, S.S. c.W-13.12<br>*The Wildlife Regulations*, c.W13.1 Reg. 1 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.   A fur licence holder must be a Saskatchewan resident.

2.   A Saskatchewan resident is a Canadian resident who has a principal residence in Saskatchewan and has resided in the Province for the three months preceding the date of the application for a licence.

**Reservation I-PT-167**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Alcohol and Gaming Regulation Act*, S.S.1997, c. A-18.011<br>Saskatchewan Liquor and Gaming Authority Policy<br>*The Slot Machine Act*, R.S.S. 1978, c. S-50<br>*The Saskatchewan Gaming Corporation Act*, S.S. 1994, c. S-18.2<br>*The Interprovincial Lotteries Act, 1984*, S.S. 1983-84, c. I-12.01 |

**Description:**          **Investment**

Only gaming equipment, including video lottery terminals and slot machines, owned or leased by the Government of Saskatchewan may be operated in Saskatchewan.

**Reservation I-PT-168**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Passenger Transportation<br>Interurban scheduled bus passenger transportation<br>Non-scheduled motor buses, chartered buses and tour and sightseeing buses |
| **Industry Classification:** | CPC 71213, 71222, 71223 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Traffic Safety Act*, S.S. 2004, c. T-18.1<br>*The Operating Authority Regulations, 1990*, c. M-21.2 Reg. 1<br>Policies of the Highway Safety Board |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  An Operating Authority Certificate is required by persons operating commercial or business use vehicles for the purpose of transporting passengers for hire within or outside of the Province.

2.  When considering an application for an operating authority certificate or an amendment to an Operating Authority Certificate, the Highway Safety Board may consider if public business will be promoted by the proposed undertaking.

3.  Public business may be measured through a public convenience and needs test which includes:

    (a)  examination of the adequacy of current levels of service;

    (b)  market conditions establishing the requirement for expanded service;

    (c)  the effect of new entrants on public convenience, including the continuity and quality of service; and

    (d)  fitness, willingness and ability of the applicant to provide proper service.

**Reservation I-PT-169**

**Sector:**                        All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**           National treatment
                                   Senior management and boards of directors

**Level of Government:**           Provincial – Saskatchewan

**Measures:**                      *The Business Corporations Act*, R.S.S. 1978, c. B-10
                                   Private Acts of the Legislature of Saskatchewan establishing
                                   corporate bodies

**Description:**                   **Investment**

1. At least 25 per cent of the directors of a corporation must be resident Canadians (such as a Canadian citizen or permanent resident), but if a corporation has fewer than four directors, at least one director must be a resident Canadian.

2. If none of the directors of a corporation resides in Saskatchewan, the corporation shall appoint an attorney pursuant to comply with the Act as if the corporation were an extra-provincial corporation.

3. Directors of a corporation may appoint from their number a managing director who is a resident Canadian or a committee of directors and delegate to such managing director or committee any of the powers of the directors.

4. If the directors of a corporation appoint a committee of directors, at least 25 per cent of the members of the committee must be resident Canadians.

5. Constraints may be placed on the transfer and ownership of shares in corporations. The object is to permit corporations to meet Canadian ownership requirements, under certain federal and provincial laws, in sectors where ownership is required as a condition to operate or to receive licences, permits, grants, payments, or other benefits. In order to maintain certain Canadian ownership levels, a corporation is permitted to sell shareholders' shares without the consent of those shareholders, and to purchase its own shares on the open market.

**Reservation I-PT-170**

**Sector:**                     All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**        National treatment
                                Senior management and boards of directors

**Level of Government:**        Provincial – Saskatchewan

**Measures:**                   *The Co-operatives Act, 1996*, S.S. 1998, c. C-37.3
                                Private Acts of the Legislature of Saskatchewan establishing
                                corporate bodies
                                Practice and Policy of the Registrar of Co-operatives

**Description:**                **Investment**

1.   A co-operative must have a registered office in Saskatchewan.

2.   Membership may be limited to Canadians resident in Saskatchewan.

3.   There must be at least five Directors and the majority of Directors must be Canadian residents. Directors are appointed from amongst the membership of the co-operative.

4.   The registrar may restrict the businesses in which a co-operative may engage in the Province.

**Reservation I-PT-171**

**Sector:**                    All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**       National treatment
                               Senior management and boards of directors

**Level of Government:**       Provincial – Saskatchewan

**Measures:**                  *The Non-profit Corporations Act*, S.S. 1995, c. N-4.2
                               Private Acts of the Legislature of Saskatchewan establishing
                               corporate bodies

**Description:**               Investment

1.  At least one director of a corporation must reside in Saskatchewan.

2.  At least 25 per cent of the directors of a corporation must be resident Canadians (such as a Canadian citizen), but if a corporation has fewer than four directors, at least one director must be a resident Canadian.

3.  Directors of a charitable corporation shall not transact business at a meeting of directors unless a majority of directors present are resident Canadians.

4.  Directors of a corporation may appoint from their number a managing director who is a resident Canadian or a committee of directors and delegate to the managing director or committee any of the powers of the directors. If the directors of a corporation appoint a committee of directors, a majority of the members of the committee must be resident Canadians.

**Reservation I-PT-172**

**Sector:**                                       All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**                National treatment
                                                     Performance requirements

**Level of Government:**              Provincial – Saskatchewan

**Measures:**                                *The Labour-sponsored Venture Capital Corporations Act*, S.S. 1986, c. L-0.2
                                                     *The Labour-sponsored Venture Capital Corporations Regulations*, R.R.S. c. L-0.2 Reg 1

**Description:**                            **Investment**

1.    A labour-sponsored venture capital corporation is required to invest the proceeds from the issuance of shares primarily in the equity shares of eligible businesses. To be eligible, a business must employ no more than 500 employees in Saskatchewan and pay at least 25 per cent of its salaries and wages to Saskatchewan residents.

2.    Tax credits are limited to persons liable to pay Saskatchewan provincial and federal income tax.

**Reservation I-PT-173**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Provincial - Saskatchewan |
| **Measures:** | *The Community Bonds Act*, S.S. 1990-91, c. C-16.1 |
| **Description:** | **Investment** |
| | All directors of the proposed community bond corporation are to be residents of Saskatchewan. |

**Reservation I-PT-174**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Agricultural land<br>Products of agriculture<br>Live animals and animal products |
| **Industry Classification:** | CPC 01, 02, 531 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Saskatchewan Farm Security Act*, S.S. 1988-89, c.S-17.1<br>Crown Land Lease Policy (93-10-01)<br>Community Pasture Policy (93-12-01) |
| **Description:** | **Investment** |

1. Only Canadian residents and incorporated agricultural corporations are unlimited in the farmland holdings that they can own, control directly or indirectly or otherwise deal with.

2. A "resident person" means an individual who:

    (a) resides in Canada for at least 183 days in any year; or

    (b) is a Canadian citizen.

3. Non-Canadian residents and non-agricultural corporations may not have or acquire an aggregate land holding exceeding ten acres and are restricted in the conditions under which they may own, control directly or indirectly or otherwise deal with farmland holdings in Saskatchewan.

4. Non-residents may not acquire an interest in land by participating in limited partnerships.

5. Livestock producers must be Canadian citizens or landed immigrants and actively operate or manage a farm and control a land base in Saskatchewan in order to lease pasture land.

**Reservation I-PT-175**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | Agriculture, mining and manufacturing<br>Services incidental to agriculture<br>Production and distribution services |
| **Industry Classification:** | CPC 0291, 0292, 02122, 22, 8811 (other than rental of agricultural equipment with operator) |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Agri-Food Act*, S.S. 2004, c. A-15.21<br>*The Broiler Hatching Egg Marketing Plan Regulations, 1985*, c. N-3, Reg. 1<br>*The Commercial Egg Marketing Plan Regulations, 2006*, c. A-15.21, Reg. 2<br>*The Milk Marketing Plan Regulations, 2010*, c. A-15.21, Reg. 12<br>*The Saskatchewan Chicken Marketing Plan, 1978*, S.R. 387/78<br>*The Saskatchewan Turkey Producers' Marketing Plan, 1975*, S.R. 275/75 |
| **Description:** | **Investment and Cross-Border Trade in Services**<br><br>Producers are required to hold a licence in order to produce or market: broiler hatching eggs; chickens, commercial eggs, milk; and turkeys. Only licenced producers can own and produce the commodities associated with each type of quota. Products produced under that quota must be produced in Saskatchewan. |

### Reservations applicable in Yukon

### Reservation I-PT-176

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment<br>Performance requirements |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Income Tax Act*, R.S.Y. 2002, c.118 |
| **Description:** | **Investment** |

1. Under the *Yukon Income Tax Act*, a Yukon Small Business Investment Tax Credit of 25 per cent of the purchased share amount is offered to Yukon residents who invest in eligible business corporations. Yukon allocates CAD $1 million annually, to distribute on a first come, first served basis.

2. Eligible small business corporations must meet certain criteria including maintaining a permanent establishment in Yukon, having at least 50 per cent of assets in Yukon, and paying at least 50 per cent of salaries in Yukon.

## Reservation I-PT-177

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Legal Profession Act*, R.S.Y. 2002, c.134 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The following persons are qualified to apply for admission to the Law Society of Yukon and enrolment as members for the provision of domestic law:

    (a)    a person who has been duly called to the bar of a province or has been admitted to practice as an attorney, advocate, barrister or solicitor in a province; or

    (b)    a person who has completed 12 months of service in Yukon under articles as a student-at-law approved by the executive.

**Reservation I-PT-178**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Notary public |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Notaries Act*, R.S.Y. 2002, c. 158 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Every person who seeks enrolment as a notary public must be a citizen of Canada or a person who has the status of a permanent resident of Canada.

**Reservation I-PT-179**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Real estate services involving own or leased property<br>Real estate services on a fee or contract basis |
| **Industry Classification:** | CPC 821, 822 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Real Estate Agents Act*, R.S.Y. 2002, c.188<br>*Regulation*, O.I.C., 1977/158, 1981/14, and 1990/136 |

**Description:**          **Cross-Border Trade in Services**

Real estate agent applicants must:

(a)  be a resident of Yukon for a period of not less than three months immediately prior to the application date; and

(b)  be licenced as a salesman in Yukon for at least one year prior to submitting an application.

**Reservation I-PT-180**

| | |
|---|---|
| **Sector:** | Travel agency, tour operator and tourist guide services |
| **Sub-Sector:** | Tourist guide services |
| **Industry Classification:** | CPC 7472 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Wilderness Tourism Licensing Act*, R.S.Y. 2002, c. 228<br>*General Regulation,* O.I.C. 1999/69 |

**Description:**    **Investment and Cross-Border Trade in Services**

1. There are a limited number of licences allocated for the Glacier Bay National Park and Preserve area. Licences allocated to Yukon are distributed with preference given to Yukon residents.

2. The above measures permit the Government of Yukon to regulate and issue various authorisations relating to wilderness tourism. This may involve, among other things, the making of measures:

    (a) to limit ownership on the basis of nationality or residence;

    (b) to limit market access; and

    (c) to favour Canadian persons and Canadian service providers.

**Reservation I-PT-181**

| | |
|---|---|
| **Sector:** | Tourism |
| **Sub-Sector:** | Services incidental to hunting, trapping, outfitting and tourist guides |
| **Industry Classification:** | CPC 8813, 7472, 96419 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Wildlife Act*, R.S.Y. 2002, c.229<br>*Wildlife Regulations*, O.I.C. 2012/84<br>*Trapping Regulation*, O.I.C. 1983/283<br>*Parks and Land Certainty Act*, R.S.Y. 2002, c.165<br>*Hershel Island Park Regulation*, O.I.C. 1990/038 |

**Description:**  **Investment and Cross-Border Trade in Services**

1.  Applicants for outfitting concessions, trapping concessions and wilderness tourism licences must be a Canadian citizen or a permanent resident who ordinarily resides in Canada. Outfitters must be in Yukon during the period when persons are hunting in his or her concession.

2.  An outfitting certificate is a yearly authorisation which gives permission to the holder to carry on the business of outfitting in a specific outfitting concession. An outfitting certificate is issued to a person who is a holder of the concession, or if requested, to an eligible corporation named by the outfitter. The corporation can then offer to provide guiding services to hunters. Assistant trapper's licences and trapping concessions are issued to Yukon residents only.

3.  The above measures permit the Government of Yukon to regulate and issue various authorisations relating to tourism, including services incidental to hunting, trapping, outfitting and tourist guides. This may involve, among other things, the making of measures:

    (a)  to limit ownership on the basis of nationality or residence;

    (b)  to limit market access; and

(c)   to favour Canadian persons and Canadian service providers.

## Reservation I-PT-182

| | |
|---|---|
| **Sector:** | Services incidental to agriculture, hunting and forestry |
| **Sub-Sector:** | Hides, skins and fur skins, raw<br>Services incidental to animal husbandry<br>Services incidental to hunting |
| **Industry Classification:** | CPC 0297, 8812, 8813 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Wildlife Act*, R.S.Y. 2002, c. 229<br>*Wildlife Regulations*, O.I.C. 2012/84<br>*Trapping Regulations*, O.I.C. 1982/283<br>*Game Farm Regulations*, O.I.C. 1995/15<br>*Yukon Environmental and Socio-Economic Assessment Act*, S.C. 2003, c.7 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.   A licence is required for a person to operate a fur farm in Yukon. Only Yukon residents are eligible for a licence. Residency is established by residing in Yukon for one year according to the *Wildlife Act*.

2.   The above measures permit the Government of Yukon to regulate and issue various authorisations relating to farming, including raw hides, skins, and fur skins, services incidental to animal husbandry and services incidental to hunting. This may involve, among other things, the making of measures:

    (a)   to limit ownership on the basis of nationality or residence;

    (b)   to limit market access; and

    (c)   to favour Canadian persons and Canadian service providers.

### Reservation I-PT-183

| | |
|---|---|
| **Sector:** | Land |
| **Sub-Sector:** | Agricultural land, forest and other wooded land |
| **Industry Classification:** | CPC 531, 8811 (other than rental of equipment with operator), 8812 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Lands Titles Act*, R.S.Y. 2002, c.130<br>*Lands Act*, R.S.Y. 2002, c. 132<br>*Lands Regulation*, O.I.C. 1983/192<br>*Lands Act – Regulation to Amend the Lands Regulation*, O.I.C. 2012/159<br>Yukon Agriculture Policy<br>*Yukon Environmental and Socio-Economic Assessment Act*, S.C. 2003, c.7 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1. Corporate applicants for agricultural land use must be incorporated in Canada or Yukon and the principle shareholders must be Canadian citizens or landed immigrants who have resided continuously in Yukon for one year.

2. To be eligible to apply for agricultural land use, a society must be registered in Yukon whose officers are Canadian citizens or landed immigrants and must have resided continuously in Yukon for one year.

3. A majority of members of an agricultural association or cooperative applicants must be Yukon residents.

4. The above measures permit the Government of Yukon to regulate and issue various authorisations relating to agriculture, including agricultural land, forest and other wooded land. This may involve, among other things, the making of measures:

    (a) to limit ownership on the basis of nationality or residence;

(b)    to impose performance requirements;

(c)    to favour Canadian persons and Canadian service providers; and

(d)    regarding the nationality or residence of senior management and boards of directors.

**Reservation I-PT-184**

| | |
|---|---|
| **Sector:** | Land |
| **Sub-Sector:** | Agricultural land, forest and other wooded land |
| **Industry Classification:** | CPC 8811 (other than rental of agricultural equipment with operator), 8812, 531 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Land Titles Act,* R.S.Y. 2002, c. 130<br>*Lands Act,* R.S.Y. 2002, c. 132<br>*Lands Regulation,* O.I.C. 1983/192<br>*Lands Act – Regulation to Amend the Lands Regulation,* O.I.C. 2012/159<br>*Grazing Regulations,* O.I.C. 1988/171<br>Yukon Grazing Policy<br>*Yukon Environmental and Socio-Economic Assessment Act,* S.C. 2003, c. 7 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  In order to apply for a grazing agreement:

    (a)  individual applicants must be a Canadian citizen or have permanent resident status; and have resided in Yukon for one year prior to applying;

    (b)  corporate applicants must have a majority of shares held by Yukon residents; or

    (c)  the majority of members of agricultural association or cooperative applicants must be Yukon residents.

2.  The above measures permit the Government of Yukon to regulate and issue various authorisations relating to agriculture, including services incidental to agriculture, services incidental to animal husbandry, agricultural land, forest and other wooded land and Crown land leases and permits. This may involve, among other things, the making of measures:

    (a)  to impose performance requirements;

(b)    to limit ownership on the basis of nationality or residence;

(c)    to favour Canadian persons and Canadian service providers; and

(d)    regarding the nationality or residence of senior management and board of directors.

**Reservation I-PT-185**

| | |
|---|---|
| **Sector:** | Agriculture, forestry and fisheries products |
| **Sub-Sector:** | Production, transformation and transport of agricultural products<br>Food and marine products<br>Services incidental to fishing<br>Services incidental to agriculture, forestry and hunting |
| **Industry Classification:** | CPC 01, 02, 04, 531, 881 (other than rental of agricultural equipment with operator and 8814), 882 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Agricultural Products Act,* R.S.Y. 2002, c. 3<br>*Meat Inspection and Abattoir Regulations,* O.I.C. 1988/104<br>Yukon Agricultural Policy<br>*Yukon Environmental and Socio-Economic Assessment Act,* S.C. 2003, c.7 |

**Description:**    **Investment and Cross-Border Trade in Services**

The above measures permit the Government of Yukon to regulate and issue various authorisations relating to agriculture, including production, marketing, transformation and transport of agricultural products food and marine products, and services incidental to fishing. This may involve, among other things, the making of measures:

    (a)    to impose performance requirements;

    (b)    to limit ownership on the basis of nationality or residence;

    (c)    to favour Canadian persons and Canadian service providers; and

    (d)    regarding the nationality or residence of senior management and board of directors

**Reservation I-PT-186**

| | |
|---|---|
| **Sector:** | Agriculture, forestry and fisheries products |
| **Sub-Sector:** | Agricultural, forest and other wooded land<br>Forestry and logging products |
| **Industry Classification:** | CPC 03, 531 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Forest Resources Act*, S.Y. 2008, c. 15<br>*Forest Resources Regulation,* O.I.C. 2010/171<br>*Yukon Environmental and Socio-Economic Assessment Act,* S.C. 2003, c. 7 |

**Description:**    **Investment and Cross-Border Trade in Services**

The above measures permit the Government of Yukon to regulate and issue various authorisations relating to forestry, including agricultural, forest and other wooded land, and forestry and logging products. This may involve, among other things, the making of measures:

(a)    to impose performance requirements;

(b)    to limit ownership on the basis of nationality or residence;

(c)    to favour Canadian persons and Canadian service providers; and

(d)    regarding the nationality or residence of senior management and board of directors.

**Reservation I-PT-187**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electrical energy<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 713, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Waters Act*, S.Y. 2003, c. 19<br>*Waters Regulation*, O.I.C. 2003/58<br>*Environment Act*, R.S.Y. 2002, c. 76<br>*Quartz Mining Act*, S.Y. 2003, c. 14<br>*Quartz Mining Land Use Regulation*, O.I.C. 2003/64<br>*Security Regulation*, O.I.C. 2007/77<br>*Yukon Environmental and Socio-Economic Assessment Act*, S.C. 2003, c.7 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  Yukon reserves the right to set or modify electricity rates.

2.  Yukon may make available to Yukon Development Corporation (or any subsidiary or successor corporation) for operational purposes any facility or any water power that is owned by Yukon or under its control.

3.  The above measures permit the Government of Yukon to regulate and issue various authorisations relating to energy, including electrical energy and services incidental to energy distribution. This may involve, among other things, the making of measures:

    (a)  to impose performance requirements;

    (b)  to limit ownership on the basis of nationality or residence;

    (c)  to favour Canadian persons and Canadian service providers; and

    (d)  regarding the nationality or residence of senior management and board of directors.

**Reservation I-PT-188**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Production, transmission, and distribution of electricity<br>Gas, steam and hot water<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 713, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Corporate Governance Act*, R.S.Y. 2002, c. 45<br>*Public Utilities Act*, R.S.Y. 2002, c. 186<br>*Yukon Power Corporation Regulations*, O.I.C. 1987/71<br>*Yukon Development Corporation Act*, R.S.Y. 2002, c. 236<br>*Energy Conservation Fund,* O.I.C. 1997/91<br>*Energy Conservation Fund Use Regulation*, O.I.C. 1998/204<br>*Yukon Environmental and Socio-Economic Assessment Act*, S.C. 2003, c. 7 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The above measures permit the Government of Yukon to regulate and issue various authorisations relating to energy, including production, transmission, distribution of electricity, gas, steam and hot water and services incidental to energy distribution. This may involve, among other things, the making of measures:

(a) to impose performance requirements;

(b) to limit ownership on the basis of nationality or residence;

(c) to favour Canadian persons and Canadian service providers; and

(d) regarding the nationality or residence of senior management and board of directors.

**Reservation I-PT-189**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Transportation via pipeline transportation of fuels<br>Transportation of other goods<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 17, 713, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Public Utilities Act*, R.S.Y. 2002, c. 186<br>*Yukon Power Corporation Regulations*, O.I.C. 1987/71<br>*Oil and Gas Act*, R.S.Y. 2002, c.162<br>*Oil and Gas Pipeline Regulations*<br>*Oil and Gas Disposition Regulations*, O.I.C. 1999/147<br>*Oil and Gas Licence Administration Regulations*, O.I.C. 2004/157<br>*Oil and Gas Drilling and Production Regulations*, O.I.C. 2004/158<br>*Oil and Gas Geoscience and Exploration Regulations*, O.I.C. 2004/156<br>*Oil and Gas Royalty Regulations*, O.I.C. 2008/25<br>*Yukon Environmental and Socio-Economic Assessment Act,* S.C. 2003, c.7 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  The Commissioner in Executive Council may designate any "energy project" (defined to include any oil or gas pipeline) as a "regulated project", and allows the Minister to impose terms and conditions in respect of the project. The Commissioner in Executive Council may give directions to Yukon Utilities Board in respect of, among other things, utility rates and the operations of public utilities.

2.  The above measures permit the Government of Yukon to regulate and issue various authorisations relating to transportation including transportation via pipeline, transportation of fuels, and transportation of other goods and services incidental to energy distribution. This may involve, among other things, the making of measures:

(a)　to impose performance requirements;

(b)　to limit ownership on the basis of nationality or residence;

(c)　to favour Canadian persons and Canadian service providers; and

(d)　regarding the nationality or residence of senior management and board of directors.

**Reservation I-PT-190**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Oil and gas<br>Services incidental to energy distribution<br>Crude petroleum and natural gas<br>Transport services via pipeline |
| **Industry Classification:** | CPC 120, 713, 887 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Canada-Yukon Oil and Gas Accord*<br>*Oil and Gas Act,* R.S.Y. 2002, c.162<br>*Oil and Gas Pipeline Regulation*<br>*Oil and Gas Disposition Regulations*, O.I.C. 1999/147<br>*Oil and Gas Licence Administration Regulations*, O.I.C. 2004/157<br>*Oil and Gas Drilling and Production Regulations*, O.I.C. 2004/158<br>*Oil and Gas Geoscience and Exploration Regulations*, O.I.C. 2004/156<br>*Oil and Gas Royalty Regulations*, O.I.C. 2008/25<br>*Yukon Environmental and Socio-Economic Assessment Act,* S.C. 2003, c.7 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The above measures permit the Government of Yukon to regulate and issue various authorisations relating to energy, including oil and gas, services incidental to energy distribution, crude petroleum and natural gas, and transport services via pipeline. This may involve, among other things, the making of measures:

(a)    to impose performance requirements;

(b)    to limit ownership on the basis of nationality or residence;

(c)    to favour Canadian persons and Canadian service providers; and

(d)    regarding the nationality or residence of senior

management and board of directors.

**Reservation I-PT-191**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services<br>Wholesale trade services<br>Retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture and transport of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107, 7123 (other than 71231, 71232, 71233, 71234), 8841 |
| **Type of Reservation:** | National treatment<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Liquor Act,* R.S.Y. 2002, c. 140<br>*Liquor Regulations*, O.I.C. 1977/37<br>*Regulations to Amend the Liquor Regulations*, O.I.C. 2010/157, O.I.C.2012/96<br>*Yukon Act,* S.C. 2002, c. 7 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The above measures permit the Government of Yukon to regulate and issue various authorisations relating to alcoholic beverages, including wholesale trade services, food retailing services, liquor, wine and beer stores, liquor, wine and beer, commission agent's services, production, manufacture and transportation of alcoholic beverages and retailing services. This may involve, among other things, the making of measures:

    (a)    to limit ownership on the basis of nationality or residence;

    (b)    to favour Canadian persons and Canadian service providers; and

    (c)    regarding the nationality or residence of senior management and board of directors.

**Reservation I-PT-192**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Public Lotteries Act,* R.S.Y. 2002, c.179<br>*Lottery Licensing Act*, R.S.Y. 2002, c. 143<br>*Lotteries and Games of Chance Regulations and the Diamond Tooth Gerties Regulations*, O.I.C. 1987/180<br>*Lottery Licensing Act – Regulation to Amend the Lottery and Games of Chance Regulations*, O.I.C. 2012/102<br>*Slot Machine Management Regulations*, O.I.C. 2205/32 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The above measures permit the Government of Yukon to regulate and issue various authorisations relating to gambling and betting, including regulating services, suppliers of services, manufacturing, suppliers of materials, operations and repairs relating to lottery schemes, amusement machines, video lottery terminals, games of chance, races, betting theatres, bingo casinos and promotional contests, and to conduct such activities, including through territorial monopolies. This may involve, among other things, the making of measures:

(a)  to impose performance requirements;

(b)  to limit ownership on the basis of nationality or residence;

(c)  to favour Canadian persons and Canadian service providers; and

(d)  regarding the nationality or residence of senior management and board of directors.

**Reservation I-PT-193**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Veterinary services for pet animals<br>Other veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Animal Protection Act,* R.S.Y. 2002, c .6<br>*Animal Health Act,* R.S.Y. 2002, c. 5<br>*Occupational Training Act,* R.S.Y. 2002, c. 160 |

**Description:**  **Investment and Cross-Border Trade in Services**

The above measures permit the Government of Yukon to regulate and issue various authorisations relating to veterinary services for pet animals and other veterinary services. This may involve, among other things, the making of measures:

(a)    to limit ownership on the basis of nationality or residence; and

(b)    to favour Canadian persons and Canadian service providers.

**Reservation I-PT-194**

| | |
|---|---|
| **Sector:** | Research and development services |
| **Sub-Sector:** | Research and experimental development services on natural sciences and engineering<br>Research and experimental development services on social sciences and humanities<br>Interdisciplinary research and experimental development services |
| **Industry Classification:** | CPC 851, 852 (linguistics and languages only), 853 |
| **Type of Reservation:** | National treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Scientists and Explorers Act,* R.S.Y. 2002, c. 200<br>*Historic Resources Act,* R.S.Y. 2002, c. 109<br>*Archaeological Sites Regulation*, O.I.C. 2003/73<br>*Wildlife Act*, R.S.Y. 2002, c. 229<br>*Wildlife Regulations*, O.I.C. 2012/84<br>*Languages Act,* R.S.Y. 2002, c. 133<br>*Yukon Environmental and Socio-Economic Assessment Act,* S.C. 2003, c.7 |

**Description:**    **Investment and Cross-Border Trade in Services**

The above measures permit the Government of Yukon to regulate and issue various authorisations relating to research and development services on natural sciences and engineering, social sciences and humanities, interdisciplinary research and experimental developmental services. This may involve, among other things, the making of measures:

(a)    to impose performance requirements;

(b)    to limit ownership on the basis of nationality or residence;

(c)    to favour Canadian persons and Canadian service providers; and

(d)    regarding the nationality or residence of senior management and board of directors.

## ANNEX I

### Schedule of the European Union

### Reservations applicable in the European Union (applicable in all Member States of the EU unless otherwise indicated)

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | EU level - National |
| **Measures:** | *Treaty on the Functioning of the European Union* |
| **Description:** | **Investment** |

All companies or firms formed in accordance with the law of a Member State of the EU and having their registered office, central administration or principal place of business within the EU, including those established in the Member States of the EU by Canadian investors, are entitled to receive the treatment accorded by Article 54 of the Treaty on the Functioning of the European Union. Such treatment is not accorded to branches or agencies of companies or firms established outside the EU.

Treatment granted to companies or firms formed by Canadian investors in accordance with the law of a Member State of the EU, and having their registered office, central administration or principal place of business within the EU, is without prejudice to any conditions or obligations, consistent with Chapter Eight (Investment), which may have been imposed on such companies or firms when they established in the EU and which shall continue to apply.

| | |
|---|---|
| **Sector:** | Research and development services |
| **Sub-Sector:** | Research and experimental development services on natural sciences and engineering, interdisciplinary research and experimental development services |
| **Industry Classification:** | CPC 851, CPC 853 |

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |

| | |
|---|---|
| **Level of Government:** | EU level - National - Regional |

**Measures:**   All currently existing and all future EU research or innovation framework programmes, including all the FP7 Rules for Participation and regulations pertaining to Joint Technology Initiatives (JTIs),art. 185 Decisions, the Competitiveness and Innovation Programme (CIP) and the European Institute for Innovation and Technology (EIT), as well as existing and future national, regional or local research programmes.

**Description:**   **Investment and Cross-Border Trade in Services**

For publicly funded research and development (R&D) services benefitting from funding provided by the EU at EU level, exclusive rights or authorisations may only be granted to nationals of the Member States of the EU and to juridical persons of the EU having their registered office, central administration or principal place of business in the EU.

For publicly funded R&D services benefitting from funding provided by a Member State exclusive rights or authorisations may only be granted to nationals of the Member State of the EU concerned and to juridical persons of the Member State concerned having their headquarters in that Member State.

This reservation is without prejudice to the exclusion of procurement by a Party, subsidies, or governmental support for trade in services in Articles 8.14(5)(a) and (b), and 9.2(2)(f) and (g) respectively.

| | |
|---|---|
| **Sector:** | Health, social and education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 92, CPC 93 |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| | Market access |
| **Level of Government:** | EU level - National - Regional |
| **Measures:** | As set out in the **Description** element |

**Description:**                **Investment**

Any Member State of the EU, when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity providing health, social or education services, may prohibit or impose limitations on the ownership of such interests or assets, and on the ability of owners of such interests and assets to control any resulting enterprise, by investors of Canada or of a third country or their investments. With respect to such a sale or other disposition, any Member State of the EU may adopt or maintain any measure relating to the nationality of senior management or members of the boards of directors, as well as any measure limiting the number of suppliers.

For purposes of this reservation:

(a) any measure maintained or adopted after the date of entry into force of this Agreement that, at the time of the sale or other disposition, prohibits or imposes limitations on the ownership of equity interests or assets or imposes nationality requirements or imposes limitations on the numbers of suppliers described in this reservation shall be deemed to be an existing measure; and

(b) "state enterprise" means an enterprise owned or controlled through ownership interests by any Member State of the EU and includes an enterprise established after the date of entry into force of this Agreement solely for the purposes of selling or disposing of equity interests in, or the assets of, an existing state enterprise or governmental entity.

**Sector:**                     Agriculture

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**         Performance requirements

**Level of Government:**         EU level

**Measures:**                    Regulation 2007/1234/EC of 22 October 2007 establishing a common organisation of agricultural markets and on specific provisions for certain agricultural products (Single CMO Regulation)

**Description:**                 **Investment**

The intervention agencies designated by the Member States of

the EU shall buy cereals which have been harvested in the EU.

No export refund shall be granted on rice imported from and re-exported to Canada or any third country. Only EU rice producers may claim compensatory payments.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting and auditing services |
| **Industry Classification:** | CPC 8621 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | EU level - National - Regional |
| **Measures:** | **Directive 2013/34/EU of the European Parliament and of the Council of 26 June 2013 on statutory audits of annual accounts and consolidated accounts** |
| | **Directive 2006/43/EC on statutory audits of annual accounts and consolidated accounts** |
| **Description:** | **Cross-Border Trade in Services** |
| | **The competent authorities of a Member State of the EU may recognise the equivalence of the qualifications of an auditor who is a national of Canada or of any third country in order to approve them to act as a statutory auditor in the EU subject to reciprocity.** |

| | |
|---|---|
| **Sector:** | Communications services |
| **Sub-Sector:** | Postal services |
| **Industry Classification:** | Part of CPC 71235, part of CPC 73210, part of 751, |
| **Type of Reservation:** | Market access |
| **Level of Government:** | EU level - National – Regional |
| **Measures:** | Directive 97/67/EC of the European Parliament and of the Council of 15 December 1997 on common rules for the development of the internal market of Community postal services and the improvement of quality of service, as amended by Directive 2002/39/EC and Directive 2008/06/EC |
| **Description:** | **Investment and Cross-Border Trade in Services** |

982

In the EU, the organisation of the siting of letter boxes on the public highway, the issuing of postage stamps, and the provision of the registered mail service used in the course of judicial or administrative procedures may be restricted in accordance with national legislation.

Licensing systems may be established for those services for which a general Universal Service Obligation exists. These licences may be subject to particular universal service obligations or a financial contribution to a compensation fund.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Supporting services for air transport |
| **Industry Classification:** | Rental of aircraft |
| **Type of Reservation:** | CPC 7461, CPC 7469, CPC 83104 |
| | National treatment |
| | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | EU level - National - Regional |
| **Measures:** | Regulation 2008/1008/EC of 24 September 2008 on common rules for the operation of air services in the Community |
| | Directive 1996/67/EC of 15 October 1996 on access to the groundhandling market at Community airports |
| | Regulation 2009/80/EC of 14 January 2009 on a Code of Conduct for computerised reservation systems |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Aircraft used by EU air carriers must be registered in the Member State of the EU licensing the carrier or, if the licensing Member State of the EU so allows, elsewhere in the EU. To be registered, aircraft may be required to be owned either by natural persons meeting specific nationality criteria or by enterprises meeting specific criteria regarding ownership of capital and control.

By exception, aircraft registered in Canada may be leased by a Canadian air carrier to an air carrier of the EU under certain circumstances – for the air carrier of the EU's exceptional needs, seasonal capacity needs, or needs to overcome operational difficulties, which cannot reasonably be satisfied through leasing aircraft registered within the EU, and subject to obtaining the approval for a limited duration from the Member State of the EU licensing the air carrier of the EU.

For groundhandling services, establishment within the EU territory may be required. The level of openness of groundhandling services depends on the size of airport. The number of suppliers in each airport may be limited. For "big airports", this limit may not be less than two suppliers. For greater certainty, this does not affect the EU's rights and obligations under the Agreement on Air Transport between Canada and the European Community and its Member States.

For airport operations, establishment within the EU is required.

984

Airport operation services may be subject to individual concession or licence from public authorities. Special approval from the competent authority may be needed for the holder of the licence or the concession to transfer the operation licence or concession in total or in part to a third party.

With respect to computer reservation system (CRS) services, where EU air carriers are not accorded, by CRS services suppliers operating outside the EU, equivalent (meaning non-discriminatory) treatment to that provided in the EU, or where EU CRS services suppliers are not accorded, by non-EU air carriers, equivalent treatment to that provided in the EU, measures may be taken to accord equivalent treatment, respectively, to the non-EU air carriers by the CRS services suppliers operating in the EU, or to the non-EU CRS services suppliers by EU air carriers.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Internal waterways transport |
| | Supporting services for internal waterways transport |
| **Industry Classification:** | CPC 722, part of CPC 745 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | EU level |
| **Measures:** | Council Regulation (EEC) No 3921/91 of 16 December 1991 laying down the conditions under which non-resident carriers may transport goods or passengers by inland waterway within a Member State |
| | Council Regulation (EC) No 1356/96 of 8 July 1996 on common rules applicable to the transport of goods or passengers by inland waterway between Member States with a view to establishing freedom to provide such transport services |
| | Council Regulation (EEC) No 2919/85 of 17 October 1985 laying down the conditions for access to the arrangements under the Revised Convention for the navigation of the Rhine relating to vessels belonging to the Rhine Navigation |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |
| | Goods or passenger transport operations by inland waterway may only be provided by an operator that fulfils the following |

conditions:

(a)     is established in a Member State of the EU,

(b)     is entitled there to carry out the (international) transport of goods or passengers by inland waterway, and

(c)     uses vessels registered in a Member State of the EU or in possession of a certificate of membership of a fleet of a Member State of the EU.

In addition, the vessels must be owned by natural persons domiciled in a Member State of the EU and who are nationals of a Member State of the EU, or owned by legal persons registered in a Member State of the EU and the majority of whom are nationals of a Member State of the EU. Derogations from the majority ownership requirement may exceptionally be provided.

In Spain, Sweden and Finland there is no legal distinction between maritime and internal waterways. The regulation of maritime transport applies equally to internal waterways.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Rail transport |
| **Industry Classification:** | CPC 711 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | EU level - National - Regional |
| **Measures:** | Council Directive 95/18/EC of 19 June 1995 on the licensing of railway undertakings |
| | Directive 2004/49/EC of the European Parliament and of the Council of 29 April 2004 on safety on the Community's railways and amending Council Directive 95/18/EC on the licensing of railway undertakings and Directive 2001/14/EC on the allocation of railway infrastructure capacity and the levying of charges for the use of railway infrastructure and safety certification (Railway Safety Directive) |
| | Council Directive 2006/103/EC of 20 November 2006 adapting certain Directives in the field of transport policy, by reason of the accession of Bulgaria and Romania |
| | Directive 2007/58/EC of the European Parliament and of the Council of 23 October 2007 amending Council Directive 91/440/EEC on the development of the Community's railways and Directive 2001/14/EC on the allocation of railway infrastructure capacity and the levying of charges for the use of |

railway infrastructure

**Description:**        **Cross-Border Trade in Services**

The provision of rail transport services requires a licence, which can only be granted to railway undertakings established in a Member State of the EU.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Other transport services (provision of combined transport services) |
| **Industry Classification:** | CPC 711,CPC 712, CPC 7212, CPC 7222, CPC 741, CPC 742, CPC 743, CPC 744, CPC 745, CPC 748, CPC 749 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | EU level - National - Regional |
| **Measures:** | Directive 1992/106/EEC of 7 December 1992 on the establishment of common rules for certain types of combined transport of goods between Member States |

**Description:**        **Investment and Cross-Border Trade in Services**

With the exception of Finland, only hauliers established in a Member State of the EU who meet the conditions of access to the occupation and access to the market for transport of goods between Member States of the EU may, in the context of a combined transport operation between Member States of the EU, carry out initial or final road haulage legs which form an integral part of the combined transport operation and which may or may not include the crossing of a frontier.

Limitations affecting any given modes of transport apply.

Necessary measures can be taken to ensure that the motor vehicle taxes applicable to road vehicles routed in combined transport are reduced or reimbursed.

| | |
|---|---|
| **Sector:** | Supporting services for all modes of transport |
| **Sub-Sector:** | Customs clearance services |
| **Industry Classification:** | part of CPC 748 |
| **Type of Reservation:** | National treatment |

987

Market access

**Level of Government:**     EU level - National - Regional

**Measures:**     Regulation 1992/2913/EEC of 12 October 1992

establishing the Community Customs Code, and subsequent amendments

**Description:**     **Cross-Border Trade in Services**

Customs clearance services may only be provided by EU residents.

***

## Reservations applicable in Austria

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition, purchase, rental or leasing of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Regional (Sub-national) |
| **Measures:** | Burgenländisches Grundverkehrsgesetz, LGBL. Nr. 25/2007 |
| | Kärntner Grundverkehrsgesetz, LGBL. Nr. 9/2004 |
| | NÖ- Grundverkehrsgesetz, LGBL. 6800 |
| | OÖ- Grundverkehrsgesetz, LGBL. Nr. 88/1994 |
| | Salzburger Grundverkehrsgesetz, LGBL. Nr. 9/2002 |
| | Steiermärkisches Grundverkehrsgesetz, LGBL. Nr. 134/1993 |
| | Tiroler Grundverkehrsgesetz, LGBL. Nr. 61/1996 |
| | Voralberger Grundverkehrsgesetz, LGBL. Nr. 42/2004 |
| | Wiener Ausländergrundverkehrsgesetz, LGBL. Nr. 11/1998 |

**Description:**  **Investment**

The acquisition, purchase and rental or leasing of real estate by non-EU natural persons and enterprises requires authorisation by the competent regional authorities (Länder). Authorisation will only be granted if the acquisition is considered to be in the public (in particular economic, social and cultural) interest.

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Aktiengesetz, BGBL. Nr. 98/1965, § 254 (2) |
| | GmbH-Gesetz, RGBL. Nr. 58/1906, § 107 (2) |
| | Gewerbeordnung, BGBL. Nr. 194/1994, § 39 (2a) |

**Description:**               **Investment**

For the operation of a branch, non-European Economic Area (EEA) corporations must appoint at least one person responsible for its representation who is resident in Austria. Executives (managing directors, natural persons) responsible for the observance of the Austrian Trade Act (Gewerbeordnung) must be domiciled in Austria.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Rechtsanwaltsordnung (Lawyers Act) - RAO, RGBl. Nr. 96/1868, art. 1 and 21c |

**Description:**               **Investment and Cross-Border Trade in Services**

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts. Residency (commercial presence) is required in order to obtain full admission to the Bar.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

According to the Lawyers Act, only EEA lawyers or lawyers of the Swiss Confederation are allowed to provide legal services through commercial presence. Cross border supply of legal services by Canadian lawyers (who must be fully qualified in Canada) is only authorised in respect of public international law and Canadian law.

For admission to the Bar, required for the practice of EU law and the law of a Member State of the EU including representation before courts, nationality of a Member State of the EEA or the

Swiss Confederation is required.

Equity participation and shares in the operating result of any law firm of Canadian lawyers (who must be fully qualified in Canada) is allowed up to 25 per cent; the rest must be held by fully fledged EEA lawyers or lawyers of the Swiss confederation) and only the latter may exercise decisive influence in the decision making of the law firm which is – according to Article 1a of the Lawyers Act – in Austria generally limited to certain forms of association.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting and bookkeeping services |
| | Auditing services |
| | Taxation advisory services |
| **Industry Classification:** | CPC 862, CPC 863 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Wirtschaftstreuhandberufsgesetz(Public Accountant and Auditing Profession Act, BGBl. I Nr. 58/1999), § 12, § 65, § 67, § 68 (1) 4 |
| | Bilanzbuchhaltungsgesetz (BibuG, BGBl. I Nr. 11/2008, § 7, § 11, § 56 and § 59 (1) 4. |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The capital interests and voting rights of foreign accountants, bookkeepers, auditors, and tax advisers, qualified according to the law of their home country, in an Austrian enterprise may not exceed 25 per cent.

The service supplier must have an office or professional seat in the EEA in order to provide bookkeeping services, and to be entitled to practice as an auditor or tax advisor according to Austrian law.

Where the employer of a foreign auditor is not a national of a Member State of the EU, they must be a member of the relevant professional body in their home country, where such a body exists.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Tierärztegesetz (Veterinary Act), BGBl. Nr. 16/, §3 (3) 1 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Only nationals of a Member State of the EEA may provide veterinary services. The nationality requirement is waived for nationals of a non-Member State of the EEA where there is an agreement with that non-Member State of the EEA providing for national treatment with respect to investment and cross-border trade of veterinary services.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Medical services |
| **Industry Classification:** | part of CPC 9312 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Medical Act, BGBl. I Nr. 169/1998, §4 (2) and §5 (b), §§ 8(5), 32, 33 and 35 |
| | Federal Act Regulating High Level Allied Health Professions, BGBl. Nr. 460/1992 |
| | Federal Act regulating Medical Masseurs lower and upper level, BGBl. Nr. 169/2002 |
| **Description:** | **Investment** |

Nationality of a Member State of the EEA or of the Swiss Confederation is required in order to provide medical services.

Regarding medical services, non-nationals of a Member State of

the EEA may apply for the following authorisations: postgraduate training, medical practice as a general medical practitioner or specialist in hospitals and penal institutions, medical practice as a general practitioner in a self-employed capacity, and medical activities for educational purposes.

This reservation does not apply to dental services or services provided by psychologists and psychotherapists.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of tobacco |
| **Industry Classification:** | CPC 63108 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Tobacco Monopoly Act 1996, § 5 and § 27 |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Only natural persons may apply for an authorisation to operate as a tobacconist. Priority is given to nationals of a Member State of the EEA. |

| | |
|---|---|
| **Sector:** | Distribution and health services |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| | Other services provided by pharmacists |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Apothekengesetz (Pharmacy Law), RGBl.No. 5/1907, §3 Arzneimittelgesetz (Medication Act) BGBL. Nr. 185/1983, §57-63 |
| **Description:** | **Investment** |
| | The retail of pharmaceuticals and specific medical goods to the public may only be carried out through a pharmacy. |
| | Nationality of a Member State of the EEA or the Swiss Confederation is required in order to operate a pharmacy. |
| | Nationality of a Member State of the EEA or the Swiss Confederation is required for leaseholders and persons in charge of managing a pharmacy. |

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Higher education services |
| **Industry Classification:** | CPC 923 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | University of Applied Sciences Studies Act, BGBl I Nr. 340/1993, § 2 |
| | University Accreditation Act, BGBL. I Nr. 168/1999, § 2 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The provision of privately funded university level education services in the area of applied sciences requires an authorisation from the competent authority, the Council for Higher education (Fachhochschulrat). An investor seeking to provide an applied science study programme must have his primary business being the supply of such programmes, and must submit a needs assessment and a market survey for the acceptance of the proposed study programme. The competent Ministry may deny an authorisation where the programme is determined to be incompatible with national educational interests.

The applicant for a private university requires an authorisation from the competent authority (the Austrian Accreditation Council). The competent Ministry may deny the approval if the decision of the accreditation authority does not comply with national educational interests.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Austrian Insurance Supervision Act, §5 (1) 3 (VAG) |
| **Description:** | **Financial Services** |

In order to obtain a licence to open a branch office, foreign insurers must have a legal form corresponding or comparable to

a joint stock company or a mutual insurance association in their home country.

The management of a branch office must consist of at least two natural persons resident in Austria.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Cross-border supply of financial services |
| **Level of Government:** | National |
| **Measures:** | Insurance Supervision Act (VAG), BGBI. Nr. 569/1978, §1 (2) |

| | |
|---|---|
| **Description:** | **Financial Services** |
| | Promotional activity and intermediation on behalf of a subsidiary not established in the EU or of a branch not established in Austria (except for reinsurance and retrocession) are prohibited. |

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Ski school services |
| | Mountain guide services |
| **Industry Classification:** | Part of CPC 96419 |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Level of Government:** | Regional (Sub-national) |
| **Measures:** | Kärntner Schischulgesetz, LGBL. Nr. 53/97 |
| | Kärntner Berg- und Schiführergesetz, LGBL. Nr. 25/98 |

NÖ- Sportgesetz, LGBL. Nr. 5710

OÖ- Sportgesetz, LGBl. Nr. 93/1997
Salzburger Schischul- und Snowboardschulgesetz, LGBL. Nr. 83/89
Salzburger Bergführergesetz, LGBL. Nr. 76/81
Steiermärkisches Schischulgesetz, LGBL. Nr.58/97
Steiermärkisches Berg- und Schiführergesetz, LGBL. Nr. 53/76
Tiroler Schischulgesetz. LGBL. Nr. 15/95
Tiroler Bergsportführergesetz, LGBL. Nr. 7/98
Vorarlberger Schischulgesetz, LGBL. Nr. 55/02 §4 (2)a
Vorarlberger Bergführergesetz, LGBL. Nr. 54/02
Wien: Gesetz über die Unterweisung in Wintersportarten, LGBL. Nr. 37/02

**Description:**        **Investment and Cross-Border Trade in Services**

The operation of ski schools and mountain guide services is governed by the laws of the 'Bundesländer'. The provision of these services may require nationality of a Member State of the EEA. Enterprises may be required to appoint a Managing Director who is a national of a Member State of the EEA.

**Sector:**        Transport

**Sub-Sector:**        Water transport

Supporting services for water transport

**Industry Classification:**        CPC 7221, CPC 7222, CPC 7223, CPC 7224, part of CPC 745

**Type of Reservation:**        National treatment

Senor management and boards of directors

Market access

**Level of Government:**        National

**Measures:**        Schifffahrtsgesetz, BGBl. I Nr. 62/1997, §75f

**Description:**        **Investment, Cross-Border Trade in Services, and International Maritime Transport Services**

For internal waterways transport, nationality of a Member State of the EEA s required for natural persons in order to set up a shipping company. A majority of the governing board of each enterprise must have EEA nationality. A registered company or permanent establishment in Austria is required. More than 50 per cent of the business shares and the working capital must be held by nationals of a Member State of the EEA.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport: passenger transportation, freight transportation, international truck transport services |
| **Industry Classification:** | CPC 712 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Güterbeförderungsgesetz (Goods Transportation Act), BGBl. Nr. 593/1995; § 5 Gelegenheitsverkehrsgesetz (Occasional Traffic Act), BGBl. Nr. 112/1996; § 6 |

**Description:** **Investment and Cross-Border Trade in Services**

For passenger and freight transportation, exclusive rights or authorisations may only be granted to nationals of the Member States of the EU and to juridical persons of the EU having their headquarters in the EU.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Pipeline transport |
| **Industry Classification:** | CPC 713 |
| **Type of Reservation:** | Senior management and boards of directors |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Rohrleitungsgesetz (Law on Pipeline Transport), BGBl. Nr. 411/1975, § 5(1) and (2), §§ 5 (1) and (3), 15, 16 |

Gaswirtschaftsgesetz (Gas Act), BGBl. I Nr. 121/2000, § 14, 15 and 16

| | |
|---|---|
| **Description:** | **Investment and Cross-Border Trade in Services** |

With regard to natural persons, authorisation is only granted to nationals of a Member State of the EEA domiciled in the EEA. Enterprises and partnerships must have their seat in the EEA. The operator of the network must appoint a Managing Director and a Technical Director who is responsible for the technical control of the operation of the network, both of whom must be nationals of a Member State of the EEA.

The competent authority may waive the nationality and domiciliation requirements where the operation of the network is considered to be in the public interest.

For the transportation of goods other than gas and water the following applies:

1.     With regard to natural persons, authorisation is only granted to EEA-nationals who must have a seat in Austria; and
**2.**     Enterprises and partnerships must have their seat in Austria. An Economic Needs Test or interest test is applied. Cross border pipelines must not jeopardise Austria's security interests and its status as a neutral country. Enterprises and partnerships have to appoint a managing director who must be a national of a Member State of the EEA. The competent authority may waive the nationality and seat requirements if the operation of the pipeline is considered to be in the national economic interest.

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Transmission and distribution of electricity |
| **Industry Classification:** | ISIC rev 3.1 40, CPC 887 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Senior management and boards of directors |
| **Level of Government:** | Regional |
| **Measures:** | Steiermärkisches Elektrizitätswirtschafts- und Organisationsgesetz(ELWOG), LGBl. Nr. 70/2005; Kärntner Elektrizitätswirtschafts-und Organisationsgesetz(ELWOG), |

LGBl. Nr. 24/2006

**Description:**                    **Investment and Cross-Border Trade in Services**
With regard to natural persons, authorisation is only granted to
nationals of a Member State of the EEA domiciled in the EEA. If
the operator appoints a managing director or a leaseholder, the
domicile requirement is waived.

Juridical persons (enterprises) and partnerships must have their
seat in the EEA. They must appoint a managing director or a
leaseholder, both of whom must be nationals of a Member State
of the EEA domiciled in the EEA.

The competent authority may waive the domicile and nationality
requirements where the operation of the network is considered to
be in the public interest.

***

## Reservations applicable in Belgium

*For the purposes of the reservations of Belgium, the national level of government covers the federal government and the governments of the Regions and the Communities as each of them holds equipollent legislative powers.*

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | Other mining and quarrying |
| **Industry Classification:** | ISIC rev 3.1 14 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National (Federal State) |
| **Measures:** | Arrêt Royal du 1$^{er}$ septembre 2004 relatif aux conditions, à la délimitation géographique et à la procédure d'octroi des concessions d'exploration et d'exploitation des ressources minérales et autres ressources non vivantes de la mer territoriale et du plateau continental |
| **Description:** | **Investment** |
| | The exploration for and exploitation of mineral resources and other non-living resources in territorial waters and the the continental shelf are subject to concession. The concessionaire must be domiciled in Belgium. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National (Federal State) |
| **Measures:** | Belgian Judicial Code (Articles 428-508); Royal Decree of 24 August 1970 |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Full admission to the Bar is required for the practice of legal |

services in respect of Belgian law, including representation before courts. Residency (commercial presence) is required in order to obtain full admission to the Bar.

The residency requirement for a foreign lawyer to obtain full admission to the Bar is at least six years from the date of application for registration, three years under certain conditions. Required to have a certificate issued by the Belgian Minister of Foreign Affairs under which the national law or international convention allows reciprocity (reciprocity condition). Representation before the "*Cour de Cassation*" is subject to quota.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212 other than accounting services |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National (Federal State) |
| **Measures:** | Law of July 22nd, 1953 creating an Institute of the Auditors of Firms and organising the public supervision of the occupation of auditor of firms, coordinated on April 30th, 2007 |
| **Description:** | **Cross-Border Trade in Services** |

To be qualified to act in an official capacity as a "firm's auditor", it is required to maintain an establishment in Belgium where the professional activity will take place and where acts, documents and correspondence relating to it will be maintained, and to have at least one administrator or manager of the company being firm's auditor and responsible for the management of an establishment in Belgium.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Architectural services |
| | Urban planning and landscape architectural services |
| **Industry Classification:** | CPC 8671, CPC 8674 |
| **Type of Reservation:** | National treatment |

| | |
|---|---|
| **Level of Government:** | National (Federal State) |
| **Measures:** | Law of February 20, 1939 on the protection of the title of the architect's profession |
| | Law of 26th June 1963, which creates the Order of Architects |
| | Regulations of December 16th, 1983 of ethics established by national Council in the Order of Architects (Approved by art. 1st of A.R. of April 18th, 1985, M.B., May 8th, 1985). |
| **Description:** | **Cross-Border Trade in Services** |
| | The provision of architectural services in Belgium requires control over the execution of jobs. |
| | Foreign architects authorised in their host countries and wishing to practice their profession on an occasional basis in Belgium are required to obtain prior authorisation from the Council of Order in the geographical area where they intend to practice their activity. |

<br/>

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Placement services of personnel |
| **Industry Classification:** | CPC 87202 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National (Regions) |
| **Measures:** | Flemish Region: Besluit van de Vlaamse Regering van 10 december 2010 tot uitvoering van het decreet betreffende de private arbeidsbemiddeling |
| | Walloon Region: Décret du 3 avril 2009 relatif à l'enregistrement ou à l'agrément des agences de placement (Decree of 3 April 2009 on registration of placement agencies), art. 7; Arrêté du Gouvernement wallon du 10 décembre 2009 portant exécution du décret du 3 avril 2009 relatif à l'enregistrement ou à l'agrément des agences de placement (Decision of the Walloon Government of 10 December 2009 implementing the Decree of 3 April 2009 on registration of placement agencies), art. 4 |
| | German-speaking Community: Dekret über die Zulassung der Leiharbeitsvermittler und die Überwachung der privaten Arbeitsvermittler / Décret du 11 mai 2009 relatif à l'agrément des |

agences de travail intérimaire et à la surveillance des agences de placement privées, art. 6

| | |
|---|---|
| **Description:** | **Investment and Cross-Border Trade in Services** |

<u>Flemish Region</u>: A company having its head office outside the EEA has to prove that it supplies placement services in its country of origin.

<u>Walloon Region</u>: A specific type of legal entity (régulièrement constituée sous la forme d'une personne morale ayant une forme commerciale, soit au sens du droit belge, soit en vertu du droit d'un Etat membre ou régie par celui-ci, quelle que soit sa forme juridique) is required to supply placement services. A company having its head office outside the EEA has to demonstrate that it fulfils the conditions as set out in the Decree (for instance on the type of legal entity) and has to prove that it supplies placement services in its country of origin.

<u>German-</u>speaking Community: A company having its head office outside the EEA has to prove that it supplies placement services in its country of origin and has to fulfill the admission criteria established by the mentioned decree.


| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National (Federal State) |
| **Measures:** | La Loi du 21 décembre 1990 relative à l'enregistrement des navires, telle que modifiée par la loi du 3 mai 1999 |
| | L'Arrêté royal du 4 avril 1996 relatif à l'enregistrement des |

navires et l'entrée en vigueur de la loi du 21 décembre 1990 relative à l'enregistrement des navires, tel que modifié

**Description:**    **Investment and International Maritime Transport Services**

According to the Belgian ship registration law and decree provisions, the owner or operator of a ship must be:

(a) an individual who is national of a Member State of the EU;

(b) an individual who is domiciled or resident in Belgium; or

(c) a legal person / body corporate / having its real place of business in one of the Member States of the EU,

in order to be eligible to register a ship on the national register.

Foreign investors must have their principal office in Belgium in order to register a vessel on the national shipping register.

The ships have to be operated from Belgium, meaning that the operating owner or the operator (if different from the owner) must have a Belgian company number.

A foreign owned vessel may be registered at the request of a Belgian operator, subject to the consent of the owner and of the Belgian authorities (Directorate General Maritime Transport in Brussels - www.mobilt.fgov.belgium).

A foreign-owned vessel may also be registered on the bareboat charter register (second Belgian register), subject to the consent of the authorities of the primary register, of the owner and of the relevant Belgian authorities.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Supporting services for air transport |
| | Rental of aircraft |
| **Industry Classification:** | CPC 83104 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National (Federal State) |
| **Measures:** | Arrêté Royal du 15 mars 1954 réglementant la navigation aérienne |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Private (civil) aircraft belonging to natural persons who are not nationals of a Member State of the EU or of the EEA may only be registered if they are domiciled or resident in Belgium

without interruption for at least one year.

Private (civil) aircraft belonging to foreign legal entities not formed in accordance with the law of a Member State of the EU or of the EEA may only be registered if they have a seat of operations, agency or office in Belgium without interruption for at least one year.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Air transport services |
| **Industry Classification:** | CPC 73 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National (Federal State) |
| **Measures:** | Arrêté ministériel du 3 août 1994 fixant les conditions de délivrance des licences d'exploitation aux transporteurs aériens |

**Description:** **Investment**

A licence is required to provide air transport services. To obtain the licence, the air carrier must have at its disposal, owned or under any type of lease, at least one aircraft registered in his name on the Belgian register.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Supporting services for air transport |
| **Industry Classification:** | CPC 7461, CPC 7469, CPC 83104 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | National (Federal State and Regions) |
| **Measures:** | Arrêté Royal du 6 novembre 2010 réglementant l'accès au marché de l'assistance en escale à l'aéroport de Bruxelles-National (art. 18) |
| | Besluit van de Vlaamse Regering betreffende de toegang tot de grondafhandelingsmarkt op de Vlaamse regionale luchthavens (art. 14) |
| | Arrêté du Gouvernement wallon réglementant l'accès au marché de l'assistance en escale aux aéroports relevant de la Région wallonne (art.14) |

**Description:** **Investment and Cross-Border Trade in Services**

For groundhandling services, reciprocity is required.

\*\*\*

## Reservations applicable in Bulgaria

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Commercial Law, art. 17a |
| | Law for Encouragement of Investments, art. 24 |
| **Description:** | **Investment** |

Foreign legal persons, unless established under the legislation of a Member State of the EU or the EEA, may conduct business and pursue activities if established in the Republic of Bulgaria in the form of a company registered in the Commercial Register. Establishment of branches is subject to authorisation.

Representative offices of foreign enterprises are to be registered with Bulgarian Chamber of Commerce and Industry and may not engage in economic activity but are only entitled to advertise their owner and act as representatives or agents.

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | All sectors other than mining of uranium and thorium ore |
| **Industry Classification:** | ISIC rev 3.1 10, ISIC rev 3.1 11, ISIC rev 3.112, ISIC rev 3.1 13, ISIC rev 3.1 14 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | |
| **Measures:** | Underground Natural Resources Act |
| | Concessions Act |
| | Law on Privatisation and Post-Privatisation Control |
| **Description:** | **Investment** |

Certain economic activities related to the exploitation or use of State or public property are subject to concessions granted under

the provisions of the Concessions Act or other special concessions laws.

The activities of prospecting or exploration of underground natural resources on the territory of the Republic of Bulgaria, in the continental shelf and in the exclusive economical zone in the Black Sea are subject to permission, while the activities of extraction and exploitation are subject to concession granted under the Underground Natural Resources Act.

It is forbidden for companies registered in preferential tax treatment jurisdictions (that is, off-shore zones) or related, directly or indirectly, to such companies to participate in open procedures for granting permits or concessions for prospecting, exploration or extraction of natural resources, including uranium and thorium ores, as well as to operate an existing permit or concession which has been granted, as such oerations are precluded, including the possibility to register the geological or commercial discovery of a deposit as a result of exploration.

Commercial corporations in which the Member State or a municipality holds a share in the capital exceeding 50 per cent, cannot effect any transactions for disposition of fixed assets of the corporation, to conclude any contracts for acquisition of participating interest, lease, joint activity, credit, securing of receivables, as well as incurring any obligations arising under bills of exchange, unless permitted by the Privatisation Agency or the municipal council, whichever is the competent authority.

Without prejudice to Article 8.4, paragraphs 1 and 2, according to Decision of the National Assembly of the Republic of Bulgaria of 18 Jan 2012, any usage of hydraulic fracturing technology that is, fracking, for activities of prospecting, exploration or extraction of oil and gas, is forbidden by Decision of the Parliament. Exploration and extraction of shale gas is forbidden.

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | Mining of uranium and thorium ores |
| **Industry Classification:** | ISIC rev 3.1 12 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | National |
| **Measures:** | Safe Use of Nuclear Energy Act, Act on Economic and Financial |

Relations with Companies Registered in Preferential Tax Treatment Jurisdictions, Such Companies' Related Parties and Their Beneficial Owners, Subsurface Resources Act

**Description:**            **Investment**

The mining of uranium ore is forbidden by Decree of the Council of Ministers No. 163 of 20.08.1992.

With regard to mining of thorium ore, the general regime of concessions for mining applies. In order to participate in concessions for mining of thorium ore, a Canadian company must be established according to the Bulgarian Commercial Act and to be registered in the Commercial Registry. Decisions to allow the mining of thorium ore are taken on a non-discriminatory individual case-by-case basis.

The prohibition against companies registered in preferential tax treatment jurisdictions (that is, off-shore zones) or related, directly or indirectly, to such companies, from participating in open procedures for concessions for mining of natural resources includes uranium and thorium ores.

**Sector:**                 Business services

**Sub-Sector:**             Legal services

**Industry Classification:** Part of CPC 861

**Type of Reservation:**    National treatment

                            Market access

                            Most-favoured-nation treatment

**Level of Government:**    National

**Measures:**               Attorney Law

                            Law for Mediation

                            Law for the Notaries and Notarial Activity

**Description:**            **Investment and Cross-Border Trade in Services**

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national

1011

law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

In so far as Canada and its territories and provinces allow Bulgarian lawyers to represent their nationals under domestic law, Bulgaria will allow Canadian lawyers to represent a national of Canada under domestic law under the same conditions and in cooperation with a Bulgarian lawyer. For this purpose, foreign lawyers must be admitted to act as an attorney by a decision of the Supreme Bar Council and registered in the Unified register of foreign lawyers. Enterprises must be registered in Bulgaria as a lawyer partnership ("advokatsko sadrujie") or a law firm ("advokatsko drujestvo"). The name of the law firm may only include the names of the partners, so a foreign firm would not be able to use its name unless the named partners were registered in Bulgaria as well.

Full admission to the Bar is allowed only for nationals of a Member State of the EU or for foreign nationals, who are qualified lawyers and have obtained their diploma providing the capacity to practice in a Member State of the EU. For procedural representation they should be accompanied by a Bulgarian lawyer.

For legal mediation services, permanent residence is required.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212 other than accounting services |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Independent Financial Audit Act |
| **Description:** | **Investment** |

"Specialised audit entity" is a company registered under the Bulgarian Commerce Act, or under the legislation of another Member State of the EU, or the European Economic Area Agreement, with its principal subject of activity being the independent financial audit of financial statements of enterprises, and three-quarters of its members being registered auditors, auditors or audit entities from a Member State of the EU, of

good repute, and which is:

(a) a general partnership in which more than half of the partners are registered auditors, auditors or audit entities from other Member State of the EU;

(b) a limited partnership in which more than half of the partners with unlimited liability are registered auditors, auditors or audit entities from other Member States of the EU; or

(c) a limited liability company in which more than half of the votes in the General Meeting of the partners and of the capital belong to registered auditors, auditors or audit entities from other Member States of the EU.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Taxation advisory services |
| **Industry Classification:** | CPC 863 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Accountancy Act |
| | Independent Financial Audit Act |
| | Income Taxes on Natural Persons Act |
| | Corporate Income Tax Act |
| **Description:** | **Cross-Border Trade in Services** |
| | Nationality of a Member State of the EU is a condition for tax advisors. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Architectural services |
| | Urban planning and landscape architectural services |
| | Engineering services |
| | Integrated engineering services |
| **Industry Classification:** | CPC 8671, CPC 8672, CPC 8673, 8674 |

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Spatial Development Act, art. 230 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

For projects of national or regional significance, Canadian investors must act in partnership with or, as subcontractors to, local investors.

Foreign specialists must have experience of at least two years in the field of construction, which is not a requirement for national specialists.

A Bulgarian nationality condition applies to urban planning and landscape architectural services.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Related scientific and technical consulting services |
| **Industry Classification:** | CPC 8675 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Cadastre and Property Register Act |
| | Geodesy and Cartography Act |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A professionally competent body is the person (physical or juridical) that may execute functions pertinent to cadastral surveying, geodesy and cartography. Establishment is required, as well as Bulgarian nationality for the natural person carrying out activities for geodesy, cadastral surveying, and in cartography when studying movements of the earth crust.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Translation and interpretation services |

| | |
|---|---|
| **Industry Classification:** | CPC 87905 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Regulation for the legalisation, certification and translation of documents |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A contract with the Ministry of Foreign Affairs is required for official translations provided by translation agencies.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Technical testing and analyses |
| **Industry Classification:** | CPC 8676 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Technical Requirements towards Products Act |
| | Measurement Act |
| | National Accreditation of Compliance Conformity Authorities Act |
| | Clean Ambient Air Act |
| | Water Act, Ordinance N-32 for the periodical inspection for proof of technical condition of road transport vehicles |
| **Description:** | **Cross-Border Trade in Services** |

In order to provide testing and analyses services, a national of Canada must be established in Bulgaria according to the Bulgarian Commercial Act and be registered on the Commercial register.

For the periodical inspection for proof of technical condition of road transport vehicles, the person should be registered in accordance with the Bulgarian Commercial Act or the Non-profit Legal Persons Act, or else be registered in another Member State of the EU or country from the EEA.

The testing and analysis of the composition and purity of air and water may be conducted only by the Ministry of Environment and

Water of Bulgaria, or its agencies in co-operation with the Bulgarian Academy of Sciences.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Commission agents' services |
| | Wholesale and retail trade services |
| **Industry Classification:** | Part of CPC 621, CPC 62228, CPC 62251, CPC 62271, part of CPC 62272, CPC 62276, CPC 63108, part of CPC 6329 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law of Veterinary Activity, arts. 343, 363, 373 |
| | Law for Prohibition of the Chemical Weapons and for Control over the Toxic Chemical Substances and Their Precursors, art. 6 |
| | Law on Control of Exports of Weapons and Dual-Use Items and Technology, art. 46 |
| | Law for the Tobacco and Tobacco Products, arts. 21, 27, 30 |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Distribution (wholesale and retail) of petroleum and petroleum products, gas, precious metals, tobacco, and tobacco products, is subject to authorisation and may be performed only after registration under the Commercial Register. Authorisation may only be given to nationals of a Member State of the EEA or foreign citizens with permanent residence in BG. |
| | Department stores may be subject to an Economic Needs Test, depending on the rules of the local municipality. |

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment |
| | Market access |

**Level of Government:**    National

**Measures:**    Law on Medicinal Products in Human Medicine, arts. 146, 161, 195, 222, 228

**Description:**    **Investment and Cross-Border Trade in Services**

The mail order of pharmaceuticals is prohibited.

The retail of pharmaceuticals and specific medical goods to the public may only be carried out through a pharmacy.

Managers of pharmacies must be qualified pharmacists and may only manage one pharmacy in which they themselves work. Requirement for permanent residence for pharmacists. A quota exists for the number of pharmacies which may be owned per person.

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Primary and secondary education services |
| **Industry Classification:** | CPC 921, CPC 922 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Public Education Act, art. 12 |
| | Law for the Higher Education, paragraph 4 of the additional provisions |
| **Description:** | **Investment** |

This reservation applies to the provision of privately funded primary and secondary education services, which may only be supplied by authorised Bulgarian enterprises (commercial presence is required).

Bulgarian kindergartens and schools having foreign participation may be established or transformed at the request of associations, or corporations, or enterprises of Bulgarian and foreign natural or legal entities, duly registered in Bulgaria, by decision of the Council of Ministers on a motion by the Minister of Education, Youth and Science.

Foreign owned kindergartens and schools may be established or transformed at the request of foreign legal entities in accordance with international agreements and conventions and under the provisions above.

Foreign high schools cannot establish subsidiaries in the territory of Bulgaria. Foreign high schools may open faculties, departments, institutes and colleges in Bulgaria only within the structure of Bulgarian high schools and in cooperation with them.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |

Market access

**Level of Government:**    National

**Measures:**    Insurance Code, arts. 8, 41, 47b

**Description:**    **Financial Services**

Before establishing a branch or agency in Bulgaria to provide insurance, a foreign insurer or re-insurer must have been authorised to operate in the same classes of insurance as those it wishes to provide in Bulgaria in its country of origin.

Local incorporation (no branches) is required for insurance intermediaries.

Residency requirement for the members of managing and supervisory body of (re)insurance undertakings and every person authorised to manage or represent the (re)insurance undertaking.

**Sector:**    Financial services

**Sub-Sector:**    Banking and other financial services (excluding insurance)

**Industry Classification:**

**Type of Reservation:**    National treatment

Market access

**Level of Government:**    National

**Measures:**    Law of Credit Institutions, art. 2, 17

Code Of Social Insurance, art. 121e

Currency Law, art. 3

**Description:**    **Financial Services**

A bank shall be established as a joint-stock company.

The bank shall be managed and represented jointly by at least two persons, at least one of whom shall be proficient in the Bulgarian language.

The persons who manage and represent the bank shall manage the bank by being personally present at its management address.

In order to perform public attraction of deposits or other renewable resources as well as other services, a bank headquartered in a non-Member State of the EU is required to obtain a license from Bulgarian National Bank for taking up and

pursuing of business activities in Bulgaria through a branch.

The financial institution shall be established as a shareholding company, a limited liability company or a commandite company with shares and the place of its main business shall be in the territory of Bulgaria.

Only financial institutions registered in Bulgaria and foreign financial institutions with a seat in a Member State of the EU may carry out activity on the territory of Bulgaria.

Pension insurance shall be carried out as a joint-stock company licensed in accordance with the Code of Social Insurance and registered under the Commerce Act or under the legislation of another Member State of the EU (no branches).

The promoters and shareholders of pension insurance companies may be non-resident legal persons, registered as a social insurance, commercial insurance or other financial institution under the national law thereof, if they present bank references from a first-class foreign bank confirmed by the Bulgarian National Bank. Non-resident individuals cannot be promoters and shareholders of pension insurance companies.

The income of the supplementary voluntary pension funds; as well as similar income directly connected with voluntary pension insurance carried out by persons who are registered under the legislation of another Member State of the EU and who may, in compliance with the legislation concerned, perform voluntary pension insurance operations, shall not be taxable according to the procedure established by the Corporate Income Tax Act.

The Chairperson of the Management Board, the Chairperson of the Board of Directors, the Executive Director and the Managerial Agent must have a permanent address or hold a durable residence permit in Bulgaria.

| | |
|---|---|
| **Sector:** | Tourism and travel related services |
| **Sub-Sector:** | Hotel, restaurants and catering |
| | Travel agencies and tour operators services |
| | Tourist guides services |
| **Industry Classification:** | CPC 641, CPC 642, CPC 643, CPC 7471, CPC 7472 |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |

Market access

**Level of Government:**     National

**Measures:**     Law For Tourism, arts. 17, 45

**Description:**     **Investment and Cross-Border Trade in Services**

Incorporation (no branches) is required.

Tour operation or travel agency services may be provided by a person established in a Member State of the EU or in a Member State of the EEA if, upon establishment in the territory of Bulgaria, the said person presents a copy of a document certifying the right thereof to practise such activity and a certificate or another document issued by a credit institution or an insurer containing data of the existence of insurance covering the liability of the said person for damage which may ensue as a result of a culpable non-fulfilment of professional duties.

The number of foreign managers may not exceed the number of managers who are Bulgarian nationals, in cases where the public (state or municipal) share in the equity capital of a Bulgarian company exceeds 50 per cent.

Nationality condition for tourist guides.

**Sector:**     Fishing

Transport

**Sub-Sector:**     All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing

Transport services (passengers and freight) by seagoing vessels

Pilotage and berthing services

Vessel salvage and refloating services

Other supporting services for water transport

Construction for waterways, harbours, dams and other water works

**Industry Classification:**     ISIC rev 3.1: 0501, ISIC rev 3.1 0502, CPC 5133, CPC5233, CPC 721,CPC 74520, CPC 74540, CPC 74590, CPC 882

**Type of Reservation:**     National treatment

Market access

| | |
|---|---|
| **Level of Government:** | National |
| **Measures:** | Merchant Shipping Code, arts. 6, 27, 28 |
| | Law For the Sea Water, Inland Waterways and Ports of the Republic of Bulgaria, arts. 116, 116a, 117, 117a |
| | Ordinance No.17/22.01.2013 for carrying goods by inland waterways |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A seagoing ship is entitled to fly the Bulgarian flag if:

(a)  it is owned by the State;
(b)  it is owned by a Bulgarian natural person or legal entity;
(c)  more than half of the ownership is by Bulgarian natural persons or legal entities; or
(d)  it is owned by a natural person or legal entity of a Member State of the EU, provided that, for the performance of the technical, administrative and other requirements of Bulgarian legislation in relation to seagoing ships, Bulgarian natural persons or legal entities or natural persons or legal entities from a Member State of the EU resident in Bulgaria have been authorised by the ship owner and are responsible to perform these tasks on their behalf.

Regarding supporting services for public transport carried out in Bulgarian ports, in ports having national significance, the right to perform supporting activities is granted through a concession contract. In ports having regional significance, this right is granted by a contract with the owner of the port.

| | |
|---|---|
| **Sector:** | Fishing |
| | Transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Transport services (passengers and freight) by non-seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |

| | |
|---|---|
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.10502, CPC 5133, CPC5223, CPC 721, CPC 722, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | Merchant Shipping Code |
| | – Law For The Sea Waters, The Internal Water Ways And The Ports Of The Republic Of Bulgaria |
| | – |
| | – Ordinance for the condition and order for selection of Bulgarian carriers for carriage of passengers and cargoes under international treaties |
| | Ordinance 3 for servicing of unmanned vessels |

**Description:** **Investment and Cross-Border Trade in Services**

The carriage and any activities related to hydraulic-engineering and underwater technical works, prospecting and extraction of mineral and other inorganic resources, pilotage, bunkering, receipt of waste, water-and-oil mixtures and other such, performed by vessels in the internal waters, the territorial sea and on the inland waterways of the Bulgaria, may only be performed by vessels flying the Bulgarian flag or vessels flying the flag of another Member State of the EU.

Services provided to unmanned vessels in Bulgarian ports and warehouses on the Danube river are provided only through Bulgarian enterprises (incorporation is required).

The number of the service suppliers at the ports may be limited depending on the objective capacity of the port, which is decided by an expert commission, set up by the Minister of Transport, Information Technology and Communications.

Nationality condition for supporting services. The master and the chief engineer of the vessel shall mandatorily be nationals of a Member State of the EU or the EEA, or of the Swiss Confederation. Not less than 25 per cent of the positions at management and operational level and not less than 25 per cent of the positions at order-taking level shall be occupied by nationals of Bulgaria.

**Sector:** Transport

| | |
|---|---|
| **Sub-Sector:** | Rail transport |
| | Supporting services for rail transport |
| **Industry Classification:** | CPC 711 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law for Railway Transport, arts. 37, 48 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Only nationals of a Member State of the EU may provide rail transport or supporting services for rail transport in Bulgaria. A licence to carry out passenger or freight transportation by rail is issued by the Minister of Transport to railway operators registered as traders.

***

## Reservations applicable in Croatia

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law on Possession and other Material Rights (OG 91/96, 68/98, 137/99, 22/00, 73/00, 114/01, 79/06, 141/06, 146/08, 38/09 i 153/09) |
| | Agricultural Land Act (OG 152/08, 25/09, 153/09, 21/10, 31/11 and 63/11), art. 2 |
| **Description:** | **Investment** |
| | Foreign companies are only allowed to acquire real estate for the supply of services if they are established and incorporated in Croatia as legal persons. Acquisition of real estate necessary for the supply of services by branches requires the approval of the Ministry of Justice. Agricultural land cannot be acquired by foreigners. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | CPC 861 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Legal Profession Act, (OG 9/94, 51/01, 117/08, 75/09, 18/11) |
| **Description:** | **Cross Border and Investment** |
| | Representation of parties before courts can be practised only by the members of the Bar Council of Croatia (Croatian title "odvjetnici"). Citizenship requirement for membership in the Bar Council. |
| | In proceedings involving international elements, parties may be represented before arbitration courts – ad hoc courts only by lawyers who are members of the bar associations of other |

countries.

Full admission to the Bar, required for legal representation services, is subject to a nationality condition (nationality of a Member State of the EU).

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting, auditing and bookkeeping services |
| **Industry Classification:** | CPC 862 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Audit Act (OG 146/05, 139/08, 144/12), Art. 3 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

**Foreign audit firms may provide audit services on the Croatian territory where they have established a branch. Auditing may be performed only by legal persons established in Croatia, or by natural persons resident in Croatia.**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Architectural services and engineering services |
| **Industry Classification:** | CPC 8671, CPC 8672, CPC 8673, CPC 8674 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | **Act on Architectural and Engineering Activities in Physical Planning and Building (OG** 152/08, 49/11, 25/13) |
| **Description:** | **Cross-Border Trade in Services** |

A design or project created by a foreign architect or engineer must be validated by an authorised natural or legal person in Croatia with regard to its compliance with Croatian Law.

1026

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Veterinary Act (OG 41/07, 55/11), Arts. 89, 106 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Only legal and natural persons established for the purpose of conducting veterinary activities in a Member State of the EU can provide cross border veterinary services in the Croatia (Veterinary Act; OG 41/07, 55/11, Article 89).

Only nationals of a Member State of the EU can establish a veterinary practice in the Croatia (Veterinary Act, OG 41/07; 55/11, Article 106).

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sale of pharmaceuticals and retail sales of medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Health Care Act (OG 150/08, 71/10, 139/10, 22/11, 84/11, 12/12, 70/12, 144/12) |
| **Description:** | **Investment** |

Authorisation is subject to an economic needs test. Main criteria: population and geographical density of existing pharmacies.

1027

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Real estate services |
| **Industry Classification:** | CPC 821, CPC 822 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Real Estate Brokerage Act (OG 107/07 and 144/12), Art. 2 |
| **Description:** | **Cross-Border Trade in Services** |
| | Commercial presence is required to provide real estate services. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Related scientific and technical consulting services |
| **Industry Classification:** | CPC 8675 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Ordinance on requirements for issuing approvals to legal persons for performing professional environmental protection activities (OG No.57/10), Arts. 32-35 |
| **Description:** | **Cross-Border Trade in Services** |
| | Services of basic geological, geodetic and mining consulting as well as related environmental protection consulting services in the territory of Croatia can be carried out only jointly with or through domestic legal persons. |

| | |
|---|---|
| **Sector:** | Health services and social services |
| **Sub-Sector:** | Hospital services |
| | Ambulance services |
| | Residential health facilities other than hospital services |
| **Industry Classification:** | CPC 9311, CPC 93192, CPC 93193, CPC 933 |
| **Type of Reservation:** | Market access |

| | |
|---|---|
| **Level of Government:** | National |
| **Measures:** | Health Care Act (OG 150/08, 71/10, 139/10, 22/11, 84/11, 12/12, 70/12, 144/12) |
| **Description:** | **Investment** |
| | Establishment of some privately funded social care facilities may be subject to needs based limits in particular geographical areas. |

| | |
|---|---|
| **Sector:** | Tourism and travel related services |
| **Sub-Sector:** | Hotels and restaurants |
| | Travel agencies and tour operators services (including tour managers) |
| | Tourist guide services |
| **Industry Classification:** | CPC 641, CPC 642, CPC 643, CPC 7471, CPC 7472 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Hospitality and Catering Industry Act (OG 138/06, 152/08, 43/09, 88/10 i 50/12) |
| | Act on Provision of Tourism Services (OG No. 68/07 and 88/10) |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Nationality requirement for hospitality and catering services in households and rural homesteads. |

| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, |

CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Maritime Act (*Pomorski zakonik*), Art. 187 |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |

A seagoing vessel owned by a natural or legal person having residency or a seat outside the EU may be registered in the Croatian national register and fly the Croatian flag if the shipper/company seeking to register the vessel has commercial presence in Croatia.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Maritime transport services: towing and pushing services Supporting services for maritime transport |
| | Services auxiliary to all modes of supply |
| | Cargo handling services |
| | Storage and warehousing services |
| | Freight transport agency services |
| | Other supporting and auxiliary transport services |
| **Industry Classification:** | CPC 7214, CPC 741, CPC 742, 745, CPC 741, CPC 742, CPC 748, CPC 749 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act on Maritime Demesne and Sea Ports (OG 158/03, 100/04, 141/06 i 38/09 (Zakon o pomorskom dobru i morskim lukama. (NN 158/03, 100/04, 141/06 i 38/09) |
| **Description:** | **Investment** |

Foreign legal persons must establish a company in Croatia and must be granted a concession by the port authority following a public tendering procedure.

1030

\*\*\*

## Reservations applicable in Cyprus

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | The Immovable Property Acquisition (Aliens) Law (Chapter 109), as amended by laws number 52 of 1969, 55 of 1972, 50 of 1990 and 54(I) of 2003 |
| **Description:** | **Investment** |

Cypriots or persons of Cypriot origin, as well as nationals of a Member State of the EU, are allowed to acquire any property in Cyprus without restrictions.

No foreigner may acquire, otherwise than *mortis causa*, any immovable property without obtaining a permit from the Council of Ministers.

For foreigners, where the acquisition of immovable property exceeds the extent necessary for the erection of a premises for a house or professional roof, or otherwise exceeds the extent of two donums (2676 sq.), any permit granted by the Council of Ministers shall be subject to such terms, limitations, conditions and criteria which are set by Regulations made by the Council of Ministers and approved by the House of Representatives.

A foreigner is any person who is not a citizen of the Republic of Cyprus, including a foreign controlled company. The term does not include foreigners of Cypriot origin or non-Cypriot spouses of citizens of the Republic of Cyprus.

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | Extraction of crude petroleum and natural gas |
| **Industry Classification:** | ISIC rev 3.1 1110 |
| | The Hydrocarbons (Prospecting, Exploration and Exploitation Law) of 2007, (Law 4(I)/2007) as amended by laws number 126(I) of 2013 and 29(I) of 2014 |
| **Type of Reservation:** | Market access |

National treatment

**Level of Government:**     National

**Measures:**

**Description:**     **Investment**

The Council of Ministers may, for reasons of energy security, refuse to allow access to and exercise of the activities of prospecting, exploration and exploitation of hydrocarbons to any entity which is effectively controlled by Canada or by nationals of Canada.

No entity may, after the granting of an authorisation for the prospecting, exploration and production of hydrocarbons, come under the direct or indirect control of Canada or a national of Canada without the prior approval of the Council of Ministers.

The Council of Ministers may refuse to grant an authorisation for the prospecting, exploration and production of hydrocarbons to an entity which is effectively controlled by Canada or a third country or by a national of Canada or a third country, where Canada or the third country does not grant entities of the Republic of Cyprus or entities of Member States of the EU, in relation to the access to and exercise of the activities of prospecting, exploring for and exploiting hydrocarbons, treatment comparable to that which the Republic of Cyprus or the Member State of the EU grants entities of Canada or that third country.

**Sector:**     Business services

**Sub-Sector:**     Legal services

**Industry Classification:**     Part of CPC 861

**Type of Reservation:**     Market access

National treatment

**Level of Government:**     National

**Measures:**     Advocates Law (Chapter 2), as amended by laws number 42 of 1961, 20 of 1963, 46 of 1970, 40 of 1975, 55 of 1978, 71 of 1981, 92 of 1983, 98 of 1984, 17 of 1985, 52 of 1985, 9 of 1989, 175 of 1991, 212 of 1991, 9(I) of 1993, 56(I) of 1993, 83(I) of 1994, 76(I) of 1995, 103(I) of 1996, 79(I) of 2000, 31(I) of 2001, 41(I) of 2002, 180(I) of 2002, 117(I) of 2003, 130(I) of 2003,

199(I) of 2004, 264(I) of 2004, 21(I) of 2005, 65(I) of 2005, 124(I) of 2005, 158(I) of 2005, 175(I) of 2006, 117(I) of 2007, 103(I) of 2008, 109(I) of 2008, 11(I) of 2009, 130(I) of 2009, 4(I) of 2010, 65(I) of 2010, 14(I) of 2011, 144(I) of 2011, 116(I) of 2012 and 18(I) of 2013

**Description:**     **Investment and Cross-Border Trade in Services**

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts.

Residency (commercial presence) and nationality of a Member State of the EU is required in order to obtain full admission to the Bar. Only advocates enrolled in the Bar may be partners or shareholders or members of the Board of Directors in a law company in Cyprus.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

**Sector:**     Business services

**Sub-Sector:**     Accounting and bookkeeping services

Auditing services, taxation advisory services

**Industry Classification:**     CPC 86211, CPC 86212, CPC 86213, CPC 86219, CPC 86220, CPC 863

**Type of Reservation:**     Market access

**Level of Government:**     National

**Measures:**     The Auditors and Mandatory Audit of the Annual and of the Consolidated Accounts Law of 2009 (Law 42(I)/2009), as amended by law number 163(I) of 2013

**Description:**     **Investment and Cross-Border Trade in Services**

Access is restricted to natural persons. Canadian auditors need to obtain special license from the Minister of Finance, which is subject to reciprocity.

The authorisation is also subject to an economic needs test. Main criteria: the employment situation in the sub-sector. Professional

associations (partnerships) between natural persons are permitted. No body corporate is allowed.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Technical testing and analyses |
| **Industry Classification:** | CPC 8676 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Registration of Chemists Law of 1988 (Law 157/1988), as amended by laws number 24(I) of 1992 and 20(I) of 2004 |
| **Description:** | **Cross-Border Trade in Services** |
| | The provision of services by chemists and biologists requires nationality of a Member State of the EU. |

| | |
|---|---|
| **Sector:** | Tourism and travel related services |
| **Sub-Sector:** | Travel agencies and tour operators services (including tour managers |
| | Tourist guide services |
| **Industry Classification:** | CPC 7471, CPC 7472 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | National |
| **Measures:** | The Tourism and Travel Offices and Tourist Guides Law 1995 to 2004 (N.41(I)/1995-2004) |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | A licence to establish and operate a tourism and travel company, as well as the renewal of an operating licence of an existing company, shall be granted only to EU natural or legal persons. |

No non-resident company except those established in another Member State of the EU, can provide in the Republic of Cyprus, on an organised or permanent basis, the activities referred to under Article 3 of the abovementioned Law, unless represented by a resident company.

The provision of tourist guide services requires nationality of a Member State of the EU.

| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | The Merchant Shipping (Registration of Ships, Sales and Mortgages) Laws of 1963 to 2005 (Law 45/1963), as amended by laws number 138(I) of 2003, 169(I) of 2004 and 108(I) of 2005 |
| **Description:** | **Investment and International Maritime Transport Services** |

A vessel may be registered in the Register of Cyprus Ships only if:

(a)    More than 50 per cent of the shares of the ship are owned by nationals of a Member State of the EU, who, if they are not permanent residents of the Republic of Cyprus, have appointed an authorised representative in the Republic of Cyprus; or

(b)    The total (100 per cent) of the shares of the ship are owned by one or more corporations, which have been established and operate:

1036

(i)    in accordance with the laws of the Republic of Cyprus and have their registered office in the Republic of Cyprus;

(ii)    in accordance with the laws of any other Member State of the EU and have their registered office, central administration or principal place of business within the European Economic Area and have either appointed an authorised representative in the Republic of Cyprus or the management of the ship is entrusted in full to a Cypriot or an EU ship management company having its place of business in the Republic of Cyprus; or

(iii)    outside the Republic of Cyprus or outside any other Member State of the EU but controlled by nationals of a Member State of the EU and have either appointed an authorised representative in the Republic of Cyprus or the management of the ship is entrusted in full to a Cypriot or an EU ship management company having its place of business in the Republic of Cyprus. The corporation is deemed to be controlled by nationals of a Member State of the EU when more than fifty per cent of its shares are owned by nationals of a Member State of the EU or when the majority of the Directors of the corporation are nationals of a Member State of the EU.

***

## Reservations applicable in the Czech Republic

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Act No. 95/1999 Coll. (on Conditions relating to the transfer of agricultural land and forests from the state ownership to ownership of other entities) |
| | *Act No. 503/2012, Coll. on State Land Office* |
| **Description:** | **Investment** |

*Agricultural and forest land can be acquired by foreign natural persons having permanent residence in the Czech Republic and enterprises established in the Czech Republic.*

*Specific rules apply to agricultural and forest land under state ownership.* State agricultural land can be acquired only by Czech nationals, by municipalities and by public universities (for training and research). Legal persons (regardless of the form or place of residence) can acquire state agriculture land from the state only if a building, which they already own, is built on it or if this land is indispensable for the use of such building. Only municipalities and public universities can acquire state forests.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Act No. 85/1996 Coll., the Legal Profession Act |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Foreign lawyers admitted to the Czech Bar Association under section 5a subsection (1) of the Legal Profession Act shall be

entitled to provide legal services in the law of the country in which they obtained their entitlement to provide legal services, and international law.

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

| | |
|---|---|
| **Sector:** | Health and social services |
| **Sub-Sector:** | Business and production services |
| | Veterinary services |
| | Paramedical personnel |
| | Restorer |
| | Physiotherapists |
| **Industry Classification:** | CPC 93191, CPC 932, CPC 96322 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | **Act No. 166/1999 Coll. (Veterinary Act), §58-63, 39** |
| | Act No. *381/1991 Coll*. (on the Chamber of Veterinary Surgeons of the Czech Republic), par. 4 |
| | Act. 20/1987 Coll., on State monument care |
| | Act. 96/2004 Coll., on conditions of obtaining and recognition of qualification for the performance of non-medical occupations in health service and for the due performance of activities related to the provision of health care |
| **Description:** | **Cross-Border Trade in Services** |
| | Access is restricted to natural persons only. |

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Higher education services |
| **Industry Classification:** | CPC 92390 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Act No. 111/1998, Coll. (Higher Education Act), § 39 |
| | ACT NO. 561/2004 COLL. ON PRE-SCHOOL, BASIC, SECONDARY, TERTIARY PROFESSIONAL AND OTHER EDUCATION (THE EDUCATION ACT) |
| **Description:** | **Investment** |
| | Establishment in the EU is required to apply for state approval to operate as a privately funded higher education institution. This reservation does not apply to secondary technical and vocational education services. |

| | |
|---|---|
| **Sector:** | Community, social and personal services |
| **Sub-Sector:** | Environmental protection services |
| | Recycling services |
| | Packaging |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Act. 477/2001 Coll. (Packaging Act) par. 16 |
| **Description:** | **Investment** |
| | An authorised package company is only allowed to provide services relating to packaging take-back and recovery and must be a legal person established as a joint-stock company |

| | |
|---|---|
| **Sector:** | Fishing |
| | Transport |

1040

| Sub-Sector: | All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing |
|---|---|
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act. 61/2000 on Maritime Navigation (§5, §6 and §28) |
| **Description:** | **Investment and International Maritime Transport Services** |
| | Operating a ship under the national flag is reserved to nationals of a Member State of the EU or juridical persons established in a Member State of the EU or the EEA. |

| **Sector:** | Transport |
|---|---|
| **Sub-Sector:** | Rail transport |
| **Industry Classification:** | CPC 711 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Act No. 266/1994 Coll., on Rail Transport |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | For passenger and freight transportation and pushing and towing services by rail, incorporation is required (no branches). |

***

**Reservations applicable in Denmark**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Danish Act on acquisition of real property |

Lovbekendtgørelse nr. 566 af 28. august 1986 om erhvervelse af fast ejendom (Ministry of Justice Act No. 566 of 28 August 1985), as amended by act No. 1102 of 21 December 1994 and Order No. 764 of 18 September 1995

Danish Act on Agricultural Real Estate (lov om landbrugsejendomme)

**Description:**          **Investment**

The Danish Act on Acquisition of Real Property applies to agricultural land, as the term "real property" refers to all real estate and thus includes agricultural and rural land.

Only persons who have permanent residence in Denmark or who have earlier resided permanently in Denmark for at least five years are able to purchase real estate property in Denmark. This requirement also applies to enterprises, associations and other bodies, public or private institutions, foundations and charitable trusts that have no registered office in Denmark, and to foreign public authorities.

Other persons must apply to the Ministry of Justice for permission to purchase real estate property, which will be permitted if the applicant is going to use the real estate property as primary residence during the stay in Denmark or for self-employment in Denmark.

Purchase of real estate property which will be used as secondary residence or summer house for the applicant will be permitted only if the person concerned has particularly close relations or ties to Denmark.

The purchase of real estate property for enterprises, associations and other bodies, public or private institutions, foundations and charitable trusts that have no registered office in Denmark will be permitted where the acquisition is a prerequisite for the business activities of the purchaser.

The acquisition of agricultural land by private or legal persons is also governed by the Danish Act on Agricultural Real Estate (lov om landbrugsejendomme), which imposes restrictions on all persons, Danish or foreign, when acquiring agricultural property. Accordingly, any private or legal person, who wishes to acquire agricultural real estate, must fulfill the requirements in both laws.

An agricultural holding may be acquired by an individual, provided that the acquirer - or another person - takes permanent residence at the holding no later than six month following the acquisition. There is no limitation on citizenship.

If the acquirer is not a national of one of the Member States of the EU or the EEA, the acquirer must also have a permit from the Ministry of Justice, unless the acquirer actually lives in Denmark or formerly has lived in Denmark for at least five years.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Lovbekendtgørelse nr. 1053 af 29. Oktober 2009 (Act No 1069 of 29 October 2009 on the administration of justice) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts.

To provide legal services in respect of EU law and the law of a Member State, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

Ninety per cent of shares of a Danish law firm must be owned by lawyers with a Danish licence to practice or law firms registered in Denmark. Only lawyers with a Danish licence to practice may

sit on the board or be a member of the management of a Danish law firm. The remaining ten per cent can be owned by other employees in law firms, who can also sit on the board and be part of the management of the firm.

Marketing of legal advisory services is restricted to lawyers with a Danish licence to practice.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting and bookkeeping services |
| | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212, CPC 86213, CPC 86219, CPC 86220 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Revisorloven (The Danish Act on Approved Auditors and Audit Firms), Act No. 468 of 17 June 2008 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Residency is required in order to provide auditing services.

In order to enter into partnership with Danish authorised accountants, foreign accountants must obtain permission from the Danish Commerce and Enterprises Agency.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Act no. 433 of 9 June 2004 on veterinary surgeons |
| **Description:** | **Cross-Border Trade in Services** |

Access is restricted to natural persons.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Real estate services (on a fee or a contract basis) |
| **Industry Classification:** | CPC 822 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Lov om omsætning af fast ejendom (The Act on the sale of real estate) |
| **Description:** | **Cross-Border Trade in Services** |

For the provision of real estate services by a physical person present in the territory of Denmark, only authorised real estate agents who are natural persons that have been admitted to the real estate agent register may use the title of "real estate agent", in accordance with. Section 25(2) of the Act on the sale of real estate which lays down the requirements for admission to the register. The Act requires that the applicant be a Danish resident or a resident of the EU, EEA or the Swiss Confederation. The residence requirement may be waived by the Danish Commerce and Companies Agency.

The Act on the sale of real estate is only applicable when providing real estate services to Danish consumers.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Translation and interpretation services |
| **Industry Classification:** | CPC 87905 |
| **Type of Reservation:** | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | Lov om translatører og tolke (Act on Authorised Translators and Interpreters), Act no. 181 of 25 March 1988, ss. 1 and 1a |
| **Description:** | **Cross-Border Trade in Services** |

For the provision of authorised translation and interpretation services by a physical person present in the territory of Denmark, an authorisation from the Danish Commerce and Enterprises

Agency is required.

Exemptions from the authorisation requirement for occasional and temporary supply of these services may be granted to persons who are established in an equivalent profession to that of state authorised translator and interpreter in another Member State of the EU, in an EEA country or in the Swiss Confederation.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | Lov om vagtvirksomhed LBK nr 227 af 03/03/2010 |
| **Description:** | **Investment** |
| | Requirement of residence for members of the board. |

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Apotekerloven (Danish Pharmacy Act) LBK nr. 855 of 04/08/2008 |
| **Description:** | **Cross-Border Trade in Services** |
| | Only natural persons are permitted to provide retail services of pharmaceuticals and specific medical goods to the public. |

1047

| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.10502, CPC 5133, CPC5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Lov om Dansk Internationalt Skibsregister (Danish International Ship Register Act), para 1 (2) |
| | Søloven (Danish Merchant Shipping Act), para 1 (2). |
| | Lov om Havne (Harbour Act), ss. 9 (6-7) and 10 (4-5) |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |
| | Non-EU residents cannot own Danish flagged vessels except: |
| | (a) Through an enterprise incorporated in Denmark i.e. an agency, a branch or a subsidiary. Furthermore, the vessels must be effectively managed, controlled and operated from the enterprise either through a national of a Member State of the EU or the EEA or a person having Danish residence; or |
| | (b) Through the establishment of a subsidiary company in another Member State of the EU or the EEA and the transfer of the ownership of the ship to this EU or EEA company. This EU or EEA company is not required to establish an agency, branch or subsidiary undertaking, but a representative in Denmark must be appointed and the ship must be effectively managed, controlled and directed from Denmark |
| **Sector:** | Fishing |

Transport

**Sub-Sector:** Supporting services for water transport

**Industry Classification:** CPC 741, CPC 742, CPC 745

**Type of Reservation:** National treatment

Market access

**Level of Government:** National

**Measures:** Lov om Dansk Internationalt Skibsregister (Danish International Ship Register Act), para 1 (2)

Søloven (Danish Merchant Shipping Act), para 1 (2).

Lov om Havne (Harbours Act), ss. 9 (6-7) and 10 (4-5)

**Description:** **Investment, Cross-Border Trade in Services, and International Maritime Transport Services**

When a foreign private port operator performs ship stevedoring services and other ship-related services at a Danish port in collaboration with a Danish municipal port, permission from the Minister of Transport is required according to the Harbours Act.

Municipal ports need permission from the Minister of Transport in order to perform ship stevedoring services and other ship-related services such as pilotage, towage etc. State ports are prohibited from performing these services.

The Harbours Act does not place restrictions on private port operators, thus foreign *private* port operators are not prohibited from performing ship stevedoring services and other ship-related services at Danish ports. However, foreign *state* and *municipal* port operators are subject to the restrictions of the Harbours Act.


**Sector:** Energy

**Sub-Sector:** Pipeline transportation of fuels

**Industry Classification:** CPC 7131

**Type of Reservation:** Market access

**Level of Government:** National

**Measures:** Bekendtgørelse nr. 724 af 1. juli 2008 om indretning, etablering og drift af olietanke, rørsysrtemer og pipelines (Order on the arrangement, establishment and operation of oil tanks, piping

systems and pipelines), no. 724 of 1 July 2008

**Description:**          **Investment**

The owner or user intending to establish a pipeline for the transport of crude or refined petroleum and petroleum products and of natural gas must obtain a permit from the local authority before commencing work. The number of such permits which are issued may be limited.

***

## Reservations applicable in Estonia

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Äriseadustik (Commercial Code) § 63[1] (2), § 385 (1) |
| **Description:** | **Investment** |

A foreign company shall appoint a director or directors for a branch. A director of a branch must be a natural person with active legal capacity. The residence of at least one director of a branch must be in Estonia, in a Member State of the EEA or in the Swiss Confederation.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Advokatuuriseadus (Bar Association Act), RT I 2001, 36, 201 |
| | Notariaadiseadus (Notaries Act), RT I 2000, 104, 684 |
| | Kohtutäituri seadus (Bailiffs Act), RT I 2009, 68, 463 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of Estonian law, including representation before courts. Residency (commercial presence) is required in order to obtain full admission to the Bar.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may

be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

For legal services other than advisory services to clients related to their legal rights and obligations and providing information on legal matters, commercial presence is restricted to sole proprietorships or to law firms with limited liability, in which cases permission is needed from the Bar Association (Advokatuur).

| | |
|---|---|
| **Sector:** | Legal services |
| **Sub-Sector:** | Patent agents |
| | Sworn translators |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Patendivoliniku seadus (Patent Agents Act) § 14 (1) |
| | Vandetõlgi seadus (Sworn Translators Act) § 3 (2) |
| **Description:** | **Cross-Border Trade in Services** |
| | A patent agent must be a national of a Member State of the EU with permanent residence in Estonia. |
| | A sworn translator must be a national of a Member State of the EU. |

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Ravimiseadus (Medicinal Products Act), RT I 2005, 2, 4; § 25 (3), §30, § 42[1] |

**Description:**     **Investment and Cross-Border Trade in Services**

The retail of pharmaceuticals and specific medical goods to the public may only be carried out through a pharmacy.

Mail order sale of medicinal products as well as delivery by post or express service of medicinal products ordered through the Internet is prohibited.

Establishment authorisation is subject to an economic needs test. Main criteria: density conditions in the area.

**Sector:**     Fishing, transport

**Sub-Sector:**    All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing, transport services (passengers and freight) by seagoing vessels

Pilotage and berthing services

Vessel salvage and refloating services

Other supporting services for water transport

Construction for waterways, harbours, dams and other water works

**Industry Classification:** ISIC rev 3.1 0501, ISIC rev0502, CPC 5133, CPC 5223, CPC 721, CPC 74520

CPC 74540, CPC 74590, CPC 882

**Type of Reservation:** National treatment

Senior management and boards of directors

Market access

**Level of Government:** National

Law of Ship Flag and Ship Registers Act

**Measures:**

**Description:**     **Investment and International Maritime Transport Services**

The right to fly the national flag of the Republic of Estonia is granted to seagoing vessels owned by Estonian citizens; seagoing vessels in common ownership if the greater share of the vessel is owned by Estonian co-owners. Majority ownership of a vessel flying the Estonian flag is reserved to nationals and legal persons from Member States of the EU provided that the person

from another Member State of the EU has:

(a) a residence or a permanent business establishment in Estonia, and the ship itself is not deemed to be a business establishment; or

(b) a permanent representative whose residence or seat is in Estonia and who is responsible for compliance with the technical, social and administrative requirements established with regard to seagoing vessels in Estonia and who directly controls and monitors the use of the ship.

***

## Reservations applicable in Finland

*For the purposes of the reservations of the EU and its Member States, a regional level of government in Finland means the Åland Islands*

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Laki elinkeinon harjoittamisen oikeudesta (Act on the Right to Carry on a Trade) (122/1919), s. 1 |
| | Osuuskuntalaki (Co-Operatives Act) 1488/2001 |
| | Osakeyhtiölaki (Limited Liabilities Company Act) (624/2006), Laki luottolaitostoiminnasta (Act on Credit Institutions) (121/2007) |

**Description:**      **Investment**

At least one of the partners in a general partnership or of general partners in a limited partnership needs to have residency in the EEA or, if the partner is a juridical person, be domiciled (no branches allowed) in the EEA. Exemptions may be granted by the registration authority.

To carry on trade as a private entrepreneur, residency in the EEA is required.

If a foreign organisation from a country outside the EEA intends to carry on a business or trade by establishing a branch in Finland, a trade permit is required.

Residency in the EEA is required for at least one of the ordinary and one of the deputy members of the Board of Directors and for the Managing Director. Company exemptions may be granted by the registration authority.

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | Mining |

Services incidental to mining

Engineering related scientific and technical consulting services

Ore mining

| | |
|---|---|
| **Industry Classification:** | ISIC rev 3.1 120, CPC 5115, CPC 883, CPC 8675 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Kaivoslaki (Mining Act) (621/2011) |
| | Ydinenergialaki (Nuclear Energy Act) (990/1987) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The exploration for and exploitation of mineral resources are subject to a licensing requirement, which is granted by the Government in relation to the mining of nuclear material. A permit of redemption for a mining area is required from the Government. Permission may be granted to a natural person resident in the EEA or a juridical person established in the EEA. An economic needs test may apply.

| | |
|---|---|
| **Sector:** | Animal husbandry |
| **Sub-Sector:** | Reindeer husbandry |
| **Industry Classification:** | ISIC rev 3.1 014 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Poronhoitolaki (Reindeer Husbandry Act) (848/1990), Chapter 1, s. 4 |
| | Protocol 3 to the Accession Treaty of Finland |
| **Description:** | **Investment** |

Only nationals of a Member State of the EEA resident in the reindeer herding area may own reindeer and practice reindeer husbandry. Exclusive rights may be granted.

| | |
|---|---|
| **Sector:** | Legal services |
| **Sub-Sector:** | |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Tavaramerkkilaki (Trademarks Act) (7/1964) |
| | Laki patenttiasiamiehistä (Patent Agent Act) (552/1967) |
| | Laki kasvinjalostajanoikeudesta (Plant Breeder's Right Act) 1279/2009 |
| | Mallioikeuslaki (Registered Designs Act) 221/1971 |
| **Description:** | **Cross-Border Trade in Services** |
| | A patent agent must be resident in the EEA in order to be recorded in the Patent Agents Register, which is necessary for the practice of the profession. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Laki asianajajista (Advocates Act) (496/1958), ss. 1 and 3, Oikeudenkäymiskaari (4/1734) (Code of Judicial Procedure) |
| **Description:** | **Cross-Border Trade in Services** |
| | For admission to the Bar, which is required for the use of the Finnish title "asianajaja", EEA residency is required. Legal services, including domestic law, may also be provided by non-Bar members. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212 other than accounting services |
| **Type of Reservation:** | National treatment<br>Market access |
| **Level of Government:** | National |
| **Measures:** | Tilintarkastuslaki (Auditing Act) (459/2007)<br>Sectoral laws requiring the use of locally-licensed auditors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | EEA residency required for at least one of the auditors of a Finnish Limited Liability company and of companies which are under the obligation to carry out an audit. |
| | An auditor must be a locally-licensed auditor or a locally-licensed audit firm. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Translation services |
| **Industry Classification:** | Part of CPC 87905 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Laki auktorisoiduista kääntäjistä (Act on Authorised Translators) (1231/2007), s. 2(1) |
| **Description:** | **Cross-Border Trade in Services** |
| | Residency in EEA is required for certified translators. |

| | |
|---|---|
| **Sector:** | Other services |
| **Sub-Sector:** | Funeral, cremation and undertaking services |
| **Industry Classification:** | Part of CPC 9703 |

| | |
|---|---|
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Hautaustoimilaki (Act on Burial Service) (457/2003) |
| **Description:** | **Investment** |

Cremation services and operation/maintenance of cemeteries and graveyards can only be performed by the state, municipalities, parishes, religious communities or non-profit foundations or societies.

| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Merilaki (Maritime Act) 674/1994 |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |

Foreign investors must have their principal office in Finland in order to register a vessel on the national shipping register.

A ship can be considered Finnish and has the right to fly the Finnish flag only where a Finnish national or company owns more than sixty per cent of the vessel.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Supporting services for water transport |
| **Industry Classification:** | CPC 745 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | Merilaki (Maritime Act) (674/1994) |
| | Laki elinkeinon harjoittamisen oikeudesta (Act on the Right to Carry on a Trade) (122/1919), s. 4 |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Supporting services for maritime transport when provided in Finnish maritime waters or internal waterways are reserved to fleets operating under the national, EU or Norwegian flag. |

***

# Reservations applicable in France

| | |
|---|---|
| **Sector:** | Agriculture and hunting |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 011, ISIC rev 3.1 012, ISIC rev 3.1 013, ISIC rev 3.1 014, ISIC rev 3.1 015 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Code rural et de la pêche maritime: art. R331-1 on installation and art. L. 529-2 on agricultural co-operatives |
| **Description:** | **Investment** |

The establishment of farms and agricultural co-operatives by non-EU investors is subject to authorisation. Prior authorisation is required in order to become a member or act as a director of an agricultural co-operative.

| | |
|---|---|
| **Sector:** | Fishing |
| **Sub-Sector:** | Fishing and aquaculture |
| | Services incidental to fishing |
| **Industry Classification:** | ISIC rev 3.1 050, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Code rural et de la pêche maritime: art. L921-3 |
| **Description:** | **Investment** |

A French vessel flying the French flag may be issued a fishing authorisation or may be allowed to fish on the basis of national quotas only when a real economic link on the territory of the France is established and the vessel is directed and controlled from a permanent establishment located on the territory of France.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Loi du 31 décembre 1971, art. 56 |
| | Loi 90-1258 relative à l'exercice sous forme de société des professions libérales |
| | Loi 90- 1259 du 31 décembre 1990, art. 7 |

**Description:**     **Investment and Cross-Border Trade in Services**

Full admission to the Bar is required for the practice of legal services in respect of French law, including representation before courts. Residency (commercial presence) is required in order to obtain full admission to the Bar. Only nationals of a Member State of the EEA or ofthe Swiss Confederation may be admitted to the Bar, and are thus entitled to provide legal services in respect of French law.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

Respresentation before the *"Cour de Cassation*" and "*Conseil d'Etat"* is subject to quotas. In a law firm providing services in respect of French or EU law, at least 75 per cent of the partners holding 75 per cent of the shares shall be lawyers fully admitted to the Bar in France.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting and bookkeeping services |
| | Auditing services |
| | Taxation advisory services |

| | |
|---|---|
| **Industry Classification:** | CPC 86211, CPC 86212, CPC 86213, CPC 86219, CPC 86220, CPC 863 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Ordonnance 45-2138 du 19 septembre 1945, arts. 3, 7, 26,27 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Provision of accounting and bookkeeping services by a foreign service supplier is conditional on a decision of the Minister of Economics, Finance and Industry, in agreement with the Minister of Foreign Affairs.

For accounting and bookkeeping services: provision through SEL (anonyme, à responsabilité limitée ou en commandite par actions), AGC (Association de gestion et comptabilité) or SCP (Société civile professionnelle) only. For taxation advisory services, provision through SEL (anonyme, à responsabilité limitée ou en commandite par actions) or SCP (Société civile professionnelle) only.

For statutory audits: provision through any company form except SNC (Société en nom collectif), SCS (Société en commandite simple).

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Architectural services |
| **Industry Classification:** | CPC 8671 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Loi 90-1258 relative à l'exercice sous forme de société des professions libérales. |
| | Décret 95-129 du 2 février 1995 relatif à l'exercice en commun de la profession d'architecte sous forme de société en participation. |
| | Décret 92-619 du 6 juillet 1992 relatif à l'exercice en commun de la profession d'architecte sous forme de société d'exercice libéral à responsabilité limitée SELARL, société d'exercice libéral à forme anonyme SELAFA, société d'exercice libéral en commandite par |

actions SELCA.

Loi 77-2 du 3 janvier 1977, arts. 12, 13, 14

| | |
|---|---|
| **Description:** | **Investment** |

An architect may only establish in France in order to provide architectural services using one of the following legal forms (on a non-discriminatory basis):-

SA et SARL (sociétés anonymes, à responsabilité limitée), EURL (Entreprise unipersonnelle à responsabilité limitée), SCP (en commandite par actions), SCOP (Société coopérative et participative), SELARL (société d'exercice libéral à responsabilité limitée), SELAFA (société d'exercice libéral à forme anonyme), SELAS (société d'exercice libéral )or SAS (Société par actions simplifiée), or as individual or as a partner in an architectural firm.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | Code rural et de la pêche maritime arts. L241-1; L241-2; L241-2-1 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Nationality condition limited to nationals of a Member State of the EU and the EEA. Insofar as Canada allows French citizens to provide veterinary services then France will allow Canadian service suppliers to provide veterinary services under the same conditions.

The legal forms available to a company providing veterinary services are limited to three types of companies (SEP (Société en participation); SCP (Société civile professionnelle); and SEL (Société d'exercice liberal).

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Related scientific and technical consulting services |
| **Industry Classification:** | CPC 8675 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Loi 90-1258 relative à l'exercice sous forme de société des professions libérales, modifiée par les lois 2001-1168 du 12 décembre 2001 et 2008-776 du 4 août 2008 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

For surveying, access through a SEL (anonyme, à responsabilité limitée ou en commandite par actions), SCP (Société civile professionnelle), SA and SARL (sociétés anonymes, à responsabilité limitée) only.

Foreign investors are required to have a specific authorisation for exploration and prospecting services.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail |
| **Industry Classification:** | CPC 631, CPC 632 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Art. L752-1 à L752-6 du code de commerce |
| **Description:** | **Investment** |

The authorisation for large department stores is subject to an Economic Needs Test.

Main criteria: number of and impact on existing stores, population density, geographic spread, impact on traffic conditions and creation of new employment.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Distribution of tobacco |
| **Industry Classification:** | Part of CPC 6222, part of CPC 6310 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Code général des impôts, art. 568 et articles 276-279 de l'annexe 2 de ce code |
| **Description:** | **Investment** |
| | State monopoly on wholesale and retail sales of tobacco. |
| | Nationality condition for tobacconists (buraliste). |

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Code de la santé publique, arts. L4221-1, L4221-13, L5125-10 |
| | Loi 90-1258 relative à l'exercice sous forme de société des professions libérales, modifiée par les lois 2001-1168 du 12 décembre 2001 et 2008-776 du 4 août 2008 (Law 90-1258 on the exercise of liberal professions in the form of a company ) |
| **Description:** | **Investment** |
| | EEA or Swiss nationality is required in order to operate a pharmacy. |
| | Foreign pharmacists may be permitted to establish within annually established quotas. |
| | Commercial presence must take one of the legal forms which are allowed under national law on a non-discriminatory basis: |

1066

anonyme, à responsabilité limitée ou en commandite par actions (SEL), société en noms collectifs (SNC), société de participations financières de profession libérale de pharmaciens d'officine and SARL only

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Privately funded primary, secondary, and higher education services |
| **Industry Classification:** | CPC 921, CPC 922, CPC 923 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Code de l'éducation, Arts. L 444-5, L 914-4, L 441-8, L 731-8, L 731-1 to 8 |
| **Description:** | **Cross-Border Trade in Services** |

Nationality of a Member State of the EU is required in order to teach in a privately funded educational institution.

However, nationals of Canada may obtain an authorisation from the relevant competent authorities in order to teach in primary, secondary and higher level educational institutions.

Nationals of Canada may also obtain an authorisation from the relevant competent authorities in order to establish and operate or manage primary, secondary or higher level educational institutions. Such authorisation is granted on a discretionary basis.

| | |
|---|---|
| **Sector:** | Health and social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 931, CPC 933 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |

| | |
|---|---|
| **Measures:** | Loi 90-1258 relative à l'exercice sous forme de société des professions libérals, modifiée par les lois 2001-1168 du 12 décembre 2001 et 2008-776 du 4 août 2008 et la loi 66-879 du 29 novembre 1966 (SCP) |
| | Code de la santé publique, art. L6122-1, L6122-2 (Ordonnance2010-177 du 23 février 2010) |

**Description:**        **Investment and Cross-Border Trade in Services**

While other types of legal form are available for EU investors, foreign investors only have access to the legal forms of "société d'exercice liberal" and "société civile professionnelle".

For medical, dental and midwives services, French nationality is required. However, access by foreigners is possible within annually established quotas.

For medical, dental and midwives services and services by nurses, provision through anonyme, à responsabilité limitée ou en commandite par actions (SEL) or SCP only.

For hospital and ambulance services, residential health facilities (other than hospital services) and social services, an authorisation is necessary in order to exercise management functions. The authorisation process takes into account the availability of local managers.

**Sector:**        Fishing

Transport

**Sub-Sector:**        All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing

Transport services (passengers and freight) by seagoing vessels

Pilotage and berthing services

Vessel salvage and refloating services

Other supporting services for water transport

Construction for waterways, harbours, dams and other water works

**Industry Classification:**        ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882

**Type of Reservation:**        National treatment

Market access

| | |
|---|---|
| **Level of Government:** | National |
| **Measures:** | Code des douanes, Art. 219 |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |

Foreign investors that are not nationals of a Member State of the EU or not incorporated or having their principal office in the EU or the EEA, cannot own 50 per cent or more of a French flag seagoing vessel.

The above reservation does not apply to ships that would satisfy the French flag ownership requirements after the exercise of a lease-option. It also does not apply to a ship that is bareboat chartered to a charterer that would satisfy the ownership requirements and is actually making use of the ship.

***

## Reservations applicable in Germany

| | |
|---|---|
| **Sector:** | Manufacturing |
| **Sub-Sector:** | Newspapers, journals and periodicals, appearing at least four times a week and newspapers, journals and periodicals, appearing less than four times a week |
| **Industry Classification:** | ISIC rev 3.1 323, ISIC rev 3.1 324 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National – Regional (sub-federal) |
| **Measures:** | § 10 Abs. 1 Nr. 4 Landesmediengesetz (LMG) Rheinland-Pfalz v. 4. Februar 2005, GVBl. S. 23 in der Fassung vom 20. Dezember 2011, GVBl. S. 427 |

§ 9 Abs. 1 Nr. 1 Gesetz über die Presse Baden-Württemberg (LPG BW) v. 14 Jan. 1964, GBl. S.11, geändert durch Gesetz v. 17. Dez. 2009, GBl. S. 809

§ 9 Abs. 1 Nr. 1 Pressegesetz für das Land Nordrhein-Westfalen (Landespressegesetz NRW) v. 24. Mai 1966 (GV. NRW. S. 340), zuletzt geändert durch Artikel 7 des Gesetzes vom 18. November 2008 (GV. NRW. S. 706)

§ 8 Abs. 1 Gesetz über die Presse Schleswig-Holstein (PressG SH) vom 25.1.2012, GVOBL. SH S. 266

§ 7 Abs. 2 Landespressegesetz für das Land Mecklenburg-Vorpommern (LPrG M-V) v. 6 Juni 1993, GVOBl. M-V 1993, S. 541

§ 8 Abs. 1 Nr. 1 Pressegesetz für das Land Sachsen-Anhalt in der Neufassung vom 2.5.2013 (GVBl. LSA S. 198)

§ 7 Abs. 2 Berliner Pressegesetz (BlnPrG) v. 15 Juni 1965, GVBl. S. 744 zuletzt geändert durch Gesetz v. 18. Nov. 2009, GVBl. S. 674

§ 10 Abs. 1 Nr. 1 Brandenburgisches Landspressegesetz (BbgPG) v. 13. Mai 1993, GVBl. I/93, S. 162, zuletzt geändert durch Gesetz v. 21. Juni 2012, GVBl. I/12, S. 1

§ 9 Abs. 1 Nr.1 Gesetz über die Presse Bremen (BrPrG), Brem. GBl. 1965, S. 63; zuletzt geändert durch Nr. 2.1 i.V.m. Anl.1 ÄndBek vom 24.1.2012 (Brem.GBl. S.24)

§ 7 Abs. 3 Nr. 1 Hessisches Pressegesetz (HPresseG) v. 12. Dezember 2004, GVBl. 2004 I S.2, zuletzt geändert durch Gesetz vom 13. Dezember 2012, GVBl. S. 622

§ 7 Abs. 2 i.V.m § 9 Abs.1 Ziffer 1 Thüringer Pressegesetz

(TPG) v. 31. Juli 1991, GVBl. 1991 S. 271 in der Fassung v. 16. Juli 2008, GvBl. S. 243

§ 9 Abs. 1 Nr. 1Hamburgisches Pressegesetz v. 29. Januar 1965, HmbGVBl., S. 15, in der Fassung v. 15. Dez. 2009, HmbGVBl. S. 444, 447

§ 6 Abs. 2 Sächsisches Gesetz über die Presse (SächsPresseG) v. 3. April 1992, SächsGVBl. S. 125 zuletzt geändert durch Gesetz v. 13. August 2009, SächsGVBl. S. 438

§ 8 Abs. 2 Niedersächsisches Pressegesetz v. 22. März 1965, GVBl. S.9 zuletzt geändert durch Artikel 2 des Gesetzes vom 11.10.2010 (Nds. GVBl. S. 480)

§ 9 Abs. 1 Nr. 1 Saarländisches Mediengesetz (SMG) vom 27. Februar 2002 (Amtsbl. S. 498), zuletzt geändert durch Art. 1 ÄndG vom 22. 4. 2013 (Amtsbl. I S. 111)

Art. 5 Abs. 2 Bayerisches Pressegesetz in der Fassung der Bekanntmachung v. 19. April 2000 (GVBl, S. 340), zuletzt geändert durch Gesetz v. 22.12.2009 (GVBl. S. 630)

| | |
|---|---|
| **Description:** | **Investment** |

Each publicly distributed or printed newspaper, journal, or periodical must clearly indicate a "responsible editor" (the full name and address of a natural person).

The responsible editor may be required to be a permanent resident of Germany, the EU or an EEA country. Exceptions may be allowed by the Federal Minister of the Interior.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | § 59e, § 59f, § 206 Bundesrechtsanwaltsordnung (BRAO; Federal Lawyers Act) |
| | Gesetz über die Tätigkeit europäischer Rechtsanwälte in Deutschland (EuRAG) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal

services in respect of German law, including representation before courts. Only EEA or Swiss lawyers may be admitted to the Bar, and are thus entitled to provide legal services in respect of German law (EuRAG).

Residency (commercial presence) is required in order to obtain full admission to the Bar.

According to the Lawyers Act (§§ 59e, 59f BRAO), only German lawyers, EEA lawyers, EU lawyers or lawyers of the Swiss Confederation are allowed to provide legal services through commercial presence, in the form of a Anwalts-GmbH or Anwalt-AG. Lawyers from other countries (§ 206 BRAO) may have their commercial presence in the form of Anwalts-GmbH or Anwalt-AG by acquiring minority shares only.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services: patent lawyers |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | § 52e, § 52 f, § 154a und § 154 b Patentanwaltsordnung (PAO) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Third country patent lawyers (non-EU, EEA Member States or the Swiss Confederation) are not allowed to act as patent lawyers (§ 154a PAO) in Germany.

According to the Patentanwaltsordnung (§§ 52e, 52f PAO), only German patent lawyers, EEA patent lawyers, EU patent lawyers or patent lawyers of the Swiss Confederation are allowed to provide legal services through commercial presence, in the form of a Patentanwalts-GmbH or Patentanwalt-AG. Patent Lawyers from other countries (§ 154a PAO) may have their commercial presence in the form of Patentanwalts-GmbH or Patentanwalt-AG by acquiring minority shares only.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting services |

Auditing services

| | |
|---|---|
| **Industry Classification:** | CPC 86211, CPC 86212 (other than accounting services), CPC 86213, CPC 86219, CPC 86220) |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Handelsgesetzbuch, HGB, (Code of Commercial Law) |
| | Wirtschaftsprüferordnung, WPO, (Public Accountant Act) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Auditing companies ("Wirtschaftsprüfungsgesellschaften") may only adopt certain German legal forms. Incorporated companies, associations limited by shares, limited liability companies, general partnerships, limited commercial partnerships, other partnerships and European companies (SE) may be recognised as "Wirtschaftsprüfungsgesellschaften". General partnerships and limited commercial partnerships may be recognised as "Wirtschaftsprüfungsgesellschaften" if they are listed as trading partnerships in the commercial register on the basis of their fiduciary activities, art. 27 WPO. The entity "GmbH & Co. Kommanditgesellschaft" may carry out accounting and auditing services.

Establishment in the EU is required in order to provide auditing services. However, auditors from Canada registered in accordance with art. 134 WPO may carry out the statutory audit of annual financial statements or provide the consolidated financial statements of a company with its headquarters outside the EU, whose transferable securities are offered for trading in a regulated market.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Medical and dental services |
| | Midwives services |
| | Services provided by nurses |
| **Industry Classification:** | CPC 9312, CPC 93191 |
| **Type of Reservation:** | National treatment |
| | Market access |

**Level of Government:**     National – Regional (sub-federal)

**Measures:**     Bundesärzteordnung (Federal Medical Regulation)

Gesetz über die Ausübung der Zahnheilkunde,

Gesetz über die Berufe des Psychologischen Psychotherapeuten und des Kinder- und Jugendlichenpsychotherapeuten (Act on the Provision of Psychotherapy Services of 16.07.1998)

Gesetz über die berufsmäßige Ausübung der Heilkunde ohne Bestallung

Gesetz über den Beruf der Hebamme und des Entbindungspflegers

Gesetz über die Berufe in der Krankenpflege
§ 7 Absatz 3 Musterberufordnung fuer Aerzte (German Model professional Code for doctors)

§95,§ 99 and seq. SGB V (Book on Social Security No. V), Statutory Health Insurance

§ 1 Absatz 2 and Absatz 5 Hebammengesetz (Midwife Code), § 291b SGB V (Book on Social Security No. V) on E-health providers

Heilberufekammergesetz des Landes Baden-Württemberg in der Fassung vom 16. 03. 1995 (GBl. BW of 17.05.1995 S. 314), zuletzt geändert durch Artikel 2 des Gesetzes zur Änderung des Landespflegegesetzes und anderer berufsrechtlicher Vorschriften vom 15.06.2010 (GBl. BW of 22.06.2010, pages 427, 431)

Gesetz über die Berufsausübung, die Berufsvertretungen und die Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Tierärzte, Apotheker sowie der Psychologischen Psychotherapeuten und der Kinder- und Jugendlichenpsychotherapeuten (Heilberufe-Kammergesetz - HKaG) in Bayern vom 06.02.2002 (BAY GVBl 2002, page 42)

Gesetz über die Kammern und die Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Apotheker, Psychologischen Psychothera- peuten und Kinder- und Jugendpsychotherapeuten (Berliner Kammergesetz) vom 04.09.1978 (Berliner GVBl. page 1937, rev. page 1980), zuletzt geändert durch Artikel I Elftes Änderungsgesetz vom 17.03.2010 (Berliner GVBl. page 135)

§ 31 Heilberufsgesetz Brandenburg (HeilBerG) vom 28.04.2003, zuletzt geändert durch Artikel 2 des Gesetzes vom 11.06.2008 (GVBl. I page 134, 139)

Bremisches Gesetz über die Berufsvertretung, die Berufsausübung, die Weiterbildung und die Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Psychotherapeuten, Tierärzte und Apotheker (Heilberufsgesetz - HeilBerG) vom 12.05.2005, zuletzt geändert durch Artikel 2 Gesetz zur

Umsetzung der EU-Dienstleistungsrichtlinie im Land Bremen und Novellierung weiterer Rechtsnormen vom 24.11.2009 (Brem.GBl. page 535)

§ 29 Heilberufsgesetz (HeilBG NRW) of 09.05.2000 in der Fassung vom 17.12.2009 (GV. NRW 2009, page 865),

§ 20 Heilberufsgesetz (HeilBG Rheinland-Pfalz) of 07.02.2003 in der Fassung vom 15.09.2011 (GV. R-Pf 2011, page 425)

Gesetz über Berufsausübung, Berufsvertretungen und Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Tierärzte, Apotheker sowie der Psychologischen Psychotherapeuten und der Kinder und Jugendlichenpsychotherapeuten im Freistaat (Sächsisches Heilberufekammergesetz – SächsHKaG) vom 24.05.1994 (SächsGVBl. page 935), zuletzt geändert durch Artikel 2 Absatz 5 des Gesetzes vom 19.05.2010 (SächsGVBl. pages 142 and 143),

Gesetz über die öffentliche Berufsvertretung, die Berufspflichten, die Weiterbildung und die Berufsgerichtsbarkeit der Ärzte/ Ärztinnen, Zahnärzte/ Zahnärztinnen, psychologischen Psychotherapeuten/ Psychotherapeutinnen und Kinder- und Jugendlichenpsychotherapeuten/-psychotherapeutinnen,

Tierärzte/Tierärztinnen und Apotheker/Apothekerinnen im Saarland (Saarländisches Heilberufekammergesetz - SHKG) vom 19.11.2007, zuletzt geändert durch Gesetz vom 19.11.2008 (ABl. page 1930)

Thüringer Heilberufegesetz vom 29. Januar 2002 (GVBl 2002, 125) zuletzt geändert durch Artikel 14 des Gesetzes vom 8. Juli 2009 (GVBl 2009, 592)

**Description:**   **Investment and Cross-Border Trade in Services**

Geographical restrictions may be imposed on professional registration, which apply to nationals and non-nationals alike. Doctors (including psychologists, psychotherapists, and dentists) need to register with the regional associations of statutory health insurance physicians or dentists (kassenärztliche or zahnärztliche Vereinigungen), if they wish to treat patients insured by the statutory sickness funds. This registration can be subject to quantitative restrictions based on the regional distribution of doctors. For dentists this restriction does not apply. Registration is necessary only for doctors participating in the public health scheme. Non-discriminatory restrictions on the legal form of establishment required to provide these services may exist (§ 95 SGB V).

For medical, dental and midwives services, access is restricted to

natural persons only.

Establishment requirements may apply.

Telemedicine may only be provided in the context of a primary treatment involving the prior physical presence of a doctor.

The number of ICT (information and communications technology) -service suppliers may be limited to guarantee interoperability, compatibility and necessary safety standards. This is applied in a non-discriminatory way.

| | |
|---|---|
| **Sector:** | Health and social services |
| **Sub-Sector:** | Human health and social care services |
| | Hospitals |
| | Ambulance services |
| | Rescue services |
| **Industry Classification:** | CPC 931, CPC 933 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | National – Regional (sub-federal) |
| **Measures:** | Bundesärzteordnung (Federal Medical Regulation) |
| | Gesetz über die Ausübung der Zahnheilkunde |
| | Gesetz über die Berufe des Psychologischen Psychotherapeuten und des Kinder- und Jugendlichentherapeuten (Act on the Provision of Psychotherapy Services of 16.07.1998) |
| | Gesetz über die berufsmäßige Ausübung der Heilkunde ohne Bestallung |
| | Gesetz über den Beruf der Hebamme und des Entbindungspflegers |
| | Gesetz über den Beruf der Rettungsassistentin und des Rettungsassistenten |
| | Gesetz über die Berufe in der Krankenpflege |
| | Gesetz über die Berufe in der Physiotherapie |
| | Gesetz über den Beruf des Logopäden |
| | Gesetz über den Beruf des Orthoptisten und der Orthoptistin |
| | Gesetz über den Beruf der Podologin und des Podologen |

Gesetz über den Beruf der Diätassitentin und des Diätassistenten

Gesetz über den Beruf der Ergotherapeutin und des Ergotherapeuten

Bundesapothekerorndung

gesetz über den Beruf des pharmazeutisch-technischen Assistenten

Gesetz über technische Assistenten in der Medizin,Personenbeförderungsgesetz (Act on Public Transport)

Gesetz über den Rettungsdienst (Rettungsdienstgesetz - RDG) in Baden-Württember vom 08.02.2010 (GBl. 2010, page 285)

Bayerisches Rettungsdienstgesetz (BayRDG) vom 22.07.2008 (GVBl 2008, page 429)

Gesetz über den Rettungsdienst für das Land Berlin (Rettungsdienstgesetz) vom 08.07.1993 (GVBl. page 313) geändert durch Anlage Nr. 33 des 7. Aufhebungsgesetzes vom 04.03.2005 (GVBl. page 125)

Gesetz über den Rettungsdienst im Land Brandenburg (BbgRettG) in der Fassung vom 18.05.2005,

Gesetz über den Rettungsdienst im Lande Bremen (BremRettDG) vom 22.09.1992, zuletzt geändert durch das Gesetz vom 26.05.1998

Hamburgisches Rettungsdienstgesetz (HmbRDG) vom 09.06.1992, zuletzt geändert am 27.09.1995

Gesetz zur Neuordnung des Rettungsdienstes in Hessen (HRDG) vom 24.11.1998

Gesetz über den Rettungsdienst für das Land Mecklenburg-Vorpommern (RDGM-V) vom 01.07.1993, geändert durch Erstes Gesetz zur Änderung des RDGM-V vom 29.05.1998,

Niedersächsisches Rettungsdienstgesetz (NRettDG) vom 02.10.2007 (GVBl, page 473, zuletzt geändert am 22.02.2012 (GVBl. Page 18)

Gesetz über den Rettungsdienst sowie die Notfallrettung und den Krankentransport durch Unternehmer (RettG NRW) vom

09.11.1992, zuletzt geändert am 06.07.2004.

Landesgesetz über den Rettungsdienst sowie den Notfall- und Krankentransport (RettDG) vom 22.04.1991.

Saarländisches Rettungsdienstgesetz (SRettG) vom 09.02.1994, zuletzt geändert am 27.11.1996.

Gesetz zur Neuordnung des Brandschutzes, Rettungsdienstes und Katastrophenschutzes im Freistaat Sachsen vom 24.06.2004.

Rettungsdienstgesetz des Landes Sachsen-Anhalt (RettDG LSA) vom 07.11.1993.

Gesetz über die Notfallrettung und den Krankentransport im Land Schleswig-Holstein (RDG) vom 29.11.1991.

Thüringer Rettungsdienstgesetz (ThüRettG) vom 22.12.1992.

§ 8 Krankenhausfinanzierungsgesetz (Hospital Financing Act)

§§ 14, 30 Gewerbeordnung (German Trade, Commerce and Industry Regulation Act)

§ 108 Sozialgesetzbuch V (Book on Social Security No. V),

Statutory Health Insurance

§ 291b SGB V (Book on Social Security No. V) E-health provider

§ 15 Sozialgesetzbuch VI (SGB VI, Book on Social Security No. VI)

§ 34 Sozialgesetzbuch VII (SGB VII, Book on Social Security No. VII), Unfallversicherung

§ 21 Sozialgesetzbuch IX (SGB IX, Book on Social Security No. IX) Rehabilitation und Teilhabe behinderter Menschen)

§ 72 Sozialgesetzbuch XI (SGB XI, Book on Social Security No. XI), Long-term Care Insurance

Landespflegegesetze

Gesetz zur Umsetzung der Pflegeversicherung in Baden-Württemberg (Landespflegegesetz - LPflG) vom 11. September 1995, zuletzt geändert sowie Abschnitt 7 neu gefasst durch Artikel 1 des Gesetzes vom 15. Juni 2010 (GBl. S. 427)

Gesetz zur Ausführung der Sozialgesetze (AGSG) vom 8. Dezember 2006, zuletzt geändert durch § 3 des Gesetzes vom 20. Dezember 2011 (GVBl. S. 689)

Gesetz zur Planung und Finanzierung von Pflegeeinrichtungen (Landespflegeeinrichtungsgesetz - LPflegEG) vom 19. Juli 2002, zuletzt geändert durch Gesetz vom 19. Dezember2005 (GVBl. S. 792)

Gesetz zur Umsetzung des Elften Buches Sozialgesetzbuch

(Landespflegegesetz - LPflegeG) Vom 29. Juni 2004, zuletzt geändert durch Artikel 1 des Gesetzes vom 12. Juli 2011 (GVBl. I S. 15)

Gesetz zur Ausführung des Pflege-Versicherungsgesetzes im Lande Bremen und zur Änderung des Bremischen Ausführungsgesetzes zum Bundessozialhilfegesetz (BremAGPflegeVG) vom 26. März 1996, zuletzt geändert durch Gesetz vom 28. Februar

2012 (GBl. S. 149)

Hamburgisches Landespflegegesetz (HmbLPG) vom 18. September 2007, zuletzt geändert durch Gesetz vom 22. Juni 2010 (GVBl. S. 440)

Hessisches Ausführungsgesetz zum Pflege-Versicherungsgesetz vom 19. Dezember 1994, zuletzt geändert durch Gesetz vom 30. April 1997 (GVBl. I S. 74)

Landespflegegesetz (LPflegeG M-V) vom 16. Dezember 2003, zuletzt geändert durch Artikel 3 des Gesetzes vom 29. September 2010 (GVBl. S. 534)

Gesetz zur Planung und Förderung von Pflegeeinrichtungen nach dem Elften Buch Sozialgesetzbuch (Niedersächsisches Pflegegesetz - NPflegeG) vom 26. Mai 2004, zuletzt geändert durch Art.1 des Haushaltsbegleitgesetzes vom 17. Dezember 2010 (Nds.GVBl. S.631)

Gesetz zur Umsetzung des Pflege-Versicherungsgesetzes (Landespflegegesetz Nordrhein-Westfalen - PfG NW) vom 19. März 1996, zuletzt geändert durch Teil I Artikel 17 des Gesetzes vom 3. Mai 2005 (GVBl. S. 498)

Landesgesetz zur Sicherstellung und Weiterentwicklung der pflegerischen Angebotsstruktur (LPflegeASG) vom 25. Juli 2005 (GVBl 2005, S. 299) – (Rheinland-Pfalz)

Saarländisches Gesetz Nr. 1355 zur Planung und Förderung von Pflegeeirich-tungen vom 21. Juni 1995, zuletzt geändert durch Gesetzes vom 1. Juli 2009 (ABl. S. 1217)

Sächsisches Pflegegesetz (SächsPflegeG) vom 25. März 1996 ist zum 31.12.2002 außer Kraft getreten)

Ausführungsgesetz zum Pflege-Versicherungsgesetz (PflegeV-AG) vom 7. August 1996, zuletzt geändert durch Art. 1 des Gesetzes vom 10. August 2007 (GVBl. S. 306)

Ausführungsgesetz zum Pflege-Versicherungsgesetz (Landespflegegesetz - LPflegeG) vom 10. Februar 1996, zuletzt geändert durch Art. 63 LVO vom 15. September 2010 (GVOBl. S. 575)

Thüringer Gesetz zur Ausführung des Pflege-Versicherungsgesetzes (ThürAGPflegeVG) vom 20. Juli 2005, zuletzt geändert durch Gesetz vom 8. Juni 2010 (GVBl. S. 206)

Personenbeförderungsgesetz (Act on Public Transport),

Landeskrankenhausgesetz Baden-Württemberg vom 29.11.2007, geändert durch Universitätsmedizingesetz vom 07.02.2011

Bavarian Act on Hospitals (Bayerisches Krankenhausgesetzes - BayKrG) vom 28.03.2007, geändert durch das

Nachtragshaus¬halts¬gesetz 2008 vom 23.04.2008, ss. 2 and 3

§§ 12, 13, 14 Krankenhausentwicklungsgesetz Brandenburg (BbgKHEG) vom 08.07.2009 (GVBl. I/09, page 310),

Berliner Gesetz zur Neuregelung des Krankenhausrechts vom 18.09.2011 (GVBl. page 483)

Bremisches Krankenhausgesetz (BrmKrHG) vom 12.04.2011 (Gesetzblatt Bremen vom 29.04.2011)

Hamburgisches Krankenhausgesetz (HmbKHG) vom 17.04.1991 (HmbGVBl. Page127), geändert durch zweites ÄndG vom 06.10.2006 (HmbGVBl. page 510)

§§ 17-19 Hessisches Krankenhausgesetz 2011 (HKHG 2011) vom 21.12.2010 (GVBl. I 2010, Seite 587)

Krankenhausgesetz für das Land Mecklenburg-Vorpommern (LKHG M-V) vom 20.05.2011 (GVOBl. M-V 2011, page 327),

Niedersächsisches Krankenhausgesetz (NKHG) vom 19.01.2012 (Nds. GVBl. Nr. 1 vom 26.01.2012, page 2)

Krankenhausgestaltungsgesetz des Landes Nordrhein-Westfalen (KHGG NRW) vom 11.12.2007 (GV. NRW page 702), geändert am 16.03.2010 (GV. NRW page 184)

§ 6 Landeskrankenhausgesetz Rheinland-Pfalz (LKG Rh-Pf) in der Fassung vom 01.12.2010 (GVBl. page 433)

Saarländisches Krankenhausgesetz (SKHG) vom 13.07.2005, zuletzt geändert durch Gesetz vom 18.11.2010 (Saarl. Amtsbl. I page 1420)

Gesetz zur Ausführung des Krankenhausfinan¬zierungs¬gesetzes (AG-KHG) in Schleswig-Holstein vom 12.12.1986 (GVOBl. Schl.-H. page 302), zuletzt geändert am 12.10.2005

§ 3 Krankenhausgesetz Sachsen-Anhalt (KHG LSA) vom 14.04.2005 (GVBl. LSA 2005, page 202)

Gesetz zur Neuordnung des Krankenhauswesens (Sächsisches Krankenhausgesetz - SächsKHG) vom 19.08.1993 (Sächs GVBl. page 675), zuletzt geändert durch Sächsisches Standortegesetz vom 27.01.2012 (SächsGVBl. Seite 130)

§ 4 Thüringischer Krankenhausgesetz (Thür KHG) in der Fassung der Neubekanntmachung 30.04.2003 (GVBl. page 262)

Gesetz zur Neuordnung des Krankenhauswesens (Sächsisches Krankenhausgesetz – SächsKHG) vom 19. August 1993 (SächsGVBl. page 675), zuletzt geändert durch Artikel 50 des Gesetzes vom 27. Januar 2012 (SächsGVBl. page 130, 147)

**Description:**                   **Investment and Cross-Border Trade in Services**

Rescue services and "qualified ambulance services" are organised and regulated by the Länder. Most Länder delegate competences in the field of rescue services to municipalities. Municipalities are allowed to give priority to not-for-profit operators. This applies equally to foreign as well as domestic service suppliers. Ambulance services are subject to planning, permission and accreditation.

Telemedicine may only be provided in the context of a primary treatment involving the prior physical presence of a doctor.

The number of ICT (information and communications technology)-service suppliers may be limited to guarantee interoperability, compatibility and necessary safety standards. This is applied in a non-discriminatory way.

**Sector:**                        Health services

**Sub-Sector:**                    Veterinary services

**Industry Classification:**        CPC 932

**Type of Reservation:**            Market access

**Level of Government:**            National - Regional (sub-federal)

**Measures:**                       Federal Code for the Veterinary Profession (Bundes-Tierärzteordnung in der Fassung der Bekanntmachung vom 20. November 1981 (BGBl. I S. 1193), die zuletzt durch Artikel 22 des Gesetzes vom 06.12.2011 (BGBl. I S. 2515) geändert worden ist, § 4Abs. 2)

sub-central level:

Acts on the Councils for the Medical Profession of the Länder (Heilberufs- und Kammergesetze der Länder) and (based on these) Baden-Württemberg, Gesetz über das Berufsrecht und die Kammern der Ärzte, Zahnärzte, Tierärzte Apotheker, Psychologischen Psychotherapeuten sowie der Kinder- und Jugendlichenpsychotherapeuten (Heilberufe-Kammergesetz - HBKG) in der Fassung vom 16.03.1995

Bayern, Gesetz über die Berufsausübung, die Berufsvertretungen und die Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Tierärzte, Apotheker sowie der Psychologischen Psychotherapeuten und der Kinder- und Jugendlichenpsychotherapeuten (Heilberufe-Kammergesetz - HKaG) in der Fassung der Bekanntmachung

1081

vom 06.02.2002

Berlin, Gesetz über die Kammern und die Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Tierärzte, Apotheker, Psychologischen Psychotherapeuten und Kinder- und Jugendlichenpsychotherapeuten (Berliner Kammergesetz) in der Fassung vom 04.091978 (GVBl. S. 1937), zuletzt geändert durch Gesetz vom 17.03.2010 (GVBl. S. 135)

Brandenburg, Heilberufsgesetz (HeilBerG) Vom 28.04.2003 (GVBl.I/03, [Nr. 07], S.126), zuletzt geändert durch Artikel 18 des Gesetzes vom 13.03.2012 (GVBl.I/12, [Nr. 16]

Bremen, Gesetz über die Berufsvertretung, die Berufsausübung, die Weiterbildung und die Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Psychotherapeuten, Tierärzte und Apotheker (Heilberufsgesetz - HeilBerG) vom 12.05.2005, (Brem.GBl. S. 149) Zuletzt geändert durch Nr. 2.1 i.V.m. Anl. 1 ÄndBek vom 24.01.2012 (Brem.GBl. S. 24)

Hamburg, Hamburgisches Kammergesetz für die Heilberufe (HmbKGH) Vom 14.12.2005 Zum Ausgangs- oder Titeldokument (HmbGVBl. 2005, S. 495) zuletzt geändert durch Gesetz vom 02.03.2010 (HmbGVBl. S. 247)

Hessen, Gesetz über die Berufsvertretungen, die Berufsausübung, die Weiterbildung und die Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Tierärzte, Apotheker, Psychologischen Psychotherapeuten und Kinder- und Jugendlichenpsychotherapeuten (Heilberufsgesetz) in der Fassung vom 07.02.2003, zuletzt geändert durch Artikel 3 des Gesetzes vom 14.05.2012 (GVBl. S. 126)

Mecklenburg-Vorpommern, Heilberufsgesetz (HeilBerG) Vom 22.01.1993 (GVOBl. M-V 1993, S. 62) zuletzt geändert durch Artikel 3 des Gesetz zur Ergänzung und Änderung von Gesundheitsrecht und zur Änderung des Aufgabenzuordnungsgesetzes vom 06.07.2011

Niedersachsen, Kammergesetz für die Heilberufe

(HKG) in der Fassung vom 08.12.2000 zuletzt geändert durch Gesetz vom 09.05.2012 (Nds. GVBl. S. 100)

Nordrhein-Westfalen, Heilberufsgesetz NRW (HeilBerg) vom 9. Mai 2000 (GV. NRW. 2000 S. 403ff.) zuletzt geändert durch Gesetz vom 17. Dezember 2009 (GV.NRW 2009 S. 865f)

Rheinland-Pfalz, Heilberufsgesetz (HeilBG) vom 20.10.1978, zuletzt geändert durch Artikel 4 des Gesetzes vom 27.10.2009 (GVBl. S. 358)

Saarland, Gesetz Nr. 1405 über die öffentliche Berufsvertretung, die Berufspflichten, die Weiterbildung und die

1082

Berufsgerichtsbarkeit der Ärzte/Ärztinnen, Zahnärzte/Zahnärztinnen, Tierärzte/Tierärztinnen und Apotheker/Apothekerinnen im Saarland (Saarländisches Heilberufekammergesetz - SHKG) vom 11.03.1998 in der Fassung der Bekanntmachung vom 19.11.2007 (Amtsbl. S. 2190) geändert durch das Gesetz vom 19.11.2008 (Amtsbl. S. 1930)

Sachsen, Gesetz über Berufsausübung, Berufsvertretungen und Berufsgerichtsbarkeit der Ärzte, Zahnärzte, Tierärzte, Apotheker sowie der Psychologischen Psychotherapeuten und der Kinder- und Jugendlichenpsychotherapeuten im Freistaat Sachsen (Sächsisches Heilberufekammergesetz – SächsHKaG) vom 24.05.1994, Rechtsbereinigt mit Stand vom 5. Juni 2010

Sachsen-Anhalt, Gesetz über die Kammern für Heilberufe Sachsen-Anhalt (KGHB-LSA) vom 13.07.1994 (GVBl. LSA 1994, S. 832) zuletzt geändert durch Artikel 4 des Gesetzes vom 02.02.2011 (GVBl. LSA S. 58)

Schleswig-Holstein, Gesetz über die Kammern und die Berufsgerichtsbarkeit für die Heilberufe (Heilberufekammergesetz - HBKG) vom 29. Februar 1996, zuletzt geändert durch Gesetz vom 13.07.2011 (GVOBl. S. 221)

Thüringen, Thüringer Heilberufegesetz (ThürHeilBG) in der Fassung der Bekanntmachung vom 29.01.2002 (GVBl 2002, S. 125) zuletzt geändert durch Artikel 14 des Gesetzes vom 08.07.2009 (GVBl. S. 592)

Codes of Professional Conduct of the Veterinary Practitioners' Councils (*Berufsordnungen der Kammern*)

| | |
|---|---|
| **Description:** | **Cross-Border Trade in Services** |
| | Access is restricted to natural persons. |
| | Telemedicine may only be provided in the context of a primary treatment involving the prior physical presence of a doctor. |
| **Sector:** | Business services |
| **Sub-Sector:** | Supply services of support personnel |
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |

| | |
|---|---|
| **Measures:** | § 1 and 3 Abs 5 Arbeitnehmerüberlassungsgesetz –AÜG § 292 SGB III§ 42 Beschäftigungsverordnung |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Nationality of a Member State of the EU or a commercial presence in the EU is required in order to obtain a licence to operate as a temporary employment agency (pursuant to s. 3 paras. 2 and 3 of this Act)

The Federal Ministry of Labour and Social Affairs may issue a regulation concerning the placement and recruitment of non-EU and non-EEA personnel for specified professions.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | § 2 para 2, § 11a Apothekengesetz (German Pharmacy Act), §§ 43 para. 1, 73 para. 1 Nr. 1a |
| | Arzneimittelgesetz (German Drugs Act), |
| | § 11 Abs. 3a Medizinproduktegesetz |
| | Verordnung über Vertriebswege für Medizinprodukte |
| **Description:** | **Investment** |

Only natural persons are permitted to provide retail services of pharmaceuticals and specific medical goods to the public.

Residency is required in order to obtain a licence as a pharmacist or to open a pharmacy for the retail of pharmaceuticals and certain medical goods to the public.

Nationals of other countries or persons who have not passed the German pharmacy exam may only obtain a licence to take over a pharmacy which has already existed during the preceding three years.

The total number of pharmacies per person is restricted to one pharmacy and up to three branch pharmacies.

**Sector:**                Fishing

Transport

**Sub-Sector:**          All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing

Transport services (passengers and freight) by seagoing vessels

Pilotage and berthing services

Vessel salvage and refloating services

Other supporting services for water transport

Construction for waterways, harbours, dams and other water works

**Industry Classification:**  ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882

**Type of Reservation:**  National treatment

Market access

**Level of Government:**  National

**Measures:**          § 1 und § 2 Flaggenrechtsgesetz vom 8. Februar 1951 (BGBl. I S. 79), das durch Artikel 561 der Verordnung vom 31. August 2015 (BGBl. I S. 1474) geändert worden ist. § 3 Abs. 2 Schiffsregisterordnung in der Fassung der Bekanntmachung vom 26. Mai 1994 (BGBl. I S. 1133), die zuletzt durch Artikel 156 der Verordnung vom 31. August 2015 (BGBl. I S. 1474) geändert worden ist.

**Description:**     **Investment, Cross-Border Trade in Services, and International Maritime Transport Services**

In order to register a seagoing vessel on the national shipping register, the majority of shares in a vessel must be owned by nationals of a Member State of the EU or companies established in accordance with EU law and that have their principal place of business in a Member State of the EU. The use of the vessel must be headed and supervised by persons residing in Germany

**Sector:**                Transport

**Sub-Sector:**         Water transport

Supporting services for water transport

Rental of ships

Leasing services of ships without operators

**Industry Classification:** CPC 72, CPC 745, CPC 83103, CPC 86751, CPC 86754, CPC 8730

**Type of Reservation:** National treatment

Market access

Most-favoured-nation treatment

**Level of Government:** National - Regional (sub federal)

**Measures:** §§ 1, 2 Flaggenrechtsgesetz (Flag Protection Act),§ 2 Verordnung über die Küstenschifffahrt vom 05.07. 2002,

§§ 1, 2 Binnenschifffahrtsaufgabengesetz (BinSchAufgG) Vorschriften aus der (Schifffahrts-) Patentverordnung in der Fassung vom 08.04.2008

§ 9 Abs.2 Nr. 1 Seelotsgesetz vom 08.12. 2010 (BGBl. I S. 1864)

§ 1 Nr. 9, 10, 11 und 13 Seeaufgabengesetz (SeeAufgG),

See-Eigensicherungsverordnung vom 19.09.2005 (BGBl. I S. 2787), geändert durch Artikel 516 Verordnung vom 31.10.2006 (BGBl. I S. 2407)

**Description:** **Investment and Cross-Border Trade in Services**

A vessel that does not belong to a national of a Member State of the EU may be used in the German federal waterways only after specific authorisation.

Cabotage operations may only be performed by vessels flying German or another Member State of the EU flag. Waivers for non-EU vessels may only be granted if no EU vessels are available or if they are available under very unfavourable conditions, or on the basis of reciprocity. Waivers for vessels flying under the Canadian flag may be granted on the basis of reciprocity (§ 2 para. 3 KüSchVO)

All activities falling within the scope of the pilot law are regulated and accreditation is restricted to nationals of a Member State of the EU, a Member State of the EEA orthe Swiss Confederation.

For rental or leasing of ships with or without operators, the conclusion of contracts for freight transport by ships flying a foreign flag or the chartering of such vessels may be restricted, depending on the availability of ships flying under the German flag or the flag of another Member State of the EU.

Transactions between residents and non-residents concerning:

(a) the rental of internal waterways vessels, which are not registered in the economic area;
(b) the transport of freight with such internal waterways vessels; or
(c) the towing services by such internal waterways vessels

within the economic area may be restricted.

***

## Reservations applicable in Greece

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law No 1892/90 |
| **Description:** | **Investment** |

For foreign natural or legal persons, discretionary permission from the Ministry of Defence is needed for acquisition of real estate in the border regions either directly or through equity participation in a company which is not listed in the Greek Stock Exchange and which owns real estate in those regions, or any change in the persons of the stockholders of such company.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Lawyers Code (Law 3026/1954), as amended by Presidential Decree 172/1989 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts. Only nationals of a Member State of the EEA or of the Swiss Confederation may be admitted to the Bar, and are thus entitled to provide legal services in respect of domestic law.

To provide legal services in respect of EU law and the law of a

Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212 other than accounting services |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Presidential Decree 226/1992 |
| | Law 3693/2008 on Auditing Standards (Implementation of Directive 2006/43/EC) |
| | Law 3386/2005 on the entry, residency and integration of foreign nationals in Greece |
| | Law 3844/2010 on Services (Implementation of Directive 2006/123/EC) |
| **Description:** | **Cross-Border Trade in Services** |
| | Nationality of a Member State of the EU is required in order to obtain a licence to be a statutory auditor. By Regulatory Act, the ELTE (Epitropi Logistikis Typopoiissis Kai Elenchon) (Oversight Body in Greece) may issue a licence to an auditor who is a national of Canada or of any third country if, in its discretion, the conditions laid down in Articles 4 and 6 to 11 of Law 3693/2008 is met. |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| | Market access |

| | |
|---|---|
| **Level of Government:** | National |
| **Measures:** | Precidential Degree 38/2010, Ministerial Decision 165261/IA/2010 (Gov. Gazette 2157/B) |
| **Description:** | **Cross-Border Trade in Services** |
| | Nationality of a Member State of the EU is required to supply veterinary services. |

| | |
|---|---|
| **Sector:** | Business services and health and social services |
| **Sub-Sector:** | Services provided by nurses, physiotherapists and paramedical personnel |
| **Industry Classification:** | Part of CPC93123, CPC 93191 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law 1666/1986 |
| **Description:** | **Cross-Border Trade in Services** |
| | Greek nationality is required for dental technicians. |

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law 5607/1932 as amended by Laws 1963/1991 and 3918/2011 |
| **Description:** | **Investment** |
| | Only natural persons, who are licenced pharmacists, and companies founded by licenced pharmacists, are permitted to provide retail services of pharmaceuticals and specific medical |

goods to the public.

Nationality of a Member State of the EU is required in order to operate a pharmacy.

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Primary education services |
| | Secondary education services |
| **Industry Classification:** | CPC 921, CPC 922 |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | Laws 682/1977, 284/1968, 2545/1940 and Presidential Degree 211/1994 as amended by Presidential Degree 394/1997 |
| **Description:** | **Investment** |
| | Nationality of a Member State of the EU is required for owners and a majority of the members of the board of directors in privately funded primary and secondary schools, and for teachers in privately funded primary and secondary education. |

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Higher education services |
| **Industry Classification:** | CPC 923 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Constitution of Hellas, art. 16, par. 5 and Law 3549/2007 |
| **Description:** | **Investment** |
| | Education at university level shall be provided exclusively by institutions which are fully self-governed public law legal |

persons.

However, Law 3696/2008 permits the establishment by EU residents (natural or legal persons) of private tertiary education institutions granting certificates which are not recognised as being equivalent to university degrees.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Legislative Degree 400/1970 |
| **Description:** | **Financial Services** |

The right of establishment does not cover the creation of representative offices or other permanent presence of insurance companies, except where such offices are established as agencies, branches or head offices.

| | |
|---|---|
| **Sector:** | Tourism and travel related services |
| **Sub-Sector:** | Tourist guides services |
| **Industry Classification:** | CPC 7472 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Presidential Degree 38/2010, Ministerial Decision 165261/IA/2010 (Gov. Gazette 2157/B) |
| **Description:** | **Cross-Border Trade in Services** |

Nationality of a Member State of the EU is required in order to provide tourist guide services.

| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Code of Public Maritime Law (Degree no 187/1973, as amended by Presidential Degree no 11/2000, art. 5 |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |
| | Over 50 per cent of shares of a seagoing vessel must be owned by EU or nationals of a Member State of the EEA or companies in order to be registered on the registry of Greece. The vessel must be managed from Greece. |

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Supporting services for water transport |
| **Industry Classification:** | CPC 745 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Code of Public Maritime Law (Legislative Degree 187/1973) |

**Description:**          **Investment**

Public monopoly imposed in port areas for cargo-handling services.

---

**Sector:**                 Road transport

**Sub-Sector:**             Operators of road freight transport services

**Industry Classification:** CPC 7123

**Type of Reservation:**    National treatment

Most-favoured-nation treatment

**Level of Government:**     National

**Measures:**               Licensing of road freight transport operators: Greek law 3887/2010 (Government Gazette A' 174), as amended by art. 5 of law 4038/2012 (Government Gazette A' 14)-EC Regulations 1071/09 and 1072/09

**Description:**            **Investment and Cross-Border Trade in Services**

In order to engage in the occupation of road freight transport operator a Hellenic licence is needed. Licences are granted on non–discriminatory terms, under condition of reciprocity Road freight transport operations established in Greece may only use vehicles that are registered in Greece.

***

## Reservations applicable in Hungary

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Government Decree No. 7/1996 on the Acquisition of Real Estate by Foreigners |
| **Description:** | **Investment** |

The purchase of real estate by non-residents is subject to obtaining authorisation from the appropriate administrative authority responsible for the geographical location of the property.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | ACT XI of 1998 on Attorneys at Law |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of Hungarian law, including representation before courts. Full admission to the Bar is subject to a nationality condition, coupled with a residency requirement.

Only nationals of a Member State of the EEA may be admitted to the Bar, and are thus entitled to provide legal services in respect of domestic law.

Commercial presence should take the form of partnership with a

Hungarian barrister (*ügyvéd*) or a barrister's office (*ügyvédi iroda*).

For foreign lawyers, the scope of legal activities is limited to the provision of legal advice on home country and international law, which shall take place on the basis of a collaboration contract concluded with a Hungarian attorney or a law firm.

| | |
|---|---|
| **Sector:** | Legal services |
| **Sub-Sector:** | Patent agents |
| **Industry Classification:** | CPC 8613 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act XXXII of 1995 on Patent Attorneys |
| **Description:** | **Cross-Border Trade in Services** |
| | For supplying patent agent services, residency is required for non-nationals of a Member State of the EEA. |

| | |
|---|---|
| **Sector:** | Professional services |
| **Sub-Sector:** | Taxation advisory services |
| | Architectural services |
| | Engineering services |
| | Integrated engineering services |
| **Industry Classification:** | CPC 863, CPC 8671, CPC 8672, CPC 8673 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Act LVIII of 1996 on the Professional Chambers of Architects and Engineers |
| | Act XCII of 2003 on the Rules of Taxation, Decree of the Ministry of Finance no. 26/2008 on the licensing and registration of taxation advisory activities |

**Description:**  **Cross-Border Trade in Services**

The provision of the following services, insofar as they are being supplied by a physical person present in the territory of Hungary, requires residency:

(a)     Taxation advisory services;
(b)     Architectural services;
(c)     Engineering services (only applicable to graduate trainees); and
(d)     Integrated Engineering services.

**Sector:**  Professional services

**Sub-Sector:**  Landscape architectural services

**Industry Classification:**  CPC 8674

**Type of Reservation:**  National treatment

Market access

**Level of Government:**  National

**Measures:**  Act LVIII of 1996 on the Professional Chambers of Architects and Engineers

**Description:**  **Cross-Border Trade in Services**

The supply of landscape architectural services by non-nationals of a Member State of the EEA requires residency. The supply of landscape architecture services is therefore only available to service suppliers established or resident in the EEA.

**Sector:**  Health services

**Sub-Sector:**  Veterinary services

**Industry Classification:**  CPC 932

**Type of Reservation:**  National treatment

Market access

**Level of Government:**  National

**Measures:**  Act CXXVII of 2012 on the Hungarian Veterinary Chamber and on the conditions how to supply Veterinary services

**Description:**            **Investment and Cross-Border Trade in Services**

For supplying veterinary services, membership of the Hungarian Veterinary Chamber is required. Only nationals of a Member State of the EEA may be admitted to the Chamber.

Authorisation for establishment is subject to an economic needs test. Main criteria: labour market conditions in the sector.

**Sector:**                Business services

**Sub-Sector:**            Services related to management consulting – arbitration and conciliation services

**Industry Classification:**  CPC 86602

**Type of Reservation:**   National treatment

Market access

**Level of Government:**   National

**Measures:**              Act LV of 2002 on Mediation

**Description:**           **Cross-Border Trade in Services**

An authorisation, by means of admission into the register, by the minister in charge of the juridical system is required for the pursuit of mediation (such as arbitration and conciliation) activities which may only be granted to juridical or natural persons that are established in or resident in Hungary.

**Sector:**                Business services

**Sub-Sector:**            Translation services

**Industry Classification:**  CPC 87905

**Type of Reservation:**   Market access

**Level of Government:**   National

**Measures:**              Decree of the Council of Ministers No. 24/1986 on Official translation and interpretation

**Description:**                    **Investment and Cross-Border Trade in Services**

Official translations, official certifications of translations, and certified copies of official documents in foreign languages may only be provided by the National Translation and Authentication Office (OFFI).

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment<br>Market access |
| **Level of Government:** | National |
| **Measures:** | Act XCVIII of 2006 on the General Provisions Relating to the Reliable and Economically Feasible Supply of Medicinal Products and Medical Aids and on the Distribution of Medicinal Products |
| **Description:** | **Investment** |
| | EEA nationality is required in order to operate a pharmacy. |
| | Establishment authorisation is subject to an economic needs test. Main criteria: density conditions in the area. |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services |
| **Industry Classification:** | CPC 811, CPC 813 |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | National |
| **Measures:** | Act CCXXXVII of 2013 on Credit Institutions and Financial Enterprises |
| **Description:** | **Financial Services** |
| | Non-EEA companies may provide financial services or engage in activities auxiliary to financial services solely through their Hungarian branch. |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services |
| **Industry Classification:** | CPC 811, CPC 813 |

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act CCXXXVII of 2013 on Credit Institutions and Financial Enterprises; Act CXX of 2001 on the Capital Market |
| **Description:** | **Financial Services** |

The board of directors of a credit institution shall have at least two members recognised as resident according to foreign exchange regulations and having had prior permanent residence in Hungary for at least one year.

Branches of non-EEA investment fund management companies may not engage in the management of European investment funds and may not provide asset management services to private pension funds.

| | |
|---|---|
| **Sector:** | Tourism and travel related services |
| **Sub-Sector:** | Travel agencies and tour operators services |
| | Tourist guide services |
| **Industry Classification:** | CPC 7471, CPC 7472 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act CLXIV of 2005 on Trade, Government Decree No. 213/1996 (XII.23.) on Travel Organization and Agency Activities |
| **Description:** | **Cross-Border Trade in Services** |

The supply of Travel Agent and Tour Operators services, and Tourist Guide Services on a cross-border basis is subject to a licence issued by the Hungarian Trade Licensing Office. Licences are reserved to nationals of a Member State of the EEA and juridical persons having their seats in the EEA Member States.

**Sector:**                       Fishing, transport

**Sub-Sector:**                   All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing

                                  Transport services (passengers and freight) by seagoing vessels

                                  Pilotage and berthing services

                                  Vessel salvage and refloating services

                                  Other supporting services for water transport

                                  Construction for waterways, harbours, dams and other water works

**Industry Classification:**      ISIC rev 3.1 0501, ISIC rev 3.10502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882

**Type of Reservation:**          National treatment

                                  Market access

**Level of Government:**          National

**Measures:**                     Act XLII of 2000 on Shipping

**Description:**                  **Investment and International Maritime Transport Services**

                                  To register a vessel in Hungary in order to fly a national flag, a majority EEA-ownership of the vessel is required. EEA nationality is required for the captain and first officer of vessels.

                                                   ***

## Reservations applicable in Ireland

| | |
|---|---|
| **Sector:** | Agriculture and hunting |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 1531 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Agriculture Produce (Cereals) Act, 1933 |
| **Description:** | **Investment** |
| | Establishment by Canadian residents in flour milling activities is subject to authorisation. |

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | Mining of coal and lignite |
| | Extraction of peat |
| | Mining of metal ores |
| | Other mining and quarrying |
| | Services Incidental to Mining |
| **Industry Classification:** | ISIC rev 3.1 10, ISIC rev 3.1 13, ISIC rev 3.1 14, CPC 883 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National and regional |
| **Measures:** | Minerals Development Acts 1940 – 1999, Planning Acts and Environmental Regulations |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | A Prospecting License gives the holder the right to explore for certain specific minerals. Only holders of current Prospecting Licenses are considered for State Mining Leases or Licenses to develop such minerals within the lease or licence area, whether the minerals are State-owned or privately-owned. |
| | Exploration and mining companies operating in Ireland are required to have a presence there. In the case of minerals |

exploration, there is a requirement that companies (Irish and foreign) employ either the services of an agent or a resident exploration manager in Ireland while work is being undertaken. In the case of mining, it is a requirement that a State Mining Lease or License be held by a company incorporated in Ireland, which has power in its memorandum of association to comply with the various covenants in the Lease or License.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Solicitors Acts 1954-2011 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of Irish law, including representation before courts. Residency (commercial presence) is required in order to obtain full admission to the Bar.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

Lawyers in Ireland are divided into two distinct categories: solicitors and barristers. The Law Society of Ireland is the statutory legal professional body that governs admission of solicitors in Ireland. The Honorable Society of King's Inns governs the admission of barristers in Ireland.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |

1104

**Type of Reservation:**    Market access

**Level of Government:**    National

**Measures:**    Veterinary Practice Act 2005

**Description:**    **Investment and Cross-Border Trade in Services**

Access through partnership or natural persons only.

**Sector:**    Fishing, transport

**Sub-Sector:**    All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing

Transport services (passengers and freight) by seagoing vessels

Pilotage and berthing services

Vessel salvage and refloating services

Other supporting services for water transport

Construction for waterways, harbours, dams and other water works

**Industry Classification:**    ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882

**Type of Reservation:**    National treatment

Market access

**Level of Government:**    National

**Measures:**    Mercantile Marine Act 1955 as amended by the Merchant Shipping (Miscellaneous Provisions) Act 1998

**Description:**    **Investment, Cross-Border Trade in Services, and International Maritime Transport Services**

Foreign investors investing in a body corporate established under and subject to the law of a Member State of the EU, and which has its principal office in Ireland or another Member State of the EU, may register a vessel on the Irish Ship Register.

\*\*\*

1105

## Reservations applicable in Italy

**Sector:**                     Publishing and printing

**Sub-Sector:**                 ISIC rev 3.1 221, ISIC rev 3.1 222

**Industry Classification:**    National treatment

                                Market access

**Type of Reservation:**        Most-favoured-nation treatment

**Level of Government:**         National

**Measures:**                   Law 416/1981, art. 1 (and subsequent amendments)

**Description:**                **Investment**

In so far as Canada and its provinces and territories allow Italian nationals and enterprises to conduct these activities, Italy will allow nationals of Canada and enterprises to conduct these activities under the same conditions.

In so far as Canada and its provinces and territories allow Italian investors to own more than 49 per cent of the capital and voting rights in a Canadian publishing company, then Italy will allow Canadian investors to own more than 49 per cent of the capital and voting rights in an Italian publishing company under the same conditions.


**Sector:**                     Business services

**Sub-Sector:**                 Legal services

**Industry Classification:**    Part of CPC 861

**Type of Reservation:**        National treatment

                                Market access

**Level of Government:**         National

**Measures:**                   Royal Decree 1578/1933, art. 17 law on the legal profession

**Description:**                **Investment and Cross-Border Trade in Services**

Full admission to the Bar is required for the practice of legal services in respect of Italian law, including representation before courts. Residency (commercial presence) is required in order to obtain full admission to the Bar.

To provide legal services in respect of EU and Italian law, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting and bookkeeping services |
| | Auditing services |
| | Taxation advisory services |
| **Industry Classification:** | CPC 86211, CPC 86212,CPC 86213, CPC 86219, CPC 86220, CPC 863 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | National |
| **Measures:** | Auditing: Legislative Decree 58/1998, art. 155, 158 and 161 |
| | Decree of the President of the Republic 99/1998 |
| | Legislative Decree 39/2010, art. 2 |
| | Accounting, Bookkeeping and Taxation: Legislative Decree 139/2005, Law 248/2006 |
| **Description:** | **Cross-Border Trade in Services** |
| | For auditing services or taxation advisory services, residency in Italy is required for individual auditors or tax advisors. |
| | Residence or business domicile is required for enrolment in the professional register, which is necessary for the provision of accounting and bookkeeping services. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Architectural services |
| | Engineering services |
| | Urban planning and landscape architectural services |
| **Industry Classification:** | CPC 8671, CPC 8672, CPC 8673, CPC 8674 |

1107

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Royal Decree 2537/1925 regulation on the profession of architect and engineer |
| | Law 1395/1923 |
| | Decree of the President of the Republic (D.P.R.) 328/2001 |
| **Description:** | **Cross-Border Trade in Services** |
| | Residency in Italy is required for enrolment in the professional register, which is necessary for the practice of the profession. |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Legislative Decree C.P.S. 233/1946, arts. 7-9 |
| | Decree of the President of the Republic (DPR) 221/1950, par. 7 |
| **Description:** | **Cross-Border Trade in Services** |
| | Residency in Italy is required for enrolment in the professional register, which is necessary for the practice of the profession. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Research and development services relating to social sciences and humanities - psychologists |
| **Industry Classification:** | CPC 852 |
| **Type of Reservation:** | National treatment |
| | Market access |

**Level of Government:**    National

**Measures:**    Law 56/1989 on the psychologist profession

**Description:**    **Cross-Border Trade in Services**

Residency in Italy is required for enrolment in the professional register, which is necessary for the practice of the profession. Nationality of a Member State of the EU is required to practice the profession, except foreign professionals may be allowed to practice based on reciprocity.

---

**Sector:**    Business services

**Sub-Sector:**    Engineering related scientific and technical consulting services

Technical testing and analysis services

Services incidental to agriculture

**Industry Classification:**    CPC 8675, CPC 8676, part of CPC 881

**Type of Reservation:**    National treatment

Market access

Most-favoured-nation treatment

**Level of Government:**    National

**Measures:**    Geologists: Law 112/1963, arts. 2 and 5; D.P.R. 1403/1965, art. 1

Biologists, chemical analysts: Law 396/1967 on the profession of biologists; Royal Decree 842/1928 on the profession of chemical analysts

Agronomists: Law 3/1976 on the profession of agronomists "Periti agrari": Law 434/1968 as amended by Law 54/1991

**Description:**    **Cross-Border Trade in Services**

Residency or professional domicile in Italy is required for enrolment in the geologists' register, which is necessary for the practice of the professions of surveyor or geologist in order to provide services relating to exploration and the operation of mines, etc. There is a nationality of a Member State of the EU requirement, however, foreigners may enrol under condition of reciprocity.

For biologists, chemical analysts, agronomists and "*periti*

*agrari*", residency and enrolment in the professional register is required. Third country nationals can enrol under condition of reciprocity.

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | Mining of coal and lignite |
| | Extraction of peat |
| | Extraction of crude petroleum and natural gas |
| | Mining of metal ores |
| | Other mining and quarrying |
| | Engineering related scientific and technical consulting services |
| | Services incidental to mining |
| **Industry Classification:** | ISIC rev 3.1 10, ISIC rev 3.1 11, ISIC rev 3.1 12, ISIC rev 3.1 13, ISIC rev 3.1 14, CPC 8675, CPC 883 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National and regional (for exploration) |
| **Measures:** | Exploration services: Royal Decree 1447/1927; Legislative Decree 112/1998, art. 34 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Mines belonging to the State have specific exploration and mining rules. Prior to any exploitation activity, a permit for exploration is needed ("permesso di ricerca", art. 4 Royal Decree 1447/1927). This permit has a duration, defines exactly the borders of the ground under exploration and more than one exploration permit may be granted for the same area to different persons or companies (this type of licence is not necessarily exclusive).

In order to cultivate and exploit minerals, an authorisation ("concessione", art. 14) from the regional authority is required.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law on public security (TULPS) 773/1931, arts. 133-141, |
| | Royal Decree 635/1940, art. 257 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Nationality of a Member State of the EU and residency is required in order to obtain the necessary authorisation to supply security guard services and the transport of valuables.

| | |
|---|---|
| **Sector:** | Distribution services |
| **Sub-Sector:** | Distribution of tobacco |
| **Industry Classification:** | Part of CPC 6222, part of CPC 6310 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Legislative Decree 184/2003 |
| | Law 165/1962 |
| | Law 3/2003 |
| | Law 1293/1957 |
| | Law 907/1942 |
| | Decree of the President of the Republic (D.P.R.) 1074/1958 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

In order to distribute and sell tobacco, a licence is needed. The licence is granted through public procedures. The granting of licences is subject to an economic needs test. Main criteria: population and geographical density of existing selling points. For an intermediary between wholesale and retail, owners of magazines (magazzini), nationality of a Member State of the EU is required.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law 362/1991, arts. 1, 4, 7 and 9 |
| | Legislative Decree CPS 233/1946, arts. 7-9 |
| | Decree of the President of the Republic (D.P.R. 221/1950, pars. 3 and 7 |
| **Description:** | **Investment** |

An authorisation is needed to open a pharmacy which is subject to an economic needs test. Main criteria: population and geographical density of existing pharmacies. New or vacant pharmacies are authorised following a public competition. Only nationals of a Member State of the EU enrolled in the Register of pharmacists ("albo") are able to participate in a public competition.

The practice of the profession is possible only for natural persons enrolled in the register, as well as for juridical persons in the form of partnerships, where every partner of the company must be an enrolled pharmacist. Enrolment in the pharmacist professional register requires nationality of a Member State of the EU or residency and the practice of the profession in Italy.

Foreign nationals having the necessary qualifications may enrol if they are citizens of a country with whom Italy has a special agreement, authorising the exercise of the profession, under condition of reciprocity (D. Lgsl. CPS 233/1946 arts. 7-9 and D.P.R. 221/1950 pars. 3 and 7).

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Higher education services |
| **Industry Classification:** | CPC 92 |
| **Type of Reservation:** | Market access |

| | |
|---|---|
| **Level of Government:** | National |
| **Measures:** | Royal Decree 1592/1933 (Law on secondary education) |
| | Law 243/1991 (Occasional public contribution for private universities) |
| | Resolution 20/2003 of CNVSU (Comitato nazionale per la valutazione del sistema universitario) |
| | Decree of the President of the Republic (DPR) 25/1998 |
| **Description:** | **Investment** |
| | An economic needs test is applied for the opening of privately funded universities authorised to issue recognised diplomas or degrees based on a three year programme. Main criteria: population and density of existing establishments. |
| | Only Italian juridical persons may be authorised to issue state-recognised diplomas. |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | National |
| **Measures:** | Law 194/1942, art. 4 |
| | Law 4/1999 on the register |
| **Description:** | **Financial Services** |
| | Residency in Italy is required for enrolment in the actuarial register, which is necessary for the practice of the actuarial profession. |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Industry Classification:** | |

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| | Cross-border supply of financial services |
| **Level of Government:** | National |
| **Measures:** | Legislative Decree 58/1998, arts. 1, 19, 28, 30-33, 38, 69 and 80 |
| | Joint Regulation of Bank of Italy and Consob 22.2.1998, arts. 3 and 41 |
| | Regulation of Bank of Italy 25.1.2005, Title V, Chapter VII, Section II |
| | Consob Regulation 16190 of 29.10.2007, arts. 17-21, 78-81, 91-111 |

**Description:**  **Financial Services**

In order to be authorised to manage the securities settlement system or central securities depository services with an establishment in Italy, a company is required to be incorporated in Italy (no branches).

In the case of collective investment schemes other than undertakings for collective investment in transferable securities ("UCITS") harmonised under EU legislation, the trustee or depository is required to be incorporated in Italy or in another Member State of the EU and established through a branch in Italy. Management enterprises of UCITS not harmonised under EU legislation are also required to be incorporated in Italy (no branches).

Only banks, insurance enterprises, investment firms and enterprises managing UCITS harmonised under EU legislation having their legal head office in the EU, as well as UCITS incorporated in Italy may carry out the activity of pension fund resources management.

In providing the activity of door-to-door selling, intermediaries must utilise authorised financial salesmen resident within the territory of a Member State of the EU.

Representative offices of non-EU intermediaries cannot carry out activities aimed at providing investment services, including trading for own account and for account of customers, placement and underwriting of financial instruments (branch required).

**Sector:**  Tourism and travel related services

| | |
|---|---|
| **Sub-Sector:** | Tourist guides services |
| **Industry Classification:** | CPC 7472 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Regional |
| **Measures:** | Law 135/2001 arts. 7.5 and 6 |
| | Law 40/2007 (DL 7/2007) |
| **Description:** | **Cross-Border Trade in Services** |

Tourist guides from non-EU countries need to obtain a specific licence from the Region in order to act as a professional tourist guide. Tourist guides from Member States of the EU can work freely without the requirement for such a licence. The licence is granted to tourist guides demonstrating adequate competence and knowledge.

| | |
|---|---|
| **Sector:** | Fishing |
| | Transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Legal basis Royal Decree 327/1942 (modified with Law 222/2007), art. 143 and 221 (Navigation Code) |

**Description:**          **Investment and International Maritime Transport Services**

Foreigners other than EU residents cannot own a majority interest in Italian flagged vessels or a controlling interest in ship owning companies having their headquarters in Italy.

**Sector:**               Transport

**Sub-Sector:**           Supporting services for water transport

**Industry Classification:**  Part of CPC 745

**Type of Reservation:**  Market access

**Level of Government:**  National

**Measures:**             Shipping Code

Law 84/1994

Ministerial decree 585/1995

**Description:**          **Investment**

An Economic Needs Test is applied for maritime cargo-handling services. Main criteria: number of and impact on existing establishments, population density, geographic spread and creation of new employment.

***

## Reservations applicable in Latvia

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | Law on land reform in the cities of the Republic of Latvia, ss. 20, 21 |
| | Law on land privatisation in rural areas, s. 28 |
| **Description:** | **Investment** |

Acquisition of urban land by nationals of Canada or of a third country is permitted through incorporated companies registered in Latvia or other Member States of the EU:

(a) if more than 50 per cent of their equity capital is owned by nationals of Member States of the EU, the Latvian Government or a municipality, separately or in total;

(b) if more than 50 per cent of their equity capital is owned by natural persons and companies of third country with whom Latvia has concluded bilateral agreements on promotion and reciprocal protection of investments and which have been approved by the Latvian Parliament before 31 December 1996;

(c) if more than 50 per cent of their equity capital is possessed by natural persons and companies of third country with whom Latvia has concluded bilateral agreements on promotion and reciprocal protection of investments after 31 December 1996, if in those agreements the rights of Latvian natural persons and companies on acquisition of land in the respective third country have been determined;

(d) if more than 50 per cent of their equity capital is possessed by persons from a) to c) together;

e) which are public joint stock companies, if their shares thereof are quoted in the stock exchange.

Where Canada and its provinces and territories allow Latvian nationals and enterprises to purchase urban real estate in their territories, Latvia will allow nationals of Canada and enterprises

to purchase urban real estate in Latvia under the same conditions as Latvian nationals.

| | |
|---|---|
| **Sector:** | Distribution and health services |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| | Other services provided by pharmacists |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Pharmaceutical Law, s. 38 |
| **Description:** | **Investment** |

In order to commence independent practice in a pharmacy, a foreign pharmacist or pharmacist's assistant, educated in a state which is not a Member State of the EU or a Member State of the EEA, must work for at least one year in a pharmacy under the supervision of a pharmacist.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Criminal Procedure Law, s. 79 |
| | Advocacy Law of the Republic of Latvia, s. 4 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

In order to obtain full admission to the Bar, which is required to practice as a sworn solicitor or as an assistant of a sworn solicitor, Latvian nationality is required. Sworn solicitors who are nationals of a Member State of the EU, and who have registered in the Latvian Council of Sworn Advocates, have the right to participate and vote in the General Meeting of Sworn Advocates.

1118

Providing domestic legal services (the services of an advocate and legal representation in criminal proceedings) in Latvia in accordance with its law is only permitted by:

(a) a sworn solicitor or an assistant of a sworn solicitor holding Latvian nationality; or

(b) a national of a Member State of the EU who has been designated as an advocate in one of the Member States of the EU; or

(c) a foreign advocate, in the framework of an agreement on legal assistance concluded between Latvia and the relevant foreign country.

For advocates of a Member State of the EU or foreign advocates, special requirements exist. For example, participation in court proceedings in criminal cases is only permitted in association with an advocate of the Latvian Collegium of Sworn Advocates.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212 other than accounting services |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law on Sworn Auditors |
| **Description:** | **Investment** |

In a commercial company of sworn auditors, a foreign investor may only own more than 50 per cent of the voting capital shares, if they are qualified as sworn auditors or commercial companies of sworn auditors, or auditors or commercial companies of auditors of Member States of the EU or Member States of the EEA, who, in accordance with laws of the Member State of the EU or the Member State of the EEA, are entitled to pursue the

professional activity of a sworn auditor or a company of sworn auditors, as this professional activity is defined in the laws of Latvia.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Printing and publishing |
| **Industry Classification:** | CPC 88442 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law on the Press and Other Mass Media, s. 8 |
| **Description:** | **Investment** |
| | Only legal persons incorporated in Latvia, and natural persons of Latvia have the right to found and publish mass media. Branches are not allowed. |

| | |
|---|---|
| **Sector:** | Fishing |
| | Transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |

| | |
|---|---|
| **Measures:** | Law "Maritime Code" |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |

The Latvian flag is granted only to vessels registered in the Ship Register of Latvia, and these vessels must be managed by EU registered entity. Foreign owners not incorporated in the EU can register vessels in the Ship Register, provided that their technical management is performed by a legal person registered in Latvia on the basis of a ship management contract.

***

## Reservations applicable in Lithuania

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | Law on the Bar of the Republic of Lithuania of 18 March 2004 No. IX-2066 as last amended on 17 November 2011 No.XI-1688 Republic of Lithuania Law on the Notarial profession 15 September 1992 – No I-2882 (As last amended on 19 April 2012 – No X-1979) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

Only nationals of a Member State of the EEA or of the Swiss Confederation may be admitted to the Bar, and are thus entitled to provide legal services in respect of domestic law.

Attorneys from foreign countries can act as advocates in court only in accordance with bilateral agreements on legal assistance.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC86212 other than accounting services |
| **Type of Reservation:** | National treatment |

|  | Market access |
|---|---|
| **Level of Government:** | National |
| **Measures:** | Law on Audit of 15 June 1999 No. VIII -1227 (a new version of 3 July 2008 No. X-1676) |
| **Description:** | **Investment and Cross-Border Trade in Services** |
|  | Not less than 75 per cent of shares should belong to auditors or auditing companies of the EU or EEA. |
|  | An auditor's report must be prepared in conjunction with an auditor accredited to practice in Lithuania. |
|  | Establishment is not permitted in the form of a Public Stock Corporation (AB). |

| **Sector:** | Business services |
|---|---|
| **Sub-Sector:** | Patent agents |
| **Industry Classification:** | Part of CPC 879 |
| **Type of Reservation:** | National treatment |
|  | Market access |
| **Level of Government:** | National |
| **Measures:** | Law on Trade Marks of 10 October 2000 No. VIII-1981 |
|  | Law on Designs of 7 November 2002 No. IX-1181 |
|  | Patent Law of 18 January 1994 No. I-372 |
|  | Law on the Legal Protection of Topographies of Semiconductor Products of 16 June 1998 |
|  | Patent Attorneys Regulation, approved by the Order of Government of the Republic of Lithuania on 20 May 1992 No.362 (as last amended on 8 November 2004 No. 1410) |
| **Description:** | **Investment and Cross-Border Trade in Services** |
|  | Third country (non-Member States of the EU) nationals are not allowed to be registered as patent attorneys. Only patent attorneys are allowed to provide patent agent services in Lithuania. |

**Sector:** Distribution

**Sub-Sector:** Distribution of pyrotechnics

**Industry Classification:**

**Type of Reservation:** Market access

**Level of Government:** National

**Measures:** Law on Supervision of Civil Pyrotechnics Circulation (23 March 2004. No. IX-2074)

**Description:** **Cross-Border Trade in Services**

The distribution of pyrotechnics is subject to licensing. Only the juridical persons established in the EU may obtain a licence.

**Sector:** Energy

**Sub-Sector:** Pipeline transport of fuels

Services incidental to energy distribution

**Industry Classification:** CPC 713, CPC 887

**Type of Reservation:** Market access

**Level of Government:** National

**Measures:** Law on Natural Gas of the Republic of Lithuania of 10 October 2000 No VIII-1973

**Description:** **Cross-Border Trade in Services**

Establishment is required. Licences for transmission and distribution of fuels may only be issued to legal persons of Lithuania or branches of foreign legal persons or other organisations (subsidiaries) established in Lithuania.

This reservation does not apply to consultancy services related to the transmission and distribution on a fee or contract basis of fuels.

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Transmission and distribution of electricity |
| **Industry Classification:** | ISIC rev 3.1 401, CPC 887 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Law on electricity of the Republic of Lithuania of 20 July 2000 No VIII-1881 |
| **Description:** | **Cross-Border Trade in Services** |

The licences for transmission, distribution, public supply and organizing of trade of electricity may only be issued to legal persons of Lithuania or branches of foreign legal person or other organisations established in Lithuania.

This reservation does not apply to consultancy services related to the transmission and distribution on a fee or contract basis of electricity.

| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev. 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | The Law of the Republic of Lithuania on Merchant Shipping of 12 September 1996, No. I-1513 |

1125

**Description:**                    **Investment and International Maritime Transport Services**

The Lithuanian flag is granted only to vessels registered in the Lithuanian register of maritime vessels and owned or chartered (bareboat charter) by a Lithuanian citizen or company established (incorporated) in Lithuania.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Rail transport services |
| **Industry Classification:** | CPC 711 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Central |
| **Measures:** | Railway transport Code of the Republic of Lithuania of 22 April 2004 No. IX-2152 as amended by 8 June 2006 No. X-653. |
| **Description:** | **Investment** |

The exclusive rights for the provision of transit services are granted to railway undertakings which are owned, or whose stock is 100 per cent owned, by the state.

***

# Reservations applicable in Luxembourg

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Loi du 16 décembre 2011 modifiant la loi du 10 août 1991 sur la profession d'avocat |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of Luxembourg law, including representation before courts.

Nationality of a Member State of the EU and residency (commercial presence) is required in order to obtain full admission to the Bar. The Council of the Order may, on the basis of reciprocity, agree to waive the nationality requirement for a foreign national.

To provide legal services in respect of Luxembourg law, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Loi du 4 juillet 1973 concernant le régime de la pharmacie (annex a043) |
| | Règlement grand-ducal du 27 mai 1997 relatif à l'octroi des |

concessions de pharmacie (annex a041)

Règlement grand-ducal du 11 février 2002 modifiant le règlement grand-ducal du 27 mai 1997 relatif à l'octroi des concessions de pharmacie (annex a017)

| | |
|---|---|
| **Description:** | **Investment** |
| | Only natural persons are permitted to provide retail services of pharmaceuticals and specific medical goods to the public. |
| **Sector:** | Fishing |
| | Transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law 9 November 1990 |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |
| | Foreign investors that are not nationals of a Member State of the EU or not incorporated in the EU or having their principal office in the EU, cannot own 50 per cent or more of a seagoing vessel flying the flag of Luxembourg. |
| | This reservation does not apply to a ship that is bareboat chartered to a charterer that would satisfy the above owner-ship requirements and is actually making use of the ship. |

\*\*\*

## Reservations applicable in Malta

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Immoveable Property (Acquisition By Non-Residents) Act (Cap. 246) |
| | Protocol No 6 of the EU Accession Treaty on the acquisition of secondary residences in Malta |
| **Description:** | **Investment** |

Non-nationals of a Member State of the EU may not acquire immovable property for commercial purposes.

Companies with 25 per cent (or more) of non-EU shareholding must obtain an authorisation from the Competent Authority (Minister responsible for Finance) to buy immovable property for commercial or business purposes. The Competent Authority will determine whether the proposed acquisition represents a net benefit to the Maltese economy.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Code of Organisation and Civil Procedure (Cap. 12) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of Maltese law, including representation

before courts. Residency (commercial presence) is required in order to obtain full admission to the Bar.

To provide legal services in respect of Maltese law, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

Only nationals of a Member State of the EEA or of the Swiss Confederation may be admitted to the Bar, and are thus entitled to provide legal services in respect of Maltese law.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Pharmacy Licence Regulations (LN279/07) issued under the Medicines Act (Cap. 458) |
| **Description:** | **Investment** |
| | Issuance of Pharmacy licences under specific restrictions. No person shall have more than one licence in his name in any town or village (Regulation 5(1) of the Pharmacy Licence Regulations (LN279/07)), except in the case where there are no further applications for that town or village (Regulation 5(2) of the Pharmacy Licence Regulations (LN279/07)). |

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Higher education services |
| | Adult education services |
| **Industry Classification:** | CPC 923, CPC 924 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |

| | |
|---|---|
| **Measures:** | Legal Notice 296 of 2012 |
| **Description:** | **Cross-Border Trade in Services** |

Service suppliers seeking to provide privately funded higher or adult education services must obtain a licence from the Ministry of Education and Employment. The decision on whether to issue a licence may be discretionary.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Water transport |
| | Supporting services for water transport |
| **Industry Classification:** | CPC 721, part of 742, CPC 745, part of CPC 749 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Gozo Passenger and Goods Service (SL499.31) |
| | Exclusive rights are allocated through public procurement procedures on the basis of contracts |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A licence is required from Transport Malta for the Rental of Vessels with Crew for vessels trading exclusively within local waters. Specific Public Service Obligations govern commercial shipping exclusively within Malta's internal waters.

Regarding the cabotage restriction between Malta and Gozo, exclusive rights are given according on the basis of a concession awarded by the Government. This exclusivity only relates to the route Malta-Gozo between the Port of Ċirkewwa and the Port of Marsamxetto (Malta) and the Port of Mġarr (Gozo) for the carriage of passengers, vehicles and goods.The tariffs for such services are regulated by law through the Gozo Passenger and Goods Service (SL499.31).

Nationality condition for supporting services.

| | |
|---|---|
| **Sector:** | Transport services |

| | |
|---|---|
| **Sub-Sector:** | Other transport services |
| **Industry Classification:** | CPC 712 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Taxi Services Regulations (SL499.59) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Taxis: Numerical restrictions on the number of licences apply.

Karozzini (horse drawn carriages): Numerical Restrictions on the number of licences apply.

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Enemalta Act (Cap. 272) |
| **Description:** | **Investment** |

EneMalta plc has a monopoly for the provision of electricity.

***

## Reservations applicable in the Netherlands

| | |
|---|---|
| **Sector:** | Supporting services for all modes of transport |
| **Sub-Sector:** | Customs clearance services |
| **Industry Classification:** | Part of CPC 748 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | General Customs Act (Algemene Douanewet) |
| **Description:** | **Cross-Border Trade in Services** |

The admittance of natural or juridical persons to act as customs representatives is subject to discretion by the inspector, as provided by articles 1(3) and 1(9) of the General Customs Act (Algemene Douanewet). Customs representatives who are not a resident of or established in the Netherlands are required to take up residence or establish a fixed location in the Netherlands, before they may perform activities as an admitted customs representative.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Advocatenwet (Act on Advocates) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national

law on a non-discriminatory basis.

Only locally-licensed lawyers may use the name or title "Lawyer" according to articles 2(c), and 16(b), (c), (d) Advocatenwet (Act on Advocates). Only lawyers registered in the Dutch registry can use the title 'advocate'. Instead of using the full term 'advocate', (non-registered) foreign lawyers are obliged to mention their home country professional organisation for the purposes of their activities in the Netherlands.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Hallmarking services |
| **Industry Classification:** | Part of CPC 893 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Waarborgwet 1986 |
| **Description:** | **Investment** |

To provide hallmarking services, commercial presence in the Netherlands is required. The hallmarking of precious metal articles is currently exclusively granted to two Dutch public monopolies.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Wet op de uitoefening van de diergeneeskunde 1990 (WUD) |
| **Description:** | **Cross-Border Trade in Services** |

Access is restricted to natural persons.

| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.10502, CPC 5133, CPC5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Art. 311, paragraph 1.b of the Commercial Code (Wetboek van Koophandel) |
| **Description:** | **Investment and International Maritime Transport Services** |

The ownership of a Dutch registered seagoing vessel is only possible for:

(a) natural persons with the nationality of a Member State of the EU, the EEA or the Swiss Confederation;

(b) companies or legal entities under the law of a Member State of the EU, one of the countries, islands or areas as meant in Articles 349 and in paragraphs 1 through 4 and paragraph 5(c) of Article 355 of the Treaty on the Functioning of the European Union, or of a Member State of the EEA or the Swiss Confederation; and

(c) natural persons or companies or legal entities other than above which can claim the European right of free establishment or settlement due to an agreement between the EU and a third country.

The owner must have a principal office or a subsidiary in the Netherlands. One or more natural persons domiciled in the Netherlands must have the responsibility for the ship, captain, crew and related matters, and have the authority to decide and represent on behalf of the owner.

It is not possible to register a seagoing ship that is already

registered in a public register, either as a seagoing ship or as an inland navigation vessel, or in any similar foreign register.

When making a request for a registration, the applicant shall elect a domicile within the Netherlands.

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity distribution |
| | Transportation of natural gas |
| **Industry Classification:** | ISIC rev 3.1 040, CPC 71310 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Elektriciteitswet 1998 |
| | Gaswet |
| **Description:** | **Investment** |

The ownership of the electricity network and the gas pipeline network are exclusively granted to the Dutch government (transmission systems) and other public authorities (distribution systems).

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | Extraction of crude petroleum and natural gas |
| **Industry Classification:** | ISIC rev 3.1 10, ISIC rev 3.1 11, ISIC rev 3.1 12, ISIC rev 3.1 13, ISIC rev 3.1 14 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Mijnbouwwet (Mining Act) |
| **Description:** | **Investment** |

The exploration for and exploitation of hydrocarbons in the Netherlands is always performed jointly by a private company and the public (limited) company designated by the Minister of Economic Affairs. Articles 81 and 82 of the Mining Act stipulate

that all shares in this designated company must be directly or indirectly held by the Dutch State.

\*\*\*

# Reservations applicable in Poland

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law of 24th March 1920 on the Acquisition of Real Estate by Foreigners (Journal of Laws of 2004 No. 167, item 1758 with later amendments) |
| **Description:** | **Investment** |
| | The acquisition of real estate, direct and indirect, by foreigners requires a permit. A permit is issued through an administrative decision by a minister competent in internal affairs, with the consent of the Minister of National Defence, and in the case of agricultural real estate, also with the consent of the Minister of Agriculture and Rural Development. |

| | |
|---|---|
| **Sector:** | Publishing and printing |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 221, ISIC rev 3.1 222 |
| **Type of Reservation:** | Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | Act of 26 January 1984 on Press law, Journal of Laws, No. 5, item 24, with subsequent amendments |
| **Description:** | **Investment** |
| | Nationality condition for the editor-in-chief of newspapers and journals. |

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Types of establishment |

**Industry Classification:**

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act of 2 July 2004 on freedom of economic activity, arts. 13.3 and 95. 1 |
| **Description:** | **Investment** |

The scope of operations of a representative office may only encompass advertising and promotion of the foreign parent company represented by the office.

For all sectors except legal services and services provided by healthcare units, non-EU investors may undertake and conduct economic activity only in the form of a limited partnership, limited joint-stock partnership, limited liability company, and joint-stock company, while domestic companies have access also to the forms of non-commercial partnership companies (general partnership and unlimited liability partnership).

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act of 5 July 2002 on the provision by foreign lawyers of legal assistance in the Republic of Poland, art. 19 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts.

Foreign lawyers may establish only in the form of a registered partnership a limited partnership, or a limited joint-stock partnership while domestic companies have access also to the forms of civil law partnership and professional partnership.

1140

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212 other than accounting services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Act of 7 May 2009 on statutory auditors, audit firms and on public oversight - Journal of Laws, No. 77, item 649, with subsequent amendments |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Audit firms may be established only in certain Polish legal forms. |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Law of 21st December 1990 on the Profession of Veterinary Surgeon and Chambers of Veterinary Surgeons |
| **Description:** | **Investment** |
| | For the provision of veterinary services by a physical person present in the territory of Poland, only nationals of a Member State of the EU may provide veterinary services. Foreign persons may apply for permission to practice. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Translation and interpretation services |

**Industry Classification:**      CPC 87905

**Type of Reservation:**          Market access

**Level of Government:**          National

**Measures:**                     Act of 25 November 2004 on the profession of sworn translator or interpreter (Journal of Laws no 273 item 2702), art. 2.1

**Description:**                  **Investment and Cross-Border Trade in Services**

                                  Only natural persons may be sworn translators.


**Sector:**                       Financial services

**Sub-Sector:**                   Insurance and insurance-related services

**Industry Classification:**

**Type of Reservation:**          National treatment

                                  Market access

                                  Cross-border supply of financial services

**Level of Government:**          National

**Measures:**                     Act on insurance activity of May 22, 2003 (Journal of Laws 2003, No 124, item 1151)

                                  Act on insurance mediation of May 22, 2003 (Journal of Laws 2003, No 124, item 1154), arts. 16 and 31

**Description:**                  **Financial Services**

                                  Local incorporation (no branches) required for insurance intermediaries.


**Sector:**                       Transport

**Sub-Sector:**                   Supporting services for air transport

**Industry Classification:**      Part of CPC 742

**Type of Reservation:**          National treatment

                                  Market access

**Level of Government:** National

**Measures:** Polish Aviation Law of 3 July 2002, Articles 174.2 and 174.3 3

**Description:** **Investment**

For storage services of frozen or refrigerated goods and bulk storage services of liquids or gases at airports, the possibility to supply certain categories of services will depend on the size of the airport. The number of suppliers in each airport may be limited due to available space constraints, and to not less than two suppliers for other reasons.

For airport operation services, foreign participation is limited to 49 per cent.

**Sector:** Energy

**Sub-Sector:** Production, transmission and distribution of electricity

Bulk storage services of liquids or gases

Services incidental to energy distribution

Wholesale or retail of electricity

**Industry Classification:** ISIC rev 3.1 040, CPC 63297, CPC 74220, CPC 887

**Type of Reservation:** National treatment

Market access

**Level of Government:** National

**Measures:** Energy Law Act of 10 April 1997, arts. 32 and 33

**Description:** **Investment and Cross-Border Trade in Services**

The following activities are subject to licensing under the Energy Law Act:

(a) the generation of fuels or energy, except for: generation of solid or gaseous fuels; generation of electricity using electricity sources of the total capacity of not more than 50 MW other than renewable energy sources; cogeneration of electricity and heat using sources of the total capacity of not more than five MW other than renewable energy sources; generation of heat using the sources of the total capacity of not more than five MW;

(b) storage of gaseous fuels in storage installations, liquefaction

1143

of natural gas and regasification of liquefied natural gas at LNG installations, as well as the storage of liquid fuels, except for: the local storage of liquid gas at installations of the capacity of less than one MJ/s capacity and the storage of liquid fuels in retail trade;

(c) the transmission or distribution of fuels or energy, except for: the distribution of gaseous fuels in grids of less than 1 MJ/s capacity and the transmission or distribution of heat if the total capacity ordered by customers does not exceed 5 MW;

(d) the trade in fuels or energy, except for: the trade in solid fuels; the trade in electricity using installations of voltage lower than one kV owned by the customer; the trade in gaseous fuels if their annual turnover value does not exceed the equivalent of EUR 100,000; the trade in liquid gas, if the annual turnover value does not exceed EUR 10,000; and the trade in gaseous fuels and electricity performed on commodity exchanges by brokerage houses which conduct the brokerage activity on the exchange commodities on the basis of the Act of 26 October 2000 on commodity exchanges, as well as the trade in heat if the capacity ordered by the customers does not exceed five MW. The limits on turnover do not apply to wholesale trade services in gaseous fuels or liquid gas or to retail services of bottled gas.

A licence may only be granted by the Competent Authority to an applicant that has registered their principal place of business or residence in the territory of a Member State of the EU, Member State of the EEA or the Swiss Confederation.

***

## Reservations applicable in Portugal

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | Law 15/2005, arts. 203,194 |
| | PortugueseBarStatute (Estatuto da Ordem dos Advogados) and Decree-Law 229/2004, arts. 5, 7 - 9 |
| | Decree-law 88/2003, arts. 77 and 102 |
| | Solicitadores Public Professional Association Statute (Estatuto da Câmara dos Solicitadores), as amended by Law 49/2004, by Law 14/2006 and by Decree-Law n.º 226/2008 |
| | Law 78/2001, arts. 31, 4. |
| | Regulation of family and labour mediation (Ordinance 282/2010) |
| | Law 21/2007 on criminal mediation, art. 12 |
| | Law 32/2004 (as modified by Decree-Law 282/2007 and Law 34/2009) on Insolvency administrator, arts. 3 and 5, among others |
| | Decree-Law 54/2004, art. 1 (Regime jurídico das sociedades de administradores de insolvência) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services, including representation before courts. Residency (commercial presence) is required in order to practice Portuguese law. The recognition of qualifications to practice Portuguese law is subject to a condition of reciprocity.

To provide legal services, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

Only law firms where the shares belong exclusively to lawyers admitted to the Portuguese Bar can practice in Portugal; access to the profession of "solicitadores" is subject to a nationality of a

1145

Member State of the EU condition.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting services |
| | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212, CPC 86213, CPC 86219 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Decree-Law 452/99, amended and republished by Decree-Law 310/2009 – Portuguese Public Professional Association Statute for Accountants (Estatuto da Ordem dos Técnicos Oficiais de Contas), arts. 85, 87 |
| | Decree-Law 487/99, amended and republished by Decree-Law 224/2008 – Portuguese Public Professional Association for Statutory Auditors (Estatuto da Ordem dos Revisores Oficiais de Contas). Arts. 95-97 |
| **Description:** | **Investment** |
| | Accounting services: Only locally licensed accountants can own accountancy firms. However, accounting services may also be provided by a legal person incorporated under the Portuguese company code without such ownership restrictions, in so far as the actual accounting services are provided by a locally licensed accountant |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Collection agency services |
| | Credit reporting services |
| **Industry Classification:** | CPC 87901, CPC 87902 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law 49/2004 |

**Description:**   **Investment**

Nationality of a Member State of the EU is required for the provision of collection agency services and credit reporting services.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Industrial property agent |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Decree-Law 15/95, as modified by Law 17/2010, on industrial property agents, art. 2 |
| | Portaria 1200/2010, art. 5 |
| **Description:** | **Cross-Border Trade in Services** |

Industrial property agents are subject to a condition of nationality of a Member State of the EEA.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Decree-Law 368/91 (Statute of the Veterinary Professional Association) |
| **Description:** | **Cross-Border Trade in Services** |

Residency is required in order to provide veterinary services.

1147

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Real estate services |
| **Industry Classification:** | CPC 821, CPC 822 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Decree-Law 211/2004 (arts. 3 and 25), as amended and republished by Decree-Law 69/2011 |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Residency in a Member State of the EEA is required for natural persons. Incorporation in a Member State of the EEA is required for legal persons. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services related to agriculture |
| **Industry Classification:** | Part of CPC 88 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Decree Law 119/92 |
| | Law 47/2011 |
| | Decree Law 183/98 |
| **Description:** | **Cross-Border Trade in Services** |
| | The professions of biologist, chemical analyst and agronomist are reserved for natural persons. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law 34/2013 |
| | Ordinance 273/2013 |
| **Description:** | **Cross-Border Trade in Services** |

The provision of security services by a foreign supplier on a cross-border basis is not allowed.

A nationality condition exists for specialised personnel.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retailing Services |
| **Industry Classification:** | CPC 631, CPC 632 other than CPC 6321, CPC 63297 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Decree-Law No. 21/2009, 19 January |
| | Ordinances n.º 417/2009 and 418/2009, 16 April |
| **Description:** | **Investment** |

A specific authorisation scheme exists for the installation of certain retail establishments. This relates to establishments having a sales area exceeding 2,000 m$^2$, establishments belonging to a company or pertaining to a commercial group that have an accumulated sales area equal to or greater than 30 000 m$^2$, or commercial outlets that have a gross floor area greater than or equal to 8000 m$^2$. Micro-enterprises are excluded.

Main criteria: Contribution to a multiplicity of commercial offers; assessment of services to consumer; quality of employment and corporate social responsibility; integration in urban environment; and contribution to eco-efficiency.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |

| | |
|---|---|
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Decree-Law 307/2007, arts. 9, 14, 15<br>Ordinance 1430/2007 |
| **Description:** | **Investment** |

Establishment authorisation is subject to an economic needs test. Main criteria: density conditions in the area.

In commercial companies where the capital is represented by shares, these shall be nominative. No person may hold or exercise, at the same time, directly or indirectly, ownership, operation or management of more than four pharmacies.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Chapter I, Section VI of Decree-Law 94-B/98, arts. 34, nr. 6, 7 |
| **Description:** | **Financial Services** |

In order to establish a branch in Portugal, foreign insurance companies need to demonstrate prior operational experience of at least five years. Direct branching is not permitted for insurance intermediation, which is reserved to companies formed in accordance with the law of a Member State of the EU.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |

**Level of Government:**     National

**Measures:**     Decree-Law 12/2006, as amended by Decree-Law 180/2007 Decree-Law 357-A/2007, Regulation 7/2007-R, as amended by Regulation 2/2008-R

Regulation 19/2008-R

Regulation 8/2009

**Description:**     **Financial Services**

Pension fund management may be provided only by specialised companies incorporated in Portugal for that purpose and by insurance companies established in Portugal and authorised to take up the life insurance business, or by entities authorised to pension fund management in other Member States of the EU. Direct branching from non-EU countries is not permitted.

**Sector:**     Fishing, transport

**Sub-Sector:**     All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing

Transport services (passengers and freight) by seagoing vessels

Pilotage and berthing services

Vessel salvage and refloating services

Other supporting services for water transport

Construction for waterways, harbours, dams and other water works

**Industry Classification:**     ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5122, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882

**Type of Reservation:**     National treatment

Market access

**Level of Government:**     National

**Measures:**     Decree-Law 194/98

Decree-Law 197/98

Decree-Law 331/99

**Description:**     **Investment**

To register a vessel on the national shipping register, foreign

1151

investors must have their principal office in Portugal.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport |
| **Industry Classification:** | CPC 71222 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Decree-Law 41/80, August 21 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Economic needs test for limousine services. Main criteria: number of and impact on existing establishments, population density, geographic spread, impact on traffic conditions and creation of new employment

***

## Reservations applicable in Romania

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Most-favoured –nation treatment |
| **Level of Government:** | National |
| **Measures:** | Law 312/2005, regarding acquisition of property over land by foreign citizens and stateless persons, as well as foreign legal persons |
| **Description:** | **Investment** |

Foreign nationals, stateless persons and legal persons (other than nationals of a Member State of the EU and nationals of a Member State of the EEA) may acquire property rights over lands, under the conditions regulated by international treaties, based on reciprocity.

Foreign nationals, stateless persons and juridical persons may not acquire the property right over lands under more favourable conditions than those applicable to the national of a Member State of the EU and to juridical persons established according to the legislation of a Member State of the EU.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Attorney Law |
| | Law for Mediation |

Law for the Notaries and the Notarial Activity

**Description:**             **Investment and Cross-Border Trade in Services**

Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts.

A foreign lawyer may practice the legal profession in one of the forms allowed under national law of their choice, on a non-discriminatory basis. These legal forms are described in art. 5 para. 1 of the Law 51/1995 (*individual law offices, associated law offices, professional civil companies, or limited-liability professional civil companies*).

A foreign lawyer may not make oral or written conclusions before the courts and other judicial bodies, except for international arbitration.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212 other than accounting services |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |

**Measures:**             Emergency Governmental Ordinance no. 90/2008, with subsequent amendments, which transposed the provisions of Directive 2006/43/EC of the European Parliament and of the Council of 17 May 2006 on statutory audits of annual accounts and consolidated accounts, amending Council Directives 78/660/EEC and 83/349/EEC and repealing Council Directive 84/253/EEC

**Description:**             **Investment and Cross-Border Trade in Services**

A statutory audit activity shall be carried out only by the statutory auditors or audit firms who are approved under the conditions provided for by Emergency Ordinance no. 90/2008.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |

**Industry Classification:**

| | |
|---|---|
| **Type of Reservation:** | Market access |
| | National treatment |
| **Level of Government:** | National |
| **Measures:** | Law no. 297/2004 on capital markets |
| | CNVM ("Comisia Nationala a Valorilor Mobiliare") Regulation no. 2/2006 on regulated markets and alternative trading systems |
| **Description:** | **Financial Services** |
| | Market operators are Romanian legal persons set up as joint stock companies according to the provisions of the Company Law. The alternative trading systems could be managed by a system operator set up under the conditions described above or by an investment firm authorised by CNVM. |

| | |
|---|---|
| **Sector:** | Fishing, transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing , aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5122, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Government Ordinance No. 42 of 28 August 1997 |
| | Ministerial Order No. 1627/2006 |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |

The right to fly the Romanian flag is granted:

(a) to ships owned by Romanian natural or legal persons;

(b) to seagoing ships owned by natural persons having the nationality of a Member State of the EU or of a Member State of the European Economic Area or by legal persons established (having their headquarters) in a Member State of the EU or a Member State of the EEA;

(c) to ships owned by foreign natural persons having their domicile or residents of Romania or by the Romanian branches of the foreign legal persons, other than those mentioned in sub-paragraph (b); and

(d) to ships owned by foreign natural or legal persons and hired by means of bare-boat or leasing charters, for periods longer than one year, by Romanian or foreign natural or legal persons.

Granting the right to fly the Romanian flag is forbidden for ships of 20 years or more.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Other scheduled passenger transportation |
| | Operators of road freight transport services |
| | Other non-scheduled passenger transportation |
| **Industry Classification:** | CPC 7121, CPC 7122, CPC 7123 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Romanian law on road transportation (Government Ordinance no. 27/2011) |
| **Description:** | **Cross-Border Trade in Services** |
| | Road haulage and road passenger transport operators may only use vehicles that are registered in Romania, owned and used according to the Government Ordinance provisions. |

\*\*\*

1156

## Reservations applicable in the Slovak Republic

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act 586/2003 on Advocacy, art. 2, 12 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Full admission to the Bar is required for the practice of legal services in respect of Slovakian law, including representation before courts. Residency (commercial presence) is required in order to obtain full admission to the Bar.

To provide legal services in respect of Slovakian law, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

Only nationals of a Member State of the EEA or of the Swiss Confederation may be admitted to the Bar, and are thus entitled to provide legal services in respect of Slovakian law.

| | |
|---|---|
| **Sector:** | Mining and quarrying |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 10, ISIC rev 3.1 11, ISIC rev 3.1 12, ISIC rev 3.1 13, ISIC rev 3.1 14, CPC 7131 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Act 51/1988 on Mining, art. 4a |
| | Act 313/1999 on Geological Activity, art. 5 |

**Description:**    **Investment and Cross-Border Trade in Services**

For mining, activities related to mining and geological activity, incorporation in a Member State of the EU or a Member State of the EEA is required (no branching).

**Sector:**    Business services

**Sub-Sector:**    Auditing services

**Industry Classification:**    CPC 86211, CPC86212 other than accounting services

**Type of Reservation:**    National treatment

Senior management and boards of directors

Market access

**Level of Government:**    National

**Measures:**    Act No 540/2007 on Auditors, arts. 3, 4, 5

**Description:**    **Investment**

Only an enterprise in which at least 60 per cent of capital interests or voting rights are reserved to Slovak nationals or nationals of a Member State of the EU may be authorised to carry out audits in the Slovak Republic.

**Sector:**    Business services

**Sub-Sector:**    Architectural services

Urban planning and landscape architectural services Engineering services

Integrated engineering services

**Industry Classification:**    CPC 8671, CPC 8672, CPC 8673, CPC 8674

**Type of Reservation:**    National treatment

Market access

**Level of Government:**    National

**Measures:**    Act 138/1992 on Architects and Engineers, arts. 3, 15, 15a, 17a, 18a

1158

**Description:**          **Cross-Border Trade in Services**

For the provision of these services by a physical person present in the territory of the Slovak Republic, membership in the Slovak Chamber of Architects or Slovak Chamber of Engineers is obligatory. Slovak residency is required for membership.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act 442/2004 on Private Veterinary Doctors, art. 2 |
| **Description:** | **Cross-Border Trade in Services** |

Obligatory membership in the Slovak Chamber of Veterinary Doctors. Residency in the Slovak Republic is required for membership.

Access is restricted to natural persons only.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Act 140/1998 on drugs and medical devices, art. 35a |
| | Act 578/2004 on healthcare providers, medical employees, professional organisation |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Residency is required in order to obtain a licence as a pharmacist

or to open a pharmacy for the retail of pharmaceuticals and certain medical goods to the public.

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Higher education services |
| **Industry Classification:** | CPC 92 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Law No. 131 of 21 February 2002 on Higher Education and on Changes and Supplements to Some Laws |
| **Description:** | **Investment** |

Establishment in a Member State of the EU is required to apply for state approval to operate as a privately funded higher education institution. This reservation does not apply to secondary technical and vocational education services.

| | |
|---|---|
| **Sector:** | Environmental services |
| **Sub-Sector:** | Processing and recycling of used batteries and accumulators, waste oils, old cars and waste from electrical and electronic equipment |
| **Industry Classification:** | Part of CPC 9402 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Act 223/2001 on Waste |
| **Description:** | **Cross-Border Trade in Services** |

For processing and recycling of used batteries and accumulators, waste oils, old cars and waste from electrical and electronic equipment, incorporation in a Member State of the EU or a Member State of the EEA is required (residency requirement).

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Medical and dental services, midwives services, nursing, physiotherapeutic and para-medical services |
| **Industry Classification:** | CPC 9312, CPC 9319 |
| **Type of Reservation:** | Market access |
| | National |
| **Level of Government:** | Health services |
| **Measures:** | Act 576/2004 on Health Treatment |
| | Act 578/2004 on health care providers, medical employees, professional organisation |
| **Description:** | **Cross-Border Trade in Services** |
| | Services may only be provided by natural persons. |

| | |
|---|---|
| **Sector:** | Fishing |
| | Transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Act 435/2000 on Maritime Navigation, art. 10 |
| **Description:** | **Investment and International Maritime Transport Services** |

In the Slovak Republic, in order to register a vessel on the national shipping register, legal persons have to be established in the Slovak Republic and natural persons have to be national of the Slovak Republic and with permanent residence in the Slovak Republic.

***

## Reservations applicable in Slovenia

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Zakon o odvetništvu (Neuradno prečiščeno besedilo-ZOdv-NPB2 Državnega Zbora RS z dne 21.5.2009 (Attorneys Act) unofficial consolidated text prepared by the Slovenian parliament from 21 5.2010) |
| **Description:** | **Investment** |
| | Commercial presence for appointed attorneys by the Slovene Bar Association is restricted to sole proprietorship, law firm with limited liability (partnership) or to a law firm with unlimited liability (partnership) only. The activities of a law firm shall be restricted to the practice of law. Only attorneys may be partners in a law firm. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting and bookkeeping services |
| | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212, CPC 86213, CPC 86219, CPC 86220 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Zakon o revidiranju (Zrev-2 Uradni list RS,št.65/2008), (Auditing Act -Official Gazetee RS No 65/2008) |
| **Description:** | **Cross-Border Trade in Services** |
| | Commercial presence is required. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Real estate services |
| **Industry Classification:** | CPC 821, CPC 822 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | Real Estate Agencies Act |
| **Description:** | **Cross-Border Trade in Services** |

In so far as Canada and its provinces and territories allow Slovenian nationals and enterprises to supply real estate agent services, Slovenia will allow nationals of Canada and enterprises to supply real estate agent services under the same conditions, in addition to the fulfilment of the following requirements: entitlement to act as a real estate agent in the country of origin, submission of the relevant document on impunity in criminal procedures, and inscription into the registry of real estate agents at the competent (Slovenian) ministry.

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Law on Pharmacy Activities (Official Gazette No. 36/2004), arts. 2, 6-8, 13-14 |
| | Medicinal Products Act (Official Gazette of the RS, no. 31/06, 45/08), arts. 17, 21, 74, 79, 81 |
| **Description:** | **Investment** |

Pharmacy activity can be performed on the basis of concessions by private persons granted by the competent administrative body of the commune or municipality with the agreement of the Ministry of Health, after the prior opinion of the Chamber of

1164

Pharmacy and the Institute for Health Insurance of Slovenia.

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Primary education services |
| **Industry Classification:** | CPC 921 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Organisation and Financing of Education Act (Official Gazette of Republic of Slovenia, no. 12/1996) and its revisions, art. 40 |
| **Description:** | **Investment** |
| | Privately funded elementary schools may be founded by Slovenian natural or legal persons only. |
| | The service supplier must establish a registered office or branch office. |

| | |
|---|---|
| **Sector:** | Health and social services |
| **Sub-Sector:** | Human health services |
| **Industry Classification:** | CPC 931 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Law of Health Services, Official Gazette of the RS, No. 23/2005, arts. 1,3, 62-64 |
| | Infertility Treatment and Procedures of the Biomedically-Assisted Procreation Act, Official Gazette of the RS, No.: 70/00, arts. 15 and 16 |
| **Description:** | **Investment** |
| | A state monopoly is reserved for the following services: |
| | Supply of blood, blood preparations, removal and preservation of human organs for transplant, sociomedical, hygiene, epidemiological and health-ecological services, patho- |

anatomical services, and biomedically-assisted procreation.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Pension and Disability Insurance Act (Official Gazette no. 109/2006), art. 306 |
| **Description:** | **Financial Services** |

A pension scheme may be provided by a mutual pension fund (which is not a legal entity and is therefore managed by an insurance company, a bank or a pension company), a pension company or an insurance company. Additionally a pension scheme can also be offered by pension scheme providers established in accordance with the regulations applicable in a Member State of the EU.

| | |
|---|---|
| **Sector:** | Energy services |
| **Sub-Sector:** | Pipeline transportation of fuels |
| | Storage and warehouse of fuels transported through pipelines |
| **Industry Classification:** | CPC 7131, part of CPC 742 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Energetski zakon (Energetic Act), Official Gazette RS, No 27/07- consolidated text, 70/80, 22/2010 |
| **Description:** | **Cross-Border Trade in Services** |

A licence is required to perform the production, trading and distribution of liquid fuels, processing of oil and petroleum products, transmission and distribution of energy and fuels through networks, storing of gaseous, liquid and solid fuels,

supply of electricity, gas or heat, operation of electricity or natural gas market, and representation and intermediation in electricity and natural gas markets.

These activities are subject to registration, which is conditioned on establishment in Slovenia.

| | |
|---|---|
| **Sector:** | Fishing |
| | Transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Article 210 of the Maritime Code |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |

Seagoing non-merchant ships may be registered to fly the Slovenian flag if:

(a) more than half of the ship is owned by citizens of the Republic of Slovenia, nationals of a Member State of the EU or by juridical persons having their headquarters in Slovenia or a Member State of the EU; or

(b) more than half of the ship is owned by a non-national of a Member State of the EU and the ship operator qualifies as one of the persons described in the previous paragraph, with the consent of the owner of the ship

If the owner or co-owner is not a citizen of Slovenia or a

juridical person having their headquarters in Slovenia, an authorised representative needs to be appointed to accept the service of judicial and administrative writs, prior to registering the ship. The authorisation must be communicated to the competent authority, responsible for keeping the register.

Nuclear ships cannot be registered.

***

## Reservations applicable in Spain

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Royal Decree 664/1999 of 23 April 1999 relating to foreign investment |
| **Description:** | **Investment** |
| | Foreign investment in activities directly relating to real estate investments for diplomatic missions by States that are not members of the EU require an administrative authorisation from the Spanish Council of Ministers, unless there is a reciprocal liberalisation agreement in place. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Estatuto General de la Abogacía Española, aprobado por Real Decreto 658/2001, art. 13.1ª |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Full admission to the Bar is required for the practice of legal services in respect of EU law and the law of a Member State of the EU, including representation before courts. |
| | Only nationals of a Member State of the EEA or of the Swiss Confederation may be admitted to the Bar, and are thus entitled |

to provide legal services in respect of domestic law.

To provide legal services in respect of EU law and the law of a Member State of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. Some types of legal form may be reserved exclusively to lawyers admitted to the Bar, also on a non-discriminatory basis.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212 other than accounting services |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Real Decreto Legislativo 1/2011 de 1 de julio por el que se aprueba el texto refundido de la Ley de Auditoria de Cuentas, arts. 8.1, 8.2.c, 9.2, 9.3,10.1 |
| **Description:** | **Cross-Border Trade in Services** |

Statutory auditors are subject to a nationality of a Member State of the EU condition. This reservation does not apply to the auditing of non-EU companies listed in a Spanish regulated market.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Intellectual property attorney |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Ley 11/1986, de 20 de marzo, de Patentes de Invención y Modelos de utilidad, arts. 155-157 |
| **Description:** | **Cross-Border Trade in Services** |

Industrial property attorneys are subject to a nationality of a Member State of the EU condition.

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Real Decreto 1840/2000. Estatutos Generales de la Organización Colegial Veterinaria Española (Statute of the Veterinary Association of Spain), arts. 62, 64 |
| **Description:** | **Cross-Border Trade in Services** |
| | Membership in a professional association is obligatory and subject to a nationality of a Member State of the EU condition, which may be waived through a bilateral professional agreement. |

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of tobacco |
| **Industry Classification:** | CPC 63108 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Ley 13/1998 de 4 de Mayo de Ordenación del Mercado de Tabacos y Normativa Tributaria, art. 4 |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | State monopoly on retail sales of tobacco. Establishment is subject to a nationality of a Member State of the EU condition. |

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Ley 16/1997, de 25 de abril, de regulación de servicios de las oficinas de farmacia (Law 16/1997, of 25 April, regulating services in pharmacies), arts. 2, 3.1 |
| **Description:** | **Investment** |

Only natural persons are permitted to provide retail services of pharmaceuticals and specific medical goods to the public.

Establishment authorisation is subject to an economic needs test. Main criteria: density conditions in the area.

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Higher education services |
| **Industry Classification:** | CPC 923 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | **Ley Orgánica 6/2001, de 21 de Diciembre, de Universidades.** (Law 6 / 2001 of 21 December, on Universities), art. 4 |
| **Description:** | **Investment** |

An authorisation is required in order to open a privately funded university which issues recognised diplomas or degrees; the procedure involves obtaining the advice of the Parliament. An economic needs test is applied, main criteria are population size and density of existing establishments.

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |

**Industry Classification:**

**Type of Reservation:**      National treatment

                             Market access

**Level of Government:**      National

**Measures:**                **Real Decreto Legislativo 6/2004, de 29 de octubre, por el que se aprueba el texto refundido de la Ley de ordenación y supervisión de los seguros privados** (Law on regulation and supervision of private insurance)

**Description:**             **Financial Services**

                             Before establishing a branch or agency in Spain in order to provide certain classes of insurance, a foreign insurer must have been authorised to operate in the same classes of insurance in its country of origin for at least five years.


**Sector:**                  Tourism and travel related services

**Sub-Sector:**              Tourist guides services

**Industry Classification:** CPC 7472

**Type of Reservation:**      National treatment

                             Market access

**Level of Government:**      Regional (Sub-federal)

**Measures:**                **Andalucía**
                             **Decreto 80/2010, de 30 de marzo, de simplificación de trámites administrativos y de modificación de diversos Decretos para su adaptación al Decreto-ley 3/2009, de 22 de diciembre, por el que se modifican diversas Leyes para la transposición en Andalucía de la Directiva relativa a los Servicios en el Mercado Interior, art 3.5**
                             **Aragón**

                             Decreto 264/2007, de 23 de octubre, del Gobierno de Aragón, por el que se aprueba el Reglamento de Guías de Turismo, art. 13

                             **Cantabria**

                             Decreto 51/2001, de 24 de julio, art. 4, por el que se modifica el

Decreto 32/1997, de 25 de abril, por el que se aprueba el reglamento para el ejercicio de actividades turístico-informativas privadas

**Castilla y León**

Decreto 25/2000, de 10 de febrero, por el que se modifica el Decreto 101/1995, de 25 de mayo, por el que se regula la profesión de guía de turismo de la Comunidad Autónoma de Castilla y León.

**Castilla la Mancha**

Decreto 96/2006 , de 17 de julio, de Ordenación de las Profesiones Turísticas.

**Cataluña**

Decreto Legislativo 3/2010, de 5 de octubre, para la adecuación de normas con rango de ley a la Directiva 2006/123/CE, del Parlamento y del Consejo, de 12 de diciembre de 2006, relativa a los servicios en el mercado interior, art. 88.

**Comunidad de Madrid**

Decreto 84/2006, de 26 de octubre del Consejo de Gobierno, por el que se modifica el Decreto 47/1996, de 28 de Marzo.

**Comunidad Valenciana**

Decreto 90/2010, de 21 de mayo, del Consell, por el que se modifica el reglamento regulador de la profesión de guía de turismo en el ámbito territorial de la Comunitat Valenciana, aprobado por el Decreto 62/1996, de 25 de marzo, del Consell.

**Extremadura**
Decreto 43/2000, de 22 de febrero, por el que se modifica el Decreto 12/1996, de 6 de febrero, por el que se aprueba el reglamento de la actividad profesional de Guía Turístico
**Galicia**

Decreto 42/2001, de 1 de febrero, de Refundición en materia de agencias de viajes, guias de turismo y turismo activo.

**Illes Balears**

Decreto 136/2000, de 22 de septiembre, por el cual se modifica el Decreto 112/1996, de 21 de junio, por el que se regula la

habilitación de guía turístico en las Islas Baleares.

**Islas Canarias**
**Decreto 13/2010, de 11 de febrero, por el que se regula el acceso y ejercicio de la profesión de guía de turismo en la Comunidad Autónoma de Canarias, art 5**
**La Rioja**

Decreto 20/2000, de 28 de abril, de modificación del Decreto 27/1997, de 30 de abril, por el que se aprueba el Reglamento regulador de la profesión de Guías de Turismo.

**Navarra**

Decreto 125/95, de 20 de mayo, por el que se regula la profesión de guias de turismo en Navarra.

**Principado de Asturias**

Decreto 59/2007, de 24 de mayo, por el que se aprueba el Reglamento regulador de la profesión de Guía de Turismo en el Principado de Asturias.

**Región de Murcia**

Decreto n.º 37/2011, de 8 de abril, por el que se modifican diversos decretos en materia de turismo para su adaptación a la ley 11/1997, de 12 de diciembre, de turismo de la Región de Murcia tras su modificación por la ley 12/2009, de 11 de diciembre, por la que se modifican diversas leyes para su adaptación a la directiva 2006/123/CE, del Parlamento Europeo y del Consejo de 12 de diciembre de 2006, relativa a los servicios en el mercado interior (los guías podrían ser extranjeros si tienen homologación de las titulaciones requeridas)

**Description:**          **Cross-Border Trade in Services**

Nationality of a Member State of the EU condition for the provision of tourist guide services.

**Sector:**               Fishing, transport

**Sub-Sector:**           All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing

Transport services (passengers and freight) by seagoing vessels

Pilotage and berthing services

1175

Vessel salvage and refloating services

Other supporting services for water transport

Construction for waterways, harbours, dams and other water works

| | |
|---|---|
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.10502, CPC 5133, CPC5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Law of Ports and Maritime Shipping(Royal Legislative Decree 2/2011) Articles 251, 252, 253, and Additional Disposition 16 th indent 4.a) as well as Article 6, in Royal Decree 1516/2007 on the legal regime of cabotage and maritime navigation of public interest |
| **Description:** | **Investment and International Maritime Transport Services** |

In order to register a ship on the national register of Spain and to fly the national flag, the owner of that ship or the person who has exclusive possession of that ship must be Spanish or established in Spain or incorporated in other Member State of the EU.

To register a ship in the Especial Register Islands, the owner company must be established in the Canary Islands.

***

## Reservations applicable in Sweden

**Sector:**                          All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**             National treatment

                                     Market access

**Level of Government:**             National

**Measures:**                        Lag om utländska filialer m.m (Foreign Branch Offices Act) (1992:160)

                                     Aktiebolagslagen (Companies Act) (2005:551),

                                     The Co-operative Economic Associations Act (1987:667)

                                     Act on European Economic Interest Groupings (1994:1927)

**Description:**                     **Investment**

**A foreign company, which has not established a legal entity in Sweden** or is conducting its business through a commercial agent**, shall conduct its commercial operations through a branch, registered in Sweden, with independent management and separate accounts.** The managing director and the vice-managing director, if appointed, of the branch, must reside in the EEA. A natural person not resident in the EEA, who conducts commercial operations in Sweden, shall appoint and register a resident representative responsible for the operations in Sweden. Separate accounts shall be kept for the operations in Sweden. The competent authority may in individual cases grant exemptions from the branch and residency requirements. Building projects with duration of less than a year - conducted by a company located or a natural person residing outside the EEA - are exempted from the requirements of establishing a branch or appointing a resident representative.

A Swedish limited liability company may be established by a natural person resident within the EEA, by a Swedish legal person or by a legal person that has been formed according to the legislation in a state within the EEA and that has its registered office, head quarters or principal place of business within the EEA. A partnership may be a founder, only if all owners with unlimited personal liability are resident within the EEA. Founders outside the EEA may apply for permission from the

competent authority.

For limited liability companies and co-operative economic associations, at least 50 per cent of the members of the board of directors, at least 50 per cent of the deputy board members, the managing director, the vice-managing director, and at least one of the persons authorised to sign for the company, if any, must reside within the EEA. The competent authority may grant exemptions from this requirement. If none of the company's or society's representatives reside in Sweden, the board must appoint and register a person resident in Sweden, who has been authorised to receive servings on behalf of the company or society.

Corresponding conditions prevail for establishment of all other types of legal entities.

| | |
|---|---|
| **Sector:** | Animal husbandry |
| **Sub-Sector:** | Reindeer husbandry |
| **Industry Classification:** | ISIC rev 3.1 014 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Reindeer Husbandry Act (1971:437), para. 1 |
| **Description:** | **Investment** |
| | Only Sami people may own and practice reindeer husbandry. |

| | |
|---|---|
| **Sector:** | Fishing and aquaculture |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |

| | |
|---|---|
| **Measures:** | Maritime Law (1994:1009) |
| | Fisheries Act (1993:787) |
| | Ordinance for fishing, aquaculture and the fishing industry (1994:1716) |
| | The Fishing Regulations of the National Board of Fisheries (2004:25) |
| | The Ship Security Regulation (2003:438) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Professional fishing is fishing with a professional fishing licence or fishing by foreign fishermen holding a specific permit to fish professionally in Swedish territorial waters or in the Swedish economic zone.

A professional fishing licence may be given to a fisherman for whom fishing is essential to his living and where the fishing has a connection to the Swedish fishing industry. A connection to Swedish fishing industry could for example be demonstrated if the fishermen lands half his catch during a calendar year (in value) in Sweden, if half the fishing trips depart from a Swedish harbour or half of the fishermen in the fleet are domiciled in Sweden.

For vessels over five meters, a vessel permit is needed together with the professional fishing licence. A permit is granted if, among other things, the vessel is registered in the national registry, the vessel has a real economic connection to Sweden, the permit holder is a fisherman with a professional fishing licence and if the commander of the vessel is a fisherman with a professional fishing licence.

The commander of a fishing vessel over 20 gross tonnages shall be a national of a Member State of the EEA. Exemptions may be granted by the Swedish Transport Agency.

A ship shall be deemed Swedish and can carry the Swedish flag if more than half is owned by Swedish citizens or juridical persons. The Government may permit foreign vessels to fly the Swedish flag where their operations are under Swedish control or the owner can demonstrate that he has his permanent residence in Sweden. Vessels which are 50 per cent owned by nationals of a Member State of the EEA or companies having their registered office, central administration or principal place of business in the EEA and whose operation is controlled from Sweden, may also be registered in the Swedish register.

1179

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Rättegångsbalken (The Swedish Code of Judicial Procedure) (1942:740) |
| | The Swedish Bar Association Code of Conduct adopted 29 August 2008 |
| **Description:** | **Investment and Cross-Border Trade in Services** |

For admission to the Bar, which is required only for the use of the Swedish title "*advokat*", residency within the EU, EEA or the Swiss Confederation is required. Exemptions may be granted by the board of the Swedish Bar Association. Admission to the Bar is not necessary for the practice of domestic law.

A member of the Swedish Bar Association may not be employed by anyone other than a Bar member or a company conducting the business of a Bar member. However, a member of the Bar may be employed by a foreign company conducting the business of an advocate, provided that the company in question is domiciled in a country within the EU, the EEA or the Swiss Confederation.

Members conducting their practice in the form of a company or a partnership may not have any other objective and may not carry out any other business than the practice of an advocate. Collaboration with other advocate businesses is permitted, however, collaboration with foreign businesses requires permission by the Board of the Bar Association.

Only a Member may directly or indirectly, or through a company, practice as an advocate, own shares in the company or be a partner. Only a Member may be a member or deputy member of the board or deputy managing director, or an authorised signatory or secretary of the company or the partnership.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC86212 other than accounting services |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Revisorslagen (Auditors Act) (2001:883) |
| | Revisionslag (Auditing Act) (1999:1079) |
| | Aktiebolagslagen (Companies Act) (2005:551) |
| | Lag om ekonomiska föreningar (The Co-operative Economic Associations Act) (1987:667) |
| | Others, regulating the requirements to make use of approved auditors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Only auditors approved in Sweden, authorised auditors and registered auditing firms may perform statutory auditing services in certain legal entities, including in all limited companies, as well as natural persons.

Only auditors approved in Sweden, and registered public accounting firms, may be shareholders or form partnerships in companies which practice qualified auditing (for official purposes).

Residency within the EEA orthe Swiss Confederation is required for approval.

The titles of "approved auditor" and "authorised auditor" may only be used by auditors approved or authorised in Sweden.

Auditors of co-operative economic associations and certain other enterprises who are not certified or approved accountants must be resident within the EEA, unless the Government, or a Government authority appointed by the Government, in a particular case allows otherwise.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Rental or leasing of vehicles without operators |

| | |
|---|---|
| **Industry Classification:** | CPC 831 |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Central |
| **Measures:** | Lag (1998:424) om biluthyrning (Act on renting and leasing cars) |
| **Description:** | **Cross-Border Trade in Services** |

Suppliers of rental or leasing services of cars and certain off-road vehicles (terrängmotorfordon) without a driver, rented or leased for a period of less than one year, are obliged to appoint someone to be responsible for ensuring, among other things, that the business is conducted in accordance with applicable rules and regulations and that the road traffic safety rules are followed. The responsible person must reside in Sweden.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Rental or leasing services without operators |
| | Rental or leasing of ships |
| **Industry Classification:** | CPC 83103 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Sjölagen (Maritime Law) (1994:1009), Chapter 1, § 1 |
| **Description:** | **Investment** |

To fly the Swedish flag, proof of dominating Swedish operating influence must be shown in case of foreign ownership interests in ships. Dominating Swedish influence means a proportionally large share of Swedish ownership in the ship, and that the operation of the ship is located in Sweden.

Foreign ships may be granted an exemption from this rule where they are rented or leased by Swedish legal persons through bareboat charter contracts. To be granted an exemption, the bareboat charter contract must be provided to the Swedish Maritime Administration and demonstrate that the charterer takes full responsibility for operation and crew of the leased or

rented ship. The duration of the contract should be at least one to two years.

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Other business services |
| **Industry Classification:** | CPC 87909 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Cooperative building societies law (1991:614) |
| **Description:** | **Cross-Border Trade in Services** |

The economic plan for a building society must be certified by two persons. These persons must be publicly approved by authorities in the EEA.

| | |
|---|---|
| **Sector:** | Other business services n.e.c. |
| **Sub-Sector:** | Pawn-shops |
| **Industry Classification:** | Part of CPC 87909 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | PAWN SHOP ACT (1995:1000) |
| **Description:** | **Investment** |

Pawn-shops must be established as a limited liability company or as a branch.

| | |
|---|---|
| **Sector:** | Distribution services |
| **Sub-Sector:** | Retailing services |
| **Industry Classification:** | Part of CPC 631, part of CPC 6322 |
| **Type of Reservation:** | Market access |

**Level of Government:**    National

**Measures:**    The Alcohol Act (2010:1622)

**Description:**    **Investment and Cross-Border Trade in Services**

Systembolaget AB has a governmental monopoly on retail sales of liquor, wine and beer (except non-alcoholic beer). Alcoholic beverages are beverages with an alcohol content over 2.25 percentage per volume. For beer, the limit is an alcohol content over 3.5 percentage per volume.

**Sector:**    Printing and publishing

**Sub-Sector:**

**Industry Classification:**    ISIC rev 3.1 22, CPC 88442

**Type of Reservation:**    National treatment

**Level of Government:**    National

**Measures:**

The Freedom of the Press Act (1949:105)

Fundamental law on Freedom of Expression (1991:1469) Act on ordinances for the Freedom of the Press Act and the Fundamental law on Freedom of Expression (1991:1559)

**Description:**    **Investment and Cross-Border Trade in Services**

Natural persons who are owners of periodicals that are printed and published in Sweden must reside in Sweden or be nationals of a Member State of the EEA. Owners of such periodicals who are juridical persons must be established in the EEA.

Periodicals that are printed and published in Sweden, and technical recordings must have a responsible editor, who must be domiciled in Sweden.

**Sector:**    Environmental services

**Sub-Sector:**    Protection of ambient air and climate

**Industry Classification:**    CPC 9404

**Type of Reservation:**    Market access

| | |
|---|---|
| **Level of Government:** | National |
| **Measures:** | The Vehicles Act (2002:574) |
| **Description:** | **Cross-Border Trade in Services** |
| | Only entities established in Sweden or having their principal seat in Sweden are eligible for accreditation to perform control services of exhaust gas. |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | National |
| **Measures:** | Lag om försäkringsförmedling (Insurance Mediation Act) (2005:405), Chapter 3, § 2 |
| **Description:** | **Financial Services** |
| | Insurance mediation undertakings not incorporated in Sweden may establish only through a branch. |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | National |
| **Measures:** | Foreign Insurers Business in Sweden Act (1998:293) |
| **Description:** | **Financial Services** |
| | The supply of direct insurance is allowed only through an insurance service supplier authorised in Sweden, provided that the foreign service supplier and the Swedish insurance company belong to the same group of companies or have an agreement of |

1185

cooperation between them.

| | |
|---|---|
| **Sector:** | Financial Services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Sparbankslagen (Savings Bank Act) (1987:619), Chapter 2, § 1, part 2 |
| **Description:** | **Financial Services** |
| | A founder of a savings bank shall be a natural person resident in a Member State of the EEA. |

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship other than fishing and aquaculture, but including transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | CPC 5133, CPC5223, CPC 721, CPC 74520, CPC 74540, CPC 74590 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | Maritime Act (1994:1009), Ship safety Ordinance (1994:1009) |
| | The Ship Security Regulation (2003:438) |

**Description:**          **Investment, Cross-Border Trade in Services, and International Maritime Transport Services**

A ship shall be deemed Swedish and may carry the Swedish flag if more than half the equity is owned by Swedish citizens or juridical persons. The Government may permit foreign vessels to fly the Swedish flag where their operations are under Swedish control or the owner can demonstrate that he has his permanent residence in Sweden.

Vessels which are 50 per cent or more owned by nationals of a Member State of the EEA or companies having their registered office, central administration or principal place of business in the EEA and whose operation is controlled from Sweden, may also be registered in the Swedish register.

The commander of a trading vessel or a traditional vessel shall be a national of a Member State of the EEA. Exemptions may be granted by the Swedish Transport Agency.

A separate Swedish reservation applies to vessels used for fishing and aquaculture.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Rail transport services |
| **Industry Classification:** | CPC 7111 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | Järnvägslagen (Rail road Act) (2004:519), Chapter 5, Section 2c |
| **Description:** | **Investment** |

Picking up and setting down passengers on the line between Stockholm City and Arlanda Airport (where Arlanda is the starting or final destination of the journey) is limited to one operator. The operator for the line between Arlanda and Stockholm may allow other operators to use their line. This reservation does not apply to transport of passengers between Arlanda and other destinations than Stockholm.

| | |
|---|---|
| **Sector:** | Transport |

| | |
|---|---|
| **Sub-Sector:** | Operators of road haulage and road passenger transport services |
| **Industry Classification:** | CPC 712 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Most-favoured-nation treatment |
| **Level of Government:** | National |
| **Measures:** | Yrkestrafiklag (2012:210) (Act on professional traffic) |
| | Lag om vägtrafikregister (2001:558) (Act on road traffic registry) |
| | Yrkestrafikförordning (2012:237) (Government regulation on professional traffic) |
| | Taxitrafiklag (2012:211) (Act on Taxis) |
| | Taxitrafikförordning (2012:238) (Government regulation on taxis) |
| **Description:** | **Cross-Border Trade in Services** |

In order to engage in the occupation of road transport operator, a Swedish licence is needed. Criteria for receiving a taxi licence include that the company has appointed a natural person to act as the transport manager (a *de facto* residency requirement – see the Swedish reservation on types of establishment).

Criteria for receiving a licence for other road transport operators require that the company be established in the EU, have an establishment situated in Sweden and have appointed a natural person to act as the transport manager, who must be resident in the EU.

Licences are granted on non-discriminatory terms, except that operators of road haulage and road passenger transport services may as a general rule only use vehicles that are registered in the national road traffic registry. If a vehicle is registered abroad, owned by a natural or legal person whose principal residence is abroad and is brought to Sweden for temporary use, the vehicle may be temporarily used in Sweden. Temporary use is usually defined by the Swedish Transport Agency as meaning not more than one year.

Operators of cross-border road haulage and road passenger transport services abroad need to be licensed for such operations

1188

by the competent authority in the country where they are established. Additional requirements for cross-border trade may be regulated in bilateral road transport agreements. For vehicles where no such bilateral agreement is applicable, a licence is also needed from the Swedish Transport Agency.

***

## Reservations applicable in the United Kingdom

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Regional |
| **Measures:** | For England and Wales, the Solicitors Act 1974, the Administration of Justice Act 1985 and the Legal Services Act 2007 |
| | For Scotland, the Solicitors (Scotland) Act 1980 and the Legal Services (Scotland) Act 2010 |
| | For Northern Ireland, the Solicitors (Northern Ireland) Order 1976 |
| | In addition, the measures applicable in each jurisdiction include any requirements set by professional and regulatory bodies. |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Residency (commercial presence) may be required for the provision of some UK domestic legal services by the relevant professional or regulatory body. |
| | To provide legal services in respect of EU law and the law of Member States of the EU, commercial presence may be required to take one of the legal forms which are allowed under national law on a non-discriminatory basis. In addition, national law may include non-discriminatory requirements as to the organisation of the permitted legal forms. |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |

1190

| | |
|---|---|
| **Measures:** | Veterinary Surgeons Act (1966) |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Access through partnership or natural persons only.

Physical presence is required to perform veterinary surgery. It is a criminal act under the Veterinary Surgeons Act for anyone in the UK who is not a veterinary surgeon (and a member, therefore, of the Royal College of Veterinary Surgeons (RCVS)) to perform veterinary surgery.

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Extraction of crude petroleum and natural gas, services incidental to mining, related scientific and technical consulting services |
| **Industry Classification:** | ISIC rev 3.1 11, CPC 883, CPC 8675 |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | *Petroleum Act 1988* |
| **Description:** | **Investment and Cross-Border Trade in Services** |

A licence is necessary to undertake exploration and production activities on the UK Continental Shelf (UKCS), and to provide services which require direct access to or exploitation of natural resources.

This reservation applies to production licences issued with respect to the UK Continental Shelf. *To be a Licensee, a company must have a place of business within the UK. That means either: (a) a staffed presence in the UK; (b) registration of a UK company at Enterprises House; or (c) registration of a UK branch of a foreign company at Enterprises House. This requirement exists for any company applying for a new licence and for any company seeking to join an existing licence by assignment. It applies to all licences and to all enterprises, whether operator or not.*

*To be a party to a Licence that covers a producing field, a company must: (a) be registered at Enterprises House as a UK company; or (b) carry on its business through a fixed place of business in the UK as defined in section 148 of the Finance Act 2003 (which normally requires a staffed presence).*

1191

| | |
|---|---|
| **Sector:** | Fishing |
| | Transport |
| **Sub-Sector:** | All commercial marine activity undertaken from a seagoing ship, including fishing, aquaculture, and services incidental to fishing |
| | Transport services (passengers and freight) by seagoing vessels |
| | Pilotage and berthing services |
| | Vessel salvage and refloating services |
| | Other supporting services for water transport |
| | Construction for waterways, harbours, dams and other water works |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC5223, CPC 721, CPC 74520, CPC 74540, CPC 74590, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | National |
| **Measures:** | The Merchant Shipping (Registration of Ships) Regulations 1993 and the Merchant Shipping Act 1995 |
| **Description:** | **Investment and International Maritime Transport Services** |
| | In order to register a UK flagged vessel, a majority interest in the vessel must be owned by qualified persons. Such qualified persons may include, but are not limited to: British citizens resident in the UK; British citizens not resident in the UK where a representative person domiciled in the UK is appointed; and those UK and EEA incorporated companies with a UK place of business or a nominated representative in the UK. |

## ANNEX II

### Headnote

### Reservations for future measures

1.    The Schedule of a Party to this Annex sets out, under Articles 8.14 (Reservations and exceptions), 9.7 (Reservations), 14.4 (Reservations), and, for the European Union, Article 13.10 (Reservations and exceptions), the reservations taken by that Party with respect to specific sectors, sub-sectors or activities for which it may maintain existing, or adopt new or more restrictive, measures that do not conform with obligations imposed by:

(a)  Articles 8.6 (National treatment), 9.3 (National treatment) or, for the European Union, Article 13.3 (National treatment);

(b)  Articles 8.7 (Most-favoured-nation treatment), 9.5 (Most-Favoured-nation treatment) or, for the European Union, Article 13.4 (Most-favoured-nation treatment);

(c)  Articles 8.4 (Market access), 9.6 (Market access) or, for the European Union, Article 13.6 (Market access);

(d)  Article 8.5 (Performance requirements);

(e)  Article 8.8 (Senior management and boards of directors) or, for the European Union, Article 13.8 (Senior management and boards of directors);

(f)  for the European Union, Article 13.7 (Cross-border supply of financial services); or

(g)  Article 14.4 (Obligations).

2.  The reservations of a Party are without prejudice to the rights and obligations of the Parties under the GATS.

3.  Each reservation sets out the following elements:

(a)  **Sector** refers to the general sector in which the reservation is taken;

(b)  **Sub-Sector** refers to the specific sector in which the reservation is taken;

(c)  **Industry Classification** refers, where applicable, to the activity covered by the reservation according to the CPC, ISIC rev 3.1, or as expressly otherwise described in a Party's reservation;

(d)  **Type of Reservation** specifies the obligation referred to in paragraph 1 for which a reservation is taken;

(e)  **Description** sets out the scope of the sector, sub-sector or activities covered by the reservation; and

(g)  **Existing Measures** identifies, for transparency purposes, existing measures that apply to the sector, sub-sector or activities covered by the reservation.

4.  In interpreting a reservation, all elements of the reservation shall be considered. The **Description** element shall prevail over all other elements.

5.  A reservation taken at the level of the European Union applies to a measure of a Member State of the European Union at the national level as well as a measure of a government within a Member State of the European Union, unless the reservation excludes a Member State of the European Union. A reservation taken by Canada at the national level of government or by a Member State of the European Union applies to a measure of a government at the regional, provincial, territorial or local level within that country.

6.  Where a Party maintains a measure that requires that a service supplier be a natural person, citizen, permanent resident or resident of its territory as a condition to the supply of a service in its territory, a reservation for that measure taken with respect to cross-border trade in services shall operate as a reservation with respect to investment, to the extent of that measure.

7.     A reservation for a measure that requires a service supplier be a natural person, citizen, permanent resident, or resident of its territory as a condition to the supply of a financial service in its territory taken with respect to Article 13.7 (Cross-border supply of financial services) shall operate as a reservation with respect to Articles 13.3 (National treatment), 13.4 (Most-favoured-nation treatment), 13.6 (Market access), and 13.8 (Senior management and boards of directors), to the extent of that measure.

8.     For the purposes of this Annex including each Party's Schedule to this Annex:

**ISIC rev 3.1** means the International Standard Industrial Classification of all Economic Activities as set out in Statistical Office of the United Nations, Statistical Papers, Series M, N° 4, *ISIC rev* 3.1, 2002.

9.     The following abbreviations are used in the European Union's Schedule to this Annex:

| | |
|---|---|
| AT | Austria |
| BE | Belgium |
| BG | Bulgaria |
| CY | Cyprus |
| CZ | Czech Republic |
| DE | Germany |
| DK | Denmark |
| EU | European Union, including all its Member States |
| ES | Spain |
| EE | Estonia |
| FI | Finland |
| FR | France |
| EL | Greece |
| HR | Croatia |
| HU | Hungary |
| IE | Ireland |
| IT | Italy |
| LV | Latvia |
| LT | Lithuania |
| LU | Luxembourg |
| MT | Malta |
| NL | Netherlands |
| PL | Poland |

PT    Portugal

RO    Romania

SK    Slovakia

SI    Slovenia

SE    Sweden

UK    United Kingdom

## Schedule of Canada

## Reservations applicable in Canada
## (applicable in all Provinces and Territories)

### Reservation II-C-1

| | |
|---|---|
| **Sector:** | Aboriginal affairs |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment<br>Most-favoured-nation treatment<br>Performance requirements<br>Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services**<br><br>Canada reserves the right to adopt or maintain a measure denying investors of the European Union and their investments, or service suppliers of the European Union, rights or preferences provided to aboriginal peoples. |
| **Existing Measures:** | *Constitution Act, 1982*, being Schedule B to the *Canada Act 1982* (U.K.), 1982, c. 11 |

**Reservation II-C-2**

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Canada reserves the right to adopt or maintain a measure related to collective marketing arrangements for agricultural goods which includes activities such as production, pricing, buying, selling or any other activity to prepare the product in a form, or make it available at a place or time, for purchase for consumption or use.

**Existing Measures:**

**Reservation II-C-3**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment** |

1.      British Columbia, New Brunswick, Nova Scotia, Nunavut, Prince Edward Island, Quebec, The Northwest Territories, and Yukon, reserve the right to adopt or maintain a measure relating to an enterprise of Canada that is a covered investment that requires 25 per cent or less of the board of directors, or any committee thereof, be of a particular nationality. An amendment to a measure referred to above must not decrease the conformity of the measure, as it existed immediately before the amendment, with the obligations set out in Chapter Eight (Investment).

2.      Canada reserves the right to adopt or maintain a measure requiring that up to 50 per cent of the board of directors of an enterprise that is a covered investment be ordinarily resident in Canada. A granting of residency to a national of the European Union who is an appointee to a board of directors of an enterprise that is a covered investment will be conducted in accordance with Canadian law relating to the entry of foreign nationals. However, a national of the European Union shall not be subject to an economic needs test solely for the purpose of the appointment to the board of directors.

**Existing Measures:**

**Reservation II-C-4**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access<br>National treatment |
| **Description:** | **Investment** |

Canada reserves the right to adopt or maintain a measure relating to residency requirements for the ownership of oceanfront land by investors of the European Union or their investments.

**Existing Measures:**

**Reservation II-C-5**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fishing and services incidental to fishing |
| **Industry Classification:** | CPC 04, 882 |
| **Type of Reservation:** | Market access<br>National treatment<br>Most-favoured nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.       Canada reserves the right to adopt or maintain a measure with respect to collective marketing and trading arrangements for fish and seafood products, and licencing fishing or fishing related activities, including entry of foreign fishing vessels to Canada's exclusive economic zone, territorial sea, internal waters or ports, and use of any services therein.

2.       Canada shall endeavour to accord to vessels entitled to fly the flag of a Member State of the European Union treatment no less favourable than the treatment it accords, in like situations, to vessels entitled to fly the flag of any other foreign State.

| | |
|---|---|
| **Existing Measures:** | *Fisheries Act*, R.S.C. 1985, c. F-14<br>*Coastal Fisheries Protection Act*, R.S.C. 1985, c. C-33<br>*Coastal Fisheries Protection Regulations*, C.R.C. 1978, c. 413<br>*Commercial Fisheries Licensing Policy*<br>*Policy on Foreign Investment in the Canadian Fisheries Sector*, 1985<br>*Freshwater Fish Marketing Act,* R.S.C. 1985, c. F-13 |

**Reservation II-C-6**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Services related to security markets |
| **Industry Classification:** | CPC 8132 |
| **Type of Reservation:** | Market access<br>National treatment |
| **Description:** | **Investment** |

Canada reserves the right to adopt or maintain a measure relating to the acquisition, sale or other disposition by nationals of the European Union of bonds, treasury bills or other kinds of debt securities issued by the Government of Canada or a Canadian sub-national government.

| | |
|---|---|
| **Existing Measures:** | *Financial Administration Act*, R.S.C. 1985, c. F-11 |

## Reservation II-C-7

| | |
|---|---|
| **Sector:** | Food, beverage and drug industries |
| **Sub-Sector:** | Liquor, wine and beer stores |
| **Industry Classification:** | CPC 241, 242, 243, 62112, 62226, 63107 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | The *Importation of Intoxicating Liquors Act* gives each provincial government an import monopoly on intoxicating liquors entering its territory. |
| **Existing Measures:** | *Importation of Intoxicating Liquors Act*, R.S.C. 1985, c. I-3 |

**Reservation II-C-8**

| | |
|---|---|
| **Sector:** | Minority affairs |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Canada reserves the right to adopt or maintain a measure conferring rights or privileges to a socially or economically disadvantaged minority.

**Existing Measures:**

**Reservation II-C-9**

**Sector:**                             Social services

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**        Market access
                                       National treatment
                                       Most-favoured-nation treatment
                                       Senior management and boards of directors

**Description:**                    **Investment and Cross-Border Trade in Services**

Canada reserves the right to adopt or maintain a measure with respect to the supply of public law enforcement and correctional services, as well as the following services to the extent that they are social services established or maintained for a public purpose: income security or insurance, social security or insurance, social welfare, public education, public training, health, and child care.

**Existing Measures:**

## Reservation II-C-10

**Sector:**                          Social services

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**             Market access

**Description:**                     **Investment and Cross-Border Trade in Services**

1.      Canada reserves the right to adopt or maintain a measure with respect to the supply of social services not otherwise reserved under its Reservation II-C-9 in respect of social services.

2.      This reservation shall not extend to the adoption of a new measure imposing limitations on the participation of foreign capital in the supply of such social services.

**Existing Measures:**

**Reservation II-C-11**

**Sector:**                    Collection, purification and distribution of water

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**       Market access
                               National treatment

**Description:**               **Investment and Cross-Border Trade in Services**

                               Canada reserves the right to adopt or maintain a measure with
                               respect to the collection, purification and distribution of water.

**Existing Measures:**

**Reservation II-C-12**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Transportation services *via* pipeline |
| **Industry Classification:** | CPC 713 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Canada reserves the right to adopt or maintain a measure with respect to the issuance of certificates for the pipeline transportation of fuels. |
| **Existing Measures:** | *National Energy Board Act,* R.S.C. 1985, c. N-7 |

**Reservation II-C-13**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Selling and marketing of air transport services, as defined in Articles 8.1 (Definitions) and 9.1 (Definitions) |
| **Industry Classification:** | Defined in Articles 8.1 (Definitions) and 9.1 (Definitions) |
| **Type of Reservation:** | Market access<br>National treatment<br>Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

**Description:** (continued)

1.    Canada reserves the right to adopt or maintain a measure relating to the selling and marketing of air transport services.

2.    For greater certainty, this reservation does not affect Canada's rights and obligations under the *Agreement on Air Transport Between Canada and the European Community and its Member States*, done at Brussels on 17 December 2009 and Ottawa on 18 December 2009.

**Existing Measures:**

**Reservation II-C-14**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Construction work for waterways, harbours, dams and other water works transportation services by sea-going or non-sea-going vessels |
| | Supporting and other services for water transport |
| | Any other marine activity of a commercial nature undertaken by or from a vessel as set out in the Description element below |
| **Industry Classification:** | CPC 5133, 5223, 721, 722, 745, any other marine activity of a commercial nature undertaken by or from a vessel |
| **Type of Reservation:** | Market access<br>National treatment<br>Most-favoured-nation treatment<br>Performance requirements<br>Senior management and boards of directors<br>Obligations |
| **Description:** | **Investment, Cross-Border Trade in Services, and International Maritime Transport Services** |

1.      Canada reserves the right to adopt or maintain a measure affecting the investment in or supply of marine cabotage services, including:

(a)      the transportation of goods or passengers by vessel between points in the territory of Canada or above the continental shelf of Canada, directly or by way of a place outside Canada; but with respect to waters above the continental shelf of Canada, the transportation of goods or passengers only in relation to the exploration, exploitation or transportation of the mineral or non-living natural resources of the continental shelf of Canada; and

(b)      the engaging by vessel in any other marine activity of a commercial nature in the territory of Canada and, with respect to waters above the continental shelf, in such other marine activities of a commercial nature that are in relation to the exploration, exploitation or transportation of the mineral or non-living natural resources of the continental shelf of Canada.

2.      This reservation relates to, among other things, limitations and conditions for services suppliers entitled to participate in these activities, to criteria for the issuance of a temporary cabotage licence to foreign vessels, and to limits on the number of cabotage licences issued to foreign vessels.

3.      For greater certainty, this reservation applies, among

other things, to marine activities of a commercial nature undertaken by or from a vessel, including feeder services and repositioning of empty containers.

4.    This reservation does not apply to a measure relating to the investment in or the supply of the following marine cabotage services undertaken from a vessel operated by an enterprise of the European Union, or a vessel operated by an enterprise of a third country[79] owned or controlled by a national of the European Union if that vessel is registered in accordance with the laws of a Member State of the European Union and is flying the flag of a Member State of the European Union:

(a)    repositioning owned or leased empty containers on a non-revenue basis;

(b)    (i) continuous pre or onward transport of international cargo between the Port of Halifax and the Port of Montreal, and between the Port of Montreal and the Port of Halifax, using vessels registered on the first (national) registries referred to in paragraph 1 of the Annex to Commission communication C(2004) 43 – Community guidelines on State Aid to maritime transport; and

(ii) pre or onward transport of international containerised cargo between the Port of Halifax and the Port of Montreal, and between the Port of Montreal and the Port of Halifax, as a single voyage concurrent to an international leg, using vessels registered on the first (national) or second (international) registries referred to in paragraphs 1, 2, and 4 of the Annex to Commission communication C(2004) 42 – Community guidelines on State Aid to maritime transport; or

(c) dredging.

**Existing Measures:**     *Coasting Trade Act,* S.C. 1992, c. 31
*Canada Shipping Act, 2001*, S.C. 2001, c. 26
*Customs Act*, R.S.C. 1985 (2d Supp.), c. 1
*Customs and Excise Offshore Application Act,* R.S.C. 1985, c. C-53

---

[79]    Canada reserves the right to not extend these benefits to enterprises of the United States of America.

**Reservation II-C-15**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Transport services by sea-going or non-sea-going vessels<br>Supporting services for water transport<br>Any other marine activity of a commercial nature undertaken<br>from a vessel in waters of mutual interest |
| **Industry Classification:** | CPC 721, 722, 745, any other marine activity of a commercial<br>nature undertaken from a vessel |
| **Type of Reservation:** | Most-favoured-nation treatment<br>Obligations |
| **Description:** | **Cross-Border Trade in Services and International Maritime**<br>**Transport Services** |
| | Canada reserves the right to adopt or maintain a measure relating<br>to the implementation of agreements, arrangements and other<br>formal or informal undertakings with other countries with<br>respect to maritime activities in waters of mutual interest in areas<br>such as pollution control (including double hull requirements for<br>oil tankers), safe navigation, barge inspection standards, water<br>quality, pilotage, salvage, drug abuse control and maritime<br>communications. |
| **Existing Measures:** | |

**Reservation II-C-16**

**Sector:**                        Transport

**Sub-Sector:**

**Industry Classification:**       CPC 07

**Type of Reservation:**           Market access

**Description:**                   **Investment**

Canada reserves the right to adopt or maintain a measure relating to the number or type of legal entity which manages or operates transportation infrastructure owned or controlled by Canada.

**Existing Measures:**

**Reservation II-C-17**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | All transportation sub-sectors, other than the following sub-sectors: |

Maritime container station and depot services
Maritime agency services
Maritime freight forwarding services
Aircraft repair and maintenance services
Computer reservation systems
Passenger and freight transportation by railway
Maintenance and repair of rail transport equipment
Repair services n.e.c. of motor vehicles, trailers and semi-trailers, on a fee or contract basis
Maintenance and repair services of motor vehicles
Maintenance and repair services of motorcycles and snowmobiles
Cargo handling services for land transport
Storage and warehousing services for land transport
Freight transport agency services for land transport
Other supporting and auxiliary transport services for land transport

**Industry Classification:**    CPC 07, CPC 51, CPC 61, CPC 886 and any other commercial activity undertaken from, or with respect to a vessel, aircraft, motor vehicle or rail transport equipment, other than:

CPC 6112
CPC 6122
CPC 7111
CPC 7112
CPC 741 (limited to land transport services)
CPC 742 (limited to land transport services)
CPC 7480 (limited to land transport services)
CPC 7490 (limited to land transport services)
CPC 8867
CPC 8868 (limited to rail transport equipment)
Computer reservation system services as defined in Articles 8.1 (Definitions) and 9.1 (Definitions)
Aircraft repair and maintenance services as defined Articles 8.1 (Definitions) and Article 9.1 (Definitions)
Maritime container station and depot services, maritime agency services, maritime freight forwarding services as defined in Article 14.1 (Definitions)

**Type of Reservation:**    Market access
                            Obligations

**Description:**    **Investment, Cross-Border Trade in Services, and**

1213

**International Maritime Transport Services**

Canada reserves the right to adopt or maintain a measure related to the designation, establishment, expansion, or operation of monopolies or exclusive service suppliers in the transportation sector.

**Existing Measures:**

**Reservation II-C-18**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Supporting and auxiliary transport services<br>Ground handling services as defined in Articles 8.1 (Definitions) and 9.1 (Definitions) |
| **Industry Classification:** | CPC 74, ground handling services as defined in Articles 8.1 (Definitions) and 9.1 (Definitions) |
| **Type of Reservation:** | Market access |

**Description:**     Investment

1.      Canada reserves the right to adopt or maintain a measure limiting the number of suppliers of certain supporting and auxiliary transport services related to: the handling of passengers, freight, cargo (including mail) and transportation conveyances that support transportation carriers, at airports, where physical or operational constraints arise primarily as a result of safety or security considerations.

2.      For greater certainty, in the case of ground handling services, this reservation does not affect Canada's rights and obligations under the *Agreement on Air Transport Between Canada and the European Community and its Member States*, done at Brussels on 17 December 2009 and Ottawa on 18 December 2009

**Existing Measures:**

**Reservation II-C-19**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Technical testing and analysis services |
| **Industry Classification:** | CPC 8676 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Canada reserves the right to adopt or maintain a measure affecting the statutory inspection and certification of vessels on behalf of Canada.

2.      For greater certainty, only a person, classification society or other organisation authorised by Canada may carry out statutory inspections and issue Canadian Maritime Documents to Canadian registered vessels and their equipment on behalf of Canada.

**Existing Measures:**

**Reservation II-C-20**

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment** |

1.      Canada reserves the right to adopt or maintain a measure that accords differential treatment under any bilateral or multilateral international agreement in force or signed prior to January 1, 1994.

2.      Canada reserves the right to adopt or maintain a measure that accords differential treatment pursuant to an existing or future bilateral or multilateral agreement relating to:

(a)      aviation;

(b)      fisheries; or

(c)      maritime matters, including salvage.

**Existing Measures:**

**Schedule of Canada**

**Reservations applicable in Alberta**

**Reservation II-PT-1**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access <br> Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Alberta reserves the right to adopt or maintain a measure relating to lottery schemes, gaming terminals, games of chance, races, bingos, casinos, or similar activities, that:

(a)      limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)      limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)      limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)      limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)      restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Alberta to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-2**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores) Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107, 643, 88411 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Alberta reserves the right to adopt or maintain a measure in the above mentioned sector that:

(a)    limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)    limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)    limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)    limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)    restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.    This reservation is without prejudice to the right of Alberta to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-3

| | |
|---|---|
| **Sector:** | Agriculture, forestry and fishing products |
| **Sub-Sector:** | Forest resource and processing<br>Forestry and logging products<br>Services incidental to forestry and logging |
| **Industry Classification:** | CPC 03, 8814 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Alberta reserves the right to adopt or maintain a measure relating to the production, processing, marketing, extraction, and development of forest resources and products derived from them, that:

(a)    limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)    limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)    limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)    limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)    restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.    This reservation is without prejudice to the right of Alberta to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-4**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fishing<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 62224, 882 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Alberta reserves the right to adopt or maintain a measure relating to the production, processing, and collective marketing of aquaculture, marine, and fish products, that:

(a)      limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)      limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)      limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)      limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)      restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Alberta to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-5**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Services incidental to energy distribution<br>Transport services *via* pipeline<br>Production, transmission and distribution of electricity, gas, steam and hot water<br>Crude petroleum and natural gas |
| **Industry Classification:** | CPC 120, 17, 713, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Alberta reserves the right to adopt or maintain a measure relating to: (i) the exploration, production, extraction, and development of crude petroleum or natural gas; (ii) the granting of exclusive rights to operate a distribution or transportation system, including, related pipeline and marine distribution and transport services; and (iii) the production, transport, distribution, furnishing, and importation and exportation of electricity, that:

(a)      limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)      limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)      limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)      limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)      restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Alberta to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental

entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservations applicable in British Columbia**

**Reservation II-PT-6**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Production, transmission, and distribution of electricity, gas, steam and hot water<br>Crude petroleum and natural gas<br>Petroleum gases and other gaseous hydrocarbons<br>Transport services via pipeline<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 17, 120, 334, 713, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services and Investment** |

1.     British Columbia reserves the right to adopt or maintain a measure relating to: (i) the exploration, production, extraction, and development of crude petroleum or natural gas; (ii) rights to operate related crude petroleum or natural gas distribution or transportation systems, including, related pipeline and marine distribution and transport services; or (iii) the production, transport, distribution, furnishing, and importation and exportation of electricity, that:

(a)     limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)     limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)     limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)     limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)     restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic

activity.

2.     This reservation is without prejudice to the right of British Columbia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-7**

| | |
|---|---|
| **Sector:** | Agriculture, forestry and fisheries products |
| **Sub-Sector:** | Forestry and logging products<br>Services incidental to forestry and logging |
| **Industry Classification:** | CPC 03, 8814 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      British Columbia reserves the right to adopt or maintain a measure relating to the production, processing, marketing, extraction, and development of forest resources and products derived from them, including the granting of licences, that:

(a)      limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service provider or the requirement of an economic needs test;

(b)      limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)      limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)      limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)      restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of British Columbia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-8**

**Sector:**                          Fisheries

**Sub-Sector:**                      Fishing
                                     Services incidental to fishing

**Industry Classification:**         CPC 04, 62224, 882

**Type of Reservation:**             Market access

**Description:**                     **Investment and Cross-Border Trade in Services**

1.      British Columbia reserves the right to adopt or maintain a measure relating to the production, processing, and collective marketing of aquaculture, marine, or other fish products that:

(a)     limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)     limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)     limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)     limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)     restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of British Columbia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-9**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access<br>Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    British Columbia reserves the right to adopt or maintain a measure relating to the conduct and administration of any gambling in the Province including lottery schemes, games of chance or games combining chance and skill, as well as directly related businesses, that:

(a)    limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)    limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)    limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)    limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)    restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.    This reservation is without prejudice to the right of British Columbia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

1228

## Reservation II-PT-10

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      British Columbia reserves the right to adopt or maintain a measure relating to the importation, marketing, licensing, sale and distribution of alcoholic beverages in the Province that:

(a)      limits the number of covered investments or service suppliers that may carry out a specific economic activity, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test;

(b)      limits the total value of transactions or assets in the form of a numerical quota or the requirement of an economic needs test;

(c)      limits the total number of operations or the total quantity of output expressed in terms of designated numerical units in the form of a quota or the requirement of an economic needs test;

(d)      limits the total number of natural persons that may be employed in a sub-sector or that a covered investment may employ and who are necessary for, and directly related to, the performance of an economic activity in the form of a numerical quota or the requirement of an economic needs test; or

(e)      restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of British Columbia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservations applicable in Manitoba

### Reservation II-PT-11

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fish and other fishing products<br>Wholesale trade services of fisheries products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 62224, 882 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Manitoba reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Manitoba to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-12

**Sector:**                     Transport

**Sub-Sector:**                 Transport services *via* pipeline

**Industry Classification:**    CPC 713

**Type of Reservation:**        Market access

**Description:**                **Investment and Cross-Border Trade in Services**

1.      Manitoba reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Manitoba to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-13**

| | |
|---|---|
| **Sector:** | Alcoholic Beverages |
| **Sub-Sector:** | Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.        Manitoba reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.        This reservation is without prejudice to the right of Manitoba to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-14**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Crude petroleum and natural gas<br>Electrical energy<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 120, 171, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Manitoba reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Manitoba to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-15**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging products<br>Forest resource processing<br>Services incidental to agriculture, hunting and forestry<br>Manufacture of paper and paper products, on a fee or contract basis |
| **Industry Classification:** | CPC 031, 321, 881 (other than rental of agricultural equipment with operator and 8814) 88430, 88441 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Manitoba reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Manitoba to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-16**

**Sector:**                        Recreational, cultural and sporting services

**Sub-Sector:**                    Gambling and betting

**Industry Classification:**       CPC 96492

**Type of Reservation:**           Market access
                                   Most-favoured-nation treatment

**Description:**                   **Investment and Cross-Border Trade in Services**

1.      Manitoba reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Manitoba to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservations applicable in New Brunswick**

**Reservation II-PT-17**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electrical energy<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 17, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      New Brunswick reserves the right to adopt or maintain a measure limiting market access in the transfer of hydraulic power vested in the domain of the Province, the production, transport, distribution and exportation of electricity, and the maintenance of electrical facilities, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of New Brunswick to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-18**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access<br>Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.　　New Brunswick reserves the right to adopt or maintain monopolies in the sub-sectors noted above.

2.　　This reservation is without prejudice to the right of New Brunswick to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**　　*Gaming Control Act*, S.N.B. 2008, c. G-1.5

**Reservation II-PT-19**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor, wine and beer stores)<br>Manufacturing of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      New Brunswick reserves the right to adopt or maintain a measure limiting market access in the sub-sectors listed above, with the exception of measures imposing limitations on the participation of foreign capital in terms of maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of New Brunswick to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

| | |
|---|---|
| **Existing Measures** | *New Brunswick Liquor Corporation Act*, S.N.B. 1974, c. N-6.1 |

**Reservations applicable in Newfoundland and Labrador**

**Reservation II-PT-20**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging products<br>Forest resource processing<br>Services incidental to agriculture, hunting and forestry<br>Manufacture of paper and paper products, on a fee or contract basis |
| **Industry Classification:** | CPC 031, 321, 881 (other than rental of agricultural equipment with operator and 8814), 88430, 88441 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Newfoundland and Labrador reserves the right to adopt or maintain a measure relating to the above sub-sectors, that:

(a)      limits the number of covered investments or service suppliers, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test; or

(b)      restricts or requires a specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Newfoundland and Labrador to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-21

| | |
|---|---|
| **Sector:** | Fishing and hunting |
| **Sub-Sector:** | Edible products of animal origin n.e.c. |
| | Raw skins of other animals n.e.c. (fresh or preserved, but not further prepared) |
| | Fish and other fishing products |
| | Other meat and edible offal, fresh, chilled or frozen (including rabbit meat), excluding frog legs |
| | Animal oils and fats, crude and refined |
| | Tanned or dressed fur skins |
| | Prepared and preserved fish |
| | Sales on a fee or contract basis of food products, beverages and tobacco |
| | Wholesale trade services of fishery products |
| **Industry Classification:** | CPC 0295, 02974, 04, 21129, 212, 2162, 2831, 62112, 62224, 8813, 882 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Newfoundland and Labrador reserves the right to adopt or maintain a measure relating to the above sub-sectors, that:

(a)      limits the number of covered investments or service suppliers, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test; or

(b)      restricts or requires the specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Newfoundland and Labrador to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

### Reservation II-PT-22

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electrical energy<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Newfoundland and Labrador reserves the right to adopt or maintain a measure relating to the above sub-sectors, that:

(a)      limits the number of covered investments or service suppliers, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test; or

(b)      restricts or requires the specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Newfoundland and Labrador to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-23**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access<br>Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Service** |

1.      Newfoundland and Labrador reserves the right to adopt or maintain a measure relating to the above sub-sectors, that:

(a)      limits the number of covered investments or service suppliers, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test; or

(b)      restricts or requires the specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Newfoundland and Labrador to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

1242

**Reservation II-PT-24**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Transportation services *via* pipeline |
| **Industry Classification:** | CPC 7131 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Newfoundland and Labrador reserves the right to adopt or maintain a measure relating to the above sub-sector, that:

(a)      limits the number of covered investments or service suppliers, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test; or

(b)      restricts or requires the specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Newfoundland and Labrador to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-25

**Sector:**                    Energy

**Sub-Sector:**                Crude petroleum and natural gas
                               Services incidental to energy distribution

**Industry Classification:**   CPC 120, 887

**Type of Reservation:**       Market access

**Description:**               **Investment and Cross-Border Trade in Services**

1.      Newfoundland and Labrador reserves the right to adopt or maintain a measure relating to the above sub-sectors, that:

(a)      limits the number of covered investments or service suppliers, whether in the form of a numerical quota, monopoly, exclusive service supplier, or the requirement of an economic needs test; or

(b)      restricts or requires the specific type of legal entity or joint venture through which an investor may perform an economic activity.

2.      This reservation is without prejudice to the right of Newfoundland and Labrador to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservations applicable in the Northwest Territories**

**Reservation II-PT-26**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to animal husbandry<br>Services incidental to hunting |
| **Industry Classification:** | CPC 8812, 8813 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      The Northwest Territories reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of the Northwest Territories to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-27

**Sector:**                    Alcoholic Beverages

**Sub-Sector:**                Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores)
Manufacture of alcoholic beverages

**Industry Classification:**   CPC 24 (other than 244), 62112, 62226, 63107

**Type of Reservation:**       Market access

**Description:**               **Investment and Cross-Border Trade in Services**

1.      The Northwest Territories reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of the Northwest Territories to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

### Reservation II-PT-28

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging products<br>Pulp and paperboard<br>Forest resource processing<br>Services incidental to agriculture, hunting and forestry<br>Manufacture of paper and paper products, on a fee or contract basis |
| **Industry Classification:** | CPC 03, 321, 881 (other than rental of agricultural equipment with operator and 8814), 88430, 88441 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

**Description:** (continued)

**Investment and Cross-Border Trade in Services**

1.    The Northwest Territories reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.    This reservation is without prejudice to the right of the Northwest Territories to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-29

**Sector:**                          Recreational, cultural and sporting services

**Sub-Sector:**                      Gambling and betting

**Industry Classification:**         CPC 96492

**Type of Reservation:**             Market access
                                     Most-favoured-nation treatment

**Description:**                     **Investment and Cross-Border Trade in Services**

1.      The Northwest Territories reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of the Northwest Territories a to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-30**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electrical energy<br>Transportation services *via* pipeline<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 713, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.     The Northwest Territories reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.     This reservation is without prejudice to the right of the Northwest Territories to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-31**

| | |
|---|---|
| **Sector:** | Crude petroleum and natural gas |
| **Sub-Sector:** | Crude petroleum and natural gas<br>Pipeline transport<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 120 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      The Northwest Territories reserves the right to adopt or maintain a measure limiting market access in the exploration, production, extraction, and development of crude petroleum or natural gas, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      The Northwest Territories reserves the right to adopt or maintain a measure granting exclusive rights to operate a distribution or transportation system, including, related pipeline and marine distribution and transport services.

3.      This reservation is without prejudice to the right of the Northwest Territories to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-32**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fish and other fishing products<br>Wholesale trade of fishing products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 62224, 882 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.     The Northwest Territories reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.     This reservation is without prejudice to the right of the Northwest Territories a to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-33**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Other land transport services |
| **Industry Classification:** | CPC 7121, 71222 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The Northwest Territories reserves the right to adopt or maintain economic needs tests for the provision of urban and interurban bus transportation services. The main criteria include the examination of the adequacy of current levels of service; market conditions establishing the requirement for expanded service; and the effect of new entrants on public convenience, including the continuity and quality of service, and the fitness, willingness, and ability of the applicant to provide proper service.

**Existing Measures**

## Reservations applicable in Nova Scotia

### Reservation II-PT-34

**Sector:**                          Forestry

**Sub-Sector:**                      Forestry and logging products
Forest resource processing
Services incidental to agriculture, hunting and forestry
Manufacture of paper and paper products, on a fee or contract basis

**Industry Classification:**         CPC 031, 321, 881 (other than rental of agricultural equipment with operator and 8814), 88430, 88441

**Type of Reservation:**             Market access

**Description:**                     **Investment and Cross-Border Trade in Services**

1.      Nova Scotia reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Nova Scotia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-35**

| | |
|---|---|
| **Sector:** | Fisheries and hunting |

**Sub-Sector:** Edible products of animal origin n.e.c.
Raw skins of other animals n.e.c. (fresh or preserved, but not further prepared)
Fish and other fishing products
Other meat and edible offal, fresh, chilled or frozen (including rabbit meat), excluding frog legs
Animal oils and fats, crude and refined
Tanned or dressed fur skins
Prepared and preserved fish
Sales on a fee or contract basis of food products, beverages and tobacco
Wholesale trade services of fishery products
Transportation of frozen or refrigerated goods

**Industry Classification:** CPC 0295, 02974, 04, 21129, 212, 2162, 2831, 62112, 62224, part of 71231, 8813, 882

**Type of Reservation:** Market access

**Description:** **Investment and Cross-Border Trade in Services**

1.     Nova Scotia reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.     This reservation is without prejudice to the right of Nova Scotia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-36**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electrical energy<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 17, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Nova Scotia reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Nova Scotia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-37**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Crude petroleum and natural gas<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 120, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.     Nova Scotia reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.     This reservation is without prejudice to the right of Nova Scotia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-38**

**Sector:**                            Recreational, cultural and sporting services

**Sub-Sector:**                        Gambling and betting

**Industry Classification:**           CPC 96492

**Type of Reservation:**               Market access
                                       Most-favoured-nation treatment

**Description:**                       **Investment and Cross-Border Trade in Services**

1.      Nova Scotia reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Nova Scotia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-39**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores)<br>Manufacturing of alcoholic beverages. |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Nova Scotia reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Nova Scotia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-40

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Transportation services *via* pipeline |
| **Industry Classification:** | CPC 713 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Nova Scotia reserves the right to adopt or maintain a measure limiting market access in the sub-sector noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Nova Scotia to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

Reservations applicable in Nunavut

## Reservation II-PT-41

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Services incidental to animal husbandry<br>Services incidental to hunting |
| **Industry Classification:** | CPC 8812, 8813 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.     Nunavut reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.     This reservation is without prejudice to the right of Nunavut to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-42**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores) Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.　　Nunavut reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.　　Nunavut has the authority under the *Liquor Act* to import, purchase, produce, distribute, supply, market, and sell alcoholic beverages in Nunavut and to conduct these activities through a territorial monopoly.

3.　　This reservation is without prejudice to the right of Nunavut to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

| | |
|---|---|
| **Existing Measures** | *Liquor Act,* R.S.N.W.T. 1988, c. L-9 |

### Reservation II-PT-43

**Sector:**                        Recreational, cultural and sporting services

**Sub-Sector:**                    Gambling and betting

**Industry Classification:**       CPC 96492

**Type of Reservation:**           Market access
                                   Most-favoured-nation treatment

**Description:**                   **Investment and Cross-Border Trade in Services**

1.      Nunavut reserves the right to adopt or maintain a measure limiting market access in the sub-sector listed above, with the exception of measures imposing limitations on the participation of foreign capital in terms of maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Nunavut to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-44**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fish and other fishing products<br>Wholesale trade of fishing products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 62224, 882 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Nunavut reserves the right to adopt or maintain a measure limiting market access in the sub-sectors listed above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.    This reservation is without prejudice to the right of Nunavut to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-45**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electrical energy<br>Electricity distribution or control apparatus<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 4621, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Nunavut reserves the right to adopt or maintain a measures limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      Nunavut maintains a monopoly on the production, generation, development, transmission, distribution, delivery, supply and exportation of electricity and related services under section 5.1 of the *Qulliq Energy Corporation Act.*

3.      This reservation is without prejudice to the right of Nunavut to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

| | |
|---|---|
| **Existing Measures** | *Qulliq Energy Corporation Act*, R.S.N.W.T. 1988, c. N-2 |

**Reservation II-PT-46**

**Sector:**                         Energy

**Sub-Sector:**                     Crude petroleum and natural gas
                                    Transport
                                    Services incidental to energy distribution

**Industry Classification:**        CPC 120, 713, 887

**Type of Reservation:**            Market access

**Description:**                    **Investment and Cross-Border Trade in Services**

1.      Nunavut reserves the right to adopt or maintain a measure limiting market access in the sub-sectors listed above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      Nunavut also reserves the right to adopt or maintain any measure limiting market access related to oil and gas development.

3.      This reservation is without prejudice to the right of Nunavut to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-47

**Sector:**                          Transport

**Sub-Sector:**                      Freight transport by sea

**Industry Classification:**         CPC 7212

**Type of Reservation:**             Market access

**Description:**                     **Investment and Cross-Border Trade in Services**

1.      Nunavut reserves the right to adopt or maintain a measure limiting market access in the sub-sector listed above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Nunavut to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-48**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Other land transport services |
| **Industry Classification:** | CPC 7121, 71222 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Nunavut reserves the right to adopt or maintain economic needs tests for the provision of urban and interurban bus transportation services. The main criteria include the examination of the adequacy of current levels of service; market conditions establishing the requirement for expanded service; and the effect of new entrants on public convenience, including the continuity and quality of service, and the fitness, willingness, and ability of the applicant to provide proper service.

**Existing Measures**

**Reservations applicable in Ontario**

**Reservation II-PT-49**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Production, transmission, and distribution of electricity, gas, steam and hot water<br>Crude petroleum and natural gas<br>Petroleum gases and other gaseous hydrocarbons<br>Transport services via pipeline<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 17, 120, 334, 713, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Ontario reserves the right to adopt or maintain a measure limiting market access in the exploration, production, generation, extraction, importation, exportation, transportation, transmission, distribution, storage, sale, retailing, marketing, conservation, demand/load management, and development of energy (including, electricity, natural gas, and renewable energy), with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      Ontario reserves the right to adopt or maintain a measure limiting market access in the granting of exclusive rights to own or operate a transmission or distribution system or to produce, generate, store, sell, retail, or market energy (including, electricity, natural gas, or renewable energy).

3.      For greater certainty, this reservation is without prejudice to the right of Ontario to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservations applicable in Prince Edward Island**

**Reservation II-PT-50**

| | |
|---|---|
| **Sector:** | Fisheries and aquaculture |
| **Sub-Sector:** | Fish and other fishing products<br>Wholesale trade services of fisheries products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 62224, 882 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Prince Edward Island reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.    This reservation is without prejudice to the right of Prince Edward Island to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-51**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Renewable energy systems<br>Electrical energy, oil and natural gas<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 120, 17, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Prince Edward Island reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Prince Edward Island to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-52**

| | |
|---|---|
| **Sector:** | Forestry |
| **Sub-Sector:** | Forestry and logging products<br>Forest resource processing<br>Services incidental to agriculture, hunting and forestry<br>Manufacture of paper and paper products, on a fee or contract basis |
| **Industry Classification:** | CPC 03, 321, 881 (other than rental of agricultural equipment with operator and 8814), 88430, 88441 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Prince Edward Island reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.    This reservation is without prejudice to the right of Prince Edward Island to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-53**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access |
| | Most-favoured-nation treatment |

**Description:**       **Investment and Cross-Border Trade in Services**

1.      Prince Edward Island reserves the right to adopt or maintain a measure limiting market access in the sub-sector noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Prince Edward Island to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

1272

**Reservation II-PT-54**

| | |
|---|---|
| **Sector:** | Alcoholic beverages |
| **Sub-Sector:** | Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores) Manufacture of alcoholic beverages |
| **Industry Classification:** | CPC 24 (other than 244), 62112, 62226, 63107 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Prince Edward Island reserves the right to adopt or maintain a measure limiting market access in the sub-sectors noted above, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Prince Edward Island to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

Reservations applicable in Québec

**Reservation II-PT-55**

| | |
|---|---|
| **Sector:** | Agriculture, fisheries |
| **Sub-Sector:** | Products of agriculture, horticulture and market gardening |
| | Live animals and animal products |
| | Fish and other fishing products |
| | Meat, fish, fruit, vegetables, oils and fats |
| | Dairy products |
| | Grain mill products, starches and starch products; other food products |
| | Services incidental to agriculture |
| | Services incidental to animal husbandry |
| | Services incidental to fishing |
| **Industry Classification:** | CPC 01, 02, 04, 21, 22, 23, 8811 (other than rental of agricultural equipment with operator), 8812, 882 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.  Québec reserves the right to adopt or maintain a measure limiting market access in the production, transfer of possession or ownership, processing, and collective marketing of aquaculture, marine, and fish products, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.  Québec also reserves the right to adopt or maintain a measure limiting market access in connection with the issuance of permits under the *Food Products Act*.

3.  These measures include, imposing a public interest test and taking into account socio-economic factors.

4.  For greater certainty, this reservation is without prejudice to the right of Québec to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing government enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

| | |
|---|---|
| **Existing Measures** | *Food Products Act*, C.Q.L.R., c. P-29; |
| | *An Act to regularize and provide for the development of local* |

1274

*slaughterhouses*, C.Q.L.R., c. R-19.1
*An Act respecting the marketing of agricultural, food and fish products*, C.Q.L.R. c. M-35.1
*An Act respecting the marketing of marine products*, C.Q.L.R., c. C-32.1;
*The Marine Products Processing Act*, C.Q.L.R., c. T-11.01

**Reservation II-PT-56**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity energy<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 171, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Québec reserves the right to adopt or maintain a measure limiting market access in the production, fixing and modification of rates and conditions, transmission, supply, distribution, and exportation of electricity, and in the maintenance of electrical facilities, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.    Québec reserves the right for the purposes of the activities mentioned in the preceding paragraph, to adopt or maintain a measure related to the transfer and the granting of lands in the domain of the State and of movable and immovable property, and any measure related to all powers and sources of energy from which it is possible to produce electricity.

3.    Hydro-Québec is the holder of exclusive rights regarding the production, transmission, distribution and exportation of electricity. Québec reserves the right to adopt or maintain powers and rights of Hydro-Québec for the purposes of the activities mentioned previously.

4.    These measures include taking into account socio-economic factors.

5.    For greater certainty, this reservation is without prejudice to the right of Québec to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing government enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

| | |
|---|---|
| **Existing Measures** | *Hydro-Québec Act*, C.Q.L.R., c. H-5<br>*An Act respecting the exportation of electric power, C.Q.L.R., c. E-23*<br>*An Act respecting the Régie de l'énergie, C.Q.L.R., c. R-6.01*<br>*An Act respecting municipal and private electric power systems, C.Q.L.R., c. S-41* |

*Act respecting the Ministère des Ressources naturelles et de la Faune, C.Q.L.R., c. M-25.2*
*An Act respecting threatened or vulnerable species, C.Q.L.R., c. E-12.01*

*Loi sur la Coopérative régionale d'électricité de Saint-Jean-Baptiste de Rouville et abrogeant la Loi pour favoriser l'électrification rurale par l'entremise de coopératives d'électricité*, L.Q. 1986, c. 21
*Watercourses Act*, C.Q.L.R., c. R-13

**Reservation II-PT-57**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Crude petroleum and natural gas<br>Transport services *via* pipeline<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 120, 713, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Québec reserves the right to adopt or maintain a measure limiting market access in the operation of oil and gas distribution systems and in transport services via pipeline, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.    Québec also reserves the right to adopt or maintain a measure limiting market access in oil and gas development.

3.    For greater certainty, this reservation is without prejudice to the right of Québec to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing government enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

| | |
|---|---|
| **Existing Measures** | *An Act respecting the Régie de l'énergie*, C.Q.L.R., c. R-6.01<br>*Mining Act*, C.Q.L.R., c. M-13.1 |

## Reservation II-PT-58

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access<br>Most-favoured-nation treatment |

**Description:**   **Investment and Cross-Border Trade in Services**

1.      Québec reserves the right to adopt or maintain a measure limiting market access in the lotteries, lottery schemes, amusement machines, video lottery machines, games of chance, races, betting rooms, bingo, casinos, publicity contests, consulting and implementation services, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      The Société des loteries du Québec is or may be granted a monopoly in the activities mentioned above.

3.      For greater certainty, this reservation is without prejudice to the right of Québec to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing government enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**   *An Act respecting the Société des loteries du Québec*, C.Q.L.R., c. S-13.1
*An Act respecting lotteries, publicity contests and amusement machines*, C.Q.L.R., c. L-6
*An Act respecting racing*, C.Q.L.R., c. C-72.1

**Reservation II-PT-59**

| | |
|---|---|
| **Sector:** | Forestry and logging products |
| **Sub-Sector:** | Wood in the rough<br>Products of wood, cork, straw and plaiting materials<br>Pulp, paper and paper products<br>Printed matter and related articles |
| **Industry Classification:** | CPC 031, 31, 32 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Service** |

1.      Québec reserves the right to adopt or maintain a measure limiting market access in the forest sector, notably measures related to the forest development, the harvesting of forest resources and the products derived from it (including biomass and non-timber), with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      Québec reserves the right to adopt or maintain a measure limiting market access in the marketing or processing of forest resources and the products derived from it as well as any measure limiting market access in the supply of wood processing plants, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

3.      These measures include, imposing public interest tests and taking into account socio-economic factors.

4.      For greater certainty, this reservation is without prejudice to the right of Québec to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing government enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

| | |
|---|---|
| **Existing Measures** | *An Act respecting the marketing of agricultural, food and fish products*, C.Q.L.R., c. M-35.1<br>*Forest Act*, C.Q.L.R., c. F-4.1<br>*Sustainable Forest Development Act*, C.Q.L.R., c. A-18.1<br>*An Act respecting the Ministère des Ressources naturelles et de la Faune*, C.Q.L.R., c. M-25.2 |

**Reservations applicable in Saskatchewan**

**Reservation II-PT-60**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access |
| | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.     Saskatchewan reserves the right to adopt or maintain a measure to limit the number of covered investments or service suppliers whether in the form of a numerical quota, monopoly, exclusive supplier or the requirements of an economic needs test.

2.     Saskatchewan reserves the right to adopt or maintain a measure to restrict or require a specific type of legal entity or joint venture through which an investor may perform an economic activity in the sub-sectors noted above.

3.     This reservation is without prejudice to the right of Saskatchewan to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-61

**Sector:**                        Alcoholic beverages

**Sub-Sector:**                    Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores) Manufacture of alcoholic beverages.

**Industry Classification:**       CPC 24 (other than 244), 62112, 62226, 63107, 643

**Type of Reservation:**           Market access

**Description:**                   **Investment and Cross-Border Trade in Services**

1.      Saskatchewan reserves the right to adopt or maintain a measure to limit the number of covered investments or service suppliers whether in the form of a numerical quota, monopoly, exclusive supplier or the requirements of an economic needs test.

2.      Saskatchewan reserves the right to adopt or maintain a measure to restrict or require a specific type of legal entity or joint venture through which an investor may perform an economic activity in the sub-sectors noted above.

3.      This reservation is without prejudice to the right of Saskatchewan to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-62**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity, town gas, steam and hot water<br>Coal gas, water gas, producer gas and similar gases, other than petroleum gases and other gaseous hydrocarbons<br>Services incidental to energy distribution<br>Electrical energy<br>Producer gas<br>Transport services via pipeline |
| **Industry Classification:** | CPC 17, 713, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Saskatchewan reserves the right to adopt or maintain a measure to limit the number of covered investments or service suppliers whether in the form of a numerical quota, monopoly, exclusive supplier or the requirements of an economic needs test.

2.      Saskatchewan reserves the right to adopt or maintain a measure to restrict or require a specific type of legal entity or joint venture through which an investor may perform an economic activity in the sub-sectors noted above.

3.      This reservation is without prejudice to the right of Saskatchewan to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

Reservations applicable in Yukon

## Reservation II-PT-63

**Sector:**                    Alcoholic beverages

**Sub-Sector:**                Commission agents' services, wholesale trade services, retailing services (liquor, wine and beer, liquor wine and beer stores) Manufacture and transportation of alcoholic beverages

**Industry Classification:**   CPC 24 (other than 244), 62112, 62226, 63107, 7123 (other than 71231, 71232, 71233, 71234), 8841

**Type of Reservation:**       Market access

**Description:**               **Investment and Cross-Border Trade in Services**

1.      Yukon reserves the right to adopt or maintain a measure limiting market access in advertising, storage, manufacture, distribution, transport, sale and trade of alcoholic beverages, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      The Yukon Liquor Corporation is the sole commercial importer of alcoholic beverages into Yukon. In-territory manufacturers of alcoholic beverages may operate a retail outlet at the manufacturing facility as a manufacturer's agent of the Yukon Liquor Corporation.

3.      This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

1285

## Reservation II-PT-64

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access<br>Most-favoured-nation treatment |

**Description:**    **Investment and Cross-Border Trade in Services**

1.      Yukon reserves the right to adopt or maintain a measure limiting market access in the ownership and operation of gambling and gaming facilities, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      Yukon reserves the right to limit market access in lottery schemes, amusement machines, video lottery machines, games of chance, races, betting theatres, bingo casinos and promotional contests, and to conduct such activities, including through a monopoly.

3.      This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-65**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Crude petroleum and natural gas<br>Transport services via pipeline<br>Services incidental to energy distribution |
| **Industry Classification:** | CPC 120, 713, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Yukon reserves the right to adopt or maintain a measure limiting market access in the exploration, production, extraction, and development of oil and gas, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      Yukon reserves the right to adopt or maintain a measure granting an exclusive right to operate a natural gas or oil distribution or transportation system, including, an activity related to oil and natural gas pipeline and marine distribution and transport services.

3.      This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-66**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Production, transmission, and distribution of electricity, gas, steam and hot water<br>Electricity and related services |
| **Industry Classification:** | CPC 17, 887 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.       Yukon reserves the right to adopt or maintain a measure limiting market access in water power, the production, transport, distribution, furnishing, and exportation of electricity, the commercial and industrial uses of water, and services incidental to energy distribution with the exception of measures imposing limitations on the participation of foreign capital in terms of maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.       Yukon may make available to Yukon Development Corporation (or any subsidiary or successor corporation) for operational purposes any facility or any water power that is owned by Yukon or under its control.

3.       This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

## Reservation II-PT-67

**Sector:**                     Forestry

**Sub-Sector:**                 Forestry and logging products

**Industry Classification:**    CPC 03, 531

**Type of Reservation:**        Market access

**Description:**                **Investment and Cross-Border Trade in Services**

1.      Yukon reserves the right to adopt or maintain a measure limiting market access in activities related to forestry and logging products, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-68**

| | |
|---|---|
| **Sector:** | Forestry and agriculture |
| **Sub-Sector:** | Services incidental to agriculture |
| | Services incidental to animal husbandry |
| | Agricultural land, forest and other wooded land |
| | Crown land leases and permits |
| | Forestry and logging products |
| **Industry Classification:** | CPC 03, 531, 8811 (other than rental of agricultural equipment with operator), 8812 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.    Yukon reserves the right to adopt or maintain a measure limiting market access in agricultural land, forest resources, and grazing agreements, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.    This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

1290

**Reservation II-PT-69**

| | |
|---|---|
| **Sector:** | Fisheries |
| **Sub-Sector:** | Fish and other fishing products<br>Services incidental to fishing |
| **Industry Classification:** | CPC 04, 882 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Yukon reserves the right to adopt or maintain a measure limiting market access in fisheries, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-70**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Research and experimental development services on natural sciences and engineering |
| | Research and experimental development services on social sciences and humanities |
| | Interdisciplinary research and experimental development services |
| **Industry Classification:** | CPC 851, 852 (linguistics and languages only), 853 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Yukon reserves the right to adopt or maintain a measure limiting market access in research and development services, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

**Reservation II-PT-71**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Recycling on a fee or contract basis |
| **Industry Classification:** | CPC 88493 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

1.      Yukon reserves the right to adopt or maintain a measure limiting market access related to recycling, with the exception of measures imposing limitations on the participation of foreign capital in terms of a maximum percentage limit on foreign shareholding or the total value of individual or aggregate foreign investment.

2.      This reservation is without prejudice to the right of Yukon to impose limitations on the participation of foreign capital when selling or disposing of its equity interests in, or the assets of, an existing state enterprise or an existing governmental entity pursuant to Canada's Reservation I-C-2.

**Existing Measures**

<u>**ANNEX II**</u>

**Schedule of the European Union**

**Reservations applicable in the European Union (applicable in all Member States of the EU unless otherwise indicated)**

**Sector:**                   All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**       Market access

**Description:**               **Investment**

In all Member States of the EU, services considered as public utilities at a national or local level may be subject to public monopolies or to exclusive rights granted to private operators.

Public utilities exist in sectors such as related scientific and technical consulting services, research and development (R&D) services on social sciences and humanities, technical testing and analysis services, environmental services, health services, transport services and services auxiliary to all modes of transport. Exclusive rights on such services are often granted to private operators, for instance operators with concessions from public authorities, subject to specific service obligations. Given that public utilities often also exist at the sub-central level, detailed and exhaustive sector-specific scheduling is not practical.

This reservation does not apply to telecommunications and to computer and related services.

**Existing Measures:**

**Sector:**                   All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**       Most-favoured-nation treatment

**Description:**               **Investment and Cross-Border Trade in Services**

The EU reserves the right to adopt or maintain any measure which

accords differential treatment to a country pursuant to any existing or future bilateral or multilateral agreement which:

a)     creates an internal market in services and investment;

b)     grants the right of establishment; or

c)     requires the approximation of legislation in one or more economic sectors.

An internal market on services and establishment means an area without internal frontiers in which the free movement of services, capital and persons is ensured.

The right of establishment means an obligation to abolish in substance all barriers to establishment among the parties to the regional economic integration agreement by the entry into force of that agreement. The right of establishment shall include the right of nationals of the Parties to the regional economic integration agreement to set up and operate enterprises under the same conditions provided for nationals under the law of the country where such establishment takes place.

The approximation of legislation means:

(a) the alignment of the legislation of one or more of the parties to the regional economic integration agreement with the legislation of the other Party or Parties to that agreement; or

(b) the incorporation of common legislation into the law of the parties to the regional economic integration agreement.

Such alignment or incorporation shall take place, and shall be deemed to have taken place, only at such time that it has been enacted in the law of the Party or Parties to the regional economic integration agreement.

| | |
|---|---|
| **Existing Measures:** | European Economic Area (EEA) |
| | Stabilisation Agreements |
| | EU-Swiss Confederation bilateral agreements |
| | |
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment** |

The EU reserves the right to adopt or maintain any measure which accords differential treatment relating to the right of establishment to nationals or enterprises through existing or future bilateral agreements between the following Member States of the EU: BE, DE, DK, EL, ES, FR, IE, IT, LU, NL, PT, UK, and any of the following countries or principalities: San Marino, Monaco, Andorra, and the Vatican City State.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Fishing |
| | Aquaculture |
| | Services incidental to fishing |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 882 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Most-favoured-nation treatment |
| | Performance requirements |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU reserves the right to adopt or maintain any measure, in particular within the framework of the Common Fisheries Policy, and of fishing agreements with a third country, with respect to access to and use of the biological resources and fishing grounds situated in maritime waters coming under the sovereignty or within the jurisdiction of Member States of the EU.

The EU reserves the right to adopt or maintain any measure:

(a) regulating the landing of catches performed in the sub-quotas allocated to vessels of Canada or of a third country in EU ports;

(b) determining a minimum size for a company in order to preserve both artisanal and coastal fishing vessels; or

(c) according differential treatment to a Canada or a third country pursuant to existing or future bilateral agreements relating to fisheries.

A commercial fishing licence granting the right to fish in the territorial waters of a Member State of the EU may only be granted to vessels flying the flag of a Member State of the EU.

The EU reserves the right to adopt or maintain any measure with regard to the nationality of the crew of a fishing vessel flying the flag of a Member State of the EU.

National complementary reservations may be found in the schedules of reservations applicable in BE, BG, DE, DK, ES, FI, FR, IT, LT, LU, LV, MT, NL, PL, PT, RO, SE, SI, SK and UK.

**Existing Measures:**


**Sector:** Collection, purification and distribution of water

**Sub-Sector:**

**Industry Classification:** ISIC rev 3.1 41

**Type of Reservation:** Market access

National treatment

**Description:** **Investment**

**Investment and Cross-Border Trade in Services**

The EU reserves the right to adopt or maintain any measure with respect to activities, including services relating to the collection, purification and distribution of water to household, industrial, commercial or other users, including the supply of drinking water, and water management.

**Existing Measures:**


**Sector:** Business services

**Sub-Sector:** Legal services

Services of notaries

Services by bailiffs

**Industry Classification:** Part of CPC 861, part of CPC 87902

**Type of Reservation:** Market access

National treatment

Senior management and boards of directors

**Description:**     **Investment and Cross-Border Trade in Services**

The EU, with the exception of SE, reserves the right to adopt or maintain any measure with respect to the supply of legal advisory and legal authorisation and certification services provided by legal professionals entrusted with public functions, such as notaries, "*huissiers de justice*" or other *"officiers publics et ministériels"*, and with respect to services provided by bailiffs who are appointed by an official act of government.

**Existing Measures:**

**Sector:**     Distribution and health services

**Sub-Sector:**     Retail sales of pharmaceutical, medical and orthopaedic goods, other services provided by pharmacists

**Industry Classification:**     CPC 63211

**Type of Reservation:**     Market access

**Description:**     **Cross-Border Trade in Services**

For all Member States of the EU with the exception of BE, BG, EE, and IE, mail order is only possible from Member States of the EEA, thus establishment in any of these countries is required for the retail of pharmaceuticals and specific medical goods to the general public in the EU.

In BG, DE and EE, the mail order of pharmaceuticals is prohibited. In IE, the mail order of pharmaceuticals requiring a prescription is prohibited.

National complementary reservations may be found in the schedules of reservations applicable in BE, FI, SE and SK.

**Existing Measures:**

**Sector:**     Distribution and health services

**Sub-Sector:**     Retail sales of pharmaceutical, medical and orthopaedic goods, other services provided by pharmacists

**Industry Classification:**     CPC 63211

1298

| | |
|---|---|
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |

The EU, with the exception of EL, IE, LT, LU, NL, and the UK, reserves the right to adopt or maintain any measure which restricts the number of suppliers entitled to provide a particular service in a specific local zone or area on a non-discriminatory basis in order to prevent oversupply in areas of limited demand. An economic needs test may therefore be applied, taking into account such factors as the number of and impact on existing establishments, transport infrastructure, population density or geographic spread.

National complementary reservations may be found in the schedules of reservations applicable in AT, DE, ES, FI, FR, IT, LU, LV, MT, PT, SE and SI.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Other business services (collection agency services, credit reporting services) |
| **Industry Classification:** | CPC 87901, CPC 87902 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |

The EU, with the exception of ES and SE, reserves the right to adopt or maintain any measure with regard to the supply of collection agency services and credit reporting services.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Placement services of office support personnel and other workers |
| | Supply services of domestic help personnel, other commercial or industrial workers, nursing, and other personnel |
| **Industry Classification:** | CPC 87202, CPC 87204, CPC 87205, CPC 87206, CPC 87209 |

| | |
|---|---|
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU, with the exception of BE, HU and SE, reserves the right to require establishment and to prohibit the cross-border supply of placement services of office support personnel and other workers.

The EU, with the exception of HU and SE, reserves the right to adopt or maintain any measure with regard to the supply of placement services of domestic help personnel, other commercial or industrial workers, nursing, and other personnel.

National complementary reservations may be found in the schedules of reservations applicable in AT, BE, BG, CY, CZ, DE, EE, ES, FI, FR, IT, LT, LV, MT, PL, PT, RO, SI, and SK.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Investigation services |
| **Industry Classification:** | CPC 87301 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU, with the exception of AT and SE, reserves the right to adopt or maintain any measure with regard to the supply of investigation services. Residency or commercial presence is required and nationality requirements may exist.

National complementary reservations may be found in the schedules of reservations applicable in LT and PT.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |

Auxiliary services to maritime, internal waterways, rail and air transport

**Sub-Sector:**           Maintenance and repair of vessels, rail transport equipment and aircraft and parts thereof

**Industry Classification:**   Part of CPC 86764, CPC 86769, CPC 8868,

**Type of Reservation:**   Market access

National treatment

**Description:**          **Cross-Border Trade in Services**

The EU, with the exception of DE, EE and HU, reserves the right to adopt or maintain any measure with respect to requiring establishment or physical presence in its territory and prohibiting the cross-border supply of maintenance and repair services of rail transport equipment from outside its territory.

The EU, with the exception of CZ, EE, HU, LU and SK, reserves the right to adopt or maintain any measure with respect to requiring establishment or physical presence in its territory and prohibiting the cross-border supply of maintenance and repair services of internal waterways transport vessels from outside its territory.

The EU, with the exception of EE, HU and LV, reserves the right to adopt or maintain any measure with respect to requiring establishment or physical presence in its territory and prohibiting the cross-border supply of maintenance and repair services of maritime vessels from outside its territory.

Only recognised organisations authorised by the EU may carry out statutory surveys and certification of ships on behalf of Member States of the EU. Establishment may be required.

The EU, with the exception of AT, EE, HU, LV, and PL, reserves the right to adopt or maintain any measure with respect to requiring establishment or physical presence in its territory and prohibiting the cross-border supply of maintenance (including line maintenance) and repair services of aircraft and parts thereof from outside its territory.

**Existing Measures:**

**Sector:**              Communication services

**Sub-Sector:**           Telecommunication services

**Industry Classification:**

**Type of Reservation:**    Market access,

Ê                          National treatment

**Description:**            **Investment and Cross-Border Trade in Services**

The EU reserves the right to adopt or maintain any measure with respect to broadcast transmission services.

Broadcasting is defined as the uninterrupted chain of transmission required for the distribution of TV and radio programme signals to the general public, but does not cover contribution links between operators.

**Existing Measures:**

**Sector:**                        Recreational, cultural and sporting services

**Sub-Sector:**

**Industry Classification:**       CPC 9619**,** CPC 963 , CPC 964 other than CPC 96492

**Type of Reservation:**           Market access

                                   National treatment

                                   Most-favoured-nation treatment

                                   Performance requirements

                                   Senior management and boards of directors

**Description:**                   **Investment and Cross-Border Trade in Services**

The EU, with the exception of AT reserves the right to adopt or maintain any measure with respect to the supply of library, archive, museum, and other cultural services. LT reserves the right to adopt or maintain any measure requiring the establishment of suppliers and restricting the cross-border supply of these services. In AT and LT, a licence or concession may be required to provide these services.

CY, CZ, FI, MT, PL, RO, SI, and SK reserve the right to adopt or maintain any measure with respect to the supply of entertainment services, including theatre, live bands, circus and discotheque services.

In addition, the EU, with the exception of AT and SE, reserves the right to adopt or maintain any measure requiring establishment and restricting the cross-border supply of entertainment services, including theatre, live bands, circus and discotheque services.

BG reserves the right to adopt or maintain any measure with respect to the supply of the following entertainment services: circus, amusement park and similar attraction services, ballroom, discotheque and dance instructor services, and other entertainment services.

EE reserves the right to adopt or maintain any measure with respect to the supply of other entertainment services except for cinema theatre services.

LT and LV reserve the right to adopt or maintain any measure with respect to the supply of all entertainment services other than cinema theatre operation services.

BG, CY, CZ, EE, LV, MT, PL, RO, and SK reserve the right to adopt or maintain any measure with respect to the cross-border supply of sporting and other recreational services.

AT reserves the right to adopt or maintain any measure with respect to the supply of mountain guide or ski school services.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Gambling and betting services |
| **Industry Classification:** | CPC 96492 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Most-favoured-nation treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU, with the exception of MT, reserves the right to adopt or maintain any measure with respect to the supply of gambling activities, which involve wagering a stake with pecuniary value in games of chance, including in particular lotteries, scratch cards, gambling services offered in casinos, gambling arcades or licensed premises, betting services, bingo services and gambling services operated by and for the benefit of charities or non-profit-making organisations.

This reservation does not apply to games of skill, gambling machines that do not give prizes or that give prizes only in the form of free games, and promotional games, whose exclusive purpose is to encourage the sale of goods or services which are not covered by this exclusion.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 92 |
| **Type of Reservation:** | Market access |
| | National treatment |

Performance requirements

Senior management and boards of directors

**Description:**  **Investment and Cross-Border Trade in Services**

The EU reserves the right to adopt or maintain any measure with regard to the supply of all educational services which receive public funding or State support in any form, and are therefore not considered to be privately funded.

The EU, with the exception of CZ, NL, SE and SK, reserves the right to adopt or maintain any measure with respect to the supply of privately funded other education services, which means other than those classified as being primary, secondary, higher and adult education services.

Where the supply of privately funded education services by a foreign provider is permitted, participation of private operators in the education system may be subject to concession allocated on a non-discriminatory basis.

National complementary reservations may be found in the schedules of reservations applicable in AT, BG, CY, CZ, FI, FR, IT, MT, RO, SE, SI, and SK.

**Existing Measures:**


**Sector:**  Health and social services

**Sub-Sector:**  Human health services

Social services

**Industry Classification:**  CPC 931 other than 9312, part of 93191

**Type of Reservation:**  Market access

National treatment

**Description:**  **Cross-Border Trade in Services**

The EU, with the exception of HU, reserves the right to adopt or maintain any measure requiring the establishment or physical presence in their territory of suppliers and restricting the cross-border supply of health services from outside their territory.

The EU reserves the right to adopt or maintain any measure requiring the establishment or physical presence in their territory of suppliers and restricting the cross-border supply of social services from outside their territory, as well as with respect to

1305

activities or services forming part of a public retirement plan or statutory system of social security.

This reservation does not relate to the supply of all health-related professional services, including the services provided by professionals such as medical doctors, dentists, midwives, nurses, physiotherapists, paramedics, and psychologists, which are covered by other reservations.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 931, other than 9312 part of CPC 93191 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |

The EU reserves the right to adopt or maintain any measure with regard to the supply of all health services which receive public funding or State support in any form, and are therefore not considered to be privately funded.

The EU reserves the right to adopt or maintain any measure with regard to all privately funded health services, other than privately funded hospital, ambulance, and residential health facilities services other than hospital services.

The participation of private operators in the privately funded health network may be subject to concession on a non-discriminatory basis. An economic needs test may apply. Main criteria: number of and impact on existing establishments, transport infrastructure, population density, geographic spread, and creation of new employment.

This reservation does not relate to the supply of all health-related professional services, including the services supplied by professionals such as medical doctors, dentists, midwives, nurses, physiotherapists, paramedics, and psychologists, , which are covered by other reservations.

National complementary reservations may be found in the schedules of reservations applicable in AT, BE, BG, CY, CZ, FI,

FR, MT, PL, SI, SK and UK.

**Existing Measures:**


**Sector:**                     Health services

**Sub-Sector:**                 Health-related professional services: medical and dental services, midwife services, nursing services, physiotherapeutic and para-medical services, psychologist services

**Industry Classification:**    CPC 9312, part of CPC 93191

**Type of Reservation:**        Market access

**Description:**                **Cross-Border Trade in Services**

In the EU, with the exception of BE, FI, NL and SE, the supply of all health-related professional services, including the services provided by professionals such as medical doctors, dentists, midwives, nurses, physiotherapists, paramedics, and psychologists, requires residency.

These services may only be provided by natural persons physically present in the territory of the EU.

National complementary reservations may be found in the schedules of reservations applicable in AT, BE, BG, FI, FR, MT, SK and UK.

**Existing Measures:**          None


**Sector:**                     Social services

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**        Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**                **Investment**

The EU reserves the right to adopt or maintain any measure with regard to the supply of all social services which receive public

funding or State support in any form, and are therefore not considered to be privately funded, and with regard to activities or services forming part of a public retirement plan or statutory system of social security.

The participation of private operators in the privately funded social network may be subject to concession on a non-discriminatory basis. An economic needs test may apply. Main criteria: number of and impact on existing establishments, transport infrastructure, population density, geographic spread, and creation of new employment.

National complementary reservations may be found in the schedules of reservations applicable in BE, CY, CZ, DE, DK, EL, ES, FI, FR, HU, IE, IT, LT, MT, PL, PT, RO, SI, SK, and UK.

**Existing Measures:**

---

**Sector:**      Financial services

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**      Market access

**Description:**      **Financial Services**

The EU reserves the right to adopt or maintain any measure requiring a financial institution, other than a branch, when establishing in a Member State of the EU to adopt a specific legal form, on a non-discriminatory basis.

**Existing Measures:**

---

**Sector:**      Financial services

**Sub-Sector:**      Banking and other financial services (excluding insurance)

**Industry Classification:**

**Type of Reservation:**      Market access

- National treatment

- Cross-Border supply of financial services

1308

| | |
|---|---|
| **Description:** | **Financial services** |
| | Only firms having their registered office in the EU can act as depositories of the assets of investment funds. The establishment of a specialised management company, having its head office and registered office in the same Member State of the EU, is required to perform the activities of management of common funds, including unit trusts, and where allowed under national law, investment companies. |
| **Existing Measures:** | Council Directive 85/611/EEC of 20 December 1985 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS). |

| | |
|---|---|
| **Sector:** | Air transport |
| **Sub-Sector:** | Services auxiliary to air transport |
| **Industry Classification:** | |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | The EU reserves the right to adopt or maintain any measure which accords differential treatment to a third country pursuant to existing or future bilateral agreements relating to the following Auxiliary air transport services: |
| | (a) the selling and marketing of air transport services; |
| | (b) computer reservation system (CRS) services; and |
| | (c) other services auxiliary to air transport, such as ground-handling services and airport operation services. |
| | In respect of maintenance and repair of aircrafts and parts, the EU reserves the right to adopt or maintain any measure which accords differential treatment to a third country pursuant to existing or future trade agreements pursuant to Article V of GATS. |
| **Existing Measures:** | |

**Sector:**                     Air transport

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**        National treatment

                                Market access

                                Senior management and boards of directors

                                Performance requirements

                                Most-favoured-nation treatment

**Description:**                **Investment**

The EU reserves the right to adopt or maintain any measure relating to air services, or related services in support of air services and other services supplied by means of air transport other than the services set out in Article 8.2.2(a) (i) to (v), with respect to the establishment, acquisition or expansion of a covered investment, to the extent that such measures are not excluded from the scope of Sections B and C of Chapter Eight (Investment).

**Existing Measures:**

**Sector:**                     Transport

**Sub-Sector:**                 Water transport

**Industry Classification:**    ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 5133, CPC 5223, CPC 722, CPC 74520, CPC 74540, CPC 74590, CPC 882

**Type of Reservation:**        National treatment

                                Market access

                                Senior management and board of directors

**Description:**                **Investment**

The EU reserves the right to adopt or maintain any measure with regard to the registration of a non-seagoing vessel in order to fly the national flag of a Member State of the EU, and with regard to the establishment of a registered company for the purpose of operating a fleet under the national flag of the State of

establishment. This reservation relates to, among other elements, requirements for incorporation or to maintain a principal office in the Member State of the EU concerned, as well as requirements relating to ownership of capital and control.

**Existing Measures:**


| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Water transport |
| **Industry Classification:** | CPC 5133 CPC 5223,CPC 721,CPC 722,CPC 74520, CPC 74540, CPC 74590<br>Any other commercial activity undertaken from a ship |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Senior management and board of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | The EU reserves the right to adopt or maintain any measure with regard to the nationality of crew on a seagoing or non-seagoing vessel. |

**Existing Measures:**


| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Water transport |
| | Supporting services for water transport |
| **Industry Classification:** | CPC 72, CPC 745 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | The EU reserves the right to adopt or maintain any measure with respect to the supply of national cabotage transport. |

Without prejudice to the scope of activities which may be considered as cabotage under the relevant national legislation, national cabotage transport is assumed to cover transportation of passengers or goods between a port or point located in a Member State of the EU and another port or point located in the same Member State of the EU, including on its continental shelf as provided in the UN Convention on the Law of the Sea, and traffic originating and terminating in the same port or point located in a Member State of the EU.

For greater certainty, this reservation applies *inter alia* to feeder services. This reservation does not apply to shipping companies of Canada repositioning owned or leased containers on a non-revenue basis.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Water transport: pilotage and berthing services, pushing and towing |
| **Industry Classification:** | CPC 7214, CPC 7224, CPC 7452 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU reserves the right to adopt or maintain any measure with respect to the supply of pilotage and berthing services. For greater clarity, regardless of the criteria which may apply to the registration of ships in a Member State of the EU, the EU reserves the right to require that only ships registered on the national registers of Member States of the EU may provide pilotage and berthing services.

For the EU, with the exception of LT and LV, only vessels carrying the flag of a Member State of the EU may provide pushing and towing services.

For LT, only juridical persons of Lithuania or juridical persons of a Member State of the EU with branches in Lithuania that have a Certificate issued by the Lithuanian Maritime Safety Administration may provide pilotage and berthing, pushing and towing services.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Internal waterways transport |
| **Industry Classification:** | CPC 722 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU reserves the right to adopt or maintain any measure which accords differential treatment to a third country pursuant for existing or future agreements relating to access to inland waterways (including agreements following the Rhine-Main-Danube link), which reserve traffic rights for operators based in the countries concerned who meet nationality criteria regarding ownership.

Subject to regulations implementing the Mannheim Convention on Rhine Shipping. This part of the reservation only applies to the following Member States of the EU: BE, FR, DE, and NL.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport: passenger transportation, freight transportation, international truck transport services |
| **Industry Classification:** | CPC 712 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU reserves the right to require establishment and to limit the cross-border supply of road transport services.

The EU reserves the right to adopt or maintain measures limiting the supply of cabotage within a Member State of the EU by foreign investors established in another Member State of the EU.

An economic needs test may apply to taxi services in the EU with the exception of BE. The economic needs test, when

1313

applied, sets a limit on the number of service suppliers. Main criteria: Local demand as provided in applicable laws.

For road passenger and freight transportation, national complementary reservations may be found in the schedules of reservations applicable in AT, BE, BG, ES, FI, FR, IE, IT, LT, LV, MT, PT, RO, SE, and SK.

|  |  |
|---|---|
| **Existing Measures:** | Regulation (EC) No 1071/2009 of the European Parliament and of the Council of 21 October 2009 establishing common rules concerning the conditions to be complied with to pursue the occupation of road transport operator and repealing Council Directive 96/26/EC |
|  | Regulation (EC) No 1072/2009 of the European Parliament and of the Council of 21 October 2009 on common rules for access to the international road haulage market |
|  | Regulation (EC) No 1073/2009 of the European Parliament and of the Council of 21 October 2009 on common rules for access to the international market for coach and bus services, and amending Regulation (EC) No 561/2006 |

|  |  |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road and rail transport |
| **Industry Classification:** | CPC 7111, CPC 7112, CPC 7121, CPC 7122, CPC 7123 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU reserves the right to adopt or maintain any measure which accords differential treatment to a country pursuant to existing or future bilateral agreements relating to international road haulage (including combined transport – road or rail) and passenger transport, concluded between the EU or the Member States of the EU and a third country.

Such treatment may:

(a) reserve or limit the supply of the relevant transport services between the contracting Parties or across the territory of the contracting Parties to vehicles registered in each contracting Party[80]; or

---

[80] With regard to Austria the part of the most-favoured-nation treatment exemption regarding traffic rights covers all countries with whom bilateral agreements on road transport or other arrangements relating to road transport exist or may be considered in future.

1314

(b) provide for tax exemptions for such vehicles.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Space transport |
| | Rental of space craft |
| **Industry Classification:** | CPC 733, part of CPC 734 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

The EU reserves the right to adopt or maintain any measure with respect to the transportation services via space and the rental of space craft.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity and gas transmission systems |
| | Oil and gas pipeline transport |
| **Industry Classification:** | ISIC rev 3.1 401, 402, CPC 7131, CPC 887 (other than advisory and consultancy services) |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |

Where a Member State of the EU permits foreign ownership of a gas or electricity transmission system, or an oil and gas pipeline transport system, the EU reserves the right to adopt or maintain any measure with respect to enterprises of Canada controlled by

natural persons or enterprises of a third country which accounts for more than 5 per cent of the EU's oil or natural gas or electricity imports, in order to guarantee the security of the energy supply of the EU as a whole, or of an individual Member State of the EU.

This reservation does not apply to advisory and consultancy services provided as services incidental to energy distribution.

This reservation does not apply to HU and LT (for LT, only CPC 7131) with regard to the pipeline transport of fuels, nor to LV with regard to services incidental to energy distribution, nor to SI with regard to services incidental to the distribution of gas.

National complementary reservations may be found in the schedules of reservations applicable in BE, BG, CY, FI, FR, HU, LT, NL, PT, SI and SK.

**Existing Measures:**     Directive 2009/72/EC of the European Parliament and of the Council of 13 July 2009 concerning common rules for the internal market in electricity and repealing Directive 2003/54/EC

Directive 2009/73/EC of the European Parliament and of the Council of 13 July 2009 concerning common rules for the internal market in natural gas and repealing Directive 2003/55/EC

***

## Reservations applicable in Austria

| | |
|---|---|
| **Sector:** | Manufacture of nuclear fuel, electricity, gas and water supply |
| **Sub-Sector:** | Nuclear based electricity generation, processing of nuclear material and fuel, transportation and handling of nuclear material |
| **Industry Classification:** | ISIC rev 3.1 233, ISIC rev 3.1 40 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Austria reserves the right to adopt or maintain any measure with respect to the processing, distribution or transportation of nuclear material and generation of nuclear-based energy. |
| **Existing Measures:** | Bundesverfassungsgesetz für ein atomfreies Österreich (Constitutional Law on a Nuclear Free Austria), BGBl. I Nr. 149/1999 |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Placement services of office support personnel and other workers |
| | Supply services of office support personnel |
| **Industry Classification:** | CPC 87202, CPC 87203 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Austria reserves the right to adopt or maintain any measure with regard to the supply of supply services of office support personnel, and the establishment of suppliers of placement services of office support personnel and other workers. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Education services |

1317

| | |
|---|---|
| **Sub-Sector:** | Higher education services |
| | Adult education services |
| **Industry Classification:** | CPC 923, CPC 924 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Austria reserves the right to adopt or maintain any measure with regard to the supply of privately funded higher education services. |
| | Austria reserves the right to prohibit the cross-border supply of privately funded adult education services by means of radio or television broadcasting. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Ambulance services |
| **Industry Classification:** | CPC 93192 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Austria reserves the right to adopt or maintain any measure with respect to the supply of privately funded ambulance services. |
| **Existing Measures:** | |

***

## Reservations applicable in Belgium

**Sector:**                        Fishing

                                   Aquaculture

                                   Services incidental to fishing

**Sub-Sector:**

**Industry Classification:**       ISIC rev 3.1 0501, 0502, CPC 882

**Type of Reservation:**           Market access

                                   National treatment

                                   Senior management and boards of directors

**Description:**                   **Investment and Cross-Border Trade in Services**

A fishing licence is mandatory for performing marine fishing activities in Belgium. The owner of a vessel who has a fishing licence is either a legal person or a natural person. The natural person has to be a resident of Belgium when applying for a fishing licence. The legal person has to be a domestic firm and the managers of the domestic firm have to be active in fisheries and to be residents of Belgium when applying for a fishing licence.

**Existing Measures:**


**Sector:**                        Business services

**Sub-Sector:**                    Security services

**Industry Classification:**       CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309

**Type of Reservation:**           Market access

                                   National treatment

                                   Senior management and boards of directors

**Description:**                   **Investment and Cross-Border Trade in Services**

The supply of security services by a foreign provider on a cross-border basis is not allowed.

Requirement of nationality of a Member State of the EU for boards of directors of companies providing guard and security services, as well as consultancy and training relating to security services. The senior management of companies providing guard

1319

and security consultancy services are required to be resident nationals of a Member State of the EU.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Retail sales of pharmaceutical, medical and orthopaedic goods |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services** |
| | Mail order is only authorised for pharmacies open to the public, thus establishment in Belgium is required for the retail of pharmaceuticals |
| **Existing Measures:** | Arrêté royal du 21 janvier 2009 portant instructions pour les pharmaciens |
| | Arrêté royal du 10 novembre 1967 relatif à l'exercice des professions des soins de santé |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Ambulance services |
| | Residential health services other than hospital services |
| **Industry Classification:** | CPC 93192, CPC 93193 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Belgium reserves the right to adopt or maintain any measure with respect to the supply of privately funded ambulance and residential health services other than hospital services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Health-related professional services: medical and dental services, midwife services, nursing services, physiotherapeutic and para-medical services, psychologist services, veterinary services |
| **Industry Classification:** | Part of CPC 85201, CPC 9312, part of CPC 93191, CPC932 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |
| | Belgium reserves the right to adopt or maintain any measure relating to the cross-border supply of medical, dental and midwives services and services provided by nurses, physiotherapists and paramedical personnel, and veterinary services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 933 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Belgium reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Transport |

| | |
|---|---|
| **Sub-Sector:** | Cargo handling services |
| **Industry Classification:** | CPC 741 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Cargo handling services can only be operated by accredited workers, eligible to work in port areas designated by royal decree. |
| **Existing Measures:** | Loi du 8 juin 1972 organisant le travail portuaire. |
| | Arrêté royal du 12 janvier 1973 instituant une Commission paritaire des ports et fixant sa dénomination et sa compétence |
| | Arrêté royal du 4 septembre 1985 portant agrément d'une organisation d'employeur (Anvers) |
| | Arrêté royal du 29 janvier 1986 portant agrément d'une organisation d'employeur (Gand) |
| | Arrêté royal du 10 juillet 1986 portant agrément d'une organisation d'employeur (Zeebrugge) |
| | Arrêté royal du 1er mars 1989 portant agrément d'une organisation d'employeur (Ostende) |
| | Arrêté royal du 5 juillet 2004 relatif à la reconnaissance des ouvriers portuaires dans les zones portuaires tombant dans le champ d'application de la loi du 8 juin 1972 organisant le travail portuaire, tel que modifié. |

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport |
| **Industry Classification:** | CPC 71221 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |
| | Belgium reserves the right to restrict the availability of licences to provide taxi services. |
| | For the Brussels Capital Region: A maximum number of licences is fixed by law. |
| | For the Flemish Region: A maximum number of taxis per capita is fixed by law. This number can be adjusted, in which case an |

economic needs test is applied. Main criteria: degree of urbanisation, average occupancy rate of existing taxis.

<u>For the Walloon Region</u>: A maximum number of taxis per capita is fixed by law. This number can be adjusted, in which case an economic needs test is applied. Main criteria: average occupancy rate of existing taxis.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Production of electricity |
| **Industry Classification:** | ISIC rev 3.1 4010 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Investment** |

An individual authorisation for the production of electricity of a capacity of 25 MW requires establishment in the EU, or in another State which has a similar regime to that enforced by Directive 96/92 in place, and where the company has an effective and continuous link with the economy.

The offshore production of electricity within the offshore territory of Belgium is subject to concession and a joint venture obligation with a company from a Member State of the EU, or a foreign company from a country having a similar regime to that of Directive 2003/54/EC, particularly with regard to conditions relating to the authorisation and selection. Additionally, the company should have its central administration or its head office in a Member State of the EU or a country meeting the above criteria, where it has an effective and continuous link with the economy.

The construction of electrical power lines which link offshore production to the transmission network of Elia requires authorisation and the company must meet the previously specified conditions, except for the joint venture requirement.

**Existing Measures:**     Arrêté Royal du 11 octobre 2000 fixant les critères et la procédure d'octroi des autorisations individuelles préalables à la construction de lignes directes

Arrêté Royal du 20 décembre 2000 relatif aux conditions et à la procédure d'octroi des concessions domaniales pour la

construction et l'exploitation d'installations de production d'électricité à partir de l'eau, des courants ou des vents, dans les espaces marins sur lesquels la Belgique peut exercer sa juridiction conformément au droit international de la mer

Arrêté Royal du 12 mars 2002 relatif aux modalités de pose de câbles d'énergie électrique qui pénètrent dans la mer territoriale ou dans le territoire national ou qui sont installés ou utilisés dans le cadre de l'exploration du plateau continental, de l'exploitation des ressources minérales et autres ressources non vivantes ou de l'exploitation d'îles artificielles, d'installations ou d'ouvrages relevant de la juridiction belge

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Energy transmission services and bulk storage services of gas |
| **Industry Classification:** | ISIC rev 3.1 4010, CPC 71310, part of CPC 742, CPC 887 (other than consultancy services) |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Belgium reserves the right to adopt or maintain any measure related to the types of legal entities and to the treatment of public or private operators to whom Belgium has conferred exclusive rights. Establishment is required within EU for energy transmission services and for bulk storage services of gas.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Energy distribution services and services incidental to energy distribution |
| **Industry Classification:** | CPC 887 (other than consultancy services) |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Belgium reserves the right to adopt or maintain any measure related to energy distribution services and services incidental to energy distribution.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Transport via pipeline of fuel |
| **Industry Classification:** | CPC 7131 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Cross-border Trade in Services** |

The pipeline transport of natural gas and other fuels is subject to an authorisation requirement. An authorisation may only be granted to a natural or juridical person established in a Member State of the EU (in accordance with Art. 3 of the AR of 14 May 2002).

Where the authorisation is requested by a company then:

(a) the company must be established in accordance with Belgian law, or the law of another Member State of the EU, or the law of a third country, which has undertaken commitments to maintain a regulatory framework similar to the common requirements specified in Directive 98/30/EC of the European Parliament and the Council of 22 June 1998 concerning common rules for the internal market in natural gas; and

(b) the company must hold its administrative seat, its principal establishment or its head office within a Member State of the EU, or a third country, which has undertaken commitments to maintain a regulatory framework similar to the common requirements specified in Directive 98/30/EC of the European Parliament and the Council of 22 June 1998 concerning common rules for the internal market in natural gas, provided that the activity of this establishment or head office represents an effective and continuous link with the economy of the country concerned.

**Existing Measures:**    Arrêté Royal du 14 mai 2002 relatif à l'autorisation de transport de produits gazeux et autres par canalisations.

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Wholesaling services of electricity and gas |
| **Industry Classification:** | CPC 62271 |
| **Type of Reservation:** | National treatment |
| **Description:** | **Cross-border Trade in Services** |

An authorisation is necessary for the supply of electricity by an intermediary having customers established in Belgium who are connected to the national grid system or to a direct line whose nominal voltage is higher than 70,000 volts. Such an authorisation may only be granted to a natural or juridical person established in the EEA.

In general, the supply of natural gas to customers (customers being both distribution companies and consumers whose overall combined consumption of gas arising from all points of supply attains a minimum level of one million cubic metres per year) established in Belgium is subject to an individual authorisation provided by the minister, except where the supplier is a distribution company using its own distribution network. Such an authorisation may only be granted to a natural or juridical person established in a Member State of the EU.

| | |
|---|---|
| **Existing Measures:** | Arrêté royal relatif aux autorisations de fourniture d'électricité par des intermédiaires et aux règles de conduite applicables à ceux-ci |
| | Arrêté royal du 12 juin 2001 relatif aux conditions générales de fourniture de gaz naturel et aux conditions d'octroi des autorisations de fourniture de gaz naturel |

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Nuclear energy |
| **Industry Classification:** | ISIC rev 3.1 233, ISIC rev 3.1 40 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Belgium reserves the right to adopt or maintain any measure with respect to the production, processing or transportation of

nuclear material and generation or distribution of nuclear-based energy.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Mining and quarrying, manufacturing and energy |
| **Sub-Sector:** | Mining and quarrying, manufacture of refined petroleum products and nuclear fuel, electricity, gas and hot water supply |
| **Industry Classification:** | ISIC rev 3.1 10, ISIC rev 3.11110, ISIC rev 3.1 13, ISIC rev 3.1 14, ISIC rev 3.1 232, part of ISIC rev 3.1 4010, part of ISIC rev 3.1 4020, part of ISIC rev 3.1 4030 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment** |
| | With the exception of the mining of metal ores and other mining and quarrying, enterprises of Canada controlled by natural persons or enterprises of a third country which accounts for more than 5 per cent of the EU's oil or natural gas or electricity imports may be prohibited from obtaining control of the activity. |
| | Incorporation is required (no branching). |

**Existing Measures:**

***

## Reservations applicable in Bulgaria

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Description:** | **Investment** |

Foreign natural and foreign juridical persons (including through a branch) cannot acquire ownership of land in Bulgaria. Juridical persons of Bulgaria with foreign participation cannot acquire ownership of agricultural land. Foreign juridical persons and foreign citizens with permanent residence abroad can acquire ownership of buildings and limited property rights (right to use, right to build, right to raise a superstructure and servitudes) of real estate. Foreign citizens with permanent residence abroad, foreign juridical persons and companies in which foreign participation ensures a majority in adopting decisions or blocks the adoption of decisions, can acquire real estate property rights in specific geographic regions designated by the Council of Ministers subject to permission.

| | |
|---|---|
| **Existing Measures:** | Constitution of the Republic of Bulgaria, art. 22 |
| | Law on Ownership and Use of Agricultural Land, art. 3 |
| | Law on Forests, art. 10 |

| | |
|---|---|
| **Sector:** | All sectors other than mining and quarrying |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Measures:** | Law on State Property |
| | Concessions Act |
| | Law on Privatisation and Post-Privatisation Control |

| | |
|---|---|
| **Description:** | **Investment** |

Certain economic activities related to the exploitation or use of State or public property are subject to concessions granted under the provisions of the Concessions Act.

Commercial corporations in which the State or a municipality holds a share in the capital exceeding 50 per cent, cannot effect any transactions for disposition of fixed assets of the corporation, to conclude any contracts for acquisition of participating interest, lease, joint activity, credit, securing of receivables, as well as incurring any obligations arising under bills of exchange, unless permitted by the Privatisation Agency or the municipal council, whichever is the competent authority.

This reservation does not apply to mining and quarrying, which are subject to a separate reservation in Annex I.

**Existing Measures:**

**Sector:**               Fishing

                          Aquaculture

                          Services incidental to fishing

**Sub-Sector:**

**Industry Classification:**   ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 882

**Type of Reservation:**   Market access

                          National treatment

                          Most-favoured-nation treatment

**Description:**           **Investment and Cross-Border Trade in Services**

                          The taking of marine and river-living resources, performed by vessels in the internal marine waters, the territorial sea and on the inland waterways of Bulgaria, shall be performed by vessels flying the flag of Bulgaria. A foreign ship may not engage in commercial fishing in the exclusive economic zone save on the basis of an agreement between Bulgaria and the flag state. While passing through the exclusive economic zone, foreign fishing ships may not maintain their fishing gear in operational mode.

**Existing Measures:**

**Sector:**               Energy

**Sub-Sector:**

| | |
|---|---|
| **Industry Classification:** | ISIC rev 3.1 40, CPC 71310, part of CPC 88 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Bulgaria reserves the right to adopt or maintain any measure with respect to the production of electricity and heat and to the services incidental to energy distribution, as well as to pipeline transportation, storage and warehousing of petroleum and natural gas, including transit transmission.

| | |
|---|---|
| **Existing Measures:** | Energy Act |

| | |
|---|---|
| **Sector:** | Manufacturing, electricity, gas and water supply |
| **Sub-Sector:** | Nuclear-based electricity generation |
| | Processing of nuclear material and fuel |
| | Transportation or handling of nuclear material |
| **Industry Classification:** | ISIC rev 3.1 23, ISIC rev 3.1 40 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment** |

Bulgaria reserves the right to adopt or maintain any measure with respect to the processing of fissionable and fusionable materials or the materials from which they are derived, as well as to the trade therewith, to the maintenance and repair of equipment and systems in nuclear energy production facilities, to the transportation of such materials and the refuse and waste matter of their processing, to the use of ionising radiation, and on all other services relating to the use of nuclear energy for peaceful purposes (incl. engineering and consulting services and services relating to software, etc.).

| | |
|---|---|
| **Existing Measures:** | Safe Use of Nuclear Energy Act |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | In Bulgaria, full national treatment on the establishment and operation of companies, as well as on the supply of services, may be extended only to companies established in, and citizens of, the countries with whom preferential arrangements have been or will be concluded. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211 and CPC 86212 other than accounting services |
| **Type of Reservation:** | National treatment |
| **Measures:** | Independent Financial Audit Act |
| **Description:** | **Cross-Border Trade in Services** |

An independent financial audit shall be implemented by registered auditors who are members of the Institute of the Certified Public Accountants. Subject to reciprocity, the Institute of the Certified Public Accountants shall register an audit entity of Canada or of a third country upon the latter's furnishing proof that:

(a) three-fourths of the members of the management bodies and the registered auditors carrying out audit on behalf of the entity meet requirements equivalent to those for Bulgarian auditors and have passed successfully the examinations for it;

(b) the audit entity carries out independent financial audit in accordance with the requirements for independence and objectivity; and

(c) the audit entity publishes on its website an annual transparency report or performs other equivalent requirements for disclosure in case it audits public-interest entities.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Veterinary services |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Measures:** | Veterinary Practices Act |
| **Description:** | **Investment and Cross-Border Trade in Services** |

In Bulgaria, a veterinary medical establishment may be established by a natural or a legal person.

The practice of veterinary medicine is subject to a condition of nationality of a Member State of the EU or the EEA, otherwise a permanent residence permit is required for foreign nationals (physical presence is required).

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Executive search |
| | Placement services |
| | Supply services of office support personnel |
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Bulgaria reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

Bulgaria reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply

services of office support personnel.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Bulgaria reserves the right to adopt or maintain any measure with regard to the supply of security services.

Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Distribution |
| **Sub-Sector:** | Distribution of chemical products |
| | Distribution of precious metals and stones |
| | Distribution of pharmaceuticals, products and objects for medical use and medical substances |
| | Distribution of tobacco and tobacco products |
| | Distribution of alcoholic beverages |
| **Industry Classification:** | Part of CPC 621, CPC 62228, CPC 62251, CPC 62271, part of CPC 62272, CPC 62276, CPC 63108, part of CPC 6329 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Cross-Border Trade in Services** |

Bulgaria reserves the right to adopt or maintain any measure with respect to the distribution chemical products, precious metals and stones, pharmaceuticals, medical substances and products and objects for medical use; tobacco and tobacco products and alcoholic beverages.

Bulgaria reserves the right to adopt or maintain any measure with respect to the services provided by commodity brokers.

**Existing Measures:**     Law on Medicinal Products in Human Medicine

Law of Veterinary Activity

Law for Prohibition of Chemical Weapons and for Control over Toxic Chemical Substances and Their Precursors

Law for Tobacco and Tobacco Products

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 921, CPC 922, CPC 923 |
| **Type of Reservation:** | National treatment |
| | Market access |

**Description:**     **Investment and Cross-Border Trade in Services**

Bulgaria reserves the right to adopt or maintain any measure restricting the cross-border supply of privately funded primary and secondary education services.

Bulgaria reserves the right to adopt or maintain any measure with respect to the supply of privately funded higher education services.

**Existing Measures:**     Public Education Act, art. 12

Law for the Higher Education, paragraph 4 of the additional provisions

Vocational Education and Training Act, art. 22

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance |
| **Type of Reservation:** | Cross-Border supply of financial services |

**Description:**              **Financial Services**

Transport insurance, covering goods, insurance of vehicles as such and liability insurance regarding risks located in the Bulgaria may not be underwritten by foreign insurance companies directly.

**Sector:**                  Health services

**Sub-Sector:**

**Industry Classification:**  CPC 9311, CPC 93192, CPC 93193

**Type of Reservation:**     Market access

                             National treatment

                             Performance requirements

                             Senior management and boards of directors

**Description:**              **Investment**

Bulgaria reserves the right to adopt or maintain any measure with respect to the supply of privately funded hospital, ambulance, and residential health services other than hospital services.

**Existing Measures:**

**Sector:**                  Health services

**Sub-Sector:**              Health-related professional services: medical and dental services, midwife services, nursing services, physiotherapeutic and para-medical services, psychologist services

**Industry Classification:**  CPC 9312, part of 9319

**Type of Reservation:**     Market access

                             National treatment

                             Performance requirements

                             Senior management and boards of directors

**Description:**              **Investment**

Bulgaria reserves the right to adopt or maintain any measure with respect to the supply of all health-related professional

1335

services, including medical and dental services, services provided by nurses, midwives, physiotherapists, paramedical personnel, as well as psychologist services.

| | |
|---|---|
| **Existing Measures:** | Law for Medical Establishments |
| | Professional Organisation of Medical Nurses, Midwives and Associated Medical Specialists Guild Act |

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Supporting services for road transport |
| **Industry Classification:** | CPC 744 |
| **Type of Reservation:** | National treatment |
| **Measures:** | Bulgarian Act for Road Transport, art. 6 |
| **Description:** | **Cross-Border Trade in Services** |
| | Establishment is required. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Water transport |
| **Sub-Sector:** | Supporting services for water transport |
| **Industry Classification:** | Part of CPC 741, part of CPC 742 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | In so far as Canada and its provinces and territories allow service suppliers from Bulgaria to supply cargo-handling services and storage and warehouse services in sea and river harbours, including services relating to containers and goods in containers, Bulgaria will allow services suppliers from Canada to supply cargo-handling services and storage and warehouse services in sea and river harbours, including services relating to containers and goods in containers under the same conditions. |
| **Existing Measures:** | |

1336

**Sector:**                               Rail transport

**Sub-Sector:**

**Industry Classification:**     CPC 7111, CPC 7112

**Type of Reservation:**        Most-favoured-nation treatment

**Description:**               **Investment and Cross-Border Trade in Services**

Measures that are taken under existing or future agreements, and which regulate traffic rights and operating conditions, and the supply of transport services in the territory of Bulgaria, the Czech Republic and Slovakia and between the countries concerned..

**Existing Measures:**

**Sector:**                               Road transport

**Sub-Sector:**

**Industry Classification:**     CPC 7111, CPC 7112

**Type of Reservation:**        Most-favoured-nation treatment

**Description:**               **Investment and Cross-Border Trade in Services**

Measures taken under existing or future agreements, which reserve or restrict the supply of these kinds of transportation services and specify the terms and conditions of this supply, including transit permits or preferential road taxes, in the territory of Bulgaria or across the borders of Bulgaria.

**Existing Measures:**

**Sector:**                               Transport

**Sub-Sector:**                      Road transport: passenger transportation, freight transportation, international truck transport services

**Industry Classification:**     CPC 712

**Type of Reservation:**        National treatment

Market access

**Description:**                    **Investment and Cross-Border Trade in Services**

For passenger and freight transportation, exclusive rights or authorisations may only be granted to nationals of a Member State of the EU and to juridical persons of the EU having their headquarters in the EU.

Incorporation is required. Condition of nationality of a Member State of the EU for natural persons.

**Existing Measures:**

***

**Reservations applicable in Croatia**

| | |
|---|---|
| **Sector:** | Agriculture, hunting |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 011, ISIC rev 3.1 012, ISIC rev 3.1 013, ISIC rev 3.1 014, ISIC rev 3.1 015, CPC 8811, CPC 8812, CPC 8813 other than advisory and consultancy services |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment** |
| | Croatia reserves the right to adopt or maintain any measure with respect to agricultural and hunting activities. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Urban planning |
| **Industry Classification:** | CPC 8674 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |
| | Croatia reserves the right to adopt or maintain any measure with respect to the cross-border supply of urban planning. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87305 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |

Senior management and boards of directors

**Description:** **Investment and Cross-Border Trade in Services**

Croatia reserves the right to adopt or maintain any measure with respect to security consultation services and guard services.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Other business services |
| **Sub-Sector:** | Translation and interpretation services |
| **Industry Classification:** | CPC 87905 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |

Croatia reserves the right to adopt or maintain any measure with respect to the cross-border supply of translation and interpretation of official documents.

**Existing Measures**

| | |
|---|---|
| **Sector:** | Transport services |
| **Sub-Sector:** | Road transport services |
| **Industry Classification:** | CPC 7111 and CPC 7112 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Measures applied under existing or future agreements on international road transport and which reserve or limit the supply of transport services and specify operating conditions, including transit permits or preferential road taxes of transport services into, in, across and out of Croatia to the parties concerned.

**Existing Measures:**

1340

| | |
|---|---|
| **Sector:** | Transport services |
| **Sub-Sector:** | Services auxiliary to all modes of transport |
| **Industry Classification:** | CPC 741, CPC 742, CPC 743, CPC 744, CPC 745, CPC 746, CPC 749 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Cross-Border Trade in Services** |
| | Croatia reserves the right to adopt or maintain any measure with respect to the cross-border supply of services auxiliary to transport other than freight transport agency services, transportation preparation document services and supporting services for road transport that are subject to permit. |
| **Existing Measures:** | |

***

## Reservations applicable in Cyprus

**Sector:**                         Business services

**Sub-Sector:**                     Executive search

                                    Placement services

                                    Supply services of office support personnel

**Industry Classification:**        CPC 87201, CPC 87202, CPC 87203

**Type of Reservation:**            Market access

                                    National treatment

                                    Senior management and boards of directors

**Description:**                    **Investment and Cross-Border Trade in Services**

                                    Cyprus reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

**Existing Measures:**


**Sector:**                         Business services

**Sub-Sector:**                     Security services

**Industry Classification:**        CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309

**Type of Reservation:**            Market access

                                    National treatment

                                    Senior management and boards of directors

**Description:**                    **Investment and Cross-Border Trade in Services**

                                    Cyprus reserves the right to adopt or maintain any measure with regard to the supply of security services.

**Existing Measures:**


**Sector:**                         Education services

**Sub-Sector:**

**Industry Classification:**     CPC 921, CPC 922, CPC 923, CPC 924

**Type of Reservation:**         Market access

                            National treatment

                            Performance requirements

                            Senior management and boards of directors

**Description:**                 **Investment and Cross-Border Trade in Services**

                            Cyprus reserves the right to adopt or maintain any measure with respect to the supply of privately funded primary, secondary, higher, and adult education services.

**Existing Measures:**


**Sector:**                      Health services

**Sub-Sector:**                  Hospital services

                            Ambulance services

                            Residential health services other than hospital services

**Industry Classification:**     CPC 9311, CPC 93192, CPC 93193

**Type of Reservation:**         Market access

                            National treatment

                            Performance requirements

                            Senior management and boards of directors

**Description:**                 **Investment**

                            Cyprus reserves the right to adopt or maintain any measure with respect to the supply of privately funded hospital, ambulance, and residential health services other than hospital services.

**Existing Measures:**


**Sector:**                      Social services

**Sub-Sector:**

**Industry Classification:**     CPC 933

**Type of Reservation:**         Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**   **Investment**

Cyprus reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes.

**Existing Measures:**

**Sector:**   Energy

**Sub-Sector:**

**Industry Classification:**   ISIC rev 3.1 232, ISIC rev 3.1 4010, ISIC rev 3.1 4020, CPC 613, CPC 62271, CPC 63297, CPC 7131, CPC 742, and CPC 887 (other than advisory and consulting services)

**Type of Reservation:**   National treatment

Market access

Senior management and boards of directors

Performance requirements

**Description:**   **Investment and Cross-Border Trade in Services**

Cyprus reserves the right to adopt or maintain any measure limiting the cross-border supply of and requiring establishment for storage and warehousing services of fuels transported through pipelines, and the retail sales of fuel oil and bottled gas other than by mail order.

Cyprus reserves the right to adopt or maintain any measure with respect to the manufacture of refined petroleum products in so far as the investor is controlled by a natural or juridical person of a non-EU country which accounts for more than 5 per cent of the EU's oil or natural gas imports, as well as to the manufacture of gas, distribution of gaseous fuels through mains on own account, the production, transmission and distribution of electricity, the pipeline transportation of fuels, services incidental to electricity and natural gas distribution other than advisory and consulting services, wholesale services of electricity, retailing services of motor fuel, electricity and non-bottled gas.

1344

**Existing Measures:**      The Regulating of the Electricity Market Laws of 2003 to 2008 (arts. 34(2) and 37)

The Regulating of the Gas Market Laws of 2004 to 2007

The Petroleum (Pipelines) Law, Chapter 273 of the Constitution of the Republic of Cyprus

The Petroleum Law L.64(I)/1975

The Petroleum and Fuel Specifications Laws of 2003 to 2009

\*\*\*

## Reservations applicable in the Czech Republic

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Real estate services |
| **Industry Classification:** | CPC 821, CPC 822 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |
| | The Czech Republic reserves the right to adopt or maintain any measure with respect to the cross-border supply of real estate services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auction services |
| **Industry Classification:** | part of CPC 612, part of CPC 621, part of CPC 625, part of 85990 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |
| | Auction services in the Czech Republic are subject to licence. To obtain a licence (for the supply of voluntary public auctions), a company must be incorporated in the Czech Republic and a natural person is required to obtain a residency permit, and the company, or natural person must be registered in the Commercial Register of the Czech Republic. |
| **Existing Measures:** | Act no.455/1991 Coll., Trade Licence Act |
| | Act no. 26/2000 Coll., on public auctions |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |

**Industry Classification:**   CPC 86211, CPC 86212 other than accounting services

**Type of Reservation:**   Market access

National treatment

Senior management and boards of directors

**Description:**   **Investment**

Only an enterprise in which at least 60 per cent of capital interests or voting rights are reserved to nationals of the Czech Republic or of the Member States of the EU may be authorised to carry out audits in the Czech Republic.

**Existing Measures:**   Law of 14 April 2009 no. 93/2009 Coll., on Auditors

**Sector:**   Business services

**Sub-Sector:**   Executive search

Placement services

Supply services of office support personnel

**Industry Classification:**   CPC 87201, CPC 87202, CPC 87203

**Type of Reservation:**   Market access

National treatment

Senior management and boards of directors

**Description:**   **Investment and Cross-Border Trade in Services**

The Czech Republic reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

The Czech Republic reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel.

**Existing Measures:**

**Sector:**   Business services

**Sub-Sector:**   Security services

| | |
|---|---|
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | The Czech Republic reserves the right to adopt or maintain any measure with regard to the supply of security services. |
| | Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 921, CPC 922, CPC 923, CPC 924 |
| **Type of Reservation:** | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | In the Czech Republic, the majority of the members of the board of directors of an establishment providing privately-funded education services must be nationals of the Czech Republic. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Hospital services |
| | Ambulance services |
| | Residential health services other than hospital services |
| **Industry Classification:** | CPC 9311, CPC 93192, CPC 93193 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |

1348

Senior management and boards of directors

**Description:**            **Investment**

The Czech Republic reserves the right to adopt or maintain any measure with respect to the supply of privately funded hospital, ambulance, and residential health services other than hospital services.

**Existing Measures:**      Act No. 372/2011 Sb. on Health Care Services and Conditions of Their Provision

**Sector:**                 Health services

**Sub-Sector:**             Health-related professional services: medical and dental services, midwife services, nursing services, physiotherapeutic and para-medical services, psychologist services

Other health-related services

**Industry Classification:** CPC 9312, part of CPC 9319

**Type of Reservation:**    Market access

National treatment

**Description:**            **Investment and Cross-Border Trade in Services**

The Czech Republic reserves the right to adopt or maintain any measure with regard to the supply of all health-related professional services, including the services provided by professionals such as medical doctors, dentists, midwives, nurses, physiotherapists, paramedics, and psychologists, as well as other health-related services relating to the handling of human tissues, organs and cells intended for use in man.

**Existing Measures:**      Act No 296/2008 Coll., on Safeguarding the Quality and Safety of Human Tissues and Cells Intended for Use in Man ("Act on Human Tissues and Cells")

Act No 378/2007 Coll., on Pharmaceuticals and on Amendments to Some Related Acts (Act on Pharmaceuticals)

Act. 123/2000 Coll., on Medical Devices

Act. 285/2002 Coll., on the Donating, Taking and Transplanting of Tissues and Organs and on Amendment to Certain Acts (Transplantation Act)

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 933 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | The Czech Republic reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services. |
| **Existing Measures** | |

| | |
|---|---|
| **Sector:** | Rail transport |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 7111, CPC 7112 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Measures that are taken under existing or future agreements, and which regulate traffic rights and operating conditions, and the supply of transport services in the territory of Bulgaria, the Czech Republic and Slovakia and between the countries concerned. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Road transport |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 7121, CPC 7122, CPC 7123 |
| **Type of Reservation:** | Most-favoured-nation treatment |

**Description:**          **Investment and Cross-Border Trade in Services**

Measures that are taken under existing or future agreements, and which reserve or limit the supply of transport services and specify operating conditions, including transit permits or preferential road taxes of a transport services into, in, across and out of the Czech Republic to the contracting parties concerned.

**Existing Measures:**

***

## Reservations applicable in Denmark

**Sector:**                    All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**       Most-favoured-nation treatment

**Description:**               **Investment and Cross-Border Trade in Services**

Measures taken by Denmark**,** Sweden and Finland aimed at promoting Nordic cooperation, such as:

(a) financial support to research and development (R&D) projects (the Nordic Industrial Fund);

(b) funding of feasibility studies for international projects (the Nordic Fund for Project Exports); and

(c) financial assistance to companies[81] utilizing environmental technology (the Nordic Environment Finance Corporation).

This reservation is without prejudice to the exclusion of procurement by a Party, subsidies, or governmental support for trade in services in Arts. 8.14.5(a) and (b), and 9.2.2(f) and (g) respectively.

**Existing Measures:**

**Sector:**                    Fishing

Aquaculture

Services incidental to fishing

**Sub-Sector:**

**Industry Classification:**   ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 882

**Type of Reservation:**       Market access

National treatment

Most-favoured-nation treatment

Performance requirements

Senior management and boards of directors

---

[81]   Applies to East European companies, which are cooperating with one or more Nordic companies.

| | |
|---|---|
| **Description:** | **Investment** |

Non-EU residents cannot own one-third or more of a business engaged in commercial fishing in Denmark.

Non-EU residents cannot own Danish flag vessels except through an enterprise incorporated in Denmark.

For a company to register its vessel as a Danish fishing vessel, at least two-thirds of the owners of the company must be registered as fishermen having an "A" status fishing licence, or two-thirds of the shares of the company must be owned by another company which is entirely owned by fishermen having an "A" status licence.

To obtain an "A" status fishing licence, a natural person must have lived in Denmark for two years prior to the request to obtain a licence or hold Danish citizenship. These restrictions do not apply to persons within the EU or Member States of the EEA.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Denmark reserves the right to adopt or maintain any measure with regard to the supply of airport guard services.

In order to provide security services in Denmark, it is a requirement to be a national juridical person.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance |

| | |
|---|---|
| **Type of Reservation:** | Market access |
| | National treatment |
| | Cross-Border supply of financial services |
| **Description:** | **Financial Services** |
| | No persons or companies (including insurance companies) may, for business purposes in Denmark, assist in effecting direct insurance for persons resident in Denmark, for Danish ships or for property in Denmark, other than insurance companies licensed by Danish law or by Danish competent authorities. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 933 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Denmark reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes. |
| **Existing Measures:** | |

***

## Reservations applicable in Estonia

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of real estate |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| **Description:** | **Investment** |

Only a natural person who is an Estonian citizen or the citizen of a Member State of the EEA, or a legal person who is entered in the appropriate Estonian register, may acquire an immovable used for profit yielding land, the land use type categories of which include agricultural or forest land, and only with the authorisation of the county governor.

This reservation does not apply to the acquisition of agricultural or forest land for the purposes of providing a service which is liberalised under this agreement.

| | |
|---|---|
| **Existing Measures:** | Kinnisasja omandamise kitsendamise seadus (Restrictions on Acquisition of Immovables Act) § 2, § 3 |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Executive search |
| | Placement services |
| | Supply services of office support personnel |
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Estonia reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

Estonia reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Estonia reserves the right to adopt or maintain any measure with regard to the supply of security services.

Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Cross-Border supply of financial services |
| **Description:** | **Financial Services** |

For acceptance of deposits, requirement of authorisation by the Estonian Financial Supervision Authority and registration under Estonian law as a joint-stock company, a subsidiary or a branch.

**Existing Measures:** Krediidiasutuste seadus (Credit Institutions Act) § 20.6.

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Maritime transport |

Road transport

Rail transport

**Industry Classification:**    Part of CPC 711, part of CPC 712, part of CPC 721

**Type of Reservation:**    Most-favoured-nation treatment

**Description:**    **Investment and Cross-Border Trade in Services**

Estonia reserves the right to adopt or maintain any measure which accords differential treatment to a country pursuant to existing or future bilateral agreements on international road transport (including combined transport-road or rail), reserving or limiting the supply of a transport services into, in, across and out of Estonia to the contracting Parties to vehicles registered in each contracting Party, and providing for tax exemption for such vehicles.

**Existing Measures:**

***

# Reservations applicable in Finland

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Restrictions on the right for natural persons, who do not enjoy regional citizenship in Åland, and for legal persons, to acquire and hold real property on the Åland Islands without obtaining permission from the competent authorities of the Åland Islands.

Restrictions on the right of establishment and right to carry out economic activities by natural persons, who do not enjoy regional citizenship in Åland, or by any enterprise, without obtaining permission from the competent authorities of the Åland Islands.

| | |
|---|---|
| **Existing Measures:** | Ahvenanmaan maanhankintalaki (Act on land acquisition in Åland) (3/1975), s. 2 |
| | Ahvenanmaan itsehallintolaki (Act on the Autonomy of Åland) (1144/1991), s. 11 |

| | |
|---|---|
| **Sector:** | All services |
| **Sub-Sector:** | Electronic identification services |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services** |

Finland reserves the right to require establishment in Finland, or elsewhere in the EEA in order to provide electronic identification services.

| | |
|---|---|
| **Existing Measures:** | Laki vahvasta sähköisestä tunnistamisesta ja sähköisistä allekirjoituksista (Act on Strong Electronic Identification and Electronic Signatures) 617/2009 |

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Measures taken by Denmark, Sweden and Finland aimed at promoting Nordic cooperation, such as:

(a) financial support to R&D projects (the Nordic Industrial Fund);

(b) funding of feasibility studies for international projects (the Nordic Fund for Project Exports); and

(c) financial assistance to companies[82] utilizing environmental technology (the Nordic Environment Finance Corporation).

This reservation is without prejudice to the exclusion of procurement by a Party, subsidies, or governmental support for trade in services in Arts. 8.14.5 (a) and (b), and 9.2.2 (f) and (g) respectively.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Manufacture of nuclear fuel, electricity, gas and water supply |
| **Sub-Sector:** | Nuclear based electricity generation |
| | Processing of nuclear material and fuel |
| | Transportation or handling of nuclear material |
| **Industry Classification:** | ISIC rev 3.1 233, ISIC rev 3.1 40 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Investment** |

Finland reserves the right to adopt or maintain any measure with respect to the processing, distribution or transportation of nuclear material and generation of nuclear-based energy.

---

[82] Applies to East European companies, which are cooperating with one or more Nordic companies.

**Existing Measures:**      Ydinenergialaki (Nuclear Energy Act) (990/1987)


**Sector:**                 Business services

**Sub-Sector:**             Executive search

                            Placement services of office support personnel and other workers

                            Supply services of office support personnel

**Industry Classification:** CPC 87201, CPC 87202, CPC 87203

**Type of Reservation:**    National treatment

                            Market access

                            Senior management and boards of directors

**Description:**            **Investment and Cross-Border Trade in Services**

                            Finland reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

                            Finland reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel and other workers.

**Existing Measures:**      Laki julkisesta työvoima- ja yrityspalvelusta (Act on Public Employment and Enterprise Service) (916/2012)


**Sector:**                 Business services

**Sub-Sector:**             Security services

**Industry Classification:** CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309

**Type of Reservation:**    National treatment

                            Market access

**Description:**            **Cross-Border Trade in Services**

                            The supply of security services by a foreign provider on a cross-border basis is not allowed.

                            Licences to provide security services may be granted only to natural persons resident in the EEA or juridical persons established in the EEA.

**Existing Measures:**    Laki yksityisistä turvallisuuspalveluista (Private Security Services Act) 282/2002

**Sector:**    Distribution services

**Sub-Sector:**    Distribution of alcoholic beverages

**Industry Classification:**    Part of CPC 62112, CPC 62226, CPC 63107, CPC 8929

**Type of Reservation:**    National treatment

Market access

Performance requirements

Senior management and boards of directors

**Description:**    **Investment and Cross-Border Trade in Services**

Finland reserves the right to adopt or maintain any measure with respect to the supply of distribution of alcoholic beverages.

**Existing Measures:**    Alkoholilaki (Alcohol Act) (1143/1994)

**Sector:**    Distribution services

**Sub-Sector:**    Distribution of pharmaceutical products

**Industry Classification:**    CPC 62117, CPC 62251, CPC 63211, CPC 8929

**Type of Reservation:**    Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**    **Investment and Cross-Border Trade in Services**

Finland reserves the right to adopt or maintain any measure with regard to distribution of pharmaceutical products.

**Existing Measures:**    Lääkelaki (Medicine Act) (395/1987)

**Sector:**    Energy

| | |
|---|---|
| **Sub-Sector:** | Transmission and distribution networks and systems |
| | Importation, wholesale and retail of electricity |
| | Production and distribution of gas, steam and hot water |
| **Industry Classification:** | ISIC rev 3.1 40, CPC 7131, CPC 887 (other than advisory and consultancy services) |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| | Performance requirements |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Finland reserves the right to adopt or maintain any measure with regard to transmission and distribution networks and systems of energy and of steam and hot water.

Finland reserves the right to prevent control or ownership of a liquefied natural gas (LNG) terminal (including those parts of the LNG terminal used for storage or re-gasification of LNG) by foreign persons or enterprises for energy security reasons.

Finland reserves the right to adopt or maintain any measure with regard to the importation, wholesale and retail of electricity.

Finland reserves the right to adopt or maintain quantitative restrictions in the form of monopolies or exclusive rights for the importation of natural gas, and for the production and distribution of steam and hot water.

Currently, natural monopolies and exclusive rights exist.

| | |
|---|---|
| **Existing Measures:** | Maakaasumarkkinalaki (Natural Gas Market Act) (508/2000) |
| | Sähkömarkkinalaki (Electricity Market Act) (386/1995) |

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 921, CPC 922, CPC 923, CPC 924 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |

1363

| | |
|---|---|
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Finland reserves the right to adopt or maintain any measure with respect to the supply of privately funded primary, secondary, higher, and adult education services. |
| **Existing Measures:** | Perusopetuslaki (Basic Education Act) (628/1998) |
| | Lukiolaki (General Upper Secondary Schools Act) (629/1998) |
| | Laki ammatillisesta koulutuksesta (Vocational Training and Education Act) (630/1998) |
| | Laki ammatillisesta aikuiskoulutuksesta (Vocational Adult Education Act) (631/1998) |
| | Ammattikorkeakoululaki (Polytechnics Act) (351/2003) |
| | Yliopistolaki (Universities Act) (558/2009) |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Hospital services |
| | Ambulance services |
| | Residential health services other than hospital services |
| | Other human health services |
| **Industry Classification:** | CPC 9311, CPC 93192, CPC 93193, CPC 93199 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Finland reserves the right to adopt or maintain any measure with respect to the supply of privately funded hospital, ambulance, residential health services other than hospital services, and other human health services. |
| **Existing Measures:** | Laki yksityisestä terveydenhuollosta (Act on Private Health Care) (152/1990) |

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Health-related professions: medical and dental services, services provided by midwives, physiotherapeutic and para-medical |

services, services provided by psychologists

**Industry Classification:** CPC 9312, CPC 93191

**Type of Reservation:** Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:** **Investment and Cross-Border Trade in Services**

Finland reserves the right to adopt or maintain any measure with respect to the supply of all health-related professional services, whether publicly or privately funded, including medical and dental services, services provided by midwives, physiotherapists and paramedical personnel, and services provided by psychologists. This reservation does not apply to services provided by nurses.

**Existing Measures:** Laki yksityisestä terveydenhuollosta (Act on Private Health Care) (152/1990)

**Sector:** Social services

**Sub-Sector:**

**Industry Classification:** CPC 933

**Type of Reservation:** Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:** **Investment**

Finland reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services.

**Existing Measures:** Laki yksityisistä sosiaalipalveluista (Private Social Services Act) (922/2011).

**Sector:** Financial services

1365

| | |
|---|---|
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Cross-Border supply of financial services |
| | Senior management and boards of directors |
| **Description:** | **Financial Services** |

The supply of insurance broker services is subject to a permanent place of business in the EU.

Only insurers having their head office in the EU or having their branch in Finland may offer direct insurance services, including co-insurance.

At least one half of the members of the board of directors and the supervisory board, the managing director of an insurance company providing statutory pension insurance shall have their place of residence in the EEA, unless the competent authorities have granted an exemption. Foreign insurers cannot obtain a licence in Finland as a branch to carry on statutory pension insurance. At least one auditor shall have his permanent residence in the EEA.

For other insurance companies, residency in the EEA is required for at least one member of the board of directors and the supervisory board and the managing director. At least one auditor shall have his permanent residence in the EEA.

The general agent of an insurance company of Canada must have his place of residence in Finland, unless the company has its head office in the EU.

| | |
|---|---|
| **Existing Measures:** | Laki ulkomaisista vakuutusyhtiöistä (Act on Foreign Insurance Companies) (398/1995) |
| | Vakuutusyhtiölaki (Insurance Companies Act) (521/2008) |
| | Laki vakuutusedustuksesta (Act on Insurance Mediation) (570/2005) |
| | Laki työeläkevakuutusyhtiöistä (Act on Companies providing statutory pension insurance) (354/1997) |

| | |
|---|---|
| **Sector:** | Financial services |

1366

| | |
|---|---|
| **Sub-Sector:** | Banking and other financial services |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| | Cross-Border supply of financial services |
| **Description:** | **Financial Services** |

At least one of the founders, the members of the board of directors, the supervisory board, the managing director of banking services providers and the person entitled to sign the name of the credit institution shall have their permanent residence in the EEA. At least one auditor shall have his permanent residence in the EEA.

For payment services, residency or domicile in Finland may be required.

**Existing Measures:** Laki liikepankeista ja muista osakeyhtiömuotoisista luottolaitoksista (Act on Commercial Banks and Other Credit Institutions in the Form of a Limited Company) (1501/2001)

Säästöpankkilaki (1502/2001) (Savings Bank Act)

Laki osuuspankeista ja muista osuuskuntamuotoisista luottolaitoksista (1504/2001) (Act on Cooperative Banks and Other Credit Institutions in the Form of a Cooperative Bank)

Laki hypoteekkiyhdistyksistä (936/2001) (Act on Morgage Societies)

Maksulaitoslaki (297/2010) (Act on Payment Institutions)

Laki ulkomaisen maksulaitoksen toiminnasta Suomessa (298/2010) (Act on the Operation of Foreign Payment Institution in Finland)

Laki luottolaitostoiminnasta (Act on Credit Institutions) (121/2007)

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Passenger or freight transport by rail |
| **Industry Classification:** | CPC 7111, CPC 7112 |
| **Type of Reservation:** | Market access |

1367

National treatment

**Description:**    **Investment and Cross-Border Trade in Services**

Finland reserves the right to adopt or maintain any measure with respect to cross-border supply of rail transport.

With regard to establishment of rail passenger transport services, currently, there are exclusive rights (granted to VR-Group Ltd that is 100 per cent owned by the State) until 2017 in Helsinki Metropolitan Area and elsewhere until 2019 in this field, which may be renewed.

**Existing Measures:**    Rautatielaki (Railway Act) (304/2011)

**Sector:**    Fishing

Aquaculture

Services incidental to fishing

**Sub-Sector:**

**Industry Classification:**    ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 882

**Type of Reservation:**    National treatment

Market access

**Description:**    **Investment**

Commercial fishing can only be exercised by vessels flying the flag of Finland. Additional requirements may apply, which relate, *inter alia*, to ownership of the vessel and the existence of a sufficient connection to the fishing industry of Finland.

**Existing Measures:**    Merilaki (Maritime Act) 674/1994

Kalastuslaki (Fishing Act) 286/1982

Laki merellä toimivien kalastus- ja vesiviljelyalusten rekisteröinnistä (Act on Registration of Sea-going vessels engaged in Fishing and Aquaculture) 690/2010

**Sector:**    Transport

**Sub-Sector:**    Road transport: passenger transportation, freight transportation, international truck transport services

**Industry Classification:** CPC 712

**Type of Reservation:** Market access

National treatment

**Description:** **Investment and Cross-Border Trade in Services**

Authorisation is required to provide road transport services, which is not extended to foreign registered vehicles.

**Existing Measures:** Laki kaupallisista tavarankuljetuksista tiellä (Act on Commercial Road Transport) 693/2006

Ajoneuvolaki (Vehicles Act) 1090/2002

**Sector:** **Transport**

**Sub-Sector:** Maritime transport

Road transport

Rail transport

**Industry Classification:** Part of CPC 711, part of CPC 712, part of CPC 721

**Type of Reservation:** Most-favoured-nation treatment

**Description:** **Investment and Cross-Border Trade in Services**

Finland reserves the right to adopt or maintain any measure which accords differential treatment to a country pursuant to existing or future bilateral agreements exempting vessels registered under the foreign flag of a specified other country or foreign registered vehicles from the general prohibition from providing cabotage transport (including combined transport, road and rail) in Finland on the basis of reciprocity.

**Existing Measures:**

***

# Reservations applicable in France

**Sector:**                        All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**           Market access

                                   National treatment

                                   Performance requirements

                                   Senior management and boards of directors

**Description:**                   **Investment**

                                   Types of establishment - Pursuant to arts. L151-1 and R153-1 sec of the financial and monetary code, foreign investments in France in sectors listed in art. R153-2 of the financial and monetary code are subject to prior approval from the Minister for the Economy.

**Existing Measures:**             Financial and monetary code, arts. L151-1, R153-1


**Sector:**                        All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**           National treatment

                                   Senior management and boards of directors

**Measures:**

**Description:**                   **Investment**

                                   Types of establishment - France reserves the right to limit foreign participation in newly privatised companies to a variable amount, determined by the government of France on a case by case basis, of the equity offered to the public.

                                   For establishing in certain commercial, industrial or artisanal activities, a specific authorisation is needed if the managing director is not a holder of a permanent residence permit.

**Existing Measures**

**Sector:**                       Fishing

                                  Aquaculture

                                  Services incidental to fishing

**Sub-Sector:**

**Industry Classification:**      ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 882

**Type of Reservation:**          National treatment

                                  Market access

**Description:**                  **Investment**

                                  Nationals of non-EU countries cannot participate in French maritime State property for fish, shellfish or algae farming.

**Existing Measures:**


**Sector:**                       Business services

**Sub-Sector:**                   Placement services

                                  Supply services of office support personnel

**Industry Classification:**      CPC 87202, CPC 87203

**Type of Reservation:**          Market access

                                  National treatment

                                  Senior management and boards of directors

**Description:**                  **Investment and Cross-Border Trade in Services**

                                  France reserves the right to restrict the number of suppliers of placement services. These services are subject to a state monopoly.

                                  France reserves the right to require establishment and to prohibit the cross-border supply of supply services of office personnel.

**Existing Measures:**


**Sector:**                       Business services

**Sub-Sector:**                     Security services

**Industry Classification:**        CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309

**Type of Reservation:**            Market access

                                    National treatment

                                    Senior management and boards of directors

**Description:**                    **Investment and Cross-Border Trade in Services**

                                    The supply of security services by a foreign provider on a cross-border basis is not allowed.

                                    Nationality requirement for managing directors and directors.

**Existing Measures:**


**Sector:**                         Financial services

**Sub-Sector:**                     Insurance

**Type of Reservation:**            Cross-Border supply of financial services

**Description:**                    **Financial Services**

                                    Insurance of risks relating to ground transport may be underwritten only by insurance firms established in the EU.

**Existing Measures:**              Art. L 310-10 du code des assurances


**Sector:**                         Health services

**Sub-Sector:**                     Laboratory analysis and testing

**Industry Classification:**        Part of CPC 9311

**Type of Reservation:**            Market access

                                    National treatment

**Description:**                    **Cross-Border Trade in Services**

                                    France reserves the right to adopt or maintain any measure with regard to the supply of privately funded laboratory analysis and testing services.

**Existing Measures:**     Art. L 6213-1 à 6213-6 du Code de la Santé Publique

**Sector:**                 Social services

**Sub-Sector:**

**Industry Classification:** CPC 933

**Type of Reservation:**    Market access

                            National treatment

                            Performance requirements

                            Senior management and boards of directors

**Description:**            **Investment**

                            France reserves the right to adopt or maintain any measure with
                            respect to the supply of privately funded social services other
                            than services relating to Convalescent and Rest Houses and Old
                            People's Homes.

**Sector:**                 Tourism and travel related services

**Sub-Sector:**             Tourist guides services

**Industry Classification:** CPC 7472

**Type of Reservation:**    National treatment

**Description:**            **Cross-Border Trade in Services**

                            France reserves the right to require nationality of a Member State
                            of the EU for the supply of tourist guide services in its territory.

**Existing Measures:**      None

**Sector:**                 News and press agency services

**Sub-Sector:**

**Industry Classification:** CPC 962

**Type of Reservation:**    Market access

                            National treatment

| | |
|---|---|
| **Description:** | **Investment** |

Foreign participation in existing companies publishing publications in the French language may not exceed 20 per cent of the capital or of voting rights in the company.

Establishment of press agencies of Canada is subject to conditions set out in domestic regulation.

Establishment of press agencies by foreign investors is subject to reciprocity.

| | |
|---|---|
| **Existing Measures:** | Ordonnance n° 45-2646 du 2 novembre 1945 portant règlementation provisoire des agences de presse |
| | Loi n° 86-897 du 1 août 1986 portant réforme du régime juridique de la presse |

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Electricity and gas transmission systems |
| | Oil and gas pipeline transport |
| **Industry Classification:** | ISIC rev 3.1 401, ISIC rev 3.1 402, CPC 7131, CPC 887 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

France reserves the right to adopt or maintain any measure with regard to electricity and gas transmission systems and oil and gas pipeline transport.

Only companies where 100 per cent of the capital is held by the French State, by another public sector organisation or by EDF, may own and operate electricity transmission or distribution systems.

Only companies where 100 per cent of the capital is held by the French State, by another public sector organisation or by GDF-Suez, may own and operate gas transmission or distribution systems for reasons of national energy security.

| | |
|---|---|
| **Existing Measures:** | Loi N° 2004-803 du 9 août 2004 relative au service public de l'électricité et du gaz et aux entreprises électriques et gazières |

1374

Loi N°2005-781 du 13 juillet 2005

Loi N°2000-108 du 10 février 2000

| | |
|---|---|
| **Sector:** | Production of electricity |
| **Industry Classification:** | ISIC rev 3.1 4010 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |
| | France reserves the right to adopt or maintain any measure with respect to the production of electricity. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Manufacturing, production, processing, generation, distribution or transportation of nuclear material |
| **Sub-Sector:** | Nuclear based electricity generation |
| | Processing of nuclear material and fuel |
| | Transportation or handling of nuclear material |
| **Industry Classification:** | ISIC rev 3.1 12, ISIC rev 3.1 23, ISIC rev 3.1 40, ISIC rev 3.1 1200, ISIC rev 3.1 2330, part of ISIC rev 3.1 4010 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment** |
| | The manufacturing, production, processing, generation, distribution or transportation of nuclear material must respect the obligations of the Euratom-Canada agreement. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Rental or leasing services without operators |
| **Sub-Sector:** | Other rental or leasing services without operators |
| **Industry Classification:** | CPC 832 |

1375

| | |
|---|---|
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |
| | France reserves the right to adopt or maintain any measure with regard to the supply of other rental or leasing services without operator. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport: passenger transportation, freight transportation, international truck transport services |
| **Industry Classification:** | CPC 712 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment** |
| | Foreign investors are not allowed to provide intercity bussing services. |
| **Existing Measures:** | |

***

## Reservations applicable in Germany

| | |
|---|---|
| **Sector:** | Fishing |
| | Aquaculture |
| | Services incidental to fishing |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 0501, 0502, CPC 882 |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Senior management and boards of directors |
| **Description:** | **Investment** |

The majority of shares must be owned by citizens of a Member State of the EU or companies established in accordance with EU rules and that have their principal place of business in a Member State of the EU. The use of the vessels must be headed and supervised by persons residing in Germany.

In order to obtain a fishing licence, all fishing vessels must register with the relevant coastal states in which the ships have their home ports.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Environmental services |
| **Sub-Sector:** | Waste management: sewage, refuse disposal, and sanitation services |
| **Industry Classification:** | CPC 9401, CPC 9402, CPC 9403 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Germany reserves the right to adopt or maintain any measure prohibiting the cross-border supply of services and requiring establishment with respect to the supply of waste management services, other than advisory services.

Germany reserves the right to adopt or maintain any measure relating to the designation, establishment, expansion, or operation of monopolies or exclusive services suppliers

providing waste management services.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Environmental services |
| **Sub-Sector:** | Soil management |
| **Industry Classification:** | CPC 94060 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Germany reserves the right to adopt or maintain any measure prohibiting the cross-border supply of services and requiring establishment with respect to services relating to the protection of soil and the management of contaminated soils, other than advisory services.

Germany reserves the right to adopt or maintain any measure relating to the designation, establishment, expansion, or operation of monopolies or exclusive services suppliers providing soil management and protection services.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Cross-Border supply of financial services |
| **Description:** | **Financial Services** |

Compulsory air insurance policies can be underwritten only by a subsidiary established in the EU or by a branch established in Germany.

**Existing Measures:** §§ 105 ff "Versicherungsaufsichtsgesetz" (VAG), insbesondere § 105 Abs. 2 VAG: „Versicherungsunternehmen eines Drittstaates, die im Inland das Erst- oder Rückversicherungsgeschäft durch Mittelspersonen betreiben wollen, bedürfen der Erlaubnis."

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Cross-Border supply of financial services |
| **Description:** | **Financial Services** |

If a foreign insurance company has established a branch in Germany, it may conclude insurance contracts in Germany relating to international transport only through the branch established in Germany.

| | |
|---|---|
| **Existing Measures:** | § 43 Abs. 2 Luftverkehrsgesetz (LuftVG) und § 105 Abs. 1 Luftverkehrszulassungsordnung (LuftVZO) |

| | |
|---|---|
| **Sector:** | Other business services |
| **Sub-Sector:** | Placement and supply services |
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203, CPC 87204, CPC 87205, CPC 87206, CPC 87209 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Germany reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services.

Germany reserves the right to restrict the number of suppliers of placement services. Authorisation is subject to an economic needs test. Main criteria: situation and development of the labour market.

Germany reserves the right to introduce or maintain a monopoly of the Federal Labour Agency (*Bundesagentur für Arbeit*). Pursuant to Sec. 292 Social Code No. III (*Drittes Buch Sozialgesetzbuch – SGB III*), the Federal Ministry of Labour and Social Affairs may issue a regulation concerning the placement and recruitment of extra-EU and extra-EEA personnel for specified professions.

**Existing Measures:**    Sec. 42 Employment Regulation (Beschäftigungsverordnung)

**Sector:**    Health and social services

**Sub-Sector:**

**Industry Classification:**    CPC 93

**Type of Reservation:**    Market access

National treatment

Most-favoured-nation treatment

Performance requirements

Senior management and boards of directors

**Description:**    **Investment**

Germany reserves the right to adopt or maintain any measure with regard to the supply of the Social Security System of Germany, where services may be provided by different companies or entities involving competitive elements which are thus not "Services carried out exclusively in the exercise of governmental authority". Germany reserves the right to accord better treatment in the context of a bilateral trade agreement with regard to the supply of health and social services.

**Existing Measures:**

**Sector:**    Social services

**Sub-Sector:**

**Industry Classification:**    CPC 933

**Type of Reservation:**    Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**    **Investment**

Germany reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes.

1382

Germany reserves the right to adopt or maintain any measure regarding the Social Security System of Germany, where services are provided by different companies or entities involving competitive elements and might therefore not fall under the definition of the "*Services carried out exclusively in the exercise of governmental authority*".

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Hospital services |
| **Industry Classification:** | 93110 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment** |

Germany reserves the right to maintain national ownership of privately funded hospitals run by the German Forces. Germany reserves the right to nationalise other key privately funded hospitals**.**

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting services |
| **Sub-Sector:** | Entertainment services, including theatre, live bands and circus services |
| | Libraries, archives and museums and other cultural services |
| **Industry Classification:** | CPC 96, other than CPC 962 and CPC 964 and audiovisual services |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Most-favoured-nation treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Germany reserves the right to adopt or maintain any measure prohibiting the cross-border supply of services irrespective of their mode of production, distribution, or transmission and requiring establishment with respect to entertainment services, with the exception of audiovisual services which are not subject to liberalisation under this agreement.

Germany reserves the right to adopt or maintain any measure with respect to the supply of libraries, archives, museums and other cultural services.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Nuclear-based electricity generation |
| | Processing of nuclear material and fuel |
| | Transportation or handling of nuclear material |
| **Industry Classification:** | ISIC rev 3.1 120, ISIC rev 3.1 40, CPC 887. |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Germany reserves the right to adopt or maintain any measure with respect to the processing or transportation of nuclear material and generation of nuclear-based energy.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Rental or leasing of vessels |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 7213, CPC 7223, CPC 83103 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Chartering-in of foreign ships by consumers resident in Germany

may be subject to a condition of reciprocity.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Other services not included elsewhere |
| **Sub-Sector:** | Funeral, cremation and undertaking services |
| **Industry Classification:** | CPC 9703 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Germany reserves the right to adopt or maintain any measure with respect to funeral, cremation and undertaking services. Only juridical persons established under public law may operate a cemetery. The creation and operation of cemeteries and services related to funerals are carried out as governmental services. |

**Existing Measures:**

***

## Reservations applicable in Greece

**Sector:**                        Social services

**Sub-Sector:**

**Industry Classification:**       CPC 933

**Type of Reservation:**           Market access

                                   National treatment

                                   Performance requirements

                                   Senior management and boards of directors

**Description:**                   **Investment**

                                   Greece reserves the right to adopt or maintain any measure with
                                   respect to the supply of privately funded social services other
                                   than services relating to Convalescent and Rest Houses and Old
                                   People's Homes.

**Existing Measures:**

***

## Reservations applicable in Hungary

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Hungary reserves the right to adopt or maintain any measure with respect to the acquisition of state-owned properties. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Legal entities |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Measures:** | |
| **Description:** | **Investment** |
| | Commercial presence should take a form of limited liability company, joint-stock company or representative office. Initial entry as a branch is not permitted except for financial services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of arable land |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |

| | |
|---|---|
| **Description:** | **Investment** |
| | Hungary reserves the right to adopt or maintain any measure with regard to the acquisition of arable land by foreign legal persons and non-resident natural persons, including with regard to the authorisation process for the acquisition of arable land. |
| **Existing Measures:** | Act LV of 1994 on Arable Land |

| | |
|---|---|
| **Sector:** | Agriculture |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 011, ISIC rev 3.1 012, ISIC rev 3.1 013, ISIC rev 3.1 014, ISIC rev 3.1 015 other than advisory and consultancy services |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | National treatment |
| | **Investment** |
| **Existing Measures:** | Hungary reserves the right to adopt or maintain any measures with respect to agricultural activities. |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Accounting, bookkeeping and auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212, CPC 86220 |
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services** |
| | Hungary reserves the right to adopt or maintain any measure with respect to cross-border activities for accounting, bookkeeping and auditing services. |
| **Existing Measures:** | Act C of 2000, Act LXXV of 2007 |

| | |
|---|---|
| **Sector:** | Business services |

**Sub-Sector:**                     Real estate services

**Industry Classification:**        CPC 821, CPC 822

**Type of Reservation:**            Market access

                                    National treatment

**Description:**                    **Cross-Border Trade in Services**

                                    Hungary reserves the right to adopt or maintain any measure
                                    with respect to the cross-border supply of real estate services.

**Existing Measures:**

**Sector:**                         Business services

**Sub-Sector:**                     Services incidental to manufacturing

                                    Services incidental to energy distribution

**Industry Classification:**        Part of CPC 884, CPC 887 other than advisory and consulting
                                    services

**Type of Reservation:**            Market access

                                    National treatment

**Description:**                    **Investment and Cross-Border Trade in Services**

                                    Hungary reserves the right to adopt or maintain any measure
                                    with respect to services incidental to energy distribution, and to
                                    the cross-border supply of services incidental to manufacturing,
                                    with the exception of advisory and consulting services relating to
                                    these sectors.

**Existing Measures:**

**Sector:**                         Business services

**Sub-Sector:**                     Security services

**Industry Classification:**        CPC 87304, CPC 87305

**Type of Reservation:**            Market access

                                    National treatment

**Description:**          **Cross-Border Trade in Services**

Hungary reserves the right to adopt or maintain any measure with regard to the supply of armoured car services and guard services.

**Existing Measures:**


**Sector:**               Business services

**Sub-Sector:**           Duplicating services

**Industry Classification:**   CPC 87904

**Type of Reservation:**  Market access

**Description:**          **Cross-Border Trade in services**

Hungary reserves the right to require establishment for the supply of duplicating services.

**Existing Measures:**


**Sector:**               Financial services

**Sub-Sector:**           Insurance

**Type of Reservation:**  Market access

National treatment

Cross-Border supply of financial services

**Description:**          **Financial Services**

The supply of direct insurance in the territory of Hungary by insurance companies not established in the EU is allowed only through a branch office registered in Hungary.

**Existing Measures:**     Act LX of 2003


**Sector:**               Health services

**Sub-Sector:**           Hospital, ambulance and residential health services other than hospital services

| | |
|---|---|
| **Industry Classification:** | CPC 9311, CPC 93192, CPC 93193 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |
| | Hungary reserves the right to adopt or maintain any measure requiring the establishment or physical presence in its territory of suppliers and restricting the cross-border supply from outside its territory of all hospital, ambulance, and residential health services other than hospital services, which receive public funding. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 933 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Hungary reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Recreational, cultural and sporting agencies |
| **Sub-Sector:** | News and press agencies services |
| **Industry Classification:** | CPC 962 |
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services** |

1391

Hungary reserves the right to adopt or maintain any measure with respect to the supply of news and press agencies services.

**Existing Measures:**     None

**Sector:**     Manufacturing of electricity, gas and water supply

**Sub-Sector:**     Nuclear based electricity generation

Processing of nuclear fuel

**Industry Classification:**     ISIC rev 3.1 2330, part of ISIC rev 3.1 4010

**Type of Reservation:**     Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**     **Investment**

Hungary reserves the right to adopt or maintain any measure with respect to the processing of nuclear fuel and nuclear-based electricity generation.

**Existing Measures:**     Act CXVI of 1996 on Nuclear Energy, Government Decree Nr. 72/2000 on Nuclear Energy

**Sector:**     Energy services

**Sub-Sector:**     Pipeline transportation of fuels

**Industry Classification:**     CPC 7131

**Type of Reservation:**     Market access

**Description:**     **Investment and Cross-Border Trade in Services**

The supply of pipeline transport services requires establishment.

Services may be provided through a Contract of Concession granted by the state or the local authority. The supply of this service is regulated by the Hungarian Concession Law.

**Existing Measures:**     Act XVI of 1991 about Concessions

1392

***

## Reservations applicable in Ireland

**Sector:**                    Business services

**Sub-Sector:**                Executive search

                               Supply services of office support personnel

**Industry Classification:**   CPC 87201, CPC 87203

**Type of Reservation:**       Market access

                               National treatment

                               Senior management and boards of directors

**Description:**               **Cross-Border Trade in Services**

                               Ireland reserves the right to require establishment and to prohibit the cross-border supply of the supply of executive search services.

                               Ireland reserves the right to require establishment and to prohibit the cross-border supply of supply services of office personnel.

**Existing Measures:**


**Sector:**                    Social services

**Sub-Sector:**

**Industry Classification:**   CPC 933

**Type of Reservation:**       Market access

                               National treatment

                               Performance requirements

                               Senior management and boards of directors

**Description:**               **Investment**

                               Ireland reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes.

**Existing Measures:**


**Sector:**                    Transport

**Sub-Sector:**            Road transport: passenger transportation

**Industry Classification:**    CPC 7121, CPC 7122

**Type of Reservation:**    Market access

**Description:**           **Investment**

Economic needs test for intercity bussing services. Main criteria: number of and impact on existing establishments, population density, geographical spread, impact on traffic conditions and creation of new employment.

**Existing Measures:**     Public Transport Regulation Act 2009

***

1395

## Reservations applicable in Italy

**Sector:**                        All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**           Market access

                                   National treatment

**Description:**                   **Investment**

The Government may exercise certain special powers in enterprises operating in the areas of defence and national security, and in certain activities of strategic importance in the areas of energy, transport and communications. This relates to all juridical persons carrying out activities considered of strategic importance in the areas of defence and national security, not only to privatised companies.

Where there is a threat of serious injury to the essential interests of defence and national security, the Government has following special powers:

(a) to impose specific conditions in the purchase of shares;

(b) to veto the adoption of resolutions relating to special operations such as transfers, mergers, splitting up, and changes of activity; or

(c) to reject the acquisition of shares, where the buyer seeks to hold a level of participation in the capital that is likely to prejudice the interests of defence and national security.

Any resolution, act and transaction (transfers, mergers, splitting up, change of activity, termination) relating to strategic assets in the areas of energy, transport and communications shall be notified by the concerned company to the Prime Minister's office. In particular, acquisitions by any physical or juridical person outside the EU that give this person control over the company shall be notified.

The Prime Minister may exercise the following special powers:

(a) to veto any resolution, act and transaction that constitutes an exceptional threat of serious injury to the public interest in the security and operation of networks and supplies;

(b) to impose specific conditions in order to guarantee the public interest; or

(c) to reject an acquisition in exceptional cases of risk to the

1396

essential interests of the State.

The criteria on which to evaluate the real or exceptional threat and conditions and procedures for the exercise of the special powers are laid down in the law.

**Existing Measures:**   Law 56/2012 on special powers in companies operating in the field of defence and national security, energy, transport and communications

Decree of the Prime Minister DPCM 253 of 30.11.2012 defining the activities of strategic importance in the field of defence and national security

**Sector:**   Fishing

Aquaculture

Services incidental to fishing

**Sub-Sector:**

**Industry Classification:**   ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 882

**Type of Reservation:**   Market access

National treatment

**Description:**   **Investment and Cross-Border Trade in Services**

Fishing in Italian territorial waters is reserved to Italian flagged vessels.

**Existing Measures:**   Royal Decree 327/1942 (modified with Law 222/2007), arts. 143, 221 (Navigation Code)

**Sector:**   Business services

**Sub-Sector:**   Placement services

Supply services of office support personnel

**Industry Classification:**   CPC 87202, CPC 87203

**Type of Reservation:**   Market access

National treatment

Senior management and boards of directors

1397

**Description:**    **Investment and Cross-Border Trade in Services**

Italy reserves the right to require establishment and to prohibit the cross-border supply of supply services of office personnel.

Italy reserves the right to restrict the number of suppliers of placement services and supply services of office personnel.

**Existing Measures:**    Legislative Decree 276/2003 arts. 4, 5

**Sector:**    Education services

**Sub-Sector:**    Primary education services

Secondary education services

Higher education services

**Industry Classification:**    CPC 921, CPC 922, CPC 923

**Type of Reservation:**    Market access

National treatment

**Description:**    **Cross-Border Trade in Services**

Italy reserves the right to require establishment and to restrict the cross-border supply of privately funded primary and secondary education services.

**Existing Measures:**    Royal Decree 1592/1933 (Law on secondary education)

Law 243/1991 (Occasional public contribution for private universities)

Resolution 20/2003 of CNVSU (Comitato nazionale per la valutazione del sistema universitario)

Decree of the President of the Republic (DPR) 25/1998

**Sector:**    Financial services

**Sub-Sector:**    Banking and other financial services (except insurance)

**Type of Reservation:**    Market access

National treatment

Cross-Border supply of financial services

**Description:**    **Financial Services**

1398

Italy reserves the right to adopt or maintain any measure relating to the activities of "*promotori di servizi finanziari*".

**Existing Measures:** Arts. 91-111 of Consob Regulation on Intermediaries (no. 16190 of 29 October 2007)

**Sector:** Financial services

**Sub-Sector:** Insurance

**Type of Reservation:** Cross-Border supply of financial services

**Description:** **Financial Services**

Transport insurance of goods, insurance of vehicles as such and liability insurance regarding risks located in Italy may be underwritten only by insurance companies established in the EU, except for international transport involving imports into Italy.

**Existing Measures:** Art. 29 of the code of private insurance (Legislative decree no. 209 of 7 September 2005)

**Sector:** Financial services

**Sub-Sector:** Insurance

**Type of Reservation:** Cross-Border supply of financial services

**Description:** **Financial Services**

Italy reserves the right to adopt or maintain any measure requiring establishment and limiting the cross-border supply of actuarial services.

**Existing Measures:** Law 194/1942 on the actuarial profession

**Sector:** Social services

**Sub-Sector:**

**Industry Classification:** CPC 933

**Type of Reservation:** Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**         **Investment**

Italy reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes.

**Existing Measures:**      Law 833/1978 Institution of the public health system

Legislative Decree 502/1992 Organisation and discipline of the health field

Law 328/2000 Reform of social services

**Sector:**            Transport

**Sub-Sector:**        Road transport: passenger transportation, freight transportation, international truck transport services

**Industry Classification:**   CPC 712

**Type of Reservation:**    Market access

**Description:**         **Investment**

An economic needs test is applied to limousine services. Main criteria: number of and impact on existing establishments, population density, geographical spread, impact on traffic conditions and creation of new employment.

An economic needs test is applied to intercity bussing services. Main criteria: number of and impact on existing establishments, population density, geographical spread, impact on traffic conditions and creation of new employment.

An economic needs test is applied to the supply of freight transportation services. Main criteria: local demand.

**Existing Measures:**      Legislative decree 285/1992 (Road Code and subsequent amendments) art. 85

Legislative Decree 395/2000 art. 8 (road transport of passengers)

Law 21/1992 (Framework law on non-scheduled public road transport of passengers)

Law 218/2003 art. 1 (transport of passenger through rented buses with driver)

Law 151/1981 (framework law on public local transport)

***

## Reservations applicable in Latvia

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | Acquisition of rural land |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Investment** |
| | Latvia reserves the right to adopt or maintain any measure with regard to the acquisition of rural land by nationals of Canada or of a third country, including with regard to the authorisation process for the acquisition of rural land. |
| **Existing Measures:** | Law on land privatisation in rural areas, ss. 28, 29, 30. |

| | |
|---|---|
| **Sector:** | Veterinary services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 932 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Cross-Border Trade in Services** |
| | Latvia reserves the right to adopt or maintain any measure relating to the cross-border supply of veterinary services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Executive search |
| | Placement services |
| | Supply services of office support personnel |
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203 |

**Type of Reservation:**      Market access

National treatment

Senior management and boards of directors

**Description:**      **Investment and Cross-Border Trade in Services**

Latvia reserves the right to adopt or maintain any measure with regard to the supply of executive search, placement services, and supply services of office support personnel.

**Existing Measures:**


**Sector:**      Business services

**Sub-Sector:**      Security services

**Industry Classification:**      CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309

**Type of Reservation:**      Market access

National treatment

Senior management and boards of directors

**Description:**      **Investment and Cross-Border Trade in Services**

Latvia reserves the right to adopt or maintain any measure with regard to the supply of security services.

Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist.

**Existing Measures:**


**Sector:**      Transport

**Sub-Sector:**      Road transport: passenger transportation, freight transportation, international truck transport services

**Industry Classification:**      CPC 712

**Type of Reservation:**      Market access

National treatment

**Description:**      **Investment**

For passenger and freight transportation services, an authorisation is required, which is not extended to foreign registered vehicles.

Established entities are required to use nationally registered vehicles.

**Existing Measures:**

***

## Reservations applicable in Lithuania

**Sector:**              All sectors

**Sub-Sector:**

**Industry Classification:**

**Type of Reservation:**    Market access

National treatment

Most-favoured-nation treatment

Performance requirements

Senior management and boards of directors

**Description:**           **Investment**

Lithuania reserves the right to adopt or maintain any measure with respect to enterprises of strategic importance to national security which must belong to the State by the right of ownership (proportion of capital which may be held by private national or foreign persons conforming to national security interests, procedure and criteria for determination of conformity of potential national investors and potential enterprise participants, etc.).

**Existing Measures:**     Law on Enterprises and Facilities of Strategic Importance for National Security and Other Enterprises of Importance to Ensuring National Security of the Republic of Lithuania of 21 July 2009 No. XI-375.

**Sector:**              All sectors

**Sub-Sector:**           Purchase of land

**Industry Classification:**

**Type of Reservation:**    National treatment

Market access

**Description:**           **Investment and Cross-Border Trade in Services**

Lithuania reserves the right to adopt or maintain any measure which is consistent with the commitments taken by the EU and which are applicable in Lithuania in the General Agreement on Trade in Services (GATS) with respect to land acquisition. The land plot acquisition procedure, terms and conditions, as well as

restrictions shall be established by the Constitutional Law, the Law on Land and the Law on the Acquisition of Agricultural Land.

However, local governments (municipalities) and other national entities of Members of the Organisation for Economic Co-operation and Development and North Atlantic Treaty Organization conducting economic activities in Lithuania, which are specified by the constitutional law in compliance with the criteria of European and other integration which Lithuania has embarked on, are permitted to acquire into their ownership non-agricultural land plots required for the construction and operation of buildings and facilities necessary for their direct activities.

**Existing Measures:**     Constitution of the Republic of Lithuania

The Constitutional Law of the Republic of Lithuania on the Implementation of Paragraph 3 of Art. 47 of the Constitution of the Republic of Lithuania of 20 June 1996, No. I-1392 as last amended 20 March 2003, No. IX-1381

Law on land, of 27 January 2004, No. IX-1983

Law on acquisition of agricultural land of 24 April 2014, No. XII-854

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Legal services |
| **Industry Classification:** | Part of CPC 861 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Attorneys from foreign countries can participate as advocates in court only in accordance with bilateral agreements on legal assistance. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Executive search |
| | Placement services |
| | Supply services of office support personnel |

| | |
|---|---|
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Lithuania reserves the right to adopt or maintain any measure with regard to the supply of executive search, placement services, and supply services of office support personnel.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Lithuania reserves the right to adopt or maintain any measure with regard to the supply of security services.

Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Investigation services |
| **Industry Classification:** | CPC 87301 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |

In Lithuania, investigation services are a monopoly reserved to the State.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Tourism and travel-related services |
| **Sub-Sector:** | Tourist guides services |
| **Industry Classification:** | CPC 7472 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

In so far as Canada and its provinces and territories allow nationals of Lithuania to provide tourist guide services, Lithuania will allow nationals of Canada to provide tourist guide services under the same conditions.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Telecommunications |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

State Enterprise "Infostruktura" has exclusive rights to provide the following services: data transmission through secure state data transmission networks, granting of internet addresses ending "gov.lt", certification of electronic cash-registers.

**Existing Measures:** Government Resolution of 28 May 2002 No.756 On the approval of the standard procedure for setting prices and tariffs of goods and services of a monopolistic nature provided by state owned enterprises and public institutions established by ministries, governmental institutions and county governors and assigned to them.

1408

| | |
|---|---|
| **Sector:** | Construction services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 51 |
| **Type of Reservation:** | Market access |
| **Measures:** | Law on Construction of Republic of Lithuania of 19 March 1996 No. I-1240 |
| **Description:** | **Cross-Border Trade in Services** |

The right to prepare design documentation for construction works of exceptional significance is only given to a design enterprise registered in Lithuania, or a foreign design enterprise which has been approved by an institution authorised by the Government for such activities. The right to perform technical activities in the main areas of construction may be granted to a non-Lithuanian person who has been approved by an institution authorised by the Government of Lithuania.

| | |
|---|---|
| **Existing Measures:** | Law on Construction of Republic of Lithuania of 19 March 1996 No. I-1240 |

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 933 |

| | |
|---|---|
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services** |
| | Lithuania reserves the right to adopt or maintain any measure with regard to the cross-border supply of all social services which receive public funding or State support in any form, and are therefore not considered to be privately funded. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| | Senior management and boards of directors |
| | National Treatment |
| **Measures:** | Law on Banks of the Republic of Lithuania of 30 March 2004 No IX-2085 |
| | Law on Collective Investment Undertakings of the Republic of Lithuania of 4 July 2003 No IX-1709 |
| | Law on Supplementary Voluntary Pension Accumulation of the Republic of Lithuania of 3 June 1999 No VIII-1212 |
| **Description:** | **Financial Services** |
| | For the purpose of asset management, incorporation as a specialised management company (no branches) is required. |
| | Only banks having their registered office or branch in Lithuania may act as the depositories of the assets of investment fund |
| | Only banks having their registered office or branch in Lithuania and authorised to provide investment services in the Member States of the European Union.EU or in the Member States of the EEA may act as the depositories of the assets of pension funds. |
| | At least one head of a bank's administration must speak the Lithuanian language and permanently reside in Lithuania. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Energy services |
| **Sub-Sector:** | Pipeline transportation of fuels |
| **Industry Classification:** | CPC 7131 |
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services** |
| | Lithuania reserves the right to adopt or maintain any measure with respect to pipeline transportation of fuels. |
| **Existing Measures:** | Law on Natural Gas of the Republic of Lithuania of 10 October 2000 No VIII-1973 |

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | Storage and warehouse services of fuels transported through pipelines |
| **Industry Classification:** | ISIC rev 3.1 402, CPC 742 |
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services** |
| | Lithuania reserves the right to adopt or maintain any measure with respect to services auxiliary to pipeline transport of goods other than fuel. |
| **Existing Measures:** | Law On Natural Gas of the Republic of Lithuania 10 October 2000 No VIII-1973 (Art 10.8) |

| | |
|---|---|
| **Sector:** | Business services |
| | Auxiliary services to maritime, internal waterways, rail and air transport |
| **Sub-Sector:** | Maintenance and repair of vessels, rail transport equipment and aircraft and parts thereof |
| **Industry Classification:** | CPC 86764, CPC 86769, part of CPC 8868 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |

In Lithuania, maintenance and repair services of rail transport equipment are subject to a state monopoly.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Road transport |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 7121, CPC 7122, CPC 7123 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Measures that are taken under bilateral agreements and which set the provisions for transport services and specify operating conditions, including bilateral transit and other transport permits for transport services into, through and out of the territory of Lithuania to the contracting parties concerned, and road taxes and levies.

**Existing Measures:**

***

## Reservations applicable in Malta

**Sector:**                          Fishing

Aquaculture

Services incidental to fishing

**Sub-Sector:**

**Industry Classification:**    ISIC rev 3.1 0501, 0502, CPC 882

**Type of Reservation:**    Market access

National treatment

**Description:**           **Investment**

For the purposes of the registration and licensing of a fishing vessel, the owner, captain or master of the fishing vessel shall be resident in Malta, in accordance with the terms of the provisions of the Immovable Property (Acquisition by Non-Residents) Act.

**Existing Measures:**    Art. 5 of Subsidiary Legislation 425.07 on Fishing Vessels Regulations

**Sector:**                          Business services

**Sub-Sector:**            Executive search

Placement services

Supply services of office support personnel

**Industry Classification:**    CPC 87201, CPC 87202, CPC 87203

**Type of Reservation:**    Market access

National treatment

Senior management and boards of directors

**Description:**           **Investment and Cross-Border Trade in Services**

Malta reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

Malta reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Malta reserves the right to adopt or maintain any measure with regard to the supply of security services.

Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 921, CPC 922, CPC 923, CPC 924 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Malta reserves the right to adopt or maintain any measure with respect to the supply of privately funded primary, secondary, higher, and adult education services.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Health services |

**Sub-Sector:**              Hospital services

                            Ambulance services

                            Residential health services other than hospital services

**Industry Classification:**  CPC 9311, CPC 93192, CPC 93193

**Type of Reservation:**     Market access

                            National treatment

                            Performance requirements

                            Senior management and boards of directors

**Description:**             **Investment**

                            Malta reserves the right to adopt or maintain any measure with respect to the supply of privately funded hospital, ambulance, and residential health services other than hospital services.

**Existing Measures:**


**Sector:**                 Health services

**Sub-Sector:**             Health-related professional services: medical and dental services, midwife services, nursing services, physiotherapeutic and para-medical services, psychologist services

**Industry Classification:**  CPC 9312, part of CPC 9319

**Type of Reservation:**     National treatment

                            Market access

**Description:**            **Investment and Cross-Border Trade in Services**

                            This reservation applies to all health-related professional services, including the services provided by professionals such as medical doctors, dentists, midwives, nurses, physiotherapists, paramedics, and psychologists, In Malta, these services may only be provided by nationals of a Member State of the EU having prior authorisation, which may be subject to an economic needs test (ENT).

**Existing Measures:**


**Sector:**                 Social services

**Sub-Sector:**

**Industry Classification:**    CPC 933

**Type of Reservation:**    Market access

Национальный treatment

Performance requirements

Senior management and boards of directors

**Description:**    **Investment**

Malta reserves the right to adopt or maintain any measure with regard to the supply of privately funded social services.

**Existing Measures:**


**Sector:**    Transport services

**Sub-Sector:**    Road transport

**Industry Classification:**    CPC 712

**Type of Reservation:**    Market access

National treatment

**Description:**    **Investment and Cross-Border Trade in Services**

Public bus service: The entire network is subject to a concession which includes a Public Service Obligation agreement to cater for certain social sectors (such as students and the elderly).

**Existing Measures:**


**Sector:**    Transport

**Sub-Sector:**    Water transport

Supporting services for water transport

**Industry Classification:**    CPC 7213, CPC 7214, part of 742, CPC 745, part of CPC 749

**Type of Reservation:**    Market access

**Description:**    **Investment and Cross-Border Trade in Services**

Exclusive rights exist for the maritime link to mainland Europe through Italy with Malta.

**Existing Measures:**

***

## Reservations applicable in the Netherlands

**Sector:**                        Business services

**Sub-Sector:**                    Supply services of office support personnel

**Industry Classification:**       CPC 87203

**Type of Reservation:**           Market access

**Description:**                   **Cross-Border Trade in Services**

The Netherlands reserves the right to require establishment and to prohibit the cross-border supply of supply services of office personnel.

**Existing Measures:**

***

## Reservations applicable in Poland

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Preferential conditions for establishment or the cross-border supply of services, which may include the elimination or amendment of certain restrictions embodied in the list of reservations applicable in Poland, may be extended through commerce and navigation treaties.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Fishing |
| | Aquaculture |
| | Services incidental to fishing |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 0501, ISIC rev 3.1 0502, CPC 882 |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Poland reserves the right to adopt or maintain any measure which accords differential treatment to services and service suppliers of a country pursuant to existing or future bilateral agreements relating to fishing in the geographical area of fisheries falling within the jurisdiction of the countries involved, in accordance with international conservation practices and policies or agreements on fisheries, particularly in the Baltic Sea basin.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |

| | |
|---|---|
| **Sub-Sector:** | Executive search |
| | Placement services |
| | Supply services of office support personnel |
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Poland reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel. |
| | Poland reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Reserve the right to adopt or maintain any measure with regard to the supply of security services. |
| | Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Health services |

**Sub-Sector:** Ambulance services

**Industry Classification:** CPC 93192

**Type of Reservation:** Market access

National treatment

Senior management and boards of directors

**Description:** **Investment**

Poland reserves the right to adopt or maintain any measure with respect to the supply of ambulance services.

**Existing Measures:**


**Sector:** Social services

**Sub-Sector:**

**Industry Classification:** CPC 933

**Type of Reservation:** Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:** **Investment**

Poland reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services.

**Existing Measures:**


**Sector:** Transport

**Sub-Sector:** All passenger and freight transport services other than maritime transport

**Industry Classification:** Part of CPC 711, part of CPC 712, part of CPC 722

**Type of Reservation:** Most-favoured-nation treatment

**Description:** **Investment and Cross-Border Trade in Services**

In so far as Canada and its provinces and territories allow the

1421

supply of transport services into and across the territory of Canada by passenger and freight transport suppliers of Poland, Poland will allow the supply of transport services by passenger and freight transport suppliers of Canada into and across the territory of Poland under the same conditions.

**Existing Measures:**

***

## Reservations applicable in Portugal

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Portugal reserves the right to waive nationality requirements for the exercise of certain activities and professions by natural persons supplying services for countries in which Portuguese is the official language (Angola, Brazil, Cape Verde, Guinea-Bissau, Mozambique and São Tomé & Principe). |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Auditing services |
| **Industry Classification:** | CPC 86211, CPC 86212, other than accounting services |
| **Type of Reservation:** | Market access |
| **Description:** | **Cross-Border Trade in Services** |
| | Portugal reserves the right to adopt or maintain any measure with respect to the cross-border supply of auditing services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Executive search |
| | Placement services |
| | Supply services of office support personnel |
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203 |
| **Type of Reservation:** | Market access |
| | National treatment |

Senior management and boards of directors

**Description:**     **Investment and Cross-Border Trade in Services**

Portugal reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

Portugal reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel.

**Existing Measures:**


**Sector:**     Business services

**Sub-Sector:**     Security services

**Industry Classification:**     CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309

**Type of Reservation:**     Market access

                            National treatment

**Description:**     **Cross-Border Trade in Services**

The cross-border supply of security services by a foreign service supplier is not allowed

Nationality condition for specialised personnel.

**Existing Measures:**


**Sector:**     Business services

**Sub-Sector:**     Investigation services

**Industry Classification:**     CPC 87301

**Type of Reservation:**     Market access

**Description:**     **Investment and Cross-Border Trade in Services**

In Portugal, investigation services are a monopoly reserved to the State.

**Existing Measures:**

**Sector:**        Financial services

**Sub-Sector:**      Insurance

**Type of Reservation:**   Cross-Border supply of financial services

**Description:**      **Financial Services**

Air and maritime transport insurance, covering goods, aircraft, hull and liability, can be underwritten only by firms established in the EU.

Only persons or companies established in the EU may act as intermediaries for such insurance business in Portugal.

**Existing Measures:**    Art. 7 of Decree-Law 94-B/98 and art. 7 of Decree-Law 144/2006


**Sector:**        Social services

**Sub-Sector:**

**Industry Classification:**  CPC 933

**Type of Reservation:**   Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**      **Investment**

Portugal reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes.

**Existing Measures:**


**Sector:**        Energy

**Sub-Sector:**      Electricity, natural gas, crude oil or petroleum products

**Industry Classification:**  ISIC rev 3.1 232, ISIC rev 3.1 4010, ISIC rev 3.1 4020, CPC 7131, CPC 7422, CPC 887 (other than advisory and consulting

services)

**Type of Reservation:** Market access

National treatment

**Description:** **Investment and Cross-Border Trade in Services**

Portugal reserves the right to adopt or maintain any measure with respect to the production, transmission and distribution of electricity, the manufacturing of gas, the pipeline transportation of fuels, wholesale services of electricity, retailing services of electricity and non-bottled gas, and services incidental to electricity and natural gas distribution.

Portugal reserves the right to adopt or maintain any measure with respect to the cross-border supply of storage and warehousing services of fuels transported through pipelines (natural gas).

The activities of electricity transmission and distribution are carried out through exclusive concessions of public service.

Concessions relating to the transmission, distribution and underground storage of natural gas and the reception, storage and regasification terminal of LNG are awarded through contracts concession, following public calls for tenders.

These concessions for electricity and gas sectors are assigned only to limited companies with their headquarters and effective management in Portugal.

**Existing Measures:** Decree-Law 230/2012 and Decree-Law 231/2012, 26 October - Natural Gas

Decree-Law 215-A/2012, and Decree-Law 215-B/2012, 8 October - Electricity

Decree-Law 31/2006, 15 February – Crude oil/Petroleum products

**Sector:** Transport

**Sub-Sector:** Road transport: passenger transportation, freight transportation, international truck transport services

**Industry Classification:** CPC 712

**Type of Reservation:** Market access

**Description:** **Investment**

1426

For passenger transportation, an economic needs test is applied to the supply of limousine services. Main criteria: number of and impact on existing establishments, population density, geographical spread, impact on traffic conditions and creation of new employment.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Other services |
| **Sub-Sector:** | Funeral, cremation and undertaking services |
| **Industry Classification:** | CPC 97030 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |

Portugal reserves the right to adopt or maintain any measure with respect to funeral, cremation and undertaking services. The private management and operation of cemeteries is carried out under a public concession.

**Existing Measures:** Decree-Law 109/2010, 14 October 2010

Law 13/2011, 29 April 2011

***

## Reservations applicable in Romania

**Sector:**                     Business services

**Sub-Sector:**                 Research and development services

**Industry Classification:**    CPC 851, CPC 852, CPC 853

**Type of Reservation:**        Market access

                                National treatment

**Description:**                **Cross-Border Trade in Services**

                                Romania reserves the right to adopt or maintain any measure with respect to the cross-border supply of research and development services.

**Existing Measures:**          Governmental Ordinance no. 6 / 2011

                                Order of Minister of Education and Research no. 3548 / 2006

                                Governmental Decision no. 134 / 2011


**Sector:**                     Business services

**Sub-Sector:**                 Executive search

                                Placement services

                                Supply services of office support personnel

**Industry Classification:**    CPC 87201, CPC 87202, CPC 87203

**Type of Reservation:**        Market access

                                National treatment

                                Senior management and boards of directors

**Description:**                **Investment and Cross-Border Trade in Services**

                                Romania reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

                                Romania reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel.

**Existing Measures:**

1428

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Romania reserves the right to adopt or maintain any measure with regard to the supply of security services. |
| | Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 921, CPC 922, CPC 923, CPC 924 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Romania reserves the right to adopt or maintain any measure with respect to the supply of privately funded primary, secondary, higher, and adult education services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 933 |
| **Type of Reservation:** | Market access |
| | National treatment |

Performance requirements

Senior management and boards of directors

**Description:**                **Investment**

Romania reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services.

**Existing Measures:**

***

## Reservations applicable in the Slovak Republic

**Sector:**                         All sectors

**Sub-Sector:**                     Acquisition of real estate

**Industry Classification:**

**Type of Reservation:**            Market access

                                    National treatment

**Description:**                    **Investment**

                                    Foreign companies or natural persons may not acquire agricultural and forest land outside the border of the built-up area of a municipality and some other land (e.g. natural resources, lakes, rivers, public roads etc.).

**Existing Measures:**              Act 202/1995, the Foreign Exchange Act, art. 19

                                    Act 229/1991 on Laws on Adjustment of ownership relations to Land


**Sector:**                         Business services

**Sub-Sector:**                     Executive search

                                    Placement services

                                    Supply services of office support personnel

**Industry Classification:**        CPC 87201, CPC 87202, CPC 87203

**Type of Reservation:**            Market access

                                    National treatment

                                    Senior management and boards of directors

**Description:**                    **Investment and Cross-Border Trade in Services**

                                    The Slovak Republic reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

                                    The Slovak Republic reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | The Slovak Republic reserves the right to adopt or maintain any measure with regard to the supply of security services. |
| | Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 921, CPC 922, CPC 923 other than CPC 92310, CPC 924 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | EEA residency requirement for providers of all privately funded education services other than post-secondary technical and vocational education services. |
| | An economic needs test may apply, the number of schools being established may be limited by local authorities. |
| | In the Slovak Republic, the majority of the members of the board of directors of an establishment providing education services must be nationals of the Slovak Republic. |
| **Existing Measures:** | Act 245/2008 on education |

Act 131/2002 on Universities, arts. 2, 47, 49a

Act 596/2003 on State Administration in Education, art. 16

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Hospital services |
| | Ambulance services |
| | Residential health services other than hospital services |
| **Industry Classification:** | CPC 9311, CPC 93192, CPC 93193 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | The Slovak Republic reserves the right to adopt or maintain any measure with respect to the supply of privately funded hospital, ambulance, and residential health services other than hospital services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 933 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | The Slovak Republic reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services. |
| **Existing Measures:** | |

1433

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance-related services |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| **Description:** | **Financial Services** |
| | Foreign nationals may establish an insurance company in the form of a joint stock company or may conduct insurance business through their branches having a registered office in the Slovak Republic. The authorisation in both cases is subject to the evaluation of supervisory authority. |
| **Existing Measures:** | Act **8/2008** on Insurance |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Industry Classification:** | |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Measures:** | Act 566/2001 on Securities |
| | Act 483/2001 on Banks |
| **Description:** | **Financial Services** |
| | Investment services in the Slovak Republic can be provided by management companies which have the legal form of joint-stock company with equity capital according to the law (no branches). |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Energy |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 4010, ISIC rev 3.1 4020, ISIC rev 3.1 4030, CPC 7131 |

| | |
|---|---|
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Investment and Cross-Border Trade in Services** |

An authorisation is required for the production, transmission and distribution of electricity, manufacture of gas and distribution of gaseous fuels, production and distribution of steam and hot water, pipeline transportation of fuels, wholesale and retail of electricity, steam and hot water, and services incidental to energy distribution. An economic needs test is applied and the application may be denied only if the market is saturated.

For all these activities, an authorisation may only be granted to a natural person with permanent residency in a Member State of the EU or the EEA or a juridical person established in the EU or the EEA.

| | |
|---|---|
| **Existing Measures:** | Act 51/1988 on Mining, art. 4a |
| | Act 569/2007 on Geological Activity, art. 5 |
| | Act 251/2012 on Energy, arts. 6, 7 |
| | Act 657/2004 on Thermal Energy, art. 5 |

| | |
|---|---|
| **Sector:** | Transportation |
| | Fishing |
| | Aquaculture |
| **Sub-Sector:** | Water transportation |
| | Services incidental to fishing |
| **Industry Classification:** | CPC 722 |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Description:** | **Cross-border Trade in Services** |

In the Slovak Republic, foreign investors must have their principal office in the Slovak Republic in order to apply for a licence enabling them to provide a service.

**Existing Measures:**

**Sector:**            Transport

**Sub-Sector:**        Road transport: passenger transportation, freight transportation, international truck transport services

**Industry Classification:**    CPC 712

**Type of Reservation:**    Market access

**Description:**        **Investment**

For freight transportation, an economic needs test is applied. Main criteria: local demand.

**Existing Measures:**


**Sector:**            Rail transport

**Sub-Sector:**

**Industry Classification:**    CPC 7111, CPC 7112

**Type of Reservation:**    Most-favoured-nation treatment

**Description:**        **Investment and Cross-Border Trade in Services**

Measures that are taken under existing or future agreements, and which regulate traffic rights and operating conditions, and the supply of transport services in the territory of Bulgaria, the Czech Republic and Slovakia and between the countries concerned.

**Existing Measures:**


**Sector:**            Road transport

**Sub-Sector:**

**Industry Classification:**    CPC 7121, CPC 7122, CPC 7123

**Type of Reservation:**    Most-favoured-nation treatment

**Description:**        **Investment and Cross-Border Trade in Services**

Measures that are taken under existing or future agreements, and which reserve or limit the supply of transport services and specify operating conditions, including transit permits or

1436

preferential road taxes of a transport services into, in, across and out of Slovakia to the contracting parties concerned.

**Existing Measures:**

***

## Reservations applicable in Slovenia

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Executive search |
| | Placement services |
| | Supply services of office support personnel |
| **Industry Classification:** | CPC 87201, CPC 87202, CPC 87203 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Slovenia reserves the right to adopt or maintain any measure with regard to the establishment of placement services of office support personnel.

Slovenia reserves the right to adopt or maintain any measure with regard to the supply of executive search services and supply services of office support personnel.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Slovenia reserves the right to adopt or maintain any measure with regard to the supply of security services.

Licensing and authorisation requirements may exist. Residency or commercial presence is required and nationality requirements may exist.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | Primary education services |
| | Secondary education services |
| | Higher education services |
| **Industry Classification:** | CPC 921, CPC 922, CPC 923 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Slovenia reserves the right to require establishment and to restrict the cross-border supply of privately funded primary education services.

The majority of the members of the board of directors of an establishment providing privately funded secondary or higher education services must be Slovenian nationals.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Health services |
| **Sub-Sector:** | Ambulance services |
| **Industry Classification:** | CPC 93192 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |

Slovenia reserves the right to adopt or maintain any measure with respect to the supply of privately funded ambulance services.

**Existing Measures:**

**Sector:**                    Social services

**Sub-Sector:**

**Industry Classification:**   CPC 933

**Type of Reservation:**       Market access

                               National treatment

                               Performance requirements

                               Senior management and boards of directors

**Description:**               **Investment**

                               Slovenia reserves the right to adopt or maintain any measure with
                               respect to the supply of privately funded social services.

**Existing Measures:**

***

# Reservations applicable in Spain

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Executive search |
| | Placement services |
| **Industry Classification:** | CPC 87201, CPC 87202 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |
| | Spain reserves the right to restrict the number of suppliers of executive search services. |
| | Spain reserves the right to restrict the number of suppliers of placement services. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Business services |
| **Sub-Sector:** | Security services |
| **Industry Classification:** | CPC 87302, CPC 87303, CPC 87304, CPC 87305, CPC 87309 |
| **Type of Reservation:** | Market access |
| | National treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | The supply of security services by a foreign provider on a cross-border basis is not allowed. |
| | Access through Sociedades Anonimas, Sociedades de Responsabilidad Limitada, Sociedades Anonimas Laborales and Sociedades Cooperativas only. |
| | Nationality condition for specialised personnel. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance |

| | |
|---|---|
| **Type of Reservation:** | Market access |
| | National treatment |
| | Cross-Border supply of financial services |
| **Description:** | **Financial Services** |
| | Residence is required, or alternatively to have two years of experience, for the actuarial profession. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Social services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 933 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Spain reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | Transport |
| **Sub-Sector:** | Road transport: passenger transportation, freight transportation, international truck transport services |
| **Industry Classification:** | CPC 712 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |
| | For passenger transportation, an economic needs test applies to services provided under CPC 7122. Main criteria: local demand. |

An economic needs test applies for intercity bussing services. Main criteria: number of and impact on existing establishments, population density, geographical spread, impact on traffic conditions and creation of new employment.

**Existing Measures:**


**Sector:**                          Road transport (freight)

**Sub-Sector:**

**Industry Classification:**         CPC 7123

**Type of Reservation:**             Most-favoured-nation treatment

**Description:**                     **Investment and Cross-Border Trade in Services**

                                     Authorisation for the establishment of a commercial presence in Spain may be refused to service suppliers, whose country of origin does not accord effective market access to service suppliers of Spain.

**Existing Measures:**               Ley 16/1987**, de 30 de julio, de Ordenación de los Transportes Terrestres**

                                     ***

# Reservations applicable in Sweden

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Sweden reserves the right to adopt or maintain discriminatory requirements for founders, senior management and boards of directors when new forms of legal association are incorporated into Swedish law. |
| **Existing Measures:** | |

| | |
|---|---|
| **Sector:** | All sectors |
| **Sub-Sector:** | |
| **Industry Classification:** | |
| **Type of Reservation:** | Most-favoured-nation treatment |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | Measures taken by Denmark, Sweden and Finland aimed at promoting Nordic cooperation, such as: |
| | (a) financial support to research and development (R&D) projects (the Nordic Industrial Fund); |
| | (b) funding of feasibility studies for international projects (the Nordic Fund for Project Exports); and |
| | (c) financial assistance to companies[83] utilizing environmental technology (the Nordic Environment Finance Corporation). |
| | This reservation is without prejudice to the exclusion of procurement by a Party, subsidies, or governmental support for trade in services in Art. 8.14.5(a) and (b), and Art. 9.2.2(f) and (g) respectively. |
| **Existing Measures:** | |

---

[83] Applies to East European companies, which are cooperating with one or more Nordic companies.

1444

| | |
|---|---|
| **Sector:** | Mining and quarrying, manufacturing of electricity, gas and water supply |
| **Sub-Sector:** | Nuclear based electricity generation |
| | Processing of nuclear fuel |
| **Industry Classification:** | ISIC rev 3.1 1200, 2330, part of 4010 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Performance requirements |
| | Senior management and boards of directors |
| **Description:** | **Investment** |
| | Sweden reserves the right to adopt or maintain any measure with respect to the processing of nuclear fuel and nuclear-based electricity generation. |
| **Existing Measures:** | The Swedish Environmental Code (1998:808) |
| | Law on Nuclear Technology Activities (1984:3) |

| | |
|---|---|
| **Sector:** | Distribution services |
| **Sub-Sector:** | Retail sales of pharmaceuticals and retail sales of medical and orthopaedic goods and other services supplied by pharmacists |
| **Industry Classification:** | CPC 63211 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |
| | The Swedish monopoly on retail sales of pharmaceuticals was abandoned on 1 July 2009. Given that the opening of the market is recent and involves new modes of services delivery, Sweden reserves the right to adopt or maintain any measure with respect to retail sales of pharmaceutical goods and the supply of pharmaceutical goods to the general public. |
| **Existing Measures:** | Law on trade with pharmaceuticals (2009:336) |

1445

Regulation on trade with pharmaceuticals (2009:659)

The Swedish Medical Products Agency has adopted further regulations, the details can be found at (LVFS 2009:9)

http://www.lakemedelsverket.se/upload/lvfs/LVFS_2009-9.pdf

| | |
|---|---|
| **Sector:** | Education services |
| **Sub-Sector:** | |
| **Industry Classification:** | CPC 92 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Investment and Cross-Border Trade in Services** |

Sweden reserves the right to adopt or maintain any measure with respect to educational services suppliers that are approved by public authorities to provide education.

This reservation applies to privately funded educational services suppliers with some form of State support, inter alia educational service suppliers recognised by the State, educational services suppliers under State supervision or education which entitles to study support.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Recycling |
| **Sub-Sector:** | |
| **Industry Classification:** | ISIC rev 3.1 37 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |

Sweden reserves the right to limit the number of suppliers of privately funded recycling services at the level of local government, by establishing or maintaining monopolies, or granting a concession or exclusive rights on a non-discriminatory basis to a service provider or service providers. The limitation on market access reflects the application of the EU reservation

relating to public utilities.

| | |
|---|---|
| **Existing Measures:** | The Environmental Code (1998:808) |
| | SFS 1994:1205 Förordning (1994:1205) om producentansvar för returpapper |
| | SFS 2000:208 Förordning (2000:208) om producentansvar för glödlampor och vissa belysningsarmaturer |
| | SFS 2005:209 Förordning (2005:209) om producentansvar för elektriska och elektroniska produkter |
| | SFS 1997:185 Förordning (1997:185) om producentansvar för förpackningar |
| | SFS 1994:1236 Förordning (1994:1236) om producentansvar för däck |
| | SFS 1993:1154 Förordning (1993:1154) om producentansvar för glasförpackningar och förpackningar av wellpapp |
| | SFS 2007:185 Förordning (2007:185) om producentansvar för bilar |
| | SFS 2007:193 Förordning (2007:193) om producentansvar för vissa radioaktiva produkter och herrelösa strålkällor |
| | SFS 2006:1273 Förordning (2006:1273) om producentansvar för förpackningar |
| | SFS 2009:1031 Förordning (2009:1031) om producentansvar för läkemedel |

| | |
|---|---|
| **Sector:** | Waste management |
| **Sub-Sector:** | Management of waste from households and waste related to producer responsibilities |
| **Industry Classification:** | CPC 9402 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |

Sweden reserves the right to limit the number of suppliers of privately funded waste management services at the level of local government, by establishing or maintaining monopolies, or granting a concession or exclusive rights on a non-discriminatory basis to a service provider or service providers. The limitation on market access reflects the application of the EU reservation relating to public utilities.

**Existing Measures:**    The Environmental Code (1998:808)

SFS 1994:1205 Förordning (1994:1205) om producentansvar för returpapper

SFS 2000:208 Förordning (2000:208) om producentansvar för glödlampor och vissa belysningsarmaturer

SFS 2005:209 Förordning (2005:209) om producentansvar för elektriska och elektroniska produkter

SFS 1997:185 Förordning (1997:185) om producentansvar för förpackningar

SFS 1994:1236 Förordning (1994:1236) om producentansvar för däck

SFS 1993:1154 Förordning (1993:1154) om producentansvar för glasförpackningar och förpackningar av wellpapp

SFS 2007:185 Förordning (2007:185) om producentansvar för bilar

SFS 2007:193 Förordning (2007:193) om producentansvar för vissa radioaktiva produkter och herrelösa strålkällor

SFS 2006:1273 Förordning (2006:1273) om producentansvar för förpackningar

SFS 2009:1031 Förordning (2009:1031) om producentansvar för läkemedel


**Sector:**    Maritime transport

**Sub-Sector:**    Cabotage

**Industry Classification:**    CPC 7211, CPC 7212

**Type of Reservation:**    Most-favoured-nation treatment

**Description:**    **Investment and Cross-Border Trade in Services**

Measures may be taken on a reciprocal basis allowing vessels from Canada under the flag of Canada to operate cabotage traffic in Sweden in so far as Canada and its provinces and territories allow vessels registered under the flag of Sweden to operate cabotage traffic in Canada. The specific aim of this reservation depends on the content of possible mutually agreed future agreement between Canada and Sweden.

**Existing Measures:**

| | |
|---|---|
| **Sector:** | Business services |
| | Auxiliary services to rail and land transport |
| **Sub-Sector:** | Maintenance and repair of rail and road transport equipment and parts thereof |
| **Industry Classification:** | CPC 6112, CPC 6122, part of CPC 8867, part of CPC 8868 |
| **Type of Reservation:** | Market access |
| **Description:** | **Investment** |
| | In Sweden, maintenance and repair services of rail and road transport equipment are subject to an economic needs test when an investor intends to establish its own terminal infrastructure facilities. Main criteria: space and capacity constraints. |
| **Existing Measures:** | Planning and Building Act (2010:900) |

| | |
|---|---|
| **Sector:** | Other services not included elsewhere |
| **Sub-Sector:** | Funeral, cremation and undertaking services |
| **Industry Classification:** | CPC 9703 |
| **Type of Reservation:** | Market access |
| | National treatment |
| | Senior management and boards of directors |
| **Description:** | **Cross-Border Trade in Services** |
| | Sweden reserves the right to adopt or maintain any measure with respect to funeral, cremation and undertaking services |
| **Existing Measures:** | |

***

## Reservations applicable in the United Kingdom

**Sector:**                        Business services

**Sub-Sector:**                    Auditing services

**Industry Classification:**       CPC 86211, CPC 86212 other than accounting services

**Type of Reservation:**           Market access

                                   National treatment

                                   Performance requirements

                                   Senior management and boards of directors

**Description:**                   **Cross-Border Trade in Services**

                                   The United Kingdom reserves the right to adopt or maintain any measure with respect to the cross-border supply of auditing services.

**Existing Measures:**             Companies Act 2006


**Sector:**                        Health services

**Sub-Sector:**                    *Medical services*

**Industry Classification:**       CPC 93121, CPC 93122

**Type of Reservation:**           Market access

**Description:**                   **Investment**

                                   Establishment for doctors under the National Health Service is subject to medical manpower planning.

**Existing Measures:**


**Sector:**                        Health services

**Sub-Sector:**                    Ambulance services

                                   Residential health facilities services other than hospital services

**Industry Classification:**       CPC 93192, CPC 93193

**Type of Reservation:**           Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**           **Investment**

The United Kingdom reserves the right to adopt or maintain any measure with respect to the supply of privately funded ambulance services and residential health facilities services other than hospital services.

**Existing Measures:**

**Sector:**              Health services

**Sub-Sector:**          Health-related professional services, including medical and dental services as well as services by psychologists; midwives services

Services by nurses, physiotherapists and paramedical personnel

Retail sales of pharmaceuticals and of medical and orthopaedic goods, and other services supplied by pharmacists

**Industry Classification:**   CPC *63211, part of* CPC *85201,* CPC 9312, part of CPC 93191

**Type of Reservation:**    National treatment

Market access

**Description:**           **Cross-Border Trade in Services**

*The United Kingdom reserves the right to adopt or maintain any measure requiring the establishment of suppliers and restricting the cross-border supply of health-related professional services by service suppliers not physically present in the territory of the UK, including medical and dental services as well as services by psychologists; midwives services; services by nurses, physiotherapists and paramedical personnel; the retail sales of pharmaceuticals and of medical and orthopaedic goods, and other services supplied by pharmacists.*

**Existing Measures:**

**Sector:**              Social services

**Sub-Sector:**

**Industry Classification:**    CPC 933

**Type of Reservation:**    Market access

National treatment

Performance requirements

Senior management and boards of directors

**Description:**    **Investment**

The United Kingdom reserves the right to adopt or maintain any measure with respect to the supply of privately funded social services other than services relating to Convalescent and Rest Houses and Old People's Homes.

**Existing Measures:**

***

## ANNEX III

### Schedule of Canada

### Explanatory notes

1.    The Schedule of Canada to this Annex sets out:

    (a)    headnotes that limit or clarify the commitments of Canada with respect to the obligations described in subparagraphs (b) and (c);

    (b)    in Section A, the reservations taken by Canada, pursuant to Articles 13.10.1 and 13.10.2 (Reservations and exceptions), with respect to an existing measure that does not conform with obligations imposed by:

        (i)    Article 13.3 (National treatment);

        (ii)    Article 13.4 (Most-favoured-nation treatment);

        (iii)    Article 13.6 (Market access);

        (iv)    Article 13.7 (Cross-border supply of financial services); or

        (v)    Article 13.8 (Senior management and boards of directors);

    (c)    in Section B, the reservations taken by Canada, pursuant to Article 13.10.3 (Reservations and exceptions), for measures Canada may adopt or maintain that do not conform with obligations imposed by Articles 13.3 (National treatment), 13.4 (Most-favoured-nation treatment), 13.6 (Market access), 13.7 (Cross-border supply of financial services), or 13.8 (Senior management and boards of directors).

2.    Each reservation in Section A sets out the following elements:

    (a)    **Sector** refers to the general sector in which the reservation is taken;

    (b)    **Sub-Sector** refers to the specific sector in which the reservation is taken;

    (c)    **Type of Reservation** specifies the obligation referred to in sub-paragraph 1(b) for which the reservation is taken;

    (d)    **Level of Government** indicates the level of government maintaining the measure for which the reservation is taken;

    (e)    **Measures** identifies the laws, regulations or other measures, as qualified, where indicated, by the **Description** element, for which the reservation is taken. A measure cited in the **Measures** element:

        (i)    means the measure as amended, continued or renewed as of the date of entry into force of this Agreement; and

        (ii)    includes a subordinate measure adopted or maintained under the authority of and consistent with the measure; and

    (f)    **Description** sets out references, if any, for liberalisation on the date of entry into force of this Agreement pursuant to other sections of Canada's Schedule to this Annex, and the remaining non-conforming aspects of the existing measures for which the reservation is taken.

3.    Each reservation in Section B sets out the following elements:

(a) **Sector** refers to the general sector in which the reservation is taken;

(b) **Sub-Sector** refers to the specific sector in which the reservation is taken;

(c) **Type of Reservation** specifies the obligation referred to in sub-paragraph 1(c) for which the reservation is taken;

(d) **Level of Government** indicates the level of government maintaining the measure for which the reservation is taken; and

(e) **Description** sets out the scope of the sectors, subsectors, or activities covered by the reservation.

4. In the interpretation of a reservation in Section A, all elements of the reservation shall be considered. A reservation shall be interpreted in the light of the relevant provisions of the Chapter against which the reservation is taken. To the extent that:

(a) the **Measures** element is qualified by a specific reference in the **Description** element, the **Measures** element as so qualified shall prevail over all other elements; and

(b) the **Measures** element is not so qualified, the **Measures** element shall prevail over all other elements, unless any discrepancy between the **Measures** element and the other elements considered in their totality is so substantial and material that it would be unreasonable to conclude that the **Measures** element should prevail, in which case the other elements shall prevail to the extent of that discrepancy.

5. In the interpretation of a reservation in Section B, all elements of the reservation shall be considered. The **Description** element shall prevail over all other elements.

6. Where Canada maintains a measure that requires that a service supplier be a citizen, permanent resident, or resident of its territory as a condition to the supply of a service in its territory, a reservation for that measure taken with respect to Articles 13.3 (National treatment), 13.4 (Most-favoured-nation-treatment), 13.6 (Market access), 13.7 (Cross-border supply of financial services), and 13.8 (Senior management and boards of directors), shall operate as a reservation with respect to Articles 8.4 (Market access), 8.5 ( Performance requirements), 8.6 (National treatment), 8.7 (Most-favoured-nation treatment), and 8.8 (Senior management and boards of directors) to the extent of that measure.

7. A reservation for a measure that requires a service supplier be a natural person, citizen, permanent resident, or resident of its territory as a condition to the supply of a financial service in its territory taken with respect to Article 13.7 (Cross-border supply of financial services) shall operate as a reservation with respect to Articles 13.3 (National treatment), 13.4 (Most-favoured-nation treatment), 13.6 (Market access), and 13.8 (Senior management and boards of directors), to the extent of that measure.

**Headnotes**

1.      Commitments under this Agreement, in the subsectors listed in this Schedule, are undertaken subject to the limitations and conditions set forth in these headnotes and in the Schedule below.

2.      The listing of a measure as a reservation in Section A or B does not mean that it cannot otherwise be justified as a measure adopted or maintained for prudential reasons pursuant to Article 13.16 (Prudential carve out).

3.      To clarify Canada's commitment with respect to Article 13.6 (Market access), juridical persons supplying financial services and constituted under the laws of Canada are subject to non-discriminatory limitations on juridical form.[84]

4.      Article 13.10.1(c) (Reservations and exceptions) shall not apply to non-conforming measures relating to Article 13.6.1(b) (Market access).

---

[84]      For example, partnerships and sole proprietorships with limited or unlimited liability are generally not acceptable juridical forms for financial institutions in Canada. This headnote is not itself intended to affect, or otherwise limit, a choice by an investor of the other Party between branches or subsidiaries.

# Schedule of Canada

## *SECTION A*

## Reservations applicable in Canada

## (applicable in all Provinces and Territories)

### Reservation IIIA-C-1

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | All |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Level of Government:** | National |
| **Measures:** | *Bank Act*, S.C. 1991, c.46, ss. 159, 749 |
| | *Insurance Companies Act*, S,C, 1991, c. 47, ss. 167, 796 |
| | *Trust and Loan Companies Act*, S.C. 1991, c. 45, s. 163 |
| | *Foreign Institutions Subject to the Canadian Residency Requirements Regulations (Insurance Companies)*, S.O.R./2003-185 |
| | *Foreign Institutions Subject to the Canadian Residency Requirements Regulations (Trust and Loan Companies)*, S.O.R./2003-186 |
| | *Cooperative Credit Associations Act*, S.C. 1991, c. 48, s. 169 |

**Description:**

A minimum of one half of the directors of a federally-regulated financial institution that is a subsidiary of a foreign institution, and a majority of the directors of any other federally-regulated financial institution must be Canadian citizens ordinarily resident in Canada or permanent residents ordinarily resident in Canada.[85]

---

[85]    For greater certainty, a holding company established under federal domestic law is a financial institution for the purposes of Article 13.1.

**Reservation IIIA-C-2**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | *Bank Act*, S.C. 1991, c.46, s. 524 |

**Description:**

In order to establish a bank branch, a foreign bank must be a bank in the jurisdiction under whose laws it is incorporated.

**Reservation IIIA-C-3**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | *Bank Act*, S.C. 1991, c.46, s. 540 |
| | *Sales or Trades (Authorized Foreign Banks) Regulations*, S.O.R./2000-52 |

**Description:**

A lending bank branch in respect of its business in Canada may only accept a deposit or otherwise borrow money by means of a financial instrument from, or guarantee a security or accept a bill of exchange issued by a person that is sold to or traded with:

(a) a financial institution (other than a foreign bank); or

(b) a foreign bank that:

(i) is a bank according to the laws of the jurisdiction under whose laws it was incorporated or in any jurisdiction in which it carries on business;

(ii) provides financial services and has a name that includes the word "bank," "banque," "banking" or "bancaire"; and

(iii) is regulated as a bank or as a deposit-taking institution according to the jurisdiction under whose laws it was incorporated or in any jurisdiction in which it carries on business,

if the financial instrument, security or bill of exchange cannot be subsequently sold or traded.

**Reservation IIIA-C-4**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | All |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | *Trust and Loan Companies Act,* S.C. 1991, c.45<br>*Bank Act*, S.C. 1991, c.46<br>*Cooperative Credit Associations Act,* S.C. 1991, c.48<br>*Insurance Companies Act,* S.C. 1991, c. 47 |

**Description:**

Federal laws do not permit a trust and loan company, credit union, or fraternal benefit society in Canada to be established through branches of corporations organised under a foreign country's law.

**Reservation IIIA-C-5**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | All |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |
| **Measures:** | *Bank Act*, S.C. 1991, c. 45, ss. 510, 522.16, 524 |
| | *Insurance Companies Act*, S.C. 1991, c. 47, ss. 574, 581 |

**Description:**

1. A bank branch must be established directly under the authorised foreign bank incorporated in the jurisdiction where the authorised foreign bank principally carries on business.

2. A foreign entity authorised to insure, in Canada, risks must be established directly under the foreign insurance company incorporated in the jurisdiction where the foreign insurance company, directly or through a subsidiary, principally carries on business.

1460

## Reservations applicable in Alberta

### Reservation IIIA-PT-1

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services<br>Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Insurance Act*, R.S.A. 2000, c. I-13 |

**Description:**

Insurance services in Alberta can be provided only through:

(a)   a corporation incorporated under Alberta laws;

(b)   an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

(c)   a federally-authorised branch of a foreign corporation;

(d)   an association formed on the plan known as Lloyds;

(e)   reciprocal insurance exchanges;

(f)   fraternal societies; or

(g)   special brokers.

**Reservation IIIA-PT-2**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services<br>Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | National Treatment<br>Market access |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Insurance Act*, R.S.A. 2000, c. I-13 |

**Description:**

Subsidiaries of foreign insurance corporations must be federally-authorised.

**Reservation IIIA-PT-3**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance |
| | Intermediation of insurance contracts related to maritime transport and commercial aviation and space launching and freight (including satellites), and to reinsurance and retrocession |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Insurance Act*, R.S.A. 2000, c. I-3 |

**Description:**

1.     A fee payable to the province of 50 per cent of the premium paid, and regulatory notification, are required on insurance of risks in the province by an unlicensed insurer, unless such insurance is placed by a special broker licensed in Alberta.


2.     For greater certainty, a special broker licensed in Alberta is not required to be resident in Alberta and a licensed insurer is not required to have a commercial presence in Alberta.

**Reservation IIIA-PT-4**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Loan and Trust Corporations Act*, R.S.A. 2000, c. L-20 |
| | *Loan and Trust Corporations Regulation*, Alta. Reg. 171/1992 |

**Description:**

To operate as a trust and loan company under the Alberta regime an entity must be a body corporate to which the *Loan and Trust Corporations Act* applies.

**Reservation IIIA-PT-5**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) Trust and loan companies |
| **Type of Reservation:** | National Treatment |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Loan and Trust Corporations Act*, R.S.A. 2000, c. L-20 *Loan and Trust Corporations Regulation*, Alta. Reg. 171/1992 |

**Description:**

At least three quarters of the directors of a trust and loan company in Alberta must be ordinarily resident in Canada.

**Reservation IIIA-PT-6**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market Access |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Credit Union Act*, R.S.A. 2000, c. C-32 |
| | *Credit Union Regulation,* Alta. Reg. 249/1989 |

**Description:**

A credit union must be incorporated in Alberta.

**Reservation IIIA-PT-7**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Credit Union Act*, R.S.A. 2000, c. C-32 |
| | *Credit Union Regulation,* Alta. Reg. 249/1989 |

**Description:**

Directors of credit unions in Alberta must be Canadian citizens or permanent residents of Canada and three-quarters must at all times be ordinarily resident in Alberta.

**Reservation IIIA-PT-8**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Advisory and auxiliary financial services |
| **Type of Reservation:** | Market access |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Securities Act*, R.S.A. 2000, c. S-4 |

**Description:**

Where an advisor provides advice in Alberta such services must be supplied through a commercial presence in Alberta.

**Reservation IIIA-PT-9**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Securities Act*, R.S.A. 2000, c. S-4, s.75 |

**Description:**

An individual or firm must register in order to trade through dealers that are not resident or registered in Alberta.

1469

**Reservation IIIA-PT-10**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Securities Act*, R.S.A. 2000, c. S-4 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in British Columbia**

**Reservation IIIA-PT-11**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| | Credit unions, caisses populaires and associations or groups thereo |
| | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Financial Institutions Act*, R.S.B.C. 1996, c. 141 |

**Description:**

For provincially-incorporated trust companies, insurance companies and credit unions, the majority of directors must be ordinarily resident in Canada and at least one director must be ordinarily resident in British Columbia.

**Reservation IIIA-PT-12**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Financial Institutions Act*, R.S.B.C. 1996, c. 141, ss.75-76 |

**Description:**

Insurance services in British Columbia can be provided only through:

    (a)    a corporation incorporated under British Columbia laws;

    (b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

    (c)    a federally-authorised branch of a foreign corporation;

    (d)    an association formed on the plan known as Lloyds; or

    (e)    reciprocal insurance exchanges.

**Reservation IIIA-PT-13**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance, reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Financial Institutions Act*, R.S.B.C. 1996, c. 141, ss. 48 through 51 with respect to trust, insurance, and holding companies |

**Description:**

Where any person controls or will control 10 per cent or more of the votes of a company, incorporation, share acquisition or application for business authorisation is subject to approval by the financial institutions commission.

### Reservation IIIA-PT-14

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Financial Services Act,* R.S.B.C. 1996, c. 141 |

**Description:**

Services must be supplied through a commercial presence in British Columbia.

## Reservation IIIA-PT-15

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) All payment and money transmission services – trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Financial Institutions Act*, R.S.B.C. 1996, c. 141, ss. 48 through 51 |

**Description:**

Where any person controls or will control 10 per cent or more of the votes of a company, incorporation, share acquisition or application for business authorisation is subject to approval by the financial institutions commission.

**Reservation IIIA-PT-16**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Securities Act*, R.S.B.C. 1996, c. 418 |

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are neither resident nor registered in British Columbia.

**Reservation IIIA-PT-17**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Securities Act*, R.S.B.C. 1996, c. 418 |
| | *National Instrument 81-102 Investment Funds,* B.C. Reg. 20/2000, Part 6 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if the sub-custodian has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Manitoba**

**Reservation IIIA-PT-18**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Insurance Act*, C.C.S.M. c. 140 |

**Description:**

Insurance services in Manitoba can be provided only through:

(a)    a corporation incorporated under Manitoba laws;

(b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction ;

(c)    a federally-authorised branch of a foreign corporation;

(d)    an association formed on the plan known as Lloyds;

(e)    reciprocal insurance exchanges;

(f)    fraternal societies; or

(g)    special brokers.

### Reservation IIIA-PT-19

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Corporations Act,* C.C.S.M. c. C225 |

**Description:**

To operate as a trust and loan company under the Manitoba regime an entity must be a body corporate to which PART XXIV of *The Corporations Act* applies.

**Reservation IIIA-PT-20**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Corporations Act,* C.C.S.M. c. C225 |

**Description:**

The direct or indirect acquisition of Canadian-controlled companies by non-residents is restricted to 10 per cent individually and 25 per cent collectively.

### Reservation IIIA-PT-21

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Corporations Act*, C.C.S.M. c. C225, s. 346(1) and (2) |

**Description:**

A non-resident shareholder may not vote, or cause to be voted, his or her or its shares, unless the non-resident is the registered shareholder of the shares.

**Reservation IIIA-PT-22**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Corporations Act*, C.C.S.M. c. C225, s. 321(6) |

**Description:**

A majority of directors of provincially incorporated trust and loan companies must be residents of Canada.

**Reservation IIIA-PT-23**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Credit Unions and Caisses Populaires Act*, C.C.S.M. c. C301 |

**Description:**

1.      A credit union or caisse populaire must be incorporated in Manitoba.

2.      The purpose of a credit union is to provide financial services on a cooperative basis to its members, and for such services to be directed or controlled primarily by residents of Manitoba. The purpose of a caisse populaire is to provide financial services in the French language on a cooperative basis to its members, and for such services to be directed or controlled by French-speaking individuals who are resident in Manitoba.

3.      "Resident in Manitoba" is defined as an individual legally entitled to be in Canada, has made his or her home in Manitoba, and is physically present in Manitoba for at least six months in a year. A reference in the English version of the *The Credit Unions and Caisses Populaires Act* to a credit union includes a caisse populaire, and a reference in the French version of the Act to a caisse populaire includes a credit union.

### Reservation IIIA-PT-24

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Credit Unions and Caisses Populaires Act,* C.C.S.M. c. C301 |

**Description:**

A director of a credit union or caisse populaire must be a resident of Canada.

**Reservation IIIA-PT-25**

**Sector:**                         Financial services

**Sub-Sector:**               Banking and other financial services (excluding insurance)

Community bonds corporations

**Type of Reservation:**    National treatment

**Level of Government:**    Provincial – Manitoba

**Measures:**              *The Agricultural Societies Act*, C.C.S.M. c. A30

**Description:**

A director of a community bonds corporation must be a resident of Manitoba.

**Reservation IIIA-PT-26**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Securities Act,* C.C.S.M. c. S50 |

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are not resident or registered in Manitoba.

### Reservation IIIA-PT-27

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) Trading in securities and commodity futures and advisory and auxiliary financial services – dealers, brokers, advisers |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Securities Act,* C.C.S.M. c. S50 |

**Description:**

1.     Where the applicant is a corporation, at least one officer or director must meet the "usual residence qualification", and where the applicant is a partnership, at least one partner or member who is an individual must meet the "usual residence qualification".

2.     The "usual residence qualification" requires the applicant to be resident in Manitoba at the date of the application and to have been resident in Canada for at least one year immediately before the date of the application, or to have been registered under the securities laws of another Canadian jurisdiction in which the applicant last resided and to have been so registered for at least one year immediately before the date of the application.

**Reservation IIIA-PT-28**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) Trading for own account and for account of customers: custodial services; trading in securities and commodity futures – persons; securities dealers and brokers; trading in securities and commodity futures; advisory and auxiliary financial services; dealers, brokers, advisors |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Securities Act,* C.C.S.M. c. S50 |

**Description:**

An individual applicant for registration must be a resident of Canada for a period of at least one year prior to the application and a resident of the province in which he or she wishes to operate at the date of application.

**Reservation IIIA-PT-29**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Securities Act*, C.C.S.M. c. S50 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

1489

**Reservations applicable in New Brunswick**

**Reservation IIIA-PT-30**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Insurance Act*, R.S.N.B. 1973, c. I-12 |

**Description:**

Insurance services in New Brunswick can be provided only through:

    (a)    a corporation incorporated under New Brunswick laws;

    (b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

    (c)    a federally-authorised branch of a foreign corporation;

    (d)    an association formed on the plan known as Lloyds; or

    (e)    reciprocal insurance exchanges.

**Reservation IIIA-PT-31**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Loan and Trust Companies Act*, S.N.B. 1987, c. L-11.2 |

**Description:**

To operate as a trust and loan company under the New Brunswick regime an entity must be a body corporate to which the *Loan and Trust Companies Act* applies.

### Reservation IIIA-PT-32

**Sector:**                  Financial services

**Sub-Sector:**              Banking and other financial services (excluding insurance)

                             Trust and loan companies

**Type of Reservation:**     National treatment

**Level of Government:**     Provincial – New Brunswick

**Measures:**                *Loan and Trust Companies Act*, S.N.B. 1987, c. L-11.2

**Description:**

At least two of the directors of a trust and loan company must be resident in New Brunswick.

1492

**Reservation IIIA-PT-33**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Loan and Trust Companies Act*, S.N.B. 1987, c. L-11.2 |

**Description:**

Incorporation or registration of a trust and loan company in New Brunswick will be refused unless authorities are satisfied that there exists a public benefit and advantage for an additional corporation.

**Reservation IIIA-PT-34**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Securities Act,* S.N.B. 2004, c. S-5.5 |

**Description:**

There is a requirement for an individual or firm to register in order to trade through dealers and brokers that are not resident or registered in New Brunswick.

## Reservation IIIA-PT-35

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Credit Unions Act*, S.N.B.1994, c. C-32. |

**Description:**

A credit union must incorporate in New Brunswick.

### Reservation IIIA-PT-36

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Community bonds corporations |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | *Securities Act,* S.N.B. 2004, c. S-5.5 |

**Description:**

A director of a Community Bonds corporation must be a resident of New Brunswick.

## Reservation IIIA-PT-37

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – New Brunswick |
| **Measures:** | Securities Act, S.N.B. 2004, c. S-5.5 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Newfoundland and Labrador**

**Reservation IIIA-PT-38**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Insurance Adjusters, Agents and Brokers Act*, R.S.N.L. 1990, c. I-9 |

**Description:**

Insurance services in Newfoundland and Labrador can be provided only through:

    (a)    a corporation incorporated under Newfoundland and Labrador laws;

    (b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

    (c)    a federally-authorised branch of a foreign corporation;

    (d)    an association formed on the plan known as Lloyds;

    (e)    reciprocal insurance exchanges;

    (f)    fraternal societies;

    (g)    special brokers;

    (h)    sororal societies; or

    (i)    mutual benefits societies.

**Reservation IIIA-PT-39**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Reinsurance and retrocession |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Insurance Companies Act,* R.S.N.L. 1990, c. I-10 |

**Description:**

The purchase of reinsurance services by an insurer, other than a life insurer or a reinsurer, from a non-resident reinsurer, is limited to no more than 25 per cent of the risks undertaken by the insurer purchasing the reinsurance.

**Reservation IIIA-PT-40**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Corporations Act*, R.S.N.L. 1990, C-36 |
| | *Trust and Loan Corporations Act,* S.N.L. 2007, c. T-9.1 |

**Description:**

To operate as a trust and loan company under the Newfoundland and Labrador regime an entity must be a body corporate to which the *Trust and Loan Corporations Act* applies.

### Reservation IIIA-PT-41

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Credit Union Act 2009*, S.N.L. 2009, c. C-37.2 |

**Description:**

A credit union must incorporate in Newfoundland and Labrador.

**Reservation IIIA-PT-42**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Securities Act*, R.S.N.L. 1990, c. S-13 |

**Description:**

In certain restricted circumstances, the Superintendent of Securities may refuse registration:

      (a) to an individual, or

      (b) to a person or company,

if the individual, or any director or officer of the person or company, has not been a resident of Canada for at least one year immediately prior to the date of application for registration.

**Reservation IIIA-PT-43**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Securities Act*, R.S.N.L. 1990, c. S-13 |

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are not resident or registered in Newfoundland and Labrador.

**Reservation IIIA-PT-44**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Newfoundland and Labrador |
| **Measures:** | *Securities Act*, R.S.N.L. 1990, c. S-13 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$100 million.

## Reservations applicable in the Northwest Territories

### Reservation IIIA-PT-45

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Northwest Territories |
| **Measures:** | *Insurance Act*, R.S.N.W.T. 1988, c. I-4 |

**Description:**

Insurance services can be provided in the Northwest Territories only through:

(a)    a corporation incorporated under Northwest Territory laws;

(b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

(c)    a federally-authorised branch of a foreign corporation;

(d)    an association formed on the plan known as Lloyds;

(e)    reciprocal insurance exchanges; or

(f)    fraternal societies.

**Reservation IIIA-PT-46**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Northwest Territories |
| **Measures:** | *Business Corporations Act*, S.N.W.T. (Nu) 1996, c. 19 |

**Description:**

Federal or provincial incorporation of a trust and loan company is required in the Northwest Territories.

### Reservation IIIA-PT-47

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Northwest Territories |
| **Measures:** | *Credit Union Act*, R.S.N.W.T. (Nu) 1988, c. C-23 |

**Description:**

A credit union must incorporate in the Northwest Territories.

**Reservation IIIA-PT-48**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Northwest Territories |
| **Measures:** | Securities Act, R.S.N.W.T. (Nu) 1988, c. S-5 |

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are not resident or registered in the Northwest Territories.

**Reservation IIIA-PT-49**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Northwest Territories |
| **Measures:** | *Securities Act*, S.N.W.T. 2008, c. 10 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Nova Scotia**

**Reservation IIIA-PT-50**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Insurance Act*, R.S.N.S. 1989, c. 231 |
| | *Licensing of Insurers Regulations*, N.S. Reg. 142/90 or any other subsidiary measures made thereto |

**Description:**

Insurance services in Nova Scotia can be provided only through:

    (a)    a corporation incorporated under Nova Scotia laws;

    (b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

    (c)    a federally-authorised branch of a foreign corporation;

    (d)    an association formed on the plan known as Lloyds;

    (e)    reciprocal insurance exchanges;

    (f)    fraternal societies;

    (g)    special brokers;

    (h)    sororal societies; or

    (i)    mutual benefits societies.

**Reservation IIIA-PT-51**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Intermediation of insurance contracts related to maritime transport and commercial aviation and space launching and freight (including satellites), and to reinsurance and retrocession |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Insurance Act*, R.S.N.S. 1989, c. 231 |
| **Description:** | |

Services must be supplied through a commercial presence in Nova Scotia.

**Reservation IIIA-PT-52**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Trust and Loan Companies Act*, S.N.S. 1991, c. 7 and any subsidiary measures made thereto |

**Description:**

Incorporation or registration of a trust and loan company in Nova Scotia will be refused unless authorities are satisfied that there exists a public benefit and advantage for an additional corporation.

**Reservation IIIA-PT-53**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Trust and Loan Companies Act*, S.N.S. 1991, c. 7 and any subsidiary measures made thereto |

**Description:**

At least two of the directors of a provincial company must be ordinarily resident in Nova Scotia and a majority of the directors must be ordinarily resident in Canada.

### Reservation IIIA-PT-54

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Trust and Loan Companies Act*, S.N.S. 1991, c. 7 |

**Description:**

To operate as a trust and loan company under the Nova Scotia regime an entity must be a body corporate to which the *Trust and Loan Companies Act* applies.

**Reservation IIIA-PT-55**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Credit Union Act*, R.S.N.S. 1994, c. 4 |

**Description:**

A director of a credit union in Nova Scotia must be a Canadian citizen.

**Reservation IIIA-PT-56**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Credit Union Act*, R.S.N.S. 1994, c. 4 |

**Description:**

A credit union must incorporate in Nova Scotia.

**Reservation IIIA-PT-57**

**Sector:**                    Financial services

**Sub-Sector:**                Residential mortgages services

**Type of Reservation:**       Market access

**Level of Government:**       Provincial – Nova Scotia

**Measures:**                  *Mortgage Brokers and Lenders Registration Act*, R.S.N.S. 1989,
                               c. 291 and any subsidiary measure made thereto

**Description:**

A mortgage broker must incorporate under the laws of Canada or Nova Scotia.

**Reservation IIIA-PT-58**

**Sector:**                    Financial services

**Sub-Sector:**                Residential mortgages services

**Type of Reservation:**       National treatment

**Level of Government:**       Provincial – Nova Scotia

**Measures:**                  *Mortgage Brokers and Lenders Registration Act*, R.S.N.S. 1989, c. 291 and any subsidiary measure made thereto

**Description:**

A mortgage broker must be a resident of Nova Scotia.

**Reservation IIIA-PT-59**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Securities Act*, R.S.N.S. 1989, c. 418 |

**Description:**

In certain restricted circumstances, the Superintendent of Securities may refuse registration in Nova Scotia:

> (a) to an individual, or

> (b) to a person or company,

if the individual, or any director or officer of the person or company, has not been a resident of Canada for at least one year immediately prior to the date of application for registration.

**Reservation IIIA-PT-60**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Advisory and auxiliary financial services and asset management |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Securities Act*, R.S.N.S. 1989, c. 418 |

**Description:**

The establishment must be managed by a resident of Nova Scotia.

### Reservation IIIA-PT-61

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Advisory and auxiliary financial services |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Securities Act*, R.S.N.S. 1989, c. 418 |

**Description:**

Where an advisor provides advice in Nova Scotia such services must be supplied through a commercial presence in Nova Scotia.

**Reservation IIIA-PT-62**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Securities Act*, R.S.N.S. 1989, c. 418 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Nunavut**

**Reservation IIIA-PT-63**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Nunavut |
| **Measures:** | *Insurance Act*, R.S.A. 2000, c. I-3 |

**Description:**

Insurance services in Nunavut can be provided only through:

    (a)    a corporation incorporated under Nunavut laws;

    (b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

    (c)    a federally-authorised branch of a foreign corporation;

    (d)    an association formed on the plan known as Lloyds;

    (e)    reciprocal insurance exchanges; or

    (f)    fraternal societies.

**Reservation IIIA-PT-64**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Nunavut |
| **Measures:** | *Business Corporations Act*, S.N.W.T. 1996, c. 19 |

**Description:**

To operate as a trust and loan company under the Nunavut regime, an entity must be a corporation to which the *Business Corporations Act* applies.

**Reservation IIIA-PT-65**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Nunavut |
| **Measures:** | *Credit Union Act*, R.S.N.W.T. (Nu) 1988, c. C-23 |

**Description:**

A credit union must incorporate in Nunavut.

**Reservation IIIA-PT-66**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Nunavut |
| **Measures:** | *Securities Act*, R.S.N.W.T. (Nu) 1998, c.10 |

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are not resident or registered in Nunavut.

**Reservation IIIA-PT-67**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Nunavut |
| **Measures:** | *Securities Act*, R.S.N.W.T. (Nu.) 1988, c. S-5 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Ontario**

**Reservation IIIA-PT-68**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Insurance Act*, R.S.O. 1990, c. I.8, s. 42 |

**Description:**

Insurance services in Ontario can be provided only through:

    (a)    a corporation incorporated under Ontario laws;

    (b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction; or

    (c)    a federally-authorised branch of a foreign corporation;

    (d)    an association formed on the plan known as Lloyds;

    (e)    reciprocal insurance exchanges; or

    (f)    fraternal societies.

## Reservation IIIA-PT-69

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services – services auxiliary to insurance and pension funding |
| **Type of Reservation:** | National treatment |
| | Most-favoured-nation treatment |
| | Market access |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Insurance Act*, R.S.O. 1990, c. I.8, ss. 48 (3), 48 (7), 169(2) |

**Description:**

Mutual insurance companies are subject to less onerous capital requirements if they are a member of the Fire Mutuals Guarantee Fund. Any mutual insurance company can be a member of the Fire Mutuals Guarantee Fund but membership is subject to the approval of the Superintendent of Financial Services.

### Reservation IIIA-PT-70

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Reinsurance and retrocession |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Insurance Act*, R.S.O. 1990, c. I.8, s. 54 |
| **Description:** | |

Services must be supplied through a commercial presence in Ontario.

### Reservation IIIA-PT-71

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Loan and Trust Corporations Act*, R.S.O. 1990, c. L.25, s. 31 |

**Description:**

Only a corporation incorporated under the federal *Trust and Loan Companies Act*, S.C. 1991, c. 45 may apply for initial registration to carry on business as a loan corporation or as a trust corporation in Ontario.

### Reservation IIIA-PT-72

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Credit Unions and Caisses Populaires Act, 1994*, S.O. 1994, c. 11, s. 332 |
| **Description:** | |

A credit union must incorporate in Ontario.

**Reservation IIIA-PT-73**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Financial intermediation services, other than insurance and pension fund services |
| | Credit unions and caisses populaires |
| **Type of Reservation:** | National treatment |
| | Senior management and board of directors |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Credit Unions and Caisses Populaires Act, 1994,* S.O. 1994, c. 11, ss. 23, 91, 160, 332 |

**Description:**

Only a natural person who is a member of the credit union, at least 18 years of age, and a Canadian citizen or permanent resident or a person admitted to Canada for permanent residency who is ordinarily resident in Canada, is eligible to be a director of a credit union.

1533

## Reservation IIIA-PT-74

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Services auxiliary to financial intermediation other than insurance and pension funding |
| | Mortgage brokers |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Mortgage Brokerages, Lenders and Administrators Act, 2006*, S.O. 2006, c. 29 |
| | *Mortgage Brokers and Agents: Licensing*, O. Reg. 409/07 |

**Description:**

A mortgage broker or mortgage agent (both are occupations practised by a natural person) must be a resident of Canada.

### Reservation IIIA-PT-75

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Services auxiliary to financial intermediation other than insurance and pension funding |
| | Mortgage brokers |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Mortgage Brokerages, Lenders and Administrators Act, 2006*, S.O. 2006, c. 29; |
| | *Mortgage Brokerages: Licensing*, O. Reg. 408/07 |
| | *Mortgage Administrators: Licensing,* O. Reg. 411/07 |

**Description:**

A mortgage brokerage or a mortgage administrator (business entities) must be a corporation incorporated in a Canadian jurisdiction, a partnership formed under the laws of a Canadian jurisdiction, or a sole proprietor who is a resident of Canada.

**Reservation IIIA-PT-76**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Commodity Futures Act*, R.S.O. 1990, c. C.20, ss. 22(1), 65 |
| | National Instrument 31-103 Registration, Exemptions and Ongoing Registrant |
| | National Instrument 33-109 Registration Requirements and Related Matters |

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are not resident or registered in Ontario.

**Reservation IIIA-PT-77**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Securities Act*, R.S.O. 1990, c. S.5, s. 143 |
| | National Instrument 31-103 Registration, Exemptions and Ongoing Registrant |
| | National Instrument 81-102 Mutual Funds |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Prince Edward Island**

**Reservation IIIA-PT-78**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Prince Edward Island |
| **Measures:** | *Insurance Act,* R.S.P.E.I. 1988, c. I-4, ss. 24, 26(5), 324 |

**Description:**

Insurance services in Prince Edward Island can be provided only through:

(a) a corporation incorporated under Prince Edward Island laws;

(b) an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

(c) a federally-authorised branch of a foreign corporation;

(d) an association formed on the plan known as Lloyds;

(e) reciprocal insurance exchanges; or

(f) fraternal societies.

**Reservation IIIA-PT-79**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Provincial – Prince Edward Island |
| **Measures:** | *Insurance Act,* R.S.P.E.I. 1988, c. I-4 |

**Description:**

Subsidiaries of foreign insurance corporations in Prince Edward Island must be federally-authorised.

**Reservation IIIA-PT-80**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Prince Edward Island |
| **Measures:** | *Trust and Fiduciary Companies Act*, R.S.P.E.I. 1988, c. T-7.1, ss. 26, 27 |
| | *Extra-provincial Corporations Registration Act*, R.S.P.E.I. 1988, c. E-14, s. 4 |

**Description:**

To operate as a trust and loan company under the Prince Edward Island regime an entity must be a body corporate to which the *Trust and Fiduciary Companies Act* applies.

**Reservation IIIA-PT-81**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Prince Edward Island |
| **Measures:** | *Credit Unions Act*, R.S.P.E.I. 1988, c. C-29.1, ss. 2, 159 |

**Description:**

A credit union must incorporate in Prince Edward Island.

**Reservation IIIA-PT-82**

**Sector:**                    Financial services

**Sub-Sector:**                Banking and other financial services (excluding insurance)

                               Trading in securities and commodity futures – persons

**Type of Reservation:**       National treatment

                               Cross-border supply of financial services

**Level of Government:**       Provincial – Prince Edward Island

**Measures:**                  *Securities Act*, R.S.P.E.I. 1988, c. S-3.1

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are not resident or registered in Prince Edward Island.

**Reservation IIIA-PT-83**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Prince Edward Island |
| **Measures:** | *Securities Act*, R.S.P.E.I. 1988, c. S-3.1 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Québec**

**Reservation IIIA-PT-84**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Banking and other financial services (excluding insurance) |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *Loi modifiant la Loi concernant les Services de santé du Québec et concernant SSQ, Mutuelle de gestion et SSQ, Société d'assurance-vie inc.*, Q.L. 1993, c. 107 |

**Description:**

Upon any allotment or transfer of voting shares of the capital stock insurance company "SSQ, Société d'assurance vie inc" or of the holding company "Groupe SSQ inc," the minister may, if the transfer confers control of the company to non-residents, ask such companies to prove that the shares were offered in priority to Québec residents and subsidiarily to other Canadian residents, but that no offer was made or was acceptable.

**Reservation IIIA-PT-85**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Banking and other financial services (excluding insurance) |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting the Caisse de dépôt et placement du Québec,* C.Q.L.R., c. C-2 |

**Description:**

A minimum of three-quarters of the members of the board of directors must reside in Québec.

**Reservation IIIA-PT-86**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | National treatment |
| | Market access |
| | Senior management and boards of directors |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting insurance*, C.Q.L.R., c. A-32 |
| | *An Act respecting trust companies and savings companies*, C.Q.L.R., c. S-29.01 |

**Description:**

1.      Three-quarters of the directors of trust companies and savings companies must be Canadian citizens.

2.      A majority of the directors of insurance companies, mutual insurance companies, saving companies and trust companies, shall reside in Québec.

3.      The direct or indirect acquisition of Canadian-controlled savings companies or trust companies by non-residents is restricted to 10 per cent individually and 25 per cent collectively.

**Reservation IIIA-PT-87**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting insurance*, C.Q.L.R., c. A-32 |

**Description:**

1.      Every legal person not constituted under an Act of Québec which does not have its head office in Québec shall, when applying for a licence, appoint a chief representative in Québec. The representative must be a person in authority who is resident in Québec.

2.      Every legal person not constituted under an Act of Québec has, in respect of the activities it carries on in Québec, the rights and obligations of an insurance company or mutual association constituted under Acts of Québec as the case may be. It is also bound to comply with its constituting Act if it is more restrictive.

**Reservation IIIA-PT-88**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting insurance*, C.Q.L.R., c. A-32 |

**Description:**

Insurance services in Québec can be provided only through:

    (a)    a corporation incorporated under Québec statutes;

    (b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

    (c)    a federally-authorised branch of a foreign corporation; or

    (d)    an association formed on the plan known as Lloyds.

**Reservation IIIA-PT-89**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Intermediation of insurance contracts related to maritime transport and commercial aviation and space launching and freight (including satellites), and to reinsurance and retrocession |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting the distribution of financial products and services*, C.Q.L.R., c. D-9.2 |

**Description:**

Services must be supplied through a commercial presence in Québec.

**Reservation IIIA-PT-90**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting financial services cooperatives*, C.Q.L.R., c. C-67.3 |

**Description:**

Credit unions, caisses populaires and associations, or groups thereof, must incorporate in Québec.

**Reservation IIIA-PT-91**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance contracts relating to maritime shipping, commercial aviation, space launching, freight (including satellites) and goods in international transit |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting Insurance*, C.Q.L.R., c. A-32 |
| **Description:** | |

Services must be supplied through a commercial presence in Québec.

**Reservation IIIA-PT-92**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting Insurance*, C.Q.L.R., c. A-32 |
| **Description:** | |

Services must be supplied through a commercial presence in Québec.

### Reservation IIIA-PT-93

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| **Type of Reservation:** | National treatment<br>Cross-border supply of financial services |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *Regulation 31-103 respecting Registration Requirements, Exceptions and Ongoing Registrant Obligations*, C.Q.L.R., c. V-1.1, r. 10<br><br>*Securities Act*, C.Q.L.R., c. V-1.1 |

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are neither resident nor registered in Québec.

## Reservation IIIA-PT-94

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *Securities Act*, C.Q.L.R., c. V-1.1 |
| | *Regulation 31-103 respecting Registration Requirements, Exemptions and Ongoing Registrant Obligations*, C.Q.L.R., c. V-1.1, r. 10 |
| | *Regulation 81-102 respecting Mutual Funds*, C.Q.L.R., c. V-1.1, r. 39 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Saskatchewan**

**Reservation IIIA-PT-95**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance and reinsurance and retrocession |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Saskatchewan Insurance Act*, R.S.S. 1978, c. S-26 |

**Description:**

Insurance services in Saskatchewan can be provided only through:

    (a)    a corporation incorporated under Saskatchewan laws;

    (b)    an extra-provincial insurance corporation, that is, an insurer incorporated by, or under the laws of another Canadian jurisdiction;

    (c)    a federally-authorised branch of a foreign corporation;

    (d)    an association formed on the plan known as Lloyds;

    (e)    reciprocal insurance exchanges; or

    (f)    fraternal societies.

**Reservation IIIA-PT-96**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Saskatchewan Insurance Act*, R.S.S. 1978, c. S-26 |

**Description:**

A fee payable to the province of 10 per cent of the premium is required on insurance of risks in the province by unlicensed insurers.

**Reservation IIIA-PT-97**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *Trust and Loan Corporations Act, 1997*, S.S. 1997, c. T-22.2 |

**Description:**

Federal or provincial incorporation of a trust and loan company is required in Saskatchewan.

### Reservation IIIA-PT-98

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *Trust and Loan Corporations Act, 1997*, S.S. 1997, c. T-22.2 |

**Description:**

Individual and collective financial ownership of Canadian-controlled and provincially incorporated companies can be no more than 10 per cent of shares.

**Reservation IIIA-PT-99**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | National treatment |
| | Senior management and boards of directors |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Credit Union Act, 1985*, S.S. 1984-85-86, c. C-45.1 |

**Description:**

A director of a credit union in Saskatchewan must be a Canadian citizen.

### Reservation IIIA-PT-100

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Credit Union Act, 1985*, S.S. 1984-85-86, c. C-45.1 |

**Description:**

A credit union must incorporate in Saskatchewan.

### Reservation IIIA-PT-101

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Community bonds corporations |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Community Bonds Act*, S.S. 1990-91, c. C-16.1 |

**Description:**

A director of a Community Bonds corporation must be resident of Saskatchewan.

**Reservation IIIA-PT-102**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Securities Act, 1988*, S.S. 1988-89, c. S-42.2 |
| | *The Securities Commission (Adoption of National Instruments) Regulations*, R.R.S. c. S-42.2 Reg. 3 |

**Description:**

There is a requirement to register in order to trade through dealers and brokers that are not resident of or registered in the province in which the trade is affected.

### Reservation IIIA-PT-103

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Advisory and auxiliary financial services |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Securities Act, 1988*, S.S. 1988-89, c. S-42.2 |

**Description:**

Where an advisor provides advice in Saskatchewan, such services must be supplied through a commercial presence, and the advisor must be registered in Saskatchewan as an advisor.

## Reservation IIIA-PT-104

**Sector:**                         Financial services

**Sub-Sector:**                  Banking and other financial services (excluding insurance)

                               Securities dealers and brokers

**Type of Reservation:**    Market access

**Level of Government:**    Provincial – Saskatchewan

**Measures:**                  *The Securities Act, 1988*, S.S. 1988-89, c. S-42.2

**Description:**

Securities dealers and brokers must be formed or continued under federal, provincial or territorial laws.

**Reservation IIIA-PT-105**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Securities Act, 1988*, S.S. 1988-89, c. S-42.2 |
| | *The Securities Commission (Adoption of National Instruments) Regulations*, R.R.S. c. S-42.2 Reg. 3 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if the sub-custodian has shareholders' equity of at least CAD$ 100 million.

## Reservations applicable in Yukon

### Reservation IIIA-PT-106

**Sector:**                     Financial services

**Sub-Sector:**                 Insurance and insurance related services

                                Direct insurance and reinsurance and retrocession

**Type of Reservation:**        Market access

**Level of Government:**        Territorial – Yukon

**Measures:**                   *Insurance Act,* R.S.Y. 2002, c. 119

**Description:**

Insurance services in the Yukon can be provided only through:

- (a)    a corporation incorporated under Yukon laws;

- (b)    an extra-provincial insurance corporation, that is an insurer incorporated by, or under the laws of another Canadian jurisdiction;

- (c)    a federally-authorised branch of a foreign corporation;

- (d)    an association formed on the plan known as Lloyds;

- (e)    reciprocal insurance exchanges; or

- (f)    fraternal societies.

**Reservation IIIA-PT-107**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Direct insurance contracts relating to maritime shipping, commercial aviation, space launching, freight (including satellites) and goods in international transit |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Insurance Act,* R.S.Y. 2002, c. 119 |
| **Description:** | |

Services must be supplied through a commercial presence in the Yukon.

### Reservation IIIA-PT-108

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Reinsurance and retrocession |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Insurance Act,* R.S.Y. 2002, c. 119 |
| **Description:** | |

Services must be supplied through a commercial presence in the Yukon.

**Reservation IIIA-PT-109**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Intermediation of insurance contracts related to maritime transport and commercial aviation and space launching and freight (including satellites), and to reinsurance and retrocession |
| **Type of Reservation:** | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Insurance Act,* R.S.Y. 2002, c. 119 |
| **Description:** | |

Services must be supplied through a commercial presence in the Yukon.

### Reservation IIIA-PT-110

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trust and loan companies |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Business Corporations Act*, R.S.Y. 2002, c. 20 |

**Description:**

To operate as a trust and loan company under the Yukon regime an entity must be a body corporate to which the *Business Corporations Act* applies.

### Reservation IIIA-PT-111

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Credit unions, caisses populaires and associations or groups thereof |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Business Corporations Act*, R.S.Y. 2002, c. 20 |

**Description:**

A credit union must incorporate in the Yukon.

**Reservation IIIA-PT-112**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading in securities and commodity futures – persons |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Business Corporations Act*, R.S.Y. 2002, c. 20 |

**Description:**

An individual or firm must register in order to trade through dealers and brokers that are not resident or registered in the Yukon.

1572

## Reservation IIIA-PT-113

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Securities dealers and brokers |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Securities Act*, S.Y. 2007, c. 16 |
| | *Business Corporations Act*, R.S.Y. 2002, c. 20 |

**Description:**

Securities dealers and brokers in the Yukon must be formed or continued under federal, provincial or territorial laws.

**Reservation IIIA-PT-114**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Trading for own account and for account of customers: custodial services; trading in securities and commodity futures – persons; securities dealers and brokers; trading in securities and commodity futures; advisory and auxiliary financial services; dealers, brokers, advisors |
| **Type of Reservation:** | National treatment |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Business Corporations Act*, R.S.Y. 2002, c. 20 |

**Description:**

An individual applicant for registration is required to have been a resident of Canada for a period of at least one year prior to the application and a resident of the province in which he or she wishes to operate at the date of application.

## Reservation IIIA-PT-115

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | National treatment |
| | Cross-border supply of financial services |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Business Corporations Act*, R.S.Y. 2002, c. 20 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has share-holders' equity of at least CAD$ 100 million.

*SECTION B*

**Reservations applicable in Canada**

**(applicable in all Provinces and Territories)**

**Reservation IIIB-C-1**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | All |
| **Type of Reservation:** | Market access |
| **Level of Government:** | National |

**Description:**

Canada reserves the right to adopt or maintain a measure stipulating that federally-regulated financial institutions having equity in excess of CAD$1 billion are required, within three years of having reached this threshold, to have 35 per cent of their voting shares widely-held and listed and posted for trading on a stock exchange in Canada.

## Reservation IIIB-C-2

**Sector:**                          Financial services

**Sub-Sector:**                      All

**Type of Reservation:**             Market access

**Level of Government:**             National

**Description:**

1. Canada reserves the right to adopt or maintain a measure requiring Ministerial approval of an acquisition by a person (Canadian or foreign) of shares of a federally-regulated financial institution constituted under the *Bank Act*, S.C. 1991, c. 46, the *Insurance Companies Act*, S.C. 1991, c. 47, or the *Trust and Loan Companies Act*, S.C. 1991, c. 45, if, following the acquisition, the person would have ownership of more than 10 per cent of any class of its shares.

2. Canada reserves the right to adopt or maintain a measure such that no person (Canadian or foreign) may own more than 20 per cent of any class of voting shares, or 30 per cent of any class of non-voting shares, of:

(a)     a bank or bank holding company with CAD$12 billion or more in equity; or

(b)     a federally-regulated financial institution constituted under the *Bank Act*, the *Insurance Companies Act* or the *Trust and Loan Companies Act* that, at the time of entry into force of the Agreement, is widely held[86] because it is so required, including by reason of its designation as a domestic systemically important financial institution.

3. Notwithstanding sub-paragraph 2(a), a European Union financial institution that is regulated as a bank in the European Union or any other European Union financial institution that is regulated in the European Union and is widely held, may continue to control a bank or a bank holding company if it controlled the bank or bank holding company on the day the bank's or bank holding company's equity reached the applicable threshold for the widely held requirement and it has controlled the bank since that day.

---

[86]     For the purposes of subparagraph 2(b), a financial institution is deemed to be widely-held at the date of entry into force of this Agreement if: (1) it was required to be widely-held on 17 July 2014; or (2) after 17 July 2014 but before the date of entry into force of this Agreement, a determination is made that the financial institution is required to become widely-held and it did not make reasonable efforts to do so by the date of entry into force of this Agreement.

**Reservation IIIB-C-3**

**Sector:**                          Financial services

**Sub-Sector:**                   Banking and other financial services (excluding insurance)

**Type of Reservation:**     National Treatment

Market access

**Level of Government:**     National

**Description:**

1. Canada reserves the right to adopt or maintain a measure requiring that a foreign bank establish a subsidiary in order to accept or maintain retail deposits of less than CAD$150,000 unless the sum of all deposits that are maintained by a foreign bank and that fall below CAD$150,000 amount to less than one per cent of total deposits or the deposits are taken from a sophisticated investor (for example, Canadian federal or provincial governments, foreign governments, international development banks to which Canada is a member, financial institutions, certain pension and mutual funds and large businesses).

2. Canada reserves the right to adopt or maintain a measure prohibiting full service bank branches and lending bank branches from becoming member institutions of the Canada Deposit Insurance Corporation.

**Reservation IIIB-C-4**

**Sector:**                          Financial services

**Sub-Sector:**                      Banking and other financial services (excluding insurance)

**Type of Reservation:**             National Treatment

                                     Market access

**Level of Government:**             National

**Description:**

Canada reserves the right to adopt or maintain a measure prohibiting lending branches of foreign banks from being members of the Canadian Payments Association.

**Reservations applicable in Alberta**

**Reservation IIIB-PT-1**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Alberta |
| **Measures:** | *Securities Act*, R.S.A. 2000, c. S-4 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in British Columbia**

**Reservation IIIB-PT-2**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – British Columbia |
| **Measures:** | *Securities Act*, R.S.B.C. 1996, c. 418 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if the sub-custodian has shareholders' equity of at least CAD$ 100 million.

**Reservation IIIB-PT-3**

**Sector:**                   Financial services

**Sub-Sector:**               Insurance and insurance related services

**Type of Reservation:**      Market access

**Level of Government:**      Provincial – British Columbia

**Measures:**                 *Insurance Corporation Act*, R.S.B.C. 1996, c. 228

                              *Exclusion Regulation*, B.C. Reg. 153/73

**Description:**

Motor vehicle insurance in British Columbia is provided by public monopoly.

**Reservations applicable in Manitoba**

**Reservation IIIB-PT-4**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| | Motor vehicle insurance |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *Manitoba Public Insurance Corporation Act*, C.C.S.M. c. P215 |

**Description:**

Motor vehicle insurance in Manitoba is provided by public monopoly.

**Reservation IIIB-PT-5**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Manitoba |
| **Measures:** | *The Securities Act*, C.C.S.M. c. S50 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in New Brunswick**

**Reservation IIIB-PT-6**

**Sector:**                          Financial services

**Sub-Sector:**                  Banking and other financial services (excluding insurance)

                                     Custodial services

**Type of Reservation:**    Market access

**Level of Government:**    Provincial – New Brunswick

**Measures:**                    *Securities Act*, S.N.B. 2004, c. S-5.5

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Newfoundland and Labrador**

**Reservation IIIB-PT-7**

**Sector:**                         Financial services

**Sub-Sector:**                     Banking and other financial services (excluding insurance)

                                    Custodial services

**Type of Reservation:**            Market access

**Level of Government:**            Provincial – Newfoundland and Labrador

**Measures:**                       *Securities Act*, R.S.N.L. 1990, c. S-13

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in the Northwest Territories**

**Reservation IIIB-PT-8**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Northwest Territories |
| **Measures:** | *Securities Act*, S.N.W.T. 2008, c. 10 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Nova Scotia**

**Reservation IIIB-PT-9**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Nova Scotia |
| **Measures:** | *Securities Act*, R.S.N.S. 1989, c. 418 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Nunavut**

**Reservation IIIB-PT-10**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Nunavut |
| **Measures:** | *Securities Act*, R.S.N.W.T. (Nu.) 1988, c. S-5 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Ontario**

**Reservation IIIB-PT-11**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services – services auxiliary to insurance and pension funding |
| **Type of Reservation:** | National treatment |
| | Most-favoured-nation treatment |
| | Market access |
| | Cross-border supply of financial services |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Insurance Act*, R.S.O. 1990, c. I.8, ss. 54(1), 386(1), 386(2), 403 |
| | *Agents,* O. Reg. 347/04 |

**Description:**

Preferential access to the Ontario insurance services market is provided to non-resident individual insurance agents of the United States of America (to all states in the United States of America based on reciprocity).

1590

**Reservation IIIB-PT-12**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Ontario |
| **Measures:** | *Securities Act*, R.S.O. 1990, c. S.5, s. 143 |
| | National Instrument 31-103 Registration, Exemptions and Ongoing Registrant |
| | National Instrument 81-102 Mutual Funds |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Prince Edward Island**

**Reservation IIIB-PT-13**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Prince Edward Island |
| **Measures:** | *Securities Act*, R.S.P.E.I. 1988, c. S-3.1 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Québec**

**Reservation IIIB-PT-14**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *An Act respecting the Société de l'assurance automobile du Québec*, C.Q.L.R., c. S-11.011 |

**Description:**

Automobile insurance, with respect to personal injury and death, is provided by public monopoly in Québec.

**Reservation IIIB-PT-15**

**Sector:**                    Financial services

**Sub-Sector:**                Banking and other financial services (excluding insurance)

**Type of Reservation:**       Market access

**Level of Government:**       Provincial – Québec

**Measures:**

**Description:**

The acceptance of deposits of public and para-public institutions and the management of pension funds of public and para-public institutions are provided by a public monopoly in Québec.

## Reservation IIIB-PT-16

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Québec |
| **Measures:** | *Securities Act*, C.Q.L.R., c. V-1.1 |
| | *Regulation 81-102 respecting Mutual Funds*, C.Q.L.R., c. V-1.1, r. 39 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has shareholders' equity of at least CAD$ 100 million.

**Reservations applicable in Saskatchewan**

**Reservation IIIB-PT-17**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Securities Act, 1988,* S.S. 1988-89, c. S-42.2 |
| | *The Securities Commission (Adoption of National Instruments) Regulations*, R.R.S. c. S-42.2 Reg. 3 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if the sub-custodian has shareholders' equity of at least CAD$ 100 million.

1596

### Reservation IIIB-PT-18

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Insurance and insurance related services |
| **Type of Reservation:** | National treatment |
| | Market access |
| **Level of Government:** | Provincial – Saskatchewan |
| **Measures:** | *The Traffic Safety Act*, S.S. 2004, c. T-18.1 |
| | *The Automobile Accident Insurance Act*, R.S.S. 1978, c. A-35 |

**Description:**

Motor vehicle insurance is provided by public monopoly in Saskatchewan.

**Reservations applicable in Yukon**

**Reservation IIIB-PT-19**

| | |
|---|---|
| **Sector:** | Financial services |
| **Sub-Sector:** | Banking and other financial services (excluding insurance) |
| | Custodial services |
| **Type of Reservation:** | Market access |
| **Level of Government:** | Territorial – Yukon |
| **Measures:** | *Business Corporations Act*, R.S.Y. 2002, c. 20 |

**Description:**

Mutual funds which offer securities in Canada must use a resident custodian. A non-resident sub-custodian may be used if it has share-holders' equity of at least CAD$ 100 million.

1598