# Mixed Agreements Revisited

## The EU and its Member States in the World

Edited by

Christophe Hillion

and

Panos Koutrakos



· H A R T ·
PUBLISHING

OXFORD AND PORTLAND, OREGON
2010

Published in the United Kingdom by Hart Publishing Ltd
16C Worcester Place, Oxford, OX1 2JW
Telephone: +44 (0)1865 517530
Fax: +44 (0)1865 510710
E-mail: mail@hartpub.co.uk
Website: http://www.hartpub.co.uk

Published in North America (US and Canada) by
Hart Publishing
c/o International Specialized Book Services
920 NE 58th Avenue, Suite 300
Portland, OR 97213–3786
USA
Tel: +1 503 287 3093 or toll-free: (1) 800 944 6190
Fax: +1 503 280 8832
E-mail: orders@isbs.com
Website: http://www.isbs.com

© The editors and contributors 2010


The editors and contributors severally have asserted their right under the Copyright, Designs and
Patents Act 1988, to be identified as the authors of this work.


All rights reserved. No part of this publication may be reproduced, stored in a retrieval system,
or transmitted, in any form or by any means, without the prior permission of Hart Publishing, or as
expressly permitted by law or under the terms agreed with the appropriate reprographic rights
organisation. Enquiries concerning reproduction which may not be covered by the above should be
addressed to Hart Publishing Ltd at the address above.

British Library Cataloguing in Publication Data

Data Available

ISBN: 978-1-84113-954-8


Typeset by Columns Design Ltd, Reading
Printed and bound in Great Britain by
TJ International Ltd, Padstow, Cornwall

# 8

# *Disconnection Clauses in EU Law and Practice*

MARISE CREMONA

## I. INTRODUCTION

DISCONNECTION CLAUSES WITHIN an international agreement are designed to protect the autonomy of the Community, and now the Union, legal order by providing that as between EU Member State parties to the agreement, the relevant provisions of Union law shall apply rather than the provisions of the international agreement. Disconnection clauses may be used where the EU is itself a party alongside the Member States (mixed agreements), where the Member States are parties but the EU is not, and even where the EU alone is a party; they have been used extensively in multilateral conventions such as those adopted within the framework of the Council of Europe.[1]

The foreign policy of EU Member States of course includes their relations, within an international law framework, with other EU Member States. Member States may conclude agreements with some or all of the other Member States, with or without third countries, and with or without the joint participation of the EU itself. The legal implications of inter-Member-State agreements have been explored systematically elsewhere.[2] Briefly, we may say that the principle of the primacy of Union law will apply, such that it will take precedence over conflicting norms in inter-Member-State agreements, whether or not these pre-date the EC/EU Treaties or accession to the EC/EU. Thus, Article 351 TFEU (ex Article

---

[1] In what follows, the term 'Convention' will generally be used to refer to a multilateral international agreement containing a disconnection clause in order to distinguish it more easily in the text from the EU Treaties.

[2] B de Witte, 'Old-fashioned Flexibility: International Agreements between Member States of the European Union' in G de Búrca and J Scott (eds), *Constitutional Change in the EU—From Uniformity to Flexibility?* (Oxford, Hart Publishing, 2000); B de Witte, 'Chameleonic Member States: Differentiation by Means of Partial and Parallel International Agreements' in B de Witte, D Hanf and E Vos (eds), *The Many Faces of Differentiation in EU Law* (Antwerp/Oxford/New York, Intersentia, 2001).

307 EC) operates only to protect the interests of third countries, not the Member States.[3] In *Commission v Italy*, for example, the Court held that a Member State could not argue—in its defence to an allegation of a breach of Community law—that its actions were in compliance with GATT rules, relying on Article 307 (then 234) EC:

> in matters governed by the EEC Treaty, that Treaty takes precedence over agreements concluded between Member States before its entry into force, including agreements made within the framework of GATT.[4]

Where some or all Member States conclude a Convention with third countries which may impact on the sphere of application of Union law, a particular technique may be used which is designed to ensure the primacy of Union law obligations in relations between the Member States themselves and to render this more transparent to other parties. As Bruno de Witte points out, in the case of open multilateral treaties, such as many of the Council of Europe Conventions, not all Member States may sign and ratify them, or not at the same time. The need for mechanisms to reduce legal differentiation (ie the phenomenon of the Member States being bound by different obligations *inter se*) is recognised, and the method considered here—the disconnection clause—is one of those options, alongside other procedures mentioned by de Witte, such as encouraging all Member States to ratify the Convention through a Council Recommendation.[5]

The aim of this chapter is to analyse the different types of disconnection clause, when they are used, their legal effects, and the relationship between disconnection clauses and Union competence. Are disconnection clauses legally necessary? Are they either beneficial or problematic with respect to third country parties to the agreement, or are they (as the EU argues) neutral? Are they facilitative of mixed agreements? Might they even, in protecting the EU *acquis*, in some cases render exclusive Union competence unnecessary? The discussion here is of disconnection clauses in general, and an answer to the question of whether a disconnection clause is necessary in a given case, or its precise legal effects, will naturally depend on the specific terms of both the Convention and the relevant Union law.

In section II. we shall first briefly set out the most common forms of disconnection clause currently used by the EU, together with a Declaration by the EU and its Member States in the case of more recent Council of Europe Conventions. This is followed by a non-exhaustive examination of the types of agreement in which the disconnection clause has been used and some alternative approaches. The following sections then turn to examine the legal effects of

---

[3] Case 812/79 *Attorney General v Juan C Burgoa* [1980] ECR 2787; Case C-158/91 *Criminal proceedings against Jean-Claude Levy* [1993] ECR I-4287.

[4] Case 10/61 *Commission v Italy* [1962] ECR 1.

[5] See de Witte, 'Old-fashioned Flexibility: International Agreements between Member States of the European Union', above n 2, 38–39. See also J Klabbers, 'Safeguarding the Organizational Acquis: The EU's External Practice' (2007) 3 *International Organizations Law Review* 1.

disconnection clauses, from the perspective of the autonomy of the Union legal order (section III.), their use in mixed agreements (section IV.), and their relation to exclusive Union competence (section V.).

## II.    WHAT IS A DISCONNECTION CLAUSE AND WHEN IS IT USED?

Disconnection clauses used by the EC/EU have developed a standard form:

> In their mutual relations, Parties which are members of the European Community shall apply Community rules and shall not therefore apply the rules arising from this Convention except in so far as there is no Community rule governing the particular subject concerned.[6]

A more recent version refers also to EU rules:

> Parties which are members of the European Union shall, in their mutual relations, apply Community and European Union rules in so far as there are Community or European Union rules governing the particular subject concerned and applicable to the specific case, without prejudice to the object and purpose of the present Convention and without prejudice to its full application with other Parties.[7]

In addition, in the case of more recent Council of Europe Conventions, the EU and Member States have made a Declaration explaining the need for and function of disconnection clauses from an EU perspective. It is worth giving this in full, as it sets out clearly the EU view of the rationale for these clauses as well as the EU's attempt to reassure non-EU Member State parties that the disconnection clause will not disadvantage them:

> The European Community/European Union and its Member States reaffirm that their objective in requesting the inclusion of a 'disconnection clause' is to take account of the institutional structure of the Union when acceding to international conventions, in particular in case of transfer of sovereign powers from the Member States to the Community.

> This clause is not aimed at reducing the rights or increasing the obligations of a non-European Union Party vis-à-vis the European Community/European Union and its Member States, inasmuch as the latter are also parties to this Convention.

> The disconnection clause is necessary for those parts of the Convention which fall within the competence of the Community/Union, in order to indicate that European Union Member States cannot invoke and apply the rights and obligations deriving from the Convention directly among themselves (or between themselves and the European Community/Union). This does not detract from the fact that the Convention applies fully between the European Community/European Union and its Member States on the one hand, and the other Parties to the Convention, on the other; the Community and

---

[6]  Art 27(1) of the European Convention on Transfrontier Television 1989, ETS No 132, as amended by Protocol ETS No 171.

[7]  Council of Europe Convention on the Prevention of Terrorism 2005, CETS No 196, Art 26(3).

the European Union Members States will be bound by the Convention and will apply it like any Party to the Convention, if necessary, through Community/Union legislation. They will thus guarantee the full respect of the Convention's provisions vis-à-vis non-European Union Parties.[8]

Although disconnection clauses are not the only way of preserving the autonomy of the Union legal order,[9] they have been used in a variety of types of agreement, in particular but not only in Conventions concluded within the framework of the Council of Europe. Since the disconnection clause is concerned with operation of an agreement as between the EU Member States, one might think that it is only necessary where the Member States are themselves parties to the agreement, with or without the Union. However, there are cases where a disconnection or a similar clause has been deemed necessary even in an agreement to which the EU alone is a party. Nevertheless, it is in Conventions concluded—or open to conclusion—by both the Member States and the EU that standard disconnection clauses are most often found, and it is possible to identify different contexts in which a disconnection clause is seen to be appropriate: cases where the Convention essentially aims to extend the *acquis* to a wider group of countries; Conventions designed to establish a regulatory framework which will operate in parallel to the Union *acquis*; cases where the Convention is designed to supplement or add to what has been achieved by the parties in other agreements, or at Union level. The following is by no means an exhaustive compilation of all disconnection clauses in mixed, or potentially mixed, agreements; it is intended to illustrate the range of types of clause and types of Convention in which they might be used.[10]

---

[8]  See, eg, the Declaration made in respect of Art 26(3) of the Council of Europe Convention on the Prevention of Terrorism 2005, CETS No 196. The Explanatory Report to the Convention adopted by the Committee of Ministers refers to this Declaration: 'As an instrument made in connection with the conclusion of a treaty, within the meaning of Article 31, para 2(b) of the Vienna Convention on the Law of Treaties, this declaration forms part of the "context" of the Convention. The European Community would be in a position to provide, for the sole purpose of transparency, necessary information about the division of competence between the Community and its Member States in the area covered by the present Convention, inasmuch as this does not lead to additional obligations placed on the Community.' (Explanatory Memorandum, paras 272–73).

[9]  Klabbers discusses disconnection clauses as one way 'to defend the acquis against being undermined from the outside', alongside conflict and priority clauses, non-affect clauses, conditional territorial application clauses, and even declarations of competence: Klabbers, above n 5, at 2. See also J Klabbers, *Treaty Conflict and the European Union* (Cambridge, Cambridge University Press, 2008) 219–23. Tell argues that the provisions in the Vienna Convention on the Law of Treaties are 'too strict or inappropriate' and that the disconnection clause is 'a surer means to guarantee the interests of the Community': O Tell, 'La "Disconnecting Clause"—Disconnection Clause' UIA seminar paper, Edinburgh, 20–21 April 2001, available at <http://www.cptech.org/ecom/jurisdiction/Tell.pdf>. On this point see also M Smrkolj, 'The Use of the 'Disconnection Clause' in International Treaties: What Does it tell us about the EC/EU as an Actor in the Sphere of Public International Law?' 14 May 2008, available at SSRN: <http://ssrn.com/abstract=1133002>.

[10]  For a typology of disconnection clauses, see C P Economidès and A G Kolliopoulos, 'La clause de deconnexion en faveur du droit communautaire: une pratique critiquable' (2006) 110 *Revue Générale de Droit International Public* 273 at 274–78.

*Marise Cremona*

## A. 'Without prejudice' and 'non-affect' clauses

A number of Council of Europe Conventions from the 1970s and 1980s include not a specific EC disconnection clause, but a general 'without prejudice' clause. So, for example, the European Convention on the Legal Status of Migrant Workers of 1977 provides that laws of or other treaties between the Contracting Parties may apply insofar as they offer more favourable treatment to the persons protected by the Convention.[11] A similar provision is found in the European Social Charter.[12] The Convention on the Custody of Children of 1980 allows Contracting States to apply between themselves, subject to notification, 'uniform laws in relation to custody of children' or a 'special system of recognition or enforcement of decisions in this field'.[13] A similar provision exists in the European Convention on offences relating to cultural property of 1985.[14]

Apart from the fact that these clauses are not limited to the EC, these Conventions, at least when drafted, did not overlap with an already existing EC *acquis*. The Lugano Convention of 1988 on jurisdiction and the enforcement of judgments in civil and commercial matters, differs on both these counts, extending to third State parties a regime close to that established by the Brussels Convention,[15] while including a 'without prejudice' clause specific to the EC:

> This Convention shall not prejudice the application by the Member States of the European Communities of the ... 'Brussels Convention'.[16]

[11] CETS No 093, Art 32: 'The provisions of this Convention shall not prejudice the provisions of the laws of the Contracting Parties or of any bilateral or multilateral treaties, conventions, agreements or arrangements, as well as the steps taken to implement them, which are already in force, or may come into force, and under which more favourable treatment has been, or would be, accorded to the persons protected by the Convention.'

[12] European Social Charter, revised, 1996, CETS No 163, Art H: 'The provisions of this Charter shall not prejudice the provisions of domestic law or of any bilateral or multilateral treaties, conventions or agreements which are already in force, or may come into force, under which more favourable treatment would be accorded to the persons protected.'

[13] European Convention on Recognition and Enforcement of Decisions concerning Custody of Children and on Restoration of Custody of Children 1980, CETS No 105, Art 20(2): 'When two or more Contracting States have enacted uniform laws in relation to custody of children or created a special system of recognition or enforcement of decisions in this field, or if they should do so in the future, they shall be free to apply, between themselves, those laws or that system in place of this Convention or any part of it. In order to avail themselves of this provision the State shall notify their decision to the Secretary General of the Council of Europe. Any alteration or revocation of this decision must also be notified.'

[14] European Convention on offences relating to cultural property 1985, CETS No 119, Art 34 (this Convention is not in force).

[15] Convention on jurisdiction and the enforcement of judgments in civil and commercial matters concluded at Brussels on 27 September 1968, as amended, [1997] OJ C/15/1.

[16] The Convention on jurisdiction and the enforcement of judgments in civil and commercial matters done at Lugano on 16 September 1988, [1988] OJ L/319/9, Art 54B(1).

*Disconnection Clauses in EU Law and Practice*

The revised Lugano Convention (Lugano II), which was concluded by the Community alone following Opinion 1/03 of the European Court of Justice,[17] is designed to extend the regime of Regulation 44/2001/EC (the 'Brussels Regulation') on jurisdiction and enforcement of judgments in civil and commercial matters to the EFTA States Iceland, Norway and Switzerland.[18] Article 64(1) of Lugano II provides that it 'shall not prejudice the application by the Member States of the European Community of the Council Regulation (EC) No 44/2001'.[19] The need for this provision, despite the fact that competence to conclude the Convention is exclusive,[20] can be seen when one considers that under Article 1(3) of Lugano II the term 'State bound by this Convention', which is used to establish the rules of jurisdiction and enforcement of judgments, is defined to include the Member States of the European Community.

The Convention on Information and Legal Co-operation concerning 'Information Society Services'[21] contains a 'non affect' rather than a disconnection clause. Article 6(1) provides generally that 'This Convention shall not affect any international instrument which is binding on the Parties and which contains provisions on matters governed by this Convention', and the Council of Europe's Explanatory Report on the Convention points out that

> In the light of [this provision] the member States of the European Community and of the Economic European Area do not apply the present instrument in their mutual relations concerning matters governed by this Convention.[22]

The formulation of some provisions of this type makes it clear that the application of alternative treaty provisions or rules is not compulsory. The Council of Europe's Convention on Cybercrime of 2001 contains a clause which allows, but does not require, parties which have concluded a treaty on matters governed by the Convention, or which 'have otherwise established their relations on such matters', to regulate their mutual relations accordingly.[23]

---

[17] In Opinion 1/03 *Lugano Convention* [2006] ECR I-1145, the Court of Justice held that EC competence to conclude the revised Lugano Convention was exclusive.

[18] Council Decision 2007/712/EC, [2007] OJ L/339/1.

[19] Art 64 of Lugano II also refers to the application of the 1968 Brussels Convention and the 2005 Agreement ([2005] OJ L/299/61) between the EC and Denmark, which is designed to extend the regime established by Reg 44/2001 to Denmark. Denmark, not being bound by the Council Decision concluding the Lugano II Convention, is a party to that Convention in its own right.

[20] Opinion 1/03, above n 17. On the link between disconnection clauses and exclusivity, see section V. below.

[21] Convention on Information and Legal Co-operation concerning 'Information Society Services' 2001, ETS No 180.

[22] *Ibid*, Explanatory Report, para 23.

[23] Convention on Cybercrime 2001, CETS No 185, Art 39(2) provides: 'If two or more Parties have already concluded an agreement or treaty on the matters dealt with in this Convention or have otherwise established their relations on such matters, or should they in future do so, they shall also be entitled to apply that agreement or treaty or to regulate those relations accordingly. However, where Parties establish their relations in respect of the matters dealt with in the present Convention other than as regulated therein, they shall do so in a manner that is not inconsistent with the Convention's objectives and principles.'

*Marise Cremona*

The UNIDROIT Convention on Stolen or Illegally Exported Cultural Objects of 1995 contains a slightly different type of clause: Contracting States which are members of regional or economic integration organisations may declare that they will apply between themselves the 'internal rules' of the organisation rather than the provisions of the Convention, 'the scope of application of which coincides with that of those rules'.[24] Thirteen EU Member States are party to the Convention, of which five have made a declaration to this effect.[25] Norway has also made such a declaration in its capacity as a member of EFTA and party to the European Economic Area Agreement. The 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property contains a similar provision; in this case 20 EU Member States are Parties to the Convention, but only the UK has made a declaration—made when it ratified the Convention in 2002. The UK, having stated that it interprets the term 'cultural property' in line with the definition in the relevant EU legislation, then states that

> As between EC member states, the United Kingdom shall apply the relevant EC legislation to the extent that that legislation covers matters to which the Convention applies.[26]

The UK thus asserts an identity of scope between the Convention and EC law, and then in effect creates a disconnection clause as regards its own position vis-à-vis other EU Member States.

Could it be argued that in such cases, where there is no automatic disconnection clause but where a declaration is an option, Member States are under a Union law obligation to make such a declaration, at least in cases where there is an internal Union *acquis*? If we consider the effects in and on Union law of *not* making such a declaration, the answer seems to be no: a failure to make a declaration would not alter the Union law obligation whereby Union law takes precedence as regards Member States' relations *inter se*[27]; it is hard, therefore, to argue that a Member State is in breach of its obligations under Union law by failing to make a declaration.

However, the position will of course be different where the Council adopts a Decision requiring Member States to make a Declaration of this kind. In 2002 the Council adopted a Decision authorising the Member States, in the interest of the Community, to sign the 1996 Hague Convention on Parental Responsibility, which had been concluded within the framework of the Hague Conference on

---

[24] UNIDROIT Convention on Stolen or Illegally Exported Cultural Objects, Rome, 24 June 1995, Art 13(3).

[25] Greece, Finland, Italy, The Netherlands and Spain have made declarations under Art 13(3). Cyprus, France, Hungary, Lithuania, Portugal, Romania, Slovakia and Slovenia have not done so.

[26] UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, 1970, letter, United Kingdom of Great Britain and Northern Ireland, LA/Depositary/2002/31.

[27] See text above at n 3.

Private International Law.[28] As the Council Decision states, although this was a Convention to which the EC was not permitted to accede, aspects of the Convention fall within the scope of Community secondary legislation, and the Convention contains a 'non affect' clause with respect to any international instrument to which Contracting States are parties as well as agreements between the Contracting Parties containing provisions on matters governed by the Convention, while also making it clear that such agreements 'do not affect, in the relationship of such States with other Contracting States, the application of the provisions of this Convention'.[29] The Council, in authorising the Member States to sign the Convention, required them to make a declaration on the application of the 'relevant internal rules of Community law'.[30] In this case, then, the Convention itself did not expressly provide for a declaration, but the Council made a declaration a condition of Member States' signature in a case where the Convention fell as least partly within exclusive Community competence.[31]

Declarations have sometimes been used as an alternative to a disconnection clause in the case of mixed agreements, where the Community is a party alongside the Member States. In acceding to the UNESCO Convention on Cultural Diversity, for example, the EU made the following declaration alongside its declaration of competences:

> As regards the Community competences described in the Declaration pursuant to Article 27(3)(c) of the Convention, the Community is bound by the Convention and

---

[28] Council Decision 2003/93/EC of 19 December 2002 authorising the Member States, in the interest of the Community, to sign the 1996 Hague Convention on jurisdiction, applicable law, recognition, enforcement and cooperation in respect of parental responsibility and measures for the protection of children, [2003] OJ L/48/1.

[29] 1996 Hague Convention on jurisdiction, applicable law, recognition, enforcement and cooperation in respect of parental responsibility and measures for the protection of children, Art 52.

[30] Art 2 of Decision 2003/93/EC provides: 'When signing the Convention, Member States shall make the following declaration: "Articles 23, 26 and 52 of the Convention allow Contracting Parties a degree of flexibility in order to apply a simple and rapid regime for the recognition and enforcement of judgments. The Community rules provide for a system of recognition and enforcement which is at least as favourable as the rules laid down in the Convention. Accordingly, a judgment given in a Court of a Member State of the European Union, in respect of a matter relating to the Convention, shall be recognised and enforced in [the Member State making the declaration] by application of the relevant internal rules of Community law [with special reference to Regulation 1347/2000/EC]." ' At the time of writing, 26 Member States were party (all except Malta) and 21 Member States had made the required declaration.

[31] The international law import of such declarations will be affected by whether they are envisaged in the Convention itself, as well as the nature of the obligations contained therein. The Cape Town Convention of 2001 on International Interests in Mobile Equipment and its Protocol on aircraft equipment include a REIO clause but not a disconnection clause; in its proposal for a Decision to accede to the Convention and Protocol, however, the Commission explains that the Convention provides sufficient flexibility by way of optional Declarations to enable the Member States to apply Community rules where necessary: Amended Proposal for a Council Decision on the conclusion by the EC of the Convention on International Interests in Mobile Equipment and its Protocol on matters specific to aircraft equipment, adopted jointly in Cape Town on 16 November 2001, COM (2008) 508, 11 August 2008. For another example see Council Decision 2002/762/EC authorising the Member States, in the interest of the Community, to sign, ratify or accede to the International Convention on Civil Liability for Bunker Oil Pollution Damage 2001 (the Bunkers Convention) [2002] OJ L/256/7.

*Marise Cremona*

will ensure its due implementation. It follows that the Member States of the Community which are party to the Convention in their mutual relations apply the provisions of the Convention in accordance with the Community's internal rules and without prejudice to appropriate amendments being made to these rules.[32]

The distinctive characteristics of the current standard disconnection clause as compared with the permissive 'without prejudice' clauses or optional declarations lie in its automatic effect and the fact that it does not merely allow the EU Member States to apply Union/Community law but requires them to do so. At the time when the Cybercrime Convention was being drafted, the Commission argued that a clause which merely allows the Member States to apply Community law as between themselves (as provided in Article 39(2) of that agreement[33]) is inadequate for the EU both because it does not refer to the EU specifically and because it is an enabling clause which does not therefore make it clear that Member States are under an obligation to apply Community law *inter se*. In section III. we shall consider more fully the legal effects of disconnection clauses.

### B.    The 'standard' disconnection clause

The disconnection clause in the sense discussed in this chapter appears in the late 1980s in Council of Europe Conventions dealing with issues falling within the scope of EC law and practice. One of the first (perhaps the first) such clause appears in the Convention on Mutual Administrative Assistance in Tax Matters of 1988:

> Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.[34]

A Protocol of 1991 also added a disconnection clause in the standard form given above to the Convention on Insider Trading.[35] In both these cases there may be overlap between the provisions of the Convention and the—sometimes more specific—obligations of Union law, although the Conventions are not designed to replicate Union law.

---

[32]  Council Decision 2006/515/EC, [2006] OJ L/201/15, Annex 2.

[33]  See above, n 23. For the Commission's view, see SEC(2001) 315.

[34]  Convention on Mutual Administrative Assistance in Tax Matters 1988, CETS No 127, Art 27(2).

[35]  Convention on Insider Trading 1989, CETS No 130, as amended by Protocol CETS No 133, 1991, Art 16*bis*. This clause is in the same form as that contained in the European Convention on Transfrontier Television, cited in the text at n 6.

Somewhat unusually, the European Convention on Transfrontier Television[36] establishes rules very close to those of the Television without Frontiers Directive[37] and has been amended by Protocol in line with the Directive. It contains both a minimum clause and a standard older form of disconnection clause.[38] The Convention is therefore designed to establish a consistent regime between EU Member States and other States, and the disconnection clause ensures both that amendments to the Directive will apply to the Member States even if not incorporated into a revised Convention, and also that EU Treaty rules will apply as a legal context for and in default of the more specific rules in the Directive.[39]

The mixed agreement establishing a European Common Aviation Area (ECAA) between the EC and its Member States, Norway, Iceland, and the Western Balkan States is intended essentially to extend the EC's legislative regime in respect of air services to a group of non-Member countries.[40] The ECAA does not contain a standard disconnection clause, but its Article 5 provides that 'The provisions of this Agreement shall not affect the relations between the Contracting Parties of the EEA Agreement.' Thus it is not only the internal Community regime but also the EEA regime—which contains its own mechanisms to ensure its continued homogeneity with Community law—which is 'disconnected' from the ECAA regime.

In other cases, a Convention is designed to establish a specific regime, while recognising the existence of other bilateral and multilateral agreements in the field. So, for example, the 2005 Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime and on the Financing of Terrorism[41] builds upon an earlier Council of Europe Convention on money laundering,[42] as well as being designed to support the implementation of the International Convention for the Suppression of the Financing of Terrorism. The EU's money-laundering (and latterly also terrorist finance) regime has developed in parallel to

---

[36] European Convention on Transfrontier Television 1989, ETS No 132, as amended by Protocol ETS No 171; for the disconnection clause, see Art 27(1).

[37] Council Directive 89/552/EEC of 3 October 1989 concerning the pursuit of television broadcasting activities, [1989] OJ L/298/23, as amended by Directive 97/36/EC of 19 June 1997, [1997] OJ L/202/60.

[38] See text at n 6.

[39] See, eg, Case C-34–36/95 *De Agostini & TV-Shop* [1997] ECR I-3843.

[40] Multilateral Agreement between the European Community and its Member States, the Republic of Albania, Bosnia and Herzegovina, the Republic of Croatia, the former Yugoslav Republic of Macedonia, the Republic of Iceland, the Republic of Montenegro, the Kingdom of Norway, the Republic of Serbia and the United Nations Interim Administration Mission in Kosovo on the establishment of a European Common Aviation Area, [2006] OJ L/285/1. The ECAA regime is said in its Preamble to be 'based upon' the relevant EC legislation, and provision is made to accommodate changes and additions to EC legislation (Art 17 ECAA).

[41] Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime and on the Financing of Terrorism 2005, CETS No 198.

[42] Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime 1990, ETS No 141. As between its parties the 2005 Convention replaces the 1990 Convention: CETS No 198, Art 49(6).

*Marise Cremona*

international initiatives and instruments,[43] and the third money-laundering Directive mentions in its Preamble the need to be consistent with international standards, especially the Recommendations of the Financial Action Task Force (FATF).[44] Thus, a disconnection clause in the standard form appears in the 2005 Convention alongside more general clauses dealing with the relationship between the 2005 Convention and other international instruments.[45]

The Council of Europe Convention on Action against Trafficking in Human Beings not only states in its Preamble that it is designed to 'improve the protection' and 'develop the standards' established by the Protocol on trafficking in persons to the Palermo Convention on Transnational Organised Crime, it also refers expressly to EU and EC legal instruments.[46] The disconnection clause is of the newer style which includes a reference to EU as well as EC rules.[47] The Council of Europe Convention on the Prevention of Terrorism[48] is also intended to be supplementary to other agreements between the parties, and the disconnection clause appears in the context of a more general provision on the relationship between the Convention and other international agreements. Thus, as well as the newer form of disconnection clause,[49] Article 26 contains explicit references to earlier Conventions between the Parties, including the European Convention on Mutual Assistance in Criminal Matters and the European Convention on the Suppression of Terrorism,[50] and a provision for the parties to regulate their relations according to existing or future agreements or regulations, subject to the obligation to act consistently with the Convention's objectives and principles.[51]

---

[43] See further V Mitsilegas and B Gilmore, 'The EU legislative framework against money laundering and terrorist finance: A critical analysis in the light of evolving global standards' (2007) 56 ICLQ 119.

[44] Directive 2005/60/EC of the European Parliament and of the Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing, [2005] OJ L/309/15, Preamble, para 5.

[45] CETS No 198, Art 52(4).

[46] Council of Europe Convention on Action against Trafficking in Human Beings 2005, CETS No 197. The instruments referred to in the Preamble are the Framework Decision of 19 July 2002 on combating trafficking in human beings, the Framework Decision of 15 March 2001 on the standing of victims in criminal proceedings, and Council Directive of 29 April 2004 on the residence permit issued to third-country nationals who are victims of trafficking in human beings.

[47] Council of Europe Convention on Action against Trafficking in Human Beings 2005, CETS No 197, Art 40(3). See also Council of Europe Convention on the Protection of Children against Sexual Exploitation and Sexual Abuse 2007, CETS No 201, Art 43(3).

[48] Council of Europe Convention on the Prevention of Terrorism 2005, CETS No 196.

[49] Convention on the Prevention of Terrorism 2005, CETS No 196, Art 26(3); see text at n 7.

[50] Convention on the Prevention of Terrorism 2005, CETS No 196, Art 26(1).

[51] Convention on the Prevention of Terrorism 2005, CETS No 196, Art 26(2); for an equivalent provision in the Convention on Cybercrime, see n 23.

III.   THE LEGAL EFFECT OF THE DISCONNECTION CLAUSE AND THE

AUTONOMY OF THE UNION LEGAL ORDER

The disconnection clause recognises that the Member States are part of the Union legal order, and as such Community and Union law obligations will apply as between themselves, notwithstanding the commitments they take on with respect to third States. The EU's Declaration attached to more recent Conventions where the disconnection clause has been used expresses this idea that 'the EC/EU and its Member States' are to be regarded as linked to each other rather than completely independent vis-à-vis other Parties:

> … the Convention applies fully between the European Community/European Union and its Member States on the one hand, and the other Parties to the Convention, on the other.

So although the Member States conclude the agreement independently, their status as members of the EU is recognised and the primacy of Union law takes effect in derogation from the normal priority given to provisions of a later treaty as between States parties to both.[52]

The more recent version of the disconnection clause refers to both Community and Union rules. It is significant that the Union legal order is given the same 'protection' of its autonomy as the Community legal order. Union law therefore does not apply between Member States as merely another international legal obligation. Since the disconnection clause is, for the Member States, an expression of the primacy of Community law, we could argue that this extension of the clause to include Union law is indicative of at least a degree of primacy inherent in Union law obligations too.

The earlier version of the clause does not give Member States a choice: they *shall not* apply the Convention rules between themselves *except in so far as there is no Community rule governing the particular subject concerned.* Thus the application of the Convention between the Member States appears as an exception to the general rule of non-application. The later version is more nuanced, being phrased in positive rather than negative terms. It does not prohibit the Member States from applying the Convention *inter se*, it merely states that Member States will apply Community/Union rules *in so far as there are Community or European Union rules governing the particular subject concerned and applicable to the specific case.* It will not always be straightforward to determine which of the Convention rules concern a subject governed by Union rules and which do not (this being one advantage of the generality of the clause). How narrowly or broadly are 'the particular subject' and 'the specific case' to be construed? Nevertheless, the clause

---

[52]   Vienna Convention on the Law of Treaties 1969, Art 30(3) and (4).

operates automatically; it does not have to be specifically invoked.[53] The scope of EC/EU law will evolve over time, and the clause allows for this.

The EU Declaration derives from the clause a rather more general proposition, that EU Member States '*cannot* invoke and apply the rights and obligations deriving from the Convention directly among themselves (or between themselves and the European Community/Union)'.[54] In fact, according to the Court of Justice, a Union law obligation arises for Member States that are party to a mixed agreement which falls 'in large measure' within Union competence. The Court has held that the Member States' obligations flow not only directly from the agreement itself, but also as a matter of Union law from Article 216(2) TFEU (ex Article 300(7) EC); thus the Commission may in fact 'invoke ... obligations deriving from the Convention' in bringing an infringement action against a Member State which has failed to fulfil an obligation under a mixed agreement.[55] Although the cases in which such action has been taken by the Commission do not concern agreements with a disconnection clause,[56] there is no suggestion that the presence of such a clause would preclude enforcement actions of this kind.

The disconnection clause does not depend on a conflict existing between the Convention rule and Union law; it is there to protect the autonomy of the Community/Union legal order *per se*. Nevertheless, the disconnection clause can also be seen as a mechanism for the protection of the Union *acquis* from possible conflict with international law norms,[57] so that a Member State is prevented from being put into a position of having to choose whether to apply, in its relation with another Member State, a Union law norm or a provision of another international agreement to which they are both parties.[58] Indeed, as such it is an expression within an international law context of the loyalty obligation found in Article 4(3) TEU (ex Article 10 EC); by inserting the disconnection clause, the Member States are ensuring that they will not be obliged by international law to set aside their Union law obligations.

Thus the disconnection clause is a substantive counterpart to the obligation expressed in Article 344 TFEU (ex Article 292 EC), whereby Member States undertake not to submit *inter se* disputes concerning the interpretation or

---

[53]  Economidès and Kolliopoulos, above n 10, at 275.

[54]  See text at n 8 (emphasis added).

[55]  Where a mixed agreement creates rights and obligations in a field covered 'in large measure' by Community legislation, 'there is a Community interest in compliance by both the Community and its Member States with the commitments entered into under those instruments.' Case C-239/03 *Commission v France (Étang de Berre)* [2004] ECR I-9325, para 29.

[56]  The Convention for the protection of the Mediterranean Sea against pollution, signed at Barcelona on 16 February 1976, and the Protocol for the protection of the Mediterranean Sea against pollution from land-based sources, signed at Athens on 17 May 1980, in Case C-239/03, n 55 above; the EEA Agreement in Case C-13/00 *Commission v Ireland* [2002] ECR I-2943.

[57]  Klabbers, above n 9, which examines disconnection clauses in the context of other types of clause used to protect the *acquis*.

[58]  See Case C-222/94 *Commission v United Kingdom* [1996] ECR I-4025, discussed below at n 68.

application of the EU Treaty to external dispute settlement processes. In the *MOX Plant* case the Court clearly expressed the obligation flowing from Article 292 EC in these terms:

> an international agreement cannot affect the allocation of responsibilities defined in the Treaties and, consequently, the autonomy of the Community legal system, compliance with which the Court ensures under Article 220 EC. That exclusive jurisdiction of the Court is confirmed by Article 292 EC, by which Member States undertake not to submit a dispute concerning the interpretation or application of the EC Treaty to any method of settlement other than those provided for therein …[59]

This suggests an alternative approach to the issue in *MOX Plant*, which would have arrived at the same end result but by a more logical route than that adopted by the Commission and the Court of Justice. It will be recalled that the Commission had brought an action against Ireland arguing that it was in breach of its obligations under Articles 292 and 10 EC (now Articles 344 TFEU and 4(3) TEU) by instituting dispute-settlement proceedings against the United Kingdom under the United Nations Convention on the Law of the Sea (UNCLOS). The Court, in order to determine whether Article 292 applied, turned to the Declaration of Competence attached to the UNCLOS on the grounds that it was only insofar as the EC concluded the UNCLOS that the agreement could be said to be within the scope of Community law[60]:

> the Convention provisions on the prevention of marine pollution relied on by Ireland, which clearly cover a significant part of the dispute relating to the MOX plant, come within the scope of Community competence which the Community has elected to exercise by becoming a party to the Convention.

> It follows that the provisions of the Convention relied on by Ireland in the dispute relating to the MOX plant and submitted to the Arbitral Tribunal are rules which form part of the Community legal order. The Court therefore has jurisdiction to deal with disputes relating to the interpretation and application of those provisions and to assess a Member State's compliance with them.[61]

However, as I have argued elsewhere,[62] the Declaration of Competence is designed for third States; it is designed to indicate who has primary responsibility for implementation of the Convention, based on competence. The disconnection clause, on the other hand, indicates to other Contracting Parties that the agreement is one in which there is a Union competence and Union rules to apply, but does not give any indication of the scope or nature of Union competence, or

---

[59]  Case C-459/03 *Commission v Ireland (MOX Plant)* [2006] ECR I-4635.

[60]  The Commission argued that the dispute between Ireland and the UK concerned provisions of the Convention falling within the scope of Community competence and therefore within the Court's exclusive jurisdiction under Art 292 EC: *ibid*, para 61.

[61]  *MOX Plant*, above n 59, paras 120–21.

[62]  M Cremona, 'Defending the Community Interest: the Duties of Cooperation and Compliance' in M Cremona and B de Witte, *EU Foreign Relations Law—Constitutional Fundamentals* (Oxford, Hart Publishing, 2008).

*Marise Cremona*

in what way it might have been exercised. The scope of Article 344 TFEU, in terms both of its wording and its purpose, should not be based on whether or not the EU has decided to exercise its competence in concluding an agreement but on whether the provisions of the agreement fall within the scope of Union law. For that purpose, the disconnection clause which signals the existence of Union law in the field is a more useful tool; it confirms that insofar as there are Union rules in place, they should apply between the Member States, and thus disputes concerning those provisions of a Convention that covers matters 'governed by' Community rules should also be submitted to the Court of Justice under Article 344 TFEU (ex Article 292 EC). In the case of UNCLOS there was no disconnection clause, but the Court could, on the basis of Article 344 TFEU (ex Article 292 EC), have followed the same line of reasoning.

Nothing is said in the disconnection clause as to the nature of the Union rule or its relation to the Convention. This is in line with the idea of the disconnection clause as preserving the autonomy of the Union legal order—Union law will apply between the Member States no matter what the alternative rule provides and whether or not there is a conflict. However, the relationship between the two rules may give rise to questions, and the two versions of the disconnection clause differ somewhat here.

If there is a Union rule which (for example) establishes a standard higher than the Convention rule, there should be no difficulty. What if, however, the Union rule imposes a lower standard? With respect to other Parties, the higher-standard Convention rule will apply, and if the Union rule (such as an environmental rule) incorporates a 'minimum clause' then there may be no problem, as the Member States will be free in terms of Union law to follow the higher standard set by the Convention. Indeed, in the more recent version of the disconnection clause, EC/EU law is to apply *without prejudice to the object and purpose of the present Convention*—this might imply that the Member States are obliged to apply the higher Convention standards as between themselves insofar as that is permitted under EU law. This is logical but does not fit well with the EU's Declaration, which rather reflects the original version of the clause which states that the Convention *shall not apply* between the Member States: 'Member States cannot invoke and apply the rights and obligations deriving from the Convention directly among themselves (or between themselves and the European Community/Union)'.

And what if Union law, imposing a lower standard, does not allow such flexibility? If it means that EU Member States have signed up to international standards which they then do not meet in their own mutual relations, such a scenario may be unacceptable to third country Parties, and indeed it seems that sometimes other Parties are not happy to include a disconnection clause which seems to offer a special type of derogation to EU Member States. The phrase in the newer version of the disconnection clause—*without prejudice to the object and purpose of the present Convention*— reflects this concern, but it is not clear exactly what 'without prejudice' would mean here; it does not seem to be intended to

bridge the 'disconnection' in such cases, since that would render the disconnection highly conditional. In fact, if the Convention is concluded as a mixed agreement then the Union, as a Party, will be under an obligation to bring its standards into line with those of the Convention. However, where the Union is not a Party, no such obligation arises; here, the disconnection clause is important in order to preserve the Union rule, but in practical terms (depending on the subject matter of the Convention) it may not be possible for the Member States to apply different standards 'in their mutual relations' from those applied in their relations with other Contracting Parties. This raises the question of the extent to which, if at all, other Contracting Parties are disadvantaged by the disconnection clause.

The disconnection clause provides that Union rules apply in the *mutual relations* of the Member States. Thus, the clause does not exempt the Member States from applying the Convention rules with respect to other Parties. This point is made more explicit in more recent disconnection clauses, which add the phrase '*without prejudice to its full application with other Parties*'. As the EC's Declaration says, the Convention will apply fully between EC/EU and its Member States on the one hand and the other Parties on the other.[63] The disconnection clause thus avoids legal differentiation between EU Member States (if, as is often the case, some Member States are party but some are not) but produces legal differentiation between the Parties to the Convention. A Member State Party will apply one rule in relations with another Member State Party and a different rule in relations with a third State Party. As Lickova has pointed out, 'one can ask whether it will always be easy to draw a clear line between "legal relations between EU Member States *inter se*", on the one hand, and their relations towards third states, on the other.'[64] In itself such differentiation may be problematic, and disconnection clauses have been criticised for contributing to the fragmentation of international law and undermining the object of multilateral Conventions, which is generally to establish a set of agreed norms applicable to all parties.[65] Klabbers, for example, comments: 'Chances are that the larger convention is more specialized than Union law on the topic, more up-to-date, and comes with a

---

[63] The Explanatory Report to the Convention on Insider Trading (see n 35) also makes this point, although it does not appear in the older form of disconnection clause added by Protocol to the Convention in 1991: 'Since it governs exclusively the internal relations between the Parties members of the European Economic Community, this paragraph is without prejudice to the application of this Convention between those Parties and Parties which are not members of the European Economic Community.'

[64] M Licková, 'European Exceptionalism in International Law' (2008) 19 *EJIL* 463, at 486.

[65] Licková, *ibid*, at 486, comments: 'Some multilateral treaties regulate subjects such as the prevention of arms sales or illegal drug trafficking, and their efficiency clearly depends on the cooperation of all parties involved. Any fragmentation of the established regime may thus threaten the success of this objective.' See also R Brillat, 'La Participation de la Communauté Européenne aux Conventions du Conseil de l'Europe' (1991) XXXVII *Annuaire Francais de Droit International* 819 at 829; Economidès and Kolliopoulos, above n 10, at 299–300; M Koskenniemi, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, Report of the Study Group of the International Law Commission, Doc A/CN.4/L.682, paras 289–94.

more appropriate monitoring mechanism.'[66] More concretely it means that the disconnection clause should not be used in cases where it does not make sense to differentiate between obligations owed to different Parties, where the aim of a Convention is to establish a set of common rules applicable to all Parties, especially where the common rules are intended to have an 'internal' scope of operation.[67]

Care is needed, however, where the common rules are an extension of the *acquis* to third countries. We need to distinguish between cases where the *acquis* itself offers complete or near-complete harmonisation and cases where it does not. If the harmonisation extended to third-country Parties is itself only partial then a disconnection clause which makes it clear that the Convention is not intended to replace the Treaty rules between the Member States may well be appropriate. So, for example, in the case of the Transfrontier Television Convention, efforts have been made to keep the Convention rules and the Union rules in line with each other and thus reduce the risk of legal differentiation, but the disconnection clause is there to ensure the integrity of the Union *acquis* as it develops and to allow primary Treaty rules to apply between Member States in cases not covered by harmonising legislation. The Court of Justice has indeed refused to accept an argument that a provision of the Television Without Frontiers Directive should be interpreted so as to ensure convergence with the Convention, on the familiar ground that the two instruments pursue different objectives. Further, in answer to the plea that such a result 'would clearly place Member States in an impossible situation by requiring them to infringe their legal obligations either at international or at Community level' the Court simply pointed to the disconnection clause in the Convention.[68]

If, on the other hand, there is complete harmonisation, the disconnection clause may in some cases be unnecessary: if complete harmonisation leads to exclusive Union competence and Union participation in the Convention, the Union will then, by virtue of being a Party, ensure that the Union *acquis* reflects Convention obligations. The Commission in the *Lugano* case argued that in cases where an international Convention has as its object to extend the Community system to non-member countries, 'since the agreement envisaged covers areas where there has been complete harmonisation of the Community rules, the

---

[66] Klabbers, above n 5, at 25.

[67] An example of this might be the EEA Agreement, which aims at the creation of 'a homogeneous European Economic Area' and does not contain a disconnection clause; instead, the definition of the Contracting Parties allows for the Community and Member States, where appropriate, to be treated as one Party; under Art 2(c): 'the term "Contracting Parties" means, concerning the Community and the EC Member States, the Community and the EC Member States, or the Community, or the EC Member States. The meaning to be attributed to this expression in each case is to be deduced from the relevant provisions of this Agreement and from the respective competences of the Community and the EC Member States'.

[68] Case C-222/94 *Commission v United Kingdom* [1996] ECR I-4025, paras 49–53.

existence of a disconnection clause is wholly irrelevant.'[69] However, as Lugano II demonstrates, in such cases it may still be necessary to include at least a 'without prejudice' clause. The revised Lugano Convention was signed, following the ruling in Opinion 1/03 that competence in this case was exclusive, by the Community alone.[70] Nevertheless, Article 64(1) provides:

> This Convention shall not prejudice the application by the Member States of the European Community of the Council Regulation (EC) No 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, as well as any amendments thereof, [and of the Brussels Convention as amended, as well as of the Agreement between the EC and Denmark on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters of 2005].

Why is this thought to be necessary? Article 1(3) of the Convention provides:

> In this Convention, the term 'State bound by this Convention' shall mean any State that is a Contracting Party to this Convention or a Member State of the European Community. It may also mean the European Community.

Thus it is made clear—as is also clear from Article 216(2) TFEU (ex Article 300(7) EC)—that the Member States are bound by the Convention. It is then necessary to ensure that when the Convention refers (as it frequently does) to situations concerning two 'States bound by this Convention', and where both of the States in question are EU Member States, Regulation 44/2001 will apply rather than the Convention.[71] Article 64(1) achieves this.

In addition, there are limits to the degree of homogeneity achievable even where a Convention is intended to extend the *acquis*, since the Court's interpretation of the Union *acquis* may not be applied to the Convention by non-Member State Parties, and the Court of Justice will have jurisdiction to interpret the Convention only in respect of the Union and Member States, not third countries.[72]

This last point may be used, however, to illustrate the benefit that a disconnection clause may in some circumstances give to a non-Member State Party. The

---

[69]  Opinion 1/03, above n 17, para 84. This point also raises the issue of the relationship between the disconnection clause and exclusivity, considered below in section V.

[70]  Council Decision 2007/712/EC of 15 October 2007 on the signing, on behalf of the Community, of the Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, [2007] OJ L/339/1. See also Proposal for a Council Decision concerning the conclusion of the Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, COM (2008) 116.

[71]  The common rules of jurisdiction established by the Regulation apply to defendants domiciled in a Member State (note the special position of Denmark).

[72]  The ECAA Agreement, referred to above n 40, is unusual in providing for references to the ECJ from the courts of non-Member State Parties as well as for the interpretation of the agreement's clauses in line with existing case law of the Court of Justice in order to ensure as uniform an interpretation as possible; see discussion in Opinion 1/00, *European Common Aviation Area*, [2002] ECR I-3493.

*Marise Cremona*

2005 Convention on Choice of Court Agreements, negotiated within the framework of the Hague Conference on Private International Law,[73] contains a 'REIO clause', allowing a Regional Economic Integration Organisation to accede to the Convention either with or without its Member States.[74] The Convention was negotiated over a long period of time which in part coincided with the process whereby the EU's 'Brussels Convention' on jurisdiction and enforcement of judgments[75] was being revised and transformed into the 'Brussels Regulation'.[76] The disconnection clause in this case, which applies only to REIOs that are party to the Convention, reflects the special nature of the scope of application of jurisdiction rules:

> This Convention shall not affect the application of the rules of a Regional Economic Integration Organisation that is a Party to this Convention, whether adopted before or after this Convention—
>
> a)   where none of the parties is resident in a Contracting State that is not a Member State of the Regional Economic Integration Organisation;
>
> b)   as concerns the recognition or enforcement of judgments as between Member States of the Regional Economic Integration Organisation.[77]

Were the EU to accede to the Choice of Court Convention, this provision would ensure that a Party who is not resident in an EU Member State (for example, a US company) would be subject to the Convention rules (including, for example, Article 5(2)) and not to the Brussels Regulation. This is significant given the strict interpretation given by the Court of Justice to the *lis pendens* rule in relation to choice of court agreements.[78]

---

[73]   The EC acceded to the Hague Conference in April 2007: Council Decision 2006/719/EC on the accession of the Community to the Hague Conference on Private International Law, [2006] OJ L/297/1. See A Schulz, 'The Accession of the European Community to the Hague Conference on Private International Law' (2007) 56 *ICLQ* 939.

[74]   Convention of 30 June 2005 on Choice of Court Agreements, Art 29. A declaration of competence is required; under Art 30, a REIO may accede without its Member States, making a declaration that it has competence over all matters covered by the Convention and that its Member States, although not party to the Convention, will be bound by its provisions by virtue of the REIO's participation (cf Art 216(2) TFEU). In such cases the term 'Contracting State' in the Convention will also apply to Member States of the REIO. The Convention is not yet in force; neither the EU nor any EU Member State is currently a Party. For a discussion of the need for a disconnection clause in the Convention, see Tell, above n 9.

[75]   Convention on jurisdiction and enforcement of judgments in civil and commercial matters of 27 September 1968, [1998] OJ C/27/1.

[76]   Regulation 44/2001/EC on jurisdiction and enforcement of judgments in civil and commercial matters, [2001] OJ L/12/1.

[77]   *Ibid*, Art 26(6).

[78]   In Case C-116/02 *Erich Gasser GmbH v MISAT Srl* [2003] ECR I-14693, the Court held that under the Brussels Regulation the court second seised, despite a choice of court agreement conferring exclusive jurisdiction on that court, must stay proceedings until the court first seised has determined jurisdiction; application of the 2005 Convention would give a different result, giving greater weight to the choice of court agreement.

IV.    DISCONNECTION CLAUSES AND MIXED AGREEMENTS

As we have seen, although disconnection clauses are not only used within mixed agreements, they are facilitative of mixed agreements in areas of law which may have an impact on the Union legal order. In particular, the disconnection clause emphasises that within a mixed agreement—particularly a multilateral mixed agreement—the EU and its Member States should be treated as in some sense forming a group separate from other Contracting Parties, and that the legal links between themselves have an impact on their interrelation with other Parties.

Beyond this, two questions arise: first, in case of a mixed agreement, does the disconnection clause add anything to the obligations on Member States derived from the Treaty by the Court's case law on mixed agreements? Secondly, does the effect of a disconnection clause vary according to whether the agreement is mixed or not?

First, does a disconnection clause add anything in terms of a Member State's obligations? Member State Parties to mixed agreements are under Union law obligations:

a)  to comply with their 'internal' Union law obligations (Article 4(3) TEU));
b)  to comply with their obligations under the mixed agreement[79]; and
c)  to submit disputes which fall within the scope of Union law (even if these relate to Convention-based obligations) to the Court of Justice rather than any Convention-based dispute settlement procedure.[80]

The disconnection clause does not appear to add to these obligations at the level of Union law. It does not help to resolve such issues as the extent of the duty of cooperation in the management of a mixed agreement, for example in constraining a Member State's ability to use Convention procedures in the absence of prior consultation and agreement at Union level.[81] However, what it does is to bring the position under Union law into line with the position in international law, ie under the mixed agreement itself, thereby preventing a possible conflict with obligations under that agreement. Thus, had a disconnection clause been included in the UNCLOS it would have been clearer from the start that Ireland's complaint against the UK should be brought to the Commission and Court of Justice.

Secondly, does it make any difference to the effects of a disconnection clause whether or not the agreement containing it is mixed, ie the Union is a party alongside the Member States? It is in fact increasingly likely that the Member States will conclude agreements which deal with matters where there is some EU

---

[79]  *Commission v Ireland,* above n 56, para 20, and *Étang de Berre,* above n 55, para 31.
[80]  *MOX Plant,* above n 59.
[81]  See, eg, Case C–246/07 *Commission v Sweden,* pending, [2007] OJ C/183/19; cf Case C–45/07 *Commission v Hellenic Republic,* judgment 12 February 2009.

*acquis* but perhaps not enough to justify EU participation per se,[82] or where Union participation is not possible. And it is where the Union is *not* a Party that the impact of the clause is more obvious in separating (disconnecting) the Member States' obligations to the Union from those to other Contracting Parties. Where the Union is a Party, on the other hand, it is itself bound by and 'connected' to the Convention regime, the Convention becoming part of the Union legal order.[83] Indeed, it has been argued that where the Union is a Party, a disconnection clause should not be legally necessary, in that the Union then takes on the obligation of implementing the Convention within the Union legal order.[84]

However, the distinction between mixed and non-mixed agreements affects the nature of Member States' obligations as well as those of the Union. In the case of a Convention to which only some or all of the Member States are party, their obligations under the Convention are simply a matter of international law. In the case of a mixed agreement, however, Article 216(2) TFEU (ex Article 300(7) EC) applies, and the Member State is bound by the agreement *as a matter of Union law* as well as international law.[85] The mixed agreement provisions apply not only to the Member States *inter se*, but also to relations between the Member States and the Union: the Member States' obligation under the agreement is (also) owed to the Union.[86] This difference between mixed agreements and agreements to which only (some or all of) the Member States are Parties is in effect minimised by the use of the disconnection clause.

Let us suppose that there is a conflict between an obligation under a mixed agreement and a Union secondary law. As the agreement is binding under Article 216(2) TFEU, it is clear that such Union international obligations take priority over secondary law.[87] The Member States may thus—within the framework of

---

[82] As suggested by Hix, this may, eg, be the case where a Convention on a substantive subject within Member State or shared competence contains procedural provisions on jurisdiction or recognition and enforcement of judgments which fall within (exclusive) Community competence following Opinion 1/03 of the Court of Justice. J P Hix, 'Mixed Agreements in the Field of Judicial Cooperation in Civil Matters: Treaty-making and Legal Effects' in B Martenczuk and S van Thiel (eds) *Justice, Liberty, Security: New Challenges for EU External Relations* (Brussels, VUB Press, 2008) 211.

[83] P-J Kuijper, 'The Opinion on the Lugano Convention and the Implied External Relations Powers of the European Community' in Martenczuk and van Thiel, above n 82. Smrkolj argues that indeed disconnection clauses are 'paradoxical' in the case of mixed agreements, querying the way that 'the EC is at the same time approaching the treaty and excluding itself from application of all provisions that would be applicable for it': Smrkolj, above n 9, at 10.

[84] F Hoffmeister, 'The Contribution of EU Practice to International Law' in M Cremona (ed), *Developments in EU External Relations Law* (Oxford, Oxford University Press, 2008). Hoffmeister gives the example of the UNESCO Convention on Cultural Diversity, where instead of a disconnection clause in the Convention itself the EU made a declaration on concluding the Convention: see Council Decision 2006/515/EC, [2006] OJ L/201/15; for text of the declaration, see above n 32.

[85] Case 104/81 *Hauptzollamt Mainz v CA Kupferberg & Cie KG aA* [1982] ECR 3641, para 13.

[86] *Étang de Berre*, above n 55, paras 25–26.

[87] Case C-61/94 *Commission v Germany* [1996] ECR I-3989, para 52; Case C-344/04 *R v Department of Transport, ex p International Air Transport Association*, [2006] ECR I-403, para 35; Case C-308/06 *Intertanko and Others* [2008] ECR I- 4057, para 42.

Union law—have to give priority to their obligations under the Convention over their obligations under secondary Union law. On the other hand, if the Union itself were *not* a Party, the Member States' *Union law* obligation under Article 4(3) TEU (ex Article 10 EC) would be to give priority to Union law, at risk of being in breach of their (international law) Convention obligations.[88] In the absence of a disconnection clause there is thus a potential difference for the Member States between mixed and non-mixed agreements in the priority accorded *by Union law* to their different obligations. Where the EU is also a Party (ie the agreement is mixed) they may find the agreement taking precedence over conflicting secondary law; where the agreement is not mixed then Union secondary law would take precedence.[89] The disconnection clause, on the other hand, operates with respect to both primary and secondary Union law, and whether or not the EU is a Party: under the disconnection clause Union law will apply at least as regards Member States *inter se* and Member State/Union relations (as we have seen it does not affect obligations to third-country Parties).

Our conclusion, then, is that because the disconnection clause operates at the level of international law, and functions to bring into line the Member States' international and Union law obligations, it adds transparency with respect to third-country Parties (making explicit and in conformity with the agreement what is already a requirement under Union law), and in addition it allows a mixed agreement to be concluded containing obligations which are fully operative as regards third Parties without jeopardising the primacy of Union law for Member States should a conflict between the two arise.

## V.  DISCONNECTION CLAUSES AND EXCLUSIVITY

It has been argued above that disconnection clauses are facilitative of mixed agreements by removing the hierarchical conflict that otherwise might exist within Union law between obligations deriving from the agreement and obligations deriving from primary or secondary law. In the *Lugano* case,[90] the Council and several Member States argued that this facilitative effect went so far as to render exclusivity unnecessary, at least in that case. What is the relation between

---

[88]  This obligation is subject to Art 351(1) TFEU (ex Art 307(1) EC) in the case of agreements concluded prior to the entry into force of the EC Treaty or of a Member State's accession to the EU. Since disconnection clauses came into use in the late 1980s, it is primarily the newer Member States that might find themselves applying Art 351(1) to an agreement containing a disconnection clause. Art 351(1) protects the rights of third States under such an agreement, and the disconnection clause would not affect this.

[89]  This differentiation between mixed agreements and agreements to which the Community is not a Party does not arise in the case of a conflict between a provision in the agreement and primary Community law (including general principles of law and fundamental rights), since whether or not Art 216(2) TEFU (ex Art 300(7) EC) applies, primary Community law would prevail within the Community legal order: Joined Cases C-402/05P and C-415/05P *Yassin Abdullah Kadi and Al Barakaat International Foundation v Council*, [2008] ECR I-6351, para 308.

[90]  Opinion 1/03, above n 17.

*Marise Cremona*

disconnection clauses and exclusivity? Might a disconnection clause, by removing the possibility of an 'effect' on the Union legal order such as to trigger pre-emption and exclusivity, offer an 'alternative answer' to the justification for exclusive Union competence based on the *AETR* effect[91]? And are disconnection clauses only applicable to cases of shared competence, or might they also be appropriate in agreements concluded under exclusive competence by the EU alone?

The disconnection clause is designed to avoid conflict and to preserve the primacy of Union law as regards the Member States; in this it goes further than a rule of priority (ie a rule that in case of conflict between Union law and the agreement, priority is given to the former[92]), being rather a choice of law rule (Union law will apply between the Member States whether or not there is a conflict).

We know that a priority rule does not remove the *AETR* effect and render exclusivity unnecessary. In *Open Skies*, for example, the Court says:

> [I]n respect of the air transport to which Regulation No 2409/92 applies, the above-mentioned Article 9 [of the Danish bilateral agreement on air services] requires that Regulation to be complied with. However praiseworthy that initiative by the Kingdom of Denmark, designed to preserve the application of Regulation No 2409/92, may have been, the fact remains that the failure of that Member State to fulfil its obligations lies in the fact that it was not authorised to enter into such a commitment on its own, even if the substance of that commitment does not conflict with Community law.[93]

Might a disconnection clause, on the other hand, be relevant to the need for exclusivity? It is not simply a priority rule but rather an allocation or choice of law rule. The UK and German submissions in the *Lugano* case stressed this difference.[94] The Court, however, citing the same passage from *Open Skies*, refers to 'any initiative seeking to avoid contradictions between Union law and the agreement envisaged' and does not distinguish between a priority clause and a disconnection clause. In its *Lugano* Opinion, the Court of Justice takes the view that the disconnection clause cannot be seen as an alternative to determining whether the conditions for pre-emption are satisfied. The question whether competence is exclusive is a separate question:

---

[91]  Case 22–70 Commission v Council (European Agreement on Road Transport) [1971] ECR 263, in which the Court of Justice held at paras 17–8 that 'each time the Community, with a view to implementing a common policy envisaged by the Treaty, adopts provisions laying down common rules, whatever form these may take, the Member States no longer have the right, acting individually or even collectively, to undertake obligations with third countries which affect those rules. As and when such common rules come into being, the Community alone is in a position to assume and carry out contractual obligations towards third countries affecting the whole sphere of application of the Community legal system.'

[92]  See, eg, Art 134 of the Schengen Convention.

[93]  Case C-467/98 *Commission v Denmark* [2002] ECR I-9519, para 101.

[94]  Opinion 1/03, above n 17, para 81.

> any initiative seeking to avoid contradictions between Community law and the agreement envisaged does not remove the obligation to determine, prior to the conclusion of the agreement, whether it is capable of affecting the Community rules ...[95]

A mechanism such as a disconnection clause, no more than a priority rule,

> is not in itself a decisive factor in resolving the question whether the Community has exclusive competence to conclude that agreement or whether competence belongs to the Member States ...[96]

This must be right, in that these clauses are one mechanism used, in cases where the Member States are exercising their own treaty-making competence, to ensure the primacy of Union law in intra-Member State relations. They are not intended to address the issue of competence. Further, both a priority rule and a disconnection clause are essentially concerned with the primacy of Union law for the Member States; the disconnection clause is a choice of law rule (in the sense of allocating which law shall apply), but the Member States do not in fact have any choice in terms of Union law about whether or not EU law should apply in their *inter se* relations.

However, the Court goes further and adds a warning: disconnection clauses, it says, not only do not guarantee that Union rules are not 'affected' but 'on the contrary may provide an indication that those rules are affected'.[97] This is, of course, the language of *AETR*; the Court seems to be saying that if it seems necessary to include a disconnection clause then that is a sign that the *AETR* conditions for exclusivity are met, that competence is after all not shared but exclusive, at least for that part of the agreement to which the clause would apply ('in so far as there are Community or European Union rules governing the particular subject concerned and applicable to the specific case'[98]). If Member States feel that by including a disconnection clause in a draft Convention they are signalling that this is an area of possible exclusive competence (because Union rules are likely to be affected), the clause is much less likely to be acceptable, and a useful way of managing agreements of genuinely shared competence will be lost.

This comment by the Court does not in fact follow its earlier logic that the determination of exclusivity via the *AETR* test is a separate question from the consideration of whether a disconnection clause is needed or appropriate. How convincing is this logic? Could it not be argued that since *AETR* exclusivity arises from legislative action (pre-emption), it should be amenable to a legislative solution (the disconnection clause)?[99] Let us take another example. In Opinion

---

[95] *Ibid*, para 129.
[96] *Ibid*, para 130.
[97] *Ibid*.
[98] Taken from the disconnection clause in the Council of Europe Convention on the Prevention of Terrorism 2005, CETS No 196, Art 26(3).
[99] Thanks to Robert Schütze for this comment.

*Marise Cremona*

2/91 on the conclusion by the Community of ILO Convention 170 on safety in the use of chemicals at work, the Court held that a part of the Convention fell within exclusive competence as it was subject to internal Community rules which did not offer the flexibility of minimum standards:

> A number of directives adopted in the areas covered by Part III of Convention No 170 do, however, contain rules, which are more than minimum requirements. … While there is no contradiction between these provisions of the Convention and those of the directives mentioned, it must nevertheless be accepted that Part III of Convention No 170 is concerned with an area which is already covered to a large extent by Community rules progressively adopted since 1967 with a view to achieving an ever greater degree of harmonisation … In those circumstances, it must be considered that the commitments arising from Part III of Convention No 170 … are of such a kind as to affect the Community rules laid down in those directives and that consequently Member States cannot undertake such commitments outside the framework of the Community institutions.[100]

Would a disconnection clause have removed the problem and thus the need for exclusivity in such a case? No—the problem in a case like this, the Court suggests, is not in fact the risk of conflict between rules (it admits there is no contradiction between the rules) but rather a potential conflict of legislative competence or legislator: the Member States have already transferred legislative authority in the field to the EU and this has been used; they cannot now delegate that same authority to another 'legislator' (the ILO machinery). As we have seen, a disconnection clause is an allocation rule designed to avoid conflicts between rules by determining that Union rules will always apply between the Member States; it is precisely designed to allow the Member States to adopt *other rules* (Convention rules) in their relations with third-country Parties. Were it to be applied in the circumstances envisaged here, it would result in the Member States adopting a differentiated system against a background where the EU had sought to establish a completely harmonised system for reasons of integration. The rationale for exclusivity found in *AETR*—that 'common rules' once in place would be affected by the exercise of a concurrent legislative competence—lies in the danger to the Union system should the Member States adopt autonomous rules, including rules that govern their relations with third countries. As expressed by the Court in its *Lugano* Opinion:

> The purpose of the exclusive competence of the Community is primarily to preserve the effectiveness of Community law and the proper functioning of the systems established by its rules.[101]

We may conclude, therefore, that while disconnection clauses are not in themselves evidence that competence may be exclusive, neither do they remove the

---

[100]  Opinion 2/91 *Convention N° 170 of the International Labour Organization* [1993] ECR I-1061, paras 22–26.
[101]  Opinion 1/03, above n 17, para 131.

need for exclusivity; indeed, they may be useful in agreements concluded by the Union alone under exclusive powers, since in these cases the Member States too may be implicated in the implementation of, and may indeed be referred to in, the agreement.

## VI.    CONCLUSION

What may we conclude?

The disconnection clause is a choice of law or allocation clause. It embodies within the context of an international legal instrument the principle of the primacy of Community and Union law, and thus can be seen as a substantive counterpart to Article 344 TFEU (ex Article 292 EC).

The disconnection clause is designed to allow the Member States to participate in parallel developments at international level where action is also undertaken at Union level. In some cases not all Member States may become Parties to the particular Convention. In some cases these developments will be supplementary to EU initiatives, in other cases it will be a matter of extending the *acquis*, or parts of it, to a wider group of countries. It has been widely used within Council of Europe Conventions, not so often used elsewhere.

The disconnection clause facilitates mixed agreements in cases of shared competence by providing, at the level of international law, by the terms of the agreement itself, for the application of the obligations placed on Member States by Union law. It thus helps to avoid conflicts between the Member States' international law and Union law obligations.

The disconnection clause also removes the potential difference between mixed and non-mixed agreements with respect to the hierarchy between international norms and Union law, by resolving the issue in favour of Union law.

The disconnection clause emphasises the unity of 'the EU and Member States', their participation as distinctive subjects of international law but which are nevertheless linked together through the Community/Union legal order(s). This common identity as Member States of the Union is important within mixed agreements, but is perhaps even more striking where the clause is used in non-mixed agreements.

The disconnection clause does not provide a reason for denying *AETR*-based exclusivity, but neither does it indicate that an *AETR*-type 'effect' on common rules is present. The disconnection clause normally operates where there is shared competence and the exclusive/shared decision is logically prior to the decision to introduce a disconnection clause or to use other methodologies to manage a shared competence. In some cases a disconnection clause may be appropriate even in case of exclusive competence where the substance of the agreement requires specific action by the Member States.

One of the main benefits of the disconnection clause is transparency, in making visible at the international level the obligations of the Member States as

*Marise Cremona*

members of the EU as well as Parties to an international agreement. However it is still liable to be categorised as a special derogation for the EU and as a refusal to enter fully into the obligations set out in the Convention. Although the validity of disconnection clauses is not contested, being agreed to by all Contracting Parties, there are concerns that they lead to uncertainty, especially as the scope of the Union *acquis* is likely to change over time.[102] The declaration attached to Council of Europe Conventions goes some way towards clarifying the position, but the EU will need to continue to explain the effects of these clauses and the necessity for them deriving from the special nature of the Union legal order, much as it needs to try to increase transparency with respect to the legal effects of mixed agreements.

---

[102] See Koskenniemi, above n 65, para 293; Smrkolj, above n 9.