COUNCIL
OF EUROPE

CONSEIL
DE L'EUROPE

*European Treaty Series - No. 132*

# EUROPEAN CONVENTION ON TRANSFRONTIER TELEVISION

## Strasbourg, 5.V.1989

Text amended according to the provisions of the Protocol (ETS No. 171) which entered into force on 1 March 2002.

**Preamble**

The member States of the Council of Europe and the other States party to the European Cultural Convention, signatory hereto,

Considering that the aim of the Council of Europe is to achieve a greater unity between its members, for the purpose of safeguarding and realising the ideals and principles which are their common heritage;

Considering that the dignity and equal worth of every human being constitute fundamental elements of those principles;

Considering that the freedom of expression and information, as embodied in Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms, constitutes one of the essential principles of a democratic society and one of the basic conditions for its progress and for the development of every human being;

Reaffirming their commitment to the principles of the free flow of information and ideas and the independence of broadcasters, which constitute an indispensable basis for their broadcasting policy;

Affirming the importance of broadcasting for the development of culture and the free formation of opinions in conditions safeguarding pluralism and equality of opportunity among all democratic groups and political parties;

Convinced that the continued development of information and communication technology should serve to further the right, regardless of frontiers, to express, to seek, to receive and to impart information and ideas whatever their source;

Being desirous to present an increasing range of choice of programme services for the public, thereby enhancing Europe's heritage and developing its audiovisual creation, and being determined to achieve this cultural objective through efforts to increase the production and circulation of high-quality programmes, thereby responding to the public's expectations in the political, educational and cultural fields;

Recognising the need to consolidate the common broad framework of regulation;

Bearing in mind Resolution No. 2 and the Declaration of the 1st European Ministerial Conference on Mass Media Policy;

Being desirous to develop the principles embodied in the existing Council of Europe Recommendations on principles on television advertising, on equality between women and men in the media, on the use of satellite capacity for television and sound radio, and on the promotion of audiovisual production in Europe,

Have agreed as follows:

## CHAPTER I – GENERAL PROVISIONS

### Article 1 – Object and purpose

This Convention is concerned with programme services embodied in transmissions. The purpose is to facilitate, among the Parties, the transfrontier transmission and the retransmission of television programme services.

### Article 2 – Terms employed [1]

For the purposes of this Convention:

a    "Transmission" means the initial emission by terrestrial transmitter, by cable, or by satellite of whatever nature, in encoded or unencoded form, of television programme services for reception by the general public. It does not include communication services operating on individual demand;

b    "Retransmission" signifies the fact of receiving and simultaneously transmitting, irrespective of the technical means employed, complete and unchanged television programme services, or important parts of such services, transmitted by broadcasters for reception by the general public;

c    "Broadcaster" means the natural or legal person who has editorial responsibility for the composition of television programme services for reception by the general public and transmits them or has them transmitted, complete and unchanged, by a third party;

d    "Programme service" means all the items within a single service provided by a given broadcaster within the meaning of the preceding paragraph;

e    "European audiovisual works" means creative works, the production or co-production of which is controlled by European natural or legal persons;

f    "Advertising" means any public announcement in return for payment or similar consideration or for self-promotional purposes, which is intended to promote the sale, purchase or rental of a product or service, to advance a cause or idea, or to bring about some other effect desired by the advertiser or the broadcaster itself;

g    "Tele-shopping" means direct offers broadcast to the public with a view to the supply of goods or services, including immovable property, rights and obligations in return for payment;

h    "Sponsorship" means the participation of a natural or legal person, who is not engaged in broadcasting activities or in the production of audiovisual works, in the direct or indirect financing of a programme with a view to promoting the name, trademark, image or activities of that person.

### Article 3 – Field of application

This Convention shall apply to any programme service transmitted or retransmitted by entities or by technical means within the jurisdiction of a Party, whether by cable, terrestrial transmitter or satellite, and which can be received, directly or indirectly, in one or more other Parties.

---

[1]    *Text amended according to the provisions of the Protocol (ETS No. 171).*

**Article 4 – Freedom of reception and retransmission**

The Parties shall ensure freedom of expression and information in accordance with Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms and they shall guarantee freedom of reception and shall not restrict the retransmission on their territories of programme services which comply with the terms of this Convention.

**Article 5 – Duties of the transmitting Parties** [1]

1   Each transmitting Party shall ensure that all programme services transmitted by broadcasters within its jurisdiction comply with the terms of this Convention.

2   For the purposes of this Convention, a broadcaster within the jurisdiction of a Party is:

   – a boradcaster who is deemed to be established in that Party according to paragraph 3;

   – a broadcaster to whom paragraph 4 applies.

3   For the purpose of this Convention, a broadcaster shall be deemed to be established in a Party, hereinafter referred to as "transmitting Party" in the following cases:

   a   the broadcaster has its head office in that Party and the decisions on programme schedules are taken in that Party;

   b   if a broadcaster has its head office in one Party but decisions on programme schedules are taken in another Party, it shall be deemed to be established in the Party where a significant part of the workforce involved in the pursuit of the television broadcasting activity operates; if a significant part of the workforce involved in the pursuit of the television broadcasting activity operates in each of those Parties, the broadcaster shall be deemed to be established in the Party where it has its head office; if a significant part of the workforce involved in the pursuit of the television broadcasting activity operates in neither of those Parties, the broadcaster shall be deemed to be established in the Party where it first began broadcasting in accordance with the system of law of that Party, provided that it maintains a stable and effective link with the economy of that Party;

   c   if a broadcaster has its head office in a Party but decisions on programme schedules are taken in a State which is not Party to this Convention, or vice-versa, it shall be deemed to be established in the Party concerned, provided that a significant part of the workforce involved in the pursuit of the television broadcasting activity operates in that Party;

   d   if, when applying the criteria of paragraph 3 of Article 2 of Directive 97/36/EC of the European Parliament and of the Council of 19 June 1997 amending Council Directive 89/552/EEC on the co-ordination of certain provisions laid down by law, regulation or administrative action in member States concerning the pursuit of television broadcasting activities, a broadcaster is deemed to be established in a member State of the European Community, that broadcaster shall also be deemed to be established in that State for the purposes of this Convention.

---

[1]   *Text amended according to the provisions of the Protocol (ETS No. 171).*

4    A broadcaster to whom the provisions of paragraph 3 are not applicable is deemed to be within the jurisdiction of a Party, so-called transmitting Party, in the following cases:

   a    it uses a frequency granted by that Party;

   b    although it does not use a frequency granted by a Party it does use a satellite capacity appertaining to that Party;

   c    although it uses neither a frequency granted by a Party nor a satellite capacity appertaining to a Party it does use a satellite up-link situated in that Party.

5    If the transmitting Party cannot be determined according to paragraph 4, the Standing Committee shall consider this issue according to Article 21, paragraph 1a, of this Convention, in order to determine this Party.

6    This Convention shall not apply to television broadcasts intended exclusively for reception in States which are not Party to this Convention, and which are not received directly or indirectly by the public in one or more Parties.

   **Article 6 – Provision of information**

1    The responsibilities of the broadcaster shall be clearly and adequately specified in the authorisation issued by, or contract concluded with, the competent authority of each Party, or by any other legal measure.

2    Information about the broadcaster shall be made available, upon request, by the competent authority of transmitting Party. Such information shall include, as a minimum, the name or denomination, seat and status of the broadcaster, the name of the legal representative, the composition of the capital, the nature, purpose and mode of financing of the programme service the broadcaster is providing or intends providing.

## CHAPTER II – PROGRAMMING MATTERS

   **Article 7 – Responsibilities of the broadcaster**

1    All items of programme services, as concerns their presentation and content, shall respect the dignity of the human being and the fundamental rights of others.

   In particular, they shall not:

   a    be indecent and in particular contain pornography;

   b    give undue prominence to violence or be likely to incite to racial hatred.

2    All items of programme services which are likely to impair the physical, mental or moral development of children and adolescents shall not be scheduled when, because of the time of transmission and reception, they are likely to watch them.

3    The broadcaster shall ensure that news fairly presents facts and events and encourages the free formation of opinions.

**Article 8 – Right of reply** [1]

1    Each transmitting Party shall ensure that every natural or legal person, regardless of nationality or place of residence, shall have the opportunity to exercise a right of reply or to seek other comparable legal or administrative remedies relating to programmes transmitted by a broadcaster within its jurisdiction, within the meaning of Article 5. In particular, it shall ensure that timing and other arrangements for the exercise of the right of reply are such that this right can be effectively exercised. The effective exercise of this right or other comparable legal or administrative remedies shall be ensured both as regards the timing and the modalities.

2    For this purpose, the name of the programme service or of the broadcaster responsible for this programme service shall be identified in the programme service itself, at regular intervals by appropriate means.

**Article 9 – Access of the public to information** [1]

Each Party shall examine and, where necessary, take legal measures such as introducing the right to short reporting on events of high interest for the public to avoid the right of the public to information being undermined due to the exercise by a broadcaster within its jurisdiction of exclusive rights for the transmission or retransmission, within the meaning of Article 3, of such an event.

**Article 9*bis* – Access of the public to events of major importance** [2]

1    Each Party retains the right to take measures to ensure that a broadcaster within its jurisdiction does not broadcast on an exclusive basis events which are regarded by that Party as being of major importance for society in such a way as to deprive a substantial proportion of the public in that Party of the possibility of following such events by live coverage or deferred coverage on free television. If it does so, the Party concerned may have recourse to the drafting of a list of designated events which it considers to be of major importance for society.

2    Parties shall ensure by appropriate means, respecting the legal guarantees granted by the Convention for the Protection of Human Rights and Fundamental Freedoms as well as, where appropriate, the national constitution, that a broadcaster within their jurisdiction does not exercise the exclusive rights purchased by that broadcaster following the date of entry into force of the Protocol amending the European Convention on Transfrontier Television in such a way that a substantial proportion of the public in another Party is deprived of the possibility of following events which are designated by that other Party, via whole or partial live coverage or where necessary or appropriate for objective reasons in the public interest, whole or partial deferred coverage on free television as determined by that other Party under paragraph 1, respecting the following requirements:

a    the Party implementing the legal measures referred to in paragraph 1 shall draw up a list of national or non-national events which are considered by that Party as being of major importance for society;

b    the Party shall do so in a clear and transparent manner in due and effective time;

---

[1]    *Text amended according to the provisions of the Protocol (ETS No. 171).*
[2]    *Article added according to the provisions of the Protocol (ETS No. 171).*

c    the Party shall determine whether these events shall be available via whole or partial live coverage, or where necessary or appropriate for objective reasons in the public interest, whole or partial deferred coverage;

d    the measures taken by the Party drawing up the list shall be proportionate and as detailed as necessary to enable other Parties to take measures referred to in this paragraph;

e    the Party drawing up the list shall notify the list and the corresponding legal measures to the Standing Committee, the time limit for which shall be fixed by the Standing Committee;

f    the measures taken by the Party drawing up the list shall be within the limitations of the guidelines of the Standing Committee referred to in paragraph 3 and the Standing Committee must have given a positive opinion on the measures.

Measures based on this paragraph shall apply only to those events published by the Standing Committee in the annual list referred to in paragraph 3 and to those exclusive rights purchased after the entry into force of the amending Protocol.

3    Once a year the Standing Committee shall:

a    publish a consolidated list of the enlisted events and corresponding legal measures notified by Parties in accordance with paragraph 2e;

b    draw up guidelines to be adopted by a majority of three quarters of the members in addition to the requirements listed up in paragraph 2a to e in order to avoid differences between the implementation of this article and that of corresponding European Community provisions.

**Article 10 – Cultural objectives** [1]

1    Each transmitting Party shall ensure, where practicable and by appropriate means, that a broadcaster within its jurisdiction reserves for European works a majority proportion of its transmission time, excluding the time appointed to news, sports events, games, advertising, teletext services and tele-shopping. This proportion, having regard to the broadcaster's informational, educational, cultural and entertainment responsibilities to its viewing public, should be achieved progressively, on the basis of suitable criteria.

2    In case of disagreement between a receiving Party and a transmitting Party on the application of the preceding paragraph, recourse may be had, at the request of one of the Parties, to the Standing Committee with a view to its formulating an advisory opinion on the subject. Such a disagreement shall not be submitted to the arbitration procedure provided for in Article 26.

3    The Parties undertake to look together for the most appropriate instruments and procedures to support, without discrimination between broadcasters, the activity and development of European production, particularly in countries with a low audiovisual production capacity or restricted language area.

4    The Parties shall ensure that a broadcaster within their jurisdiction does not broadcast cinematographic works outside periods agreed with the rights holders.

---

[1]    *Text amended according to the provisions of the Protocol (ETS No. 171).*

### Article 10*bis* – Media pluralism [1]

The Parties, in the spirit of co-operation and mutual assistance which underlies this Convention, shall endeavour to avoid that programme services transmitted or retransmitted by a broadcaster or any other legal or natural persons within their jurisdiction, within the meaning of Article 3, endanger media pluralism.

## CHAPTER III – ADVERTISING AND TELE-SHOPPING [2]

### Article 11 – General standards [3]

1    Advertising and tele-shopping shall be fair and honest.

2    Advertising and tele-shopping shall not be misleading and shall not prejudice the interests of consumers.

3    Advertising and tele-shopping addressed to or using children shall avoid anything likely to harm their interests and shall have regard to their special susceptibilities.

4    Tele-shopping shall not exort minors to contract for the sale or rental of goods and services.

5    The advertiser shall not exercise any editorial influence over the content of programmes.

### Article 12 – Duration [1]

1    The proportion of tele-shopping spots, advertising spots and other forms of advertising, with the exception of tele-shopping windows within the meaning of paragraph 3, shall not exceed 20% of the daily transmission time. The transmission time for advertising spots shall not exceed 15% of the daily transmission time.

2    The proportion of advertising spots and tele-shopping spots within a given clock hour shall not exceed 20%.

3    Windows devoted to tele-shopping programmes broadcast within programme services which are not exclusively devoted to tele-shopping shall be of a minimum uninterrupted duration of 15 minutes. The maximum number of windows per day shall be eight. Their overall duration shall not exceed three hours per day. They must be clearly identified by optical and acoustic means.

4    For the purposes of this article, advertising shall not include:

   – announcements made by the broadcaster in connection with its own programmes and ancillary products directly derived from those programmes;

   – announcements in the public interest and charity appeals broadcast free of charge.

---

[1]    *Article added according to the provisions of the Protocol (ETS No. 171).*
[2]    *Heading amended according to the provisions of the Protocol (ETS No. 171).*
[3]    *Text amended according to the provisions of the Protocol (ETS No. 171).*

### Article 13 – Form and presentation [1]

1    Advertising and tele-shopping shall be clearly distinguishable as such and recognisably separate from the other items of the programme service by optical and/or acoustic means. In principle, advertising and tele-shopping spots shall be transmitted in blocks.

2    Advertising and tele-shopping shall not use subliminal techniques.

3    Surreptitious advertising and tele-shopping shall not be allowed, in particular the presentation of products or services in programmes when it serves advertising purposes.

4    Advertising and tele-shopping shall not feature, visually or orally, persons regularly presenting news and current affairs programmes.

### Article 14 – Insertion of advertising and tele-shopping [1]

1    Advertising and tele-shopping shall be inserted between programmes. Provided the conditions contained in paragraphs 2 to 5 of this article are fulfilled, advertising and tele-shopping spots may also be inserted during programmes in such a way that the integrity and value of the programme and the rights of the rights holders are not prejudiced.

2    In programmes consisting of autonomous parts, or in sports programmes and similarly structured events and performances comprising intervals, advertising and tele-shopping spots shall only be inserted between the parts or in the intervals.

3    The transmission of audiovisual works such as feature films and films made for television (excluding series, serials, light entertainment programmes and documentaries), provided their scheduled duration is more than forty-five minutes, may be interrupted once for each complete period of fourty-five minutes. A further interruption is allowed if their scheduled duration is at least twenty minutes longer than two or more complete periods of fourty-five minutes.

4    Where programmes, other than those covered by paragraph 2, are interrupted by advertising or tele-shopping spots, a period of at least twenty minutes should elapse between each successive advertising or tele-shopping break within the programme.

5    Advertising and tele-shopping shall not be inserted in any broadcast of a religious service. News and current affairs programmes, documentaries, religious programmes, and children's programmes, when their scheduled duration is less than thirty minutes, shall not be interrupted by advertising or tele-shopping. If their scheduled duration is thirty minutes or longer, the provisions of the previous paragraphs shall apply.

### Article 15 – Advertising and tele-shopping of particular products [2] [1]

1    Advertising and tele-shopping for tobacco products shall not be allowed.

2    Advertising and tele-shopping for alcoholic beverages of all varieties shall comply with the following rules:

a    they shall not be addressed particularly to minors and no one associated with the consumption of alcoholic beverage in advertising or tele-shopping should seem to be a minor;

---

b    they shall not link the consumption of alcohol to physical performance or driving;

c    they shall not claim that alcohol has therapeutic qualities or that it is a stimulant, a sedative or a means of resolving personal problems;

d    they shall not encourage immoderate consumption of alcohol or present abstinence or moderation in a negative light;

e    they shall not place undue emphasis on the alcoholic content of beverages.

3    Advertising for medicines and medical treatment which are only available on medical prescription in the transmitting Party shall not be allowed.

4    Advertising for all other medicines and medical treatment shall be clearly distinguishable as such, honest, truthful and subject to verification and shall comply with the requirement of protection of the individual from harm.

5    Tele-shopping for medicines and medical treatment shall not be allowed.

**Article 16 – Advertising and tele-shopping directed specifically at a single Party** [1]

1    In order to avoid distortions in competition and endangering the television system of a Party, advertising and tele-shopping which are specifically and with some frequency directed to audiences in a single Party other than the transmitting Party shall not circumvent the television advertising and tele-shopping rules in that particular Party.

2    The provisions of the preceding paragraph shall not apply where:

a    the rules concerned establish a discrimination between advertising and tele-shopping transmitted by a broadcaster within the jurisdiction of that Party and advertising and tele-shopping transmitted by a broadcaster or any other legal or natural person within the jurisdiction of another Party, or

b    the Parties concerned have concluded bilateral or multilateral agreements in this area.

## CHAPTER IV – SPONSORSHIP

### Article 17 – General standards

1    When a programme or series of programmes is sponsored in whole or in part, it shall clearly be identified as such by appropriate credits at the beginning and/or end of the programme.

2    The content and scheduling of sponsored programmes may in no circumstances be influenced by the sponsor in such a way as to affect the responsibility and editorial independence of the broadcaster in respect of programmes.

3    Sponsored programmes shall not encourage the sale, purchase or rental of the products or services of the sponsor or a third party, in particular by making special promotional references to those products or services in such programmes.

---

[1]    *Text amended according to the provisions of the Protocol (ETS No. 171).*

### Article 18 – Prohibited sponsorship [1]

1    Programmes may not be sponsored by natural or legal persons whose principal activity is the manufacture or sale of products, or the provision of services, the advertising and tele-shopping of which are prohibited by virtue of Article 15.

2    Companies whose activity includes, *inter alia*, the manufacture or sale of medicines and medical treatments may sponsor programmes by promoting the name, trademark, image or activities of the company, to the exclusion of any reference to medicines or specific medical treatment available only on medical prescription in the transmitting Party.

3    Sponsorship of news and current affairs programmes shall not be allowed.

## CHAPTER IV*bis* – PROGRAMME SERVICES DEVOTED EXCLUSIVELY TO SELF-PROMOTION OR TELE-SHOPPING [2]

### Article 18*bis* – Programme services devoted exclusively to self-promotion

1    The provisions of this Convention shall apply *mutatis mutandis* to programme services devoted exclusively to self-promotion.

2    Other forms of advertising shall be allowed on such services within the limits established by Article 12, paragraphes 1 and 2.

### Article 18*ter*: Programme services devoted exclusively to tele-shopping

1    The provisions of this Convention shall apply *mutatis mutandis* to programme services devoted exclusively to tele-shopping.

2    Advertising shall be allowed on such services within the limits established in Article 12, paragraph 1. Article 12, paragraph 2, shall not apply.

## CHAPTER V – MUTUAL ASSISTANCE

### Article 19 – Co-operation between the Parties

1    The Parties undertake to render each other mutual assistance in order to implement this Convention.

2    For that purpose:

   a    each Contracting State shall designate one or more authorities, the name and address of each of which it shall communicate to the Secretary General of the Council of Europe at the time of deposit of its instrument of ratification, acceptance, approval or accession;

   b    each Contracting State which has designated more than one authority shall specify in its communication under sub-paragraph *a.* the competence of each authority.

3    An authority designated by a Party shall:

   a    furnish the information foreseen under Article 6, paragraph 2, of this Convention;

---

[1]    *Text amended according to the provisions of the Protocol (ETS No. 171).*
[2]    *Chapter added according to the provisions of the Protocol (ETS No. 171).*

b    furnish information at the request of an authority designated by another Party on the domestic law and practices in the fields covered by this Convention;

c    co-operate with the authorities designated by the other Parties whenever useful, and notably where this would enhance the effectiveness of measures taken in implementation of this Convention;

d    consider any difficulty arising from the application of this Convention which is brought to its attention by an authority designated by another Party.

## CHAPTER VI – STANDING COMMITTEE

### Article 20 – Standing Committee [1]

1    For the purposes of this Convention, a Standing Committee shall be set up.

2    Each Party may be represented on the Standing Committee by one or more delegates. Each delegation shall have one vote. Within the areas of its competence, the European Community shall exercise its right to vote with a number of votes equal to the number of its member States which are Parties to this Convention; the European Community shall not exercise its right to vote in cases where the member States concerned exercise theirs, and conversely.

3    Any State referred to in Article 29, paragraph 1, which is not a Party to this Convention may be represented on the Standing Committee by an observer.

4    The Standing Committee may seek the advice of experts in order to discharge its functions. It may, on its own initiative or at the request of the body concerned, invite any international or national, governmental or non-governmental body technically qualified in the fields covered by this Convention to be represented by an observer at one or part of one of its meetings.

5    The Standing Committee shall be convened by the Secretary General of the Council of Europe. Its first meeting shall be held within six months of the date of entry into force of the Convention. It shall subsequently meet whenever one-third of the Parties or the Committee of Ministers of the Council of Europe so requests, or on the initiative of the Secretary General of the Council of Europe in accordance with the provisions of Article 23, paragraph 2, or at the request of one or more Parties in accordance with the provisions of Articles 21, sub-paragraph c, and 25, paragraph 2.

6    A majority of the Parties shall constitute a quorum for holding a meeting of the Standing Committee.

7    Subject to the provisions of Article 9*bis*, paragraph 3b, and Article 23, paragraph 3, the decisions of the Standing Committee shall be taken by a majority of three-quarters of the members present.

8    Subject to the provisions of this Convention, the Standing Committee shall draw up its own Rules of Procedure.

---

[1]    *Text amended according to the provisions of the Protocol (ETS No. 171).*

### Article 21 – Functions of the Standing Committee [1]

1    The Standing Committee shall be responsible for following the application of this Convention. It may:

    a    make recommendations to the Parties concerning the application of the Convention;

    b    suggest any necessary modifications of the Convention and examine those proposed in accordance with the provisions of Article 23;

    c    examine, at the request of one or more Parties, questions concerning the interpretation of the Convention;

    d    use its best endeavours to secure a friendly settlement of any difficulty referred to it in accordance with the provisions of Article 25;

    e    make recommendations to the Committee of Ministers concerning States other than those referred to in Article 29, paragraph 1, to be invited to accede to this Convention.

    f    give opinions on abuse of rights under Article 24*bis,* paragraph 2c.

2    In addition, the Standing Committee shall:

    a    draw up the guidelines referred to in Article 9*bis*, paragraph 3b, in order to avoid differences between the implementation of the rules of this Convention concerning access of the public to events of major importance for society and that of corresponding European Community provisions;

    b    give an opinion on the measures taken by Parties which have drawn up a list of national or non-national events which are considered by those Parties as being of major importance for society in accordance with Article 9*bis*, paragraph 2;

    c    publish once a year a consolidated list of the enlisted events and corresponding measures notified by Parties in accordance with Article 9*bis*, paragraph 2e.

### Article 22 – Reports of the Standing Committee

After each meeting, the Standing Committee shall forward to the Parties and the Committee of Ministers of the Council of Europe a report on its discussions and any decisions taken.

## CHAPTER VII – AMENDMENTS

### Article 23 – Amendments [1]

1    Any Party may propose amendments to this Convention.

2    Any proposal for amendment shall be notified to the Secretary General of the Council of Europe who shall communicate it to the member States of the Council of Europe, to the other States party to the European Cultural Convention, to the European Community and to any non-member State which has acceded to, or has been invited to accede to this Convention in accordance with the provisions of Article 30. The Secretary General of the Council of Europe shall convene a meeting of the Standing Committee at the earliest two months following the communication of the proposal.

---

[1]    *Text amended according to the provisions of the Protocol (ETS No. 171).*

3    The Standing Committee shall examine any amendment proposed and shall submit the text adopted by a majority of three-quarters of the members of the Standing Committee to the Committee of Ministers for approval. After its approval, the text shall be forwarded to the Parties for acceptance.

4    Any amendment shall enter into force on the thirtieth day after all the Parties have informed the Secretary General of their acceptance thereof.

5    However, the Committee of Ministers may, after consulting the Standing Committee, decide that a particular amendment shall enter into force following the expiry of a period of two years after the date on which it has been opened to acceptance, unless a Party has notified the Secretary General of the Council of Europe of an objection to its entry into force. Should such an objection be notified, the amendment shall enter into force on the first day of the month following the date on which the Party to the Convention which has notified the objection has deposited its instrument of acceptance with the Secretary General of the Council of Europe.

6    If an amendment has been approved by the Committee of Ministers, but has not yet entered into force in accordance with paragraphs 4 or 5, a State or the European Community may not express their consent to be bound by the Convention without accepting at the same time the amendment.

## CHAPTER VIII – ALLEGED VIOLATIONS OF THIS CONVENTION

### Article 24 – Alleged violations of this Convention

1    When a Party finds a violation of this Convention, it shall communicate to the transmitting Party the alleged violation and the two Parties shall endeavour to overcome the difficulty on the basis of the provisions of Articles 19, 25 and 26.

2    If the alleged violation is of a manifest, serious and grave nature which raises important public issues and concerns Articles 7, paragraphs 1 or 2, 12, 13, paragraph 1, first sentence, 14 or 15, paragraphs 1 or 3, and if it persists within two weeks following the communication, the receiving Party may suspend provisionally the retransmission of the incriminated programme service.

3    In all other cases of alleged violation, with the exception of those provided for in paragraph 4, the receiving Party may suspend provisionally the retransmission of the incriminated programme service eight months following the communication, if the alleged violation persists.

4    The provisional suspension of retransmission shall not be allowed in the case of alleged violations of Articles 7, paragraph 3, 8, 9 or 10.

### Article 24*bis* – Alleged abuses of rights conferred by this Convention [1]

1    When the programme service of a broadcaster is wholly or principally directed at the territory of a Party other than that which has jurisdiction over the broadcaster (the "receiving Party"), and the broadcaster has established itself with a view to evading the laws in the areas covered by the Convention which would have applied to it had it fallen within the jurisdiction of that other Party, this shall constitute an abuse of rights.

2    Where such an abuse is alleged by a Party, the following procedure shall apply:

---

[1]    *Article added according to the provisions of the Protocol (ETS No. 171).*

a    the Parties concerned shall endeavour to achieve a friendly settlement;

b    if they fail to do so within three months, the receiving Party shall refer the matter to the Standing Committee;

c    having heard the views of the Parties concerned, the Standing Committee shall, within six months of the date on which the matter was referred to it, give an opinion on whether an abuse of rights has been committed and shall inform the Parties concerned accordingly.

3    If the Standing Committee has concluded that an abuse of rights has occurred, the Party whose jurisdiction the broadcaster is deemed to be within shall take appropriate measures to remedy the abuse of rights and shall inform the Standing Committee of those measures.

4    If the Party whose jurisdiction the broadcaster is deemed to be within has failed to take the measures specified in paragraph 3 within six months, the arbitration procedure set out in Article 26, paragraph 2, and the appendix of the Convention shall be pursued by the Parties concerned.

5    A receiving Party shall not take any measures against the programme service concerned until the arbitration procedure has been completed.

6    Any measures proposed or taken under this article shall comply with Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms.

## CHAPTER IX – SETTLEMENT OF DISPUTES

### Article 25 – Conciliation

1    In case of difficulty arising from the application of this Convention, the parties concerned shall endeavour to achieve a friendly settlement.

2    Unless one of the parties concerned objects, the Standing Committee may examine the question, by placing itself at the disposal of the parties concerned in order to reach a satisfactory solution as rapidly as possible and, where appropriate, to formulate an advisory opinion on the subject.

3    Each party concerned undertakes to accord the Standing Committee without delay all information and facilities necessary for the discharge of its functions under the preceding paragraph.

### Article 26 – Arbitration

1    If the parties concerned cannot settle the dispute in accordance with the provisions of Article 25, they may, by common agreement, submit it to arbitration, the procedure of which is provided for in the appendix to this Convention. In the absence of such an agreement within six months following the first request to open the procedure of conciliation, the dispute may be submitted to arbitration at the request of one of the parties.

2    Any Party may, at any time, declare that it recognises as compulsory, *ipso facto* and without special agreement in respect of any other Party accepting the same obligation, the application of the arbitration procedure provided for in the appendix to this Convention.

## CHAPTER X – OTHER INTERNATIONAL AGREEMENTS AND THE INTERNAL LAW OF THE PARTIES

### Article 27 – Other international agreements or arrangements [1]

1   In their mutual relations, Parties which are members of the European Community shall apply Community rules and shall not therefore apply the rules arising from this Convention except in so far as there is no Community rule governing the particular subject concerned.

2   Nothing in this Convention shall prevent the Parties from concluding international agreements completing or developing its provisions or extending their field of application.

3   In the case of bilateral agreements, this Convention shall not alter the rights and obligations of Parties which arise from such agreements and which do not affect the enjoyment of other Parties of their rights or the performance of their obligations under this Convention.

### Article 28 – Relations between the Convention and the internal law of the Parties [1]

Nothing in this Convention shall prevent the Parties from applying stricter or more detailed rules than those provided for in this Convention to programme services transmitted by a broadcaster deemed to be within their jurisdiction, within the meaning of Article 5.

## CHAPTER XI – FINAL PROVISIONS

### Article 29 – Signature and entry into force [1]

1   This Convention shall be open for signature by the member States of the Council of Europe and the other States party to the European Cultural Convention, and by the European Community. It is subject to ratification, acceptance or approval. Instruments of ratification, acceptance or approval shall be deposited with the Secretary General of the Council of Europe.

2   This Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date on which seven States, of which at least five member States of the Council of Europe, have expressed their consent to be bound by the Convention in accordance with the provisions of the preceding paragraph.

3   A State may, at the time of signature or at any later date prior to the entry into force of this Convention in respect of that State, declare that it shall apply the Convention provisionally.

4   In respect of any State referred to in paragraph 1, or the European Community, which subsequently express their consent to be bound by it, this Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date of deposit of the instrument of ratification, acceptance or approval.

### Article 30 – Accession by non-member States

1   After the entry into force of this Convention, the Committee of Ministers of the Council of Europe, after consulting the Contracting States may invite any other State to accede to this Convention by a decision taken by the majority provided for in Article 20d. of the Statute of the Council of Europe and by the unanimous vote of the representatives of the Contracting States entitled to sit on the Committee.

---

[1]   *Text amended according to the provisions of the Protocol (ETS No. 171).*

2  In respect of any acceding State, this Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date of deposit of the instrument of accession with the Secretary General of the Council of Europe.

**Article 31 – Territorial application**

1  Any State may, at the time of signature or when depositing its instrument of ratification, acceptance, approval or accession, specify the territory or territories to which this Convention shall apply.

2  Any State may, at any later date, by a declaration addressed to the Secretary General of the Council of Europe, extend the application of this Convention to any other territory specified in the declaration. In respect of such territory, the Convention shall enter into force on the first day of the month following the expiration of a period of three months after the date of receipt of such declaration by the Secretary General.

3  Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn by a notification addressed to the Secretary General. The withdrawal shall become effective on the first day of the month following the expiration of a period of six months after the date of receipt of such notification by the Secretary General.

**Article 32 – Reservations** [1]

1  At the time of signature or when depositing its instrument of ratification, acceptance, approval or accession any State may declare that it reserves the right of restrict the retransmission on its territory, solely to the extent that it does not comply with its domestic legislation, of programme services containing advertising for alcoholic beverages according to the rules provided for in Article 15, paragraph 2, of this Convention.

No other reservation may be made.

2  A reservation made in accordance with the preceding paragraph may not be the subject of an objection

3  Any Contracting State which has made a reservation under paragraph 1 may wholly or partly withdraw it by means of a notification addressed to the Secretary General of the Council of Europe. The withdrawal shall take effect on the date of receipt of such notification by the Secretary General.

4  A Party which has made a reservation under paragraph 1 may not claim the application of that provision by any other Party; it may, however, if its reservation is partial or conditional, claim the application of that provision in so far as it has itself accepted it.

**Article 33 – Denunciation**

1  Any Party may, at any time, denounce this Convention by means of a notification addressed to the Secretary General of the Council of Europe.

2  Such denunciation shall become effective on the first day of the month following the expiration of a period of six months after the date of receipt of the notification by the Secretary General.

---

[1]  *Text amended according to the provisions of the Protocol (ETS No. 171).*

**Article 34 – Notifications** [1]

The Secretary General of the Council of Europe shall notify the member States of the Council of Europe, the other States party to the European Cultural Convention, the European Community and any State which has acceded to, or has been invited to accede to this Convention of:

a    any signature;

b    the deposit of any instrument of ratification, acceptance, approval or accession;

c    any date of entry into force of this Convention in accordance with the provisions of Articles 29, 30 and 31;

d    any report established in accordance with the provisions of Article 22;

e    any other act, declaration, notification or communication relating to this Convention.


In witness whereof the undersigned, being duly authorised thereto, have signed this Convention.

Done at Strasbourg, the 5th day of May 1989, in English and French, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Council of Europe. The Secretary General of the Council of Europe shall transmit certified copies to each member State of the Council of Europe, to the other States party to the European Cultural Convention, to the European Community and to any State invited to accede to this Convention. [1]

---

[1]  *Text amended according to the provisions of the Protocol (ETS No. 171).*

## APPENDIX

**Arbitration**

1   A request for arbitration shall be notified to the Secretary General of the Council of Europe. It shall include the name of the other party to the dispute and the subject matter of the dispute. The Secretary General shall communicate the information so received to all the Parties to the Convention.

2   In the event of a dispute between two Parties one of which is a member State of the European Community, the latter itself being a Party, the request for arbitration shall be addressed both to the member State and to the Community, which jointly shall notify the Secretary General, within one month of receipt of the request, whether the member State or the Community, or the member State and the Community jointly, shall be party to the dispute. In the absence of such notification within the said time-limit, the member State and the Community shall be considered as being one and the same party to the dispute for the purposes of the application of the provisions governing the constitution and procedure of the arbitration tribunal. The same shall apply when the member State and the Community jointly present themselves as party to the dispute. In cases envisaged by this paragraph, the time-limit of one month foreseen in the first sentence of paragraph 4 hereafter shall be extended to two months.

3   The arbitration tribunal shall consist of three members: each of the parties to the dispute shall appoint one arbitrator; the two arbitrators so appointed shall designate by common agreement the third arbitrator who shall be the chairman of the tribunal. The latter shall not be a national of either of the parties to the dispute, nor have his usual place of residence in the territory of either of those parties, nor be employed by either of them, nor have dealt with the case in another capacity.

4   If one of the parties has not appointed an arbitrator within one month following the communication of the request by the Secretary General of the Council of Europe, he shall be appointed at the request of the other party by the President of the European Court of Human Rights within a further one-month period. If the President of the Court is unable to act or is a national of one of the parties to the dispute, the appointment shall be made by the Vice-President of the Court or by the most senior judge to the Court who is available and is not a national of one of the parties to the dispute. The same procedure shall be observed if, within a period of one mont following the appointment of the second arbitrator, the Chairman of the arbitration tribunal is not designated.

5   The provisions of paragraphs 3 and 4 shall apply, as the case may be, in order to fill any vacancy.

6   Two or more parties which determine by agreement that they are in the same interest shall appoint an arbitrator jointly.

7   The parties to the dispute and the Standing Committee shall provide the arbitration tribunal with all facilities necessary for the effective conduct of the proceedings.

8   The arbitration tribunal shall draw up its own Rules of Procedure. Its decisions shall be taken by majority vote of its members. Its award shall be final and binding.

9    The award of the arbitration tribunal shall be notified to the Secretary General of the Council of Europe who shall communicate it to all the Parties to this Convention.

10   Each party to the dispute shall bear the expenses of the arbitrator appointed by it; these parties shall share equally the expenses of the other arbitrator, as well as other costs entailed by the arbitration.

_____

Case 1:19-cv-01618-TSC    Document 23-7    Filed 12/20/19    Page 20 of 55



# European Convention
## on Transfrontier Television (ETS no. 132)

## *Explanatory Report*
### as amended by the provisions of the Protocol (ETS No. 171) which entered into force, on 1 March 2002.

This document reproduces the final version of the draft Explanatory Report to the draft amended Convention, as approved at the 18th meeting of the Standing Committee (16-17 April 1998, cf. document T–TT (98) 7).

### I.    Introduction

1. Meeting in Vienna on 9 and 10 December 1986, the ministers taking part in the 1st European Ministerial Conference on Mass Media Policy adopted a declaration in which they decided "to assign the highest priority (...) to the rapid preparation, within the Council of Europe framework, of binding legal instruments on certain crucial aspects of transfrontier broadcasting".

2. In the same declaration, they also urged the Committee of Ministers of the Council of Europe to "provide the appropriate means for preventing or solving possible conflicts caused by the transfrontier development of the mass media".

3. Subsequent to the adoption of the aforementioned declaration, the Committee of Ministers, at the 403rd meeting of the Ministers' Deputies, in January 1987, instructed the Steering Committee on the Mass Media (CDMM):

"to assign the highest priority to the elaboration of a binding legal instrument embodying the major principles which should govern transfrontier broadcasting, bearing in mind the existing Council of Europe recommendations concerning the media, and to submit the text of such a draft instrument without delay to the Committee of Ministers".

4. The Committee of Ministers also instructed the CDMM to propose, in the context of its work on a binding legal instrument, "the appropriate means for preventing or solving possible conflicts caused by the transfrontier development of the media".

5. In accordance with these instructions, the CDMM undertook the elaboration of the binding legal instrument requested at its 14th to 17th meetings (March to December 1987). It was assisted in this work by a drafting group (CDMM-GR) which held six meetings (April to December 1987). In addition, the Committee of Legal Experts in the Media Field (MM-JU), a subordinate body of the CDMM, held a special meeting in May 1987 to advise the CDMM on the inclusion of certain legal questions within the scope of the draft instrument.

6. During its work, the CDMM took into account, *inter alia*, that:

– the ministers participating in the European Ministerial Conference on Mass Media Policy had stressed the highest priority they attached to the rapid preparation of binding legal instruments in the field;

– in the final communiqué of the 80th Session of the Committee of Ministers (6-7 May 1987), the ministers "took cognizance with great interest of the texts adopted by the European Ministerial Conference on Mass Media Policy (Vienna, 9-10 December 1986). They noted with satisfaction that preparation of a draft for a binding legal instrument was in hand (...). They expressed the hope that preparation of the draft can be completed before the next ministerial conference which will be taking place in Stockholm in late 1988" (paragraph 13 of the final communiqué);

– it had, itself, been mandated to submit the text of a draft binding legal instrument without delay to the Committee of Ministers;

– the Parliamentary Assembly, in Recommendation 1067 (1987) adopted on 8 October 1987, recommended that the Committee of Ministers "finalise and open for signature early in 1988 a binding legal instrument on basic standards for transfrontier broadcasting by both public and private bodies, with a view to the possibility of its entering into force before the 2nd European Ministerial Conference on Mass Media Policy, in Stockholm, in November 1988, and set up an effective mechanism (including the representation of broadcasting bodies) to monitor the implementation of this instrument".

7. The CDMM also organised a hearing with representatives of the following bodies: World Federation of Advertisers (WFA), European Advertising Tripartite (EAT), European Association of Advertising Agencies (EAAA), European Office of Consumers Unions (BEUC), European Trade Union Confederation (ETUC), Union of Industries of the European Communities (UNICE), Joint Committee of the International Federation of Actors, International Federation of Musicians and International Federation of Audiovisual Workers' Unions (FFF), International Federation of Journalists (FIJ), International Federation of Film Producers' Associations (FIAPF), International Federation of Associations of Film Distributors (FIAD), Committee of the Cinematographic Industries of the European Community (CICCE), International Federation of Newspaper Publishers (FIEJ), International Federation of Periodical Press (FIPP), European Institute for the Media (EIM), International Institute of Communications (IIC), Fininvest, Bundesverband Kabel und Satellite BV, European Group of Television Advertising (EGTA), Super Channel.

8. At its 17th meeting (December 1987), the CDMM transmitted the text of a draft convention to the Committee of Ministers with a view to obtaining guidance on a number of outstanding issues before the text of the draft convention could be finalised. It was in this context that an informal meeting of European Ministers responsible for Mass Media Policy took place in Vienna on 12 and 13 April 1988, at the invitation of the Austrian Government. The purpose of the meeting was to seek solutions to the outstanding issues in the draft convention.

9. On the basis of the guidelines emerging from this informal meeting, the CDMM finalised the text of the draft European Convention on Transfrontier Television and draft Explanatory Report at a meeting held from 24 to 27 May and 6 to 10 June 1988 and transmitted these texts to the Committee of Ministers.

10. Following discussions on the draft Convention at the 419th, 420th and 421st meetings of the Ministers' Deputies (September, October and November 1988), the 2nd European Ministerial Conference on Mass Media Policy, held in Stockholm on 23 and 24 November 1988, examined a communication on the draft Convention and agreed to transmit to the Committee of Ministers a package of proposals on the final outstanding issues with a view to the rapid finalisation, adoption and opening for signature of the text.

11. The Committee of Ministers adopted the text of the Convention on 15 March 1989. It was opened for signature by member States of the Council of Europe and the other States Party to the European Cultural Convention, as well as the European Community, on 5 May 1989.

## II.   Background

12. Announcements made by several European countries and groups of countries in the early 1980s about their intention to introduce direct broadcasting by satellite (DBS) led to intergovernmental consultations in the Council of Europe and to the establishment of an action plan.

13. The Parliamentary Assembly expressed its interest in this question in Recommendation 926 (1981) on questions raised by cable television and direct satellite broadcasts. Following a proposal by the Government of the Federal Republic of Germany, the Committee of Ministers, at its 70th Session (April 1982), instructed its Deputies to prepare an opinion on the possibility of concluding a legal instrument in this field. In November 1982, following extensive legal discussions, a report of the CDMM was presented to the 71st Session of the Committee of Ministers. It concluded that a legal instrument was not only possible but also urgent, stressing that closer co-operation between the Council of Europe's member States would help to enhance the positive aspects of DBS and to prevent or attenuate possible negative effects.

14. Following this report, the Committee of Ministers instructed its Deputies to continue work in this field as a matter of urgency, with a view to drawing up recommendations to governments.

15. In February 1983, the CDMM adopted an action plan on satellite broadcasting, giving effect to the decision of the ministers. It noted that, in addition to direct broadcasting by satellite, use was already being made of communications satellites for the transmission of programmes from one country for distribution in another. This new application underlined the necessity for early action. For the implementation of this plan, the CDMM and its subordinate committees held regular exchanges of views on developments in member States in the media field, and, in particular, on the political, economic, cultural, technical and legal aspects of them. Likewise, exchanges of information on the technological aspects of the media, particularly as regards technical standards (transmission, distribution and reception) were held. Finally, the CDMM and its subordinate committees gathered, in the course of their work, the views of other interested organisations by holding hearings with their representatives (organisations representing consumers, advertisers, the press, rights holders, social partners, etc.).

16. The work conducted under the action plan led, *inter alia*, to the adoption by the Committee of Ministers of the

following recommendations to member States:

– Recommendation No. R (84) 3 of 23 February 1984 on principles on television advertising;

– Recommendation No. R (84) 22 of 7 December 1984 on the use of satellite capacity for television and sound radio;

– Recommendation No. R (86) 2 of 14 February 1986 on principles relating to copyright law questions in the field of television by satellite and cable;

– Recommendation No. R (86) 3 of 14 February 1986 on the promotion of audiovisual production in Europe.

17. Concurrently with this work, in January 1984, at the 366th meeting of the Ministers' Deputies, the Committee of Ministers decided to broaden the CDMM's remit, in particular to ensure that it could "act as a platform for exchanges of information and views for discussions between the member States on developments in the field of satellite broadcasting which could have an impact on the media situation in several European countries". This decision was motivated by the fact that, whilst the action plan was to be completed within a limited period of time, developments in the field were likely to have a profound effect on member States' broadcasting policies and arrangements for some time to come.

18. Furthermore, the European Ministers responsible for Cultural Affairs, taking part in their 4th Conference in Berlin in May 1984, in their Resolution No. 1 on culture and communications technology, appealed to the Committee of Ministers to consider convening a European conference "in order to define a comprehensive policy on the media".

19. Following consideration of the opinions of the CDMM and the Council for Cultural Co-operation (CDCC) on the advisability and scope of such a conference, the Committee of Ministers decided, at the 389th meeting of the Ministers' Deputies (October 1985), to entrust the preparation of the 1st European Ministerial Conference on Mass Media Policy to the CDMM, on the topic of "the future of television in Europe" and dealing respectively with the promotion of European audiovisual works and public and private broadcasting in Europe.

20. The conference took place in Vienna on 9 and 10 December 1986 at the invitation of the Austrian Government.

### III.    Reasons for the elaboration of the original Convention

21. Fundamental changes in the European broadcasting landscape were being brought about by large-scale technical developments in the field of information and communication.

22. The use of a variety of new transmission techniques, in particular for television programme services, was radically transforming the traditional concept of television in Europe. For many years characterised by relatively restricted technical capacity, television programme services available in individual European countries had been limited in number and could, except in certain small countries and frontier regions, rarely be received by viewers in other countries. This was no longer the case with the widespread use of communications satellites (fixed satellite service – FSS) and wide-band cable systems, as well as similar devices, for the transmission of television programme services; the introduction by European countries of services via direct broadcasting satellites (DBS) and new intermediate satellites, together with trends in generalising individual and community reception from FSS and the commercialisation of the relevant reception equipment, were likewise contributing to the change in the traditional concept of television programme services.

23. Two major consequences of these developments were, firstly, the increasingly transfrontier character of the services transmitted: it had become possible to receive the same service, with the appropriate transmission and reception equipment, in many European countries and the introduction of services via DBS and certain intermediate satellites resulted in the fact that the same service could be received throughout and beyond the circle of member States of the Council of Europe; secondly, due to the abundance of technical capacity, the number of transmission channels available was expected to become almost unlimited, thereby leading to the multiplication of programme services and competition between them.

24. Whilst it was realised that these developments might open up previously unexplored horizons to the public and offer it a considerable increase in choice, as well as provide new opportunities for cultural expression, international communication and contacts between nations, it was thought that they also carried with them a number of inherent challenges, *inter alia*, as regards national media structures and the fundamental functions of broadcasting, the maintenance and development of European cultural identities and the interest of the public to receive a full-range, high-quality service which contributes as a whole to the free formation of opinions and the development of culture.

25. Given the risk that increased international competition between the new services which were developing in Europe could induce a purely market approach to broadcasting and a general lowering of standards to the detriment of the effective choice of the public, the public service concept of broadcasting (whether publicly or privately organised) and Europe's cultural heritage were at the heart of concerns in those days about the development of transfrontier broadcasting in Europe.

26. The member States of the Council of Europe, attached as they are to the fundamental principles of freedom of expression and information contained in Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms (1950 - hereinafter referred to as the "European Convention on Human Rights"), and the free flow of information and ideas, as an indispensable basis for their media policies, welcomed the positive opportunities brought about by the developments which had already taken place in those days and future developments in television broadcasting in Europe and were determined that these opportunities should be seized in the best possible conditions and that the potential risks should be obviated to the greatest possible extent. However, the magnitude and complexity of those developments were considered to be such that they required a common response from the member States of the Council of Europe.

27. All these points were, moreover, analysed in some depth in Resolution No. 2 and the Declaration adopted by the 1st European Ministerial Conference on Mass Media Policy and those texts constituted the framework within which the drafting of the Convention was undertaken.

### IV.    Main features of the original Convention

28. The objective pursued by the member States in elaborating the Convention was to strengthen the free exchange of information and ideas by encouraging the transfrontier circulation of television programme services on the basis of a number of commonly agreed basic standards.

29. Those standards were designed to ensure that the unhindered transfrontier circulation of television programme services promotes certain fundamental values common to the member States, in particular the pluralism of ideas and opinions, and does not prejudice free circulation at national level, within individual member States.

30. Since the Convention seeks to elaborate a framework within which the transfrontier transmission of television programme services is to be encouraged, its purpose is not to regulate broadcasting activities *per se*, nor to impinge upon the domestic broadcasting policies and arrangements of the Parties. These remain for the Parties to determine, in the light of their individual political, legal, cultural, social and other traditions. Nor does the Convention seek to impinge upon the responsibility and independence of the broadcaster in programming matters. It follows, therefore, that certain aspects of broadcasting fall outside the purview of the Convention.

31. The Convention, in effect, represents a common basic standard for the harmonious development of transfrontier television programme services and confirms the guarantee of freedom of reception and establishes the principle of non–restriction of the retransmission of programme services conforming to that standard.

32. It follows from the above that Parties remain free to apply stricter or more detailed rules than those laid down in the Convention to programme services transmitted by entities or by technical means within their jurisdiction (see below, paragraphs 127, 365 and 366).

33. The areas in which the Convention establishes common basic standards are what the 1st European Ministerial Conference on Mass Media Policy qualified as "crucial aspects" of transfrontier television broadcasting:

> – the protection of certain individual rights;
> – the responsibility of the broadcaster in maintaining programme standards;
> – advertising;
> – sponsorship.

34. Recognising that transfrontier television broadcasting in Europe may be subject to rapid changes brought about by future technical developments, the authors of the Convention attempted to elaborate provisions which would stand up to such changes and yet which would carry the necessary degree of precision and rigour to be enforceable.

35. The Convention nevertheless embodies provisions enabling its amendment in the light of the experience gained from its implementation and of technical developments in the field.

36. Given the variety of situations that may arise, particularly as a result of the transmission of television programme services via satellite, the authors of the Convention sought to clarify the responsibilities of the Parties in respect of the conformity with the Convention of programme services transmitted or retransmitted by entities or by technical means within their jurisdiction.

37. The Convention lays emphasis on the notion of co-operation for the implementation of its provisions: mutual assistance between the Parties on specific issues; friendly settlement of any difficulty in the application of the instrument at bi- or multilateral level between the Parties directly concerned and in a Standing Committee, composed of the Parties, and responsible for following the application of the Convention.

38. Provision was nonetheless made for arbitration, should it prove impossible to reach a friendly settlement through the channels referred to above.

### IV*a*.    Reasons for the elaboration of an amending Protocol

39. Since the entry into force of the Convention on 1 May 1993, the Standing Committee on Transfrontier Television which was established in June 1993 under Article 20 of the Convention has been monitoring the implementation of the Convention by the Parties, discussing the difficulties related to the implementation of the Convention and has formulated Opinions on the interpretation of the provisions of the Convention. It has also monitored the economic, technological and political developments which have taken place since 1989. One of the major relevant political developments was the revision of the "Television without Frontiers" Directive in the framework of the European Community, since the Convention, at the time of its preparation, had been negotiated in parallel with the drafting of this Directive. Therefore, the Standing Committee felt that it was necessary to examine whether the Convention should be amended so as to maintain a coherence with the revised Directive, in the interest of legal certainty of both States and transfrontier broadcasters.

40. As a result of this examination, the Standing Committee in general stressed the importance of preserving the coherence of legal rules for transfrontier television in order to facilitate the transfrontier circulation of television programmes. Therefore, it has been one of the main objectives of the amendment of the Convention to ensure its realignment with the revised Directive. Accepting several fundamental differences resulting from the different characters of both legal instruments (the Convention, for example, applies exclusively to transfrontier television while the Directive does not) the Standing Committee intended to safeguard coherence of at least those rules of both instruments which may apply to broadcasters under the jurisdiction of a Party to the Convention and of a Member State of the European Community at the same time. This intention will be taken into account by the Standing Committee in future cases of interpretation of the amended Convention.

### IVb.    Main features of the amending Protocol

41. In the course of the revision process, the Standing Committee considered the following areas and came to the following conclusions:

> #### a. The possible inclusion of communication services operating on individual demand in the scope of the Convention

42. It was concluded that a large majority of the Parties was against the inclusion of such services in a revised Convention, mainly for the following reasons: the Convention's underlying philosophy and assumptions were inappropriate for dealing with these services; the rapidity of technological change, including the evolution of Internet services; communication services operating on individual demand were still at the embryonic stage of development; the global dimensions of the issues raised.

43. Furthermore, it was noted that the exclusion of communication services operating on individual demand from the scope of an amended Convention was consistent with the approach followed in the revised Directive.

44. Therefore, the Standing Committee decided not to deal with these services within the framework of the amending Protocol.

45. At the same time, the Standing Committee concluded that the exclusion of communication services operating on individual demand from the scope of a revised Convention did not mean that they should operate in a legal vacuum. It was noted that these services raised, *inter alia*, content problems similar to those which needed to be addressed in the context of traditional programme services, and in particular violence, racism, pornography and other matters of public interest.

46. In this connection, the Standing Committee noted that new communications services were addressed at the 5th European Ministerial Conference on Mass Media Policy (Thessaloniki, 1997) and that the participating Ministers responsible for national media policies decided to include these services in their Political Declaration containing an "Action Plan for the promotion of freedom of expression and information at the pan-European level within the framework of the Information Society" as well as in their Resolution No. 1 on "The impact of new communications technologies on human rights and democratic values".

47. According to the Political Declaration, the introduction of new technologies and new communications and information services, in particular on–line services, as a result of digitisation and the prospects for progressive disappearance of technological boundaries between broadcasting, telecommunications and informatics, will lead to the development of the Information Society, which may require a new approach concerning the regulation of the media sector.

> #### b. The timeframe for the broadcasting of cinematographic works

48. The Standing Committee decided that the point of departure should be contractual freedom and thus to align the Convention on this issue with the revised Directive.

> #### c. The definition of advertising and the issue of self-promotion

49. The Committee noted that self-promotion had already been dealt with in part in the Explanatory Report to the

original Convention. Nevertheless, a grey zone existed since it was not always easy to determine whether a given message from a broadcaster concerning, for example, the announcement of forthcoming programmes was primarily aimed at informing the public or at self-promotion of the broadcaster.

50. As regards the definition of self–promotion, the Committee decided to amend Article 2 (f) to include self-promotion in the concept of advertising.

51. The Committee considered at the same time that the provisions of Article 12 (duration of advertising) should not apply to non-profit announcements in the public interest and to charity appeals broadcast free of charge (see paragraphs 104 and 227 below). Similarly, it was felt that Article 12, as specified in paragraph 4, first indent (see paragraph 103 below) should not apply to broadcasters' messages concerning their own programmes and associated products directly derived from these programmes.

52. Furthermore, the Committee decided to add in the Convention a new Article 18*bis* concerning programme services devoted exclusively to self-promotion (see paragraphs 293 and 294 below).

### d. Tele–shopping

53. The Standing Committee agreed to align the Convention on this issue with the approach taken in the revised Directive, namely that tele-shopping and advertising, although they have certain similarities should be treated separately.

54. It should be noted that the notion of tele-shopping includes:

– tele–shopping spots which are similar to advertising spots;
– tele–shopping programmes (broadcast within programme services not exclusively devoted to tele–shopping, especially in the form of isolated programmes or tele-shopping windows); and,
– programme services exclusively devoted to tele-shopping, which are dealt with especially in Article 18b of the Convention.

### e. The limitation of advertising and tele-shopping spots

55. In the original Convention, the criterion of a given one-hour period was used to avoid an excessive concentration of advertising spots by limiting their amount to 20% within a given one hour period.

56. In the revision process, two possible interpretations were identified for the calculation of a given one-hour period: the sliding hour and the clock–hour. Although the sliding hour criterion is the option which most limits the possibilities for concentrating advertising at prime time, its calculation is complex (under the sliding hour criterion, the "given one hour period" could begin, for example, at 7.07 pm and end at 8.07 pm). On the other hand, the clock–hour criterion is much simpler to calculate: for example, it is only necessary to examine whether or not the 20% limit had or had not been exceeded between 7.00 pm and 8.00 pm. Therefore, the criterion of the clock–hour was retained. This is the approach which is also taken in the framework of the revised Directive.

### f. Programme sponsorship

57. The Standing Committee also decided to align the Convention's definition of "Sponsorship" with that of the revised Directive.

58. The Committee agreed to supplement the definition of sponsorship by indicating that it also includes the promotion of the sponsor's activities. It was agreed that the sponsor should have the possibility of choosing the most appropriate form of promotion so as to be identified easily by the public (reference to the company name or the name of one of its most well-known products, etc). In no circumstances, however, should the identification of the sponsor contain specific promotional elements (encouragement to purchase, references to the quality or the effectiveness of the product, etc).

59. Furthermore, the Committee decided that the sponsoring of broadcasts by pharmaceutical companies whose main activity consisted in the manufacture or sale of medicines available only on medical prescription, could be authorised and therefore decided to amend the text of the original Convention accordingly (see paragraph 290 below).

### g. Jurisdiction

60. In order to ensure a coherent approach to the regulation of transfrontier television programme services at the European level and, in particular, to avoid possible problems in determining the competence of States with regard to such services, the criteria concerning jurisdiction which appeared in the original text of the Convention were revised so as to be consistent with those of the revised Directive.

61. The establishment criterion was chosen as the primary criterion for determining the jurisdiction of a particular contracting Party.

### h. Abuse of rights granted by the Convention and advertising directed specifically at a single Party

62. This issue concerns the situation in which broadcasting organisations as part of a deliberate strategy place themselves outside the jurisdiction of one contracting Party and set up operations in another contracting Party in order to direct all or a substantial amount of their programme services towards the territory of the latter thus avoiding the rules which would have applied to them under the Convention in that Party (see paragraph 334 below). It was decided to include a special provision in the Convention to deal with this issue (Article 24 *bis*, see paragraphs 332 and further below).

63. The issue of advertising directed specifically to a single Party which is related to that of abuse of rights, was analysed by the Standing Committee in its Opinion No. 2 (1994) on the notion of "retransmission". Although the possible deletion of Article 16 concerning advertising directed specifically at a single Party was considered, it followed from the analysis that the issue remained important for the contracting Parties and that the way in which the issue was dealt with by the Convention prevented the emergence of distortion in competition between national broadcasters and foreign broadcasters and enabled the countries with a limited linguistic coverage to face competition from broadcasters in the larger countries sharing the same language. In addition, experience had shown that the provision included in the Convention on this issue had been successfully invoked in concrete cases which might not have been resolved on the basis of the abuse of rights' criteria.

### i. Access by the public to information

64. The question of the right to information and the issue of exclusive rights to major events was already discussed at the end of the 80s. Those discussions resulted in the adoption of Article 9 of the original Convention and Recommendation No. R (91) 5 on the right to short reporting on major events where exclusive rights for their television broadcast have been acquired in a transfrontier context.

65. Since then, the issue of exclusive rights has assumed an ever increasing importance in Europe. The Standing Committee noted that there were in Europe concrete cases where the public in a country had been deprived of images (or commentaries adapted to its national sensitivity and in its own language(s)) of a major event by virtue of the fact that a foreign broadcaster had acquired exclusive rights to the event for a particular geographical zone which included the country in question.

66. In addition, there are examples of broadcasters of pay TV services having acquired exclusive rights to major events in order to broadcast these events in an encrypted format to those members of the public who are willing and able to subscribe to their services or to pay a certain fee on a case by case basis in order to be able to watch the event.

67. The Standing Committee considered that this problem was a complex one, especially since property rights and the principle of contractual freedom needed to be taken into account when identifying possible solutions at the European level. Discussing the possible amendment of Article 9 of the Convention, the Standing Committee had to take into account all the developments which took place since Article 9 had been drafted (for example, the adoption of the above-mentioned 1991 Recommendation and the discussions in the framework of the European Community which resulted in the adoption of Article 3*a* of the revised Directive).

68. The Committee decided to bring the Convention in line with Article 3a of the revised Directive while taking into account the specificity of the Council of Europe, so as to ensure wide access by the public to television coverage of national or non-national events regarded by Parties to the Convention as being of major importance for society. The criteria for selecting such events of major importance are set out below in paragraph 182.

69. Furthermore, in order to preserve the "acquis" of the original Convention, the Committee decided to maintain a more general provision concerning the right to information and aimed at events of high public interest (Article 9, see paragraphs 174 and further below).

### j Protection of minors

70. The Committee carefully considered the possible arguments for and against the use of techniques designed to prevent minors from watching programmes considered as violent. The Committee came to the conclusion that, although these technical procedures could be a useful instrument, they did not provide a complete answer to the problems. In this respect, it took note of Recommendation No. R (97) 19 of the Committee of Ministers to the member States on the portrayal of violence in the electronic media and concluded that broadcasters should remain responsible for the violent content of their programmes regardless of whether or not technical procedures enabled the public to control access to programmes.

71. In the end, it was decided that any measures would be premature and that it would be preferable to await the results of the investigation on the possible advantages and drawbacks of further measures with a view to facilitating the control exercised by parents or guardians over the programmes that minors may watch, which the European Commission is to undertake on the basis of Article 22*b* of the revised Directive.

72. The Standing Committee also examined the desirability of aligning the Convention with the revised Directive so as to have same degree of detail as the latter instrument's provisions on the protection of minors, programme content and

advertising. However, it was noted that in drafting the Convention, a general approach had been preferred to an exhaustive list of provisions covering all possibilities. The Standing Committee agreed that such a general approach should be maintained in the amending Protocol.

### k. Programme services exclusively devoted to self–promotion or tele–shopping

73. The Standing Committee has noted the appearance over the last few years, of a new type of programme services devoted exclusively to tele-shopping, as well as prospects for the development of channels exclusively devoted to self-promotion. In the light of the provisions included in this respect in the revised Directive, the Committee has examined the extent to which such programme services should be covered by the Convention.

74. Given the uncertainty which remains as to the content and the form which programme services exclusively devoted to self-promotion might take in the future, the Standing Committee came to the conclusion that all the provisions of the Convention should apply to these services, as far as they are relevant (see below, paragraphs 293 and 294 below). The Committee agreed that it would be necessary to revert to this matter after a few years, once the development of programme services exclusively devoted to self-promotion is better known.

## V.  Comments on the provisions of the Convention

### Preamble

75. The preamble sets out the reasons which led the member States of the Council of Europe to elaborate the Convention (see above, Sections II and III).

76. It reaffirms the commitment of the signatory States to human rights and fundamental freedoms and, in particular, to freedom of expression and information as embodied in Article 10 of the European Convention on Human Rights. In line with the Declaration of 29 April 1982 of the Committee of Ministers of the Council of Europe on the freedom of expression and information, it stresses that the free flow of information and ideas constitutes the basis for their broadcasting policy and recognises their responsibility to take steps in common to encourage the free circulation of television programme services.

77. The preamble highlights that the Convention is inspired by the existing recommendations of the Council of Europe, as well as by Resolution No. 2 and the Declaration of the 1st European Ministerial Conference on Mass Media Policy.

## CHAPTER I – GENERAL PROVISIONS

### Article 1 – Object and purpose

78. This article defines the object and purpose of the Convention: facilitating the transfrontier transmission and retransmission of television programme services.

79. The reference to "retransmission" in this article covers the retransmission of programme services originating from a Party in cases where such retransmission only affects the territory of the Party in which the retransmission is effected. But it also covers the retransmission on the territory of a Party of programme services originating from another Party or a State which is not a Party to the Convention, where such retransmission is, in turn, transfrontier in character due to unavoidable overspill or the technical means of retransmission employed.

### Article 2 – Terms employed

80. This article establishes, for the purposes of the Convention, the scope and meaning of the principal terms employed therein. The terms may not necessarily be identical to similar terms employed in other international instruments or in the domestic legislation or regulations of the Parties, and they are without prejudice to those terms.

### Sub-paragraph a: "Transmission"

81. The authors of the Convention decided to opt for the concept of "transmission" in order to avoid any possible contradiction and confusion with the concept of "broadcasting" to be found in other international instruments and, in particular, the notion of "broadcasting service" which is defined in Appendix II (reference 2012) to the International Telecommunication Convention (Nairobi, 1982) as a "radio communication service in which the transmissions are intended for direct reception by the public".

82. Indeed, the chief criterion retained for the purposes of this Convention is whether, independently of the technical means employed (terrestrial transmitter, cable system, satellite, etc.), the television programme service in question is designed for direct or indirect reception by the general public. By opting for the term "transmission", the authors thus wished to embrace the whole range of technical means employed to bring television programme services to the public. It followed that, as far as transmission via satellite is concerned, the distinction prevailing in the Radio Regulations of the International Telecommunications Union (ITU) between a broadcasting satellite service (DBS) and a fixed satellite service (FSS) should not be retained. The reason was that, already, the technical difference between the two types of service was becoming increasingly blurred, making individual reception from FSS a fairly common phenomenon, and

the fact that further technical developments, particularly the emergence of new intermediate satellites, were likely to blur this distinction even further.

83. By "communication services operating on individual demand", the authors of the Convention wished to exclude services which cannot be regarded as being designed for reception by the general public, such as video-on-demand, and interactive services like video conferencing, videotext, telefacsimile services, electronic data banks and similar communication services.

84. However, this exclusion was not intended to apply to services such as subscription television services (that is, a service intended for reception by the general public where the users pay a specific fee in return for the service offered), pay-per—view or near video-on-demand services, or teletext services. On the other hand, closed user-group systems, such as encrypted programme services designed specifically and exclusively for members of a given profession (for example the medical profession) are not within the scope of the notion of "transmission" in so far as they are not intended for reception by the general public.

85. Communications between broadcasters, such as programme exchanges, are not considered to be transmissions within the meaning of this Convention.

86 The terms "initial emission" used in the notion of "transmission" refer to the programme service as a whole, at the initial stage of transmission, and not to a given programme within the service which is transmitted for the first time.

*Sub-paragraph b: "Retransmission"*

87. The three essential criteria for a retransmission are that it should be simultaneous with the transmission, complete and unchanged, that is that it should not cut out individual programme items, or that sounds or images or both should not be superimposed on the original transmission. All three criteria must be fulfilled, failing that, a new transmission is involved. This point has, as will be seen in paragraphs 124 to 142 below, implication as regards the duties of the transmitting Parties.

88. The retransmission is nevertheless considered to be simultaneous where, due to reasons linked to the technical means employed to ensure the retransmission, a delay of a few seconds intervenes between the transmission and the retransmission.

89. The notion of "complete" within the meaning of this sub–paragraph covers the complete retransmission of an entire television programme service as well as the retransmission of important parts of such a service, provided the coherence and integrity of the programme is not prejudiced and the broadcaster concerned has authorised such a practice. It does not, however, cover the retransmission of isolated items of a television programme service nor situations in which a new programme is composed from isolated items of several television programme services, nor the simultaneous retransmission of several programmes of parts of television programme services on the same screen.

90. The act of decoding an encoded television programme service, where authorised, is not considered to be a change within the meaning of this notion.

*Sub-paragraph c: "Broadcaster"*

91. The principal criterion to be applied here is the editorial responsibility for the television programme service, irrespective of whether the broadcaster transmits the service for reception by the general public or calls on a third party to do so.

*Sub-paragraph d: "Programme service"*

92. This notion of programme service relates to all the items within a given service (that is individual programme items, advertising, tele-shopping , programme trailers, logo of the service, etc.). However, it is understood that a single programme service furnished by a broadcaster within the meaning of this Convention may be composed by different entities that, according to national law, are called "broadcasters", among which would be an organisation having the exclusive task of composing and transmitting advertising or tele-shopping preceding and following programmes of other "broadcasters" on that same channel. The provisions of this Convention will apply to a programme service as a whole, regardless of whether this service is provided by one or more "broadcasters", provided it is clear to the viewers (for instance by the name of the service) that the elements are an integral part of one service.

93. This notion of programme service does not include other services offered by the broadcaster as a subsidiary of its broadcasting activities (for example production and sale of video cassettes, publications, etc.).

94. Furthermore, as indicated in paragraphs 73 and 74 above, account should be taken of the specific case of programme services which are exclusively devoted to self-promotion or tele-shopping. Such programme services are covered by Chapter IV*bis* of the Convention (see paragraphs 293 to 296 below).

95. Where a given broadcaster offers two or more television programme services, including in the form of packages of

services, each individual programme service must be considered for the purposes of the Convention.

*Sub-paragraph e: "European audiovisual works"*

96. A creative work is considered to be European within the framework of this Convention if its production or co-production is controlled by European natural or legal persons. In general terms, this is in line with the general philosophy of Resolution (85) 6 of the Committee of Ministers on European cultural identity.

97. Reference must also be made to the fact that the revised Directive provides in its Article 6, more detailed criteria for the identification of the European character of an audiovisual work. The Standing Committee came to the conclusion that these criteria are in conformity with the wording which it chose to use in Article 2e of the Convention. Furthermore, the European Convention on Cinematographic Co-Production contains a detailed definition of the term "European cinematographic work" in its Appendix II, which may also be helpful for the identification of the European character of an audiovisual work.

*Sub-paragraph f: "Advertising"*

98. Two elements make up this concept: firstly, that the announcement in question pursues a specific objective, that is to promote the sale, purchase or rental of a product or service, to advance a cause or idea or to bring about some other desired effect; secondly, that the transmission time has either been allotted in return for remuneration or similar consideration by an advertiser or used by broadcasters themselves for self-promotional purposes.

99. The words "to bring about some other effect desired by the advertiser" refer, for example, to cases where advertising aims to enhance the name, the responsibilities or the general activities of a company without necessarily encouraging the purchase or rental of a particular product or service of that company.

100. It follows from this concept that advertising at sports and similar events (for example, advertising panels in stadiums, logos on equipment, etc.) which are transmitted or retransmitted falls outside the scope of the Convention and remains a matter governed by the domestic rules and practices within the Parties and/or between the broadcaster and the organiser of the event in question. However, a distinction must be made to such events between situations where advertising is displayed in the background, which the broadcaster cannot avoid, and situations where, due to the particular use of the camera or other transmission techniques (including data processing and the use of virtual techniques), the broadcaster presents permanently, repeatedly or prominently one or more specific advertising on the television screen. In the latter case, the rules of the Convention will be applicable (see in particular paragraphs 231 and 232 below). In general, an economic assessment may support the distinction: direct payment to the broadcaster by the advertiser may be an argument in favour of the application of the rules of the Convention, payment to the organiser of the event only without any economic advantage for the broadcaster could be an argument against the application.

101. In its Opinion No 6 (1995) on the legal framework for "infomercials", the Standing Committee concluded that "infomercials" should be subject to the advertising rules of the Convention. An infomercial is a programme-long advertisement which aims to "promote the sale, purchase or rental of a product or service", even if its form gives it a strong informational character. Therefore, infomercials are covered by the definition of advertising contained in Article 2 (f) of the Convention.

102. Thus, infomercials must, in particular, respect the provisions on the duration of advertising (Article 12) and those on the form and presentation of advertising (Article 13).

103. The question arose as to whether publicity for a given television programme service, inserted in that service, should be considered as advertising within the meaning of the Convention. Through the explicit reference to self-promotion in Article 2 (f) of the Convention, such publicity can generally be considered as advertising for the purposes of the Convention. An exception should, however, be made for announcements of programme services merely for information purposes and without any promotional character.

104. Non-profit announcements in the public interest, for example those for road safety, civic duties or health campaigns and charity appeals broadcast free of charge, are considered as "advertising" in the sense that the general standards of Article 11 should constitute a yardstick for these various forms of publicity and announcement. Moreover, it is recalled that the provisions of Article 7, paragraphs 1 and 2, are applicable to all the above–mentioned forms of publicity and announcement.

105. It was also recognised that the presentation of cultural products or events within an information programme or a critique (for example, a literary programme or a programme on the cinema) is not to be assimilated to advertising.

*Sub-paragraph g: "Tele-shopping"*

106. "Tele-shopping" means direct offers broadcast to the public with a view to the supply of goods or services, including immovable property, rights and obligations in return for payment. The notion of tele-shopping includes:

    – tele-shopping spots;

– tele–shopping programmes (broadcast within programme services not exclusively devoted to tele–shopping, especially in the form of isolated programmes or tele–shopping windows); and,

– programme services exclusively devoted to tele-shopping.

*Sub-paragraph h: "Sponsorship"*

107. Again, two elements make up this notion: the participation of a natural or legal person in the direct or indirect financing of a television programme; the fact that such participation pursues a specific objective, namely to promote the sponsor by a reference to his/her name, trademark, image or activities. The sponsor has the possibility of choosing the most appropriate form of promotion so as to be identified easily by the public (reference to the company name or the name of one of its most well-known products, etc.; see below, paragraph 281). In no circumstances, however, should the identification of the sponsor contain specific promotional elements (encouragement to purchase, reference to the quality or the effectiveness of the product, etc.; see below, paragraph 284).

108. As to the first element, participation in the direct or indirect financing of a programme is intended to refer to both direct participation in the financing of the programme as such and the various forms of indirect participation, such as the provision of material and goods for the production, or prizes for game shows or quizzes. Such participation will be established by an agreement or contract between the sponsor and the broadcaster concerned.

109. Among the criteria for distinguishing between sponsorship and advertising, which it was considered unnecessary to introduce into the text of the Convention, mention might be made of the different assignments of the revenue gained from these two activities: generally speaking, advertising revenue is allocated to the general budget of the service, whereas revenue from sponsorship is integrated into the specific budget of the sponsored programme.

110. As in the case of advertising, the sponsorship of events which are transmitted or retransmitted in programme services falls outside the scope of this Convention and remains subject to the domestic rules and practices in the Parties. However, a clear distinction is to be made between sponsored programmes and sponsored events. It was considered that, unlike a sponsored programme, in the case of a sponsored event, the broadcaster gains no material benefit from the sponsor for the transmission or retransmission. It was, however, recognised that situations may occur in which the same person sponsors both the event and the transmission or retransmission, either by directly financing the latter or by indirectly financing it (for example by payment of royalties). In such cases, the rules of the Convention on sponsorship are applicable.

111. The reference to "who is not engaged in broadcasting activities or in the production of audiovisual works" is intended to exclude co-productions or the co-financing of audiovisual works between broadcasters or between broadcasters and independent producers, from being treated as a form of sponsorship. On the other hand, it is clear that the sponsorship of a programme does not confer on the sponsor the status of co-producer, nor the corresponding rights and obligations.

*Article 3 – Field of application*

112. This article is essential to the Convention as a whole in that it determines its field of application, that is to say the television programme services which are subject to the basic standards contained therein.

113. As indicated in Section IV, paragraph 30 above, the object of the Convention is not to regulate broadcasting activities as a whole, nor is it designed to harmonise the different television broadcasting rules of the Parties; it aims to lay down basic standards by which television programme services may enjoy unhindered transfrontier circulation. It follows, therefore, that the programme services in respect of which the Convention's rules are enforceable are those which are transfrontier in character.

114. The criterion retained for determining the transfrontier character of a programme service is a purely factual one: any programme service which is transmitted or retransmitted by entities or by technical means within the jurisdiction of a Party and which can be received directly (using standard equipment) or indirectly (via a cable network, for example) by the general public in one or more other Parties is considered to be transfrontier in character.

115. This implies that all forms of overspill, whether unavoidable or intentional and whatever the technical means of transmission involved (terrestrial transmitter, satellite, cable, etc.), are taken into account for the purpose of determining the applicability of the Convention.

116. Consideration was given, in this context, to the question of whether local and regional television programme services as well as specialised services (such as specialised sports or film services) should be excluded from the field of application of the Convention because of their specific focus and audience. The possibility of introducing a criterion of intention was evoked in this regard. It was, however, concluded that there was no objective reason for not including such services where they can be received in one or more other Parties, and that, furthermore, any determination of intention is a particularly hazardous operation.

117. It follows from the preceding paragraphs that the term "retransmitted" concerns retransmissions which can be

received, directly or indirectly, in one or more other Parties (that is, retransmissions which are transfrontier in character).

118. The terms "entities or by technical means within the jurisdiction of a Party" are to be read in conjunction with Article 5, paragraphs 2-5.

### Article 4 – Freedom of reception and retransmission

119. This article establishes a major principle: the Parties shall ensure freedom of expression and information in accordance with Article 10 of the European Convention on Human Rights; consequently, they shall ensure freedom of reception and, as far as this is technically possible, retransmission on their territories of programme services which comply with the terms of the Convention.

120. Such guarantees shall be subject to the sole derogations provided for under Articles 24 and 24 *bis* according to the conditions and procedures foreseen thereby and subject to respect for the principles derived from Article 10 of the European Convention on Human Rights.

121. The implications of this article are that a Party will not be entitled to rely on the specific provisions of its domestic broadcasting legislation or regulations in areas covered by the Convention (advertising and tele-shopping, sponsorship, responsibility of the broadcaster in maintaining programme standards, etc.) to restrict reception or to prevent the retransmission, on its territory, of a programme service transmitted from another Party which complies with the provisions of the Convention. This article is, however, without prejudice to the current situation with regard to areas which are not governed by the Convention (for example, civil and criminal law responsibility of the broadcaster).

122. The principle embodied in this article does not concern the question of technical capacity, for example, the capacity of cable networks or the number of available frequencies. Situations may clearly arise in which, due to limited technical capacity, a Party is unable to ensure the retransmission on its territory, notwithstanding the conformity of the television programme service with the Convention. Should such situations arise, it was considered that the provisions concerning co-operation and mutual assistance between the Parties (Article 19) would be the appropriate means for solving any difficulties.

123. On a more general level, the principle that freedom of reception and retransmission shall be guaranteed is not intended to inhibit Parties in the exercise of their general spectrum allocation policies in ways authorised under other international agreements.

### Article 5 – Duties of the transmitting Parties

124. This article establishes the duties of the Parties with regard to television programme services transmitted or retransmitted by entities or by technical means within their jurisdiction and which can be received in one or more other Parties. The specific objective of this provision arises from the need to ensure that such services comply with the terms of the Convention.

125. It is to be noted, therefore, that this Article does not deal with the question of which domestic law is applicable in areas which are not covered by the Convention; as indicated in paragraph 30 above, certain aspects of broadcasting remain outside the scope of the Convention.

126. Furthermore, as this article concerns exclusively the duties of the transmitting Parties under the Convention, it does not nullify the responsibilities of the broadcaster or entity ensuring the transmission or retransmission in matters such as the obtaining of the necessary authorisations from the authors and other rights holders and their remuneration, respect of technical regulations, criminal and civil law liability, criminal and civil law liability, respect of rules on unfair competition (see, in this context, paragraphs 146 and 210 below).

127. It is clear from Article 28 that the provisions of this article do not prevent a Party from applying stricter or more detailed rules than those embodied in the Convention to programme services transmitted by entities or by technical means within its jurisdiction (see paragraph 365 below). However, that Party is not entitled to rely on such stricter or more detailed rules in order to restrict the retransmission on its territory of programme services which are transmitted by entities or a technical means with the jurisdiction of another Party and which comply with the terms of the Convention, namely Articles 6 to 18*b* (see also paragraph 121 above).

*Paragraph 1*

128. Paragraph 1 establishes the responsibility of each transmitting Party, as identified in paragraph 2, to ensure compliance with the terms of the Convention of television programme services transmitted by entities or by technical means within its jurisdiction, within the meaning of Article 3.

129. It is to be noted that the responsibility under paragraph 1 in no way implies establishing an interference with the responsibility and independence of the broadcaster as regards programming content; nor does it imply in any way the introduction of a system of *a priori* control. Both are contrary to the philosophy of the member States of the Council of Europe in such matters.

130. The Convention leaves the detailed fulfilment of their duties under this paragraph to the discretion of the Parties, who will take into account their constitutional, legislative or regulatory provisions (including, *inter alia*, the domestic courts of a Party) for the purpose of determining the appropriate means and the competent organs by which compliance with the Convention is ensured.

*Paragraph 2*

131. This paragraph sets out the criteria for establishing the competence of a Party *vis-à-vis* a television broadcasting organisation for the purposes of the Convention.

132. According to paragraph 2, two hypotheses are enumerated for determining the competence of a Party *vis-à-vis* a television broadcasting organisation. They are designed to avoid, as far as possible, any circumvention of the provisions of the Convention.

133. Paragraph 2, first indent, lays down the general principle whereby the transmitting Party is the Party in which a television broadcasting organisation is established, on the basis of and in accordance with the criteria set out in paragraph 3 to determine such establishment. The pre-eminence given to the criteria of establishment is aimed at ensuring that the competent Party with regard to a television broadcasting organisation is the Party in which the operation of such an organisation is actually carried out, in order to avoid the possible circumvention mentioned above.

134. In the event that the competence of a Party cannot be defined on the basis of the principle of establishment in accordance with the criteria of paragraph 3, the second indent of paragraph 2 sets out an ancillary rule for determining the competence of the Parties by indicating that they assume the role of transmitting Party *vis-à-vis* those services to which paragraph 4 applies.

*Paragraph 3*

135. This paragraph determines a chain of criteria to determine whether a television broadcasting organisation is established, within the meaning of paragraph 2, in a given Party. As indicated above, the objective of these cascading criteria is to ensure that the competent Party is the Party in which the activities of a television broadcasting organisation are carried out, given the fact that such organisations may split up their activities between several States.

136. Paragraph 3(a) covers the situation, in principle the most common, in which a television broadcasting organisation has its head office in a Party and where the editorial decisions on programme schedules are taken in that Party. In such a case, the organisation concerned clearly falls within the competence of that Party, in so far as the decisions concerning the most important activities related to management and programming matters are taken on the territory of that Party.

137. However, it may arise in certain cases that a television broadcasting organisation has its head office in one Party, while editorial decisions on programme schedules are taken in another Party. In such a situation, paragraph 3(b) provides that this organisation is deemed to be established in the Party where a significant part of the workforce involved in the pursuit of the television broadcasting activity operates, given that this provides considerable material evidence of the place where the broadcasting activity is effectively carried out.

138. There may be, however, cases where a significant part of the workforce involved in the pursuit of the television broadcasting activity operates in each of the Parties, or in neither of those Parties. This situation may make it more difficult to determine the place of establishment. In the first case, paragraph 3(b) again uses the criterion of the head office to determine the competent Party. In the second case, the television broadcasting organisation is deemed to be established in the Party where it first began broadcasting in accordance with the law of that Party, provided that it maintains a stable and effective link with the economy of that Party.

139. A last situation concerns the hypothesis in which a television broadcasting organisation has its head office in a Party, but editorial decisions on programmes schedules are taken in a State which is not Party to the Convention, or vice-versa. In such a case, paragraph 3(c) provides that such an organisation will be deemed to be established in the Party concerned if a significant part of the workforce involved in the pursuit of the television broadcasting activity operates in that Party.

140. It should be noted that the alignment of the criteria for establishing jurisdiction in the Convention with those in the revised Directive does not exclude that marginal problems of conflict of jurisdiction may arise in the context of the implementation of the two instruments as long as some member States of the European Community have not become Parties to the Convention and Parties to the Convention have not become members of the European Community. In the course of the revision of the Convention, the Standing Committee noted that a solution to such conflicts might be to introduce in the Convention a special provision in order to avoid that, as a result of the simultaneous application of the criteria of Article 5, paragraph 3 of the amended Convention and of Article 2, paragraph 3 of the revised Directive, two States would assume jurisdiction at the same time and in respect of the same broadcaster. To this end, Article 3(d) provides that if a broadcaster is deemed to be established in a member State of the European Community, when applying the criteria of paragraph 3 of Article 2 of the revised Directive, that broadcaster shall also be deemed to be established in that State for the purposes of the Convention. In the case where conflicts of jurisdiction cannot be

resolved, despite of the application of paragraph 3 (d) of Article 5, a solution should be sought by the bodies responsible for supervising the implementation of the amended Convention and the revised Directive.

*Paragraph 4*

141. It may be the case that the application of the cascading criteria set out in paragraph 3 does not make it possible to determine that a television broadcasting organisation is established in a Party within the meaning of paragraph 2. In such a case, the ancillary rule laid down in paragraph 4 has to be examined to settle the question of the competence of the Parties. As for the rule concerning establishment, paragraph 4 provides for a chain of criteria based on the means used for the transmission of the programme service or services of the television broadcasting organisation. These criteria are the use of a frequency granted by a Party or, failing this, the use of a satellite capacity appertaining to a Party or, if the two aforementioned means are not used, the use of a satellite uplink situated in that Party.

*Paragraph 5*

142. Should the ancillary rule provided for under paragraph 4 not make it possible to determine the transmitting Party, paragraph 5 provides that the Standing Committee shall consider the issue according to Article 21 of the Convention in order to determine this Party. On this issue, Article 5 of the Convention departs from the solution retained in Article 2, paragraph 5, of the revised Directive which provides, as an ultimate criterion for determining competence, that "the competent Member State shall be that in which the broadcaster is established within the meaning of Articles 52 and following of the Treaty establishing the European Community". Although this criterion shall, under Article 27, paragraph 1 of the Convention, apply to those Member States of the European Community which are Parties to the Convention, it cannot, on the other hand, be used in the direct relationship between Member States and non-Member States of the European Community, as well as in the relationship existing only between these non-Member States.

*Article 6 – Provision of information*

143. The provisions of this article confirm the general philosophy of the Council of Europe and the member States in regard to access to information and enhance the provisions adopted in 1984 concerning the use of satellite capacity for television and sound radio (Recommendation No. R (84) 22).

144. Given the current evolution of television broadcasting, it is particularly necessary that information about the broadcaster is available to everyone. Because of the multiplication and diversification of programme services, on the one hand, and the transfrontier character of transmissions, on the other, it is important, both for States and viewers, to know who is responsible for what.

*Paragraph 1*

145. This paragraph deals with the question of transparency as regards the responsibilities of the broadcaster.

146. The term "responsibilities" refers to the obligations, for example, under the contract or franchise by which the broadcaster is bound; but it also concerns the broadcaster's civil and criminal law liability.

147. The terms "authorisation", "contract" and "any other legal measure" cover all forms of arrangements by which broadcasters are entitled to transmit programme services. This may, as appropriate, be through legislation or a regulation of the Party concerned.

*Paragraph 2*

148. This provision does not mean that the Party responsible for ensuring respect for the principle of transparency must automatically publish the information in question. However, it should at least satisfy itself that such information is available and is furnished on request to any interested natural or legal person: individual, organisation, broadcaster, State, etc. Where appropriate, such information will be requested through the competent authority in the receiving Party; Article 19 of the Convention provides for the designation of one or more authorities whose task is, *inter alia*, to provide the information referred to in this paragraph.

149. The transparency required under this paragraph corresponds to a more general objective than that of the preceding paragraph; it aims to satisfy the interest of the public in knowing the name under which the broadcaster is registered or name under which the broadcaster is known by the public, the composition of a broadcasting organisation, its legal status and mode of financing, etc. In this respect, reference should be made to Recommendation No. R (94) 13 on measures to promote media transparency which defines a number of possible lines of action to ensure transparency of broadcasting organisations.

150. The provision of information provided for by this paragraph shall take place within the framework of the general rules on provision of information and shall duly respect, in particular, the rules on data protection, professional secrecy and commercial secrets. It follows that information on the composition of the capital and on the mode of financing means information of a general nature on financial sources (public and/or private, licence fee and/or commercial resources) and breakdown of the capital.

151. Whilst it follows from paragraph 150 above that the information concerning the composition of the capital and the mode of financing is of a general nature, it is clear that this Article should in no way be interpreted as limiting the rights of the Parties to apply their domestic law to prevent abuses of dominant positions.

## CHAPTER II – PROGRAMMING MATTERS

*Article 7 – Responsibilities of the broadcaster*

152. This article confirms the principles already embodied in Recommendation No. R (84) 22 on the use of satellite capacity for television and sound radio.

153. The philosophy underlying the title of this article is that, whilst the Parties are responsible for ensuring the application of the Convention and for taking any necessary legal measures in their domestic legal frameworks for this purpose, the broadcaster will, in the first instance, be responsible for observing the provisions of this article. It is in this sense that the terms "responsibilities of the broadcaster" are to be understood in the title of this article, compared with the notion of "responsibilities" contained in Article 6, paragraph 1, of the Convention (see above, paragraph 146).

154. It is emphasised, as in paragraph 129 above, that this article in no way implies establishing an interference with the responsibility and independence of the broadcaster as regards programming content, nor indeed the introduction of a system of *a priori* control.

155. It is to be noted that the standards embodied in paragraphs 1 and 2 of this article, in so far as they concern all items of programme services, apply equally to programmes, advertising, programmes trailers, public announcements and any other element of the programme service transmitted (see above, paragraph 92, in relation to the notion of "programme service").

*Paragraph 1*

156. The standards contained in this paragraph, which is inspired notably by the European Convention on Human Rights and should be interpreted in the light of the case-law of its organs, represent the affirmation of the desire to respect basic values common to all member States of the Council of Europe. Among the provisions of that Convention, mention should be made of Article 10 which guarantees freedom of expression and information. The exercise of this freedom, however, carries certain responsibilities and may therefore be subject to certain conditions or limitations provided for in paragraph 2 of Article 10 of that Convention.

157. This paragraph is also a reflection of elements contained in the preamble to the Universal Declaration of Human Rights (1948) concerning the inherent dignity and equality of all human beings, including equality between women and men.

158. Paragraph 1a. is designed to exclude indecency and pornography from all programme services transmitted by a broadcaster, otherwise the effective control of such services would be difficult in a transfrontier context.

159. The notion of indecency is to be read in the light of the case–law of the organs of the European Convention on Human Rights, notably in the Handyside case (Judgment of 7 December 1976) and the Müller and others case (Judgment of 24 May 1988).

160. Paragraph 1b. concerning violence and racial hatred, does not imply that such violence and hatred as exist in society cannot be portrayed in television programme services, but it is designed to ensure that violence as such is not given a prominent place in programme services. In this context, reference must be made to Recommendation No. R (97) 19 on the portrayal of violence in the electronic media and Recommendation No R (97) 20 on "hate speech", both of which were adopted by the Committee of Ministers on 30 October 1997.

161. This paragraph is derived from the objectives fixed by the Committee of Ministers in its reply of 22 January 1984 to the Parliamentary Assembly's Recommendation 963 (1983) on culture and educational means of reducing violence as well as the legislation of a large number of member States and their international undertakings under the International Convention on the Elimination of All Forms of Racial Discrimination (1965).

*Paragraph 2*

162. This provision echoes and develops the principles embodied in the Committee of Ministers' Recommendations Nos. R (84) 3 on principles on television advertising and R (84) 22 on the use of satellite capacity for television and sound radio.

163. The scheduling of programmes or other items of programme services which are unsuitable for children or adolescents must take into account the time difference between the Parties, and consequently the official time in both the transmitting and receiving Parties.

164. The Convention supplements the protection provided for in this article by dealing with the specific problem of advertising and tele-shopping addressed to, or using children in Article 11, paragraph 3 (see below, paragraph 211).

*Paragraph 3*

165. This paragraph embodies an important principle, which is moreover reflected in codes of conduct of professional organisations of journalists, and aims to guarantee the plurality of information sources and the independence of news programmes. Those responsible for programme services and journalists in charge of news services have a moral responsibility towards the public not only for the reporting of news but also for their comments on events and their developments.

166. The reference to the free formation of opinions concerns, *inter alia*, respect of Parties' rules regarding electoral or political campaigns, without prejudice to freedom of expression.

## *Article 8 – Right of reply*

167. The principle embodied in this article follows on from Resolution (74) 26 on the right of reply and the provisions of Recommendation No. R (84) 22 on the use of satellite capacity for television and sound radio.

168. A right of reply within the meaning of the Convention is a right exercised by a natural or legal person in order to correct inaccurate facts or information, in cases where such facts or information concern him/her or constitute an attack on his/her legitimate rights (especially in regards to his/her dignity, honour or reputation). As indicated in paragraph 169 below, the modalities of exercise of this right are determined by the transmitting Party.

*Paragraph 1*

169. The exercise of a right of reply or the access to other comparable legal or administrative remedies may be ensured by any legal or other procedure, the modalities of which are determined by the transmitting Party: right of reply, right of correction, right of rectification, right of recourse to special bodies or procedures.

170. According to this paragraph, a right of reply or other comparable legal or administrative remedies are transfrontier in character. Therefore, they may be exercised equally by nationals and non-nationals, residents and non-residents of Parties to the Convention.

171. It follows from this paragraph that the transmitting Parties are under an obligation to ensure that a right of reply or other comparable legal or administrative remedies may be exercised in relation to television programmes transmitted or retransmitted by entities or by technical means within their jurisdiction, within the meaning of Article 3. Therefore, where no right of reply or other comparable legal or administrative remedies are provided in a Party, it is bound to introduce such a right or remedies with regard to programmes transmitted by entities or by technical means within its jurisdiction, within the meaning of Article 3. However, this need not necessarily be in the form of legislation; it could be established in the broadcaster's contract or franchise.

172. According to this paragraph, the transmitting Parties are obliged to furnish the necessary modalities for the effective exercise of such a right or access to other comparable legal or administrative remedies by any person referred to in the paragraph. This includes the timing and other arrangements, which should be such that the exercise of this right or access to other comparable legal or administrative remedies can be effective. Thus, for example, the context in which a right of reply is exercised should be comparable to that in which the incriminated statement was made.

*Paragraph 2*

173. The reference to the name of the programme service or of the broadcaster responsible for this programme service must appear with the programme service itself; this corresponds to the practice of broadcasters.

## *Article 9 – Access of the public to information*

174. Having regard to the different interests involved in respect of the transmission of events of high public interest (organisers of the events, broadcasters, the public), this article is based on the right of the public to receive information and aims to avoid that the exercise of this right be undermined in a transfrontier context. In cases where exclusive rights have been acquired by a broadcaster outside the country in which the event takes place such a transfrontier safeguard seems to be essential.

175. Another objective is to guarantee, through access to events of high public interest, the plurality of information sources in transfrontier television.

176. An "event of high public interest" means any political, social, cultural or sports event which is regarded by one or more broadcasters in other Parties as being of high interest to the public in one or more other Parties.

177. The term "event of high public interest" indicates that at least some aspects of the event justify short footage in a television programme providing information to the public. Such events need not (and in many cases will not) meet the criteria fixed in paragraph 182 below. They do not have to be of major importance for society nor do they have to be

included in lists as foreseen in Article 9*bis*. The latter would not be appropriate nor possible in all cases. Sometimes events being of high public interest will be identified only shortly before they take place. In general, broadcasters asking for a right to short reporting and not the Parties will have to gauge the interest of the public to receive information about the event in question.

178. Whilst events of high public interest do not have to meet the criteria for the "events of major importance for society" which are protected by Article 9*bis*, those events of major importance will usually meet the criteria for national measures foreseen in Article 9. In such situations both measures may be relevant. National measures provided for in Article 9 *bis* may be necessary to ensure that a substantial proportion of the public is deprived of the possibility of following the event on free television by live or deferred exclusive coverage. However, for informational purposes, it may be necessary to allow other broadcasters the right to short reporting in their news programmes.

179. This provision is not concerned with the acquisition of exclusive rights but with the modalities of the exercise of such rights in a transfrontier context. It does not therefore imply that, when exclusive rights have been acquired by a broadcaster, other broadcasters have the right to retransmit the event in its entirety.

180. Whilst it is generally recognised that broadcasters should in any event be authorised to transmit extracts of the event, under the conditions foreseen in Recommendation No. R (91) 5 of the Committee of Ministers to member States on the right to short reporting on major events where exclusive rights for their television broadcast have been acquired in a transfrontier context, the practice permitting retransmission of a maximum of three minutes per day may not guarantee adequately the right to information in all cases. This is why the Parties may also examine and take other legal measures.

*Article 9bis – Access of the public to major events*

*Paragraph 1*

181. Apart from events which are deemed to be of high public interest, certain events may be of such importance to society as a whole, that more far-reaching measures to protect access by the public to information on these events is justified. In these cases, the Parties may have recourse to the drafting of a list of designated events which are considered to be of major importance for society and in regard to which the Party concerned shall ensure that broadcasters under its jurisdiction do not broadcast such events on an exclusive basis in such a way as to deprive a substantial proportion of the public in that Party of the possibility of following such events on free television (see paragraph 183 below) by live or deferred coverage. In doing so, Parties shall respect the fundamental rights which are laid down in the European Convention for the Protection of Human Rights and Fundamental Freedoms and, where appropriate, in their national constitutions. Furthermore, as set out in paragraph 67 above, they shall take due account of property rights and the principle of contractual freedom.

*Paragraph 2*

182. In drafting such a list of designated events, Parties should first of all respect the criteria of transparency and proportionality. Furthermore, they should respect the following criteria, which the Standing Committee may supplement or amend at a later stage on the basis of the developments in relation to the implementation of the Article 3*a* of the revised Directive:

a) compatibility with the letter and spirit of paragraph 1 of this article;

b) national measures must apply only to broadcasters under the jurisdiction of the Party concerned. The jurisdiction of a Party in regard to this Convention is to be determined on the basis of its Article 5;

c) national measures must genuinely pursue the public interest objective referred to in paragraph 2 of this article. All restrictions going beyond what is necessary to achieve that objective may not be endorsed by the Standing Committee in the case of disputes, and even less be extended to other Parties' jurisdictions. Proportionality will be assessed having specific regard to the impact of the relevant measures on the social and economic activities linked to the trade of broadcasting rights. In performing this test, due account will be taken of the combined effect of the listing of events itself and the modalities laid down for its broadcast (i.e., live or deferred, whole or partial coverage);

d) national measures must not constitute a means of discrimination or market foreclosure against other Parties' broadcasters, rights holders or other economic operators. Nor must they have a culturally negative impact for instance by hampering unnecessarily the circulation of broadcasting rights to culturally important events or by seriously reducing the sources of financing for such events in Europe;

e) events to which national measures apply must genuinely be of major importance for society in all or part of the relevant Party, which means that they should be outstanding events which are of interest to the general public of the geographical area covered by the Council of Europe or of a Party to the Convention or an important part of the population of a given Party to the Convention. Such events are, for example, the Olympic Games, the football World Cup and the European Football Championship. In general terms, on the basis of a case by case evaluation made in the light of the documentation provided

by Parties, events may qualify as an event of major importance for society if at least two of the following conditions are met:

– the event and its outcome has a special general resonance in the relevant Party, not simply a significance to those who ordinarily follow the sport or activity concerned;

– the event has a generally recognised, distinct cultural importance for the population in the Party concerned and in particular contains elements of its cultural identity;

– it involves the national team in the sport concerned in a major international tournament;

– the event has traditionally been broadcast on free television and has commanded large television audiences in the Party concerned.

The Convention allows Parties to include in their lists events taking place outside of their national territory. Since this will usually imply that rights holders established in other Parties or in third countries are affected by such measures, the Standing Committee, in the case of a dispute, will consider with special attention the inclusion of such events in national lists.

f) In any case, events must be specifically and clearly designated either individually or by reference to defined objective criteria (for example, international sports championships which involve the national team). Interested parties (i.e., rights holders, rights brokers, broadcasters and broadcasting authorities) would find it impossible to carry out their activity if confronted with a lack of legal certainty as to the regime applicable to any given event.

g) The procedure leading to the adoption of national measures and the choice of the listed events must be transparent. This implies, in particular, that the criteria used to designate the listed events must be explicit and public, and that appropriate consultation with interested parties has taken place.

h) The moment in time from which measures apply to a given event should take due account of the practical implications for the operators, in particular the need for event organisers and broadcasters across Europe to be able to plan in advance their marketing and programming strategies.

183. Essential for the implementation of Article 9*bis* is the notion of "free television". Without a definition of this term, broadcasters will not be able to meet the requirements of national legal measures implementing this provision nor will Parties be able to safeguard those measures. Generally, the notion of "free television" is to be understood as broadcasting on a programme service, either public or private, of programmes which are accessible to the entire public of the area of geographical coverage of the broadcaster in their own language(s) without payment in addition to the modes of funding of broadcasting that are widely prevailing in each Party (such as licence fee and/or the basic tier subscription fee to a cable system). Thus, broadcasting services may qualify as "free television" services irrespective of their distribution mode(s), the distinctive element being that there is no need for the public to make special additional payment (beyond the licence fee and/or subscription to basic tier cable services) in order to be able to have access to the relevant broadcasts. Given the differences between the audiovisual landscapes in several Parties, the possibility of a generally accepted definition needs further discussion in detail.

184. In implementing this article, Parties will exchange of the information provided for in Article 19. The Standing Committee will be informed of the results of the Parties' examination of the legal measures to guarantee access to the information, notably with a view to identifying collective measures to be taken by the Parties.

185. The Standing Committee shall also be informed by the Parties of the lists of designated events which are drawn up by them. Such information shall include all necessary elements in order to enable the Standing Committee, in case of a dispute, to carry out a comprehensive assessment of the compatibility of national measures with the spirit and the wording of paragraph 2 of this Article. Sufficient information is to be provided, in particular, as regards:

– the reasons why listed events are considered of "major importance for society";

– the procedure followed for the choice of the events and the relevant measures.

The Standing Committee may request any additional information it may require.

*Paragraph 3*

186. The information provided by the Parties under Article 9, paragraph 2 (e) of the Convention will be published once a year by the Standing Committee, whenever possible, before the end of the first quarter.

187. The guidelines to be drawn up by the Standing Committee shall respect the criteria set out above in paragraph 182. In drawing up such guidelines, the Standing Committee will have regard to the work undertaken in the framework of the European Community in regard to the implementation of Article 3*a* of the revised Directive in order to guarantee legal certainty and to ensure coherence between the amended Convention and the revised Directive as foreseen in

paragraph 40 above.

188. In case of a dispute between the Parties in regard to the implementation of Article 9, should the Standing Committee find that a particular Party should not have listed an event and without prejudice to a possible arbitration procedure under Article 26, the other Parties do not have to recognise that event.

*Article 10 – Cultural objectives*

189. The general philosophy underlying this Article is to be found in the preamble to the Convention, which emphasises that the development of European audiovisual production and the circulation of quality European programmes constitute a means of achieving the cultural objectives of the Parties. It is also developed in Recommendation No. R (86) 3 on the promotion of audiovisual production in Europe and in Resolution No. 1 of the 1st European Ministerial Conference on Mass Media Policy (Vienna, December 1986) in which the ministers decided "to take appropriate measures so that television programme services comprise a reasonable proportion of audiovisual works, in particular fiction works, of European origin".

*Paragraph 1*

190. The objective pursued by this paragraph is to ensure the development and exploitation, notably in the European context, of creative national productions and European co-productions (fiction, series, serials, films, documentaries, arts and educational programmes, etc.) in order to uphold European cultural identity as regards both its specific national features and common values, and to guarantee pluralistic means of expression.

191. This paragraph therefore provides that each transmitting Party shall ensure, where practicable and by appropriate means, that broadcasters of services transmitted by entities or by technical means within its jurisdiction, within the meaning of Article 3, reserve for European audiovisual works a majority proportion of their transmission time, excluding the time devoted to news, sports events, games, advertising, tele-shopping and teletext services. It is further specified that this majority proportion, having regard to the broadcaster's information, educational, cultural and entertainment responsibilities *vis-à-vis* its viewing public, should be achieved progressively, on the basis of suitable criteria.

192. The requirement for a majority proportion of European works in the programmes must not, however, be made at the expense of Southern countries. Works from that part of the world must not suffer from unduly strict quota regulations which would run counter to the duty incumbent on Europe in its exchanges with those countries. Moreover, this requirement for majority European programmes must not be interpreted in such a way as to prejudice member States' undertakings in the framework of other international organisations.

193. The references to "where practicable", to the responsibilities of the broadcaster *vis-à-vis* its viewing public and to "suitable criteria" are intended to allow the transmitting Party a margin of appreciation in determining the extent to which the "majority proportion" can in fact be achieved progressively, for example having regard to the particular audiovisual situation of the Party concerned, the situation of the individual broadcaster, the nature of the service the broadcaster is providing (single–purpose channel, subscription channel, pay-per-view channel, etc.), or the viewing public concerned.

194. The transmission time devoted to news, sports events, games, advertising, tele-shopping and teletext services does not qualify for inclusion in the calculation of the "majority proportion" referred to in this paragraph. This is because, as indicated in paragraph 190 above, the purpose of this provision is to ensure the development and exploitation of creative works (fiction, series, serials, films, documentaries, arts and educational programmes etc.).

195. It is for each Party to determine the most appropriate means to achieve the "majority proportion" referred to in this paragraph, for instance in the light of its particular audiovisual situation, cultural traditions or financial situation. They could, for example, take the form of a legislative enactment or regulation, accompanied by sanctions, or could be embodied in the broadcaster's authorisation or contract.

196. It follows from the provisions of Article 28 of the Convention that the provisions of this paragraph are without prejudice to the possibility for a transmitting Party to introduce stricter or more detailed rules for broadcasters of programme services transmitted by entities or by technical means within its jurisdiction.

*Paragraph 2*

197. This paragraph concerns possible situations in which, notwithstanding the transmitting Party's margin of appreciation embodied in paragraph 1, a difference of opinion on the application of paragraph 1 arises between a receiving and a transmitting Party.

198. It establishes that, in derogation of the provisions of Article 25, paragraph 2, only one of the Parties may refer the matter to the Standing Committee with a view to obtaining an advisory opinion. However, having regard to the particular nature of this kind of dispute, it may not be submitted to arbitration as provided for in Article 26 of the Convention.

*Paragraph 3*

199. This paragraph embodies an undertaking on the part of the Parties to seek together the most appropriate instruments and procedures to support the activity and development of European production, as a complement to the measures foreseen in paragraph 1 of this Article. Particular reference is made to those Parties with a low audiovisual production capacity or restricted language area, highlighting thereby the concern to sustain and promote the distinctive and diverse features of Europe's cultural identity In this respect, reference can be made to Recommendation No. R (93) 5 containing principles aimed at promoting the distribution and broadcasting of audiovisual works originating in countries or regions with a low audiovisual output or a limited geographic or linguistic coverage on the European television markets.

200. The reference to "without discrimination between broadcasters" is intended to preclude instruments and procedures in support of the activity and development of European production which establish discrimination between different broadcasters (for example, public service and private broadcasters).

*Paragraph 4*

201. The main objective of this paragraph is to ensure that the broadcasting of cinematographic works by broadcasters under the jurisdiction of the Parties respects the time lapse agreed with the rights holders. The latter may wish to ensure that the television broadcasting of cinematographic works to which they own rights is only possible after a certain period of time, which may vary especially depending on the nature of the programme service concerned (free access television, pay television, etc.), in order to avoid that such broadcasting prejudices their strategy of dividing the market into different exploitation windows according to different outlets (i.e. the so-called cascade strategy which covers, in particular, cinema distribution, video publishing and television showing). Under this cascade strategy, one type of exploitation will only take place after having maximised the revenue from a previous type of exploitation.

202. In this respect, it is important that rights holders to cinematographic works are allowed to use their rights to maximise the exploitation of such works, in particular by fixing a time lapse for their broadcasting, given the fact that the revenue from such exploitation constitutes both fair remuneration for the work undertaken by rights holders in producing such works and a source of reinvestment in the production of other works for the benefit of cultural creativity, the programme industry and the public at large.

203. The question of specific time scales for each type of television showing of cinematographic works is primarily a matter to be settled by means of agreements between the interested Parties or professionals concerned, via individual or collective agreements. Against this background, this paragraph provides that the Parties shall ensure that the broadcasters under their jurisdiction do not broadcast cinematographic works outside periods agreed with the rights holders, given the importance of ensuring respect for such periods in a transfrontier context.

### Article 10bis – Media pluralism

204. Given the importance of media pluralism for the exercise of freedom of expression and information, as underlined in the Declaration of the Committee of Ministers of 29 April 1982 on freedom of expression and information, this paragraph emphasises in a more general manner the responsibility of the transmitting Parties in view of the importance of maintaining media pluralism, without however imposing any specific obligations on them.

## CHAPTER III – ADVERTISING AND TELE-SHOPPING

### Article 11 – General standards

205. The principles embodied in this article confirm and reinforce those already set out in Recommendation No. R (84) 3 on principles on television advertising and Recommendation 952 (1982) of the Parliamentary Assembly on international means to protect freedom of expression by regulating commercial advertising. Similar concerns are also reflected in codes of conduct such as the International Code of Advertising Practice of the International Chamber of Commerce (ICC), a code which members of the European Broadcasting Union (EBU) agreed to follow when they adopted the Declaration on Principles regarding Commercial Advertising by DBS.

206. Examples of general standards to which this article refers can be found in Article 12 of the revised Directive, which stipulates that television advertising shall not (a) prejudice respect for human dignity; (b) include any discrimination on grounds of race, sex or nationality; (c) be offensive to religious or political beliefs; (d) encourage behaviour prejudicial to health or to safety; (e) encourage behaviour prejudicial to the protection of the environment.

207. In addition to the principles set out in this article, it follows from Article 7 of the Convention that advertising and tele-shopping programmes must comply with the standards set out in paragraphs 1 and 2 thereof.

*Paragraph 1*

208. It follows from the provisions of this paragraph that advertising and tele-shopping should not unfairly discredit the products or services of competitors.

*Paragraph 2*

209. This paragraph underlines the importance attached to respecting viewers' interests. This responsibility of advertisers and providers of tele-shopping programmes v *is-à-vis* consumers is the corollary of the freedom of commercial speech which they enjoy: they should not, for example, take advantage of the trust or lack of knowledge of consumers.

210. It follows from paragraph 126 above that the provisions of this paragraph 2 and of paragraph 1 are without prejudice to the civil or criminal law liability of the broadcaster in these matters and to the rules on unfair competition.

*Paragraph 3*

211. This paragraph supplements the provisions of Article 7, paragraph 2, on the protection of minors. In addition to the general principle for respect of the individual's interests affirmed in paragraphs 1 and 2, the Convention accords specific protection of the interests of children and adolescents. The will to protect such interests is already reflected in principle 5 of Recommendation No. R (84) 3 and the codes referred to in paragraph 205 above.

212. From Article 16 of the revised Directive, examples can be derived of the manner in which minors shall be protected against any advertising as well as tele-shopping programmes which could cause moral or physical harm to them. Thus, advertising and tele-shopping programmes shall respect the following criteria: (a) they shall not directly exhort minors to buy a product or a service by exploiting their inexperience or credulity; (b) they shall not directly encourage minors to persuade their parents or others to purchase the goods or services being advertised; (c) they shall not exploit the special trust minors place in parents, teachers or other persons; (d) they shall not unreasonably show minors in dangerous situations.

*Paragraph 4*

213. In addition to compliance with the general standards set out in the paragraphs 1 to 3, tele-shopping shall not exhort minors to contract for the sale or rental of goods or services.

*Paragraph 5*

214. This paragraph confirms an important principle: the editorial independence of the broadcaster *vis-à-vis* advertisers in respect of the content of programmes. In relation to sponsored programmes, however, this provision is without prejudice to the general rule contained in Article 17, paragraph 2.

215. The term "advertiser" means the natural or legal person for whom advertising or, as the case may be, tele-shopping is broadcast.

*Article 12 – Duration*

216. The provisions of this article are designed to maintain a balance between the needs of certain broadcasters for advertising revenue and respect for the independence of the broadcaster and the integrity of programmes, bearing in mind current and future trends in the mode of financing of programme services.

217. This article aims at ensuring that the amount of transmission time devoted to teleshopping spots, advertising spots and other forms of advertising broadcast by programme services not exclusively devoted to tele-shopping, is neither excessive nor detracts from the function of television as a medium of information, education, social and cultural development and entertainment. Paragraph 1 establishes a general balance calculated over a 24-hour period; paragraph 2 is designed to prevent this balance from being upset by an excessive concentration of advertising and tele-shopping spots during prime time; paragraph 3 establishes a ceiling on the number of daily tele-shopping windows and the daily amount of broadcasting time which can be devoted to tele-shopping windows. Paragraph 4 excludes certain types of announcements from the application of the present Article.

*Paragraph 1*

218. This paragraph specifies that the total amount of tele-shopping spots, advertising spots and other forms of advertising taken together, shall not exceed 20% of the daily transmission time. At the same time, it is specified that the total amount of daily transmission time devoted to advertising spots only should not exceed 15%. In fact, the substance of this provision has not changed since it was already the case that where tele-shopping activities were authorised, in a transmitting Party, the total daily percentage of transmission time devoted to advertising (the definition of which included tele-shopping activities) could be increased to 20%, provided that the amount of spot advertising did not exceed 15%.

219. It is however to be noted that this paragraph is to be considered in the light of paragraph 3, which is designed to avoid an excessive amount of tele-shopping programmes within programme services which are not exclusively devoted to tele-shopping, over a 24-hour period (see below, paragraph 224).

220. Subject to the foregoing and depending on the number of hours the programme service is transmitted per day,

programme services not exclusively devoted to tele-shopping are free to determine how much time shall be devoted respectively to tele-shopping spots, advertising spots and other forms of advertising. Therefore, a given programme service which is not exclusively devoted to tele-shopping could transmit 15% of advertising spots and 5% of tele-shopping spots and other forms of advertising or 10% advertising spots and 10% of tele-shopping spots and other forms of advertising or even 20% of tele-shopping spots and other forms of advertising and no advertising spots.

*Paragraph 2*

221. This paragraph provides that the total amount of advertising and tele-shopping spots within a given clock-hour period shall not exceed 20%. As indicated in paragraph 217 above, its purpose is to avoid an excessive concentration of advertising and tele-shopping spots during prime time in programme services which are not devoted exclusively to tele-shopping.

222. In order to calculate the percentage of advertising in both paragraphs 1 and 2 of this article, it is also necessary to bear in mind Article 2, sub–paragraph f; it follows that the forms of advertising, publicity or announcements in the public interest referred to in paragraph 104 above, which are excluded from the concept of ""advertising"" in Article 2, sub–paragraph f, are not to be included in these calculations.

*Paragraph 3*

223. The revised Directive distinguishes, as regards channels not exclusively devoted to tele-shopping, between transmission time devoted to tele-shopping spots, advertising spots and other forms of advertising on the one hand and, on the other hand, transmission time devoted to tele-shopping windows. In addition, the revised Directive applies to channels exclusively devoted to tele-shopping or self-promotion, without conventional programme elements such as news, sports, films, documentaries and drama. It was decided that the provisions of the Convention should be brought in line with these distinctions made in the Directive. Therefore, this article was re-formulated extensively in order to take account of the fact that tele-shopping is now considered to be different from advertising.

224. Whereas paragraph 1 fixes global percentages of the daily transmission time authorised for tele-shopping spots, advertising spots and other similar forms of advertising, paragraph 3 acts as a counter-balance in order to avoid an excessive amount of tele-shopping in programme services which are not exclusively devoted to tele-shopping over a 24-–hour period as well as to avoid an excessive number of interruptions of the regular programme service of a broadcaster. Paragraph 3 therefore provides that tele-shopping windows in programme services which are not exclusively devoted to tele-shopping shall be of a minimum uninterrupted duration of 15 minutes and that the maximum number of windows per day shall be eight. In addition, their overall duration shall not exceed three hours per day.

*Paragraph 4*

225. In order to avoid distortions of competition, the derogation provided for under this paragraph is limited to announcements concerning products which fulfil the dual condition of being both ancillary to and directly derived from the programmes of a broadcaster. In this respect, the term "ancillary products" is understood as referring to products intended specifically to allow the viewers to benefit fully from or to interact with these programmes (for example, an ancillary product will be a book or a video cassette distributed by a broadcaster in support of a programme dedicated to teaching foreign languages, so that the public can supplement teaching).

226. The derogation also applies to announcements by broadcasters in connection with their own programmes, such as the identification of the broadcaster or programme service, the display of the schedule of upcoming programmes services, the preview of films and other programme services in advance, programme trailers announcing forthcoming programmes of the broadcaster, as well as self-promotional messages.

227. Finally, the derogation applies to announcements in the public interest and charity appeals broadcast free of charge by broadcasters. It will be recalled that such announcements and appeals are covered by the definition of advertising (see paragraphs 51 and 104 above).

*Article 13 – Form and presentation*

*Paragraph 1*

228. The purpose of this provision is to avoid any confusion between advertising or tele-shopping programmes and the other items of the programme service. It is based on principles 6 and 7 of Recommendation No. R (84) 3 on principles on television advertising. It established that advertising and tele-shopping programmes shall be clearly distinguishable as such and separate from the other items of the programme service with a view to guaranteeing the function of television as a medium of information, education, social and cultural development and entertainment, as well as the editorial independence of the broadcaster; this principle is moreover to be found in various codes such as that of the ICC.

229. As a general rule, advertising and tele-shopping programmes should be transmitted in blocks comprising two or more separate spots. There may be circumstances where individual spots are permissible, in the case for example of

a single long advertisement; or where the period available for advertising or tele-shopping is very short, as between the rounds of a boxing or wrestling match; or where the broadcaster has insufficient advertising orders to permit a grouping of spots. But these situations should remain the exception. In its Opinion No. 4 (1995) on certain provisions on advertising and sponsorship, the Standing Committee expressed the view that national authorities have a margin of appreciation to evaluate on a case-by-case basis whether or not an exception can be made to the rule on block advertising. However, the "ratio" of the Convention's provision is clear: block advertising is the overriding rule, and the possibilities for exceptions are limited.

230. In this context, reference must be made to the relatively new techniques of 'virtual advertising'. Today, it is technically feasible to produce 'virtual' images (images of which the quality and the context in which they are presented are such that the viewer who has not been warned, may perceive them as real images). The questions raised by the use of such images in news and current affairs programmes have been the subject of profound investigation within the Standing Committee. In its Recommendation No. R (96) 1 concerning the use of virtual images in news and current affairs programmes, it considered that the use of virtual images in news and current affairs programmes falls under the editorial responsibility of the broadcaster. In certain cases, virtual images may be an effective means of presenting and explaining facts or events to the public. The Standing Committee considered that, within the framework of Article 7 of the Convention (responsibilities of the broadcaster), the use of virtual images in news and current affairs programmes needs to comply in particular with the following principles:

  – firstly, the use of virtual images must be necessary or helpful to illustrate information or a hypothetical version of the event being discussed;

  – secondly, the broadcaster should not use virtual images to manipulate or distort the content of a news item;

  – thirdly, the viewer must be clearly informed, by appropriate means, when virtual images are being used.

231. Furthermore, the Standing Committee examined the questions raised by the use of virtual techniques to insert advertising messages, notably during the broadcast of sports events, either by the virtual replacement of advertising messages on hoardings around the ground, or by inserting new, sometimes three-dimensional images in other parts of the picture. In the transfrontier context, virtual image technology may, in certain cases, permit the masking of messages banned by law in the receiving country without affecting the broadcast of the sporting event. Sometimes, however, these techniques help to increase the presence of advertising on the screen under conditions which are detrimental to the perception and the understanding of the event.

232. In its Recommendation No. R (97) 1 concerning the use of virtual advertising notably during the broadcast of sports events, the Standing Committee considered that the broadcaster, who is exclusively responsible for the content of the signal produced and/or broadcast, should retain ultimate control over this content. Given his/her responsibility towards the viewers, the broadcaster must ensure that virtual advertising messages comply with the rules of the Convention, and in particular that virtual advertising, in its presentation and content, meets the requirements stemming from Articles 7, 11 and 13 of the Convention.

233. In this respect, the Standing Committee noted the appropriateness of self-regulation and welcomed the code of conduct on virtual advertising adopted in 1996 by the European Broadcasting Union and the Association of Commercial Television in Europe.

234. Furthermore, without prejudice to any other indications which might be necessary in the future, the Standing Committee stressed that:

  – the presence of virtual advertising messages during the broadcast of sports events should be indicated to the viewers, by appropriate means, at the beginning and the end of the programme concerned;

  – in no case should virtual advertising messages transform the perception or the understanding of the event, or be detrimental to its visibility.

*Paragraph 2*

235. This paragraph confirms principle 10 of Recommendation No. R (84) 3. It prohibits the transmission of physically weak visual or oral advertising messages or tele-shopping of which the recipient is not consciously aware; such messages are contrary to the principles of identification and separation embodied in paragraph 1.

236. It follows from the concept of advertisement retained in Article 2, sub-paragraph f, that this prohibition also relates to subliminal messages aimed at advancing a cause or idea.

*Paragraph 3*

237. The absence of identification and separation from the other items of the programme service also justifies prohibiting surreptitious advertising or tele-shopping programmes, in particular the presentation of products or services in programmes when it serves advertising purposes. It should be recalled that the revised Directive defines surreptitious advertising as the representation in words or pictures of goods, services, the name, the trade mark or the

activities of a producer of goods or a provider of services in programmes which such representation is intended by the broadcaster to serve advertising and might mislead the public as to its nature. Such representation is considered to be intentional in particular if it is done in return for payment or for similar consideration. A distinction must be made between the broadcasting by a broadcaster of cinematographic films containing product placement for which the broadcaster cannot be held responsible and audiovisual works containing product placement, which have been conceived for television. In this second case, the broadcaster must ensure that these works are in conformity with the provisions of paragraph 3.

238. The forms of presentation of products or services which are prohibited under this paragraph are those which attach a value judgment to a product or service (such as extolling the merits of the product or service or expressing a preference for a particular product or service in relation to other similar products or services) or which use the same terms or visual elements as those used in a spot advertisement for the product or service concerned.

239. On the other hand, the presentation of a product or service of broadcasters or third parties is authorised when it only refers to its characteristic features for information purposes, or when such presentation is necessary for the conduct of the programme (such as game shows in which the prizes comprise the products or services of the sponsor, announcements for films in a programme devoted to the cinema, or for literary works in a literary programme).

*Paragraph 4*

240. This paragraph aims to ensure that the renown of persons regularly presenting news and current affairs programmes is not exploited in such a way that audiences are no longer able to distinguish between news and advertising or tele-shopping.

241. Having regard to the principles of identification and separation established in paragraph 1, it is important that this prohibition is not limited to the particular programme service in which the person regularly presents news or current affairs programmes.

242. This provision is linked to Articles 7, paragraph 3, 14, paragraph 5, and 18, paragraph 3, in so far as it highlights the importance attached to news; this is also the reason why the prohibition is limited solely to persons regularly presenting news and current affairs programmes.

243. The term "current affairs" refers to strictly news-related programmes such as commentaries on news, analysis of news developments and political positions on events in news. In its Opinion No. 4 (1995) on certain provision on advertising and sponsorship, the Standing Committee concluded that although this is a definition *stricto sensu*, "there may be cases where it will be difficult to determine whether a particular programme is a current affairs programme. In these cases, the principle behind this provision must be borne in mind, namely to avoid confusion between "information" and "advertising".

244. The reference to "orally" is intended to exclude use being made of the presenter's voice in advertising, without the person actually appearing on the screen.

*Article 14 – Insertion of advertising and tele-shopping*

245. This article aims to establish a reasonable balance between the financial interests of the broadcaster and advertiser, on the one hand, and the interests of viewers, authors and creators or providers of tele-shopping programmes, on the other hand. It establishes the conditions in which programmes may be interrupted by advertising or tele-shopping.

246. Paragraph 1 establishes that advertising and tele-shopping shall be inserted between programmes; subject to fulfilment of the conditions in the subsequent paragraphs, they may also be inserted during programmes in such a way that the integrity and value of the programme and the rights of the rights holders are not prejudiced. This general requirement applies in all the cases specified in the subsequent paragraphs of this Article where programmes may be interrupted by advertising and tele-shopping.

247. Paragraph 2 refers to programmes consisting of autonomous parts (such as game shows with rounds, magazine programmes) or sports programmes or similarly structured events or performances (concerts, opera or theatre, etc.) comprising intervals. Advertising and tele-shopping may only be inserted between the autonomous parts or in the intervals. In its Opinion No. 4 (1995) on certain provisions on advertising and sponsorship, the Standing Committee concluded that the notion of "autonomous part" during sports programmes must, generally speaking, correspond to natural breaks which are in keeping with the sport in question. This means that, in principle, attempts by the broadcaster to create artificial breaks are contrary to the spirit of the Convention. This being said, there may be cases where, bearing in mind the nature of a particular sports event (for example, a cycle race) artificial breaks introduced by the broadcaster may be justified. In these contexts, national authorities may enjoy a margin of appreciation, it being understood that the overriding rule expressed in paragraph 1 of Article 14 must be borne in mind namely, the need to avoid prejudice to the integrity of programmes.

248. Paragraph 3 specifies that the transmission of audiovisual works such as feature films and films made for television (excluding series, serials, light entertainment programmes and documentaries), provided their scheduled

duration is more than 45 minutes, may be interrupted once for each complete period of 45 minutes. A further interruption is allowed if their scheduled duration is at least 20 minutes longer than two or more complete periods of 45 minutes. This means that the transmission of a feature film or a film made for television, the scheduled duration of which is 90 minutes, may be interrupted twice by advertising or tele-shopping; where the scheduled duration is 110 minutes or more, a further interruption is authorised. In keeping with the spirit of this paragraph, documentaries having a degree of artistic merit are to be assimilated to feature films and other films. Such works are very similar to the latter, both in themselves and in the audience they reach. The same rules must accordingly be applicable to them.

249. The broadcaster nevertheless remains free to determine at what point the interruption should occur, provided the general requirements in paragraphs 1 and 4 are respected. Therefore, where the broadcaster transmits a film made for television, the scheduled duration of which is 50 minutes, he may, for example, choose to insert advertising after a period of 25 minutes has elapsed; where the scheduled duration of the film is 100 minutes, he may, for example, choose a first interruption after a period of 35 minutes has elapsed, followed by a second interruption after a further period of 35 minutes; where the scheduled duration is 120 minutes, he may, for example, choose a first interruption after 40 minutes have elapsed, a second interruption after a period of 80 minutes and a final interruption after 100 minutes.

250. Paragraph 4 of this article contains a further general requirement, over and above the specifications in paragraphs 3 and 5, to the effect that at least 20 minutes should elapse between each successive advertising or tele-shopping break within the programme. The programmes referred to in paragraph 2 have been excluded from this requirement in so far as a period of less or more than 20 minutes may elapse – depending on the programme – before the end of the autonomous part or before the interval.

251. In exceptional circumstances where it is not practicable to adhere rigidly to the exact application of this 20 minutes rule, the broadcaster may allow a subsequent break slightly less than 20 minutes after the preceding one.

252. The first sentence of paragraph 5 reflects the concern that religious services should not be interrupted by advertising or tele-shopping, which corresponds moreover to the current practice of broadcasters. The second sentence covers a series of concerns: firstly the importance attached to news and current affairs programmes (reflected elsewhere in the Convention); secondly the desire to respect religious beliefs and convictions; thirdly, the protection of children and young persons from an excessive amount of advertising or tele-shopping inserted in programmes designed especially for them; finally, the desire to avoid advertising interruptions in documentaries of a limited duration. Accordingly, where the scheduled duration of such programmes is less than 30 minutes, advertising or tele-shopping may not be inserted in them; where their scheduled duration is 30 minutes or more, the provisions of the preceding paragraphs apply, according to the nature of the programme concerned.

### Article 15 – Advertising and tele-shopping of particular products

253. This article develops the concerns expressed in principle 4 of Recommendation No. R (84) 3 on principles on television advertising and reflects the increasingly restrictive position of member States with regard to the advertising of certain specific products. Similar principles are also to be found in certain codes of practice such as those mentioned in paragraph 205 above.

*Paragraph 1*

254. This paragraph prohibits advertising and tele-shopping for tobacco products: cigarettes, cigars, pipe tobacco or cigarette tobacco, chewing tobacco, snuff or any other tobacco-based product.

255. The prohibited advertising is advertising within the meaning of Article 2; consequently this provision does not deal with advertising placed in certain events which are transmitted or retransmitted in television programme services, in so far as these have been excluded from the Convention's field of application (see, however, paragraph 100 above *in fine*).

*Paragraph 2*

256. Alcoholic beverage means any beverage with an alcoholic content, whatever the degree of alcohol; it includes among others, cider, beer, shandy, wine.

257. Advertising and tele-shopping for alcoholic beverages are subject to a number of rules aimed at ensuring the protection of consumers (in particular, minors) and preventing an excessive consumption of such beverages prejudicial to health.

258. The rules are designed to prevent the consumption of such beverages from being presented in an attractive light (physical performance, therapeutic qualities, etc.) and to prevent advertising and tele-shopping from boasting the high or low alcoholic content of a given beverage.

*Paragraphs 3 and 4*

259. Two reasons justify the inclusion of common rules on advertising for medicines and medical treatment: firstly, the

risk that such advertising could encourage their abusive consumption; secondly the fact that, due to the absence of harmonisation of legislations and to the internationalisation of television advertising, domestic legislation on medicines and medical treatment will have an increasing impact beyond national territories.

260. The provisions embodied in paragraphs 3 and 4 of this article are inspired by two Resolutions, AP (95) 1 (on the classification of medicines which are obtainable only on medical prescription) and the attached list of medicines available on medical prescription, as well as AP (83) 1 (on regulations governing the advertising of medicines to the public) resulting from the Partial Agreement in the Social and Public Health Field concluded within the Council of Europe. They follow the distinction made in those resolutions between medicines and medical treatment which are only obtainable on medical prescription and those which are not.

261. In the absence of harmonisation of legislations in this field, the regulations of the transmitting Party, within the meaning of Article 5, paragraph 2, are to constitute the reference for determining medicines and medical treatment obtainable only on medical prescription; however, it is possible that neighbouring Parties clarify, through bilateral agreements, the situation of medicines and medical treatment which are available only on prescription in one Party and not in the other.

262. According to paragraph 3, advertising for medicines and medical treatment which are available only on medical prescription are prohibited. *A contrario*, this paragraph will not apply to medicines or medical treatment which are available in a transmitting Party both with or without a medical prescription; paragraph 4 will apply in such cases.

263. Paragraph 4 subjects advertising for other medicines and medical treatment to a number of general requirements: they must be honest, truthful, subject to verification and comply with the requirement of protection of the individual from harm. These requirements appear in more specific terms in the aforementioned recommendations of the partial agreement and in various professional codes, establishing, inter alia, that advertising must not contain exaggerated expressions or treatment indications of too general a nature, suggestions that good health is likely to be endangered if the product is not used, offer a diagnosis or treatment by correspondence, suggest that the efficacy or the safety of a product is due to the fact that it is "natural", or be addressed to children, induce fear, etc.

264. For the implementation of paragraphs 3 and 4 of this Article, it will be important to make use of the provisions on the exchange of information set out in Article 19 of the Convention.

*Paragraph 5*

265. Medicine means any substance or combination of substances which is used for treating or preventing disease in human beings, as well as any substance or combination of substances, which may be administered to human beings with a view to making a medical diagnosis or to restoring, correcting or modifying physiological functions in human beings. This definition takes particularly account of the meaning given to the term medicines by European Community Law. In this context, the term "substance", which is used in this definition, as referring to any matter irrespective of origin which may be (i) human, e.g. human blood and human blood products; (ii) animal, e.g. micro-organisms, whole animals, parts of organs, animal secretions, toxins, extracts, blood products etc.; (iii) vegetable, e.g. micro-organisms, plants, parts of plants, vegetable secretions, extracts etc.; (iv) chemical, e.g. elements, naturally occurring chemical materials and chemical products obtained by chemical change or synthesis. It is worth recalling that the prohibition under Article 15 (5) does not apply to non-medicinal products, like shampoos, beauty products etc.

266. Tele-shopping for medicines and medical treatments shall not be allowed. The notion of 'medical treatment' shall be interpreted in the light of the regulations existing in each Party. For example, in certain Parties there are provisions which include in the category of "medical treatment" products or services such as prostheses, products claiming health effects or spa treatments (see paragraphs 259 to 262 above).

### Article 16 – Advertising and tele-shopping directed specifically at a single party

267. This article lays down that, where a particular audience in a single Party is targetted specifically and with some frequency by advertising or tele-shopping programmes in a programme service transmitted from another Party, the advertising or tele-shopping programmes concerned shall not circumvent the rules governing television advertising or tele-shopping in the Party in which the audience is targetted. The purpose of this aArticle is therefore to avoid situations whereby advantage is taken in the transfrontier character of a programme service and of the different rules applicable to television advertising or tele-shopping in the Parties, in order to circumvent the television advertising or tele-shopping rules in a single Party other than the transmitting Party, thereby creating distortions in competition or affecting the equilibrium of its television system.

268. It is to be noted that this article does not prohibit the targetting of a particular audience other than that of the transmitting Party, but merely aims to ensure that, when an audience in a single receiving Party is targetted by advertising or tele-shopping programmes, there is a reasonable equality of between, on the one hand, advertising or tele-shopping programmes transmitted by entities or by technical means within the jurisdiction of the transmitting Party concerned and, on the other hand, advertising or tele-shopping programme transmitted by entities or by technical means within the jurisdiction of the receiving Party concerned (including those which are not transfrontier in character in the case of the latter Party).

269. This aArticle provides two exceptions to the rule of non-circumvention of the television advertising or tele-shopping rules of the Party in which the audience is targetted. The first exception concerns cases in which the television advertising or tele-shopping rules establish discriminations on the basis of the origin of advertising or tele-shopping (for example, stating that advertising emanating from another Party are not allowed in respect of a particular product, whereas advertising transmitted by entities or by technical means within the jurisdiction of the Party concerned are allowed). Clearly such rules would be contrary to the notion of equality of opportunity referred to in paragraph 268 above.

270. The second exception, which is not necessarily cumulative with the first one, covers the case where the Parties concerned have concluded bilateral or multilateral agreements in this area, either prior to the adoption of the Convention, or subsequently.

271. The criteria mentioned in this article ("specifically", "with some frequency", "single Party"; "circumvention") are cumulative; in the absence of one criterion, advertising cannot be considered to be prohibited.

272. In order to determine whether advertising or tele-shopping is specifically directed at audiences in a single Party other than the transmitting Party, the following additional elements might, for example, be retained:

– the (name of the) product or service advertised or shown in the framework of a tele-shopping programme;

– the currency used in advertising or tele-shopping;

– the selling points mentioned;

– the language used in advertising or tele–shopping (speech and/or subtitle).

273. It is to be noted that the mere fact of subtitling or dubbing advertising concerned in several languages may not necessarily preclude the application of this article. This would be the case, for example, where notwithstanding such dubbing or subtitling, elements referred to in paragraphs 271 and 272 above clearly illustrate that a single audience is in fact being targetted by advertising or tele-shopping concerned.

274. The notion of circumvention referred to in this Article does not imply that, when a particular audience is being targetted in a given single Party, the broadcaster must first acquire detailed knowledge of all the television advertising or tele-shopping rules in that Party, but rather a broad understanding thereof. It follows that failure to respect rules of an obscure, ambiguous or imprecise character would not qualify as circumvention for the purposes of this article. Indeed, in this as in other matters, the principles of legal certainty, accessibility and proportionality should be applied.

275. It is understood that, where different advertising or tele-shopping regimes apply to different broadcasters in a Party, for example public and private broadcasters, the most favourable treatment principle shall apply to advertising or tele-shopping specifically targetted at the audience of that Party.

276. It will be for the Party in which the audience is specifically targetted by advertising or tele-shopping in programme services transmitted by entities or by technical means within the jurisdiction of another Party to provide elements to illustrate that the circumvention of its television advertising or tele-shopping rules could lead to distortions in competition or the endangering of its television system.

277. It follows from the preceding paragraphs, for example, that:

– a programme service containing advertising or tele-shopping for products or services the television advertising or tele-shopping of which is prohibited in a receiving Party would not be considered contrary to this Article unless such advertising or tele-shopping are specifically and with some frequency directed solely to audiences in that Party in order to circumvent its advertising or tele-shopping rules;

– a programme service containing a percentage of advertising or tele-shopping which is superior to that authorised in a receiving Party or advertising or tele-shopping which is inserted in a manner which is not authorised in a receiving Party would not be considered contrary to this article, subject to conformity with the provisions of Articles 12 and 14 of the Convention. However, notwithstanding conformity with Articles 12 and 14, this article would be applicable if advertising or tele-shopping in question are specifically and with some frequency directed solely to audiences in that Party and can clearly be considered as circumventing the advertising or tele-shopping rules in that Party;

– a programme service transmitting with some frequency advertising or tele-shopping for products or services exclusively available in one receiving Party and in the language of that Party would not be considered contrary to this article unless the transmission of such advertising circumvents the advertising or tele–shopping rules in that Party.

## CHAPTER IV – SPONSORSHIP

*Article 17 – General standards*

278. In accordance with the provisions of Article 2, sub-paragraph h., the notion of sponsored programmes does not embrace sponsored events (see above, paragraph 110).

*Paragraph 1*

279. This paragraph embodies the principle that sponsored programmes must be clearly identified as such. The identification of the sponsor is a means of warning viewers that special interests might be involved in the production of the programme. Consequently surreptitious sponsorship (when the sponsor is not identified in any way) is prohibited under this paragraph.

280. Furthermore, the possibility for viewers of immediately identifying the sponsor constitutes, for the sponsor, the guarantee of obtaining the desired increase in renown in return for his/her participation in the direct or indirect financing of a programme.

281. The appropriate credits at the beginning or end of the programme may, subject to the choice of the sponsor, be the company name or the name of one of its most well-known products, logo or any other means of identifying the sponsor, on the condition that such credits do not contain specific promotional elements (encouragement to purchase, reference to the quality or the effectiveness of the product, etc.; see above, paragraph 107). In its Opinion No. 4 (1995) on certain provisions on advertising and sponsorship, the Standing Committee concluded that under paragraph 1 of Article 17, mention of the sponsor is obligatory. The Convention requires that the public be informed that a programme has been sponsored (this information could be useful to viewers so as to alert them to the possible risk of the sponsor exercising editorial influence over the content of the programme). Only one possibility for mentioning the sponsor is expressly referred to in the Convention namely, in the credits at the beginning and/or at the end of the programme. It does not prohibit the insertion of the name and/or logo of the sponsor at other times than the beginning and/or end of the programme, provided that any such reference to the sponsor is not repeated excessively during the programme.

282. It will be for the broadcaster to choose whether the credits will be at the beginning or end of the programme, or both.

*Paragraph 2*

283. The principle underlying this provision is that the broadcaster retains full responsibility over the content and scheduling of the sponsored programme and, consequently, editorial independence with regard to programmes. This paragraph therefore echoes a similar concern expressed in Article 11, paragraph 5, in relation to advertising (see above, paragraph 214).

*Paragraph 3*

284. Having regard to the concept of sponsorship used in Article 2, subparagraph h., the purpose of this paragraph is to exclude any promotion of a product or service of the sponsor within the sponsored programme. Such promotion would be tantamount to advertising and would therefore be prohibited under Article 13, paragraphs 1 and 3. However, the mere fact of the acknowledgement of the identity of the sponsor in accordance with Article 17, paragraph 1, shall not in itself be taken as encouraging the purchase or rental of the sponsor's products or services.

285. The reference in this paragraph to the promotion of a third party's products or services is designed to avoid the emergence of practices of cross–sponsorship between two or more sponsors and two or more sponsored programmes.

286. In the case of game shows and quizzes in which the prizes comprise the products or services of the sponsor, one single oral or visual reference to the name or logo of the sponsor or to the same product or service is allowed as information for the public. With the exception of this and the other cases referred to in paragraph 239, any other form of presentation of products or services within sponsored programmes is prohibited.

*Article 18 – Prohibited sponsorship*

*Paragraph 1*

287. This paragraph establishes that, when the principal activity of a natural or legal person is the manufacture or sale of products, or the provision of services, the advertising or tele-shopping of which is prohibited under Article 15, he/she may not sponsor a programme. This is to prevent such a person from benefiting, through sponsorship, from the indirect advertising of his/her products or services.

288. Among criteria for determining whether the activity in question is the principal activity, the following might be mentioned: the share of the revenue drawn from the activity in relation to the global revenue of the natural or legal person; the activity for which the person is mainly known by the public (for example: the prior establishment of the activity in relation to connected activities); the nature of the connected activities (for example: when such activities are closely linked to the principal activity).

289. *A contrario*, Article 18 implies that the possibility of sponsoring programmes is available to any natural or legal person whose "principal" activity falls outside the scope of Article 15. This includes natural or legal persons who do not have access to television advertising, for example where the advertising of certain products or services is confined to other media than television.

*Paragraph 2*

290. Companies in the pharmaceutical sector willingly give financial support to major cultural events. Since, through sponsorship, they may encourage the creation and televised broadcasting of such events, this Convention authorises them to sponsor programmes at the transfrontier level. However, in the case of companies whose activity includes, *inter alia*, the manufacture or sale of medicines and medical treatment available only on medical prescription in the transmitting Party, their sponsorship may consist of the promotion of the name, trademark, image or activities of the company, including the reference to the name of one of its most well-known innocuous products, but in no circumstances may it refer to a specific medicine or medical treatment available only on medical prescription. If this were not the case, it could lead to the circumvention of Article 15 (3), which clearly prohibits television advertising for these kinds of medicines and medical treatment.

*Paragraph 3*

291. This paragraph reflects the special interest of the member States of the Council of Europe in the guarantee of the plurality of information sources and the independence of news and current affairs programmes. The prohibition of the sponsorship of such programmes reinforces the principles embodied in the preamble, Article 7, paragraph 3, and Article 13, paragraph 4.

292. The term "current affairs" in this Article refers to strictly news related programmes such as commentaries on news, analysis of news developments and political positions on events in the news (see paragraph 243 above).

## CHAPTER IV*bis* – PROGRAMME SERVICES DEVOTED EXCLUSIVELY TO SELF–PROMOTION OR TELE–SHOPPING

### Article 18bis – Programme services devoted exclusively to self–promotion

293. A specific case concerns programme services aimed exclusively at promoting the products, services, programmes or programme services of a broadcaster under the meaning of Article 2 (c) of the Convention, without conventional programme elements such as news, sports programmes, cinematographic works, television films, documentaries and drama. Like all other programme services, they are subject to the relevant provisions of the Convention, with the exception of Articles 9 and 10, which are not relevant since they apply to television programmes which, by definition, cannot be broadcast in these particular types of programme services. In particular, these services must comply with the general standards provided for under Article 7, as well as rules on transparency (Article 6).

294. The Convention allows such services to broadcast other forms of advertising, including tele-shopping and sponsorship, provided such advertising complies with the provisions of Chapters III (Advertising and tele-shopping) and IV (Sponsorship) of the Convention. In particular the transmission time devoted to such advertising cannot exceed the ceilings fixed in Article 12, paragraphs 1 and 2, of the Convention.

### Article 18ter – Programme services devoted exclusively to tele-shopping

295. Over and above tele-shopping spots and tele-shopping windows broadcast within the framework of the traditional programme services, programme services exclusively devoted to tele-shopping have appeared over the last few years. Such services are an increasingly important outlet for goods and services and are more and more used by consumers. Article 18*ter* lays down the principle that, like programme services exclusively devoted to self-promotion, such services are covered by the provisions of the Convention, with the exception of Articles 9 and 10, which are not relevant since they apply to television programmes which, by definition, cannot be broadcast in these particular types of programme services. In particular, the general standards provided for under Articles 7 (Responsibilities of the broadcaster) and 11 (General standards concerning advertising and tele-shopping), as well as the rules on transparency provided for under Article 6, fully apply to these services.

296. Furthermore, the daily limit to the broadcasting of advertising spots fixed in Article 12, paragraph 1 applies to these services. On the other hand, the limit concerning the amount of advertising spots and tele-shopping spots within a given clock hour does not apply.

## CHAPTER V – MUTUAL ASSISTANCE

### Article 19 – Co-operation between the Parties

297. The principal idea underlying this article is that the implementation of the Convention will be based essentially on co-operation between the Parties. This Article therefore aims to reduce as far as possible the risk of possible conflicts arising between Parties as a result of the transfrontier transmission of television programme services.

298. The main provisions in this article are inspired by similar provisions in the Convention for the Protection of individuals with regard to Automatic Processing of Personal Data (1981) but have been adapted to meet the requirements arising from the subject matter of the Convention.

299. While paragraph 1 establishes the principle that the Parties shall render each other mutual assistance, paragraph 2 requires the designation of one or more authorities for this purpose. In several member States of the Council of Europe, specialised authorities in broadcasting matters have been set up; such authorities could be chosen for the purpose of the Convention. The Convention does not, however, require the institution of such specialised authorities where they do not yet exist. An authority may be designated for the purposes of the Convention only.

300. Paragraph 3 enumerates the means by which the Parties are to render each other mutual assistance through their designated authorities.

301. With regard to sub-paragraph b, the information to be furnished may be of a legal, administrative or factual nature (for example on the transfrontier activities of broadcasters registered in the Party concerned).

302. Sub-paragraph d again reflects the important idea of co-operation underlying Article 19 as a whole in the particular case of a difficulty arising in the application of the Convention, and it should be read in conjunction with Article 25, paragraph 1, which embodies the principle of the friendly settlement of any such difficulty. It is clear that such co-operation presupposes that, in many instances, contacts between the broadcasters concerned or between the broadcasters and the competent national authorities concerned will have been instigated in the initial stages.

## CHAPTER VI – STANDING COMMITTEE

### Article 20 – Standing Committee

303. It was considered that the aims of the Convention would be more easily achieved if the representatives of the Parties were given the possibility of meeting at regular intervals with a view to following the application of the Convention, taking into account any developments in transfrontier television broadcasting and the experience gained from the implementation of the Convention's provisions. It was felt that much of the responsibility for the functioning of the Convention should be left to those representatives meeting in the Standing Committee so that the Convention would have the capacity to respond to new situations brought about by technical developments.

304. The Committee is to meet whenever one-third of the Parties or the Committee of Ministers of the Council of Europe so requests, or on the initiative of the Secretary General of the Council of Europe in accordance with the provisions of Article 23, or at the request of one or more Parties in accordance with Articles 21, sub-paragraph c, and 25, paragraph 2. It follows that the committee will not be in permanent session, but only whenever the need is felt.

305. It is specified in paragraph 2 that each Party may be represented on the Standing Committee by one or more delegates, each delegation having one vote. However, since Article 29, paragraph 1, makes provision for the European Community to become a Party to the Convention, this paragraph further specifies that, within its areas of competence, the European Community shall exercise its right to vote with a number of votes equal to the number of its Member States which are Parties to the Convention. The European Community shall not however exercise its right to vote in cases where the Member States concerned exercise theirs and vice versa.

306. In Council of Europe conventions where a committee is to be set up, member States which are not party to the convention have the right to be represented by an observer. Because, for the reasons indicated in paragraph 368 below, the Convention is open for signature by the Parties to the European Cultural Convention which are not members of the Council of Europe, this right has been extended to the latter which are not Parties to the Convention.

307. Because of the special nature of the matters dealt with in the Convention, it was considered appropriate to empower the Standing Committee to seek the advice of experts in the discharge of its functions. Likewise, the Committee may, on its own initiative or at the request of the body concerned, invite any international or national governmental or non-governmental body technically qualified in the fields covered by the Convention to be represented by an observer at one or part of one of its meetings. The decision to invite such experts or bodies requires a majority of three–quarters of the members of the Standing Committee present.

308. A majority of the Parties constitutes a quorum for holding a meeting of the Standing Committee. This rule also applies for the conduct of meetings of the Committee.

309. The general rule in paragraph 7 that a majority of three-quarters of the members present is required for the decisions of the Standing Committee is designed to ensure that such decisions are representative of the Parties' views.

### Article 21 – Functions of the Standing Committee

310. This article enumerates the functions of the committee. The list of functions is exhaustive. These functions are confined to the application and interpretation of the Convention and are without prejudice to the further elaboration of a European mass media policy within the framework of existing Council of Europe bodies competent in the field.

311. One of the principal functions of the committee is to make recommendations to the Parties concerning the application of the Convention. It is also possible that questions concerning its interpretation will arise, all the more so since the Convention deals with an area which is subject to rapid changes. The Standing Committee is empowered to examine any such question raised by a Party.

312. A further important task of the committee is to suggest any necessary modifications of the Convention and to examine those proposed in accordance with the provisions of Article 23.

313. The co-operation referred to in Article 19 is echoed at the level of the Standing Committee; it is to use its best endeavours to secure a friendly settlement of any difficulty referred to it (see paragraph 348 below).

314. Furthermore, the Standing Committee has been given the task of determining on a case by case basis whether a broadcaster abuses the rights granted by the Convention by establishing itself on the territory of a Party with a view to directing its programme service or services to another Party with the objective of evading the laws which would have applied to it, in the areas covered by the Convention, had it been established on the territory of the receiving Party (see paragraph 334 below).

315. Finally, the Standing Committee will monitor the implementation by the Parties of the provisions of Article 9*bis* of the Convention concerning access of the public to major events, with a view to publishing an annual overview of the national implementing measures and, in addition, it will draw up guidelines for the drafting of such measures in order to avoid differences between the implementation of Article 9*bis* of the Convention and that of corresponding European Community provisions (see paragraphs 181–188 above).

### Article 22 – Reports of the Standing Committee

316. Committees instituted in the framework of Council of Europe conventions report, as a rule, to the Committee of Ministers. In addition, this article specifies that the Standing Committee's report shall be transmitted to the Parties.

## CHAPTER VII – AMENDMENTS

### Article 23 – Amendments

317. Any Party may propose amendments to the articles of the Convention. They are communicated to all member States of the Council of Europe, to the other Parties to the European Cultural Convention, to the European Community and to any other State which has acceded to, or has been invited to accede to the Convention in accordance with Article 30.

318. When the Standing Committee examines a proposed amendment, a majority of three-quarters of the members of the Standing Committee is required for its adoption before its submission to the Committee of Ministers for approval (see, in this context, paragraph 309 above).

319. The provisions of this paragraph do not rule out the possibility for the Standing Committee to propose amendments in accordance with Article 21, sub-paragraph b (see above, paragraph 312).

320. Before approving an amendment, the Committee of Ministers may, in certain cases, wish to consult the existing Council of Europe bodies competent for mass media policy.

321. In principle, any amendment shall enter into force on the thirtieth day after all the Parties have informed the Secretary General of the Council of Europe of their acceptance thereof. However, the Committee of Ministers may decide in certain circumstances, after consulting the Standing Committee, that such amendments shall enter into force following the expiry of a two-year time lapse, unless a Party notifies the Secretary General of an objection. This procedure, the purpose of which is to speed up the entry into force of amendments while preserving the principle of the consent of all the Parties, might for example apply to amendments merely aimed at clarifying the terminology used in the Convention, in the light of new technical developments in the transfrontier television sector, at specifying or supplementing the functions of the Standing Committee (cf. Article 21 of the Convention) or at amending the provisions concerning the settlement of disputes (cf. Chapter IX and Appendix to the Convention) or the final provisions of the Convention on technical matters such as the modalities of accession by non-member States to the Convention (cf. Article 30 of the Convention).

## CHAPTER VIII – ALLEGED VIOLATIONS OF THIS CONVENTION

### Article 24 – Alleged violations of this Convention

322. This article aims to establish a balance between the transmitting and receiving Parties by establishing specific procedures to be followed when a Party invokes this Convention. These procedures are designed, on the one hand, to prevent the arbitrary suspension of retransmission by a receiving Party and, on the other hand, to provide a receiving Party with some means of reaction in the case of transmissions contrary to the terms of the Convention.

*Paragraph 1*

323. This paragraph provides that, where a receiving Party finds a violation of the Convention, the alleged violation must be communicated to the transmitting Party and that the two Parties shall endeavour to overcome the difficulty on the basis of the provisions of Articles 19, 25 and 26. It highlights, therefore, that the procedures laid down in the subsequent paragraphs of this Article are to be considered in the light of the mechanisms of mutual assistance and friendly settlement of disputes, as well as, where appropriate, arbitration, provided for in Chapters V and IX of the Convention.

324. Paragraphs 2, 3 and 4 of this article seek to determine the circumstances in which a receiving Party may or may not suspend provisionally the retransmission of a programme service on the grounds that it is allegedly in breach of the terms of the Convention.

325. The specific conditions in which provisional suspension may be envisaged are set out in paragraphs 2 and 3, and it is to be noted that in no circumstances may one single and isolated alleged violation entitle a receiving Party to suspend the retransmission.

326. It is also to be noted that the time-limits fixed in these two paragraphs apply even when the procedures of mutual assistance, conciliation and arbitration referred to in paragraph 1 are prolonged over a longer period of time.

327. Furthermore, where provisional suspension of the retransmission of an incriminated programme service is authorised under this article, this does not dispense a Party from instigating whatever procedures are required under its domestic law before such suspension can become effective.

*Paragraph 2*

328. This paragraph determines the circumstances in which a receiving Party may provisionally suspend retransmission within a short period of time, that is, if the alleged violation persists within two weeks following the communication of the alleged violation to the transmitting Party and the implementation of the procedure set out in paragraph 1.

329. However, since such provisional suspension is a grave measure, the possibility of envisaging recourse to it has been restricted to cases of alleged violations of a manifest, serious and grave nature, which raise important public issues and which concern a limited number of articles: 7, paragraphs 1 or 2, 12, 13, paragraph 1, first sentence, 14 or 15, paragraphs 1 or 3. When considering applying this paragraph, the Parties will have due regard to the principle of proportionality, which is an essential criterion resulting from the case-law of the organs of the European Convention on Human Rights whenever restrictions are imposed on the fundamental freedoms embodied notably in Article 10 of that Convention. This is the purpose of the qualification "manifest, serious and grave nature which raises important public issues", which is designed to limit the application of this paragraph to alleged violations of a sufficiently serious nature to warrant such action. Clearly, therefore, alleged violations of a minor or technical character could not justify action under this paragraph.

*Paragraph 3*

330. This paragraph provides that in all other cases of alleged violation of the Convention, with the exception of those referred to in paragraph 4 of this article, a receiving Party may suspend provisionally the retransmission of the incriminated programme service after a period of eight months following the communication of the alleged violation to the transmitting Party and provided that the alleged violation persists.

*Paragraph 4*

331. According to this paragraph, the provisional suspension of retransmission may in no event occur in respect of alleged violations of Articles 7, paragraph 3, 8, 9 or 10.

### Article 24bis – Alleged abuses of rights conferred by this Convention

332. This provision defines the circumstances under which the fact that a broadcaster has established itself on the territory of a Party with a view to directing its programme service or services to another Party is an abuse of rights, as well as the measures which may possibly be taken in such circumstances. As with Article 24, Article 24 *bis* aims to establish a balance between the transmitting and receiving Parties by establishing specific procedures to be followed when a Party invokes an abuse of rights granted by the Convention. These procedures are all the more important since the fundamental principle of freedom of reception and retransmission of programme services laid down in Article 4 is at stake.

333. It should be noted that Article 24 *bis* does not apply between Parties which are members of the European Community.

*Paragraph 1*

334. While Article 16 deals with the circumvention of the Convention's rules on advertising and tele-shopping by a broadcaster established in one Party which broadcasts advertising and tele-shopping programmes which are specifically targeted and with some frequency to an audience in another Party (see paragraphs 267 to 277 above), this paragraph of Article 24*bis* defines what can constitute an abuse of rights within the meaning of the Convention, on the basis of the 14th recital of the revised Directive. The mere fact that a broadcaster establishes itself on the territory of a Party with a view to directing its programme service or services to another Party cannot *per se* constitute an abuse of rights. Such an abuse can only be established to the extent that the objective of the broadcaster, via this operation, is to evade the laws which would have applied to it, in the areas covered by the Convention, had it been established on the territory of the receiving Party. For example, the decision of a broadcaster to establish itself in a Party for taxation reasons or in view of the legislation concerning labour law applied in that Party cannot constitute an abuse of rights, as these branches of law are not covered by the Convention.

335. Furthermore, for the application of Article 16 it suffices that the advertising and tele-shopping programmes of a broadcaster established in a transmitting Party are targeted specifically to an audience in another Party (see paragraphs 267 to 277 above), while under Article 24*bis*, the programme service or services concerned must be wholly or principally directed to the territory of a Party other than that where the broadcaster has established itself. The assessment of this condition will have to be made in regard to objective elements (content of the programmes broadcast, language used in the programmes, etc).

336. Finally, the determination of the Party which is competent *vis-à-vis* the broadcaster under paragraph 1 must be made on the basis of the criteria defined on this matter in Article 5 of the Convention.

*Paragraph 2*

337. This paragraph provides for a specific procedure in the case where a receiving Party would allege the existence of an abuse of rights under paragraph 1. In accordance with the philosophy which, under Chapter IX, governs the settlement of disputes within the framework of the implementation of the Convention, sub-paragraph a) gives priority to the search for a friendly settlement between the Parties concerned. Should such a settlement not be found within a three-months time lapse, sub-paragraph b) provides that the receiving Party shall refer the matter to the Standing Committee.

338. On the basis of the information provided to it by the Parties concerned, the Standing Committee must, within six months as from the date on which it has been seized, give an opinion as to whether an abuse of rights has taken place, within the meaning of paragraph 1. This opinion is notified by the Committee to the Parties concerned.

339. The six–months time lapse aims at providing the Standing Committee with sufficient time to carry out an in–depth examination of the case concerned and, in particular, to obtain from the Parties concerned any clarifications which are necessary in order to enable it to give a substantiated opinion. In this respect, the Parties should, in the same vein as is provided for under paragraph 3 of Article 25, accord the Standing Committee without delay all information and facilities necessary for the discharge of its functions under Article 24*bis*.

*Paragraph 3*

340. Should the Standing Committee conclude that there has been an abuse of rights, the transmitting Party must take appropriate measures, in view of the circumstances concerned, in order to remedy the abuse. As specified in paragraph 6, such measures must comply with Article 10 of the European Convention on Human Rights.

*Paragraph 4*

341. In case the transmitting Party has not taken appropriate measures within six months from the date on which the Standing Committee has notified its opinion concluding that there has been an abuse of rights, paragraph 4 provides that the Parties concerned must have recourse to arbitration. The six-months time lapse is aimed at ensuring that the transmitting Party has sufficient time to take measures once the Standing Committee has given an opinion.

342. By laying down the obligation to have recourse to arbitration, Article 24 *bis* derogates to the first sentence of paragraph 1 of Article 26, under which this procedure is only optional. This obligation is justified by the importance of the question of abuse of rights and the consequences which possible measures aimed at remedying such abuses may have, both for the activities of broadcasters and the relationship between the Parties.

*Paragraph 5*

343. This paragraph provides that the arbitration procedure must be completed before the receiving Party can, if appropriate, take measures against the programme service or services of the broadcaster who has been found, under the arbitration procedure, to have committed an abuse of rights. Like the possible measures referred to in paragraph 3, such measures must, under paragraph 6, comply with Article 10 of the European Convention on Human Rights.

344. The measures which may be taken by the receiving Party can, for example, be the suspension of the retransmission of the programme service or services concerned, or the prohibition to sell or rent decoding equipment, as well as advertising for such equipment, if the services are encrypted.

*Paragraph 6*

345. As the general objective of the Convention, as defined in Article 4, is to ensure freedom of expression and information via the free circulation of transfrontier television programme services which comply with the minimum standards of the Convention, it is necessary that any measures which might be taken by the Parties under Article 24*bis* comply with Article 10 of the European Convention on Human Rights, as interpreted by the supervisory organs of that Convention.

346. Paragraph 6 implies that such measures respect the requirements laid down by these organs to accept a restriction to freedom of expression and information. In this context, the proportionality requirement mentioned above under paragraphs 3 and 5 is particularly important.

347. It is understood that the time lapses referred to in this article constitute maximum delays.

## CHAPTER IX – SETTLEMENT OF DISPUTES

### *Article 25 – Conciliation*

348. This article elaborates the principle – already evoked in Articles 19 and 21 – of the friendly settlement of difficulties, firstly through bi- or multilateral co-operation between the parties concerned and, secondly, if this proves necessary and unless one of the parties concerned objects, through the intervention of the Standing Committee.

349. Paragraph 2 provides that, where the matter is brought before the Standing Committee, the latter may examine the question by placing itself at the disposal of the parties concerned in order to reach a satisfactory solution and, where appropriate, to formulate an advisory opinion on the subject.

350. Paragraphs 2 and 3 refer respectively to "as rapidly as possible" and "without delay". This is to avoid undue delays in the conciliation procedure which could be prejudicial to the solution finally reached.

351. Emphasis is placed on the importance of exhausting the possibilities of co-operation and conciliation laid down in Article 19 and the present article before envisaging recourse to arbitration.

### *Article 26 – Arbitration*

352. This article provides for arbitration in cases where a dispute cannot be settled under the conciliation procedures set out in Article 25, although it was recognised that such cases should be rare because of the emphasis placed on mutual assistance and conciliation between the parties in the preceding articles. Recourse to arbitration was considered a necessary means of finally settling such disputes in the absence of a friendly settlement, notably because the arbitration tribunal's award is final and binding on the parties to the dispute.

353. The arbitration procedure set out in the appendix may be instituted by common agreement between the parties concerned. However, in the absence of such agreement within six months following the first request to open the procedure of conciliation, the dispute may be submitted to arbitration at the request of only one of the parties. It was thought that this possibility of having recourse to arbitration at the request of only one of the parties – in the absence of a common agreement to do so within the six-month time-limit – would constitute an additional incentive for the parties concerned to reach a friendly settlement.

354. Paragraph 2 of this article enables Parties to issue a declaration, recognising as compulsory *ipso facto* and without special agreement in respect of other Parties accepting the same obligation, the application of the procedure of arbitration set out in the appendix. Such a declaration may be made at any time and independently of any dispute involving the Party making the declaration.

355. The appendix to the Convention sets out the procedure for arbitration. It provisions are inspired by similar provisions in other Council of Europe instruments: in particular the European Convention for the Protection of Animals during International Transport (1968) and the Convention on the Conservation of European Wildlife and Natural Habitats (1979).

356. Paragraph 2 of the appendix covers situations in which a dispute arises between two Parties, one of which is a Member State of the European Community, in the event of the latter being itself a Party to the Convention.

357. In the last sentence of paragraph 4, the expression "the same procedure" means that, in this hypothesis, the third arbitrator will be designated by the President of the European Court of Human Rights.

358. Paragraph 6 covers situations in which two or more parties determine by agreement that they are in the same interest. It provides that, in such situations, they shall appoint an arbitrator jointly. This provision concerns exclusively the composition of the arbitration tribunal and is without prejudice to the rights of the parties to put forward their views individually.

359. Paragraph 7 embodies the principle of co-operation between the parties to the dispute, the Standing Committee and the arbitration tribunal for the effective conduct of the proceedings.

360. Paragraph 8 states *inter alia* that the arbitration tribunal shall draw up its own rules of procedure. This implies that the tribunal is empowered to determine the means by which it is to conduct its procedure, including, where appropriate, the consultation or hearing of experts.

## CHAPTER X – OTHER INTERNATIONAL AGREEMENTS AND THE INTERNAL LAW OF THE PARTIES

### Article 27 – Other international agreements or arrangements

361. This article specifies the relations between the Convention and other international agreements or arrangements under which the Parties may agree to establish between them particular regimes, which are either derogatory in relation to the rules arising from the Convention or which extend the scope of those rules. It only concerns, therefore, such agreements or arrangements and not, more generally, all other treaties by which the Parties to this Convention may be bound (see in this context, the comments on Article 4, paragraphs 119 to 123 above).

362. Paragraph 1 is designed to cover the particular situation of those Parties which are members of the European Community. It states that, in their mutual relations, those Parties shall apply Community rules and shall not therefore apply the rules arising from the Convention except in so far as there is no Community rule governing the particular subject concerned. Since it governs exclusively the internal relations between the Parties members of the European Community, this paragraph is without prejudice to the application of this Convention between those Parties and Parties which are not members of the European Community.

363. Paragraph 2 is designed to enable Parties to conclude other international agreements completing or developing the provisions of the Convention or extending their field of application.

364. Paragraph 3 is concerned solely with particular cases where two States conclude a bilateral agreement to establish arrangements – possibly derogatory – for the application of the Convention in their mutual relations. For example, one could envisage the situation of two neighbouring States one of which, due to unavoidable spill-over, receives programme services which, whilst conforming to the legislation of the other State, do not respect all the provisions of the Convention. This paragraph states that, where such an agreement exists, the Convention does not alter the rights and obligations of the two Parties arising from such an agreement in so far as they do not affect the enjoyment of other Parties of their rights, or the performance of their obligations, under the Convention.

### Article 28 – Relations between the Convention and the internal law of the Parties

365. As is already indicated in paragraph 127 above, the Parties remain free to apply stricter or more detailed rules that those provided for in the Convention to programme services transmitted by entities or by technical means within their jurisdiction, within the meaning of Article 3. It was thought advisable to specify this point in the text of the Convention, particularly for those Parties where an international treaty, duly ratified, has a rank superior to ordinary legislation.

366. However, as is also indicated in paragraph 127 above, the existence of stricter or more detailed rules in a Party, which are applicable to programme services transmitted by entities or by technical means within its jurisdiction, may not justify the restriction of the retransmission on its territory of programme services transmitted by entities or by technical means within the jurisdiction of another Party, where those services comply with the terms of the Convention (i.e., Articles 6–18*b*).

## CHAPTER XI – FINAL PROVISIONS

### Articles 29 to 35

367. These articles are largely inspired by the "Model Final Clauses for Conventions and Agreements concluded within the Council of Europe" approved by the Committee of Ministers in February 1982. Some particular points, however, might be underlined.

### Article 29 – Signature and entry info force

*Paragraph 1*

368. Since the Parties to the European Cultural Convention which are not members of the Council of Europe share largely the same concerns as the member States of the Council with regard to the issues which the Convention addresses, and since representatives of two of those Parties took part in the preparatory work as observers, it was decided to open the Convention for signature by those Parties at the same time as the member States.

369. Furthermore, this paragraph also makes provision for the European Community to become a Party to the Convention.

Case 1:19-cv-01618-TSC     Document 23-7     Filed 12/20/19     Page 55 of 55

*Paragraph 3*

370. This paragraph lays down a procedure for the provisional application of the Convention prior to fulfilment of the conditions for its entry into force laid down in paragraph 2. Such a procedure is to be found in certain Council of Europe instruments (Convention on the elaboration of a European Pharmacopoeia, 1964; Third Protocol to the General Agreement on Privileges and immunities of the Council of Europe, 1959) and other international instruments. This particular provision is inspired by the Convention on the Early Notification of a Nuclear Accident, adopted in 1986 within the framework of the International Atomic Energy Agency. It provides that a State may, at the time of signature or any later date prior to the entry into force of the Convention in respect of that State, declare that it shall apply the Convention provisionally.

371. It was thought advisable to provide for such a clause in the Convention because of the pace of developments in the field of transfrontier television broadcasting and the need for the Convention's provisions to be applied as rapidly as possible.

372. It follows from the preceding observations that the provisions of paragraph 3 are without prejudice to the requisite internal procedures for the formal ratification, acceptance or approval of the Convention.

## Article 30 – Accession by non-member States

373. After the Convention has entered into force, and after having consulted the Contracting States, the Committee of Ministers may invite any State which is not referred to in Article 29, paragraph 1, to accede to the Convention.

## Article 31 – Territorial application

374. Since this provision is mainly aimed at territories overseas, it was agreed that it would be clearly against the philosophy of the Convention for any Party to exclude from the application of this instrument parts of its main territory and that there was no need to specify this in the Convention.

## Article 32 – Reservations

375. Given the specific nature and purpose of the Convention, namely to lay down basic standards by which television programme services may enjoy unhindered transfrontier circulation, it was considered essential not to provide unlimited possibilities for States to make reservations when signing or depositing their instruments of ratification, acceptance, approval or accession of the Convention. Paragraph 1 of this Article therefore specifies the only reservation which may be made.

376. In so far as the content of authorised reservations is the result of negotiations during the drafting of the Convention, it was agreed, as specified in paragraph 2, that a reservation made in accordance with paragraph 1 may not be the subject of an objection.

377. Paragraphs 3 and 4 are inspired by the model final clauses referred to in paragraph 367 above.

## *Appendix – Arbitration*

378. The arbitration procedure set out in the appendix is described in paragraphs 355 to 360 above.