**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**MASDAR SOLAR & WIND COOPERATIEF U.A.**
Claimant

and

**KINGDOM OF SPAIN**
Respondent

**ICSID Case No. ARB/14/1**

---

# AWARD

---

*Members of the Tribunal*
Mr. John Beechey CBE, President of the Tribunal
Mr. Gary Born, Arbitrator
Professor Brigitte Stern, Arbitrator

*Secretary of the Tribunal*
Ms. Luisa Fernanda Torres

*Date of dispatch to the Parties:* 16 May 2018

## REPRESENTATION OF THE PARTIES

*Representing Claimant:*

Ms. Judith Gill QC *
Mr. Jeffrey Sullivan *
Mr. Yacine Francis
Mr. Simon Roderick
Mr. Ignacio Madalena
Mr. Tomasz Hara
Ms. Stephanie Hawes

Allen & Overy LLP
11th Floor, Burj Daman Building, Happiness
Street
Dubai International Financial Centre
Dubai
United Arab Emirates

* no longer with the firm

*Representing Respondent:*

Mr. Diego Santacruz
Mr. Antolín Fernández
Mr. Javier Torres
Ms. Mónica Moraleda
Ms. Amaia Rivas
Ms. Elena Oñoro
Mr. Roberto Fernández
Ms. Patricia Froehlingsdorf
Mr. Javier Castro

Abogacía General del Estado
Ministry of Justice of the Government of
Spain
Calle Ayala 5
28001, Madrid
Spain

**TABLE OF CONTENTS**

I.    INTRODUCTION AND PARTIES.....................................................................1

II.   PROCEDURAL HISTORY............................................................................1

III.  FACTUAL BACKGROUND.........................................................................14

IV.   RELEVANT SPANISH LEGAL FRAMEWORK........................................19

V.    THE PARTIES' RELIEF SOUGHT.............................................................40

    A.   Claimant's Request for Relief.............................................................40

    B.   Respondent's Request for Relief.........................................................42

VI.   JURISDICTION..........................................................................................44

    A.   Objection Based on Lack of Jurisdiction "*Ratione Personae*"....................46

        (1)  Respondent's Position.........................................................46

        (2)  Claimant's Position...........................................................49

        (3)  Analysis............................................................................51

    B.   Objection Based on Lack of Jurisdiction "*Ratione Materiae*"...................53

        (1)  Respondent's Position.........................................................53

        (2)  Claimant's Position...........................................................55

        (3)  Respondent's Further Objection..........................................57

        (4)  Analysis............................................................................58

    C.   Objection Based on Lack of Jurisdiction "*Ratione Voluntatis*" (Denial of Benefits)...62

        (1)  Respondent's Position.........................................................62

        (2)  Claimant's Position...........................................................64

        (3)  Analysis............................................................................69

            a.   The Timing of The Denial of Benefits...........................69

            b.   The Effect of The Denial.............................................71

            c.   The Cumulative Conditions of Article 17(1) ...................76

    D.   Objection Based on Lack of Jurisdiction "*Ratione Voluntatis*" (The Levy)...............77

        (1)  Respondent's Position.........................................................77

        (2)  Claimant's Position...........................................................79

        (3)  Analysis............................................................................83

    E.   The Intra-EU Objection....................................................................88

        (1)  The Diversity of Nationality Objection..................................88

            a.   Respondent's Position.................................................88

| | b. | Claimant's Position | 89 |
| | c. | The Commission's Amicus Curiae Submission | 90 |
| | d. | Analysis | 91 |
| **(2)** | The "Primacy of EU Law" Objection | | 96 |
| | a. | Respondent's Position | 96 |
| | b. | Claimant's Position | 96 |
| | c. | Analysis | 97 |

**VII. LIABILITY** ... 101

A. Overview of Claimant's Claims ... 101

   **(1)** The Regulatory Regime Ensured Stability ... 102

   **(2)** Claimant's Expectations ... 104

      a. Due Diligence ... 104

      b. The Process of Registration ... 107

      c. The Disputed Measures ... 109

   **(3)** On Spain's Own View of RD661/2007, Masdar's Expectations Were Objectively Well-Founded and Reasonable ... 112

   **(4)** Claimant's Claims for Breach of the ECT ... 114

   **(5)** The Tariff Deficit ... 121

B. Overview of Respondent's Position ... 126

   **(1)** The Spanish Electricity System at The Time of The Investment ... 127

   **(2)** The Activity of Electricity Generation in October 2012 ... 128

   **(3)** The Remuneration Regime ... 130

   **(4)** The Impact of the Financial Crisis ... 131

   **(5)** Economic Sustainability of the Spanish Electricity System and the Correction of Excess Compensation ... 132

C. Article 10(1) ECT: Fair And Equitable Treatment ... 135

   **(1)** Claimant's Position ... 135

   **(2)** Respondent's Position ... 141

   **(3)** Analysis ... 146

      a. No Unreasonable or Unjustified Modification ... 147

      b. No Modification if There Is a Specific Commitment ... 149

**VIII. DAMAGES** ... 161

A. Claimant's Position ... 161

B. Respondent's Position ... 165

C.   Analysis ........................................................................................169

    **(1)** Restitution.................................................................................171

    **(2)** The DCF-Method is the Appropriate Calculation Method ...............174

    **(3)** Claimant's Claims for Damages...............................................183

    **(4)** Lost Future Cash Flows: Analysis of Assumptions Underlying the DCF Model ...............................................................................187

        a.   Discounting Period: Valuation Date .......................................187

        b.   Projection Period: Useful Asset Life ......................................189

        c.   Revenues .........................................................................193

        d.   Risk Assessment................................................................198

    **(5)** Lost Historical Cash Flows ....................................................203

    **(6)** Conclusion...........................................................................204

    **(7)** Tax Gross-Up .......................................................................205

    **(8)** Interest................................................................................206

**IX.**   THE APPLICATION OF THE PRINCIPLE OF JUDICIAL ECONOMY WITH RESPECT TO CLAIMANT'S OTHER CLAIMS FOR BREACH OF ARTICLE 10(1) OF THE ECT.....208

**X.**   RESPONDENT'S APPLICATION TO REOPEN THE ARBITRAL PROCEDURE......209

  A.   Respondent's Position................................................................210

  B.   Claimant's Position ...................................................................211

  C.   Analysis ...................................................................................212

**XI.**   COSTS...........................................................................................214

  A.   Claimant's Position ...................................................................214

  B.   Respondent's Position................................................................215

  C.   Analysis ...................................................................................215

**XII.** AWARD ..........................................................................................218

TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| Accuracy First Quantum ER | Accuracy Asesores de Empresa S.A.U. ("Accuracy") Expert Report, titled "*Economic Report on the Claimant and Its Quantum Valuation,*" dated 15 September 2015 |
| Accuracy First Regulatory ER | Accuracy Expert Report, titled "*Economic Report on the Incentives to the Solar Thermal Sector in Spain,*" dated 15 September 2015 |
| Accuracy Second Quantum ER | Accuracy Expert Report, titled "*Second Economic Report on the Claimant and Its Claim,*" dated 9 June 2016 |
| Accuracy Second Regulatory ER | Accuracy Expert Report, titled "*Second Report on Incentives in the Solar Thermal Sector in Spain,*" dated 9 June 2016 |
| Al Jaber WS | Witness Statement of Dr. Sultan Al Jaber, dated 20 January 2015 |
| Al Ramahi First WS | First Witness Statement of Mr. Mohamed Al Ramahi, dated 20 January 2015 |
| Al Ramahi Second WS | Second Witness Statement of Mr. Mohamed Al Ramahi, dated 29 February 2016 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Brattle First Quantum ER | Brattle Group Expert Report, titled "*Financial Damages to Masdar,*" dated 21 January 2015 |
| Brattle First Regulatory ER | Brattle Group Expert Report, titled "*Changes to the Regulation of Concentrated Solar Power Installations in Spain,*" dated 21 January 2015 |
| Brattle Second Quantum ER | Brattle Group Expert Report, titled "*Rebuttal Report: Financial Damages to Masdar,*" dated March 2016 |
| Brattle Second Regulatory ER | Brattle Group Expert Report, titled "*Rebuttal Report: Changes to the Regulation of Concentrated Solar Power Installations in Spain,*" dated 1 March 2016 |

| | |
|---|---|
| C-[#] | Claimant's Exhibit |
| CL-[#] | Claimant's Legal Authority |
| Cl. Bif. | Claimant's Observations on Respondent's Request for Bifurcation, dated 24 March 2015 |
| Cl. Mem. | Claimant's Memorial on the Merits, dated 22 January 2015 |
| Cl. Obs. EC | Claimant's Observations on the European Commission's Written *Amicus Curiae* Submission, dated 8 April 2015 |
| CSP | Concentrated Solar Power |
| Cl. Rej. Jur. | Claimant's Rejoinder on Jurisdiction, dated 24 July 2016 |
| Cl. Reply | Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction, dated 3 March 2016 |
| Cl. RfA | Request for Arbitration, dated 30 January 2014 |
| ECT | Energy Charter Treaty |
| Evans First WS | First Witness Statement of Mr. Jonathan Evans, dated 21 January 2015 |
| Evans Second WS | Second Witness Statement of Mr. Jonathan Evans, dated 1 March 2016 |
| FIT | Feed-in tariff mechanism introduced in Spain on 25 May 2007 by Royal Decree No. 661/2007 |
| García WS | Witness Statement of Mr. Raul García, dated 21 January 2015 (*withdrawn*) |
| Hearing | Hearing on Jurisdiction and Merits held on 19-23 September 2016 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, dated 18 March 1965 |

| | |
|---|---|
| JVA | Joint Venture Agreement, dated 12 March 2008, entered between Abu Dhabi Future Energy Company and Sener Grupo de Ingeniería, S.A. for the creation of Torresol Energy Investments S.A. |
| Montoya First WS | First Witness Statement of Mr. Carlos Montoya, dated 15 September 2015 |
| Montoya Second WS | Second Witness Statement of Mr. Carlos Montoya, dated 6 June 2016 |
| PER | Renewable Energy Plan 2005-2010 (in Spanish, "*Plan de Acción Nacional de Energías Renovables*") |
| R-[#] | Respondent's Exhibit |
| RAIPRE | "*Registro Administrativo de Instalaciones de Producción en Régimen Especial*" |
| RL-[#] | Respondent's Legal Authority |
| Resp. Bif. | Respondent's Request for Bifurcation, dated 3 March 2015 |
| Resp. C-Mem. | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, dated 16 September 2015 |
| Resp. Obs. EC | Respondent's Observations on the European Commission's Written Amicus Curiae Submission, dated 8 April 2015 |
| Resp. Rej. | Respondent's Rejoinder on the Merits and Reply on Jurisdiction, dated 10 June 2016 |
| Servert Gemasolar ER | Expert Report of Dr. Jorge Servert, titled "*GEMASOLAR Solar Tower CSP Plant – Lifetime Analysis,*" dated 8 June 2016 |
| Servert Valle ER | Expert Report of Dr. Jorge Servert, titled "*Valle I & II Parabolic Trough CSP Plant – Lifetime Analysis,*" dated 8 July 2016 |
| Tassabehji WS | Witness Statement of Mr. Ziad Tassabehji, dated 21 January 2015 |

| Tr. Day [#], [Speaker(s)], page [__], line [__]. | Transcript of the Hearing (English) |
|---|---|
| Tribunal | Arbitral Tribunal constituted on 18 July 2014 |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty which entered into force on 16 April 1998 for The Netherlands and the Kingdom of Spain (the "**ECT**" or the "**Treaty**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.    Claimant is Masdar Solar & Wind Cooperatief U.A. ("**Claimant**"), a private limited liability company incorporated under the laws of The Netherlands.

3.    Respondent is the Kingdom of Spain ("**Spain**" or "**Respondent**").

4.    Claimant and Respondent are collectively referred to as the "**Parties.**" The Parties' representatives and their addresses are listed above on page (i).

5.    Claimant's claims arise out of investments made by Claimant in November 2008 and July 2009 in three CSP Plants, Gemasolar (in 2008) and Arcosol and Termesol (both in 2009). The basis of the dispute between the Parties is the asserted impact upon those investments of measures implemented by Respondent, the effect of which, Claimant contends, was to modify the regulatory and economic regime of renewable energy projects in general and solar thermal power installations in particular, causing Claimant substantial damages.

## II.    PROCEDURAL HISTORY

6.    On 4 February 2014, ICSID received a request for arbitration dated 30 January 2014 from Claimant against Spain (the "**Request for Arbitration**").

7.    On 11 February 2014, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with

Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.      In accordance with Article 37(2)(a) of the ICSID Convention, the Parties agreed to constitute the Tribunal as follows: three arbitrators, one to be appointed by each Party and the third, presiding arbitrator, to be appointed by agreement of the Parties. Failing an agreement of the Parties on the President of the Tribunal, pursuant to the Parties' agreed method of constitution, s/he would be appointed by the Chairman of the ICSID Administrative Council without limitation to the ICSID Panel of Arbitrators.

9.      The Tribunal is composed of Mr. John Beechey, a national of the United Kingdom, President, appointed by the Chairman of the ICSID Administrative Council pursuant to the Parties' agreement on the method of constitution; Mr. Gary Born, a national of the United States of America, appointed by Claimant; and Prof. Brigitte Stern, a national of France, appointed by Respondent.

10.     On 18 July 2014, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Luisa Fernanda Torres, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

11.     In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 15 October 2014 by videoconference.

12.     On 14 November 2014, the European Commission filed an application for leave to intervene as a non-disputing party pursuant to ICSID Arbitration Rule 37(2), dated 12 November 2014 (the "**European Commission's Application**").

13.     Following the first session, on 20 November 2014, on behalf of the Tribunal, the President of the Tribunal issued Procedural Order No. 1 embodying the Parties' agreements on procedural matters and the Tribunal's rulings on the disputed matters. Procedural Order No. 1 provides, *inter alia*, that the applicable ICSID Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish,

and that the place of the proceeding would be Washington D.C., United States. Procedural Order No. 1 also set out the Procedural Calendar for this arbitration.

14. Following an invitation from the Tribunal, on 3 December 2014, the Parties submitted their respective observations on the European Commission's Application. Respondent's observations were submitted with exhibit R-1.

15. Following an invitation from the Tribunal, on 15 December 2014, the Parties submitted their second round of observations regarding the European Commission's Application.

16. On 9 January 2015, the Tribunal notified its "*Ruling on the European Commission's Application to Intervene as a Non-Disputing Party,*" dated 8 January 2015. The Tribunal granted the European Commission leave to file a written submission by 12 February 2015, subject to a number of conditions, including the requirement that the Commission provide a written undertaking that it would "*bear any costs consequences arising from its intervention, including, but not limited to, reasonable institutional and tribunal costs, which the Tribunal, in the exercise of its discretion, deems appropriate.*" (the "**Undertaking on Costs**").

17. On 16 January 2015, the European Commission requested an extension until 12 February 2015 to submit the above-mentioned Undertaking on Costs.

18. On 20 January 2015, the Tribunal granted the European Commission the requested extension.

19. On 22 January 2015, Claimant filed its Memorial on the Merits ("**Memorial**"), accompanied by exhibits C-1 to C-118; legal authorities CL-1 to CL-88; five (5) witness statements by Dr. Sultan Al Jaber, Mr. Mohamed Al Ramahi, Mr. Jonathan Evans, Mr. Raul García, and Mr. Ziad Tassabehji, respectively; and two (2) expert reports by the Brattle Group with exhibits BRR-1 to BRR-93 and BQR-1 to BQR-81.

20. On 12 February 2015, the European Commission: (i) filed with the Tribunal a request to reconsider the imposition of the Undertaking on Costs required by the Tribunal's Ruling dated 8 January 2015 (the "**European Commission's Request for Reconsideration**");

3

and (ii) separately, filed with the ICSID Secretariat a "*Written Amicus Curiae Submission*" (the "**European Commission's Written Submission**").

21.    On 13 February 2015, the Parties were informed of the above-mentioned developments, including the decision, on instructions of the Tribunal, that the European Commission's Written Submission would not be incorporated into the record of the arbitration pending further instructions from the Tribunal. The Tribunal invited the Parties to provide their observations on the European Commission's Request for Reconsideration by 20 February 2015.

22.    On 19 and 20 February 2015, Claimant and Respondent, respectively, submitted their observations on the European Commission's Request for Reconsideration.

23.    On 3 March 2015, on behalf of the Tribunal, the President of the Tribunal issued Procedural Order No. 2, declining the European Commission's Request for Reconsideration and inviting the European Commission to file its Undertaking on Costs by 20 March 2015.

24.    On 3 March 2015, Respondent submitted a Request for Bifurcation, accompanied by exhibits R-2 to R-18 and legal authorities RL-1 to RL-17.

25.    On 19 March 2015, the European Commission submitted the Undertaking on Costs.

26.    On 20 March 2015, the Tribunal informed the Parties that it was satisfied with the terms of the undertaking provided by the European Commission. The Tribunal also informed the Parties that, absent any further observations, the European Commission's Written Submission would be incorporated into the record of the arbitration by 25 March 2015. The Parties were also invited to provide their observations on the European Commission's Written Submission by 8 April 2015.

27.    On 24 March 2015, Claimant submitted its observations on Respondent's Request for Bifurcation, accompanied by exhibits C-119 to C-123 and legal authorities CL-89 to CL-135.

28.    On 25 March 2015, the European Commission's Written Submission dated 12 February 2015 was incorporated into the record of the arbitration.

29.     On 8 April 2015, Claimant submitted its Observations on the European Commission's Written Submission, accompanied by exhibits C-124 to C-127 and legal authorities CL-136 to CL-160.

30.     Also on 8 April 2015, Respondent submitted its Observations on the European Commission's Written Submission.

31.     On 9 April 2015, the Parties were informed that the deadline for the Tribunal to render its decision on the Respondent's Request for Bifurcation was extended, pending receipt of translations of the Respondent's submission of 8 April 2015.

32.     On 21 April 2015, having received the pending translations, on behalf of the Tribunal, the President of the Tribunal issued Procedural Order No. 3 denying the Respondent's Request for Bifurcation.

33.     On 20 May 2015, the Tribunal invited the Parties to provide their views concerning the venue for the Hearing. On 24 and 25 May 2015, Claimant and Respondent, respectively, confirmed their preference to hold the Hearing in Paris, France.

34.     On 16 September 2015, Respondent filed its Counter-Memorial on the Merits and Memorial on Jurisdiction ("**Counter-Memorial**"), accompanied by exhibits R-19 to R-145; legal authorities RL-18 to RL-63; a witness statement by Mr. Carlos Montoya; and two (2) expert reports by Accuracy Asesores de Empresa, S.A.U. ("**Accuracy**") with exhibits ATR-1 to ATR-22 and AMR-1 to AMR-29.

35.     On 30 October 2015, following an agreement of the Parties, the Tribunal amended the Procedural Calendar.

36.     On 11 November 2015, the Parties submitted their respective applications to the Tribunal to decide on their requests for document production (the "**Document Production Applications**"), with their respective Redfern Schedules.

37.     On 12 November 2015, following consultations with, and the agreement of, the Parties, it was confirmed that the Hearing would be held in Paris, France.

38.    On 23 November 2015, the President of the Tribunal, with the approval of the co-arbitrators, proposed to the Parties the appointment of Mr. Niccolò Landi as assistant to the President of the Tribunal.

39.    On 26 and 30 November 2015, Claimant and Respondent, respectively, confirmed their agreement to the appointment of Mr. Landi as assistant to the President of the Tribunal.

40.    On 1 December 2015, Mr. Niccolò Landi was appointed as assistant to the President of the Tribunal.

41.    On 3 December 2015, on behalf of the Tribunal, the President of the Tribunal issued Procedural Order No. 4 on the Parties' Document Production Applications.

42.    On 3 March 2016, Claimant submitted its Reply on the Merits and Counter-Memorial on Jurisdiction ("**Reply**"), accompanied by exhibits C-128 to C-209; legal authorities CL-161 to CL-238; two (2) second witness statements by Mr. Mohamed Al Ramahi and Mr. Jonathan Evans, respectively; and two (2) rebuttal expert reports by the Brattle Group, with exhibits BRR-94 to BRR-166 and BQR-83 to BQR-117.[1]

43.    On 10 June 2016, Respondent submitted its Rejoinder on the Merits and Reply on Jurisdiction ("**Rejoinder**"), accompanied by exhibits R-146 to R-296; legal authorities RL-64 to RL-74 and RL-76 to RL-98;[2] a second witness statement by Mr. Carlos Montoya with exhibits; two (2) rebuttal expert reports by Accuracy, with exhibits ATR-23 to ATR-34 and AMR-30 to AMR-37; and two (2) expert reports by Dr. Jorge Servert with two sets of exhibits designated JSR-1 to JSR-10 and JSR-01 to JSR-11, respectively.

44.    On 29 June 2016, Claimant filed a request to add a number of new documents (designated exhibits C-210 to C-212 and legal authority CL-239) to the record.

45.    On 6 July 2016, Respondent submitted its observations on Claimant's request of 29 June 2016 to add new documents to the record and filed observations on the documents

---

[1] The accompanying exhibits and legal authorities were uploaded to the electronic file sharing system on 6 March 2016.

[2] Legal authority RL-75 (ENG) was submitted on 28 June 2016, on the basis of prior authorisation from the Tribunal.

themselves. Respondent, in turn, filed a request to add new documents (designated exhibits R-297 to R-299) to the record.

46.    On 11 July 2016, following an agreement of the Parties, the Tribunal amended the Procedural Calendar.

47.    On 17 July 2016, Claimant submitted its observations on Respondent's request of 6 July 2016 to add new documents to the record.

48.    On 18 July 2016, the Tribunal admitted the new documents designated as exhibits C-210 to C-212, CL-239 and R-297 to R-299 into the record of the arbitration.

49.    On 24 July 2016, Claimant submitted its Rejoinder on Jurisdiction ("**Rejoinder on Jurisdiction**"), accompanied by exhibits C-213 to C-214; and legal authorities CL-240 to CL-248.

50.    On 25 July 2016, Claimant submitted its observations on Respondent's exhibits R-297 to R-299.

51.    On 28 July 2016, following an invitation from the Tribunal, the Parties submitted their observations on the agenda for the pre-hearing organisational call.

52.    On 29 July 2016, the Tribunal held a pre-hearing organisational telephone conference with the Parties.

53.    On 5 August 2016, the Parties made additional submissions in connection with matters pertaining to the organisation of the Hearing.

54.    On 11 August 2016, on behalf of the Tribunal, the President of the Tribunal issued Procedural Order No. 5 regarding the organisation of the Hearing.

55.    On 22 August 2016, the Parties submitted their respective list of witnesses and experts called for examination at the Hearing.

56.    On 30 August 2016, pursuant to the provisions of Procedural Order No. 5, the Parties jointly submitted for consideration of the Tribunal an agreed proposed detailed Agenda for the Hearing.

57.    On 5 September 2016, following an inquiry from the Tribunal, the Parties provided clarifications concerning the witnesses and experts called for examination at the Hearing. Claimant also informed the Tribunal that Mr. Raul García's witness statement was withdrawn from the record.

58.    On 9 September 2016, pursuant to the provisions of Procedural Order No. 5, the Parties dispatched to the Tribunal an agreed Hearing Consolidated Bundle in electronic format.

59.    On 13 and 14 September 2016, Respondent and Claimant, respectively, informed the Tribunal of certain agreements reached between the Parties in anticipation of the Hearing. These agreements included the introduction into the record of a number of new documents (*i.e.* documents not previously filed), corrected versions of documents previously filed and new translations of documents previously filed. The Parties informed the Tribunal that these materials had been included in the electronic Hearing Consolidated Bundle dispatched to the Tribunal, but they did not identify the materials specifically.

60.    On 15 September 2016, the Tribunal confirmed that, in light of the Parties' agreement, the new materials included in the Hearing Consolidated Bundle were admitted into the record, and could be used and referred to by the Parties during the Hearing. The Tribunal also asked the Parties to submit a joint statement specifying the new documents, the corrected documents and the new translations, for clarity of the record.

61.    On 16 September 2016, the Parties submitted the joint statement requested by the Tribunal. The new materials were identified and designated as follows:

**From Claimant**

- New documents: C-215 to C-229.

- Corrected documents: C-38; CL-21, CL-82; BRR-1, BRR-16, BRR-21, BRR-27, BRR-50, BRR-83, BRR-94.

**From Respondent**

- New documents: R-300 to R-304; RL-99; AMR-38.

- Corrected document: RL-8.

- Additional translations: R-98, R-107, R-253, R-255.

62.    A Hearing on Jurisdiction and Merits was held in Paris, France from 19 to 23 September 2016 (the "**Hearing**"). The following persons were present at the Hearing:

Tribunal:
| | |
|---|---|
| Mr. John Beechey | President |
| Mr. Gary Born | Arbitrator |
| Prof. Brigitte Stern | Arbitrator |

ICSID Secretariat:
| | |
|---|---|
| Ms. Luisa Fernanda Torres | Secretary of the Tribunal |

Assistant:
| | |
|---|---|
| Mr. Niccolò Landi | Assistant to the President of the Tribunal |

For Claimant:

| | |
|---|---|
| Ms. Judith Gill QC | Allen & Overy LLP, Partner |
| Mr. Jeffrey Sullivan | Allen & Overy LLP, Partner |
| Mr. Simon Roderick | Allen & Overy LLP, Partner |
| Mr. Yacine Francis | Allen & Overy LLP, Senior Associate |
| Ms. Stephanie Hawes | Allen & Overy LLP, Associate |
| Mr. Tomasz Hara | Allen & Overy LLP, Associate |
| Mr. Jack Busby | Allen & Overy LLP, Trainee |
| Ms. Sara Maria Moreno Sanchez | Allen & Overy LLP, Trainee |
| Mr. Craig Heschuk | Masdar Solar & Wind Cooperatief, General Counsel |
| Mr. Marwan Naim Nijmeh | Mubadala Legal |
| Mr. Mohamed Al Ramahi | Witness |
| Mr. Jonathan Evans | Witness |
| Mr. Ziad Tassabehji | Witness |
| Mr. Richard Caldwell | Expert, Brattle Group |
| Mr. Jose Garcia | Expert, Brattle Group |
| Mr. Carlos Lapuerta | Expert, Brattle Group |
| Mr. John (Jack) Stirzaker | Expert, Brattle Group |

For Respondent:

| | |
|---|---|
| Mr. Diego Santacruz | Abogacía General del Estado, Ministry of Justice |
| Mr. F. Javier Torres | Abogacía General del Estado, Ministry of Justice |
| Ms. Mónica Moraleda | Abogacía General del Estado, Ministry of Justice |
| Ms. Amaia Rivas | Abogacía General del Estado, Ministry of Justice |
| Ms. Elena Oñoro | Abogacía General del Estado, Ministry of Justice |
| Mr. Antolín Fernández | Abogacía General del Estado, Ministry of Justice |
| Mr. Roberto Fernández | Abogacía General del Estado, Ministry of Justice |
| Mr. Alfonso Olivas | IDAE |
| Ms. Raquel Vázquez | IDAE |
| Mr. Carlos Montoya | Witness |
| Mr. Eduard Saura | Expert, Accuracy |
| Mr. Christophe Schmit | Expert, Accuracy |
| Mr. Alberto Fernández | Expert, Accuracy |
| Ms. Laura Cózar | Expert, Accuracy |
| Dr. Jorge Servert | Expert |

Court Reporters:

| | |
|---|---|
| Mr. Paul Pelissier | DR-ESTENO |
| Mr. Rodolfo Rinaldi | DR-ESTENO |
| Mr. Trevor McGowan | |

Interpreters:
Mr. Jesús Getan Bornn
Mr. Mark Viscovi
Ms. Amalia Thaler de Klem

During the Hearing, the following persons were examined:

For Claimant:

| | |
|---|---|
| Mr. Mohamed Al Ramahi | Witness |
| Mr. Jonathan Evans | Witness |
| Mr. Ziad Tassabehji | Witness |
| Mr. Richard Caldwell | Expert |
| Mr. Jose García | Expert |
| Mr. Carlos Lapuerta | Expert |

For Respondent:

| | |
|---|---|
| Mr. Carlos Montoya | Witness |
| Mr. Eduard Saura | Expert |
| Dr. Jorge Servert | Expert |

63.    During the Hearing, the Parties submitted the following demonstrative exhibits:

**From Claimant**

- C-230 to C-234; C-236.

- BRR-167 and BQR-118.

**From Respondent**

- R-305 to R-309.

- Servert Hearing Presentation (not numbered) and Accuracy Hearing Presentation (not numbered).

64. On 22 November 2016, the Parties submitted agreed upon corrections to the Hearing transcripts in English and Spanish.

65. On 24 November 2016, Respondent submitted a communication dated 18 November 2016, seeking authorisation from the Tribunal to add a new legal authority to the record, namely, the Final Award in *Isolux Netherlands, BV v. Kingdom of Spain*, SCC Case V2013/153, of 17 July 2016 (the "***Isolux* Award Application**").

66. Subsequently, the Tribunal received multiple communications from the Parties in connection with this matter, as follows: from Claimant on 26 and 29 November 2016, and 1 December 2016; and from Respondent on 28 and 29 November 2016.

67. Having heard the Parties' observations, on 1 December 2016, the Tribunal ruled as follows:

> "[…] *The Tribunal notes that no direct answers have been forthcoming from Respondent to Claimant's request for specific confirmation that Isolux Netherlands, BV ('Isolux') has consented to the production of the Award in this proceeding. However, unless the Kingdom of Spain advises the Tribunal immediately to the contrary, the Tribunal will rely expressly on Respondent's representation that: 'there are no legal impediments for the Kingdom of Spain in order to submit such Award to the Arbitral Tribunal', on the basis that that representation is to be understood as encompassing the question of any necessary consent on the part of Isolux.*"

> *On this basis, the Tribunal has decided to authorize the introduction of the Award into the record. Each Party shall have 14 days from the date the Award is produced within which to submit observations to the Tribunal concerning the Award.* […]."

68.    On 7 December 2016, Claimant and Respondent, respectively, submitted further communications to the Tribunal in connection with the *Isolux* Award Application.

69.    Having received the Parties' further observations, on 7 December 2016, the Tribunal sent the following message to the Parties:

> "[…] *The Tribunal has nothing to add to the directions issued in the Secretariat's letter of 1 December 2016. As stated in that letter 'unless the Kingdom of Spain advises the Tribunal immediately to the contrary, the Tribunal will rely expressly on Respondent's representation that: 'there are no legal impediments for the Kingdom of Spain in order to submit such Award to the Arbitral Tribunal', on the basis that that representation is to be understood as encompassing the question of any necessary consent on the part of Isolux.' It is for the Respondent to decide whether it confirms that the Tribunal might continue to do so in light of the matters raised by Claimant.*"

70.    On 8 December 2016, Respondent submitted a further communication concerning the *Isolux* Award Application.

71.    On 12 December 2016, Respondent submitted an *ex-parte* communication to the ICSID Secretariat (not copying Claimant) attaching the *Isolux* Award, requesting that it be transmitted to the Tribunal, and asking the Tribunal to transmit the award to Claimant.

72.    On 14 December 2016, the Tribunal sent the following message to the Parties:

> "*The Tribunal has been informed that, on 12 December 2016, Respondent submitted a communication to the Secretary of the Tribunal only (without copying the Claimant) attaching the Isolux Award, and requesting that the Secretariat 'transmit the Award in the ISOLUX Case to the Arbitral Tribunal, with its unofficial English translation, in order for the Tribunal to transmit it to the Claimant declaring the confidentiality of said Award.' (English Translation.) On instructions of the Tribunal, the Secretariat has not yet transmitted the Isolux Award or its translation to the Members of the Tribunal.*

> *The Tribunal considers that it has already made its position on this issue clear to the Parties. If, on that basis, Respondent wishes to introduce the Isolux Award into the record of this arbitration, it is for Respondent to do so following the regular form of communications established in Section 12.2 of Procedural Order No. 1, pursuant to which '[e]ach party's written communications shall be transmitted by email or other electronic means to the opposing party and to the Secretary of the Tribunal, who shall send them to the Tribunal.*"

73.    Thereafter, also on 14 December 2016, Respondent submitted a communication, copying Claimant, attaching the *Isolux* Award and introducing it into the record of the present arbitration.

74.    On 22 December 2016, the Parties submitted for consideration by the Tribunal an agreed extension of the deadline for submission of their respective observations on the *Isolux* Award until 5 January 2017. The agreement was approved by the Tribunal on that same day.

75.    On 5 January 2017, the Parties submitted to the Tribunal their observations on the *Isolux* Award.

76.    Pursuant to an agreement reached by the Parties, during Day 4 of the Hearing, the Parties had stated the intention (i) on the part of Claimant to submit into the record one new document (to be designated as exhibit C-235); (ii) on the part of Respondent to submit two new undefined documents and one corrected document; and (iii) to "*provide* [the Tribunal] *with an updated USB stick with the hearing bundle* [i]*n due course, which will have those additional and replacement documents on it.*"[3] In the event, however, neither matter was pursued by either Party.

77.    The Parties filed their submissions on costs on 2 March 2017.

78.    On 9 May 2017, Claimant submitted a communication seeking authorisation from the Tribunal to add a new legal authority to the record, namely the Award in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID

---

[3] Tr. Day 4, Ms. Gill, p. 238, line 15 to p. 239, line 5.

Case No. ARB/13/36. On 12 May 2017, Respondent provided observations indicating that it did not object to this addition to the record. On 12 May 2017, the Tribunal authorised Claimant to introduce the *Eiser* Award into the record. On 16 May 2017, Claimant introduced the *Eiser* Award into the record (designated as legal authority CL-249). Claimant and Respondent submitted their comments and observations on the *Eiser* Award respectively on 22 May 2017 and 5 June 2017.

79.    On 23 November 2017, Respondent submitted a communication seeking authorisation from the Tribunal to add a new document to the record, identified as the "*European Commission Final Decision regarding the Spanish State Aid Framework for Renewable Sources*" of November 2017. On 28 November 2017, Claimant provided observations opposing the application. On 3 January 2018, the Tribunal rejected Respondent's application. On 8 January 2018, Respondent filed a request for reconsideration of the Tribunal's ruling of 3 January 2018. On 11 January 2018, Claimant opposed the request for reconsideration. On 13 January 2018, the Tribunal rejected Respondent's request for reconsideration "*not*[ing] *that it reached its conclusion having taken account of the points of substance raised in the Respondent's application of 8 January 2018 and in the Claimant's observations in response in its letter of 11 January 2018.*"

80.    The proceeding was closed on 7 February 2018. On 6 March 2018, Respondent submitted an application by which it requested the Tribunal to reopen the Arbitral Procedure pursuant to Article 38 of the ICSID Rules of Procedure for Arbitration Proceedings. The Tribunal has denied this application for the reasons set out in Section X below.

## III.    FACTUAL BACKGROUND

81.    The following factual summary does not purport to be an exhaustive summary of all of the matters of fact upon which the Parties have placed reliance in the course of these proceedings. However, the Tribunal considers that it would be helpful to set out in chronological order certain salient events, which are of importance for the resolution of this case.

82. Claimant, **Masdar**, is owned and controlled by Abu Dhabi Future Energy Company ("**ADFEC**"), which at all material times has owned 99% of the share capital of Claimant. ADFEC was founded in 2007 as part of the programme for the economic diversification of Abu Dhabi. ADFEC's principal object is investment in renewable energy and sustainable technology in Abu Dhabi and overseas.

83. ADFEC is wholly controlled by Mubadala Development Company ("**Mubadala**"), which, in turn, is owned by the Government of Abu Dhabi.

84. Although Respondent had had in place a regulatory framework intended to stimulate investment in renewable energy projects, a further iteration of its policy, considered to be more likely to attract investment and based upon a feed-in tariff ("**FIT**") mechanism, was introduced on 25 May 2007 by Royal Decree No. 661/2007 ("**RD661/2007**"). A fuller description of the relevant Spanish legislation is set out in Section IV below.

85. Prior to the enactment of RD661/2007, ADFEC had already embarked on a fact-finding survey of the Spanish solar thermal technology market – and CSP in particular. In the course of a visit to Spain, Mr. Tassabehji, ADFEC's Chief Executive Officer, had met representatives of IDAE, the Spanish Institute for Energy Diversification and Saving. He was briefed on Spain's Renewable Energy Plan (2005-2010).

86. The enactment of RD661/2007 gave added impetus to the fact-finding undertaken by Mr. Tassabehji and his team. In the latter part of 2007, they identified Sener Grupo de Ingeniería, S.A. ("**Sener**") as a prospective joint venture partner for investments in Spanish CSP projects and commissioned BNP to undertake a due diligence review of the RD661/2007 regime (the "**BNP Report**").[4]

87. The results of Mr. Tassabehji's investigations were set forth in a document entitled "*Draft Strategy Plan 2008-2012 for ADFEC to proceed with the investment in the CSP Plants through a JV with Sener*" (the "**Strategy Plan**").[5] The Strategy Plan constituted a proposal

---

[4] **C-43**, BNP Paribas, Due Diligence Report, *Investment Analysis on SENER CSP Projects Named Solar Tres & Termesol 50* (24 January 2008) (hereinafter "**2008 BNP Report**").

[5] **C-41**, Draft Strategy Plan 2008-2012 for ADFEC to Proceed with the Investment in the CSP Plants through a JV with Sener (26 December 2007).

for consideration by ADFEC senior management (and, ultimately, the Mubadala investment committee) pursuant to which, the opportunities presented by the new RD661/2007 Special Regime for the development of solar energy in Spain in general, and Spanish CSP installations in particular, might be taken up by ADFEC in a joint venture with Sener. The Strategy Plan identified the risk inherent in the planned review of RD661/2007 in 2011 to any CSP installation that had not qualified for the RD661/2007 Special Regime within the prescribed deadline.

88.    The BNP Report was published on 24 January 2008. It confirmed ADFEC's understanding of the operation of the RD661/2007 Special Regime, the effect of which was to remove many of the risks associated with making capital investments in renewable energy electricity generation in Spain.

89.    Pursuant to the approval of ADFEC senior management and, subsequently, that of the Mubadala investment committee, ADFEC entered into a joint venture agreement (the "**JV Agreement**" or "**JVA**") with Sener for the creation of Torresol Energy Investments S.A. ("**Torresol Energy**") on 12 March 2008.[6] Torresol Energy was to acquire the rights to the three CSP installations, which are at the centre of this dispute, Gemasolar, Termesol and Arcosol (the "**Plants**").

90.    Claimant was incorporated in The Netherlands on 19 March 2008. Dr. Sultan and Mr. Tassabehji, respectively ADFEC's Director of Innovations and Investments and ADFEC's Chief Executive Officer, were appointed as its founding directors.

91.    On 27 May 2008, the investment committee of Mubadala authorised ADFEC to fund an investment by Masdar in the CSP installations in the amount of EUR 79.37 million to enable Masdar to take up 40% of the equity of Torresol Energy.

---

[6] **C-44**, Joint Venture Agreement (12 March 2008).

92.    Claimant acceded to the JV Agreement pursuant to a variation of the JV Agreement on 9 June 2008.[7] It contributed equity to Torresol Energy for the purposes of developing the Gemasolar project through Gemasolar 2006 S.A.

93.    The task of finding project financing for the first of the three Plants, Gemasolar, was led by Sener on behalf of Torresol Energy. A consortium of Spanish banks undertook their own due diligence. On 24 July 2009, Torresol Energy entered into a EUR 540 million loan agreement with Banco Santander, La Caixa, Caja Madrid, BBVA, Banesto, Banco Popular and ICO.

94.    On 11 December 2009, the Ministry of Industry, Tourism and Trade issued the "*Pre-Allocation Registry for Compensation*" certificate (as per Royal Decree Law 6/2009) for the Plants.[8]

95.    In April 2010, Claimant contributed equity to Torresol Energy for the purposes of the Arcosol and Termesol projects through Arcosol–50 S.A. and Termesol–50 S.A. respectively.

96.    On 1 December 2010, Gemasolar 2006 S.A., Arcosol-50 S.A. and Termesol-50 S.A. waived their right to supply electricity into the grid until 1 May 2011 (for the Gemasolar Plant) and 1 January 2012 (for the Arcosol and Termesol Plants), and requested the Ministry of Industry, Tourism and Trade to confirm that the FIT would apply (subject to certain limitations) for the "*operating life*" of the installations.[9]

---

[7] **C-45**, Variation to the Joint Venture Agreement between ADFEC, Sener and Masdar Solar (9 June 2008).

[8] **C-54**, Resolution of the Directorate General for Energy Policy and Mines, through which the THERMOELECTRIC SOLAR ENERGY POWER PLANT SOLAR TRES owned by GEMASOLAR 2006 S.A. is registered in the Pre-Allocation Registry for Compensation and to which the economic regime regulated in Royal Decree 661/2007, dated 25 May, is granted (11 December 2009) (hereinafter "**2009 Resolution Gemasolar**"); **C-55**, Resolution of the Directorate General for Energy Policy and Mines, through which the THERMOELECTRIC SOLAR ENERGY POWER PLANT ARCOSOL-50 owned by ARCOSOL 50, S.A. is registered in the Pre-Allocation Registry for Compensation and to which the economic regime regulated in Royal Decree 661/2007, dated 25 May, is granted (11 December 2009) (hereinafter "**2009 Resolution Arcosol**"); and **C-56**, Resolution of the Director General for Energy Policy and Mines, through which the THERMOELECTRIC SOLAR ENERGY POWER PLANT TERMESOL-50 owned by Sener Grupo de Ingeniería S.A. is registered in the Pre-Allocation Registry for Compensation and to which the economic regime regulated in Royal Decree 661/2007 dated 25 May, is granted (11 December 2009) (hereinafter "**2009 Resolution Termesol**").

[9] **C-60**, Letter of Waiver dated 1 December 2010 for the entry into operation on a particular date within the Phase assigned to the SOLAR TRES facility through a Resolution by the Directorate General of Energy Policy and Mines,

97.     On 28 December 2010, the Ministry of Industry, Tourism and Trade replied to the said communications dated 1 December 2010 by issuing a Resolution for each of the three Plants.[10]

98.     On 29 April 2011, the Gemasolar Plant was registered with the "*Registro Administrativo de Instalaciones de Producción de Régimen Especial*" (the "**RAIPRE**").

99.     On 23 December 2011, the Arcosol and Termesol Plants were registered with the RAIPRE.[11]

100.    Following the introduction of a number of legislative measures, starting with Law 15/2012 (*see* paragraphs 130 *et seq.* below), Claimant formally notified Spain of the dispute on 19 February 2013. It requested negotiations pursuant to Article 26(1) of the ECT with a view to reaching an amicable settlement of the dispute.[12]

101.    On 26 February 2013, Spain responded to Claimant, requesting that it submit its request for negotiations in Spanish.[13]

---

dated 11 December 2009, and a request for the Resolution for the communication of the compensation conditions during the operating life of the facility (hereinafter "**2010 Gemasolar Waiver and Request**"); **C-61**, Letter of Waiver dated 1 December 2010 for the entry into operation on a particular date within the Phase assigned to the ARCOSOL-50 facility through a Resolution by the Directorate General of Energy Policy and Mines, dated 15 February 2010, and a request for the Resolution for the communication of the compensation conditions during the operating life of the facility (hereinafter "**2010 Arcosol Waiver and Request**"); and **C-62**, Letter of Waiver dated 1 December 2010 for the entry into operation on a particular date within the Phase assigned to the TERMESOL-50 facility through a Resolution by the Directorate General of Energy Policy and Mines, dated 15 February 2010, and a request for the Resolution for the communication of the compensation conditions during the operating life of the facility (hereinafter "**2010 Termesol Waiver and Request**").

[10] **C-65**, Resolution by the Director General for Energy Policy and Mines in respect of Gemasolar (28 December 2010) (hereinafter "**2010 Resolution Gemasolar**"); **C-66**, Resolution by the Director General for Energy Policy and Mines in respect of Arcosol (28 December 2010) (hereinafter "**2010 Resolution Arcosol**"); and **C-67**, Resolution by the Director General for Energy Policy and Mines in respect of Termesol (28 December 2010) (hereinafter "**2010 Resolution Termesol**").

[11] **C-6,** Notices of Inscription issued by the Department of Economy, Innovation and Science of the Autonomous Community of Andalucía (29 April 2011 and 23 December 2011).

[12] **C-8**, Letter from Allen & Overy LLP to President Mariano Rajoy Brey on behalf of the Claimant (19 February 2013).

[13] **C-9**, Letter from the Ministry of Industry, Energy and Tourism to Allen & Overy LLP (26 February 2013).

102.  On 12 March 2013, Claimant replied to Spain, stating that the ECT did not require Claimant to follow the procedure requested by Spain. It invited Spain to reconsider its position and to engage in negotiations.

## IV.    RELEVANT SPANISH LEGAL FRAMEWORK

103.  The beginnings of the development of a renewable energy sector in Spain go back to the 1992 United Nations Framework Convention on Climate Change, pursuant to which, Spain, in common with other industrialised nations, committed to a reduction in "greenhouse gases" and to the allocation of resources to tackle climate change. The European Union ("**EU**") made clear its intention to adhere to those aims.

104.  Pursuant to the subsequent Kyoto Protocol of 1997, the EU and other contracting parties were tasked with the achievement of ambitious targets to reduce greenhouse gases over the period 2008-2012. Part of the EU's proposal was to encourage the development of renewable energy technologies. It foresaw both an environmental and an economic benefit in that an investment in renewable energy projects would stimulate employment in the EU.

105.  By its Renewables Directive of 2001, the EU set forth binding targets for the consumption of renewable energy. The EU recognised that it would be necessary to put in place government-backed financial incentives to attract the necessary (private sector) investment. At about the time of the Kyoto Convention, Spain adopted a new Electricity Law, which reformed the electricity sector in Spain and anticipated the development of a regulatory regime applicable to renewables. Recognising that renewables projects involved pioneering technology and higher upfront capital costs, Law 54/1997 of 27 November 1997 on the electric power sector ("**Law 54/1997**")[14] introduced two separate regulatory regimes, one for traditional generation plants (the "**Ordinary Regime**") and the other (the "**Special Regime**") for the generators of electricity from non-consumable renewable energies. Under the Ordinary Regime, remuneration derived solely from the wholesale market price of electricity. Under the Special Regime, generators benefitted from a premium set by the Spanish Government over and above the wholesale market price. The

---

[14] **R-149 Bis / C-16 / R-191**, Law 54/1997 of 27 November 1997 (published on 28 November 1997).

basis of remuneration for those generators benefitting from the Special Regime was the FIT, calculated in EUR/c per kWh of electricity produced. Law 54/1997 required the amount of that premium to be set out in statutory terms by a Government regulation, according to a general principle stated in Article 30.4 of the law:

> "*In order to determine the premiums, account shall be taken of the level of delivery voltage of the energy to the grid, effective contribution to improvement of the environment, saving in primary energy and energy efficiency, production of economically justifiable useful heat and the investment costs which have been incurred, in order to achieve reasonable rates of return by reference to the cost of money in the capital market.*"[15]

106. Royal Decree 2818/1998 of 23 December 1998 on electricity production installations supplied by renewable energy, waste or cogeneration ("**RD2818/1998**")[16] recognised that the elevated running costs of the renewable energy plants and the level of technology demanded by them would not allow for competition in a free market. Article 2.1 provided that:

> "*Electrical energy producing power plants with an installed power capacity equal or inferior to 50MW that meet the requirements outlined below may be registered for operation under the special regime defined herein.*"[17]

Generators qualified under the Special Regime had the right to be connected to, and supply electricity to, the national grid. Plants that used as a primary energy source any of the non-consumable renewable energies, biomass or any kind of bio fuel were granted a premium to be reviewed by the Government on an annual basis, pursuant to Article 28.2 of the Royal Decree.

107. The introduction of an annual review brought about an element of financial uncertainty for prospective investors, who were faced with significant commitments of upfront capital and who were looking for long term stability and predictability.

---

[15] *Id.*, Art. 30.4.

[16] **C-20 / R-259**, Royal Decree 2818/1998 of 23 December 1998 (published on 30 December 1998).

[17] *Id.*, Art. 2.1.

108. Royal Decree 1432/2002 of 27 December 2002 ("**RD1432/2002**"), established a methodology for the approval or modification of the average, or reference, electricity tariff. It also amended a number of the provisions of Royal Decree 2017/1997 of 26 December 1997 ("**RD2017/1997**"), governing the organisation and regulation of the procedure for the settlement of transmission, distribution and tariff retailing costs, the permanent costs of the system and diversification and security of supply costs.[18]

109. A new Government, which regarded the development of the renewable sector as a priority, was elected in Spain in early 2004.

110. Royal Decree 436/2004 of 12 March 2004 ("**RD436/2004**") abolished RD2818/1998 and established a new methodology for the updating and systematisation of the legal and economic regime for electric power production in the Special Regime.[19] Pursuant to RD436/2004, qualifying installations benefitted either from a regulated (fixed) tariff or else a premium payment over and above the wholesale market price per kWh of energy produced.[20] The values of the regulated tariff and of the premium were to be calculated by reference to the "*tarifa media de referencia*" ("**TMR**"), fixed by the Government.[21] Further, RD436/2004 remuneration continued to be based on the level of production of the plant, being paid in Euros per kWh. The more efficient the plant and the higher the level of production, the greater the remuneration (and the margin) that it would receive. Finally, and importantly, RD436/2004 provided greater stability than had RD2818/1988. Article 40.3 provided that:

> "*The tariffs, premiums, incentives and supplements resulting from any of the revisions provided in this section* **shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to** […] **above and shall not have a backdated effect on any previous tariffs and premiums**."[22] (Emphasis added)

---

[18] **R-72**, Royal Decree 1432/2002 of 27 December 2002 (published on 31 December 2002).

[19] **C-24 / R-148 Bis**, Royal Decree 436/2004 of 12 March 2004 (published on 27 March 2004).

[20] *Id.*, Art. 22.

[21] *Id.*, Arts. 23-24.

[22] *Id.*, Art. 40.3.

The Explanatory Memorandum of RD436/2004 established that:

> "[…] *the Royal Decree guarantees operators of special regime installations fair remuneration for their investments and an equally fair allocation to electricity consumers of the costs that can be attributed to the electricity system* […]."[23]

The drawback remained, however, that the incentives were linked to the (variable) TMR, which was tied to general market energy prices. Nor were the incentives offered high enough in themselves to attract the necessary growth in investment, as the Government was to acknowledge in its Renewable Energy Plan ("**PER**", in Spanish, *Plan de Acción Nacional de Energías Renovables*) (*see* paragraph 112 below):

> "[T]*he incentives that have been established have not been sufficient to ensure the anticipated rate of growth. Although Royal Decree 436/2004 has, in some cases, brought about an improvement in returns on investment, it is necessary to provide further incentives if possible in particular technology areas in order to make them more attractive to future investors.*"[24]

111.  Royal Decree 2351/2004 of 23 December 2004 ("**RD2351/2004**") amended the previous resolution's procedure for technical restrictions and other regulatory standards of the electricity market.[25]

112.  In 2005, the Spanish Government published its PER. Particular attention was devoted to CSP installations for which Spain was ideally suited. In addition to the natural advantage of abundant solar resources, it had a body of existing CSP know-how and it was a sector in which developers were showing considerable interest. The PER made clear the importance that the Government attached to renewable energy as a key element in the development of a sustainable Spanish economy. Specifically, it recorded that renewables would contribute:

---

[23] *Id.*, pp. 10-11.

[24] **C-27**, Ministry of Industry, Tourism and Commerce & IDAE, *Summary of the Spanish Renewable Energy Plan 2005-2010* (August 2005) (hereinafter "**PER 2005-2010 Summary**"), Section 6.2, para. 4.

[25] **R-119**, Royal Decree 2351/2004 of 23 December 2004 (published on 24 December 2004).

(i)     decisively to guaranteeing the long-term supply of energy through independent and inexhaustible energy sources;

(ii)    to job creation (particularly in rural areas) and improved industrial competitiveness and accordingly they should be encouraged in order to secure long-term economic growth;

(iii)   to the increased use of renewables to provide electricity in cities, which would reduce emissions from fossil fuels; and

(iv)    to the development of renewables in Spain, which would help to achieve binding EU carbon emission goals.

The PER acknowledged, too, that two factors would be critical, if the requisite levels of investment were to be attracted.

First, incentives would be essential:

> "[I]t is essential to position different technologies in such a way that their economic profitability becomes attractive to investors, therefore facilitating access to bank finance."[26]

Second, a stable regulatory framework had to be in place:

> "[T]he financial market continues to view return on investment within a stable regulatory framework as the decisive factor. This highlights once again the importance of public initiatives to facilitate and stimulate the fulfilment of the targets that have been defined."[27]

The PER made clear that the Spanish Government was estimating the level of debt finance likely to be tapped in the period 2005-2010 at some EUR 18.198 billion – or 77.1% of the total investment. The PER noted:

---

[26] **C-28,** *Renewable Energy Plan in Spain 2005 – 2010* (August 2005) (hereinafter "**PER 2005-2010**"), Section 4.3, para 1.

[27] **C-27**, PER 2005-2010 Summary, Section 7.1, para. 5.

> "*It is therefore essential to place the various technologies in a position where they are sufficiently profitable to be attractive to investors and to facilitate access to bank loans.*"[28]

113.    Royal Decree Law 7/2006 of 23 June 2006 ("**RDL7/2006**"), on the adoption of urgent measures for the energy sector, was published on 24 June 2006.[29] It amended Law 54/1997 by affording qualifying installations priority of access to the transmission and distribution network. Importantly, at Article 1, RDL7/2006 also removed temporarily the connection between future reviews of the TMR and renewable energy incentives:

> "*[…] A new paragraph b) is included in point 2 of Article 30 to the following effect: 'b) The energy thus generated will have priority access to transport and distribution networks, while respecting the continuing maintenance and safety of such networks.'*"

> "*Until that which is foreseen in sections one to twelve of article 1 can be developed, in accordance with that established in the penultimate dispositions of this Royal Decree-law: 1. Electrical energy production installations with an installed power that is equal to or less than 50MW, that when Act 54/1997 entered in force, on November 27, were accepted by the scheme foreseen by Royal Decree 2366/1994 on December 4, on production of electrical energy by hydraulic installations, of cogeneration and others stored by renewable sources or resources, as well as those referred in the second additional disposition to the mentioned Royal Decree, shall maintain the mentioned scheme. 2. The review of the average rate made by the Government shall not be applied to the prices, bonuses, incentives and rates that are part of the compensation for the electrical energy production activity in the special scheme.*"[30]

114.    It was clear to the Spanish authorities by 2007 that Spain and other EU Member States would not meet their renewables goals for 2010, prompting the European Commission to issue a new package of policy proposals intended to assist in the realisation of those goals. In its Energy Policy for Europe, issued on 10 January 2007, the European Commission stated that the purpose of its Strategic review was to:

---

[28] *Id.*, Section 7.3, para. 1.

[29] **C-33 / R-154 Bis**, Royal Decree Law 7/2006 of 23 June 2006 (published on 24 June 2006).

[30] *Id.*, Second Transitional Disposition and Art. 1.

> "[…] *set out a set of policies required to achieve the goals of sustainable, secure and competitive energy* […] [w]*ere the EU to succeed* […] [t]*he EU would have set the pace for a new global industrial revolution.*"[31]

115.    In the case of Spain, that led to the enactment of new legislation in the form of Royal Decree 661/2007 ("**RD661/2007**", the "**Decree**"), which lies at the heart of this dispute.

116.    RD661/2007[32] came into force on 1 June 2007, replacing RD436/2004. It provided for increased installed capacity targets for the various renewables technologies consistent with the PER. So far as the CSP Plants were concerned, it set the target at 500 megawatts and, in order to reach that level of installed capacity, RD661/2007 offered investors enhanced incentives. The objectives of the new Spanish policy were set out in the Preamble to the Decree:

> "*Spanish society today, in the context of reducing dependence on foreign energy, better use of available energy sources and a greater awareness of the environment, is increasingly demanding the employment of renewable sources of energy and efficiency in the generation of electricity as basic principles in the achievement of sustainable development from an economic, social and environmental point of view.*
>
> […]
>
> [...] [A]*lthough the growth seen overall in the special regime for electricity generation has been outstanding, in certain technologies the targets posed are still far from being reached.*
>
> [...] [T]*he economic circumstances established by Royal Decree 436/2004* […] *make it necessary to modify the compensation system and de-link it from the* [TMR]*, which has been used to date.*"[33]

Article 2.1 of RD661/2007 made clear that:

---

[31] **C-37**, Communication from the Commission to the Council and the European Parliament, *An Energy Policy for Europe*, COM(2007) 1 final (10 January 2007), Section 4, paras. 1 and 2.

[32] **C-38 / R-150 Bis**, Royal Decree 661/2007 of 25 May 2007 (published on 26 May 2007).

[33] *Id.*, pp. 73-74.

25

> "*Facilities for the production of electrical energy under Article 27.1 of Law 54/1997, of 27 November, may avail themselves of the special regime established under this Royal Decree.*"[34]

Article 9.1 provided for the registration of facilities producing electricity under the Special Regime:

> "*In order to ensure appropriate monitoring of the special regime and in particular in order to ensure the management and control of the receipt of the regulated tariffs, the premiums and supplements, both in respect of the categories, groups, and sub-groups, the installed power, and where applicable the date of entry into service, and in respect of the evolution of the electrical energy produced, the energy sold to the grid, the primary energy employed, the useful heat produced, and the primary energy saving achieved, facilities for the production of electrical energy under the special regime shall be subject to compulsory registration in Section Two of the Public Authority Register of facilities for the production of electrical energy indicated in Article 21.4 of Law 54/1997, which is a part of the Ministry of Industry, Tourism, and Trade. Section Two of the Public Authority Register indicated above shall hereinafter be known as the Public Authority Register for production facilities under the Special Regime* [RAIPRE].*"[35]

Its Explanatory Memorandum reiterates the principle of reasonable return in the following terms:

> "*The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997 […], guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable […].*"[36]

Among the key features of RD661/2007 were the following:

---

[34] *Id.*, Art. 2.1.

[35] *Id.*, Art. 9.1.

[36] *Id.*, p. 74.

(i)     while the option of a fixed tariff or a premium was still offered, the tariffs were expressed in actual amounts per kWh and they were adjusted for inflation on a yearly basis in accordance with the consumer price index;

(ii)    in the case of CSP, the fixed tariff was EUR 26.94/kWh for the first 25 years and thereafter EUR 21.55/kWh. Under the premium option, the premium was set at no less than 25.40 cents/kWh for the first 25 years and no less than 20.32 cents/kWh thereafter;

(iii)   the CSP tariff was increased by 17%;

(iv)    a floor (25.40 cents/kWh) and a ceiling (34.40 cents/kWh) were introduced to the premium option in order to ensure stability;

(v)     Article 17 set out the rights to be enjoyed by producers under the Special Regime, among them:

> "b) Transfer to the system their net production of electrical energy or energy sold, by way of the distribution or transport company upon condition that it is technically possible for it to be absorbed by the grid.
>
> c) Receive, for the total or partial sale of their net electrical energy generated under any of the options appearing in Article 24.1, the compensation provided in the economic regime set out by this Royal Decree. The right to receive the regulated tariff, or if appropriate the premium, shall be subject to final registration of the facility in the Register of production facilities under the special regime of the General Directorate of Energy Policy and Mines, prior to the final date set out in Article 22. [...]."[37]

(vi)    the CSP producers continued to be permitted to produce energy using natural gas and receive the FITs, whether under the fixed tariff (up to 12% of total annual

---

[37] Id., Art. 17(b)-(c).

production attributable to gas usage) or the premium option (up to 15% of total annual production attributable to gas usage);[38]

(vii)    pursuant to Article 22 of RD661/2007, once the CSP sector reached 85% of Spain's target capacity of 500 MW, a time limit of at least 12 months ("**Tariff Window**") would be fixed within which CSP installations would be required to register with the RAIPRE in order to have the benefit of RD661/2007's economic regime. Thereafter, new installations would be unable to access the tariffs and incentives established under RD661/2007, which remained available only to registered existing installations. The terms of Article 22.1 were as follows:

*"1. As soon as 85% of the power target for any Group or Sub-Group as established in Articles 35-42 of the present Royal Decree has been reached, the maximum period during which such facilities as have been registered in the Public Authority Register of production facilities under the special regime prior to the date of the termination of such period shall have the right to a premium or if applicable the regulated tariff established in the present Royal Decree for such Group or Sub-Group, which shall be no less that twelve months, shall be established by Resolution of the General Secretariat for Energy.*

*To this effect, the National Energy Commission shall propose to the General Energy Secretariat a deadline taking into account the analysis of the data reflected in the information system indicated in Article 21 and taking into account the speed of implementation of new facilities and the average duration of the works for a standard project of any technology."*[39]

Article 22.2 continued:

*"2. Such facilities as have been given final registration in the Public Authority Register for production under the special regime of the Ministry of Industry, Tourism, and Trade, subsequent to the deadline for that technology, shall if they have elected option a) under Article 24.1, receive compensation for the energy sold equivalent to the final hourly price on the production market, and if*

---

[38] *Id.*, Art. 2.1(b) (sub-Group b.1.2). It was the evidence of Mr. Al Ramahi, (Al Ramahi First WS, para. 25) that Masdar had designed its Plant on that basis.

[39] **C-38 / R-150 Bis**, RD661/2007, Art. 22.1.

*they have elected option b), the price for the sale of the electricity shall be the price arising in the organized market or the price freely negotiated by the proprietor or the representative of the facility supplemented by the applicable market supplements if any:*

*Without prejudice to the above, such facilities shall be taken into account when determining the new power targets for the Renewable Energies Plan 2011-2020.*"[40]

(viii)    options for the sale of net production of electrical energy produced by these facilities were set out in Article 24.1 of RD661/2007:

"*In order to sell their net production of electrical energy in full or in part, the proprietors of facilities to which this Royal Decree is applicable should elect one of the following options:*

*a) Sell the electricity to the system through the transport or distribution grid, receiving for it a regulated tariff, which shall be the same for all scheduling periods expressed in Euro cents per kilowatt/hour.*

*b) Sell the electricity in the electrical energy production market. In this case the sale price of the electricity shall be the price obtained in the organised market or the price freely negotiated by the proprietor or the representative of the facility, supplemented where appropriate by a premium, in Eurocents* [sic] *per kilowatt/hour.*"[41]

(ix)    Article 44.3 of RD661/2007 provided that the anticipated introduction of tariff revisions in 2010, on the expiration of the 2005-2010 PER planning period, would have no bearing upon installations, which had qualified for the RD661/2007 FITs prior to 1 January of the second year after the introduction of the revisions and which would continue to benefit from them:

"*During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and*

---

[40] *Id.*, Art. 22.2.

[41] *Id.*, Art. 24.1.

> *lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and **a reasonable rate of profitability shall always be guaranteed** with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.*
>
> ***The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed***."[42] (Emphasis added)

117.    The Royal Decree 1578/2008 of 26 September 2008 ("**RD1578/2008**") – on the remuneration for the electric energy production activity using photovoltaic solar technology (Solar PV and not CSP installations) subsequent to the deadline for maintenance of the remuneration under RD661/2007 – established a regime for photovoltaic investors that had registered after the closing of the RD661/2007 "Tariff Window." Spain included in RD1578/2008 a mechanism for the centralised control and planning of PV installation development in the form of a Pre-Assignment Register.[43] RD1578/2008 revised downwards the remuneration provided for in RD661/2007 for photovoltaic installations and opened the possibility to benefit from the Special Regime to installations that missed the deadline for registering in RAIPRE.

118.    Royal Decree Law 6/2009 of 30 April 2009 ("**RDL6/2009**"), introduced a register of pre-allocation pursuant to which, projects had to meet certain criteria in order to be registered and to qualify for the RD661/2007 tariffs.[44] Once registered, projects had a maximum of 36 months within which to enter into commercial operation. (*See* Article 4.8). RDL6/2009, as did RD1578/2008, required qualifying installations to meet these criteria as a preliminary step towards full registration with RAIPRE and then obtaining the benefit of the RD661/2007 regime. While Spain faced a recognised tariff deficit, both RD1578/2008

---

[42] *Id.*, Art. 44.3.

[43] **C-46 / R-87**, Royal Decree 1578/2008 of 26 September 2008 (published on 27 September 2008).

[44] **C-51 / R-231**, Royal Decree Law 6/2009 of 30 April 2009 (published on 7 May 2009).

and RDL6/2009 made explicit reference to the fact that in accordance with RD661/2007, there would be no change of economic regime once a plant was registered. The Preamble of RDL6/2009 provided that:

> "*In any event, the rights and expectations of the owners of the facilities are respected, with the necessary caution being exercised and the necessary transitional regime for adaptation being envisaged.*"[45]

Article 4.2 provided that:

> "*Registration in the […] Pre-Assignment Registry shall be a necessary condition to being awarded the right to the economic regime established in Royal Decree 661/2007 […].*"[46]

119.    In the course of 2009, the Ministry of Industry, Trade and Tourism issued Resolutions to each of Gemasolar, Termesol and Arcosol, confirming that:

> "*[…] the economic regimen for the facilities that are registered in the Pre-Allocation Registry for Compensation* [as they were] *[...] will be as foreseen in Royal Decree 661/2007 […].*"[47]

120.    In July 2010, the Spanish Government made public an agreement that it had reached with the CSP Plants and wind sectors. There was to be a limit on the number of production hours for CSP Plants, which enjoyed the tariff benefits, but it was set at sufficiently high a level that it was comfortably in excess of the production forecasts of each of the Claimant's installations. Further, new installations qualifying under RD661/2007 would be limited for the first twelve months of operation only to the fixed tariff option, but thereafter, they could elect between the fixed tariff and premium options. As a "*quid pro quo*," the use of gas in the production of electricity in the context of the fixed tariff option would be permitted up to 15% rather than 12%.[48]

---

[45] *Id.*, General Provisions, p. 39406.

[46] *Id.*, Art. 4.2.

[47] **C-54**, 2009 Resolution Gemasolar; **C-55**, 2009 Resolution Arcosol; and **C-56**, 2009 Resolution Termesol.

[48] **C-57**, Ministry of Industry, Tourism and Commerce, Press Release, *The Ministry of Industry, Tourism and Trade Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Rate Structures* (2 July 2010) (hereinafter "**2010 Ministry Press Release**").

121.    That agreement was formalised by Royal Decree 1614/2010 of 7 December 2010 ("**RD1614/2010**"), regulating and modifying certain aspects relating to the production of electricity based on thermoelectric and wind technologies.[49] RD1614/2010 included a stabilisation provision in terms similar to Article 44.3 of RD661/2007 at Article 4:

> Stabilisation commitments: "*For solar thermoelectric technology facilities that fall under Royal Decree 661/2007 of 25 May, the revisions of tariffs, premiums and upper and lower limits referred to in article 44.3 of the aforementioned Royal Decree, shall not affect facilities registered definitively in the Administrative Registry of production facilities entitled to the special regime that is maintained by the Directorate-General for Energy and Mining Policy as of 7 May 2009, nor those that were to have been registered in the Remuneration Pre-assignment Registry under the fourth transitional provision of Royal Decree-Law 6/2009 of 30 April, and that meet the obligation envisaged in its article 4.8, extended until 31 December 2013 for those facilities associated to phase 4 envisaged in the Agreement of the Council of Ministers of 13 November 2009.*"[50]

122.    That "guarantee" was said by the Ministry of Industry Commerce and Tourism to be:

> "[…] *superior to the one provided by the current Article 44.3 of the Royal Decree 661/2007* […]."[51]

123.    Just before the enactment of RD1614/2010, Claimant sought confirmation from the Directorate of Energy Policy and Mines of the compensation conditions applicable to the facilities throughout their operating life. The Directorate responded with three Resolutions, which, Claimant submits, confirmed in the case of each plant that the RD661/2007 regime would apply:

> "[…] *currently* […] *the retribution* [sic] *applicable to the installations consists of the tariffs, premiums, upper and lower limits and supplements established in Royal Decree 661/2007, dated 25 May, and which are updated on an annual basis by order of the*

---

[49] **C-63 / R-151 Bis**, Royal Decree 1614/2010 of 7 December 2010 (published on 8 December 2010).

[50] *Id*., Art. 4.

[51] **C-161**, Ministry of Industry Commerce and Tourism, *Report on the Draft RD 1614/2010* (26 October 2010).

*Ministry of Industry, Tourism and Trade. The values to be effective as of 1 January 2011 are the following:*

| Term | Regulated tariff c€/kWh | Reference premium c€/kWh | Upper Limit c€/kWh | Lower Limit c€/kWh |
|---|---|---|---|---|
| *First 25 years* | *29.0916* | *27.4312* | *37.1483* | *27.4353* |
| *Thereinafter* | *23.2731* | *21.9449* | | |

*Value of the reference supplement per reactive energy for the application of the bonus or malus percentage: 8.4681 c€/kWh."*[52]

124.    Pursuant to Royal Decree Law 14/2010 of 23 December 2010 ("**RDL14/2010**") – on urgent measures to correct the tariff deficit in the electricity sector –, a cap was imposed on the hours of production eligible to receive the FITs.[53] The tariff deficit issue is addressed further at paragraphs 128 and 129 below and in Sections VII.A(5) and VII.B(4) of this Award.

125.    Royal Decree 1565 of 19 November 2010 ("**RD1565/2010**") modified RD661/2007 by suppressing the right of solar photovoltaic installations to a lifetime FIT (limitation of FIT to 25 years).[54]

126.    RDL14/2010 established urgent measures to correct the tariff deficit: it applied (i) a maximum number of hours on operation hours on solar photovoltaic installations; and (ii) a fee for all those using the transport and distribution networks, which was also an implementation of Commission Regulation (EU) No. 838/2010 of 23 September 2010.[55]

127.    Royal Decree Law 1 of 27 January 2012 ("**RDL1/2012**") eliminated economic incentives for new production installations. In this RDL, the Spanish Government announced that "*it has become necessary to design a new remuneration model for this type of technologies*

---

[52] **C-65**, 2010 Resolution Gemasolar; **C-66**, 2010 Resolution Arcosol; and **C-67**, 2010 Resolution Termesol.

[53] **C-64 / R-152 Bis**, Royal Decree Law 14/2010 of 23 December 2010 (published on 24 December 2010).

[54] **R-78**, Royal Decree 1565/2010 of 19 November 2010 (published on 23 November 2010).

[55] **C-64 / R-152 Bis**, Royal Decree Law 14/2010 of 23 December 2010 (published on 24 December 2010).

> *that takes into account the new economic scenario, promoting the efficient assignment of resources through market mechanisms."* [56]

128.    On 7 March 2012, the National Energy Commission, in its "*Report on the Spanish Energy Sector,*" pointed out the following:

> *"The insufficiency of fees is endangering the economic-financial sustainability of gas and electrical systems. Significantly, the fundamental problem in the electrical sector is that the lack of convergence between revenues and costs for activities regulated in the electrical sector in these last 10 years has created a growing debt in the electrical system. This imbalance between revenue and costs in the system is unsustainable due to the impact of the growing debt accumulated on access licenses, present and future, for consumers, and the temporal impact on the indebtedness of the companies that are obligated to finance the system's deficit."* [57]

129.    On 27 April 2012, the Spanish Government approved the "*2012 National Reforms Programme*" in which it confirmed its intention to do away with the tariff deficit, specifying that:

> *"[I]t shall be equally distributed amongst consumers, the private sector and the public sector as part of a comprehensive reform of the electricity sector, which shall involve cost reduction measures for regulated activities, an increase of revenue from tolls, a review of energy planning and the establishment of a stable regulatory framework."* [58]

130.    On 1 January 2013, Law 15/2012 of 27 December 2012 ("**Law 15/2012**") concerning tax measures to ensure energy sustainability[59] came into effect. Law 15/2012 introduced three drastic changes in the economic regime applicable to existing installations. First, it abolished the right of the operating companies to use natural gas, whether for 15% or 12%, or any other percentage of annual production, while retaining the right to receive the FITs. Second, it eliminated an exemption provided for by Law 38/1992, exempting from the

---

[56] **R-94**, Royal Decree Law 1/2012 of 27 January 2012 (published on 28 January 2012), p. 8069.

[57] **C-77**, CNE, *Report on the Spanish Energy Sector,* Introduction and Executive Summary (7 March 2012) (hereinafter "**2012 CNE Report – Executive Summary**").

[58] **R-100**, Nationals Reform Programme (27 April 2012), p. 208.

[59] **C-81 / R-18**, Law 15/2012 of 27 December 2012 (published on 28 December 2012).

hydrocarbons levy the supply and import of natural gas to the extent it was used for any purposes other than engine fuel and heating fuel. Third, it imposed a 7% levy on all electricity produced (in other words, on production revenues rather than profits), which was fed into the national grid:

> "***The taxable event is the production of electricity and its incorporation into the electricity system*** *measured at power station bus bars, including the peninsular electricity system and those of the insular and extra-peninsular territories, in any of the facilities referred to in Chapter IV of Law 54/1997, of 27 November, concerning the Electricity Industry.*"[60] (Emphasis added)

131.    Royal Decree Law 2/2013 of 1 February 2013[61] ("**RDL2/2013**") reduced to zero the premium provided for by RD661/2007 and it amended the Inflation Adjustment Index. In effect, RDL2/2013 removed the premium FIT option, leaving only the fixed price option.

> "*Article 1. […] As of 1 January 2013, in all methodologies which govern the updating of the remuneration, tariffs and premiums that apply to agents of the electricity system through the implementation of industry regulations and which are linked to the Consumer Price Index, this index will be replaced by the Consumer Price Index (CPI) at constant taxes excluding unprocessed foods or energy products.*"

> "*Article 2. […] Royal Decree 661/2007, of 25 May, regulating the production of electricity under a special regime, is hereby modified as follows:*

> *One. In tables 1 and 2 of article 35, the value of the reference premium for all the subgroups is modified, and now **has a value of 0 c€/kWh**.*

> *Two. In table 3 of article 36, the value of the reference premium for all the subgroups is modified, and now **has a value of 0 c€/kWh**. The values of the upper and lower limits are abolished. […]*"[62] (Emphasis added).

---

[60] *Id.*, Art. 4.1.

[61] **C-83 / R-226**, Royal Decree Law 2/2013 of 1 February 2013 (published on 2 February 2013).

[62] *Id.*, Art. 1 and 2.

132.     Royal Decree Law 9/2013 of 12 July 2013[63] ("**RDL9/2013**") amended Article 30.4 of Law
         54/1997. RDL9/2013 repealed the economic regime created by RD661/2007 and replaced
         it with a new remuneration model. Article 30.4 of RDL9/2013 provided that:

> "*4. Additionally, subject to the terms that the Council of Ministers
> might adopt pursuant to Royal Decrees, in relation to the
> remuneration for the generation of electricity calculated according
> to market price, installations may receive a specific remuneration
> [the Special Payment] composed of an amount per unit of installed
> capacity. Such amount shall cover, as appropriate, the investment
> costs of a standard installation that cannot be recovered through the
> sale of energy, as well as an amount for the operation of the
> installation to cover, as the case may be, the difference between
> exploitation costs and the revenues obtained from the participation
> of such a standard installation in the market.*
>
> *For the calculation of that specific remuneration, the following
> elements shall be considered, based on the installation's regulatory
> useful life and by reference to the activities carried out by an
> efficient and well administered business:*
>
> *a) The standard revenues for the sale of generated energy valued at
> market price of production;*
>
> *b) The standard exploitation costs;*
>
> *c) The standard value of the initial investment.*
>
> *To that effect, the costs or investments determined by laws or
> administrative regulations that do not apply to the Spanish territory
> shall not be considered in any case. In the same manner, only those
> costs and investments related to the activity of electric energy
> generation can be taken into account.*
>
> *As a result of the individual characteristics of the electricity system
> in the Spanish islands or the extra-peninsular territories, a standard
> installation for each of those electricity systems may be defined.*
>
> *This remuneration regime shall not exceed the minimum required
> level to cover the costs that are necessary for installations to
> compete on an equal footing with the rest of the technologies in the*

---

[63] **C-86 / R-146 Bis**, Royal Decree Law 9/2013 of 12 July 2013 (published on 13 July 2013).

> *market in order to allow those installations to obtain a reasonable*
> *return, by reference to the standard installation, as the case may be.*
> *Notwithstanding the above, exceptionally the remuneration regime*
> *might also include an incentive to investments and timely execution*
> *of an installation, if this was going to result in a significant cost*
> *reduction for the Spanish islands or the extra-peninsular territories'*
> *electricity systems.*
>
> *Such reasonable return will be based on, before taxes, the average*
> *returns in the secondary market of the State's ten-year bonds plus*
> *the adequate differential.*
>
> *The parameters of the remuneration regime can be revised every six*
> *years.*"[64]

RDL9/2013 changed the remuneration regime which previously was calculated based on production (rate per kW produced) to a regime based on efficiency criteria (investment costs, operating costs, revenues) and introduced a Special Payment.

133. Law 24/2013 of 26 December 2013 ("**Law 24/2013**")[65] superseded Law 54/1997. It confirmed and developed the principles set out in RDL9/2013 in that it eliminated the formal distinction between the Ordinary and Special Regimes. In Law 24/2013, the principle of economic and financial sustainability of the electricity system is given as a guiding principle for the actions of the public administration. Under this regime, renewables producers were put on the same footing as conventional power generators, save to the extent that express provision was made. While renewable installations would have priority of dispatch over non-renewable generators where electricity was offered at the same price, that priority was afforded on terms fixed by the Government and subject to requirements of the security of the system. Further, tariffs fixed for the lifetime of the installations were replaced by a mechanism whereby the Special Payment would be susceptible to revision every six years and the estimates of income derived from energy sales would be revised every three years.

---

[64] *Id.*, Art. 1 (Two).
[65] **C-102 / R-147 Bis / R-192,** Law 24/2013 of 26 December 2013 (published on 27 December 2013).

134.    The Preamble to Law 24/2013 set out the reasons why it was deemed necessary to adopt a new regulatory framework. Citing a number of salient factors, including the "*significant penetration of renewable electricity generation technologies,*" it stated that a "*key element*" in the decision to reform the system was the accumulation of a very substantial tariff deficit:

> "[T]*he accumulation, during the last decade, of annual income/expense imbalances of the electric system,* […] *has created a structural deficit.*
>
> *The causes of this imbalance lie in the excessive growth of certain cost items due to energy policy decisions, without guaranteeing any corresponding income by the system. All this has then been worsened by the absence of growth in electricity demand, fundamentally a consequence of the economic crisis.*
>
> […] *This situation of imbalance has reached the point where the debt accumulated by the electric system presently exceeds twenty-six thousand million euros, the structural deficit of the system totals ten thousand million per year and the failure to correct the imbalance will generate a risk of bankruptcy for the entire electric system.* […]."[66]

135.    Royal Decree 413/2014 ("**RD413/2014**"), regulating the production of electricity from renewable energy sources, cogeneration and wastes, followed on 6 June 2014.[67] It implemented the regime put in place by RDL9/2013 and Law 24/2013. On the basis of the new legislation, the fixed tariff and premium were scrapped and replaced by the Special Payment. Unlike the FITs, which were calculated solely by reference to production, the Special Payment is triggered only once a threshold production is reached and the amount of the remuneration is capped to that which would be received by a notional "*standard installation*" which was deemed to have a standard operational life of 25 years. Beyond that notional operational life of 25 years, there is no provision for any further Special Payment to be made. Furthermore, tariff payments received prior to the inception of the new regime are counted towards the total remuneration that an installation might receive over its deemed operational life.

---

[66] *Id.*, p. 1.
[67] **C-111 / R-112**, Royal Decree 413/2014 of 6 June 2014 (published on 10 June 2014).

"*1. The value on which the reasonable return of the standard installation shall hinge will be calculated as the average yield of ten-year Treasury Bonds in the secondary market of the 24 months prior to the month of May of the year prior to the start of the regulatory period increased in a differential.*

*The reviews of the value on which reasonable return shall hinge will be applicable in what is left of the regulatory useful life of the standard installation.*

*2. Before 1 January of the last year of the corresponding regulatory period, the Ministry of Industry, Energy and Tourism shall present to the Council of Ministers a draft bill that will include a proposal for the value of the differential indicated in the previous section during the next regulatory period, pursuant to the criteria established in Article 14.4 of Act 24/2013 dated 26 December.*

*In order to set this value, the Ministry of Industry, Energy and Tourism may obtain a report from the National Commission on Markets and Competition, which shall be issued before 1 July of the second-to-last year of the corresponding regulatory system, in addition to obtaining the services of an independent specialized entity.*"[68]

136.    Ministerial Order IET/1045/2014 of 16 June 2014[69] approved the remuneration parameters of standard installations applicable to installations engaged in the production of electricity from renewable energy sources, co-generation and wastes.

"*The aforementioned Act 24/2013, dated 26 December, thus provides in its additional tenth provision that the first regulatory period will begin on the date that Royal Decree-Law 9/2013, dated 12 July, enters into force, and will end on 31 December 2019, also setting the amount on which the return of sample reference projects is based. Moreover, in its third final provision for this first regulatory period, in line with what was already established in the first additional provision of the aforementioned Royal Decree-Law, it sets the value on which reasonable return will hinge throughout the regulatory life of installations that produce electricity from renewable energy sources, co-generation and wastes and for which*

---

[68] *Id.*, Art. 19.

[69] **C-112 / R-113**, Ministerial Order IET/1045/2014 of 16 June 2014 (published on 20 June 2014).

*premium remuneration was recognized when the aforementioned Royal Decree-Law entered into force.*

*This new legal and economic framework regulated under Act 24/2013, dated 26 December, was set forth, first of all, in Royal Decree 413/2014, dated 6 June, regulating the production of electricity from renewable energy sources, co-generation and wastes, while in Article 12, it establishes the procedure for granting the specific remuneration regime. Secondly, the new legal and economic framework is established through the approval of this order, which primarily approves the remuneration parameters for standard installations that apply to specific installations for the production of electricity from renewable energy sources, co-generation and wastes.*

*This order finalizes the changes to the remuneration model for renewable energy, co-generation and wastes, granting financial stability to the system in a definitive manner, at the same time as it guarantees a reasonable return on the installations. These installations will continue to receive additional revenue over and above what they receive from the market until the end of their operational life, as long as they have not obtained this level of return. Furthermore, the importance of this order resides in the fact that it concerns the determination of useful operational life and the quantification of the initial value of the investment, insofar as it concerns parameters that may not be revised.*"[70]

137.    Order IET/1882/2014 of 14 October 2014,[71] provided that any remuneration earned by the CSP plants from the production of energy with natural gas as from 1 January 2013 had to be repaid.

## V.    THE PARTIES' RELIEF SOUGHT

### A.    CLAIMANT'S REQUEST FOR RELIEF

138.    Claimant requests the following relief:[72]

---

[70] *Id.*, Preamble.

[71] **C-118 / R-262**, Ministerial Order IET/1882/2014 of 14 October 2014 (published on 16 October 2014).

[72] In the Memorial, Claimant confirmed that it "*no longer maintains the claim for expropriation under Article 13 of the ECT which is set out in paragraph 132 of the Request for Arbitration.*" Cl. Mem., n. 19.

"*(a) a declaration that the Respondent has breached Article 10(1) of the ECT;*

*(b) an order that the Respondent make full reparation to the Claimant for the injury to its investments arising out of Spain's breach of the ECT and international law, such full reparation being in the form of:*

> *(i) full restitution to the Claimant by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered prior to the reinstatement of the prior regime; or*

> *(ii) pay the Claimant compensation for all losses suffered as a result of Spain's breaches of the ECT; and*

> *(iii) in any event:*

>> *A. pay the Claimant pre-award interest at a rate of 1.60% compounded monthly; and*

>> *B. pay post-award interest, compounded monthly at a rate to be determined by the Tribunal on the amounts awarded until full payment thereof; and*

*(c) pay the Claimant the costs of this arbitration on a full indemnity basis, including all expenses that the Claimant have incurred or will incur in respect of the fees and expenses of the arbitrators, ICSID, legal counsel and experts; and*

*(d) any other relief the Tribunal may deem appropriate in the circumstances.*

*Claimant reserves its rights to amend or supplement this relief and to request such additional, alternative or different relief as may be appropriate.*"[73]

---

[73] Cl. Mem., Part VI, paras. 504-505.

139.   Subsequently, in its Reply, Claimant repeats its request for relief set out at paragraph 504 of the Memorial. It also asks the Tribunal to dismiss all of Spain's jurisdictional (and admissibility) objections, and adds:

> "*In addition to the reservation of rights contained at paragraph 505 of the Memorial, the Claimant also reserves its right to address any discrepancies that the Claimant subsequently discovers between the English and the Spanish versions of Spain's Counter-Memorial, the Claimant having relied on the English translation.*"[74]

140.   In its Rejoinder on Jurisdiction, Claimant seeks the following additional relief:

> "*Insofar as Spain's jurisdictional Objections are concerned (and in addition to the relief set out at paragraph 504 of the Claimant's Memorial and paragraphs 1032 to 1033 of the Claimant's Reply),*
>
> *(a) the dismissal of all of Spain's jurisdictional Objections; and*
>
> *(b) an order that Spain bear the cost of bringing its jurisdictional Objections.*"[75]

### B.   RESPONDENT'S REQUEST FOR RELIEF

141.   Respondent seeks the following orders and relief:

> "*[…] in accordance with the principles of efficiency and procedural economy,* [the bifurcation of] *this proceeding, providing for a separate phase of jurisdiction and admissibility, so that the Preliminary Objections presented in this Document can be analysed and resolved by the Tribunal in a separate and previous manner.*
>
> *This request for bifurcation should not be construed as a waiver of the Kingdom of Spain's right to raise other objections of jurisdiction or regarding the admissibility of the claims presented by the Claimants, at the appropriate time during the proceedings.*
>
> *The Kingdom of Spain reserves the right to supplement, modify or complement the arguments outlined in this Request and to formulate, where appropriate, subsequent jurisdictional or admissibility objections as soon as these circumstances become*

---

[74] Cl. Reply, para. 1033.
[75] Cl. Rej. Jur., para. 193.

> *apparent during the proceedings, in accordance with the provisions of Article 41 of the ICSID Convention, and with the rest of the ICSID Convention, the ICSID Rules, Procedural Order No. 1 and the decisions of the Arbitral Tribunal.*"[76]

142.    In its Counter-Memorial, Respondent further requests:

> "*a) a Declaration that the Tribunal has no jurisdiction over the Claimant's claims, or, as the case may be, its* [sic] *inadmissibility, referring to Jurisdictional Objections;*
>
> *b) In the alternative, in case the Arbitral Tribunal decides it has jurisdiction over this dispute, the dismissal of all the Claimant's pretensions regarding to merits as the Kingdom of Spain has not breached the ECT in any way;*
>
> *c) In the alternative, to dismiss all Claimant's claims for compensation; and*
>
> *d) an Order that Claimant pay all the costs and expenses that arise from the present arbitration, including the administrative expenses incurred by ICSID, the fees of the arbitrators and the fees of the legal representation of the Kingdom of Spain, their experts and advisers, as well as any other cost or expense incurred, including interest at a reasonable interest rate from the date on which said costs were incurred until the date of its [sic] effective payment.*
>
> *The Kingdom of Spain reserves the right to supplement, amend or complement these observations and to present any additional argument as needed, in accordance with the ICSID Convention, the ICSID Arbitration Rules, the Procedural Orders and the directives of the Arbitral Tribunal in order to respond to all allegations made by Claimant with regard to this matter.*"[77]

143.    In the Rejoinder, Respondent also requests the Tribunal:

> "*In light of the arguments expressed in this writ,* […]:
>
> *a) To declare its lack of jurisdiction over the claims of the Claimants* [sic] *or, if applicable, their inadmissibility, in accordance with what*

---

[76] Resp. Bif., Part V, paras. 144-146.

[77] Resp. C-Mem., paras. 1109-1110.

*is set forth in section III of this Document, referring to Jurisdictional Objections;*

*b) Subsidiarily, for the case that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, that it dismiss all the claims of the Claimants [sic] on the merits because the Kingdom of Spain has not breached in any way the ECT, in accordance with what is stated in paragraphs (A) and (B) of section IV of this Document, on the substance of the matter;*

*c) Subsidiarily, to dismiss all the Claimants' [sic] claims for damages as said claims are not entitled to compensation, in accordance with section V of this Document; and*

*d) Sentence the Claimants [sic] to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.*

*The Kingdom of Spain reserves the right to supplement, modify or complement these pleadings and present any and all additional arguments that may be necessary in accordance with the ICSID Convention, the ICSID rules of arbitration, procedural orders and the directives of the Arbitral Tribunal in order to respond to all allegations made by the Claimant in regards to this matter.*"[78]

## VI. JURISDICTION

144.    Respondent maintains the following objections to the jurisdiction of this Tribunal:

(i)    lack of jurisdiction "*ratione personae*": Respondent contends that the dispute is, in reality, a dispute between two States, the UAE (and specifically Abu Dhabi) and the Kingdom of Spain; under international law, the conduct of Claimant must be attributed to the UAE, which is not a party to the ECT. Accordingly, neither the

---

[78] Resp. Rej., paras. 1482 and 1483.

requirements of Article 26 of the ECT, nor those of Article 25 of the ICSID Convention have been met;

(ii)     lack of jurisdiction "*ratione materiae*": Respondent contends that Claimant has no "*investment*" in Spain for the purposes of Article 1(6) of the ECT and Article 25 of the ICSID Convention;

(iii)    lack of jurisdiction "*ratione voluntatis*": Respondent contends that it denied Claimant the benefits of Part III of the ECT in a timely fashion and in reliance upon the provisions of Article 17 of the ECT; it says that Claimant maintains no "*substantial business activities*" in The Netherlands (being the Area of the Contracting Party in which it is accepted that Claimant is organised);

(iv)     lack of jurisdiction "*ratione voluntatis*" relating to tax measures, in light of the provisions of Articles 10(1) and 21 of the ECT, being a lack of jurisdiction to entertain the dispute arising out of the introduction, pursuant to Law 15/2012, of the TVPEE ("**Levy**") on the production and incorporation into the grid of electricity within the ambit of the Spanish electrical system; and

(v)      the "*intra-EU*" objection: Respondent submits that the Tribunal has no jurisdiction to hear the claims, because it says that there is an:

> "[A]*bsence of any investor protected in accordance with the ECT. The Claimant does not come from the territory of another Contracting Party as the Netherlands, just like the Kingdom of Spain, are Member States of the European Union. The ECT does not apply to disputes pertaining to intra-EU investments.*"[79]

---

[79] Resp. C-Mem., Section III, Section C. In the Counter-Memorial Respondent included an additional objection alleging lack of compliance with the "*cooling off*" period established in Article 26 of the ECT, with respect to RDL9/2013, Law 24/2013, RD413/2014 and Ministerial Order IET/1045/2014. Resp. C-Mem., para. 364 *et seq.* That objection was later withdrawn in the Rejoinder. Resp. Rej., n. 1.

**A.**    **OBJECTION BASED ON LACK OF JURISDICTION "*RATIONE PERSONAE*"**

**(1)**    **Respondent's Position**

145.    Respondent maintains that, as a matter of international law, the conduct of Claimant is attributable to the UAE, and specifically to Abu Dhabi, which is not a party to the ECT.[80] It says that, in reality, this is a dispute between two States, the UAE (Abu Dhabi) and Spain, rather than a dispute between a Contracting State and an investor, which is a national of another Contracting State. Since the dispute is between two States, the requirements of Article 26 of the ECT and of Article 25 of the ICSID Convention have not been met.

146.    Respondent points to two principles of attribution, which it says are recognised in case law and which are codified in the ILC Articles on the Responsibility of States for Internationally Wrongful Acts ("**ILC Articles**"), namely:

(i)    the actions of a legal person must be considered actions performed by the State when such person acts in the exercise of elements of governmental authority; and

(ii)    the actions of a legal person are considered actions of the State when such person acts under the control, direction or instructions of the State.

147.    While Respondent confirms that it does not assert that the ILC Articles are applicable for jurisdictional purposes,[81] it says that they are evidence of the existence of principles of international customary law on attribution. That is relevant, it says, because:

(i)    Article 26(6) of the ECT requires this Tribunal to:

"[…] *decide the dispute in accordance with this Treaty and applicable rules and principles of international law*"; and

---

[80] Tr. Day 1, Ms. Oñoro, p. 5, line 14 to p. 6, line 2.
[81] Tr. Day 1, Ms. Oñoro, p. 7, lines 6-10.

(ii)    there is authority in ICSID case law for the proposition that attribution is relevant to jurisdiction. Respondent relies upon *Tulip*[82] and *CSOB*.[83] In the former case, the tribunal had determined that:

> "*The issue of attribution relates both to the Tribunal's jurisdiction and to the merits of this dispute. Attribution is relevant […] for the purposes of the BIT and Art. 25 of the ICSID Convention.*"[84]

And in *CSOB*, the tribunal had concluded that:

> "*[…] for purposes of the Convention a mixed economy company or government-owned corporation should not be disqualified as a 'national of another Contracting State' unless it is acting as an agent for the government or is discharging an essentially government function.*"[85]

148.    In the event, Respondent concedes that it has found nothing to support the proposition that Claimant exercised any public function prerogative.[86]

149.    Respondent focusses instead upon what it says are indicia of control over Claimant by Abu Dhabi.

150.    Claimant, it is alleged, is under the "*general control*," direction or instructions of Abu Dhabi, because:

> "*[T]he key goals and functions of the Claimant have been determined/defined expressly by [Abu Dhabi] and those are the objectives of economic and social policy, objectives/goals of [Abu Dhabi].*"[87]

---

[82] **CL-129**, *Tulip Real Estate and Development Netherlands BV v. Republic of Turkey*, ICSID Case No. ARB/11/28, Award, 10 March 2014 (hereinafter "*Tulip*"), para. 276.

[83] **CL-16**, *Ceskoslovenska Obchodni Banka A.S. v. The Slovak Republic*, ICSID Case No. ARB/97/4, Decision on Objections to Jurisdiction, 24 May 1999 (hereinafter "*CSOB*"), para. 17.

[84] **CL-129**, *Tulip*, *supra* n. 82, para. 276.

[85] **CL-16**, *CSOB*, *supra* n. 83, para. 17.

[86] Tr. Day 1, Ms. Oñoro, p. 9, lines 22-24.

[87] Tr. Day 1, Ms. Oñoro, p. 10, lines 18-22.

151.   Respondent maintains that it is clear from Abu Dhabi's policy agenda that it had established the Masdar initiative to fulfil "*four key goals*," namely:

> "*(i)* [T]*o contribute to the economic diversification of Abu Dhabi; (ii) to maintain, and later expand, Abu Dhabi's position in evolving global energy markets; (iii) position Abu Dhabi as a developer of technology, rather than an importer; and (iv) to make a meaningful contribution towards sustainable human development.*"[88]

152.   All of these goals, it is submitted, are "*very clearly goals and functions of the general economic and social policy of the government.*"[89]

153.   Control is manifest in the requirement that any investment made by Claimant has to be approved by the Abu Dhabi Government through Mubadala.

154.   Specific control on the part of Abu Dhabi is evidenced, says Respondent, by the fact that the Government of Abu Dhabi, through Mubadala, had commissioned BNP Paribas to conduct due diligence for the joint venture with Sener. Thereafter, and again through Mubadala, the Government had approved the investment, defined the requirements and the terms and conditions, approved the capital as well as the financing or funding or project finance and approved the EPC contracts and the like.[90]

155.   In essence, submits Respondent, Claimant is a special purpose vehicle to which Abu Dhabi provided funding and, through Mubadala, guarantees for the investments in issue in this arbitration.[91]

156.   Respondent contends that it is plain that Mubadala is an entity which identifies itself with Abu Dhabi and acts expressly on its behalf as its agent.

---

[88] **R-148**, Abu Dhabi Policy Agenda 2007/2008, pp. 55-56.
[89] Tr. Day 1, Ms. Oñoro, p. 11, lines 8-9.
[90] Tr. Day 1, Ms. Oñoro, p. 11, line 22 to p. 12, line 8.
[91] Tr. Day 1, Ms. Oñoro, p. 12, lines 13-19.

(2)     **Claimant's Position**

157.    Claimant submits that the issue of control is the wrong legal test. It states that in none of the cases in which this issue has arisen has a tribunal declined jurisdiction.[92]

158.    The actual test is set out in *CSOB* – in fact in the very paragraph and the paragraph following to which Respondent had drawn attention. The tribunal stated that:

> "[…] *for purposes of the Convention, a mixed economy company or government owned corporation should not be disqualified as a 'national of another Contracting State' unless it is acting as an agent for the government or is discharging an essentially government function.* […]."

It continued:

> "[…] [the fact that] *CSOB is a public sector rather than a private sector entity, does not address the here crucial issue* […] *For, as has been shown above, such ownership or control alone will not disqualify a company under the here relevant test from filing a claim with the Centre as 'a national of another Contracting State.'*"[93]

159.    Claimant further submits that even if control were the test, Respondent has failed to meet it.

160.    Claimant and ADFEC are both subsidiaries of Mubadala. Each of them has a level of delegated authority to pursue investment plans. Above that level of authority, decisions are referred to the investment committee of Mubadala and if the proposed investment exceeds the investment committee's approval authority, the matter is referred to the Board of Mubadala, which exercises the highest level of approval authority for investment decisions.[94] In the case of the investments in the Plants, which were an ADFEC initiative

---

[92] *See,* **CL-96,** *Telenor Mobile Communications SA v. The Republic of Hungary,* ICSID Case No. ARB/14/05, Award, 13 September 2003; **CL-99,** *CDC Group PLC v. The Republic of The Seychelles,* ICSID Case No. ARB/02/14, Award, 17 December 2003; **CL-110,** *Hrvatska Elektroprivreda DD v. Republic of Slovenia,* ICSID Case No. ARB/05/24, Decision on the Treaty Interpretation Issue, 12 June 2009; and **CL-70,** *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. The Republic of Kazakhstan,* ICSID Case No, ARB/05/16, Decision of the Ad Hoc Committee, 25 March 2010.

[93] **CL-16,** *CSOB, supra* n. 83, paras. 17-18.

[94] **C-183,** Mubadala Base Prospectus (23 April 2014), pp. 226-227. And *see also* Al Ramahi Second WS, para. 13.

led by Dr. Sultan and Mr. Tassabehji, the investment decision had been made by the investment committee of Mubadala. Abu Dhabi itself was not involved in the decision to invest in the Plants and the proposal had not gone to the Board of Mubadala either, as the authority of the investment committee was sufficient for the purposes of approval.[95]

161.    At the time the investments were made, no Abu Dhabi Government officials sat on the boards/investment committees of either Claimant or ADFEC; Dr. Sultan became a Minister of State some four years after the investments in the Plants were made and his resignation from any role with Claimant.

162.    It is a primary objective of Masdar to be profitable.[96] The investment in Spain was a commercial investment in partnership with Sener with a clear aim to profit. The Mubadala Group is not required to take on any investments proposed by the Government and only considers those which it believes will meet its financial criteria.[97]

163.    Claimant says that the decision to invest in the Plants was not taken pursuant to instructions from Abu Dhabi, but on the basis of considerations of financial, rather than socio-economic, interests. The primary driver was economic return.[98] Claimant sought:

> "[T]o produce a commercially attractive rate of return by taking advantage of the financial incentives offered by the RD661/2007 special regime."[99]

164.    Further, the investment was to be financed by bank debt. One of the principal concerns of those responsible for the financial modelling and due diligence undertaken in connection with the investments in 2008 and 2009 was to ensure that the potential revenue streams

---

[95] Evans Second WS, paras. 12-13.
[96] **C-183**, Mubadala Base Prospectus (23 April 2014).
[97] *Id.*, p. 130.
[98] In fact, the scope for developing new know-how was limited, according to Claimant, because much of the technology deployed at the Plants was already available in the market and only two ADFEC employees were ever seconded to Torresol. *See* Evans Second WS, para. 2.
[99] Evans Second WS, para. 19.

from the Plants would be sufficient both to service the debt and produce an adequate rate of return.[100]

165.    Claimant maintains that the activities of the three Plants in which it invested are "*quintessentially commercial*": the Plants operate commercially, they sell electricity to the market and they are paid in Euros for each kWh sold. Claimant submits that it is a commercial entity. It made a commercial investment, which is now the subject of a dispute.[101]

(3)    **Analysis**

166.    The Tribunal has little hesitation in dismissing this objection to its jurisdiction.

167.    The ILC Articles have been embodied in Resolution A/56/83 adopted by the General Assembly of the United Nations on 28 January 2002. This resolution is considered as a statement of customary international law on the question of attribution for purposes of asserting the responsibility of a State towards another State, which is applicable by analogy to the responsibility of States towards private parties.

168.    In order for an act to be attributed to a State, it must have a close link to the State. Such a link can result from the fact that the person performing the act is part of the State's organic structure (Article 4 of the ILC Articles), or exercises governmental powers specific to the State in relation to that act, even if it is a separate entity (Article 5 of the ILC Articles),[102] or if it acts under the direct control (on the instructions of, or under the direction or control of the State, even if it is a private party (Article 8 of the ILC Articles).[103]

---

[100] Cl. Reply, para. 734 (*citing* García WS, para. 10). Mr. García's witness statement was later withdrawn from the record. *See supra* para. 57.

[101] Cl. Reply, para. 753.

[102] **CL-30**, J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (Cambridge University Press, 2002) (hereinafter "**ILC Articles**"), Art. 5, Conduct of Persons or Entities Exercising Elements of Governmental Authority: "*The conduct of a person or entity which is not an organ of the State, under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority ['à exercer des prérogatives de puissance publique', in the French version] shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.*"

[103] **CL-30**, ILC Articles, Art. 8, Conduct Directed or Controlled by a State: "*The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of that State in carrying out the conduct.*"

169.    The question is therefore to examine whether the acts of Claimant, as a separate entity, can be attributed to the State of Abu Dhabi, either because it exercises governmental authority ("*prérogatives de puissance publique*") or because it is under the effective control of the State in its investment activities.

170.    First, the Tribunal adopts the reasoning of the tribunal in *CSOB* cited above. Masdar is plainly not disqualified on the ground that it was:

> "[…] *acting as an agent for the government or is discharging an essentially government function.*"[104]

Indeed, Respondent has expressly acknowledged that Masdar is not exercising any public function prerogative.

171.    Second, Respondent has not adduced any elements showing in a convincing manner that the State of Abu Dhabi was exercising both a general control over Claimant and a control on its investment decisions.

172.    On the basis of Respondent's concession recognising the absence of governmental powers of Claimant and its failure to adduce evidence supporting its control argument, Respondent's submission that this is a dispute between two States must fail.

173.    As Claimant cannot be equated to the State of Abu Dhabi, it has to be considered for what it is, *i.e.* a commercial company. The next step in order to verify the Tribunal's jurisdiction *ratione personae*, is thus to determine whether the company has the nationality of a State whose investors are protected under the ICSID Convention and the ECT.

174.    The ICSID Convention does not specify any particular test to determine the nationality of a juridical person.

175.    The standard test in international law (and ICSID case law) to determine the nationality of a juridical person is the place of incorporation. As the tribunal in *Amco Asia* observed, the concept of nationality in the ICSID Convention is:

---

[104] **CL-16**, *CSOB*, *supra* n. 83, para. 17.

"[…] *a classical one, based on the law under which the juridical person has been incorporated* […]."[105]

176. The ECT, for its part, defines the investor in its Article 1:

> "*'Investor' means:*
>
> *(a) with respect to a Contracting Party:*
>
> *(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;*
>
> *(ii) a company or other organization organized in accordance with the law applicable in that Contracting Party;*"[106]

It is common ground between the Parties that Claimant is incorporated in The Netherlands and organized under the laws of that country, and that it satisfies therefore the nationality test under both the ICSID Convention and the ECT. In other words, the nationality of Claimant is that of The Netherlands, a Contracting State for the purposes of Article 25 of the ICSID Convention and a Contracting State of the ECT.

177. The Tribunal is satisfied that on the plain language and interpretation of the ECT, as well as that of the ICSID Convention, the Claimant is an "*investor*" for the purposes of Article 1(7)(a)(ii) of the ECT and Article 25 of the ICSID Convention. Accordingly, Respondent's "*ratione personae*" objection fails.

## B. OBJECTION BASED ON LACK OF JURISDICTION "*RATIONE MATERIAE*"

### (1) Respondent's Position

178. Respondent contends that Claimant has no "*investment*" in Spain for the purposes of Article 1(6) of the ECT and Article 25 of the ICSID Convention.

---

[105] **CL-207**, C. Schreuer, *The ICSID Convention: A Commentary* (2nd ed., Cambridge University Press, 2009), p. 320 (para. 841), citing *Amco Asia Corp. and Others v. The Republic of Indonesia*, Decision on Jurisdiction, Case No. ARB/81/1, 25 September 1983, 1 ICSID Reports 389, para. 396.
[106] **C-1**, ECT, Art. 1(7).

179.   It says that Claimant has failed to make a qualifying "*investment*" in Spain for the purposes of either Article 25 of the ICSID Convention or Articles 26(1) and 1(6) of the ECT, because two "*mandatory*" criteria are not met by the investment:

   (i)    there had been no contribution of economic resources, because Claimant's equity investment in Torresol Energy was financed by Mubadala *via* ADFEC, and because bank financing provided by Spanish banks to Torresol was underwritten by shareholder guarantees from Mubadala and ADFEC, with the result that there had been no investment in the "*objective or ordinary sense*" of the term; and

   (ii)   there had been no assumption of risk by Claimant.

180.   In short, Respondent contends that it is clear from Claimant's own actions that it:

   "[…] *has not come up with any funds and has not assumed any risk for the investment, as Masdar is simply a shell company, a ghost company set up for purely tax purposes in order to be able to act as a channel for the investment of the Government of Abu Dhabi in the Kingdom of Spain.*"[107]

181.   Furthermore, when the investment was under consideration, Claimant did not even exist. Its creation:

   "[W]*as a mere eventuality,* [it] *could have existed or not, but that would not have changed the material investment.*"[108]

   In any event, submits Respondent, ADFEC and Mubadala remained:

   "[J]*ointly obligated as concerns each and every single obligation subscribed to by Masdar ever since it was set up. In other words, Masdar is not carrying out any investment. The funds and the assumption of risk are always to be pinned on the shoulders of Mubadala.*"[109]

---

[107] Tr. Day 1, Ms. Moraleda, p. 15, lines 17-22.
[108] Tr. Day 1, Ms. Moraleda, p. 17, lines 15-17.
[109] Tr. Day 1, Ms. Moraleda, p. 17, lines 18-23.

### (2)    Claimant's Position

182.    Claimant dismisses these objections, describing them as "*hopeless.*"[110] It says that its shareholding in Torresol Energy and the shareholder loans fall within the definition of an "*investment*" under Article 1(6) of the ECT and Claimant is the owner of, and has control over, those assets.

183.    Claimant submits that it appears to be accepted, or at least, it is not disputed by Respondent, that the term "*investment*" in Articles 1(6) and 26(1) of the ECT is to be given a broad interpretation, sufficient to include:

    (i)    shares in Torresol Energy, debt interests in the Operating Companies (through Torresol Energy) that own and operate the Plants and interests in those Plants (Article 1(6)(b));

    (ii)    claims to money (Article 1(6)(c));

    (iii)    returns (Article 1(6)(e)); and

    (iv)    rights conferred by law, including those conferred by RD661/2007 (Article 1(6)(f)).

184.    Claimant is the legal and beneficial owner of the shares in Torresol Energy and the creditor in respect of the shareholder loans to Torresol Energy.

185.    Claimant submits that:

    (i)    since Article 1(6) of the ECT must be regarded as an agreement between the Parties on the definition of "*investment*" for the purposes of protection under the ECT; and

    (ii)    since Article 26 of the ECT (and specifically Article 26(4)(a)(i)) must be regarded as an agreement between the Parties to refer disputes in respect of such investments to arbitration under the ICSID Convention,

---

[110] Cl. Reply, para. 770.

it must follow that Claimant's assets and interests, which fall within the meaning of "*investment*" for the purposes of Article 1(6) of the ECT must also constitute "*investments*" for the purposes of Article 25(1) of the ICSID Convention.

186.    Accordingly, submits Claimant, the Tribunal need do no more than consider the definition of "*investment*" stated in Article 1(6) of the ECT in order to establish its jurisdiction – an express definition, which Respondent overlooks for the purposes of its objection. It says that there is no need to explore the cases, which turn on the various tribunals' interpretations of "*investment*" for the purposes of the ICSID Convention, which, itself contains no specific definition – notably the decision in *Salini*.[111]

187.    Claimant's submission is that even if an application of the "*Salini* test" were apposite, and it states very clearly that it does not believe that it is,[112] its investment would satisfy the four criteria of:

　　(i)　　duration;

　　(ii)　　a contribution on the part of the investor;

　　(iii)　　a contribution to the development of the host State; and

　　(iv)　　some risk taking.

188.    In this regard, Claimant notes that:

　　(i)　　when it became a party to the JVA on 9 June 2008, Claimant, in its capacity as shareholder in Torresol Energy, assumed joint and several liability (with ADFEC) for the fulfilment of all obligations under the JVA rights and obligations, including:

　　　　- its subscription for and payment for the shares;

---

[111] **CL-22**, *Salini Costruttori Generali S.P.A. and Italstrade v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 23 July 2001; and *see* **RL-23**, *Toto Costruzioni Generali S.p.A v. The Republic of Lebanon*, ICSID Case No. ARB/07/12, Decision on Jurisdiction, 11 September 2009.

[112] Cl. Reply, para. 784.

- its application of reasonable endeavours to promote, develop, grow and support Torresol Energy's business;

- its contributions to investment and funding provided in the business plan of Torresol Energy, including a commitment to provide "*additional financing in the form of equity or shareholder loans*";

(ii)    it has contributed some EUR 119,028,669 in equity and shareholder loans to the investment in Torresol Energy and the Plants; and it is a full participant in the risk of the operation of the Plants as an equity investor in Torresol Energy and as a creditor pursuant to the shareholder loans.

189.    Critically, says Claimant, Respondent does not dispute any of these points.[113]

### (3)    Respondent's Further Objection

190.    Respondent raises a further objection; it says that Claimant's shareholding in, and its shareholder loans to, Torresol Energy cannot qualify as "*investments*" under either the ECT or the ICSID Convention, any more than can financing provided by Mubadala *via* ADFEC in respect of Claimant's equity investment in Torresol Energy and the shareholder guarantees in respect of the financing provided to Torresol Energy by the Spanish banks.

191.    Claimant rejects that argument. It submits that such a proposition would purport to introduce into the ECT an origin of capital requirement when the reality is that the origin of capital used to make an investment is immaterial for the purposes of jurisdiction under the ECT or the ICSID Convention. The sole criterion for the purposes of the ECT, so far as any company claiming the benefit of the Treaty's protection for its investment is concerned, is that it be incorporated in a signatory State to the Treaty; the source of the funding for the investment is immaterial.

---

[113] *Id.*, para. 784.

192.    As to risk, the value of Claimant's shareholding in Torresol Energy is, and remains, at risk and as to duration, as is typically the case in renewable energy investments, the commitment made by Claimant is intended to be for the long term.

**(4)    Analysis**

193.    Unlike the ICSID Convention, which contains no definition of "*investment*", and is therefore susceptible to the interpretative efforts of ICSID tribunals, notably in *Salini*, Article 1(6) of the ECT does contain a definition of investment. It provides that:

> "*'Investment' means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:*
>
> *(a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;*
>
> *(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;*
>
> *(c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;*
>
> *(d) Intellectual Property;*
>
> *(e) Returns;*
>
> *(f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.*"[114]

194.    According to Claimant, it is sufficient for it to establish that its investment enters into the list of the assets adumbrated in Article 1(6) of the ECT, which it undoubtedly does.

195.    In the opinion of the Tribunal, Claimant's proposition that Article 1(6) of the ECT is an agreement between the Parties on the definition of "*investment*" for the purposes of the

---

[114] **C-1**, ECT, Art. 1(6).

protections under the ECT is incontrovertible. Further, it is an extremely broad definition, as numerous tribunals have pointed out, for example *Energoalliance*:

> "[...] [T]he definition of an 'Investment' in Article 1(6) of the ECT should be recognised as more broad compared to other acts on investment protection, namely: as a treaty covering maximum possible varieties of assets in the energy sector and optional operations therewith."[115]

196. However, the Tribunal must also interpret the general meaning of the word "*investment*" in Article 1(6) of the ECT and in Article 25 of the ICSID Convention. It has to be noted that a substantial number of recent investor-State awards have considered that the term "*investment*" has an inherent meaning, which an alleged investment must meet in addition to falling into one of the categories of assets generally mentioned in BITs. Importantly, these awards have applied this so-called inherent, or objective, definition not only when applying the ICSID Convention, but also when interpreting BITs. An illustration of this approach can be found in *GEA*, where the tribunal found as follows: "*[I]t is not so much the term 'investment' in the ICSID Convention than the term 'investment' per se that is often considered as having an objective meaning in itself, whether it is mentioned in the ICSID Convention or in a BIT.*"[116]

197. In other words, in the Tribunal's view, elucidating the meaning of the term "*investment*" in Article 1(6) of the ECT is part of the interpretation of that provision. As decided in *Romak*, an UNCITRAL arbitration in which the ICSID Convention had no application, the starting point is the ordinary meaning of the term "*investment*," ascertained in its context and in light of the object and purpose of the Treaty in accordance with the rules of interpretation of Article 31 of the VCLT.[117]

---

[115] **CL-223**, *Energoalliance Ltd. (Ukraine) v. The Republic of Moldova*, UNCITRAL, Award, 23 October 2013, para. 244.

[116] *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award, 31 March 2011, para. 141. Lastly, mention of an objective definition of investment existing equally under the ICSID Convention and BITs is also found in **CL-76**, *Abaclat and Others (formerly, Giovanna Beccara and Others) v. The Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility, 4 August 2011, para. 371.

[117] The tribunal in *Romak* also held in favour of an objective meaning of the term investment: "*The term 'investment' has a meaning in itself that cannot be ignored when considering the list contained in Article 1(2) of the BIT. [...] The Arbitral Tribunal therefore considers that the term 'investments' under the BIT has an inherent meaning (irrespective*

198.    This is also the position adopted by the *Isolux* tribunal:

> *"683. The Arbitral Tribunal does not share Claimant's position that the definition of the concept of investment in the ECT is sufficient in and of itself. The list of assets listed in ECT Article 1(6) provides examples of investment but* [it] *does not define the concept.* […]
>
> *684. The Arbitral Tribunal shares the position of the Kingdom of Spain when it argues that this additional definition must be objective, in the absence of a subjective definition included in the ECT. It is not convinced by the Claimant's argument that the objective definition developed by many other courts faced with the absence of a definition in other bilateral or multilateral treaties, in particular but not exclusively within the ICSID arbitration, would be inapplicable. More than just the content of each treaty, what truly matters is the silence of each one regarding the definition of the concept of investment. This is the common feature of these treaties which justifies a definition of the concept of investment.*
>
> *685. As noted by the Claimant, the source of this definition is the award of 2001 in the case Salini Construttori Spa and Italstrade Spa v. Kingdom of Morocco where the court considered that an investment: 'infers: contributions, a certain duration of performance of the contract and a participation in the risks of the transaction.' It added the condition of 'contribution to the economic development of the host State of the investment' (free translation). With the evolution of arbitral jurisprudence, the objective definition of the notion of investment now includes only: (i) a contribution, (ii) the receipt of returns and (iii) the assumption of risks."*[118]

199.    In sum, the existence of an "*investment*" requires a commitment or allocation of resources for a duration and involving risk. For example, a one-time sale resulting in receivables would not qualify as an "*investment*," even if the receivables may be listed as "*assets*." In other words, as summarised in *Poštová banka*, "*the definition of what constitutes an*

---

*of whether the investor resorts to ICSID or UNCITRAL arbitral proceedings) entailing a contribution that extends over a certain period of time and that involves some risk* [...]. *By their nature, asset types enumerated in the BIT's non-exhaustive list may exhibit these hallmarks. But if an asset does not correspond to the inherent definition of 'investment', the fact that it falls within one of the categories listed in Article 1 does not transform it into an 'investment'*." **RL-20**, *Romak S.A. v. The Republic of Uzbekistan*, PCA Case No. AA280, Award, 26 November 2009, para. 207.

[118] *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case V2013/153, Award, 12 July 2016 (hereinafter "*Isolux*"), paras. 683-685. This legal authority was introduced into the record on 14 December 2016, without an assigned legal authority number. *See supra* para. 73.

*investment"* implies "*a contribution to an economic venture of a certain duration implying an operational risk.*"[119]

200. Claimant also points out, rightly in the view of the Tribunal, that even if it were applicable, the *Salini* test has demonstrably been satisfied. In the present case, there can be no serious doubt that resources committed by Claimant fully correspond to the meaning of the term "*investment*" enshrined in Article 1(6) of the ECT and in Article 25 of the ICSID Convention and that the definition has been satisfied.

201. Finally, the Tribunal addresses the "*origin of capital*" objection. It is satisfied that no such requirement is to be found in either the ECT or the ICSID Convention. Whether or not the finding of the *Yukos* tribunal that "*the definition of investment in Article 1(6) of the ECT does not include any additional requirement with regard to the origin of capital or the necessity of an injection of foreign capital*"[120] is still persuasive *per se*, it articulates in that formulation precisely the position that this Tribunal would adopt. In any event, further support for the Tribunal's conclusion is to be found in *Arif*:[121]

> "[...] [U]nder ICSID jurisprudence, Tribunals have generally found the origin of capital used in investments immaterial. According to doctrinal authorities, the origin of the funds is irrelevant for the purposes of jurisdiction. Whether investments are made from imported capital, from profits made locally, from payments received locally or from loans raised locally, makes no difference to the degree of protection enjoyed."

202. The Tribunal is satisfied that on the plain language and the interpretation of the ICSID Convention and of the ECT, Claimant has made an "*investment*" within the meaning of Article 1(6) of the ECT and in accordance with the ICSID Convention. Accordingly, Respondent's "*ratione materiae*" objection fails.

---

[119] **RL-72**, *Poštová banka, a.s. and Istrokapital SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award, 9 April 2015, para. 371.

[120] **CL-114**, *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. AA 227, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "*Yukos, Jurisdiction*"), para. 432.

[121] **CL-84**, *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, para. 383.

**C.**     **OBJECTION BASED ON LACK OF JURISDICTION "*RATIONE VOLUNTATIS*" (DENIAL OF BENEFITS)**

203.     Article 17 ("*Non-Application of Part III in Certain Circumstances*") provides that:

> "*Each Contracting Party reserves the right to deny the advantages of this Part to:*
>
> *(1) a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized [...]*."[122]

**(1)**     **Respondent's Position**

204.     Respondent maintains that there is nothing in the language of the provision to say how or when the right is to be exercised. It sets three requirements:

(i)     the legal entity to which the advantages may be denied is legally incorporated in the territory of a Contracting Party;

(ii)     the entity must be owned or controlled by nationals of a third State; and

(iii)     the legal entity has no substantial business activities in the territory in which it is set up.

205.     Respondent accepts that there is no disagreement that Claimant was incorporated in The Netherlands, nor that it is ultimately owned and controlled by ADFEC. There is an issue, however, in respect of the extent of Claimant's business activities in The Netherlands. Respondent notes that in the Spanish language version of the ECT, reference is made to "*actividades empresariales importantes*" ("*important business activities*") and the Italian language version refers to "*attività commerciali rilevanti*" ("*relevant business activities*"), but, says Respondent, in whichever language the ECT is read, what is intended is "*many business activities.*"[123]

---

[122] **C-1**, ECT, Art. 17.

[123] Tr. Day 1, Ms. Moraleda, p. 23, lines 2-12. *See also*, **RL-2** (SPA), ECT, Art. 17; **RL-83** (IT), ECT, Art. 17.

206.    According to Respondent, Claimant:

> "[W]as not even paying for the rent of an office, nor does it have
> any permanently employed people in The Netherlands, nor does it
> give any instructions to invest in The Netherlands."

Rather, it was set up in a building, where

> "[H]undreds of companies are being represented. It has no workers
> at all there; they simply have two members on the board of directors
> that give them fiduciary services. They […] submit […] only
> shortened annual accounts. They didn't even submit the full
> accounts in 2014 […] they have [...] gone to the [UAE] in order to
> find a [law] firm to defend them [and not to The Netherlands] […]
> They are simply a mailbox, a shell company, set up for mere
> convenience and [which] carries out no substantial business activity
> in The Netherlands."[124]

207.    Respondent states that it gave timely and adequate notice of its intention to deny benefits
pursuant to Article 17 at paragraph 49 of Respondent's Request for Bifurcation and in
Respondent's Rejoinder paragraph 253, when the true nature of Claimant's standing had
become apparent.[125] Respondent maintains that not only had it exercised its right properly:

> "[it] has exercised its rights to deny benefits wholly adequately at
> the opportune time […]."[126]

208.    In any event, Claimant could hardly complain in circumstances in which the investment
had always been seen as an investment from the UAE:

> "Claimant did not configure its investment thinking of the
> protections under the ECT. Rather it placed itself in The
> Netherlands in order to seek tax advantages."[127]

209.    Respondent placed reliance upon:

---

[124] Tr. Day 1, Ms. Moraleda, p. 23, line 24 to p. 24, line 14.
[125] Tr. Day 1, Ms. Moraleda, p. 24, line 15 to p. 25, line 5.
[126] Tr. Day 1, Ms. Moraleda, p. 26, line 25 to p. 27, line 1.
[127] Tr. Day 1, Ms. Moraleda, p. 26, lines 15-18 (and see Brattle Second Quantum ER, para. 46).

(i)    the decision of the UNCITRAL tribunal in *Ulysseas*[128] for the proposition that a retrospective denial of the advantages of a BIT could not be excluded, because it was known to a putative investor from the time that it made its investment that the host State might not grant the protections offered by the Treaty during the life of the investment; and

(ii)    the decision in *Guaracachi & Rurelec,*[129] in which the tribunal had pointed out that:

> "*The very purpose of the denial of benefits is to give* [a State] *the possibility of withdrawing the benefits granted under the BIT to investors who invoke those benefits. As such, it is proper that the denial is 'activated' when the benefits are being claimed.*"

**(2)    Claimant's Position**

210.    Claimant rejects the objection based on Article 17 of the ECT. It says that, first, Respondent failed to give Claimant, an investor covered by the Treaty, reasonable notice pursuant to Article 17 of any decision to deny it benefits; second, even if it had validly invoked Article 17, Respondent's notice could have prospective effect only, so far as any denial of benefits was concerned; and, in any event, Article 17 was inapplicable to Claimant, which engages in "*substantial business activities*" (properly construed) in The Netherlands.

211.    Claimant further submits that Respondent's purported jurisdictional objection based upon Article 17(1) of the ECT is misconceived. Article 17, on a proper reading, concerns only the benefits under Part III of the Treaty; it does not impact upon the right to submit claims to arbitration pursuant to Article 26, which is in Part V of the ECT.

212.    Claimant draws attention to the decision in *Plama* in which the tribunal stated:

> "*Article 26 provides a procedural remedy for a covered investor's claims: and it is not physically or juridically part of the ECT's substantive advantages enjoyed by that investor under Part III. As a matter of language, it would have been simple to exclude a class of investors completely from the scope of the ECT as a whole, as do*

---

[128] **RL-28**, *Ulysseas Inc. v. Ecuador*, UNCITRAL, Interim Award, 28 September 2010 (hereinafter "*Ulysseas*"), para. 173.

[129] **RL-11**, *Guaracachi America Inc. & Rurelec, PLC v. Bolivia*, PCA Case No. 2011-17, Award, 31 January 2014 (hereinafter "*Guaracachi*"), para. 376.

> *certain other bilateral investment treaties; but that is self-evidently not the approach taken in the ECT. This limited exclusion from Part III for a covered investor, dependent upon certain specific criteria, requires a procedure to resolve a dispute as to whether that exclusion applies in any particular case; and the object and purpose of the ECT […] clearly requires Article 26 to be unaffected by the operation of Article 17(1) […]."*[130]

213.    On the basis of that decision, Claimant argues that Respondent's contention that its consent to arbitrate this dispute is excluded by the application of Article 17(1) of the ECT is incorrect, and its objection that the Tribunal has no jurisdiction by reason of Respondent's purported notice of its intention to deny benefits is unsustainable.

214.    Be that as it may, Claimant says that the objection fails, because Respondent did not affirmatively exercise its right to deny benefits and the cumulative conditions (ownership and no substantial business activities) set out in Article 17(1) have not been met.

215.    Claimant submits that if Respondent wished to invoke Article 17(1) for the reasons advanced in this case (a Claimant allegedly owned or controlled by a national of a third State and having no substantial business activities in its country of incorporation), it must first have taken positive steps to exercise its right to deny benefits to Claimant – and to have done so publicly in such a manner that its decision was reasonably available to any affected investors in due and timely fashion if it was to apply to an existing investment dispute; the rights conferred upon States by Article 17(1) do not operate automatically.

216.    Claimant's position in this arbitration is that no such timely notice was given. It points out that Claimant gave Respondent formal notification of dispute on 19 February 2013 and it served its Request for Arbitration on 30 January 2014. The first suggestion by Respondent that it might seek to deny benefits in respect of the claims advanced in this arbitration was to be found in its Request for Bifurcation of 3 March 2015. It was not until the service of Respondent's Counter-Memorial on 16 September 2015 that Respondent confirmed that it was:

---

[130] **RL-9**, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005 (hereinafter "***Plama, Jurisdiction***"), para. 148.

"[E]*xercising its right at this time to deny the Claimant the application of the benefits of Part III of the ECT in concurrence with the circumstances of Article 17.*"[131]

217.   Claimant submits that it is not necessary that a Contracting Party knows whether a particular investor (or class of investor) meets the conditions of Article 17(1) in order to give notice; the validity of any such notice may be tested against the particular facts. But in any event, it says that Respondent knew, or had reason to know, that the conditions of Article 17(1) might be relevant in the case of Claimant.

218.   Claimant submits that a purported exercise by Respondent of its right to deny benefits nearly two years after the arbitration had commenced and the claim had been filed does not constitute reasonable notice of its intent to deny benefits under Article 17(1).

219.   Claimant says that, as a result of Respondent's failure to provide reasonable notice of its intent, it has not effectively exercised the right to deny benefits pursuant to Article 17(1). That is fatal to its denial of benefits objection. That being the case, there is no need to consider whether the substantive conditions for the application of Article 17(1) have been satisfied.

220.   But even if the statement contained in Respondent's Counter-Memorial were to be regarded as constituting valid notice, Claimant says that there is ample authority for the proposition that any such denial of benefits case could only operate prospectively under the ECT.

221.   Claimant's further submission is that even if this Tribunal were to determine that the right to exercise Article 17 had been properly invoked by Respondent, it would not be able to fulfil the cumulative conditions of Article 17(1), because it could not demonstrate that Claimant has no substantial business activities in The Netherlands.

222.   Claimant rejects the suggestion that it is a "*mere mailbox or shell corporation,*" which does not engage in substantial business activity in The Netherlands and that the fact that it is

---

[131] Resp. C-Mem., para. 188.

registered at a "*virtual office*" and has no permanent employees is indicative of its shell company standing.[132]

223.    In Claimant's submission, "*substantial*" should be construed in a qualitative sense as meaning business activities of substance.[133] Claimant drew attention to the decision of the tribunal in *AMTO*,[134] which held that the decisive factor was the materiality of the business in question.

224.    Claimant is, in that sense, an entity of substance. It is a holding company, which owns major investments – and not only in Spain. In addition to the Plants, those assets include the London Array offshore wind farm and Dudgeon projects, both UK renewable energy projects, and the Tafila wind project in Jordan, all of which are high value capital-intensive projects. Claimant points out that similar structures, such as that adopted in this case for the investments in the Plants, are commonly used by international corporations investing abroad. It is asserted further by Claimant that Masdar is demonstrably a business that has grown in the period 2008-2014.[135]

225.    It is acknowledged that Claimant has its office in a corporate services company's (Vistra's) premises and that it has no employees in Amsterdam other than its two Dutch Directors. Mr. Al Ramahi explained that Claimant had four Directors: 2 'A' Directors (who are based in Abu Dhabi and hold directorships with other group companies) and 2 'B' Directors (who are Dutch nationals and Vistra company staff). Mr. Al Ramahi testified that the voting rights of the B Directors were not limited to administrative issues and that there was no weighting in favour of 'A' Director voting rights. The Tribunal was told that the Dutch 'B' Directors are active participants in Board meetings and that they have prior renewables experience. Mr. Al Ramahi told the Tribunal that the Masdar Board met at least four times a year in The Netherlands: that it oversaw the investments and the assets owned by Masdar and that it ensured that they were "*well funded, well managed and, sometimes, we make*

---

[132] Cl. Reply, para. 911 *et seq.*

[133] Tr. Day 1, Mr. Sullivan, p. 227, lines 25 *et seq.*

[134] **CL-203**, *Limited Liability Company AMTO v. Ukraine,* SCC Case No.080/200, Final Award, 26 March 2008 (hereinafter "*AMTO*"); Cl. Reply, paras. 909-910.

[135] Tr. Day 5, Mr. Sullivan, p. 96, lines 15-20.

*decisions on capital contributions.*" He went on to say that not only were these Board meetings important to Claimant's business, they were required by law.[136]

226.    Meetings of Claimant's Board take place at the Claimant's registered office in Amsterdam. Claimant enjoys autonomy in the financial management of its investments, it assumes its own financial risk and it issues guarantees.[137]

227.    Claimant rejects Accuracy's assessment that its Financial Statements filed with the Dutch Commercial Registry show that Claimant is "*without business activity.*" It says that such conclusion is premised in part on a comparison with Mubadala's financial statements and that it is inapposite, since Mubadala is an issuer of public bonds and therefore subject to enhanced financial reporting requirements.

228.    In fact, says Claimant, its Financial Statements are not the whole picture; in his evidence, Mr. Al Ramahi stated that Claimant takes advantage of the limited disclosure requirements available under The Netherlands small company regime. He explained that Claimant's full financial reports are audited and include income statements, detailed notes and management and directors' reports.[138]

229.    Upon questioning from the Tribunal, Claimant stated that it held bank accounts in The Netherlands with Royal Bank of Scotland BV and ING Bank NV.[139]

230.    It must be said that none of this cut much ice with Respondent. It insisted that Claimant was a mere "*shell*" or "*mailbox,*" which had no economic activity, much less, substantial business activity in The Netherlands:[140] the company address was at Schiphol Airport; the accounts were summary; the annual accounts themselves reflected the (uncontested) fact that the company was a holding company; it had no employees; and it was an entity wholly financially dependent upon Abu Dhabi. While reference had been made to a bank account

---

[136] Tr. Day 2, Mr. Al Ramahi, p. 230, line 5 to p. 231, line 6.
[137] Tr. Day 1, Mr. Sullivan, p. 234, lines 8-13.
[138] Al Ramahi Second WS, para. 29.
[139] Tr. Day 5, Mr. Sullivan, p. 148, lines 1-6; and Ms. Gill, p. 213, line 19 to p. 214, line 3. *See also*, Al Ramahi Second WS, para. 34.
[140] Tr. Day 5, Mr. Fernández, p. 174, lines 1-9.

at a branch of Royal Bank of Scotland, there was, it was suggested, "*not a shred of evidence*" that an account had actually been opened in The Netherlands. And to the extent that business was being conducted in The Netherlands, it was merely to ratify agreements taken in Abu Dhabi and funded entirely by Abu Dhabi money.[141]

**(3)    Analysis**

231.    Article 17, "*Non-Application of Part III in Certain Circumstances,*" provides as follows:

> "*Each Contracting Party reserves the right to deny the advantages of this Part to:*
>
> *(1)  a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized; or*
>
> *(2)  an Investment, if the denying Contracting Party establishes that such Investment is an Investment of an Investor of a third state with or as to which the denying Contracting Party:*
>
> *(a) does not maintain a diplomatic relationship; or*
>
> *(b) adopts or maintains measures that:*
>
>> *(i) prohibit transactions with Investors of that state; or*
>>
>> *(ii) would be violated or circumvented if the benefits of this Part were accorded to Investors of that state or to their Investments.*"[142]

**a.    The Timing of The Denial of Benefits**

232.    Respondent has argued that "*a right can only be denied when it is known that it is being invoked and claims to be exercised*" and, furthermore, that "*Spain has only been able to*

---

[141] Tr. Day 5, Mr. Fernández, p. 172, line 18 to p. 176, line 23.
[142] **C-1**, ECT, Art. 17.

*verify the concurrence of the circumstances established in Article 17 of the ECT*" in the course of the litigation.[143]

233.    In essence, Respondent took the position that the denial can be made up to the moment an objection to jurisdiction may be raised (in the Statement of Defence under the UNCITRAL Rules or the Counter-Memorial under the ICSID Rules) and the possibility of a denial is clear on the face of the Treaty, if the conditions set out in Article 17(1) are met. That is a position with which one member of the Tribunal agrees.

234.    Claimant submits that the requirement to give affirmative notice before an exercise of the right to deny benefits pursuant to Article 17(1) is consistent with the object and purpose of the ECT, which, as Article 2 of the ECT makes clear, are to establish:

> "[A] *legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the* [European Energy] *Charter.*"[144]

235.    That is a position with which a majority of the Tribunal concurs, noting the opinion of the tribunal in *Khan. Khan* took the view that a requirement to give notice would be meaningless, if Article 17(1) could be invoked after an arbitration has been started:

> "*It is difficult to imagine that any Contracting Party, whatever its general policy regarding mailbox companies, would refrain from exercising its right to deny the substantive protections of the ECT to an investor who has already commenced arbitration and is claiming a substantial sum of money. A good faith interpretation does not permit the Tribunal to choose a construction of Article 17 that would allow host states to lure investors by ostensibly extending to them the protections of the ECT, to then deny these protections when the investor attempts to invoke them in international arbitration.*"[145]

236.    The *Khan* tribunal concluded that:

---

[143] Resp. C-Mem., para. 194.

[144] Cl. Reply, para. 886; **C-1,** ECT, Art. 2.

[145] **CL-219**, *Khan Resources, Inc., Khan Resources B.V., and CAUC Holding Company Ltd. v. The Government of Mongolia and MonAtom LLC*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012, para. 429.

> "*The Treaty seeks to create a predictable legal framework for investments in the energy field. This predictability materializes only if investors can know in advance whether they are entitled to the protections of the Treaty. If an investor such as Khan Netherlands, who falls within the definition of 'Investor' at Article 1(7) of the Treaty and is therefore entitled to the Treaty's protections in principle, could be denied the benefit of the Treaty at any moment after it has invested in the host country it would find itself in a highly unpredictable situation. This lack of certainty would impede the investor's ability to evaluate whether or not to make an investment in any particular state. This would be contrary to the Treaty's object and purpose.*"[146]

### b. The Effect of The Denial

237.   In the course of its opening submissions, Respondent maintained that whether Article 17:

> "[…] *has a retroactive effect or a prospective effect is not really germane. In this case, there is no reason why it couldn't have a retroactive effect* […]."[147]

238.   That was a proposition challenged by Claimant. It maintained that it was "*absolutely germane,*"[148] because Respondent was seeking to deny the rights of the Treaty during the course of the arbitration.

239.   A majority of the Tribunal accepts that submission. It considers that it would contradict the text and the purposes of the ECT to say that a Contracting State may deny benefits retrospectively, after an investment has been made and a dispute has arisen. That would be contrary to the transparency, co-operation and stability objectives of the ECT and it would lead to anomalous results. The majority notes that a majority of tribunals, which has considered this issue, has concluded that before disputes arise, a Contracting State must act, whether by adopting legislation denying benefits generally (or to a specific sector or sectors) or by promulgating measures directed at specific investors. That is both practical

---

[146] *Id.*, para. 426.

[147] Tr. Day 1, Ms. Moraleda, p. 44, lines 11-14.

[148] Tr. Day 5, Mr. Sullivan, p. 92, line 15.

and consistent with the object and purpose of the ECT – co-operation, transparency and predictability.

240. In *Liman*,[149] the tribunal stated:

> "*With regard to the question of whether the right under Article 17(1) of the ECT can only be exercised prospectively, the Tribunal considers that the above-mentioned notification requirement* […] *can only lead to the conclusion that the notification has prospective but no retroactive effect. Accepting the option of a retroactive notification would not be compatible with the object and purpose of the ECT, which the Tribunal has to take into account according to Article 31(1) of the VCLT and which the ECT in its Article 2, expressly identifies as 'to promote long-term co-operation in the energy field.' Such long-term co-operation requires, and it also follows from the principle of legal certainty, that an investor must be able to rely on the advantages under the ECT, as long as the host state has not explicitly invoked the right to deny such advantages. Therefore the Tribunal finds that Article 17(1) of the ECT does not have retroactive effect.*"

241. In *Yukos,*[150] the tribunal held that:

> "*Retrospective application of a denial of rights would be inconsistent with such promotion and protection and constitute treatment at odds with those terms.*"

242. The tribunal in *Plama*[151] held that:

> "[…] *the object and purpose of the ECT suggests that the* [exercise of Article 17] *should not have retrospective effect. A putative investor, properly informed and advised of the potential effect of Article 17(1), could adjust its plans accordingly prior to making its investment. If, however, the right's exercise had retrospective effect, the consequences for the investor would be serious. The investor could not plan in the 'long term' for such an effect (if at all); and indeed such an unexercised right could lure putative investors with*

---

[149] **CL-71**, *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010, para. 225. In that case, it was not disputed that were a State to decide to exercise its right to deny benefits, it would be required expressly to invoke Article 17(1) of the ECT.

[150] **CL-114**, *Yukos, Jurisdiction*, *supra* n. 120, para. 458.

[151] **RL-9**, *Plama, Jurisdiction*, *supra* n. 130, para. 162.

> *legitimate expectations only to have those expectations made retrospectively false at a much later date.*"

243.    In *Stati*,[152] the tribunal stated that:

> "*Article 17 ECT, as clearly indicated by its introductory words 'of this part' only applies to Part III of the ECT, leaving unaffected the dispute resolution provision in Part V with Art.26 ECT (see tribunal in Plama v. Bulgaria). And further, Art.17 ECT would only apply if a state invoked that provision to deny benefits to an investor before a dispute arose and Respondent did not exercise this right.*"

244.    The tribunal in *Ulysseas*[153] has pointed out that:

> "*A further question is whether the denial of advantages should apply only prospectively, as argued by Claimant, or may also have retrospective effects, as contended by Respondent. The Tribunal sees no valid reasons to exclude retrospective effects. In reply to Claimant's argument that this would cause uncertainties as to the legal relations under the BIT, it may be noted that since the possibility for the host State to exercise the right in question is known to the investor from the time when it made its the investment, it may be concluded that the protection afforded by the BIT is subject during the life of the investment to the possibility of a denial of the BIT's advantages by the host State.*"

245.    Along the same lines, the tribunal pointed out in the *Guaracachi* case[154] that:

> "*The same must be said in relation to the supposedly retroactive application of the clause. The Tribunal cannot agree with the Claimants when they argue that the Respondent is precluded from applying the denial of benefits clause retroactively. The very purpose of the denial of benefits is to give the Respondent the possibility of withdrawing the benefits granted under the BIT to*

---

[152] **CL-86**, *Anatolie Stati, Gabriel Stati, Ascom Group S.A. and Terra Raf Trans Trading Ltd v. The Republic of Kazakhstan*, SCC Case No. V116/2010, Award, 19 December 2013, para. 745. *See also*, **CL-112**, *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009; **CL-113**, *Veteran Petroleum Limited (Cyprus) v. The Russian Federation*, PCA Case No. 228, Interim Award on Jurisdiction and Admissibility; **CL-191**, *Petrobart v. The Kyrgyz Republic*, SCC Case No. 126/2003, Award, 29 March 2005; and *Libananco v. Turkey*, ICSID Case No. ARB/06/8, Award, 2 September 2011.

[153] **RL-28**, *Ulysseas*, *supra* n. 128, para. 173.

[154] **RL-11**, *Guaracachi, supra* n. 129, para. 376.

> *investors who invoke those benefits. As such, it is proper that the denial is 'activated' when the benefits are being claimed.*"

246. The question of the retrospective/prospective character of the denial of benefits has also been hotly debated in the *Pac Rim* case, a CAFTA case applying the ICSID Rules. Two Parties to CAFTA were clearly of the view that the denial of benefits only made sense if it was retrospective.

247. This was the position of Costa Rica, as a non-disputing party:

> "*4.52. As to timing, Costa Rica observes that CAFTA Article 10.12.2 is silent on when a CAFTA Party may deny benefits; and it suggests that, consequently, '**denial of benefits may occur at any time, regardless even of the existence or not of an investment arbitration**' (paragraph 6), particularly when a tribunal is examining its jurisdiction (paragraphs 8 & 9), although such a denial could not be legally effective after an award was made (paragraph 7).*"[155] (Emphasis added)

248. The position of the United Sates, also as a non-disputing party, was similar:

> "*4.56. The USA observes (in common with Costa Rica) that a CAFTA Party is not required to invoke denial of benefits under CAFTA Article 10.12.2 before an arbitration commences; and that it may do so as part of a jurisdictional defence after a claim has been submitted to arbitration (paragraph 5). The USA likewise observes that this CAFTA provision contains no time-limit for its invocation; and that a contrary interpretation would place an untenable burden on a CAFTA Party, contrary to the purpose of CAFTA Article 10.12.2:*
>
> *'[...] It would require the respondent, in effect, to monitor the ever-changing business activities of all enterprises in the territories of each of the other six CAFTA-DR Parties that attempt to make, are making, or have made investments in the territory of the respondent* [citing Ms. Kinnear's NAFTA Commentary]. *This would include conducting, on a continuing basis, factual research, for all such enterprises, on their respective corporate structures and the extent of their business activities in those countries. To be effective, such monitoring would in many cases require foreign investors to provide*

---

[155] **RL-10**, *Pac Rim Cayman LLC. v. Republic of El Salvador*, ICSID Case No. ARB/09/12, Decision on Jurisdictional Objections (1 June 2012), para. 4.52.

*business confidential and other types of non-public information for review. Requiring CAFTA-DR Parties to conduct this kind of continuous oversight in order to be able to invoke the denial of benefits provision under Article 10.12.2 before a claim is submitted to arbitration would undermine the purpose of the provision.' (paragraph 6)."*[156]

249.    The tribunal adopted the same analysis:

> *"4.83. (iii) Timeliness: There is no express time-limit in CAFTA for the election by a CAFTA Party to deny benefits under CAFTA Article 10.12.2. […]*
>
> *4.85. Second, this is an arbitration subject to the ICSID Convention and the ICSID Arbitration Rules, as chosen by the Claimant under CAFTA Article 10.16(3)(a). Under ICSID Arbitration Rule 41, any objection by a respondent that the dispute is not within the jurisdiction of the Centre, or, for other reasons, is not within the competence of the tribunal 'shall be made as early as possible' and* **'no later than the expiration of the time limit fixed for the filing of the counter-memorial'**. *In the Tribunal's view, that is the time-limit in this case here incorporated by reference into CAFTA Article 10.12.2. Any earlier time-limit could not be justified on the wording of CAFTA Article 10.12.2; and further, it would create considerable practical difficulties for CAFTA Parties inconsistent with this provision's object and purpose, as observed by Costa Rica and the USA from their different perspectives as host and home States (as also by the Amicus Curiae more generally). In the Tribunal's view, the Respondent has respected the time-limit imposed by ICSID Arbitration Rule 41."*[157]   (Emphasis added)

250.    Claimant has submitted that those decisions do not provide any basis upon which to depart from the "*consistent line*" of ECT precedent. First, the relevant treaties must be interpreted on their own terms, consistent with the requirements of the Vienna Convention. Second, and in any event, in *Ulysseas*, the contested reservation of right went to the denial of the benefits of the Treaty and thus included the right to refer disputes to arbitration; in *Guaracachi*, the investment had been made before the BIT entered into force and therefore could not have been made in reliance on its terms.

---

[156] *Id.*, para. 4.56.
[157] *Id.*, paras. 4.83-4.85.

251.   In the circumstances of this case, however, these points give rise to a controversy that need not be resolved, because the Tribunal is unanimous in its view that the cumulative conditions of Article 17(1) have not been met, such that a denial may be triggered.

### c.   The Cumulative Conditions of Article 17(1)

252.   In this case, there is no dispute that Claimant fulfils the criterion of being a party owned or controlled by citizens or nationals of a third State. Nor is it in dispute that Claimant is organised in The Netherlands. Issue is joined over the third limb of the test, namely, as to whether Claimant has "*substantial business activities*" in The Netherlands.

253.   There is no definition in the ECT itself of "*substantial business activities.*" The Tribunal has had regard, however, to the decision of the tribunal in *AMTO* in which it concluded that:

> "[…] *'substantial' in this context means 'of substance and not merely of form'. It does not mean 'large', and the materiality, not the magnitude of the business activity is the decisive question.*"[158]

254.   The Tribunal adopts this analysis. It has taken note of all the reservations raised by the Respondent, but it concludes that the unchallenged evidence adduced by Claimant, notably as to its standing as a holding company with substantial international assets under its control (*see* paragraph 224 above) and the similarly unchallenged evidence of Mr. Al Ramahi,[159] is persuasive of the true extent and materiality of the business conducted by Claimant in The Netherlands. Respondent has failed to demonstrate that Claimant has no substantial business activity in The Netherlands. Accordingly, there is no basis for a denial of benefits under Article 17(1) of the ECT.

255.   That conclusion is a complete answer to the objection, and the controversy that arises by reason of the timing of Respondent's purported notice is not a matter that need be resolved.

256.   For these reasons, Respondent's denial of benefits objection fails.

---

[158] **CL-203**, *AMTO*, *supra* n. 134, para. 69.
[159] Al Ramahi Second WS, paras. 26-27 and 30-34.

**D.    OBJECTION BASED ON LACK OF JURISDICTION "*RATIONE VOLUNTATIS*" (THE LEVY)**

**(1)    Respondent's Position**

257.    Pursuant to Law 15/2012, which came into effect on 1 January 2013, Respondent introduced a:

> "[T]*ax on the value of the production of electricity of a direct and real nature, which taxes the production of electricity and its incorporation into the Spanish electricity system.*
>
> *This tax shall be imposed on the economic capacity of those producers of electricity whose facilities give rise to important investments in the electricity transmission and distribution grids in order to be able to distribute the energy supplied to them, and entail whether on their own or as a result of the very existence and development of such grids, undeniable environmental effects, as well as the generation of very significant costs needed to maintain the guaranteed supply. The tax shall apply to the production of all generation facilities.*"[160]

258.    Respondent contends that the Levy is a "*Taxation Measure*" within the meaning of Article 21(7) ECT. It is "*part and parcel of the legislation of the Kingdom of Spain,*" having been approved by the Congress of Deputies and the Spanish Senate, and a "*true tax*" both under Spanish and international law.[161]

259.    As such, it is submitted that it falls within the "*carve out*" provided for in Article 21(1) of the ECT, which provides that:

> "[…] *nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.* […]."[162]

260.    Accordingly, Respondent maintains that the Tribunal has no jurisdiction to entertain Claimant's claims in respect of the Levy. Respondent submits that it is applied equally to all producers of electricity, be they conventional or renewable, and its effect is neutralised,

---

[160] **C-81 / R-18**, Law 15/2012, Preamble, Part II.
[161] Tr. Day 1, Ms. Oñoro, p. 30, lines 5-13.
[162] **C-1**, ECT, Art. 21(1).

Case 1:19-cv-01618-TSC    Document 23-11    Filed 12/20/19    Page 87 of 228

so far as the renewable producers are concerned, because they are reimbursed the cost of the tax:

> "[T]he cost of that tax is paid back to the renewables producers through the specific remuneration package they receive."[163]

261.   Respondent insists that the economic effect of the tax on the renewables producers is "*nil*"; it is "*completely offset by repayment.*"[164]

262.   Respondent argues that the tax meets all four of the criteria confirmed by the decisions in *EnCana*,[165] *Duke Energy*,[166] and *Burlington*,[167] and summarised thus in *Burlington*:

> "*Building on Encana's ruling,* [[168]] *Duke Energy stands for the proposition that there is 'tax'* […] *if the following four requirements are met: (i) there is a law (ii) that imposes a liability on classes of persons (iii) to pay money to the State (iv) for public purposes.*"[169]

263.   In this case, Respondent argues that there could be "*no doubt whatsoever that we are faced here with a tax measure under the Treaty.*"[170] Indeed, Respondent points out that Claimant has accepted that the Levy falls within the literal definition of the word "*tax.*"[171] It contends that Claimant is not entitled to pursue Respondent for any losses arising from the Levy under Article 10(1). It says that the tax imposed by Law 15/2012 is a tax established by a law of general application.

---

[163] Tr. Day 1, Ms. Oñoro, p. 35, lines 19-21.

[164] Tr. Day 1, Ms. Oñoro, p. 36, lines 3-6 and p. 37, lines 13-15.

[165] **RL-32,** *EnCana v. Ecuador*, LCIA Award, 3 February 2006 (hereinafter "***Encana***"), para. 142.

[166] **RL-33,** *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, para. 174.

[167] **RL-34,** *Burlington Resources v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010 (hereinafter "***Burlington***"), paras. 164-165.

[168] "*The question of whether or not something is a tax measure is* [something which should be analysed from the standpoint] *of its legal operation, not from its economic effect.*" **RL-32,** *Encana, supra* n. 165, para. 142 (4). "*It is in the nature of a tax that it is imposed by law* […]." *Id.*, para. 142(1). "*A taxation law is one which imposes a liability on classes of persons to pay money to the State for public purposes.*" *Id.*, para. 142(4).

[169] **RL-34,** *Burlington, supra* n. 167, para. 165.

[170] Tr. Day 1, Mr. Oñoro, p. 29, lines 9-10.

[171] Cl. Rej. Jur., para. 162.

78

264.   Respondent maintains that the Levy is a *bona fide* tax measure, falling within the definition of a tax, both under the domestic law of Spain and under international law. Thus, according to Respondent, the Levy falls within the "*carve out*" in Article 21(1) of the ECT and it is not open to the Tribunal to determine whether the introduction of the Levy constitutes a breach of Respondent's obligations under Article 10(1) of the ECT.

265.   Respondent insists that the Levy was not a measure introduced in bad faith. It maintains that it was one of a series of measures (including measures relating to nuclear power) introduced in Law 15/2012, and there is no suggestion that those other elements were the result of bad faith either.

**(2)    Claimant's Position**

266.   Claimant says that if and to the extent that the Levy purported to be a taxation measure, it was not a *bona fide* taxation measure, and if that were right, the Levy would not be subject to the carve out.

267.   Claimant submits that the Tribunal should have regard to:[172]

(i)     Article 31(1) of the Vienna Convention, which provides that "[a] *treaty shall be interpreted in good faith* [...]";[173]

(ii)    the ILC Draft Articles on the Law of Treaties with Commentaries, 1966, which state that "[...] *Pacta sunt servanda – the rule that treaties are binding on the parties and must be performed in good faith – is the fundamental principle of the law of treaties*" and the principle of good faith "*is enshrined in the Preamble to the Charter of the United Nations*";[174]

---

[172] Cl. Reply, paras. 933-934.

[173] **CL-3**, Vienna Convention on the Law of Treaties, 23 May 1969 (hereinafter "**VCLT**"), Art. 31.

[174] **CL-163**, *International Law Commission's Draft Articles on the Law of Treaties with Commentaries*, 1966, p. 211 (Art. 23, Commentary, item 1).

(iii)    the extensive authority for this principle in the jurisprudence of the ICJ (*e.g.*: "[t]*he principle of good faith is one of the basic principles governing the creation and performance of legal obligations*");[175] and

(iv)    Article 26 of the Vienna Convention, which provides that "[e]*very treaty in force is binding upon the parties to it and must be performed by them in good faith.*"[176]

268.    Claimant submits that Respondent cannot simply frame a measure as a tax and then, on the basis that it is a measure compliant with Spanish domestic law, seek, without more, to avail itself of the Article 21(1) "*carve-out*"; were it to do so, and it is Claimant's case that it has, Respondent would not be acting in good faith; rather, it would be acting:

> "[I]*n accordance with its strict legal rights in a manner that amounted to an abuse of those rights.*"[177]

269.    There is, says Claimant, no presumption that the introduction of a tax measure purportedly in conformity with Spanish domestic law (or, as Respondent suggests with EU law)[178] might not be considered to be wrongful conduct as a matter of international law. It points to Article 3 of the ILC Articles for the proposition that:

> "*A State cannot adduce […] its own Constitution with a view to evading obligations incumbent upon it under international law or treaties in force.*"[179]

270.    Claimant submits that since no State is ever likely to declare expressly that an asserted taxation measure is a sham, it is necessary for the Tribunal to consider the conduct of Respondent in the round and to determine whether on the balance of probabilities, the measure complained of is, or is not, *bona fide*.

---

[175] **CL-168**, *Border and Transborder Armed Actions (Nicaragua v. Honduras)*, International Court of Justice, Judgment on Jurisdiction, 20 December 1988,1988 ICJ Rep. 69, para. 94.

[176] **CL-3**, VCLT, Art. 26.

[177] Cl. Reply, para. 936.

[178] *Id.*, para. 952.

[179] *Id.*, para. 1003, quoting **CL-181**, *Draft Articles on Responsibility of States for Internationally Wrongful Acts*, with Commentaries, 2001 (hereinafter "**ILC Articles**"), Art. 3, Commentary, para. 2.

271.   Claimant says that the Tribunal should be guided by the approach taken in *Yukos*:

> "*The crucial question* […] *is whether Claimants have discharged their burden of proof and established that the tax assessments, and the enforcement processes of the Russian Federation which followed, are more consistent with the conclusion that they evidence a punitive campaign against Yukos and its principal beneficial owners with sanctions entirely disproportionate to the company's tax liability, rather than with the conclusion that they were a legitimate exercise of tax enforcement.*"[180]

272.   Here, Claimant frames the question in terms of a determination whether the imposition of the Levy is "*more consistent with*" the conclusion that it forms part of a scheme to deprive Claimant of the rights granted pursuant to RD661/2007, despite the stabilisation provisions of the latter enactment rather than that it is a *bona fide* tax measure of general application.

273.   Claimant submits that in this case, there is *prima facie* evidence that the Levy is arbitrary and there is reason to consider Respondent's explanations for the measure inconsistent or contradictory. That being the case, it is open to the Tribunal to draw the appropriate inferences. Moreover, if a complainant party adduces evidence sufficient to suggest that a taxation measure is *prima facie* arbitrary or discriminatory, it falls to the Respondent State to provide a rational explanation for its conduct.

274.   Were the Tribunal to determine that Respondent had been unable to rebut the presumption that the Levy had been implemented as a disguised cut of the rights granted under RD661/2007, then, says Claimant, the "*carve-out*" in Article 21(1) of the ECT would not be triggered and a breach of the ECT would be established.

275.   On proper analysis, Claimant says that the Levy is not a taxation measure of general application, but a tariff reduction for renewable energy installations and a limitation upon the regime introduced by RD661/2007, pursuant to which Claimant had made its investment. The true purpose of the Levy was to address the tariff deficit and overcapacity

---

[180] **CL-226**, *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, Case PCA No. AA 227, Final Award, 18 July 2014 (hereinafter "*Yukos, Award*"), para. 514. It has to be noted that Respondent retorts that *Yukos* has been annulled and, moreover, it was a case dealing with extraordinary circumstances and measures, the principal purpose of which was the destruction of a company or the elimination of a political opponent, rather than the raising of revenues for the State. Resp. Rej., para. 312.

in the renewable energy infrastructure. Specifically, the Levy was an attempt to circumvent the stabilisation provision in RD661/2007 (and in RD1614/2010), which provided that any changes to the tariff would only apply to new investments. The introduction of the Levy by Respondent, says Claimant, amounted to a breach of Article 10(1) of the ECT.

276.    Claimant says that the ostensible purpose of the Levy was presented by Respondent as:

> "[a harmonisation of] *our tax system with a more efficient and respectful use of energy resources with the environment and sustainability.*"[181]

277.    That, says Claimant, is a sham: the Levy was particularly detrimental to renewable energy ("**RE**") installations; as Respondent's own Regulatory Dossier of Law 15/2012 makes clear, a measure said to be targeted at all electricity production installations, was, in fact, aimed predominantly at the RE installations, which were themselves encouraged by the RD661/2007 regime, precisely because they were regarded as beneficial in the context of environmental concerns.

278.    Claimant's argument is that this is a tax levied on revenues, which, in large part for the CSP producers, derive from subsidies received from the State. It is, in effect, a back-door tariff cut – something which could not be done directly without breaching Article 44.3 of RD661/2007. While on its face, the Levy applied to both Ordinary and Special Regimes producers, the measure was discriminatory of the RE installations and in direct contradiction to the commitments on Respondent's part, which had induced foreign investors to invest. The difference was that the ordinary generators could pass on the cost to customers by raising prices, but the Special Regime producers could not do that. They received a guaranteed price for electricity produced, so a 7% charge on revenues was a true 7% cut in revenues.

279.    To the extent that it was said that the Levy was being raised to fund the electricity system, including revenues, Claimant says that it meant, in effect, that the moneys raised from the Special Regime producers were being used to fund the very same subsidies from which

---

[181] Cl. Reply, para. 972, n. 1504; **C-172**, Regulatory Dossier of Law 15/2012, Memoria (14 September 2012), p. 1.

much of their revenues now subject to the tax were being paid.[182] The real issue for the Tribunal, suggests Claimant, is whether this is a *bona fide* tax.[183]

**(3)    Analysis**

280.    Article 21(1) of the ECT provides that:

> "*Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency, between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*"[184]

281.    The Contracting Parties to the ECT considered that, as a matter of course, the prerogative of a State to raise taxes should not be subject to review by a tribunal seized of a dispute under the ECT. The tribunal in *Renta4* took the view that, to the extent that a tribunal were to be invited to undertake such a review and to consider whether a measure promulgated as a tax did, or did not, come within the carve out for taxation measures provided for in Article 21 of the ECT, it should proceed on the basis that "*the measures are, in fact,* [taken] *bona fide* [...]."[185]

282.    That proposition is echoed in the Energy Charter Secretariat's Commentary about Article 21(1) of the ECT, written in the aftermath of the *Yukos* case:

> "*Whether it is explicitly provided within the carve-out provision or not, Contracting Parties to the ECT shall take measures in good faith, irrespective of whether they are labelled as taxation measures or not.*"[186]

---

[182] Tr. Day 1, Ms. Gill, p. 154, lines 5-13.

[183] Tr. Day 1, Mr. Sullivan, p. 228, lines 16-22.

[184] **C-1**, ECT, Art. 21(1).

[185] **CL-218**, *Renta 4 S.V.S.A., Ahorro Corporacion Emergentes F.I., Ahorro Corporacion Eurofondo F.I. Rovime Inversiones SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A. v. The Russian Federation*, SCC Case No. 24/2007, Award, 20 July 2012 (hereinafter "***Renta4***"), para. 181.

[186] **CL-234**, U.E. Ozgur, *Taxation of Foreign Investments under International Law: Article 21 of the Energy Charter Treaty in Context*, Energy Charter Secretariat (June 2015), p. 48.

283.    As a commentator on the *Yukos* case, to which Claimant has drawn the Tribunal's attention, observed:

> "*While international law has long recognised that taxation is a necessary and legitimate component of the State's sovereign prerogative, it equally recognises that the taxing power may be easily used to confiscate, discriminate, violate specific commitments and otherwise serve as an abusive tool, particularly in the context of foreign investment where specific tax incentives may have been given to attract foreign investment.*
>
> *What underlies the limitations on the sovereign taxing prerogative is that the power to tax is not really what is at stake. In each instance, the cloak of taxation is peeled away in order to determine whether the State has used its government authority to achieve an unlawful end under principles of international law.*"[187]

284.    *Yukos* was, on any view, an extreme case. The *Yukos* tribunal concluded that the tax exemption of Article 21 of the ECT did not apply to:

> "[A]*ctions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose* […]."[188]

But it was dealing with measures which were egregious and which, in reality, had little, if anything, to do with the *bona fide* raising of tax revenues for public purposes.

285.    The question in this case turns upon a disputed measure of a very different order from those which were under review in *Yukos* and *RosInvestCo*.[189] Yet, even in the context of apparently flagrant abuse of tax raising powers, the latter tribunal concluded that:

> "*States have a wide latitude in imposing and enforcing taxation laws, even if resulting in substantial deprivation without compensation.*"[190]

---

[187] **CL-231**, R Teitelbaum, *What's Tax Got to Do with It? The Yukos Tribunal's Approach to Motive and Treaty Interpretation*, 5 Transnational Dispute Management 1 (2005), pp. 5-6.

[188] **CL-226,** *Yukos, Award, supra* n. 180 , para. 1407.

[189] *RosInvestCo UK Ltd v. Russian Federation*, SCC Case No. V079/2005, Award, 12 September 2010, para. 580 (cited in *Isolux*, *supra* n. 118, para. 739).

[190] *Id.*, para. 574.

286. Respondent maintains that the Levy is a *bona fide* tax to which the Article 21(1) exemption applies. Respondent insists that there is no discrimination, first, because the tax treats all affected taxpayers equally; second, because it is a direct tax based upon each taxpayer's production capacity and revenues and third, because in the case of the renewable producers, it is cost neutral:

> "[T]*he specific remuneration received by renewable producers allows them, in addition to obtaining a reasonable return, to recover certain costs which, unlike with the conventional technologies, they cannot recover on the market. Among those costs is precisely the TVPEE.*"[191]

287. Claimant suggests that the Levy amounts to an attempt on Respondent's part to avoid fulfilling its commitments to Claimant by dint of "*manipulating an ostensible loophole in the ECT* […]."[192]

288. The Tribunal accepts the submission by Claimant that the Levy is but one element in the current dispute and that it is necessary to consider the Levy (and Law 15/2012) in the context of the measures affecting the Renewable Energy sector in Spain enacted by Respondent as a whole, from the introduction of the economic regime embodied in RD661/2007 to its repeal by RDL9/2013. That is a period somewhat colourfully described by Claimant as a "*regulatory rollercoaster.*"[193]

289. It was, on any view, a period during which an economic regime highly favourable to qualifying renewable energy projects for their operational lifetimes, which led to Spain becoming a world leader in renewable energy, was first curtailed and then eventually repealed. Law 15/2012 was an important step in that process. As the tribunal in *Renta4* put it, the question whether a tax amounts to a breach of a treaty obligation requires:

> "[A] *comprehensive assessment of the factual circumstances that have led to the loss of which a claimant complains.*"[194]

---

[191] Resp. Rej., para. 341.
[192] Cl. Reply, para. 948.
[193] *Id.*, para. 987.
[194] **CL-218**, *Renta4*, *supra* n. 185, para. 181.

290.    There are undoubtedly questions that might be raised about the economic effects and the purpose of the Levy, not least, that while one can see an obvious connection with the stated aim of environmental protection and sustainability in two of the further measures introduced in Law 15/2012, namely the tax on the production of spent nuclear fuel and radioactive waste and the tax on storage of spent nuclear fuel and radioactive waste, it is not possible to make so direct a connection between the stated aim and the Levy.

291.    Nonetheless, the Tribunal does not consider that the circumstances of the introduction of the Levy could be said to reach the high bar set by the cases in which a tribunal has concluded that the conduct of a State is such as to merit the loss of the benefit of the Article 21(1) "*carve out*."

292.    A principal premise of Claimant's argument is that the RD661/2007 Special Regime constituted a stabilisation clause and that Respondent introduced the Levy in a deliberate effort to circumvent it. Its actions were therefore not those of a party acting in good faith. But that proposition itself presupposes that the dispute between the Parties as to the nature of the commitments made by Respondent is not a good faith dispute and that Respondent's conduct is tainted with bad faith. That is not a leap that the Tribunal is prepared to make.

293.    The Tribunal respectfully adopts the reasoning of the tribunal in *Isolux* that, while:

> "[…] [i]*t is probable that* [the Levy] *does not have the intended effect in favour of the environment and that its promulgation had no other real purpose than to reduce the tariff deficit* […] *if the true purpose of the measure were merely to raise funds* […] *it would coincide with the legitimate purpose of any tax without the bad faith that this tax measure is being characterized with. If it were true that the State submitted a measure that would merely raise funds in the form of a favourable measure to the environment, the conclusion would be the same. It is the actual purpose of the measure that must be assessed by the Tribunal and not its cosmetic presentation which can be explained by political reasons that do not fit within the analysis of the Arbitral Tribunal.*"[195]

294.    The *Eiser* tribunal arrived at the same conclusion, with which the Tribunal agrees:

---

[195] *Isolux*, *supra* n. 118, para. 740.

> *"266. As Respondent contends, and as Claimants acknowledge, the TVPEE has characteristics typically associated with a legitimate tax. It was established by law, imposes obligations on a defined class of persons, generates revenues going to the State, and these revenues are used for public purposes. The TVPEE thus falls within the literal definition of 'Taxation Measure' under ECT Article 21(7).*
>
> *[…]*
>
> *270. The power to tax is a core sovereign power that should not be questioned lightly. The ECT Article 21(1) tax 'carve-out' and the corresponding provisions in many other bilateral and multilateral investment treaties reflect States' determination that tax matters not become a subject of investor-State arbitration, save perhaps in carefully limited circumstances. (ECT Article 21(5)(a) thus allows claims for expropriation effected through taxation, but subject to limiting procedures requiring consideration of the claim by national tax authorities). The present case does not on the facts reach a situation where the tax enforcement measures are found to have been used as part of a pattern of behavior aimed at destroying Claimants and therefore the Tribunal does not reach a view on the availability of such an exception, were such a case to be made out.*
>
> *271. The Tribunal cannot disregard the ECT's clear terms on the strength of the record here, which falls well short of demonstrating any improper or abusive use of the power to tax. The Tribunal therefore finds that it does not have jurisdiction to decide Claimants' claim with respect to the alleged inconsistency of the TVPEE with Spain's obligations under Article 10(1) of the ECT."*[196]

295.    For these reasons, the Tribunal concludes that it does not have jurisdiction to entertain claims arising out of the introduction of the Levy.

---

[196] **CL-249**, *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.r.l. v. Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017 (hereinafter "*Eiser*"), paras. 266, 270-271.

E.    THE INTRA-EU OBJECTION

(1)    The Diversity of Nationality Objection

a.    Respondent's Position

296.    Despite a number of cases in which tribunals have considered and rejected this very objection raised by Respondent,[197] Respondent still maintains that Article 26 of the ECT does not apply to an intra-EU dispute. It contends that the fact that Claimant is a national of a Member State of the EU and Respondent is a Member State of the EU means that it is impossible to meet:

> "[T]he requirement […] that is foreseen on Article 26(1) of the ECT which states that to access arbitration the dispute must be between a Contracting Party and investors from different Contracting Parties."[198]

297.    Accordingly, Respondent says that the Tribunal has no jurisdiction over a dispute under the ECT relating to the rights of an EU Investor in the internal electricity market of the EU and a Member State of the EU. Respondent relies on, inter alia, the amicus curiae Submission of the European Commission (the "Commission") dated 12 February 2015.

298.    There seemed to be a suggestion on the part of Respondent that a number of previous decisions could be distinguished from the situation that obtains in this case, because they involved current Member States, which had signed the ECT before they became Member States, whereas in this case, both the Investor's Contracting State of incorporation, The Netherlands, and Respondent were already EU Member States when they acceded to the ECT.

299.    Respondent submits that the Tribunal has no jurisdiction to hear the claims, because it says that there is an:

---

[197] **CL-229**, *The PV Investors v. The Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014 (hereinafter "***The PV Investors***"); **RL-71 / CL-238**, *Charanne B.V. v. The Kingdom of Spain*, SCC Arbitration No. V 062/2012, Final Award, 21 January 2016 (hereinafter "***Charanne***"); **CL-247**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l. v. The Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (hereinafter "***RREEF***"); *Isolux, supra* n. 118.

[198] Resp. Rej., para. 158.

> "[A]bsence of any investor protected in accordance with the ECT.
> The Claimant does not come from the territory of another
> Contracting Party as the Netherlands, just like the Kingdom of
> Spain, are Member States of the European Union. The ECT does not
> apply to disputes pertaining to intra-EU investments."[199]

300.    In effect, Respondent suggests that since The Netherlands and Spain are both EU Member
        States, then Claimant, as an Investor incorporated in The Netherlands, has undertaken an
        Investment in the EU and on that basis, the condition that an Investment had to be
        undertaken in a different Area in order to come within Article 26(1) could not be met.

### b. Claimant's Position

301.    As to the first ground of objection, Claimant's answer was that the plain and ordinary
        meaning of Article 26 of the ECT was clear; it applied to disputes between any Contracting
        Party to the ECT and an Investor of any other Contracting Party. It pointed out that there
        is no express disconnection clause in the ECT to the effect that the terms of Article 26 do
        not apply to the relationships inter se of EU Member States.

302.    The absence of such a clause is telling, because elsewhere the ECT contains provisions
        catering for the application of other international treaties. Claimant drew attention to Annex
        2 to the Final Act of the European Energy Charter Conference, which addressed the
        question of the Svalbard Treaty:

> "In the event of a conflict between the Treaty concerning
> Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the
> [ECT], the treaty concerning Spitsbergen will prevail to the extent
> of the conflict, without prejudice to the positions of the Contracting
> Parties in respect of the Svalbard Treaty. In the event of such
> conflict or dispute as to whether there is such conflict or as to its
> extent, Article 16 and Part V of the [ECT] shall not apply."[200]

303.    As to the subsidiary points, Claimant submits that such a situation would amount to
        impermissible discrimination under both the ECT and EU law. In any event, there is

---

[199] Resp. C-Mem., Section III, Section C, p. 39.

[200] **C-26 / RL-2**, Energy Charter Secretariat, *The Energy Charter Treaty and Related Documents* (September 2004)
(hereinafter "**ECT and Related Documents**"), Annex 2 to the Final Act of the European Energy Charter Conference,
*Decisions with Respect to the Energy Charter Treaty*, item 1, p. 135.

nothing in the text of the ECT to support the suggestion of a two-tier categorisation of both Investors and Contracting Parties.

### c. *The Commission's Amicus Curiae Submission*

304.  By its "*amicus curiae*" Submission, the Commission stated its view that the Tribunal lacked jurisdiction over this dispute and invited it to decline jurisdiction on the basis that:

> "[A]*t the time of signing of the ECT, none of the* [C]*ontracting* [P]*arties intended to confer the right to an EU investor to rely on investor-State arbitration against a Member State.*"[201]

305.  The Commission further stated:

(i)  reliance by an EU investor on investor-State arbitration against another EU Member State would violate the EU Treaties; the ECT:

> "[C]*annot create new rights and obligations for EU investors vis-à-vis EU Member States, because the Treaties and EU legislation adopted in the field of energy contain a complete set of rules, including on judicial protection, for the protection of investments of nationals of a Member State when investing in another Member State.*"[202]

(ii)  a general principle had emerged, based upon Article 344 of the Treaty on the Functioning of the European Union ("**TFEU**") and the judgment of the ECJ in *Commission v. Ireland* (C-459/03), to the effect that:

> "*EU Member States cannot agree that intra-EU disputes concerning the interpretation or application of EU law can be subject to a method of dispute settlement different from those provided in the treaties on which the Union is founded.*"[203]

(iii)  since Respondent had notified the disputed measure to the Commission under Article 108(3) TFEU, the Tribunal was invited to suspend the arbitration pursuant to its case-management authority and the principle of comity, to the extent that it

---

[201] European Commission's Written Submission, para. 14.

[202] *Id.*, para. 32.

[203] *Id.*, para. 42.

considered that it would be necessary to establish whether the national support scheme constituted State aid in order to decide the dispute.[204]

### d.   Analysis

306.   As a preliminary matter, the Tribunal acknowledges the assistance that it has received from the Commission and which will inform its review of the arguments of the Parties to this arbitration.

307.   As a second preliminary matter, it is bound to take note of the fact that at the Hearing of this arbitration, Respondent elected not to address the Tribunal on the intra-EU objection. It stated:

> "*Respondent is aware that all arbitral awards on this subject are now being disregarded, clearly. But by virtue of the principle of the institutional respect to the European Union to which we belong, as long as the European Court of Justice does not pronounce on the two issues*[205]*] that have been put before them, we will continue raising this subject, which we consider neither to be reckless nor frivolous.*"[206]

308.   As a third preliminary matter, the Tribunal notes that one of the principal grounds upon which the Respondent's objection was based appears to have been abandoned.

309.   Respondent had submitted that:

(i)     the EU has its own system for the "*specific and preferential protection*" of investments made by an investor of one Member State in the territory of another and; "*the preferential application between EU Member States of their own protection system is reflected in the wording, context and purpose of the ECT*"; and

---

[204] *Id.*, paras. 44-46.

[205] **R-305**, Respondent's Hearing Opening Presentation: Preliminary Objections, p. 75, referring to **CL-246**, Federal Supreme Court Decision in the Procedure for the Annulment of a Domestic Arbitral Award (3 March 2016), Preliminary Ruling C-284/16 in *Achmea*; and Case T-624/15 (annulment application of **R-31**, EC Decision (EU) 2015/1470 of 30 March 2015 in Case SA.38517 (2014/C), Arbitral Award, *Micula v. Romania*, 11 December 2013).

[206] Tr. Day 1, Ms. Moraleda, p. 27, lines 8-15.

(ii)    "[Respondent's] *position is confirmed by the European Commission and by doctrine*."[207]

310.    It was suggested by Respondent that the arbitration of such an intra-EU dispute as this pursuant to the ECT would contravene both the rules of the EU internal market and the principle of autonomy of EU law.

311.    As the tribunal in *PV Investors* observed:

> "*It would seem striking that the Contracting Parties made an express exception for the Svalbard Treaty, which concerns an archipelago in the Arctic, but somehow omitted to specify that the ECT's dispute-settlement system did not apply in all of the EU member states' relations. Compared to the Svalbard Treaty Exception, an exception with regard to the intra-EU relations would be of much greater significance. It would be extraordinary that an essential component of the Treaty, such as investor-State arbitration, would not apply among a significant number of Contracting Parties without the Treaty drafters addressing this exception.*"[208]

312.    It is now common ground between the Parties that there is no "*disconnect*" clause, express or implicit, in Article 26 of the ECT. Respondent says that it "*does not hold to the existence of an express or implied disconnection clause.*"[209] It would seem to follow that such objection is now moot.

313.    On a plain reading of the text of Article 26, including the exclusory language of Article 26(3), the Tribunal concludes that there is nothing in the text of the ECT which precludes intra-EU disputes from its scope.

314.    No explanation has been offered by Respondent as to why there should be a difference of approach with the preceding cases. Were that in fact the case, it would lead to the remarkable result that Article 26 would apply to an intra-EU dispute, so long as either the Contracting State of the claimant Investor or the respondent Contracting State was NOT a

---

[207] Resp. C-Mem., Section C, Part III, sub-Sections (2), (3) and (4).

[208] **CL-229**, *The PV Investors*, *supra* n. 197, para. 183.

[209] Resp. Rej., para. 220.

Member State of the EU when the ECT was signed and/or ratified but the ECT would not apply to intra-EU disputes if both of the Contracting States in question were EU Member States when the ECT was signed.

315.    A further objection has been raised on the basis that the Parties to the arbitration are a "*single Contracting Party*" and that it is against both the "*context, object and purpose of the ECT*" and EU law for disputes between Claimant and Respondent to be within the scope of protection of the ECT.

316.    It is perfectly true that Article 1(2) of the ECT defines a "*Contracting Party*" as: "*a state or Regional Economic Integration Organisation* [REIO] *which has consented to be bound by this Treaty and for which the Treaty is in force*"; and that Article 1(3) defines "*Regional Economic Integration Organization*" as: "*an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters*."[210] The EU is such an REIO and, of course, it is a Contracting Party to the ECT in its own right.

317.    "*Area*" is defined at Article 1(10): "'*Area' means with respect to a State that is a Contracting Party: (a) the territory under its sovereignty* […] *With respect to a* [REIO] *which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization.*" [211]

318.    Respondent has suggested that Article 1(3) "*expressly recognises that there are matters governed by the ECT that should be negotiated by the EU because its Member States do not have the competence* […] [t]*hat competence has been given to the* [EU], *the sole REIO that has signed the ECT.*"[212] It is then suggested that because the REIO Area (for the

---

[210] **C-1**, ECT, Art. 1(2) and 1(3).

[211] *Id.*, Art. 1(10).

[212] Resp. Rej., para. 203.

purposes of Article 26(1)) of the EU would subsume all EU Member States, there could be no jurisdiction over intra-EU claims at all.

319.    That argument received short shrift in *PV Investors*:

> "*178. The Tribunal is unable to follow this view. While it is true that the second sentence of Article 1(10) of the ECT defines Area with respect to a REIO as 'the Areas of the member states of such Organization', the first sentence of Article 1(10) of the ECT defines Area with respect to a state that is a Contracting Party as the territory under the state's sovereignty. In the Tribunal's view, the two components of the definition must be clearly distinguished and correctly related to the notion of Area that is referred to in Article 26.*
>
> *179. The phrase 'in the Area of the former* [Contracting Party] *in Article 26(1) of the ECT refers to the particular dispute initiated by the investor. If the investor commences arbitration against a member state of the EU (rather than against the EU itself), the 'Area' means 'with respect to a state that is a Contracting Party', the territory of that particular member state in accordance with the first sentence of Article 1(10). In other words, the relevant area is that of the Contracting Party that is party to the dispute. In this case, the relevant Area is the territory of Spain (not of the EU) and thus the diversity of area requirement is complied with where the investors are of a Contracting Party other than Spain and the investment has been carried out in the territory of Spain.*
>
> *180. The situation may be different where the EU itself is the Respondent. In that case, 'with respect to a [REIO]' (Article 1(10) second sentence), the relevant Area would be the entire EU Area and the diversity of area requirement would have to be satisfied with respect to that territory. This is, however, not the scenario before the Tribunal.*"[213]

320.    The reasoning adopted in *Charanne* was consistent with that in *PV Investors*:

> "*430. When defining the notion of 'area,' Article 1(10) ECT refers both to the area of the Contracting parties (Article 1(10)(a)), and to the area of the EU (second indent of Article 1(10)). Therefore, it seems reasonable to infer that, since it refers to investments made 'in the area' of a contracting party, Article 26(1) refers, in the case*

---

[213] **CL-229,** *The PV Investors, supra* n. 197, paras. 178-180.

> *of an EU Member State, both to the area of a State and to the area*
> *of the EU itself. There is no provision in the ECT that could lead to*
> *a different interpretation.*"[214]

321.    The same approach was adopted by the tribunal in *Isolux*. That case, as in this arbitration, dealt with an Investor from The Netherlands and an Investment in Spain. The *Isolux* tribunal followed the same line of enquiry as had the *PV Investors* tribunal, so far as Article 1(10) was concerned. It concluded that whilst the Areas of The Netherlands and Spain were parts of the Area of the EU, under the terms of Article 1(10), there could be "*no doubt that the Netherlands and the Kingdom of Spain exercise their sovereignty over their respective national territories.*"[215]

322.    The tribunal continued:

> "*Thus, the fact that the 'area' of the EU […] covers the territories*
> *of the Netherlands and the Kingdom of Spain, does not prevent each*
> *of them from retaining an 'area' as well within the scope of the ECT.*
> *Only an interpretation of ECT Article 26.1 allows determining what*
> *'area' should be referred to in order to verify that the requirement*
> *of diversity of territories is met.* […]
>
> *In the present dispute, the alleged investment was made in Spain by*
> *an investor that claims to be Dutch and is acting on the basis of the*
> *ECT against* [Spain]*, not against the EU.* […] [T]*he dispute before*
> *the Arbitral Tribunal is presented as a dispute between one*
> *Contracting Party (Spain) and an investor of another Contracting*
> *Party (Netherlands) concerning an investment made by the latter in*
> *the former. In this sense, the requirements of territorial diversity*
> *ECT Article 26.1 are to be respected.* […]
>
> *As a result of this, the Tribunal concludes that the fact that*
> [Respondent] *and the Netherlands belong to the same REIO does*
> *not imply that this dispute may not be brought by the investor of one*
> *Contracting Party against another investor of another Contracting*
> *Party.*"[216]

---

[214] **RL-71 / CL-238**, *Charanne*, *supra* n. 197*, para. 430.

[215] *Isolux*, *supra* n. 118, para. 633.

[216] *Id.,* paras. 634-636-640.

323.    This Tribunal sees no reason to depart from the reasoning and the conclusions adumbrated above.

324.    As a consequence, the Respondent's first prong of its "intra-EU" objection to the Tribunal's jurisdiction *ratione personae* is dismissed.

### (2)    The "Primacy of EU Law" Objection

#### a.    Respondent's Position

325.    As the Tribunal understands it, Respondent's objection is predicated on the basis that EU law applies to inter-community relations "*in preference to or prevailing over any other law, displacing any other national or international provision. The preference given to community law does not admit comparisons with other laws. It does not demand that it be proven that other laws are more or less favourable. Simply put, EU Law is given preference over any other dealing with regulating internal EU relations.*"[217]

#### b.    Claimant's Position

326.    Even if ECT and EU law covered the same subject matter, Claimant says that Respondent's submission could not be right, because Article 16 of the ECT provides that:

> "*Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or Part V of this Treaty,*
>
> *(1) nothing in Part III or Part V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and*
>
> *(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or Part V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,*

---

[217] Resp. Rej., para. 163.

*where any such provision is more favourable to the Investor or Investment*."[218] (Emphasis added)

### c. Analysis

327. It is uncontested that investor protections and judicial remedies afforded by EU law differ from the ECT scheme in a number of ways, notably, in that, pursuant to Article 26 of the ECT, an Investor has a right to bring claims directly against a Contracting Party in arbitration proceedings.

328. Claimant draws attention to the decision in *Oostergetel*, which drew a comparison between the TFEU and the investment treaty in play in that case:

> "[…] *there is at least one fundamental distinction between* [them]: […] *the* [TFEU] *provides no equivalent to one of, if not the most important, feature of the BIT regime, namely, the dispute settlement mechanism providing for investor-State arbitration.*"[219]

329. Claimant submits that the EU legal framework makes no provision for Investors to bring claims against EU Member States directly in arbitration proceedings. That right was conferred on Investors by the Contracting States in entering into the ECT. It is an extra right granted to Investors by the Contracting States and it is that right of which Claimant has availed itself. Respondent suggests that that is discriminatory, contrary to the principle of non-discrimination guaranteed to all intra-EU investors by EU law (Article 18 TFEU), but Claimant points out that the constructive way to address any such discrimination would be to bring EU remedies into line (as the German BGH has suggested be done in its referral to the CJEU)[220] rather than complain about the ECT scheme.

330. Respondent purports to rely upon Article 25 of the ECT as further support for its primacy of EU law in intra-EU relations theory, but Article 25:

---

[218] **C-1**, ECT, Art. 16.

[219] **CL-115**, *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 30 April 2010, para. 77.

[220] *See* **CL-246**, Federal Supreme Court Decision in the Procedure for the Annulment of a Domestic Arbitral Award (3 March 2016).

(i)    deals with Economic Integration Agreements ("**EIA**"); it has nothing whatsoever to say about the primacy of EU law; it provides that Most Favoured Nation treatment does not oblige ECT Contracting Parties to extend the rights of another EIA to ECT Contracting Parties, which are not themselves members of that other EIA; and

(ii)    it does not even imply that EU Investors are precluded from bringing claims against EU Member States, pursuant to Article 26 of the ECT.

331.    Respondent's purported reliance upon Article 36(7) of the ECT as a "*reaffirmation*"[221] of the recognition in the ECT of EU competence (and, in consequence, that the intra-EU objection is acknowledged) is equally wide of the mark: Article 36(7) deals with voting rights at Charter Conference meetings. It provides no more than that a REIO is vested with a number of votes in accordance with the number of its member States – but it may not exercise its right to vote if its member States exercise theirs. Again, it is straining logic to maintain that this provision amounts to some form of prohibition upon the right of an Investor of one Contracting State to bring a claim against another Contracting State pursuant to Article 26 of the ECT. What it does demonstrate, however, is that the ECT is astute to recognise that the individual Member States of the EU and the EU itself are not an indivisible whole or a single Contracting Party for all purposes.

332.    Article 16 of the ECT affords precedence to the more favourable investor-protection provisions of Article 26 of the ECT of which Claimant has availed itself over any conflicting provision of the EU treaties.[222] They are more favourable, not least, because they obviate the need to bring the claim in the Spanish courts and Respondent cannot derogate from Article 26, pursuant to which it has given unconditional consent to arbitration.

333.    To the extent that it is maintained, the Tribunal must consider Respondent's objection that Article 344 of the TFEU, which applies to disputes between EU Member States, precludes

---

[221] Resp. Rej., para. 204.
[222] **CL-247**, *RREEF*, *supra* n. 197.

the submission of a dispute of an intra-EU nature to arbitration pursuant to Article 26 of the ECT, because it would require the Tribunal to decide about European investor rights on the Internal Market.[223]

334.    Article 344 of the TFEU provides that:

> "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided therein.*"[224]

335.    As the Tribunal understands it, Respondent's objection is that:

(i)    The Netherlands and Spain were both Members of the EU at the time of the negotiation, ratification and entry into force of the ECT. They were not able to sign international investment treaties providing autonomous mechanisms for the resolution of investor-State disputes, relating to intra-EU investment;

(ii)   it would be contrary to EU law to allow the resolution by arbitration of disputes affecting the freedom of establishment and free movement of capital of an EU Investor in EU territory in the field of renewable energy; and

(iii)  were intra-EU disputes to fall within the scope of the protection of the ECT, it would be necessary to assume that the EU and its Member States had encouraged the creation and conclusion of the ECT to deal with intra-EU investments by way of a parallel dispute settlement system under Article 26 of the ECT in contravention of the rules of the Internal Market as well as the principles of autonomy of EU law and the EU judicial system's monopoly on final interpretation.

336.    The Tribunal notes that this objection has been considered, and rejected, by tribunals in *Electrabel*, *Charanne* and, most recently, *Isolux*.

337.    In *Electrabel*, the tribunal had emphasised that while the ECJ had exclusive jurisdiction to decide disputes amongst EU Member States on the application of EU law under Article

---

[223] Resp. C-Mem., para. 195.
[224] **R-1,** Consolidated Version of the Treaty on the Functioning of the European Union (26 October 2012).

292 EC (now Article 344 TFEU), this did not apply to other disputes between two private parties or between a private party and a State: "[…] *as is well known and recognised by the ECJ, such an exclusive jurisdiction does not prevent numerous other courts and arbitral tribunals from applying EU law, both within and without the European Union. Given the widespread relevance and importance of EU law to international trade, it could not be otherwise.*"[225]

338.    The tribunal in *Charanne*, too, observed:

> "[…] [T]*he scope of Article 344 of the TFEU cannot be so broad as to prevent Member States from submitting any dispute concerning the interpretation of EU treaties to a dispute settlement procedure different from those envisaged in EU legislation. As rightfully stated by the tribunal of* […] *Electrabel vs Hungary, the scope of Article 344 of the TFEU is more limited. The purpose of this provision is to ensure that the European Court of Justice has the last word on the interpretation of EU law to ensure a uniform interpretation thereof. In this regard, Article 344 of the TFEU cannot have the scope given to it by* [Spain]*, but must be, rather, considered an additional tool which, prohibiting dispute settlement agreements between Member States, allows for attaining the goal of having EU law applied in a uniform manner.*
>
> *This conclusion is reinforced by the fact that the* [Electrabel tribunal] *also deemed relevant the fact that the EU signed the ECT, thus accepting the possibility of arbitrations between investors and Member States under Article 26. In this regard, it is noteworthy that the ECT does not allow for reservations.*"[226]

339.    And as the tribunal in *Isolux* noted, arbitral tribunals not only have the power, but the duty, to apply EU law.[227]

340.    To conclude, EU law is not incompatible with the provision for investor-State arbitration contained in Part V of the ECT, including international arbitration under the ICSID Convention. The two legal orders can be applied together as regards the Parties' arbitration

---

[225] **RL-96**, *Electrabel v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (hereinafter "***Electrabel, Liability***"), para. 4.147.

[226] **RL-71 / CL-238**, *Charanne, supra* n. 197, paras. 444-445.

[227] *Isolux, supra* n. 118, para. 654.

agreement and this arbitration, because only the ECT deals with investor-State arbitration; and nothing in EU law can be interpreted as precluding investor-State arbitration under the ECT and the ICSID Convention.

341.    For the reasons identified above, the Tribunal finds that there is no bar to the submission of this dispute to arbitration by reason of EU law and the Respondent's second prong of its "intra-EU" objection to the Tribunal's jurisdiction is dismissed.

342.    In summary, and save for the objection based upon the Levy, the Tribunal declines to uphold any of the jurisdictional objections raised by Respondent and it will proceed to consider the substantive claims and defences raised in this case.


## VII.    LIABILITY

### A.    OVERVIEW OF CLAIMANT'S CLAIMS

343.    As noted in the factual summary, Masdar was incorporated in The Netherlands in March 2008. It is a holding company. Claimant says that, typically, it invests in assets operating in regulated sectors where a host State provides a stable and predictable revenue stream for the lifetime of the asset.

344.    On the basis of the regulatory regime introduced in Spain by RD661/2007 in May 2007, Masdar invested in the Spanish renewable energy sector, specifically, in the three Plants: Gemasolar, in November 2008 and, in July 2009, in Arcosol and Termesol.

345.    These investments were made through a joint venture project company, Torresol Energy, in which Masdar has a 40% interest and Sener, which was responsible for the provision and sourcing of the development costs, holds 60%.

346.    Claimant is 100% owned by Abu Dhabi Future Energy Company ("**ADFEC**"), which was founded in 2007 to make investments in renewable energy and sustainable technology in Abu Dhabi and internationally.

347.    ADFEC is a private joint stock company formed by Decree in Abu Dhabi. It, in turn, is owned by Mubadala, a public joint stock company formed by Decree.[228]

**(1)    The Regulatory Regime Ensured Stability**

348.    According to Claimant, RD661/2007 was the measure by which, after a couple of less successful prior initiatives described above, Spain embarked in May 2007 upon a concerted strategy to attract renewable energy investment into Spain by offering FITs above normal market rates for electricity for each kWh produced, together with other significant benefits, including priority of dispatch to the grid over conventional generators.

349.    RD661/2007 guaranteed investors in installations such as the CSP an inflation-linked FIT for the lifetime of the installation by way of what Claimant maintains is a stability commitment (Article 44.3) to the effect that no future changes to the tariff regime would affect CSP plants that had been commissioned by 1 January in the second year after any such change had been introduced. In other words, any anticipated tariff review carried out in 2010 would not affect any plant, which had been registered and commissioned by 1 January 2012 within the "Tariff Window."

350.    That was the basis upon which Masdar maintains that it invested and met the commissioning date in order to secure the RD661/2007 tariffs. But having gained a world leading renewable energy sector, and in violation of investors' legitimate expectations, by the series of measures introduced between 2012 and 2014 and described above, Claimant contends that Respondent abolished the RD661/2007 regime and introduced a much less favourable regime, which applied to both new installations and those commissioned under the RD661/2007 regime alike. Masdar questions why Respondent would have introduced the concept of a "Tariff Window" in RD661/2007 if, thereafter, it were simply to treat RD661/2007 as any other legislative enactment that it could amend or dispense with at will. The effect of the wholesale repeal of RD661/2007 was that any of the protections afforded to registered installations would be lost and they would be subject to the new

---

[228] **C-183**, Mubadala Base Prospectus (23 April 2014).

tariffs along with new installations which had previously been denied access to the RD661/2007 regime by the operation of the "Tariff Window."[229]

351.    Masdar draws attention to the fact that in an earlier draft iteration of RD661/2007, what it describes as the stability commitment subsequently provided for at Article 44.3 of RD661/2007 had been omitted. That had prompted criticism from the regulator, the CNE. In its Report 3 of 2007 (the "**2007 CNE Report**"), CNE had pointed out that the arrangements contemplated by the proposed RD661/2007 regime would be transitory and of four years duration only until new tariffs were introduced and, accordingly, less attractive than those already offered under the RD436/2004 regime, which:

> "[M]*inimises the regulatory risk by granting stability and predictability to the economic incentives during the service life of the facilities. This is done by establishing a transparent annual adjustment mechanism, associating incentives to trends in a robust index such as the average or reference tariff (TMR), and by exempting existing facilities from the four-year review because only new incentives affect the new facilities.*
>
> [...]
>
> *The guarantees covered in Royal Decree 436/2004 have allowed cheaper financing, with lower project costs and a lower impact on the electricity tariff ultimately paid by the consumer.*"[230]

352.    Masdar relies upon the CNE Report in support of its contention that the importance of the retention in the new Decree of the stability provision for which provision had been made in RD436/2004 was well understood.

353.    While Respondent argues that it was always open to the Spanish Government to change the stability commitment, Claimant says that such an approach "*completely ignores the commercial reality that the stability commitment is about ensuring that a generator is not*

---

[229] Tr. Day 1, Ms. Gill, p. 79, lines 5-18.
[230] **R-203,** CNE Report 3/2007 of 14 February 2007 ("hereinafter "**2007 CNE Report**").

*subsequently made worse off by the introduction of changes.*" Should the Government elect to do it nonetheless, it could, but it could not avoid the consequences.[231]

354.    Masdar points to the CNE Report:

> "[A]*lthough it is difficult to defend the petrification of regulations, it is necessary to try to achieve sufficient legal certainty to counteract regulatory uncertainty and risk as much as possible* […].
>
> […] *The constitutional doctrine admits that if its need is sufficiently justified, it is possible to retroactively enforce a regulation provided that, in exchange, an adequate transition period is established and investors are compensated.*
>
> *In the opinion of the majority of the* [CNE] *Managing Board, the need to retroactively enforce the proposed Royal Decree is not sufficiently justified, the proposed transition period is not adequate* […] *and* […] *investors are not sufficiently compensated.*"[232]

### (2)    Claimant's Expectations

355.    Two investment decisions are central to this case. Claimant's decisions:

(i)    in March 2008 to invest in the Gemasolar Plant; and

(ii)    in June 2009 to invest in Arcosol (Valle 1) and Termesol (Valle 2).

356.    Claimant submits that it invested in the reasonable expectation that the installations would benefit from the RD661/2007 regime for their lifetimes and that once they had been qualified pursuant to the "Tariff Window" requirements, there would be no retroactive changes.

### a.    Due Diligence

357.    In the course of 2006, ADFEC undertook a fact-finding mission in Spain with a view to possible investments in renewables, particularly in CSP plants. Mr. Tassabehji held a series of meetings with Spanish officials, including representatives of IDAE. Claimant maintains

---

[231] Tr. Day 1, Ms. Gill, p. 82, lines 22-25; Tr. Day 1, Ms. Gill, p. 84, lines 1-7.
[232] **R-203**, 2007 CNE Report, p. 19.

that the existing regime under RD436/2004 was thought to provide insufficient stability and predictability, but ADFEC had become aware of the proposal to implement a new regime with FITs and a stable regulatory environment – the proposed RD661/2007.

358.    Discussions were held with Sener, which had three CSP Plants in the pipeline, all of which would be operational in time to qualify for the RD661/2007 tariffs. At the same time, parallel discussions took place with Spanish banks, which regarded the projects as low risk with a predictable and secure revenue stream. They were prepared to offer funding, which would become non-recourse once the installations were registered under the RD661/2007 regime and an 80/20 debt/equity ratio was implemented.

359.    In terms of project specific due diligence, BNP Paribas was commissioned to prepare a report on Gemasolar and Termesol. It submitted its Investment Analysis on SENER CSP projects named Solar Tres and Termesol 50, the BNP Report, on 24 January 2008.[233] In terms of risk factors, and in addition to the "Tariff Window," BNP considered construction and revenues risk (that is to say, the need to ensure that the works would be completed in time to qualify for the RD661/2007 regime) and regulatory risk in respect of which, it concluded that "*the legal framework governing renewable energies in Spain is very stable.*"[234] BNP's considered view was that, provided a CSP installation was commissioned within the "Tariff Window," it would be locked into the RD661/2007 regime. BNP, no more than had ADFEC, did not contemplate that any subsequent changes to the RD661/2007 regime would have a retroactive impact upon qualifying CSP installations.

360.    A proposal for a joint venture with Sener was put, first, to ADFEC senior management and then, in March 2008, to the Mubadala investment committee for approval.[235] The committee initially approved an equity contribution to cover developmental and promotional costs. Subsequently, it approved the JV Agreement with Sener, signed on 12 March 2008, which anticipated the development of the three Plants.

---

[233] **C-43**, 2008 BNP Report.

[234] *Id.*, pp. 48 and 63.

[235] **C-42**, Presentation to MDC Investment Committee (14 January 2008); Tr. Day 1, Ms. Gill, p. 118, line 19 to p. 119, line 1. *See also*, Tr. Day 1, Ms. Gill, p. 123, lines 9-11.

361.   Thereafter, in May 2008, the investment committee approved an investment of EUR 79.37 million by Masdar in the CSP sector through the acquisition of a 40% interest in Torresol Energy. Torresol Energy was to enter into the construction contracts for the three Plants.

362.   Following discussions with the consortium of banks, which, as noted above, had undertaken its own independent technical and legal due diligence, the project financing agreement for Gemasolar was signed on 5 November 2008. Pursuant to that agreement, EUR 171 million of funding was provided to the joint venture. Claimant draws particular attention to the fact that the banks only required shareholder guarantees for the period up to the point at which the Plants became operational; it was in that period that the regulatory and construction risk remained that the "Tariff Window" might be missed, such that the plant would not be locked into the RD661/2007 regime.

363.   Claimant submits that the fact that a "Tariff Window" had been introduced in the RD661/2007 regime was indicative of the fact that Respondent, while making clear the likelihood of reviews resulting in the implementation of tariff changes in the future, would respect the rights of a qualifying class of investors to the protection of having come within the "Tariff Window," irrespective of any subsequent change.[236]

364.   Arcosol and Termesol were the subject of further due diligence as part of Claimant's assessment of the viability of these projects.

365.   One report upon which Claimant places considerable weight is the Pöyry Report, commissioned in 2009.[237] Claimant maintains that this Report confirmed the view that the outlook for CSP development in Spain was very positive and that the "main risk" was the need to complete the project within the "Tariff Window."[238]

366.   Claimant rejects the contention made by Spain that Pöyry was seeking to draw attention to the fact that the primary aim of the regulatory framework introduced by Spain was to ensure a reasonable level of profitability. That, says Claimant, takes out of context the Pöyry

---

[236] Tr. Day 1, Ms. Gill, p. 128, lines 18-22.
[237] **C-49**, Pöyry, *Current and Future Trends in the Spanish Solar Industry*, An ILEX Report to Torresol Energy (March 2009) (hereinafter "**2009 Pöyry Report**").
[238] *Id.*, *see e.g.*, paras. 6.4 and 8.

findings, which, in respect of the then current state of affairs rather than in anticipation of any future scenario, were that:

> "[R]ecent history tells us that even though renewable technologies are expensive, the Government is willing to provide a reasonable return for investors by keeping the subsidies, even in the event of tariff deficits being generated over time."[239]

367. In Claimant's submission, there is no suggestion in the Pöyry Report, and certainly none to be inferred from that citation, that the concept of "reasonable profitability" was to be deployed as a limit or cap on an investor's return.

368. A further due diligence report in respect of the Arcosol and Termesol investments was produced by Mr. Tassabehji and his team in June 2009.[240] The report concluded that both installations were expected to qualify for the RD661/2007 tariff regime and it also took note of the Pre-Allocation Registry contemplated by RDL6/2009.

369. On 16 June 2009, the Mubadala investment committee granted approval to Masdar to invest in Arcosol and Termesol and to enter into project financing – as it did in July 2009.

### b.  The Process of Registration

370. Subsequently, the registration of all three Plants in the Pre-Allocation Registry was confirmed, as was the fact that the "*economic regimen for the facilities that are registered in the Pre-Allocation Registry* […] *will be as foreseen in Royal Decree 661/2007.*" Claimant relies upon the fact that such confirmation came in the form of three Resolutions issued by the Ministry of Industry, Tourism and Trade, one in respect of each installation.[241]

---

[239] Cl. Reply, para. 158, citing **C-49**, 2009 Pöyry Report, p. 131.

[240] **C-52**, Masdar, Due Diligence Report, *Torresol Energy Investments S.A. Request for Approval of EUR 55.3 MM Masdar Equity Investment in 2x50MW CSP Solar Plants in Spain* (15 June 2009).

[241] **C-54**, 2009 Resolution Gemasolar; **C-55**, 2009 Resolution Arcosol; and **C-56**, 2009 Resolution Termesol.

371.    Meantime, in the wake of rumours of a change to the tariff system, a Government press release issued on 2 July 2010 recorded an agreement between the Government and the CSP and wind sectors, stating:

> "*This agreement* […] *assumes the reinforcement of the visibility and stability of the regulation of these technologies in the future, guaranteeing the current subsidies and rates of RD661/2007 for the facilities in operation (and for those included in the pre-registration) starting in 2013* […]."[242]

372.    Claimant says that the agreement introduced two changes: first, it contemplated a limit on the number of production hours to which the tariff benefits would be applied, although the limit was set sufficiently high that it exceeded by a margin the production forecasts for all three of the Masdar installations. Second, new installations qualifying under the RD661/2007 regime would be limited to the fixed tariff option for the first twelve months of operation, but they would then be free to choose between the fixed and premium options. The use of gas to generate electricity previously capped at 12% of production was increased to 15%. These measures were then formalised in RD1614/2010, the Preamble to which recorded that Spain's pre-eminence in the field of renewables technology was:

> "[T]*hanks to the existence of a solid, stable and predictable economic and legal support regime* […]."[243]

373.    Following the promulgation of RD1614/2010, the Directorate of Energy Policy and Mines issued three Resolutions on 28 December 2010 pursuant to enquiries made by Claimant on 1 December 2010. As the Tribunal has already noted at paragraph 123 above, the Resolutions, issued in respect of each of the Gemasolar, Termesol and Arcosol installations, stated that:

> "[…] *currently and by virtue of* […] *Royal Decree Law 6/2009* […] *the retribution* [sic] *applicable to the installations consists of the tariffs, premiums, upper and lower limits and supplements established in Royal Decree 661/2007* […] *updated on an annual*

---

[242] **C-57**, 2010 Ministry Press Release.
[243] **C-63 / R-151 Bis**, RD1614/2010, Preamble.

*basis* [...]" [The values effective as of 1 January 2011 for (a) the first 25 years and (b) thereafter were then set out.][244]

374. Claimant rejects Respondent's submission that these statements did not amount to a commitment on Spain's part and that, rather, (a) it could continue to amend the provisions; and (b) the possibility of extraordinary revisions was not excluded. Claimant insists that such a reading of a response directed to an enquiry seeking specific confirmation that the RD661/2007 regime would apply for the lifetime of the three installations in respect of which the Resolutions were issued defies common sense.

375. Claimant rejects, too, the suggestion that the Resolutions were mere "Communications" on the part of the Spanish Government. It is Claimant's position that Spanish law provides for two sorts of legal instrument through which the Government can act: rules and regulations, such as the Royal Decrees, and administrative acts or "resolutions," which are of specific, rather than generic, application. It says that Spanish law recognises no category of administrative act identified as a "communication."

376. It is Claimant's submission that the 28 December 2010 Resolutions constituted binding commitments toward Masdar's investments until they were declared void, which was not the case here.[245]

377. On 28 April 2011, the Gemasolar Plant was registered with RAIPRE. The Arcosol and Termesol installations followed on 22 December 2011.

378. Claimant says that all three installations thereby qualified for the RD661/2007 regime for their operational lifetimes.

    *c.* ***The Disputed Measures***

379. By reason of what are called the Disputed Measures (*see* paragraph 464 below and which have been described in more detail in Section IV above), which were promulgated between

---

[244] **C-65**, 2010 Resolution Gemasolar; **C-66**, 2010 Resolution Arcosol; and **C-67**, 2010 Resolution Termesol.
[245] Tr. Day 1, Ms. Gill, p. 150, lines 3-24.

2012 and 2014, Claimant says that by the time the last of these measures was introduced in 2014:

> "[N]*othing was left of the 661 economic regime. The foundation on which Masdar had invested had been completely abolished and replaced by something very different.*"[246]

380.    In support of that proposition, Claimant submits that the Disputed Measures had the following effects:

(i)    Law 15/2012 stripped away the right of the installations to use natural gas for any part of their annual production and still receive FITs;

(ii)    the 7% Levy, likewise introduced by Law 15/2012, was applied to production revenues and not to profits. It amounted to a thinly disguised tariff cut for renewable installations and a limit to the rights under the economic regime that Law 15/2012 purportedly applied to Ordinary and Special Regimes producers alike. In reality, however, it did not; whereas ordinary generators could pass on the extra cost to consumers, the Special Regime generators operated in a regulated environment and received a guaranteed price for energy produced. A 7% charge on revenues constitutes a 7% reduction in revenues. To the argument advanced by Respondent that the effect of the Levy was cost neutral, because an amount equivalent to the Levy was used to finance the cost of the Spanish electricity system earmarked for developing renewables and its offset was paid back to the plants through their remuneration package, Claimant answers that this is a circular argument; the moneys raised by the Levy were not given back; they were being used to fund the Government's obligation to pay incentives. Furthermore, under the regime introduced by the 2013 legislation, any entitlement to incentives was limited. If the threshold benchmark for full production hours was not met, for whatever reason, the full operational element of the incentives payment, which included the reimbursement of the 7% Levy, would not be recovered;

---

[246] Tr. Day 1, Ms. Gill, p. 152, lines 9-12.

(iii)     RDL2/2013 reduced the RD661/2007 premium to zero, with the effect that the premium FIT option disappeared, leaving only the fixed tariff option. Incentives were no longer adjusted by reference to the consumer price index, but to a variant of the same index, at constant taxes and excluding unprocessed foods or energy products;

(iv)     within a matter of weeks, that system was scrapped by the enactment on 12 July 2013 of RDL9/2013. RD661/2007 was repealed and the FIT regime was replaced by a form of remuneration described as a "Special Payment;"

(v)     on 26 December 2013, Law 54/1997 itself was supplanted by Law 24/2013. The formal distinction between the Ordinary and Special Regimes was abolished and, save for express exceptions, renewables producers and conventional generators were to be treated alike. Priority of dispatch for renewables producers was subject to the determination of the Spanish Government. The Special Payment itself and estimates of income derived from energy sales were to be reviewed every six and three years respectively;

(vi)     the effect of RD413/2014, which was followed almost immediately by the Ministerial Order of 16 June 2014, was to eradicate any vestiges of the RD661/2007 regime. Not only was the new regime applied to installations which had qualified for protection from any change to the RD661/2007 regime, but there was a clawback of incentives paid prior to the introduction of the new regime. Stability and predictability had been swept away; Claimant says that if an installation is to receive any incentive payments at all, it is only to the extent that there are sufficient funds in the system, leaving an investor with no assurance that a Special Payment will be received when due, as opposed to being paid at some point in the five-year period following the year in which there was a funding shortfall.

### (3)    On Spain's Own View of RD661/2007, Masdar's Expectations Were Objectively Well-Founded and Reasonable

381.    Claimant submits that Respondent was very well aware of the need to minimise regulatory uncertainty. It draws attention once again to the 2007 CNE Report, in which the criteria necessary to inform the regulation of the Special Regime were set out:

> *"The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility."*[247]

382.    Moreover, the CNE had noted with disfavour any suggestion that the proposed new legislation should have retrospective effect on facilities operating on 1 January 2008. On that basis, it had issued "*an unfavourable ruling*" on the then draft proposal.[248]

383.    In a press release coinciding with the date of enactment of RD661/2007, Respondent, through the Ministry of Industry, Energy and Tourism, stated:

> *"The Government prioritises profitability and stability in the new Royal Decree."*

It anticipated a rise to 8% profitability for facilities choosing to supply distributors and between 7 and 11% for those participating in the wholesale market.[249] Claimant draws attention to the fact that the Ministry's own review of the then draft legislation anticipated:

> *"For the market option, a premium is proposed that ensures a project IRR of 9.5% for the typical 25-year case, with a minimum of 7.6% and a maximum of 11% in the band limits."*[250]

Claimant points out that Respondent's position now is that 7.3% is a reasonable return.

384.    Respondent's press release continued:

---

[247] **R-203**, 2007 CNE Report, Section 5.3(b).

[248] *Id.,* Section 11.

[249] **C-138**, Ministry of Industry, Energy and Tourism, Press Release, *The Government Prioritises Profitability and Stability in the New Royal Decree on Renewable Energy and Combined Heat and Power* (25 May 2007) (hereinafter "**2007 Ministry Press Release**").

[250] **C-137**, Regulatory Dossier of RD 661/2007, Memoria (21 March 2007).

> "*Future tariff revisions shall not be applied to existing facilities. This guarantees legal certainty for the electricity producer and stability for the sector, thereby favouring development.*"[251]

385.    Claimant submits that:

> "[I]*f you've got those stability provisions in, yes you can change the rules, you can change the tariffs; but you cannot backdate it for facilities that had already sunk their capital on a different regulatory regime basis because they cannot change what they have already spent, they cannot change the debt finance arrangements that they have already entered into.*"[252]

386.    Claimant says that certainly the message that Respondent sought to promote through its international presentations in the course of 2007, 2008 and up to 2010 was that the new RD661/2007 regime guaranteed the premium system over the lifespan of the installations and made no provision for retroactive benefits for past investments.[253]

387.    To the extent that Spain seeks to apply the 2005-2010 PER to changes implemented in 2012-2013, Claimant points to what it says is a logical flaw: in the period when that PER was in effect, there were no tariff changes and the plan had run its course in 2010.

388.    According to Masdar's experts, the effect of the new regime on the cash flows and the fair market value of the CSP Plants is of the order of EUR 132 or 179 million, depending on the useful life adopted for modelling purposes.

389.    Claimant says that RD661/2007 was part of a bigger picture. It constituted a clear strategic decision to induce investment, earlier initiatives having failed to produce the level of investment sought by Respondent.

---

[251] **C-138**, 2007 Ministry Press Release, p. 1.

[252] Tr. Day 1, Ms. Gill, p. 94, lines 16-23.

[253] *See*, **C-140**, InvestInSpain Presentation (15 November 2007); **C-48**, InvestInSpain Presentation (November 2008); and **C-144**, CNE Presentation, *Legal and Regulatory Framework for the Renewable Energy Sector* (by CNE Vice President Scharfhausen) (29 October 2008).

(4)    **Claimant's Claims for Breach of the ECT**

390.    Claimant maintains three specific claims for breach of Article 10(1) of the ECT:

(i)    breach of the fair and equitable treatment ("**FET**") provision, in that:

(a)    Claimant's legitimate expectations have been frustrated;

(b)    Spain has not been transparent in its conduct;

(c)    the measures Spain has taken are unreasonable and disproportionate; and

(d)    Spain has failed to offer a stable legal framework pursuant to Article 10(1).

Claimant contends that these breaches are non-cumulative and that the breach of any one of them amounts to a breach of the FET provision;

(ii)    breach of the non-impairment standard; and

(iii)    breach of the "umbrella clause," including the obligations undertaken by Spain in RD661/2007 and the 28 December 2010 ministerial Resolutions.

391.    Claimant notes that it is common ground between the Parties that the Tribunal should apply Articles 31 and 32 of the Vienna Convention in its interpretation of the ECT, that is to say:

"*A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"[254]

392.    However, Claimant emphasises that the ECT is unique among the many bilateral and multilateral international treaties, because it deals solely with investments in the energy sector and its provisions, including the FET provision, must be considered in that light. Claimant drew attention to the statement of the tribunal in *Suez*:[255]

---

[254] **CL-3**, VCLT, Art. 31.1.

[255] **CL-215**, *Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/19 (hereinafter "***Suez***"); *AWG Group Ltd v. The Argentine Republic*, UNCITRAL, Decision on Liability, 30 July 2010, para. 214.

114

> *"The context of the term 'fair and equitable' largely depends upon the contents of the treaty in which it is employed. Thus, the term must be interpreted not as three words plucked from the BIT text but within the context of the various rights and responsibilities, with all their various conditions and limitations, to which the Contracting Parties agreed. However, conducting such analysis in abstracto namely without addressing specific relations between specific provisions of the BITs would not take us further than the analysis of the ordinary meaning of the terms 'fair and equitable'."*

393.    The FET, maintains Claimant, must be assessed within the framework of a Treaty which affords particular significance to stability and regulatory certainty in the promotion of energy sector investment. Claimant notes that Article 2 of the ECT states that:

> *"This Treaty establishes a legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the* [predecessor European Energy Charter]."[256]

394.    Claimant points out that, in 2007, Spain espoused an approach intended to encourage inward renewable energy investment, which laid particular emphasis upon precisely these criteria of stability and regulatory certainty.

395.    More generally, Claimant submits that the ECT offers a higher standard of protection than conventional BITs. It points, first, to the introductory statement of the objectives of the ECT:

> *"The fundamental objective of the* [ECT's] *provisions on investment issues is to ensure the creation of a 'level playing field' for energy sector investments throughout the Charter's constituency, with the aim of reducing to a minimum the non-commercial risks associated with energy-sector investments."*[257]

396.    The ECT Secretariat itself refers to the ECT's "[…] *added value as compared to the bilateral investment treaties* […]." And it points out that the ECT is:

---

[256] **C-1**, ECT, Art. 2.
[257] **C-26 / RL-2**, ECT and Related Documents, Introduction, p. 14.

> "[…] *the first multilateral agreement on the promotion and protection of foreign investment, covering all important investment issues and providing high standards of protection.*"[258]

397.    Claimant relies, too, on the commentary of the late Professor Wälde for the proposition that the protections offered by the ECT constitute a "*high watermark for investor protection*":[259]

> "*The implication of these quite explicitly and specifically identified objectives is that the overriding purpose of the Treaty is the encouragement of private investment by stable, equitable, transparent conditions at a 'high level' of protection.*"

And

> "*From this detailed identification of relevant objectives of the Treaty identified in a formal, explicit and legally relevant form* […] *it seems clear that the broad thrust of the ECT is intended to offer extensive, rather than restrictive, protection to foreign investors and their investments.*"[260]

398.    Claimant notes that the ECT is unusual, too, first, for the restrictive scope of the exceptions for which the Treaty provides – and particularly those which can be brought to bear on Part III of the Treaty, which deals with investor protection. Second, it enshrines as a binding provision in Article 10(1) the basis of the obligation of a Contracting Party to afford fair and equitable treatment to investments made by investors of other Contracting Parties.

399.    Claimant also addressed the *Charanne*[261] case upon which Respondent sought to rely. First, Claimant stated that *Charanne* has no bearing upon this case, because it involved the PV sector, not CSP, and it turned on a consideration of certain 2010 measures[262] alone, which altered the regulatory framework for PV only and which were held not to have eliminated

---

[258] **RL-73**, *The Energy Charter Treaty: A Reader's Guide* (June 2002), p. 20.

[259] Tr. Day 1, Mr. Sullivan, p. 173, line 3.

[260] **CL-239**, T.W. Wälde, *In the Arbitration under Art. 26 Energy Charter Treaty (ECT), Nykomb v. The Republic of Latvia*, Legal Opinion, 2 Transnational Dispute Management, Issue 5 (November 2005) (hereinafter "**Wälde Opinion**"), paras. 34 and 36.

[261] **RL-71 / CL-238**, *Charanne*, *supra* n. 197.

[262] Tr. Day 1, Mr. Sullivan, p. 181, lines 5-22.

the essential characteristics of the existing regulatory framework. Here, it is Claimant's case that the measures of which it complains have had the effect of wiping out entirely the regulatory framework upon the basis of which it made its investment.

400.    However, the case was noteworthy, because it had drawn attention to an UNCTAD study of existing case law to which, in Claimant's submission, the majority of the *Charanne* tribunal, in reaching its decision, had failed to give due weight. UNCTAD had noted that:

> "[A]*rbitral decisions suggest* […] *that an investor may derive legitimate expectations either from (a) specific commitments addressed to it personally, for example in the form of a stabilisation clause, or (b) rules that are not specifically addressed to a particular investor but which are put in place with a specific aim to induce foreign investments and on which the foreign investor relied in making his investment.*"[263]

Claimant suggests that the majority of the *Charanne* tribunal had disregarded the second limb of the test. But it is apposite here in a case in which, on Respondent's own documents, it was stated:

> "[T]*hat the tariff was intended to remain in place for the life of the facility, that it was guaranteed, that future changes would not affect existing investments* [and] *that there would be no retroactivity.*"[264]

401.    Claimant submits that the entire purpose of RD661/2007 was to induce investment. In addition, specific commitments were given to Claimant in the form of the ministerial Resolutions issued to the project companies, assuring them of their entitlement under the RD661/2007 scheme. Claimant submits that there are substantial parallels with *Micula*[265] in that it concerned an investment incentive programme in Romania to encourage inward investment in an underdeveloped area and a ministerial order was issued granting a right to that incentive. The scheme was then withdrawn and the tribunal found a breach of the FET standard.

---

[263] **CL-217**, UNCTAD, *Fair and Equitable Treatment* (2012), p. 69.

[264] Tr. Day 1, Mr. Sullivan, p. 186, lines 9-14.

[265] **CL-85**, *Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.r.l. and S.C. Multipack S.r.l. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013.

402.    Claimant pointed to *Suez* and to the tribunal's observation that:

> "[…] *when an investor undertakes an investment a host government through its laws, regulations, declared policies and statements creates in the investor certain expectations about the nature of the treatment that it may anticipate from the host State. The resulting reasonable and legitimate expectations are important factors that influence initial investment decisions and afterwards the manner in which the investment is to be managed.* […]*

> *Where a government through its actions subsequently frustrates or thwarts those legitimate expectations, arbitral tribunals have found that such host government has failed to accord the investments of that investor fair and equitable treatment.*"[266]

403.    In this case, RD661/2007 had set out a 25-year tariff, access to which was conditional only upon registration pursuant to Article 17. The regime was predictable, because to the extent that changes were to be introduced in 2010, they were not going to apply to existing, qualifying, investments.

404.    While there was no dispute that Spain had not honoured the commitment made in Article 44.3 of RD661/2007, Claimant did not question Respondent's right to change its law, even in the face of a commitment by a State to maintain a stable legal framework, as Article 10(1) of the ECT requires. But to the extent that such a change gave rise to a violation of the protections set out in the ECT, a liability to compensate the investor arose for the damage caused to vested rights and legitimate expectations.[267]

405.    Claimant summarised Respondent's defences to its claims as follows:

(i)    Claimant's expectations were not reasonable and they are not susceptible to ECT protection.

---

[266] **CL-215**, *Suez, supra* n. 255, paras. 222-223, citing **CL-42**, *Saluka Investments BV v. The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006.
[267] *See* **RL-71 / CL-237**, Dissenting Opinion of Guido Tawil in *Charanne, supra* n. 197; and **CL-39**, *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (hereinafter "*CMS*"), para. 277.

In answer to Respondent's argument, first, that there was no basis to assume that Article 44.3 of RD661/2007 would remain unchanged and, second, that Masdar should have known that it was subject to change by a higher-ranking law, Claimant accepted the proposition that all laws, whatever their ranking for domestic law purposes, can be changed. But it says that the question for this Tribunal remained: had a legitimate expectation been created that Spain would (or could) change the law? Claimant says that there was no expectation that Spain would change the law.

(ii)    The only thing that Claimant could legitimately expect was a reasonable return.

As to the proposition that Masdar could only ever expect a reasonable return and that it should not have assumed an ongoing entitlement to the RD661/2007 tariff, if, in effect (and as alleged), the tariff was giving rise to "windfall" profits, Claimant's short answer was, first, that Respondent had never sought to ascertain whether or not "windfall" profits were, in fact, being made before it changed the law.[268] Claimant maintained that there was no evidence of any kind before the Tribunal that any such assessment had been made in respect of Claimant in particular, or the CSP sector generally, before or after the change had been made, nor was there any mention of "windfall profits" in the Preamble to RDL9/2013.

Second, the concept of a "reasonable return" was based on three words in Law 54/1997. It was a concept formulated with the regulator and the manner in which premiums should be set.[269] It was not aimed at the investor. Further, the Preamble of RD661/2007 recorded that:

"*The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997, of 27 November, on the Electricity Sector, guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable* […]."[270]

---

[268] Tr. Day 1, Mr. Sullivan, p. 198, lines 1-14.

[269] *See*, **R-191 / R-149 Bis**, Law 54/1997, Art. 30.4.

[270] **C-38 / R-150 Bis**, RD661/2007, Preamble.

119

406.    Claimant pointed out that there was no suggestion that the RD661/2007 tariff had violated the "reasonable return" formulation adopted in Law 54/1997, nor that it had been repealed on that basis, nor that it had ever been the subject of an administrative challenge in the Spanish courts.

407.    So far as Article 17 of RD661/2007 itself is concerned, Claimant emphasises that:

(i)    the only prerequisite to the entitlement to compensation in accordance with the economic regime is final registration; and

(ii)    there is nothing in the *chapeau* of Article 17 to cause a putative investor to believe that the regulator might have reason to change or repeal the law based on the "reasonable return" concept. Article 17 provides, so far as is relevant for present purposes:

> "*Without prejudice to the provisions of Article 30.2 of Law 54/1997, of 27 November* [which sets out the rights to be enjoyed by energy producers operating under the special regime]*, the proprietors of production facilities under the special regime shall enjoy the following rights:* […] *c) Receive, for the total or partial sale of their net electrical energy generated under any of the options appearing in Article 24.1, the compensation provided in the economic regime set out by this Royal Decree. The right to receive the regulated tariff, or if appropriate the premium, shall be subject to final registration of the facility in the Register of production facilities under the special regime of the General Directorate of Energy Policy and Mines, prior to the final date set out in Article 22.*"[271]

408.    As to what a "reasonable return" was assessed to be, Claimant pointed to the 2005-2010 PER, which had anticipated "*an internal rate of return (IRR) close to 7%, measured in common currency and for each project type, for own resources (before financing) and after tax.*"[272]

409.    The Ministry's own report, specific to RD661/2007 and to the CSP installations, projected:

---

[271] **C-38** / **R-150 Bis**, RD661/2007, Art. 17.
[272] **C-28**, PER 2005-2010, Section 4.2.

> *"[F]or the market option, a premium is proposed that ensures a project IRR of 9.5% for the typical 25-year case, with a minimum of 7.6% and a maximum of 11% in the band limits."*[273]

410.    Claimant also relies on the Association of Renewable Energy Producers' ("**APPA**") draft law of 2009, which was said by Respondent to correspond to "*best regulatory practices*"[274] and which proposed the implementation of a new tariff-based system based on 10-year yields of government bonds, plus 300 basis points, a system very similar to the way in which the return is calculated under the new regime. The critical point is that Article 27(5) of the draft provides that:

> *"[I]n any case, it is not permitted for modifications made to support schemes to be extended to facilities or uses that were enjoying the benefits of previous support schemes, which shall be retained unless an express replacement request is submitted by the respective beneficiary."*[275]

411.    On the face of this document, says Claimant, it is clear that best practice does not involve making changes with retrospective effect.

412.    Claimant points to the fact that neither its co-venturer, Sener, nor the BNP and Pöyry Reports raised the possibility of retrospective changes to the tariff regime. Nothing in the contemporary record points to such a contingency either. Nor, says Claimant, do any of the Spanish Supreme Court cases cited by Respondent assist its case.

**(5)    The Tariff Deficit**

413.    Respondent raises the tariff deficit as a defence to Claimant's FET claim for impairment by unreasonable and arbitrary measures.

---

[273] **C-137**, Regulatory Dossier of RD 661/2007, Memoria (21 March 2007), Section 3.2.2.

[274] Resp. Rej., para. 722.

[275] **R-213**, Draft Law presented by *Asociación de Productores de Energías Renovables* ("**APPA**")-Greenpeace (May 2009).

414.  Respondent contends that before it made its investment, Claimant had been put on notice by the Pöyry Report of the generation of the tariff deficit.[276] Claimant knew, therefore, that the principal purpose of RDL6/2009 was to "*eliminate the tariff deficit.*"[277]

415.  Respondent states that the Spanish Government passed RDL14/2010 in order to take urgent measures to correct the tariff deficit in the electricity sector: "*In actual fact, the maximum deficit levels set out by Royal Decree-Law 6/2009 for 2010, 2011 and 2012 were raised by Royal Decree-Law 14/2010 as a consequence of the impossibility to comply with the previous one.*"[278]

416.  Respondent maintains that the 2012 reform of the Spanish electricity sector – based on RDL1/2012 – was "*put into operation to avoid the generation of a tariff deficit.*"[279] In addition, the Spanish Government took another measure: it instructed the National Energy Commission (NEC) "*to prepare a report on the measures of regulatory adjustment that could be adopted by the energy sector. Particularly, the study of measures in order to contain the progress of the tariff deficit in the electric sector.*"[280] On 7 March 2012, the NEC issued its report. It concluded that: "*the fundamental problem with regard to the Electric Sector is that the lack of convergence between the income and costs of the activities regulated in the Electric Sector during the last ten years has generated a growing debt in the electric system. The disequilibrium between the income and costs of the system is unsustainable […].*"[281]

417.  Respondent also recalls that: (i) on 27 April 2012, the Spanish Government approved the "*2012 National Reforms Programme*" in which "*the commitment of the Kingdom of Spain to eliminate the tariff deficit is repeated, and qualifies the future reform in the electric*

---

[276] Resp. Rej., paras. 424-427. *See also id.*, paras. 567-569 and 571. Resp. C-Mem., para. 582 (stating that "*The Pöyry report asserts the determination of the Government to avoid over-remuneration situations to reduce the tariff deficit.*").

[277] Resp. Rej., para. 710. *See also*, Resp. C-Mem, paras. 588, 589 and 872.

[278] Resp. C-Mem., para. 601.

[279] *Id.*, para. 642, citing **R-95**, Press Release, Ministry of Industry, Energy and Tourism, *The Government will Temporarily Discontinue the Premiums for New Special Regime Power Plants* (27 January 2012).

[280] Resp. C-Mem., paras. 643 *et seq.*

[281] *Id.*, para. 966, n. 544, citing **R-98**, CNE, *Report on the Spanish Energy Sector, Part I: Measures for Guaranteeing the Economic-Financial Sustainability of the Electricity System* (7 March 2012.) (hereinafter "**2012 CNE Report**").

*sector as deep;"*[282] *and that (ii)* "*September 2012 sees the announcement of the 'Bill Energy Reform' on forthcoming dates to resolve the tariff deficit on whose increase the premiums on renewables were decisive. In said month 'Structural Measures to correct the tariff deficit' were also announced and a 'New Electric Sector Act for the first quarter of 2013.'"*[283]

418.    Respondent submits that this Tribunal should have regard to decisions of the Spanish Supreme Court, which has: "*constantly and clearly repeat*[ed] *that Act 54/1997 is limited to ensuring companies* […] '*reasonable rates of return with reference to the cost of the money in the capital market.' It has, in addition, consecrated the fact that the content of this right does not grant the producers the acquired and petrified in time right* [sic] *when to obtain the same remuneration through the exercise of its activity.*"[284]

419.    Respondent recalls that the Spanish Supreme Court: (i) in 2006, upheld the legality of RD436/2004;[285] (ii) in 2007, "*reiterated that there was no acquired right to* [receipt] *of the premium;*"[286] (iii) in 2009, reiterated that legitimate expectation of itself "*does not guarantee the perpetuation of the existing situation;*"[287] and (iv) in 2012, "*once more establishes that the holders of production facilities of electricity production under the special regime are not covered by an 'unchangeable right' to keep unaltered the economic regime governing the collection of their remunerations.*"[288]

420.    With specific reference to the tariff deficit, Respondent states that the Spanish Supreme Court considered "*the existence and amount of the tariff deficit*" for the first time in its judgment of 12 April 2012:

> "[I]*f these imply adjustments in many producing sectors* [...]*, it is not unreasonable that these are also extended to the renewable energies sector that wish to continue to receive the regulated tariffs*

---

[282] Resp. C-Mem., para. 652.

[283] *Id.*, para. 966.

[284] *Id.*, para. 528 (emphasis omitted).

[285] *Id.*, para. 530.

[286] *Id.*, para. 533.

[287] *Id.*, para. 539 (emphasis omitted).

[288] *Id.*, para. 544. *See also id.*, para. 543.

123

> *instead of resorting to market mechanisms* [...] *And this much more in the face of situations of generalised economic crisis and, in the case of electrical energy, in the face of the growth of the tariff deficit that, in a certain part, derives from the impact, on calculating the access tolls, of the remuneration of these through the regulated tariff, with respect to the cost attributable to the electrical system.*"[289]

421.    In light of the Spanish Supreme Court case law, Respondent argues that:

> "*It is surprising that the Claiming Party completely omitted this Jurisprudence completely clear, essential for appreciating the true legitimate expectations that the Kingdom of Spain offered to all national or foreign investors. As a result then, it is essential for setting the Legitimate Expectations Objectives that the claiming party could have made as a part of their investment.*"[290]

422.    Claimant says that Respondent's tariff deficit defence fails to satisfy either the requirement that there be a rational policy goal or that the measures are appropriately tailored and proportional.

423.    Claimant argues that the benefits accorded to the CSP installations pursuant to RD 661/2007 did not cause, much less significantly enhance, the tariff deficit. Respondent had failed to show any causal effect whatsoever.

424.    Claimant further argues that Spain could have dealt with the tariff deficit without reneging on its obligations to CSP investors pursuant to RD661/2007. Its first and most obvious option would have been to increase network access tolls. (Claimant points out that Articles 15, 17 and 18.1 of Law 54/1997 required Spain to ensure that the access tolls were set at a level such that revenues met costs – and the Supreme Court had confirmed that Respondent was required as a matter of law to set them at such a level.)[291]

425.    Claimant drew attention to a Report issued by the CNE in 2012, in which it stated:

---

[289] *Id.*, para. 544, citing **R-80**, Judgement of the Supreme Court (12 April 2012), Appeal 40/2011, Seventh Legal Basis (emphasis omitted).

[290] Resp. C-Mem., para. 549.

[291] **C-133**, Judgment of the Supreme Court No. 2004/1876 (14 February 2004).

> "*The insufficiency of fees is endangering **the economic-financial sustainability of gas and electrical systems**. Significantly, the fundamental problem in the electrical sector is that the lack of convergence between revenues and costs for activities regulated in the electrical sector in these last 10 years has created a growing debt in the electrical system.*"[292] (Emphasis in original)

426.  Claimant points out (a) that a problem that has been incipient since 2002 can hardly be laid at the door of subsidies introduced pursuant to RD661/2007 and which were not paid until 2010 after the plants benefitting from them began to come on line in 2009/2010; and (b) that it is unreasonable to expect renewables producers to pay for Respondent's regulatory failures.

427.  Claimant further relied on a 2013 publication by the European Commission: "*Delivering the Internal Electricity Market and Making the Most of Public Intervention*," in which the Commission had warned that:

> "[…] *In order to achieve their objectives, public interventions need to represent stable, long-term, transparent, predictable and credible commitments to investors and consumers. A need to make changes in regulatory conditions in response to developments in the market does not justify applying such changes retroactively to investments already made in situations where the need arises because of failures on the part of the public authorities to correctly predict or adapt to such developments in a timely manner. Applying retroactive changes in such situations will seriously undermine investor confidence and should, to the extent possible, be avoided.*"[293]

428.  It was suggested by Claimant that Spain could, in fact, have funded the entire 2013 tariff deficit by raising tariffs without exceeding German or Italian electricity prices.[294] The reality, it said, was that consumers in Spain had underpaid for years, thereby creating the deficit in the first place.

---

[292] **C-77**, 2012 CNE Report – Executive Summary (7 March 2012).

[293] **C-95**, Communication from the European Commission, *Delivering the Internal Electricity Market and Making the Most of Public Intervention*, C(2013) 7243 final (5 November 2013), p. 12.

[294] Brattle Second Regulatory ER, para. 12.

429.    Claimant further noted that in the 2012 CNE Report it had been proposed that, whilst the deficit was tackled, the CSP tariff should be lowered. Once the deficit had been corrected, the CSP tariff should be restored to the previous set level, so that the NPV to the investor remained the same. Such an approach would not only have given the investor the NPV of the tariff, but it would also have been a far more proportionate response than eliminating the entire regime.

430.    In the event, the CNE Report was ignored and RDL9/2013 was enacted, following attempts in the latter part of 2012 to contain the deficit.

431.    Claimant draws attention to the CNE's assessment of the new regime:

> "[…] *one should note that there is no evidence that there exists a remuneration system similar to the one reflected in the proposal in any jurisdiction in the European Union, nor in other countries whose support systems are known through international associations of regulatory bodies.*"[295]

In other words, the new regime was unprecedented.

## B.    OVERVIEW OF RESPONDENT'S POSITION

432.    Respondent bases its defence to Claimant's claims on six principal points:

(i)    the nature of the entity into which the investment was made;

(ii)    the activity of electricity generation;

(iii)    the remuneration regime;

(iv)    the impact of the international financial crisis;

(v)    the Disputed Measures: the economic sustainability of the Spanish electricity system and the correction of excess remuneration; and

---

[295] Brattle Second Regulatory ER, para. 188, citing **BRR-75**, CNE, *Report 18/2013 on the Proposal of Royal Decree to Regulate the Generation of Electricity by Renewable Projects, Cogeneration and Waste Plants* (4 September 2013).

(vi)    its assessment of the measures taken.

**(1)    The Spanish Electricity System at The Time of The Investment**

433.    Respondent states that the Spanish electrical system is a "*technical, economic and legal entity.*"[296] So far as generators are concerned, they are reliant on free market prices to recoup the cost of their investment and to gain a profit, save to the extent that they benefit from the Special Regime. Transportation and distribution are regulated activities. It is, in essence, a closed economic system. The only source of revenue is the Spanish electricity consumer and the National Energy Commission, CNE, is responsible for making payments to generators, transporters and distributors and for the allocation of subsidies for renewables.

434.    The general principles of the Spanish electrical system are codified in Law 54/1997, the Preamble of which notes:

> "[The] *three-fold goal of guaranteeing the supply of electric power, its quality and the provision of such supply at the lowest possible cost. Environmental protection is yet another element to be taken into account in the equation and* [is] *one of considerable importance given the characteristics of this particular sector of the economy.*"[297]

435.    Respondent says that these fundamental principles – of economic and technical sustainability and of the provision of electric power at the lowest possible cost to the consumer – are matters of which any investor must have been aware.

436.    Second, an investor will have wanted to know where its rights and obligations are to be found in the hierarchy of laws and regulations, which has the Constitution at its apex, with laws at the next level and regulations below that. A legal standard at the level of a regulation cannot override a law. If a law provides for the economic sustainability of the system or establishes that the return an investor may expect is a reasonable return, those principles

---

[296] Tr. Day 2, Mr. Santacruz, p. 4, lines 17-18.

[297] **R-191 / C-16,** Law 54/1997, Preamble. *See also*, **R-306**, Respondent's Hearing Opening Presentation: Fundamental Fact Issues of the Arbitration, p. 5.

cannot be overridden by regulation and in any event, the State may take measures to correct situations of under or over-remuneration.[298]

437.    Respondent points out, too, that the Spanish legal system is a mixture of statute and case law established by the Supreme Court, the decisions of which are binding on all legal operators, including public authorities. While Respondent accepts that these decisions are not binding on an international tribunal, it maintains that they are of "*paramount importance*" in determining what a prospective investor might have by way of legitimate expectation. Respondent relies on the observation in *Charanne* that:

> "*Although these decisions by the Spanish courts are not binding for this Arbitration Tribunal, they are factually relevant to verify that the investor was unable, at the time of the disputed investment, to have the reasonable expectation that in the absence of a specific commitment the regulation was not going to be modified during the lifespan of the plants.*"[299]

### (2)    The Activity of Electricity Generation in October 2012

438.    Respondent notes, further, that in this case, Claimant elected to invest in the production of electricity under the Special Regime established by Law 54/1997. Article 27.1 of the Law provided that:

> "*Electrical energy production shall be approved for operation under the special regime in the following cases and when said activity is carried out in power plants with an installed power capacity that does not exceed 50MW.*"[300]

439.    Spain submits that it is to be borne in mind that the subsidies from which Claimant benefitted were a system cost for the entire electricity supply industry. There should be a reasonable balance between ordinary generators, which bear the risks of reliance on the open market for the sale of electricity, and beneficiaries of the Special Regime, which are:

---

[298] Tr. Day 2, Mr. Santacruz, p. 8, lines 15-20.
[299] **RL-71 / CL-238**, *Charanne, supra* n. 197, para. 508.
[300] **C-16,** Law 54/1997, Art. 27.1.

> "[G]*iven a guarantee of reasonable return on their investment when compared to the going rates in the money market.*"[301]

440.    Respondent maintains that there are two aspects of the European directives intended to promote the development of renewable energy generation that Claimant overlooks. First, Article 3 of Directive 2001/77/EC makes clear that a State may support renewables by whatever means it deems most appropriate, be that by way of tax breaks, FITs or some other mechanism, but Article 4(1) of the same Directive provides that:

> "*Without prejudice to Article 87 and 88 of the Treaty, the Commission shall evaluate the application of mechanisms used in the Member States according to which a producer of electricity, on the basis of regulations issued by the public authorities, receives direct or indirect support and which could have the effect of restricting trade on the basis that these contribute to the objectives set out in Articles 6 and 174 of the Treaty.*"[302]

441.    That, according to Respondent, requires that a State must not lose sight of the fact that a system of support for renewables is part of the entire regime by which public assistance supports the market. It is incumbent on the State, therefore, to adopt proportionate measures, on the basis of which, Respondent submits that rates of return cannot be unlimited.

442.    In this instance, Respondent says that it was a case of ensuring that renewables producers were afforded a level playing field in terms of competition with conventional producers of electricity. It puts its submission in colourful terms:

> "*We're not trying to completely eliminate conventional power generators, but we are trying to give* [the renewables producers] *a leg-up, a crutch, so they can compete on equal footing with ordinary sources of electricity. But what it doesn't try to do is give them a motorcycle or a dragster so that they can go much faster than*

---

[301] Tr. Day 2, Mr. Santacruz, p. 10, lines 12-14.

[302] **BRR-12**, *Directive 2001/77/EC of 27 September 2001 on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market* (27 September 2001), Art. 4(1).

> *everybody else for ever and ever. No, it has to be something that's*
> *proportionate.*"[303]

443.    Respondent draws attention to Article 30(2) of Law 54/1997, which sets out the benefits of the Special Regime, including priority access to the transmission and distribution networks and the right to use in their installations the power that they purchase through other agents.

### (3)     The Remuneration Regime

444.    Respondent submits that the concept of a "*reasonable return*" underpins the Special Regime remuneration scheme. It refers to a 2010 publication, which considered the different descriptions attributed to the different approaches utilised for FIT tariff calculation in a number of European countries, including Spain. It noted that Spain had adopted a support scheme mechanism proposing a "*reasonable rate of return.*"[304]

445.    Respondent suggests, further, that a reasonable rate of return is the objective of Article 30(4) of Law 54/1997, but it states that how that might be achieved is not prescribed. Article 30(4) provides, in pertinent part:

> "[P]*roduction* […] *shall be subsidised with a premium established by the Government whereby the price of electricity sold by these plants shall fall into a percentage category between 80 and 90 percent of an average electricity price; this shall be calculated by dividing the revenue collected from the supply of electrical energy by the energy supplied. The items to be used in calculating said price shall be determined without the Value Added Tax and free of any other tax that might levy electrical energy consumption.*
>
> *In order to establish premium quotas, the following factors shall be considered: the tension level of delivery to the grid, the actual contribution to the improvement of the environment, the saving on primary energy and energy efficiency as well as the costs incurred from investment, in order that reasonable remunerative tariffs may*

---

[303] Tr. Day 2, Mr. Santacruz, p. 12, lines 13-21.

[304] **R-58**, M. Mendonca, D. Jacobs and B. Socacool, *Powering the Green Economy – The Feed In Tariff Handbook*, p. 19.

> *be established related to the costs in assets on the capital*
> *market.*"[305]

446.    Respondent says that the Supreme Court has been consistent to emphasise in its judgments that the objective is to achieve a reasonable rate of return, but it has not set down how the objective should be achieved.

447.    Respondent notes that in the Preamble to RD661/2007 itself, it was made clear that:

> "*The economic framework established in the present Royal Decree*
> *develops the principles provided in Law 54/1997* […] *guaranteeing*
> *the owners of the facilities under the special regime a reasonable*
> *rate of return on their investments and the consumers of electricity*
> *an assignment of the costs attributable to the electricity system*
> *which is also reasonable* […].*"[306]

448.    Respondent maintains that the starting points for the assessment of the reasonable return are the Renewable Energy Plan, the PER, and the regulations promulgated in order to give effect to the Law.[307] The PER contemplated a 7% return for a renewable energy project – 8% in the regulated tariff.[308]

### (4)    The Impact of the Financial Crisis

449.    In the wake of the financial crisis, Respondent was faced with a need urgently to address the tariff deficit. The crisis had exacerbated the problem, because the drop in demand (and corresponding reduction in revenues) did not produce a corresponding drop in costs. In 2010, when thermal-solar power began to come on line, it had accounted for 2.6% of the costs in the electricity system. By 2014, 19.2% of those costs were attributable to thermal-solar installations.[309]

---

[305] **C-16,** Law 54/1997, Art. 30(4). It is to be noted that Article 30(4) also allows the Government leeway "[i]*n exceptional circumstances* [to] *establish premium rates for solar energy which exceed the established rates provided for herein.*"

[306] **C-38 / R-150 Bis**, RD661/2007.

[307] *See* **C-16 / R-191**, Law 54/1997, Art. 25.

[308] Tr. Day 2, Mr. Santacruz, p. 25, lines 4-14; and *see* **C-38 / R-150 Bis**, RD661/2007.

[309] Accuracy First Regulatory ER, Figure 3.7, para. 325.

450.    There was little scope to look to end consumers: between 2007 and 2015 prices had
        increased by some 65%.[310]

451.    Instead, Respondent undertook a series of measures, the purpose of which was to take cost
        out of the system. It was suggested that:

> "*Can anyone think that one could solve the problem of the tariff
> deficit without taking on board the main cost to the electrical system
> which is the subsidies to renewables? Obviously the answer is no.*"

The purpose behind the subsequent measures was "*to guarantee the economic
sustainability of the system and to correct over-remuneration.*"[311]

### (5)    Economic Sustainability of the Spanish Electricity System and the Correction of Excess Compensation

452.    It is common ground between the Parties that RD436/2004 had linked remuneration of
        renewable energy projects to the average reference tariff. As the Pöyry Report noted, in
        reference to PV projects:

> "*The* [TMR] *was one of the key components to the remuneration of
> renewable energy projects in Spain, and in the case of solar PV
> projects was the only component under the previous regulatory
> framework (RD 436/2004). Hence higher average reference tariffs
> were beneficial for solar PV projects.*
>
> *With high pool prices due to high gas prices, the average reference
> tariffs were set to increase over and above the inflation rate.* [...]
>
> *The Spanish government was not willing to deal with this issue by
> raising tariffs to avoid potential inflation risk. Therefore they
> changed the renewable scheme from RD 436/2004 (linked to the
> TMR) to RD 661/2007 and subsequently reviewed the Solar PV
> tariffs of 661/2007 via the publishing of RD/1578.*"[312]

---

[310] Tr. Day 2, Mr. Santacruz, pp. 29-39.

[311] Tr. Day 2, Mr. Santacruz, p. 31, lines 21-24; and p. 32, lines 22-24.

[312] **C-49**, 2009 Pöyry Report, Section 4.1., p. 75.

453.    In essence, Respondent argues that the successive tariff changes introduced, notably, by Article 40 of RD436/2004 and Article 44.3 of RD661/2007 did not preclude the introduction of subsequent measures intended to establish, or to ensure, economic sustainability and to correct over-remuneration within the bounds of ensuring a reasonable return.

454.    Respondent maintains that support for this proposition is to be found in *Charanne* and the finding of the tribunal in that case that:

> "*In this case, the Claimants could not have the legitimate expectation that the regulatory framework laid down by RD 661/2007 and RD 1578/2008 would remain unchanged during the entire lifespan of their plants. Accepting such an expectation would, in fact, amount to freezing the regulatory framework applicable to eligible plants, even though the circumstances may change. Any modification to the tariff amount or any limitation in the number of eligible hours would thus constitute a violation of international law. In practice, the situation would be equivalent to that resulting from the signing by a State of a stabilization agreement, or of a commitment to never modify the regulatory framework. The Arbitration Tribunal cannot accept such a conclusion. In fact, the Claimants themselves have clearly stated that they could not reasonably expect that the regulatory framework would remain unchanged.*"[313]

455.    Respondent contends that the measures adopted in 2010 and thereafter all had the aim of preserving economic sustainability and correction of what was termed "*excess remuneration.*"[314]

456.    The need for reform was recognised at the highest levels of government in Spain. Respondent draws attention to the speech of then Prime Minister Rajoy in the Cortes on 19 December 2011:

> "*If reforms* [in the electricity sector] *are not made, the imbalances will be unsustainable, and increases in prices and tariffs will place Spain at the greatest disadvantage in terms of energy costs in the entire developed world. We must therefore introduce policies based*

---

[313] **RL-71 / CL-238**, *Charanne*, *supra* n. 197, para. 503.
[314] Tr. Day 2, Mr. Santacruz, p. 42, line 14.

> *on putting a brake on and reducing the average costs of the system, take decisions without demagoguery, employ all the technologies available, without exception, and regulate with the competitiveness of our economy as our prime objective.*"[315]

457.    Some three months later, the CNE issued a report in which it proposed some short-term measures, including the "*harmonisation of the premium for solar thermal electricity technology*", the "*temporary staggering*" of premiums for the CSP installations, and a limit to the use of back-up fossil fuels with a primary energy premium of 5 %. It also proposed for the medium term the "*elimination of tariffs and premiums* [upon] *finalisation of economic lifetime.*"[316]

458.    Respondent maintains that the essence of the system which was replaced was retained under the new measures. It continued to be based upon a concept of a reasonable return: the investor recovered its investment costs and its operating costs and it received a reasonable return upon that investment, based upon an estimated 25-year installation lifespan. Respondent insisted that "*this methodology is nothing new.*"[317] The investor also retained the benefit of substantial public subsidies – it was suggested that 17.2% of revenues came from the market and the rest from public subsidies[318] – and pursuant to Article 26.2 of Law 24/2013, first priority of dispatch and of access to the grid went to renewable energy sources.[319]

459.    The Preamble to Royal Decree 413/2014 explained that at the heart of the new system was the "*standard installation*":

> *"For the calculation of the remuneration to the investment and the remuneration to the operation for a standard installation, the standard revenues from the sale of energy valued at market price, the standard operating costs necessary to carry out the activity and the standard value of the initial investment will be considered as if for an efficient and well-managed company. A set of remuneration parameters will be established and approved by an order of the*

---

[315] **R-92**, Mariano Rajoy, Speech During Investiture as Prime Minister, Congress of Deputies (19 December 2011).

[316] **R-98**, 2012 CNE Report, pp. 52, 81 and 82 (pp. 22, 26 and 27 of the translation).

[317] Tr. Day 2, Mr. Santacruz, p. 51, line 16.

[318] Accuracy First Quantum ER, para. 434.

[319] **C-102** / **R-147 Bis**, Law 24/2013.

*Ministry of Industry, Energy and Tourism for each of the different standard installations* […] [which] [...] *may be classified according to their technology, electrical system, power, age, etc.*

[…]

*The remuneration to the investment and, where appropriate, the remuneration to the operation will permit covering the higher costs of production installations using renewable energy sources* […] *so that they can compete on an equal footing with the other technologies and obtain a reasonable return with reference to the standard installation in each applicable case.*

*Additionally, the concept of reasonable return of the project is alignment with the legal doctrine on the matter* […] *establishing it as the return before taxes situated in approximately the average performance of the ten-year Treasury Bonds in the secondary market for the 24 months prior to then month of May of the year before the beginning of the regulatory period increased by a differential.*"[320]

460.    Respondent points out that in 2009, the industry had itself regarded as a reasonable rate of return a tariff of 300 base points above Spanish ten-year bonds.[321] It represents that the current rate is 7.3908% against a Spanish ten-year bond rate of 1%.[322]

## C.    ARTICLE 10(1) ECT: FAIR AND EQUITABLE TREATMENT

### (1)    Claimant's Position

461.    Claimant contends that Respondent has breached its obligations to afford it fair and equitable treatment, in that its legitimate expectations upon which it invested have not been met.

462.    Claimant seeks a declaration that Respondent has breached Article 10(1) of the ECT. And in the event that such a breach were established, it applies for an order that Respondent

---

[320] **C-111 / R-112**, RD413/2014, Preamble.

[321] Tr. Day 2, Mr. Santacruz, p. 60, lines 14-17.

[322] Tr. Day 2, Mr. Santacruz, p. 61, lines 6-13.

make full reparation to Claimant for the injury to its investments arising out of Spain's breach of the ECT and international law.

463.    Claimant also recalls some of the pertinent facts:

(i)    In March 2004, Respondent enacted RD436/2004 as a further iteration of its policy to develop the renewable energy sector in Spain and of its renewable energy regulatory regime, which had been initiated by Law 54/1997. RD436/2004 introduced the option of a fixed tariff or a pool price + premium for installations qualifying under the Special Regime, the tariff being valued by reference to the TMR, the "*average or reference electricity tariff.*" It also provided that future tariff reviews were to apply "*solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs or premiums.*"[323]

(ii)    The PER 2005-2010 made the development of CSP a priority, stating that the incentives that had been established in RD436/2004 were insufficient – "*it is necessary to provide further incentives if possible in particular technology areas in order to make them more attractive to future investors.*"[324]

(iii)    In October 2006, Mr. Tassabehji made his first fact-finding trip to Spain.

(iv)    In its consideration of the mooted successor to RD436/2004, draft RD661/2007, the CNE issued the CNE Report 3/2007 of February 2007. It emphasised the need to minimise regulatory uncertainty if investment in new capacity was to be incentivised: "*The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility.*"[325] The CNE made clear, too, its concern that future tariff reviews should only affect new facilities, and it expressed similar concern about proposals to make the new legislation retroactive, the length of any transition arrangements (it thought

---

[323] **C-24, R-148 Bis**, RD436/2004, Arts. 23, 24 and 40.3.

[324] **C-27**, PER 2005-2010 Summary, Section 6.2, para. 4.

[325] **R-203**, 2007 CNE Report, Section 5.3 (b).

them inadequate), and about the inadequacy of compensation to investors facing lower remuneration going forward. It stated its opinion that "*although it is difficult to defend the petrification of regulations, it is necessary to try to achieve sufficient legal certainty to counteract regulatory uncertainty and risk as much as possible; only this way can there be sufficient investment.*"[326] The CNE noted, further, that "*the constitutional doctrine admits that if its need is sufficiently justified it is possible to retroactively enforce a regulation provided that, in exchange, an adequate transition period is established and investors are compensated.*"[327] And it went so far as to issue an unfavourable ruling on the draft.[328] These points clearly had considerable weight, as is apparent on a reading of the final text.

(v)    RD661/2007[329] was enacted on 25 May 2007. Among the important features of the new Royal Decree were:

(a)    an annual updating of tariffs by reference to the CPI, resulting in a projected 17% increase in tariff remuneration for CSP over 2004,[330] and the option for Special Regime generators to obtain either a fixed tariff or a premium option for every MW of electricity produced without limit;

(b)    the "*right,*" pursuant to Article 17, to FITs subject "*only to final registration in the RAIPRE*";

(c)    the right to generate electricity using natural gas to a limit of 12% (Fixed Tariff) and 15% (Premium Option);

(d)    pursuant to Article 22, the right to FITs, provided that once notice that 85% of the relevant power target had been reached, a special regime facility had

---

[326] *Id.*, Section 6, p. 19.

[327] *Id.*, Section 6, p. 19.

[328] *Id.*, Section 11, p. 61.

[329] **C-38 / R-150 Bis**, RD661/2007.

[330] **R-203**, 2007 CNE Report, p. 21.

been registered with the RAIPRE within a period of not less than 12 months fixed by Resolution of the General Secretariat for Energy; and

(e)    pursuant to Article 44.3, no tariff revisions for facilities for which the deed of commissioning had been granted prior to 1 January of the second year following the year in which the revision shall have been performed.

(vi)    The CNE described Article 44.3 of RD661/2007 as "*one of the most important criteria of the current regulations of the special regime in relation to legal certainty and the stability of the economic system.*"[331]

(vii)    In May 2007, the Ministry of Industry, Energy and Tourism issued a press release announcing that the Government was prioritising "*profitability and stability*" in the new Royal Decree. It noted that "*profitability shall rise to 8% for facilities that choose to supply distributors and between 7% and 11% return for those participating in the wholesale market.*" And it confirmed that "[f]*uture tariff revisions shall not be applied to existing facilities. This guarantees legal certainty for the electricity producer and stability for the sector, thereby favouring future development.*"[332]

(viii)    Presentations internationally by *InvestInSpain* in November 2007 (and again in November 2008) highlighted the benefits of the new RD661/2007 regime,[333] as did presentations in October 2008 and February 2010 by the then Vice President of CNE.[334]

(ix)    On 12 March 2008, the Sener Joint Venture was formed and Torresol Energy was set up.

---

[331] **C-159**, CNE, *Report on the Proposed RD Regulating and Modifying Certain Aspects of the Special Regime* (14 September 2010) (emphasis omitted).

[332] **C-138,** 2007 Ministry Press Release.

[333] **C-140**, InvestInSpain Presentation (15 November 2007); and **C-48**, InvestInSpain Presentation (November 2008).

[334] **C-144**, CNE Presentation, *Legal and Regulatory Framework for the Renewable Energy Sector* (29 October 2008), and **C-157**, CNE Presentation, *Renewable Energy Regulation in Spain* (February 2010).

(x)     Claimant was incorporated in The Netherlands on 19 March 2008.

(xi)    On 27 May 2008, Claimant was authorised to commit some EUR 79 million to the acquisition of a 40% in Torresol Energy and it acceded to the Sener Joint Venture on 9 June 2008.

(xii)   Claimant's own Strategy Plan[335] identified the principal risk as an inability to have a CSP Plant up and running within two months of an announcement that the 85% threshold had been reached such that it would not be possible to take advantage of the initial RD661/2007 tariffs. A major study by BNP in January 2008, the BNP Report, "flagged" the same construction risk, but noted that the "*legal framework governing renewable energies in Spain is very stable. The Special Regime provides premiums and incentives for renewable energies in general and solar plant generators in particular.*"[336] Subsequently, the March 2009 Pöyry Report[337] and Claimant's own due diligence report of June 2009,[338] both of which were very positive about the regulatory framework in Spain, likewise focussed on the risk that installations in development, but not yet under construction, might fail to "make the cut."

(xiii)  In July 2009, a Loan Agreement for EUR 540 million was executed with a consortium of Spanish banks.

(xiv)   On 11 December 2009, registration of all three Plants in the Remuneration Pre-Assignment Registry was completed pursuant to RDL6/2009.

(xv)    Claimant received the Resolutions issued by the Directorate of Energy Policy and Mines on 28 December 2010.

---

[335] **C-41**, Draft Strategy Plan 2008-2012 for ADFEC to Proceed with the Investment in the CSP Plants through a JV with Sener (26 December 2007).

[336] **C-43**, 2008 BNP Report.

[337] **C-49**, 2009 Pöyry Report.

[338] **C-52**, Masdar, Due Diligence Report, *Torresol Energy Investments S.A. Request for Approval of EUR 55.3 MM Masdar Equity Investment in 2x50MW CSP Solar Plants in Spain* (15 June 2009).

(xvi)    On 29 April 2009, RAIPRE registration of Gemasolar was secured.

(xvii)    On 22 December 2011, RAIPRE registration of Arcosol and Termesol followed.

464.    Claimant's case is that at that point, it had done all that it was required to do to ensure that the RD661/2007 regime would apply to the three installations. However, those expectations were dashed by the enactment, in rapid succession, of the "**Disputed Measures**," namely:

(i)    Law 15/2012 (effective 1 January 2013), which (a) prohibited CSP plants from using natural gas in production and receiving FITs; and (b) imposed the Levy;

(ii)    RDL2/2013 of 1 February 2013, which reduced the premium option under RD661/2007 to nil and revised downward the CPI inflation measure for the FITs;

(iii)    RDL9/2013 of 13 July 2013, which repealed the RD661/2007 regime and introduced a new Special Payment regime, calculated by reference to a standard installation having a standard (25) year operational life; and after 25 years, incentive payments stop;

(iv)    Law 24/2013 of 26 December 2013, which removed the formal distinction between the Ordinary and Special Regimes; made priority of dispatch subject to terms to be fixed by the Government; and provided for a review of income derived from the sale of energy every three years.

465.    The new regime was implemented by RD413/2014 in June 2014 and a subsequent Ministerial Order on 16 June 2014 (IET/1045/2014) – themselves also among the Disputed Measures.

466.    In addition to the many other changes, Claimant says, first, that it is now apparent that if insufficient funds are available to make the incentive payments in a particular year, they will be paid over the following five years, so there is no guarantee that a plant owner will even receive the Special Payment to enable it to service its debts. Second, the new regime imports a degree of retroactivity in that tariff payments already received prior to the inception of the new regime are now to be brought back into account, because they are

counted towards the total remuneration received by a plant over its notional operational life. That, it says, constitutes a "clawback."

467.    In short, Claimant says that:

> "[T]hrough the enactment of these disputed measures, the 661 regime has been completely dismantled and obliterated, and replaced with a new regime, which provides investors like Masdar with significantly lower returns and has removed the stability that was promised and on the basis of which they entered into these investments in the first place."[339]

468.    It is the specific object and purpose of the ECT to "establish a legal framework in order to promote long-term co-operation in the energy field," which is "[u]nique to the ECT."[340] The late Professor Wälde, one of the most authoritative commentators on the ECT, noted the emphasis in the ECT upon a "high" as opposed to a "normal" level of protection of foreign investors as would be the case in other BITs and that the protection offered to investors under the ECT is "extensive, rather than restrictive."[341]

### (2)    Respondent's Position

469.    Respondent says that Claimant has failed to adduce any evidence of a violation of its legitimate expectations and the FET standard.[342] Respondent argues that the overriding objectives of the ECT are, first, observance of the principle of non-discrimination – an assurance that a foreign investor will be treated at least as well as national investors (and in any event, no worse than it would be pursuant to international minimal standards) – and, second, that in the strategic and highly regulated energy sector, prices will be set by reference to the market. In this case, Respondent had been obliged to apply macroeconomic control measures, because measures that it had adopted had led to over-remuneration, thereby distorting the market, when the true purpose of the subsidies in issue had been to create a level playing field. The question for the Tribunal is to weigh the interest of the

---

[339] Tr. Day 1, Ms. Gill, p. 163, lines 1-8.

[340] **C-26 / RL-2**, ECT and Related Documents, Art. 2.

[341] **CL-239**, Wälde Opinion, supra n. 260, para. 36. See also, **CL-29**, Energy Charter Secretariat, The Energy Charter Treaty: A Reader's Guide (2002).

[342] Tr. Day 2, Mr. Torres, p. 72, lines 10-24.

investor against the need for a State to adopt justified and logical macroeconomic measures "[to] *address the electricity tariff deficit*,"[343] even if they affect an investor's profits.

470.    Respondent emphasises that it is incumbent upon Claimant to satisfy the Tribunal that it had had regard to all of the information that it could, and should, have known at the time that it made its investment. Respondent relies on *Charanne*, in which, having found that no specific commitment had been made to the claimants in that case by Spain, the tribunal stated that, had the claimants undertaken a proper due diligence at the time that they made their investment in 2009:

> "[…] [they] *could have carried out an analysis of the investment's legal framework in Spanish law and understood that the regulations enacted in 2007 and 2008 could be modified. At least, that is the degree of diligence that could be expected from a foreign investor in a heavily-regulated sector like the energy industry. In such a sector, thorough prior analysis of the legal framework applicable thereto is essential to make an investment.*"[344]

471.    Respondent says that the sector was well aware that the tariff regime was susceptible to change; it pointed to the APPA commentary on the draft RD661/2007 and its observation that:

> "[A]*ny rational investor, when planning facilities of this type, must bear in mind not only the costs and the foreseeable remuneration, but it must also consider the risk that such remuneration could be lowered* […]."[345]

Similarly, in 2009, APPA, in its comments on RDL6/2009, noted that a new decree to replace RD661/2007 was in preparation. It posed the (rhetorical) question: "*By the way, is that regulatory stability?*"[346]

472.    In summary, it is Respondent's position that:

---

[343] **RL-91**, Memorandum of Understanding of Financial-Sector Policy Conditionality (20 July 2012).

[344] **RL-71 / CL-238**, *Charanne*, *supra* n. 197, para. 507.

[345] **R-300**, APPA Submissions before the Council of State concerning the Draft Royal Decree on the Special Regime RD 661/2007 (3 April 2007).

[346] **R-232**, APPA, *Renewables: Europe, New Directive Spain, New Controversial Decree Law* (29 May 2009).

(i)  The Disputed Measures were not retroactive according to international law in that they did not seek to claw back remuneration already enjoyed by the investor; nor did they breach the limitations upon the regulatory power of the State recognised by the Spanish Supreme Court in that "*the change does not reach the already received income and* […] *the principle of reasonable return is not infringed.*"[347]

Furthermore, the Spanish Supreme Court had held that there was: "[…] *no proscribed retroactivity when a rule governs pro futuro legal situations created prior to its entry into force or whose effects have not been consummated.* […]"[348]

(ii)  The Supreme Court had expressly rejected the proposition that an already existing remuneration regime could be "*petrif*[ied]" and rendered impervious to subsequent amendment;[349] and that "[…] *the petrifaction or freezing of the remuneration regime of the owners of electrical power plant owners under a special regime or the inalterability of this regime*" is not apparent.[350] In fact, Respondent says that it undertook no obligations analogous to those that formed the basis of the ruling in *BG Group*.[351] In this case, there is "*merely an inference*"[352] and certainly no evidence of any guarantee that this regime would never be changed for these Plants throughout their entire operational lifespan; rather,

(iii)  The power of the regulator to make retroactive modification to the remuneration framework was subject to "*the requirements of the Law on the Electrical Sector* [being] *observed with regard to the reasonable return of investments.*"[353]

---

[347] Resp. C-Mem., para. 536; **R-307**, Respondent's Hearing Opening Presentation: Grounds on the Merits, p. 57, both citing **R-76** and **R-77**, Judgments of the Supreme Court (December 2009).

[348] **R-241**, Judgment of the Constitutional Court (18 February 2016).

[349] **R-242**, Judgment of the Supreme Court No. 1260/2016 (1 June 2016).

[350] Resp. Rej., para. 461, citing **R-182**, Pleadings from the AEE concerning Royal Decree 1614/2010 (30 August 2010).

[351] **CL-55**, *BG Group v. Republic of Argentina*, UNCITRAL, Award, 24 December 2007.

[352] Tr. Day 2, Mr. Torres, p. 109, line 22.

[353] **R-194**, AEE Submission Against RD1614/2010 Draft (II) (30 August 2010), p. 6, n. 4 (citing Judgment of the Supreme Court of 9 December 2009).

473.    The investors' right to a reasonable return has been respected even as the worst effects of the financial crisis were being felt in 2012, notwithstanding the wholesale modification of the previous regime, which Respondent contended had become unsustainable.[354]

474.    Respondent emphasises that not only has there been a consistent adherence to the principle of maintaining a reasonable return, but IDAE had stated the objective of a return of around 7% in the PER. Respondent dismisses the relevance of the presentations made by *InvestInSpain* upon which Claimant relies, noting that, in *Invesmart*,[355] the tribunal had been astute to distinguish between statements made by entities which had the authority to commit the State and those which did not. *InvestInSpain*'s presentations, asserts Respondent, fall into the latter category.[356]

475.    That contention is inconsistent with Respondent's adoption of Claimant's position as to the standing of *InvestInSpain*.[357] Claimant had maintained that *InvestInSpain* "*subsists entirely on funds budgeted by the Spanish Government and is directly and fully controlled by the Spanish State. It lacks any genuine independence and autonomy and is therefore properly considered an organ of the State.*"[358] It was a public company overseen by the Ministry of Industry, the full name of which was *Sociedad Estatal para la Promoción y Atracción de las Inversiones Exteriores, S.A.U.* Its primary object was the encouragement, promotion and facilitation of investments in Spain on behalf of the Government. Upon its dissolution in 2012, all of its assets were transferred to the *Instituto Español de Comercio Exterior* ("**ICEX**"), previously the sole shareholder in *InvestInSpain* and part of the Ministry of Economic Affairs and Competitiveness. While Respondent had adopted that position on the basis that it contended that it allowed it to challenge the standing of Claimant on the same substantive grounds,[359] it does not alter the fact that Respondent had

---

[354] Tr. Day 2, Mr. Torres, pp. 94-95.

[355] **RL-92**, *Invesmart B.V. v. Czech Republic*, UNCITRAL, Award, 26 June 2009.

[356] Tr. Day 2, Mr. Torres, p. 108, lines 19-25.

[357] Resp. C-Mem., para. 48(b).

[358] Cl. Mem., para. 334.

[359] Resp. C-Mem., para. 48(b).

accepted the premises upon which the assessment of *InvestInSpain's* standing had been made by Claimant.

476.   Respondent suggests that the banks, which financed the projects, were under no illusion that there might be a derogation of the RD661/2007 regime and that in such event, if "*for any reason*" the FIT defined in the Royal Decree ceased to be applicable to the Projects, a Partial Principal Prepayment would apply. It was contended that this language was not conditioned upon the existence of a "Tariff Window" or anything else.[360]

477.   It is suggested, too, that there had been a failure on Claimant's part to conduct legal, as opposed to financial and regulatory, due diligence. And such regulatory due diligence as there is, maintains Respondent, is limited to the Pöyry 2009 Report, which "[d]*oes not establish that there is a commitment to keep the regime set up by RD 661 intact, without changes, forever after*."[361] Respondent takes the position that Claimant never once requested clarification as to whether the suggestion that the regime might be susceptible to change at any time would exclude the "Tariff Window."[362]

478.   Much weight is placed by Respondent upon the letter sent by the Secretary of State for Energy to Masdar in January 2010, referencing the future adoption of a new regulatory scheme and inviting requests for further information.[363] Respondent says that no questions were raised by Claimant, which proceeded to invest EUR 60 million in Termesol and Arcosol in April 2010.

479.   Respondent denies that it is in breach of the FET standard imposed by Article 10 of the ECT or that it has failed to provide stable conditions for investment. Nor did any of the measures that it had taken offend international principles in respect of retroactivity, in that they did not purport to revoke acquired rights and they applied to the future. Respondent submits that:

---

[360] Tr. Day 2, Mr. Torres, p. 111, lines 8-20.

[361] Tr. Day 2, Mr. Torres, p. 113, lines 7-9.

[362] Tr. Day 2, Mr. Torres, p. 118, lines 11-14.

[363] **R-158**, Letters between Masdar's CEO and the Ministry of Industry, Tourism and Commerce (25 November 2009 and 14 January 2010).

> "*Charanne says you cannot think that simply because you registered in an administrative register, and that is just an administrative requirement,*[364]*] or that you could infer from the regulatory framework that the Claimant would have a right to every single benefit. Charanne says no.* [...] *there is no acquired right. The only acquired right is the remuneration that you have already received* [...] *A law that is applied going forward in respect of pre-existing situations respecting* [...] *the acquired rights is not a violation of the ECT, because the future is not part and parcel of the acquired right.* [...] *Royal Decree 661 does not make a commitment to it all, ever. This is the key. This is why it says it is not retroactive, because it is only going forward where there is no acquired right.*"[365]

480.    Respondent says further that the measures that it took were transparent; that they were the subject of proper consultation; and they were neither arbitrary, nor discriminatory – rather, they were reasonable and proportionate. The macroeconomic measures were introduced to ensure the sustainability of the system in the face of an exceptional drop in demand and to avoid over-remuneration to the suppliers at excessive cost to consumers.

481.    Respondent disputes the interpretation placed upon the exchanges between Respondent and Claimant in December 2010. To the extent that they go to remuneration, Respondent says that they are mere communications and they address simply the then present status of remuneration; they are not in any shape or form a guarantee for the future.

**(3)    Analysis**

482.    Article 10(1) of the ECT provides that

> "*Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that*

---

[364] *See also* Tr. Day 2, Mr. Torres, p. 144, line 9 to p. 145, line 25.
[365] Tr. Day 2, Mr. Torres, p. 129, line 21 to p. 130, line 16.

> *required by international law, including treaty obligations. Each*
> *Contracting Party shall observe any obligations it has entered into*
> *with an Investor or an Investment of an Investor of any other*
> *Contracting Party.*"[366]

483.   The 1969 Vienna Convention on the Law of Treaties provides that a treaty is to be interpreted "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose.*"[367] As the *ad hoc* Annulment Committee observed in *CMS*:

> "[T]*he Committee would only note that the fair and equitable*
> *standard has been invoked in a great number of cases brought to*
> *ICSID arbitration and that there is some variation in the practice of*
> *arbitral tribunals in this respect.*"[368]

484.   Notwithstanding those variations, the Tribunal is in no doubt that the FET constitutes a standard the purpose of which is to ensure that an investor may be confident that (i) the legal framework in which the investment has been made will not be subject to unreasonable or unjustified modification; and (ii) the legal framework will not be subject to modification in a manner contrary to specific commitments made to the investor.

### a.   No Unreasonable or Unjustified Modification

485.   It is undisputed that a State is at liberty to amend its legislation. Among a series of decisions including *Parkerings*,[369] *Continental Casualty*,[370] *Plama*,[371] *EDF*,[372] and *AES Summit*,[373] the tribunal in *El Paso* stated:

---

[366] **C-1**, ECT, Art. 10(1).

[367] **CL-3**, VCLT, Art. 31.

[368] **RL-57**, *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the *Ad Hoc* Committee on the Application for Annulment of the Argentine Republic, 25 September 2007, n. 86 (hereinafter "***CMS Annulment***").

[369] **RL-45**, *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007 (hereinafter "***Parkerings***"), para 332.

[370] **CL-59**, *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008 (hereinafter "***Continental Casualty***"), paras. 258 and 363.

[371] **CL-58**, *Plama Consortium Limited v The Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008.

[372] **RL-40**, *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, para. 217.

[373] **RL-47**, *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, para. 9.3.29 and paras. 10.3.7-10.3.8.

"*In other words, the Tribunal cannot follow the line of cases in which fair and equitable treatment was viewed as implying the stability of the **legal and business framework**. Economic and legal life is by nature evolutionary. [...]*

*Firstly, **economic stability** cannot be a legitimate expectation of any economic actor, as stated quite clearly at the beginning of the last century by the Permanent Court of International Justice, whose dictum still rings true today:*

> *'No enterprise – least of all a commercial or transport enterprise, the success of which is dependent on the fluctuating level of prices and rates – can escape from the changes and hazards resulting from general economic conditions. Some industries may be able to make large profits during a period of general prosperity, or else by taking advantage of a treaty of commerce or of an alteration in customs duties; but they are also exposed to the danger of ruin or extinction if circumstances change.'*[374]

*Secondly, it is inconceivable that any State would accept that, because it has entered into BITs, it can no longer modify pieces of legislation which might have a negative impact on foreign investors, in order to deal with modified economic conditions and must guarantee absolute **legal stability**.*"[375]

486.    But that right is not unfettered, as the tribunal in *CMS*, for example, explained:

> "*It is not a question of whether the legal framework might need to be frozen as it can always evolve and be adapted to changing circumstances, but neither is it a question of whether the framework can be dispensed with altogether when specific commitments to the contrary have been made. The law of foreign investment and its protection has been developed with the specific objective of avoiding such adverse effects.*"[376]

---

[374] **CL-77**, *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (hereinafter "*El Paso*"), paras. 352 and 366 (quoting *Oscar Chinn (United Kingdom v. Belgium)*, Judgment of 12 December 1934, 1934 P.C.I.J. Rep., Serie A/B, No. 63, p. 88.)

[375] **CL-77**, *El Paso*, *supra* n. 374, paras. 352, 366 and 367. Emphasis in the original. *See also*, the dissenting opinion of Professor Tawil in *Isolux*, *supra* n. 118, para. 9: "*The power of the host state to amend its legislation at any time is not under discussion, as no one has a vested right to the maintenance of laws and regulations.*"

[376] **CL-39**, *CMS*, *supra* n. 267, para. 277.

148

487.   That conclusion was reflected in a series of later decisions, including all of those cited above.

488.   The *Eiser* tribunal has also referred to the restriction of the State's power to legislate in the following terms:

> "*362. **Absent explicit undertakings directly extended to investors** and guaranteeing that States will not change their laws or regulations, investment treaties do not eliminate States' right to modify their regulatory regimes to meet evolving circumstances and public needs.*"[377] (Emphasis added)

### b.   No Modification if There Is a Specific Commitment

489.   The question is therefore to determine which kind of specific commitments can give rise to protected legitimate expectations.

490.   There are two schools of thought on this question. In essence, one school of thought considers that such commitments can result from general statements in general laws or regulations. The other considers that any such commitments have to be specific.

491.   Supporting the first view, leading commentators state that the starting point to determine an investor's legitimate expectations is the "*legal order*" or "*legal framework*" of the host State at the time when the investor made its investment.[378] That proposition finds support in the case law. In *Suez*, the tribunal stated:

> "*When an investor undertakes an investment, a host **government through its laws, regulations, declared policies and statements** creates in the investor certain expectations about the nature of the treatment that it may anticipate from the host State. **The resulting reasonable and legitimate expectations** are important factors that influence initial investment decisions and afterwards, the manner in which the investment is to be managed.*

---

[377] **CL-249**, *Eiser*, *supra* n. 196, para. 362.

[378] *See* **RL-90**, C. Schreuer, *Fair and Equitable Treatment in Arbitral Practice,* 2005 JWIT (2005), p. 374; and **CL-87**, R. Dolzer, *Fair and Equitable Treatment: Today's Contours*, 12 Santa Clara J. Int'l L. 7 (2014), p. 22: "*The appropriate starting point to determine legitimate expectations is the legal order of the host state at the time when the investor made its investment. A number of investment tribunals have relied on the nexus between legitimate expectations and the host state's legal order at the time of the investment.*"

[…]

> *Where a government through its actions subsequently frustrates or thwarts those legitimate expectations, arbitral tribunals have found such host government has failed to accord the investments of that investor fair and equitable treatment.*"[379] (Emphasis added)

492.   The Tribunal notes, too, the conclusion of UNCTAD upon which Professor Tawil relied in his dissents in *Charanne* and *Isolux* in support of his statement that:

> "[L]*egitimate expectations can in fact be generated from the legal system in force at the time of the investment, especially when the rules issued – as was the case with RD661/2007 and 1578/2008 – had the declared purpose of attracting investments in a specific sector of the economy* […].*"*[380]

493.   UNCTAD says:

> "*Arbitral decisions suggest in this regard that an investor may derive legitimate expectations either from (a) specific commitments addressed to it personally, for example, in the form of a stabilisation clause, or (b) rules that are not specifically addressed to a particular investor but which are put in place with a specific aim to induce foreign investments and on which the foreign investor relied in making his investment.*"[381]

494.   If the general legislation is to be regarded as a source of an investor's legitimate expectations, the investor must demonstrate that it has exercised appropriate due diligence and that it has familiarised itself with the existing laws.

495.   The decision in *Electrabel*[382] laid considerable emphasis upon what the investor knew at the time when it made its investment; the investor's expectations were to be assessed considering the "*information that the investor knew and should reasonably have known at the time of the investment* […]."

---

[379] **CL-215**, *Suez, supra* n. 255, paras. 222-223.

[380] *Isolux, supra* n. 118, Tawil Dissenting Opinion, para. 4.

[381] **CL-217**, UNCTAD, *Fair and Equitable Treatment* (2012), *supra* n. 263, p. 69.

[382] **RL-89**, *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, para. 7.78.

496.    When Masdar was considering its investment, it knew that:

    (i)    Since 1997, Spain had actively encouraged investments in the RE sector. Having determined that the incentives offered in RD436/2004 were insufficient to attract the level of investment that it sought, it had considered, debated and finally adopted the RD661/2007 regime. Its own regulator, CNE, had argued that:

        *"Sufficient guarantees should be offered by the regulation in order to achieve the stability of incentives which should be converted into foreseeable assets during the entire working life of the plant […]."*[383]

    (ii)    As the Government's own press releases and overseas presentations to prospective investors made clear, it had decided to adopt that course, well knowing that the level of incentive went beyond the mere prospect of a reasonable return.

    (iii)    There was no Supreme Court authority, which in any way cast doubt upon the legality or validity of the terms of RD661/2007 generally or the stability provision of Article 44.3 in particular. And,

    (iv)    The RD661/2007 regime held out, through Article 17(c), the prospect that, provided an installation complied with certain registration requirements and within prescribed time limits, it would acquire the right to receive the regulated tariff or premium.[384]

497.    On the evidence before the Tribunal, it is also clear that Claimant had undertaken substantial due diligence. Claimant had:

    •    commissioned external reports;

---

[383] **C-135**, 2007 CNE Report, p. 16. *See also*, **R-203**, 2007 CNE Report, p. 16 ("*The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility.*")
[384] **C-38 / R-150 Bis**, RD661/2007, Art. 17(c).

- engaged in multiple discussions with its co-venturer, Sener, which had detailed knowledge of the regulatory framework;

- held extensive discussions with the Spanish banks, which put up 80% of the capital for the CSP projects;

- consulted the law firms of Latham & Watkins and Jones Day in respect of regulatory issues.

No concerns were aroused, much less any indication at the time when Claimant was making its investment that there was the slightest possibility that the RD661/2007 regime applicable to **existing installations registered with RAIPRE** would be swept away by the Disputed Measures, or that any reasonable investor might foresee that they might be.

498. To that extent, the Tribunal is satisfied that Claimant had:

"[E]*xercised due diligence and that its legitimate expectations were reasonable in light of the circumstances.*"[385]

499. On the basis of the due diligence exercised by Claimant, it believed that it had a legitimate expectation that the laws would not be modified, as they included stabilisation clauses.

500. Particular reliance is placed on stabilisation clauses included in the general regulations, and in particular that which is found in Article 44(3) of RD661/2007:

"*During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets.*

---

[385] **RL-45**, *Parkerings, supra* n. 369, para. 333.

> *Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.*
>
> ***The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.***"[386] (Emphasis added)

501.    Claimant relies heavily on this Article for the proposition that its expectations that the legal framework would not be modified were legitimate, as it made clear in its Memorial:

> "*Indeed, Spain had explicitly promised that the economic regime for qualifying Special Regime installations would remain stable under RD 661/2007, which contains a stabilisation clause in Article 44(3). This stability commitment was core to the Claimant's expectations.*"[387]

By way of elaboration, Claimant argues as follows at footnote 478 of the Memorial:

> "*Article 44(3) provided for the possibility not only to update the Fixed Tariff or Premium pursuant to the CPI, but also to review the Fixed Tariff and Premiums (and the floor and cap in the latter case) in consideration of the evolution of the cost of the technology and its coverage in the renewable sector. However, Article 44(3) expressly stated that those revisions would not affect the Fixed Tariff, nor the floor and cap of the Premium option, for existing installations commissioned prior to 1 January of the second year following the year in which the revision was implemented (for instance, if a review was conducted in 2010, it would not affect installations that had obtained a commissioning certificate prior to 1 January 2012). Thus, RD 661/2007 guaranteed that any review of the Fixed Tariff would not apply to existing installations and that in the case of the Premium option, although the amount of the Premium could change, the minimum revenue would not change as any modification of the cap and floor would not apply to existing installations.*"

---

[386] **C-38 / R-150 Bis**, RD661/2007, Art. 44(3).

[387] Cl. Mem., para. 370.

502.    Article 4 of RD1614/2010 of 7 December 2010 also included a "stabilisation commitment" in terms similar to those of Article 44.3:

> "*For solar thermoelectric technology facilities that fall under Royal Decree 661/2007 of 25 May, revisions of tariffs, premiums and upper and lower limits referred to in article 44.3 of the aforementioned Royal Decree, shall not affect facilities registered definitively in the Administrative Registry of production facilities entitled to the special regime that is maintained by the Directorate-General for Energy and Mining Policy as of 7 May 2009, nor those that were to have been registered in the Remuneration Pre-assignment Registry under the fourth transitional provision of Royal Decree-Law 6/2009 of 30 April, and that meet the obligation envisaged in its article 4.8, extended until 31 December 2013 for those facilities associated to phase 4 envisaged in the Agreement of the Council of Ministers of 13 November 2009.*"[388]

503.    In sum, from the perspective of this first school of thought, the fact that RD661/2007 and other texts included a stabilisation clause is sufficient to exclude any modification of the law, so far as investors, which had made investments in reliance upon its terms, were concerned.

504.    The second school of thought considers that a specific commitment giving rise to legitimate expectations cannot result from general regulations and that something more is needed. It espouses the principle that a stabilisation commitment made in a law is just as much subject to change as all the other dispositions of the law in question. A limitation of the State's legislative power can only be derived from constitutional principles in the internal legal order and possibly rules of *jus cogens* in the international legal order.

505.    The Tribunal has in mind the observations of the tribunal in *El Paso* at paragraphs 375 to 377 and at paragraph 402:

> "*375. A reasonable general regulation can be considered a violation of the FET standard if it violates a specific commitment towards the investor. The Tribunal considers that a special commitment by the State towards an investor provides the latter with a certain protection against changes in the legislation, but it needs to discuss more thoroughly the concept of 'specific commitments.' **In the***

---

[388] **C-63 / R-151 Bis**, RD1614/2010, Art. 4.

154

*Tribunal's view, no general definition of what constitutes a specific commitment can be given, as all depends on the circumstances. However, it seems that two types of commitments might be considered 'specific': those specific as to their addressee and those specific regarding their object and purpose*.

*376. First, in order to prevent a change in regulations being applied to an investor or certain behaviour of the State, there can indeed exist specific commitments directly made to the investor – for example in a contract or in a letter of intent, or even through a specific promise in a person-to-person business meeting – and not simply general statements in treaties or legislation which, because of their nature of general regulations, can evolve. The important aspect of the commitment is not so much that it is legally binding – which usually gives rise to some sort of responsibility if it is violated without a need to refer to FET – but that it contains a specific commitment directly made to the investor, on which the latter has relied.*

*377. Second, a commitment can be considered specific if its precise object was to give a real guarantee of stability to the investor. Usually general texts cannot contain such commitments, as there is no guarantee that they will not be modified in due course. However, a reiteration of the same type of commitment in different types of general statements could, considering the circumstances, amount to a specific behaviour of the State, the object and purpose of which is to give the investor a guarantee on which it can justifiably rely.*

*[…]*

*402. The Tribunal will thus consider whether any of the measures complained of by El Paso can be considered as adopted outside the acceptable margin of change that must be taken into account by any investor and therefore be characterised as unfair and inequitable treatment, before considering the issue of a possible violation of the FET standard by the accumulation of all the measures complained of. The question is therefore whether the measures adopted exceeded the normal regulatory powers of the State and violated the legitimate expectations of the Claimant.*"[389]
(Emphasis added)

---

[389] **CL-77**, *El Paso*, *supra* n. 374, paras. 375-377, 402.

506.    Some guidance can be found in *Continental Casualty* for the determination of what might constitute a specific commitment:

> "*261. In summary, in order to evaluate the relevance of that concept* [of legitimate expectations] *applied within Fair and Equitable Treatment standard and whether a breach has occurred, relevant factors include:*
>
> *i) the specificity of the undertaking allegedly relied upon which is mostly absent here, considering moreover that **political statements** have the least legal value, regrettably but notoriously so;*
>
> *ii) **general legislative statements** engender reduced expectations, especially with competent major international investors in a context where the political risk is high. Their enactment is by nature subject to subsequent modification, and possibly to withdrawal and cancellation, within the limits of respect of fundamental human rights and ius cogens; [...]*"[390] (Emphasis added)

507.    In other words, for adherents of the second school of thought, stabilisation provisions offered in general legislation, or political announcements, like press releases and others, cannot create legitimate expectations.

508.    That was the position adopted by the majority of the tribunal in *Charanne*:

> "*491. [...] the Claimants consider that RD 661/2007 and RD 1578/2008, since they were addressed to a specific and limited group of investors who met the requirements laid down within the set deadlines, amounted to specific commitments entered into by Spain.*
>
> *492. The Tribunal will examine below whether such regulatory framework could give rise to the legitimate expectations that it would not be modified as it actually was in 2010. However, the Tribunal does not accept the argument that such rules could amount to or could be equivalent to a specific commitment.*
>
> *493. **Even if RD 661/2007 and 1578/2008 were addressed to a limited group of investors, that does not turn them into***

---

[390] **CL-59**, *Continental Casualty, supra* n. 370, para. 261.

*commitments specifically addressed to each of those investors.*
*Having a specific scope does not mean that the disputed provisions*
*lose the general nature that characterizes any legislative or*
*regulatory measure. **Turning a regulatory provision, due to the***
***limited number of persons that may be subject thereto, into a***
***specific commitment entered into by the State towards each and***
***every one of those persons would be an excessive limitation of the***
***capacity of States to regulate the economy according to the public***
***interest.***

[…]

*504. The conclusion drawn by the Tribunal, i.e. that in the absence*
*of a specific commitment the Claimants could not reasonably expect*
*that the applicable regulatory framework provided in RD 661/2007*
*and RD 1578/2008 would remain unchanged, is backed by case law*
*from the highest courts in Spain. Prior to the investment, these*
*courts had clearly established the principle that domestic law could*
*modify the regulations in force.*

[…]

*508. Although these decisions by the Spanish courts are not binding*
*on this Arbitration Tribunal, they are factually relevant to verify that*
*the investor was unable, at the time of the disputed investment, to*
*have the reasonable expectation that in the absence of a specific*
*commitment the regulation was not going to be modified during the*
*lifespan of the plants.*"[391]  (Emphasis added)

509.   The same analysis was performed by the majority of the *Charanne* tribunal concerning the
general documents, press releases, presentations and reports distributed to potential
investors to attract them. The majority of the *Charanne* tribunal dismissed any reliance on
such types of documentation as a possible legal basis for reasonable legitimate
expectations:

"*497. It is true that these documents and the presentation thereof*
*carried out in Spain, show the Respondent's intention to encourage*
*and attract investments in the renewable energy sector. However,*
*these documents are not sufficiently specific to give rise to any*
*expectations regarding the fact that RD 661/2007 and RD*
*1578/2008 were not going to be modified. Although the 2007*

---

[391] **RL-71 / CL-238**, *Charanne, supra* n. 197, paras. 491-493, 504, 508.

> *presentation does indeed contain a reference to RD 661/2007, **none of its wording could lead anyone to reasonably infer that the regulated tariff would remain unmodified during the entire lifespan of the plants**.*"[392]  (Emphasis added)

510.    It is to be noted, however, that the *Charanne* tribunal recognised that the enquiry upon which it had embarked was necessarily limited:

> "*By reaching this conclusion, the Arbitration Tribunal obviously does not intend to prejudge in any way the conclusions that could be reached by another arbitration tribunal based on the analysis of all the regulations enacted to date, including the 2013 regulations, which, at the choice of the Parties, are outside the scope of the analysis submitted to this Tribunal.*"[393]

511.    Be that as it may, and to whichever of the two schools of thought individual members of the Tribunal might adhere, this Tribunal need not be detained by the decision of the majority of the *Charanne* tribunal, in that it has to consider in this case not only the totality of the Spanish legislative regime applicable to CSP installations, but it must also take account of the existence of specific commitments, outside the general legislation or general documentation.

512.    First, it is important to have in mind the procedure, which had been put in place and with which an investor seeking to benefit from the tariffs granted by Spain in RD661/2007 had to comply. The State guaranteed the stability of the benefits, if the investors fulfilled a certain number of conditions, both procedural and substantial, during a certain window of time. Specifically, the State undertook that it would offer to investors the possibility to continue to enjoy the existing benefits, provided that within a certain window of time, they did everything necessary to enable them to register in the RAIPRE. This was a very specific unilateral offer from the State, which an investor would be deemed to have accepted, once it had fulfilled the substantial condition of construction of the plant and the formal condition of registration within the prescribed "window."

---

[392] *Id.*, para. 497.
[393] *Id.*, para. 542.

513.    One of the elements of this procedure was the registration first in the Pre-Allocation Registry, then with the RAIPRE ("*Registro Administrativo de Instalaciones de Producción en Régimen Especial*"). The three Plants were duly registered with RAIPRE on 29 April 2011 (Gemasolar) and 22 December 2011 (Arcosol and Termesol) – that is to say, within the prescribed "window."

514.    The majority of the *Charanne* tribunal considered this to be a mere administrative requirement with no specific consequences*:*

> *509. In this regard, the Claimants have submitted that according to the existing regulatory framework, registration on the RAIPRE granted energy producers a vested right to receive the tariff, which provided a legitimate expectation that it would not be subsequently modified. The Tribunal does not agree with this argument.*
>
> *510. Firstly, the Respondent has convincingly proved that, under Spanish law, registration with the RAIPRE was a mere administrative requirement in order to be able to sell energy, and by no means implied that registered facilities had a vested right to a certain remuneration.*"[394]

515.    Such an analysis might be valid in the context of a general obligation of registration, but the circumstances in this case compel a different analysis.

516.    First, as far as the Pre-registration is concerned, each of the Plants received a specific letter dated 11 December 2009 addressed to it, the title of which was "*Resolution of the Directorate General for Energy Policy and Mines, through which the* [relevant Plant]*, is registered in the Pre-Allocation Registry for Compensation and to which to economic regime regulated in Royal Decree 661/2007, dated 25 May, is granted.*"[395]

517.    The indication that the Plant in question was to benefit from the guarantees of RD661/2007 is stated in express terms in each of the respective Resolutions, specifically addressed to each of the three Plants:

---

[394] *Id.,* paras. 509-510.

[395] **C-54**, 2009 Resolution Gemasolar; **C-55**, 2009 Resolution Arcosol; and **C-56**, 2009 Resolution Termesol, *supra* n. 8.

> "*In accordance with the provisions of Section 1 of the Fifth Temporary Provision of the aforementioned Royal Decree Law, **the economic regimen** for the facilities that are registered in the Pre-Allocation Registry for Compensation, in application of the provisions of the Fourth Temporary Provisions of the same, **will be as foreseen in Royal Decree 661/2007**, dated 26 September.*"[396] (Emphasis added)

518.    Second, on 1 December 2010, Torresol had sent three letters to the Ministry of Industry, Tourism and Business, Directorate General of Energy Policy and Mines in the names of Gemasolar,[397] Arcosol-50,[398] and Termesol,[399] respectively. Each of the letters set out its request that: *"[…] the compensation conditions for the facility **throughout its operating life** be communicated.*" (Emphasis added)

519.    Third, the Ministry of Industry, Tourism and Business answered these three requests, which sought specific clarification in respect of each facility as to the *"[…] compensation conditions for the facility **throughout its operating life** […]*" by sending a further three letters, each of which was addressed to one of the three Plants, by which it:

> "[c]*ommunicates that, currently, and by virtue of the provisions of section 1 of the fifth transitional provision of Royal-Decree-law 6/2009, dated 30 April, **the retribution applicable to the installations consists of the tariffs, premiums, upper and lower limits and supplements established in Royal Decree 661/2007**, dated 25 May […]*"[400] (Emphasis added)

520.    It would be difficult to conceive of a more specific commitment than a Resolution issued by Spain addressed specifically to each of the Operating Companies, confirming that each of the Plants qualified under the RD661/2007 economic regime for their "*operational lifetime.*"

---

[396] *Id.*

[397] **C-60**, 2010 Gemasolar Waiver and Request.

[398] **C-61**, 2010 Arcosol Waiver and Request.

[399] **C-62**, 2010 Termesol Waiver and Request.

[400] **C-65**, 2010 Resolution Gemasolar; **C-66**, 2010 Resolution Arcosol; **C-67**, 2010 Resolution Termesol, *supra* n. 10.

521.   Because of these specific commitments, and irrespective of whether the general provisions of RD661/2007 would be sufficient (as the first school of thought would contend was the case), the Tribunal concludes that, in any event, Claimant had legitimate expectations that the benefits granted by RD661/2007 would remain unaltered.

522.   On the facts of this case and by reason of the loss of the RD661/2007 regime and the rights accrued to Claimant thereunder pursuant to the Disputed Measures, the Tribunal finds that Respondent is in breach of its fair and equitable treatment obligations pursuant to Article 10(1) of the ECT.

## VIII.  DAMAGES

### A.  CLAIMANT'S POSITION

523.   Claimant alleges that it has suffered losses as a result of Spain's violations of Article 10 of the ECT. In its Memorial, Claimant states that its losses, as at 20 June 2014, amounted to EUR 165 million, comprising the net present value of: (a) losses sustained between December 2012 and 20 June 2014 of EUR 12 million; and (b) future lost cash flows as at 20 June 2014 of EUR 153 million.[401]

524.   Claimant notes that Respondent assumes no liability and that, on the basis of its But For model, it concludes that there would have been no loss in any event – in fact, it is suggested that Claimant makes more money under the new regime.[402]

525.   Claimant requests the Tribunal to order Respondent to make full reparation in accordance with the following ILC Articles: 1, 28 and 34 to 36 of Chapter Two.

526.   Claimant submits that Respondent should make restitution (by withdrawing "*the relevant articles of Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order*"),[403] or alternatively, it should compensate Claimant.

---

[401] Cl. Mem., para. 432.
[402] Tr. Day 1, Mr. Sullivan, p. 235, lines 1-16.
[403] Cl. Mem., para. 438.

527.    Claimant submits that the standard of damages applicable to a breach of Article 10 of the ECT is fair market value of the investment, more specifically, the difference in the fair market value of the investments with, and without, the Disputed Measures. In particular, Spain must compensate Claimant for the lost fair market value of its investments, comprised of lost historical and future cash flows.

528.    While the Parties agree that the correct basis of assessment is fair market value, they differ as to the approach to be adopted. Claimant asserts that Respondent's experts had consistently adopted a worst-case scenario basis. It was submitted by Claimant that the adoption of least favourable assumptions was not a fair market value analysis. The Parties differ, too, upon the use of a discounted cash flow analysis ("**DCF**") in this case. Claimant asserts that it is an appropriate case, because irrespective of any operating history, future cash flow can be predicted by reference to the tariff regime and the guaranteed offtake through priority of dispatch, and by making reasonable assumptions about the basis of operation of the Plants. With reference to Respondent's criticism on recourse to the DCF method, Claimant pointed out that "*Spain ignores that the DCF has been used by Spain itself in developing its projections. It was recommended in the CNE report, as I said before, on profiling of the FITs.*"[404]

529.    Brattle values the fair market value of Claimant's investments in the CSP projects as at 20 June 2014 using a DCF analysis, which:

> "[C]*ompares two scenarios, 'But For' and 'Actual.' In the But For scenario, Brattle assumes that the Disputed Measures were never implemented: the Claimant's investments continue to operate under the economic regime set out in RD 661/2007 for the entire operating life of the plants. The net present value of cash flows that would have been received in the But For scenario is then compared to the Actual scenario, which takes into account the full effect of the Disputed Measures. The damages due to the Claimant is the difference in net present value between the Claimant's cash flows with and without the Disputed Measures.*"[405]

---

[404] Tr. Day 1, Mr. Sullivan, p. 239, lines 20-23.
[405] Cl. Mem., para. 446.

530.    The two principal elements of the Brattle evaluation are:

- Claimant's lost cash flows between 27 December 2012 and 20 June 2014, measured as at 20 June 2014 (the "**Lost Historical Cash Flows**");

- Claimant's lost future cash flows as at 20 June 2014 (the "**Lost Future Cash Flows**").

531.    Claimant submits that: (i) a DCF analysis is the appropriate method in the present case; and that (ii) the date to be adopted by the Tribunal to determine the fair market value of its assets is 20 June 2014 ("[…] *the Claimants* [sic] *submit that in order to determine the appropriate valuation date, the Tribunal should consider when the Claimants* [sic] *suffered harm by reference to the 'irreversible deprivation' test, taking into account when the 'most serious damage' was caused to the Claimants* [sic]. *As explained in the next Section, the Claimants* [sic] *contend that the final act of the Spanish measures is the relevant date, namely 20 June 2014 when Ministerial Order IET/1045/2014 was published.* […] *20 June 2014 represents the ultimate act of a two-year legislative backlash against RE. On this date, 72% of the Claimant's investment is wiped out.*")[406]

532.    Brattle's valuation of Claimant's losses as at 20 June 2014, using a DCF analysis, is based on three steps:

- measuring Lost Historical Cash Flows: "*Applying the above assumptions to Brattle's financial model quantifies the difference in the total lost cash flows to the CSP Plants as EUR 30 million. The Claimant's portion of those lost cash flows is EUR 12 million (based on the Claimant's percentage shareholding in Torresol Energy which owns the Operating Companies);*"[407]

- measuring Lost Future Cash Flows: "*Brattle concludes that the present value of the debt and interest swap obligations in the But For scenario is EUR 741 million and EUR 631 million in the Actual scenario. The impact of the debt and interest rate*

---

[406] *Id.*, paras. 466 and 469(c).
[407] *Id.*, para. 474.

*swap obligations is to decrease the difference between the But For and Actual scenarios by EUR 104 million. Taking this into account gives an impact on the Final Equity Value of the CSP Projects of EUR 465 million;*"[408]

- accounting for Claimant's shareholding and illiquidity: Claimant submits that any valuation of the fair market value must take into account the value of the shareholder's loan provided by Claimant to Torresol Energy and its impact on the value of Claimant's equity in the CSP projects. In this respect, "*Brattle concludes that the Lost Future Cash Flows to the Claimant, as at 20 June 2014, amount to EUR 153 million. This amount, taken together with the Lost Historical Cash Flows, bring the Claimant's damages to EUR 165 million.*"[409]

533.    With its Reply, Claimant submitted:

    (i)    an updated (primary) calculation: Claimant notes that "[i]*n the Brattle Quantum Report, the total damages amount was EUR 165 million. This has been updated in light of debt restructuring in respect of the Arcosol and Teremesol* [sic] *plants, the project companies' ability to accelerate depreciation and generate a corresponding tax benefit, and to correct minor modelling errors.*"[410] Claimant summarises its updated primary damages claim as follows:

> "*Brattle compared the cash flows due to the Claimant under the But For and Actual scenarios. Then, taking the difference between the two scenarios, Brattle assessed the Claimant's lost cash flows to be* **EUR 179 million (excluding interest and a gross-up for tax).**"[411] (Emphasis added)

    (ii)    an alternative damages calculation: Claimant develops in its Reply an alternative DCF calculation, predicated upon Respondent's contention that Claimant's expectations were limited to "a reasonable return" on its investments, under RD661/2007, which, Claimant contends, corresponds to an after tax return of

---

[408] *Id.*, para. 491.
[409] *Id.*, para. 494.
[410] Cl. Reply, n. 820.
[411] *Id.*, para. 520.

9.5%.[412] As with their primary DCF calculation, Brattle takes the difference between the fair market value of Claimant's investments under the But For and Actual scenarios as at June 2014 to estimate Claimant's damages.[413] Basing its calculations on its preferred cost target, Brattle assessed Claimant's lost cash flows to be EUR 208 million (excluding interest and tax gross-up).[414]

534.    Claimant seeks an award by the Tribunal of both pre-award and post-award interest on the amounts due: "*In the present case, the Claimant submits that a rate that affords full reparation and that is a 'commercial rate established on a market basis' within the meaning of the ECT is Spain's borrowing rate, which for the relevant period is 1.60%, compounded monthly.* […] *The Claimant submits that the Tribunal should order post-award interest at a rate higher than 1.60% that should also be compounded on a monthly basis.*"[415]

535.    So far as tax is concerned, Claimant maintains that the Tribunal "*should therefore order compensation, including a tax gross-up of 25%.*"[416] In this respect, Mr. Sullivan clarified that: "*The question there revolves around whether Masdar will have to pay corporate tax on the award. It's unknown whether we will or not; the indication we have on instructions is that they probably will. Obviously you don't know until the time.* […] *But it's not a question of double recoveries; Masdar is not seeking a tax gross-up if it doesn't have to pay the tax.*"[417]

**B.    RESPONDENT'S POSITION**

536.    Respondent affirms that: (i) the Spanish regulatory, legal regime has always "*granted the same, a reasonable rate of return;*"[418] and (ii) Spain has not violated any ECT provision.

---

[412] *Id.*, paras. 663-685.

[413] *Id.*, para. 677.

[414] *Id.*, para. 685.

[415] Cl. Mem., paras. 501 and 502.

[416] *Id.*, para. 503.

[417] Tr. Day 1, Mr. Sullivan, p. 246, lines 14-24.

[418] Resp. C-Mem., paras. 1075-1076.

As a consequence, Respondent submits that no damages have been caused to Claimant and it requests the Tribunal to dismiss all the compensation claims.

537.    Respondent asserts that, in any event, the damages estimated by Claimant cannot be compensated due to their "*speculative*" nature, as Claimant's approach based on the "*But For*" and "*Actual*" scenarios "*disregards the fundamental concept of regularly useful life and avoids the joint consideration of past and futurible* [sic] *cash flows to guarantee the reasonable rate of return of the investments made.*"[419]

538.    Respondent criticises the Brattle Report, stating that it "*is opaque, not revealing nor providing the information used. Consequently, it cannot be checked or verified.*"[420]

539.    Respondent contests the application of the "*DCF method to calculate the market value, assuming the cash flows of the Thermosolar Plants for 37 years (until 2051).*"[421] Respondent maintains that doctrine and arbitration case law reject, under certain circumstances, speculative methods like DCF.[422] According to Respondent, in the present case:

> "[T]*here are certain circumstances which point towards both the inadmissibility and impossibility of using the DCF method: (a) The lack of sufficient financial record (less than five years) sustaining a minimally solid future forecast on cash flows. (b) The fact that this is a business which is capital intensive, with an important asset base. Virtually all its costs are investment costs on tangible infrastructures which were made recently (Plants finished in 2011-2012). There are no relevant intangibles to be valued. (c) The characteristics of the thermosolar industry itself: evolving, lacking the necessary maturity. And the groundbreaking technology worldwide of one of the Plants in particular, Gemasolar. (d) The high dependence on cash flows from exogenous elements which are volatile and unpredictable such as the pool price, inter alia. (e) The financial weakness of the non-recourse Project Finance structures agreed upon which excessively leveraged the Thermosolar Plants, compromising and placing constraints on their feasibility. (f) The long timeframe of the predictions, 37 years (until 2051) (g) The*

---

[419] *Id.*, para. 1083.
[420] *Id.*, para. 1107.
[421] *Id.*, para. 1090.
[422] *Id.*, para. 1093.

*contradiction between said time horizon and the working life declared in the official accounts of the Plants (between 20 and 25 years) and the monthly reports provided by the Claimant itself. (h) The clear time disproportion between the track record (background, less than five years) and the projections (37 years). (i) The disproportion between the alleged investments (and the pretended risk assumed) and the amount claimed."*[423]

In this respect, Counsel for Spain, Mr. Fernández affirmed that:

*"Were you to carry out a DCF exercise on the basis of correct parameters* [Respondent's experts had predicated their analyses upon a useful life of the Plants of 25 years]*, then the value of the investment of the Claimant instead of going down in fact would go up, and it's gone up by more than €12 million."*[424]

540. Respondent argues that the Tribunal should apply methods based on asset values,[425] *"examining whether they are recovered and reasonable profitability is obtained from them."*[426]

541. Respondent asserts that: (i) Claimant wrongly assumed as the basis for its damages calculations a useful life of 40 years for the Plants; (ii) Claimant has never had a useful life expectancy of the Plants of more than 25 years; (iii) the Plants have a maximum useful life of 25 years; (iv) Claimant's calculations have not taken into account renovations or their effect on the subsidies; and (v) Claimant's calculations are speculative, based on wrong technical and economic assumptions.[427]

542. With reference to the date of valuation chosen by Claimant (*i.e.* 20 June 2014), Mr. Fernández submitted that:

*"It is an absolutely arbitrary date. Mr. Sullivan, when he was speaking about the standards of compensation and fair market value, said it was the same standard in the case of expropriation and in the case of fair and equitable treatment. We don't agree on the*

---

[423] *Id.*, para. 1096.

[424] Tr. Day 2, Mr. Fernández, p. 174, lines 15-18.

[425] **R-308**, Respondent's Hearing Opening Presentation: Quantum, pp. 13 and 14.

[426] Resp. Rej., para 1431.

[427] *Id.*, paras 1437-1450.

> *date. The date must not be the same for the standard of*
> *expropriation or for the standard of FET. […] Why the*
> *compensation concerning fair market value can be applicable both*
> *for the expropriation standard and the FET standard?  Because the*
> *ECT in its Article 13 mentions the fair market value. We don't agree*
> *with the fact that the date of valuation could be the same. It is an*
> *arbitrarily chosen date. Under the FET, which is relevant, it is the*
> *fair market value at the most recent date. So normally what is*
> *applicable is the date of the award, while in the case of*
> *expropriation the date is the date of expropriation.*"[428]

543.    Respondent points out that, in any event, Claimant has received a "*reasonable return*" equal to 7.398%.[429]

544.    So far as pre-award and post-award interest is concerned, Mr. Fernández stated that: "*In the submissions yesterday* [the Claimant has] *said that the interest post-award – in the hypothetical case of an award – that we agreed that the interest should be higher than the pre-award. We disagree entirely, because in Article 36 of the Draft Articles it is stated that compensation interests are not allowed.*"[430]

545.    Respondent considers that Claimant's tax gross-up claim is manifestly unfounded for the following reasons: (i) the tax gross-up is precluded by Article 21 of the ECT which establishes a "*Tax Gross-Up carve-out*" and Spain cannot be liable for a tax measure of a different State (*i.e.* The Netherlands); (ii) any hypothetical compensation granted in the Award would be exempt from taxation in The Netherlands; (iii) the claim is essentially speculative, contingent and uncertain.

546.    Mr. Fernández had this to say:

> "*And one more sentence: the tax gross-up. Why should I mention*
> *that? Because it is €62.5 million; that's 50% of the total claim. And*
> *yesterday I was listening to Mr. Sullivan, who said that they didn't*
> *know if they had to pay or not tax in the Netherlands. He didn't know*
> *that. So it is a reckless claim, €62 million, really reckless. But I know*
> *you don't need to pay tax in The Netherlands. Why not? Because in*
> *the European Union there is a participation exemption. So to*

---

[428] Tr. Day 2, Mr. Fernández, p. 159, line 13 to p. 160, line 18.

[429] **R-308**, Respondent's Hearing Opening Presentation: Quantum, p. 10.

[430] Tr. Day 2, Mr. Fernández, p. 173, lines 3-9.

*prevent double taxation, the participation in benefits – as would be the case of an award – do not pay tax in the state of origin of the investment, in the state of origin.*"[431]

## C.    ANALYSIS

547.    The Tribunal has found Respondent liable for a breach of its obligations to treat Claimant's investments fairly and equitably according to Article 10 of the ECT and must now determine the appropriate means by which that breach is to be remedied. This is an issue in respect of which the Tribunal has been unable to reach an overall consensus as to its conclusions, which largely reflect the view of a majority of the Tribunal.

548.    Article 10 of the ECT sets forth no express provisions regarding remedies or reparations for breach of the Treaty's protection. In light of Article 10's silence, it is for the Tribunal to determine the remedies for breaches of Article 10. In these circumstances, the default standard provided by customary international law is appropriately applied.[432]

549.    Under international law, a State is obligated to make full reparation for the damage caused by its internationally wrongful act. This principle was articulated by the Permanent Court of International Justice in the *Chorzów Factory* case in the following terms:

> "*The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by the restitution in kind or payment in place of it – such are the principles which should serve to determine the*

---

[431] Tr. Day 2, Mr. Fernández, p. 173, lines 10-23.

[432] **CL-63**, S. Ripinsky & K. Williams, *Damages in International Investment Law* (British Institute of International and Comparative Law, 2008) (hereinafter "**Ripinsky & Williams**"), p. 89; **CL-44**, *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006 (hereinafter "**ADC**"), para. 483.

> *amount of compensation due for an act contrary to international law.*"[433]

550.    International arbitral tribunals have treated this principle as reflecting customary international law[434] and consistently applied it to investor-State disputes.[435] The ILC Articles also codified the *Chorzów Factory* principle, requiring that States responsible for an internationally wrongful act make full reparation for the moral and material injury caused (Article 31).[436]

551.    The drafting history of the ILC Articles, and particularly their provisions regarding reparation, indicates that these provisions reflect a general consensus on international principles of State responsibility.[437] The status of the principles set out in the ILC Articles as customary international law is also undisputed between the Parties.[438] Consequently, the Tribunal considers that the principles on reparation set out in the ILC Articles are applicable for determination of the appropriate remedies for Respondent's breach of the Treaty.

552.    Applying these principles, the Tribunal is unanimous in its conclusion that Claimant is entitled to full reparation of the damage caused by Respondent's breach of the ECT's FET standard. This is the standard prescribed by the *Chorzów Factory* principle and by Article 31(1) of the ILC Articles, which the Tribunal considers fully applicable here.

---

[433] **CL-1**, *Case Concerning the Factory at Chorzów* (Claim for Indemnity), Merits, 13 September 1928, PCIJ Series A, No. 17, p. 47.

[434] **CL-44**, *ADC*, *supra* n. 432, paras. 484-494.

[435] **CL-63**, Ripinsky & Williams, *supra* n. 432, p. 89. *See* references cited in **CL-44**, *ADC*, *supra* n. 432, paras. 484-494.

[436] *See* **CL-181**, ILC Articles, *supra* n. 179, Commentary to Art. 31, para. 3: "*The obligation placed on the responsible State by article 31 is to make 'full reparation' in the Factory at Chorzów sense. In other words, the responsible State must endeavour to 'wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed' through the provision of one or more of the forms of reparation set out in chapter II of this part.*" (footnote omitted).

[437] Ripinsky & Williams, *supra* n. 432, pp. 32-33.

[438] Cl. Mem., para. 434; Resp. Rej., para. 70.

(1)     **Restitution**

553.    The Parties disputed whether full reparation should be made through restitution (and additional compensation) or, alternatively, solely through compensation.

554.    Claimant requests the Tribunal to order Respondent to make full reparation in accordance with Articles 1, 28, 34, 35 and 36 of the ILC Articles, seeking primarily restitution of the legal and regulatory regime under which it made its investments.[439] Accordingly, Claimant submits that Respondent should make restitution (by withdrawing "*the relevant article of Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order* […] *and together with such restitution, compensate the Claimant for all losses suffered prior to the reinstatement of the original regulatory regime*"),[440] or alternatively, should the Tribunal deem restitution materially impossible or excessively burdensome, Respondent should be directed to make monetary compensation to Claimant.[441]

555.    As its primary request for relief, Claimant applies to the Tribunal to order Respondent to restore the RD661/2007 regime. Claimant cites Article 35 of the ILC Articles, which provides that:

> "*A State responsible for an internationally wrongful act is under an obligation to make restitution, that is, to re-establish the situation which existed before the wrongful act was committed, provided and to the extent that restitution:*
>
> *(a) is not materially impossible;*
>
> *(b) does not involve a burden out of all proportion to the benefit deriving from restitution instead of compensation.*"[442]

556.    In response, Respondent asserts that (i) the Spanish regulatory, legal regime has always "*granted the same, a reasonable rate of return;*"[443] and (ii) denies any violation of the

---

[439] Cl. Mem., paras. 433–438; Cl. Reply, para. 519.

[440] Cl. Mem., para. 438. *See also*, Cl. Reply, para. 519.

[441] Cl. Mem., para. 439; Cl. Reply, para. 519.

[442] **CL-181**, ILC Articles, *supra* n. 179, Art. 35.

[443] Resp. C-Mem., para. 1075.

ECT.[444] As a consequence, Respondent submits that no damages have been caused to Claimant and it requests the Tribunal to dismiss all Claimant's claims for compensation.

557.   The Tribunal is unpersuaded by these submissions on behalf of Respondent; as discussed above, the Tribunal has already concluded that Respondent breached its obligation to afford Claimant's investments fair and equitable treatment by reason of Respondent's abrogation of the RD661/2007 regime. The decisive issue, in light of that breach, is what is the appropriate reparation for which Respondent is accountable.

558.   Pursuant to Article 35 of the ILC Articles, restitution is the primary remedy for reparation of wrongful acts under international law. Nonetheless, Article 35 of the ILC Articles also provides that pecuniary compensation is the appropriate remedy for an internationally wrongful act where restitution appears materially impossible or disproportionally burdensome. The ILC Commentary clarifies that this balancing of public and private interests is based on considerations of equity and reasonableness, "*although with a preference for the position of the injured State in any case where the balancing process does not indicate a clear preference for compensation as compared with restitution*."[445]

559.   The Tribunal takes the view that, in the present case, juridical restitution should not be granted. As discussed below, that is because doing so would unduly burden Respondent's legislative and regulatory autonomy, and would potentially benefit numerous parties not protected by the ECT (or otherwise).

560.   Similarly situated tribunals have denied restitution of regulatory regimes. The tribunal in *LG&E*, where claimants requested an order compelling Argentina to reinstate the legislative framework in place prior to the dispute, rejected that request, declaring that:

---

[444] *Id.*, para. 1076.

[445] *See* **CL-181**, ILC Articles, *supra* n. 179, Commentary to Art. 35, para. 11: "*This applies only where there is a grave disproportionality between the burden which restitution would impose on the responsible State and the benefit which would be gained, either by the injured State or by any victim of the breach. It is thus based on considerations of equity and reasonableness, although with a preference for the position of the injured State in any case where the balancing process does not indicate a clear preference for compensation as compared with restitution. The balance will invariably favour the injured State in any case where the failure to provide restitution would jeopardize its political independence or economic stability.*" (footnote omitted).

> "*The judicial restitution required in this case would imply modification of the current legal situation by annulling or enacting legislative and administrative measures that make over the effect of the legislation in breach. The Tribunal cannot compel Argentina to do so without a sentiment of undue interference with its sovereignty. Consequently, the Tribunal arrives at the same conclusion: the need to order and quantify compensation.*"[446]

561.    Similarly, confronted with an analogous claim for restitution of the RD661/2007 regime, the *Eiser* tribunal denied restitution on similar grounds, explaining that it did "*not question Respondent's sovereign right to take appropriate regulatory measures to meet public needs, potentially including revision of the RD 661/2007 regime.*" Instead, the tribunal ordered Spain to provide compensation for any breach of its commitments under the ECT.[447]

562.    The Tribunal comes unanimously to the same conclusion as the *LG&E* and *Eiser* tribunals. Ordering Respondent to reinstate its pre-breach legislative and regulatory framework would involve a disproportionate burden compared to the benefit it potentially yields to Claimant. As set out above, Article 35(b) of the ILC Articles exempts responsible States from their primary obligation to make restitution when restitution is disproportionately burdensome compared to the benefit which would be gained.

563.    In the present case, this balance favours Respondent's exercise of its legislative and regulatory autonomy to address public needs. Furthermore, implementation of an award of restitution would face obvious practical and enforcement obstacles, making its benefits to Claimant uncertain. Even if implemented, an arbitral award in such terms in favour of Claimant would materially affect Respondent's legislative authority and would benefit numerous parties not protected by the ECT (or otherwise), while imposing commensurate burdens on Respondent. Under these circumstances, the Tribunal does not regard an order for restitution as an appropriate remedy for Respondent's internationally wrongful act. That

---

[446] **CL-52**, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. The Argentine Republic*, ICSID Case No. ARB/02/1, Award, 25 July 2007 (hereinafter "*LG&E*"), para. 87.

[447] **CL-249**, *Eiser*, *supra* n. 196, para. 425.

remedy may, in the present dispute, be attained by the means of pecuniary compensation. The calculation of those monetary damages is addressed below.

### (2)    The DCF-Method is the Appropriate Calculation Method

564.    Although Claimant is not entitled to the primary remedy of restitution, which it seeks, it is entitled to full reparation of the loss that it has suffered from Respondent's breaches of the treaty. As discussed above, this principle of full reparation is reflected in the *Chorzów Factory* principle and in the ILC Articles.

565.    In particular, Article 36(1) of the ILC Articles codifies the requirements for full reparation, providing that "[t]*he State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.*"[448] Full compensation requires putting an investor into a position that would have existed but for the breach[449] – only damages not "*financially assessable,*"[450] such as moral damages are not covered by the principle set out in Article 36 of the ILC Articles.

566.    The Parties agree that, under the ECT, the appropriate standard for assessing full compensation for a breach of the FET standard is the reduction of the fair market value of Claimant's adversely-affected investment as a consequence of Respondent's breaches of the Treaty's FET protection.[451] The Parties disagree, however, on the appropriate method of calculation for determining the fair market value of Claimant's investments.

567.    As set out above,[452] Claimant takes the position that an income-based valuation, primarily based on DCF, constitutes the appropriate method to assess the fair market value of its investments. In contrast, Respondent contends that the DCF method, although widely

---

[448] **CL-181**, ILC Articles, *supra* n. 179, Art. 36.

[449] **CL-63**, Ripinsky & Williams, *supra* n. 432, p. 89.

[450] **CL-181**, ILC Articles, *supra* n. 179, Commentary to Art. 36, para. 1.

[451] Tr. Day 2, Mr. Fernández, p. 160, lines 9-18: "*Why the compensation concerning fair market value can be applicable both for the expropriation standard and the FET standard?  Because the ECT in its Article 13 mentions the fair market value.  We don't agree with the fact that the date of valuation could be the same.  It is an arbitrarily chosen date.  Under the FET, which is relevant, it is the fair market value at the most recent date.  So normally what is applicable is the date of the award, while in the case of expropriation the date is the date of expropriation.*"

[452] *Supra*, para. 531.

174

recognised,[453] is inappropriate in the circumstances here, due to its speculative nature. Respondent instead argues for an asset-based valuation ("**ABV**").

568.    In its written submissions, Claimant emphasises the Tribunal's discretion as to the selection of a valuation method.[454] It also submits that the DCF method should be adopted to calculate the fair market value of its investment. In the words of Claimant's damages expert, a DCF analysis is appropriate in the present case, because its flexibility allows "*regulatory risk to be properly accounted for by modifying the revenues that the Claimant will earn in light of the Disputed Measure*s."[455] Moreover, Claimant contends that the DCF method has emerged as the prevailing approach for the valuation of power plants. It further contends that its application to CSP projects is appropriate, due to the relative simplicity of their business model, which is limited to the production of electricity.[456] Applying this reasoning, Claimant and its expert calculate Claimant's damages primarily using a DCF method. Adopting an *ex post/ex ante* approach, Brattle calculates Claimant's Lost Future Cash Flows from June 2014 using the DCF method, while it calculates the Lost Historical Cash Flows using full hindsight and without discounting these amounts.[457]

569.    Respondent rejects Claimant's proposed DCF method of valuation, asserting that it is excessively speculative[458] and that "*said approach, setting against each the distinction between 'historic' and future flows disregards the fundamental concept of regulatory useful life and avoids the joint consideration of past and futurible* [sic] *cash flows to guarantee the reasonable rate of return of the investments made*."[459] Respondent also argues that "[t]*he complexity and subjectivity of the calculations carried out by Brattle* [Claimant's damages expert] *are shown in paragraph 472 and subsequent paragraphs*

---

[453] Tr. Day 2, Mr. Fernández, p. 166, lines 15-17; Resp. C-Mem., para. 1092.

[454] Cl. Mem., para. 452.

[455] *Id*., para. 456(a).

[456] Brattle First Quantum ER, paras. 36-39.

[457] *See* Cl. Mem., para. 453.

[458] Resp. C-Mem., para. 1081.

[459] *Id.*, para. 1083. *See also*, Tr. Day 2, Mr. Fernández, p. 161, lines 1-7.

*which endeavour to provide a summary and then explain the steps taken. Said complexity and subjectivity, per se, invalidates the method selected.*"[460]

570.    Respondent submits a number of academic authorities,[461] arbitral decisions[462] and domestic case law[463] upon which it seeks to rely as support for the proposition that the DCF method is inappropriate when, due to the circumstances of the case, its application would result in excessively speculative valuation results.[464] In its oral and written submissions, Respondent summarises these circumstances as follows: lack of sufficient track record to found a forecast of future cash flows, the capital intensive nature and large capital asset base of the business in which the investment is made, the fact that the investment is recent, the high dependency of calculations on volatile elements such as pool prices included in cash flows, excessively leveraged project financing, the long time frame of future predictions (until 2051), the lack of proportionality between the alleged investments and the claimed damages[465] and excessive fluctuations in production.[466]

571.    In these circumstances, Respondent submits that an asset or investment-based valuation method would be more appropriate to calculate the fair market value of Claimant's investments.[467] Respondent cites a number of academic authorities that, in its view, point towards the appropriateness of a calculation method based on the cost of the assets.[468]

572.    In addition, in order to "*substantiate the volatility of the method in this case and how wrong […] Brattle's calculation is,*"[469] Respondent instructed its damages expert, Accuracy, to

---

[460] Resp. C-Mem., para. 1091.

[461] **RL-61**, Ripinsky & Williams, *supra* n. 432, pp. 200, 201 and 227.

[462] Resp. C-Mem., para. 1102. Respondent cites Sabahi's analysis of *Metaclad v. Mexico* and *Wena v. Egypt*, in **RL-63**, B. Sabahi, *Compensation and Restitution in Investor-State Arbitration – Principles and Practice* (Oxford International Economic Law 2011) (hereinafter "**Sabahi**"), pp. 132-133.

[463] **R-145**, Judgment from the Third Chamber of the Supreme Court (24 September 2012), Sixth Legal Basis.

[464] Resp. C-Mem., paras. 1095-1103; Resp. Rej., paras. 1426-1436.

[465] Resp. C-Mem., para. 1096; **R-308**, Respondent's Hearing Opening Presentation: Quantum, p. 12; Tr. Day 2, Mr. Fernández, p. 165, line 3 to p. 168, line 23; Accuracy First Quantum ER, pp. 43-51.

[466] **R-308**, Respondent's Hearing Opening Presentation: Quantum, p. 16; Tr. Day 2, Mr. Fernández, p. 169, lines 18-25; Accuracy Second Quantum ER, pp. 57-59.

[467] Resp. C-Mem., paras. 1098-1102; Resp. Rej., paras. 1431-1432.

[468] Resp. C-Mem., para. 1098.

[469] Resp. Rej., para. 1451.

submit an alternative DCF calculation.[470] The result of that alternative DCF calculation, in the preparation of which Accuracy departed from some of Brattle's assumptions,[471] is that "*there would be no financial impact on the Claimant, but rather the new remuneration system would provide an additional return of €12.5 million.*"[472]

573.   Claimant rejects Respondent's arguments by asserting that (i) the objection *"that Brattle's calculations are too complex or detailed* […] *is clearly not a basis for rejecting the DCF method;*"[473] (ii) domestic case law rejecting the DCF methodology as a valuation method in a similar case is irrelevant in the context of this arbitration, since a State cannot plead provisions of its own law to justify a breach of its own obligations under international law;[474] (iii) investment-treaty jurisprudence generally favours a DCF methodology;[475] and (iv) "*Spain and Accuracy also make a number of arguments that, while framed as arguments for not using the DCF method in this arbitration, truly go to the question of whether the valuation results obtained by Brattle are robust and correct.*"[476]

574.   In essence, Claimant submits that "[w]*hether or not a DCF method is appropriate reduces to a single consideration, the certainty of future cash flows.* […] [I]*ssues of duration (of both the existing track record and the projection) and financial viability, to the extent they are relevant factors at all, all go to the question of whether the future cash flows determined by the expert are likely to eventuate.*"[477] Certainty of future cash flows, Claimant asserts, has been demonstrated by Brattle's analysis, which fully satisfies the required standard of proof.[478] Claimant also rejects Accuracy's ABV method on the grounds that it is

---

[470] Accuracy Second Quantum ER, para. 402.

[471] *Id.*, paras. 404-437; Resp. Rej., para. 1453.

[472] Accuracy Second Quantum ER, para. 436.

[473] Cl. Reply, para. 543.

[474] *Id.*, para. 537.

[475] *Id.*, para. 550.

[476] *Id.*, para. 547.

[477] *Id.*, para. 548.

[478] *Id.*, paras. 566-577.

inappropriate, because it fails to assume Respondent's liability for a breach and hence models a But For scenario that is essentially the same as the Actual scenario.[479]

575.    A majority of the Tribunal finds Respondent's arguments against the use of the DCF method unpersuasive. It is undisputed that both valuation methods – DCF and ABV – are widely accepted in valuation theory and are widely used by tribunals in investment treaty arbitrations.[480] There also is no presumption against (or disfavouring) the use of the DCF method; if anything, the DCF valuation method is presumptively appropriate, absent persuasive reasons making it inappropriate in particular cases.

576.    Moreover, Respondent's asserted benchmark for damage valuation – confidence approaching absolute certainty – is neither realistic, nor shared among valuation experts and commentators. Instead, academic authorities – including those submitted by Respondent – and arbitral practice[481] acknowledge that "*there is* uncertainty *associated with valuation and that it is unrealistic to expect or demand absolute certainty.*"[482]

577.    Calculation of damages inevitably involves assumptions about events that did not occur, and neither certainty nor standards of proof applicable to issues of liability are appropriate. Likewise, the fact that the DCF method implies more complex calculations than ABV methods cannot be considered as a circumstance that would *per se* rule out an income-based valuation. Whether a valuation method is appropriate or justified for the purpose of assessing the fair market value of losses caused by a State's internationally wrongful act

---

[479] **C-233**, Claimant's Hearing Opening Presentation, p. 236.

[480] Tr. Day 2, Mr. Fernández, p. 166, lines 15-17; Resp. C-Mem., para. 1092; Cl. Reply, para. 550.

[481] *See* **CL-53**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, para. 8.3.16; **CL-232**, *Khan Resources Inc., Khan Resources B.V. and CAUC Holding Company Ltd. v. Government of Mongolia*, UNCITRAL, Award on the Merits, 2 March 2015, para 375; **CL-75**, *Joseph C. Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011, para. 246: "*The Tribunal agrees that it is a commonly accepted standard for awarding forward looking compensation that damages must not be speculative or uncertain, but proved with reasonable certainty; the level of certainty is unlikely, however, to be the same with respect to the conclusion that damages have been caused, and the precise quantification of such damages. Once causation has been established, and it has been proven that the in bonis party has indeed suffered a loss, less certainty is required in proof of the actual amount of damages; for this latter determination Claimant only needs to provide a basis upon which the Tribunal can, with reasonable confidence, estimate the extent of the loss.*" (footnote omitted).

[482] **RL-61**, Ripinsky & Williams, *supra* n. 432, p. 189.

rather depends on the specific circumstances of the case.[483] There are "[n]*o hard and fast rules*" when it comes to valuation methods.[484] In the words of the tribunal in *Vestey Group*: "*the income-based and the asset-based methods* [...] *can be* [both] *used to set the FMV of an asset and should in principle yield similar results. However, there are circumstances which may render one method more appropriate than the other.*"[485]

578.    In this regard, the Tribunal disagrees with Respondent's criticism of Brattle's two-step income-based calculation involving reliance on actual data and assumptions for the measurement of the (undiscounted) Lost Historical Cash Flows and the Lost Future Cash Flows. As discussed above, the full reparation standard is intended to put the injured party in the position in which it would have found itself, but for the wrongful act. As other tribunals have found, and as Claimant submitted in its Memorial, to fulfil that aim, tribunals enjoy a wide margin of discretion as to which valuation method they adopt to quantify the compensation due to the injured party.[486] In the view of the Tribunal, Brattle's approach of using *ex post* information to calculate Lost Historical Cash Flows and *ex ante* information to calculate Lost Future Cash Flows is appropriate. In any event, Accuracy's criticism of the use of *ex post* information for the DCF calculation is unwarranted, because Brattle calculated the *discounted* cash flows (the Lost Future Cash Flows) using only *ex ante* information. Brattle relied on *ex post* information solely for the purpose of calculating the (*undiscounted*) Lost Historical Cash Flows. Therefore, Brattle followed the approach that Accuracy posited for the DCF calculation: "*In an* ex ante *approach, all cash flows generated since the Measures are projected flows and are discounted to the valuation date using a rate that includes the remuneration of the operational risk.*"[487]

---

[483] *Id.*, pp. 192-194; Sabahi, *supra* n. 462, pp. 107-108.

[484] **RL-61**, Ripinsky & Williams, *supra* n. 432, p. 194.

[485] *Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, 15 April 2016, para. 350.

[486] Cl. Mem., para. 452. *See, e.g.*, **CL-25**, *Wena Hotels v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on Annulment Proceeding, 5 February 2002, para 91; and **CL-70**, *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. The Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the Ad Hoc Committee, 25 March 2010, para. 146.

[487] Accuracy Second Quantum ER, para. 406.

579.    The Tribunal also considers Respondent's reliance on the findings of the Spanish Supreme Court with regard to valuation methods[488] unwarranted. Domestic case law is irrelevant to determining the calculation method for the fair market value of an investment under Article 10(1) of the ECT. While Respondent does not contend that the rulings of the Spanish Supreme Court justify the breach of its obligations under the ECT, it relies on the judgment as a "*plain and simple appraisal of the evidence*."[489] The Tribunal does not agree.

580.    The standard of compensation for a breach of Article 10(1) of the ECT, as well as the method of quantification of such compensation, are prescribed by international law, and are defined autonomously. When determining the method of valuation, it is inappropriate to rely on a domestic assessment, such as the rejection of the DCF method by a Spanish court. In particular, the refusal of the Spanish Supreme Court to apply an income-based valuation in a specific case is not, as Respondent submits "*pure appreciation of the factual elements of evidence,*"[490] which may be viewed in isolation, but reflects the specific rules and judgments of the Spanish legal order, and not those of the ECT.

581.    A majority of the Tribunal considers that the circumstances of the present case warrant use of the DCF method for assessing the fair market value of Claimant's investments. Respondent's principal objection against an income-based valuation method – the lack of certain future cash flows – is unwarranted. Although the Plants that Claimant invested in had only operated for a relatively short period of time prior to Respondent's adverse measures, it was clearly sufficient to generate adequate information for the calculation of future income, which could have been expected with reasonable certainty, thus qualifying as "*going concerns.*"[491]

---

[488] Resp. C-Mem., paras. 1086-1087; Resp. Rej., paras. 1426-1428. As an example of the Spanish Supreme Court's case law with regard to valuation methods in cases related to the modification of the remuneration regime of renewable energies, Respondent cites **R-145**, Judgment of the Third Chamber of the Supreme Court (24 September 2012), Appeal No. 60/2011, Sixth Legal Basis.

[489] Resp. Rej., para. 1428.

[490] *Id.*, para. 1428.

[491] **AMR-28**, World Bank Guidelines on the Treatment of Foreign Investment.

582.  Income-based valuation methods, such as DCF, have frequently been adopted when assessing the fair market value of businesses operating as going concerns.[492] Moreover, as the *Eiser* tribunal found in a similar case, power plants, such as Claimant's businesses, rely on a relatively simple business model – limited only to generating electricity, pursuant to generally stable parameters.[493] Both income generated and costs incurred are relatively predictable in the renewable energy sector.  Thus, Respondent's damages expert notes that "[t]*he sale of 100% of the Plant's production is guaranteed* – [m]*ore than 80% of the Plants' total income is subsidised,*"[494] while Claimant's damages expert explains that "*the costs and operating performance of power stations are easy to predict.*"[495]

583.  A majority of the Tribunal also finds Respondent's remaining objections to use of the DCF method unconvincing. Neither the fact that Claimant's businesses are capital intensive, nor the fact that they are supposedly financed with excessive leverage[496] precludes the use of the DCF method. These factors may affect how a DCF valuation is performed, but they do not provide grounds for refusing to adopt such a valuation method in the first place.

584.  Equally unpersuasive is Respondent's argument that other circumstances in themselves – including the alleged disproportion between the amounts invested and the claimed damages, an asserted high dependence on volatile elements included in cash flows, the long time frame of predictions (until 2051),[497] or fluctuations in production[498] – render use of the DCF method inappropriate. A majority of the Tribunal notes that these contentions are either the result of Brattle's particular damage valuation (the disproportion between

---

[492] **CL-67**, I. Marboe, *Calculation of Compensation and Damages in International Investment Law* (Oxford University Press, 2009) (hereinafter "**Marboe**"), p. 216; **CL-249**, *Eiser*, *supra* n. 196, para. 465.

[493] **CL-249**, *Eiser*, *supra* n. 196, para. 465.

[494] Accuracy's Hearing Presentation, p. 4.

[495] Brattle First Quantum ER, para. 38.

[496] Resp. C-Mem., para. 1096; **R-308**, Respondent's Hearing Opening Presentation: Quantum, p. 12; Tr. Day 2, Mr. Fernández, p. 167, line 7 to p. 168, line 23; Accuracy First Quantum ER, pp. 41-56. In any event, Claimant's project finances reflect reasonable commercial judgment.  At the Hearing, Respondent's fact witness confirmed that funding the high upfront costs of CSP-projects through project financing was a "*feasible*" option. *See* Tr. Day 3, Mr. Montoya, p. 58, lines 8-9.

[497] Resp. C-Mem., para. 1096; **R-308**, Respondent's Hearing Opening Presentation: Quantum, p. 12; Tr. Day 2, Mr. Fernández, p. 166, line 12 to p. 168, line 23; Accuracy First Quantum ER, pp. 41-56.

[498] **R-308**, Respondent's Hearing Opening Presentation: Quantum, p. 16; Tr. Day 2, Mr. Fernández, p. 169, lines 18-25; Accuracy Second Quantum ER, pp. 57-59.

Claimant's investment and the claimed damages) or factual assumptions that may be reviewed and corrected in applying a DCF valuation methodology. These factors do not imply that the DCF method as such is inappropriate in the present case.

585.   The Tribunal also sees no reason not to use a DCF valuation method because it requires estimates and predictions regarding future assets. Damages can very well be calculated on the basis of estimates as long as the underlying assumptions can be rationally justified. As the tribunal in *CMS* concluded, "*estimates need not be arbitrary or analogous to a shot in the dark; with the appropriate methodology and the use of reasonable alternative sets of hypotheses, it is possible to arrive at figures which represent a range of values which can be rationally justified* [...]."[499]

586.   Use of the DCF method in the present case also does not necessarily result in an overvaluation of Claimant's investment – a phenomenon referred to by Accuracy as the *Cinderella* effect[500] – nor necessarily yield disproportionate damages. This is evidenced by Accuracy's own DCF analysis, which, based on different factual premises, resulted in a positive future cash flow for Claimant's investment. At the Hearing, Respondent's expert stated: "*So, we did a DCF trying to avoid the Cinderella effect, trying to take factual figures, the least number of assumptions possible, and we have basically three areas of difference with Brattle*."[501] The result of Accuracy's alternative valuation evidences that the DCF method does not necessarily yield inflated valuations, but rather requires a careful analysis of the reasonableness of the factual assumptions and estimates used for such a calculation.

587.   For these reasons, a majority of the Tribunal is satisfied that it is appropriate to apply a DCF valuation methodology in calculating Claimant's damages. In doing so, it rejects Respondent's various critiques of the DCF methodology and adopts the approach of most other tribunals to the issue.

---

[499] **CL-39**, *CMS, supra* n. 267, para. 420.
[500] Accuracy First Quantum ER, p. 51.
[501] Tr. Day 4, Mr. Saura, p. 152, lines 2-5.

(3)    **Claimant's Claims for Damages**

588.    A majority of the Tribunal in principle accepts Claimant's primary DCF model and the assumptions contained in it. However, it also rejects various assumptions (discussed below) that served as a basis for Claimant's DCF calculation.

589.    Brattle's DCF model is comprehensively documented and applies well-recognized valuation principles and methodology. A majority of the Tribunal sees no reason to fault or criticise Brattle's basic methodology or most of its assumptions. Likewise, Respondent has not challenged the mechanics of Brattle's DCF model – it has confined its critiques to the DCF valuation as a whole, discussed above, and criticisms of particular assumptions, discussed below. In these circumstances, a majority of the Tribunal accepts Brattle's primary DCF model, set forth in its rebuttal report,[502] as a realistic and credible basis for valuing Claimant's loss, subject to the criticisms addressed below.

590.    A majority of the Tribunal next considers the principal assumptions that are required for application of Brattle's model. The Parties adopted significantly different positions with regard to a number of these assumptions, thus arriving at materially different views regarding Claimant's damages.

591.    Preliminarily, Claimant's expert submitted two calculations of Claimant's damages. In its first report, Brattle provided a DCF calculation based on a But For scenario in which the Disputed Measures were not adopted, compared with the Actual scenario, where the Disputed Measures were adopted.[503] In its rebuttal report, Brattle revised its initial calculations[504] and also submitted an alternative DCF calculation predicated upon Respondent's contention that Claimant's expectations were limited to "*a reasonable return*" on its investments.[505] The Tribunal finds the reasoning behind Brattle's alternative damage calculation misplaced. As the *Eiser* tribunal noted in an analogous case, "*Article*

---

[502] Brattle Second Quantum ER, paras. 20-27.
[503] Cl. Mem., Section 18.
[504] Brattle Second Quantum ER, paras. 20-27.
[505] Cl. Reply, Section 7.5; Brattle Second Quantum ER, Section X.

*10(1)* [of the ECT] *does not entitle Claimants to a 'reasonable return' at any given level, but to fair and equitable treatment.*"[506]

592.    Therefore, a majority of the Tribunal will consider Claimant's main damage calculation as updated by Brattle in its rebuttal report on damages.[507] That calculation results – depending whether a 25 or a 40-year plant life is posited – in the following alleged losses:

(a)    Assuming a 40-year plant life: Total Damages EUR 250 million[508]

i.    Damages for reduction in cash flow and fair market value: EUR 179 million;

ii.    Pre-award interest and tax gross-up: EUR 71 million.

(b)    In the alternative, assuming a 25-year plant life: Total Damages EUR 184 million[509]

i.    Damages for reduction in cash flow and fair market value: EUR 132 million;

ii.    Pre-award interest and tax gross-up: EUR 52 million.

The amount of pre-tax and pre-interest damages consists of Claimant's Lost Historical and Future Cash Flows.

593.    As to the Lost Historical Cash Flows, Claimant's damages expert asserts that, in the absence of Respondent's Disputed Measures, the CSP Plants it had invested in would have generated approximately EUR 50 million between December 2012 and June 2014.[510]

---

[506] *See* **CL-249,** *Eiser, supra* n. 196, para. 434.

[507] As noted *supra* in paragraph 533, in the rebuttal report on damages, Brattle updates its calculations from its first report on damages by accounting for debt restructuring for Valle I and Valle II and making adjustments based on the regulatory risk. Brattle concludes that the Disputed Measures reduced cash flows and the fair market value of Claimant's CSP assets by EUR 179 million as opposed to the amount of EUR 153 million as per its first report on damages. *See* Brattle Second Quantum ER, paras. 20-24.

[508] Brattle Second Quantum ER, paras. 24, 27.

[509] *Id.*, paras. 26-27.

[510] *Id.*, para 24, calculated from Table 1.

Consequently, given Claimant's 40% equity holding in the Plants, Brattle calculates Claimant's pre-20 June 2014 cash flow losses as EUR 20 million in its rebuttal report.[511]

594. Claimant summarizes Brattle's calculation of the lost historical damages, which it terms "Step One" of the damages valuation, as follows: "*Starting at 20 June 2014, Brattle looks back to the commencement of the Disputed Measures in December 2012, and calculates the cash flows accruing to the Claimant under both the But For and the Actual scenarios. This analysis has the benefit of the CSP projects' actual financial and operational data for that period. Brattle has been provided with cash flow spreadsheets and other data from the Claimant so as to ascertain the actual pre-June 2014 cash flows of each of the CSP Plants. Therefore, Brattle's assumptions within this first step only apply to the But For scenario. Brattle adopts the following seven assumptions to define the But For scenario in the period between December 2012 to June 2014.*"[512]

595. The assumptions on which Brattle bases its But For scenario between December 2012 and June 2014 include (i) that the FIT continues under RD661/2007 in the But For scenario, including for that portion of electricity generated using natural gas (up to 15%); (ii) that the Plants continue using natural gas for up to 15% of the total electricity produced and are able to achieve the same average pool prices for that portion of electricity generated from natural gas as from solar power; (iii) that, in absence of the 7% Levy, pool prices in the But For scenario should be lower than in the Actual scenario; (iv) that O&M costs in the But For scenario are the same as those incurred in the Actual scenario, save for those costs that would have been spent on natural gas. Brattle also takes into account tax liabilities and cash collection problems. [513]

596. The amount of Lost Historical Cash Flows measured by Brattle is the same, irrespective of whether one assumes a 25 or 40-year lifespan for the CSP Plants, but it is susceptible of

---

[511] *Id.*, p. 8, Tables 1 and 2. As discussed *supra* in n. 507, Brattle updated its calculations from its first report on damages. Brattle concludes in its rebuttal report on damages that the Disputed Measures would have reduced Claimant's Historical Cash Flows by EUR 20 million as opposed to the amount of EUR 12 million calculated in the first damages report. *See* Brattle First Quantum ER, para 23. In the Reply, Claimant only refers to Brattle's original calculation amounting to 12 million. *See* Cl. Reply, para. 538.

[512] Cl. Mem., paras. 472-473 (footnotes omitted).

[513] *Id.*, para. 473.

185

variation when a different valuation date is applied. Hence, for the assessment of Claimant's claimed Lost Historical Cash Flows, the valuation date represents a crucial parameter.

597.    While Claimant's Lost Historical Cash Flows, as calculated by Brattle, are based on both actual data and assumptions, the calculation of Claimant's Lost Future Cash Flows, "Step Two" of the damages valuation, depends, in addition to the assumptions underlying the calculation of the historical losses, on a series of further assumptions allowing for the future cash flows to be discounted to the valuation date, *i.e.* using the DCF methodology. The Parties and their experts disagreed about a number of these assumptions, or in Mr. Saura's (Accuracy) words, there are "*areas of difference with Brattle.*"[514]

598.    At the Hearing, Claimant's and Respondent's experts summarised these points of disagreement regarding their respective DCF calculations, as involving the following three categories of assumptions: (i) Plant life-time, (ii) Expected Revenues, and (iii) Risk Profile.[515] The first two categories refer to assumptions adopted by Brattle to measure Claimant's lost cash flows (both historical and future), while the third category refers to assumptions adopted to account for regulatory risk and marketability of Claimant's investment interests. Although the Tribunal agrees with these three broad categories of disputed issues, as identified by Claimant's and Respondent's damages experts, it also considers it necessary to consider the impact of the Levy on the Plants' expected revenues and to determine the appropriate valuation date, as that impacts the length of time for which the cash flows are discounted.

599.    A majority of the Tribunal will therefore assess the reasonableness of the four categories of factual assumptions set out above – Discounting Period (*i.e.* valuation date), Projection Period (*i.e.* plant lifetime), Expected Revenues and Risk Profile – and provide its reasoning and conclusions on these issues. It will then use the resulting assumptions in Brattle's primary calculation model.

---

[514] Tr. Day 4, Mr. Saura, p. 152, lines 2-5.

[515] Accuracy's Hearing Presentation, pp. 34-36; **BQR-118**, Brattle's Hearing Presentation on Quantum, p. 4.

### (4)    Lost Future Cash Flows: Analysis of Assumptions Underlying the DCF Model

600.    A majority of the Tribunal next considers the four categories of assumptions underlying Brattle's DCF model.

### a.   Discounting Period: Valuation Date

601.    A DCF calculation consists of two main steps: projecting out revenues into the future (the projection period), and discounting that cash flow back to the valuation date (the discounting period). These two periods are limited by two crucial dates, both in dispute between the Parties: the valuation date for the discounting period and the remaining useful life of the assets for the projection period. The valuation date determines the point in time relative to which the fair market value of an asset is assessed.[516] The choice of the valuation date is crucial, especially when applying a DCF methodology, because it generally limits information to be taken into account to that available at that date.[517]

602.    Claimant submits that the appropriate valuation date to measure its cash flows is 20 June 2014. According to Claimant, the relevant date for valuation purposes is to be determined by reference to the "*irreversible deprivation*" test applied by arbitral tribunals in cases of indirect expropriation.[518] In cases of breaches other than expropriation, Claimant argues that the "*irreversible deprivation*" would find its equivalent at the moment when the "*most serious damage*" was caused to Claimant.[519]

603.    Claimant contends that considering the impact of each of the Disputed Measures on Claimant's investments, the "*most serious damage*" corresponds to the final one of the Spanish measures, Ministerial Order IET/1045/2014 published on 20 June 2014, which assertedly resulted in 72% of Claimant's investment being wiped out.[520] Consequently, Claimant's damages expert uses an *ex post* approach to calculate the historical cash flows between 27 December 2012 and 20 June 2014, and an *ex ante* approach to calculate the

---

[516] **RL-61**, Ripinsky & Williams, *supra* n. 432, p. 243.

[517] **CL-67**, Marboe, *supra* n. 492, paras. 3.250-3.251; **RL-61**, Ripinsky & Williams, *supra* n. 432, p. 243.

[518] Cl. Mem., paras. 458-461.

[519] *Id.*, paras. 462-466.

[520] *Id.*, paras. 458-469.

187

future cash flows (in both scenarios, Actual and But For) for the remaining useful asset life and then discounts those cash flows back to a present value at 20 June 2014.[521]

604.   In contrast, Respondent disputes the 20 June 2014 valuation date, which it contends is a *"date chosen at random by the Claimant as the valuation date."*[522] For its DCF calculation, Respondent's damages expert chose *"31 December 2012, the commencement of the Measures in dispute, as the valuation date instead of 20 June 2014."*[523] Accuracy submits that by "[u]*sing a* [valuation] *date subsequent to the implementation of the Measures,*" Claimant's damages expert effectively followed an *ex post* approach to the financial impact assessment.[524] Accuracy argues that the circumstances of the case – the recent introduction of the Disputed Measures and the brief operating history of the Plants before the valuation date chosen by Brattle – support an *ex ante* approach because, by using only information available at the earlier valuation date, no subjective elements are introduced.[525]

605.   The Tribunal concludes that the circumstances of the case support Claimant's valuation date. The Tribunal considers Claimant's proposed application of an *"irreversible deprivation test"* to cases of non-expropriatory breaches convincing. As a number of tribunals have concluded, and Claimant correctly argues, this date provides a reasonably ascertainable point in time, capable of consistent and objective application in FET cases,[526] just as it does in expropriation cases.[527]

606.   Further, as set out above,[528] Claimant is entitled to full reparation for Respondent's breach of the ECT's FET standard. In this regard, Claimant's valuation date is better suited to

---

[521] Tr. Day 3, Mr. Caldwell, p. 130, line 21 to p. 131, line 5.

[522] Resp. C-Mem., para. 1082.

[523] Accuracy Second Quantum ER, para. 408.

[524] *Id.*, para. 404.

[525] *Id.*, para. 407.

[526] **CL-51**, *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, para. 405; **CL-43**, *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, para. 417.

[527] **CL-7**, *International Technical Products Corporation and ITP Export Corporation v. The Government of the Islamic Republic of Iran*, 9 Iran-United States Claims Tribunal 206, Final Award, 28 October 1986; **CL-17**, *Compañía del Desarrollo de Santa Elena S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, para. 78.

[528] *See supra*, para. 552.

provide such compensation as it uses hindsight and historical experience until Ministerial Order IET/1045/2014 implemented the new regime. As Claimant's expert observed at the Hearing: "*We choose a valuation date of June 2014. Why? Because that's when the parameters for the new regime are finally defined and enable us to forecast what remuneration is going to be under the new regime.*"[529]

607.    In contrast, Accuracy's earlier valuation date requires departing from a pure *ex ante* approach by resorting to hindsight for certain parameters, including those relative to the new regime and to regulatory risk.[530] When addressing the illiquidity discount, Accuracy's Mr. Saura explained: "*My market liquidity – well, let's say I am considering the actual scenario. So the liquidity discount or liquidity level must be considered once the measures are really in effect, because you don't know what will be the impact of those measures on the liquidity levels. We are trying to measure what is more liquid, a market with measures or without measures. So what's the impact on the liquidity? And we have to review what's happening now, you know, in the meantime, since the enactment of those measures.*"[531] In a majority of the Tribunal's view, this explanation casts serious doubt on Accuracy's claim that a pure *ex ante* approach is more appropriate in the circumstances of the present case than Brattle's *ex post/ex ante* approach.

608.    In a majority of the Tribunal's view, Brattle's approach is not only better suited to provide Claimant full compensation, but also displays greater consistency in the use of hindsight. The Tribunal finds therefore Claimant's valuation date, 20 June 2014, appropriate for the purpose of evaluating the impact of the Disputed Measures on Claimant's investments.

### b.  Projection Period: Useful Asset Life

609.    The Parties disagree over the useful asset life to be used in the DCF projection period. As set out above,[532] in its rebuttal report on damages, Claimant's expert submitted two

---

[529] Tr. Day 3, Mr. Caldwell, p. 130, lines 15-19.

[530] Tr. Day 5, Mr. Saura, pp. 42-43. *See also* Tr. Day 3, Mr. Caldwell, p. 138, lines 17-21: "*The difficulty with moving to 2012 is that the valuation use hindsight in some places -- you have to import the parameters for the new regime, they import a view of regulatory risk from the future -- but then they ignore hindsight in other respects.*"

[531] Tr. Day 5, Mr. Saura, p. 48, lines 7-16.

[532] *See supra*, para. 592.

calculations, one assuming an operational life of 40 years for the CSP Plants that Claimant invested in and another considering a 25-year plant life.[533]

610.    To justify the 40-year operational life, Brattle relies on experience from U.S. CSP projects,[534] an IRENA Report on CSP-Technology,[535] and a 2008 European Commission Staff Working Document,[536] which in its view confirm that CSP Plants have a useful life of 40 years. Claimant also asserts that projecting an operational life of 40 years for the Plants is reasonable because the Special Regime envisaged that CSP Plants would operate beyond 25 years.[537]

611.    Respondent rejects Claimant's projection of a 40-year operational life for the CSP Plants, contending that Brattle's assumption contradicts "*all evidence, and* [is] *without any rational foundation*"[538] and results in "*artificially extending the hypothetical financial impact.*"[539] Respondent asserts that the CSP Plants' useful life is limited to 25 years.[540]

612.    Respondent relies on a number of documents introduced by Claimant in this arbitration, including financial models prepared by Claimant for financing purposes[541] and technical due diligence reports on the CSP Plants at issue commissioned by Claimant.[542] Respondent submits that, because those documents assume an operational life of 25 years at most for the CSP Plants, Claimant itself could not expect the Plants it invested in to have a "*useful*

---

[533] Brattle Second Quantum ER, paras. 24-27.

[534] Brattle First Regulatory ER, para. 77, n. 71; **BRR-46**, *National Renewable Energy Laboratory – TroughNet Parabolic Trough Solar Power Network, U.S. Parabolic Trough Power Plant Data* (19 September 2014).

[535] Brattle First Regulatory ER, para. 77; n. 71; **BRR-11**, *The International Energy Agency-Energy Technology Systems Analysis Programme and IRENA Report, Concentrating Solar Power-Technology Brief E10* (January 2013), pp. 3-4.

[536] Brattle Second Regulatory ER, para. 145, n. 254; **BRR-156**, EC Report, *Commission Staff Working Document Accompanying The Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions – Second Strategic Energy Review - An EU Energy Security and Solidarity Action Plan, Energy Sources, Production Costs And Performance Of Technologies For Power Generation, Heating And Transport*, Brussels, SEC(2008) 2872 (13 November 2008), p. 16.

[537] Cl. Mem., para. 478 (d).

[538] Resp. Rej., para. 1438.

[539] *Id*., para. 1438.

[540] *Id*., para. 1437.

[541] **BQR-60**, Arcosol Financial Model; **BQR-61**, Termesol Financial Model; **BQR-62**, Gemasolar Financial Model.

[542] Resp. Rej., para. 1441; **AMR-38**, Lahmeyer International, Due Diligence, *Solar Tres, Central Solar Térmica con Receptor Central de Torre 17MW España* (October 2008); **C-43**, 2008 BNP Report, p. 43.

*life expectancy*" beyond those 25 years.[543] Moreover, Respondent relies on the conclusions of its expert, Mr. Jorge Servert, setting out that "*under the assumption of a correct design and operation, the expected lifetime of the* […] *power Plants will be 25 years.*"[544] Finally, Respondent contends that Brattle's calculations failed to take into account the fact that beyond 25 years of operation, essential components of the CSP Plants would have to be replaced, resulting in a substantial modification which would end the application of RD661/2007 and its benefits.[545]

613.    The Tribunal considers Respondent's projection of a 25-year operational life for the CSP Plants that Claimant invested in persuasive. At the outset, the Tribunal notes that, in contrast with Respondent's reliance on contemporaneous documents bearing a direct relationship with the Plants at issue (as well as on the analysis of an expert engineer in solar technology), Claimant did not introduce contemporaneous contractual documents or present fact or expert witnesses able to support its contention regarding the projected 40-year life of the CSP Plants. Only Claimant's witness, Mr. Raul García, who did not testify at the Hearing, briefly asserted in his written witness statement that the Alatec due diligence report specified an operational life of 25 to 30 years.[546] Instead, Claimant's position relies almost exclusively on a very limited number of generic reports which are unrelated to the Plants at issue and which do not account for their specific design.

614.    The Tribunal agrees with Mr. Servert's view[547] that, given their generic scope and the general statements on CSP technology they contain, the IRENA Report and European Commission Staff Working Document are of very limited guidance for a projection of the operational life of particular CSP Plants.[548] In contrast to Brattle's analysis of these generic documents, Mr. Servert's analysis relied on the conclusions of technical due diligence

---

[543] Resp. Rej., paras. 1439-1441.

[544] Servert Valle ER, p. 27 and Servert Gemasolar ER, p. 28.

[545] Resp. Rej., paras. 1447-1448.

[546] García WS, para. 15. Mr. García's witness statement was withdrawn from the record. *See supra* para. 57. However, as Mr. Servert notes in his expert reports, when referring generally to a 25 to 30-year operational life for CSP Plants, the Alatec due diligence report does not consider the design criteria of the CSP Plants at issue, but only gives a general account of the value chain of a CSP plant. *See* Servert Valle ER, p. 19 and Servert Gemasolar ER, p. 20.

[547] Tr. Day 4, Mr. Servert, p. 122, lines 18-24; Tr. Day 4, Mr. Servert, p. 124, lines 7-15.

[548] *See also* Accuracy Second Quantum ER, para. 319.

commissioned by Claimant for the CSP Plants at issue that explicitly concluded that "*25 years of lifetime is a correct assumption taking into account the above mentioned risks* [whether the main elements except the tower can withstand 25 years of lifetime with an elevated number of operating hours]."[549] If anything, the technical advisor's conclusions indicate that an operational life of 25 years for the CSP Plants at issue is an optimistic estimate.

615.     Claimant asserts that the technical due diligence on the CSP Plants was for the purpose of obtaining loans for the construction of the Plants that were due to be repaid over a period of 20 years – apparently suggesting that the technical advisor's main concern would have been coming to a conservative life-time estimate covering the repayment period.[550] The Tribunal cannot agree with this contention. If, as Claimant argues, a 40-year operational life was a realistic estimate for the Plants at issue, there is no apparent reason why the technical advisor would not have stated that estimate in the same cautious terms he concluded that a useful life of 25 years was a correct assumption.

616.     Moreover, the Tribunal finds Mr. Servert's analysis of the due diligence reports consistent with his technical analysis of the operational life of the CSP Plants' components. At the Hearing, he explained convincingly that essential elements of the Plants Claimant had invested in, including vacuum tubes, heliostats, receiver and steam turbines, whose replacement would go beyond contractually covered operation and maintenance, had a design life of 25 years or less.[551] In essence, according to Mr. Servert's testimony, the only original component of the Plants that would remain after 25 years would be the chimney constructed of concrete.[552] Mr. Servert also asserted: "*Power plants are designed for a lifetime of around 25 years. That is what we do, and that is what I have seen in all projects of solar power plants.*"[553]

---

[549] Servert Gemasolar ER, p. 20.

[550] Tr. Day 4, Mr. Francis, p. 85, lines 3-5.

[551] Tr. Day 4, Mr. Servert, p. 75, line 1 to p. 79, line 24; p. 101, line 6 to p. 103, line 25.

[552] Tr. Day 4, Mr. Servert, p. 75, line 1 to p. 77, line 20.

[553] Tr. Day 4, Mr. Servert, p. 124, lines 15-17.

617. In contrast, Mr. Caldwell admitted at the Hearing that "[u]*ltimately, we are not CSP technology experts, so I can't independently tell you whether 25 or 40 is the right number* [...] *So that's why in our rebuttal report we split it out and give you a 25-year case and a 40-year case*."[554] Moreover, Mr. Caldwell confirmed that the main reason for assuming a 40-year operational life was the fact that the Special Regime took into account that plants would operate beyond 25 years.[555] He admitted that Brattle's knowledge about CSP plants life-times was the fruit of "*stud*[ying] *numerous CSP plants* [...] *and talk*[ing] *to an expert who indicated to us that 40 years was a reasonable thing*."[556] As Mr. Caldwell noted, Claimant decided not to present this expert, upon whose indications, Brattle, experts in damage valuation with no technical expertise in life-time analyses,[557] partially based their assumptions.

618. Claimant bears the burden of proof regarding this assumption of its damage valuation. It nonetheless did not present an expert in solar or CSP technology who supported the 40-year operational life contention. As discussed above, the weight of the evidence that is in the record contradicts Claimant's assumption. Having assessed all the evidence presented, the Tribunal is of the view that a lifespan of 25 years is a reasonable assumption.

### c.  Revenues

619. The second category of disputed assumptions concerns the revenues of the CSP Plants, which Brattle termed the "But For standard" at the Hearing.[558] Accuracy takes issue with Brattle's forecasts, including the assumptions regarding use of the tariff option, the Plants' electricity production and gas usage.[559] In summary, the Parties' experts disagree on which of the scenarios contemplated in Claimant's financial models should provide the basis for the Plants' revenue forecasts for the But For scenario.[560]

---

[554] Tr. Day 4, Mr. Caldwell, p. 33, lines 9-19. *See also id.*; p. 34, lines 6-8.

[555] Tr. Day 4, Mr. Caldwell, p. 32, lines 11-13.

[556] Tr. Day 4, Mr. Caldwell, p. 32, lines 13-15.

[557] Tr. Day 4, Mr. Caldwell, p. 34, lines 6-7.

[558] **BQR-118**, Brattle's Hearing Presentation on Quantum, p. 12.

[559] Accuracy Second Quantum ER, paras. 264 and 416.

[560] **BQR-60**, Arcosol Financial Model; **BQR-61**, Termesol Financial Model, and **BQR-62**, Gemasolar Financial Model.

620.  Furthermore and as outlined above,[561] Claimant's damages expert also applied the Levy on all income obtained through electricity production from 1 January 2013 in the Actual scenarios for both the Historical and Future Lost Cash Flows[562] and adjusted the electricity prices in the But For Scenario under the assumption that absent the Levy, "*prices would have been somewhat lower than in reality,* [reducing] *average pool prices by half of the 7%, reflecting an expectation that 50% of a 7% tax would be pass-through in pool prices.*"[563]

(i)    Impact of the Levy

621.  The Tribunal has concluded that it does not have jurisdiction to entertain claims arising out of the introduction of the Levy.[564] In order to account for the Tribunal's lack of jurisdiction with respect to the Levy, its impact must be eliminated from the damages calculation. Therefore, the Levy and its impact on the electricity prices both need to be factored out.

(ii)   Revenue Forecast

622.  To provide a basis for the Plants' revenue forecasts for the But For scenario, Claimant's damages expert submits that it updated one of Claimant's financial models, namely the "base case" or "expected low scenario,"[565] and consequently adopted the pool + premium FIT option, a 15% gas usage and a P50 electricity production scenario as the assumptions for its DCF valuation.[566] In contrast, Respondent's damages expert based its forecasts for the CSP Plants' revenues on Claimant's "guaranteed scenario" and assumed the fixed FIT option, a 12% gas usage and a P80 production scenario.[567]

---

[561] *See supra*, para. 595.

[562] Cl. Mem., paras. 473(c) and 478 (b).

[563] Brattle First Quantum ER, paras 29, 57.

[564] *See supra*, paras. 280 *et seq.*

[565] Brattle uses the "*Expected Low*" scenario for the Valle I and II Plants and "*Precios Mercado*" for the Gemasolar Plant (Brattle Second Quantum ER, n. 73) and applies a valuation uplift at *Valle I* and *Valle II*, and a valuation discount at Gemasolar to take into account production levels turned out higher than originally expected at Valle I and Valle II, and lower than expected at Gemasolar. *See* Brattle Second Quantum ER, para. 108.

[566] Cl. Mem., para. 478 (d); Cl. Reply, para. 571(e); **BQR-118**, Brattle's Hearing Presentation on Quantum, p. 13.

[567] Accuracy's Hearing Presentation, p. 35; Accuracy Second Quantum ER, para. 222.

623.    Respondent contends that among the "*scenarios proposed in the original investor model (6 scenarios),* [it] *consider*[s] *that the most conservative model must be used for reasons of prudence given that this is the scenario that is most likely to come about. In this case, it corresponds to the scenario referred to as the 'Guaranteed' one by Masdar.*"[568] Respondent asserts that, as regards the production estimates, the "guaranteed scenario" is not overly prudent, because actual production data has shown that Gemasolar failed to reach the production level considered in the "guaranteed scenario."[569]

624.    At the Hearing, Mr. Saura contended that using the conservative guaranteed scenario "*we used the financial models. Basically we used what BNP recommended the investor to do. Basically we took a fact, which is that we don't know if under any other assumption these plants would have actually existed, because that was the assumption taken by the banks to finance the project, and it actually was contingent to this assumption. So any other assumption is speculative, in our opinion; and this is, I would say, more reasonable and factual data.*"[570] Likewise, Accuracy submits that it would be excessively speculative to model the pool + premium FIT option as does Brattle in its *ad hoc* scenario since it would imply projecting "*the electricity pool price over more than a 20-year period, even more so when there is no sufficiently extensive pool price record, no correlation with macroeconomic data and the available market projections do not go beyond 2020.*"[571]

625.    Claimant and its damages expert argue that what Accuracy selected as its "guaranteed scenario" was in fact a "downside scenario" which reflects the bank's concerns with debt sustainability in adverse circumstances, rather than the fair market value of Claimant's investment interest.[572] Brattle also suggests that the assumptions underlying that scenario are unrealistic because (i) it would only make sense for investors to choose the fixed FIT option, rather than pool + premium FIT, if the average pool price would fall below EUR 17/MWh, but in 2015 the average pool price amounted to EUR 50/MWh, (ii) Plants were

---

[568] Accuracy Second Quantum ER, para. 262.

[569] *Id.*, para. 416.

[570] Tr. Day 4, Mr. Saura, p. 152, lines 15-23.

[571] Accuracy Second Quantum ER, para. 416.

[572] Tr. Day 1, Mr. Sullivan, p. 236, lines 7-24; **BQR-118**, Brattle's Hearing Presentation on Quantum, p. 12.

permitted to use 15% gas, and (iii) the Plants' production was likely to exceed the production forecast 80% of the time.[573]

626. Brattle criticises Accuracy's focus on the "guaranteed scenario," arguing that this model is overly conservative.[574] Brattle contends that "*the guaranteed scenario reflected the minimum production guarantee provided by the EPC contractor, the fixed FIT, 12% production using gas and a 25 year useful life. Masdar's financial models contained further scenarios, such as 'Expected Low', 'Expected Central', 'Expected High', 'Hybrid per Year', and 'Hybrid Theoretical'. These scenarios reflected production in excess of the guarantee level, the pool price plus premium tariff option, 15% production using gas, and a useful life in excess of 25 years through the inclusion of a terminal value.*"[575]

627. A majority of the Tribunal does not consider Accuracy's rationale for relying on the "guaranteed scenario" convincing. That scenario was highly conservative, reflecting a lender's desire for security even in very pessimistic circumstances. A majority of the Tribunal instead regards Brattle's updated "Expected Low" scenario as a realistic, contemporaneous projection for the Plants' production and the tariffs that could be earned from that production, in particular because it includes both upwards and downwards adjustments to the original investor expectations in production levels, in light of actual production levels in the past few years[576] – limited, however, to the remaining useful asset life as determined above.

628. Nonetheless, as regards the selection of the tariff option, a majority of the Tribunal cannot entirely follow Claimant's reasoning. There are two factors that create uncertainty as regards the assumption relating to the selection of the tariff option in the But For scenario (where, absent the enactment of the Disputed Measures, both fixed FIT and pool + premium FIT options were available to CSP producers): the lengthy projection period for electricity pool prices and the likelihood of Claimant selecting either tariff option.

---

[573] **BQR-118**, Brattle's Hearing Presentation on Quantum, p. 13.

[574] Brattle Second Quantum ER, para. 101

[575] *Id.*.

[576] *Id.*, para. 108.

629. Respondent's damages expert, when asked whether he believed that the investor would choose the option that it believed will provide the highest remuneration, explained that investors had convincing reasons for choosing the fixed FIT option over the pool + premium FIT option: "*Not just higher remuneration, but it would also opt for the solution – it would be weighing that against risk, like any investor would do. The pool plus premium option means that a part of the revenue stream depends on the pool price, right? So there is greater variability. That's the economic principle at work here. When you've got a fixed tariff, then there's a lower level of risk. It's not just that you're making more with one option or the other, but there's also an exchange, there's a trade-off between the remuneration and the risk associated with that option.*"[577] However, Mr. Saura later admitted that in the past CSP producers had unanimously elected the pool + premium FIT option when available.[578] Given this, the Tribunal generally accepts the assumption that Claimant, as virtually all the other CSP producers had done in the past, would have elected the pool + premium FIT option but for the Disputed Measures.

630. However, the Tribunal considers that selecting the pool + premium FIT option as a projection parameter for the approximately 23 years of remaining useful asset life would be overly speculative because it would imply projecting electricity pool prices over a period of more than 20 years. The Tribunal notes that Claimant did not present evidence contradicting Accuracy's objection that uncertainty of macroeconomic data and available market projections beyond 2020 would result in an excessively speculative projection. The Tribunal also notes the very significant difficulties that would arise from efforts to project electricity pool prices 10 or 20 years in the future.

631. A majority of the Tribunal considers that limiting the projection period for an assumption that Claimant would select the pool + premium FIT option to a 7.5-year period and, subsequently, for the Plants' remaining operational life, projecting the fixed FIT option, strikes the most plausible balance between the requirement for full reparation and the bar against speculative claims. Using the pool + premium FIT option as a projection parameter

---

[577] Tr. Day 4, Mr. Saura, p. 161, line 19 to p. 162, line 5.
[578] Tr. Day 5, Mr. Sullivan/Mr. Saura, p. 47, lines 15-18: "*Q. Do you agree with me that, as a matter of course, CSP producers were electing the premium option when it was available? Isn't that right? A. Yes.*"

for the first 7.5 years of the But For Scenario, that is from the beginning of the Plants' operational life to the end of December 2018, is, even according to Respondent's own assertions – market projections being available until 2020 – not excessively speculative.

632.    A majority of the Tribunal adopts a projection of the Plants' revenues based on Brattle's revised "Expected Low" scenario. On the other hand, it adopts in this scenario the pool + premium FIT option for calculation of revenues from June 2011 (the start of the operational life of the Plants) to December 2018 and the fixed FIT option for the Plants' remaining useful asset life.

### d.  Risk Assessment

633.    Finally, the Parties disagree in their assessment of risk in the Actual and the But For scenarios. While Brattle assumes a higher regulatory risk in the Actual than in the But For scenario, Accuracy contends that the Disputed Measures have lowered the regulatory risk and therefore assumes a higher regulatory risk for the But For scenario.[579] The Tribunal addresses this issue below.

#### (i)  Illiquidity Discount

634.    Brattle's final step in its DCF calculation consists of reflecting the relatively illiquid nature (and hence lack of marketability) of Claimant's investment by applying a discount.[580] Specifically, assuming that Claimant would be likely to sell its investment within six months (trade restriction period) and assuming a 30% share price volatility as of June 2014, Brattle calculates a maximum liquidity discount of approximately 18%.[581]

635.    Brattle applies that same 18% discount rate to both its Actual and But For scenarios. Brattle contends that there are persuasive reasons to apply a higher discount rate to the Actual scenario, since the regulatory risk arising from the Disputed Measures should raise asset price and equity volatility, both factors justifying a higher discount. Brattle thus submits

---

[579] **BQR-118**, Brattle's Hearing Presentation on Quantum, pp. 4 and 18; Accuracy's Hearing Presentation, p. 36.
[580] Brattle First Quantum ER, paras. 160-161.
[581] *Id.*, Appendix I, para. 222.

that they "*conservatively apply the same 18% discount to the Actual and But For scenarios in spite of reasons to suspect an increase in equity volatility.*"[582]

636. Accuracy objects to Brattle's illiquidity discount on the basis that Brattle applies the same rate to both their Actual and But For scenarios. Accuracy considers that "[i]*n the absence of adjustment Measures, the unsustainable situation in the electricity system would significantly reduce the possibility of the Claimant of finding a buyer.*"[583] As a consequence, according to Respondent, the discount rate for the But For scenario should be higher than the discount rate in the Actual scenario.

637. Accuracy uses the same model as Brattle in its calculations, but applies its valuation date of December 2012 and assumes that a reasonable trade restriction period would be one year for the But For scenario and three months for the Actual scenario. As a result, taking into account the volatility of these comparable assets in 2012, Accuracy reasons that the illiquidity discounts should be 35.0% for the But For scenario and 16.7% for the Actual scenario.[584]

638. As to the disputed valuation date, the Tribunal detailed above why the appropriate date is 20 June 2014.[585] While both experts acknowledged that the length of the restriction periods they respectively considered is an assumption,[586] a majority of the Tribunal is persuaded by the rationale underlying Brattle's assumption that an increased regulatory risk in the Actual scenario would tend to raise asset price and equity volatility, translating in a higher discount rate. The majority of the Tribunal does not accept Respondent's argument that the increase in transaction volume on the Spanish renewable energy market in the years following the enactment of the Disputed Measures evidences a shorter restriction period in the Actual scenario. The majority of the Tribunal notes that accepting Respondent's

---

[582] *Id.*, para. 167.

[583] Accuracy Second Quantum ER, para. 431.

[584] *Id.*, para. 433.

[585] *See supra*, paras. 605 *et seq.*

[586] Tr. Day 5, Mr. Saura, p. 46, lines 16-19.

position uses the benefit of hindsight,[587] which is incompatible with its *ex ante* valuation approach.

639.    Furthermore, the evidence submitted by Respondent for an increase in transaction volumes after the enactment of the Disputed Measures supports Brattle's contention that the Disputed Measures implied an increase in equity volatility. A 2015 Press Release states that "*a recent Report of E&Y placed in Spain amongst the leading countries in Europe in transaction volumes, but said that the attractiveness of the assets is due to the deterioration they have suffered in the last years. Some experts say the transfer of assets is loss-made by the seller, who is very rushed by the debt.*"[588] Likewise, a 2013 article, published by the Spanish newspaper Cinco Días, states that: "*The role of banking in a reform that is creating a lot of uncertainty could be that of assuming the cost of possible bankruptcies of many photovoltaic thermal solar or cogenerating facilities. Another twist to the story is that the Spanish Photovoltaic Union (UNEF) says it 'would not be able to meet debt service payments and would have to hand over the keys of the plants to the banks.' It cannot be ruled out that the Government could make them refinance.*"[589]

640.    Moreover, a majority of the Tribunal accepts Brattle's testimony that the regulatory risk due to the Disputed Measures increased rather than, as Accuracy contends, decreased in the Actual scenario. According to the majority, given the enactment of the Disputed Measures in breach of investors' legitimate expectations, there can be, if anything, only greater uncertainty as to whether Respondent will make use again of its regulatory authority to modify the regulatory regime. This is evidenced by the 2014 Fraunhofer/Ecofys report "*Design Features of Support Schemes*" submitted by Claimant and which states: "*In contrast, numerous abrupt and unpredicted changes in several support schemes, as they have taken place lately, are counterproductive to an effective and efficient support scheme. First, they decrease the overall transparency of market conditions in Europe, thus generally raising transaction costs for investors. Sudden changes in policies are perceived*

---

[587] Tr. Day 5, Mr. Saura, p. 48, lines 7-16.

[588] **R-287**, Expansion, *Renewable Energy Resumes its Momentum in Spain* (17 October 2015), p. 1.

[589] **BRR-86**, Cinco Días, *The Ministry of Industry Announces that the Financial Sector Will Also Pay the Bill of the Electricity Reform* (10 June 2013), p. 1.

*by investors as 'policy and regulatory risk' (Klessmann et al. 2013: 394). This results in higher capital costs, thus in higher required support and ultimately in decreased efficiency of the overall support scheme.*"[590]

641.    In the view of a majority of the Tribunal, Respondent offered no valid explanation as to why regulatory risk would decrease in the Actual scenario and increase in the But For scenario, other than that the financial sustainability of the Spanish electricity system was at risk prior to the enactment of the Disputed Measures and that, as evidenced by rating agencies, this risk decreased once the measures were enacted.[591] As Claimant's expert testified at the Hearing, this reasoning is flawed. Accepting Accuracy's premise would require assuming that the Disputed Measures were Respondent's only way to address the tariff deficit and that they did not only contribute to the sustainability of the Spanish electricity system but to the overall improvement in government finances that Respondent has experienced since 2012.[592]

642.    For these reasons, a majority of the Tribunal considers Brattle's illiquidity discount rate of 18% for both Actual and But For scenarios a reasonable – indeed, conservative – parameter to be applied to Claimant's Lost Future Cash Flows.

(ii)    Discount Rate

643.    Both Brattle and Accuracy agree that the discount rate calculation consists of four components: risk-free rate, asset beta, market risk premium, and unsystematic risk premium.

644.    The Parties' damages experts agree on the method of calculating the risk-free rates and asset betas, albeit they differ on the appropriate valuation dates to apply. Accuracy also

---

[590] **C-106**, Ecofys, *Design Features of Support Schemes for Renewable Electricity* (27 January 2014), p. 24 (PDF p. 31).

[591] Accuracy's Hearing Presentation, p. 36.

[592] **BQR-118**, Brattle's Hearing Presentation on Quantum, p. 18.

contested the 5.5% market risk premium used by Brattle, pointing out that the study Brattle relies upon reports the rate as 4.5%.[593]

645.    The Tribunal has previously adopted Brattle's chosen valuation date (*i.e.* 20 June 2014), and it therefore adopts Brattle's risk-free rate and asset beta. With regard to the market risk premium, the Tribunal agrees with Accuracy that the study relied upon by Brattle reports a worldwide risk premium of 4.5%, and it accordingly adopts this as the market risk premium.

646.    The main point of disagreement between the Parties' damages experts lies in the unsystematic risk or regulatory risk premium. Here again, the central area of contention is the different allocation of regulatory risk to the Actual and But For scenarios. Claimant and its damages expert contend that the enactment of the Disputed Measures has increased the regulatory risk in the Actual scenario,[594] while Respondent contends the opposite.[595]

647.    Both Parties' experts acknowledge that their disagreement centres on the existence and causes of regulatory risk.[596] The arguments submitted by the Parties reproduce the contentions addressed by the Tribunal when deciding on the illiquidity discount: Respondent's expert submits that the But For scenario should take into account the continuous degradation of the sustainability of the Spanish electricity system, and therefore an increasing probability of default, while the Actual scenario should take into account the gradual recovery of credibility of the system.[597]

648.    At the Hearing, Claimant's expert objected that Accuracy's theory assumes that the Disputed Measures caused the entire improvement in Spanish government finances since 2012 and that it further assumes that the But For scenario was inherently unstable with the Disputed Measures being the only possible solution to the tariff deficit.[598] Furthermore,

---

[593] Accuracy Second Quantum ER, para. 422 referring to the study **BQR-8**, *Equity Premia Around the World* by Dimson, Marsh and Staunton (7 October 2011).

[594]    **BQR-118**, Brattle's Hearing Presentation on Quantum, pp. 17-18; **C-236**, Claimant's Hearing Closing Presentation, p. 81.

[595] **R-308**, Respondent's Hearing Opening Presentation: Quantum, p. 19; Accuracy's Hearing Presentation, p. 36.

[596] Tr. Day 3, Mr. Caldwell, p. 141, lines 7-10; Tr. Day 5, Mr. Saura, p. 38, lines 11-19.

[597] Accuracy Second Quantum ER, para. 411.

[598] Tr. Day 3, Mr. Caldwell, p. 144, lines 1-9.

Claimant's expert testified that Accuracy's inversion of risk contradicts the *raison d'être* of the discount rate: "[W]*hat you are really doing with regulatory risk is you are discounting the promised flows for the risk that Spain might adjust them later. That's effectively discounting the but-for for the risk that Spain is going to reduce the promises under the original regime, just as it has done, and why we are here*."[599]

649.    Having concluded that Respondent's allocation of regulatory risk in the Actual and But For scenarios is unpersuasive, a majority of the Tribunal is satisfied with Brattle's calculation of the discount rate, based on an increased regulatory risk in the Actual scenario.

### (5)    Lost Historical Cash Flows

650.    As set out above,[600] Claimant's Lost Historical Cash Flows, which its damages expert quantifies in EUR 20 million, are undiscounted cash flows between January 2013 and 20 June 2014, calculated on the basis of both actual data and assumptions. In its written submissions, Respondent did not substantively engage with Claimant's claim for Lost Historical Cash Flows. Respondent's objections to Brattle's calculation of Claimant's Lost Historical Cash Flows were limited to general criticisms of Brattle's valuation method.[601] A majority of the Tribunal has discussed – and rejected these objections – above.[602]

651.    More importantly, the economic regime established by Respondent between 6 and 20 June 2014 in RD413/2014 and Ministerial Order IET/1045/2014 had retroactive effect. In order to compensate Claimant for losses that it incurred, as a consequence of the retroactive application of RD413/2014 prior to the valuation date, the lost profits resulting from RD413/2014's regime must be taken into account.[603] Not doing so would ignore a

---

[599] *Id.*, lines 10-16.

[600] *See supra*, paras. 593-597.

[601] Resp. C-Mem., para. 1083.

[602] *See supra*, para. 578.

[603] Furthermore, the historic losses also reflect the economic impact that the Disputed Measures adopted before 20 June 2014 (*see* Cl. Mem., paras. 22-27, 213-225, the "Initial Disputed Measures") had on Claimant's revenues (including the reduction to nil of the value of the premium under RD661/2007, the withdrawal of the incentives for electricity produced using natural gas, and the replacement of the inflation adjustment index, but excluding the Levy and its impact on electricity prices, *see supra*, para. 621).

significant consequence of Respondent's wrongful conduct and fail to provide Claimant full compensation.

652.    As to the measurement of the Lost Historical Cash Flows, the majority of the Tribunal sees no reason to question the validity of the information on which Brattle based its Actual scenario. The same conclusion applies to the assumptions underlying the But For scenario for Claimant's historical losses. These assumptions are compatible with the majority of the Tribunal's findings regarding the DCF assumptions underlying the Lost Future Cash Flows.

**(6)    Conclusion**

653.    In accordance with its findings, a majority of the Tribunal must determine the amount of compensation due, recognising as noted by the *Eiser* tribunal "*that in a case of such scope and complexity damages cannot be determined with mechanical precision.*"[604] As regards Claimant's Lost Historical and Future Cash Flows, a majority of the Tribunal adopted Brattle's primary valuation model and the following assumptions:

> (a)    Valuation date: 20 June 2014

> (b)    Illiquidity Discount

654.    A majority of the Tribunal however also adjusted the following assumptions:

> (a)    Plants' useful life: 25 years

> (b)    Expected Revenues: Based on Brattle's "Expected Low" scenario, applying the pool + premium FIT option from the beginning of the Plants' operational life until December 2018, and the fixed FIT option from January 2019 until the end of the Plants' operational life

> (c)    Impact of the Levy: Eliminating the impact of the Levy, including the effects on the electricity prices

---

[604] *See* **CL-249**, *Eiser*, *supra* n. 196, para. 473.

> (d)    Discount rate: Using a market risk premium of 4.5%

655.    Applying these adjusted assumptions to Brattle's valuation model,[605] the resulting Lost Historical Cash Flows amount to EUR 14.34 million and Lost Future Cash Flows to EUR 50.16 million. As a result, a majority of the Tribunal concludes that Claimant is entitled to an award of compensation in the amount of EUR 64.5 million.

### (7)    Tax Gross-Up

656.    As set out above,[606] the Parties also disagree on whether the amount of any damages awarded should be increased on account of future tax that Claimant would be required to pay in its home jurisdiction.

657.    The Tribunal notes that neither of the Parties has made a substantial effort to engage with this claim in their written submissions. In its Memorial, Claimant limits itself to asserting that any amounts received by it would be subject to corporate tax at 25% in The Netherlands. Since any damages should place Claimant in the same position it would have enjoyed but for the wrongful measures, the amount of any tax liability that may be incurred as a result of the Award must be anticipated by adjusting the damages upward accordingly.[607] Claimant relies exclusively on Brattle's interpretation[608] of a "Tax Advice"[609] provided by Claimant's counsel.

658.    Claimant's tax gross-up claim was addressed in equally terse fashion by Respondent in its Counter-Memorial when it stated that it would "*wholly reserve the right to make ulterior objections to the calculation of compensation requested, amongst them:* [...] *the inappropiate* [sic] *tax gross-up.*"[610] It is only in its Rejoinder that Respondent substantively grappled with the tax gross-up claim, contending that it is manifestly unfounded for the following reasons: (i) the tax gross-up is precluded by Article 21 of the ECT which

---

[605] **BQR-110**.

[606] *See supra*, paras. 535 and 545.

[607] Cl. Mem., para. 503.

[608] Brattle First Quantum ER, para. 176.

[609] **BQR-81**, Letter from John Brouwer of Allen & Overy LLP to the CEO of Masdar Solar & Wind Coöperatief U.A. (19 January 2015) (hereinafter "**Tax Advice Letter from Allen & Overy Netherlands**").

[610] Resp. C-Mem., para. 1079.

establishes a "*Tax Gross-Up carve-out*"[611] and Respondent cannot be liable for a tax measure of a different State (*i.e.* The Netherlands);[612] (ii) any hypothetical compensation granted in the award would be exempt from taxation in The Netherlands;[613] and (iii) the claim is essentially speculative, contingent and uncertain.[614]

659.    Claimant's counsel confirmed at the Hearing the uncertainty of a Dutch levy on any award: "*The question there revolves around whether Masdar will have to pay corporate tax on the award. It's unknown whether we will or not; the indication we have on instructions is that they probably will. Obviously you don't know until the time.*"[615] During cross-examination, Brattle's expert (Mr. Lapuerta) stated that he had included the tax gross-up upon Counsel for Claimant's instructions on the basis of the tax advice he was provided. He confirmed that his report did not include the accuracy of the underlying tax advice, he was not a tax expert and thus not qualified to give expert testimony on any substantive tax issues.[616]

660.    The Tribunal concludes that Claimant failed to provide sufficient evidence for an actual future obligation imposed by its home jurisdiction to pay taxes on an award paid by a foreign government. The "Tax Advice" on which Brattle bases the inclusion of a tax gross-up in its calculations does not give a categorical answer to the "*question […] whether an award granted for the loss in value of shares in Torresol might be exempt from Dutch tax under the Dutch participation exemption.*"[617]

**(8)    Interest**

661.    As to interest on damages for a breach of the FET under the ECT, and given that Article 10 of the ECT does not set out a standard for the calculation of interest, the Tribunal looks to the rule set out in Article 13 of the ECT which provides that "[c]*ompensation shall also include interest at a commercial rate established on a market basis from the date of*

---

[611] Resp. Rej., paras. 1464-1471.

[612] *Id.*, paras. 1472-1473.

[613] *Id.*, paras. 1474-1476.

[614] *Id.*, paras. 1477-1481.

[615] Tr. Day 1, Mr. Sullivan, p. 246, lines 14-18.

[616] Tr. Day 4, Mr. Lapuerta, p. 49, line 12 to p. 51, line 9.

[617] **BQR-81**, Tax Advice Letter from Allen & Overy Netherlands.

*expropriation until the date of payment*."[618] Having already applied Article 13's standard for the purpose of damage valuation, it is also appropriate to apply Article 13 when calculating interest owed.

662.    Claimant requests both pre-award and post-award interest on any amount due. For the pre-award interest, Claimant considers "*that a rate that affords full reparation and that is a 'commercial rate established on a market basis' within the meaning of the ECT is Spain's borrowing rate, which for the relevant period is 1.60%, compounded monthly.*"[619] According to Brattle, it is appropriate to calculate interest at Respondent's borrowing rate because "[b]*y delaying compensation, Spain has exposed Masdar to the same risks as investors who have loaned money to Spain. Spain's borrowing rate reflects the compensation demanded by market participants for bearing those risks* [the risk of Spanish sovereign default]."[620] As *dies a quo* for the period of interest, Brattle chooses June 2014, ostensibly referring to the valuation date, 20 June 2014.[621]

663.    Since post-award interest serves purposes beyond compensation of damages *stricto sensu* – such as encouraging prompt compliance with the award – Claimant requests from the Tribunal to order a post-award interest at a rate higher than 1.60%, also compounded monthly.[622]

664.    Respondent's expert, Accuracy, agrees with Brattle in reference to the Spanish debt rate, but rejects "*the term of the bond chosen by Brattle (10 years)*" arguing that "*the reference rates must be that of the 2- or 3-year Spanish government bonds*" resulting in "*applicable rates at the date amounted to 0.601% and 0.906% (2-year and 3-year Spanish bonds, respectively).*"[623] As to the post-award interest requested by Claimant, Respondent stated its opposition to a higher rate for post-award interest.[624]

---

[618] *See* **CL-249**, *Eiser, supra* n. 196, para. 475.

[619] Cl. Mem., para. 501.

[620] Brattle First Quantum ER, para. 173.

[621] *Id.*, paras. 22 and 170; Brattle Second Quantum ER, para. 25.

[622] Cl. Mem., para. 502.

[623] Accuracy Second Quantum ER, paras. 501-504.

[624] Tr. Day 2, Mr. Fernández, p. 173, lines 3-9. *See supra*, para. 544.

665.  The majority of the Tribunal has had regard to the decisions of the tribunals in *Maffezini*[625] and *Metalclad*,[626] which awarded compounded interest, both pre- and post-award. In those cases, a higher (monthly, as opposed to annual) rate was applied in respect of post-award interest in order to encourage prompt settlement of the award. In *Eiser*, the tribunal applied monthly compound rates in respect of both pre- and post-award interest, but at a lower rate pre-award, in order to "*facilitate prompt payment.*"[627] That, in the view of the majority, is the appropriate course to follow here. It awards Claimant pre-award interest at a rate of 0.906% from the valuation date, 20 June 2014, to the date of this Award, compounded monthly, and post-award interest at a rate of 1.60% from the date of this Award to the date of payment, also compounded monthly.

## IX.  THE APPLICATION OF THE PRINCIPLE OF JUDICIAL ECONOMY WITH RESPECT TO CLAIMANT'S OTHER CLAIMS FOR BREACH OF ARTICLE 10(1) OF THE ECT

666.  Claimant maintains two additional claims for breach of Article 10(1) of the ECT – *see* paragraph 390 above. In particular, Claimant submits that Respondent breached the non-impairment standard[628] and the "umbrella clause", including the obligations undertaken by Spain in RD661/2007 and the 28 December 2010 ministerial resolutions ("**Other Claims**").[629]

667.  The Tribunal has taken careful note of the Other Claims, which rely on the very same facts and arguments as the claim pertaining to FET. The Tribunal has found that Respondent breached the FET standard under Article 10(1) of the ECT. In light of that finding, the Tribunal concludes that judicial economy militates against any need to address the Other

---

[625] **CL-19,** *Emilio Agustin Maffezini v. Kingdom of Spain*, ICSID Case No. ARB/97/7, Award, 13 November 2000, para. 97.

[626] **CL-18**, *Metalclad Corporation v. United Mexican States***,** ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, para. 131.

[627] **CL-249**, *Eiser*, *supra* n. 196, para. 478.

[628] Cl. Reply, paras. 492-493.

[629] *Id.*, paras. 494-518.

Claims; even if the Tribunal decided in favour of Claimant with respect to the Other Claims, the quantum of Claimant's damages would not be increased.

668.    The principle of judicial economy has been widely applied in similar circumstances in a number of cases which have been the subject of ICSID arbitration proceedings[630] and it was recently reaffirmed in the *Eiser* case:

> "*As other Tribunals have observed, considerations of economy — both jurisprudential and financial — may lead a tribunal to conclude that it need not address issues extraneous to those essential to its decision.*"[631]

## X.    RESPONDENT'S APPLICATION TO REOPEN THE ARBITRAL PROCEDURE

669.    On 6 March 2018, Respondent submitted an application (the "**Respondent's Application**") by which it requested the Tribunal to reopen the Arbitral Procedure pursuant to Article 38 of the ICSID Rules of Procedure for Arbitration Proceedings. It sought leave to introduce into the record:

(i)     the judgment rendered on 6 March 2018 by the Court of Justice of the European Union (the "**CJEU**") in *Slowakische Republik (Slovak Republic) v. Achmea BV* (the "***Achmea* Judgment**");[632] and

(ii)    the EU Commission's decision C(2017)7384 regarding the Spanish State Aid Framework for Renewable Sources, dated 10 November 2017 (the "**Decision**").[633]

---

[630] **RL-96**, *Electrabel*, *Liability*, *supra* n. 225, paras. 6.119-6.120; *Hochtief AG v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Liability, 29 December 2014, paras. 291 and 336(c); *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/02, Award, 31 October 2012, paras. 535-540; **CL-227**, *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, para. 632; *Swisslion Doo Skopje v. The Former Yugoslav Republic of Macedonia*, ICSID Case No. ARB/09/16, Award, 6 July 2012, paras. 328-329; **CL-78**, *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Award, 10 February 2012, paras. 160-161.

[631] **CL-249**, *Eiser*, *supra* n. 196, para. 354.

[632] **RL-101**, *Slowakische Republik (Slovak Republic) v. Achmea BV*, Case C-284/16, Judgment of the Court, 6 March 2018, ECLI:EU:C:2018:158 (hereinafter "***Achmea* Judgment**").

[633] OJ L 9, 13.1.2017, p. 8–32.

670.  On 14 March 2018, Claimant sent a letter requesting that the Tribunal dismiss Respondent's Application.

671.  It is to be noted that the Tribunal had already denied Respondent's application to introduce the Decision into the record.[634]

672.  On 30 March 2018, with specific reference to Respondent's Application pertaining to the *Achmea* Judgment, the Tribunal invited the Parties simultaneously to submit their observations no later than 6 April 2018. The Parties duly submitted their observations and comments within the deadline and pursuant to the Tribunal's directions.

673.  In the *Achmea* Judgment, the CJEU reached the following conclusion:

> "*Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*"[635]

## A.  RESPONDENT'S POSITION

674.  Respondent maintains that the *Achmea* Judgment confirms the Intra-EU objection raised by Respondent in the present case.[636] In particular, Respondent states that the Tribunal should interpret the ECT in line with EU law and, thus, it must reach the conclusion that an EU investor is not entitled to bring an investment arbitration proceeding against an EU Member State.

675.  Respondent points out that the *Achmea* Judgment refers generally to "*international agreement*[s]" (and not to bilateral investment treaties) and it applies not only to

---

[634] *See supra* para. 79.

[635] **RL-101**, *Achmea* Judgment, *supra* n. 632, dispositif.

[636] *See supra* paras. 296 *et seq.*

international agreements concluded between *two* EU Member States, but also to international agreements concluded by EU Member States. Respondent submits that: (i) the ECT is an international agreement concluded by EU Member States; and (ii) the fact that the EU itself signed the ECT is irrelevant and does not limit in any way the application of the *Achmea* Judgment to the ECT and to ICSID tribunals.

676.    Respondent contends that the Tribunal has no jurisdiction to hear the present case (which, according to Respondent, is an intra-EU dispute). In reaching this conclusion, Respondent relies on the following grounds:

- the Tribunal shall interpret and apply EU law to decide the present dispute pursuant to Article 26(6) of the ECT. Respondent maintains that EU law prevails over the ECT and that this intra-EU international investment arbitration breaches the principles of autonomy and primacy of EU law;

- the need for the interpretation and application of EU law is particularly important in the present case due to the fact that the subject matter of the dispute concerns a tariff scheme that the EU Commission has qualified as State aid;

- the EU's autonomy and its legal order are not respected by the ECT. As a tribunal constituted pursuant to its terms, the Tribunal does not form part of the EU judicial system and it is not entitled to make a request for preliminary ruling to the CJEU under Article 267 of the TFEU.

## B.    CLAIMANT'S POSITION

677.    Claimant maintains that the *Achmea* Judgment is of no relevance to the Tribunal's jurisdiction, nor to the merits of the present case for the following reasons:

- the *Achmea* Judgment applies only to a treaty to which the EU is not itself a Contracting Party;

- there can be no incompatibility between the ECT (a treaty to which the EU is a Contracting Party) and EU law; but even if there was incompatibility, the ECT would prevail;

- the investor-State arbitration provisions under the ECT are binding on the EU and the ECT grants an investor a right of action, through international arbitration, against an offending Contracting Party, including the EU; thus, the ECT investor-State arbitration mechanism cannot be deemed incompatible with EU law;

- the ECT provides that investor-State disputes shall be decided in accordance with the ECT and public international law; thus, the investor-State arbitration mechanism under Article 26 of the ECT is not open to claims for breaches of EU law by a Contracting Party.

## C.   ANALYSIS

678.   Upon consideration of the Parties' respective submissions and upon analysis, the Tribunal has concluded that the *Achmea* Judgment has no bearing upon the present case.

679.   The *Achmea* Judgment is of limited application – first, and specifically, to the Agreement on encouragement and reciprocal protection of investment between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic and, second, in a more general perspective, to any "*provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic.*"[637] The ECT is not such a treaty. Thus, the *Achmea* Judgment does not take into consideration, and thus it cannot be applied to, multilateral treaties, such as the ECT, to which the EU itself is a party.

680.   The conclusion of the Tribunal is in line with the Opinion of Advocate General Wathelet delivered on 19 September 2017 in *Achmea*.[638] The Advocate General stated that *Achmea*

---

[637] **RL-101**, *Achmea* Judgment, *supra* n. 632, dispositif.

[638] Opinion of Advocate General Wathelet, delivered on 19 September 2017, Case C-284/16, *Slowakische Republik (Slovak Republic) v. Achmea BV*, ECLI:EU:C:2017:699.

was: "*the first opportunity* [for the CJEU] *to express its views on the thorny question of the compatibility of* **BITs concluded between member States** *and in particular of the investor-State dispute settlement ('ISDS') mechanisms established by those BITs.*" (Emphasis added).[639] Thus, it is clear that *Achmea* pertains <u>only</u> to BITs concluded between EU Member States – as the wording of question No. (1) referred by the *Bundesgerichtshof* to the CJEU likewise confirms: "*Does Article 344 TFEU preclude the application of a provision in a* **bilateral investment protection agreement between Member States of the European Union** *(a so called intra-EU BIT)* […]." (Emphasis added).[640]

681.    With specific reference to the ECT, the Advocate General made the following statement:

>    "*That multilateral treaty on investment in the field of energy* [the ECT] *operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing. In that sense,* **the material provisions for the protection of investments provided for in that Treaty and the ISDS mechanism also operate between Member States. I note that if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible**." (Emphasis added).[641]

682.    Had the CJEU seen it necessary to address the distinction drawn by the Advocate General between the ISDS provisions of the ECT and the investment protection mechanisms to be found in bilateral investment treaties made between Member States within the ambit of its ruling, it had the opportunity to do so. In fact, the Tribunal notes that the CJEU did not address this part of the Advocate General's Opinion, much less depart from, or reject, it. The *Achmea* Judgment is simply silent on the subject of the ECT. The Tribunal respectfully adopts the Advocate General's reasoning on this matter, and it relies in particular upon the observation in the final sentence cited above from his Opinion.

---

[639] Opinion of Advocate General Wathelet, *supra* n. 638, para. 2.

[640] **RL-101**, *Achmea* Judgment, *supra* n. 632, para. 23.

[641] Opinion of Advocate General Wathelet, *supra* n. 638, para. 43.

683.  For these reasons, the Tribunal concludes that the *Achmea* Judgment has no bearing upon its determination of the matters in issue in this arbitration and it denies Respondent's Application.

## XI.  COSTS

### A.  CLAIMANT'S POSITION

684.  In its Statement of Costs, dated 2 March 2017, Claimant submitted its claim for costs under four discrete heads:

- legal costs and related disbursements: USD 3,966,762.619;

- experts' fees and related disbursements: USD 547,528.90;

- costs and disbursements directly incurred by Claimant in connection with the proceedings: USD 39,809.73; and

- institutional, Tribunal and hearing costs covered by payments that Claimant made directly to ICSID: USD 375,000.00.[642]

685.  Claimant predicated its claim for costs on the basis that the Tribunal would find in its favour, so far as Claimant's contentions, first, that: "*Spain committed a number of breaches of its international law obligations under the ECT in relation to Masdar;*" and, second, that "*Respondent's challenges to the jurisdiction of the Tribunal to hear Masdar's claims are without merit.*"[643] Such an award was "*necessary to reinstate the Claimant to the position it would have been in but for Spain's violations of the ECT.*"[644]

686.  Claimant requested the Tribunal to make an award pursuant to Article 61(2) of the ICSID Convention ordering Respondent to pay the costs of this arbitration, including Claimant's costs for legal representation, in the amount of USD 4,929,101.24. Claimant further

---

[642] This amount does not include two additional advanced payments requested on 23 June 2017 (USD 200,000.00 per Party), and 1 February 2018 (USD 25,000.00 per Party), which were paid by the Parties.

[643] Claimant's Statement of Costs, para. 7.3.

[644] *Id.*, para. 7.4.

submitted that it should not be liable for any of Respondent's legal fees and disbursements or for any of the costs that it had incurred in connection with the arbitration.

## B.  RESPONDENT'S POSITION

687.    In its Submission on Costs, dated 2 March 2017, Respondent presented its costs in eight categories:

- advance on costs paid to ICSID: EUR 303,601.36;[645]

- experts' reports: EUR 612,502.00;

- translations: EUR 46,676.28;

- editing services: EUR 60,573.79;

- courier: EUR 4,595.59;

- travelling expenses: EUR 16,371.52;

- legal fees: EUR 1,373,200.00;

- other costs, *i.e.* costs of obtaining copies from public registers and notaries, as well as the purchase of material necessary during the Hearing: EUR 4,153.45.

688.    Respondent seeks an award of the Tribunal "*together with a decision on costs according to Section 23 of Procedural Order No. 1 and Rule 48 of ICSID Convention Rules, including Respondent's costs amounting to 2,421,673.98 €.*"[646]

## C.  ANALYSIS

689.    Rule 28(2) of the ICSID's Arbitration Rules provides that:

---

[645] This amount does not include two additional advanced payments requested on 23 June 2017 (USD 200,000.00 per Party), and 1 February 2018 (USD 25,000.00 per Party), which were paid by the Parties.

[646] Respondent's Submission on Costs, Section V.

215

> *"Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding."*

690.    On 2 March 2017, both Claimant and Respondent submitted statements of their claimed costs (*see* paragraphs 684 and 687 above).

691.    The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to:

| | |
|---|---|
| Arbitrators' Fees and Expenses | |
| Mr. John Beechey | USD 286,803.17 |
| Mr. Gary Born | USD 184,073.61 |
| Prof. Brigitte Stern | USD 323,527.03 |
| Assistant's Expenses | USD 11,096.68 |
| ICSID's Administrative Fees | USD 138,000.00 |
| Direct Expenses | USD 208,494.10 |
| **Total** | **USD 1,151,994.59** |

The above costs have been paid out of the advances made by the Parties in equal parts.[647] As a result, each Party's share of the costs of arbitration amounts to USD 575,997.30.

692.    Article 61(2) of the ICSID Convention provides that:

> *"In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."*

---

[647] The remaining balance will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

216

693.    ICSID tribunals have full discretion to award costs. As stated in *LG&E*: "*The Tribunal notes that Article 61(2) of the ICSID Convention and Rule 28 of the ICSID Arbitration Rules grant discretion to ICSID tribunals with regard to the award of costs.*"[648]

694.    However, there is no uniform practice in treaty arbitration with regard to the allocation of the costs of the arbitration. The Tribunal notes that in *Eiser*, the tribunal was concerned with an allocation of costs in a case in which it had largely upheld the claims submitted to it. The *Eiser* tribunal observed that:

> "*The Tribunal is mindful that some ICSID tribunals have adopted the practice of awarding to the prevailing party some or all of its costs. However, in the circumstances of this case, the Tribunal determines that it is most appropriate for each Party to bear its own costs. The case involved a number of challenging procedural and legal issues, which both Parties addressed with professional and effective advocacy. While Claimants have in large measure prevailed on jurisdiction and have established a breach of the ECT's fair and equitable treatment standard, the Tribunal has not accepted all elements of their claims.*"[649]

695.    The Tribunal has also considered whether, in the particular circumstances of this case, it would be appropriate to hold the European Commission to its undertaking to meet costs attributable to its intervention in these proceedings in circumstances in which the Tribunal considered it appropriate that it should do so. Having regard to the limited impact of that intervention upon the work of the Tribunal and the Parties, the Tribunal concludes that the proper course is to assimilate those costs into the costs of the arbitration such that they are borne as they fell between the Parties.

696.    Accordingly, the Tribunal concludes that the fair and proper result overall is that each Party should bear its own legal and other expenses and its respective equal share of "*the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre.*"[650]

---

[648] **CL-52**, *LG&E*, *supra* n. 446, para. 112.

[649] **CL-249**, *Eiser, supra* n. 196, para. 484.

[650] *Id.*, para. 485.

## XII.  AWARD

697.  For the reasons stated in the body of this Award, the Tribunal hereby declares, orders and decides:

    (a)  Save that the Tribunal upholds Respondent's objection to its jurisdiction with respect to the claim that Respondent's taxation measures, in particular the 7% tax on the value of electric energy production created by Law 15/2012, violate the ECT, the Tribunal decides that it has jurisdiction under the ECT and the ICSID Convention over Claimant's claims.

    (b)  Respondent has failed to accord fair and equitable treatment to Claimant pursuant to Article 10(1) of the ECT.

    (c)  Respondent shall pay Claimant damages assessed at EUR 64.5 million as damages, by the decision of a majority of the Tribunal.

    (d)  Respondent shall pay interest on the sum awarded in (c) above from 20 June 2014 to the date of this Award at the rate of 0.906% per annum, compounded monthly, and it shall further pay interest from the date of the Award to the date of payment of all sums due pursuant to this Award at a rate of 1.60% per annum, compounded monthly, at majority of the Tribunal.

    (e)  Each Party shall bear its legal and other expenses.

    (f)  The fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be borne equally between the Parties.

_____

Professor Brigitte Stern
Arbitrator
Date:  8 May 2018

_____

Mr. Gary Born
Arbitrator
Date:  9 May 2018

_____

Mr. John Beechey, CBE
President
Date:  01.05. LN8