**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**ESKOSOL S.P.A. IN LIQUIDAZIONE**

Claimant

and

**ITALIAN REPUBLIC**

Respondent

**ICSID Case No. ARB/15/50**

---

**DECISION ON**

**ITALY'S REQUEST FOR IMMEDIATE TERMINATION**

**AND**

**ITALY'S JURISDICTIONAL OBJECTION BASED ON INAPPLICABILITY
OF THE ENERGY CHARTER TREATY TO INTRA-EU DISPUTES**

---

*Members of the Tribunal*
Ms. Jean E. Kalicki, President
Prof. Brigitte Stern, Arbitrator
Prof. Dr. Guido Santiago Tawil, Arbitrator

*Secretary of the Tribunal*
Mr. Francisco Abriani

7 May 2019

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................... 1

II.  THE RELEVANT PROCEDURAL HISTORY ................................................... 2

III. THE PARTIES' POSITIONS ................................................................................ 5

    A.   Italy's Position ............................................................................................... 5

        1.   Interpretation of the ECT ...................................................................... 5

        2.   EU Law Developments .......................................................................... 8

            a.   Progressive Development of EU Treaties ...................................... 8

            b.   The *Achmea* Judgment ................................................................ 10

            c.   The January 2019 Declaration ..................................................... 12

    B.   Eskosol's Position ........................................................................................ 14

        1.   Interpretation of the ECT .................................................................... 14

        2.   EU Law Developments ........................................................................ 17

            a.   Progressive Development of EU Treaties .................................... 17

            b.   The *Achmea* Judgment ................................................................ 18

            c.   The January 2019 Declaration ..................................................... 20

IV.  THE COMMISSION'S POSITION .................................................................... 22

    A.   Interpretation of the ECT ............................................................................. 22

    B.   EU Law Developments ................................................................................. 25

        1.   Progressive Development of EU Treaties............................................. 25

        2.   The *Achmea* Judgment ........................................................................ 27

V.   THE TRIBUNAL'S ANALYSIS ........................................................................ 28

    A.   Interpretation of the ECT As of Its Entry Into Force .................................. 29

        1.   ECT Article 26(3), in the Context of ECT Articles 1(2), (3) and (10) ............... 31

        2.   Additional "Context" Provided by ECT Articles 16, 25, and 26(6) ................... 39

        3.   The ECT's History and Circumstances................................................. 43

    B.   EU Law Developments ................................................................................. 46

        1.   Progressive Development of the EU Treaties....................................... 46

            a.   EU Treaties as Part of Applicable Law: ECT Article 26(6)........... 48

            b.   EU Treaties in Interpreting the ECT: VCLT Article 31(3)(c)....... 53

            c.   EU Treaties as "Successive Treaties": VCLT Article 30(2) ......... 55

            d.   EU Treaties as "Successive Treaties": VCLT Article 30(4)(a)..... 57

            e.   EU Treaties as "Agreements to Modify" ECT: VCLT Article 41(1)........... 65

i

2.   The *Achmea* Judgment ........................................................................... 67

  a.   Summary of the *Achmea* Judgment ................................................ 68

  b.   Whether the *Achmea* Judgment Reaches the ECT ........................................ 74

  c.   Whether the *Achmea* Judgment Binds This Tribunal.................................... 80

  d.   Whether the *Achmea* Judgment Invalidates ECT Provisions ........................ 85

  e.   Whether the *Achmea* Judgment Retroactively Invalidates Consent.............. 91

3.   The January 2019 Members' Declaration............................................. 94

C.   The Duty to Render An Enforceable Award ........................................... 103

VI.   DECISION ...................................................................................................... 106

## TABLE OF ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| *Achmea* BIT | The bilateral investment treaty between the Netherlands and the Czech and Slovak Federative Republic, discussed in the *Achmea* Judgment |
| *Achmea* Judgment | The judgment of the CJEU issued on 6 March 2018 in Case C-284/16, *Achmea v. Slovak Republic* |
| Bifurcation Request | Italy's request for bifurcation, as contained in Section V of Italy's Memorial on Jurisdiction and Requests for Bifurcation and Suspension, dated 7 July 2017 |
| Bifurcation Response | Eskosol's Response to Respondent's Bifurcation Request, dated 28 July 2017 |
| CJEU or ECJ | The Court of Justice of the European Union |
| Commission | The European Commission |
| Commission Application | The European Commission's Application for Leave to Intervene as a Non-Disputing Party dated 16 January 2017 |
| Commission Submission | The European Commission's *Amicus Curiae* Brief dated 6 March 2017 |
| Commission Update | The European Commission's Update of *Amicus Curiae* Brief dated 26 October 2018 |
| Counter-Memorial | Italy's Counter-Memorial on the Merits dated 27 October 2017 |
| ECT | The 1994 Energy Charter Treaty |
| Eskosol | Eskosol S.p.A in liquidazione |
| Eskosol PHB | Eskosol's Post-Hearing Brief dated 21 December 2018 |
| EU | European Union |
| Hearing | Hearing on Jurisdiction and the Merits held from 24 September through 26 September 2018 |
| ICJ | International Court of Justice |
| ILC | International Law Commission |

| Italy | The Italian Republic |
|---|---|
| Italy PHB | Italy's Post-Hearing Brief dated 21 December 2018 |
| January 2019 Declaration (or Declaration) | The Declaration of 15 January 2019 by 22 EU Member States, entitled "Declaration of the Governments of the Member States on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union" |
| Memorial | Eskosol's Memorial dated 9 May 2017 |
| Memorial on Jurisdiction | Italy's Memorial on Jurisdiction and Requests for Bifurcation and Suspension, dated 7 July 2017 |
| Reply | Eskosol's Statement of Reply dated 2 March 2018 |
| Rejoinder | Italy's Rejoinder dated 25 May 2018 |
| Rejoinder on Jurisdiction | Eskosol's Rejoinder on Jurisdiction dated 15 June 2018 |
| RFA | Eskosol's Request for Arbitration dated 9 December 2015 |
| Rule 41(5) Request | Italy's Article 41(5) Objection for Manifest Lack of Legal Merits, dated 18 November 2016 |
| Termination Rejoinder | Eskosol's submission dated 1 March 2019, in further opposition to Italy's Termination Request |
| Termination Reply | Italy's submission dated 26 February 2019, in further support of its Termination Request |
| Termination Request | Italy's request for an award declaring immediate termination of this arbitration, dated 4 February 2019 |
| Termination Response | Eskosol's response to the Termination Request, dated 18 February 2019 |
| Tr. Day [#], [page:line] | Transcript of the Hearing |
| TFEU | Treaty on the Functioning of the European Union |
| VCLT | Vienna Convention on the Law of Treaties |

## I.     INTRODUCTION

1.      This Decision addresses the request filed on 4 February 2019 by the Respondent, the Italian Republic ("**Italy**"), "for an award declaring immediate termination" of this arbitration (the "**Termination Request**").  Italy's Termination Request seeks dismissal of all claims brought by the Claimant, Eskosol S.p.A. in liquidazione ("**Eskosol**"), on the basis of a Declaration dated 15 January 2019 by 22 Member States of the European Union ("**EU**"), which is entitled "Declaration of the Governments of the Member States on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union" (the "**January 2019 Declaration**").

2.      As the title of the January 2019 Declaration reveals, its principal subject is the judgment of the Court of Justice of the European Union ("**CJEU**") issued on 6 March 2018 in Case C-284/16, *Achmea v. Slovak Republic* (the "***Achmea* Judgment**").  The *Achmea* Judgment also features prominently in Italy's pending jurisdictional objection (the "**intra-EU objection**") based on the alleged inapplicability of the Energy Charter Treaty (the "**ECT**") to disputes between investors of one EU Member State and another EU Member State ("**intra-EU disputes**").  As discussed further in the procedural summary in Section II below, Italy lodged this jurisdictional objection long before the *Achmea* Judgment, but both it and Eskosol (the "**Parties**") subsequently addressed the implications of the *Achmea* Judgment in both written and oral submissions.  The Parties also submitted their respective views of the January 2019 Declaration.

3.      In addition, the European Commission (the "**Commission**") sought and was granted the opportunity, pursuant to Rule 37(2) of the ICSID Arbitration Rules, both to file a written submission as a non-disputing party prior to the *Achmea* Judgment (the "**Commission Submission**," dated 6 March 2017), and later to file an updated submission addressing the legal consequences of the *Achmea* Judgment for an intra-EU dispute under the ECT (the "**Commission Update**," dated 26 October 2018).

4.      The Tribunal acknowledges that early in these proceedings, through its Procedural Order No. 4 dated 1 August 2017, it denied Italy's request to bifurcate these proceedings in order to address its jurisdictional objections prior to the merits, and to suspend these proceedings until the CJEU rendered its decision in the *Achmea* case.  The case has thus proceeded in a plenary fashion, through a full hearing on jurisdiction and the merits and full post-hearing briefs.

5.      The Tribunal nonetheless has decided to address now both the Termination Request and Italy's closely related intra-EU objection.  First, there is no question that these should be addressed in tandem.  While

the two developments at issue in the Termination Request – the January 2019 Declaration and the *Achmea* Judgment on which it is based – certainly are new developments since the time the Tribunal previously decided to join the intra-EU objection to the merits, the Tribunal does not believe they fundamentally change the jurisdictional questions that already were before it, based on Italy's intra-EU objection and the Commission's submissions. However, explaining why that is so requires the Tribunal to set out its views on the substance of the intra-EU issue under the ECT, and not just its views on the more recent events (the *Achmea* Judgment and the January 2019 Declaration). For this reason, it is not procedurally efficient to rule only on the Termination Request, without also ruling at the same time on the underlying jurisdictional objection.

6.      Second, the alternative to deciding both issues now in a stand-alone Decision would be to defer addressing even the Termination Request for some time, until the issuance of the Final Award. Numerous factors weigh against that approach, including the sense of urgency claimed by Italy in its Termination Request, the Tribunal's readiness now to announce its ruling on Italy's related intra-EU objection, and the important attention that the Commission, as well as the other EU Member States and the investment arbitration community as a whole, have paid to these issues both before and even more after the *Achmea* Judgment. On balance, the Tribunal therefore considers it more appropriate to rule expeditiously on these important jurisdictional issues, rather than holding that aspect of its decision for later while it continues to work on other unrelated issues to be addressed in the Final Award.

## II.      THE RELEVANT PROCEDURAL HISTORY

7.      The Tribunal sets out here only the procedural history relevant to the two issues addressed in this decision, namely Italy's Termination Request and its related intra-EU objection. A more comprehensive procedural history of this arbitration will be set out in the Award.

8.      First, on 11 December 2015, ICSID received Eskosol's Request for Arbitration dated 9 December 2015 (the "**RFA**"). The Secretary-General registered the RFA on 22 December 2015, in accordance with Article 36(3) of the ICSID Convention. The Tribunal was subsequently deemed constituted on 19 October 2016, in accordance with Rule 6(1) of the ICSID Arbitration Rules. In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 2 December 2016, by teleconference.

9.    On 18 November 2016, Italy filed a request under ICSID Arbitration Rule 41(5), asking that the proceedings be dismissed for manifest lack of legal merits (the "**Rule 41(5) Request**").  This request raised four objections of a jurisdictional nature, but not the intra-EU objection.  Pursuant to an agreed schedule, Eskosol filed its response to the Rule 41(5) Request on 23 December 2016, Italy filed its reply on 13 January 2017, and Eskosol filed its rejoinder on 1 February 2017.  The Tribunal held a hearing in Paris on 8 February 2017 in connection with the Rule 41(5) Request, and subsequently rendered its decision on that Request on 20 March 2017.

10.    In the meantime, on 16 January 2017, the Commission had filed its Application for Leave to Intervene as a Non-Disputing Party (the "**Commission Application**"), on which the Parties submitted their respective observations on 3 February 2017.  On 10 February 2017, the Tribunal issued Procedural Order No. 2 granting the Commission permission to file a written submission as a non-disputing party. The Commission Submission was filed on 6 March 2017.

11.    On 9 May 2017, Eskosol filed its Memorial (the "**Memorial**"), which addressed *inter alia* the Commission Submission and the intra-EU nature of this dispute.

12.    On 7 July 2017, Italy filed its Memorial on Jurisdiction and Requests for Bifurcation and Suspension (the "**Memorial on Jurisdiction**"), which provided further briefing on the jurisdictional objections Italy had raised in its Rule 41(5) Request, and also presented out its intra-EU objection, *i.e.*, that the ECT does not apply to intra-EU disputes.  Section V of the Memorial on Jurisdiction set out Italy's request for bifurcation to address its jurisdictional objections as a preliminary matter, and an additional request to suspend these proceedings until the CJEU issued its decision in the then-pending *Achmea* case (the "**Bifurcation Request**").  Pursuant to an agreed schedule, Eskosol filed its Response to Respondent's Bifurcation Request on 28 July 2017 (the "**Bifurcation Response**").  On 1 August 2017, the Tribunal issued Procedural Order No. 4, dismissing Italy's Bifurcation Request with detailed reasons to follow, pursuant to an agreement on such an expedited procedure reflected in Procedural Order No. 1, Annex A, n.3.  On 15 September 2017, the Tribunal issued Procedural Order No. 5, providing the detailed reasoning for its decision in Procedural Order No. 4.

13.    Also on 15 September 2017, the Tribunal issued Procedural Order No. 6, in which it provided the detailed reasoning for its decision on the Commission's Application in Procedural Order No. 2.

14.    On 27 October 2017, Italy filed its Counter-Memorial on the Merits (the "**Counter-Memorial**"), which maintained (but did not further brief) the jurisdictional objections filed in its Memorial on

Jurisdiction.[1]  On 2 March 2018, Eskosol filed its Statement of Reply (the "**Reply**"), which incorporated by reference (but did not further brief) its position on the jurisdictional objections set forth in its Bifurcation Response.[2]  On 25 May 2018, Italy filed its Rejoinder (the "**Rejoinder**"), which addressed both jurisdiction and the merits, including among other things a discussion of the CJEU's *Achmea* Judgment rendered on 6 March 2018.  On 15 June 2018, Eskosol filed its Rejoinder on Jurisdiction (the "**Rejoinder on Jurisdiction**"), which completed the written stage of proceedings prior to the oral hearing.  The Parties nonetheless agreed to add to the record, before the hearing, certain recent legal authorities including decisions of other investment arbitration tribunals on intra-EU objections.[3]

15.    A hearing on jurisdiction and the merits was held in Paris from 24 through 26 September 2018 (the "**Hearing**").  Both Parties presented oral argument on the jurisdictional issues in the case, including the intra-EU objection.

16.    On 3 October 2018, the Commission offered to update its prior submission in light of the *Achmea* Judgment.  The Parties filed observations on this offer on 15 October 2018.  On 18 October 2018, the Secretariat communicated the Tribunal's decision to accept the Commission's offer subject to certain page and time limitations, and with the understanding that the Parties would be able to comment on its updated submission within the framework of their post-hearing briefs, subject to reasonable schedule adjustments.  On 26 October 2018, the Commission filed the Commission Update.

17.    On 3 December 2018, the Tribunal resolved certain disputes regarding transcript correction, and the final corrected transcripts were circulated on 14 December 2018.

18.    On 17 December 2018, the Parties again agreed to add to the record certain additional legal authorities reflecting decisions of other investment arbitration tribunals on intra-EU objections.

19.    The Parties then filed their respective post-hearing briefs, dated 21 December 2018 ("**Eskosol PHB**" and "**Italy PHB**"), followed by cost submissions dated 11 January 2019 and responses to certain questions about the cost submissions on 15 and 18 January 2019.

20.    On 4 February 2019, Italy filed its Termination Request, citing the January 2019 Declaration.  Eskosol responded by letter dated 18 February 2019 (the "**Termination Response**"), Italy replied on 26

---

[1] Counter-Memorial, ¶ 226.

[2] Reply, ¶ 17.

[3] *See* ICSID Secretariat letter to the Parties, dated 18 September 2018.

February 2019 (the "**Termination Reply**"), and Eskosol further responded on 1 March 2019 (the "**Termination Rejoinder**").

## III.   THE PARTIES' POSITIONS

21.   The Parties' positions with respect to the intra-EU issues in this case have developed during the course of the proceedings in response to each other's arguments, the Commission's two submissions, and various supervening events including the *Achmea* Judgment and the January 2019 Declaration.  Not surprisingly, the Parties also organized their submissions differently, emphasizing different themes set out under different subtopic headers.  In order to provide some analytical logic to the summary of their positions, the Tribunal organizes this summary not by the Parties' varying structures but rather by the same analytical structure that the Tribunal adopts for its analysis in Section V.  This begins with the Parties' arguments about interpretation of the ECT itself; followed by their arguments about the implications of various EU law developments, including in chronological order the progressive development of the EU Treaties, the *Achmea* Judgment and the January 2019 Declaration; and finally concludes with a few words on the subject of enforceability of awards.

22.   As always in a synthesis of lengthy submissions, it is possible that the Tribunal will not reflect each point the Parties made.  This summary is not intended to be all-inclusive, but simply to provide some high-level background about the Parties' arguments to lay the groundwork for the analysis that follows.  The fact that a particular argument may not be reflected here should not be taken as an indication that the Tribunal did not consider it.  The Tribunal has carefully reviewed and considered all aspects of their written and oral submissions and considered all contentions presented in the course of these proceedings.

### A. ITALY'S POSITION

#### 1.   Interpretation of the ECT

23.   Italy begins from the proposition that all States relevant to this dispute were EU Member States at the time they ratified the ECT,[4] and therefore the relevant question is "to what extent the EU and EU Member States bound themselves signing the ECT," which is an "issue … of intent."[5]  Italy accepts

---

[4] Eskosol invokes the ECT on the basis of the Belgian nationality of Blusun S.A., its 80% shareholder.  Memorial, ¶¶ 5-6.  Italy, Belgium and the EU (at that time known as the European Communities) each signed the ECT in 1994 and ratified it in 1997.

[5] Memorial on Jurisdiction, ¶ 165.

that its intent should be determined by interpretation of the ECT consistent with Articles 31 and 32 of the Vienna Convention on the Law of Treaties ("**VCLT**"), beginning with an assessment "in good faith, in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose,"[6] but also taking into account preparatory works and subsequent State practice.

24.    Beginning with the "letter" of the ECT, Italy emphasizes that under its Article 1, the Contracting Parties are both individual States and the EU as a "regional economic integration organization" ("**REIO**") to whom EU Member States "have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matter[s]."[7]  Since the ECT defines an REIO's "Area" as "the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization," this means that "an allocation of competences within the Union … cannot rely on geographical boundaries, but rather on competences by matter."[8]  Article 25 of the ECT further recognizes that Contracting Parties who extend certain trade and investment liberalization to one another by virtue of an "Economic Integration Agreement" ("**EIA**") like the EU are not required by the ECT to extend the same benefits to non-EIA States.[9]  Finally, Italy interprets the conflict rule for successive treaties set out in Article 16 of the ECT as requiring deference from the outset to the earlier EU Treaties, since those "represent[] a more developed and articulated legal system, which is doubtless more favorable and offers more articulated forms of protection" than does the ECT.[10]  As a result, nothing in the ECT's Part III (on investment promotion and protection) or Part V (on dispute settlement) may be "construed to derogate from any provision of the EU Treaties as for investment promotion and protection, or from any right to dispute resolution with respect thereto under the EU Treaties."[11]  In Italy's view, all of these provisions lead to "the conclusion that … Contracting Parties signed the ECT under the mutual understanding that this would not apply to [an] intra-EU situation."[12]

25.    Italy contends that the same conclusion is required by the context, purpose and objectives of the ECT.[13]  It refers in particular to a decision at the Energy Charter Conference with respect to ECT Articles

---

[6] Memorial on Jurisdiction, ¶¶ 166-168.

[7] Memorial on Jurisdiction, ¶ 169 (quoting ECT Article 1(3)).

[8] Memorial on Jurisdiction, ¶¶ 171-172 (quoting ECT Article 1(10)).

[9] Memorial on Jurisdiction, ¶¶ 173-175 (referring to ECT Article 25).

[10] Memorial on Jurisdiction, ¶¶ 176-177.

[11] Memorial on Jurisdiction, ¶ 177.

[12] Memorial on Jurisdiction, ¶ 178.

[13] Memorial on Jurisdiction, ¶ 179.

24(4)(a) and 25, permitting a non-EIA investor to obtain EIA benefits by virtue of registered offices in or certain other links to EIA territory, and a related Declaration by the EU and its Member States with respect to Article 25. In Italy's view, these steps "define[d] the criteria under which a legal entity of a non-EU Member State could benefit of the rules internal to the EU," and "[i]n order to avoid double protection to the same situations," it follows that the intent must have been that such investors could *only* pursue remedies available under EU law, with "no right to apply" alternatively the ECT's own dispute resolution mechanism set forth in its Article 26. Italy suggests that it would be "fully redundant" to regulate access to EU law protections if the ECT's own dispute resolution procedures were available equally to both EU investors and non-EU investors, "since the EU law … already contemplates protection for entities established in the Union."[14]

26.    With reference to Article 32 of the VCLT, Italy invokes the "preparatory work of the [ECT] and the circumstances of its conclusion," which confirm a goal of integrating the energy sectors of the former Soviet Union and Eastern Europe with those of Europe, and "surely not to regulate the EU internal market for energy," which already was under way through other instruments.[15] Finally, Italy refers to "the practice of EU Member States and the EU," which "has always been consistent" with a reading of the ECT as not extending investor-State arbitration to "a purely intra-EU situation."[16]

27.    Italy concludes from all the above that "the ECT does not apply *ab initio* to intra-[EU] situations because this was not the intention of the Contracting Parties," and therefore Eskosol cannot invoke Article 26 of the ECT as the basis for jurisdiction in this dispute.[17] Put simply, in Italy's Rejoinder, "it did not intend to include intra-EU disputes within the scope of Article 26," and "it never acquiesced, let alone agree[d], to the arbitration of ECT claims in intra-EU scenarios."[18]

28.    In its Rejoinder, Italy adds that the offer in Article 26(3) to arbitrate ECT disputes must also be interpreted in light of the applicable law provision of Article 26(6), under which "[a] tribunal … shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law," a governing law provision that in Italy's view applies equally to matters of jurisdiction as to matters of merits.[19] As EU law forms part of international law, EU law must apply

---

[14] Memorial on Jurisdiction, ¶¶ 180-184.

[15] Memorial on Jurisdiction, ¶¶ 186-189.

[16] Memorial on Jurisdiction, ¶¶ 190-183.

[17] Memorial on Jurisdiction, ¶ 194.

[18] Rejoinder, ¶¶ 97-98.

[19] Rejoinder, ¶¶ 88-89.

"when a tribunal assesses the applicability of the arbitration agreement and of the ECT at large in intra-EU disputes."[20]  It follows that even as a matter of ECT interpretation itself, since EU law "prevents Member States from contracting the obligation to arbitrate claims that could have repercussions on EU law issues," then "Italy's offer to arbitrate investment disputes has thus *always* been inapplicable … to intra-EU disputes," based on propositions of EU law that have been codified "*from the very beginning*."[21]

## 2. EU Law Developments

### a. Progressive Development of EU Treaties

29.     Italy argues that even if the Tribunal does not accept its interpretation of the "intention *ab initio* of the Contracting Parties" to the ECT, the progressive development of the EU Treaties – and in particular the adoption of the Lisbon Treaty in 2009 – requires the exclusion of intra-EU disputes from the ECT's scope.[22]  Italy emphasizes that under the Lisbon Treaty, direct foreign investment was "added to the common commercial policy, that is traditionally an exclusive competence" of the EU, with the result that EU Member States "cannot undertake *inter se* agreements in those matters …, which only EU law can regulate."[23]  Otherwise stated, the Lisbon Treaty "strongly modified the balance of external competences of Member States and the Union, respectively, and affected the general understanding of external commitments, since it is necessary to ensure uniformity of rules within the Union, of which international treaties signed by the Union become a part."[24]

30.     Italy invokes the international law conflict of rules mechanism in Article 30(4)(a) of the VCLT, under which a subsequent treaty between some of the parties to an earlier treaty prevails over a prior one relating to the "same subject matter" to the extent of any incompatibility.[25]  Italy contends that in order for Article 30 to have "concrete utility," the concept of "same subject matter" must be viewed expansively and not as requiring an "exact coincidence of provisions or even of objectives."[26]  It argues that "[a]lthough the EU provisions on internal market … do not 'deal' technically with promotion and

---

[20] Rejoinder, ¶ 90; *see also* Tr. 1, 104:10-14.

[21] Rejoinder, ¶¶ 91-92 (emphasis added).

[22] Memorial on Jurisdiction, ¶ 195.

[23] Memorial on Jurisdiction, ¶ 196.

[24] Memorial on Jurisdiction, ¶ 200; *see also id.*, ¶¶ 201-202.

[25] Memorial on Jurisdiction, ¶¶ 205-206, 214.

[26] Memorial on Jurisdiction, ¶ 207 (discussing a 2006 ILC Report on Fragmentation of International Law).

protection of investments …, they share the same efforts of integration," and thus VCLT Article 30(4)(a) should apply in this case.[27]

31.    Italy also invokes VCLT Article 30(2), which provides that "[w]hen a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail."[28]  It recalls Article 16 of the ECT, which by its terms applies to subsequent and not just prior international agreements, and contends that nothing in Part III or V of the ECT therefore may be construed to derogate from EU law as developed through the Lisbon Treaty.[29]

32.    Finally, Italy suggests that "by adhering to the Lisbon Treaty," EU Member States effectively "modified" the ECT, to the extent of any intra-EU obligations they might be viewed as having undertaken.[30]  It invokes Article 41 of the VCLT, referring to agreements by certain parties to a multilateral treaty to modify it *inter se*, and contends that the modifications effected by the Lisbon Treaty as among EU Member States did not affect the enjoyment of ECT rights by any other ECT parties, and that no notification of such modifications was required.[31]

33.    Accordingly, Italy contends that as a matter of *international law*, the ECT cannot be viewed in the wake of the Lisbon Treaty as covering disputes "internal to the EU,"[32] which are "regulated by Union law and heard within the European judicial system."[33]  The same conclusion would be warranted *under EU law*, under which EU law has primacy over any national law, the CJEU and Member State courts cooperate on matters of EU law by way of the preliminary ruling mechanism established by Article 267 of the Treaty on the Functioning of the European Union ("**TFEU**"), and only these authorities have jurisdiction to hear claims against Member States that acted in violation of Union law.[34]  In the specific context of investment, Italy repeats that in the wake of the Lisbon Treaty, the Union has exclusive competence to conclude agreements on foreign direct investment;[35] EU law comprehensively governs and protects all steps of the life cycle of an investment;[36] and EU law does

---

[27] Memorial on Jurisdiction, ¶¶ 208-209.

[28] Memorial on Jurisdiction, ¶¶ 210-213; *see also* Tr. 1, 105:5-8 (invoking the "*lex posterior* principle" in favor of the Lisbon Treaty).

[29] Memorial on Jurisdiction, ¶¶ 211-213.

[30] Memorial on Jurisdiction, ¶ 197.

[31] Memorial on Jurisdiction, ¶¶ 216, 218-222.

[32] Memorial on Jurisdiction, ¶ 222.

[33] Memorial on Jurisdiction, ¶ 223.

[34] Memorial on Jurisdiction, ¶¶ 225-228.

[35] Memorial on Jurisdiction, ¶ 235.

[36] Memorial on Jurisdiction, ¶¶ 241-250.

not allow Member States to agree to investment protection rules *inter se*, outside the EU legal order.[37] This includes any agreement to dispute settlement outside the EU judicial framework, which is "not conceivable in the relationship between Member States."[38]  Italy adds that pursuant to Article 344 TFEU, Member States cannot submit a dispute concerning interpretation or application of the EU Treaties to any method of settlement other than provided by EU law, including to arbitral tribunals which may not refer a preliminary question to the CJEU.[39]  It is for that reason, Italy explains, that the Commission expressly declared – when signing the International Energy Charter of 2015 on behalf of the EU – that the Charter's dispute settlement mechanisms "cannot be construed so as to mean that any such [arbitral] mechanism would become applicable in relations" between EU Member States.[40] The same conclusion necessarily must apply to arbitration under the ECT.[41]

### b.  The *Achmea* Judgment

34.  Italy contends that the *Achmea* Judgment "sealed the debate" that ECT arbitration is "unavailable when a EU company sues a EU host State,"[42] because the CJEU "confirmed that the legal order of European Union does not permit intra-EU investor-State disputes to be resolved through arbitration of the kind envisaged in investment protection treaties."[43]  This conclusion is binding in an arbitration governed by international law, because under that law, the jurisdiction of an arbitral tribunal can arise only when there has been a "valid offer[] to arbitrate" made by each party and subsequently accepted by the other.[44]  Italy's offer to arbitrate under the ECT could not validly have extended to intra-EU disputes.  Moreover, the ECT requires EU law to be taken into account for jurisdictional purposes, because "EU law, being based on a treaty, forms part of international law," as the tribunal in *Electrabel v. Hungary* found, and Article 26(6) requires tribunals to "decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[45]

---

[37] Memorial on Jurisdiction, ¶¶ 251-255.

[38] Memorial on Jurisdiction, ¶ 256.

[39] Memorial on Jurisdiction, ¶¶ 258-260; *see also* Rejoinder, ¶¶ 59-64 (discussing the CJEU's decision in the *Mox Plant* case), ¶¶ 66-67 (discussing the CJEU's opinion 1/09 regarding an international court for patent disputes).

[40] Memorial on Jurisdiction, ¶ 262.

[41] Memorial on Jurisdiction, ¶ 265.

[42] Rejoinder, ¶ 8.

[43] Rejoinder, ¶¶ 45, 73.

[44] Rejoinder, ¶ 87.

[45] Rejoinder, ¶¶ 89-90 (quoting *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/18, Decision on Jurisdiction, Applicable Law and Liability, § 4.136 (30 November 2012) (**RL-58**) ("*Electrabel*")).

35.     Italy also contends that "in the application of the principles confirmed in *Achmea* no distinction can be drawn between treaties exclusively undertaken by member States (like the BITs) and agreements signed also by the EU (like the ECT)."[46]  First, while Italy accepts that the *Achmea* Judgment does not discuss the ECT, Italy rejects any attempt to draw inferences from the CJEU's silence.[47]   Italy emphasizes that in *Achmea*, "the CJEU was not even seised with a question regarding the compatibility with EU law of the ECT," and "[t]his is the only reason why there is no reference to the ECT in *Achmea*."[48]

36.     Nonetheless, the CJEU's core reasoning is "exactly transposable to the ECT."[49]  Italy describes the *Achmea* Judgment as concluding that "application of EU law by a body which cannot request a preliminary ruling from the CJEU inherently prevents those disputes from being resolved in a manner that ensures the full effectiveness of EU law."  In its view, "[t]his conclusion holds true irrespective of whether the claim is based on, and the arbitration is established under, a bilateral or multilateral treaty."[50]  Italy emphasizes that "the main element to take into consideration is whether EU law can apply," and under the ECT "EU law inevitably comes into play both as international law and as the law of the host State."[51]

37.     Moreover, "[w]hen the *Achmea* judgment refers to agreements concluded between member States, this language clearly indicates all obligations reciprocally undertaken between member States, irrespective of the kind of source."[52]  The ECT establishes just such reciprocal obligations, since the commitment to arbitrate is "only owed to the State of nationality of the investor, they are not owed *erga omnes partes* of a multilateral source."[53]  As for the fact that the EU itself is a party to the ECT, this is "immaterial," because "the obligations that are relevant to the present dispute are those obligations that Italy assumed towards Belgium for the benefit of Belgian investors," and the EU's ratification of

---

[46] Rejoinder, ¶ 107; Tr. 1, 111:13-19 ("the Achmea case applies to any kind of international agreement," because it adopts "a very general, wide and broad perspective").

[47] Rejoinder, ¶ 52 (disagreeing with the *Masdar* tribunal's analysis based on the CJEU's decision not to address Advocate General Wathelet's statements about the ECT); Italy PHB, ¶¶ 134-135.

[48] Rejoinder, ¶ 53.

[49] Italy PHB, ¶ 135.

[50] Rejoinder, ¶ 74; Italy PHB, ¶¶ 138, 140, 144-146.

[51] Rejoinder, ¶ 117; Italy PHB, ¶ 152.

[52] Rejoinder, ¶ 108.

[53] Rejoinder, ¶ 109.

the ECT "does not affect the bilateral nature of the offer to enter into arbitration at stake in these proceedings."[54]

38.    Finally, Italy rejects any suggestion that "the principles confirmed in *Achmea* would only concern the phase of enforcement," emphasizing that "a valid award must be based on a functioning arbitration agreement, which here does not exist."[55]  Italy does however insist that lack of enforceability "should warrant the Tribunal's refusal to exercise jurisdiction," because a tribunal should not proceed where it is unable to "discharge the essential mandate to produce an enforceable award."[56]

### c.   The January 2019 Declaration

39.    With respect to the January 2019 Declaration, Italy observes that both Italy and Belgium have joined the 22 EU Member States signing that document, which contains *inter alia* the following statements:

> [I]nternational agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties.  Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States.  Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied. …
>
> … With regard to agreements concluded between Member States … [t]he same result [on primacy of Union law] follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of the Treaties and customary international law (*lex posterior*). …
>
> … By the present declaration, Member States inform investment arbitration tribunals about the legal consequences of the Achmea judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between Member States or under the Energy Charter Treaty.[57]

Italy further observes that footnote 2 of the Declaration specifies, for the sake of clarity, that "[f]or the Energy Charter Treaty, its systemic interpretation in conformity with the Treaties precludes intra-EU investor-State arbitration."[58]

---

[54] Rejoinder, ¶¶ 112-113.

[55] Rejoinder, ¶ 121.

[56] Rejoinder, ¶ 122.

[57] Termination Request, pp. 1-2 (quoting the January 2019 Declaration).

[58] Termination Reply, ¶ 3.

40.   Italy contends that "[g]iven that arbitral tribunals are bound by the will of the Contracting Parties," the Tribunal should "duly take the abovementioned Declaration into account in conformity with Article 31(2)(b) VCLT and Article 31(3)(a) VCLT, and consequently … terminate the proceedings accordingly."[59]  In its view, the Declaration is "a binding instrument emanating from sovereign States," amounting to a "shared understanding … regarding the interpretation of the ECT," and such "interpretative declarations … provide an authentic interpretation" of Article 26 of the ECT "as far as the Contracting Parties signing the Declaration are concerned."[60]  As a result, it is no longer "a matter of discussion how to interpret *Achmea*," but rather a requirement to acknowledge that the Member States signing the Declaration interpret the *Achmea* Judgment as applying to the ECT, with the "consequence of prohibiting any pending or future arbitration procedure concerning the ECT."[61]

41.   Italy adds that it is irrelevant that several EU Member States have chosen not to sign, since both Italy and Belgium did so, and "each declaration can be formally broken down into a bundle of unilateral declarations amounting to a shared understanding between" them.[62]  Even multilateral treaties like the ECT reflect "reciprocal obligations," and here the two relevant States have confirmed reciprocally their interpretation of the ECT's dispute settlement clause,[63] with the effect that "the binding nature of the Declaration affecting reciprocal obligations … cannot be challenged."[64]  According to Italy, this also must be taken as having "been always their understanding of such clause,"[65] since the exercise of "interpreting" is not the same as revising, but rather involves clarifying the meaning and scope attributed to a particular provision.[66]  Such a clarification does not constitute a retroactive withdrawal of consent, but simply "confirm[s] how the ECT should have always been interpreted in their understanding."[67]

---

[59] Termination Request, p. 2.

[60] Termination Reply, ¶ 4.

[61] Termination Reply, ¶ 7.

[62] Termination Reply, ¶ 13.

[63] Termination Reply, ¶ 13.

[64] Termination Reply, ¶ 20; *see also id.*, ¶¶ 22-23 (referring to certain reports by the International Law Commission ("**ILC**"), **RL-102** and **RL-103**).

[65] Termination Reply, ¶ 13.

[66] Termination Reply, ¶ 31 (citing **RL-103**), ¶ 38.

[67] Termination Reply, ¶ 45.

42.     It follows, in Italy's view, that an arbitration tribunal "has to interpret the treaty acknowledging the existence of a specific interpretative declaration by one or more Contracting Party/ies."[68]  Stated most plainly, "[s]uch reading is binding on the Tribunal."[69]

## B. ESKOSOL'S POSITION

### 1. Interpretation of the ECT

43.     Eskosol rejects Italy's contention that it never agreed in the ECT to arbitrate disputes with investors from other EU Member States.  Eskosol starts with "the plain terms" of Article 26 of the ECT, and in particular the "interplay between" Article 26(1), which identifies the scope of "disputes" covered by the Article, and Article 26(7), which offers arbitration to resolve those disputes.[70]  Under Article 26(1), the relevant "disputes" are those between a "Contracting Party" and an investor of "another Contracting Party."   Under the definition of "Contracting Party" in Article 1(2) – under which a "Contracting Party means *a state or* Regional Economic Integration Organization" – the individual EU Member States "are each considered to be Contracting Parties."[71]   In other words, Italy and Belgium "each voluntarily signed, ratified, and agreed to be bound by the ECT …."[72]

44.     In Eskosol's view, this conclusion is not affected by the fact that the EU is also a "Contracting Party" to the ECT, by virtue of being an REIO,[73] since "[t]he fact that the EU is a Contracting Party does not deprive Italy and Belgium of their own status … as a Contracting Party in their own right."[74]  Rather, in the words of the tribunal in *Eiser v. Spain*, "[b]oth the EU and [its] Member States can have legal standing as respondents in a claim under the ECT."[75]

45.     Nor does Article 26(1)'s reference to "disputes … relating to an Investment … in the Area" of the relevant Contracting Party lead to a conclusion, either (a) as the Commission argues, that since "[t]he 'Area' of the EU comprises the entirety of the areas of the EU Member States," then "an investment by … an EU investor in Italy is not an investment in the area of *another* Contracting Party, but in the

---

[68] Termination Reply, ¶ 29.

[69] Termination Reply, ¶ 45.

[70] Memorial, ¶ 228.

[71] Memorial, ¶ 229; Eskosol PHB, ¶ 72.

[72] Bifurcation Response, ¶ 66.

[73] Memorial, ¶ 231.

[74] Memorial, ¶ 232 (citing decisions in several ECT cases); Bifurcation Response, ¶ 66.

[75] Bifurcation Response, ¶ 69 (quoting *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award ¶ 94 (4 May 2017) (**CL-149**) ("*Eiser*")).

area of the same Contracting Party,"[76] or (b) as Italy argues, that there is an overlap of "Areas" where "competences" should be allocated by subject matter, with the EU having exclusive competence on investment issues.[77] To the contrary, Eskosol endorses the reasoning of the tribunal in *Charanne v. Spain* that "Article 1(10) of the ECT, when defining the term 'Area', refers to both the area of the [ECT] Contracting States … as well as the area of the EU …. Thus, it seems reasonable to conclude that, when referring to investments made 'in the area' of one Contracting Party, Article 26(1) refers to both …. Whether 'area' refers to one or the other depends on the content of the claim and the entity against which the claim is pursued …."[78] In this case, Eskosol notes, it "is not suing the EU and thus there is and cannot be identity of 'Areas'."[79]

46.    Eskosol argues that "[h]ad the drafters of the ECT intended to exclude [intra-EU] disputes … from the ambit of Article 26 they easily could have made an exception to this effect," but "[t]here is no such exception anywhere in the treaty, and certainly none in Article 26."[80] Eskosol observes that the ECT Contracting Parties did include an express exception for the Svalbard Treaty, but did not do so for ECT dispute settlement.[81] There is thus "no way to read the ambit of Article 26(1) of the ECT so as to exclude intra-EU disputes without doing violence to the plain terms of the ECT."[82] Taking the point further, Eskosol observes that a carve-out for intra-EU disputes "would be a very significant exception, normally necessitating specific wording."[83] In that case, "the treaty would have said so," most likely by means of a "disconnection clause," *i.e.*, an "express provision … stating that 'EU Member States will apply EU law in their relations *inter se* rather than the convention in which it is inserted'."[84] The

---

[76] Memorial, ¶ 231 (quoting Commission Submission, ¶ 22).

[77] Bifurcation Response, ¶ 65 (quoting Memorial on Jurisdiction, ¶ 172).

[78] Memorial, ¶ 233 (quoting *Charanne and Construction Investments v. Spain*, SCC Arbitration No. 062/2012, Award ¶¶ 430-431 (21 January 2016) (**CL-82**) ("*Charanne*")).

[79] Memorial, ¶ 234; Bifurcation Response, ¶ 74; *see also* Eskosol PHB, ¶ 78 (endorsing with respect to this issue the reasoning in *Vattenfall AV et al. v. Federal Republic of Germany*, ICSID Case No. ARB/1212, Decision on the *Achmea Issue*, ¶ 182 (31 August 2018) (**CL-193**) ("*Vattenfall*")).

[80] Memorial, ¶ 229; *see also* Tr. 1, 70:15-17 (describing Article 26 as "an opportunity for the drafters of the treaty to exclude intra-EU disputes; it's not here"), 70:18-71:7 (describing the Article 1 definitions of "Contracting Party," "REIO," and "Area" as further "opportunities" for carve-outs that were not used).

[81] Eskosol PHB, ¶ 74; Tr. 1, 73:6-17.

[82] Memorial, ¶ 229; *see also* Eskosol PHB, ¶ 65 ("The heart of the VCLT interpretation exercise is an analysis of the express words used in Article 26 ECT and related provisions. The simple fact is that nowhere in Article 26 EC nor the remaining provisions of the ECT is there a carve-out for intra-EU disputes.").

[83] Bifurcation Response, ¶ 67; Rejoinder on Jurisdiction, ¶ 67; Eskosol PHB, ¶ 74.

[84] Memorial, ¶ 236 (quoting *RREEF Infrastructure (GP) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction ¶ 82 (6 June 2016) (**CL-101**) ("*RREEF*")).

EU had included such disconnection clauses in other treaties before the ECT, but did not do so here.[85] In Eskosol's view, the lack of such a clause "was no coincidence as there was never any intention to carve out intra-EU disputes from the jurisdictional ambit of the ECT."[86] Eskosol cites several prior investment arbitration decisions concluding as much.[87]

47.    Eskosol rejects Italy's reliance on Article 25 of the ECT regarding EIAs, which it considers "plainly not on point," since "[n]owhere does this provision refer to the relationship between EU law and the ECT," much less "support[] the proposition that EU law ousts the application of the ECT."[88]  Likewise, Eskosol deems Article 16 of the ECT to be "of no assistance to Italy."[89]  Eskosol interprets Article 16 "[q]uite the opposite," as providing that "both regimes would be able to co-exist peacefully, to the benefit of relevant investors," in the sense that (as the *Eiser* tribunal found) "Article 16 assures Investors or their Investments the greatest protection available under either the ECT or the other agreement."[90]  Eskosol points in particular to the "very clear language at Article 16(2) ECT which protects the rights of Investors under parts III and V (and in particular Article 26 ECT) in the event of any conflicting prior or subsequent international treaties."[91]  It notes that "the *Vattenfall* tribunal in particular found this provision to be a complete answer" to intra-EU objections in that case.[92]

48.    Eskosol further rejects Italy's suggestion that the ECT's history and circumstances show an intent not to apply it to intra-EU disputes.  Since Article 26 of the ECT "on its face, does not exclude intra-EU disputes," resort to supplementary materials cannot be said to "confirm" such exclusion "within the meaning of Article 32 of the VCLT."[93]  Nor is there anything "ambiguous or obscure" in the ECT that even permits resort to supplementary materials under Article 32(a) of the VCLT.  Eskosol quotes the

---

[85] Eskosol PHB, ¶ 75 (citing *inter alia Vattenfall*, ¶ 203 (**CL-193**)).  Eskosol also argues that the fact that the EU took steps in 2005 to carve out intra-EU disputes from the International Energy Charter that might replace the ECT "underscores the fact that there is no such carve-out within the ECT or its ancillary documents."  Eskosol PHB, ¶ 76.

[86] Memorial, ¶ 236.

[87] Bifurcation Response, ¶¶ 67-68 (quoting *RREEF*, ¶¶ 84-85 (**CL-101**) and *Eiser*, ¶ 86 (4 May 2017) (**CL-149**)); Rejoinder on Jurisdiction, ¶¶ 68-71 (quoting the same and also *Novoenergia II – Energy & Environment (SCA) Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Arbitration (2015/063), Award ¶ 454 (15 February 2018) (**CL-191**) ("*Novoenergia*") and *Masdar Solar & Wind Cooperatief U.A. v. Spain*, ICSID Case No. ARB/14/1, Award ¶ 311 (16 May 2018) (**RL-90**) ("*Masdar*")); Eskosol PHB, ¶ 78 (also citing *Vattenfall*, ¶ 202 (**CL-193**), for the absence of an disconnection clause).

[88] Bifurcation Response, ¶ 70 (discussing *Eiser*, ¶ 194 (**CL-149**)).  Eskosol similarly rejects as "completely irrelevant" Italy's reliance on the Energy Charter Conference Decision relating to the EIA issue.  Bifurcation Response, ¶ 72.

[89] Bifurcation Response, ¶ 71.

[90] Bifurcation Response, ¶ 71 (quoting *Eiser*, ¶ 202 (**CL-149**)); Rejoinder on Jurisdiction ¶ 73; Tr. 1, 71:13-17.

[91] Eskosol PHB, ¶¶ 77, 85.

[92] Eskosol PHB, ¶ 77 (citing *Vattenfall*, ¶ 192 (**CL-193**)); Tr. 1, 72:20-73:5.

[93] Bifurcation Response, ¶ 73.

*Charanne* tribunal to the effect that "the terms of the [ECT] are clear and do not justify recourse to supplementary means of interpretation that could lead to add to the ECT an implied disconnection clause in respect of intra-EU disputes."[94]  Moreover, application of the ECT to intra-EU disputes does not amount to "a result which is manifestly absurd or unreasonable" under Article 32(b) of the VCLT.[95]

49.     Finally, with respect to Italy's invocation of the "practice" of EU Member States to protest intra-EU claims under the ECT, Eskosol asserts that this cannot "lead to an interpretation that is at odds with the terms of the ECT."[96]

### 2.  EU Law Developments

#### a.  Progressive Development of EU Treaties

50.     In Eskosol's view, subsequent EU treaties, including "the adoption of the Lisbon Treaty in 2007, roughly 13 years after the signing of the ECT," are "immaterial."[97]  Eskosol emphasizes that under Article 30 of the VCLT, a subsequent treaty may only abrogate provisions of an earlier treaty if the treaties relate to the same subject matter, and then only to the extent the treaties are incompatible.  In its view, the ECT and the Lisbon Treaty "do not relate to the same subject matter, nor are they incompatible."[98]  Further, even if the two were considered as having the same subject matter, the conflict rule in Article 16(2) of the ECT – and not the general conflict rule in Article 30(4)(a) of the VCLT – would apply "by operation of the *lex specialis* principle."[99]  Eskosol in any event questions which is really the later treaty, given that "Articles 267 and 344 TFEU have existed in the same form prior to the ECT," and "[t]herefore it is not clear that the EU Treaties and specifically those provisions are the successive treaties to the ECT, nor for that matter that this is truly the type of situation in which Article 30(4)(a) VCLT was intended to apply."[100]

---

[94] Bifurcation Response, ¶ 74 (quoting *Charanne*, ¶ 437 (**CL-82**)); *see also* Eskosol PHB, ¶ 68 ("Any reading of an implicit carve-out would significantly depart from the original meaning of the text used in the ECT and related instruments") and ¶ 79 (rejecting resort to "selected *travaux preparatoires* … given the clarity of the terms of the ECT").

[95] Bifurcation Response, ¶ 75.

[96] Bifurcation Response, ¶ 76.

[97] Bifurcation Response, ¶ 77 & V.C; *see also* Tr. 1, 67:15-68:5 (contending that Italy is "inviting this Tribunal to look through the wrong end of the telescope, meaning to start with EU law, and then to use EU law to inform and govern the Tribunal's interpretation of the ECT … The approach should be to analyse the source of this Tribunal's jurisdiction, meaning the Energy Charter Treaty and Article 25 of ICSID, as a matter of international law ….").

[98] Bifurcation Response, ¶ 79 (citing *Blusun S.A. et al. v. Italy*, ICSID Case ARB/14/3, Final Award ¶¶ 285-286 (27 December 2016) (**RL-56**) ("*Blusun*")); Eskosol PHB, ¶ 88(i).

[99] Eskosol PHB, ¶ 88(ii) (citing *Vattenfall*, ¶ 217 (**CL-193**)).

[100] Eskosol PHB, ¶ 88(iii) (citing *Vattenfall*, ¶ 218 (**CL-193**)).

51.     Eskosol also rejects Italy's suggestion that the Lisbon Treaty amounted to an agreement to modify the ECT under Article 41 of the VCLT, noting that under that provision a "partial agreement" to modify a multilateral treaty between certain parties is effective only if it is not prohibited by the treaty and "does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole."[101]   In Eskosol's view, a "modification" resulting in a carve-out for intra-EU disputes is prohibited by the ECT, given that Article 16 of the ECT prevents another treaty from derogating from more favorable rights in Parts III and V of the ECT, including the right to dispute resolution.[102]   Moreover, Italy's argument would lead to "the effective derogation" of the ECT's substantive protections to qualifying investors despite those protections being "certainly superior to, or more protective than, those under EU law," including by affording access to an independent ICSID tribunal rather than the courts of the very host State whose actions are being challenged.[103]

52.     Finally, Eskosol rejects Italy's attempt to demonstrate incompatibility between the ECT and EU law "based solely on EU law principles," which supposedly would "entail that this Tribunal lacks jurisdiction to resolve the present dispute."[104]   Eskosol's view is that "there is no conflict between the ECT and EU law," since Article 344 of the TFEU is "immaterial to the dispute in hand," relating only to State-to-State disputes and not investor-State disputes.[105]   In any event, if there was a conflict between the ECT and EU law, "the ECT should prevail" as a matter of public international law.[106]

**b.   The *Achmea* Judgment**

53.     In Eskosol's view, the *Achmea* Judgment in no way compels a finding that this Tribunal lacks jurisdiction.   First, as a threshold matter, "a decision by the ECJ is not binding upon this Tribunal, which under the ICSID framework operates on an international plane, insulated from the intervention of other courts."[107]   Indeed, Eskosol warns against Italy's effort to "persuade the Tribunal to abdicate its decision-making function and defer to a decision of a regional judicial body formed under a different treaty."[108]   Eskosol emphasizes that the Tribunal's mandate is to interpret and apply the ECT,

---

[101] Bifurcation Response, ¶ 81.

[102] Eskosol PHB, ¶ 91.

[103] Bifurcation Response, ¶¶ 82, 91.

[104] Bifurcation Response, ¶ 83.

[105] Bifurcation Response, ¶¶ 85-86.

[106] Bifurcation Response, ¶¶ 85, 89.

[107] Bifurcation Response, ¶ 90; Rejoinder on Jurisdiction, ¶ 76; Tr. 1, 77:2-10.

[108] Rejoinder on Jurisdiction, ¶ 61.

and it "is not bound by EU law any more than it is bound by the domestic law of any given state."[109]
To the contrary, "each of this Tribunal and the ECJ are judicial decision-making entities created by
virtue of the provisions of the respective treaties from which they each derive their jurisdiction and
authority," and the decisions of one are not binding on the other.[110]

54.     Second, even if the Tribunal were required to take regard of the *Achmea* Judgment, "that judgment
        does not extend to intra-EU disputes under the ECT for good reason."[111]   Eskosol notes that the
        question referred to the ECJ by the German Federal Court of Justice was: "Does Article 344 TFEU
        preclude the application of a provision in a *bilateral investment protection agreement between Member
        States* of the European Union (a so-called intra-EU BIT) …," and the ECJ's response was to find that
        "Articles 257 and 344 TFEU must be interpreted as precluding a provision in an international
        agreement *concluded between Member States* …,"[112] making no reference to the ECT even though the
        Advocate General had expressly commented on the ECT in his opinion.[113]   That is significant, in
        Eskosol's view, and no doubt reflects that unlike intra-EU BITs (such as the BIT in issue in *Achmea*),
        "[t]he EU is a party to the ECT and, as such, the ECJ could not seriously contend that the ECT is
        contrary to EU law."[114]   Eskosol invokes the *Masdar* tribunal's finding on this basis that the *Achmea*
        Judgment "does not take into consideration, and thus it cannot be applied to, multilateral treaties, such
        as the ECT, to which the EU itself is a party."[115]   It similarly cites the decisions of the *Vattenfall* and
        *Greentech* tribunals that the *Achmea* Judgment at most extends only to intra-EU BITs.[116]

55.     Eskosol also argues that the *Achmea* Judgment post-dates its acceptance (by virtue of initiating this
        case) of Italy's offer to arbitrate contained in the ECT.   Eskosol emphasizes that under Article 25(1)
        of the ICSID Convention, "[w]hen the parties have given their consent, no party may withdraw its
        consent unilaterally."   Eskosol notes that Italy filed a notice to withdraw from the ECT on 31
        December 2014, and "yet – of course – [it] has not pursued an argument that such withdrawal could

---

[109] Rejoinder on Jurisdiction, ¶ 61; *see also* Tr. 1, 68:18-22 ("Achmea changes nothing for the purposes of this Tribunal's jurisdictional analysis.  It is a pronouncement by a judicial body within the EU legal order applying EU law.  Achmea does not change the rules of interpretation of international treaties.").

[110] Rejoinder on Jurisdiction, ¶ 79.

[111] Rejoinder on Jurisdiction, ¶¶ 76, 81; Eskosol PHB, ¶¶ 69, 80; Tr. 1, 69:13-17, 77:11-14.

[112] Rejoinder on Jurisdiction, ¶¶ 82-83.

[113] Eskosol PHB, ¶ 83.

[114] Rejoinder on Jurisdiction, ¶ 62; Eskosol PHB, ¶ 83.

[115] Rejoinder on Jurisdiction, ¶ 85 (quoting *Masdar*, ¶ 679 (**RL-90**)).

[116] Eskosol PHB, ¶ 84 (citing *Vattenfall*, ¶¶ 160-164, 212-214 (**CL-193**) and *Foresight Luxembourg Solar 1 S.À.R.L., Foresight Luxembourg Solar 2 S.À.R.L., Greentech Energy Systems A/S, GWM Renewable Energy I S.PA., GWM Renewable Energy II S.PA. v. The Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, ¶ 220 (14 November 2018) (**CL-195**) ("*Greentech*")).

amount to a withdrawal of [Italy]'s consent to these proceedings.  Similarly, by no stretch could a decision of the ECJ pursuant to the TFEU amount to withdrawal of consent by [Italy] under the ECT."[117]

56.    Finally, Eskosol rejects Italy's reference to the issue of enforceability in the face of the *Achmea* Judgment, deeming it "pure speculation" that an award issued by this Tribunal under the ECT would not be enforceable within the EU.   "However, more fundamentally, questions of enforceability in certain jurisdictions should not impact a tribunal's jurisdictional analysis."[118]

### c.    The January 2019 Declaration

57.    Eskosol rejects Italy's interpretation of the January 2019 Declaration.  It observes that the Declaration contains "no analysis" of the *Achmea* Judgment, but simply a "self-serving" statement of view about the "alleged consequences" of that Judgment.[119]   That statement is "extraneous to the ECT," in the sense that it is not authorized by any provision of the ECT, and Italy's invocation of it constitutes an "effort to retroactively invalidate its consent to arbitrate, which has already been accepted by Claimant here, … inconsistent with international law."[120]

58.    Eskosol adds that not all EU Member States have signed the Declaration, and in fact six other EU Member States have declared it inappropriate to express a view on the compatibility of EU law and the ECT at this time, based on the *Achmea* Judgment's silence about the ECT.[121]  In any event, even for the States signing the Declaration, at most that document reflects an interpretation of *Achmea*, which the Tribunal can interpret for itself.  Moreover, the Tribunal's jurisdiction is governed by the ECT and ICSID, and the Member States signing the Declaration "do not purport to issue [it] … on the basis of any authority or right granted to Contracting States under the ECT or ICSID."[122]  As for the "so-called will of Belgium and Italy to self-declare that their offer to arbitrate under the present circumstances is invalid," Eskosol contends that this does not bind the Tribunal for purposes of jurisdiction, but rather "[i]n accordance with the principle of compétence-compétence, the Tribunal has the power to determine its own jurisdiction in accordance with the ECT and ICSID."[123]

---

[117] Rejoinder on Jurisdiction, ¶ 80.
[118] Eskosol PHB, ¶ 99 & n. 152 (quoting *Vattenfall*, ¶¶ 230-231 (**CL-193**)); Tr. 1, 78:15-25.
[119] Termination Response, p. 1.
[120] Termination Response, p. 1.
[121] Termination Response, p. 2.
[122] Termination Response, p. 3.
[123] Termination Response, p. 3.

59.   Eskosol also rejects the suggestion that Articles 31(2)(b) and 31(3)(a) of the VLCT could guide the Tribunal's analysis with respect to the January 2019 Declaration. Those provisions involve interpretation of treaties, but the Declaration "does not purport to interpret a single provision or term of the relevant treaty, the ECT," but merely declares the invalidity of one of its provisions.[124] This is "at most a political declaration,"[125] which in Eskosol's view "cannot overcome the plain meaning of the terms and provisions of the ECT, which provide no carve out for intra-EU disputes" and moreover already regulates any possible conflict with EU law, by virtue of its own Article 16(2).[126] Eskosol characterizes Italy's attempt to apply the January 2019 Declaration to bind the Tribunal in interpreting Article 26 of the ECT as "highly remarkable, and a significant departure from a common-sense VCLT-led process of interpretation."[127] In fact, Eskosol contends that the January 2019 Declaration is not an interpretation at all, but rather an "attempted late-stage 'reservation,'" which is prohibited by the unambiguous prohibition on reservations set forth in Article 46 of the ECT.[128] Eskosol contrasts the January 2019 Declaration with those issued at the time the ECT was concluded, which in its view were intended at the time of signing to be the "final word" on the ECT's scope and obligations. These were far different from a "declaration issued 25 years after concluding a treaty in circumstances where a State seeks to absolve itself from liability in on-going arbitration proceedings."[129]

60.   With respect to such ongoing proceedings, Eskosol finally emphasizes that it accepted Italy's offer to arbitrate in the ECT in 2015, more than three years before the January 2019 Declaration was issued. "The idea that a Respondent could retroactively withdraw or vitiate its consent to arbitration on the eve of an award through a self-serving declaration would clearly run contrary to the investor protections contained in the ECT."[130] For this reason, Eskosol "queries the relevance and applicability" of ILC guidelines on interpretative declarations, which were "produced for the purposes of determination of State-to-State obligations in the sphere of public international law" and "cannot be directly transposed" to investment treaty arbitration, where investors are relying on treaty provisions to assert their rights and have accepted consent by commencing an arbitration. In that context, allowing States power to issue "self-serving 'interpretative declarations' … would have the

---

[124] Termination Response, p. 3; Termination Rejoinder, p. 1.

[125] Termination Rejoinder, p. 1.

[126] Termination Response, p. 3; Termination Rejoinder, p. 5.

[127] Termination Rejoinder, p. 1.

[128] Termination Rejoinder, pp. 2, 3.

[129] Termination Rejoinder, pp. 3, 4.

[130] Termination Response, p. 3.

potential to undermine the investor-State system of rights and protections."[131]  Such a result also would be contrary to Article 25(1) of the ICSID Convention, under which "no party may withdraw its consent unilaterally" once the consent has been given previously by both parties.[132]

## IV.    THE COMMISSION'S POSITION

### A. INTERPRETATION OF THE ECT

61.      The Commission contends that from the date of Italy's ratification of the ECT, its "offer for arbitration … was only addressed to investors from Contracting Parties other than EU Member States."[133]  That is because the ECT "created international obligations only between third countries and the *competent* subject of international law of the area of Union law," *i.e.*, "either the Union (for areas of Union competence) or the EU Member States (for areas of Member State competence)."[134]  This in turn is so because EU Member States "can only enter into international obligations *inter se* to the extent that they have not transferred their external competence to the Union."[135]

62.      The Commission accepts that Article 26 of the ECT is to be interpreted in accordance with the VCLT.[136]  It notes that Articles 1(2) and 1(3) allow a REIO to be a Contracting Party with respect to matters over which States have "transferred competence …, including the authority to take decisions binding on them," and contends that Article 36(7) further reflects "the division of competences and foresees that the Union votes on matters falling in its competence, and the Member States on matters falling in their competence …."[137]  Moreover, Article 1(10)'s reference to the "Area" of a REIO cross-references "the agreement establishing that Organization," which in this case are "the EU Treaties, i.e. the TEU, the TFFEU and the Euratom Treaty."[138]  In consequence, since the "Area" of the EU "comprises the entirety of the areas of the EU Member States," an investment by an EU investor in Italy is "not an investment in the area of another Contracting Party, but in the area of the same Contracting Party."[139]  Starting from this proposition that "[t]he Union [is] a single investment area

---

[131] Termination Rejoinder, p. 2.

[132] Termination Response, p. 3.

[133] Commission Submission, p. 3, section heading 2.

[134] Commission Submission, ¶ 13.

[135] Commission Submission, ¶ 14.

[136] Commission Submission, ¶ 15.

[137] Commission Submission, ¶¶ 17-18; Commission Update, ¶¶ 14-15.

[138] Commission Submission, ¶¶ 20-21.

[139] Commission Submission, ¶ 22.

for its Member States," the Commission concludes that "the offer for arbitration made by the Union (comprising, among others, Italy) is hence only made to investors from Contracting Parties that are not EU Member States."[140]

63.    The Commission rejects the contrary notion, adopted by the *Charanne* and *RREEF* tribunals, that the term "Area" instead should be "defined depending on who is the respondent."[141]   That view, which would remove any assessment of whether a Member State or the Union "has the external competence for the matter in question," would deprive Article 1(10)'s reference to "the agreement establishing that Organization" of any effectiveness or *effet utile*.[142]   It also "disregards the importance that the ECT places in Article 1(3) on the transfer of competence" from individual States to the REIO. [143]   Finally, only the Commission's interpretation would avoid "respondent shopping," under which investors could always avoid bringing claims against the EU itself simply by challenging the "national acts of execution of Union law" on which the Union generally relies in the absence of its own direct enforcement tools.[144]

64.    The Commission contends that its view of these provisions was clear from the outset, when it submitted a statement to the ECT Secretariat pursuant to ECT Article 26(3)(ii), referring to determinations "if necessary" between the EU and its Member States as to "who is the respondent party to arbitration proceedings initiated by an Investor of *another Contracting Party*."   The Commission contends that the word "another" in this context "clearly excludes disputes brought by EU investors against a Member State," and thus illustrates the understanding from the beginning that only investors from non-EU States could bring a case against the EU or its Member States.[145]

65.    The Commission further argues that its interpretation is "supported by the context, object and purpose of the ECT."[146]   First, EU law is a "relevant rule of international law applicable in the relations between the parties" in the sense of Article 31(3)(c) of the VCLT, particularly as the ECT was initiated by the EU and incorporates by reference the Charter of Paris and the European Energy Charter, which refer to the EU's special role and status.[147]   As a matter of EU law, both the EU and its Member States are

---

[140] Commission Submission, ¶ 22.

[141] Commission Submission, ¶ 25.

[142] Commission Submission, ¶ 27.

[143] Commission Submission, ¶ 28; Commission Update, ¶¶ 14-16.

[144] Commission Submission, ¶ 29.

[145] Commission Submission, ¶ 30.

[146] Commission Submission, ¶ 32; Commission Update, ¶ 22.

[147] Commission Submission, ¶ 33.

"bound by the general principle of … unity in the international representation of the Union,"[148] and accordingly they "acted throughout the [ECT] negotiations like one single block."[149]  Indeed, the ECT was proposed by the Commission and initially conceived as a European treaty, to promote cooperation "between the European Communities, on the one hand, and Russia, the CIS and the countries of Central and Eastern Europe, on the other hand."[150]  This "historical process" confirms that the ECT was "perceived as part of the European Communities' external energy policy" and "never intended … [to] influence their internal energy policy," which was already "well under way when the ECT was negotiated."[151]

66.    In the Commission's view, the absence of a "disconnection clause" in the ECT is of no significance, since such a clause is "*only* needed where the application of Union law between the Member States is not in line with Article 41(1)(b) VCLT.  Where, on the contrary, as in the present case, the rights and obligations of third countries are not affected, 'the insertion of the EU-specific 'disconnection clause' seems to be entirely superfluous'."[152]  Moreover, disconnection clauses have "traditionally been used in international treaties where the Union could not become a Contracting Party itself," so "disconnection clauses may indeed be useful, as … a 'reminder of [the Union's] existence'."[153]  This is unnecessary in treaties like the ECT where the EU itself is a party and its role as a REIO is explicitly recognized.[154]

67.    The Commission acknowledges in its updated submission the fact that the EU nonetheless had attempted during the ECT negotiations to introduce a disconnection clause, but that clause in the end was removed from the relevant ministerial declaration.[155]  In its view, the *Vattenfall* tribunal was wrong to "attach[] particular importance" to this history,[156] for two reasons.  First, there was "no legal need for a disconnection clause," which would have had "purely declaratory, but no constitutive character."  Second, the ECT's language on the REIO itself "evolved over time in the negotiations, turning into a disconnection clause itself, because it recognizes the transfer of competences" to the

---

[148] Commission Submission, ¶ 36.

[149] Commission Submission, ¶ 39.

[150] Commission Submission, ¶¶ 39, 42.

[151] Commission Submission, ¶¶ 42-44.

[152] Commission Submission, ¶ 49 (citation omitted).

[153] Commission Submission, ¶ 51.

[154] Commission Submission, ¶ 52.

[155] Commission Update, ¶ 24.

[156] Commission Update, ¶ 24 (citing *Vattenfall*, ¶ 205 (**CL-193**)).

REIO and the fact that "in such a situation, the relevant territory of the Contracting Party is that of the [REIO], and not that of its members."[157]

## B. EU Law Developments

### 1. Progressive Development of EU Treaties

68.     For the reasons above, the Commission submits that Italy cannot be viewed as ever having made an offer of arbitration to investors of other EU Member States.  However, even if *arguendo* Member States had entered into certain *inter se* obligations through the ECT, "those obligations would only cover areas where EU Member States retain external competence."[158]

69.     However, by virtue of the progressive development of the EU Treaties, EU law internal market rules now "govern and protect all steps of the life-cycle of an investment,"[159] including through provisions on freedom of establishment and free movement of capital and payments, which forbid discriminatory measures and other restrictions on investment, and also govern expropriation.[160]  EU law also "provides for a complete set of remedies that ensure its proper application."[161]  In consequence of these EU law rules on investment protection, EU Member States now lack the "external competence" to conclude an investment protection treaty between themselves, since this "might affect common rules or alter their scope" within the meaning of Article 3(2) TFEU.[162]  Only "the Union has exclusive external competence to conclude agreements … for areas where the EU Treaties expressly stipulate such exclusive competence."[163]

70.     The Commission concludes that because "all provisions in Part III and Article 26 ECT fall within the external competence of the Union," only the EU – and not its Member States – are bound by those provisions.[164]  Any opposite conclusion would place the ECT into conflict with Article 19(1) TEU and Articles 267 and 344 TFEU with respect to interpretation and application of EU law.[165]  That is because, pursuant to Article 26(6) of the ECT, EU law is part of the "applicable rules of international

---

[157] Commission Update, ¶ 25.

[158] Commission Submission, ¶ 54.

[159] Commission Submission, ¶ 67.

[160] Commission Submission, ¶¶ 68-74.

[161] Commission Submission, ¶ 75.

[162] Commission Submission, ¶ 77.

[163] Commission Submission, ¶¶ 61, 64.

[164] Commission Submission, ¶ 87.

[165] Commission Submission, Section 3.1.2 and ¶¶ 95-96.

law" to be applied by any arbitral tribunal, and under Article 26(8) of the ECT any arbitral decision should be "final and binding." Yet, EU law does not permit the creation of dispute settlement systems to interpret EU law that are outside the "complete system" created by Article 19(1) TEU and Articles 267 and 344 TFEU.[166]

71.    The Commission urges the Tribunal to resolve any ambiguity with respect to intra-EU disputes through "harmonious interpretation," in other words in a way that does not conflict with Union law.[167] In the event of any "open conflict" between the ECT and the EU Treaties, however, the Commission considers that the EU Treaties "take precedence over the ECT."[168] The Commission rejects the notion that the ECT was intended to apply as *lex specialis* to EU law,[169] and in particular the view (adopted by the *Vattenfall* tribunal) that Article 16 of the ECT "qualifie[s] … as a special conflict rule applicable to this conflict, to the detriment of the primacy of Union law."[170] To the contrary, in its view, Article 16 of the ECT "does not contain a rule of conflict, but only a rule of interpretation," and in any event any conflict rule reflected in ECT Article 16 "would have been overruled by the later special conflict rule" of the primacy of EU law within intra-EU relations, reflected in Article 351 TFEU and "re-affirmed" in the Lisbon Treaty.[171] The Commission considers Article 351 TFEU to prevail even over the general conflict rules in Article 30 of the VCLT, since the latter "were conceived as residual rules," whereas "EU law foresees a special conflict rule" involving the primacy of EU law.[172] The Commission emphasizes that under Article 351 TFEU (formerly 307 EC), "in matters governed by the EU Treaties, EU law takes precedence over international treaties concluded between Member States, regardless of whether they were concluded before or after EU accession."[173] The Commission invokes the *Electrabel* decision in support of this argument.[174]

72.    In any event, the Commission argues, the same result would be obtained even if the Tribunal instead were to start with the general international law conflict rules contained in Articles 41(1)(b) and

---

[166] Commission Submission, ¶ 97.

[167] Commission Submission, ¶¶ 89, 91, 110 (2), ¶ 116; Commission Update, ¶ 8.

[168] Commission Submission, ¶¶ 91, 110(3), 113 (citing *Electrabel*, ¶¶ 4.178-4.191 (**RL-58**)); Commission Update, ¶ 8.

[169] Commission Submission, ¶ 115.

[170] Commission Update, ¶¶ 27, 48.

[171] Commission Update, ¶ 44.

[172] Commission Update, ¶ 31.

[173] Commission Update, ¶ 32 (citing CJEU case law).

[174] Commission Update, ¶¶ 33, 36.

30(4)(a) of the VCLT, rather than with EU law.[175]  First, since the Treaties of Amsterdam, Nice and Lisbon "re-affirmed" the investment protection rules of EU law as well as general principles concerning competences and judicial protection, this "could be interpreted as an amendment [of the ECT] pursuant to Article 41(1)(b) VCLT."[176]  Alternatively, since the Member States have "reaffirmed their commitment to Union law" by these three Treaties, the EU Treaties constitute the "subsequent" treaty for a *lex posterior* analysis under VCLT Article 30(4)(a).[177]  The result is that the ECT would apply only to the extent the EU Treaties did not relate to the same subject matter and their respective provisions were not incompatible.[178]  The Commission contends, however, that the ECT and the EU Treaties *do* relate to the same subject matter, since the ECT "established a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the European Energy Charter," and the EU Treaties "establish a European Union to achieve European unity, including an internal market that also covers energy," including a "dedicated competence for energy" introduced by the Lisbon Treaty "for the first time."[179]  Moreover, the provisions of the ECT on investment protection (Chapter III) and dispute settlement (Article 26) are not compatible with EU law when applied between EU Member States. For this reason, the Commission concludes, "they are, pursuant to Article 30(4)(a) VCLT, not applicable."[180]

## 2. The *Achmea* Judgment

73. According to the Commission, the *Achmea* Judgment is an "authoritative and binding interpretation of the relevant provisions of Union law," not just for all EU Member States and any investor established in those States, but also for this Tribunal.[181]

74. The Commission moreover interprets the *Achmea* Judgment as precluding intra-EU arbitration "independently of the type of investment protection agreement it is based on (bilateral or

---

[175] Commission Submission, ¶ 118.

[176] Commission Submission, ¶ 127.

[177] Commission Submission, ¶ 132.

[178] Commission Submission, ¶¶ 128, 132.

[179] Commission Submission, ¶ 130; Commission Update, ¶ 39.

[180] Commission Submission, ¶ 133.  In the Commission's Update, it urges the Tribunal to consider "same subject matter" and "incompatibility" as a single condition rather than "two separate conditions," contending based on the ILC drafting history of VCLT Article 30 that "conflict is the necessary and sufficient condition," and that the rule "applies to all situations where there is a conflict between the earlier and the later treaty."  Commission Update, ¶¶ 39-41.

[181] Commission Update, ¶ 2.

plurilateral)."[182]   It notes that the operative part of the judgment refers to "*a provision in an international agreement concluded between Member States …*," and further observes that "all considerations set out in *Achmea* apply equally to intra-EU investment arbitration based on Article 26 ECT."[183]   That conclusion "cannot be put into question" by paragraph 57 of the *Achmea* Judgment, addressing agreements concluded by the Union, because the EU case law referenced in that paragraph addresses relationship with *non*-EU States, and the possibility of creating international courts under which the autonomy of the EU legal order will be respected, unlike the ECT where an intra-EU arbitral tribunal would have to apply EU law as part of the "applicable rules and principles of international law."[184]

75.     The Commission notes that CJEU judgments "apply, as a matter of principle, *ex tunc*, because the Court only interprets the law, and does not create new law."[185]   Although the CJEU in exceptional cases can limit the application of judgments in time, it has not done so in *Achmea*.   Accordingly, "there should be no doubt that the judgment in *Achmea* applies to all pending investment arbitration cases."[186]   In addition, "when applied on an intra-EU basis, any grandfathering or sunset clause, such as Article 47(3) of the ECT, would be ineffective because it cannot extend the *ratione temporis* application of a treaty clause which is unlawful."[187]   The Commission rejects any concern, such as that expressed by the tribunal in *UP and CD Holding v. Hungary*, that an immediate application of the *Achmea* Judgment to pending cases would result in a retroactive withdrawal of consent in violation of Article 25(1) of the ICSID Convention.[188]   In its view, that concern "overlooks the fundamental point that consent did not have to be withdrawn, because … no consent to arbitration in the concrete case had ever been validly given.   The judgment in *Achmea* applies *ex tunc*."[189]

## V.     THE TRIBUNAL'S ANALYSIS

76.     Although Italy's Termination Request filed earlier this year invokes most proximately the *Achmea* Judgment and the January 2019 Declaration, the Tribunal considers it appropriate to begin its analysis

---

[182] Commission Update, ¶ 3.

[183] Commission Update, ¶¶ 3-4.

[184] Commission Update, ¶ 5.

[185] Commission Update, ¶ 10.

[186] Commission Update, ¶ 10.

[187] Commission Update, ¶ 10.

[188] Commission Update, ¶ 51 (citing *UP and CD Holdings v. Hungary*, ICSID Case No. ARB/13/35, Award ¶ 252 (9 October 2018) (**CL-194**) ("***UP and CD Holdings***")).

[189] Commission Update, ¶ 51.

not with these recent EU law developments, but rather with the underlying issue of ECT interpretation on which both Parties, and the Commission itself, centered their jurisdictional submissions. This reflects the reality, not disputed in this case, that the source of the Tribunal's jurisdiction is in the international legal order, not the EU legal order. The Tribunal has been constituted as an international tribunal following Eskosol's presentation of an RFA under the ECT and the ICSID Convention. The Commission itself acknowledges that in these circumstances, "[t]he starting point of your analysis is therefore necessarily one of international law."[190]  Italy likewise acknowledges that as an ECT signatory, it is "bound by the obligations arising out of the ECT as established under international law," and therefore the specific question – whether it and other EU Member States "bound themselves" to intra-EU arbitration under the ECT – is equally one of international law, to be determined by use of traditional VCLT treaty interpretive tools.[191]

77.    The Tribunal therefore begins in the same place, with the goal of assessing whether – as of when the ECT entered into force for Italy and Belgium in 1998 – these States thereby reciprocally consented to arbitration of potential ECT claims by qualified investors of the other, notwithstanding their common membership in the EU. Following this analysis, the Tribunal examines the implications on Italy's consent of various subsequent developments in the EU legal order, including chronologically (a) the progressive development of the EU Treaties, (b) the *Achmea* Judgment, and (c) the January 2019 Declaration. This sequence mirrors the organizing principle the Tribunal used in the preceding Sections III and IV to summarize the positions of the Parties and of the Commission. The Tribunal finally addresses briefly the issue of enforcement, to which the Parties alluded in their submissions on jurisdiction.

### A. INTERPRETATION OF THE ECT AS OF ITS ENTRY INTO FORCE

78.    As a threshold matter, there is no dispute that both Italy and Belgium are Contracting States to the ICSID Convention, and accordingly under Article 25(1) of that Convention, jurisdiction "shall extend to any legal dispute arising directly out of an investment, between [Italy] and a national of [Belgium], which the parties to the dispute consent in writing to submit to the Centre."[192]  The relevant question for this Decision is whether Italy and Belgium so consented by virtue of their ratification of the ECT.

---

[190] Commission Submission, ¶ 7.

[191] Bifurcation Request, ¶ 165 and Section IV.A.A ("Interpretation of the Contracting Parties' Intent Under Articles 31 and 32 VCLT").

[192] ICSID Convention, Article 25(1).

79.    In resolving this question, the Parties broadly agree that the ECT should be interpreted by means of a traditional VCLT analysis, in particular according to the principles set forth in VCLT Articles 31 and 32.  VCLT Articles 31 and 32 provide as follows:

Article 31
General rule of interpretation

1.  A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2.  The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

(b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3.  There shall be taken into account, together with the context:

(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) any relevant rules of international law applicable in the relations between the parties.

4.  A special meaning shall be given to a term if it is established that the parties so intended.

Article 32
Supplementary means of interpretation

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a)   leaves the meaning ambiguous or obscure; or

(b)   leads to a result which is manifestly absurd or unreasonable.[193]

---

[193] VCLT, Articles 31 and 32 (**CL-57**).

80.    In conducting such a VCLT analysis, the Tribunal bears in mind several propositions.  First, the ECT, like all other treaties, is to be interpreted and applied in accordance with the "natural and ordinary meaning" of its terms, in the context in which they occur.  As the International Court of Justice ("**ICJ**") has explained, this means that "[i]f the relevant words in their natural and ordinary meaning make sense in their context, that is the end of the matter,"[194] since the Contracting Parties' use of unambiguous terms should be taken as reflecting their clear intent.  Second, the relevant "context" for construing any given passage in a treaty includes both the words and sentences found in close proximity to that passage, including definitional terms, and other provisions of the same treaty which help illuminate its object and purpose.[195]  Third, in accordance with Article 32 of the VCLT, only if the approach required by Article 31 leaves a meaning "ambiguous or obscure," or leads to a result that is "manifestly absurd or unreasonable," may recourse be had to supplementary means of interpretation.[196]  The ICJ has explained that even in these circumstances, "a decisive reason" (such as unmistakable evidence of the State Parties' intentions from such supplementary materials) would be required "[t]o warrant an interpretation other than that which ensues from the natural meanings of the words" of a provision.[197]

### 1.    ECT Article 26(3), in the Context of ECT Articles 1(2), (3) and (10)

81.    In this case, the obvious place to begin is with Article 26 of the ECT, which is the provision directly addressing the Contracting Parties' consent to arbitration of ECT disputes.  Article 26 provides in relevant part as follows:

SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR
AND A CONTRACTING PARTY

(1)    Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2)    If such disputes can not [sic] be settled according to the provisions of paragraph (1) within a period of three months from the date on which either

---

[194] *Competence of the General Assembly for the Admission of a State to the United Nations*, Advisory Opinion, ICJ Reports 1950, p. 8 (**CL-59**).

[195] *See generally Kiliç İnşaat İthalat İhracat Sanayi ve Ticaret Anonim Şirketi v. Turkmenistan*, ICSID Case No ARB/10/1, Award ¶ 5.2.6 (2 July 2013) ("Treaty terms are obviously not drafted in isolation, and their meaning can only be determined by considering the entire treaty text. The context will include the remaining terms of the sentence and of the paragraph; the entire article at issue; and the remainder of the treaty […].").

[196] VCLT, Article 32 (**CL-57**) (emphasis added).

[197] *Admission of a State to Membership in the United Nations* (Charter, Art. 4), Advisory Opinion:  I.C.J Reports 1948, pp. 57, 63.

party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

(3) (a)  Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

…

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

(a) (i) The International Centre for Settlement of Investment Disputes …; or

…

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.[198]

82.    Beginning with the opening words of Article 26(1) ("Disputes between a Contracting Party and an Investor of another Contracting Party"), there is no question that both Italy and Belgium were Contracting Parties to the ECT at the times relevant to this dispute.  The ECT entered into force for both States in 1998, and Belgium remains a Contracting Party.[199]  Italy by contrast made a formal notification of its withdrawal from the ECT on 31 December 2014.  Article 47(2) of the ECT however provides that "[a]ny such withdrawal shall take effect upon the expiry of one year after the date of receipt of the notification by the Depository …,"[200] and according to the ECT Secretariat, Italy's withdrawal from the ECT took effect only on 1 January 2016.[201]  This was several weeks after Eskosol

---

[198] ECT, Article 26 (**C-1**).

[199] For purposes of this Decision, the Tribunal assumes *arguendo* that Eskosol qualifies under the ECT as an investor of Belgium by virtue of Blusun's 80% shareholding, notwithstanding Eskosol's eventual entry into liquidation proceedings in Italy.  The Tribunal addressed that question preliminarily in its Decision on Italy's Rule 41(5) Request, and will address it further in its Final Award.

[200] ECT Art. 47(2) (**C-1**).

[201] ECT Secretariat, Members and Observers: Italy (**C-90**).

had filed its Request for Arbitration on 9 December 2015.  Even had it not done so until later, the sunset provision in Article 47(3) of the ECT provides that "[t]he provisions of this Treaty shall continue to apply to Investments made in the Area of a Contracting Party by Investors of other Contracting Parties … as of the date when that Contracting Party's withdrawal from the Treaty takes effect for a period of 20 years from such date."[202]  Notably, Italy has never contested Eskosol's contention in its Memorial that based on these ECT provisions, "Italy's withdrawal is of no consequence to the present dispute."[203]  To the contrary, Italy acknowledged in its Post-Hearing Brief that "under the ECT a decision to withdraw[] takes effect after one year."[204]  Accordingly, the Tribunal takes it as agreed that Italy, like Belgium, meets the definition of an ECT "Contracting Party" for purposes of this case.

83.     Articles 26(2) and (3) then address the procedures for resolution of certain types of "disputes."  Under Article 26(2), subject to a three-month amicable settlement period, "the Investor party to the dispute may choose to submit it for resolution" through various mechanisms, one of which is as stated in Article 26(2)(c), namely "in accordance with the following paragraphs of this Article."  The immediately following provision, Article 26(3)(a), in turn provides that "[s]ubject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration."  Here, three expressions are important:  the reference again to "*a dispute*," the words "*unconditional consent*," and the words "*subject only*."  The natural and ordinary meaning of the word "unconditional" is "without conditions."  The words "subject only" indicate that there are certain exceptions to this unconditional consent, but these are a finite universe, consisting solely of the exceptions expressly referenced in Articles 26(3)(b) and (c), neither of which Italy or the Commission has invoked in this case.  Accordingly, the plain text of Article 26(3)(a) provides that, *unless* this case does not qualify in the first place as a covered "dispute" within the meaning of Article 26(3), Italy – a Contracting Party – consents to submission of the matter to international arbitration, and does so without conditions, *i.e.*, unequivocally.  Article 26(4)(a)(i) confirms that ICSID arbitration is one procedural option available at the investor's election.

84.     The central question in interpreting Article 26(3) is thus the scope of the covered "*disputes*," for which Italy has provided its "unconditional" consent, *inter alia*, to ICSID arbitration.  That scope is described in Article 26(1), which refers to "[d]isputes between a Contracting Party and an Investor of another

---

[202] ECT Art. 47(3) (**C-1**).

[203] Memorial, n.8.

[204] Italy PHB, n. 34.

Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III …."  On its face, this provision would seem to apply here, because Eskosol presents a claim against Italy for alleged breach of several ECT Part III obligations, relating to its investments within the physical territory of Italy.  According to Italy and the Commission, however, a deeper analysis is required of Article 26(1), including of the defined terms "*Contracting Party*" and "*Area*" that it incorporates, which properly should result in a conclusion that even from the moment of its entry into force, the ECT *never* reflected consent for arbitration of intra-EU disputes.

85.    Before turning to these particular arguments, the Tribunal observes that nothing in the text of Article 26 itself suggests its scope was intended to be restricted to disputes involving either an investor or a Contracting Party outside the EU.  The argument thus depends on reading the provision in the context of *other* provisions of the ECT, pursuant to Article 31(1) of the VCLT, to see if an intent to exclude intra-EU disputes fairly can be located there and imported back into Article 26, as a significant implied constraint on Article 26(3)(a)'s otherwise "unconditional consent" to arbitration.

86.    According to Italy and the Commission, such an exclusion is implicit both in the definitions of "Contracting Party" and "Area," provided in ECT Articles 1(2) and 1(10), respectively.  Article 1(2) confirms that a Contracting Party may be either an individual State or a REIO, which is defined in Article 1(3) as an organization to which various States have "transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters."  Article 1(10) defines the "Area" of an individual State in terms of the physical "territory under its sovereignty," and the "Area" of a REIO as the collective "Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization."  Italy and the Commission suggest that by using these terms in Article 26, the ECT Contracting Parties demonstrated an intent *ab initio* to eliminate any possibility of an intra-EU claim, or at least any possibility of such a claim relating to a "matter" for which Member States had "transferred competence" to the EU.  The Commission additionally frames this as an absence of geographic diversity, arguing in essence that an EU national's investment in Italy is not a foreign investment as such, *i.e.*, "not an investment in the area of another Contracting Party, but in the area of the same Contracting Party."[205]

---

[205] Commission Submission, ¶ 22.

87.     The principal difficulty with this argument is that nothing in the ECT so states.  Beginning with Article 1(2), there is no doubt that this *expands* the universe of ECT Contracting Parties by enabling REIOs (and not just States) to ratify the treaty, but nothing in its language suggests a concomitant intent to *curtail* the obligations of States which choose to become Contracting Parties in their own right.  As for Article 1(3), this does refer to States having "transferred competence" to a REIO "over certain matters," and the word "transfer" in its natural and ordinary meaning is capable of denoting the conveyance of exclusive (and not simply concurrent) powers.  The effect of such a reading would be that for the "certain matters" over which the transferee (the REIO) *gains* authority, the transferor (the States) concomitantly *cedes* all residual authority.  This notion of a transfer of exclusive competence is consistent with Article 1(3)'s reference to the REIO thereby obtaining "authority to take decisions *binding* on [the States] in respect of those matters."

88.     The fact remains, however, that Article 1(3) alludes only in the abstract to "certain matters" where such an exclusive transfer may occur, without elucidation as to which matters those may be.  In particular, nothing in this Article remotely suggests a shared understanding, as of the date the ECT entered into force, that either the entirety of Part III's substantive obligations, or the entirety of Part V's procedural obligations with respect to dispute settlement, were the contemplated subjects of such an exclusive transfer.[206]  If such a wholesale transfer of exclusive competence for major parts of the ECT, among a large group of the ECT's original Contracting Parties, already had been completed or was directly contemplated as of the ECT's entry into force, one would expect that this major development would have been expressly referenced somewhere.

89.     Moreover, the Commission itself acknowledges that as a matter of EU law, "in theory, EU Member States have the international capacity to enter into *inter se* obligations when negotiating a multilateral agreement for those areas of the agreement for which they retain competence …."[207]  The same point is recognized by prominent EU law scholars, for example Pieter Jan Kuijper, who notably summarized this in his account of the negotiations and conclusion of the WTO agreement:

> It is clear as a matter of international law that a mixed Community agreement, concluded simultaneously between the Community, its Member States and third

---

[206] *See Vattenfall*, ¶ 180 (**CL-193**) ("The mere mention in Article 1(3) that EU Member States have 'transferred competence over certain matters' to the EU does not convey that there is no application of the provisions of the ECT between EU Member States"); *Blusun*, ¶ 281 (**RL-56**) ("The mere fact that the EU is party to the ECT does not mean that the EU Member States did not have competence to enter into *inter se* obligations in the Treaty.  Indeed, the ECT seems to contemplate that there would be overlapping competences," with "nothing in Article 1, nor any other provision in the ECT, suggest[ing] that the EU Member States had then transferred exclusive competence for all matters of investment and dispute resolution to the EU.").

[207] Commission Submission, ¶ 37; *see also id.*, ¶ 46 ("in theory a possibility").

States, is in principle capable of creating rights and obligations between all the parties and hence also between the Member States *inter se.*[208]

While the Commission insists that "in practice" this is never done,[209] in fact it is the obvious conclusion from the fact that both the Member States and the EU separately became Contracting Parties to the ECT, with no declaration that in doing so, the Member States' competence was restricted only to obligations *vis-à-vis* third States and specifically to the exclusion of any *inter se* obligations whatsoever.  It seems undisputed, as the *Blusun* tribunal observed, that "[n]o limitation on the competence of the EU Member States was communicated at the time that the ECT was signed," leading to a conclusion that "[t]he *inter se* obligations in the ECT are not somehow invalid or inapplicable because of an allocation of competence that the EC says can be inferred," without having been stated anywhere at all.  The *Blusun* tribunal concluded that "[t]he more likely explanation, consistent with the text of the ECT, is that, at the time the ECT was signed, the competence was a shared one."[210]

90.  For these reasons, Article 26's incorporation by reference of Article 1(2)'s definition of "Contracting Party," which in turn incorporates Article 1(3)'s definition of REIO, does not support the reading proffered by Italy and the Commission.  Nor do the definitions of "Area" provided in Article 1(10) meaningfully assist their case.  The "Area" of a REIO is defined in terms of the "Areas of the member states of such Organization," and their particular "Areas" in turn are defined in terms of the "territory under [their] sovereignty."  The natural and ordinary meaning of the word "*territory*" is a geographical one, which is different in kind from the subject-related word "matters" that is used in Article 1(3) to describe the possible transfer of "competence" from States to a REIO.  Moreover, while the term "territory" is qualified in one respect ("territory *under their sovereignty*"), it is difficult to accept that the transfer of certain powers to a REIO renders the "territory" in which those powers may be exercised any less "sovereign" for the States involved.  The notion of "sovereignty" is a profound concept in public international law, which is not coextensive with the notion of "authority to take decisions binding on them in respect of [designated] matters," the description of "competence" used in Article 1(3) in the context of an REIO.  Furthermore, the cross-reference in Article 1(10) to "the provisions contained in the agreement establishing" the REIO does not transform the meaning of the constituent "Areas" of the REIO's member states, rendering those Areas any less "territory under [their]

---

[208] Pieter Jan Kuijper, "The Conclusion and Implementation of the Uruguay Round Results by the European Community," (1995) 6, *European Journal of International Law,* issue 1, pp. 228-229 (attached as **Annex EC-3** to the Commission Submission).

[209] Commission Submission, ¶ 37.

[210] *Blusun,* ¶ 283 (**RL-56**).

sovereignty." There is no suggestion in this phrase of an exclusionary intent, *i.e.,* that the "Area" of a particular State may cease to qualify as such once that "Area" also becomes part of the broader "Areas" relevant to a REIO.[211] There is certainly no stated link between this provision and the subject of dispute settlement, suggesting a contemporaneous intent to restrict Article 26 consent for any Contracting Party that avails itself of a REIO procedure.

91.     As several tribunals have now concluded, the ECT Contracting Parties could have explicitly referenced an intent (had they in fact so intended at the time) that the ECT as a whole be exclusively an outward-looking document, to regulate only the relations between EU Member States and third States, but not the rights and obligations of EU Member States to one another. Alternatively, the ECT Contracting Parties could have incorporated a narrower exclusion clause, limited specifically to the subject of dispute settlement. As the ILC has noted, the very function of a "disconnection clause" is that it "seek[s] to replace a treaty in whole or in part with a different regime that should be [] applicable between certain parties only," with such clause "agreed to by all the parties of the treaty."[212]

92.     The Tribunal agrees with the *Eiser* tribunal that an express provision in the ECT addressing intra-EU disputes would have been the proper way for "treaty makers … to carry out their function in good faith, and not try to lay traps for the unwary with hidden meanings and sweeping implied conclusions."[213] The *RREEF* tribunal likewise considered an express warning, such as that contained in an "unequivocal disconnection clause," to be required.[214] It is notable that before the ECT entered into force the EU already had incorporated express disconnection clauses into other treaties, to ensure that the provisions of a mixed agreement would not apply as between EU Member States.[215] This confirms the obvious, that it knew how to provide for these when it wished to do so. Indeed, as the *Vattenfall* tribunal observed, the EU in fact *had* proposed the insertion of a disconnection clause, but

---

[211] *See Vattenfall*, ¶ 181 (**CL-193**) (concluding that "Within the EU's 'Area', the Contracting Parties being members of the REIO do not cease to have their own Area"); *see also Eiser*, ¶¶ 195-196 (**CL-149**) (suggesting an additional "difficulty with this analysis," namely that also implies "an Investor loses its national character and becomes predominantly an Investor of the EU, because its home country is also an EU Member State and subject to EU law," but it is "not evident how there can be an 'Investor of the EU' satisfying Article 1(7)(a)(ii)'s definition" of investors, since "[t]here is no trans-national body of European law regulating the organization of business units, a matter that remains subject to member countries' domestic law.").

[212] ILC 2006 Report on Fragmentation of International Law, ¶ 294 (**R-8**).

[213] *Eiser*, ¶ 186 (**CL-149**).

[214] *RREEF*, ¶¶ 84-85 (**CL-101**). *See also Blusun*, ¶ 280(2) (**RL-56**) ("*Prima facie* at least, a treaty applies equally between its parties. It would take an express provision or very clear understanding between the negotiating parties to achieve any other result.").

[215] *See Vattenfall*, ¶ 203 (**CL-193**).

that clause ultimately was not included in the final treaty.[216] The Commission's contention that this decision should be interpreted as confirmation that no such clause was needed after the REIO language was finalized is not supported by anything in the text of the ECT.[217] There is no suggestion anywhere in the treaty, nor for that matter in any supplementary material submitted to this Tribunal, that the REIO language was intended to function as some form of implicit disconnection clause whose inclusion obviated the need for the explicit clause that the EU originally had sought to include.

93.    In these circumstances, the Tribunal finds that the inclusion of REIOs within the definition of "Contracting Party" means no more for purposes of Article 26 than what the *Eiser* tribunal found, namely that "[b]oth the EU and [its] Member States can have legal standing as respondents in a claim under the ECT."[218] The same is true for the reference to "Area" in Article 26, as the *Charanne* and *Masdar* tribunals found.[219] In particular, whether a particular "dispute" relates to a State or to the EU depends both on the *entity against whom* the claim is brought and on *the content of the claim*,[220] in the sense of whether that claim in substance challenges a decision taken by State authorities or one emanating from the EU itself. In that regard, it is notable that the EU's 1998 statement submitted to the ECT Secretariat as part of its ratification process[221] expressly affirmed that "the European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences."[222] The document went on to explain, in this context of "respective competences," that the EU and the relevant Member State would determine, if needed for a particular case initiated by an investor of "another Contracting Party," which of them should go forward as "the respondent party to arbitration proceedings" to defend a challenge to a particular act.[223] Nothing in this procedure to allocate the respondent's role, however, suggests a *jurisdictional* limitation preventing an EU investor from invoking the ECT's protections in the first place. In particular, the

---

[216] *Vattenfall*, ¶ 205 (**CL-193**); *see also Blusun*, ¶ 280(4) (**RL-56**).

[217] Commission Update, ¶ 25.

[218] *Eiser*, ¶ 94 (**CL-149**).

[219] *Charanne*, ¶¶ 427-431 (**CL-82**); *Masdar*, ¶¶ 318-323 (**RL-90**) (quoting with approval the conclusions of several prior tribunals).

[220] *Charanne*, ¶ 431 (**CL-82**).

[221] Pursuant to VCLT Article 31(2)(b), the "context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, … [a]ny instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty." **CL-57**, Article 31(2)(b).

[222] Statement by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the ECT, 9.3.98, OJ L 69/115 (**Annex EC-1** to the Commission Submission).

[223] Statement by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the ECT, 9.3.98, OJ L 69/115 (**Annex EC-1** to the Commission Submission).

Tribunal agrees with the *Vattenfall* tribunal that "[t]here is no basis to read a qualification that 'another' Contracting Party only includes non-EU Member States."[224]

### 2.    Additional "Context" Provided by ECT Articles 16, 25, and 26(6)

94.    Aside from its arguments based on Article 26's use of the defined terms "Contracting Party" and "Area," Italy presents additional arguments based on the "context" supposedly provided by other ECT Articles.

95.    The first of these is Article 25, which immediately precedes Article 26.[225]  The Tribunal however does not consider Article 25 relevant to the analysis.  The provision states that the ECT "shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement … to extend, by means of most favoured nation treatment," any equivalent "preferential treatment" to other States that are not members of the same EIA.  Italy points to a related Declaration by the EU and its Member States that nonetheless permitted certain third-State entities access to EU law protections, by virtue of registered offices or other substantial activities in EU territory.[226]  But these provisions fall far short of demonstrating a wholesale intent that the ECT's substantive protections and investment arbitration procedures not apply among EU Member States.  If anything, Article 25 demonstrates that the EU had the ability, as part of the ECT drafting process, to incorporate provisions specific to its circumstances, in order to delineate precisely any desired limitations to the reach of particular ECT provisions, such as the MFN provision addressed in Article 25.  As discussed above, there is no similar provision expressing any limitations on the reach of the investor-State dispute resolution mechanisms of Article 26.[227]

96.    Nor does the governing law provision in ECT Article 26(6) demonstrate, as Italy suggests, that its "offer to arbitrate investment disputes *has … always been inapplicable* … to intra-EU disputes," based on propositions of EU law that have been codified "*from the very beginning*."[228]  As a threshold matter, a governing law clause would be a highly unusual place to signal an intent to exclude numerous Contracting Parties from the reach of express treaty provisions, including the treaty's dispute resolution mechanisms, based on an ostensible supposition that readers of the clause would understand the jurisdictional implications of any bodies of law thus incorporated.  It would be particularly curious

---

[224] *Vattenfall*, ¶ 189 (**CL-193**).

[225] Memorial on Jurisdiction, ¶¶ 173-175.

[226] Memorial on Jurisdiction, ¶¶ 180-184.

[227] *See Eiser*, ¶ 192 (**CL-149**); *Greentech*, ¶ 215 (**CL-195**).

[228] Rejoinder, ¶¶ 91-92 (emphasis added).

to use a governing law clause in this way, *without ever mentioning* the particular body of law said to result in such a sweeping carve-out from the otherwise clear meaning of the arbitral submission clause. In this case, Article 26(6) provides simply that "[a] tribunal … shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

97.    The Tribunal will discuss this particular phrase further in Section V.B.1 and V.B.2 below, in the context of examining the potential implications for ECT cases of the progressive development of the EU Treaties and certain interpretations of those Treaties now authoritatively rendered by the CJEU in the *Achmea* Judgment.  As developed further there, the Tribunal does not consider this phrase in Article 26(6) to be a broad *renvoi* to EU law as part of the ECT's own governing law, and particularly not for issues of jurisdiction.  For present purposes, however, it is noteworthy that nothing in the phrase "applicable rules and principles of international law" signaled an intent *ab initio*, when the ECT entered into force in 1998 for the EU and its various Member States, that the provision thereby excluded any possible form of intra-EU arbitration.  Had this proposition been such an obvious and unmistakable proposition of EU law as of 1998, one would have expected it to be referenced more explicitly somewhere in the treaty, or at least expressly in the preparatory works or the declarations submitted at the time, not simply left to future interpretations of a general provision on applicable law.[229]  In these circumstances, even if (*arguendo*) Article 26(6) of the ECT could be said to require some attention to EU law for purposes of interpreting the original intent of the ECT Contracting Parties at the time the ECT entered into force, "no persuasive case has been made out for applying it so as to yield an interpretation of Article 26 … that departs so radically from the ordinary meaning of the terms of that Article," as to exclude intra-EU disputes from the scope of Italy's consent to arbitration in that provision.[230]

98.    The final ECT provision that Italy invokes, in support of its contention that even as of the date of its entry into force the ECT did not apply to intra-EU disputes, is the conflict rule reflected in Article 16. Article 16 provides as follows:

---

[229] *See similarly Eiser*, ¶ 198 (**CL-149**) (rejecting an "argument [that] Article 26(6) seeks to introduce a major, if unwritten, exception into the coverage of the ECT on the back of a somewhat intricate argument regarding choice of law," absent any evidence that the ECT's drafters "either intended or accomplished this result").

[230] *Vattenfall*, ¶ 167 (**CL-193**).

RELATION TO OTHER AGREEMENTS

Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject-matter of Part III or V of this Treaty,

(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment.

99.     The Tribunal will discuss in Section V.B.1 the implications of Article 16 with respect to the relationship between the ECT and *later* treaties, including the possibility that Article 16 may have been superseded by subsequent conflict rules established through the progressive development of the EU Treaties.  For present purposes, it suffices to conclude that nothing in Article 16 remotely supports the contention that the ECT itself, as of its entry into force for Italy and Belgium in 1998, already excluded the possibility of claims by their respective investors by virtue of the requirements of the *then-existing* EU Treaties.  First, Article 16 is a *general* conflict rule, making no specific reference to any particular treaty, and is thus different in kind from a *treaty-specific* conflict rule like the one the ECT incorporates for the Svalbard Treaty through its annexed Decision 1.[231]  It would be exceedingly odd for the negotiators of a new multilateral treaty to exclude its application as among a major block of intended Contracting Parties, not by means of an express provision like Decision 1 that addresses a specific instrument governing the relationship among those parties, but instead through a general provision regulating globally the new treaty's relationship with all other potential past and future treaties.  As previous tribunals have found, this is hardly the obvious way to provide notice of an intended exclusion, particularly one of such potentially sweeping significance.[232]

---

[231] **C-1**, p. 227, Decision 1 ("In the event of a conflict between the treaty concerning Spitsberger of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty.  In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.").

[232] *See, e.g., Masdar*, ¶ 311 (**RL-90**) (quoting with approval the following text from *PV Investors v. Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, ¶ 183 (13 October 2014): "It would seem striking that the Contracting Parties made an express exception for the Svalbard Treaty, which concerns an archipelago in the Arctic, but somehow omitted to specify that the ECT's dispute settlement system did not apply in all of the EU member states' relations.  Compared to the Svalbard Treaty Exception, an exception with regard to intra-EU relations would be of much greater significance.  It would be extraordinary that an essential component of the Treaty, such as investor-State

100.    Second, and in any event, Article 16(2) provides the inverse of what Italy contends, by making clear that its provisions on dispute resolution were intended to apply *notwithstanding* any prior treaties among Contracting Parties with which it arguably might conflict.  Thus, even in circumstances where the prior treaty might be found *arguendo* to "concern the subject-matter of Part III or V of this Treaty" – the predicate for the rest of Article 16 to apply at all[233] – Article 16(2) confirms nonetheless that "nothing in such terms of the other agreement shall be construed to derogate from *any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto* under this Treaty … where any such provision is more favourable to the Investor or Investment."  This provision co-exists with Article 16(1), which provides similarly that "nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement," again in circumstances "where any such provision is more favourable to the Investor or Investment."  Articles 16(1) and 16(2) are connected by an "*and,*" not an "*or,*" which in its natural and ordinary meaning indicates that they are to be read cumulatively, not in the alternative.  As other tribunals have found, the plain reading of the two in conjunction is that an investor is entitled to the dispute resolution benefits of *whichever* of the ECT and a prior or posterior treaty is "more favourable."[234]

101.    As to that issue, Italy contends that "EU law, as representing a more developed and articulated legal system, is doubtless more favorable to the investor and the investment than the ECT."[235]  Eskosol contends that EU law is not "more protective" than the ECT, "in particular with regard to the right of investors to bring arbitral claims directly against Contracting Parties under the ECT."[236]  In the view

---

arbitration, would not apply among a significant number of Contracting Parties without the Treaty drafters addressing this exception."); *see also Eiser*, ¶ 187 (**CL-149**) (noting that the ECT "includes multiple limiting decisions and understandings," including the conflict rule about the Svalbard Treaty, but "no similar clarifying provisions regarding what Respondent now contends is a major exclusion in the ECT's coverage").

[233] The Tribunal addresses the same "subject-matter" issue later in this Decision, in the context of Italy and the Commission's arguments that the progressive development of the EU Treaties leads to an alternate conflict rule than Article 16, under VCLT Article 30(4)(a)'s regulation of incompatible provisions in successive treaties relating to the same subject matter.  There is no need to discuss the issue in the context of Article 16 of the ECT itself, given Article 16(2)'s express "saving" of an ECT arbitration option even in circumstances where another treaty is found to relate to the same "subject-matter."

[234] *See, e.g., Eiser*, ¶ 202 (**CL-149**) ("To the extent that provisions of European law may in some manner provide protections more favorable to Investors or Investments than those under the ECT, Article 16(2) makes clear that they do not detract from or supersede other ECT provisions, in particular the right to dispute settlement under ECT Part V.  By its terms, Article 16 assures Investors or their Investments the greatest protection available under either the ECT or the other agreement.  Thus, an agreement covered by Article 16(2) may improve upon particular protections available to Investors or their Investments, but it cannot lessen rights or protections under the ECT that are in other respects more favorable.").

[235] Memorial on Jurisdiction, ¶ 212.

[236] Rejoinder on Jurisdiction, ¶ 73.

of the Tribunal, there is no need to opine abstractly on the comparative "favourability" of these two bodies of law, since the obvious object and purpose of Article 16 is to expand rather than curtail investor protections in the circumstance of multiple applicable treaties. It is therefore entirely logical to read the provision as allowing *the investor itself* to make the choice, in any particular circumstance, as to which treaty's dispute resolution mechanism it prefers to invoke.

102.    The bottom line is that the "favourability" of a particular mechanism, like the beauty of a particular person in the classic idiom, is very much "in the eye of the beholder." Nothing in Article 16 suggests an intent for any particular body – be it the Contracting Parties, a REIO, an international arbitration tribunal, or otherwise – to make sweeping pronouncements at the level of theory about which dispute resolution mechanisms are "more favourable" than others, much less to have such pronouncements bind all future investors in all future cases, notwithstanding their own possibly different views of the comparative benefits and drawbacks of the various alternatives offered by the treaties in force. If a particular investor in its own wisdom prefers to invoke the ECT's arbitration mechanism rather than a different dispute resolution mechanism offered through a different treaty, *that choice alone* suggests the investor considers ECT arbitration to be "more favourable" in its particular circumstances.[237] There is nothing in Article 16 which requires this choice to be overridden, in favor of a one-size-fits-all conclusion that a different forum might be "more favourable" to a different investor in other circumstances.

### 3.    The ECT's History and Circumstances

103.    The analysis puts to rest Italy's arguments regarding the non-applicability of the ECT by its own terms, either under Article 26 itself or in the context of other provisions. In these circumstances, the Tribunal sees no need to delve deeply into Italy and the Commission's additional arguments based on the historical circumstances of the ECT's conclusion, including references from its preparatory work to a goal of integrating the energy sectors of the former Soviet Union and Eastern Europe.[238] There is nothing "ambiguous or obscure" in the ECT that permits resort to supplementary materials under

---

[237] *See generally Masdar*, ¶ 332 (**RL-90**) (explaining that a Claimant availing itself of the provisions of Article 26 of the ECT, over alternative mechanisms available under EU law, evidently considers this "more favourable, not least, because they obviate the need to bring the claim" in the national courts of the host State); *Vattenfall*, ¶¶ 194-195 (**CL-193**) (concluding that "Article 26 ECT, granting the possibility to pursue arbitration, would be understood as 'more favourable to the Investor', insofar as the EU Treaties are interpreted to prohibit that avenue of dispute resolution," and accordingly "by the terms of Article 16 ECT itself, it would be prohibited for a Contracting Party to construe the EU Treaties so as to derogate from an Investor's right to dispute resolution under Article 26 ECT," even "assuming for the sake of argument" that provisions of the EU Treaties are understood to concern the same subject matter).

[238] Memorial on Jurisdiction, ¶¶ 186-189; Commission Submission, ¶¶ 39-44.

Article 32(a) of the VCLT.[239]  In any event, even if the historical materials were consulted and the proposition about integration accepted on face value, this still would not prove Italy's point, since an *intent to include* third parties in a network of relationships to be governed by common legal obligations does not necessarily denote a concomitant *intent to exclude* existing partners from the same network governed by the same legal obligations.[240]

104.    If anything, several aspects of the contemporaneous history suggest the contrary.  First, as Advocate General Wathelet has observed, the ECT "was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing.  In that sense, the material provisions for the protection of investments provided for in that Treaty and the ISDS mechanism also operate between Member States."[241]  Moreover, it is notable that "no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties," presumably indicating that "none of them had the slightest suspicion that it might be incompatible."[242]  While the Tribunal accepts that Advocate General Wathelet's Opinion is in no way binding as *an interpretation of EU law*, the observations above are nonetheless compelling as a recitation of *historical fact*, from which the Tribunal can draw its own conclusions regarding the contemporaneous understanding and intent of the ECT Contracting Parties.

105.    It is equally useful to recall the legal basis on which the EU became a party to the ECT, which is set out in Council Decision 94/998/EC (as to signature) and Council and Commission Decision 98/181/EC, ECSC, Euratom (as to ratification).[243]  This last decision authorizing the ratification was approved by all the interested European institutions, and stated *inter alia* that the EU and Member States signed the ECT and the Energy Charter Protocol "in order to provide a *secure and binding* international legal framework for the principles and objectives set out in that Charter," and that the EU considered it necessary for it "*to participate fully in the implementation*" of the ECT and the Energy Charter Protocol by becoming a Contracting Party itself.[244]  This reference to the EU's joining

---

[239] *See similarly Charanne*, ¶ 437 (**CL-82**); *Eiser*, ¶ 205 (**CL-149**); *Greentech*, ¶ 213 (**CL-195**).

[240] *See Vattenfall*, ¶ 200 (**CL-193**) (noting that "the stated purpose of the ECT under Article 2 is framed generally, and without the geographical distinction argued by the EC.  Moreover, even if the EC is correct that this was indeed one purpose behind the Treaty, it does not follow that the ECT was not intended to cover other kinds of investment").

[241] Case No. C-284/16, *Slovak Republic v. Achmea BV*, Opinion of Advocate General Wathelet, 19 Sep. 2017, ¶ 43 (**RL-91**).

[242] Case No. C-284/16, *Slovak Republic v. Achmea BV*, Opinion of Advocate General Wathelet, 19 Sep. 2017, ¶ 43 (**RL-91**).

[243] OJ 1994 L 380/1-2 and OJ 1998 69/1-3.

[244] Council and Commission Decision 98/181/EC, OJ 1998 69/1-3 (emphasis added).

in order to "participat[e] fully" in the ECT's "implementation" in no way suggests an intent that any particular ECT provision – in this case, the core dispute settlement provision in Article 26 – would accordingly *not* be implemented with respect to the subset of ECT Contracting Parties who were also EU Member States.  To the contrary, the language suggests that at the time the ECT was ratified, the European institutions considered the treaty, interpreted according to its natural and ordinary meaning, to be in perfect conformity with EU law.

106.    Equally important, and as clearly stated in *Electrabel*, is "the important legal fact that the European Commission itself, in signing the ECT, accepted the possibility of international arbitrations under the ECT,"[245] notwithstanding the Commission's responsibility under EU law for ensuring that all such treaties negotiated "are compatible with internal Union policies and rules."[246]  As the *Electrabel* tribunal reasoned, it can be presumed that the Commission did not at the time consider EU law to conflict or otherwise be inconsistent with the ECT:

> The Tribunal notes the still more important fact that the European Union also accepted in signing the ECT to submit itself to international arbitration, thereby accepting the possibility of an arbitration between the European Union and private parties, whether nationals of EU or Non-EU Member States and whether held within or without the EU.
>
> …
>
> In the Tribunal's view, if the European Union has itself accepted to submit to arbitration a dispute with a private investor concerning the application of the ECT (as it did), it cannot properly argue that such an arbitration is not similarly available to the same private investor advancing a claim under the ECT against an EU Member State, including an arbitration under the ICSID Convention.[247]

107.    Finally, neither Italy nor the Commission have pointed to any materials in the historical record that suggest a different objective and understanding at the time they ratified the ECT.  As the *Eiser* tribunal noted, it is "[o]f perhaps greater significance" that "there is no evidence showing that any such objective was shared by all EEC members, or was communicated to and accepted by the other parties to the treaty."[248]  In these circumstances, the Tribunal is unable to conclude that anything in the ECT's history and circumstances demonstrates a contemporaneous intent and agreement by Contracting

---

[245] *Electrabel*, ¶ 4.158 (**RL-58**).
[246] *Electrabel*, ¶ 4.135 (**RL-58**). The relevant EU rule at the time was contained in Article 133 EC (now Article 207(3) TFEU).
[247] *Electrabel*, ¶¶ 4.163, 4.164 (**RL-58**).
[248] *Eiser*, ¶ 206 (**CL-149**).

Parties not to apply it to intra-EU disputes, particularly given the clear terms otherwise reflected in ECT Article 26.

## B. EU LAW DEVELOPMENTS

108. Italy argues that even if the Tribunal does not accept its interpretations of the "intention *ab initio* of the Contracting Parties" to the ECT, certain developments in EU law – in particular, the progressive development of the EU Treaties, as now interpreted by the CJEU in the *Achmea* Judgment – require intra-EU disputes to be excluded from the ECT's scope.[249]

109. As a threshold matter, the Tribunal emphasizes that this Decision does not seek to interpret EU law as such, much less express any judgment regarding the correctness of particular interpretations rendered by others on matters of EU law.  Rather, the focus for this Tribunal is the *relationship* between the EU Treaties and the ECT, as a matter of international law.  The Tribunal addresses below the Parties' arguments about that relationship, starting with the later EU Treaties (Section V.B.1) and then turning to the *Achmea* Judgment (Section V.B.2).

### 1.    Progressive Development of the EU Treaties

110. First, Italy argues that the progressive development of the EU Treaties, and in particular the adoption of the Lisbon Treaty, requires intra-EU disputes to be excluded from the ECT's scope.[250]  Italy emphasizes that the Lisbon Treaty added direct foreign investment to the EU's common commercial policy, with the result that this area is now considered to be within the EU's exclusive competence as a matter of EU law.[251]  This is relevant to the REIO issue discussed above, based on the Commission's argument that even if EU Member States initially may have undertaken *inter se* obligations through the ECT, those obligations could only cover areas where EU Member States thereafter continue to "retain external competence."[252]  Italy and the Commission contend that as a result of the Lisbon Treaty, however, EU Member States no longer have such competence for foreign direct investment, which is now part of the core sphere of matters for which EU law demands uniformity of rules and interpretations.[253]  This applies both to substantive obligations regarding investment, which are

---

[249] Memorial on Jurisdiction, ¶ 195.

[250] Memorial on Jurisdiction, ¶ 195.

[251] Memorial on Jurisdiction, ¶¶ 196, 235.

[252] Commission Submission, ¶ 54.

[253] Memorial on Jurisdiction, ¶ 200.

covered by EU law internal market rules, and to procedural remedies.[254]  With respect to the latter, the primacy of EU law over any national law is ensured through the CJEU preliminary ruling mechanism established by Article 267 TFEU,[255] and pursuant to Article 344 TFEU, Member States cannot submit any dispute concerning interpretation or application of EU law to any forum (including arbitration) where the preliminary ruling procedure is inapplicable.[256]  Thus, Italy and the Commission contend, the consequence of the Lisbon Treaty is that only the EU *now* may conclude international agreements in this area of exclusive competence; EU Member States may not conclude agreements between themselves which "might affect common rules or alter their scope."[257]  It follows as a matter of EU law, they suggest, that any *prior* consent to intra-EU arbitration, even if granted under an earlier treaty, no longer can be applicable.

111.  Both Italy and the Commission recognize, however, that this Tribunal derives its powers from international law (the ICSID Convention and the ECT) rather than directly from EU law.[258]  They contend that the progressive development of the EU Treaties is nonetheless relevant, for two separate reasons, each with several subparts.  *First*, they contend that *the ECT itself* must be interpreted with reference to EU law, either because (a) ECT Article 26(6) directly incorporates EU law as part of the law applicable to an intra-EU dispute, or (b) VCLT Article 31(3)(c) commands that treaty interpretation "take[] into account … any relevant rules of international law applicable in the relations between the parties."[259]  *Second*, they contend that the EU Treaties are "successive treaties" to the ECT, within the meaning of VCLT Article 30(2) and/or Article 30(4)(a), or alternatively are "[a]greements to modify" the ECT within the meaning of VCLT Article 41(1).  Whichever analytical path is followed, Italy and the Commission argue that it leads to the same result, namely non-applicability of any prior consent to ECT arbitration by virtue of the subsequent Lisbon Treaty.  The Tribunal addresses these issues below.

---

[254] Commission Submission, ¶¶ 67-75.

[255] Memorial on Jurisdiction, ¶¶ 225-228.

[256] Memorial on Jurisdiction, ¶¶ 258-260; Rejoinder, ¶¶ 59-64.

[257] Commission Submission, ¶¶ 61, 64.

[258] Memorial on Jurisdiction, ¶ 197 ("From an international point of view, the issue is whether this subsequent agreement [the Lisbon Treaty] among only some of the Contracting Parties of the ECT, is compatible with the previous (general) treaty (the ECT).  The answer can be derived from Articles 30 and 41 of the VCLT, as codifying customary international law."); Commission Submission, ¶ 7 ("your Tribunal applies as its rules of procedure the ICSID Convention, another treaty of international law, which is not part of Union law.  The starting point of your analysis is therefore necessarily one of international law.").

[259] VCLT, Article 31(3)(c) (**CL-57**).

### a.  EU Treaties as Part of Applicable Law: ECT Article 26(6)

112.   First, as noted above, Italy and the Commission contend that the applicable law provision of the ECT itself requires application of the EU Treaties as progressively developed through the Lisbon Treaty, since Article 26(6) provides that "[a] tribunal … shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."  In their view, this provision applies equally to matters of jurisdiction as merits, since jurisdiction is frequently an "issue[] in dispute," the phrase used in Article 26(6).  Moreover, according to their reading, this provision incorporates by reference *any* body of international law applicable as between particular ECT Contracting Parties, which would include EU law as derived from the EU Treaties in force for Belgium and Italy.  Thus, since the EU Treaties are a part of international law as among these EU Member States, EU law must apply "when a tribunal assesses the applicability of the arbitration agreement and of the ECT at large in intra-EU disputes."[260]  Essentially, the argument is that ECT Article 26(6) operates as a direct and broad *renvoi* to the EU Treaties, with the result that there is no need to look elsewhere for potential rules regulating the relationship between successive treaties.

113.   As a threshold matter, the Tribunal notes the *Vattenfall* tribunal's conclusion that Article 26(6) *in toto* "applies only to the merits of a dispute between the Parties. It does not apply to issues or questions relating to the Tribunal's jurisdiction."[261]  The *Vattenfall* tribunal reached this conclusion on a construction of the opening words of Article 26(6), namely that "[a] tribunal established under paragraph (4) shall decide *the issues in dispute* in accordance with …."  In its view, the expression "issues in dispute" referred back to Article 26(1), which describes "disputes" under the ECT as those "which concern an alleged breach of an obligation of [a Contracting Party] under Part III," *i.e.*, the part of the ECT that "sets out the substantive standards of treatment and protection to which investments are entitled."  Since Part III "does not include the provisions on dispute settlement, which appear in Part V of the ECT," the *Vattenfall* tribunal concluded that Article 26(6)'s provision concerning the applicable law "is not relevant to issues concerning the dispute settlement clause in Article 26 ECT."[262]  This Tribunal finds that reasoning persuasive.  It also is consistent with the text of ECT Article 26(3)(a), which states that the Contracting Parties' "unconditional consent to the submission of a dispute to international arbitration" is *"[s]ubject only* to subparagraphs (b) and (c)"

---

[260] Rejoinder, ¶¶ 88-90; *see also* Commission Submission, ¶ 97 (contending that pursuant to Article 26(6) of the ECT, EU law is part of the "applicable rules of international law" to be applied by any arbitral tribunal).

[261] *Vattenfall,* ¶ 121 (**CL-193**); *see also Greentech*, ¶ 218 (**CL-195**) (similarly concluding that "Article 26(6) ECT applies to the merits of the case and not to jurisdiction").

[262] *Vattenfall,* ¶¶ 114-116 (**CL-193**).

of Article 26(3),[263] and by exclusion therefore not to any additional restrictions on jurisdiction potentially lurking in Article 26(6).

114.    However, even if *arguendo* that were not the case – and therefore Article 26(6) were considered relevant to issues of jurisdiction as well as the merits – the Tribunal does not agree that the effect would be to incorporate EU law as part of the applicable law. This is based both on the "natural and ordinary meaning" of the terms in Article 26(6), and on the "context" of those terms in relation to other provisions of the ECT.

115.    First, focusing on the text of the provision, the Tribunal will analyze the specific phrase *"applicable rules and principles of international law."* The Tribunal considers that, although EU law is undoubtedly international law, it is not general international law, but rather a special species of international law. The narrower question with which the Tribunal is faced here is whether EU law is encompassed in the expression "rules and principles of international law."

116.    The sources of international law are authoritatively listed in Article 38(1) of the ICJ Statute as follows:

    a.    international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;

    b.    international custom, as evidence of a general practice accepted as law;

    c.    the general principles of law recognized by civilized nations;

    d.    subject to the provisions of Article 59 [of the ICJ Statute], judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.

117.    Similar to the *Vattenfall* tribunal, this Tribunal has no doubt that the EU Treaties qualify as one type of international law, namely the one described in Article 38(1)(a) of the ICJ Statute as "international conventions, whether general or particular, establishing rules expressly recognized by the contesting states."[264] But that is not the operative question, since ECT Article 26(6) does not state that all other international treaties concluded as between the host State and the investor's home State are automatically incorporated into the applicable law of the ECT. Rather, Article 26(6) uses the particular phrase "*applicable rules and principles of international law.*" Textually, this phrase incorporates two

---

[263] ECT, Article 26(3)(a) (**C-1**) (emphasis added).

[264] *Vattenfall,* ¶¶ 140-141, 145-146 (**CL-193**) (agreeing with the finding of the *Electrabel* tribunal that "EU law is international law because it is rooted in international treaties") (quoting *Electrabel,* ¶ 4.120 (**RL-58**)).

different notions: (a) "*principles* of international law," and (b) "*rules* … of international law." These phrases have particular meanings in public international law.

118.    Starting with the former, the reference to "principles of international law" encompasses two types of principles: (i) principles accepted by "international custom, as evidence of a general practice accepted as law," referred to in Article 38(1)(b) of the ICJ Statute, and (ii) "general principles of law recognized by civilized nations," referred to in Article 38(1)(c) of the ICJ Statute. The first of these two, general principles accepted as customary international law, has an unambiguously narrow scope, as described by the Permanent Court of International Justice in the *Lotus* case:

> … the Court considers that the words 'principles of international law', as ordinarily used, can only mean international law as it is *applied between all nations* belonging to the community of States.
>
> …
>
> … it is impossible – except in pursuance of a definite stipulation – to construe the expression 'principles of international law' otherwise than as meaning the principles which are in force *between all independent nations*.[265]

Examples of such universally applied principles are the norms of *jus cogens*, from which no derogation by treaty is possible under VCLT Article 53;[266] the fundamental principle *pacta sunt servanda*, from which the entire international order flows;[267] the principle of good faith;[268] and other principles of interpretation of international law, reflected in the VCLT itself.

---

[265] *SS Lotus (France v Turkey)*, (1927) PCIJ Ser A No 10, pp. 16-17 (emphasis added).

[266] *See* VCLT Article 53, entitled "*Treaties conflicting with a peremptory norm of general international law ('jus cogens')* (providing that "[a] treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law. For the purposes of the present Convention, a peremptory norm of general international law is a norm accepted and recognized *by the international community of States as a whole* as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.") (**CL-57**) (emphasis added).

[267] *See* ILC Draft Articles on the Law of Treaties with Commentaries, 1966, p. 211 (Art. 23, Commentary, item 1) ("*Pacta sunt servanda* – the rule that treaties are binding on the parties and must be performed in good faith – is the fundamental principle of the law of treaties").

[268] *See* ILC Draft Articles on the Law of Treaties with Commentaries, 1966, p. 211 (Art. 23, Commentary, item 1) (noting that the principle of good faith "is enshrined in the Preamble to the Charter of the United Nations"); *Border and Transborder Armed Actions (Nicaragua v. Honduras),* ICJ, Judgment on Jurisdiction, 20 December 1988, 1988 ICJ Rep. 69, ¶ 94 (stating that "[t]he principle of good faith is one of the basic principles governing the creation and performance of legal obligations").

119.  As far as the "general principles of law recognized by civilized nations" are concerned, these are international principles stemming from the convergence of national legal orders. The ICJ explained this concept in *Barcelona Traction* as follows:

> In turning now to the international legal aspects of the case, the Court must, as already indicated, start from the fact that the present case essentially involves factors derived from municipal law – the distinction and the community between the company and the shareholder – which the Parties however widely their interpretations may differ, each take as the point of departure of their reasoning. If the Court were to decide the case in disregard of the relevant institutions of municipal law it would, without justification, invite serious legal difficulties. It would lose touch with reality, for there are no corresponding institutions of international law to which the Court could resort. Thus the Court has, as indicated, not only to take cognizance of municipal law but also to refer to it. It is to *rules generally accepted by municipal legal systems* which recognize the limited company whose capital is represented by shares, and not to the municipal law of a particular State, that international law refers.[269]

The ICJ's reference in *Barcelona Traction* to "rules generally accepted by municipal legal systems" is a clear reference to what Article 38(1)(c) of the ICJ Statute referred to as the "general principles of law recognized by civilized nations," but with less historically fraught terminology (*i.e.*, eliding the reference to "civilized" nations).   The ICJ's point was that just as customary international law principles can be created by the universal behavior of States considered to have ripened into law, such principles also may emanate from the convergence in their national laws of generally accepted principles.

120.  These two accepted concepts, delineating the origins of *general principles* of international law, encompass the scope of the reference in ECT Article 26(6) to "applicable … *principles* of international law."   They are quite distinct from the far broader concept of incorporating by reference *all other treaties* between ECT Contracting Parties, on which Italy and the Commission's arguments about ECT Article 26(6) depend.   The same is true with respect to the word "rules" in Article 26(6), in the context of the expression "applicable *rules* … of international law."   For this word, it is useful to refer to a Report of the International Law Association:

> Some commentators draw a distinction between "principles" and "rules". Their definitions vary, but the general idea is that principles operate at a higher level of generality than rules. So, for example, one might speak of the "principle" of the freedom of the high seas, but of the "rule" that submarines, in passing through the

---

[269] *Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain)*, ICJ, Judgment, 5 February 1970, [1970] ICJ 1, ¶ 50.

> territorial sea, must navigate on the surface and show their flag. However, in ordinary (legal) usage *the two terms are often used interchangeably* …. [270]

In other words, like "principles of international law," the phrase "rules of international law" refers also to rules *applicable to all States*, *i.e.*, to general rules.

121.    For these reasons, the phrase "rules and principles in international law" cannot be interpreted as encompassing EU law, which is a regional and not a worldwide system of law.  This was well understood by the *Eiser* tribunal, when it rejected the argument that "the treaties creating the EEC and the EU […] constitute 'applicable rules and principles of international law' for purposes of Article 26(6)."[271]  The *Vattenfall* tribunal likewise concluded that "EU law does not constitute principles of international law which may be used to derive meaning from Article 26 ECT, since *it is not general law* applicable as such to the interpretation and application of the arbitration clause in another treaty such as the ECT."[272]  This Tribunal reaches the same conclusion with respect to Article 26(6), based on the "natural and ordinary meaning" of its terms, as they are understood within the broader field of public international law.

122.    The same conclusion is reinforced, moreover, by a review of these terms "in their context," pursuant to the interpretative principles of VCLT Article 31(1).  Specifically, the ECT contains another article, Article 16, for the specific purpose of addressing (as its title reflects) the ECT's "RELATION TO OTHER AGREEMENTS."[273]  If the effect of Article 26(6) were that other treaties between the relevant Contracting Parties were directly incorporated into the ECT as applicable law – and indeed, in such a way as to override any contrary reading of other provisions of the ECT, which is what Italy and the Commission suggest as the necessary outcome of their Article 26(6) argument – then there would be *no* reason to have a specific article, Article 16, to regulate the impact of potentially overlapping treaties.  By definition, there would be nothing to regulate, by the simple fact that other treaties already had been interpolated into the ECT by virtue of Article 26(6).  In other words, the natural effect of an overbroad reading of Article 26(6) would be to render Article 16 superfluous.  This would run counter to the accepted notion of *effet utile*, namely that the words of a treaty should be interpreted so as not to deprive them of all independent meaning and effect.  The requirement to give

---

[270] International Law Association, Final Report of the Committee. Statement of principles applicable to the formation of general customary international law, London Conference 2000, pp. 10-11 (emphasis added).

[271] *Eiser*, ¶¶ 197-198 (**CL-149**) (stating that "Respondent's argument from Article 26(6) … seeks to introduce a major, if unwritten, exception in to the coverage of the ECT on the back of a somewhat intricate argument regarding choice of law.  The Tribunal does not agree that the drafters of the ECT either intended or accomplished this result.").

[272] *Vattenfall,* ¶ 133 (**CL-193**)

[273] ECT, Article 16 (title) (**C-1**).

Article 16 independent purpose reinforces and confirms the Tribunal's interpretation of the natural and ordinary meaning of the terms of Article 26(6).

123.    For the avoidance of doubt, the Tribunal's conclusion that EU law is not part of the ECT's applicable law, and particularly not for determining the scope of the Tribunal's jurisdiction under Article 26 of the ECT, does not mean that an ECT tribunal could not consider EU law as a *matter of fact* if potentially relevant to the merits of a dispute, just as an ECT tribunal may consider a State's domestic law as part of the factual matrix of a case.  For example, while the Tribunal does not consider this case to involve a challenge to any acts that Italy was required to take under applicable EU directives, nor to involve a defense by Italy that it was required by EU law to take the challenged acts, in theory both types of arguments could be presented in an ECT case.  In such situations, an ECT tribunal would be entitled to take into account, as did the *Electrabel* tribunal in its analysis of such issues, whether the respondent State had any legal discretion to act otherwise in accordance with its other international obligations.[274] The absence of any such discretion could be a relevant factor in applying certain of the ECT's substantive standards in Part III, to the extent for example they incorporate restrictions on arbitrary or irrational conduct.  Considering EU law to that extent, as a fact relevant to the application of international law standards, would be perfectly consistent with the Tribunal's interpretation of Article 26(6).  It also for that matter would be consistent with the CJEU's interpretation of EU law in its Opinion in the *Commission v. Ireland* case, under which "it is not sufficient, in order to establish a breach of Article 344 TFEU, that an arbitration tribunal takes account of EU law as a criterion for interpreting a provision *not forming part of EU law*. There could be an infringement of Article 344 TFEU only if the subject-matter of the decision of the arbitration tribunal were the interpretation and application of provisions of EU law themselves."[275]

### b.   EU Treaties in Interpreting the ECT: VCLT Article 31(3)(c)

124.    The second basis on which Italy and the Commission contend that the ECT itself must be interpreted with reference to the later EU Treaties, including the Lisbon Treaty, is the statement in VCLT Article 31(3)(c) that interpretation of a treaty "take[] into account, together with the context … any relevant

---

[274] *See Electrabel*, ¶¶ 6.70, 6.72 (**RL-58**) (concluding that "[i]n the Tribunal's view, that Final Decision required Hungary under EU law to terminate Dunamenti's PPA," and "[w]here Hungary is required to act in compliance with a legally binding decision of an EU institution, recognized as such under the ECT, it cannot (by itself) entail international responsibility for Hungary.  Under international law, Hungary can be responsible only for its own wrongful acts.  The Tribunal considers that it would be absurd if Hungary could be liable under the ECT for doing precisely that which it was ordered to do by a supranational authority whose decisions the ECT itself recognises as legally binding on Hungary.").

[275] Opinion of the Council Legal Service of 22 June 2007 (emphasis added).

rules of international law applicable in the relations between the parties."[276]   As the Commission frames the argument:

> When both the Union and EU Member States become parties to a multilateral agreement, it is the Union legal order that informs the latter's behavior and actions. The Union legal order therefore constitutes a "*relevant rule of international law applicable in the relations between the parties*" in the sense of Article 31(3)(c) VCLT.[277]

125.   In the Tribunal's view, this argument requires little discussion.  The critical phrase in VCLT Article 31(3)(c) is "*between the parties*," meaning all parties to the treaty in question.  It is hardly an exceptional proposition that where all parties to a given treaty have agreed to a particular "rule[] of international law," then that rule may inform an understanding of their mutual intent in agreeing to particular treaty text.  However, the ECT is not a treaty exclusively among EU Member States, but rather a much broader multilateral treaty that includes non-EU Member States.  This prevents the application of EU law for the interpretation of specific provisions within the ECT.  The text of a multilateral treaty must have a consistent and objective meaning, not different meanings determined separately and subjectively for each different subset of States that may be involved in a particular future dispute.  As the *Vattenfall* tribunal cogently observed in rejecting a similar argument:

> The EC's approach is unacceptable as it would potentially allow for different interpretations of the same ECT treaty provision.  The Tribunal considers that this would be an incoherent and anomalous result and inconsistent with the object and purpose of the ECT and with the rules of international law on treaty interpretation and application. …

> When States enter into international legal obligations under a multilateral treaty, *pacta sunt servanda* and good faith require that the terms of that treaty have a single consistent meaning.  States parties to a multilateral treaty are entitled to assume that the treaty means what it says, and that all States parties will be bound by the same terms.  It cannot be the case that the same words in the same treaty provision have a different meaning depending on the independent legal obligations entered into by one State or another, and depending on the parties to a particular dispute.[278]

126.   Moreover, VCLT Article 31(3)(c) addresses what should be "taken into account, together with the context" of particular terms of a treaty.  This provision itself must be viewed in the context of the core preceding proposition in Article 31(1), that "[a] treaty shall be interpreted in good faith in accordance

---

[276] VCLT, Article 31(3)(c) (**CL-57**).

[277] Commission Submission, ¶¶ 33-34.

[278] *Vattenfall*, ¶¶ 155-156 (**CL-193**).

with the ordinary meaning to be given to the terms of a treaty in their context and in the light of its object and purpose."[279]  This Tribunal agrees with the *Vattenfall* tribunal that Article 31(1), and not Article 31(3)(c), is the "correct starting point for the interpretation of Article 26 ECT," and also that "[t]he need for coherence, and for a single unified interpretation of each treaty provision, is reflected in the priority given to the text of the treaty itself over other contextual elements under Article 31 VCLT."[280]  In these circumstances, "[i]t is not the proper role of Article 31(3)(c) VCLT to rewrite the treaty being interpreted, or to substitute a plain reading of a treaty provision with other rules of international law, external to the treaty being interpreted, which would contradict the ordinary meaning of its terms."[281]  And yet this would be the natural result of the Commission's arguments, by overriding as between some ECT Contracting Parties, but not others, the "unconditional consent" to international arbitration clearly reflected in ECT Article 26(3).  The Tribunal rejects the notion that VCLT Article 31(3)(c) can be used in this way.

### c.  EU Treaties as "Successive Treaties": VCLT Article 30(2)

127.  For the reasons stated above, the Tribunal is unable to accept the notion that the ECT *itself* requires a *renvoi* to the Lisbon Treaty for purposes of determining jurisdiction in intra-EU disputes, either by virtue of ECT Article 26(6) or by operation of the interpretative principle in VCLT Article 31(3)(c).  If the Lisbon Treaty is to be relevant at all for jurisdictional purposes, it would have to be because of some *alternate rule* of international law regulating the relationship between multiple treaties concluded between the same sovereign States.  The Tribunal turns below to the three provisions of the VCLT – specifically, VCLT Articles 30(2), 30(4)(a) and 41(1) – that Italy and the Commission have invoked in the alternative, to support their argument that the Lisbon Treaty must be deemed to override any consent to intra-EU arbitration that EU Member States earlier provided through the ECT.

128.  First, Italy invokes VCLT Article 30(2), which provides (together with Article 30(1)) as follows:

> *Application of successive treaties relating to the same subject matter*
>
> 1.  Subject to Article 103 of the Charter of the United Nations, the rights and obligations of State Parties to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs.

---

[279] VCLT, Articles 31(1), (3) (**CL-57**).

[280] *Vattenfall*, ¶¶ 153, 156 (**CL-193**).

[281] *Vattenfall*, ¶ 154 (**CL-193**).

> 2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail. ...[282]

129. Italy contends that the ECT Article 16 itself requires deference to subsequent treaties, in the same fashion as VCLT Article 30(2) does with respect to "successive treaties." In particular, Italy invokes Article 16(1), stating in relevant part that where the terms of a subsequent treaty "concern the subject-matter" of Part III or V of the ECT, "nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement … where any such provision is more favourable to the Investor or Investment."[283] Italy argues, in essence, that this is functionally equivalent to Article 30(2)'s statement that the ECT is "subject to" the Lisbon Treaty, since the provisions of the ECT cannot be construed to derogate from the terms of the Lisbon Treaty.[284]

130. The Tribunal does not agree with this interpretation. A statement that a particular treaty is "subject to" another treaty is clearly a declaration of priority as between the two, in the event of any conflict. The natural and ordinary meaning of "subject to" connotes a giving way by the subordinate treaty, in the face of the other dominant treaty. It is only logical that where a treaty so provides, the will of the Contracting Parties should be respected, with the result (in the language of VCLT Article 30(2)) that "the provisions of that other treaty prevail." This is not, however, what ECT Article 16 says. Nowhere in its text does it indicate that the ECT is "subject to," and accordingly always subordinate to, any other treaty, whether prior or subsequent. To the contrary, as already discussed, Articles 16(1) and 16(2) read together clearly provide that where the ECT and another treaty concern "the same subject-matter," *neither* treaty is absolutely dominant over the other. Rather, under Article 16(1), where the other treaty is "more favourable to the Investor or Investment," the investor may invoke its benefits, notwithstanding anything in the ECT, and under Article 16(2), where the ECT is considered "more favourable," the investor in turn may invoke its benefits, notwithstanding anything in the other treaty. Given the inherently subjective nature of "favourability," as also discussed above, the decision about which path to pursue is logically left to the investor. There is no suggestion in Article 16 of a process by which some higher authority must first weigh the abstract "favourability" of the two regimes, and then impose its comparative valuation on the investor. In this light, the evident object and purpose of

---

[282] VCLT, Articles 30(1), (2) (**CL-57**).

[283] ECT, Article 16(1) (**C-1**).

[284] Memorial on Jurisdiction, ¶¶ 211-213.

the provision, emanating from the natural and ordinary meaning of its terms, is to provide the investor with a choice between two possible avenues, not to preclude one or the other.

131.   ECT Article 16 is thus the *very opposite* of the type of treaty provision addressed in Article 30(2) of the VCLT, namely a clause that *removes ex ante* any choice as between two possible treaty regimes, by expressly stating that one is intended to be "subject to" the other.  The negotiators of the ECT could have chosen to include such a clause, but they did not do so, except in a declaration specific to the Svalbard Treaty, as discussed above.[285]  In these circumstances, VCLT Article 30(2) is simply not applicable to provide a rule of priority as between the ECT and the Lisbon Treaty, *even if* those two treaties were considered to "relat[e] to the same subject matter," which is the threshold condition specified in VCLT Article 30(1).

### d.   EU Treaties as "Successive Treaties": VCLT Article 30(4)(a)

132.   The Tribunal accepts, of course, that while ECT Article 16 purports to regulate its relationship with subsequent treaties, that treaty provision, like any other, is capable in principle of being superseded by a later agreement which provides an alternate rule of priority.  The Tribunal therefore turns next to the *lex posterior* arguments Italy and the Commission present under VCLT Article 30(4)(a).  Under their theory, the "primacy of EU law" principle that was reaffirmed in the Lisbon Treaty operates as a "later special conflict rule" that overrules any conflict rule reflected in ECT Article 16.[286]  Specifically, the Commission argues that under Article 351 TFEU (formerly Article 307 EC), "in matters governed by the EU Treaties, EU law takes precedence over international treaties concluded between Member States, regardless of whether they were concluded before or after EU accession."[287]

133.   Article 30 provides in relevant part as follows:

> *Application of successive treaties relating to the same subject matter*
>
> 1.  Subject to Article 103 of the Charter of the United Nations, the rights and obligations of State Parties to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs.
>
> 2.  ….

---

[285] ECT, p. 227, Decision 1 ("In the event of a conflict between the [Svalbard Treaty] … and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict ….  In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.") (**C-1**).

[286] Commission Update, ¶ 44.

[287] Commission Update, ¶ 32.

3.  When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.

4.  When the parties to the later treaty do not include all the parties to the earlier one:

>    (a) as between State Parties to both treaties the same rule applies as in paragraph 3; ....[288]

134.    There is a threshold question, of course, as to whether the EU Treaties should be considered the "later treaty" for purposes of any Article 30(4) analysis. Eskosol contends not, on the basis that "Articles 267 and 344 TFEU have existed in the same form prior to the ECT,"[289] whereas the Commission considers that the EU Treaties do constitute the "subsequent" treaty, on the basis that the EU Member States "reaffirmed" these principles in the Amsterdam, Nice and Lisbon Treaties that postdate the ECT.[290] Italy also emphasizes that the Lisbon Treaty did introduce at least one relevant further change, in the sense of extending the common commercial policy to include foreign direct investment.[291] For present purposes, the Tribunal assumes *arguendo* that the principles included in the Lisbon Treaty can be said to postdate the ECT at least with respect to foreign direct investment, even if many of these principles were drawn from the much earlier founding treaties of the European legal order.

135.    The second threshold question raised by the Parties' submissions is whether VCLT Article 30 contains two distinct conditions for application of the *lex posterior* principle, or just one. Textually, the provision refers to two conditions: (a) that the "successive treaties relat[e] to the same subject matter," a phrase that is referenced both in Article 30's title and in Article 30(1), and (b) that the "provisions" of the two treaties are not "compatible," which is referenced in Article 30(3) and made applicable in this particular context by Article 30(4). Nonetheless, the Commission urges the Tribunal to consider "same subject matter" and "incompatibility" as a single condition rather than "two separate conditions," with the former essentially collapsing into the latter. In its view, "conflict is the necessary and sufficient condition," and the *lex posterior* rule "applies to all situations where there is a conflict between the earlier and the later treaty."[292]

---

[288] VCLT, Articles 30(1), (3), 4(a) (**CL-57**).

[289] Eskosol PHB, ¶ 88(iii).

[290] Commission Submission, ¶ 132.

[291] Memorial on Jurisdiction, ¶¶ 200, 235.

[292] Commission Update, ¶¶ 39-41.

136.   The Tribunal disagrees.  First, adopting the Commission's interpretation would effectively require rewriting the text, to ignore a threshold provision ("the rights and obligations of State Parties to successive treaties relating to the same subject matter") which is expressly stated to be the foundational requirement for any of the following provisions of Article 30 even to apply ("shall be determined in accordance with the following paragraphs …").  Adherence to the natural and ordinary meaning of the terms does not permit the requirements of Article 30(1) to be skipped over, allowing direct recourse to Article 30(3).

137.   It is notable, moreover, that the *comparators* in Articles 30(1) and 30(3) are different:  Article 30(1) examines the relationship between *treaties as a whole* (whether they "relat[e] to the same subject matter"), while Article 30(3) examines the relationship between *particular provisions* within such related treaties (whether they are "compatible").  While in principle it could be possible to reason from the whole to a part (*i.e.,* that if two treaties at their macro-level *do* relate to the same subject matter, their particular provisions may well contain overlaps which require scrutiny for compatibility), it is not equally possible to reason in reverse, from a part to a whole (*i.e.,* that treaties necessarily relate to the same subject matter because specific provisions in different treaties might have different effects).  The Commission's argument thus fails at the level of logic, in light of the different comparators set out in Article 30's plain text.

138.   Finally, the Commission has offered only limited jurisprudential support for its interpretation that VCLT Article 30 reflects a single test rather than two cumulative tests.  It relies largely on a construction of the ILC's drafting history of VCLT Article 30, in which a prior version did not contain the phrase "relating to the same subject matter," but the ILC final draft inserted this concept.  The Commission cites the following explanation in the commentary:

> The rules set out in the text of this article provisionally adopted in 1964 were formulated in terms of the priority of application of treaties having incompatible provisions.  On re-examining the article at the present session the Commission felt that, although the rules may have particular importance in cases of incompatibility, they should be stated more generally in term of the application of successive treaties to the same subject-matter.  One advantage of this formulation of the rules, it thought, would be that it would avoid any risk of [the provision] being interpreted as sanctioning the conclusion of a treaty incompatible with obligations undertaken towards another State under another treaty.  Consequently, while the substance of the article remains the same as in the 1964 text, its wording has been revised in the manner indicated.[293]

---

[293] Commission Update, ¶ 40 (quoting **Annex EC-49** at p. 232).

139.   In the Tribunal's view, however, even if recourse to such supplementary materials were appropriate under VCLT Article 32, this commentary cannot be read to suggest that the "same subject matter" proviso added to the final text should be treated as merely superfluous and given no meaning whatsoever.  This is particularly the case given the difference in comparators discussed above, namely that the phrase relates to the "subject matter" of the treaties as such and not simply the compatibility of particular provisions.

140.   Consequently, the Tribunal interprets Article 30(4) of the VCLT consistent with the ordinary and natural meaning of its terms, which apply the *lex posterior* principle only where (a) there are "successive treaties relating to the same subject matter," and (b) there exists an incompatibility between certain provisions of the two related treaties.  In this case, as discussed further below, there is no need to reach the second question (compatibility as a matter of international law), because in the Tribunal's view, the ECT and the Lisbon Treaty as a whole do *not* relate to the same subject matter.

141.   The Tribunal acknowledges that VCLT Article 30(1) does not define what it means for two treaties to be "successive treaties relating to the same subject matter."  Nonetheless, content must be given to these terms.  The first observation is that a treaty is not "successive" to *all* treaties that came before it, simply because it is later in time; to "succeed" a prior treaty implies *some intended relationship* between the two, such that an inference may be drawn from the sequence regarding the Contracting Parties' intent for provisions of the latter to supplant those of the former.  Otherwise, the *lex posterior* notion would be fatally broad, inconsistent with the right of States to enter into various different treaties for different purposes, without the earlier ones being negated each time a later one entered into force.  The "same subject matter" test provides the description of the *type of relationship* that must be established between distinct treaties, before any inferences regarding intent may be drawn based on temporal considerations.  This test accordingly must be given some positive meaning.

142.   For this purpose, Italy itself suggests the Tribunal have recourse to the ILC's 2006 Report on Fragmentation of International Law, which examined the challenge of defining a treaty's "subject matter" for purposes of determining when various conflict rules (*lex specialis*, *lex posterior*, etc.) may be applied.[294]  The ILC Report is indeed an important document, but its analysis does not necessarily support the result Italy suggests.  It is true that the ILC expressed concern that if *too narrow* a test for subject matter were adopted, based simply on "informal labels" or characterizations, then the regulation of potential conflicts between treaties might be "dependent on argumentative success in

---

[294] Memorial on Jurisdiction, ¶ 207.

pigeon-holing legal instruments," including through the assignment of "arbitrary labels on forms of professional specialization" such as trade law, human rights law, or environmental law.[295]  At the same time, if *too broad* a test for "subject matter" were adopted, such that many quite different treaties could be swept into the same subject matter bucket, then arguably there would be no place any more for application of the important principle of *lex specialis*; the principle of *lex posterior* would supply an automatic rule of priority merely as a function of chronology, without allowing any deeper examination of the underlying scope and purposes of the various instruments.  The ILC noted that the *lex specialis* principle would thus have "an unclear relationship to other maxims of interpretation or conflict-solution techniques, such as, for instance, the principle … [that] later law overrides prior law …."[296]  Yet, *lex specialis* is "widely accepted" as having an independent role to play, since "[a] special rule is more to the point … than a general one and it regulates the matter more effectively … than general rules."[297]  At the same time, *lex specialis* itself "can only apply where both the specific and general provisions concerned deal with the same substantive matter"; indeed, the ILC's own Draft Articles on State Responsibility limit the *lex specialis* principle to the context of treaties involving the "same subject-matter."[298]  This again suggests the need for the "same subject matter" construct to be given independent meaning, ideally one that is neither too narrow nor too broad.

143.  Importantly, in the ILC's view, "the question of the relationship between two treaties cannot be resolved completely in abstraction from any institutional relationship between them."  The ILC suggests the possibility of looking for "an institutional connection between 'chains' or clusters of treaties that are linked institutionally and that States parties envisage as part of the same concerted effort."[299]  The ILC further explained that "the notion of a 'regime' points to the institutional arrangements that may have been established to link sets of treaties to each other," which then allows more reasonable inferences regarding the intent of the States parties in regulating potential overlaps or conflicts as among those treaties.[300]  In particular, the ILC explained, the identification of such

---

[295] ILC 2006 Report on Fragmentation of International Law, ¶¶ 21-22, 254 (**R-8**).

[296] ILC 2006 Report on Fragmentation of International Law, ¶ 58 (**R-8**).

[297] ILC 2006 Report on Fragmentation of International Law, ¶ 60 (**R-8**).

[298] ILC 2006 Report on Fragmentation of International Law, ¶ 116 (citing Article 55 of the Draft articles on responsibility of States for internationally wrongful acts) (**R-8**).  That Article, entitled "*Lex specialis*," states that "[t]hese articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law."  The Commentary explains that "[f]or the *lex specialis* principle to apply it is not enough that the same subject matter is dealt with by two provisions; there must be some actual inconsistency between them, or else a discernable intention that one provision is to exclude the other."  **CL-143**, Article 55 and Commentary ¶ 4.

[299] ILC 2006 Report on Fragmentation of International Law, ¶ 255 (**R-8**).

[300] ILC 2006 Report on Fragmentation of International Law, ¶ 256 (**R-8**).

"treaty regimes" aids in application of principles of *lex posterior* or *lex specialis*, since "the argument from [such principles] seems clearly more powerful between treaties within a regime than between treaties in different regimes."[301]   Thus, while *lex posterior* may be logically applied to successive treaties *within* a given regime, as across different regimes "a straightforward priority of one treaty over another (that is in fact, of one regime over another) cannot be reasonably assumed on a merely chronological basis."[302]   To the contrary, the ILC emphasizes that where different treaties are *not* part of the same regime – that is, they are not "institutionally linked and intended to realize parallel objectives" – then "[t]hose are also situations where the *lex posterior* rule has least application.   In such situations, emphasis should be on guaranteeing the rights set up in the relevant conventions."[303]

144.   For purposes of the present debate, the Tribunal considers this notion of "treaty regimes," involving "'clusters' of treaties that are linked institutionally and that States parties envisage as part of the same concerted effort," to be a useful way of considering the VCLT Article 30(1) inquiry into whether the ECT and the Lisbon Treaty are "successive treaties relating to the same subject matter."   Under this approach, the Lisbon Treaty certainly would qualify as such with respect to the prior EU Treaties, since all such treaties were adopted through the same institutional processes and were envisaged by the EU as part of a single concerted effort, to regulate the EU internal market by reference to EU law. By contrast, while Italy and the Commission argue that the ECT likewise was an "effort[] of integration,"[304] in the sense that it "establish[ed] a legal framework in order to promote long-term cooperation in the energy field,"[305] this integration goal is insufficient on its own to qualify the ECT and the EU Treaties as having the same "subject matter" from the standpoint of international law. Numerous treaties pursue efforts of integration, as part of a general purpose of international law of bringing diverse States into greater legal and policy alignment through the adoption of common norms and procedures.   Yet, the reality remains that the ECT was a quite different instrument from the EU Treaties, adopted on a multilateral level and for certain distinct purposes.

145.   Thus, as the ECT's Preamble reflects, its many signatories not only "undertook to pursue the objectives and principles" of an EU document, the European Energy Charter, but also to "broaden their cooperation" multilaterally in support of various specifically stated goals, including *inter alia* "the effective implementation of full national treatment and most favoured nation treatment," the

---

[301] ILC 2006 Report on Fragmentation of International Law, ¶ 255 (**R-8**).

[302] ILC 2006 Report on Fragmentation of International Law, ¶ 272 (**R-8**).

[303] ILC 2006 Report on Fragmentation of International Law, ¶ 323 (**R-8**).

[304] Memorial on Jurisdiction, ¶¶ 208-209.

[305] Commission Submission, ¶ 130; Commission Update, ¶ 39.

"progressive liberalization of international trade and … avoidance of discrimination in international trade" in the energy sector, and more generally encouraging steps towards "the most efficient exploration, production, conversion, storage, transport, distribution and use of energy."[306]  In support of these objectives, the ECT signatories agreed to detailed rules for "Investment Promotion and Protection" set out in Part III, and to equally detailed rules for "Dispute Settlement" set out in Part V, to apply on a broad multilateral basis.  The objective of Part III of the ECT evidently was to provide for specific guarantees, defined in terms of international law rather than domestic law principles, in order to encourage international flows of investment into the energy sectors of at least certain ECT Contracting Parties.  The objective of Part V in turn was to provide specific mechanisms, again at an international level and removed from domestic law, for resolving disputes about whether the Part III guarantees had been observed.  This was no doubt a "concerted effort," to use the ILC's terminology, but it is not one that can be considered part of the same "treaty regime" or "cluster" of treaties as the various EU Treaties.  For this reason, the later EU Treaties (such as the Lisbon Treaty) do not qualify as a "successive treaty related to the same subject matter" as the ECT.

146.    The Tribunal thus arrives at the same place as several prior tribunals, even if it adopts Italy's suggestion to examine the "same subject matter" issue by way of the ILC's 2006 Report on Fragmentation.  For example, similarly to the analysis of VCLT Article 59 by the *EURAM v. Slovak Republic* tribunal, the Tribunal considers that a good faith interpretation of VCLT Article 30 does not support the conclusion that two treaties deal with the same subject matter simply because they may apply simultaneously to the same set of facts.[307]  Two different treaties may apply simultaneously to the same set of facts, or even share very broadly stated goals (such as "integration" or "cooperation" with other States) but approach the achievement of those goals from different perspectives.[308]  The Tribunal likewise agrees with the *EURAM* tribunal that the subject matter of a treaty "is inherent in the treaty itself and refers to the issues with which its provisions deal, *i.e.* its topic or substance."[309]  Using those standards, however, the Tribunal likewise sees no reason to depart from consistent case law finding that the EU Treaties deal with a different subject matter than investment treaties.[310]  As

---

[306] ECT, Preamble (**C-1**).

[307] *European American Investment Bank AG v. Slovak Republic*, PCA Case No. 2010-17, Award on Jurisdiction, ¶¶ 168-169 (22 October 2012) ("*EURAM*").

[308] *EURAM*, ¶¶ 168-171.

[309] *EURAM*, ¶ 172.

[310] *See*, e.g., *EURAM*, ¶¶ 178, 184 ("To accede to an economic community is simply not the same as to set up a special investment protection regime providing for investor-State arbitration"); *Eastern Sugar B.V. v. Czech Republic*, SCC No. 088/2004, Partial Award, ¶¶ 164-165 (27 March 2007) (**CL-84**); *Oostergetel v. Slovak Republic*, UNCITRAL, Decision on Jurisdiction, ¶¶ 74-79 (30 April 2010) (**CL-102**); *Electrabel*, ¶ 4.176 (**RL-58**).

noted above, the topic or substance of the EU Treaties was the creation of a common market between EU Member States, governed by EU law, whereas the topic or substance of the ECT was the creation of a broader multilateral network of energy cooperation, liberalization and investment, including through embracing certain reciprocal undertakings as a matter of international law. Moreover, although the "same subject matter" test in Article 30 is stated in terms of treaties as a whole, the key parts of the ECT for present purposes (ECT Parts III and V) address very specific topics of investment promotion and protection, and involve substantive and procedural protections that are not coincident with (or arguably, even of the same nature as) those offered under the EU Treaties' internal market provisions, which Italy itself admits "do not 'deal' technically with promotion and protection of investments."[311] Not surprisingly given these different regimes, the content of the standards is far from coextensive.[312] The mere fact that protections under both regimes could be afforded in certain circumstances to the same investors – at least in the context of direct rather than indirect investment[313] – does not conclusively demonstrate that the ECT and the EU Treaties themselves have the same subject matter for purposes of international law.

147. For these reasons, the Tribunal concludes that the EU Treaties, and in particular the Lisbon Treaty, are not "successive treaties relating to the same subject matter" within the meaning of VCLT Article 30(1). Given this conclusion, there is no need for the Tribunal to reach the further question of whether specific provisions of the Lisbon Treaty are "incompatible" with those of the ECT as a matter of international law under VCLT Article 30(4). Nonetheless, the Tribunal observes that this would be unlikely given its conclusion in Section V.B.1.a above that the ECT does not command application of EU law in order to resolve disputes. As the Tribunal discusses further below in Section V.B.2, in the context of the *Achmea* Judgment, it is entirely possible to have two coexisting systems of law applicable to a particular fact scenario, in which the State conduct's may be adjudged independently by different authorities assessing obligations owed under different bodies of law. Indeed, this is frequently the case for States that are party to investment treaties, and as such have undertaken obligations to foreign investors governed by international law, separate from whatever obligations

---

[311] Memorial on Jurisdiction, ¶¶ 208-209.

[312] *See, e.g., Eureko B.V. v Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, ¶¶ 245-266 (26 October 2010) (**CL-86**) (concluding that the fair and equitable treatment protections afforded by a BIT were not exhausted by existing EU law provisions prohibiting discrimination; similar doubts could be raised as to whether the standard is co-extensive with the EU fundamental freedoms, or whether EU law provisions regarding expropriatory takings extend comparable protections to indirect expropriations or to "every kind of asset").

[313] From the standpoint of EU law, the CJEU distinguishes between "foreign direct investment," for which it considers the EU now to have exclusive competence to enter into treaties with non-EU States, and indirect investment, for which it considers individual EU Member States to have shared competence. *See* CJEU, Opinion 2/15 of the Court (Full Court), 16 May 2017, ¶¶ 225-226, 238.

they already may owe such investors under their own domestic laws.  The two regimes (international law and domestic law) exist independently, with neither necessarily usurping the role of the other.

### e.   EU Treaties as "Agreements to Modify" ECT: VCLT Article 41(1)

148.   Finally, Italy contends that "by adhering to the Lisbon Treaty," EU Member States effectively "modified" the ECT pursuant to VCLT Article 41(1), to the extent of any intra-EU obligations they might previously have undertaken.[314]  The Commission presents an equivalent argument, stating that since the Treaties of Amsterdam, Nice and Lisbon "re-affirmed" the investment protection rules of EU law as well as general principles concerning competences and judicial protection, this "could be interpreted as an amendment [of the ECT] pursuant to Article 41(1)(b) VCLT."[315]  These arguments relate to the notion that under international law, a multilateral treaty may be modified not only collectively by all of its Contracting Parties, but also by a subset of those parties as between themselves, subject however to certain specified conditions.  With respect to these conditions, Article 41 provides as follows:

> *Agreements to modify multilateral treaties between certain of the parties only*
>
> 1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
>
>  (a)  the possibility of such a modification is provided for by the treaty; or
>
>  (b)  the modification in question is not prohibited by the treaty and:
>
>   (i)  does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
>
>   (ii)  does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.
>
> 2. Unless in a case falling under paragraph 1(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.[316]

149.   Italy contends that the conditions of VCLT Article 41(1)(b) are met in this case, because the Lisbon Treaty did not affect the enjoyment of ECT rights by any other ECT Contracting Parties.[317]  Eskosol

---

[314] Memorial on Jurisdiction, ¶ 197.

[315] Commission Submission, ¶ 127.

[316] VCLT, Article 41 (**CL-57**).

[317] Memorial on Jurisdiction, ¶¶ 216, 218-222.

contends that the conditions of Article 41(1)(b) are not met, both because the ECT (in its Article 16(2)) prohibits any modification that would result in derogation from ECT Parts III and V,[318] and because such a modification would undermine the object and purpose of the ECT as a whole, which was to provide qualifying investors substantive protections and access to independent arbitration.[319]

150.    The Tribunal rejects the Article 41(1) argument at a more fundamental level, which is that nothing in the Lisbon Treaty even purported to be an exercise of powers to "conclude an agreement to modify" the ECT as among EU Member States, which must be the starting point of any Article 41(1) analysis. Nothing in the Lisbon Treaty refers to the ECT at all, much less expresses an intent to modify the ECT's reach or application.  In that scenario, as the *Vattenfall* tribunal observed, "[i]t is unclear what precise modification of the ECT is alleged to have taken place."[320]  Nor is there any suggestion that in enacting the Lisbon Treaty, the EU followed the procedures set out in Article 41(2) for advance notification of other ECT Contracting Parties of their intention to conclude an agreement which henceforth would legally modify ECT obligations among EU Member States.  A useful contrast is provided by the Commission's approach to the International Energy Charter of 2015, where it formally declared, upon signing the document on behalf of the EU, that the Charter's dispute settlement mechanisms "cannot be construed so as to mean that any such [arbitral] mechanisms would become applicable in relations" between EU Member States.[321]  Yet the modification of an existing multilateral treaty under VCLT Article 41, no less than the conclusion of a new multilateral treaty, is intended to be a formal process, which the ILC describes as "subject[] … to strict conditions" both of substance and of procedure.[322]  The procedural conditions require notification to all other Contracting Parties "in time for those parties to react."[323]  It is not consistent with that process for States to make no reference in an *inter se* agreement to any intention to formally modify or withdraw from prior commitments made through a multilateral instrument, and then subsequently claim – in the context of a challenge to compliance with obligations imposed by the multilateral instrument – that the *inter se* agreement modified the multilateral treaty *sub silentio* and without any prior notice to the other Contracting Parties.

---

[318] Bifurcation Response, ¶ 81; Eskosol PHB, ¶ 91.

[319] Bifurcation Response, ¶¶ 81-82, 91.

[320] *Vattenfall*, ¶ 221 (**CL-193**).

[321] Declaration of the European Union at the signing of the International Energy Charter (2015) (Annex **EC-16** to the Commission Submission).

[322] ILC 2006 Report on Fragmentation of International Law, ¶ 304 (**R-8**).

[323] ILC 2006 Report on Fragmentation of International Law, ¶ 316 (**R-8**).

151.    In these circumstances, the Tribunal cannot conclude that the Lisbon Treaty was an "agreement to modify" the ECT within the sense of VCLT Article 41(1), nor that it complied with the procedural conditions for such a modification as set forth in Article 41(2).  Moreover, the Tribunal further agrees with the *Vattenfall* tribunal that the particular modification of the ECT proposed in this case would be "prohibited by the treaty" contrary to VCLT Article 41(1)(b), because ECT Article 16(2) expressly prevents a later treaty from being construed so as to derogate from the "more favourable" rights granted to investors in Parts III and V of the ECT.[324]

### 2.    The *Achmea* Judgment

152.    For all the reasons stated above, the Tribunal does not accept the argument that the progressive development of the EU Treaties, and in particular the conclusion of the Lisbon Treaty, requires as a matter of international law that intra-EU disputes be excluded from the ECT's scope.  The Tribunal turns next to the argument that the CJEU's authoritative interpretation of EU law in the *Achmea* Judgment nonetheless compels such a result.

153.    In conducting this analysis, the Tribunal emphasizes that it offers no criticism here of the *Achmea* Judgment as such.  Whatever views may be held individually or collectively of a particular line of reasoning, the Tribunal accepts that the judgments of the CJEU constitute settled and decisive interpretations of the particular issues of EU law that they actually reach.  However, the *implications* of such EU law decisions for proceedings in the broader international order, governed not by EU law but by multilateral agreements like the ICSID Convention and the ECT, remain open to assessment.  The Tribunal focuses on these issues in the Section below.

154.    In particular, the Tribunal addresses in this Section several different reasons why it ultimately concludes that the *Achmea* Judgment, accepted as a valid decision concerning certain intra-EU BITs in the European legal order, does not disturb its jurisdiction to decide a dispute in the international legal order under the ECT.  These points stand independently, and therefore the Tribunal could have chosen to rest on any one of them.  Nonetheless, given the extensive attention that the Parties and the Commission have given to the *Achmea* Judgment in their most recent submissions, as well as the broader interest in this issue in the international community, the Tribunal addresses each point in the alternative, demonstrating why its jurisdiction would not be affected even if the other points were not also established or were later called into question by subsequent developments.  First, however, the

---

[324] *Vattenfall*, ¶ 221 (**CL-193**).

Tribunal provides a summary of the *Achmea* Judgment, reproducing relevant passages in the CJEU's own words.

### a.    Summary of the *Achmea* Judgment

155.    The matter came before the CJEU on a request by the German Bundesgerichtshof for a preliminary ruling.  In December 2012, an UNCITRAL tribunal had issued an arbitration award in favor of Achmea B.V., a Dutch company, finding that the Slovak Republic had violated certain obligations owned to the company under a bilateral investment treaty between the Netherlands and the Czech and Slovak Federative Republic (the "***Achmea* BIT**").  As the seat of the arbitration was in Frankfurt, the Slovak Republic brought a set-aside action before the Oberlandesgericht Frankfurt am Main, and when that court dismissed its action, the Slovak Republic appealed to the Bundesgerichtshof on a point of law.

156.    The Bundesgerichtshof in turn decided to stay the appeal and sought a preliminary ruling from the CJEU on the following questions, referring to the text of Articles 18,[325] 267[326] and 344[327] of the TFEU:

> (1)  Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the

---

[325]  The first paragraph of Article 18 TFEU (formerly Article 12 TEC) provides as follows:

Within the scope of application of the Treaties, and without prejudice to any special provisions contained therein, any discrimination on grounds of nationality shall be prohibited.

[326]  Article 267 TFEU (formerly Article 234 TEC) provides as follows:

The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:

(a) the interpretation of the Treaties;

(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;

Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.

Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.

If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay.

[327]  Article 344 TFEU (formerly Article 292 TEC) provides as follows:

Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.

Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?

If Question 1 is to be answered in the negative:

(2) Does Article 267 TFEU preclude the application of such a provision?

If Questions 1 and 2 are to be answered in the negative:

(3) Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?[328]

157.    Advocate General Wathelet proposed that the CJEU should answer these questions as follows:

> Articles 18, 267 and 344 TFEU must be interpreted as not precluding the application of an investor/State dispute settlement mechanism established by means of a bilateral investment agreement concluded before the accession of one of the Contracting States to the European Union and providing that an investor from one Contracting State may, in the case of a dispute relating to investments in the other Contracting State, bring proceedings against the latter State before an arbitral tribunal.[329]

158.    The CJEU did not, however, accept Advocate General Wathelet's proposed resolution.

159.    Instead, it began by reformulating the questions posted by the Bundesgerichtshof, into a combined first and second questions framed as follows:

> 31.    By its first and second questions, which should be taken together, the referring court essentially asks whether Articles 267 and 344 TFEU must be interpreted as precluding *a provision in an international agreement* concluded between Member States, *such as Article 8 of the BIT*, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[330]

160.    The CJEU's reformulation included a specific reference to Article 8 of the *Achmea* BIT.  That clause provided first, in Article 8(1), that "[a]ll disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall, if possible, be settled amicably."   Failing such a settlement, Article 8(2) of the *Achmea* BIT provided that "[e]ach Contracting Party hereby consents to submit a dispute referred to in paragraph 1 of this Article to an

---

[328] *Achmea* Judgment, ¶ 23 (**RL-85**).

[329] Case No. C-284/16, *Slovak Republic v. Achmea BV*, Opinion of Advocate General Wathelet, 19 Sep. 2017, ¶ 273 (**RL-91**).

[330] *Achmea* Judgment, ¶ 31 (**RL-85**) (emphasis added).

arbitral tribunal."  The *Achmea* BIT then provided as follows in Article 8(6), regarding the law applicable to such a dispute:

> The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:
>
> - the law in force of the Contracting Party concerned;
>
> - the provisions of this Agreement, and other relevant agreements between the Contracting Parties;
>
> - the provisions of special agreements relating to the investment;
>
> - the general principles of international law.[331]

161.    Beginning its analysis, the CJEU set out various EU law considerations which it considered relevant:

> 32.  In order to answer those questions, it should be recalled that, according to settled case-law of the Court, an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties ….
>
> 33.  Also according to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law. EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other ….
>
> 34.  EU law is thus based on the fundamental premiss that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premiss [sic] implies and justifies the existence of mutual trust between the Member States that those values will be recognised, and therefore that the law of the EU that implements them will be respected. It is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU, to ensure in their respective territories the application of and respect for EU law, and to take for

---

[331] *Achmea* Judgment, ¶ 6 (**RL-85**) (quoting Article 8 of the *Achmea* BIT).

those purposes any appropriate measure, whether general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU ….

35.  In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law ….

36.  In that context, in accordance with Article 19 TEU, it is for the national courts and tribunals and the Court of Justice to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law ….

37.  In particular, the judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which, by setting up a dialogue between one court and another, specifically between the Court of Justice and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties ….

38.  The first and second questions referred for a preliminary ruling must be answered in the light of those considerations.[332]

162.   The CJEU then organized its analysis into three intermediary questions.  The first was "whether the disputes which the arbitral tribunal mentioned in Article 8 of the BIT is called on to resolve are liable to relate to the interpretation or application of EU law."[333]  The CJEU answered this question in the affirmative, reasoning as follows:

40.  Even if, as Achmea in particular contends, that tribunal, despite the very broad wording of Article 8(1) of the BIT, is called on to rule only on possible infringements of the BIT, the fact remains that in order to do so it must, in accordance with Article 8(6) of the BIT, take account in particular of the law in force of the contracting party concerned and other relevant agreements between the contracting parties.

41.  Given the nature and characteristics of EU law mentioned in paragraph 33 above, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.

42.  It follows that on that twofold basis the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed to apply EU law, particularly the

---

[332] *Achmea* Judgment, ¶¶ 32-38 (**RL-85**) (citations omitted).

[333] *Achmea* Judgment, ¶ 39 (**RL-85**).

provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital.[334]

163.    The second intermediate question was "whether an arbitral tribunal such as that referred to in Article 8 of the BIT is situated within the judicial system of the EU, and in particular whether it can be regarded as a court or tribunal of a Member State within the meaning of Article 267 TFEU."[335]   The CEJ answered this question in the negative, on the basis that an international arbitral tribunal is neither part of the judicial system of a single EU Member State nor a court common to a number of such States.[336]

164.    The CJEU's third intermediate question was "whether an arbitral award made by such a tribunal is, in accordance with Article 19 TEU in particular, subject to review by a court of a Member State, ensuring that the questions of EU law which the tribunal may have to address can be submitted to the Court by means of a reference for a preliminary ruling."[337]   It noted that under the UNCITRAL Arbitration Rules, a tribunal may choose its own seat, and it was only by virtue of the chosen seat in this instance being Frankfurt that a set-aside proceeding was brought in the German courts.[338]   Even in these circumstances, moreover, judicial review was limited by German law to the validity of the arbitration agreement and the consistency of the award with public policy.[339]   While the CJEU had accepted the notion of limited review of commercial awards, "provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference to the Court for a preliminary ruling,"[340] it considered that "arbitration proceedings such as those referred to in Article 8 of the BIT are different from commercial arbitration proceedings."   The CJEU explained as follows:

> While the latter originate in the freely expressed wishes of the parties, the former derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law …, disputes which may concern the application or interpretation of EU law. In those circumstances, the considerations set out in the

---

[334] *Achmea* Judgment, ¶¶ 40-42 (**RL-85**).

[335] *Achmea* Judgment, ¶ 43 (**RL-85**).

[336] *Achmea* Judgment, ¶¶ 45-46 (**RL-85**).

[337] *Achmea* Judgment, ¶ 50 (**RL-85**).

[338] *Achmea* Judgment, ¶¶ 51-52 (**RL-85**).

[339] *Achmea* Judgment, ¶ 53 (**RL-85**).

[340] *Achmea* Judgment, ¶ 54 (**RL-85**).

preceding paragraph relating to commercial arbitration cannot be applied to arbitration proceedings such as those referred to in Article 8 of the BIT.[341]

165.    Based on this analysis, the CJEU considered as follows:

> 56.  Consequently, having regard to all the characteristics of the arbitral tribunal mentioned in Article 8 of the BIT …, it must be considered that, by concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.
>
> 57.  It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected ….
>
> 58.  In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above.
>
> 59.  In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law.[342]

166.    The CJEU accordingly concluded as follows:

> 60.  Consequently, the answer to Questions 1 and 2 is that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

---

[341] *Achmea* Judgment, ¶ 55 (**RL-85**) (citations omitted).

[342] *Achmea* Judgment, ¶¶ 56-59 (**RL-85**).

62. … On those grounds, the Court (Grand Chamber) hereby rules:

Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[343]

### b. Whether the *Achmea* Judgment Reaches the ECT

167.    The first issue the Tribunal must address is whether the *Achmea* Judgment even reaches, from the standpoint of EU law, the jurisdiction of an ECT tribunal.  It is common ground that there is no explicit reference in the *Achmea* Judgment to any application of its principles to the ECT, even though Advocate General Wathelet had expressly discussed the ECT in his Opinion submitted to the CJEU.[344]  The question is whether the CJEU nonetheless indirectly addressed ECT issues by the breadth of its analysis.  The Parties disagree on this issue.[345]  The Tribunal considers that the decision does not reach the ECT, for several reasons.

168.    First, the vocabulary used by the CJEU in its *dispositif* is an undeniable reference *only to bilateral treaties* among EU Member States, not multilateral treaties to which the EU itself gave imprimatur by virtue of ratification.  It is true that the CJEU did not adopt the precise formulation presented by the Bundesgerichtshof, which had expressly referenced "a bilateral investment protection agreement between Member States,"[346] and instead replaced it with a formulation that does not expressly reference BITs.  Nonetheless, consistent with the general principle that the CJEU usually answers the question asked to it and not others, the *dispositif* in two respects still clearly references bilateral treaties.  The relevant language is italicized below:

---

[343] *Achmea* Judgment, ¶¶ 60, 62 (**RL-85**).

[344] Case No. C-284/16, *Slovak Republic v. Achmea BV*, Opinion of Advocate General Wathelet, 19 Sep. 2017, ¶ 43 (**RL-91**).

[345] *See* Italy PHB, ¶ 135 ("the Respondent does accept that *Achmea* does not directly address the ECT, but firmly affirms that the very same language and reasoning of the *Achmea* decision is exactly transposable to the ECT. The CJEU reasoning does apply to multilateral treaties like the ECT."): Rejoinder on Jurisdiction, ¶¶ 81, 88 (Eskosol contending that "the possible influence of the decision in *Achmea* is, rightly, limited in scope at most to intra-EU bilateral investment treaties and its reasoning does not extend to the ECT" and that "[e]ven the ECJ in *Achmea* recognized that international treaties to which the EU is a party are entirely different from BITs concluded between Member States").

[346] *See Achmea* Judgment, ¶ 23 (**RL-85**) (reflecting the Bundesgerichtshof question, "[d]oes Article 344 TFEU preclude the application of a provision in a *bilateral investment protection agreement* between Member States of the European Union (a so-called intra-EU BIT) under which …." (emphasis added)

On those grounds, the Court (Grand Chamber) hereby rules:

Articles 267 and 344 TFEU must be interpreted as precluding a provision in an *international agreement concluded between Member States, such as Article 8 of the Agreement* on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from *one of those Member States* may, in the event of a dispute concerning investments in *the other Member State*, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[347]

169. As can be seen from the text, the phrase "a provision in an international agreement concluded between Member States" is immediately qualified by the phrase "*such as*," followed by a reference to Article 8 of the BIT at stake in the *Achmea* case. Taking that qualification into account, the Tribunal considers that the evident goal was not to restrict the *Achmea* Judgment to a single BIT, but rather to encompass *comparable provisions* in other international agreements *of a similar nature*. As to which features of an agreement supply the requisite similarities, the first evidently concerns the nature of the Contracting Parties. Here, the Tribunal refers to an agreement "*between Member States*," rather than *among* States in general, including EU Member States. More importantly, it refers to an agreement under which "an investor from *one* of those Member States" has rights in the event of a dispute concerning investments in *the* other Member State," not *an* other Member State. The other language versions contain the same references: in French, it is referred to as "un investisseur de *l'un* de ces Etats membres concernant des investissements dans *l'autre* Etat membre," not "dans *un autre* Etat membre"; in German, as "ein Investor *eines* dieser Mitgliedstaaten in Fall einer Streitigkeit uber Investitionen in *dem anderen* Mitgliedstaat," not "in *ein anderen* Mitgliedstaat"; and in Spanish, as "un inversor de *uno* de esos Estados miembros … en caso de controversia en *el otro* Estado miembro," not "*en otro* Estado miembro." In the view of this Tribunal, these references refer only to a bilateral treaty, and cannot be simply presumed to extend *mutatis mutandis* to multilateral treaties involving non-EU Member States. The Tribunal notes that the *Masdar* and *Vattenfall* tribunals have reached the same conclusion.[348]

170. Second, other language used by the CJEU suggests an intent not to address a situation in which the *EU itself is a Contracting Party* to the same international agreement as its various Member States. In a paragraph almost immediately preceding its conclusion, the CJEU describes the situation before it as follows:

In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to

---

[347] *Achmea* Judgment, ¶ 62 (**RL-85**) (emphasis added).

[348] *See Masdar*, ¶¶ 679-680 (**RL-90**); *Vattenfall*, ¶ 162 (**CL-193**).

> the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by *an agreement which was concluded <u>not by the EU</u> but by Member States*.[349]

If the CJEU did not consider this to be a relevant distinguishing feature, there would have been no reason to mention at all the absence of the EU as a Contracting Party to the *Achmea* BIT.  The fact that the CJEU drew attention to the EU's absence as a party to the *Achmea* BIT, particularly in the wake of Advocate General Wathelet's discussion of the ECT in his Opinion, suggests an awareness that the EU's presence as a party to a different treaty (such as the ECT) could be a relevant factor.  While the CJEU evidently did not consider it necessary to fully assess the implications of the distinction, it clearly was leaving room in the passage above for a possible distinction.  This Tribunal should not assume that having done so, the CJEU nonetheless intended this to be a distinction without a difference.[350]

171.  Third and most important, the CJEU was at pains throughout its analysis – as indicated *inter alia* in the passage above – to emphasize a concern about submission to arbitration of *disputes requiring application of EU law*.  The issue of applicable law had been front and center in the Commission's own 2016 submission to the CJEU prior to the Judgment, and interestingly the Commission in that submission had used applicable law as its basis for distinguishing between (on the one hand) a bilateral treaty between two EU Member States, and (on the other hand) a treaty that the EU itself might conclude with non-EU Member States such as Singapore, Vietnam or Canada.  The Commission presented its position on the latter by way of written observations to the CJEU as follows:

> 157. This case concerns only an international investment protection agreement between two Member States.
>
> 158. For the sake of completeness and to prevent any misunderstanding, the Commission stresses once more ... that the considerations set out in this memorandum *are not transposable to the Union's international investment protection agreements with third countries*, such as those that it is about to conclude with Singapore, Vietnam and Canada.
>
> 159. The Union's international investment protection agreements with third countries concern relations between the Union and those countries. They are very different, in many ways, from BITs concluded between Member States.

---

[349] *Achmea* Judgment, ¶ 58 (**RL-85**) (emphasis added).

[350] *See Masdar*, ¶¶ 681-682 (**RL-90**); *Vattenfall*, ¶¶ 162-163, 213 (**CL-193**); *Greentech*, ¶ 220 (**CL-195**).

160. First, the Court has explicitly recognized the compatibility of the establishment of dispute settlement mechanisms in agreements with third countries.

161. Secondly, in relationships with third countries, neither Article 344 TFEU nor the premise of mutual trust in the jurisdiction of the Member States, which complete the Union's system of judicial protection, are applicable.

162. Thirdly, the Union's investment protection agreements with third countries, such as those with Singapore, Vietnam and Canada, *regularly state in explicit terms that Union law does not apply, not as part of the law of the host country, nor as international law*. This last point is almost a self-evident fact since the third country is not a member of the Union. The dispute settlement mechanisms established by these agreements thus *concern only the application and interpretation of the Agreement and not the rest of Union law*. Its interpretation plays a role only as a factual element in the context of the finding of a possible breach of the agreement and in no way binds the courts of the Union.

163. *Arbitral tribunals operating on the basis of these agreements must therefore only apply the investment protection rules enshrined in international law between the Union and the third country, and not those provided for by Union law.* Therefore, in the case of an investment protection agreement with third countries, the problem of material overlap with the protection of investments provided for by Union law does not arise in the same way as it does with the international investment protection agreements concluded between Member States.[351]

While the Commission did not refer to the ECT in the passages above, its reasoning logically would extend to the ECT as well, since the EU treaties with Singapore, Vietnam or Canada likewise were envisioned as multilateral ones to which the individual EU Member States (and not just the EU itself) also would be Contracting Parties.

172.     In any event, the CJEU evidently shared the Commission's concern about applicable law.  Its reasoning in the *Achmea* Judgment emphasized that under the particular terms of Article 8(6) of the *Achmea* BIT, an arbitral tribunal would have little choice but to interpret and apply EU law to the dispute, since EU law was incorporated by reference as mandatory law within the BIT's own applicable law clause.  As indicated above, Article 8(6) provided that "[t]he arbitral tribunal *shall* decide on the basis of the law, *taking into account in particular* though not exclusively" four types of applicable law:  (a) "the law in force of the Contracting Party concerned," (b) "the provisions of this Agreement, and other relevant agreements between the Contracting Parties," (c) "the provisions of

---

[351] European Commission, Written Observations regarding a Prejudicial Decision, submitted pursuant to Article 23, second paragraph, of the protocol of the Court of Justice's statute (Ref. sj.c(2016) 5385926 - 30/08/2016). Unofficial translation from French original, available at available at: http://ec.europa.eu/dgs/legal_service/submissions/c2016_284_obs_fr.pdf (emphasis added); no official English version provided by the European Commission.

special agreements relating to the investment," and (d) the general principles of international law.[352] The CJEU considered *the first two* of these provisions to be problematic, stating that in order to "rule … on possible infringements of the BIT," a tribunal applying the BIT "*must*, in accordance with Article 8(6) of the BIT, take account in particular of the law in force of the contracting party concerned and other relevant agreements between the contracting parties."[353] Yet, the CJEU observed that EU law has a dual nature which qualifies it as falling in both of these categories, namely as both "part of the law in force in every Member State and as deriving from an international agreement between the Member States."[354] The CJEU concluded that "on that *twofold basis* the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed to apply EU law."[355] The *dispositif* of the *Achmea* Judgment then referred back to "a provision … *such as* Article 8" of the *Achmea* BIT, making clear that its Judgment related to the specific content of Article 8,[356] *i.e.*, the "*twofold*" respects in which Article 8 commanded that EU law be applied.

173.    The Tribunal has no quibble with the CJEU's observations about the dual nature of EU law, which has been recognized as well by prior investment tribunals, including in *AES v. Hungary*.[357] Importantly, however, the CJEU did *not* consider EU law to come into the *Achmea* BIT on a *third* basis, namely by virtue of Article 8(6)'s incorporation by reference also of "the general principles of international law." This too was a proper conclusion, because as the Tribunal explained in detail in Section V.B.1(a) above, the phrase "general principles of international law" is a term of art in international instruments, referring to customary international law accepted by all States and to principles of law generally recognized by all States in their municipal legal systems. The CJEU quite rightly did not contend that EU law qualified for inclusion in this rarified category of universally accepted norms. Nor did it express any concern about the authority of EU Member States to consent to adjudication of issues under "general principles of international law." Rather, its stated concern was that *beyond* such general principles of international law, an arbitral tribunal empaneled under the *Achmea* BIT necessarily would have to apply EU law, by virtue of Article 8(6)'s mandate that a tribunal also apply

---

[352] *Achmea* Judgment, ¶ 4 (**RL-85**) (quoting Article 8 of the *Achmea* BIT) (emphasis added).

[353] *Achmea* Judgment, ¶ 40 (**RL-85**) (emphasis added).

[354] *Achmea* Judgment, ¶ 41 (**RL-85**).

[355] *Achmea* Judgment, ¶ 42 (**RL-85**) (emphasis added).

[356] *Achmea* Judgment, ¶ 41 (**RL-85**).

[357] *See AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, ¶ 7.6.6 (23 September 2010) (**RL-82**) ("Regarding the Community competition law regime, it has a dual nature: on the one hand, it is an international law regime, on the other hand, once introduced in the national legal orders, it is part of these legal orders.").

the national law of the host State and the provisions of other relevant agreements between the Contracting Parties.

174.     This is a critical distinction, because the ECT contains *no equivalent incorporation* into its applicable law of either category of law that the CJEU found offending in Article 8(6) of the *Achmea* BIT.  As discussed at length in Section V.B.1(a), ECT Article 26(6) provides that tribunals shall decide disputes only under "this Treaty and applicable rules and principles of international law," neither of which categories incorporates EU law.  In these circumstances, the CJEU's concern about an arbitral tribunal applying EU law under the *Achmea* BIT is not directly transposable to the ECT.  EU law simply is *not* part of the applicable law of any ECT dispute, under the very different provisions of ECT Article 26(6).  As such, there is no equivalent risk that the arbitration mechanism in the ECT could endanger the CJEU's ultimate control on the application of EU law, which was the driving force in the *Achmea* Judgment about its decision about a "provision in an international agreement … *such as* Article 8" of the *Achmea* BIT.[358]

175.     In this context, it bears emphasis that nothing in the CJEU's Judgment suggested that EU Member States were barred from offering to arbitrate disputes under treaties *not* governed even in part by EU law, but only by express treaty provisions and by general principles of international law.  The *Achmea* Judgment was not predicated on the exclusive competence of the EU to enter into such treaties on its Member States' behalf.  Rather, the Tribunal understands the *Achmea* Judgment more narrowly, as objecting only to treaty provisions that by their terms give tribunals the authority (or indeed the mandate) to decide a dispute among other things by reference to EU law, in either or both of the "twofold" aspects the CJEU identified.[359]  Put otherwise, it appears that EU Member States may bring arbitral tribunals into being for the purposes of deciding treaty disputes under general principles of international law, but are no longer allowed to authorize such disputes to apply EU law in addition.  The ECT does not offend this limitation imposed by the *Achmea* Judgment.

176.     Finally, and for avoidance of doubt, the Tribunal sees no likelihood in this particular case that it even will need to interpret EU law as a *matter of fact,* relevant to its application of international law to decide the dispute in question.  As noted above, there is no claim in this case by either Eskosol or Italy that the challenged government conduct by Italy was necessitated by EU directives.  The case in that sense is similar to *Charanne* and *Novoenergia*, where the tribunals found that their cases did "not involve any assessment of the validity of Community acts or decisions adopted by organs of the

---

[358] *Achmea* Judgment, ¶ 62 (**RL-85**) (emphasis added).
[359] *Achmea* Judgment, ¶ 42 (**RL-85**).

European Union," and did "not concern in any way allegations … of violations of EU law nor claims directed against such organisation."[360]

177.     In conclusion, the Tribunal sees no basis for finding that the *Achmea* Judgment extends to ECT cases, much less to this particular ECT case, *even by the CJEU's own analysis*.   The CJEU's stated concern in paragraph 42 of the *Achmea* Judgment was about a circumstance in which an arbitral tribunal "*may* be called on to interpret or indeed to apply EU law,"[361] a scenario that the CJEU found to exist based on the applicable law clause in the particular BIT before it.   But it would be inappropriate to extend that reasoning about a *possible* risk into a blanket ban on all investment arbitration, even under different scenarios where no equivalent risk arises.   A concern that arbitration *in some cases* could endanger CJEU control over application of EU law does not logically support a finding that the *mechanism of arbitration* itself is improper; rather, the CJEU's logic suggests a need to determine whether the danger actually arises in the context of a particular treaty.   Some intra-EU BITs, like the *Achmea* BIT, may require application of EU law, but other intra-EU BITs by their terms may not.   In the context of the ECT, which the CJEU has not even discussed, it would be particularly surreal to interpret the CJEU as already having decided that the arbitral mechanism is contrary to EU law, when that mechanism as discussed above does not actually command the application of EU law, and thus decidedly does not pose the particular risk that the CJEU identified as its basis for concern.

### c.     Whether the *Achmea* Judgment Binds This Tribunal

178.     A second and independent reason why the *Achmea* Judgment does not preclude this Tribunal from exercising jurisdiction – even *arguendo*, if it were deemed to extend to ECT cases as a matter of EU law – is that the decisions of the CJEU with respect to EU law are not binding on an international investment tribunal empaneled under a different legal order.

179.     The Tribunal starts by noting that the CJEU did not purport to conduct any international law conflicts analysis.   It concluded that an incompatibility existed between Article 8 of the *Achmea* BIT and the EU legal system, in particular Articles 267 and 344 TFEU.   But the CJEU did not indicate by what means such an incompatibility should be resolved.   It made no reference either to an alleged hierarchy of norms between EU law derived from the TFEU and general international law norms contained in an international investment treaty.   The CJEU accordingly did not discuss any of the conflict of norms

---

[360] *Charanne*, ¶ 448 (**CL-82**); *Novoenergia*, ¶ 462 (**CL-191**) (quoting *Charanne* and stating that "[t]his situation is similar").

[361] *Achmea* Judgment, ¶ 42 (**RL-85**) (emphasis added).

principles this Tribunal carefully examined in Section V.B.1 above, including application of VCLT Article 30, which is not even mentioned in the *Achmea* Judgment.

180. This Tribunal, by contrast, cannot simply skip over the relevant analysis, in blind deference to the CJEU's analysis under EU law.  As the *Electrabel* tribunal clearly stated, a tribunal that "has been seized as an international tribunal by a Request for Arbitration … under the ECT and the ICSID Convention" is required accordingly to apply the ECT and "applicable rules and principles of international law," because it "is placed in a public international law context and not a national or regional context."[362]

181. It is useful to recall that the international legal system is a general system without any central authority from whom the entire system flows.  It is composed of different legal sub-systems which have independent life, even if at times there may be interactions between them.  As a whole, the international legal system is bound by general principles of international law, *i.e.*, by customary international law, including norms such as *jus cogens* and *pacta sunt servanda* as discussed above.  But below this level of general principles there exist various sub-systems of international law, with no precise hierarchy between the different norms established in each sub-system.  Rather, each of these sub-systems is governed by its own applicable norms, and vests dispute resolution authority in particular bodies obligated to proceed under those norms.  The EU Treaties are one such sub-system, vesting authority in various organs including the Commission, the CJEU, etc.  But the EU Treaties are not *general* international law displacing all other sub-systems of international law; rather, they exist side-by-side with other sub-systems, including those created by various multilateral treaties.  The ECT is one such other sub-system of law, and it vests authority in arbitral tribunals such as this one.  Each authority is empowered in its sub-system to render decisions within its sphere, such as the CJEU's *Achmea* Judgment under the EU Treaties and the awards of various arbitral tribunals under the ECT.  A given State may be subject to obligations arising from both types of decisions.  This structure of international law may be graphically illustrated as below:

---

[362] *Electrabel,* ¶¶ 4.111, 4.112 (**RL-58**).



182.    In the *Achmea* Judgment, the CJEU recognized that EU law exists in its own sub-system, which is "autonom[ous] … with respect *both* to the law of the Member States and to international law."[363]  This autonomy means that EU law is different and separate not only from the national legal orders of its constituent States, but also from general international law, including other sub-systems of international law in the broader international legal order.  Essentially, and as the CJEU itself has recognized, EU law is a *regional sub-system* of law.  The CJEU explained many years ago in the famous *Van Gend en Loos* case, and has frequently reiterated since then,[364] that "[t]he Community constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights …"[365]  In the *Kadi* case, Advocate General Maduro's Opinion also described EU law as a "municipal legal order of transnational dimension."  It is even more accurately expressed in the French version: *"un*

---

[363] *Achmea* Judgment, ¶ 33 (**RL-85**) (stating that "the autonomy of EU law *with respect both to the law of the Member States and to international law* is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law. EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves.") (emphasis added).

[364] *See, e.g.,* Opinion 2/13 of the Court (Full Court) of 18 December 2014, given to the Commission on the compatibility of draft agreement providing for the accession of the European Union to the Convention for the Protection of Human Rights and Fundamental Freedoms with the European Treaties ("As the Court of Justice has repeatedly held, the founding treaties of the EU, unlike ordinary international treaties, established a new legal order, possessing its own institutions, for the benefit of which the Member States thereof have limited their sovereign rights, in ever wider fields, and the subjects of which comprise not only those States but also their nationals.").

[365] Case 26/62, *NV Algemene Transporten Expeditie Onderneming van Gend & Loos v Netherlands Internal Revenue Administration* [1963] ECR 1, at Section B.

*ordre juridique interne de dimension transnationale.*"[366]  This means that EU law certainly has primacy over the national laws of EU Member States,[367] but not in the same fashion over independent rules of international law.

183.  Arbitration tribunals sitting in the general international legal order, for example in *Electrabel*, have considered that *at the procedural level*, there is no contradiction between investment arbitration (whatever its source) and EU law, in part because there remain mechanisms that guarantee the CJEU's control on the interpretation and application of EU law *on the merits* when there is a link with the EU legal order.[368]  The CJEU, sitting in the European regional legal order, evidently now considers to the contrary, *i.e.*, that the control it can exercise on investment arbitral awards is insufficient to satisfy its monopoly of application and interpretation of EU law.  This creates a clear contradiction of positions.  However, faced with such a contradiction, a tribunal situated on the international plane is not bound by the views adopted by the CJEU, *i.e.*, within a regional sub-system of international law.  As the ILC itself recognized in its 2006 Report on Fragmentation of International Law, "when conflicts emerge between treaty provisions that have their home in different regimes, care should be taken so as to guarantee that any settlement is not dictated by organs exclusively linked with one or the other of the conflicting regimes."[369]  Nor can the notion of "harmonious interpretation," while no doubt "a desirable outcome" in the words of the *Electrabel* tribunal, be transformed into a principle that compels an international law tribunal to abandon an international law conflicts analysis in favor of a very different conflicts analysis derived from EU law.[370]  Rather, if different rules deal with an issue in a way that seems contradictory, a tribunal empaneled under international law must do the best it can under the tools of interpretation provided by international law, including those "regarding chronology (*lex posterior derogat priori*), specificity (*lex specialis generalibus derogat*) and identity of the Parties

---

[366] Opinion of the Advocate General Maduro in Case C-402/05, *Kadi*, ¶ 21, [2008] ECR I-6351 (**RL-96**).

[367] CJEU case law has confirmed that primacy of EC law over the domestic law of EU Member States is a cornerstone principle of Community law.  According to the Court, this principle is inherent to the specific nature of the European Community, as stated in the judgment of *Costa and Enel*, 6/64, EU:C:1964:66, p. 594: "It follows … that the law stemming from the treaty, an independent source of law, could not, because of its special and original nature, be overridden by *domestic legal provisions*, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question."

[368] *Electrabel*, ¶¶ 4.162 ("In other words, even when disputes raising issues of EU law are decided by international arbitration, if the resulting award is honored voluntarily by the EU Member State or enforced judicially within the European Union against that Member State, the ECJ retains the possibility, through different mechanisms for both ICSID and non-ICSID awards under the EU Treaties, to exercise its traditional role as the ultimate guardian of EU law.") (**RL-58**).

[369] ILC 2006 Report on Fragmentation of International Law, p. 252 (**R-8**).

[370] *Electrabel*, ¶ 4.130 (stating that while "harmonious interpretation of different treaties … may be a desirable outcome … the end does not establish the means to that end") (**RL-58**).

to the agreements (same or different Parties) …. However, these rules do not always apply or can only be applied with difficulty."[371]

184.  Ultimately, the bottom line is that in a case of contradiction, each legal order remains bound by its own rules, for purposes of its own judgments. The CJEU's conclusions regarding the EU legal order are addressed to EU Member States and European institutions, and they accordingly may have no choice but to take steps consistent with the CJEU's ruling, including submitting arguments to international tribunals based on the EU legal order. But the CJEU's conclusions derived from EU law do not alter this Tribunal's mandate to proceed under the legal order on which its jurisdiction is founded, namely the ECT. This means that an international investment tribunal empaneled under the ECT is not bound by the jurisprudence of the CJEU, just as the CJEU is not bound by decisions taken by ECT tribunals. Eskosol has quite rightly described this situation as follows:

> … this Tribunal's jurisdiction is derived from the ECT and its corresponding mandate is to interpret the terms of that international treaty and apply them to the facts of this case. By contrast, the ECJ derives its jurisdiction from the TFEU, specifically Article 267 which grants the ECJ jurisdiction to give preliminary rulings concerning (a) the interpretation of the TFEU and the Treaty on European Union; and (b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union.
>
> Therefore, each of this Tribunal and the ECJ are judicial decision-making entities created by virtue of the provisions of the respective treaties from which they each derive their jurisdiction and authority. The decisions of the ECJ are thus not binding upon this Tribunal.[372]

185.  This conclusion is entirely consistent with those of many other investment tribunals, starting with the *Electrabel* tribunal, which emphasized that:

> This Tribunal is an international tribunal established under the ECT and the ICSID Convention. From its perspective under international law, the Tribunal notes the establishment under international law of the Parties' consent to international arbitration under the ICSID Convention and also the effect of Article 26 of the ICSID Convention, providing for ICSID arbitration "to the exclusion of any other remedy". It is therefore no answer for the European Commission to submit that the "proper avenue" for the Claimant lies only in "the Community courts", whether the Respondent's own national courts or the EC.[373]

---

[371] *Electrabel*, ¶ 4.173 (**RL-58**).

[372] Rejoinder on Jurisdiction, ¶¶ 78-79.

[373] *Electrabel*, ¶ 5.37 (**RL-58**).

The *Eiser* and *Novoenergia* tribunals observed to the same effect that their jurisdiction was based on the express terms of the ECT, that they were not constituted on the basis of the "European legal order," and accordingly that they were not subject to the requirements of that legal order.[374]  The *Vattenfall* tribunal noted that there was "no principle of public international law … which would permit the Tribunal to interpret the words of the ECT, being its foundational jurisdictional instrument, so as to give priority to external treaties (the TFEU and the TEU), and a court judgment interpreting those treaties."[375]  Finally, the *RREEF* tribunal explained the point as follows:

> 75. … if there must be a "*hierarchy*" between the norms to be applied by the Tribunal, *it must be determined from the perspective of public international law, not of EU law*. Therefore, the ECT prevails over any other norm (apart from those of *ius cogens* – but this is not an issue in the present case). In this respect, this Tribunal fully agrees with the position of the tribunal in *Electrabel*.
>
> …
>
> 87. The Tribunal observes, however, that should it ever be determined that there existed an inconsistency between the ECT and EU law … and absent any possibility to reconcile both rules through interpretation, the unqualified obligation in public international law of any arbitration tribunal constituted under the ECT would be to apply the former. This would be the case even were this to be the source of possible detriment to EU law. *EU law does not and cannot "trump" public international law*.[376]

186.  In conclusion, even if the *Achmea* Judgment were to be construed as a matter of EU law to extend to the ECT, and not just to BITs similar to the one actually before the CJEU, that would not deprive this Tribunal of jurisdiction to decide this case.  Indeed, the Tribunal not only has the right to exercise its jurisdiction under the ECT, it is under a duty to do so.  The Tribunal is required to operate in the international legal framework of the ECT and the ICSID Convention, outside the EU and the dictates of EU law.

### d.  Whether the *Achmea* Judgment Invalidates ECT Provisions

187.  Even if, *arguendo*, the *Achmea* Judgment were construed so as to reach issues under the ECT and to be binding on international arbitration tribunals, there is a third alternative reason why it nonetheless would not divest this Tribunal of jurisdiction.  That is because as a matter of international law, a court

---

[374] *Eiser*, ¶ 199 (**CL-149**); *Novoenergia*, ¶ 461 (**CL-191**).

[375] *Vattenfall*, ¶ 131 (**CL-193**).

[376] *RREEF*, ¶¶ 74, 87 (**CL-101**).

judgment of any scope or authority cannot without more automatically invalidate a treaty or an individual provision of a treaty.

### i.  There is no accepted ground for invalidation under the VCLT

188.  First, there is no accepted ground for invalidation, as enumerated in the VCLT.  Article 26 of the VCLT provides that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith."[377]  This provision, a codification of the customary international law principle *pacta sunt servanda*, implies that a judgment of the CJEU cannot *by itself* put an end to the ECT, or even to one of its Articles.  For that purpose, certain procedures have to be followed by States wishing to invalidate provisions, whether on the basis of a CJEU judgment that the ECT should be considered incompatible with EU law, or on any other basis.

189.  In this respect, pursuant to Article 42 of the VCLT (to which both Italy and Belgium are parties), the validity of Italy's consent to be bound by a particular treaty can be challenged solely on the basis of the grounds set forth in the VCLT:

> *Validity and continuance in force of treaties*
>
> 1. *The validity of a treaty or of the consent of a State to be bound by a treaty may be impeached only through the application of the present Convention.*
>
> 2. The termination of a treaty, its denunciation or the withdrawal of a party, may take place only as a result of the application of the provisions of the treaty or of the present Convention. The same rule applies to suspension of the operation of a treaty.[378]

190.  The grounds for invalidating a treaty are set out in Articles 46 through 53 of the VCLT:  (a) provisions of internal law regarding competence to conclude treaties (Article 46); (b) specific restrictions on authority to express consent of the State (Article 47); (c) error (Article 48); (d) fraud (Article 49); (e) corruption of a representative of a State (Article 50); (f) coercion of a representative of a State (Article 51); (g) coercion of a State by the threat or use of force (Article 52); and (h) conflict with a peremptory norm of general international law (Article 53).  Of these, the only possible ground for invalidating Italy's consent to arbitration under the ECT would be the first, *i.e.* provisions of internal law regarding competence to conclude treaties, on the reasoning that the EU law, as interpreted by the CJEU, is part of the internal law of all EU Member States. But even analyzed from this angle, the VCLT is not of great assistance to Italy's case, as Article 46(1) of the VCLT specifies that provisions of a State's

---

[377] VCLT, Article 26 (**CL-57**).

[378] VCLT, Article 42 (**CL-57**) (emphasis added).

internal law may not be invoked to invalidate its consent to be bound by a treaty, unless the violation of internal law was "manifest" and concerned a "rule of fundamental importance":

> *Provisions of internal law regarding competence to conclude treaties*

> 1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent *unless that violation was manifest and concerned a rule of its internal law of fundamental importance*.

> 2. A violation is *manifest if it would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith*.[379]

191.  In this case, the Tribunal need not engage in discussion of the second factor in Article 46(1), namely whether the rule of EU law at issue is "of fundamental importance." That is because, in its view, any incompatibility between Article 26 of the ECT and Articles 267 and 344 of the TFEU could not be considered as "manifest" before the *Achmea* Judgment, as required by VCLT Article 46(1) and as this this term is defined in VCLT Article 46(2).[380]

192.  First, the Tribunal recalls that, in the *Achmea* Judgment, the CJEU framed the incompatibility between intra-EU investment arbitration clauses and the TFEU in terms of the *mere potential* to threaten the full effectiveness of EU law, not as a *blatant* violation of EU law:

> 56. Consequently, having regard to all the characteristics of the arbitral tribunal mentioned in Article 8 of the BIT and set out in paragraphs 39 to 55 above, it must be considered that, by concluding the BIT, the Member States parties to it established *a mechanism* for settling disputes between an investor and a Member State *which could prevent* those disputes from being resolved in a manner that ensures the full effectiveness of EU law, *even though they might* concern the interpretation or application of that law …

> […]

> 59. […] Article 8 of the BIT has an *adverse effect* on the autonomy of EU law."[381]

193.  Second, the Tribunal recalls that the question of the compatibility of intra-EU investment treaties with EU law has been the subject of considerable debate. The position of the Commission itself has shifted. When the EU expanded to the East in 2004, the purported incompatibility between intra-EU arbitration

---

[379] VCLT, Article 46 (**CL-57**) (emphasis added).

[380] Indeed, even after the *Achmea* Judgment it could be considered that incompatibility with the ECT was not "manifest," considering the diverging Declarations of EU Member States with respect to the ECT that were made in January 2019, as discussed further in Section V.B.3 below.

[381] *Achmea* Judgment, ¶¶ 56, 59 (**RL-85**) (emphasis added).

clauses and EU law was not raised as an issue. Subsequently, the Commission took the view that Member States should begin proceedings to terminate intra-EU BITs according to their own terms. At that time, however, the Commission was careful to note that these agreements did not terminate or cease to apply automatically. Later, the Commission began arguing that intra-EU BITs already had ceased to apply on account of being incompatible with EU law, but this position was by no means universally accepted. Before the CJEU rendered its *Achmea* judgment, for example, Advocate General Wathelet expressed the opinion that no incompatibility existed between either intra-EU BITs and the ECT on the one hand and the EU Treaties on the other. The Tribunal considers that the shift in the Commission's own position, and the differing opinion of Attorney General Wathelet, perfectly illustrate that the issue of the arbitration clauses' compatibility with EU law – whether in bilateral or in multilateral treaties – remained very much an open and complex question until the CJEU rendered its first decision on the subject in the *Achmea* Judgment. In these circumstances, it was certainly not "objectively evident to any State conducting itself in the matter in accordance with normal practice and good faith"[382] that the CJEU eventually would find an incompatibility to exist. In other words, the violation was not "manifest" within the meaning of VCLT Article 46(2) before the *Achmea* Judgment, and accordingly VCLT Article 46(1) is not a ground upon which Article 26 of the ECT can be invalidated, at least for purposes of disputes where the investor invoked that Article long before the *Achmea* Judgment was rendered.[383]

### ii. The procedures of the VCLT have not been followed

194. Moreover, even if the statement of preclusion in the *Achmea* Judgment were considered as a viable ground of invalidation under VCLT Article 46(2), such invalidation still must follow the established procedures in the VCLT. The only circumstance in which a treaty may be deemed automatically terminated under international law is where it is contrary to a norm of *jus cogens*, according to Article 64 of the VCLT : "If a new peremptory norm of general international law emerges, any existing treaty which is in conflict with that norm becomes void and terminates."[384] It is quite evident, however, that EU law does not qualify as a peremptory norm of general international law (or *jus cogens*) such that a conflict with its norms and principles would invalidate Italy's consent to be bound by the ECT.

---

[382] VCLT, Article 46(2) (**CL-57**).

[383] With respect to this temporal issue, *see also* Section V.B.2.e below.

[384] VCLT, Article 64 (**CL-57**).

195.    In all other situations, procedures have to be followed to effectuate invalidation.  These procedures are set forth in Articles 65 to 67 of the VCLT as follows:

### Article 65

*Procedure to be followed with respect to invalidity,*
*termination, withdrawal from or suspension of the operation of a treaty*

1.  A party which, under the provisions of the present Convention, invokes either a defect in its consent to be bound by a treaty or a ground for impeaching the validity of a treaty, terminating it, withdrawing from it or suspending its operation, must notify the other parties of its claim. The notification shall indicate the measure proposed to be taken with respect to the treaty and the reasons therefor.

2. If, after the expiry of a period which, except in cases of special urgency, shall not be less than three months after the receipt of the notification, no party has raised any objection, the party making the notification may carry out in the manner provided in article 67 the measure which it has proposed.

3.  If, however, objection has been raised by any other party, the parties shall seek a solution through the means indicated in Article 33 of the Charter of the United Nations.[385]

4.  Nothing in the foregoing paragraphs shall affect the rights or obligations of the parties under any provisions in force binding the parties with regard to the settlement of disputes.

5.  Without prejudice to article 45, the fact that a State has not previously made the notification prescribed in paragraph 1 shall not prevent it from making such notification in answer to another party claiming performance of the treaty or alleging its violation.

### Article 66

*Procedures for judicial settlement, arbitration and conciliation*

If, under paragraph 3 of article 65, no solution has been reached within a period of 12 months following the date on which the objection was raised, the following procedures shall be followed:

(*a*)    any one of the parties to a dispute concerning the application or the interpretation of article 53 or 64 may, by a written application, submit it to the International Court of Justice for a decision unless the parties by common consent agree to submit the dispute to arbitration;

---

[385] Article 33 of the UN Charter provides:  "The parties to any dispute, the continuance of which is likely to endanger the maintenance of international peace and security, shall, first of all, seek a solution by negotiation, enquiry, mediation, conciliation, arbitration, judicial settlement, resort to regional agencies or arrangements, or other peaceful means of their own choice."

(*b*) any one of the parties to a dispute concerning the application or the interpretation of any of the other articles in part V of the present Convention may set in motion the procedure specified in the Annex to the Convention by submitting a request to that effect to the Secretary-General of the United Nations.

Article 67

*Instruments for declaring invalid, terminating, withdrawing from or suspending the operation of a treaty*

1. The notification provided for under article 65, paragraph 1, must be made in writing.

2. Any act of declaring invalid, terminating, withdrawing from or suspending the operation of a treaty pursuant to the provisions of the treaty or of paragraphs 2 or 3 of article 65 shall be carried out through an instrument communicated to the other parties. If the instrument is not signed by the Head of State, Head of Government or Minister for Foreign Affairs, the representative of the State communicating it may be called upon to produce full powers.[386]

196.    In other words, successive steps have to be followed.  The first step, pursuant to Article 65(1) of the VCLT, involves a notification to the other party or parties to the treaty in question of its view that there was a "defect in its consent to be bound" by that treaty or another recognized ground for impeaching the validity of the treaty.  The notice should include a proposal for the measure to be taken as a consequence of such defect.  Second, pursuant to Article 65(2) of the VCLT, if the party thus notified does not react after a period of at least three months, then the party invoking invalidity can adopt the measure it proposed to rectify the situation.  By contrast, if the party notified objects, then (pursuant to Article 65(3) of the VCLT) the two parties have to resort to some means of dispute settlement, like mediation or arbitration.  The third step is that, if no solution has been found in 12 months after the objection was raised, then the parties should present their dispute to the ICJ, pursuant to Article 66 of the VCLT.  In the meantime, Article 65(4) states that "[n]othing in the foregoing paragraphs shall affect the rights or obligations of the parties under any provisions in force binding the parties with regard to the settlement of disputes."

197.    In this case, none of these steps required to invalidate the ECT or its Article 26 have been completed. As previously noted in Section V.A.1, Italy did take steps to withdraw entirely from the ECT, but this is subject to the 20-year sunset provision of ECT Article 47(3),[387] and is far different from claiming an invalidity in its original consent to be bound by the ECT based on an incompatibility with its internal law.  It results that unless and until Italy or other EU Member States pursue the procedures established

---

[386] VCLT, Articles 65-67 (**CL-57**).
[387] ECT Art. 47(3) (**C-1**).

by the ECT for declaring invalidity of their consent, the ECT remains in full effect for them, subject to the timetable provided by the sunset provision for those who (like Italy) have given notice of an intent to withdraw.

198.    For all these reasons, the Tribunal concludes that whatever the scope and reach of the *Achmea* Judgment may be, it cannot be considered as a matter of international law to automatically invalidate, for Italy or any under EU Member State, either the ECT as a whole or the consent to arbitration reflected in Article 26 of the ECT.  The Tribunal considers that the principle of legal certainty entitles investors to rely legitimately upon a State's written consent to arbitrate disputes, as long as that consent has not been withdrawn or invalidated through the proper procedures, including those set forth in the underlying treaty and the express provisions in the VCLT.

### e.    Whether the *Achmea* Judgment Retroactively Invalidates Consent

199.    Finally, even if all of the prior grounds established in Sections V.B.2.b, V.B.2.c and V.B.2.d were not an issue with respect to the *Achmea* Judgment's possible invalidation of EU Member State consent to ECT arbitration generally, they still would not divest this Tribunal of jurisdiction to resolve this particular case.  That is because any invalidation of ECT Article 26 could not be applied *retroactively* to invalidate a consent to arbitration given before the *Achmea* Judgment, but only prospectively for purposes of investors who have not yet initiated an ECT arbitration.  In the Tribunal's view, this conclusion holds whether the *Achmea* Judgment *itself* is considered under EU law to be applied *ex nunc* (*i.e.,* for the future, starting from the date of the Judgment) or alternatively *ex tunc* (*i.e.,* from the outset, dating back to ratification of the ECT allegedly without proper consent).

#### i.    The analysis if the Achmea Judgment is prospective only under EU law

200.    The outcome in the first scenario, in which as a matter of EU law the *Achmea* Judgment is considered as having only prospective effects, is straightforward to explain.

201.    The jurisdiction of an international tribunal must be evaluated as of the date when the parties have given their consent to submit a dispute to arbitration.  In this case, Article 26(3) of the ECT states that "each Contracting Party hereby gives its *unconditional consent* to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article," including various procedural options, one of which is ICSID arbitration.[388]  Eskosol has chosen ICSID arbitration

---

[388] ECT, Article 26(3) (**C-1**) (emphasis added).

as among the options available to it. Article 25(1) of the ICSID Convention in turn provides that "[w]hen the parties have given their consent, *no party may withdraw its consent unilaterally*."[389] In other words, once consent for arbitration under the ICSID Convention has been given, it becomes irrevocable, and no posterior event can annul such consent retroactively.

202.    It is not controversial that the jurisdiction of an ICSID tribunal is fixed at the moment the proceedings are deemed to have commenced. This has been stated repeatedly by ICSID tribunals. For example, the tribunal in the *CSOB* case stated that "it is generally recognized that the determination whether a party has standing in an international judicial forum for purposes of jurisdiction to institute proceedings is made by reference to the date on which such proceedings are deemed to have been instituted."[390] Support for this proposition also can be found in the *Vivendi* case, where the tribunal explained as follows:

> 61. This is not only a principle of ICSID proceedings; it is an accepted principle of international adjudication that jurisdiction will be determined in the light of the situation as it existed on the date when the proceedings were instituted. Events that take place before that date may affect jurisdiction; events that take place after that date do not. The ICJ developed cogent case law to this effect in the *Lockerbie case*. There, in a preliminary objection, Libya relied on the Montreal Convention to establish the Court's jurisdiction. The United States and the United Kingdom contended that Security Council Resolutions adopted after the initiation of the proceedings deprived the Court of jurisdiction. The Court rejected categorically the arguments of the United States and the United Kingdom, deciding that:
>
> > "The Court cannot uphold this line of argument. Security Council Resolutions 748 (1992) and 883 (1993) were in fact adopted after the filing of the Application on 3 March 1992. In accordance with its established jurisprudence**,** *if the Court had jurisdiction on that date, it continues to do so. The subsequent coming into existence of the above-mentioned Resolutions cannot affect its jurisdiction once established ..."*
>
> 62. The Court confirmed this rule in the *Arrest Warrant case*, where it stated:
>
> > "The Court recalls that, according to its settled jurisprudence, its jurisdiction must be determined at the time that the act instituting proceedings was filed. Thus, *if the Court has jurisdiction on the date the case is referred to it, it continues to do regardless of subsequent events.* Such events might lead to a finding that an application has subsequently become moot and to a decision not to proceed to judgment on the merits, but they cannot deprive the Court of jurisdiction ..."

---

[389] ICSID Convention, Article 25(1) (emphasis added).

[390] *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision of the Tribunal on Objections to Jurisdiction, ¶ 3 (24 May 1999) (**CL-157**).

> 63.  The consequence of this rule is that, *once established, jurisdiction cannot be defeated. It simply is not affected by subsequent events*. Events occurring after the institution of proceedings (other than, in a case like this, an *ad hoc* Committee's Decision to annul the prior jurisdictional finding) cannot withdraw the Tribunal's jurisdiction over the dispute.[391]

203.    There is no question that the *Achmea* Judgment itself was an event posterior to the commencement of these proceedings.  Accordingly, if that Judgment is itself deemed to be prospective only, it cannot affect the consent granted by *both Parties* prior to the date on which it was rendered.

### *ii.    The analysis if the Achmea Judgment is retroactive under EU law*

204.    Even if as a matter of EU law the *Achmea* Judgment is considered to be *ex tunc*, in the sense that Italy lacked consent from the inception to agree to Article 26 of the ECT, this still would not imply that Eskosol's acceptance – prior to the *Achmea* Judgment – of Italy's apparent offer of ECT arbitration is considered to be void.  This follows from Article 69 of the VCLT regarding the consequences under international law of the invalidity of a treaty because of lack of consent.

205.    Article 69 of the VCLT provides as follows:

> *Consequences of the invalidity of a treaty*
>
> 1.  A treaty the invalidity of which is established under the present Convention is void. The provisions of a void treaty have no legal force.
>
> 2.  *If acts have nevertheless been performed in reliance on such a treaty*:
>
> (a)  each party may require any other party to establish as far as possible in their mutual relations the position that would have existed if the acts had not been performed;
>
> (b)  *acts performed in good faith before the invalidity was invoked are not rendered unlawful by reason only of the invalidity of the treaty*.
>
> 3.  In cases falling under articles 49, 50, 51 or 52, paragraph 2 does not apply with respect to the party to which the fraud, the act of corruption or the coercion is imputable.[392]

206.    Under Article 69(1), the general rule is that invalidation of a treaty based on the absence of consent operates    retroactively,    with    the    effect    that    the    provisions    of    that    treaty    are    "void"

---

[391] *Compañiá de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3 (formerly *Compañía de Aguas del Aconquija, S.A. and Compagnie Générale des Eaux v. Argentine Republic*), Decision on Jurisdiction, ¶¶ 61-63 (14 November 2005) (**RL-37**) (emphasis added).

[392] VCLT, Article 69 (**CL-57**) (emphasis added).

and "have no legal force." Consistent with the general rule, the parties to the treaty may require each other to restore the situation that existed as between them *ex ante* (*restitutio in integrum*). However, there is an important exception to this rule stated in Article 69(2)(b), under which acts that have been performed "in good faith before the invalidity was invoked" are not considered unlawful simply because of invalidity of the treaty. In the Tribunal's view, this is the case for arbitration agreements perfected before the *Achmea* Judgment, in reliance on EU Member States' apparent offer of consent to investor-State arbitration under the ECT or other treaties. The conclusion that investors accepted that apparent offer in good faith follows from the point, discussed above, that any invalidity in the offer of consent was far from "manifest" prior to the *Achmea* Judgment. Indeed, lack of consent was neither manifested in the text of the ECT itself; the contemporaneous conduct of the Commission and EU Member States, none of which "sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties";[393] and the subsequent shifting positions of the Commission regarding whether additional action by EU Member States would be required in order to terminate intra-EU treaties. It was not until the CJEU actually issued the *Achmea* Judgment that, at the very *earliest*, given persisting debate about whether that Judgment even reaches the ECT, it could be said that investors were placed on notice about the risks of relying on Member States' apparent consent to arbitration in Article 26 of the ECT.

### 3. The January 2019 Members' Declaration

207. The Tribunal turns now to Italy's Termination Request on 4 February 2019, by which it requested "an award declaring immediate termination" of this arbitration, by virtue of the January 2019 Declaration filed by 22 EU Member States, including Italy and Belgium.

208. As it will be recalled, the January 2019 Declaration was entitled "Declaration of the Governments of the Member States on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union." Citing the *Achmea* Judgment, the January 2019 Declaration first stated that "Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law."[394] The rest of the Declaration may be divided into two parts, the first expressing views on certain legal issues in the wake of the *Achmea*

---

[393] Case No. C-284/16, *Slovak Republic v. Achmea BV*, Opinion of Advocate General Wathelet, 19 Sep. 2017, ¶ 43 (**RL-91**).

[394] January 2019 Declaration, p. 1.

Judgment,[395] and the second declaring that in accordance with those views, the 22 EU Member States "will undertake the following actions without undue delay."[396]

209.    Regarding the legal issues, the signatories state *inter alia* as follows:

> Union law takes precedence over bilateral investment treaties concluded between Member States.[1] As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable. They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses). An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty.
>
> Furthermore, international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties.[2] Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States.[3] Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied.[4] [397]

210.    The passages above contain several footnotes. The first footnote, following the statement that "Union law takes precedence over bilateral investment treaties concluded between Member States," cites certain CJEU judgments and then asserts, without any analysis or citations, that "[t]he same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of the Treaties and customary international law (*lex posterior*)."[398] The second footnote, following the statement that the ECT "must be compatible with the Treaties," states that "[f]or the Energy Charter Treaty, its systemic interpretation in conformity with the Treaties precludes intra-EU investor-State arbitration."[399] The fourth footnote, following the statement that if the ECT's investor-State arbitration clause were interpreted as applicable between Member States, "that clause would be incompatible with the Treaties and thus would have to be disapplied," cites only to the Commission's own 2018 Communication on "Protection of intra-EU investment."[400]

---

[395] January 2019 Declaration, pp. 1-2.

[396] January 2019 Declaration, pp. 3-4.

[397] January 2019 Declaration, pp. 1-2.

[398] January 2019 Declaration, p. 1, n. 1.

[399] January 2019 Declaration, p. 2, n. 2.

[400] January 2019 Declaration, p. 2, n. 4.

211.    Regarding the actions to be taken by the 22 signatories, the January 2019 Declaration pledges that they will "undertake the following," *inter alia*:

> 1. By the present declaration, Member States inform arbitration tribunals about the legal consequences of the *Achmea* judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between Member States or under the Energy Charter Treaty.
>
> 2. In cooperation with a defending Member State, the Member State, in which an investor that has brought such an action is established, will take the necessary measures to inform the investment arbitration tribunals concerned of those consequences. Similarly, defending Member States will request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.
>
> 3. By the present declaration, Member States inform the investor community that no new intra-EU investment arbitration should be initiated.
>
> ...
>
> 5. In light of the *Achmea* judgment, Member States will terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.
>
> ...
>
> 8. Member States will make best efforts to deposit their instruments of ratification, approval or acceptance of that plurilateral treaty or of any bilateral treaty terminating bilateral investment treaties between Member States no later than 6 December 2019.
>
> 9. Beyond actions concerning the Energy Charter Treaty based on this declaration, Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the *Achmea* judgment in relation to the intra-EU application of the Energy Charter Treaty.[401]

212.    Italy has now followed through on the first undertaking above, by virtue of informing this Tribunal about the January 2019 Declaration in its letter of 4 February 2019. Having been so informed, the question for the Tribunal is whether the January 2019 Declaration has legal significance for its jurisdiction to proceed in this case.

---

[401] January 2019 Declaration, pp. 3-4.

213.    The Tribunal's first observation is that in their statements regarding legal issues on the first pages of the January 2019 Declaration, the signatories have gone far beyond the actual holding in the *Achmea* Judgment.  First, as discussed in Section V.B.2.b above, it is far from clear whether the *Achmea* Judgment stands for the proposition that "*all* investor-state arbitration clauses contained in bilateral investment treaties … are contrary to Union law,"[402] or simply those with a "provision … *such as* Article 8" of the *Achmea* BIT,[403] *i.e.*, clauses that make EU law part of the applicable law of the treaty and thus require tribunals to apply EU law in reaching their decision.

214.    Second, even if the *Achmea* Judgment did stand for a proposition regarding "all" intra-EU BITs, it does not address the ECT, much less state that the ECT's arbitration clause – which contains no command about applying EU law, and to which the EU also agreed by becoming a Contracting State – itself "would be incompatible with the Treaties."[404]  There is nothing in the *Achmea* Judgment that even purports to reach the conclusion in the second footnote of the January 2019 Declaration, namely that a "systemic interpretation [of the ECT] in conformity with the Treaties precludes intra-EU investor-State arbitration."[405]  This reality was emphasized by the six other EU Member States that have declined to express a view at this time regarding the compatibility of EU law and the ECT, based on the *Achmea* Judgment's complete silence about the ECT in its analysis.[406]

215.    Finally, and most importantly, the *Achmea* Judgment was restricted to a discussion of EU law, and nowhere purported to discuss the broader international law consequences of its findings regarding EU law.  There is no discussion whatsoever in the *Achmea* Judgment of the points asserted in the first footnote of the January 2019 Declaration, namely that "[t]he same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of the Treaties and customary international law (*lex posterior*)."[407]  It certainly did not explain, as a matter of either VCLT conflicts analysis or VCLT rules on invalidity of treaty provisions, that

---

[402] January 2019 Declaration, p. 1.

[403] *Achmea* Judgment, ¶ 62 (**RL-85**) (emphasis added).

[404] January 2019 Declaration, p. 1.

[405] January 2019 Declaration, p. 2, n. 2.

[406] For example, in a Declaration signed on 16 January 2019, Hungary stated that "in its view, the *Achmea* Judgment concerns only intra-EU bilateral treaties. The *Achmea* Judgment is silent on the investor-state arbitration clause in the [ECT] and it does not concern any pending or prospective arbitration proceedings initiated under the ECT. Against this background, Hungary underlines the importance of allowing for due process and considers that it is inappropriate for a Member State to express its views as regards the compatibility with Union law of the intra-EU application of the ECT."  Finland, Luxembourg, Malta, Slovenia and Sweden expressed a similar position in another Declaration signed on 16 January 2019.

[407] January 2019 Declaration, p. 1, n. 1.

intra-EU arbitration clauses are "inapplicable" and "would have to be disapplied," with the effect that an "arbitral tribunal established on the basis of [such] clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate."[408]

216.   In other words, these particular assertions by the 22 Member State signatories are not grounded in the express findings of the CJEU in the *Achmea* Judgment, but merely reflect the signatories' own interpretation of the further "legal consequences of the judgment," as the title of the January 2019 Declaration reflects.  Moreover, in expressing that interpretation the signatories made no reference to any international law analysis.  There is no attempt in the January 2019 Declaration to work through, for example, the impact of the numerous VCLT provisions this Tribunal has carefully analyzed above.

217.   The Tribunal further notes that important language in the signatories' undertakings is stated in the future tense.  For example, in undertaking numbers 5 and 8 the signatories state that they "*will terminate*" all bilateral investment treaties concluded between them, and "*will make best efforts*" to complete this process by 6 December 2019.  With respect to the ECT, the signatories state in undertaking number 9 they state that they "*will discuss* … whether any additional steps are necessary to draw all the consequences from the *Achmea* judgment in relation to the intra-EU application of the Energy Charter Treaty."[409]  The use of the future tense suggests that the signatories do not believe their intra-EU BITs already have been terminated for invalidity of the underlying consent, much less that an equivalent result already has been accomplished with respect to the intra-EU application of the ECT.  As discussed above in Section V.B.2.d, the VCLT provides specific procedures in this regard, yet there is no assertion in the January 2019 Declaration that these procedures have been commenced, much less completed.

218.   In these circumstances, the Tribunal is unable to accept Italy's assertion that the mere fact that Italy and Belgium both signed the 2019 Declaration requires termination of these proceedings.  The proposition would require a finding that even with no analysis to support its key assertions regarding international law, the 2019 Declaration qualifies *simply by its existence* as a "binding instrument" amounting to a "shared understanding … regarding the interpretation of the ECT,"[410] and moreover one that applies even to cases that were filed years before any such interpretation was declared, based on the plain meaning of a treaty text that has been in force for decades.  Yet, neither VCLT Article

---

[408] January 2019 Declaration, pp. 1-2.

[409] January 2019 Declaration, pp. 3-4 (emphasis added).

[410] Termination Reply, ¶¶ 4, 7.

31(2)(b) or VCLT Article 31(3)(a), which Italy invokes in support of this position,[411] requires such a result.

219.    First, VCLT Article 31(2)(b) provides that "[t]he context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, ... any instrument which was made by one or more parties *in connection with the conclusion of the treaty* and accepted by the other parties as an instrument related to the treaty."[412]  Yet, the January 2019 Declaration was not "made ... in connection with the conclusion" of the ECT, in the sense that various instruments deposited as part of its ratification process were, and thus hardly can be considered a reliable record of the contemporaneous understanding of the relevant Contracting Parties at the time the ECT came into force.  To the contrary, it was issued *25 years after* the "conclusion" of the ECT, in the context of pending arbitrations against various EU Member States. The Tribunal does not interpret VCLT Article 31(2)(b) as requiring obedience to *post-hoc* statements of this sort as relevant (much less determinative) "context" for interpreting the original intent of these Contracting Parties.

220.    Different considerations apply to VCLT Article 31(3)(a), which does address a "subsequent agreement" as distinct from one made "in connection with the conclusion" of a treaty.  Article 31(3)(a) states that "[t]here shall be taken into account, together with the context ... any subsequent agreement *between the parties* regarding the interpretation of the treaty or the application of its provisions."[413] The first point here is that there is a significant distinction in international law between interpretations agreed by *all* Contracting Parties to a multilateral treaty, and those offered unilaterally by *only a subset* of such Parties.  This point is firmly established by the very authority Italy invokes in support of its arguments, namely the ILC's 2001 Guide to Practice on Reservations to Treaties, which distinguishes between "interpretative declarations" made unilaterally by one or more States or international organizations and those accepted by *all* signatories to a particular treaty.  In particular, "[t]he joint formulation of an interpretative declaration by several States or international organizations does not affect the unilateral character of that interpretative declaration,"[414] whereas "[a]n interpretative declaration that has been approved by all the contracting States and contracting organizations may constitute an agreement regarding the interpretation of the treaty."[415]

---

[411] Termination Request, p. 2.

[412] VCLT, Article 31(2)(b) (**CL-57**) (emphasis added).

[413] VCLT, Article 31(3)(a) (**CL-57**) (emphasis added).

[414] ILC 2011 Guide to Practice on Reservations to Treaties, Guideline 1.2.1, p. 2 (**RL-102**).

[415] ILC 2011 Guide to Practice on Reservations to Treaties, Guideline 4.7.3, p. 27 (**RL-102**); *see also id.*, Comments (1) and (2) to Guideline 4.7.3, p. 559 ("Assent to an interpretive declaration by all the other parties to the treaty ...

221.    The Tribunal is unable to accept Italy's suggestion that the critical requirement of unanimity in a subsequent agreement on interpretation can be dispensed with in the ECT context, since any particular arbitration will involve only two interested States (the investor's home State and the host State of the investment), who have "reciprocal" obligations.[416]  While it may be true that only Belgium and Italy have any stake specifically in this arbitration, this does not mean that the *terms* of the ECT can be transformed simply by their bilateral agreement. As previously discussed, the terms of a multilateral treaty must be given a consistent meaning, not varying meanings depending which particular States may have concrete interests in the outcome of a particular dispute and/or subsequently agree to particular interpretations.

222.    A further difficulty with Italy's reliance on the January 2019 Declaration is that it does not actually purport to "interpret" any particular term of the underlying treaty, such as the terms "Contracting Party," "REIO" or "Area" that the Tribunal assessed through a detailed VCLT Article 31 analysis in Section V.A. above.  To the contrary, while denominated as "interpretation," the Declaration is more a statement of current political will.  This is quite different from the types of "subsequent agreements" that VCLT Article 31(3)(a) was intended to address.  As the ILC's 1966 Commentaries on the Draft VCLT Articles discuss regarding this provision, "[a] question of fact may sometimes arise as to whether an *understanding reached during the negotiations* concerning the meaning of a provision was or was not intended to constitute an agreed basis for its interpretation."[417]  The January 2019 Declaration does not assert, however, that any understanding regarding ECT Article 26(6)'s application to intra-EU disputes actually was reached during the ECT negotiations.  To the contrary, it seems that the issue was not discussed at all, likely because (as Advocate General Wathelet has suggested) neither the EU Member States nor the Commission at the time "had the slightest suspicion that [Article 26(6)] might be incompatible" with EU law.[418]

223.    The goal of the January 2019 Declaration thus appears less to confirm a shared understanding *at the time*, but rather to offer a *new understanding* (as among the 22 signatories) for the purposes of overriding interpretations of the ECT that arbitral tribunals have reached in various intra-EU

---

radically alters the situation. … Unanimous agreement by all the parties therefore constitutes a true interpretative agreement which represents the will of the 'masters of the treaty' and thus an authentic interpretation.").

[416] Termination Reply, ¶ 13.

[417] *See* ILC Draft Articles on the Law of Treaties with Commentaries, 1966, p. 221 (Art. 27, Commentary, item 14) (emphasis added).

[418] Case No. C-284/16, *Slovak Republic v. Achmea BV*, Opinion of Advocate General Wathelet, 19 Sep. 2017, ¶ 43 (**RL-91**).

disputes.[419]   VCLT Article 31(3)(a) is not, however, a trump card to allow States to offer new interpretations of old treaty language, simply to override unpopular treaty interpretations based on the plain meaning of the terms actually used.   Indeed, the ILC was quite clear in its 1966 Commentaries that even a *contemporaneous* document "made … in connection with the conclusion of the treaty," within the meaning of what became VCLT Article 31(2)(b), is "not … necessarily to be considered as an integral part of the treaty," but simply as "part of the context for the purpose of arriving at the ordinary meaning of the terms of the treaty."[420]   This is all the more true for an interpretative declaration, which "does not modify treaty obligations," but "may only specify or clarify the meaning or scope which its author attributes to a treaty … and may, as appropriate, constitute an element to be taken into account in interpreting the treaty in accordance with the general rule of interpretation of treaties."[421]

224.   In particular, an interpretative declaration may "corroborate or 'support' an interpretation that has already been determined by other methods," such as "the objective elements listed in articles 31 and 32 of the Vienna Convention," but it cannot override the application of those elements.[422]   The ILC explains that:

> It is therefore clear from practice and doctrinal analyses that interpretative declarations come into play only as an auxiliary or complementary means of interpretation corroborating a meaning revealed by the terms of the treaty, considered in light of its object and purpose.  As such, they do not produce an autonomous effect: when they have an effect at all, interpretive declarations are associated with another instrument of interpretation, which they usually uphold.[423]

The ILC explains the bottom line as follows:  "Whether or not the interpretation is correct, its author remains bound by the provisions of the treaty."[424]

225.   As Eskosol notes,[425] there can also be a fine line between an interpretive declaration and an attempted reservation to a treaty, which becomes particularly important in cases where a treaty unambiguously prohibits the latter.  This is the case for the ECT, which states authoritatively in Article 46:  "No

---

[419] *See* January 2019 Declaration, p. 2 ("Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States.")

[420] *See* ILC Draft Articles on the Law of Treaties with Commentaries, 1966, p. 221 (Art. 27, Commentary, item 13).

[421] ILC 2011 Guide to Practice on Reservations to Treaties, Guideline 4.7.1.1, p. 26 (**RL-102**).

[422] ILC 2011 Guide to Practice on Reservations to Treaties, Comment (26) on Guideline 4.7.1, p. 555 (**RL-102**).

[423] ILC 2011 Guide to Practice on Reservations to Treaties, Comment (31) on Guideline 4.7.1, p. 556 (**RL-102**).

[424] ILC 2011 Guide to Practice on Reservations to Treaties, Comment (7) on Guideline 4.7.1, p. 549 (**RL-102**).

[425] Termination Rejoinder, pp. 2-3.

reservations may be made to this Treaty."[426]   The ILC cautions not to defer to mere labels in distinguishing between the two.[427]   Rather, its Guideline 1.3.3 offers a practical distinction, namely that "[w]hen a treaty prohibits reservations to all or certain of its provisions, a unilateral statement formulated in respect of those provisions … nevertheless constitutes a reservation if it purports to exclude or modify the legal effect of certain provisions of the treaty, or of the treaty as a whole with respect to certain specific aspects, in their application as to its author."[428]   In other words:

> In determining the legal nature of a statement formulated in connection with a treaty, the decisive criterion lies in the effective result that implementing the statement has (or would have).  If it results (or would result) in modifying or excluding the legal effect of the treaty or certain of its provisions, it is a reservation "however phrased or named"; if the statement simply clarifies the meaning or scope that its author attributes to the treaty or certain of its provisions, it is an interpretative declaration.[429]

Applying this standard, the ultimate effect of the 2019 Declaration would be to significantly modify the legal reach of Article 26(6) of the ECT as otherwise interpreted pursuant to the ordinary meaning of its terms, with the effect of excluding that reach entirely in any intra-EU dispute brought against any of the 22 signatories.  That is more in the nature of an attempted reservation to the ECT than a simple clarification in support of the plain meaning of the text.

226.   Finally, even if the January 2019 Declaration were to be treated as a binding joint interpretation of ECT Article 26(6) on a prospective basis, the Tribunal is unable to accept that it should be given retroactive effect to require the termination of a pending arbitration, initiated in good faith by an investor years before the Declaration was issued, and indeed already *sub judice* as of its issuance.  Giving it such effect in a pending case would go against the security of the legal order intended to be achieved by Article 25(1) of the ICSID Convention, namely that "[w]hen the parties have given their consent, no party may withdraw its consent unilaterally."  The ECT itself contains protections against revocation of specific assurances provided to investors, through the concept of legitimate expectations embodied in fair and equitable treatment.  In the Tribunal's view, it would be inconsistent with general notions of acquired rights under international law to permit States effectively to non-suit an investor part-way through a pending case, simply by issuing a joint document purporting to interpret long-standing treaty text so as to undermine the tribunal's jurisdiction to proceed.  Such a result would be

---

[426] ECT Article 46 (**C-1**).

[427] *See* ILC 2011 Guide to Practice on Reservations to Treaties, pp. 63-65 (Comment (5)) (**RL-102**).

[428] ILC 2011 Guide to Practice on Reservations to Treaties, Guideline 1.3.3, p. 3 (**RL-102**).

[429] ILC 2011 Guide to Practice on Reservations to Treaties, p. 76, Comment (3) (**RL-102**).

particularly inappropriate to condone, where the express words of the joint document reveal that the signatories themselves do not believe the treaty has yet been terminated, but simply plan to "discuss without undue delay whether any additional steps are necessary" to achieve the desired result.[430]

227. The Tribunal adds, as a final note, that the January 2019 Declaration seems to be, by its own word, only a means of *information* of the position of the EU Member States signatories of this Declaration,[431] which have now aligned with the Commission position. It indicates also, as already mentioned, that no EU Member State considers that its intra-EU BITs or the ECT have automatically been terminated by virtue of either the *Achmea* Judgment or the January 2019 Declaration itself,[432] which is precisely the conclusion to which this Tribunal has arrived in the course of its analysis.

## C. THE DUTY TO RENDER AN ENFORCEABLE AWARD

228. Finally, the Tribunal briefly addresses the issue of enforceability of its eventual Award, which the Parties have raised in their submissions. In so doing, the Tribunal emphasizes that this Section does not imply any conclusion that there necessarily will be any Award that requires enforcement, either against Italy (if Eskosol prevails on the remaining jurisdiction and merits issues, and obtains an award of either damages or costs), or by Italy (if Italy prevails on either jurisdiction or the merits, and obtains a costs award against Eskosol). By including this Section in the discussion, the Tribunal is not signaling anything about its current thinking on the remaining jurisdictional, liability, damages or costs issues in the case.

229. Rather, the Tribunal discusses enforcement only because the Parties have raised the issue as ostensibly relevant to the Tribunal's consideration of Italy's intra-EU jurisdictional objection. As noted in the summary of their positions, Italy contends that the Tribunal should "refus[e] to exercise jurisdiction" because any award it would issue would be unenforceable due to a lack of a "functioning arbitration agreement," and a tribunal should not proceed where it is unable to "discharge the essential mandate to produce an enforceable award."[433] Eskosol deems the issue of enforceability to be "pure speculation," and states that "more fundamentally, questions of enforceability in certain jurisdictions should not impact a tribunal's jurisdictional analysis."[434]

---

[430] January 2019 Declaration, p. 4, ¶ 9.

[431] *See* January 2019 Declaration, p. 3, ¶¶ 1-3.

[432] *See* January 2019 Declaration, p. 4, ¶¶ 5, 9.

[433] Rejoinder, ¶ 122.

[434] Eskosol PHB, ¶ 99 & n. 152 (quoting *Vattenfall,* ¶¶ 230-231 (**CL-193**)).

230.    The Tribunal of course acknowledges that the *Achmea* Judgment is binding in the European legal order, including on EU Member States (including Italy and Belgium) and in their respective judicial systems.  The CJEU has not yet clarified whether it considers the reasoning in that Judgment to be applicable to the ECT, as a matter of EU law.  If the CJEU ultimately finds the ECT distinguishable from the intra-EU BIT that it discussed in the *Achmea* Judgment – for example, because an ECT tribunal does not apply EU law to resolve the dispute, as this Tribunal has found in interpreting ECT Article 26(6) – then ultimately no enforcement issue may arise even within Europe.

231.    Nonetheless, the Tribunal accepts that if the *Achmea* Judgment ultimately is determined to be applicable to the ECT, a court subject to the EU legal order could eventually question the enforceability under EU law of an ECT award rendered in an intra-EU case.  In non-ICSID arbitrations, this might happen because the seat of the arbitration was in an EU Member State, but that possibility does not arise in ICSID cases such as this one, which are de-nationalized, *i.e.*, with no legal seat in any individual State.   In ICSID cases, therefore, the concern about enforceability would arise principally in the scenario in which enforcement is sought in an EU Member State.  Logically, that would not occur if Italy prevails:  Eskosol would have no damages or cost award to enforce against Italy, and Italy may be unlikely to seek enforcement through the EU courts of any costs award against Eskosol that is not paid voluntarily, given its position that this Tribunal has no proper authority to render any award.  Thus, it seems that any enforcement challenge in this case could arise only in a scenario under which Eskosol prevails on both jurisdiction and merits and obtains a damages award and/or a costs award against Italy.  The Tribunal accepts that there could be a risk in that scenario that a European court might not grant enforcement of such an award.

232.    The Tribunal also accepts that Eskosol could face certain challenges in enforcing an award against Italy in a non-EU country, beyond the common problem that investors face of locating appropriate overseas assets that are not immune from execution.  Article 54(1) of the ICSID Convention obligates all Contracting States to "recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State."   Nonetheless, non-EU courts may face certain pressure not to enforce an intra-EU investment arbitration award, based on the undertaking by Italy and others in the January 2019 Declaration that "defending Member States *will request the courts, including in any third country*, which are to decide in proceedings relating to an intra-EU investment arbitration award*,

to set these awards aside or *not to enforce them* due to a lack of valid consent."[435]  Alternatively, if a non-EU court proceeds to enforce an award against Italy, the Commission eventually could deem any amounts collected to be unlawful State aid, and require Italy to seek recovery from Eskosol in an equivalent amount.

233.    The Tribunal expresses no views on the appropriateness of such potential developments as a matter of international law.  It identifies these possibilities only to illustrate that while the scenarios are limited in which issues of enforcement of an award could arise, it accepts that there are at least some scenarios where enforcement could be challenging and/or create further residual disputes.  Nonetheless, a tribunal has not rendered an "*un*enforceable award" simply because its award may prove challenging to enforce, or is capable of enforcement only in certain jurisdictions but not in others.  The issue of a categorically "*un*enforceable award" would seem to arise only if an award is issued in violation of the mandatory rules of the arbitral seat.  That possibility does not arise in ICSID cases such as this one.

234.    The Tribunal of course accepts that it is preferable to render an award that is easily enforceable.  But the Tribunal does not agree with the proposition that it is restricted in its jurisdiction simply because there may be some limitations or complexities that arise at the enforcement stage.  This Tribunal's jurisdiction is not determined by any national rules governing the enforceability of arbitral awards, but rather by the ICSID Convention and the ECT, neither of which subordinates jurisdiction to issues of enforcement.

235.    Based on these considerations, the Tribunal rejects Italy's contention that any award it may render (in either Party's favor) necessarily would be unenforceable. The Tribunal has found that it has jurisdiction under the ECT, notwithstanding Italy's intra-EU jurisdictional objection, the *Achmea* Judgment, and the Termination Request based on the January 2019 Declaration. In these circumstances, a tribunal finding that it has jurisdiction under the ICSID Convention and the ECT should not decline to exercise that jurisdiction, simply because there are certain scenarios under which one or the other Party might face challenges in enforcement in certain jurisdictions, based on their national laws and/or their other treaty obligations.  This Tribunal has a duty to exercise the jurisdiction it has found to exist, and will proceed to do so with respect to the issues remaining in this case.

---

[435] January 2019 Declaration, p. 4, ¶ 2 (emphasis added).  It remains to be seen how the courts of such third countries (*i.e.*, courts not seated in EU Member States) would react to such requests, which effectively ask them to accept the extraterritorial application of EU law at the enforcement stage of disputes that arbitral tribunals already have found not to be governed by EU law.

## VI.    DECISION

236.    For the reasons set forth above, the Tribunal unanimously decides as follows:

(1)    Italy's request of 4 February 2019 for an award declaring immediate termination of this arbitration, on the basis of the January 2019 Declaration of 22 EU Member States, is hereby denied;

(2)    Italy's related jurisdictional objection, based on the alleged inapplicability of the ECT to disputes between investors of one EU Member State and another EU Member State, is hereby denied;

(3)    The Tribunal will address separately in its Award the other jurisdictional and/or merits issues remaining in this case; and

(4)    Decisions regarding costs are deferred for resolution in the context of the forthcoming Award.

[Signed]

_____
Guido Santiago Tawil
Arbitrator
Date:    6   MAY   2019


[Signed]

_____
Brigitte Stern
Arbitrator
Date:   28   April   2019


[Signed]

_____
Jean Kalicki
President of the Tribunal
Date:   24   April   2019