**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**BELENERGIA S.A.**
Claimant

and

**ITALIAN REPUBLIC**
Respondent

**ICSID Case No. ARB/15/40**

---

# AWARD

---

***Members of the Tribunal***
Mr. Yves Derains, President
Professor Bernard Hanotiau
Professor José Carlos Fernández Rozas

***Assistant to the President of the Tribunal***
Dr. Ana Gerdau de Borja Mercereau

***Secretary of the Tribunal***
Ms. Catherine Kettlewell

*Date of dispatch to the Parties:* 6 August 2019

## REPRESENTATION OF THE PARTIES

*Representing Belenergia S.A.:*

Mr. Elvezio Santarelli
Mr. Eugenio Tranchino
Ms. Raffaela Colamarino
Watson Farley & Williams
Piazza Navona 49
00186 Rome
Italy

Mr. Robert Fidoe
Mr. Jack Moulder
Watson Farley & Williams
15 Appold Street, London
EC2A 2HB
United Kingdom

Professor Eirik Bjorge
University of Bristol
8-10 Berkeley Square
Bristol, BS8 1HH
United Kingdom

Dr. Cameron Miles
3 Verulam Buildings
Gray's Inn, London
WC1R 5NT
United Kingdom

*Representing the Italian Republic*:

Avv. Gabriella Palmieri
Avv. Giacomo Aiello
Avv. Sergio Fiorentino
Avv. Paolo Grasso
Avvocatura Generale dello Stato
Via dei Portoghesi
00186 Rome
Italy

Prof. Avv. Maria Chiara Malaguti
Dott. Giuseppe Stuppia
Ministero degli Affari Esteri e della
Cooperazione Internazionale
Servizio per gli affari giuridici del
contenzioso diplomatico e dei trattati
Piazzale della Farnesina
00135 Rome
Italy

**Table of Contents**

I.    INTRODUCTION AND PARTIES ................................................................. 12

II.   PROCEDURAL HISTORY ....................................................................... 13

   A.   Registration and Tribunal's Constitution........................................... 13

   B.   The First Session .............................................................................. 14

   C.   The European Commission's Application to Intervene ..................... 15

   D.   The Written Phase ............................................................................. 15

   E.   The Oral Procedure ........................................................................... 19

   F.   The Post-Hearing Procedure ............................................................. 22

III.  FACTUAL BACKGROUND .................................................................... 27

   A.   Italian Legislative and Regulatory Framework................................. 27

   B.   The Claimant's Investment ............................................................... 49

IV.   THE PARTIES' REQUESTS FOR RELIEF ............................................ 66

   A.   The Claimant's Request for Relief .................................................... 66

   B.   The Respondent's Request for Relief ................................................ 66

V.    JURISDICTION AND ADMISSIBILITY ................................................ 68

   A.   The Respondent's Position ................................................................ 68

      (1)   The ECT Does Not Apply To Intra-EU Disputes ....................... 68

      (2)   The Exclusive Jurisdiction Clause Under The GSE Conventions Leads To Italy's Lack Of Unconditional Consent Under Article 26 ECT ......................................... 81

      (3)  Imbalance Costs Are "Taxation Measures" Within the Meaning of Article 21(7) ECT   85

      (4)   The Waiting Period Under Articles 26(1) And 26(2) ECT.......... 89

   B.   The Claimant's Position...................................................................... 90

      (1)   Italy's Intra-EU Dispute Jurisdictional Objection Is Unfounded ................................ 90

      (2)   The GSE Conventions' Clause Conferring Exclusive Jurisdiction on Rome Courts Does Not Trigger The ECT's Fork-In-The-Road Clause .................................................... 102

      (3)   The GSE Conventions' Exclusive Jurisdiction Clause Does Not Bar The Tribunal's Jurisdiction Or Render Any Claims Inadmissible ............................................................... 106

      (4)   Imbalance Costs Are Not "Taxation Measures" Within the Meaning of Article 21(7) ECT 109

      (5)   The Waiting Period Under Articles 26(1) And 26(2) ECT......... 111

   C.   The European Commission's *Amicus Curiae* Brief....................... 112

D.   The Tribunal's Decision .......................................................................... 113

   (1)   Does Italy's EU Jurisdictional Objection Bar the Tribunal's Jurisdiction?............... 113

   (2)   Do the Exclusive Jurisdiction Clauses under the GSE Conventions Bar Jurisdiction?
         .................................................................................................................... 130

   (3)   Has the Claimant Complied with the Waiting Period under Articles 26(1) and
         26(2) ECT in relation to the Imbalance Costs Claim?........................................... 136

   (4)   Are Imbalance Costs a "Taxation Measure" Falling Outside the ECT's Scope? ....... 141

VI.  THE MERITS.............................................................................................. 145

A.   The Claimant's Position........................................................................... 146

   (1)   Italy Has Breached the FET Standard under Article 10(1) ECT ................................ 146

   (2)   Italy Has Breached the Umbrella Clause under Article 10(1) ECT............................. 163

   (3)   Italy Has Breached the Prohibition against Unreasonable and Discriminatory Measures
         under Article 10(1) ECT.................................................................................... 170

   (4)   Italy Has Breached the Most Constant Protection and Security Obligation under
         Article 10(1) ECT............................................................................................ 172

   (5)   Italy Has Breached the Prohibition of Discrimination under Articles 10(2) and
         10(3) ECT...................................................................................................... 174

   (6)   Damages........................................................................................................ 175

   (7)   Interest.......................................................................................................... 183

B.   The Respondent's Position ..................................................................... 185

   (1)   Italy Has Not Breached the FET Standard under Article 10(1) ECT ......................... 185

   (2)   Italy Has Not Breached the Prohibition against Unreasonable and Discriminatory
         Measures under Article 10(1) ECT ..................................................................... 199

   (3)   Italy Has Not Breached the Most Constant Protection and Security Obligation under
         Article 10(1) ECT............................................................................................ 200

   (4)   Italy Has Not Breached the Umbrella Clause under Article 10(1) ECT..................... 200

   (5)   Italy Has Not Breached the Obligation not to Discriminate under Articles 10(2) and
         10(3) ECT...................................................................................................... 202

   (6)   Damages........................................................................................................ 204

   (7)   Interest.......................................................................................................... 207

C.   The Tribunal's Decision .......................................................................... 207

   (1)   Has Italy Breached the FET Obligation under Article 10(1) ECT?............................ 208

   (2)   Has Italy Breached the Umbrella Clause under Article 10(1) ECT?.......................... 224

   (3)   Has Italy Breached the Most Constant Protection and Security Obligation under
         Article 10(1) ECT?........................................................................................... 226

(4)   Has Italy Breached the Provisions Prohibiting Unreasonable and Discriminatory Measures under Articles 10(1), (2) and (3) ECT?................................................ 227

**VII. COSTS** ............................................................................................................... **230**

A.   The Claimant's Position.......................................................................... 230

B.   The Respondent's Position ...................................................................... 232

C.   The Tribunal's Decision .......................................................................... 232

**VIII.      AWARD** ............................................................................................ **234**

TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| AEEG | *Autorità per l'energia elettrica e il gas* |
| *Achmea* | ECJ Case C-284/16 (*Slowakische Republik (Slovak Republic) v. Achmea BV*) |
| Alpha Value Report No. 1 | Expert Report of Alpha Value/Juan Camilo Rodríguez dated 13 December 2016, submitted by the Claimant |
| Alpha Value Report No. 2 | Integration Expert Report of Alpha Value/Juan Camilo Rodríguez undated, submitted by the Claimant |
| Alpha Value Report No. 3 | (REVISED) Update to Expert Reports of Alphavalue dated 10 April 2018, submitted by the Claimant |
| Althesys' Report | Expert Report by Althesys dated 20 September 2017, submitted by the Claimant |
| *Amicus* Brief | *Amicus curiae* brief submitted by the European Commission dated 31 May 2017 |
| *Bersani* Decree | Legislative Decree No. 79/1999 of 16 March 1999 |
| CDP | *Cassa Depositi e Presitti* |
| Claimant's Post Hearing Brief | Claimant's Written Closing Submissions dated 1 June 2018 |
| Claimant's Reply | Claimant's Counter-Memorial on Jurisdiction and Reply on the Merits dated 20 September 2017 |
| Commission's Communication | Communication from the Commission to the European Parliament and the Council: Protection of Intra-EU Investment (COM(2018) 547/2) |
| DARIO | Draft Articles on the Responsibility of International Organizations |
| DCF | Discounted cash flow method |

| | |
|---|---|
| *Destinazione Italia* Decree | Legislative Decree No. 145/2013 of 23 December 2013 |
| EC | European Commission |
| EC's Application | EC's Application for Leave to Intervene as a Non-Disputing Party dated 24 October 2016 |
| ECHR | European Convention on Human Rights of 4 November 1950 |
| ECJ | European Court of Justice |
| ECOWAS | Economic Community of West African States |
| ECT | Energy Charter Treaty signed in December 1994 and in force since 16 April 1998 |
| Energy Account I | Energy Account regime introduced by Ministerial Decree of 28 July 2005 & Ministerial Decree of 6 February 2006 |
| Energy Account II | Energy Account regime introduced by Ministerial Decree of 19 February 2007 |
| Energy Account III | Energy Account regime introduced by Ministerial Decree of 6 August 2010 |
| Energy Account IV | Energy Account regime introduced by Ministerial Decree 5 May 2011 |
| Energy Account V | Energy Account regime introduced by Ministerial Decree of 5 July 2012 |
| Eng. Boucher's Report | Expert Report of Olivier Boucher from OB Consulting dated 6 September 2017, submitted by the Claimant |
| EU | European Union |
| Exhibit C-# | Claimant's Factual Exhibit |
| Exhibit CL-# | Claimant's Legal Authority |
| Exhibit REX-# | Respondent's Factual Exhibit |
| Exhibit RL-# | Respondent's Legal Authority |

| | |
|---|---|
| FET | Fair and equitable treatment standard |
| First GRIF Report | First GRIF's Expert Economic Report dated 12 April 2017, submitted by the Respondent |
| First Opinion of Professors Onida and Randazzo | First Expert Opinion of Profs. Onida and Randazzo dated 24 November 2016, submitted by the Claimant |
| First Witness Statement of Eng. Bacchiocchi | First Witness Statement of Mr. Daniele Bacchiocchi dated 24 April 2017, submitted by the Respondent |
| First Witness Statement of Eng. Miraglia | First Witness Statement of Mr. Luca Miraglia dated 21 April 2017, submitted by the Respondent |
| First Witness Statement of Mr. Levy | First Witness Statement of Mr. Jacques Edouard Levy dated 15 November 2016, submitted by the Claimant |
| FPS | Most constant protection and security obligation |
| GRIF Financial Report | GRIF's Financial Expert Report dated 12 April 2017, submitted by the Respondent |
| GSE | *Gestore dei Servizi Energetici - GSE S.p.a.* |
| GSE Conventions | Conventions concluded between GSE and Belenergia's PV invested companies on feed-in tariffs and on minimum prices |
| GSE Conventions on feed-in tariffs | Conventions concluded between GSE and Belenergia's PV invested companies on feed-in tariffs |
| GSE Conventions on minimum prices | Conventions concluded between GSE and Belenergia's PV invested companies on minimum prices |
| Hearing | Hearing on Jurisdiction and the Merits, held on 26 to 29 March 2018 in the World Bank Group Paris |
| ICJ | International Court of Justice |

| | |
|---|---|
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings of 2006 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States of 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ILC | International Law Commission |
| ILC Articles on State Responsibility | ILC Articles on Responsibility of States for Internationally Wrongful Acts of 2001 |
| ILC Report on Fragmentation | ILC Study Group Report on Fragmentation of International Law of 13 April 2006 |
| Istat | *Istituto nazionale di statistica* |
| ITLOS | International Tribunal for the Law of the Sea |
| MISE | Ministry of Economic Development (*Ministero dello sviluppo economico*) |
| MPS | *Monte dei Paschi di Sena* |
| MSD | Dispatching Service Market (*Mercato per il Servizio di Dispacciamento*) |
| OECD | Organisation for Economic Co-operation and Development |
| OECD Glossary | OECD Glossary of Tax Terms |
| PO1 | Procedural Order No. 1 dated 12 September 2016, concerning the Procedural Calendar |
| PO2 | Procedural Order No. 2 dated 6 November 2016, concerning the amended Procedural Calendar |
| PO3 | Procedural Order No. 3 dated 5 March 2018, on the organization of the Hearing |
| Procedural Calendar | Procedural Calendar attached to the PO1 as Annex A |

| | |
|---|---|
| Professor Bollino's Report | Expert Report of Professor Carlo Andrea Bollino dated 11 September 2017, submitted by the Claimant |
| Professor Rojas' First Opinion | First Expert Legal Opinion of Prof. Giacomo Rojas Elgueta dated 23 April 2017, submitted by the Respondent |
| Professor Rojas' Second Opinion | Second Expert Legal Opinion of Prof. Giacomo Rojas Elgueta dated 15 December 2017, submitted by the Respondent |
| Protos' Report | Expert Report by Protos S.P.A. dated 18 September 2017, submitted by the Claimant |
| PV | Photovoltaic |
| PVGIS | Photovoltaic Geographical Information System |
| PV Project | Belenergia's investment in ten Italian SPVs having developed and operating 20 PV plants in Southern Italy |
| Request for Arbitration | Request for Arbitration from Belenergia S.A. against the Italian Republic, received by the Centre on 7 August 2015, dated 30 July 2015 |
| Respondent's Post Hearing Brief | Respondent's Post Hearing Closing Statement dated 1 June 2018 |
| Respondent's Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 15 December 2017 |
| *Retiro dedicato* | The GSE's purchase regime established by Legislative Decree No. 387/2003 |
| RIA | Regulatory Impact Analysis |
| *Romani* Decree | Legislative Decree No. 28/2011 of 3 March 2011 |
| *Salva Alcoa* Law | Law No. 129/2010 of 13 August 2010 |
| Second GRIF Report | Second GRIF's Expert Report dated 15 December 2017, submitted by the Respondent |

| Second Opinion of Professors Onida and Randazzo | Second Expert Opinion of Profs. Onida and Randazzo dated 31 August 2017, submitted by the Claimant |
|---|---|
| Second Witness Statement of Eng. Bacchiocchi | Second Witness Statement of Mr. Daniele Bacchiocchi dated 15 December 2017, submitted by the Respondent |
| Second Witness Statement of Eng. Miraglia | Second Witness Statement of Mr. Luca Miraglia dated 14 December 2017, submitted by the Respondent |
| Second Witness Statement of Mr. Levy | Second Witness Statement of Mr. Jacques Edouard Levy dated 8 September 2017, submitted by the Claimant |
| SMEs | Small and medium-sized enterprises |
| *Spalma Incentivi* Decree | Legislative Decree No. 91 of 24 June 2014 |
| SPVs | Special Purpose Vehicles |
| Statement of Claim | Claimant's Memorial dated 14 December 2016 |
| Statement of Defense | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 24 April 2017 |
| Terna | *Terna S.p.A. – Rete Elettrica Nazionale*, the manager of electricity transmission and dispatching activities |
| TEU | Treaty on the EU |
| TFEU | Treaty on the Functioning of the EU |
| Tr. [Day] [Speaker(s)] [page:line] | Transcript of the Hearing |
| TRA | Technical Regulatory Analysis |
| Tribunal | Arbitral tribunal constituted on 18 May 2016, composed of Mr. Yves Derains, Prof. Bernard Hanotiau, and Prof. José Carlos Fernández Rozas |
| UNCLOS | United Nations Convention on the Law of the Sea of 10 December 1982 |

| VCLT | Vienna Convention on the Law of Treaties of 23 May 1969 |
|------|------------------------------------------------------------|
| WACC | Weighted average cost of capital |

## I.     INTRODUCTION AND PARTIES

1.  This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") based on the Energy Charter Treaty which entered into force on 16 April 1998 ("**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 ("**ICSID Convention**").

2.  The Claimant is Belenergia S.A., a company incorporated under the laws of Luxembourg. ("**Belenergia**" or "**Claimant**").

3.  The Respondent is the Italian Republic ("**Italy**" or "**Respondent**").

4.  The Claimant and the Respondent are collectively referred to as the "Parties."  The Parties' representatives and their addresses are listed above on page (i).

5.  This dispute relates to a series of measures implemented by the government of Italy that amended its legislation and altered the legal regimes applicable to the Claimant's Special Purpose Vehicles ("**SPVs**")[1] through which the Claimant had invested in the photovoltaic ("**PV**") sector in Italy.

6.  The Claimant alleges that its investment benefited from "Conventions" signed with the *Gestore dei Servizi Energetici* ("**GSE**"), the State-owned energy regulatory agency.  Claimant further alleges that these incentives were the main reason for its investment and that the measures implemented by the Respondent constitute breaches of the ECT.

---

[1] Request for Arbitration, ¶ 5.

## II.    PROCEDURAL HISTORY

### A.  Registration and Tribunal's Constitution

7.  On 7 August 2015, ICSID received a Request for Arbitration, from Belenergia against the Italian Republic ("**Request for Arbitration**") dated 30 July 2015. On 28 August 2015, the Centre requested the Claimant to submit support documentation to its Request. The Request was supplemented on 11 and 13 August 2015.

8.  On 22 September 2015, the Secretary-General of ICSID registered the Request in accordance with Article 36 of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings ("**ICSID Arbitration Rules**") and Articles 37 to 40 of the ICSID Convention.

9.  The Request contained the Claimant's proposal for the Arbitral Tribunal's ("**Tribunal**") constitution which was confirmed by Claimant's email dated 22 October 2015.  On 3 November 2015, the Respondent agreed to the Claimant's proposal.   The Centre acknowledged its receipt of the proposal on 5 November 2015. Pursuant to the Parties' agreement, the Tribunal would consist of three arbitrators, one to be appointed by each Party and the presiding arbitrator to be appointed by the two-party appointed arbitrators.  In this communication, the Centre also acknowledged its receipt of the Claimant's appointment of Professor Bernard Hanotiau, a national of Belgium, as its party-appointed arbitrator.

10.  On 16 November 2015, following the appointment by the Claimant, Professor Hanotiau accepted his appointment as arbitrator.

11.  On 23 February 2016, the Claimant requested to the Chairman of the ICSID Administrative Council to appoint the arbitrator not yet appointed by the Respondent in accordance with Article 38 of the ICSID Convention and Arbitration Rule 4.   On 29 February 2016, the Respondent stated that it was in the process of appointing an arbitrator.

**12.** On 10 March 2016, the Italian Republic appointed Professor José Carlos Fernández Rozas, a national of Spain, as its party-appointed arbitrator.  On 16 March 2016, Prof. Fernández Rozas accepted his appointment as arbitrator.

**13.** Pursuant to the Claimant's proposal on its Request, and the Respondent's agreement to such proposal on 3 November 2015, the two-party appointed arbitrators, Prof. Hanotiau and Prof. Fernández Rozas, jointly elected on 8 May 2016, Mr. Yves Derains, a national of France, as the presiding arbitrator.

**14.** On 12 May 2016, Mr. Derains accepted his appointment as the presiding arbitrator.  On 13 May 2016, the Centre invited the Parties to submit any observations on this appointment no later than on 17 May 2016.

**15.** Not having received any observations from the Parties, on 18 May 2016, the Secretary-General, in accordance with Rule 6(1) of the ICSID Arbitration Rules, notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Natalí Sequeira, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

**16.** The Tribunal is composed by Mr. Yves Derains, a national of France, President, appointed by agreement of the co-arbitrators; Professor Bernard Hanotiau, a national of Belgium, appointed by the Claimant; and Professor Fernández Rozas, a national of Spain, appointed by the Respondent.

**17.** On 7 June 2016, on request by the President of the Tribunal, the Centre enquired the Parties whether they agreed to the appointment of Ms. Aurore Descombes as his assistant in this case. Ms. Descombes provided a *curriculum vitae* and declaration of independence.  Both Parties confirmed that they did not have any observations on Ms. Descombes appointment.

### B.  The First Session

**18.** In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a First Session with the Parties on 7 July 2016 by teleconference.

**19.** Following the first session, on 12 September 2016, the Tribunal issued Procedural Order No. 1 ("**PO1**") recording the agreement of the Parties on procedural matters and the decision of the

Tribunal on disputed issues.  PO1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and that the place of proceeding would be Paris, France.  PO1 also sets out a schedule for the merits phase of the proceedings ("**Procedural Calendar**"), attached as Annex A.

### C.  The European Commission's Application to Intervene

**20.** On 24 October 2016, the European Commission ("**EC**") submitted an Application for Leave to Intervene as a Non-Disputing Party ("**EC's Application**") pursuant to Article 37(2) of the ICSID Arbitration Rules.

**21.** On 26 October 2016, the Tribunal invited the Parties to submit their comments on the EC's Application. On 10 and 24 November 2016, the Claimant and the Respondent, respectively, submitted their observations on the EC's Application.

**22.** On 16 December 2016, the Tribunal issued its Decision to grant the EC's Application and informed the Parties that it will fix a date for the submission of the EC's *amicus curiae* brief ("***Amicus* Brief**").  On 3 April 2017, the Tribunal invited the EC to submit its *amicus curiae* brief by 31 May 2017 limited to issues of jurisdiction and to the issue whether Article 26 of the ECT applies to the dispute.  On 8 May 2017, the Centre made the jurisdiction submissions and certain exhibits available to the EC as agreed by the Parties.

**23.** On 31 May 2017, the EC filed an *Amicus* Brief accompanied by the supporting documentation, EC-1 to EC-41.

### D.  The Written Phase

**24.** On 31 October 2016, the Claimant requested the Tribunal to stay the deadline for its submission of the Memorial ("**Statement of Claim**"), which in accordance with the Procedural Calendar was due on 21 November  2016, this due to the overlapping of deadlines triggered by the EC's Application.   On 2 November 2016, the Respondent submitted its comments on the Claimant's request and requested the Tribunal to also stay all further deadlines and to establish new deadlines of further submissions.

25. On 3 November 2016, the Parties submitted further observations on the Claimant's request to stay the Procedural Calendar.

26. On 6 November 2016, the Tribunal issued Procedural Order No. 2 ("**PO2**"), confirming the schedule for the Parties to submit comments to the EC's Application and amending some deadlines in the Procedural Calendar.

27. On 18 November 2016, Lexlitis notified that it was no longer going to represent the Claimant in this proceeding.  On 21 November 2016, the Claimant requested the Tribunal to grant an extension to file its Statement of Claim to 7 December 2016 due to the change in legal representation.  On 22 November 2016, the Centre informed the Parties that the Tribunal had suspended the time-limit for the Claimant's submission of its Statement of Claim and invited the Respondent to comment on the Claimant's request for the extension.

28. On 23 November 2016, the Respondent submitted its agreement to the Claimant's request for the extension of its submission of its Statement of Claim.  On 6 December 2016, the Tribunal granted the Claimant's request.

29. On 6 December 2016, the Claimant requested a further extension to file its Statement of Claim to 14 December 2016.  On 7 December 2016, the Tribunal granted this extension.

30. On 14 December 2016, the Claimant filed its Statement of Claim, accompanied by the witness statement of Mr. Jacques Edouard Levy ("**First Witness Statement of Mr. Levy**"), the Expert Opinion of Professor Valerio Onida and Professor Barbara Randazzo ("**First Opinion of Professors Onida and Randazzo**"), the Expert Report of Alpha Value (Mr. Juan Camilo Rodríguez) ("**Alpha Value's First Report**") which contained Appendices 1-7, Factual Exhibits C-1M to C-29M, and Legal Exhibits CL-1M to CL-84M.

31. On 13 February 2017, the Respondent requested the Tribunal to grant an extension to file its Counter-Memorial on the Merits and Memorial on Jurisdiction ("**Statement of Defense**").  On 14 February 2017, the Tribunal invited the Claimant to submit its observations on this request and invited the Parties to agree on a revised Procedural Calendar without modifying the hearing dates.  On 21 February 2017, the Claimant confirmed that it had no objection on the Respondent's request of 13 February 2017, and transmitted to the Tribunal an agreed revised Procedural Calendar.

**32.** On 21 February 2017, the Parties agreed to a revised Procedural Calendar.

**33.** On 3 April 2017, by the President of the Tribunal's request, the Centre enquired if the Parties agreed to the replacement of Ms. Descombes with Ms. Ana Paula Montans as his assistant in this case. Ms. Montans provided her *curriculm vitae* and a declaration of independence. The Parties confirmed that they did not have any observations to Ms. Montans appointment.

**34.** On 24 April 2017, the Respondent filed its Statement of Defense. This submission was accompanied by the Index of Factual Exhibits and Legal Authorities, the witness statements of: Mr. Daniele Bacchiocchi ("**First Witness Statement of Eng. Bacchiocchi**"), Eng. Luca Miraglia ("**First Witness Statement of Eng. Miraglia**"), the Expert Legal Opinion of Prof. Giacomo Rojas Elgueta ("**Professor Rojas' Opinion**") which contained Exhibits GRA-1 to GRA-40, GRIF's Expert Report ("**First GRIF Report**") which contained Exhibits GRIF-1 to GRIF-18, GRIF's Financial Expert Report ("**GRIF Financial Report**") which contained Exhibits GRIF-F1 to GRIF-F44, Factual Exhibits REX-1 to REX-62, and Legal Exhibits RLA-1 to RLA-32. In the Statement of Defense, Italy requested that *(i)* the proceedings be bifurcated requesting that the Tribunal decide on the jurisdictional objections before discussing the merits;[2] and that *(ii)* the arbitration be suspended until the decision of the European Court of Justice ("**ECJ**") in *Slowakische Republik (Slovak Republic) v. Achmea BV* ("*Achmea*").[3]

**35.** On 24 July 2017, the Respondent transmitted to the Tribunal the Parties' agreement to postpone the deadline for the submissions of the Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction to 20 September 2017 ("**Claimant's Reply**"), and the Respondent's Rejoinder on the Merits and Reply on Jurisdiction to 15 December 2017 ("**Respondent's Rejoinder**"). The Parties' agreement also requested the postponement of the hearing suggesting the end of January 2018 as a possible date.

**36.** On 28 July 2017, the Tribunal confirmed the Parties' agreement of 24 July 2017, but informed that the hearing dates could not be confirmed at that time. On 30 July 2017, the Tribunal proposed to the Parties to hold the hearing on the week of 26 March 2018. The Tribunal asked

---

[2] Statement of Defense, ¶ 33.

[3] Statement of Defense, ¶ 34.

the Parties to confirm their availability as soon as possible.  On 2 August 2017, both Parties confirmed their availability to hold the hearing on the dates proposed by the Tribunal.

**37.** On 28 August 2017, the Centre informed the Parties that Ms. Catherine Kettlewell, ICSID Legal Counsel, would serve as Secretary of the Tribunal, replacing Mrs. Natalí Sequeria.

**38.** On 20 September 2017, the Claimant filed its Reply, accompanied by the second witness statement of Mr. Jacques Edouard Levy ("**Second Witness Statement of Mr. Levy**"), the Second Expert Opinion of Professor Valerio Onida and Professor Barbara Randazzo ("**Second Opinion of Professors Onida and  Randazzo**"), and the following Expert Reports of: Olivier Boucher from OB Consulting ("**Eng. Boucher's Report**"), Emiliano Guerrieri and Giorgio Saraceno of Protos S.P.A. ("**Protos' Report**"), Alessandro Marangoni of Althesys Strategic Consultants ("**Althesys' Report**"), Prof. Carlo Andrea Bollino ("**Professor Bollino's Report**"), and the Integration Report of Alpha Value/Juan Camilo Rodríguez ("**Alpha Value's Second Report**") which contained Appendices 1 to 7, Factual Exhibits C-1RM to C-24RM, and Legal Exhibits CL-1RM to CL-165RM.

**39.** On 15 December 2017, the Respondent filed its Rejoinder, accompanied by the second witness statements of: Mr. Daniele Bacchiocchi ("**Second Witness Statement of Eng. Bacchiocchi**"), Eng. Luca Miraglia ("**Second Witness Statement of Eng. Miraglia**"), the Second Expert Legal Opinion of Prof. Giacomo Rojas Elgueta ("**Professor Rojas' Second Opinion**") which contained Exhibits GRA-41 to GRA-58, GRIF's Second Expert Report ("**Second GRIF Report**") which contained Exhibits GRIF-R1 to GRIF-R4, Consolidated Indexes of Factual and Legal Exhibits, Factual Exhibits REX-63 to REX-71, and Legal Exhibits RLA-33 to RLA-36.  Italy did not reiterate its request for bifurcation let alone its request for the suspension of the proceedings in the Rejoinder.

**40.** On 11 January 2018, by the President of the Tribunal's request, the Centre enquired if the Parties agreed to the replacement of Ms. Montans with Dr. Ana Gerdau de Borja Mercereau as his assistant in this case.  Dr. Gerdau de Borja Mercereau provided her *curriculm vitae* and a declaration of independence.  The Parties confirmed that they did not have any observations to Dr. Gerdau de Borja Mercereau appointment and on 12 January 2018 the Centre sent a letter to confirm her appointment.

41. On 8 March 2018, the Tribunal invited the Parties to provide its comments on the ECJ's decision in *Achmea* by 19 March 2018, and stated that it was prepared to admit such evidence into the record of the case.

42. On 19 March 2018, each Party submitted its comments on the *Achmea* decision as instructed by the Tribunal on 8 March 2018.

### E.  **The Oral Procedure**

43. On 27 February 2018, the President and the Secretary of the Tribunal held a pre-hearing telephone conference with the Parties.

44. On 1 March 2018, the Tribunal requested the Parties to confirm whether they agreed to derogate from certain cross-examination rules which had been modified from the PO1 to the agreements expressed by the Parties in the pre-hearing agenda.  The Parties agreed to the modification and cross-examination during the hearing would be limited to the contents of the witness or expert reports.

45. On 5 March 2018, the Tribunal issued Procedural Order No. 3 ("**PO3**"), embodying the Parties' agreements and the Tribunal's decisions on procedural matters concerning the organization and logistical arrangements of the hearing.

46. On 12 March 2018, as ordered in PO3, the Respondent submitted the annexes to Eng. Luca Miraglia's two witness statements of 21 April 2017 and 14 December 2017 which had not been previously submitted.

47. On 19 March 2018, the Respondent requested leave from the Tribunal to submit an additional document into the record of this arbitration.

48. On 21 March 2018, the Tribunal invited the Claimant to provide comments on the Respondent's request to submit an additional document into the case record, no later than on 22 March 2018.   By a communication of 22 March 2018, the Claimant submitted its observations on the Respondent's request of 19 March 2018.

49. On 22 March 2018, the Claimant indicated that it would provide certain improved translations which would be included in the hearing bundles.  The Respondent commented on Claimant's

request on the same date. On 23 March 2018, the Tribunal indicated "[i]*n view of Respondent's comments, no modified translations should be introduced in the bundles at this stage. If there is an issue of translation in a witness statement relevant to the witness examination, the point will have to be raised at the time. The Parties will have to liaise after the hearing in order to decide if it is necessary to amend the translations on the record* […]"

50. On 23 March 2018, the Centre informed the Parties that the Tribunal had granted the Respondent's request of 19 March 2018, but for the sole purpose of "*to serv*[e] *as a ground to impeach the witness Mr. Edouard Lévy at the Hearing.*"

51. A hearing on Jurisdiction and the Merits was held in Paris, France, from 26 to 29 March 2018 ("**Hearing**"). The following persons were present at the Hearing:

> *Tribunal*:
>   Mr. Yves Derains                      President
>   Prof. Bernard Hanotiau                Arbitrator
>   Prof. José Carlos Fernández Rozas     Arbitrator
>
> *ICSID Secretariat*:
>   Ms. Catherine Kettlewell              Secretary of the Tribunal
>
> *Assistant to the President of the Tribunal:*
>   Dr. Ana Gerdau de Borja Mercereau
>
> *For the Claimant*:
>   Mr. Elvezio Santarelli                Watson Farley & Williams - Rome
>   Mr. Eugenio Tranchino                 Watson Farley & Williams - Rome
>   Mr. Andrew Savage                     Watson Farley & Williams - London
>   Mr. Robert Fidoe                      Watson Farley & Williams - London
>   Professor Eirik Bjorge                Bristol University
>   Mr. Cameron Miles                     3VB Barristers - London
>
> *Counsels' Assistants:*
>   Mr. Diego Rovelli                     Watson Farley & Williams - Rome
>   Ms. Raffaela Colamarino               Watson Farley & Williams - Rome
>   Mr. Jack Moulder                      Watson Farley & Williams - London
>
> *Parties:*
>   Mr. Jacques Edouard Levy              CEO Belenergia S.A.
>   Mr. Fabio Caggiula                    Belenergia S.A.
>
> *For the Respondent*:
>   Avv Giacomo Aiello                    Avvocatura dello Stato

| | |
|---|---|
| Avv. Sergio Fiorentino | Avvocatura dello Stato |
| Avv. Pietro Garofalo | Avvocatura dello Stato |
| Prof. Maria Chiara Malaguti | MAECI – External Expert |
| Prof. Saverio Di Benedetto | MAECI – External Expert |

*Parties:*

| | |
|---|---|
| Eng. Daniele Bacchiocchi | GSE |
| Dott. Valerio Ventura | GSE |
| Avv. Marta Capriulo | GSE |
| Avv Cosimo Danilo Raimondi | GSE |
| Avv. Paolo Berisio | GSE |

*Observer:*

| | |
|---|---|
| Mr. Harshad Pathak | Hanotiau & van den Berg |

*Court Reporters*:

| | |
|---|---|
| Ms. Diana Burden | English Court Reporter |
| Ms. Laurie Carlisle | English Court Reporter |

*Interpreters*:

| | |
|---|---|
| Mr. Jesus Getan Bornn | English-Spanish Interpreter |
| Ms. Roxana Dazin | English-Spanish Interpreter |
| Mr. Marc Viscovi | English-Spanish Interpreter |
| Ms. Francesca Geddes | English-Italian Interpreter |
| Ms. Monica Robiglio | English-Italian Interpreter |
| Ms. Delfina Genchi | English-Italian Interpreter |

During the Hearing, the following persons were examined:

*On behalf of the Claimant*:

| | |
|---|---|
| Mr. Jacques Edouard Levy | CEO Belenergia S.A. |
| Prof. Valerio Onida | Onida Randazzo e Associati Law Firm |
| Prof. Barbara Randazzo | Onida Randazzo e Associati Law Firm |
| Prof. Carlo Andrea Bollino (Expert-witness) | University of Perugia and AIEE (Italian Association for Energy Economics) |
| Prof. Alessandro Marangoni | Althesys – Strategic Consultants |
| Mr. Juan Camilo Rodriguez | Alpha Value |
| Dr. Olivier Boucher | OB Consulting |
| Eng. Giorgio Saraceno | Protos S.p.A |
| Eng. Emiliano Guerrieri | Protos S.p.A. |

*On behalf of the Respondent*:

| | |
|---|---|
| Eng. Daniele Bacchiocchi | GSE |
| Eng. Luca Miraglia | GSE |
| Prof. Umberto Monarca | GRIF |

|                                        |                     |
| -------------------------------------- | ------------------- |
| Prof. Cesare Pozzi                     | GRIF                |
| Prof. Davide Quaglione                 | GRIF                |
| Prof. Giacomo Rojas Elgueta            | Università Roma Tre |
| Prof. Ernesto Cassetta (not testifying)| GRIF                |

52. During the Hearing, each Party submitted various factual and legal exhibits, and the Tribunal admitted into the record the following: Factual Exhibits REX-72 to 73 and Legal Exhibits CL-166RM, CL-174RM through CL-177RM.

### F.   **The Post-Hearing Procedure**

53. On 3 April 2018, the Claimant's counsel submitted an authorization to act on behalf *Compagnia Solare 1 SRL* issued by the judicial administrator of that company.

54. On 10 April 2018, the Claimant submitted an Updated Expert Report of AlphaValue/Juan Camilo Rodríguez with Appendices 1 through 5 ("**Alpha Value's Third Report**").

55. On 16 April 2018, the Tribunal requested the Parties to inform on the following: *(i)* agreement on the final version of the Hearing transcripts; *(ii)* disagreement on "improved translations" submitted at the Hearing; and *(iii)* submission of electronic versions of certain demonstratives and documents submitted at the Hearing.

56. On 23 April 2018, the Tribunal confirmed the Parties' agreement to extend the deadline to submit corrections to the Hearing transcript and to accept the "improved translations" submitted by the Claimant during the Hearing.

57. On 7 May 2018, the Claimant submitted the electronic versions of Exhibits C-25RM, C-26-RM, CL-178RM, an errata to the Althesys' Report, and the Parties' joint translation into English of Exhibit CL-3M with a point of disagreement.

58. By email of even date, the Claimant submitted the corrected Hearing transcript as agreed by the Parties, with a point of disagreement in relation to Prof. Onida's testimony (Claimant's expert).

59. On 11 May 2018, the Tribunal informed the Parties that the court reporter would be inserting their agreed changes to the Hearing transcript. The Tribunal took note of the Parties'

disagreement on the translation of "*proveddimento*" in Prof. Onida's testimony, accepting the transcript with both translations and noting that it would "*resolve the possible inconsistency if and when it is necessary for its decision.*"

**60.** On 17 May 2018, the Secretariat informed the Parties that the Hearing transcript, as revised by the court reporter, was available in the case folder (Box).

**61.** On the same day, the Parties requested a further correction to the transcript of Day 4 of the Hearing.

**62.** On the next day, the Secretariat submitted to the Parties a new revised transcript of Day 4 of the Hearing, as agreed by the Parties.

**63.** On 24 May 2018, the Claimant made a request to introduce the award rendered in *Masdar Solar et al. v. Spain* (ICSID Case No. ARB/14/1) as provided in PO1, ¶ 17.3, in order to refer to the same in its Post-Hearing Brief due on 25 May 2018.  The Tribunal invited the Respondent to comment on the Claimant's request dated 24 May 2018.

**64.** On the same day, the Respondent agreed with the Claimant's request on the condition that the Respondent was granted an extension of time until 1 June 2018 to submit its Post-Hearing Brief.

**65.** Later on that day, the Claimant indicated that it agreed with the Respondent's request for a time extension.

**66.** By letter dated 24 May 2018, the Secretariat informed the Parties of the Tribunal's decision to grant both Parties a time extension to file their Post-Hearing Briefs by 1 June 2018 and their Statements of Costs by 8 June 2018, considering that the time limits for these submissions were simultaneous.

**67.** On 25 May 2018, the Claimant introduced the *Masdar Solar et al. v. Spain* award (Exhibit CL-179RM), as authorised by the Tribunal.

**68.** The Parties filed simultaneous Post-Hearing Briefs on 1 June 2018.

**69.** On 8 June 2018, the Claimant filed its Statement of Costs.

**70.** On the same date, the Claimant objected to the Respondent's reliance in its Post-Hearing Brief on Decision No. 10795/2017 of Italy's *Corte di Cassazione*, arguing that this document was not on record, although an Italian version of this document had been provided to Prof. Onida at the Hearing.

**71.** On 11 June 2018, the Respondent submitted Decision No. 10795/2017 in Italian and the respective English translation, stating that it would not object to the Claimant's commenting on it so long as it also had an opportunity to respond.

**72.** By letter of the same date, the Secretary of the Tribunal informed the Parties of the Tribunal's decision to grant the Claimant a ten-day time limit to comment on the *Corte di Cassazione*'s Decision No. 10795/2017, to which Italy could respond within ten-days of receipt of the Claimant's comments.  The Tribunal also informed that it would ignore any other comments unrelated to this decision.  By the same letter, the Tribunal highlighted that if Italy did not provide its Statement of Costs (due on 8 June 218) on or before 18 June 2018, the Tribunal would assume that it had given up its claims on costs.

**73.** By letter dated 19 June 2018, the Secretary of the Tribunal informed the Parties that the Tribunal had taken note of the fact that Italy did not present its Statement of Costs on 18 June 2018, pointing out that "[i]*f Italy does not submit a Statement on Costs until 22 June 2018, the Secretariat will distribute to Italy the Claimant's Statement on Costs*" and that "*Italy shall not have an opportunity to submit a Statement on Costs after 22 June 2018*."

**74.** On 21 June 2018, the Respondent filed its Statement of Costs.

**75.** On the same date, the Claimant requested a one-day time extension to submit its comments on *Corte di Cassazione*'s Decision No. 10795/2017.

**76.** On 22 June 2018, the Tribunal granted the Claimant's request for a time extension dated 21 June 2018.

**77.** On the same day, the Claimant submitted its comments on *Corte di Cassazione*'s Decision No. 10795/2017, informing that it would provide a revised English translation of the same in the following week.

**78.** By email of even date, the Respondent filed its revised Statement of Costs.

79. On 26 June 2018, the Claimant filed its English translation of *Corte di Cassazione*'s Decision No. 10795/2017.

80. On the next day, the Tribunal informed the Parties that the *Corte di Cassazione*'s Decision No. 10795/2017 would be introduced into the record as Exhibit REX-74.

81. On 2 July 2018, the Respondent filed its response to the Claimant's comments on *Corte di Cassazione*'s Decision No. 10795/2017.

82. By letter dated 3 July 2018, the Secretary of the Tribunal informed the Parties that the Tribunal "*(a) acknowledge*[d] *receipt of Italy's Reply to Claimant's Observations on* Corte di Cassazione*'s Decision No. 10795/2017 (Exhibit REX-74), and (b) declare*[d] *the discussion on the content and on the translation of this Decision closed*."

83. On 24 July 2018, the Respondent made a request to introduce the Communication from the Commission to the European Parliament and the Council Protection of intra-EU investment (COM(2018) 547/2) as provided in PO1, ¶ 17.3.

84. On the next day, the Tribunal invited the Claimant to comment by 30 July 2018 on the Respondent's request to introduce dated 24 July 2018.

85. On 30 July 2018, the Claimant filed its comments on the Respondent's request to introduce dated 24 July 2018.

86. By letter dated 1 August 2018, the Secretary of the Tribunal informed the Parties that the Tribunal granted the Respondent's request to introduce the Communication from the Commission to the European Parliament and the Council Protection of intra-EU investment (COM(2018) 547/2), inviting the Parties to file simultaneous observations on the same by 8 August 2018, and noting that discussions on the matter will be closed thereafter.

87. On 8 August 2018, the Parties filed simultaneous observations on the Communication from the Commission to the European Parliament and the Council Protection of intra-EU investment (COM(2018) 547/2).

88. On 3 October 2018, the European Commission offered to "*up-date its written observations in the light of judgment of the European Court of Justice in Case C-284/16 Achmea v Slovak*

*Republic, and in particular to set out its view on the consequences of that judgment for pending arbitration cases based on the Energy Charter Treaty*."

89. By letter dated 8 October 2018, the Secretary of the Tribunal informed the European Commission, with the Parties in copy, that the Tribunal thanked the European Commission for its offer dated 3 October 2018 but found that additional *amicus curiae* submissions could not be accepted at such late stage of the proceedings, noting that "*upon Italy's request the Communication from the Commission to the European Parliament and the Council: Protection of intra-EU Investment (COM(2018) 547/2) was introduced into the record as Exhibit REX-75 and that the Parties have filed simultaneous observations on this document on 8 August 2018*."

90. By letter dated 14 February 2019, the Respondent submitted a request for termination of the proceedings and, in the alternative, suspension of the proceedings, along with the EU Member States' Declarations of 15 and 16 January 2019.

91. By letter of the same date, the Secretary of the Tribunal invited the Claimant to submit by 22 February 2019 its observations on the Respondent's request dated 14 February 2019.

92. On 22 February 2019, the Claimant submitted its observations on the Respondent's request dated 14 February 2019.

93. By email dated 7 June 2019, the Claimant informed the Tribunal that Mr. Andrew Savage was to be removed from the list of counsel of record for the Claimant.

94. On 18 June 2019, Italy requested the suspension of the proceeding. On 20 June 2019, Belenergia filed its observations by invitation of the Tribunal. On 26 June 2019, the Tribunal decided to dismiss Italy's request for suspension on the following basis:

> *First, Italy submitted its Request for Suspension by letter dated 18 June 2019, although the Secretariat had informed the Parties on 23 May 2019 that the Tribunal expected to be able to render the Award by the end of June 2019.15 Hence, Italy's Request for Suspension comes at a very late stage of the proceedings.*
>
> *Second, the Joined Cases* [ECJ Joined Cases C-798/18 and C-799/18] *concern referrals to the ECJ by the Administrative Court of Lazio, while this is an ECT arbitration. Italy did not satisfy its burden of proving that the Joined Cases involve (i) the same parties (i.e. Belenergia is not a*

> *party to the Lazio dispute), (ii) the same object of the dispute, let alone (iii) the same cause of action.*
>
> *Third, the Joined Cases are still pending before the ECJ. Thus, the purported risks of inconsistent decisions and legal uncertainty16 are hypothetical.*

**95.** The proceeding was closed on 26 June 2019.

* * *

**96.** Although the procedural language of the arbitration is English,[4] the Parties did not always present a full translation of the original documents presented in Italian. Consequently, when necessary the Tribunal quotes some excerpts of documents in Italian when they are not translated.

### III.    FACTUAL BACKGROUND

**97.** The purpose of this Section is to provide a brief account of the factual background to the dispute. Although the Parties have no major differences in relation to events described, they often disagree on the legal consequences of these events, as summarised in Sections V and VI of this Award.

#### A.    <u>Italian Legislative and Regulatory Framework</u>

**98.** At its inception PV energy technology required a high upfront investment. In 1992, Italy sought to encourage PV investment with the adoption of Law No. 9/1991 in light of Italy's National Energy Plan of 1988.[5] This Law established the CIP6 incentive scheme, which enshrined individual power purchase agreements concluded between *ENEL S.p.a.* and independent private producers with an eight-year duration.[6]

---

[4] PO1, ¶ 11.1.
[5] Professor Bollino's Report, ¶ 45.
[6] Professor Bollino's Report, ¶ 46.

99.  Later in 1999, Italy adopted Legislative Decree No. 79/1999[7] in light of EU Directive 77/2001/EC[8] on the promotion of electricity produced from renewal energy resources in the internal electricity market.  Legislative Decree No. 79/1999 established the Green Certificates' scheme repealing the CIP6 incentive.[9]  The subsidy level of Green Certificates was associated with wind and biomass technology costs rather than PV technology costs, which meant that it was not attractive to PV investment.[10]

100.  In the 2000s, Italy adopted a new policy with PV-specific incentive mechanisms, including mechanisms associated with the 20-year life of PV plants like the feed-in tariffs under the Energy Account ("*Conto Energia*") regime,[11] in addition to the minimum price incentive.

Energy Account Incentives (Feed-In Tariffs)

101.   The Energy Account regime was introduced by Legislative Decree No. 387/2003[12] in light of EU Directive 77/2001/EC.  Article 7 of Legislative Decree No. 387/2003 directed the Minister for Production Activities and the Minister for the Environment to adopt ministerial decrees defining the criteria for promotion of electricity production from solar energy.  Article 7(2) set forth that the criteria for promotion measures shall not entail burden on the State budget, be in accordance with EU laws, and include the conditions for PV incentives.  Article 7(2)(d) of Legislative Decree No. 387/2003 required that incentives be "*of*

---

[7] Legislative Decree No. 79/1999 (Exhibit C-1M).

[8] Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market (Exhibit C-RFA-II-4).

[9] Professor Bollino's Report, ¶ 45.

[10] Professor Bollino's Report, ¶¶ 49-50.

[11] Professor Bollino's Report, ¶ 51; Althesys' Report, ¶ 20.

[12] Exhibit C-RFA-II-7 (Hearing Bundle, vol. 2, Tab 10).

*decreasing amount and of duration such as <u>to guarantee fair remuneration of the investment and operating costs.</u>*" (emphasis added).

102. Legislative Decree No. 387/2003 was implemented with the adoption of ministerial decrees providing for incentive tariffs (feed-in tariffs) pursuant to its Article 7, which provided as follows:

*Article 7*

*Specific provisions for solar energy*

*1. Within six months from the date when this Decree enters into force, the Minister for Production Activities, in agreement with the Minister for the Environment and after consultation with the Joint Conference, shall adopt one or more decrees defining criteria for the promotion of electrical energy production from solar energy.*

*2. Without entailing any burdens on the State budget and in accordance with the Community laws in force, the criteria referred to in paragraph 1, shall:*

*a) establish the requisites of parties who might benefit from promotion measures;*

*b) establish the minimum technical requirements of plants and their components;*

*c) establish conditions concerning the cumulation of promotion measures with other incentives;*

*d) establish procedures to determine the size of promotion measures. For electricity produced by photovoltaic conversion of solar energy, they shall provide for a specific, incentive tariff, of decreasing amount and of duration such as to guarantee fair remuneration of the investment and operating costs;*

*e) establish a target for the rated power to be installed;*

*f) also fix the maximum limit of the cumulative electric power of all the plants that may benefit from the promotion measures;* […]

103. Ministerial Decree of 28 July 2005[13] and Ministerial Decree of 6 February 2006 set up the "**Energy Account I.**" Article 6(3) of Ministerial Decree of 28 July 2005 on Energy Account

---

[13] <u>Exhibit C-RFA-II-14.1</u> (<u>Hearing Bundle, vol. 2, Tab 17</u>).

I set forth the incentive tariff (feed-in tariff) in relation to PV plants with power exceeding 50kW and less than 1000kW, as follows:

*Article 6*

*Criteria to determine the amount aimed at supporting photovoltaic plants with a rated power higher than 20 kW*

*[…] 3. In addition to the recognition of conditions referred to in Subparagraph 1, electricity produced by photovoltaic plants of a rated power exceeding 50 kW and less than 1000 kW, entered in whole or in part in the* [electricity network], *has the right, in accordance with the provisions of this decree,* [to] *an incentive tariff whose maximum measures are as follows:*

*a) Plants for which the application mentioned in Article 7, Paragraph 1, was* [submitted] *in 2005 and 2006: 0,490 euro/kWh for a period of twenty years;*

*b) Plants for which the application mentioned in Article 7, Paragraph 1, was submitted in the years following 2006: the value of the incentive tariff referred in point a) shall be reduced by 2%, with rounding to the third decimal place, for each of the years following 2006, without prejudice to the period of twenty years.*

*The amount of the incentive tariff actually recognized shall be determined by the rules set out in Article 7, in the maximum limit of the cumulated nominal power referred to in Article 12, Paragraph 3.*

104.  Article 6(6) set forth the criteria for the revision of feed-in tariffs to be carried out on 1 January yearly, "*on the basis of the annual rate of change, referred to in the previous 12 months, of consumer prices for the families of workers and employees reported by Istat*."

105.  Article 11(1) of Ministerial Decree of 28 July 2005 provided that 300MW was the national target of accumulated PV power to be installed by 2015. Further, Article 12(3) of the same Ministerial Decree fixed at 40MW the accumulated nominal power limit of all PV plants that can obtain the feed-in tariff pursuant to Article 6(3). The overall accumulated nominal power limit was fixed at 100MW under Article 12(1) of the same Ministerial Decree.

106.  In 2007, Ministerial Decree of 19 February 2007 introduced the "**Energy Account II**" seeking to make corrections to the Energy Account I regime "*introducing a simplified, stable*

*and sustainable system of access to incentives.*"[14]    Article 6 of Ministerial Decree of 19 February 2007 fixed the incentive tariffs (feed-in tariffs), as follows:

*Article 6*

*Incentive tariffs and period of entitlement*

*1. The electricity produced by photovoltaic systems, realized in accordance with this decree and entered into service during the period between the date of issue of the measure referred to in Article 10, Paragraph 1, and 31 December 2008, has the right to an incentivising tariff which, in relation to the nominal power and typology of the plant, referred to in art. 2, paragraph 1, letters b1), b2) and b3), takes the value set out in the next table (Euro/KWh values produced by the photovoltaic plant). The tariff identified on the basis of the same table is recognised for a period of twenty years from the date of entry into operation of the plant at a constant price throughout the entire period of twenty years.*

|  |  | *1* | *2* | *3* |
|---|---|---|---|---|
|  | *Power Nominal of Plant P (Kw)* | *Plants [referred to in] Art. 2, Coma 1, Letter (b1)* | *Plants [referred to in] Art. 2, Coma 1, Letter (b2)* | *Plants referred to [in] Art. 2, Coma 1, Letter (b3)* |
| *A* | *1 minor or equal to P minor or equal to 3* | *0.40* | *0.44* | *0.49* |
| *B* | *3 < P minor or equal to 20* | *0.38* | *0.42* | *0.46* |
| *C* | *P > 20* | *0.36* | *0.40* | *0.44*[15] |

107. Article 12(1) of Ministerial Decree of 19 February 2007 set forth 3,000MW as the national target of accumulated PV power to be installed by 2016, while Article 13(1) fixed at 1,200MW the overall accumulated nominal power of PV plants that could obtain incentives.

108. Article 16(1) of the same Decree contained a transitory provision in relation to Energy Account I, providing that "[t]*he provisions of the Interministerial decrees of 28 July 2005 and 6 February 2006 continue to apply exclusively to photovoltaic plants that have already acquired, by 2006, the right to the incentive rates established by the same decrees.*"

---

[14] Exhibit C-RFA-II-14.2 (Hearing Bundle, vol. 2, Tab 18), Preamble.
[15] Exhibit C-RFA-II-14.2 (Hearing Bundle, vol. 2, Tab 18).

**109.**  Ministerial Decree of 6 August 2010[16] introduced the "**Energy Account III**" designed to take effect on 1 January 2011.  This Decree was adopted in light of Article 6(3) of Ministerial Decree of 19 February 2007, which foresaw the adoption of subsequent decrees with redefined incentive tariffs to be adopted every two years for plants becoming operational after 2010.

**110.**  Article 8 of Ministerial Decree of 6 August 2010 set forth tariff incentives (feed-in tariffs) for PV plants without innovative features becoming operational after 31 December 2010, as follows:

*Article 8*

*Incentive tariffs*

*1. The incentive tariffs under this title shall apply to solar photovoltaic plants that come into exercise after new construction works, total refitting or repowering, on a date after 31 December 2010.*

*2. The electric energy produced by photovoltaic plants of this title that come into exercise within 31 December 2011, have the right to incentive tariff as determined in table A.  The electric energy produced by photovoltaic plants of this title that enter into exercise in 2012 and 2013 have the right to the incentive tariff as defined in Table A, column C) reduced by 6% each year, with commercial rounding to the third decimal digit.*

---

[16] Exhibit C-RFA-II-14.3 (Hearing Bundle, vol. 2, Tab 19).

*Table A*

| | RELATED TARIFF | | | | | |
|---|---|---|---|---|---|---|
| Power Range | A) Plants entered into Exercise after the 31 December 2010 and within the 30 April 2011 | | B) Plants entered into Exercise after the 30 April 2011 and within the 31 August 2011 | | C) Plants entered into Exercise after the 31 August 2011 and within the 31 December 2011 | |
| | Photovoltaic plants realized on buildings | Other photovoltaic plants | Photovoltaic plants realized on buildings | Other photovoltaic plants | Photovoltaic plants realized on buildings | Other photovoltaic plants |
| [Kw] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] […] |
| 200<P< 1000 | 0,355 | 0,314 | 0,335 | 0,303 | 0,314 | 0,266 […] |

111. Pursuant to Article 8(2) of Ministerial Decree of 6 August 2010, PV plants without innovative features starting operations in 2012 and 2013 were entitled to the same rate with a 6% reduction per annum and with commercial rounding to the third decimal place. Tables B and C of the same Decree set out incentive rates for PV plants with innovative features and PV plants concentrating photovoltaic installations, respectively.

112. The tariffs set out in Table A above were granted for a 20-year period pursuant to Article 8(4) of Ministerial Decree of 6 August 2010 (Energy Account III). Article 3(1) of the same Decree fixed at 8,000MW the national target of accumulated PV power to be installed by 2020. In turn, the overall accumulated nominal power limit was fixed at (a) 3,000MW for PV plants without innovative features; (b) 3,000MW for PV plants with innovative features; and (c) 200MW for PV plants concentrating photovoltaic installations, pursuant to Article 12(2), (3) and (4) of the same Ministerial Decree, respectively.

113. Before the Energy Account III took effect, Italy adopted Law No. 129/2010 of 13 August 2010 ("***Salva Alcoa*** Law") to tackle delays in network connection faced by PV producers. The *Salva Alcoa* Law thus extended the 2010 tariffs under the Energy Account II until 30 June 2011 for plants certifying full installation by 31 December 2010 and start of

operations by 30 June 2011.[17]   This means that the Energy Account II coexisted with the Energy Account III for six months.

114.  Later on 3 March 2011 Italy enacted Legislative Decree No. 28/2011[18] ("*Romani* **Decree**") implementing EU Directive 2009/28/EC.[19]   Article 23 on "General Principles" of the *Romani* Decree set forth the principles of efficiency, simplification, stability, harmonization and reduction of burden on consumers, seeking to "redefine" and "develop" incentives in light of "*market mechanisms and the evolution of technologies of renewable sources and energetic efficiency,*" reading that:

*Article 23*

*General Principles*

*1. This Title redefines the regulation of the support regimes applicable to the energy produced by renewable sources and energetic efficiency through the reorganization and strengthening of current incentive systems. The new regulation establishes a general framework in order to promote the energy production from renewable sources and energetic efficiency adequately to achieve the purposes under Article 3, through the provision of criteria and instruments that promote the efficacy, efficiency, simplification, stability in the long term of the incentive systems, pursuing at the same time the harmonization with other instruments that have similar purpose and the reduction of specific support burdens for consumers.*

*2. Further general principles of the redefinition and the development of incentive systems are the gradation of the action for the protection of investments made and the proportionality to the objectives, moreover the flexibility of the structure of support regimes, in order to take into account the market mechanisms and the evolution of technologies of renewable sources and energetic efficiency.*[20]

115.  Among other amendments, the *Romani* Decree repealed Article 7 on "Specific provisions for solar energy" of Legislative Decree No. 387/2003, "[w]*ithout prejudice to the acquired rights and the effects produced taking into account the provisions of Article 24, Paragraph 5,*

---

[17] Althesys Report, ¶ 26.

[18] Legislative Decree No. 28/2011 (Exhibit C-RFA-II-8; Hearing Bundle, vol. 2, Tab 11).

[19] Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC (Exhibit C-RFA-II-5; Hearing Bundle, vol. 2, Tab 8).

[20] Legislative Decree No. 28/2011 (Exhibit C-RFA-II-8; Hearing Bundle, vol. 2, Tab 11).

*Letter c).*"[21]   Article 24 of *Romani* Decree set forth the general criteria for PV incentives, as follows:

*Article 24*

*Incentive mechanism*

*1. The production of electric energy from plants powered by renewable sources entered in exercise after 31 December 2012 is incentivized through instruments and on the basis of general parameters provided by Paragraph 2 and specific criteria under Paragraphs 3 and 4.  The protection of not incentivized productions is shall be made with the instruments under Paragraph 8.*

*2. The production of electric energy from plants under Paragraph 1 is incentivized on the basis of the following general criteria:*

*a) the incentive has the aim to grant an equal remuneration of investments and functioning costs;*

*b) the duration of the right to the incentive is equal to the average standard life for the specific typologies of plants and starts from the date in which the plant came into exercise;*

*c) the incentive remain stable for the whole period of the right and may take into account the economic value of the energy produced;*

*d) the incentives are allocated through private contracts between the GSE and the responsible person of the plant, based on a standard contract defined by the Authority for the electric energy and gas, within three months from the date of come into force of the first of the decrees under paragraph 5;*

*e) without prejudice to Letter i) of this Paragraph and Letter c) of Paragraph 5, the incentive is assigned exclusively to the production of new plants, included plants realized after a total rebuilding, repowered plants, limited to the additional reproducibility, and from hybrid central, limited to the portion of the energy produced by renewable sources;*

*f) the incentive assigned to the electric energy produced by solar photovoltaic plants is greater for plants with high concentration (400 suns) and take account of the greater relation between the energy produced and the used surface;* […]

---

[21]Legislative Decree No. 28/2011 (<u>Exhibit C-RFA-II-8</u>; <u>Hearing Bundle, vol. 2, Tab 11</u>), Article 25(11).

*5. With the decrees of Minister of Economic Development in agreement with the Minister for the Environment and the Protection of Land and Sea, and, for the competence profiles, with the Minister of Agricultural and Forestry Politics, heard the Authority for the electric energy and gas and the Unified Conference, pursuant to Article 8 of Legislative Decree 28 August 1997, No. 281, are defined the procedures to implement incentive systems under this Article, in accordance with the criteria set out in the preceding Paragraphs 2, 3 and 4. The decrees regulate, in particular:*

*a) the values of the incentives provided by paragraph 3 for plants that come into exercise starting from 1 January 2013 and the incentives auction base in application of paragraph 4, without prejudice to the different effective dates fixed pursuant to the implementing decrees provided by the Article 7 of Legislative Decree 29 December 2003, No. 387 as well as the power values, articulated for source and technology, of plants subject to tender procedures;*

*b) the procedures with which the GSE selects the subjects that are entitled to receive the incentive through tender procedures;*

*c) the procedure for the transition from the old to the new incentive mechanism. In particular, are determined the procedures with which the right to benefit of green certificates for the years subsequent to 2015, also from plants not powered by renewable sources, is switched over into the right to access, for the remaining period of right to green certificates, to an incentive included in the kind provided by paragraph 3, in order to grant the return on investments made;*

*d) the calculation procedure and application of the incentives for the productions attributed to renewable sources in hybrid centrals;*

*e) the procedure with which was modified the mechanism of net metering for plants, also in exercise, that access to this service, in order to simplify the use;* [...]

**116.** After the enactment of the *Romani* Decree, Ministerial Decree of 5 May 2011[22] established the **Energy Account IV** for PV plants starting operation after 31 May 2011. The Preamble of Ministerial Decree of 5 May 2011 referred to the progressive reduction of tariffs in light of the evolution of PV technology costs and that subsidies may no longer be necessary.[23]

---

[22] Exhibit C-RFA-II-14.4 (Hearing Bundle, vol. 2, Tab 20).

[23] Exhibit C-RFA-II-14.4 (Hearing Bundle, vol. 2, Tab 20), Preamble: "*Ritenuto che l'incentivazione della produzione di energia elettrica da impianti solari fotovoltaici che entrano in esercizio successivamente al 31/05/2011 debba essere attuata tramite una progressiva diminuzione delle tariffe che, da un lato, miri ad un allineamento graduale dell'incentivo pubblico con i costi delle tecnologie, in Jinea con le politiche adottate nei principali Paesi europei e,*

Article 1 of the same Ministerial Decree set forth the indicative national target of 23,000MW corresponding to cumulated annual incentives costs between € 6 billion to € 7 billion.

117. Like Energy Account III, Energy Account IV provided for differentiated feed-in tariffs *(a)* for PV plants without innovative features; *(b)* for PV plants with innovative features; and *(c)* for PV plants concentrating photovoltaic installations, according to Article 12, Article 16, and Article 18 of Ministerial Decree of 5 May 2011, respectively. Paragraphs (2) of Article 12, Article 16, and Article 18 read that:

> *The incentive rate is recognised for a period of twenty years from the date of entry into operation of the plant and is constant in current currency throughout the period of incentive.*[24]

118. Annex 5 of the same Decree contained different tables with tariffs applying to these different types of PV plants depending on the date that a PV plant started operations. For example, Tables 1 to 4 set forth the feed-in tariffs under Energy Account IV for plants without innovative features starting in 2011 and subsequent years:

*Table 1* [Tariffs for Year 2011]

|  | June | | July | | August | |
|---|---|---|---|---|---|---|
|  | *Plants on buildings* | *Other photovoltaic plants* | *Plants on buildings* | *Other photovoltaic plants* | *Plants on buildings* | *Other photovoltaic plants* |
|  | *[€/kWh]* | *[€/kWh]* | *[€/kWh]* | *[€/kWh]* | *[€/kWh]* | *[€/kWh]* […] |

---

*dall'altro, mantenga stabilità e certezza sui mercato; Considerato che, in base all'evoluzione dei costi tecnologici, si prevede il raggiungimento entro pochi anni della cd. grid parity, ossia alla convenienza economica dell'elettricità fotovoltaica rispetto a quella prelevata o immessa in rete, perle installazioni più efficienti, condizione che fa ritenere non più necessario il mantenimento di uno schema di sostegno pubblico a decorrere dal raggiungimento di tale condizione; Ritenuto pertanto opportuno sviluppare la potenza elettrica cumulativa degli impianti fotovoltaici che possono ottenere le tariffe incentivanti, di cui all'art. 25, comma 10, del D.Lgs. n. 28 del 2011 secondo obiettivi temporali che assicurino una crescita graduale della potenza stessa negli anni, in modo da usufruire dei miglioramenti della tecnologia sotto il profilo dei costi e dell'efficienza, che diano prospettiva di crescita di lungo termine agli investitori e all'industria di settore, con un minore impatto della spesa annua aggiuntiva su prezzi e tariffe dell' energia elettrica; Considerato che, sulla base delle previgenti disposizioni di sostegno al fotovoltaico e dei dati sugli investimenti effettuati e in corso di realizzazione, I 'onere gravante sugli oneri di sistema del settore elettrico dovrebbe raggiungere, dal 2011, il valore di circa 3,5 miliardi di euro annui; Considerato opportuno adottare un metodo che colleghi l'andamento tariffario programmato e le eventuali ulteriori riduzioni all'andarnento della potenza installata, rispetto ad obiettivi fissati in termini programmatici; Ritenuto opportuno prevedere, a tutela degli investimenti in corso alla data di entrata in vigore del decreto, un regime transitorio, fino al 31/12/2012, nell'ambito di un contingente di potenza per i grandi impianti, per dare gradualità al processo di ridefinizione della disciplina vigente ed assicurare il controllo degli oneri conseguenti; […]"*
[24] Exhibit C-RFA-II-14.4 (Hearing Bundle, vol. 2, Tab 20).

| | | | | | | |
|---|---|---|---|---|---|---|
| 200<P<1000 | 0,325 | 0,291 | 0,315 | 0,276 | 0,303 | 0,263 [...] |

*Table 2 1* [Tariffs for Year 2011]

| | September | | October | | November | | December | |
|---|---|---|---|---|---|---|---|---|
| | Plants on buildings | Other photovoltaic plants | Plants on buildings | Other photovoltaic plants | Plants on buildings | Other photovoltaic plants | Plants on buildings | Other photovoltaic plants |
| | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] [...] |
| 200<PC<1000 | 0,298 | 0,245 | 0,285 | 0,233 | 0,265 | 0,210 | 0,246 | 0,189 [...] |

*Table 3*

| | 1st Sem. 2012 | | 2nd Sem. 2012 | |
|---|---|---|---|---|
| | Plants on buildings | Other photovoltaic plants | Plants on buildings | Other photovoltaic plants |
| | [€/kWh] | [€/kWh] | [€/kWh] | [€/kWh] [...] |
| 200<P<1000 | 0,224 | 0,172 | 0,202 | 0,155 [...] |

*Table 4* [Tariffs for 1st semester of year 2013]

| | Plants on buildings | | Other photovoltaic plants | |
|---|---|---|---|---|
| | All inclusive tariffs | Self consumed tariffs | All inclusive tariffs | Self consumed tariffs [...] |
| 200<P<1000 | 0,281 | 0,183 | 0,239 | 0,141 [...] |

*Table 5* [Reductions on tariffs for subsequent semesters]

| | 1st Semester | 2nd Semester |
|---|---|---|
| 2013 | | 9% |
| 2014 | 13% | 13% |
| 2015 | 15% | 15% |
| 2016 | 30% | 30% |

119.  In 2012, Ministerial Decree of 5 July 2012[25] set up the last **Energy Account V** referring in its Preamble to the fact that by March 2012 the cumulated annual cost of PV incentives reached € 5.6 billion, close to the cost cap set forth in Article 1 of Ministerial Decree of 5 May 2011.  Consequently, Article 1(5) of Ministerial Decree of 5 July 2012 capped at € 6.7 billion the cumulated annual cost of PV incentives, as follows:

> *This Decree shall cease to apply, in any case, after thirty calendar days from the date of the achievement of cumulative indicative cost equal to 6.7 billion of euro*[s] *each year.  The date of the achievement of the aforementioned value of 6.7 billion of euro*[s] *each year shall be communicate*[d]*, based on the elements provided by the GSE,* [by] *the Authority for the Electric Energy and Gas, with the procedures mentioned in Paragraph 2.*

120.  Article 5(1) of Ministerial Decree of 5 July 2012 provided, among other things, for incentive tariffs for plants with power up to 1MW, pursuant to its Annexes 5 to 7.  Article 5(4) set forth that the "*incentive tariff is recognized for a period of twenty years starting from the date of the plant coming into operation and is constant in currency for the whole incentive period.*"  Further, Article 20(1) provided that the cost cap did not affect rights of PV plant owners acquired before the cap is reached:

> *Starting from the date indicated in Article 1, Paragraph 5, the present Decree and the dispositions of the previous incentives measures of the photovoltaic source that contributed to increase the cumulative costs reached at the mentioned date, shall cease to apply.  The rights acquired up to the mentioned date are saved.*[26]

121.  The Energy Account V ended when it reached the € 6.7 billion cost cap on 6 July 2013.[27]  The table below illustrates the duration of the Energy Accounts I to V:[28]

| Ministerial Decree | Energy Account No. | Start Date | End Date |
|---|---|---|---|
| Ministerial Decree of 28 July 2005 & Ministerial Decree of 6 February 2006 | Energy Account I | 30 September 2005 | 12 April 2007 |

---

[25] Exhibit C-RFA-II-14.5 (Hearing Bundle, vol. 2, Tab 21).

[26] *See* Exhibit C-RFA-II-14.5 (Hearing Bundle, vol. 2, Tab 21).

[27] Althesys Report, ¶ 29.

[28] Claimant's Power Point Presentation of 26 March 2018, Slides 17 to 19.  *See also* Prospect on Energy Accounts I to V (Exhibit C-25RM).

| Ministerial Decree of 19 February 2007 | Energy Account II | 13 April 2007 | 30 June 2011 |
| Ministerial Decree of 6 August 2010 | Energy Account III | 1 January 2011 | 31 May 2011 |
| Ministerial Decree 5 May 2011 | Energy Account IV | 1 June 2011 | 26 August 2012 |
| Ministerial Decree of 5 July 2012 | Energy Account V | 27 August 2012 | 6 July 2013 |

**122.** Later in 2013, Article 1(3) of Legislative Decree No. 145/2013[29] of 23 December 2013 ("***Destinazione Italia* Decree**") provided PV plant owners with the option to continue with the incentive tariffs or to have the tariffs adjusted on a voluntary basis.[30]

**123.** In 2014, the *Spalma Incentivi* Legislative Decree No. 91 of 24 June 2014 ("***Spalma Incentivi* Decree**")[31] reduced feed-in tariffs applying to all PV plants with a nominal power above 200kW, irrespective of GSE Conventions already in force. The *Spalma Incentivi* Decree was later confirmed by Conversion Law No. 116/2014 of 11 August 2014.[32] Article 26(3) of *Spalma Incentivi* Decree as amended by Conversion Law No. 116/2014 provides as follows:

---

[29] Exhibit C-RFA-II-10 (Hearing Bundle, vol. 2, Tab 13).

[30] Exhibit REX-35, Article 1(3): "*3. Al fine di contenere l'onere annuo sui prezzi e sulle tariffe elettriche degli incentivi alle energie rinnovabili e massimizzare l'apporto produttivo nel medio-lungo termine dagli esistenti impianti, i produttori di energia elettrica da fonti rinnovabili titolari di impianti che beneficiano di incentivi sotto la forma di certificati verdi, tariffe omnicomprensive ovvero tariffe premio possono, per i medesimi impianti, in misura alternativa: a) continuare a godere del regime incentivante spettante per il periodo di diritto residuo. In tal caso, per un periodo di dieci anni decorrenti dal termine del periodo di diritto al regime incentivante, interventi di qualunque tipo realizzati sullo stesso sito non hanno diritto di accesso ad ulteriori strumenti incentivanti, incluso ritiro dedicato e scambio sul posto, a carico dei prezzi o delle tariffe dell'energia elettrica; b) optare per una rimodulazione dell'incentivo spettante, volta a valorizzare l'intera vita utile dell'impianto. In tal caso, a decorrere dal primo giorno del mese successivo al termine di cui al comma 5, il produttore accede a un incentivo ridotto di una percentuale specifica per ciascuna tipologia di impianto, definita con decreto del Ministro dello sviluppo economico di concerto con il Ministro dell'ambiente e della tutela del territorio e del mare, con parere dell'Autorità per l'energia elettrica e il gas, entro 60 giorni dall'entrata in vigore del presente decreto, da applicarsi per un periodo rinnovato di incentivazione pari al periodo residuo dell'incentivazione spettante alla medesima data incrementato di 7 anni. La specifica percentuale di riduzione e' applicata: 1) per gli impianti a certificati verdi, al coefficiente moltiplicativo di cui alla tabella 2 allegata alla legge 24 dicembre 2007, n. 244; 2) per gli impianti a tariffa onnicomprensiva, al valore della tariffa spettante al netto del prezzo di cessione dell'energia elettrica definito dall'Autorità per l'energia elettrica e il gas in attuazione dell'articolo 13, comma 3, del decreto legislativo 29 dicembre 2003, n. 387, registrato nell'anno precedente; 3) per gli impianti a tariffa premio, alla medesima tariffa premio.*" *See also* Respondents' Post Hearing Brief, ¶ 28.

[31] Exhibit C-RFA-II-11 (Hearing Bundle, vol. 2, Tab 14).

[32] Exhibit C-RFA-II-12 (Hearing Bundle, vol. 2, Tab 15).

*3. As from 1 January 2015, the tariff for the energy produced by systems, which rated power is above 200 kW, is reformulated, to the operator's choice, based on one of the following options to be communicated to GSE by 30 November 2014:*

*a) the tariff is supplied for a period of 24 years, from the entry into operation of the systems, and is therefore recalculated according to the percentage of reduction indicated in the table in Annex 2 to this decree;*

*b) subject to the twenty years period of supply, the tariff is reformulated providing a first period of use of an incentive reduced with respect to the current and a second period of use of an incentive equally increased. The percentages of remodulating are established by decree of the Minister of Economic Development, in consultation with the Authority for electricity, gas and water system, to be issued by 1 October 2014 so as, in case of acceptance of all those who are entitled to the option, to allow a saving of at least 600 million of euros per year for the period 2015-2019, compared with the expected supply with the applicable tariffs;*

*c) subject to the twenty years period of supply, the tariff is reduced by a percentage of the incentive recognized at the date of entry into force of this decree, for the remainder of the incentive period, in according to the following amounts:*

*1) 6 percent for systems with rated power above 200 kW and up to the rated power of 500 kW;*

*2) 7 percent for systems with rated power above 500 kW and up to the rated power of 900 kW;*

*3) 8 percent for systems with rated power above 900 kW.*

*In the event of no communication by the operator, GSE applies the option under c ).*[33]

**124.** Subparagraphs (a), (b), and (c) of Article 26(3) above provided the PV plant owners with three possible choices following the regime change. The first choice under Article 26(3)(a) allowed PV plant owners to extend incentives from 20 to 24 years while reducing the feed-in tariffs proportionally to the PV plant's lifetime. The second choice under Article 26(3)(b) kept the 20-year duration of incentives but varied the feed-in tariffs over time. Finally, the third choice under Article 26(3)(c) reduced in 6% to 8% incentives proportionally to the PV

---

[33] Exhibit C-RFA-II-12 (Hearing Bundle, vol. 2, Tab 15).

plant's nominal power (i.e. capacity).  Finally, in the absence of choice by the PV plant owner, the third choice under Article 26(3)(c) applied.  Belenergia's invested companies were deemed to have opted for the third choice, which automatically applied in the event of failure to expressly make a choice.[34]

125.  By the end of 2014, Article 22bis of Law No. 164/2014[35] of 11 November 2014 excluded from the application of Article 26 of Conversion Law No. 116/2014[36] certain Italian public entities and schools ("*enti locali o scuole*").

Minimum Price Incentives

126.  Running in parallel to the Energy Account regime described above, minimum price incentives also benefited certain PV plant owners like Belenergia's SPVs.  Article 13(3) of Legislative Decree No. 387/2003[37] of 29 December 2003 provided that the GSE as the network operator could be requested by the PV plant owner to withdraw and thus purchase electricity from the PV plant, feeding electricity directly into the grid.  The GSE purchase regime ("***retiro dedicato***") was acknowledged by Law No. 239/2004 of 23 August 2004 whose Article 1(41) provided that the AEEG will "*determine*[s] *the modalities for the withdrawal of electricity* […] *referring to economic conditions*."[38]

127.  The *retiro dedicato* regime established by Legislative Decree No. 387/2003 was implemented by resolutions adopted by the *Autorità per l'energia elettrica e il gas*[39] ("**AEEG**"), namely, AEEG Resolution No. 34/2005[40] and later by AEEG Resolution No. 280/2007.[41]  PV plant owners adhering to this purchase regime could thus sell electricity directly to the GSE as an alternative to selling electricity on the wholesale market or to selling electricity through individual power purchase agreements concluded with consumers.  The

---

[34] Statement of Claim, ¶ 139. *See also*, ¶ 101.

[35] Exhibit C-RFA-II-13 (Hearing Bundle, vol. 2, Tab 16).

[36] Exhibit C-RFA-II-12 (Hearing Bundle, vol. 2, Tab 15).

[37] Exhibit C-RFA-II-7 (Hearing Bundle, vol. 2, Tab 10).

[38] Exhibit REX-44 (Hearing Bundle, vol. 6, Tab 14).

[39] The Arbitral Tribunal will refer to AEEG as designating the Italian authority *Autorità di regolazione per energia reti e ambiente* (ARERA), previously *Autorità per l'energia elettrica e il gas* (AEEG) between 1995 and 2013 and *Autorità per l'energia elettrica il gas e il sistema idrico* (AEEGSI) between 2013 and 2017, to be consistent with the Parties' submissions.

[40] Exhibit C-8M (Hearing Bundle, vol. 3, Tab 7).

[41] Exhibit C-RFA-II-15 and Exhibit C-9M (Hearing Bundle, vol. 2, Tab 22).

minimum prices established pursuant to this purchase regime took into account operating costs and were thus an alternative to market prices defined at hourly zonal prices ("*prezzi zonali orari*").[42]

128.  Once adhering to the GSE purchase regime, PV plant owners concluded with the GSE Conventions on minimum prices with an annual and renewable term pursuant to Article 3(6) of AEEG Resolution No. 34/2005 of 23 February 2005. Article 5.1(a) of the same Resolution set forth the minimum guaranteed prices limited to "*the first two (2) million kWh annually withdrawn*" from PV plants with power below 1MW adhering to the GSE purchase regime, without differentiation by source of renewable energy, as follows:

*Article 5*

*Guaranteed minimum prices for plants powered by renewable sources of electrical power of up to 1 MW*

*5.1. For plants powered by renewable sources of electrical power of up to 1 MW, with the exception of hybrid plants, the first two (2) million kWh annually withdrawn from each plant by the network operator in accordance with Article 13, Paragraphs 3 and 4, of Legislative Decree no. 387/03, will be offered, in progressive brackets, the following minimum prices:*

*a) up to 500,000 kWh per year, EUR 95/MWh; over 500,000 up to 1,000,000 kWh per year, EUR 80/MWh; over 1,000,000 up to 2,000,000 kWh per year, EUR 70/MWh; [...]*[43]

129.  Article 5(4) of AEEG Resolution No. 34/2005 further provided that the minimum prices under Article 5(1) were subject to annual update in light of consumer prices for the families of workers and employees determined by the *Istituto nazionale di statistica* ("**Istat**").

---

[42] *See* <u>Exhibit C-2M</u> (<u>Hearing Bundle, vol. 3, Tab 2</u>), p. 14: "*Prezzi zonali orari – Coincidono con i prezzi che il produttore otterrebbe se partecipasse direttamente al mercato.*" According to Italy, the minimum prices sought to cover operating costs and did not prevent PV plant owners from getting higher revenues if market prices were higher: at the end of each year the GSE paid an adjustment to PV plant owners equal to the difference between the earnings pursuant to the hourly zone price and the minimum price offered by the GSE (if the market or hourly zone price surpassed the minimum price). *See* Respondent's Power Point Presentation of 26 March 2018, Slides 27-28.
[43] <u>Exhibit C-8M</u>.

130. Later on 27 December 2006, AEEG Resolution No. 317/2006[44] determined that studies be carried out on the production costs of different sources of renewable energy seeking, among other things, to update AEEG Resolution No. 34/2005.

131. On 6 November 2007, Article 7 of Annex A to AEEG Resolution No. 280/2007 set forth the minimum guaranteed prices differentiated by source of renewable energy subject to a 2 million kWh cap withdrawn from a PV plant, as follows:

> *7.1 The Authority shall establish the minimum guaranteed prices for the withdrawal of electricity injected annually by hydroelectric plants of average annual nominal power up to 1 MW and by plants powered by other renewable sources of rated active power up to 1 MW, with the exception of hybrid power plants. The guaranteed minimum prices are differentiated by source, they are defined by progressive brackets and refer to the calendar year.*

> *7.2. The guaranteed minimum prices referred to in Paragraph 7.1, upon the request of the producer at the time of signing the agreement and as an alternative to the prices referred to in Article 6, shall be applied by GSE only for the first two (2) million kWh of electricity injected. The producer may alter this request no later than 31 December of each year, valid for the entire calendar year thereafter, by notifying GSE according to the instructions given by the latter. For the electricity injected every year and exceeding the first two (2) million kWh, GSE shall apply the prices referred to in Article 6.*

> *[…] 7.5 Pending the measures referred to in Paragraph 7.1, the guaranteed minimum prices are set by applying, on an annual basis, to the values in force in the previous calendar year, the annual rate of change in consumer prices for families of workers and employees detected by Istat, rounded to the first decimal place according to commercial criteria. With reference to the year 2007, the guaranteed minimum prices assume the following values:*

> *a) for the first 500,000 kWh per year, 96.4 EUR/MWh;*

---

[44] Exhibit REX-46 (Hearing Bundle, vol. 6, Tab 15): "*DELIBERA* […] *2.di prevedere che, ai fini della svolgimento dell'attività preparatoria delle decisioni conclusive: a. siano effettuate analisi circa il livello dei costi di produzione di energia elettrica delle diverse fonti rinnovabili e che, a tal fine, possano essere organizzati incontri con i soggetti interessati, nonché possano essere coinvolti organismi indipendenti che svolgano attività di ricerca nel settore elettrico; b. siano pubblicati uno o più documenti perla consultazione finalizzati alle determinazioni di competenza dell'Autorità basate, tra l'altro, sui livello dei costi di produzione di energia elettrica da fonti rinnovabili e, in via prioritaria, finalizzati all'aggiornamento della deliberazione n. 34/05 e all'applicazione delle deliberazione n. 113/06;* […]"

> *b) over 500,000 and up to 1,000,000 kWh per year, 81.2 EUR/MWh;*
>
> *c) over 1,000,000 and up to 2,000,000 kWh per year, EUR 71.0/MWh.*[45]

**132.** AEEG Resolution No. 280/2007 provided that for energy withdrawn in excess of 2 million kWh, the hourly zonal price applied to prevent market distortions and limit public expenditure, as follows: [46]

> *ai fini del ritiro dedicato, si faccia riferimento al prezzo di vendita zonale, in quanto più aderente alle condizioni economiche di mercato per la vendita e perché garantisce la continuità con l'attuale deliberazione n. 34/05 […]*
>
> *ai fini di ridurre i rischi di distorsione del mercato e di contenere gli oneri a carico della collettività derivanti da scostamenti dal regime di mercato, il GSE riconosca i prezzi zonali orari;*

**133.** Article 7.5 above set forth minimum prices for 2007 subject to annual update in light of consumer prices for the families of workers and employees determined by the Istat.  On this basis, the AEEG published updates on the minimum prices for the years 2008 to 2011, depending on the kWh amount withdrawn annually, as follows:[47]

| KWh Range | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Up to 500,000 kWh per annum | € 98.0/MWh | € 101.1/MWh | € 101.8/MWh | € 103.4/MWh |
| Over 500,000 up to 1,000,000 kWh per annum | € 82.6/MWh | € 85.2/MWh | € 85.8/MWh | € 87.2/MWh |
| Over 1,000,000 up to 2,000,000 kWh per annum | € 72.2/MWh | € 74.5/MWh | € 75.0/MWh | € 76.2/MWh |

**134.** With the *Romani* Decree[48] of 3 March 2011, Italy maintained the minimum price incentives, as follows:

> *8. Fermo restando quanto stabilito dall'articolo 13 del decreto legislativo 29 dicembre 2003, n. 387 in materia di partecipazione al mercato elettrico dell'energia prodotta da fonti rinnovabili, entra il 31 dicembre 2012, sulla base di indirizzi stabiliti dal Ministro dello*

---

[45] Exhibit C-RFA-II-15 and Exhibit C-9M (Hearing Bundle, vol. 2, Tab 22).

[46] Exhibit C-RFA-II-15 and Exhibit C-9M (Hearing Bundle, vol. 2, Tab 22), pp. 5-6.

[47] *See* Exhibit C-10M and Exhibit C-9M (Hearing Bundle, vol. 3, Tab 9).

[48] Legislative Decree No. 28/2011 (Exhibit C-RFA-II-8; Hearing Bundle, vol. 2, Tab 11), Article 24(8).

*sviluppo economico, l'Autorità per l'energia elettrica e il gas provvede a definire prezzi minimi garantiti, ovvero integrazioni dei ricavi conseguenti alla partecipazione al mercato elettrico, per la produzione da impianti a fonti rinnovabili che continuano ad essere eserciti in assenza di incentivi e per i quali, in relazione al perseguimento degli obiettivi di cui all'articolo 3, la salvaguardia della produzione non è assicurata dalla partecipazione al mercato elettrico.* […]

**135.** In July of the same year, AEEG Resolution No. 103/2011 of 28 July 2011 determined the calculation method of minimum prices differentiated by source of renewable energy for 2012 and 2013, and adopted a basic minimum price of € 76.20/MWh in light of a report by the *Politecnico di Milano*.[49]   The AEEG then issued minimum price updates for years 2012 and 2013 with different ranges corresponding to the kWh nominal amount withdrawn annually:[50]

| KWh Range | 2012 | 2013 |
|---|---|---|
| Up to 3,750 kWh per annum | € 102.7/MWh | € 105.8/MWh |
| Over 3,750 up to 25,000 kWh per annum | € 92.4/MWh | € 95.2/MWh |
| Over 25,000 up to 2,000,000 kWh per annum | € 78.3/MWh | € 80.6/MWh |

**136.** Later, on 19 December 2013, AEEG Resolution No. 618/2013[51] cut minimum prices to € 38.5/MWh for year 2014 limited to the first 1.5 million kWh annually withdrawn from PV plants, subject to annual updates in light of consumer prices for the families of workers and employees determined by the Istat.

**137.** Four days later, Article 1(2) of *Destinazione Italia* Decree[52] of 23 December 2013, later confirmed by Conversion Law No. 9/2013 of 21 February 2014, repealed minimum price incentives altogether.  Pursuant to Article 1(2) of *Destinazione Italia* Decree the minimum guaranteed price for PV plants with incentives was fixed as equal to the applicable hourly

---

[49] *See* GRIF Economic Report, p. 41 and Annex GRIF-05; Report Politecnico di Milano of July 2013 (*Costi di produzione di energia elettrica da fontti rinnovabili*) (Exhibit REX-51).

[50] *See* Exhibit C-10M and Exhibit C-9M (Hearing Bundle, vol. 3, Tab 9).

[51] Exhibit C-RFA-II-16 (Hearing Bundle, vol. 2, Tab 23).

[52] Exhibit C-RFA-II-10 (Hearing Bundle, vol. 2, Tab 13).

zonal price ("*prezzo zonale orario*"), except for PV plants with power capacity up to 100kW.[53]

The Imbalance Costs

138. Electricity transmission and dispatching activities are managed by *Terna S.p.A. – Rete Elettrica Nazionale* ("**Terna**") pursuant to Article 1(1) of Legislative Decree No. 79/1999 of 16 March 1999 ("***Bersani* Decree**").[54]   Article 2(10)  of  Legislative Decree No. 79/99 defines dispatching as "*the activity aimed at providing instructions for the use and the coordinated operation of production facilities, the network of transmission and auxiliary services.*"

139. The Respondent explains that until 2012 imbalance costs for non-programmable renewable energy plants such as Belenergia's PV plants were fixed "*as equal to the hourly zonal price, with the full residual share allocated to the end consumer.*"[55]   An imbalance is the discrepancy between the programmed and the injected electricity by a power plant, which, in the case of PV plants, is calculated in aggregate fashion, per market area.[56]  The unitary imbalance cost for a PV plant will depend on the aggregate imbalance of an electricity zone.

140. If the unitary imbalance is positive (i.e. the PV plant has programmed injecting 80MWh but has actually injected 100MWh), two scenarios[57] may follow depending on the aggregate zonal imbalance.  If the aggregate zonal imbalance was negative, the PV plant is entitled to 80MWh multiplied by the hourly zonal price € 70/MWh <u>plus</u> 20MWh multiplied by the average selling price on the Dispatching Service Market or "*Mercato per il Servizio di Dispacciamento*" ("**MSD**") € 90/MWh, managed by Terna.  If the aggregate zonal imbalance was positive, the PV plant is entitled to 80MWh multiplied by the hourly zonal price € 70/MWh <u>plus</u> 20MWh multiplied by the MSD average purchasing price € 50/MWh, as follows:

---

[53] <u>Exhibit C-RFA-II-10</u> (<u>Hearing Bundle, vol. 2, Tab 13</u>), including Table 1 of Legislative Decree No. 145/2013.

[54] <u>Exhibit REX-14</u>.

[55] Statement of Defense, ¶ 385.

[56] Statement of Defense, ¶¶ 377-378.

[57] To illustrate costs of imbalance between the programmed and the injected electricity by a power plant, the two scenarios below consider hypothetical hourly zonal prices and hypothetical MSD average selling and purchasing prices.  *See* <u>Exhibit C-2M</u>, Slides 24 and 25; Statement of Defense, ¶ 383.

| | With Positive Imbalance | | Without Imbalance |
|---|---|---|---|
| Programme valuation | € 5,600 | € 5,600 | € 5,600 |
| Imbalance valuation if negative aggregate zonal imbalance | € 1,800 | | |
| Imbalance valuation if positive aggregate zonal imbalance | | € 1000 | |
| *Total* | *€ 7,400* | *€ 6,600* | *€ 5,600* |

141.  If the unitary imbalance is negative (i.e. the PV plant has programmed injecting 80MWh but has actually injected 60MWh), two scenarios may follow depending on the aggregate zonal imbalance.  If the aggregate zonal imbalance was negative, the PV plant is entitled to 80MWh multiplied by the hourly zonal price € 70/MWh <u>minus</u> 20MWh multiplied by the average MSD selling price € 90/MWh.  If the aggregate zonal imbalance was positive, the PV plant is entitled to 80MWh multiplied by the hourly zonal price € 70/MWh <u>minus</u> 20MWh multiplied by the average MSD purchasing price € 50/MWh.

| | With Negative Imbalance | | Without Imbalance |
|---|---|---|---|
| Programme valuation | € 5,600 | € 5,600 | € 5,600 |
| Imbalance valuation if negative aggregate zonal imbalance | (€ 1,800) | | |
| Imbalance valuation if positive aggregate zonal imbalance | | (€ 1000) | |
| *Total* | *€ 3,800* | *€ 4,600* | *€ 5,600* |

142.  AEEG Resolution No. 281/2012/R/EFR[58] of 5 July 2012 adopted provisional measures to promote better planning by renewable energy plants allocating imbalance costs in excess of 20% of programmed electricity to renewable energy plant owners.  After partial annulment of AEEG Resolution No. 281/2012/R/EFR, Italy explains that the AEEG issued Resolution No. 522/2014/R/EEL[59] of 23 October 2014 encouraging better planning by non-

---

[58] Exhibit REX-55.

[59] Exhibit REX-56 (Hearing Bundle, vol. 6, Tab 18).

programmable energy plants, noting the need for review of "*the guidelines on imbalances for non-programmable renewable sources.*"

143. On 28 July 2016, AEEG Resolution No. 444/2016[60] introduced imbalance costs to be charged on PV plant owners to compensate for dispatching costs of the electricity grid allegedly attributable to PV plants' discrepancies in planning the electricity amount injected into the grid. Pursuant to the Preamble of AEEG Resolution No. 444/2016, imbalance charges were justified:

> [...] *because of the general obligation for each dispatching user to program the amount of electrical emission and consumption with diligence, skill, prudence and foresight with regard to the system; as well as clarified by the administrative courts, it is an obligation which, although explained by the Authority with Resolution 525/2014/R/eel, was already inherent in the previous legislation of dispatch in particular in Paragraphs 14.1 and 14.3 of Resolution 111 (original version); this provision, pending a thorough and complete reform of the dispatching service (which hopefully will solve the problem in a more radical manner), introduces mechanisms to provide: (a) a more effective incentive to plan with diligence, skill, prudence and security and, at the same time, (b) to enable the Authority to detect more easily possible breaches of this obligation (also for the purpose of prescribing and / or disciplinary measures).*

144. The Parties disagree on whether imbalance costs charged to PV plant owners with the adoption of AEEG Resolution No. 444/2016 is a taxation measure (the Parties' position is summarised below in ¶¶ 215-226 and 280-282).

B. **The Claimant's Investment**

145. The Claimant is a company incorporated in Luxembourg acting as an investor in the PV energy sector. Belenergia was initially financed by the Belgian company Bel A Venture SRL, the holding company of the investor and entrepreneur Mr. Vincent Bartin.[61] Belenergia invested in ten Italian SPVs having developed and operating 20 PV plants in Southern Italy ("**PV Project**") between September 2011 and December 2013. Nineteen of these plants had a capacity of just under 1MW.

---

[60] Exhibit C-12M (Hearing Bundle, vol. 3, Tab 11).
[61] First Witness Statement of Mr. Lévy, ¶ 15.

146. For development of the PV Project, Belenergia established a corporate structure in which it featured as the company holding 100% participating interest in nine of 10 SPVs, as follows: *Acquaviva SRL* (100%); *Brindisi Solar SRL* (100%); *Casamassima Solare SRL* (100%); *Compagnia Solare 1 SRL* (100%); *Compagnia Solare 2 SRL* (100%); *Compagnia Solare 3 SRL* (100%); *Puglia Energia SRL* (100%); *Solaria Real Estate SRL* (100%); *Società di Produzione Energia Solare SRL* (100%).[62]  Belenergia owns and controls *Solar Solution Puglia SRL* with a 59% participating interest since 6 December 2013,[63] as follows:[64]

| *Solar Solution Puglia*'s Ownership | |
|---|---|
| Belenergia SA | 59% |
| PE Invest SRL | 41% |

147. *Solar Solution Puglia SRL* and *Puglia Energia SRL* merged by incorporation into *Solaria Real Estate SRL* in early 2016.[65]  Consequently, the Conventions concluded with the GSE in relation to the merging companies' PV plants were transferred to *Solaria Real Estate SRL.*

148. Later in 2016 Belenergia shifted *Solaria Real Estate SRL's* control to its Italian subsidiary Belenergia Mezz Finance SRL which, in turn, is owned by Belenergia Solaire Luxembourg SA, a Luxembourg company owned and controlled by the Claimant (Belenergia SA).[66]

Claimant's Three Waves of Investment and the Energy Account Regime

149. The Claimant's investment in Italy took place in three waves.  Belenergia first invested in the SPVs *Casamassima Solare SRL*, *Compagnia Solare 1 SRL, Compagnia Solare 2 SRL, Compagnia Solare 3 SRL,* and *Puglia Energia  SRL* in September 2011.[67]  This first wave of investment took place about four months after Energy Account IV took effect.  Because all plants belonging to these PV companies started operations between June and August 2011,

---

[62] Request for Arbitration, ¶ 5. *See also* Exhibit C-RFA-I-1 (Hearing Bundle, vol. 2, Tab 2).

[63] Claimant explains that before 6 December 2013 it held only 10% of *Solar Solution Puglia SRL.  See* Statement of Claim, ¶ 93.

[64] Request for Arbitration, ¶ 7. *See also* Trade Register Extract of *Camera di Commercio Pesaro e Urbino* (Exhibit C-19M, Hearing Bundle, vol. 3 Tab 16), p. 96.

[65] *See* Trade Register Extract (*Camera di Commercio Lecce* and *Camera di Commercio Milano*) (Exhibit C-19M, Hearing Bundle, vol. 3 Tab 16), pp.  90, 108.

[66] Statement of Claim, ¶ 95. *See also* Trade Register Extract (*Camera di Commercio Milano*) (Exhibit C-19M, Hearing Bundle, vol. 3 Tab 16), p. 76; Trade Register Extract (*Camera di Commercio Milano*) (Exhibit C-20M, Hearing Bundle, vol. 3 Tab 17).

[67] Claimant's Power Point Presentation of 26 March 2018, Slides 18 and 24.

they were all granted feed-in tariffs under Energy Account IV pursuant to Ministerial Decree 5 May 2011.

150. Belenergia's second investment wave took place between April and July 2013 with the acquisition of *Società di Produzione Energia Solare SRL, Solaria Real Estate SRL, Acquaviva SRL,* and *Brindisi Solar SRL*.[68] This investment wave took place when Energy Account V was effective. Energy Account V quickly reached its cap on 6 July 2013 and thus ceased to apply to new plants. Irrespective of the regime applying to new plants at the time of investment, the PV plants of these invested companies received tariffs under previous Energy Accounts. *Solaria Real Estate SRL*'s plants started operations in December 2008, benefiting from tariffs under Energy Account I (Ministerial Decree of 28 July 2005).[69] In turn, *Acquaviva SRL*'s and *Brindisi Solar SRL*'s plants started operations between August and October 2009 receiving feed-in tariffs under Energy Account II (Ministerial Decree of 19 February 2007). *Società di Produzione Energia Solare SRL*'s three plants started operations between June 2011 and February 12 receiving feed-in tariffs under Energy Account IV (Ministerial Decree 5 May 2011).

151. The third and last investment wave took place in December 2013 with Belenergia's acquisition of *Solar Solution Puglia SRL*.[70] At this time, Energy Account V no longer applied to new plants. Because *Solar Solution Puglia SRL*'s both plants started operations in November 2011 and March 2012, they were entitled to tariffs under Energy Account IV.

152. The Table below illustrates Belenergia's three investment waves in the 10 invested companies whose PV plants were entitled to feed-in tariffs:[71]

---

[68] Claimant's Power Point Presentation of 26 March 2018, Slide 19.

[69] *See* <u>Exhibit C-21M</u>, pp. 17, 22, 28 of pdf.

[70] Claimant's Power Point Presentation of 26 March 2018, Slide 20.

[71] This Table was prepared based on data contained in the Claimant's Power Point Presentation of 26 March 2018, Slides 23 to 25, <u>Exhibit C-RFA-I-1</u>; and <u>Exhibit C-21M</u>.

| Invested PV Company | Acquisition Date by Belenergia | Incorporation Date | Start of Operations | Nominal Power (kW) | Energy Account |
|---|---|---|---|---|---|
| FIRST INVESTMENT WAVE | | | | | |
| *Casamassima Solare SRL* | 29 Sept. 2011 | 3 June 2009 | Plant 1 *Leporano1*: 26 Aug. 2011 | 939.06 | Energy Account IV (Min. Decree 5 May 2011) |
| | | | Plant 2 *Faggiano1*: 31 Aug. 2011 | 955.71 | |
| *Compgania Solare 1 SRL* | 29 Sept. 2011 | 12 Mar. 2010 | Plant 1 *Adelfia1*: 30 June 2011 | 937.02 | Energy Account IV (Min. Decree 5 May 2011) |
| | | | Plant 2 *Casamassima1* 30 June 2011 | 939.06 | |
| *Compagnia Solare 2 SRL* | 29 Sept. 2011 | 12 Mar. 2010 | Plant 1 *Ugento1*: 30 June 2011 | 996.87 | Energy Account IV (Min. Decree 5 May 2011) |
| *Compagnia Solare 3 SRL* | 29 Sept. 2011 | 12 Mar. 2010 | Plant 1 *Nardo1*: 27 June 2011 | 957.60 | Energy Account IV (Min. Decree 5 May 2011) |
| | | | Plant 2 *Massafra1*: 30 Aug. 2011 | 946.68 | |
| *Puglia Energia SRL* | 29 Sept. 2011 | 29 Mar. 2007 | Plant 1 *Sternatia*: 30 June 2011 | 6549.12 | Energy Account IV (Min. Decree 5 May 2011) |
| SECOND INVESTMENT WAVE | | | | | |
| *Società di Produzione Energia Solare SRL* | 29 April 2013 | 3 June 2009 | Plant 1 *Taranto Masseria Giulianello*: 29 Feb. 2012 | 939.84[72] | Energy Account IV (Min. Decree 5 May 2011) |
| | | | Plant 2 *Contrada Titolato*: 30 June 2011 | 916.88 | |
| | | | Plant 3 *La Torrata*: 28 July 2011 | 917.61 | |
| *Solaria Real Estate SRL* | 9 July 2013[73] | 6 Dec. 2005 | Plant 1 *Racale500kW*: 18 Dec. 2008 | 504 | Energy Account I (Min. Decree of 28 July 2005) [74] |
| | | | Plant 2 *Brindisi300kW*: 1 Feb. 2009 | 302.40 | |

---

[72] *See* Exhibit C-21M, p. 102 of pdf.

[73] *See* Exhibit C-RFA-I-2, p. 135 of pdf.

[74] *See* Exhibit C-21M, pp. 17, 22, 28 of pdf.

| Invested PV Company | Acquisition Date by Belenergia | Incorporation Date | Start of Operations | Nominal Power (kW) | Energy Account |
|---|---|---|---|---|---|
| | | | Plant 3 *Brindisi250kW*: 1 Feb. 2009 | 252 | |
| *Acquaviva SRL* | 9 July 2013 | 26 June 2008 | Plant 1 *Acquaviva 1*: 4 Aug. 2009 | 993.84 | Energy Account II (Min. Decree of 19 Feb. 2007) |
| | | | Plant 2 *Acquaviva 2* 3 Aug. 2009 | 596.64 | |
| *Brindisi Solar SRL* | 9 July 2013 | 8 Sept. 2008 | Plant 1 *Racale498*: 15 Oct. 2009 | 498.96 | Energy Account II (Min. Decree of 19 Feb. 2007) |
| | | | Plant 2 *Brindisi805*: 28 Oct. 2009 | 804.96 | |
| THIRD INVESTMENT WAVE | | | | | |
| *Solar Solution Puglia SRL* | 6 Dec. 2013 | 30 June 2009 | Plant 1 *Martano*: 30 Mar. 2012 | 991.76 | Energy Account IV (Min. Decree 5 May 2011) |
| | | | Plant 2 *Castrignano*: 30 Nov. 2011 | 906.20 | |

<u>GSE Conventions on Feed-In Tariffs</u>

**153.** Each invested PV company concluded with the GSE Conventions on feed-in tariffs for each of their PV plants ("**GSE Conventions on feed-in tariffs**").  For example, because the SPV *Acquaviva SRL* possessed two plants *Acquaviva 1* and *Acquaviva 2*, *Acquaviva SRL*  received two different GSE letters[75] of admission to the relevant feed-in tariff and concluded two different GSE Conventions on feed-in tariffs under the applicable Energy Account regime.

**154.** Each GSE Convention on feed-in tariffs contained information on the PV plant receiving the tariffs, including *(a)* its nominal power capacity, *(b)* the Ministerial Decree applying to the plant, *(c)* the applicable feed-in tariff, *(d)* the possibility of assignment of future credits, *(e)* the Convention's duration, *(f)* the choice of forum, and *(g)* other final provisions.  The

---

[75] For an example of a GSE admission letter to the feed-in tariff, *see* <u>Exhibit C-20RM</u> (<u>Hearing Bundle, vol. 4, Tab 20</u>) (This admission letter relates to the feed-in tariff of € 0.3550/kWh granted to the PV plant *Acquaviva 2* belonging to the PV invested company *Acquaviva SRL*).

GSE Convention concluded by the PV company *Acquaviva SRL* in relation to its plant *Acquaviva 1* illustrates this, as follows:[76]

*Tariffs Photovoltaic Convention*

*Convention n. I08F06196607 for the recognition of incentive tariffs for the production of electric energy from photovoltaic plants pursuant to Ministerial Decree 19 February 2007, and resolution of electric energy and gas authority n. 90/07*

*With this Convention*

*Between*

*The Italian Electric Services - GSE S.p.a., […]*

*And*

*ACQUAVIVA S.P.A., with its registered office in Via DURINI, 18, Milan, Tax Code and VAT No. 06257020963, represented by Mr. LUCA FAEDO, born in Vicenza (VI) 06.02.1963 ( data format inglese), acting as legal representative and responsible of the photovoltaic plant above mentioned convention, hereinafter called "Producer" hereinafter, jointly, also called "the Parties"*

*whereas*

*- As requested, according to GSE protocol 09.30.2009, it was sent an application for "incentive rate" provided by Ministerial Decree 19 February 2007, for the photovoltaic plant defined ACQUAVIVA, rated power of 992,84 kW, located in San Domenico n.snc. Comune di Acquaviva delle fonti (BA);*

*- This application for the incentive rate is identified by GSE with the n. 103172;*

*- The GSE, with its own letter transmitted to the Producer, has communicated the value of incentive rate, recognized for the photovoltaic plant mentioned above, equal to 0,3530 E/kWh; […]*

*Article 1*

*Scope of this Agreement*

*The scope of this Convention is the grant by the GSE to the Producer, of the incentive for the electrical energy produced by solar energy*

---

[76] S*ee* <u>Exhibit C-21M</u> (<u>Hearing Bundle, vol. 3, Tab 18</u>).

*through photovoltaic conversion incentivized by Article 7 of D.lgs.387/03, Ministerial Decree 19 February 2007 and Resolution n.90/07.*

## Article 2

### Effective date and the amount of incentive

*The incentive tariff is granted in respect to the photovoltaic plant which is the object of this Convention for a period of 20 years starting from 4 August 2009 at a constant amount, in the current currency, is equal to amount of , 0,3530 Euro/kWh.*

## Article 3

### Procedure of the release for incentive tariffs

*The payment of incentive tariffs will be performed by GSE on the basis of the measures provided for the in the resolution of A.E.E.G. n.88/07, and in accordance with the payment procedures governed by the resolution n.90/07. […]*

## Article 4

### Assignment of credits

*The GSE will proceed to fulfil its own payment obligation of the credits towards the assignee subject to the following conditions:*

*a) The assignment of credits concerns all the remaining credits held by the transferor to the GSE;*

*b) The credits will be assigned to a single assignee;*

*c) The assignment of credits contract:*

*(i.) Shall be entered into after this Convention;*

*(ii.) Shall drawn up exclusively in accordance with specific provision of the standard model published on GSE's web site www.gse.it), the contents of which may not be modified in any part;*

*(iii.) Shall be notarized by public agreement or executed as a private agreement authenticated by notary, pursuant to Article 69 of D.R. n. 2440/1923, and sent to the GSE by registered letter (Raccomandata A/R);*

*(iv.) has got this Convention as annex, as integral and substantial part of that assignment of credits;*

*(v) The notification to GSE has to be accompanied by the express and informed consent of the assignor in respect of personal data by the assignor, pursuant to Article 23 of D.lgs. 196/03, in order to allow the GSE to proceed to assess the assignor, according to Article 48 bis of D.P.R. 19 September 1973, n. 602, when the assignment of credit is notified;*

*d) The verification, provided for in point c) (v) shall have a positive outcome (notably there will not be any failure of the obligation to pay taxes);*

*e) The assignment of credits has to be expressly accepted by the GSE using registered letter (Raccomandata A/R) sent to assignor and assignee;*

*The acceptance of the credits assignment does not affect the GSE's right to oppose against the assignee the set-off that GSE would have been able to claim against the assignor.*

*The possible re-assignment of remaining credit to previous assignor has to be:*

*(a. 1) in the same form as the assignment of credits was written the first time, this implies:*

*(i) drafted by notarised public act or private agreement authenticated by notary;*

*(ii) drawn up exclusively filling the ad hoc field, of standard model published on GSE's web site (www.gse.it) which contents may not be changed in any part;*

*(b.1) undersigned by both parties; G. Supplementary Documents Page 20556 of (c.1) notified to GSE using registered letter (Raccomandata A/R) and the new bank account requested for the credits payment;*

*(d.1) expressly accepted by the GSE through registered letter (Raccomandata A/R) to the parties;*

*The re-assignment of remaining credits, will not change the GSE's right to claim, against the previous assignor, a set-off that GSE would have been able to claim against the assignee.*

*The GSE will pay the remaining credits to the original creditor from the second month subsequent to that of acceptance of the re-assignment of credits.*

*The above provisions of this article will be applied also if the credit assignment is made by the assignee to third parties, with the exception of point c (ii) and a.1 (il)*

*The conditions laid down in paragraph 1, with the exception of point c. (ii), and laid down in paragraph 3, with the exception of point (a.2), of this article will be applied also in case of:*

*(a.2) collection mandate (revocable/irrevocable) given to third parties;*

*(b.2) transfer in pledge of credits.* […]

*Article 8*

*Effective date and duration*

*This Convention will be effective from 4 August 2009 and will terminate on 3 August 2029.*

*This Convention will terminate by law and will be declared ineffective between the parties if the Producer falls under any case of termination pursuant to Article 10 of Law n. 575/1965 as subsequently amended and integrated, or if the aforementioned situation provided for by Article 10, Paragraph 3 of Resolution n.90/07 occurs.*

*Article 9*

*Jurisdiction*

*Any proceedings deriving from or in any case connected to the interpretation or the execution of this Agreement and connected documents shall be settled before the Court of Rome.*

*Article 10*

*Completion of this Convention*

*For the completion of this Convention the Producer has to print, from the web site, the specific Declaration of Acceptance and send it to GSE, signed with the attached copy of his own valid document.*

*This Convention will be effective once the GSE accepts the mentioned Declaration, making available on the website the copy for the Producer, undersigned by its own legal representative.*

*Following the entrance into legal force of this convention, any possible agreement to amend or add the content of the Convention, shall be a nullity unless agreed in writing.*

*The parties are aware that every declaration originating from this Convention are given pursuant to DPR. 445/00.*

*In accordance with Clause 1341 and 1342 of the Italian Civil Code, the Parties specifically approve the following Clauses, after having carefully reviewed them:*

*Article 2 "Effective date and value of incentive", 3 "Procedure for the release of the incentive tariffs", 4 "Assignment of credits", 5 "Liability", 9 "Jurisdiction", 10 "Completion of this Convention", provided by this Convention.* […]

155. Article 4 above expressly provided for the possibility of assignment of future receivables of the SPV founded on the feed-in tariffs granted under the GSE Convention. In this respect, Belenergia explains that it assigned most of these receivables to banks to help finance its investment; the GSE Conventions' income stream served as the basis for the receivables' assignment as a collateral for bank loans.[77]

156. For example, Recital (e) of the Assignment Agreement of receivables generated by the PV plant *Faggiono 1,* owned by *Casamassima Solare SRL*, expressly provided that the banks (assignees) sought to acquire through this Agreement "*all the pro solvendo receivables, present and future, due to the Assignor from* [the] *GSE under the Agreement as a collateral for the loan agreed between* [Casamassima Solare SRL] *and* [the banks]." Among other

---

[77] Statement of Claim, ¶ 135. For the agreements on the assignment of receivables, *see* Exhibit C-25M (Hearing Bundle, vol. 3, Tab 21). This translated document illustrates the agreement on assignment of receivables of PV plant *Faggiano 1* concluded by the invested PV company *Casamassima Solare SRL* on one side, and Banca Infrastrutture Innovazione e Sviluppo SpA and Banco di Napoli SpA on the other. For the loan agreements requiring the assignment of GSE Conventions' receivables as a collateral, *see* Exhibit C-25M. For example, Section 9.1(h) of the Loan Agreement concluded on 14 December 2010 between *Casamassima Solare SRL* on the one side, and *Banca Infrastrutture Innovazione e Sviluppo SpA* and *Banco di Napoli Spa*, on the other side, reads that: "*Deed of Assignment for Receivables from Incentives and Permanent Mandate Agreement for Approved Receivables for Energy Withdrawal: the Beneficiary undertakes to sign the Deed of Assignment for Receivables from Incentives and Permanent Mandate Agreement for Approved Receivables for Energy Withdrawal, within 15 (fifteen) days, respectively, from the date of signing the GSE Agreement (Energy Service Provider) and the Agreement for Energy Withdrawal.*"

representations and guarantees provided by the banks, Section 4.3 of the Assignment Agreement stipulated that:

> *4.3 The Assignees also declare that they are aware that:*
>
> *(a) The assigned receivables are derived from the recognition in relation to the Assignor of subsidised rates to produce photovoltaic energy by the plant described in more detail in the Agreement;*
>
> *(b) The payment of subsidised rates, in other words the receivables assigned by virtue of this document, shall be performed by the GSE on the basis of the current measures defined in resolutions passed by the authority for electricity and gas.*[78]

157. Finally, the forum selection clause under Article 9 of the GSE Conventions on feed-in tariffs conferred jurisdiction upon Rome courts. The Parties disagree on whether this forum selection clause affects the Tribunal's jurisdiction (see below ¶¶ 206-214 and 260-279).

GSE Conventions on Minimum Prices

158. Moreover, each invested SPV with plants of up to 1MW adhered to the GSE's purchase regime in relation to each of the respective plants with of up to 1MW selling thus electricity directly to the GSE. Once having adhered to the GSE purchase regime, these PV companies concluded with the GSE Conventions on minimum prices ("**GSE Conventions on minimum prices**") in relation to each PV plant of up to 1MW, as follows:[79]

| Invested PV Company | Acquisition Date by Belenergia | Start of Operations | Nominal Power (kW) | Date of GSE Convention on minimum prices |
|---|---|---|---|---|
| FIRST INVESTMENT WAVE | | | | |
| *Casamassima Solare SRL* | 29 Sept. 2011 | Plant 1 *Leporano1*: 26 Aug. 2011 | 939.06 | 11 October 2011 |
| | | Plant 2 *Faggiano1*: 31 Aug. 2011 | 955.71 | 11 October 2011 |
| *Compgania Solare 1 SRL* | 29 Sept. 2011 | Plant 1 *Adelfia1*: 30 June 2011 | 937.02 | 6 October 2011 |

---

[78] Hearing Bundle, vol. 3, Tab 21 (Agreement on the assignment of receivables of PV plant *Faggiano 1* concluded by the invested PV company *Casamassima Solare SRL* on one side, and Banca Infrastrutture Innovazione e Sviluppo SpA and Banco di Napoli SpA on the other).

[79] This Table was prepared based on data contained in the Claimant's Power Point Presentation of 26 March 2018, Slides 23 to 25, and Exhibit C-26M.

| | | Plant 2 *Casamassima1* 30 June 2011 | 939.06 | 6 October 2011 |
|---|---|---|---|---|
| *Compagnia Solare 2 SRL* | 29 Sept. 2011 | Plant 1 *Ugento1*: 30 June 2011 | 996.87 | 6 October 2011 |
| *Compagnia Solare 3 SRL* | 29 Sept. 2011 | Plant 1 *Nardo1*: 27 June 2011 | 957.60 | 6 October 2011 |
| | | Plant 2 *Massafra1*: 30 Aug. 2011 | 946.68 | 11 October 2011 |
| SECOND INVESTMENT WAVE | | | | |
| *Società di Produzione Energia Solare SRL* | 29 April 2013 | Plant 1 *Taranto Masseria Giulianello*: 29 Feb. 2012 | 950.00[80] | 16 May 2011 |
| | | Plant 2 *Contrada Titolato*: 30 June 2011 | 916.88 | 11 October 2011 |
| | | Plant 3 *La Torrata*: 28 July 2011 | 917.61 | 11 October 2011 |
| *Solaria Real Estate SRL* | 9 July 2013[81] | Plant 1 *Racale500kW*: 18 Dec. 2008 | 504.00 | 8 April 2009 |
| | | Plant 2 *Brindisi300kW*: 1 Feb. 2009 | 302.40 | 15 April 2009 |
| | | Plant 3 *Brindisi250kW*: 1 Feb. 2009 | 252 | 10 April 2009 |
| *Acquaviva SRL* | 9 July 2013 | Plant 1 *Acquaviva 1*: 4 Aug. 2009 | 993.84 | 26 October 2009 |
| | | Plant 2 *Acquaviva 2* 3 Aug. 2009 | 596.64 | 26 October 2009 |
| *Brindisi Solar SRL* | 9 July 2013 | Plant 1 *Racale498*: 15 Oct. 2009 | 498.96 | 11 January 2010 |
| | | Plant 2 *Brindisi805*: 28 Oct. 2009 | 804.96 | 22 January 2010 |
| THIRD INVESTMENT WAVE | | | | |
| *Solar Solution Puglia SRL* | 6 Dec. 2013 | Plant 1 *Martano*: 30 Mar. 2012 | 991.76 | 30 May 2012 |
| | | Plant 2 *Castrignano*: 30 Nov. 2011 | 906.20 | 20 March 2012 |

---

[80] *See* <u>Exhibit C-26M</u>, p. 92 of pdf.

[81] *See* <u>Exhibit C-RFA-I-2</u>, p. 135 of pdf.

159. As set out in the table above, Belenergia's PV invested companies concluded GSE Conventions on minimum prices between April 2009 and May 2012 on the basis of the "*retiro dedicato*" regime established by Legislative Decree No. 387/2003, implemented by AEEG resolutions.  For example, the GSE Convention on minimum prices concluded by the PV company *Acquaviva SRL* in relation to the plant *Acquaviva 1* contained provisions *(a)* identifying the PV plant and its power in kW; *(b)* determining the applicable AEEG Resolution; *(c)* fixing the conditions for delivering electricity and the electricity price; *(d)* prohibiting assignment of credits founded on the minimum price incentives; *(e)* determining the Convention's duration; *(f)* setting forth rules on termination and on the choice of forum, as follows: [82]

*Agreement Concerning the Purchase ("Ritiro") of Electric Energy Pursuant To Article 13, Paragraphs 3 And 4, of Legislative Decree No. 387/03 And Article 1, Paragraph 41 Of Law No. 239/04*

*Procedure Number: Rid 006952*

*With this Agreement*

*The Italian Electric Services - GSE S.p.a.,* […]

*And*

*Acquaviva S.R.L.,* […] *hereinafter called "Producer" hereinafter, separately or jointly, also called the Party or the Parties,*

*whereas*

*- Legislative Decree December 29, 2003, No. 387 (hereinafter Legislative Decree No. 387/03), at Article 13, Paragraphs 3 and 4, provides that the Italian Energy and Gas Authority (hereinafter the "Authority") sets the ways for purchasing "per il ritiro" electric energy, referring to the economic conditions of the market;* […]

*- the Producer operates the photovoltaic plant fed by solar source so called ACQUAVIVA1, located in the Municipality of Acquaviva delle fonti (BA), with an installed power equal to 993,84 KW and to KVA, and*

---

[82] S*ee* <u>Exhibit C-26M</u> (<u>Hearing Bundle, vol. 3, Tab 22</u>).

*that this plant is defined as not programmable pursuant to the resolution AEEG No. 111/06;*

*- the Producer submitted the application "istanza" to the GSE for purchasing "per il ritiro" of the electric energy, pursuant to Article 13, Paragraphs 3 and 4, of Legislative Decree No. 387/03 and Article 1, Paragraph 41, of Law No. 239/04; […]*

*Article 1*

*Object of this Agreement*

*This Agreement has as its object the regulation of the technical-economic[] conditions of the purchase "ritiro", by the GSE, further to the request of the Producer, for electric energy in accordance with Article 13, paragraphs 3 and 4, of Legislative Decree No. 387/03 and/or Article 1, Paragraph 41, of Law No. 239/04, produced and injected into the grid by the forementioned plant, as well as the economic conditions referring to the transportation and displacement in injection "dispacciamento in immissione" services.*

*Article 2*

*Delivery of electric energy to the GSE*

*The electric energy which is the subject of this Agreement is the entire amount of the electric energy injected into the grid, equal to the gross energy produced by the plant, net of the energy taken by the auxiliary services, by the workshop, if any, by the self-used electric energy "autoconsumata", by the losses of transformation and of line up to the point of delivery to the grid and by the energy sold in accordance with the long-term agreements mentioned by Article 13, Paragraphs 3 and 4, of Legislative Decree No. 387/03 and/or Article 1, Paragraph 41, of Law No 239/04. This electric energy is deemed delivered to the GSE at the point of interconnection to the electric grid, competence of Enel Distribution S.p.a., located in the Municipality of Acquaviva delle fonti (BA), with voltage equal to 20 kV.*

*The produce Breaches of the rules referring to the operating by the Producers shall be deemed to be of the exclusive liability of the Producer himself.*

*Possible amounts of energy taken by the grid are the subject of separated commercial agreements not entered into with the GSE and not regulated by this Agreement.*

*With regard to the consideration, the electric energy injected into the grid and the subject of this Agreement is increased, in the case of points*

*of injection in low and medium voltage, of a one percentage factor pursuant to the same ways provided for in Article 12, Paragraph 6 letter a), of Attachment A of the resolution AEEG No. 111/06 and subsequent modifications and integrations.* […]

### Article 4

### Considerations for the purchase "ritiro" of the energy and considerations for covering the costs borne by the GSE for the access to the regime, so called "Regime Dedicato."

*The prices given by the GSE to the Producer for the purchasing ("per il ritiro") of the energy which is the subject of this Agreement are defined in Articles 6 and 7 of the resolution AEEG No. 280/07 and subsequent modifications and integrations.*

*The prices due from the Producer to the GSE in order to cover the administrative costs for the access to the regime so called "regime dedicato" are defined in article 4, paragraph 2 letter e), of the resolution AEEG No. 280/07 and subsequent modifications and integrations.*

### Article 5

### Considerations for the transmission service

*The considerations for the transmission service are regulated between the Producer and the SE in accordance with Article 4, Paragraph 2 letter b), of the Resolution AEEG No. 280/07 and any future possible modifications and addition.*

### Article 6

### Considerations of imbalance "sbilanciamento" referring to plants fed by programmable sources

*With regard to plants fed by programmable sources, the considerations of imbalance "sbilanciamento" are regulated between the Producer and the GSE pursuant to article 8 of the resolution AEEG No. 280/07.* […]

### Article 9

### Assignment of credits and payments

*The credits generated from this Agreement cannot be object of credit assignment or pledge.* […]

*Article 13*

*Effective Date and Duration of the Convention*

*This Agreement will be effective from 4 August 2009.*

*The Parties agree to tacitly renovate this Agreement yearly, registered letter with receipt, except in case of termination to be communicated by the Producer, to the GSE, with a registered letter with at least 60 days in advance in respect to the termination.*

*In case of early withdrawal during the year, the GSE can start a new Convention for the purchasing (ritiro dedicato) of energy, exclusively in the subsequent year of the withdrawal.*

*Article 14*

*Resolution, withdraw and suspension of the Convention*

*This Convention shall be considered terminated and shall not be deemed in force between the Parties if the Producer breaches the provisions of Clause 10 of Law 575/1965 as amended and integrated.*

*In case of non-fulfilment of obligations provided for this Agreement, in case of changes, amendments related to the requested authorization for the exercise of the plant, in case of appeal actions against the authorisation, or in case of Authority's provisions that affect the availability, functionality or productivity of the plant, the GSE has the right to suspend the contract, as well as to terminate the contract, without prejudice to its right for damages and the recover, including by adjustment between the bills related to different pending contract relationship, of any advantage wrongly received by the producer.*

*Pursuant to Point 6 of Resolution AEEG ARG/elt 4/10, the GSE has the right to terminate the underwritten agreement by the producer related to the productive unit mentioned in the Point 5 of Resolution ARG/elt 4/10 in case of non-fulfilment to the provision of that resolution.*

*The Producer is enabled to terminate this Agreement by registered letter giving notice at least 60 days in advance from the date in which the Producer intends terminate this Agreement.*

*If one of the condition listed for the release of "regime dedicato" will be not valid anymore, this Agreement will terminate according to article 1456 civil code.*

*Article 15*

*Competent jurisdiction*

*Any proceedings deriving from or in any case connected to the interpretation or the execution of this Agreement and connected documentation shall be settled before the Court of Rome.*

*Article 16*

*Amendment and renvoi*

*The premises are integral and substantial part of this Agreement.*

*In relation to any matters not expressly included in this Agreement, the Parties agree to refer to the resolution AEEG n. 280/07, the Applicable Law concerning the interconnection of the plants to the grid and electric energy, and if applicable, the provisions of the Italian Civil Code.*

*The GSE has the discretion to modify the Agreement's clause according to potential changes and updates introduced* [to] *resolution AEEG 280/07, with prejudice to the possibility for the producer to terminate this contract relationship according to Article 14.*

*The producer is aware that every declarations originating from this Convention are provided pursuant to DPR 445/00.* […]

160. Nine of ten Belenergia's PV companies benefited from minimum prices extending through different periods starting with the conclusion of the respective GSE Convention until the minimum price reduction by AEEG Resolution No. 618/2013[83] and the final cut by the *Destinazione Italia* Decree by the end of the same year.

161. The forum selection clause under Article 9 of the GSE Conventions on minimum prices conferred jurisdiction upon Rome courts. The Parties disagree on whether this forum selection clause affects the Tribunal's jurisdiction (see below ¶¶ 206-214 and 260-279).

162. Finally, Parties disagree on the private or public character of the GSE Conventions, and on whether these Conventions are "accessory" to public regulatory acts, referring and citing to Italian courts' decisions on the Conventions (the Parties' position is summarised below in ¶¶ 431-443 and 505-511).

---

[83] Exhibit C-RFA-II-16 (Hearing Bundle, vol. 2, Tab 23).

## IV.   THE PARTIES' REQUESTS FOR RELIEF

### A.  The Claimant's Request for Relief

**163.**  The Claimant's request for relief appears in its Statement of Claim, not modified thereafter:

> *222. In view of the above, the Claimant hereby requests that the Tribunal:*
>
> *a. Declare that the Respondent has breached its obligations under Articles 10(1), (2) and (3) ECT as set out in Part V above.*
>
> *b. Award the Claimant damages in compensation for losses suffered as a result of these breaches as set out in Part IV above, plus interest thereon from the due date for payment of such damages until the actual date of payment.*
>
> *c. Order the Respondent to pay all costs incurred in connection with these arbitral proceedings, including the administrative costs of ICSID, the fees and costs of the arbitrators and all legal and other expenses incurred by the Claimant, including the fees of its legal counsel, experts and consultants, plus interest thereon from the date on which such costs are incurred by the Claimant until the date of payment.*
>
> *223. For the avoidance of doubt, the Claimant reserves the right to amend the relief sought in light of the submission of further claims against the Respondent, the amending, supplementing, or augmenting of any of its claims here submitted, or the submission of counterclaims by the Respondent.*[84]

### B.  The Respondent's Request for Relief

**164.**  Italy's most recent request for relief appears in its Post-Hearing Brief, as follows:

> *In jurisdiction and admissibility,*
>
> *A. Decline jurisdiction to decide, as the ECT does not cover intra-EU disputes.*
>
> *B. Alternatively, decline jurisdiction over the totality of claims, since:*
>
> *a) as for feed-in tariffs (and minimum guaranteed prices), the requirement of unconditional consent under Article 26 ECT is not*

---

[84] Statement of Claim, ¶¶ 222-223.

*satisfied as the GSE Conventions contain exclusive jurisdiction clauses in favour of domestic courts;*

*b) the measures on imbalance charges are exempted under Article 21 ECT, and*

*c) no amicable solution has been attempted for measures on imbalance charges, should these not be considered as covered by Article 21 of the ECT.*

*C. In a further alternative, decline admissibility of protection of the Claimant alleged interests as this is barred from seeking relief, since*

*a) an exclusive forum clause was selected between the Claimant and the GSE in the GSE Conventions, and*

*b) the Claimant did not seek amicable solution for the claim on imbalance charges.*

*Should the Tribunal retain to have jurisdiction over the case and that claims be either totally or partially admissible*

*D. Declare, on the merits, that the Respondent did not violate Article 10(1) ECT, first and second sentence, since it did not fail to grant fair and equitable treatment to the Claimant's investment.*

*E. Declare, on the merits, that the Respondent did not violate Article 10(1) ECT, third sentence, second part, since it always adopted reasonable and non-discriminatory measures to affect Claimant's investment.*

*F. Declare, on the merits, that Article 10(1) ECT, last sentence (the so-called "umbrella clause") does not apply in the case at stake, or, alternatively, that the Respondent did not violate it neither through statutory or regulatory measures, nor the GSE Conventions.*

*G. Declare, on the merits, that Article 10(1) ECT, third sentence, first part, does not apply to the case at stake or, alternatively, that the Respondent did not violate it.*

*H. Declare, on the merits, that Article 10(2) and (3) ECT does not apply to the case at stake, or alternatively that the Respondent did not violate it since it never adopted discriminatory measures to comparable situations unduly benefitting Italian investors.*

*Consequently,*

*I. Declare that no compensation is due.*

> *In the unfortunate event that the Tribunal were to recognise legitimacy to one of the Claimant's grievances,*
>
> *J. Declare that damages were not adequately proved.*
>
> *K. Declare that both the method for calculation and the calculation itself of damages proposed by the Claimant are inappropriate and erroneous.*
>
> *In all cases,*
>
> *L. Reduce proportionally any eventually recognised damages to conform to the fact that in the Reply the Claimant abandoned its claims on both guarantee minimum prices and imbalance costs.*
>
> *M. Order the Claimant to pay all relevant expenses and disbursements by the Respondent because of these proceedings in accordance with ICSID Arbitration Rules.*[85]

## V.    JURISDICTION AND ADMISSIBILITY

**165.**    The following provides an overview of the Parties' respective claims and defences.  This summary has been prepared to set in context the decisions made by the Tribunal in this Award, and is not an exhaustive description of the arguments presented during this arbitration through the written and oral submissions of the Parties.  The fact that a particular submission is not expressly referenced below should not be taken as any indication that it has not been considered by the Tribunal.

### A.    <u>The Respondent's Position</u>

**166.**    Italy states that some of its jurisdictional objections have been interpreted at times as "admissibility" objections by the Claimant.  Should this be the case, the Respondent submits that such jurisdictional objections also serve as grounds for non-admissibility.[86]

### (1) The ECT Does Not Apply to Intra-EU Disputes

**167.**    The Respondent claims that the ECT does not apply to intra-EU disputes, the appropriate forum for Belenergia's claims being Italian courts that could eventually refer the question of

---

[85] Respondent's Post-Hearing Brief, ¶ 232.
[86] Statement of Defense, ¶ 35.  *See also* Respondent's Rejoinder, ¶ 55; Respondent's Post Hearing Brief, ¶ 231.

ECT's applicability to intra-EU investors to an ECJ's preliminary ruling. Italy's EU jurisdictional objection on this basis is grounded as follows: *(a)* the ECT's interpretation under international law in view of the pre-existing Treaty establishing the European Community ("**EC Treaty**") prevents ECT application to intra-EU disputes; *(b)* the EU's evolution affects ECT application under international law on treaty succession; *(c)* the EU legal order already protects foreign investment; and *(d)* the ECJ's decision in *Slovak Republic v. Achmea* confirms that this Tribunal lacks jurisdiction.

### *(a) The ECT's interpretation under international law in view of the pre-existing EC Treaty prevents ECT application to intra-EU disputes*

168. In a preliminary note, Italy states that it is undisputed *(a)* that the EU Member States involved in this arbitration were Members of the European Community ("**EC**") at the time of ECT's adoption; and *(b)* that the EC (now the EU) and the EU Member States are bound by ECT obligations under international law.[87]  Italy adds that it has never agreed or acquiesced to ECT jurisdiction; neither has any other Member State.[88]

169. According to Italy, the Parties disagree on the extent that ECT obligations bind the EU and its Member States *inter se*.  In Italy's view, this is a question "*of intent*."[89]  It rejects the ECT's interpretation proposed by Belenergia.[90]

170. The Respondent submits that the ECT should be interpreted "*in good faith, in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose*" under Article 31 of the Vienna Convention on the Law of Treaties[91] ("**VCLT**").[92]  It adds that treaty interpretation may include recourse to supplementary means of interpretation under Article 32 VCLT.[93]

171. Italy cites the definitions of "Contracting Party," "Regional Economic Integration Organization," and "Area" under Articles 1(2), 1(3) and 1(10) ECT when arguing that the

---

[87] Statement of Defense, ¶ 38.
[88] Respondent's Post Hearing Brief, ¶¶ 204-205.
[89] Statement of Defense, ¶ 38.
[90] Respondent's Rejoinder, ¶ 59.
[91] Vienna Convention on the Law of Treaties of 23 May 1969 (Exhibit RLA-3).
[92] Statement of Defense, ¶¶ 39, 41.  *See also* Respondent's Rejoinder, ¶ 59.
[93] Statement of Defense, ¶ 40.

ECT's interpretation should consider the overlapping areas between the EU and its Member States.[94]    In its view, the EU's internal allocation of competences notwithstanding geographical boundaries bears on external competences and on the ECT's interpretation.[95]

172.  The Respondent also relies on Article 25 ECT, stating that the EU treaties are an "Economic Integration Agreement" ("**EIA**") having the same subject-matter of the ECT, "*substantially liberalizing [...] trade and investment.*"[96] Also, under Article 25 ECT the EU Member States have adopted a "*preferential treatment*" that prevails and is recognised by the ECT.[97]

173.  Moreover, Italy submits that Article 16 ECT provides for a "*conflict rule*" meaning that "*nothing in Part III or V of the ECT* [can] *be construed to derogate from any provision of the EU Treaties as for investment promotion and protection, or from any right to dispute resolution* [under EU law].*"*[98]  The Respondent rejects the Claimant's proposed reading of Article 16 ECT,[99] stating that a "*systematic*", "*good faith*" interpretation[100] of the ECT's text suggests that:

> [...] *the EU is recognized by the ECT as a unified legal system, based on an international treaty whose provisions on the same matters as those covered by the ECT prevail over the ECT itself, and consequently that Contracting Parties signed the ECT under the mutual understanding that this would not apply to intra-EU situation.*[101]

174.  If the Tribunal finds that the ECT's textual interpretation is not sufficiently clear, Italy argues that the ECT's context shows that it does not apply to intra-EU disputes.  Italy states that Decision in Annex 2(5) ECT[102] on Articles 24(4)(a) and 25, and the EU's and Member States' Declaration on Article 25[103] provide context to this interpretation.

---

[94] Statement of Defense, ¶ 45.

[95] Statement of Defense, ¶ 45.

[96] Statement of Defense, ¶ 47.

[97]  Statement of Defense, ¶ 48.

[98] Statement of Defense, ¶¶ 49-50.

[99] Respondent's Rejoinder, ¶ 60.

[100] Statement of Defense, ¶ 52.

[101] Statement of Defense, ¶ 51.  *See also* Respondent's Post Hearing Brief, ¶ 207.

[102] Decision 5 of Annex 2 to the Final Act of the European Energy Charter Conference (Exhibit CL-2M).

[103] Declaration 5 of the Final Act of the European Energy Charter Conference (Exhibit CL-2M): "*The European Communities and their Member States recall that, in accordance with article 58 of the Treaty establishing the European Community: a) companies or firms formed in accordance with the law of a Member State and having their registered office, central administration or principal place of business within the Community shall, for the right of*

175. In the Respondent's view, the combined reading of ECT's Annex 2(5) Decision and of Article 25 Declaration on EIA treatment to investments of investors of non-EU Contracting Parties with EIA presence supports its position. Accordingly, this Decision (confirmed by the Declaration) approves that an investor of a non-EU Party with presence in the EIA "*would have no right to apply Article 26* [ECT] *to protect its position, but would be covered by EU law and refer to* [EU dispute resolution] *mechanisms*."[104] Italy adds that the language of the Article 25 Declaration suggests that it relates to "investments."[105]

176. As preparatory work relevant to ECT's interpretation, Italy refers to the 1991 European Energy Charter[106] that sought to "*integrate the energy sector of the Soviet Union and Eastern Europe countries at the end of the Cold War with that of Europe.*"[107] Article 2 ECT refers to the "*objectives and principles*" of the Charter in the following terms:

> *This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.*

177. Italy adds that the recitals[108] of the European Energy Charter distinguish between the EU's internal market on energy within the EU, on one hand, and the ECT's adoption, on the other.[109] In addition, at the ECT's conclusion several EU Directives in the energy sector had

---

*establishment pursuant to Part Three, Title III, Chapter 2 of the Treaty establishing the European Community, be treated in the same way as natural persons who are nationals of Member States; companies or firms which only have their registered office within the Community must, for this purpose, have an effective and continuous link with the economy of one of the Member States; (b) 'companies and firms' means companies or firms constituted under civil or commercial law, including cooperative societies, and other legal persons governed by public or private law, save for those which are non-profitmaking. The European Communities and their Member States further recall that: Community law provides for the possibility to extend the treatment described above to branches and agencies of companies or firms not established in one of the Member States; and that, the application of Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities.*"

[104] Statement of Defense, ¶ 55, *see also*, ¶¶ 56-57.

[105] Statement of Defense, ¶ 58.

[106] European Energy Charter (Exhibit CL-2M).

[107] Statement of Defense, ¶ 60.

[108] European Energy Charter (Exhibit CL-2M): "[…] *Certain that taking advantage of the complementary features of energy sectors within Europe will benefit the world economy; persuaded that broader energy cooperation among signatories is essential for economic progress and more generally for social development and a better quality of life*; […] *Assured of support from the European Community, particularly through completion of its internal energy marke*t;" *See,* Statement of Defense, footnote 14.

[109] Statement of Defense, ¶ 61.

already been or were to be adopted (e.g. Directive 90/547/EEC[110] and Directive 91/296/EEC[111]).[112]  To illustrate, the European Commission's 1992 Proposal on common rules for the internal electricity market provided in its Article 26[113] a specific dispute settlement provision for "*disputes* […] *between an investor and a Member State.*"[114]

178.  Italy differs with Belenergia that ECT-related documents at its adoption indicate that the ECT was to apply generally and to intra-EU disputes.  In its view, the absence of an express exclusion [disconnection clause] cannot result in an ECT's wide application.[115]

179.  Italy rejects Belenergia's argument that "*unanimous case law confirms the ECT's application to intra-EU disputes.*"[116]  In its view, the Claimant relies on four to five decisions of dozens of pending arbitrations; these decisions mainly discuss the compatibility between Article 26 ECT and Articles 267 and 344 of the Treaty on the Functioning of the European Union ("**TFEU**"), but not all international law arguments made in this arbitration.[117]

180.  According to the Respondent, practice also shows that the ECT does not cover intra-EU disputes, because *(a)* no intra-EU investment disputes had been instituted under the ECT before the *Electrabel v. Hungary* arbitration in 2007; *(b)* no intra-EU investment dispute between EU Member States that were ECT Parties at its conclusion had been raised until today; *(c)* EU Member States have consistently objected to ECT arbitral jurisdiction, the European Commission having applied to intervene as *amicus curiae*.  Because the ECT does not apply *ab initio* to intra-EU matters, Italy concludes that Article 26 ECT is not a valid legal basis for this arbitration.[118]

---

[110] Council Directive 90/547/EEC of 29 October 1990 on the transit of electricity through transmission grids.

[111] Council Directive 91/296/EEC of 31 May 1991 on the transit of natural gas through grids.

[112] Statement of Defense, ¶ 62.

[113] European Commission's Proposal for a Council Directive concerning common rules for the internal market in of 24 February 1992 (Exhibit REX-3), Article 26: "*Member States shall establish a dispute resolution procedure by which the parties can settle disputes on matters covered by this Directive.*"

[114] Statement of Defense, ¶ 62.

[115] Respondent's Rejoinder, ¶ 72.

[116] Respondent's Rejoinder, ¶ 74.

[117] Respondent's Rejoinder, ¶ 75-76.

[118] Statement of Defense, ¶ 67.

### (b) The EU's evolution affects ECT application under international law on treaty succession

181. Italy further submits that the EU has evolved in a way that prevents the ECT's application to intra-EU disputes. While energy is a shared internal competence, the Lisbon Treaty "*strongly modified the balance of external competences of Member States and the Union.*"[119] As a result, the "*original allocation of competences*" justifying participation of the EU and the Member States at the time of ECT's adoption has changed with the EU requiring further uniformity of its legal order.[120] The Respondent states that the ECT as a mixed agreement is part of the EU legal order applying within the EU subject to the ECJ's guardianship.[121] It argues, however, a potential ECT inconsistency with the EU's non-discrimination principle.[122]

182. As for Article 30 VCLT on successive treaties, Italy argues that the Lisbon Treaty prevails over the ECT provisions because both instruments cover the same subject-matter. Italy relies[123] on the 2006 ILC Study Group Report on Fragmentation of International Law ("**ILC Report on Fragmentation**") to argue that the Lisbon Treaty and the ECT have the same subject-matter. The Respondent explains that Article 30 VCLT does not require "*exact coincidence of provisions or even objectives*;" it suffices that EU and ECT provisions equally cover integration efforts and investor protection, being "*institutional*[ly] *linked*." [124]

183. Italy also submits that the so-called "*conflict rule*" under Article 16 ECT favours the intra-EU jurisdictional objection, EU law being more favourable to investors than the ECT. It highlights that Article 16 ECT concerns *inter se* agreements between some of the parties on topics in Parts III and V of the ECT on protection standards and dispute settlement. Accordingly, by ratifying the ECT third States accepted that EU law exclusively applied between EU Member States in intra-EU situations.[125] This interpretation is, according to

---

[119] Statement of Defense, ¶ 73.
[120] Statement of Defense, ¶¶ 74-75.
[121] Statement of Defense, ¶ 76.
[122] Statement of Defense, ¶ 77.
[123] *See* Statement of Defense, ¶¶ 80-81.
[124] Statement of Defense, ¶¶ 79-82, citing Exhibit RLA-5, ¶¶ 253-254.
[125] *See* Respondent's Post Hearing Brief, ¶¶ 211-212.

Italy, favoured by Article 30(2) VCLT[126] providing that "[w]*hen a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail*."[127]

184. Italy asserts that intra-EU questions falling under the ECT are subject to EU law under Articles 30(3) and 30(4)(a) VCLT, while extra-EU questions under the ECT are subject to the ECT under 30(4)(b) VCLT.[128]  The Respondent adds that the argument that Article 307 EC on Previous Agreements of Member States (now Article 351 TFEU) trumps Article 16 ECT cannot prevail because Article 307 only applies to treaties prior to 1958 between the original EU Member States (as in this arbitration).[129]

185. Finally, Italy argues that the Lisbon Treaty is "*a perfectly legitimate* inter se *agreement derogating from the general rules of the ECT by reinforcing the treatment of investors and investments within the EU.*"[130]   Article 41(1)(a) VCLT permits this *inter se* agreement between EU Member States parties to the ECT, which is exempt from any Article 41(2) VCLT notification.[131]

186. Moreover, Italy relies on the combined reading of the applicable law clause Article 26(6) ECT providing that an ECT tribunal shall decide "*the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*" and the offer to arbitrate under Article 26(3).  According to Italy, EU law applies to the issues in dispute within the meaning of "*applicable rules and principles of international law*," making inapplicable Italy's and Luxembourg's offer to arbitrate under the ECT.[132]  Italy adds that

---

[126] Exhibit RLA-3.

[127] Statement of Defense, ¶ 83.

[128] Statement of Defense, ¶ 87.  *See*, Exhibit RLA-3, Article 30: "[…] *3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty. 4. When the parties to the later treaty do not include all the parties to the earlier one: (a) As between States parties to both treaties the same rule applies as in paragraph 3; (b) As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations*."

[129] Statement of Defense, footnote 29.

[130] Statement of Defense, ¶ 90.

[131] Statement of Defense, ¶¶ 91-95.

[132] *See* Respondent's Post Hearing Brief, ¶¶ 193-201.

the ECT offer to arbitrate is discriminatory against Italian nationals, thereby breaching EU law.[133]

187. The Respondent differs with the Claimant that Article 41 VCLT does not favour *inter se* obligations applying only between EU Member States parties to the ECT.[134] Firstly, the ECT does not prohibit agreement on special rules (which differ from treaty reservations).[135] Secondly, stronger EU rules as *inter se* obligations applying between Member States do not hinder ECT rights of non-EU Member States.[136] Thirdly, an *inter se* agreement does not affect non-EU investors' right to ECT arbitration.[137]

### (c) The EU legal order already protects foreign investment

188. Italy submits that EU law's specific features confirm that the ECT does not apply to intra-EU matters under international law. It explains that among the fundamental features of the EU legal order are the EU law's primacy over Member States law and the direct effect of EU provisions.[138] Further, the ECJ and national courts of Member States are the guardians of the EU legal order, cooperating between them through the use of preliminary rulings under Article 267 TFEU.[139] Another fundamental feature is "*mutual trust*" between EU Member States in the promotion of EU common values through their national legal systems and courts.[140]

189. Italy refers to the EU principle of conferral governing the attribution of internal and external competences between the Union and the Member States. The Respondent submits that energy is a shared internal competence and foreign direct investment is an exclusive internal competence since the Lisbon Treaty.[141] Under EU law, the Member States cannot *(i)* conclude international agreements affecting common rules, meaning that investment

---

[133] Respondent's Post Hearing Brief, ¶ 202.
[134] Respondent's Rejoinder, ¶ 65.
[135] Respondent's Rejoinder, ¶ 66.
[136] Respondent's Rejoinder, ¶ 67.
[137] Respondent's Rejoinder, ¶ 69.
[138] Statement of Defense, ¶ 98.
[139] Statement of Defense, ¶ 99.
[140] Statement of Defense, ¶ 102.
[141] Statement of Defense, ¶¶ 105-107.

promotion and protection and energy fall within EU's external competence,[142] and that "*Member States cannot invoke international agreements they have concluded between themselves to justify a failure to comply with Union law.*"[143]

190.  The Respondent argues that the internal market is an EU cornerstone.  According to Italy, the provisions on freedom of establishment and free movement of capital and payments prohibit *(i)* "*directly discriminatory measures by the host Member State,* inter alia, *in relation to investment;*" and *(ii)* "*any other restrictions, even those of non-discriminatory measures*" deterring establishment and investment from other Member States.[144]  Italy adds that EU freedom of establishment and free movement of capital provisions and the EU's Charter of Fundamental Rights protect EU investors' "*right to property*" against expropriation and "*freedom to conduct a business,*" subject to public policy, security and health restrictions under Articles 52 or 65 TFEU.[145]

191.  Italy disagrees with Belenergia that EU does not offer equivalent substantive or procedural protection.  In its view, the EU provides *(i)* for wide investor protection, including protection of legitimate expectations through the principles of reasonableness and proportionality of public acts; and *(ii)* for access to justice to national courts subject to ECJ's control ensuring predictability and the rule of law.[146]  Italy further submits that the *Achmea* decision highlighted that investors are not fully protected in investment treaty arbitration because arbitral tribunal cannot refer matters of EU law to the ECJ.[147]

192.  Finally, the Respondent adds that EU law has created a separate legal order[148] from those of the Member States forbidding them to agree on investment protection rules *inter se.*  Citing the decision in the *MOX Plant* (Commission v. Ireland) case, Italy alleges *(i)* that under Article 344 TFEU Member States cannot submit an intra-EU dispute to ECT arbitration; and *(ii)* that "*an international agreement cannot affect the allocation of responsibilities defined*

---

[142] Statement of Defense, ¶ 111.

[143] Statement of Defense, ¶113.

[144] Statement of Defense, ¶¶ 115-116.

[145] Statement of Defense, ¶¶ 118-123, citing the Charter of Fundamental Rights of the European Union (Exhibit REX-2A, Articles 16 and 17) and the TFEU (Exhibit REX-2C, Articles 52 and 65).

[146] Respondent's Rejoinder, ¶¶ 60-63.

[147] Respondent's Post Hearing Brief, ¶ 210.

[148] Respondent's Post Hearing Brief, ¶ 164.

*in the Treaties and, consequently, the autonomy of the Union's legal system, compliance with which is the task of the ECJ to ensure.*"[149]   Italy refers to the European Commission's statement on behalf of the Union when signing the 2015 International Energy Charter:[150]

> *It is declared that, due to the nature of the EU internal legal order, the text in Title II, Heading 4, of the International Energy Charter on dispute settlement mechanisms cannot be construed so as to mean that any such mechanisms would become applicable in relations between the European Union and its Member States, or between the said Member States, on the basis of that text.*

193.   Italy relies on the *MOX Plant* (Commission v. Ireland) case in which the ECJ found that by bringing an UNCLOS claim raising matters of EU environmental legislation against the United Kingdom, Ireland had breached Article 344 TFEU.[151]   Italy also cites ECJ's *Opinion 1/09* finding that the creation of a European and Community Patents Court was incompatible with EU law.[152]   The fact that the present dispute also concerns a private party is irrelevant.[153]

194.   Italy concludes that Italian courts are the "*appropriate forum*" for the Belenergia's claims.[154]

### (d)  The ECJ's decision in Achmea *confirms that this Tribunal lacks jurisdiction*

195.   Italy submits that the ECJ's decision in *Achmea*[155] confirms the Tribunal's lack of jurisdiction in relation to intra-EU disputes, which are non-arbitrable in light of the sincere cooperation duty of Member States under EU law.[156]   Italy refers to *Electrabel v. Hungary*, arguing that EU law is part of international law and therefore applicable to matters of jurisdiction and merits under Article 26(6) ECT.[157]

---

[149] Statement of Defense, ¶ 131.

[150] International Energy Charter of 20 May 2015.

[151] *See* Respondent's Post Hearing Brief, ¶¶ 165-169.

[152] *See* Respondent's Post Hearing Brief, ¶¶ 171-173.

[153] *See* Respondent's Post Hearing Brief, ¶ 174.

[154] Statement of Defense, ¶¶ 138-139, referring to the discussion in *Slovak Republic v. Achmea* before the ECJ.

[155] Exhibit CL-166.

[156] *See* Respondent's Post Hearing Brief, ¶ 177.

[157] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 4.

196. According to Italy, the *Achmea* decision confirmed that intra-EU investment arbitration is incompatible with EU law breaching Articles 267 and 344 TFEU and the autonomy principle of EU law, this arbitration being thus incompatible with EU law.[158]  The ECJ's reasoning in *Achmea* applies to arbitration under Article 26 ECT, the circumstances of this arbitration being identical to those of *Achmea* under Article 8 of the Netherlands-Slovakia BIT.[159] Italy adds that the ECT's multilateral character does not affect the bilateral character of the obligation to arbitrate under Article 26 ECT,[160] noting that *Achmea* generally referred to agreements concluded between the EU Member States and did not distinguish between BITs and mixed agreements like the ECT, let alone multilateral agreements.[161]

197. Moreover, Italy posits that the ECJ confirmed in *Achmea* that arbitral tribunals cannot request preliminary rulings under Article 267 TFEU.  It adds that Wathelet AG's Opinion was based on the premise that arbitral tribunals could request preliminary rulings to the ECJ, which was rejected by the Court.[162]  Thus, this arbitration breaches the ECJ's monopoly to give the final word on EU law matters.[163]

198. Italy adds that this Tribunal should adopt the principle of harmonious interpretation to exclude ECT application between EU Member States.[164]  Alternatively, the Respondent argues that any conflicts between the ECT and EU law should be ruled in favour of EU law.[165]  In any event, Italy submits that the principle of harmonious interpretation favours an interpretation of the ECT as not applying between EU Member States.[166]  The Respondent highlights that EU law already provides for investment protection, the ECT Contracting Parties sharing the understanding that the ECT would not apply to intra-EU situations.[167]

---

[158] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 9; Respondent's Post Hearing Brief, ¶¶ 178-181, 219.

[159] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 11.

[160] Respondent's Comments to *Slovak Republic v. Achmea*, ¶¶ 14-15.

[161] Respondent's Post Hearing Brief, ¶¶ 213-214, 216.

[162] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 41.  *See also* Respondent's Post Hearing Brief, ¶¶ 182-187.

[163] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 19.

[164] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 22.

[165] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 23.  *See also* Respondent's Post Hearing Brief, ¶ 190.

[166] Respondent's Post Hearing Brief, ¶ 189.

[167] Respondent's Comments to *Slovak Republic v. Achmea*, ¶¶ 35-37.

199. According to Italy, whether EU law can apply to the dispute is a decisive point of the *Achmea* decision: it is undisputed in this arbitration that Italy's PV policies sought to comply with EU law.[168]  It then cites the *Achmea*'s decision, as follows:[169]

> *39 It must be ascertained, first, whether the disputes which the arbitral tribunal mentioned in Article 8 of the BIT is called on to resolve are liable to relate to the interpretation or application of EU law.*
>
> *40 Even if, as Achmea in particular contends, that tribunal, despite the very broad wording of Article 8(1) of the BIT, is called on to rule only on possible infringements of the BIT, the fact remains that in order to do so it must, in accordance with Article 8(6) of the BIT, take account in particular of the law in force of the contracting party concerned and other relevant agreements between the contracting parties.*
>
> *41 Given the nature and characteristics of EU law mentioned in paragraph 33 above, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.*
>
> *42 It follows that on that twofold basis the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital.* [170]

200. Italy further submits that the *Achmea*'s rationale applies to this arbitration irrespective of whether the arbitral seat is within the EU.[171]  It cites the European Commission's decisions against Spain and the Czech Republic finding that "*awards rendered by arbitral tribunals under the ECT in cases concerning intra-EU situations constitute State aids to be authorised by the Commission before being executed.*"[172]

201. Italy also objects to the *Masdar v. Spain* tribunal's reading of the *Achmea* decision, including the tribunal's reference to the Wathelet AG's Opinion, noting that the ECJ disagreed with his Opinion.[173]  The Respondent submits that Belenergia's reliance on an alleged distinction

---

[168] Respondent's Post Hearing Brief, ¶¶ 222-226.
[169] Respondent's Post Hearing Brief, ¶ 222.
[170] Exhibit CL-166.
[171] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 44.
[172] Respondent's Comments to *Slovak Republic v. Achmea*, ¶ 45.
[173] Respondent's Post Hearing Brief, ¶¶ 155-156.

between BITs and the ECT by Wathelet AG is unwarranted, adding that the ECJ has not discussed the ECT because it simply was not at issue in *Achmea*.[174]   According to Italy, Wathelet AG's remark that no EU institution or Member State has challenged the ECT is immaterial because the ECT is not limited to intra-EU situations.[175]

202.   Italy also argues that the Communication from the Commission to the European Parliament and the Council: Protection of intra-EU Investment[176] is relevant for this arbitration, showing that the *Achmea* decision also affects ECT jurisdiction.   In Italy's view, the Commission's Communication, despite its non-binding character, shows how the European Commission would decide as a body entrusted with the responsibility to ensure the application of the EU treaties and to oversee the application of EU law pursuant to Article 17(1) of the Treaty on European Union ("**TEU**").[177]   Among other matters, the Respondent adds that the Commission's Communication highlights the ECT's incompatibility with EU law and the risk of forum shopping, parallel proceedings, and double recovery.[178]

203.   According to Italy, the *Achmea* decision confirms that an award on the merits would not be recognised and enforced in the seat of arbitration[179] (France), the host State (Italy), and the State of the investor's nationality (Luxembourg).[180]   In this respect, Italy refers to Article 42 of the ICC Rules and Article 32.2 of the LCIA Rules on the tribunal's duty to render an "enforceable" award.[181]   Thus, the Tribunal should refuse to entertain jurisdiction in this arbitration because of "*its inability to discharge the essential mandate to produce an enforceable award.*"[182]

---

[174] Respondent's Post Hearing Brief, ¶¶ 158-159.

[175] Respondent's Post Hearing Brief, ¶ 160.

[176] Communication from the Commission to the European Parliament and the Council: Protection of Intra-EU Investment (COM(2018) 547/2) (Exhibit REX-75) ("**Commission's Communication**").

[177] Claimant's Observations of 8 August 2018 on the Communication from the Commission to the European Parliament and the Council: Protection of Intra-EU Investment (COM(2018) 547/2), ¶ 5, footnote 1.

[178] Claimant's Observations of 8 August 2018 on the Communication from the Commission to the European Parliament and the Council: Protection of Intra-EU Investment (COM(2018) 547/2), ¶¶ 4, 7-9.

[179] As the seat of arbitration has no application in an ICSID arbitration, the Tribunal understands that Italy refers to any of the places which have a direct connection to the dispute.

[180] Respondent's Post Hearing Brief, ¶¶ 227-230.

[181] Respondent's Post Hearing Brief, ¶ 229.

[182] Respondent's Post Hearing Brief, ¶ 228.

204. Moreover, Italy relies on a Declaration dated 15 January 2019[183] by 22 Member States including Italy to request the termination of the proceedings, citing, among others, an excerpt that declares the international arbitration provision under the ECT incompatible with the EU Treaties:

> *Furthermore, international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties. Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied* [sic].[184]

205. In the alternative, Italy relies on a Declaration dated 16 January 2019[185] by Luxembourg, together with Finland, Malta, Slovenia and Sweden, requesting the suspension of the proceedings, based on the incompatibility between the ECT and the EU, which "*should be left for the national judge of the CJEU to* [] *decide*[]." [186]

### (2) The Exclusive Jurisdiction Clause Under The GSE Conventions Leads To Italy's Lack Of Unconditional Consent Under Article 26 ECT

206. The Respondent submits that the GSE Conventions' exclusive jurisdiction clause triggers the fork-in-the-road rule under Articles 26(2) and 26(3) ECT[187] and bars arbitral jurisdiction over all ECT claims related to GSE Conventions, including matters about incentives through feed-in-tariffs and minimum prices, their rates and duration.[188] Italy adds that Rome courts' exclusive jurisdiction under the GSE Conventions also bars ECT jurisdiction over umbrella

---

[183] *See* Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by 22 Members States including the Italian Republic (Annex to Italy's Letter to the Tribunal dated 14 February 2019).

[184] Italy's Letter to the Tribunal dated 14 February 2019, pp. 1-2; Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by 22 Members States including the Italian Republic (Annex to Italy's Letter to the Tribunal dated 14 February 2019), p. 2.

[185] *See* Declaration of the Representatives of the Governments of the Member States of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by the Republic of Finland, the Grand Duchy of Luxembourg, the Republic of Malta, the Republic of Slovenia and the Kingdom of Sweden (Annex to Italy's Letter to the Tribunal dated 14 February 2019).

[186] Italy's Letter to the Tribunal dated 14 February 2019, p. 3.

[187] Statement of Defense, ¶¶ 140-145.

[188] Statement of Defense, ¶ 145; Respondent's Rejoinder, ¶ 80.

clause claims on reduction of incentives, and on modification or repeal of minimum prices.[189] The Respondent submits that the exclusive jurisdiction clause under the GSE Conventions on feed-in-tariffs and on minimum prices provides that:

> [f]or any dispute arising out of or in any case connected to the interpretation and/or execution of the [Convention] and the documents referred to therein the Parties agree on the exclusive jurisdiction of the Court of Rome.[190]

207.   According to the Respondent, Italy's unconditional consent to arbitrate under Article 26(3) ECT is subject to subparagraph (b) of Article 26(2), which expressly allows the parties "*to agree on a specific settlement procedure for a dispute or a set of disputes alternative to arbitration.*"[191]   In the Respondent's view, Article 26(3) excludes Italy's unconditional consent to arbitration in case of "*any applicable, previously agreed dispute settlement procedure.*"[192]   The combined reading of Articles 26(2)(b) and 26(3) ECT therefore means that the exclusive jurisdiction of Rome courts in the GSE Conventions bars Italy's unconditional consent to arbitrate.[193]

208.   Italy disagrees with the Claimant's interpretation of Article 26 ECT.   According to Italy, the contract-based, exclusive jurisdiction clause under the GSE Conventions is sufficient to trigger the fork-in-the-road rule; thus, commencement of litigation before Rome courts is unnecessary.[194]   The conclusion of the GSE Conventions as standard form contracts does not affect this argument.[195]

209.   The Respondent asserts that the broad language of the exclusive jurisdiction clause ("*any dispute arising out of or in any case connected to the interpretation and/or execution of the [Convention] and the documents referred to therein*") supports Italy's lack of unconditional

---

[189] Statement of Defense, ¶ 154.

[190] Statement of Defense, ¶¶ 143-144.  *See*, Sample GSE Conventions on feed-in-tariffs under the First, Second, Third, Fourth and Fifth Energy Accounts (Exhibits REX-11a, REX-11b, REX-11c, REX-11d, REX-11e), and GSE Conventions on minimum prices concluded with Claimant's PV subsidiaries (Exhibit C-26M).

[191] Statement of Defense, ¶147.

[192] Respondent's Rejoinder, ¶ 78.

[193] Statement of Defense, ¶ 147.

[194] Respondent's Rejoinder, ¶ 82.

[195] Respondent's Rejoinder, ¶¶ 83-84.

consent to arbitrate.[196]  In the Respondent's view, this clause refers to disputes direct- and indirectly related to the GSE Conventions.[197]  To illustrate, the Respondent refers to litigation before the *Tribunale Amministrativo Regionale per il Lazio – Roma* against two decrees of *Ministero dello sviluppo economico* ("**MISE**") implementing the *Spalma-Incentivi*.[198]  In this litigation brought against MISE and GSE, the Respondent submits that energy producers challenged the MISE decrees before Rome courts on ECT grounds (among other grounds).[199]

210.  The Respondent alleges that the *SGS v. Philippines* decision supports this argument because it affirms that "*exclusive jurisdiction* [clauses] *prevail over dispute settlement clauses in investment treaties*."[200]  Having applied the principle *generalia specialibus non derogant*, the *SGS v. Philippines* tribunal was correct holding that a specific, contract-based, exclusive jurisdiction clause affects arbitral jurisdiction. This specific clause prevails over a general, treaty-based jurisdiction clause like Article 26 ECT, unless "*the treaty clearly intended to override contractual provisions*."[201]  On the contrary, the Respondent sustains that the combined reading of Articles 26(2)(b) and 26(3) ECT, and that previous litigation before Rome courts by other energy producers support its interpretation.[202]  In addition, the GSE Conventions' conclusion was subsequent to the ECT's signature, confirming Italy's intention not to give its unilateral consent to ECT arbitration.[203]

211.  Italy flags contradictions in the Claimant's argument that the fundamental basis of the dispute is not the interpretation and "execution" of GSE Conventions covered by the exclusive jurisdiction clause, but sovereign acts implementing the *Spalma-Incentivi* Decree and the Law of Conversion, including sovereign acts amending the GSE Conventions.[204]  Italy argues that contract breaches ought to relate to contract "execution;"[205] Claimant is not able

---

[196] Statement of Defense, ¶ 148.

[197] Statement of Defense, ¶ 148.

[198] Statement of Defense, ¶ 148, citing Exhibit REX-12.

[199] Statement of Defense, ¶ 148, explaining that the ECT was a ground for the energy producers' referral request to the Italian Constitutional Court (Exhibit REX-12).

[200] Statement of Defense, ¶ 149.

[201] Statement of Defense, ¶ 151.

[202] Statement of Defense, ¶ 152.

[203] Respondent's Rejoinder, ¶ 79.

[204] Respondent's Rejoinder, ¶¶ 95-98.

[205] Respondent's Rejoinder, ¶ 96.

to distinguish GSE Conventions' breaches from the purported ECT breaches (FET and umbrella clause). The Claimant's "*carte blanche*" accusation is groundless, because *(i)* the incentives were not cancelled but re-modulated; and *(ii)* Italian courts remain open to Belenergia.[206]

212. Alternatively, if the Tribunal finds that Italy's objections to the other ECT claims should not prevail—*quod non*—Italy submits that the umbrella clause claim remains inadmissible. In support of this argument, the Respondent cites the *SGS v. Philippines* and the *BIVAC v. Paraguay* decisions. According to the Respondent, "[i]*t would be contradictory to invoke a contractual clause providing for a specific obligation of conduct, but not to invoke, nor take into account, the contractual clause providing for another obligation, regarding the exclusivity of the forum.*"[207] The Respondent highlights that the jurisdiction clause in *BIVAC v. Paraguay* had the same content as the GSE Conventions' clause.[208]

213. The Respondent disagrees with the Claimant on classifying this objection as one of admissibility rather than jurisdiction. Italy also disagrees with the *BIVAC v. Paraguay* tribunal's findings on admissibility.[209] Even if the Tribunal considers the objection as one of admissibility—*quod non*—the Respondent states that the same conclusions generally apply to all Article 10(1) ECT claims, including the umbrella claim.[210]

214. First, the exclusive jurisdiction clause under the GSE Conventions applies as a "*previously agreed dispute settlement procedure*" under Article 26(2)(b) ECT. This leads to Claimant being deemed to having "submitted" its dispute "*in accordance with*" the GSE Convention's forum clauses. As a result, Respondent's "unconditional consent" to arbitration under Articles 26(2)(b) and 26(3) is barred, and Claimant's claims are inadmissible.[211] According to the Respondent, this argument is irrespective of the umbrella clause under Article 10(1) ECT and thus of the distinction between contract and treaty claims.[212] Second,

---

[206] Respondent's Rejoinder, ¶ 99.
[207] Respondent's Rejoinder, ¶ 92.
[208] Respondent's Rejoinder, ¶ 94.
[209] Statement of Defense, ¶ 153, citing Exhibit RLA-8, ¶¶ 142-158.
[210] Respondent's Rejoinder, ¶¶ 83-84, 100. *See also* Statement of Defense, ¶ 182.
[211] Statement of Defense, ¶ 183.
[212] Statement of Defense, ¶ 184.

and, if the Tribunal finds that the umbrella clause under the last sentence of Article 10(1) ECT applies to the dispute—*quod non*—the Respondent asserts that the GSE Conventions' exclusive jurisdiction clauses render umbrella claims inadmissible, referring to the *SGS v. Philippines* findings.[213]    The Respondent adds that in *BIVAC v. Paraguay* the tribunal declared umbrella clause claims inadmissible, giving effect to the contract's forum selection clause.[214]    The Respondent finds it surprising the Claimant's exclusive reliance on the ECT as applicable law, when contract claims would be subject to Italian law instead.[215]

### (3) Imbalance Costs Are "Taxation Measures" Within the Meaning of Article 21(7) ECT

215.    The Respondent argues that the definition of "Taxation Measures" under Article 21(7) ECT is "*extremely large*" and refers to "*an open-ended category of measures.*"[216]    Pursuant to Article 21(7), a "Taxation Measure" has to be in domestic legislation or in an international treaty and has to have a "fiscal" character, as defined by domestic law.[217]    To illustrate, the Respondent refers to the double-taxation treaty between Italy and the Netherlands.[218]    This double-taxation treaty does not define future "similar taxes" that may fall within its scope under its Article 2(4); rather, its Article 3(2) states that undefined terms will have the meaning ascribed to them under domestic tax law of the relevant State party.[219]

216.    According to the Respondent, under Italian law "fiscal" measures are classified as "*imposta*" (tax), "*tassa*" (fee) or "*contributo*" (contribution), irrespective of the name of the measure:[220]

---

[213] Statement of Defense, ¶ 182.

[214] Statement of Defense, ¶ 182.

[215] Statement of Defense, ¶¶ 186-187.

[216] Statement of Defense, ¶ 159.

[217] Statement of Defense, ¶ 160, citing Exhibit RLA-9, p. 4.

[218] Convention Between the Kingdom of the Netherlands and the Republic of Italy for the Avoidance of Double Taxation With Respect to Taxes on Income and on Capital of 8 May 1990.

[219] Statement of Defense, ¶ 160, citing the double-taxation treaty concluded between Italy and the Netherlands, Article 2(4) and Article 3: "[Article 2] *4. The Convention shall apply also to any identical or substantially similar taxes which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the States shall notify each other of substantial changes which have been made in their respective taxation laws.*"   "*Article 3 - General definitions* […] *2. As regards the application of the Convention by each State any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.*"

[220] Statement of Defense, ¶ 161.

(a) a fee is paid in consideration for a public service requested by an individual;

(b) a tax is proportionate to the contributing capacity of an individual, paid for general public services; and

(c) a contribution is a compulsory levy paid by certain individuals because they benefit, directly or indirectly from certain public services, irrespective of whether individuals have requested these services.

217. In the absence of legislative measures indicating the "fiscal" character of a specific measure, Italy states that the Italian Constitutional Court's definition of "fiscal" measures applies. Pursuant to the Italian Constitutional Court, the features of "fiscal" measures are: *(a)* mandatory contribution; *(b)* "*absence of exact reciprocity between the parties*"; and *(c)* link between this contribution and public spending with a relevant economic purpose.[221] The Respondent adds that Article 23[222] of the Italian Constitution requires that "fiscal" measures be established by law.[223]   Fees, taxes and contributions under Italian law fall therefore within the meaning of "Taxation Measures" under Article 21(7) ECT.[224]

218. Moreover, the Respondent submits that the Glossary of Tax Terms (the "**OECD Glossary**") of the Organisation for Economic Co-operation and Development (the "**OECD**") defines tax as "*a compulsory unrequited payment to the government*."[225]   The OECD qualifiers "*compulsory*" and "*unrequited*" (unreciprocated) used in the definition precisely correspond, in the Respondent's view, to the first and second features of "fiscal" measures pursuant to the Italian Constitutional Court.[226]   The terms "*payment to the government*" could, in turn, refer to the third feature, that is, contribution toward public spending.

---

[221] Statement of Defense, ¶ 162, citing Exhibit REX-13, ¶¶ 7.2-7.2.1.
[222] Italian Constitution, Article 23: "No obligation of a personal or financial nature may be imposed on any person except by law."  *See* Statement of Defense, footnote 61.
[223] Statement of Defense, ¶ 163.
[224] Statement of Defense, ¶ 163.
[225] Statement of Defense, ¶ 164.
[226] Statement of Defense, ¶ 164.

219. The Respondent submits that the OECD Glossary also defines the sources of tax law,[227] domestic sources being "*primary legislation, such as acts or laws, and secondary legislation such as regulations, decisions, circulars, orders, etc.*"  On the international sources of tax law, the OECD Glossary refers to the OECD model tax treaty as an interpretative tool.  To illustrate, Respondent cites Article 2(1) of the 2014 OECD Model Tax Treaty,[228] which applies to income and capital taxes "*irrespective of the manner in which they are levied.*"[229]

220. The 2014 OECD Model Treaty does not define the characteristics of income and capital taxes in its Article 2(2), let alone define "*substantially similar*" future taxes under Article 2(4). Pursuant to Article 3(2) of the 2014 OECD Model Treaty, Respondent therefore concludes that these definitions will have "*the meaning that* [they] *have at that time under the law of that State* [;] *any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.*"[230]

221. The Respondent submits that the imbalance costs are "Taxation Measures" because they are levied as a contribution to "*the general mechanism of storage of electricity by Terna* [the Italian electricity transmission system operator] *(the Italian system operator), based on advance projections of the quantity each producer would estimate to inject in the national grid and deviations therefrom.*"[231]

222. The Respondent highlights the Claimant's admission in ¶ 126 of the Statement of Claim that imbalance costs (charges) used to be levied from the final users ("*energy consumers*") before the adoption of AEEG Resolution No. 444/2016.[232] Adoption of AEEG Resolution No. 444/2016 caused public service charges (funding Terna's electricity storage) to be levied from energy producers like Claimant rather than energy users. AEEG Resolution No. 444/2016 did not change the "fiscal" character of the imbalance

---

[227] Statement of Defense, ¶ 165. *See* OECD Glossary of Tax Terms, Definition of "Sources of Tax Law": "*The main domestic sources of tax law are primary legislation, such as acts or laws, and secondary legislation such as regulation, decisions, circulars, orders, etc. The main international sources of tax law are bilateral or multilateral treaties, and one important source for the interpretation of treaties is the OECD model tax treaty and the accompanying commentary. Another model is UN model.*"

[228] Exhibit RLA-11.

[229] Statement of Defense, ¶ 166.

[230] Statement of Defense, ¶ 167.

[231] Statement of Defense, ¶ 168.

[232] Statement of Defense, ¶ 169.

charges; rather, it merely changed the general category of individuals from which these charges were levied.[233]

223.  The Respondent adds that under Article 1(1) of Legislative Decree No. 79/1999[234] electricity transmission and dispatching activities are reserved to the State, "*granted in concession to Terna*", the manager of the national transmission network.[235]   In turn, Article 2(10) of Legislative Decree No. 79/99 defines "dispatching" activities as instructing the use and the coordinated operation of production facilities, the transmission network, and auxiliary services.   As the sole concessionary of these activities, Terna sets forth the rules on dispatching contracts, including provisions on access conditions and imbalance coverage. The GSE acts as a commercial contract intermediator *vis-à-vis* energy producers under AEEG Resolution No. 280/2007,[236] reinforcing the regulatory character of electricity dispatching activities.   In this respect, the Respondent cites decisions by the Italian Constitutional Court holding that GSE contract payments are "*material/factual*" contributions despite their contractual formulation, their contractual formulation being weakened by the GSE's intermediation and by the prevalence of non-market-based considerations.[237]

224.  Respondent asserts that Terna has the duty to grant non-discriminatory access to energy producers, but this does not prevent it from levying specific charges from them.   In this respect, the Respondent refers to litigation before Italian courts about imbalance costs imposed on energy producers under AEEG Resolution No. 281/2012[238] on non-programmable renewable sources.[239]   It submits that producers challenging this Resolution referred to "imbalance costs" as contributions within the meaning of Article 23 of the Italian Constitution.[240]   In addition, the *Consiglio di Stato* has declared that imbalance costs under

---

[233] Statement of Defense, ¶ 169.
[234] Exhibit REX-14.
[235] Statement of Defense, ¶ 170.
[236] Exhibit REX-15.
[237] Statement of Defense, ¶ 170.
[238] Exhibit REX-16.
[239] Statement of Defense, ¶ 172.
[240] Statement of Defense, ¶ 172, and Exhibit REX-17.

AEEG Resolution No. 281/2012 should be levied from a "*general category of producers*" not discriminating in the calculation method between producers.[241]

225.  The Respondent stresses that Claimant's arguments rejecting the "fiscal" character of imbalance charges are groundless.  Claimant's position is inconsistent with treaty interpretation and with the meaning of "fiscal" measures under domestic and international law.[242]  The Italian legislature's failure to expressly designate imbalance costs as "Taxation Measures" is irrelevant; rather, their "fiscal" features are clear under interpretative principles of tax law.[243]

226.  In conclusion, the Respondent submits that the imbalance costs claim falls outside the Tribunal's jurisdiction.  Imbalance costs are therefore "Taxation Measures" under Article 21(7) ECT, from a domestic and international law perspective,[244] because *(i)* they are a mandatory contribution; *(ii)* they are not reciprocated by a specific service by Terna; and *(iii)* they cover public spending with Terna's dispatching activities and with guaranteeing the system's security.[245]  Alternatively, the Respondent submits that the imbalance costs dispute is an intra-EU dispute equally falling outside the Tribunal's jurisdiction.[246]

### (4) The Waiting Period Under Articles 26(1) And 26(2) ECT

227.  The Respondent submits that the Claimant's belated introduction of the imbalance costs claim infringes the waiting period requirement under Article 26 ECT, the Tribunal therefore lacking jurisdiction to rule on it.  The waiting period under Article 26 ECT is a pre-condition to the Respondent's consent to arbitrate.[247]  It further submits that the Amicable Solution Letter of 8 December 2014 and the Request for Arbitration of 30 July 2015 refer only to claims on feed-in tariffs and on minimum prices, and not to the imbalance costs claim.[248]  According to the Respondent, the Claimant raised—for the first time—the imbalance costs

---

[241] Statement of Defense, ¶ 173.
[242] Respondent's Rejoinder, ¶ 102.
[243] Respondent's Rejoinder, ¶ 103.
[244] Respondent's Rejoinder, ¶ 104.
[245] Statement of Defense, ¶¶ 174-175.
[246] Statement of Defense, ¶ 175.
[247] Statement of Defense, ¶ 189.
[248] Statement of Defense, ¶¶ 177-178.

claim in its Statement of Claim of 14 December 2016, on autonomous grounds.  Grounded on the AEEG Resolution No. 444/2016, the imbalance costs claim is unrelated to the other claims on incentive measures.[249]

228.  On the distinction between jurisdictional and admissibility objections, the Respondent submits that this distinction is "*blurring*."[250]  If the Tribunal finds that the waiting period objection has an admissibility character, the Respondent requests the Tribunal to consider its arguments on jurisdiction regardless of this objection's character.

## B.  **The Claimant's Position**

### (1) Italy's Intra-EU Dispute Jurisdictional Objection Is Unfounded

229.  The Claimant rejects Italy's jurisdictional objection that the present dispute is an intra-EU dispute falling outside the scope of the ECT, for the following reasons: *(a)* the ECT was originally conceived to apply to intra-EU disputes; *(b)* the ECT applies to intra-EU disputes irrespective of subsequent EU developments; and *(c)* the ECJ's decision in *Slovak Republic v. Achmea* does not affect this arbitration.

### (a) The ECT was originally conceived to apply to intra-EU disputes

230.  The Claimant asserts that its arguments draw on the interpretative guidance of Articles 31 and 32 VCLT,[251] favouring the "ordinary meaning" of treaty provisions, including their context and the parties' subsequent practice.[252]  The Claimant also states that the Respondent has failed to produce "*a single award in which a tribunal has agreed with an argument that the operation of the EU treaties bar*[s] [ECT] *jurisdiction.*"[253]  Several awards, including *RREEF v. Spain*, *Blusun v. Spain*, and *Isolux v.Spain* confirm a consistent pattern of decisions rejecting the intra-EU objection.[254]  Although the Claimant accepts that the Tribunal is not bound by these decisions, there are "*cogent reasons*" to rely on past decisions,

---

[249] Statement of Defense, ¶ 179.
[250] Statement of Defense, ¶ 181.
[251] Vienna Convention on the Law of Treaties of 23 May 1969 (Exhibit RLA-3).
[252] Claimant's Reply, ¶¶ 39-41.
[253] Claimant's Reply, ¶ 51.
[254] Claimant's Reply, ¶¶ 51-53.

because, as stated by Professor Christoph Schreuer, "[r]*eliance on past decisions is a fundamental feature of any orderly decision process.*"[255]

231.  The Claimant disagrees with Italy and the European Commission that the ECT could not have created *inter se* obligations between the EU Member States and that EU Member States should apply EU law in their *inter se* relations and not the ECT. Citing the *Blusun v. Italy*[256] award, the Claimant submits that the *inter se* doctrine, although applied between Commonwealth States, was never recognised as customary international law.[257] Because the *inter se* doctrine is no international customary rule, its efficacy requires an express treaty provision; thus, Italy's argument that the relations between EU Member States are not subject to international law (and to the ECT) fails.[258] The Claimant refers to arbitral decisions rejecting the application of the *inter se* doctrine to intra-EU affairs (*Blusun v. Italy*, *Charanne v. Spain*, *Electrabel v. Hungary, RREEF v. Spain* and *Isolux v. Spain*).[259]

232.  Belenergia also objects to Italy's and to the European Commission's argument that the ECT did not give rise to *inter se* obligations between the EU Member States because the Member States had no competence to enter into ECT obligations, rejecting Italy's and the European

---

[255] Claimant's Reply, ¶¶ 53-55, citing, among others, Exhibit CL-8RM, p. 139.
[256] Exhibit RLA-1.
[257] Claimant's Reply, ¶¶ 47-48.
[258] Claimant's Reply, ¶ 49.
[259] Claimant's Reply, ¶ 50, citing Exhibits RLA-1, RLA-2, RLA-4; CL-2RM, CL-5RM and CL-6RM.

Commission's reading of Articles 1(2),[260] 1(3),[261] 1(10),[262] 16[263] and 25[264] ECT.[265]  Relying on *Blusun v. Italy*, Belenergia submits that Articles 6 and 46 VCLT[266] do not support Italy's position, adding that no limitation on Member States' competence was ever communicated at the time of ECT's signature.[267]

**233.**  The Claimant also disagrees that the application of the *inter se* doctrine is a question "of intent."  In the Claimant's view, there is no "*unequivocal disconnection clause,*" or "*express provision or clear understanding*" that could lead to the application of the *inter se* doctrine in the present case.[268]  The Claimant adds that the ECT text is "*the only and most recent expression of the common will of the parties.*"  Pursuant to VCLT treaty interpretation rules, "*if the intention of the parties was to include in the ECT a disconnection clause regarding*

---

[260] Energy Charter Treaty (Exhibit CL-2M), Article 1(2): "'*Contracting Party' means a state or Regional Economic Integration Organisation which has consented to be bound by this Treaty and for which the Treaty is in force.*"

[261] Energy Charter Treaty (Exhibit CL-2M), Article 1(3): "'*Regional Economic Integration Organisation' means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.*"

[262] Energy Charter Treaty (Exhibit CL-2M), Article 1(10): "[…] *With respect to a Regional Economic Integration Organisation which is a Contracting Party, Area means the Areas of the member states of such Organisation, under the provisions contained in the agreement establishing that Organisation.*"

[263] Energy Charter Treaty (Exhibit CL-2M), Article 16: "*Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty, (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.*"

[264] Energy Charter Treaty (Exhibit CL-2M), Article 25: "*(1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as 'EIA') to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto. (2) For the purposes of paragraph (1), 'EIA' means an agreement substantially liberalising, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame.* […]"

[265] Claimant's Reply, ¶¶ 71-72.

[266] Vienna Convention on the Law of Treaties of 23 May 1969 (Exhibit RLA-3), Article 6: "*Every State possesses capacity to conclude treaties;*" Article 46: "*1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance. 2. A violation is manifest if it would be objectively evident to any State con ducting itself in the matter in accordance with normal practice and in good faith.*"

[267] Claimant's Reply, ¶ 73.

[268] Claimant's Reply, ¶¶ 53-55, citing *RREEF v. Spain* (Exhibit CL-2RM, ¶ 85), and *Blusun v. Italy* (Exhibit RLA-1, ¶ 280.2).

*the EU, they can be trusted to have expressed that in the wording of the treaty.*"[269]  On the contrary, Belenergia submits that the ECT Parties have included a disconnection clause to the Svalbard Treaty but not in relation to the EU in Annex 2(1) ECT; the Svalbard disconnection clause in Annex 2(1) ECT provides that:

> *In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict.*[270]

234.  Claimant also cites examples of express disconnection clauses in relation to the EU provided in international agreements other than the ECT:[271]

> *Article 47(1) of the 2005 Convention on the stepping up of cross-border cooperation, particularly in combating terrorism, cross-border crime and illegal migration (Schengen III Agreement)*
>
> *The provisions of this Convention shall apply only in so far as they are compatible with European Union law.*
>
> *Article 27 of the 1988 Convention on Mutual Administrative Assistance in Tax Matters*
>
> *Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.*[272]

235.  The Claimant relies on the principle *expressio unius est exclusio alterius,* stating that the omission of a EU disconnection clause in the ECT should be interpreted as entirely excluding it.[273]  The Claimant also cites another excerpt from the Svalbard disconnection clause under the ECT: "[i]*n the event of such conflict* [between the Svalbard treaty and the ECT] *or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the*

---

[269] Claimant's Reply, ¶ 58.

[270] Claimant's Reply, ¶ 60, citing Decision 1 of Annex 2 to the Final Act of the European Energy Charter Conference (Exhibit CL-2M) and the Svalbard Treaty (Exhibit CL-21RM).

[271] Claimant's Reply, ¶ 59.

[272] *See* Exhibit CL-16RM and Exhibit CL-17RM.

[273] Claimant's Reply, ¶¶ 61-66, citing the *S.S. Wimbledon* decision by the PCIJ (Exhibit CL-23RM, p. 23), the decision on the *Question of the Delimitation of the Continental Shelf* by the ICJ (Exhibit CL-24RM, ¶ 35), and the arbitral decisions in *Waste Management v. Mexico* (Exhibit CL-13M, ¶ 85) and in *National Grid v. Argentina* (Exhibit CL-25RM, ¶ 82).

*Energy Charter Treaty shall not apply*."   Express exclusion of Article 16 ECT's[274] application to treaty conflicts covered by the Svalbard disconnection clause shows that an EU disconnection clause could not have been implicit.[275]

236.   Moreover, the Claimant rejects Italy's reliance on ECT's preparatory work as a supplementary means of interpretation under Article 32 VCLT.  According to the Claimant, recourse to a treaty's preparatory work for interpretation purposes can only take place when interpretation under Article 31 VCLT "*leaves the meaning ambiguous or obscure*" or "*leads to a result which is manifestly absurd or unreasonable.*"[276]   Citing the *Blusun v. Italy* decision, the Claimant argues that it is not permissible to rely on preparatory works when the treaty terms are clear.  In any case, the Claimant refers to the *Blusun v. Italy* tribunal's finding that "*the* travaux préparatoires *seem to point against implying a disconnection clause: one was proposed during the course of the Energy Charter Treaty negotiations, but was rejected.*"[277]

237.   Neither can the ECT's context, purpose or objective establish a disconnection clause, in the Claimant's view.  In particular, the purported ECT's context expressed in Annex 2(5) ECT below does not support Italy's interpretation:

> *An Investment of an Investor referred to in Article 1(7)(a)(ii), of a Contracting Party which is not party to an EIA or a member of a free-trade area or a customs union, shall be entitled to treatment accorded under such EIA, free-trade area or customs union, provided that the Investment:*
>
> *(a) has its registered office, central administration or principal place of business in the Area of a party to that EIA or member of that free-trade area or customs union; or*
>
> *(b) in case it only has its registered office in that Area, has an effective and continuous link with the economy of one of the parties to that EIA or member of that free-trade area or customs union.*[278]

---

[274] Energy Charter Treaty (Exhibit CL-2M), Article 16.
[275] Claimant's Reply, ¶¶ 62-63.
[276] Claimant's Reply, ¶ 68.
[277] Claimant's Reply, ¶ 69, citing *Blusun v. Italy* (Exhibit RLA-1, ¶ 280.4).
[278] Claimant's Reply, ¶ 74, citing Decision 5 of Annex 2 to the Final Act of the European Energy Charter Conference (Exhibit CL-2M).

238. The Claimant explains that the ECT's textual interpretation should prevail and that the ECT Contracting Parties have failed to include an express disconnection clause.[279]  Italy's interpretation seeking to establish their "intention" to adopt an implied disconnection clause falls afoul of the *pacta sunt servanda* principle under Article 26 VCLT.[280]

239. Belenergia rejects the European Commission's comparison with the WTO as unfounded under Articles 31 to 33 VCLT.[281]  Nothing in the ECT terms, their context, object or purpose, or its preparatory work suggest an implied EU disconnection clause.  On the contrary, the ECT's Title 1 on Objectives provides no reference to the EU, reading as follows:

> *Within the framework of State sovereignty and sovereign rights over energy resources and in a spirit of political and economic cooperation, they undertake to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns.  They are determined to create a climate favourable to the operation of enterprises and to the flow of investments and technologies by implementing market principles in the field of energy.*[282]

240. In the Claimant's view, the purported ECT's purpose that its adoption was separate from "*the completion of the internal market on energy within the EU*" cannot support Italy's argument on the disconnection clause.[283]

241. Belenergia also disagrees that subsequent ECT practice under Article 31(3)(b) VCLT[284] could affect this Tribunal's jurisdiction.  Referring to the 2016 International Law Commission's ("**ILC**") Report, the Claimant alleges that Italy has failed to show any

---

[279] Claimant's Reply, ¶ 68.

[280] Claimant's Reply, ¶ 78, citing *Blusun v. Italy* (Exhibit RLA-1, ¶ 280.3), *RREEF v. Spain* (Exhibit CL-2RM, ¶¶ 84-85), and the ICJ's *ELSI* case (Exhibit CL-46M, p. 42), among others.

[281] Claimant's Reply, ¶¶ 79-80.

[282] Energy Charter Treaty (Exhibit CL-2M).

[283] Claimant's Reply, ¶ 84.

[284] Vienna Convention on the Law of Treaties of 23 May 1969 (Exhibit RLA-3), Article 31(3): "*There shall be taken into account, together with the context:* [...] *(b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation*; [...]"

subsequent practice consistent with Article 31(3)(b) VCLT that "*specifically and purposefully relates*" to the ECT.[285]

### (b) The ECT applies to intra-EU disputes irrespective of developments after its conclusion

242. The Claimant argues that subsequent developments to the ECT's conclusion do not bar ECT arbitral jurisdiction. The facts that no intra-EU investment arbitrations under the ECT were commenced before 2007 and that EU Member States have presented EU-related jurisdictional objections in ECT proceedings are irrelevant and do not qualify as subsequent practice under Article 31(3)(b) VCLT.[286] The Claimant adds that the *Electrabel v. Hungary* decision does not support Italy's argument that the ECT covers only extra-EU disputes. Italy's argument is misleading because the *Electrabel v. Hungary* tribunal did not have to and did not decide on an intra-EU dispute.[287]

243. The Claimant also disagrees with Italy's argument on successive treaties relating to the same subject-matter under Article 30 VCLT[288] because *(i)* the Lisbon Treaty and the ECT do not have the same subject-matter; *(ii)* even if they had the same subject-matter—*quod non*—the Lisbon Treaty does not prevail over the ECT, since there is no incompatibility between these treaties.[289] Accordingly, Article 30 VCLT does not apply in the circumstances; this is the approach adopted in *Electrabel v. Hungary* and *Blusun v. Italy*.[290]

244. Belenergia submits that there is no incompatibility in the dispute resolution methods under Article 26 ECT and Article 344[291] of the TFEU, and that this is supported by previous arbitral

---

[285] Claimant's Reply, ¶¶ 86-87, citing ILC Report, Sixty-eight session (2 May-10June and 4July-12 August 2016), Supplement No. 10 (A/71/10), (Exhibit CL-30RM), p. 143.

[286] Claimant's Reply, ¶¶ 88-89.

[287] Claimant's Reply, ¶¶ 90-91, citing Exhibit RLA-4, ¶¶ 4.150, 4.158.

[288] Vienna Convention on the Law of Treaties of 23 May 1969 (Exhibit RLA-3), Article 30: "*1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs. 2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.* [...]"

[289] Claimant's Reply, ¶¶ 92-98, citing, among other authorities, *Electrabel v. Hungary* (Exhibit RLA-4, ¶ 4.176) and *Blusun v. Italy* (Exhibit RLA-1, ¶ 286).

[290] Claimant's Post Hearing Brief, ¶ 35.

[291] Treaty on the Functioning of the European Union (Exhibit REX-2C), Article 344: "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*"

decisions. It disagrees that an impossibility to request an ECJ's preliminary ruling *(i)* under the applicable rules, or *(ii)* from courts of an arbitral seat outside the Union may cause EU Member States to breach Article 344 TFEU. According to the Claimant, Italy cannot rely on EU law to invalidate the ECT, on Article 46 VCLT grounds.[292] Article 46 provides that the parties (EU Member States and the EC) to a treaty (the ECT) cannot—as a rule—rely on their internal law (EU law included) vitiating their treaty-making competence.

245. The Claimant rejects Italy's accusation that the ECT discriminates against EU citizens. In its view, the ECT "*extends to all Member States and is necessarily neutral in this regard.*"[293] Belenergia adds that bilateral investment agreements are not discriminatory either, because it can hardly be argued that they adversely affect the functioning of the internal market.[294]

246. Moreover, the Claimant submits that Article 16 ECT is not a conflict rule barring ECT application to intra-EU disputes.[295] On the contrary, the Claimant argues that the conflict rule under Article 16 ECT allows treaties to coexist.[296] The Claimant adds that Article 16 does not apply to conflicts between treaties whose subject-matter is different, citing *Electrabel v. Hungary*.[297] Even if the ECT and the EU treaties covered the same subject-matter, EU law cannot prevail under the conflict rule because it is not more favourable to investors than the ECT.[298] According to the Claimant, ECT protection is broader than EU law especially in the post-establishment phase, including the fair and equitable treatment standard ("**FET**") and investor-State arbitration. The Claimant favours a harmonious interpretation of the ECT with EU law.[299]

247. In any event, Belenergia posits that the ECT is the "*constitution*" of the Tribunal; thus, the ECT should prevail in case of any contradiction with EU law. In Belenergia's view, interpretation under Article 31(3)(c) VCLT taking into account "[a]*ny relevant rules of*

---

[292] Claimant's Reply, ¶¶ 107-108,

[293] Claimant's Reply, ¶ 110, citing Mr. Christer Söderlund (Exhibit CL-65RM, p. 106).

[294] Claimant's Reply, ¶ 111, citing Mr. Christer Söderlund (Exhibit CL-65RM, p. 106).

[295] Claimant's Reply, ¶ 112.

[296] Claimant's Reply, ¶ 113.

[297] Claimant's Reply, ¶ 115.

[298] Claimant's Reply, ¶¶ 117-124, citing the decisions in *Eastern Sugar* (Exhibit CL-12RM, ¶¶ 164, 180), *RREEF v. Spain* (Exhibit CL-2RM, ¶ 60), and Professor Piet Eeckhout's Expert Opinion on *AES v. Hungary* (Exhibit CL-20RM, ¶ 74), among other authorities.

[299] Claimant's Reply, ¶ 123, citing *RREEF v. Spain* (Exhibit CL-2RM, ¶ 76).

*international law applicable in the relations between the parties*" cannot be used "*to negate rights expressly granted in the Treaty.*"[300]

248. Belenergia also objects to Italy's and to the European Commission's argument on the ECT's derogation by the Lisbon Treaty under Article 41 VCLT.[301] The Claimant points out that derogation by certain ECT Contracting Parties is barred pursuant to Article 46 ECT, providing that "[n]*o reservations may be made to this Treaty.*"[302] The Claimant also points out that derogation would be "*incompatible with the effective execution of the object and purpose of the* [ECT] *as a whole.*"[303] And, even if derogation were possible, the Contracting Parties to the Lisbon Treaty have failed to notify the other ECT Contracting Parties under Article 41(2).[304]

249. Finally, Belenergia rejects Italy's and the European Commission's arguments founded on EU competition law and commercial arbitration as being irrelevant for this arbitration.[305]

### (c) The ECJ's decision in Achmea does not affect this arbitration

250. In a preliminary remark, the Claimant submits that the ECJ's decision in *Achmea*[306] does not affect this arbitration. Firstly, Belenergia argues that, irrespective of the ECJ's findings, the Tribunal has jurisdiction under Article 26(6) ECT, the ECT being its "constitutional instrument."[307] Moreover, the Claimant raises three reasons why the *Achmea* decision has no bearing on this arbitration.

---

[300] Claimant's Reply, ¶¶ 128-130, citing *Indus Waters Kishenganga (Pakistan v. India)* (Exhibit CL-32RM, ¶ 112), among others.

[301] Vienna Convention on the Law of Treaties of 23 May 1969 (Exhibit RLA-3), Article 41: "*1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if: (a) The possibility of such a modification is provided for by the treaty; or (b) The modification in question is not prohibited by the treaty and: (i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; (ii) Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole. 2. Unless in a case falling under paragraph l(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.*"

[302] Claimant's Reply, ¶ 133, citing *RREEF v. Spain* (Exhibit CL-2RM, footnote 80).

[303] Claimant's Reply, ¶ 135.

[304] Claimant's Reply, ¶ 134.

[305] Claimant's Reply, ¶ 136.

[306] *Slovak Republic v. Achmea* (Exhibit CL-166RM).

[307] Claimant's Comments on *Slovak Republic v. Achmea*, ¶¶ 5-6.

251.  First, differently from *Achmea* (founded on the Netherlands-Slovakia BIT), this arbitration is founded on the ECT providing for a different applicable law clause. While the Netherlands-Slovakia BIT provided for the application, among others, of "*of the law in force of the Contracting Party concerned*" and "*other relevant agreements between the Contracting Parties*", Article 26(6) ECT provides for the application of "*this Treaty and applicable rules and principles of international law.*"[308] Relying on *Eiser v. Spain*, Belenergia argues that EU law does not fall within the meaning of Article 26(6), not being applicable to these proceedings.[309]

252.  Belenergia further disagrees with Italy that EU law is part of international law and thus applies pursuant to Article 26(6) ECT. Belenergia cites the *Rainbow Warrior* case, noting that the expression "*applicable rules and principles of international law*" refers to customary international law, which does not include EU law even if it arises under international treaty.[310] The Claimant also submits that the statements in relation to the application of EU law by the *Blusun* and *Masdar* tribunals were made without an analysis of Article 26(6) ECT.[311]

253.  Moreover, Belenergia argues that Italy's argument based on Article 31(3)(c) VCLT is unfounded because "[a]*ny relevant rules of international law*" within the meaning of this provision refers to general international law as customary international law.[312] Belenergia further sustains that Article 31(3)(c) VCLT cannot be used to substitute let alone negate treaty rights.[313]

254.  Second, Belenergia argues that, differently from *Achmea*, the EU is a Contracting Party to the ECT.[314] According to the Claimant, "*by concluding or acceding to the ECT, the Member States of the EU and the EU itself established a mechanism for settling disputes between an*

---

[308] Claimant's Comments on *Slovak Republic v. Achmea*, ¶¶ 12, 16.

[309] Claimant's Comments on *Slovak Republic v. Achmea*, ¶¶ 19-21.

[310] Claimant's Post Hearing Brief, ¶¶ 17-20, citing, among others, *Rainbow Warrior (New Zealand v. France)* (Exhibit CL-178RM); Thomas Roe & Matthew Happold, *Settlement of Investor-State Disputes under the Energy Charter Treaty* (Exhibit CL-167RM).

[311] Claimant's Post Hearing Brief, ¶¶ 21-22.

[312] Claimant's Post Hearing Brief, ¶¶ 23-29.

[313] Claimant's Post Hearing Brief, ¶¶ 30-31, citing Frank Berman, *Treaty "Interpretation" in a Judicial Context* (Exhibit CL31-RM) and *Indus Waters Kishenganga (Pakistan v. India)* (Exhibit CL-32RM).

[314] Claimant's Comments on *Slovak Republic v. Achmea*, ¶ 25.

*investor and an EU Member State.*"[315]  This does not prevent that these disputes be "*resolved in a manner that ensures the full effectiveness of EU law,*" the ECT being compatible with EU law.[316]

255.  Third, Belenergia adds that the ECJ in *Achmea* acknowledged that an international agreement establishing a court "*is not in principle incompatible with EU law.*"[317]

256.  Fourth, Belenergia argues[318] that the *Masdar v. Spain*[319] award confirms that the *Achmea* decision has no bearing on ECT arbitrations.  According to the *Masdar* tribunal, the *Achmea* decision applies only to BITs and does not consider multilateral treaties like the ECT to which the EU is a party.[320]  The Claimant also adds that the *RREEF v. Spain*[321] decision on jurisdiction is not an outlier; rather it is consistent with the awards in *Novenergia v. Spain*[322] and *Eiser v. Spain.*[323]

257.  Fifth, the Claimant objects to Italy's reliance on the Communication from the Commission to the European Parliament and the Council: Protection of intra-EU Investment[324] because: *(a)* this Communication is not a legally binding authority pursuant to Articles 288 to 292 of the TFEU; and *(b)* it does not present "*more than bare assertions*" with "*no reasoned analysis*" on how the *Achmea* decision could affect the Tribunal's jurisdiction.[325]

---

[315] Claimant's Comments on *Slovak Republic v. Achmea*, ¶ 27.

[316] Claimant's Comments on *Slovak Republic v. Achmea*, ¶¶ 27, 29.

[317] Claimant's Comments on *Slovak Republic v. Achmea*, ¶ 22.

[318] Claimant's Post Hearing Brief, ¶ 14.

[319] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (Exhibit CL-179RM).

[320] Claimant's Post Hearing Brief, ¶ 14.

[321] Exhibit CL-2RM.

[322] Exhibit CL-174RM.

[323] Exhibit CL-5RM.

[324] Communication from the Commission to the European Parliament and the Council: Protection of Intra-EU Investment (COM(2018) 547/2) (Exhibit REX-75).

[325] Claimant's Observations of 8 August 2018 on the Communication from the Commission to the European Parliament and the Council: Protection of Intra-EU Investment (COM(2018) 547/2).

258. Belenergia also objects to Italy's request for termination of the proceedings, arguing that the Member States' Declarations dated 15 January 2019[326] and 16 January 2019[327] cannot affect the Tribunal's jurisdiction as they postdate the date when the Tribunal was seized of the dispute and its date of registration on 22 November 2015.[328]  According to Belenergia, these Declarations are not different from the Commission's Communication to the European Parliament and the Council: Protection of intra-EU Investment,[329] not to mention that Luxembourg is not a signatory of the Declaration dated 15 January 2019.[330]  Belenergia relies on Luxembourg's declaration dated 16 January 2019,[331] providing that "*it would be inappropriate, in the absence of a specific judgment on the matter, to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty.*"[332]

259. Further, Belenergia objected to Italy's alternative request for suspension of the proceedings, arguing that Luxembourg's Declaration dated 16 January 2019 does not state that its signatories intended the suspension of ECT arbitral proceedings.[333]  Even if it were the case (*quod non*), the Tribunal is the judge of its own competence as per Article 41(1) of the ICSID Convention.[334]  Belenergia relies on decision of the *RREEF et al. v. Spain* tribunal, finding

---

[326] *See* Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by 22 Members States including the Italian Republic (Annex to Italy's Letter to the Tribunal dated 14 February 2019).

[327] *See* Declaration of the Representatives of the Governments of the Member States of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by the Republic of Finland, the Grand Duchy of Luxembourg, the Republic of Malta, the Republic of Slovenia and the Kingdom of Sweden (Annex to Italy's Letter to the Tribunal dated 14 February 2019).

[328] Belenergia's Submission dated 22 February 2019, ¶¶ 2-4.

[329] Communication from the Commission to the European Parliament and the Council: Protection of Intra-EU Investment (COM(2018) 547/2) (Exhibit REX-75).

[330] Belenergia's Submission dated 22 February 2019, ¶¶ 6, 8.1.

[331] *See* Declaration of the Representatives of the Governments of the Member States of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by the Republic of Finland, the Grand Duchy of Luxembourg, the Republic of Malta, the Republic of Slovenia and the Kingdom of Sweden (Annex to Italy's Letter to the Tribunal dated 14 February 2019).

[332] Belenergia's Submission dated 22 February 2019, ¶ 8.3; Declaration of the Representatives of the Governments of the Member States of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by the Republic of Finland, the Grand Duchy of Luxembourg, the Republic of Malta, the Republic of Slovenia and the Kingdom of Sweden (Annex to Italy's Letter to the Tribunal dated 14 February 2019), p. 3.

[333] Belenergia's Submission dated 22 February 2019, ¶ 11.

[334] Belenergia's Submission dated 22 February 2019, ¶ 11.

that even if there were an incompatibility between EU law and the ECT, "*EU law does not and cannot trump public international law.*"[335]

### (2) The GSE Conventions' Clause Conferring Exclusive Jurisdiction on Rome Courts Does Not Trigger The ECT's Fork-In-The-Road Clause

260. The Claimant denies Italy's objection on lack of unconditional consent to arbitrate under Article 26 ECT, as follows: *(a)* Belenergia has not previously "submitted" the investment dispute to the Rome courts under the GSE Conventions triggering the fork-in-the-road clause under Article 26(3)(b) ECT, as interpreted pursuant to Article 31 VCLT;[336] *(b)* Belenergia has not previously "submitted" the investment dispute to Rome courts under Article 26(3)(b) ECT as interpreted and applied by arbitral tribunals; *(c)* Italy has failed to show that Rome courts' jurisdiction cover the same dispute, the same cause of action, and the same parties of this arbitration; and *(d)* Italy's objection is one of admissibility, not capable of barring the Tribunal's jurisdiction.

### (a) Belenergia has not previously "submitted" the investment dispute to Rome courts under the GSE Conventions triggering the fork-in-the-road clause under Article 26(3)(b) ECT, as interpreted pursuant to Article 31 VCLT

261. Belenergia disagrees with the Respondent that the exclusive jurisdiction clause under the GSE Conventions automatically triggers the fork-in-the-road in Article 26(3)(b) ECT.[337] In the Claimant's view, the fork-in-the-road clause is only triggered with the actual filing of the dispute before Rome courts, "*a forum expressly stipulated*" under Article 26(2) ECT.[338] It adds that an existing exclusive jurisdiction clause "*does not mean that the investor has 'submitted' a dispute for resolution to a particular dispute settlement procedure*"[339] under

---

[335] Belenergia's Submission dated 22 February 2019, ¶ 11.

[336] Vienna Convention on the Law of Treaties of 23 May 1969 (Exhibit RLA-3).

[337] Energy Charter Treaty (Exhibit CL-2M), Article 26(3)(b): "*(i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).* […]"

[338] Claimant's Reply, ¶¶ 156.1, 158.

[339] Claimant's Reply, ¶ 156.2. *See also*, Claimant's Reply, ¶ 158.

Article 26(3) ECT.[340]  In the Claimant's view, an exclusive jurisdiction clause could be a "*previously agreed dispute settlement procedure*" under Article 26(2)(b), which does not equal to "filing" an investment dispute.[341]

262.  According to the Claimant, neither the Claimant nor its SPVs have commenced any proceedings, let alone claimed any relief before Rome courts or any other forum.[342]  It adds that they merely agreed on Rome courts' jurisdiction over contract claims under the GSE Conventions.[343]  The Claimant therefore asserts that all dispute settlement methods under Article 26 were available to it at the time that it filed its Request for Arbitration.[344]

263.  The Claimant argues that Article 26 ECT should be interpreted "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*" pursuant to Article 31(1) VCLT; it adds that its "context" "*shall comprise* […] *the text, including its preamble and annexes*" for interpretation purposes under Article 31(2) VCLT.[345]  The Claimant points out that the Tribunal should only have recourse to supplementary means of interpretation under Article 32 VCLT (ECT's preparatory work) if Article 26 ECT is not sufficiently clear, which is not the case.[346]

---

[340] Energy Charter Treaty (Exhibit CL-2M), Article 26(3): "*(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.* […]"

[341] Claimant's Reply, ¶ 158.  *See also*, Energy Charter Treaty (Exhibit CL-2M), Article 26(2): "*If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution: (a) to the courts or administrative tribunals of the Contracting Party party to the dispute; (b) in accordance with any applicable, previously agreed dispute settlement procedure; or (c) in accordance with the following paragraphs of this Article.*" (emphasis added)

[342] Claimant's Reply, ¶ 159.

[343] Claimant's Reply, ¶ 159.

[344] Claimant's Reply, ¶ 159.

[345] Claimant's Reply, ¶ 161.

[346] Claimant's Reply, ¶¶ 162-163., citing the book *Oppenheim's International Law* and the Advisory Opinion by the International Court of Justice (the "ICJ") in *Competence of Assembly Regarding Admission to the United Nations* (Exhibits CL-43RM, pp. 1275-1276 and CL-45RM, p. 8).

**264.** The Claimant submits that the textual interpretation of Article 26 ECT indicates that:

(a) the expression "*disputes*" concern existing disputes and not future disputes, the 3-month waiting period under Article 26(2) supporting this interpretation;

(b) the term "*choose*" in Article 26(2) implies that the Claimant can choose between different options, including the option of "[a] *previously agreed dispute settlement procedure*" under Article 26(2)(b), but not excluding other options;

(c) the terms "*submit*" and "*submitted*" in Articles 26(2), 26(3)(b) and 26(4) "*refer to the decision to file suit rather than to an agreement that exists before the choices under Article 26(2) even arise.*" [347]

**265.** Moreover, the Claimant asserts that an interpretation of Article 26 ECT in its context and in light of its purpose suggests that *(a)* proceedings have to be filed to trigger the fork-in-the-road clause; and *(b)* a party can file proceedings and subsequently withdraw from them, without triggering the fork-in-the-road clause, provided that no final dispute resolution took place.[348]   In support of this argument, the Claimant refers to Articles 26(3)(b)(i) and 26(3)(b)(ii),[349] and to Italy's Statement of 17 December 1997 of Annex ID ECT.[350]

---

[347] Claimant's Reply, ¶ 165.

[348] Claimant's Reply, ¶ 167.

[349] Energy Charter Treaty (Exhibit CL-2M), Article 26(3)(b): "*(i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).  (ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.*"

[350] Italy's Statement of 17 December 1997 of Annex ID ECT (Exhibit CL-151RM): "*In accordance with Article 26(3)(b)(ii), Italy declares that it does not allow for a dispute between an Investor and a Contracting Party to be submitted for international arbitration or conciliation, provided that an Investor has: a) already submitted the dispute Italian courts or administrative tribunals; or b) followed an applicable, previously agreed procedure for the settlement of disputes. In this respect a distinction must be made between two options: 1) if a resolution of the dispute has not yet been made by internal judicial or conciliation bodies, the Investor may revoke his judicial action or arbitral procedure by procedural or lateral renouncement and apply to other forms of dispute settlement; 2) if a resolution or any formal or legal document of execution has already been made to settle the dispute, conciliation or international arbitration is no longer possible. The above statements are based either on the principle of 'ne bis in idem' (to avoid two judgments being awarded for the settlement of the same dispute: one by the arbitration and the other by the court*

266. Even if Belenergia had actually filed a suit before Rome courts—*quod non*—it would nonetheless have access to ICSID arbitration provided that it withdrew its claims pursuant to Italy's Statement of 17 December 1997.  The Claimant therefore concludes that the exclusive jurisdiction clause in favour of Rome courts under the GSE Conventions cannot bar ICSID jurisdiction.[351]

### (b) *Belenergia has not previously "submitted" the investment dispute under Article 26(3)(b) ECT as interpreted and applied by arbitral tribunals*

267. The Claimant submits that arbitral decisions confirm that the fork-in-the-road clause is triggered when an investor chooses to file proceedings before host State courts or under some other dispute settlement mechanism.[352]  In this sense, it cites the decisions in *Toto v. Lebanon*, holding that a claim is barred when it was "*already brought before a different judicial forum*", and in *Maffezini v. Spain*, finding that this is "*final and irreversible.*"[353]

268. Drawing a parallel with the present case, Belenergia submits that the *Lanco v. Argentina*[354] tribunal held that an exclusive jurisdiction clause in favour of Argentine courts under a concession agreement did not bar ICSID jurisdiction under the US-Argentina BIT.[355]  The Claimant adds that the fork-in-the-road clause under Article VII of the US-Argentina BIT resembles the ECT one.[356]

### (c) *Italy has failed to show that the Rome courts' jurisdiction clause covers the same dispute, the same cause of action and the same parties of this arbitration*

269. Even if the exclusive jurisdiction clause under the GSE Conventions in favour of Rome courts could trigger the fork-in-the-road clause under Article 26(3) ECT—*quod non*—the

---

*of law), or on the principle of incontrovertibility of "decisum" which is binding on the parties in their substantial relations without giving them any possibility, during the procedure or after it, to use the normal means of appeal.*"

[351] Claimant's Reply, ¶ 168.

[352] Claimant's Reply, ¶¶ 169-171.

[353] Claimant's Reply, ¶ 171, citing *Emilio Agustín Maffezini v. The Kingdom of Spain* (Exhibit CL-46RM) and *Toto Costruzioni Generali SpA v. The Republic of Lebanon* (Exhibit CL-49RM).

[354] Exhibit CL-50RM.

[355] Claimant's Reply, ¶¶ 173-178, citing Mr. Stanimir Alexandrov (Exhibit CL-51RM).

[356] Claimant's Reply, footnote 175.

Claimant argues that the "*triple identity test*" under fork-in-the-road clauses is not fulfilled. The Claimant refers to various arbitral decisions in support of the "*triple identity test*" requiring *(i)* the same dispute, *(ii)* the same cause of action, and *(iii)* the same parties, as conditions for triggering the fork-in-the-road clause.[357]

270. Referring to *Vivendi I*,[358] the Claimant adds that its investment claims do not allege a cause of action under the GSE Conventions, but under the ECT. Because the present dispute does not satisfy the "*triple identity test*", the fork-in-the-road clause of Article 26(3) ECT could not have been triggered.[359]

### (d) Italy's objection is one of admissibility; thus, it does not bar the Tribunal's jurisdiction

271. Belenergia argues that the Respondent has made a "*taxonomical error*" when referring to the fork-in-the-road objection as one of jurisdiction rather than admissibility.[360] The GSE Conventions' jurisdiction clause was contained in standard form contracts. As such, these contracts were not freely negotiated, a purported jurisdictional choice triggering the fork-in-the-road rule being therefore invalid.[361] The objection being one of admissibility of claims, this Tribunal enjoys discretion and procedural flexibility to proceed to the merits despite Respondent's objection.[362]

### (3) The GSE Conventions' Exclusive Jurisdiction Clause Does Not Bar The Tribunal's Jurisdiction Or Render Any Claims Inadmissible

272. The Claimant objects to Italy's jurisdictional and admissibility objection under Articles 26(2)(b) and 26(3) ECT favouring Rome courts' exclusive jurisdiction under the GSE Conventions[363] in the light of *SGS v. Philippines*, as follows: *(a)* the GSE Conventions' exclusive jurisdiction clause has no effects on the Claimant's umbrella clause claim under Article 10(1) ECT; *(b)* a stay of the umbrella clause claim would be inappropriate; and

---

[357] Claimant's Reply, ¶¶ 179-180.
[358] Claimant's Reply, ¶ 181. *See* Exhibit CL-69M.
[359] Claimant's Reply, ¶¶ 181-182.
[360] Claimant's Reply, ¶ 183.
[361] Claimant's Reply, ¶ 156.4.
[362] Claimant's Reply, ¶ 183.
[363] Exhibits C-RFA-I-3 and C-RFA-I-4.

*(c)* the GSE Conventions' exclusive jurisdiction clause has no effects on the other Claimant's claims.

### *(a) The GSE Conventions' exclusive jurisdiction clause has no effects on the Claimant's umbrella clause claim under Article 10(1) ECT*

**273.** First, the Claimant submits that the present dispute is distinguishable from the *SGS v. Philippines* dispute.[364] In *SGS v. Philippines* the claimant SGS had concluded a customs inspection contract with the Philippines containing a broadly worded exclusive jurisdiction clause. After the Philippines' refusal to extend the contract's duration and to pay several invoices, SGS brought FET, expropriation and umbrella clause claims before an ICSID tribunal. The tribunal held that the entirety of SGS claims arose from the contract providing for exclusive jurisdiction of Philippine courts, and suspended the proceedings.

**274.** Conversely, Belenergia states that the present dispute is not limited to contract claims: it "*aris*[es] *from legislative and regulatory measures with contractual elements, particularly insofar as the FiT and RDI Conventions* [the GSE Conventions] *inculcated a legitimate expectation of stability on the part of the Claimant.*"[365] The Claimant adds that the jurisdiction clause of the GSE Conventions is not broadly worded as the one in *SGS v. Philippines* because it covers only disputes "*connected to the interpretation and/or execution of the* [Conventions] *and the documents referred to therein.*"[366] The Claimant explains that the dispute does not fall within the scope of the jurisdiction clause of the GSE Conventions because:

> […] *it concerns (a) sovereign acts of the Italian state through the implementation of the Spalma Incentivi Decree and Law of Conversion, neither of which are mentioned in [the GSE Conventions]; and (b) the unilateral amendment of [the GSE Conventions] through these same*

---

[364] Claimant's Reply, ¶ 190-196, citing *SGS Société Générale de Surveillance S.A. v. Republic of Philippines* (Exhibit RLA-6).

[365] Claimant's Reply, ¶ 196.

[366] The jurisdiction clauses under the GSE Conventions provide in the original the following. Sample jurisdiction clause from GSE Conventions on feed-in-tariffs (Exhibit C-RFA-I-3: "*Per qualsiasi controversia derivante o comunque connessa all'interpretazione e alla esecuzione della presente Convenzione e degli atti da essa richiamati le Parti convengono la competenza esclusiva del Foro di Roma*;" Sample jurisdiction clause from GSE Conventions on minimum prices (Exhibits C-RFA-I-4 and C-26M): "*Per qualsiasi controversia derivante o comunque connessa all'interpretazione e/o all'esecuzione della presente Convenzione e degli atti dalla stessa richiamati, che non possa essere risolta in via bonaria, le Parti convengono la competenza esclusiva del Foro di Roma.*"

> *sovereign instruments, an act distinct from interpretation and execution.*[367]

**275.** To interpret the jurisdiction clause of the GSE Convention as barring arbitral jurisdiction would be, in the Claimant's view, the same as giving Italy *carte blanche* to change the GSE Conventions as it pleases, including "*reducing the FiT and RID* [minimum prices] *to zero.*"[368]

**276.** Second, the Claimant argues that the *SGS v. Philippines*'s classification of umbrella clause claims as contract claims is legally wrong. The Claimant refers to *SGS v. Paraguay*,[369] among other decisions, explaining that an umbrella clause claim is a treaty claim; thus, treaty jurisdiction cannot be displaced by a contract's jurisdiction clause.[370]

### *(b) A stay of the umbrella clause claim would be inappropriate*

**277.** According to Belenergia, a stay of the umbrella clause claim would be inappropriate. The Claimant refers to the *SGS v. Paraguay*'s findings refusing to suspend the arbitration because umbrella claims were not mere contract claims covered by an exclusive jurisdiction clause.[371] The Claimant disapproves the *SGS v. Philippines*'s decision suspending the umbrella clause claim because *(i)* giving prevalence to an exclusive jurisdiction clause risks making the umbrella clause useless; *(ii)* staying the umbrella clause claim creates uncertainty; and *(iii)* an umbrella clause claim is a claim for treaty breach and not contract breach.[372] Belenergia also submits that the Tribunal should not suspend the arbitration because Claimant's claims extend beyond mere contract breaches, differently from the *SGS v. Philippines* dispute.[373]

---

[367] Claimant's Reply, ¶ 198.
[368] Claimant's Reply, ¶ 200.
[369] Exhibit CL-68RM.
[370] Claimant's Reply, ¶¶ 201-203.
[371] Claimant's Reply, ¶¶ 204-205.
[372] Claimant's Reply, ¶¶ 206.1, 206.2 and 206.4.
[373] Claimant's Reply, ¶ 206.3.

### (c) The GSE Conventions' exclusive jurisdiction clause has no effects on the other Claimant's claims

278. The Claimant disagrees with the Respondent that the exclusive jurisdiction clause under the GSE Conventions could bar any claims based on the re-modulation of tariff incentives and on the modification/cancellation of the minimum prices.[374]  The Claimant argues that the Respondent overlooks the distinction between treaty and contract claims.  Referring to arbitral decisions and to a scholarly writing, the Claimant states that:

> *The fundamental basis of* [its] *claim (save under the umbrella clause) is not the* [GSE Conventions]*, but the* Spalma Incentivi *Decree and the Law of Conversion that – among other things – unilaterally modified these agreements through the sovereign power of the Italian state. Thus, to paraphrase the tribunal in* BIVAC v. Paraguay*, the non-umbrella clause claims of the Claimant here turn on the interpretation and application of the ECT and the acts of the Respondent (as puissance publique), not on the interpretation of the* [GSE Conventions] *as such – although these instruments will necessarily be part of the overall legal and factual matrix, particularly insofar as violation of the legitimate expectations are concerned for the purposes of the FET analysis.*[375]

279. The Claimant concludes that even if *SGS v. Philippines* applied to this arbitration—*quod non*—it could only affect the umbrella claim but not the other claims.[376]   The fork-in-the-road clause under Article 26(3) has not been triggered because neither the Claimant nor its subsidiaries commenced proceedings before Rome courts.  No "*final and irreversible*" choice of forum being made by Claimant or its subsidiaries, the Claimant's claims are admissible under Article 26 ECT.[377]

### (4) Imbalance Costs Are Not "Taxation Measures" Within the Meaning of Article 21(7) ECT

280. Objecting to the Respondent's position, the Claimant argues that imbalance costs do not possess a "*fiscal*" character; thus, the imbalance cost claims do not fall within the meaning

---

[374] Claimant's Reply, ¶¶ 208-209.
[375] Claimant's Reply, ¶ 214.
[376] Claimant's Reply, ¶ 215.
[377] Claimant's Reply, ¶ 216.

of the "Taxation Measures" exception to ECT application under its Article 21.[378]    The Claimant submits that the ordinary meaning of the treaty terms defining "Taxation Measure" under Article 21(7)[379] confirms this.[380]

281.  According to Belenergia, the references in Article 21(7) to "*taxes of the domestic law of the Contracting Party*" and to "*taxes of any convention for avoidance of double taxation or of any other international agreement*" imply that only "*specific provisions in Italy's tax legislation or in its treaties*" can trigger the ECT exception on "Taxation Measures."[381] Imposition of additional costs from electricity supply variations caused by weather changes[382] on PV producers rather than on energy consumers cannot be, in the Claimant's view, equated to "Taxation Measures" under the ECT for a simple reason.[383]  The reason being that these additional imbalance costs do not refer to "*specific provisions in Italy's tax legislation or in its tax treaties*" within the meaning of Article 21(7)(a)(i) and (ii) ECT.[384]

282.  The Claimant further argues that the preparatory work on the ECT corroborates its view. The introduction of the expression "includes" in Article 21(7)(a) ECT by French, Canadian and Norwegian negotiators suggests that the expression "includes" has the same sense as the expression "means".  As a result, the definition of "Taxation Measures" in items (i) and (ii) of this provision is "*exhaustive*" and should be interpreted restrictively.[385]  The Claimant therefore disagrees with the Respondent that "Taxation Measures" are broadly defined.  In support of a restrictive interpretation of "Taxation Measures" the Claimant refers to scholarly writings by Professor Emmanuel Gaillard and Mr. Mark McNeil, and to the *Yukos v. Russia*

---

[378] Energy Charter Treaty (Exhibit CL-2M), Article 21(1): "*Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*"  (emphasis added)

[379] Energy Charter Treaty (Exhibit CL-2M), Article 21(7): "*For the purposes of this Article: (a) The term 'Taxation Measure' includes: (i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and (ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.*" (emphases added)

[380] Claimant's Reply, ¶ 218.

[381] Claimant's Reply, ¶¶ 219-220.

[382] Claimant defines weather changes as "*change in seasons, reduction in the number of hours of sunlight per day, increased cloud cover*".  *See* Statement of Claim, ¶ 126.

[383] Claimant's Reply, ¶ 220; Statement of Claim, ¶ 126.

[384] Claimant's Reply, ¶ 220.

[385] Claimant's Reply, ¶ 221.

and the *EnCana v. Ecuador* awards.[386]   In particular, the Claimant submits that the Respondent has failed to show that imbalance costs are "'*sufficiently clearly connected' to the existing framework of Italian taxation law to be considered a taxation measure within the meaning of Article 21(7).*"[387]   The Claimant adds that imbalance costs' "*arbitrary nature is apparent from the context of their imposition*."[388]

### (5) The Waiting Period Under Articles 26(1) And 26(2) ECT

283.  Belenergia argues that it has complied with the 3-month waiting period under Articles 26(1) and 26(2) ECT[389] through its Letter of 8 December 2014[390] ("**Amicable Solution Letter**") to the Respondent.[391]   According to Belenergia, the waiting period under Article 26 ECT does not bar the Tribunal's jurisdiction over the Claimant's imbalance costs claim for two reasons.

284.  First, the waiting period under Article 26 ECT, a mere procedural requirement, does not hinder ECT jurisdiction.[392]   The Claimant alleges that the Respondent has made a "*taxonomical*" mistake when referring to the waiting period as barring jurisdiction, rather than the admissibility of claims.[393]   It refers to the findings in *SGS v. Pakistan* and in *Abaclat v. Argentina* rejecting the "jurisdictional" character of a waiting period objection, among other decisions.[394]   It concludes that—at most—the Tribunal could find that the imbalance costs claim is "*temporarily inadmissible*," but not outside its scope of jurisdiction.[395]

---

[386] Claimant's Reply, ¶¶ 222-223.  *See* Exhibits CL-152RM, CL-161RM and CL-162RM.

[387] Claimant's Reply, ¶ 224.

[388] Claimant's Reply, ¶ 224.

[389] Energy Charter Treaty (Exhibit CL-2M), Articles 26(1) and 26(2): "*(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.  (2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:* […]" (emphasis added)

[390] Claimant's Letter of 8 December 2014 (Exhibit C-RFA-I-1).

[391] Request for Arbitration, ¶¶ 14-15; Statement of Claim, ¶¶ 14-15; Claimant's Reply, ¶¶ 225-236.

[392] Claimant's Reply, ¶ 226.1.

[393] Claimant's Reply, ¶¶ 228, 230.

[394] Claimant's Reply, ¶¶ 228-229.

[395] Claimant's Reply, ¶ 230.

285. Second, negotiations between the Parties on the imbalance costs claim would have been futile because the 3-month waiting period would have elapsed by the Hearing date.[396]  The Claimant refers to the Respondent's "*complete lack of enthusiasm*" about other "*properly brought*" claims by the Claimant under Article 26 ECT, as purportedly admitted by the Respondent.[397]  In the Claimant's view, the Respondent "*has shown a complete lack of appetite for negotiation,*" not having reached out to the Claimant for discussions; the Respondent has adopted a similar attitude toward other PV investors, which sought to challenge the PV measures before Italian courts.[398]  For all these reasons, the Claimant concludes that the Respondent would not have acted differently in relation to the imbalance costs claim.

286. The Claimant adds that by the Hearing date the 3-month waiting period would have elapsed. It then refers to case decisions and to an article by Professor Christoph Schreuer, favouring the admissibility of claims whose waiting period has elapsed in the interim of the proceedings.[399]  In Belenergia's view, requiring the Claimant to commence separate ICSID proceedings on the imbalance costs claim would lead to inefficiency and would not serve the interests of justice.[400]

### C. **The European Commission's *Amicus Curiae* Brief**

287. The Tribunal has given due consideration to the *amicus curiae* Brief ("***Amicus* Brief**") of the European Commission, which has proven useful.  The Tribunal therefore thanks the European Commission for its *Amicus* Brief.  The Tribunal highlights, however, that the European Commission is not a Party to this arbitration.  The Tribunal will therefore respond only to the arguments made by the Parties, taking into consideration the observations of the European Commission.

---

[396] Claimant's Reply, ¶ 226.2.
[397] Claimant's Reply, ¶ 232.
[398] Claimant's Reply, ¶ 233.
[399] Claimant's Reply, ¶ 234.
[400] Claimant's Reply, ¶ 235.

### D.  The Tribunal's Decision

### (1) Does Italy's EU Jurisdictional Objection Bar the Tribunal's Jurisdiction?

**288.** The Tribunal will consider below *(a)* the applicable law to the dispute; *(b)* whether the ECT has created *inter se* obligations between the EU Member States; *(c)* whether successive EU treaties could have affected the Tribunal's jurisdiction as per Article 30 VCLT; *(d)* whether an *inter se* modification of the ECT as per Article 41 VLCT could have affected the Tribunal's jurisdiction; and *(e)* whether the Tribunal should refrain from exercising its jurisdiction because of an alleged risk of non-recognition and non-enforcement of the award.

### *(a) Applicable law*

**289.** At the Hearing,[401] when discussing the effects of the *Achmea* decision on the Tribunal's jurisdiction, the Parties disagreed on whether EU law could be relevant to resolving this question.  According to the Claimant, Article 26(6) ECT's reference to the ECT and to "*applicable rules and principles of international law*" should be interpreted to include only the ECT and customary international law excluding the application of EU law, relying on the *Rainbow Warrior* case.[402]   In turn, Italy sustains that EU law applies as part of international law.

**290.** Article 42(1) of the ICSID Convention provides that this Tribunal "*shall decide in accordance with such rules of law as may be agreed by the parties.*"  In turn, the applicable law clause under Article 26(6) ECT provides that the Tribunal "*shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*"  In light of Article 26(6)'s text, the Tribunal disagrees with Belenergia that the

---

[401] *See also* Claimant's Comments to *Slovak Republic v. Achmea,* ¶¶ 16-21; Respondent's Comments to *Slovak Republic v. Achmea*, ¶¶ 4-5.

[402] Exhibit CL-178RM, ¶ 72: "[…] This provision refers to two sources of international law: the conventional source, represented by certain bilateral agreements concluded between the Parties, and the customary source, constituted by the 'applicable rules and principles of international law'.  The customary source, in turn, comprises two important branches of general international law: the Law of Treaties, codified in the 1969 Vienna Convention, and the Law of State Responsibility, in process of codification by the International Law Commission.  The Parties disagree on the question of which of these two branches should be given primacy or emphasis in the determination of the primary obligations of France."

expression "*applicable rules and principles of international law*" should be read to exclude EU law.

291. The *Rainbow Warrior* case differs from this case because its disputing parties disagreed on whether France's primary obligations were governed by conventional or customary law. Hence, the matter before the *Rainbow Warrior* tribunal was whether conventional or customary law governed French primary obligations (including the hierarchy between conventional and customary sources of law) rather than whether other international law rules were applicable at all.

292. Several investment treaty tribunals have considered that EU law is part of international law, including ECT arbitral tribunals in the *Electrabel, Blusun* and *RREEF* cases.[403]   This Tribunal cannot therefore accept Belenergia's narrow reading of the text of Article 26(6) ECT to exclude the application of EU law when its text expressly refers to "*applicable rules of international law*."   This Tribunal concurs with the *Electrabel* tribunal that "*all EU legal rules are part of a regional system of international law and therefore have an international legal character*."[404]   Further, the Tribunal sees a certain contradiction in the Claimant's position which assumes that intra-EU Member State investments are international investments and refuses to accept that EU law is part of international law.   Hence, the Tribunal finds that it can apply EU law as part of international law and "*where relevant should apply European law as such*"[405] to the extent that the ECT regime permits it.

293. Moreover, the Parties agree that the treaty interpretation rules of the VCLT apply to this dispute.   This Tribunal can therefore apply the ECT provisions and international law including the VCLT when relevant.

### (b) Has the ECT created inter se obligations between the EU Member States?

294. Italy argues that the ECT has not created obligations binding the EU Member States and the EU *inter se,* noting that this interpretation should prevail in light of VCLT interpretation

---

[403] *Electrabel v. Hungary,* Decision on Jurisdiction, Applicable Law and Liability (Exhibit CL-27M), ¶¶ 4.120, 4.122-4.126, *Blusun v. Italy* (Exhibit RLA-1), ¶ 278.  *See also RREEF v. Spain* (Exhibit CL-2RM), ¶ 73.

[404]  *Electrabel v. Hungary,* Decision on Jurisdiction, Applicable Law and Liability (Exhibit CL-27M), ¶ 4.122.

[405] *Blusun v. Italy* (Exhibit RLA-1), ¶ 278.

principles and of the EU's and its Member States' "intent."  In turn, Belenergia rejects the *inter se* doctrine as not representative of customary international law, submitting that the ECT was conceived to apply to intra-EU disputes creating obligations between the EU Member States, in accordance with Articles 31 and 32 VCLT.

295.  The Tribunal has to decide whether the ECT applies to the relations *inter se* of EU Member States.  Like the *Blusun* tribunal, which also decided on the same issue in relation to ECT jurisdiction, this Tribunal will interpret the ECT in good faith and pursuant to the ordinary meaning of the ECT's terms in their context and in light of the ECT's object and purpose.

296.  Historically, the Great Britain relied on the *inter se* doctrine when affirming the British Empire's "diplomatic unity" by rejecting the application *inter se* of multilateral treaties to which British Dominions were also parties.[406]  As pointed out in *Blusun v. Italy,* this was not accepted in the absence of an express treaty provision or a clear understanding of the parties to that treaty supporting the application of the *inter se* doctrine.[407]  This is consistent with the premise that multilateral treaties apply *prima facie* equally between the parties pursuant to the *pacta sunt servanda* rule under Article 26 VCLT, subject to express provisions to the contrary.

297.  The Tribunal therefore departs from the premise that like any other multilateral treaty the ECT applies *prima facie* equally between the parties unless the contrary is supported by express provision.  To respond to Italy's reliance on the *inter se* doctrine, the Tribunal will interpret the ECT's text in accordance with the principles of treaty interpretation of the VCLT.

298.  <u>First</u>, the ECT's Preamble recalls that the ECT sought to adopt "*on a secure and binding international legal basis*" the commitments under the 1991 European Energy Charter, of which the European Communities ("**EC**") and the Euratom were signatories together with the EC Member States at the time.  Nothing in the European Energy Charter suggests that it did not apply to EC Member States *inter se.*  Like the EU, which by way of Article 47 of the TEU[408]  has been conferred legal personality, the EU Member States Parties to the ECT are

---

[406] *See Blusun v. Italy* (<u>Exhibit RLA-1</u>), ¶ 280(2).
[407] *Blusun v. Italy* (<u>Exhibit RLA-1</u>), ¶ 280(2).
[408] *See* Treaty on European Union (<u>Exhibit REX-2B</u>).

equally independent entities with legal personality in their own rights.  To recall the historical origins of the *inter se* doctrine, the EU Member States are not Dominions or protectorates from the EU, as illustrated, *inter alia*, by the principle of conferral.

299.  Neither does the definition of "Contracting Party" under the ECT indicate an *inter se* exclusion with respect to the EU Member States.  Rather, "Contracting Party" is defined in Article 1(2) ECT as a State or a "Regional Economic Integration Organisation" ("**REIO**") that has consented to be bound by the ECT.  Pursuant to this definition, the ECT applies equally between the Contracting Parties so defined.[409]

300.  Further, Article 2 ECT on the treaty's purpose sets forth the objective "*to promote long-term cooperation in the energy field, based on complementarities and mutual benefits*."  Article 2 contains no hint of an *inter se* exclusion either.

301.  Second, the Decision in Annex 2(5) ECT on Articles 24(4)(a) and 25 provides, among other matters, that an investment of an investor of a non-party to an Economic Integration Agreement ("**EIA**") is entitled to EIA treatment if it "*has its registered office, central administration or principal place of business within the EIA area*," and that if the investor has only its registered office in the EIA, it has to present "*an effective and continuous link with the economy*" of one of the EIA parties to be able to benefit from EIA treatment.  Contrary to Italy's allegation, this Decision, together with the Declaration on Article 25, contemplates different types of corporate presence within the EU, which cannot be interpreted to exclude the ECT application from the EU Member States' relations *inter se*.

302.  Third, Italy's and the European Commission's submissions on the Member States' lack of competence to enter into ECT obligations lack support.  Article 1(3) ECT's definition of REIO as an organisation to which its member States "*have transferred competence over certain matters*" and Article 1(10) ECT's definition of "Area" of an REIO as meaning "*the Areas of the member states of such Organisation*" cannot be interpreted as referring to EU Member States' lack of competence to conclude the ECT.  Neither could Article 25 ECT on the MFN exception in relation to non-parties to EIAs be construed to imply the EU Member States' lack of competence to conclude the ECT.  Further, Article 16 ECT setting forth a

---

[409]  *See Blusun v. Italy* (Exhibit RLA-1), ¶ 280(2), and footnote 510.

non-derogation clause of more favourable provisions towards investors and investments in relation to past and future international agreements cannot warrant this purported lack of competence either.

303. Rather, the fact that EU Member States were required to participate in the ECT as a mixed agreement implies that the EU Member States and the EU had overlapping or complementary competences to conclude the ECT. As the *Blusun* tribunal rightly put it, "[t]*he mere fact that the EU is a party to the ECT does not mean that the EU Member States did not have competence to enter into* inter se *obligations in the Treaty. Instead, the ECT seems to contemplate that there would be overlapping competences.*"[410] Thus, the ECT text does not suggest that EU Member States have transferred exclusive competence over all matters of investment and dispute resolution to the EU. If the EU Member States had envisaged not having competence over *inter se* obligations, the EU would have included a declaration of competence in light of other declarations made in relation to mixed agreements like the EU Declaration of Competence to the FAO.[411]

---

[410] *Blusun v. Italy* (Exhibit RLA-1), ¶ 281.

[411] *Blusun v. Italy* (Exhibit RLA-1), ¶ 282, and footnote 515 citing the European Community's Declaration of Competence when acceding to the Food and Agriculture Organisation of the United Nations ("FAO"). *See*, Constitution of the FAO, European Community Declaration of Competence, OJ C (16 December 1991), p. 238 et seq.: "[…]*The scope of the competence which the Member States have transferred to the Community pursuant to the Treaty is, by its nature, subject to continuous change. The Community will make further declarations whenever the need arises. In some matters the European Community has exclusive competence and in other matters competence is shared between the European Community and the Member States. The Member States remain competent for matters in respect of which no competence has been transferred to the European Community. I. The Community has exclusive competence in: a) All matters relating to commercial policy, in accordance with Article 113 of the EC Treaty. […]; b) all matters concerning fisheries which are aimed at protecting the fishing grounds and conserving the biological resources of the sea in accordance with Article 102 of the 1972 Act of Accession. II. The Community also has competence, shared with the Member States, in the following matters which come under the FAO's field of activity. a) Development cooperation (Articles 130u to 130y of the Treaty) […] b) Policy on research and technological development (Articles 130f to 130p of the EC Treaty) (1) […] c) Environmental policy (Articles 130r to 130t of the EC Treaty) […]"*; 2006 International Tropical Timber Agreement, European Community Declaration in accordance with Article 36(3) of the Agreement, OJ L262 (9 October 2007), p. 26: *"In accordance with Article 36(3) of the International Tropical Timber Agreement, 2006, this declaration indicates the powers transferred to the European Community by its Member States in the matters governed by the Agreement. The European Community declares that, in accordance with the Treaty establishing the European Community: - with respect to the trade matters covered by the Agreement, the European Community has exclusive competence under the common commercial policy, and - the European Community shares powers with its Members States in environmental matters and in development cooperation. The scope and the exercise of the European Community powers are, by their nature, subject to continuous development, and the European Community will complete or amend this declaration, if necessary, in accordance with Article 36(3) of the Agreement."*

304. <u>Fourth</u>, the Tribunal agrees with the *Blusun* tribunal that "*nothing in the text of the ECT* [] *carves out or excludes issues arising between Member States.*" [412]  The Tribunal disagrees with Italy that the *inter se* doctrine applies as a matter of "*intent.*"  Rather, Articles 31 to 33 VCLT give preference to the treaty's text as its main source of interpretation.

305. As discussed above, the ECT's text in its context and in light of the ECT's object and purpose does not support an interpretation disconnecting relations between Member States from the ECT.  Italy's argument on an alleged "disconnection" clause is thus unfounded.  The ECT Parties have included the following "disconnection" clause in relation to the Svalbard Treaty:

> *DECISION With respect to the Treaty as a whole*
>
> *In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty.  In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.*

306. In light of the principle *expressio unius est exlusio alterius* according to which when one or more things of a class are expressly referred to others of the same class are excluded, the Tribunal considers that if the ECT Parties intended to provide an intra-EU "disconnection clause," they would have done it expressly as they did with the Svalbard Treaty.

307. Moreover, the Tribunal disagrees with Italy that "*subsequent practice in the application*" of the ECT could support, together with the ECT's context, Italy's jurisdictional objection within the meaning of Article 31(3)(b) VCLT.  Article 31(3)(b) VCLT provides that "[a]*ny subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation*" shall be taken into account together with the treaty's context.

308. The Tribunal does not see how the following facts could support Italy's argument on Article 31(3)(b) VCLT: *(i)* that intra-EU ECT arbitrations had not been instituted before 2007; *(ii)* that certain of the EU Member States, which featured as respondents in investment

---

[412] *Blusun v. Italy* (<u>Exhibit RLA-1</u>), ¶ 280.

arbitrations, have "consistently" objected to jurisdiction; and *(iii)* that no ECT Contracting Party has ever intervened in favour of ECT jurisdiction in these arbitrations. These isolated facts cannot establish the agreement of all ECT Contracting Parties within the meaning of Article 31(3)(b). Neither could the European Commission's Statement[413] in relation to the 2015 International Energy Charter be relevant because this is a different treaty. Rather, this Statement highlights instead the fact that the EU has provided none in relation to the EU Member States' *inter se* relations under the ECT.

309. Differently from the ECT, other multilateral treaties like the 2005 Schengen III Agreement[414] and the 1988 Convention on Mutual Administrative Assistance in Tax Matters[415] contain express clauses on the relations between EU Member States *inter se*, which is not the case of the ECT. In the absence of an express provision, the Tribunal finds that Italy's allegation that the ECT has not created obligations binding the EU Member States *inter se* fails.

310. <u>Finally</u>, the Tribunal dismisses Italy's alternative argument that *inter se* obligations cannot cover areas falling under EU competence. As demonstrated above, the fact that EU Member States participated in the ECT as a mixed agreement implies that EU Member States and the EU had overlapping or complementary competences over ECT matters.

311. The Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty provides as follows:

> *The European Communities are a regional economic integration organisation within the meaning of the Energy Charter Treaty. The Communities exercise the competences conferred on them by their Member States through autonomous decision-making and judicial institutions.*

---

[413] "It is declared that, due to the nature of the EU internal legal order, the text in Title II, Heading 4, of the International Energy Charter on dispute settlement mechanisms cannot be construed so as to mean that any such mechanisms would become applicable in relations between the European Union and its Member States, or between the said Member States, on the basis of that text." (Statement of Defense, ¶ 135).

[414] *See* <u>Exhibit CL-16RM</u>, Article 47(1): "*1. The provisions of this Convention shall apply only in so far as they are compatible with European Union law. Should the European Union in future introduce arrangements affecting the scope of this Convention, European Union law shall take precedence in applying the relevant provisions of this Convention. The Contracting Parties may amend or replace the provisions of this Convention in view of those new arrangements resulting from European Union law.*"

[415] *See* <u>Exhibit CL-17RM</u>, Article 27(2): "*Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.*".

*The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.*

*The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days (1).*

*The Court of Justice of the European Communities, as the judicial institution of the Communities, is competent to examine any question relating to the application and interpretation of the constituent treaties and acts adopted thereunder, including international agreements concluded by the Communities, which under certain conditions may be invoked before the Court of Justice.*

*Any case brought before the Court of Justice of the European Communities by an investor of another Contracting Party in application of the forms of action provided by the constituent treaties of the Communities falls under Article 26(2)(a) of the Energy Charter Treaty (2). Given that the Communities' legal system provides for means of such action, the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation.*

*As far as international arbitration is concerned, it should be stated that the provisions of the ICSID Convention do not allow the European Communities to become parties to it. The provisions of the ICSID Additional Facility also do not allow the Communities to make use of them. Any arbitral award against the European Communities will be implemented by the Communities' institutions, in accordance with their obligation under Article 26(8) of the Energy Charter Treaty.*[416]

312. Nothing in the text of this Statement suggests a derogation from this Tribunal's jurisdiction. Rather, the text above seems to refer to the allocation of liability between the EU and its Member States, which is not at stake. The text's reference to the ECJ's competence does not include any restrictive expression in relation to this Tribunal's jurisdiction. The same Statement also reads that that the European Communities cannot participate in ICSID

---

[416] See *Amicus* Brief, ¶ 76, and Annex EC-12.

proceedings.  Thus, this Tribunal finds that the above Statement has no bearing on ECT arbitral jurisdiction under the ICSID Convention in this arbitration.

313.  In relation to Italy's reliance on the ECT's preparatory work as a "supplementary means" of interpretation under Article 32 VCLT, the Tribunal considers this impermissible because the terms of the ECT are clear against Italy's interpretation of the ECT.[417]

314.  In light of the foregoing, the Tribunal concludes that the ECT binds equally its Contracting Parties including the EU Member States *inter se* pursuant to the *pacta sunt servanda* rule under Article 26 VCLT.

### (c)  Have successive EU treaties affected the Tribunal's jurisdiction pursuant to Article 30 VCLT?

315.  Italy sustains that the EU has evolved in a way that prevents ECT application to intra-EU disputes, referring to Article 30 VCLT on successive treaties.  According to the Respondent, the Lisbon Treaty prevails over the ECT because they relate to the same subject-matter.  Italy makes, first, an argument based on the combined reading of Article 30(2) VCLT and Article 16 ECT, and, second, an argument based on the *lex posterior* rule under Article 30(4)(a) VCLT, stating that the Lisbon Treaty prevails to the extent of any incompatibility with the ECT.  Belenergia objects to this by arguing that the Lisbon Treaty and the ECT do not relate to the same subject matter, and that, even if they did, they are not incompatible with each other.

316.  Article 30 VCLT sets forth rules on the relationship between successive treaties relating to the same subject-matter, including the *lex posterior* rule that successive treaties prevail over the earlier if the treaties are incompatible, as follows:

> *Article 30. APPLICATION OF SUCCESSIVE TREATIES RELATING TO THE SAME SUBJECT-MATTER*
>
> *1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.*

---

[417] *See Blusun v. Italy* (Exhibit RLA-1), ¶ 280(4).

> *2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.*
>
> *3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.*
>
> *4. When the parties to the later treaty do not include all the parties to the earlier one:*
>
> *(a) As between States parties to both treaties the same rule applies as in paragraph 3;*
>
> *(b) As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations* […]

**317.** Italy's reliance[418] on the ILC Report on Fragmentation to argue that the Lisbon Treaty and the ECT have the same subject-matter is unwarranted. According to the ILC Report on Fragmentation, the "test" on whether two treaties deal with the same subject-matter should be carried out on a case-by-case basis seeking to establish "*an institutional connection between 'chains' or clusters of treaties that are linked institutionally and that States parties envisage as part of the same concerted effort.*" This Tribunal does not find that this connection or concerted effort exists because the EU treaties do not provide for investor-State arbitration under the ICSID Rules.

**318.** Even if the Tribunal would consider that the Lisbon Treaty and the ECT dealt with the same subject-matter, it would note that the combined reading of Article 16 ECT and Article 30(2) VCLT could not lead to ECT derogation as the earlier treaty. Article 16 sets forth a non-derogation clause of more favourable provisions towards investors and investments in relation to past and future international agreements, as follows:

> *Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,*

---

[418] *See* Statement of Defense, ¶¶ 80-81.

> *(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and*
>
> *(2) <u>nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,</u>*
>
> *<u>where any such provision is more favourable to the Investor or Investment.</u>* (emphases added)

319.    Because the ECT provides for a more favourable dispute resolution mechanism this cannot be derogated by the Lisbon Treaty. Article 26 ECT confers upon investors of a Contracting Party the right to directly initiate international arbitration such as ICSID arbitration against another Contracting Party, after a short waiting period with the possibility of raising claims based on ECT's rights and obligations, directly effective before an arbitral tribunal. The EU judicial system does not offer a similar option for investors, which have to act in the courts of the State that allegedly damaged their investment, under national procedural rules, in the language admitted in these courts and with the obligation to engage local lawyers. Hence, the conflict rule under Article 16 ECT confirms, as a *lex specialis*, the investor's right to international arbitration under Article 26 ECT, as being a more favourable dispute resolution mechanism.

320.    The Tribunal is unconvinced by Italy's Article 30(4)(a) argument on the *lex posterior* rule in case of incompatibility between earlier and successive treaties. The Tribunal finds complementarity rather than incompatibility between the ECT and the Lisbon Treaty, from a substantive and a procedural perspective.[419] From a substantive law perspective, EU rules establishing the internal market are complementary to ECT rules, including rules prohibiting discrimination.

321.    From a procedural perspective, this Tribunal finds that Article 26 ECT on investor-State arbitration is complementary rather than incompatible to the remedies of the EU legal order.

---

[419] On substantive complementarity, *see Blusun v. Italy* (<u>Exhibit RLA-1</u>), ¶ 286. *See also,* on the presumption of compatibility or improbable incompatibility, *Electrabel v. Hungary* (<u>Exhibit CL-27M</u>), ¶¶ 4.135-4.141; *Isolux v. Spain* (<u>Exhibit CL-6RM</u>), ¶¶ 644-645.

The Tribunal is well aware of the ECJ's *Achmea*[420] decision holding Article 8 of the Netherlands-Czech and Slovak Federal Republic BIT inconsistent with Articles 267 and 344 TFEU. According to the ECJ, an offer to arbitrate by the EU Member States such as the one under Article 8 of this BIT:

> (a) violates Article 344 TFEU which sets forth the principle that "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for*" in the EU treaties;[421] and

> (b) removes dispute settlement from the jurisdiction of EU Member States and from the EU judicial system with "*mechanisms capable of ensuring the full effectiveness of the rules of the EU*" such as referring questions of EU law for a preliminary ruling by the ECJ, in breach of Article 267 TFEU.[422]

322. Yet ¶ 58 of the ECJ's decision in *Achmea* reads as follows:

> *In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above.*[423] (emphasis added)

323. <u>First</u>, the *Achmea* decision does not concern a treaty to which the EU itself participates as a Party. The ECJ expressly relies above on the fact that the BIT was concluded between the EU Member States without the participation of the EU. This Tribunal agrees with the *Masdar v. Spain*[424] tribunal that the ECJ's reasoning cannot be transposed to the ECT, which

---

[420] *See* <u>Exhibit CL-166RM</u>.
[421] *See* <u>Exhibit CL-166RM</u>, ¶¶ 32, 60.
[422] *See* <u>Exhibit CL-166RM</u>, ¶¶ 43, 45, 55, 60.
[423] <u>Exhibit CL-166RM</u>.
[424] *See Masdar v. Spain* (<u>Exhibit CL-179RM</u>), ¶ 679.

is a mixed agreement with the EU as a Contracting Party. Italy is pre-empted from relying on the principle of sincere cooperation between the Union and the Member States under Article 4(3) of the TEU[425] when the EU is a Party to the ECT.

324. <u>Second</u>, this Tribunal takes note of the ECJ's perception of inconsistency of the Member States' offer to arbitrate with Articles 267 and 344 TFEU. Nevertheless, this is the perspective from the EU legal order. As determined in ¶¶ 290-292 above on the applicable law, EU law can be applied to the extent that the ECT regime permits its application. This Tribunal considers that different international law regimes can communicate to the extent that their own rules permit it. This Tribunal has been constituted and exercises its jurisdiction under the ECT regime to which the EU is a Contracting Party. A treaty means what it says. No text or conflict rule under ECT suggests that an ECJ's decision pertaining to the EU legal order could derogate from the offer to arbitrate under Article 26 ECT as pertaining to the ECT as an independent international law regime.

325. Moreover, the European Commission's Communication[426] on the Protection of Intra-EU Investment following the ECJ's *Achmea* decision presents an EU legal order perspective. Even from an EU legal order perspective a communication of the European Commission is a non-binding instrument, not to mention that it cannot bind an ICSID Tribunal.

326. As to the Member States' Declarations dated 15 January 2019[427] and 16 January 2019,[428] Luxembourg is only signatory of the 16 January 2019 Declaration, together with Finland, Malta, Slovenia and Sweden, while Italy is signatory of the 15 January 2019 Declaration, together with other 21 Member States. Italy's declaration provides that the ECT, to which the Union is a Contracting Party, is an integral part of the EU legal order and thus need to be compatible with the EU Treaties and that interpreting the ECT investor-State arbitration

---

[425] *See* Treaty on the European Union (<u>Exhibit REX-2B</u>).

[426] *See* Claimant's and Respondent's Observations of 8 August 2018 on the Communication from the Commission to the European Parliament and the Council: Protection of intra-EU Investment (COM(2018) 547/2) (<u>Exhibit REX-75</u>).

[427] *See* Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by 22 Members States including the Italian Republic (Annex to Italy's Letter to the Tribunal dated 14 February 2019).

[428] *See* Declaration of the Representatives of the Governments of the Member States of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by the Republic of Finland, the Grand Duchy of Luxembourg, the Republic of Malta, the Republic of Slovenia and the Kingdom of Sweden (Annex to Italy's Letter to the Tribunal dated 14 February 2019).

clause as applicable between Member States "*would be incompatible with the Treaties and thus would have to be disapplied.*"[429]

327.  Yet, Luxembourg's declaration provides that it would be inappropriate to express views on the compatibility between EU law and the intra-EU application of the ECT, as follows:

> *The* Achmea *case concerns the interpretation of EU law in relation to an investor-state arbitration clause in a bilateral investment treaty between Member States. The Member States note that the* Achmea *judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty. A number of international arbitration tribunals post the* Achmea *judgment have concluded that the Energy Charter Treaty contains an investor-State arbitration clause applicable between EU Member States. This interpretation is currently contested before a national court in a Member State* [Set-aside proceeding in Svea Court of Appeal, Case No 4658-18, Novenergia II- Energy & Environment (SCA) (Grand Duchy of Luxembourg), SI CAR vs the Kingdom of Spain, SCC Arbitration (20 15/06)]. *Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty.*[430]

328.  Regardless of the Declarations above, the Tribunal is the judge of its own competence as per Article 41(1) of the ICSID Convention. The undertakings of the signatories of the declaration signed by Italy use the future tense not only in relation to the future of intra-EU BITs but also in relation to the ECT, as follows:

> [...] *5. ln light of the Achmea judgment, Member States will terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.*
>
> [...] *8. Member States will make best efforts to deposit their instruments of ratification, approval or acceptance of that plurilateral treaty or of*

---

[429] *See* Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by 22 Members States including the Italian Republic (Annex to Italy's Letter to the Tribunal dated 14 February 2019), p. 2.

[430] *See* Declaration of the Representatives of the Governments of the Member States of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by the Republic of Finland, the Grand Duchy of Luxembourg, the Republic of Malta, the Republic of Slovenia and the Kingdom of Sweden (Annex to Italy's Letter dated 14 February 2019), p. 3.

> *any bilateral treaty terminating bilateral investment treaties between*
> *Member States no later than 6 December 2019.  They will inform each*
> *other and the Secretary General of the Council of the European Union*
> *in due time of any obstacle they encounter, and of measures they*
> *envisage in order to overcome that obstacle.*
>
> *9. Beyond actions concerning the Energy Charter Treaty based on this*
> *declaration, Member States together with the Commission will discuss*
> *without undue delay whether any additional steps are necessary to draw*
> *all the consequences from the Achmea judgment in relation to the intra-*
> *EU application of the Energy Charter Treaty.*

329.  The language in the future tense above is clear that neither the intra-EU BITs nor the ECT have been terminated.

330.  More, Luxembourg's declaration as the Contracting Party of the investor's nationality in this arbitration differs from Italy's declaration, the Contracting Party hosting the investment, in relation to the compatibility between the ECT and EU law.  The Tribunal does not see how these declarations could be reconciled and thus cannot apply them in the present case as Italy's unilateral declaration enshrined in the Member States' Declaration dated 15 January 2019[431] cannot trump the *inter se* obligations under the ECT binding on Italy and Luxembourg.  Thus, Italy's request for termination or suspension of the proceedings dated 14 February 2019 cannot stand on the basis of these declarations.

331.  Third, Italy's reference to the *MOX Plant (Commission v. Ireland)* case is not convincing because it omits that the ECJ relied on Article 282 UNCLOS in its reasoning in this case. The Commission brought infringement proceedings against Ireland for having instituted arbitration proceedings against the UK on the basis of Chapter VII of UNCLOS.  Although the UNCLOS is a mixed agreement like the ECT, Article 282 UNCLOS provides that dispute settlement procedures under general, regional or bilateral agreements "*shall apply in lieu of the procedures provided for in this Part* [i.e. in UNCLOS]*, unless the parties to the dispute otherwise agree.*"  The ECJ expressly referred to Article 282, as follows:

> *It follows from Article 282 of the Convention that, as it provides for*
> *procedures resulting in binding decisions in respect of the resolution of*

---

[431] *See* Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, signed by 22 Members States including the Italian Republic (Annex to Italy's Letter to the Tribunal dated 14 February 2019).

> *disputes between Member States, the system for the resolution of disputes set out in the EC Treaty must in principle take precedence over that contained in Part XV of the Convention.*[432]

332. The ECT contains no equivalent provision to Article 282 UNCLOS.

333. <u>Finally</u>, the Tribunal is unconvinced that ECJ's *Opinion 1/09* bears on this dispute because *Opinion 1/09* concerned a mere draft agreement on the European and Community Patents before the EU, its Member States, and third countries could even accede to it. Conversely, the EU and its Member States signed and ratified the ECT on the basis of decisions by the European Council and the Commission.[433] In any case, *Opinion 1/09* enshrines a perspective from the EU legal order that cannot be transposed to the ECT's regime.

334. Thus, the Tribunal finds that successive EU treaties have not affected the Tribunal's jurisdiction pursuant to Article 30 VCLT.

### (d) Has there been an **inter se** *modification of the ECT under Article 41 VCLT affecting the Tribunal's jurisdiction?*

335. The Respondent argues that the Lisbon Treaty is an *inter se* agreement between the EU Member States modifying the ECT pursuant to Article 41 VCLT. Belenergia objects to this, relying on Article 46 ECT prohibiting reservations and on Article 41(2) VCLT requiring notification of modification.

336. Article 41 VCLT provides for the possibility of an *inter se* modification *(a)* when this possibility is provided in the treaty, and *(b)* when, in the absence of a modification provision, the *inter se* modification does not affect the enjoyment of third States parties and does not derogate from a provision whose derogation is incompatible with the object and purpose of the treaty, in which case notification of modification is required, as follows:

> Article 41 AGREEMENTS TO MODIFY MULTILATERAL TREATIES BETWEEN CERTAIN OF THE PARTIES ONLY

---

[432] *See MOX Plant (Commission v. Ireland)* (<u>Exhibit REX-9</u>), ¶ 125.

[433] *See Electrabel v. Hungary* (<u>Exhibit CL-27M</u>), ¶ 4.135: "*The legal basis on which the European Union became a party to the ECT is set out in Council Decision 94/998/EC (as to signature) and Council and Commission Decision 98/181/EC, ECSC, Euratom (as to ratification).*"

> *1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:*
>
> *(a) The possibility of such a modification is provided for by the treaty; or*
>
> *(b) The modification in question is not prohibited by the treaty and:*
>
> *(i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;*
>
> *(ii) Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.*
>
> *2. Unless in a case falling under paragraph l(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.*

337. On the possibility of modification under Article 41(1)(a) above, the ECT expressly provides in Article 46 that "[n]*o reservations may be made to this Treaty*."  Hence, failing notification pursuant to Article 41(2) VCLT, the Tribunal cannot favour Italy's argument on the alleged *inter se* modification.

### *(e)  Could the Tribunal refuse to exercise its jurisdiction because of an alleged risk of non-recognition and non-enforcement of the award?*

338. Italy argues that there is a risk of award non-recognition and non-enforcement after the *Achmea* decision, citing  Article 42 ICC Arbitration Rules  (effective  1 March 2017) and Article 32.2 LCIA Arbitration Rules (effective 1 October 2014) on the Tribunal's obligation to render an enforceable award.

339. This arbitration is based on the ICSID Convention, which establishes a self-contained system independent from national legal systems.  ICSID awards may be subject to limited annulment grounds under Article 52 of the ICSID Convention, and it is within this legal framework that this Tribunal must be concerned by the enforceability of its award.  Under the ICSID Convention, the recognition obligation is unconditional under Article 54(1), although enforcement of pecuniary obligations is subject to the law of the place of enforcement under

Article 54(3).  The Tribunal therefore finds that, at this stage, Italy's concerns are unfounded in relation to award recognition and hypothetical in relation to award enforcement.

* * *

340. Based on the foregoing, the Tribunal dismisses Italy's EU jurisdictional objection in light of the following findings: *(a)* EU law can apply as part of international law and "*where relevant should apply European law as such*"[434] to the extent that the ECT regime permits this; *(b)* the ECT binds equally between its Contracting Parties including the EU Member States *inter se* pursuant to the *pacta sunt servanda* rule under Article 26 VCLT; *(c)* successive EU treaties have not affected the Tribunal's jurisdiction as per Article 30 VCLT; *(d)* failing notification pursuant to Article 41(2) VCLT, a purported *inter se* modification of the ECT cannot affect the Tribunal's jurisdiction; and *(e)* Italy's concerns are unfounded in relation to award recognition and hypothetical in relation to award enforcement at this stage.

### (2) Do the Exclusive Jurisdiction Clauses under the GSE Conventions Bar Jurisdiction?

341. Italy submits that the Tribunal lacks jurisdiction because the broad terms of the choice of forum clause conferring exclusive jurisdiction upon Rome courts under the GSE Conventions would trigger the fork-in-the-road rule under Articles 26(2) and 26(3) ECT.  Belenergia objects to Italy's position.

342. The choice of forum clause under the GSE Conventions (on feed-in tariffs and minimum prices) confers jurisdiction upon Rome courts, as follows:

> *Any proceedings deriving from or in any case connected to the interpretation or the execution of this Agreement and connected documents shall be settled before the Court of Rome.*[435]

343. Article 26(2)(b) and (3) stipulate that the ECT Contracting Parties give their "*unconditional consent*" to arbitration except if an investor chooses to submit the dispute for resolution "*in*

---

[434] *Blusun v. Italy* (Exhibit RLA-1), ¶ 278.
[435] *See*, for example, GSE Convention on feed-in-tariffs concluded by the PV company *Acquaviva SRL* in relation to its plant *Acquaviva 1* (Exhibit C-21M).

*accordance with any applicable, previously agreed dispute settlement procedure,*" as
follows:

> […] *(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*
>
> *(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;*
>
> *(b)* <u>in accordance with any applicable, previously agreed dispute settlement procedure</u>*; or*
>
> *(c) in accordance with the following paragraphs of this Article.*
>
> *(3) (a)* <u>Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration</u> *or conciliation in accordance with the provisions of this Article.*
>
> *(b) (i)* <u>The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b)</u>*.*
>
> *(ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.* (emphases added)

344. The Tribunal considers that the above provision does not state that the mere existence of a forum selection clause in a contract would preclude Italy's consent to arbitrate. Article 26(3)(b)(i) and Annex ID to the ECT, read together with Italy's Statement of 17 December 1997 in relation to Annex ID, makes it clear that the fork-in-the-road provision under the ECT concerns a "*previously submitted*" dispute or the "*resubmission*" of the same dispute to arbitration, not the mere possibility of submitting a dispute in the future to another dispute settlement procedure.

345. Article 26(3)(b)(i) stipulates that the Contracting Parties listed in Annex ID "*do not give such unconditional consent where the Investor has previously submitted the dispute*" as per Article 26(2)(b). Further, Annex ID to the ECT includes Italy in the List of Contracting

Parties not allowing an investor to resubmit the same dispute to international arbitration at a later stage under Article 26.

346. Were the Tribunal to interpret Article 26 as precluding consent to arbitrate when there is a choice of forum clause, it would render Article 26 futile. Even if a contract does not provide for the choice of forum, it is subject to the applicable default rules on conflicts of jurisdiction determining the competent forum. Hence, Italy's position would make it impossible for an investor having entered into any contract related to an investment dispute to pursue ICSID arbitration under the ECT, even if this contract did not provide for a choice of forum.

347. Italy's Statement of 17 December 1997 in relation to Annex ID is clear that the mere presence of a forum selection clause in a contract cannot trigger the fork-in-the-road provision under Article 26. Rather, this Statement states that only a dispute "*already submitted*" or a previously agreed dispute settlement procedure already "*followed*" could trigger the fork-in-the-road provision:

> *In accordance with Article 26(3)(b)(ii), Italy declares that it does not allow for a dispute between an Investor and a Contracting Party to be submitted for international arbitration or conciliation, provided that an Investor has: a) already submitted the dispute Italian courts or administrative tribunals; or b) followed an applicable, previously agreed procedure for the settlement of disputes. In this respect a distinction must be made between two options: 1) if a resolution of the dispute has not yet been made by internal judicial or conciliation bodies, the Investor may revoke his judicial action or arbitral procedure by procedural or lateral renouncement and apply to other forms of dispute settlement; 2) if a resolution or any formal or legal document of execution has already been made to settle the dispute, conciliation or international arbitration is no longer possible. The above statements are based either on the principle of 'ne bis in idem' (to avoid two judgments being awarded for the settlement of the same dispute: one by the arbitration and the other by the court of law), or on the principle of incontrovertibility of "decisum" which is binding on the parties in their substantial relations without giving them any possibility, during the procedure or after it, to use the normal means of appeal.*[436] (emphases added)

---

[436] Italy's Statement of 17 December 1997, Annex ID ECT (Exhibit CL-151RM).

348.  It is also clear from Italy's Statement above that even if a dispute had "*already* [been] *submitted*" or a previously agreed dispute settlement procedure had already been "*followed*," the fork-in-the-road provision would not be triggered if the "*resolution of the dispute has not yet been made*" and the investor withdraws from this procedure.  In other words, Italy's Statement expressly allows an investor to file a suit and later withdraw from it without triggering the fork-in-the-road provision under Article 26(3)(b) ECT.  In any event, Italy has not argued, let alone demonstrated that the invested PV companies of Belenergia have filed suits before Rome courts based on each of the choice of law clauses of each and every GSE Convention on feed-in tariffs and minimum prices.

349.  Thus, Article 26 ECT, interpreted in light of Italy's Statement of 17 December 1997, is clear that the fork-in-the-road provision can only be triggered when the investor actually elects a dispute settlement method by instituting proceedings before choosing to commence international arbitration.  This reflects the generally accepted view of fork-in-the-road clauses,[437] and their underlying purpose to avoid the institution of multiple proceedings in multiple fora.  Italy has not satisfied its burden of proving that Belenergia seeks to institute multiple proceedings in different fora.

350.  Even if it were the case—*quod non*—Belenergia is not a party to the choice of forum clauses under the GSE Conventions.  Thus, there would be no identity of parties capable of triggering a fork-in-the-road clause.

351.  Thus, the Tribunal finds that it has jurisdiction over Belenergia's claims and dismisses Italy's jurisdictional objection based on the choice of forum clause under the GSE Conventions.

352.  Alternatively, Italy argues that the choice of forum clause under the GSE Conventions precludes Belenergia's umbrella clause claim under Article 10(1) ECT.  Article 10(1) ECT provides that "[e]*ach Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party*."  As the Tribunal has found above that the fork-in-the-road clause under Article 26 has not been triggered, the Tribunal has jurisdiction over Belenergia's claims, including the umbrella

---

[437] *See*, for example, Christoph Schreuer, "Travelling the BIT Route: Of Waiting Periods, Umbrella Clauses and Forks in the Road", *Journal of World Investment & Trade,* Vol. 5, No. 2 (Exhibit CL-52RM), p. 248: "*The domestic proceeding must have been instituted prior to the choice of international arbitration.* […]"

clause claim.  It is undisputed that the dispute relates to Belenergia's investment in Italian territory and purported breaches of ECT obligations pertaining to Part III of this treaty.  Thus, Italy's alternative argument hinges on the admissibility of the umbrella claim, rather than jurisdiction.

353. Italy relies on the approach taken in *SGS v. Philippines* and *BIVAC v. Paraguay* in support of its position that Belenergia's umbrella clause claims are contract claims subject to the jurisdiction of Rome courts.

354. First, the *SGS v. Philippines* and the *BIVAC v. Paraguay* cases are inapposite because in this arbitration each invested PV company concluded with the GSE Conventions on feed-in tariffs and minimum prices for each of their PV plants.  The Claimant Belenergia is not privy to the GSE Conventions.  Conversely, in *SGS v. Philippines*[438] the claimant SGS had concluded with the Philippines a contract for a comprehensive import supervision service, while the claimant BIVAC in *BIVAC v. Paraguay*[439] had concluded with Paraguay's Ministry of Finance a contract for the provision of technical services for pre-shipment inspection of imports.  There is no reason why the Tribunal should not consider Belenergia as having different legal personality from its PV companies, let alone disregard its legal personality deeming it a party to the GSE Convention.

355. Second, even if the Tribunal were to consider these case decisions relevant (*quod non*), it cannot agree with the approach taken in *SGS v. Philippines*.  According to the *SGS v. Philippines* tribunal, the claims for money founded on the contract between SGS and the Philippines were inadmissible because they were contract claims subject to the choice of forum clause under the relevant contract.  This approach would automatically deprive the umbrella clause under Article 10(1) ECT of its meaning because each and every contract,

---

[438] *SGS Société Générale de Surveillance S.A. v. Republic of Philippines,* ICSID Case No. ARB/02/6, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004 (Exhibit RLA-6), ¶ 13.
[439] *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC BV v. The Republic of Paraguay,* ICSID Case No. ARB/07/9, Decision of the Tribunal on Objections to Jurisdiction, 29 May 2009 (Exhibit RLA-8), ¶ 7.

even one without a choice of forum clause, would inherently be subject to a State court based on default rules on conflicts of jurisdiction

356. Rather, the Tribunal considers the *SGS v. Paraguay* approach on the source of the umbrella claim being the treaty even if it requires a showing of contractual breach.[440]  According to the *SGS v. Paraguay* tribunal, declining to hear the umbrella claim by virtue of a contractual forum selection clause "*would place the Tribunal at risk of failing to carry out its mandate under the Treaty and the ICSID Convention.*"[441]  As the *SGS v. Paraguay* tribunal put it, one cannot presume that umbrella clause claims are co-extensive with claims under the contract:

> […] *Claimant's Article 11 claims are not co-extensive with claims under the Contract, and they are not necessarily disposed of by the four corners of the Contract.  Claimant has advanced Article 11 claims not only for breach of the Contract's payment obligation but also for breach of alleged subsequent commitments by Paraguay's representatives.  Whether or not both might be within the reach of the Contract's broadly worded forum selection clause, the latter cannot be judged under the Contract alone.  Whether Paraguayan representatives made the alleged commitments, whether those commitments could be relied upon by SGS, and whether the commitments were breached, must all be decided by this Tribunal with reference to the Treaty and the applicable bodies of law specified under it.  Accordingly, it would sweep too broadly to say that all umbrella clause claims—and, in particular, all of the umbrella clause claims before us—can be disposed of on contractual grounds by the contractual forum.* […][442]

357. Here, Belenergia has advanced the umbrella clause claim irrespective of the GSE Conventions' "contractual" character, arguing that these Conventions contain specific commitments towards Belenergia, breached by Italy through the adoption of legislative and regulatory acts unilaterally modifying these Conventions.[443]

---

[440] *SGS Société Générale de Surveillance S.A. v. The Republic of Paraguay,* ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010 (Exhibit CL-68RM), ¶ 142.

[441] *SGS Société Générale de Surveillance S.A. v. The Republic of Paraguay,* ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010 (Exhibit CL-68RM), ¶ 172.

[442] *SGS Société Générale de Surveillance S.A. v. The Republic of Paraguay,* ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010 (Exhibit CL-68RM), ¶ 173.

[443] Claimant's Reply, ¶¶ 322.4, 409, 446-447.

358. <u>Third</u>, having affirmed jurisdiction over the umbrella claim, this Tribunal "*would have to have very strong cause indeed to decline to exercise it*,"[444] which is not the case.

359. Based on the foregoing, the Tribunal dismisses Italy's jurisdictional objection that the choice of forum clause under the GSE Conventions bars ECT jurisdiction over Belenergia's claims and finds that Belenergia's umbrella clause claim under Article 10(1) ECT is admissible.

### (3) Has the Claimant Complied with the Waiting Period under Articles 26(1) and 26(2) ECT in relation to the Imbalance Costs Claim?

360. Italy submits that Belenergia raised the imbalance costs claim only with its Statement of Claim of 14 December 2016, arguing that the Amicable Solution Letter dated 8 December 2014[445] and the Request for Arbitration dated 30 July 2015 do not refer to imbalance costs imposed by AEEG Resolution No. 444/2016.

361. Conversely, Belenergia argues that its Amicable Solution Letter satisfies the 3-month waiting period and that, even if it did not, starting negotiations would be futile in light of Italy's unwillingness to negotiate other claims, adding that this period would have elapsed at the time of the Hearing. According to Belenergia, requiring the Claimant to commence separate ICSID proceedings on the imbalance costs claim would lead to inefficiency and would not serve the best interests of justice.

362. Article 26(1) and (2) of the ECT provide that an investment dispute between a Contracting Party and an investor shall be, if possible, settled amicably within a 3-month period from the date either party requested amicable settlement. Only then the investor may submit its dispute to international arbitration, as follows:

> *Article 26: Settlement of Disputes between an Investor and a Contracting Party*
>
> *(1) <u>Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment</u> of the latter in the Area of*

---

[444] *SGS Société Générale de Surveillance S.A. v. The Republic of Paraguay,* ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010 (<u>Exhibit CL-68RM</u>), ¶ 175.
[445] <u>Exhibit C-RFA-I.1</u>.

*the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*

*(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*

*(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;*

*(b) in accordance with any applicable, previously agreed dispute settlement procedure; or*

*(c) in accordance with the following paragraphs of this Article.*

*(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.* […] (emphases added)

**363.** The question is whether Belenergia's Amicable Solution Letter dated 8 December 2014 satisfies the requirement that the parties engage in negotiations, if possible, to settle their dispute amicably as per Article 26 ECT.   Irrespective of whether in this arbitration Belenergia challenges the imbalance costs imposed by AEEG Resolution No. 444/2016, it is clear from the Amicable Solution Letter predating this Resolution that there was already a dispute between the Parties in relation to imbalance costs:

> […] *With reference to the renewable energy market and specifically the photovoltaic sector, the Italian Government has approved, during recent years, various retroactive and discriminatory changes to the legal and taxation regime for solar plants, causing a significant detriment to the economic use, enjoyment and value of the relevant investments.*

> […] *Indeed, the Investors owning many PV plants with a capacity of up to 1 MW benefiting from the mandatory purchase regime were also very much affected by the change of take-off regime: first with the decreasing of the amount of minimum guaranteed prices (through the AEEG Resolution 618/2013) and afterwards with the introduction of a system according to which the minimum price shall be equal to the relevant applicable hourly zone prices (through the art.1, par.2 of the "Destinazlone Italia" Decree).   Moreover since 2013 the operators benefiting from the mandatory purchase regime, are charged from the GSE of the imbalance of costs (so called "costi di sbilanciamento") and*

*of the costs originating from the participation of the GSE in the intra-day market (mercato infragiornarliero).*

*These measures along with the Law have clearly affected and strongly modified the original legal framework according to which the Investors have made their investment in Italy and have relied upon.*

*In particular the investors relied on a feed-in tariffs system based (according to Law no. 28/2011, Implementing Directive no. 28 of 2009 on the promotion of renewable energy)* […]

*We, therefore, take this opportunity to express our disappointment with regard to the changes in law introduced to the applicable legislation, lastly by the Law on Conversion, which substantially and negatively affect the legal framework applicable to the investments that the Investors have made in the photovoltaic sector.*

*In light of the above, Italy's legislative actions are in breach of its obligations, provided for under the Energy Charter Treaty (the "ECT"), and have caused, and are continuing to cause, serious, permanent and substantial damages to the Investors' investments strongly affecting the economic value of the investments.*

*This also in light of the fact that Italy undertook, according to the ECT, to grant a stable legal framework for energy investments without affecting the economic use, enjoyment and value of the investment made. Moreover, the ECT protects foreign investors, as the Investors, from, inter alia arbitrary, unfair and discriminatory actions such as those described above and included under the Decree.*

*Therefore, should an amicable solution of the matter be not reached, also as stated according to Article 26 of the ECT, Investors reserve the right to protect their interests at all appropriate premises, in particular starting an international arbitration proceeding against the Government of Italy under the rules provided for in article 26 of the ECT.*

*[…] In light of the above, the undersigned confirm their availability to negotiate an alternative solution to the matter and hereby formally request You to start negotiations, also according to Article 26 of the ECT, to the aim of obtaining an amicable solution of the dispute.*

*Investors would be delighted to schedule a meeting with You at your earliest convenience.*

*For the avoidance of any doubt, in case said negotiations may have negative outcome, Investors reserve the right to adopt any legal action in order to protect their right and interests.*

> *Finally, we underline that the present letter shall not be, in any case, deemed, nor indirectly and/or partially, as Investors' (and/or company's belonging to Investors 'group) waiver to any right and/or action they may be entitled to according to applicable legislation and/or according to agreement in place with any third party.*[446] (emphases added)

364. The Amicable Solution Letter above broadly refers to regulatory changes affecting solar energy producers, making express reference to "*imbalance costs.*"[447]  Hence, the Tribunal considers that this express reference to imbalance costs later continued by way of AEEG Resolution No. 444/2016 suffices for the purposes of the three-month waiting period requirement under Article 26(2) ECT.

365. The *Eiser v. Spain* tribunal faced a similar issue, having dismissed the three-month waiting period objection under Article 26 ECT.   According to the *Eiser* tribunal, the claimants' notices of dispute listed several changes to the legal and economic regime for solar plants leading to a single dispute that did "*not require additional piecemeal requests for amicable settlement of new issues or elements arising in the course of an ongoing dispute following a request for negotiations,*" as follows:

> *The particular measures involved in Respondent's objection – Law 24/2013, RD 413/2014, and Order IET/1045/2014 – are not a new dispute or disputes triggering Article 26's requirement for another request for negotiations. Articles 26(1) and (2) do not require additional piecemeal requests for amicable settlement of new issues or elements arising in the course an ongoing dispute following a request for negotiations.  It would be unreasonable and inefficient in case like this, involving an evolving situation, to interpret Article 26 to require the dispute to be carved into multiple slices, with each new development requiring an additional request for negotiations and a subsequent request for a separate additional arbitration.  The situation is akin to that in cases such as Enron v. Argentina, where Enron was found to have only a single dispute regarding provincial taxation, and did not need to give further notice or observe a cooling off period before adding other provinces to its claim.*[448]

---

[446] Belenergia's Amicable Solution Letter dated 8 December 2014 (Exhibit C-RFA-I.1).

[447] Belenergia's Amicable Solution Letter dated 8 December 2014 (Exhibit C-RFA-I.1), p. 3.

[448] *Eiser Infrastructure Limited and Energia Solar Luxembourg Sarl v. Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017 (Exhibit CL-5RM), ¶ 318.  *See also RREEF Infrastructure (GP) Ltd and RREEF Pan-European Infrastructure Two Lux Sarl v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction (Exhibit CL-2RM), ¶ 226: "[…] *the Tribunal is of the view that the core issue is whether the additional claims change the character of the case: if yes, then they are not part of the dispute, the new claims must be declared*

366. The Tribunal finds that Belenergia's Amicable Solution Letter referred to a single dispute in relation to Italy's solar energy legal and regulatory framework, with express reference to imbalance costs. It would be unreasonable and inefficient to carve a single dispute into multiple slices by requiring Belenergia to make an additional request for negotiations when *(i)* the Amicable Solution Letter already referred to imbalance costs; *(ii)* Belenergia clearly has a single dispute against Italy in relation to its regulatory and legal framework applying to PV plants; and *(iii)* the three-month waiting period had already elapsed at the time of the Hearing on 26 to 29 March 2018.

367. Although the Parties have not referred to ICSID Arbitration Rule 40 in their written and oral pleadings, this provision stipulates that an incidental or additional claim can be introduced no later than in the reply. ICSID Arbitration Rule 40 provides that:

> *(1) Except as the parties otherwise agree, a party may present an incidental or additional claim or counter-claim arising directly out of the subject-matter of the dispute, provided that such ancillary claim is within the scope of the consent of the parties and is otherwise within the jurisdiction of the Centre.*
>
> *(2) An incidental or additional claim shall be presented not later than in the reply and a counter-claim no later than in the countermemorial, unless the Tribunal, upon justification by the party presenting the ancillary claim and upon considering any objection of the other party, authorizes the presentation of the claim at a later stage in the proceeding.* […]

368. For instance, the *CMS v. Argentina* tribunal accepted an additional claim brought by CMS, relying on ICSID Arbitration Rule 40, finding that the incidental or additional claim was "*so close as to require the adjudication of the latter in order to achieve the final settlement of the dispute, the object being to dispose of all the grounds of dispute arising out of the same subject matter.*"[449] In the present case, the imbalance costs claim was introduced before

---

inadmissible and the Tribunal must abstain to exercise jurisdiction. If this is not the case, the objection must be dismissed since (i) it can be admitted that the cooling-off period will have elapsed at the time the Tribunal's decision is taken and (ii) it would be totally artificial and unreasonably heavy to request the Claimant to lodge new applications directed against facts which are but the continuation of those at stake in the initial Application. […]"

[449] *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Decision of the Tribunal on Objections to Jurisdiction, 17 July 2003 (Exhibit CL-176RM), ¶¶ 117-119: "*117. To this end the Tribunal must reach a determination on the subject-matter of the dispute and decide whether the ancillary or additional claim arises directly out of that subject matter.*

Belenergia's Reply, i.e. with the Statement of Claim,[450] satisfying the timing requirement under Rule 40(2), not to mention that it could be considered an "incidental or additional claim" so close to the dispute requiring its adjudication to achieve the final settlement of the dispute.

369. Based on the foregoing, the Tribunal dismisses Italy's jurisdictional /admissibility objection that Belenergia has not complied with the 3-month waiting period under Articles 26(1) and (2) of the ECT in relation to the imbalance costs claim.

### (4) Are Imbalance Costs a "Taxation Measure" Falling Outside the ECT's Scope?

370. The Respondent submits that the imbalance costs claim falls within the meaning of the taxation carve-out under Article 21 ECT.  According to the Respondent, the "Taxation Measure" definition under Article 21(7) is broad, referring to "*an open-ended category of measures*" and requiring that a "Taxation Measure" have "fiscal" character and be contained in domestic legislation or in a treaty.  Italy further submits that the "fiscal" character of a measure is defined by reference to Italian domestic law, classifying a "fiscal" measure as tax ("*imposta*"), fee ("*tassa*"), or contribution ("*contributo*"), irrespective of its name.  Italy relies on Italy's Constitutional Court Decision No 238/2009[451] defining taxation measures as having the following features: *(a)* mandatory contribution; *(b)* absence of exact reciprocity between the parties; and *(c)* the contribution is linked to public spending with a relevant economic purpose, and on Article 23 of the Italian Constitution requiring that taxation measures be established by law.

---

118. *The Tribunal is of the view that, in the instant case, the subject-matter of the dispute is the alleged loss by CMS of its investment in TGN caused, it is argued, by the breaches by the Republic of Argentina of its obligation under the BIT. Such breaches relate, in the Claimant's view, to the interference of organs of the Argentine State with the tariff regime applicable to TGN, which was first subjected to deferral of adjustments, followed by a freeze, culminating in the abrogation of that adjustment and the removal of the right to calculate tariffs in U.S. dollars and then express them in convertible pesos at the time of billing.*

119. *Note B to Arbitration Rule 40 supports the conclusion that the post-July 2001 events give rise to incidental or additional claims. There is no doubt, in the mind of the Tribunal, that the claim resulting from those events is 'so close as to require the adjudication of the latter in order to achieve the final settlement of the dispute, the object being to dispose of all the grounds of dispute arising out of the same subject matter.'*

[450] Statement of Claim, ¶¶ 163, 200-201.

[451] Exhibit REX-13.

371.   On the other hand, the Claimant objects to Italy's position that the imbalance costs claim falls within the meaning of the taxation carve-out under Article 21 ECT, in light of the ordinary meaning of Article 21(7) ECT defining the term "Taxation Measure".  According to the Claimant, the references in Article 21(7) to "*taxes of the domestic law of the Contracting Party*" and to "*taxes of any convention for the avoidance of double taxation or of any other international agreement*" imply that only specific provisions of Italy's tax legislation or treaties could trigger the "Taxation Measure" exception and should therefore be interpreted restrictively.  The Claimant adds that imbalance costs is not a "Taxation Measure" because they are not "*sufficiently clearly connected*" to Italy's taxation law, in addition to being arbitrarily imposed by Italy.

372.   Article 21 ECT provides, among others, that nothing in the ECT shall create rights or impose obligations in relation to "Taxation Measures" of the Contracting Parties, as follows:

> *Article 21: Taxation*
>
> *(1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*
>
> *[…] (3) Article 10(2) and (7)* [on NT and MFN] *shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:*
>
> *(a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organisation; or*
>
> *(b) any Taxation Measure aimed at ensuring the effective collection of taxes, <u>except where the measure arbitrarily discriminates against an Investor of another Contracting Party or arbitrarily restricts benefits accorded under the Investment provisions of this Treaty</u>.*
>
> *[…]*
>
> *(7) For the purposes of this Article:*
>
> *(a) The term "Taxation Measure" <u>includes</u>:*

> (i) _any provision relating to taxes of the domestic law of the Contracting_
> _Party_ or of a political subdivision thereof or a local authority therein;
> and
>
> (ii) any provision relating to taxes of any convention for the avoidance
> of double taxation or of any other international agreement or
> arrangement by which the Contracting Party is bound. […] (emphases
> added)

**373.** Article 21(7)(a)(i) ECT above defines the term "Taxation Measure" as to include "_any_
_provision relating to taxes of the domestic law of the Contracting Party._" "[I]_ncludes_" under
Article 21(7)(a) in light of its ordinary meaning should be interpreted as to mean that what
is listed as a "Taxation Measure" in the same provision is not exhaustive.  For example, the
Cambridge Dictionary defines the verb "include" in a non-restrictive way so as "_to contain_
_something as a part of something else, or to make something part of something else_" and "_to_
_have something smaller as a part of it, or to make something smaller part of it._"[452]  Thus, the
Tribunal considers that Article 21(7)(a)(i) ECT cannot be restrictively interpreted.

**374.** The Tribunal considers that imbalance costs imposed by AEEG Resolution No. 444/2016
should be interpreted as falling within the meaning of a "Taxation Measure" under
Article 21(7)(a)(i) ECT because they should be considered a "Taxation Measure" pursuant
to Italian domestic law.  Established by AEEG Resolution No. 444/2016, imbalance costs
satisfy the Italian law requirement that taxation measures have to be established by law
pursuant to Article 23 of the Italian Constitution[453]

**375.** Moreover, the Italian Constitutional Court has defined taxation measures as such measures
_(a)_ requiring a mandatory contribution _(b)_ in the absence of exact reciprocity between the
parties _(c)_ linked to public spending with a relevant economic purpose.[454]  This indicates that

---

[452]    _See_    Definition    of    "Include"    of    the    Cambridge    Dictionary,    available    at
https://dictionary.cambridge.org/dictionary/english/include. _See also_ Definitions of "Include" of the Oxford
Dictionary, available at https://www.lexico.com/en/definition/include: "_Include (verb): 1._ [c]_omprise or contain as_
_part of a whole;" 2._ "[m]_ake part of a whole or set._"

[453] _See_ Italian Constitution, Article 23: "[n]_o obligation of a personal or financial nature may be imposed on any_
_person except by law._" In the original: "[n]_essuna prestazione personale o patrimoniale può essere imposta se non in_
_base alla legge._" Statement of Defense, ¶ 163, and footnote 61.

[454] _See_ Italian Constitutional Court's Decision No. 238/2009 (Exhibit REX-13), ¶ 7.2.1: "_This Court, through_
_numerous judgments, has indicated the criteria to refer to qualify as a tribute_ [fiscal measure] _certain withdrawals._
_These criteria, regardless of the_ nomen iuris _used by the regulation governing the withdrawals, consist of the_
_dutifulness of the obligation, the lack of a relationship of reciprocal nature between the parties and the connection of_
_that benefit to public expenditure in relation to an economically relevant precondition_ […]"

substance prevails over form and that the name of the measure (*nomen iuris*) is irrelevant.[455] Imbalance costs are mandatory and non-reciprocated, levied from a general category of energy producers (originally levied from the general category of consumers), and linked to public spending with transmission and dispatching services.

376.  The Tribunal cannot agree with Belenergia's argument that imbalance costs are arbitrary and thus not covered by the Article 21(1) "Taxation Measure" carve-out, which applies only to *bona fide* taxation measures.  Rather, the Tribunal finds that imbalance costs established by AEEG Resolution No. 444/2016 should qualify as a *bona fide* taxation measure falling within the meaning of Article 21 ECT.

377.  The present arbitration differs from the *Yukos* arbitration[456] where the arbitral tribunal identified extraordinary circumstances indicating that Russia's taxation measures were not "*bona fide*."  As the *Isolux v. Spain* tribunal put it, it is not easy to rebut the presumption that taxation measures are *bona fide* because what matters is the real purpose of the measure irrespective of how it is presented by the domestic legislator, as follows:

> *It is not easy to rebut the presumption that taxation measures enacted by a State are* bona fide*.  As stated by the tribunal in* RosInvestCo*, "States have a wide latitude in imposing and enforcing taxation law, even if resulting in substantial deprivation without compensation." The cases* Yukos *and* RosInvestCo *compare* bona fide *measures with measures adopted to destroy a party or a political adversary.  The criticism made to the IVPEE by the Claimant does not reveal such extreme purpose.  The economic consequences or effects of the IVPEE may be obscure or debatable, but this is not a sufficient argument to conclude that the IVPEE is a taxation measure adopted in bad faith.*

---

[455] *See* Italian Constitutional Court's Decision No. 238/2009 (Exhibit REX-13), ¶ 7.2.1.

[456] *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227, Final Award (18 July 2014) (Exhibit CL-162RM), ¶ 1404: "*In Chapter VIII.B, the Tribunal concluded, on the totality of the evidence, that the tax authorities used the "re-attribution" formula not only so as to be able to collect the revenue-based taxes against Yukos, but also so as to establish a basis for imposing on Yukos the massive VAT liability and excessive fines that followed.  In the Tribunal's view, while Yukos was vulnerable on some aspects of its tax optimization scheme, principally because of the sham-like nature of certain elements of its operations in at least some of the low-tax regions, and could have faced some legitimate claims relating to revenue-based taxes had the Russian Federation limited itself to bona fide taxation measures, the State apparatus decided to take advantage of that vulnerability; it did so by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena. The Tribunal has come to these conclusions based on its review of the entire record, as detailed in the other chapters of Part VIII, above.*" (emphasis added)

> […] *It is probable that this taxation measure does not have its intended effect in favour of the environment and that its adoption had no other purpose than to reduce the tariff deficit* […] *Yet, the Arbitral Tribunal does not need to decide this because if the true purpose of the measure were merely to raise funds* […] *it would nevertheless coincide with the legitimate purpose of any taxation measure incapable of qualifying it as a bad faith measure. Even if it were right that the State has presented a measure to merely raise funds as being in favour of the environment, the conclusion would be the same. It is the real purpose of the measure that has to be considered by the Tribunal rather than its presentation that may be justified by political reasons* […].[457]

378. Belenergia has not satisfied its burden of proving that imbalance costs are a *mala fide* taxation measure, used as part of a pattern of behaviour aimed at partially or completely destroying its investment.

379. Based on the foregoing, the Tribunal finds that it lacks jurisdiction over Belenergia's imbalance costs claim, based on Article 21 ECT.

## VI. THE MERITS

380. The following provides an overview of the Parties' respective claims and defences on the merits. This summary has been prepared to set in context the decisions made by the Tribunal in this Award, and is not an exhaustive description of the arguments presented during this

---

[457] Free translation from the original in Spanish, *see Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award (17 July 2016) (Exhibit CL-6RM), ¶¶ 739-740: "*739. No es fácil destruir la presunción de que las medidas impositivas promulgadas por un Estado son bona fide. Como lo subrayó el Tribunal en el caso RosInvestCo, 'States have a wide latitude in imposing and enforcing taxation law, even if resulting in substantial deprivation without compensation.' Los casos Yukos y RosInvestCo contrastan medidas bona fide con medidas adoptadas para destruir a una parte o a un adversario político. Las críticas del IVPEE formuladas por la Demandante no revelan un propósito tan extremo. Las repercusiones económicas o los efectos del IVPEE pueden resultar oscuros y discutibles, pero eso no constituye un argumento suficiente para concluir que el IVPEE es una medida impositiva promulgada de mala fe. 740. Es probable que dicha medida impositiva no tenga el pretendido efecto a favor del medioambiente y que su promulgación no tenía otro propósito más que el de disminuir el déficit tarifario, según lo afirma la Demandante. Sin embargo, el Tribunal Arbitral no necesita pronunciarse al respecto, puesto que, si la verdadera finalidad de la medida hubiera sido meramente recaudaría, de acuerdo con la argumentación desarrollada por la Demandante, coincidiría con la finalidad legítima de todo impuesto sin que se pueda caracterizar la mala fe de esta medida impositiva. Si fuera cierto que el Estado presentó una medida meramente recaudaría como medida favorable al medioambiente, la conclusión sería la misma. Es la finalidad real de la medida que tiene que ser valorada por el Tribunal y no su presentación cosmética que puede explicarse por motivos políticos que no caben dentro del análisis del Tribunal Arbitral.*" *See also Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award (4 May 2017) (Exhibit CL-5RM), ¶¶ 268-271; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award (16 May 2018) (Exhibit CL-179RM), ¶¶ 292-295.

arbitration through the written and oral submissions of the Parties. The fact that a particular submission is not expressly referenced below should not be taken as any indication that it has not been considered by the Tribunal.

381. As the Tribunal decided above that it lacks jurisdiction over Belenergia's imbalance costs claim, the Parties' arguments on the merits relating to such costs are not reproduced thereafter.

## A. The Claimant's Position

382. The Claimant argues that Italy has breached Article 10(1) ECT, which provides for "*distinct but mutually reinforcing obligations,*" including the FET and the most constant protection and security obligations ("**FPS**"), the prohibition of unreasonable or discriminatory measures, and the umbrella clause.[458] According to the Claimant, these distinct obligations should be interpreted in the light of the "*effet utile*" principle.[459] The Claimant further relies on Article 10(2) and Article 10(3) ECT, arguing that Italy has also breached its obligation not to discriminate under these provisions.

### (1) Italy Has Breached the FET Standard under Article 10(1) ECT

#### (a) The applicable FET standard

383. The Claimant states that the FET standard under Article 10(1) ECT is an objective, autonomous, self-contained standard.[460] The FET standard must not fall below the minimum treatment standard under international law.[461] In the Claimant's view, "international law" corresponds to "*treaty obligations by which Italy is bound and any rules of general*

---

[458] Statement of Claim, ¶ 106.

[459] Statement of Claim, ¶ 106.

[460] Statement of Claim, ¶¶ 108, 110; Claimant's Reply, ¶ 457.

[461] Statement of Claim, ¶ 108; Claimant's Reply, ¶ 458.

*international law.*"[462]   The Claimant adds that the FET standard is not restricted by the minimum standard under customary international law.[463]

384.   Belenergia argues that the FET standard under Article 10(1) ECT should be interpreted in accordance with Articles 31 and 32 VCLT, including the ordinary meaning of its terms, in their context, in the light of the ECT's object and purpose.[464]   The Claimant refers to the text of Article 10(1) ECT providing that Contracting Parties "*encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties*."[465]   It also refers[466] to Article 2 ECT on the "Purpose of the Treaty," which states that:

> [The ECT] *establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.*[467]

385.   Then it refers[468] to an excerpt from the 1991 European Energy Charter (a precursor document to the ECT) providing that:

> *In order to promote the international flow of investments, the signatories will at national level provide for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade.*[469]

386.   Belenergia highlights the text of Article 10(1) ECT that Contracting Parties commit "*to accord at all times*" FET, referring to *Blusun v. Italy.*[470]   The Claimant endorses a "*tripartite*" application of the FET standard to host State's conduct that *(a)* violates the investor's legitimate expectations; *(b)* is procedurally improper; and *(c)* is substantively improper.[471]

---

[462] Statement of Claim, ¶ 108.

[463] Claimant's Reply, ¶ 457.

[464] Claimant's Reply, ¶ 452.

[465] Claimant's Reply, ¶ 455-456, referring to *Eiser v. Spain* (Exhibit CL-5RM, ¶ 379).

[466] Claimant's Reply, ¶ 453.

[467] Exhibit CL-2M.

[468] Claimant's Reply, ¶ 454.

[469] Exhibit CL-2M, p. 33.

[470] Claimant's Reply, ¶ 456.

[471] Claimant's Reply, ¶ 470.

387. First, Belenergia argues that several arbitral tribunals have considered that the protection of investors' "legitimate expectations" is a "*dominant element*" of the FET standard,[472] to be assessed when the investment was made.[473] The Claimant defines "legitimate expectations" with a citation from *Murphy v. Ecuador* that "*legitimate expectations are based upon an objective understanding of the legal framework within which the investor has made its investment*," requiring:

> (a) a legal framework including the host State's international law obligations, domestic legislations, regulations and contracts concluded with the investor;

> (b) general representations by the host State creating legitimate expectations by the investor; and

> (c) (although not strictly necessary) specific representations or undertakings by the host State creating legitimate expectations by the investor.[474]

388. In this respect, the Claimant adds that good faith is as an international law principle relevant for a FET finding, meaning that "*a State cannot blow hot and cold*" and that the parties should "*deal honestly and fairly with each other.*"[475] The Claimant therefore rejects Italy's modulation of the FET standard in the light of "sovereign" regulatory prerogatives.[476] In its view, "*sovereign prerogatives have a role to play but only in the content of assessing whether the FET standard* [protects] *an investor's legitimate expectations.*"[477]

389. In Belenergia's view, the Tribunal should consider two aspects of legitimate expectations: *(a)* the investor's general expectation of regulatory and business stability; and *(b)* the investor's reasonable reliance on specific commitments by the host State.[478] The Claimant

---

[472] Statement of Claim, ¶ 110.  *See also*, Claimant's Reply, ¶¶ 472-473; Claimant's Post Hearing Brief, ¶136.

[473] Statement of Claim, ¶ 115.

[474] Statement of Claim, ¶¶ 111-114.  *See also*, Claimant's Reply, ¶¶ 476-478, citing *Murphy v. Ecuador* (Exhibit CL-117RM, ¶ 248), *Frontier Petroleum v. Czech Republic* (Exhibit CL-32M, ¶ 285) and *Isolux v. Spain*. (Exhibit CL-6RM, ¶ 775)

[475] Statement of Claim, ¶¶ 116-118, citing scholarly writings and arbitral decisions.

[476] Claimant's Reply, ¶ 459.

[477] Claimant's Reply, ¶ 462.

[478] Claimant's Reply, ¶ 474.

argues that a breach of either of these aspects of legitimate expectations leads to a FET breach.[479]  It highlights the importance of Belenergia's reliance on specific commitments in this arbitration, citing various arbitral decisions.[480]

**390.**  The Claimant also distinguishes this arbitration from recent PV investment treaty arbitrations (*Charanne v. Spain, Blusun v. Italy, Isolux v. Spain* and *Eiser v. Spain*).  It explains that in none of these arbitrations claimants have demonstrated specific commitments by the host State; rather, in these arbitrations claimants have relied on the general stability of the host State's regulatory framework.[481]  Belenergia submits, however, that the tribunal in *Eiser v. Spain* found in favour of Eiser holding that "*regulatory regimes cannot be radically altered*" on the basis of the investor's general expectation of regulatory and business stability.

**391.**  The Claimant also cites *Micula v. Romania,*[482] noting that even if the investor's umbrella claim did not succeed because it did not establish a breach of a legal obligation under Romanian law, the Romanian legislative framework's stabilisation component could have given rise to a FET breach.[483]

**392.**  Second, Belenergia further submits that procedurally improper conduct by the host State also breaches the FET standard.  In its view, a procedurally improper conduct is conduct that *(a)* violates transparency and consistency rules; *(b)* violates due process; or *(c)* fails to negotiate with the investor or does so in bad faith.[484]

**393.**  Third, substantive impropriety meaning arbitrary, unreasonably, discriminatory, bad-faith conduct also breaches the FET standard.[485]  According to the Claimant, the pursuit of a rational policy sometimes does not pass the proportionality test, leading to an FET breach.[486]

---

[479] Claimant's Reply, ¶ 474.
[480] Claimant's Reply, ¶¶ 480-499.
[481] Claimant's Reply, ¶¶ 500-510.
[482] Exhibit CL-37M.
[483] Claimant's Post Hearing Brief, ¶ 137.

[484] Claimant's Reply, ¶¶ 511, citing arbitral decisions and Professor Rudolf Dolzer and Professor Christoph Schreuer, *Principles of International Investment Law*, 2nd edn, OUP 2012 (Exhibit CL-47RM), p. 149.
[485] Claimant's Reply, ¶ 517.
[486] Claimant's Reply, ¶¶ 522-523, citing arbitral decisions.

### *(b) Breach of legitimate expectations*

**394.** The Claimant submits that Italy undertook explicit and implicit specific commitments toward PV energy investors under the following regulatory and contractual instruments:

(a) legislative decrees such as Legislative Decree No. 387/2003[487] implementing EU Directive 2001/77/EC[488] and Legislative Decree No. 28/2011[489] implementing EU Directive 2009/28/EC;[490]

(b) Ministerial decrees setting up Energy Accounts I to V;[491]

(c) AEEG Resolution No. 34/2005[492] and AEEG Resolution No. 280/2007[493] on minimum prices;

(d) the GSE Conventions concluded between Belenergia's SPVs and Italy (through the GSE), establishing feed-in tariffs, payment modalities, the 20-year credit assignment option, the purported prohibition of unilateral termination or amendment;[494] and

(e) the GSE Conventions concluded between Belenergia's SPVs and Italy (through the GSE) establishing minimum prices, subject to annual renewal on an inflation index basis, and the purported prohibition of unilateral

---

[487] Exhibit C-RFA-II-7.

[488] Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market (Exhibit C-RFA-II-4).

[489] Legislative Decree No. 28/2011 (Exhibit C-RFA-II-8; Hearing Bundle, vol. 2, Tab 11), Article 25(11). *See also* Claimant's Post-Hearing Brief, footnote 222.

[490] Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC (Exhibit C-RFA-II-5).

[491] *See* Claimant's Post-Hearing Brief, footnote 222, citing Article 16(1) of Conto Energia II (Ministerial decree of 19 February 2007) (Hearing Bundle, vol. 2, Tab 18) and Article 20(1) of Conto Energia V (Hearing Bundle, vol. 2, Tab 21).

[492] Exhibit C-8M.

[493] Exhibit C-9M.

[494] Statement of Claim, ¶¶ 119-122.

termination or amendment.[495]

395.  Belenergia submits that it has relied on these regulatory and contractual commitments providing for PV incentives.  It has therefore made its investment with the legitimate expectation that the feed-in tariffs and the minimum prices had become acquired rights and thus could not be modified in relation to existing PV plants.[496]

396.  The context of these PV incentives caused Belenergia's legitimate expectations that these incentives would remain in place.  According to the Expert Report by Professor Carlo Andrea Bollino[497] ("**Prof. Bollino's Report**"), Italy's previous PV incentives did not lead to significant PV investment.  Prof. Bollino's Report and Professor Alessandro Marangoni in its Expert Report[498] ("**Prof. Marangoni's Report**") concur that the cost of capital of PV energy production was very high, Italy needed to set up generous incentives to encourage PV investment.[499]  Therefore, Italy devised incentives granted to private operators that connected their PV plants to the national grid, in addition to "*the usual market set electricity price, a significant fixed subsidy over the expected life span of the plants, being 20 years.*"[500]

Feed-in tariffs

397.  According to Belenergia, Legislative Decree 387/2003 set out the incentives' features, including *(a)* the scheme's funding by final electricity consumers; *(b)* subsidies as a premium in addition to PV electricity's market price; *(c)* PV investment's fair remuneration; *(d)* subsidies' decrease proportionate to technology costs' reduction, different subsidies applying to PV plants with different aggregate level capacity (in Mw); *(e)* subsidies' duration for the PV plants' life, that is, 20 years; *(f)* subsidies' amount constant during the PV plants'

---

[495] Statement of Claim, ¶ 125.

[496] Statement of Claim, ¶ 123.

[497] Professor Bollino's Report of 11 September 2017, ¶¶ 45-50.  Prof. Bollino was the GSE's President between 2005 and 2009 (Claimant's Reply, ¶ 249).

[498] Althesys Report of 20 September 2017.

[499] Claimant's Reply, ¶¶ 248-250.

[500] Claimant's Reply, ¶ 250.

life; and *(g)* grant of subsidies through private law contracts with the GSE.[501]  The Claimant submits that Italy granted these PV incentives through the following Energy Accounts:

(a) Energy Account I: Ministerial Decrees adopted on 28 July 2005[502] and 6 February 2006 establishing feed-in tariffs for an equitable recovery of investment and operating costs by PV energy producers, capped at an overall maximum PV energy production of 500 MW (with annual caps). The 20-year feed-in tariffs—Article 2(1)(l)—were crystallised in the Conventions concluded between the PV plant owners and the GSE, authorising assignment of credits to third parties such as banks.[503]

(b) Energy Account II: Ministerial Decree adopted on 19 February 2007[504] establishing a "*balance approach*" encouraging PV plant's efficiency, not affecting acquired rights under Energy Account I—Article 16, and confirming the 20-year feed-in tariffs—Article 2(1)(h).  It established a new threshold of 1200 MW without annual caps.[505]

(c) Energy Account III: Ministerial Decree of 6 August 2010,[506] establishing a progressive reduction of feed-in tariffs, not affecting rights under previous Energy Accounts—Article 1(3).[507]  Application of this decree was postponed until 30 June 2011 due to PV plant owners' criticism against unclear application of Energy Account II.[508]

(d) Energy Account IV: Ministerial Decree of 5 May 2011,[509] adopted after the enactment of Legislative Decree 28/2011 (implementing EU Directive 2009/28/EC), introducing further reductions to feed-in tariffs

---

[501] Claimant's Reply, ¶¶ 252-253, 256.
[502] Exhibit C-RFA-II-14.1.
[503] Statement of Claim, ¶¶ 36-38.
[504] Exhibit C-RFA-II-14.2.
[505] Statement of Claim, ¶ 42.
[506] Exhibit C-RFA-II-14.3.
[507] Statement of Claim, ¶ 45.
[508] Statement of Claim, ¶ 46.
[509] Exhibit C-RFA-II-14.4.

for larger plants commissioned after August 2011, and caps related to overall nominal installed capacity of PV plant owners.  It called for a review of the feed-in tariffs when annual costs reached € 6 billion.

(e) <u>Energy Account V</u>: Ministerial Decree of 5 July 2012, [510] adopted when annual costs with feed-in tariffs approached € 6 billion.  It established an "*all-inclusive tariff*" ("*tariffa omnicomprensiva*") to plants meeting additional technical requirements, applicable to PV plants entering in operation after 27 August 2012.  It did not affect acquired rights under the previous Energy Accounts—Article 20(1).[511]

**398.**  The relevant Energy Accounts I to V,[512] adopted through Ministerial Decrees, built on these incentives' features, ensuring stability of the system: PV plants achieving a higher aggregate level capacity—as technology advanced and became cheaper—had to move to a different Energy Account with lesser subsidies.[513]  The GSE Conventions concluded under the Energy Accounts provided for an acquired right to 20-year feed-in tariffs, that is a long-term incentives guarantee under a private contract, helping increase the Italian PV sector and easing security assignments of these 20-year receivables with banks.[514]  Belenergia adduces that Italian legislation's "*grandfathering*" is undeniable because when a new tariff came in under a new Energy Account, "*prior* [feed-in tariffs] *Conventions were 'grandfathered'*" thereby retaining tariffs granted under the GSE Conventions despite ongoing reduction in tariffs for future solar plants.[515]

---

[510] <u>Exhibit C-RFA-II-14.5</u>.

[511] Statement of Claim, ¶ 56.

[512] Belenergia clarifies that its subsidiaries'' PV plants received subsidies under Energy Accounts I, II and IV (Claimant's Reply, ¶254).

[513] *See* First Witness Statement of Eng. Bacchiocchi, ¶ 18 *et seq*.

[514] Claimant's Reply, ¶ 267.  *See also* Professor Bollino's Report, ¶¶ 43, 64, and Annexes I to IV of this Report; Althesys Report of 20 September 2017, ¶ 34.

[515] Claimant's Post Hearing Brief, ¶¶ 39, 141.

399. Yet the Claimant explains that these regulatory and specific contractual commitments were abandoned with, among other regulatory acts, the *Spalma Incentivi* Decree[516] of 24 June 2014 later confirmed by Conversion Law No. 116/2014 of 11 August 2014.[517]

400. The *Spalma Incentivi* Decree reduced feed-in tariffs applying to all PV plants with a nominal power above 200 Kw, irrespective of GSE Conventions already in force. [518] All three options offered to PV plant owners under this Decree were disadvantageous, as confirmed by Italian courts.[519]  In Belenergia's view, these three options affected the PV system's stability failing to provide them with proper remuneration through feed-in tariffs,[520] the three options being the following:

> (a) the "spread incentives option" extending the duration of incentives from 20 to 24 years but reducing incentives proportionally to the PV plant's lifetime;
>
> (b) the "butterfly option" keeping the 20-year duration but varying the quantum of incentives throughout time; and
>
> (c) the "outright cut option" reducing 6% to 8% of incentives altogether proportionally to the PV plant's nominal capacity.[521]

401. Belenergia's SPVs were deemed to have opted for the "outright cut option," automatically applying in the event of failure to expressly make an option.[522]

402. Belenergia argues that Article 26 of Conversion Law No. 116/2014 also changed the payment modality of feed-in tariffs: rather than monthly payments at 100% of estimated annual electricity production, Article 26 provided for monthly payments at 90% with payment of the final 10% balance by 30 June of next year.[523]  Belenergia submits that the

---

[516] Statement of Claim, ¶¶ 124, 138.  *See* Exhibit C-RFA-II-11.

[517] Statement of Claim, ¶ 69.  *See* Exhibit C-RFA-II-12.

[518] Statement of Claim, ¶ 124.

[519] Statement of Claim, ¶ 124.

[520] Claimant' Reply, ¶¶ 280-281.  *See also* Althesys' Report of 20 September 2017, ¶¶ 85-89.

[521] Statement of Claim, ¶ 139.  *See also* ¶ 72.

[522] Statement of Claim, ¶ 139.  *See also* ¶ 101.

[523] Statement of Claim, ¶¶ 73, 140.

two mitigation schemes under Article 26 of Conversion Law No. 116/2014 were never adopted.[524]

403. The Claimant alleges that the GSE Conventions replicated the GSE's standard terms and conditions, forbade their unilateral termination or amendment and did not provide for *force majeure* or hardship exceptions.[525] Belenergia refers to the First Opinion of Professors Onida and Randazzo[526] that the *Spalma Incentivi* Decree "*partially revoked, unilaterally and authoritatively*" the GSE Conventions' commitments in relation to the Claimant's PV subsidiaries.[527]

404. The Claimant concludes that the *Spalma Incentivi* Decree breached the *pacta sunt servanda* principle in relation to contractual and international obligations undertaken by Italy. It adds that doubts about the interpretation of the GSE Conventions should be interpreted in favour of the Claimant (*contra proferentem* rule).[528]

405. Belenergia differs with Italy that feed-in tariffs were unsustainable or that Italy could not afford them because Italy was not funding them.[529] On the contrary, the incentives resulted in higher PV capacity and thus lower prices to consumers, with benefits to the Italian economy estimated at € 1.8 billion in 2013.[530] The Claimant also disagrees with Italy that the reduction in feed-in tariffs could enhance competitiveness favouring small and medium-sized enterprises ("**SMEs**"); rather, the SMEs' cost savings were "*negligible and irrelevant for a real improvement of the SME's competitiveness,*"[531] and "*about 4 million small scale business users of electricity have not benefited from the reduction.*"[532]

---

[524] Statement of Claim, ¶¶ 74-76; Claimant's Reply, ¶ 282. *See also* Althesys' Report of 20 September 2017, ¶ 94. Belenergia explains that the first mitigation scheme under Article 26 of Conversion Law No. 116/2014 was the option to sell 80% of electricity by the recognised feed-in tariff to primary financial operators. In turn, the second scheme under Article 26 provided for access to loans guaranteed by Italy's *Cassa Depositi e Presitti* ("**CDP**").

[525] Statement of Claim, ¶ 128.

[526] First Opinion of Professors Onida and Randazzo of 24 November 2016, ¶ 18.

[527] Statement of Claim, ¶¶ 128-129.

[528] Statement of Claim, ¶¶ 128, 130-131.

[529] Claimant's Reply, ¶ 271.

[530] Claimant's Reply, ¶¶ 277-278. *See also* Althesys Report of 20 September 2017, ¶¶ 69, 71-72.

[531] Althesys Report of 20 September 2017, ¶ 120; Claimant's Reply, ¶¶ 271-273.

[532] Claimant's Reply, ¶ 275; Althesys Report of 20 September 2017, ¶ 122.

406.    Moreover, Belenergia rejects Italy's additional reasons, being PV investments' low risk, Italy's solar irradiation underestimation and PV technology's efficiency.  The Claimant argues that these reasons were not raised at the time Italy adopted the challenged measures.[533] The Claimant submits that PV investors bear all risks associated with production, including quality risk in relation to design, components, construction, national grid, solar irradiation risks, and regulatory risks.[534]  Belenergia submits that Italy did not challenge the conclusions on risks of its experts Professor Marangoni (Althesys), and Eng. Sarraceno and Eng. Guerrieri (Protos' Report), noting that GRIF accepted at the Hearing that the factors listed in the Protos' Report incur risk.[535]

407.    Moreover, the Claimant asserts that data on better solar irradiation levels had existed since 2010; it had long been established that 80% was a more appropriate PV efficiency factor than 75%.[536]  The Claimant submits that it has shown during the Hearing that Italy's justification for the incentives reduction is not supported by the use of less accurate data (Photovoltaic Geographical Information System's ("**PVGIS**") data vs. more accurate PVSYST data) when granting incentives.  Among other things, the Claimant argues that it has shown that it has never used PVGIS data but used PVSYST when estimating with accuracy its plants' production data and that Italy provided very little evidence that it relied on PVGIS data when granting incentives.[537]

408.    Belenergia further states that Italian courts have recognised the general principles of "consolidated substantial situations" ("*situazioni sostanziali*") and acquired rights ("*diritti acquisiti*").[538]  The High Administrative Court has also recognised that private parties had

---

[533] Claimant's Reply, ¶ 284.

[534] Claimant's Reply, ¶ 285.

[535] Claimant's Post Hearing Brief, ¶¶ 94-96, citing, among other sources, Althesys' Report, Item 3.2; Protos' Report, Item C.1.1; Tr. 28 March 2018, Counsel for Claimant & Eng. Umberto Monarca (GRIF), 505:13-506:21.

[536] Claimant's Reply, ¶¶ 288-289.  *See also*¸ Protos' Report of September 2017, ¶ 66; GRIF's Report of 12 April 2017, pp. 33-34.

[537] *See* Claimant's Post Hearing Brief, ¶¶ 97-110, citing, among other sources, Tr. 26 March 2018, Mr. Jacques Edouard Lévy & Counsel for Claimant, 126:11-127:20, 132:18-133:12; Tr. 27 March 2018, Dr. Olivier Boucher & Counsel for Respondent, 370:19-372:8.  *See also* Claimant's Post Hearing Brief, ¶¶ 54-57.

[538] Statement of Claim, ¶ 131, citing Exhibits CL-3M, CL-4M, CL-5M, CL-6M.

legitimate expectations that the State must not unilaterally modify the legal regime applying to the GSE Conventions.[539]

409.  The Claimant also argues that it relied on legitimate expectations created by Italy when financing and making the investment.  Firstly, the Claimant relied on due diligence reports by "*prominent Italian legal and accountancy firms and banks.*"[540] These reports made "*no record of any previous case of unilateral modification of* [GSE] *Conventions.*"[541]  Secondly, Belenergia also relied on the "*financial sustainability*" of Italy's PV incentives scheme and on the "*financial capability of the GSE.*" [542]  Thirdly, the Claimant relied on the GSE Convention's income stream allowing credit assignment as collateral for bank loans.[543] Belenergia refers to its CEO Mr. Eduard Levy's First Witness Statement stating that:

> "*It was an incredible surprise for us to incur the above-mentioned changes of laws because we had already executed surface contracts with the owners of the lands where the plants were located and specific terms had been agreed, as well as contracts with the banks to receive their loans on the basis of specific conditions and assumptions that had been negotiated in advance.  We had also assigned our GSE credits to the banks in order to guarantee our loans.  Furthermore we had already executed the Operation and Maintenance agreements with our contractors to maintain the plants under specific terms and conditions, as well as insurance policies, security agreements to protect the plants etc.* […] *If we had known in advance that such fundamental economic terms underlying the Conventions* […] *were going to change for the worse, we would have never realized such investment.*"[544]

410.  The Claimant states that the Respondent misconstrues its legitimate expectation argument:  Claimant's case is not that it could not have expected that Italy's PV regulatory framework would change; rather, its case is that it could not have expected the changes affecting its acquired rights.[545]

---

[539] Statement of Claim, ¶ 131, citing Exhibits CL-5M.

[540] Statement of Claim, ¶ 132, citing due diligence report (Exhibit C-18M).

[541] Statement of Claim, ¶ 133.  *See also* Post Hearing Brief, ¶ 73 et seq.

[542] Statement of Claim, ¶ 134.

[543] Statement of Claim, ¶ 135.

[544] First Witness Statement of Mr. Levy of 15 November 2016, ¶ 34.

[545] Claimant's Reply, ¶ 525.

411. Noting Italy's refusal to consider the GSE Conventions as private contracts,[546] Belenergia submits that even if this were not the case—*quod non*—the GSE Conventions are specific commitments by the host State.[547] In the Claimant's view, the wording of GSE Conventions on feed-in tariffs' duration and quantum makes these specific commitments a stabilisation clause.[548]

412. Belenergia distinguishes the present case from *Blusun v. Italy*, among other reasons, because *(a)* in *Blusun* the investor had not received a GSE letter confirming the incentive let alone entered into GSE Conventions; and *(b)* the challenged *Romani* Decree in *Blusun* did not affect investors with acquired rights.[549] The *JSW v. Czech Republic* case is also distinguishable from the present case because no specific commitment let alone a contract existed.[550] Further, Belenergia analyses the findings in *Eiser, Novenergia, Isolux, Charanne* and *Masdar* decisions, as follows:

> *What the cases (except* Masdar*) say is that if an investor makes an investment where there is no specific commitment to a rate, then small changes (which were envisaged by documents issued by the State prior to investment) may not give rise to a claim* (Charanne) […]
>
> [I]*nvesting in the knowledge that producers' entitlements to an incentive have been changed in certain respects, and may be liable to change according to Court decisions* […] *makes it difficult to say that there is a legitimate expectation that rates will not change* (Isolux) […]
>
> [A] *complete change in approach to tariffs can give rise to a claim, certainly if that change entirely destroys the investment* (Eiser)*, but even if that change does not make a plant uneconomic* (Novenergia)*. Now, with* Masdar*, we have a Tribunal emphasising that the consideration of the nature of the change has little relevance in the context of legitimate expectations derived from specific commitments.*[551]

413. Belenergia then concludes that these prepositions are not detrimental to its case:

> *First, as has been stated, save for Masdar, they do not involve specific commitments. It is submitted that the Claimant's case on specific*

---

[546] For Claimant's arguments on the nature of the GSE Conventions, *see* Item VI.A(2)(b) below on the umbrella clause.
[547] Claimant's Reply, ¶ 531.
[548] Claimant's Reply, ¶¶ 533-535.
[549] Claimant's Post Hearing Brief, ¶ 159. *See also* Claimant's Post Hearing Brief, ¶ 135.
[550] Claimant's Post Hearing Brief, ¶ 157.
[551] Claimant's Post Hearing Brief, ¶ 155. *See also* Claimant's Post Hearing Brief, ¶¶ 147-154.

> *commitment is even stronger than in the Masdar case, given that the Claimant holds a contractual commitment. Second, the regulatory regime in Spain was subject to a stream of changes and case law which, depending on the timing of the claims, affected the legitimate expectations of the investors. These factors feature heavily in the cases where the investors have lost. These factors are not present in our case and in fact stability in Italy is emphasised by the fact that the producers were grandfathered and unaffected by changes in law. Third, the principle that legitimate expectations can be derived from an objective understanding of the legislation is supported. Fourth, read properly, they do not establish a proposition that a very large impact on an investment is required to bring a claim* [552]

414. Belenergia concludes that the *Spalma Incentivi* Decree undermined the "*perfectly reasonable expectation*" [553] relied on by Belenergia that the GSE Conventions on feed-in tariffs "*would be respected and producers holding such rights would be grandfathered, irrespective of future reductions in incentives.*"[554]

Minimum prices

415. Moreover, the Claimant states that Italy adopted additional PV incentives through a mandatory purchase regime ("*ritiro dedicato*") based on minimum prices ("*prezzi minimi garantiti*") under AEEG Resolutions No. 34/2005 and 280/2007. This mandatory purchase regime enabled PV plant owners to sell electricity directly to the GSE under simplified terms and conditions, as an alternative to selling on the wholesale market or to selling through power purchase agreements with consumers.[555] This regime was crystallised in the GSE Conventions on minimum prices, concluded between the GSE and PV plant owners.[556]

416. The Claimant cites Article 13[557] of GSE Conventions on minimum prices, noting that these Conventions automatically renewed yearly. Claimant also submits that Article 13 granted the PV producer the option to terminate without cause, not the GSE, and that the prices are determined by reference to AEEG Resolution No. 280/2007. According to this Resolution,

---

[552] Claimant's Post Hearing Brief, ¶ 156.

[553] Claimant's Post Hearing Brief, ¶ 76.

[554] Claimant's Post Hearing Brief, ¶ 161.

[555] Statement of Claim, ¶ 58.

[556] Statement of Claim, ¶ 58.

[557] To illustrate, Claimant refers to Hearing Bundle, vol. 3, Tab 22 (Exhibit C-26M). *See* Claimant's Post Hearing Brief, ¶ 120.4.

the AEEG was to fix the price annually, the default position being prices fixed by reference to an inflation measure.[558]  This was consistent with AEEG Resolution No. 34/2005, which led to "*an established approach over 8 years*."[559]  Among other things, the Claimant refers to the minimum price updates of AEEG in relation to years 2008 to 2011 that gave "*no idea about a change to come*,"[560] which was confirmed by Mr. Lévy.[561]

417.  Nevertheless, AEEG Resolution No. 618/2013 cut minimum prices to € 38.5/MWh for the calendar year 2014, that is, a 50% cut.  Four days later, Article 1(2) of *Destination Italia* Decree[562] of 23 December 2013, later confirmed by Conversion Law No. 9/2013 of 21 February 2014, repealed the fixed minimum price applying to Belenergia's PV plants benefiting from feed-in tariffs.[563]  Under Article 1(2) of the *Destinazione Italia* Decree the minimum guaranteed price for PV plants with incentives was fixed as equal to the applicably hourly zonal price, except for PV plants with capacity up to 100Kw.[564]

418.  The Claimant explains that the Respondent agrees that minimum prices sought to cover operating costs[565] and that this was aimed at attracting investors.[566]  According to the Claimant, Italy has failed to show that operating costs dropped; hence Italy's justification to cut minimum prices is unwarranted.[567]

419.  By repealing the minimum price regime Italy breached the FET provision in view of Belenergia's legitimate expectation that the minimum prices "*would continue to cover OPEX costs and would not be suddenly and radically changed.*"[568]  The Claimant clarifies that these repealing measures applied to PV plants under the Energy Accounts I to IV.[569]  Belenergia also clarifies that AEEG Resolution No. 618/2013 of 19 December 2013 had already

---

[558] Claimant's Post Hearing Brief, ¶ 120.2.  *See also* Hearing Bundle, vol. 3, Tab 8 (Exhibit C-9M).

[559] Claimant's Post Hearing Brief, ¶ 120.6.  *See also* Hearing Bundle, vol. 3, Tab 7 (Exhibit C-8M).

[560] Claimant's Post Hearing Brief, ¶ 120.6.  *See also* Hearing Bundle, vol. 3, Tab 9 (Exhibit C-10M).

[561] Claimant's Post Hearing Brief, ¶ 121.  *See also* CWS-JEL1, ¶ 30; Tr. 26 March 2018, Mr. Jacques Edouard Lévy, 180:1-6.

[562] Exhibit C-RFA-II-10.

[563] Statement of Claim, ¶ 64.

[564] Statement of Claim, ¶¶ 65-67.

[565] Claimant's Post Hearing Brief, ¶ 120.1.

[566] Claimant's Post Hearing Brief, ¶ 120.2.

[567] Claimant's Post Hearing Brief, ¶ 120.2.

[568] Claimant's Post Hearing Brief, ¶¶ 123-125.

[569] Statement of Claim, ¶ 68.

reduced the minimum prices applying to renewable resources (aligning these prices to operating and fuel costs).[570]

420. According to Belenergia, legitimate expectations in relation to minimum prices are not founded on specific assurances but on Belenergia's objective understanding of Italian legislation, as follows:

(a) Italian legislation on fixed minimum price "*was designed to cover operating costs and protect investors from fluctuation in the market price and therefore attract investors*;"

(b) Italy's practice to maintain stable prices from 2005 to the end of 2013;

(c) The minimum price commitment under the GSE Conventions was "*automatically renewable and not revocable at will by the State, albeit this then did refer back to the commitment to pay prices pursuant to AEEG Resolution No. 280/2007*;" and

(d) Italy has failed to show facts justifying the radical cut and later removal of fixed minimum prices.[571]

### (c) Procedural impropriety

421. Belenergia also submits that Italy's measures were procedurally improper for lack of due process and transparency, breaching the FET standard under Article 10(1) ECT.[572]   The Claimant argues that the *Spalma Incentivi* Decree's adoption did not comply with Italian law requiring a two-phase consultation, including a Regulatory Impact Analysis ("**RIA**") and a Technical Regulatory Analysis ("**TRA**").

422. The sole report[573] on the *Spalma Incentivi* Decree disclosed by Italy fails to cover most RIA requirements, is silent on the TRA, reveals little public consultation, and lacks transparency.[574]   The Claimants lists the report's defects as follows:

---

[570] Statement of Claim, ¶ 67, citing Exhibit C-RFA-II-16.
[571] Claimant's Post Hearing Brief, ¶ 163.4.
[572] Claimant's Reply, ¶ 536.
[573] Exhibit C-10RM.
[574] Claimant's Reply, ¶¶ 304, 307.

(a) insufficient reference to public consultation (only one reference to *Assorinnovabile*, but no reference to consultation results);

(b) failure to report on alternative regulatory options, considering the measures' retroactive effects;

(c) failure to indicate possible disadvantages of the measures;

(d) failure to analyse foreseeable effects of the measures (including negative effects) and the measures' consistency with their impact on the PV market;

(e) insufficient analysis of the measures' impact on international competitiveness; and

(f) failure to discuss legal uncertainty and compliance with international obligations.[575]

423. The Claimant further states that Italy has made no disclosure about the Parliamentary Commission responsible for the *Spalma Incentivi* Decree.[576]   Citing publicly available documents, the Claimant stresses that Italy has provided no response to strong criticism to the *Spalma Incentivi* Decree's law conversion bill by various PV stakeholders,[577] let alone to criticism by the Italian Senate.[578] Belenergia concludes that the *Spalma Incentivi* Decree "*came out of nowhere*," being hastily adopted and flawed in vital respects.[579]

424. The Claimant highlights that Professor Rojas admitted not to have examined legislative reports leading to the *Spalma Incentivi* Decree and his reluctance to answer whether these reports complied with Italian law.[580]   According to the Claimant, this reveals the weakness

---

[575] Claimant's Reply, ¶ 305.

[576] Claimant's Reply, ¶ 308.

[577] Claimant's Reply, ¶¶ 309-312, citing opinions by Confidustria (Exhibit C-11RM, p. 8), ABI (Exhibit C-12RM, p. 13), ASSILEA (Exhibit C-13RM, p. 6), Terrafirma (Exhibit C-14RM, p. 7).

[578] Claimant's Reply, ¶ 311, citing an opinion by the Italian Senate criticising the use of guarantees by *Cassa Depoisiti and Prestiti* as mitigation tools (Exhibit C-15RM, p. 70).

[579] Claimant's Reply, ¶ 312.

[580] Claimant's Post Hearing Brief, ¶¶ 117-119.

of Italy's position.[581]   Therefore, Belenergia concludes that the *Spalma Incentivi* Decree does not observe legislative processes breaching transparency and due process requirements.[582]

### (d) Substantive impropriety

425.   Finally, the Claimant argues that Italy's measures are substantively improper because the *Spalma Incentivi* Decree was: *(a)* unjustifiable in relation to the declared public policy to increase small and medium enterprises' ("**SME**") competitiveness; *(b)* unjustifiable in relation to Italy's unproven claim on GSE Conventions' unsustainability; *(c)* discriminatory against foreign investors; and *(d)* disproportionate because they "*barely assisted SMEs but substantially harmed*" Belenergia.[583]   The Claimant refers to decisions by international tribunals and national courts on individuals' legitimate expectations that regulatory changes be proportionate to public policy goals.[584]

426.   Belenergia thus concludes that the *Spalma Incentivi* Decree has discriminatory effect and does not follow a rational policy because its justifications are incorrect.[585]

### (2) Italy Has Breached the Umbrella Clause under Article 10(1) ECT

### (a) The applicable umbrella clause

427.   The Claimant submits that the proper law of the underlying obligation protected under the ECT's umbrella clause may be domestic law.[586]   Yet, it disagrees with the Respondent that domestic law also applies to treaty breaches or to the effects of exclusive jurisdiction contract clauses.[587]

428.   The Claimant submits that Article 10(1) ECT contains a "*broadly formulated*" umbrella clause,[588] providing that a Contracting Party "*shall observe any obligation it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.*"   In its

---

[581] Claimant's Post Hearing Brief, ¶ 119.
[582] Claimant's Post Hearing Brief, ¶ 144.
[583] Claimant's Reply, ¶ 538.
[584] Claimant's Reply, ¶¶ 539-546.
[585] Claimant's Post Hearing Brief, ¶ 143.
[586] Claimant's Reply, ¶ 411.
[587] Claimant's Reply, ¶¶ 412-413.
[588] Statement of Claim, ¶ 154.

view, an umbrella clause should be interpreted pursuant to its own terms, which should be given their ordinary meaning pursuant to the VCLT, in the light of the *effet utile* principle.[589]

429. Belenergia also submits that Italy has failed to opt out from the umbrella clause under Article 10(1) ECT, although it had this option under Article 26(3)(c) ECT.[590]  So, Italy "*unconditionally consent*[ed]" to the umbrella clause.[591]  The Claimant describes the umbrella clause's effects as follows:

> [T]he effect of umbrella clauses is to stabilise investor-State relations
> ex post *by offering an enforcement mechanism for investment-related
> host State promises, entirely independent of whether the breach that
> gives rise to liability under the clause is of sovereign or a purely
> commercial nature.*[592]

430. Moreover, Belenergia asserts that violation of contractual obligations by a Contracting Party leads to violation of the umbrella clause's treaty obligation to comply with contractual commitments; in other words, the umbrella clause "*internationalises*" contractual breaches.[593]  This is the interpretation adopted, for example, in *Noble Ventures v. Romania,* the umbrella clause under the US-Romania BIT having a broad, "*almost identical*" wording to the umbrella clause under Article 10(1) ECT.[594]

### (b) The nature of GSE Conventions on feed-in tariffs

431. The Claimant stresses that Italy does not dispute that the GSE Conventions on the feed-in tariffs are contracts under Italian law; rather Italy argues that they are not "private" contracts, but "accessory", public law contracts.  The Claimant argues that they are "private" contracts, breached by Italy and that Italy is estopped from denying their "private", "contractual" character.[595]    According to Claimant, Italy is estopped from denying this because

---

[589] Claimant's Reply, ¶¶ 322.1, 345.

[590] Claimant's Reply, ¶¶ 322.1, 348.  *See* Energy Charter Treaty (Exhibit CL-2M), Article 26(3)(c): "*A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).*"

[591] Claimant's Reply, ¶ 349.

[592] Claimant's Reply, ¶ 328.  *See also* ¶¶ 344, 366.

[593] Statement of Claim, ¶ 154; Claimant's Reply, ¶¶ 322.2, 351, 357, citing *Noble Ventures v. Romania* (Exhibit RLA-27, ¶ 60), *BIVAC v. Paraguay* (Exhibit RLA-8, ¶ 141) on broadly worded umbrella clauses, among other arbitral decisions.

[594] Claimant's Reply, ¶ 354.

[595] Claimant's Reply, ¶ 322.3.  *See also* ¶¶ 425-427.

*(i)* Legislative Decree No. 28/2011 expressly stated that GSE Conventions are private contracts; *(ii)* Italy drafted and marketed the GSE Conventions as private contracts with a 20-year duration guarantee; *(iii)* Belenergia relied in good faith on all these unconditional, express and implied representations by Italy.[596]

432.  The Claimant disagrees with Italy that the GSE Conventions "*simply reflect whatever the legislation says from time to time.*"[597]  The Claimant cites Professor Onida saying that a private law contract can be accessory to an administrative act but this does not mean that it simply reflects legislation let alone that the State could freely modify it:[598]

> PROF ONIDA: *If we are saying that these contracts are linked to a procedure that up to that point is realised through unilateral acts then this is true, because these contracts could not come into being without the existence of the law, the ministerial decree of Conto Energia, the investigation of the GSE, the letter of the GSE recognising the tariffs and so we sign the Conventions.  This is true. It is a contract that is accessory to a procedure, but we cannot say this contract does not have the same effect as a contract of private law, this is not true, because otherwise it would be fully pointless to sign this contract, the administrative act would be sufficient.  We would only need the administrative act to grant the incentive. But the fact that the content of these provisions is then transposed into a private law contract means, in our opinion, that the intention was to give a different effect to the commitment.  Normally when the States make commitments in its role as regulator, they are limited by reasonableness and so on and so forth, but when the State makes commitments in its role as a party to a contract it does not do so and assumes a specific commitment as a contracting party vis-à-vis the private investor.  Where there is no contract, such specific undertaking is not given.  Here we have this specific commitment.*
>
> *[…] PROF ONIDA: We have to establish what we mean by accessory contract. If it's a public law contract, it's only regulated by public law. Here the specification of a contract of private law, it must necessarily have consequences. Otherwise, it would be illogical.*[599]

---

[596] Claimant's Reply, ¶ 437.
[597] Claimant's Post Hearing Submission, ¶ 68.3.
[598] Claimant's Post Hearing Submission, ¶ 68.
[599] Claimant's Post Hearing Submission, ¶ 68.3, citing the Hearing Transcript (Tr. 29 March 2018, Professor Valerio Onida, 585:6-586:8, 586:25-587:5).

433.  The Claimant submits that the evidence, including Professor Onida's statements at the Hearing, established that "*the* [GSE] *Conventions operate as binding contractual commitments as to the incentive rate contained within the Conventions, for their entire 20 year duration, which are distinct from the legislative and administrative acts preceding them.*"[600]

434.  The Claimant further disagrees with Italy's argument on the basis of the Corte di Cassazione's Decision No. 10795/2017.[601]  According to the Claimant, the United Chambers of the court ruled on the conflict of jurisdiction in favour of administrative courts' jurisdiction on the basis of Article 41 of the Italian Code of Civil Procedure, not on the merits of the case that is subject to the exclusive competence of administrative courts.  Hence, Italy cannot rely on this Decision to argue that the GSE Conventions are "accessory" or "hybrid" contracts.[602]

435.  If the Tribunal agrees that the GSE Conventions qualify as binding contracts, "*it inexorably follows that the umbrella clause is applicable*."[603]  The Claimant submits that the Respondent accepted in the Rejoinder that the umbrella clause applies to purely contractual claims when the State acts as a commercial entity.[604]  The contractual nature of the GSE Conventions is "*a clear point of distinction from all the solar cases (hence the absence of any real attention to the ECT umbrella clause in those cases), including Blusun.*"[605]

436.  According to the Claimant, the fact that the GSE Conventions were not negotiated is irrelevant because Article 10(1) ECT only requires that the obligation "*be entered into*," citing the *Micula v. Romania* award.[606]  The Claimant submits that in *Micula* investors' certificates issued by Romania fell within the meaning of the umbrella clause (although the Tribunal found that there was no breach of Romanian law).[607]

---

[600] Claimant's Post Hearing Submission, ¶ 128.
[601] Exhibit REX-74.
[602] *See* Claimant's Observations on Corte di Cassazione's Decision No. 10795/2017 of 21 June 2018.
[603] Claimant's Post Hearing Submission, ¶ 130.
[604] Claimant's Post Hearing Submission, ¶ 131.
[605] Claimant's Post Hearing Submission, ¶ 135.
[606] Claimant's Post Hearing Submission, ¶¶ 131-132.
[607] Claimant's Post Hearing Submission, ¶ 132.

**437.** Accepting that private contracts like the GSE Conventions may be "*instruments of regulation*" to the extent that they result from legislation, the Claimant argues that Italy misinterprets Decision No. 16/2017 of the Constitutional Court.[608]   According to the Claimant, the Italian courts have not ruled on the question of breach of contract, that is, whether the GSE breached the GSE Conventions; rather, the Constitutional Court ruled in Decision No. 16/2017 that the *Spalma Incentivi* Decree was consistent with certain provisions of the Italian Constitution.[609]   The Claimant cites two Italian cases which identified the GSE Conventions as private contracts;[610] relying on Professor Onida's oral evidence:

> *PROF ONIDA: Well, the breach of a contract is simply conduct not provided for by the contract, while the modification of the regulatory framework is an amendment within the limits that the legislator may operate within, so it is a matter of discussing the limits in this case. It is a different thing.*

> *MR AIELLO: If there is such a difference why do you say in your first statement on page 6 that the GSE is a breaching party in relation to the executed contract?*

> *PROF ONIDA: Because, according to the contract, changing the content without the agreement of the other party is a breach of the contract, even if, from the GSE standpoint, it is something that stems from a regulatory intervention.*[611]

**438.** Belenergia rejects Italy's argument that the unilateral amendment clause inserted in Article 10 of GSE Conventions after Energy Account V could confirm the "accessory" or "reflective" character of GSE Conventions because it is wholly inconsistent with the clause not permitting unilateral amendment in previous GSE Conventions.[612]   Belenergia challenges Professor Rojas' position during the Hearing, noting that his position that the GSE

---

[608] Claimant's Post Hearing Submission, ¶ 68.5.

[609] Claimant's Post Hearing Submission, ¶ 126.

[610] Claimant's Post Hearing Submission, ¶ 68.6, citing Exhibit CL-4M (Hearing Bundle, vol. 6, Tab 24, p. 37), Exhibit CL-6 (Hearing Bundle, vol. 6, Tab 26, p. 19), and Exhibit CL-3M (Hearing Bundle, vol. 6, Tab 23).

[611] Claimant's Post Hearing Brief, ¶ 133, citing the Hearing Transcript (Tr. 29 March 2018, Professor Valerio Onida & Avv. Giacomo Aiello, 574:12-575-2).

[612] Claimant's Post Hearing Submission, ¶¶ 68.8-68.9.

Conventions served no purpose and did not create any contractual right "*defies common sense,*" and that preference should be given to Professor Onida's explanations.[613]

439. Moreover, Belenergia argues that Italy has failed to prove how Article 1139 of the Italian Civil Code could assist Italy's right to cut incentives if the GSE Conventions qualify as private contracts.[614]  Belenergia adds that Italy has failed to show that the Italian Constitutional Court has a longstanding practice to accept that the State can change the law as it did affecting the GSE Conventions, citing Professor Onida' view that Decision 16/2017 was a "*turning point.*"[615]

440. Belenergia also argues that—irrespective of GSE Conventions' "private", "accessory" or "contractual" character—these Conventions contain specific commitments by Italy that have been breached.[616]  Belenergia relies on arbitral decisions and scholarly writings supporting that the ECT's broadly worded umbrella clause concerns:

> […] *all investment-related promises of the host State that are either contractual in nature, constitute a functional substitute to a contractual commitment or are otherwise binding obligations, irrespective of whether that commitment is in the form of a unilateral undertaking.*[617]

> [And that] *there is no reason to restrict the umbrella clause in the ECT to contractual obligations, still less a particular type of contractual obligation.*[618]

441. In the Claimant's view, the GSE, the party signatory to the GSE Conventions concluded with Belenergia's PV subsidiaries, acts as an "*emanation*" of Italy, which, in turn, enacted legislation breaching the GSE Conventions and the ECT's umbrella clause.[619]  Belenergia refers to Article 4(1) of the ILC Articles on State Responsibility,[620] which provides that:

> *The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in*

---

[613] Claimant's Post Hearing Submission, ¶¶ 68.10-68.15.

[614] Claimant's Post Hearing Submission, ¶ 69.

[615] Claimant's Post Hearing Submission, ¶¶ 70-71.

[616] Claimant's Reply, ¶ 322.4.  *See also* Claimant's Reply, ¶ 409.

[617] Claimant's Reply, ¶ 368. *See also* ¶¶ 370-410.

[618] Claimant's Reply, ¶ 409.

[619] Claimant's Reply, ¶ 322.5.

[620] Claimant's Reply, ¶ 417.

*the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State.*

442. Belenergia then refers to Articles 4(1) and 8(1)[621] of GSE's bylaws, stating that the GSE performs activities of "*public nature*" in the electricity sector ("*funzioni di natura pubblicistica del settore elettrico*") and that its shareholders are the Ministry of Economy and Finance and the Ministry of Economic Development.[622] The Claimant adds that Italian courts have confirmed that the GSE is equal to the Italian public administration.[623] Thus, the Claimant states that the *Spalma Incentivi* Decree and the Conversion Law No. 116/2014 repudiated the feed-in tariff regime and the respective GSE Conventions, being "*directly attributable to the Respondent in its capacity* as a sovereign."[624]

443. The Claimant objects to the Respondent's argument that Italy could not have breached the GSE Conventions on feed-in tariffs through the *Spalma Incentivi* Decree and the Conversion Law No. 116/2014. The Claimant disagrees that an umbrella clause violation covers only an "*autonomous act*" by the GSE because this argument deprives the umbrella clause of effects.[625] In its view, Italy cannot rely on domestic law to evade international responsibility, relying on *Sempra v. Argentina*.[626] Italy cannot rely on Italian law to deny the "*internationalisation*" of these breaches.[627]

444. Belenergia differs with Italy that the *Spalma Incentivi* Decree and the Conversion Law No. 116/2014 affecting the entire Italian PV sector could exempt Italy from the umbrella

---

[621] *Statuto del Gestori dei Servizi Energetici – GSE S.p.A.*, Article 4(1): "*La Società ha per oggetto l'esercizio delle funzioni di natura pubblicistica del settore elettrico e in particolare delle attività di carattere regolamentare, di verifica e certificazione relativa al settore dell'energia elettrica […] nonché le attività correlate […] in materia di promozione dell'energia elettrica prodotta da fonti energetiche rinnovabili nel mercato interno dell'elettricità, comprese le attività di carattere regolamentare e le altre competenze, diritti e poteri ad esse inerenti. […];*" Article 8(1): "*Ai sensi dell'articolo 3, comma 4, del decreto legislativo 16 marzo 1999, n. 79, i diritti dell'azionista sono esercitati d'intesa tra il Ministro dell'economia e delle finanze ed il Ministro dello sviluppo economico*"

[622] Claimant's Reply, ¶ 418.

[623] Claimant's Reply, ¶¶ 419-421, citing Exhibit REX-12: "*Premesso che ai sensi dell'art. 7, co. 2, c.p.a., 'per pubbliche amministrazioni, ai fini del presente codice, si intendono anche i soggetti ad esse equiparati o comunque tenuti al rispetto dei principi del procedimento amministrativo' e che in tale ambito rientra certamente il GSE in virtù delle sue competenze e prerogative pubblicistiche in materia di impianti di produzione di energia da fonti rinnovabili.*" (translated in ¶ 419)

[624] Claimant's Reply, ¶ 328.

[625] Claimant's Reply, ¶ 442.

[626] Claimant's Reply, ¶ 444. *See Sempra v. Argentina* (Exhibit CL-91RM, ¶¶ 311-314).

[627] Claimant's Reply, ¶ 322.4.

clause violation.[628]  It also differs that the Tribunal's findings on the FET standard affect the umbrella clause, an independent standard under Article 10(1) ECT.[629]

445.  According to the Claimant, Italy or its agency has entered into contracts with specific undertakings towards Belenergia establishing the umbrella clause claim.  Belenergia therefore submits that Italy has violated the umbrella clause under Article 10(1) ECT with "*the adoption of legislative and regulatory acts* […] *unilaterally modif*[ying]" the GSE Conventions on the feed-in tariffs.[630]

446.  Nevertheless, "[i]*f the umbrella clause case fails for some reason, these undertakings ought, in the absence of very powerful countervailing factors, to establish the FET claim in this case*"[631] above.

### (3) Italy Has Breached the Prohibition against Unreasonable and Discriminatory Measures under Article 10(1) ECT

447.  Belenergia argues that the prohibition of unreasonable and discriminatory measures is an independent protection standard under Article 10(1) ECT.[632]  Belenergia objects to Italy's interpretation of this standard as overlapping with the FET standard.[633]  Rather, Belenergia argues that several arbitral tribunals confirmed that the prohibition of unreasonable and discriminatory measures is independent from the FET standard.[634]

448.  According to Belenergia, the "reasonableness" of a measure implies a "*rational policy*" addressing public interest goals, and a reasonably designed and reasonably applied measure, in light of the particular circumstances.[635]  Belenergia also states that *"reasonableness"* of a

---

[628] Claimant's Reply, ¶ 447.

[629] Claimant's Reply, ¶ 448.

[630] Statement of Claim, ¶ 155; Claimant's Reply, ¶¶ 319, 321: "[…] *the Claimant confirms that its claim for breach of the umbrella clause is only focused on the FiT Conventions.*" (¶ 321)

[631] Claimant's Post Hearing Brief, ¶ 137.

[632] Statement of Claim, ¶ 141; Claimant's Reply, ¶ 563.

[633] Claimant's Reply, ¶¶ 564-566.

[634] Claimant's Reply, ¶ 567.

[635] Statement of Claim, ¶ 142, citing the ICJ's *ELSI* decision (Exhibit CL-46M, p. 76), and the *Whaling in the Antarctic* decision (Exhibit CL-47M, pp. 254, 260), among others.

measure requires proportionality and a "*reasonable relationship to some rational policy*," subject to a host State's investigation of less harmful, alternative measures.[636]

449. Belenergia submits that the non-discriminatory character of a measure is entirely independent, extending beyond a FET analysis—contrary to Italy's position.[637]   The Claimant refers to *Electrabel v. Hungary*'s broad approach to discrimination as "*any lesser treatment*" irrespective of discriminatory intent.[638]

450. The Claimant submits that Italy's measures affecting feed-in tariffs and minimum prices were unreasonable and discriminatory breaching Article 10(1) ECT.

451. First, Belenergia argues that Italy has failed to carry out an investigation of the measures' impact and of less harmful, alternative measures because only one month elapsed between the measures' announcement and their adoption.[639]

452. Second, Italy's regulatory changes were unpredictable, not balanced by adequate mitigating or compensatory measures.[640]   Italy's offering mitigation measures to foreign investors means an acceptance that the *Splama Incentivi* Decree was "*unduly harmful*." According to Belenergia, mitigation measures were unreasonable, as confirmed by Professor Marangoni (Althesys) and Mr. Lévy and not challenged by Italy at the Hearing;[641] in addition, these measures were never implemented.[642]

453. Third, and alternatively, Belenergia claims that Italy's measures are disproportionate, lacking public interest goals such as environment or public health protection, and a "*rational policy*".[643]   As for feed-in tariffs, Italy's measures lack public interest goals, when favouring specific, limited electricity consumers of medium and low electric voltage, with available power higher than 16.5Kw, excluding residential consumers and public lighting.[644]   In

---

[636] Statement of Claim, ¶¶ 144-146, citing arbitral decisions, including *Saluka v. Czech Republic* (Exhibit CL-15M, ¶ 460).

[637] Claimant's Reply, ¶ 569.

[638] Claimant's Reply, ¶ 570-572, citing Exhibit CL-27M (¶¶ 7.152-7.153), among others.

[639] Statement of Claim, ¶ 148.

[640] Statement of Claim, ¶ 149.

[641] Claimant's Post Hearing Brief, ¶¶ 90-93, citing Althesys' Report, ¶¶ 79-84; CWS-JEL-1, ¶ 36.

[642] Claimant's Post Hearing Brief, ¶ 90

[643] Statement of Claim, ¶¶ 150, 152.

[644] Statement of Claim, ¶¶ 151-152.

relation to minimum prices, Belenergia argues that Italy's measures also lack public interest goals because their sole motivation is containing electricity prices.[645]

454.  The Claimant highlights Professor Marangoni's (Althesys) conclusion that the *Spalma Incentivi* Decree did not achieve the goal of "*enhancing competitiveness*" of SMEs, noting that Italy has failed to challenge this at the Hearing.[646]  According to the Claimant, Italy did not challenge either the conclusions of Professor Marangoni in the Althesys Report that the reduction of incentives *(a)* did not benefit other citizens or entities because the A3 cost component in consumer electricity bills increased again in 2014 and 4 million small scale business users of electricity did not benefit from the reduction; and *(b)* did not take into account PV benefits, such as the decrease in prices to consumers in 2011-2016 with a cumulative impact of € 4.7 billion and the € 1.8 billion benefit to the Italian economy in 2013.[647]

455.  Fourth, the Claimant submits that the *Spalma Incentivi* Decree discriminated against foreign investors.  *De facto* discrimination suffices, proof of discriminatory intent being unnecessary.[648]  The Claimant concludes that Italy has failed to challenge Claimant's evidence on discrimination in its Rejoinder and at the Hearing, which, in the Claimant's view, is revealing.[649]  Among other things, the Claimant asserted that Italy's "late" argument on a purported discrimination against Italian investors founded on a future ECT award favouring foreign investors should be rejected.[650]

### (4) Italy Has Breached the Most Constant Protection and Security Obligation under Article 10(1) ECT

456.  The Claimant states that Article 10(1) ECT's obligation to provide "*most constant protection and security*" extends beyond a mere obligation to provide "*physical*" protection and

---

[645] Statement of Claim, ¶¶ 65, 153.

[646] Claimant's Post Hearing Brief, ¶¶ 79-85, citing, among other sources, the Hearing Transcript (Tr. 27 March 2018, Professor Alessandro Marangoni (Althesys), 318:12-17, 319:8-320:14, 320:23-321-14).

[647] Claimant's Post Hearing Brief, ¶¶ 86-89.  *See also* Althesys' Report, ¶¶ 69, 71.

[648] Claimant's Reply, ¶¶ 572-573.

[649] Claimant's Post Hearing Brief, ¶ 113.

[650] Claimant's Post Hearing Brief, ¶ 113.3.

security, including "*legal*" protection and security.[651]   The Claimant disagrees with the Respondent that FPS is limited to "*preventing and protecting aliens from violence and harassment.*"[652]

457.   Moreover, Belenergia explains that this obligation comprises "*full protection and security*" as a guarantee of stability, physical, commercial and legal security, and legal protection.[653] It refers to various commentators supporting its position that Article 10(1) ECT protects not only physical integrity, but also economic and legal security.[654]   The Claimant also advocates that "*investment case law is also heavily*" in its favour.[655]

458.   The Claimant rejects Italy's argument that the FPS standard overlaps with the FET standard, stating that Italy overlooks the *effet utile* principle of treaty interpretation.[656]   Among others, Belenergia refers to the *Electrabel v. Hungary* award holding that the FET and the FPS standard under the ECT are distinct.[657]

459.   Belenergia highlights the same reasons for the FET breach leading to violation of the FPS standard under Article 10(1) ECT.[658]   It submits that Italy has substantially changed the applicable legal framework irrespective of GSE Conventions' rights harming Belenergia's investment.[659]

---

[651] Statement of Claim, ¶¶ 156-157.

[652] Claimant's Reply, ¶ 551.

[653] Statement of Claim, ¶ 157, citing Professor Thomas Wälde (Exhibit CL-51M, p. 391): "[…] *a duty, enforceable by investment arbitration, to use the powers of government to ensure the foreign investment can function properly on a level playing field, unhindered and not harassed by the political and economic powers that be.*"  *See also*, arbitral decisions in *Biwater v. Tanzania* (Exhibit CL-26M, ¶ 729) and in *CME v. Czech Republic* (Exhibit CL-52M, ¶ 613).

[654] Claimant's Reply, ¶¶ 553-554.  *See also* Exhibit CL-126RM (Professor Christoph Schreuer), Exhibit CL-127RM (Professor Jeswald Salacuse), Exhibit CL-128RM (Professor Gleider Hernández), among others.

[655] Claimant's Reply, ¶ 556, citing various arbitral decisions.

[656] Claimant's Reply, ¶¶ 557-559.

[657] Claimant's Reply, ¶ 558.

[658] Statement of Claim, ¶ 158.

[659] Statement of Claim, ¶ 158.

### (5) Italy Has Breached the Prohibition of Discrimination under Articles 10(2) and 10(3) ECT

**460.** Belenergia asserts that the combined reading of Articles 10(2) and 10(3) ECT prohibits legal and *de facto* discrimination against foreign investors in relation to Italian nationals.[660] The Claimant also rejects Italy's argument that application of Articles 10(2) and 10(3) ECT on national treatment is limited to the initial making of investments.[661] Rather, Belenergia argues that the text of these provisions does not freeze their application within time.

**461.** The Claimant differs with Italy that WTO case law on national treatment is relevant for this arbitration.[662] It also rejects Italy's argument that Belenergia's PV plants are not comparable to Italian public entities and schools ("*enti locali o scuole*"); it highlights that "*in like situations*" under the ECT "*cannot be interpreted in the narrow sense* [because] *the purpose of national treatment is to protect investors as compared to local producers, and this cannot be done by addressing exclusively the sector in which the particular activity is undertaken*" (citing *Occidental v. Ecuador*).[663] It also refers to *Nycomb v. Latvia*, supporting that when entities are "*comparable, and subject to the same laws and regulations*," respondent bears the burden of proof that discrimination has not taken place.[664]

**462.** First, the Claimant points out that Article 22*bis* of Law No. 164/2014[665] excludes from the application of Article 26 of Conversion Law No. 116/2014[666] "*certain Italian public entities and schools*" ("*enti locali o scuole*"). In its view, Article 22*bis* discriminates against Belenergia's PV subsidiaries because certain Italian public entities are Belenergia's competitors.[667]

**463.** Second, the regulatory changes do not apply to PV plant owners with a plant nominal capacity less than 200Kw. Belenergia submits that this regulatory capacity distinction

---

[660] Statement of Claim, ¶ 160.

[661] Claimant's Reply, ¶¶ 574-576.

[662] Claimant's Reply, ¶ 577.

[663] Claimant's Reply, ¶¶ 578-580, citing *Occidental v. Ecuador,* LCIA Case No. UN3467, Final Award (1 July 2004), ¶173.

[664] Claimant's Reply, ¶ 581, citing Exhibit CL-137RM, ¶ 4.3.2.

[665] Exhibit C-RFA-II-13.

[666] Exhibit C-RFA-II-12.

[667] Statement of Claim, ¶ 161.

discriminates against medium and big PV plants (like those from Belenergia and from major foreign investors).[668]

### (6) Damages

#### (a) The compensation standard under international law

464. The Claimant argues that it is entitled to compensation pursuant to the principle of full reparation set forth in the Permanent Court of International Justice's ("**PCIJ**") decision in *Chorzów Factory*:[669]

> *The essential principle contained in the actual notion of an illegal act-a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals is that reparation must, as far as possible, wipe out al1 the consequences of the illegal act and re-establish the situation which would, in al1 probability, have existed if that act had not been committed.* [670]

465. Belenergia submits that the *Chorzów*'s compensation standard is reproduced in Article 31[671] of the International Law Commission's ("**ILC**") 2001 Articles on Responsibility of States for Internationally Wrongful Acts ("**ILC Articles on State Responsibility**"), including the need for causation between the harm and the wrongful act.[672]  It adds that full reparation "*shall take the form of restitution, compensation and satisfaction, either singly or in combination*" under Article 34 of the ILC Articles on State Responsibility.[673]

466. The Claimant agrees with Italy that the *Chorzów* decision concerns the full reparation principle, rather than damages quantification methods.[674]  Yet, the Claimant rejects the Respondent's argument that the expression "*as far as possible*" in the PCIJ's *Chorzów* decision limits its application in this arbitration.  According to Belenergia, this expression

---

[668] Statement of Claim, ¶ 161.

[669] Statement of Claim, ¶¶ 165-166.

[670] Statement of Claim, ¶ 165, citing *The Case Concerning the Factory at Chorzów (Germany v. Poland)*, Judgment No. 13 of 13 September 1928, Claim for Indemnity (The Merits), p. 47.

[671] 2001 ILC Articles on State Responsibility, Article 31: "*1. The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act. 2. Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State.*"

[672] Statement of Claim, ¶¶ 167, 174-175.

[673] Statement of Claim, ¶ 168.

[674] Claimant's Reply, ¶ 586.

seeks merely to recognise that the principle of full reparation may not entirely "*erase the consequences of the wrongful act.*"[675]

467. The Claimant equally rejects Italy's argument that the *Chorzów* decision reproduced in Article 34 of the ILC Articles on States Responsibility does not apply to investor-State disputes. Belenergia submits that the *Chorzów* case related to diplomatic protection, that is, the protection of an individual in relation to a State, stating that Italy ignores "*the overwhelming number of investment tribunal decisions in which the Chorzów Factory principle has been applied*" and that this principle is acknowledged "*by nearly all academic commentators.*"[676]

468. The Claimant requests application of Article 36 of the ILC Articles on State Responsibility as a customary law rule providing that compensation for an internationally wrongful act "*shall cover any financially assessable damage including loss of profits insofar as it is established.*"[677] It agrees with the reparation principle prohibiting double recovery.[678]

469. The Claimant rejects Italy's argument that the full reparation principle of *Chorzów* does not apply to damages caused by FET breaches but only to expropriation.[679] Conversely, Belenergia argues that arbitral tribunals have consistently applied the *Chorzów*'s principle to breaches of investment protection standards other than expropriation, calculating actual loss by the investor rather than the investment's market value.[680]

470. Belenergia differs with Italy that damages should be reduced because of the measures' general, regulatory character. It submits that Italy's argument fails to present a calculation method for a purported damages reduction, explaining that Italy's reliance on

---

[675] Claimant's Reply, ¶ 585.
[676] Claimant's Reply, ¶¶ 587-590.
[677] Statement of Claim, ¶¶ 168-169.
[678] Statement of Claim, ¶ 172.
[679] Claimant's Reply, ¶ 593.
[680] Claimant's Reply, ¶¶ 594, 598, 600, citing Mr. Sergei Ripinski (Exhibit CL-157RM, pp. 90-91), among others.

*CMS v. Argentina*[681] and *Azurix v. Argentina*[682] is misplaced. Thus, the non-fraudulent character of measures does not justify derogation from the full reparation principle.[683]

471. The Claimant also disagrees with the Respondent's criticism on using the discounted cash flow method ("**DCF**") in cases other than expropriation. The Claimant adds that Italy misunderstands Belenergia's argument on damages (when referring to an "*overall assessment of the value of the investment in its entirety*).[684] Belenergia explains that the discounted cash flow method is "*widely accepted*" and is "*the best method for valuing lost profits,*"[685] taking account "*the time value for money and the risk of uncertainty.*"[686] According to the Claimant, Italy did not offer an "*alternative method to account for the time value of money and the risk of uncertainty in the quantification of future losses.*"[687] It further explains that the Tribunal should award the difference between the calculations of the company's fair market value before and after the implementation of the measures, stating that:

> [T]*here is nothing wrong with using a DCF analysis in cases where there is no total loss or deprivation of the asset, so long as the portion of the profits lost as a result of the measures complained of can be identified with precision.*[688]

472. In the Claimant's view, this is precisely the method adopted by Mr. Rodriguez in the Alpha Value Report,[689] adopting maximum accuracy and avoiding excessive recovery,[690] as follows:

---

[681] Belenergia distinguishes this arbitration from the *CMS v. Argentina*'s statement on reduction in damages (Exhibit CL-20M, ¶ 356), stating (i) the statement related to Article XI of the US-Argentina BIT, which differs from the ECT; (ii) Italy's circumstances do not compare to Argentina's crisis in early 2000s; and (iii) there is no proof of actual reduction in damages in the award. *See* Claimant's Reply, ¶ 596.

[682] Belenergia submits that Italy omits part of the Annulment Committee's reasoning in *Azurix v. Argentina* (Exhibit RLA-31, ¶ 332), which actually supports application of the "fair market value" standard to cases other than expropriation.

[683] Claimant's Reply, ¶ 601.

[684] Claimant's Reply, ¶¶ 609-610.

[685] Claimant's Reply, ¶ 603.2

[686] Claimant's Post Hearing Submission, ¶ 172.

[687] Claimant's Post Hearing Submission, ¶ 174

[688] Claimant's Reply, ¶ 605, citing arbitral decisions, such as *CMS v. Argentina* (Exhibit CL-20M, ¶¶ 409-410), *Sempra v. Argentina* (Exhibit CL-91RM, ¶¶ 411-412) and *El Paso v. Argentina* (Exhibit CL-70M, ¶¶ 703-714).

[689] Alpha Value Report No. 1 of 13 December 2016.

[690] Claimant's Reply, ¶ 611.

> [The Alpha Value Report] [p]*rojects the amount of money the SPVs* would *have made if the Respondent's PV pricing regime remained constant as was promised in the Conventions, and the unbalancing costs were not imposed on the SPVs.* [It] [c]*ompares this against the amount of money the SPVs will* actually *make now that those measures have been introduced. And, finally,* [it] *presents the differences between these two figures as an amount to be paid in damages.*[691]

473.  The Claimant highlights that the Respondent has failed to provide an alternative rate for the 3.5% DCF discount rate, which Belenergia argues suits the Italian PV sector.[692]   The Claimant relies on Mr. Rodriguez's (Alpha Value) statements at the Hearing explaining, among other things, that: *(i)* the 3.5% "*synthetic default risk free rate*" represents implicit capital cost being the rate used for all companies within the STOXX 600 fixed by Alpha Value's head of strategy; *(ii)* the DCF discount rate is not interchangeable with the 6% rate of working average cost of capital ("**WACC**"); *(iii)* using a 6% WACC rate as a proxy for the discount rate would be hard to explain because the applicable rate should be close to financing rates (Italy claims that Belenergia's investment is low risk) and because PV returns are stable.[693]   Belenergia also relies on Alpha Value Report No. 1 on the reasons for adopting a low discount rate, these reasons being predictable revenues in the Italian PV sector, proven output consistency by Belenergia's PV plants, among others.[694]

474.  The Claimant further submits that a 0.6% annual degradation rate should apply founded on the PV plants' productivity decline.[695]   The Claimant disagrees with GRIF on a purported 0.8% rate suggested by a Canadian Solar's performance guarantee of 90% over 25 years because this rate does not consider that Belenergia's plants are for shorter periods ranging between 10 and 14 years.[696]

475.  Belenergia submits that Mr. Juan Camilo Rodriguez has made a few adjustments to the Alpha Value Report, these adjustments were not "*particularly significant.*"[697]

---

[691] Claimant's Reply, ¶ 608.

[692] Claimant's Post Hearing Brief, ¶¶ 177, 179, 185.1.

[693] *See* Claimant's Post Hearing Brief, ¶¶ 181-184.4.

[694] Statement of Claim, ¶¶ 190-191, citing the Alpha Value Report No. 1, ¶ 18.

[695] Claimant's Post Hearing Brief, ¶ 186.

[696] *See* Claimant's Post Hearing Brief, ¶¶ 186-188.

[697] Claimant's Reply, ¶ 614.

476.    Belenergia also claims application of Article 38[698] of ILC Articles on State Responsibility on interest as a customary international rule which ensures full reparation.[699]

### (b) Quantification of damages

477.    In a preliminary note, the Claimant stresses that quantification by the Alpha Value Report considers a "but for" scenario if Italy's measures had not been adopted in the light of the *Chorzów* compensation standard.[700]  It also states that quantification considers the causation requirement.[701]

478.    The updated quantification of damages dated 10 April 2018 introduced some adjustments to the previous quantification, including *(a)* tariff reduction of 7% rather than 8% in relation to Acquaviva 2; *(b)* alternative calculations with a 0.6% and a 0.8% annual degradation rate. Alpha Value presented the following scenarios:

(a) Scenario 1 assessing actual losses until 31 December 2016 with future losses calculated from 1 January 2017, and with a 0.6% or a 0.8% annual degradation rate (**Scenario 1A** and **Scenario 1B**, respectively), and used the average of the annual impact to revenue based on historical production values from 2015 and 2016 to calculate future losses.[702]

(b) Scenario 2 assessing actual losses until 31 December 2017 with future losses calculated from 1 January 2018, and with a 0.6% or a 0.8% annual degradation rate (**Scenario 2A** and **Scenario 2B**, respectively).  Because 2017 actual production values have not been reported under the official *Dichiarazione di Consumo*, Alpha Value relied on the meter readings taken from Belenergia's PV plants, and used the

---

[698] 2001 ILC Articles on State Responsibility, Article 38: "*1. Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation.  The interest rate and mode of calculation shall be set so as to achieve that result. 2. Interest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.*"

[699] Statement of Claim, ¶¶ 170-171.

[700] Statement of Claim, ¶ 177.

[701] Statement of Claim, ¶ 178.

[702] *See* Alpha Value Report 3, ¶¶ 6-9.

average of the annual impact to revenue based on historical production values from 2015 and 2017 to calculate future losses.[703]

(i)  Quantification of damages caused by the adjustment of feed-in tariffs

479.  Belenergia refers to the Alpha Value Report No. 1 quantifying actual and future lost profits caused by the 8% reduction in "*subsidies*" (feed-in tariffs) from 1 January 2015 onwards.[704] It submits that this Report calculated actual lost profits for 2015 of € 401,800 (reserving the right to present numbers for 2016 and 2017).[705]

480.  According to the Claimant, the Alpha Value Report No. 1 calculates future lost profits at € 6,402,900 adopting the discounted-cash-flow analysis with a low discount rate (at the valuation date 1 January 2017).[706]

481.  On the basis of the adjustments and updates in Alpha Value Report No. 3, the Claimant seeks total losses caused by the adjustment of feed-in tariffs of € 6,940,00 (of which € 1,533,300 are actual losses), applying Scenario 2A.[707]

482.  The Claimant rejects Italy's objections to the quantification above, among other reasons, because *(a)* Italy adopts the wrongful assumption that Claimant used PVGIS 3 data when the Claimant actually used PVSYST data on production estimates; and *(b)* Italy quantifies damages on the basis of "expectations" by reference to wrongful assumptions, including unofficial production estimates such as PVGIS 3, rather than on the basis of what the Claimant "*did receive/should have received.*"[708]

483.  The Claimant further highlights that GRIF's alternative calculation of € 5,707,900 as total losses is close to the Alpha Value Report No. 1's number.  The Claimant submits that GRIF explains that these differences are caused by *(a)* the application of the 0.8% (rather than 0.6%) annual degradation rate; *(b)* Alpha Value had applied a wrong tariff reduction rate for the PV plant *Acquaviva 2* (8% rather than 7%); *(c)* Alpha Value should have used 2016

---

[703] *See* Alpha Value Report No. 3, ¶¶ 6-9.
[704] Statement of Claim, ¶¶ 179-181.
[705] Statement of Claim, ¶¶ 183-184, citing the Alpha Value Report No. 1, ¶ 51, Table 5.
[706] Statement of Claim, ¶¶ 185-192, citing the Alpha Value Report No.1, ¶¶ 18, 51, Table 5.
[707] *See* Claimant's Post Hearing Brief, ¶ 195.
[708] *See* Claimant's Post Hearing Brief, ¶¶ 199-201.

production data as a starting point of future loss calculation; and *(d)* Alpha Value should have reduced in 41% losses of *Solar Solution Puglia SRL* because Belenergia holds only a 59% stake interest in this entity.[709]  The Claimant disagrees about items (a), (c), and (d), insisting that a 0.6% annual degradation rate applies, that Alpha Value's average of annual impact to revenue based on actual production values should apply, and that *Solar Solution Puglia SRL* is entitled to claim 100% of the losses as a controlling shareholder.[710]  On this last point, the Claimant submits that even if the Tribunal finds that *Solar Solution Puglia SRL* is not entitled to claim 100% of losses, this would result in a reduction of feed-in-tariff loss of 2.44%.[711]

(ii) Quantification of damages caused by the adjustment of guaranteed minimum price

484.  The Claimant argues that the minimum price was advantageous compared to "*lower prices fixed through bilateral power purchasing agreements or by selling directly into the wholesale electricity market.*"[712]  It then refers to the Alpha Value Report quantifying actual and future lost profits caused by Italy's measures repealing the fixed minimum price for electricity, noting their application from 1 January 2014 onwards (further price reductions applying from 1 January 2017 onwards).[713]

485.  Belenergia cites the Alpha Value Report's quantification of actual lost profits for years 2014 and 2015 at € 1,009,740, reserving the right to present figures for 2016 and 2017.[714]  In turn, the Claimant presents quantification of future lost profits pursuant to a discounted cash flow analysis at € 8,183,400 (reserving the right to provide an accurate calculation at the date of the award).[715]

486.  On the basis of the adjustments and updates in Alpha Value Report No. 3, the Claimant submits that quantification of losses has to consider the 50% cut by AEEG

---

[709] *See* Claimant's Post Hearing Brief, ¶ 202.

[710] *See* Claimant's Post Hearing Brief, ¶¶ 203-204; Alpha Value Report No. 3, ¶ 8.

[711] *See* Claimant's Post Hearing Brief, ¶ 204.

[712] Statement of Claim, ¶ 193.

[713] Statement of Claim, ¶ 194.

[714] Statement of Claim, ¶¶ 196-197, citing the Alpha Value Report No. 1, ¶ 94, Table 7.

[715] Statement of Claim, ¶¶ 198-199, citing the Alpha Value Report No. 1, ¶ 94, Table 7.

Resolution No. 618/2013 of 19 December 2013 and the complete removal of the minimum prices on 23 December 2013 by *Destinazione Italia* Decree.[716]  The Claimant further asserts that quantification should also consider reference prices in 2012 and 2013 and reasonable assumptions taking into account long term energy prices and inflation.[717]  On this basis, the Claimant seeks € 8,753,200 (of which € 2,270,600 are actual losses), applying Scenario 2A.[718]

487.  The Claimant rejects GRIF's quantification because it "*artificially deflate*[s]" the loss amount staring the loss calculation after the 50% cut, failing therefore the present an alternative quantification.[719]  If the Tribunal finds that calculation should start after the 50% cut, then the Claimant indicates that the GRIF Report quantifies the loss as in excess of € 134,711 (of which € 15,557.30 are actual losses for 2016, to which actual losses for 2014 and 2015 should be added).[720]

(iii)    Quantification of direct (out of pocket) and indirect losses

488.  Belenergia argues that out of pocket and indirect losses caused by an internationally wrongful act are recoverable under international law.[721]  It states that Mr. Jacques Edouard Lévy has provided in his Second Witness Statement[722] that the *Spalma Incentivi* measures led to Belenergia's out of pocket expenses and indirect losses.[723]

489.  The Claimant asserts that the reduction in feed-in tariffs led to its PV subsidiaries' breaching project finance agreements.[724]  Belenergia had *(i)* to renegotiate project finance agreements with *Intesa San Paolo* and *Monte dei Paschi di Sena* ("**MPS**") to prevent contractual

---

[716] *See* Claimant's Post Hearing Brief, ¶ 211.

[717] *See* Claimant's Post Hearing Brief, ¶ 214.

[718] *See* Claimant's Post Hearing Brief, ¶ 216.

[719] *See* Claimant's Post Hearing Brief, ¶¶ 217-222.

[720] *See* Claimant's Post Hearing Brief, ¶ 223.

[721] Statement of Claim, ¶ 202, citing case decisions and scholarly writings, and the ILC's Commentary to the Article 36 of the ILC Articles on State Responsibility: "*(34) It is well established that incidental expenses are compensable if they were reasonably incurred to repair damage and otherwise mitigate loss arising from the breach.  Such expenses may be associated, for example, with the displacement of staff or the need to store or sell undelivered products at a loss.*"

[722] Witness Statement of Mr. Jacques Edouard Lévy of 8 September 2017.

[723] Claimant's Reply, ¶ 613.

[724] Statement of Claim, ¶ 204.

penalties; and *(ii)* to merge three PV subsidiaries (*Solaria Real Estate SRL*, *Solar Solution Puglia SRL* and *Puglia Energia SRL*) into *Solaria Real Estate SRL* to refinance an € 19,000,000 outstanding debt with MPS, buying out minority shareholders with additional debt financed by MPS.[725]  These operations caused damages as follows:

   (a) € 115,000 in legal due diligence;

   (b) € 13,000 in technical due diligence; and

   (c) €300,000 in MPS banking fees.[726]

490. On the basis of the adjustments and updates in Alpha Value Report No. 2, the Claimant seeks *(a)* additional € 724,814.45 caused by the increased duration of loans after their renegotiation; *(b)* additional € 30,000 in MPS banking fees; and *(c)* additional unquantified costs incurred in debt renegotiation and additional unquantified interest costs.[727]  Thus, the Claimant seeks a total of € 1,182,814.45 compensation for direct costs.[728]  According to the Claimant, these costs were not challenged by Italy.[729]

491. According to Belenergia, the feed-in tariff reduction and the minimum price repeal led to difficulties in equity financing other biomass and wind power projects.[730]  In this respect, the Alpha Value Report No. 1 calculates an opportunity cost (loss) of € 1,800,000.[731]  Belenergia states that Italy has not challenged this cost either.[732]

### (7) Interest

492. The Claimant submits that it should be awarded interest, as permitted under customary international law, at a fair and reasonable rate "*equal to its costs of borrowing*."[733]  Although

---

[725] Statement of Claim, ¶¶ 204-205, citing the Alpha Value Report No. 1, ¶¶ 106-110.

[726] Statement of Claim, ¶ 206, citing the Alpha Value Report No. 1, ¶¶ 110-111.

[727] Claimant's Post Hearing Brief, ¶ 230, citing the Alpha Value Report No. 2, pp. 5-6.

[728] Claimant's Post Hearing Brief, ¶ 232.

[729] Claimant's Post Hearing Brief, ¶¶ 231-232.

[730] Statement of Claim, ¶ 207, citing the Alpha Value Report No. 1, ¶¶ 113-126.

[731] Statement of Claim, ¶ 208, citing the Alpha Value Report No. 1, ¶ 121.

[732] Claimant's Post Hearing Brief, ¶¶ 235-236.

[733] Statement of Claim, ¶ 178, citing arbitral decisions, including *Cargill v. United States* (Exhibit CL-82M, ¶ 544). *See also* Claimant's Post Hearing Brief, ¶¶ 241-242.

the Claimant "*is not in a position at the date of* [its] *Memorial to provide further evidence of its cost of borrowing at the relevant time*," it argues that the costs of borrowing correspond to the borrowing costs of Belenergia's group of companies.[734]   The Claimant states that the Parties do not disagree on whether interest is recoverable, but that they disagree on the applicable interest rate and on whether interest be compound.[735]

493.   The Claimant rejects Italy's position that the interest rate should not consider Belenergia's subjective position, arguing that interest has a compensatory function enshrined in Article 38 of the ILC Articles on State Responsibility and reproduced in arbitral decisions.[736]   The Claimant adds that Alpha Value has applied 3.06% as the appropriate interest rate, and that Italy has not proposed an alternative rate.[737]

494.   The Claimant also argues that interest shall be compounded quarterly to adequately compensate for Belenergia's losses.[738]   Belenergia rejects Italy's objection to compound interest as speculative, unfair, disproportionate, and inappropriate if applied to recent damage.   The Claimant submits that compounding interest is a "normal" compensatory, not punitive practice, citing *Santa Elena v. Costa Rica*,[739] among other authorities.[740]

495.   Belenergia further states that interest on out of pocket and indirect losses shall accrue from the date of submission of the Request for Arbitration, and that interest on loss of profit shall accrue from the date when profit would have occurred, calculated yearly.[741]   In both cases, interest shall run until payment.[742]

---

[734] Statement of Claim, ¶¶ 211-212.

[735] Statement of Claim, ¶¶ 241-242.

[736] Claimant's Reply, ¶¶ 615-617; Claimant's Post Hearing Brief, ¶ 245.

[737] Claimant's Post Hearing Brief, ¶¶ 243-245, citing the Alpha Value Report No. 3, ¶¶ 19-22.

[738] Statement of Claim, ¶¶ 216-217.

[739] Exhibit CL-67M, ¶ 104: "[W]*here an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then became due to him, the amount of compensation should reflect, at least in part, the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest.  It is not the purpose of compound interest to attribute blame to, or to punish, anybody for the delay in the payment made to the expropriated owner; it is a mechanism to ensure that the compensation awarded the Claimant is appropriate in the circumstances*."

[740] Claimant's Reply, ¶¶ 620-624.  *See also* Claimant's Post Hearing Brief, ¶¶ 246-250.

[741] Statement of Claim, ¶¶ 213-214.

[742] Statement of Claim, ¶ 215.

496. Later the Claimant modified its position on pre-award interest, stating that both interest on *(a)* direct and indirect expenses; and *(b)* lost revenue shall accrue "*from the date on which those expenses were incurred or revenue would originally have realised until the date of the Final Award*," calculated yearly at a 3.06% rate on a compound basis.[743]   In the Claimant's view, the same rate should apply to post-award interest, noting that its experts can update the Alpha Value Report No. 3 once the Tribunal decides on damages and interest.[744]

### B. The Respondent's Position

### (1) Italy Has Not Breached the FET Standard under Article 10(1) ECT

497. Italy agrees with Belenergia that good faith and proportionality underlie the FET standard.[745]   Italy also agrees that this standard covers "legitimate expectations" existing at the time the investment was made.[746]

498. Italy disagrees, however, that the FET standard under Article 10(1) FET is "self-contained;" rather, it argues that the FET standard is a general clause to be interpreted in accordance with general, evolving international law.[747]   Italy adds that the Tribunal should consider Italian law when determining whether Italy breached the ECT and the fact that the Italian Constitutional Court held that the *Spalma Incentivi* Decree was constitutional.[748]

499. According to the Respondent, the expression "expectations" refers to "*representations of future legal facts and acts, which foreign investors derive from the conduct of the authorities of a State, and on whose basis they made their investment.*"   Italy defines the qualifier "legitimate" as representations "*worthy of protection under international law*" that consider the States' sovereign, regulatory right to modify their legislation.[749]

---

[743] Claimant's Post Hearing Brief, ¶¶ 252, 254.
[744] Claimant's Post Hearing Brief, ¶¶ 255-256.
[745] Statement of Defense, ¶¶ 438, 463.
[746] Statement of Defense, ¶ 442.
[747] Statement of Defense, ¶¶ 437-438.
[748] Respondent's Post Hearing Brief, ¶ 81.
[749] Statement of Defense, ¶¶ 441, 444.

500. Italy denies that the FET standard could "*freeze its own normative activity*" as contrary to democracy and to the natural evolution of States' legislation.[750]  The Respondent cites several decisions,[751] including in *Charanne v. Spain* and *Blusun v. Italy*, holding that investors could not have legitimately expected that PV regulation "*would remain unchanged for the lifetime of their plants*,"[752] and declining "*to sanctify laws as promises.*"[753]  It also distinguishes this arbitration from *Eiser v. Spain* because there has been no radical, total, unreasonable regulatory changes, let alone full disruption of the investment.[754]

501. Italy favours the approach taken by the *Isolux* and *Charanne* tribunals and disagrees with the *Masdar v. Spain* tribunal's reasoning, noting that this tribunal gives too much weight to letters granting tariffs when these letters simply result from renewable energy regulation and as such cannot be considered "specific commitments" towards an investor.[755]

502. Italy also denies that the disputed measures lack good faith.[756]  The FET standard under Article 10(1) ECT does not have a chilling effect on States' regulatory activity; on the contrary, a purported FET stabilisation (freezing) clause would rather lead to imbalance.[757]  But rather, stability implies reasonable and proportionate legislative changes such as the measures adopted "*within a time span of more than ten years, by different governments and within a clearly traced EU framework.*"[758]

503. Therefore, Italy argues that Belenergia could not have legitimately expected that Italy's PV regulatory framework would not be subject to legislative changes, because: *(i)* the GSE Conventions and Italy's regulatory scheme on feed-in tariffs could not have created Belenergia's alleged legitimate expectations; *(ii)* the *Spalma Incentivi* Decree was reasonable and proportionate, with no procedural or substantive impropriety; *(iii)* neither Italy's regulatory scheme nor GSE Conventions on minimum prices could have created

---

[750] Statement of Defense, ¶ 447.
[751] Statement of Defense, ¶¶ 448-460.
[752] Exhibit RLA-2, ¶ 503.
[753] Exhibit RLA-1, ¶ 367.
[754] Respondent's Rejoinder, ¶¶ 308-310.
[755] Respondent's Post Hearing Brief, ¶¶ 70-76.
[756] Statement of Defense, ¶ 467.
[757] Statement of Defense, ¶ 467-469.
[758] Statement of Defense, ¶¶ 467-468.  *See also*, Respondent's Rejoinder, ¶¶ 301-302.

legitimate expectations on Belenergia; *(iv)* the *Destinazione Italia* Decree and the AEEG Resolution No. 618/2013 on minimum prices were reasonable and consistent with Italy's regulatory framework.

504. Italy submits, however, that Belenergia has tacitly given up its FET claims on minimum prices and imbalance charges, having contested only the *Spalma Incentivi* Decree in its Reply.[759]

### (a) The GSE Conventions and Italy's regulatory scheme on feed-in tariffs could not have created Belenergia's alleged legitimate expectations

505. If the Tribunal finds that it has jurisdiction over the claims founded on the GSE Conventions—*quod non*—Italy argues that the GSE Conventions on feed-in tariffs could not have created Belenergia's purported legitimate expectations that these tariffs would not change.[760] Italy refers to Professor Rojas' First Opinion[761] and to Professor Rojas' Second Opinion that the GSE Conventions are "*accessory contracts*" ("*contratti accessivi*") to public acts and thus instruments of regulation.[762] According to Professor Rojas, the GSE Conventions' changes result from integrating statutory changes.[763] In this context, Italy argues that the *pacta sunt servanda* principle is irrelevant.[764]

506. Italy submits that the GSE Conventions' obligations on the duration and content of incentives found their basis outside the GSE Conventions, in Italian legislation.[765] Italy cites Article 1339 of the Italian Civil Code providing "[t]*erms, including the prices of goods or*

---

[759] Respondent's Rejoinder, ¶¶ 281-283.

[760] Statement of Defense, ¶ 481.

[761] Professor Rojas' First Opinion of 23 April 2017. *See also* Professor Rojas' Second Opinion of 15 December 2017.

[762] Statement of Defense, ¶¶ 482; Respondent's Post Hearing Brief, ¶¶ 84-85, 102; and ¶¶ 252-269; Respondent's Rejoinder, ¶¶ 132-140; Professor Rojas' Second Opinion of 15 December 2017, ¶¶ 122-137; Exhibit CL-3M, p. 5. On the GSE Conventions as instruments of regulation, *see also* Italian Constitutional Court Decision No. 16/2017 Exhibit REX-1, p. 9: *However, the guarantee of stability of the incentive for ail the due period does not imply, however, as a necessary consequence, that the measure should remain unchanged for 20 years, unchanged and unaffected by the variations which are common to long-term contracts. This is even truer if one considers that the agreements reached with GSE cannot be qualified as contracts meant to determine the exclusive profit of the operator, with terms and conditions blocked at the initial conditions, for twenty years, even if technological conditions may change profoundly. They are instead regulatory instruments, aimed at reaching the objective of incentivizing certain sources of energy in equilibrium with other sources of renewable energy, and with the minimum sacrifice for the users who ultimately bear the economic burden."*

[763] Statement of Defense, ¶ 482. *See also* Professor Rojas' First Opinion of 23 April 2017, ¶¶ 31-45.

[764] Statement of Defense, ¶ 483.

[765] Respondent's Rejoinder, ¶ 147.

*services, which are imposed by law* […] *are automatically inserted in the contract, even in place of contrary clauses included by the parties.*[766]  The Respondent rejects the opinion of Professors Onida and Randazzo, referring to Professor Rojas' testimony, noting that the Italian legislator was entitled to modify the feed-in tariffs just like it is entitled to "*set the price of gas because it wants to mitigate the price of gas.*"[767]

507.  The Respondent rejects Belenergia's argument on Article 24(2)(d) of the *Romani* Decree[768] referring to GSE Conventions as "*private contracts*" ("*contratti privati*").  First, Italy disagrees that Claimant could rely on an act adopted after its investment on estoppel grounds.[769]  Second, Italy states that a private law contract may have an "*accessory*" character under Italian law.[770]  Third, Italy submits that Belenergia omits the full quote of Article 24(2)(d) of the *Romani* Decree referring to the non-negotiable regulatory terms of the standard contract, as follows:

> [I]*incentives are allotted through private contracts between the GSE and the subject responsible for the system on the basis of a standard contract defined by the Authority for Energy, Electricity and Gas.*[771]

508.  According to Italy, the GSE Conventions' prohibition on unilateral contract variations without agreement of the parties "*refer*[] *to the GSE as party to the agreement and not the legislative branch of the Italian Republic.*"[772]  PV plant owners did not have to conclude GSE Conventions to be entitled to incentives; receipt of a GSE's letter confirming incentives sufficed.[773]

---

[766] Italian Civil Code, Article 1339: "*Le clausole, i prezzi di beni o di servizi, imposti dalla legge o da norme corporative, sono di diritto inseriti nel contratto, anche in sostituzione delle clausole difformi apposte dalle parti.*" (Exhibit GRA-48).

[767] Respondent's Post Hearing Brief, ¶¶ 118-119; Tr. 29 March 2018, Professor Giacomo Rojas, 620:7-12.

[768] Legislative Decree No. 28/2011(Exhibit C-RFA-II-8, Hearing Bundle, vol. 2, Tab 11).

[769] Respondent's Rejoinder, ¶ 143.

[770] Respondent's Rejoinder, ¶ 143.

[771] Legislative Decree No. 28/2011 (*Romani* Decree) (Exhibit C-RFA-II-8), Article 24(2)(d): "*gli incentivi sono assegnati tramite contratti di diritto privato fra il GSE e il soggetto responsabile dell'impianto, sulla base di un contratto-tipo definito dall'Autorità per l'energia elettrica e il gas, entro tre mesi dalla data di entrata in vigore del primo dei decreti di cui al comma 5;*"

[772] Professor Rojas' Second Opinion of 15 December 2017, ¶ 141; Respondent's Rejoinder, ¶ 148.

[773] Respondent's Rejoinder, ¶ 153.

**509.** The Respondent disagrees with Belenergia's reading of the *Corte di Cassazione*'s Decision No. 10795/2017.[774]  Although this decision on conflicts of jurisdiction was about jurisdiction and not the merits, the *Corte di Cassazione* decided on the character of GSE Conventions to be able to determine jurisdiction.[775]  Italy explains that in this case the *Corte di Cassazione* sat as United Chambers, which means that Decision No. 10795/2017 becomes relevant for lower civil and administrative courts.[776]  According to Italy, the United Chambers concluded that the question of modification of GSE Conventions fell within the jurisdiction of administrative courts under Article 133 of the Italian Code of Administrative Procedure.[777]  And to reach this conclusion the *Corte di Cassazione* referred to Decision No. 16/2017 of the Italian Constitutional Court affirming the accessory character of GSE Conventions and confirming the constitutionality of Article 26 of *Spalma Incentivi* Decree.[778]  Italy cites the *Corte di Cassazione* Decision stating that when concluding the GSE Conventions the GSE has not acted as a mere private counterparty but as public administration "*destined to operate in a position of supremacy through the exercise of authoritative powers*"[779] and that the dispute was not merely of private nature requiring consideration of administrative measures and *ius imperii* matters.[780]

**510.** Italy concludes that the "*hybrid nature of the GSE position towards investors cannot be a clearer confirmation of Italy's argument that the GSE Conventions do not have (as claimed by the Claimant and his experts) a mere private law nature.*"[781]  According to Italy, Professor Rojas' Opinion confirms that the GSE did not unilaterally modify the GSE Conventions; rather, it complied with the regulatory change: the validity and effectiveness of feed-in tariffs depended on the general regulatory framework.[782]  In any event, Italy submits that even if the Tribunal finds that the GSE Conventions had a "*private*" character, *quod non,* the Italian

---

[774] Exhibit REX-74.

[775] *See* Respondent's Observations on Corte di Cassazione's Decision No. 10795/2017 of 2 July 2018, ¶ 6.

[776] Respondent's Observations on Corte di Cassazione's Decision No. 10795/2017 of 2 July 2018, ¶ 8.

[777] Respondent's Observations on Corte di Cassazione's Decision No. 10795/2017 of 2 July 2018, ¶ 9.

[778] Respondent's Post Hearing Brief, ¶ 12.

[779] *See* Respondent's Observations on Corte di Cassazione's Decision No. 10795/2017 of 2 July 2018, ¶¶ 10, 14.

[780] Respondent's Observations on Corte di Cassazione's Decision No. 10795/2017 of 2 July 2018, ¶ 12.

[781] Respondent's Observations on Corte di Cassazione's Decision No. 10795/2017 of 2 July 2018, ¶ 15.

[782] Respondent's Observations on Corte di Cassazione's Decision No. 10795/2017 of 2 July 2018, ¶ 16, citing Professor Rojas' First Opinion (¶¶ 40-42) and the Hearing Transcript (Tr. 29 March 2018, Counsel for Claimant & Prof. Giacomo Rojas, 640:8-641:8).  *See also* Respondent's Post Hearing Brief, ¶¶ 8-9.

legislator was entitled to change them because new legislation can affect vested rights ("*consolidated subjective rights*") and because Article 1339 of the Italian Civil Code authorised this change.[783]

511. Moreover, Italy's regulatory regime of feed-in tariffs could not have created legitimate expectations on Belenergia because the regime had a "*gratuity*" character, proportionate to produced energy, granted in addition to PV plants' sales at market prices or at minimum prices.[784]  Italy relies on Professor Rojas' testimony, submitting that GSE Conventions on feed-in tariffs refer to a subsidy, which is no contractual obligation and does not create bilateral reciprocal obligations.[785]

512. Italy submits that Belenergia made its investment after the adoption of EU Directive 2009/28/EC requiring PV incentives' stability and tariffs/effective costs matching (Italy having adopted one of the most favourable PV regimes); also, Belenergia made its investment when PV earnings were already high, costs having highly decreased.[786] Belenergia entered the Italian market "*at a very late stage, when the support mechanism was close to reach its sustainability limits.*"[787]  In Italy's view, the Ministerial Decrees setting up the Energy Accounts were secondary measures implementing primary legislation enshrined in Article 7 of Legislative Decree No. 387/2003[788] (for Energy Accounts I to III) and in Article 24 of the *Romani* Decree[789] (for Energy Accounts IV to V), which in turn implemented EU directives, the *Spalma Incentivi* Decree having merely reshaped these incentives.[790]  These provisions established incentives with "*decreasing amount and duration,*" corresponding to the rationale of the "*successive changes*" underlying each Energy Account.[791]  It adds that the *Romani* Decree[792] adopted in 2011 before Belenergia's investment introduced sharp changes to the incentives' regime (reducing the duration and

---

[783] Respondent's Post Hearing Brief, ¶ 109 et seq.

[784] Statement of Defense, ¶ 478; Respondent's Rejoinder, ¶ 316.

[785] Respondent's Post Hearing Brief, ¶¶ 92-98.

[786] Statement of Defense, ¶ 478; Respondent's Rejoinder, ¶ 316.

[787] Respondent's Rejoinder, ¶ 124(c).  *See also*, ¶ 175 of the same brief.

[788] Exhibit C-RFA-II-7.

[789] Legislative Decree No. 28/2011(Exhibit C-RFA-II-8, Hearing Bundle, vol. 2, Tab 11).

[790] Statement of Defense, ¶ 478.  Respondent's Post Hearing Brief, ¶ 41.

[791] Statement of Defense, ¶ 493; Respondent's Rejoinder, ¶ 316.

[792] Legislative Decree No. 28/2011(Exhibit C-RFA-II-8, Hearing Bundle, vol. 2, Tab 11).

amount of incentives under Energy Account II).[793]  The *Romani* Decree "*recognized the need to reconsider tariffs because of excessive burdens.*"[794]  The Respondent adds that the *Spalma* Incentivi Decree could not have come as a surprise because it was adopted after the 2013 regulatory changes of the *Destinazione Italia* Decree "*proposing the same re-modulation on a facultative basis*."[795]  Italy adds that other European States like Spain had also reduced incentives.[796]

513.  Italy further argues that the Claimant's due diligence reports do not address Italian regulatory changes,[797] noting that the investments were made when the Italian market "*had already reached a critical point.*"[798]  According to Italy, Mr. Levy confirmed that Belenergia invested in *Casamassima Solare SRL, Compagnia Solare 2 SRL, Compagnia Solare 3 SRL* and *Puglia Energia SRL* before obtaining the GSE letter granting the feed-in tariff and thus before concluding the GSE Conventions on feed-in tariffs.[799]  Italy adds that Belenergia has only produced in this arbitration due diligence reports covering the PV SPVs *Compagnia Solare 1 SRL* and *Compagnia Solare 3 SRL,* and that a preliminary due diligence report covers the SPV *Puglia Energia SRL*: neither of them examine Italian regulatory risks.[800]

514.  The Respondent also argues that the provision on assignment of receivables under the GSE Conventions on feed-in tariffs "*cannot in any way be seen as a form of guarantee provided by the GSE to the banks in relation to the fact that the incentives would remain fixed and immutable over time.*"[801]  Italy then relies on the testimony of Eng. Bacchiocchi:

> *MR BACCHIOCCHI: The assignment of the receivables was in essence that the receivables, instead of being paid into the bank account of the operator, were paid directly to the bank, but then any financing agreements between the operator and the banks were not mentioned or were not taken into account by this agreement.  In fact, the financing agreements had contractual logics which were completely different.*

---

[793] Respondent's Rejoinder, ¶¶ 316, 338.  *See also* Respondent's Post Hearing Brief, ¶ 7.

[794] Respondent's Power Point Presentation of 26 March 2018, Slide 69.

[795] Respondent's Power Point Presentation of 26 March 2018, Slides 59 and 69.  *See also* Respondent's Post Hearing Brief, ¶ 13.

[796] Respondent's Post Hearing Brief, ¶ 14.

[797] Respondent's Rejoinder, ¶ 124(d).  *See also* Respondent's Post Hearing Brief, ¶¶ 50-52.

[798] Respondent's Power Point Presentation of 26 March 2018, Slide 69.

[799] Respondent's Post Hearing Brief, ¶ 51.  *See also* Tr. 26 March 2018, Avv. Aiello & Mr. Levy, 172:13-174:18.

[800] Respondent's Post Hearing Brief, ¶ 52.

[801] Respondent's Post Hearing Brief, ¶ 59.

*Otherwise, we would have a situation where GSE was basically guaranteeing all the subjects that received incentives and this was not the case. It was simply an instrument created to allow the mechanism to be fluid regardless of any subjective relationships, contractual etc that were entered into obviously in other places, though not within the GSE; the GSE had no influence on the relationships that a subject had with the banks.*

*[Counsel for Claimant]: Obviously here I'm talking about the guarantee of the producers that used the assignment of receivables as a guarantee.*

*MR BACCHIOCCHI: Well, I think this should be seen within the context of an assessment which belongs to investment decisions. These are assessments that either operators or banks have to carry out independently and without that this mechanism of the assignment of the receivables may in any case influenced the contractual relationship because the assignment of receivables simply provides that a transfer of money, instead of being addressed to the operator, goes to the bank. The mechanism of trust is based on the system of incentives, on the other hand, there are other subjective considerations that the bank assessed in relation to the subjects that then received the financing.*[802]

515. Italy therefore rejects Belenergia's argument on legitimate expectations related to loans and the banking sector: because the Claimant not being a bank, Italy was not responsible for Belenergia's business choices to rely on loans for investment.[803]

516. Italy sustains that a general, regulatory framework cannot create "*specific commitments.*" It accepts that Italian legislative and regulatory measures could have led to a reasonable expectation of "*stability*" and of "*equitable remuneration;*" it does not accept, however, Belenergia's expectations that incentives stay frozen, "stabilised" for twenty years, "*irrespective of the fact that they proved to be excessive, and that they were not socially sustainable any longer with the risk of failure of the system itself.*"[804] Italy further claims that the FET standard cannot be equal to a stabilisation clause.[805] It refuses that a stabilization clause was ever included in its PV regulation.[806]

---

[802] Respondent's Post Hearing Brief, ¶ 59; Tr. 27 March 2018, Eng. Bacchiocchi & Mr. Santarelli, 241:11-242:20.

[803] Respondent's Rejoinder, ¶ 205.

[804] Statement of Defense, ¶¶ 488-490.

[805] Statement of Defense, ¶ 490.

[806] Statement of Defense, ¶ 490.

517. Finally, Italy concludes that one of the pillars of the tariff incentives was that they ensure sustainable, fair returns to PV plant owners associated with the average plant life, which is the express language of Italian regulation that should have been known by an experimented investor like Belenergia.[807]  The *Spalma Incentivi* Decree reduced feed-in tariffs to ensure the incentives' sustainability,[808] as confirmed by the witnesses Eng. Bacchiocchi and Eng. Miraglia, and the expert Mr. Saraceno (Protos), as follows:

> [Eng. Bacchiocchi] [T]*he legislator therefore has the option to intervene to stabilise the mechanism.  We must not forget that if at some point there are issues that are so serious that the entire mechanism and system becomes unsustainable, then in this case we wouldn't be talking about small remodulation of rates, but the entire mechanism would collapse, would be put in danger.* […][809]

> MR MIRAGLIA: *The measures in this Spalma-Incentivi is coherent because this is a light regulation of the incentive system.  The incentive system is based on the tariffs that are defined in the ministerial decrees, but these decrees enact wider principles that are determined by the laws to which these decrees are subordinate.  In particular, in all the legislative decrees that determined the definition of the tariffs, the criterion of fair remuneration of investment and operating costs has always been referred to.*[810]

> [Eng. Miraglia] *So a possible tuning of the tariffs should have been taken into account right from the start, because the criteria of fair remuneration had been fixed since 2003 because Decree 387 Article 7 said that—and this generates the whole thing—these tariffs had to be set in order to pay back, through fair remuneration, the investment and the operating costs for the plant.*[811]

> [Counsel for Respondent]*: The costs that are linked to the production of solar panels, how much did these prices come down at that period of time?*

> MR SARACENO: *Quite a lot. I remember that in 2007 or 2008 when we started to look into PV, 1MW plant was 4 to 5 million, but then over time, slowly, these prices came down quite a lot.  At one point the cost of these modules went up because there was a specific market situation for the silicon, but generally, as we also said in our report, there was a*

---

[807] Respondent's Post Hearing Brief, ¶¶ 3-5, 10, 15.

[808] Respondent's Post Hearing Brief, ¶ 24.

[809] Respondent's Post Hearing Brief, ¶ 26; Tr. 27 March 2018, Eng. Bacchiocchi, 210:5-12.

[810] Respondent's Post Hearing Brief, ¶ 32; Tr. 27 March 2018, Eng. Miraglia, 263:20-264:5.

[811] Respondent's Post Hearing Brief, ¶ 33; Tr. 27 March 2018, Eng. Miraglia, 264:24-265:6.

*curve on a logarithmic basis that showed that, when the capacity was*
*doubled, there was 20 per cent decrease in the modules' price.* […][812]

### (b) The Spalma Incentivi Decree was reasonable and proportionate, with no procedural or substantive impropriety

518. First of all, Italy readjusted feed-in tariffs with the *Spalma Incentivi* Decree by reducing them not cutting them, as an emergency measure to tackle the economic crisis. According to Italy, the A3 cost component of electricity consumer bills covering the cost of renewable energy incentives including PV had become too burdensome to consumers and unsustainable.[813] Although the tariff reduction was substantial, it was not "*crippling or disabling*", but proportionate to the reduction of PV technology costs.[814]

519. Rejecting Belenergia's bad faith accusations,[815] Italy agrees with the Claimant that Article 10(1) ECT requires that a "*rational policy*" underlie Italy's measures.[816] The Respondent states that the *Spalma Incentivi* Decree sought to readjust the incentives promoting renewable energy production, in the light of a "*genuine general interest*" and "*fully legitimate macro policy stances*".[817]

520. Rebalancing was a "*rational measure*" consistent with the evolution of European and Italian regimes, because *(a)* reduced production costs had generated excessive incentives borne by consumers; *(b)* electricity cost for Italian SMEs was 30% more expensive than in other EU Member States;[818] *(c)* increase in consumers' electricity bills was attributable to PV incentives; *(d)* electricity consumption dropped in the relevant years.[819]

521. Italy also states that returns of Belenergia's plants are higher than estimated at the time of the investment,[820] citing an excerpt from the First GRIF Report, as follows:

*Based on such data, Italian policy-maker valued the feed-in tariffs to be*
*granted to RES plants, in order to make these investments profitable in*

---

[812] Respondent's Post Hearing Brief, ¶ 37; Tr. 28 March 2018, Counsel for Respondent & Mr. Saraceno, 405:10-23.
[813] Respondent's Power Point Presentation of 26 March 2018, Slides 61-62, and 64.
[814] Respondent's Power Point Presentation of 26 March 2018, Slides 65-66.
[815] Statement of Defense, ¶ 514.
[816] Statement of Defense, ¶¶ 496-498.
[817] Statement of Defense, ¶¶ 498-500, Respondent's Rejoinder, ¶ 124(e).
[818] Respondent's Rejoinder, ¶ 185.
[819] Respondent's Rejoinder, ¶ 187. *See also*, Second Witness Statement of Eng. Miraglia of 14 December 2017.
[820] Statement of Defense, ¶¶ 429-430.

*light of the industry's average yields. Investors made, on the same basis, their financial plans and assessed their expected yields. Practical experience has also revealed that the PVGIS-3 data underestimated solar radiation levels, with the result that actual plant output could be higher than had been initially estimated. The PVGIS database was accordingly updated, foreseeing, when compared with PVGIS-3, a significant average increase in solar radiation. In the light thereof, the plants' production levels increased well beyond expectations, giving rise, on the one hand, to an abnormal increase in the companies' profitability, which went far beyond the reasonable assumptions made when the investments were made and, on the other hand, to an excessive amount of costs being incurred by end consumers, which adversely affected the efficient allocation of resources.*

*By way of conclusion, it can be stated that the "Spalma-incentivi" Decree was only intended to partially correct this gap, by cutting the feed-in tariffs in a manner that was not in proportion to the increases in productivity that the plants were experiencing. The overall result has been a reduction in consumer spending without this adversely affecting in any way the plants' financial forecasts, and investors continue to make profits that go well beyond what was initially forecasted.*[821]

522. Italy refers to the recitals of EU Directive 2009/28/EC on needed regulatory review seeking stability and cost-effectiveness,[822] and to the 2012 European Commission's Communication on Renewable Energy on the 48% decrease of PV costs and on needed cost-effectiveness reforms.[823] Italy explains that it initially attempted to favour voluntary adjustment mechanisms with the *Destinazione Italia* Decree in 2013, but in the end chose to reform the Energy Accounts with the *Spalma Incentivi* Decree in 2014.

523. The Respondent denies that the *Spalma Incentivi* Decree was substantively improper.[824] First, the *Spalma Incentivi* Decree was reasonable because Italy sought to readjust (not eliminate) the disproportionate PV investors' remuneration and the excessive burdens on consumers leading to reduced consumption. Second, the *Spalma Incentivi* Decree was proportionate, consistent with a rational policy: rebalancing was achieved keeping PV remuneration above market prices, not jeopardising PV plants' profitability.[825] Third, the

---

[821] *See* First GRIF Report of 12 April 2017, p. 39.
[822] Statement of Defense, ¶¶ 504-505.
[823] Statement of Defense, ¶¶ 506-507. *See also* <u>Exhibit REX-33</u>, pp. 3-5.
[824] Respondent's Rejoinder, ¶¶ 346-348.
[825] Respondent's Rejoinder, ¶¶ 124(h) and (i).

*Spalma Incentivi* Decree was reasonable, consistent with Italian and European policies enshrined in Legislative Decree No. 387/2003 (requiring an "*equitable remuneration*") and EU Directive 2009/28/EC.  According to the Respondent, the *Blusun v. Italy* award and the Italian Constitutional Court's Decision No. 16/2017 confirm this.[826]

524.  Italy adds that the measures had no retroactive effect and offered safeguards.[827]   The Respondent explains that the measures reduced only payment of future tariffs not past tariffs already granted.[828]   According to the Respondent, Italian law does prohibit that a new law affect pre-existing subjective rights (except for criminal law), noting that the Constitutional Court has affirmed this principle in Decision No. 16/2017.[829]   Italy submits that Decision No. 16/2017 also confirms the proportionality of the *Spalma Incentivi* Decree in light of Italian law and of the European Convention on Human Rights ("**ECHR**").[830]   Italy adds that the Constitutional Court Decision No. 92/2013 relied on by Professors Onida and Randazzo is irrelevant to the retroactivity argument, because it discussed cancellation of tariffs due to services that had already been performed.[831]

525.  Italy equally denies that the *Spalma Incentivi* Decree was procedurally improper.[832]   Preliminarily, Italy submits that this argument has only been raised in Belenergia's Reply and thus should be dismissed by the Tribunal.[833]   According to Italy, Belenergia failed to satisfy its burden of proof that the *Spalma* Incentivi Decree lacked due process or transparency.[834]

526.  Italy states that due process and transparency in international investment arbitration relate to the notion of "*audire alteram partem*" that private parties should be involved and informed of decisions affecting their interests.  Conversely, the *Spalma Incentivi* Decree's adoption does not lack due process or transparency because *(i)* it was a transparent, legislative measure

---

[826] Statement of Defense, ¶ 515, citing Exhibit RLA-1 and Exhibit REX-1.
[827] Respondent's Rejoinder, ¶ 124(f) and (j).
[828] Respondent's Power Point Presentation of 26 March 2018, Slide 73.
[829] Respondent's Power Point Presentation of 26 March 2018, Slide 74.  *See also* Exhibit REX-1; Respondent's Post Hearing Brief, ¶¶ 110-115.
[830] Respondent's Power Point Presentation of 26 March 2018, Slide 102.
[831] Respondent's Post Hearing Brief, ¶¶ 116-117.
[832] Respondent's Rejoinder, ¶¶ 346-348.
[833] Respondent's Rejoinder, ¶ 342.
[834] Respondent's Rejoinder, ¶ 343.

of general application affecting numerous stakeholders; *(ii)* its adoption complied with all Italian legislative procedures.[835]

527. Italy refers to the Second GRIF Report as a response to Claimant's submissions on underestimation of irradiation levels.[836]

### (c) Neither Italy's regulatory scheme nor GSE Conventions on minimum prices could have created legitimate expectations

528. In a preliminary note, Italy points out that the minimum prices claim "*should be dismissed by the Tribunal due to the implicit renunciation by the Claimant and its acquiescence to the Respondent's arguments.*"[837]

529. Italy states that Belenergia has failed to indicate which acts created its legitimate expectations, inferring that the Claimant may have referred to the AEGG Resolution No. 618/2013 and to the *Destinazione Italia* Decree.[838]  Italy also identifies two aspects of Belenergia's purported expectations on minimum prices: the amount of minimum prices and their duration.[839]  Italy clarifies that the goal of these instruments was not "*eliminating such regime, but simply […] removing the possibility, for medium and large PV plants with a capacity above 100Kw, to enjoy of both minimum prices and incentive tariffs.*"[840]

530. Italy rejects that the GSE Conventions on minimum prices could have created legitimate expectations on Belenergia because they had a 1 one-year duration, founded on AEEG Resolution No. 280/2007.[841]  The Respondent also submits that the primary rules, Article 13 of Legislative Decree No. 387/2003 and Article 1(41) of Law No. 239/2004, do not set up minimum prices; they merely set up the off-take regime to be adopted by the AEEG.  No expectations could have therefore arisen from these primary rules.[842]

---

[835] Respondent's Rejoinder, ¶¶ 206-209, 344-345.
[836] Respondent's Rejoinder, ¶ 199.  *See also* First GRIF Report of 15 December 2017, pp. 17-21.
[837] Respondent's Post Hearing Brief, ¶ 20.  *See also* Rejoinder, ¶ 283.
[838] Statement of Defense, ¶ 518.
[839] Statement of Defense, ¶ 519.
[840] Statement of Defense, ¶ 519.
[841] Statement of Defense, ¶ 522.  *See also* Exhibit C-9M.
[842] Statement of Defense, ¶¶ 524-525.

**531.** The Respondent explains that the first AEEG Resolution No. 34/2005 provided minimum prices only to the first 2 million kWh early produced by each plant. Later, AEEG Resolution No. 280/2007[843] reshapes the off-take regime, determining that minimum prices are yearly determined by the AEEG under Article 7(1) of its Annex A.[844] According to Italy, this "*exclude*[s] *any expectation regarding the exercise of such power by the Authority, except for the hypothesis of an abusive exercise.*"[845] It adds that the reference "*ensuring the economic survival of smaller plants*" in the preamble of AEEG No. Resolution 280/2007 cannot justify expectations of "*a high and durable profitability separated from the economic conditions of the investment.*"[846]

### (d) The 2013 Destinazione Italia Decree and the AEEG Resolution No. 618/2013 reducing minimum prices were reasonable and consistent with Italy's regulatory framework

**532.** Italy argues that the 2013 reform granted to PV investors minimum level prices covering operational costs and "*ensuring economic survival of smaller plants.*"[847] The AEEG Resolution No. 618/2013 setting up 2014 minimum prices lower than those granted between 2008 and 2013 was reasonable and coherent with the objectives of the minimum prices system. Based on a report by the *Politecnico di Milano,*[848] Italy argues that the AEEG Resolution No. 618/2013 ensured "*economic survival*" of plants covering their operational costs with basic capital remuneration.[849]

**533.** The Respondent argues that the AEEG Resolution No. 618/2013 was preceded by a long debate with stakeholders.[850] It also took into account technical data showing that previous minimum prices were detached from production costs at the time, harming electricity consumers.[851] The AEEG Resolution No. 618/2013 was also coherent with the primary rules under Article 13(3) and(4) of Legislative Decree No. 387/2003 and under Article 1(41) of

---

[843] Exhibit C-9M.
[844] Statement of Defense, ¶ 528.
[845] Statement of Defense, ¶ 528.
[846] Statement of Defense, ¶ 531.
[847] Statement of Defense, ¶ 532.
[848] *Rapporto commissionato da AEEG al Politecnico di Milano* of July 2013 (Exhibit REX-51).
[849] Statement of Defense, ¶¶ 535-536.
[850] Statement of Defense, ¶ 538.
[851] Statement of Defense, ¶ 538.

Law No. 239/2004 requiring that the off-take regime consider "*market economy conditions*" ("*condizioni economiche di mercato*").[852]

534. Finally, Italy rejects Belenergia's criticism of the *Destinazione Italia* Decree of 2013 when not allowing certain plants to combine minimum prices and feed-in tariffs. First, the Respondent argues that no rule suggests that minimum prices and feed-in tariffs should be combined.[853] Second, authorised combination of minimum prices and feed-in tariffs by smaller plants not exceeding 100kWh is reasonable in relation to the preamble of AEEG Resolution No. 618/2013 requiring "*the economic survival of smaller plants.*"[854] Third, the *Destinazione Italia* Decree was preceded by a long debate, starting with the *Romani* Decree[855] of 2011 preceding Belenergia's investment.[856]

### (2) Italy Has Not Breached the Prohibition against Unreasonable and Discriminatory Measures under Article 10(1) ECT

535. Italy submits that there is "*a broad or complete overlapping between the FET standard*" and the prohibition against unreasonable and discriminatory measures under Article 10(1) ECT, citing the *Al-Bahloul v. Tajikistan* case.[857] Thus, Italy states that the measures' reasonableness should be dealt with under the FET standard, referring back to its arguments on the FET standard.[858] It states that this is confirmed by the Claimant when referring to the "reasonableness" and "unpredictability" of the measures, rather than to their "discriminatory" character.[859]

---

[852] Statement of Defense, ¶¶539-540.

[853] Statement of Defense, ¶ 542.

[854] Statement of Defense, ¶ 543.

[855] Exhibit C-RFA-II-8.

[856] Statement of Defense, ¶ 544.

[857] Statement of Defense, ¶¶ 557-558. *See also,* Exhibit RLA-13, ¶ 248.

[858] Statement of Defense, ¶¶ 559, 560.

[859] Statement of Defense, ¶ 559; Respondent's Rejoinder, ¶ 362.

### (3) Italy Has Not Breached the Most Constant Protection and Security Obligation under Article 10(1) ECT

**536.** The Respondent rejects Belenergia's accusation that Italy breached the FPS standard under Article 10(1) ECT. Italy explains that this standard is limited to "*preventing and protecting aliens from violence and harassment.*"[860]

**537.** Italy adds that defining the FPS standard broadly would lead to substantial overlap with the FET standard, citing *Houben v. Burundi*.[861] Because Belenergia did not raise different arguments from those raised under the FET standard, Italy refers back to its arguments on the FET standard.[862]

### (4) Italy Has Not Breached the Umbrella Clause under Article 10(1) ECT

**538.** If the Tribunal affirms jurisdiction over the umbrella clause claim or declares its admissibility—*quod non*—Italy argues that the umbrella clause claim is unfounded.[863] Italy submits that the application of umbrella clauses is controversial. Because they derogate from the international law principle on the separation between international and domestic obligations, umbrella clauses should be interpreted restrictively.[864]

**539.** First, Italy's regulatory scheme could not have led to specific commitments toward Belenergia.[865] Second, Italy states that it is unclear from Belenergia's Statement of Claim whether it refers to GSE Conventions on feed-in tariffs or to GSE Conventions on minimum prices. It submits that GSE Conventions on minimum prices had a one-year duration, which makes it impossible to sustain an umbrella clause claim.[866] It also submits that Belenergia has given up its umbrella claim in relation to minimum prices in its Reply.[867]

---

[860] Statement of Defense, ¶ 584, citing *Electrabel v. Hungary* (Exhibit RLA-4, ¶ 7.83) and *Plama v. Bulgaria* (Exhibit RLA-24, ¶ 180).

[861] Respondent's Rejoinder, ¶¶ 351-353, and Exhibit CL-133RM, ¶¶ 155-156, 160 (The *Houben v. Burundi* tribunal had distinguished the relevant BIT provision from the general FPS standard because the BIT provision referred to FPS "*as a matter of law and as a matter of law*" ("*en droit ou en fait*").

[862] Statement of Defense, ¶ 587.

[863] Statement of Defense, ¶ 562.

[864] Statement of Defense, ¶ 665, citing *Noble Ventures v. Romania* (Exhibit RLA-27, ¶ 55).

[865] Respondent's Rejoinder, ¶ 168; Professor Rojas' Second Opinion of 15 December 2017, ¶¶ 43-45.

[866] Statement of Defense, ¶¶ 566, 576.

[867] Respondent's Rejoinder, ¶ 220.

202 of 236

**540.** Third, Italy agrees with the Claimant that an umbrella clause "*internationalises*" contract breaches.[868]  In its view, a condition to the application of umbrella clauses is that contract breaches be founded on "*contractual*" obligations.  Italy refers to *Noble Ventures v. Romania* confirming that the umbrella clause relates to contractual obligations and not to "*general commitments, for example*[,] *by way of legislative acts.*"[869]  It differs with Belenergia that the umbrella clause includes obligations undertaken by States in their "*function as sovereign or as a merchant in a commercial transaction.*"[870]

**541.** Italy states that the GSE Conventions on feed-in tariffs and on minimum prices have a statutory and not a "*contractual*" character; rather, they are mere "*accessory contracts*" transposing legal provisions into a contract as "*a sort of appendix of legislative or regulatory provisions.*"[871]  Because the duration and amount of incentives under the GSE Conventions on feed-in tariffs and on minimum prices were previously determined by a public law source, claims concerning them should be discussed under the FET standard.[872]  It differs with Belenergia that it is estopped from arguing so.[873]

**542.** Italy also submits that interpretation of Article 10(1) ECT under the VCLT confirms this. The Respondent highlights the expressions "*entered into*" and "*entered into with*" in Article 10(1) ECT, sustaining that it could not have entered into concrete, specific, contractual commitments through adopting general regulatory measures.[874]  The *effet utile* principle suggests that the Tribunal should not interpret the umbrella clause as overlapping with the FET standard; rather, the umbrella clause should be interpreted restrictively.[875]

**543.** Even if the Tribunal considers that the claims on the GSE Conventions could fall within the meaning of the umbrella clause—*quod non*—Italy states that Belenergia has failed to show

---

[868] Respondent's Rejoinder, ¶ 221(A).
[869] Respondent's Rejoinder, ¶¶ 226-228, citing, among others, to Exhibit RLA-27, ¶ 51.
[870] Respondent's Rejoinder, ¶ 229.
[871] Statement of Defense, ¶ 568.  *See also* Professor Rojas' First Opinion of 23 April 2017, ¶¶ 31-45; Respondent's Rejoinder, ¶¶ 221(B), 261-262; Respondent's Post Hearing Brief, ¶¶ 92-98, 123.
[872] Statement of Defense, ¶¶ 569-570; Respondent's Post Hearing Brief, ¶¶ 124-126.
[873] Respondent's Rejoinder, ¶¶ 263-267.
[874] Respondent's Rejoinder, ¶¶ 231-244.
[875] Respondent's Rejoinder, ¶¶ 245-251.

their breach and denies that they could have been breached.[876]  First, the purported breach of GSE Conventions is not caused by or attributable to the GSE, but is caused by statutory change.[877]  Second, Italy was not a party to the GSE Conventions; so, the umbrella claim is inconsistent with privity of contract.[878]  Third, the challenged measures being general, not aimed at Belenergia, and compliant with the FET standard, the Tribunal should reject the Belenergia's umbrella clause claim.[879]  Fourth, the umbrella clause does not change the contract's proper law; international law intervenes at a later stage if pursuant to domestic law there has been a contract breach.[880] Decision No. 16/2017[881] of the Italian Constitutional Court confirms that the *Spalma Incentivi* Decree pursued legitimate goals, being valid and lawful.[882]

### (5) Italy Has Not Breached the Obligation not to Discriminate under Articles 10(2) and 10(3) ECT

**544.**  The Respondent denies that Articles 10(2) and 10(3) ECT apply in this arbitration.  In its view, "*Treatment*" referred in Article 10(3) ECT refers to the "*Making of Investments*" under Article 10(2) ECT, which is confirmed by the use of the same expression "*Making of Investments*" in Article 10(4) ECT.[883]  It then refers[884] to the definition of "*Making of Investments*" under Article 1(8) ECT, which reads that:

> *"Make Investments" or "Making of Investments" means establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity.*

**545.**  Therefore, Articles 10(2) and 10(3) ECT cannot apply to the challenged measures, because their adoption was long after Belenergia's "*Making of Investments*" with acquisition of the

---

[876] Statement of Defense, ¶ 575; Respondent's Rejoinder, ¶¶ 221(C), 270-272; Respondent's Post Hearing Brief, ¶¶ 130-133.

[877] Statement of Defense, ¶ 574.

[878] Statement of Defense, ¶ 578.

[879] Statement of Defense, ¶ 581.  *See also* Respondent's Post Hearing Brief, ¶ 135.

[880] Respondent's Rejoinder, ¶¶ 273-276, citing Professor James Crawford (Exhibit RLA-33, pp. 367, 369).

[881] Exhibit REX-1.

[882] Respondent's Rejoinder, ¶ 221(D); Respondent's Post Hearing Brief, ¶¶ 134.

[883] Statement of Defense, ¶¶ 591-596.

[884] Statement of Defense, ¶ 593.

SPVs and construction of its PV plants.[885]  Moreover, Italy adds that ECT Tribunals have never applied Articles 10(2) and 10(3) ECT.

546.  Even if the Tribunal considers applicable Articles 10(2) and 10(3) ECT, Italy submits that the challenged measures do not discriminate against Belenergia's investment.  Italy argues that discrimination can be "*invoked when two different situations are comparable, alike.*"[886] It explains that its reference to WTO law's likeness standard is an interpretative tool in the light of Article 31(3)(c) VCLT.[887]  Law No. 164/2014[888] exempting certain Italian public entities and schools ("*enti locali o scuole*") from the *Spalma Incentivi* Decree's application applies to public entities and schools whose situation is not comparable to the PV plant owners' situation.[889]

547.  First, public entities and schools are non-profit entities; PV plant owners are for-profit entities.[890]  Second, public entities and schools primarily produce energy for their own use; PV plant owners produce energy primarily for sale.[891]  This shows that the exemption under Law No. 164/2014 seeks specific and legitimate public goals.[892]  It submits that the only public entity cited by Belenergia is AVCP (today ANAC), the supervisory authority monitoring public contracts and fighting corruption.[893]

548.  Italy further denies that its measures discriminate against larger PV plants.  In its view, the measures' rational policy differentiates between PV plants with different sizes, which is a logic and normal regulatory practice in advanced economies.[894]  It adds that smaller PV plants' renewable energy production is primarily for self-consumption.[895]

---

[885] Statement of Defense, ¶ 595.  *See also,* Respondent's Rejoinder, ¶¶ 375-380, noting that Belenergia has failed to reply to this argument.

[886] Statement of Defense, ¶ 602.

[887] Respondent's Rejoinder, ¶ 383.

[888] Exhibit C-RFA-II-13.

[889] Statement of Defense, ¶ 602.

[890] Statement of Defense, ¶ 602.

[891] Statement of Defense, ¶ 602.

[892] Statement of Defense, ¶¶ 603, 605.

[893] Respondent's Rejoinder, ¶ 384.

[894] Statement of Defense, ¶ 605.

[895] Statement of Defense, ¶ 605.

549. Finally, Italy clarifies that the Italian measures do not discriminate between foreign and national PV producers.[896]

### (6) Damages

550. Italy submits that Belenergia is not entitled to compensation.  If the Tribunal decides, however, to grant compensation, Italy rejects the criteria for calculation and the quantum of compensation submitted by Belenergia, relying on the First and Second GRIF Reports, and on the GRIF Financial Report.[897]

### *(a) The compensation standard*

551. Contrary to Belenergia's position, Italy objects that the full reparation principle of *Chorzów Factory* applies.  It submits that the PCIJ used the expression "*as far as possible*" when referring to the full reparation principle, by that mitigating its application.[898]  Rather than setting a criterion for damages quantification, the PCIJ compared restitution and compensation for international wrongful acts.[899]

552. Italy submits that the ILC Articles on State Responsibility apply only to obligations between States, not between States and individuals.[900]  It also states that the full reparation principle has to be mitigated when there is no expropriation, fair market value calculation being limited to expropriation cases.[901]  In its view, the Tribunal should consider when calculating damages: *(i)* the measures' general, regulatory character; *(ii)* the absence of fraudulent intent; *(iii)* the investment's high profitability; and *(iv)* the absence of material harm to the investment.[902]

---

[896] Respondent's Rejoinder, ¶ 385.

[897] Statement of Defense, ¶¶ 609-610.  *See* First GRIF Report of 12 April 2017; GRIF Financial Report of 12 April 2017; Second GRIF Report of 15 December 2017, p. 31.

[898] Statement of Defense, ¶ 612; Respondent's Rejoinder, ¶¶ 391-392.

[899] Statement of Defense, ¶ 612.

[900] Statement of Defense, ¶¶ 613-615, citing the commentary to Article 33 of the ILC Articles on State Responsibility (Exhibit RLA-28), p. 95, Article 33, ¶ 4: "*The articles do not deal with the possibility of the invocation of responsibility by persons or entities other than States, and paragraph 2 makes this clear.  It will be a matter for the particular primary rule to determine whether and to what extent persons or entities other than States are entitled to invoke responsibility on their own account.  Paragraph 2 merely recognizes the possibility: hence the phrase 'which may accrue directly to any person or entity other than a State.'*"  *See also*, Respondent's Rejoinder, ¶¶ 393-401.

[901] Statement of Defense, ¶¶ 618-621, 625.

[902] Statement of Defense, ¶623.

### (b) Quantification of damages

553. First of all, Italy submits that Belenergia cannot claim compensation in the absence of injury.[903]  According to the Respondent, when setting up the incentives regime Italy relied on the PVGIS database to calculate PV incentives; Belenergia production levels are much higher than the production estimated on the basis of the PVGIS database: this database was later proven unsatisfactory because it underestimated the solar irradiation levels in Italy.[904] Irrespective of the solar irradiation database used by Belenergia (PVSYST rather than PVGIS as recognised during the Hearing),[905] the Respondent refers to the testimony of Professor Quaglione (GRIF) to argue that Belenergia could not have expected that incentives would not change when it was proven that solar irradiation level was much higher than expected:

> [Professor Quaglione] [T]*he expectations that Belenergia must have had at the beginning of the process must be based on the same data as the ones contained in the PVGIS-3 database.  So the conservative ones. The reason why we are assuming this is that if they had more generous expectations, they, as professional operators, should have immediately understood that they were obtaining extra profits which was not compatible with any regulatory intervention.  So there are two options. Either they recognised immediately that they were obtaining extra profits and then they could expect a cut in the future, or they had the same expectations as the government and so we are right on this path.*[906]

554. Moreover, Italy also challenges Mr. Rodriguez's expertise in the PV sector (as recognised by Counsel for Claimant), highlighting several errors made in his reports.[907]

555. The Respondent rejects Belenergia's reliance on the discounted cash flow method for quantifying damages.  In its view, this method is used for calculating the fair market value of an investment, typically used in expropriation cases.[908]  Italy explains that, if the Tribunal decides to calculate compensation, it has to consider that Belenergia's investment persists

---

[903] Respondent's Post Hearing Brief, ¶ 138.

[904] Respondent's Post Hearing Brief, ¶¶ 139-140.

[905] Respondent's Post Hearing Brief, ¶ 143.

[906] Respondent's Post Hearing Brief, ¶ 145; Tr. 28 March 2018, Professor Quaglione (GRIF), 476:25-477:15.

[907] Respondent's Post Hearing Brief, ¶¶ 146-148.

[908] Statement of Defense, ¶ 629.

"*fully operational and profitable.*"[909]  The Tribunal should avoid income-based calculation methods such as the discounted cash flow method leading to "*speculative,*" "*unpredictable,*" "*excessive remuneration of the invested capital;*" rather, the Tribunal should consider the expected equitable capital remuneration, reduced energy costs, and PV market and industry developments.[910]

556. Italy objects to Belenergia's quantification applying the discounted cash flow method, being "*methodologically erroneous to sum the assessment of actual lost profits with a calculation of the value of the investment according to the DCF method*" made in relation to feed-in tariffs and minimum prices.[911]

557. Italy equally objects that out of pocket expenses and other indirect costs could be compensated.[912]  The Claimant has failed to show that these losses related to the challenged measures; rather, they are unforeseeable losses and result from "*autonomous entrepreneurial choices.*"[913]

558. Italy further submits that Belenergia's damages calculation is incorrect.  It explains that the GRIF Reports and the GRIF Financial Report show that its SPVs' returns are higher than originally expected despite the *Spalma Incentivi* Decree reducing the feed-in tariffs.[914]

559. The GRIF Reports and the GRIF Financial Report also show, first, that there should be no compensation for measures on minimum prices, and, second, that the correct compensation of an alleged compensation would "*almost annul*" the amount calculated by Belenergia.[915]

560. Neither should there be any damages on imbalance charges, the GRIF Economic Report corroborating this.[916]

---

[909] Statement of Defense, ¶ 629.

[910] Statement of Defense, ¶¶ 630-632.

[911] Statement of Defense, ¶ 634.

[912] Statement of Defense, ¶ 637.

[913] Statement of Defense, ¶¶ 636-638.

[914] Statement of Defense, ¶ 641.  *See* Economic Report by GRIF "Fabio Gobbo" Industrial and Financial Research Group of 12 April 2017, pp. 30-39; Financial Report by GRIF "Fabio Gobbo" Industrial and Financial Research Group of 12 April 2017, pp. 8-9, 11-21 and Table 5.

[915] Statement of Defense, ¶ 642.  *See* First GRIF Report of 12 April 2017, pp. 40-46; GRIF Financial Report of 12 April 2017, pp. 24-28.

[916] Statement of Defense, ¶ 643.  *See* First GRIF Report of 12 April 2017, pp. 47-52.

561.  It submits that Belenergia and its experts have failed to rebut arguments on minimum prices and on imbalance costs, leading to Belenergia's giving up these claims.[917]  If the Tribunal finds that there has been a breach of the FET standard—*quod non*—Italy requests the Tribunal not to include in its calculation claims on minimum prices and on imbalance costs.[918]

562.  Italy stresses that all deficiencies, errors, inconsistencies and approximations contained in the calculation presented by Belenergia affect the legitimacy of its claims.[919]  The Respondent reserves its right to present future estimates of damages.[920]

### (7) Interest

563.  The Respondent denies that the interest rate should be "*based on the subjective position of the Claimant.*"[921]

564.  Italy also rejects interest compound on a quarterly basis because simple interest "*is less speculative and better reflects the circumstances of the case.*"[922]  It further explains that the Tribunal should apply simple interest because *(i)* the alleged damages are recent; *(ii)* the measures have public policy objectives; *(iii)* Belenergia had already received high incentives (making compound interest unfair and disproportionate).[923]

### C.  **The Tribunal's Decision**

565.  The Tribunal will consider below whether Italy breached *(1)* the FET obligation under Article 10(1) ECT; *(2)* the umbrella clause under Article 10(1) ECT; *(3)* the most constant protection and security obligation under Article 10(1) ECT; and *(4)* the provisions prohibiting unreasonable and discriminatory measures under Articles 10(1), (2) and (3) ECT.

---

[917] Respondent's Rejoinder, ¶¶ 408, 410.

[918] Respondent's Rejoinder, ¶ 409.

[919] Statement of Defense, ¶ 644.

[920] Statement of Defense, ¶ 645.

[921] Statement of Defense, ¶ 646.

[922] Statement of Defense, ¶ 647.

[923] Statement of Defense, ¶ 648.  *See also* Respondent's Rejoinder, ¶¶ 413-414.

**(1) Has Italy Breached the FET Obligation under Article 10(1) ECT?**

*(a) The applicable FET standard*

566. The Parties disagree to a certain extent on the applicable FET standard under Article 10(1) ECT. The Claimant sustains that the FET standard under the ECT is an objective and self-contained standard that is not limited to the minimum standard of treatment under customary international law, referring to VCLT interpretation principles on the basis of the text of Article 10(1) ECT in light of the ECT's object and purpose. The Claimant further sustains that FET requires that the host State *(i)* observe the investor's legitimate expectations; and that the host State refrain from acting in a manner that is *(ii)* procedurally improper or *(iii)* substantially improper. Belenergia submits that the protection of legitimate expectations is a "dominant" element of FET, including good faith considerations. According to the Claimant, legitimate expectations can relate to legal and regulatory stability or arise from the investor's reliance on specific commitments by the host State.

567. In turn, Italy disagrees that the FET standard is self-contained under Article 10(1) ECT. According to Italy, this standard should be interpreted in accordance with international law. Italy further submits that legitimate expectations have to consider the States' sovereign right to regulate to be worthy of international law protection. Among other sources, Italy cites the *Charanne* and the *Blusun* decisions refusing to sanctify laws as promises when legal and regulatory changes are reasonable and proportionate.

568. The Tribunal is satisfied that FET under the ECT is set forth in its Article 10(1) ECT, which provides an autonomous, self-contained definition of FET, with no reference to the minimum standard of treatment of aliens under customary international law, as follows:

> *(1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use,*

> *enjoyment or disposal.  In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.*  […]

569.  As Article 10(1) ECT provides that treatment, including FET, cannot be "*less favourable than that required by international* law," it requires treatment that is not strictly equivalent to international law.    This non-restrictive standard confers on the Tribunal some interpretation leeway.

570.  Arbitral tribunals have found FET violations when State conduct *(a)* goes against investors' legitimate expectations; *(b)* denies justice and due process; *(c)* is arbitrary, discriminatory, and abusive.    The Tribunal agrees with the Claimant that the protection of legitimate expectations is a key element of FET.

571.  To be legitimate, investors' expectations must not be frivolous or unrealistic and must be grounded in reality.    As the *Duke Energy v. Ecuador* tribunal rightly put it:

> *To be protected, the investor's expectations must be legitimate and reasonable at the time when the investor makes the investment.  The assessment of the reasonableness or legitimacy must take into account all circumstances, including not only the facts surrounding the investment, but also the political, socioeconomic, cultural and historical conditions prevailing in the host State.  In addition, such expectations must arise from the conditions that the State offered the investor and the latter must have relied upon them when deciding to invest.*[924]

572.  The Tribunal agrees with Italy that the FET obligation does not prevent host States' regulatory autonomy.    In *Saluka v. Czech Republic*, the tribunal held that "[n]*o investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged*" and that whether expectations are justified and reasonable takes into account "*the host State's legitimate right subsequently to regulate domestic matters in*

---

[924] *Duke Energy v. Ecuador*, ICSID Case No. ARB/04/19, Award (18 Aug. 2008) (Exhibit CL-18M, Exhibit RLA-36), ¶ 340.

*the public interest.*" [925]  This means that legitimate regulatory activity in the public interest does not amount to an FET breach even if it adversely affects investments. [926]

### (b) Application of the FET standard

Legitimate expectations

573. Belenergia submits that Italy undertook explicit and implicit specific commitments toward PV investors through regulatory and contractual instruments, citing Legislative Decree No. 387/2003 and Legislative Decree No. 28/2011 on feed-in tariffs, Ministerial decrees setting up Energy Accounts I to V on feed-in tariffs, AEEG Resolutions No. 34/2005 and 280/2007 on minimum prices, and the GSE Conventions concluded with Belenergia's SPVs on feed-in tariffs and minimum prices.

574. Belenergia admits that the successive Energy Accounts progressively reduced the feed-in tariffs, and that the last two of which introduced an annual costs cap.  However, it points out that this succession of reduced feed-in tariffs did not affect the 20-year feed-in tariffs granted to its SPVs pursuant to GSE Conventions already concluded, based on a "*grandfathering*" mechanism.  It also submits that the regulatory and contractual 20-year term for feed-in tariffs was based on the 20-year estimate of the PV plants' life and that its SPVs concluded loan agreements relying on the 20-year feed-in tariff receivables assignable to banks pursuant to the GSE Conventions.

575. The Claimant sustains that the *Spalma Incentivi* Decree of 24 June 2014 later confirmed by Conversion Law No. 116//2014 reduced the feed-in tariffs granted in relation to all its PV plants with nominal power above 200 kW, irrespective of the GSE Conventions' prohibition on unilateral termination or amendments and thus in breach of its acquired rights and legitimate expectations.

576. The Claimant submits that the "*outright cut*" choice under the *Spalma Incentivi* Decree applied to its PV plants imposing a 6% to 8% feed-in tariff reduction proportionate to the

---

[925] *Saluka Investments BV (The Netherlands) v. Czech Republic*, UNCITRAL, Partial Award (17 Mar. 2006) (Exhibit RLA-16), ¶ 305.
[926] *Joseph C. Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability (21 Jan.2010) (Exhibit CL-113RM).

plants' capacity.  The Claimant adds that Article 26 of Conversion Law No. 116//2014 also changed the monthly payment modality from 100% to 90% of estimated annual electricity production providing for payment of the 10% difference by 30 June of the following year.[927]

577.  Moreover, the Claimant relies on Article 13 of the GSE Conventions, arguing that they provided for annual automatic renewal of minimum prices covering operating costs of PV plants in light of AEEG Resolution No. 280/2007.  *Destinazione Italia* Decree's repealing minimum prices and fixing prices as equal to hourly zonal prices for Belenergia's plants on 23 December 2013 breached Belenergia's legitimate expectations.

578.  Conversely, Italy rejects that Italian legislation or the GSE Conventions could have given rise to legitimate expectations.  First, Italy sustains that the Italian Constitutional Court has confirmed in Decision No. 10795/2017 that the GSE Conventions are accessory contracts and thus instruments of regulation concluded by the GSE as public administration exercising public powers.  Hence, Italy argues that there is no breach of commitment through the *Spalma Incentivi* Decree reducing the feed-in tariffs through regulatory changes, limited to future payment of future tariffs, and that the *Spalma Incentivi* Decree did not affect past tariffs granted in relation to energy already provided.  Neither did the *Destinazione Italia* Decree breach alleged commitments on minimum prices, because these had a one-year duration pursuant to AEEG Resolution No. 280/2007 and were limited only to the first 2 million kWh withdrawn.  Italy explains that the *Destinazione Italia* Decree sought to prevent that PV plants exceeding 100kWh cumulate two incentives, that is, minimum prices in addition to feed-in tariffs.  Second, Italy denies that the regulatory scheme before the *Spalma Incentivi* Decree and the *Destinazione Italia* Decree could have given rise to legitimate expectations because it was clear from the Italian regulatory framework that subsidy reduction was to be expected in the PV sector.

579.  The Tribunal finds that Belenergia could not have derived legitimate expectations from purported commitments granted under the GSE Conventions on feed-in tariffs.  Belenergia accepted at the Hearing that the feed-in tariffs were first communicated to each of its SPVs by a GSE letter, which was later included in the GSE Conventions.[928]  Further, the Italian

---

[927] *See* GSE Letters to Belenergia's SPVs (Exhibit C-27M).
[928] Tr. 26 March 2018, Mr Jacques Edouard Lévy, 172:2-17.

Constitutional Court found in Decision No. 10795/2017[929] that the GSE as part of Public Administration has acted in a position of supremacy exercising public powers when concluding and modifying the GSE Conventions in light of Italian regulatory and legislative framework, leading to jurisdiction of Italian administrative courts to discuss this. Hence, the Tribunal cannot agree with the Claimant that the GSE Conventions could have contained specific commitments addressed specifically to Belenergia. As Mr. Lévy stated at the Hearing in answer to Counsel for Respondent's question on whether Belenergia invested in *Casamassima Solare SRL*'s plants before obtaining the GSE Convention in relation to its PV plants:

> *MR LEVY:* […] *we had not the contract because, as you said, so the contracts came afterwards. But the contracts are standards, contracts that were proposed before that were part of the Conto Energia, so we knew exactly what we would get.*[930]

580. Neither does the Tribunal agree that the contractual 20-year term originally applying to feed-in tariffs or the prohibition on unilateral changes could be considered a stabilization clause. The subsidy (feed-in tariff) (1) amount and (2) duration components under the GSE Conventions on feed-in tariffs were replicated from the relevant legislation including the successive Energy Account Ministerial Decrees that automatically applied to Belenergia's PV plants depending on their date of start of operations as they equally applied to any other PV plants satisfying the pre-requisites for this subsidy. These two components were set forth in Italian legislation and were not personally addressed to Belenergia.[931] The contractual prohibition on unilateral changes concerned the GSE and not the Italian legislator.

581. Moreover, the GSE Conventions on minimum prices were subject to a yearly duration pursuant to Article 13,[932] and minimum prices were subject to "*subsequent modifications and integrations*" under Article 4 of GSE Conventions on minimum prices, as follows:

---

[929] Italian Constitutional Court Decision No. 10795/2017 of 11 April 2017 (Exhibit REX-74).

[930] Tr. 26 March 2018, Mr Jacques Edouard Lévy, 174:1-6.

[931] *See,* for example, Article 12(2) of Ministerial Decree of 5 July 2012 (Energy Account IV) and its Annex 5, in Exhibit C-RFA-II-14.4 (Hearing Bundle, vol. 2, Tab 20).

[932] S*ee* Exhibit C-26M (Hearing Bundle, vol. 3, Tab 22), Article 13. "[…] *The Parties agree to tacitly renovate this Agreement yearly, registered letter with receipt, except in case of termination to be communicated by the Producer, to the GSE, with a registered letter with at least 60 days in advance in respect to the termination.*"

> *The prices given by the GSE to the Producer for the purchasing ("per il ritiro") of the energy which is the subject of this Agreement are defined in Articles 6 and 7 of the Resolution AEEG No. 280/07 and subsequent modifications and integrations.* [...][933]

582. Further, Article 16 on "Amendment and *Renvoi*" of the GSE Conventions on minimum prices foresaw future amendments in light of "*potential changes and updates*" to AEEG Resolution No. 280/07, as follows:

> [...] *The GSE has the discretion to modify the Agreement's clause according to potential changes and updates introduced* [to] *Resolution AEEG 280/07, without prejudice to the possibility for the producer to terminate this contract relationship according to Article 14.*[934]

583. Neither can this Tribunal agree that the Italian legal and regulatory framework before the *Spalma Incentivi* Decree and the *Destinazione Italia* Decree could have created legitimate expectations in relation to the subsidies feed-in tariffs and minimum prices. This Tribunal refers to the findings in *Electrabel v. Hungary* assessing "*the amount of information that the investor knew and should reasonably have known at the time of the investment*"[935] when deciding on whether an investor's expectations are legitimate to conclude that Belenergia could not have expected that the Italian PV regulatory framework would not change.

584. Like the *Isolux*[936] tribunal, this Tribunal does not require a full and extensive due diligence by the investor. Rather, the Tribunal has considered whether Belenergia's alleged expectations are reasonable considering the information that a "prudent" investor had to know about Italian PV regulatory framework at the time of the investment. In other words, an investor cannot legitimately expect that the legal and regulatory framework will not change when any prudent investor could have anticipated this change before making its investment.

---

[933] S*ee* Exhibit C-26M (Hearing Bundle, vol. 3, Tab 22), Article 4.

[934] S*ee* Exhibit C-26M (Hearing Bundle, vol. 3, Tab 22), Article 16, in the original: "*Il GSE si riserva di modificare le clausole della presente Convenzione in conformità alle eventuali modifiche ed aggiornamenti apportati alla delibera AEEG 280/07, ferma restando la possibilità per il Produttore di recedere dal presente rapporto contrattuale in conformità a quanto previsto dal precedente Articolo 14.*"

[935] *Electrabel v. Hungary*, ICSID Case No. ARB/07/19, Award (25 November 2105) (Exhibit CL-27M), ¶ 7.78.

[936] *Isolux v. Spain,* SCC Case No. V2013/153, Award (12 July 2016) (Exhibit C-6RM), ¶ 781.

585. Belenergia has presented due diligence reports only in relation to the SPVs *Compagnia Solare 1 SRL*, *Compagnia Solare 3 SRL*, and *Società di Produzione Energia Solare SRL* and a preliminary due diligence report in relation to *Puglia Energia SRL*.[937]  Belenergia has failed to show that these due diligence reports examined Italian regulatory risks in relation to the feed-in tariffs and minimum prices.  Belenergia has not submitted any other due diligence documents in relation to the other 6 SPVs.

586. Mr Lévy's testimony is unclear about whether Belenergia expressly requested a "regulatory" due diligence.  At the Hearing, when answering a question by Counsel for Respondent on whether Belenergia considered the Spanish 2010 regulatory changes in the PV sector, Mr Lévy stated that he did not believe that Italy could change its PV incentives regime at the time of investment:

> [Counsel for Respondent]*: […] Were you aware of the changes made by Spain in 2010 to the legislation relating to the incentives for the photovoltaic plants that had changed the conditions initially envisaged?*
>
> *MR LEVY: Yes, but I was explaining that Spain and Italy were very different and I looked personally into the reason why Spain did the change, and why we estimated that for Italy it will be impossible.  […]*
>
> [Counsel for Respondent]*: Despite all these facts, have you ever asked for regulatory due diligence?*
>
> *MR LEVY: I don't think if I asked regulatory due diligence the regulator would have answered, but I can tell you what I did, I looked at the balance sheet of GSE and I looked at the balance sheet in Spain.* […]
>
> [Counsel for Respondent]*: If you had asked for a regulatory due diligence, we should assume that the law firms did not include any reference to the possible regulatory risk.*
>
> *MR LEVY: I think I've done—we are careful investors, and we ask relevant lawyers to provide us their legal due diligence.  At the time in Italy all people were just short-sighted, and this question of changing the laws was not ever considered.  Now if you ask a lawyer— at the time I cannot—I mean in the regulatory reports there was nothing on it.  But I read the—I read the—what the State was publishing, which was an*

---

[937] *See* <u>Exhibits C-18M</u> (including Chiomenti's Legal Due Diligence Report undated on *Compagnia Solare 1 SRL* and *Compagnia Solare 3 SRL*, Orrick's Preliminary Due Diligence Report dated 26 July 2011 on *Puglia Energia SRL*; Tonucci & Partners' Due Diligence Report dated 27 September 2011 on *Società di Produzione Energia Solare SRL*) and <u>C-26RM</u> (Orrick's Due Diligence Report dated 28 December 2010 on *Compagnia Solare 1 SRL*).

*annual report of GSE. I read that, which was in English and Italian. I can assure you reading it that nothing transpired about the willingness to change anything. Otherwise I would not have invested* […][938]

587.  The Tribunal has examined the translated excerpts from the GSE's Reports[939] submitted by the Claimant on which Mr Lévy has purportedly relied in his testimony. For example, the excerpt translated from the 2011 GSE Activities Report covering Energy Account IV expressly highlights "*a further decrease in the average tariff of 11% compared to plants incentivized*" by feed-in tariffs under Energy Account III.[940] In any event, a "prudent" investor was required to examine more than GSE Reports: a "prudent" investor was required to examine Italian PV laws and regulations, which suggest a clear trend toward incentives' reduction.

588.  Before Belenergia first invested in the SPVs *Casamassima Solare SRL*, *Compagnia Solare 1 SRL*, *Compagnia Solare 2 SRL*, *Compagnia Solare 3 SRL*, and *Puglia Energia SRL* on 29 September 2011,[941] Italy had already enacted the *Romani* Decree[942] on 3 March 2011. Article 23 of the *Romani* Decree included in its general principles the need for "*reduction of specific support burdens for consumers*," as well as "*the gradation of the action for the protection of investments made and the proportionality to the objectives*" "*tak*[ing] *into account the market mechanisms and the evolution of technologies of renewable sources and energetic efficienc*y."[943]

589.  Also before Belenergia's September 2011 investment, Ministerial Decree dated 5 May 2011[944] set up Energy Account IV for PV plants starting operation after 31 May 2011. The Preamble of this Ministerial Decree referred to the progressive reduction of tariffs in light of lower PV technology costs, stating that subsidies may no longer be necessary.[945]

---

[938] Tr. 26 March 2018, Counsel for Respondent &Mr Jacques Edouard Lévy, 153:22-155-10.

[939] *See* Exhibits C-13M, C-14M, C-1RM.

[940] *See* GSE, Incentivazione degli impianti fotovoltaici: Relazione delle attività 2011 (Exhibit C-13M), p. 10.

[941] Claimant's Power Point Presentation of 26 March 2018, Slide 18.

[942] Legislative Decree No. 28/2011 (Exhibit C-RFA-II-8; Hearing Bundle, vol. 2, Tab 11).

[943] Legislative Decree No. 28/2011 (Exhibit C-RFA-II-8; Hearing Bundle, vol. 2, Tab 11).

[944] Exhibit C-RFA-II-14.4 (Hearing Bundle, vol. 2, Tab 20).

[945] Exhibit C-RFA-II-14.4 (Hearing Bundle, vol. 2, Tab 20), Preamble: "*Ritenuto che l'incentivazione della produzione di energia elettrica da impianti solari fotovoltaici che entrano in esercizio successivamente al 31/05/2011 debba essere attuata tramite una progressiva diminuzione delle tariffe che, da un lato, miri ad un allineamento graduale dell'incentivo pubblico con i costi delle tecnologie, in Jinea con le politiche adottate nei principali Paesi europei e,*

Article 1 of the same Ministerial Decree set forth the indicative national target of 23,000MW, fixing a cap on cumulated annual incentives costs between € 6 billion to € 7 billion.

590. Annex 5 of the same Decree setting up Energy Account IV contained different tables with tariffs of decreasing value starting in 2011 up to 2016.  For example, the same PV plant, which was awarded 0,263 €/kWh as a feed-in tariff if it had come into operation in August 2011, would have received only 0,155 €/kWh if it had come into operation in August 2012, which represents a 41% incentive reduction within one year.  Further, Table 5 in the same Annex 5 included reductions ranging from 9% to 30% for start of operations between 2013 and 2016.  All Belenergia's SPVs *Casamassima Solare SRL*, *Compagnia Solare 1 SRL, Compagnia Solare 2 SRL, Compagnia Solare 3 SRL,* and *Puglia Energia SRL* acquired in September 2011 possessed plants starting operations between June and August 2011 and thus benefiting from Energy Account IV incentives.

591. Belenergia's second investment wave between April and July 2013 took place after Italy adopted the Ministerial Decree of 5 July 2012[946] establishing the last Energy Account V. The acquisition of *Società di Produzione Energia Solare SRL, Solaria Real Estate SRL, Acquaviva SRL,* and *Brindisi Solar SRL*[947] took place when Energy Account V was about to reach its cap.  Although it is true that the PV plants of these invested companies received tariffs under previous Energy Accounts (Energy Accounts I, II and IV), it is clear that

---

*dall'altro, mantenga stabilità e certezza sui mercato; Considerato che, in base all'evoluzione dei costi tecnologici, si prevede il raggiungimento entro pochi anni della cd. grid parity, ossia alla convenienza economica dell'elettricità fotovoltaica rispetto a quella prelevata o immessa in rete, perle installazioni più efficienti, condizione che fa ritenere non più necessario il mantenimento di uno schema di sostegno pubblico a decorrere dal raggiungimento di tale condizione; Ritenuto pertanto opportuno sviluppare la potenza elettrica cumulativa degli impianti fotovoltaici che possono ottenere le tariffe incentivanti, di cui all'art. 25, comma 10, del D.Lgs. n. 28 del 2011 secondo obiettivi temporali che assicurino una crescita graduale della potenza stessa negli anni, in modo da usufruire dei miglioramenti della tecnologia sotto il profilo dei costi e dell'efficienza, che diano prospettiva di crescita di lungo termine agli investitori e all'industria di settore, con un minore impatto della spesa annua aggiuntiva su prezzi e tariffe dell' energia elettrica; Considerato che, sulla base delle previgenti disposizioni di sostegno al fotovoltaico e dei dati sugli investimenti effettuati e in corso di realizzazione, I 'onere gravante sugli oneri di sistema del settore elettrico dovrebbe raggiungere, dal 2011, il valore di circa 3,5 miliardi di euro annui; Considerato opportuno adottare un metodo che colleghi l'andamento tariffario programmato e le eventuali ulteriori riduzioni all'andarnento della potenza installata, rispetto ad obiettivi fissati in termini programmatici; Ritenuto opportuno prevedere, a tutela degli investimenti in corso alla data di entrata in vigore del decreto, un regime transitorio, fino al 31/12/2012, nell'ambito di un contingente di potenza per i grandi impianti, per dare gradualità al processo di ridefinizione della disciplina vigente ed assicurare il controllo degli oneri conseguenti; […]"*

[946] <u>Exhibit C-RFA-II-14.5</u> (<u>Hearing Bundle, vol. 2, Tab 21</u>).

[947] Claimant's Power Point Presentation of 26 March 2018, Slide 19.

Belenergia invested at a very late stage when new incentives were subject to reduction and annual cost caps set by the Italian legislator were being reached. The Preamble of Ministerial Decree of 5 July 2012 on Energy Account V expressly indicated that by March 2012 the cumulated annual cost of PV incentives reached € 5.6 billion, close to the cost cap set forth in the previous Ministerial Decree on Energy Account IV. Article 1(5) of the same Decree capped at € 6.7 billion the cumulated annual cost of PV incentives, as follows:

> *This Decree shall cease to apply, in any case, after thirty calendar days from the date of the achievement of cumulative indicative cost equal to 6.7 billion of euro[s] each year. The date of the achievement of the aforementioned value of 6.7 billion of euro[s] each year shall be communicate[d], based on the elements provided by the GSE, [by] the Authority for the Electric Energy and Gas, with the procedures mentioned in Paragraph 2.*

592. Hence, the original annual cost cap stipulated between € 6 and 7 billion under Energy Account IV was reduced to a € 6.7 billion cap under Energy Account V. Just one year after its adoption, on 6 July 2013, Energy Account V reached its € 6.7 billion cost cap and thus stopped applying to new plants.[948]

593. Belenergia's third investment wave took place in December 2013 after Energy Account V ceased to apply to new plants, with Belenergia's acquisition of *Solar Solution Puglia SRL*[949] Although *Solar Solution Puglia SRL*'s plants were entitled to tariffs under Energy Account IV, the Tribunal highlights that this third and last wave of investment took place when no Energy Account could possibly apply to new plants.

594. The 6% to 8% reduction to feed-in tariffs adopted in the *Spalma Incentivi* Decree[950] of 24 June 2014 as amended by Conversion Law No. 116/2014 applying to all PV plants with a nominal power above 200KW is not surprising in light of Italy's previous significant reductions of incentives to new plants entering into operation before Belenergia first invested in Italy in September 2011. The Tribunal considers that a 6% to 8% reduction could not

---

[948] Althesys Report, ¶ 27.
[949] Claimant's Power Point Presentation of 26 March 2018, Slide 20.
[950] Exhibit C-RFA-II-11 (Hearing Bundle, vol. 2, Tab 14).

have breached Belenergia's legitimate expectations irrespective of the GSE Conventions on feed-in tariffs already concluded.

595.   The Tribunal acknowledges that the 20-year duration of incentives was founded on Italian legislation such as Article 12(2)[951] of Ministerial Decree of 5 July 2012 on Energy Account IV.  The Tribunal is also aware that reaching the annual cost cap under Energy Account V did not affect rights of PV plant owners acquired before the cap had been reached.[952] Nevertheless, the evolution of the Italian incentives scheme speaks against Belenergia's alleged expectations that Italy cannot legitimately apply a modest 6% to 8% reduction to a subsidy (feed-in tariff) paid in addition to the energy price applicable for 20 years of a PV plant's estimated life.

596.   The Tribunal also considers that a "prudent" investor would have taken into account other European PV incentives schemes.  Italian incentives were higher than in other European countries like France and Germany, although solar irradiation in Italy is higher than in Germany and France:[953]

---

[951] Exhibit C-RFA-II-14.4 (Hearing Bundle, vol. 2, Tab 20), Article 12(2): "*The incentive tariff is recognized for a period of twenty years starting from the date of the plant coming into operation and is constant in currency for the whole incentive period.*" In relation to Energy Accounts II and III, *see also* Ministerial Decree of 19 February 2007, Exhibit C-RFA-II-14.2 (Hearing Bundle, vol. 2, Tab 18), Article 6(1); Ministerial Decree of 6 August 2010, Exhibit C-RFA-II-14.3 (Hearing Bundle, vol. 2, Tab 19), Article 8(4).

[952] *See* Exhibit C-RFA-II-14.5 (Hearing Bundle, vol. 2, Tab 21), Article 20(1): "*Starting from the date indicated in Article 1, Paragraph 5, the present Decree and the dispositions of the previous incentives measures of the photovoltaic source that contributed to increase the cumulative costs reaches at the mentioned date, shall cease to apply.  The rights acquired up to the mentioned date are saved.*"

[953] GRIF's Power Point Presentation of 27 March 2018, Slide 9; First Witness Statement of Eng. Bacchiocchi, p. 9.



Figure: Historical change in the total remuneration for ground-mounted photovoltaic plants

597. As already pointed out in ¶ 586, Mr Lévy, Belenergia's CEO, declared at the Hearing that he considered that changes to Italian incentives were "*impossible*," in response to a question by Counsel for Respondent in relation to the 2010 changes to the Spanish regime.[954]   The Tribunal finds that this was not "prudent."

598. Contrary to the Claimant's suggestion, it is irrelevant that the GSE Conventions did not contain a *force majeure* or hardship clause because supervening circumstances justified by the public interest imply a legitimate limitation on the sanctity of contracts.

599. Neither does the Tribunal find it "prudent" that the investor did not expect that cumulating minimum prices and feed-in tariffs could be subject to later derogation by *Destinazione Italia* Decree.  The Claimant challenges the *Destinazione Italia* Decree fixing minimum prices at hourly zonal prices, derogating minimum prices of € 38.5/MWh for 2014, as updated in light of Istat data and limited to the first 1.5 million kWh annually withdrawn from PV plants, pursuant to AEEG Resolution No. 618/2013.[955]   The Tribunal considers,

---

[954] Tr. 26 March 2018, Avv. Giacomo Aiello & Mr Jacques Edouard Lévy, 153:22-154-5.
[955] Exhibit C-RFA-II-16 (Hearing Bundle, vol. 2, Tab 23).

however, that the average hourly zonal prices have often exceeded the former minimum prices of € 38.5/MWh (Istat-adjusted), as follows:[956]

**Average monthly market prices per time slot in Southern Italy in €/MWh for 2014**

|  | F1 | F2 | F3 |
|---|---|---|---|
| January | 57,39 | 60,30 | 42,73 |
| February | 46,56 | 54,42 | 34,65 |
| March | 24,08 | 46,15 | 30,05 |
| April | 21,29 | 49,05 | 30,36 |
| May | 24,73 | 50,03 | 37,08 |
| June | 33,41 | 47,67 | 37,27 |
| July | 38,78 | 44,39 | 37,47 |
| August | 35,69 | 47,38 | 38,89 |
| September | 47,69 | 55,66 | 42,98 |
| October | 49,85 | 57,49 | 45,12 |
| November | 57,68 | 57,55 | 40,54 |
| December | 65,10 | 67,80 | 47,52 |
| Average | 41,85 | 53,16 | 38,72 |

600.  Thus, the Tribunal cannot but agree with Italy that a "prudent" investor should have predicted Italy's reduction of feed-in tariffs and derogation of the possibility to combine two incentives (feed-in tariffs with minimum prices).

Substantive impropriety

601.  In relation to the Claimant's allegation of substantive impropriety of the *Spalma Incentivi* Decree, the Tribunal has taken into account the Parties' disagreement in relation to the estimates of solar irradiation allegedly relied on by Italy at the outset of the Energy Account scheme and the solar irradiation estimates allegedly considered by Belenergia at the time of investment.  The testimony of Mr Lévy confirms that Belenergia's

---

[956] GRIF's Power Point Presentation of 27 March 2018, Slide 26.

production predictions based on the PVSYST database[957] were accurate in relation to actual production of the invested plants, as follows:

> [Counsel for Claimant]*: And the* [production data] *predictions that you obtained before and after investment, have they been accurate or not accurate?*
>
> *MR LEVY: Yes, they have been accurate. In some circumstances some plants were worse than what we were expecting; others a bit better, but on average it's* […] *rather fair. It's a rather fair estimate. Which is kind of logical because we knew what we would have, and we had done also—I trust models but I also trust—I think here the same, what is done in the neighbouring plants before you invest. So I'm not surprised at 1 per cent less, 1 per cent more, we would do better or worse in different plants or it was about the same. There are years that are better. 2017 was an excellent year. 2016 was not a good year. 2015 was a good year. It seems to be that every two years is good, every two years is bad but on average, yes, it's about what we anticipated. On this particular aspect we were rather satisfied with our forecast.*[958]

602. Even if Belenergia relied on PVSYST solar irradiation estimates providing for production predictions closer to actual solar irradiation, solar irradiation has increased in Europe in the last years. The evidence shows that the Italian regulator might have underestimated solar irradiation and thus overestimated the subsidy enshrined in the feed-in tariffs. The testimony of Dr Boucher confirms that the PVGIS-3 database, relied on by Italy, was "*a very old database* […] *the best you had in the 1990s*" and that by the years 2000 this database "*was sort of reliable in some sense, but there were other databases that were probably as reliable and which could be looked at.*"[959] His testimony also confirms that the PVGIS database was "*developed by the* [European Commission Joint Research Centre (JRC)] *to support policy of the European Union in terms of solar energy.*"[960]

603. The testimony of Italy's experts attested that the Italian legislator relied on the PVGIS-3 database and later on PVGIS-CMSAF database. A simple calculation of the difference between PVGIS-3 and PVGIS-CMSAF shows an 8.7% production prediction

---

[957] *See* clarification by Dr Juan Camilo Rodriguez that Belenergia relied on the PVSYST database and not on the PVGIS database: Tr. 28 March 2018, Dr Rodriguez, 441:10.

[958] Tr. 26 March 2018, Counsel for Claimant & Mr Jacques Edouard Lévy, 132:18-133:12.

[959] Tr. 27 March 2018, Dr Olivier Boucher, 375:7-12.

[960] Tr. 27 March 2018, Dr Olivier Boucher, 377:7-10.

underestimation.[961]   According to Eng. Quaglione (GRIF), Italy adopted the conservative estimates of the PVGIS-3 database thus overestimating the subsidy, although Italy has in average higher irradiation levels than other European countries:

> As you can see, the Italian tariffs are quite a bit higher than the other tariffs, notwithstanding of course the quantity of electricity produced in Italy is probably higher than the quantity of electricity produced in Germany since the solar irradiation is, of course, higher in Italy.  So this means that Italy has adopted an approach which is very conservative.
>
> Notwithstanding the higher level of solar irradiation compared to other countries Italy has chosen to set very high incentive tariffs which, multiplied by a very high quantity of electricity produced, they sum up to a very high revenue incentive given to the firms.
>
> Why has this happened? Because Italy has relied on the (very well known now) PVGIS database, which is a database, as we know, issued by the Joint Research Centre and has been conceived in order to support the policy intervention in Europe about energy sources and energy policies, of course.
>
> As you may see in bold in the middle point, "The JRC is a Directorate-General of the European Commission under the responsibility of Tibor Navracsics, Commissioner for Education [and so on]. It is spread across six sites in five different countries within the EU". [Slide 10]
>
> So the PVGIS is an independent third-party database which is characterised by the fact that solar irradiation measurements included in the first version of the database were particularly conservative, let's say.[962]

**604.** The Tribunal finds that underestimated production predictions could justify a subsidy reduction of 6% to 8% like the one of the *Spalma Incentivi* Decree.[963]   In any event, the Claimant's PV plants actual production levels of 32,861,143 kWh exceed by 171,830 kWh Italy's production data of 32,689,313 kWh founded on the newer, more precise PVGIS-

---

[961] GRIF's Power Point Presentation of 27 March 2018, Slide 16: If total production prediction pursuant to PVGIS-3 is 30,071,851 kWh, total production prediction of 32,689,313 kWh pursuant to PVGIS-CMSAF is 8.7% higher (equivalent to the difference of 2,617,462  kWh between these two databases).
[962] Tr. 28 March 2018, Mr Davide Quaglione (GRIF), 449:15-450:21.
[963] GRIF's Power Point Presentation of 27 March 2018, Slides 16-18.

CMSAF database.[964]   Hence, Belenergia could not have legitimately expected that overestimated subsidies funded by Italy's taxpayers could remain intact for 20 years because Italy's original incentives had been based on underestimated energy production predictions. Whether Belenergia was aware that Italy relied on an old prediction database when fixing feed-in tariffs is irrelevant.

605.   Moreover, the Tribunal rejects Belenergia's argument that the 6-8% reduction in feed-in tariffs has not benefited SMEs.  First of all, Belenergia has not adduced convincing evidence in this respect.  And, in any event, other reasons for feed-in tariffs' reduction such as underestimated production predictions, lower PV technology costs and burdens on Italian tax payers and electricity consumers suffice for the Tribunal to consider the *Spalma Incentivi* Decree as reasonable, justifiable and proportionate.

606.   Therefore, the Tribunal rejects Belenergia's allegation of substantive impropriety of reducing feed-in tariffs because this change was reasonable, justifiable and proportionate to Italy's policies in the PV sector.

Procedural impropriety

607.   Belenergia argues that Italy's adoption of the *Spalma Incentivi* Decree did not observe legislative processes, breaching transparency and due process requirements, and, in particular, failing to comply with *(a)* the Directive of the President of the Council of Ministers of 16 January 2013[965] establishing the rules on the Regulatory Impact Analysis ("*Analisi di impatto della regolamentazione*" or RIA) and *(b)* the Directive of the President of the Council of Ministers of 10 September 2008[966] setting forth the rules on the Technical Regulatory Analysis ("*Analisi tecnico-normativa*" or TRA).

608.   The Tribunal is not convinced that this is the case.  The Claimant has introduced a report (Exhibit C-10RM) dated of 11 July 2014 and issued by the Legal and Legislative Affairs Department of the Presidency of the Council of Ministers, which contains the RIA and the

---

[964] GRIF's Power Point Presentation of 27 March 2018, Slide 16.  *See also* First GRIF Report, pp. 35-36 (Table 2. Production values of the Belenergia SA plants. Comparison between the PVGIS-3 and PVGIS-CMSAF estimates and the actual production levels).

[965] Directive of the President of the Council of Ministers of 16 January 2013 (Exhibit C-6RM).

[966] Directive of the President of the Council of Ministers of 10 September 2008 (Exhibit C-9RM).

TRA concerning the bill of conversion into law of the *Spalma Incentivi* Decree of 24 June 2014.  This report is dated of one month before the enactment of Conversion Law No. 116 on 11 August 2014.  The Claimant has not presented sufficient evidence that the RIA and the TRA contained in this report do not satisfy the formalities under Italian law.  The Claimant has alleged that the document "*contains nothing on the TRA*"[967] but did not translate the section that covers the TRA in the document, except for the section's title.[968]

609. The Tribunal further considers that the standard for a finding of procedural impropriety is a high one under the FET.  Belenergia has not adduced evidence showing a serious due process breach in Italy's legislative process that could justify an FET breach under the ECT.

610. Finally, the Tribunal differs with Belenergia that the feed-in tariffs' reduction contained in the *Spalma Incentivi* Decree "*came out of nowhere.*"  The Tribunal's regulatory and legislative review of Italian law above shows that PV investors should have expected reductions in PV incentives in light of previous reductions.

611. Based on the foregoing, the Tribunal dismisses Belenergia's FET claim under Article 10(1) ECT.

### (2) Has Italy Breached the Umbrella Clause under Article 10(1) ECT?

612. As the Tribunal has held in ¶¶ 352-358 above that it has jurisdiction over the umbrella clause claim and that it is admissible, the Tribunal will now decide on whether Italy breached the umbrella clause under Article 10(1) ECT, on which the Parties disagree.

613. Irrespective of the "contractual" character of the GSE Conventions, the Claimant argues that they constitute commitments undertaken by Italy falling within the meaning of the umbrella clause under Article 10(1) ECT.  The Respondent disagrees.

---

[967] Claimant's Reply, ¶ 304.

[968] *See* Report dated 11 July 2014 of the Legal and Legislative Affairs Department of the Presidency of the Council of Ministers with the RIA and the TRA concerning the bill of conversion into law of the Spalma Incentivi Decree of 24 June 2014 (Exhibit C-10RM), p. 2 of TRA (p. 48 of the pdf): "*Il provvedimento normative, in tema di sviluppo economico, reca interventi orientati prioritariamente alle piccole e medie imprese, prevedendo in particolare incentivi fiscali agli investimenti produttivi, interventi relativi alia capitalizzazione d'azienda e alia riduzione di alcune componenti delle tariffe elettriche.  La crescita economica e infatti un obiettivo prioritario per il Governo anche in relazione all'esigenza di rilanciare la competitività delle imprese italiane nel mercato nazionale e interazionale e accompagnare il superamento della congiuntura economica negativa degli ultimi anni.*"

614.    Article 10(1) ECT provides in its last sentence that "[e]*ach Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.*"  Pursuant to this provision, Belenergia has to demonstrate that Italy has breached an obligation "*entered into with*" Belenergia.

615.    As stated in ¶¶ 579-580 above, the Tribunal cannot agree with the Claimant that the GSE Conventions on feed-in tariffs contained specific commitments addressed specifically to or entered into with Belenergia because the feed-in tariffs were firstly communicated to each of its SPVs by a GSE letter, which was later automatically included in the GSE Conventions.[969]  The feed-in tariff's amount and duration included in the GSE Conventions were set forth in Italian legislation and were not personally addressed to Belenergia, but replicated from the relevant legislation including the successive Energy Account Ministerial Decrees that automatically applied to Belenergia's PV plants depending on their date of start of operations as they equally applied to any other PV plants satisfying the pre-requisites for this subsidy.  This means that Belenergia could have invested in PV plants (as it did) even before obtaining the GSE Convention.[970]

616.    Neither did the GSE Conventions on minimum prices contain specific commitments specifically addressed to or entered into with Belenergia.  As stated in ¶¶ 581-582 above, the GSE Conventions on minimum prices also replicated minimum prices set forth in Italian legislation, subject to a yearly duration pursuant to their Article 13[971] and to "*subsequent modifications and integrations*" under Article 4 of each GSE Convention on minimum prices.[972]  Not to mention that Article 16 of the same Conventions foresaw future amendments in light of "*potential changes and updates*" to AEEG Resolution No. 280/07.[973]

---

[969] *See* Tr. 26 March 2018, Mr Jacques Edouard Lévy, 172:2-17.

[970] *See* in relation to Belenergia's investment in *Casamassima Solare SRL*: Tr. 26 March 2018, Mr Jacques Edouard Lévy, 174:1-6.

[971] S*ee* Exhibit C-26M (Hearing Bundle, vol. 3, Tab 22), Article 13. "[...] *The Parties agree to tacitly renovate this Agreement yearly, registered letter with receipt, except in case of termination to be communicated by the Producer, to the GSE, with a registered letter with at least 60 days in advance in respect to the termination.*"

[972] S*ee* Exhibit C-26M (Hearing Bundle, vol. 3, Tab 22), Article 4.

[973] S*ee* Exhibit C-26M (Hearing Bundle, vol. 3, Tab 22), Article 16, in the original: "*Il GSE si riserva di modificare le clausole della presente Convenzione in conformità alle eventuali modifiche ed aggiornamenti apportati alla delibera AEEG 280/07, ferma restando la possibilità per il Produttore di recedere dal presente rapporto contrattuale in conformità a quanto previsto dal precedente Articolo 14.*"

617. Moreover, as stated by the *Isolux* tribunal, a regulation equally addressed to national and foreign investors cannot, because of its general character, create obligations only in relation to national investors, as follows:

> *The Arbitral Tribunal accepts that, in special cases, the laws and administrative acts may contain commitments, in particular when they are specifically addressed to foreign investors, as indicated in the award in* Liman Caspian Oil BV and NCL Dutch Investment BV v. Kazakhstan. *The obligation to arbitrate provided in various investments codes is a typical example. Yet, a rule addressing national and foreign investors cannot, because of its general character, create only obligations only* vis-à-vis *the former, including when they are investors of a Contracting Party.*[974]

618. The Italian legal and regulatory framework before the *Spalma Incentivi* Decree and the *Destinazione Italia* Decree was clearly addressed to national and foreign investors and thus could not be interpreted as creating obligations specifically "*entered into with*" Belenergia.

619. Based on the foregoing, the Tribunal dismisses Belenergia's umbrella clause claim under Article 10(1) ECT.

### (3) Has Italy Breached the Most Constant Protection and Security Obligation under Article 10(1) ECT?

620. The Parties disagree on whether the obligation of most constant protection and security under Article 10(1) ECT extends beyond a mere obligation to provide "*physical*" protection and security, including stability, physical, commercial and legal security, and legal protection.[975]

621. Article 10(1) ECT provides that Investments of Investors of other Contracting Parties "*shall also enjoy the most constant protection and security*." While the Tribunal agrees with the Claimant that this standard may extend beyond the protection of physical security in certain situations, the Tribunal does not find that this standard could protect investments against the State's right to legislate or regulate in a manner that negatively affects them. The *AES Summit v. Hungary* tribunal also found that the most constant protection and security under the ECT does not protect against the State's legislative and regulatory activity:

---

[974] *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain,* SCC Case No. V2013/153, Award (12 July 2016) (Exhibit C-6RM), ¶ 771.

[975] *See* Statement of Claim, ¶ 156; Statement of Defense, ¶ 584.

> *In the Tribunal's view, the duty to provide most constant protection and security to investments is a state's obligation to take reasonable steps to protect its investors (or to enable its investors to protect themselves) against harassment by third parties and/or state actors. But the standard is certainly not one of strict liability. And while it can, in appropriate circumstances, extend beyond a protection of physical security it certainly does not protect against a state's right (as was the case here) to legislate or regulate in a manner which may negatively affect a claimant's investment, provided that the state acts reasonably in the circumstances and with a view to achieving objectively rational public policy goals.[976]*

622. Italy's legislative activity by way of the *Spalma Incentivi* Decree and the *Destinazione Italia* Decree cannot qualify as a breach of the obligation of most constant protection and security under Article 10(1) ECT even if it negatively affects national and other foreign investments such as Belenergia's.

623. Based on the foregoing, the Tribunal dismisses Belenergia's most constant protection and security claim under Article 10(1) ECT.

### (4) Has Italy Breached the Provisions Prohibiting Unreasonable and Discriminatory Measures under Articles 10(1), (2) and (3) ECT?

624. The Claimant argues that Italy breached its obligation not to impair Belenergia's investment by unreasonable and discriminatory measures under Article 10(1) ECT and not to discriminate against Belenergia pursuant to Article 10(2) and (3) ECT. Italy objects to the Claimant's position, arguing, among others, that the claim on unreasonable and discriminatory measures overlaps with the FET claim, and that Article 10(2) and (3) ECT only apply to the "Making of Investments" as defined in Article 1(8) ECT.

625. Article 10(1), (2) and (3) of the ECT provide, in the relevant part, as follows:

> *(1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments [of*

---

[976] *AES Summit Generation Limited et al. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award (23 September 2010) (Exhibit RLA-21), ¶ 13.3.2. *See also Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award (12 July 2016) (Exhibit C-6RM), ¶ 817.

Investors of other Contracting Parties] *shall also enjoy the most constant protection and security <u>and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal</u>. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.* […]

*(2) Each Contracting Party shall endeavour to accord to Investors of other Contracting Parties, as regards the Making of Investments in its Area, the <u>Treatment</u> described in paragraph (3).*

*(3) For the purposes of this Article, "<u>Treatment" means treatment accorded by a Contracting Party which is no less favourable than that which it accords to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable</u>.* (emphases added)

626.  The Tribunal will first consider Italy's objection to the application of Article 10(2) and (3) ECT. The Tribunal agrees with Italy that an interpretation in light of the ordinary meaning of these treaty provisions indicates that they concern only the "Making of Investments." <u>First</u>, the use of the expression "Treatment" is capitalized in paragraph (2) but not in paragraph (1), which indicates that the definition of "Treatment" as capitalised in paragraph (3) should be limited to "Treatment" related to the "Making of Investments," referred to in paragraph (2) of Article 10 ECT.

627.  <u>Second</u>, Article 1(8) ECT defines the "Making of Investments" as establishing or acquiring new or additional investments, as follows:

*(8) "Make Investments" or "Making of Investments" means establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity.*

628.  Belenergia has not satisfied its burden of proving that the alleged discriminatory character of the measures affect the establishment or acquisition of new or additional investments in the PV sector. Therefore, Belenergia's claim under Article 10(2) and (3) ECT cannot stand.

629.  The Tribunal now turns to the claim based on the prohibition of unreasonable and discriminatory measures under Article 10(1) ECT in relation to existing investments.

630.  <u>First</u>, the Tribunal has already stated in ¶¶ 602-610 above that the changes to Italy's regulatory and legislative framework were neither unreasonable nor disproportionate, let

alone unpredictable. As to Belenergia's argument that Italy's measures lack public interest goals such as environment or public health protection, and a "*rational policy,*"[977] it suffices for the Tribunal that the true purpose of the measures was to reduce the cost of subsidies.

631. <u>Second</u>, Belenergia's position that the regulatory differentiation linking the reduction of feed-in tariffs to the nominal capacity of PV plants discriminates against medium and big PV plants (like those of Belenergia and of major foreign investors)[978] cannot prevail. Italy's differentiation between smaller plants, on the one hand, and medium and big power plants with nominal capacity in excess of 200kW, on the other, is not discriminatory because it is based on objective and legitimate grounds. This differentiated treatment is by no means based on the national or foreign origin of producers, but on their capacity, size, economic and commercial dimension. Thus, differentiated treatment based on legitimate grounds leading to special protection of smaller plants is easily justifiable so far as it seeks to guarantee free competition in the energy sector.

632. Likewise, differentiated scales applying to minimum prices based on production capacity is objectively justified because production capacity affects the calculation of operational costs, an objective base for the estimation of minimum prices. Moreover, the Claimant has not argued or demonstrated that such an objective differentiated treatment could lead to a subjective differentiated treatment and thus to concealed discrimination.

633. <u>Third</u>, Article 22bis of Law No. 164/2014[979] of 11 November 2014 excludes from the application of Article 26 of Conversion Law No. 116/2014[980] certain Italian public entities and schools ("*enti locali o scuole*") operating in the PV sector. Belenergia argues that this legislation is discriminatory as these entities are competitors *vis-à-vis* Belenergia.[981] The Tribunal does not see how these entities could qualify as "competitors" to Belenergia, since they are not profit-making enterprises, and Belenergia has failed to demonstrate this.

---

[977] Statement of Claim, ¶¶ 150, 152.
[978] Statement of Claim, ¶ 161.
[979] <u>Exhibit C-RFA-II-13</u> (Hearing Bundle, vol. 2, Tab 16).
[980] <u>Exhibit C-RFA-II-12</u> (Hearing Bundle, vol. 2, Tab 15).
[981] Statement of Claim, ¶ 161.

Differentiated treatment based on the special characteristics of these entities is easily justified in the energy sector's regulation.

634. Based on the foregoing, the Tribunal dismisses Belenergia's claim on unreasonable and discriminatory measures under Articles 10(1), (2) and (3) ECT.

* * *

635. Summing up, the Tribunal dismisses all Belenergia's claims on the merits, finding that Italy has not breached *(1)* the FET obligation under Article 10(1) ECT; *(2)* the umbrella clause under Article 10(1) ECT; *(3)* the most constant protection and security obligation under Article 10(1) ECT; let alone *(4)* the provisions prohibiting unreasonable and discriminatory measures under Articles 10(1), (2) and (3) ECT.  Consequently, no damages have to be assessed.

## VII.    COSTS

### A.  __The Claimant's Position__

636. The Claimant requests that the Tribunal orders Italy to pay for *(i)* fees and expenses of the Tribunal; *(ii)* charges and expenses of the Centre; and *(iii)* Belenergia's technical and legal expenses incurred in the proceedings,[982] based on Articles 59 to 61 ICSID Convention and Rule 28(1) ICSID Arbitration Rules.  It also claims interest on arbitration costs, compounded quarterly, from the date of the award until payment.[983]

---

[982] Statement of Claim, ¶ 218.
[983] Statement of Claim, ¶¶ 220-221, citing *SD Myers v. Canada* (Exhibit CL-84M, ¶ 50).

**637.** In its Statement of Costs,[984] the Claimant outlines the total arbitration costs incurred by Claimants totalling € 1,954,689.86, broken down as follows:

| | |
|---|---|
| Claimant's legal fees | € 1,250,000.00 |
| Expert and witness fees | € 276,781.80 |
| Translation fees | € 33,366.70 |
| Disbursements | € 76,946.64 |
| **Subtotal** | **€ 1,637,095.14** |
| Claimant's advanced payments made to ICSID | € 317,594.72[985] |
| **Total** | **€ 1,954,689.86** |

**638.** The Claimant "*reserves the right to seek additional costs subsequent to the filing of this Statement of Costs*" and submits that the Claimant should not bear Italy's arbitration or legal representation costs.[986]

---

[984] Claimant's Statement of Costs of 8 June 2018.

[985] This amount in Euros is equivalent to US$ 349,960.00, pursuant to the Secretariat's Interim Financial Statement dated 10 July 2019.

[986] Claimant's Statement of Costs of 8 June 2018.

### B.  The Respondent's Position

**639.** Italy claims that the Tribunal order Belenergia "*to pay all relevant expenses and disbursements*" incurred by Italy in the arbitration pursuant to the ICSID Arbitration Rules.[987]

**640.** In its Statement of Costs,[988] the Respondent outlines the costs and expenses of these proceedings totalling € 361,603.00, and the advance on costs of US$ 100,000, broken down as follows:

| | |
|---|---|
| Respondent's representation costs (*Compenso tabellare*) | € 309,220.00 |
| General expenses (*Spese generali 15% sul compenso totale*) | € 46,383.00 |
| Costs of attending the Hearing | € 6,000.00 |
| **Subtotal** | **€ 361,603.00** |
| Respondent's advanced payments made to ICSID | **US$ 100,000.00**[989] |

### C.  The Tribunal's Decision

**641.** Article 61(2) of the ICSID Convention addresses assessment and allocation of the costs of an ICSID arbitration, as follows:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

**642.** Article 61(2) refers to three arbitration cost components: expenses incurred by the parties, fees and expenses of the Tribunal members, and ICSID's own charges.  The same provision also provides for the Tribunal's wide discretion to allocate the arbitration costs between the Parties as it deems appropriate.

---

[987] Statement of Defense, ¶ 649(m); Respondent's Rejoinder, ¶ 415(m).

[988] Respondent's Statement of Costs of 22 June 2018.

[989] Pursuant to the Secretariat's Interim Financial Statement dated 10 July 2019, the accurate amount deposited by Italy as advance payments is US$ 343,876.83.

**643.** Rule 28(2) of the ICSID's Rules of Procedure for Arbitration Proceedings then provides:

> *Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding.*

**644.** As required by Rule 28(2), the Parties submitted statements of their claimed costs in June 2018. In its cost submission, the Claimant sought a total of € 1,954,689.86 in respect of legal, translation, witness and experts' fees and disbursements and payments to ICSID. For its corresponding expenses, the Respondent sought € 361,603.00 in legal fees and disbursements plus US$ 100,000.00 in payments to ICSID. The Secretariat's Interim Financial Statement dated 10 July 2019 circulated to the Tribunal states that the Claimant had advanced US$ 349,960.00 and the Respondent US$ 343,876.83, in total.

**645.** The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in US$):[990]

| Arbitrators' fees and expenses | |
| --- | --- |
| Yves Derains (President) | US$ 176,681.25 |
| Bernard Hanotiau (Co-arbitrator) | US$ 81,414.80 |
| José Carlos Fernández Rozas (Co-arbitrator) | US$ 136,681.15 |
| ICSID's administrative fees | US$ 148,000 |
| Direct expenses (estimated)[991] | US$ 109,476.90 |
| **Total** | US$ 652,254.10 |

---

[990] The ICSID Secretariat will provide the Parties with a detailed Financial Statement of the case account once all invoices are received and the account is final.

[991] This amount includes estimated charges relating to the dispatch of this Award (courier, printing and copying).

**646.** The above costs have been paid out of the advances made by the Parties in equal parts.[992] As a result, each Party's share of the costs of arbitration amounts to US$ 326,127.05.

**647.** The Tribunal is mindful that some ICSID tribunals have adopted the practice of awarding to the prevailing party some or all of its costs.  However, in the circumstances of this case, the Tribunal finds that it is appropriate for each Party to bear its own costs.  This arbitration involved a number of challenging procedural and legal issues, which both Parties addressed with professional advocacy.  While the Claimant has mostly prevailed on jurisdiction and admissibility, the Tribunal has dismissed all of its claims on the merits.  Accordingly, the Tribunal concludes that it is fair for each Party to bear its own legal and other expenses and its respective equal share of "*the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre*."

## VIII.  AWARD

**648.** For the reasons set forth above, the Tribunal decides as follows:

(i)  DECLARES that it has jurisdiction over Belenergia's claims except for its claim regarding imbalance costs and that Belenergia's claims are admissible;

(ii) DECLINES jurisdiction over Belenergia's imbalance costs claim;

(iii)DISMISSES Belenergia's claims on the alleged breaches of Articles 10(1), (2) and (3) of the ECT;

(iv)ORDERS the Parties to bear the arbitration costs in equal shares;

(v) ORDERS each Party to bear their own legal costs and expenses;

(vi)DISMISSES all other claims brought by the Parties in this arbitration.

---

[992] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

_____
Professor Bernard Hanotiau
Arbitrator

Date: 17/07/2019

_____
Professor José Carlos Fernández Rozas
Arbitrator

Date: 17/07/2019

_____
Mr. Yves Derains
President of the Tribunal

Date: 17/07/2019