**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**OperaFund Eco-Invest SICAV PLC and Schwab Holding AG**

**v.**

**Kingdom of Spain**

**(ICSID Case No. ARB/15/36)**

---

# AWARD

---

*Members of the Tribunal*
Professor Dr. Karl-Heinz Böckstiegel, President of the Tribunal
Prof. MMag. Dr. August Reinisch, LL.M., Arbitrator
Prof. Philippe Sands, Q.C., Arbitrator

*Secretary of the Tribunal*
Mr. Francisco Grob, ICSID

*Assistant to the Tribunal*
Dr. Katherine Simpson

**Date of dispatch to the Parties: 6 September 2019**

**REPRESENTATION OF THE PARTIES**

**OPERAFUND ECO-INVEST SICAV PLC AND
SCHWAB HOLDING AG:**

Mr. Alberto Fortún Costea
Mr. Luis Pérez de Ayala
Professor Miguel Gómez Jene
Ms. María Isabel Rodríguez Vargas (no longer with
Cuatrecasas)
Mr. Antonio Delgado Camprubí
Dr. José Ángel Rueda García
Mr. Antonio María Hierro
Mr. José Ángel Sánchez Villegas
Ms. Adriana González García
Mr. Borja Álvarez Sanz

Cuatrecasas, Gonçalves Pereira
Almagro, 9
28010 Madrid
Spain

**KINGDOM OF SPAIN:**

Mr. José Manuel Gutiérrez Delgado
Ms. Amaia Rivas Kortázar
Mr. Antolín Fernández Antuña
Ms. María José Ruiz Sánchez
Ms. Patricia Fröhlingsdorf Nicolás
Mr. Diego Santacruz Descartín
Ms. Mónica Moraleda Saceda
Mr. Pablo Elena Abad
Ms. Elena Oñoro Sáinz
Mr. Alberto Torró Molés
Mr. Rafael Gil Nievas

Abogacía General del Estado
Ministry of Justice of the Government of Spain
Calle Ayala 5
28001, Madrid
Spain

I

**Table of Contents**

REPRESENTATION OF THE PARTIES .................................................................. I

FREQUENTLY USED ABBREVIATIONS AND ACRONYMS ........................ VI

I.    INTRODUCTION .................................................................................... 1

    A.    THE DISPUTE AND THE PARTIES ................................................. 1

    B.    THE TRIBUNAL'S TERMINOLOGY AND REASONING .............. 1

II.   THE ARBITRAL TRIBUNAL ............................................................... 2

III.  PROCEDURAL HISTORY ..................................................................... 3

IV.   THE PARTIES' REQUESTS ................................................................ 17

    A.    CLAIMANTS' REQUESTS ............................................................. 17

    B.    RESPONDENT'S REQUESTS ........................................................ 19

V.    STATEMENT OF FACTS ..................................................................... 20

VI.   APPLICABLE LAW .............................................................................. 70

    A.    THE ROLE OF EU LAW AS "APPLICABLE LAW" .................. 70

        1.    Arguments by Claimants ......................................................... 70

        2.    Arguments by Respondent ....................................................... 76

        3.    Statements by the European Commission ................................ 80

        4.    The Tribunal ........................................................................... 83

VII.  JURISDICTION OF THE TRIBUNAL ............................................... 85

    A.    JURISDICTIONAL OBJECTION 1:  THE INTRA-EU OBJECTIONS / WHETHER RESPONDENT HAS CONSENTED TO THE ARBITRATION OF INTRA-EU DISPUTES .................................... 86

        1.    Respondent's Arguments ......................................................... 86

        2.    Claimants' Arguments ............................................................. 94

        3.    The European Commission ..................................................... 102

        4.    The Tribunal ......................................................................... 106

    B.    JURISDICTIONAL OBJECTION 2:  WHETHER TRIBUNAL HAS JURISDICTION OVER MATTERS CONCERNING TVPEE .......... 110

        1.    Whether the TVPEE is a bona fide Tax ................................ 110

            a.    Respondent's Arguments ............................................... 110

            b.    Claimants' Arguments ................................................... 114

            c.    The Tribunal .................................................................. 117

        2.    Alternatively, Whether Protection Standards Apply to TVPEE via the MFN Principle .......................................................... 119

            a.    Claimants' Arguments ................................................... 119

            b.    Respondent's Arguments ............................................... 121

    c. The Tribunal ........................................................................123

VIII. THE MERITS .........................................................................124

  A. SCOPE OF "TREATMENT" OBLIGATIONS UNDER ARTICLE 10(1) OF THE ECT ...........124

    1. Claimants' Arguments ................................................124

    2. Respondent's Arguments ............................................127

    3. The Tribunal ...............................................................128

  B. FET .........................................................................................130

    1. Legitimate Expectations .............................................130

      a. Claimants' Arguments ......................................130

      b. Respondent's Arguments ...................................141

      c. European Commission .......................................155

      d. The Tribunal ......................................................156

      e. The Majority's Comment on Prof. Sands' Dissent .................160

    2. Breach Regarding Stable Conditions .........................162

      a. Claimants' Arguments ......................................162

      b. Respondent's Arguments ...................................166

      c. The Tribunal ......................................................170

    3. Transparency and Due Process ..................................172

      a. Claimants' Arguments ......................................172

      b. Respondent's Arguments ...................................177

      c. The Tribunal ......................................................178

    4. Proportionality ...........................................................179

      a. Claimants' Arguments ......................................179

      b. Respondent's Arguments ...................................184

      c. The Tribunal ......................................................194

  C. UMBRELLA CLAUSE ..............................................................195

    1. Claimants' Arguments ................................................195

    2. Respondent's Arguments ............................................201

    3. The Tribunal ...............................................................203

  D. MOST CONSTANT PROTECTION AND SECURITY ("MCPS") ........204

    1. Claimants' Arguments ................................................204

    2. Respondent's Arguments ............................................206

    3. The Tribunal ...............................................................207

  E. IMPAIRMENT BY UDM / NON-IMPAIRMENT CLAUSE ...............208

III

1. Claimants' Arguments ................................................................208

2. Respondent's Arguments ..........................................................212

3. The Tribunal ............................................................................214

F. CLAIMANTS' ALTERNATIVE CLAIM ......................................................214

1. Claimants' Arguments ................................................................214

2. Respondent's Arguments ..........................................................216

3. The Tribunal ............................................................................218

IX. DAMAGES ................................................................................................219

A. LEGAL STANDARD AND BURDEN OF PROOF ........................................219

1. Claimants' Arguments ................................................................219

2. Respondent's Arguments ..........................................................220

3. The Tribunal ............................................................................221

B. APPROPRIATENESS OF DCF VALUATION VS. ABV VALUATION ..................221

1. Claimants' Arguments ................................................................221

2. Respondent's Arguments ..........................................................224

3. The Tribunal ............................................................................226

C. APPLICATION OF THE DCF METHOD....................................................226

1. Summary Remarks ....................................................................226

a. Claimants' Arguments ................................................226

b. Respondent's Arguments ............................................230

2. The Valuation Date ..................................................................233

a. Claimants' Arguments ................................................233

b. Respondent's Arguments ............................................233

3. Life of Plant ............................................................................234

a. Claimants' Arguments ................................................234

b. Respondent's Arguments ............................................237

4. Accounting for Risk and Liquidity in the But-For Scenario ..................238

a. Claimants' Arguments ................................................238

b. Respondent's Arguments ............................................239

5. Stand-Alone Impact of Disputed Measures ..................................242

a. Claimants' Remarks ....................................................242

b. Respondent's Arguments ............................................245

6. The Tribunal's Considerations and Conclusions regarding the Calculation of Damages ..................................................................248

D.   ALTERNATIVE VALUATION BY BRATTLE.................................................251

   1.  Claimants' Arguments ...............................................251

   2.  Respondent's Arguments ...........................................252

   3.  The Tribunal ...........................................................253

E.   TAX GROSS UP ..................................................................253

   1.  Claimants' Arguments ...............................................253

   2.  Respondent's Arguments ...........................................255

   3.  The Tribunal ...........................................................257

F.   INTEREST ........................................................................257

   1.  Claimants' Arguments ...............................................257

   2.  Respondent's Arguments ...........................................259

   3.  The Tribunal ...........................................................261

XII.  COSTS ..............................................................................262

A.   CLAIMANTS' ARGUMENTS .................................................262

B.   RESPONDENT'S ARGUMENTS .............................................268

C.   THE TRIBUNAL ...............................................................270

XIII. DECISIONS .........................................................................272

## FREQUENTLY USED ABBREVIATIONS AND ACRONYMS

| Short Form | Long Title |
|---|---|
| § / §§ | paragraph / paragraphs |
| ABV | Asset Based Valuation |
| Act 2/2011 | Act 2/2011, of 4 March, on Sustainable Economy [C-0115] / [R-0045] |
| Act 3/2013 | Act 3/2013, of 4 June, on the creation of the CNMC, BOE, 5 June 2013 [C-0043] / [R-0046] |
| Act 14/2000 | Act 14/2000, of 29 December, on fiscal, administrative and social order measures [C-0062] |
| Act 15/2012 | Act 15/2012, of 27 December, on Fiscal Measures for Energetic Sustainability [C-0112] / [R-0003] |
| Act 17/2007 | Act 17/2007, of 4 July 2007, modifying Act 54/1997 for adaptation thereof in accordance with the provisions of Directive 2003/54/EC, of the European Parliament and of the Council, of 26 June 2003, concerning common rules for the internal market in electricity [C-0299] |
| Act 17/2012 | Act 17/2012, of 27 December, on the General State Budgets for 2013, Fifth Additional Provision [R-0023] / [R-0246] |
| Act 19/2013 | Act 19/2013, of 9 December, of transparency, access to public information and good governance, BOE, 10 December 2013 [C-0152] |
| Act 24/2013 | Act 24/2013, of 26 December, on the Electric Power Sector [C-0116] / [R-0047] (also referred to as "EPA 2013" in pleadings) |
| Act 40/1994 | Act 40/1994, of 30 December, on the Organization of the National Electric System [C-0053] / [R-0037] |
| Act 47/2003 | Act 47/2003, of 26 November, on General Budgets [R-0024] |
| Act 54/1997 | Act 54/1997, of 27 November, on the Electricity Sector ("Electrical Power Act") [C-0055bis] / [R-0059] (also referred to as "EPA 1997" and "LSE 1997" in pleadings) |
| Act 58/2003 | Act 58/2003, of 17 December, on General Taxation [R-0006] |
| AEE | Asociación Empresarial Eólica |
| APPA | Association of Renewable Energy Producers |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings of 10 April 2006 |
| ASIF | Photovoltaic Industry Association |
| BCG | Boston Consulting Group |
| BIT | Bilateral Investment Treaty |
| C.Costs-I | Claimants' Statement of Costs (18 October 2018) |
| C.Costs-II | Claimants' Reply Submission on Costs (25 October 2018) |
| C-# | Claimants' Exhibit |
| C-I | Claimants' Memorial on the Merits (27 October 2016) |
| C-II | Claimants' Counter-Memorial on Jurisdictional Objections (30 November 2017) |
| C-III | Claimants' Reply on the Merits (Corrected Version) (19 December 2017) |
| C-IV | Claimants' Rejoinder on Jurisdiction (27 April 2018) |

| | |
|---|---|
| CER-# | Claimants' Expert Report |
| CLA-# | Claimants' Legal Exhibit |
| CNE | Spain's National Energy Commission (Until June 2013) |
| CNMC | National Markets and Competition Commission, successor entity to CNE |
| CPHB-I | Claimants' Post-Hearing Brief (27 August 2018) |
| CPHB-II | Claimants' Rebuttal Post-Hearing Brief (4 October 2018) |
| CPI | Consumer Price Index |
| CWS-# | Claimants' Witness Statement |
| DBAFL | Deutsche Bank AG, Asset Finance & Leasing Renewable Energies |
| EC | European Commission |
| EC Amicus | European Commission *Amicus Curiae* Brief (29 September 2017) |
| EC Application | European Commission's Application for Leave to Intervene as a Non-Disputing Party (16 January 2017) |
| ECO 3 | Ecoinversión en Extremadura 3, S.L. |
| EU | European Union |
| FIT | Feed-in Tariff |
| FMV | Fair Market Value |
| IDAE | Institute for Energy Diversification and Savings |
| IFIC | International Feed-in Cooperation |
| ILC Draft Articles | ILC's Draft Articles on Responsibility of States for Internationally Wrongful Acts |
| kWh | Kilowatt-hour |
| LSE | Act 54/1997 |
| Majorca SPVs | Paso-Palma Sol's 24 wholly-owned operating subsidiaries |
| MCPS | Most Constant Protection and Security |
| MINETUR | Ministry of Industry, Energy, Tourism |
| MO HAP/703/2013 | Ministerial Order HAP/703/2013, of 29 April, which approves Form 583 "Tax on the value of the production of electrical energy. Self-assessment and Installment Payments", and establishes the form and procedure for its submission [R-0008] |
| MO IET/221/2013 | Ministerial Order IET/221/2013 of 14 February, BOE, 16 February 2013 [C-0169] |
| MO IET/843/2012 | Ministrial Order IET/843/2012, of 25 April, by the Ministry of Industry, Energy and Tourism, establishing the access tolls applicable as of 1 April 2012 and certain tariffs and premiums applicable to special-regime power generation plants [R-0084] |
| MO IET/1045/2014 | Ministerial Order IET/1045/2014, of 16 June, approving the remuneration parameters for standard plants applicable to certain facilities that produce power from renewable sources of energy, cogeneration and waste [R-0086] / [C-0126] / [C-0126bis] |
| MoU | Memorandum of Understanding |
| MST | International Minimum Standard of Treatment |
| MWh | Megawatt-hour |

| Order ITC/914/2006 | Order ITC/914/2006, of 30 March, establishing the methodology for calculating power guarantee remuneration for the ordinary regime facilities of island and extra-peninsular electricity systems [R-0103] |
|---|---|
| PANER | Spain's National Renewable Energy Action Plan 2011 – 2020 [C-0044] / [R-0093] (also referred to as "2011 – 2020 Renewable Energies Plan / Plan de Energías Renovables – PER" in pleadings) |
| Paso-Palma Sol | Paso-Palma Sol Gestión de Proyectos, S.L., Claimants' wholly owned subsidiary |
| PER 1989 | Plan for the Promotion of Renewable Energies 1989 [R-0244] |
| PER 2000 – 2010 | Renewable Energy Promotion Plan in Spain 2000-2010 [C-0050] / [R-0090] (also referred to as "2000 RPP" and "PFER 2000-2010" in pleadings). |
| PER 2005 – 2010 | Renewable Energy Promotion Plan in Spain 2005 – 2010 [C-0066] / [R-0092] (also referred to as "PER 2005" or "2005-2010 RPP" in pleadings) |
| PHB | Post-Hearing Brief |
| PO-# | Procedural Order No. # |
| PV | Photovoltaic |
| R.Costs-I | Respondent's Submission on Costs (18 October 2018) |
| R.Costs-II | Respondent's Comments on the Allocation of Costs and on Claimants' Submission on Costs (25 October 2018) |
| R-# | Respondent's Exhibit |
| R-I | Respondent's Counter-Memorial on the Merits on Memorial on Jurisdiction (10 March 2017) |
| R-II | Respondent's Rejoinder on the Merits and Reply on Jurisdiction (9 March 2018) |
| RAIPRE | *Registro administrativo de instalaciones de producción en regimen especial* (meaning "*Register of Production Installations under the Special Regime*" (Claimants) or "*Administrative Registry of electricity production facilities* (Respondent) |
| RB | Roland Berger |
| RD 325/2008 | Royal Decree 325/2008, of 29 February, establishing the remuneration of the electricity transmission activity for installations commissioned after 1 January 2008 [R-0183] |
| RD 344/2012 | Royal Decree 344/2012, of 10 February, which regulates the basic organic structure of the Ministry of Industry, Energy and Tourism [C-0041] |
| RD 359/2017 | Royal Decree 359/2017, of 31 March, establishing a call for granting the specific remuneration regime to new facilities producing electricity from renewable energy sources in the peninsular electricity system [R-0234] |
| RD 413/2014 | Royal Decree 413/2014, of 6 June, regulating the activity of power production from renewable sources of energy, cogeneration and waste [C-0131] / [R-0080] |
| RD 436/2004 | Royal Decree 436/2004, of 12 March, establishing the methodology for updating and systematizing the legal and economic regime governing electric power production under the special regime [C-0065] / [R-0069] |
| RD 661/2007 | Royal Decree 661/2007, of 25 May, which regulates the activity of electric energy production under the special regime [R-0071] / [C-0046] |
| RD 1047/2013 | Royal Decree 1047/2013, of 27 December, which establishes the methodology for calculating the remuneration for the activity of electricity transport [R-0078] |

| RD 1048/2013 | Royal Decree 1048/2013, of 27 December, which establishes the methodology for calculating the remuneration for the activity of electricity distribution and other regulations [R-0079] |
| --- | --- |
| RD 1432/2002 | Royal Decree 1432/2002, of 27 December, establishing the Methodology for the approval or modification of the average or reference electricity tariff and amending a number of articles in RD 2017/1997 of 26 December, governing the organization and regulation of the procedure of the settlement of transmission, distribution and tariff retailing costs, the permanent costs of the system, and diversification and security of supply costs [C-0063] / [R-0068] |
| RD 1544/2011 | Royal Decree 1544/2011, of 31 October, establishing tolls for access to transmission and distribution networks to be satisfied by electricity producers [C-0118] |
| RD 1565/2010 | Royal Decree 1565/2010, of 19 November, which regulates and modifies given aspects relative to the activity for the production of electric power on the special regime [C-0110] / [R-0074] |
| RD 1578/2008 | Royal Decree 1578/2008, of 26 September, on the payment for the electric production activity from solar photovoltaic technology for facilities built after the deadline until which the remuneration under Royal Decree 661/2007 of 25 May, was maintained for said technology [R-0072] / [C-0070] |
| RD 1614/2010 | Royal Decree 1614/2010, of 7 December, regulating and modifying certain aspects related to electric energy production using thermoelectric solar and wind power technologies [R-0075] |
| RD 2366/1994 | Royal Decree 2366/1994, of 9 December, on the Production of Electrical Energy by Hydraulic Facilities, Cogeneration Facilities, and Other Facilities supplied by renewable Energy Sources or Resources [C-0052] / [R-0055] |
| RD 2818/1998 | Decree 2818/1998, of 23 December on Production of Electricity by Facilities Supplied with Renewable Energy, Waste or Cogeneration Sources or Resources [C-0059] / [R-0067] |
| RD-Law | Royal Decree-Law |
| RD-Law 1/2012 | Royal Decree-Law 1/2012, of 27 January, proceeding to the suspension of the remuneration pre-assignment procedures and the elimination of the economic incentives for new electric energy production plans using cogeneration, renewable energy sources, and waste [R-0060] / [C-0301] |
| RD-Law 2/2013 | Royal Decree-Law 2/2013, of 1 February, on urgent measures in the electricity sector and the financial sector [C-0113] / [R-0063] |
| RD-Law 6/2009 | Royal Decree-Law 6/2009, of 30 April, which adopts certain measures in the energetic sector and passes the discount tariff, published in the Official Gazette of the Kingdom of Spain on 7 May 2009 [C-0268] / [R-0057] |
| RD-Law 7/2006 | Royal Decree-Law 7/2006, of 23 June, on the adoption of urgent measures in the energy sector [R-0056] |
| RD-Law 9/2013 | Royal Decree-Law 9/2013, of 12 July, which sets forth urgent measures to ensure the financial stability of the electricity system [R-0064] / [C-0128] |
| RD-Law 9/2015 | Royal Decree-Law 9/2015, of 10 July, on urgent measures to reduce fiscal burden by taxpayers of [income tax] and other measures of economic content [C-0295] |
| RD-Law 13/2012 | Royal Decree-Law 13/2012, of 30 March, that transposes directives relating to the internal electricity and gas markets, electronic communication-related matters and |

| | adopts measures for correcting deviations due to imbalances between costs and revenues in the electricity and gas sectors [R-0061] |
|---|---|
| RD-Law 14/2010 | Royal Decree-Law 14/2010, of 23 December, on the establishment of urgent measures for the correction of the tariff deficit in the electricity sector [C-0111] / [R-0058] |
| RD-Law 20/2012 | Royal Decree-Law 20/2012, of 13 July, on measures to guarantee budgetary stability and promotion of competitiveness [R-0062] |
| REIO | Regional Economic Integration Organisation (Article 1(3) ECT) |
| REN | Renewable Energy Policy Network for the 21st Century |
| REX-# | Respondent's Expert Report |
| RfA | Claimants' Request for Arbitration (31 July 2015) |
| RLA-# | Respondent's Legal Exhibit |
| RPHB-I | Respondent's Post-Hearing Brief (27 August 2018) |
| RPHB-II | Respondent's Second Post-Hearing Brief (4 October 2018) |
| RWS-# | Respondent's Witness Statement |
| SES | Spanish Electricity System |
| SPV | Special Purpose Vehicles |
| TEU | Treaty on European Union [RL-0001] |
| TFEU | Treaty on the Functioning of the European Union [RL-0001] |
| TMR | Average Reference Electricity Tariff (by Spanish Acronym) [R-0242] |
| TVPEE | Tax on the Value of the Production of Electrical Energy, introduced by Act 15/2012 |
| VCLT | Vienna Convention on the Law of Treaties (23 May 1969) |

## I.    INTRODUCTION

### A.    THE DISPUTE AND THE PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") pursuant to the Energy Charter Treaty ("ECT"), which entered into force for Spain and the Swiss Confederation on 16 April 1998 and for the Republic of Malta on 28 August 2001,[1] and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force for Spain on 17 September 1994, for the Republic of Malta on 3 December 2003, and for the Swiss Confederation on 14 June 1968 (the "ICSID Convention").[2]

2.    Claimants in these proceedings are OperaFund Eco-Invest SICAV PLC ("OperaFund"), a public limited company incorporated on 24 January 2005 and existing under the laws of the Republic of Malta,[3] and Schwab Holding AG ("Schwab"), a public limited company incorporated on 28 February 1975 and existing under the laws of the Swiss Confederation,[4] (collectively "Claimants").

3.    Respondent is the Kingdom of Spain ("Respondent"), a sovereign state.

### B.    THE TRIBUNAL'S TERMINOLOGY AND REASONING

4.    The Tribunal has carefully examined all the arguments and evidence presented by the Parties throughout these proceedings.  The Tribunal does not consider it necessary to reiterate in this Award all such arguments or evidence, which are well-known to the Parties.  Further, insofar as any matter has not been specifically identified or recorded in the body of this Award, this does not mean that it

---

[1]    RfA §§ 98, 104; Website of the Energy Charter Secretariat on the entry into force and applicability of the Energy Charter Treaty to the Republic of Malta  (www.encharter.org) **[C-0033]**; Publication and Instrument of ratification of the ECT in Switzerland's Official Journal **[C-0034a]**; Publication in Switzerland's Official Journal showing that the ECT remains in force in Switzerland **[C-0034b]**; Publication of the ECT in the Spanish Official Gazette of 17 May 1995 **[C-0035a]**; Instrument of ratification of the ECT published in the Spanish Official Gazette of 17 March 1998 **[C-0035b]**.

[2]    ICSID Document, List of Contracting States and Other Signatories of the Convention (as of 18 April 2015) **[C-0038]**.

[3]    RfA § 4(i); C-I § 476; OperaFund Eco-Invest SICAV PLC's certificate of incorporation and good  standing **[C-0001]**.

[4]    RfA § 4(ii); Schwab Holding AG's certificate of incorporation and good standing **[C-0002]**.

has not been taken into full consideration.  The Tribunal discusses only those submissions which it considers most relevant for its decisions.  The Tribunal's reasons, without repeating all the arguments advanced by the Parties, address what the Tribunal considers to be the determinative factors required to decide on the Requests of the Parties.

5.   The Tribunal's use of one Party's terminology is without prejudice and in no way reflects the Tribunal's understanding of a particular issue.  Rather, effort has been made to use consistent terminology throughout this Award to facilitate understanding.  Likewise, the order in which the references are presented is not a reflection of a source's value in the eyes of the Tribunal.  Instead, effort has been made to format the footnotes consistently and to cite all documents referenced by the Parties.

## II.    THE ARBITRAL TRIBUNAL

6.   On 23 October 2015, Claimants proposed the appointment of Prof. Dr. August Reinisch as arbitrator. He accepted the appointment on 30 October 2015 and ICSID notified the Parties of his acceptance of this appointment on 2 November 2015.  His contact details are as follows:

> Prof. MMag. Dr. August Reinisch, LL.M.
> Department of European, International and Comparative Law
> Section of International Law and International Relations
> University of Vienna
> Schottenbastei 10-16
> A-1010 Vienna
> Austria
> Tel.:       +43 1-4277/35307
> Fax:       +43 1-4277/9353
> Email:   august.reinisch@univie.ac.at

7.   On 23 October 2015, Claimants informed the ICSID Secretariat that, since more than 60 days had elapsed since the date of registration of the Request for Arbitration ("RfA"), Claimants confirmed that they opt for the formula provided in Article 37(2)(b) of the ICSID Convention to have the Tribunal constituted as soon as possible.  Claimants proposed the appointment of Mr. Gary B. Born as President of the Tribunal.  ICSID invited Respondent's response to this proposal on the same day.

8.   On 13 November 2015, Respondent opposed the appointment of Mr. Born as President of the Tribunal and proposed the appointment of Prof. Philippe Sands QC (British / French) as arbitrator.  ICSID

notified the Parties of Prof. Sands's acceptance of this appointment on 25 November 2015.  Prof. Sands's contact details are as follows:

> Prof. Philippe Sands QC
> Matrix Chambers
> Griffin Building
> Gray's Inn
> London, WC1R 5LN
> United Kingdom
> Phone:           +44 20 7404 3447
> Fax:         +44 20 7404 3448
> Email:           philippesands@matrixlaw.co.uk

9.  On 18 December 2015, Counsel for the Parties sent the ICSID Secretariat the Parties' agreed method of appointment of the Presiding Arbitrator.  On 21 and 22 December 2015, Claimants and Respondent respectively agreed to the ballot procedure proposed by ICSID to select a Tribunal President.  On 4 February 2016, Claimants informed the Tribunal that the Parties had not agreed on a Tribunal President and requested the ICSID Secretary General to appoint the presiding arbitrator in accordance with sections 2(b) and 2(c) of the Parties' Agreement on the Constitution of the Arbitral Tribunal.  On 10 March 2016, ICSID proposed a ballot of five (5) candidates for appointment as President of the Tribunal.  On 17 March 2016, after receiving ballots from the Parties, ICSID informed the Parties of the results of the Parties' ballot procedure to elect a President.  The Parties elected Prof. Karl-Heinz Böckstiegel (German).  Prof. Böckstiegel's contact details are as follows:

> Prof. Dr. Karl-Heinz Böckstiegel
> Parkstr. 38
> D-51427 Bergisch Gladbach, Germany
> Tel.:           +49 (0)2204 66268
> Fax:           +49 (0)2204 21812
> Email:           kh@khboeckstiegel.com

## III.   PROCEDURAL HISTORY

10.  Claimants filed their RfA against the Kingdom of Spain on 31 July 2015.  This was supplemented by a further communication on 10 August 2015.

11.  ICSID registered the RfA, as supplemented, in accordance with Article 36(3) of the ICSID Convention on 11 August 2015.

12.     On 4 August 2015, ICSID confirmed receipt of the RfA and transmitted the same, together with all accompanying exhibits and authorities, to Respondent.

13.     On 23 October 2015, ICSID informed the Parties that Mr. Francisco Grob, a Chilean lawyer who joined the ICSID Secretariat in April 2015, would be assisting in this case.  ICSID informed the Parties that, although Mr. Grob assisted the law firm Herbert Smith Freehills in a non-ICSID arbitration against the Kingdom of Spain during his August 2014 – February 2015 internship, Mr. Grob's role, access to the file, and participation was limited.  ICSID informed the Parties that it has no concerns about Mr. Grob's impartiality and independence.

14.     On 1 April 2016, the ICSID Secretariat requested that the Parties make their advance payments, pursuant to ICSID Administrative and Financial Regulation 14(3).

15.     On 6 April 2016, the Tribunal proposed that the First Session be held by teleconference.

16.     On 14 April 2016, following the Parties' respective communications of 13 and 14 April and after confirming the availability of the Parties, the Tribunal decided to schedule its first session for 24 May 2016.  The Tribunal provided the Parties a draft of Procedural Order No. 1 ("PO-1") and invited them to liaise regarding the draft and to submit their proposals by 2 May 2016.

17.     After the Tribunal invited the Parties to liaise regarding draft PO-1, including the timetable, the Parties agreed to amendments to the draft and submitted these to the Tribunal on 29 April 2016.

18.     On 29 April 2016, the Parties informed the Tribunal that they had reached agreement on some parts of PO-1, but that their discussions regarding the procedural calendar were ongoing.

19.     On 9 May 2016, the Parties informed the Tribunal that they reached agreement on the procedural calendar contained in PO-1, Annex A.

20.     On 19 May 2016, the Tribunal circulated an agenda for this meeting and a list of attendees to the Parties. The first session of the Tribunal with representatives of the Parties was held on 24 May 2016, by way of teleconference that was recorded.  The Parties confirmed that the Tribunal was properly constituted and that they had no objection to the appointment of any member of the Tribunal.

21.     On 27 May 2016, Claimants reported to the Tribunal that the Parties have agreed that non-disputing parties (1) shall be subject to the Tribunal's determination as to costs and (2) shall bear their own costs

in any case, but that disagreement as to the proposed Article 9.5 regarding the payment of a costs advance by a non-disputing party remained.  Claimants also alleged that Respondent and the European Commission ("EC") were coordinating in this and other proceedings and, thus, the EC cannot be considered a true *amicus curiae* or non-disputing party.

22.   On 2 June 2016, Respondents rejected the allegation of coordination between Respondent and the EC. Respondent also objected to a requirement to require *amicus* to pay any advance.

23.   On 7 June 2016, the Tribunal invited the Parties to comment on the Tribunal draft of PO-1 by 13 June 2016.

24.   On 13 June 2016, Claimants submitted that the Draft PO-1 is in conformity with the points discussed at the First Session of 24 May 2016.  In addition, Claimants forwarded the EC's Decision of 13 April 2016 to the Tribunal, which Claimants alleged served as further evidence that the EC had already decided to intervene in the present case.  Respondent did not submit further comments on the draft.

25.   On 14 June 2016, the ICSID Secretariat transmitted Claimants' comments (13 June 2016) regarding the Draft PO-1 to the Tribunal.

26.   On 20 June 2016, the Tribunal issued **Procedural Order No. 1 ("PO-1")** and transmitted the same to the Parties.

27.   On 27 October 2016, Claimants submitted (1) their Memorial on the Merits ("C-I"), (2) Exhibits C-0041 – C-0214, (3) Legal Authorities CL-0001 to CL-0146, (4) Expert Reports from the Brattle Group with corresponding exhibits, and (5) the Witness Statement of Mr. Lars Bauermeister with corresponding exhibits, to the Tribunal.  ICSID acknowledged their 8 November 2016 receipt of these on 11 November 2016.

28.   On 16 January 2017, the EC filed its Application for Leave to Intervene as a Non-Disputing Party ("EC Application").  ICSID confirmed receipt on 17 January 2017.

29.   On 23 January 2017, the Tribunal forwarded the EC's Application to the Parties.  In accordance with ICSID Arbitration Rule 37(2), the Tribunal indicated that it would invite the Parties to provide their observations on the EC's Application following the Tribunal's receipt of the Respondent's Counter-Memorial.

30. On 10 March 2017, Respondent submitted its (1) Counter-Memorial on the Merits and Memorial on Jurisdiction ("R-I"), (2) Witness Statement of Mr. Carlos Montoya (9 March 2017), (3) Expert Report of Accuracy (10 March 2017), and (4) Exhibits R-0001 – R-0232 to the Tribunal.

31. On 8 May 2017, the Tribunal invited the Parties to provide their observations to the EC's Application, by 22 May 2017.

32. On 18 May 2017 and without copying the Tribunal, the Parties exchanged their responses to the other side's objections to produce.

33. On 22 May 2017, the Parties submitted their observations on the EC's Application.

34. On 23 May 2017, the Parties wrote to the Tribunal to report their agreement that their Observations to the EC's Application would be submitted solely in English.

35. On 13 June 2017, the Tribunal issued **Procedural Order No. 2 ("PO-2") Regarding the EC Application to Intervene as a Non-Disputing Party**, sending it to the Parties and the EC.

36. On 13 June 2017, Respondent filed its Responses to Claimants' Objections to Respondent's Requests to Produce.

37. On 13 June 2017, Claimants filed their Request to Produce, containing their Responses to the Objections raised by the Respondent, together with five additional exhibits.

38. On 15 June 2017, Claimants wrote to the Tribunal and objected to Sections 8.7 – 8.9 of PO-2 and requested further elaboration on the Tribunal's decision to allow the EC to attend the Hearing, notwithstanding Claimants' objection.

39. On 19 June 2017, the Tribunal acknowledged receipt of Claimants' 15 June 2017 letter and invited Respondent to submit any comments that it may have thereon by 22 June 2017.

40. On 23 June 2017, Respondent offered its comments regarding the potential value of the EC's intervention as *amicus curiae*.

41. On 26 June 2017, the Tribunal responded to the Parties and explained that, if the Tribunal considered that it would be assisted by the third party's attendance and availability to provide explanations and

answers to questions of the Tribunal at the Hearing, the Tribunal was authorized to fulfill that purpose of Article 37(2).

42.    On 30 June 2017, the Parties, having not agreed on the documents to be disclosed to the EC to enable the EC to file its *amicus* submission, filed their respective comments with the Tribunal.

43.    On 10 July 2017, the Tribunal proposed the appointment of Dr. Katherine Simpson as Tribunal Assistant and sent her CV and Declaration of Independence to the Parties for their consideration.  The Tribunal requested that the Parties submit any comments regarding Dr. Simpson's appointment by 13 July 2017.

44.    On 11 July 2017, the Tribunal, taking note of the comments received from the Parties regarding PO-2 § 8.3, ordered the disclosure to the EC of limited documents or paragraphs thereof to enable the EC to complete its *amicus* submission.  This exception to the duty of confidentiality was justified to fulfill the purpose of Article 37(2) of the ICSID Arbitration Rules.  Further, the Tribunal ordered the EC to file its submission electronically and in hard copy by 29 September 2017, so as to enable Claimants to comment on the EC's submission in their next memorial, due on 30 November 2017.

45.    On 18 July 2017, the Tribunal noted that the Parties had no objections and appointed Dr. Katherine Simpson as Tribunal Assistant.  In response to Claimants' reference to the ICC Note on such appointments, the Tribunal indicated that, while it had no problem with the description of the function in that Note, it did not consider it appropriate to include such rules of another arbitration institution in its procedural provisions.  The Tribunal explained that ICSID practice was capable and sufficient to assure that Tribunal Assistants were not authorized for activities that were exclusively reserved for the arbitrators.

46.    On 26 July 2017, the Tribunal issued **Procedural Order No. 3 ("PO-3") Regarding Production of Documents**, attaching the Redfern Schedules thereto as Annexes A and B.

47.    On 29 September 2017, the EC submitted its Amicus Curiae Brief to the Tribunal.

48.    On 13 November 2017, Claimants filed "Claimants' Application on Respondent's Non Compliance with Procedural Order No. 3" with the Tribunal.

49.    On 30 November 2017, Claimants filed their Counter-Memorial on Jurisdictional Objections ("C-II").

50.    On 14 December 2017, Claimants submitted their Reply on the Merits to the Tribunal.

51.    On 18 December 2017, the Parties informed the Tribunal that they had agreed to extend Claimants' deadline for submitting the Spanish translation of the Reply on the Merits and accompanying documents to 15 January 2018, and to extend Respondent's deadline for submitting its Rejoinder on the Merits until 2 March 2018.

52.    On 19 December 2017, Claimants submitted their corrected Reply on the Merits ("C-III"), together with an *errata* mark-up.  On the same day, the Tribunal approved the Parties' agreement to extend the deadlines for the Claimants' submission of the Spanish translation of their Reply on the Merits and accompanying documents (to 15 January 2018) and for Respondent's submission of its Rejoinder on the Merits (to 2 March 2018).

53.    On 17 January 2018, the Parties informed the Tribunal that they had agreed to extend the deadlines for the submission of Respondent's Reply on Jurisdiction to 2 March 2018 and of Claimants' Rejoinder on Jurisdiction to 23 April 2018.  The Tribunal agreed to this modification on 7 February 2018.

54.    On 20 February 2018, the Parties requested to extend the deadlines for the submission of Respondent's Rejoinder on the Merits and Reply on Jurisdiction to 9 March 2018, and on Claimants' Rejoinder on Jurisdiction to 30 April 2018.  The Tribunal agreed to this further extension on 21 February 2018.

55.    On 27 February 2018, Claimants requested to place the Award rendered in the SCC Arbitration (2015/063) *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg, SICAR v. The Kingdom of Spain* dated 15 February 2018 ("*Novenergia* Award") in the record.  On the same day, Respondent requested an additional 5 days to respond to Claimants' request.  The Tribunal granted Respondent's request and invited Respondent to submit its comments by 7 March 2018.

56.    On 9 March 2018, Respondent submitted its Rejoinder on the Merits ("R-II"), in Spanish.

57.    On 10 March 2018, Claimants requested the opportunity to respond to Respondent's comments of 7 March 2018.  The following day, the Tribunal granted the Claimants' request and invited their submission by 14 March 2018.

58.    On 12 March 2018, Claimants submitted their comments on Respondent's submission of 7 March 2018.  Respondent requested the Tribunal's consent that Respondent briefly reply to them.

59. On 12 March 2018, Respondents submitted corrections to the Rejoinder on the Merits (Spanish version) and requested permission to upload final versions of the exhibit lists to BOX.

60. On 14 March 2018, Respondent submitted its comments on Claimants' request to introduce the *Novenergia* Award.

61. On 17 March 2018, the Tribunal decided to admit the *Novenergia* Award, ordering Claimants to submit the Award with a new exhibit number to be admitted to the file in these proceedings. The Tribunal also invited the Parties to submit their Notifications of Witnesses and Experts they wish to examine at the Hearing by 11 May 2018.

62. On 23 April 2018, the Tribunal invited the Respondent to correct clerical errors in its submission of 9 March 2018, such that they could be considered during Hearing preparation.

63. On 25 April 2018, by simultaneous submission, the Parties informed the Tribunal that the Hearing could be held exclusively during the week starting 11 June 2018 and requested that the Tribunal cancel the booking of the World Bank's facilities in Paris for the second week (beginning 18 June 2018). The Tribunal informed the Parties of its agreement with the Parties' proposals on the following day. The Tribunal also advised that it would send the Parties a draft procedural order concerning the details of the Hearing.

64. On 27 April 2018, Respondent replied to the Tribunal's letter of 23 April 2018 that it would send a revised pleading the following week.

65. On 27 April 2018, Claimants filed their Rejoinder on Jurisdiction ("C-IV").

66. On 4 May 2018, the Tribunal sent the Parties its draft of Procedural Order No. 4 Regarding the Details of the Hearing, for their review and comment by 11 May 2018.

67. On 8 May 2018, the Parties jointly requested that the Tribunal accept Witness Notifications on 10 May, the responses to the draft PO-4 on 14 May, and to schedule the Pre-Hearing teleconference for 28 or 29 May.

68. On 10 May 2018, the Parties submitted their Witness Notifications.

69.    On 14 May 2018, the Parties submitted their comments to the draft of PO-4 and their proposed Hearing agendas to the Tribunal.

70.    On 16 May 2018, the EC requested leave from the Tribunal to submit an update to its written observations, in light of the recent judgment of the CJEU in the Case C-284/16 *Achmea v. Slovak Republic*, and to set out its view on the consequences of that judgment for pending arbitration cases based on the ECT.  The following day, the Tribunal invited the Parties' comments by close of business on 18 May 2018.  The Parties agreed that it would not be necessary for the EC to provide updated written submissions.

71.    On 21 May 2018, the Tribunal informed the EC that there would be no need for it to update its submission and reminded the EC that, pursuant to PO-2, the EC may only be present during the Opening Statements of the Parties, on 11 June 2018.

72.    On 24 May 2018, the Tribunal issued **Procedural Order No. 4 ("PO-4") Regarding the Details of the Hearing**, together with a Hearing Agenda.

73.    On 25 May 2018, the Parties jointly proposed amendments to PO-4 and the Hearing Agenda. Respondent presented further proposals to increase the time allocation for Opening Statements and for the examination of experts.

74.    On 29 May 2018, the Tribunal issued **Procedural Order No. 5 ("PO-5") Regarding the Hearing**, wherein the Tribunal amended PO-4 and invited the Parties to liaise to create a new Hearing Agenda based on PO-5.  On the same day, ICSID distributed information regarding the Hearing logistics to the Parties.

75.    The Parties submitted their proposed agreed Agenda to the Tribunal on 30 May 2018. On the following day, the Parties submitted their updated exhibit lists to the Tribunal.

76.    On 31 May 2018, Claimants requested authorization to submit new documents, prior to the Hearing. On 1 June, the Tribunal asked Respondent whether Respondent also had such an application. Respondent replied that, while it had no new documents, it wished nonetheless to respond to Claimants' request.

77.    On 2 June 2018, the Tribunal invited Respondent to respond to Claimants' request to introduce new documents.

78.    On 4 June 2018, Respondent submitted its corrected Rejoinder to the Tribunal.

79.    On 5 June 2018, Respondent sent its comments, together with 12 Annexes, to the Tribunal.

80.    On 6 June 2018, the Tribunal wrote to the Parties and rejected all of the new documents that the Parties applied to submit at this stage, but informed the Parties that this matter may be discussed further at the Hearing. The Tribunal also accepted Respondent's corrected Rejoinder, which the Tribunal requested on 23 April 2018.

81.    The Hearing was held from 11 – 15 June 2018 at the World Bank Hearing Centre in Paris. The following individuals attended the Hearing:

| TRIBUNAL | |
|---|---|
| Prof. Dr. Karl-Heinz Böckstiegel | President |
| Prof. MMag. Dr. August Reinisch, LL.M. | Co-Arbitrator |
| Prof. Philippe Sands QC | Co-Arbitrator |
| **ICSID SECRETARIAT** | |
| Mr. Francisco Grob | ICSID Secretariat |
| **ASSISTANT TO THE TRIBUNAL** | |
| Dr. Katherine Simpson | Simpson Dispute Resolution Inc |
| **CLAIMANTS** | |
| **Mr./Ms. First Name/ Last Name** | **Affiliation** |
| *Counsel:* | |
| Mr. Alberto Fortún Costea | Cuatrecasas Gonçalves Pereira, S.L.P. |
| Mr. Luis Pérez de Ayala | Cuatrecasas Gonçalves Pereira, S.L.P. |
| Ms. Cani Fernández Vicién | Cuatrecasas Gonçalves Pereira, S.L.P. |
| Ms. Maribel Rodríguez Vargas | Cuatrecasas Gonçalves Pereira, S.L.P. |
| Mr. Antonio Delgado Camprubí | Cuatrecasas Gonçalves Pereira, S.L.P. |
| Mr. José Ángel Rueda García | Cuatrecasas Gonçalves Pereira, S.L.P. |
| Mr. Borja Álvarez Sanz | Cuatrecasas Gonçalves Pereira, S.L.P. |
| Ms. Ana Martínez Valls | Cuatrecasas Gonçalves Pereira, S.L.P. |
| Mr. Ignacio Frutos Blanco | Cuatrecasas Gonçalves Pereira, S.L.P. |
| *Parties:* | |
| Mr. Erik Schnider | OperaFund Eco-Invest SICAV PLC |
| *Witness:* | |
| Mr. Lars Bauermeister | Ahead Wealth Solutions AG |

| Mr. Peter Kofmel | Schwab Holdings AG |
|---|---|
| *Experts:* | |
| Dr. José Antonio García | The Brattle Group |
| Mr. Richard Caldwell | The Brattle Group |
| Ms. Ying-Chin Chou | The Brattle Group |
| Ms. Annika Opitz | The Brattle Group |
| Mr. Álvaro Payán | ATA Renewables |
| **RESPONDENT** | |
| **Mr./Ms. First Name/ Last Name** | **Affiliation** |
| *Counsel:* | |
| Ms. Amaia Rivas Kortazar | Abogacía General del Estado |
| Mr. Antolín Fernández Antuña | Abogacía General del Estado |
| Ms. Patricia Fröhlingsdorf Nicolas | Abogacía General del Estado |
| Ms. María José Ruiz Sánchez | Abogacía General del Estado |
| *Parties:* | |
| Ms. Raquel Vázquez | IDAE |
| *Witness:* | |
| Mr. Carlos Montoya | IDAE |
| *Experts:* | |
| Mr. Eduard Saura | Accuracy |
| Mr. Nicolas Barsalou | Accuracy |
| Ms. Laura Cozar | Accuracy |
| Mr. Alberto Fernandez | Accuracy |
| Ms. Aurea Alvarez | Accuracy |
| Mr. Carlos Canga | Accuracy |
| Mr. Jorge Servert | Sta-Solar |
| **NON-DISPUTING PARTIES (ONLY DAY 1)** | |
| Mr. Steven Noë | EC |
| Ms. Petra Nemeckova | EC |
| Mr. Nicolaj Kuplewatzky | EC |
| **INTERPRETERS** | |
| Mr. Jesus Getan Bornn | English-Spanish Interpreter |
| Ms. Anna Sophia Chapman | English-Spanish Interpreter |
| Mr. Marc Viscovi | English-Spanish Interpreter |
| Ms. Barbara Bethausser-Conte | English-German Interpreter (only Day 2) |

| Ms. Barbara Chisholm | English-German Interpreter (only Day 2) |
|---|---|
| **COURT REPORTERS** | |
| Mr. Trevor McGowan | The Court Reporter Ltd. |
| Mr. Paul Pelissier | DR-Esteno |
| Mrs. Luciana Sosa | DR-Esteno |

82.    At the beginning of the Hearing, the Chairman informed the Parties of his concerns regarding the exhibits submitted in this matter, as it appeared that there had been unannounced re-numbering and translation changes, among other potential issues.  The Chairman invited the Parties' representatives to confer with Dr. Simpson and Mr. Grob regarding these issues, after Opening Statements.  At this meeting, the Party representatives agreed to proceed with the Hearing, with Respondent agreeing to strike from the record any new document to which Claimants object, and Claimants agreeing to use the previously submitted joint USB while reserving the right to object to the use of any potentially new document contained therein in cross examination. The Parties further agreed to submit a new, corrected Joint USB to the Tribunal following the Hearing.  This agreement was memorialized in Procedural Order No. 6.

83.    On 18 June 2018, the Tribunal issued **Procedural Order No. 6 ("PO-6") Regarding the Procedure After the Hearing**.  In addition to setting a timetable for the further submissions, PO-6 ruled as follows:

2.1    *By 27 August, 2018, the Parties shall simultaneously submit the English-language version of their Post-Hearing Briefs, Limited to a maximum of 50 pages (double-spaced) in length and in font Times New Roman 12, containing the following:*

2.1.1.    *Any comments they have regarding issues raised at the Hearing;*

2.1.2.    *In separate sections of the brief, any comments the Parties have regarding each of the following questions of the Tribunal (which are without prejudice as to the final relevance given by the Tribunal to such questions and the comments received):*

a)    *What, if any, is the application and effect in this case, situated as it is in the field of environmental protection, of the "margin of appreciation enjoyed by national regulatory agencies when dealing with public policy determinations" (ICSID Case No. ARB 10/7, Philip Morris v Uruguay, Award, 8 July 2016, § 388, [CL-0178]). [sic – RL-0088]*

b)    *In a short chart, the Parties are invited to identify what they consider to be, in comparison to the present case, the common*

*denominators and main differences of the factual and legal background in the following cases:*

- Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain *(SCC Case 062/2012), Final Award, January 21, 2016, and dissenting opinion by Prof. Guido S. Tawil, 21 December 2015 [CL-0030 / RL-0049]*

- Eiser Infrastructure Limited and Energia Solar Luxembourg S.Á R.I. vs. The Kingdom of Spain*, ICSID Case No. ARB 13/36, Award of 4 May 2017 [CL-0148 / BQR-87 / RL-0077];*

- Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain*, Arbitration SCC V2013/153, Award, 12 July 2016 [RL-0004];*

- Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain *(SCC Arbitration 2015/063), Final Award, 15 February 2018 [CL-0213]; and*

- Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 [CL-0220].*

c) *What, if any, is the stand-alone impact of (1) Royal Decree 1565/2010 and Royal Decree Law 14/2010 (considered together), (2) Law 15/2012, and (3) the subsequent measures (taken together) on Claimants' overall damages claim?*

84. On 20 June 2018, Respondent proposed adding a further category to question (c) of PO-6 to single out the impact, if any, of RD-Law 2/2013 on Claimants' overall damages claim.

85. On 21 June 2018, the Tribunal invited Claimants' response to Respondent's proposal. Claimants responded on 25 June 2018 that they had no objection to the proposed modification.

86. On 26 June 2018, the Tribunal accepted Respondent's proposal to amend question (c) in PO-6.

87. On 11 July 2018 and after the Parties and the Court Reporters revised them, the Tribunal issued the final transcripts of the Hearing.

88. On 23 July 2018, Claimants requested leave to submit the *Antin v. Spain* Award (ICSID Case No. ARB/13/31) to the Tribunal. On 24 July 2018, the Tribunal invited Respondent's comments on Claimants' request. Respondent submitted these on 25 July 2018.

14

89. On 30 July 2018, the Tribunal decided to authorize the introduction of the *Antin* Award and Respondent's Application for Rectification, no later than 3 August 2018, with comments thereto to be submitted along with the Parties' post-hearing briefs, by 27 August 2018. The Tribunal stated that it would not make a decision at this point regarding the decision on rectification of the *Antin* Award and Respondent's possible application for annulment.

90. On 31 July 2018, Respondent submitted its Request for Rectification of the *Antin* Award (Exhibit R-0359) to the Tribunal.

91. On 1 August 2018, Claimants submitted the *Antin* Award (CL-0222) to the Tribunal.

92. On 17 and 18 August 2018, the Parties informed the Tribunal of their agreement to increase the length of their post-hearing briefs by 5 pages, to accommodate their comments on the *Antin* Award.

93. On 22 August 2018, the Tribunal informed the Parties that it approved of the agreement to increase the page limit of the post-hearing briefs to 55 pages.

94. On 27 August 2018, by simultaneous submission, the Parties provided their post-hearing briefs to the Tribunal. Respondent's brief was accompanied by two separate documents answering the Tribunal's questions regarding the "*stand-alone*" effect of measures, in response to the Tribunal's question. Respondent also inquired as to whether Spanish-language translations would be required of the post-hearing brief.

95. On 28 August 2018, Respondent wrote to the Tribunal requesting consent to reply to Claimants' post-hearing brief or, in the alternative, that sections of Claimants' post-hearing brief be stricken from the record and that this be taken into consideration in a later costs award.

96. On 29 August 2018, Claimants responded, alleging that Respondent submitted new evidence with their post-hearing submission and requested leave to submit their expert's report in response.

97. On 6 September 2018, the Tribunal wrote to the Parties. It decided to admit the post-hearing briefs as submitted and to allow each Party to file a second post-hearing brief, but only in rebuttal to the other Party's first post-hearing brief, including any new documents as long as they are in rebuttal only. The Tribunal also noted the jurisdictional decision of 31 August 2018 in the *Vattenfall AB and others v. Federal Republic of Germany* case and offered the Parties the opportunity to comment thereon. The Tribunal clarified that it intends not to admit the introduction of any further awards, but rather to

close the procedure and deliberate based on the file as it would stand after the second round of post-hearing briefs and the cost claims had been submitted by the Parties.

98.    On 11 September 2018, the Parties informed the Tribunal of their agreement to extend the deadline for the submission of their second-round post-hearing brief and the submissions on costs. The Tribunal approved the extension on the same day.

99.    On 18 September 2018, Respondent requested the Tribunal's directions on whether it would require that pleadings be submitted in Spanish. The Tribunal invited Claimants' response, and they stated that Spanish translations should be required. Thereafter, on 1 October 2018, the Tribunal decided that PO-1 § 11(4) should be followed and Respondent was, therefore, required to provide Spanish translations of its past and future submissions.

100.   On 4 October 2018, the Parties simultaneously submitted their second-round post-hearing briefs to the Tribunal, together with supporting documentation, to the Tribunal.

101.   On 18 October 2018, the Parties simultaneously submitted their statements of costs to the Tribunal.

102.   On 19 October 2018, again by simultaneous submission, the Parties informed the Tribunal that they had agreed to only submit their costs arguments in electronic format and to not require the translation of those submissions into Spanish. The Tribunal approved of the Parties' agreement on 25 October 2018.

103.   On 25 October 2018 the Parties simultaneously submitted their responses to the other side's statement of costs, together with supporting documentation, to the Tribunal. Claimants' submission included new legal exhibits numbered CL-0222 – CL-0244. Respondent's submission included a new exhibit, numbered RL-0113.

104.   On 28 January 2019, Respondent requested the Tribunal's leave to introduce into the record an additional legal authority, the "*Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in* Achmea *and on Investment Protection in the European Union*" ("Declaration"), together with a written submission commenting exclusively on the relevance of said Declaration. On the same day, the Tribunal invited Claimants to comment on Respondent's Request, by 5 February 2019.

105. On 5 February 2019, Claimants responded in opposition to Respondent's Request and asked that the Tribunal provide an estimate of the timing of an award.

106. On 11 February 2019, the Tribunal decided to admit (1) the Declaration, (2) the other related declarations made by France, Finland (with other States), and Hungary of 16 January 2019, and (3) the opinion of 29 January 2019 by the ECJ's Advocate General Bot in Opinion 1/17 into the file.  The Tribunal invited the Parties to present their brief written observations on these materials, not to exceed 10 pages, simultaneously by 26 February 2019.  The Tribunal further stated that it expected to issue the Award before summer 2019.

107. The Parties each submitted their written observations on 25 February 2019.

108. On 26 February 2019, the Tribunal invited Claimants to respond to Respondent's comments as to costs.  Claimants provided this timely response on 12 March 2019.

109. On 5 June 2019, the Tribunal declared the proceeding closed in accordance with Rule 38(1) of the ICISD Arbitration Rules.

## IV.    THE PARTIES' REQUESTS

### A.    CLAIMANTS' REQUESTS

110. The Prayer for Relief contained in Claimants' Reply Submission on Costs ("C.Costs-II") represents Claimants' complete Prayer for Relief, and repeats prior requests contained in Claimants' Post-Hearing Brief ("CPHB-I"), Claimants' Memorial on the Merits ("C-I"), Corrected Reply on the Merits[5] ("C-III"), and their Rejoinder on Jurisdiction ("C-IV").  Claimants' Prayer for Relief has the same content as prior requests contained in Claimants' Request for Arbitration ("RfA") and Claimants' Counter-Memorial on Jurisdictional Objections ("C-II"):

> 50.    *For the foregoing reasons, the Claimants respectfully request that the Arbitral Tribunal (i) admit the present Reply Submission on Costs; and (ii) issue an Award as follows:*
>
> (i)    *DECLARING that the Arbitral Tribunal has jurisdiction to hear all claims submitted by OperaFund and Schwab under the Energy Charter Treaty and, consequently, rejecting each of the preliminary objections that the*

---

[5]   C-III §§ 675 – 676.

*Respondent raised against the jurisdiction of the Arbitral Tribunal;*

(ii)    *DECLARING that Respondent's actions and omissions with respect to OperaFund and Schwab's Investment in the PV subsector in Spain amount to breaches of Respondent's obligations under Part III of the Energy Charter Treaty, as well as under the applicable rules and principles of international law;*

(iii)    *ORDERING Respondent to pay to OperaFund compensation in the amount of __EUR 36,800,000__ and to Schwab compensation in the amount of __EUR 3,300,000__ (amounts which may be increased to provide full compensation); or alternatively, an amount based on the alternative "But-for" scenario presented in Brattle Second Quantum Report of 13 December 2017, that is, to pay to OperaFund compensation in the amount of EUR 39,000,000 and to Schwab compensation in the amount of EUR 3,000,000;*

(iv)    *ORDERING the Respondent to pay to the Claimants the entire costs of the arbitration and all costs incurred by the Claimants as detailed above in this Reply Submission on Costs, totaling EUR (Euro) 2,267,669.57, USD (United States Dollars) 525,000.00 and CHF (Swiss Francs) 26,850.15; and also including, in particular but without limitation, the legal costs incurred by the Claimants in order to address the jurisdictional objections raised by the Respondent and the related intervention of the European Commission as amicus curiae in the present proceedings [footnote: Petition (iv) updated with respect to the Prayer for Relief included in the Claimants' First PHB (which did not include the Claimants' incurred costs)]*

(v)    *ORDERING Respondent to pay to OperaFund and Schwab pre- and post-award interest accrued on all amounts claimed, compounded monthly, until full payment thereof, at the rates specified by OperaFund and Schwab (1.59% compounded monthly for pre-award interest; and 3.59% compounded monthly for post-award interest);*

(vi)    *DECLARING that the Arbitral Tribunal's Award is made net of all taxes and/or withholdings, and ORDERING Spain to indemnify Claimants for any tax liability or withholding that may be imposed in Spain, Malta or Switzerland, in relation to the compensation awarded in the Tribunal's Award; and*

(vi)    *ORDERING any such further relief as the Arbitral Tribunal may deem appropriate.[6]*

---

[6]    C.Costs-II § 50.

18

B.    RESPONDENT'S REQUESTS

111.    Respondent's request for relief in its Counter-Memorial on the Merits and Memorial on Jurisdiction ("R-I")[7] was restated in Respondent's Rejoinder on the Merits and Reply on Jurisdiction ("R-II") as follows:

> 1477.    *In light of the arguments expressed therein, the Kingdom of Spain respectfully requests the Arbitral Tribunal to:*
>
>    a)    *declare its lack of jurisdiction to hear the claims of the Claimants, or if applicable their inadmissibility, in accordance with what is set forth in section III of this Document, referring to Jurisdictional Objections;*
>
>    b)    *Subsidiarily, in the event that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, to dismiss all the Claimants' claims regarding the Merits, as the Kingdom of Spain has not breached the ECT in any way, pursuant to Sections IV and V herein, referring to the Facts and the Merits, respectively;*
>
>    c)    *Secondarily, to dismiss all the Claimants' claims for damages, as said Claimants are not entitled to compensation, in accordance with section VI of this Document; and*
>
>    d)    *Order the Claimant to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisers, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment.*
>
> 1478.    *The Kingdom of Spain reserves the right to supplement, modify or complement these pleadings and present any and all additional arguments that may be necessary in accordance with the ICSID rules of arbitration, procedural orders and the directives of the Arbitral Tribunal in order to respond to all allegations made by the Claimant in regards to this matter.*

112.    Respondent made the following Request for Relief in its post-hearing submission ("RPHB-I")[8]:

> 223.    *In view of the arguments put forward, the Arbitral Tribunal is respectfully requested to:*
>
>    a)    *Declare its lack of jurisdiction to hear the Claimants' claims;*
>
>    b)    *Secondarily, dismiss the Claimants' claims on the merits, since the Kingdom of Spain has not violated the ECT;*
>
>    c)    *Secondarily, dismiss all claims for compensation from the Claimants, as*

---

[7]    R-I §§ 1283 – 1284.

[8]    RPHB-I § 223.

*they do not have the right to any compensation; and*

d)  *Order the Claimants to pay all costs and expenses derived from the arbitration, all updated at a reasonable interest rate, from the date on which the costs are incurred until the day on which they are paid.*

113. In its second costs submission ("R.Costs-II"), Respondent made the following Petitum, which is consistent with the Petitum contained in its first submission on costs ("R.Costs-I")[9]:

24.  *Accordingly, the Respondent respectfully requests that the Tribunal grant an award pursuant to Article 61(2) of the ICSID Convention ordering that the Claimants bear the costs of this arbitration, as well as the Respondent's costs for legal representation, in the amount of EUR 1,541,677.39. The Respondents [sic] reserves the right to seek additional costs arising subsequent to the filing of the Statement of Costs.*

24.[sic]  *Further, the Respondent submits that it should not be liable for any of the Claimants' arbitration or representative costs.*

25.  *Finally and in the alternative, should the Tribunal render an award condemning Spain to pay in whole or in part, the costs of this procedure, the Respondent respectfully requests that the Tribunal: i) excludes from Claimants' Submission of costs realted [sic] to "other expesnes[sic]" and ii) reduces Counsel for Claimants' fees to a reasonable amount.*

26.  *The Respondent expreslly[sic] reserves its right to submit further arguments in this regard, if it deems it necessary according to the Procedural Orders, the ICSID Convention, and the Arbitration Rules applicable to this case.[10]*

## V.    STATEMENT OF FACTS

114. The following summary of facts is based on the Parties' submissions and is without prejudice to the relevance of these facts for the decisions of the Tribunal. While the events leading to this arbitration are largely not in dispute, where the characterization of many events described herein is, each Party's views are summarized, without prejudice.

115. Claimants submitted that Respondent's international activities began in 2004 when, following the International Conference for Renewable Energies, Spain and Germany led the creation of an institutional framework known as the International Feed-In Cooperation ("IFIC") to promote the feed-

---

[9]   R. Costs-I §§ 18 – 19.

[10]   R. Costs-II §§ 24 – 26.

in model.[11]   On 27 January 2005, Spain and 6 other EU Member States organized the first IFIC workshop at the Institute for Energy Diversification and Savings ("IDAE") premises in Madrid.[12] IDAE is an agency of the Ministry of Energy, Tourism and Digital Agenda, through the Ministry of Energy, on which it is organically dependent.[13]   The Parties agree that IDAE's purpose is to help the Respondent improve energy efficiency and use of renewable energy and other low-carbon technologies and that IDAE has played an essential role in Respondent's energy policies.[14]   Claimants argue that, in addition, IDAE had a role in "*promoting the regulatory framework applicable to renewable energy producers to attract investments.*"[15]

116.   On 6 October 2005, Respondent and Germany institutionalized IFIC by signing a Joint Declaration in Madrid.[16]   From 23 – 24 November 2006, the Third IFIC Workshop was held in Madrid.[17]   In late January 2007, IFIC was extended to Slovenia.[18]   The 6th IFIC Workshop was held in Brussels from 3 – 4 November 2008.[19]   There, Grupo Santander – Spain's largest banking institution – gave a presentation entitled "*The Importance of Feed In Tariffs to Attract Financial Resources*" and stated that "*risk reduction makes easier the access to financing.*"[20]   On 18 – 19 November 2010, the 8th IFIC Workshop was held.[21]

---

[11]   C-I §§ 214, 216; M. Mendonça, *Feed-in tariffs, Accelerating the Deployment of Renewable Energy*, Earthscan, 2007 **[C-0045]**.

[12]   C-I § 217; C-III § 130; Summary of the first workshop of the IFIC held in Madrid on 27 January 2005 **[C-0072]**.

[13]   R-II § 944; C-I fn. 4; Royal Decree 344/2012, of 10 February, regulating the basic organic structure of the Ministry of Industry, Energy and Tourism, BOE, 11 February 2012 (hereinafter "RD 344/2012"), Art. 2(6) **[C-0041]**.

[14]   R-II §§ 944 – 951; C-I fn. 4.

[15]   C-I fn. 4.

[16]   C-I § 219, 691; C-III § 46; Joint Declaration of the IFIC organization between the Ministry of Industry, Tourism and Trade of the Kingdom of Spain and the Federal Ministry of the Environment, Nature Protection and Nuclear Safety of the Federal Republic of Germany, signed in Madrid on 6 October 2005 **[C-0073]**.

[17]   C-I § 225; Summary of the third workshop of IFIC, Madrid, 23 – 24 November 2006 **[C-0075]**.

[18]   C-I § 220; Joint Declaration cooperation on the development and promotion of a feed-in system to increase the use of renewable energy sources in the production of electricity, IFIC, co-signed with Slovenia, 29 January 2007 **[C-0074]**.

[19]   Agenda and list of participants to the 6th IFIC workshop, Brussels, 3 – 4 November 2008 **[C-0076]**.

[20]   C-II § 227; Mr. Ricardo Díaz, "The Importance of Feed In Tariffs to Attract Financial Resources", Grupo Santander, November 2008, slide 20 **[C-0077]**.

[21]   C-I § 228; Agenda and list of participants to the 8th IFIC workshop, Berlin, 18 – 19 November 2010 **[C-0078]**.

117. Claimants submitted that on 24 May 2005, IDAE published a brochure called "*El Sol Puede Ser Suyo*" ("*The Sun Can be Yours*").[22]  In a presentation on the same date, it was suggested that investing in a PV solar facility could generate returns of up to 15%.[23]  IDAE updated and re-issued its brochure on 6 June 2007,[24] in November 2007, and April 2008.[25]  In November 2007 and 2008, Invest In Spain gave presentations entitled "*Opportunities in Renewable Energy in Spain*."[26]

118. On 26 October 2009, Dr. Pedro Marín Uribe, Secretary of State for Energy, gave a speech in Los Angeles, California before US investors where he stated that "*[f]eed-in tariff mechanisms have provided a reliable and stable regulatory environment*."[27]  In November 2009, Dr. Miguel Sebastián Gascón emphasized Respondent's leadership in renewable energy, thanks to its regulatory policy represented by the feed-in model of its first regulatory framework.[28]  Claimants allege that in February 2010, Mr. Marti Scharfhausen, Vice Chairman of CNE, gave a presentation entitled "*Renewable Energy Regulation in Spain*", which explicitly referred to the idea that the incentives would be available during the entire lifespan of the installations and that there would not be any retroactive change to existing facilities.  Mr. Scharfhausen stated that, to reach targets set in the indicative planning, economic incentives "*enough to obtain a reasonable profitability*" works as an energy and environmental policy tool.[29]  The presentation praised Spain's feed-in model as efficient and effective, and noted that it contributed to "*improve the quality of the technology*", and referred to the four criteria of RD 661/2007, including regulatory stability (no retroactive effect).[30]  Respondent, however, states that CNE's functions and competencies do not include either (1) promoting the Spanish regulatory framework to Spanish or foreign investors, or (2) organizing rounds of presentations to promote the

---

[22]  C-I § 678; IDAE Brochure, *"El Sol puede ser suyo"*, 24 May 2005 **[C-0084]**.

[23]  C-I § 241; IDAE Brochure, *"El Sol puede ser suyo"*, 24 May 2005 **[C-0084]**.

[24]  IDAE Brochure, "*El Sol puede ser suyo*", 6 June 2007 **[C-0179]**.

[25]  C-I § 678; IDAE Brochure, *"El Sol Puede Ser Suyo"*, April 2008 **[C-0181]**.

[26]  C-I § 233; Presentation "Opportunities in Renewable Energy in Spain", *Invest in Spain*, November 2008 **[C-0079]**; Presentation "Opportunities in Renewable Energy in Spain", *Invest in Spain*, Graz, 15 November 2007 **[C-0080]**.

[27]  C-I § 651; "Actividades del Plan Made in/Made by Spain en EE.UU. - California-Colorado-Texas, de 26-30 octubre de 2009", of 24 October 2009 **[C-0184]**; Speech by Dr. Pedro Marín Uribe, Secretary of State for Energy, US-Spain Business Sustainability Forum, Los Angeles CA, USA, 26 October 2009 **[C-0187]**.

[28]  C-I § 614; "Q&A: Official details Spain's big green-energy push", *Houston Chronicle*, 7 November 2009 **[C-0185]**.

[29]  C-I §§ 238, 678; Fernando Marti Scharfhausen, "Renewable Energy Regulation in Spain", CNE, February 2010, slides 21, 29 **[C-0183]**.

[30]  *Id.*

investment regime to Spanish or foreign investors.[31]  The Parties dispute the role and responsibilities of the CNE.  Claimants state that, under Regulatory Framework No. 1, the CNE was the advisory body in regulatory matters and the entity in charge of defining a methodology for FITs.[32]  Respondent states that CNE was the Regulatory Authority of the SES.[33]

119.   Following the Hearing, Claimants stated that Respondent's efforts to show that Claimants could not have been induced by an "*attraction campaign*" carried out by Respondent because they did not "*see*" a number of presentations "*completely misses the point.*"[34]  Rather, Claimants explained that they "*have pointed to such statements and representations to establish that Spain's contemporaneous interpretation of its own regulatory framework (essentially, RD 661/2007) coincides with the views on such legislation that the Claimants had before making the Investments:  one of regulatory stability.*"[35]

120.   Respondent summarizes the sources of the Spanish legal system as follows:[36]

-   *The* <u>*Spanish Constitution of 1978*</u>*: This is the supreme Act of the Spanish legal system, which establishes the organisation of the public authorities, their institutional and territorial structure, and regulates the essential aspects of the rights and duties of citizens.*

-   <u>*Act*</u>*: is a written rule which emanates from legislative power. Two kinds of Acts can be distinguished:*

   •   <u>*Organic Acts*</u>*: those reserved for the regulation of certain matters provided for in the Constitution (Fundamental Rights and Public Liberties, general electoral system, among others). An absolute majority of the Congress of Deputies is required for their approval.*

   •   <u>*Ordinary Acts*</u>*: these regulate matters not reserved by the Constitution to an Organic Act. A simple majority of the Congress of Deputies is sufficient for their approval.*

-   <u>*Royal Decree-Act*</u> [Royal Decree-Law] *this is a regulation with force of Law whereby the Government is authorised by the Constitution to approve them in situations of extraordinary need or urgency. The approval of a Royal Decree-Act*

---

[31]   R-II § 661.

[32]   C-I fn. 196; Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*",* of October 2007 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

[33]   R-I § 746.

[34]   CPHB-I § 36 (partially quoted); *citing* Respondent's Closing, slide 75.

[35]   *Id.* (emphasis omitted).

[36]   R-I §§ 234 – 235 (internal citations omitted).

> *is subject to strict conditions, controls and limits and its subsequent parliamentary validation.*
>
> - *<u>Royal Decree</u>: a Royal Decree is a regulatory standard that emanates from the Government. It complements or implements the Acts and is hierarchically inferior to them. It can regulate within the authorisations granted by the Act and cannot breach the Law.*
>
> - *The <u>Ministerial Order</u>: regulation emanating from one or several ministerial Departments. Within the energy framework, the most frequent type is a Ministerial Order emanating from the Ministry of Industry, Energy and Tourism.*
>
> *[...] <u>Resolutions</u>, meanwhile, are not regulations but decisions with a lower rank than Ministerial Order which emanate from competent bodies of the Administration, involving technical content.*[37]

121. Respondent explains that the energy sector and the Spanish supportive scheme "*is a highly regulated and subsidized sector paid by consumers and is governed by the principle of hierarchy of norms that determines (i) that the rights and obligations of the operators can never be contained in a law with the rank of a RD, but in an Act and (ii) any RD must always be consistent with the principles of the Act that it develops.*"[38]

122. The Plan for the Promotion of Renewable Energies 1989 ("PER 1989") defined a standard facility based on "*investment costs, operating costs, useful life which was set at 20 years, the facility's rated power, production and price of electricity on the market.*"[39] Respondent explained that, based on these parameters and by deducting the price obtained from the sale of energy on the market, the amount of public aid could be determined as that which was required to cover the investment and operating costs while also achieving the target return set for these purposes, 10%.[40]

123. Claimants state that Respondent began promoting renewable energy ("RE") in late 1994, through Royal Decree 2366/1994, of 9 December, on the Production of Electrical Energy by Hydraulic Facilities, Cogeneration Facilities, and Other Facilities supplied by renewable Energy Sources or Resources ("RD 2366/1994")[41] and Act 40/1994, of 30 December, on the Organization of the National

---

[37] R-I §§ 234 – 235 (emphasis in original).

[38] RPHB-I § 19(b), 131; Tr. Day 3 p. 93:20-23, p. 94:8-12, p. 95:10-19 (Garcia, Brattle); Tr. Day 3 p. 47:13-24 (Montoya); R. Closing Slides 22 – 23, 25.

[39] R-II § 408, 1989 Plan for the Promotion of Renewable Energies in Spain (hereinafter "*PER 1989*"), page 119 **[R-0244]**.

[40] R-II § 408; PER 1989, pages 119 and 120 **[R-0244]**.

[41] Royal Decree 2366/1994, of 9 December, on the Production of Electrical Energy by Hydraulic Facilities,

Electric System ("Act 40/1994").[42]  Act 40/1994 set up the "Ordinary Regime" for conventional energy production and the "Special Regime" for the generation of RE.[43]

124.  On 27 November 1997, Respondent approved the Electrical Power Act of 1997 ("Act 54/1997"),[44] which replaced Act 40/1994.[45]  What Claimants call "Regulatory Framework No. 1" lasted from 1997 – 2010.[46]

125.  Article 30 of Act 54/1997 established essential general entitlements including "*(i) the right to receive, in exchange for the energy produced, the wholesale pool price plus a supplementary payment to achieve a guaranteed remuneration above the pool price*" and "*(ii) the right to sell the net amount of energy produced by the renewable power installation*."[47]  The Parties agree that, to benefit from the rights, facilities authorized under the Special Regime must be registered in the *Registro administrativo de instalaciones de producción en regimen especial* ("RAIPRE").[48]  The RAIPRE is managed by the Ministry of Energy, and coordinated with the local registers managed by each Autonomous Community in Spain, pursuant to Article 21(4) and 31 of Act 54/1997.[49]

---

Cogeneration Facilities, and Other Facilities supplied by renewable Energy Sources or Resources (hereinafter "RD 2366/1994" **[C-0052]** / **[R-0055]**.

[42]  Act 40/1994, of 30 December, on the Organization of the National Electric System (hereinafter "Act 40/1994") **[C-0053]** / **[R-0037]**.

[43]  C-I § 86 (*discussing* Respondent's promotion of renewable energy); C-III § 25 (*stating* that, combined, Act 40/1994 and RD 2366/1994 created the Special Regime to encourage power generation with renewable energy sources); RD 2366/1994 **[C-0052]** / **[R-0055]**; Act 40/1994 **[C-0053]** / **[R-0037]**.

[44]  Act 54/1997, of 27 November, on the Electricity Sector (hereinafter "Act 54/1997") **[C-0055bis]** / **[R-0059]**.

[45]  RfA § 27; C-I §§ 87; C-III § 25; R-I §§ 245, 299; R-II §§ 275 – 279 (*describing* purpose and assumptions of Act 54/1997); Act 54/1997, Art. 27(1) **[C-0055bis]** / **[R-0059]**; Directive 1996/92/CE, of 19 December, of the European Parliament and the Council, on common rules for the internal market in electricity, published in the Official Journal of the European Union on 30 January 1997 (No L 27/20) **[C-0054]**.

[46]  C-I § 80.

[47]  *Id*. at § 96.

[48]  *Id*. at § 97; R-I § 523; Claimants call this "*Register of Production Installations under the Special Regime*", while Respondents translate this as "*Administrative Record of electricity production facilities*."

[49]  C-I § 97.

126.  Shortly after enacting Act 54/1997, Respondent ratified the ECT,[50] and signed the Kyoto Protocol.[51]

127.  On 30 December 1998, Respondent published Royal Decree 2818/1998, of 23 December on production of electricity by facilities supplied with renewable energy, waste or cogeneration sources or resources ("RD 2818/1998"), which Claimants state "*implement[ed] the feed-in remuneration scheme that converted the* [Act 54/1997] *general entitlements into specific economic rights, designed to attract investment into Spanish renewable energy production.*"[52]

128.  One year later, on 30 December 1999, Respondent adopted the Renewable Energy Promotion Plan 2000 – 2010 ("PER 2000 – 2010").[53]  Claimants explain that, through the PER 2000 – 2010, Respondent committed to carry out a public policy aimed at promoting photovoltaic ("PV") technology to increase the share of renewables in its overall energy consumption to 12% by 2010.[54] According to Respondent, the PER 2000 – 2010 set 7% as the reasonable return and placed two limits on the receipt of subsidies:  (1) the number of years the subsidy would be maintained and (2) the number of hours with the right to the subsidy.  The target return was to be attained through public subsidies.[55]

129.  On 30 December 2000, Respondent published Act 14/2000, of 29 December, on fiscal, administrative and social order measures ("Act 14/2000"), modifying the wording of Act 54/1997 to allow an increase in the incentives for PV installations.[56]

130.  On 27 September 2001, the European Union ("EU") adopted Directive 2001/77/EC on the promotion

---

[50]  Instrument of ratification of the ECT published in the Spanish Official Gazette of 17 March 1998 (Original document in Spanish and partial translation into English included) **[C-0035b]**.

[51]  C-I § 119.

[52]  C-I § 120 (emphasis in original); RfA § 30; R-I § 380; C-III §§ 25, 87 – 89; Decree 2818/1998, of 23 December on Production of Electricity by Facilities Supplied with Renewable Energy, Waste or Cogeneration Sources or Resources (hereinafter "RD 2818/1998") **[C-0059]** / **[R-0067]**.

[53]  C-I §§ 95, 130; R-I § 389; C-III § 54; Act 54/1997 **[C-0055bis]** / **[R-0059]**; Renewable Energy Promotion Plan in Spain 2000-2010 (hereinafter "PER 2000 – 2010") **[C-0050]** / **[R-0090]**; RD 2818/1998 **[C-0059]** / **[R-0067]**.

[54]  C-I § 5, 683; Renewable Energy Promotion Plan in Spain 2005 – 2010 (hereinafter "PER 2005 – 2010") **[C-0066]** / **[R-0092]**; Act 54/1997 **[C-0055bis]** / **[R-0059]**.

[55]  R-II §§ 410 – 413; PER 2000 – 2010 **[C-0050]** / **[R-0090]**.

[56]  C-I § 145; Act 14/2000, of 29 December, on fiscal, administrative and social order measures (hereinafter "Act 14/2000") **[C-0062]**.

of electricity produced from renewable energy sources in the internal electricity market.[57]

131.    On 31 December 2002, Respondent published Royal Decree 1432/2002, of 27 December, establishing the methodology for the approval or modification of the average or reference electricity tariff and amending a number of articles in RD 2017/1997 of 26 December, governing the organization and regulation of the procedure for the settlement of transmission, distribution and tariff retailing costs, the permanent costs of the system, and diversification and security of supply costs ("RD 1432/2002"),[58] which Claimants state introduced the new methodology to calculate the average or reference electricity tariff.[59]

132.    On 27 March 2004, after the 22 January 2004 publication of CNE Report on the same,[60] Respondent published Royal Decree 436/2004, of 12 March, establishing the methodology for updating and systematizing the legal and economic regime governing electric power production under the special regime ("RD 436/2004").[61]  This implementing regulation to Act 54/1997 was in force until 31 May 2007.[62]

133.    On 25 August 2004, there was a meeting between Juergen Frick, Roland Frick, and Gabriel Tschui regarding intentions of Bank Frick to launch a fund for renewable energy.[63]  This meeting led to the

---

[57]    C-I ¶ 114; R-I ¶ 288; R-II ¶ 312; Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market, published in the Official Journal of the European Union on 27 October 2001 (No L 283/33), ("Directive 2001/77/EC") **[C-0057]** / **[RL-0015]**.

[58]    Royal Decree 1432/2002, of 27 December, establishing the Methodology for the approval or modification of the average or reference electricity tariff and amending a number of articles in RD 2017/1997 of 26 December, governing the organization and regulation of the procedure of the settlement of transmission, distribution and tariff retailing costs, the permanent costs of the system, and diversification and security of supply costs (hereinafter "RD 1432/2002") **[C-0063]** / **[R-0068]**.

[59]    *Id.*; C-I § 146; Act 14/2000 **[C-0062]**.

[60]    CNE Report 4/2004, of 22 January, regarding the proposed Royal Decree, which establishes the methodology for the updating and systematisation of the legal and economic regime for electricity production in the special regime **[R-0099]**.

[61]    Royal Decree 436/2004, of 12 March, establishing the methodology for updating and systematizing the legal and economic regime governing electric power production under the special regime (hereinafter "RD 436/2004") **[C-0065]** / **[R-0069]**.

[62]    *Id.*; RfA § 30, C-I § 149; C-III §§ 25, 90 – 92; R-I §§ 329, 399; IFIC, A. Held, M. Ragwitz, G. Resch, F. Nemac and K. Vertin, *Feed-In Systems in Germany, Spain and Slovenia - A Comparison*, Karlsruhe, December 2010 **[CL-0006]** (*summarizing* RD 436/2004).

[63]    Bank Frick & Co. AG, Management Meeting – Minutes of Decision: Launch of a fund for renewable energies,

creation of OperaFund, on the initiative of Mr. Juergen Frick, on 24 January 2005. Claimants state that Mr. Frick conceived OperaFund as a dedicated investment company specializing in acquiring assets with an environmental focus.[64]

134. Deutsche Bank began developing the PV Projects that now underlie Claimants' investments in 2004, when RD 436/2004 was in force. Claimants state that this "*initial development*" created only negligible costs related to permits. Claimants stated that Deutsche Bank did not commit substantial funds toward the development of the PV Plants until after 1 June 2007.[65]

135. By the end of 2004, "*the percentage of renewable energy contributed to primary energy consumption had only increased by a few tenths as compared to 1998, the reference year for the* [PER 2000 – 2010]."[66]

136. In August 2005, IDAE published PER 2005 – 2010, which revised PER 2000 – 2010,[67] and which Respondent states abandoned the term "*minimum rate of return*" for the term "*around 7%.*"[68]

137. Paso-Palma began operations on 22 September 2005.[69]

138. On 15 December 2005, the Spanish Supreme Court issued a judgment regarding RD 436/2004 and expressly refused the possible freezing of the remuneration system.[70]

139. Claimants state that, in 2006, Deutsche Bank AG, Asset Finance & Leasing Renewable Energies ("DABFL") got involved with a local developer from Majorca in a renewable project to build four

---

held on 25 August 2004 **[C-0094]**.

[64]  C-I § 247.

[65]  CPHB-I § 32 – 33.

[66]  C-I § 163; PER 2005 – 2010 **[C-0066]** / **[R-0092]**.

[67]  C-III § 59; PER 2005 – 2010 **[C-0066]** / **[R-0092]**; Evaluation of the Spanish Renewable Energy Plan 2005- 2010, Madrid, April 2011 **[R-0091]**; Press Article, "Spain: New Plan for Renewable Energy", 11 November 2005 **[C-0266]**.

[68]  R-II § 414 – 417; PER 2005 – 2010, page 275 **[C-0066]** / **[R-0092]**.

[69]  Paso-Palma Sol Gestión de Proyectos, S.L.'s online excerpt issued by the Commercial Registry of Palma (Majorca) **[C-0007]** / **[Document 05 CWS-LB]**.

[70]  Judgment from the Third Chamber of the Supreme Court, of 15 December 2005 **[R-0117]**; *compare* R-I § 344, C-III § 198(i).

PV plans in four different municipalities on Majorca.[71]  Paso Palma and Deutsche Bank entered into a Cooperation Agreement on 6 March 2006.[72]

140.  On 30 March 2006, Order ITC/914/2006, which establishes the method for the calculation of the power guarantee compensation for generation facilities under the Ordinary Regime of electricity systems on the islands and outside the Iberian Peninsula, was issued.[73]

141.  On 24 June 2006, after the Ministry of Industry, Energy, and  Tourism ("MINETUR") published a report in support of the same,[74] Royal Decree-Law 7/2006, of 23 June, on the adoption of urgent measures in the energy sector ("RD-Law 7/2006") was published.[75]  Respondent states that RD-Law 7/2006 froze the Average Reference Electricity Tariff ("TMR") referred to in RD 436/2004 for reasons of general interest such as that of market distortion.[76]  Claimants argue this freeze was a temporary measure to enable the Government to correct an error in the Feed-in Tariff ("FIT") remuneration system created by RD 436/2004.[77]

142.  In response to RD-Law 7/2006, leading associations of the renewables sector requested "*the immediate cessation of the ongoing regulatory process.*"[78]

---

[71]  C-I § 244.

[72]  Cooperation Agreement between DBAFL and Paso-Palma Sol, of 17 March 2006 **[C-0210]** / **[Document 06 CWS-LB]**.

[73]  Order ITC/914/2006, of 30 March, establishing the methodology for calculating power guarantee remuneration for the ordinary regime facilities of island and extra-peninsular electricity systems (hereinafter "Order ITC/914/2006") **[R-0103]**.

[74]  Supporting Report of RD-Law 7/2006 **[R-0066]**.

[75]  Royal Decree-Law 7/2006, of 23 June, on the adoption of urgent measures in the energy sector (hereinafter "RD-Law 7/2006") **[R-0056]**.

[76]  *Id.*; R-I §§ 446, 624(a); R-II § 1195(a).

[77]  C-III §§ 99 – 103; Brattle, Regulatory Rebuttal Report:  Changes to the Regulation of Photovoltaic Installations in Spain Since November 2010 (hereinafter "Brattle, Regulatory Rebuttal Report"), §§ 93 – 94, 96 **[CER-0003]**.

[78]  R-I § 448; "*The Controversial Energy Decree-Act*", APPA Info magazine no. 22, May –July 2006. Editorial **[R-0165]**.

143.  In July 2006, the law firm Cuatrecasas prepared a Report for Deutsche Bank.[79]  The Parties dispute whether this Report demonstrated that FITs applied for the total life of the PV Plant.[80]

144.  In August and September 2006, Paso-Palma Sol's 23 Operating subsidiaries (the "*Majorca SPVs*") and Paso-Palma Sol's non-operating subsidiary Photovoltaico Mediterráneo, S.L. began operations.[81]

145.  On 25 October 2006, the Supreme Court of the Kingdom of Spain indicated that "*the remuneration regime [...] does not guarantee, on the contrary, holders of facilities under special regime the inviolability of certain level of returns or income in relation to those obtained in past years, nor indefinite permanence of the formulas used for fixing premiums*."[82]

146.  The final quarter of 2006 saw a variety of statements regarding the draft of what would become Royal Decree 661/2007, of 25 May, which regulates the activity of electric energy production under the special regime ("RD 661/2007").  On 26 October 2006, the Minister of Industry and Energy launched a message to operators regarding the proposed RD 661/2007.[83]  In November 2006, the Association

---

[79]  Cuatrecasas, "Opinion in the interest of Deutsche Bank. Applicable structure for PV projects in Spain*", of July 2006 [C-0211] / [Document 07 CWS-LB] / [Document 08 CWS-PK].

[80]  *Compare* C-II § 158; R-II §§ 644 – 648.

[81]  RfA ¶ 14; Online Excerpts issued by the Commercial Registry of Palma (Majorca) for Alzasol Energía Fotovoltaica, S.L. [C-0008], Arta Sol Mayor, S.L. [C-0009]; Camposol Sali, S.L. [C-0010]; Fotosolar Island, S.L. [C-0011]; Fotopark Llit y Mar, S.L. [C-0012]; Fotovoltaica de Margarita, S.L. [C-0013]; Islasolar Santany, S.L. [C-0014]; Joansol Margaluz, S.L. [C-0015]; Mar Fotosol, S.L. [C-0016]; Margarita ST.Solar, S.L. [C-0017]; Parkarta Fotoluz, S.L. [C-0018]; Parque Solgalmes, S.L. [C-0019]; PFM Bahía Costa Sol, S.L. [C-0020]; Sofolt Salinas, S.L. [C-0021]; Solana de Arta, S.L. [C-0022]; Solarfoto del Mar, S.L. [C-0023]; Solarllit P.S. S.L. [C-0024]; Solmar Fotovol, S.L. [C-0025]; Solarparque de los Pinos, S.L. [C-0026]; Solarsur Park, S.L. [C-0027]; Solarta Galme, S.L. [C-0028]; Solarta Parque Luz, S.L. [C-0029]; Solgames Arta, S.L. [C-0030]; Parque Fotovoltaico Mediterráneo, S.L. [C-0031].

[82]  R-I §§ 338, 384, 582, 605, 724; R-II § 261, 379 – 380, 525, 871, 899, 1207(a); C-III § 198(ii) (*explaining* that the Court was not considering a challenge to RD 436/2004); Judgment from the Third Chamber of the Supreme Court dated 25 October 2006, appeal 12/2005, reference El Derecho EDJ 2006/282164 (Spanish) [R-0118].

[83]  R-II §§ 512, 612, 1207; Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 [R-0248]; Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 [R-0224]; Appearance before the Congress of Joan Clos i Matheu, Minister of Energy and Tourism, of 8 May 2007 [R-0250]; RD 661/2007 [R-0071] / [C-0046]; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 [R-0223]; Royal Decree-Law 6/2009, of 30 April, which adopts certain measures in the energetic sector and passes the discount tariff, published in the Official Gazette of the Kingdom of Spain on 7 May 2009 (hereinafter "RD-Law 6/2009") [C-0268] / [R-0057]; Royal Decree-Law 14/2010, of 23 December, on the establishment of urgent measures for the correction of the tariff deficit in the electricity sector (hereinafter "RD-Law 14/2010") [C-0111] / [R-0058]; Act 2/2011, of 4 March, on Sustainable Economy (hereinafter "Act 2/2011") [C-0115] / [R-0045]; Journal for the Sessions of the Congress, Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in

of Renewable Energy Producers ("APPA") submitted pleadings in response to RD 661/2007 proposing that remuneration be based on standard facilities defined according to their capacity.[84]

147. On 8 November 2006, Mr. Ignasi Nieto Magaldi, Secretary General of Energy, appeared before the Congress and objected to the over-remuneration of renewable energy producers.[85]  There were several published articles and statements related to changes and reductions to premiums for wind energy producers between November and December 2006.[86]

148. In 2007, DBAFL teamed up with another local developer in the region of Extremadura to develop three PV installations with a nominal capacity under 10 MW.[87]

149. On 10 January 2007, there was a Communication from the EC to the Council and the European

---

[84] the electricity sector, 46-48 [R-0238]; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011 [R-0169]; Royal Decree-Law 13/2012, of 30 March, that transposes directives relating to the internal electricity and gas markets, electronic communication-related matters and adopts measures for correcting deviations due to imbalances between costs and revenues in the electricity and gas sectors (hereinafter "RD-Law 13/2012") [R-0061]; National Reform Programme 2012 [R-0094]; *The Reforms of the Spanish Government: Determination in the face of the crisis*", Secretariat of State for Communication, Ministry of the Presidency, September 2012 [R-0204]; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012 [R-0095]; Memorandum of Understanding signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*" [RL-0067].

[84] R-II § 418; Renewable Energy Economic Regime Review; APPA proposals report, November 2006 [R-0216] / [R-0270].

[85] R-II §§ 621 – 634, 1207(a); Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 [R-0224]; Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 [R-0248]; Appearance before the Congress of Joan Clos i Matheu, Minister of Energy and Tourism, of 8 May 2007 [R-0250]; RD 661/2007 [R-0071] / [C-0046]; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 [R-0223]; RD-Law 6/2009 [C-0268] / [R-0057]; RD-Law 14/2010 [C-0111] / [R-0058]; Journal for the Sessions of the Congress. Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, pages 46-48 [R-0238]; Act 2/2011 [C-0115] / [R-0045]; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, Monday 19 December 2011 [R-0169]; RD-Law 13/2012 [R-0061]; MoU signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*" [RL-0067].

[86] *See e.g.* APPA Info magazine no. 23, August –December 2006 [R-0164]; "Industry to reduce wind energy bonuses to encourage other types", Diario de Leon, 12 November 2006 [R-0192]; "Last year wind energy remuneration fell to the levels of 2003" [R-0195]; "Wind energy companies nosedive and threaten to take their investment elsewhere", La Verdad, 3 December 2006 [R-0214]; UNESA Allegations to RD Draft 661/2007, regulating the activity of electricity production under the special regime and certain facilities using similar technology under the ordinary regime, 20 December 2006 [R-0318].

[87] C-I § 244.

Parliament entitled "*Renewable Energy Road Map [-] Renewable Energies in the 21st Century: Building a More Sustainable Future*,"[88] wherein the EU recommended increasing RE consumption to 20% by 2020.[89]

150.  On 19 January 2007, AEE described the draft of RD 661/2007 as retroactive, because it would affect plants in operation.[90]

151.  On 9 February 2007, MINETUR issued a press release, stating that it had signed an agreement with "*the Bank*" to facilitate financing of renewable energy and cogeneration projects.[91]

152.  On 14 February 2007, CNE issued a report on the draft RD 661/2007 entitled "*CNE's Report 3/2007 Concerning the Proposal for a Royal Decree Regulating Electric Power Production in the Special Regime and that of Certain Installations in the Ordinary Regime with Similar Technologies*" ("CNE Report 3/2007")[92]

153.  On 20 March 2007, the Supreme Court confirmed that there is no vested right to receive a specific subsidy in the future.[93]

154.  On 23 March 2007, the Ministry of Industry, Tourism and Commerce issued its "*Report on the Draft Royal Decree Regulating the Activity of Production of Electric Power under Special Regime and of*

---

[88]  Communication from the Commission to the Council and the European Parliament, COM(2006) 848, *Renewable Energy Road Map*, 10 January 2007 **[C-0259]**.

[89]  C-III § 37; Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, COM(2008) 30, *20 20 by 2020 Europe's climate change opportunity,* 23 January 2008 **[C-0260]**.

[90]  R-II § 549; "Technical and Solar Power Production Due Diligence for the Paso Power Plant Project, Mallorca, Spain (Son Jordi, Son Cortera, Santa Margarita, Arta)", Final Report for Deutsche Bank AG, Fichtner, October 2008 **[R-0273]** / **[Document 03 CWS-PK]** / **[BQR-77]**.

[91]  Press release issued by the Ministry of Energy, "Industria firma con la banca un convenio para facilitar la financiación de los proyectos de energías renovables y cogeneración" (*Industry signs an agreement with the bank to facilitate the financing of renewable energy and cogeneration projects*), 9 February 2007 **[C-0267]**.

[92]  C-I § 169; CNE's Report No. 3/2007 regarding the draft Royal Decree regulating the activity of electricity production under the Special Regime and certain facilities of equivalent technologies of the Ordinary Regime, 14 February 2007 (hereinafter "CNE Report 3/2007") **[C-0051]** / **[R-0101]**.

[93]  R-I §§ 348, 582; R-II § 525; C-III § 198(iii) Judgment from the Third Chamber of the Supreme Court, 20 March 2007, Appeal 11/2005 EDJ 2007/18059 **[R-0119]**; Judgment from the Third Chamber of the Supreme Court, 9 October 2007, Appeal 13/2006 EDJ 2007/175313 **[R-0120]**; Article published in the Economic newspaper "CINCO DIAS": *"The Supreme Court allows retroactive change in premiums"* (22 April 2010) **[R-0210]**.

*Certain Facilities with Technologies Under Ordinary Regime*."[94]  Claimants argue that this is contemporaneous evidence that Respondent offered investors grandfathered FITs to create a climate of price stability and low regulatory risk, incentivizing investments in the Spanish renewable sector.[95]

155.   On 3 April 2007, Mr. Jose Maria Gonzalez Valez, as the Chairman of APPA, provided testimony against the proposed RD 661/2007,[96] which Respondent states shows that "*APPA expressly warned that no rational investor could deduce a commitment to the future immutability of the remunerations of RD 661/2007 and that the remuneration for renewable facilities could be reduced in the future*."[97]

156.   Respondent states that, on 1 May 2007, Cuatrecasas issued a due diligence Report to a redacted recipient, concluding that "*the new methodology for calculating their retribution (…) would be directly applied to all installations*", including those that had begun to operate when RD 436/2004 was in force.  Cuatrecasas never stated that this infringed the Spanish legal system. Rather, Cuatrecasas pointed out that the draft of Royal Decree 661/2007 would annul the four-year revision system of RD 436/2004.[98]

157.   On 26 May 2007, the Kingdom of Spain published RD 661/2007, which replaced RD 436/2004 and came into force on 1 June 2007.[99]  The Parties dispute whether RD 661/2007 linked the reasonability of the subsidies to the reasonableness of the costs (Respondent argues) or guaranteed PV energy producers a fixed FIT, indexed to inflation, during the lifetime of a PV installation (Claimants argue).[100]  Respondent disputes Claimants' assertion that RD 661/2007 provided Claimants' PV Installations the following six rights:

---

[94]   Report prepared by the Ministry of Industry, Tourism and Commerce's General Technical Secretariat on the Royal Decree draft regulating the activity of production of electric power under the special regime and of certain facilities with technologies under the Ordinary Regime (legal and economic assessment of draft RD 661/2007), 23 March 2007 **[C-0300]**.

[95]   *Id*. at 1; C-III § 361; CNE Report 3/2007, 23 **[C-0051]** / **[R-0101]**.

[96]   Claims of APPA of 3 April 2007 against the Royal Decree 661/2007 draft **[R-0271]**.

[97]   *Id*.; R-II § 548.

[98]   R-II § 598; Report Due Diligence 1 May 2007, Cuatrecasas **[R-0293]**.

[99]   RD 661/2007 **[R-0071]** / **[C-0046]**.

[100]   *Id*.; RfA § 30; C-I §§ 8 – 9, 170; R-I §§ 331, 349; C-III §§ 25, 93 – 98; R-II §§ 426, 493, 502, 621, 1195(b); RD 436/2004 **[C-0065]** / **[R-0069]**; Brattle Regulatory Report (26 October 2016) [hereinafter "Brattle, Regulatory Report"], § 94 **[CER-0001]**.

(i)      *Right to receive a Regulated Tariff for an unlimited period of time (Article 24(1)).*

(ii)     *Right to sell the full net amount of electricity produced (Article 17(b)).*

(iii)    *Right to not be affected by future revisions of the regulatory framework (Article 44(3)).*

(iv)     *Right to receive a feed-in remuneration scheme annually updated in accordance with general CPI less 0.25 % until the end of 2012 and less 0.50 % onwards (Article 44(1)).*

(v)      *Right to priority access to the transmission and distribution grid and energy dispatch priority (Article 17(e) and Annex XI(3)).*

(vi)     *Right to receive a reactive energy supplement for the maintenance of certain stipulated power factor values (which was established at 0.082954 Euro/kWh) (Article 29(1)).*[101]

158.   A press release accompanied RD 661/2007.  According to Claimants, Respondent's press release stated that "*[a]ny revisions of tariffs to be carried out in the future shall not affect the plants already in operation.  This guarantee provides legal certainty for the producer, providing stability for the sector and promoting its development*[.]"[102]  Respondent states that the press release contained obvious errors and did not guarantee that the rates of 661/2007 would continue in perpetuity or that there was a right of option between 2 systems of remuneration.[103]

159.   In July 2007, Pöyry issued a report on the RE market.  While the report focused on wind energy technology, it also focused on economic sustainability and over-remuneration, noting Spain's concern about the remuneration regime.[104]

160.   On 5 July 2007, Act 17/2007, of 4 July, modifying Act 54/1997 for adaptation thereof in accordance with the provisions of Directive 2003/54/EC, of the European Parliament and of the Council, of 26 June 2003, concerning common rules for the internal market in electricity ("Act 17/2007") was published.[105]  Act 17/2007 contained the following text:  "*[t]hese tariffs of last resort will be*

---

[101] C-I § 666; *contra* RPHB-I § 7 (*denying*); *see also* CPHB-I §§ 42 – 43 (*explaining* how the PV Plants were developed in response to RD 661/2007).

[102] C-I §§ 9, 171, 612, 672; C-III §§ 98, 107; Official Press Release of the Ministry of Energy of 25 May 2007, regarding the enacted RD 661/2007 **[C-0067]**.

[103] R-II § 666 – 671; Official Press Release of the Ministry of Energy of 25 May 2007, regarding the enacted RD 661/2007 **[C-0067]**.

[104] R-II §§ 509, 590; ILEX-Pöyry Report Current and future state of wind energy in Spain and Portugal 2007 **[R-0249]**.

[105] Act 17/2007, of 4 July 2007, modifying Act 54/1997 for adaptation thereof in accordance with the provisions of

*established in such a way that the calculation thereof will respect the principle of sufficient revenue and not cause any distortion to competition*."[106]

161. On 26 July 2007, Ecoinversión en Extremadura 3 S.L. ("ECO 3") commenced operations.[107]

162. In September 2007, the amount of PV installed capacity reached 85% of the installed capacity objective.[108]

163. On 27 September 2007, the Ministry of Energy issued a resolution that "*established a time limit of 12 months for maintaining the regulated tariff for photovoltaic technology*."[109] Claimants state that this resolution put Deutsche Bank under pressure to complete the PASO and ECO 3 Projects on time,[110] because those PV projects failing to meet this deadline would not benefit from RD 661/2007 and would have to choose between completing their projects to operate under a different (and still unknown) to-be-enacted feed-in remuneration regime or lose their incurred project development costs.[111]

164. After the Hearing, Claimants explained that:

   a)    *El Paso was constructed (and always conceived) as a 100 kW facility. Thus, Deutsche bank always intended it to achieve the maximum remuneration for PV under the FIT regulations; and*

   b)    *ECO 3 was ultimately constructed as a 10MW facility (rather than as an aggregation of "smaller" 100 kW sub-facilities) (only) due to the fact that RD 661/2007 put an end to the difference in remuneration between "smaller" (≤ 100kW) and "not-small" (between 100 kW and 10 MW) PV plants. With RD 661/2007, there was no longer an economic incentive for "staggering" it into 100*

---

Directive 2003/54/EC, of the European Parliament and of the Council, of 26 June 2003, concerning common rules for the internal market in electricity (hereinafter "Act 17/2007") **[C-0299]**.

[106] C-III § 354.

[107] Ecoinversión en Extremadura 3, S.L.'s online excerpt issued by the Commercial Registry of Badajoz **[C-0006]**.

[108] C-I § 25; C-III § 10.

[109] C-III § 152; R-I fn. 280; Resolution by the General Secretariat for Energy establishing the time limit for maintaining the regulated tariff for photovoltaic technology ended on this date (27 September 2007) **[R-0226]**; Lars Bauermeister Witness Statement (24 October 2016), §§ 49 – 50 **[CWS-LB]**.

[110] C-III § 152.

[111] *Id*. at § 10.

*kW sub-facilities.*[112]

165. In October 2007, Cuatrecasas issued a Legal Opinion analyzing the legal regime applicable to the PASO and ECO 3 Projects to Deutsche Bank.[113]  Claimants have not stated when Deutsche Bank shared this report with OperaFund.[114]

166. On 9 October 2007, the Spanish Supreme Court confirmed that there is no vested right to receive a specific subsidy in the future.[115]

167. Arthur D. Little published a report on behalf of ASIF and APPA entitled "*The role of photovoltaic energy generation in Spain*", which commented that 7% is a reasonable rate of return and that the useful life of a facility is 25 years.[116]

168. The Parties agree that there was a dramatic fall in electricity demand in 2008, brought about by the international financial crisis.[117]

169. On 23 January 2008, there was a Communication from the EC to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions entitled "*20 20 by 2020 Europe's Climate Change Opportunity*," which adopted the EU's 2006 recommendations for increasing RE consumption to 20% by 2020.[118]

170. On 29 February 2008, Royal Decree 325/2008, of 29 February, establishing the remuneration of the electricity transmission activity for installations commissioned after 1 January 2008 ("RD 325/2008")

---

[112] CPHB-I § 33(a) – (b).

[113] Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*",* of October 2007 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

[114] C-I § 256.

[115] R-I § 348; C-III § 198(iv) (*arguing* that the case is irrelevant and based on an administrative appeal); Judgment from the Third Chamber of the Supreme Court, 20 March 2007, Appeal 11/2005 EDJ 2007/18059 **[R-0119]**; Judgment from the Third Chamber of the Supreme Court, 9 October 2007, Appeal 13/2006 EDJ 2007/175313 **[R-0120]**.

[116] R-II § 394; The Role of the Photovoltaic Generation in Spain by Arthur D Little, November 2007, for ASIF and APPA **[R-0255]**.

[117] R-II §§ 1269 – 1272, 1281 – 1284; C-III §§ 558 – 561.

[118] C-III § 37; Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, COM(2008) 30, *20 20 by 2020 Europe's climate change opportunity,* 23 January 2008 **[C-0260]**.

set remuneration "*in the Spanish 10-year bond plus 375 basis points*."[119]

171. On 1 April 2008, the EC published the Official Notice entitled "*Community Guidelines on State Aid for Environmental Protection*."[120]

172. On 30 April 2008, Son Jordi achieved final RAIPRE registration under Article 12 of RD 661/2007.[121]

173. The Parties agree that Claimants invested between July 2008 and July 2009. Claimant OperaFund's investment began in July 2008, and Schwab's in April 2009.[122] Claimants state that they have invested in five PV facilities in Spain and that these investments consist of (1) shares in special purpose vehicles ("SPVs") which own PV Installations in Spain and (2) participative loans granted to these SPVs.[123] These investments are held through (1) Claimants' wholly owned subsidiary Paso-Palma Sol Gestión de Proyectos, S.L. ("*Paso-Palma Sol*") and (2) Paso-Palma Sol's 24 wholly owned operating subsidiaries ("*Majorca SPVs*"), which own PV installations in 4 municipalities in

---

[119] R-I § 814; Royal Decree 413/2014, of 6 June, regulating the activity of power production from renewable sources of energy, cogeneration and waste ("RD 413/2014") **[C-0131]** / **[R-0080]**; Ministerial Order IET/1045/2014, of 16 June, approving the remuneration parameters for standard plants applicable to certain facilities that produce power from renewable sources of energy, cogeneration and waste (hereinafter "MO IET/1045/2014") **[R-0086]** / **[C-0126]** / **[C-0126bis]**; Royal Decree 325/2008, of 29 February, establishing the remuneration of the electricity transmission activity for installations commissioned after 1 January 2008 (hereinafter "RD 325/2008") **[R-0183]**.

[120] Community guidelines on State Aid for environmental protection 2008/C82/01, European Commission, published in the Official Journal of the European Union on 1 April 2008 **[R-0031]**.

[121] C-I § 245; C-III § 138(i); Final Commissioning Certificate and registration with the regional RAIPRE obtained by the Facilities within Son Jordi PV Project, on 30 April 2008 **[C-0085]** / **[Document 12 CWS-LB]**; Certificate confirming the registration with RAIPRE of the Facilities within Son Jordi PV Project, on 8 September 2008 **[C-0086]**.

[122] C-I § 40; R-I § 368, 617 – 619 (*citing* C-I §§ 261, 266, 269); R-II § 685; Public Deed notarizing the Share Purchase Agreement of Paso-Palma Sol's shares between Dean Solar Energy GmbH and OperaFund, of 16 July 2008 **[C-0097]** / **[Document 19 CWS-LB]**; Participative Loan Agreement between OperaFund and Paso-Palma Sol, of 16 July 2008 **[C-0098]**; Amendment to the Participative Loan Agreement between OperaFund and Paso-Palma Sol, of 23 January 2009 **[C-0099]**; Public Deed notarizing ECO 3's corporate resolutions on the change of the sole shareholder and execution of a capital increase, of 15 June 2009 **[C-0105]**; Public Deed notarizing the Share Purchase Agreement of Paso-Palma Sol's shares between OperaFund and Schwab, of 15 April 2009 **[C-0106]**; Public Deed notarizing correcting the previous Share Purchase Agreement of Paso-Palma Sol's shares between OperaFund and Schwab, of 14 July 2009 **[C-0107]**; Public Deed notarizing the assignment of part of the Participative Loan between OperaFund and Paso-Palma Sol to Schwab, of 14 July 2009 **[C-0108]**; Public Deed notarizing the Share Purchase Agreement of Paso- Palma Sol's shares between OperaFund and Schwab, of 14 July 2009 **[C-0109]**.

[123] C-I §§ 38 – 39.

Majorca.[124]  The share capital of Paso-Palma Sol is divided between OperaFund and Schwab on a 75% / 25% basis, as is the participative loan granted to Paso-Palma Sol.[125]  Claimants refer to the "*going concern*" underlying their investment in Majorca as the "*PASO Project*."[126]

174.  OperaFund owns 100% of the shares ECO 3.  ECO 3 owns an installation located in Badajoz ("Badajoz Installation").  OperaFund's investment includes a participative loan to ECO 3.[127]  The "*going concern*" underlying OperaFund's investment in Badajoz is referred to as the "*ECO 3 Project*."[128]

175.  Claimants' PV projects were financed through the Public Deed of Private Financing Agreement, whereby HSH Nordbank AG provided financing to the Solar Parks of Extremadura, SL, Ecoinversión en Extremadura 1, 2, and 3 in the amount of EUR 229,850,000.  This agreement to finance a solar farm in Extremadura with a total capacity of 30 MWp was signed on 2 July 2008 and executed on 10 July 2008.[129]

176.  On 16 July 2008, OperaFund acquired a 99% shareholding interest in Paso-Palma Sol,[130] and granted a participative loan of EUR 10,000,000 to Paso-Palma Sol to enable it to lend that amount to the Majorca SPVs.[131]

177.  On 29 July 2008, CNE published "*CNE Report 30/2008 in Relation to the Draft Royal Decree on*

---

[124] C-I §§ 40 – 41, 43; RfA Annex II; RfA Annex III.

[125] C-I § 43 – 44.

[126] *Id*. at § 46.

[127] *Id*. at §§ 46 – 47; RfA Annex I; Power of Attorney granted by OperaFund Eco-Invest SICAV PLC and Resolution granted by the Board of Directors of OperaFund Eco-Invest SICAV PLC authorizing the initiation of the arbitration **[C-0003]**.

[128] C-I § 48.

[129] C-I § 200; Public Deed notarizing the Common Terms of Agreement entered into by Paso-Palma Sol Gestión de Proyectos, S.L., OperaFund Eco-Invest Sicav p.l.c., Parque Fotovoltaico Mediterráneo, S.L., Deutsche Bank AG, London Branch and Deutsche Bank Luxembourg, S.A., of 28 January 2009 **[C-0060]** / **[Document 21 CWS-LB]**; Public Deed notarizing the facilities agreement between HSH NordBank AG, Solar Parks of Extremadura SL, EcoInversión en Extremadura 1 SL, EcoInversión en Extremadura 2 SL, and EcoInversión 3 SL, of 2 July 2008 **[C-0061]** / **[Document 17 CWS-LB]**.

[130] RfA § 19; C-I § 261; RPHB-I § 130; Public Deed notarizing the Share Purchase Agreement of Paso-Palma Sol's shares between Dean Solar Energy GmbH and OperaFund, of 16 July 2008 **[C-0097]** / **[Document 19 CWS-LB]**.

[131] RfA § 20; C-I § 261; Participative Loan Agreement between OperaFund and Paso-Palma Sol, of 16 July 2008 **[C-0098]**.

*Subsidising Electricity Production Activity Through Solar Photovoltaic Technology for Facilities Subsequent to the Maintenance Deadline of the Retribution of Royal Decree 661/2007, of 25 May, for This Technology*" ("CNE Report 30/2008").[132]  According to Respondent, this Report upheld the applicability of the case law from 2005 and 2006, "*to justify the possibility of reducing the premiums for existing wind farms.*"[133]

178.  On 30 July 2008, Vernissa Nou and Son Quatera achieved final RAIPRE registration.[134]

179.  On 8, 10, and 17 September 2008, the facilities within the Son Jordi PV Project, S'Estelrica, and Badajoz achieved RAIPRE registration, respectively.[135]

180.  On 27 September 2008, Royal Decree 1578/2008, of 26 September, on the payment for the electric production activity from solar photovoltaic technology for facilities built after the deadline until which the remuneration under Royal Decree 661/2007, of 25 May, was maintained  for said technology ("RD 1578/2008") was published.[136]  Claimants argue that RD 1578/2008 introduced a new feed-in regime for PV installations registered with RAIPRE after the one-year window set by the Government (ending 29 September 2008).[137]  Respondent states that RD 1578/2008 warned that there could be a

---

[132] Report 30/2008 by the CNE, regarding the draft Royal Decree on the remuneration for production of electrical energy using solar photovoltaic technology for facilities after the deadline for the maintenance of the remuneration fixed under Royal Decree 661/2007, of 25 May, for such technology (hereinafter "CNE Report 30/2008") **[R-0087]** / **[W-0410]** / **[C-0341]** / **[BRR-221]**.

[133] R-II §§ 457 – 458; CNE Report 3/2007 **[C-0051]** / **[R-0101]**; CNE Report 30/2008 **[R-0087]** / **[W-0410]** / **[C-0341]** / **[BRR-221]**; Spain State Legal Service Report on Industry and Energy of 29 March 2007 **[R-0251]**.

[134] C-I § 245; C-III § 138(i); Final Commissioning Certificate and registration with the regional RAIPRE obtained by the Facilities within Vernissa Nou PV Project, on 30 July 2008 **[C-0087]** / **[Document 13 CWS-LB]**; Certificate confirming the registration with RAIPRE of the Facilities within Vernissa Nou PV Project, on 23 October 2008 **[C-0088]**; Final Commissioning Certificate and registration with the regional RAIPRE obtained by the Facilities within Son Quartera PV Project, on 30 July 2008 **[C-0089]** / **[Document 14 CWS-LB]**.

[135] C-I § 245, C-III § 138(i) – (ii); Certificate confirming the registration with RAIPRE of the Facilities within Son Jordi PV Project, on 8 September 2008 **[C-0086]**; Final Commissioning Certificate and registration with the regional RAIPRE obtained by the Facilities within S'Estelrica PV Project, on 10 September 2008 **[C-0091]** / **[Document 15 CWS-LB]**; Certificate confirming the registration with RAIPRE of the Facilities within S'Estelrica PV Project, on 1 December 2008 **[C-0092]**; Final Registration of the Badajoz PV Installation in the RAIPRE, on 17 September 2008 **[C-0093]** / **[Document 18 CWS-LB]**.

[136] Royal Decree 1578/2008, of 26 September, on the payment for the electric production activity from solar photovoltaic technology for facilities built after the deadline until which the remuneration under Royal Decree 661/2007 of 25 May, was maintained for said technology (hereinafter "RD 1578/2008") **[R-0072]** / **[C-0070]**.

[137] RfA § 36; C-I §§ 205 – 206, 610, 675 – 677; C-III §§ 120 – 120; Resolution of the Secretary of State for Energy of 27 September 2007 establishing the timeframe to benefit from the feed-in scheme for PV installations under RD 661/2007, of 25 May, as defined in their Art.  22 and 37 **[C-0069]** / **[Document 10 CWS-LB]**; RD 1578/2008 **[R-**

change to the remuneration of the production of electricity using solar PV technology, in 2012, depending on the sustainability of the remuneration regime.[138]

181.    Claimants state that all their facilities were registered in RAIPRE by 29 September 2008.[139]

182.    On 16 October 2008, the Secretary General for Energy appeared before Parliament and expressly referred to the need for economic sustainability of the remuneration system.  At that point, the Tariff Deficit generated since 2000 was growing and increasingly unsustainable.[140]

183.    On 29 October 2008, Fernando Marti Scharfhausen, Vice President of CNE, gave a presentation entitled "*The Legal and Regulatory Framework for Renewable Energies*."[141]  According to Claimants, this reflects that Spain did not guarantee investors an "*abstract*" reasonable return, but rather a specific system of remuneration that enabled investors to plan their investments and incur substantial costs under conditions of certainty and predictability.[142]  Respondent, however, states that the CNE PowerPoint presentations were part of training courses given by CNE personnel and were not aimed at foreign investors or delivered as part of an campaign to capture foreign investors.[143]

---

0072] / [C-0070]; Brattle, Regulatory Report, § 100 [CER-0001].

[138]    R-I § 624(e); R-II § 307; RD 1578/2008, Additional Provision Five [R-0072] / [C-0070]; *see also* "The new remuneration of photovoltaic solar energy after Royal Decree 1578/2008, of 26 September", *Pedro Gomez Ibarguren,* Legal News [R-0232].

[139]    C-I § 610.

[140]    R-I § 479; R-II §§ 308, 621, 1207(i); CNE Report 30/2008   [R-0087] / [W-0410] / [C-0341] / [BRR-221]; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 [R-0223]; Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 [R-0248]; Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 [R-0224]; Appearance before the Congress of Joan Clos i Matheu, Minister of Energy and Tourism, of 8 May 2007 [R-0250]; RD 661/2007 [R-0071] / [C-0046]; RD-Law 6/2009 [C-0268] / [R-0057]; RD-Law 14/2010 [C-0111] / [R-0058]; Journal for the Sessions of the Congress. Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, pages 46-48 [R-0238]; Act 2/2011 [C-0115] / [R-0045]; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011 [R-0169]; RD-Law 13/2012 [R-0061]; MoU signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*" [RL-0067].

[141]    F. Martí Scharfhausen, "The Legal and Regulatory Framework of Renewable Energies*"*, CNE, 29 October 2008 [C-0081].

[142]    C-III § 189.

[143]    R-I § 598 (*responding* to F. Martí Scharfhausen, "The Legal and Regulatory Framework of Renewable Energies*"*, CNE, 29 October 2008 [C-0081]; Solé Martín & L.J. Sánchez de Tembleque, "Estudio económico de las energías Renovables," CNE, Cartagena de Indias, 9 – 13 February 2009 [C-0082]; and Fernando Marti Scharfhausen,

184.  In November 2008, Pöyry published their Report, entitled "*Current and Future Trends in the Spanish Solar Industry, An ILEX Energy Report to FPL, November 2008 Edition*", where it explained that Spain had been unwilling to deal with the increasing TMR by raising tariffs to avoid the risk of inflation and that, instead, Spain (1) changed the renewable scheme from RD 436/2004 to RD 661/2007 and (2) reviewed the Solar PV tariffs under RD 661/2007 by publishing RD 1578/2008.[144]

185.  On 10 November 2008, OperaFund acquired the remaining 1% shareholding interest of Paso-Palma Sol which, on the same date, acquired the share capital of the Majorca SPVs.[145]  OperaFund approved a capital increase in Paso-Palma Sol and issued new shares.[146]

186.  On 1 December 2008, the Ministry of Energy issued a Certificate confirming the registration of the Facilities within the S'Estrelrica PV project with the RAIPRE.[147]

187.  On 3 December 2008, Cuatrecasas issued a report, entitled "*Limited Legal Due Diligence Report 'Paso-Palma Sol Gestión De Proyectos, S.L.'*", which Respondent states was limited to legal issues unrelated to the legal framework of the subsidies.[148]

188.  On 23 January 2009, the 16 July 2008 loan from OperaFund to Paso-Palma Sol was extended up to EUR 11,223,800 and Paso-Palma Sol extended its loans to the Majorca SPVs.[149]

189.  On 28 January 2009, Deutsche Bank and OperaFund signed a no-recourse long-term financing agreement.[150]

---

"Renewable Energy Regulation in Spain", CNE, February 2010 **[C-0183]**).

[144]  R-II § 510; Pöyry: current and future trends in the Spanish solar industry, November 2008 Edition **[R-0242]**.

[145]  C-I § 262; Public Deed notarizing the Shares Purchase Agreement under which Paso-Palma Sol acquired share nº 31 of all the Majorca SPVs, of 10 November 2008 **[C-0101]** / **[Document 20 CWS-LB]**.

[146]  C-I § 263; Public Deed of capital increase of Paso-Palma Sol's share capital, of 10 November 2008 **[C-0102]**.

[147]  C-I fn. 185; Certificate confirming the registration with RAIPRE of the Facilities within S'Estelrica PV Project, on 1 December 2008 **[C-0092]**.

[148]  Limited Legal Due Diligence Report "Paso-Palma Sol Gestión De Proyectos, S.L.", Cuatrecasas, 3 December 2008 **[R-0329]**.

[149]  RfA § 20; C-I § 261; Amendment to the Participative Loan Agreement between OperaFund and Paso-Palma Sol, of 23 January 2009 **[C-0099]**.

[150]  R-II §§ 657 – 658; C-I § 144; Public Deed notarizing the Common Terms of Agreement entered into by Paso-Palma Sol Gestión de Proyectos, S.L., OperaFund Eco-Invest Sicav p.l.c., Parque Fotovoltaico Mediterráneo, S.L.,

190.  On 9 and 13 February 2009, Messrs. Carlos Solé Martin and Luis Jesús Sánchez de Tembleque of CNE gave a presentation entitled "*Economic Study of Renewable Energies*" wherein they analyzed the economic profitability of renewables.  The presentation stated that "[a]*llowing a remuneration to investments with a profitability higher than the WACC implies that the business will be able to develop the project with profitability.*"  They also discussed the financing of renewable projects through "*project finance*", mentioning a "*financial leverage between 55% and 90% of the investment.*"[151]  Respondent states that these presentations took place within the framework of "*training courses or meetings among regulatory authorities*" rather than as an attempt to attract foreign investors.[152]

191.  On 1 March 2009, attorney Mr. Pedro Gómez Ibaguren published a legal report entitled "*The new remuneration of photovoltaic solar energy after Royal Decree 1578/2008, of 26 September*", wherein he concludes that "*it does not fully end with legal uncertainty, […] due to the fact that the revision of tariffs continues to be determined by the Ministry of Industry through the Secretariat-General for Energy.*"[153]

192.  In April 2009, the State Association Attorneys' Association Journal no. 23 featured an article by Eduardo Soler Tappa, State Attorney Head in MINETUR entitled "*Acquired Rights, Legitimate Expectations and Retroactivity of Regulations that Alter or Modify Recognized Economic Rights. Particular Case of Electricity Production Facilities:  Different Regime of Bonuses in Royal Decree 661/2007 with Respect to Royal Decree 486/2004*."[154]  Respondent explains that this Report examined the case-law of the Supreme Court from 2005, 2006, and 2007, which showed that future RD 661/2007 premiums were not an "*acquired right*", since that would imply a petrification of RD 661/2007.[155] This article was re-published on 9 October 2009.[156]

---

Deutsche Bank AG, London Branch and Deutsche Bank Luxembourg, S.A., of 28 January 2009 **[C-0060]** / **[Document 21 CWS-LB]**.

[151] C-I § 237; Solé Martín & L.J. Sánchez de Tembleque, "Estudio económico de las energías Renovables," CNE, Cartagena de Indias, 9 – 13 February 2009, slides 30 – 31 **[C-0082]**.

[152] R-II § 673.

[153] *Id*. at §§ 532, 604.

[154] R-I § 573 – 574; Abogados del Estado Magazine nº 23 January to March 2009. Legal article by Eduardo Soler Tappa **[R-0054]**.

[155] *Id*.

[156] R-I § 575; Eduardo Soler Tappa, "Acquired Rights, Legitimate Expectations and Retroactivity In The Rules That

193.  On 15 April 2009, Schwab acquired a 22.09% shareholding interest in Paso-Palma Sol from OperaFund, and was assigned a 22.09% share of OperaFund's participative loan to Paso-Palma Sol.[157] At the Hearing, Mr. Kofmel of Schwab stated that he relied fully on the legal opinion of Cuatrecasas to inform his investment decision.[158]  He also stated that he invested relying on EU renewable policies.[159]

194.  On 23 April 2009, the EU promulgated Directive 2009/38/EC of the Parliament and of the Council "*on the Promotion of the Use of Energy from Renewable Sources and Amending and Subsequently Repealing Directives 2001/77/EC and 2003/30/EC*", which established individual binding targets for 2020 for EU Member States and reinforced the idea that "*[t]he main purpose of mandatory national targets is to provide certainty for investors and to encourage[] continuous development of technologies which generate energy from all types of renewable sources.* […]"[160]

195.  On 7 May 2009, Royal Decree-Law 6/2009, of 30 April, which adopts certain measures in the energy sector and passes the discount tariff ("RD-Law 6/2009"), was published.[161]  RD-Law 6/2009 imposed changes to RD 661/2007 that were not foreseen in the articles of RD 661/2007.[162]  The Parties dispute whether RD-Law 6/2009 modified RD 661/2007 to address the tariff deficit.[163]  Respondent explains that RD-Law 6/2009 was introduced to deal with the impact of the economic imbalance caused by the financial crisis and its preamble warned of the necessity of measures to tackle the Tariff Deficit and

---

Alter Or Modify Recognised Economic Rights – Particular Case Of The Installations of Electricity: Different Regime of Premiums On the Royal Decree 661/2007 With Respect To The Royal Decree 436/2004", Press release La Ley, Nº 7259, Sección Tribuna, 9 Oct. 2009, Año XXX, Ref. D-317, Editorial LA LEY, p.12 **[BRR-156]**.

[157]  RfA § 21; C-I § 269; Public Deed notarizing the Share Purchase Agreement of Paso-Palma Sol's shares between OperaFund and Schwab, of 15 April 2009 **[C-0106]**; *see also* CPHB-I § 34 (*calling* this the "*El Paso*" project).

[158]  CPHB-I § 37; Tr. Day 2, 68:16-18, 70:24 – 71:1, 71:9-12, 73:1-6 (Kofmel).

[159]  RPHB-I § 34; Respondent's Closing Statement, Slides 37-38; Tr. Day 2, 46:3-5, 46:13-16, 49:1-4, 48:6-25 (Kofmel).

[160]  C-I § 118 (*quoting* part of Recital 14 of the Directive); R-I § 63 – 64; Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, published in the Official Journal of the European Union on 5 June 2009 (No L 140/16) (hereinafter "Directive 2009/28/EC") **[C-0058]**.

[161]  RD-Law 6/2009 **[C-0268]** / **[R-0057]**.

[162]  R-I § 28.

[163]  *Compare* R-I §§ 28, 547, 624, R-II §§ 621, 1195(e) (*explaining* that RD-Law 6/2009 was introduced to deal with the tariff deficit); C-III § 124 (*stating* that, since RD-Law 6/2009 did not apply to PV technology, it cannot have modified RD 661/2007 to address the tariff deficit).

emphasized the link between the SES and its economic sustainability.[164]  Claimants state that RD-Law 6/2009 did not apply to PV technology and, therefore, does not support Respondent's arguments that this legislation brought "*major modifications to RD 661/2007*" in order to address the Tariff Deficit.[165]

196.  On 21 May 2009, APPA and Greenpeace, with the legal support of Cuatrecasas, submitted a "*Draft Law on the Promotion of Renewable Energy*" to Mr. Pedro Luis Marín Uribe, State Secretary of Energy.[166]  APPA quantified the return that could be attributable to RE assets "*in that of the Spanish 10-year bond plus 300 basis points*."[167]  Respondent states that this proposal is what it used to determine the remuneration chosen in 2013.[168]

197.  On 29 May 2009, APPA ran an editorial against the then-Minister of Industry, holding him responsible for the publication of RD-Law 6/2009.[169]

198.  On 12 June 2009, OperaFund acquired a 100% shareholding interest in ECO 3.[170]  On the same day, OperaFund and ECO 3 entered into a loan agreement, whereby OperaFund granted ECO 3 a loan of EUR 18,550,000 to be fully repaid by 31 December 2033.[171]

199.  On 15 June 2009, OperaFund increased ECO 3's share capital with a share premium.[172]

---

[164]  R-I §§ 28, 547, 624; R-II §§ 280, 621, 1195(e); RD-Law 6/2009, Preamble **[R-0057]** / **[C-0628]**.

[165]  C-III § 124.

[166]  R-I §§ 338, 562; Press release, "Spain could be 100% renewable by 2050", El Mundo, 25 May 2009 **[R-0198]**; News release, *"Too much renewable energy or too expensive?"* El País, 26 May. Last Accessed 14 April 2016 **[R-0212]**; Submission of the Draft Bill on Renewable Energy by APPA and Greenpeace to the Ministry of Industry, Tourism and Commerce (21 May 2009) **[R-0218]**.

[167]  R-II § 799; Submission of the Draft Bill on Renewable Energy by APPA and Greenpeace to the Ministry of Industry, Tourism and Commerce (21 May 2009) **[R-0218]**.

[168]  R-I §§ 1154 – 1157.

[169]  *Id*. at § 553; "Europe, new Directive. Spain, new imposed decree" APPA info May 2009. Editorial **[R-0166]**.

[170]  RfA § 12(i); RPHB-I § 130; Public Deed notarizing the Share Purchase Agreement of ECO 3's shares between Solar Parks of Extremadura and OperaFund, of 12 June 2009 **[C-0209]** / **[Document 22 CWS-LB]**.

[171]  RfA § 12(ii); C-I § 265 (*stating* that the loan was for EUR 18,500,000); Participative Loan Agreement between OperaFund, ECO 3 and HSH NordBank, of 12 June 2009 **[C-0103]**.

[172]  C-I § 266; Public Deed notarizing ECO 3's corporate resolutions on the change of the sole shareholder and execution of a capital increase, of 15 June 2009 **[C-0105]**.

200. On 30 June 2009, the EC issued the Commission Decision establishing a template for National Renewable Energy Action Plans under Directive 2009/28/EC of the European Parliament and of the Council.[173]

201. On 14 July 2009, Schwab and OperaFund entered into a stock purchase and credit assignment agreement whereby Schwab acquired an additional 2.91% shareholding interest in Paso-Palma Sol and an additional 2.91% share of OperaFund's participative loan to Paso-Palma Sol.[174]

202. According to Respondent, on 13 November 2009, the objectives of RD-Law 6/2009 of (1) creating the pre-assignment register and (2) giving the Government the power to scale the entry into operation of preregistered facilities whenever the economic and technical sustainability of the SES so required, was made effective by means of the Agreement of the Council of Ministers.[175]

203. Respondent states that, on 20 November 2009, Gas Natural-Fenosa proposed that a sustainable and efficient energy policy be defined.[176]

204. On 3 December 2009, the Spanish Supreme Court issued a judgment in a challenge against on the transition from the remuneration regime of RD 436/2004 to RD 661/2007.[177]  Claimants explain that the Supreme Court rejected the challenge, noting that "*the retribution of PV installations under RD 436/2004 was essentially the same as under RD 661/2007[.]*"[178]  Respondent states that this judgment

---

[173] R-II § 292; Directive 2009/28/EC **[RL-0017]**.

[174] RfA § 21; C-I § 269; Public Deed notarizing correcting the previous Share Purchase Agreement of Paso-Palma Sol's shares between OperaFund and Schwab, of 14 July 2009 **[C-0107]**; Public Deed notarizing the assignment of part of the Participative Loan between OperaFund and Paso-Palma Sol to Schwab, of 14 July 2009 **[C-0108]**; Public Deed notarizing the Share Purchase Agreement of Paso- Palma Sol's shares between OperaFund and Schwab, of 14 July 2009 **[C-0109]**.

[175] R-I § 551; Resolution of 19 November 2009, of the Secretary of State for Energy, publishing the Agreement by the Spanish Council of Ministers of 13 November 2009 **[R-0088]** / **[C-0329]**.

[176] R-II §§ 584 – 585; Presentation PPT Gas Natural Fenosa, 20 November 2009: "Challenges of the electricity sector" R. Villaseca, CEO of Gas Natural **[R-0313]**.

[177] *Id.*; Judgment from the Third Chamber of the Supreme Court, 3 December 2009, Appeal 151/2007 EDJ 2009/307349 **[R-0121]**.

[178] C-III § 200(i); *but see* CPHB-I §§ 42 – 43 (*arguing* that RD 436/2004 and RD 661/2007 are very different regimes); Cuatrecasas, "Opinion in the interest of Deutsche Bank. Applicable structure for PV projects in Spain*"*, of July 2006, §§ 2.1, 8.3, 10.1 **[C-0211]** / **[Document 07 CWS-LB]** / **[Document 08 CWS-PK]**; Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*"*, of October 2007, § 8.3 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]** (*noting* approximate 5% difference in remuneration range under current legislation is lower than in the previous regulation).

(1) confirmed previous caselaw, (2) elaborated that the concept of a "*reasonable return*" is dynamic (not petrified or frozen by Act 54/1997), (3) explained why the "*regime for facilities under the special regime [of RD 661/2007] cannot be considered arbitrary in the abstract*", and (4) noted that RD 1578/2008 was delivered to provide a "*reasonable rate of return*" to facilities registered after 29 September 2008.[179]

205. On 9 December 2009, the Spanish Supreme Court issued two decisions in two challenges against RD 661/2007.[180] The Parties dispute the relevance of this judgment. Respondent states that the Supreme Court clarified to investors that there is no inalterable right to a specific compensation framework.[181] Claimants state that the Supreme Court dismissed the appeal with reference to its judgment of 9

---

[179] R-I §§ 475 – 476, 584, 724, 865; R-II §§ 900, 1207; Judgment from the Third Chamber of the Supreme Court, 3 December 2009, Appeal 151/2007 EDJ 2009/307349 **[R-0121]**; Judgment from the Third Chamber of the Supreme Court, 9 December 2009, rec. 152/2007, reference El Derecho EDJ 2009/307357, Fourth Legal Ground **[R-0122]**; Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 **[R-0248]**; Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 **[R-0224]**; RD 661/2007 **[R-0071]** / **[C-0046]**; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 **[R-0223]**; RD-Law 6/2009 **[C-0268]** / **[R-0057]**; RD-Law 14/2010 **[C-0111]** / **[R-0058]**; Act 2/2011 **[C-0115]** / **[R-0045]**; Journal for the Sessions of the Congress. Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, pages 46-48 **[R-0238]**; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011 **[R-0169]**; RD-Law 13/2012 **[R-0061]**; National Reform Programme 2012 **[R-0094]**; *The Reforms of the Spanish Government: Determination in the face of the crisis"*, Secretariat of State for Communication, Ministry of the Presidency, September 2012 **[R-0204]**; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012 **[R-0095]**; MoU signed with the European Union on 20 July 2012: *"VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform"* **[RL-0067]**.

[180] R-I § 355; Judgment from the Third Chamber of the Supreme Court, 9 December 2009, rec. 152/2007, reference El Derecho EDJ 2009/307357 **[R-0122]**.

[181] R-I §§ 356, 724, 865; R-II §§ 900, 1207; Judgment from the Third Chamber of the Supreme Court, 9 December 2009, rec. 152/2007, reference El Derecho EDJ 2009/307357, Fifth Legal Ground **[R-0122]**; Judgment from the Third Chamber of the Supreme Court, 3 December 2009, Appeal 151/2007 EDJ 2009/307349 **[R-0121]**; Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 **[R-0248]**; Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 **[R-0224]**; RD 661/2007 **[R-0071]** / **[C-0046]**; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 **[R-0223]**; RD-Law 6/2009 **[C-0268]** / **[R-0057]**; RD-Law 14/2010 **[C-0111]** / **[R-0058]**; Act 2/2011 **[C-0115]** / **[R-0045]**; Journal for the Sessions of the Congress. Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, pages 46-48 **[R-0238]**; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011 **[R-0169]**; RD-Law 13/2012 **[R-0061]**; National Reform Programme 2012 **[R-0094]**; *The Reforms of the Spanish Government: Determination in the face of the crisis"*, Secretariat of State for Communication, Ministry of the Presidency, September 2012 **[R-0204]**; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012 **[R-0095]**; MoU signed with the European Union on 20 July 2012: *"VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform"* **[RL-0067]**.

October 2007, noting that the amendments to RD 436/2004 were not carried out by RD 661/2007, but rather by RD 1454/2005.

206. Respondent states that, on 19 February 2010, a study was published in Suelo Solar that analyzed the history of retroactivity in PV premiums.[182]

207. According to Respondent, in Spring 2010, reform of the SR plan remuneration scheme was imminent and had been the subject of numerous headlines.[183]

208. On 27 April 2010, APPA and Greenpeace presented their draft bill of 21 May 2009 on renewable energies at the 12th Sustainable Energy Forum.[184]

209. On 29 April 2010, APPA published an article where it demonstrated its awareness of "*(i) the relevance of the case-law, (ii) the dynamic nature of reasonable return and (iii) that the expectations of reasonable return could not even be 7% since it depended on the economic circumstances of the moment[.]*"[185]

210. On 8 May 2010, Respondent proposed to RE Associations the application of the remuneration system, involving linking it to the Spanish 10-year bond, plus a spread, thereby cutting the premiums of RE by EUR 2,500 million.[186]  On 13 May 2010, the Associations supported the idea that the adjustments should be shared among facilities and opposed only introducing them in new facilities,[187] and the

---

[182] Article published in Diario Suelo Solar: "There is a clear history of retroactivity in photovoltaic premiums" (19 February 2010) **[R-0202]**.

[183] R-I § 580 – 587; R-II § 730; Cinco Dias, 20 May 2010: "CNE Chairwoman calls for more reasonableness in the photovoltaic energy premiums" **[R-0320]**; *see e.g.* Article published in the Economic newspaper "CINCO DIAS": *"The Supreme Court allows retroactive change in premiums"* (22 April 2010) **[R-0210]**; Article published in the Economic newspaper "Expansión" "War of the renewables against the Government for 30,000 million Euros of subsidies" (21 April 2010) **[R-0217]**; Article published in Diario Suelo Solar: No to the retroactivity of photovoltaic premiums (23 April 2010) **[R-0219]**; Article published in the Economic newspaper "Expansión" "Sebastián tries to stop a spate of lawsuits" (27 April 2010) **[R-0222]**.

[184] R-II § 557; PowerPoint presentation of 27 April 2010 on the APPA-Greenpeace proposal, presented at the XII Forum on Sustainable Energy **[R-0162]**; Suelo Solar, 29 April 2010: APPA report, Retroactivity summary **[R-0260]**.

[185] R-II § 557; Suelo Solar, 29 April 2010: APPA report, Retroactivity summary **[R-0260]**.

[186] R-II §§ 552, 553; Cinco Días Journal, 8 May 2010: "Industry proposes to cut premiums for renewables by 2.5 billion" **[R-0266]**; Cinco Dias, 14 June 2010 "Industry will lower premiums to all renewables in operation" **[R-0275]**.

[187] R-II § 554; Expansion, 13 May 2010: "Industry looks for where to put the green scissors" **[R-0276]**.

possibility of fee modification was criticized but accepted by the sector.  ASIF requested that the reduction in remuneration be applied to other producers on the basis of remuneration that was higher than reasonable.[188]  In June 2010, Respondent proposed that the system of compensation would apply to all plants, including those in operation.[189]

211.  On 30 June 2010, Spain's National Renewable Energy Action Plan 2011 – 2020 ("PANER"), which was required by Directive 2009/38/EC of 23 April 2009, was published.[190]

212.  On 22 July 2010, the Council of State issued Opinion No. 1155/2010,[191] the meaning of which is disputed.  Claimants state that Opinion No. 1155/2010 confirms that, through mandatory RAIPRE registration, "*investors acquired an economic right under Spanish law to earn a specific FIT for the electricity to feed into the grid in exchange for investing substantial amounts of money to conduct a renewable installation[.]*"[192]  Respondent states that Opinion No. 1155/2010 recalled that the system of registration in the RAIPRE was a non-constitutive or declarative registration system, such that the registration did not confer any right.[193]

213.  On 29 August 2010, AEE responded to the "*Royal Decree Proposal regulating and amending certain aspects relating to the special regime*" that it had received from CNE and MINETUR.[194]  It noted the sensitive economic situation in Spain and the exceptional fall in the demand for electricity.[195]

214.  In September 2010, the Brattle Group published a Discussion Paper that Respondent states warned of

---

[188] R-II § 562; Energías Renovables Journal nº 90, June 2010: "Retroactivity?" Article by Tomás Díaz, Communication Director of ASIF **[R-0279]**.

[189] R-II § 553, Cinco Dias, 14 June 2010 "Industry will lower premiums to all renewables in operation" **[R-0275]**.

[190] R-II §§ 292, 295; PANER **[C-0044]** / **[R-0093]**; Directive 2009/28/EC **[RL-0017]**.

[191] Opinion no. 1155/2010 of the Council of State on the Royal Decree draft regulating the settlement of the equivalent premium for production facilities using photovoltaic technology under the Special Regime, dated 22 July 2010 **[C-0270]** / **[R-0301]**.

[192] C-III § 143.

[193] R-II § 484; Opinion no. 1155/2010 of the Council of State on the Royal Decree draft regulating the settlement of the equivalent premium for production facilities using photovoltaic technology under the Special Regime, dated 22 July 2010 **[C-0270]** / **[R-0301]**.

[194] Submissions of the AEE before the CNE during the CCE ([by its Spanish acronym] Electricity Advisory Council) hearing on the proposed Royal Decree which will regulate and amend certain aspects of the special regime (30 August 2009) **[R-0140]**.

[195] *Id.*; R-I §§ 720 – 722; R-II § 677.

the unsustainability of the SES, because subsidies for RE were overly generous.[196]

215.　On 24 September 2010, the EC published Regulation No 838/2010 of 23 September 2010 on laying down guidelines relating to the inter-transmission system operator compensation mechanism and a common regulatory approach to transmission charging.[197]

216.　On 4 November 2010, the Regulatory Impact Analysis Report of the Draft RD 1614/2010 revealed that the purpose of that regulation is to guarantee sustainability of the SES, by containing expenditure tied to the RE subsidy.[198]

217.　On 23 November 2010, Royal Decree 1565/2010, of 19 November, which regulates and modifies given aspects relative to the activity for the production of electric power on special regime ("RD 1565/2010"), was published.[199]　According to Claimants, this is among the first set of measures that retroactively modified RD 661/2007, undermining the stability of the legally warranted FIT.[200]　Article 10(1) of RD 1565/ 2010 suppressed the right of PV plants to receive the FIT from year 26 onwards, eliminating the right to FIT during the installation's entire lifetime, which Claimants state was granted by Article 36 of RD 661/2007.[201]　According to Respondent, RD 1565/2010 limited the rewarded production hours of facilities operating with PV technology.[202]　Claimants define the period

---

[196] R-II § 594; The Brattle Group, September 2010: "Resource Adequacy and Renewable Energy in Competitive Wholesale Electricity Markets" The FTI Group (Serena Hesmondhalgh, Johannes Pfeifenberger and David Robinson) **[R-0292]**; Judgment from the Third Chamber of the Supreme Court dated 25 October 2006, appeal 12/2005, reference El Derecho EDJ 2006/282164 (Spanish) **[R-0118]**.

[197] Commission Regulation (EU) No 838/2010, of 23 September 2010, on laying down guidelines relating to the inter-trans- mission system operator compensation mechanism and a common regulatory approach to transmission charging (OJEU L 250, 24 September 2010) **[C-0244]**.

[198] R-I § 716; Report on Analysis of the Regulatory Impact of the Draft Royal Decree, regulating and amending certain aspects relating to the activity of electricity production using solar thermal and wind power technologies, 4 November 2010. Secretary of State for Energy. DGPEM **[R-0050]**.

[199] Royal Decree 1565/2010, of 19 November, which regulates and modifies given aspects relative to the activity for the production of electric power on the special regime (hereinafter "RD 1565/2010") **[C-0110]** / **[R-0074]**.

[200] C-I §§ 15, 279; Brattle, Regulatory Report, § 21 **[CER-0001]**.

[201] C-I § 278; RD 1565/2010, Art. 1(1) **[C-0110]** / **[R-0074]**.

[202] R-II § 398; Brief filing contentious administrative appeal brought by Grupo ISOLUX Corsán S.A., on 21 January 2011, Appeal 60/2011 **[R-0303]**; Judgment of the Third Chamber of the Supreme Court of 24 September 2012, Appeal 60/2011 **[R-0128]**.

of 2010 – 2013 as "Regulatory Framework No. 2."[203]

218.    On 29 November 2010, the Council of State issued Opinion 2408/2010 on the draft version of RD 1614/2010,[204] which admitted the possibility of reducing remuneration for existing wind and solar thermal facilities based on Supreme Court Case law.[205]

219.    On 7 December 2010, the Government adopted Royal Decree 1614/2010, of 7 December, which regulates and modifies certain aspects of the activity of electricity production through solar thermoelectric and wind power technologies.[206] Respondent states that the Preamble of RD 1614/2010 indicated that further measures would need to be adopted.[207]

220.    On 23 December 2010, the Ministry of Industry, Tourism and Commerce wrote a Regulatory Impact Report on the draft Royal Decree-Act 14/2010, of 23 December, on the establishment of urgent measures for the correction of the tariff deficit in the electricity sector ("RD-Law 14/2010").[208]

221.    On 24 December 2010, RD-Law 14/2010 was published.[209] Claimants state that RD-Law 14/2010 included a cap on the hours of production (equivalent hours of operation) that could benefit from the

---

[203]  C-I § 81.

[204]  R-II § 460; Decision of the Council of State number 224/2007, of 30 April 2007, on Royal Decree 661/2007, regulating the activity of electricity production under the special regime and certain facilities using similar technology under the ordinary regime **[R-0328]**; Limited Legal Due Diligence Report "Paso-Palma Sol Gestión De Proyectos, S.L.", Cuatrecasas, 3 December 2008 **[R-0329]**.

[205]  *Id*.

[206]  Royal Decree 1614/2010, of 7 December, regulating and modifying certain aspects related to electric energy production using thermoelectric solar and wind power technologies (hereinafter "RD 1614/2010") **[R-0075]**.

[207]  R-II § 621; Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 **[R-0248]**; Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 **[R-0224]**; Appearance before the Congress of Joan Clos i Matheu, Minister of Energy and Tourism, of 8 May 2007 **[R-0250]**; RD 661/2007 **[R-0071]** / **[C-0046]**; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 **[R-0223]**; RD-Law 6/2009 **[C-0268]** / **[R-0057]**; RD-Law 14/2010 **[C-0111]** / **[R-0058]**; Journal for the Sessions of the Congress. Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, pages 46-48 **[R-0238]**; Act 2/2011 **[C-0115]** / **[R-0045]**; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011 **[R-0169]**; RD-Law 13/2012 **[R-0061]**; MoU signed with the European Union on 20 July 2012: *"VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform"* **[RL-0067]**.

[208]  R-II § 732; Report on regulatory impact of Draft of RD-Law 14/2010 establishing urgent measures for the correction of the tariff deficit in the electricity sector (registered 27 December 2010) **[R-0111]**.

[209]  RD-Law 14/2010 **[C-0111]** / **[R-0058]**.

FIT and extended the operational life of a PV plant to 28 years.[210] Respondent states that the Government sought to correct the situation of over-remuneration and acted with the intention of guaranteeing the right to receive a reasonable return, as stated in the Preamble to RD-Law 14/2010.[211] The maximum hours contained in RD-Law 14/2010 had already been contained in the PER 2005 – 2010, which also contained the methodology to determine a return of approximately 7%.[212]

222. On 19 January 2011, Paso-Palma Sol and the SPVs notified the Lenders of RD-Law 14/2010, explaining that from thereon, the PASO Project would be subject to (1) a 1,250 cap on equivalent hours per year (10,302,375 kWh) and (2) an additional grid access fee of EUR 0.5 per MWh.[213]

223. On 26 January 2011, Minister Sebastián stated in a session before Congress that further measures, in addition to those of 2009 and 2010, may be necessary.[214]

224. On 5 March 2011, the Government published Act 2/2011, of 4 March, on Sustainable Economy ("Act 2/2011").[215] The Parties agree that Act 2/2011 set out the legal criteria to be followed by the regulation on energy and on the incentives of the premium regime, underlining the link between planning and legislation mandating subsidies in order to achieve specific planning objectives.[216] Act 2/2011 reaffirmed Act 40/1994 and explicitly established the need for any planning to be done on the basis of a sustainable system.[217] Claimants state that Act 2/2011 (1) endorsed the principle of proportionality, (2) extended the 25-year operational life of a PV plant from 25 to 28-30 years and thereby represented an attempt to compensate PV producers, and (3) extended the "*liquidity lines of credit*" through the ICO for PV installations to adapt to the new regulatory framework under RD-Law 14/2010.[218]

---

[210] C-I § 16, 280 – 281; Brattle, Regulatory Report, § 143 **[CER-0001]**.

[211] R-II § 734; RD-Law 14/2010 **[C-0111]** / **[R-0058]**.

[212] R-II § 735; PER 2005 – 2010 **[C-0066]** / **[R-0092]**.

[213] C-I § 428.

[214] R-II § 629; Journal for the Sessions of the Congress. Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, at 46-48 **[R-0238]**.

[215] Act 2/2011 **[C-0115]** / **[R-0045]**.

[216] Id. at Art. 4(5), 5(3); R-II § 288; C-I § 417.

[217] R-I § 260 (*stating* "Act 1//2011").

[218] C-I §§ 291 – 292; Act 2/2011, 44th and 45th Disposition **[C-0115]** / **[R-0045]**.

225. On 12 May 2011, Deutsche Bank wrote to Paso-Palma Sol expressing concerns about the effects of RD-Law 14/2010 on the borrower's ability to comply with their obligations under the Common Terms Agreement, in particular, to meet the financial covenants (Cover Ratios).[219]

226. On 11 November 2011, the PANER was approved by the Council of Ministers.[220]

227. On 16 November 2011, the Government published Royal Decree 1544/2011, of 31 October, establishing tolls for access to transmission and distribution networks to be satisfied by electricity producers ("RD 1544/2011").[221] RD 1544/2011 established a 0.5 EUR / MWh access toll to address the impact the increase in the number of power producing installations that had been provisionally introduced by RD-Law 14/2010 had on transport and distribution networks.[222]

228. On 19 December 2011, in his inaugural address as President of the Government to the Spanish Congress, Mr. Mariano Rajoy Brey announced that future measures could be taken in the energy sector to address (1) the annual deficit and (2) high electricity tariffs for domestic and industrial consumers.[223]

---

[219] C-I § 429; Reservation of Right Letter sent by Deutsche Bank Luxembourg S.A. to Paso-Palma Sol on 12 May 2011 **[C-0156]** / **[Document 25 CWS-LB]**.

[220] PANER **[C-0044]** / **[R-0093]**.

[221] Royal Decree 1544/2011, of 31 October, establishing tolls for access to transmission and distribution networks to be satisfied by electricity producers (hereinafter "RD 1544/2011") **[C-0118]**.

[222] C-I § 303 (*quoting* RD 1544/2011 **[C-0118]**); RD-Law 14/2010, First Transitional Provision **[C-0111]** / **[R-0058]**.

[223] R-I § 745 (*calling* him "Candidate"); R-II §§ 621 – 634, 1207; RD 1822/2011, of 20 December, which appoints Mr Mariano Rajoy Brey as President of the Government, published in the Official State Gazette on 21 December 2011 **[R-0076]**; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011 **[R-0169]**; Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 **[R-0248]**; Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 **[R-0224]**; Appearance before the Congress of Joan Clos i Matheu, Minister of Energy and Tourism, of 8 May 2007 **[R-0250]**; RD 661/2007 **[R-0071]** / **[C-0046]**; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 **[R-0223]**; RD-Law 6/2009 **[C-0268]** / **[R-0057]**; RD-Law 14/2010 **[C-0111]** / **[R-0058]**; Journal for the Sessions of the Congress. Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, pages 46-48 **[R-0238]**; Act 2/2011 **[C-0115]** / **[R-0045]**; RD-Law 13/2012 **[R-0061]**; MoU signed with the European Union on 20 July 2012: *"VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform"* **[RL-0067]**; National Reform Programme 2012 **[R-0094]**; *The Reforms of the Spanish Government: Determination in the face of the crisis"*, Secretariat of State for Communication, Ministry of the Presidency, September 2012 **[R-0204]**; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012 **[R-0095]**.

229. On 28 December 2011, CNE announced the need to introduce immediately "*proposals on the regulation of activities, targeted at removing the structural deficit of the system and mitigating the costs of financing the debt.*"[224]

230. On 27 January 2012, the Government requested that CNE develop a report on regulatory adjustment measures that could be taken in the energy sector to address the Tariff Deficit.[225]  MINETUR also issued a press release regarding Royal Decree-Law 1/2012, of 27 January, proceeding to the suspension of the remuneration pre-assignment procedures and the elimination of the economic incentives for new electric energy production plans using cogeneration, renewable energy sources, and waste ("RD-Law 1/2012").[226]  Claimants state that RD-Law 1/2012 and the press release of the same day reflected the Spanish Government's intention to encourage investments in PV projects.[227]

231. On 28 January 2012, the Government published RD-Law 1/2012.[228]

232. On 2 February 2012, CNE opened a public consultation, during which it received 477 allegations from the affected companies and sectors.  Among them, Protermosolar Association (a solar thermal industry association) presented pleadings proposing regulatory measures to be adopted in the electricity sector in view of the imbalance.  Protermosolar requested the Principle of Reasonable Return be applied to other producers.[229]

233. On 11 February 2012, the Government published Royal Decree 344/2012, of 10 February, which regulates the basic organic structure of the Ministry of Industry, Energy and Tourism ("RD

---

[224] R-I § 746; *"The CNE is analysing the review of access tariffs and certain tariffs and bonuses for facilities under the special regime"*. Press release from the Spanish National Energy Commission, 28 December 2011 **[R-0200]**.

[225] R-I § 750; Letter from the Secretary of State for Energy to the President of the CNE of 27 January 2012 **[R-0170]**.

[226] "The Government will temporarily suspend premiums for these new special regime facilities". Press release from the Ministry of Industry, Energy and Tourism (27 January 2012) **[R-0104]** / **[C-0302]**.

[227] C-III § 401.

[228] Royal Decree-Law 1/2012, of 27 January, proceeding to the suspension of the remuneration pre-assignment procedures and the elimination of the economic incentives for new electric energy production plans using cogeneration, renewable energy sources, and waste (hereinafter "RD-Law 1/2012") **[R-0060]** / **[C-0301]**.

[229] R-II § 912; Information on the public consultation on regulatory adjustment measures in the energy sector of 2 February and 9 March 2012, published on the CNE **[R-0171]**; Email Protermosolar to CNE 10 February 2012 **[R-0281]**.

344/2012").[230]

234. On 7 March 2012, HSH Nordbank sent a letter to ECO 3 waiving its right to claim an Event of Default under the Facilities Agreement in the event ECO 3 failed to meet its obligations as a borrower.[231]

235. On 7 March 2012, CNE issued its "*Report on the Spanish Energy Sector*" 02/2012 ("CNE Report 02/2012").[232] CNE's report noted that the tolls paid by Spanish consumers increased 70.7% from 2003 – 2012, leading to the price of the electricity paid by Spanish households and industries being among the highest in the EU.[233] Claimants state that the CNE Report 02/2012 recognized that the debt in the electricity system was caused by the lack of convergence between revenue and costs and proposed a combination of amendments and tariff increases that would have resolved the Tariff Deficit issue without the adoption of the "*2013 Disputed Measures*."[234] Respondent disputes this and states that the CNE Report found the over remuneration of the Solar Thermal Sector and the need for reforms to reduce such remuneration to the Plants already installed.[235] Respondent states that it implemented the following legislation in response to CNE Report 02/2012: Royal Decree-Law 2/2013, of 1 February, on urgent measures in the electricity sector and the financial sector ("RD-Law 2/2013")[236] and Act 15/2012, of 27 December, on Fiscal Measures for Energetic Sustainability ("Act 15/2012").[237] CNE proposed extending RD 1565/2010 to all technologies.[238] The CNE Report

---

[230] RD 344/2012 **[C-0041]**.

[231] C-I § 441; Waiver letter sent by HSH NordBank AG to ECO 3 on 7 March 2012 **[C-0164]** / **[Document 26 CWS-LB]**.

[232] CNE Report 2/2012, 7 March 2012 (hereinafter "CNE Report 2/2012") **[R-0105]** / **[C-0214]** / **[C-0294]**.

[233] R-II § 698 – 699, CNE Report 2/2012 **[R-0105]** / **[C-0214]** / **[C-0294]**.

[234] C-III §§ 275 (i), 336, 367, 566.

[235] R-II § 400; Letter dated 20 May 2012 from Felipe Benjumea Llorente, President of Abengoa, to the Ministry of Industry **[R-0257]**.

[236] Royal Decree-Law 2/2013, of 1 February, on urgent measures in the electricity sector and the financial sector (hereinafter "RD-Law 2/2013") **[C-0113]** / **[R-0063]**.

[237] R-II §§ 713, 770; Act 15/2012, of 27 December, on Fiscal Measures for Energetic Sustainability (hereinafter "Act 15/2012") **[C-0112]** / **[R-0003]**; *"Powering the Green Economy. The feed in tariff handbook."* Miguel Mendonça, David Jacobs and Benjamin Socacool. Editorial. Earthscan, 2010 **[RL-0062]**; CNE Report 2/2012 **[R-0105]** / **[C-0214]** / **[C-0294]**; RD-Law 2/2013 **[C-0113]** / **[R-0063]**; Royal Decree-Law 9/2013, of 12 July, which sets forth urgent measures to ensure the financial stability of the electricity system (hereinafter "RD-Law 9/2013") **[R-0064]** / **[C-0128]**.

[238] R-II § 721, CNE Report 2/2012 **[R-0105]** / **[C-0214]** / **[C-0294]**.

02/2012 also used the "*reasonable return*" principle.[239]

236.    On 31 March 2012, Royal Decree-Law 13/2012, of 30 March, that transposes directives relating to the internal electricity and gas markets, electronic communication-related matters and adopts measures for correcting deviations due to imbalances between costs and revenues in the electricity and gas sectors ("RD-Law 13/2012") was published.[240]

237.    On 12 April 2012, the Supreme Court rendered its judgment in the case 59/2011, dismissing the appeal against RD 1565/2010 and establishing that a "*reasonable rate of return*" does not entail the right to receive a fee for each year of the entire lifespan of a facility.[241]

238.    On 26 April 2012, Ministerial Order IET/843/2012, of 25 April, by the MINETUR, establishing the access tolls applicable as of 1 April 2012 and certain tariffs and premiums applicable to special-regime power generation plants ("MO IET/843/2012"), was published.[242]  This increased the access tolls payable by the consumer.[243]

---

[239] R-II § 862; CNE Report 2/2012 **[R-0105]** / **[C-0214]** / **[C-0294]**.

[240] R-I §§ 668 – 669, 756, 766; R-II §§ 621 - 34, 1207(h); RD-Law 13/2012 **[R-0061]**; Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 **[R-0248]**; Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 **[R-0224]**; Appearance before the Congress of Joan Clos i Matheu, Minister of Energy and Tourism, of 8 May 2007 **[R-0250]**; RD 661/2007 **[R-0071]** / **[C-0046]**; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 **[R-0223]**; RD-Law 6/2009 **[C-0268]** / **[R-0057]**; RD-Law 14/2010 **[C-0111]** / **[R-0058]**; Journal for the Sessions of the Congress. Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector, pages 46-48 **[R-0238]**; Act 2/2011 **[C-0115]** / **[R-0045]**; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011 **[R-0169]**; MoU signed with the European Union on 20 July 2012: *"VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform"* **[RL-0067]**; National Reform Programme 2012 **[R-0094]**; *The Reforms of the Spanish Government: Determination in the face of the crisis"*, Secretariat of State for Communication, Ministry of the Presidency, September 2012 **[R-0204]**; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012 **[R-0095]**.

[241] R-I § 359b; R-II § 724; Judgment from the Third Chamber of the Supreme Court, 12 April 2012, rec. 40/2011. EDJ 2012/65328 **[R-0125]**; Judgment from the Third Chamber of the Supreme Court of 12 April 2012. (App. 59/2011). Reference El Derecho EDJ 2012/65328 **[R-0235]**; Judgment from the Third Chamber of the Supreme Court, 19 June 2012, rec. 62/2011 **[R-0127]**.

[242] Ministrial Order IET/843/2012, of 25 April, by the Ministry of Industry, Energy and Tourism, establishing the access tolls applicable as of 1 April 2012 and certain tariffs and premiums applicable to special-regime power generation plants (hereinafter "MO IET/843/2012") **[R-0084]**.

[243] *Id.*; R-I § 768.

239. On 27 April 2012, the Government approved the "National Reform Programme 2012."[244] Respondent states that this restated its commitment to eliminating the Tariff Deficit.[245] Claimants state that the 2012 National Reform Program suggested that economic rights of existing investments would remain safe.[246]

240. On 30 April 2012, the Government submitted the 2012 National Reform Program to the Council of the EU.[247]

241. On 14 June 2012, the IMF issued a statement on Spain's 2012 National Reform Program, appreciating Spain's commitment to eliminating the tariff deficit in the SES.[248]

242. On 10 July 2012, after circulating a draft of the same on 6 July 2012, the Council of the EU issued its recommendations on the 2012 National Reform Program and delivered a Council opinion on the Stability Programme for Spain, 2012-2015.[249]

243. On 14 July 2012, Royal Decree-Law 20/2012 of 13 July on measures to guarantee budgetary stability and promotion of competitiveness ("RD-Law 20/2012") was published.[250] RD-Law 20/2012

---

[244] R-II § 1207(h); C-III § 275; RD-Law 13/2012 **[R-0061]**; National Reform Programme 2012 **[R-0094]**; *The Reforms of the Spanish Government: Determination in the face of the crisis"*, Secretariat of State for Communication, Ministry of the Presidency, September 2012 **[R-0204]**; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012 **[R-0095]**; MoU signed with the European Union on 20 July 2012: *"VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform"* **[RL-0067]**.

[245] R-II § 1207(h); National Reform Programme 2012 **[R-0094]**; Reference from the Council of Ministers, 27 April 2012 **[R-0172]**; RD-Law 13/2012 **[R-0061]**; *The Reforms of the Spanish Government: Determination in the face of the crisis"*, Secretariat of State for Communication, Ministry of the Presidency, September 2012 **[R-0204]**; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012 **[R-0095]**; MoU signed with the European Union on 20 July 2012: *"VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform"* **[RL-0067]**.

[246] C-III § 275(ii); Organic Act 2/2012, of April 27, on Budget Stability and Financial Sustainability, BOE, 30 April 2012, as amended by Organic Act 9/2013, of 20 December, on control of commercial debt in the public sector **[C-0170]**.

[247] C-III § 275(iii).

[248] R-I § 758; "*Article IV Consultation with Spain Final Statement of IMF Mission, Madrid, 14 June 2012*" International Monetary Fund, Section 19 **[R-0174]**.

[249] C-III § 275(iii); Council Recommendation of 10 July 2012 on the 2012 National Reform Programme of Spain and delivering a Council opinion on the Stability Programme of Spain, 2012 – 2015 **[R-0029]**.

[250] Royal Decree-Law 20/2012, of 13 July, on measures to guarantee budgetary stability and promotion of competitiveness (hereinafter "RD-Law 20/2012") **[R-0062]**.

contained cost reduction measures for the system that did not affect the renewable generation facilities. Respondent explains that "*RD-Law 20/2012 reduced the spread of the Spanish 10-year bond + 300 base points to 200 base points in the remuneration of the production activity and the power guarantee for ordinary generation facilities of the mainland and island electricity systems.*"[251]

244. On 20 July 2012, because of certain banks needed bailouts, Respondent signed a Memorandum of Understanding ("MoU") with the EU.[252] The Parties dispute whether one line of text contained therein, "*address the electricity tariff deficit in a comprehensive way*", created a binding international commitment to do so.[253]

245. Claimants state that, in an interview on 26 August 2012, the former Under-Secretary of State for Energy admitted that the Government decided to follow the "*tax route*", but could have reached the same result through a direct cut to the Feed-In Model remuneration.[254]

246. In September 2012, the Government published "*Reforms of the Government of Spain: Determination Against the Crisis*", which included energy reform.[255]

247. On 14 September 2012, following the approval of the bill of what became Act 15/2012, of 27 December, on Fiscal Measures for Energetic Sustainability ("Act 15/2012"), H.E. Mr. José Manuel Soria López stated that the purpose of Act 15/2012 would be to tackle and avoid further increases in the existing tariff imbalance in the SES.[256]

---

[251] R-I §§ 766 – 767; Order ITC/914/2006 **[R-0103]**.

[252] R-I §§ 760, 1013; C-III § 275(iv); R-II § 1058; MoU signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*", §§ 29 - 31 **[RL-0067]**.

[253] MoU signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*", §§ 29 – 31 **[RL-0067]**; *compare* C-III (iv) (no legally binding obligation was created); R-II § 1070 (binding legal obligations were thereby created).

[254] C-I § 310, 555; Interview to the former Under-Secretary of State for Energy, Mr. Enrique Hernández Bento, press article "No queremos que la solución a la reforma energética sea subir el recibo de la luz", *La Provincia*, 26 August 2012 **[C-0177]**.

[255] R-II § 1207(h); *The Reforms of the Spanish Government: Determination in the face of the crisis*", Secretariat of State for Communication, Ministry of the Presidency, September 2012 **[R-0204]**; National Reform Programme 2012 **[R-0094]**; Reference from the Council of Ministers, 27 April 2012 **[R-0172]**; RD-Law 13/2012 **[R-0061]**; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012 **[R-0095]**; MoU signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*" **[RL-0067]**.

[256] C-I §§ 523 – 524; Press conference following the meeting of the Council of Ministers of the Kingdom of Spain, of

248. On 8 October 2012, Deutsche Bank wrote to Paso Palma on behalf of Lenders.[257]

249. On 30 October 2012, there was parliamentary debate on the bill of Act 15/2012 in the Lower House of the Parliament.[258]

250. On 28 December 2012, Respondent published Act 15/2012, which created a new measure, the tax on the value of the production of electrical energy ("TVPEE"), levying 7% on all revenues obtained by energy producers, with effect from 1 January 2013.[259] Act 15/2012 amended Article 15(2) of Act 54/1997 by its reference to the principle of self-sufficiency.[260] Act 15/2012 is supported by the Fifth Additional Provision of Act 17/2012, of 27 December, on the General State Budgets for 2013 ("Act 17/2012"), pursuant to which an amount equivalent to the estimated annual collection deriving from the taxes included in Act 15/2012, including the TVPEE, will be allocated in the General State Budget Acts for each year to finance the electricity system costs related to the promotion of RE.[261]

251. On 2 February 2013, Respondent published RD-Law 2/2013,[262] which the Parties agree formally entered into force on 2 February 2013 but was given legal effect from 1 January 2013.[263] RD-Law

---

14 September 2012 [C-0173].

[257] Reservation of Rights Letters sent by Deutsche Bank Luxembourg S.A. to Paso-Palma Sol on 8 October 2012 [C-0159].

[258] C-I § 524; Diary Sessions of the Lower House of Parliament, year 2012, X Legislature term, No. 69, 30 October 2012 [C-0174].

[259] C-I § 18, 294; R-I §§ 111, 776 – 786; R-II §§ 758 – 760; Excerpt from the Spanish General State Budget for 2013 [R-0020]; Excerpt from the Spanish General State Budget for 2015 [R-0022]; Excerpt from the Spanish General State Budget for 2016 [R-0019]; Excerpt from the Spanish General State Budget for 2017 [R-0240]; Act 15/2012, Art. 1 – 11, Fifth Final Provision [C-0112] / [R-0003].

[260] C-I § 272; C-III § 357.

[261] R-II §§ 758 – 761; Act 15/2012 [C-0112] / [R-0003]; Act 17/2012, of 27 December, on the General State Budgets for 2013 Act 17/2012 (hereinafter "Act 17/2012") [R-0023] / [R-0246]; Excerpt from the Spanish General State Budget for 2013 [R-0020]; Excerpt from the Spanish General State Budget for 2015 [R-0022]; Excerpt from the Spanish General State Budget for 2016 [R-0019]; Excerpt from the Spanish General State Budget for 2017 [R-0240].

[262] RD-Law 2/2013 [C-0113] / [R-0063].

[263] Id. at Art. 1 and Additional Provision; C-I § 320; R-I § 788.

2/2013 changed the FIT's inflation index from the general CPI to an amended CPI pre-tax.[264]  The Parties dispute whether this has harmed Claimants.[265]

252.  On 14 February 2013, the Minister of Energy passed Ministerial Order IET/221/2013 ("MO IET/221/2013"), which set out the new value for regulated tariffs to be perceived by RD 661/2007.[266]

253.  The self-assessment and payment of the TVPEE is made through Form 583, which was approved by Ministerial Order HAP/703/2013 ("MO HAP/703/2013") on 29 April 2013.[267]

254.  On 7 May 2013, Deutsche Bank sent a letter informing of the continuation of the "Event of Default" and the "Senior Lock-Up Event."  Consequently, distributions continued to be blocked in the Senior Lock-Up Account.[268]

255.  On 4 June 2013, the National Markets and Competition Commission ("CNMC") was created through Act 3/2013.[269]  Respondent states that the CNMC is the successor entity of the CNE and summarizes the CNMC's functions as follows:

> a)     To act as an advisory body of the Administration in energy matters by issuing non-binding reports.
>
> b)     To participate, through proposals or non-binding reports, in the process of drafting general provisions on energy matters
>
> c)     To issue Notices on the development and implementation of Royal Decrees and Orders of the Ministry of Industry and Energy issued on energy matters, provided that these provisions authorise it to do so. These Notices on implementation are mandatory for the subjects affected by the scope thereof, once published in the Official State Gazette.

---

[264] C-I § 273, RD-Law 2/2013, Art. 1 **[C-0113]** / **[R-0063]**; Brattle, Regulatory Report, § VI.C.2 **[CER-0001]**.

[265] C-I § 273; R-I § 789.

[266] C-I § 488, Ministerial Order IET/221/2013 of 14 February, BOE, 16 February 2013 (hereinafter "MO IET/221/2013") **[C-0169]**.

[267] R-I § 164; Ministerial Order HAP/703/2013, of 29 April, which approves Form 583 "Tax on the value of the production of electrical energy. Self-assessment and Installment Payments", and establishes the form and procedure for its submission (hereinafter "MO HAP/703/2013") **[R-0008]**.

[268] C-I § 434; Letter sent by Deutsche Bank to Paso-Palma Sol on 7 May 2013 **[C-0162]** / **[Document 28 CWS-LB]**.

[269] Act 3/2013, of 4 June, on the creation of the CNMC, BOE, 5 June 2013 (hereinafter "Act 3/2013") **[C-0043]** / **[R-0046]**.

> d)    *To manage the settlements of the Electrical System. It delivers 14 settlements for each financial year for those entitled to receive amounts from the SES.*
>
> e)    *To supervise and control the electricity sector including, among others:*
>
> - *To supervise the suitability of the legal system of prices and conditions for the end consumers and publishing recommendations to adapt the supply prices to the obligations of public service and consumer protection.*
>
> - *To manage the guarantee of origin system for electricity from renewable sources and high-efficiency cogeneration.*
>
> - *To publish electricity final market prices, based on the information provided by the market operator and system operator.*[270]

256.    Claimants state that the CNMC is only formally independent from the Spanish Government, as the CNMC is governed by the Council of the CNMC and the President of CNMC, which are appointed by the Spanish Government.[271]

257.    Claimants state that a bill on a new Act 24/2013, of 26 December, on the Electric Power Sector ("Act 24/2013") was prepared by the Spanish Government in July 2013.  This bill incorporated 57 of the 498 proposals (all 57 from the same entity) for amendment at the Lower House.[272]

258.    At a press conference on 12 July 2013, Respondent announced an upcoming new regulatory framework for existing renewable energy installations and announced that a draft new Electricity Power Act and an accompanying Royal Decree had been adopted.[273]

259.    On 13 July 2013, Royal Decree-Law 9/2013 of 12 July, which sets forth urgent measures to ensure the financial stability of the electricity system ("RD-Law 9/2013") was published.[274]  Claimants state that RD-Law 9/2013 (1) repealed what remained of RD 661/2007,[275] (2) eliminated the Special Regime contained in RD 661/2007, RD 1578/2008 and the RAIPRE, and (3) ended the feed in model

---

[270]    R-I § 250.

[271]    C-I fn. 6; Act 3/2013, Art.  7, 15, 25 **[C-0043]** / **[R-0046]**.

[272]    C-I §§ 770 – 771; Diary Sessions of the Lower House of Parliament, year 2013, X Legislative Term, No. 65-3, of 14 November 2013 **[C-0194]**.

[273]    C-I §§ 22, 326; Official transcript of the press conference given on 12 July 2013 by the Vice-President and spokesperson of the Spanish Government and by the Minister of Industry, Energy and Tourism, after the meeting of the Spanish Cabinet **[C-0127]**.

[274]    RD-Law 9/2013 **[R-0064]** / **[C-0128]**.

[275]    C-I § 22.

regulation in Spain.  They state that "*RD-L[aw] 9/2013 empowered the Government to 'approve a new legal and economic regime for existing electric energy production facilities using renewable energy sources'* and further explain that this New Regime introduced a remuneration system based *"on obtaining revenue arising from the participation in the market with an additional remuneration, which, if necessary, will cover those investment costs which an efficient and well-managed company does not recover in the market."*[276]  Respondent states that RD-Law 9/2013 maintains the principle of reasonable rate of return for facilities and provides a new remuneration model that is consistent with community guidelines.[277]  RD-Law 9/2013 entered into force on 14 July 2013.[278]

260.   On 16 July 2013, Respondent submitted a draft of Royal Decree 413/2014, of 6 June, regulating the activity of power production from renewable sources of energy, cogeneration and waste ("RD 413/2014") to the CNE.[279]

261.   On 22 July 2013, Secretary of State for Energy, Mr. Alberto Nadal, requested that Secretary General of IDAE, Mr. Arturo Fernández, organize a public tender procedure to retain at least two independent consulting firms "*to produce a study valuing and establishing investment and operational cost standards for electricity generation technologies operating under the special regime in Spain.*"[280] The following day, in light of its recognition of the "*significant economic and social repercussions that future regulations will have*", the Ministry of Energy provided Special Terms and Conditions and Technical Terms and Conditions for the independent consultants to be recruited by IDAE.  Claimants explain that pursuant to these, the independent consultants would be required to prepare a study analyzing the remuneration needs of existing installations to achieve reasonable profitability and to

---

[276] *Id*. at §§ 327, 329; 766 – 769; RD-Law 9/2013, Preamble, Section II, § 1, Sole Repeal Provision (2)(a), Third Transitional Provision **[R-0064]** / **[C-0128]**; Spanish Constitution, Art. 86(1) **[C-0114]**.

[277] R-I § 320; R-II §§ 205, 768 – 770; RD-Law 9/2013 **[R-0064]** / **[C-0128]**; Act 24/2013, of 26 December, on the Electric Power Sector (hereinafter "Act 24/2013") **[C-0116]** / **[R-0047]**; RD 413/2014 **[C-0131]** / **[R-0080]**; MO IET/1045/2014 **[R-0086]** / **[C-0126]** / **[C-0126bis]**; Judgment of the Spanish Supreme Court 1730/2016 of 12 July 2016 which rejects the appeal filed by the AEE against RD 413/2014 and MO 1045/2014 (appeal 456/2014) **[R-0113]**; CNE Report 2/2012 **[R-0105]** / **[C-0214]** / **[C-0294]**.

[278] C-I § 766; Press release, "Soria pronostica ahora que no habrá déficit de tarifa eléctrica a final de año", *El País*, 11 November 2013 **[C-0193]**.

[279] C-I § 773; C-III § 285; First draft Royal Decree regulating the activity of power production from renewable sources of energy, cogeneration and waste, submitted to the CNE on 16 July 2013 **[C-0196]**; *see also* Press release, "Consulte aquí los decretos de desarrollo de la reforma energética", *El Economista.es*, 16 July 2013 **[C-0129]**.

[280] C-III § 290, Letter sent by Mr. Alberto Nadal, Secretary of State for Energy, to Mr. Arturo Fernández, Secretary General of IDAE, 22 July 2013 **[C-0279]**.

test IDAE's remuneration models for standard facilities. [281]   Respondent explains that Boston Consulting Group ("BCG") and Ronald Berger ("RB") were hired not to prepare or quantify the parameters on which the implementing remunerative model of RD 413/2014 would be based, but rather to act as "*technical assistance*" in support of IDAE, which was the expert that would conduct the study of the production cost of the electricity generation technologies under the special regime.[282]

262. On 30 July 2013, Protermosolar,[283] UNEF,[284] APPA[285] made declarations to CNE regarding the Royal Decree Proposal regulating the electricity production activity from renewable energy, cogeneration, and waste.  AEE made a proposal on 1 August 2013.[286]

263. On 4 September 2013, CNE issued "*Report 18/2013 on the new Royal Decree on renewable energy production*" ("CNE Report 18/2013").[287]  The Parties agree that this report contained the criticisms made by RE associations during the consulting period and noted that the consultation period had been too short,[288] which, Respondent states, led it to re-start the procedures for RD 413/2014.  Claimants state that this report demonstrates that Respondent's 2013 regulatory overhaul was unprecedented and caused significant uncertainty.  [289]

---

[281] C-III §§ 291 – 295; IDAE, *Terms of technical reference*, "Contratación de  servicios de asistencia especializada al Ministerio de Industria, Energía y Turismo para la Realización de Estudios y Análisis de Estándares de Proyectos de Producción de Electricidad en Régimen Especial" (*Procurement of specialist support services for the Ministry of Industry, Energy and Tourism for the execution of studies and analyses of standards for special regime electricity generation* projects), 23 July 2013 **[C-0280]**.

[282] R-II § 939 – 951; C-III § 296; Act 50/1997, of 27 November, on the Government, published in the Spanish Official State Gazette no. 285, 28 November 1997 **[R-0039]**; Appeal filed before the Supreme Court by PROTERMOSOLAR against RD 413/2014 and Order IET 1045/2014 (Rca. 500/2014) on 10 April 2015 **[R-0325]**.

[283] PROTERMOSOLAR submissions to the Public Consultation of the Spanish National Energy Commission (CNE) (30 July 2013) **[R-0145] / [R-0147]**.

[284] Submissions from the UNEF to RD 413/2014 before the CNE (30 July 2013) **[R-0151]**.

[285] Submissions from APPA to draft RD 413/2014 before the CNMC (30 July 2013) **[R-0155]**.

[286] Submissions from the AEE concerning the draft RD 413/2014 before the CNE (1 August 2013) **[R-0141]**.

[287] Report 18/2013 on the new Royal Decree on renewable energy production, CNE, of 4 September 2013 (hereinafter "Report 18/2013"), 5-6 **[C-0192]**.

[288] C-III § 287; R-II §§ 919 – 920.

[289] R-II §§ 919 – 920.

264.    On 26 November 2013, the Ministry sent a second draft RD 413/2014 to CNMC.[290]  Respondent states that Protermosolar viewed the drafts of the Royal Decree.[291]

265.    On 28 November 2013, IDAE awarded BCG and RB the tender to issue reports on the estimated values for the remuneration parameters to be approved under what would become Ministerial Order IET/1045/2014, of 16 June, approving the remuneration parameters for standard plants applicable to certain facilities that produce power from renewable sources of energy, cogeneration and waste ("MO IET/1045/2014").[292]

266.    Claimants explain that, in December 2013, the Senate approved 47 proposals for amendment to Act 24/2013, each coming from the same party.[293]

267.    On 11 December 2013, UNEF,[294] Protermosolar,[295] and AEE[296] provided their comments on the proposed RD 413/2014 to CNMC.[297]

268.    Claimants state that the consultation period for the second draft of RD 413/2014 ended in mid-December 2013.  CNMC issued its report on 17 December 2013, and this report completely surpassed CNE Report 18/2013.[298]

269.    On 18 December 2013, IDAE entered into contracts with BCG and RB.[299]

---

[290]  C-I § 774; C-III § 288; Second draft Royal Decree regulating the activity of power production from renewable sources of energy, cogeneration and waste, submitted to the CNMC on 26 November 2013 **[C-0198]**.

[291]  Submissions from PROTERMOSOLAR concerning the draft RD 413/2014 before the CNMC **[R-0146]**; Submissions from PROTERMOSOLAR concerning the draft RD 413/2014 before the Council of State **[R-0147]**.

[292]  C-III § 296.

[293]  C-I § 772; Diary Sessions of the Lower House of Parliament, year 2013, X Legislative Term, No. 287, of 18 December 2013 **[C-0195]**.

[294]  Submissions from the UNEF to RD 413/2014 before the CNMC (11 December 2013) **[R-0152]**.

[295]  Submissions from PROTERMOSOLAR concerning the draft RD 413/2014 before the CNMC **[R-0146]** (stamped 11th).

[296]  Submissions from the AEE concerning the draft RD 413/2014 before the CNMC (11 December 2013) **[R-0142]**.

[297]  *See also* R-II § 914 – 915; Index of administrative file for Royal Decree 413/2014 **[R-0053]**; Submissions from PROTERMOSOLAR concerning the draft RD 413/2014 before the CNMC **[R-0146]**.

[298]  R-II § 923.

[299]  C-III § 296; Contract signed between BCG and IDAE on 18 December 2013 to prepare a study calculating the standard parameters of existing installation, including Special Terms & Conditions and Terms of Technical

270. On 27 December 2013, Act 24/2013 was published.[300] Two Royal Decrees that followed the Act 24/2013 are Royal Decree 1047/2013, of 27 December, which establishes the methodology for calculating the remuneration for the activity of electricity transport ("RD 1047/2013")[301] and Royal Decree 1048/2013, of 27 December, which establishes the methodology for calculating the remuneration for the activity of electricity distribution and other regulations ("RD 1048/2013").[302]

271. The Act 24/2013 went into force on 28 December 2013.[303]

272. On 31 January 2014, the Government released the first draft of MO IET/1045/2014 (an "Order of Parameters") and submitted it to CNMC for fast-track consultation and invited interested entities to submit allegations.[304] Claimants state that the values contained in this draft revealed for the first time the economic parameters of the standard installations.[305]

273. On 3 February 2014, BCG delivered a January 2014 report to IDAE at a meeting of the IDAE-BCG Joint Committee. The Parties dispute whether this Report, which Claimants state contained BCG's conclusions and recommendations for IDAE's methodology,[306] was a draft or final report.[307]

---

References, of 23 July 2013 **[C-0238]**; Contract signed between IDAE and RB, 18 December 2013 **[C-0281]**.

[300] R-I §§ 253, 668 – 669; Act 24/2013 **[C-0116]** / **[R-0047]**.

[301] Royal Decree 1047/2013, of 27 December, which establishes the methodology for calculating the remuneration for the activity of electricity transport (hereinafter "RD 1047/2013") **[R-0078]**.

[302] R-I § 666; Royal Decree 1048/2013, of 27 December, which establishes the methodology for calculating the remuneration for the activity of electricity distribution and other regulations (hereinafter "RD 1048/2013") **[R-0079]**.

[303] RfA § 57(ii).

[304] C-I § 405; C-III § 318; Draft Ministerial Order establishing the categories of standard plants and the remuneration parameters to renewable facilities for year 2013 and for the period 2014-2016, draft submitted to the CNMC on 31 January 2014 **[C-0139]** / **[C-0286]**.

[305] C-III § 318; R-II § 926; Index of the administrative file of Order 1045/2014. 12 June 2014 **[R-0310]** (*stating that the Order of Parameters was circulated to interested entities on 3 February 2014*).

[306] C-III § 298; BCG, "*Análisis de estándares de proyectos de producción de electricidad en Régimen Especial. Documento Final*", January, 2014 **[C-0239]**; Minutes of the first meeting held by BCG-IDAE Joint Committee, 3 February 2014 **[C-0282]**.

[307] Compare C-III § 298 (stating that the document is a final report), R-I §§ 933 – 934 (*stating that the document – a draft – was never requested by Claimants*); *see also* R-II § 960 – 961; BCG, "*Análisis de estándares de proyectos de producción de electricidad en Régimen Especial. Documento Final*", January, 2014 **[C-0239]**; BCG: "ANALYSIS OF STANDARDS OF ELECTRICITY PRODUCTION PROJECTS UNDER THE SPECIAL REGIME Executive Summary" 28 June 2014 **[R-0332]**; BGC: "ANALYSIS OF STANDARDS OF ELECTRICITY PRODUCTION PROJECTS UNDER THE SPECIAL REGIME. Final document" 30 July 2014

274. On 4 February 2014, RB delivered its report to IDAE at a meeting of the IDAE-RB Joint Committee.[308] The Parties dispute whether this was a draft[309] or a final Report.[310] Respondent states that neither draft report submitted by BCG or RB have been requested or provided in these proceedings.[311]

275. On 17/18 and 21 February 2014, respectively, Acciona and Iberdrola Renovables Energia, SA requested that Respondent grant a new public consulting period to present arguments on the draft MO IET/1045/2014.[312]

276. By the end of February 2014, when Claimants state that the consultation period ended,[313] CNMC received pleadings on the draft MO IET/1045/2014 from the Regional Government of Aragon,[314] the

---

**[R-0333]**.

308  Minutes of the first meeting held by RB-IDAE Joint Committee, 4 February 2014 **[C-0283]**; Roland Berger's first report "Análisis de estándares de proyectos de producción de electricidad en régimen especial" (*Analysis of standards for electricity-generating projects under the Special Regime*), 4 February 2014 **[C-0284]**.

309  R-II § 945; Roland Berger's first report "Análisis de estándares de proyectos de producción de electricidad en régimen especial" (*Analysis of standards for electricity-generating projects under the Special Regime*), 4 February 2014 **[C-0284]**.

310  C-III § 303.

311  R-II §§ 933 – 934.

312  *See* Allegations of Acciona to the draft MO IET/1045/2014 before the Advisory Council for Electricity, CNMC, 17 February 2014 **[C-0154]**; Allegations of Iberdrola to the draft MO IET/1045/2014 before the Advisory Council for Electricity, CNMC, 21 February 2014 **[C-0155]**.

313  C-I § 423.

314  Allegations by Aragón's Regional Government to the draft MO IET/1045/2014 before the Advisory Council for Electricity, CNMC, 24 February 2014 **[C-0287]**.

Navarra Regional Government,[315] Protermosolar,[316] UNEF,[317] the Government of Extremadura,[318] ACIE,[319] and AEE.[320]

277.  On 6 March 2014, RB responded to IDAE's comments on their report of 4 February 2014.[321]

278.  On 21 March 2014, there was a meeting of the IDAE-BCG Joint Committee, where IDAE identified errors in the BCG Report and BCG corrected them.[322]

279.  On 4 April 2014, CNMC issued a report where it commented on the draft of MO IET/1045/2014, noting that applying the parameters laid down in the draft would entail an approximate EUR 1,700 million decrease in feed-in remuneration received by the facilities covered by the draft.[323]  Respondent notes that the CNMC Report also made a positive assessment regarding the different standard facilities contained in the draft.[324]

---

[315] Allegations by Navarra's Regional Government to the draft MO IET/1045/2014 before the Advisory Council for Electricity, CNMC, 25 February 2014 **[C-0289]**.

[316] Submissions from PROTERMOSOLAR to the Ministerial Order (OIET 1045/2014), before the National Competition Commission (25 February 2014) **[R-0148]**.

[317] Submissions on 25 February 2014 from the UNEF Photovoltaic Association to the Draft Ministerial Order before the CNMC **[R-0153]**.

[318] Allegations by Extremadura's Regional Government to the draft MO IET/1045/2014 before the Advisory Council for Electricity, CNMC, 26 February 2014 **[C-0288]**.

[319] Draft Order approving the remuneration parameters for standard plants applicable to certain facilities which produce power from renewable sources of energy, cogeneration and waste **[C-0290]**.

[320] Submissions from the AEE concerning draft Order ITE/1045/2014 before the CNMC (28 February 2014) **[R-0143]**.

[321] Minutes of the second meeting held by RB-IDAE Joint Committee, 6 March 2014 **[C-0333]**; Letter sent by RB to IDAE, appraising IDAE's comments and instructions for improvement to RB First Final Report, 6 March 2014 **[C-0334]**; IDAE's comments and instructions for improvement to RB First Final Report, 24 February 2014 **[C-0332]**.

[322] R-II § 974; IDAE's comments and instructions for improvement to BCG First Report, 21 March 2014 **[R-0327]**; Minutes of the second meeting held by BCG-IDAE Joint Committee, 21 March 2014 **[C-0330]**; Comments by IDAE on the document drafted by Boston Consulting Group "Analysis of standards of electricity production projects under the special regime," January 2014, and instructions to rectify the errors noticed **[R-0326]**; Decision of the Council of State number 224/2007, of 30 April 2007, on Royal Decree 661/2007, regulating the activity of electricity production under the special regime and certain facilities using similar technology under the ordinary regime **[R-0328]**.

[323] C-III §§ 263, 271; CNMC Report. Administrative file relating to draft Order IET/1045/2014 0 (2014) **[R-0107]**.

[324] R-II §§ 827 – 828; CNMC Report. Administrative file relating to draft Order IET/1045/2014 0 (2014) **[R-0107]**.

280.   On 9 April 2014, BCG provided further written responses to IDAE's comments on its report.[325]

281.   In late May 2014, the Council of State received pleadings on the draft MO IET/1045/2014 from AEE,[326] UNEF,[327] Protermosolar,[328] and APPA.[329]

282.   On 11 June 2014, RD 413/2014, which introduced the remuneration system announced by RD-Law 9/2013, went into force.[330]

283.   On 12 June 2014, the Council of State issued its Opinion on the draft of MO IET/1045/2014.[331] Claimants state that this Opinion confirmed that the Ministry of Energy never explained how it calculated the economic parameters included in the Draft and expressed that Respondent's new regulatory framework represented a sudden switch.[332]   Respondent states that this non-mandatory report is one example of Respondent going above and beyond what was required to ensure that all interested parties have the opportunity to participate.[333]

284.   On 16 June 2014, Respondent enacted MO IET/1045/2014.[334]  This established the Government's rate of return on assets for every standard installation of 7.398%.[335]   Claimants state that, when MO IET/1045/2014 was enacted, they learned they "*would have to hand back incentive payments earned*

---

[325]   C-III § 309; Letter by Ivan Marten *et al*. (BCG) to Arturo Fernandez (IDAE), dated 9 April 2014 **[C-0240]**.

[326]   Submissions from the AEE concerning draft Order ITE/1045/2014 before the Council of State (26 May 2014) **[R-0144]**.

[327]   Submissions on 26 May 2014 from the UNEF Photovoltaic Association to the Draft Ministerial Order before the Council of State **[R-0154]**.

[328]   Submissions from PROTERMOSOLAR to the Ministerial Order (OIET 1045/2014), before the Council of State (27 May 2014) **[R-0149]**.

[329]   Submissions from APPA to draft Order ITE/1045/2014 before the CNMC (29 May 2014) **[R-0157]**.

[330]   RfA § 57(iii); RD 413/2014 **[C-0131]** / **[R-0080]**.

[331]   Council of State, dated 12 June 2014, Opinion on draft Order by which the retributive parameters of the standard facilities applicable to certain installations for the production of electrical energy from renewable energy sources; cogeneration and waste **[C-0277 / R-0098]**.

[332]   C-III §§ 282, 320, 446.

[333]   R-I § 912.

[334]   C-I § 423; MO IET/1045/2014 **[R-0086]** / **[C-0126]** / **[C-0126bis]**.

[335]   C-III § 263(iii).

*since July 2013 exceeding the amounts granted under* [MO IET/1045/2014]."[336]  According to Respondent, the new remuneration model is contained in RD-Law 9/2013, Act 24/2013, and regulations with the force of law that have been developed by RD 413/2014, and MO IET/1045/2014.[337]

285.  On 28 June 2014, the EC issued a Communication, entitled "*Guidelines on State Aid for Environmental Protection and Energy 2014 – 2020.*"[338]

286.  On 31 July 2014, BCG submitted its confidential final report dated to IDAE.[339]  On 31 October 2014, RB issued a document – which Claimants call a version of RB's "*Failed Report*"[340] and Respondent characterizes as a technical document which could not be subjected to public hearing as of February 2014.[341]  Claimants state that Respondent did not receive the RB report until much later – 11 December 2014.[342]  Respondent agrees with Claimants that the reports became public after the entry into force of RD 413/2014 and MO IET/1045/2014.[343]  Respondent notes that their publication is

---

[336] *Id*. at § 519.

[337] R-II § 768; RD-Law 9/2013 **[R-0064]** / **[C-0128]**; Act 24/2013 **[C-0116]** / **[R-0047]**; MO IET/1045/2014 **[R-0086]** / **[C-0126]** / **[C-0126bis]**; RD 413/2014 **[C-0131]** / **[R-0080]**; Judgment of the Spanish Supreme Court 1730/2016 of 12 July 2016 which rejects the appeal filed by the AEE against RD 413/2014 and MO 1045/2014 (appeal 456/2014) **[R-0113]**.

[338] R-II § 864; Guidelines on State Aid for environmental protection and energy 2014-2020, 2014/C200/01, Communication from the European Commission, published in the Official Journal of the European Union on 28 June 2014 **[R-0032]**.

[339] R-II §§ 960, 962; BCG, "*Análisis de estándares de proyectos de producción de electricidad en Régimen Especial. Documento Final*", January, 2014 **[C-0239]**; Letter sent by BCG to IDAE, communicating the submission of BCG Third Report dated 30 July 2014 with supporting documents and a CD-Rom, 31 July 2014 **[C-0335]**; BCG: "ANALYSIS OF STANDARDS OF ELECTRICITY PRODUCTION PROJECTS UNDER THE SPECIAL REGIME Executive Summary" 28 June 2014 **[R-0332]**; BGC: "ANALYSIS OF STANDARDS OF ELECTRICITY PRODUCTION PROJECTS UNDER THE SPECIAL REGIME. Final document" 30 July 2014 **[R-0333]**.

[340] Roland Berger's Failed Report "Análisis de estándares de proyectos de producción de electricidad en régimen especial", 31 October 2014 **[C-0144]**.

[341] *Id*.; R-II §§ 958 – 961; Roland Berger report: "Analysis of standards for electricity-generating projects under the special Regime" 30 September 2014 **[R-0334]**; BCG, "*Análisis de estándares de proyectos de producción de electricidad en Régimen Especial. Documento Final*", January, 2014 **[C-0239]**; BCG: "ANALYSIS OF STANDARDS OF ELECTRICITY PRODUCTION PROJECTS UNDER THE SPECIAL REGIME Executive Summary" 28 June 2014 **[R-0332]**; BGC: "ANALYSIS OF STANDARDS OF ELECTRICITY PRODUCTION PROJECTS UNDER THE SPECIAL REGIME. Final document" 30 July 2014 **[R-0333]**.

[342] C-I § 780(i).

[343] R-II §§ 966, 968; C-III §§ 326 – 329.

meaningless and has nothing to do with the transparency or consistency of an administration.[344] Claimants argue that the reports that post-date are evidence of wrongdoing.[345]

287. On 26 February 2015, after IDAE adopted a resolution to terminate the agreement with BCG, IDAE notified BCG of the termination of the contract for nonfulfillment and requested that BCG pay back the amounts already invoiced.  BCG requested that IDAE reverse its decision.[346]

288. On 11 July 2015, the Ministry of Energy published Royal Decree-Law 9/2015, of 10 July, on urgent measures to reduce fiscal burden by tax payers of [income tax] and other measures of economic content ("RD-Law 9/2015").[347]  This reduced Access Tolls that consumers pay for the remainder of 2015 and thereby reduced final domestic consumer electricity prices by 0.7% and had an impact of EUR 250 million, representing a 4% decline in the total regulated revenues that the electricity system collected for the same period.[348]

289. On 1 April 2017, Royal Decree 359/2017, of 31 March, establishing a call for granting the specific remuneration regime to new facilities producing electricity from renewable energy sources in the peninsular electricity system ("RD 359/2017") was published.[349]  Respondent states that the success

---

[344] R-II § 966.

[345] C-III § 326; C-I § 411 (*stating* that reports that post-date MO IET/1045/2014 is evidence of wrongdoing); Letter sent by IDAE to BCG terminating the contract, dated 26 February 2015 **[C-0291]**; Press release, "El recorte a las renovables se basó en un informe inexistente", *El País*, 13 March 2015 **[C-0141]**; Press release, "Criticas a Soria por ocultar el informe que justificaba el recorte a renovables", *El País*, 13 March 2015 **[C-0143]**; Roland Berger's Failed Report "Análisis de estándares de proyectos de producción de electricidad en régimen especial", 31 October 2014 **[C-0144]**; Approval Certificate for the Study Corresponding to Contract for Technical and Consultancy Assistance between the Ministry of Energy and Roland Berger, 11 December 2014 **[C-0145]**; Press release, "Soria desechó dos informes del hachazo renovable hasta conseguir uno diseñado a la carta", *Vozpópuli*, 29 April 2015 **[C-0146]**.

[346] C-III § 328; Letter sent by IDAE to BCG terminating the contract, dated 26 February 2015 **[C-0291]**.

[347] Royal Decree-Law 9/2015, of 10 July, on urgent measures to reduce fiscal burden by tax payers of [income tax] and other measures of economic content (hereinafter "RD-Law 9/2015") **[C-0295]**.

[348] *Id.*; C-III § 345.

[349] Royal Decree 359/2017, of 31 March, establishing a call for granting the specific remuneration regime to new facilities producing electricity from renewable energy sources in the peninsular electricity system (hereinafter "RD 359/2017") **[R-0234]**.

of the auction enabled by RD 359/2017 demonstrates that the situation of the Spanish SES and the Tariff Deficit is no longer a problem for markets.[350]

290.  On 10 November 2017, the EC rendered its Decision regarding the Support for Electricity generation from renewable energy sources, cogeneration and waste ("EC State Aid Decision (11 November 2017)").[351]

## VI.    APPLICABLE LAW

### A.    THE ROLE OF EU LAW AS "APPLICABLE LAW"

#### 1.    Arguments by Claimants

291.  The Tribunal does not have to apply or interpret EU law.[352]

292.  The Tribunal's jurisdiction arises exclusively from Articles 25 and 26 of the ICSID Convention and Article 26 of the ECT.[353]  The ECT is the constitutional treaty and, by definition, must prevail over other treaties in the Tribunal's analyses.[354]  This Tribunal will not be called upon to apply EU law.[355]

293.  Claimants explain that, since EU law must be treated as a fact and must be analyzed in light of the ECT, "*the discussion will be whether the EU's actions and omissions (in the form of EU law*

---

[350]  R-II § 1045.

[351]  EC State Aid Decision (11 November 2017) **[RL-0080]**.

[352]  CPHB-I §§ 1.1.b and c.

[353]  C-IV §§ 9, 60.

[354]  C-II §§ 55 – 59; *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain* (SCC Case 062/2012), Final Award, January 21, 2016, and dissenting opinion by Prof. Guido S. Tawil, 21 December 2015 (hereinafter "*Charanne*"), § 444 **[CL-0030] / [RL-0049]**; *Eiser Infrastructure Limited and Energía Solar Luxembourg, S.À.R.I. v. Kingdom of Spain* (ICSID Case No. ARB/13/36), Final Award, 4 May 2017 (hereinafter "*Eiser*"), § 204 **[RL-0078] / [CL-0148]**; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), Decision on Jurisdiction, 6 June 2016 ("*RREEF v. Spain*") § 79 **[CL-0179]**; *see also* EC Amicus brief §§ 118 – 122.

[355]  C-IV §§ 26, 57, 58; *SAUR International SA v. Republic of Argentina* (ICSID Case No.ARB/04/4), Decision on Jurisdiction and Liability, 6 June 2012 (hereinafter "*SAUR v. Argentina*"), § 42 **[CL-0104]**; P.M. Dupuy, "The Danger of Fragmentation or Unification of the International Legal Order and the International Court of Justice", *International Law and Politics*, vo. 31, 1999, 796 – 797 **[CL-0216]**.

*provisions) comply with the ECT*."[356]  Hence, the ECT must prevail over EU law as applicable law before an ECT tribunal.[357]

294.  The ECT's scope is broader than the concept of "*energy*" in Article 4(2) of the TFEU, and several legal rules contained in the ECT have no equivalent in EU law.  Even following the Treaty of Lisbon in 2009, EU Member States retained their competences on energy matters, such that the new treaty could not supersede the ECT.  EU treaties subsequent to the ECT did not change the content of the EU Member States' *inter se* obligations under the ECT, and energy remained a shared competency between the EU and its Member States.  The ECT continues to apply to intra-EU disputes after the Treaties of Amsterdam, Nice, and Lisbon, as does the ECHR.[358]

295.  Respondent incorrectly invokes Article 25 of the ECT to suggest that EU law prevails over the ECT, ignoring Article 16 of the ECT.[359]  No problems with the ECT's compatibility with EU law exist.[360]  Any compatibility of regimes between EU law and the ECT would be resolved in the ECT's favor by virtue of Article 16 of the ECT, which gives precedence to the provisions of either the ECT or other international agreement that are most favourable to the investor or investment.[361]  Even if this Tribunal considered that a "*conflict of treaties*" could exist (finding that the TFEU and the ECT have the same subject matter), the Tribunal should apply Article 16 of the ECT, which, in the words of the *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* decision "*affords precedence of the more favorable investor-protection provisions of Article 26 of the ECT […] over any conflicting provision of the EU treaties*."[362]  Article 25 of the ECT only refers to the non-extension of preferential treatment stemming from economic integration agreements to non-signatories of those agreements.  It does not prohibit the application of the ECT to intra-EU disputes or establish that EU law supersedes the

---

[356] C-II § 59.

[357] *Id*.

[358] *Id*. at §§ 43 – 45; Vienna Convention on the Law of Treaties, done in Vienna on 23 May 1969, 1155 U.N.T.S. 331 (hereinafter "VCLT") **[CL-0007]** / **[RL-0010]**; *see also* EC's Application, § 3; EC Amicus Brief, §§ 129 – 137.

[359] C-IV § 10 (*citing* R-II §§ 118 – 120).

[360] C-II § 38; *Eastern Sugar v. Czech Republic* **[CL-0149]**.

[361] C-II § 55; C-IV §§ 30 – 32; EC Amicus §§ 47 – 48, 118 – 122; *Eiser*, § 202 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *RREEF v. Spain*, §§ 75, 79 **[CL-0179]**.

[362] CPHB-I § 10; Tr. Day 1, 68:21 – 69:11 (Claimants' Counsel); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, May 16, 2018 (hereinafter "*Masdar*"), § 332 **[CL-0220]**.

71

investor's protection warranted by the ECT in intra-EU relations.[363]  The primacy of EU law does not have any application in the context of the ECT, whether on jurisdictional issues or on the merits.[364]

296.  Every time the EU has wanted treaty provisions to supersede the investor's protection warranted by a treaty, the EU has negotiated and included a disconnection clause in that treaty.  The *travaux préparatoires* show that the ECT does not contain a disconnection clause that would bar its applicability in intra-EU disputes because the European Communities withdrew it.[365]  Other ECT tribunals involving Respondent have rejected the existence of an alleged implicit disconnection clause in the ECT.[366]

297.  Neither the Respondent nor the EU can amend the ECT by way of a judgment of the CJEU.  Any amendment to the ECT must be made pursuant to the mechanisms set out in the ECT and, subsidiarily,

---

[363] C-IV § 78.

[364] *Id*. at §§ 23 – 26; *see e.g. RREEF v. Spain*, § 74 **[CL-0179]** (*highlighting* that the ECT was its "constitutional" treaty); *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain* (SCC Arbitration 2015/063), Final Award, 15 February 2018 (hereinafter "*Novenergia*"), § 461 **[CL-0213]** ("*this Tribunal's jurisdiction is based exclusively on the explicit terms of the ECT. As is evident, the Tribunal is not constituted on the basis of the European legal order and it is not subject to any requirements of such legal order*").

[365] C-II §§ 60, 63 – 69, 91; C-IV §§ 21, 27 – 29, 72 – 77, 79; CPHB-I § 8; Tr. Day 1 p. 65:7 – 82:7; *Eiser*, §§ 187, 192, 207 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Novenergia*, §§ 187, 454, 456, 460, 462 – 465 **[CL-0213]**; *see also Charanne*, §§ 437 – 438 **[CL-0030]** / **[RL-0049]**; A. Dimopoulos, "The validity and applicability of international investment agreements between EU Member States under EU and International Law", *Common Market Law Review*, vol. 48, 2011, p. 75 **[CL-0165]**; *RREEF v. Spain*, §§ 82, 85 **[CL-0179]**; *International Law Commission*, "Fragmentation of International Law: difficulties arising from the diversification and expansion of international law. Report of the Study Group of the International Law Commission Finalized by Martti Koskenniemi", A/CN.4/L.682, 13 April 2006, p. 147 **[CL-0190]**; M. Smrkolj, "The Use of the 'Disconnection Clause' in International Treaties: What Does it tell us about the EC/EU as an Actor in the Sphere of Public International Law?" (14 May 2008) **[CL-0191]**; *Convention on Mutual Administrative Assistance in Tax Matters*, 1988, and chart of signatures and ratifications **[CL-0192]**; *Convention on Insider Trading* (1989) and chart of signatures and ratifications **[CL-0193]**; P. Andrés Sáenz de Santa María, "La Unión Europea y el Derecho de los Tratados: una relación compleja", *REDI*, vol. 68/2, July-December 2016, p. 86 **[CL-0194]**; ECT's *travaux préparatoires*, Basic Agreement BA-15 – pages 83-87 (12 August 1992) **[C-0215]**; ECT's *travaux préparatoires*, Basic Agreement BA-18 – pages 43-47 (18 September 1992) **[C-0216]**; ECT's *travaux préparatoires*, Basic Agreement BA-22 – pages 76-82 (21 October 1992) **[C-0217]**; ECT's *travaux préparatoires*, Basic Agreement BA-26 – pages 82-89 (25 November 1992) **[C-0218]**; ECT's *travaux préparatoires*, Basic Agreement BA-15 (version without contracting parties' comments) (12 August 1992) **[C-0219]**; ECT's *travaux préparatoires*, Basic Agreement BA-22 (version without contracting parties' comments) (21 October 1992) **[C-0220]**; ECT's *travaux préparatoires*, Basic Agreement BA-26 (version without contracting parties' comments) (25 November 1992) **[C-0221]**; Limited Legal Due Diligence Report "Paso-Palma Sol Gestión De Proyectos, S.L.", Cuatrecasas, 3 December 2008 **[R-0330]**.

[366] C-II §§ 61 – 62 (*noting* that Respondent has not raised this claim in this case); *Charanne*, §§ 437 – 438 **[CL-0030]** / **[RL-0049]**; *RREEF v. Spain*, §§ 82, 85 **[CL-0179]**.

by the Charter Conference envisioned in Article 40 of the ECT.  The intra-EU issue is not presently on the Charter Conference agenda.[367]  Article 46 of the ECT expressly forbids reservations in the context of the ECT, and Article 46 of the VCLT provides that a State may not invoke provision of its internal law regarding competence to conclude treaties to invalidate a treaty unless it was a manifest violation of a rule of fundamental importance.[368]  No CJEU judgment should be binding on an international tribunal seized under the ECT and the ICSID Convention.  The CJEU is no more and no less than the highest court of a Contracting Party, and as such cannot decide whether a tribunal is competent.[369]

298.    *Achmea* must be read in its narrow context of (1) dealing only with the compatibility of an intra-EU investment arbitration based on an intra-EU BIT with the TFEU and (2) resolving the intra-EU issue in the context of an annulment proceeding before a court of an EU Member State.  It cannot apply to cases where other treaties control,[370] and it cannot supersede any international obligations the Contracting States have acquired under a treaty.[371]  The CJEU expressly recognized in *Achmea* that an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on institutions, including the CJEU, is not in principle incompatible with EU law.[372]

299.    In *Achmea*, the CJEU recognized the capacity of the EU to conclude international agreements like the ECT and the obligation to implement the resulting awards, "*provided that the autonomy of the EU and its legal order is respected.*"[373]  This exception of the general competence of the EU to conclude agreements must be read restrictively.[374]

---

[367] C-IV §§ 65 – 70 (per Art. 46 of the ECT, abrogation of the applicability of the ECT to intra-EU disputes can only be made by way of an amendment adopted as a protocol, and not a declaration.).

[368] *Id*. at §§ 70, 75.

[369] *Id*. at § 61; P.M. Dupuy, "The Danger of Fragmentation or Unification of the International Legal Order and the International Court of Justice", *International Law and Politics,* vo. 31, 1999, 796 – 797 **[CL-0216]**.

[370] C-IV §§ 51 – 52.

[371] *Id*. at § 53; *Blusun S.A. Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, (ICSID Case No ARB/14/3), Award, 27 December 2016 (hereinafter "*Blusun v. Italy*"), § 289 **[RL-0081]** / **[CL-0200]**.

[372] C-IV § 9; Judgment of EUCJ (Court of Justice of the European Union) Case C-284/16 Republic of Slovakia/Achmea BV (6 March 2018) (hereinafter "*Achmea* Judgment") § 57 **[RL-0104]**.

[373] C-IV § 54; *Achmea* Judgment, § 57 **[RL-0104]**.

[374] C-IV § 55; *fly LAL- Lithuanian Airlines AS, in liquidation v. Starptautiska lidosta Rïga VAS, Air Baltic Corporation*

300.  Claimants explain that:

> [t]*he respect for the autonomy of the EU and its legal order is fully ensured in our case. First, the merits of the dispute should be resolved in accordance with the provisions of the ECT. Second, both Parties admit that there is no conflict between the ECT and EU law. The Tribunal has to decide if the abrogation of Regulatory Framework No. 1 applicable to the PV Plants, operated by the Respondent between 2010 and 2014, is compatible with Articles 10(1) and 13 ECT. All the awards that have analyzed such compatibility (*Charanne, Isolux, Eiser *and* Novenergia*) have found no conflict between the ECT and EU law*.[375]

301.  The EC's presentation on the state of EU law should be disregarded *in limine*.[376]  Rather than offer a straightforward explanation of law, the EC has presented a pleading.  The EC ignored publicly available awards and neglected to mention that, in *RREEF v. Spain*, the tribunal expelled the EC twice during proceedings.[377]  The EC's analysis was selective and omitted (1) that the disconnection clause was expressly excluded from the ECT, (2) the German Supreme Court's and General Wathelet's statements that there is no incompatibility between EU law and investment law, (3) Opinion 2/15's rule that arbitration is consensual.[378]

302.  After the Hearing, Claimants rejected Respondent's condition that they have relied on EU law, and stated that, as found by other tribunals,[379] this dispute presents no question of the validity of EU law

---

*AS* (Case C-302/13), Judgment, Third Chamber, CJEU, October 23, 2014, § 27 ("*Exclusions from the scope of Regulation No 44/2001 are exceptions which, like all exceptions, (…) must be strictly interpreted*.").

[375] C-IV § 56; C-II §§ 13, 49 – 50; EC Amicus § 46; C. H. Schreuer, "Fair and Equitable Treatment in Arbitral Practice", *The Journal of World Investment & Trade*, Vol. 6, 2005, pp. 357-386 **[CL-0093]**; *Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania* (ICSID Case No. ARB/05/20), Final Award, 11 December 2013 (hereinafter "*Micula v. Romania*"), § 319 **[RL-0028]** / **[CL-0099]**; A. De Luca, "Renewable Energy in the EU, the Energy Charter Treaty, and Italy's Withdrawal Therefrom" *Transnational Dispute Management* (May 2015) Vol. 12, Issue 3, p. 12 **[CL-0182]**; Opinion of Advocate General Wathelet delivered on 19 September 2017 in *Case C-284/16, Slowakische Republik v Achmea BV* (hereinafter "Opinion of Advocate General Wathelet"), § 173 **[CL-0188]**.

[376] C-II §§ 84, 90.

[377] *Id*. at §§ 7, 78 – 79, 95 – 96; EC Amicus § 88; REN21, *Global Status Report Renewables 2015*, §§ 159 **[CL-0005]**; *Charanne*, § 431 **[CL-0030]** / **[RL-0049]**; *RREEF v. Spain*, §§ 20, 32 **[CL-0179]**.

[378] C-II §§ 80 – 83; EC Amicus Brief §§ 107 – 121; EC Application § 13; BGH, Beschluss, 3.3.2016 – I ZB 2/15, Schieds VZ, 2016, p. 328 **[CL-0186]**; Opinion 2/15 CJEU, May 16, 2017, ECLI:EU:2017:376 **[CL-0187]**; Opinion of Advocate General Wathelet **[CL-0188]**; Press Release No. 52/17, The free trade agreement with Singapore cannot, in its current form, be concluded by the EU alone, Luxembourg, 16 May 2017 **[C-0243]**.

[379] CPHB-I § 15; *Charanne*, § 448 **[CL-0030]** / **[RL-0049]**; *Eiser*, § 199 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Novenergia*, § 460 **[CL-0213]**.

or a challenge of EU legislation.[380]  References to EU Directives and soft law have served as evidence of the attractiveness of Respondent's legislative framework.  These establish the policy in favor of RE that was followed at the time of Claimants' investment and was later dismantled.[381]  The reference to EU law as background cannot convert this ECT case into an EU law dispute.[382]

303.  This Tribunal is not called upon to rule on State Aid matters.[383]  A State Aid issue would only arise when the Tribunal renders an Award ordering Respondent to pay damages.[384]  Such an Award would not impair EC competencies in State Aid, as the EC will exercise those competencies when Respondent notifies the Award to it.[385]  In the event of disagreement of Respondent or Claimants with the eventual EC Decision on State Aid in relation to the Award, the CJEU will have the final word on this matter of EU internal law.[386]  Claimants noted that the *Novenergia* tribunal considered the EC Decision on State Aid to be irrelevant, and stated that the *Antin* and *Masdar* tribunals refused to accept evidence on it prior to closure of proceedings.  The issue was not considered by the *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain* or *Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain* tribunals.[387]

304.  The *Vattenfall* tribunal carries out this interpretation, as required, under international law (in particular, the law of treaties codified under the VCLT). That tribunal did not deny the existence/effectiveness of EU law. To the extent that the EC or the EU Member States saw an

---

[380]  CPHB-I §§ 14, 15; Tr. Day 5, 50:16-17 (Respondent); *Novenergia*, § 460 **[CL-0213]**.

[381]  CPHB-I §§ 15 – 16; Tr. Day 1 81:12-17 (Claimants' Counsel).

[382]  CPHB-I § 16.

[383]  *Id*. at § 17; Tr. Day 1, 101:3-23, 105:25 – 106:6 (Respondent's Counsel); EC State Aid Decision (11 November 2017) **[RL-0080]**.

[384]  CPHB-I § 11; EC State Aid Decision (11 November 2017), § 165 **[RL-0080]** ("*The Commission recalls that any compensation which an Arbitration [sic] Tribunal were to grant to an investor […] would constitute in and of itself State aid. […] If they award compensation, such as in Eiser v. Spain, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU […]*") (*emphasis added by Claimants*).

[385]  CPHB-I § 12.

[386]  *Id*.

[387]  *Id*. at page 47 line 16 and page 49 line 7, both entitled "Irrelevance and non-applicability of EC Decision on State Aid"; *Antin Infrastructure Services Luxembourg S.á.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (hereinafter "*Antin*"), §§ 51 – 58 **[CL-0222]**; *Masdar*, §§ 79 – 80, 669 – 671 **[CL-0220]**; *Novenergia*, § 465 **[CL-0213]**.

incompatibility between EU law and Article 26 ECT at the time of the ECT negotiation, or to the extent that they now see such an incompatibility, it was and is incumbent upon them to take necessary action to remedy that situation. But "*[i]t is not for this Tribunal to redraft the Treaty which has been agreed by the Contracting Parties to the ECT*."[388]  Even if there existed any type of conflict between the ECT and the TFEU (*quod non*, in the eyes of the *Vattenfall* tribunal since both instruments do not share the "*same subject matter*"), the conflict would have to be resolved by applying the *lex specialis* in Article 16 of the ECT that gives preference to the ECT dispute settlement mechanism.[389]

### 2.    Arguments by Respondent

305.   Since the Tribunal must resolve disputes in line with the ECT and other principles and rules of international law under Article 26(6) of the ECT, the Tribunal must apply EU Law and the ECT under equal conditions.[390]  Under the principle of primacy, it is EU Law and not the ECT that is the international law that must be applied to resolve this dispute.[391]

306.   Claimants' invocation of Article 16 of the ECT is based on an objective lack of confidence in the EU judicial system (of which the courts of their country of origin are a part), which is incompatible with EU law.[392]

307.   Article 16 of the ECT establishes the rules of compatibility between earlier and later treaties with the ECT.  These treaties include those governing the EU, which prevail over the ECT in intra-EU relations.[393]  As recognized in Article 25 of the ECT and the Declaration of the European Communities and their Member States, the Treaties Establishing the European Communities pre-date the ECT and share and exceed the objectives of the ECT.  The protection of the ECT is superseded by EU

---

[388] CPHB-II § 20; *Vattenfall AB; 2. Vattenfall GMBH; 3. Vattenfall Europe Nuclear Energy GMBH; 4. Kernkraftwerk Krümmel GMBH & Co. oHG; 5. Kernkraftwerk Brunsbüttel GMBH & Co. oHG v. Federal Republic of Germany,* ICSID Case No. ARB/12/12, Decision on the *Achmea Issue,* August 31, 2018 (hereinafter "*Vattenfall* Decision"), §§ 207 – 208 **[CL-0223]** / **[RL-0113]**.

[389] CPHB-II § 21; *Vattenfall* Decision, § 229 **[CL-0223]** / **[RL-0113]**.

[390] R-I § 57; R-II §§ 73 – 77, 149; ECT, Art. 26(6) **[CL-0009]**; *Electrabel, S.A. v. the Republic of Hungary* (ICSID Case No.ARB/07/19), Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 ("*Electrabel v. Hungary*, Decision on Jurisdiction") **[CL-0094] / [RL-0002]**.

[391] R-II § 125.

[392] *Id*. at §§ 149 – 150.

[393] R-I § 74.

regulations, which post-date the ECT and prevail due to the principle of primacy.[394]  Any hypothetical conflict is resolved by Article 25 of the ECT, which recognizes that the primacy of EU law in intra-EU relations and prevents an EU right from being extended to nationals of the ECT signatory states that are not members of the EU, through an MFN clause.[395]  Further, the ECT itself recognizes the primacy of EU law.[396]  As recognized in Article 25 of the ECT and as elaborated in the CJEU judgment of *Costa v. ENEL*,[397] the principle of primacy means that EU Law must be applied to intra-community relations in preference to or prevailing over other law, displacing any other national or international provision.[398]  Article 25 of the ECT recognizes that the process of economic integration of the EU is more advanced than the ECT and, ultimately, more favorable to the Investor.[399]

308.  Respondent states that it "*has never upheld the existence of an explicit disconnection clause, since the application of the principle of primacy renders it superfluous.*"[400]  Claimants' insistence on the need for such a clause, by analogy to the case of the Convention on Mutual Administrative Assistance in Tax Matters of 1988 of the Council of Europe and the Organisation for Economic Co-operation and Development ("OECD") and the Convention on Insider Trading of 1989, which expressly included disconnection clauses regarding the *acquis communautaire*, lacks the necessary "*identity of*

---

[394] R-II §§ 156 – 161; ECT, Art. 10.2, 10.3, 10.4, 10.8 **[CL-0009]**; Treaty on European Union and Treaty on the Functioning of the European Union and Charter of Fundamental Rights (2012/C/326/02) consolidated version. Official Journal of the European Union C 326/49 26 October 2012 (hereinafter "TEU and TFEU, consolidated version") **[RL-0001]**; Opinion 1/03 of the plenary session of the Court of Justice of the European Union (CJEU) of 7 February 2006, §§ 83 – 84 **[R-0331]**.

[395] R-II § 149.

[396] *Id*. at §§ 137 – 140, 151.

[397] *Id*. at § 116; CJEU Judgment of 15 July 1964, in case 6/64, *Flaminio Costa v. ENEL* ("*Costa v. ENEL*") **[R-0230]**.

[398] *Id*.; R-II §§ 116 – 120, 124 – 125; R-I §§ 58 – 59; Opinion 1/91 on 14 December 1991 issued by the Court of Justice of the European Union regarding the "Agreement to Create a European Economic Area" (EEA) (hereinafter "CJEU Opinion 1/91 regarding EEA") **[R-0001]**; "The Energy Charter Treaty and Related Documents." 17 December 1991. Consolidated version, excluding Guide to the ECT **[RL-0074]**; *see also* Art. 26(6) ECT, which requires that disputes are resolved "*in accordance with this Treaty and applicable rules and principles of International Law*", which Respondent argues entails treating EU Law and applicable International Law on equal terms when it comes to resolving the dispute.  R-II § 73 – 77.

[399] R-II § 149.

[400] *Id*. at § 152.

*reason.*"[401]  The relationship that these conventions may have with EU regulations has nothing to do with the relationship between EU Treaties and the ECT.[402]

309.    The economic and non-discrimination goals of the ECT could best be met by applying EU Competition Law, which require that State Aid (1) be proportional and (2) not have the effect of distorting competition.[403]  An investor's receipt of subsidies that distort the energy market competition that the ECT seeks to create is incompatible with the ECT and EU Law.[404]

310.    After the Hearing, Respondent noted that Claimants' witness, Mr. Kofmel, stated that Schwab invested in Spain relying on the EU legal order.  The Brattle Report also assumed that the Spanish Supportive Scheme was approved in compliance with EU Directives on RE, which set out the State Aid nature of such schemes.  The application and interpretation of EU Law is, thus, necessary for the resolution of this dispute.[405]

311.    Contrary to Claimants' assessment, the conflict between the ECT and the EU legal order is not limited to the enforcement of an award, nor may it be resolved by the EC's determination of whether payment of an Award would constitute State Aid.  This conflict affects the core of the dispute, as (1) the EU legal order must be applied to the present dispute with prevalence over any other international rules, and (2) Claimants are asking for additional State Aid, which can only be granted by the EC.[406]

312.    The *Vattenfall* Decision is irrelevant and neither invalidates or affects Respondent's position regarding the *Achmea* Judgment because the *Vattenfall* (1) proceeds from a radically flawed premise of international law and (2) did not address the relevance of *Achmea*.[407]  The *Vattenfall* tribunal simply ruled out the application of EU law to the assessment of its own jurisdiction, by means of a *sui generis* interpretation of Article 26(6) and 42(1) of the ICSID Convention, despite having concurred with the

---

[401]  R-II § 155.

[402]  *Id.*

[403]  *Id.* at §§ 1054 – 1055; "*Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice*", T W Wälde (2004) 1 Transnational Dispute Management (English version) **[RL-0054]**.

[404]  R-II §§ 1056 – 1058.

[405]  RPHB-I § 14 (Requirement 1); R. Opening on Facts, 7-33; Respondent's Closing, Slides 37-38; Art. 26(6) of the ECT, Art. 42 ICSID Convention; Tr. Day 2 46:3-5, 46:13-16, 49:1-4 (Kofmel).

[406]  RPHB-I § 16.

[407]  RPHB-II §§ 3 – 5; *Vattenfall* Decision, §§ 108 *et seq.*, 166 **[CL-0223] / [RL-0113]**.

parties and the EC that EU law constituted International Law as defined in Article 38(1) of the Statute of the ICJ. This decision, thus, is internally inconsistent and unsupported by arbitral case law and doctrine.[408] The *Vattenfall* tribunal's interpretation of Article 26(6) of the ECT and Article 42(1) of the ICSID Convention is contrary to the principles of treaty interpretation contained in Article 31 and 32 of the VCLT and to arbitral precedent, including *Electrabel S.A. v. Hungary*; *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*; *AES Summit v. Hungary; Charanne;* and *Isolux*,[409] as well as *Blusun* and *AES Summit*, which considered that the principles of EU law are relevant as part of the applicable law.[410]

313. The *Vattenfall* tribunal further erred by rejecting the application of EU Law as an interpretative parameter under Article 31(3)(C) of the VCLT and by rejecting a harmonious or systemic interpretation between the ECT and the relevant provisions of EU Law.[411] *Vattenfall* provided a partial and decontextualized interpretation of the ECT, in complete isolation from and without reference to EU Law or to the relevant provisions contained therein that apply to each EU Member State.[412] This isolated and biased interpretation of the ECT is improper and renders the *Vattenfall* decision irrelevant to this Tribunal, which must start from the harmonious or systemic interpretation of the ECT and EU Law.[413]

314. The *Vattenfall* decision is further flawed because it considers Article 16 of the ECT to be a conflict rule, when it is nothing more than an interpretive provision. The *Vattenfall* decision also misinterprets Article 351 of the TFEU.[414] As reasoned in *Electrabel*:

---

[408] RPHB-II §§ 6 – 10, 14-15, 24; *Vattenfall* Decision, §§ 140 *et seq.*, 147 (*in fine*) **[CL-0223] / [RL-0113]**.

[409] RPHB-II § 11, *Electrabel v. Hungary*, Decision on Jurisdiction, § 4.20 **[CL-0094] / [RL-0002]** ("*the possible laws applying to the arbitration agreement invoked by the Claimant and to the Parties' rights and obligations under the ECT may include: international law, EU law and Hungarian law*"), *see also Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain*, Arbitration SCC V2013/153, Award, 12 July 2016 (hereinafter "*Isolux*") **[RL-0004] / [RL-0076]**; *Charanne*, §§ 444 *et seq.* **[CL-0030] / [RL-0049]**, *Achmea* Judgment, §§ 39 – 42 **[RL-0104]**.

[410] RPHB-II §§ 12 – 13; *AES v. Hungary*, §§ 7.6 – 7.6.4 **[RL-0039]**; *Blusun v. Italy*, p. 277 – 278 **[RL-0081] / [CL-0200]**.

[411] RPHB-II § 16; *Vattenfall* Decision, §§ 152 et seq., 158 229 **[CL-0223] / [RL-0113]**.

[412] RPHB-II § 17; *Vattenfall* Decision, §§ 168 et seq. **[CL-0223] / [RL-0113]**.

[413] RPHB-II § 19; *Electrabel v. Hungary*, Decision on Jurisdiction, §§ 4.130, 4.133 **[CL-0094] / [RL-0002]**.

[414] RPHB-II § 18; *Vattenfall* Decision, §§ 225 *et seq.* **[CL-0223] / [RL-0113]**.

*the ECT's historical genesis and its text are such that the ECT should be interpreted, if possible, in harmony with EU law. (...) [F]or three important legal reasons. The first derives from the ECT's genesis: it would have made no sense for the European Union to promote and subscribe to the ECT if that had meant entering into obligations inconsistent with EU law. The second derives from one of the ECT's objectives: it is an instrument clearly intended to combat anti-competitive conduct, which is the same objective as the European Union's objective in combating unlawful State aid. The third derives from the ECT's implicit recognition that decisions by the European Commission are legally binding on all EU Member States which are party to the ECT.*[415]

315. Respondent pointed out that the *Masdar* Award was not consistent in its position on the applicability of EU law. While recognizing the tribunal's power and duty to apply EU law, it decided not to apply the *Achmea* Judgment, which is clearly binding under EU law.[416] The *Masdar* Award's findings regarding the applicability of EU law on the jurisdictional phase was at odds with its decision on the facts, merits, and on quantum, where that tribunal failed to analyze how, according to the EC Decision on State Aid, EU law shapes the expectations of an investor.[417] Likewise, the *Novenergia* tribunal recognized that (1) the Spanish regulatory framework comes from EU Law, (2) it should comply with EU Law on State Aid, and (3) EU Law's relevance for the resolution of the dispute, as international law, under Article 26(6) of the ECT. Nonetheless, that Tribunal failed to apply EU Law because it reasoned that none of the claimant's claims were submitted based on EU law and failed to reference EU Law on the merits.[418] Respondent explains that "*the applicable law for the resolution of the case is determined by Article 26(6) of the ECT, which undeniable [sic] comprises the EU Law, and the same should be applied iuria novit curia by the Arbitral Tribunal, even if the parties do not invoke it. That's why, Novenergia's findings on jurisdiction and the merits are flawed, since it does not apply the international rules imposed by the ECT, i.e., the EU Law.*"[419]

### 3.    Statements by the European Commission

316. When both the EU and its Member States become parties to a multilateral agreement, it is the EU's legal order that informs the latter's behavior and actions and, therefore, constitutes a "*relevant rule of*

---

[415] RPHB-II § 19, *Electrabel v. Hungary*, Decision on Jurisdiction, §§ 4.130, 4.133 **[CL-0094] / [RL-0002]**.

[416] RPHB-I § 205.

[417] *Id*. at § 207.

[418] *Id*. at §§ 193 – 194; *Novenergia*, §§ 456, 460 **[CL-0213]**.

[419] RPHB-I § 195.

*international law applicable in the relations between the parties*" in the sense of Article 31(3)(c) of the VCLT.[420]

317.  EU law provides a complete set of substantive and procedural rules for investment protection, and the Internal Market rules govern and protect the life-cycle of an investment.[421]  The intra-EU application of the ECT would create the risk of a substantive conflict between EU law on energy and investment protection and the rules of the ECT.[422]

318.  Based on Articles 30(4)(a) or 41(1)(b) of the VCLT or Article 351 of the TFEU, the EU Treaties prevail over the ECT:[423]

> *Article 30(3) VCLT provides that when all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under Article 59 VCLT, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty. Article 30(4) and (5) of the VCLT specify that when the parties to the later treaty do not include all the parties to the earlier one, as between States parties to both treaties the same rule applies, provided that the provisions of Article 41 VCLT are respected.*[424]

319.  Here, the ECT and the EU Treaties relate to the same subject matter:  energy.  If one assumes that the provisions on investment protection in Chapter III and Article 26 of the ECT have created *inter se* obligations between EU Member States, *quod non,* the EU Member States would be party to successive treaties that relate to the same subject matter.[425]  Here, the ECT is the earlier Treaty, preceding Treaty of Accession of Malta to the EU and the Treaty of Lisbon.[426]  Under Article 30(4)(a) of the VCLT, the ECT only applies to the extent that its provisions are compatible with those later treaties.[427]  The provisions of the ECT on investment protection (Chapter III) and dispute settlement

---

[420]  EC Amicus §§ 90, 66 (*citing Oil Platforms* regarding systemic coherence).

[421]  C-II §§ 25 – 34 (substantive rules); 35 – 36 (procedural); 41 (court).

[422]  EC Amicus §§ 17, 37 – 39.

[423]  *Id*. at §§ 3, 15, 123.

[424]  *Id*. at §§ 132 – 133.

[425]  *Id*. at § 135.

[426]  *Id*. at § 136.

[427]  *Id*.

(Article 26) are not compatible with EU law and are, therefore, not applicable.[428]  The same result is reached by application of Article 351(2) of the TFEU (formerly Article 307 of the Treaty Establishing the European Community, "TEC"), pursuant to which the Member State must apply all appropriate means to remove any incompatibility with EU law arising from prior international agreements.[429]  *Pacta sunt servanda* does not apply to treaties concluded between EU Member States.[430]

320.  The *inter se* obligations between EU Member States would have been superseded on the basis of Article 41(1)(b) of the VCLT, pursuant to which a treaty can be amended by a later treaty if it does not (1) affect the enjoyment by other parties of their rights under the treaty or performance of their obligations and (2) relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty.  Here, by the Accession Treaty of Malta to the EU and the Treaty of Lisbon, the investment protection rules of EU law were reaffirmed.  This treaty could be interpreted as an amendment pursuant to Article 41(1)(b) VCLT.[431]  The suppression of *inter se* obligations between EU Member States only concerns those EU Member States. In the case of investor-State arbitration such as the one foreseen in Article 26 of the ECT, this is compatible with the effective execution of the object and purpose of the ECT as a whole: the possibility of investor-State arbitration between investors from non-EU Member States and either the EU or EU Member States remains untouched.[432]

321.  The ECT lacks an explicit disconnection clause, but this is not material for the interpretation of the ECT.  EU Member States are presumed to be aware of the rules governing the distribution of competencies in the supranational organization they have created.  Disconnection clauses have traditionally been used in international treaties where the EU could not become a Contracting Party itself.  Such a clause serves as a "*reminder*" of the EU's existence.  The ECT contains detailed provisions by means of which Contracting Parties have been made aware of the special features of the legal order of the European Communities.[433]

---

[428] *Id*. at § 137.

[429] *Id*. at §§ 60(3), 61 – 67, 124 – 127, 137.

[430] *Id*. at § 125.

[431] *Id*. at § 131.

[432] *Id*. at §§ 129 – 130.

[433] *Id*. at §§ 107 – 121.

### 4.     The Tribunal

322.  Article 26(6) of the ECT provides: "*A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*."

323.  The Parties agree that, pursuant to that provision, the Tribunal shall decide this dispute in accordance with the ECT and applicable rules and principles of international law.[434]  Articles 31 – 33 of the VCLT reflect the relevant rules of interpretation of international treaties under customary international law, and these are applicable to the construction of the ECT and the ICSID Convention.[435]

324.  The Parties also agree that the Tribunal is not bound by Spanish domestic law, which the Tribunal shall consider as fact.[436]

325.  While the Parties agree that EU law is part of the domestic law of any Member State, the Respondent also contends that EU Law is also applicable international law.[437]

326.  The Tribunal considers that the difference between the applicable substantive law and the law applicable to jurisdiction must be respected.

---

[434] *See* C-I §§ 481 – 482, 484, 486; R-II § 32; International Law Commission's *Draft Articles on Responsibility of States for Internationally Wrongful Acts*, "Report of the International Law Commission on the work of its fifty-third session" (UN Doc. A/56/10), in *Yearbook of the International Law Commission* 2001, vol. II, Part II (hereinafter "ILC Draft Articles"), Art. 3, 55 **[CL-0001]**; L. Gouiffès, "The Dispute Settlement Mechanisms of the Energy Charter Treaty", in C. Ribeiro (Ed.): *Investment Arbitration and the Energy Charter Treaty*, JurisNet, New York, 2006, p. 27 **[CL-0014]**; *El Paso Energy International Company v. The Argentine Republic* (ICSID Case No. ARB/03/15), Award, 31 October 2011 (hereinafter "*El Paso v. Argentina*"), § 135 **[CL-0017]** / **[RL-0041]**; *Luigiterzo Bosca v. Lithuania* (UNCITRAL, PCA Case No. 2011-05), Award, 17 May 2013 (hereinafter "*Luigiterzo Bosca v. Lithuania*"), § 199 **[CL-0018]**; *EDF International, S.A., SAUR International S.A. and León Participaciones Argentinas, S.A. v. Argentina* (ICSID Case No. ARB/03/23), Award, 11 June 2012 (hereinafter *EDF International v. Argentina*"), §§ 904 – 908 **[RL-0102]** / **[CL-0019]**.

[435] C-I §§ 445 – 446; R-I § 149 (*using* the VCLT in its analysis); Energy Charter Secretariat, *The Energy Charter Treaty and Related Documents. A Legal Framework for International Energy Cooperation*, 2080 U.N.T.S. 95 (hereinafter "*ECT and Related Documents*"), p. 158 **[CL-0009]**; Energy Charter Secretariat, *The Energy Charter Treaty and Related Documents. A Legal Framework for International Energy Cooperation*, 2080 U.N.T.S. 95. Spanish version ("*ECT and Related Documents*, Spanish"), pp. 111 – 112 **[CL-0010]**; *Plama Consortium v. Republic of Bulgaria* (ICSID Case No. ARB/03/24), Award, 27 August 2008 (hereinafter "*Plama v. Bulgaria*"), §§ 138 and 164 **[CL-0011]** / **[RL-0034]**; NAFTA, Art. 2103 **[RL-0011]**.

[436] C-I § 484; R-II § 32; *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary* (ICSID Case No. ARB/07/22), Award, 23 September 2010 (hereinafter "*AES v. Hungary*") § 7.6.5 **[CL-0016]**; *Luigiterzo Bosca v. Lithuania*, § 199 **[CL-0018]**.

[437] R-II § 100; C-II § 59.

327. As the Parties agree, Article 26(6) of the ECT is the provision ruling on the substantive law applicable for this Tribunal. Even if, as Respondent argues, in addition to the ECT itself, this provision would make EU law applicable as part of the "*applicable rules and principles of international law*", in the view of the Tribunal it is clear that EU law does not prevail over any provisions of the ECT relevant in the present arbitration. Article 16(2) of the ECT expressly provides:

> **Article 16 Relation to Other Agreements**
>
> *Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,*
>
> *(1)     nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and*
>
> *(2)     nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.*

328. Subsection (1) of this provision is not relevant for the present arbitration, as the Claims raised by Claimants rely only on and call for application only of the ECT and not for any application of EU law. However, subsection (2) makes it expressly clear that Parts III and IV of the ECT – which are precisely those dealing with *Investment Promotion and Protection* and *Dispute Settlement* relevant for this arbitration – remain fully applicable.

329. Further, Articles 21 and 25 of the ECT show that, insofar as the Member States of the ECT wanted to carve out certain matters from application of the ECT, they did so expressly. In this context, the Tribunal, without the need to repeat the details of the reasoning, agrees with that of the *Vattenfall* Tribunal in its interpretation of international law and in particular, the law of treaties codified under the VCLT, that, to the extent that the EC or the EU Member States saw an incompatibility between EU law and the ECT negotiation, the conflict would have to be resolved by applying the *lex specialis* in Article 16 of the ECT.[438]

330. In view of the above considerations, the Tribunal concludes that all substantive provisions of the ECT remain fully applicable and EU law is not part of the applicable substantive law in this case.

---

[438] *Vattenfall* Decision, § 229 **[CL-0223]** / **[RL-0113]**.

331. Whether and, if so, to which extent EU law has to be taken into account for determining the Tribunal's jurisdiction will be discussed below.

## VII.  JURISDICTION OF THE TRIBUNAL

332. Claimants state that they are entitled to submit this dispute to arbitration before ICSID, because (1) Claimants are investors under the ECT, (2) Respondent is another Contracting Party to the ECT, (3) the dispute refers to an Investment of the former in the Area of the latter, (4) both Parties have consented to submit the dispute to international arbitration and have not submitted this dispute to another settlement procedure,[439] and (5) the Parties have complied with the 3-month negotiating period, during which no response was received from Respondent.[440]  Claimants met the three-month "*Cooling-Off*" period of Article 26(2) of the ECT by (1) OperaFund sending the appropriate trigger letters to the competent Spanish authorities on 26 January 2015; (2) Schwab sending the appropriate trigger letters to the competent Spanish authorities on 31 March 2015, and (3) by Claimants submitting an additional triggering letter specifically related to RD 1565/2010, RD-Law 14/2010 and Act 2/2011 *ad cautelam* on 11 May 2016.[441]

---

[439] C-I §§ 462 – 464.

[440] *Id.* at § 447; *Mavrommatis Palestine Concessions (Greece v. United Kingdom)*, Judgment, PCIJ, 30 August 1924, p. 11 **[CL-0012]**.

[441] C-I §§ 465 – 469; Acknowledgement of receipt at the President of the Spanish Government's office, dated 27 January 2015, of the Certified fax of Letter sent by OperaFund Eco- Invest SICAV PLC and Paso-Palma Sol Gestión de Proyectos, S.L. to the Government of the Kingdom of Spain dated 26 January 2015 (notice of dispute - Art. 26 of the ECT) **[C-0036a]**; Acknowledgement of receipt at the Minister of Foreign Affairs and Cooperation's office, 27 January 2015 of the Certified fax of Letter sent by OperaFund Eco- Invest SICAV PLC and Paso-Palma Sol Gestión de Proyectos, S.L. to the Government of the Kingdom of Spain dated 26 January 2015 (notice of dispute - Art.  26 of the ECT) **[C-0036b]**; Acknowledgement of receipt at the Minister of Industry, Energy and Tourism's office, dated 27 January 2015 of the Certified fax of Letter sent by OperaFund Eco- Invest SICAV PLC and Paso-Palma Sol Gestión de Proyectos, S.L. to the Government of the Kingdom of Spain dated 26 January 2015 (notice of dispute - Art. 26 of the ECT) **[C-0036c]**; Acknowledgement of receipt at the President of the Spanish Government's office, dated 1 April 2015 of the Certified fax of Letter sent by Schwab Holding AG to the Government of the Kingdom of Spain dated 31 March 2015 (notice of dispute - Art. 26 of the ECT) **[C-0037a]**; Acknowledgement of receipt at the Minister of Foreign Affairs and Cooperation's office, 6 April 2015 of the Certified fax of Letter sent by Schwab Holding AG dated 31 March 2015 (notice of dispute - Art. 26 of the ECT) **[C-0037b]**; Acknowledgement of receipt at the Minister of Industry, Energy and Tourism's office, dated 6 April 2015 of the Certified fax of Letter sent by Schwab Holding AG dated 31 March 2015 (notice of dispute - Art. 26 of the ECT) **[C-0037c]**; Acknowledgement of receipt at the President of the Spanish Government's Office, dated 11 May 2016 of the Certified fax of Letter sent by OperaFund Eco-Invest SICAV PLC and Schwab Holding AG to the Government of the Kingdom of Spain dated 11 May 2016 (notice of dispute Art. 26 of the ECT) **[C-0208a]**; Acknowledgement of receipt at the Minister of Foreign Affairs and Cooperation's Office, dated 11 May 2016 of the Certified fax of Letter sent by OperaFund Eco-Invest SICAV PLC and Schwab Holding AG to the Government

333. Claimants submit that the Tribunal has jurisdiction *ratione materiae* over this case because Claimants' investments include, without limitation "*shares in several limited liability companies, participative loans granted to the SPVs owning and running the PV Installations, and other investments having economic value in the SPVs.*"[442]  Claimants' investments are associated with "*an Economic Activity in the Energy Sector.*"[443]

334. Finally, Claimants state that the jurisdictional requirements of the ICSID Convention have been met, as (1) Claimants are nationals of Contracting States (Article 25(2) ICSID); and Respondent is another Contracting State to the ICSID Convention.[444]

335. Respondent accepts that Claimants made investments between July 2008 and July 2009, though no decisions from Claimants have been provided.[445]  Respondent has only objected to Claimants' jurisdictional arguments insofar as they relate to (1) Respondent and Malta's membership in the EU (a partial objection related only to Claimant OperaFund) and (2) arbitration over matters related to the TVPEE (as not being covered by Part III of the ECT).

### A.    JURISDICTIONAL OBJECTION 1:  THE INTRA-EU OBJECTIONS / WHETHER RESPONDENT HAS CONSENTED TO THE ARBITRATION OF INTRA-EU DISPUTES

#### 1.    Respondent's Arguments

336. The Tribunal should declare that it lacks jurisdiction over the present intra-EU dispute brought by a Maltese investor (OperaFund) against Respondent because (1) access to arbitration under Article 26(1) of the ECT is only available in a dispute between a Contracting Party and an investor of a

---

of the Kingdom of Spain dated May 11, 2016 (notice of dispute Art. 26 of the ECT) **[C-0208b]**; Acknowledgement of receipt at the Minister of Industry, Energy and Tourism's Office, dated 11 May 2016 of the Certified fax of Letter sent by OperaFund Eco-Invest SICAV PLC and Schwab Holding AG to the Government of the Kingdom of Spain dated 11 May 2016 (notice of dispute Art. 26 of the ECT) **[C-0208c]**.

[442] C-I § 458.

[443] *Id.* at §§ 453 – 461; Directive 2009/28/EC **[C-0058]**.

[444] C-I §§ 471 – 478; ICSID Document, List of Contracting States and Other Signatories of the Convention (as of 18 April 2015) **[C-0038]**; Publication in Switzerland's Official Journal showing that the ICSID Convention remains in force in Switzerland (original document in French and translation into English  included) **[C-0039]**; C. H. Schreuer, *The ICSID Convention. A Commentary,* Cambridge University Press, 2nd. Edition, 2009, § 699 **[CL-0013]**.

[445] R-I §§ 368, 617 – 619; R-II § 685.

different Contracting Party – a requirement not satisfied here – and (2) the valid interpretation of the arbitration clause of Article 26 of the ECT excludes arbitration between investors from the EU and Member States.[446]

337. First, the dual nationality requirement of Article 26(1) of the ECT, combined with the European nationality recognized under Article 20 of the TFEU, excludes OperaFund's dispute from the Tribunal's jurisdiction because OperaFund has dual citizenship: Maltese and European. OperaFund is a European investor investing in Europe, and both the Kingdom of Spain and Malta belong to the EU, which is also a Contracting Party to the ECT. An EU Member State cannot be "*another contracting party*" in relation to another Member State under Article 26 of the ECT.[447]

338. Under Article 25(2) of the ICSID Convention,[448] dual nationals that have the nationality of the Respondent State cannot seek ICSID arbitration, and this is the case with OperaFund. While Article 25(2) of the ICSID Convention refers to natural persons, it must also be applied to cases where legal entities have dual nationality, as occurs in the case of national legal entities of the Member States of the EU. Accordingly, the Tribunal lacks jurisdiction over this matter, as Claimant OperaFund meets neither the dual nationality requirement of Article 26 of the ECT nor Article 25(2) of the ICSID Convention.[449]

339. Second, analyzing Article 26 of the ECT in light of EU law, one also sees that there is no valid offer to arbitrate because EU Member States are not competent to bind themselves to one another under Part III of the ECT.[450] By acceding to the EU, the Member States transferred the competency for treatment of EU investors and investments within the EU to the EC. This prevents – and indeed has

---

[446] R-I § 5; R-II §§ 8, 70 – 78, 162; Respondent's Submission (25 February 2019), §§ 1 – 2; *Electrabel v. Hungary*, Decision on Jurisdiction **[CL-0094] / [RL-0002]** (*rejecting* intra-EU arbitration in the context of the ECT).

[447] R-II §§ 5, 61, 62, 73.

[448] "*(2) 'National of another Contracting State' means: (a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute*" (emphasis added)

[449] R-II §§ 108 – 112; R-I §§ 49 – 53 (*citing* C-I § 34); TEU and TFEU, Art. 20 **[RL-0001]**; Art. 25(2)(a) ICSID Convention; Energy Charter webpage, "Members and Observers" **[R-0228]**; EU Webpage, "EU Countries" **[R-0229]**.

[450] R-II § 139.

prevented – Member States from entering into investment treaties that establish protections that overlap or differ from the rights to which any EU citizen is entitled under EU law.[451]

340.   Within the EU, the only "*foreign investors*" are those who come from non-Member States.[452]  This reality is contained in the ECT itself:  Article 1(2) defines "*Contracting Party*" as "*a state or Regional Economic Integration Organisation ["REIO"], which has consented to be bound by this Treaty and for which the Treaty is in force*."[453]  In addition, Article 1(3) of the ECT's definition of REIO as one "*constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty*" expressly recognizes that there are matters governed by the ECT that should be negotiated by the REIO – here, the EU – because its Member States do not have the competence over them.[454]  This is reflected in and confirmed by the Article 1(1) definition of "*territory*" of the REIO,[455] and the voting rights contained in Article 36(7), which give the EU a number of votes equal to its number of Member States, and preclude the EU and its Member States from voting simultaneously:  each may only vote within its scope of competencies.[456]

341.   Interpreted in accordance with its context and purpose of speeding the recovery of Eastern Europe after the fall of the Berlin Wall though cooperation in the energy sector, Article 26 of the ECT provides no grounds for submitting disputes between an intra-EU investor and an EU Member State to arbitration.[457]  Respondent's position is confirmed by the CJEU's 6 March 2018 judgment in *Achmea*, which examined whether investment arbitration proceedings are compatible with EU law:[458]

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States…, under which an investor*

---

[451] R-II §§ 114, 140, 162.

[452] R-II § 140; R-I §§ 66 – 69; Judgment from the Court of Justice of the European Union, of 11 March 2010, Case C 384/08, Attanasio Group [2010] ECR I 2055, § 43 **[RL-0020]**.

[453] R-II § 141.

[454] *Id*. at §§ 141 – 143; R-I § 70.

[455] R-I § 73.

[456] *Id*. at § 76; R-II §§ 144 – 146.

[457] R-II §§ 87 – 90.

[458] *Id*. at §§ 66, 83 – 84; *Achmea* Judgment, §§ 35 – 37, 41, 45, 46, 49, 55, 56 **[RL-0104]**; Action brought on 6 November 2015 — European Food and Others/Commission (Case T-624/15). OJ C 16, 18.1.2016, pp. 45 & 46 **[R-0315]**; *see also* R-II §§ 129 – 136 (*explaining* that Art. 344 TFEU makes the CJEU the competent authority to rule on whether ECT arbitration is compatible with EU law in intra-EU disputes).

*from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*[459]

342. Thereby, the CJEU declared that investor-state arbitration is incompatible with (1) essential values of the EU such as the autonomy and primacy of its legal order, distribution of powers, mutual trust between Member States (Article 2 TEU) and (2) the duty of sincere cooperation (Article 4 TEU). Both (1) and (2) are protected and guaranteed by the Member States' obligation to submit disputes to the European court system (Article 344 TFEU) and the obligation of the legal authorities to raise preliminary judgments (Article 267 TFEU), which guarantee the uniform application of EU law.[460]

343. Applying the *Achmea* Judgment, this Tribunal should declare its lack of jurisdiction over the present dispute. First, this Tribunal is called upon to interpret and apply EU Law, as Claimants' witnesses invested relying on the EU Legal Order and Brattle assumed that the Spanish Supportive Scheme complied with EU Law.[461] Second, it is not in dispute that intra-EU investment arbitration tribunals are not part of the judicial system and that, third, there is no possibility of complete judicial control by a national judge at the annulment or recognition stages.[462] Fourth, agreements concluded by Member States need to safeguard the principle of autonomy of EU law and, as conceded by Claimants' counsel, this Tribunal is not an EU judicial body and, therefore, cannot safeguard the autonomy of EU Law.[463] The Tribunal should, therefore, declare that it lacks jurisdiction over this dispute.[464]

344. Arbitration within the context of the ECT is only possible between a non-EU investor and an EU Member State or between an EU investor and a non-EU Member State because to do otherwise violates the principles of autonomy and primacy.[465] Although arbitral tribunals have ruled

---

[459] R-II § 82.

[460] *Id.* at §§ 67 – 71, 84 – 85, 87 – 89, 97 – 99, 129 – 136; Final Commission Decision C(2016) 7827, of 28 November 2016, regarding case number SA.40171 in the State Aid Register (2015/NN)– Czech Republic **[RL-0070]**; EC State Aid Decision (11 November 2017) **[RL-0080]**; *Achmea* Judgment, §§ 35, 36, 37, 41, 45, 46, 49, 55, 56 **[RL-0104]**; European Commission - Press release. "Commission asks Member States to terminate their intra-EU bilateral investment treaties" 18 June 2015 **[R-0245]**.

[461] RPHB-I § 14; Tr. Day 2 46:3-5, 46:13-16, 49:1-4, 48:6-25 (Kofmel); Tr. Day 3 99:20 – 100:14, 100:20 – 101:2 (Garcia).

[462] RPHB-I § 14; Claimants' Opening Presentation slide 185.

[463] RPHB-I § 14; Tr. Day 1 89:12-20 (Claimants' Opening).

[464] *Id.* at § 15.

[465] R-I § 85; *Electrabel v. Hungary*, Decision on Jurisdiction, § 4.158 **[CL-0094] / [RL-0002]**.

otherwise,[466] paragraph 58 of the *Achmea* Judgment explains that international agreements that provide for arbitration are not "*in principle*" incompatible with EU legislation, but rather must "*provid[e] that the autonomy of the EU and its legal order is [sic] respected.*"[467] Thus, in cases where the autonomy and legal order of the EU are not guaranteed, those treaties would be incompatible with EU regulations.[468] A regime that removes purely *intra*-EU disputes from the jurisdiction of courts of the Member States would not be compatible with EU law because such disputes have only an internal dimension, governed by European legislation, which prevails over any other international law.[469]

345. The judicial system of the EU, which per Article 344 of the TFEU has a monopoly on the interpretation of EU law, guarantees the freedoms that support the Internal Market. No matter relating to the Internal Market may be submitted to arbitration.[470] The institutional and judicial framework of the EU provides the appropriate judicial appeals and actions when the rights of investors are breached: the investor may claim damages and report any violation of EU law. When a national court fails to fulfill its obligations under EU law, the injured party has grounds to file a claim for damages from the Member State. This system to promote and protect investments requires that no distinction is made within the EU between investors from one Member State or another. Only foreign investors may seek arbitration to defends rights granted under Article 10(1) of the ECT.[471] Article 26 of the ECT does not provide a preferential ordering to its methods of dispute resolution, and Claimants have not explained how arbitration is more favorable for investors or investments. Under Article 26 of the

---

[466] *See e.g.* R-II §§ 129 – 130.

[467] *Id.* at §§ 93 – 94.

[468] R-II § 95; *Achmea* Judgment **[RL-0104]**.

[469] R-II §§ 93 – 94, 96.

[470] R-I §§ 55, 78, 84; TEU and TFEU, Art. 344 **[RL-0001]**; *Electrabel v. Hungary*, Decision on Jurisdiction, § 4.189 **[CL-0094] / [RL-0002]**; CJEU Opinion 1/91 regarding EEA **[R-0001]**.

[471] R-II §§ 78 – 81; R-I §§ 65 – 69; Judgment from the Court of Justice of the European Union, of 11 March 2010, Case C 384/08, Attanasio Group [2010] ECR I 2055 **[RL-0020]**; *see also* R-I §§ 91 – 101 (*regarding* doctrine on the validity of applying EU dispute settlement mechanisms to an intra-EU dispute); "*Investment protection and EU Law: the intra- and extra- EU dimension of the Energy Charter Treaty,*" Jan Kleinheisterkamp, Journal of International Economic Act 15 (1), Oxford University Press, 2012, pages 101, 103 and 108 **[RL-0064]**; Final Commission Decision C(2016) 7827, of 28 November 2016, regarding case number SA.40171 in the State Aid Register (2015/NN)– Czech Republic, §§ 147 – 150 **[RL-0070]**; Decision (EU) 2015/1470 by the Commission on 30 March 2015 pertaining to State aid SA.38517 (2014/C) (ex 2014/NN) carried out by Romania, Arbitration Award Micula/Romania on 11 December 2013 **[R-0002]**; Order of the Court of Justice of the European Union laid down regarding the preliminary judgment C- 275/13, ELCOGAS, on 22 October 2014 **[R-0033]**.

ECT, the Parties could have the possibility of recourse to international conciliation or to the ordinary or Administrative Tribunals of the Contracting Party involved in the dispute.[472]

346.  With regard to State Aid, Respondent has argued that Article 10(8) of the ECT excludes "subsidies" from its scope of application, subjecting them to a supplementary treaty that has not yet been approved.[473]  As an EU Member State, Respondent undertook to achieve the aims of the Directives handed down by the EU, and these directives enabled Spain to incentivize the investment by means of the concession of State Aid, as permitted by the EU within limitations.[474]  OperaFund's investment was made within the framework of the Internal Market in Energy of the EU, which is preferential to the protection conferred by the ECT or any BIT.[475]  Claimants are requesting payment of compensation deriving from a subsidy system that the EC has classified as State Aid.[476]  State Aid is the exclusive competence of the EC and is of essential character to the four fundamental freedoms supporting the Internal Market.  Any decision made in relation to Claimants' alleged right to receive a particular amount of aid will affect an essential pillar of the EU – competition – and will infringe upon the EC's competency in this area.[477]  Here, the autonomy is EU law, its primacy, and the

---

[472] R-II § 147.

[473] *Id*. at § 107; R-I § 7.

[474] R-I §§ 63 – 64; Directive 2001/77/EC, Recital 14 **[C-0057]** / **[RL-0015]**.

[475] R-I §§ 56, 60 – 64; TEU and TFEU **[RL-0001]**; Treaty Establishing the European Community (92/C 224/01), published in the Official Journal of the European Communities on 31 August 1992, Art. 86 **[RL-0005]**; Directive 90/547/EEC of the Council, of 29 October 1990, on the transit of electricity through transmission grids, published in the Official Journal of the European Union on 13 November 1990 **[RL-0012]**; Council Directive 90/377/EEC of 29 June 1990 concerning a Community procedure to improve the transparency of gas and electricity prices charged to industrial end-users, published in the Official Journal of the European Union on 17 July 1990 **[RL-0013]**; Directive 96/92/EC of the European Parliament and of the Council, of 19 December 1996, concerning common rules for the internal market in electricity, published in the Official Journal of the European Union on 30 January 1997 **[RL-0014]**; Directive 2001/77/EC, Recital 14 **[C-0057]** / **[RL-0015]**; Directive 2003/54/EC of the European Parliament and of the Council of 26 June 2003 concerning common rules for the internal market in electricity, published in the Official Journal of the European Union on 15 July 2003 **[RL-0016]**; Directive 2009/28/EC **[RL-0017]**.

[476] R-II §§ 91 – 92, 100 – 101; Community guidelines on State Aid for environmental protection 2008/C82/01, European Commission, published in the Official Journal of the European Union on 1 April 2008 **[R-0031]**; Guidelines on State Aid for environmental protection and energy 2014-2020, 2014/C200/01, Communication from the European Commission, published in the Official Journal of the European Union on 28 June 2014 **[R-0032]**.

[477] R-II §§ 102 – 106, 121 – 124; Order of the Court of Justice of the European Union laid down regarding the preliminary judgment C- 275/13, ELCOGAS, on 22 October 2014 **[R-0033]**; TEU and TFEU, Art. 3(1)(e) **[RL-0001]**; Regulation (EU) No 1219/2012 of 12 December 2012 of the European Parliament and of the Council establishing transitional arrangements for bilateral investment agreements between Member States and third countries **[RL-0071]** ("*After the entry into force of the Lisbon Treaty, foreign direct investment is included in the list of subjects forming part of the common commercial policy. According to Article 3(1)(e) of the Treaty on the*

distribution of powers can only be guaranteed if this Tribunal recognizes the sole and exclusive competence of the CJEU.[478]

347. Respondent stated that it was necessary for it to formulate this jurisdictional objection, due to the principle of institutional loyalty, which is derived from Article 4 of the TEU.[479]

348. After the Hearing, Respondent explained that the *Vattenfall* Decision does not address the *Achmea* issue.[480]  In addition to its failure to consider EU law as applicable, the *Vattenfall* tribunal failed to consider whether an ICSID arbitration tribunal is part of the EU judicial system.  Had it considered such, it would have found that it is not, because it is not subject to the mechanisms capable of ensuring the full effectiveness of the EU Rules and, particularly, it cannot refer to the ECJ for a preliminary ruling.[481]  The *Vattenfall* tribunal failed to analyze whether the effectiveness of EU rules could be ensured in the phases of enforcement and execution of the arbitral award.  It must, however, be concluded that no such control is possible, given the applicable rules on annulment and enforcement of the ICSID Convention, which determine that such phases escape completely the control of EU Courts.[482]  Finally, the *Vattenfall* Tribunal failed to analyze whether an arbitration mechanism would be in accordance with EU Law and its autonomy.[483]  The *Vattenfall* Decisions reference to *Masdar's*

---

*Functioning of the European Union ('TFEU'), the European Union has exclusive competence in matters of common commercial policy. Consequently, only the Union can legislate and adopt legally binding acts in this area. Member States may do so only if they are authorised by the Union, in accordance with article 2(1) TFEU*"); Council Regulation (EC) No 659/1999 of 22 March 1999 laying down detailed rules for the application of Art. 93 of the EC Treaty (OJ L 83, p.1), Art. 11 **[RL-0072]**; *Achmea* Judgment, § 32 **[RL-0104]**; EC State Aid Decision (11 November 2017) **[RL-0080]** ("*The Commission considers that any provision that provides for investor-State arbitration between two Member States is contrary to Union law; in particular, this concerns Article 19(1) TEU, the principles of the freedom of establishment, the freedom to provide services and the free movement of capital, as established by the Treaties (in particular Articles 49, 52, 56, and 63 TFEU), as well as Articles 64(2), 65(1), 66, 75, 107, 108, 215, 267 and Article 344 TFEU, and the general principles of Union law of primacy, unity and effectiveness of Union law, of mutual trust and of legal certainty.*")

[478] R-II § 91.

[479] R-I § 102; TEU and TFEU, Art. 20 **[RL-0001]**.

[480] RPHB-II §§ 20 – 23; *Vattenfall* Decision, § 161 **[CL-0223] / [RL-0113]**.

[481] RPHB-II §§ 24 – 25; *Achmea* Judgment, §§ 39 – 49 **[RL-0104]**.

[482] RPHB-II § 26; *Achmea* Judgment, §§ 50 – 55 **[RL-0104]**; Opinion of Advocate General Wathelet, §§ 252 – 253 **[CL-0188]**.

[483] RPHB-II § 27; *Achmea* Judgment, §§ 56 – 60 **[RL-0104]**; *Vattenfall* Decision, § 144 **[CL-0223] / [RL-0113]**.

reliance on the Opinion of the Advocate General Wathelet is striking because, contrary to that, the *Achmea* Judgment rejected it in its entirety.[484]

349.    In its later Submission on the Member State Declarations on *Achmea* and the Opinion 01/17 of AG Bot, Respondent noted that all Member States acknowledge the EC's position as to the incompatibility with EU law of investor-State arbitration between a Member State and an investor from another Member State.  EU law offers a comprehensive and effective legal framework to intra-EU investors when they invest in another Member State, a regulation that precludes any arbitration on such matters subtracting them from the EU judicial system.[485]

350.    The Declarations are significant and relevant to the Tribunal's interpretation of the ECT because EU law is among the "*applicable rules and principles of international law*" specified in Article 26(6) of the ECT, to be applied in this case.[486]  The 22-Member State Declaration resolves the conflict between EU law and the ECT because the ECT must be interpreted in a way that accords with EU law.  Where that is not possible, that provision of the ECT is inapplicable.  Article 26 of the ECT cannot be considered a valid consent to arbitration in the case of intra-EU disputes for it would be incompatible with the autonomy and primacy of EU law, and the Declaration reinforces the need to solve any potential conflict in favor of EU law.[487]

351.    The Declaration issued by 5 EU Member States, including Malta, does not contradict this.[488]  AG Bot's Opinion concluded that the CJEU should declare the compatibility between CETA and the EU Treaties based on four elements:  "*a) the context of the agreement; b) the possible impact on the autonomy of EU Law of a dispute settlement mechanism as the one designed in the agreement; c) the effects on the principle of equal treatment; and d) finally, the compatibility of the mechanism with the right of access to an independent and impartial Tribunal.*"[489]  From this, one sees that all agreements concluded by the EU must be compatible with constitutional principles stemming therefrom,

---

[484] RPHB-II § 28; RPHB-I § 205 – 206; *Masdar*, §§ 681, 682 **[CL-0220]**; *Achmea* Judgment, § 57 **[RL-0104]**; Opinion of Advocate General Wathelet, §§ 163 – 168 **[CL-0188]**.

[485] Respondent's Submission (25 February 2019), § 7.

[486] *Id*. at §§ 13 – 18.

[487] *Id*. at §§ 19 – 25.

[488] *Id*. at §§ 26 – 27.

[489] *Id*. at § 31.

including the autonomy of the EU legal order.[490]  The test of whether the exclusive powers of the EU judicial system are ensured is by reference to either by the possibility of the arbitration tribunal to refer to the CJEU or rather by the possibility of control by the EU judicial system in the enforcement and/or annulment stages.  With these in mind, the basic principles of the EU, meaning autonomy, loyal cooperation and mutual trust, are respected by the international agreement, by ensuring the exclusive powers of the EU judicial system and specifically the CJEU.[491]

## 2.    Claimants' Arguments

352.    Respondent's intra-EU objection, which Claimants note is made for "*the sole purpose [of] [...] so-called 'institutional loyalty' towards the Commission*", is without merit and must be dismissed.[492]  Respondent maintains the intra-EU objection despite the *jurisprudence constante* (and *cohérente*) which has repeatedly dismissed the objection in ECT and BIT cases.[493]  This *jurisprudence constante* makes the ECT and EU law perfectly compatible and gives tribunals jurisdiction under Article 26 of the ECT over intra-EU investment disputes.[494]  In *Electrabel*, the tribunal agreed that the ECT applies to intra-EU disputes.[495]  The Hearing confirmed Claimants' position, as well as that of the *Masdar* and *Antin* awards.[496]

---

[490]  *Id*. at § 45.

[491]  *Id*.

[492]  C-II § 7.

[493]  *Id*. at §§ 9 – 12; C-IV §§ 5, 43; CPHB-I page 47 (line 15 "Rejection of Intra-EU Objection"), page 49 (line 6: "Rejection of the Intra-EU Objection") *RREEF v. Spain*, § 89 **[CL-0179]**; Schreuer, C. H.: "The Development of International Law by International Tribunals," *ICSID Review* (2016), p. 11 **[CL-0180]**; *Saipem S.p.A. v. People's Republic of Bangladesh* (ICSID Case No. ARB/05/07), Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, § 67 **[CL-0181]**; *Novenergia*, § 464 **[CL-0213]**.

[494]  C-II § 13; *Electrabel v. Hungary*, Decision on Jurisdiction **[CL-0094] / [RL-0002]**; *Micula v. Romania*, § 319 **[RL-0028] / [CL-0099]**; A. De Luca, "Renewable Energy in the EU, the Energy Charter Treaty, and Italy's Withdrawal Therefrom" *Transnational Dispute Management* (May 2015) Vol. 12, Issue 3, p. 12 **[CL-0182]**.

[495]  C-I § 21; C-IV §§ 19 – 20; European Commission's Written Submission Pursuant to Art. 37(2) of the ICSID Arbitration Rules in the arbitration ICSID Case No. ARB/07/19, *Electrabel v. Hungary*, 12 June 2009, § 140 **[C-0228]**.

[496]  CPHB-I § 6; COM(2018)547/2 (*stating* that the EC deems that the Achmea Judgment should apply to ECT cases); *Masdar*, §§ 678 – 683 **[CL-0220]**; *Antin*, §§ 56 – 58 **[CL-0222]**.

353. Since 2014, tribunals in Spanish ECT cases have analyzed and dismissed the intra-EU objection and none of these awards have been challenged by Respondent.[497] The same is true in at least four other intra-EU ECT cases.[498] These cases have not "*ignored*" the principle of primacy EU law.[499] While there is no doctrine of precedent in investment arbitration, these decisions are compelling since they concern circumstances that are identical to the case at hand.[500] In particular, (1) the ECT and EU law do not cover the same subject matter and there is no inconsistency or incompatibility between them, (2) the CJEU has no interpretative monopoly preventing tribunals from exercising jurisdiction over cases that would require them to apply EU law, and (3) EU law does not prevent investor-state arbitration of intra-EU disputes.[501] Regardless, however, it is well settled that an arbitral tribunal can and must apply EU law if the circumstances so require it.[502] The *Achmea* Judgment does not change

---

[497] C-IV § 44 – 45; *Charanne* **[CL-0030]** / **[RL-0049]**; *Eiser*, § 207 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *RREEF v. Spain* **[CL-0179]**; *Novenergia*, § 466 **[CL-0213]**.

[498] C-IV § 46; *AES v. Hungary* **[CL-0016]**; *EDF International v. Argentina* **[RL-0102]** / **[CL-0019]**; *Electrabel v. Hungary*, Decision on Jurisdiction **[CL-0094]** / **[RL-0002]**; *Blusun v. Italy* **[RL-0081]** / **[CL-0200]**.

[499] C-IV §§ 48 – 50; *RREEF v. Spain*, §§ 71 – 77 **[CL-0179]**.

[500] C-IV 47.

[501] C-II §§ 13 – 32; *AES v. Hungary*, § 7.6.9 **[CL-0016]**; *Luigiterzo Bosca v. Lithuania*, §§ 181 – 182 **[CL-0018]**; *Charanne*, §§ 424 – 450 **[CL-0030]** / **[RL-0049]**; *Dan Cake (Portugal), S.A. v. Hungary* (ICSID Case No. ARB/12/9), Decision on Jurisdiction and Liability, 24 August 2015, § 67 **[CL-0034]**; *Electrabel v. Hungary*, Decision on Jurisdiction, §§ 4.146 *et seq.* **[CL-0094]** / **[RL-0002]**; *Micula v. Romania*, § 319 **[RL-0028]** / **[CL-0099]**; L. E. Peterson, "Intra-EU treaty claims controversy: new decisions and developments in claims brought by EU investors vs. Spain and Hungary", *Investment Arbitration Reporter*, 24 December 2014 **[CL-0147]**; *Eiser*, §§ 179 – 207 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Eastern Sugar B.V. v. Czech Republic* (UNCITRAL *ad hoc* arbitration SCC No. 088/2004), Partial Award, 27 March 2007 (hereinafter "*Eastern Sugar v. Czech Republic*"), §§ 159 *et seq.*, 165 **[CL-0149]**; *Jan Oostergetel and Theodora Laurentius v. Slovak Republic* (UNCITRAL *ad hoc* arbitration), Decision on Jurisdiction, 30 April 2010 **[CL-0150]**; *Achmea B.V. (formerly Eureko B. V.) v. The Slovak Republic* (PCA Case No. 2008-13), Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, §§ 245 *et seq.*, 274 **[CL-0151]**; *OLG Frankfurt a M.: Beschluss vom 10.05.2012 – 26 SchH 11/10*, 10 May 2012 **[CL-0153]**; Judgment of the Supreme Federal Court of Switzerland (in re *EDF International v. Hungary* [ECT/UNCITRAL-PCA]), 6 October 2015 **[CL-0154]**; *RREEF v. Spain*, §§ 71 – 90 **[CL-0179]**; A. De Luca, "Renewable Energy in the EU, the Energy Charter Treaty, and Italy's Withdrawal Therefrom" *Transnational Dispute Management* (May 2015) Vol. 12, Issue 3, p. 12 **[CL-0182]**; *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic* (PCA Case No. 2010-5), Award, 19 September 2013 (hereinafter "*ECE Projektmanagement v. Czech Republic*") **[CL-0183]** / **[RL-0045]**; *OLG Frankfurt a M.: Beschluss Az. 26 Sch 3/13\**, 18 December 2014 **[CL-0184]**; L. E. Peterson, "German court sees no clash between *Achmea v. Slovakia* arbitral award and EU law, and is unmoved by persistent arguments of European Commission", *IA Reporter*, 8 January 2015 **[CL-0185]**; BGH, Beschluss, 3.3.2016 – I ZB 2/15, Schieds VZ, 2016, p. 328 **[CL-0186]**; *Isolux*, §§ 621 – 660 **[RL-0004]** / **[RL-0076]**.

[502] C-IV § 38; *Achmea B.V. (formerly Eureko B. V.) v. The Slovak Republic* (PCA Case No. 2008-13), Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, §§ 245 *et seq.* **[CL-0151]**; *Eco Swiss China Time Ltd v Benetton International NV* (C-126/97), Judgment, CJEU, 1 June 1999 **[CL-0189]**.

the ECT landscape.[503]  There is no provision in either the EU Treaties, the European Energy Charter, or the ECT that proscribe the settlement of intra-EU disputes by investor-State arbitration.[504]  The EC's exercise in distinguishing an investment arbitration from a commercial arbitration is one of futility:  a non-EU organ (a tribunal) can apply EU law to a legal relationship (public or private).[505]  The Tribunal has jurisdiction to hear a claim pursued by a Maltese investor against Spain under the ECT.[506]

354.  No CJEU judgment should be binding on an international tribunal seized under the ECT and the ICSID Convention.  The CJEU is no more and no less than the highest court of a Contracting Party, and as such cannot decide whether a tribunal is competent.[507]  Thus, the validity of the arbitration agreement must be analyzed through the application of Article 26 of the ECT and in light of Article 25 of the ICSID Convention, without consideration of the CJEU's views on the compatibility of the arbitration agreement with the TFEU.  Consent to arbitration cannot depend on the preliminary question mechanism set out in Article 267 of the TFEU, *i.e.* on the unilateral interpretation of the highest court of a legal sub-system.[508]  A judge in an EU Member State where enforcement is sought can request a preliminary ruling from the CJEU if they consider necessary.[509]  Even if Respondent were correct in considering the superior protection of EU law (*quod non*), the ECT does not exclude intra-EU disputes from its scope.[510]

355.  Articles 1 and 26 of the ECT, together with Articles 25 and 26 of the ICSID Convention, provide the basis for jurisdiction of the Tribunal and allow nationals of the EU Members States to bring a claim

---

[503]  C-IV § 50.

[504]  *Id.* at § 10.

[505]  C-II § 53; EC Amicus §§ 50 – 52.

[506]  C-II §§ 3(i), 5, 101; C-IV §§ 3(i); 80.

[507]  C-IV § 61; P.M. Dupuy, "The Danger of Fragmentation or Unification of the International Legal Order and the International Court of Justice", *International Law and Politics,* vo. 31, 1999, 796 – 797 **[CL-0216]**.

[508]  C-IV §§ 62 – 63; *RREEF v. Spain* §§ 74 – 75 **[CL-0179]** (*underlining* the tribunal's obligation to apply the ECT as its "*constitutional treaty*" and that "*Article 16 of the ECT expressly stipulates the relationship between the ECT and other agreements from which there is no reason to distinguish EU law*.").

[509]  C-II §§ 51 – 52; Opinion of Advocate General Wathelet, §§ 112 – 119 **[CL-0188]**; *Eco Swiss China Time Ltd v Benetton International NV* (C-126/97), Judgment, CJEU, 1 June 1999, § 32 **[CL-0189]**.  Nothing in the *Achmea* Judgment changes the conclusion reached in *RREEF v. Spain*.  C-II §§ 38 – 39; C-IV § 64; *Eastern Sugar v. Czech Republic* **[CL-0149]**; *RREEF v. Spain*, §§ 74 – 75 **[CL-0179]**.

[510]  C-II § 40.

against another EU Member State under the ECT.[511]   Pursuant to these, an irrevocable and unconditional consent to arbitrate has been perfected between Claimants and Spain.  Claimants accepted Respondent's offer to arbitrate under Article 26(3) of the ECT prior to the *Achmea* Judgment, and Article 26(3)(a) of the ECT and Article 25(1) of the ICSID Convention proscribe the unilateral withdrawal of consent once given, which is provided unconditionally.[512]  The fact that one of the Claimants is a national of an EU Member State that is a Contracting Party other than the Respondent, and that Malta and Respondent are EU Member States does not change anything:  the ECT has intra-EU effects.[513]

356.   The term "*Area*" in Article 26 of the ECT, per Article 1(2) and (10) of the ECT, refers to the territory of a particular respondent – either an EU Member State or the EU.[514]  Contrary to the EC's view, Article 1(10) ECT has *effet utile*:  if the EU makes a decision on energy cases within the scope of its competences that is contrary to the ECT, the EU will be held responsible under international law.[515]

357.   The concept of European nationality as intended by Respondent does not exist.  Respondent's invocation of the "*Citizenship of the Union*" as an equivalent of dual nationality is an attempt to assimilate terms under to different concepts:  the concept of nationality and the concept of citizenship of the EU.  Citizenship of the EU is not equivalent to the concept of nationality.  EU citizenship is distinguished from nationality and, per Articles 20 – 25 of the TFEU, applies only to natural persons and includes five limited political rights.[516]

358.   There is no dispute that both the EU and the Respondent are parties to the ECT.  Article 216(2) of the TFEU sets for that "*[a]greements concluded by the Union are binding upon the institutions of the Union and on its Member States*."[517]  EU Member States are separate subjects of international law,

---

[511] *Id*. at §§ 34 – 36; C-IV § 12.

[512] CPHB-I § 7; Tr. Day 1, 198:6 – 199:23 (Arbitrator Sands, Mr. Noë (EC).

[513] C-IV § 8.

[514] *Id*. at §§ 14 – 16; C-II §§ 37, 94; *Charanne*, §§ 429 – 431 **[CL-0030] / [RL-0049]**; *Eiser*, §§ 194 – 196 **[CL-0148] / [RL-0077] / [RL-0078]**; *Novenergia*, §§ 451 – 453 **[CL-0213]**; *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain* (SCC Arbitration 2015/063), Procedural Order No. 17, 9 April 2018 **[CL-0214]**.

[515] C-II §§ 9, 33.

[516] C-IV §§ 40 – 42.

[517] CPHB-I § 9; Tr. Day 1, 75:15-20 (Claimants' Counsel); *Achmea* Judgment, § 58 **[RL-0104]**; TFEU, Art. 216 **[RL-

capable of entering into international obligations between them under international conventions like the ECT.[518]  Both Spain and Malta were competent to enter into the ECT, which as a "*mixed treaty*", that covers matters for which the EU and the Member States share competencies.[519]  As confirmed by the Tribunal in *Eiser v. Spain*, the definition of REIO provided in Article 1(3) of the ECT and its voting rights provided in Article 36(7) do not affect this.[520]  The CJEU confirmed in its Opinion 2/15 concerning the Free Trade Agreement between the EU and the Republic of Singapore that there are shared competences of the EU Member States at an international level.[521]  There is no violation of Article 3(2) of the TFEU:  the rules of competence of the EU and its Member States do not mean that intra-EU disputes are legally impossible.[522]  The ECT's scope of application is broader than the concept of energy established in Article 4(2) of the TFEU.  The Treaty of Lisbon's entry into force in 2009 did not change this, as Member States still retain their competences on energy matters.[523]  EU treaties subsequent to the ECT did not change the content of EU Member State *inter se* obligations under the ECT.  The ECT continues to apply to intra-EU disputes after the Treaties of Amsterdam, Nice and Lisbon, as does the ECHR.[524]

359.  The Respondent's invocation of EU law does not affect the jurisdiction of the Tribunal.  Respondent's argument that the incentives granted by Spain constituted State Aid has no relevance to the Tribunal's jurisdiction or for the merits of this dispute, though it could later have relevance for enforcement.[525]  The question before the Tribunal is whether Respondent breached its duty by Respondent to accord fair and equitable treatment to Claimants as foreign investors.[526]

---

**0001]**.

[518]  C-II §§ 61 – 62; *Charanne*, §§ 437 – 438 **[CL-0030] / [RL-0049]**; *RREEF v. Spain*, §§ 82, 85 **[CL-0179]**.

[519]  C-IV § 17; *Electrabel v. Hungary*, Decision on Jurisdiction, § 5.11 **[CL-0094] / [RL-0002]**.

[520]  C-IV § 18; *Eiser*, §§ 190 – 191 **[CL-0148] / [RL-0077] / [RL-0078]**.

[521]  C-II §§ 46 – 48; Opinion 2/15 CJEU, May 16, 2017, ECLI:EU:2017:376, §§ 291 – 293 **[CL-0187]**; Opinion of Advocate General Wathelet, §§ 76 – 77 **[CL-0188]**.

[522]  C-II § 41.

[523]  *Id*. at §§ 43 – 44, 92; Respondent's Observations § 3; VCLT **[CL-0007] / [RL-0010]**.

[524]  C-II § 45; EC Amicus §§ 129 – 137.

[525]  C-IV §§ 35, 57; *Novenergia*, § 465 **[CL-0213]** (*explaining* that the State Aid Decision is only binding on arbitral tribunals where applying Union Law"); *Achmea* Judgment, § 42 **[RL-0104]**.

[526]  C-IV § 36.

360. The ECT gives a specific and much appreciated right to investors:  access to an international arbitral tribunal to solve a dispute with the host State.[527]  Since the ECT provides for investor-state arbitration in intra-EU disputes, but EU law does not, the Tribunal must rule in favor of the ECT's provisions, as they are more favorable to investors and offer an additional avenue for the settlement of disputes.[528]  Article 344 TFEU only applies in inter-State disputes, and the EC's interpretation of that provision is contrary to its plain meaning.[529]  In addition, Respondent's doctrinal citations are misleading, as Prof. Kleinheisterkamp and other commentators unequivocally support the resolution of intra-EU disputes under the ECT.[530]

361. In response to the EC's submissions, Claimants note that the EC ignored that, in *Eastern Sugar v. Czech Republic*, Ms. Stier underlined that the EC did not deny jurisdiction for claims under Dutch-Czech Republic BIT.[531]  In *Electrabel*, the EC submitted that other measures under the ECT "*fall within the Respondent's (Hungary) responsibility under the ECT, being 'neither ordered nor determined in substance by the European Commission or Community State aid law.'*"[532]  The EC has made no reference to its amicus brief in *Electrabel*,[533] and, as a matter of international law, the EC is

---

[527] *Id.* at § 4; *Eastern Sugar v. Czech Republic*, § 165 **[CL-0149]**.

[528] C-IV § 33.

[529] C-II § 54; EC Amicus §§ 47 – 48.

[530] C-II §§ 70 – 75; EC Amicus fn. 7; A. Stier, "The jurisdiction of the arbitral tribunal in intra-EU investment treaty disputes after the decision in *Electrabel v Hungary*", *Arbitration International*, 2015, 169 **[CL-0164]**; J. Kleinheisterkamp, "The Next 10 Year ECT Investment Arbitration: A Vision for the Future – From a European Law Perspective" Report for the SCC/ECT/ICSID Conference on "10 years of Energy Charter Treaty Arbitration", 9-10 June 2011, p. 14 **[CL-0168]**; J. Kleinheisterkamp, "The Next 10 Year ECT Investment Arbitration: A vision for the future – From a European Law Perspective", *LSE Law, Society and Economy Working Papers* 7/2011 London School of Economics and Political Science Law Department, pp. 14 – 15 **[CL-0169]**; A. De Luca, "Renewable Energy in the EU, the Energy Charter Treaty, and Italy's Withdrawal Therefrom" *Transnational Dispute Management* (May 2015) Vol. 12, Issue 3, p. 12 **[CL-0182]**; C. Tietje, *The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs. EU Member States*, September 2008, Heft 78, 17 **[CL-0195]**; G. Coop, "Energy Charter Treaty and European Union: Is Conflict Inevitable?" 27 *Journal of Energy and Natural Resources*, 2009, 419 **[CL-0196]**; "*Investment protection and EU Law: the intra- and extra- EU dimension of the Energy Charter Treaty*," Jan Kleinheisterkamp, Journal of International Economic Act 15 (1), Oxford University Press, 2012, pages 103 – 104 **[RL-0064]**; *compare* R-I §§ 92 – 94.

[531] C-II § 85; Respondent's Observations §§ 24 – 26; *Eastern Sugar v. Czech Republic*, § 119 **[CL-0149]**; A. Stier, "The jurisdiction of the arbitral tribunal in intra-EU investment treaty disputes after the decision in *Electrabel v Hungary*", *Arbitration International*, 2015, 167 **[CL-0164]**.

[532] C-II §§ 87 – 89; *Electrabel v. Hungary*, Decision on Jurisdiction, § 5.11 **[CL-0094] / [RL-0002]**; European Commission's Written Submission Pursuant to Art. 37(2) of the ICSID Arbitration Rules in the arbitration ICSID Case No. ARB/07/19, *Electrabel v. Hungary*, 12 June 2009, § 140 **[C-0228]**.

[533] C-II § 90; Respondent's Observations § 29.

estopped from departing from its previous position on the ECT's application to intra-EU disputes.[534] The EC's analysis in paras 25 – 39 is superfluous and refers to the merits, rather than jurisdiction. The EC is not entitled to request that the Tribunal suspend proceedings, nor is the Tribunal empowered to accept it.[535]

362.  After the Hearing, Claimants confirmed that the *Isolux* and *Charanne* tribunals rejected Spain's intra-EU objection,[536] as did the *Antin*, *Masdar*, *Novenergia*, and *Eiser* tribunals.[537]

363.  The *Vattenfall* Decision has also affirmed the jurisdiction of an ECT tribunal in an intra-EU context.[538] *Vattenfall* makes clear that a "Contracting Party" to the ECT includes both EU Member States and Non-EU Member States without distinction or carve-out from the ECT's dispute settlement provisions concerning their applicability to EU Member States *inter se*.[539]

364.  In response to AG Bot's Opinion 01/17 and the Member State Declarations, Claimants pointed out that the applicability of the reasoning of the *Achmea* judgment to matters arising under the ECT is far from agreed by the EU Member States under the 2019 Declarations.  Thus, while 22 Member States believe that the ECT does not apply to intra-EU disputes, 5 others – including the Republic of Malta, read *Achmea* restrictively, stating that it only concerns the application of EU Law in relation to intra-EU BITs.  Hungary, making its own declaration, believes that *Achmea* is silent on the investor-state dispute resolution clause in the ECT and that it does not concern any pending or prospective arbitration proceedings initiated under the ECT.  It is obvious that, for Switzerland, the intra-EU issue is *res inter alios acta*.[540]

---

[534] C-II §§ 76 – 77 (*stating* that the EC hid these previous statements in its application to intervene and in EC Amicus), 97.

[535] C-II §§ 97 – 100; EC Amicus §§ 140 – 144; *Isolux*, §§ 657 – 660 **[RL-0004]** / **[RL-0076]**.

[536] CPHB-I page 49 line 6; *Isolux*, §§ 622 – 660 **[RL-0004]** / **[RL-0076]**; *Charanne*, §§ 424 – 450 **[CL-0030]** / **[RL-0049]**.

[537] CPHB-I page 47, line 15; *citing Antin*, §§ 204 – 230, 56-58 **[CL-0222]** ("*+ Rejection of application to reopen the case in light of* Achmea *Judgment*") **[CL-0222]**; *Masdar*, §§ 306 – 324, 327 – 341, 678 – 683 **[CL-0220]** (*Achmea* Judgment has no bearing on this case); *Novenergia*, §§ 449 – 466 **[CL-0213]**; *Eiser*, §§ 179 – 207 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[538] CPHB-II § 19; *Vattenfall* Decision, § 207 **[CL-0223]** / **[RL-0113]**.

[539] CPHB-II § 20; *Vattenfall* Decision, §§ 207 – 208 **[CL-0223]** / **[RL-0113]**.

[540] Claimants' Submission (25 February 2019), § 4.

365.    As a matter of international law, the EU-22 Declaration does not reflect any consensus among EU Member States and cannot unilaterally modify the application of the ECT to intra-EU disputes.[541] Likewise, the Opinion of AG Bot is not binding upon the CJEU, nor is the Tribunal bound by it. It concerns a different treaty. Unlike the CETA, the ECT was established in 1994 when EU Member States, Third States, and the EU established a special set of rules to deal with investments in the energy sector.[542] The CETA and the ECT do not share the same subject matter. Even if they did, however, any conflict should be resolved by the Tribunal in the ECT's favor, according to Article 16 of the ECT. Undoubtedly, having access to a neutral, independent tribunal, as per the ECT, is more favourable than not having such an option, as under the EU Treaties.[543]

366.    While AG Bot's opinion is of little importance, the conclusion that "*the domestic law of each Party, of which EU law forms part in the case of the Member States, can be taken into account by the Tribunal only as a matter of fact*" is noteworthy.[544] AG Bot also correctly identified that the ECT falls within the exception provided for by paragraph 57 of the *Achmea* judgment.[545]

367.    Finally, neither the EU-22 Declaration nor the CJEU can override the impossibility for Respondent to withdraw its consent pursuant to the second sentence of Article 25(1) of the ICSID Convention.[546] It is undisputed that the Claimants consented to arbitration on July 31, 2015 when they accepted the Respondent's offer of Article 26 ECT with their filing of the request for arbitration.[547] Thus, Claimants respectfully request that the Tribunal affirm its jurisdiction over the totality of the case and the Claimants and, consequently, to dismiss the Respondent's intra-EU objection.[548]

---

[541] *Id*. at §§ 6 – 11.

[542] *Id*. at § 15.

[543] *Id*. at § 17.

[544] *Id*. at § 18(i).

[545] *Id*. at § 18(ii).

[546] *Id*. at §§ 20 – 23.

[547] *Id*. at §§ 24 – 25.

[548] *Id*. at § 26.

### 3.    The European Commission

368.    Insofar as OperaFund is concerned, this dispute is an intra-EU dispute between an investor from one EU Member State and the Kingdom of Spain, based on an international treaty – which is part of EU law – covering a field that is regulated by EU law.  The Parties agree that the contested measures transpose the First and Second Directive on Renewable Energy of 2001 and 2009 into Spanish law. The Contested Measures constitute State Aid in the sense of Article 107(1) of the TFEU.[549]

369.    The EC suggested three options for the resolution of the present dispute.  The EC's proposal to suspend proceedings pending the ruling in *Achmea* is now moot.  Next, the Tribunal could declare that it lacks the competence to hear the case.  Finally, the EC urged the Tribunal to suspend proceedings until the EC has taken a view on Spain's notification regarding Spain's national RE support scheme, which was notified to the EC on the basis of Article 108(3) of the TFEU as constituting State Aid pursuant to Article 108(1) TFEU.[550]

370.    The published awards concerning intra-EU BITs that give the ECT intra-EU effect proceed from the faulty premise that EU Member States remain free to conclude international agreements *inter se* because the internal competence for energy in the internal market is qualified as a "*shared competence*" in Article 4(2)(a) of the TFEU.[551]  This is based on an incorrect understanding of Article 2(2) of the TFEU, which only regulates to what extent an EU Member State may legislate within its own territory, but does not define the extent to which an EU Member State may enter into international agreements, including with other Member States.[552]  The CJEU addressed this issue in *Pringle*, finding that, under Article 3(2) of the TFEU "*Member States are prohibited from concluding an agreement between themselves which might affect common rules or alter their scope.*"[553]  Thus, as a result of the exclusive external competence of the EU for RE, any international agreement between EU Member States *inter se* is incompatible with EU Law.[554]

---

[549]  EC Amicus § 2.

[550]  *Id*. at §§ 145 – 149.

[551]  *Id*. at § 21.

[552]  *Id*. at § 22.

[553]  *Id*. at §§ 17, 20 – 23.

[554]  *Id*. at §§ 17, 24.

371. As RE falls within the external exclusive competence of the EU, the EU – and not its Member States – are bound under international law by the ECT. This has the consequence that (1) the EU is the internationally responsible party for a breach of provisions on investment protection and promotion and (2) Article 26 of the ECT does not allow an EU investor to initiate arbitration proceedings against a Member State because the dispute would be one between the EU and an EU investor from the EU.[555] The EC also argues that EU investors are unable to bring claims against the EU:

> [b]y defining area with reference to the agreement establishing the REIO, the ECT wants to make it clear that EU investors cannot bring claims against the Union. That aim would, however, be put into jeopardy if one were to allow EU investors to bring a claim against an EU Member State: Indeed, EU law is usually implemented by actions of the Member States, as the Union lacks - with very narrow exceptions mainly in the area of competition law - enforcement tools. EU investors, therefore, in most cases, will find national acts of execution of Union law, which they could challenge by bringing a claim against the EU Member State executing Union law, rather than against the Union itself. This can well be illustrated in the present case, where the measure contested by the Claimant constitutes the transposition of an obligation flowing from the First and Second Renewable Energy Directives.[556]

372. Article 26 of the ECT must be interpreted on the basis of Article 31 of the VCLT "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*" and with the assistance of "*the preparatory work of the treaty and the circumstances of its conclusion*"[557] Such interpretation shows that, rather than create *inter se* relationships between EU Member States, the ECT created international obligations only between third countries and the competent subject of international law in the area of EU law – either the EU, or the Member States (for areas of Member State competence). This is analogous to the situation of the WTO agreement.[558] Article 1(2) of the ECT supports this, defining "*Contracting Party*" as either the State or the REIO, defined in Article 1(3). A Contracting Party is bound only by parts of the ECT – i.e., the parts for which it enjoys international competence. The fact that the EU and the Member States only vote on matters where each has competence, with the EU voting with the number of votes equal to the number of its Member States, supports this. The term "*Area*" defined in Article 1(10) further recognized the relationships between the Contracting Parties that are members of the REIO

---

[555] *Id*. at §§ 107 – 121.

[556] *Id*. at § 85.

[557] *Id*. at § 70.

[558] *Id*. at § 71.

(the EU).[559]  While other tribunals have considered that the term "*Area*" must be defined depending on who the respondent is, this view is not convincing because (1) it deprives part of Article 1(10) of its *effet utile*, ignoring the text "*under the provisions contained in the agreement establishing that Organization*" and (2) it disregards the importance that the ECT placed in Article 1(3) on the transfer of competence from the EU Member States to the EU.[560] The term "*another*" contained in Article 26 of the ECT also excludes disputes brought by EU investors against a Member State.[561]  The interpretation proposed by the EC avoids "*respondent shopping*", which is not allowed under the ECT, as confirmed by the statement submitted by the EU to the Secretariat of the ECT pursuant to Article 26(3)(ii) of the ECT.[562]

373.  A systemic or harmonious interpretation of the ECT discussed at length in *Electrabel* leads to the conclusion that there is no valid offer for arbitration under EU law.  If the Tribunal agrees that EU law constitutes "*relevant rules of international law applicable to the relations between the parties*", then an interpretation of Article 26 of the ECT on the basis of Article 31(3)(c) of the VCLT leads to the conclusion that there is no valid offer to arbitrate from Spain to Maltese investors.  Due to a lack of valid consent, the Tribunal would not be competent to hear the case.[563]

374.  The interpretation based on the context, object and purpose of the ECT shows that the EU Member States did not intend to create *inter se* obligations between them.  The historical process of creating the European Energy Charter and the ECT (as the translation of the European Energy Charter – a policy document – into international law), shows that the ECT aimed to create an international framework for cooperation in the energy sector between the European Communities, Russia, the Commonwealth of Independent States ("CIS"), and the countries of Central and Eastern Europe.  The ECT was perceived as part of the European Communities' external – not internal - energy policy.[564]

---

[559] *Id*. at §§ 73 – 80.

[560] *Id*. at §§ 81 – 84.

[561] *Id*. at §§ 87 – 88.

[562] *Id*. at § 86.

[563] *Id*. at §§ 58 – 69.

[564] *Id*. at §§ 89 – 103.

The EC argues that, at the time, "*the ECT provisions on investment protection fell into the Union's undisputed exclusive external competence under the common Commercial Policy.*"[565]

375.  Intra-EU investor-state dispute settlement is not compatible with EU law and this renders the offers for intra-EU investment arbitration in intra-EU BIT and ECT cases invalid.  The offer by Spain to investors from Malta ceased as of the date of Malta's accession to the EU, on 1 May 2004.[566]  Said offer would violate Article 3(2) of the TFEU, because the EU has exclusive external competence in the field of renewable energy at least since 2001, as the Court held in *Green Network*.[567]

376.  The submission of intra-EU disputes to treaty-based investor-State arbitration under the ECT violates Articles 267 and 344 TFEU and the principles of unity, autonomy and effectiveness.[568]  Through the preliminary ruling mechanism established by Article 267 of the TFEU, the EU can ensure that, in all circumstances, the law has the same effect in all Member States and avoid divergences in interpretation.  The dispute settlement system is exhaustive for intra-EU disputes and, if any Member State creates such an additional mechanism, those States are in violation of Article 19 of the TEU and 344 of the TFEU.[569]  Article 26 of the ECT creates a new, separate dispute settlement system, for subjects that would otherwise be covered by the exhaustive dispute settlement procedures envisaged in Article 258 – 260, 263, and 267 of the TFEU.[570]  By submitting this dispute to arbitration, the Member States violate Article 267 of the TFEU because this system does not have the possibility or obligation to refer preliminary questions to the CJEU pursuant to Article 267 of the TFEU.[571]  Only one Arbitral Tribunal (*EURAM v. Slovakia*) has considered this problem, but incorrectly transposed case law from the field of commercial arbitration to the field of investment arbitration and did not address the underlying problem – one which is not solved by the possibility of ICSID annulment

---

[565] *Id*. at § 105.

[566] *Id*. at §§ 4, 15.

[567] *Id*. at §§ 17 – 20.

[568] *Id*. at § 13.

[569] *Id*. at § 40.

[570] *Id*. at § 42.

[571] *Id*. at § 43.

(which obliges ICSID to apply and interpret EU law without the possibility of requesting a preliminary ruling).[572]

377.    Article 344 of the TFEU is the expression of the general principle that an international agreement cannot affect the allocation of powers fixed by the EU Treaties or the autonomy of the EU system covers an agreement by which EU Members States agree to submit intra-EU investment disputes to a new dispute settlement structure outside the EU Treaties.[573]  Tribunals in *Electrabel*, *Charanne*, *RREEF*, *Eiser* and *Blusun* wrongly interpreted Article 344 of the TFEU, believing that it only applies in disputes between two EU Member States and not to disputes between an investor and an EU Member State.[574] Unlike commercial arbitration, which the CJEU accepts, an investment treaty is an act of public international law and the subject matter of investor-State arbitration is not a contractual relationship, but rather concerns the behavior of States in their capacity as public authority and the exercise of public policy prerogatives.[575]  Nothing in the ECT prevents the Tribunal from fixing its seat outside of the EU, which facilitates that circumvention of the control on the application and interpretation of EU Law by judges of a Member State.[576]  The EU confirmed its position that intra-EU investor-state dispute resolution is contrary to EU law when signing the International Energy Charter.[577]

### 4.    The Tribunal

378.    Regarding this intra-EU objection, the Tribunal is aware of the decisions issued by other tribunals in similar cases in ECT and ICSID arbitrations, and particularly also on the very similar scenarios regarding the disputed measures by the Kingdom of Spain which is also the Respondent in the present case.  Indeed, in Section 2.1.2. of PO-6 after the Hearing on the merits, the Tribunal expressly invited the Parties' comments as follows:

---

[572] *Id*. at §§ 44 – 46.

[573] *Id*. at § 55.

[574] *Id*. at §§ 47, 53, 54, 57.

[575] *Id*. at §§ 48 – 51.

[576] *Id*. at § 52.

[577] *Id*. at § 56.

*By 27 August, 2018, the Parties shall simultaneously submit the English-language version of their Post-Hearing Briefs, Limited to a maximum of 50 pages (double-spaced) in length and in font Times New Roman 12, containing the following:*

2.1.1.  *Any comments they have regarding issues raised at the Hearing;*

2.1.2.  *In separate sections of the brief, any comments the Parties have regarding each of the following questions of the Tribunal (which are without prejudice as to the final relevance given by the Tribunal to such questions and the comments received):*

a)  *What, if any, is the application and effect in this case, situated as it is in the field of environmental protection, of the "margin of appreciation enjoyed by national regulatory agencies when dealing with public policy determinations" (ICSID Case No. ARB 10/7, Philip Morris v Uruguay, Award, 8 July 2016, § 388, [CL-0178]). [sic – RL-0088]*

b)  *In a short chart, the Parties are invited to identify what they consider to be, in comparison to the present case, the common denominators and main differences of the factual and legal background in the following cases:*

-  Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain *(SCC Case 062/2012), Final Award, January 21, 2016, and dissenting opinion by Prof. Guido S. Tawil, 21 December 2015 [CL-0030 / RL-0049]*

-  Eiser Infrastructure Limited and Energia Solar Luxembourg S.Á R.I. vs. The Kingdom of Spain*, ICSID Case No. ARB 13/36, Award of 4 May 2017 [CL-0148 / BQR-87 / RL-0077];*

-  Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain*, Arbitration SCC V2013/153, Award, 12 July 2016 [RL-0004];*

-  Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain *(SCC Arbitration 2015/063), Final Award, 15 February 2018 [CL-0213]; and*

-  Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 [CL-0220].*

379.  In its letter of 6 September 2018, the Tribunal invited the Parties to extend these comments in their second Post-Hearing Briefs ("PHBs") also to the *Vattenfall* Decision, which had been issued in the meanwhile.

380.  In view of the decisions of other tribunals and comments received from the Parties regarding the Tribunal's questions, the present Tribunal considers that there is no need to "*re-invent the wheel*" and start a new examination of all the details regarding the intra-EU objection. The Tribunal agrees with all the recent conclusions of other tribunals to the effect that, also after the *Achmea* Judgment of the Court of Justice of the EU, the intra-EU objection is not justified, and the Tribunal has indeed

jurisdiction in the present case. The Tribunal considers it sufficient to shortly indicate the major determinative reasons on which it relies for this conclusion.

381. The first reason is that in the present case, jurisdiction is based on the ECT, while in the *Achmea* Case it was alleged to be based only on a BIT between two EU Member States. The *Achmea* Judgment makes no mention of the ECT and the reasoning of the Court does not cover or apply to arbitrations based on the ECT. In this respect, the present Tribunal particularly agrees with the reasoning provided by the *Vattenfall* tribunal. In particular, the *Vattenfall* tribunal correctly found that there was nothing in the ECT to indicate the parties had intended to carve out intra-EU disputes while it would have been "*a simple matter*" to include such a carve-out but there was no indication that this had been intended. And indeed, as mentioned by the *Vattenfall* tribunal, it is also telling that the ECT lacks a "*disconnection clause*" providing that it would not apply as to between EU member states. The EU has included such clauses in other treaties to which it is a party and the negotiating history of the ECT reveals that an EU proposal to include such a clause was dropped from the draft treaty.

382. Further, neither *Achmea* (explicitly limiting its scope to intra-EU BITs and leaving an assessment of the ECT open) nor EU law generally (Article 344 TFEU, being limited to inter-state disputes) prevents member states to agree on investment arbitration in the framework of the ECT.

383. In particular, the Tribunal considers that there is also no basis for Respondent's argument that the EU Treaty by virtue of the accession of Malta superseded the ECT. There is no identity of subject matter, the ECT provides for very different remedies against Spain than the TFEU, not at least the possibility to access an investment tribunal in case of breaches and it contains guarantees against uncompensated expropriation as well as against violations of FET, FPS and other standards which are not contained in the TFEU. Furthermore, the lack of a disconnection clause is important; it cannot be presumed that such a clause is implicit. Rather, the ECT fully applies and provides jurisdiction in the present case.

384. The second major reason is that, in the *Achmea* Case the alleged jurisdiction was based on the respective BIT between two EU Member States pursuant to the UNCITRAL Arbitration Rules, while the present case is an ICSID arbitration. *i.e.* a multilateral public international law treaty for the specific purpose of resolving investment disputes between private parties and a State (here, Spain). Thus, this Tribunal is placed in a public international law context and not in a national or regional context. With regard to the relevance of the *Achmea* Judgment for the present arbitration, the Tribunal notes that the *Achmea* Judgment relies expressly on the following aspects:

- The place of arbitration was Frankfurt, Germany, with the result that German law applied to the arbitration proceedings,[578]

- The judicial review of the validity of the award was within the competence of the German courts and was exercised by those courts,[579]

- That it was in this review process that the German Federal Court of Justice (*Bundesgerichtshof*) submitted the preliminary questions to the European Court of Justice.[580]

385.  None of these factors exist in the present case:

- While the place of arbitration according to PO-1 § 10.1 is Washington, D.C.,[581] it is not US law, but exclusively the ICSID Convention and the ICSID Arbitration Rules which are applicable to the proceedings.

- The judicial review of the validity of the award is not in the competence of US courts or of any other national courts, but subject exclusively to the annulment procedure according to Article 52 of the ICSID Convention,

- This annulment review leads to a final decision by an international *ad hoc* committee, which is not subject to further review by any other court.

386.  Further, Articles 53 and 54 of the ICSID Convention provide as follows:

*Article 53*

(1) *The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.*

(2) *For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.*

*Article 54*

(1) *Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State.*

---

[578] *Achmea* Judgment, § 10 **[RL-0104]**.

[579] *Id*. at §§ 52 and 53.

[580] *Id*. at 23.

[581] PO-1 § 10.1.

> *A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.*

387. Thereby, Spain as a party to the ICSID Convention is expressly bound by the Tribunal's Award in the present case, has no option of appeal outside the ICSID system, and has to recognize the present Award as binding and enforce the pecuniary obligations imposed by this Award within its territory as if it were a final judgment of a court in Spain. The *Achmea* Judgment contains no reference to the ICSID Convention or to ICSID Arbitration. Therefore, and in view of the above-mentioned determinative differences between the *Achmea* Case and the present one, the *Achmea* Judgment cannot be understood or interpreted as creating or supporting an argument that, by its membership in the EU, Spain is not bound by the ICSID Convention.

388. In view of the above considerations, the present Tribunal, as all recent arbitral decisions dealing with the disputed measures in Spain, concludes that the intra-EU objection is not justified and that it does have jurisdiction.

### B. JURISDICTIONAL OBJECTION 2: WHETHER TRIBUNAL HAS JURISDICTION OVER MATTERS CONCERNING TVPEE

#### 1. Whether the TVPEE is a bona fide Tax

##### a. Respondent's Arguments

389. The Tribunal lacks jurisdiction to hear the claim on the alleged breach of the standards of protection of FET, Most Constant Protection and Security ("MCPS"), Non-Impairment, and Umbrella Clause based on the introduction of the TVPEE by Act 15/2012 because the TVPEE is a tax measure under the Article 21(7)(a)(i) of the ECT and is, therefore, excluded from the scope of Article 10(1) of the ECT.[582] Respondent has not consented to submit tax claims to arbitration.[583]

---

[582] R-I §§ 6, 104 – 109, 118 – 119, R-II §§ 168 – 171, 173; ECT, Art. 21(7)(a) **[RL-0073]**; Act 15/2012 **[C-0112]** / **[R-0003]**.

[583] R-I §§ 120 – 130; R-II §§ 6 – 7, 163 – 166; ECT, Art. 21(1) – (5), 26(1) **[RL-0006]**; *ST-AD GmbH v Republic of Bulgaria, PCA Case No. 2011-06* (ST-BG), Decision on Jurisdiction, 18 July 2013 (hereinafter "*ST-AD v. Bulgaria*, Decision on Jurisdiction") § 337 **[RL-0044]**.

390.  The principle of economic capacity is a fundamental principle of the tax system which is set out in the Spanish Constitution.[584]  While the TVPEE is levied on gross income, this does not prevent the TVPEE from being considered a tax on income for purposes of the ECT.[585]  The ECT considers taxes levied on gross income and those levied on net income as taxes on income.[586]  The TVPEE is a tax deductible expense on the Corporations Tax of TVPEE Taxpayers.[587]  Both the Spanish Constitutional Court and the EC have ratified the nature and legality of this direct tax.[588]

391.  The TVPEE is part of the domestic law of the Kingdom of Spain and its provisions relate to tax, from both domestic and international law perspectives.[589]  The TVPEE is a tax under international law, as understood in arbitral caselaw, because it is (1) established by law, (2) imposes obligations on a class of people, and (3) that obligation implies paying money to the State for public purposes.[590]  The TVPEE is public income of the Spanish State that is integrated into the General State Budget and it aims to raise revenue for the Spanish State for public purposes.[591]  The TVPEE also finances the costs

---

[584]  R-II § 231; Spanish Constitution of 1978, Art. 31(1) **[R-0005]**.

[585]  R-I § 226; R-II § 232; Act 15/2012, Art. 1, 4, 6 **[C-0112]** / **[R-0003]**.

[586]  R-II § 232; Act 15/2012, Art. 1, 4, 6 **[C-0112]** / **[R-0003]**.

[587]  R-II § 233; Act 15/2012, Art. 6(1) **[C-0112]** / **[R-0003]**.

[588]  R-II § 238.

[589]  R-I §§ 140 – 154; R-II § 172; ECT, Art. 21(7)(a), 26(6) **[RL-0006]**; *Saipem S.p.A. v. The People's Republic of Bangladesh,* ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, § 82 **[RL-0029]**; "*The Oxford Handbook of International Investment Law*", Muchlinski, Ortino y Schreuer, Oxford University Press, 110 – 112 **[RL-0066]**; *Hussein Nuaman Soufraki v. The United Arab Emirates* Decision of the ad hoc, ICSID Case No ARB/02/7 committee on the application for annulment, 5 June 2007 **[RL-0084]**; *Azurix Corporation v. The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 (hereinafter "*Azurix v. Argentina*") **[RL-0100]** / **[CL-0127]**; NAFTA, Art. 2103 **[RL-0011]**; The procedure of processing and approval of Act 15/2012 by the Spanish Congress of Deputies and the Senate is public and can be consulted in detail on the website of the Congress of Deputies and of the Senate **[R-0004]**; Spanish Constitution of 1978, Art. 66, 133 **[R-0005]**; Agreement between the Kingdom of Spain and Malta to avoid double taxation and prevent tax evasion with respect to taxes on income, signed in Madrid (8 November 2005) **[R-0040]**; Agreement to avoid double taxation with respect to taxes on income and capital between the Spanish State and the Swiss Confederation (3 March 1967), Art. 3(2) **[R-0042]**.

[590]  R-I §§ 174 – 191; Black's Law Dictionary, Ninth Edition, Bryan A. Garner Editor in Chief, 1594 **[RL-0025]**; *EnCana Corporation v. Republic of Ecuador,* LCIA Case No. UN 3481, Award dated 3 February 2006 (hereinafter "*EnCana v. Ecuador*"), § 142 **[RL-0027]**; *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award 18 August 2008 (hereinafter "*Duke Energy v. Ecuador*"), § 174 **[RL-0033]** / **[CL-0102]**; *Burlington Resources Inc. v. Republic of Ecuador,* ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010 (hereinafter "*Burlington v. Ecuador*"), §§ 164 – 165 **[RL-0036]**; Act 15/2012, Art. 10 **[C-0112]** / **[R-0003]**; Act 58/2003, of 17 December, on General Taxation (hereinafter "Act 58/2003"), Art. 2 **[R-0006]**; MO HAP/703/2013 **[R-0008]**.

[591]  R-I §§ 111 – 117; 161 – 173, 190 – 198; R-II §§ 209 – 212; Act 15/2012, Art. 1, 4, 5, 6, 7, 8, Second Additional

of the SES concerning the development of renewable energies.[592]  The applicable tax rate is 7%.[593]
The TVPEE is a tax under Spanish domestic law.  In 2014, the EC ratified the taxation nature of the
TVPEE and its conformity with EU Law by closing a Pilot Procedure it initiated in 2013 in response
to a complaint that the TVPEE infringed EU Law.  This shows that the EC has not doubted that the
TVPEE is a tax.[594]

392.  To examine whether this tax is *bona fide*, Claimants argue that the effect of the measure must be
analyzed, citing the quashed *Yukos Universal Limited (Isle of Man) v. The Russian Federation* award
as support.  Under the ECT, however, it is not appropriate to examine the economic effect of the

---

Provision, Fifth Final Provision **[C-0112]** / **[R-0003]**; Act 58/2003, Art. 2 **[R-0006]** ("*Concept, purposes and types of taxes*"); Website of the State Tax Administration Agency, re Form 583 and its electronic submission **[R-0007]**; MO HAP/703/2013 **[R-0008]**; *see also* Judgment from the Spanish National Audience of 2 June 2014, dismissing administrative appeal 297/2013 **[R-0009]**, Judgment by the Spanish National Audience of 2 June 2014, dismissing administrative appeal 298/2013 **[R-0010]**, Judgment by the Spanish National Audience of 30 June 2014, dismissing administrative appeal 296/2013 **[R-0011]** (*dismissing* contentious administrative appeals against MO HAP/703/2013); Website of the Institute of Accounting and Auditing (ICAC by its Spanish acronym) **[R-0012]**; for tax deductible nature of the TVPEE, *see* Consultation 1, BOICAC no. 94/June 2013 **[R-0013]**, Corporation Tax Act 27/2014 of 27 November **[R-0014]**, Website of the Directorate-General for Taxation **[R-0015]**, Response from the Directorate-General for Taxation, of 23 December 2014, to Binding Tax Consultation V3371-14 **[R-0016]**; Judgment 183/2014, from 6 November 2014 issued by the Constitutional Court Plenary in unconstitutionality appeal number 1780-2013 filed by the Cabinet of the Andalusian Regional Government with regard to Articles 4, 5 and 8 of Act 15/2012 (and other regulations), published in the BOE (Official State Gazette) on 4 December 2014 **[R-0018]** (*dismissing* unconstitutionality appeal No. 1780-2013 against the TVPEE); Excerpt from the Spanish General State Budget for 2013 **[R-0020]**; Excerpt from the Spanish General State Budget for 2015 **[R-0022]**; Excerpt from the Spanish General State Budget for 2016 **[R-0019]**; Excerpt from the Spanish General State Budget for 2014 **[R-0021]**; Excerpt from the Spanish General State Budget for 2017 **[R-0240]**; Act 17/2012, Fifth Additional Provision **[R-0023]** / **[R-0246]**; Act 47/2003, of 26 November, on General Budgets (hereinafter "Act 47/2003"), Art. 27 **[R-0024]**.

[592]  R-II § 213 – 214; Fifth Additional Provision **[R-0023]** / **[R-0246]**.

[593]  R-I §§ 116, 163; Act 15/2012, Art. 8 **[C-0112]** / **[R-0003]**.

[594]  R-I §§ 199 – 211; Case file of the procedure EU Pilot 5526/13/TAXU relating to the TVPEE (Tax on the value of the production of electrical energy), which records the closure thereof by the European Commission in the absence of evidence that there is an infringement of EU law by the TVPEE **[R-0025]**; European Commission's email to the Spanish Ministry of Foreign Affairs and Cooperation communicating the closure of EU-Pilot Project 5526/13/TAXU **[R-0026]**; European Commission website regarding "EU Pilot" Procedures **[R-0027]**; ECT **[RL-0006]**.

TVPEE.[595]  Regardless, even under such an analysis, the TVPEE is a *bona fide* taxation measure, and Claimants have not met their burden of proving the alleged bad faith.[596]

393. The TVPEE applies to all energy producers.  As confirmed by the Spanish Constitutional Court in 2014, the TVPEE's grant of the same treatment to all energy producers cannot be a ground to consider that it is not a *bona fide* taxation measure.[597]  The Spanish Constitution grants the State the primary power to establish taxes:  creating generally applicable taxation measures is a legitimate option of the legislature.[598]  The TVPEE's general applicability is linked to the environmental nature of the tax: there are environmental effects in all facilities for electric power generation, whether based on the existence of the facilities themselves or on their use of the transport and distribution networks.[599]  There is no discrimination against RE producers in terms of repercussion, whether legal or economic.[600]  The TVPEE is specifically included among the operating costs of RE producers that are taken into account to calculate the specific remuneration for those producers, per MO IET/1045/2014.[601]

394. The tribunals in the *Eiser* (by majority) and the *Isolux* (unanimous) found that they lacked jurisdiction to hear the dispute on the alleged breach of obligations under Article 10(1) of the ECT through the introduction of the TVPEE by Act 15/2012.[602] The dissenting opinion in *Eiser* does not challenge the

---

[595] R-II §§ 174 – 180; *EnCana v. Ecuador*, § 142 **[RL-0027]**; *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL, PCA Case No. AA 227, Final Award, 18 July 2014 (hereinafter "*Yukos v. Russia*"), § 1407 **[RL-0085]** / **[CL-0038]**.

[596] R-II § 180.

[597] *Id*. at §§ 183 – 186, 188 – 190; Judgment 183/2014, from 6 November 2014 issued by the Constitutional Court Plenary in unconstitutionality appeal number 1780-2013 filed by the Cabinet of the Andalusian Regional Government with regard to Articles 4, 5 and 8 of Act 15/2012 (and other regulations), published in the BOE (Official State Gazette) on 4 December 2014 **[R-0018]**.

[598] R-I §§ 155 – 157; R-II §§ 187; Spanish Constitution of 1978, Art. 66, 133 **[R-0005]**; Act 58/2003, Art. 4 **[R-0006]**.

[599] R-II §§ 191 – 194; Act 15/2012, Preamble **[C-0112]** / **[R-0003]**.

[600] R-II §§ 195 – 201; (*citing* Black's Law Dictionary, Ninth Edition, Bryan A. Garner Editor in Chief, 1595 - 1596 **[RL-0025]** (*defining* "direct" and "indirect" tax)); Act 15/2012, Art. 1 – 6 **[C-0112]** / **[R-0003]**.

[601] R-II §§ 202 – 208; R-I §§ 167 – 169; RD-Law 9/2013 **[R-0064]** / **[C-0128]**; MO IET/1045/2014 **[R-0086]** / **[C-0126]** / **[C-0126bis]**; Corporation Tax Act 27/2014 of 27 November, Art. 15 **[R-0014]** (the TVPEE does not fit into the categories of non-deductable expenses); Website of the Directorate-General for Taxation **[R-0015]**; Response from the Directorate-General for Taxation, of 23 December 2014, to Binding Tax Consultation V3371-14 **[R-0016]** (*confirming* tax deductibility of the TVPEE).

[602] R-I §§ 212 – 215; R-II §§ 215 – 219; *Isolux*, §§ 717 – 741 **[RL-0004]** / **[RL-0076]**; *Eiser*, §§ 250 – 272 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

majority's declaration of its lack of jurisdiction in relation to the TVPEE.[603]  The *Novenergia* tribunal – in its only finding that may be of relevance to the Tribunal – concluded that it lacked jurisdiction to resolve the dispute regarding the TVPEE, as a tax.[604]  The *Masdar* tribunal likewise concluded that it lacked jurisdiction over the TVPEE.[605]  In *Eiser*, the tribunal concluded that the TVPEE did not violate the ECT, but nonetheless awarded damages based on the TVPEE – and this is one of many inconsistencies that the Tribunal should consider when evaluating the relevance of that award.[606]

### b.  Claimants' Arguments

395.  While Article 21(1) of the ECT carves out *bona fide* taxation measures from the scope of Part III of the ECT, the carve-out does not apply to action carried out "*under the guise of taxation*", as is the case with the TVPEE.[607]

396.  The TVPEE does not meet the two essential features of taxes as defined by Spanish law:  (1) having as its main obligation to yield revenue to the State to finance public expenses and (2) being levied on transactions that evidence taxpayers' economic capacity.[608]

397.  The circumstances prove the TVPEE cannot be considered a *bona fide* exercise of taxation powers.[609]  *First* and as has been confirmed by public statements of government officials,[610] the TVPEE was

---

[603] R-I § 215; R-II § 219; *Eiser*, § 271 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[604] RPHB-I §§ 173, 191; *Novenergia*, §§ 516 – 525, 656 **[CL-0213]**.

[605] RPHB-I § 211(iii); *Masdar*, § 621 **[CL-0220]**.

[606] RPHB-I § 171(i); *Eiser*, § 144 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[607] C-II §§ 107, 149; C-I §§ 514 – 516, 549; *Yukos v. Russia*, § 1407 **[RL-0085]** / **[CL-0038]**; *Veteran Petroleum Limited (Cyprus) v. The Russian Federation* (UNCITRAL, PCA Case No. AA 228) Final Award, 18 July 2014 (one of the *Yukos* Final Awards) ("*Veteran Petroleum v. Russia*"), §§ 1407, 1431 **[CL-0039]**; *Hulley Enterprises Limited (Cyprus) v. The Russian Federation* (UNCITRAL, PCA Case No. AA 226) Final Award, 18 July 2014 (one of the *Yukos* Final Awards) (hereinafter "*Hulley Enterprises v. Russia*"), §§ 1407, 1431 **[CL-0040]**; Judgment rendered by The Hague District Court (*Rechtbank*), The Netherlands, on 20 April 2016 on the request for setting aside various arbitral awards submitted by the *Russian Federation v. Yukos Universal Limited*, *Veteran Petroleum Limited* and *Hulley Enterprises Limited* [ECLI:NL:RBDHA:2016:4230] **[CL-0041]** (*setting* the *Yukos* judgments aside regarding the provisional application of the ECT to Russia, but not questioning any other finding of those tribunals on other provisions of the ECT).

[608] C-I § 518.

[609] C-II § 109.

[610] Press conference following the meeting of the Council of Ministers of the Kingdom of Spain, of 14 September 2012 **[C-0173]**; Diary Sessions of the Lower House of Parliament, year 2012, X Legislature term, No. 69, 30

designed for the sole purpose of addressing Respondent's self-inflicted tariff deficit and not to collect revenues in support of Respondent's general public expenses.[611]  To the extent that Respondent argues that the TVPEE supports the SES, Claimants state that the SES is not a branch of the State or any political subdivision and its budget cannot be regarded as a State's public expense.  It is a complex economic system that functions independently from the Spanish Government, yet under the CNMC's supervision and control.  Respondent acknowledged that it could have reached the same result through a direct cut to RE plants' remuneration in place of a "*tax*" and the Preamble confirms the TVPEE's specific aim of addressing the Tariff Deficit.[612]

398.  *Second*, the TVPEE's proffered environmental purpose (as a measure to formally comply with Article 14 of Directive 2003/96/EC) is non-existent – the measure focuses on the SES's imbalance.[613]  The lack of environmental purpose is also proven by the fact that the TVPEE charges all electricity production sources and technologies indiscriminately, offering no benefits to less-polluting technologies.[614]  Relatedly, the TVPEE had a disproportionate and discriminatory impact on RE producers *vis-à-vis* conventional energy producers from January – July 2013 because, unlike conventional producers, RE producers were only allowed to receive the RD 661/2007 regulated tariff during that time, and that tariff was detached from market price.[615]

---

October 2012 **[C-0174]**.

[611]  *Id.*; C-I §§ 521 – 524, 529 – 537 (*explaining* the Spanish Electricity System and the occurrence of the Tariff imbalance), 538; C-II §§ 116 – 118.

[612]  C-II § 119; C-I §§ 526 – 528; Act 54/1997, Preamble **[C-0055bis]** / **[R-0059]**; Act 24/2013 **[C-0116]** / **[R-0047]**.

[613]  C-II §§ 122 – 125, 127 (the Lagares Committee – a committee of experts appointed by the Spanish Council of Ministers – acknowledged that the alleged environmental justification is nowhere to be found in the TVPEE), 130; Diary Sessions of the Lower House of Parliament, year 2012, X Legislature term, No. 69, 30 October 2012 **[C-0174]**; Report prepared by the Committee of Experts for the Reform of the Spanish Fiscal System ("Lagares Committee"), February 2014, 326 – 327 **[C-0176]**; Directive 2003/96/EC **[C-0245]**.

[614]  C-I §§ 544 – 547; C-II §§ 126; Act 15/2012, Art. 1 – 11, Fifth Final Provision **[C-0112]** / **[R-0003]**; Diary Sessions of the Lower House of Parliament, year 2012, X Legislature term, No. 69, 30 October 2012 **[C-0174]**; Report prepared by the Lagares Committee, February 2014, 326 – 327 **[C-0176]**.

[615]  C-II §§ 134 – 136; CNE Report 2/2012 **[R-0105]** / **[C-0214]** / **[C-0294]**.

399. *Third*, the TVPEE does not charge a true manifestation of economic capacity because it charges on gross revenue rather than on real profits and, thus, has no consideration of expenses incurred in the activity of power generation.[616]

400. None of Respondent's allegations prove that the TVPEE is a *bona fide* exercise of taxation powers.[617] The fact that the TVPEE is called a "tax" is irrelevant to whether it is covered by the carve-out in Article 10(1) ECT. The Spanish Constitutional Court did not reach a conclusion on whether the TVPEE is consistent with the Spanish Constitution[618] and did not ratify the *bona fide* nature of the TVPEE as a tax.[619] Nor did the EC ratify the TVPEE's tax nature or its conformity with EU law, as has been suggested by Respondent.[620] The TVPEE does not meet Respondent's 3-part criterion to be considered a "*tax*" under International Law – the TVPEE fails to serve a legitimate "*public purpose*." Respondent's criterion ignores those established by the *Yukos* tribunal – the only tribunal to have considered the classification of taxes for the purposes of the ECT.[621] Subsequent authorities on which Respondent has relied either have no bearing on this position or have no bearing on this issue – none changes the inevitable conclusion that the TVPEE is not a *bona fide* tax.[622]

401. Finally, the *Isolux* award has no relevance in these proceedings. Although that tribunal ruled on whether the TVPEE was included in the tax carve-out of Article 21(1) of the ECT, the investor's arguments are not the same as the ones Claimants used in this arbitration.[623] Claimants' case chart

---

[616] C-I §§ 539 – 543; C-II §§ 131 – 133.

[617] C-II § 110.

[618] *Id*. at § 129; Order 202/2016, of 13 December 2016, of the Constitutional Court **[C-0248]**; Press Release, "El impuesto sobre la energía eléctrica favorece el uso de energías sucias", *Panorama,* 17 November 2017 **[C-0249]**.

[619] C-II § 139.

[620] *Id*. at § 148; Case file of the procedure EU Pilot 5526/13/TAXU relating to the TVPEE (Tax on the value of the production of electrical energy), which records the closure thereof by the European Commission in the absence of evidence that there is an infringement of EU law by the TVPEE **[R-0025]**.

[621] C-II §§ 120 – 121, 137 – 142; Act 15/2012, Section 2 of the Explanatory Preamble, Second Additional Provision **[C-0112]** / **[R-0003]**; *compare Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador* (ICSID Case No. ARB/06/11), Award, 5 October 2012 (hereinafter "*Occidental v. Ecuador*"), §§ 492 – 495 **[CL-0146]** / **[RL-0099]**.

[622] *See e.g.* C-II §§ 143 – 147; *Burlington v. Ecuador*, §§ 164 – 165 **[RL-0036]**; *EnCana v. Ecuador*, § 142 **[RL-0027]**; *Duke Energy v. Ecuador*, § 174 **[RL-0033]** / **[CL-0102]**.

[623] C-II §§ 177 – 180; *Isolux*, §§ 317 – 324, 729, 734 – 735, 738, 740 **[RL-0004]** / **[RL-0076]**.

provides a red "*X*" under the cases *Antin*, *Masdar*, *Novenergia*, *Isolux*, and *Eiser*, and indicates that MFN treatment was not invoked in those cases.[624]

### c. The Tribunal

402.   The Tribunal recalls that the ECT provides:

> **Article 21 Taxation**
>
> *(1)    Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*
>
> *[...]*
>
> *(3)    Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:*
>
> > *(a)    impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organization; or*
> >
> > *(b)    any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure arbitrarily discriminates against an Investor of another Contracting Party or arbitrarily restricts benefits accorded under the Investment provisions of this Treaty.*
>
> *[...]*
>
> *(7)    For the purposes of this Article:*
>
> > *(a)    The term "Taxation Measure" includes:*
> >
> > > *(i)    any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and [...]*

403.   The Tribunal is aware of the earlier jurisprudence by other arbitral tribunals on the introduction of the TVPEE by Act 15/2012. The tribunals in the *Eiser* (by majority) and the *Isolux* (unanimous) found that they lacked jurisdiction.[625] The dissenting opinion in *Eiser* does not challenge the majority's

---

[624]  CPHB-I page 44 (line 2) and page 48 (line 2) "*Jurisdiction on TVPEE*".

[625]  R-I §§ 212 – 215; R-II §§ 215 – 219; *Isolux*, §§ 717 – 741 **[RL-0004]** / **[RL-0076]**; *Eiser*, §§ 266 – 272 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

declaration of its lack of jurisdiction in relation to the TVPEE.[626]  The *Novenergia* tribunal and, lastly, the *Masdar* tribunal likewise concluded that they lacked jurisdiction over the TVPEE.[627]

404.   While the present Tribunal is by no means bound by this earlier jurisprudence, it agrees with the conclusions reached.  Indeed, the Tribunal is not persuaded by Claimants' arguments focusing on contributing to finance public expenses and a tax being based on economic capacity. Even under these criteria supporting the SES could be viewed as serving a public purpose and applying it to income seems to be related to economic capacity. Rather, the Tribunal finds the three criteria mentioned by Respondent as rather convincing. Indeed, the TVPEE is a tax under international law, as understood in arbitral case-law, because it is (1) established by law, (2) imposes obligations on a class of people, and (3) that obligation implies paying money to the State for public purposes.[628]  As Respondent has pointed out, the TVPEE's general applicability is linked to the environmental nature of the tax:  there are environmental effects in all facilities for electric power generation, whether based on the existence of the facilities themselves or on their use of the transport and distribution networks.[629]  There is no discrimination against RE producers in terms of repercussion, whether legal or economic.[630]  The TVPEE is a tax on income for the purposes of the ECT.[631]  The TVPEE is specifically included among the operating costs of RE producers that are taken into account to calculate the specific remuneration for those producers, per MO IET/1045/2014.[632]

405.   The Tribunal therefore concludes that due to Article 21 of the ECT, it lacks jurisdiction in this respect.

---

[626]  R-I § 215; R-II § 218; *Eiser*, § 271 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[627]  RPHB-I § 211(iii); *Masdar*, § 621 **[CL-0220]**.

[628]  R-I §§ 174 – 191; Black's Law Dictionary, Ninth Edition, Bryan A. Garner Editor in Chief, 1594 **[RL-0025]**; *EnCana v. Ecuador*, § 142 **[RL-0027]**; *Duke Energy v. Ecuador*, § 174 **[RL-0033]** / **[CL-0102]**; *Burlington v. Ecuador*, §§ 164 – 165 **[RL-0036]**; Act 15/2012, Art. 10 **[C-0112]** / **[R-0003]**; Act 58/2003, Art. 2 **[R-0006]**; MO HAP/703/2013 **[R-0008]**; Excerpt from the Spanish General State Budget for 2016 **[R-0019]**; Excerpt from the Spanish General State Budget for 2014 **[R-0021]**.

[629]  R-II §§ 191 – 194; Act 15/2012, Preamble **[C-0112]** / **[R-0003]**.

[630]  R-II §§ 195 – 201; Act 15/2012, Art. 1 – 6 **[C-0112]** / **[R-0003]**.

[631]  R-II §§ 236 – 237; Article 21(7)(b) of the ECT.

[632]  R-II §§ 202 – 208; R-I §§ 167 – 169; MO IET/1045/2014, Explanatory Memorandum III **[R-0086]** / **[C-0126]** / **[C-0126bis]**; Corporation Tax Act 27/2014 of 27 November, Art. 15 **[R-0014]** (the TVPEE does not fit into the categories of non-deductible expenses); Website of the Directorate-General for Taxation **[R-0015]**; Response from the Directorate-General for Taxation, of 23 December 2014, to Binding Tax Consultation V3371-14 **[R-0016]** (*confirming* tax deductibility of the TVPEE).

### 2. Alternatively, Whether Protection Standards Apply to TVPEE via the MFN Principle

#### a. Claimants' Arguments

406. Even if the TVPEE was a *bona fide* taxation measure and the tax carve-out of Article 21(1) applied, it would be a tax other "*than on income or capital*", and the Tribunal would, therefore, have jurisdiction through the claw-back in Article 21(3) of the ECT, which is an exception to Article 21(1)'s carve-out.[633] This claw-back provision entitles Claimants to MFN treatment under Article 10(7) ECT relating to Respondent's taxation of foreign investments.[634]

407. There is no inconsistency in Claimants' arguments because Article 21(1) of the ECT applies taxes, even taxes other than those on income or capital, to the extent that they are *bona fide*.[635] If the Tribunal considers the TVPEE a tax, however, it would be a tax other than on income or capital, and would benefit from the MFN clause of Article 10(7) of the ECT, as indicated in Article 21(3).[636] Article 21(7)(b) does not define what are "*taxes imposed on total income, on total capital and on elements of income or capital*" (the "*Term*").[637] In order to interpret the Term in Article 21(7)(b), the Tribunal should resort to the far more specific and comprehensive Article 2.2 of the OECD Model Tax Convention, because it was the ECTs writers' intention that the Term and Article 2.2 would have the same meaning.[638] While the Term as developed by the OECD is vague, scholars have argued that the Term could have an autonomous meaning according to which "*income is understood as the money value of net accretion of one's economic power during a certain period of time*",[639] which finds

---

[633] C-I §§ 549 – 551; C-II §§ 105, 150 – 153; C-III § 399; C-IV §§ 85, 109; Art. 10(7) ECT.

[634] C-I § 517; C-III § 399 (*referring* to German investors); C-IV § 87; Agreement for the Promotion and Reciprocal Protection of Investments between Spain and Ukraine, done at Kiev on February 26, 1998 (BOE, 5 May 2010) (hereinafter "Spain-Ukraine BIT"), Art. 3 **[CL-0036]**; Agreement for the Promotion and Reciprocal Protection of Investments between Spain and Costa Rica, done at San José on July 8, 1997 (BOE, 17 July 1999) (hereinafter "Spain-Costa Rica BIT"), Art. III **[CL-0037]**.

[635] C-IV §§ 92 – 93.

[636] *Id*. at § 91.

[637] C-II § 155; C-IV § 94.

[638] C-II § 158 – 161; C-IV § 97; OECD Model Tax Convention on Income and on Capital (July 2010), p. 75 – 77 **[C-0250]**; P. Brandstetter, "Taxes Covered: A Study of Article 2 of the OECD Model Convention" IBFD, 2011, p. 11 **[C-0251]**; U. Erman Özgur, "Taxation of Foreign Investments under International Law: Article 21 of the Energy Charter Treaty in Context" (10 June 2015) Energy Charter Secretariat Publications (2015), p. 56 **[CL-0197]**.

[639] C-II § 164.

support in the OECD's interpretive guides.[640]  Under this approach, the Term under Article 2.2 of the OECD Model Tax Convention does not include taxes on gross revenues, such as the TVPEE, but rather only taxes on "*net income or profits*."  Focusing on the taxes listed in double taxation treaties, taxes on gross amounts – like the TVPEE – are only covered by the Double Taxation Treaties to the extent that they are imposed on entities without a taxable presence in Spain.  Both approaches lead to the same conclusion:  the TVPEE is not a tax on income under the ECT.[641]  Accordingly, under Article 10(7) of the ECT, the Respondent must accord Claimants the same treatment concerning the TVPEE as it accords to other foreign investors.[642]

408.  Respondent's discussion of indirect and direct taxes has no basis in the ECT.[643]  The TVPEE affects the PV Installations' remuneration in a manner similar to a direct 7% cut on remuneration.[644]

409.  The ECT does not prohibit applying Article 10(7) so as to impose MFN obligations.[645]  First, Article 21(3)(a) only indicates that MFN obligations will not apply with respect to "*advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii),*" which refers to double taxation or similar agreements.  Claimants, however, are relying on classic BITs, none of which contain "*tax provisions*" of the type referred to in Article 21(3)(a).[646]  Rather arbitral case law confirms that such a clause shall not preclude the application of the umbrella clause, the FET, and FPSs standards to tax measures.[647]

---

[640] *Id.*; C-I §§ 552 – 554; The OECD classification of taxes and interpretative guide, elaborated by the OECD in 2016 **[C-0252]**; OECD Factbook 2014: Economic, Environmental and Social Statistics – Government: tax revenue definition, 6 May 2014 **[CL-0042]**; OECD 1992 Model Tax Convention on Income and on Capital, English version, 1 September 1992, Art. 2.2 **[CL-0043]**; OECD 2014 Model Tax Convention on Income and on Capital, English version, 15 July 2014, Art. 3.3 **[CL-0044]**.

[641] C-II §§ 165 – 169; C-IV §§ 98 – 99; Spain-Costa Rica BIT **[CL-0037]**.

[642] C-II § 170.

[643] *Id.* at §§ 156 – 157; C-IV §§ 95 – 96.

[644] C-II § 555

[645] C-IV §§ 100 – 101.

[646] *Id.* at §§ 102 – 104.

[647] *Id.* at §§ 105 – 107; *Jürgen Wirtgen, Stefan Wirtgen, Gisela Wirtgen and JSW Solar (zwei) GmbH & Co. KG v. Czech Republic* (PCA Case No. 2014-03), Final Award, 11 October 2017 (hereinafter "*Wirtgen v. Czech Republic*"), § 270 **[RL-0093]** / **[CL-0218]** (*deciding* that Clause 3(4) of the Germany-Czech BIT shall not "*preclude the application of the umbrella clause, the FET and FPSs standards to tax measures*"); *Wirtgen v. Czech Republic*, Born Dissent **[CL-0219]**.

410.  Claimants invoke the following provisions of BITs that Respondent entered into with other States to obtain protection from the challenge of the TVPEE:

>     172.  *Umbrella Clause: article III(2) Spain-Costa Rica; article 3(2) Spain-Libya BIT; article 3(2) Spain-Morocco BIT; article 3(2) Spain-Ukraine BIT; and article 3(2) Spain-Uzbekistan BIT.*
>
>     173.  *FET: article III(1) of the Spain-Costa Rica BIT; article 4(1) of the Spain-India BIT; article 3(1) of the Spain-Libya BIT; article 3(1) of the Spain-Morocco BIT; article 3(1) of the Spain-Ukraine BIT; and article 3(1) of the Spain-Uzbekistan BIT.*
>
>     174.  *MCPS: article III(1) of the Spain-Costa Rica BIT; article 4(1) of the Spain-India BIT; article 3(1) of the Spain-Libya BIT; article 3(1) of the Spain-Morocco BIT; article 3(1) of the Spain-Ukraine BIT; and article 3(1) of the Spain-Uzbekistan BIT.*
>
>     175.  *Non-Impairment: article III(2) of the Spain-Costa Rica BIT; article 4(2) of the Spain-India BIT; article 3(2) of the Spain-Libya BIT; and article 3(2) of the Spain-Morocco BIT.*[648]

411.  None of the cases analyzing Spain's objections to the claims against the TVPEE decided that they did not have jurisdiction over non-expropriatory breaches.[649]  Neither *Isolux*, *Novenergia*, nor *Eiser* analyzed whether the TVPEE would be a tax "*other than those on income or on capital*" for the purposes of Article 21(3) ECT claw back provision *via* the application of MFN treatment.[650]  MFN treatment was not invoked with respect to jurisdiction over TVPEE issues in *Isolux*, *Charanne*, *Antin*, *Masdar*, *Novenergia*, or *Eiser*.[651]

###     b.  Respondent's Arguments

412.  Claimants' alternative claim is internally contradictory. If the TVPEE is a taxation measure under the ECT (and, therefore, Article 10(1) of the ECT is not applicable to the TVPEE), its nature as a tax on

---

[648]  C-I § 557; C-II §§ 172 – 175; Spain-Ukraine BIT **[CL-0036]**; Spain-Costa Rica BIT **[CL-0037]**; Agreement for the Promotion and Reciprocal Protection of Investments between Spain and Libya, done at Madrid on December 17, 2007 (BOE, 1 October 2009) (hereinafter "Spain-Libya BIT") **[CL-0063]**; Agreement for the Promotion and Reciprocal Protection of Investments between Spain and Morocco, done at Madrid on 11 December 1997 (BOE, 11 April 2005) (hereinafter "Spain-Morocco BIT") **[CL-0064]**; Agreement for the Promotion and Reciprocal Protection of Investments between Spain and Uzbekistan, done at Madrid on 28 January 2003 (BOE, 31 March 2004) (hereinafter "Spain-Uzbekistan BIT") **[CL-0066]**; Agreement for the Promotion and Reciprocal Protection of Investments between Spain and India, done at New Delhi on 30 September 1997 (BOE, 3 February 1999) (hereinafter "Spain-India BIT") **[CL-0096]**.

[649]  C-IV § 110.

[650]  *Id.*; C-II § 180; CPHB-I pages 44, 48.

[651]  CPHB-I pages 44, 48.

income has been proven. Claimants' alternative claim is internally contradictory: the TVPEE cannot simultaneously be a tax under Article 10(1) of the ECT but not a tax on income for the purposes of Article 21(3) of the ECT.[652] Respondent requests that the Tribunal declare that the protection standards of FET, MCPS, Non-Impairment, and Umbrella Clause are not applicable to the TVPEE by virtue of the MFN principle of Article 10(7) of the ECT, pursuant to Article 21(3) of the ECT.[653] Even if Article 21(3) applied to the TVPEE, the ECT expressly prohibits extending MFN treatment to taxation measures, as intended by Claimants.[654]

413. In accordance with Article 21(3) of the ECT, Article 10(7) does not apply to taxes on income, *i.e.*, direct taxes.[655] Article 10(7) of the ECT applies, with certain limitations, to indirect taxes – such as those levying indirect manifestations of the economic capacity of taxpayers, such as consumption. Indirect taxes are those that are legally passed on to another person.[656] The Secretariat of the Energy has made clear that Article 21(7), in any event, can be applied to indirect taxes (which the TVPEE is not).[657] Under Article 21(7)(a)(ii) of the ECT, MFN treatment cannot be imposed with respect to "*any provision relating to taxes of any convention for the avoidance of double taxation of any other international agreement or arrangement by which the Contracting Party is bound.*"[658] The BITs invoked by Claimants are such international agreements. Respondent explains that "*the provisions of those BITs by which standards such as FET would be extended to taxes are provisions relating to taxes. Otherwise, it would not make sense for the Claimants to invoke them for the purposes they do.*"[659]

---

[652] R-I §§ 217 – 218, 224 – 225; R-II § 220 – 227; ECT, Art. 21(1) and (3) **[RL-0006]**.

[653] R-I §§ 6, 216, 229, 1022 -- 1026; R-II §§ 6 – 7, 167, 239, 245 – 246.

[654] R-II § 240.

[655] R-I § 223.

[656] *Id*. at § 221; R-II §§ 228 – 230; "*The Energy Charter Treaty: A Reader's Guide*", Energy Charter Secretariat, p. 39 **[RL-0053]**; ECT, Art. 21 (1), (3) **[RL-0073]**; Lessons on Financial Law. Sainz de Bujanda. 1979, p. 125 **[RL-0094]**.

[657] R-II § 238.

[658] *Id*. at § 242; ECT, Art. 21(7)(a)(ii) **[RL-0006]**.

[659] R-II §§ 242 – 244; *compare Parkerings-Compagnient AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8 Award 11 September 2007 **[RL-0092]**.

### c.  The Tribunal

414.  The Tribunal recalls the following sections from Article 21 of the ECT:

> (1)  *Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*
>
> *[...]*
>
> (3)  *Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:*
>
> > (a)  *impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organization; or*
> >
> > (b)  *any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure arbitrarily discriminates against an Investor of another Contracting Party or arbitrarily restricts benefits accorded under the Investment provisions of this Treaty.*
>
> *[...]*
>
> (7)  *For the purposes of this Article:*
>
> > (a)  *The term "Taxation Measure" includes:*
> >
> > > (i)  *any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and*
> > >
> > > (ii)  *any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.*

415.  Above at paragraph 405, the Tribunal found that the TVPEE is a tax on income under the ECT. Having concluded that the TVPEE is a tax under the ECT, the Tribunal need not consider whether, through Article 21 of the ECT, Article 10(7) of the ECT may be applied in such a manner as to impose MFN-obligations, as argued by Claimants.

## VIII.  THE MERITS

### A.    SCOPE OF "TREATMENT" OBLIGATIONS UNDER ARTICLE 10(1) OF THE ECT

#### 1.    Claimants' Arguments

416.  The normative content of FET, including that in Article 10(1) of the ECT, encompasses, "*among others, the respect for the legitimate expectations of the investors, including the specific commitments entered into the State with them; the prohibition to act arbitrarily or in a discriminatory manner; and the duty to act in a transparent way and with due regard to due process of law*."[660]  FET is the *Grundnorm* or the golden rule of the protection of foreign investments.  The FET is an absolute standard, not a relative one.[661]  Under the ECT, FET is autonomous, different from, and beyond the minimum standard of treatment of customary international law ("MST").[662]

417.  Insofar as FET is not defined in the ECT, the VCLT must be used to interpret it "*in good faith and in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*."[663] The terms "*fair*" and "*equitable*" have been considered to mean "*just, even-handed, unbiased and legitimate*."[664]  Under Article 31(2) of the VCLT, the context shall

---

[660] C-I § 634; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.73 **[CL-0094]** / **[RL-0002]**.

[661] C-III §§ 377 – 378; C. H. Schreuer, "Fair and Equitable Treatment (FET): Interactions with other Standards", *Transnational Dispute Management*, Vol. 4, issue 5, September 2007, 7 **[CL-0052]**.

[662] C-I § 628; C. A. Patrizia, J. R. Profaizer, S. W. Cooper and I. V. Timofeyev, "Investment Disputes Involving the Renewable Energy Industry Under the Energy Charter Treaty", in J.W. Rowley (Gen. Ed.), *The Guide to Energy Arbitrations*, Global Arbitration Review, London, 2015 (hereinafter "Patrizia *et al*"), 80 **[CL-0002]**; *Plama v. Bulgaria*, § 163 **[CL-0011]** / **[RL-0034]**; Salacuse, J.W., *The Law of Investment Treaties*, Oxford University Press, 2nd Edition, 2015 (hereinafter "Salacuse, *The Law of Investment Treaties*"), 241, 242, 249 – 251 **[CL-0047]**; *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan* (ICSID Case No. ARB/07/14), Award, 22 June 2010 (hereinafter "*Liman v. Kazakhstan*"), § 263 **[CL-0073]**; *Suez, Sociedad General de Aguas de Barcelona S.A., and InterAgua Servicios Integrales del Agua S.A. v. Argentine Republic* (ICSID Case. No. ARB/03/17), Decision on Liability, 30 July 2010 (hereinafter "*Suez v. Argentina*"), § 181 **[CL-0083]**; C. H. Schreuer, *Selected Standards of Treatment Available under the Energy Charter Treaty*, in G. Coop and C. Ribeiro (eds.), *Investment Protection and The Energy Charter Treaty*, 2008, 77 **[CL-0084]**; C. Schreuer, "Fair and Equitable Treatment", in A. K. Hoffmann (Ed.), *Protection of Foreign Investments through Modern Treaty Arbitration. Diversity and Harmonisation*, ASA Special Series No. 34, May 2010 (hereinafter "Schreuer, FET"), 129 **[CL-0085]**; K. Yannaca-Small, "Fair and Equitable Treatment: Recent Developments", in A. Reinisch (Ed.), *Standards of Investment Protection*, Oxford University Press, Oxford, 2008, 113 – 118 **[CL-0086]**; *Waste Management, Inc. v. United Mexican States* (ICSID Case No. ARB(AF)/00/3), Award, 30 April 2004, §§ 86 – 99 **[CL-0087]**.

[663] C-I § 629; VCLT **[CL-0007]** / **[RL-0010]**.

[664] C-I § 630; *MTD Equity Sdn. Bhd. And MTD Chile S.A. v. Republic of Chile* (ICSID Case No. ARB/01/7), Award,

be understood as including the preamble and annexes to the treaty. FET is, thus, observed in its own context.[665] Likewise, the "*object and purpose*" of the ECT is the establishment of a legal framework that "*promote(s) long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter*."[666] This purpose supposes positive obligations that go beyond the MST, and this purpose is the inspiring principle of the standards of the ECT.[667] The link between FET and long-term stability may serve as the basis for affording the legitimate expectations of investors operating in the energy field comparatively greater protection against changes to regulatory regimes, as is offered to investors in other industries.[668]

418. The attempt to conflate Article 10(1)'s FET standard and MST goes against the treaty interpretation rules contained in Article 31 of the VCLT and the basic principle of interpretation whereby preference is given to an interpretation that provides meaning to all terms of the treaty. Had the Contracting Parties to the ECT intended to limit their FET obligations to the MST, they could have made that intention clear.[669] In no way does Article 10(1) of the ECT's declaration in its penultimate sentence that "*in no case shall such Investment be accorded treatment less favorable than that required by international law, including treaty obligations*" alter that conclusion: rather, it confirms the understanding of the ECT's signatories that FET is not equal to MST.[670]

419. Respondent's position that "*the maximum aspiration of the ECT is (…) national treatment*" cannot be reconciled with Article 10(1) of the ECT, Article 10(3) of the ECT's definition of "*Treatment*", or

---

25 May 2004 (hereinafter "*MTD v. Chile*"), § 113 **[CL-0089]**.

[665] C-I §§ 630 – 631; *Plama v. Bulgaria*, § 173 **[CL-0011] / [RL-0034]**; *Charanne*, § 477 **[CL-0030] / [RL-0049]**; *Swisslion DOO Skopje v. The Former Yugoslav Republic of Macedonia* (ICSID Case No. ARB/09/16), Award, 6 July 2012, § 273 **[CL-0088]**.

[666] C-I § 632; ECT, Art. 2.

[667] C-III §§ 384 – 390, 396; *ECT and Related Documents*, pp. 214, 218 **[CL-0009]**; T. Roe and M. Happold, "Settlement of Investment Disputes under the Energy Charter Treaty", *Cambridge University Press*, 2011, excerpts. Chapter 5, 114 **[CL-0201]**; *see e.g. Liman v. Kazakhstan*, § 263 **[CL-0073]**; *Azurix v. Argentina*, §§ 360 – 372 **[RL-0100] / [CL-0127]**.

[668] C-I § 628; *Patrizia et al*, 80 **[CL-0002]**.

[669] C-III § 379; *Liman v. Kazakhstan*, § 263 **[CL-0073]**.

[670] C-III § 380 – 383; C. H. Schreuer, "Fair and Equitable Treatment (FET): Interactions with other Standards", *Transnational Dispute Management*, Vol. 4, issue 5, September 2007, 16 **[CL-0052]**; C. H. Schreuer, "Fair and Equitable Treatment in Arbitral Practice", *The Journal of World Investment & Trade*, Vol. 6, 2005, p. 360 **[CL-0093]**.

Article 10(7) of the ECT, which provide MFN treatment.[671] The Part III Standards of the ECT are not limited to non-discrimination, which is a floor – not a ceiling – for the protection of foreign investors. Even where there is no discrimination between domestic and foreign investors, the host State is under the obligation to grant additional treatment to foreign investors.[672] Likewise, Spain's position that "*the maximum aspiration of the ECT is ... national treatment*" cannot be reconciled with Article 10(1) of the ECT, Article 10(3) ECT's definition of "*Treatment*", or Article 10(7) of the ECT, which provide MFN treatment.[673]

420. Pursuant to the MFN Clause included in Article 10(7) of the ECT, Claimants invoke the FET clauses of the following BITs, for the event that the Tribunal considers the TVPEE a *bona fide* taxation measure:

    (i)    *Article III(1) of the Spain-Costa Rica BIT:* "Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall receive at all times fair and equitable treatment..."[674]

    (ii)    *Article 4(1) of the Spain-India BIT:* "Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall at all times be accorded fair and equitable treatment..."[675]

    (iii)    *Article 3(1) of the Spain-Libya BIT:* "Investments made by investors of each Contracting Party in the territory of the other Contracting Party shall be accorded fair and equitable treatment..."[676]

    (iv)    *Article 3(1) of the Spain-Morocco BIT:* "Investments made by investors of each Contracting Party in the territory or the maritime zone of the other Contracting Party shall at all times be accorded fair and equitable treatment..."[677]

    (v)    *Article 3(1) of the Spain-Ukraine BIT:* "Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall at all times be accorded fair and equitable treatment."[678]

---

[671] C-III § 377 – 378; C. H. Schreuer, "Fair and Equitable Treatment (FET): Interactions with other Standards", *Transnational Dispute Management*, Vol. 4, issue 5, September 2007, 7 **[CL-0052]**.

[672] C-III § 375 – 376; C. H. Schreuer, "Fair and Equitable Treatment in Arbitral Practice", *The Journal of World Investment & Trade*, Vol. 6, 2005, p. 367 **[CL-0093]**.

[673] C-III §§ 377 – 378.

[674] Spain-Costa Rica BIT **[CL-0037]**.

[675] Spain-India BIT **[CL-0096]**.

[676] Spain-Libya BIT **[CL-0063]**.

[677] Spain-Morocco BIT **[CL-0064]**.

[678] Spain-Ukraine BIT **[CL-0036]**.

(vi)   Article 3(1) of the Spain-Uzbekistan BIT: "Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall be accorded fair and equitable treatment."[679]

## 2.   Respondent's Arguments

421.   Per Article 2 of the ECT, the terms of the ECT must be analyzed in accordance with their common meaning in their context and in light of the object and purpose of the ECT.[680]  Ultimately, the ECT was an attempt to export the energy market model that existed in the EU beyond its frontiers[681] and aimed to create an efficient energy market that (1) would grant foreign investors domestic or non-discriminatory treatment that would be no worse than the MST and (2) would foster market-oriented price formation.[682]  Where Article 10(1) obliges investments already made to be granted "*treatment no less favorable than that required by International Law*", it is referring to the MST.[683]

422.   Respondent states that "*the FET minimum standard is the common standard in investment treaties*", and it is not admissible to claim that the ECT introduced a standard that is superior to that existing in other treaties.[684]  The ECT's greatest ambition is non-discrimination, though that has not yet been fully achieved.[685]  Respondent explains that "*the maximum aspiration of the ECT is national treatment, as this treatment is applied to foreign investments when it is more favorable to foreign investors than the FET standard*".[686]  The FET minimum standard is the common standard in investment treaties, and it is not admissible to claim that the ECT introduced a standard that is superior to that existing in other treaties.[687]

---

[679] Spain-Uzbekistan BIT [CL-0066].

[680] R-I §§ 979 – 980; C-I § 632.

[681] R-I §§ 982 – 983; ECT, Preamble, Objectives, p. 8 [RL-0006].

[682] R-I §§ 984 – 985; R-II §§ 31, 1046 – 1053, 1060, 1095; ECT, Title I [RL-0006] (for citations in French, *see* p. 7) [RL-0007], Italian *see* p. 7 [RL-0008]; German *see* p. 9 [RL-0009]; "*The Energy Charter Treaty: A Reader's Guide*", Energy Charter Secretariat, p. 16 [RL-0053]; "The Energy Charter Treaty and Related Documents", 17 December 1991, Consolidated version, TITLE I Objectives, p. 8, 15 [RL-0073].

[683] R-I § 990.

[684] R-II § 1049.

[685] R-I §§ 986, 989; *International Investment under the 1994 Energy Charter Treaty"* in T W Wälde The Energy Charter Treaty: An East-West Gateway for Investment and Trade (Kluwer Law International, 1996) [RL-0051].

[686] R-II § 1062.

[687] *Id*. at § 1061; *International Investment under the 1994 Energy Charter Treaty"* in T W Wälde The Energy Charter

423. For the period prior to investment, national and MFN treatment were reserved for the signing of a "*supplemental treaty*", which still has not been signed.  For the moment after the investment is made, the guarantee of national treatment and the MFN clause apply to the foreign investor, with limitations.[688]  This guarantee of national treatment is subject to an exception related to the payment of subsides and public aid.[689]  This Article 10(8) exception is applicable to this case, where Claimants are claiming the payment of subsidies or State Aid for the production of energy.  The "*supplementary treaty*" referred to in Article 10(8) has not been signed, and there is no obligation for signatory states of the ECT to grant foreign investors "*national treatment*" in the matter of programs by which a Contracting Party provides grants or "*other financial assistance*" to the investor.[690]  In regulating state subsidies to promote trade or investment abroad, Article 9(4) of the ECT provides that nothing in Article 9 shall prevent a Contracting Party from taking measures.[691]

### 3.    The Tribunal

424. Article 10(1) of the ECT provides:

> *Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.  Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.  (footnotes omitted)*

---

Treaty: An East-West Gateway for Investment and Trade (Kluwer Law International, 1996) **[RL-0051]**.

[688] R-I §§ 986 – 988; *"An Overview of the Energy Charter Treaty"*, C Bamberger, in T W Wälde (ed), The Energy Charter Treaty: An East-West Gateway for Investment and Trade, (Kluwer Law International, 1996) **[RL-0052]**; "*Investment Arbitration Under the Energy Charter Treaty: From Dispute Settlement to Treaty Implementation*", T. W. Wälde (1996) 12 Transnational Dispute Management 4 **[RL-0065]**.

[689] R-I §§ 1005 – 1007, 1010; ECT and related documents, p. 8 **[RL-0006]**.

[690] R-I § 991 – 993.

[691] *Id*. at § 994.

425.  The "*commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment*" (FET) is mentioned expressly as a separate obligation, as is indicated by the word "*also*" introducing the obligation that follows.  The express inclusion of this commitment in Article 10 also clarifies that its standard is autonomous, and beyond the MST.  As clarified in *Liman v. Kazakhstan,* had the Contracting Parties to the ECT intended to limit their FET obligations to the MST, they could and would have made that intention clear.[692]

426.  As the same wording for FET is found in a great number of BITs, for the present case, it will have to be interpreted taking note of the large jurisprudence established in this regard.  In that jurisprudence, it is generally recognized, and the present Tribunal agrees, that the FET commitment in particular includes the respect of the legitimate expectations of the investor. As clarified in *Electrabel*, "*[f]air and equitable treatment is connected in the ECT to the encouragement to provide stable, equitable, favorable and transparent conditions for investors*."[693] And as the same tribunal stated, "*[i]t is widely accepted that the most important function of the fair and equitable treatment standard is the protection of the investor's reasonable and legitimate expectations*."[694] The Tribunal also notes that other arbitral tribunals have considered the protection of legitimate investor expectations as even the "*dominant*"[695] or "*primary element*",[696] the "*dominant feature*",[697] or "*one of the major components*"[698] of FET.

---

[692]  C-III § 379; *Liman v. Kazakhstan*, § 263 **[CL-0073]**.

[693]  *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.73 **[CL-0094] / [RL-0002]**.

[694]  *Id.* at § 7.75.

[695]  *Saluka Investments BV v. Czech Republic* (UNCITRAL), Partial Award, 17 March 2006 (hereinafter "*Saluka v. Czech Republic*"), § 302 **[CL-0109]** / **[RL-0083]** ("*The standard of 'fair and equitable treatment' is therefore closely tied to the notion of legitimate expectations which is the dominant element of that standard. By virtue of the 'fair and equitable treatment' standard included in Article 3.1 the Czech Republic must therefore be regarded as having assumed an obligation to treat foreign investors so as to avoid the frustration of investors' legitimate and reasonable expectations.*").

[696]  *Novenergia*, § 648 **[CL-0213]** ("*[…] the Tribunal agrees with the Respondent that the FET's primary element is the legitimate and reasonable expectations of the Claimant.*").

[697]  *Invesmart, B.V.* v. *Czech Republic*, UNCITRAL, Award, 26 June 2009 (hereinafter "*Invesmart v. Czech Republic*"), § 202 **[RL-0019]** ("*[…] the Respondent correctly noted that […] the dominant feature of* [the FET] *standard is the protection of the investor's expectations which must, however, be legitimate and reasonable and follow from the state of the domestic law at the time of the investment and the totality of the business environment at the time.*").

[698]  *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award dated 8 October 2009 ("*EDF (Services) v. Romania*"), § 216 **[RL-0035]** / **[CL-0204]**; *see also Generation Ukraine Inc. v. Ukraine* (ICSID Case No. ARB/00/9), Award, 15 September 2003 ("*Generation Ukraine Inc. v. Ukraine*"), § 20.37 **[CL-0108]** (*stating* that the protection of legitimate expectations is "*a major concern of the minimum standards of treatment contained in*

## B.    FET

### 1.    Legitimate Expectations

#### a.    Claimants' Arguments

427.    The most important function of the FET standard is the protection of the investor's legitimate and reasonable expectations.[699]  Legitimate expectations are part of the normative content of FET, and these are created when a State's conduct is such that an investor may reasonably rely on that conduct as being consistent.  Prof. Dolzer identified five requirements for a successful FET claim grounded on legitimate expectations:   (1) the objective conduct of the host State inducing legitimate expectations on the part of the foreign investor; (2) reliance on that conduct on the part of the foreign investor; (3) frustration of investor's legitimate expectations by subsequent conduct of the host State; (4) unilateralism of conduct of the host State; and (5) damages for the investor.[700]  Commitments, promises, or assurances attributable to the competent organs or representatives of the host State, whether explicit or implicit, general or specific, even where contained in the State's domestic legislation, may create legitimate expectations in investors.[701]

---

*bilateral investment treaties"*).

[699] C-I § 639; *see e.g. Anatolie Stati, Gabriel Stati, Ascom Group S.A. and Terra Raf Trans Traiding Ltd v. Republic of Kazakhstan* (SCC Case No. V116/2010) Award, 19 December 2013 (hereinafter "*Stati v. Kazakhstan*"), § 941 **[CL-0015]**; Salacuse, *The Law of Investment Treaties*, 253 – 259 **[CL-0047]**; Institute of International Law, *Resolution on Legal Aspects of Recourse to Arbitration by an Investor Against the Authorities of the Host State under Inter-State Treaties* (Session of Tokyo, 13 September 2013), Art. 13(1) **[CL-0053]**; K. Yannaca-Small, "Fair and Equitable Treatment: Recent Developments", in A. Reinisch (Ed.), *Standards of Investment Protection*, Oxford University Press, Oxford, 2008, 124 – 126 **[CL-0086]**; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.75 **[CL-0094] / [RL-0002]**; L. Reed and S. Consedine, "Fair and Equitable Treatment: Legitimate Expectations and Transparency", in Kinnear M. *et alios* (Eds.), *Building International Investment Law. The First 50 Years of ICSID*, Kluwer Law International, Alphen aan den Rijn, 2016, 283, 285 – 286 **[CL-0097]**.

[700] R. Dolzer, "Fair and Equitable Treatment: Today's Contours", *Santa Clara Journal of International Law*, Vol. 12 (2014), 20 **[CL-0091]**.

[701] C-I § 640 – 647; *LG&E Energy Corp., LG&E Capital Corp. And LG&E International Inc.v. Argentine Republic* (ICSID Case No. ARB/02/1), Decision on Liability, 3 October 2006 (hereinafter "*LG&E v. Argentina*"), § 175 **[CL-0206]** / **[CL-0057]** (legitimate expectations may stem from a sector-specific regulatory framework); *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic* (ICSID Case No. ARB/01/3), Award, 22 May 2007 (hereinafter "*Enron v. Argentina*"), § 264 **[CL-0060]** (a favorable sectoral framework can  create legitimate expectations); *Enron v. Argentina*, Decision on Annulment, § 312 – 316 **[CL-0074]** (annulled on other grounds); *BG Group Plc. V. Republic of Argentina* (UNCITRAL), Award, 24 December 2007 (hereinafter "*BG v. Argentina*") §§ 304 – 307, 310 **[CL-0075]** / **RL-0061**] (legitimate expectations may stem from a sector-specific regulatory framework); *Suez v. Argentina*, § 207 **[CL-0083]**; Schreuer, FET, 126 **[CL-0085]**; *Gold Reserve, Inc. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/09/1), Award, 22 September 2014 (hereinafter "*Gold Reserve*

428. Here, Respondent undertook the following:

(i)   *Resorted to the Feed-in Model to develop a stable and attractive legal framework in line with its regulatory principles.*

(ii)  *Introduced simple and clear grandfathering provisions in Article 40(3) of RD 436/2004 and Article 44(3) of RD 661/2007. These provisions promised that detrimental revisions of Fixed FITs and Premium FITs would only affect new installations, not existing installations. This commitment was respected when the Government adopted RD 1578/2008.*

(iii) *Improved the FIT framework under RD 661/2007 through increasing the FITs for different renewable technologies, de-linking the FITs from the TMR and introducing fixed FITs subject to a cap & floor mechanism.*

(iv)  *Marketed Regulatory Framework No. 1 and the Feed-in Model in Spain and abroad through the IFIC, IDAE and* Invest in Spain.[702]

429. The facts of this case allow the Tribunal to find that Respondent breached the legitimate expectations Claimants had at the time of their investments in 2008 and 2009.[703] Prior to the Hearing, Claimants argued that Respondent's conduct from 2006 until late 2010, along with its reputation as a reliable EU Member State, created legitimate expectations on Claimants.[704] After the Hearing, Claimants clarified that they relied in particular on the text of RD 661/2007 and on the Cuatrecasas Memo.[705]

---

*v. Venezuela*"), § 570 [**CL-0098**]; *Micula v. Romania*, §§ 669, 671 [**RL-0028**] / [**CL-0099**]; *Nykomb Synergetics Technology Holding AB v. Republic of Latvia* (SCC), Award, 16 December 2003 (hereinafter "*Nykomb v. Latvia*"), § 4.2 [**CL-0100**] (*holding* that regulation can provide a statutory established right to a specific tariff); *Técnicas Medioambientales Tecmed S.A. v. The United Mexican States* (ICSID Case No. ARB(AF)/00/2), Award, 29 May 2003 (hereinafter "*Tecmed v. Mexico*"), § 154 [**CL-0101**] (legitimate expectations may be linked to "*regulatory stability*"); *Duke Energy v. Ecuador*, § 340 [**RL-0033**] / [**CL-0102**]; (stability in the business and legal framework is linked to an investor's justified expectations); *see also* A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment*, WoltersKluwer, Alphen aan den Rijn, 2009, 286 *et seq*. [**CL-0067**]; L. Reed and S. Consedine, "Fair and Equitable Treatment: Legitimate Expectations and Transparency", in Kinnear M. *et alios* (Eds.), *Building International Investment Law. The First 50 Years of ICSID*, Kluwer Law International, Alphen aan den Rijn, 2016, 287 [**CL-0097**]; *Occidental Exploration and Prod. Co. v. Republic of Ecuador* (LCIA Administered Case, No. UN 3467) Award, 1 July 2004, § 183 [**CL-0103**]; *SAUR v. Argentina*, § 492 [**CL-0104**].

702   C-III § 426 (internal citations omitted); Official Press Release of the Ministry of Energy of 25 May 2007, regarding the enacted RD 661/2007, at 1 [**C-0067**] ("*This guarantee provides legal certainty to generators, granting stability to the sector and encouraging its development. The new regulation will not be retroactive*.").

703   C-I § 696.

704   C-III § 417; Lars Bauermeister Witness Statement (24 October 2016) (hereinafter "Bauermeister Statement"), §§ 22, 67, 88; Witness Statement of Peter Kofmel (hereinafter "Kofmel Statement"), § 7.

705   CPHB-I §§ 36 – 37; Tr. Day 2, 68:16-18, 70:24 – 71:1, 71:9-12, 73:1-6 (Kofmel); Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*", of October 2007, § 8.9 [**C-0095**] / [**Document 11 CWS-LB**] / [**Document 09 CWS-PK**].

430. Respondent entered into international commitments under EU and international law to promote RE and reduce carbon emissions. Pursuant to these, Respondent adopted an energy policy directed at promoting RE investments.[706] Respondent was interested in promoting RE generation, it sought to preserve the stability of the Special Regime and to deal with the Tariff Deficit in a way that was compatible with its RE policies to keep attracting investments and increase RE installed capacity.[707] Respondent implemented these international policies through Regulatory Framework No. 1, which – in a *quid pro quo* manner – was designed to attract investments into risky RE projects by guaranteeing investors that the market price for RE generation would always be supplemented with a premium guaranteeing "*reasonable profitability rates*."[708] Respondent adopted three successive feed-in regulations that guaranteed investors specific Fixed or Premium FITs, for the lifetime of these installations, subject to "*the construction of renewable installations in line with administrative requirements, culminating in a RAIPRE registration*."[709] Registration in RAIPRE perfected with the administration the specific right to claim regulated payments from Respondent. Along with these rights, Claimants acquired investment-backed expectations under the ECT and international law.[710] The tribunals in *Antin*, *Masdar*, and *Novenergia* agreed that registration in the RAIPRE was not simply an administrative requirement but gave rise to legitimate expectations of investors.[711]

431. Specific commitments are not just those addressed to a particular investor or group of investors, but also include those which are "*specific regarding their object and purpose*."[712] The contemporaneous statements and actions of Government officials and major stakeholders in Spain's PV industry confirm the reasonableness and fundamental correctness of Claimants' understanding of the RD 661/2007 framework: *i.e*., as guaranteeing a FIT for the PV Plants' lifetime, protected from retroactive

---

[706] C-III § 418.

[707] C-III § 428; Brattle, Regulatory Report, §§ 103 – 104 **[CER-0001]**.

[708] C-III §§ 419, 421.

[709] *Id*. at § 420; RD 661/2007 **[R-0071]** / **[C-0046]**; RD 2818/1998 **[C-0059]** / **[R-0067]**; RD 436/2004 **[C-0065]** / **[R-0069]**.

[710] C-III §§ 422, 423.

[711] CPHB-I page 45 line 5 ("*Registration in the RAIPRE is not simply an administrative requirement but gives rise to legitimate expectations of investors*"); *citing Antin*, § 552 **[CL-0222]**; *Masdar*, §§ 512 – 520 **[CL-0220]**; *Novenergia*, §§ 665 – 667 **[CL-0213]**.

[712] C-I § 659; *El Paso v. Argentina*, § 375 **[CL-0017]** / **[RL-0041]**.

detrimental adjustments.[713]  In presentations, Respondent reiterated the importance of Article 44(3) of RD 661/2007.[714]  The passing of RD 661/2007 was accompanied by a press release that also contained a specific commitment that the regulatory framework would remain stable, and made a guarantee in relation to the adjustment of tariffs.[715]  By entering into the ECT, Respondent accepted a limitation on its powers to alter the remuneration framework that applies to Claimants' investment:  it accepted that if it gave foreign investors clear and repeated assurances of a long-term and stable framework, it could not contradict those with impunity if it subsequently decided to take the remuneration framework apart.[716]

432.  Respondent intended to be bound by its guarantees and created the credible appearance that it would be so bound.[717]  Indeed, without creating this appearance, Respondent's RE policies would be a catastrophe, and Respondent would risk breaching its international environmental commitments if no investors came.[718]  Respondent publicized the conditions of Regulatory Framework No. 1 with the full expectation that promises of stability were the key to attract investments and to ensure the success of its RE policies.[719]  The two determining factors in Claimants' decision to invest were (1) the attractive conditions of RD 661/2007 (which were designed to attract investors like Claimants) and

---

[713] C-I §§ 665, 678 (*listing* Statements from Ministry of Energy, IDAE, CNE, Invest in Spain, all of which are listed in Factual Background); C-III §§ 18, 401 – 402; *see e.g.* Presentation "Opportunities in Renewable Energy in Spain", *Invest in Spain*, Graz, 15 November 2007 **[C-0080]**; F. Martí Scharfhausen, "The Legal and Regulatory Framework of Renewable Energies", CNE, 29 October 2008 **[C-0081]**; C. Solé Martín & L.J. Sánchez de Tembleque, "Estudio económico de las energías Renovables," CNE, Cartagena de Indias, 9 – 13 February 2009 **[C-0082]**; IDAE Brochure, *"El Sol puede ser suyo"*, 24 May 2005 **[C-0084]**; Interview to H.E. Mr. Mariano Rajoy Brey, President of the Government, *Televisión Española*, 26 October 2015 **[C-0178]**; IDAE Brochure, "El Sol puede ser suyo", 6 June 2007 **[C-0179]**; IDAE Brochure, "El Sol Puede Ser Suyo", November 2007 **[C-0180]**; IDAE Brochure, "El Sol Puede Ser Suyo", April 2008 **[C-0181]**; Presentation "Legal Framework for Renewable Energies in Spain", *Invest in Spain*, October 2009 **[C-0182]**; Fernando Marti Scharfhausen, "Renewable Energy Regulation in Spain", CNE, February 2010, Slide 21, 29 **[C-0183]**.

[714] Presentation "Legal Framework for Renewable Energies in Spain", *Invest in Spain*, October 2009, Slide 4 **[C-0182]**.

[715] C-I §§ 672 – 674; Official Press Release of the Ministry of Energy of 25 May 2007, regarding the enacted RD 661/2007 **[C-0067]**.

[716] C-I § 654; C-III §§ 394, 407 – 411; Salacuse, *The Law of Investment Treaties*, 254 **[CL-0047]**; R. Dolzer, "Fair and Equitable Treatment: Today's Contours", *Santa Clara Journal of International Law*, Vol. 12 (2014), 12 **[CL-0091]**; *Micula v. Romania*, §§ 635, 645, 667, 669, 686 – 688 **[RL-0028]** / **[CL-0099]**.

[717] C-III §§ 420, 424.

[718] C-III § 425; CNE Report 3/2007, pp. 23 – 24 **[C-0051]** / **[R-0101]**.

[719] C-III § 426; F. Martí Scharfhausen, "The Legal and Regulatory Framework of Renewable Energies", CNE, 29 October 2008, slide 72 **[C-0081]**.

(2) the numerous commitments, promises, and assurances that the regulatory framework would not be altered in any way to the disadvantage of investors.[720]  The specific commitments from Respondent provided enough legal certainty for investors to obtain financing for their RE projects – and the commitments were designed with this aim.[721]  After the Hearing, Claimants clarified that they relied in particular on the text of RD 661/2007 and on the Cuatrecasas Memo in making their investment decision.[722]

433.  Claimants conducted due diligence on the legal regime applicable to the PV installations and to their facilities, and undertook their investment relying fully on the economic regime guaranteed under RD 661/2007.[723]  The attractive conditions of RD 661/2007 (which were designed to attract investors like Claimants) and the numerous commitments, promises and assurances that the regulatory framework would not be altered any way to the disadvantage of investors were two determining factors in Claimants' decision to invest.[724]  The specific commitments from Spain provided enough legal certainty for investors to obtain financing for their RE projects – and the commitments were designed with this aim.[725]  Registration in RAIPRE perfected with the administration the specific right to claim regulated payments from Respondent.  Along with these rights, Claimants acquired investment-backed expectations under the ECT and international law.  Claimants argue that the Cuatrecasas Legal Opinion issued to Deutsche Bank in October 2007 forms part of the due diligence research performed for prospective investors.[726]

434.  RD 1578/2008 was enacted in September 2008 with the aim of providing "*continuity and expectations to such investments [in the Spanish PV subsector] and foresaw specific Regulated Tariffs for PV*

---

[720] C-I §§ 666 – 671; RD 661/2007 **[R-0071]** / **[C-0046]**; Bauermeister Statement, § 27; *Charanne*, §§9 – 11, 509 – 510 **[CL-0030] / [RL-0049]**; *compare Micula v. Romania*, §§ 431, 438 **[RL-0028] / [CL-0099]**.

[721] C-I §§ 681 – 682; Bauermeister Statement, § 14.

[722] CPHB-I §§ 36 – 37; Tr. Day 2, 68:16-18, 70:24 – 71:1, 71:9-12, 73:1-6 (Kofmel); Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*", of October 2007, § 8.9 **[C-0095] / [Document 11 CWS-LB] / [Document 09 CWS-PK]**.

[723] C-I §§ 679 – 680; Bauermeister Statement, §§ 41 – 43.

[724] C-I §§ 666 – 671.

[725] *Id.* at §§ 681 – 682.

[726] C-III § 154.  Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*", of October 2007 **[C-0095] / [Document 11 CWS-LB] / [Document 09 CWS-PK]**.

*facilities registered in the RAIPRE after September 29, 2008.*"[727] Since Claimants' PV Installations were registered in the RAIPRE prior to 29 September 2008, RD 1578/2008 did not apply to them. Through RD 1578/2008 and its exclusion of already-registered facilities from the scope of the changes, Respondent reassured its commitment to certainty, predictability and stability for registered PV installations.[728] The PER 2000 – 2010 and the PER 2005 – 2010 provided Respondent's commitments toward the future development of RE in Spain.[729]

435. Shortly after the PV Installations began producing energy and benefitting from the feed-in remuneration scheme in November and December 2010, Respondent began to dismantle Regulatory Framework No. 1. Claimants state that these circumstances resemble the facts of cases like *Metalclad v. Mexico*, *Tecmed S.A. v. Mexico*, *MTD v. Chile* or *Gold Reserve v. Venezuela*, where the investors patiently complied with regulatory requirements to set up their investments and suddenly were deprived of their rights exactly at the moment when it was scheduled for them to start benefitting from their investment.[730] Claimants were hit with a roller-coaster of legislative changes that unduly thwarted the legitimate expectations it had at the time of investment.[731]

436. Claimants' case is different from *Charanne* where investors challenged only the 2010 Measures. That tribunal did not consider the complete dismantling of the previous regulatory regime undertaken in 2012 and 2014, nor the damage that the claimants suffered since 2010.[732] Had that tribunal considered later measures, it likely would have found Respondent liable under the ECT.[733] The *Charanne* tribunal did not consider the documentary evidence of Respondent's promotion of investment in the PV sector and instead only examined the presentation "*El Sol Puede Ser Suey*" and understood that that alone was not sufficient to create legitimate expectations. Other factual errors

---

[727] C-I § 675; IDAE Brochure, *"El Sol puede ser suyo"*, 24 May 2005 **[C-0084]**.

[728] C-I §§ 676 – 677.

[729] C-I § 683; PER 2000 – 2010 **[C-0050]** / **[R-0090]**; Act 54/1997 **[C-0055]**; PER 2005 – 2010 **[C-0066]** / **[R-0092]**.

[730] C-I §§ 692 – 694; *MTD v. Chile* **[CL-0089]**; *Gold Reserve v. Venezuela*, § 579 **[CL-0098]**; *Tecmed v. Mexico* **[CL-0101]**; *Metalclad Corporation v. the United Mexican States* (ICSID Case No. ARB(AF)/97/1), Award, 30 August 2000 (hereinafter "*Metalclad v. Mexico*") **[CL-0110]**.

[731] C-I §§ 637, 695.

[732] C-I § 663; *Charanne*, §§ 95, 102, 299, 497, 510, 527, 542 **[CL-0030]** / **[RL-0049]**.

[733] C-I §§ 718 – 720; *Charanne*, §§ 8, 395, 452, 481 – 485, 533, 539 – 542 **[CL-0030]** / **[RL-0049]**.

include accepting that the RAIPRE registration was a mere administrative requirement and linking the lease's term with the facilities' operational life.[734]

437.    According to Claimants, the 28 January 2009 no recourse long-term financing agreement between Deutsche Bank and OperaFund demonstrates that "*non-recourse long-term project financing schemes were precisely the type of financial arrangements contracted by Paso-Palma Sol and ECO 3 to finance the PASO and ECO 3 Projects.*"[735]

438.    After the Hearing, Claimants explained that their expectations were at all times linked to RD 661/2007.[736] RD 661/2007 was the only regulation analyzed by the Cuatrecasas Due Diligence Report of October 2007, which – while prepared for the benefit of Deutsche Bank as the developer – was later shared with Claimants.[737] Deutsche Bank's expectations, if based on the implicit values of RD 436/2004, would range between a 6.7% and 8.2% rate of return after taxes.[738] Respondent's contention that the reasonable expectation varied between rates of return of 1.5 and 2% is untrue both in the case of Deutsche Bank and in the case of Claimants.[739] Deutsche Bank planned to invest in the plants with the 6.7 – 8.2% return range, by staggering PV plants to legitimately optimize FIT remuneration.[740] RD 661/2007, however, put an end to the difference in remuneration, thus eliminating the need to develop smaller PV facilities.[741] After the Hearing, Claimants explained that, according to Dr. Garcia, the transition from RD 436/2004 to RD 661/2007 was guided by the regulatory "grandfathering" principle, despite the fact that there were no transitional provisions for

---

[734]  C-I §§ 663 – 664.

[735]  C-I § 144; Public Deed notarizing the facilities agreement between HSH NordBank AG, Solar Parks of Extremadura SL, EcoInversión en Extremadura 1 SL, EcoInversión en Extremadura 2 SL, and EcoInversión 3 SL, of 2 July 2008 **[C-0061]** / **[Document 17 CWS-LB]**; Bauermeister Statement, §§ 17, 18, 63, 72.

[736]  CPHB-I § 32.

[737]  *Id*. at §§ 33 – 34, 40 – 43; CPHB-II §§ 9, 11; RPHB-I § 37; Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*"*, of October 2007 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

[738]  CPHB-II § 10; CPHB-I § 33.

[739]  CPHB-II § 12, CPHB-I § 40.

[740]  CPHB-I §§ 41 – 42; Tr. Day 3, 17:1-9 (Montoya); Cuatrecasas, "Opinion in the interest of Deutsche Bank. Applicable structure for PV projects in Spain*"*, of July 2006, §§ 2.1, 8.3, 10.1 **[C-0211]** / **[Document 07 CWS-LB]** / **[Document 08 CWS-PK]**.

[741]  CPHB-I § 42; Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*"*, of October 2007, § 8.3 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

PV plants in RD 661/2007, because the change from RD 436/2004 to RD 661/2007 was beneficial. RD 661/2007 increased the FITs by 82% with respect to RD 436/2004.[742] This change is why ECO 3 was not divided into smaller facilities:  the developer relied on the increased RD 661/2007 FITs for PV plants over 100kW and up to 10 MWs.[743]  Thus, neither Deutsche Bank nor Claimants relied on the 1.5 – 2% return rate of RD 436/2004.  Rather, Deutsche Bank's expectations would have been to obtain a return of 6.7 – 8.2% for both projects under RD 436/2004 or 6.5% – 8 8% (El Paso) and 7.1 – 7.7% (ECO 3) under RD 661/2007.[744]  Further, Claimants' investments were made between July 2008 and July 2009, in full reliance upon the fact that the PV plants were finally registered in the RAIPRE under RD 661/2007 and granted the RD 661/2007 FIT economic rights.

439. Claimants explained that "*[n]one of [Mr. Bauermeister's] answers addressed the expectations that the Claimants themselves had when they invested later in time (between 2008 and 2009) and do not change the fact that the Claimants Investments were made with RD 661/2007 in force and relying precisely on its assured FIT.  The Tribunal should make no mistake here:  this is not the case of* Deutsche Bank v. Spain*, but rather* OperaFund and Schwab v. Spain*."[.]*"[745]  Claimants, however, nonetheless stated that "*[the] certainty [of a secured FIT regime], enhanced after the entry into force of RD 661/2007, [that] created the Claimants' legitimate expectations, which were, in essence, the same as those of Deutsche Bank*."[746]  Claimants explained that this does not imply that their expectations were based on RD 436/2004, but rather on RD 661/2007.  RD 661/2007 was the only regulation analyzed in the Cuatrecasas Due Diligence Report of October 2007, which "*allowed Claimants to assess the Spanish FIT regime before initiating their investment process*."[747]

---

[742] CPHB-I § 45 – 49; C-I Section III.4; C-III § 98; R. Closing, slide 35; Tr. Day 3 16:13-25, 17:1-9 (Montoya); Tr. Day 3 129:1-8 (Brattle, Garcia); Brattle, Regulatory Report, §§ 94 – 97 **[CER-0001]**; Official Press Release of the Ministry of Energy of 25 May 2007, regarding the enacted RD 661/2007, 1 **[C-0067]** (*noting* that RD 661/2007 increased the FIT for PV Plants for over 100kW by 82%); Brattle, Regulatory Rebuttal Report, §§ 97 – 99, Figure 3 **[CER-0003]** (bankability was enhanced and legal and regulatory uncertainties linked to the TMR were minimized).

[743] CPHB-I § 48; Tr. Day 3, 17:1-9 (Montoya).

[744] CPHB-I § 43.

[745] *Id*. at § 34.

[746] *Id*. at §§ 34, 35, 43; CPHB-II § 11; Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*"*, of October 2007, § 8.9 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

[747] *Id*.

440.  Brattle never stated that a 7% rate of return is or should be the expected return on Claimants' investments, and it is wrong and misleading to conclude that Claimants' legitimate expectations under RD 661/2007 were limited to a 7% rate of return.[748]

441.  Claimants explained that there is "*no support in the record*" for the position that Claimants' expectations were linked to RD 436/2004.[749]  Even though Deutsche Bank began developing the PV projects while RD 436/2004 was in force, this initial development was limited to obtaining preliminary regulatory permits and did not require any investment decision by Deutsche Bank.  The costs incurred were negligible.[750]  The bulk of the Projects' development, including the commitment of funds to commence construction of PV Plants and to acquire the necessary equipment occurred after 1 June 2007 and after the entry into force of RD 661/2007, under which the PV Plants obtained final registration in the RAIPRE and began operations.[751]

442.  The EC Decision on State Aid (2017)[752] did not assess the Original Regime (RD 661/2007)'s compatibility with the EU internal market at the time of its enactment, because the Original Regime was never notified to the EC, as neither Respondent nor the EC deemed it to constitute State Aid under CJEU Case law.[753]  Claimants' are entitled to rely on Respondent's and the EC's conduct, and Respondent is estopped from invoking the EC Decision to escape international liability under the ECT.[754]  The EC only considered the Original Regime to assess whether the New Regime could lead to overcompensation.[755]  Respondent has hidden that distinction, stating that "[o]*ne thing is to affirm that past payments <u>are considered</u> to determine whether the Disputed Measures are compatible with the internal market and a completely different thing is to conduct a state aid assessment (based on*

---

[748] CPHB-II § 6 – 8; CPHB-I § 77; Tr. Day 3, 124:20 – 125:5 (Garcia); Brattle Quantum Presentation slides 26 – 31; Brattle Second, § 228, Brattle, Quantum Rebuttal Report, Section II.D, XI, Table 1, p. 9 **[CER-0004]**; Brattle, Regulatory Report, Figure, §§ 73 – 77 **[CER-0001]**.

[749] CPHB-II § 9; CPHB-I § 34.

[750] CPHB-I § 32; Tr. Day 5, 67:12-19.

[751] CPHB-I § 33.

[752] EC State Aid Decision (11 November 2017) **[RL-0080]**.

[753] *Id*. at §§ 4, 156; CPHB-I § 18, 24; Tr. Day 1 55:23 – 56:15 (Claimants' Counsel).

[754] CPHB-I §§ 24 – 25; Tr. Day 1, 55:23 – 57:7 (Claimants' Counsel) (*citing Micula* **[CL-0099]** "*investors should not be held to a higher standard than the government [...] [because] investors are entitled to believe that the government is acting legally.*").

[755] CPHB-I § 19 – 20; Tr. Day 1, 83:21 – 84:17 (Claimants' Counsel).

*Articles 107 and 108 of the TFEU) directly on the Original Regime of 2007 that provided for the feed-in payments to renewable facilities*."[756]  It is incorrect to affirm that the EC Decision declared that the Original Regime was State Aid.[757]  The EC Decision on State Aid is irrelevant for the purposes of establishing Claimants' legitimate expectations as of 2008 – 2009.[758]

443.  Respondent was in the middle of the financial crisis at the time of Claimants' investment and opted to alleviate or soften its effects by calling on foreign and local investors to enter the Spanish energy market.  An efficient and diligent investor would have invested during the crisis.[759]  Spain sought to attract RE investments in the context of the economic crisis and with a huge Tariff Deficit on the table and, despite these, maintained its commitment to FIT system stability.[760]

444.  After the Hearing, Claimants alleged that Respondent's legislative actions from 2010 – mid-2014 constituted a composite act, entailing a creeping violation of the FET standard.[761]  Claimants alleged that these measures violated Article 10(1) of the ECT because, they were inimical to the regulatory *quid pro quo* that Respondent offered in RD 661/2007 (a lifetime fixed FIT to be updated only with a specific CPI) and OperaFund and Schwab's PV projects accepted, subject to compliance administrative conditions, building and obtaining final registration within the proscribed window.[762]

445.  The 2010 introduction of a limit of "*equivalent hours of operation*" under RD 661/2007 by RD-Law 14/2010 was radically different from PER 2005 – 2010.[763]  The Report on the Regulatory Impact of draft RD-Law 14/2010 confirmed that the performance hours of PV facilities were assumptions of the average performance hours used to calculate RD 661/2007.[764]  It caused a reduction in remuneration

---

[756]  CPHB-I § 20 (emphasis in original).

[757]  *Id*. at § 22; Tr. Day 3, 114:9 – 115:3 (Brattle, Dr. Garcia).

[758]  CPHB-I § 23; Tr. Day 1, 55:10-22 (Claimants' Counsel); *Novenergia*, § 465 **[CL-0213]**.

[759]  CPHB-I § 38; Tr. Day 3, 73:6 – 74:4 (Brattle, Dr. Garcia).

[760]  CPHB-I § 39; Brattle, Regulatory Report, Figure, 12, Figure 13, pp. 54 – 55 **[CER-0001]**.

[761]  CPHB-II §§ 22 – 25, 49; ILC Draft Articles, Art. 2 **[CL-0001]**; ILC Draft Articles, With Commentary, pp. 62 – 64 **[RL-0032]** / **[CL-0028]**; *Stati v. Kazakhstan*, §§ 945, 1095 **[CL-0015]**; *El Paso v. Argentina*, § 17 **[CL-0017]** / **[RL-0041]**; *Pac Rim Cayman LLC v. Republic of El Salvador* (ICSID Case No. ARB/09/12), Decision on the Respondent's Jurisdictional Objections, 1 June 2012, §§ 2.70 – 2.71 **[CL-0029]**.

[762]  CPHB-II § 26; Tr. Day 1, 37:11-24 (Claimants).

[763]  CPHB-I § 50 – 51; C-II §§ 280 – 293; C-III §§ 232 – 239.

[764]  CPHB-I § 52.

and offered to compensate its effect by extending the period of regulatory life of the PV plants under RD 661/2007.[765]

446. Brattle confirmed that the New Regime introduced, in the feed-in regulations, the newly defined "*standard installations*."[766]  Dr. Garcia confirmed that the use of "*standards*" by Respondent differed completely between (1) PER 2005 – 2010 and (2) the New Regime.[767]  This contradicts Respondent's "*Same System Fallacy*", wherein Respondent argues that RD 661/2007's FIT system already adopted the concept of standard installations.[768]

447. The *Novenergia* tribunal said that the terms of RD 661/2007 were so adamantly clear that it did not require sophisticated analysis.[769]

448. Regarding the "*specific knowledge*" of the Spanish Supreme Court decisions, *Isolux* concluded that the investor should have anticipated that the essential characteristics of the legal framework would change, due to the special circumstances of that case, one that involved a claimant who was "*not an ordinarily reasonable investor (not required to conduct an 'extensive legal investigation) […] but rather 'an especially well-informed one*."[770]

---

[765] *Id*. at § 53; Report on regulatory impact of Draft of RD-Law 14/2010 establishing urgent measures for the correction of the tariff deficit in the electricity sector (registered 27 December 2010), p. 14 **[R-0111]**.

[766] CPHB-I § 54; R. Closing, Slide 28; Tr. Day 5, 58:3-8.

[767] CPHB-I § 55; Tr. Day 3, 70:5-16 (Brattle, Garcia); Brattle Regulatory Presentation (Day 3) Slide 17.

[768] CPHB-I § 56 – 61; C-IV §§ 71 – 78; Tr. Day 3, 54:23-55:17 (Brattle, Garcia) (*regarding* RD 661/2007 allocation of risk); RD 661/2007, Art. 17, 25, 36, 44(3) **[R-0071]** / **[C-0046]**; Report 18/2013, p. 5 **[C-0192]**; "Technical and Solar Power Production Due Diligence for the Paso Power Plant Project, Mallorca, Spain (Son Jordi, Son Cortera, Santa Margarita, Arta)", Final Report for Deutsche Bank AG, Fichtner, October 2008, pp. 1705 – 1706 **[C-0273]** / **[BQR-77]**; Brattle, Regulatory Report, § 155 **[CER-0001]**; Brattle, Regulatory Rebuttal Report, §§ 41, 148 **[CER-0003]**; *Antin*, §§ 561 – 568 **[CL-0222]** (*rejecting* "Same System Fallacy").

[769] CPHB-I § 60; *Novenergia*, § 679 **[CL-0213]**.

[770] CPHB-I page 49 (line 5) (contrasting Claimants' case with that in *Isolux* **[RL-0004]** / **[RL-0076]**).

449. Claimants noted that the Tribunals in *Antin*, *Masdar*, *Novenergia*, and *Eiser* rejected Spain's defense based on the "*reasonable return*" argument.[771]  *Antin* and *Eiser* rejected Spain's defense based on the Tariff Deficit.[772]

### b. Respondent's Arguments

450. Under a rational and objective understanding of the Spanish regulatory framework, the only expectation that an investor could have is that of recovering the costs linked to the electricity produced by an efficient and well-managed company, and to obtain a reasonable rate of return.[773]  The following principles constitute the objective legitimate expectations of a diligent investor:[774]

(1)    *The regulatory system governed by the principle of regulatory hierarchy and the result of legally stipulated regulation creation procedures.*

(2)    *The regulatory framework is not limited to RD 661/2007 and RD 1614/2010 as claimed by the Claimant. It is configured from Act 54/1997 and the regulations which developed it, as interpreted by case-law.*

(3)    *The fundamental principle that subsidies to the SR are a cost of the SES, secondary to the principle of economic sustainability of the same.*

(4)    *Right to priority of access and dispatch of electricity production.*

(5)    *That the remuneration of the SR consists of a subsidy which, once added to the market price, provides RE Plants with a reasonable rate of return, in the context of its entire lifespan, according to capital markets, which has a dynamic and balanced nature within the SES. This return was linked to the cost made in the construction and operation of the plants.*

(6)    *That the subsidies were determined according to the evolution of the demand and other basic economic data, expressed in the Renewable Energy Plans on the investment and operation costs of standard facilities, with a view to ensuring that these facilities are able to reach a reasonable rate of return during their useful lives.*

(7)    *That the regulatory changes in the remuneration regime of the RE since 2007 have been motivated (i) to correct situations of over-remuneration, or (ii) or by the strong variation in the economic data that served as the basis for the estimation of subsidies.*

---

[771] CPHB-I page 46 line 7; *citing Antin*, §§ 561 – 568, 672 **[CL-0222]**; *Masdar*, §§ 521 – 522 **[CL-0220]**; *Novenergia*, §§ 666 – 669 **[CL-0213]**; *Eiser*, §§ 389 – 406 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[772] CPHB-I page 46, *citing Antin*, §§ 569 – 572 **[CL-0222]**; *Eiser*, § 371 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[773] R-II § 1122.

[774] R-I §1060 (internal citations omitted).

451.    The only reasonable and objective expectation that Claimants could have had at the time of investment would have been the recovery of the CAPEX, OPEX and the obtaining of a reasonable rate of return to the regulatory useful life of the Plants of not more than 25 years.[775]  This return is still received by Claimants' PV Plants.[776]  Respondent did not commit to never modifying the subsidies of RD 661/2007, and Respondent continues to guarantee the recovery of the investment and obtaining a reasonable return for its RE plants through public subsidies that allow a facility to achieve a return of 7.4 % before taxes. This rate of return is converted into 8.6 % after taxes for the asset portfolio of the Claimant subject to this arbitration.[777]

452.    The Tribunal must analyze what the investor knew or should have known about the general regulatory framework at the time of the investment.[778]  At the time of the investment, the investor must know and understand (1) the regulatory framework, (2) how it is applied, and (3) how it affects the investment.  The investor is presumed to make an investment based on this knowledge and is aware of the risks assumed when the investment is made.[779]

453.    The Tribunal cannot accept that Claimants' alleged expectation that the maintenance of a FIT fixed, *sine die*, in favor of its RE plants registered in the RAIPRE was objective or reasonable.[780]  RAIPRE registration is a mere administrative requirement that facilities must fulfil to operate and participate in the SES and "*has nothing to do with the fact that the facilities, having complied with this*

---

[775] RPHB-I §§ 41 – 42; Respondent's Closing Statements, Slides 76-85; Brattle Rebuttal Report, Appendix B; Tr. Day 3 25:1-11 (Montoya); Tr. Day 2 60:21-25 (Kofmel); Tr. Day 2 12:13-21, 23:8-12, 27:19-22 (Bauermeister); Tr. Day 2 92:22-25, 93:1-2 (Payan); Annual Accounts **[BQR-72]**; Moody's. 22 January 2018. "*Moody's upgrades the ratings of four Spanish ABS transactions backed by electricity tariff deficit receivables*", page 1 **[ACQ-0046]**; "O&M and Administration Contracts" signed on 06/25/2007 and 12/02/2008 between DeanSolar Energy GmbH (hereinafter dSE or the O&M Operator) and the corresponding 23 SPVs **[ATA-002.1t]**; FICHTNER Report_Final_2008-12-02 **[ATA-002.5]**.

[776] R-II §§ 1148, 1160, 1165.

[777] *Id*. at §§ 1211 – 1212; Accuracy, Second Economic Report on the Claim of the Claimants (7 March 2018) (hereinafter "Accuracy, Second Economic Report"), § 43 **[RER-0002]**; *AES v. Hungary*, § 9.3.73 **[RL-0039]**.

[778] R-I § 1034.

[779] *Id*. at §§ 1035 – 1039; R-II § 1147; RPHB-I §§ 24, 27 – 30; *Electrabel v. Hungary*, § 7.78 **[CL-0094] / [RL-0002]**; *Charanne*, §§ 495, 505, 509 **[CL-0030] / [RL-0049]**; *Isolux*, §§ 781, 793, 794 **[RL-0004] / [RL-0076]**.

[780] *Isolux*, § 787 **[RL-0004] / [RL-0076]** ("*The Arbitral Tribunal [...] considers that the Claimant had special knowledge that would not allow it to have a legitimate expectation that the long-term system of FIT enshrined in RDs 661/2007 and 1565/2008 would last for the lifetime of the plants. The legitimate expectation of the Claimant was a reasonable rate of return on its investment.*") (emphasis provided by Respondent).

*requirement, acquire the ownership of an* 'acquired right' *to receive future yield, indefinitely,* sine die."[781]

454. Claimants attempt to build an expectation based on a generally applicable regulation – one that is and must by its very nature be changeable and, thus, able to enable to legislator to the adaptation of the regulatory framework to the changing economic and technical circumstances.[782] The regulatory framework, as interpreted by the Supreme Court and as recognized by the tribunal in *Isolux*, only promised that RE facilities, throughout their lifetime, could achieve a reasonable rate of return.[783] There was no reasonable expectation of "*freezing*", because the government intervened frequently in the market and any reasonable investor would know that intervention in the face of market distortions or overcompensation in State Aid would be demanded by the EU, as well.[784] All awards that have examined the Spanish regulatory framework deny that an investor could rationally expect that the remuneration regime set forth under RD 661/2007 could not change.[785]

455. Objective expectations cannot be built independently of the Spanish regulatory framework, which showed that change was possible and that changes could affect existing facilities.[786] A review of the regulatory framework and the case law would have shown that changes would occur to (1) ensure the economic sustainability of the SES and (2) to correct situations of over-remuneration.[787] The Spanish Supreme Court has reiterated in all judgments that "[t]*he principle of legitimate expectations does not guarantee the perpetuation of the existing situation; which can be modified at the discretion of the institutions and public authorities to impose new regulations taking into account the needs of the*

---

[781] R-I § 523; *see also* RD 661/2007, Art. 6 *et seq.* **[R-0071]** / **[C-0046]**.

[782] R-II §§ 1174 – 1179; *Isolux*, § 772 **[RL-0004]** / **[RL-0076]** (RD 661/2007 was not enacted to attract foreign investment); *Blusun v. Italy*, §§ 367 – 369, 371 **[RL-0081]** / **[CL-0200]** (*finding* that an investor cannot have a legitimate expectation in the absence of a specific commitment to stability).

[783] R-I §§ 1051 – 1053; R-II §§ 1154; *Isolux*, § 807 **[RL-0004]** / **[RL-0076]**; *see also Charanne*, §§ 504 – 508 **[CL-0030]** / **[RL-0049]** (*confirming* that at the time, Spanish law left open on the possibility of modifying the remuneration scheme applicable to PV energy and investors cannot have had the reasonable expectation that RD 661/2007 and RD 1578/2008 were not going to be modified during the lifespan of their facilities).

[784] R-II §§ 1143 – 1148.

[785] *Id.* at §§ 1173, 1181 – 1181; R-I § 1030; "*Powering the Green Economy. The feed in tariff handbook.*" Miguel Mendonça, David Jacobs and Benjamin Socacool. Editorial. Earthscan, 2010 **[RL-0062]**.

[786] R-II § 1144.

[787] *Id.* at §§ 1145 – 1146.

*general interest*."[788]  The Contested Measures served to (1) apply the principle of reasonable rate of return, (2) resolve situations of imbalance of the SES that jeopardized its sustainability, and (3) reinforce the stability of regulatory framework by elevating some aspects previously regulated by regulations to the rank of law.[789]

456.  Claimants and their Expert assumed that Respondent's supportive scheme was subject to the EU regulation on State Aid, pursuant to which Aid should be limited to cover the difference between the market price and the LCOE.  Claimants, therefore, could not expect to receive a specific level of Aid *sine die* and in excess of that gap between the market price and the LCOE.[790]

457.  The ECT is not an insurance policy against the risk of changes to the regulatory framework.  Under the ECT, Claimants could not expect that their interests would be protected unconditionally, at the expense of the free market and the interests of consumers.[791]  Article 2 of the ECT, by its reference to the European Energy Charter, makes one of its objectives "*to promote the development of an efficient energy market*."[792]  This is not the same as aiming "*(i) to maintain inefficient energy markets, (ii) to protect situations of unsustainability of the electricity markets or (iii) to protect expectations of petrification of over-remuneration for indefinite periods against the formation of market prices since they are public subsidies*."[793]

458.  The *Charanne* Award examined the Spanish regulatory framework from 2008 – 2009, and found that all RD 661/2007 and RD 1578/2008 promised was "*the reasonable rate of return referred to in Article 30.4 of* [Act 54/1997]."[794]  Under *Charanne*, the essential characteristics of the Spanish regulatory framework in 2008 and 2009 were (1) a subsidy that supplements the market price, (2) a grant of privileged access to deliver its electricity to the grid, and (3) to ensure through both that the producer

---

[788] R-I §§ 354, 1043 – 1044; *see also Charanne*, §§ 506 – 508 **[CL-0030] / [RL-0049]** (*confirming* the factual relevance of the case-law of the Spanish Supreme Court in the evaluation of an investor's legitimate expectations).

[789] RPBH-I § 10.

[790] *Id*. at § 35; Tr. Day 3 108:9-19 (Garcia), Respondent's Opening, slide 26; Respondent's Closing, slide 42.

[791] R-II § 1108.

[792] *Id*. at § 1104; R-I § 983; ECT, Title I **[RL-0006]**.

[793] R-II § 1104.

[794] *Id*. at § 1161; R-I §§ 1043, 1052; RPHB-I § 8; *Charanne*, §§ 499 – 505, 507, 511, 517, 518 **[CL-0030] / [RL-0049]**.

obtains the reasonable rate of return established in Article 30.4 LSE, until reaching a level playing field with ordinary producers. It must be "*reasonable with reference to the cost of money on the capital market.*"[795] Respondent passes the "*Stability Test*" established by the *Charanne* Award.[796]

> *In this case, it has been demonstrated that the regulatory framework established by the contested measures (i) grants a subsidy (88.14 % of the income of the plants relating to this arbitration come from public subsidies); (ii) maintains the access privilege to the electricity grid and the priority of dispatch privilege; (iii) allows the Claimants to recover the amounts invested in the construction of the plant; (iv) allows the Claimant to obtain a reasonable return on the investment costs in the RE plants with reference to the cost of money in the capital market.*[797]

459. Article 44(3) of RD 661/2007 contains no immutability commitments or the other alleged 6 rights invoked by Claimants.[798] Article 44(3) of RD 661/2007 deals with the periodic mandatory review of tariffs, excluding modifications that are necessary to (1) guarantee the economic sustainability of the SES or (2) rectify situations of over-remuneration. RD 1578/2008 could not create expectations to the maintenance of the tariffs on the facilities in operation, and even the Fifth Additional Provision of this Regulation warned of the possible revision of the tariffs applicable to PV technology in 2012. The RE Sector did not infer that RD 1578/2008 created a promise to freeze tariffs, nor could Claimants infer such a promise from this regulation.[799]

460. The *Isolux* Award denied the existence of a grandfathering expectation for tariffs for facilities in operation,[800] bluntly stating that "*the only legitimate expectation of the Claimant was a reasonable rate of return on its investment*", as this was the expectation of the RE sector after the remuneration system under RD 436/2004 was amended by RD-Law 7/2006 and was later repealed by RD 661/2007.[801]

---

[795] R-II §§ 1162 – 1164 (partial quoted).

[796] *Id.* at § 1167; NREL, "A Policymaker's Guide to Feed-in Tariff Policy Design", July 2010 **[R-0324]**.

[797] R-II § 1165.

[798] RPHB-I § 7.

[799] R-I §§ 1065 – 1068.

[800] *Id.* at § 1056; *Isolux*, §§ 787 – 790 **[RL-0004]**.

[801] R-I § 1057.

461. After the Hearing, Respondent stated that it proved the essential elements of the Spanish supportive Scheme: that the schemes were enacted in compliance with and subject to EU Directives, including the regulation on state aid; that the scheme is a highly-regulated and subsidized sector paid by consumers, developed under the principle of the hierarchy of norms, and that the supportive schemes were developed within the limits of the principles of Act 54/1997 and its principles of reasonable rate of return and sustainability of the SES.[802] *Charanne*, *Eiser*, *Isolux*, *Novenergia*, and *Antin* each confirmed that the measures enacted prior to RD-Law 9/2013 were lawful.[803] Further, RD 661/2007 was approved to resolve the overcompensation problem generated by RD 436/2004 and implied a reduction on the remuneration to PV Plants and, therefore, in contrast to Claimants' arguments, could not have been enacted to attract foreign investors.[804]

462. *Invesmart v. Czech Republic* established that, when examining the true objective expectations of an investor, the investor has the burden of performing its own due diligence within the context of the operative legal regime.[805] Claimants have not provided a single piece of legal due diligence that upholds the existence of a commitment to freeze the regime in RD 661/2007 in favor of plants in operation.[806] This lack of due diligence means that Claimants' expectations cannot be deemed to be real or objective.[807] The Hearing confirmed that Claimants (1) did not request Due Diligence of the

---

[802] RPHB-I .§§ 19(a) – (e), 132 – 135; Respondent's Closing Slides 22 – 29, 37 – 38; Tr. Day 2 46:3-5, 46:13-16, 48:6-25, 49:1-4 (Kofmel); Tr. Day 3 59:15-18, 60:13-23, 63:15-18, 93:20-23, 94:8-12, 95:10-19, 99:20 – 100:14, 100:20 – 101:2, 118:21 – 119:4, 121:5-17, 122:20 – 123:6 (Garcia); Tr. Day 3 47:13-24 (Montoya) *Charanne*, §§ 102, 109 **[CL-0030]** / **[RL0049]** ("*In compliance with the EU's directive and in pursuit of its own national interests, Respondent adopted extensive measures aimed at promoting CSP and other sources of renewable energy. (...) Law 54/1997, which provided the legal framework for regulation of the electrical sector [...] Eiser's contemporaneous documents show that (...) were keenly aware of the features of the RD661/2007 regime [...]. The evidence shows that Claimants recognized that there could be changes in regulatory regimes [...]*"); *Isolux*, §§ 788, 789, 805 – 807 **[RL-0004]** / **[RL-0076]** ("*[...] a regulatory framework that the government has the power and the duty to adapt to the economic and technical needs of the moment, within the LSE framework.*"); *Novenergia*, § 688 **[CL-0213]** ("*The Claimant could not have reasonably expected that there would be no changes at all to the regulatory regime that would lower the value of its investment*"); *Antin*, § 555 **[CL-0222]** ("*The requirement of stability under the Treaty does not equate to the immutability of the legal framework. The State is certainly entitled to exercise its sovereign power to amend its regulations to respond to changing circumstances in the public interest*").

[803] RPHB-I § 136.

[804] *Id.* at § 19(h); Respondent's Closing Statements, Slides 32-33; Tr. Day 3, 8:2-8, 45:24 – 46:9 (Montoya); Tr. Day 3, 67:4-14 (Garcia).

[805] R-I § 1072; *Invesmart v. Czech Republic*, § 254 **[RL-0019]**.

[806] R-I §§ 1040 – 1042; R-II §§ 1131 – 1133.

[807] R-I § 1048; RPHB-I §§ 31 – 32; *Parkerings-Compagnient AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8 Award 11 September 2007, § 332 **[RL-0092]**; *Invesmart v. Czech Republic*, § 250 **[RL-0019]**; Judgment from the

Spanish Regulatory framework, (2) did not analyze the case law of the Supreme Court, and (2) did not analyze the legislative precedents.[808] Other Awards have been inconsistent in their approach to due diligence. *Charanne* and *Isolux* analyzed the level of diligence required from an investor,[809] while the *Eiser* award simply assumed that investors are "*sophisticated.*"[810] The *Novenergia* Award similarly concluded that the due diligence performed by an investor was reasonable because the individual responsible for it so stated.[811]

463.    Other arbitral tribunals have found that Spanish case law is an objective fact that should shape reasonable expectations.[812] In the period preceding Claimants' investment, there were several reforms that were criticized by the renewable sector due to alleged retroactivity. These reforms were implemented in accordance with Supreme Court case law regarding the application of rules going forward to already-existing situations.[813] The RE sector was aware of the regulatory framework in Spain.[814] Claimants should have had the same objective expectations as other actors in the market, including the RE Associations, who knew that the Government was limited by the legal duty to grant RE plants a reasonable rate of return on the cost of money in the capital market in an economically sustainable SES.[815] Respondent argues the Cuatrecasas Legal Opinion issued to Deutsche Bank in

---

Third Chamber of the Supreme Court dated 25 October 2006, appeal 12/2005, reference El Derecho EDJ 2006/282164, p. 4 – 5 **[R-0118]**; Judgment from the Third Chamber of the Supreme Court, 3 December 2009, Appeal 151/2007 EDJ 2009/307349 **[R-0121]**.

[808]   RPHB-I § 33, 38; Respondent's Opening Statement, slides 159-181; Respondent's Closing Statements, slides 60-74; Tr. Day 2 44:21-25, 45:3-5; 49:1-4, 53:3-10, 55:4-13, 58:9-12, 60:2-15, 63:12-14, 66:10-15 (Kofmel), Tr. Day 2 12:13-21, 17, 18:18-25; 28:21-25, 29:1-2 (Bauermeister).

[809]   RPHB-I §§ 156 – 157; *Charanne*, § 509 **[CL-0030] / [RL-0049]**; *Isolux*, § 794 **[RL-0004] / [RL-0076]**.

[810]   RPHB-I § 155; *Eiser*, § 119, 364 **[CL-0148] / [RL-0077] / [RL-0078]**.

[811]   RPHB-I § 155; *Novenergia*, § 679 **[CL-0213]**.

[812]   RPHB-I §§ 149 – 151, 154; *Charanne*, §§ 504, 505, 508, 518 **[CL-0030] / [RL-0049]**; *Isolux*, §§ 793, 794 **[RL-0004] / [RL-0076]**.

[813]   R-I § 1041.

[814]   *Id*. at §§ 1054 – 1055; Submissions of the AEE before the CNE during the CCE ([by its Spanish acronym] Electricity Advisory Council) hearing on the proposed Royal Decree which will regulate and amend certain aspects of the special regime (30 August 2009), at 6 **[R-0140]**; "*Powering the Green Economy. The feed in tariff handbook.*" Miguel Mendonça, David Jacobs and Benjamin Socacool. Editorial. Earthscan, 2010 **[RL-0062]**.

[815]   R-II §§ 1140 – 1142.

October 2007 confirms Respondent's case,[816] showing that the supportive scheme could be changed within the limit of the reasonable rate of return.[817]

464.    The successive regulatory changes relating to existing facilities in the regulatory framework under which Claimants invested[818] were always made to maintain the principle of reasonable rate of return within the framework of a sustainable SES.  Claimants have not met their burden of showing that any diligent investor could expect that Respondent would not adopt macroeconomic control measures to resolve a situation of deficit or economic imbalance that affected the sustainability of the SES or rectify situations of over-remuneration.[819]  Further, EU Directives enabled Respondent to "*incentivise the investment by means of the concession of State aid, as permitted by the EU within certain limitations.*"[820]  Respondent's membership in the EU should have dispelled any expectation of perpetual subsidies, as there can be no expectation that Spanish law would not evolve in line with EU law, especially the principle of proportionality.[821]

465.    Claimants have avoided discussing relevant precedents that have applied the ECT standard.[822]  The *Micula v. Romania* case has no identity of reason with this case, since *Micula* does not apply the ECT or take into account the objects or principles thereof.[823]  Unlike here, in *Micula* there was an offer aimed at investors.[824]  Further, whereas *Micula* concluded that Romania never warned of the possible elimination of the established aid,[825]  Respondent has proven that, since 2006 when it intervened

---

[816]  *Id*. at §§ 649 – 652; Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*",* of October 2007, pp. 4, 5, 10 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

[817]  RPHB-I § 158; Respondent's Opening Statements on Facts, slides 160 – 174, Respondent's Closing, slides 60 – 74.

[818]  *See e.g*. RD 436/2004 **[C-0065]** / **[R-0069]**; RD-Law 7/2006 **[R-0056]**; RD 661/2007 **[R-0071]** / **[C-0069]**; RD-Law 6/2009 **[C-0268]** / **[R-0057]**; RD 1565/2010 **[C-0110]** / **[R-0074]**; RD 1614/2010 **[R-0075]**; RD-Law 14/2010 **[C-0111]** / **[R-0058]**.

[819]  R-I §§ 1028, 1061 – 1064, 1068; R-II §§ 1086, 1092, 1143, 1149, 1168, 1174; RPHB-I §§ 22 – 23; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.154 **[CL-0094] / [RL-0002]** (burden of proof rests with Claimants); *Invesmart v. Czech Republic*, § 250 **[RL-0019]**; *Blusun v. Italy*, §§ 383 – 386 **[RL-0081]** / **[CL-0200]**.

[820]  R-I § 64.

[821]  R-II § 1148.

[822]  *Id*. at § 1089.

[823]  *Id*. at §§ 1094 – 1096; *Micula v. Romania*, §§ 137 *et seq*. **[RL-0028]** / **[CL-0099]**.

[824]  R-II § 1097; *Micula v. Romania*, § 548 **[RL-0028]** / **[CL-0099]**.

[825]  R-II § 1099.

through RD-Law 7/2006, it would intervene in cases of over-remuneration or market distortion.  Spain successively amended the remuneration mechanisms while respecting the essential elements established in the Act 54/1997,[826] which established the objective of the subsidized system:  "*for the purpose of achieving Reasonable rates of return with reference to the cost of money on the capital market.*"[827]  Respondent states that Act 40/1994 and Act 54/1997 both focused on the financial self-sufficiency of the SES.[828]  Respondent has, thus, given warning *ab initio* of the limits placed on the receipt of subsidies:  obtaining a reasonable return.  Removal of the subsidies, thus, was not arbitrary or discretionary:  the implementation of the limit was pre-determined by law.[829]  Brattle also recognized that each of the RDs approved since 1998 have applied different payment methods, indexes, installation types.  The only elements that have been maintained are (1) the methodology of using standard installations, (2) the principle of reasonable rate of return, and (3) priority of dispatch.[830]  At the Hearing, Brattle's expert confirmed that he assumed that the expected reasonable rate of return at the time of the investment was 7%.[831]

466.    Only objective expectations can give rise to a successful claim.  Subjective beliefs do not suffice to create legitimate expectations.[832]  To assess the investor's objective expectations, the Tribunal should examine:  (1) the investor's contract documents; (2) the negotiations in which the investor actually participated; (3) the due diligence process implemented by the investor; (4) the regulatory framework of the State and its international agreements; and (5) the competent bodies of the State for fulfilment of the commitment undertaken.[833]  In relation to each of the above, Respondent states that:

---

[826] *Id*. at § 1098; *Micula v. Romania*, § 678 **[RL-0028]** / **[CL-0099]**.

[827] R-II § 1100.

[828] R-I § 260; Act 54/1997, Art. 15 – 16 **[C-0055bis]** / **[R-0059]** (*regarding* self-sufficiency in the SES; Act 40/1994 **[C-0053]** / **[R-0037]**.

[829] R-II §§ 1102 – 1103.

[830] RPHB-I § 19(g); Tr. Day 3 127:1 – 128:7 (Garcia), Respondent's Opening Statements, Slides 111 – 157, Respondent's Closing, slide 31.

[831] RPHB-I § 19(f); Respondent's Opening, Slide 74; Respondent's Closing, slide 30; Tr. Day 3 124:20 – 125:5 (Garcia).

[832] R-I § 1037; R-II § 1149; RPHB-I §§ 25 – 26; *Invesmart v. Czech Republic*, § 250 **[RL-0019]**; *Charanne*, §§ 495, 505 **[CL-0030]** / **[RL-0049]**; *Blusun v. Italy*, §§ 383 – 386 **[RL-0081]** / **[CL-0200]**. *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.78 **[CL-0094]** / **[RL-0002]**; *Saluka v. Czech Republic*, § 304 **[CL-0109]** / **[RL-0083]**.

[833] R-I § 1073.

*[1] the contracts signed by the Claimant demonstrate that it knew and assumed the regulatory risk; [2] the Claimant did not participate in any negotiations or agreements whatsoever, as the general regulations applicable erga omnes, both domestic and foreign, were applicable; [3] no exhaustive Due Diligence process regarding the operation of the Spanish regulatory framework was conducted; [4] the regulatory framework and the case-law interpreting it do not support the Claimant's stance [and] the international agreements signed by Spain in relation to the bailout of the financial sector established the obligation to adopt macroeconomic control measures that could not be ignored; and [5] the competence (a) of the Government and the Parliament to adopt amendments to the regulatory framework and (b) of the Supreme Court for their ultimate interpretation.*[834]

467.   Claimants' position that it was deceived by the Respondent is contradicted by contemporaneous facts, including (1) the opinion stated by the RE Associations at the time of the investment; (2) the case-law of the Supreme Court at the time of the investment; (3) the opinion of the main investors in the field of RE at the time of the investment[835]; (4) Respondent's statements; (5) the actual content of the documents linked to the investment; and (6) the evolution of the regulatory framework.[836]   Since 2006, Respondent has warned the energy sector operators of action to remedy over-remuneration and to improve the sustainability of the SES, and since 2008 it has warned of the need to introduce reforms to tackle the deficit.[837]   Claimants foresaw the possibility of regulatory regime change in their

---

[834] *Id.* at § 1074.

[835] Submissions of the AEE before the CNE during the CCE ([by its Spanish acronym] Electricity Advisory Council) hearing on the proposed Royal Decree which will regulate and amend certain aspects of the special regime (30 August 2009), at 6 **[R-0140]**; Suelo Solar, 29 April 2010: APPA report. Retroactivity summary, 6 – 7 **[R-0260]**; Claims of APPA of 3 April 2007 against the Royal Decree 661/2007 draft **[R-0271]**.

[836] R-II §§ 36, 1198 – 1205; Judgment of the Supreme Court of, 1260/2016 (Appeal 649/2014) (1 June 2016) **[R-0116]**.

[837] R-I §§ 1119 – 1120; R-II §§ 1207 – 1208; Act 2/2011, Art. 79.4(a) and (d) **[C-0115]** / **[R-0045]**; RD-Law 6/2009, Preamble **[C-0268]** / **[R-0057]**; RD-Law 14/2010, Preamble **[R-0058]**; RD-Law 13/2012, at 8 **[R-0061]** (*explaining* that the tariff deficit has become a structural problem that requires effort of all parties involved to resolve); RD 661/2007, Preamble **[R-0071]** / **[C-0046]**; National Reform Programme 2012 **[R-0094]**; Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012, Section C.8 p. 70 **[R-0095]**; Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011 **[R-0169]**; *The Reforms of the Spanish Government: Determination in the face of the crisis"*, Secretariat of State for Communication, Ministry of the Presidency, September 2012, p. 18 **[R-0204]**; Appearance before the Senate of Mr Pedro Luis Martín Uribe, Secretary General of Energy, of 16 October 2008 **[R-0223]** (*noting* increasing unsustainability of tariff deficit); Appearance of the Secretary General for Energy, Ignasi Nieto Magaldi, in the Congress of Deputies on 8 November 2006 **[R-0224]** (*"We must be reasonable"*); Journal for the Sessions of the Congress, Ratification of RD-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector **[R-0238]** (measures of 2009 and 2010 were insufficient and it is necessary to pass new measures); Appearance before the Senate of Joan Clos i Matheu, Minister of Energy and Tourism, of 26 October 2006 **[R-0248]** (criterion of objective energy costs); MoU signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*" **[RL-0067]**.

documents linked to its investment.[838]  According to Respondent, OperaFund's participative loan to ECO 3 accounted for the existence of a regulatory risk that could prevent the borrower from meeting its obligations.[839]

468.  Unlike in its work in the *Eiser* case, Claimants' expert Brattle now agrees that the Regulator never considered debt financing when setting FITs.[840]  The financing costs were never considered by the Spanish regulatory framework as a cost that had to be covered by the SES.[841]  Thus, it cannot be said that the investment costs used by the regulator do not correspond to actual data, nor are they retroactive or self-interested to the detriment of investors.[842]

469.  There was no "*active campaign*" to attract foreign investors, and legitimate expectations cannot be based on advertising brochures, books, press releases, or political speeches.[843] Neither the general statements by Ministry officials, the presentations by CNE, nor the presentations and brochures by IDAE and InvestSpain prove the existence of any campaign.  Claimants have not furnished any proof of ever having knowledge of these presentations or statements or of reliance thereupon.[844]  Even if they had, none of the above could create a real and objective expectation that the framework of RD 661/2007 was going to remain unchanged in favor of Claimants.[845]  The Hearing demonstrated that

---

[838]  R-II Section IV (J).

[839]  *Id*. at § 659; Waiver letter sent by HSH NordBank AG to ECO 3 on 7 March 2012 **[C-0164]** / **[Document 26 CWS-LB]** (*confirming* that there is a facilities agreement dated 2 July 2008); Public Deed notarizing the facilities agreement between HSH NordBank AG, Solar Parks of Extremadura SL, EcoInversión en Extremadura 1 SL, EcoInversión en Extremadura 2 SL, and EcoInversión 3 SL, of 2 July 2008 **[C-0061]** / **[Document 17 CWS-LB]**.

[840]  R-II §§ 1120 – 1121; Brattle Quantum Report 29 September 2017, § 65 **[R-0311]**.

[841]  R-II § 1166.

[842]  *Id*. at § 1123.

[843]  R-I §§ 1075 – 1077, 1081; RPHB-I §§ 6, 9.

[844]  RPHB-I § 34; Respondent's Closing Statements, Slides 37-38; Tr. Day 2 46:3-5, 46:13-16, 49:1-4, 48:6-25 (Kofmel).

[845]  R-I §§ 1078 – 1081; *Charanne*, §§ 496 – 497 **[CL-0030]** / **[RL-0049]** (*dismissing* the possibility of the information contained in the advertising brochures as being capable of generating a real, objective expectation for a diligent investor); *ECE Projektmanagement v. Czech Republic*, § 4.771 **[CL-0183]** / **[RL-0045]** (*declaring* that legitimate expectations could hardly be generated as a result of statements made by subjects who lack the capacity or competence to grant or comply with the commitment undertaken).

Claimants were not attracted to Spain by any campaign or alleged stabilization commitments:  they invested trusting on EU regulations alone.[846]

470.   In order for the Tribunal to grant protection to an investor in regard to "*specific commitments*" under the ECT, (1) the investor must have specific commitments made to it that the regulation in force will remain immutable,[847] (2) the investor's expectations must be reasonable and justified in relation to any changes of laws in the host country,[848] (3) the investor must have performed a diligent analysis of the applicable legal framework,[849] and (4) the legitimacy and coherence of the expectations must be assessed along with the background information that the investor had or should have had when making the investment.[850]

471.   The cases that Claimants rely on for support of legitimate expectations, including *Total v. Argentina*; *MTD; TecMed; Gold Reserve; LG&E v. Argentina;* and *BG v. Argentina*, are inapplicable to the present regulatory framework because those cases concerned signed concession agreements that included stabilization clauses in favor of the foreign investors, whereas the present matter concerns general regulations *erga omnes* issued by Spain and within the Spanish regulatory framework.[851]  A stability clause cannot be deduced from a general regulatory framework.[852]

---

[846] RPHB-I § 34, 39 – 40; Respondent's Closing Statements, Slides 37-38, 69-75; Tr. Day 2 46:3-5, 46:13-16, 49:1-4, 48:6-25, 64-67, 69:21-25, 72:3-8 (Kofmel); Tr. Day 2 30:24-25, 28:5-1 (Bauermeister).

[847] R-I §§ 1049(a); *AES v. Hungary*, § 9.3.29 [**RL-0039**]; *Plama v. Bulgaria*, § 219 [**CL-0011**] / [**RL-0034**]; *EDF (Services) v. Romania*, § 217 [**RL-0035**] / [**CL-0204**]; *Charanne*, § 499 [**CL-0030**] / [**RL-0049**]; *Isolux*, §§ 771 and 775 [**RL-0004**] / [**RL-0076**]; *Blusun v. Italy*, § 319 [**RL-0081**] / [**CL-0200**].

[848] R-I § 1049(b); *Plama v. Bulgaria*, § 219 [**CL-0011**] / [**RL-0034**]; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.154 [**CL-0094**] / [**RL-0002**].

[849] *Charanne*, § 507 [**CL-0030**] / [**RL-0049**]; *Isolux*, § 781 [**RL-0004**] / [**RL-0076**].

[850] R-I § 1049; R-II §§ 1128 – 1130, 1224; *EDF (Services) v. Romania*, § 217 [**RL-0035**] / [**CL-0204**]; *AES v. Hungary*, § 9.3.29 [**RL-0039**]; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.78 [**CL-0094**] / [**RL-0002**]; *Charanne*, §§ 495, 499, 505 [**CL-0030**] / [**RL-0049**].

[851] R-I §§ 1069 – 1071; *Enron v. Argentina*, §§ 108, 109, 151, 1278 [**CL-0060**], §§ 36, 42, 49, 51, 53 [**CL-0106**]; *Total S.A. v. The Argentine Republic* (ICSID Case No. ARB/04/01), Decision on Liability, 27 December 2010 (hereinafter "*Total v. Argentina*") §§ 53, 54, 58 [**CL-0106**]; *BG v. Argentina*, §§ 160 – 175 [**CL-0075**] / **RL-0061**].

[852] R-I §§ 1088 – 1090; *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. the Republic of Hungary*, ICSID Case No. ARB/07/22, Award of 23 September 2010 ("*AES v. Hungary*"), §§ 9.3.29 – 9.3.30 [**RL-0039**]; *Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v. the Republic of Albania,* ICSID Case No. ARB/11/24, Award, 30 March 2015 (hereinafter "*Mamidoil v. Albania*"), §§ 617 – 618 [**RL-0046**]; *Charanne*, §§ 499 [**CL-0030**] / [**RL-0049**].

472. No specific commitments were made to Claimants that the regulation in force would remain immutable.[853]  Claimants attempt to base their expectations on (1) alleged promises of RD 661/2007 and its press release, (2) RD 1578/2008, (3) alleged promises repeated by senior Ministry officials, and (4) an unproven "*enthusiastic campaign*" to attract foreign investors.[854]  Neither RD 436/2004, RD-Law 7/2006, RD 661/2007, RD 1578/2008, nor RD-Law 6/2009 contain any guarantee or promise to petrify their framework in favour of Claimants or their investments.[855]

473. RD 661/2007 was approved before the economic crisis.  Claimants' investments were made in 2008 – 2009, during a period of economic crisis where all efforts of the regulator were focused on reducing the Tariff Deficit, while increasing revenues of the SES and lowering its costs and respecting commitments assumed by Spain with the EU in terms of the promotion of RE.[856]  Claimants' argument that Respondent promoted RE in order to alleviate or soften the crisis is without basis:  promoting the most expensive technologies during a crisis is counter-intuitive.  Regardless, Respondent was forbidden by the EU from applying such type of economic policy of higher government spending.[857] The Hearing confirmed that the greenfield investment in Claimants' plants was decided under RD 436/2004, meaning that RD 661/2007 was not crucial for Claimants and their predecessors.[858] Claimants are brownfield investors that consciously take the risk of investing in the middle of a crisis, when the disputed measures were foreseeable and assuming that they would obtain a lower return than that expected by a greenfield investor.  Claimants' experts asserted that the reasonable expectation at the time of the construction of the PV Plans and their investment varied between 1.5% and 7% IRR.[859]

474. Claimants' argument that the equivalent-hours methodology is different in the PER 2005 – 2010 and RD-Law 14/2010 is erroneous.  According to Respondent, the *Charanne* Tribunal agreed that the RD

---

[853] R-II § 1152.

[854] R-I § 1032.

[855] *Id*. at § 1051; R-II § 1153.

[856] RPHB-II §§ 36 – 37, RPHB-I § 8.

[857] RPHB-II §§ 34 – 35; CPHB-I §§ 38 – 39.

[858] RPHB-I § 36; 130 (*stating* that *Novenergia* refers to a greenfield investment); Respondent's Closing, slides 52 and 53; Tr. Day 1:17:24 – 18:2 (Claimants' Opening); Tr. Day 2, 24:14-25 (Bauermeister).

[859] RPHB-I § 37; Respondent's Closing Statements, 54 – 58; Brattle Quantum Presentation, Slide 10; Tr. Day 2, 49:22-25, 50:1-9, 51:1-6 (Kofmel), Tr. Day 3, 87:9-20 (Garcia).

661/2007 tariffs were designed taking into account the same operations used in RD-Law 14/2010. The elimination of the subsidy above the threshold is merely an elimination of windfall profits, since the tariff was calculated using that hours reference.[860]

475. The *Eiser* Award recognized the State's right to regulate in the absence of specific commitments, it considered that the Kingdom of Spain infringed the FET's "[…] *obligation to provide fundamental stability in the essential characteristics of the legal regime*[.]"[861] *Eiser* rejected Claimants' claim that RD 661/2007 gave them immutable economic rights that could not be altered by changes in the regulatory regime.[862] *Isolux*, however, considered that "[…] *the government has the power and the duty to adopt to the economic and technical needs of the moment, within the LSE framework.*"[863] While *Charanne* and *Antin* recognized the essential characteristics of the supportive Scheme,[864] the *Eiser* Award inconsistently ignored this, and the *Novenergia* Award failed to specify which were the essential characteristics of the supportive scheme.[865]

476. *Novenergia* failed to properly address the elements of the regulatory framework.[866] The *Antin* Award's finding should not be extrapolated to this case, as neither the regulatory framework, the economic and social circumstances, nor the expectations are comparable to this case. The *Antin* Award contained logical and legal inconsistencies.[867]

477. Respondent has proven (1) that the Spanish regulatory framework is rooted in two essential principles: reasonable return and the economic sustainability of the SES, (2) the dynamic nature of the reasonable rate of the return.[868] Claimants' documentation (investment dates, banking finance agreements, the

---

[860] RPHB-II § 40.

[861] R-II § 1169; *Eiser v. Spain*, § 382 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[862] R-II § 1172; *Eiser v. Spain*, §§ 372, 387 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[863] R-II § 1170; *Isolux*, § 788 **[CL-0004]** / **[RL-0076]**.

[864] RPHB-I §152; *Antin*, §§ 559 – 560 **[CL-0222]**.

[865] RPHB-I § 153; *Eiser*, p. 147 – 148 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Novenergia*, §§ 671 – 681 **[CL-0213]**.

[866] RPHB-I §§ 197 – 198.

[867] *Id*. at §§ 199 – 203; *Antin*, §§ 70, 158 – 160, 223 *et seq*., 559 – 560 **[CL-0222]**.

[868] RPHB-I §§ 138 – 142; *Charanne*, §§ 502 – 512 **[CL-0030]** / **[RL-0049]** (RD 661/2007 and 1578/2008 can be modified without violating the expectations of an investor); *Eiser v. Spain*, § 102, 106, 108 **[CL-0148]** / **[RL-0077]** / **[RL-0078]** (*acknowledging* dynamic nature of RD 661/2007, without analyzing the consequences of regulatory hierarchy or the guarantee of reasonable return); *Novenergia*, §§ 672, 673, 688 **[CL-0213]**; *Isolux* **[RL-0004]** /

due diligence reports submitted) show that Claimant was fully aware of these principles, and their contracts and other internal documents show that Claimants knew of the possibility of regulatory change in Spain that would affect the Special Regime for RE producers.[869]  According to Respondent, the 28 January 2009 no recourse long-term financing agreement between Deutsche Bank and OperaFund expressly provides for the existence of regulatory risk and establishes agreements in numerous clauses in the event of the amendment of the remunerative regime or its legal interpretation by the case-law.[870]

478.    Respondent provided the following explanation for why the Tribunal should not extrapolate the findings in *Eiser* to the present case:

> *In addition,[sic] to the flaws, errors and inconsistencies mentioned in the above sections, the Eiser award constitutes a clear example of "bad law" since (a) its finding that Spain's regulatory measures breached the FET standard is in contradiction with its findings that Spain has a sovereign right to regulate and change the regulatory regime (and that the Eiser Parties had no right or expectation to stabilization of that regime); its finding that the measures were in breach of the FET standard was premised on the supposedly severe economic impact of the post-June 2014 "New Regime", which was deemed "more drastic" than the earlier, "piecemeal" measures implemented under Law 15/2012 and RDL 2/2013, even though the individual impact of the various Disputed Measures had never been quantified, and thus there was no factual or legal basis for the Tribunal's conclusion' and (c) the Tribunal failed to apply the FET standard of Article 10(1) of the ECT, employing an expropriation-based analysis focusing on destruction of value, even though it declared FET to be "the most appropriate legal context" and it never addressed the expropriation claim. For all the reasons, the Respondent encourages this Arbitral Tribunal to completely ignore this flawed award, when resolving the present dispute.[871]*

### c.    European Commission

479.    Should the Tribunal consider that it is competent to hear the case, the EC invites the Tribunal to interpret the FET standard and the umbrella clause harmoniously with EU law.  In that context, the Spanish Supreme Court, as an ordinary judge of EU law, has found that the principles of non-

---

[RL-0076] (principle of reasonable return is the limit on the Government's regulatory power).

[869]  R-II §§ 1138 – 1139.

[870]  *Id*. at §§ 657 – 658.

[871]  RPHB-I § 190.

retroactivity and legitimate expectations have not been violated by the Contested Measures and that, in principle, there can be no legitimate expectation regarding unlawful State Aid.[872]

### d. The Tribunal

480. Of the many arguments submitted by the Parties regarding FET and legitimate expectations, including those submitted in the many other similar arbitrations between investors and Spain on which the Parties have commented particularly in reply to the questions raised by the Tribunal in section 2.1.2.b. of PO-6, the present Tribunal will only focus on those issues which it considers determinative for its decision in the present case.

481. Claimants focus on RD 661/2007 as creating their legitimate expectations coupled with various separate assurances and promises. Legitimate expectations require reasonable reliance of investors on host state acts; the more specific they are directed towards the investors the more likely they can be considered to be reasonable and thus protected. The Tribunal considers that it is crucial to establish whether RD 661/2007 itself contained a stability promise or otherwise whether the assurances were indeed given by appropriate high-level organs of the state.

482. Article 44(3) of RD 661/2007 provides:

> *The revisions of the regulated tariff and the upper and lower limits indicated in this section shall not affect facilities for which the commissioning certificate had been granted prior to January 1 of the second year following the year in which the revision had been performed.*

483. In view of this provision, for the present case, the RAIPRE registration is an important additional element in order to assess the legitimate expectations of the investors. In this respect, the Tribunal notes the view of the *Masdar* tribunal, which expressly left open the possibility that Article 44(3)'s stabilization promise could constitute a "*specific commitment*" by Spain, which would create "*legitimate expectations that the benefits granted by RD661/2007 would remain unaltered.*"[873] Such a stabilization promise could be perfected by the registration of the RE plants to receive the preferential FIT under RD 661/2007. However, the *Masdar* tribunal did not need to decide whether

---

[872] EC § 150.

[873] *Masdar*, § 489 – 503; 521 **[CL-0220]**; *compare Philip Morris Brands SÀRL, Philip Morris Products S.A. and Abal Hermanos S.A., Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7 Final Award 8 July 2016 (hereinafter "*Philip Morris v. Uruguay*"), § 426 **[RL-0088]**.

the legislative commitment alone could give rise to legitimate expectations, because there were other commitments.

484.  Claimants' investments were made between July 2008 and July 2009, in reliance upon the fact that the PV plants were finally registered in the RAIPRE under RD 661/2007 and granted the RD 661/2007 FIT economic rights.  Thus, the formal registration led to the investors' entitlement to receive the benefits under RD 661/2007 (including not being subject to regulatory change).

485.  The Tribunal, therefore, has no doubt that the stabilization assurance given in Article 44(3) is applicable for the investments by Claimants. Indeed, it is hard to imagine a more explicit stabilization assurance than the one mentioned in Article 44(3):  "*revisions [...] shall not affect facilities for which the functioning certificate had been granted*."  As put by the *Novenergia* tribunal, "*RD 661/2007 was so adamantly clear that its understanding by common readers did not require a particularly sophisticated analysis*."[874]  The Tribunal, thus, agrees that investors could perfect a right to the remuneration set forth by the Spanish legislator, and this is consistent with the Spanish legislator's expressed intention:  changes in law were, indeed, contemplated within the express text of RD 661/2007 by its reference to "*revisions*", and the contemplated effect of such changes were that these "*shall not affect facilities for which the functioning certificate has been granted*."  There is no question as to the State's right to regulate, which has not been challenged.  There is no dispute that the laws changed in the past and would change in the future.  This was expressly contemplated and accounted for within Article 44(3) of RD 661/2007, which laid out the consequences of such changes.  Taken in this context, Article 44(3) of RD 661/2007 contained an express stability commitment that served its purpose of inducing investment in part by shielding investors in Claimants' position from legislative or regulatory changes (including the ones complained of in this matter).  The Tribunal, thus, respects the legislative authority of the Respondent State by giving effect to each of the terms in Article 44(3) of RD 661/2007, including its assurance that "*revisions [...] shall not affect facilities for which the functioning certificate had been granted*[.]"  The Claimants must have been able to rely on the measures aimed at encouraging the use of renewable and other new technologies and at inducing and protecting their investment. The Tribunal notes that its interpretation of Article 44(3) RD 661/2007 is also shared by other tribunals.  For instance, the *Novenergia* tribunal found that the Spanish legislation and regulation *"created a very favourable investment. climate for [renewable energy] investors, and*

---

[874] *Novenergia*, § 679 [**CL-0213**].

the nucleus of such investment climate was the Special Regime"[875] which included "*statements or assurances*"[876] which in the view of that tribunal "*were indeed aimed at incentivising companies to invest heavily in the Spanish electricity sector*" – mostly through a guaranteed Feed-in-Tariff (FIT) in Royal Decree (RD) 661/2007 – and the tribunal found "*that the Claimant made its investment in reliance of the terms provided in RD 661/2007.*"[877] This led the *Novenergia* tribunal to conclude that the investor's "*initial expectations were legitimate since there was nothing to contradict the guaranteed FIT in RD 661/2007 [...]. In other words, the Tribunal concludes that the Claimant had a legitimate and reasonable expectation that there would not be any radical or fundamental changes to the Special Regime as set out in RD 661/2007.*"[878] Also the tribunal in *Antin* found that the Spanish regulatory regime, as a sufficiently specific one, triggered legitimate expectations of stability. It found that provisions in RD 661/2007 and other parts of the renewable energy regime were "*contemporary representations that '[f]uture tariff revisions shall not be applied to already functioning facilities' [which] give rise to legitimate expectations of the Claimants.*"[879]

486. In view of this applicability of RD 661/2007 for the Claimants' investments, it is not determinative how relevant Claimants' reliance on the Cuatrecasas Due Diligence Report of October 2007 was. However, the Tribunal notes that RD 661/2007 was the only regulation analyzed by that Report, which – while prepared for the benefit of Deutsche Bank as the developer – was later shared with Claimants.[880] The Tribunal agrees with the decision in *Novenergia*, accepting the requirement of "*an adequate due diligence prior to making its investment*", was met when it held that the investor did, in fact, "*carry out a reasonable analysis of the Spanish regulatory framework prior to its investment.*"[881] It also agrees with the assessment of the tribunal in *Antin* which held that it "*[...] must consider when the investment was made, what the circumstances were at that time and the information that the investor had or should reasonably have had, had it acted with the requisite degree of diligence*

---

[875] *Id.* at § 665.

[876] *Id*. at 666.

[877] *Id*. at 667.

[878] *Id.* at 681.

[879] *Antin*, § 552 **[CL-0222]**.

[880] Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*", of* October 2007 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

[881] *Novenergia*, § 679 **[CL-0213]**.

*(considering its expertise). In carrying out this assessment, tribunals must attempt to place themselves at the time of the investment and consider the information and conditions available at such time, and to refrain from appraising the investor's expectations with the benefit of hindsight.*"[882] It also agrees with the reasoning of the *Antaris* tribunal that the absence of "*real due diligence*" on the part of the investors would vitiate a legitimate expectations claim.[883]

487.   However, the Tribunal does not see a lack of due diligence by the Claimants.  Both Claimants did what could be expected under the circumstances and at the time of their investments by a prudent investor. Claimants' reliance on a Legal Opinion by Cuatrecasas was also sufficient at least in confirming their expectations, because the Tribunal cannot see what other better means of information they could have obtained than that provided by what seems to have been the most competent law firm for these matters in Spain. The Tribunal also does not see a conflict of interest in the law firm's acting first for Deutsche Bank or later as Claimants' counsel in these proceedings.  Rather, in view of its earlier engagement in this highly complex matter, it seems understandable that its advice was used later as well.  In that context for the relevance of the information provided it is irrelevant whether such information was provided to Deutsche Bank or to Claimants directly. The Claimants had no reason to think that the Report for Deutsche Bank was incorrect or was outdated by the time they became aware of it.  Further, a direct contact by Claimants, who were not familiar with the details of the relevant parts of Spanish law, to the Spanish authorities would certainly not have been able to provide better information. In particular, it has not been shown and cannot be argued that any further steps to achieve information would have resulted in an expectation that new measures which later were issued in 2014 were to be issued by the State which would fundamentally withdraw the assurances and benefits provided by the State such as in RD 661/2017. This reliance on RD 661/2007 is not changed by the answer given by Claimants and bank-witness during the hearing to the question raised by Arbitrator Sands[884] whether they had inquired about possible future changes of the regulations. There was no need for such an enquiry by Claimant, because Article 44(3) expressly excluded such changes by the words "*shall not affect facilities for which the commissioning certificate had been granted.*"  This conclusion is not altered by Respondent's arguments related to the alleged understanding of other participants in the RE market (many of which have brought claims against Spain), Respondent's views

---

[882] *Antin*, § 537 **[CL-0222]**.

[883] *Antaris Solar GmbH and Dr. Michael Göde* v. *Czech Republic*, PCA Case No. 2014-01, 2 May 2018, § 434.

[884] Tr. Day 2 at pages 63 – 73 (exchange between Philippe Sands and Peter Kofmel) and pages 73 – 74 (exchange between August Reinisch and Peter Kofmel).

on EU state aid law, and the Claimants' internal documents that Respondent argues show awareness of regulatory risk.

488.    The Tribunal is not persuaded by Respondent's contention that the reasonable expectation varied between rates of return of 1.5 and 2% both in the case of Deutsche Bank and in the case of Claimants. Deutsche Bank and the Claimants planned to invest in the plants with the 6.7 – 8.2% return range, by staggering PV plants to legitimately optimize FIT remuneration.[885]    RD 661/2007, however, put an end to the difference in remuneration, and fundamentally changed and assured the profitability of the investments.[886]

489.    Further, the Tribunal is aware and shares the view of the Tribunals in *Antin*, *Masdar*, *Novenergia*, and *Eiser* which also rejected Spain's defense based on the "*reasonable return*" argument.[887]    *Antin* and *Eiser* rejected Spain's defense based on the Tariff Deficit.[888]

490.    In view of the above considerations, the Tribunal concludes that Respondent breached the legitimate expectations of Claimants and therefore breached the FET commitment provided in Article 10(1) ECT, by enacting the Disputed Measures, (*i.e.* RD 1565/2010, RD 14/2010, Act 2/2011; RD-Law 2/2013; RD-Law 9/2013, Act 24/2013, RD 413/2014, and MO IET/1045/2014).

### e.    The Majority's Comment on Prof. Sands' Dissent

491.    The majority fully understands that sometimes one member of a tribunal concludes that it should express its disagreement with certain aspects of the reasoning of the other two members. Regarding the Dissent by Co-Arbitrator Prof. Sands, the majority feels it should point out the following: First of all, paragraphs 4 and 480 are recalled which clarify that, throughout this Award, the Tribunal, without repeating all the arguments advanced by the Parties, addresses only what the Tribunal considers to be the determinative factors required to decide on the Requests of the Parties, and that, regarding FET

---

[885] Cuatrecasas, "Opinion in the interest of Deutsche Bank. Applicable structure for PV projects in Spain*", of July 2006, §§ 2.1, 8.3, 10.1 **[C-0211]** / **[Document 07 CWS-LB]** / **[Document 08 CWS-PK]**.

[886] Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*", of October 2007, § 8.3 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

[887] *Antin*, §§ 561 – 568 **[CL-0222]**; *Masdar*, §§ 521 – 522 **[CL-0220]**; *Novenergia*, §§ 666 – 669 **[CL-0213]**; *Eiser v. Spain*, §§ 389 – 406 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[888] *Antin*, §§ 569 – 572 **[CL-0222]**; *Eiser v. Spain*, § 371 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

and legitimate expectations, the present Tribunal only focuses on those issues, including those in the many other similar arbitrations between investors and Spain on which the Parties have commented particularly in reply to the questions raised by the Tribunal in section 2.1.2.b. of PO-6, which it considers determinative for its decision in the present case. The Dissent partly contains a different evaluation of the evidence and of the legal reasoning. However, also, in so far as the Dissent refers to reasoning in the Award, a mere re-reading of that reasoning in the Award shows that a number of such references are incorrect, out of context, or misleading. In particular, the Dissent several times alleges that the Award does not take into account the relevant case law. In fact, the Award does refer to and relies on the by now many awards issued in the parallel Spanish renewable energy cases addressing almost the same factual and legal scenarios as in the present case while the Dissent relies on cases dealing with very different factual and legal scenarios without explaining why these should nevertheless be more relevant for and prevail for the present case over the awards in the Spanish cases. Further, contrary to what the Dissent alleges, the Award (in paragraphs 481 to 485) does explain the legal standard for legitimate expectations as part of FET in the ECT and refers to respective jurisprudence on the same Spanish measures in what it considered the closest comparable cases. Further, contrary to what is said in the Dissent, the Award (in paragraphs 486 and 487) does explain why it evaluates the evidence in the file to the effect that sufficient due diligence was applied by the Claimants and why it sees no conflict regarding the involvement of the Cuatrecasas law firm. Finally, while the Dissent claims that the Award does not respect the decisions of the Spanish courts, it fails to explain why these should change the reasoning of the present Tribunal regarding the application and interpretation of the ECT. The Tribunal need not and does not take any view as to the correctness of the decisions of the Spanish Supreme Court, which the Parties agree the Tribunal must accept as fact.[889]  The majority agrees with Claimants' view that the cited Spanish Supreme Court decisions that were issued before Claimants' investment concerned issues and laws that are not relevant to the interpretation of Article 44(3) of RD 661/2007,[890] and cannot be applied thereto by analogy. [891]  The

---

[889] R-II § 100; C-II § 59.

[890] *See e.g.* Judgment from the Third Chamber of the Supreme Court, of 15 December 2005 **[R-0117]** (analysis limited to the validity of RD 436/2004); Judgment from the Third Chamber of the Supreme Court dated 25 October 2006, appeal 12/2005, reference El Derecho EDJ 2006/282164 (Spanish) **[R-0118]** (*concerning* an administrative appeal seeking annulment of provisions of RD 2351/2004); Judgment from the Third Chamber of the Supreme Court, 20 March 2007, Appeal 11/2005 EDJ 2007/18059 **[R-0119]** (*concerning* RD 2392/2004); Judgment from the Third Chamber of the Supreme Court, 9 October 2007, Appeal 13/2006 EDJ 2007/175313 **[R-0120]** (*relating* to an administrative appeal of provisions of RD 1454/2005, amending RD 436/2004).

[891] Judgment from the Third Chamber of the Supreme Court, 3 December 2009, Appeal 151/2007 EDJ 2009/307349

later occurring Supreme Court judgments are not relevant to the question of Claimants' expectations at the time of investment in 2008 and 2009.[892] Finding them irrelevant, the Tribunal makes no statement whatsoever as to the correctness of those decisions.

### 2. Breach Regarding Stable Conditions

#### a. Claimants' Arguments

492.  Respondent agrees that the FET standard in the ECT includes an obligation to provide "*stable and equitable conditions*."[893]  The FET standard prohibits the state from acting arbitrarily against a foreign investment.[894]  Consequently and as confirmed in arbitral case law, radical changes to the regulatory framework existing at the time of investment constitute a blatant violation of the FET.[895]  Investors are entitled to believe that the regulatory framework will remain stable and consistent over time, especially when investing in a state like Spain – an EU Member State, a member of the OECD, and a defender of investor-state dispute resolution – that has conditions of seriousness and reliability as an investment friendly state.[896]  The importance of the stability of the regulatory framework applicable

---

[R-0121]; Judgment from the Third Chamber of the Supreme Court, 9 December 2009, rec. 152/2007, reference El Derecho EDJ 2009/307357 [R-0122].

[892]  C-I § 191; *see also* fn 198; Judgment from the Third Chamber of the Supreme Court of 25 June 2013 (RJ/2013/5644) appeal 259/2012 [R-0131]; Judgment 63/2016, of 21 January 2016, of the Supreme Court handed down in cassation appeal 627/2012 [R-0135].

[893]  C-I §§ 508 – 510; C-III § 16; *Charanne*, §§ 477, 484, 483 [CL-0030] / [RL-0049]; Energy Charter Secretariat, *Decision of the Energy Charter Conference, Subject: Road Map for the Modernisation of the Energy Process*, 24 November 2010 [CL-0032].

[894]  C-I §§ 697 – 699; Patrizia *et al*, 78 [CL-0002]; *Charanne*, §§ 514, 517 [CL-0030] / [RL-0049]; Salacuse, *The Law of Investment Treaties*, 261 [CL-0047]; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.74 [CL-0094] / [RL-0002].

[895]  C-I §§ 700 – 704; *BG v. Argentina*, § 307 [CL-0075] / RL-0061]; *Total v. Argentina*, §§ 309, 333 [CL-0106]; *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary* (ICSID Case No. ARB/03/16), Award, 2 October 2006 (hereinafter "*ADC v. Hungary*"), § 423 [CL-0111]; *CMS Gas Transmission Company v. The Republic of Argentina* (ICSID Case No. ARB/01/8) Award, 12 May 2005 (hereinafter "*CMS v. Argentina*"), § 277 [CL-0112]; N. Blackaby and R. Teitelbaum, "Utilities, Government Regulations and Energy Investment Arbitrations", in J.W. Rowley (Gen. Ed.), *The Guide to Energy Arbitrations*, Global Arbitration Review, London, 2015, p. 69 [CL-0113].

[896]  C-I §§ 648 – 650, 652, 665, 685 – 689; Interview to H.E. Mr. Mariano Rajoy Brey, President of the Government, *Televisión Española*, 26 October 2015 [C-0178]; Diary Sessions of the Lower House of Parliament, year 2011, IX Legislative term, No. 219, 26 January 2011, 57 [C-0189]; Diary Sessions of the Upper House of Senate, year 2012 X Legislative Term, No. 43, 17 April 2012, 21 [C-0190]; Patrizia *et al*, 73 [CL-0002]; *El Paso v. Argentina*, § 360 [CL-0017] / [RL-0041]; *Charanne*, § 486 [CL-0030] / [RL-0049]; R. Dolzer, "Fair and Equitable Treatment: Today's Contours", *Santa Clara Journal of International Law*, Vol. 12 (2014), 17 [CL-0091]; *Duke Energy v.*

to the PV Installations was highlighted by Dr. Pedro Marín Uribe, Secretary of State for Energy, during a speech in Los Angeles (California) before US investors on 26 October 2009.[897] Since regulatory stability is a decisive factor for foreign investors, denying the FET's role in terms of stability and consistency would be incompatible with the spirit of international investment treaties like the ECT.[898] The numerous and radical changes to the regulatory framework which the Respondent adopted between November 2010 and June 2014 against the PV Installations have breached Claimants' legitimate expectations of the stability of the regulatory framework.[899]

493. So-called "*roller coaster*" changes in law (i.e. "*consecutive changes in law that occur within a relatively short period of time*") are inconsistent with the expectation of stability and consistency because "*stability cannot exist in a situation where the law kept changing continuously and endlessly*."[900] Such changes have been equated with the taking of simultaneous but inconsistent positions by the host state.[901]

494. Respondent breached Article 10(1) of the ECT because it changed the essential characteristics of the regulatory framework.[902] The unforeseeable "*roller-coaster*" of legislative changes introduced since November 2010 were contrary to stability and consistency[903] and represented a continued violation of the FET standard.[904] Respondent breached Claimants' legitimate expectations by amending and replacing this framework with a new one that "*was based on antagonistic regulatory principles,*

---

*Ecuador*, § 340 [**RL-0033**] / [**CL-0102**]; U. Kriebaum, "The Relevance of Economic and Political Conditions for Protection under Investment Treaties", *The Law and Practice of International Courts and Tribunals*, vol. 10, 2011, 387 – 390 [**CL-0107**] (*referring* to cases involving factually different situations); *Generation Ukraine Inc. v. Ukraine* (ICSID Case No. ARB/00/9), Award, 15 September 2003, § 20.37 [**CL-0108**]; *Saluka v. Czech Republic*, §§ 358 – 360 [**CL-0109**] / [**RL-0083**]; Bauermeister Statement §§ 12, 20, 25, 34.

[897] C-I § 651; Speech by Dr. Pedro Marín Uribe, Secretary of State for Energy, US-Spain Business Sustainability Forum, Los Angeles CA, USA, 26 October 2009 [**C-0187**].

[898] C-I § 652.

[899] *Id*. at §§ 637, 510 (*saying* 2012).

[900] *Id*. at § 660; *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Tikaret Limited Sirketi v. Republic of Turkey* (ICSID Case No. ARB/02/5), Award, 19 January 2007 (hereinafter "*PSEG v. Turkey*"), §§ 250, 254 [**CL-0105**].

[901] C-I §§ 659 – 661, *see e.g. Total v. Argentina*, § 121 [**CL-0106**]; *El Paso v. Argentina*, §§ 364, 375 [**CL-0017**] / [**RL-0041**]; K. J. Vandevelde, "A Unified Theory of Fair and Equitable Treatment", *International Law and Politics*, Vol. 43, 2010, 68 – 69 [**CL-0092**].

[902] C-I § 479(i); C-III § 403, 427, 429 (*explaining* that prior to the reforms, Respondent was consistent and transparent).

[903] C-I §§ 721, 732; *PSEG v. Turkey*, § 250 [**CL-0105**].

[904] C-I § 717; Report 18/2013, 5-6 [**C-0192**]; *Micula v. Romania*, § 687 [**RL-0028**] / [**CL-0099**].

*carrying out 'mid-stream' a 'paradigm change' on the PASO and ECO 3 Projects*." In *Eiser*, the tribunal found that Spain's measures did not maintain the essential nature of the existing regulatory framework, but instead replaced it with a new and untested regulatory approach aimed at unfairly and inequitably reducing subsidies to existing plants.[905]

495. The reforms produced a new and unique regulatory system that has had a negative effect on legal security and investment opportunities in Spain, contrary to best regulatory practices.[906] The Specific Remuneration is insecure, as it will be subject to full revision every three or six years.[907] Respondent's behavior sharply contrasts with that of Germany, the co-founder of IFIC who has, with Spain, actively promoted the Feed-In model for renewable energy facilities.[908]

496. Claimants state that RD-Law 14/2010 included a cap on the hours of production (equivalent hours of operation) that could benefit from the FIT and extended the operational life of a PV plant to 28 years. The implementation of the cap constituted a retroactive tariff cut and ended the stability of Claimants' investment.[909]

497. After the Hearing, Claimants explained that the "Dynamic Return Fallacy" is incompatible with a coherent interpretation of RD 661/2007 and Act 54/1997.[910] Article 30(4) of Act 54/1997 does not determine how Respondent should ultimately provide investors a "*reasonable return*" by reference to

---

[905] C-III § 16; *Eiser v. Spain*, §§ 365, 391 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[906] C-I §§ 724 – 731; REN21, *Global Status Report Renewables 2016*, 61 **[CL-0004]**; *Global Status Report Renewables 2015*, pp. 60, 64, 88 **[CL-0005]**; Frankfurt School-UNEP Centre/BNEF (2013), *Global Trends in Renewable Energy Investment 2013*. Key Findings, 2013, 11, 13 **[CL-0114]**; Frankfurt School-UNEP Centre/BNEF (2014), *Global Trends in Renewable Energy Investment 2014* (excerpts), 13, 19 **[CL-0115]**; Frankfurt School-UNEP Centre/BNEF (2015), *Global Trends in Renewable Energy Investment 2015*, 52 **[CL-0116]**; Frankfurt School-UNEP Centre/BNEF (2016), *Global Trends in Renewable Energy Investment 2016*, 15, 19, 23, 25, 50 **[CL-0117]**; *Commission Staff Working Document – European Commission guidance for the design of renewables support schemes* SWD(2013) 439 final, 5 November 2013, 5 **[CL-0118]**; WindEurope Position Paper, "Statement of the Investment Protection Coalition", September 2016, 1 **[CL-0119]**; Brattle, Regulatory Report, §§ 229 – 230 **[CER-0001]**.

[907] C-I §§ 722 – 723; Bauermeister Statement, §§ 91 – 92.

[908] C-I §§ 690 – 691; Joint Declaration of the IFIC organization between the Ministry of Industry, Tourism and Trade of the Kingdom of Spain and the Federal Ministry of the Environment, Nature Protection and Nuclear Safety of the Federal Republic of Germany, signed in Madrid on 6 October 2005, Clauses 1 and 2, p. 2 **[C-0073]**; RD 1544/2011 **[C-0118]**.

[909] C-I § 16, 280 – 281; Brattle, Regulatory Report, § 143 **[CER-0001]**.

[910] CPHB-I § 27.

the cost of money on the capital markets.[911]  It is not a stand-alone provision, as Respondent concedes.[912]  The development of the section, could have been achieved by (1) setting the feed-in remuneration according to the cost of money on the capital markets when Respondent made its regulatory offer, only to be updated for inflation or (2) setting up a system where FITs were going to be updated on a regular basis.  Respondent opted for Option (1) when creating RD 661/2007.  There, Respondent put into place a regime defining and fixing feed-in values according to the cost of money on capital markets at that point in time, and provided that those values would be updated annually according to inflation.[913]  RD 661/2007 set remuneration for the lifetime of the plant.[914]  Through its regulatory offer, Respondent assumed an obligation of regulatory stability, which resulted in the boosting of renewable investments in Spain and gave rise to legitimate expectations of stability under the ECT.[915]

498.  Claimants noted that the tribunals in *Antin*, *Masdar*, *Novenergia*, and *Eiser* agreed that Article 10(1) of the ECT included an obligation to provide fundamental stability of the economic and legal regime in place, and that the FET protected against changes in the "*essential characteristics of the regulatory regime relied on by the host state*."[916]  Those tribunals also confirmed that the investors' legitimate expectations be based on commitments made by the host state,[917] and found that Spain removed the essential characteristics of the regulatory regime relied on by investors,[918] and breached the FET standard through the 2013 – 2014 Measures.[919]  *Masdar* also found a breach for the 2012 – 2013

---

[911] *Id*. at § 28; Tr. Day 3, 60:4-12 (Brattle, Dr. Garcia).

[912] CPHB-I § 28; C-I § 338.

[913] CPHB-I § 30; C-III: 179 – 183, Tr. Day 3, 61:5-12, Brattle Regulatory presentation (Day 3), slide 5; Brattle, Regulatory Rebuttal Report, §§ 27 – 37 **[CER-0003]**.

[914] CPHB-I § 30; *Antin*, § 568 **[CL-0222]** ("*objective criteria*"); RD 661/2007, Art. 17, 36, 44(3) **[R-0071]** / **[C-0046]**.

[915] CPHB-I § 31.

[916] *Id*. at page 44 (line 3), *citing Antin*, §§ 536 – 550 **[CL-0222]**; *Masdar*, §§ 489 – 511 **[CL-0220]**; *Novenergia*, §§ 654 – 656, 694 – 697 **[CL-0213]**; *Eiser*, §§ 363, 382 – 387 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[917] CPHB-I page 44 (line 4), *citing Antin*, §§ 536 – 550 **[CL-0222]**; *Masdar*, §§ 489 – 511 **[CL-0220]**; *Novenergia*, §§ 650 – 652, 662 – 681 **[CL-0213]**; *Eiser*, § 387 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[918] CPHB-I page 45 (line 6); *citing Antin*, § 560 **[CL-0222]**; *Masdar*, § 521 – 522 **[CL-0220]**; *Novenergia*, §§ 694 – 697 **[CL-0213]**;  *Eiser*, §§ 388 – 418 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; CPHB-I page 48 line 3 *citing Isolux*, §§ 773 – 781 **[RL-0004]** / **[RL-0076]**; *Charanne*, § 514 **[CL-0030]** / **[RL-0049]**.

[919] CPHB-I page 46 (line 9); (*citing Antin* **[CL-0222]**; *Masdar* **[CL-0220]; ** *Novenergia* **[CL-0213]**; *Eiser* **[CL-0148]** / **[RL-0077]** / **[RL-0078]**).

Measures.[920]  While this was not addressed by the *Isolux* tribunal, the *Charanne* tribunal, in considering claims only about the 2010 – 2011 measures, did not find a breach.  Claimants explain that *Charanne* is distinguishable from the present matter, and noted that the tribunal appeared to not have considered Article 44(3) of RD 661/2007.[921]

### b. Respondent's Arguments

499.  By reference to Article 2 of the ECT, Article 2 of the European Energy Charter should be considered as an applicable regulation.  The ECT establishes protection measures for investments and investors that limit the regulatory power of the signatory States to achieve that objective.  Arbitral precedent confirms that the efficiency of the market, the interest of the investors, and the burdens of the consumers in the energy market must be weighed.[922]  The ECT does not prevent States from exercising macroeconomic control power.[923]

500.  Precedents applying the ECT incorporate the guarantee of granting stable and transparent conditions within the FET standard.[924]  States may adopt reasonable and proportionate macroeconomic control measures to avoid distortions of the market, even if such affect the returns of investors.[925]  In the absence of a specific commitment to stability, an Investor cannot have an expectation that a regulatory framework will not be amended.  While Article 10(1) alludes to "*stable conditions*", States that are party to the ECT are not required to maintain a predictable regulatory Framework during any investment.[926]  Maintaining stable conditions cannot be understood as the ECT requiring the

---

[920]  CPHB-I page 46 (line 9) (*citing Masdar* [CL-0220]).

[921]  CPHB-I page 48 (line 4); *Charanne*, §§ 481 – 482 [CL-0030] / [RL-0049].

[922]  R-II §§ 1105 – 1107; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.165 [CL-0094] / [RL-0002].

[923]  R-I § 983; R-II § 1059; ECT, Title 1 "OBJECTIVES" [RL-0006]; "The Energy Charter Treaty and Related Documents", 17 December 1991, Consolidated version, 8 [RL-0073].

[924]  R-II §§ 1077 – 1081; *Plama v. Bulgaria*, § 173 [CL-0011] / [RL-0034]; *Charanne*, § 477 [CL-0030] / [RL-0049].

[925]  R-II §§ 31, 1034.

[926]  *Id.* at §§ 1063 – 1067; R-I §§ 998 – 1003, 1008, 1009; *see e.g. Isolux*, § 788 [RL-0004] / [RL-0076]; *Plama v. Bulgaria*, § 219 [CL-0011] / [RL-0034]; *AES v. Hungary*, § 9.3.25 [RL-0039] (*upholding, see AES v. Hungary*, Decision on Application for Annulment, § 95 [RL-0042]); *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.165 – 7.166 [CL-0094] / [RL-0002]; *Charanne*, §§ 493, 510, 483 [CL-0030] / [RL-0049]; "*Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice*", T W Wälde (2004) 1 Transnational Dispute Management (English version), 2 [RL-0054] ("*A general stabilisation requirement would go beyond what the investor can legitimately expect.*").

grandfathering of regulatory frameworks for investors, such that any changes in the regulatory framework are deemed unforeseeable or arbitrary.[927]  Interpreted in its context and in accordance with its subject matter (i.e. energy, a strategic and highly regulated sector), it is not realistic for the Parties to the ECT to have agreed to provide an *Insurance Policy*" to foreign investors that would protect them against regulatory reforms adopted for reasons of public interest.  The ECT's application of National Treatment and FET must consider the established facts and interests of (1) investors, (2) States, and (3) consumers.

501.  Respondent adopted the Disputed Measures in compliance with the European Council's recommendations of March 2012 and the MoU signed with the EU on 20 July 2012. [928] The Disputed Measures provide national and foreign investors a guaranteed reasonable return within the framework of a sustainable SES.[929]  They are not retroactive according to international arbitration case law,[930] Spanish domestic case law or scientific doctrine,[931] or the criterion of RE Sector Associations or of other investors, such as Iberdrola.[932]  Claimants had no right to remuneration by means of a fixed

---

[927] R-I §§ 1084 – 1085; "*Fair and Equitable Treatment in Arbitral Practice*", C. Schreuer, 2005, Journal of World Investment & Trade ("Schreuer"), 365 **[RL-0056]**; *compare* C-I § 721.

[928] R-I §§ 1011 – 1013; Council Recommendation of 10 July 2012 on the 2012 National Reform Programme of Spain and delivering a Council opinion on the Stability Programme of Spain, 2012 – 2015 **[R-0029]** ("*to address the tariff deficit of the electricity sector globally, in particular by improving the return of the electricity supply chain*"); MoU signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*" **[RL-0067]** (to "*correct[] macroeconomic imbalances … and address the electricity tariff deficit in a comprehensive way*").

[929] R-I § 1014.

[930] *Id.* at §§ 1101 – 1105; R-II §§ 1189 – 1190; *Case of Nations Energy Inc. and others v. Republic of Panama,* ICSID Case No. ARB/06/19, 24 November 2010, §§ 642, 644, 646 **[RL-0040]** (*discussing* "*retroactivity*"); Act 24/2013 **[C-0116]** / **[R-0047]** (*excluding* claims for remuneration received prior to 14 July 2013 from the new remuneration model); *Charanne*, §§ 546, 548 **[CL-0030]** / **[RL-0049]** ("[…] *there is no principle of international law preventing a State from adopting regulatory measures with immediate effect on ongoing situations*"); *Isolux*, § 814 **[RL-0004]** / **[RL-0076]**.

[931] R-I §§ 1109 – 1111; Opinion no. 937/2013 of the Standing Committee of the Council of State, of 12 September 2013, on the Electricity Sector Bill, published in the Official State Gazette **[R-0096]**; Judgment from the Third Chamber of the Supreme Court, 9 December 2009, rec. 152/2007, reference El Derecho EDJ 2009/307357 **[R-0122]**; Judgment from the Constitutional Court of 17 December 2015, passed in unconstitutionality appeal no. 5347/2013 **[R-0136]**; Judgment from the Constitutional Court of 18 February 2016, passed in unconstitutionality appeal no. 5852-2013 **[R-0137]**; Judgment from the Constitutional Court of 18 February 2016, passed in unconstitutionality appeal no. 6031-2013 **[R-0138]**.

[932] R-I §§ 1097 – 1099, 1112.

FIT.[933] RD-Law 9/2013 expressly respects the remuneration received by facilities.[934] As confirmed in *Charanne* and *Isolux*, the Disputed Measures do not violate international law because reform applies only toward the future without affecting consolidated rights.[935]

502. It is undisputed that MO 1045/2014 did not represent a reduction of the investment costs of standard facilities with respect to the costs considered by PER 2005 – 2010 and that Claimants' PV Plants' costs are aligned with those assigned by the MO.[936] Further, Brattle assumed that the methodology of RD 661/2007, contained in PER 2005-2010, always considered (1) a limited equivalent operating hours and a limited regulatory useful life.[937] Claimants' main criticisms to the disputed measures were inherent to the supportive scheme in force at the time of the investment.[938] The change in CPI implemented by RD-Law 2/2013 was not a radical or unexpected change, since each prior RD used a different yearly index or update.[939] Thus, the Disputed Measures imply continuity in (1) the essential elements of the supportive schemes, (2) the inherent methodology and (3) purpose of obtaining a reasonable rate of return in the context of a sustainable SES. Thus, they comply with the stable conditions of Article 10(1) of the ECT.[940]

503. Through the Disputed Measures, Respondent granted stable conditions to the Claimants according to the ECT: it maintained the essential nature of the Regulatory Framework in which Claimants invested, including: the priority of access and dispatch, the payment of subsidies, the reasonable rate of return, and the methodology used in 2000 and 2005. Following the Disputed Measures, the

---

[933] *Id*. at §§ 1100, 1106; R-II § 1191; *Charanne*, §§ 509 – 510 **[CL-0030] / [RL-0049]**.

[934] Act 24/2013 **[C-0116] / [R-0047]**.

[935] R-I §§ 1090 – 1092, 1105 – 1108; R-II §§ 1192 – 1196; *Isolux*, §§ 787, 813 – 815 **[RL-0004] / [RL-0076]**; *Charanne*, §§ 509 – 510, 546, 548 **[CL-0030] / [RL-0049]**.

[936] RPHB-I § 45; Respondent's Closing, Slide 49; MO IET/1045/2014, §§ 88 – 89 **[R-0086] / [C-0126] / [C-0126bis]**.

[937] RPHB-I § 46; C-III §§ 465 – 515; Respondent's Closing, Slides 44, 46-47; Tr. Day 3, 133:16 – 135:17, 138:10-16 (Garcia); PER 2005 – 2010 **[C-0066] / [R-0092]**.

[938] RPHB-I § 46; C-III §§ 465 – 515; Respondent's Closing, Slides 44, 46-47; Tr. Day 3, 133:16 – 135:17, 138:10-16 (Garcia); PER 2005 – 2010 **[C-0066] / [R-0092]**.

[939] RPHB-I § 47; Respondent's Closing, slide 48; Tr. Day 3, 149:1-16 (Garcia).

[940] RPHB-I § 48.

subsidies that Claimants will receive throughout the regulatory life of their Plants will account for approximately 88% of their total revenue. The measures cannot be considered "*arbitrary*."[941]

504. The Hearing demonstrated that Claimants were not attracted to Spain by any campaign or alleged stabilization commitments: they invested trusting on EU regulations alone.[942] Article 44(3) of RD 661/2007 did not contain a stabilization clause, and even if it did, neither Claimant has demonstrated that an alleged clause was the basis of the investment.[943] The Brattle report acknowledged that RD 661/2007 constituted a FIT, and that the supportive scheme with the disputed Measures in place constituted a FIT system. Thus, the latter cannot be considered a radical change or wipe out.[944] Both before and after the disputed measures, the remuneration for RE in Spain depended on production level.[945]

505. Claimants' "*dynamic return fallacy*" is a misrepresentation of the economic principles of the SES. The possibility of a fixed rate of return regardless of capital markets would not comply with the "*reasonable rate of return*" principle. Spain could not set an immutable FIT under Art 30(4) Act 54/1997.[946] Claimant's investments were made during an economic crisis, and the Disputed Measures

---

[941] R-I §§ 1093 – 1096; Accuracy, Economic Report on the Claimant and its Claim (10 March 2017) ("Accuracy, First Economic Report"), § II.1 **[RER-0001]**; "*Powering the Green Economy. The feed in tariff handbook.*" Miguel Mendonça, David Jacobs and Benjamin Sovacool. Editorial. Earthscan, 2010 **[RL-0062]** (*referring* to Submission of the Draft Bill on Renewable Energy by APPA and Greenpeace to the Ministry of Industry, Tourism and Commerce (21 May 2009) **[R-0218]**).

[942] RPHB-I § 34, 39 – 40; Tr. Day 1, 81:4-11 (Claimants' Opening); Claimants' Opening, slide 12; Respondent's Closing, slides 36 – 38; Tr. Day 2, 46:3-16, 49:1-4, 48:6-25 (Kofmel).

[943] RPHB-I § 19(i); 143 – 148 (explanatory); R. Closing slides 34 – 35; Tr. Day 3, 39:5-18 (Montoya); Tr. Day 3, 129:1-8 (Garcia); *see also Charanne*, p. 778, 807 **[CL-0030] / [RL-0049]** (*finding* that RD 661/2007 and RD 1578/2008 do not contain commitments); *Eiser* **[CL-0148] / [RL-0077] / [RL-0078]** ("*absent explicit undertakings directly extended [...] treaties do not eliminate States' right to modify their regulatory regimes [...] Claimants could not reasonably expect that there would be no change whatsoever in the RD 661/2007 regime [...]*"); *Novenergia*, §§ 656, 688 **[CL-0213]** (*recognizing* Spain's right to regulate and that Claimants could not have reasonably expected that Respondent did not have that right); *Antin*, §§ 555 – 556 **[CL-0222]**.

[944] RPHB-I § 43; C-I § 637; Respondent's Closing, slide 43; Tr. Day 3, 95:1-13 (Garcia).

[945] RPHB-I § 44; Brattle, Regulatory Rebuttal Report, § 58 **[CER-0003]**.

[946] RPHB-II §§ 31 – 33; CPHB-I §§ 28, 30-31, Accuracy's First Economic Report, Appendix 6 **[RER-0001]**; *Charanne*, § 503 **[CL-0030] / [RL-0049]**.

were the only way to meet the compatible regulatory goals of (1) complying with Respondent's international commitments and (2) eliminating the Tariff Deficit.[947]

506.  After the Hearing, Respondent explained that the awards agree that (1) expectations must be objective and assessed at the time of investment, (2) the stable conditions of the FET standard does not prevent the State from adopting measures to adapt the regulatory framework to changes in economic and technical circumstances, and (3) measures stopped to control the Tariff Deficit and to avoid excessive charges for consumers respond to a legitimate public policy.[948]

507.  The *Masdar* Award is useless for this Tribunal because its findings are based on facts that do not concur with the case at hand.[949]  In relation to stabilization commitments, *Masdar* – opposite of the result of *Charanne*, *Isolux*, *Eiser*, and *Novenergia* – considered that Article 44(3) of RD 661/2007 and Article 4 of RD 1614/2010 contained stabilization commitments that precluded Respondent from changing its regulatory framework.[950]  The legal grounds for this decision are flawed and, factually, the pre-registration requirements applied in that case and the correspondence by the Directorate General of Energy Policy and Mines to CSP Plants do not exist in this one.[951]

### c.  The Tribunal

508.  The Tribunal agrees with both Parties and the tribunals in *Antin*, *Masdar*, *Novenergia*, and *Eiser* that Article 10(1) of the ECT includes an obligation to provide fundamental stability of the economic and legal regime in place, and that the FET protects against changes in the "*essential characteristics of the regulatory regime relied upon by investors.*"[952]

---

[947]  RPHB-II §§ 34 – 37; CPHB-I §§ 38 – 39.

[948]  RPHB-I §§ 159 – 164; *Novenergia*, p. 53, §§ 652, 686 **[CL-0213]**; *Charanne*, §§ 517 – 518, 536 **[CL-0030]** / **[RL-0049]** (*concluding* that the stable conditions of the FET allow reasonable and proportionate modifications); *Isolux*, § 823 **[RL-0004]** / **[RL-0076]** (Spain's measures were not exorbitant); *Antin*, §§ 536 – 538, 569 – 570 **[CL-0222]**; *Eiser*, §§ 371, 382 **[CL-0148]** / **[RL-0077]** / **[RL-0078]** (*explaining* that the stable conditions of FET do not involve a stabilization clause and that Respondent implemented a legitimate policy).

[949]  RPHB-I § 204.

[950]  *Id*. at § 208; *Masdar*, §§ 504, 507 **[CL-0220]**.

[951]  RPHB-I §§ 209 – 210; *Masdar*, §§ 514, 516 – 517, 520 **[CL-0220]**.

[952]  CPHB-I page 44 (line 3) (*citing Antin*, §§ 531 – 533 **[CL-0222]**; *Masdar*, §§ 482 – 484 **[CL-0220]**; *Novenergia*, § 654 – 656, 694 – 698 **[CL-0213]**, *Eiser*, §§ 363, 382 – 387 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**); *see also* R-I §§ 1087 – 1089 (*citing Plama v. Bulgaria*, § 219 **[CL-0011]** / **[RL-0034]**).

509. It is obvious that States are, in principle, free to change their regulatory framework for various business sectors. The issue is whether and to what extent the degree of the regulatory change was so radical that it amounts to a breach of the FET-inherent stability requirement. The Tribunal shares the approach formulated by the *Antin* tribunal, relying on *Charanne* and *Eiser*, which stated:

> [...] that the obligation under Article 10(1) of the ECT to provide FET to protected investments comprises an obligation to afford fundamental stability in the essential characteristics of the legal regime relied upon by the investors in making long-term investments. This does not mean that the legal framework cannot evolve or that a State Party to the ECT is precluded from exercising its regulatory powers to adapt the regime to the changing circumstances in the public interest. It rather means that a regulatory regime specifically created to induce investments in the energy sector cannot be radically altered – i.e., stripped of its key features – as applied to existing investments in ways that affect investors who invested in reliance on those regimes.[953]

510. When addressing the extent of such a change, the issue of whether the Spanish measures aimed at tackling the tariff crisis were reasonable becomes particularly relevant. Mere reliance on an existing legislative framework may not be a sufficient element for claiming breach of legitimate expectations While sympathetic to the idea that States retain much leeway in deciding on reasonable measures, such discretion does not necessarily mean that a state is free to change the rules of the game it issued itself by express codification to such an extent as to burden particularly the investors who have already made investments and are unable to exit the regulatory framework. To provide a regulatory framework that aims at attracting investors in certain business sectors by offering various incentives is a common practice in many states. Dismantling such incentives for future investments may also be possible and occurs frequently.

511. However, to do so for already existing investments to which the past incentives were the basis of investing can hardly be considered reasonable, especially when considering the legislator's express statement that the old regime should continue to apply to existing registered investments in spite of possible future changes.

512. Respondent put into place a regime defining and fixing feed-in values according to the cost of money on capital markets at that point in time, and provided that those values would be updated annually according to inflation. RD 661/2007 set remuneration for the lifetime of the plant. Through its regulatory offer, Respondent assumed an obligation of regulatory stability, which resulted in the

---

[953] *Antin*, § 532 **[CL-0222]** (citations omitted).

boosting of renewable investments in Spain and gave rise to legitimate expectations of stability under the ECT.

513.    These expectations were clearly and fundamentally changed by the Disputed Measures, for which Claimants have claimed damages and over which the Tribunal has jurisdiction (*i.e.* RD 1565/2010, RD 14/2010; Act 2/2011, RD-Law 2/2013, RD-Law 9/2013; Act 24/2013, RD 413/2014, and MO IET 1045/2014), which breached the stable conditions promised by RD 661/2007. In this regard, the Tribunal concurs with the assessment of the 2013 – 2014 Spanish measures in *Eiser* finding that "*the ECT did protect Claimants against the total and unreasonable change that they experienced*"[954] and in *Novenergia* finding that the "*radical changes enacted by the Kingdom of Spain in 2013 and 2014 have definitely abolished the fixed long-term FIT and have done so retroactively.*"[955] The Tribunal also notes that the tribunal in *Greentech*, expressly relying on *Eiser and Novenergia*, concluded that these Spanish regulatory changes were "*radical and unexpected*" and "*constituted a fundamental change to the legal and regulatory framework that crossed the line from a non-compensable regulatory measure to a compensable breach of the FET standard in the ECT.*"[956]

### 3.    Transparency and Due Process

#### a.    Claimants' Arguments

514.    By its failure to disclose the BCG and RB reports during the consultation procedures held before the enactment of the Disputed Measures, the Respondent denied investors essential information concerning the parameters of MO IET/1045/2014 and limited the effectiveness of the consultation procedures, thereby breaching the transparency, reasonableness, and due process requirements of the FET.[957] Respondent's complete elimination of the Feed-in Model designed to promote PV installed capacity and maintained until 2013 and its abrupt replacement with an entirely New Remuneration

---

[954] *Eiser*, §§ 363, 387 **[CL-0148]** / **[RL-0077]** / **[RL-0078]** (*finding* breach in the post-2013 Measures).

[955] *Novenergia*, §§ 688, 697 **[CL-0213]** (*finding* breach in the post-2013 measures, and based on its finding that the claimant in that case could not have expected regulatory stability, finding that the 2010 Measures did not amount to an FET breach).

[956] *Greentech Energy Systems A/S and others* v. *The Kingdom of Spain*, SCC Case No. V2015/150, Final Award, 14 November 2018, §§ 397 – 398.

[957] C-I § 637.

Model based on antagonistic regulatory principles implies a breach of the prohibition to act arbitrarily, also contained in the FET.[958]

515.   Transparency is part of the normative content of the FET.[959]  Per arbitral case law, it "*can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations*."[960]  A host state breaches its transparency obligations when it fails to inform the investor about intended changes in policy or regulations that may significantly affect investments or fails to enact regulations clarifying investor rights.[961]  A failure to act transparently can entail an intentionally wrongful act by omission.[962]

516.   Due process is part of the normative content of the FET.[963]  Under customary international law, a state commits an internationally wrongful act by omission if the State does not grant due process to investors.[964]  Under the Principle of Transparency contained in Article 10(1) of the ECT, the reasons for MO IET/1045/2014 should have been given in that piece of legislation or made available to investors in the administrative record, especially after they expressly requested them.[965]  Respondent

---

[958] *Id*.

[959] *Id*. at §§ 743 – 744; Patrizia *et al*, 78 **[CL-0002]**; *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan* (SCC Case No. V (064/2008)), Partial Award on Jurisdiction and Liability, 2 September 2009 (hereinafter "*Al-Bahloul v. Tajikistan*"), § 183 **[CL-0026]**; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.74 **[CL-0094] / [RL-0002]**; *Gold Reserve v. Venezuela*, § 570 **[CL-0098]**.

[960] C-I §§ 745 – 747; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.79 **[CL-0094] / [RL-0002]**; *Metalclad v. Mexico*, § 76 **[CL-0110]**; *see also* Salacuse, *The Law of Investment Treaties*, 260 **[CL-0047]**; R. Dolzer, "Fair and Equitable Treatment: Today's Contours", *Santa Clara Journal of International Law*, Vol. 12 (2014), 30 **[CL-0091]**.

[961] C-I § 748; *PSEG v. Turkey*, § 240 **[CL-0105]**.

[962] C-I § 749; ILC Draft Articles, Art. 2 **[CL-0001]**.

[963] C-I §§ 750 – 753; Patrizia *et al*, 78 **[CL-0002]**; Salacuse, *The Law of Investment Treaties*, 265 **[CL-0047]**; Institute of International Law, *Resolution on Legal Aspects of Recourse to Arbitration by an Investor Against the Authorities of the Host State under Inter-State Treaties* (Session of Tokyo, 13 September 2013), Art. 13(1) **[CL-0053]**; Schreuer, FET, 128 **[CL-0085]**; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.74 **[CL-0094] / [RL-0002]**; *Saluka v. Czech Republic*, § 308 **[CL-0109]** / **[RL-0083]**; *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/03/29), Award, 27 August 2009, § 178 **[CL-0120]**; UNCTAD, *Fair and Equitable Treatment: UNCTAD Series on Issues in International Investment Agreements II*, 2012, 81 **[CL-0121]**; J. E. Viñuales, *Foreign Investment and the Environment in International Law*, 2012, 357 – 358 **[CL-0122]**.

[964] C-I § 753; ILC Draft Articles, Art. 2 **[CL-0001]**.

[965] C-III §§ 524 – 526; Judgment of the Supreme Court (Contentious-Administrative Chamber, Section Three)

acted unreasonably and in a non-transparent manner during the law-making process of Regulatory Framework No. 3 by instructing two expert firms, BCG and RG, to calculate the standard parameters of MO IET/1045/2014 but later "*dismiss[ing] their reports because they would not support [the] desired cuts in remuneration*."[966]  The Ministry of Energy's failure to explain how it set up the economic parameters of the new regulations and to disclose their underlying calculations was incompatible with Spain's obligations of transparency under Article 10(1) ECT.[967]

517.  Brattle has confirmed that the documents produced by Respondent do not disclose the methodology used to estimate the underlying costs assumed for standard installations, nor the underlying calculations that Respondent used to derive the target reasonable return.[968]  Even if the formalities of

---

570/2017, Appeal 607/2014, of 3 April 2017, 21 **[C-0293]**.

[966]  C-III§ 280; C-I § 411.

[967]  C-I §§ 399 – 414, 754; C-III §§ 405, 520 – 522; Resolution awarding the contracts to assist the Ministry of Energy in the determination of the standard investment and operational costs for the electricity generation facilities operating under the Special Regime in Spain as well as in judicial and arbitral proceedings involving State's Central Administration, IDAE, 28 November 2013 (hereinafter "IDAE Resolution, 28 November 2013") **[C-0135]**; Press release, "La adjudicación de los informes sobre renovables a Roland Berger y Boston Consulting Group, en entredicho", *El Periódico de la Energía*, 6 April 2015 **[C-0136]**; Press release, "Pulso entre Boston y Roland con Industria por la orden de renovables", *Cinco Días*, 29 July 2014 **[C-0137]**; Press release, "Industria forzó a Roland y Boston a suscribir su recorte a las renovables", *Cinco Días*, 14 March 2015 **[C-0138]**; First draft MO IET/1045/2014, submitted to CNMC on 31 January 2014 **[C-0139]** / **[C-0286]**; Press release, "Las renovables, contra el recorte de Industria con 'datos inventados'", *Expansión*, 13 March 2015 **[C-0140]**; Press release, "El recorte a las renovables se basó en un informe inexistente", *El País*, 13 March 2015 **[C-0141]**; Press release, "Roland Berger dice lo que Industria quería oír: misma TIR, critica las ventajas del Decreto 661 y a la CNMC", *El Periódico de la Energía*, 16 March 2015 **[C-0142]**; Press release, "Criticas a Soria por ocultar el informe que justificaba el recorte a renovables", *El País*, 13 March 2015 **[C-0143]**; Roland Berger's Failed Report "Análisis de estándares de proyectos de producción de electricidad en régimen especial", 31 October 2014 **[C-0144]**; Approval Certificate for the Study Corresponding to Contract for Technical and Consultancy Assistance between the Ministry of Energy and Roland Berger, 11 December 2014 **[C-0145]**; Press release, "Soria desechó dos informes del hachazo renovable hasta conseguir uno diseñado a la carta", *Vozpópuli*, 29 April 2015 **[C-0146]**; Press report, "APPA solicita al Supremo que Industria aporte toda la documentación sore la que elaboró la retribución a las renovables", *El Periódico de la Energía*, 18 March 2015 **[C-0147]**; Press release "Industria niega al Supremo papeles del recorte a las renovables", *El País*, 22 June 2015 **[C-0148]**; Press report, "El IDAE contrata un seguro de responsabilidad civil para altos cargos el mismo día que entregó los informes de las consultoras al Supremo", *El Periódico de la Energía*, 6 May 2015 **[C-0149]**; Correspondence exchanged by the Claimants and the Respondent, between 8 September and 18 October 2017 **[C-0236]**; Contract signed between BCG and IDAE on 18 December 2013 to prepare a study calculating the standard parameters of existing installation, including Special Terms & Conditions and Terms of Technical References, of 23 July 2013, 2 **[C-0238]**; Council of State, dated 12 June 2014, Opinion on draft Order by which the retributive parameters of the standard facilities applicable to certain installations for the production of electrical energy from renewable energy sources; cogeneration and waste, 13 **[C-0277 / R-0098]**; Víctor Martínez, "Insolvencies in the Energy Sector Spikes by 18% Since the Cuts to Renewable Financial Support", El Mundo, 13 November 2014 **[C-0311]**.

[968]  C-III § 527; Brattle, Regulatory Rebuttal Report, § 227 **[CER-0003]**.

Spanish law were met, which Claimants dispute,[969] the Ministry of Energy's refusal to disclose essential information preventing the independent scrutiny of the standard installations, "*vitiated*" the approval process of these provisions, breaching Respondent's transparency obligations under Article 10(1) ECT.[970]

518.   Respondent adopted RD-Law 9/2013 with immediate effect and without the necessary implementing regulations.[971] This lack of transparency – during which compensation continued to be paid under RD 661/2007's parameters, allowed investors to ignore the changes' true impact on ongoing PV projects – continued in the drafting of RD 413/2014.[972] January – June 2014 was characterized by complete legal uncertainty.[973] Thereafter, with the enactment of MO IET/1045/2014 in June 2014, Claimants learned that they would have to return the incentive payments earned since July 2013 that exceeded the amounts granted under MO IET/1045/2014.  The Second Final Provision of RD-Law 9/2013 provided for the retroactive application of RD 413/2014 and MO IET/1045/2014.[974]

519.   Claimants state that MO IET/1045/2014 lacks a "*known, verifiable and controllable justification*" that Respondent has attempted to "*paper over*" in this arbitration.[975]  Respondent had from its closure of the consultation period in February 2014 until its enactment of MO IET/1045/2014 on 16 June 2014 to remedy the lack of transparency by disclosing the BCG-RB reports or the data used to calculate the remunerative parameters of the New Remuneration.[976]  The Ministry of Energy never disclosed the

---

[969]  C-I §§ 415 – 420; Act 2/2011 **[C-0115]** / **[R-0045]**; Act 19/2013 **[C-0152]**; Act 50/1997, of 27 November, on the Government, BOE, 28 November 1997 **[C-0153]**.

[970]  C-III § 528; C-I §§ 420 – 423 (*explaining* that groups were unable to provide comments on the conclusions submitted by BCG and RB); MO IET/1045/2014 **[R-0086]** / **[C-0126]** / **[C-0126bis]**; Allegations of Iberdrola to the draft MO IET/1045/2014 before the Advisory Council for Electricity, CNMC, 21 February 2014, 3 **[C-0155]**.

[971]  C-III § 515.

[972]  *Id*. at § 516; Report on the results of provisional settlement 6/2014 of the remuneration to renewable energy, cogeneration and waste production facilities, CNMC, 4 August 2014, 1-2 **[C-0130]**.

[973]  C-III §§ 517 – 518; Report 18/2013, 5-6 **[C-0192]**; EconInversión en Extremadura 3, S.L., Semi-annual Commercial Report. Period January to June 2013, Executive Summary, 2/6 **[C-0275]**.

[974]  C-III § 519.

[975]  *Id*. at § 523; Judgment of the Supreme Court (Contentious-Administrative Chamber, Section Three) 570/2017, Appeal 607/2014, of 3 April 2017, 20 – 21 **[C-0293]**; IDAE, "*Informe. Referencias Orden IET/1045/2014 Solar Fotovoltaica para OPERAFUND*", September  2017 **[C-0237]**; Claimants' Application on Respondent's Non Compliance with PO 3 (13 November 2017).

[976]  C-I § 423; MO IET/1045/2014 **[R-0086]** / **[C-0126]** / **[C-0126bis]**.

BCG or RB Reports and has never offered reasons for not doing so.  There is a presumption that the Ministry has hidden these reports for purely political reasons.[977]  Claimants allege that Respondent was not prepared to accept the analysis by BCG and RB on standard parameters that would prevent the adoption of the retroactive cuts.  Claimants allege that the experts did not validate the Respondent's methodology and instead criticized it, putting into risk the introduction of new retroactive cuts that Respondent was planning under the new Remuneration Model.[978]  Claimants were entitled to expect that the Ministry of Energy would provide investors the information that was compiled and used to calculate the standard installations.  It is unclear whether Respondent relied on any documents submitted with the BCG-RB Reports to elaborate the Disputed Measures.[979]  Respondent's decision not to disclose these reports cannot be traced to the legal framework and is therefore arbitrary and contrary to the ECT.[980]  Respondent's failure to disclose the BCG Report and the RB Report during the consultation procedure of draft MO IET/1045/2014 was both arbitrary and non-transparent.[981]  Claimants allege that, ultimately, IDAE decided not to use the BCG-RB reports when it determined the values for each installation under MO IET/1045/2014.[982]  Claimants argue that the reports that post-date are evidence of wrongdoing.[983]

---

[977] C-I § 759; C-III §§ 530 – 536; Judgment of the Supreme Court (Contentious-Administrative Chamber, Section Three) 570/2017, Appeal 607/2014, of 3 April 2017, 19 – 21 **[C-0293]**; BCG, "*Análisis de estándares de proyectos de producción de electricidad en Régimen Especial. Documento Final*", January, 2014, Deliverables 1 and 2 **[C-0239]**.

[978] C-I §§ 754 – 757.

[979] *Id*. at § 759.

[980] *Id*. at § 760

[981] *Id*. at § 758; C-III § 529; Contract signed between BCG and IDAE on 18 December 2013 to prepare a study calculating the standard parameters of existing installation, including Special Terms & Conditions and Terms of Technical References, of 23 July 2013, 2 **[C-0238]**.

[982] C-III § 280; C-I § 411.

[983] C-III § 326; C-I § 411 (*stating* that reports that post-date MO IET/1045/2014 is evidence of wrongdoing); Letter sent by IDAE to BCG terminating the contract, dated 26 February 2015 **[C-0291]**; Press release, "El recorte a las renovables se basó en un informe inexistente", *El País*, 13 March 2015 **[C-0141]**; Press release, "Criticas a Soria por ocultar el informe que justificaba el recorte a renovables", *El País*, 13 March 2015 **[C-0143]**; Roland Berger's Failed Report "Análisis de estándares de proyectos de producción de electricidad en régimen especial", 31 October 2014 **[C-0144]**; Approval Certificate for the Study Corresponding to Contract for Technical and Consultancy Assistance between the Ministry of Energy and Roland Berger, 11 December 2014 **[C-0145]**; Press release, "Soria desechó dos informes del hachazo renovable hasta conseguir uno diseñado a la carta", *Vozpópuli*, 29 April 2015 **[C-0146]**.

520. Respondent breached the transparency and due process requirements by approving pieces of legislation that form Regulatory Framework No. 2 and Regulatory Framework No. 3 through a law making process that was marred with irregularities.[984]  Starting in 2010 when Respondent introduced the first round of harmful measures (RD 1565/2010 and RD-Law 14/2010), foreign and domestic investors complained that Respondent was hiding its true intentions with regard to the regulatory framework applicable to renewable energy in Spain.[985]  Claimants state that the Council of State's Opinion on the draft of MO IET/1045/2014 confirmed that the Ministry of Energy never explained how it calculated the economic parameters included in the draft and expressed that Respondent's new regulatory framework represented a sudden switch.[986]  What Claimants characterize as a disorienting "*roller-coaster*" legislative changes continued through 2014.[987]  The Spanish Supreme Court later found that Respondent committed serious mistakes in MO IET/1045/2014.[988]

### b.  Respondent's Arguments

521. The Kingdom of Spain has at all times acted in a transparent and consistent manner, fully complying with the principle of good faith.[989]

---

[984] C-I § 761.

[985] *Id*. at § 763.

[986] C-III §§ 282, 320, 446; Council of State, dated 12 June 2014, Opinion on draft Order by which the retributive parameters of the standard facilities applicable to certain installations for the production of electrical energy from renewable energy sources; cogeneration and waste **[C-0277 / R-0098]**.

[987] C-I §§ 779 – 781; Press release, "El recorte a las renovables se basó en un informe inexistente", *El País*, 13 March 2015 **[C-0141]**; Press release, "Criticas a Soria por ocultar el informe que justificaba el recorte a renovables", *El País*, 13 March 2015 **[C-0143]**; Roland Berger's Failed Report "Análisis de estándares de proyectos de producción de electricidad en régimen especial", 31 October 2014 **[C-0144]**; Approval Certificate for the Study Corresponding to Contract for Technical and Consultancy Assistance between the Ministry of Energy and Roland Berger, 11 December 2014 **[C-0145]**; Press release, "Soria desechó dos informes del hachazo renovable hasta conseguir uno diseñado a la carta", *Vozpópuli*, 29 April 2015 **[C-0146]**; Press report, "APPA solicita al Supremo que Industria aporte toda la documentación sore la que elaboró la retribución a las renovables", *El Periódico de la Energía*, 18 March 2015 **[C-0147]**; Press release "Industria niega al Supremo papeles del recorte a las renovables", *El País*, 22 June 2015 **[C-0148]**; Press report, "El IDAE contrata un seguro de responsabilidad civil para altos cargos el mismo día que entregó los informes de las consultoras al Supremo", *El Periódico de la Energía*, 6 May 2015 **[C-0149]**.

[988] C-I § 782; Spanish Supreme Court's Judgment No. 1463/2016, of 20 June 2016 **[C-0205]**; Spanish Supreme Court's Judgment No. 2059/2016, of 12 May 2016 **[C-0206]**.

[989] R-II §§ 1197, 1213.

522. Respondent has provided the entire processing of the regulatory procedure of RD 413/2014 and MO IET 1045/2014.  Drafts of reforms were available for public comment.  The lack of delivery of the Reports by BCG and RB is insignificant, and Claimant acknowledges that the RB report was subsequent to MO IET/1045/2014.  The publication of the BCG and RB reports is meaningless and has nothing to do with the transparency or consistency of an administration.[990]  What is relevant is that the interested entities were able to file pleadings and these pleadings were considered.[991]  The Council of State's Opinion on the draft of MO IET/1045/2014 was a non-mandatory report is one example of Respondent going above and beyond what was required to ensure that all interested parties have the opportunity to participate.[992]

523. Respondent also notes that, following this processing of RD 413/2014 and MO IET 1045/2014, "*the amounts recognized as Investment Costs and Operating Costs of the RE plants of the Claimant are higher than the actual cost of investment and operation of such RE plants*."[993]

### c.  The Tribunal

524. The Tribunal doubts that host states should generally be required to inform investors of any change of their regulatory framework. On the other hand, there may indeed be such scenarios as found by the *Micula* tribunal, finding a breach of fair and equitable treatment, by stating that Romania had also acted in a manner amounting to a lack of transparency in so far as it had failed "*to inform the Claimants in a timely manner that the regime would be terminated prior to its stated date of expiration*."[994]  By analogy, even where there is no stated date expiration (though Claimants claim 25 years) a significant change of the FIT regime may be considered as giving rise to notice requirements.  Further, the

---

[990] R-II § 966.

[991] R-I §§ 1120 – 1129; Act 24/2013, Art. 14.4 **[C-0116]** / **[R-0047]**; Index of administrative file for Royal Decree 413/2014 **[R-0053]**; RD 413/2014, Art. 20(1) **[C-0131]** / **[R-0080]**; MO IET/1045/2014 **[R-0086]** / **[C-0126]** / **[C-0126bis]**; Judgment from the Third Chamber of the Supreme Court, of 16 March 2015, appeal 118/2013, reference CENDOJ: 28077913003201510072 **[R-0133]** (*setting* out the processing, with the participation of the whole sector, and the restart of its processing as a result of the proposals admitted); First Witness Statement of Carlos Montoya (9 March 2017) (hereinafter "First Montoya Statement"), § 7.

[992] R-I § 912; *see e.g.* Council of State, dated 12 June 2014, Opinion on draft Order by which the retributive parameters of the standard facilities applicable to certain installations for the production of electrical energy from renewable energy sources; cogeneration and waste **[C-0277 / R-0098]**.

[993] R-I § 1128.

[994] *Micula* v. *Romania*, § 872 **[RL-0028]** / **[CL-0099]**.

Tribunal notes that the FET clause of the ECT, Article 10(1) expressly obliges host states to "*create stable, equitable, favourable and transparent conditions for investors.*"

525. In the present case, starting in 2010 when Respondent introduced the first round of harmful measures (RD 1565/2010 and RD-L 14/2010), the Council of State's Opinion on the draft of MO IET/1045/2014 confirmed that the Ministry of Energy never explained how it calculated the economic parameters included in the draft and expressed that Respondent's new regulatory framework represented a sudden switch.[995]  The Spanish Supreme Court later found that Respondent committed serious mistakes in MO IET/1045/2014.[996]

526. Nevertheless, the Tribunal doubts that this regulatory process by itself could be considered as lack of transparency constituting a breach of the FET commitment in Article 10(1) of the ECT. However, there is no need for the Tribunal to take a final decision in this regard, as irrespective thereof, the breaches of Claimants' legitimate expectations and the FET standard found above by the Tribunal remain.

### 4.   Proportionality

#### a.   Claimants' Arguments

527. The FET standard contains an obligation of proportionality, and this applies to both administrative acts and to the promulgation of legislation and regulations.[997]  The requirement of proportionality is well established in Spanish Law.[998]  The Tribunal could use the test from *Occidental v. Ecuador*, where the tribunal found that the state's actions were disproportionate and in breach of the FET

---

[995] Council of State, dated 12 June 2014, Opinion on draft Order by which the retributive parameters of the standard facilities applicable to certain installations for the production of electrical energy from renewable energy sources; cogeneration and waste, 13 **[C-0277 / R-0098]**.

[996] Spanish Supreme Court's Judgment No. 1463/2016, of 20 June 2016 **[C-0205]**; Spanish Supreme Court's Judgment No. 2059/2016, of 12 May 2016 **[C-0206]**.

[997] C-I §§ 735 – 736; C-III § 537; *Charanne*, §§ 514, 517 **[CL-0030] / [RL-0049]**; *MTD v. Chile*, § 109 **[CL-0089]**; *Tecmed v. Mexico*, § 122 **[CL-0101]**; *Azurix v. Argentina*, §§ 311 – 312 **[RL-0100] / [CL-0127]**; *Occidental v. Ecuador*, § 404 **[CL-0146] / [RL-0099]**; Judgment of the Supreme Court (Contentious-Administrative Chamber, Section Three) 570/2017, Appeal 607/2014, of 3 April 2017, 19 – 21 **[C-0293]**.

[998] C-I § 734; Act 2/2011, Art. 4 **[C-0115] / [R-0045]** (until 2 October 2016); Act 39/2015, of 1 October, on the Common Administrative Procedure of Public Administrations, BOE, 2 October 2015, Art. 129(3) **[C-0213]** (following 2 October 2016).

standard in the US-Ecuador BIT because (1) other, less restrictive measures could have adopted and (2) the harm to the investor was out of proportion to the benefit of the state.[999]  That tribunal followed a proportionality analysis characterized as "*one of overall judgment, balancing the interest of the State against those of the individual to assess whether the particular sanction is a proportionate response in the circumstances*" and used a 4-stage test, considering cumulatively "[1] *the legitimacy of the state's aim;* [2] *whether the measure that the state adopted was suitable and reasonably connected to the objective it pursued;* [3] *whether the measure that the state adopted was necessary (i.e., it was the least restrictive measure available to achieve the state's aim); and* [4] *whether the effects of the measure were disproportionate or excessive in relation to the interests involved (i.e., whether the benefit of realizing the state's aim exceeded the harm caused to the investors' rights).*"[1000]

528.  The Disputed Measures breached Article 10(1) of the ECT because they were neither reasonable nor proportionate under international law.[1001]  Since the Tariff Deficit was a problem of Spain's own making and pre-existed RD 661/2007, the Tariff Deficit could not provide a legitimate justification for Respondent's revocation of the RD 661/2007 regime and the destruction of Claimants' investments.[1002] The Tariff Deficit in 2010 and 2013 amounted to approximately EUR 5,545 million and EUR 3,540 million, respectively.  Claimants did not contribute to this Tariff Deficit, but the Disputed Measures caused them damages, which reduced approximately 57% (OperaFund) and 75% (Schwab) the value of their investments.[1003]

529.  Respondent breached Claimants' legitimate expectations by damaging their investments and altering the essential characteristics of the legal framework.[1004]  Under the approach used in *Blusun*, Claimants would have to prove that the FITs (1) were lawfully granted and that (2) Respondent failed to pay due

---

[999]  C-III § 546; *Occidental v. Ecuador*, §§ 428 – 436, 450, 452 **[CL-0146]** / **[RL-0099]**; *Occidental v. Ecuador*, Decision on Annulment of the Award, 2 November 2015, §§ 311, 321 – 351 **[CL-0205]**; *LG&E v. Argentina*, § 158 **[CL-0206]** / **[CL-0057]**.

[1000]  C-III §§ 544 – 545, 548; C-I §§ 734, 737; *Occidental v. Ecuador*, §§ 416 – 417, 428 – 436, 450 **[CL-0146]** / **[RL-0099]**; *Tecmed v. Mexico*, §§ 124, 125, 128 – 132, 147 **[CL-0101]**; *EDF (Services) v. Romania*, § 293 **[RL-0035]** / **[CL-0204]**.

[1001]  C-III §§ 406, 538; *compare Occidental v. Ecuador*, § 408 **[CL-0146]** / **[RL-0099]**.

[1002]  C-III § 17.

[1003]  *Id*. at § 573; Brattle, Regulatory Rebuttal Report, Figure 11 **[CER-0003]**; Brattle, Quantum Rebuttal Report: Financial Damages to Investors (13 December 2017) [hereinafter "Brattle, Quantum Rebuttal Report"], Table 12, column G, p. 81 **[CER-0004]**.

[1004]  C-III §§ 539 – 542; *Blusun v. Italy*, §§ 319(5), 372 **[CL-0200]**.

regard to the reasonable reliance interests of recipients.  Here, Claimants' Majorca Plants and Badajoz Installation duly qualified under RD 661/2007 and had acquired economic rights thereunder.  With the first elements met, Respondent has the burden of proving that it was necessary to modify the FIT.  Respondent has not demonstrated that the Disputed Measures were necessary.  The Disputed Measures were unnecessary because there were reasonable alternatives to them to achieve the same end.[1005]

530.  Following this test, the Disputed Measures affecting the PASO and ECO 3 Projects breached the FET because they neither pursued a legitimate aim, nor were they reasonably connected to Respondent's stated objective. [1006]   None of Respondent's arguments, including that it acted (1) to "*protect consumers*" harmed by "*excessive*" or "*luxury*" profits, (2) to correct a tariff imbalance, or (3) to correct for the economic crisis in 2008 and its exceptional decrease in electricity demand, hold.[1007]  *First*, RD 661/2207 feed-in remuneration did not lead to the generation of the Tariff Deficit.  Rather, the Tariff Deficit is explained by Spain's systematic failure, since 2000 and despite repeated warnings, to comply with its own laws and to set electricity tariffs at a level that would be sufficient to cover the SES's actual regulated costs.[1008]  That Respondent continues to take actions that increase the Tariff Deficit, in contradiction of its stated goal of reducing it, underlines the lack of legitimate purpose in the Disputed Measure.[1009]  *Second*, the fall in demand for electricity in 2008 cannot provide a valid justification for the Measures because (1) the commitment made in RD 661/2007 was for 25 years and (2) Spain bore the risk of future electricity demand. [1010]  The Disputed Measures were also disproportionate because, as Brattle has demonstrated, the reduction in demand was temporary.

---

[1005]  C-III § 543.

[1006]  C-I § 738; C-III § 550.

[1007]  C-III § 549.

[1008]  *Id.* at §§ 551 – 552; C-I § 739; Act 54/1997, Art. 15(1), 17 **[C-0055]**; RD-Law 6/2009 **[C-0268]** / **[R-0057]**; CNE Report 2/2012, 4 **[R-0105]** / **[C-0214]** / **[C-0294]**; Brattle, Regulatory Report, §§ 17 – 19, 112 – 121 **[CER-0001]**; Brattle, Regulatory Rebuttal Report, §§ 166 – 178 **[CER-0003]**.

[1009]  C-III §§ 553 – 557; Act 24/2013, Art. 13 **[C-0116]** / **[R-0047]**; Press report *"Nadal afirma que la factura de la luz baja hasta un 10% con el recorte a las renovables",* El Confidencial, 28 June 2017 **[C-0312]**; Brattle, Regulatory Report, § 126 **[CER-0001]**; "Electricity Will Be Cheaper Next January", *Cinco Días* press news, 17 November 2015 **[BRR-90]**; "The Final Superavit in 2014 in the Spanish Electricity System Will Amount to €650 Million", *Cinco Días* press news, 17 November 2015 **[BRR-91]**.

[1010]  C-III §§ 558 – 561; Brattle, Regulatory Rebuttal Report, § 115 **[CER-0003]**.

Respondent, thus, could have relied on temporary measures.[1011]  *Third*, although the Disputed Measures have been effective in eliminating the Tariff Deficit, that does not mean that that was their aim.  If that were their aim, following the elimination of the Tariff Deficit, Respondent could have attenuated the damage caused to the PASO and ECO 3 Projects, but has chosen not to, preferring instead to reduce tariffs for consumers.[1012]  The measures have no environmental purpose.[1013]  After the Hearing, Claimants noted that the Disputed Measures protect pollutant sources of energy and have halted new PV installations in Spain.[1014]

531.  The Disputed Measures were not the least restrictive means available to achieve Respondent's stated objective and were excessive in relation to the interests involved.[1015]  The CNE Report of 7 March 2012 acknowledged that there were alternative ways of addressing the Tariff Deficit and Respondent has not explained why they were not preferred over the measures adopted against RE producers.[1016]  In addition to those alternatives proposed by CNE, Respondent could have instead (1) raised regulated tariffs, (2) eliminated the regulated tariffs for electricity generation, (3) introduced a CO2 tax, (4) introduced a broad levy on fuel consumption, and/or (4) changed the profile of FITs to investments in RE, like CSP.[1017]  The figures that the CNMC weighted in its Report on MO IET/1045/2014 demonstrate that Spain could have implemented less restrictive measures to reach the same goal of eliminating the Tariff Deficit.[1018]

532.  Spain's failure to follow any other measure demonstrates that it only wanted the Disputed Measures.[1019]  The benefits that Spain has derived from the Disputed Measures do not compensate the

---

[1011]  C-III §§ 569 – 570; Brattle, Regulatory Report, §§ 137 – 138 **[CER-0001]**.

[1012]  C-III §§ 562 – 564.

[1013]  C-I § 740; M. M. Mbengue and D. Raju, "Energy, Environment and Foreign Investment", in E. De Brabandere and T. Gazzini (Eds.), *Foreign Investment in the Energy Sector*, Brill/Nijhoff, Leiden/Boston, 2014, 186, 191 **[CL-0126]**.

[1014]  CPHB-I § 103; Brattle, Regulatory Report, §§ 107 – 110 **[CER-0001]**.

[1015]  C-I § 741; C-III § 565; CNE Report 2/2012 **[R-0105]** / **[C-0214]** / **[C-0294]**; Brattle, Regulatory Report, § 132 **[CER-0001]**.

[1016]  C-III § 566; Brattle, Regulatory Rebuttal Report, §§ 256 – 257 **[CER-0003]**.

[1017]  C-III § 567; Brattle, Regulatory Report, §§ 123 *et seq.* **[CER-0001]**.

[1018]  C-III § 572; CNMC Report. Administrative file relating to draft Order IET/1045/2014 0 (2014), 17 **[R-0107t resubmitted]**.

[1019]  C-III § 568.

harm caused to Claimants and the affected PV Investors.[1020]  Even if Respondent's measures were deemed to be suitable and necessary to the aims pursued, the effect of the Disputed Measures on Claimant's investments are so harmful that they cannot be considered proportionate.[1021]

533.  Respondent's argument that the ECT imposes no limit on the regulatory powers of the Contracting Parties is without merit.  While States should not be precluded from enacting laws when circumstances change, tribunals and commentators alike recognize that regulatory actions are not impervious to scrutiny under international law.[1022]

534.  In response to the Tribunal's question regarding the application and effect of the "*Margin of Appreciation*" (*Philip Morris v. Uruguay*), Claimants stated that it is not for the Tribunal to second-guess Respondent's decision.  Rather, this case is about whether the "*unfair and radical change*" was within the bounds of the ECT.[1023]  The margin of appreciation test should not be applied to the present case – the ECT should govern.[1024]  By entering into the ECT, Respondent accepted that if it decided to implement regulatory changes that frustrated the legitimate expectations of an investor or violated specific assurances, Respondent must compensate investors.[1025]  Nonetheless, if the Tribunal were to apply the margin of appreciation test, it would reinforce the conclusion that Respondent's conduct violated its FET international obligations.[1026]

---

[1020]  *Id*. at § 571.

[1021]  C-I § 742; Bauermeister Statement §§ 75 – 76.

[1022]  C-III §§ 391 – 393, 395; R. Dolzer, "Fair and Equitable Treatment: Today's Contours", *Santa Clara Journal of International Law*, Vol. 12 (2014), 21 **[CL-0091]**; *ADC v. Hungary*, § 423 – 424 **[CL-0111]**.

[1023]  CPHB-I § 95 – 96; Tr. Day 5, 12:18-21; 12:22-24 (Claimants' Counsel); *Eiser*, §§ 363, 371, 387 **[CL-0148]** / **[RL-0077]** / **[RL-0078]** (Respondent's FET obligation protects investors from a fundamental change to the regulatory regime in a manner that does not take account the circumstances of existing investments, made in reliance on prior regime); *Novenergia*, § 557 **[CL-0213]**.

[1024]  CPHB-I § 99; *Siemens AG v. The Argentine Republic* (ICSID Case No. ARB/02/8), Award, 6 February 2007 (hereinafter "*Siemens v. Argentina*"), § 354 **[CL-0139]**; *Quasar de Valores SICAV, S.A., Orgor de Valores SICAV, S.A., GBI 9000 SICAV, S.A. and ALOS 34, S.L. v. the Russian Federation*, SCC, Award, July 2012, § 22 **[CL-0031]**; *Bernhard Von Pezold and Others v. Zimbabwe* (ICSID Case No. ARB/10/15), Award, 28 July 2015, § 943 **[CL-0208]**; *Philip Morris v. Uruguay*, §§ 181 – 188 **[RL-0088]** (Born, dissenting).

[1025]  CPHB-I § 96.

[1026]  *Id*. at § 98, 99, 106.

535.    Other Tribunals have considered that the margin of appreciation of national agencies could be relevant in contexts such as public health or safety.[1027]  This case, however, presents no such scenario. Claimants are not investors threatening public health or causing negative externalities to the State. Rather, Claimants contributed to Respondent by providing clean energy and helping Respondent to achieve its RE targets and reach higher employment rates and leadership in the RE industry.[1028] Claimants state that Respondent granted specific assurances of long-term stability and created legitimate expectations in investors, but – after obtaining the benefits from RE producers, changed its priorities and adopted regulatory measures that would eliminate the Tariff Deficit at the expense of green investors.[1029]

536.    The Tariff Deficit is a problem for which Respondent is fully accountable – Respondent's design of its SES created the Tariff Deficit, and as it increased, it became an important issue for political reasons. Respondent decided to increase RE installed capacity, but refused to rebalance the costs of the SES with its incomes (consumer tariffs).  The *Antin* tribunal also concluded that it could not agree that the Tariff Deficit justified the elimination of the key features of the RD 661/2007 regime.[1030]  Respondent adopted the New Regime to the detriment of RE producers, using unrelated budgetary reasons as an excuse.  By adopting alternative measures, however, Respondent could have reduced the Tariff Deficit and would not have breached the legitimate expectations or specific assurances it had granted to Claimants.[1031]

### b.  Respondent's Arguments

537.    Respondent's reform of the SES sector is a valid and rational policy that was carried out by reasonable and proportionate action that falls within the FET standard of the ECT.[1032]  All awards handed down

---

[1027] *Id*. at § 100 – 101; *Philip Morris v. Uruguay*, §§ 199, 217, 399 – 400, 423 **[RL-0088]**.

[1028] CPHB-I § 101 – 102; Brattle, Regulatory Report, §§ 35 – 41 **[CER-0001]**.

[1029] CPHB-I § 102; Tr. Day 1, 30:13 – 34:24 (Claimants' Counsel); *Total v. Argentina* **[CL-0106]**; *Micula v. Romania* **[RL-0028]** / **[CL-0099]**.

[1030] CPHB-I § 104; *Antin*, § 572 **[CL-0222]**; Brattle, Regulatory Report, Figures 12 and 13 **[CER-0001]**.

[1031] CPHB-I § 105; Tr. Day 5, 82:3-7 (Respondent's Counsel); 75:17 – 76:4 (Brattle, Dr. Garcia); Brattle, Regulatory Rebuttal Report, §§ 179 – 187 **[CER-0003]** (alternative Measures); Brattle, Regulatory Report, §§ 123 – 139 **[CER-0001]** (alternative Solutions); Brattle Presentation (Day 5), slide 25.

[1032] R-II § 1322.

in the "*European Green Energy Arbitrations*" support the proportionality tests that Respondent proposes in this arbitration and show that Respondent has fulfilled its obligation not to adopt disproportionate or irrational measures.[1033]   The measures have been recognized as reasonable measures of macroeconomic control of the SES by (1) international institutions, (2) ratings agencies, and (3) Spanish and international investors.[1034]   In a strategic sector such as energy, states enjoy a "*margin of appreciation*" to adapt their regulations in a reasonable manner to the benefit of the general interest and within the limits of the law.[1035]

538.   Claimants invested in a highly regulated and subsidized sector.[1036] The electricity supply is regarded as "*an essential service*" for any economy, and the main objective of Act 54/1997 is to guarantee the supply of electricity, "*the quality of said supply and that it is supplied at the lowest possible cost.*"[1037]   Given that the Kyoto Protocol and EU Directives forced EU Member States to adopt the necessary measures to ensure that electricity is supplied through RE sources, and that the development of such technologies are expensive and must be enabled to compete with conventional technologies in the market, States are permitted to subsidize within the limits of the State Aid Regulation.[1038]   The regulator must intervene by subsidizing RE producers to ensure that they reach the level playing field with conventional energy, without distorting the competition and without overcompensating.[1039]   This intervention takes place through regulations that govern the SES as a service of general interest. These

---

[1033] *Id.* at §§ 1226, 1243 – 1259; RPHB-I §§ 110 – 113; *Wirtgen v. Czech Republic* **[RL-0093]** / **[CL-0218]**; *see also* Final Commission Decision C(2016) 7827, of 28 November 2016, regarding case number SA.40171 in the State Aid Register (2015/NN)– Czech Republic **[RL-0070]**; *Isolux*, §§ 500 and 823 **[RL-0004]** / **[RL-0076]**; EC State Aid Decision (11 November 2017), § 180 **[RL-0080]**; *Blusun v. Italy*, § 317 **[RL-0081]** / **[CL-0200]**; Accuracy, Second Economic Report, § II.5 **[RER-0002]**; Declaration of Carlos Montoya (7 March 2018) (hereinafter "Second Montoya Statement"), figure 17; *Charanne*, §§ 503, 505, 507 **[CL-0030]** / **[R-0049]**; Judgment from the Third Chamber of the Supreme Court dated 25 October 2006, appeal 12/2005, reference El Derecho EDJ 2006/282164, Legal Ground 3 **[R-0118]**; Judgment from the Third Chamber of the Supreme Court, 3 December 2009, Appeal 151/2007 EDJ 2009/307349, Legal Ground Four **[R-0121]**.

[1034] RPHB-I § 11.

[1035] R-II §§ 1074 – 1075, 1086 – 1087; *Plama v. Bulgaria*, §§ 134, 219 **[CL-0011]** / **[RL-0034]**; *Electrabel v. Hungary*, Decision on Jurisdiction, § 8.35 **[CL-0094]** / **[RL-0002]**; *see also Frontier Petroleum Services v. The Czech Republic*. Award, 12 November 2010, § 537 **[CL-0021]** / **[RL-0095]**; *Saluka v. Czech Republic*, § 272 **[CL-0109]** / **[RL-0083]**; *Joseph Charles Lemiere v. Ukraine*, ICSID Case No. ARB/06/18 Decision On Jurisdiction and Liability, 14 January 2010, § 505 **[RL-0087]**; *Philip Morris v. Uruguay*, § 423 **[RL-0088]**.

[1036] RPHB-I § 102; Act 54/1997 **[C-0055bis]** / **[R-0059]**.

[1037] RPHB-I § 102; Act 54/1997 **[C-0055bis]** / **[R-0059]**.

[1038] RPHB-I §§ 103 – 104; Directive 2001/77/EC, Recital 14 **[C-0057]** / **[RL-0015]**; Directive 2009/28/EC **[RL-0017]**.

[1039] RPHB-I § 104.

regulations stipulate all rights and obligations of operators, and any prudent investor should have a sufficient knowledge of that regulatory framework and its limits at the time of making an investment.[1040] Although neither the Kyoto Protocol, nor the EU Directives or the ECT establish the means by which each country must reach their goals, such means may be chosen by the states, so long as they respect the limits of State Aid Regulation.[1041] Here, the EC determined that Spanish subsidies for renewables constitute State Aid.[1042] Subsidies to RE must be provided in relation to the goal to be met (i.e., to make RE able to compete), keeping in mind that there is no right to state aid – not even under the ECT.[1043]

539. Already in 1997, Act 54/1997 limited Respondent's margin of appreciation by linking the provisions of a reasonable return by reference to the cost of money of Article 30(4).[1044] Contemporaneous documentation and statements show that the main Spanish investors in the solar thermosolar sector and energy associations like AEE and APPA did not claim the immutability of the regulatory framework, but rather the application of the principle of reasonable return.[1045] All measures adopted since Act 54/1997 have sought to adapt the remuneration for RE to the changing economic and technical circumstances, and none of these revisions were made within the four-year reviews of premiums and tariffs set forth in Article 40(3) of RD 436/2004 or RD 661/2007. All revisions were made within the limits of Act 54/1997 to guarantee the economic and technical sustainability of the SES and to avoid over-remuneration.[1046] There can be no doubt that Claimants were aware that Respondent holds the discretionary power that requires it to adapt the regulatory framework to changing circumstances.[1047]

---

[1040] *Id.* at § 105.

[1041] *Id.* at § 106.

[1042] *Id.* at § 107 – 108; EC State Aid Decision (11 November 2017) **[RL-0080]**; Response from the European Commission on 29 February 2016 to the request for investigation from the National Association of Renewable Energy Producers and Investors **[R-0160]**.

[1043] RPHB-I § 109; Final Commission Decision C(2016) 7827, of 28 November 2016, regarding case number SA.40171 in the State Aid Register (2015/NN)– Czech Republic, § 92 **[RL-0070]**.

[1044] RPHB-I § 114.

[1045] *Id.* at § 118; Helionoticias, 24 April 2013: "Abengoa, FCC, Sacyr, Elecnor, Samca and Sener takes the Government to the Supreme Court due to the thermal and solar cutback" **[R-0288]**.

[1046] RPHB-I § 120.

[1047] *Id.* at § 121; Respondent's Opening Statements, slides 160 – 181; Public Deed notarizing the Common Terms of Agreement entered into by Paso-Palma Sol Gestión de Proyectos, S.L., OperaFund Eco-Invest Sicav p.l.c., Parque

540. Under the ECT, as confirmed in *Electrabel*, the investors' interests must not unconditionally be placed above the rational and legitimate public policy of the host state.[1048]  Here, there was a rational policy and the Government's action was reasonable.[1049]  Using the test applied in *AES Summit* to determine whether a measure is rational and proportional in the sense of Article 10(1) of the ECT,[1050] this Tribunal must consider (1) whether a rational policy having a public explanation and helping to achieve an objective of general interest exists and (2) whether the challenged measure helps to achieve the public interest that justifies its adoption.[1051]  Here, the unsustainability of the SES in the context of a severe international crisis and the over-remuneration in the RE sector were alleviated by the Challenged Measures.  These Measures have helped to re-establish the sustainability of the SES by controlling the Tariff Deficit and RE producers continue to obtain a reasonable return on the investment costs of efficient facilities.[1052]

541. The test in *Occidental* is not the four-part one suggested by Claimants, but rather a balancing exercise: "[…] *one of overall judgment, balancing the interests of the State against those of the individual, to assess whether the particular sanction is a proportionate response in the particular circumstances*."[1053]  It is not for the Tribunal to evaluate the possibility of adopting other measures.[1054]  *Occidental* does not involve a case that is factually similar to the one at hand, as it refers to the annulment of a contract.[1055]  Nonetheless, if the Tribunal were to find it applicable, the Tribunal should first consider that tribunal's conclusion that the principle of proportionality "*requires that administrative measures must not be any more drastic than is necessary for achieving the desired*

---

Fotovoltaico Mediterráneo, S.L., Deutsche Bank AG, London Branch and Deutsche Bank Luxembourg, S.A., of 28 January 2009, pp. 29, 40, 50, 75, 79, 82, 88 **[C-0060]** / **[Document 21 CWS-LB]**; Senior Debt Contracts, p. 30 **[BQR-0076]**.

[1048] R-II § 1286; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.165 **[CL-0094]** / **[RL-0002]**.

[1049] R-II §§ 1287 – 1288; *Blusun v. Italy*, § 319 **[RL-0081]** / **[CL-0200]**.

[1050] R-II §§ 1214 – 1215.

[1051] *Id*. at §§ 1219 – 1221; *AES v. Hungary*, §§ 10.3.7 – 10.3.9 **[RL-0039]**.

[1052] R-II §§ 1222 – 1223.

[1053] *Id*. at §§ 1260 – 1261; *Occidental v. Ecuador*, § 417 **[CL-0146]** / **[RL-0099]**.

[1054] R-II §§ 1262 – 1263; *Occidental v. Ecuador*, §§ 417, 428 – 436 **[CL-0146]** / **[RL-0099]**.

[1055] R-II §§ 1252 – 1257; *Occidental v. Ecuador*, § 419 **[CL-0146]** / **[RL-0099]**; Second Montoya Statement, Figure 17.

*end*."[1056]  That tribunal concluded that the principle of proportionality is well-established in European law and is applied throughout the European legal order, of which Spain is a part.[1057]  The Supreme Court and the Constitutional Court of Spain concluded that the Contested Measures comply with the principles of legal certainty and legitimate expectations and the prohibition on acting arbitrarily and, thus, with the principle of proportionality.[1058]

542.  The *Occidental* and *Blusun* awards use a balancing test to evaluate the proportionality of a measure.[1059]  The *Blusun* award recognized that the FET standard is a high threshold that "*preserves the regulatory authority of the host state to make and change its laws and regulations to adapt to changing needs, including fiscal needs, subject to respect for specific commitments made*."[1060]  *Blusun* then performs a balancing of interests:

> *In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime* […][1061]

543.  The terms in the text above have specific meaning.  The "*reasonable confidence of investors*" refers to investors having performed due diligence, though this does not pass the regulatory risk onto the state.  The "*need for regulatory adjustment and proportionality thereof*" is not an invitation for the Tribunal to re-decide public interest or to second-guess the host state's policies, but rather the proportionality analysis must be carried out as if it were regarding a balance in comparison with the legitimate purpose that is intended through the measures.[1062]  The evaluation of proportionality in this case shows that Respondent acted rationally and proportionately in the face of public needs, while respecting the reasonable return of renewable energy producers.[1063]  In 2015, subsidies received by

---

[1056] R-II § 1258; *Occidental v. Ecuador*, § 403 **[CL-0146]** / **[RL-0099]**.

[1057] R-II § 1259.

[1058] *Id.*

[1059] *Id.* at §§ 1224 – 1225.

[1060] *Id.* at §§ 1226 – 1233; *Blusun v. Italy*, § 319(4) **[RL-0081]** / **[CL-0200]**.

[1061] R-II § 1234; *Blusun v. Italy*, § 319(5) **[RL-0081]** / **[CL-0200]**.

[1062] R-II §§ 1234 – 1235.

[1063] *Id.* at §§ 1236 – 1241.

Claimants' plans accounted for 87.65% of their entire income. [1064]   The proportion of revenue attributable to subsidies throughout the entire regulatory life of Claimants' PV Plants is 88.14%. [1065] This was recognized in *Eiser*, where the tribunal acknowledged the public interest policy that justified the challenged measures' adoption. [1066]

544.    Claimants' proportionality analysis is based on a misrepresentation of the economic and social context in which the measures were adopted. [1067]   Respondent adopted the macroeconomic measures on the following reasonable grounds:

(1)    *The legal obligation to adjust the economic regime to the principle of reasonable rate of return for investors, thereby preventing over-remuneration that (i) would distort the free market that the ECT aims to create in an undue manner and (ii) would be contrary to EU Law;*

(2)    *The existence of public interest by the sustainability of the SES, in a context of a severe international crisis and with a sharp reduction in energy demand, affecting the RE Sector, which decreased the revenue of the SES and economically destabilised the SES, along with increased RE costs; and*

(3)    *The impossibility of passing the whole economic imbalance onto consumers. A consumer that paid EUR 370 on its electricity bill per year in 2003 paid a total of EUR 669 in 2012. The cumulative 81% increase over these years for receiving the same service is disproportionate. The greatest increases, however, took place in 2008 (10%), 2009 (10.1%) and 2011 (17.7%). The aforementioned increase has placed the electricity price in Spain among the most expensive in the European Union.* [1068]

545.    Respondent has never stated that the measures were adopted to address only the Tariff Deficit.  It is a fallacy that Respondent contributed to producing the Tariff Deficit by not adopting measures to control it sooner.  While it is not for the Tribunal to decide when and what policies Respondent should apply, Respondent adopted the measures required through RD-Law 7/2006 and RD 661/2007 diligently and in order to control the Tariff Deficit. [1069]   There is a correlation between the increase in

---

[1064]  *Id.* at § 1112; Second Montoya Statement, Figure 17.

[1065]  R-II § 1113; Second Montoya Statement, Figure 18.

[1066]  R-II § 1242; *Eiser*, § 371 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *see also Eiser*, Application for Annulment **[RL-0103]**.

[1067]  R-II § 1264.

[1068]  *Id.* at § 1069, *see also* R-II §§ 1264 – 1269.

[1069]  *Id.* at §§ 1270 – 1275; *compare Wirtgen v. Czech Republic*, § 444 **[RL-0093]** / **[CL-0218]**.

the Tariff Deficit and the increase in the subsidies paid to PV generators,[1070] and the tariff paid by consumers increased exponentially and beyond that in other EU countries since 2007, despite the severe international crisis affecting all European economies.[1071]

546.  The drop in electricity demand during the severe international crisis was one of the determining factors of the unsustainability of the SES.  The tariffs and premiums under RD 661/2007 were set out in PER 2005 – 2010 and were established based on projected demand.  Any prudent investor should have known that a sharp decrease in demand would result in a change of subsidies.[1072]  In addition to this drop in demand, CNE and the EC reported that RE plants were receiving higher than reasonable returns according to the cost of money on the capital market and as compared to the purpose of the subsidies, respectively.[1073]  Neither the Spanish economy nor electricity demand have recovered.  Even if they had, the Disputed Measures are still necessary to contain the Tariff Deficit and to avoid situations of over- or under-remuneration that jeopardize the sustainability of the SES.[1074]

547.  The public interest of the Disputed Measures and their legitimacy are presumed.[1075]  The alternative measures of Claimants and their experts are not relevant for the proportionality test and, in any event, do not have any proven effectiveness.  They should be ignored as a futile attempt to invert the burden of proof.[1076]  In 2014 and 2015, the SES went from having a deficit to a surplus, and the return of 7.398% has been considered reasonable by the EC.[1077]  The IMF has recognized Spain's "*impressive recovery*" and that the reforms "*have paid off.*"[1078]

---

[1070] R-II §§ 1276 – 1280; Accuracy, First Economic Report, graph 19, charts 23 and 24 **[RER-0001]**; Respondent's "*own preparation of data from the settlement reports of the CNE/CNMC for 2005 – 2013*" (website omitted).

[1071] R-II §§ 1281 – 1284; Accuracy, First Economic Report, graphs 21, 22 **[RER-0001]**.

[1072] R-II §§ 1289 – 1291; Act 54/1997, Art. 15 – 16 **[C-0055bis]** / **[R-0059]**.

[1073] R-II §§ 1292 – 1295; Accuracy, First Economic Report, Figure 1 **[RER-0001]**; Accuracy, Second Economic Report, § III **[RER-0002]**; EC State Aid Decision (11 November 2017) **[RL-0080]**; CNE Report 2/2012 **[R-0105]** / **[C-0214]** / **[C-0294]**.

[1074] R-II §§ 1308 – 1313; IMF Country Report, 13 December 2016: "Spain: Staff Concluding Statement of the 2016 Article IV Mission" **[R-0308]**.

[1075] R-II § 1304.

[1076] *Id.* at §§ 1302 – 1303, 1311 – 1313.

[1077] R-II §§ 1305 – 1307; EC State Aid Decision (11 November 2017), § 120 **[RL-0080]**.

[1078] R-II § 1308; IMF Country Report, 13 December 2016: "Spain: Staff Concluding Statement of the 2016 Article IV Mission" **[R-0308]**.

548. The reasonableness of the Contested Measures is evident, as the remuneration chosen in 2013 was proposed in 2009 by APPA, who prepared the recommendation with the legal assistance of Cuatrecasas.[1079]  The measures were accepted by most domestic and foreign investors, and have attracted more than EUR 5,000 million in investments in RE in Spain.[1080]  It is only because these reasonable and proportional measures guarantee a reasonable rate of return that they have been well received by international agencies and have generated new investment in Spain.[1081]  Claimants have accepted *AES Summit* as a parameter of the FET standard.  In that case, a 7% rate of return, after tax, was considered reasonable and proportionate.[1082]  Under the current framework, the rate of return obtained by Claimants' plants reaches 7.5% after taxes.  This is higher than the costs of Claimants' capital calculated by their own experts.[1083]  The return is reasonable as compared to other regulated sectors of the SES,[1084] and as compared to other returns analyzed by the EC.[1085]

549. The *Eiser* and *Charanne* awards use the criteria of "*essential characteristics*" of controlling the state's margin of appreciation, but do so differently.[1086]  *Eiser* establishes two limits on the state's regulatory power:  the measures must have respected the investment costs incurred by the investor and the measures must have protected the level of indebtedness of the investors.[1087]  In *Eiser*, however, is not the investor who must adapt to the regulatory framework:  it is the Regulator who must adapt to the behavior and actions of the investors.[1088]  *Eiser* further assumes that investors act correctly and that,

---

[1079] R-I §§ 1154 – 1157; APPA-Greenpeace Press Release concerning the Draft Bill for the Promotion of Renewable Energy, dated 20 May 2009 **[R-0197]**; Submission of the Draft Bill on Renewable Energy by APPA and Greenpeace to the Ministry of Industry, Tourism and Commerce (21 May 2009), Art. 23.3 and 23.4 **[R-0218]**.

[1080] R-I § 1158; Press release: "*The Boom in renewable energy attracts 5 billion in investments*": "*So far this year, the renewable energy sector has accumulated almost EUR 5,000 million in buying and selling operations [...]*" Article from economic newspaper "El Economista", 17 October 2015 **[R-0208]**.

[1081] R-I § 1160; R-II § 1314.

[1082] R-II § 1319; Accuracy, Second Economic Report, § II.1 **[RER-0002]**; *AES v. Hungary*, §§ 10.3.31, 10.3.34 **[RL-0039]**.

[1083] R-II §§ 1314 – 1317; Accuracy, Second Economic Report, §§ II.3, II.5 **[RER-0002]**.

[1084] R-II § 1318; Act 24/2013, Tenth Additional Provision **[C-0116]** / **[R-0047]**.

[1085] R-II § 1320; EC State Aid Decision (11 November 2017), § 120 **[RL-0080]**.

[1086] R-II § 1114; *Eiser*, § 382 **[RL-0078]** / **[CL-0148]**.

[1087] R-II §§ 1115, 1119.

[1088] *Id.* at § 1118.

therefore, the Regulator must adjust regulations in line with the subjective behavior of investors.[1089] Respondent has filed for annulment of *Eiser* because it omits highly relevant facts and circumstances from its analysis, [1090] such as the objective expectations of the RE sector with regard to the Government's constraints to make potential regulatory changes, and EU-based limitations regarding subsidies.[1091]

550. After the Hearing, Respondent explained that the reasonableness of a State's act is determined through analysis of (1) the rational policy and (2) the reasonableness of the act of State in relation thereto.[1092] The sustainability of the SES is one of the essential principles and all regulatory changes have been oriented at protecting that by guaranteeing a reasonable return based on the investment costs of a standard facility.[1093] Respondent publicly announced the legitimate purpose of the measures prior to their approval.[1094] Respondent demonstrated that, given the economic crisis that affected the Spanish economy, the enactment of the disputed measures was calibrated and proportional.[1095] Tackling the Tariff Deficit was a legitimate public policy[1096] and there is a correlation between the increase of the Tariff Deficit and the promotion of RE.[1097] The reasonableness of the Disputed Measures is supported by the fact that (1) the regulation fits the proposal made by APPA with the support of Cuatrecasas in 2009, (2) RE producers are recovering their CAPEX and OPEX and are obtaining a reasonable rate of return that is above that expected at the time of the investment, and (3) the measures affected all operators and agents within the SES in proportion to their contribution to the Tariff Deficit. [1098] Without accepting that the Tribunal can second-guess Respondent's measures, Respondent accepts

---

[1089] *Id.* at §§ 1116 – 1117.

[1090] *Id.* at § 1182.

[1091] *Id.* at §§ 1109 – 1111, 1125 – 1126.

[1092] RPHB-I §§ 49 – 50; *Electrabel. v. Hungary,* ICSID Case No. ARB/07/19, Award of 25 November 2015 ("*Electrabel v. Hungary*, Award"), § 179 **[RL-0048]**; *AES v. Hungary*, §§ 10.3.7 – 10.3.9 **[RL-0039]**.

[1093] RPHB-I § 51.

[1094] *Id.* at § 53; Respondent's Opening, Slides 81 – 157; Respondent's Closing, slides 88 – 91.

[1095] RPHB-I § 54; Respondent's Closing, slides 92 – 93; Tr. Day 3, 114:9-12 (Garcia); Accuracy, First Economic Report Appendix 10 **[RER-0001]**; Second Accuracy Report, Appendix 9 **[RER-0002]**.

[1096] RPHB-I § 55; Respondent's Closing, slide 94; Tr. Day 3, 148:7-8 (Garcia).

[1097] RPHB-I § 56; Respondent's Closing, slide 95; Tr. Day 3, 151:10-23 (Garcia); Brattle, Regulatory Report, p. 55 **[CER-0001]**.

[1098] RPHB-I § 57; Respondent's Closing, slides 96 – 99; Tr. Day 3, 144:5-25, 147:2-24 (Garcia).

that while it could have adopted other measures, the efficiency of alternatives has not been proven.[1099] The measures have had no impact on Claimants' expectations since (1) their audited annual accounts have shown no impairment, (2) they are obtaining a positive EBITDA, yearly, (3) they obtain a reasonable rate of return of 7%, which is aligned with their expectations at the time of the investment and with the return granted by other EU Member States.[1100]

551.    The ECT makes express reference to the applicability of common principles of international law in its Article 26(6), which empowers tribunals to assess and apply the margin of appreciation principle, as a principle of international law.[1101] The State's power and duty to regulate are envisaged in the ECT.[1102] The FET standard protected by the ECT must be construed as paying deference to the principle of margin of appreciation of the Contracting States. It, therefore, does not bar changes to general legislation in the absence of a stabilization clause, provided that those changes to not exceed the host state's normal regulatory power aimed at public interest policy.[1103]

552.    The margin of appreciation doctrine has been stated by the ECtHR in case law in the application of the ECHR.[1104] It has been recognized as an international principle by several tribunals when assessing the lawfulness of a State's public policy acts. To assess whether the treatment afforded to investments

---

[1099]   RPHB-I § 58; Respondent's Closing, slides 100 – 105; *Isolux*, §§ 401, 823 **[RL-0004]** / **[RL-0076]**; Tr. Day 3, 78:10-17, 153:7-23, 167:7 – 168:9 (Garcia).

[1100]   RPHB-I §§ 59 – 60; Respondent's Closing, slides 106 – 107.

[1101]   RPHB-I § 95.

[1102]   RPHB-I §§ 96 – 99 (*citing* http://www.energycharter.org/fileadmin/DocumentsMedia/Legal/ECT-es.pdf); *Principles of International Investment Law*, Oxford University Press. R. Dolzer and C. Schreuer, 162 **[RL-0068]**; *AES v. Hungary*, § 9.3.29 **[RL-0039]**; *Electrabel v. Hungary*, Award, § 165 **[RL-0048]**; *Mamidoil v. Albania,* §§ 617 – 618 **[RL-0046]**.

[1103]   RPHB-I §§ 100 – 101; *AES v. Hungary*, § 9.3.29 **[RL-0039]**; *Charanne*, § 499 **[CL-0030]** / **[RL-0049]**; *Electrabel*, Award, § 165 **[RL-0048]**.

[1104]   RPHB-I §§ 88 – 93; *Philip Morris v. Uruguay*, § 399 **[RL-0088]**; TFEU and TEU Art. 17 **[RL-0001]**; Protocol No. 15 amending the Convention on the Protection of Human Rights and Fundamental Freedoms. Dated 24.VI.2013, http://www.coe.int/en/web/conventions/full-list/-/conventions/treaty/213; Explanatory Report to Protocol No. 15 amending the Convention for the Protection of Human Rights and Fundamental Freedoms, dated 24.VI.2013. Paras. 7 and 9. Council of Europe Treaty Series - No. 213 http://www.coe.int/en/web/conventions/full-list/-/conventions/treaty/213; Decision of the European Court of Human Rights (Fifth Section) 12 July 2016 – Case No. 562/05 "SIA AKKA/LLA v. LATVIA" §§ 60 and 69 https://link.springer.com/article/10.1007/s40319-017-0564-3; EFTA Court Judgment of January 28, 2013, §§ 54, 227; Case E-16/11 EFTA Surveillance Authority v Iceland http://www.eftacourt.int/uploads/tx_nvcases/16_11_Judgment_EN.pdf (*citing* Case E-3/11 Sigmarsson [2011] EFTA Ct. Rep. 432).

is in accordance with the Treaties, tribunals must take account of all surrounding circumstances, including the fact that States retain discretionary powers for the protection of public interests.[1105]

553. Applying the "margin of appreciation principle" to the present case, this Tribunal must consider whether the Disputed Measures a (1) rational, (2), proportionate, (3) non-discriminatory, and (4) bona fide exercise of Respondent's regulatory power. The Disputed Measures have met each requirement, and the Respondent request that the Tribunal apply the "*margin of appreciation*" principle in this case.[1106]

554. In performing the "*Margin of Appreciation*" analysis, the *Philipp Morris* Tribunal assumed that the definition of arbitrariness as applied by the ICJ Chamber in the *ELSI (United States v. Italy)* case, pursuant to which a measure is arbitrary where it "*a willful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety*."[1107] Here, the Parties agree that the Disputed Measures are not arbitrary.[1108] They resolved the Tariff Deficit problem and ensured the sustainability of the SES and, thus, achieved the legitimate public purpose that justified their enactment.[1109]

### c. The Tribunal

555. The Tribunal has some doubts as to whether proportionality should be accepted as a separate element of FET. It may rather be considered as an inherent element when balancing regulatory state interests and investor interests in assessing stability obligations as well as legitimate expectations. The Tribunal is also not persuaded by the Claimants' reliance on *Occidental*, where the crucial issue was whether the host state's *Caducidad* Decree, which

---

[1105] RPHB-I § 94; *Chemtura Corporation v. Government of Canada*, Award dated August 2, 2010, § 123. https://www.italaw.com/sites/default/files/case-documents/ita0149_0.pdf; *Frontier v. Czech Republic*, § 527 **[CL-0021]** / **[RL-0095]**.

[1106] RPHB-I §§ 122 – 125; Respondent's Opening Statement, slides 194 – 255; Respondent's Opening on Quantum, slide 9; Respondent's Closing, slides 89 – 108; *Philip Morris v. Uruguay*, § 401 **[RL-0088]**; Accuracy Second Report, p. 14; Brattle First §§ 85, 108; EC State Aid Decision (11 November 2017), §120 **[RL-0080]**.

[1107] RPHB-I § 87; *Philip Morris v. Uruguay*, §§ 390 – 391 **[RL-0088]**; Tr. Day 3, 148:7-8, 151:10-23 (Garcia), Respondent's Closing, slides 94, 95; Brattle Regulatory Report, p. 55 **[CER-0001]**.

[1108] *Id.*

[1109] *Id.*

terminated a participation contract as a reaction to an investor's undisputed breach of contract, was "*proportionate*."[1110]  It seems doubtful whether such considerations can be transferred *tel quel* to general legislative measures as Claimants suggest.  However, again, there is no need for the Tribunal to finally decide this issue, as the two breaches of the FET standard found above by the Tribunal remain and suffice to establish that Respondent has breached its FET commitment.

## C.  UMBRELLA CLAUSE

### 1.  Claimants' Arguments

556.  Through its repeal of Regulatory Framework No. 1 by its successive passing of Regulatory Framework No. 2 in 2010 – 2013 and Regulatory Framework No. 3 in 2013 – 2014, Respondent failed to observe any obligations it has entered into with Claimants under Article 10(1) *in fine* ECT.[1111]  Article 10(1) *in fine* ECT includes a so-called "*umbrella clause,*"[1112] "*observance of undertakings clause,*"[1113] or "*observance of obligations clause*"[1114] through which the host state's breach of the commitments and obligations due to the investor amount to a breach of the ECT.[1115]  It is a further substantive standard of protection included in Part III of the ECT and it does not preclude the Tribunal from finding other simultaneous breaches of the ECT.[1116]  Article 10(1) *in fine* ECT has been

---

[1110] *Occidental v. Ecuador*, §§ 416 *et seq*. **[CL-0146]** / **[RL-0099]**.

[1111] C-I §§ 479(i), 558; 626; *ECT and Related Documents*, Art. 10(1) **[CL-0009]**.

[1112] *See e.g. AES v. Hungary*, § 9.3.2 **[CL-0016]**; *Al-Bahloul v. Tajikistan*, § 256 **[CL-0026]**; Judgment of the Supreme Federal Court of Switzerland (in re *EDF International v. Hungary* [ECT/UNCITRAL-PCA]), 6 October 2015, § 3.2.2 **[CL-0045]**; Cremades, A.C., "Swiss Supreme Court rejects Hungary's application to set aside award under Energy Charter Treaty", *Schellenberg-Wittmer*, 4 November 2015 **[CL-0046]**; Salacuse, *The Law of Investment Treaties*, 303 **[CL-0047]**; T.W. Wälde, "The "Umbrella" Clause in Investment Arbitration. A Comment on Original Intentions and Recent Cases", 6 *The Journal of World Investment & Trade* 183 2005, 203 **[CL-0048]**.

[1113] *El Paso Energy International Company v. Argentine Republic* (ICSID Case No. ARB/03/15), Decision on Jurisdiction, 27 April 2006, § 70 **[CL-0049]**; *Pan American Energy LLC and other and BP America Production Company and others* (ICSID Cases No. ARB/03/13 and ARB/04/8), Decision on Preliminary Objections, 27 July 2006, § 99 **[CL-0050]**.

[1114] *Plama v. Bulgaria*, § 161 **[CL-0011]** / **[RL-0034]**.

[1115] C-I § 559.

[1116] *Id.* at §§ 560 – 564; *Eureko B.V. v. Republic of Poland* (UNCITRAL), Partial Award, 19 August 2005 (hereinafter "*Eureko v. Poland*"), §§ 258, 260 **[CL-0020]**; Salacuse, *The Law of Investment Treaties*, 307 **[CL-0047]**; T.W. Wälde, "The "Umbrella" Clause in Investment Arbitration. A Comment on Original Intentions and Recent Cases",

considered "*one of the most extensive umbrella clauses*" among investment treaties.[1117] It encompasses obligations entered into with Claimants and with the Claimants' investment, thus covering more situations than do other such clauses in investment treaties.[1118] The Tribunal has jurisdiction to hear Claimants' claim under Article 10(1) *in fine* ECT.[1119]

557. Pursuant to the MFN clause included in Article 10(7) of the ECT, Claimants invoke the following umbrella clauses of BITs entered into between Respondent and other States, for the purpose of obtaining protection for the challenge of the TVPEE, in the event the Tribunal considers it a *bona fide* taxation measure:

---

6 *The Journal of World Investment & Trade* 183 2005, 212 – 213 **[CL-0048]**; *Continental Casualty Company v. Argentine Republic* (ICSID Case No. ARB/03/9), Award, 5 September 2008 (hereinafter "*Continental Casualty v. Argentina*"), § 299 **[CL-0051]**; C. H. Schreuer, "Fair and Equitable Treatment (FET): Interactions with other Standards", *Transnational Dispute Management*, Vol. 4, issue 5, September 2007, 8 **[CL-0052]**.

[1117] C-I §§ 565 – 571; *Plama v. Bulgaria*, § 186 **[CL-0011]** / **[RL-0034]**; *EDF International v. Argentina*, § 938 **[RL-0102]** / **[CL-0019]**; *Eureko v. Poland*, § 244 **[CL-0020]**; T.W. Wälde, "The "Umbrella" Clause in Investment Arbitration. A Comment on Original Intentions and Recent Cases", 6 *The Journal of World Investment & Trade* 183 2005, 203 **[CL-0048]**; Institute of International Law, *Resolution on Legal Aspects of Recourse to Arbitration by an Investor against the Authorities of the Host State under Inter-State Treaties* (Session of Tokyo, 13 September 2013) **[CL-0053]**; C. Söderlund, "Multiple Judicial Proceedings and the Energy Charter Treaty", in C. Ribeiro (Ed.), *Investment Arbitration and the Energy Charter Treaty*, JurisNet, New York, 2006, 252 **[CL-0054]**; E. De Brabandere, "The Settlement of Investment Disputes in the Energy Sector", in E. De Brabandere and T. Gazzini (Eds.), *Foreign Investment in the Energy Sector*, Brill/Nijhoff, Leiden/Boston, 2014, 162 **[CL-0055]**; *Limited Liability Company Amto v. Ukraine* (SCC Case No. 080/2005), Award, 26 March 2008 (hereinafter "*Amto v. Ukraine*"), § 110 **[CL-0056]**; *LG&E v. Argentina*, § 170 **[CL-0206]** / **[CL-0057]**; *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic* (ICSID Case No. ARB/03/23), Decision on Annulment, 5 February 2016, §§ 228 – 280 **[CL-0058]**.

[1118] C-I §§ 572 – 576; Salacuse, *The Law of Investment Treaties*, 299 – 301, 303, 305 – 306 **[CL-0047]**; *SGS Société Générale de Surveillance, S.A. v. Republic of Paraguay* (ICSID Case No. ARB/07/29), Decision on Jurisdiction, 12 February 2010, (hereinafter "*SGS v. Paraguay*"), § 167 **[CL-0059]**; *Enron v. Argentina*, § 274 **[CL-0060]**; *SGS Société Générale de Surveillance S.A v Republic of the Philippines* (ICSID Case No. ARB/02/6), Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004, §§ 115 – 116 **[CL-0061]**; R. A. Nathanson, "The Revocation of Clean-Energy Investment Economic-Support System as Indirect Expropriation Post-Nykomb: A Spanish Case Analysis", *Iowa Law Review*, vol. 98 (2012), 898 **[CL-0062]**.

[1119] C-I § 577; L. Gouiffès, "The Dispute Settlement Mechanisms of the Energy Charter Treaty", in C. Ribeiro (Ed.): *Investment Arbitration and the Energy Charter Treaty*, JurisNet, New York, 2006, 27 – 28 **[CL-0014]**; *AES v. Hungary*, § 9.3.3 **[CL-0016]**; Judgment of the Supreme Federal Court of Switzerland (in re *EDF International v. Hungary* [ECT/UNCITRAL-PCA]), 6 October 2015, §§ 3.5.2 – 3.5.4 **[CL-0045]**; E. De Brabandere, "The Settlement of Investment Disputes in the Energy Sector", in E. De Brabandere and T. Gazzini (Eds.), *Foreign Investment in the Energy Sector*, Brill/Nijhoff, Leiden/Boston, 2014, 162 **[CL-0055]**.

(i)     Article III(2) of the Spain-Costa Rica BIT: "*Each Contracting Party shall fulfill any obligation entered into with respect to investments of investors of the other Contracting Party.*" [1120]

(ii)    Article 3(2) of the Spain-Libya BIT: "*Each Contracting Party shall fulfill all the commitments undertaken in writing with regard to the investments of investors of the other Contracting Party.*" [1121]

(iii)   Article 3(2) of the Spain-Morocco BIT: "*Each Contracting Party shall observe any obligation it may have entered into with an investor of the other Contracting Party within the framework of an investment*." [1122]

(iv)    Article 3(5) of the Spain-Romania BIT: "*Each Contracting Party shall fulfill the commitments entered into with investors of the other Contracting Party in respect of their investments*." [1123]

(v)     Article 3(2) of the Spain-Ukraine BIT: "*Each Contracting Party shall observe any obligation it may have entered into with regard to investments of investors of the other Contracting Party.*" [1124]

(vi)    Article 3(2) of the Spain-Uzbekistan BIT: "*Each Contracting Party shall observe any obligation it may have entered into in writing with regard to investments of investors of the other Contracting Party.*"[1125]

558.   Article 10(1) *in fine* ECT covers obligations entered into unilaterally by the Respondent, as a sovereign State, in its domestic legislation[1126] and through official statements of state officials.[1127] These are binding on the State at the international level pursuant to a well-known line of reasoning followed by the ICJ in the *Nuclear Tests* cases, which can be extended to investors pursuant to the

---

[1120] C-I § 578; Spain-Costa Rica BIT, Art. III(2) **[CL-0037]**.

[1121] C-I § 578; Spain-Libya BIT, Art. 3(2) **[CL-0063]**.

[1122] C-I § 578; Spain-Morocco BIT, Art. 3(2) **[CL-0064]**.

[1123] C-I § 578; Agreement for the Promotion and Reciprocal Protection of Investments between Spain and Romania (Spain-Romania BIT), done at Bucharest on 25 January 1995 (BOE, 23 November 1995), Art. 3(5) **[CL-0065]**.

[1124] C-I § 578; Spain-Ukraine BIT, Art. 3(2) **[CL-0036]**.

[1125] C-I § 578; Spain-Uzbekistan BIT, Art. 3(2) **[CL-0066]**.

[1126] C-I §§ 584 – 587; *Plama v. Bulgaria*, § 186 **[CL-0011]** / **[RL-0034]**; *Al-Bahloul v. Tajikistan*, § 257 **[CL-0026]**; *Khan Resources Inc., Khan Resources B.V. and CAUC Holding Company Ltd. v. The Government of Mongolia and MonAtom LLC* (PCA Case No. 2011-09), Decision on Jurisdiction, 25 July 2012 (hereinafter "*Khan Resources v. Mongolia*, Decision on Jurisdiction"), § 438 **[CL-0072]**; *Liman v. Kazakhstan*, § 449 **[CL-0073]**; *see also* C-I §§ 624 – 625; *Khan Resources v. Mongolia*, §§ 266, 296 **[CL-0082]** (*establishing* that a breach of a statutory provision automatically entails a breach of the ECT).

[1127] C-I § 579; Judgment of the Supreme Federal Court of Switzerland (in re *EDF International v. Hungary* [ECT/UNCITRAL-PCA]), 6 October 2015, §§ 3.5.4.3 **[CL-0045]**; A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment*, WoltersKluwer, Alphen aan den Rijn, 2009, 457 **[CL-0067]**.

current development of international investment law.  The ultimate basis for understanding such provisions and statements as binding at an international level is the principle of good faith.[1128]

559. Non-ECT cases have concluded that a piece of domestic legislation can generate legal effects internally and may bind the state on an international level.[1129]  Professor Salacuse also supports this approach.[1130]  Scholarly works also indicate that investments may be protected by formal declarations made by the state in the form of official statements.[1131]  In the field of energy, there is no obstacle for accepting that a State is bound by the declarations – formal or informal – by its Minister/Ministry of Energy, as those are organs of the State for the purposes of attribution.[1132]

---

[1128] C-I §§ 580 – 582; Nuclear Tests *(Australia v. France)*, Judgment, I.C.J. Reports 1974, p. 268, § 46 **[CL-0024]**; Nuclear Tests *(New Zealand v. France)*, Judgment, I.C.J. Reports 1974, pp. 472 – 473, §§ 46, 49 **[CL-0025]**; W. M. Reisman and M. H. Arsanjani, "The Question of Unilateral Governmental Statements as Applicable Law in Investment Disputes", in P. M. Dupuy et al. (Eds.): *Völkerrecht als Wertordnung – Common Values in International Law. Festschrift für / Essays in Honour of Christian Tomuschat*, 2006, 420 **[CL-0068]**; D. D. Caron, "The Interpretation of National Foreign Investment Law as Unilateral Acts Under International Law", in Mahnoush H. Arsanjani et al. (Eds.), *Looking to the Future: Essays on International Law in Honor of W. Michael Reisman*, Brill, 654 **[CL-0069]**; *The Mavrommatis Jerusalem Concessions*, Judgment of 26 March 1925, P.C.I.J. Series A, No. 5, pp. 37 – 38 **[CL-0070]**.

[1129] C-I §§ 588 – 597; *LG&E v. Argentina*, §§ 172, 174, 175 **[CL-0206]** / **[CL-0057]**; *Continental Casualty v. Argentina*, §§ 297, 301 **[CL-0051]**; *Enron v. Argentina*, §§ 274, 275 **[CL-0060]**; A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment*, WoltersKluwer, Alphen aan den Rijn, 2009, 459 **[CL-0067]**; D. D. Caron, "The Interpretation of National Foreign Investment Law as Unilateral Acts Under International Law", in Mahnoush H. Arsanjani et al. (Eds.), *Looking to the Future: Essays on International Law in Honor of W. Michael Reisman*, Brill, 649, 653 **[CL-0069]**; *Enron v. Argentina*, Decision on Annulment, § 331 **[CL-0074]**; *BG v. Argentina*, § 365 **[CL-0075]** / **RL-0061]**; *Noble Energy Inc. and MachalaPower Cía. Ltd. V. Republic of Ecuador and Consejo Nacional de Electricidad* (ICSID Case No. ARB/05/12), Decision on Jurisdiction, 5 March 2008, §§ 157, 331 **[CL-0076]**.

[1130] C-I §§ 598 – 599; Salacuse, *The Law of Investment Treaties*, 299, 306 **[CL-0047]**.

[1131] C-I §§ 600 – 601, 604; Salacuse, *The Law of Investment Treaties*, 299, 306 **[CL-0047]**; *The Mavrommatis Jerusalem Concessions*, Judgment of 26 March 1925, P.C.I.J. Series A, No. 5, 37 **[CL-0070]**; M. C. Gritón Salias, "Do Umbrella Clauses Apply to Unilateral Undertakings?", in C. Binder, U. Kriebaum, A. Reinisch and S. Wittich (Eds.), *International Investment Law for the 21ˢᵗ. Century. Essays in Honour of Christoph Schreuer*, Oxford University Press, 2009, 491 – 492 **[CL-0077]**; J. Antony, *"Umbrella Clauses Since SGS v. Pakistan and SGS v. Philippines – A Developing Consensus"*, Arbitration International, Vol. 29, No. 4, 623 – 625 **[CL-0078]**; *Case concerning certain German interests in Polish Upper Silesia (The Merits)*, Judgment of 25 May 1926, P.C.I.J. Series A, No. 7, p. 13 **[CL-0079]**.

[1132] C-I §§ 602 – 603; *Armed Activities on the Territory of the Congo (New Application: 2002) (Democratic Republic of the Congo v. Rwanda)*, Jurisdiction and Admissibility, Judgment, I.C.J. Reports 2006, p. 27 (§ 47) **[CL-0023]**; *Al-Bahloul v. Tajikistan*, § 169 **[CL-0026]**; International Law Commission's *Guiding Principles applicable to unilateral declarations of States capable of creating obligations, with commentaries thereto*, Text adopted by the International Law Commission at its Fifty-eighth session, in 2006, and submitted to the General Assembly as a part of the Commission's report covering the work of that session (A/61/10), *Yearbook of the International Law Commission, 2006*, vol. II, Part Two (hereinafter "ILC *Guiding Principles Applicable to Unilateral Declarations*

560. Here, Respondent's statutory provisions that granted rights to investors under Regulatory Framework No. 1 (Act 54/1997 and RD 661/2007) were confirmed by official statements by State officials.[1133] Prior to the Hearing, Claimants argued that there was an unequivocal relationship of inducement and reliance between Regulatory Framework No. 1 and its promise of the six feed-in rights and Claimants' decision to invest in PV Installations.[1134]  To obtain these rights, final registration in RAIPRE was essential.[1135]  Later, this was confirmed in RD 1578/2008, which only applied to PV facilities registered in the RAIPRE after 29 September 2008.  By excluding already registered facilities from the scope of the changes, Respondent reassured its commitment to certainty, predictability, and stability for registered PV installations.[1136]  Respondent, through its Government and Ministry of Energy issued press releases, presentations, and even international roadshows wherein it confirmed that Regulatory Framework No. 1 would not be changed for renewable energy facilities that would meet certain requirements.[1137]  Promises of these public officials that were included in official statements are unilateral acts binding on Respondent as a matter of international law.[1138]

---

*of States Capable of Creating Obligations*"), Preamble **[CL-0080]**.

[1133] C-I §§ 605 – 607.

[1134] *Id.* at § 608; M. Reisman and M. H. Arsanjani, "The Question of Unilateral Governmental Statements as Applicable Law in Investment Disputes", in P. M. Dupuy et al. (Eds.): *Völkerrecht als Wertordnung – Common Values in International Law. Festschrift für / Essays in Honour of Christian Tomuschat*, 2006, 422 **[CL-0068]**; *El Paso v. Argentina*, §§ 219 – 220 **[CL-0017]** / **[RL-0041]**; Interview to H.E. Mr. Mariano Rajoy Brey, President of the Government, *Televisión Española*, 26 October 2015 **[C-0178]**.

[1135] C-I § 609.

[1136] *Id.* at §§ 610 – 611; RD 1578/2008, Art. 2 **[R-0072]** / **[C-0070]**.

[1137] C-I §§ 612 – 614; *see e.g.* PER 2005 – 2010 **[C-0066]** / **[R-0092]**; Official Press Release of the Ministry of Energy of 25 May 2007, regarding the enacted RD 661/2007 **[C-0067]**; Presentation "Opportunities in Renewable Energy in Spain", *Invest in Spain*, Graz, 15 November 2007, slides 4, 40 **[C-0080]**; F. Martí Scharfhausen, "The Legal and Regulatory Framework of Renewable Energies*"*, CNE, 29 October 2008 **[C-0081]**; C. Solé Martín & L.J. Sánchez de Tembleque, "Estudio económico de las energías Renovables," CNE, Cartagena de Indias, 9 – 13 February 2009 **[C-0082]**; IDAE Brochure, *"*El Sol puede ser suyo*"*, 24 May 2005 **[C-0084]**; IDAE Brochure, "El Sol Puede ser suyo", 6 June 2007 **[C-0179]**; IDAE Brochure, "El Sol Puede Ser Suyo", November 2007 **[C-0180]**; IDAE Brochure, "El Sol Puede Ser Suyo", April 2008 **[C-0181]**; Presentation "Legal Framework for Renewable Energies in Spain", *Invest in Spain*, October 2009 **[C-0182]**; Fernando Marti Scharfhausen, "Renewable Energy Regulation in Spain", CNE, February 2010 **[C-0183]**; "Actividades del Plan Made in/Made by Spain en EE.UU. - California-Colorado-Texas, de 26-30 octubre de 2009", of 24 October 2009 **[C-0184]**; "Q&A: Official details Spain's big green-energy push", *Houston Chronicle*, 7 November 2009 **[C-0185]**; Speech by Dr. Miguel Sebastián Gascón, Minister of Energy, Denver CO, USA, 27 October 2009 **[C-0186]**; Speech by Dr. Pedro Marín Uribe, Secretary of State for Energy, US-Spain Business Sustainability Forum, Los Angeles CA, USA, 26 October 2009 **[C-0187]**.

[1138] C-I § 615; Interview to H.E. Mr. Mariano Rajoy Brey, President of the Government, *Televisión Española*, 26 October 2015 **[C-0178]**; Nuclear Tests *(Australia v. France)*, Judgment, I.C.J. Reports 1974, pp. 267 – 269 (§ 45) **[CL-0024]**; Nuclear Tests *(New Zealand v. France)*, Judgment, I.C.J. Reports 1974, p. 473 (§ 48) **[CL-0025]**;

Respondent's statements and promises were repeated, and Claimants could legitimately trust in them for the purpose of making its investment in the Spanish PV subsector and to keep it over time. [1139] Any regulatory change must consider the acquired rights of investors in order to be consistent with the State's international obligations.[1140]  Rather than consider these rights, Respondent fully bypassed its obligations toward Claimants, disregarding statutory provisions and official statements by state officials. [1141]  This Tribunal must find that Respondent is now estopped from disregarding its commitment to respect and apply Regulatory Framework No. 1 to the PV Installations for their entire useful lifetime.[1142]

561.  After the Hearing, Claimants stated that they have pointed to Respondent's "*attraction campaign*" to show Respondent's contemporaneous interpretation of its own regulatory framework.  Claimants stated that they relied in particular on the language of RD 661/2007 and the legal explanations contained in the Cuatrecasas Due Diligence Reports when making their investment.[1143]

---

"ILC *Guiding Principles Applicable to Unilateral Declarations of States Capable of Creating Obligations*"), Principle 5 **[CL-0080]**.

[1139] C-I §§ 616 – 619; *Armed Activities on the Territory of the Congo (New Application: 2002) (Democratic Republic of the Congo v. Rwanda),* Jurisdiction and Admissibility, Judgment, I.C.J. Reports 2006, p. 27 (§ 47) **[CL-0023]**; Nuclear Tests *(Australia v. France),* Judgment, I.C.J. Reports 1974, pp. 267 – 269 (§§ 45, 51) **[CL-0024]**; Nuclear Tests *(New Zealand v. France),* Judgment, I.C.J. Reports 1974, p. 473 – 474 (§§ 48, 53) **[CL-0025]**; . M. Reisman and M. H. Arsanjani, "The Question of Unilateral Governmental Statements as Applicable Law in Investment Disputes", in P. M. Dupuy et al. (Eds.): *Völkerrecht als Wertordnung – Common Values in International Law. Festschrift für / Essays in Honour of Christian Tomuschat*, 2006, 417, 420 **[CL-0068]**; "ILC *Guiding Principles Applicable to Unilateral Declarations of States Capable of Creating Obligations*"), Principles No. 3, 4, 7, 10 **[CL-0080]**.

[1140] C-I § 620.

[1141] *Id.* at §§ 621 – 623; Press release "Bundesministerium für Wirtschaft und Energie" from Germany's Ministry of Economy and Energy, 21 January 2014 **[C-0188]**; T. Herbold, "Renewable Energy Sources Act 2014 – Overview of the most important changes", *Görg*, 8 August 2014 **[CL-0081]** (example on promoting legal security); Nuclear Tests *(Australia v. France),* Judgment, I.C.J. Reports 1974, p. 267 (§ 51) **[CL-0024]**; Nuclear Tests *(New Zealand v. France),* Judgment, I.C.J. Reports 1974, p. 472 (§ 53) **[CL-0025]**.

[1142] C-I §§ 616 – 619; *Armed Activities on the Territory of the Congo (New Application: 2002) (Democratic Republic of the Congo v. Rwanda),* Jurisdiction and Admissibility, Judgment, I.C.J. Reports 2006, p. 27 (§ 47) **[CL-0023]**; Nuclear Tests *(Australia v. France),* Judgment, I.C.J. Reports 1974, pp. 267 – 269 (§§ 45, 51) **[CL-0024]**; Nuclear Tests *(New Zealand v. France),* Judgment, I.C.J. Reports 1974, p. 473 – 474 (§§ 48, 53) **[CL-0025]**; . M. Reisman and M. H. Arsanjani, "The Question of Unilateral Governmental Statements as Applicable Law in Investment Disputes", in P. M. Dupuy et al. (Eds.): *Völkerrecht als Wertordnung – Common Values in International Law. Festschrift für / Essays in Honour of Christian Tomuschat*, 2006, 417, 420 **[CL-0068]**; "ILC *Guiding Principles Applicable to Unilateral Declarations of States Capable of Creating Obligations*"), Principles No. 3, 4, 7, 10 **[CL-0080]**.

[1143] CPHB-I §§ 36 – 37; Tr. Day 2, 68:16-18, 70:24 – 71:1, 71:9-12; 73:1-6 (Kofmel); *Novenergia*, § 679 **[CL-0213]**

2.    **Respondent's Arguments**

562. Since Claimants did not address this claim in its Reply, Respondent requests that the Tribunal understand that Claimants have abandoned their claims regarding the Umbrella Clause. The burden of proof of these violations lies with Claimants, and Claimants have not refuted Respondent's arguments.[1144]

563. Respondent has not breached any obligations it incurred in relation with the Claimants' investment.[1145] This claim should be dismissed pursuant to the literal interpretation of Article 10(1), last sentence. Neither the Claimants as the investors, nor Claimants' investment, is covered under the Umbrella Clause of the ECT, as the Respondent has not contracted any specific commitments *vis-à-vis* the Claimant or their investment to petrify the RD 661/2007 regime in their favor.[1146]

564. Claimants' interpretation of Article 10(1) of the ECT contradicts the literal sense of that provision and its interpretation through doctrine and arbitral precedents.[1147] Claimants' conflate a regulation that is applicable *erga omnes*, such as RD 661/2007, with commitments specifically agreed with an investor or their investment. This approach ignores the terms of the ECT, which expressly include "*entered into*", which involves the State's assumption of specific obligations regarding an investor or an investment.[1148] As stated by the tribunal in *SGS v. The Philippines*, obligations of the State must be specific and assumed by the state with respect to a particular investor, in a *vis-à-vis* relationship.[1149] This is how the clauses in Article 10(1) of the ECT have earned the name "*a pacta sunt servanda clause*."[1150]

---

(RD 661/2007 was so adamantly clear that its understanding by common readers did not require a particularly sophisticated analysis); Cuatrecasas, "Opinion in the interest of DEUTSCHE BANK. Applicable structure for PV projects in Spain*", of October 2007, § 8.9 **[C-0095]** / **[Document 11 CWS-LB]** / **[Document 09 CWS-PK]**.

[1144] R-II §§ 40 – 42; 1084 – 1085.

[1145] R-II § 1196.

[1146] R-I § 1214.

[1147] *Id.* at § 1185.

[1148] *Id.* at §§ 1186 – 1187, 1195; *Noble Ventures, Inc v. Romania,* ICSID Case No. ARB/01/11, Award of 12 October 2005 (hereinafter "*Noble Ventures v. Romania*"), § 51 **[RL-0026]**.

[1149] R-I § 1188; *Société Générale de Surveillance S.A. v. Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to Jurisdiction, of 29 January 2004, § 166 **[RL-0024]**.

[1150] R-I § 1191; *The "Umbrella" Clause in Investment Arbitration: A Comment on Original Intentions and Recent*

565. There is no arbitral precedent that supports Claimants' theory.[1151]  The tribunal in *Plama Consortium v. Bulgaria* ruled that it was not necessary to decide whether Article 10(1) covers commitments arising from laws.[1152]  *Khan Resources v. Mongolia* is unlike the present case because it analyzed an umbrella clause in relation to a Foreign Investment Law that was passed specifically for foreign investors and was not, as here, general in nature.[1153]  *Al-Bahloul v. Tajikistan* also does not support Claimants' conclusion as it stated that "*it is clear that the obligation must have been entered into 'with' an Investor … this provision does not refer to general obligations of the State arising as a matter of law.*"[1154]  Likewise, the ECT cases presented by Claimants, including *Eureko B.V. v. Poland*, do not support Claimant's thesis.[1155]

566. Respondent is not bound *vis-à-vis* Claimants or their investment through unilateral acts.[1156]  RD 661/2007 is a decree passed by Respondent in the exercise of its regulatory powers.  It was aimed at any owners of electrical plants, regardless of their nationality or the origin of funds.[1157]  The tribunals in *Charanne* and *Isolux* also found that RD 661/2007 and RD 1578/2008 did not create *vis-à-vis* obligations between the State and the investor.[1158]

---

*Cases*". Thomas W. Wälde. HEINONLINE 6 J. World Investment & Trade 183 2005, 226 **[RL-0055]**; *see also* R-I §§ 1190, 1194; "*The Energy Charter Treaty: A Reader's Guide*", Energy Charter Secretariat, p. 26 **[RL-0053]**.

[1151]  R-I §§ 1193, 1196 – 1198.

[1152]  *Id.* at §§ 1199 – 1200; *Plama v. Bulgaria*, §§ 186 – 187 **[CL-0011] / [RL-0034]**.

[1153]  R-I § 1201; *Khan Resources v. Mongolia*, Decision on Jurisdiction, § 366 **[CL-0072]**.

[1154]  R-I § 1202; C-I § 585; *Al-Bahloul v. Tajikistan*, § 257 **[CL-0026]**.

[1155]  R-I §§ 1203 – 1209; *see e.g. Noble Ventures v. Romania*, § 85 **[RL-0026]** (*explaining* that the umbrella clause only protects obligations arising from specific bilateral relationships between the State and the investor); *CMS Gas Transmission Company v. the Republic of Argentina*, ICSID Case No. ARB/01/8, Decision of the Annulment Committee, 25 September 2007 **[RL-0031]**; *Eureko B.V. v. the Republic of Poland*, Partial Award of Jurisdiction and Fund of 19 August 2005, § 258 **[RL-0043]**; *El Paso v. Argentina*, § 533 **[CL-0017] / [RL-0041]**; *SGS v. Paraguay*, § 169 **[CL-0059]**.

[1156]  R-I § 1185.

[1157]  *Id.* at §§ 1210 – 1212.

[1158]  *Id.* at §§ 1211 – 1213; (accepting that RD 661/2007 applied to all owners of electrical plants, regardless of nationality and origin of funds); *Isolux*, §§ 769, 771, 772 **[RL-0004] / [RL-0076]**; *Charanne*, §§ 494, 504, 505 **[CL-0030] / [RL-0049]** (*reiterating* absence of *vis-à-vis* commitments).

567. In its post-hearing submission, Respondent pointed out that the *Charanne*, *Eiser*, and *Antin* awards did not deal with the Umbrella Clause, and the *Isolux* and *Novenergia* tribunals dismissed claims under it.[1159]

### 3.    The Tribunal

568. While the Tribunal maintains the above summaries of the Parties' submissions in this Award in order to provide a complete picture of the reasoning, it considers it does not have to decide on them.  Since neither Party, in its relief sought, requests any different consequences or damages based on these claims beyond those claimed on the basis of FET and as it has been concluded above that there is a breach of FET, Tribunal need not decide whether additionally any of these other alleged breaches has occurred as that would not lead to any other conclusion and dispositive.

569. Nevertheless, in this context, the Tribunal notes that recently the tribunal in *Greentech v. Italy* considered "*the ECT's umbrella clause as sufficiently broad to encompass not only contractual duties but also certain legislative and regulatory instruments that are specific enough to qualify as commitments to identifiable investments or investors.*"[1160]  This, in a way, follows the broad reasoning of the *Plama* tribunal saying "*that the wording of this clause in Article 10(1) of the ECT is wide in scope since it refers to 'any obligation.' An analysis of the ordinary meaning of the term suggests that it refers to any obligation regardless of its nature, i.e., whether it be contractual or statutory.*"[1161] The present Tribunal finds the interpretation of most Spanish RE cases more convincing and notes in this context that the tribunal in *Isolux*  was of the view that the ECT's umbrella clause, although speaking of "*any obligations*" because it referred to "*entered into*" was limited to contractual obligations[1162] and that the tribunal in *Novenergia* held that "*Article 10(1) of the ECT does indeed provide for a duty of each Contracting Party to 'observe any obligations it has entered into with an Investor', a provision that recalls the 'umbrella clause' contained in several investment treaties. However, the application*

---

[1159] RPHB-I § 165 – 167; *Isolux*, §§ 768 – 771 **[RL-0004]** / **[RL-0076]**; *Novenergia*, p. 715 **[CL-0213]**.

[1160] *Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR, and NovEnergia II Italian Portfolio SA v. The Italian Republic*, SCC Case No. V2015/095, Award, 23 December 2018, § 464.

[1161] *Plama v. Bulgaria*, § 186 **[CL-0011] / [RL-0034]**.

[1162] *Isolux*, § 769 **[RL-0004]** / **[RL-0076]**.

*of the umbrella clauses requires that the host State either concluded with the investor a specific contract or made to the investor a specific personal promise*."[1163]

### D. MOST CONSTANT PROTECTION AND SECURITY ("MCPS")

#### 1. Claimants' Arguments

570. By passing the Regulatory Framework No. 2 in 2010-2013 and Regulatory Framework No. 3 in 2013 – 2014, Respondent violated Claimants' right to enjoy the most constant protection and security ("MCPS") under Article 10(1) of the ECT.[1164]  Pursuant to the MFN clause included in Article 10(7) of the ECT, Claimants invoke the following MCPS clauses from BITs entered into by Respondent with another state for the purposes of obtaining protection for (1) legal security and a secure legal environment, if the Tribunal considers that MCPS does not encompass legal security but only physical security, and (2) the challenge of the TVPEE, if the Tribunal considers it a *bona fide* taxation measure:

(i) Article III(1) of the Spain-Costa Rica BIT: "*Investments made by investors of one Contracting Party in the territory of the other Contracting Party* (…) *shall enjoy full protection and security.*"[1165]

(ii) Article 4(1) of the Spain-India BIT: "*Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall at all times* (…) *enjoy full protection and security.*"[1166]

(iii) Article 3(1) of the Spain-Libya BIT: "*Investments made by investors of each Contracting Party in the territory of the other Contracting Party* (…) *shall enjoy full protection and security.*"[1167]

(iv) Article 3(1) of the Spain-Morocco BIT: "*Investments made by investors of each Contracting Party in the territory or the maritime zone of the other Contracting Party* (…) *shall enjoy full and complete protection and security.*"[1168]

---

[1163] *Novenergia*, § 715 **[CL-0213]**.

[1164] C-I §§ 479(iii), 784.

[1165] *Id.* at §§ 790 – 792; Spain-Costa Rica BIT, Art. III(1) **[CL-0037]**.

[1166] C-I §§ 790 – 792; Spain-India BIT, Art. 4(1) **[CL-0096]**.

[1167] C-I §§ 790 – 792; Spain-Libya BIT, Art. 3(1) **[CL-0063]**.

[1168] C-I §§ 790 – 792; Spain-Morocco BIT, Art. 3(1) **[CL-0064]**.

(v)     Article 3(1) of the Spain-Ukraine BIT: "*Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall at all times (…) enjoy full protection and security*."[1169]

(vi)    Article 3(1) of the Spain-Uzbekistan BIT: "Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall (…) enjoy full protection and security."[1170]

571.    Analyzed using Article 31(1) of the VCLT, the expression "*the most constant protection and security*" is equivalent to another used in international investment treaties: "*full protection and security*",[1171] which obliges the host State to provide physical protection of the investor, and to provide a secure legal investment environment.[1172]

572.    The roller-coaster of legislative changes from November 2010 until June 2014 and the retroactive application of regulations shows that Respondent has disregarded the obligations guaranteed by MCPS.[1173]  Respondent created instability, and this was reflected in the 11-month lag period between RD-Law 9/2013 and RD 413/2014 and MO IET/1045/2014, which shaped the New Regime and defined remuneration parameters.  During that period, PV Installations performed on a purely interim basis.  Regulatory Framework No. 3 is unstable because it is subject to Respondent's discretionary changes every three and six years.  Since 2010, remuneration for PV Installations has been cut by more than half.[1174]

---

[1169] C-I §§ 790 – 792; Spain-Ukraine BIT, Art. 3(1) **[CL-0036]**.

[1170] C-I §§ 790 – 792; Spain-Uzbekistan BIT, Art. 3(1) **[CL-0066]**.

[1171] C-I § 785; *AES v. Hungary*, § 13.3.5 **[CL-0016]**; Salacuse, *The Law of Investment Treaties* **[CL-0047]**; *Electrabel v. Hungary*, Decision on Jurisdiction, § 7.80 **[CL-0094] / [RL-0002]**.

[1172] C-I §§ 786 – 788; for protection of a secure legal investment market, *see Frontier v. Czech Republic*, § 263 **[CL-0021] / [RL-0095]**; *CME Czech Republic B.V. v. The Czech Republic* (UNCITRAL), Partial Award, 13 September 2001 (hereinafter "*CME v. Czech Republic*"), § 613 **[CL-0035]**; *Total v. Argentina*, § 343 **[CL-0106]**; *Azurix v. Argentina*, § 408 **[RL-0100] / [CL-0127]**; *Biwater Gauff (Tanzania) Limited v. United Republic of Tanzania* (ICSID Case No. ARB/05/22), Award, 24 July 2008 (hereinafter "*Biwater Gauff*"), § 729 **[CL-0128] / [RL-0082]**; Schreuer, FET, 85 **[CL-0085]**; for protection that goes beyond physical security, *see Al-Bahloul v. Tajikistan*, § 246 **[CL-0026]**; Salacuse, *The Law of Investment Treaties*, 236 – 239 **[CL-0047]**; S.A. Alexandrov, "The Evolution of the Full Protection and Security Standard", in Kinnear M. *et alios* (Eds.), *Building International Investment Law. The First 50 Years of ICSID*, Kluwer Law International, Alphen aan den Rijn, 2016, 325, 326 **[CL-0129]**; R. Dolzer and C. Schreuer, *Principles of International Investment Law*, Oxford University Press, 2nd. Edition, 2012, 163 – 165 **[CL-0130]**.

[1173] C-I §§ 793 – 794, 801.

[1174] *Id*. at §§ 795 – 797.

573. The *CSOB v. Slovakia* tribunal found that taking a contrary position to a previous State practice would not comply with the obligation to provide full protection and security.[1175]  Regarding security, Article 44(3) of RD 661/2007 guaranteed that future modifications to the Regulated Tariff would be prospective and would not affect existing PV facilities.  This has been substituted by a regime under which Claimants are remunerated only with pool market prices, which has caused substantial damage to the Investments. These regulatory changes have devalued Claimants' investment and withdrawn the agreed and approved security and protection of the foreign investor's investment.[1176]

### 2.    Respondent's Arguments

574. Since Claimants did not address the MCPS claim in their Reply, Respondent requests that the Tribunal understand that Claimants have abandoned their claims.  The burden of proof of these violations lies with Claimants, and Claimants have not refuted Respondent's arguments.[1177]  In light of the factual record, the concurrence of regulatory power, and the adoption of the measures in accordance with existing economic circumstances, Respondent requests that the Tribunal dismiss this claim.[1178]

575. Respondent has respected the guarantee of MCPS provided for in Article 10(1) of the ECT.  This standard does not provide investors protection against a Government's right to legislate or to regulate in such a way that may negatively affect a particular investment, provided that the Government's actions are reasonable in light of the circumstances and are made with the intention of achieving objectively reasonable results of public order.[1179]  Here, the remuneration method chosen was expressly proposed by APPA with the support of Cuatrecasas in 2009.  These measures prompted the

---

[1175] *Id.* at § 789; *Ceskoslovenska Obchodni Banka, A.S. v. The Slovak Republic* (ICSID Case No. ARB/97/4), Award, 29 December 2004, § 161 **[CL-0131]**.

[1176] C-I §§ 798 – 800; *CME v. Czech Republic*, § 613 **[CL-0035]**.

[1177] R-II §§ 40 – 42; 1084 – 1085.

[1178] R-I § 1137.

[1179] *Id.* at §§ 1130 – 1135; R. Dolzer and C. Schreuer, *Principles of International Investment Law*, Oxford University Press, 2nd. Edition, 2012 **[CL-0130]**; *Principles of International Investment Law*, Oxford University Press. R. Dolzer and C. Schreuer, 162 **[RL-0068]**; *AES v. Hungary*, § 13.3.2 **[RL-0039]**.

stabilization of the Tariff Deficit and the maintenance of a reasonable rate of return for energy producers.[1180]  The Tribunal should, therefore, dismiss this claim.[1181]

### 3.    The Tribunal

576.  Again, while the Tribunal maintains the above summaries of the Parties' submissions in this Award in order to provide a complete picture of the reasoning, it considers it does not have to address and decide on them.  Since neither Party, in its relief sought, requests any different consequences or damages based on these claims beyond those claimed on the basis of FET and as it has been concluded above that there is a breach of FET, the Tribunal need not decide whether additionally any of these other alleged breaches has occurred as that would not lead to any other conclusion and dispositive. Nevertheless, in this context, the Tribunal notes that it considers that the obligation to provide constant protection and security differs from the obligation to provide fair and equitable treatment and that thus both claims have to be examined separately.  It shares the view of the tribunal in *Mamidoil* v. *Albania* that the ECT's "*standard of constant protection and security does not imply strict liability but rather obliges States to use due diligence to prevent harassment and injuries to investors*."[1182] The wording of the ECT's most constant protection and security clause does not suggest that it extends to legal security. Rather, the protection and security is one directed against interferences by third parties. The alleged violations of the most constant protection and security obligation in the form of legal insecurity resulting from the Respondent's changing legal framework have been addressed in the Tribunal's discussion of the FET claims. Since these matters are directly emanating from the Respondent, they do not raise issues of protection against interferences by third parties.

---

[1180] R-I § 1136; Copy of the letter from the Secretary of State for Energy to the President of the National Energy Commission of 27 January 2012 **[R-0170]**.

[1181] R-I § 1137.

[1182] *Mamidoil v. Albania*, § 821 **[ RL-0046]**.

E.    IMPAIRMENT BY UDM / NON-IMPAIRMENT CLAUSE

1.    **Claimants' Arguments**

577.    Respondent's repeal of Regulatory Framework No. 1 through the successive passing of Regulatory Framework No. 2 in 2010 – 2013 and Regulatory Framework No. 3 in 2013 – 2014 constitutes a breach of Respondent's obligation under Article 10(1) of the ECT to not "*in any way impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of the Investment.*"[1183]   Respondent has breached Article 10(1) of the ECT because (1) the regulatory measures which have given rise to a radically different regulatory framework to the one in place when the Claimants made their Investment are unreasonable, (2) certain regulatory measures adopted by Respondent are discriminatory, and (3) these regulatory measures have impaired the Claimants' Investment.[1184]

578.    The requirements are non-cumulative and the breach of any factor of this two-fold standard entails the host-State's responsibility under the ECT.[1185]   Analyzing the term "*impairment*" in light of Article 31(1) of the VCLT, the measure must have been to some extent "*detrimental*" to the investment.   A reduction in the income received meets this definition and may be considered an "*impairment.*"[1186]

579.    The non-impairment requirement of Article 10(1) may be breached by measures that are unreasonable from either an objective or subjective viewpoint.[1187]   *BG* found that the unilateral withdrawal of assurances given in good faith to investors to induce them to invest is unreasonable by definition.[1188]   Respondent's conduct prior to November 2010 created an expectation in Claimants that the regulatory framework for PV Installations would remain stable, certain, and consistent.[1189]   Since Respondent's

---

[1183] C-I § 479(iv).

[1184] *Id.* at § 810.

[1185] *Id.* at §§ 802 – 804.

[1186] *Id.* at §§ 808, 833; *AES v. Hungary*, §§ 10.3.4 – 10.3.5 **[CL-0016]**; A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment*, WoltersKluwer, Alphen aan den Rijn, 2009, 300 **[CL-0067]**; *Saluka v. Czech Republic*, § 458 **[CL-0109]** / **[RL-0083]**.

[1187] C-I § 805; *Black's Law Dictionary,* 7th. Ed., 1999 **[CL-0134]**.

[1188] C-I § 806; *BG v. Argentina*, §§ 342 – 344 **[CL-0075]** / **RL-0061]**; A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment*, WoltersKluwer, Alphen aan den Rijn, 2009, 304 **[CL-0067]**.

[1189] *See e.g.* RD 661/2007, Art. 44(3) **[R-0071]** / **[C-0046]**.

measures disregarded Claimants' expectations and the regulatory scenario under which it decided in invest in 2008 and 2009, they are unreasonable.[1190]  Under the New Remuneration Model, Respondent grants RE producers a Specific Remuneration based on standard parameters calculated by Respondent, which make up the cost profile of the "*standard installations*."[1191]  These measures are further unreasonable because they are ultimately based on an unreasonable target:  a so-called 7.398% "*reasonable rate of return*", whereby Respondent unilaterally decided how much investors should earn and then designed a remuneration model to achieve that target, with no regard to Claimants' investment or their specific reliance upon the Feed-In Model assured by Regulatory Framework No. 1.[1192]  The 7.398% figure is a targeting ceiling.  Nothing prevents investors from earning less, as is the case of Claimants in this arbitration.[1193]  No international precedent can be found of a successful renewable investment regime based exclusively on a "*reasonable rate of return*." CNE (now CNMC) acknowledged that the "*reasonable rate of return*" is unjustified and does not reflect the capital cost of the most efficient companies.[1194]

580.  Claimants, pursuant to the MFN Clause included in Article 10(7) of the ECT invoke the following BITs entered into by Respondent with other States for the purpose of obtaining protection regarding the challenge of the TVPEE, if the Tribunal considers it a *bona fide* taxation measure:

  (i)  Article III(2) of the Spain-Costa Rica BIT: "*Neither Contracting Party shall obstruct in any way, by arbitrary or discriminatory measures, the functioning, management, maintenance, use, enjoyment, sale or, where appropriate, liquidation of such investments.*" [1195]

  (ii)  Article 4(2) of the Spain-India BIT: "*Neither Contracting Party shall in any way impair by arbitrary or discriminatory measures the operation, management, maintenance, use, enjoyment, sale, and if it is the case, the liquidation of such investments.*" [1196]

---

[1190] C-I §§ 811 – 813.

[1191] *Id*. at § 354.

[1192] *Id*. at §§ 814, 817.

[1193] *Id*. at § 815; Interview to H.E. Mr. Mariano Rajoy Brey, President of the Government, *Televisión Española*, 26 October 2015 **[C-0178]**.

[1194] C-I § 816; CNE Report 18/2013 **[C-0192]**.

[1195] C-I § 809; Spain-Costa Rica BIT, Art. III(2) **[CL-0037]**.

[1196] C-I § 809; Spain-India BIT, Art. 4(2) **[CL-0096]**.

(iii)   Article 3(2) of the Spain-Libya BIT: "*Neither Contracting Party shall in any way impair by means of unjustified or discriminatory measures the management, maintenance, use, enjoyment or disposal of said investments.*" [1197]

(iv)   Article 3(2) of the Spain-Morocco BIT: "*Neither Contracting Party shall impair by unjustified or discriminatory measures the management, maintenance, use, extension, enjoyment, sale, or, where appropriate, liquidation of such investments.*" [1198]

(v)   Article 3(2) of the Spain-Ukraine BIT: "*Neither Contracting Party shall in any way impair by unreasonable or discriminatory measures the operation, management, maintenance, use, enjoyment, sale, and if it is the case, the liquidation of such investments.*" [1199]

(vi)   Article 3(2) of the Spain-Uzbekistan BIT: "*Neither Contracting Party shall in any way impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of such investments.*"[1200]

581.   The TVPEE lacks objective reasonableness because it lacks the environmental purpose that Respondent claims to be linked to it.[1201]  The Spanish Expert Committee created for the Tax System Reform moved for the elimination of the TVPEE because it did not respond to any environmental criteria but rather to the collection of income.[1202]  The TVPEE aims to collect money for the SES.[1203]

582.   The following three-prong test may be considered to determine if the effects of a measure are discriminatory and, thus, give rise to liability under Article 10(1) of the ECT:  (1) whether the group of investors that must be taken into account for the purposes of comparison is in similar circumstances to those of the aggrieved investor; (2) whether a differentiated treatment has been given to the investor by the host State; and (3) whether such a differentiated treatment is reasonably justified.[1204]

---

[1197]   C-I § 809; Spain-Libya BIT, Art. 3(2) **[CL-0063]**.

[1198]   C-I § 809; Spain-Morocco BIT, Art. 3(2) **[CL-0064]**.

[1199]   C-I § 809; Spain-Ukraine BIT, Art. 3(2) **[CL-0036]**.

[1200]   C-I § 809; Spain-Uzbekistan BIT, Art. 3(2) **[CL-0066]**.

[1201]   C-I § 818.

[1202]   *Id*. at § 825.

[1203]   *Id*. at §§ 818 – 823, 825 – 826; Act 15/2012, Preamble **[C-0112]** / **[R-0003]**.

[1204]   C-I § 807; *LG&E v. Argentina*, § 146 **[CL-0206]** / **[CL-0057]**; *BG v. Argentina*, § 356 **[CL-0075]** / **RL-0061]**; *Occidental Exploration and Prod. Co. v. Republic of Ecuador* (LCIA Administered Case, No. UN 3467) Award, 1 July 2004, § 177 **[CL-0103]**; *Saluka v. Czech Republic*, § 313 **[CL-0109]** / **[RL-0083]**.

583. The TVPEE has had a discriminatory impact on RE producers *vis-à-vis* conventional energy producers because, in effect, RE producers were unable to pass through the additional cost imposed by the TVPEE to their consumers as their remuneration was legally fixed by a Regulated Tariff (a fixed value per MWh).[1205] Claimants state that they "*lack any tangible evidence that could show the way (if any) in which the Respondent has considered the TVPEE to determine the specific remuneration regime applied to their PV Installations. Thus, the TVPEE would be significantly affecting renewable producers such as the PV Installations.*"[1206]  Claimants also state that "*since the TVPEE is also charging the Specific Remuneration paid to renewable energy producers (such as the PV Installations), each unit of energy produced (MWh) by the latter pays in proportion 'more' TVPEE than any unit of energy produced (MWh) by conventional producers using contaminating sources of energy. Put differently, since the price of electricity paid to PV producers (and, generally, to renewable producers) is higher than the one paid to conventional producers, the TVPEE affects the former to a greater extent.*"[1207]

584. Where a state's action consists of wiping out a remuneration previously guaranteed to investors, it may be characterized as discriminatory under Article 10(1) ECT.  The tribunal's reasoning in *Nykomb v. Latvia* can be applied to this case because Respondent has dashed the value of PV Installations if compared to conventional technologies not subjected to the Special Regime as far as the TVPEE is concerned.[1208]

585. Finally, it cannot be ruled out that the TVPEE continues to have a discriminatory impact on RE producers under Regulatory Framework No. 3, considering, *inter alia*, (1) the fact that the remuneration of the PV Installations has been determined considering *standard* and *hypothetical* (not actual) costs and values, and (2) the Respondent's concealment of basic evidence in setting parameters and variable operating costs.[1209]

---

[1205] C-I § 827.

[1206] *Id*. at § 828.

[1207] *Id*. at § 829.

[1208] *Id*. at §§ 830 – 831; *Nykomb v. Latvia*, § 4.2 [**CL-0100**].

[1209] C-I § 832.

## 2.    Respondent's Arguments

586.    Since Claimants did not address this claim in its Reply, Respondent requests that the Tribunal understand that Claimants have abandoned their claims regarding non-impairment. The burden of proof of these violations lies with Claimants, and Claimants have not refuted Respondent's arguments.[1210]

587.    The measures challenged comply with the different tests applied in arbitral case-law to evaluate whether the UDM-standard of Article 10(1) of the ECT has been infringed. The application of these tests demonstrates that the Measures (1) are not discriminatory, (2) respect the FET standard in the ECT, and (3) fulfil the minimum FET standard in international law by respecting the economic equilibrium of the investment.[1211]

588.    The test for whether a measure is discriminatory is contained in *EDF v. Romania*:

a)    *A measure that inflicts damage on the investor without serving any apparent legitimate purpose;*

b)    *A measure that is not based on legal standards but on discretion, prejudice or personal preference;*

c)    *A measure taken for reasons that are different from those put forward by the decision maker;*

d)    *A measure taken in wilful disregard of due process and proper procedure*.[1212]

589.    None of the four criteria examined in *EDF* for assessing a discriminatory action against an investor is met.[1213] Under (a), it has been established that the purpose of the reform was legitimate: the Measures aim to resolve an unstable situation of imbalance, where domestic and international circumstances led to a decrease in demand that required the system to be rebalanced. This rebalance was implemented without imposing an excessive burden on consumers.[1214] Regarding (b), the Measures were implemented in full observance of the laws in place and aimed to guarantee the principle of "*reasonable rate of return*" to all investors, foreign and domestic, in RE facilities. It is a reform of

---

[1210]  R-II §§ 40 – 42, 1084 – 1085.

[1211]  *Id*. at §§ 37, 1076.

[1212]  R-I § 1163; *EDF (Services) v. Romania*, § 303 **[RL-0035]** / **[CL-0204]**.

[1213]  R-I §§ 1164 – 1165.

[1214]  *Id*. at § 1164.

general scope.  Regarding (c), the need to reform the SES was announced in each Explanatory Statement of RD-Law 6/2009, RD-Law 14/2010, and as the MAIN of RD 1614/2010.  Regarding (d), the Respondent followed the legally established procedures to pass the regulations on remuneration in the SES.[1215]

590.  *AES Summit* states that two elements must be analyzed to determine whether a policy is reasonable under the FET standard:  the existence of a rational policy, and the reasonableness of the State action in relation to the policy.[1216]  The Contested Measures were adopted in pursuit of what *AES Summit*, and other tribunals including those in *Electrabel*, *Charanne*, and *Isolux* have confirmed to be a valid, rational public policy:  "*the reduction in excessive profits for investors and the burdens on consumers.*"[1217]  Here, the policy was implemented to protect consumers from paying investors higher than reasonable compensation.[1218]  Respondent's action was reasonable, considering the objective of the state public policy and the measure taken to reach this objective.[1219]  Respondent explains that

> [t]*he reform passed by the Government affects all the subjects of the SES. This reform distributed the measures to increase income and reduce the costs of the SES among consumers and all the operators in the system (producers, distributors and transmitters) with the aim of dealing with the tariff deficit. In addition, for the first time since the SES was created in 1994, economic contributions from the General Spanish State Budget were foreseen: Spanish taxpayers also defray the costs of the SES, including remuneration for the Claimant.*[1220]

591.  The Measures were proportionate, enabling producers to reach a reasonable rate of return around 7.398% "*on a greenfield investment typical of an efficient and well-managed company, during its lifespan*", and this amount could be higher if the standards set for a standard facility are surpassed. The Measures correct and prevent imbalances that were harming consumers and placing the financial

---

[1215]  *Id.*

[1216]  *Id.* at § 1166; *AES v. Hungary*, §§ 10.3.7 – 10.3.9 **[RL-0039]**.

[1217]  R-I §§ 1171 – 1174; *AES v. Hungary*, §§ 10.3.31 – 10.3.34 **[RL-0039]**; T.W. Wälde, "The "Umbrella" Clause in Investment Arbitration. A Comment on Original Intentions and Recent Cases", 6 *The Journal of World Investment & Trade* 183 2005 **[CL-0048]**; *Charanne*, § 510 **[CL-0030]** / **[RL-0049]**; *Isolux*, § 823 **[RL-0004]** / **[RL-0076]**.

[1218]  R-I §§ 1167 – 1170, 1175; Copy of the certificate of the Agreement adopted by the Interministerial Commission of Article 16 of Royal Decree 437/2010, in a meeting held on 26 November 2012 **[R-0175]**; MoU signed with the European Union on 20 July 2012: "*VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform*" **[RL-0067]**.

[1219]  R-I § 1176.

[1220]  *Id.* at § 1177.

sustainability of the SES at risk.[1221]  This rate of return was set as it has been in the past. Remuneration, thus, cannot represent a disproportionate or irrational measure.[1222]

592.  The Spanish remuneration model guarantees that Claimants will recover its investment in the construction of the plant and its operating costs, and will receive a reasonable rate of return.[1223]  This model is compliant with the return and the system model that APPA proposed in 2009, and this further highlights the reasonableness of the remuneration model adopted by Spain.[1224]

### 3.    The Tribunal

593.  Again, while the Tribunal maintains the above summaries of the Parties' submissions in this Award in order to provide a complete picture of the reasoning, it considers it does not have to address and decide on them.  Since neither Party, in its relief sought, requests any different consequences or damages based on these claims beyond those claimed on the basis of FET and as it has been concluded above that there is a breach of FET, Tribunal need not decide whether additionally any of these other alleged breaches has occurred as that would not lead to any other conclusion and dispositive.

### F.    CLAIMANTS' ALTERNATIVE CLAIM

### 1.    Claimants' Arguments

594.  Even if the Tribunal were to find that the Respondent only guaranteed a "*reasonable return*", Respondent would still be liable for breaching its obligations under Article 10 ECT "*by* [(1)] *imposing, ex post, a lower allowed 'target rate of return' for existing PV plants such as the Claimants'*,  [(2)] *appropriating the efficiency gains made by more efficient plants on the system (such as the Claimants')*,  [(3)] *clawing back returns earned by Claimants' plants in previous years under the Original Regime, and* [(4)] *undermining the incentive to maximize production through a change from a per MWh (of production) to a per MW (of capacity) system.*"[1225]  Rather than respect the alleged

---

[1221]  *Id*. at §§ 1178 – 1180.

[1222]  *Id*. at §§ 1181 – 1183; First Montoya Statement, § 5.

[1223]  R-II § 38.

[1224]  *Id*. at § 39; R-I § 1178.

[1225]  C-III §§ 576; 584(c), (d); Brattle, Quantum Rebuttal Report, §§ 229(c), 248 **[CER-0004]**.

guaranteed reasonable return, the Disputed Measures reduced Claimants' investment value by 60% and the investment sustained EUR 42 million in damages,[1226] in violation of the Non-Impairment standard.[1227] Thus, Respondent violated the FET standard contained in Article 10(1) on three counts: (1) by frustrating Claimants' legitimate expectations, (2) by arbitrarily and non-transparently switching the target rate of return by fixing *ex post* a 7.398% rate of return, and (3) by failing to provide any justification as to why and how it calculated the reasonable return with respect to the 10-year Spanish Bond plus a spread.[1228] Through these actions, Respondent also violated its obligation to provide MCPS under Article 10(1) ECT.[1229] These breaches entail Respondent's international liability and its obligation to repair damages in the amount quantified by Brattle.[1230]

595. Based on RD 661/2007 and consistent with CNE's contemporaneous report (CNE 3/2007), Claimants reasonably expected that their PV Plants would earn at least 7% and 8% after taxes.[1231] Brattle explains that a 7% or 8% project return is equivalent to an 8.8% or 10.1% project return, respectively.[1232] Under Respondent's *ex post* argument that expectations were limited by the concept of "*reasonable return*", Claimants at minimum would be entitled to the level of remuneration stemming from the return that Respondent considered "*reasonable*" under RD 661/2007: between 8.8% and 10.1% before tax, and not 7.398% before tax.[1233] Despite its commitment under the Original Regime, however, Respondent's Disputed Measures abruptly imposed a "*target return*" of 7.398% before taxes (5.9% post tax).[1234] This reduction caused substantial damages to Claimants.

---

[1226] C-III § 577; Brattle, Quantum Rebuttal Report, Table 12 **[CER-0004]**.

[1227] C-III § 585(iii).

[1228] *Id*. at § 585(i); *Micula v. Romania*, § 669 **[RL-0028]** / **[CL-0099]**; *Total v. Argentina*, §§ 309(g), 333 **[CL-0106]**; RD 413/2014, Second Additional (5) Provision, Art. 19(1) **[C-0131]** / **[R-0080]**.

[1229] C-III § 585(ii).

[1230] *Id*. at § 586.

[1231] *Id*. at §§ 578 – 579; The Report on Draft Royal Decree 661/2007 regulating the activity of electricity production under the special regime and the production of certain facilities with similar technologies under the ordinary regime, Section 3.2.1 and p. 18 **[R-0049]**; Brattle, Regulatory Rebuttal Report, § 153, fn. 261 **[CER-0003]**; CNE Report 3/2007, p. 22 **[BRR-36]**.

[1232] C-III § 580; §§ 235 – 236, Brattle, Quantum Rebuttal Report, Table 11 **[CER-0004]**.

[1233] C-III § 583.

[1234] *Id*. at § 581; Brattle, Quantum Rebuttal Report, § 80 **[CER-0004]**.

596. Respondent breached the ECT because the Disputed Measures retroactively reduced the level of remuneration committed to existing plants.[1235]  Respondent further breached the ECT by abandoning the principle of a single cost target, associated with the "*marginal plant*" to appropriate the efficiency gains earned by more efficient plants in the system, such as Claimants'.[1236]  Under the New Regime, Respondent provided different levels of remuneration to different types of plants.  This discriminates against more efficient plants as compared to higher-cost ones that Respondent continues to consider efficient.  This is a further aspect of the retroactive nature of the New Regulatory Regime in respect of PV installations.  Under the guarantee of a "*target rate of return*", Respondent would not be allowed to *ex post* impose stricter cost targets on the types of PV plants that turned out to be cheaper to construct and/or to perform better than the marginal plant.[1237]

## 2.    Respondent's Arguments

597. Claimants' purported alternative claim is a legal fiction, designed only to reiterate their initial claim under a different appearance and name.[1238]  Each premise of this claim is incorrect and misrepresents Respondent's regulatory system and Respondent's defense.[1239]  Claimants have not suffered a violation of the ECT and this alternative claim must be dismissed, because (1) Claimants' legitimate expectations have not been violated, as Claimants continue to obtain a reasonable return of 7% post-tax, even on their inefficient costs,[1240] (2) the Contested Measures were approved in a reasonable and transparent manner to achieve a legitimate aim, (3) the Contested Measures comply with the principle of FPS under the ECT, and (4) Respondent's measures are proportional and reasonable and have not been to the detriment of Claimants' investment.[1241]

598. *First*, Respondent has never guaranteed static returns.  Under Article 30.4 of Act 54/1997, Respondent agreed to grant a reasonable return in accordance with the cost of money on the capital market.  These

---

[1235] C-III § 584(a); Brattle, Quantum Rebuttal Report, §§ 229(a), 236 **[CER-0004]**.

[1236] C-III § 584(b).

[1237] *Id*.; Brattle, Quantum Rebuttal Report, §§ 229, 238, 246 – 247, Figure 9 **[CER-0004]**.

[1238] R-II §§ 1323 – 1325.

[1239] *Id*. at §§ 1326, 1331 – 1332.

[1240] *Id*. at § 1344(i).

[1241] *Id*. at §§ 1344 – 1345; Accuracy, Second Economic Report, § 11.5 **[RER-0002]**.

returns must be dynamic through the facility's useful life, and this has been recognized by the Spanish Supreme Court and Constitutional Court, by the EC Decision on State Aid, and the *Charanne*, *Isolux*, and *Eiser* Awards.[1242]  In *Eiser*, the Tribunal expressly found that Article 10(1) of the ECT "*does not entitle Claimants to a 'reasonable return' at any level, but to fair and equitable treatment.*"[1243]

599.  *Second*, Respondent's regulations have never been on "*marginal plants.*"  From 1997 to present, Respondent's regulations have used standard facilities contained in the successive Renewable Energy Plans, *i.e.* PER 2000-2010, PER 2005 – 2010 and, currently, in MO IET/1045/2014.  These standard facilities "*bring together efficient and well-managed facilities characterized by having the same technical parameters relating to their size, equivalent operating hours, unit costs, periods of implementation, useful life, operational and maintenance costs[,] and sale prices per final units of energy.* […]"[1244] PER 2000-2010 and PER 2005 – 2010 consider 4 standard facilities.  Claimants' and Brattle have invented the so-called "*marginal plant*", which has no basis in any legal or regulatory documentation in the Spanish system or in any background at the time of or after the investment.[1245] The absurdity of Claimants' "*marginal plant*" is further demonstrated by the fact that it does not have the same characteristics as Claimants' facilities, which are of different size, power, and technology.[1246] Claimants' "*marginal plant*" is simply one "*with the highest costs in a given tariff category*" and the *Eiser* award further pointed out the unpersuasiveness of using these "*as the basis for calculating the future revenues that should accrue to Claimants' very different plants*."[1247]  Reasonable return has been set with reference to the standard facilities and not to the individualized facilities of each investor.  Claimants, thus, cannot have expected to obtain a specific return on their plants, especially given the cost inefficiencies of Claimants' facilities.[1248]

---

[1242] R-II § 1330(i); Act 54/1997 **[C-0055bis]** / **[R-0059]**; Judgment from the Third Chamber of the Supreme Court dated 25 October 2006, appeal 12/2005, reference El Derecho EDJ 2006/282164 **[R-0118]**; *Charanne*, §§ 503, 505 **[CL-0030]** / **[RL-0049]**; Final Commission Decision C(2016) 7827, of 28 November 2016, regarding case number SA.40171 in the State Aid Register (2015/NN)– Czech Republic **[RL-0070]**; *Isolux*, §§ 788 and 807 **[RL-0004]** / **[RL-0076]**; *Eiser*, §§ 102, 106, 362, 434 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1243] *Eiser*, § 434 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1244] R-II § 1330(ii).

[1245] *Id*.; PER 2000 – 2010, pp. 280 – 283 **[C-0050]** / **[R-0090]**; PER 2005 – 2010, p. 272 **[C-0066]** / **[R-0092]**.

[1246] R-II § 1330(ii); Accuracy, Second Economic Report, § VII.2 **[RER-0002]**.

[1247] *Eiser*, § 434 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1248] Accuracy, Second Economic Report, Appendix 4 **[RER-0002]**.

600.   Claimants allege an entitlement to a minimum return of 7 – 8% post tax, without basis.  The *Isolux* award recognized that Respondent's laws did not contain a floor or ceiling, but rather that it guaranteed only "*a reasonable rate of return with reference to the cost on money in the capital market.*"[1249]  The CNE Reports did not promise an 8% return and did not create an expectation of an 8% return.[1250]  Finally, Claimants' conversion from post-tax to pre-tax is fictitious.[1251]

601.   *Third*, Claimants confuse prohibited retroactivity with the temporary application of future regulations to ongoing situations.[1252]  The tribunal in *Isolux* agreed that RD-Law 9/2013 did not have retroactive effect, but rather immediate application.[1253]

602.   *Fourth*, Claimants confuse the return calculation formula with a "*clawback*."[1254]  Respondent's form of calculation was accepted in *Isolux*, and the Decision of the Commission of the EU, as it states that to assess whether plants are receiving over-remuneration or normal remuneration, both past and future flows must be considered.[1255]

603.   *Fifth*, the remuneration regime for RE contained in the Contested Measures continues to be based on production.[1256]

### 3.    The Tribunal

604.   Claimants submit this claim expressly "[e]*ven if the Tribunal were to find that the Respondent only guaranteed a 'reasonable return,' Respondent would still be liable for breaching its obligations under Article 10 ECT".*  This alternative is not applicable as, above, the Tribunal has accepted Claimants' primary claims for breach of the FET standard and thereby of Article 10(1) of the ECT and thereby

---

[1249]  *Isolux*, § 807 **[RL-0004]** / **[RL-0076]**.

[1250]  R-II § 1330(iv); Accuracy, Second Economic Report, § III.2 **[RER-0002]**.

[1251]  R-II § 1330(v).

[1252]  *Id*. at §§ 1333 – 1335.

[1253]  R-II § 1336; *Isolux* **[RL-0004]** / **[RL-0076]**.

[1254]  R-II § 1337.

[1255]  *Id*. at § 1338; Final Commission Decision C(2016) 7827, of 28 November 2016, regarding case number SA.40171 in the State Aid Register (2015/NN)– Czech Republic, §§ 155 – 156 **[RL-0070]**.

[1256]  R-II §§ 1339 – 1342; *see generally* Accuracy, Second Economic Report **[RER-0002]**.

dismissed the alternative that Respondent only guaranteed a reasonable return.  There is, thus, no need for the Tribunal to determine this alternative claim.

## IX.    DAMAGES

### A.    LEGAL STANDARD AND BURDEN OF PROOF

### 1.    Claimants' Arguments

605.    Respondent has committed an internationally wrongful act that entails international responsibility. This obligation implies putting Claimants in the same position they would have found themselves, had Respondent not breached the ECT.[1257]  Since the ECT does not specify the consequences of an unlawful expropriation or a breach of the Article 10(1) standards, customary international law applies.[1258] The relevant principles of customary international law are derived from the PCIJ Judgment in the *Chorzów Factory Case (Germany v. Poland)* and are recorded in Articles 31 – 38 of the ILC Draft Articles.[1259]

606.    Compensation aims to put an investor into a position that would have existed "*but for*" Respondent's breach of the ECT.  To find damages derived from this "*But-For*" position, experts use a differential method comparing two scenarios – the "*But-For*" and the "*Actual*" – as a means of determining

---

[1257] C-I §§ 836 – 841, 847, 849 – 851; ILC Draft Articles, Art. 1, 31 **[CL-0001]**; *Stati v. Kazakhstan*, § 1527 **[CL-0015]**; *Nykomb v. Latvia*, p. 38 **[CL-0100]**; *Metalclad v. Mexico*, 122 **[CL-0110]**; *Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia* (ICSID Cases No. ARB/05/18 and ARB/07/15), Award, 3 March 2010 (hereinafter "*Kardassopoulos v. Georgia*"), §§ 532 – 534 **[CL-0136]** / **[RL-0097]**; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic* (ICSID Case No. ARB/97/3), Award, 20 August 2007, §§ 8.2.7 – 8.2.8 **[CL-0137]**; *S.D. Myers, Inc. v. Canada* (UNCITRAL Arbitration Proceeding), Partial Award, 13 November 2000 §§ 309, 315 **[CL-0138]**.

[1258] C-I §§ 842 – 843; *Stati v. Kazakhstan*, § 1506 **[CL-0015]**; *Yukos v. Russia*, § 1766 **[RL-0085]** / **[CL-0038]**; *Veteran Petroleum v. Russia*, § 1766 **[CL-0039]**; *Hulley Enterprises v. Russia*, § 1766 **[CL-0040]**; *Nykomb v. Latvia*, p. 38 **[CL-0100]**; *Kardassopoulos v. Georgia*, § 594 **[CL-0136]** / **[RL-0097]**; *Siemens v. Argentina*, § 349 **[CL-0139]**; S. Ripinsky with K. Williams, *Damages in International Investment Law*, British Institute of International & Comparative Law, 2008, 88 – 89 **[CL-0140]**.

[1259] C-I §§ 485, 502, 835, 844 – 846; ILC Draft Articles, Art. 31, 36 **[CL-0001]**; ILC Draft Articles, With Commentary, 91 **[RL-0032]** / **[CL-0028]**; *Chorzów Factory Case (Germany v. Poland)*, Judgment on the merits, PCIJ Series A, No. 17, 13 September 1928 ("*Chorzów Factory*"), page 47 **[CL-0141]**.

damages based on a lost income stream, as well as to determine the fair market value ("*FMV*") of an investment.[1260]

607. Here, causation of damages is beyond doubt. The dramatic reduction in remuneration brought about by Regulatory Framework Nos. 2 and 3 will (1) "*force the closing down of the SPVs at least five years before the completion of their technical useful life*" and (2) frustrate Claimants' possibility to obtain the required additional investment to extend their useful life. The breaches have also delayed compensation to Claimants, preventing them from obtaining the benefits of Regulatory Framework No. 1. These cash collection delays have increased PV Plants' need for working capital, thus delaying their servicing of debt and distributions to equity shareholders.[1261]

### 2.    Respondent's Arguments

608. Respondent appears to argue that the principle of full reparation would apply, but for the absence of breach.[1262] Claimants have always been granted a reasonable rate of return and, as such, there is no claim to be made: Claimants have not been deprived of anything, and there is no damage. Claimant continues to own its investments in Spain and its plants continue to receive remunerations that are reasonable and proportionate to their activity.[1263] Even if the Tribunal finds that there has been a breach, the damages claimed are speculative and hypothetical: Claimants have not fulfilled the burden of proof required to support this claim.[1264]

---

[1260] C-I § 851; S. Ripinsky with K. Williams, *Damages in International Investment Law*, British Institute of International & Comparative Law, 2008, 89 **[CL-0140]**; *Chorzów Factory*, page 48 **[CL-0141]**; *Sapphire International Petroleums Limited v. National Iranian Oil Company*, Award, 15 March 1963, 35 ILR 136, 185 – 186 **[CL-0143]**.

[1261] C-I §§ 852 – 853; Brattle, Quantum Report (26 October 2016) [hereinafter "Brattle, Quantum Report"], §§ 78 – 80, 82 – 83, 88, fn. 59 **[CER-0002]**.

[1262] R-II § 1147 – 1148 fn. 1131.

[1263] R-I §§ 39 – 40.

[1264] *Id.* at §§ 1215 – 1230; R-II §§ 47 – 48, 1349 – 1356; Judgment of the Third Chamber of the Supreme Court of 24 September 2012, appeal 60/2011, Sixth Legal Ground **[R-0128]**; *Gemplus, S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4, Award, 16 June 2010 ("*Gemplus v. Mexico*"), §§ 12 – 56 **[RL-0050]** / **[CL-0230]**.

### 3. The Tribunal

609. Above, the Tribunal has concluded that Respondent breached the FET standard provided by Article 10(1) of the ECT. By this internationally wrongful act, Respondent is liable under international law. This obligation implies putting Claimants in the same position they would have found themselves, had Respondent not breached the ECT.[1265] As the ECT does not specify the consequences of a breach of the Article 10(1) standards, customary international law applies.[1266] As has been established in a long tradition of international jurisprudence, the relevant principles of customary international law are derived from the PCIJ Judgment in the *Chorzów Factory Case* and are recorded in Articles 31 – 38 of the ILC Draft Articles.[1267]

## B. APPROPRIATENESS OF DCF VALUATION VS. ABV VALUATION

### 1. Claimants' Arguments

610. An appropriate way to measure damages suffered by Claimants' Investments is by comparing the actual free cash flows that the SPVs obtained or will obtain because of Respondent's ECT breaches ("*Actual*" scenario) with the free cash flows that they would have obtained in the absence of the breach ("*But-For*" scenario).[1268] The "*Historical Damages*" account for the impact on the Claimants' investments arising out of Spain's ECT breaches from 24 November 2010 to 30 June 2014, the Valuation Date.[1269] "*Present damages*" account for the reduction in FMV of Claimants' financial

---

[1265] ILC Draft Articles, Art. 1, 31 **[CL-0001]**; *Stati v. Kazakhstan*, §§ 1506, 1527 **[CL-0015]**; *Metalclad v. Mexico*, § 122 **[CL-0110]**; *Kardassopoulos v. Georgia*, §§ 532 – 534, 594 **[CL-0136]** / **[RL-0097]**; *Compañía de Aguas del Aconquija S.A. and Vendi Universal S.A. v. Argentine Republic* (ICSID Case No. ARB/97/3), Award, 20 August 2007, §§ 8.2.7 – 8.2.8 **[CL-0137]**; *S.D. Myers, Inc. v. Canada* (UNCITRAL Arbitration Proceeding), Partial Award, 13 November 2000 § 315 **[CL-0138]**.

[1266] *Yukos v. Russia*, § 1766 **[RL-0085]** / **[CL-0038]**; *Veteran Petroleum v. Russia*, § 1766 **[CL-0039]**; *Hulley Enterprises v. Russia*, § 1766 **[CL-0040]**; *Nykomb v. Latvia*, p. 38 **[CL-0100]**; *Kardassopoulos v. Georgia*, § 594 **[CL-0136]** / **[RL-0097]**; *Siemens v. Argentina*, § 349 **[CL-0139]**; S. Ripinsky with K. Williams, *Damages in International Investment Law*, British Institute of International & Comparative Law, 2008, 88 – 89 **[CL-0140]**.

[1267] ILC Draft Articles, Art. 31 – 36 **[CL-0001]**; ILC Draft Articles, With Commentary, 91 **[RL-0032]** / **[CL-0028]**; *Chorzów Factory*, page 47 **[CL-0141]**.

[1268] C-I §§ 855 – 857; CPHB-II § 27.

[1269] C-III § 857(i); RD 1565/2010, Art. 1(1) **[C-0110]** / **[R-0074]** (entry into force: 24 November 2010); RD-Law 14/2010 **[C-0111]** / **[R-0058]**; Brattle, Regulatory Report, §§ II.D and VI.C **[CER-0001]**; Brattle, Quantum Report, §8 **[CER-0002]**.

interests in the PV Plants as of the Valuation Date.[1270]  The Present Damages are obtained by discounting the expected cash flows as an appropriate rate at the Valuation Date ("*DCF Methodology*").[1271]

611. The DCF methodology is the most appropriate technique to calculate damages arising from breaches of international law affecting investments in going concerns, such as the ones at stake.  As Brattle indicated in its Second Report, "*PV investments carry less risk than the average investment on the stock market, if not as low as suggested by Spain's allowed return. DCF is well suited because the most important parameters are well defined: pool price, production, inflation and FIT.*"[1272] Claimants' Plants had a sufficient operational track record of profitability at the Valuation Date and would have benefitted from stable feed-in remuneration under RD 661/2007, but for Respondent's wrongful measures.[1273]

612. Respondent's recitation of "*arbitration doctrine and case law*" supports the use of DCF analysis where, as here, cashflows can be determined with "*reliability for future periods*"[1274] and there is a sufficient operational track record of profitability.[1275]  The *Eiser* tribunal endorsed the DCF methodology for CSP plants and rejected similar arguments by Spain advocating for methodologies rooted in investment costs.[1276]  The DCF model is used by all relevant participants in the PV sector to assess FMV.  Respondent used the DCF model (a cash-flow forecast) to value PV assets in Spain, to set tariffs, and to design the cash-flow forecast under the Original and the New Regimes.[1277]

---

[1270] C-III § 857 (ii).

[1271] *Id.* at § 859; Brattle, Quantum Report, § V **[CER-0002]**.

[1272] Brattle, Quantum Rebuttal Report, § 124 **[CER-0004]**.

[1273] C-III §§ 607 – 610, 614; *Enron v. Argentina*, §§ 385 – 386 **[CL-0060]**; *ADC v. Hungary*, § 502 **[CL-0111]**; *CMS v. Argentina*, § 416 **[CL-0112]**; *National Grid P.L.C. v. Argentina Republic,* UNCITRAL, Award, 3 November 2008 ("*National Grid v. Argentina*"), § 275 **[CL-0144]** / **[RL-0030]**; Brattle, Quantum Rebuttal Report, § VIII **[CER-0004]**.

[1274] Brattle, Quantum Rebuttal Report, § VIII.B **[CER-0004]**.

[1275] C-III § 613.

[1276] *Id.*; *Eiser*, §§ 441, 465 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1277] C-III § 611; Brattle, Quantum Rebuttal Report, § 126 **[CER-0004]**.

613. It is inconsistent for Accuracy to, on the one hand, claim that high uncertainty impedes the use of the DCF approach while, on the other hand, defending the reasonableness of the low return offered by Spain.[1278]

614. Accuracy's primary approach to damages based on "*asset-based valuation*" ("ABV") is no more than a simplified, opaque DCF.[1279]  Accuracy's ABV introduces the "*prescribed target return*" as an input to the model, while the return should be an output.[1280]  As Claimants explain:

> *Accuracy analogizes the remuneration to Claimants' Plants as a stream of constant annual cash flows over 30 years of the assumed plant lifetime, and then discounts the cash flows with its estimate of discount rate to obtain a valuation as of June 2014. The ABV applies the same regulated asset base (RAB) in the But-For and the Actual scenarios. Accuracy then considers a different target (i.e., allowed) return to compute an annual cash-flow (annuity) in both the But-For and the Actual scenarios, so the only difference between Accuracy's both scenarios is the magnitude of the "annuity" or annual cash-flows.*[1281]

615. Accuracy's ABV approach cannot measure damages, because it assumes that investors were never entitled to the incentives under the Original Regime, but rather just to a reasonable return.[1282]  Accuracy's ABV also contains errors which, once corrected, lead to a valuation closer to that under Brattle's DCF.[1283]

616. Respondent's position that the analysis in *Isolux* regarding internal rates of return (IRRs) – an ABV method – is the correct approach to assess damages in this case finds no support in arbitral case law.[1284]  *Isolux* is inapplicable, as it did not perform a damages analysis.[1285]  Further, in all ECT cases where Spain has been found liable, tribunals have explicitly rejected an ABV method and applied a DCF methodology.[1286]

---

[1278] C-III § 612; Brattle, Quantum Rebuttal Report, §§ 119, 123 **[CER-0004]**.

[1279] C-III §§ 600 – 602, 604; §§ 48 – 49, Brattle, Quantum Rebuttal Report, §§ IV.B, V.B, C **[CER-0004]**.

[1280] C-III § 604; Brattle, Quantum Rebuttal Report, §§ IV.B, V.B, C, §§ 48 – 49 **[CER-0004]**.

[1281] C-III § 603; Brattle, Quantum Rebuttal Report, §§ 50 – 54 **[CER-0004]**.

[1282] C-III § 605; Brattle, Quantum Rebuttal Report, § 37 **[CER-0004]**.

[1283] C-III § 606; Brattle, Quantum Rebuttal Report, § 70 **[CER-0004]**.

[1284] CPHB-II § 15; RPHB-I §§168 – 170.

[1285] CPHB-II § 16; RPHB-I § 2; *Isolux*, § 868 **[RL-0004]** / **[RL-0076]**.

[1286] CPHB-II § 17; CPHB-I § 84, pp. 44 – 47 line 11 (Discounted Cash Flow); *Antin*, §§ 677 – 691 **[CL-0222]**; *Masdar*,

## 2.    Respondent's Arguments

617.  The DCF method, as shown in scientific doctrine and arbitral precedents, is excessively speculative and, therefore, inappropriate for this case.[1287]  Claimants' DCF model tries to predict data – including pool price and the demand for energy – and its projection of existing parameters is hypothetical and illusory.  Such speculation has been rejected by the Spanish Supreme Court,[1288] and by arbitral tribunals.[1289]  The tribunal in *Tenaris v. Venezuela* rejected DCF in favor of cost-based methods, citing (1) that claimant's short, 42-month history of operations, (2) uncertainties compounded by government interventions in the marketplace, and (3) the fact that general market conditions did not, at the time, give rise to the likelihood that the claimant's free cash flows could be projected with reasonable certainty.[1290]  Ripinsky warns that the use of DCF could, in many cases, lead to the overvaluation of financial impacts based on future events.[1291]  For the present matter, the (1) capital-intensity of the business, (2) high dependency of the cash flows on external, volatile and unpredictable elements (such as price pool), (3) long-term nature of the forecasts, and (4) lack of sufficient financial history that maintains a minimally solid, future cash flow projection speak against the admissibility or appropriateness of the DCF methodology.[1292]

618.  The tribunal in *Rusoro v. Venezuela* explained that the DCF analysis must be subjected to a "*sanity check*" against other valuation methodologies.[1293]  No such check was carried out by Claimants or

---

§§ 564 – 587 **[CL-0220]**; *Novenergia*, §§ 818 – 821 **[CL-0213]**; *Eiser*, § 441 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1287]  R-I §§ 41 – 44, 1231 – 1234; R-II §§ 49 – 52; *Rusoro Mining Limited v. Venezuela*, ICSID Case No. ARB(AF)/12/5, Award of 22 August 2016 (hereinafter "*Rusoro v. Venezuela*"), § 760 **[RL-0047]**.

[1288]  Judgment of the Third Chamber of the Supreme Court of 24 September 2012, appeal 60/2011, Sixth Legal Ground **[R-0128]**.

[1289]  R-II §§ 1351 – 1356; *Gemplus v. Mexico*, §§ 12-56 **[RL-0050]** / **[CL-0230]** ("*[i]f [...] loss is found to be too uncertain or speculative or otherwise unproven, the Tribunal must reject these claims, even if liability is established against the Respondent.*").

[1290]  R-I § 1242; R-II §§ 1361 – 1362; *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26, Award, 29 January 2016, §§ 525 – 537 **[RL-0038]**.

[1291]  R-I § 1236; "*Damages in International Investment Law*", Sergey Ripinsky with Kevin Williams, British Institute of International and Comparative Law (BIICL), 2008, 200 – 201 **[RL-0057]**.

[1292]  R-I §§ 1237 – 1238.

[1293]  *Id*. at §§ 1239, 1241; R-II §§ 1357 – 1358; *Rusoro v. Venezuela*, § 760 **[RL-0047]**.

their experts – Brattle's "*consistency check*" contained flaws.[1294]  Accuracy proposes instead a "*reality check*" based on public information from the RE sector in Spain.  Accuracy's check shows that multiple independent sources positively value the impact of the Disputed Measures.[1295]

619. The appropriate method for evaluating damages should be based on the cost of assets, examining whether they are recovered and a reasonable return is obtained therefrom.[1296]  Asset-based valuation ("ABV") is less speculative and simpler to apply.[1297]  In particular, references to normal return and book value are obligatory references, particularly when the investment is recent.[1298]  The *Masdar* tribunal dived on this point, which is why it explains that both DCF and ABV are accepted, and this is why Respondent and the EC believe that ABV and one based on rates of return is the one suitable to valuable RE assets.[1299]

620. The *Isolux* award assessed the economic impact of the Disputed Measures.  It considered the IRRs valuation method to be proper.  It also found that the claimant's plant obtained a higher IRR under the disputed measures than it would have expected to at the time of investment.  That tribunal concluded that the claimants had not met the burden of proof regarding the claimed damages.  These *Isolux* findings are applicable to the present case since Respondent has proven the evaluation method based on IRRs (an ABV valuation) to be the correct approach, that the Claimants are obtaining higher IRRs than expected.[1300]

---

[1294] R-I § 1239; R-II § 52.

[1295] R-I § 1240; Accuracy, First Economic Report, §§ 133 *et seq*. **[RER-0001]**.

[1296] R-I §§ 1235, 1243; R-II § 1363; "*Damages in International Investment Law*", Sergey Ripinsky with Kevin Williams, British Institute of International and Comparative Law (BIICL), 2008, 227 **[RL-0057]**.

[1297] R-I § 1244; R-II § 1364; *Calculation of Compensation and Damages in International Investment Law*, Irmgard Marboe, Oxford, Oxford International Arbitration Series, 2009, 267 **[RL-0058]**.

[1298] R-I §§ 1245 – 1248 (citations omitted); R-II §§ 1365 – 1366; "*Damages in International Investment Law*", Sergey Ripinsky with Kevin Williams, British Institute of International and Comparative Law (BIICL), 2008, 221 **[RL-0057]**; *Calculation of Compensation and Damages in International Investment Law*, Irmgard Marboe, Oxford, Oxford International Arbitration Series, 2009, 275 – 276 **[RL-0058]**; "*Compensation and Restitution in Investor-State Arbitration – Principles and Practice*", Borzu Sabahi, Oxford, International Economic Law, 132 – 133 **[RL-0059]**.

[1299] RPHB-I § 211(i); EC State Aid Decision (11 November 2017), §§ 119 – 120 **[RL-0080]**.

[1300] RPHB-I §§ 168 – 170; Respondent's Opening Statement on Quantum, slides 5, 10 – 15; Respondent's Closing, slides 110 – 135; *Isolux*, §§ 840 – 844, 848 – 851 **[RL-0004]** / **[RL-0076]**.

### 3.    The Tribunal

621.   The Tribunal does not agree with Respondent's allegation that the DCF method, as shown in doctrine and arbitral precedents, is excessively speculative and, therefore, inappropriate for this case.[1301]  Quite to the contrary, that method is generally recognized and used as the most appropriate technique to calculate damages arising from breaches of international law affecting investments in going concerns.[1302]  It compares the actual free cash flows that the SPVs obtained or will obtain because of Respondent's ECT breaches ("*Actual*" scenario) with the free cash flows that they would have obtained in the absence of the breach ("*But-For*" scenario).  Claimants' Plants had a sufficient operational track record of profitability and there is no reason to doubt that they would have benefitted from stable feed-in remuneration under RD 661/2007, but for Respondent's wrongful measures.[1303]

### C.    APPLICATION OF THE DCF METHOD

622.   Since the issues addressed in sections 1 to 5 below are interlinked, the Tribunal will address them in a consolidated separate chapter numbered 6 at the end of this Section C.

### 1.    Summary Remarks

#### a.    Claimants' Arguments

623.   The Brattle Second Quantum Report concludes that the Disputed Measures reduced cashflows and the FMV of Claimants' PV assets by **EUR 40.1 million (=EUR 36.8 million for OperaFund and EUR 3.3 million for Schwab)**, as principle sum assessed at the Valuation Date (June 2014).[1304]  This amount includes pre-award interest, but the tax gross-up should be added to ensure full reparation.[1305]

---

[1301] R-I §§ 41 – 44, 1231 – 1234; R-II §§ 49 – 52; *Rusoro Mining Limited v. Venezuela*, ICSID Case No. ARB(AF)/12/5, Award of 22 August 2016 (hereinafter "*Rusoro v. Venezuela*"), § 760 **[RL-0047]**.

[1302] *See e.g. CMS v. Argentina*, § 411 **[CL-0112]**; *ADC v. Hungary*, § 502 **[CL-0111]**.

[1303] *See* the similar approach in: *Enron v. Argentina*, §§ 385 – 386 **[CL-0060]**; *CMS v. Argentina*, § 416 **[CL-0112]**; *National Grid v. Argentina*, § 275 **[CL-0144]** / **[RL-0030]**; *see also* Brattle, Quantum Rebuttal Report, § VIII **[CER-0004]**.

[1304] C-III §§ 597, 623; Brattle, Quantum Rebuttal Report, § 25 **[CER-0004]**.

[1305] C-III § 599.

624. Accuracy's Report carries out its own DCF calculation and concludes that the Disputed Measures reduce the financial interests of Claimants by EUR 4.5 million (EUR 4.7 million including interest).[1306] Brattles' Second Quantum Report performs six corrections to Accuracy's DCF Model. These have the effect of increasing Accuracy's damage estimate, closer to Brattle's of 40.3 million.[1307] After the Hearing, Claimants explained that "Past Damages" (January 2011 – June 2014) amounted to EUR 9.7 million, "Future Damages" amounted to 30.4 million. The total impact of the measures, pre-interest is 40.1 million, and with interest amounts to 43.3 million.[1308]

625. Respondent's and Accuracy's suggestion that the Disputed Measures have been positive for Claimants is outrageous. Accuracy only obtains a lower amount of damages in its subsidiary DCF analysis through its (1) consideration that the "*But-For*" scenario involves a greater risk than the actual scenario, and (2) lower estimate of PV Plants' lifetime.[1309] The divergence in these calculations is based on (1) the useful life of the PV Plants, which Brattle estimates as 35 years and Accuracy as 30 years,[1310] (2) the regulatory risk and the illiquidity discount,[1311] (3) the application of a "*risk free rate*" – Accuracy assumes a risk free rate of 3.5% without support, while Brattles applies a rate of 2.09% based on objective market data,[1312] and (4) the consideration of third party debt – Accuracy considers the book value, rather than the market value, of debt and thereby obtains a higher figure for damages.[1313]

626. Brattle modelled the future update of the target return based on the forecast of the Spanish yields as of June 2014, while Accuracy maintained the same target return of 7.398% throughout the regulatory life of the Plants in its calculation. This ignores that Respondent recently announced its intention to

---

[1306] *Id.*; Accuracy, First Economic Report, Table 9, § 129 **[RER-0001]**.

[1307] C-III §§ 641 – 642.

[1308] CPHB-I § 77; C-I § 281; MO IET/1045/2014 **[R-0086]** / **[C-0126]** / **[C-0126bis]**; Brattle, Quantum Rebuttal Report, Table 1, 16 p. 9, 87 **[CER-0004]**.

[1309] C-III §§ 624 – 625.; Brattle, Quantum Rebuttal Report, § 12 **[CER-0004]**; Accuracy, First Economic Report, § 24 **[RER-0001]**.

[1310] Brattle, Quantum Report, § 78 **[CER-0002]**; Brattle, Quantum Rebuttal Report, 137 **[CER-0004]**; PV Lifetime Assessments **[BQR-64]**; Leasing Agreements **[BQR-75]**.

[1311] Brattle, Quantum Rebuttal Report, 137 **[CER-0004]**.

[1312] *Id.* at §§ XI.B, 137, 161 **[CER-0004]**.

[1313] *Id.* at § 137 **[CER-0004]**.

reduce the alleged return for the New Regulatory Regime from 7.398% to only 4.1 – 4.3% beginning in 2020, due to a further decline in interest rates.[1314]

627.  Brattle forecasted the Plants' production based on actual performance.  In its second report, Brattle adjusted this data by an assumed annual degradation factor of 0.5%.  Brattle strongly objects to Accuracy's refusal to adjust the past performance for the degradation factor,[1315] the failure of which lets production forecast to a higher figure.  Accuracy derives a lower forecast because it uses inconsistent assumptions.[1316]

628.  Brattle performed reality checks that prove the soundness of its damages valuation.  It amended the But-For DCF model to reflect a June 2009 valuation.  This verified that Claimants determined the initial investment on the basis that the PV Plants would continue to receive feed-in incentives under RD 661/2007 (assumed in the But-For model).  By using assumptions in line with investors' initial expectations, Brattle's DCF model produced a result that is consistent with the initial investment.[1317] Brattle also surveyed available transaction evidence concerning PV assets under the Original and the New Regulatory Regimes.  Brattle compiled evidence of seven transactions involving PV assets and obtained a price range of EUR 6.73-10 million per MW installed. This range is consistent with the EUR 8.4-10.2 million per MW implied by Brattle's DCF analysis for the Claimants' Plants.[1318] Accuracy does not provide a reality check based on comparable transactions.[1319]

629.  The negative impact of the Disputed Measures is unquestionable, and Accuracy itself even acknowledges EUR 164 million in cash flow reductions.[1320]  Claimant suffered a 57% (OperaFund) and 75% (Schwab) decline in past cash flows in future earnings.[1321]  The experts agree that the

---

[1314]  *Id.*; C-III § 617; Accuracy, First Economic Report, § 103 **[RER-0001]**.

[1315]  C-III § 618 – 619; Accuracy, First Economic Report, § 101 **[RER-0001]**.

[1316]  C-III § 619; Brattle, Quantum Rebuttal Report, § 188 **[CER-0004]**.

[1317]  C-III § 620; Brattle, Quantum Rebuttal Report, § 204 **[CER-0004]**.

[1318]  C-III § 621; Brattle, Quantum Report, § V.G. **[CER-0002]**; Brattle, Quantum Rebuttal Report, §§ 210 – 211 **[CER-0004]**.

[1319]  C-III § 622; Accuracy, First Economic Report, §§ 134 – 141 **[RER-0001]**; Brattle, Quantum Rebuttal Report, §§ 210 – 216 **[CER-0004]**.

[1320]  CPHB-I § 73; Tr. Day 4, 16:11-17 (Brattle, Caldwell); Brattle Quantum Presentation (Day 4), slide 2; Updated correction of Brattle DCF model June 2014, Tab A6 **[ACQ-0054]**.

[1321]  CPHB-I § 74; Brattle, Quantum Rebuttal Report, Table 12, p. 81 **[CER-0004]**; *Novenergia*, § 695 **[CL-0213]**.

expected project Internal Rate of Return (IRR), calculated by Applying RD 661/2007 was decreased in the New Regime by 200 basis points, which entails a 76% reduction in the return on equity for an investor.[1322]

630. After the Hearing, Claimants responded to the Exercises proposed by Respondent at the Hearing, stating that they reinforce the robustness of Brattle's calculations.[1323]  Regarding Exercise 1, which purported to compare the FMV of the investments in 2009 with their But-For value, Claimants explained that the difference between the values is "*due to the fact that the PV Plants pertain to two different projects, with different performance ratios, which are, in turn, due to their different features [(i) ECO 3: 10 MW and with 2 axis tracking system; in contrast to (ii) El Paso: formed upon the aggregation of multiple 100 kW plants and with fixed structure] and to the fact that they are placed in different locations in Spain. Thus, as remarked by Mr. Caldwell, the only conclusion to be drawn here by the Tribunal is that, after nearly six years of operation, ECO 3 outperformed the 2008/2009 expectations (it was "doing better") while El Paso performed slightly below the 2008/2009 expected range. Needless to say, under a feed-in regime ("But-for" scenario) based on RD 661/2007, which was 'performance-driven,' different performance rates notably impact the Investments' valuation throughout time.*"[1324] Respondent's comparison between ratios of Past Damages and Future Damages in Exercise 2 is misplaced and lacks any support from a damages methodology perspective.[1325] Nonetheless, it confirms that the New Regime, which retrospectively appropriates the Plants' efficiency gains, is more harmful to those PV Plants which were outperforming the initially expected values.[1326]  In Exercise 3, Respondent suggested that future corrections are warranted in Brattle's analysis, but has not pointed to one.  Corrections to "*Past Damages*" have no impact on "*Future Damages*."[1327]

---

[1322]  CPHB-I § 75; Tr. Day 4, 190:3-15 (Sands, Saura); Tr. Day 5, 46:10-22 (Claimants' Counsel); Claimants' Closing Presentation, Slide 72; Brattle Quantum Presentation (Day 4), slide 6; Accuracy, Second Economic Report, Figures 6 and 12, § VI.2.3 [**RER-0002**].

[1323]  CPHB-I § 89.

[1324]  *Id*. at § 85, Brattle Quantum Report, pp. 12 – 13, Tables 3 and 4 [**CER-0002**].

[1325]  CPHB-I § 86; Respondent's Closing Statement, slides 116 – 118; Tr. Day 5 85:12-25 (Respondent's Counsel).

[1326]  CPHB-I § 87.

[1327]  *Id*. at § 88; Respondent's Closing Statement, slides 119 – 121; Tr. Day 4, 79:9-14 (Brattle, Caldwell); Tr. Day 5, 77:13 – 79:20 (Respondent's Counsel); Brattle, Quantum Rebuttal Report, §§ 20 – 27 [**CER-0004**].

631. Regarding "*lost historical cash flows*", Claimants argued that "*in the event that the Tribunal were to exclude from a liability finding the 2010 Measures and/or the 2012/2013 Measures (RF No. 2) it should still award damages from July 2013 to the Claimants. The Tribunal should note that the New Regime (2013/2014 Measures) was applied by Spain retroactively with effect from July 2013 and that these were only Temporary Measures [...]*."[1328] The *Masdar* tribunal took the retroactive effect of new measures into account to achieve full compensation,[1329] but the *Antin*, *Novenergia*, and *Eiser* tribunals awarded damages from June 2014 onwards.[1330]

### b.  Respondent's Arguments

632. Whether using the speculative DCF methodology correctly or correcting the parameters employed by Claimants, the result obtained is the same:  the impact would have been less than that calculated by Brattle.[1331]  The defects in Brattle's analysis include (1) using an inflated maximum life of plants, (2) its treatment of regulatory risk in the But-For scenario, and (3) higher illiquidity in the But-For scenario.  The calculations must be adapted to the economic reality of what a willing buyer would offer in one scenario or another:  the FMV.  After correcting Brattle's DCF, Accuracy's calculation shows that, if the Tribunal understood that the TVPEE is outside its jurisdiction, the damages would be reduced by EUR 7.8 million and, accordingly, there would be no damage to compensate.[1332]  Correcting Brattle's DCF as of June 2014, Claimants' damages would be **EUR 4.5 million**.[1333]

633. The damages estimated in the Brattle reports are not subject to compensation, as there has been no breach and, regardless, Brattle's speculative calculation has not been minimally provided.  Claimants have not met their burden of proof as required to sustain their claims.[1334]  The Hearing confirmed that (1) Brattle's model is not reliable even to calculate past damages and, thus, is by no means reliable

---

[1328] CPHB-I page 47 (line 14).

[1329] *Id*. (*citing Masdar*, § 651 **[CL-0220]**).

[1330] *Id*. (*citing Antin*, §§ 666 – 668 **[CL-0222]**; *Novenergia*, §§ 839 – 842 **[CL-0213]**; *Eiser*, §§ 457 – 458 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**).

[1331] *Compare* R-I § 44 (8% less) with R-I §§ 1249 – 1255 (89% less); Corrected Brattle DCF model as of June 2014 **[ACQ-0001]**.

[1332] R-II §§ 53 – 58, 1387 – 1389; Accuracy, Second Economic Report, Table 1 **[RER-0002]**.

[1333] Accuracy, First Economic Report, § 129 **[RER-0001]**.

[1334] R-II § 47.

for future projections and (2) the alleged damages are unrelated to the Disputed Measures, since the same measures have a different impact, depending on Claimants' investment decision.[1335]

634. Brattle's DCF method applied and parameters chosen are unreliable and are inconsistent with the investment price paid by the Claimants' and with the results audited in the Annual Accounts of Claimants' PV Plants.[1336] If one compares the FMV obtained by Brattles DCF Method for the But-For world in June 2014 with the price Claimants paid for their interests in the PV Plants (which is itself a FMV) in 2009, one sees that the value of the ECO 3 Plants increased by 69%, and the Paso Plants decreased by 23%. These variations in the But-For valuation are unrelated to the Disputed Measures, and there was no impairment by the Measures.[1337] Respondent also verified, by means of comparison of Brattle's But-For and Actual values for Claimants' PV Plants, that the alleged damages are not proportional with respect to the disputed measures and are, therefore, neither correlated to nor caused by them.[1338] Regarding "*historic damages*", Brattle decreased its initial calculation by 25% between their first and second report.[1339] Since Brattle's model does not properly calculate "*historic damages*", it cannot reliably forecast damages for up to 30 years using the same model.[1340] The *Antin* and *Eiser* tribunals' glorification of the work of Brattle experts must be understood in light of the flaws alleged in both awards, and in light of the long relationship between Brattle's experts and one of the co-arbitrators on the *Eiser* tribunal.[1341] Mr. Caldwell of Brattle recognized that his calculation of damages was divorced from any reality check.[1342] Brattle's model is sensitive to a variety of variables that cannot be reliably projected in the long-term.[1343] They assume without justification a

---

[1335] RPHB-II § 42; CPHB-I §§ 84 – 88.

[1336] RPHB-I § 62.

[1337] *Id.* at §§ 63 – 65, 72 – 73; Respondent's Closing Statements, slides 112 – 118, 122 – 129; Brattle's Loss Demonstratives **[R-0357]**; Brattle, Quantum Rebuttal Report,, p. 9, Table 1 **[CER-0004]**; Tr. Day 4, 65:13-25, 66:18-25, 71:16 – 72:21 (Caldwell); Brattle, Quantum Report, §§ 6, 7, 26 – 29 **[CER-0002]**.

[1338] RPHB-I §§ 66 – 67; Tr. Day 4, 76:7-25, 77:1-11 (Caldwell).

[1339] RPHB-I § 69; Respondent's Closing Statements, slides 120 – 121; Tr. Day 4, 78:6-21.

[1340] RPHB-I §§ 68, 70; Brattle's Loss Demonstratives **[R-0357]**; Respondent's Closing Statement, slides 119 – 121.

[1341] RPHB-I § 71.

[1342] *Id.* at § 74; Tr. Day 4, 55:19-24 (Caldwell); Respondent's Closing Statements, slide 130.

[1343] RPHB-I § 78; Tr. Day 4, 193:19-21 (Caldwell).

longer life of plant, and failed to calculate the impact of each disputed measure, even though the 8 measures were approved in different moments in time.[1344]

635.    Brattle's analysis is useless for the Tribunal, as it assumes that RD 661/2007 was immutable and compares a "B*ut For*" which corresponds to only an unaltered application of /RD 661/2007 and an "*Actual*" where all of the Disputed Measures are applied.  This is the same blind application used in the *Eiser* and *Antin* Tribunals and is the source of the inconsistency in those Awards, which declared the conformity of Act 15/2012 and RD-Law 2/2013 with the ECT and their lack of jurisdiction to hear the case of the 7% TVPEE.[1345]

636.    Brattle acknowledged that, if the Tribunal were to decide that the PV Plants contributed to the Tariff Deficit or that the Tribunal does not have to analyze whether alternative measures were available to Respondent to tackle it, then the regulatory risk needs to be applied such that there is a higher regulatory risk in the But-For than in the Actual scenario.  In its report, Brattle incorrectly applies a lower "*revenue hair-cut*" in the But-For than in the Actual, and the same liquidity discount in both scenarios.[1346]

637.    Finally, the alleged EUR 164 million reduction is not "*acknowledged*" by Accuracy.  Rather, it is based on extending the Plants' useful life to 35 years – Brattle's assumption.[1347]

638.    Respondent states that the quantification Brattle made for returns in the *Eiser* case is technically incorrect, because the return on a project cannot be calculated by referring to the annual accounts for just one year, and this is another reason to find the *Eiser* findings inapplicable to this case.[1348]  Respondent explained that in *Eiser*, the tribunal considered "*that RD 661/2007 could be modified but it applie[d] in the quantum Brattle experts' quantum[sic] built from a but-for scenario based on an RD661/2007[sic] that cannot be modified.  Brattle experts have recognized to apply the same frozen*

---

[1344]  RPHB-I §§ 79 – 80; Tr. Day 4, 51:19-24, 61:14-18, 150:12-23 (Caldwell).

[1345]  RPHB-I §§ 75 – 77; Respondent's Closing, slide 111; Tr. Day 4, 39:5-8 (Caldwell); Art. 52(b) and (3) of the Ciadi Agreement; *Eiser*, §§ 271 – 272, 458, 473 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1346]  RPHB-I § 81; Respondent's Closing, slide 135.

[1347]  RPHB-I § 43; C-I § 637; Tr. Day 3, 95:1-13 (Garcia); Respondent's Closing, slide 43

[1348]  RPHB-I § 171(iii).

*RD661/2007*[*sic*] *to the present case*."[1349]   These and other inconsistencies demonstrate the inapplicability of the findings of the *Eiser* award to the present case.[1350]   The *Novenergia* award also contained inconsistencies that render its use inappropriate for this Tribunal.[1351]   In *Antin*, as in *Eiser* and *Novenergia*, the tribunal rendered a decision that was inconsistent with its liability findings and contained numerous errors – it is an award that should not be followed, and Respondent requests that the Tribunal avoid making such errors.[1352]

### 2.    The Valuation Date

#### a.    Claimants' Arguments

639.    Under settled international law, Claimants are entitled to damages valued as of the date of injury or as of the date of the Tribunal's award, whichever is higher.[1353]   Although the later valuation date would show that the damages suffered by Claimants are higher, Claimants choose June 2014 because that is the date when Respondent, through MO IET/1045/2014, defined the economic parameters of the New Regulatory Regime.   That defined the injury to Claimants and was the final picture of the extent of damage suffered by Claimants could be known.[1354]

640.    The *Antin*, *Masdar*, and *Eiser* tribunals applied a valuation date of June 2014, while the *Novenergia* tribunal used September 2016.[1355]

#### b.    Respondent's Arguments

641.    There is no discrepancy that an *ex ante* date must be used in this case.[1356]   Nonetheless, *ad cautelam*, Respondent explains that a hypothetical "*breach*" date, rather than the "*award*" date, should be

---

[1349]   *Id*. at § 171(ii).

[1350]   *Id*. at § 172.

[1351]   *Id*. at §§ 174 – 177.

[1352]   *Id*. at §§ 178 – 188.

[1353]   C-III § 592; *Yukos v. Russia*, § 1769 **[RL-0085]** / **[CL-0038]**; *Siemens v. Argentina*, § 352 **[CL-0139]**.

[1354]   C-III §§ 593 – 594; Brattle, Quantum Report, § 11 **[CER-0002]**.

[1355]   CPHB-I page 47 (line 12).

[1356]   R-II §§ 1390 – 1395 (*citing* C-III §§ 592 – 594); *see also Quiborax S.A. & Non Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2. Dissenting Opinion to the Award. 16 September 2015

considered as the valuation date because (1) case law is virtually unanimous in this approach,[1357] (2) under Article 13 of the ECT, the breach date is the valuation date,[1358] and (3) logic dictates that an *ex ante* date must be used.[1359]

642. The *ex ante* date, is the only one that complies with the principles of causality, legal certainty, material justice, and full reparation.[1360]  Using the *ex post* date (the award) – a procedural date that is unrelated to the material dispute and has no bearing on the measures or the damage sustained – would  violate the principle of causality enshrined in Articles 31 (Reparation) and 36 (Compensation) of the ILC Articles.[1361]  Use of an *ex post* date would also be unfair to the investor if, due to events occurring after the Measures, the investment substantially loses its value.  It would be unfair and unlawful not to pay compensation because the investment had lost its value by the award date.[1362]

### 3.    Life of Plant

#### a.    Claimants' Arguments

643. Claimants mitigate damages by assuming a 30-year operation in the Actual Scenario.  This is appropriate because "*any support would be removed from year 31st and that the pool price will be insufficient to cover Majorca and Badajoz operating costs.*"[1363]

---

**[RL-0096]**.

[1357] R-II § 1397, *see e.g. Gemplus v. Mexico*, §§ 12-43 – 12-44 **[RL-0050]** / **[CL-0230]**; *Biwater Gauff*, § 788 **[CL-0128]** / **[RL-0082]**; *Kardassopoulos v. Georgia*, § 464 **[CL-0136]** / **[RL-0097]**; *Flemingo Duty Free Shop Private Limited (India) v. Republic of Poland*, UNCITRAL, Award, 12 August 2016, §§ 903 – 904 **[RL-0098]**; *Occidental v. Ecuador*, §§ 80, 708 **[RL-0099]**; *Azurix v. Argentina*, § 418 **[RL-0100]** / **[CL-0127]**; *Compañíá de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic (Vivendi II)*, ICSID Case No. ARB/97/3, Award, 20 August 2007, § 8.3.19 **[RL-0101]**; *EDF International v. Argentina*, § 1183 **[RL-0102]** / **[CL-0019]**.

[1358] R-II § 1398.

[1359] *Id*. at § 1399.

[1360] *Id*. at § 1407.

[1361] *Id*. at § 1404; ILC Draft Articles, With Commentary **[RL-0032]** / **[CL-0028]**.

[1362] R-II §§ 1405 – 1406.

[1363] C-III § 615(i); Brattle, Quantum Rebuttal Report, § 137 **[CER-0004]**.

644. Brattle's assumption that the PV plants could operate for 35 years in the But-For scenario is based on (1) a study about PV plants published by the EC,[1364] (2) ECO 3's Plant's 25-year land lease agreement, which included two 5-year extensions and supports Claimants' expectation of a 35-year useful life for the plants,[1365] and (3) conclusions reached by ATA about Claimants' PV Plants' useful life of 35 years.[1366] The ATA Addendum Reports validate the Plants' O&M Contracts, operating expenses, and spare parts. They considered the historical operating expenses between 2009 and 2015/2016 and concluded that Claimants' Plants could have operated a minimum of 35 years.[1367] Replacement of the inverters would occur in the normal course of operation, and Brattle forecasts an annual expense of EUR 35,000 – 80,000 after 2018 at Paso Palma Sol for the replacement of inverters, and EUR 150,000 – 290,000 at ECO 3 for repairs. Both amounts are sufficient to accommodate the expected replacement of inverter components and the inverters themselves.[1368] Mr. Payan (ATA) conclusions are supported by contemporaneous technical evidence.[1369]

---

[1364] EC DG ENV, *Study on Photovoltaic Panels Supplementing the Impact Assessment for a Recast of the [Waste Electrical and Electronic Equipment] WEEE Directive – Final Report*, 14 April 2011, p. 13 **[BRR-47]**.

[1365] Leasing Agreements **[BQR-75]**; Brattle, Quantum Rebuttal Report, § 143 **[CER-0004]**.

[1366] C-III § 626; CPHB-I § 62 – 63. Brattle, Quantum Rebuttal Report, § IX.A **[CER-0004]**; PV Lifetime Assessments **[BQR-64]**; ATA, "ESP Addendum PV Lifetime Report Badajoz 10MW," 30 November 2017 **[BQR-88]** / **[C-0253]**; ATA, "ESP Addendum PV Lifetime Report Paso 8.3MW", 30 November 2017 **[BQR-89]** / **[C-0254]**; Accuracy, First Economic Report, § 27 **[RER-0001]**.

[1367] C-III § 633; CPHB-I § 64; Accuracy, First Economic Report, § 209, Appendix 8 **[RER-0001]**; ATA, "ESP Addendum PV Lifetime Report Badajoz 10MW," 30 November 2017, §§ 18, 22, 47, 48 **[BQR-88]** / **[C-0253]**; ATA, "ESP Addendum PV Lifetime Report Paso 8.3MW", 30 November 2017, §§ 21, 29, 52 – 53 **[BQR-89]** / **[C-0254]**; PV Lifetime Assessments, Reports 1 – 5 **[BQR-64]**.

[1368] C-III § 634; CPHB-I § 64. Brattle, Quantum Rebuttal Report, § 149 **[CER-0004]**; Accuracy, First Economic Report, § 209, Appendix 8 **[RER-0001]**; PV Lifetime Assessments, §§ 28, 32 **[BQR-64]**; ATA, "ESP Addendum PV Lifetime Report Paso 8.3MW", 30 November 2017, § 66 **[BQR-89]** / **[C-0254]**.

[1369] CPHB-I § 65; "Technical and Solar Power Production Due Diligence for the Paso Power Plant Project, Mallorca, Spain (Son Jordi, Son Cortera, Santa Margarita, Arta)", Final Report for Deutsche Bank AG, Fichtner, October 2008, pp. 1705 – 1706 **[C-0273]** / **[BQR-77]**; Kofmel Witness Statement, § 16 **[CWS-PK]**; "O&M and Administration Contracts" signed on 06/25/2007 and 12/02/2008 between DeanSolar Energy GmbH (hereinafter dSE or the O&M Operator) and the corresponding 23 SPVs **[ATA-002.1]**; Final Commissioning Certificate and registration with the regional RAIPRE obtained by the Facilities within Son Jordi PV Project, on 30 April 2008 **[C-0085]** / **[Document 12 CWS-LB]**; Certificate confirming the registration with RAIPRE of the Facilities within Son Jordi PV Project, on 8 September 2008 **[C-0086]**; Final Commissioning Certificate and registration with the regional RAIPRE obtained by the Facilities within Vernissa Nou PV Project, on 30 July 2008 **[C-0087]** / **[Document 13 CWS-LB]**; Certificate confirming the registration with RAIPRE of the Facilities within Vernissa Nou PV Project, on 23 October 2008 **[C-0088]**; Final Commissioning Certificate and registration with the regional RAIPRE obtained by the Facilities within Son Quartera PV Project, on 30 July 2008 **[C-0089]** / **[Document 14 CWS-LB]**; Certificate confirming the registration with RAIPRE of the Facilities within Son Quartera PV Project, on 23 October 2008 **[C-0090]**; Final Commissioning Certificate and registration with the regional RAIPRE

645.   Respondent's artificial reduction to 30 years in the But-For scenario is unjustified:  Respondent and Accuracy only assume a "*regulatory*" lifetime of 30 years.  It is evident that 30 years is the minimum operational period considered by Respondent, not the maximum.[1370]

646.   Accuracy's use of financial statements when estimating the useful life of operating assets is invalid.  Accounting depreciation lifetime does not limit operational lifetime.  This is in part because there is a financial incentive to accelerate depreciation by the use of shorter useful lives.  Accelerated depreciation provides tax benefits earlier in the life of a project and, thus, generates a present value benefit.[1371]

647.   Dr. Servert's technical input, suggesting a technical lifetime of 20-25 years, was not even considered reasonable by Respondent's damages expert.[1372]  Dr. Servert's testimony is vitiated by a clear and undisclosed conflict of interest, as he is the sole director on a company that "*depends*" on Respondent.[1373]  Further, contrary to his CV, Dr. Servert is not a PV technical expert but, rather, may have expertise in Concentrated Solar Power ("CSP").[1374]  Dr. Servert disregarded all evidence pointing to a useful life of 35 – 40 years and reached his assumption of a 20-25 years useful life based on an assumption that (1) the PV Plants will be operated in a non-diligent manner and (2) partial replacements of the PV Plants' elements would give rise to new plants.[1375]  Accuracy's Mr. Payan, however, explained that the performance and availability of the PV Plants is working properly and according to expectations.  Mr. Servert was unable to explain even why 40 years would not be an appropriate estimate.[1376]

---

obtained by the Facilities within S'Estelrica PV Project, on 10 September 2008 **[C-0091]** / **[Document 15 CWS-LB]**; Certificate confirming the registration with RAIPRE of the Facilities within S'Estelrica PV Project, on 1 December 2008 **[C-0092]**; Email sent by Ulrich Schmall to Mr. Schoolmann on 28 June 2007, p. 4 **[C-0096]**; EC DG ENV, *Study on Photovoltaic Panels Supplementing the Impact Assessment for a Recast of the [Waste Electrical and Electronic Equipment] WEEE Directive – Final Report*, 14 April 2011, p. 13 **[BRR-47]**.

[1370]  C-III § 628, 631; Brattle, Quantum Rebuttal Report, § 143 **[CER-0004]**.

[1371]  C-III § 630; Brattle, Quantum Rebuttal Report, § 151 **[CER-0004]**.

[1372]  CPHB-I § 63; Accuracy, First Economic Report, § 27a **[RER-0001]**.

[1373]  CPHB-I §66; Tr. Day 2, 157:5-21, 161:7-10 (Dr. Servert).

[1374]  CPHB-I § 66; Tr. Day 2, 142:9-24, 144:14, 147:4-12; 152:1 (Servert).

[1375]  CPHB-I § 67.

[1376]  *Id*. at § 68; Tr. Day 2, 84:2-8, 85:4-8, 86:6-19; 114:14-18 (Payan); Tr. Day 2, 116:8-15 (Servert); Tr. Day 2, 168:17 – 169:21 (Reinisch, Servert).

648. The PV Plants' expected lifetime is unrelated to the matter of legitimate expectations. It is a technical lifetime that represents an input into the quantum experts' But-For scenario.[1377] If it were to be considered as relating to legitimate expectations, the Tribunal should note that Article 36 of RD 661/2007 set a FIT "*for the first 25 years*" of operation, and a lower FIT for the remaining language, making it clear that – in 2007 – that State expected a useful life of PV Plants to exceed 25 years.[1378] There is no limitation, which reinforces what is unambiguously evidenced by the technical documents in the record: contemporaneous evidence pointing to a 35-40 year technical lifetime.[1379]

649. After the Hearing, Claimants explained that the *Antin*, *Masdar*, and *Eiser* tribunals found that those claimants had not provided evidence showing that their facilities would have a 40-year operational lifetime.[1380]

### b. Respondent's Arguments

650. The useful life of the PV Plants is a maximum of 30 years. Brattle uses 35 and thereby artificially inflates damages by 5 years, increasing the claim by EUR 9 million.[1381] As explained by Accuracy, the EC report does not establish a useful life of 35 years for PV plants.

651. While the lease provisions are irrelevant to the longer useful life of a PV installation, Accuracy noted that Palma Sol's land lease agreements were set at 25 years with the option to extend up to 30 years, after which the contract would extinguish and be without effect.[1382] The contemporaneous technical due diligence of Palma Sol estimated the useful lifetime of the Plants to be 20-25 years, and this is consistent with a study issued by the Department of Energy and Climate Change of the UK, which also assumed an operating useful lifetime of 25 years.[1383] Consistent with the above, engineering

---

[1377] CPHB-I § 69.

[1378] *Id*. at § 70; RD 661/2007, RD 661/2007, Art. 36 **[R-0071]** / **[C-0046]** ("*first 25 years*" / "*thereafter*").

[1379] CPHB-I § 70 – 72.

[1380] *Id*. at page 46 line 10; *Antin*, § 713 **[CL-0222]**; *Masdar*, § 618 **[CL-0220]**; *Eiser*, § 452 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1381] R-I § 1254; R-II §§ 54, 1368 – 1370; RPHB-I § 41; Tr. Day 3, 95:1-13 (Garcia); Respondent Closing slides 44; Accuracy, Second Economic Report, §§ 185 *et seq*. **[RER-0002]**.

[1382] R-II § 1370; Accuracy, Second Economic Report, §§ 186 – 189 **[RER-0002]**.

[1383] R-II § 1370, Accuracy, Second Economic Report, § 190(b) **[RER-0002]**.

Expert Prof. Servert's reports state that the expected lifetime of PV plants built in Spain in 2007 – 2008 should be between 20 and 30 years.[1384]

652. Claimants' witnesses and internal documents verified that the expected useful life was 25 years.[1385] At the time of investment, Claimants could only have had a reasonable expectation of obtaining a reasonable rate of return to the regulatory useful life of the Plants of no more than 25 years.[1386]

### 4. Accounting for Risk and Liquidity in the But-For Scenario

#### a. Claimants' Arguments

653. Respondent's expert, Accuracy, distorts the impact of the Disputed Measures by alleging that the But-For scenario would have been associated with high risk and large discounts, while the Disputed Measures would have rendered the Actual scenario "*safe*":[1387]

> [Accuracy] *accepts that the Disputed Measures reduced the cash flows of the PV Plants, but no damage was caused because there was a significant risk that comparable tariff reductions would have occurred anyway and the reduction was necessary to address overall system sustainability. Should this theory be accepted, it would have devastating consequences, as it would set a precedent of impunity for states wishing to vary investment conditions that they may consider financially problematic. This would unquestionably endanger security and confidence in international investments.*[1388]

654. The Tariff Deficit was caused by Respondent's policies, and alternatives that would have permitted the continuation of the Original Regime and the maintenance of system stability were ignored.[1389] Respondent's arguments regarding additional regulatory risk in the "*But-For*" scenario are groundless and "*would also entail a deterioration of any investment climate. Respondent's and Accuracy's inversion of risk in the But-For and Actual scenarios produces the shocking, perverse effect of*

---

[1384] Servert, Jorge, SPEX PV Plant Technical Lifetime Analysis (3/2018), § 3 **[RER-0003]**; Servert, Jorge, El Paso PV Plants Technical Lifetime Analysis (03/2018), § 4 **[RER-0004]**.

[1385] RPHB-I §§ 41, 79; 211(iv); *compare Masdar*, § 618 **[CL-0220]**; Tr. Day 3, 95:1-13 (Garcia); Tr. Day 4, 51:19-24, 150:12-23 (Caldwell).

[1386] RPHB-I § 42.

[1387] C-III § 615(ii); Brattle, Quantum Rebuttal Report, § 137 **[CER-0004]**.

[1388] C-III §§ 635 – 636; Brattle, Quantum Rebuttal Report, §§ 14 – 15 **[CER-0004]**.

[1389] C-III § 637; Brattle, Quantum Rebuttal Report, § 17 **[CER-0004]**.

*diminishing Accuracy's damages figure to EUR 4.5 million even when the Plants' cash flow reduction as per Accuracy's projections is so significant (EUR 41 million cash flow reduction with Accuracy's DCF analysis)."*[1390]   Regulatory risk was higher in the Actual than in the But-For scenario.[1391]   The liquidity factor should not be higher in the But-For than in the Actual.  The correct approach is to apply the same illiquidity factor to both the Actual and the But-For scenarios.[1392]

655.    Base WACCs (4.84% Brattle, 5.8% Accuracy) cannot be used as a benchmark of reasonable returns.  The proposition that the proscribed target return of 7.398 (pre-tax) (=5.9% post-tax) is reasonable because it is higher than the cost of capital is simply incorrect.  Neither base WACC includes non-market risks which include regulatory risk, illiquidity risk, and construction risks, all of which are borne by investors in PV plants.  Further, Accuracy fails to account for the 1.4% decrease in interest rates between 2007 and 2014, and possible efficiency gains.[1393]   There is a temporal inconsistency because Accuracy's approach, as explained by Brattle, mixes 2007 and 2014 estimates.[1394]

656.    An investor would not have invested in the PV sector in 2008 – 2009 unless the IRR of the project rendered a figure in the range of 7.8 – 8.8% after tax.[1395]   It is blatantly false that the Claimants' current rates of return are higher than those they had considered at the time of investing.[1396]

        **b.   Respondent's Arguments**

657.    Brattle does not apply a regulatory risk in its financial models.  Instead, it applies a discount to the Actual scenario – and this serves to inflate hypothetical damages further.[1397]

---

[1390]   C-III § 638; Brattle, Quantum Rebuttal Report, § 153 **[CER-0004]**.

[1391]   C-III § 639; Brattle, Quantum Rebuttal Report, §§ 16, 69 **[CER-0004]**.

[1392]   C-III § 640; Brattle, Quantum Rebuttal Report, §§ 180, 182 **[CER-0004]**.

[1393]   CPHB-I 80, 82; Tr. Day 4, 19:6-19 (Brattle, Caldwell); Tr. Day 5, 80:17 – 81:5 (Respondent's Counsel); Respondent's Closing Statement presentation, Slides 106 – 107; Brattle Quantum Presentation (Day 4), slide 7, 8.

[1394]   CPHB-I § 81; Tr. Day 4, 18:23 – 19:5 (Caldwell); Brattle, Quantum Rebuttal Report, §§ 75 – 79 **[CER-0004]**.

[1395]   CPHB-I § 82; Tr. Day 5, 18:6-8 (Brattle, Caldwell); Claimants' Closing Statement, slide 74; Brattle Quantum Presentation, Slide 10; PER 2005 – 2010, p. 274 **[C-0066]** / **[R-0092]**; *Antin*, §§ 545 **[CL-0222]**; *Masdar* **[CL-0220]** (*acknowledging* that Spain sought that projects were financed with bank loans).

[1396]   CPHB-I § 83.

[1397]   R-II §§ 1372 – 1373.

658. Regulatory risk affects the value of investments – the higher the risk, the lower their current value. In the But-For scenario, regulatory risk is high because of the unsustainable situation of the SES due to the Tariff Deficit that was generated by the subsidies for RE and the drop in electricity demand, due to the worldwide economic crisis. In the But-For scenario, the SES would have become increasingly unsustainable and this would entail an increasing probability of partial or total default and regulatory adjustment. The measures solved the Tariff Deficit and made the system sustainable. It eliminated the windfall profits, which, create a higher regulatory risk and are inadmissible in a sector with over 80% of its income subsidized.[1398]

659. From a valuation standpoint, the increased risk in the But-For scenario needs to be translated into a risk premium added to the discount rate, since the projected cash flows are worthless if there is a larger probability of the system's default. This is consistent with CNE's view in 2012.[1399] The market showed gradual recovery due to the Disputed Measures. This continued improvement and lower regulatory risk in the Actual scenario confirmed the premium over the discount rate of 2.2% and 0.5% in the But-For and Actual scenarios, respectively.[1400] The economic reality is that any willing buyer performing an assessment of the FMV, would have applied a large discount to the regulatory risk. Thus, when the FMV assessment standard and a DCF approach are applied, it is necessary to consider the actual situation of the market and the actual risks that a willing buyer would have perceived.[1401] No economic agent could have reasonably expected that the subsidies would have been frozen in perpetuity, as Brattle's analysis does.[1402]

660. There is a direct link between the regulatory risk and the illiquidity discount. Accuracy maintains its asymmetry for the same reasons as explained for the regulatory risk premium.[1403] One defect in the Brattle scenario is that there is higher illiquidity in the But-For scenario.[1404] Thanks to the Disputed Measures, the number of transactions of RE plants has increased. Thus, after the Disputed Measures,

---

[1398] R-I § 1253; R-II §§ 1375 – 1376.

[1399] R-II § 1377; Accuracy, Second Economic Report, §§ 202 – 204 **[RER-0002]**.

[1400] R-II §§ 1377 – 1379; Accuracy, Second Economic Report, §§ 205 – 207 **[RER-0002]**.

[1401] R-II §§ 1380 – 1381.

[1402] *Id.* at § 1382.

[1403] *Id.* at § 1386; Accuracy, Second Economic Report, § 210 **[RER-0002]**.

[1404] R-II §§ 56, 1385.

the investment is a more liquid asset (or, less illiquid).[1405]  Thus, the discount for illiquidity must be lower in the Actual scenario than in the But-For.  Accordingly, for the same cash flows, their current value is higher after the Contested Measures.[1406]

661.  Brattle acknowledged that, if the Tribunal were to decide that the PV Plants contributed to the Tariff Deficit or that the Tribunal does not have to analyze whether alternative measures were available to Respondent to tackle it, then the regulatory risk needs to be applied such that there is a higher regulatory risk in the But-For than in the Actual scenario.  In its report, Brattle incorrectly applies a lower "*revenue hair-cut*" in the But-For than in the Actual, and the same liquidity discount in both scenarios.[1407]

662.  Claimants erroneously compare a projected decline in equity cash flows with a projected decline in revenues, comparing their alleged 57% (OperaFund) and 75% (Schwab) decline in past cash flows and future expected earnings to a decrease in revenues.[1408]  This is absolutely uninformative:  revenues are not the same as cash flows and are further not the same as equity cash-flows, which depend on financial leverage.[1409]  If a project is mostly financed through debt, any small reduction in future cash flows will impact only equity investors, since debt providers have senior rights over cash flows.[1410]

663.  Claimants' counsel has misrepresented Accuracy's contention regarding the significance of a spread of 2%.  Accuracy was discussing the difference in IRR across Brattle's But-for and Actual scenarios.  The 2.3 % reduction in reduction in returns due to the Measures is not from the 7% target IRR in the Economic Memorandum of RD 661/2007, but rather from a "But-For" scenario that yields an 8.1% IRR.  The reduction in IRR compared to the Economic Memorandum of RD 661/2007 is only 1.2% (from 7% to 5.8%):  a limited reduction that was reasonable considering the regulatory duties in the circumstances at the time.[1411]

---

[1405]  *Id*. at § 1383.

[1406]  *Id*. at §§ 1384 – 1385.

[1407]  *Id*. at § 81; Respondent's Closing, slide 135.

[1408]  RPHB-II § 44; CPHB-I § 73.

[1409]  RPHB-II § 45; CPHB-I § 74; Brattle, Regulatory Report, footnote 149 **[CER-0001]**.

[1410]  RPHB-II § 46.

[1411]  *Id*. at §§ 48 – 49; Tr. Day 4, 190:3-14 (Sands, Saura).

664.    The long-term return in a regulated market should be the cost of capital, which is the return that appropriately remunerates the risks assumed.  As explained by Accuracy, (1) the regulator should review the regulation and ensure that investors are receiving a reasonable return, (2) capital markets are constantly changing, (3) a return may be fair in certain economic conditions and become either insufficient or excessive if interest rates change, and (4) successive elimination of windfall profits does not differ from the observable reality in competitive markets.[1412]  Some tribunals, including *Isolux*, use the cost of capital as a benchmark to measure the reasonableness of the return after Measures.[1413]  It is undeniable that the cost of capital provides a solid benchmark to measure the reasonableness of a rate of return.[1414]

### 5.    Stand-Alone Impact of Disputed Measures

#### a.    Claimants' Remarks

665.    The stand-alone effect of the Disputed Measures is (1) EUR 4.6 million for the 2010 Measures, (2) EUR 0.48 million for the TVPEE, (3) EUR 0.1 million for RD-Law 2/2013 and (4) EUR 33.6 million for the New Regime.[1415]

666.    Claimants refer to RD 1565/2010, RD 14/2010 and Act 2/2011 as the "*2010 Measures*" and consider these and Act 15/2012 and RD-Law 2/2013 as "*Temporary Measures*."[1416]  These measures were de facto temporary due to the chaotic waterfall of detrimental measures to which Respondent subjected the PV Plants.  None of the tribunals condemning Respondent has assessed the impact of the Temporary Measures until the end of the plants' lifetime.[1417]  *Novenergia* confirms that the 2010 Measures were of limited effect.[1418]  Claimants point out that the *Eiser* and *Antin* tribunals also

---

[1412] RPHB-II §§ 50 – 52; CPHB-I §§80 – 83; Accuracy, First Economic Report, §§ 40, 11.2 **[RER-0001]**; Accuracy, Second Economic Report, § 11.3 **[RER-0002]**; Tr. Day 4, 120:14 – 121:1 (Saura, Reinisch); Tr. Day 4, 190:17 – 191:7 (Saura, Reinisch).

[1413] RPHB-II § 53; *Isolux*, § 594 **[RL-0004]** / **[RL-0076]**.

[1414] RPHB-II § 54; Accuracy, First Economic Report, § 11.2 **[RER-0001]**.

[1415] CPHB-II § 50 – 53; Brattle Rebuttal Expert Report, Table 2, Column A, Annex 3 **[CER-0005]**.

[1416] CPHB-I § 107; C-III §§ 271, 277 – 293.

[1417] CPHB-I § 110.

[1418] CPHB-II § 42 – 45; *Novenergia*, §§ 697, 840 **[CL-0213]**; Brattle Rebuttal Expert Report, Column C of Table 2 **[CER-0005]**.

considered the 2012 and 2013 measures as temporary.[1419]  The *Masdar* tribunal did not have to run the same analysis.[1420]  Claimants calculate the stand-alone impact of the Temporary Measures for the period in which they were applied by Respondent.[1421]

667.  The 2010 Measures were in effect from January 2011 to July 2013.[1422]  Their combined effect was EUR 4.6 million.[1423]  RD 1565/2010 reduced the time that PV Plants would receive the FIT to 25 years.  This was extended to 28 years under RD-Law 14/2010 (which also limited the hours entitled to the FIT), and this was extended to 30 years by Act 2/2011.[1424]

668.  Act 15/2012 was in effect from January 2013 to July 2013.[1425]  Its stand-alone effect was EUR 0.48 million (0.5 million including prejudgment interest).[1426]  Respondent asserts that after July 2013, the effect of the TVPEE was "*neutralized*" and, therefore, would have no impact or damages thereafter.  This is consistent with the majority of tribunals that have found Respondent liable under the ECT.  Thus, Claimants explain that the Tribunal's finding of liability should not detract from the "future damages" figure any "*TVPEE impact*."[1427]

---

[1419]  CPHB-II § 46; *Eiser*, §§ 388 – 389 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Antin*, §§ 667 – 668 **[CL-0222]**.

[1420]  CPHB-II § 47.

[1421]  *Id*. at § 29; CPHB-I § 107.

[1422]  CPHB-I § 109; CPHB-II § 29.

[1423]  CPHB-II § 30(i), 31 (EUR 5.51 million.  CPHB-I § 111).

[1424]  CPHB-I § 111.

[1425]  *Id*. at § 109; CPHB-II § 29.

[1426]  CPHB-I § 112; CPHB-II § 30(ii); ("*The calculations to arrive at this figure are as follows – path: Brattle Second Quantum Report (CER-0004) > BQR Exhibits > Workpaper Exhibits > BQR-115 Quantum Workpapers > Excel File "Tables P – Financial Model." Then, **Step 1**: Tab "PastCF" shows that without Disputed Measures the Claimants would obtain EUR 1.48 million in the first semester of 2013 (sum of [3][E] and [4][E]). **Step 2**: Choose "Yes" in cell E50 of tab "A1", which assumes Energy Tax in the "But-for." **Step 3**: Click "Update" in tab "Results". **Step 4**: Tab "PastCF" shows that with energy tax in place, Claimants would obtain EUR 1 million in the first semester of 2013 (sum of [3][E] and [4][E]). **Step 5**: The difference between EUR 1.48 million and EUR 1 million is EUR 0.48 million. Applying prejudgment interest factor of 1.04 (cell [9][E] of tab "PastCF") to EUR 0.48 million, it results in EUR 0.5 million*.").

[1427]  CPHB-I § 112.

669.  RD-Law 2/2013 was in effect from January 2013 – July 2013,[1428] and its standalone impact amounts to EUR 0.19 million.[1429]  The change in the CPI from 1 January 2013 until RD-Law 2/2013 was superseded by Regulatory Framework No. 3.[1430]

670.  In June 2014, the New Regime replaced the Original Regime with effect from July 2013.[1431]  The total impact of Regulatory Framework No. 3 was EUR 33.6 million[1432] (EUR 32.8 million,[1433] comprised of (1) EUR 2.4 million past damages from July 2013 – June 2014 and (2) EUR 30.4 million future damages (EUR 30.4 million is the FMV loss of future earnings as of June 2014).[1434]

671.  Claimants note that Accuracy's ABV method is unable to isolate the impact of the Disputed Measures, thus reinforcing the appropriateness of Brattle's DCF methodology.[1435]  Accuracy has not calculated the stand-alone impact of the measures.  Rather, it has calculated the additional or incremental impact of each measure.  Further, it has run this alternative calculation under the assumption that the earlier Disputed Measures (1) were not replaced by the New Regime, (2) were lawful, and (3) applied to the end of the PV Plants' lifetime, contrary to the facts.[1436]  Even if Accuracy's assumptions were correct, its calculations are flawed and understated by at least EUR 11.9 million.[1437]  Accuracy's results are completely untenable and are inconsistent with findings of other Tribunals that the 2013 Measures had an impact of close to EUR 53.3 (*Novenergia*), EUR 128 million (*Eiser*), EUR 112 million (*Antin*), EUR 50.16 million (*Masdar*).[1438]

---

[1428]  *Id*. at § 109; CPHB-II § 30.

[1429]  CPHB-II § 30(iii).

[1430]  CPHB-I § 113 (calculation in footnote 186).

[1431]  *Id*. at § 109.

[1432]  CPHB-II §§ 32, 39; Brattle Rebuttal Expert Report, § 7, Table 1, Column C, Annex 3 **[CER-0005]**.

[1433]  CPHB-I § 114.

[1434]  *Id*.

[1435]  *Id*. at § 108.

[1436]  CPHB-II §§ 33 – 34, 38; Servert, Jorge, SPEX PV Plant Technical Lifetime Analysis (3/2018), § 19 **[RER-0003]**.

[1437]  CPHB-II §§ 35 – 36; Brattle Rebuttal Expert Report, §§ 9 – 10, 12, 19 – 31, 37, 39, p. 36 **[CER-0005]**.

[1438]  CPHB-II § 37; RPHB-I § 218; *Novenergia*, §§ 841 – 843, 860(c) **[CL-0213]**; *Eiser*, § 486(c) **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Antin*, § 748(c) **[CL-0222]**; *Masdar*, § 655 **[CL-0220]**.

### b.  Respondent's Arguments

672.  Accuracy calculated the stand-alone impact of each measure, assuming a 35- and 30-years useful life. Accuracy also performed these calculations using its prior model.[1439]

673.  Using Brattle's calculations, the stand-alone impact of RD 1565/2010 was EUR 11.9 million, of RD-Law 14/2010 was EUR 11.4 million; of the combination of RD 1565/2010 and RD-Law 14/2010 was EUR 11.4 million, Law 15/2012 was EUR 10.2 million, RD-Law 2/2013 was EUR 8.2 million, and the subsequent measures was EUR 1.5 million.[1440]  Using Accuracy's assumptions, considering any individual measure (except RD-Law 2/2013) as lawful would eliminate damages.  These calculations reflect that Claimants' assertions regarding the paradigm changes imposed by the measures from July 2013 – June 2014 in comparison to the prior measures is baseless.[1441]

674.  Claimants have suffered no harm based on the idea that the equivalent-hours methodology is different in PER 2005-2010 as in RD-Law 14/2010.  The RD 661/2007 tariffs were designed to take into account the same operating hours used in RD-Law 14/2010 onwards.  Therefore, any production above that threshold is remunerable at the market price, and the elimination of the subsidy to that excess is merely an elimination of windfall profits, since the tariff was calculated using that hours reference.[1442]

675.  Claimants have changed their position regarding the nature and economic impact of the measures prior to July 2013, and have not raised new arguments regarding the "*temporal*" nature of the Disputed Measures prior to July 2013.  This was not raised in previous submissions and is contradictory to prior submissions.  Respondents argue that this is inadmissible under Article 31 of the ICSID Rules and

---

[1439]  RPHB-I §§ 215 – 216; Table 1, Accuracy, Stand-Alone Report Regarding the Quantification of Damages in ICSID 15 36 **[RER-0005]**.

[1440]  RPHB-I §§ 217.

[1441]  *Id.* at §§ 218 – 222; C-III §§ 240 – 277; Accuracy Second Economic Report, Table 19 **[RER-0002]**.

[1442]  RPHB-II §§ 38 – 40; CPHB-I §§ 50 – 53; *Charanne*, §§ 529 – 532 **[CL-0030] / [RL-0049]**.

PO-1 §§ 11, 12, 14, and 16 and must be disregarded.[1443]  This new position is also contradicted by the position adopted by Brattle in this proceeding[1444] and in others.[1445]

676.  Claimants' new position is unsupported in view of the nature and effects of the Disputed Measures prior to July 2013.[1446]  The measures prior to July 2013 were permanent.  Claimant's conception otherwise defies elementary legal logic:  legal rules remain in force as long as they are not expressly superseded by another rule or as long as the rule itself does not set its own time limit.  There is no need to renew a law or a royal decree for it to continue to be in force.[1447]  The only disputed measure that contained a transitory provision was RD-Law 14/2010, which specified two caps:  one until 31 December 2013, and one from 2014 onwards.[1448]

677.  Further, it is inconsistent to consider the Disputed Measures to be temporary, but to consider RD 661/2007 to be permanent and, thus, the basis for the "*But-For*" scenario.  Following Claimants' logic, if Measures that were *de facto* applied temporarily are to be considered temporary, then that would apply to RD 661/2007 because, *de facto*, it only temporarily applied.  It is nonsensical.  If the Tribunal finds that the measures prior to July 2013 did not violate the ECT, they must be applied in the "*But-For*" scenario to ensure the standard of compensation guaranteed by *Chorzow* and Article 35 of the ILC Articles.[1449]

678.  While Brattle's calculation of the stand-along impact of the 2010 measures (EUR 5.51 million) is correct, it is conceptually wrong to reflect a but-for scenario should those measures be logical.  Adding those measures back to the *"But-For"* Scenario reduces Claimants' damages by EUR 22 million to EUR 18 million.[1450]  The difference between Brattle's impact (EUR 22 million) and Respondent's

---

[1443] RPHB-II §§ 55 – 57, 76 – 78; CPHB-I §§ 111, 112, 181; C-III §§ 227, 248 – 251; RD 1565/2010, Art. 1(1) **[C-0110]** / **[R-0074]**; RD-Law 14/2010 **[C-0111]** / **[R-0058]**.

[1444] RPHB-II § 58, 60; Tr. Day 4, 59 – 62, Tr. Day 3, 133 – 155; Brattle Second, Appendix B, Appendix 6, Tables P, sheet A1 to A19.

[1445] RPHB-II § 62; *Eiser*, §§ 250 – 272, 458 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Antin* **[CL-0222]**.

[1446] RPHB-II § 63.

[1447] *Id*. at § 64.

[1448] *Id*. at § 65.

[1449] *Id*. at § 66 (*referring* to RD 1565/2010, Art. 1(1) **[C-0110]** / **[R-0074]**; RD-Law 14/2010 **[C-0111]** / **[R-0058]**; Act 2/2011 **[C-0115]** / **[R-0045]**; Act 15/2012 **[C-0112]** / **[R-0003]**; RD-Law 2/2013 **[C-0113]** / **[R-0063]**).

[1450] *Id*. at § 68.

(EUR 20.6 million) is due to Brattle applying the cap in hours of RD-Law 14/2010 to the whole useful live of the Plants.  Brattle, thus, did not update the value of the cap in hours from January 2014 onwards.[1451]  Brattle did not model the limitation of regulatory lifetime, either.  Brattle included Act 2/2011, which extended the FIT collection period to 30 years, which was not directly requested by the Tribunal.[1452]  Brattle's calculation of the stand-alone impact of the Disputed Measures is the same as in Respondent's first PHB, though Respondent has simulated that the Measures are permanent in the But-For scenario.  Regardless of their new tailored approach, Claimants' experts have agreed with Respondent's contention:  if Measures prior to July 2013 are not in breach of the ECT, they should be part of the But-For scenario.

679.   Regarding Act 15.2012, Claimants have confused Respondent's contention on the TVPEE.  The 7% is included as a standard cost in the financial economic support scheme and as such is reimbursed through the Remuneration to the Operation.  This is true in the Actual world.  But, in the But For scenario, the Tribunal need simply apply the 7% tax.  If the 7% tax was lawful, it would have applied to the But-For world.[1453]  Brattle did this in its reports, resulting in a EUR 10.8 million stand-along impact of the TVPEE.[1454]

680.   Claimants' assessment of RD-Law 2/2013 considers only the first semester 2013.[1455]  To determine what would have been the impact of RD-Law 2/2013 in the but for world, one need only forecast the IPC "corrected" to the But-For Scenario until the end of the Plants' useful life and compare it to the "*Actual*" Scenario.  Prolonging Brattle's IPC "corrected" results in a reduction of damages of EUR 9.4 million.[1456]

681.   Respondent noted that in *Masdar*, the Tribunal only awarded 25% of the damages claimed, dismissing 75% of the claims.  To date, that Tribunal's calculations are not clarified.[1457]

---

[1451]  *Id*. at § 69.

[1452]  *Id*. at § 70.

[1453]  *Id*. at § 72.

[1454]  *Id*. at § 73.

[1455]  *Id*. at § 74.

[1456]  *Id*. at § 75.

[1457]  *Id*. at § 211(ii).

**6.     The Tribunal's Considerations and Conclusions regarding the Calculation of Damages**

682.  As mentioned above, since the issues addressed in the above sections 1 to 5 are interlinked in their relevance for the calculation of damages, the Tribunal considers them together hereafter.

683.  Regarding the **valuation date**, as settled in international jurisprudence, Claimants are entitled to damages valued as of the date of injury or as of the date of the Tribunal's award, whichever is higher.[1458]  Claimants choose June 2014 because that is the date when Respondent, through MO IET/1045/2014, defined the economic parameters of the New Regulatory Regime.  That defined the injury to Claimants and was the final picture of the extent of damage suffered by Claimants could be known.[1459] The valuation date is, therefore, June 2014 as the date on which the breach of the ECT became permanently effective. In this context, to avoid misunderstanding, the Tribunal notes that the New Regime (2013/2014 Measures) was applied by Spain retroactively with effect from July 2013 and that these were only Temporary Measures. While the *Antin*, *Novenergia*, and *Eiser* tribunals awarded damages from June 2014 onward,[1460] the *Masdar* tribunal took the retroactive effect of new measures into account to achieve full compensation.[1461] As the measures before June 2014 – although temporary – caused damage, the present Tribunal considers that the latter approach is more appropriate in this case.

684.  Regarding the **expected lifetime of the plants**, the Tribunal notes that Article 36 of RD 661/2007 set a FIT "*for the first 25 years*" of operation, and a lower FIT for the remaining lifetime, making it clear that – in 2007 – that State expected a useful life of PV Plants to exceed 25 years.[1462] According to Respondent, the useful life of the PV Plants is a maximum of 30 years.[1463]  Brattle used 35 years. From the evidence provided, the Tribunal considers it more appropriate to accept Brattle's assumption that the PV plants could operate for 35 years in the But-For scenario based on (1) a study about PV

---

[1458] *Yukos v. Russia*, § 1769 **[RL-0085]** / **[CL-0038]**; *Siemens v. Argentina*, § 352 **[CL-0139]**.

[1459] C-III §§ 593 – 594; Brattle, Quantum Report, § 11 **[CER-0002]**.

[1460] CPHB-I page 47 (line 14), (*citing Antin*, §§ 666 – 668 **[CL-0222]**; *Novenergia*, § 839 – 842 **[CL-0213]**; *Eiser*, §§ 457 – 458 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**).

[1461] CPHB-I page 47 (line 14) (*citing Masdar*, § 651 **[CL-0220]**).

[1462] CPHB-I § 70; RD 661/2007, Art. 36 **[R-0071]** / **[C-0046]** ("*first 25 years*" / "*thereafter*").

[1463] R-I § 1254; R-II §§ 54, 1368 – 1370; RPHB-I § 41; Respondent Closing slide 44; Accuracy, Second Economic Report, §§ 185 *et seq.* **[RER-0002]**.

plants published by the EC,[1464] (2) ECO 3's Plant's 25-year land lease agreement, which included two 5-year extensions and supports Claimants' expectation of a 35-year useful life for the plants,[1465] and (3) conclusions reached by ATA about Claimants' PV Plants' useful life of 35 years.[1466]

685. Regarding the further application of the DCF method for the present case, in the view of the Tribunal, Claimants are correct that Respondent's expert, Accuracy, distorts the impact of the Disputed Measures by alleging that the But-For scenario would have been associated with high risk and large discounts, while the Disputed Measures would have rendered the Actual scenario "*safe*"[1467] and that the Tariff Deficit was caused by Respondent's policies. [1468] Further, the Tribunal agrees with Claimants' criticism that Accuracy's ABV method is unable to isolate the impact of the Disputed Measures.[1469] Accuracy has not calculated the stand-alone impact of the measures. Rather, it has calculated the additional or incremental impact of each measure. Further, it has run this alternative calculation under the assumption that the earlier Disputed Measures (1) were not replaced by the New Regime, (2) were lawful, and (3) applied to the end of the PV Plants' lifetime, contrary to the facts.[1470] In this context, the Tribunal notes that the experts agree that the expected project IRR, calculated by applying RD 661/2007 was decreased in the New Regime by 200 basis points, which entailed a 76% reduction in the return on equity for an investor.[1471]

686. Since the calculations submitted by the Parties and their experts have varied over the time of the proceedings, the Tribunal will rely on their last calculations which are as follows: Accuracy's Report carries out its own DCF calculation and concludes that the Disputed Measures reduce the financial

---

[1464] EC DG ENV, *Study on Photovoltaic Panels Supplementing the Impact Assessment for a Recast of the [Waste Electrical and Electronic Equipment] WEEE Directive – Final Report*, 14 April 2011, p. 13 **[BRR-47]**.

[1465] Leasing Agreements **[BQR-75]**; Brattle, Quantum Rebuttal Report, § 143 **[CER-0004]**.

[1466] C-III § 626; CPHB-I § 62 – 63; Brattle, Quantum Rebuttal Report, § IX.A **[CER-0004]**; PV Lifetime Assessments **[BQR-64]**; ATA, "ESP Addendum PV Lifetime Report Badajoz 10MW," 30 November 2017 **[BQR-88]** / **[C-0253]**; ATA, "ESP Addendum PV Lifetime Report Paso 8.3MW", 30 November 2017 **[BQR-89]** / **[C-0254]**; Accuracy, First Economic Report, § 27 **[RER-0001]** (*using* 30 years for its calculations).

[1467] C-III § 615(ii); Brattle, Quantum Rebuttal Report, § 137 **[CER-0004]**.

[1468] CPHB-I § 74; Brattle, Quantum Rebuttal Report, Table 12, p. 81 **[CER-0004]**; *Novenergia*, § 695 **[CL-0213]**.

[1469] CPHB-I § 108.

[1470] CPHB-II §§ 33 – 34, 38; Accuracy, Stand-Alone Report Regarding the Quantification of Damages in ICSID 15 36, § 19 **[RER-0005]**.

[1471] CPHB-I § 75; Tr. Day 4, 190:3-15 (Sands, Saura); Tr. Day 5, 46:10-22 (Claimants' Counsel); Claimants' Closing Presentation, Slide 72; Accuracy, Second Economic Report, Figures 6 and 12 **[RER-0002]**.

interests of Claimants by EUR 4.5 million (EUR 4.7 million including interest). Brattles' Second Quantum Report performs six corrections to Accuracy's DCF Model. These have the effect of increasing Accuracy's damage estimate, closer to Brattle's of 40.3 million. After the Hearing, Claimants explained that "Past Damages" (January 2011 – June 2014) amounted to EUR 9.7 million, "Future Damages" amounted to 30.4 million. The total impact of the measures, pre-interest is 40.1 million, and with interest amounts to 43.3 million.

687. Finding Respondent's calculation unpersuasive, the Tribunal considers it appropriate to start its calculation by Brattle's final table submitted with Claimants' the last post-hearing brief (CER 005 p.6):

### Table 2: Stand-alone Impact of the Disputed Measures under the Two Different Legal Interpretations (€ mln, exc. prejudgment interest)

| | | Primary Legal Interpretation ("Applied until Superseded") | Alternative Legal Interpretation ("Applied until End of Plants' Lifetime") | |
| --- | --- | --- | --- | --- |
| | | | Accuracy | Brattle |
| | | [A] | [B] | [C] |
| Overall claim | [1] | -40.1 | -40.1 | -40.1 |
| *Stand-alone impact of:* | | | | |
| 2010 Disputed Measures | [2] | -4.6 | -20.6 | -12.6 |
| Law 15/2012 | [3] | -0.5 | -10.8 | -10.8 |
| RDL 2/2013 | [4] | -0.2 | -9.4 | -3.9 |
| New Regulatory Regime (Subsequent Measures) | [5] | -33.6 | n.a. | -33.6 |

Notes and Sources:
[1]: Brattle Second Quantum Report, Table 1.
[A][2] to [5]: See Simplified Financial Model.
[B][2] to [5]: Accuracy III Report, Table 1.
[C][2], [4]: See Table 3, Table 4, respectively.
[C][3]: Brattle Second Quantum Report, Table 14.
[C][5]: Claimants' PHB, Section II.3, paragraph 114.

688. Since the Tribunal has concluded above that it has no jurisdiction regarding the tax of the TVPEE, the Tribunal deducts in the above table the impact of the Law 15/2012 which both Accuracy and Brattle see as amounting to rather similar figures (10.8 million in the above Table and 10.1 or 10.5 million in

Table 5 on page 17 of the Brattle Report). (The much smaller figure mentioned in §§ 51 – 53 of Claimants' second post-hearing brief seems to address a different scenario.) Thus, subtracting 10.8 million from 40.1 leads to a final damage amount for Claimants of **USD 29.3 million**

### D.   ALTERNATIVE VALUATION BY BRATTLE

#### 1.   Claimants' Arguments

689.   If the Tribunal concludes that all that was guaranteed to Claimants was a "*reasonable return*", Respondent would still be liable for breach of the ECT because it implemented changes that were inconsistent with the reasonable return implicit in the FITs originally offered in RD 661/2007.[1472]

690.   Brattle constructed an alternative "But-For" scenario to assess damages where all that was guaranteed was the reasonable return implicit in RD 661/2007's FITs, with the following premises: (1) Claimants' plants fell into 2 categories under RD 661/2007:  the Majorca plants fit into the "*less than 100Kw*" category and the Badajoz plants fit into the "*less than 10Kw*" category, (2) the single FIT for each of the two PV types should provide a return for each "*marginal plant*" (defined as the most expensive, efficient type of PV plant in either category, which would have had the same FIT under RD 661/2007 as Claimants' plants) equal to 7.0% after taxes, or 8.8% before, (3) each FIT assumes a 25-year regulatory life for each efficient marginal PV plant, and (4) Brattle's own forecasts of inflation and pool prices.  Under these assumptions, each per MWh FIT calculated should provide the alleged "*reasonable return*" for the marginal PV plant in each category.[1473]

691.   Calculating by reference to the marginal plant is the only way to appreciate efficiency benefits accomplished by investors that developed more efficient plants than the marginal one.[1474]  This analysis shows that Claimants suffered substantial damages under the "*reasonable return*" theory: EUR 42 million (= EUR 39 million sustained by OperaFund and EUR 3 million by Schwab), before

---

[1472]  C-III §§ 591, 669.

[1473]  *Id.* at §§ 669 – 671; Brattle, Quantum Rebuttal Report, §§ 232, 238, Figure 6 **[CER-0004]**.

[1474]  C-III § 672; Brattle, Quantum Rebuttal Report, §§ 228 – 229, 238 **[CER-0004]**.

adding pre-award interest and tax gross-up.[1475]  Claimants suffered a 59% (OperaFund) and 75% (Schwab) decline in past cash-flows and future expected earnings.[1476]

### 2.    Respondent's Arguments

692.  Brattle's "*Alternative Claim*" is nothing more than a crude DCF reverse engineering exercise in which the selected parameters have only the aim of resulting in higher damages than those of the main claim.[1477]  Brattle uses the inflated cost of its theoretical "*marginal plant*" and applies an inflated percentage to it.  The conversion from post-tax to pre-tax is inconsistent with the reality of a project.  Due to (1) the large capital outlays involved in these investments, (2) book depreciation, and (3) tax benefits, the effective tax rate paid by these projects in their first years of life is very low and, thus, the actual difference between pre-tax and post-tax is insignificant.[1478]  Brattle acknowledged that this alternative claim is based on an asset base and a tariff that do not correspond to the real costs of Claimants' PV Plants or to the tariff of RD 661/2007.  Simply by adjusting the asset base of the alternative plants to the costs of standard plants, the claimed damages are reduced by 25%.[1479]

693.  Further, Claimants' "*alternative FIT*" is calculated to reach a result over 25 years, but it then applied to a 35-year lifetime.  This resulted in a target return of not 7%, but rather 10% post-tax.  Further, the correct reference is not the 7% post-tax target return used, but rather the cost of capital, as this is a regulated market.  Using an appropriate set of parameters, there are no damages caused to Claimants.[1480]

---

[1475] C-III §§ 673 – 674; The Report on Draft Royal Decree 661/2007 regulating the activity of electricity production under the special regime and the production of certain facilities with similar technologies under the ordinary regime, p. 1 **[R-0049]**; Brattle, Quantum Rebuttal Report, § 3.2.1, 81, 254, Table 12 **[CER-0004]**.

[1476] CPHB-I § 78 (59% figure); Brattle, Quantum Rebuttal Report, Table 14, p. 72 **[CER-0004]**.

[1477] R-II § 1408; *Eiser*, §§ 433 – 434 **[CL-0148]** / **[RL-0077]** / **[RL-0078]** (*rejecting* this Alternative Claim).

[1478] R-II §§ 1409 – 1412.

[1479] RPHB-I § 82; Tr. Day 4, 67:13 – 70:25, 71:3-14 (Caldwell).

[1480] R-II §§ 1413 – 1415; Accuracy, Second Economic Report, §§ 28 – 29 **[RER-0002]**.

694. The *Eiser* tribunal was not persuaded by the alternative claim's use of projected costs of the most expensive type of solar generation as the basis for calculating the future revenues that should accrue to Claimants' different plants.[1481]

### 3. The Tribunal

695. In view of the Tribunal's conclusions above accepting the primary claim, there is no need to examine and decide on this alternative claim and valuation.

### E. TAX GROSS UP

### 1. Claimants' Arguments

696. A tax gross-up should be added to the damages award to ensure full reparation.[1482] Brattle's But-For and Actual valuations represent the after tax value of the claims.[1483] In the But-For world, Claimants would have obtained returns on their investments *via* dividends, interest from Claimants' subordinated loans, and capital gains. None of these would have attracted taxes in Malta for OperaFund. Schwab would have been taxed 7.83% on the interest income received from its loan investment.[1484] Any taxation of this Award imposed in Switzerland or Malta will result in additional harm to Claimants, as a direct result of Respondent's conduct because those taxes would, *de facto*, diminish the amount that Claimants would otherwise obtain. The tax gross-up is necessary to make Claimants whole.[1485]

---

[1481] RPHB-I § 83; *Philip Morris v. Uruguay*, § 473 **[RL-0088]**.

[1482] C-III § 599.

[1483] *Id*. at § 654; Convention between the Swiss Confederation and Spain for the avoidance of double taxation with respect to taxes on income and on capital signed at Bern on 26 April 1966, as amended by protocols signed on 29 June 2006 and on 27 July 2011 **[C-0315]**; Tax residency certificate for Schwab, 24 November 2017 **[C-0316]**; Convention between the Kingdom of Spain and Malta for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, 7 September 2006 **[C-0317]**; Tax residency certificate for OperaFund, 12 December 2017 **[C-0318]**; Brattle, Quantum Report, § 184 **[CER-0002]**.

[1484] C-III § 655; CPHB-I § 93; Schwab Holding AG – Taxation of income, PriceWaterHouseCoopers, 12 December 2017, § 4, p. 9 **[C-0319]** / **[BQR-111]**.

[1485] C-III §§ 654 – 668; CPHB-I § 94; Claimants' Opening Statement, slides 132 – 133; *Saudi Arabian Texaco v. Iraq*, United Nations Compensation Commission Governing Council, "Report and Recommendations made by the Panel of Commissioners concerning the Second Instalment of "E1" Claims", S/AC.26/1999/10, 24 June 1999, §§ 453 – 455 **[CL-0210]**; *Sociedad Anónima del Ucieza v. Spain,* Application no. 38963/08, European Court of Human Rights, Judgment, 20 December 2016 (hereinafter "*Sociedad Anónima del Ucieza v. Spain*") **[CL-0211]**.

697.  There is nothing in Article 21 of the ECT prohibiting a tax gross up or limiting a tax gross up to ensure full reparation.[1486]  That the award may attract taxes in Switzerland and Malta (and/or another country) does not relieve Respondent of its liability regarding the amount imposed.  The payment of taxes on the award is an unavoidable consequence of Respondent's wrongful measures.[1487]  This is the same approach adopted by the United Nations Compensation Commission when assessing the quantum of reparation due under international law, following Iraq's invasion of Kuwait, as well as with awards of compensation to private parties for breaches of international law.[1488]

698.  There is no excessive speculation, uncertainty, or contingency in requesting the Tribunal's declaration that the Award is made net of all taxes.  Claimants request that the amount to be awarded be calculated and expressed in the Award according to the formula A/(1-T), where "*A*" would be the damages to be awarded to Claimants and "*T*" would be "*the accumulate of any tax, withholding or equivalent*" concept applicable to the payment of damages in any jurisdiction.[1489]  For Schwab, the tax burden on this award will amount to EUR 0.3 million, assuming no use of losses carried forward.[1490]  OperaFund should not sustain an additional tax burden, but if it were to, OperaFund would be entitled to tax gross up.[1491]

699.  Following the Hearing, Claimants noted that, unlike in the present matter where there is sufficient evidence to support the entitlement to a tax gross up, the tribunals in *Antin*, *Masdar*, and *Eiser* found that they lacked evidence to support the tax-gross up claim.[1492]

---

[1486] C-III §§ 659 – 660.

[1487] *Id*. at § 661.

[1488] *Id*. at §§ 662 – 663; *Saudi Arabian Texaco v. Iraq*, United Nations Compensation Commission Governing Council, "Report and Recommendations made by the Panel of Commissioners concerning the Second Instalment of "E1" Claims", S/AC.26/1999/10, 24 June 1999 **[CL-0210]**; *Sociedad Anónima del Ucieza v. Spain*, § 29 **[CL-0211]**.

[1489] C-I § 875.

[1490] C-III §§ 664 – 665; *Sociedad Anónima del Ucieza v. Spain*, § 29 **[CL-0211]**.

[1491] C-III § 666.

[1492] CPHB-I page 47 (line 13); *citing Antin*, §§ 669 – 673 **[CL-0222]**; *Masdar*, § 656 – 660 **[CL-0220]**; *Eiser*, § 456 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

### 2. Respondent's Arguments

700. Claimants' requested a tax gross up that is "[1] *contrary to the ECT, the ILC Articles, and the principles of causality and attribution;* [2] *contrary to the elimination of double taxation;* [and] [3] *is naturally speculative, contingent and uncertain, in which the burden of proof has not been met.*"[1493] This claim is inadmissible.[1494]  Respondent reserved rights to make further pleadings and to submit reports regarding the tax gross up.[1495]

701. For the principle of full reparation to be applied, there must be an obligation to provide reparation, and this requires (1) attribution and (2) causality.[1496]  Arbitral cases have concluded that taxation on arbitral awards outside of the host country does not qualify as consequential loss and is not a liability of the host country.[1497]  Any taxation on an Award will depend on (1) the acts of another sovereign state or (2) acts or private decisions of Claimants or the companies that form parts of their business groups.  Respondent cannot be obliged to compensate for these hypothetical damages, over which it has no control.[1498]  Further, within the EU, the "*participation exemption*" is established by Directive 2011/96 for the elimination of taxation within the Member States and any hypothetical compensation should be exempt thereunder.  The compensation would also be tax exempt in Switzerland.[1499]

702. The tax gross up is prohibited under the first sentence of Article 21(1) of the ECT:  which states that "*nothing in this Treaty shall create rights or impose obligations with respect to the Taxation Measures of the Contracting Parties.*"[1500]  The text does not use the term "*Host Party*" (a concept recognized in Article 15) but rather refers to "*Contracting Parties.*"  It, therefore, applies to taxation measures in

---

[1493]  R-II §§ 59, 1431 – 1433, 1475 – 1476.

[1494]  R-I §§ 1269 – 1271.

[1495]  R-II § 1474.

[1496]  *Id.* at §§ 1447 – 1448; ILC Draft Articles, With Commentary, Art. 31 (Reparation) and 36 (Compensation) **[RL-0032]** / **[CL-0028]**.

[1497]  R- II § 1449; RPHB-I § 211 (v); *Masdar*, §§ 656 – 660 **[CL-0220]**; *Rusoro v. Venezuela*, § 854 **[RL-0047]**.

[1498]  R-II §§ 1434 – 1436; RPHB-I § 84; Respondent Opening on Quantum, slides 26-30, Tr. Day 1, 159:13-23 (Fernández Antuña); Rebuttal Report:  Financial Damages to Investors, §§ 260 – 263.

[1499]  R-II §§ 1437, 1451 – 1455; Schwab Holding AG – Taxation of income, PriceWaterhouseCoopers, 12 December 2017, 4 **[C-0319]** / **[BQR-111]**; Council Directive 2011/96/EU of 30 November 2011 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States **[RL-0090]**.

[1500]  R-I § 1272; R-II § 1439.

the host country and in the home country.[1501]  This creates a tax gross-up carve-out.  The second sentence of Article 21 ECT emphasizes that Article 21 prevails over any other provision of the ECT, including Articles 10, 13, or 26.[1502]

703.  Alternatively, the claim for a tax gross-up is speculative, contingent, and uncertain.[1503]  Arbitral case law confirms the speculative and uncertain nature of a tax gross-up claim,[1504] as does Claimants' Reply on the Merits, where Claimants have failed to prove with the minimum certainty required that (1) a hypothetical award would be subject to taxation in a country and (2) the amount of taxes that would have to be paid.[1505]  Claimants' *ad hoc* memo does not prove that taxation in Switzerland would be EUR 0.3 million.[1506]  Rather, that memo shows that "*(i) there is no valid fiscal rule or case-law that proves this hypothetical taxation; (ii) the hypothetical taxation would be written off with "tax carry forward losses", for example; (iii) the hypothetical taxation would depend on the corporate structure, meaning the group's fiscal planning (lack of causality); (iv) the hypothetical taxation would depend on who paid the compensation.*"[1507]  Here, Claimants claim EUR 3.6 million in potential taxes that Swiss authorities may impose on part of the award payable to Schwab, and acknowledge that Schwab owns tax loss carry forwards of more than EUR 4 million, which would absorb any possible tax.  Claimants are claiming damages for a tax that they are unlikely to pay.[1508]  Respondent, therefore, cannot be obliged to compensate for the hypothetical damages resulting from (1) acts of another state or (2) private acts or decisions of the Claimant itself or of the companies of its business group.[1509]

---

[1501] R-I §§ 1272 – 1276; R-II §§ 1441 – 1443.

[1502] R-I § 1277; R-II §§ 1444 – 1446.

[1503] R-II §§ 1456 – 1460; *Abengoa, S.A. and COFIDES, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/09/2, Award, 18 April 2013 (hereinafter "*Abengoa v. Mexico*"), §§ 775 – 777 **[RL-0021]**; *Venezuela Holdings, B.V., Mobil Cerro Negro holding, LTD., Mobil Venezolana de Petróleos Holdings, INC.., Mobil Cerro Negro, LTD. and Mobil Venezolana de Petróleos v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27. Award 09 October 2014, § 388 **[RL-0089]**; Bilateral Investment Treaties (BIT) Netherlands and Bolivarian Republic of Venezuela, Art. 4 **[RL-0091]**.

[1504] R-I §§ 1280 – 1282; *Abengoa v. Mexico*, §§ 775 – 777 **[RL-0021]**.

[1505] R-II §§ 1461 – 1466.

[1506] *Id*. at § 1467; Schwab Holding AG – Taxation of income, PriceWaterHouseCoopers, 12 December 2017, § 4, p. 9 **[C-0319]** / **[BQR-111]**.

[1507] R-II § 1469.

[1508] RPHB-I § 84; Respondent Opening on Quantum, slides 26-30, Tr. Day 1, 159:13-23.

[1509] R-II §§ 1470 – 1473.

### 3.    The Tribunal

704.    The Tribunal finds Claimants' references to possible taxation in Switzerland and Malta too speculative and not as sufficient proof of any such taxes or of Respondent's liability for these as part of the damages to be paid.

705.    However, the Tribunal does not agree with Respondent that the tax gross up is prohibited under the first sentence of Article 21(1) of the ECT[1510] or that this creates a tax gross up carve-out. There is nothing in Article 21 of the ECT prohibiting a tax gross up or limiting a tax gross up to ensure full reparation.[1511]  To the Tribunal, it is clear that Spain as the Respondent is to pay the entire amount of damages and cannot charge and deduct Spanish taxes on the amount awarded.  As other Tribunals have done in similar cases, in view of Respondent's express objection, there is indeed a need to clarify that. Therefore, as a precaution, the Tribunal concludes and will expressly provide in the dispositive of this Award that the Award is made net of all taxes and/or withholdings by Spain, and Spain is ordered to indemnify Claimants for any tax liability or withholding that may be imposed in Spain.

### F.    INTEREST

### 1.    Claimants' Arguments

706.    Interest compensates for the fact that, during the period of non-payment, the creditor is deprived of the sum owed.[1512]  Claimants request that Respondent be ordered to pay pre- and post-award interest.[1513]  Pre-award interest is consistent with the principle of full compensation.  Interest is expressly foreseen in Article 26(8) of the ECT and this principle is enshrined in Article 38 of the ILC Draft Articles.[1514]  After the Hearing, Claimants noted that, although Article 10(1) of the ECT does not establish an interest rate to apply to breaches, Article 13 of the ECT provides for it.[1515]

---

[1510]  *Id*. at §§ 1441 – 1443; R-I §§ 1272 – 1276.

[1511]  C-III §§ 659 – 660.

[1512]  C-I § 865.

[1513]  *Id*. at § 862.

[1514]  *Id*. at §§ 863 – 864; I. Marboe, *Calculation of compensation and damages in international investment law*, Oxford University Press, New York, 2009, §§ 6.06, 6.16 **[CL-0135]**.

[1515]  CPHB-I § 90.

707. Pre-Award interest was calculated by Brattle on the basis of Respondent's borrowing rate.[1516]  In the present circumstances, pre-award interest should be set with reference to Respondent's borrowing rate, in particular to the relevant Spanish 10-year bond yield.[1517]  This is the benchmark used by Spain under the New Regime to determine the allowed return.[1518]  The Spanish 10-year bond yields have been lower than actual borrowing costs of project companies over the relevant period.[1519]  Brattle computes this from 20 June 2014 to 30 January 2019 at 1.59%, compounded monthly (=EUR 2.44 million (EUR 2.23 million to OperaFund and EUR 0.21 million to Schwab).[1520]  This rate is lower than the one granted by the *Eiser* tribunal as pre-award interest (2.07%).[1521]

708. Claimants do not concede that the reference point should be the time for the rendering of the award.[1522]

709. Respondent's defense to post-award interest is untenable.  Post-award interest provides an incentive to pay as is recognized in the ILC Draft Articles, Commentary (12) of Article 38.[1523]  Thus, tribunals may determine a different, higher post-award interest to eliminate Respondent's incentive to delay

---

[1516] C-III § 598; Brattle, Quantum Rebuttal Report, § 26 **[CER-0004]**.

[1517] C-III § 643; C-I § 866; Brattle, Quantum Report, § 181 **[CER-0002]**; Brattle, Quantum Rebuttal Report **[CER-0004]**.

[1518] C-III § 645; Accuracy, First Economic Report, §§ 29 – 30 **[RER-0001]**.

[1519] C-III § 647; Brattle, Quantum Rebuttal Report, § 113 **[CER-0004]**.

[1520] C-III §§ 644, 648; CPHB-I § 90; C-I § 867 (stating 0.88%, Brattle, Quantum Report, fn. 140 **[CER-0002]**); Brattle, Quantum Rebuttal Report, fn. 17, Tables S-16, N2 **[CER-0004]**; ILC Draft Articles, Art. 38 **[CL-0001]**; for compound interest, *see Stati v. Kazakhstan*, § 1855 **[CL-0015]**; *Kardassopoulos v. Georgia*, § 664 **[CL-0136]** / **[RL-0097]**; *Waguih Elie George Siag & Clorinda Vecchi v. The Arab Republic of Egypt* (ICSID Case No. ARB/05/15), Award, 1 June 2009, § 595 **[CL-0132]**; *Compañía del Desarrollo de Santa Elena, S.A. v. The Republic of Costa Rica* (ICSID Case No. ARB/96/1), Award, 17 February 2000, § 104 **[CL-0145]**.

[1521] C-III § 646.

[1522] *Id.* at § 645; Accuracy, First Economic Report, §§ 29 – 30 **[RER-0001]**.

[1523] C-III § 649; ILC Draft Articles, Art. 38 **[CL-0001]**.

full payment of an award, as was done in *Gold Reserve*, *Metalclad*, *Maffezini*, and *Eiser*.[1524]  Post-award interest penalizes a respondent State defaulting on an award.[1525]

710.  Finally, post-award interest is commonplace and an established practice in Spain.[1526]  Claimants maintain their claim for post-award interest at a moratorium differential of 2%, to be added to pre-award interest, because that constitutes a real incentive for the prompt payment of the award.[1527]  Thus, the post-award interest rate should be 3.59%, which should be applied to all amounts due under the Award until it is paid.  Pre- and post-award interest shall be compounded monthly because compound interest reflects commercial reality of investors.[1528]

### 2.    Respondent's Arguments

711.  Interest is exclusively for compensation purposes and punitive interest cannot be awarded.  The requested pre- and post-award interest is inadmissible.[1529]

712.  The pre-award interest must be risk-free and have a maximum period of 4-5 years, which in this case can be a reasonable estimate between the Valuation Date and the Award date.  A shorter-term rate could be taken, given that in principle the final period is not known.[1530]  A higher rate, such as that of a 10-year bond, would imply overcompensation that is contrary to the principle of full reparation and would compensate for risks not taken.[1531]

---

[1524] C-I § 870; C-III §§ 650 – 651; for incentive to delay payment, *see Valeri Belokon v. The Kyrgyz Republic* (UNCITRAL), Award, 24 October 2014, § 325 **[CL-0207]**; *Bernhard Von Pezold and Others v. Zimbabwe* (ICSID Case No. ARB/10/15), Award, 28 July 2015, § 943 **[CL-0208]**; for the common practice of awarding compound interest, *see Gold Reserve v. Venezuela* **[CL-0098]**; *Metalclad v. Mexico*, §§ 128, 131 **[CL-0110]**; *Emilio Augustin Maffezini v Kingdom of Spain* (ICSID Case No ARB/97/7), Award, 13 November 2000, §§ 96 – 97 **[CL-0209]**; *Eiser*, § 478 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1525] C-I § 869; I. Marboe, *Calculation of compensation and damages in international investment law*, Oxford University Press, New York, 2009, § 6.245 **[CL-0135]**.

[1526] C-III § 652.

[1527] *Id*. at § 653; C-I § 871.

[1528] CPHB-I § 92; *Eiser*, § 478 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Novenergia*, § 847 **[CL-0213]**; *Masdar*, § 665 **[CL-0220]**; *Antin*, § 734 **[CL-0222]**.

[1529] R-II §§ 59, 1404 – 1405; ILC Draft Articles, With Commentary **[RL-0032]** / **[CL-0028]**.

[1530] R-I §§ 1257 – 1258; R-II §§ 1418, 1420; Accuracy, First Economic Report, § VI **[RER-0001]**.

[1531] R-II §§ 1419, 1421; "Valuation for Arbitration: Compensation Standards, Valuation Methods and Expert

713. The punitive post-award interest requested by Claimants is higher than the pre-award interest and is, at a 2% spread, exaggerated. Spreads are usually proportional to the benchmark rate. Considering current interest rates of close to zero or even negative, a 2% spread is inappropriate and disproportionate.[1532] The *Eiser* tribunal applied a punitive spread of 0.43% - less than ¼ of what is Claimants are requesting.[1533]

714. Claimants state that the Spanish Civil Procedure Act – a subsidiary law – adds a "*moratorium differential*", but Claimants are conflating concepts.[1534] Claimants have omitted from their arguments reasoning in accordance with the Act on General Budgets – the law that would apply if Spanish domestic law was resorted to – which establishes (1) a grace period of 3 months and (2) simple, rather than compound interest.[1535]

715. The legal basis for the award of interest must be the ECT and customary international law, and not domestic law. It is sufficient to turn to the ILC Draft Articles, pursuant to which the punitive nature of post-award interest is inadmissible.[1536] The punitive nature of post-award interest was found unacceptable in *Vestey v. Venezuela*, *National Grid v. Argentina*, and *Micula*.[1537]

716. After the Hearing, Respondent explained that, in the *Masdar* Award, the pre-award interest granted was the government bond rate (0.906%), proximate to a risk-free rate. For pre-award interest, it tailored the term of the bond to the time period to cover. The post-award interest was 1.60%, equivalent to the Spanish 10-year government bond rate. The spread between pre-and post-award interest is less than 1%.[1538]

---

Evidence" Mark Kantor. 2008 Kluwer Law International, 49 **[RL-0079]**.

[1532] R-II §§ 1422– 1424, 1426.

[1533] R-II § 1425; *Eiser*, § 478 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

[1534] R-I § 1261; C-I § 872.

[1535] R-I § 1263; R-II § 1427; Judgment by the Spanish National Audience of 30 June 2014, dismissing administrative appeal 296/2013 **[R-0011]**; Act 47/2003, Art. 17, 24 **[R-0024]**.

[1536] R-I §§ 1262, 1264 – 1265; ILC Draft Articles, With Commentary **[RL-0032]** / **[CL-0028]**.

[1537] R-I §§ 1260, 1266 – 1268; R-II §§ 1428 – 1430; *Micula v. Romania*, § 1269 **[RL-0028]** / **[CL-0099]**; *National Grid v. Argentina*, fn. 122 **[CL-0144]** / **[RL-0030]**; *Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, 15 April 2016, § 445 **[RL-0037]**.

[1538] RPHB-I § 211(v); *Masdar*, §§ 664 – 665 **[CL-0220]**.

### 3.    The Tribunal

717.    Interest compensates for the fact that, during the period of non-payment, the creditor is deprived of the sum owed.[1539]  It is common practice and needs no further references that interest is due on the amounts ordered as damages in investment cases.  Claimants' request that Respondent be ordered to pay pre- and post-award interest[1540] is, therefore, admissible and justified.

718.    Pre-award interest is consistent with the principle of full compensation and also generally accepted in investment arbitration and this principle is enshrined in Article 38 of the ILC Draft Articles.[1541]  For the present case, this is expressly confirmed in Article 26(8) of the ECT which provides as follows: "*(8) The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute.*"

719.    Although neither the above provision nor Article 10(1) of the ECT establish an interest rate to apply to breaches, Article 13 of the ECT provides for one as follows:

> *Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.*

720.    This provision is applicable to compensation in case of a lawful expropriation and thus not directly in case of an unlawful breach of the ECT.  But it can be concluded that the interest due for an unlawful breach shall not be lower than that for a lawful measure under the ECT.  Therefore, the Tribunal takes guidance from this provision to the effect that "*interest at a commercial rate established on a market basis*" is at least due for the amount of damages found in the present case.

721.    Regarding the rate of interest, pre-award interest was calculated by Brattle on the basis of Respondent's borrowing rate,[1542] in particular at the relevant Spanish 10-year bond yield.[1543] This is

---

[1539]  C-I § 865.

[1540]  *Id.* at § 862.

[1541]  *Id.* at §§ 863 – 864; I. Marboe, *Calculation of compensation and damages in international investment law*, Oxford University Press, New York, 2009, §§ 6.06, 6.16 **[CL-0135]**.

[1542]  C-III § 598; C-I § 867; Brattle, Quantum Rebuttal Report, § 26 **[CER-0004]**.

[1543]  C-III § 643; Brattle, Quantum Report, § 181 **[CER-0002]**; Brattle, Quantum Rebuttal Report **[CER-0004]**.

the benchmark used by Spain under the New Regime to determine the allowed return.[1544]  Brattle computes this from 20 June 2014 to 30 January 2019 at 1.59%.[1545]  The Tribunal considers that as reasonable and notes that this rate is lower than the rate of pre-award interest granted by the *Eiser* tribunal (2.07%).[1546]  The Tribunal considers, however, that this pre-award interest should not be compounded.

722.   However, post-award interest provides an incentive to pay as is recognized in the ILC Draft Articles, Commentary (12) of Article 38.[1547]  Thus, tribunals may determine a different, higher post-award interest to eliminate Respondent's incentive to delay full payment of an award, as was done in *Gold Reserve*, *Metalclad*, *Maffezini*, and *Eiser*.[1548]  For the present case, the Tribunal finds that, though the same rate of interest should be applied as for pre-award interest, the post-award interest due in the present case should be compounded monthly as suggested by Brattle.

## XII.   COSTS

### A.   CLAIMANTS' ARGUMENTS

723.   Claimants request that, pursuant to Rule 47(1)(j) of the Institution Rules, Respondent be ordered to pay the entire costs of the arbitration and all legal costs and other expenses incurred by Claimants including, but not limited to, the fees of their legal counsel, experts, consultants, and those of Claimants' own employees, on a full indemnity basis.  Claimants argued that Respondent is obliged

---

[1544] C-III § 646.

[1545] *Id*. at §§ 644, 648; CPHB-I § 90; C-I § 867 (stating 0.88%, Brattle, Quantum Report, fn. 140 **[CER-0002]**); Brattle, Quantum Rebuttal Report, fn. 17, Tables S-16, N2 **[CER-0004]**; ILC Draft Articles, Art. 38 **[CL-0001]**; for compound interest, *see Stati v. Kazakhstan*, § 1855 **[CL-0015]**; IDAE Resolution, 28 November 2013, § 6.236 **[C-0135]**; *Kardassopoulos v. Georgia*, § 664 **[CL-0136]** / **[RL-0097]**; *Waguih Elie George Siag & Clorinda Vecchi v. The Arab Republic of Egypt* (ICSID Case No. ARB/05/15), Award, 1 June 2009, § 595 **[CL-0132]**; *National Grid v. Argentina*, § 121 **[CL-0144]** / **[RL-0030]**; *Compañía del Desarrollo de Santa Elena, S.A. v. The Republic of Costa Rica* (ICSID Case No. ARB/96/1), Award, 17 February 2000, § 104 **[CL-0145]**.

[1546] C-III § 646

[1547] *Id*. at § 649; ILC Draft Articles, Art. 38 **[CL-0001]**.

[1548] *Id*. at §§ 650 – 651; C-I § 870; for incentive to delay payment, *see Valeri Belokon v. The Kyrgyz Republic* (UNCITRAL), Award, 24 October 2014, § 325 **[CL-0207]**; *Bernhard Von Pezold and Others v. Zimbabwe* (ICSID Case No. ARB/10/15), Award, 28 July 2015, § 943 **[CL-0208]**; for the common practice of awarding compound interest, *see Gold Reserve v. Venezuela* **[CL-0098]**; *Metalclad v. Mexico*, §§ 128, 131 **[CL-0110]**; *Emilio Augustin Maffezini v Kingdom of Spain* (ICSID Case No ARB/97/7), Award, 13 November 2000, §§ 96 – 97 **[CL-0209]**; *Eiser*, § 478 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**.

to compensate Claimants for all damages effectively caused. The principle of full reparation warrants Claimants' entitlement to compensation for all the costs, internal and external, arising from this arbitration.[1549]

724. Claimants state that the following costs incurred were necessary to pursue Claimants' claims under Article 10(1) of the ECT.[1550] Claimants request that the Tribunal admit its reasonable cost summary and issue costs in the amounts of **EUR 2,634,758.49**, **USD 525,000.00**, and **CHF 26,850.15**, calculated as follows:[1551]

| Costs Incurred by Claimants | | |
|---|---|---|
| **Attorney's Fees** | | **= EUR 1,973,127.50**<br>**= 5,277.25 Hours** |
| | *Partner Hours (533.75)* | *EUR 293,053.75* |
| | *Associate Hours (4,743.50)* | *EUR 1,680,073.75* |
| **Other Representatives' Fees and Expenses** | | **=EUR 632.46**<br>**=CHF 6,188.00** |
| | *Mr. Erich Schneider, Ahead Wealth Solutions AG)* | *EUR 632.46*<br>*CHF 6,188.00* |
| **Expert Witnesses' Fees and Expenses** | | **=EUR 536,242.10**<br>**=CHF 19,818.00** |
| | *The Brattle Group* | *EUR 498,622.37* |
| | *ATA Renewables* | *EUR 37,619.73* |
| | *PWC (Tax Gross-Up)* | *CHF 19,818.00* |
| **Expenses Incurred by Claimants' Witnesses** | | **=EUR 2,556.97**<br>**=CHF 844.15** |
| | *Mr. Lars Bauermeister* | *EUR 1,924.51* |
| | *Mr. Peter Kofmel* | *EUR 632.46*<br>*CHF 844.15* |
| **Advanced Payments to ICSID** | | **=USD 525,000.00** |
| **Other Expenses** | | **=EUR 115,110.54** |
| | *Hearing in Paris (June 2018)* | *EUR 19,316.26* |
| | *Translation* | *EUR 56,821.21* |
| | *Courier Services* | *EUR 2,111.33* |

---

[1549] C-I §§ 876 – 879.

[1550] C.Costs-II § 2.

[1551] C.Costs-I §§ 3 – 14; C.Costs-II §§ 24 – 26, 45 – 48.

| | Photocopies Expenses | EUR 31,063.40 |
| | Other Expenses (taxis, meals, flights, registry, etc.) | EUR 5,798.34 |
| **TOTALS** | | **=EUR 2,627,669.57**<br>**=USD 525,000.00**<br>**=CHF 26,850.15** |

725.   Claimants submitted their Statement of Costs under Article 61(2) of the ICSID Convention and Rule 28(2) of the ICSID Rules.[1552]   The two instruments grant the Tribunal discretion to allocate costs, and the practice of tribunals has been to allocate costs based on rational guidance principles.   The first such principle is the idea that "*costs follow the event*" (the losing party pays part or all of the expenses of the winning party).[1553]   Tribunals have linked the decision on costs to the full reparation principle under *Chorzow*.[1554]   Beyond this, recent ICSID decisions confirm a "*growing awareness of the principle that the losing party should bear the consequences in terms of costs*."   Respondent has agreed, and its position here is not based on an "*equal costs share*" reading of Article 61(2) of the ICSID Convention or Rule 28 of the ICSID Rules, but rather on a "*costs follow the event*" basis.[1555]

---

[1552] C.Costs-I § 2; C.Costs-II §§ 5 – 6; ICSID Convention, Art. 61(2); ICSID Arbitration Rules 28, 47(1)(j).

[1553] C.Costs-II §§ 7 – 8, 10 – 11; *Stati v. Kazakhstan*, § 1878 – 1885 **[CL-0015]**; *Gold Reserve v. Venezuela*, §§ 860 – 862 **[CL-0098]**; *ADC v. Hungary*, §§ 531 – 533 **[CL-0111]**; *Ceskoslovenska Obchodni Banka, A.S. v. The Slovak Republic* (ICSID Case No. ARB/97/4), Award, 29 December 2004, §§ 369 – 373 **[CL-0131]**; *Kardassopoulos v. Georgia*, §§ 689 – 692 **[CL-0136]** / **[RL-0097]**; *Bear Creek Mining Corporation v. Republic of Peru,* ICSID Case No. ARB/14/21, Award, 30 Nov. 2017, §§ 727 – 737 **[CL-0224]**; *Hrvatska Elektroprivreda d.d. v. Republic of Slovenia*, ICSID Case No. ARB/05/24, Award, 17 Dec. 2015, § **[CL-0225]**; *Von Pezold v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 Jul. 2015, § 1001 **[CL-0226]**; C. Schreurer (w. L. Malintoppi, A. Reinisch and A. Sinclair), *The ICSID Convention: a Commentary*, Cambridge University Press, Second Edition 2009, p. 1236, § 44 **[CL-0227]**; L. Nurick, *Costs in International Arbitration*, 7 ICSID Review – FILJ 57 (1992), p. 64 *et seq*. **[CL-0228]**; *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/02, Award, 31 Oct. 2012, §§ 588 – 590 **[CL-0229]**; *Gemplus v. Mexico*, §§ 17-20 to 17-22 **[RL-0050]** / **[CL-0230]**; *Hassan Awdi, Enterprise Business Consultants, Inc. and Alfa El Corporation v. Romania*, ICSID Case No. ARB/10/13, Award, 2 Mar. 2015, §§ 529 – 531 **[CL-0231]**; *LG & E Energy Corp, LG & E Capital Corp and LG & E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/11, Award, 25 Jul. 2007, § 112 **[CL-0232]**; *Telenor Mobile Communications A.S. v. Republic of Hungary*, ICSID Case No. ARB/04/15, Award, 13 Sep. 2006, § 107 **[CL-0233]**; *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Award, 5 Jun. 2012, §§ 485 – 495 **[CL-0234]**.

[1554] C.Costs-II § 12 – 14; *Gold Reserve v. Venezuela*, § 860 **[CL-0098]**; *ADC v. Hungary*, §§ 531 – 533 **[CL-0111]**; *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award, 20 May 1992, § 207 **[CL-0235]**; *S.D. Myers Inc. v. Canada, NAFTA (UNCITRAL)*, Final Award on Costs, 30 Dec. 2002, § 15 **[CL-0236]**; Pierre Bienvenu and Martin J. Valasek, *Compensation for Unlawful Expropriation, and Other Recent Manifestations of the Principle of Full Reparation in International Investment Law*, in Albert Jan van den Berg (ed.)*, 50 Years of the New York Convention: ICCA International Arbitration Conference*, 14 ICCA CONGRESS SERIES 231, 273 (2009) **[CL-0237]**; Noah Rubins, *The Allocation of Costs and Attorney's Fees in Investor-State Arbitration*, 18 ICSID Review – IFLJ 109 (2003) **[CL-0238]**.

[1555] C.Costs-II § 15; C. Schreurer (w. L. Malintoppi, A. Reinisch and A. Sinclair), *The ICSID Convention: a*

Claimants note that they would still be entitled to recover the reasonable costs incurred by it, in the unlikely event that the Tribunal does not award them the entirety of the amount of damages. Investment tribunals have consistently granted costs where claimants have not recovered all of the requested damage or succeeded in all claims.[1556]

726. The second principle is based on the idea that "*a party that is responsible for a part of the proceedings should bear the resulting costs.*"[1557]  Here, upon rejection of Respondent's jurisdictional objections, the Tribunal should order Respondent to bear the costs resulting from the jurisdictional objections and the inextricably-related intra-EU objection.  Respondent raised and maintained the intra-EU objection despite that it has been rejected in several cases, some even decided against Respondent.  Further, Respondent and the EC followed a coordinated strategy and, thus, required Claimants to deal with the EC's allegations as well as Respondent's.[1558]  The defense of the jurisdictional objections represents approximately "*270 – 280 hours of effective work of Claimants' Counsel and between EUR 120,000.00 and EUR 130,000.00 (VAT included)*", and this includes the EUR 23,603.75 related to the EC submission.[1559]

727. Claimants explain that their legal expenses were reasonable.[1560]  This arbitration included seven "*full-blown*" submissions and the proceedings have lasted more than three years.[1561]  The 5,277.25 hours "*represent the hours effectively worked by the Cuatrecasas legal team*"[1562] and is less than the average

---

*Commentary*, Cambridge University Press, Second Edition 2009, p. 1233 (§ 34) **[CL-0227]**; *Charanne*, § 556 **[CL-0030] / [RL-0049]**; *Masdar*, § 688 **[CL-0220]**; *Antin*, § 739 **[CL-0222]**.

[1556] C.Costs-II § 16; *Gold Reserve v. Venezuela*, § 860 **[CL-0098]**; *PSEG v. Turkey* § 352 **[CL-0105]**; *Gemplus v. Mexico*, §§ 17-20 **[RL-0050]** / **[CL-0230]**; *Hochtief AG v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Liability, 29 Dec. 2014, § 330 **[CL-0239]**; *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Re-public of Venezuela*, ICSID Case No. ARB/10/19, Award, 18 Nov. 2014, §§ 992, 1000 **[CL-0240]**; *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Award, 10 Mar. 2015, §§ 966 – 976 **[CL-0241]**; *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Venezuela*, ICSID Case No. ARB/10/5, Award, 13 Mar. 2015, §§ 213 – 216 **[CL-0242]**.

[1557] C.Costs-II §§ 7 – 8; C. Schreuer (w. L. Malintoppi, A. Reinisch and A. Sinclair), *The ICSID Convention: a Commentary*, Cambridge University Press, Second Edition 2009, p. 1236 (§ 44) **[CL-0227]**; L. Nurick, *Costs in International Arbitration*, 7 ICSID Review – FILJ 57 (1992), pp. 64 et seq. **[CL-0228]**.

[1558] C.Costs-II §§ 19 – 21.

[1559] C-Costs-I § 6; C.Costs-II §§ 22 – 23.

[1560] C.Costs-II § 30.

[1561] *Id*. at § 31.

[1562] *Id*. at § 32 – 33

annual billable hours worked by two law firm associates during two years.[1563]  The hourly rates were reasonable and ranged from EUR 150 – EUR 575/hour, depending on the lawyer's seniority.[1564]  The first level Associate billed at EUR 315/hour, and the average billing rate is less than EUR 374/hour.[1565]  This is reasonable in light of rates charged by other international arbitration teams,[1566] as well as in light of the average cost borne by the claimant party in an arbitration, which from 2011-2017 was USD 6,043,914.93.[1567]

728.  Only part of these fees has been invoiced to the Claimants, and "[t]*he difference, up to the amount incurred, will be invoiced when the Award [is] notified to the Parties*."[1568]

729.  The reasonableness of Claimants' costs is not to be judged by reference to Respondent's costs.  The vast difference can be explained by the fact that Respondent chose not to retain outside counsel.[1569]  Further, it is difficult to compare Claimants' and Respondent's costs because Respondent has not provided a breakdown of hours expended.[1570]

730.  Claimants have billed for the time and expenses of Mr. Erich Schnider of AHEAD Wealth Solutions AG,[1571] because Mr. Schnider is the portfolio manager of OperaFund for the renewable investments in Spain and, therefore, is a party representative.[1572]

---

[1563] *Id.* at § 34.

[1564] C.Costs-I § 7.

[1565] C.Costs-II §§ 35 – 36.

[1566] *Id.* at § 37 – 39; *Eiser*, § 482 **[CL-0148]** / **[RL-0077]** / **[RL-0078]**; *Novenergia*, §§ 848, 857 – 859 **[CL-0213]**; *Masdar*, §§ 684, 686 **[CL-0220]**; *Antin*, §§ 738, 744 – 746 **[CL-0222]**.

[1567] C.Costs-II § 40; Jeffery Commission & Rahim Moloo, *Procedural Issues in International Investment Arbitration*, Oxford University Press, 2018, §§ 10.15 and 10.17 **[CL-0243]**.

[1568] C.Costs-I § 8.

[1569] C.Costs-II § 41; *ADC v. Hungary*, § 535 **[CL-0111]**; *Waguih Elie George Siag & Clorinda Vecchi v. The Arab Republic of Egypt* (ICSID Case No. ARB/05/15), Award, 1 June 2009, §§ 624 – 625 **[CL-0132]**; *Isolux*, § 863 **[RL-0004]** / **[RL-0076]**.

[1570] C.Costs-II § 42.

[1571] C.Costs-I § 9.

[1572] C.Costs-II § 27 – 29; *Ceskoslovenska Obchodni Banka, A.S. v. The Slovak Republic* (ICSID Case No. ARB/97/4), Award, 29 December 2004, § 371 **[CL-0131]**; *Novenergia*, § 848 **[CL-0213]**; C. Schreurer (w. L. Malintoppi, A. Reinisch and A. Sinclair), *The ICSID Convention: a Commentary*, Cambridge University Press, Second Edition 2009, p. 1227 – 1228 (§ 15) **[CL-0227]**; Jeffery Commission & Rahim Moloo, *Procedural Issues in International Investment Arbitration*, Oxford University Press, 2018, p. 185, § 10.10 **[CL-0243]**; *OKO Pankki Oyj and others*

731.  Claimants request that the Tribunal order Respondent to bear Claimants' costs incurred in their entirety, plus compound interest calculated monthly from the date of the Award, at the post-award interest rate of 3.59%, until the date of payment by Respondent.[1573]

732.  In response to the Tribunal's invitation to respond thereto, Claimants noted that Respondent's objection Claimants' hours effectively worked on this matter, and the fees for those hours, was frivolous.[1574]  The 5,277.25 hours devoted are far from excessive.[1575]  There have been seven "full-blown" submissions on Claimants' side, and this case has been registered with ICSID since August 2015.  The total number of hours worked by Claimants' legal team is less than the average annual billable hours worked by two law firm associates during two years.[1576]  The legal rates applied to these hours of work are, likewise, reasonable and below many useful comparative references.[1577]  Further Counsel has acted in other ECT claims against Spain, and tribunals have awarded Costs.[1578]  The average rate charged for this work (374 EUR/h) is reasonable in light of the rates charged by other teams in international law firms operating in the same market segment, and the rate reflects a proper balance among work completed by lawyers with varying seniority and rates, ranged from 150 EUR/h to 575 EUR/h, where the first level associate's rate is 315 EUR/h.[1579]

733.  Claimants provided a Certificate from the Chief Operating Officer of Cuatrecasas Emilio Martinez Poyatos that Cuatrecasas attorneys had worked 5,355.75 hours, and that by 18 October 2018, the number of registered hours was 5,277.25.  The resulting fees incurred to date are EUR 2,006,670 (VAT included) and as of 18 October 2018 were 1,973,127.50 EUR (VAT included).  He confirmed the hourly rates and stated that as of 2019, the standard hourly rates of the firm range from 200 EUR/h to 600 EUR/h.[1580]

---

*v. Republic of Estonia*, ICSID Case No. ARB/04/6, Award, 19 Nov. 2007 § 373 **[CL-0244]**.

[1573]  C.Costs-II § 49.

[1574]  Claimants' Cost Response (12 March 2019), § 4.

[1575]  *Id*. at § 6.

[1576]  *Id*. at § 7 (calculated as 1350 hours per year, per associate).

[1577]  *Id*. at §§ 9 – 11.

[1578]  *Id*. at § 12.

[1579]  *Id*. at §§ 13 – 15.

[1580]  Claimants' Cost Response (12 March 2019), Annex 1.

## B.    RESPONDENT'S ARGUMENTS

734. Respondent requests that the Tribunal accept its Submission on Costs and to fix the costs caused to Respondent in this arbitration in the total amount of **EUR 1,541,677.39**, calculated as follows:[1581]

| Costs Incurred by the Respondent (EUR) | |
|---|---:|
| Advance on Costs paid to ICSID | 426,222.67 |
| Expert and Witness Submissions | 510,412.25 |
| Translations | 32,609.36 |
| Editing and Printing Services | 54,578.28 |
| Courier Services | 3,020.61 |
| Travelling Expenses | 14,834.22 |
| Legal Fees | 500,000.00 |
| **TOTAL** | **1,541,677.39** |

735. Article 28 of the ICSID Rules require that costs be (1) reasonable and (2) incurred in the proceedings. Respondents have, therefore, requested (1) the detail and proof of the alleged 5,277 hours that Claimants state have been devoted to the present proceedings, (2) the justification for the attorney's fees of EUR 23,603.75 allegedly corresponding to the hours incurred in relation to the EC intervention requests.[1582]  The number of hours allegedly worked by Claimants' counsel is excessive, equaling 220 working days of 24 hours each, especially given that the same team of attorneys is engaged in at least 6 additional arbitration proceedings against Respondent.[1583]

736. Claimants have provided no documentation of the hourly rates charged in this case.  Even if one assumed that the middle rate applied as alleged by Claimants, their counsel fees would be reduced from over EUR 1.9 million to around EUR 1.5 million.[1584]  The Tribunal should note that this amount is still unjustifiable and is triple the fees submitted by counsel for Respondent.  Respondent therefore requests that the Tribunal (1) order Claimants to produce the documents proving counsel fees and (2)

---

[1581]  R.Costs-I §§ 10 – 18:

[1582]  R.Costs-II §§ 2 – 5.

[1583]  *Id*. at §§ 6 – 7.

[1584]  *Id*. at §§ 8 – 9.

in the alternative, to reduce the amount of the counsel fee to a reasonable one, lower than EUR 1.5 million.[1585]

737. Respondent points out that there appears to be duplication of expenses, as Claimants state that they have incurred EUR 115,110.54 in "*other expenses, including travels [sic], accommodations and translations, photocopies and courier services*", and EUR 5,798.34 in "*other expenses*" including "*costs for taxis, meals in meetings, flights, etc*" in addition to the same costs that are included as witness costs and costs of the Hearing in Paris of June 2018.[1586]  These costs, therefore should be excluded from Claimant's cost claim.[1587]

738. Although the ECT is silent on the allocation of costs, the Respondent requests that the Tribunal exercise its broad discretion by ordering Claimants to pay all costs and expenses derived from this proceeding.[1588]  Respondent is entitled to its costs on a full indemnity basis.[1589]  As demonstrated by the EC's application to intervene as amicus, Respondent's objections to jurisdiction are well-founded.[1590]  Further, these proceedings have demonstrated that Respondent has acted in conformity with its international law obligations under the ECT in relation to Claimants' investment in Spain. Respondent should never have been charged with the burden of defending itself.  On damages, Respondent has proven Claimants' failure to provide expert reports that could quantify the separate effect of each of several disputed measures.  The audited financial statements show that there has been no impairment to the investment and that the actual profitability of the plants, with the Disputed Measures in place, is higher than the expected IRR.[1591]  Regarding Claimants' auxiliary remedies, Claimants' request is contrary their expert's position, albeit when engaged by a respondent State, and the tax gross-up with baseless and speculative.[1592]

---

[1585] *Id*. at § 10.

[1586] *Id*. at § 12.

[1587] *Id*. at § 13.

[1588] *Id*. at §§ 14 – 17.

[1589] *Id*. at § 22.

[1590] *Id*. at § 18.

[1591] *Id*. at §§ 19 – 20.

[1592] *Id*. at § 21.

739. In the alternative, Respondent should not be ordered to bear Claimants' costs, even if Claimants prevail, because the proceedings involved a number of challenging issues which Respondent addressed with professional and effective advocacy.[1593]

### C.    THE TRIBUNAL

740. According to Article 59 of the ICSID Convention, ICSID has set the cost of arbitration as follows:

| | |
|---|---|
| Arbitrator's fees and expenses: | |
| Professor Dr. Karl-Heinz Böckstiegel | USD 400,438.72 |
| Prof. MMag. Dr. August Reinisch | USD 99,016.66 |
| Prof. Philippe Sands | USD 133,895.17 |
| Assistant's fees and expenses | USD 105,568.92 |
| ICSID's administrative fees | USD 148,000.00 |
| Direct expenses[1594] | USD 156,074.90 |
| **Total** | **USD 1,042,994.37** |

The above costs have been paid out of the advances made by the Parties in equal parts. Each Party has made the following advance payments: the Claimants USD 575,000.00, the Respondent USD 574,732.00.[1595]

741. Turning first to the allocation of costs between the Parties, using the discretion given tribunals by Article 61(2) of the ICSID Convention or Rule 28 of the ICSID Rules, the Tribunal considers it should apply the mostly accepted practice that "*costs follow the event.*"[1596]

---

[1593] *Id*. at § 23.

[1594] This amount includes charges relating to court reporting and interpretation, catering and courier, and estimated charges relating to the dispatch of this Award (courier, printing and copying).

[1595] The remaining balance will be reimbursed to the Parties in proportion to the payments that each has advanced to ICSID.

[1596] C. Schreurer (w. L. Malintoppi, A. Reinisch and A. Sinclair), *The ICSID Convention: a Commentary*, Cambridge University Press, Second Edition 2009, p. 1233 (§ 34) **[CL-0227]**; *Charanne*, §§ 560 – 566 **[CL-0030] / [RL-0049]**; *Isolux*, § 857 – 865 **[RL-0004] / [RL-0076]**; *Antin*, § 739 **[CL-0222]**.

742. In view of the Tribunal's conclusions found above that Claimants prevail in the range of 30 million and fail with the claim regarding the TVPEE in the range of 10 million, the Tribunal finds it appropriate and decides that:

- Claimants have to bear 25% and Respondent 75% of the costs of arbitration as set by ICSID, and
- Respondent has to reimburse Claimants 75% of the expenses of Claimants as the Tribunal finds them to be reasonable.

743. Turning to the question which expenses submitted by the Parties are considered to be reasonable, the Tribunal does not have to decide whether those submitted by Respondent are reasonable, because above it has decided that none of Respondent's expenses have to be reimbursed by Claimants.

744. Regarding the expenses submitted by Claimants, the Tribunal has taken note of the objections raised by Respondent[1597] and the reasoning submitted by Claimants before and in reply to these objections. The Tribunal has also taken note of Claimants' reply submission thereto dated 12 March 2019 and finds Claimants' submission on their expenses to be in form and content what one usually sees in similar arbitrations. The costs claimed by Claimants do not seem to the Tribunal to be excessive if one compares them to cost claims in similar cases and taking into account that both Claimants' and particularly Respondent's submissions and numbers of exhibits were very voluminous. It is also obvious that Respondent's costs are lower because it used only their in-house counsel.

745. The total of the expenses claimed by Claimants is therefore accepted to be EUR 2,627,669.57 (=USD 2,914,742.48)[1598] plus CHF 26,850.15 (=USD 27,372.93),[1599] which as converted totals USD 2,942,115.41. Accordingly, 75% of this total shall be reimbursed by Respondent to Claimants, i.e. USD 2,206,586.56.

---

[1597] R.Costs-II §§ 2 – 9.

[1598] Converted using "Transferwise" on 28 August 2019 and rounded to the nearest cent.

[1599] Converted using "Transferwise" on 28 August 2019 and rounded to the nearest cent.

## XIII. DECISIONS

746.  **For the reasons above, the Tribunal decides as follows:**

1.  **The Tribunal has jurisdiction over the claims submitted by Claimants, except for the claim regarding the tax measures of the TVPEE.**

2.  **Respondent has breached its obligations under Article 10(1) ECT to provide fair and equitable treatment and stable conditions to Claimants.**

3.  **Respondent shall pay damages to Claimants amounting to USD 29.3 million.**

4.  **The Award is made net of all taxes and/or withholdings by Spain, and Spain is ordered to indemnify Claimants for any tax liability or withholding that may be imposed in Spain**.

5.  **On the above amount, Respondent shall pay simple interest at the Spanish 10-year bond yield rate from 20 June 2014 to the date of this Award.**

6.  **On the above amount, Respondent shall pay interest at the Spanish 10-year bond yield rate from the date of this Award compounded monthly till the time of payment.**

7.  **Claimants shall bear 25% and Respondent 75% of the total costs of arbitration as set by ICSID to be USD 1,042,994.37. The Respondent shall thus pay Claimants USD 260,748.59.**

8.  **Respondent shall reimburse Claimants USD 2,206,586.56, representing 75% of the expenses of Claimants.**

9.  **All other claims are dismissed.**

[Signed]
_____
Prof. MMag. Dr. August Reinisch, LL.M
Arbitrator
Date: July 24, 2019

[Signed]
_____
Prof. Philippe Sands QC
Arbitrator
*Subject to the attached dissenting opinion*
[*Dissent as to points 2 to 9*]
Date: August 13, 2019

[Signed]
_____
Prof. Dr. Karl-Heinz Böckstiegel
President of the Tribunal
Date: July 16, 2019