**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**SOLES BADAJOZ GMBH**

Claimant

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/15/38**

_____

# AWARD

_____

*Members of the Tribunal*

Judge Joan E. Donoghue, President
Professor Giorgio Sacerdoti, Arbitrator
Sir David A R Williams KNZM, QC, Arbitrator

*Secretary of the Tribunal*

Mrs. Ana Constanza Conover Blancas

*Date of dispatch to the Parties:* 31 July 2019

## REPRESENTATION OF THE PARTIES

*Representing SolEs Badajoz GmbH*:

Mr. Charles Kaplan
Mr. Tunde Oyewole
Ms. Agnès Bizard
Ms. Lorna Maupilé

Orrick Herrington & Sutcliffe (Europe) LLP
31, avenue Pierre 1er de Serbie
75782 Paris Cedex 16
France

  and

Mr. Felix Montero
Mr. Fernando Bedoya

Pérez-Llorca
Castellana 50
28046 Madrid
Spain

*Representing the Kingdom of Spain*:

Mr. José Manuel Gutiérrez Delgado
Ms. María José Ruiz Sánchez
Mr. Pablo Elena Abad
Ms. Elena Oñoro Sáinz
Mr. Antolín Fernández Antuña
Mr. Roberto Fernández Castilla
Ms. Patricia Fröhlingsdorf Nicolás
Mr. Javier Torres Gella
Mr. Alberto Torró Molés
Mr. Rafael Gil Nievas
Ms. Alicia Segovia Marco

Abogacía General del Estado
Ministry of Justice of the Government of Spain
Calle Ayala 5
28001 Madrid
Spain

i

TABLE OF CONTENTS

I.      INTRODUCTION AND PARTIES ............................................................... 1

II.     PROCEDURAL HISTORY ......................................................................... 2

III.    FACTUAL BACKGROUND ...................................................................... 17

        A.   Regulatory Framework .................................................................. 17

             (1)  General Background and Description of the "Special Regime" in Place
                  when Claimant Invested ......................................................... 17

             (2)  The Disputed Measures ......................................................... 26

                  a.   The First Set of Disputed Measures ............................... 27

                  b.   The Second Set of Disputed Measures ........................... 30

        B.   Claimant and its Investment ........................................................ 33

             (1)  Claimant SolEs Badajoz ........................................................ 33

             (2)  The Establishment of Fotones de Castuera and the Construction of the
                  PV Plants Badajoz I and II ..................................................... 34

             (3)  Claimant's Acquisition of Fotones ........................................ 35

IV.     THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ........................... 36

V.      THE APPLICABLE LAW .......................................................................... 38

        A.   The Parties' Positions .................................................................. 41

             (1)  Claimant's Position .............................................................. 41

             (2)  Respondent's Position .......................................................... 42

        B.   The Tribunal's Analysis .............................................................. 43

VI.     PRELIMINARY OBJECTIONS TO JURISDICTION AND ADMISSIBILITY ............ 48

        A.   Lack of Jurisdiction *Ratione Personae* in view of an Intra-EU Dispute ...... 51

             (1)  The Parties' Positions .......................................................... 51

                  a.   Respondent's Position ................................................. 51

                  b.   Claimant's Position ..................................................... 61

             (2)  The Tribunal's Analysis ........................................................ 67

                  a.   The Contention that the ECT Contains an Implied Exception for
                       "Intra-EU Disputes" ................................................... 67

                  b.   The Claim that the TFEU Excludes the Tribunal's Jurisdiction,
                       Taking into Account *Achmea v. Slovakia* ........................ 72

**B.** Lack of Jurisdiction *Ratione Materiae* over Taxation Measures ................................. 77

    **(1)** The Parties' Positions ................................................................. 77

        a. Respondent's Position ................................................ 77

        b. Claimant's Position ..................................................... 80

    **(2)** The Tribunal's Analysis .............................................................. 82

**VII.** LIABILITY ............................................................................................. 83

  **A.** The Alleged Breach of the Fair and Equitable Treatment Obligation (Article 10(1)) ................................................................................ 83

    **(1)** Overview of the Parties' Positions ............................................. 84

        a. Claimant's Position ..................................................... 84

        b. Respondent's Position ................................................ 85

    **(2)** The Legal Standard ..................................................................... 88

        a. Claimant's Views on the Legal Standard .................... 88

        b. Respondent's Views on the Legal Standard ................ 90

        c. The Tribunal's Analysis .............................................. 95

    **(3)** The Evidence .............................................................................. 103

        a. The Evidence on which Claimant Relies ..................... 103

        b. The Evidence on which Respondent Relies ................ 116

    **(4)** The Tribunal's Analysis .............................................................. 131

        a. Claimant's Expectations as of the Date of its Investment ......................... 132

        b. The Evidence Regarding the Effect of the Disputed Measures ................. 142

  **B.** The Alleged Violations of the Expropriation Provision and of the Umbrella Clause ................................................................................ 147

**VIII.** DAMAGES ............................................................................................. 148

  **A.** The Applicable Legal Standard ............................................................. 149

    **(1)** The Parties' Positions ................................................................. 149

        a. Claimant's Position ..................................................... 149

        b. Respondent's Position ................................................ 150

    **(2)** The Tribunal's Analysis .............................................................. 151

  **B.** Valuation Method ................................................................................... 152

    **(1)** The Parties' Positions ................................................................. 152

        a. Claimant's Position ..................................................... 152

        b. Respondent's Position ................................................ 153

    **(2)** The Tribunal's Analysis .............................................................. 155

**C.** Amount of Compensation to which Claimant is Entitled ........................................ 156

    **(1)** The Parties' Positions ...................................................................... 156

        a. Claimant's Position ................................................................. 156

        b. Respondent's Position ............................................................. 164

    **(2)** The Tribunal's Analysis ..................................................................... 170

        a. Valuation of the Reduction in Value of Claimant's Investment ............... 170

        b. The Proposed Gross-up for Taxes Owed to Germany ..................... 178

        c. Pre-Award interest ................................................................. 180

**IX.** COSTS ................................................................................................... 182

  **A.** Claimant's Cost Submission ..................................................................... 182

  **B.** Respondent's Cost Submission .................................................................. 183

  **C.** The Tribunal's Decision on Costs .............................................................. 184

**X.** AWARD ................................................................................................. 186

**TABLE OF SELECTED DEFINED TERMS**

| | |
|---|---|
| ABV | Asset-Based Valuation |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings in force as of 10 April 2006 |
| C-[#] | Claimant's exhibit |
| CJEU | Court of Justice of the European Union |
| CL-[#] | Claimant's legal authority |
| Cl. Mem. or Claimant's Memorial | Claimant's Statement of Claim dated 9 September 2016 |
| Cl. PHB | Claimant's Post-Hearing Brief dated 31 July 2018 |
| Cl. Rej. or Claimant's Rejoinder | Claimant's Rejoinder on Jurisdiction dated 31 January 2018 |
| Cl. Reply or Claimant's Reply | Claimant's Reply on the Merits and Counter-Memorial on Jurisdiction dated 10 July 2017 |
| Cl. Sub. Costs | Claimant's Submission on Costs dated 10 May 2019 |
| Claimant or SolEs | SolEs Badajoz GmbH |
| CNE or NEC | National Energy Commission of Spain (*Comisión Nacional de Energía*) |
| DCF | Discounted Cash Flow |
| EC or Commission | European Commission |
| ECT | Energy Charter Treaty |
| FET | Fair and equitable treatment |
| First AMG Report | Expert Report of Altran-MaC Group titled "*Expert Report Relating to the Arbitration SolEs Badajoz GmbH vs. the Kingdom of Spain, ICSID Case ARB/15/38*" dated 27 January 2017, prepared by Grant Greatrex, Jesús Fernández Salguero and Carlos Montojo González |

| | |
|---|---|
| First Brattle Regulatory Report | Expert Report of The Brattle Group titled "*Changes to the Regulation of Photovoltaic Installations in Spain Since November 2010*" dated 9 September 2016, prepared by José Antonio García and Carlos Lapuerta |
| First Brattle Quantum Report | Expert Report of The Brattle Group titled "*Financial Damages to Investors*" dated 9 September 2016, prepared by Carlos Lapuerta and Richard Caldwell |
| First Hopp Statement | Witness Statement of Thomas Hopp dated 8 September 2016 |
| First Montoya Statement | Witness Statement of Carlos Montoya dated 4 January 2017 |
| First Voigt Statement | Witness Statement of Markus Voigt dated 8 September 2016 |
| FIT | Feed-in tariff |
| Hearing | Hearing on jurisdiction, merits and quantum held in Paris, France, from 26 to 29 June 2018 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| IDAE | Instituto para la Diversificación y Ahorro de la Energía |
| IRR | Internal Rate of Return |
| LSE | Act 54/1997 of 27 November 1997, on the Electricity Sector (*Ley del Sector Eléctrico*) |
| MINETUR | Ministry of Industry, Trade and Tourism of Spain (*Ministerio de Industria, Comercio y Turismo*) |
| PV | Photovoltaic |
| R-[#] | Respondent's exhibit |
| RD | Royal Decree |
| RDL | Royal Decree Law |
| Resp. C-Mem. or Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated 27 January 2017 |
| Resp. PHB | Respondent's Post-Hearing Brief dated 10 September 2018 |

| | |
|---|---|
| Resp. Rej. or Respondent's Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 15 September 2017 |
| Resp. Sub. Costs | Respondent's Submission on Costs dated 9 May 2019 |
| Respondent or Spain | Kingdom of Spain |
| Rev. Tr. Day [#] (ENG), [page:line] ([Speaker(s)]) | Transcript of the Hearing (as revised by the Parties on 25 July 2018) |
| Request for Arbitration or RfA | Request for Arbitration dated 3 August 2015 |
| RL-[#] | Respondent's legal authority |
| Second AMG Report | Expert Report of Altran-MaC Group titled "*Rebuttal Expert Report Relating to the Arbitration SolEs Badajoz GmbH vs. the Kingdom of Spain, ICSID Case ARB/15/38*" dated 15 September 2017, prepared by Grant Greatrex, Jesús Fernández Salguero and Carlos Montojo González |
| Second Brattle Regulatory Report | Expert Report of The Brattle Group titled "*Rebuttal Report: Changes to the Regulation of Photovoltaic Installations in Spain Since November 2010*" dated 10 July 2017, prepared by José Antonio García and Carlos Lapuerta |
| Second Brattle Quantum Report | Expert Report of The Brattle Group titled "*Rebuttal Report: Financial Damages to Investors*" dated 10 July 2017, prepared by Carlos Lapuerta and Richard Caldwell |
| Second Hopp Statement | Second Witness Statement of Thomas Hopp dated 10 July 2017 |
| Second Montoya Statement | Second Witness Statement of Carlos Montoya dated 13 September 2017 |
| Second Voigt Statement | Second Witness Statement of Markus Voigt dated 10 July 2017 |

## I.  INTRODUCTION AND PARTIES

1.  This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty which entered into force on 16 April 1998 with respect to the Federal Republic of Germany and the Kingdom of Spain (the "**ECT**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.  The claimant is SolEs Badajoz GmbH ("**SolEs**" or "**Claimant**"), a company incorporated under the laws of the Federal Republic of Germany.

3.  The respondent is the Kingdom of Spain ("**Spain**" or "**Respondent**").

4.  Claimant and Respondent are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

5.  This dispute relates to various legislative and regulatory measures implemented by Spain that modified the regulatory and economic regime applicable to producers of electricity from photovoltaic ("**PV**") energy sources, which allegedly negatively impacted Claimant's investment in two PV plants located in the Autonomous Community of Extremadura.

6.  In particular, Claimant alleges that Spain has breached its obligation under *(i)* Article 10(1) of the ECT concerning fair and equitable treatment ("**FET**") and compliance with obligations entered into with investors or investments (umbrella clause); and *(ii)* Article 13 of the ECT by means of the indirect expropriation of its investment.  Claimant submits that it is entitled to receive compensation for damage caused as a result of Respondent's violations of the ECT amounting to EUR 95.8 million.

## II. PROCEDURAL HISTORY

7.  On 3 August 2015, ICSID received a request for arbitration from SolEs against Spain, accompanied by exhibits C-0001 to C-0041 and legal authorities CL-0001 to CL-0015 (the "**Request for Arbitration**").

8.  By letter of 14 August 2015, ICSID requested additional information from SolEs concerning its Request for Arbitration, which was provided on 21 August 2015, accompanied by legal authorities CL-0016 to CL-0023.

9.  On 24 August 2015, the Secretary-General of ICSID registered the Request for Arbitration, as supplemented on 21 August 2015, in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

10. The Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party, and the third, presiding arbitrator to be appointed by agreement of the Parties. Pursuant to the Parties' agreed method of constitution, failing an agreement of the Parties on the presiding arbitrator, she or he would be appointed by the Secretary-General of ICSID, without limitation to the ICSID Panel of Arbitrators.

11. The Tribunal was composed (until 24 October 2017) of Judge Joan E. Donoghue, a national of the United States of America, President, appointed by the Secretary-General; Dr. Stanimir A. Alexandrov, a national of Bulgaria, appointed by Claimant; and Mrs. Anna Joubin-Bret, a national of France, appointed by Respondent.

12. On 16 February 2016, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Mr. Gonzalo Flores, ICSID Team Leader/Legal Counsel, was designated to serve as Secretary of the

Tribunal.  On 8 August 2016, the Centre informed the Parties that Mrs. Ana Constanza Conover Blancas, ICSID Legal Counsel, would replace Mr. Flores as the Secretary of the Tribunal.

13.    On 8 April 2016, in accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties by teleconference.

14.    Following the first session, on 22 April 2016, the Tribunal issued Procedural Order No. 1 embodying the Parties' agreements on procedural matters and the Tribunal's decisions on the disputed issues.  Procedural Order No. 1 established, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, and that the place of proceeding would be Paris, France.  Procedural Order No. 1 also set out the procedural calendar applicable to this arbitration.

15.    On 18 April 2016, the European Commission (the "**Commission**" or "**EC**") filed with ICSID an application for leave to intervene as non-disputing party, pursuant to Arbitration Rule 37(2), concerning the question whether the Tribunal had jurisdiction to hear the case (the "**First EC Application**").  The Secretary of the Tribunal transmitted a copy of the application to the Tribunal and the Parties on the same date.

16.    On 6 May 2016, in response to an invitation to provide comments from the Tribunal, each Party filed observations on the First EC Application.

17.    On 23 May 2016, the Tribunal issued Procedural Order No. 2 "*On the European Commission's Application for Leave to Intervene as a Non-Disputing Party of April 18, 2016*".  In its order, the Tribunal dismissed the First EC Application on the ground that it was premature.  The Tribunal observed that the Commission sought to address the Tribunal's alleged lack of jurisdiction at a time in which Respondent had not yet indicated whether it intended to object to the Tribunal's jurisdiction.  The Tribunal noted that it would be "*unable to determine the existence or the extent of any disagreement between the Parties* […] *regarding the jurisdiction of the Centre or of this Tribunal*" until it received Claimant's

3

memorial and Respondent's counter-memorial.[1] The Tribunal indicated that its decision was without prejudice to its consideration of any application to intervene by the Commission to be filed at a later stage, and it mentioned the date in which Respondent's counter-memorial (including preliminary objections, if any) was to be filed.

18. On 9 September 2016, Claimant filed a Statement of Claim ("**Claimant's Memorial**"), with exhibits C-0042 to C-0181 and legal authorities CL-0024 to CL-0106. The pleading was also accompanied by two witness statements and two expert reports, as follows: *(i)* Witness Statement of Thomas Hopp dated 8 September 2016 ("**First Hopp Statement**"); *(ii)* Witness Statement of Markus Voigt dated 8 September 2016 ("**First Voigt Statement**"); *(iii)* Expert Report of The Brattle Group ("**Brattle**") titled "*Changes to the Regulation of Photovoltaic Installations in Spain Since November 2010*" dated 9 September 2016, prepared by José Antonio García and Carlos Lapuerta, with exhibits BRR-0001 to BRR-0127 ("**First Brattle Regulatory Report**"); and *(iv)* Expert Report of The Brattle Group titled "*Financial Damages to Investors*" dated 9 September 2016, prepared by Carlos Lapuerta and Richard Caldwell, with exhibits BQR-0001 to BQR-0086 ("**First Brattle Quantum Report**").

19. On 18 January 2017, the Commission filed with ICSID a second application for leave to intervene as a non-disputing party (the "**Second EC Application**"). The Secretary of the Tribunal transmitted a copy of the application to the Tribunal and the Parties on the same date.

20. On 27 January 2017, Respondent filed a Counter-Memorial on the Merits and Memorial on Jurisdiction ("**Respondent's Counter-Memorial**"), with exhibits R-0001 to R-0232 and legal authorities RL-0001 to RL-0076. The pleading was also accompanied by a witness statement and an expert report, as follows: *(i)* Witness Statement of Carlos Montoya dated 24 January 2017, with 60 supporting exhibits "W-", their numbering ranging from W-0005 to W-0453 ("**First Montoya Statement**"); and *(ii)* Expert Report of Altran-MaC Group ("**AMG**") titled "*Expert Report Relating to the Arbitration SolEs Badajoz GmbH vs. the*

---

[1] Procedural Order No. 2 "*On the European Commission's Application for Leave to Intervene as a Non-Disputing Party of April 18, 2016*" dated 23 May 2016, ¶ 20.

*Kingdom of Spain, ICSID Case ARB/15/38*" dated 27 January 2017, prepared by Grant Greatrex, Jesús Fernández Salguero and Carlos Montojo González, with supporting documents 1 to 40 ("**First AMG Report**").

21. On 9 February 2017, in response to an invitation to provide comments from the Tribunal, each Party filed observations on the Second EC Application.

22. On 21 February 2017, the Tribunal issued Procedural Order No. 3 "*On the European Commission's Second Application for Leave to Intervene as a Non-Disputing Party of 18 January 2017*".  In its order, the Tribunal authorized the Commission to file a written non-disputing party submission no later than 31 March 2017, under certain procedural directions and subject to a condition.  The Tribunal noted that while "[i]*t would be premature for the Tribunal to decide whether any costs attributable to the participation of the Commission should be borne by the Commission* […] *the Commission shall include in its submission an undertaking that it will comply with any decision on costs to be issued by the Tribunal.*"[2]

23. On 2 March 2017, the Commission filed with ICSID a "*Request to Alter Procedural Order No. 3 of 21 February 2017 on the European Commission's Second Application for Leave to Intervene as a Non-Disputing Party of 18 January 2017*", by which it requested the Tribunal to remove the condition to provide an undertaking to comply with any decision on costs to be issued by the Tribunal.  The Secretary of the Tribunal transmitted a copy of the request to the Tribunal and the Parties on the same date.

24. On 9 March 2017, in response to an invitation to provide comments from the Tribunal, each Party filed observations on the Commision's request to alter Procedural Order No. 3.

25. By letter of 17 March 2017, the Tribunal declined the Commision's request to alter Procedural Order No. 3.  The Tribunal indicated the following:

> *The Tribunal wishes to express that the procedural directions laid out in Procedural Order No. 3 (including paragraph 47(d), related*

---

[2] Procedural Order No. 3 "*On the European Commission's Second Application for Leave to Intervene as a Non-Disputing Party of 18 January 2017*" dated 21 February 2017, ¶ 47(d).

> *to the allocation of costs) are not included in order to deter*
> *participation by the Commission. Rather, they are intended to*
> *ensure that the Commission's participation does not unduly burden*
> *or unfairly prejudice either Party, consistent with ICSID Arbitration*
> *Rule 37(2).*
>
> *Having considered the Commission's Request and the views of the*
> *Parties, the Tribunal declines to alter Procedural Order No. 3. The*
> *Tribunal emphasizes that it has made no decision that any costs*
> *should be allocated to the Commission, as was stated in Procedural*
> *Order No. 3. In addition, the Tribunal offers the following*
> *clarifications in response to the Commission's Request, which may*
> *be of assistance to the Commission:*
>
> > *(a) Paragraph 47(d) does not contemplate any order that would*
> > *allocate to the Commission costs other than those arising from*
> > *its participation in this case;*
> >
> > *(b) If the Commission intervenes as a Non-Disputing Party, the*
> > *Tribunal will seek the views of the Commission (in addition to*
> > *those of the Parties) in respect of the possible allocation of costs*
> > *to the Commission, prior to any decision on the allocation of*
> > *those costs.*[3]

26.   On 21 March 2017, the Commission submitted a communication informing the Tribunal
      that it would not provide the requested undertaking on costs. The Commission did not file
      a non-disputing party submission in this proceeding.

27.   On 3 April 2017, following exchanges between the Parties, and in accordance with
      Procedural Order No. 1, the Parties submitted their document production applications in
      the form of Redfern Schedules for decision by the Tribunal.

28.   On 14 April 2017, the Tribunal issued Procedural Order No. 4 on document production.

29.   On 10 July 2017, Claimant filed a Statement of Reply on the Merits and Counter-Memorial
      on Jurisdiction ("**Claimant's Reply**"), with exhibits C-0182 to C-0187 and legal
      authorities CL-0107 to CL-0118. The pleading was also accompanied by two witness
      statements and two expert reports, as follows: *(i)* Second Witness Statement of Thomas

---

[3] Letter from the Tribunal to the European Commission dated 17 March 2017, pp. 2-3.

Hopp dated 10 July 2017 ("**Second Hopp Statement**"); *(ii)* Second Witness Statement of Markus Voigt dated 10 July 2017 ("**Second Voigt Statement**"); Second Expert Report of The Brattle Group titled "*Rebuttal Report: Changes to the Regulation of Photovoltaic Installations in Spain Since November 2010*" dated 10 July 2017, prepared by José Antonio García and Carlos Lapuerta, with exhibits BRR-0128 to BRR-0196 ("**Second Brattle Regulatory Report**"); and *(iv)* Second Expert Report of The Brattle Group titled "*Rebuttal Report: Financial Damages to Investors*" dated 10 July 2017, prepared by Carlos Lapuerta and Richard Caldwell, with exhibits BQR-0087 to BQR-0120 ("**Second Brattle Quantum Report**").

30. On 17 July 2017, Respondent requested disclosures from Dr. Alexandrov concerning his relationship with The Brattle Group ("**Brattle**"), Claimant's expert in this case. Dr. Alexandrov provided his observations concerning Respondent's request on 26 July 2017.

31. On 4 August 2017, Respondent requested further disclosures from Dr. Alexandrov concerning his relationship with Brattle. Dr. Alexandrov provided his observations concerning Respondent's request on 18 August 2017.

32. On 15 September 2017, Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction ("**Respondent's Rejoinder**"), with exhibits R-0233 to R-0359 and legal authorities RL-0077 to RL-0095. The pleading was also accompanied by a witness statement and an expert report, as follows: *(i)* Second Witness Statement of Carlos Montoya dated 13 September 2017, with 50 supporting exhibits "W-", their numbering ranging from W-0005 to W-1029 ("**Second Montoya Statement**"); and *(ii)* Second Expert Report of Altran-MaC Group titled "*Rebuttal Expert Report Relating to the Arbitration SolEs Badajoz GmbH vs. the Kingdom of Spain, ICSID Case ARB/15/38*" dated 15 September 2017, prepared by Grant Greatrex, Jesús Fernández Salguero and Carlos Montojo González, with supporting documents 41 to 113 ("**Second AMG Report**").

33. On 18 September 2017, Respondent proposed the disqualification of Dr. Alexandrov, in accordance with Article 57 of the ICSID Convention and ICSID Arbitration Rule 9 (the "**Disqualification Proposal**"). On the same date, the Centre informed the Parties that

the proceeding was suspended until the Disqualification Proposal was decided, pursuant to Arbitration Rule 9(6).  The Parties were also informed that the Disqualification Proposal would be decided by the other Members of the Tribunal, in accordance with Article 58 of the ICSID Convention and Arbitration Rule 9(4).

34.    By letter of 19 September 2017, the Parties were informed of the applicable schedule for the filing of written observations on the Disqualification Proposal.

35.    On 25 September 2017, Claimant submitted its observations on the Disqualification Proposal.  On 28 September 2017, Dr. Alexandrov furnished his explanations, as envisaged by Arbitration Rule 9(3).  On 6 October 2017, the Parties filed simultaneous observations.

36.    On 10 October 2017, the non-challenged arbitrators invited Dr. Alexandrov to provide additional explanations and fixed a date by which the Parties could submit an additional simultaneous round of observations on the Disqualification Proposal.

37.    On 12 October 2017, in response to the invitation of the non-challenged Members of the Tribunal, Dr. Alexandrov furnished additional explanations.  On 17 October 2017, the Parties filed an additional simultaneous round of observations.

38.    On 18 October 2017, Claimant requested the non-challenged Members of the Tribunal to exclude from consideration certain pages from Spain's observations of 17 October 2017 and accompanying annexes.  In the alternative, Claimant requested to be given a minimum of fifteen days to file a responsive submission.  On 19 October 2017, Respondent requested the dismissal of Claimant's request of 18 October 2017.

39.    On 19 October 2017, the Parties were notified that Judge Joan E. Donoghue and Mrs. Anna Joubin-Bret were equally divided and that the Disqualification Proposal would be decided by the Chairman of the Administrative Council (the "**Chairman**"), in accordance with Article 58 of the ICSID Convention and Arbitration Rule 9(4).

40.    By communications of 20 October 2017, Claimant requested the Chairman to decide on its request of 18 October 2017, and Respondent maintained its objection to Claimant's request.

8

41. On 24 October 2017, the Centre informed the Parties that Dr. Alexandrov had submitted his resignation as an arbitrator in this case.

42. On that same date, Mrs. Joubin-Bret advised the Centre that she had decided to step down as arbitrator in this case, having accepted the position of Director of the International Trade Law Division in the Office of Legal Affairs of the United Nations and *ex officio* Secretary of the United Nations Commission on International Trade Law, and the Centre so informed the Parties.

43. Also on 24 October 2017, each Party was invited to appoint a new arbitrator, in accordance with ICSID Arbitration Rule 11.

44. On 10 November 2017, following appointment by Claimant, Mr. Jonathan Schiller, a national of the United States of America, accepted his appointment as arbitrator.

45. On 15 November 2017, following the resignation of arbitrator Jonathan Schiller, the Centre notified the Parties of the vacancy on the Tribunal.

46. On 28 November 2017, following appointment by Claimant, Sir David A R Williams KNZM, QC, a national of New Zealand, accepted his appointment as arbitrator.

47. On 8 December 2017, following appointment by Respondent, Professor Giorgio Sacerdoti, a national of Italy, accepted his appointment as arbitrator.

48. On 12 December 2017, the Tribunal was reconstituted. Its members are: Joan E. Donoghue, a national of the United States of America, appointed by the Secretary-General; David A R Williams, a national of New Zealand, appointed by Claimant; and Giorgio Sacerdoti, a national of Italy, appointed by Respondent. On the same date, the proceeding was resumed pursuant to Arbitration Rule 12.

49. On 27 December 2018, the Parties were informed of the applicable procedural calendar following the reconstitution of the Tribunal.

50. On 31 January 2018, Claimant filed a Statement of Rejoinder on Jurisdiction ("**Claimant's Rejoinder**"), accompanied by exhibit C-0188 and legal authorities CL-0119 to CL-0122.

51. On 15 February 2018, following exchanges between the Tribunal and the Parties, the Parties were informed that the hearing on jurisdiction, merits and quantum (the "**Hearing**") was to be held in Paris, France, from 25 June to 29 June 2018.

52. On 9 March 2018, following consultations with the Parties, the Tribunal informed the Parties that a pre-hearing organizational meeting was to be held by telephone conference on 30 May 2018. On the same date, and in preparation for the meeting, the Tribunal circulated a draft agenda to facilitate the Parties' discussions on the organization of the Hearing.

53. On 12 April 2018, Claimant requested leave from the Tribunal to file five new factual exhibits. On 13 April 2018, the Tribunal invited Respondent to submit observations on Claimant's request. On 19 April 2018, Respondent submitted its observations. On 27 April 2018, the Tribunal invited Claimant to present additonal observations concerning its request and also invited Respondent to comment on Claimant's observations. On 2 May 2018, Claimant submitted additional observations, followed by Respondent's comments on 4 May 2018.

54. On 9 May 2018, the Parties informed the Tribunal of the expert and factual witnesses that they wished to call for cross-examination at the Hearing.

55. On 11 May 2018, the Tribunal granted Claimant's request of 12 April 2018. The Tribunal requested Claimant to submit the factual exhibits admitted into the record by 18 May 2018.

56. On 18 May 2018, Claimant submitted factual exhibits C-0189 to C-0193.

57. On 25 May 2018, Claimant requested leave from the Tribunal to introduce a new legal authority into the record, namely the award of 16 May 2018 rendered in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1. On 1 June 2018, the Tribunal informed the Parties that, unless it received an objection from Respondent on or before 8 June 2018, Claimant's request of 25 May 2018 would be considered granted.

58. On 30 May 2018, the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

59.  On 4 June 2018, Respondent informed the Tribunal that it did not object to Claimant's request of 25 May 2018, and requested leave from the Tribunal to introduce nine new documents into the record, including the award of 27 December 2016 rendered in *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3 ("**Blusun v. Italy**" or "**Blusun**"), the Final Award of 11 October 2017 rendered in *Jürgen Wirtgen, Stefan Wirtgen, Gisela Wirtgen and JSW Solar (zwei) GmbH & Co. KG v. Czech Republic*, PCA Case No. 2014-03 ("**Wirtgen v. Czech Republic**"), and the Judgment of the Court of Justice of the European Union ("**CJEU**") of 6 March 2018 in Case C-284/16, *Slowakische Republik v. Achmea BV* ("**Achmea**" or "**Achmea v. Slovakia**").

60.  On 5 June 2018, the Tribunal issued Procedural Order No. 5, on the organization of the Hearing.  On the same date, the Tribunal invited Claimant to submit observations on Respondent's request of 4 June 2018.

61.   On 11 June 2018, Claimant submitted observations on Respondent's request of 4 June 2018.

62.  On 15 June 2018, the Tribunal granted in part Respondent's request of 4 June 2018.

63.  On 22 June 2018, pursuant to Procedural Order No. 5, Respondent submitted legal authorities RL-0096 through RL-0099, together with an updated consolidated list of legal authorities.

64.  On 23 June 2018, pursuant to Procedural Order No. 5, Claimant submitted legal authorities CL-0123 and CL-0124, together with an updated consolidated list of legal authorities.

65.  The Hearing was held in Paris, France, from 26 to 29 June 2018.  The following persons were present throughout the Hearing:

*Tribunal*:

Judge Joan E. Donoghue              President
Professor Giorgio Sacerdoti          Arbitrator
Sir David A R Williams KNZM, QC    Arbitrator

*ICSID Secretariat*:

Mrs. Ana Conover                          Secretary of the Tribunal

*For Claimant*:

Counsel

Mr. Charles Kaplan                        Orrick Herrington & Suttcliffe (Europe) LLP
Mr. Tunde Oyewole                         Orrick Herrington & Suttcliffe (Europe) LLP
Ms. Agnès Bizard                          Orrick Herrington & Suttcliffe (Europe) LLP
Ms. Lorna Maupilé                         Orrick Herrington & Suttcliffe (Europe) LLP
Ms. Federica Re Depaolini                 Orrick Herrington & Suttcliffe (Europe) LLP (intern)
Ms. Lucille Coulon                        Orrick Herrington & Suttcliffe (Europe) LLP (intern)
Ms. Marie Chereau                         Orrick Herrington & Suttcliffe (Europe) LLP (intern)
Ms. Mahalkita Guiberd                     Orrick Herrington & Suttcliffe (Europe) LLP (intern)
Mr. Fernando Bedoya                       Pérez-Llorca
Ms. Sara Martín                           Pérez-Llorca

Parties

Mr. Thomas Hopp                           Voigt & Collegen

Witness

Mr. Markus Voigt                          Voigt & Collegen

Experts

Mr. Carlos Lapuerta                       The Brattle Group
Mr. Richard Caldwell                      The Brattle Group
Mr. Jose Antonio García                   The Brattle Group
Ms. Claudia Cuchi                         The Brattle Group
Ms. Ying-Chin Chou                        The Brattle Group

*For Respondent*:

Counsel

Mr. Roberto Fernández Castilla            Abogacía General de Estado
Mr. Antolín Fernández Antuña              Abogacía General de Estado
Ms. Patricia Fröhlingsdorf Nicolás        Abogacía General de Estado
Mr. Javier Torres Gella                   Abogacía General de Estado
Ms. María José Sánchez Ruiz               Abogacía General de Estado
Mr. Alberto Torró Molés                   Abogacía General de Estado

Parties

Ms. Raquel Vázquez Meco                   IDAE

12

<u>Witness</u>

Mr. Carlos Montoya Rasero   IDAE

<u>Experts</u>

Mr. Grant Greatrex     ALTRAN-Mac Group
Mr. Jesús Fernández Salguero  ALTRAN-Mac Group
Mr. Carlos Montojo González   ALTRAN-Mac Group
Mr. David Pérez López    ALTRAN-Mac Group
Mr. Antonio Sanchis Boscá   ALTRAN-Mac Group

*Court Reporters*:

Mr. Trevor McGowan
Ms. Luciana Sosa      D. R. Esteno
Ms. Elizabeth Cicoria    D. R. Esteno

*Interpreters*:

Mr. Jesús Getan Bornn
Ms. Amalia Thaler-de Klemm
Ms. Anna-Sophie Chapman

66. The following persons were examined during the Hearing:

*On behalf of Claimant*:

Mr. Thomas Hopp     Voigt & Collegen
Mr. Markus Voigt      Voigt & Collegen
Mr. José Antonio García   The Brattle Group
Mr. Carlos Lapuerta     The Brattle Group
Mr. Richard Caldwell    The Brattle Group

*On behalf of Respondent*:

Mr. Carlos Montoya     IDAE
Mr. Grant Greatrex     ALTRAN-Mac Group
Mr. Jesús Fernández Salguero  ALTRAN-Mac Group
Mr. Carlos Montojo González   ALTRAN-Mac Group

67. On 29 June 2018, as agreed on the first day of the Hearing, Claimant submitted legal authority CL-0125, together with an updated consolidated list of legal authorities.

13

68.  On 2 July 2018, the Tribunal issued Procedural Order No. 6 concerning the filing of post-hearing briefs.

69.  On 4 July 2018, Claimant filed a request for the Tribunal to decide on the admissibility of a new document.

70.  On 9 July 2018, Respondent filed observations on Claimant's request of 4 July 2018.

71.  On 13 July 2018, the Tribunal issued Procedural Order No. 7 concerning the introduction of documents and legal authorities in the proceeding.

72.  On 19 July 2018, Claimant filed a request for the Tribunal to decide on the admissibility of twenty-one new documents.

73.  On 25 July 2018, the Parties submitted their agreed revisions of the hearing transcripts.

74.  On 26 July 2018, Respondent filed observations on Claimant's request of 19 July 2018.

75.  On 27 July 2018, the Tribunal granted in full Claimant's request of 19 July 2018.

76.  On 31 July 2018, Claimant filed a post-hearing brief, accompanied by legal authorities CL-0126 through CL-0150 and a list of legal authorities.

77.  On 14 August 2018, Respondent filed a request *(a)* for Claimant to translate legal authority CL-0128, which was submitted with Claimant's post-hearing brief; *(b)* to suspend Respondent's deadline to submit its post-hearing brief; and *(c)* to introduce a new legal authority, namely the "*Communication from the* [European] *Commission to the European Parliament and the Council: Protection of intra-EU Investment*" dated 19 July 2018.

78.  On 20 August 2018, Claimant filed observations on Respondent's requests of 14 August 2018.

79.  On 21 August 2018, the Tribunal *(a)* requested Claimant to produce a fuller translation of legal authority CL-0128 to be made available to Respondent more than ten days before the due date for its post-hearing brief; *(b)* rejected Respondent's request to suspend the

deadline for the filing of its post-hearing brief; *(c)* and granted Respondent's request to introduce an additional document into the record.

80. On 10 September 2018, Respondent filed a post-hearing brief together with legal authority RL-0100 and an updated consolidated list of legal authorities.

81. On 19 September 2018, Claimant requested leave from the Tribunal to make a submission of no more than three pages concerning the difference between two documents in the record, in response to Respondent's post-hearing brief. On the same date, in view of the reasons given for the request, the Tribunal granted Claimant's request and invited observations from both Parties. Claimant filed its observations on 24 September 2018 and Respondent filed its observations on 27 September 2018.

82. On 28 January 2019, Respondent filed a request to introduce an additional legal authority into the record, namely the "*Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the legal consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union*", together with a written submission commenting on the relevance of such document.

83. On 4 February 2019, Claimant filed observations requesting the Tribunal to reject Respondent's request of 28 January 2019, or alternatively to grant an equal opportunity to Claimant to submit and comment on other documents, including two related declarations of European Union ("**EU**") Member States of 16 January 2019.

84. On 11 February 2019, the Tribunal granted Respondent's request of 28 January 2019 and admitted into the record the additional documents referred to by Claimant in its communication of 4 February 2019.

85. On 18 February 2019, Respondent filed legal authorities RL-0101 through RL-0103 together with a submission commenting on the relevance of these documents and an updated consolidated list of legal authorities.

86. On 25 February 2019, Claimant filed a submission concerning the documents introduced by Respondent into the record on 18 February 2019.

87. On 18 March 2019, Respondent filed a request to introduce an additional legal authority into the record, namely the "*Decision on Responsibility and on the Principles of Quantum*" of 30 November 2018 issued in *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30 ("***RREEF* Decision**"), together with a written submission commenting on the relevance of such document.

88. On 21 March 2019, Claimant filed observations requesting the Tribunal to reject Respondent's request of 18 March 2019, or alternatively to grant an equal opportunity to Claimant to submit and comment on the partial dissent to the *RREEF* Decision and the Final Award of 14 November 2018 rendered in *Foresight Luxembourg Solar 1 S. Á.R1., et al. v. Kingdom of Spain*, SCC Case No. 2015/150 ("***Foresight* Award**").

89. On 10 April 2019, the Tribunal granted the Parties' requests to introduce the *RREEF* Decision and the *Foresight* Award into the record, together with the dissenting opinions accompanying these rulings. The Tribunal invited the Parties to simultaneously submit by 17 April 2019 short submissions commenting on those documents.

90. On 17 April 2019, each Party provided its comments concerning the documents admitted into the record on 10 April 2019. Respondent's submission was accompanied by legal authorities RL-0104 and RL-0105. Claimant's submission was accompanied by legal authority CL-0151.

91. On 18 April 2019, the Tribunal declared the proceeding closed.

92. On 9 and 10 May 2019, the Parties filed their respective submissions on costs. Pursuant to instructions from the Tribunal, each Party was allowed to provide comments on the other Party's costs by 17 May 2019.

93. On 21 May 2019, the Tribunal took note of a communication from Claimant of 17 May 2019 indicating that it had no comments on the Respondent's submission on costs, and noted that no comments to Claimant's costs submission had been filed by Respondent by the due date of 17 May 2019.

94. On 11 June 2019, Respondent filed with ICSID comments on Claimant's submission on costs of 10 May 2019, noting that it had not been able to submit them by the deadline established by the Tribunal. On the same date, Claimant objected to the introduction into the record of Respondent's submission. On 12 June 2019, the Tribunal noted that Respondent had submitted its document nearly one month after the deadline established by the Tribunal for such filing and, having considered all relevant circumstances, the Tribunal declined to accept Respondent's submission into the record of the proceeding.

## III.    FACTUAL BACKGROUND

95. This case arises out of Claimant's investments in Spain in PV plants, which use one of several technologies that produce renewable energy. As background, the Tribunal sets out below the key developments in the regulatory framework governing investments in renewable energy in Spain, focusing on those developments of greatest relevance to this proceeding. It then describes Claimant and its investment.

### A.  Regulatory Framework

#### (1)    General Background and Description of the "Special Regime" in Place when Claimant Invested

96. The 1978 Spanish Constitution is the supreme law of Spain.[4] The Parliament enacts legislation ("**Laws**" or "**Acts**").[5] Royal Decree Laws ("**RDL**"s) are adopted by the government in emergency situations and require subsequent legislative approval.[6]

---

[4] Spanish Constitution of 1978 (R-0005) (the "**Spanish Constitution**").

[5] Spanish Constitution, Article 66.

[6] *Id.*, Article 86.

Royal Decrees ("**RD**"s) are promulgated by the Council of Ministers to complement or develop legislation,[7] and ministries issue ministerial orders and resolutions.[8]

97. Law No. 54/1997, known by its Spanish acronym "**LSE**" (*Ley del Sector Eléctrico*), was enacted in 1997 to regulate the activities involved in the supply of power, including generation, transmission, distribution and retailing. It liberalized the energy sector and set out two regimes for energy production, an Ordinary Regime and a Special Regime that encouraged the production of energy from renewable sources. Under the Special Regime, remuneration was supplemented by a premium. The LSE stated:

> *To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets.*[9]

98. From enactment of Law 54/1997 through 2004, Spain adopted successive regulations designed to regulate and to encourage energy production from renewable sources, which provided additional details regarding the Special Regime, including the remuneration of producers of renewable energy.[10] Under RD 436/2004, PV plants participating in the Special Regime were entitled to receive *(i)* a regulated tariff (consisting of a single, flat rate) or *(ii)* either the price resulting in the organized market or the price freely negotiated by the plant operator supplemented by an incentive and by a premium.[11] The regulated tariff and the premium were calculated as a percentage of an annual average or reference

---

[7] See Act 50/1997 dated 27 November of the Government, published in the Official State Gazette number 285 of 28 November 1997 (R-0039) ("**Act 50/1997**"), Article 25.

[8] Resp. C-Mem., ¶¶ 234-235; Act 50/1997, Article 25.

[9] Act 54/1997 dated 27 November 1997, on the Electric Power Sector (R-0059) ("**Act 54/1997**"), Article 30(4)(c).

[10] See, e.g., Royal Decree 2818/1998 dated 23 December 1998, on the Production of Electricity by Facilities Supplied by Renewable Energy, Waste or Cogeneration Resources or Sources (R-0067) ("**RD 2818/1998**").

[11] Royal Decree 436/2004 dated 12 March 2004, on the Methodology for Updating and Systematising the Legal and Economic Framework of the Activity of Electricity Production under the Special Regime (CL-0026, R-0069) ("**RD 436/2004**"), Article 22(1).

electricity tariff.[12]  The tariffs and the premiums were payable during the useful life of the plants, but the rates were reduced after the first twenty-five years from their commissioning.[13]

99.  In 2005, Spain adopted the 2005-2010 Renewable Energy Plan (the "**2005-2010 PER**").[14] It noted that overall growth in renewable energy had been lower than expected and referred to national indicative targets for renewable energy that had been set by the EU in 2001.  The 2005-2010 PER concluded that, in order to meet Spain's target for the year 2010, Spain needed to revise its 2000-2010 Plan for Promotion of Renewable Energies.[15]  The 2005-2010 PER addressed PV facilities in particular:

> *Production of electricity directly through photovoltaic sources presents undeniable energetic, industrial, environmental and social, etc. advantages. Among them, the implementation of photovoltaic solar energy as widely as possible will contribute to boosting future technological development, which will cause this power generating process to be increasingly competitive compared to other generation methods.*[16]

100.  The 2005-2010 PER proposed to increase the capacity target for PV plants from 135 megawatts ("**MW**") to 400 MW.[17]  It identified public support as "*an essential factor to drive growth of different renewable sectors*"[18] and stated that public aid to achieve the proposed increases in PV capacity would amount to €499.4 million (for 2005-2010).[19]

---

[12] RD 436/2004, Articles 23 and 24.

[13] *Id.*, Article 33.

[14] Renewable Energy Plan 2005-2010 (BRR-0017, C-0042, R-0092) ("**2005-2010 PER**").  The 2005-2010 PER was prepared by the *Instituto para la Diversificación y Ahorro de la Energía* ("**IDAE**"), part of the Ministry of Industry, Trade and Tourism ("**MINETUR**").

[15] 2005-2010 PER, pp. 7, 19, 319-321.

[16] *Id.*, p. 157 (citing English translation from Cl. Mem., fn. 69).

[17] *Id.*, pp. 175-176.

[18] *Id.*, p. 276 (citing English translation from Cl. Mem., ¶ 98).

[19] *Id.*, p. 182.

19

101. In February 2007, the National Energy Commission ("**CNE**" or "**NEC**")[20] of Spain issued a report on a proposed royal decree regulating energy production under the Special Regime ("**2007 CNE Report**").[21]  It set out the criteria that, in the opinion of the CNE, should apply to the special regime: *(a)* reaching the planning targets; *(b)* minimizing regulatory uncertainty; *(c)* facilitating operation of the system; and *(d)* incentivizing voluntary integration in the market.[22]  As to the criterion of minimizing regulatory uncertainty, the 2007 CNE Report stated:

> *The NEC understands that transparency and predictability in the future of economic incentives reduces regulatory uncertainty, incentivising investments in new capacity and minimizing the cost of financing projects, thus reducing the final cost to the consumer.  The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility.  In each case, regulation must provide both transparent annual adjustment mechanisms, associated to robust trend indexes (such as the average or reference tariff, the CPI, ten-year bonds, etc.) and regular reviews that only affect new facilities (e.g. every four years) with regard to investment costs, which could also affect the reduction of operating costs at existing facilities.*[23]

102. The 2007 CNE Report also noted that the facilities subject to the Special Regime are capital-intensive, with a long period for capital recovery.[24]

---

[20] The CNE was created by Act 34/1998, of 7 October 1998, on the Hydrocarbons Sector, in its Additional Provision Eleven (R-0043).  Its purpose was to promote "*the competitive operation of the energy sector to guarantee the effective availability and delivery of quality and competitive services concerning the supply of electricity and hydrocarbons (liquid and gaseous) to the benefit of the market as a whole and consumers and users.*"  (Additional Provision Eleven, Sixth, 1(a)).  The CNE was integrated in the National Commission of Markets and Competition by Act 3/2013 of 4 June 2013, on the creation of the National Commission of Markets and Competition (R-0046).

[21] CNE Report 3/2007 dated 14 February 2007 concerning a proposed Royal Decree on Regulation of the Electric Energy Production Activity under a Special Regime and Certain Technology Facilities Regulated under the Ordinary Regime (CL-0027, R-0101).

[22] 2007 CNE Report, Section 5.3.

[23] *Id.*, Section 5.3(b).

[24] *Id.*, Section 7.2.

103. In May 2007, Spain adopted RD 661/2007, which replaced the framework for the Special Regime that had been specified in RD 436/2004.[25] As stated in its preamble:

> Spanish society today, in the context of reducing dependence on foreign energy, better use of available energy sources, and a greater awareness of the environment, is increasingly demanding the employment of renewable sources of energy and efficiency in the generation of electricity as basic principles in the achievement of sustainable development from an economic, social, end environmental point of view.
>
> […]
>
> The creation of the special regime for the generation of electricity meant an important milestone in the energy policy of our country. The targets in respect of the promotion of renewable energy and combined heat and power are covered in the Renewable Energy Plan 2005-2010 and in the Strategy for Energy Saving and Efficiency in Spain (E4), respectively. In view of the above, it can be seen that although the growth seen overall in the special regime for electricity generation has been outstanding, in certain technologies the targets posed are still far from being reached.
>
> From the point of view of compensation, the business of the production of electrical energy under the special regime is characterized by the possibility that the compensation system can be supplemented by the receipt of a premium under the terms and conditions established in the regulations, in order to determine which such factors as the voltage level of the energy delivered into the grid, the contribution to the improvement in the environment, primary energy saving, energy efficiency, and the investment costs incurred, may all be taken into account.
>
> […]
>
> The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997, of 27 November, on the Electricity Sector, guaranteeing the owners of facilities under the special regime a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable,

---

[25] Royal Decree 661/2007, of 25 May, Regulating the Activity of Electricity Production under the Special Regime (CL-0003, R-0071) ("**RD 661/2007**"), Article 1(a).

> *although incentives are provided to playing a part in this market since it is considered that in this manner lower government intervention will be achieved in the setting of prices, together with better, more efficient, attribution of the costs of the system, particularly in respect of the handling of diversions and the provisions of supplementary services.*[26]

104. Under RD 661/2007, two options were available for producers participating in the Special Regime, a premium relative to market prices and a "regulated tariff" (i.e., a feed-in tariff, or "**FIT**").[27]  Whereas the FIT under RD 436/2004 had been set with reference to prevailing market prices, the FIT under RD 661/2007 was "*a fixed sum which shall be the same for all scheduling periods and shall be determined as a function of the Category, Group,* [or] *Sub-Group to which the facility belongs, and the installed power, and where applicable the length of time since the date of commissioning*[.]"[28]

105. RD 661/2007 set out formulae for calculating the FITs for three categories of plants (which depended on the capacity of the plant), and specified a reduced rate after the first twenty-five years of operation.[29]  The applicable FIT was to be updated annually using a consumer price index ("**CPI**").[30]  In order to participate in the Special Regime, installations were required to be registered on the Administrative Registry of Production Installations under the Special Regime ("**RAIPRE**").[31]

106. Article 44(3) of RD 661/2007 also provided for the review of tariffs:

> *During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of*

---

[26] RD 661/2007, Preamble (Resp. translation).

[27] *Id.*, Article 24(1).

[28] *Id.*, Article 25.

[29] *Id.*, Article 36, Table 3.

[30] *Id.*, Article 44(1).

[31] *Id.*, Articles 9-12.

> *participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.*
>
> *The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.* [32]

107. On 29 September 2007, the General Energy Secretary, having been advised that 85% of the PV target defined in RD 661/2007 had been reached in September 2007,[33] issued an order specifying that only PV facilities registered before 30 September 2008 could benefit from the FITs established in RD 661/2007.[34]

108. In July 2008, the CNE issued a report (CNE Report 30/2008) with respect to a proposed Royal Decree that would govern PV facilities that were registered after the 29 September 2008 deadline that had been set by the General Energy Secretary. Noting the unexpected growth in what it described as an "*over-incentivized market*,"[35] the CNE expressed its agreement with the objective of the proposed Royal Decree, i.e., the establishment of a "*system of tariffs that guides the reduction of costs of technology, so that by moderating its expansion, cost reductions are progressively transferred to the owners of the facilities, and ultimately to the consumer.*"[36] As in the 2007 CNE Report,[37] CNE Report 30/2008 summarized the four criteria in the CNE's methodology, including the following:

> *b) **Legal certainty and the protection of legitimate expectations.** Stability and predictability of economic incentives (tariffs and*

---

[32] *Id.*, Article 44(3).

[33] CNE Report 30/2008 dated 29 July 2008 (CL-0029, R-0222) ("**2008 CNE Report**"), Preamble.

[34] Order ITC/1857/2008 on Review of Energy Feed-in Tariffs as of 1st July dated 26 June 2008 (CL-0028) ("**Order ITC/1857/2008**").

[35] 2008 CNE Report, Section 4.4.

[36] *Id.*, Section 7.1.

[37] 2007 CNE Report, Section 5.3.

*premiums) reduce regulatory uncertainty, which encourages investments in new capacity to address their projects, while minimizing the cost of financing and thereby reducing the final cost to the consumer. The current regulation has established annual updates of economic incentives, based on robust indexes (such as the IPC, ten-year bonds, etc.), and periodic reviews every four years, which in this case only affect the new facilities.*

*Certainly, the principles of legal certainty and the protection of legitimate expectations (Article 9.3 EC) do not constitute insurmountable obstacles to the innovation of the legal system and cannot therefore be used as instruments to petrify the legal framework in force at any given time. In this sense, these principles do not prevent the dynamic innovation of the regulatory frameworks, nor of new normative provisions which can be applied pro-future to situations initiated before it comes into force. But these principles do require that regulatory innovation - especially if it is abrupt, unforeseeable or unexpected - is carried out with certain guarantees and cautions (transitional periods to adapt to the new regimes, where appropriate compensatory measures, etc.) that dampen, moderate and minimize, as far as possible, the disappointing of any expectations generated by the previous regulations.*[38]

109. Analyzing the proposed Royal Decree in light of its four criteria, the CNE stated:

### 5.2 On the criterion of minimizing regulatory uncertainty

*Special-regime production facilities are often capital-intensive and have long recovery times. The regulation of the generation facilities under the special regime established in Royal Decree 661/2007, has tried to minimize the regulatory risk of this group, providing security and predictability to economic incentives during the useful life of the facilities, by establishing transparent mechanisms to update them annually, and by exempting existing installations from the four-year review, since the new incentives that are being set out only affect the new installations.*

---

[38] 2008 CNE Report, Section 4.2(b), p. 9 (Resp. translation, emphasis in the original).

> *The guarantees included in this regulation allow for better financing, with lower project costs and less impact on the electricity tariff finally paid by the consumer.*[39]

110. Royal Decree 1578/2008, regarding remuneration for PV power plants that obtained their permanent registration after 29 September 2008, was adopted on 26 September 2008.[40] The preamble recalled that RD 661/2007 had established a new compensation framework for renewable energy for the purpose of meeting the goals in the 2005-2010 PER, and that the growth of installed capacity in the PV sector had been greater than expected. To avoid excessive compensation that would have repercussions for the costs of the system and would create disincentives for investing in research and development, the new Royal Decree stated that it would "*modify the economic regime downward, following the expected evolution of the technology, with a long-term perspective.*"[41] RD 1578/2008 raised the goals for installed capacity that had been set in RD 661/2007 and set out a "*new economic regime that stimulates technological evolution and the competitiveness of photovoltaic facilities in Spain over the medium and long term.*"[42]

111. To guarantee a minimum market for the development of the PV sector and to ensure continuity of the support system, RD 1578/2008 established a compensation mechanism whereby installations were pre-registered at the beginning of development of a project (a pre-assignment registry), "*which will provide the necessary legal security to promoters with respect to the return that the facility will earn once it is put into operation.*"[43] The specific FIT assigned to a facility depended on the pre-registration date.[44] On a quarterly basis, the FIT adjustable to newly-registered plants was adjusted.[45] The applicable FIT

---

[39] *Id.*, Section 5.2 (emphasis in the original).

[40] Royal Decree 1578/2008 dated 26 September 2008 covering the compensation for the generation of electric power by photovoltaic solar technology for facilities subsequent to the deadline for the maintenance of compensation under Royal Decree 661/2007 of May 25, 2007 (CL-0004, R-0072) ("**RD 1578/2008**").

[41] RD 1578/2008, Preamble (Resp. translation).

[42] *Id.*

[43] *Id.*

[44] *Id.*, Article 6.

[45] *Id.*, Article 11 and App. III.

applied to a facility for a "*maximum period of twenty-five years*."[46]  RD 1578/2008 specified that the tariffs would be adjusted for inflation using the mechanism specified in RD 661/2007.[47]

112. The Fifth Additional Provision of RD 1578/2008, entitled "*Modification of the compensation for generation by photovoltaic technology*," stated: "*During the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by photovoltaic solar technology may be modified*."  The Parties disagree about the meaning of this provision.

113.  Claimant refers to the laws and regulations up to and including RD 1578/2008, which was in effect at the time of Claimant's investment, as the "**Original Regulatory Regime.**"

### (2)     The Disputed Measures

114. Claimant's case arises out of regulatory changes subsequent to RD 1578/2008, which it describes as the "**Disputed Measures.**"  For convenience, the Tribunal divides the Disputes Measures into two sets of measures.

115. Before describing the two sets of Disputed Measures, the Tribunal provides background information regarding the tariff deficit, i.e., the gap between the revenue of the Spanish Electricity System ("**SEE**") and the costs of regulated activities in the electricity sector.

116. The tariff deficit in the SEE began in the year 2000.[48]  It increased during the global economic crisis, which led to reduced demand for energy as compared to expectations.  The 2005-2010 PER had forecast an increase in energy demand of 4% during that period,[49] which was adjusted to an annual increase of 3.72% in the PER 2011-2020.[50]  Energy

---

[46] *Id.*, Article 11(5).

[47] *Id.*, Article 12.

[48] First AMG Report, Annex III, p. 66.

[49] 2005-2010 PER, p. 325.

[50] IDAE Renewable Energy Plan 2011-2020 dated 11 November 2011 (BRR-0021) ("**2011-2020 PER**"), p. 59, cited in First AMG Report, p. 69, fn. 208.

demand fell short of both forecasts. Spain's Energy Secretary stated in 2013 that growth in energy demand over the period 2005-2012 was 2%, while generation capacity had increased by 39%.[51] A 2014 Report by the European Commission stated that the tariff deficit in Spain amounted to €28.5 billion at the end of 2013, "*almost 3% of GDP.*"[52]

117. The growth of the tariff deficit was addressed in a report prepared by the CNE in March 2012.[53] That report stated that from 2006 to 2010, average revenues from access tolls had increased by 70% in accumulated terms, while the increase in access costs was 140%. The three most significant access costs items were Special Regime premiums (representing 40.3% of total costs in 2010), network costs (39.8%) and the cost of financing the accumulated deficit (10.5%).[54]

118. The 2012 CNE Report forecast that the tariff deficit would continue to increase (with the precise figures dependent on the scenario that was used) and stated that the tariff deficit would be "*unsustainable*" unless measures were introduced either on revenues or regulated costs.[55] The 2012 CNE Report also stated that prices paid by household consumers and industrial consumers in Spain were higher than the EU average.[56]

119. As indicated below, in the summary of Party positions with respect to liability, the Parties disagree on many points with respect to the tariff deficit, such as the contribution that PV subsidies made to the tariff deficit and the extent to which Spain could have taken measures other than the Disputed Measures in order to address the tariff deficit.

### a. The First Set of Disputed Measures

120. The First Set of Disputed Measures are:

---

[51] Energy Balance of 2012 and Prospects for 2013, Club Español de la Energía, 2013 (DOC 21), p. 15, quoted in First AMG Report, Annex III, pp. 70-71.

[52] European Commission, "Spain – Post Programme Surveillance Autumn 2014 Report", Occasional Papers 206, December 2014 (R-0179), ¶ 67.

[53] CNE, Report on the Spanish Energy Sector dated 7 March 2012 (BRR-0090, R-0105) ("**2012 CNE Report**").

[54] 2012 CNE Report, pp. 5-6.

[55] *Id.*, p. 10.

[56] *Id.*, p. 13.

(1) RDL 14/2010 of 23 December 2010, which imposed a cap on the number of hours per year during which PV installations could sell electricity under the FIT;[57]

(2) Law 15/2012 of 27 January 2012, imposing a seven percent tax on electric energy production;[58] and

(3) RDL 2/2013 of 1 February 2013, which changed the inflation index used to update FITs.[59]

121. RDL 14/2010 of 23 December 2010,[60] entitled "*on the Establishment of Urgent Measures for the Correction of the Tariff Deficit in the Electricity Sector*," referred to the need to address the tariff deficit.  It stated that, since the adoption of RDL 6/2009 in April 2009, "*there have been a series of supervening circumstances that have had a direct impact on the anticipated tariff deficit*."  It observed that the global crisis had led to a decline in demand for energy, while there had also been increased energy production.  Producers in the Ordinary Regime had seen a reduction in hours and wholesale prices, but those in the Special Regime had received preferential rates.  The preamble of RDL 14/2010 provided:

> *In formulation of these measures, care has been taken to ensure the safeguard of the supply of electricity, in terms of universality, quality, safety and continuity and to ensure the protection of consumer rights for electrical power supply, under equitable terms, as well as to ensure compliance of the targets regarding energy efficiency and the promotion of renewable energies.  In parallel, special attention and care has been taken not to affect the economic-financial balance of companies within the sector, and not solely for large companies, preserving the principles of a free market, which are governed under Law 54/1997, of 27 November, on the electricity sector, but also for sets of power generation facilities, monitoring such, because, especially in the case of power generation companies under the special regime, these have secured adequate and reasonable compensation.*
>
> […]

---

[57] Royal Decree Law 14/2010 dated 23 December 2010, on the Establishment of Urgent Measures for the Correction of the Tariff Deficit in the Electricity Sector (CL-0006, R-0058) ("**RDL 14/2010**").

[58] Law 15/2012 dated 27 December 2012 on Tax Measures for Energy Sustainability (CL-0008, R-0003) ("**Law 15/2012**").

[59] Royal Decree-Law 2/2013 dated 1 February 2013, on Urgent Measures in the Electricity System and in the Financial Industry (CL-0009, R-0063) ("**RDL 2/2013**").

[60] RDL 14/2010.

> [I]*t is deemed reasonable that producers under the special regime also make a contribution to mitigate the additional costs on the system, and such contribution must be proportionate to the characteristics of each technology, to the degree of participation in the generation of such additional costs and to the current extent for compensation, whose reasonable return, nonetheless, is guaranteed. Thus, for the same purpose, there has been Government approval, over recent months, for regulatory measures directed at producers of wind, solar thermal and co-generation electricity.*
>
> *Thus, in consideration of the rate of growth of photovoltaic installations, and for safeguarding the principle of sufficiency for compensation, due to the special impact that the deviations in the forecast generation of this energy source have caused to the tariff deficit, it is established, in general terms, the possibility for limiting the recognised equivalent operating hours entitled by the prevailing economic system.*[61]

122.   Accordingly, RDL 14/2010 imposed a cap on the number of hours per year for which a PV installation could sell electricity at the FIT, after which it could sell electricity at the prevailing market rate.[62]

123.   Law 15/2012,[63] the Law on Tax Measures for Energy Sustainability, imposed energy-related taxes, including a tax on the value of energy production.  This tax, set at the rate of seven percent, applied, *inter alia*, to the remuneration received pursuant to the Special Regime under RD 1578/2008.

124.   RDL 2/2013 of 1 February 2013,[64] on Urgent Measures in the Electricity System and in the Financial Industry, changed the CPI that had been used for annual adjustments of FITs and replaced it with an adjusted CPI that excluded energy products, food prices and the effects of tax changes.

---

[61] *Id.*, Preamble.

[62] On 19 November 2010, Spain also issued RD 1565/2010 on Regulation and Modification of Certain Aspects in Relation to the Electricity Production under the Special Regime (CL-0005), which limited FITs for plants operating under RD 661/2007 to a maximum of 25 years.  This provision did not apply to Claimant, which was operating under RD 1578/2008.

[63] Law 15/2012.

[64] RDL 2/2013.

### b. The Second Set of Disputed Measures

125. Subsequent changes in Spanish law and regulations (in 2013 and 2014) led to the abolition of the Special Regime, including the FITs. The Tribunal refers to these measures (RDL 9/2013 (12 July 2013), Law 24/2013 (26 December 2013), RD 413/2014 (6 June 2014) and Ministerial Order IET/1045/2014) as the Second Set of Disputed Measures.

126. RDL 9/2013 (12 July 2013)[65] amended Law 54/1997 and abrogated RD 661/2007 and RD 1578/2008. It set forth "*urgent measures to ensure the financial stability of the electricity system*."[66] Its preamble stated that the "*Spanish electricity system has generated a tariff deficit for a decade*." It indicated that between 2004 and 2012, revenues from consumer toll fees had increased by 122%, whereas regulated costs had increased by 197%. It cited special regime premiums as having contributed in particular to this gap. It described the situation as unsustainable, thus requiring urgent measures, and stated that past measures had proven insufficient.

127. RDL 9/2013 amended Article 30(4) of the LSE, replacing it with the following text:

> *4. Additionally, and in the terms determined legally by Royal Decree of the Council of Ministers, for the remuneration for the sale of the energy generated, valued at market price, the facilities shall be able to receive a specific remuneration made up of one term per power unit installed, that covers, when appropriate, the investment costs of standard facility that cannot be recovered by the sale of energy and an end to the operation that covers, as applicable, the difference between the operating costs and revenue by participation in the market of such standard facility.*
>
> *For purposes of calculating this specific remuneration, the Law shall consider the following for any standard facility throughout its useful life and in reference to the business activity carried out by an efficient and well-managed company:*

---

[65] Royal Decree-Law 9/2013 dated 12 July 2013, on Urgent Measures to Guarantee the Financial Stability of the Electricity System (CL-0010, R-0064) ("**RDL 9/2013**").

[66] RDL 9/2013.

*a) The standard revenue for the sale of the energy generated, valued at the production market price.*

*b) The standard operating costs.*

*c) The standard value of the initial investment.*

*For these purposes, this shall never include the costs or investments determined by regulations or administrative acts which are not applicable across the entire Spanish territory. In the same way, this will only take into account those costs and investments that respond exclusively to the field of production of electricity.*

*As a result of the unique characteristics of the insular and extra-peninsular electricity systems, standard facilities may be defined exceptionally for each one of them.*

*This remuneration scheme does not exceed the minimum level necessary to cover the costs that allow for the facilities to compete equally with the rest of technologies in the market and that would lead to a reasonable rate of return by reference to the standard facility applicable in each case. Notwithstanding the foregoing, exceptionally the remuneration scheme may also include an incentive for investment and the execution within a specific time period when the facility in question involves a significant reduction of costs in the insular and extra-peninsular systems.*

*This reasonable rate of return shall focus, before tax, on the average yield in the secondary market of the Obligations of the State within ten years by applying the appropriate differential.*

*The parameters of the remuneration scheme may be revised every six years.*[67]

128. RDL 9/2013 directed MINETUR to approve a Royal Decree applicable to existing facilities receiving feed-in tariff remuneration, effective on the date of RDL 9/2013 (12 July 2013).[68]

---

[67] *Id.*, Article 1. The Spanish original of the last two paragraphs cited above reads as follows: "*Esta rentabilidad razonable girará, antes de impuestos, sobre el rendimiento medio en el mercado secundario de las Obligaciones del Estado a diez años aplicando el diferencial adecuado. Los parámetros del régimen retributivo podrán ser revisados cada seis años*".
[68] RDL 9/2013, Second final provision.

129. Law 24/2013 eliminated the distinction between the Ordinary Regime and the Special Regime and confirmed the changes contained in RDL 9/2013.[69] It authorized the establishment of a "**Specific Regime**" for remuneration of renewable energy facilities. Under the Specific Regime (which applies to Claimant's plants), remuneration for each category of installation type is premised on the standard income, standard operating costs and standard initial investment figure of an efficient, well-managed facility of that category.[70] Law 24/2013 also states:

> *The remuneration regime will not exceed the minimum level required to cover costs which allow production installations from renewable energy sources, high-efficiency and waste cogeneration to compete on an equal footing with the other technologies on the market and which allows a reasonable return to be earned on the installation type in each applicable case. This reasonable return will refer, before tax, to the mean yield on the secondary market for Ten-Year State Bonds, applying the appropriate differential.*[71]

130. As contemplated by RDL 9/2013, in June 2014 Spain adopted two measures providing greater details regarding the new remuneration scheme applicable to renewable energy facilities. These measures (RD 413/2014 and IET/1045/2014)[72] set out detailed parameters for various categories of "model facilities" on which remuneration was based. Consistent with RDL 9/2013, these remuneration parameters were effective as of the date of RDL 9/2013 (i.e., 12 July 2013). The remuneration parameters may be amended.[73]

131. Under these provisions, the target return at the beginning of 2020 will be set with reference to the average yield of 10-year Spanish State bonds for the 24-month period prior to the month of May of the year preceding the beginning of each regulatory period, increased by a to-be-specified spread. However, prior to 2020, the target return is instead based on the

---

[69] Law 24/2013 dated 26 December 2013, on the Electricity Sector (CL-0011, R-0047) ("**Law 24/2013**").

[70] Law 24/2013, Article 14(7).

[71] *Id*.

[72] Royal Decree 413/2014 dated 6 June 2014, which Regulates the Activity of Electricity Production from Renewable Energy, Cogeneration and Waste Sources (R-0080) ("**RD 413/2014**") and Order IET/1045/2014 dated 16 June 2014, Approving the Remuneration Parameters of Standard Facilities for Certain Electricity Production Facilities using Renewable Energy, Cogeneration and Waste Sources (CL-0033, R-0086) ("**IET/1045/2014**").

[73] RD 413/2014, Article 20.

average yield of ten-year bonds in the 120-month period prior to July 2013. For facilities whose remuneration was recognized prior to enactment of RDL 9/2013 (which includes Claimant's facilities) this initial rate is 7.398%.[74]

## B. Claimant and its Investment

### (1)    Claimant SolEs Badajoz

132.    Claimant, a company incorporated in 2009 under the laws of Germany, is a "*GmbH that acts as an investment vehicle (a 'special purpose vehicle' or SPV) or holding company for other investors.*"[75]  It is owned by SolEs XXI Projekt GmbH and SolEs XXII Projekt GmbH.  Each of these two entities is owned by a closed-end fund organized as a limited partnership under the laws of Germany for the purpose of investing in certain assets (PV plants in Spain).[76]  These funds (and others) were organized by the closed-end fund initiator Voigt & Coll GmbH, which had been established in 2005 for the purpose of investing in renewable energy and which manages the investments.[77]  Each of these funds has approximately 2,000 investors who are limited partners who hold almost all of the equity in those funds.  Voigt & Coll. GmbH markets the shares on the basis of an investment prospectus and acts as managing partner, maintaining a small ownership share in the investment.[78]  It owns 0.054% of the equity in SolEs XXI Projekt GmbH and 0.011% of the equity in SolEs XXII Projekt GmbH.[79]

133.    Claimant filed witness statements by Mr. Marcus Voigt, managing partner at Voigt and Coll. GmbH, and Mr. Thomas Hopp, legal counsel at Voigt and Coll. GmbH, both of whom also testified at the Hearing.

---

[74] *Id.*, Article 19; IET/1045/2014, Annex III.

[75] Cl. Mem., ¶ 168.  See also Commercial Register Excerpt for SolEs Badajoz and English translation dated 13 July 2015 (C-0001).

[76] Commercial Register Excerpt for SolEs XXI Projekt GmbH, SolEs XXII Projekt GmbH, SolEs 21 Gmbh & Co. KG and SolEs 22 Gmbh & Co. KG dated 17 July 2014 (C-0099).

[77] Commercial Registry Excerpt for Voigt & Coll. GmbH dated 23 July 2015 (C-0025). See also Cl. Mem., ¶¶ 166-172.

[78] First Hopp Statement, ¶¶ 7-9.

[79] Cl. Mem., ¶¶ 166-169.

(2)    **The Establishment of Fotones de Castuera and the Construction of the PV Plants Badajoz I and II**

134.  Fotones de Castuera ("**Fotones**"), currently owned by Claimant, was incorporated under Spanish law in 2007 for the purpose of constructing, installing and operating PV plants in the Autonomous Region of Extremadura, Spain.[80]  Fotones operates the two PV plants at issue in this case: Badajoz I and Badajoz II.[81]

135.  Between November 2007 and December 2009, Fotones followed the administrative processes at the municipality, regional and national level related to the establishment and operation of the "La Verilleja" PV plant, which corresponds to present-day PV plants Badajoz I and II. Construction of the plants was authorized on 2 April 2008.[82]  On 29 October 2008, Fotones submitted its first applications for registration of Badajoz I and Badajoz II in the Pre-allocation Tariff Registry.[83]  The resolution registering Badajoz I was issued on 10 December 2009 and the resolution registering Badajoz II was issued in February 2010.  These dates determined the FIT applicable to each plant.[84]

136.  Meanwhile, in September 2009, a Spanish firm called Assyce Fotovoltaica, S.L ("**Assyce**") acquired all the shares in Fotones.[85]  In December 2009, FS Solar Farms Spain GmbH

---

[80] Deed of Incorporation of Fotones de Castuera S.L. dated 26 March 2007 (C-0003).

[81] See, e.g., Resolution of the Directorate General of Energy Policy and Mines of the Ministry of Industry on the basis of which Badajoz I (facility "FTV-000140-2008-E") was registered with the Pre-allocation Tariff Registry, notified to Fotones de Castuera dated 11 December 2009 (C-0012) ("**2009 Pre-allocation Tariff Registration Badajoz I**") and Resolution of the Directorate General of Energy Policy and Mines of the Ministry of Industry on the basis of which Badajoz II (facility "FTV-000136-2008-E") was registered with the Pre-allocation Tariff Registry, dated 11 February 2010, as notified on 23 February 2010 (C-0013) ("**2010 Pre-allocation Tariff Registration Badajoz II**"); Cl. Mem., ¶ 141.

[82] Resolution of the General Directorate of Industrial and Energy Planning of the Regional Government of Extremadura dated 2 April 2008 (C-0095).

[83] Application by Fotones de Castuera before the Directorate General of Energy Policy and Mines for the inscription in the Tariff Registry of the 10 MW photovoltaic power plant located in the municipality of Castuera (C-0009); and Application by Fotones de Castuera before the Directorate General of Energy Policy and Mines for the inscription in the Pre-allocation Tariff Registry of the 10 MW photovoltaic power plant located in the municipality of Benquerencia de la Serena (C-0010).

[84] 2009 Pre-allocation Tariff Registration Badajoz I and 2010 Pre-allocation Tariff Registration Badajoz II.  See also Cl. Mem., ¶¶ 143-158.

[85] Cl. Mem., ¶¶ 141-142.

("**FS Solar**") purchased Fotones from Assyce and entered into an engineering, production and construction contract with Assyce for the turnkey construction of the power plants.[86]

137. Construction of Badajoz I was completed on 12 July 2010 and construction of Badajoz II was completed on 14 January 2011.[87] Claimant states that Badajoz I began producing and selling energy "*by the end of August 2010 at the latest*" and that Badajoz II began producing and selling energy "*by 8 February 2011 at the latest.*"[88]

**(3)    Claimant's Acquisition of Fotones**

138. On 25 March 2010, Claimant and FS Solar entered into an agreement for the purchase and sale of all shares of Fotones.[89] Some details regarding the acquisition and financing, as described by Claimant, follow:

> *In connection with this acquisition [...] SolEs Badajoz paid EUR 18,678,523 for the transfer to it of (i) a profit participating loan of EUR 2,517,671, (ii) an intercompany loan of EUR 15,987,197, which FS Solar had previously provided to the Company and (iii) the reimbursement of an amount of EUR 173,655 under the agreement on remuneration and reimbursement of expenses with the* [Landesbank Baden-Württemberg]*.*
>
> *In May 2010, SolEs Badajoz began the re-financing of Fotones de Castuera which included the execution of the following agreements:*
>
> *- (i) a new intercompany loan agreement entered into on 11 May 2010 by and among SolEs Badajoz and Fotones de Castuera for an amount of EUR 17,000,000 (the "IC Loan Agreement");*
>
> *- (ii) a credit facility agreement dated 25 May 2010 in relation to the erection and operation of Badajoz I and Badajoz II between Fotones de Castuera, as borrower and two German banks (the "Credit Facility Agreement"). Under this agreement Fotones de*

---

[86] Agreement between FS Solar Farms Spain and Assyce for purchase of shares of Fotones from Assyce dated 21 December 2009 (C-0015). See also Cl. Mem., ¶¶ 163-164.

[87] RfA, ¶ 19; Cl. Mem., ¶ 154.

[88] Cl. Mem., ¶ 157.

[89] Deed of the Share Purchase Agreement between FS Solar Farms Spain GmbH and SolEs Badajoz GmbH dated 25 March 2010 (C-0026).

> *Castuera was extended over EUR 93,475,000 in credit. This agreement was amended a number of times.* [...][90]

139. Claimant also describes agreements between Fotones and two German banks governing hedging transactions and a December 2012 participative loan agreement between SolEs Badajoz and Fotones de Castuera.[91]

140. Claimant states in summary that "*SolEs Badajoz thus obtained third party debt funding in the amount of EUR 93,475,000 and itself invested EUR 35.68 million (EUR 18,678,523 paid in accordance with* [a share purchase agreement] *and the IC Loan in the amount of EUR 17,000,000).*"[92]

141. According to Claimant's witness Thomas Hopp, the mix of equity provided by the investor and third party financing to effect the acquisition "*was a typical debt financing model for the Spanish PV sector. The project had a leverage of 72%, meaning that 72% of the initial capital was provided by loans and the remaining 28% was provided by equity. Based on my discussions with other investors and banks at the time, this was in the low range of leveraging for projects in the Spanish PV sector, where leverage was frequently closer to 80% debt financing*".[93]

## IV.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

142. In its Rejoinder, Claimant requests that the Tribunal:

    − *Declare:*

        ➢ *that it has jurisdiction to hear this dispute;*

        ➢ *that the Kingdom of Spain has breached Article 13 of the ECT by unlawfully expropriating SolEs Badajoz;*

---

[90] Cl. Mem., ¶¶ 183-184 (footnotes and emphasis in the original omitted).

[91] *Id.*, ¶ 184.

[92] *Id.*, ¶ 185. See also First Hopp Statement, ¶¶ 29-34.

[93] First Hopp Statement, ¶ 35.

> ➢ *that the Kingdom of Spain has breached Article 10(1) of the ECT by failing to accord fair and equitable treatment to SolEs Badajoz's investment;*

> ➢ *that the Kingdom of Spain has breached Article 10(1) of the ECT by violating the umbrella clause of the Treaty.*

– *Order the Kingdom of Spain:*

> ➢ *to compensate SolEs Badajoz for damage caused as a result of its violations of the ECT amounting to €81.8 million, including the necessary tax gross-up, which when adjusted for pre-Award interest as at July 2018 should result in an Award of €95.8 million;*

> ➢ *to pay interest at the rate of 5.94% compounded with quarterly rests on all compensation for damages awarded by the Tribunal until full payment of the Award;*

> ➢ *to reimburse SolEs Badajoz for any damage that may occur in the future as a result of its violations of the ECT; and*

> ➢ *to pay all of the costs and expenses of this arbitration, including SolEs Badajoz's legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and ICSID's other costs.*[94]

143.  In its Rejoinder, Respondent requests that the Tribunal:

> (a) *declare its lacks of jurisdiction to hear the claims of the Claimant, or if applicable their inadmissibility, in accordance with what is set forth in Section III of the present Memorial, referring to Jurisdictional Objections; and*

> (b) *Subsidiarily, in the event that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, to dismiss all the Claimant['s] claims regarding the Merits, as the Kingdom of Spain has not breached the ECT in any way, pursuant to Sections IV and V herein, referring to the Facts and the Merits, respectively;*

---

[94] Cl. Rej., ¶ 55.

(c) *Secondarily, to dismiss all the Claimant's claims for damages as the Claimant has no right to compensation, in accordance with Section V herein; and*

(d) *Order the Claimant to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment.*[95]

## V.    THE APPLICABLE LAW

144.  The Tribunal next addresses the applicable law, a matter to which the Parties devoted considerable attention in their post-hearing briefs.  The Parties recognize that the applicable law includes the ECT.[96]

145.  Both Parties have relied on the law of treaties, as reflected in the Vienna Convention on the Law of Treaties ("**VCLT**"), to which both Germany and Spain are parties.[97]  For convenience, the Tribunal sets out below certain provisions of the VCLT:

*Article 30. APPLICATION OF SUCCESSIVE TREATIES RELATING TO THE SAME SUBJECT-MATTER*

*1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.*

*2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.*

*3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in*

---

[95] Resp. Rej., ¶ 1260.

[96] See, e.g., Cl. Reply, ¶¶ 288, 312; Resp. C-Mem., ¶ 96; Resp. Rej., ¶ 55.

[97] The VCLT was introduced by Claimant as CL-0063 and by Respondent as RL-0010.  References to this treaty were made, *inter alia*, at Cl. Mem., ¶ 409; Resp. C-Mem., ¶ 145; and Cl. Reply, ¶ 336.

*operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.*

*4. When the parties to the later treaty do not include all the parties to the earlier one:*

*(a) As between States parties to both treaties the same rule applies as in paragraph 3;*

*(b) As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.*

*5. Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.*

*Article 31. GENERAL RULE OF INTERPRETATION*

*1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*

*2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*

*(a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;*

*(b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.*

*3. There shall be taken into account, together with the context:*

*(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*

*(b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*

*(c) Any relevant rules of international law applicable in the relations between the parties.*

*4. A special meaning shall be given to a term if it is established that the parties so intended.*

*Article 32. SUPPLEMENTARY MEANS OF INTERPRETATION*

*Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:*

*(a) Leaves the meaning ambiguous or obscure; or*

*(b) Leads to a result which is manifestly absurd or unreasonable.*

[…]

*Article 41. AGREEMENTS TO MODIFY MULTILATERAL TREATIES BETWEEN CERTAIN OF THE PARTIES ONLY*

*1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:*

*(a) The possibility of such a modification is provided for by the treaty; or*

*(b) The modification in question is not prohibited by the treaty and:*

> *(i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;*

> *(ii) Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.*

> *2. Unless in a case falling under paragraph l(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.*

146. The central disagreement between the Parties is the question whether EU law is applicable law in respect of the Tribunal's jurisdiction and in respect of the merits.

## A. The Parties' Positions

### (1)    Claimant's Position

147. According to Claimant, Article 42 of the ICSID Convention indicates that the applicable law is the rules of law agreed by the parties to the dispute.  In this case, the agreed rules of law are those of the ECT.  Article 26(6) of the ECT states that a tribunal "*shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*"  Thus, "*the applicable law is first and foremost the ECT.*"[98]  Claimant also invokes the law of treaties and the law of State responsibility.[99]

148. Claimant maintains that provisions of EU law (including rules regarding State aid) are not applicable law because those provisions are not "*principles of international law.*" It states that the European legal order is autonomous and is distinct from "*general public international law and from the ECT.*"[100]  Claimant considers that the CJEU has made clear that "*EU law and international law are radically separate.*"  It states that there is no room for the applicability of EU law to an ECT dispute.[101]

149. Claimant addresses the awards in *Electrabel v. Hungary* and *Blusun v. Italy,* on which Respondent relies.  Claimant asserts that the key holding in *Electrabel* was that "*EU law as a whole is part of the international legal order,*" which the tribunal in *Electrabel* stated in the context of rejecting claimant's argument that only EU treaties were part of international law.  According to Claimant, the tribunal in *Electrabel* did not consider the

---

[98] Cl. PHB, ¶ 5.  See also *id.*, ¶ 7.

[99] See, e.g., Cl. Mem., ¶¶ 593, 666-667; Cl. Reply, ¶ 683; Cl. PHB, ¶ 30.

[100] See Cl. PHB, ¶¶ 10-14.

[101] *Id.*, ¶¶ 24-25.

distinct nature of the EU legal order within the international legal order and did not take proper account of the characterization of the European legal order by the CJEU itself. Claimant asserts that the tribunal in *Blusun* failed to offer any explanation for applying EU law in that case.[102]

150. For these reasons, Claimant considers that "*EU law is simply not applicable to a dispute governed by the ECT, whether regarding jurisdiction, or the merits.*"[103] EU law is also inapplicable as domestic law, according to Claimant. Under Article 27 of the VCLT, a State cannot rely on domestic law as an excuse for failing to comply with treaty obligations.[104] "*EU law can only be relevant at most as fact since it is part of a legal order which is distinct from the ECT and the general public international order.*"[105]

### (2)    Respondent's Position

151. Respondent recognizes that the ECT is applicable law. Like Claimant, Respondent also relies on the law of treaties as applicable law. It has raised no objection to Claimant's reliance on the law of State responsibility.

152. Respondent asserts that EU law is applicable law. It states that EU law has a triple nature, as international law, as domestic law and as fact.[106] It maintains that the Treaty on the Functioning of the European Union ("**TFEU**") sets out rules that have priority over other rules. As an international treaty, the TFEU is international law between Germany and Spain, according to public international law. The Tribunal is bound by ECT Article 26(6) to apply "*applicable rules of and principles of international law.*"[107] Respondent also relies on a November 2017 decision of the European Commission that states that "*Union*

---

[102] *Id.*, ¶ 26 (referring to *Electrabel S.A v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability dated 30 November 2012 (CL-0070 and RL-0002) ("***Electrabel Decision***")).

[103] *Id.*, ¶ 28 (footnotes omitted).

[104] *Id.*, ¶¶ 29-31. Under Article 27 of the VCLT, a party to a treaty "*may not invoke the provisions of its internal law as justification for its failure to perform a treaty.*"

[105] Cl. PHB, ¶ 32.

[106] See *infra*, ¶ 161.

[107] See Resp. PHB, ¶ 19.

*law provides for a complete set of rules on investment protection*" and that EU law is part of the applicable law in an intra-EU dispute.[108]

153. Respondent maintains that applicable EU laws "*are not only the TFEU but also the relevant rules on energy matters of EU,*" such as directives.[109] Respondent states that this has been the conclusion of tribunals in *Electrabel*, *Blusun* and *Wirtgen v. Czech Republic*.[110] It considers that Claimant's observations regarding *Electrabel* and *Blusun* are nothing more than a disagreement with the conclusions of those tribunals. According to Respondent, the body of EU law applicable to this case includes the case law of the CJEU.[111]

154. Respondent also asserts that EU law is applicable as domestic law, as a relevant fact. It maintains that Claimant was aware of the applicability of EU law regarding state aid[112] and of the "*binding nature of EU Laws in the Spanish framework.*"[113] Spain considers that Claimant distorts Respondent's position on "*the relevance of EU law as internal Spanish law.*" Respondent does not invoke the applicability of EU law as an excuse for failing to comply with the ECT. Instead, "[t]*he relevance of its application as a fact is that the EU state aid rules are essential to assess the objective and reasonable Expectations of the Claimant.*"[114]

## B. The Tribunal's Analysis

155. In articulating their positions with respect to applicable law, both Parties invoke Article 26(6) of the ECT, which states that a tribunal "*shall decide the issues in dispute in*

---

[108] Resp. PHB, ¶ 23 (emphasis omitted) and ¶ 35, referring to a communication to Respondent's Minister for Foreign Affairs and Cooperation from the European Commission, entitled "Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste", State Aid SA.40348 (2015/NN) dated 10 November 2017 (C-0188) ("**SA40348 (2015/NN)**").

[109] Resp. PHB, ¶ 27.

[110] *Id.*, ¶ 28.

[111] *Id.*, ¶ 36.

[112] *Id.*, ¶¶ 30-33.

[113] *Id.*, ¶ 43.

[114] *Id.*, ¶ 39 (emphasis omitted).

*accordance with this Treaty and applicable rules and principles of international law*." They disagree on whether EU law is part of "international law."

156. The positions of both Parties are premised on the view that Article 26(6) governs not only the law applicable to the merits, but also the law that governs the Tribunal's jurisdiction. Thus, the Tribunal first considers whether the phrase "issues in dispute" in Article 26(6) has a scope that extends beyond the dispute on the merits to determine the law that governs the Tribunal's jurisdiction.

157. Paragraph (6) of Article 26 of the ECT must be interpreted in its context, i.e., in light of other provisions of the Treaty,[115] including the other paragraphs of Article 26, entitled "*Settlement of Disputes between and Investor and a Contracting Party*". Article 26(1) states that "[d]*isputes between a Contracting Party and an Investor of another Contracting Party* […] *which concern an alleged breach of an obligation of* […] *Part III*" of the ECT "*shall, if possible, be settled amicably*".[116] Part III of the ECT contains the substantive standards of investment treatment, including those on which Claimant relies in this case. Paragraph (2) is the first of a series of paragraphs of Article 26 that address the circumstances in which "*such disputes can not be settled according to the provisions of paragraph (1)*." Absent an indication to the contrary, the phrase "issues in dispute" in paragraph (6) of Article 26 can be expected to have the same scope as paragraph (1), which refers to disputes that "*concern an alleged breach of an obligation* […] *under Part III*," in other words, to the merits of a dispute. If the drafters of the ECT had intended the scope of Article 26(6) to extend beyond Part III of the ECT, such that it governed the law to be applied by Tribunal to decide whether it had jurisdiction over a dispute, they could have so indicated. Article 16 of the ECT, which addresses the relationship between the ECT and other treaties, for example, refers both to Part III and Part V (Dispute Settlement).[117]

---

[115] VCLT, Article 31(1) and 31(2).

[116] ECT, Article 26(1).

[117] Article 16 addresses situations in which "*two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty*."

158. Claimant asserts jurisdiction on the basis of Article 25 of the ICSID Convention and Article 26 of the ECT.  For purposes of arbitration within the framework of the ICSID Convention, the Tribunal considers that Article 26(6) operates as a choice of law provision, as contemplated by Article 42(1) of the ICSID Convention, which provides:

> The Tribunal <u>shall decide a dispute in accordance with such rules of law as may be agreed by the parties</u>. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable. (Emphasis added).

159. Thus, Article 26(6) contains the agreement of the disputing parties as to the law to be applied to the dispute that concerns an alleged breach of an obligation of a Contracting Party under Part III of the ECT and states the law applicable to the merits.  It does not assist the Tribunal in addressing the effect of EU law on its jurisdiction. This matter will be considered when the Tribunal addresses Respondent's objections to jurisdiction.

160. Turning to the law applicable to the merits, Article 26(6) requires the Tribunal to decide the dispute in accordance with the ECT and "*applicable rules and principles of international law.*"  These applicable rules and principles unquestionably include the law of treaties, and, where applicable, the law of State responsibility.  The Tribunal focuses here on Claimant's contention that EU law is not "international law" for purposes of Article 26(6).

161. Respondent has asserted that EU law has a "triple nature," as international law, as domestic law and as fact.  The ECT does not identify domestic law as a source of applicable law.  The Tribunal therefore considers that, when EU law is understood to operate as Spain's domestic law, it operates as fact.[118]  For purposes of determining the applicable law, the Tribunal sets aside Respondent's invocations of EU law as domestic law or fact (to be considered when the Tribunal reaches the merits) and addresses the question whether

---

[118] See *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award dated 23 September 2010 (RL-0039) ("***AES Summit***"), ¶ 7.6.6, describing EU competition law as having a dual nature, as an international law regime and as national law, which is to be considered as fact.

EU law provides "*applicable rules and principles of international law*," pursuant to ECT Article 26(6).

162. Claimant alleges breaches of the ECT, which, as the Parties recognize, is to be interpreted and applied pursuant to the law of treaties. In the interpretation and application of the ECT, the ECT itself and the law of treaties can call for examination of other treaties. A clear example of this possibility is found in Article 16 of the ECT, pursuant to which the substantive protections of another "international agreement" cannot derogate from the investor protections contained in Part III of the ECT if the provisions of the ECT are more favorable to the Investor or the Investment than are the provisions of the other international agreement. More generally, when the ECT is interpreted and applied pursuant to the VCLT, treaties other than the ECT could also play a role as applicable law in a variety of ways, e.g., as agreements relevant to the interpretation of the ECT (pursuant to Article 31 of the VCLT) or as agreements that modify the ECT (pursuant to VCLT Article 40). Thus, under both the ECT and the law of treaties, there are circumstances in which the provisions of a treaty other than the ECT could have an impact on the substantive law to be applied in a dispute in which a breach of Part III of the ECT is alleged and thus can play a role as applicable law.

163. Under Claimant's approach, however, EU treaties would not be "international agreements" that fall with within the scope Article 16 of the ECT, nor would they be considered "treaties" or "agreements" under the VCLT. The VCLT defines a treaty as "*an international agreement concluded between States in written form and governed by international law*[.]"[119] In the view of the Tribunal, EU treaties are clearly "international agreements" under ECT Article 16 and "treaties" and "agreements" under the VCLT. Accordingly, the Tribunal considers that EU treaties cannot be excluded as potential sources of "*applicable rules and principles of international law*" within the meaning of ECT Article 26(6).

---

[119] VCLT, Article 2(1)(a).

164. However, under Article 16 of the ECT, a provision of another treaty can only operate as the rule of decision that supplants the investment protection provisions of Part III of the ECT if that other treaty provides substantive protections that are more favorable to investors than are the investment protection provisions of Part III of the ECT.  Claimant has not invoked any such provision in an EU treaty, nor does the Tribunal find one to exist.

165. *A fortiori*, even assuming that an EU instrument that is derived from an EU treaty (such as a decision of the European Commission) could be regarded as international law for purposes of Article 26(6) of the ECT, it follows from Article 16 of the ECT that the provisions of an EC decision could replace an investor protection provisions of the ECT as a rule of decision only if the EC decision contained investor protection provisions that were more favorable to investors than are the provisions of Part III of the ECT.  No such provision has been identified in this proceeding.

166.  Respondent asserts that European Commission decisions on State aid are binding, referring  in particular on a 2017 decision in which the European Commission concluded that Spain's current regime for remuneration of renewable energy providers meets EU requirements for State aid.[120]  Respondent points to the finding of the tribunal in *Electrabel* that EU law was applicable law (in a case arising under the ECT), including the EU "*droit dérivé*", such as decisions of the European Commission.[121]  The tribunal in *Electrabel* made this observation in a case in which the claimant's "principal claim" was that the respondent had violated the ECT by terminating an agreement "*following a legally binding order of the European Commission*," which the claimant did not dispute was legally binding on the respondent under EU law.[122]  By contrast, even assuming that some statements in the 2017 decision could  be "binding" on Spain under EU law, the 2017 decision invoked by Respondent could not have operated as law governing Respondent's imposition of the Disputed Measures on Claimant and other investors in 2010-2013.

---

[120] SA.40348 (2015/NN).

[121] *Electrabel* Decision, ¶ 4.122 (cited in Resp. PHB, ¶ 28).

[122] *Electrabel* Decision, ¶ 2.24.

167. For the forgoing reasons, the Tribunal concludes that the applicable law in this case is the Energy Charter Treaty, interpreted pursuant to the law of treaties and supplemented by the customary international law of State responsibility. For the reasons stated in the preceding paragraphs, EU law is not part of the law applicable in this case.

## VI.    PRELIMINARY OBJECTIONS TO JURISDICTION AND ADMISSIBILITY

168. Claimant asserts jurisdiction on the basis of Article 25 of the ICSID Convention and Article 26 of the ECT. It maintains that all requirements of Article 25 of the ICSID Convention are met.[123] Respondent has not disputed that the jurisdictional requirements of the ICSID Convention have been met.

169. The Tribunal is satisfied that the requirements of Article 25 of the ICSID Convention are met:

- Spain has been an ICSID Contracting State since 17 September 1994.

- Claimant is a company incorporated in Germany, which has been an ICSID Contracting State since 18 May 1969, and thus is a "*national of another Contracting State*" within the meaning of Article 25(2)(b) of the ICSID Convention.

- Claimant's shareholding, interests and other rights in Fotones constitute an "*investment*" for purposes of Article 25(1) of the ICSID Convention.

- There is a legal dispute between Claimant and Respondent arising directly out of Spain's alleged acts and omissions with respect to Claimant's investment in Spain which, according to Claimant, violate Respondent's obligations under the ECT.

170. Jurisdiction pursuant to Article 25 of the ICSID Convention also depends on the Parties' consent to the jurisdiction of the Centre. Claimant maintains that Spain has given its consent pursuant to Article 26 of the ECT. However, Respondent has lodged two objections to the Tribunal's jurisdiction, which can be understood as a contention that it did not consent to the Tribunal's jurisdiction pursuant to Article 25 of the ICSID Convention and Article 26 of the ECT:

---

[123] RfA, ¶ 48.

171. First, Respondent maintains that the Tribunal lacks jurisdiction to decide this case. It argues that Claimant is not a protected investor since Article 26 of the ECT does not apply to disputes between a national of the EU and an EU member State and asserts that EU law takes precedence over the ECT and bars the Tribunal's jurisdiction.[124] Claimant opposes this objection and submits that the Tribunal has jurisdiction.[125]

172. Second, Respondent maintains that Spain's 7% tax on the value of the production of electrical energy through the enactment of Law 15/2012 (the "**TVPEE**"), is a taxation measure that is excluded from the scope of ECT Article 10(1) (which includes the FET standard and the umbrella clause), by virtue of ECT Article 21. Accordingly, the Tribunal lacks jurisdiction over Claimant's claim of alleged breaches of Article 10(1) of the ECT based on the adoption of the TVPEE.[126] Claimant opposes this objection and submits that the Tribunal has jurisdiction to decide alleged violations of Article 10(1) of the ECT in relation to the enactment of Law 15/2012.[127]

173. Respondent also submits an admissibility objection. It argues that Claimant cannot submit at the present time claims concerning an alleged breach of Article 13 of the ECT on expropriation related to Respondent's adoption of the TVPEE. Respondent acknowledges that taxation measures are applicable to Article 13 of the ECT; however, Article 21(5) of the ECT requires Claimant (or the Tribunal, as applicable) to first refer the issue to the competent national tax authorities for a six-month period.[128] Claimant opposes this objection and submits that its claim on expropriation based on the enactment of Law 15/2012 is admissible.[129]

174. Before setting out the Parties' positions in respect of Respondent's preliminary objections, the Tribunal makes three preliminary points.

---

[124] Resp. C-Mem., ¶¶ 5, 50-101; Resp. Rej., ¶¶ 88-111.

[125] Cl. Reply, ¶¶ 279-312; Cl. Rej., ¶¶ 4-32.

[126] Resp. C-Mem., ¶¶ 6, 102-209; Resp. Rej., ¶¶ 112-179.

[127] Cl. Reply, ¶¶ 313-338; Cl. Rej., ¶¶ 33-46.

[128] Resp. C-Mem., ¶¶ 7, 210-229; Resp. Rej., ¶¶ 180-198.

[129] Cl. Reply, ¶¶ 339-343; Cl. Rej., ¶¶ 47-54.

175. First, although the main thrust of each Party's position on the preliminary objections has remained constant, there has been considerable variation in the precise formulations used by the Parties in support of their positions. A number of awards relating to the renewable energy sector have been issued or made public during the pendency of this case, and the Parties understandably have taken into account those awards as they have become available. The summary of Party positions that appears below is intended to set out their positions, without capturing each and every point made by a Party. The Tribunal has considered the various arguments presented by each Party in support of its positions, including the arguments not summarized below.

176. Second, Respondent took note in the written pleadings of a case that was then pending before the CJEU, which presented the question of the compatibility between a bilateral investment treaty and EU law.[130] The CJEU delivered its Judgment in that case, *Achmea v. Slovakia*,[131] after the Parties had completed their written submissions and prior to the Hearing. The Parties presented their respective views on the implications of the *Achmea* Judgment at the Hearing. For the convenience of the reader, the Tribunal will summarize that Judgment in paragraphs 190-198 below before it sets out the Parties' positions on the Judgment.

177. Third, as noted in Procedural Order No. 6, the Parties agreed at the Hearing that their post-hearing briefs would not address questions of jurisdiction and admissibility. The summary of Party positions on these matters is based on positions taken by the Parties in their written pleadings and at the Hearing.

---

[130] Resp. Rej., ¶ 91, citing Request for a Preliminary Ruling from the Bundesgerichtshof (Germany) lodged on 23 May 2016 – *Slovak Republic v. Achmea BV* (Case C-284/16) (R-0320).

[131] *Achmea v. Slovakia, supra* ¶ 59.

**A. Lack of Jurisdiction *Ratione Personae* in view of an Intra-EU Dispute**

(1)  **The Parties' Positions**

a.  ***Respondent's Position***

178.  Among the various arguments that Respondent has presented in support of its jurisdictional objection *ratione personae,* there are two main strands.

179.  First, Respondent maintains that the ECT should be interpreted such that there is no jurisdiction over a dispute brought by an Investor of one ECT Contracting Party against another Contracting Party if both Contracting Parties are also Member States of the European Union. It advances an implied exception to Article 26 of the ECT for these "**intra-EU disputes,**"[132] which it supports with reference to the text of various ECT provisions and the purposes of the ECT. It maintains that the ECT was negotiated against the backdrop of a principle of primacy of EU law, which must be taken into account in interpreting the Treaty.

180.  The second strand of Respondent's jurisdictional objection, which would apply even if the Tribunal rejected Respondent's interpretation of the ECT, is the contention that EU law has priority over other treaty obligations of EU Member States and, in particular, that the TFEU takes precedence over the dispute settlement provisions of the ECT. At the Hearing, it placed particular emphasis on the Judgment of the CJEU in *Achmea v. Slovakia.*[133]

***(i)  The Contention that there is an Implied Exception from Article 26(1) of the ECT for Intra-EU disputes***

181.  Respondent notes that the dispute resolution mechanism set forth in Article 26(1) of the ECT requires the dispute to be between a Contracting Party and an investor of another Contracting Party.[134] Respondent argues that this provision "*inevitably implies*" the

---

[132] The Tribunal uses the term "intra-EU dispute" to refer only to the situation in the present case, in which both the claimant's State of nationality and the respondent State were members States of the European Community when the ECT was negotiated and ratified by the two States and the claimant invoked the ICSID Convention and the ECT as the basis for jurisdiction. It takes no position on other circumstances in which expressions such as "intra-EU dispute" are sometimes used.

[133] *Achmea v. Slovakia, supra* ¶ 59.

[134] See, e.g., Resp. C-Mem., ¶ 51.

exclusion from Article 26 of disputes between EU nationals and EU member States, in relation to intra-EU disputes and investments made within the EU ("**intra-EU investments**").[135]

182.   Respondent explains that Germany (Claimant's country of nationality) and Spain are member States of the EU, as was the case at the time of their respective ratifications of the ECT.  As such, they were unable to contract obligations between themselves within the framework of the EU internal energy market.  In turn, according to Respondent, the EU, as the organization to which its member States had granted their sovereignty with regard to the internal energy market, became a Contracting Party to the ECT.[136]  Claimant is therefore not an Investor of another Party, nor is it from the "area" of another Contracting Party, as required by Article 26(1) of the ECT.[137]  Respondent concludes that Article 26 of the ECT cannot generate any obligations between EU member States,[138] and Claimant cannot therefore be considered as "*an Investor of another Contracting Party*", as required under this provision.

183.   Respondent considers that there is "*literal recognition in the ECT itself*"[139] that the ECT does not apply to intra-EU investments and intra-EU disputes.  The conclusion follows from the interpretation, purpose and context of the ECT.[140]  In Respondent's view, from a literal interpretation of provisions such as Articles 1(2), 1(3), 25 and 26(6) of the ECT, the following can be observed:

- *Article 1(2)*: Regional Economic Integration Organisations ("**REIOs**") are included in the definition of Contracting Parties, and the EU is the only REIO that is a party to the ECT.[141]

---

[135] *Id.*

[136] *Id.*, ¶¶ 5, 52-54.

[137] Resp. Rej., Section III.A.

[138] Resp. C-Mem., ¶ 84.

[139] *Id.*, ¶ 68.

[140] *Id.*, ¶¶ 69-90.

[141] *Id.*, ¶ 69.

- *Article 1(3)*: The definition of REIOs explicitly recognizes their authority to take decisions binding on their member States in respect of certain matters a number of which are governed by the ECT. If the ECT had not wanted to consider that part of the matters comprised by it were exclusively decided by the EU, such formulation would not have been adopted.[142]

- *Article 25*: This provision excludes from the application of the ECT's most favored nation clause the preferential treatment applicable between parties to an economic integration agreement, thereby preventing the intra-EU investment promotion and protection system from extending to ECT signatory States that are not EU member States.[143]

- *Article 26(6)*: This provision sets forth that disputes shall be decided in accordance with the ECT "*and applicable rules and principles of international law.*" In this case, EU law is applicable international law and its rules and principles must be applied with the same hierarchy as the ECT itself. Therefore, the initiation of arbitration proceedings under the ECT by an EU investor against an EU member State would be contrary to EU law and incompatible with the content of Article 26(6).[144]

184. According to Respondent, to consider that intra-EU disputes are covered by the ECT would defeat the purpose of the ECT. The intention of the EU and its member States in concluding the ECT was not to cover the area of intra-EU investments, which had been already covered by EU law.[145] Respondent relies on the preamble of the ECT to indicate that its purpose was to promote industrial cooperation between the East and the West, and to speed up the economic recovery of Eastern Europe through cooperation in the energy sector.[146]

185. In support of its proposed interpretation of the ECT, Respondent asserts that the primacy of EU law is "*the essential Principle*" upon which its jurisdictional objection *ratione personae* rests.[147] The ECT must be interpreted in light of the jurisprudence of the CJEU that was in effect when the ECT was concluded. Respondent explains that the principle of

---

[142] *Id.*, ¶¶ 70-71.

[143] *Id.*, ¶ 74.

[144] *Id.*, ¶¶ 76-77, 96.

[145] *Id.*, ¶ 87.

[146] *Id.*, ¶¶ 88-89.

[147] Resp. Rej., ¶ 92. See also *id.*, ¶¶ 93-104.

primacy was first established by the CJEU in the *Costa v. ENEL* judgment of 1964 and means that EU law has preference and prevails over the application of any other law (national or international) when regulating internal EU relations.[148]  It also invokes a 1991 Opinion in which the CJEU found the draft Agreement to Create a European Economic Area to be incompatible with the exclusive jurisdiction of the Court of Justice, in light of Article 219 of the European Economic Community (EEC) Treaty (the predecessor of Article 344 of the TFEU), pursuant to which Member States undertook not to submit disputes concerning interpretation or application of the EEC Treaty to any method of dispute settlement not provided by the EEC Treaty.[149]

186. Respondent considers that the principle of primacy of EU law is explicitly recognized in Article 25 of the ECT as it refers to 'preferential treatment'.[150]  The European Communities made an explicit declaration in relation to Article 25 to the effect that its application would only allow those derogations necessary to safeguard the preferential treatment resulting from the European Communities.[151]

187. Respondent claims that the principle of primacy of EU law should be respected because the present dispute affects essential elements of EU Law (such as State aid, free movement of capital and freedom of establishment), which fall under the competence of the EU's own judicial system and, ultimately, of the CJEU.[152]

188. Respondent also considers that to uphold jurisdiction in this case would be contrary to the principle of non-discrimination between EU investors.  This would allow Claimant to resort to a dispute settlement mechanism outside the EU's judicial system to resolve what is an intra-EU dispute, to which Spanish investors have no access.[153]

---

[148] Resp. Rej., ¶¶ 93-94, citing CJEU Judgment of 15 July 1964, delivered in case 6/64, *Flaiminio Costa v. ENEL* (R-0235) ("***Costa v. ENEL***").

[149] Resp. C-Mem., ¶¶ 80-84, citing Opinion 1/91 of 14 December 1991 issued by the Court of Justice of the European Union regarding the "Agreement to Create a European Economic Area" (R-0001) ("**Opinion 1/91**").

[150] See ¶ 185 *supra*.

[151] See Resp. Rej., ¶¶ 95-96.

[152] Resp. Rej., ¶ 103, citing Opinion 1/91.

[153] Resp. Rej., ¶ 102.

189. Respondent also recalls that the European Commission has concluded that the ECT does not apply to intra-EU disputes; that the ECT should be interpreted in harmony with EU law to avoid treaty conflict, and that in case of conflict, EU law prevails.[154]  Respondent also refers to the writings of certain commentators and asserts that its position is supported by doctrine.[155]

### *(ii) The Effect of the Treaty on the Functioning of the European Union (Including the Implications of Achmea v. Slovakia)*

190. Before setting out Respondent's position, the Tribunal summarizes the relevant parts of the Judgment of the CJEU in *Achmea v. Slovakia*.

191. In *Achmea*, the CJEU considered a request from the Federal Court of Justice of Germany for a preliminary ruling:

> *(1) Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?*
>
> *If Question 1 is to be answered in the negative:*
>
> *(2) Does Article 267 TFEU preclude the application of such a provision?*
>
> *If Questions 1 and 2 are to be answered in the negative:*

---

[154] See, e.g., Resp. Rej., ¶ 109, citing SA.40171 (2015/NN).

[155] Resp. C-Mem., ¶¶ 91-93, citing Bruno Poulain, "*Developpements récents du droit communautaire des investissements internationaux*", Revue Générale de Droit International Public, C XIII/2009, 4 (RL-0060), p. 881; and Jan Kleinheisterkamp, "*Investment protection and EU Law: the intra- and extra- EU dimension of the Energy Charter Treaty*", Journal of International Economic Law 15 (1), Oxford University Press, 2012 (RL-0064), pp. 101, 103 and 108.

> *(3) Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?*[156]

192. Article 267 TFEU provides in its relevant part:

> *The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:*
>
> > *(a) the interpretation of the Treaties;*
> >
> > *(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;*
>
> *Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.*
>
> *Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.*

193. Article 344 of the TFEU provides that: "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*"[157]

194. The request of the Federal Court of Justice was made in the context of a proceeding to enforce an award against Slovakia issued by a tribunal constituted pursuant to the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, to which Slovakia succeeded in 1993 (the "**Netherlands-Slovakia BIT**"). As the CJEU noted, Slovakia acceded to the EU in 2004.[158]

---

[156] *Achmea*, ¶ 23.

[157] The CJEU does not analyze the impact of Article 18 of the TFEU, so it is not reproduced here.

[158] *Achmea*, ¶ 6.

195. In Article 8 of the Netherlands-Slovakia BIT, the Contracting Parties consent to arbitration of "*disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter*" if the dispute has not been settled amicably within a period of six months.[159]  Article 8(6) of the BIT also addresses the applicable law:

> *The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:*
>
> - *the law in force of the Contracting Party concerned;*
>
> - *the provisions of this Agreement, and other relevant Agreements between the Contracting Parties;*
>
> - *the provisions of special agreements relating to the investment;*
>
> - *the general principles of international law.*[160]

196. In respect of the first and second questions of the Federal Court of Justice, related to Articles 267 and 344 TFEU, the CJEU framed the issues as follows:

> [T]*he referring court essentially asks whether Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*[161]

197. According to the CJEU, an arbitral tribunal convened pursuant to the Netherlands-Slovakia BIT "*may be called on to interpret or indeed to apply EU law,*" pursuant to Article 8(6) of the BIT.[162]  However, because such an arbitral tribunal is not a court or tribunal of a Member State, it is not entitled to seek a preliminary ruling from the CJEU.  In

---

[159] See *Slowakische Republik v. Achmea BV* (CJEU Case No. C-284/16), Opinion of the Advocate General dated 19 September 2017 (CL-0119) ("**Opinion of the Advocate General**"), ¶ 13 (citing the Netherlands-Slovakia BIT, Article 8(1) and (2)).

[160] See Opinion of the Advocate General, ¶ 13 (citing the Netherlands-Slovakia BIT, Article 8(6)).

[161] *Achmea*, ¶ 31.

[162] *Id.*, ¶ 42.

addition, an award rendered by such a tribunal is subject only to limited review in the courts of EU Member States.[163]

> *Consequently, having regard to all the characteristics of the arbitral tribunal mentioned in Article 8 of the BIT […], it must be considered that, by concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.*[164]

198. The CJEU therefore ruled:

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*[165]

199. In its written pleadings, Respondent maintained that the EU legal system for the protection of EU investors prevails over the protection of investors that is provided by the ECT. In the present case, Claimant's investment was made within the framework of the Internal Market in Electricity of the EU. It follows that the dispute should be resolved within the EU legal system, per Article 344 of the TFEU.[166] Otherwise, if the Tribunal were to resolve the dispute presented in this arbitration, it would have to deliver an opinion on the

---

[163] *Id.*, ¶¶ 49, 53.

[164] *Id.*, ¶ 56.

[165] *Id.*, ¶ 62 (emphasis omitted).

[166] Treaty on the Functioning of the European Union, Consolidated version published in the Official Journal of the European Union on 26 October 2012 (RL-0001) ("**TFEU**"). See, e.g., Resp. C-Mem., ¶¶ 55, 78, 95.

rights of EU investors in the framework of the Internal Market in Electricity, which would interfere with the competence of the EU judicial system.[167]

200. Thus, Respondent submits that EU law precludes recourse to any dispute settlement mechanism other than that established by its treaties, which may interfere with its Internal Market (i.e., an area without internal borders that ensures the free movement, *inter alia*, of services and capital).[168]  Such market includes an Internal Market in Electricity, which is regulated, *inter alia*, through a number of directives.[169]  Spain asserts that the promotion of investment that it made in renewable energies was enshrined in the obligations that it undertook, as an EU member State, to achieve the aims established by these EU directives.[170]  Respondent argues that, because the EU jurisdictional system has the exclusive competence to interpret EU Law, and one of the main aims of the aforementioned directives is to protect investors, the institutional and judicial framework of the EU provides the appropriate means and legal remedies in case the rights of EU nationals are violated.[171]

201. According to Respondent, although the Judgment in *Achmea* involved a bilateral investment treaty, the reasoning of the CJEU in *Achmea* applies equally to the ECT.  Respondent points out that the CJEU interpreted the TFEU to preclude an investor-State arbitration provision in "*an international agreement concluded between Member States... [s]uch as*" the BIT at issue in that case, and thus is not limited to an agreement between two Member States.[172]  The jurisprudence on which the CJEU relies in *Achmea* includes prior decisions in which the CJEU addressed multilateral treaties.[173]  Respondent

---

[167] Resp. C-Mem., ¶ 57.

[168] *Id.*, ¶¶ 56, 59-60.

[169] *Id.*, ¶¶ 61, 239, and fn. 4.

[170] *Id.*, ¶ 62.

[171] *Id.*, ¶¶ 64-65, 86.

[172] Rev. Tr. Day 1 (ENG), 143:4 to 143:6 (Mr. Torres Gella).

[173] Rev. Tr. Day 1 (ENG), 144:8 to 144:24 (Mr. Torres Gella).

maintains that the ruling of the CJEU in *Achmea* confirms the case law since CJEU Opinion 1/1991 regarding the European Economic Area.[174]

202. Respondent states that the "prerequisites" set out in *Achmea* are met in the present case: The Tribunal has to interpret and apply EU law. The CJEU cannot exercise its powers through a preliminary ruling, and, under the ICSID Convention, the review of the award rendered by the Tribunal "*cannot be made by the European Court of Justice totally.*" As a result, the Tribunal lacks jurisdiction.[175]

203. Respondent also states that:

> *The Achmea case ruling affirms that the principle of primacy of the European Union law precludes that intra-European Union disputes regarding investments could be solved by arbitral tribunals. This is admitted under the international law, because Article 41(b) of the Vienna Convention allows that two or more of the parties of a multilateral treaty may modify a multilateral treaty when it affects only procedural rules.*
>
> *So the international law allows that in 2008 the Member States of the European Union modified between them the priority of the methods to resolve disputes between the Member States.*[176]

204. Respondent cites in support of its position the November 2017 decision communicated by the European Commission to Spain.[177] In that communication, the Commission referred to the pendency of "*investor-State arbitration against Spain on the basis of the Energy Charter Treaty against the changes brought by the Royal Decree 413/2014 to beneficiaries of the premium remuneration scheme it replaces.*"[178] It stated, in relevant part:

> *The Commission considers that any provision that provides for investor-State arbitration between two Member States is contrary to Union law; in particular, this concerns Article 19(1) TEU, the principles of the freedom of establishment, the freedom to provide services and the free movement of capital, as established by the*

---

[174] Rev. Tr. Day 1 (ENG), 147:9 to 148:9 (Mr. Torres Gella).

[175] Rev. Tr. Day 1 (ENG), 149:5 to 149:20 (Mr. Torres Gella).

[176] Rev. Tr. Day 1 (ENG), 148:16 to 149:3 (Mr. Torres Gella).

[177] Rev. Tr. Day 1 (ENG), 142:7 to 142:13, citing SA40348 (2015/NN) (Mr. Torres Gella).

[178] SA40348 (2015/NN), ¶ 159.

*Treaties (in particular Articles 49, 52, 56, and 63 TFEU), as well as Articles 64(2), 65(1), 66, 75, 107, 108, 215, 267 and Article 344 TFEU, and the general principles of Union law of primacy, unity and effectiveness of Union law, of mutual trust and of legal certainty.*

*[…] Union law provides for a complete set of rules on investment protection (in particular in Articles 49, 52, 56, and 63 TFEU, as well as Articles 64(2), 65(1), 66, 75 and 215 TFEU). Member States are hence not competent to conclude bilateral or multilateral agreements between themselves, because by doing so, they may affect common rules or alter their scope. As the two sets of rules on investment protection potentially applicable between an EU Member State and an investor of another State (i.e. the Treaties and intra-EU bilateral investment treaties (BITs) or the ECT in an intra-EU setting) are not identical in content and are applied by different adjudicators, there is also a risk of conflicts between the international investment treaty and Union law.*

*[…] The resulting treaty conflict is to be solved, in line with the case-law of the Court, on the basis of the principle of primacy in favour of Union law. For those reasons, ECT does not apply to investors from other Member States initiating disputes against another Member States.*[179]

### b. *Claimant's Position*

205. Claimant opposes Respondent's jurisdictional objection *ratione personae*. In its view, the ECT applies to intra-EU investments and intra-EU disputes and provides jurisdiction over its claims.

206. Claimant submits that it is a protected investor under Article 26 of the ECT and that there is no implied exception to the ECT for intra-EU investments or intra-EU disputes. It also opposes Respondent's argument that the EU legal system prevails over the investor protections of the ECT and disagrees with the conclusions that Respondent draws from the *Achmea* Judgment.

---

[179] *Id.*, ¶¶ 160-163 (footnotes omitted).

### *(i) The ECT contains no implied exception for intra-EU investments*

207. Claimant states that the Tribunal has jurisdiction to decide this case since there exists a dispute between a "Contracting Party" and an "Investor of another Contracting Party", as required under Article 26 of the ECT.

208. Claimant indicates that the Parties satisfy the definitions of these terms, as set out in Articles 1(2) and 1(7)(a)(ii) of the ECT, respectively. Spain qualifies as a "Contracting Party" as it is a "*state* [...] *which has consented to be bound by* [the ECT] *and for which the Treaty is in force.*"[180] Claimant is "*a company* [...] *organized in accordance with the law applicable in* [a] *Contracting Party*" (in this case, a company organized under the laws of Germany). Therefore, Claimant is an Investor of a Contracting Party.[181] By extension, Claimant's investments in Spain qualify as "*an Investment of [an Investor of a Contracting Party] in the Area of [another] Contracting Party*" under Article 26(1) of the Treaty.[182]

209. Accordingly, because Spain is a Contracting Party and SolEs Badajoz is an Investor from the Area of another Contracting Party, according to the terms of the ECT, Claimant concludes that the Tribunal has jurisdiction *ratione personae* in this case.[183]

210. Claimant also disputes the conclusions that Respondent draws from various provisions of the ECT. In Claimant's view, from a reading of provisions such as Articles 1(2), 1(3), 25 and 26(6) of the ECT, which have been invoked by Respondent to imply that the Tribunal lacks jurisdiction, the following can be observed:

- *Article 1(2)*: Claimant agrees with Respondent that this provision provides the definition of a REIO, the EU being the only REIO that is a party to the ECT.[184] Claimant argues that, as a REIO, the EU is a party to the ECT, and the member States of the EU are also parties to the ECT and are each bound by the ECT, in their own capacity. Claimant submits that the ECT makes no exception to jurisdiction as to a dispute between State that is a party to the ECT and an investor of another State party to the ECT on the basis that both States are also members of

---

[180] Cl. Reply, ¶ 282.
[181] Cl. Reply, ¶ 283; Cl. Rej., ¶ 4.
[182] Cl. Rej., ¶ 4.
[183] See Cl. Rej., ¶ 7.
[184] Cl. Reply, ¶ 305.

the same REIO.  Accordingly, there cannot be an exception to jurisdiction for intra-EU disputes under the ECT.[185]

- *Article 1(3)*: Claimant disagrees with Respondent's interpretation of this provision.  Claimant notes that Spain cannot establish that the EU (then the European Economic Community ("**EEC**")) member States transferred competence over energy investments and their protection to the EEC at the time they signed the ECT.  In fact, the Lisbon Treaty, which transferred to the EU exclusive competence over investment protection, was not signed until 2007.[186]

- *Article 25*: Claimant indicates that Respondent has failed to establish why and how this provision impacts the arbitration clause of the ECT.  Claimant explains that the fact that the benefits extended among EU member States do not automatically extend to non-EU signatories of the ECT "*does not exclude the fact that EU Member States are bound by other obligations under a different treaty regime, in this case, the arbitration clause of the ECT*."[187]

  Claimant also considers that the EC's declaration under Article 25 of the ECT mentioned by Respondent is a limited carve-out from the ECT that allows EU Member States to extend benefits between themselves without an obligation to extend them to non-EU Members and in fact suggests that outside the "necessary" "derogations" from the ECT rules, the ECT provisions will prevail.[188]

- *Article 26(6)*: Claimant recalls that, pursuant to this provision, tribunals established under the ECT shall decide the issues in dispute in accordance with this treaty and applicable rules and principles of international law.  Claimant argues that the primary applicable law in this case is the ECT itself (as the dispute concerns breaches of the FET, expropriation and the umbrella clause contained in the ECT), and not EU law.[189]

211. In addition, Claimant rejects Respondent's assertion that the inclusion of intra-EU disputes within the ECT would defeat the purpose of the ECT.  Claimant relies, *inter alia*, on the findings of the *Eiser* tribunal, which found nothing in the ECT to justify the exclusion of a large category of investors and potential disputes from its scope.[190]  That is, nothing in the ECT allows a disparity of treatment that would result in "*a mandatory and unjustified*

---

[185] Rev. Tr. Day 1 (ENG), 9:3 to 9:14 (Mr. Oyewole).

[186] Cl. Reply, ¶¶ 305-307.

[187] Cl. Reply, ¶ 310.

[188] Cl. Rej., ¶¶ 15-16.

[189] Cl. Reply, ¶¶ 311-312.

[190] *Id.*, ¶ 292, citing *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award dated 4 May 2017 (CL-0107) ("*Eiser*"), ¶ 188.

*twofold dispute regime*" (i.e., intra-EU disputes being submitted to national courts, while non-EU disputes being resolved through the ECT's dispute settlement mechanisms).[191]  On the contrary, Claimant notes that the purpose of ECT Article 26 is to provide investors with a choice of dispute settlement *fora*, and that such free choice constitutes an integral part of the guarantees that are provided by the ECT.[192]

212.  Claimant refutes Spain's reliance on a "principle of primacy of EU law" to contest Claimant's argument that there is no requirement or justification to apply EU law in this case.[193]  It rejects Respondent's contention that provisions of the ECT such as Article 25 explicitly recognize EU primacy.[194]

213.  Contrary to Respondent's assertion, Claimant submits that the EU legal system does not confer particular protections upon EU investors which are preferable to the protection conferred by the ECT.  The ECT provides investors with a wide range of protections, including guarantees against discrimination and the FET standard under international law.[195]

214.  Claimant considers Respondent's assertions to be irrelevant in view of Article 16(2) of the ECT, which provides that if ECT Contracting Parties enter into international agreements addressing matters covered by Parts III ("Investment Promotion and Protection") or V ("Dispute Settlement") of the ECT, any provision which is more favorable to the investor or investment shall prevail.[196]  Under Part V, Article 26(1) and (2) of the ECT, an investor may choose to submit a dispute for resolution *(a)* to the courts or tribunals of the Contracting Party that is a party to the dispute, *(b)* in accordance with another previously agreed procedure or *(c)* to international arbitration or conciliation in accordance with

---

[191] Cl. Reply, ¶¶ 293-294.

[192] *Id.*, ¶ 294.

[193] Cl. Rej., ¶¶ 10-16.

[194] *Id.*, ¶¶ 15-16.

[195] Cl. Reply, ¶ 298.

[196] *Id.*, ¶¶ 299-302.

Article 26.  The ECT's option of giving investors access to international arbitration is more favourable than litigation before Spanish courts, pursuant to EU law.[197]

215. Thus, according to Claimant, pursuant to Article 16(2) of the ECT, provisions of subsequent EU agreements (including the TFEU, on which Respondent relies) cannot prevail over more favorable protections granted to investors by the ECT, such as the right to dispute settlement under Part V of the ECT.[198]

### (ii) The TFEU and the Achmea Judgment have no effect on the Tribunal's jurisdiction

216. Claimant submits that the present case does not involve the interpretation and application of EU law and, even if it did, that would not preclude the Tribunal's jurisdiction over this dispute.[199]

217. Claimant dismisses Respondent's reliance on Article 344 of the TFEU to conclude that such provision impedes Spain from referring matters relating to the Internal Market in Electricity to arbitration as it would require the Tribunal to rule on the rights of an EU investor and to apply EU law.[200]  Claimant notes that this case does not involve the interpretation and application of EU Law.  It concerns violations of certain provisions of the ECT.  Therefore, the primary applicable law is the ECT itself.[201]  Claimant refers to the findings of the tribunals in *Eiser*, *Charanne*, and *Isolux* in support of this assertion.[202]

218. In its Rejoinder, Claimant notes that the ECT and EU law are two distinct regimes under international law, and such autonomy is reinforced by the fact that Claimant's claim is brought under the ECT and not under EU law.[203]  Claimant highlights that a foreign

---

[197] *Id.*, ¶ 302.

[198] *Id.*, ¶¶ 300-301.

[199] See, e.g., Cl. Rej., ¶ 9.

[200] Cl. Reply, ¶¶ 285-286.

[201] *Id.*, ¶¶ 287-288.  See also Cl. Rej., ¶ 9.

[202] See, e.g., Cl. Reply, ¶ 289 and footnotes 373 and 374 (citing *Eiser*, ¶ 204; *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. 062/2012, Award dated 21 January 2016 (CL-0046 and RL-0049) ("***Charanne***"), ¶ 448; and *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Arbitration SCC V2013/153, Award dated 12 July 2016 (CL-0108 and RL-0083) ("*Isolux*"), ¶ 651).

[203] Cl. Rej., ¶¶ 17-19.

investor cannot be precluded from exercising its choice of dispute settlement forum under Article 26 of the ECT (which explicitly includes the option to resort to ICSID arbitration rather than domestic courts or administrative tribunals).[204]

219.   Claimant cites the *Charanne* award to the effect that there is no rule of EU law that prevents an arbitral tribunal from applying EU law to resolve a dispute between an EU investor and an EU member State.[205]   Claimant further reasons that, because the Tribunal is not an EU institution, it is "*not bound by EU rules according to which only European Courts are competent to pass upon the meaning and content of EU law*."[206]

220.   In its Rejoinder, Claimant elaborates on its arguments that there is no competing jurisdiction between an ECT based tribunal and the CJEU.[207]   Claimant also considers that Respondent's arguments on whether an award could constitute State aid are irrelevant for determining the Tribunal's jurisdiction.[208]   Among other arguments, Claimant notes that: this Tribunal's award would not be binding on an EU Court or legislator;[209] the absence of conflict is evidenced in the fact that this Tribunal is called upon to decide claims of violations of Articles 10 and 13 of the ECT while an EU judge has a distinct jurisdiction, which includes the examination of State aid as a matter of EU regulation;[210] while the principle of loyalty to EU institutions may be an obligation of Respondent as an EU member State, it is "*of no concern to an international tribunal constituted pursuant to the provisions of the ECT and principles of international law*";[211] and the ECT offers a distinct regime by virtue of which an EU investor may seek relief that it might not obtain under EU law.[212]

---

[204] *Id.*, ¶¶ 20-23.

[205] Cl. Reply, ¶ 290, citing *Charanne*, ¶ 438.

[206] Cl. Reply, ¶ 290.

[207] Cl. Rej., ¶¶ 25-32.

[208] *Id.*, ¶¶ 25-28.

[209] *Id.*, ¶ 27.

[210] *Id.*, ¶ 28.

[211] *Id.*, ¶ 31.

[212] *Id.*, ¶ 32.

221.    Claimant maintains that the reasoning of the CJEU in *Achmea* does not apply to the ECT, because the ECT is not a bilateral treaty, but instead is a multilateral treaty to which "*the EU is itself a party*."[213]  Claimant also maintains that, even if *Achmea* did apply to multilateral treaties, there would be no clash between the ECT and EU law because the ECT, as a treaty concluded by the EU, is part of EU law.[214]  Claimant also states that, even if there were a clash between the ECT and EU law, it would be resolved pursuant to Article 27 of the VCLT, which provides that a party may not invoke its internal law as justification for its failure to perform a treaty.  Thus, Respondent may not invoke EU law to justify a failure to meet its obligations under the ECT.[215]

222.    With respect to the November 2017 decision of the European Commission cited by Respondent, Claimant takes the view that this decision merely reiterates positions that the EC has taken in other arbitrations, which were not taken into account by those tribunals.[216]  It also states that the Tribunal is not bound by the content of the decision "*since EU law is not applicable to the resolution of this dispute*."[217]

### (2)    The Tribunal's Analysis

#### a.    The Contention that the ECT Contains an Implied Exception for "Intra-EU Disputes"

223.    The contention that the ECT does not apply to intra-EU investments and intra-EU disputes calls for the interpretation of the ECT.  Consistent with Article 31(1) of the VCLT, the Tribunal interprets the ECT in accordance with the ordinary meaning of its terms, in their context and in light of the object and purpose of the treaty.

224.    The starting point is an examination of definitions in Article 1 of the ECT of terms that are used in the jurisdictional article (Article 26).  A company incorporated under the laws of a Contracting Party (such as Claimant, incorporated under the laws of Germany) fits within

---

[213] Rev. Tr. Day 1 (ENG), 12:4 (Mr. Oyewole).  Claimant invokes the award in *Masdar* in support of this conclusion (*Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award dated 16 May 2018 (CL-0123) ("***Masdar***")).  Rev. Tr. Day 1 (ENG), 12:15 (Mr. Oyewole).

[214] Rev. Tr. Day 1 (ENG), 13:21 to 13:22 (Mr. Oyewole).

[215] Rev. Tr. Day 1 (ENG), 14:4 to 14:14 (Mr. Oyewole).

[216] Cl. Rej., ¶ 25.

[217] *Id.*, fn. 35.

the definition of "Investor" in Article 1(7)(a)(ii).  Respondent is a State that is a Contracting Party of the ECT as defined in ECT Article 1(2).  The dispute that is the subject of this case arises out of Claimant's investment in the land territory of Spain and thus in the "Area" of Respondent, as defined in ECT Article 1(10)(a).

225.  Article 26, entitled "*Settlement of Disputes between an Investor and a Contracting Party*," applies to a dispute between a Contracting Party and an Investor of another Contracting Party "*relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III.*"[218]  Claimant has exercised the choice of procedure available to it under Article 26(2) of the ECT by initiating arbitration pursuant to the ICSID Convention.  By becoming a Contracting Party to the ECT, the Kingdom of Spain has consented unconditionally to the submission of such a dispute to arbitration (ECT Article 26(3)).  Taking into account the ordinary meaning of Articles 1 and 26, the present case concerns a dispute over which this Tribunal has jurisdiction.

226.  According to Respondent, however, the Tribunal lacks jurisdiction *ratione personae* because "[b]*oth Germany, the country of the Claimant, and the Kingdom of Spain are member States of the European Union*[, which is a] *Contracting Party of the ECT and therefore the Claimant does not originate from 'another Contracting Party', as demanded by Article 26 of the ECT to be able to resort to arbitration.*"[219]  To similar effect is Respondent's assertion that Claimant is not from the "area" of another Contracting Party.[220]  On Respondent's theory, Article 26(1) refers to a dispute between a Contracting Party and an Investor of "another" Contracting Party and thus requires diversity of nationality and Area.  However, if two Contracting Parties are also member States of a REIO, there is no diversity of nationality or of Area.

---

[218] ECT, Article 26(1).

[219] Resp. Rej., ¶ 5.

[220] *Id.*, Preliminary Objection A.

68

227. It would be highly unusual for a court or tribunal to interpret a treaty to contain an implied exception to its terms. The implied exception proposed by Respondent is not a small tweak of the Treaty. If established, it would mean that the negotiators concluded a treaty that was largely inoperable as between EU investors and other EU Member States, but did not indicate that exception in the text.

228. It is necessary to consider whether Respondent's proposed interpretation of the ECT finds support in "context,"[221] in particular, in the provisions that address the particular situation of the European Community, which was an active participant in the negotiation of the ECT.[222] The Treaty permits a REIO, as defined in Article 1(3), to become a Contracting Party. The European Community signed the treaty and became a Contracting Party in that capacity.

229. The definition of the "Area" in Article 1(10) contains a definition of the term "Area" that is tailored to the situation of a REIO; the Area of a REIO is defined as the Areas of its member States. Having set out a specialized definition of "Area" that applies to a REIO, negotiators also could have specified that the "Area" of a Contracting Party that is also a Member State of a REIO is deemed to be the entire Area of the REIO. They did not do so, nor did they indicate that a State cannot be "another Contracting Party," as that phrase is used in Article 26, if the two States in question are also Member States of a REIO.

230. Respondent points to Article 25 of the ECT in support of the claimed intra-EU exception. That provision expressly allows derogation from the ECT's most-favored nation provision by permitting States parties to an Economic Integration Agreement ("**EIA**") to accord preferential treatment to each other without extending the same treatment to other ECT Contracting Parties. Had the drafters of the ECT intended an additional derogation denying to intra-EU investors the protections and dispute settlement options that would otherwise apply, they could have done so. They did not.

---

[221] See VCLT, Article 31(2)(a).

[222] As stated by the Tribunal in *Electrabel*, "*the European Union was the determining actor in the creation of the ECT.*" *Electrabel* Decision, ¶ 4.131.

231. In the view of the Tribunal, the various provisions of the ECT that refer to REIOs and EIAs demonstrate that negotiators used express language to address the circumstances of the EU when they decided that differentiation from the situation of other Contracting Parties was necessary.

232. As noted by the Tribunal in *Eiser*, "[t]*reaty law and practice provide familiar mechanisms for treaty makers wishing to limit or exclude application of particular provisions in particular situations*."[223] The ECT "*includes multiple limiting decisions and understandings [...] Yet the EEC sought no similar clarifying provisions regarding what Respondent now contends is a major exclusion in the ECT's coverage*."[224] Of particular relevance is Decision 1 of the ECT, which provides that the Svalbard Treaty prevails in the event of any conflict between that treaty and the ECT and that any dispute about the existence or extent of such a dispute is excluded from Part V of the ECT (Dispute Settlement).[225] Had there been an intention to state any special rules for EU treaties or REIO treaties more generally, or for intra-REIO investments and intra-REIO disputes, another decision could have been included. That was not done.

233. It might also be suggested that the primacy of EU law over inconsistent obligations in non-EU treaties was so firmly established at the time that the ECT was being negotiated that no express exception for intra-EU investments and intra-EU disputes was necessary. Respondent points to Opinion 1/91 of the European Court of Justice to support the asserted primacy of EU law. In that Opinion, the Court concluded that the proposed European Economic Area ("**EEA**") Court was incompatible with the Treaty Establishing the European Economic Community because the EEA Court could be required to interpret and apply EU law.[226] It stated that the "*exclusive jurisdiction of the Court of Justice is confirmed by Article 219 of the EEC Treaty, under which Member States undertake not to*

---

[223] *Eiser*, ¶ 187.

[224] *Id*.

[225] Decisions that appear in Annexes of the ECT are integral parts of the Treaty.

[226] Opinion 1/91, ¶ 72.

*submit a dispute concerning the interpretation or application of that treaty to any method of settlement other than those provided for in the Treaty.*"[227]

234. The Tribunal does not find in this Opinion and other authorities cited by Respondent a principle of EU primacy over non-EU treaties that was so obvious in the early 1990s that there was no need for an express exclusion of intra-EU disputes from the investor-State arbitration provisions of the ECT.  Even decades later, a number of arbitral tribunals and the Advocate General of the ECJ have concluded that Article 344 of the TFEU (which is identical in substance to former Article 219 of the EEC Treaty) does not even address the same subject matter as the investor-State provisions of an investment treaty and thus that EU law does not conflict with the investment treaty at issue.[228]  It cannot be the case that the opposite conclusion was so obvious to participants in the negotiations of the ECT that no express exception was needed.

235. Respondent does not convince the Tribunal that the object and purpose of the ECT calls for an interpretation of the Treaty that implies an exception for intra-EU disputes.  Respondent is no doubt correct that increased East-West cooperation was one objective of the ECT, but the preamble makes clear that the object and purpose of the treaty was much broader, to include the catalysation of economic growth through measures to liberalise investment and trade in energy.

236. Respondent has not pointed to any supplementary means of interpretation of the ECT (such as the *travaux préparatoires*) that would call into question the ordinary meaning of Article 26.

237. Taking into account the ordinary meaning of Articles 1 and 26 of the ECT, in light of the other provisions of the ECT and its object and purpose, the Tribunal concludes that there is no implied exception to the ECT that excludes intra-EU investments and intra-EU disputes from the Treaty.

---

[227] *Id.*, ¶ 35.

[228] See ¶ 241 *et seq. infra*.

**b.  The Claim that the TFEU Excludes the Tribunal's Jurisdiction, Taking into Account *Achmea v. Slovakia***

238. Having concluded that the ECT applies to intra-EU investments and intra-EU disputes, the Tribunal must now consider whether the TFEU operates to change the meaning or validity of the ECT for those ECT Contracting Parties that are also EU Member States.  The Tribunal, which is not an institution of the European Union, approaches this question from the vantage point of a tribunal established pursuant to the ICSID Convention and the ECT.  It focuses in particular on the Parties' arguments as updated by the Judgment of the CJEU in *Achmea.*

239. Respondent maintains that the investor-State provisions of the ECT are inconsistent with the TFEU and that the TFEU takes precedence over the ECT.  It considers that the reasoning of the CJEU in *Achmea* applies equally to the ECT.  Thus, the Tribunal does not have the jurisdiction that it would otherwise have under Article 26 of the ECT. The position advanced by the European Commission[229] is to the same effect.

240. Claimant considers that the reasoning in *Achmea* involved a bilateral investment treaty and that its reasoning does not apply to the ECT, a multilateral treaty to which the EU is also a party.

241. The Tribunal addresses three questions regarding the relationship of the ECT to the TFEU.  First, does Article 344 of the TFEU address the same subject matter as Article 26 of the ECT?  Second, if so, is there an inconsistency between the two treaties?  Third, if there is an inconsistency, which treaty takes priority?

242. As to the question whether Article 344 of the TFEU addresses the same subject matter, the Tribunal notes that some past tribunals have concluded[230] that Article 344 of the TFEU does not address investor-State arbitration.  On this reasoning, Article 344 of the TFEU has a different subject-matter from that of Article 26 of the ECT, so there is no conflict between the two provisions and no need to decide whether one treaty takes precedence over the

---

[229] See ¶ 204 *supra*.
[230] See *Eiser*, ¶ 204; *Charanne*, ¶ 438; *Masdar*, ¶ 340; *Electrabel* Decision, ¶ 4.153.

other.  This was the logic of the opinion of the Advocate General in *Achmea*, which stated that arbitration between an investor and a Member State of the EU does not come under Article 344 of the TFEU.[231]

243.  The CJEU did not agree with the Advocate General.  It found instead that the obligations of The Netherlands under Article 3 of the BIT (in which The Netherlands had consented to investor-State arbitration) were inconsistent with the TFEU.  It concluded that the TFEU (in particular, Articles 267 and 344) had primacy over the BIT.

244.  The Tribunal in *Masdar*, writing after the Judgment of the CJEU in *Achmea*, concluded that the reasoning of that Judgment, which involved a bilateral treaty between EU Member States, did not apply to the ECT, a multilateral treaty to which the EU itself is a party.[232] However, the Tribunal sees reason to doubt that the bilateral nature of the treaty at issue in *Achmea* was critical to the reasoning of the CJEU.  Respondent is correct in pointing out that the Court in *Achmea* relied on past jurisprudence that did not address bilateral agreements, such as Opinion 1/91, which addressed a treaty to which non-EU States, EU Member States and the European Community were to be parties.[233]  The Tribunal also notes that the European Commission has taken the position that the "*ECT does not apply to investors from other Member States initiating disputes against another Member States.*"[234]

245.  This Tribunal considers it prudent to proceed, *arguendo,* on the assumption that a provision of a non-EU treaty in which treaty parties agree to investor-State dispute settlement does fall within the scope of Article 344 of the TFEU, even if the investment treaty is a multilateral treaty to which the EU itself is a party, such as the ECT.  Assuming that this is the case, it would follow from the reasoning in *Achmea* that the consent of EU Member States to investor-State arbitration pursuant to Article 26 of the ECT is in conflict with

---

[231] Opinion of the Advocate General, ¶ 153.

[232] *Masdar*, ¶ 679.

[233] Opinion 1/91, ¶ 2.

[234] SA.40348 (2015/NN), ¶ 163.

Article 344 of the TFEU, as the TFEU has been interpreted by the CJEU. The Tribunal must therefore determine which treaty takes precedence.

246. When a treaty does not expressly address possible inconsistencies between that treaty and prior or subsequent treaties on the same subject-matter, Article 30 of the VCLT (entitled "*Application of Successive Treaties Relating to the Same Subject-Matter*") provides residual rules that can be used to determine which treaty has primacy. As to Part V of the ECT (concerning Dispute Settlement), however, no resort to these residual rules is necessary, because Article 16 of the ECT expressly addresses the relationship between the dispute settlement chapter of the ECT and the provisions of another treaty on that subject matter. It does so in clear terms and comprehensive terms, as follows:

> *Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,*
>
> *(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and*
>
> *(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.*

247. Pursuant to Article 16, if (as the Tribunal has assumed above) the "right to dispute settlement" provided in Part V of the ECT is in conflict with Article 344 of the TFEU, the provisions of the TFEU can derogate from an Investor's right to dispute resolution under Part V of the ECT only if the provisions of the TFEU are more favourable to the Investor than is Part V of the ECT.

248. Part V of the ECT provides a right to dispute settlement that is additional to those otherwise available to an investor in respect of an intra-EU dispute, i.e., the right to initiate investor-State arbitration. Part V of the ECT also expressly preserves the right of an Investor to pursue resolution of a dispute in "the courts or administrative tribunals of a Contracting Party" or another previously agreed dispute settlement procedure. Because the ECT adds the mechanism of investor-State dispute settlement to the mechanisms that would otherwise be available to an investor, the Tribunal finds that the provisions of the TFEU are not more favourable to an investor than is Part V of the ECT, and thus that the TFEU cannot derogate from the rights of an investor of Part V of the ECT.[235]

249. Article 16 of the ECT has a comprehensive temporal scope; it applies both to treaties that are subsequent to the ECT (such as the TFEU) and prior EU and European Community treaties.

250. Bearing in mind that the task of this Tribunal is to determine its own jurisdiction, pursuant to the ICSID Convention and the ECT, and that the Tribunal is not an institution of the EU, the Tribunal concludes that, if the ECT and the TFEU address the same subject matter, Article 16 of the ECT means that the TFEU may not derogate from the dispute settlement provisions of the ECT and thus that the TFEU does not detract from the Tribunal's jurisdiction.

251. The Tribunal also notes that Respondent suggested at the Hearing that the EU and its Member States had modified the ECT in 2008, referring to Article 41 of the VCLT, which allows two or more parties to a multilateral treaty to modify the treaty as between them, under defined conditions.[236] Respondent does not specify the terms of such modification. It does not address the conditions in Article 41 to have been met here (i.e., that the modification does not affect the enjoyment of other parties of their rights and does not relate to a provision derogation from which is incompatible with the effective execution of the treaty's object and purpose). Moreover, Article 41 requires notification of any intended

---

[235] Article 16 of the ECT also applies to Part III of the ECT (Investment Promotion and Protection), but the Tribunal here addresses jurisdiction and thus does not address the question whether the investment protection provisions of the ECT are more favorable to an Investor than the provisions of EU treaties.

[236] Rev. Tr. Day 1 (ENG), 148:20 to 149:3 (Mr. Torres Gella).

modification to the other parties to the treaty. No such notification was provided. Accordingly, there is no basis to conclude that the ECT has been modified to include an intra-EU exception to jurisdiction.

252. On the basis of the above analysis, and having considered fully the Parties' many assertions in relation to jurisdiction over intra-EU disputes (including those not specifically addressed in this Award), the Tribunal rejects Respondent's objection to its jurisdiction in respect of intra-EU disputes.

253. On 11 February 2019, the Tribunal granted Respondent's request to file as an additional legal authority the Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (signed by twenty-two EU Member States) and Claimant's request to file two related documents, the Declaration of Governments of the Member States of 16 January 2019, signed by five EU Member States and the Declaration of the Government of Hungary of 16 January 2019.[237] The Parties were invited to submit brief observations on these declarations. Rather than reprising the Parties' observations in detail, the Tribunal notes that each Party sought to make use of these declarations to reinforce positions that it had previously taken in these proceedings. Having considered those observations, as well as the three Declarations, the Tribunal considers that these Declarations do not affect the reasoning that the Tribunal has used in addressing the objection to its jurisdiction. As stated at paragraphs 245-249 above, even assuming, *arguendo,* that the "*right to dispute resolution*" provided in Part V of the ECT is seen to conflict with Article 344 of the TFEU, Article 16 of the ECT provides that the TFEU can derogate from Part V of the ECT only if the TFEU is more favorable to investors than is Part V of the ECT. The Tribunal has found that this is not the case.

---

[237] Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (RL-0101), Declaration of the Representatives of the Governments of the Member States, of 16 January, on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (RL-0102), and Declaration of the Representative of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (RL-0103).

**B. Lack of Jurisdiction *Ratione Materiae* over Taxation Measures**

**(1)    The Parties' Positions**

254.  Respondent maintains that, pursuant to the exception for tax measures contained in Article 21 of the ECT, it has not consented to the Tribunal's jurisdiction to hear alleged breaches of ECT Article 10(1) related to the TVPEE, a 7% tax on the value of energy production that was imposed in Act 15/2012.  Claimant responds that the Tribunal has jurisdiction to decide whether the TVPEE violates ECT Article 10(1) because the Article 21 applies only to genuine tax measures and the TVPEE is not a *bona fide* tax measure.

*a.  Respondent's Position*

255.  Article 26 of the ECT limits the Contracting Parties' consent to arbitration to "*an alleged breach of an obligation of* [a Contracting Party] *under Part III* [of the ECT]."[238] Article 10(1) of the ECT is located in Part III of the ECT.  However, Article 21(1) of the ECT provides:

> *Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*[239]

256.  Respondent points out that the exceptions contained elsewhere in the ECT do not apply to an alleged breach of Article 10(1)[240] and that this conclusion has been confirmed by the ECT Secretariat and previous arbitral jurisprudence.[241]

---

[238] Resp. C-Mem., ¶ 118 (emphasis omitted), citing Article 26 of the ECT.

[239] Resp. C-Mem., ¶ 123, citing Article 21(1) of the ECT.

[240] Resp. C-Mem., ¶¶ 124-133; Resp. Rej., ¶ 114.

[241] Resp. C-Mem., ¶ 128 (citing "*The Energy Charter Treaty: A Reader's Guide*", Energy Charter Secretariat (RL-0053), pp. 38-39) and ¶ 129 (citing *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award dated 27 August 2008 (RL-0034) ("***Plama***"), ¶ 266).

257. Respondent notes that, pursuant to Article 21(7)(a)(i) of the ECT, the term "taxation measure" includes "[a]*ny provision relating to taxes of the domestic law of the Contracting Party*[.]"[242]  Respondent maintains that the TVPEE fits within this definition.  Act 15/2012 was passed by the Spanish Parliament in accordance with Article 133 of the Spanish Constitution, which grants the State the authority to establish taxes.[243]  The TVPEE is levied on the performance of the activities of production and incorporation into the SEE of electric energy.  Act 15/2012 explicitly refers to the taxation nature of the TVPEE[244] and the TVPEE satisfies the definition of tax set forth in Spanish Act 58/2003 on General Taxation.[245]  The self-assessment and payment to the Public treasury of the TVPEE is made through a tax form, in accordance with a ministerial order which has been deemed to be compliant with domestic law by the Spanish High Court.[246]  The Spanish Constitutional Court has confirmed the taxation nature of the TVPEE and its conformity with the Spanish Constitution.[247]

258. Respondent also considers that the TVPEE is a tax under international law.[248]  It relies, *inter alia*, on prior decisions of arbitral tribunals to support its contention that the concept of tax in international law has a number of defining characteristics which the TVPEE fulfills, as follows: *(a)* the tax is established by law;[249] *(b)* such law imposes an obligation on a class of people (in this case, the TVPEE is levied on all persons who produce and incorporate energy into the SEE);[250] and *(c)* this obligation involves paying money to the State for public purposes.  Respondent also notes that the European Commission has confirmed the TVPEE's taxation nature and its consistency with EU law.[251]

---

[242] Resp. C-Mem., ¶ 138 and Resp. Rej., ¶ 118 (emphasis omitted).

[243] Resp. C-Mem., ¶¶ 151-153, 181; Resp. Rej., ¶¶ 120, 178(i).

[244] Resp. C-Mem., ¶ 157.

[245] *Id.*, ¶¶ 158-159.

[246] Resp. C-Mem., ¶ 161; Resp. Rej., ¶ 124.

[247] Resp. C-Mem., ¶¶ 156, 166-168; Resp. Rej., ¶ 123.

[248] See, e.g., Resp. C-Mem., ¶¶ 180, 194; Resp. Rej., ¶¶ 128, 133.

[249] Resp. C-Mem., ¶¶ 179-181; Resp. Rej., ¶ 131.

[250] Resp. C-Mem., ¶¶ 179-180, 182; Resp. Rej., ¶¶ 129-131.

[251] Resp. C-Mem., ¶¶ 195-204; Resp. Rej., ¶ 132.

259. Accordingly, the TVPEE is a tax within the meaning of Article 21(7)(a)(i) of the ECT.

260. Respondent maintains that the Tribunal should reject Claimant's contention that the TVPEE is not a *bona fide* taxation measure.[252] It submits that only "*extraordinary circumstances*" could exempt a taxation measure from the protection of the taxation carve-out in Article 21(1), such as a tax with a purpose that is "*entirely unrelated*" to the purpose of raising revenue for the State (e.g., the destruction of a company or the elimination of a political opponent).[253]

261. Respondent also contends that the good faith analysis proposed by Claimant implies examining the economic effects of such tax. Respondent recalls the tribunal's conclusion in *EnCana* that the determination of what constitutes a tax measure "*is primarily a question of its legal operation, not its economic effect*" and that, while the economic effects or impacts of a tax "*may be unclear and debatable*[,] *nonetheless a measure is a taxation measure if it is part of the regime for the imposition of a tax.*"[254] The legal operation of the TVPEE is that of a taxation measure; it is not appropriate to examine its economic effect in order to determine that it constitutes a taxation measure for purposes of the ECT.[255]

262. Moreover, Respondent disputes Claimant's assertion that the TVPEE is not a *bona fide* taxation measure because it allegedly discriminates against renewable producers in comparison to conventional producers and is a disguised tariff cut.[256] The TVPEE applies to all energy producers (both renewable and conventional) and its impact is neutralised as it is a recoverable cost by renewable producers under the current remuneration

---

[252] Resp. Rej., ¶ 115.

[253] *Id.*, ¶ 139, citing *Yukos Universal Limited (Isle of Man) v. the Russian Federation*, PCA Case No. AA 227, Final Award dated 18 July 2014 (RL-0080) ("*Yukos*"), ¶ 1407.

[254] Resp. Rej., ¶ 140, citing *EnCana Corporation v. Republic of Ecuador*, LCIA Case UN3481, Award dated 3 February 2006 (RL-0027) ("***Encana***"), ¶ 142.

[255] Resp. Rej., ¶ 141.

[256] *Id.*, ¶ 143.

scheme.[257]  Respondent also notes that its position is aligned with that of the tribunals of the *Isolux* and *Eiser* cases.

263.  Based on the above, Respondent concludes that Article 10(1) of the ECT does not generate obligations for Contracting States with respect to the TVPEE.  As a consequence, the Tribunal lacks jurisdiction with regard to Claimant's claim of an alleged breach of Article 10(1) of the ECT through the adoption of the TVPEE.[258]

### b.  Claimant's Position

264.  Claimant submits that the Tribunal has jurisdiction over the claim that the TVPEE violates Article 10(1) of the ECT.  Article 31(1) of the VCLT obligates Respondent to interpret the ECT in good faith.  Thus, a measure that is not a *bona fide* tax cannot fall within the exception in Article 21(1).  The TVPEE is not a *bona fide* tax measure, but is instead a measure with the purpose and effect of reducing the remuneration to which Claimant was entitled pursuant to the Original Regulatory Regime, in a manner designed to avoid liability under the ECT.  Moreover, the Tribunal cannot isolate the TVPEE from the rest of the Disputed Measures.

265.  Claimant disputes Respondent's "formalistic interpretation" of the definition of "Taxation Measures" under Article 21(7)(a)(i) of the ECT and the alleged main characteristics of the concept of tax under international law.  If the observance of formal aspects sufficed to qualify a measure as legitimate tax measure, a State  would be able to impose a draconian tax as long as it observed basic formalities, thereby circumventing the protections of the ECT.  The Tribunal's analysis should privilege substance over form, taking into account the context in which Law 15/2012 was implemented and Respondent's motivations.[259]

266.  Claimant considers that the standard indicated by Respondent (under which the analysis of the good faith of taxation measures is justified only in extraordinary circumstances) sets the threshold too high.  The TVPEE was the product of an act of bad faith and satisfies

---

[257] *Id.*, ¶¶ 153-165.
[258] Resp. C-Mem., ¶¶ 102, 115, 208-209; Resp. Rej., ¶¶ 113, 179.
[259] Cl. Rej., ¶¶ 35-37.

Respondent's suggested criterion of destruction of a company, given that it contributed to the dismantling of the Original Regulatory Regime and brought Claimant "*to the brink of ruin.*"[260]

267.  In support of its contention that the TVPEE is not a *bona fide* tax, Claimant asserts that the fact that the TVPEE is of general application is irrelevant, because PV investors are *de facto* discriminated against because they are unable to pass on the cost of the tax on to their customers (i.e., since conventional energy producers did not benefit from the same FIT incentives, even if the TVPEE was applied to both conventional and renewable energy producers, only the latter were subject to a reduction of FITs).[261]  Because the cost of the TVPEE cannot be passed to consumers, Claimant's investment lost value directly corresponding to the amount levied, amounting to disguised deprivation of Claimant's investment.[262]

268.  Claimant asserts that the TVPEE is a tariff cut framed as a taxation measure "*to reduce revenue streams without appearing to modify the fixed, regulated prices established by the FITs*" to "*avoid overtly breaching investors' rights and thereby limit its exposure to liability under the ECT.*"[263]  It argues that the TVPEE was an initial step towards the destruction of a regulatory system based on fixed FITs.[264]  Respondent "*necessarily knew*" that the FITs provided for in RD 661/2007 and RD 1578/2008 were fixed and they could not be modified.  Respondent therefore must have known that the cost of a tax such as the TVPEE could not be passed on by the energy producer.  In both intent and in effect, the TVPEE "*was a deliberate and substantial reduction of the FITs, by indirect means.*"[265]

---

[260] *Id.*, ¶ 40.

[261] *Id.*, ¶ 43.

[262] Cl. Reply, ¶¶ 315, 318.  See also *id.*, ¶¶ 321, 328.

[263] Cl. Rej., ¶ 38.

[264] Cl. Reply, ¶¶ 325-326.

[265] *Id.*, ¶ 328.  See also *id.*, ¶ 337.

269. Claimant concludes that the introduction of the TVPEE through Act 15/2012 was an attempt to circumvent the protections of the ECT. Therefore, it should not fall within the scope of Article 21 of the ECT.[266]

270. Claimant also considers that the TVPEE cannot be isolated from the other Disputed Measures by the Tribunal as "[t]*hey have a cumulative damaging effect and they have all contributed to Spain's breaches of the ECT.*"[267]

271. Based on the above, Claimant concludes that the Tribunal has jurisdiction to hear its claim that the introduction of the TVPEE breaches Spain's obligations under ECT Article 10(1).

### (2)    The Tribunal's Analysis

272. The TVPEE imposes a 7% tax on a large class of persons that includes Claimant. Its provisions, as noted by Respondent, are consistent with a tax measure, as is the method of its adoption (enactment by the Spanish Parliament in accordance with Spain's Constitution and its law regarding taxation measures). The TVPEE generates revenue for the State, which is included in the State General Budget. The Tribunal considers that it has the characteristics of a "taxation measure" within the scope of ECT Article 21(1)(7)(a)(i).

273. Article 21(1) of the ECT contains an explicit exception from jurisdiction in respect of alleged breaches of Article 10(1). The Tribunal agrees with Respondent that this explicit tax carve-out could only be overridden in extraordinary circumstances.

274. Claimant asserts that, rather than being a *bona fide* tax measure, the TVPEE is the "*tariff cut which dares not speak its name.*"[268] Claimant's contention is that Respondent styled the measure as a tax, rather than a reduction in applicable tariffs, in response to the initiation of arbitration by investors that claimed that Respondent's changes to remuneration under RD 661/2007 violated the ECT, and did so in order to reduce the remuneration of producers of renewable energy without appearing to reduce

---

[266] Cl. Rej., ¶ 46.
[267] Cl. Reply, ¶ 333.
[268] Cl. Reply, ¶ 313; Rev. Tr. Day 1 (ENG), 15:22 to 15:23 (Mr. Oyewole).

tariffs.[269] Claimant maintains that such a measure runs afoul of Respondent's obligation to perform its obligations under the ECT in good faith.[270]

275. Even assuming that Respondent took into account the provisions of the ECT in deciding to impose the TVPEE, the fact that a State's legislation is informed by its treaty obligations would not be sufficient to establish that the State had failed to perform its obligations under that treaty in good faith. During the period when Respondent enacted the TVPEE (2010-2012), it took other measures (e.g., the change in inflation index and the cap on hours) that were not subject to the tax carve-out and thus could be challenged as violations of Article 10(1). It has defended the legality of all of those measures in this proceeding.

276. The Parties refer to the conclusions of other tribunals that have addressed the question whether a measure constitutes a *bona fide* tax. In *Yukos*, the tribunal found that the respondent State had launched a "*full assault*" on the investor and its beneficial owners in order to bankrupt the investor and to appropriate its assets while, at the same time, removing its chief executive officer "*from the political arena*".[271] No extraordinary conduct of this sort is alleged by Claimant, nor is it established by the record before the Tribunal.

277. Thus, the Tribunal concludes that the TVPEE is a taxation measure within the scope of Article 21(7) of the ECT and that the Tribunal does not have jurisdiction to decide Claimant's claim that the TVPEE violates Article 10(1) of the ECT.

## VII.   LIABILITY

### A.  The Alleged Breach of the Fair and Equitable Treatment Obligation (Article 10(1))

278. In its relevant part, Article 10(1) of the ECT reads as follows:

---

[269] Cl. Rej., ¶ 38.
[270] VCLT, Article 26.
[271] *Yukos*, ¶ 1404.

### ARTICLE 10
### PROMOTION, PROTECTION AND
### TREATMENT OF INVESTMENTS

*(1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.* [N]*o Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal*.

**(1)     Overview of the Parties' Positions**

### a.  Claimant's Position

279.   The thrust of Claimant's fair and equitable treatment allegation is that Respondent violated Claimant's legitimate expectations.  As stated in Claimant's Reply:

> *Spain's commitment to the Claimant's investment must be judged according to an objective standard, understood in the light of Spain's past commitments (in the present case, RD 661/2007 and RD 1578/2008, and indeed Law No. 54/1997).  On the basis of such previous legislation, SolEs Badajoz and other investors who qualified under RD 1578/2008 were entitled to expect that a "reasonable return" under the Spanish PV regime would (1) remain at a level consistent with the return provided by the regulatory scheme up to that point; (2) remain at a broadly secure, fixed rate (rather than the variable rate now offered by the New Regulatory Regime); and (3) at most, be subject to reasonable and limited amendments which would nevertheless leave the core features of the regime intact.  Spain, of course, chose to disregard these expectations.*[272]

280.   Claimant emphasizes in particular that the "essential feature" of the Original Regulatory Regime was "*a guaranteed FIT for a period of 25 years, which allowed any investor to calculate the estimated income derived from the investment, providing certainty to*

---

[272] Cl. Reply, ¶ 4 (emphasis omitted).

*investors.*"[273]  The FITs applicable to Claimant's plants were based on production, without a cap, and provided priority of dispatch (i.e., access to the electrical grid).[274]  Claimant considers that Spain "*annihilated the economic foundation of the Original Regulatory Regime when it enacted the new Regulatory Regime, starting in 2013 (notably RDL 9/2013 and Order IET 1045/2013).*"[275]

281.  Claimant also maintains that the changes introduced by the Disputed Measures were disproportionate and unreasonable.[276]  It states that there were alternative measures that Spain could have chosen to address the tariff deficit.  Instead, Respondent adopted the Specific Regime, which employs an unreasonable "one size fits all" approach, using arbitrarily-determined hypothetical costs.  The Disputed Measures are irrational because there were other, less drastic means of addressing the tariff deficit.[277]

282.  According to Claimant, the Disputed Measures were disproportionate in two senses.  First, the Disputed Measures suddenly and unexpectedly removed essential features of the regulatory regime in place.[278]  Second, Claimant maintains that the burden that the Disputed Measures imposed on PV investors was not commensurate with the economic rationale or public interest.[279]

###      *b.  Respondent's Position*

283.  Respondent submits that Claimant was not induced to believe that the Original Regulatory Regime would remain immutable, and that the Disputed Measures have maintained the economic and regulatory foundation which induced SolEs to invest.  Respondent submits that Claimant, in the absence of a specific commitment, could not hold a legitimate expectation that the regime established by RD 661/2007 and RD 1578/2008 would not be

---

[273] Cl. PHB, ¶ 83.  See also Cl. PHB, ¶ 89.

[274] Cl. Reply, ¶ 455.

[275] *Id.*, ¶ 517.

[276] See, e.g., Cl. Mem, ¶¶ 552-562.

[277] See, e.g., Cl. Reply, ¶¶ 551, 575-576.

[278] Cl. Reply, ¶ 543, citing *Charanne*, ¶ 517.

[279] Cl. Mem., ¶ 559.

subject to modification, a possibility that Spanish law clearly admitted.[280]  In Respondent's view, and as indicated by the *Isolux* tribunal, investors in renewable energy projects should have known that, pursuant to Spain's legislation, the limit to any regulatory change is the reasonable return for the investment, which has been respected in this case.[281]  Respondent requests the Tribunal to apply this criterion in determining whether there has been a breach of the FET standard.[282]

284.   In the alternative, Respondent (referring to the *Charanne* award), requests the Tribunal to find that the "essential elements" of its regulatory regime have been respected following the enactment of the Disputed Measures.[283] Respondent disagrees with Claimant's characterization of the essential elements of the regulatory regime. According to Respondent, the essential elements, which have always been maintained, are the methodology of using standard installations to set remuneration, the principle of a reasonable rate of return and the priority of dispatch.[284]

285.   Respondent also opposes Claimant's contention that the Disputed Measures were unreasonable and disproportionate.  It maintains that the measures were based on the need to guarantee the sustainability and balance of the SEE which was being affected by (1) the economic crisis that had brought about a reduction in electricity demand; (2) the increase of the tariff for consumers; (3) the existence of over-compensation in the renewable energy sector ("**RE sector**"); and (4) the expectation of an increase of the tariff deficit.[285]

---

[280] Resp. C-Mem., ¶ 1026.

[281] Resp. Rej., ¶ 1086 (citing *Isolux*, ¶¶ 787-792 and 795).

[282] *Id.*, ¶ 1102.

[283] *Id.*

[284] Resp. PHB, ¶ 59. Respondent elsewhere stated that the "*essential elements*," which have been retained in the Specific Regime, are a subsidy, privileged access to the electricity grid and a "*reasonable return on the investment costs in the RE plants with reference to the cost of money in the capital market*."  Resp. Rej., ¶¶ 1125-1126.

[285] Resp. C-Mem., ¶ 1093.

286. Respondent also submits that the adoption of the Disputed Measures must be placed within the context of international commitments deriving from the collapse of the Spanish financial system. This collapse gave rise to the Memorandum of Understanding signed with the European Union on 20 July 2012. In this Memorandum, Spain undertakes to adopt macroeconomic measures to deal with the specific imbalance: "*address the electricity tariff deficit in a comprehensive way*".[286] According to Respondent, statements of the European Union, the International Monetary Fund ("**IMF**") and the International Energy Agency in 2014 and 2015 recognized that the measures it had adopted, including the Disputed Measures, had resolved the macroeconomic problem derived from the tariff deficit.[287]

287. According to Respondent, the Disputed Measures were carried out respecting the principle of reasonable return in accordance with the cost of money in the capital market.[288] Respondent disputes Claimant's contentions about the effect that the Disputed Measures had on Claimant's return. It maintains that Claimant's pre-tax return under the Specific Regime is in the range of 8.03%[289] to 8.11%,[290] which is higher than the 7.398% target under the Specific Regime. According to Respondent, based on calculations by its experts, Claimant is currently receiving project returns that exceed the reference rate of return when Claimant invested ("'*around' 7% after taxes*").[291]

---

[286] Resp. Rej., ¶ 1032 (internal quotation marks omitted), citing Memorandum of Understanding with the European Union dated 20 July 2012 (RL-0067), ¶¶ 29 and 31.

[287] Resp. C-Mem., ¶¶ 947-956 (citing, *inter alia*, European Commission, "Macroeconomic imbalances Country Report – Spain 2015", Occasional Papers 216, June 2015 (R-0181); Reply from the European Commission of 29 February 2016 to the request for investigation of the National Association of Renewable Energy Producers and Investors (R-0160); "Spain: 2014 Article IV consultation-Staff Report; Staff Supplement; Press Release; and Statement By the Executive Director for Spain", IMF Country Report No. 14/192, July 2014 (R-0110); "Energy Policies of IEA Countries - Spain 2015 Review, Executive summary and key recommendations", published by the International Energy Agency (R-0182)).

[288] Resp. C-Mem., ¶ 1058.

[289] Resp. PHB, ¶ 166.

[290] *Id.*, ¶ 179.

[291] *Id.*, ¶ 186.

(2)    **The Legal Standard**

a.    **Claimant's Views on the Legal Standard**

(i)  *Legitimate Expectations*

288.  Claimant asserts that the obligation to provide fair and equitable treatment includes, as "*an integral component of FET*" the stability of the legal system.  It submits that this obligation is "*reinforced in the ECT*", noting that "*Article 10(1) provides that the Contracting States are under the obligation to 'encourage and create stable, equitable, favourable and transparent conditions for Investors'.*"[292]  Claimant further asserts that FET encompasses the protection of investors' legitimate expectations.[293]  Those legitimate expectations may arise not only from commitments made directly to a particular investor, but also from legislative and regulatory acts.  Claimant submits that, while States retain a right to modify their legislation, investors are "*entitled to believe that regulatory changes would not 'come to unforeseeably and abruptly suppress the essential characteristics of the existing regulatory framework.'*"[294]  A State cannot radically alter the legal framework upon which an investment is based without breaching the FET standard.[295]

289.  Claimant states that an investor's legitimate expectations are to be evaluated as of the date of its investment.[296]  This is an objective standard, taking into account not only what an investor knew (its subjective expectations) but also the expectations of a prudent investor as of the date of the investment.[297]

290.  Claimant rejects as "artificial" certain limitations on the scope of the FET standard suggested by Respondent.[298]  In particular, Respondent cannot avoid liability by establishing that it has met national treatment and non-discrimination standards, on which

---

[292] Cl. Reply, ¶ 413.

[293] See, e.g., Cl. Mem., ¶¶ 394-395; Cl. Reply, ¶¶ 413, 418.

[294] Cl. Reply, ¶ 168, quoting *Charanne*, ¶ 517.

[295] Cl. Reply, ¶¶ 418-421.

[296] *Id.*, ¶¶ 442-443.

[297] Rev. Tr. Day 1 (ENG), 54:10 to 54:16 (Mr. Kaplan).

[298] Cl. Reply, Section 4.2.1.2.

Claimant does not rely.[299]  Claimant also maintains that the FET standard is an obligation that is distinct from and goes beyond the minimum standard of treatment under international law.[300]

291.   Claimant supports its assertion on the applicable legal standard under the ECT, in particular as to the import of the protection of investors' legitimate expectations, by reference to a host of arbitral awards and commentaries, with an emphasis on the stability of the legal and business framework on which an investor relied in making its investment.  Claimant refers to the statement in *Biwater Gauff* that:

> *the purpose of the fair and equitable treatment standard is to provide to international investments treatment that does not affect the basic expectations that were taken into account by the foreign investor to make the investment, as long as these expectations are reasonable and legitimate and have been relied upon by the investor to make the investment.*[301]

292.   Claimant recognizes that a State "*always retains its right to modify its legislation,*" but it asserts, relying on *Eiser,* that it cannot do so in a manner that radically alters the legal framework upon which an investment is based without breaching the FET:

> *Taking account of the context and of the ECT's object and purpose, the Tribunal concludes that Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments. This does not mean that regulatory regimes cannot evolve. Surely they can. "[T]he legitimate expectations of any investor [...] [have] to include the real possibility of reasonable changes and amendments in the legal framework, made by the competent authorities within the limits of the powers conferred on them by the law." However, the Article 10(1) obligation to accord fair and equitable treatment means that regulatory regimes cannot be radically altered as applied to existing investments in ways that*

---

[299] *Id.*, ¶¶ 399-400.

[300] *Id.*, ¶¶ 401, 406-411.

[301] Cl. Mem., ¶ 397 (citing *Biwater Gauff (Tanzania) Limited v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award dated 24 July 2008 (CL-0059) ("***Biwater Gauff***"), ¶ 602).

*deprive investors who invested in reliance on those regimes of their investment's value [...]*[302]

### (ii) Disproportionate and Unreasonable Measures

293. Claimant also alleges that the Disputed Measures were disproportionate and unreasonable. As to disproportionality, it invokes two legal standards. First, it cites the statement of the Tribunal in *Charanne* that modifications to a regulatory regime that are not random or unnecessary meet the proportionality requirement "*provided that they do not suddenly and unexpectedly remove the essential features of the regulatory regime in place.*"[303] Second, the Disputed Measures imposed on PV investors such as Claimant, resulted in "*huge losses*" that were "*not commensurate with the alleged economic rationale and 'public interest' put forward by Spain.*"[304]

294. Claimant disagrees with Respondent's contention that the Tribunal should consider whether the Disputed Measures were unreasonable under what Respondent has described as the "*EDF v. Romania* test." Claimant states that this test enquires into whether measures are discriminatory, whereas Claimant's FET case does not require any showing that the measures were discriminatory.[305]

295. Claimant also addresses Respondent's observations regarding the "*AES* test." Claimant states that it "*agrees that per the 'AES Test', as Respondent identifies it, '[a] challenged measure must also be reasonable. That is, there needs to be an appropriate correlation between the State's public policy objective and the measure adopted to achieve it. This has to do with the nature of the measure and the way it is implemented.*'"[306]

### b. Respondent's Views on the Legal Standard

296. Respondent observes that Claimant's FET case is broken into two alleged violations, the legitimate expectations claim, which Claimant links to stability, and the claim that

---

[302] Cl. Reply, ¶ 418 (emphasis omitted), quoting *Eiser*, ¶¶ 382, 387.

[303] Cl Reply, ¶ 543 (emphasis omitted), citing *Charanne*, ¶ 517.

[304] Cl. Mem., ¶ 559.

[305] Cl. Reply, ¶ 539.

[306] *Id.*, ¶ 540 (emphasis omitted), citing Resp. C-Mem., ¶ 1107.

Respondent enacted disproportionate and irrational measures.[307]  Respondent "*shares with the Claimant that the following duties should be examined within the FET standard of the ECT: (i) not to violate the reasonable and objective expectations of the investor, (ii) to create stable and transparent conditions and (iii) not to adopt irrational and disproportionate measures in detriment of the investor.*"[308]  Respondent responds separately to each of these violations and refers to the legitimate expectations claim as the "*main structuring element*" of the claim.[309]

297.  Respondent does not deny Claimant's assertion that "[t]*he Precedents that apply the ECT incorporate within the Fair and Equitable Treatment standard both the guarantee of respecting the reasonable and objective Expectations of the investors and of creating stable conditions.*"[310]

### (i)  Legitimate Expectations

298.  Respondent submits that the principle of legitimate expectations does not amount to "*a requirement for the host State to freeze its legal system for the investor's benefit*", over and above the needs of the State's general interest.  Instead, "*a reasonable evolution of the host State's law is part of the environment with which investors must contend*".[311]  Respondent states that arbitral precedents applying the standard of legitimate expectation have established that:

> the ECT is not a type of insurance policy for investors against the risk of changes in the regulatory framework and, therefore:
>
> a) *There must be specific commitments made to an investor that the regulations in force will remain unchanged*[; and]

---

[307] Resp. Rej., ¶ 1039.

[308] *Id.*, ¶ 1043.

[309] *Id.*, ¶ 1044.

[310] *Id.*, ¶ 1040.

[311] Resp. C-Mem., ¶ 992, quoting C. Schreuer, "Fair and Equitable Treatment in Arbitral Practice", Journal of World Investment & Trade, Vol. 6, No. 3 (June 2005) (RL-0056), p. 374 (footnotes omitted).

> b) *The investor's expectations have to be reasonable and justified in relation to any changes to the laws of the host country.*[312]

299. Respondent, quoting the Award in *Plama*, recognizes that stable and equitable conditions are part of the fair and equitable treatment standard under the ECT.[313]  However, Respondent states that the "'*stable conditions' referred to in the ECT clearly allow the adoption of reasonable and proportionate macroeconomic control measures, provided these are adopted as a result of a reasonable cause.  This principle has been stated by many previous awards.*"[314]

300. Respondent stresses that stability is not equal to "petrification" of the regulation in place when the investment was made.  Respondent quotes with approval the statement of *Electrabel* that:

> *The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations* in every circumstance. [...] even assuming that Electrabel had an expectation that it would be awarded the maximum compensation [...], once weighed against Hungary's legitimate right to regulate in the public interest, such an expectation does not appear reasonable or legitimate.* [Emphasis and ellipsis added by Respondent][315]

301. Respondent further refers in the same vein to the *Charanne* award's statement that

> To convert a regulatory standard into a specific commitment of the state, by the limited character of the persons who may be affected, would constitute an *excessive limitation on power of states to regulate the economy* **in accordance with the public interest**.
>
> [...] in the absence of a specific commitment toward stability, *an investor cannot have a legitimate* expectation that a regulatory framework such as that at issue in this arbitration is to not be

---

[312] Resp. C-Mem., ¶ 1022 (emphasis omitted).  See also *id.*, ¶ 1023; Resp. Rej., ¶ 1055.

[313] Resp. C-Mem., ¶ 1054, quoting *Plama*, ¶ 173.

[314] Resp. C-Mem., ¶ 1055 (emphasis omitted).

[315] Resp. Rej., ¶ 1027.

> *modified at any time to adapt to the needs of the market and to the public interest.* [Emphasis and ellipsis added by Respondent] [316]

302. Respondent agrees with Claimant that it is appropriate to assess the legitimate expectations that an investor had at the time of its investment to determine whether there has been a violation of the FET standard and that legitimate expectation must be evaluated with reference to an objective standard, i.e., with reference to the information regarding the regulatory regime that a prudent investor should have known. [317] Respondent also asserts that an investor in a highly regulated sector such as renewable energy must have engaged in exhaustive due diligence. [318]

### *(ii) Disproportionate and Unreasonable Measures*

303. Respondent maintains that the measures that it took were reasonable and non-discriminatory. [319] As many awards have recognized, the ECT allows the adoption of reasonable and proportionate macroeconomic control measures. [320]

304. Respondent states that arbitral case law contains three tests that Spain applies to establish that the Disputed Measures were "*not abusive or disproportionate, by meeting the FET objectives and standards established in the ECT:*

> *(a) The* <u>*EDF Test*</u> *v.* <u>*Romania*</u>*, which allows us to examine whether Spain has fulfilled the main objective of the ECT, adopting non-discriminatory measures against the Claimant;*

> *(b) The* <u>*AES Summit test v. Hungary*</u>*, accepted by the Claimant as relevant, which allows us to examine whether the Kingdom of Spain has respected the FET standard of 10(1) ECT; and*

---

[316] *Id.*, ¶ 1028.

[317] Resp. C-Mem., ¶¶ 1009-1013, 1017; Resp. Rej., ¶¶ 1055(e), 1056-1058.

[318] Resp. Rej., ¶ 1055.

[319] Resp C-Mem., ¶¶ 1080-1124; Resp. Rej., ¶¶ 1118-1151.

[320] Resp. C-Mem., ¶ 1055.

> *(c) The <u>Test Total v. Argentina</u> that allows us to examine whether the Kingdom of Spain has respected the* minimum protection standard *guaranteed by International Law for long-term investments, as happens in the Energy Sector.*"[321]

305. As to the "*EDF* Test" and non-discrimination, Respondent asserts that the main objective of the ECT was "*to achieve the introduction of a free market in order to carry out energy-related activities without discrimination on account of the investor's nationality*"[322] and that the "*best standard of protection afforded by the ECT*" is national treatment.[323]

306. In respect of the legal standard that Respondent describes as the "test of *AES Summit*" Respondent states:

> *The test set out in the AES SUMMIT case is used to determine whether or not an abusive (unreasonable) or disproportionate measure exists that does not comply with the FET standard laid down by the ECT. This Award has been invoked by the Claimant, so that the parties agree on the decision criterion applicable in respect of this Award. The Tribunal of the Case Aes Summit v. Hungary established:*
>
> > *'There are two elements that must be analysed to determine whether a State's act was unreasonable: the existence of a rational policy; and the reasonableness of the act of the State in relation to the policy.*
> >
> > *A rational policy is taken by a State following a logical (good sense) explanation and with the aim of addressing a public interest matter.*
> >
> > *(…) A challenged measure must also be reasonable. That is, there needs to be an appropriate correlation between the State's public policy objective and the measure adopted to achieve it. This has to do with the nature of the measure and the way it is implemented.'*[324]

---

[321] Resp. Rej., ¶ 1118 (emphasis in the original).
[322] Resp. C-Mem., ¶ 969 (emphasis omitted).
[323] *Id.*, ¶ 973.
[324] *Id.*, ¶ 1107 (emphasis omitted), quoting *AES Summit*, ¶¶ 10.3.7-10.3.9.

307. With respect to *Total v. Argentina,* Respondent states that "[t]*he Arbitration Tribunal in the Total Case assessed whether the Principle of economic equilibrium that allows a long-term investor to recover costs and to obtain a return on their investment was respected*."[325]  Respondent states that this test has been met because Claimant recovers investment costs necessary for construction and operation of the plants.  It bases this conclusion on the assertion that, since 1989, the costs that Respondent has used to set remuneration for renewable energy plants have not included costs outside of construction and operating costs, such as financing.[326]

### c.  The Tribunal's Analysis

308. As stated in *Electrabel v. Hungary,* "*the obligation to provide fair and equitable treatment comprises several elements, including an obligation to act transparently and with due process; and to refrain from taking arbitrary or discriminatory measures or from frustrating the investor's reasonable expectations with respect to the legal framework adversely affecting its investment*."[327]  The tribunal in *Blusun v. Italy* observed that a State has no obligation to grant subsidies such as feed-in tariffs.  However, if it does so "*and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime*."[328]

309. In the present case, Claimant alleges that Respondent violated its FET obligation in two ways.  It relies primarily on the alleged failure to respect Claimant's legitimate expectations and secondarily on the contention that the Disputed Measures were unreasonable and disproportionate.

---

[325] Resp. Rej., ¶ 1147, citing *Electrabel S.A v. Hungary*, ICSID Case No. ARB/07/19, Award dated 25 November 2015 (RL-0048) ("*Electrabel* **Award**"), ¶ 313.

[326] Resp. Rej., ¶¶ 1148-1149, referring to analysis in ¶¶ 1128-1130.

[327] *Electrabel* Decision, ¶ 7.74.

[328] *Blusun v. Italy*, ¶ 319(5).

### (i) The Legal Standard Applicable to Claimant's Legitimate Expectations Claim

310. The centrepiece of Claimant's case is the allegation that Spain has failed to meet Claimant's legitimate expectations and thus has violated the FET obligation contained in Article 10(1) of the ECT. Claimant does not allege that Spain has expressly promised Claimant that Spain would maintain the legal regime that was in place when Claimant invested. Instead, Claimant asserts that Respondent, through its laws, regulations and other authoritative pronouncements, made "*clear representations*" that "*the financial support provided would be long lasting and stable, thereby making it attractive to potential investors.*"[329] Claimant says that, having relied on these representations when it made its investment in March 2010,[330] it has a legitimate expectation of what it calls a "*guaranteed FIT*" and other "*essential*" or "*core*" features of the regulatory regime in place when it invested, for the twenty-five year period specified in RD 1578/2008. It asserts that the Disputed Measures annihilated those expectations by eliminating the "*fixed*" FIT and "*other core components*" that determined the remuneration of PV plants.[331] Claimant maintains that the Disputed Measures drastically reduced the value of its investment.

311. Respondent answers Claimant's legitimate expectations claim by asserting that its regulatory regime gave Claimant no legitimate expectations beyond that of a reasonable return with reference to the cost of capital, as specified in the governing Spanish legislation, and that Claimant continues to receive a reasonable return under the Specific Regime. Alternatively, Respondent states that Claimant's legitimate expectations have been met because the essential features of the regulatory regime on the basis of which Claimant invested have been retained in the Special Regime. Respondent states that the Disputed Measures were enacted to correct a macroeconomic imbalance, i.e., the tariff deficit, exacerbated by the economic crisis. It also maintains that Claimant's investment has not been impaired.

---

[329] Cl. PHB, ¶ 51.

[330] *Id.*, ¶ 52.

[331] *Id.*, ¶ 162.

312. The Parties agree on several well-established points on which there is no need for the Tribunal to dwell. First, they concur that the ECT should be interpreted in accordance with the law of treaties.[332] Second, they agree that legitimate expectations are to be evaluated as of the date of Claimant's investment. Third, they recognize that, in order for an investor to establish "legitimate" expectations, it is not sufficient for the investor to demonstrate its subjective expectations. The evidence must establish the legitimacy of its expectations on an objective basis, i.e., with reference to the expectations of a prudent investor.

313. The Tribunal does not accept Respondent's assertion that "*specific commitments made to an investor*" are necessary to an FET claim.[333] As has been widely recognized, an investor's legitimate expectations can also arise from provisions of law and regulations and from statements made by or on behalf of the State for the purpose of inducing investment by class of investors.[334]

314. The Parties have addressed the implications of the reference to stability in the first sentence of Article 10(1) of the ECT ("*Each Contracting Party shall* [...] *encourage and create stable* [...] *conditions*"). Respondent regards this sentence to be "*soft law*."[335] Claimant maintains that this sentence contains a specific obligation to create stable investment conditions. However, Claimant does not ask the Tribunal to find that Respondent has breached a stability obligation that is independent of the FET obligation. Instead, it identifies a stable and predictable business environment as an aspect of Respondent's FET obligation.[336] Claimant states that a host State's regulatory regime is subject, "*at most* [...] *to reasonable and limited amendments which would nevertheless leave the core features of the regime intact*."[337]

---

[332] See, e.g., Cl. Mem., ¶ 402 and Resp. C-Mem., ¶ 963.

[333] Resp. Rej., ¶ 1055.

[334] See, e.g., *Electrabel* Decision, ¶ 7.78, and *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award dated 15 June 2018 (CL-0124) ("**Antin**"), ¶ 538.

[335] Resp. C-Mem., ¶ 971.

[336] Cl. Mem., ¶¶ 392-394.

[337] Cl. Reply, ¶ 4. See ¶ 279 *supra.*

315. For purposes of assessing Claimant's legitimate expectations claim, the Tribunal considers, as stated by the Tribunal in *Eiser*, that the FET obligation "*necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments.*"[338] The "*obligation to accord fair and equitable treatment means that regulatory regimes cannot be radically altered as applied to existing investments in ways that deprive investors who invested in reliance on those regimes of their investment's value.*"[339]

316. As observed by the tribunal in *Charanne*, "*an investor has a legitimate expectation that, when modifying the regulation under which it made the investment, the State will not act unreasonably, contrary to the public interest or in a disproportionate manner.*"[340] In addressing claimant's legitimate expectations, the *Charanne* tribunal gave a distinctive meaning to "proportionality":

> *The Arbitral Tribunal considers that the proportionality requirement is fulfilled inasmuch as the modifications are not random or unnecessary, provided that they do not suddenly and unexpectedly remove the essential features of the regulatory framework in place.*[341]

317. The Tribunal finds this formulation of "proportionality" to be suitable to the circumstances of this case, and notes that it has been applied by other tribunals considering changes in renewable energy subsidies, including *Antin*,[342] *Blusun*,[343] *Eiser*,[344] and *RREEF*.[345] This

---

[338] *Eiser*, ¶ 382.  Other tribunals have reached similar conclusions in interpreting Article 10(1) of the ECT.  *Antin*, ¶ 529; *Electrabel* Decision, ¶ 7.73; *Plama*, ¶ 173.

[339] *Eiser*, ¶ 382.

[340] *Charanne*, ¶ 514.

[341] *Id.*, ¶ 517 (as cited in the Award in *Eiser* at ¶ 370).

[342] *Antin*, ¶ 556.

[343] *Blusun*, ¶ 317.

[344] *Eiser*, ¶ 370.

[345] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum dated 30 November 2018 ("**RREEF**"), ¶ 460.

Tribunal will therefore also consider proportionality, as formulated in *Charanne*, in considering Claimant's legitimate expectations claim.

318.   In the view of the Tribunal, the FET provision of the ECT does not operate as a stabilization provision that applies generally to the laws and regulations in place at the time of an investment.   Instead, the assessment of a legitimate expectations claim requires "*a weighing of the Claimant's legitimate and reasonable expectations on the one hand and the Respondent's legitimate regulatory interests on the other.*"[346]   Both the legitimacy of the investor's expectations and the host State's scope to modify its regulatory regime without violating the FET obligation must be measured in light of any undertakings of stability that are contained in the laws, regulations and authoritative pronouncements of the host State, upon which the investor relied when it made its investment.

319.   In order to evaluate the expectations that Claimant could legitimately have had at the time of its investment, the Tribunal will examine Respondent's law and regulations, informed by other evidence, including regulatory reports, other pronouncements by Spanish authorities and the case law of Spain's Supreme Court.   It will take into account the characteristics of investments in photovoltaic plants, as well as the economic conditions at the time of Claimant's investment, such as the large tariff deficit and the global economic crisis.   After stating its views on Claimant's legitimate expectations, the Tribunal will consider whether, by enacting the Disputed Measures, Respondent failed to respect those expectations.

### (ii) The Legal Standard Applicable to a Claim of Disproportionate and Unreasonable Measures

320.   Claimant relies primarily on the alleged failure to respect Claimant's legitimate expectations.   Secondarily, Claimant alleges that the Disputed Measures also violated Respondent's FET obligation because they were disproportionate and unreasonable.

---

[346] *Electrabel* Award, ¶ 165, quoting *Saluka Investments B.V. v. the Czech Republic*, UNCITRAL, Partial Award dated 17 March 2006 ("*Saluka*"), ¶ 306.

321.  The Tribunal first addresses the three "tests" suggested by Respondent to determine whether measures are reasonable (not arbitrary) and non-discriminatory.

322.  Claimant has not alleged that it has faced discrimination, nor is a showing of discrimination necessary to establish a violation of an FET obligation, so the Tribunal sets aside what Respondent labels the "*EDF* test."

323.  With respect to the test that Respondent describes as the *Total v. Argentina* test, the Tribunal does not understand that tribunal to have decided that a State's FET obligation is met whenever it is established that a claimant's construction costs and operating costs are covered by a remuneration regime.  The Tribunal in *Total* considered a range of factors in reaching its conclusions.  The phrase of that Award on which Respondent relies, taken out of context, cannot fairly be described as a free-standing "test" of whether an FET obligation has been met.

324.  Of greater interest is the award in *AES Summit*.  In that case, the claimant alleged, *inter alia,* that the respondent had failed to meet two obligations contained in Article 10(1) of the ECT, the FET obligation and the "non-impairment" obligation, which provides that "*no Contracting Party shall in any way impair by unreasonable or discriminatory measures* the "*management, maintenance, use, enjoyment or disposal*" of an Investment.[347]  In the present case, Claimant does not allege that Respondent breached the non-impairment obligation.

325.  The excerpt that Respondent invokes as a legal standard applicable to the present case (which was embraced at least in part by Claimant), does not appear in the part of the *AES Summit* award that addresses the legal standard relevant to the FET obligation.[348]  It is located instead in the portion of the award that addresses the legal standard applicable to non-impairment obligation.[349]

---

[347] *AES Summit*, ¶¶ 9.1-9.1.10.

[348] See *id.*, ¶ 9.3 (addressing legal standards applicable to alleged breach of the FET provision).

[349] *Id.*, ¶¶ 10.3.7-10.3.9 (addressing legal standard applicable to non-impairment claim, quoted by Respondent in Resp. C-Mem., ¶ 1107).

326.  Without suggesting that the FET obligation and the non-impairment obligation have identical content, the Tribunal embraces the notion of reasonableness used in *AES Summit* and endorsed by both Parties.  In order for a challenged measure to be reasonable, there must be "*an appropriate correlation between the state's public policy objective and the measure adopted to achieve it*."[350]  The FET standard prevents a host State from acting "*in a way that is manifestly inconsistent, non-transparent, unreasonable (*i.e. *unrelated to some rational policy) or discriminatory (*i.e. *based on unjustifiable distinctions)*."[351]

327.  As to Claimant's contention that the Disputed Measures are disproportionate, the Tribunal takes note of two ways in which disproportionality can be understood.  The first of these is the formulation of the Tribunal in *Charanne*, cited earlier,[352] which this Tribunal has adopted.

328.  The question of proportionality can also be addressed by weighing the legitimate policy interest pursued by the State against the impact of the measure on the investment or a class of investments to which the claim belongs. These competing considerations can be examined in light of the degree of stability in the regulatory regime in place at the time of an investment.  As stated in *Electrabel*, the requirement that measures be reasonable and not arbitrary "*includes the requirement that the impact of the measure on the investor be proportional to the policy objective sought*."[353]

329.  Before turning to the evidence, the Tribunal briefly addresses certain other points of law raised by the Parties' positions.

330.  The Parties have addressed the implications of due diligence – or lack thereof – by an investor.  Respondent states that Claimant did not "*perform a minimum due diligence*"

---

[350] *Id.*, ¶ 10.3.9.

[351] *Saluka*, ¶ 309.

[352] See ¶ 316 *supra*.  Cl. Reply, ¶ 543, citing *Charanne*, ¶ 517.

[353] *Electrabel* Award, ¶ 179 (after addressing the investor's legitimate expectations claim, the tribunal in *Electrabel* separately considered claimant's "*arbitrariness*" claim, which the tribunal found to encompass several concepts, including disproportionality and reasonableness).  See also, *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Arbitration (2015/063), Final Arbitral Award dated 15 February 2018 (RL-0099) ("***Novenergia II***"), ¶ 705 (finding that Spain's measures did not relate to a rational public policy and were "*disproportionately burdensome*" on investors).

prior to its investment.[354]  Claimant states that the clear language of RD 661/2007 RD 1578/2008, along with additional materials and the public statements of the Spanish government, gave investors a clear understanding of Spain's "*favourable framework*."  In these circumstances, Claimant maintains that it was not compelled to conduct a "*formal due diligence procedure*."[355]

331. The Tribunal considers that a formal due diligence process is not a precondition to a successful claim of legitimate expectations.  However, an investor cannot benefit from gaps in its subjective knowledge of the regulatory environment because, under an objective standard, the investor's legitimate expectations are measured with reference to the knowledge that a hypothetical prudent investor is deemed to have had as of the date of the investment.  The extent of inquiry that is incumbent on a prudent investor depends on the particular circumstances of the case.

332. As to Respondent's suggestion that the standard of treatment required by the FET provision of the ECT is fulfilled when the Contracting Party meets the minimum standard required by international law,[356] the Tribunal recalls that, after setting out several obligations, including the obligation to accord fair and equitable treatment, Article 10(1) of the ECT provides: "*In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations*."  The Tribunal considers that this sentence indicates that the standard of treatment under international law, including other treaty obligations, operates as a floor, with the consequence that the FET obligation in Article 10(1) cannot be interpreted to require less than is required by "*international law, including treaty obligations*."  Moreover, the Parties have not advanced particular arguments based on asserted similarities or dissimilarities between the requirements of the FET provision in Article 10(1) and those otherwise found in international law, including other treaty obligations.

---

[354] Resp. PHB, ¶ 76.
[355] Cl. PHB, ¶¶ 101-102.
[356] Resp. Rej., ¶ 67.

333. The Parties invoke numerous prior arbitral awards. The Tribunal has taken this arbitral case law into account, without being bound by the conclusions of other tribunals.

334. This case is one of many proceedings arising out of changes in Spain's regime for remuneration of renewable energy providers. Even when cases arise under the same treaty (the ECT) and involve the same regulatory regime, the awards reveal variations in critical evidence, including the date of investment, the type of renewable energy, and the evidence given by witnesses and experts. Each claimant presents its legal theory and its evidence in a unique way, with inevitable consequences for the way in which Respondent defends the case. In circumstances in which a tribunal's conclusions follow from accumulated inferences of fact, these distinctions mean that the conclusion in any one case is highly specific to that case. This Tribunal bases its decision on the record in this proceeding.

335. Each Party bears the burden of proving the facts that it alleges. Thus, in the main, the burden of proof falls on Claimant.

### (3)    The Evidence

#### a.   The Evidence on which Claimant Relies

##### (i)  Claimant's Expectations as of the Time of the Investment

336. Claimant maintains that its legitimate expectations follow from provisions of Spain's law and regulations, as they stood when Claimant invested, as well as other pronouncements by Spain. It claims that it was induced to invest by the regulatory regime that was in place when it invested.

337. Claimant states that the date of its investment was March 2010, when it acquired ownership of Fotones. The fact that it engaged in additional financing transactions in May 2010 does not change the date of investment and, in any event, the information available in the market was similar in March and May 2010, so the legitimate expectations of Claimant would have been the same during either month.[357]

---

[357] Cl. PHB, ¶¶ 80-81.

338.  Claimant and Brattle make a series of observations about the general characteristics of investment in PV plants.

339.  PV plants are expensive as compared to non-renewable forms of energy production.  They are capital-intensive, meaning that the largest component of their cost is the initial investment (purchase and installation of equipment).[358]  Claimant's experts stated that initial capital expenses for a PV plant account for about 90% of "*levelised costs*" of a PV plant, i.e., "*the annual price per MWh of electricity that the PV installations would need to earn, increasing each year by inflation, to obtain sufficient revenues to compensate for all operating and maintenance costs over the life of the facility, pay back the initial investment, and provide a reasonable return to the investor*."  Operating and maintenance costs account for the remaining ten percent.[359]

340.  Claimant's expert explains that, because an investment in a PV plant is so capital-intensive, the initial investment cost drives the economics of a plant.  The investor is "*stuck with*" those costs for the lifetime of the plant.[360]  The expert presented the view that the Original Regulatory Regime therefore reflected the cost of money by establishing a rate of return that was reasonable as of the time that an investment was made, to be adjusted in light of inflation.  As to RD 1578/2008 in particular, this was accomplished by adjusting the tariffs applicable to new plants on a quarterly basis.[361]

341.  Claimant has also called attention to the method of financing investments in PV plants.  Equity shareholders face lower risks if their revenue streams are predictable and stable, as is the case with a long-term, fixed FIT, adjusting over time with

---

[358] Cl. Mem., ¶ 28.

[359] First Brattle Regulatory Report, ¶ 49.  Brattle defines "levelised costs" as follows:

> "*The term 'levelised cost' includes depreciation and interest payments, which are both accounting costs, and other items that accountants would not normally consider as 'costs': the payment of outstanding principal on loans, and also the portion of accounting profits that is necessary to provide a reasonable return on the initial equity investment.  It is appropriate to describe a portion of the accounting profits as a 'cost,' because the return on investment is a cost in a broader sense of the word.  If a PV project cannot offer shareholders a reasonable return on equity then investors will simply turn elsewhere.*"  First Brattle Regulatory Report, fn. 32.

[360] Rev. Tr. Day 2 (ENG), 237:7 to 237:11 (Mr. Lapuerta).

[361] Rev. Tr. Day 2 (ENG), 238:22 to 240:13 (Mr. Lapuerta).

inflation. Stability and predictability has important implications for debt financing. If a project is seen to have a sufficiently low risk of default, lenders will make non-recourse or limited-recourse loans.[362] According to Claimant's experts, a typical financing structure for a PV project involves non-recourse or limited-recourse financing for about 60-80% of total initial capital costs.[363] Claimant states that there is "*no doubt that Spain not only envisaged that investors would seek financing for their renewable energy projects, it also acknowledged that such financing would enable them to obtain higher returns on their investments.*"[364]

342.  In support of its contention that the Original Regulatory Regime was informed by Spain's understanding that PV investments were highly leveraged, Claimant notes the analysis in the 2005-2010 PER, which is premised on approximately 77% external financing for renewable energy investments.[365]

343.  According to Claimant, stable and predictable FITs translate into stable and predictable revenues, thus reducing the risks for PV investors, which, in turn, reduces the return that is necessary to attract investors.[366]

344.  To substantiate its legitimate expectations claim, Claimant identifies what it considers to be the provisions of Spain's laws and regulations that were key to the legitimate expectations of a PV investor in March 2010. When Claimant invested, Article 30(4) of Law 54/1997 specified "*reasonable profitability rates with reference to the cost of money on capital markets.*"[367] Claimant observes that the preamble of RD 661/2007 refers to the principles of Law 54/1997, "*guaranteeing the owners of facilities under the special regime a reasonable return on their investments.*"[368]

---

[362] Cl. Mem., ¶ 43.

[363] First Brattle Regulatory Report, ¶ 79.

[364] Cl. PHB, ¶ 71, citing RD 436/2004 Memoria, p. 5 (exhibit W-0019 of Second Montoya Statement).

[365] First Brattle Regulatory Report, ¶¶ 79, 194 and fn. 214, referring to 2005-2010 PER, p. 275.

[366] First Brattle Regulatory Report, ¶ 78.

[367] Act 54/1997, Article 30(4). The Spanish original reads: "…*tasas de rentabilidad razonables con referencia al coste del dinero en el mercado de capitales*".

[368] Cl. Opening Presentation, slide 29, quoting RD 661/2007, Preamble.

345. Claimant calls attention to the following provisions of RD 661/2007: Article 24(1), which allowed providers to elect a "*regulated tariff, which shall be the same for all scheduling periods;*"[369] Article 17(c), pursuant to which this financial support applied to all production (without limitation as to number of hours);[370] and Article 44(3), which, according to Claimant, exempted existing FITs from future revisions of tariffs.[371] In addition, according to Claimant, RD 661/2007 provided for a guaranteed priority of dispatch, assuring that all production could be introduced into the grid subject to the established tariff.[372]

346. Claimant observes that CNE Report 3/2007, issued in advance of RD 661/2007, stated that the new regulation "*must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility.*" That report also stated that the regulation must provide, *inter alia,* for regular reviews "*that only affect new facilities.*"[373]

347. Claimant also calls attention to the press release issued by Respondent upon adoption of RD 661/2007, entitled "*Government grants profitability and stability with new Royal Decree for renewable energy and cogeneration,*" which included these statements:

> *Future revision of the tariffs will not affect facilities already operating. This guarantee gives legal certainty for the producer, providing stability to the sector and promoting its development. The new regulation will not have retroactive effects. Installations commissioned up until 1 January 2008 will remain under the previous regulation in terms of the fixed-tariff option throughout their service life.* […]
>
> *The government's commitment in favour of these energy technologies has been the reason why the new regulation seeks stability over time that allows entrepreneurs to plan in the medium to long-term, as well as [granting them] an adequate and*

---

[369] Cl. Opening Presentation, slide 28, quoting RD 661/2007, Article 24(1).

[370] Cl. Opening Presentation, slide 28, referring to RD 661/2007, Article 17(c).

[371] Cl. Opening Presentation, slide 29. See ¶ 106 *supra*.

[372] Cl. Reply, ¶ 455.

[373] Cl. Opening Presentation, slide 27, quoting 2007 CNE Report, p. 16.

> *reasonable return that, along with stability, make the investment and the activity attractive.*[374]

348. According to Claimant, the essential features and benefits of RD 661/2007 (including stable and predictable FITs and priority of dispatch) continued to apply under RD 1578/2008. It notes that the preamble of RD 1578/2008 stated that the Royal Decree was necessary to provide "*continuity and expectations*" to renewable energy investments.[375]

349. Claimant observes that RD 1578/2008 reduced FITs for PV investments, but did so only for facilities that had not met the deadline to qualify for the FITs governed by RD 661/2007. In addition, whereas FITs for plants operating under RD 661/2007 applied for the useful life of a plant, FITs for plants operating under RD 1578/2008 did not extend beyond 25 years.

350. Claimant notes that the preamble of RD 1578/2008 refers to the pre-assignment registry that is used for setting FITs under RD 1578/2008, stating that "*a mechanism is established for assigning compensation by registration in a compensation assignment registry, at the beginning of the development of a project, which will provide the necessary legal security to promoters with respect to the return that the facility will earn once it is put into operation.*"[376] It also points to Article 4(3) of RD 1578/2008, which provides: "*Registrations in the compensation preassignment registry shall be associated with a period of time hereinafter referred to as the 'call for registration,' which will create the right to receive the compensation set in such period of time.*"[377]

351. As further support for the legitimacy of its expectation that the FIT would continue, Claimant maintains that, prior to the Disputed Measures, Spain had not made changes to FITs that had an adverse impact on existing plants.[378]

---

[374] Minetur Press Release dated 25 May 2007 (C-0063) ("**RD 661/2007 Press Release**"); Cl. Reply, ¶ 114 and fn. 108.

[375] Cl. PHB, ¶ 51 and fn. 64.

[376] RD 1578/2008, Preamble (Resp. translation).

[377] Cl. Opening Presentation, slide 37 (citing Resp. translation) (emphasis omitted).

[378] Cl. Mem., ¶¶ 429-443; Cl. Reply, ¶¶ 455-465.

352.   Claimant rejects Respondent's assertion that Claimant's views would freeze Spain's remuneration scheme, because RD 1578/2008 contemplated that remuneration of PV plants could be reduced as technology becomes less expensive.  It points out that Article 11(2) of 1578/2008 provided for quarterly updates of FITs that would take into account reduced investment costs.  However, those updated FITs did not apply to a plant that had previously been assigned a FIT based on its date of entry into the pre-assignment registry.

353.   Claimant also points to the Fifth Additional Provision of RD 1578/2008, which provides: "*During 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by photovoltaic solar technology may be modified.*"[379]  Claimant considers that this provision necessarily refers only to modification of compensation for new facilities, because it is not feasible to modify a PV plant after it has been constructed in order to take advantage of "technological evolution."  It points out that this interpretation of the Fifth Additional Provision corresponds to the view expressed by the CNE in October 2009 (in response to an inquiry from an investor) that "*modification of the remuneration regime referred to in additional provision five should be applicable to new facilities registered from 2012 onwards.*"[380]

354.   Claimant submits that Spain's open support for renewable energy and its intense promotion of the Original Regulatory Regime publicly, "*on numerous occasions, in a variety of fora, before multiple persons, over an extended period of time*" reinforced Claimant's legitimate expectations.[381]  According to Claimant, Respondent widely advertised the Original Regulatory Regime, *inter alia*, through government statements, CNE reports, presentations made abroad specifically directed at foreign investors, press releases and presentations, declarations from the Minister of Energy, activities promoted by MINETUR, and other

---

[379] Cl. PHB, ¶ 57, citing RD 1578/2008, Fifth Additional Provision.

[380] Cl. Opening Presentation, slide 39, quoting from CNE Consultation of an individual on the fifth additional provision of the Royal Decree 1578 dated 22 October 2009 (C-0189) ("**2009 CNE RD 1578/2008 Consultation**").

[381] Cl. Mem., ¶¶ 482.

official programs and documents.[382]  Claimant refers, for example, to presentations for the purpose of promoting Spain's remuneration scheme that included the statements that, under RD 1578/2008, FITs "*will be guaranteed for a determined quota*"[383] and that Spanish legislation "[g]*uarantee*[s] *the necessary legal security for investors*."[384]

355.  Claimant concludes that all of these substantial and formal guarantees were key to attracting Claimant's investment, and – as was found to be the case in *Micula* – Respondent could not remove such incentives and legal framework without breaching Claimant's legitimate expectations and the FET standard.[385]

356.  Claimant states that SolEs investigated, and was fully aware of, Respondent's regulatory environment before and at the time it invested (e.g., through enquiries and analysis that Claimant, or Voigt & Coll, had carried out since 2006).[386]  It states that no due diligence was required to establish legitimate expectations in light of the clear language of RD 661/2007 and RD 1578/2008 and that no amount of due diligence could have foreseen the drastic changes undertaken by Respondent.[387]

357.  Claimant disputes Respondent's contention that there were warning signs, prior to Claimant's investment, that the regulatory regime applicable to existing plants would change.  It considers that contemporaneous evidence leads to the opposite conclusion.  For example, Claimant refutes Spain's assertion that press reports had indicated certainty about upcoming regulatory changes, and that the industry was aware of those changes.  It considers that those reports suggest instead that Spain intended to adjust tariffs without changing those of existing plants, as it had in RD 1578/2008.  As illustrations, it

---

[382] Cl. Reply, ¶¶ 470, 475, 478.

[383] Invest in Spain (Ministerio de Economía y Competitividad), "Business opportunities in the Spanish solar PV sector" (2010) (C-0023).

[384] Presentation "Renewable Energy in Spain" of the Embassy of Spain and the "Oficina Económica y Comercial de España.Ucrania" October 2009 (C-0059).  See also Cl. Mem., ¶¶ 445-447 (citing, *inter alia*, RD 436/2004, Preamble and Article 1; RD 661/2007, Preamble and Article 44(3); RD 1578/2008, Preamble; and Cl. Reply, ¶¶ 466-468.

[385] Cl. Mem., ¶¶ 450-459 (citing, *inter alia, Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania,* ICSID Case No. ARB/05/20, Award dated 11 December 2013, ¶¶ 678, 686 (CL-0069, RL-0093) ("*Micula*")).  See also Cl. Reply, ¶ 521.

[386] Cl. Reply, ¶¶ 497-507.

[387] *Id.*, ¶¶ 508-515.

points out that a February 2010 press report on which Spain relies refers to planned projects (thus making reference to plants to which a FIT had not yet been assigned) and calls attention to a May 2010 report indicating that the then-Chairwoman of the CNE stated that "*the return on current and future investments will be guaranteed*."[388]

358. Claimant also addresses an Altran and Arthur D. Little Report of a workshop held in April 2010[389] and offers an interpretation that differs from that of Respondent. Whereas AMG represented that the Report indicated a 25% chance that FITs for existing facilities would be reduced in five years, Claimant and its expert consider that this report referred instead to a ten percent chance of a 25% reduction FITs within five years and, moreover, that the risk addressed in the report was not the risk that tariffs on existing facilities would be reduced, but rather to a risk of missing a tariff window, with the consequence of being assigned a new, lower in a subsequent tranche.[390]

359. As further evidence of industry expectations, Claimant relies on testimony of Respondent's expert, Mr. Greatrex, at the Hearing. As discussed below,[391] Respondent's Expert Report stated that there was "*almost total certainty*" as of the date of Claimant's investment of the introduction in the short term of measures that would reduce Claimant's remuneration. In cross-examination, Mr. Greatrex addressed statements that he had made in e-mails sent during the period March 2009 to March 2010, when he was a partner at Arthur D Little with responsibility for PV investments in Portugal and Spain. In a March 2010 e-mail, Mr. Greatrex referred to an unleveraged return of 10% on a PV project in Spain, which

---

[388] Cl. PHB, ¶¶ 140-149 (referring to Article published in Suelo Solar: "The Cut in Premiums for Photovoltaic Energy is Confirmed" dated 9 February 2010 (R-0346), News article from Aguayoabogados: "The Cut in Premiums for Photovoltaic Energy is Confirmed" dated 24 February 2010 (R-0347), and Newspaper article in Cinco Días: "The Chairwoman of the CNE Calls for More 'Reasonableness' in Photovoltaic Energy Premiums" dated 20 May 2010 (R-0258)).

[389] Cl. PHB, ¶¶ 133-139.

[390] *Id.*, referring to Second AMG Report and Altran and Arthur D. Little Report, "Risk Quantification and Risk Management in Renewable Energy Projects" (BQR-0105).

[391] See ¶ 435 *infra*.

could lead to a leveraged return "*north of 15%*."[392]  Claimant noted in its post-hearing brief:

> *During the hearing, Mr. Greatrex recognized that the e-mail did not so much as suggest the possibility of the impending annihilation of the* [Original Regulatory Regime].  *Mr. Greatrex's email does not include any warning that the potential return* 'north of 15%' *was at any risk of being substantially cut after the implementation of the measures that he claims today were widely foreseen at the time.*[393]

360.  Claimant also addresses Respondent's contention that the case law of Spain's Supreme Court[394] made clear that Claimant could have had no legitimate expectation other than that of a reasonable return.  Claimant considers that only the case law of Spain's Supreme Court that was issued prior to Claimant's investment is relevant to its case and that none of the relevant case law addressed substantial retroactive changes in the energy sector.[395]  It states that the relevant case law establishes that:

> *(a) Spain did not have an unlimited right to amend the regulatory framework; (b) principles of legal certainty, predictability, and stability prevented Spain from radical amendments with no guarantees, transitional periods or compensatory measures; and (c) if such Spain were to violate such principles, a diligent, well-advised investor was entitled to believe that Spain would be liable for the damages caused.*[396]

361.  Claimant counters Respondent's contention[397] that, because there is no right to State aid under EU law, an investor can have no legitimate expectation that support for renewable energy will be maintained.  With respect to European Commission decisions regarding State aid programmes of Member States, Claimant points out that the European Commission has made no finding that the Original Regulatory Regime is incompatible with EU regulations, nor has the Original Regulatory Regime been challenged on that

---

[392] Email of Mr. Grant Greatrex to Mr. Luis Quiroga and Mr. Jean Perarnaud dated 19 March 2010 (C-0192).

[393] Cl. PHB, ¶ 123.

[394] See ¶ 386 *et seq. infra*.

[395] Rev. Tr. Day 1 (ENG), 57:2 to 57:17 (Mr. Bedoya).

[396] Cl. PHB, ¶ 93 (emphasis omitted).

[397] See ¶ 392 *infra*.

ground.[398]  Claimant's expert stated that there had been ninety applications to the European Commission for approval of renewable energy support schemes and all of them have been granted.[399]  Claimant offers comparisons between the rate of return under the Original Regulatory Regime and the rates of return in various programmes approved by the Commission, that, according to Claimant, were higher than the rate of return pertaining to Claimant.[400]

362.  In response to Respondent's observations regarding statements made in prospectuses that Claimant issued to prospective investors, Claimant acknowledges that the prospectuses included a provision about regulatory risks, including the risk of the FITs changing.  Claimant states that such warnings were mandatory under German regulations and that, "[a]*s Mr. Hopp has explained, this disclaimer did not mean that SolEs Badajoz was aware of any specific risk of retroactive changes – or that it accepted any such risk*."[401]

363.  Claimant maintains that Spain had represented the return under the Original Regulatory Regime to be 7-8%, calculated without financing and after taxes.  It notes, for example, that the 2005-2010 PER referred to a return of "*around 7%, on equity (before any financing) and after taxes*"[402] and that the 2008 CNE Report contemplated a return of 7%, as had been used in RD 661/2007.[403]

### (ii) Claimant's Evidence Regarding the Disputed Measures

364.  Claimant states that there were alternatives to the Disputed Measures that Respondent could have employed to address the tariff deficit, including *(i)* raising regulated tariffs; *(ii)* eliminating the regulated tariffs for electricity generation; *(iii)* imposing a tax on all $CO_2$ emissions; *(iv)* imposing a broad levy on fuel consumption; and *(v)* temporarily changing the profile of FITs for concentrated solar power.[404]  *The EU Environmental*

---

[398] Cl. PHB, ¶ 41.

[399] *Id*., ¶¶ 41-44, citing the testimony of Mr. Lapuerta.

[400] *Id*., ¶ 43, citing the testimony of Mr. Lapuerta.

[401] *Id*., ¶ 100.

[402] 2005-2010 PER, p. 274.

[403] 2008 CNE Report, p. 17.

[404] Cl. PHB, ¶¶ 210-211; First Brattle Regulatory Report, ¶¶ 121-137; Second Brattle Regulatory Report, ¶¶ 130-137.

*Implementation Review Country Report – Spain*[405] recommended that Spain raise environmental taxes. That Report estimated that Spain could raise €3.45 billion in real 2005 terms and €6.96 billion by 2030.[406] According to testimony by one of the Brattle experts, €3.45 billion would have compensated for the Disputed Measures.[407] Claimant also asserts that the tariff deficit was the result of Spain's own actions and omissions.[408]

365. As to the First Set of Disputed Measures, Claimant maintains that RDL 14/2010, which capped the number of hours for which a PV plant would receive the FIT, had a clear negative impact on the sector.[409] Further measures taken in 2012 and 2013 "*retroactively reduced incentives and support*" to PV facilities. These included Law 15/2012 (which imposed a seven percent tax, and as to which the Tribunal has concluded that it lacks jurisdiction) and RDL 2/2013, which changed the index used to make annual adjustments to the FITs for inflation.[410] Claimant states that these measures reduced the revenue of its plants.[411]

366. Turning to the Second Set of Disputed Measures, pursuant to which Claimant is subject to the Specific Regime, Claimant asserts that the rate of return under the Specific Regime is lower than it had been under the Original Regulatory Regime. Claimant points out that, because the rate of return under the Original Regulatory Regime was calculated before financing and after taxes, a fair comparison requires that the rate of return under the Specific Regime also be calculated before financing and after taxes. It also points out that the target rate of return under the Specific Regime is subject to periodic revision.

367. Claimant asserts that the current rate of return under the Specific Regime, which is 7.398% before taxes, equates to a return of 5.9% after taxes. This is lower than the target return of

---

[405] European Commission, Commission Staff Working Document: The EU Environmental Implementation Review Country Report – Spain dated 3 February 2017 (BRR-0193).

[406] Cl. PHB, ¶ 211.

[407] Rev. Tr. Day 3 (ENG), 85:10 to 85:22 (Mr. García).

[408] Cl. Reply, ¶ 178.

[409] Cl. Mem., ¶¶ 189-190.

[410] *Id.*, ¶¶ 198-203.

[411] *Id.*, ¶ 605.

7-8% (without financing and after taxes) under the Original Regulatory Regime.[412] According to Claimant's expert, the return under the Original Regulatory Regime (7-8% after taxes) would be between 8.7% and 10% before taxes. Claimant's expert further states that, because the rate of return under the Original Regulatory Regime was set without consideration of financing, the after-tax return under the Original Regulatory Regime cannot be fairly compared to the after-tax return under the Specific Regime that is calculated using a low tax rate (6.51%) that results from the "tax shield" that arises from high leveraging. It is inappropriate to calculate a low tax rate based on interest payments when the Original Regulatory Regime calculated returns without financing, as Respondent's experts do.[413]

368. In response to Respondent's contention that the Specific Regime offers a reasonable return tied to the cost of money, as did the Original Regulatory Regime, Claimant states that a "reasonable return" cannot be a "*wholly subjective, self-judging standard that depended entirely on Spain's unilateral determination.*"[414] Claimant's expert points out that yields on Spanish bonds were roughly the same in 2013 as they were when Spain adopted RD 661/2007 and RD 1578/2008. Thus, a change in the "cost of money" could not justify the change in economic parameters in 2013, when the Specific Regime replaced the Original Regulatory Regime.[415]

369. In response to Respondent's assertion that the rate of return under the Original Regulatory Regime was set with reference to greenfield investors, whereas Claimant is a brownfield investor, because construction of its PV plants had largely been completed with Claimant acquired them, Claimant's expert accepted both that Claimant was "largely" a brownfield investor and that a brownfield investor does not bear construction risk, but explains that a brownfield investor pays a premium to the greenfield investor in order to reduce that risk.[416]

---

[412] Brattle Regulatory Presentation, slides 17-18 and Rev. Tr. Day 2 (ENG), 249:20 to 251:18 (Mr. Lapuerta).

[413] Rev. Tr. Day 2 (ENG), 255:15 to 256:11 (Mr. Lapuerta).

[414] Cl. Reply, ¶ 3.

[415] Rev. Tr. Day 2 (ENG), 243:14 to 245:5 (Mr. Lapuerta).

[416] Rev. Tr. Day 3 (ENG), 99:21 to 100:17 (Mr. Lapuerta).

370. Claimant states that the detrimental aspects of the "midstream switch" in regulatory regime extend beyond a comparison of two rates of return. The structure of the tariff that applies to Claimant's plants has also changed. Under the Original Regulatory Regime, the FIT applied to every megawatt-hour produced, creating an incentive to build efficient plants and to maximize production to achieve an "efficiency reward." By contrast, under the Specific Regime, plants receive the pool price (which is much lower than the subsidized FIT) once they reach an annual cap, which reduces the efficiency reward.[417] Brattle states that Claimant's plants are 20% more efficient than the standard plants used to set rates under the Specific Regime.[418]

371. Claimant also maintains that the lack of clarity in the Specific Regime makes it impossible to predict the future regime and thus to predict future cash flows. It states that Respondent has retained the discretion to alter parameters such as the target rate of return, which is subject to revision every three or six years. Under the Specific Regime, the target rate of return will depend on the yield on ten-year Spanish bonds, to which a "spread" will be added, but there is no clear or specific methodology for establishing the target rate of return or, more specifically, the spread that will be applied in setting the target rate.[419]

372. Claimant's expert also states that there is a logical problem in the analysis of the rate of return presented by Respondent's expert. On the one hand, AMG justifies a 21% reduction in revenue on the ground that there had been excess profits under the Original Regulatory Regime. On the other hand, AMG maintains that the rate of return under the Specific Regime is close to 7% after tax, as it was under the Original Regulatory Regime. Claimant's expert considers that the correct analysis is that the cost of money has not changed, but the return has been reduced, leading to far lower revenues for PV plants.[420] According to Claimant's expert, this observation is consistent with the position that the CNMC took in 2013, shortly after the new regulatory regime was adopted. The CNMC

---

[417] Cl. PHB, ¶ 164 and Brattle Regulatory Presentation; Rev. Tr. Day 2 (ENG), 249:1 to 249:19 (Mr. Lapuerta).
[418] Rev. Tr. Day 4 (ENG), 21:22 to 22:7 (Mr. Caldwell) and Brattle Quantum Presentation, slide 25.
[419] First Brattle Regulatory Report, ¶¶ 202-210.
[420] Cl. PHB, ¶ 164; Brattle Regulatory Presentation, slide 26 (citing Second AMG Report, ¶ 32); and Rev. Tr. Day 2 (ENG), 258:6 to 260:18 (Mr. Lapuerta).

stated that "[t]*he change in remuneration is fundamentally due to the introduction of a rate of return applicable to the full regulatory lifespan of each facility, which is lower than the rate implied by the premiums and tariffs under the remuneration framework prior to RD-Act 9/2013*".[421]

373. While Claimant maintains that the FET standard can be breached without evidence of impairment of the investment, it considers that such impairment is in any event present in this case due to the extent of the financial damages suffered by Claimant. Claimant refers to the findings of the tribunal in *Total v. Argentina* to conclude that such impairment is an international wrong for which compensation must be paid.[422]

374. Claimant asserts that the new regulatory regime impaired its investment due to the loss of value of its shares in Fotones, the fact that it is no longer in a position to obtain any return, and that it has been denied future cash flows from Fotones which were assured under the prior regime.[423] For instance, Claimant asserts that Respondent's measures reduced the aggregate present value of Fotones' future cash flows by 41%, and reduced the free cash flows to SolEs over the operating lifetime of the plants by 88.4% compared to the Original Regulatory Regime.[424]

### b. The Evidence on which Respondent Relies

#### (i) The Evidence Related to Claimant's Expectations as of the Time of the Investment

375. Respondent considers that Claimant's claim of legitimate expectations amounts to an unreasonable expectation that Spain's regime would be frozen and wrongly assumes that

---

[421] CNMC Report, "Assessment of the Proposal Order Approving the Remuneration Parameters for the Standard Installations Applicable to Renewable Generation Projects, Cogeneration and Waste Plants and Determining the Methodology to Update the Operating Incentive" dated 3 April 2014 (BRR-0101), p. 28, mentioned at Rev. Tr. Day 2 (ENG), 260:4 to 260:18 (Mr. Lapuerta).

[422] Cl. Mem., ¶¶ 550 and 551 (citing *Total S.A. v. Argentine* Republic, ICSID Case No. ARB/04/1, Decision on Liability dated 27 December 2010 (CL-0065), ¶ 122).

[423] Cl. Mem., ¶ 549; Cl. Reply, ¶ 590.

[424] Cl. Reply, ¶¶ 534-535.

Claimant has an acquired right to all future tariffs, for all energy produced by its plants over a 25-year span.[425]

376. With respect to the date of investment (that is, the date relevant to determining Claimant's legitimate expectations), Respondent recognizes that Claimant acquired its interest in Fotones in March 2010, but states that Claimant's "*actual brownfield investment*" was not made until May 2010, when Claimant obtained additional financing.[426] When asked at the Hearing to address the significance that it attached to the May date, Respondent answered that there had been "*news in the renewable sector regarding the future amendments to the regulatory framework*", referring to three documents that it had submitted as evidence, which were "*issued by newspapers.*"[427]

377. According to Respondent, Spain made no specific commitments in favor of Claimant or its investments.[428] No diligently informed investor could expect the freezing of an entire regulatory regime due to the mere fact of fulfilling a mandatory administrative registration procedure (in this case, RAIPRE).[429]

378. Respondent argues that Claimant's expectations, beyond that of a reasonable return, are not objective, taking into account all the evidence, including the regulatory regime itself, statements by the Government and the CNE, the case law of Spain's Supreme Court, EU requirements regarding State aid and industry and press reports that make clear that the renewable energy sector was well aware of possible changes to the remuneration scheme. According to Respondent, there were warning signs that the Government would modify the remuneration of photovoltaic producers, limited by the principle of a reasonable rate of return.[430]

---

[425] Resp. C-Mem., ¶ 1008.

[426] Resp. C-Mem., ¶ 617.

[427] Rev. Tr. Day 2 (ENG), 32:3 to 32:19 (Mr. Fernández Castilla).

[428] Resp. C-Mem., ¶¶ 1024-1030, 1088; Resp. Rej., ¶¶ 1075-1076.

[429] Resp. C-Mem., ¶ 1030.

[430] Resp. Rej., ¶¶ 1065, 1067, 1077. Respondent refers in its post-hearing brief to "*18 Documents*," including seven that are dated April or May 2010. Respondent considers all of these documents to be relevant because Claimant entered into loans in May 2010 and "*leases of 17 Million Euros.*" Resp. PHB, ¶¶ 129-130 and fn. 125.

379. Respondent states that "*Claimant has given a biased explanation of the regulatory framework and of the economic situation in Spain at the time of* [its] *investment, with the only purpose of trying to sustain* [its] *thesis on the supposed immutability of RD 661/2007 and RD 1578/2008.*"[431] Respondent submits that Claimant's expectations are not reasonable within the regulatory framework applicable to the RE sector in Spain.[432] An investor ought to have known that such framework had, *inter alia*, the following basic principles: the regulatory system is governed by the principle of regulatory hierarchy and it is not limited to RD 661/2007 and RD 1578/2008 (instead, it is comprised by Act 54/1997 and the regulations which implemented it, as interpreted by case law); subsidies to the Special Regime are a cost for the SEE, subordinated to the principle of its economic sustainability; the remuneration of the Special Regime consists of a subsidy which, added to the market price, provides RE plants with a reasonable return; and the determination of the subsidies is fixed on the basis of changing demand and other basic economic data.[433]

380. Respondent emphasizes the centrality of the principle of reasonable return, stating that "*all the consecutive supportive schemes approved by the Kingdom of Spain through RDs and RDActs, since the RD 2818/1998 to the RDAct 2/2013, were enacted to develop the LSE 54/1997 and within the limits of its principles of reasonable rate of return and sustainability*" of the Spanish Electricity Sector.[434] The principle of reasonable rate of return incorporates the notion of balance.[435] Remuneration must be sufficient for the investor but not excessive for the consumer.[436] If cost exceeds income, the tariff deficit arises.[437] The cost of money, to which Article 30(4) of the LSE refers, is dynamic. The target rate of return must also be dynamic.[438] The Disputed Measures applied the principle of reasonable return, resolved a situation of imbalance that jeopardized the stability of the

---

[431] Resp. PHB, ¶ 58.

[432] See Resp. C-Mem., ¶¶ 1032-1051.

[433] Resp. C-Mem., ¶ 1033.  See also *id.*, ¶¶ 1058-1059, 1088; Resp. Rej., ¶¶ 1076, 1080.

[434] Resp. PHB, ¶ 59.

[435] *Id.*, ¶ 10.

[436] Rev. Tr. Day 1 (ENG), 184:11 to 184:22 (Mr. Fernández Castilla).

[437] Rev. Tr. Day 1 (ENG), 178:2 to 178:9 (Mr. Fernández Castilla).

[438] Rev. Tr. Day 1 (ENG), 184:23 to 185:6 (Mr. Fernández Castilla).

system and reinforced the stability of the system by elevating some aspects of the regulatory regime to the rank of law.[439]

381. According to Respondent, RD 661/2007 was approved to resolve the overcompensation problem caused by RD 436/2004 and implied a reduction in the remuneration of PV plants and thus could not have been enacted to attract foreign investors.[440]  Respondent states that Claimant has failed to prove that Article 44(3) of RD 661/2007 "*contain*[s] *any stabilization clause.*"[441]

382. Respondent also claims that registration pursuant to RD 1578/2008 did not give Claimant a right to a stable FIT.[442]  As to the Fifth Additional Provision of RD 1578/2008, Respondent raises a procedural concern, as follows:

> *The first and foremost with respect to the Claimant's new position regarding the RD 1578/2008 and its 5th Additional Provision is that everything that the Claimant now alleges was not exposed in its pleadings, that is, all of its arguments are* ex-novo *and it has not been proved that this way it had interpreted the mentioned RD 1578/2008. The Respondent refers to the Exhibit C-189, CNE Consultation on the Fifth Additional Provision of RD 1578/2008, 22 October 2009, which the Claimant did not allege in the written procedural phase, despite the fact that the aforementioned query is from 2009, and also, he included it in the record shortly before the hearing.*[443]

383. With respect to the substance of the Fifth Additional Provision, Respondent states that the provision, which states that remuneration "*may be modified*," is "*totally contrary*" to Claimant's position of guaranteed tariffs for the operational life of the plant.[444] Respondent considers that its interpretation of the Fifth Additional Provision is supported by the explanatory statement (preamble) of RD 1578/2008, which provides:

---

[439] Resp. PHB, ¶ 11.

[440] *Id.*, ¶ 59, citing Rev. Tr., Day 2 (SPA), 635:1 to 639:9 (Mr. Montoya).

[441] Resp. PHB, ¶ 59.

[442] Resp. C-Mem., ¶ 1030.

[443] Resp. PHB, ¶ 117.

[444] *Id.*, ¶ 119.

> *With this purpose in mind, an annual capacity goal has been proposed that would evolve upward in lockstep with technological improvements, instead of using cumulative total capacity to set the limits for the market for this technology. This should be accompanied by a new economic regime that stimulates technological evolution and the competitiveness of photovoltaic facilities in Spain over the medium and long term. In addition, the support framework for this technology, represented by Royal Decree 661/2007 of May 25, 2007, which regulates the generation of electric power under a special regime, which has demonstrated its effectiveness, should also be adapted rapidly enough to keep pace with the evolution of technology, it in order to ensure its effectiveness. Just as insufficient compensation would make the investments nonviable, excessive compensation could have significant repercussions on the costs of the electric power system and create disincentives for investing in research and development, thereby reducing the excellent medium-term and long-term perspectives for this technology. Therefore, it is felt that it is necessary to rationalize compensation and, therefore, the royal decree that is approved should modify the economic regime downward, following the expected evolution of the technology, with a long-term perspective.*[445]

384. As to the 2009 CNE consultation on which Claimant relies, Respondent notes that the document states both that it is "*for informational purposes only*" and that "*the Government has the power to determine the application of the fifth additional provision.*"[446] According to Respondent, this consultation "*lacks any value in shaping the legitimate expectations of the Claimant.*"[447] The Fifth Additional Provision instead contains a clear warning of change based not only on the development of technology but also on market development and the functioning of the remuneration system.[448] In support of this position, Respondent refers to an InvestSpain presentation on which Claimant relies, which states "[i]*n the light of the sector's development, fees may be modified in 2012 (Additional Provision*

---

[445] *Id.*, ¶ 120.

[446] *Id.*, ¶ 122.

[447] *Id.*, ¶ 122.

[448] *Id.*, ¶ 125.

*Five)*".[449]  Respondent also relies on the testimony of Mr. Montoya, who stated that, in the Fifth Additional Provision, "*the revision in 2012 does not exclude existing facilities*."[450]

385.  Respondent refutes Claimant's arguments that its legitimate expectations were reinforced by statements made in an alleged 'aggressive campaign' undertaken by Government personnel to attract foreign investors.  Respondent submits that "*there was no aggressive campaign to attract foreign investors, nor was legislation enacted aimed exclusively at foreign investors*."[451]  Respondent refers to the findings of the *Charanne* tribunal that information contained in presentations or leaflets carried out by Spain were not sufficiently specific to give rise to any expectations that the regime would not be modified.[452]  Also, it submits that Claimant's argument that RD 661/2007 was an essential part of a campaign aimed to attract foreign investors is not reasonable, given the general nature of that regulation, aimed at both domestic and foreign investors.[453]

386.  Respondent asserts that the case law of Spain's Supreme Court supports its contention that Claimant had no legitimate expectation other than that of a reasonable return.  It maintains, based on Judgments delivered by the Supreme Court in 2006-2007, that the case law establishes that regulatory changes are "*admissible as long as the principle set forth in Act 54/1997 is respected: a reasonable return*."[454]  It also refers to three judgments rendered in December 2009 addressing challenges by energy producers to measures taken pursuant to RD 661/2007.  According to Spain, these three Judgments establish that "*there is no unmodifiable right to the fact that a specific framework of remuneration must be*

---

[449] *Id.*, ¶ 119, quoting from Invest in Spain presentation, Ministry of Industry, Tourism and Trade, "Legal Framework for Renewable Energies in Spain", 2010 (C-0062).

[450] Rev. Tr. Day 2 (ENG), 185:23 to 185:24 (Mr. Montoya).  Resp. PHB, ¶¶ 132-133.

[451] Resp. C-Mem., ¶ 1046.

[452] *Id.*, ¶ 1049.

[453] Resp. Rej., ¶ 1097.

[454] Resp. C-Mem., ¶ 342, referring to the Judgement of the Third Chamber of the Supreme Court dated 25 October 2006, administrative appeal 12/2005, reference El Derecho EDJ 2006/282164 (R-0118) and ¶ 343, referring to the Judgement of the Third Chamber of the Supreme Court dated 9 October 2007, app. 13/2006 EDJ 2007/175313 (R-0120).

*kept. It can only be expected that said framework of remuneration must respect the principle of a reasonable return.*"[455]

387.  Respondent asserts that this case law was well known to the renewable energy sector.  It points to reports from within the RE sector that, according to Respondent, reflect an understanding that the Supreme Court had not required the perpetuation of the existing situation and had upheld the legality of measures that modified the Special Regime with respect to existing facilities.[456]

388.  Respondent also relies on the following conclusion from the Award in *Charanne* regarding Judgments of Spain's Supreme Court:

> […] *those judgments clearly lay down the principle that domestic law can modify, in compliance with the LSE, an economic regime, such as the one provided in RD 661/2007 and RD 1578/2008, aimed at fostering renewable energy production.*
>
> *Although these decisions by the Spanish courts are not binding on this Arbitration Tribunal, they are factually relevant to verify that the investor was unable, at the time of the disputed investment, to have the reasonable expectation that in the absence of a specific commitment the regulation was not going to be modified during the lifespan of the plants.*[457]

389.  Additionally, Respondent refers to the conclusion by the tribunal in *Isolux*, in light of the Supreme Court's jurisprudence, including a ruling of 9 December 2009, that claimant in that case had more than sufficient knowledge that the remuneration method for its investment could be "*drastically modified, including with a removal of the regulated tariff.*"[458]

---

[455] Resp. C-Mem., ¶ 351, referring to the Judgement of the Third Chamber of the Supreme Court dated 3 December 2009, appeal 151/2007 EDJ 2009/307349 (R-0121) and Judgement of the Third Chamber of the Supreme Court dated 9 December 2009, app. 152/2007, reference El Derecho EDJ 2009/307357 (R-0122).

[456] Resp. PHB, ¶¶ 95-106.

[457] *Id.*, ¶ 107, quoting *Charanne*, ¶¶ 507-508 (emphasis omitted).

[458] Resp. PHB, ¶ 109, citing *Isolux*, ¶¶ 781-792 and 798.

390. Respondent also points to the testimony of Mr. Voigt that he was aware of Supreme Court case law prior to Claimant's investment decision. He testified "*I remember that we've discussed a few points, especially in regard of the changes under the RD 661 and if it would have an impact, and we came to the conclusion that we can still rely on the system of the RD 1578.*"[459] Respondent concludes that "*it has been proven not only the relevance of the Case Law to any prudent investor on March-May 2010, but also that Claimant's managers were aware of this Case Law, and relied on it to invest in Spain.*"[460]

391. Respondent submits that Claimant's objective expectations must be similar to the expectations of the RE associations, other relevant investors, regulatory advisors and law firms who examined the Spanish regulatory framework.[461] Respondent lists statements by participants in the Spanish RE sector that are said to establish that they knew and acknowledged that the Government's limits on a possible regulatory reform was determined by the legal duty to grant RE plants a reasonable rate of return.[462] Fotones is member of a RE association which should have been informed of these developments.[463] Therefore, Claimant could not have been unaware of this relevant background information.[464] Respondent disagrees with Claimant's interpretation of the Altran Arthur D. Little Report of an April 2010 workshop of RE industry participants. Respondent maintains that the 25% risk addressed in that Report (which referred to the risk of a reduction of FITs within 5 years) addressed regulatory risk, not (as Brattle contends) the risk that a provider would miss a particular quarterly tariff due to construction risk.[465]

392. Respondent also maintains that Claimant should have realized, based on EU directives and European Commission decisions, that there is no right to State aid and that the State aid

---

[459] Resp. PHB, ¶ 114 (emphasis omitted), quoting Rev. Tr., Day 2 (ENG), 130:19 to 131:3 (Mr. Voigt).

[460] Resp. PHB, ¶ 116.

[461] Resp. Rej., ¶ 1069. See also *id.*, ¶¶ 1066, 1098.

[462] *Id.*, ¶¶ 1059, 1070.

[463] *Id.*, ¶ 1062.

[464] *Id.*, ¶¶ 1071-1072.

[465] Resp. PHB, ¶¶ 217-220.

provided pursuant to RD 1578/2008 could eventually be seen as excessive, undercutting Claimant's contention that it had a legitimate expectation to the FITs for a 25-year period. It states that "*Spanish Supportive Schemes were enacted in compliance with the EU Directives and thus, they were subject to the requirements and constant reviews of the EU regulation on State Aid*."[466] Respondent notes that Mr. Voigt testified that he was aware of European regulation of state aid.[467] As State aid is subject to constant review, Claimant could not have had "*the expectation to have a right to future State aid subsidies, under EU law*."[468]

393. Respondent also addresses Claimant's references to decisions whereby the European Commission approved certain renewable energy support schemes in EU Member States other than Spain. According to Respondent, the rates of return in some of those cases (which appear to have been higher than in Spain) are explained by distinctions between those factual circumstances and those relevant to the present case. Respondent also considers that those European Commission decisions indicated warnings that aid levels could be modified in the future. Thus, Respondent concludes that no prudent investor in the EU could have concluded that a tariff set by an EU Member State would be immutable for 25-30 years.[469]

394. As additional evidence that Claimant was aware that the regulatory regime could change, Respondent cites statements made in prospectuses directed at potential investors. For example, those prospectuses stated that the legal and regulatory framework in the relevant jurisdictions, "*(here, Germany, Spain and/or Italy) may change over the course of the investment to the detriment of the investment*".[470] The prospectuses warned of possible changes in the tariffs, even including the loss of all the dividends.[471] The prospectuses

---

[466] *Id.*, ¶ 59 (emphasis omitted).

[467] *Id.*, ¶ 32, referring to Rev. Tr. Day 2 (ENG), 111:3 to 111:8.

[468] Resp. PHB, ¶ 33.

[469] *Id.*, ¶¶ 51-57.

[470] Voigt & Coll. "Revenues from the Sun" – SolEs 22 GmbH & Co. KG Prospectus dated 18 December 2009 (C-0098) and Voigt & Coll. "Revenues from the Sun" – SolEs 21 GmbH & Co. KG Prospectus dated 21 January 2009 (C-0100), cited at Resp. PHB, ¶ 134.

[471] Resp. Rej., ¶ 1068.

indicate that Claimant was aware of and accepted regulatory risks when it invested in Spain.[472]

395.   In Respondent's view, Claimant's asserted expectations were also not reasonable because the adoption of measures aimed at avoiding excess remuneration had been foreseen since 2006.[473]   Respondent highlights that the regulatory changes to the remuneration scheme since 2004 were made by the Government to ensure the sustainability of the SEE (as a macroeconomic control measure to address situations of economic deficit of imbalance) and to avoid and correct situations of excess remuneration (preventing that the costs fall only on the consumers).[474]   AMG states that as of Claimant's investment, the large size of the tariff deficit was well-known.   The unsustainability of the SEE was impending and foreseeable when Claimant invested.[475]   Respondent considers that Claimant was aware or should have been aware of the necessity of a sustainable electricity system.[476]

396.   Also, Respondent asserts that Claimant failed to undertake regulatory due diligence prior to making its investment,[477] which is to be expected of an investor in a highly regulated sector.[478]

### (ii) The Evidence Related to the Disputed Measures

397.   As previously noted, Respondent maintains that it took the Disputed Measures in order to respond to the growing tariff deficit, which had been exacerbated by the economic downturn (resulting in lower demand for electricity).[479]   It states that it took measures to address the tariff deficit as "*part of a set of structural macroeconomic control measures adopted pursuant to recommendations by the European Union and the International Monetary Fund. These measures have affected all Spanish citizens and businesses,*

---

[472] Resp. PHB, ¶ 135.
[473] Resp. Rej., ¶¶ 1078-1079, 1081-1082.
[474] Resp. C-Mem., ¶¶ 1033-1036, 1088.
[475] Second AMG Report, ¶¶ 199-221.
[476] Resp. Rej., ¶ 1068.
[477] *Id.*, ¶¶ 1059, 1063.  See also Resp. C-Mem., ¶ 1020; Resp. Rej., ¶ 1055(d).
[478] Resp. PHB, ¶ 68, referring to *Charanne*, ¶ 509.
[479] See ¶¶ 285-286 *supra* and Resp.C -Mem., ¶¶ 758-762.

*which have had to bear certain sacrifices and burdens within a highly negative economic context.*"[480]

398. In response to Claimant's contention that the Disputed Measures undermined its legitimate expectations, Respondent counters that the only essential elements of the remuneration regime, which have always been maintained, are the methodology of using standard installations, the principle of a reasonable rate of return and the priority of dispatch.[481]

399. As to the First Set of Disputed Measures (setting aside the TVPEE, as to which the Tribunal has found that it lacks jurisdiction), Respondent states that the cap on hours to which the FIT would apply (imposed pursuant to RDL 14/2010), corresponded to the operating hours of the standard facility identified in the 2005-2010 PER and that facilities continued to receive remuneration (at the market rate) for additional production.[482]  It states that the change in inflation index that was made in RDL 2/2013 was a methodological change that avoided distortions caused by the prior index.  Citing documents from 2012 and Supreme Court Judgments from 2015, Respondent contends that this change was foreseeable to a prudent and diligent operator.[483]

400. Turning to the Second Set of Disputed Measures, Respondent points to the economic unsustainability of the SEE in 2012 (resulting from an international economic crisis, in the context of a rise in consumer tariffs, excess remuneration in the RE sector, predictions of a tariff deficit increase, and Spain's commitments to the EU to adopt macroeconomic control measures in the SEE).[484]

401. Respondent and its expert (AMG) compare the return received by Claimant under the Original Regulatory Regime to the return that it has received under the Specific Regime (which took effect as a result of the Second Set of Disputed Measures).  AMG agrees with Brattle that RD 1578/2008 was designed to generate a return of around 7% after taxes on

---

[480] Resp. C-Mem., ¶ 760.

[481] Resp. PHB, ¶ 59.

[482] Resp. C-Mem., ¶¶ 705-707.

[483] *Id.*, ¶¶ 788-796.

[484] Resp. Rej., ¶¶ 1031-1032, 1068.

PV investments. However, AMG considers that the target of 7% in the Original Regulatory Regime refers 7% "project return," not a 7% return on equity.[485] AMG also maintains that the target rates of return used by Respondent have been designed with reference to greenfield investors, whereas Claimant is a brownfield investor.[486] It states that any diligent investor in the RE sector in Spain in 2010 would have known that the costs for construction used to develop the target rate of return did not include premia paid by brownfield investors.[487] Respondent argues that the RE sector was fully aware that the financial costs and other costs unrelated to the construction of the PV plants would not be taken into account when establishing the remuneration to be received by the RE plants.[488]

402. AMG states that the after-tax rate of return of a PV plant in Spain under the current regime is "*in the region of the 7% after tax return conferred by both RD 661/2007 and RD 1578/2008.*"[489] It explains that PV investors enjoy a low effective tax rate, such that a pre-tax return of 7.398% equates to around a post-tax return of 7%.[490] AMG calculates that the project pre-tax return of Claimant's two plants (using a weighted average) is in the range of 8.03-8.11%, which exceeds the governing "reasonable rate of return" of 7.398%.[491] AMG also considers that the return under Spain's current regime is in line with French and UK benchmarks and exceeds the German reference rate.[492]

403. Respondent refutes Claimant's argument that its expectations were breached because a number of what Claimant characterizes as essential elements were not retained.[493] Respondent maintains that the relevant parameters and methodology used to set remuneration remained the same after the Disputed Measures. It refers to several reports and other documents showing that the rates set under the Original Regulatory Regime were

---

[485] Second AMG Report, ¶¶ 19, 120.
[486] First AMG Report, ¶¶ 2-3.
[487] Second AMG Report, ¶ 55.
[488] Resp. Rej., ¶ 1129.
[489] Second AMG Report, ¶ 139.
[490] Rev. Tr. Day 3 (ENG), 143:16 to 143:21 (Mr. Greatrex).
[491] Resp. PHB, ¶ 179.
[492] Rev. Tr. Day 3 (ENG), 149:14 to 150:11 (Mr. Greatrex).
[493] Resp. Rej., ¶ 1083.

never based on specific facilities or investors, but rather on "standard facilities" and "remuneration standards."[494]  Respondent emphasizes that it never established the remuneration according to companies' financial statements, but rather according to standard facilities based on market data provided by the RE associations themselves.[495]

404.  Although Claimant argues that an essential element of the Original Regulatory Regime was that subsidies were set according to production, Respondent submits that both production and investment costs have always been considered in setting remuneration.[496]

405.  Respondent also disputes Claimant's characterization of the Disputed Measures as retroactive.[497]  It argues that a measure is not retroactive if it does not have the effect of revoking acquired rights and only applies to the future,[498] and that no principle of international law prevents a State from adopting measures with an immediate effect on ongoing situations.[499]  The Disputed Measures apply to future facts with respect to legal situations in progress, but do not affect rights already acquired.[500]  Respondent submits that "[f]*or a regulation to be retroactive, it must affect* acquired rights."[501]  In this case, however, "*Claimant has never had an* 'acquired right' *to any future remuneration,* over 25 years*, by means of a fixed and unchangeable FIT, not subject to possible macroeconomic control measures or SEE reforms*."[502]  Respondent also notes, as a relevant fact, that its Supreme Court and the Spanish Council of State have confirmed the non-retroactive nature of the legislative modifications, given that they apply to the future without affecting acquired rights.[503]

---

[494] Resp. Rej., ¶ 1099(1).

[495] *Id.*, ¶ 1128.

[496] *Id.*, ¶ 1085.

[497] *Id.*, ¶ 1107.  See also Resp. C-Mem., ¶¶ 1064-1079.

[498] Resp. C-Mem., ¶ 1068 (citing *Nations Energy Inc. and others v. Republic of Panama*, ICSID Case No. ARB/06/19, Award dated 24 November 2010 (RL-0040), ¶¶ 642, 644, 646).

[499] Resp. C-Mem., ¶¶ 1072-1073 (citing *Charanne*, ¶¶ 509-510, 546 and 548).

[500] Resp. C-Mem., ¶¶ 1069-1070.  See also Resp. Rej., ¶ 1109, citing *Charanne* , ¶ 548 and *Isolux*, ¶ 814.

[501] Resp. C-Mem., ¶ 1067 (emphasis in the original).

[502] *Id.*  See also Resp. Rej., ¶ 1108.

[503] Resp. C-Mem., ¶¶ 1076-1079.

406. Based on the above, Respondent concludes that Claimant has not satisfied its burden of proof regarding an alleged breach of legitimate and objective expectations.[504]

407. Respondent points out that prior tribunals have acknowledged that States may introduce regulatory modifications for a public interest cause through reasonable and proportionate measures without infringing the ECT.[505] In this case, the measures were enacted to correct a macroeconomic imbalance, in order to protect consumers and to ensure the sustainability of the SEE. Therefore, Claimant could not expect that its interests would be protected unconditionally, even when harming the interests of the Spanish electricity consumers.[506]

408. Respondent submits that its actions were reasonable, since there is an appropriate correlation between the State's public policy objective and the measure adopted to achieve it. Among other arguments, Respondent considers that the measures adopted affected all parties involved in the SEE to address the tariff deficit (including all operators in the system and consumers, as Spanish taxpayers also met the costs of the SEE through financial contributions from the General State Budget), and that those measures allowed the stabilisation of the tariff deficit, while maintaining a reasonable profitability to RE producers.[507]

409. Respondent emphasizes that the reduction of the subsidies to the PV sector became necessary due to their impact on the "*spiral*[ling] *out of control*" of the tariff deficit (i.e., the imbalance between costs and revenues of the electricity system).[508] The tariff deficit grew because the increase in demand for electricity that had been forecasted was not realized. Instead, the demand for electricity declined due to the economic crisis. This deficit in turn contributed to the financial instability of the country since ultimately the deficit had to be covered by the State budget.[509] According to Respondent, the introduction

---

[504] Resp. C-Mem., ¶¶ 1001, 1086, 1092; Resp. Rej., ¶¶ 1045, 1049, 1055(a), 1061.

[505] Resp. Rej., ¶ 1053.

[506] *Id*. See also *id*., ¶¶ 1139-1143.

[507] Resp. C-Mem., ¶¶ 1118-1119.

[508] AMG Regulatory Presentation, slides 8-13; Resp. PHB, ¶¶ 155-159.

[509] See Resp. Rej., ¶ 323.

of measures to guarantee the economic sustainability of the system was predictable before and during the time the Claimant invested.[510]

410. Respondent also addresses Claimant's argument that it could have applied other, less drastic, measures. Further increases of the electricity price charged to consumers were not practicable because end-users prices in Spain were already among the highest in the European Union. The measures taken by Respondent were successful in stopping the increase in the tariff deficit, and even in reducing it progressively, and returned the SEE to economic and financial stability. Respondent reasserts that the measures that it adopted have received positive opinions from international organisations such as the IMF and the European Commission, as well as from private consultancies.[511] In addition, Respondent notes that Claimant has not disputed the reasonability of macroeconomic control measures aimed at guaranteeing the sustainability of the RE sector, nor has Claimant substantiated the viability of the proposed alternative measures it mentions.[512]

411. Respondent submits that the current regime has resolved a situation of imbalance that endangered the economic sustainability of the SEE in a reasonable and proportionate way.[513] Because the Disputed Measures reflect a valid and rational policy which was carried out in a reasonable and proportional manner, Respondent submits that it has complied with the FET objectives and standards established in ECT Article 10(1).[514]

412. Respondent also maintains that there has been no impairment of Claimant's investment. The alleged destruction of its investment is neither real nor is it based on actual data. Instead, it is based on hypothetical calculations. Moreover, Respondent considers that Claimant's calculations are contradicted by relevant evidence. For instance, Respondent refers to the AMG Report to note that according to Fotones' audited financial

---

[510] AMG Regulatory Presentation, slides 14-18.
[511] Resp. Rej., ¶ 1135. See AMG Regulatory Presentation, slides 14-19, 22-23.
[512] Resp. Rej., ¶¶ 1137-1138.
[513] Resp. C-Mem., ¶¶ 1062, 1080-1124.
[514] See Resp. C-Mem., ¶¶ 1103, 1123-1124. See also Resp. Rej., ¶ 1151.

statements, the average reduction in Fotones' revenues for 2014 and 2015 is only -21% (as opposed to the 41% reduction that SolES claims).[515]

### (4)    The Tribunal's Analysis

413.    In light of the legal standards that it has identified with respect to the allegation that Respondent failed to respect Claimant's legitimate expectations and the claim that the Disputed Measures were disproportionate and unreasonable, the Tribunal takes stock of the evidence.

414.    To provide context for its analysis, the Tribunal first sets out some general considerations related to investments in PV plants.

415.    PV plants cannot compete with conventional forms of energy production without substantial public subsidy or other form of incentive. They are capital-intensive, meaning that most of an investor's costs are incurred prior to operation (90%, according to Claimant's expert). They face a long period for capital recovery.[516]  Investments in PV plants are usually heavily leveraged (in the range of 55-80% leverage).[517]

416.    A PV plant typically has an operating life of 25 years or more.  In the time period relevant to this case, there have been technological advances in the PV sector, leading to significant reductions in the cost of constructing PV plants.  However, once a plant is installed using then-existing technologies, it cannot take advantage of these technological advances in order to reduce its operating costs.

417.    Respondent's regulations and regulatory reports indicate that Respondent took account of these characteristics of PV plants in the design of the Special Regime.

---

[515] Resp. Rej., ¶ 1116, citing Second AMG Report, ¶ 264.

[516] 2007 CNE Report, Section 7.2.

[517] AMG used 80% leverage as the basis for its calculation of the after-tax return of a PV plant under the current remuneration regime. Second AMG Report, ¶¶ 134-139 and Annex VII, Section VII.13.  At the Hearing, Mr. Fernández-Salguero of AMG stated that 80% leverage was typical based on his experience in modelling over 200 PV plants in Spain.  Rev. Tr. Day 4 (ENG), 185:9 to 185:17 (Mr. Fernández Salguero).

### a. Claimant's Expectations as of the Date of its Investment

418. Claimant made its investment in Spain in March 2010, when it acquired its interest in Fotones and engaged in financing transactions in May 2010. Having considered the evidence relevant to Claimant's legitimate expectations, the Tribunal concludes that there were no developments between March 2010 and May 2010 that could have altered in a material way the legitimate expectations of a PV investor. The Tribunal has therefore assessed Claimant's legitimate expectations as of the time when it made its investment, i.e., March 2010.

419. When Claimant made its investment, LSE Article 30(4) stated that remuneration of a producer participating in the Special Regime would be based on "*reasonable profitability rates with reference to the cost of money on capital markets*."[518] The Tribunal must decide whether Claimant's legitimate expectations were confined to that of a reasonable return with reference to the cost of money in capital markets, as Respondent contends, or embraced specific "essential elements," in particular, a stable FIT, as Claimant contends.

420. Spain has provided public aid to the renewable energy sector in order to meet its objectives for renewable energy, which it has set against the backdrop of EU targets. This aid has included large subsidies to PV plants.[519] Within the Special Regime that was established pursuant to the 1997 LSE, the key instrument for subsidizing investment in PV facilities was a premium in the form of a FIT.

421. In RD 661/2007, Spain changed the mechanism for setting FITs, making the remuneration more attractive to future investors than was the previous FIT (by de-linking it from market prices) and thus encouraging investment in renewable energy. In so doing, it sought to address shortfalls in meeting its renewable energy targets.

422. When Spain concluded that the policy set in RD 661/2007 had generated more investment than had been expected, it made further adjustments, first announcing that the FITs under

---

[518] LSE Article 30(4) refers to "*reasonable profitability rates with reference to the cost of money on capital markets*." For convenience, the Tribunal, like the Parties, at times uses a shorthand of "reasonable return," without specific reference to the cost of money in capital markets.

[519] According to AMG, during the period 2010-2015, subsidies accounted for 87.5% of the revenues of PV plants in Spain. First AMG Report, p. 68, Graphic 8.

RD 661/2007 would not be available to new plants and later, in RD 1578/2008, reducing the FITs that would apply to new plants. The reduced FITs for new plants took advantage of technological advances and led to cost reductions that would ultimately benefit consumers. At the same time, RD 1578/2008 increased the target for PV capacity.

423. The laws and regulations that were in place when Claimant made its investment in March 2010 did not expressly state that the FIT assigned to a plant would be retained for 25 years. Instead, RD 1578/2008 stated that a FIT assigned to a facility applied "*for a maximum period of twenty-five years.*"[520] However, Respondent's regulations and associated regulatory reports indicate that the stability of a FIT assigned to a particular plant was a fundamental aspect of the design of the regulatory regime that was in place when Claimant invested. In particular:

    a. The 2007 CNE Report stated that regulations "*must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility.*"[521] The Report also noted that transparency and predictability in economic incentives reduce regulatory uncertainty and reduce financing costs, thereby lowering the cost to consumers.[522]

    b. The 2008 CNE Report stated in section 4.2(b) that "[s]*tability and predictability of economic incentives (tariffs and premiums) reduce regulatory uncertainty, which encourages investments in new capacity to address their projects, while minimizing the cost of financing and thereby reducing the final cost to the consumer.*" When it analyzed the proposed Royal Decree (corresponding to RD 1578/2008), the CNE stated:

> *The regulation of the generation facilities under the special regime established in Royal Decree 661/2007, has tried to minimize the regulatory risk of this group, providing security*

---

[520] RD 1578/2008, Article 11(5).

[521] 2007 CNE Report, Section 5.3(b).

[522] *Id.*

> *and predictability to economic incentives during the useful life of the facilities, by establishing transparent mechanisms to update them annually, and by exempting existing installations from the four-year review, since the new incentives that are being set out only affect the new installations.*
>
> *The guarantees included in this regulation allow for better financing, with lower project costs and less impact on the electricity tariff finally paid by the consumer.*[523]

    c. RD 1578/2008 stated that the mechanism of assigning a FIT to an individual plant based on its preregistration date will "*provide the necessary legal security to promoters with respect to the return that the facility will earn once it is put into operation.*"[524] It provided that registration in the pre-assignment registry would "*create the right to receive compensation set*"[525] for that particular quarter.

424. The regulations and regulatory reports also indicated that adjustments to the FITs (other than annual adjustments for inflation) would apply only to new facilities. In particular:

    a. The 2007 CNE Report called for "*regular reviews that only affect new facilities.*"[526]

    b. This approach was given effect in Article 44(3) of RD 661/2007, pursuant to which reviews were to be held in 2010 and every four years thereafter, but the revisions of FITs would not affect installations that had been authorized before the revision and for up to two years after the revision.[527]

    c. The 2008 CNE Report stated that existing facilities would be exempted from periodic reviews.[528]

---

[523] 2008 CNE Report, Section 5.2.

[524] RD 1578/2008, Preamble (Resp. translation).

[525] *Id.*, Article 4(3).

[526] 2007 CNE Report, Section 5.3(b).

[527] *Supra*, ¶ 106.

[528] 2008 CNE Report, Section 5.2.

d.  When Respondent concluded in 2007 that progress towards the target for PV capacity had been more rapid than expected, it issued an order setting an end-date for applicability of FITs assigned pursuant to RD 661/2007, but did not reduce the FITs assigned to existing plants.  Instead, the reduced FITs established in RD 1578/2008 did not apply to plants that had been assigned higher FITs under RD 661/2007.[529]

e.  RD 1578/2008 specified a mechanism for quarterly updates of the FITs assigned to be assigned to new plants,[530] such that the "*support framework*" could be "*adapted rapidly enough to keep pace with the evolution of technology*."[531]  These updates did not affect plants to which a FIT had previously been assigned.

425.  Fifth Additional Provision of RD 1578/2008, applicable specifically to PV plants, provided that compensation would be reviewed during the year 2012 to "*modify the economic regime downward, following the expected evolution of the technology*."  Respondent has suggested that this downward adjustment could have applied to existing plants.  Given that existing PV plants cannot benefit from technological evolution, however, the Tribunal concludes that a prudent investor operating under RD 1578/2008 could reasonably have understood the Fifth Additional provision to contemplate "*downward modification*" only for new plants.  This conclusion is consistent with the position that the CNE indicated in 2009, in response to an investor query.[532]  The preamble of RD 1578/2008 does not detract from this understanding of the Fifth Additional Provision.

---

[529] *Supra*, ¶ 105.

[530] RD 1578/2008, Article 11 and App. III (Resp. translation).

[531] *Id.*, Preamble.

[532] 2009 CNE RD 1578/2008 Consultation.  See *supra*, ¶ 353.  As previously noted, Respondent complained that Claimant had raised a "new position" regarding the Fifth Additional Provision at the Hearing and that it cited Exhibit C-0189 (a CNE consultation regarding that provision) which was introduced into evidence shortly before the Hearing.  The Tribunal finds no procedural irregularity here.  The cited Exhibit was introduced pursuant to applicable procedural orders.  Respondent had a full opportunity to address Claimant's argument regarding the Fifth Additional Provision at the Hearing and in its post-hearing brief.

426. Claimant cites other statements made by Respondent that indicate that the FIT assigned to a plant would be stable and would not be subject to adjustment other than for inflation.[533] These include Respondent's press release issued upon adoption of RD 661/2007,[534] and various statements made by Respondent and its officials in the context of promoting investment in renewable energy.[535] In the aggregate, these statements confirm that the stability of remuneration was a key component of the Original Regulatory Regime, which emphasized by Respondent in communications intended to attract investments in renewable energy.

427. In its Statement of Claim, Claimant did not rely on Judgments of the Supreme Court of Spain to support its claim of legitimate expectations. However, Respondent's defense has emphasized the case law of the Supreme Court "*as a decisive factual element to configure the legitimate expectation of any investor*."[536] It maintains that those Judgments establish that "*the only limit that must be respected by the Government in regulatory changes is to grant the RE facilities a reasonable return in terms of the cost of money in the capitals* [sic] *market*."[537] It also maintains that any prudent investor would be aware of the limits on legitimate expectations established by the case law.[538]

428. The Judgments of the Supreme Court operate in this case as fact, not applicable law, so Respondent's assertions about the content of those Judgments and investor awareness of them are allegations of fact that must be established based on the evidence. Only Judgments issued prior to Claimant's investment could inform its legitimate expectations, so the Tribunal has not taken into account Judgments issued after that date.

429. The Tribunal considers that a prudent investor should be expected to have a general awareness of recent decisions of the highest court of the host State that interpret provisions

---

[533] The Tribunal notes that some of the statements introduced by Claimant have insufficient clarity and precision to establish that the FITs would be stable, although they do lend support to conclusions indicated above.

[534] RD 661/2007 Press Release.

[535] See ¶ 354 *supra*.

[536] Resp. C-Mem., ¶ 11.

[537] *Id.*, ¶ 14 (emphasis omitted).

[538] Resp. PHB, ¶¶ 95-96.

of the regulatory regime on which the investor would rely. The record contains a number of reports that indicate that participants in the renewable energy sector were following developments in the Supreme Court. Both Mr. Voigt and Mr. Hopp indicated that they had at least a general appreciation of the case law prior to Claimant's investment.[539]

430. The Tribunal approaches with caution the evidence regarding Judgments of the Supreme Court. The Supreme Court is applying Spanish law, not the ECT. Because each Judgment addresses specific facts and provisions of law and regulation, the Parties' selective quotations from various Judgments are of limited assistance to the Tribunal. In addition, the Judgments under consideration do not address changes in the remuneration of an existing plant that are comparable in significance to the abolition of the Special Regime.

431. At the Hearing, the President of the Tribunal inquired of Respondent: "*are there decisions of the Supreme Court that make clear that, in the view of that court, retroactive changes to the tariff that applied to particular providers are lawful under Spanish law?*"[540] Respondent answered by referring to six Judgment that it had introduced as exhibits.[541] In its post-hearing briefing, it asserted that "*it was not necessary an identity of facts to apply the Case Law*"[542] and asked the Tribunal to "*read the reasoning of the Case Law and the understanding of the RE sector regarding this case law,*"[543] referring the Tribunal to particular Judgments and reports of industry analysis of Supreme Court case law.

432. Taking into account the evidence before it, including reports of Supreme Court decisions that were circulating within the renewable energy sector, the Tribunal is not persuaded by Respondent's assertion that the case law of the Supreme Court establishes that a prudent investor could have had no legitimate expectation other than that of a reasonable return.

---

[539] Rev. Tr. Day 2 (ENG), 130:17 to 131:3 (Mr. Voigt); Rev. Tr. Day 2 (ENG), 44:22 to 45:1 (Mr. Hopp).

[540] Rev. Tr. Day 1 (ENG), 186:14 to 186:17. See also Rev. Tr. Day 1 (ENG), 189:12 to 189:19 (renewing the question after an exchange between opposing counsel and inviting Respondent to provide the answer after the break if it so wished).

[541] Rev. Tr. Day 1 (ENG), 288:7 to 288:9 (Mr. Fernández Castilla).

[542] Resp. PHB, ¶ 96.

[543] *Id.*, ¶ 100.

433. At most, the Tribunal considers that a general awareness of the Judgments would have led a prudent investor in March 2010 to anticipate the possibility that the Supreme Court would uphold the legality of modest changes to the remuneration regime applicable to an existing plant. This conclusion is consistent with the observation regarding Supreme Court Judgments made by the tribunal in *Charanne*, cited by Respondent, in circumstances in which modest changes to remuneration were at issue.[544] The Tribunal notes that the tribunal in *Isolux* (also cited by Respondent) took into account not only 2009 case law, but also a 2012 Judgment.[545]

434. Respondent also maintains that "*economic circumstances are an essential fact that should shape as well the expectations of the Claimant, in accordance with the regulatory framework.*"[546] The Tribunal agrees with this observation. The economic circumstances invoked by Respondent are the global economic crisis and the tariff deficit in Spain. The tariff deficit is the result of an imbalance between costs to the system (such as subsidies to energy producers) and revenue (consumer payments). The tariff deficit in Spain was large several years prior to the global economic crisis. The Tribunal accepts Respondent's contention that the economic crisis led to a decline in demand for electricity, with consequent increase in the tariff deficit.

435. According to Respondent, the tariff deficit had become "unsustainable" by 2010.[547] Respondent's expert (AMG) stated that Claimant decided to invest "*under the almost total certainty of introduction in the short term of Measures in the SES that would reduce the remuneration paid to RE.*"[548] Respondent states that other avenues for addressing the tariff deficit (such as raising prices paid by consumers) had been exhausted and thus were not available as alternatives to the Disputed Measures.

---

[544] See ¶ 388 *supra*.

[545] The Tribunal also notes that a judicial finding that a measure meets the requirements of national law does not preclude a conclusion that the measure violates the State's treaty obligations.

[546] Rev. Tr. Day 1 (ENG), 223:7 to 223:10 (Mr. Fernández Castilla).

[547] Resp. PHB, ¶ 155; AMG Regulatory Presentation, slide 11.

[548] Second AMG Report, ¶ 223.

436. Claimant disagrees with Respondent's assertions[549] about the implications of the tariff deficit and the economic crisis for Claimant's legitimate expectations. According to Brattle, there was a large tariff deficit (annual and cumulative) both in 2008, when Respondent adopted RD 1578/2008, and in 2010, when Claimant made its investment.[550] Brattle states that the economic crisis had hit its peak in late 2008 and that its implications were clear by 2009.[551] However, Spain increased its renewable energy targets in 2009 and 2010, rather than decreasing them. Brattle also maintains that Respondent has exaggerated the effect of the economic conditions on electricity demand.[552] Claimant's expert also asserts that there were five alternatives means of addressing the tariff deficit, other than the Disputed Measures. Claimant states that the EU itself had recommended that Spain increase its environmental tax.

437. Claimant also points to the discrepancy between AMG's assertion in this proceeding that there was "*almost total certainty*" of measures to reduce tariffs and statements made in 2009-2010 by one of the authors of the AMG report (Mr. Greatrex) to the effect that PV investors could anticipate high returns, e.g., leveraged returns of over 15%.[553]

438. The Tribunal notes that Respondent's own policy choices determine many of the key variables that give rise to balance or imbalance between costs and revenues in its electricity system, including the remuneration paid to producers and the prices paid by consumers. Obviously, Respondent was aware of the magnitude of the tariff deficit in 2008, when it revised the mechanism for setting FITs for new plants and increased targets for PV plants in RD 1578/2008. Yet it maintained that regulation up to and beyond the date of Claimant's investment in March 2010. It did so despite the fact that, as Claimant's expert observed at the Hearing, "[t]*he extended nature* [of the economic crisis] *and the*

---

[549] See ¶¶ 395, 409 and 435 *supra*.

[550] First Brattle Regulatory Report, pp. 55 and 56, figs. 12 and 13, showing annual and cumulative tariff deficits.

[551] Rev. Tr., Day 2 (ENG), 261:23 to 262:12 (Mr. Lapuerta).

[552] Second Brattle Regulatory Report, ¶¶ 124-127. Brattle quotes with agreement a February 2009 lecture by Mr. Javier Péon Torre, who was then a "*member of the board of directors of the Spanish regulator*," which describes as a "*myth*" the allegation that financial support to renewable energy was a primary cause of the tariff deficit. *Id.*, ¶¶ 126-127.

[553] Cl. PHB, ¶¶ 117-132.

*implications for Spain were clear by 2009, and the key point is: at that time Spain could*
*actually reliably project how much it would cost to support renewable energy, because it*
*had a system that was easy to predict, with inflation updates. And it increased its targets*
*in 2009 and 2010, in the height of the recession, in part because that was a way of*
*attracting more investment, and it made sense*."[554]

439. In the Tribunal's view, the evidence establishes that participants in the renewable energy
sector were aware, as of the date of Claimant's investment, of the size of the tariff deficit
and of the prospect that Spain would address it.[555]  It therefore can be said, as Respondent
suggests, that there were "warning signs" that Spain would act in some manner to correct
the tariff deficit, possibly leading to some diminution in the remuneration of existing
plants.  However, the reports attributed to participants in the renewable energy sector do
not establish that a prudent PV investor in March 2010 should have expected that
Respondent would decide, as the means to address the tariff deficit, to reduce the FITs of
existing plants and to abolish the Special Regime.  If Respondent had contemplated doing
so as of the time of Claimant's investment, those intentions were not transparent to
investors.  The legitimate expectations of investors can only be based on information that
is available to them.

440. The Tribunal takes note of the assertion by Claimant's expert that Respondent could have
addressed the tariff deficit through changes other than the reduction in remuneration of
existing investors.  These observations lend support to Claimant's contention that there was
no certainty in March 2010 about the manner in which Respondent would address the tariff
deficit. However, the Tribunal expresses no opinion about whether these alternative
measures would have been appropriate policy choices.  For purposes of considering the
scope of Claimant's legitimate expectations, it is sufficient to conclude that a prudent
PV investor as of March 2010 had reason to anticipate some measures by Spain to address
the tariff deficit, possibly giving rise to reduced remuneration to existing investors, but that
the evidence does not establish that a substantial reduction in FITs applied to existing plants

---

[554] Rev. Tr., Day 2 (ENG), 262:3 to 262:10 (Mr. Lapuerta).

[555] As Brattle stated, "[w]*e have always agreed on Spain's need to implement some reforms to address the Tariff Deficit*."  Second Brattle Regulatory Report, ¶ 130.

or elimination of the Special Regime was an almost total certainty, as Respondent has asserted, or even that it was probable.

441. The Tribunal has also considered the Parties' positions on European Commission decisions on State aid, as they bear on an investor's legitimate expectations. The thrust of Respondent's argument is that a prudent PV investor in April 2010 should have realized there is no right to State aid under EU law and that the aid provided pursuant to RD 1578/2008 could eventually be seen as excessive, undercutting Claimant's contention that it had a legitimate expectation to receive stable FITs for a 25-year period. Claimant, on the other hand, points to ninety applications to the European Commission for approval of renewable energy support schemes, all of which were granted. Claimant also compares the high rates of return in certain of those support schemes to the returns under the Original Regulatory Regime, suggesting (according to Claimant) that the Original Regulatory Regime would not be found to run afoul EU requirements. Respondent counters by distinguishing those other programs from that of Spain.

442. Each European Commission decision addressed by the Parties is highly fact-specific. Any observation about how the Original Regulatory Regime might have fared if subjected to similar analysis would be speculation. There is no basis for the Tribunal to conclude that an investor should have anticipated, as of March 2010, that the Original Regulatory Regime would eventually have been found to be inconsistent with EU requirements.

443. Taking into account the evidence before it (including evidence not summarized above), such as Respondent's regulations and regulatory reports, as well as its pronouncements about those regulations, the case law of Spain's Supreme Court and the economic circumstances as of the date of Claimant's investment, the Tribunal concludes that the legitimate expectations of a PV investor in March 2010 were not limited to a reasonable return in light of the cost of money in the capital markets, as determined by Respondent.

444. The evidence establishes instead that a PV investor in March 2010 had a legitimate expectation that it would receive a FIT that was stable, once assigned to a PV plant, for the 25-year period specified in RD 1578/2008 (save for inflation adjustment). The stable FIT was an essential element of the regulatory regime on which Claimant relied when it made

its investment decision, taking into account the capital-intensity, long period of capital recovery and high leverage that is characteristic of investments in PV plants.

### *b.* **The Evidence Regarding the Effect of the Disputed Measures**

445. Having set out its understanding of the essential elements of the regulatory regime that was in place in March 2010 and the legitimate expectations that arose therefrom, the Tribunal next examines the evidence regarding each of the two sets of Disputed Measures.

### *(i)* *The First Set of Disputed Measures*

446. The Tribunal has identified three measures as the First Set of Disputed Measures. However, because the Tribunal decided that it lacks jurisdiction to decide whether the TVPEE violates Article 10(1) of the ECT, it considers here only whether the cap on hours (pursuant to RDL 14/2010) and the change in the CPI (pursuant to RDL 2/2013) were consistent with Respondent's obligation under Article 10(1) to accord fair and equitable treatment.

447. The evidence before the Tribunal establishes that, as of March 2010, there were indications that Spain was considering options for addressing the tariff deficit. A prudent PV investor could have anticipated that Respondent might make adjustments leading to modest reductions in the remuneration of existing RE plants, including PV plants operating under RD 1578/2008.[556] However, Claimant does not maintain that the regime in place when it invested was immutable, but rather that Respondent had an obligation to retain its essential or core features.

448. The Tribunal finds no basis to conclude that the method for indexing FITs to inflation was – to use Claimant's own term – a "core feature" of the regulatory regime.[557] It cannot be said that a prudent investor would have placed particular reliance on that element of the

---

[556] Respondent suggested that RD 661/2007 reduced FITs applicable to existing plants under the prior regulation (RD 7/2006), Rev. Tr. Day 3 (ENG), 53:9 to 55:15. However, Claimant's expert made a convincing case that the changes pursuant to RD 661/2007 actually increased remuneration for most existing plants. Second Brattle Regulatory Report, ¶¶ 68-69.

[557] Cl. Reply, ¶ 4, quoted at ¶ 279 *supra*.

regulatory regime. The Tribunal does not consider that the change in CPI, pursuant to RDL 2/2013, violated Respondent's FET obligation.

449. The cap on hours imposed pursuant to RDL 14/2010 was superseded by the Second Set of Disputed Measures, effective July 2013. Claimant provides limited information about its consequences (although it does quantify the damages that it associates with this cap). By contrast, in respect of the cap on hours imposed under the Second Set of Disputed Measures (as part of the elimination of the entire Special Regime), Claimant provides considerable detail establishing the loss of the "efficiency premium" that had been available under the Original Regulatory Regime. On the record before the Tribunal, there is not sufficient evidence to establish that the cap on hours imposed by RDL 14/2010 was a fundamental change to the regulatory regime on which Claimant had relied. Accordingly, the Tribunal concludes that the cap on hours imposed by pursuant to RDL 14/2010 did not violate Article 10(1) of the ECT.

450. In view of these findings, the Tribunal concludes that, although it appears that the First Set of Disputed Measures (RDL 14/2010 and RDL 2/2013)[558] reduced Claimant's revenue during the limited period while the measures were in effect, they did not change the basic features of the Original Regulatory Regime (the FIT) and did not undermine Claimant's legitimate expectation. Because the First Set of Disputed Measures did not remove the essential features of the regulatory regime in place when Claimant invested, these measures also cannot be characterized as disproportionate within the meaning given to that concept in *Charanne*.[559] The Tribunal concludes that the First Set of Disputed Measures did not fail to meet Claimant's legitimate expectations.

451. Although the First Set of Disputed Measures had an impact on PV investors such as Claimant, the impact of these measures on investors cannot be described as disproportionate to the policy objectives of those measures, i.e., the reduction of the tariff

---

[558] Consistent with its holding on jurisdiction, the Tribunal's conclusion does not take into account the effect on Claimant of the TVPEE.

[559] Cl. Reply, ¶ 543, citing *Charanne*, ¶ 517.

deficit. There is a clear correlation between those objectives and the measures and, in that sense, the First Set of Disputed Measures cannot be characterized as unreasonable.

452. Spain's adoption of the First Set of Disputed Measures was not inconsistent with its obligation to accord fair and equitable treatment to Claimant's investment.

453. The Tribunal notes that its conclusion regarding the First Set of Disputed Measures aligns with the reasoning of other tribunals (including *Charanne*,[560] *Eiser*[561] and *Novenergia II*).[562]

### (ii) The Second Set of Disputed Measures

454. By abolishing the Special Regime and replacing it with the Specific Regime, the Second Set of Disputed Measures eliminated the FITs that had been assigned to Claimant's plants based on their dates of registration.

455. The remuneration that Claimant currently receives under the Specific Regime is considerably lower than the remuneration that it received under RD 1578/2008. Although the experts disagree on the extent to which the revenue of Claimant's plants has been reduced by the Second Set of Disputed Measures, AMG recognizes that Claimant's revenue is lower now than it was under RD 1578/2008 (having experienced a 21% reduction in revenue, according to AMG[563]).

456. The evidence also establishes that the target rate of return under the initial period of the Specific Regime is lower than the target rate of return under the Original Regulatory Regime. Under RD 661/2007 and RD 1578/2008, the target rate of return was approximately 7%, after taxes and before financing. AMG reaches the conclusion that the rate of return under the Specific Regime is "*around 7% after taxes*," but arrives at this figure by assuming a low tax rate on remuneration pursuant to the Specific Regime. The Tribunal finds credible Brattle's observation that this assumption of a low tax rate could

---

[560] *Charanne*, ¶¶ 530-539.

[561] *Eiser*, ¶ 458.

[562] *Novenergia II*, ¶¶ 688-689.

[563] Resp. Rej., ¶¶ 1170-1174, 1178, citing, e.g., Second AMG Report, ¶ 264.

only result from a "tax shield" that results from financing, and thus cannot be applied in a fair comparison to the 7% target under the Original Regulatory Regime, which was calculated without financing. When a higher tax rate is applied to the remuneration under the Specific Regime, Claimant's expert concludes that the Specific Regime generates a return (after tax) of 5.9%.

457. The Tribunal also notes that Respondent maintains that Claimant and Brattle overstate the rate of return that Claimant received under the Original Regulatory Regime because: the target rate of return set under the Original Regulatory Regime was a project return, not a return on equity; the target rate of return was set with respect to a greenfield investor, not a brownfield investor such as Claimant, and Claimant paid an unreasonably high premium for its plants. In Respondent's view, once such considerations are taken into account, Claimant's rate of return under the Original Regulatory Regime is approximately the same as the target return under the present-day Specific Regime. On Respondent's reasoning, it follows that Claimant's rate of return under the Specific Regime meets its legitimate expectation of a reasonable return.

458. Having rejected Respondent's contention that Claimant's only legitimate expectation is that of a reasonable return, the Tribunal considers it unnecessary to examine possible ways of calculating the rate of return applicable to Claimant's investment. Claimant's case is not that it had a legitimate expectation to a particular rate of return. It claims instead that it had a legitimate expectation to stable remuneration in the form of the FIT set for each plant pursuant to RD 1578/2008. It is on this basis that the Tribunal has reached its conclusion on Respondent's liability.

459. The Specific Regime made changes to the regulatory regime that go beyond a reduction in the FIT that currently applies to Claimant's plants. Under RD 1578/2008, Claimant was entitled to receive the FIT for all energy produced during a particular year, creating what Claimant's expert described as an "efficiency reward." This was of particular benefit for plants that are more efficient than standard plants, as is the case with Claimant's plants.[564]

---

[564] The Parties' experts agree on this point, although they disagree on the extent to which Claimant's plants are more efficient than standard plants.

Under the Specific Regime, by contrast, there is no financial support beyond specified maximum hours. According to Claimant's expert, in 2014 and 2015, Claimant's plants met the cap on hours around September or October of each year.[565]

460. Whereas the Original Regulatory Regime provided stable FITs (subject to inflation adjustment), there is uncertainty about the remuneration that will apply under the Specific Regime, because it is subject to periodic revision. For the first period governed by the Specific Regime, Spain set the "reasonable return" using the average yield on ten-year bonds in the 120-month period prior to July 2013, to which it applied a margin of 300 basis points. However, as of 2020, the target rate of return will be based on a different benchmark, i.e., the average yield on ten-year bonds in the prior 24-month period. As Brattle noted, Respondent has not been transparent about the spread that it will use in future periods or about the methodology that it will use to determine that spread.

461. Respondent repeatedly emphasized that there is continuity between the Original Regulatory Regime and the present regime because the consistent benchmark has been a reasonable return in light of the cost of money in the capital market. However, yields on Spanish bonds were roughly the same in 2013 (when Spain adopted the Specific Regime) as they were in 2008, in which RD 1578/2008 was adopted. This fact, coupled with the variable benchmark and uncertainty about the spread that Respondent will use to set future remuneration under the Specific Regime, demonstrates that, in comparison with the stability inherent in the Special Regime, Claimant's remuneration under the Specific Regime could be even further reduced during the life of Claimant's plants.

462. Having considered the evidence, the Tribunal concludes that the Second Set of Disputed Measures changed the basic features of the regulatory regime that was in place when Claimant made its investment, exceeding the changes that Claimant could have reasonably anticipated at that time. The Second Set of Disputed Measures was disproportionate in the sense that the term was used in *Charanne*, because those measures suddenly and unexpectedly removed the essential features of the regime in place when Claimant invested. The Second Set of Disputed Measures did not meet Claimant's legitimate

---

[565] First Brattle Regulatory Report, ¶ 180.

expectations. Additionally, the Second Set of Disputed Measures was disproportionate in that the severity of the impact of those measures on the value of Claimant's investment exceeded that which a prudent investor could have reasonably anticipated in light of the stability that inhered in the Original Regulatory Regime, even taking into account Spain's need to address its tariff deficit.[566]

463. On the basis of the above analysis, the Tribunal concludes that, by enacting the Second Set of Disputed Measures, Respondent violated its obligation under Article 10(1) of the ECT to accord fair and equitable treatment to Claimant's investment.

## B. The Alleged Violations of the Expropriation Provision and of the Umbrella Clause

464. As previously noted, Claimant contends that its investment was expropriated in violation of Article 13 of the ECT. One of the allegedly expropriatory measures is the TVPEE, as to which Respondent has raised an admissibility objection.

465. Claimant also contends that the Disputed Measures violated the "umbrella clause" of Article 10(1) of the ECT by failing to honor undertakings entered into with respect to Claimant's investments.

466. Although the elements of a claim under each of these provisions differ from the elements of an alleged violation of the FET obligation, all of these claims arise from the same facts. Claimant, which has stated that the loss under each head of damages is the same,[567] seeks an aggregate sum as damages for the alleged violations of the three provisions.[568] In stating its position on damages, Respondent has not differentiated among the three grounds of liability.[569] The Tribunal has already found that the Second Set of Disputed Measures violated Respondent's obligation to accord fair and equitable treatment. Under these circumstances, the Tribunal considers that its decision as to liability under the FET

---

[566] See Section VIII(C)(2)(a) *infra*. Even on Respondent's evidence, Claimant's revenues were reduced by 21%. See ¶¶ 412 and 455 *supra*.

[567] Cl. Mem., ¶ 680.

[568] *Id.*, ¶ 682; Cl. Reply, ¶ 715; Cl. Rej., ¶ 55.

[569] See, e.g., Resp. Rej., ¶¶ 1205-1208 and 1217 (supporting the use of an asset-based valuation methodology and an alternative DCF model that do not differentiate among grounds of liability).

provision fully disposes of the matter of liability in this case. It thus does not reach any finding in respect of the admissibility objection raised with respect to the expropriation claim, nor does it make a finding as to the merits of the expropriation claim or the umbrella clause claim. In this regard, the Tribunal follows the approach taken by other tribunals, including *Eiser*[570] and *Micula*.[571]

## VIII.  DAMAGES

467.  Claimant asserts that it is entitled to damages "*based on the reduction in the value of net profit flows to equity investors that has resulted from Spain's implementation of the Disputed Measures.*"[572] It claims that the value of its investment was reduced by EUR 52.7 million,[573] to which should be added pre-Award interest at the rate of 5.94% (compounded monthly) and a tax "gross up," as well as post-Award interest (compounded quarterly) at the rate of 5.94%.[574]

468.  Respondent considers that no damages are due to Claimant, which has failed to meet its burden of proof. Respondent's experts consider that, even if the methodology used by Claimant's experts is used, the value of Claimant's investment has increased by EUR 4.5 million.[575] It opposes the claim for a tax "gross-up" and disagrees with the pre-Award and post-Award interest rates proposed by Claimant.

469.  The Tribunal addresses below the legal standard applicable to the valuation of damages, the valuation methodology and the quantification of the loss in the value of Claimant's investment. It then considers Claimant's claims for a tax "gross-up" and for post-Award interest.

---

[570] *Eiser*, ¶¶ 352-356.

[571] *Micula*, ¶ 874.

[572] Cl. PHB, ¶ 183.

[573] *Id.*, ¶ 191; Second Brattle Quantum Report, ¶ 29 and Table 1.

[574] Cl. Reply, ¶ 715.

[575] Resp. Rej., ¶ 1218; Second AMG Report, ¶ 35.

## A. The Applicable Legal Standard

### (1) The Parties' Positions

#### a. Claimant's Position

470. Claimant argues that the applicable legal standard derives from Article 13(1) of the ECT, under which compensation shall "*amount to the fair market value of the Investment* [and it] *shall also include interest at a commercial rate*".[576] Claimant submits that, while this standard corresponds to compensation in the event of expropriation and the ECT does not specify a standard for compensation for a breach of the FET standard or the umbrella clause, "*the principle remains the same*[:] *Spain must restore SolEs Badajoz to the economic position it would have been in but for Spain's treaty violations.*"[577]

471. Claimant submits that the compensation standard of Article 13(1) of the ECT is consonant with the standard for reparation set out by the Permanent Court of International Justice in the *Chorzów Factory* case (i.e., that compensation must "*wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed*").[578] Claimant indicates that the ILC Draft Articles on State Responsibility[579] and the tribunal's award in *Enron v. Argentina*[580] confirm that the *Chorzów Factory* principle covers all violations of a State's international obligations. Therefore, "*the amount claimed under each head (indirect expropriation, breach of the FET standard and breach of the ECT's umbrella clause) is the same, since in each case it consists in the loss of the value of SolEs Badajoz's investment in Fotones.*"[581]

---

[576] Cl. Mem., ¶ 590, citing ECT, Article 13(1) (internal quotation marks omitted).

[577] Cl. Mem., ¶ 593.

[578] *Id.*, ¶¶ 591-592, citing *Case Concerning the Factory at Chorzów*, PCIJ, Claim for Indemnity – Merits, Judgment No 13, Series A No. 17, 13 September 1928 (CL-0096) ("***Chorzów Factory***"), p. 47 (internal quotation marks omitted).

[579] Cl. Mem., ¶ 593, citing Draft Articles on Responsibility of States for Internationally Wrongful Acts, International Law Commission (2001) (CL-0077, RL-0091) ("**ILC Articles on State Responsibility**"), Articles 31 and 36.

[580] Cl. Mem., ¶ 594, citing *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award dated 22 May 2007 (CL-0064), ¶ 359.

[581] Cl. Reply, ¶ 713.

Accordingly, irrespective of the ECT provision on which the Tribunal holds Spain liable, Respondent remains liable for the entirety of Claimant's loss under international law.[582]

472. Claimant concludes that, due to the loss it incurred as a result of Respondent's measures, Spain "*must now make SolEs Badajoz whole by paying the Claimant monetary compensation equal to the Claimant's monetary losses that would not have occurred in the absence of Spain's unlawful actions.*"[583]

### b. Respondent's Position

473. Respondent's position is that the Tribunal does not have jurisdiction and that there is no merit in Claimant's claims.[584] Since, in Respondent's view, the Spanish legal and regulatory regime has always granted a reasonable return to investors, Claimant cannot have been dispossessed of anything which may give rise to damages.[585]

474. Respondent also argues that Claimant does not meet the required burden of proof and its damages claims should be rejected because they are speculative (e.g., Claimant has not proven that its plants have lost value and Brattle's 'actual' scenario is based on a false premise that the current remuneration scheme will remain frozen).[586] Respondent supports its assertion, *inter alia*, by referring to the *Gemplus v. Mexico* award in which the Tribunal found that "[…] *the Claimants bear the overall burden of proving the loss founding their claims for compensation. If that loss is found to be too uncertain or speculative or otherwise unproven, the Tribunal must reject these claims, even if liability is established against the Respondent*".[587]

---

[582] Cl. Reply, ¶¶ 713-714; Cl. PHB, ¶ 227.

[583] Cl. Mem., ¶ 595.

[584] Resp. Rej., ¶ 1260; Resp. PHB, ¶ 238.

[585] Resp. C-Mem., ¶ 1195.

[586] *Id.*, Section V(A). See also Resp. Rej., ¶¶ 1189, 1194.

[587] Resp. C-Mem., ¶ 1210, citing *Gemplus, S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4, Award dated 16 June 2010 (RL-0070) ("***Gemplus v. Mexico***"), ¶ 12-56; and Resp. Rej., ¶ 1196.

(2)     **The Tribunal's Analysis**

475.  Claimant does not ask the Tribunal to order reparation in the form of restitution.  Instead, it seeks compensation.  Whereas Article 13 of the ECT specifies the standard governing compensation for a breach of that article, the ECT does not specify the manner in which compensation is to be determined when there has been a breach of Article 10(1).

476.  The Tribunal considers that compensation for a breach of Article 10(1) is governed by the customary international law of State responsibility.  As stated by the Permanent Court of Justice, the "essential principle" is that reparation must "*as far as possible, wipe out all the consequences of the illegal act.*"[588]  To the same effect is Article 31(1) of the International Law Commission's Draft Articles on the Responsibility of States for Internationally Wrongful Acts, which provide that a "*responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.*"[589]  Respondent therefore has an obligation to compensate Claimant for the reduction in the fair market value of its investment that was caused by the Disputed Measures.

477.  As stated in Article 31(2) of the ILC Draft Articles, the injury for which reparation is due includes damage "*caused by*" the State's internationally wrongful act.[590]  The ILC explained in the Commentary to the Draft Articles that the reference to a "causal link" is used "*to make clear that the subject matter of reparation is, globally, the injury resulting from and ascribable to the wrongful act, rather than any and all consequences flowing from an internationally wrongful act.*"[591]  "*The notion of a sufficient causal link which is not too remote is embodied in the general requirement in article 31.*"[592]

---

[588] *Chorzów Factory*, p. 47.

[589] ILC Articles on State Responsibility, Article 31(1).

[590] *Id.*, Article 31(2).

[591] *Id.*, Commentary on Article 31, ¶ 9.

[592] *Id.*, Commentary on Article 31, ¶ 10.

478. Claimant has the burden of proving the losses that it claims. As stated by the tribunal in *Gemplus v. Mexico*, "[i]*f that loss is found to be too uncertain or speculative or otherwise unproven, the Tribunal must reject these claims, even if liability is established.*"[593]

## B. Valuation Method

### (1) The Parties' Positions

#### a. Claimant's Position

479. Claimant states that the damages the Tribunal must award if it finds Spain liable should be "*based on the reduction in the value of net profit flows to equity investors that has resulted from Spain's implementation of the Disputed Measures.*"[594] Claimant argues that it has lost past and future cash flows due to the measures adopted by Respondent and thus that the appropriate methodology for measuring damages is the calculation of the present value of such losses.[595] Claimant considers that the Discounted Cash Flow ("**DCF**") methodology should be used to quantify the financial consequences of Respondent's violations of the ECT.[596]

480. In the words of Claimant's experts, the DCF method "*measures the future stream of expected cash flows from a project, and 'discounts' them by a particular percentage rate per year to determine a present value.*"[597]

481. Claimant's position is that the DCF method is "*particularly well-adapted to the electricity sector*"[598] and "*all the more appropriate under the particular facts of this case.*"[599] The reasons for which Claimant considers the DCF appropriate in light of the facts of the case include, *inter alia*, the following: *(i)* the DCF method is highly suitable when quantifying the impact of different scenarios which alter cash flows, as it can capture the effect of the

---

[593] *Gemplus v. Mexico*, ¶ 12-56.
[594] Cl. PHB, ¶ 183.
[595] Cl. Mem., ¶ 596; Cl. PHB, ¶ 186.
[596] See Cl. Mem., ¶¶ 596-600; Cl. Reply, ¶¶ 617-622; Cl. PHB, ¶¶ 184-190.
[597] Cl. Mem., ¶ 598, citing First Brattle Quantum Report, ¶ 77.
[598] Cl. Mem., ¶ 599.
[599] *Id.*, ¶ 600.

individual changes caused by particular risks;[600] *(ii)* this case requires the assessment of the impact of changes to a regulatory system which defined input parameters on future cash flows;[601] *(iii)* SolEs made most of its investment up front based on predictable costs and revenues, and to the extent that Spain's "*withdrawal of the benefits of RD 1589/2008* [...] *severely reduced the revenue stream that SolEs Badajoz legitimately expected and rendered it less certain*," Brattle's DCF model is the appropriate one for calculating the damages;[602] and *(iv)* Spain's objections to the use of the DCF method were previously dismissed by the *Eiser* tribunal, which – along with other tribunals that have found Spain liable for disputed measures – awarded damages based on the DCF method.[603]

482. Claimant also submits that there is no merit to AMG's criticism that Brattle's calculation of damages produces speculative and inconsistent results. For instance, Claimant argues that AMG itself relies on notions such as "*lifetime project IRRs*" (which require the assessment of future, hypothetical cash flows), that AMG provides no detail as to what specific aspects of the DCF method it challenges, and that Spain itself used forecasts of future cash flows over expected plant lifetimes when designing renewable energy incentives.[604]

### b. *Respondent's Position*

483. Respondent opposes the use of the DCF method and instead favors an asset-based valuation ("**ABV**") methodology to calculate damages in this case.[605]

484. Respondent submits that the DCF method should be dismissed in cases such as the present one where its implementation would be too speculative.[606] The reasons for which Respondent considers that applying the DCF method in this case would be inappropriate include, *inter alia*, the following: *(i)* this method is based on a simplistic distinction

---

[600] Cl. Reply, ¶ 617, citing the Second Brattle Quantum Report, ¶ 114.  See also Cl. PHB, ¶ 184.
[601] Cl. Reply, ¶ 620, referring to the Second Brattle Quantum Report, ¶¶ 106 and 114.
[602] Cl. Mem., ¶ 600.
[603] Cl. Reply, ¶¶ 620-622; Cl. PHB, ¶ 185.
[604] Cl. Reply, ¶¶ 618-619.  See also Cl. PHB, ¶ 185.
[605] See Resp. C-Mem., ¶¶ 1212-1232; Resp. Rej., ¶¶ 1197-1208.
[606] Resp. C-Mem., Section V(B).

between an 'actual' and a 'counterfactual' scenario, and the false premise that the 'actual' scenario will remain without changes in the future;[607] *(ii)* the fact that such extrapolations to a far-off future lack the necessary rigour and certainty has been confirmed by the Spanish Supreme Court in over a hundred rulings;[608] *(iii)* the plants have a scant record and Claimant has not proven that they have lost value;[609] *(iv)* this is a capital intensive business, where almost all investment costs are in tangible infrastructures (i.e., there are no relevant intangibles to assess);[610] *(v)* the cash flows are highly dependent on "*volatile and unpredictable exogenous elements*";[611] and *(vi)* the fact that there is a "*disproportion between the alleged investments (and the intended assumed risk) and the amount claimed, evidenced by the returns obtained.*"[612]

485. Respondent submits that arbitration case law and doctrine support the rejection of the DCF method in cases such as the present one where it is excessively speculative.[613] Instead, the best-suited valuation methodology should be based on the costs of assets, which is more credible and reliable than DCF.[614] An ABV methodology ensures that investors receive "*the repayment of its investments plus an adequate return on the costs thereof.*"[615] Among the advantages of the ABV methodology, Respondent mentions the following: *(i)* it is simpler and less speculative than DCF;[616] and *(ii)* its use is particularly appropriate when the company at issue has normal rates of return and was recently established.[617]

---

[607] Resp. C-Mem., ¶¶ 1205-1206; Resp. Rej., ¶ 1191.

[608] Resp. C-Mem., ¶¶ 1207-1209; Resp. Rej., ¶¶ 1192-1195.

[609] Resp. C-Mem., ¶¶ 1208, 1218; Resp. Rej., ¶ 1194.

[610] Resp. C-Mem., ¶ 1218.

[611] *Id*.

[612] *Id*.

[613] See, e.g., Resp. C-Mem., ¶¶ 1214-1215, 1217, 1219-1220, 1225. See also Resp. Rej., ¶¶ 1202-1203.

[614] Resp. C-Mem., ¶¶ 1215-1216, 1227-1231. See also Resp. Rej., ¶ 1205.

[615] Resp. C-Mem., ¶ 1216. See also *id*., ¶ 1231.

[616] Resp. C-Mem., ¶ 1228; Resp. Rej., ¶ 1206.

[617] Resp. C-Mem., ¶ 1229; Resp. Rej., ¶ 1207.

486.  Respondent concludes that, for the reasons stated above, the Tribunal should adopt a methodology which values the costs of the assets to best determine the quantum and "*rule out any value judgement based on a DCF in the present case.*"[618]

### (2)    The Tribunal's Analysis

487.  Regardless of the particular valuation methodology that is used, the calculation of damages necessarily involves the use of certain assumptions and estimations.  Neither the ECT nor international law mandates the use of any particular methodology for determining damages.

488.  Having considered the positions of the Parties, the Tribunal concludes that the DCF methodology is well-suited to the present case, in which the Tribunal has found that the Second Set of Disputed Measures violated Respondent's obligation to accord fair and equitable treatment to Claimant's investment and diminished the revenue that Claimant would have received had the Original Regime been maintained.  It provides a sound basis to compare the present value of Claimant's investment in the absence of the Disputed Measures to the present value of Claimant's investment in light of the Disputed Measures.  The DCF method is widely used and has been applied to assess damages in other proceedings in which Spain's repeal of the Special Regime has led tribunals to find liability.[619]

489.  Respondent and AMG have made a number of specific criticisms of the DCF methodology, as used by Brattle.  The Tribunal considers that these criticisms, and the responses thereto, are best addressed in the context of the particulars of Brattle's analysis.

---

[618] Resp. C-Mem., ¶ 1232.  See also Resp. Rej., ¶ 1205.

[619] See, e.g., *Antin*, ¶ 691; *Eiser*, ¶ 465; *Masdar*, ¶ 581; and *Novenergia II*, ¶ 837.

### C. Amount of Compensation to which Claimant is Entitled

#### (1) The Parties' Positions

##### a. Claimant's Position

490. Claimant states that Brattle calculates that the Disputed Measures reduced Claimant's free cash flows (that is, the cash flows available for distribution to shareholders or to banks)[620] by a total of EUR 52.7 million, to which Claimant adds EUR 14.0 million in pre-Award interest (at the rate of 5.94%, compounded monthly) and a tax gross-up of EUR 29.1 million. In total, calculated as of the date of Brattle's Second Quantum Report, the Award would be EUR 95.8 million.[621] This amount reflects adjustments made by Claimant to the compensation originally requested in its Memorial of EUR 97.7 million.[622] Claimant relies on: *(i)* the three-step valuation methodology adopted by its experts from Brattle;[623] *(ii)* Brattle's main conclusions, including its criticisms of the valuation methodology adopted by Respondent's experts;[624] and *(iii)* Brattle's alternative claim.[625]

##### (i) Brattle's Valuation Methodology

491. Brattle calculated the damages to Claimant by:

> *(1) calculating the value of free cash flows to SolEs Badajoz, as they would have been in the absence of Spain's illicit measures (the "But-For scenario"); (2) calculating the reduced value of free cash flows to SolEs Badajoz as a result of the implementation of the Disputed Measures (the "Actual scenario"); and then (3) calculating the difference between the amounts established in steps (1) and (2), as of the appropriate valuation date.[626]*

---

[620] Cl. Reply, fn. 706, citing First Brattle Quantum Report, ¶ 73.

[621] Cl. PHB, ¶ 191.

[622] See Cl. Mem., ¶ 679; Cl. Rej., ¶ 55; Cl. Reply, ¶¶ 627-629, 712; Second Brattle Quantum Report, Table 14; and Cl. PHB, ¶ 191.

[623] See Cl. Mem., ¶¶ 602, 606-678; Cl. Reply, ¶¶ 623, 625; Cl. PHB, ¶ 191.

[624] See Cl. Mem., ¶ 605; Cl. Reply, ¶¶ 626, 629-658; Cl. PHB, ¶¶ 191-225.

[625] See Cl. Reply, ¶¶ 688-711.

[626] Cl. Mem., ¶ 602. See also Cl. Reply, ¶ 623.

492. Claimant argues that the appropriate valuation date is based on the ECT's requirement that the time for compensation shall be "*immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the investment*."[627]  Claimant argues that the applicable valuation date is therefore 30 June 2014 (i.e., when Respondent defined the framework that overhauled the Original Regulatory Regime).[628]

493. Brattle quantified the financial impact of the Disputed Measures on SolEs as follows:

> *First, in "**Step 1**"* **[Impact of the Disputed Measures up to the valuation date]***, Brattle evaluates the financial impact of the Disputed Measures on the cash flows that SolEs Badajoz's interest in Fotones would have generated between the connection date of Badajoz I (12 July 2010) and the Valuation Date [...] by comparing a "But-For scenario" (without the Disputed Measures) with an "Actual scenario", which applies the Disputed Measures.*

> *Then, in "**Step 2**"* **[Cash flows that SolEs' interests would have generated beyond the valuation date, in the absence of the Disputed Measures]***, Brattle establishes a* [DCF model] *to evaluate the cash flows that SolEs Badajoz's interest would have generated following the Valuation Date, in the absence of the Disputed Measures, over the remaining operating lifetime of the plants during which they could operate without significant new capital investment (the But-For scenario)* [This scenario assumes that the FITs provided under RD 1578/2008 continue to apply, that the plants will cease operations after 25 years, and that that there is less regulatory risk than exists under the current regime]. *This is compared to the cash flows forecast taking into account the effect of the Disputed Measures, i.e. the Actual scenario. After measuring the value of SolEs Badajoz's interest as a whole, Brattle deducts the value of outstanding liabilities to measure the value of SolEs Badajoz's equity interest.  Brattle also performs a number of reality checks to confirm the reliability of its valuations*[.]

---

[627] ECT, Article 13(1).

[628] Cl. Mem., ¶ 604; Cl. Reply, ¶ 624.  See also Cl. PHB, ¶¶ 187, 189.

> − *Finally, in "**Step 3**"* [**Pre-award interest and tax gross-up**]*,*
> *Brattle computes pre-Award interest and the tax "gross-up" to be*
> *applied to an award in the Claimant's favour*[.][629]

494.  In Step 2, in order to calculate the cash flows after the valuation date that would have been generated in the absence of the Disputed Measures, Brattle developed two versions of the DCF model.  For both the Actual and the But-For scenarios, certain assumptions are common, such as the forecast production levels, operating and maintenance costs and inflation rates.[630]  Production levels were based on historical performance of the two plants as well as contemporaneous forecasts by SolEs.[631]

495.  The But-For scenario differs from the Actual scenario in three main ways.  First, in the But-For scenario, Brattle assumed that the FITs provided by RD 1578/2008 would continue, whereas the Actual scenario was calculated on the basis of the Specific Regime.  Second, the But-For scenario assumed that the plants would cease operating after 25 years (consistent with RD 1578/2008) while the Actual scenario assumes 30 years of operation (consistent with the Specific Regime).  Third, Brattle's model assumed lower regulatory risk under the But-For scenario than the risk that exists under the new regulatory regime.[632]

496.  To account for the fact that future cash flows have less value than current cash flows due to market risk and the time value of money, Brattle's DCF model discounted future cash flows to reflect the risks under the But-For scenario and the Actual scenario and thus to determine their present value.[633]  This required Brattle to conduct an analysis of the discount rates for the But-For scenario and the Actual scenario, by: applying the Capital Asset Pricing Model, resulting in a discount rate of 4.84%;[634] quantifying the regulatory risk that is specific to Spain (meriting a rating of "BB+" under the Actual scenario and of

---

[629] Cl. Mem., ¶ 606.  Details on "Step 1" are provided in Cl. Mem., ¶¶ 607-617; details on "Step 2" are provided in Cl. Mem., ¶¶ 618-662; and details on "Step 3" are provided in Cl. Mem., ¶¶ 663-678.  See also Cl. Reply, ¶ 625.

[630] Cl. Mem., ¶ 620.

[631] First Brattle Quantum Report, ¶¶ 12, 21.

[632] Cl. Mem., ¶¶ 621-625.

[633] Cl. Mem., ¶ 629.  See also Cl. Reply, ¶ 645.

[634] Cl. Mem., ¶ 638.

"A+" under the But-For Scenario);[635] and establishing a 'liquidity discount' (of 25% in the Actual scenario and of 12% in the But-For scenario).[636]

497. In addition, Brattle performed a number of reality checks, which included verifying that: the value attributed by Brattle to SolEs' interest in Fotones as at June 2014 was consistent with the price that SolEs actually paid for that interest in 2010; that the Internal Rate of Return ("**IRR**") for SolEs under Brattle's But-For scenario was consistent with the IRR that Claimant anticipated at the time of making its investment; and that Brattle's DCF valuation of the plants was consistent with current views about the market value of concentrated solar power assets.[637]  Contrary to Respondent's assertions, Claimant maintains that Brattle's analysis of SolEs' IRRs is sound.[638]

498. As part of "Step 3", Brattle calculates the interest due to Claimant.  Claimant notes that ECT Article 13(1) specifically provides that interest be applied to compensation "*at a commercial rate established on a market basis from the date of Expropriation until the date of payment.*"  According to Claimant, the expropriation standard should apply to all of its claims.[639]  It considers SolEs' commercial borrowing rate at the time that it made its original investment (5.94%) as the appropriate rate for pre-Award interest (i.e., the interest that will have accrued between the valuation date and the date of the Award).[640]  Claimant submits that this rate "*is an arms' length, market-driven interest rate* [which] *represents SolEs Badajoz's cost of borrowing for this project.*"[641]  Claimant further requests the interest to be compounded on a monthly basis.[642]  On this basis, Brattle calculates pre-Award interest of EUR 14 million up until the receipt of the Award, assumed to take place

---

[635] *Id.*, ¶ 640.

[636] *Id.*, ¶ 646.  See also Cl. Reply, ¶¶ 646-647.

[637] See Cl. Mem., ¶¶ 654-661; First Brattle Quantum Report, ¶¶ 136-154; Cl. Reply, ¶ 639; Second Brattle Quantum Report, Section IX, "Reality Checks".

[638] Cl. Reply, ¶¶ 639-644.

[639] *Id.*, ¶ 681.

[640] Cl. Mem., ¶ 667.  See also Cl. Reply, ¶¶ 681-683.

[641] Cl. Mem., ¶ 667.  See also *id.*, ¶¶ 668-672, and Cl. Reply, ¶ 682.

[642] Cl. Mem., ¶¶ 673-675.

in July 2018 (this amount is an adjustment to the initial amount of EUR 14.1 million set out in the First Brattle Quantum Report).[643]

### (ii) Brattle's Main Conclusions and Criticisms of Respondent's Valuation Methodology

499.  Brattle concludes that, as a result of Respondent's measures:

- the measures introduced between 2010 and 2013 reduced the revenues of Fotones by 12% or EUR 3.63 million between January 2011 and June 2013 and reduced the free cash flows of Fotones by 17% or EUR 3.58 million;[644]

- the regime established by RDL 9/2013 of 12 July 2013 and Law 24/2013 of 26 December 2013 (and then clarified in June 2014 by RD 413/2014 and Ministerial Order IET/1045/2014) in combination with Law 15/2012 "*reduce[d] the revenues of Fotones by €84.4 million and the free cash flows by €67.1 million between 1 July 2013 and the last operating year [of the two plants]*";[645]

- and, ultimately, the Disputed Measures reduced the cash flows to SolEs by EUR 52.7 million (this amount, set out in Claimant's Reply, is an adjustment to the EUR 53.2 million originally calculated under the First Brattle Quantum Report).[646]

500.  Claimant objects to AMG's ABV methodology as it "*inverts the logic of the Claimant's claim*".[647]  Claimant maintains that AMG takes a legal premise – as opposed to a purely economic approach – as a starting point for its analysis: that investors in the Spanish PV sector were only entitled to a "*reasonable return*" that Spain determined from time to time, rather than the "*stable returns provided under the Original Regulatory Regime*", such as the FITs provided under RD 1578/2008.[648]  Claimant argues that there is no basis for AMG's ABV methodology as it only derives calculations from the initial investment and does not quantify the economic effects of the Disputed Measures.[649]

---

[643] *Id.*, ¶ 675; Cl. Reply, ¶ 687.

[644] Cl. Mem., ¶ 605, citing First Brattle Quantum Report, ¶ 7.

[645] Cl. Mem., ¶ 605 (emphasis omitted), citing First Brattle Quantum Report, ¶ 8.

[646] Cl. Mem., ¶ 605; Cl. Reply, ¶¶ 626, 648.

[647] Cl. Reply, ¶ 630.

[648] *Id.*  See also *id.*, ¶¶ 631-638 and Cl. PHB, ¶ 222 (referring to Second Brattle Quantum Report, ¶ 51 *et seq.*).

[649] Cl. Reply, ¶ 633.

501. Claimant concludes its objection to the ABV method as follows:

> *Asset valuation is in any event irrelevant* [in this case]. [T]*he Claimant's case is that SolEs Badajoz was entitled to the stable FIT provided in RD 1578/2008. As a consequence of the Disputed Measures, it has received (and will continue to receive) much less. The difference between these two values constitutes the Claimant's loss. This loss is unaffected by the value, real or supposed, of its initial investment.*[650]

502. In addition, Claimant considers AMG's version of the DCF model to be untenable. It asserts that AMG inverts the regulatory risk that drives the discount rate under the "Actual" and "But-For" scenarios. That is, AMG understates the damages based on an incorrect assumption that the Actual scenario should be deemed less risky than the But-For scenario (thus incorrectly applying a regulatory risk premium of 4.99% under the But-For scenario and a 0% regulatory risk premium under the Actual scenario).[651] Claimant relies on Brattle's conclusions that the regulatory risk premium is lower in the But-For scenario and that "*the New Regulatory Regime increased risks*", including those of financial, regulatory and insolvency nature.[652] Claimant points out that Brattle has calculated that AMG's assessment of regulatory risk accounts for EUR 43.8 million of the difference between in damages assessed under AMG's DCF model and damages under Brattle's model.[653] Once Brattle's corrections to AMG's DCF model are applied, AMG's amount of damages is raised to a level approaching Brattle's damages estimate.[654]

503. Claimant disputes the main conclusion that AMG draws using its ABV methodology, i.e., the contention that Claimant's plants currently receive a rate of return in excess of the reasonable rate of return of 7.398%, because their weighted average return before taxes is 8.7%. Claimant submits that this calculation was not obtained using Claimant's actual cost

---

[650] Cl. PHB, ¶ 224 (footnotes omitted).

[651] Cl. Reply, ¶¶ 652-658. See also Cl. PHB, ¶¶ 196-197.

[652] Cl. PHB, ¶¶ 194-195 (citing Second Brattle Regulatory Report, ¶ 143).

[653] At the Hearing, Brattle combined its calculation of regulatory risk and liquidity discount under the heading of "regulatory risk," which, taken together, total EUR 43.8 million. Brattle Quantum Presentation, slide 5.

[654] Cl. Reply, ¶ 658, citing Second Brattle Quantum Report, Section VIII.H ("Corrections to AMG's DCF"), ¶ 193 and Figure 3 ("*AMG Waterfall – Eight Corrections*").

of investment, but it mostly relied on investment and operating costs established by Ministerial Order IET/1045/2014 for "standard installations".[655] Moreover, Claimant points out that, despite AMG's assertions that Claimant has suffered no damages and is in fact better off under the current regime, AMG's DCF model shows substantial pre-tax cash flow reductions.[656]

*(iii) Brattle's "Alternative Claim"*

504.  Brattle calculated an "Alternative Claim" for damages in the amount of EUR 37 million, to account for Respondent's allegations that SolEs was entitled to the return that Respondent deemed reasonable under RD 1578/2008.[657] To this end, Brattle constructed an "Alternative But-For Scenario" which assumes that Respondent would have remunerated producers with an "Alternative Tariff per MWh of production", based on the cost and production parameters set forth in Ministerial Order IET/1045/2014 (e.g., including an after-tax target return of 7%, over a 25-year regulatory lifetime).[658]

505.  Claimant submits that the Alternative Claim allowed Brattle to identify and quantify the following four harms: *(i)* that Spain reduced the "reasonable return" of 7% originally assured under RD 1578/2008 (i.e., Brattle finds that when certain assumptions are applied to the 7.398% return provided under the current regime, the result is an after-tax of 5.93%);[659] *(ii)* that Spain has appropriated the efficiency gains that had previously been earned by more efficient plants under RD 1578/2008 (e.g., Brattle finds that the current regime has reduced the remuneration to single-axis plants –such as Badajoz I and II– more than it has reduced the remuneration to double-axis plants, and Brattle's alternative tariff eliminates this defect);[660] *(iii)* that Spain unduly and retroactively recovered returns earned in previous years under the Original Regulatory Regime (Brattle corrects this feature by constructing the Alternative But-For scenario without minimizing investors' future returns

---

[655] Cl. Reply, ¶¶ 635-636; Cl. PHB, ¶ 223.

[656] Cl. Reply, ¶ 649.  See also Cl. PHB, ¶ 193.

[657] See, e.g., Cl. Reply, ¶¶ 688, 710-711.

[658] Cl. Reply, ¶¶ 689-691, 694.

[659] *Id.*, ¶¶ 692, 694-695 (citing, e.g., Second Brattle Quantum Report, ¶ 241).

[660] *Id.*, ¶¶ 692, 696-701.

based on their past returns);[661] and *(iv)* that Spain's change in the basis of payment to producers –from a FIT per MWh of production to an incentive per MW of installed capacity– undermined the previous incentive to maximize production (in contrast, Brattle's Alternative But-For scenario preserves the incentive to maximize production).[662]

### (iv) The Claim for a Tax Gross-up

506. Claimant seeks a tax "gross-up" to compensate Claimant for the difference between the income taxes it would have to pay on the award in Germany (at a rate of 31.23%) and the withholding tax that it would have to have paid on dividends (at a rate of 1.56%) and interest payments (at a rate of 31.23%) from Fotones, absent the Disputed Measures.[663]  On this basis, Brattle calculates a tax gross-up of EUR 29.1 million (this figure is an adjustment to the EUR 30.4 million set out in Claimant's Memorial).[664]

507. Claimant states that a tax gross-up is necessary to compensate Claimant fully for Respondent's violations of international law which are "*the direct, but-for cause of such additional taxes.*"[665]  Claimant contends that the tax gross-up is an indispensable component of the damages given that: *(i)* Article 21 of the ECT does not prevent the award of a tax gross-up;[666] *(ii)* the so-called "*Monetary Gold*" principle invoked by Respondent is inapposite, since the Tribunal can award the tax gross-up without exercising jurisdiction or affecting the rights and obligations of Germany;[667] *(iii)* the acts giving rise to the tax gross-up are attributable to Respondent under international law;[668] *(iv)* contrary to Respondent's assertion, no tax exemption under EU law would apply to any award in

---

[661] *Id.*, ¶¶ 692, 702-705.

[662] *Id.*, ¶¶ 692, 706-709.

[663] Cl. Mem., ¶¶ 676-678; Cl. Reply, ¶¶ 659, 661.

[664] Cl. Mem., ¶¶ 676-678; Cl. Reply, ¶ 660.  See also Cl. PHB, ¶¶ 226 and 239 (referring to First Brattle Quantum Report, ¶ 160; Second Brattle Quantum Report, ¶ 210; and Taylor Wessing Memorandum (BQR-0111).

[665] Cl. Reply, ¶ 660.  See also *id.*, ¶¶ 662 and Cl. PHB, ¶¶ 227-228, 248.

[666] Cl. Reply, ¶¶ 663-665.

[667] *Id.*, ¶¶ 666-667.

[668] *Id.*, ¶¶ 668-672.

this arbitration;[669] and *(v)* the tax treatment of the award is sufficiently certain to justify the tax gross-up.[670]

508. Finally, Claimant submits that Respondent should be ordered to pay post-Award interest at the rate of 5.94%, compounded quarterly, on all damages awarded by the Tribunal until full payment of the Award.[671]

### b. *Respondent's Position*

509. Respondent requests the Tribunal to dismiss all Claimant's claims for damages. It considers that Claimant has no right to compensation, as the alleged damages are speculative.[672] Respondent opposes the use of the DCF method to calculate damages in this case since it considers that it is "*excessively speculative*".[673] In any event, as summarized below, Respondent submits that the results of the AMG valuations using the DCF method show that the Disputed Measures have not caused any damage to Claimant's investment.[674] Respondent also considers that the valuation date used by Claimant (30 June 2014) was "*arbitrarily chosen*."[675]

510. Concerning the amount of compensation, Respondent relies on: *(i)* the valuation methodology adopted by its experts from AMG, which show a positive financial impact to Claimant of EUR 4.5 million, as well as Claimant's incorrect determination of interest and the inadmissibility of the tax gross-up;[676] *(ii)* AMG's main conclusions, including criticisms to the valuation methodology adopted by Brattle;[677] and *(iii)* the reasons for which it considers that Brattle's alternative claim is flawed.[678]

---

[669] *Id.*, ¶¶ 673-674. See also Cl. PHB, ¶¶ 240-241.

[670] Cl. Reply, ¶¶ 675-679.

[671] Cl. Rej., ¶ 55.

[672] Resp. Rej., ¶¶ 78-80, 1260.

[673] *Id.*, ¶ 81.

[674] *Id.*, ¶ 85.

[675] Resp. C-Mem., ¶ 1202.

[676] See Resp. C-Mem., ¶¶ 1238-1265; Resp. Rej., ¶¶ 1216-1259; Resp. PHB, ¶ 196.

[677] See Resp. C-Mem., ¶¶ 1223, 1233-1237; Resp. Rej., ¶¶ 1209-1215.

[678] See Resp. Rej., ¶¶ 81, 1200; Resp. PHB, ¶¶ 181-184.

### (i) AMG's Valuation Methodology

511. AMG's approach to damages is based on the following main premises:

> [AMG employs an ABV methodology that] *is based solely on reliable data such as Regulatory investment and operating costs*[,] *thus eliminating the uncertainty inherent to the DCF method.*[679]

> *The Spanish Regulator bestows each plant or installation and* Greenfield *investment, a reasonable return of around 7.398%* [...] *Claimant* [...] *is a secondary, financial or* Brownfield *investor since its two photovoltaic plants were acquired by the Claimant after several related transactions, when the plants had already obtained the main permits necessary and were already under construction. Therefore,* [...] *the focus* [is shifted] *from the shareholder to the project, making the necessary adjustments* [...]

> [AMG] *calculated the project pre-tax returns of the Claimant's two plants on the basis of the characteristics that define the compensation pursuant to Royal Decree Law 9/2013 and its Regulatory development, Royal Decree 413/2014 and Ministerial Order IET 1045/2014 for each type installation.* [In its Second Report, AMG updated its calculation to take into account remuneration parameters for 2017-2019].

> [AMG then performed alternative calculations using the DCF method which] *arrive at diametrically opposite conclusions to those presented by Brattle. The divergence* [...] *has its origin in a very different interpretation of the situation of the SEE in the* Actual *and the* But for *scenarios. Brattle's* But for *scenario does not take into account the effect that the Tariff Deficit would have had on investments while* [AMG's] *takes into account the SEE's drift towards bankruptcy had the Measures not been introduced. Brattle's* Actual *scenario assumes that the Regulator shall in the future substantially cut the remuneration to RE and they discount this cut (which has not occurred*[...]*).* [AMG's] Actual *scenario reflects the reduction of the Tariff Deficit that is evidencing itself and interprets this reduction as a sign of stability that improves the forecast for the Claimant's investment in regards to the* But for *scenario.*[680]

---

[679] First AMG Report, ¶ 163.

[680] *Id.*, ¶¶ 3, 4, 14.

512. AMG also calculated the financial impact of the measures through a DCF method, to provide a simulation of the volatility of the DCF results used by Brattle.[681]  Among other elements of its analysis, AMG construed its DCF alternative model based on: 20 June 2014 as valuation date (under both scenarios, But-For and Actual);[682] a useful life of 30 years (both scenarios); a discount rate of 10.30% (But-For scenario) and of 5.40% (Actual scenario); capital expenses ("**CAPEX**") and operating expenses ("**OPEX**") based on IET 1045/2014; a CAPEX depreciation of 7% annually; and an illiquidity discount of 25% (But-For) and of 18% (Actual).[683]

513. On the basis of its DCF calculations, AMG concludes that the net present value ("**NPV**") of cash flows at the date of valuation is EUR 86.3 million for the But-For scenario, while the Actual scenario provides an increase in NPV to EUR 90.8 million. Therefore, the current regulatory regime increased the value of Claimant's investment by EUR 4.5 million (this is an adjustment to the amount indicated in Respondent's Counter Memorial of an alleged positive impact on Claimant's investment of EUR 7.3 million).[684]

514. Moreover, Respondent submits that Brattle's analysis of SolEs' IRRs (computed as part of Brattle's reality checks) reflect the speculative nature of Claimant's damages claim.[685]  In this regard, AMG calculated that Brattle's But-For scenario would lead to an average IRR of 15.88%, which is disproportionate considering the risk profile of the investment.[686]  In contrast, in its second report, AMG ratified its earlier observations and updated its calculations, concluding the following regarding the IRRs:

> *[…] In our calculations, we have we have used the CAPEX and OPEX set out by Ministerial Order IET 1045/2014 for each of the standard type classes that correspond to the Plants. We compare the IRRs thus obtained with the IRRs calculated using the actual real*

---

[681] Resp. C-Mem., ¶¶ 1238-1239; Resp. Rej., ¶ 1216.

[682] AMG uses Claimant's valuation date for sole purpose of contrasting its DCF valuation with that of Brattle.

[683] Resp. Rej., ¶ 1217.

[684] *Id.*, ¶¶ 1217-1218; Resp. C-Mem., ¶¶ 1239-1240 (citing First AMG Report, Table 11 at Section 5.3, ¶ 193).  See also Resp. Rej., ¶ 1201, and Resp. PHB, ¶ 196.

[685] Resp. C-Mem., ¶¶ 1233-1237; Resp. Rej., ¶ 1215.

[686] Resp. C-Mem., ¶¶ 1234-1235; Resp. Rej., ¶¶ 1213-1214.

> *CAPEX incurred by the Claimant – excluding non-remunerable items, such as the acquisition premia paid by the Claimant.* […]
>
> [T]*he weighted average project IRR of both Plants amounts to 8.80% when we use the IET 1045/2014 CAPEX, and to 8.86% when we use the actual CAPEX incurred in the Plants.  Both rates are well above the RRoR of 7.398%.*[687]

515.  AMG therefore concludes that, after the Disputed Measures, Claimant's plants are obtaining returns that are higher than the benchmark returns.[688]

### (ii) AMG's Main Conclusions and Criticisms of Claimant's Valuation Methodology

516.  As a result of its analysis, AMG concludes that under the Specific Regime a reasonable rate of return of more than 7.398% is attained for both of Claimant's plants (as their weighted average return before taxes amounts to 8.768%, representing 137 base points above the reasonable rate of return of 7.398%).[689]  In other words, Claimant's plants are profitable and Claimant has not suffered damages.[690]

517.  Respondent objects to Claimant's chosen valuation date (30 June 2014), as it considers that it has been "*arbitrarily chosen by the Claimant.*"[691]  It submits that the discrepancies between the results of the Parties' experts are due to the different parameters used by each side, which further highlights the "*inadmissibility and inconsistency of the DCF method.*"[692]  Contrary to Brattle, AMG considers that the But-For scenario entails a greater risk and greater levels of uncertainty to the investment than the Actual scenario, which is deemed as "*stable, more predictable and with lower risk*".[693]

---

[687] Resp. Rej., ¶ 1210 (citing Second AMG Report, ¶¶ 20-22).

[688] Resp. Rej., ¶ 1211.  See also Resp. PHB, ¶ 146.

[689] Resp. C-Mem., ¶ 1233; First AMG Report, ¶¶ 4, 59-64.

[690] See, e.g., Resp. PHB, ¶¶ 146-149.

[691] Resp. C-Mem., ¶ 1202.

[692] *Id.*, ¶ 1241.  See also Resp. Rej., ¶ 1219.

[693] Resp. C-Mem., ¶ 1242.  See also Resp. Rej., ¶ 1220.

518.  In its post-hearing brief, Respondent criticizes further elements of Brattle's calculation of damages, including the following: Respondent highlights AMG's conclusion that about 44% of the future purported damages calculated by Brattle are attributable to prior measures (such as the generation of the 7% tax and the permanent cap on production introduced by Royal Decree Law 14/2010);[694] it submits that, since Claimant is a *Brownfield* investor, it is to expect lower returns for lower risks (given that a reasonable rate of return is provided to *Greenfield* investors, not *Brownfield* ones);[695] it argues that Brattle's financial model does not reflect the historical production of the plants[696] and that Claimant took excessive levels of debt.[697]

519.  Respondent and its experts disagree with the 5.94% interest rate put forward by Claimant, which Brattle uses as part of Step 3 in its valuation methodology.  Respondent requests the Tribunal to use the interest rate of the Spanish short-term sovereign bond as the appropriate pre-Award interest rate, since this rate would be sufficient to cover the risk of non-payment.[698]  AMG indicates that the mean average of the yields of Spanish 1-year treasury bills from June 2014 to the time of reference of the last available rate in December 2016 produces a rate of 0.037%.[699]  Respondent does not propose any compounding of interest.[700]

### *(iii) Brattle's "Alternative Claim"*

520.  Respondent summarizes its objections to Brattle's "Alternative Claim" as follows:

> *Brattle present*[s] *an Alternative Claim based on* "the application of Spain's originally accepted 7% after-tax reasonable return", *but* "rather than simply verifying that the Claimant's PV Plants attain

---

[694] Resp. PHB, ¶ 197.

[695] See, e.g., Resp. PHB, ¶¶ 152, 160-163.

[696] See Resp. Rej., ¶ 174.

[697] See Resp. PHB, ¶¶ 187-190.

[698] Resp. C-Mem., ¶¶ 1244-1246; Resp. Rej., ¶ 1224.

[699] Resp. Rej., ¶ 1223 (citing Second AMG Report, ¶ 323).

[700] See, e.g., Resp. C-Mem., ¶¶ 1244-1247 and Resp. Rej., ¶ 1224 (mentioning "*the interest rate of the Spanish short-term sovereign debt*" without reference to compound or simple interest).

the target Reasonable Rate of Return, Brattle instead creates a hypothetical FiT system as the basis of their analysis.*

*When creating this hypothetical FiT, Brattle uses an imaginary "marginal plant" that is "far from the reality of the Claimant's plants". They did "not considered the real cost of these PV plants of the Claimant", "The Claimant's Plants are fixed-tilt structure PV plants and Brattle's plant is a two-axis tracking installation, which requires a far more costly CAPEX for build-out".*

*Brattle then uses a 20% Effective Discounted Tax Rate when "grossing-up" the 7% post tax return target to set their pre-tax returns target, instead of using 7.47% that is the Effective Discounted Tax Rate of the Plants that can be inferred from Brattle's own financial model. Brattle thereby significantly inflates the pre-tax target return they then use in their Alternative Claim analysis.*[701]

521.  Respondent considers that Brattle's Alternative Claim entails "*a convoluted methodology, where a simple exercise would suffice*", and fails to calculate the real project return of Claimant's plants.[702]

### *(iv) The Claim for a Tax Gross-up*

522.  Respondent objects to the tax gross-up calculated by Claimant, allegedly to compensate it for the taxes in Germany that Claimant would be required to pay as a result of the award.[703]  Respondent argues that the tax gross-up is inadmissible, *inter alia*, on the following basis: *(i)* Article 21 of the ECT prevents the award of a tax gross-up (since it is a tax measure and, as such, it explicitly falls outside the scope of the ECT);[704] *(ii)* the so-called "*Monetary Gold*" principle prevents the Tribunal to award the tax gross-up since doing so would entail affecting the rights and obligations of Germany, which is not a party to the dispute;[705] *(iii)* the acts giving rise to the tax gross-up are not attributable to

---

[701] Resp. PHB, ¶¶ 181-183 (footnotes omitted).

[702] *Id.*, ¶ 184.

[703] Resp. C-Mem., ¶¶ 1248-1265.

[704] Resp. C-Mem., ¶¶ 1251-1252; Resp. Rej., ¶¶ 1233-1239.

[705] Resp. C-Mem., ¶¶ 1253-1255.

Respondent under international law;[706] *(iv)* an obligation to pay taxes arising out of the award would not arise in Germany in view of the participation exemption established by a EU Directive;[707] and *(v)* the tax gross-up is not justified since it is "*excessively speculative, uncertain and contingent*".[708]

523. Respondent adds that Claimant's request of a tax gross up is also flawed because it ignores that any dividends received under the But-For scenario "*would have been generated by profits at the project company level (Fotones) and that these profits would have been taxable in Spain at the rate of 25% of corporation tax* […] *thus offsetting the taxes purportedly payable by the alternative compensatory award*."[709]

524. Finally, Respondent submits that, if post-Award interest is awarded, the rate should not be higher than the pre-Award interest, since no punitive post-Award interest is appropriate (nor does Claimant request post-Award interest at a higher rate than that of the pre-Award).[710]

### (2)    The Tribunal's Analysis

### *a.  Valuation of the Reduction in Value of Claimant's Investment*

525. The Tribunal has previously indicated that it considers a DCF methodology to be appropriate in this case.  It now examines the particular methodology on which Claimant relies to support its claim for EUR 52.7 million, taking into account the observations made by Respondent and AMG, as well as the alternative DCF model prepared by AMG.  It does not attempt to address here every point made by the Parties and their respective experts, but instead focuses on the issues that were most material to the divergence in the two DCF valuations.

526. Before turning to analysis of the DCF methodology, the Tribunal notes that AMG's ABV model employs assumptions that are inconsistent with the Tribunal's finding on

---

[706] Resp. C-Mem., ¶¶ 1256-1259; Resp. Rej., ¶¶ 1240-1241.

[707] Resp. C-Mem., ¶ 1260; Resp. Rej., ¶ 1243.

[708] See Resp. C-Mem., ¶ 1261; Resp. Rej., ¶¶ 1251-1257.

[709] Resp. PHB, ¶ 201.

[710] Resp. Rej., ¶¶ 1226-1231.

liability. AMG's model is premised on the assumption that Claimant is entitled only to a reasonable rate of return, as determined by Respondent. The Tribunal rejected that assertion in addressing liability. In addition, Respondent and AMG placed emphasis on several contentions about Claimant's investments, e.g., that Claimant paid more than market prices for its investment,[711] that Claimant's returns should be calculated on a project level, not at the level of equity, and that Claimant, as a brownfield investor, should expect lower returns than would be expected by a greenfield investor.[712] While these points may have been relevant to Respondent's legal theory and/or to AMG's ABV calculations, which are premised on the calculation of project returns, the Tribunal does not consider them to be material to the analysis of the DCF methodology that focuses instead on the net present value of future cash flows.

527. The Tribunal does not accept Respondent's contention that the June 2014 valuation date used by Claimant and Brattle is arbitrary. As Claimant points out, June 2014 was the date when Respondent issued a ministerial order containing the details of the remuneration scheme that would be applied under the new regulatory regime. The Tribunal questioned Mr. Caldwell about the alternatives of a July 2013 valuation date (coinciding with the adoption of RDL 9/2013, which abrogated RD 661/2007 and RD 1578/2008) or a present-day valuation date.[713] Mr. Caldwell's explanations confirmed that June 2014 was a reasonable valuation date.

528. Badajoz I began producing energy no later than August 2010 and Badajoz II began producing energy in February 2011.[714] The Tribunal recognizes that a long period of historical performance of an investment can lend confidence to predictions about how it would have performed in the future. In the present case, however, the Tribunal considers that periods of operation of Badajoz I and Badajoz II provide a sufficient basis for the

---

[711] Respondent states that Claimant paid an "acquisition premium" that was close to fifty percent of the CAPEX to acquire PV plants and that Spain's financial support does not extend to acquisition premiums. Resp. PHB, ¶¶ 164-173.

[712] Second AMG Report, ¶¶ 16-17; First AMG Report, ¶¶ 2-3.

[713] Rev. Tr. Day 4 (ENG), 92:23 to 93:20; 115:6 to 116:3 (Mr. Caldwell).

[714] *Supra*, ¶ 137.

DCF analysis. In setting the production level to be used in the DCF model, Brattle took into account, in addition to historical performance, contemporaneous forecasts by Claimant made in the course of doing business.[715] Brattle set production at the same level in both the Actual and the But-For scenarios.

529. The Parties' respective experts agree that the Disputed Measures substantially reduced cash flows to Claimant. Brattle asserts a reduction of EUR 105 million and AMG asserts a reduction of EUR 60 million[716]. However, the results of their respective DCF analyses are far more divergent than are their respective conclusions regarding cash flows. AMG asserts that the Disputed Measures increased the value of Claimant's investment by EUR 4.5 million whereas Brattle concludes that the value of the investment has been reduced by EUR 52.7 million.[717]

530. This difference of approximately EUR 57 million in the valuations by the Parties' respective experts is largely a consequence of the way in which each expert derives the discount rate that is applied to the future stream of cash flows. That discount rate is constructed by amalgamating various elements, including systematic risk, regulatory risk, inflation and an illiquidity discount.

531. The disagreement between the experts that has the largest impact on their divergent DCF valuations is the assessment of regulatory risk in the two scenarios. Brattle assigns a significantly higher regulatory risk to the Actual scenario than it assigns to the But-For scenario. AMG's assertion, by contrast, is that regulatory risk was high under the Original Regulatory Regime, due to the unsustainability of the SEE, which meant that a radical change in the regulatory regime was likely. According to AMG, regulatory risk is lower in the Actual scenario than in the But-For scenario.

532. The logic underlying AMG's regulatory risk assessment is at odds with the conclusions of this Tribunal on liability. The But-For scenario is premised on continued application of the regulatory regime that was in place prior to the Disputed Measures. The Tribunal has

---

[715] First Brattle Quantum Report, ¶ 12.
[716] Second AMG Report, p. 111.
[717] *Id.*, ¶¶ 35, 341; Second Brattle Quantum Report, ¶¶ 8, 29.

rejected the contention that Claimant should have expected radical changes in that regime. The stability inherent in the But-For scenario (which assumes that the Original Regulatory Regime had continued for 25 years) stands in contrast to the Actual Scenario, which is based on the Specific Regime. Under the Specific Regime, tariffs are subject to periodic adjustment and there is uncertainty about the methodology that will be used to make those adjustments.[718] The Tribunal therefore finds Brattle's assessment of regulatory risk to be more convincing than that of AMG. Brattle quantifies this regulatory risk with reference to the ratings that ratings agencies have assigned to securitized debt instruments linked to Spain's tariff deficit.[719] Having considered Brattle's methodology and taking into account AMG's observations on that methodology, the Tribunal is satisfied with Brattle's quantification of regulatory risk under the two scenarios.

533. The Parties' respective experts also hold inverted views in respect of the illiquidity discount to be applied in the two scenarios. In DCF methodologies, an illiquidity discount is applied to investments that are less liquid than shares freely traded on a public exchange. The size of the discount depends on the particular characteristics of the investment. For reasons that align with its approach to regulatory risk, AMG considers that the Disputed Measures have increased the liquidity of Claimant's investment.[720] It therefore applies a higher discount rate in the But-For scenario than it applies in the Actual Scenario. Brattle instead concludes that the Disputed Measures have reduced the liquidity of Claimant's investment and thus applies a higher illiquidity discount rate to the Actual scenario than it applies to the But-For scenario.[721]

534. The Tribunal is persuaded by Brattle's contention that Claimant's investment should be regarded as more liquid under the But-For scenario than under the Actual scenario. This conclusion, like the Tribunal's conclusion on regulatory risk, aligns with the Tribunal's finding on liability. Under the Actual Scenario, according to Brattle, it would be more difficult for Claimant to sell its interests in Fotones than would be the case under the But-

---

[718] See ¶¶ 454-463 *supra*.

[719] First Brattle Quantum Report, ¶¶ 98-103.

[720] Second AMG Report, ¶¶ 304-305.

[721] Second Brattle Quantum Report, ¶¶ 127(b), 167-175.

For Scenario, which is premised on continuity of the Original Regulatory Regime for 25 years. Brattle has supported its quantification of the illiquidity discount rates that it applies with two separate kinds of analyses.[722] Taking into account the reports of both experts, the Tribunal is satisfied by the illiquidity discount rates employed by Brattle.

535. When combined, regulatory risk and the illiquidity discount account for EUR 43.8 million of the EUR 57.2 million difference in the DCF valuations of the two experts.[723] The experts' respective estimates of inflation rates over the relevant period account for a difference of EUR 11.8 million in their respective DCF valuations.[724] Brattle bases its estimates of inflation on Spanish inflation swaps, noting that the rates of those swaps reflect the assessment by market participants of future inflation.[725] AMG considers that Brattle's estimates are too high, leading Brattle to overstate revenues in its But-For scenario (because FITs under RD 1578/2008 were inflation-indexed).[726] AMG instead estimates inflation based on an average of three inflation forecasts. Brattle criticizes AMG's methodology on two grounds. First, these studies are limited to a 5-year period and, second, the studies on which AMG relies are from 2017 and 2020, so they do not reflect the June 2014 valuation date.[727]

536. Taking into account the positions of the experts, and recognizing that an estimate of inflation is necessary to a DCF analysis, the Tribunal is satisfied by the inflation estimate used by Brattle.

537. The Tribunal has also taken into account other differences between the criteria used by the two experts to construct their respective DCF analyses and the justifications advanced by the experts. However, because these other differences account for much smaller divergences in the DCF analyses, the Tribunal does not consider it necessary to set out in

---

[722] First Brattle Quantum Report, ¶ 131 and Appendix Q.

[723] See Cl. PHB, ¶ 197 (citing Brattle Quantum Presentation, slide 5; Second Brattle Quantum Report, Figure 3 and Section VIII.H ("Corrections to AMG's DCF")).

[724] Second Brattle Quantum Report, figure 3.

[725] First Brattle Quantum Report, ¶¶ 12, 58.

[726] Second AMG Report, ¶ 310.

[727] Rev. Tr. Day 4 (ENG), 9:8 to 9:23 (Mr. Caldwell).

this Award the competing analyses relevant to each such point. The Tribunal has reviewed competing contentions in respect of these other criteria and is satisfied with the DCF analysis presented by Brattle. As one example, Brattle's damages calculation is based on an effective tax rate of 30%, whereas AMG uses an effective tax rate of 25%.[728] Respondent claims that Brattle "*know full well*" that the effective tax rate was "*30%-28%-25%, before 2015, in 2015, and after 2015, respectively,*" citing what it represents to be the nominal tax rates applicable to the most common types of corporate taxpayers.[729] Brattle recognizes that the tax rate fell after its valuation date but explains, first, that it uses the tax rate applicable as of its valuation date and, second, that it applies the same tax rate to both the Actual Scenario and the But-For Scenario. By contrast, AMG applies the 2014 tax rate to the Actual Scenario and the 2016 tax rate to the But-For Scenario. As Brattle points out, by using different tax rates for the two scenarios, AMG's methodology reduces the damages that result from its DCF analysis.[730]

538. Having examined the positions of the experts and the Parties in relation to the effect of the Disputed Measures on the fair market value of Claimant's investment, the Tribunal concludes that Brattle's DCF analysis provides a sound basis for the Tribunal to determine the reduction in the fair market value of Claimant's investment. However, the amount of damages to be awarded to Claimant must be adjusted to take into account (1) the Tribunal's conclusion that it lacks jurisdiction in respect of Claimant's contention that the TVPEE violates Article 10(1) of the ECT and (2) the Tribunal's finding that Spain is not liable as to the First Set of Disputed Measures.

539. Brattle has indicated the damages that it associates with particular measures in Appendix C to the First Brattle Quantum Report).[731] One set of calculations assumes (as is the case) that the Tribunal has not found the TVPEE to be illegal. On this basis, Brattle presents the damages that it attributes to *(i)* the limit on production hours, *(ii)* the change in the inflation index (which, taken together, correspond to the First Set of Disputed Measures) and *(iii)* the

---

[728] Second Brattle Quantum Report, ¶ 127.
[729] Second AMG Report, ¶ 142 and Table 10 (p. 133).
[730] Second Brattle Quantum Report, ¶¶ 127, 182.
[731] First Brattle Quantum Report, Appendix C.

July 2013 measures (corresponding to the Second Set of Disputed Measures). Brattle calculates that the July 2013 measures reduced the fair market value of Claimant's investment by 40.98 million.

540. The Tribunal has taken note of the quantum presentation made by AMG at the Hearing, in which AMG contended that Brattle does not divide the individual effects of the Measures in its future damages calculation. In that presentation, AMG stated that the generation tax (i.e., the TVPEE) and the limit on production hours accounted for 44% of the damages claimed by SolES, and "*only 56 percent*" of the claimed damages result from RDL 9/2013 (which abolished the Special Regime and replaced it with the Specific Regime) and RDL 2/2013 (which changed the inflation index). Respondent made a similar observation in its post-hearing brief.[732] The Tribunal notes that AMG's presentation at the Hearing was based on Figure 1 in Brattle's First Quantum Report, which depicts in general terms the "*three principal steps*" that Brattle undertook in its damages calculation. That figure does not isolate the damages attributable to the July 2013 measures from earlier measures, as was done in Appendix C of Brattle's First Quantum Report. The Tribunal does not find in AMG's presentation at the Hearing a basis to question the calculations presented by Brattle in Appendix C of its First Quantum Report.

541. Taking into account the evidence before it, including evidence not specifically addressed above, the Tribunal finds that Respondent's breach of its fair and equitable treatment obligation reduced the fair market value of Claimant's investment by EUR 40.98 million.

542. In view of this conclusion, the Tribunal considers it unnecessary to analyze Brattle's "alternative claim." This alternative valuation was developed in light of Respondent's assertion that PV investors were always entitled to a reasonable return. However, the Tribunal's conclusions as to liability were not premised on a finding that Article 10(1) of the ECT entitles Claimant to a particular return.

---

[732] Resp. PHB, ¶ 197.

543.  Paragraphs 544-546 below set out the individual view of Professor Sacerdoti in relation to the valuation of the reduction in value of Claimant's investment.

544.  Professor Sacerdoti joins in the Tribunal's conclusion regarding the valuation to be assigned to the reduction in value of Claimant's investment, taking into account the evidence available to the Tribunal.  However, he regrets that the evidence before the Tribunal required the Tribunal to choose between Claimant's valuation, which was based on a "But-for" scenario with a 25-year duration of the feed-in tariffs set in 2010 under the Special Regime, and Respondent's DCF valuation, which the Tribunal did not adopt for the reasons stated above, pursuant to which the regulatory risk in the but-for scenario was so high that Claimant's investment would have increased in value due to the Disputed Measures.

545.  Professor Sacerdoti considers that the evidence shows that it would have been justified and was inevitable that Spain would not have let the tariff deficit continue to grow for 25 years and instead would have acted in some manner to address it.  As the Tribunal has observed at paragraph 440 above  *"a prudent PV investor as of March 2010 had reason to anticipate some measures by Spain to address the tariff deficit, possibly giving rise to reduced remuneration to existing investors"* although "*the evidence does not establish that a substantial reduction in FITs applied to existing plants or elimination of the Special Regime was an almost total certainty, as Respondent has asserted, or even that it was probable.*"  He would have welcomed evidence on the basis of which the Tribunal could have accepted Claimant's general approach to liability and quantum without also accepting Claimant's premise that the Original Regulatory Regime would remain stable for 25 years.  On the basis of such evidence the Tribunal might have adjusted the analysis of the Claimant's expert to base the calculation of damages (loss of value of the investment due to the reduction of returns under the new regime) on the difference between this adjusted But-for scenario (with a shorter time horizon) and the actual scenario, based on the reduced returns provided under the Disputed Measures.

546. Professor Sacerdoti acknowledges, however, that the Tribunal was unable to perform such complicated calculations on its own motion because neither Party pursued this approach, not even as a fallback, subordinate or alternative argument, and, specifically, because the Respondent has not supplied the necessary information.

### b. The Proposed Gross-up for Taxes Owed to Germany

547. Claimant's contention that the Disputed Measures will increase its tax burden accounts for a sizable portion of the overall damages sought by Claimant (EUR 29.1 million of a total claim (before pre-Award interest) of EUR 81.8 million).[733]  As proof of this sum, Claimant relies on a 7 July 2017 memorandum from German law firm, Taylor Wessing Partnerschaftgesellschaft mbB (the "**Taylor Wessing memorandum**") which was an exhibit to the Second Brattle Quantum Report, as well as the quantum reports by Brattle.[734]

548. The Taylor Wessing memorandum is unsigned.  At the Hearing, counsel for Claimant sought to introduce a signed copy of the memorandum.  Respondent objected on the basis that there were no exceptional circumstances, as required by Procedural Order No. 1.  The President instructed Claimant to make a written request, on which Respondent would be invited to comment.[735]  After hearing from the Parties, the Tribunal rejected Claimant's request to submit the signed memorandum, on the basis that there were no exceptional circumstances justifying the late submission.[736]

549. Claimant invokes the Commentaries of the ILC's Draft Articles on the Responsibility of States for Wrongful Acts to support its assertion that "*causation and remoteness are not to be understood as a bar*" to the tax gross-up claim.[737]  However, the ILC's commentary is more nuanced than Claimant has suggested.  The Commentaries indicate that causality in fact is a necessary but not a sufficient condition for reparation and call attention to other considerations, including foreseeability, proximity and the question whether State organs

---

[733] See Cl. PHB, ¶¶ 191, 226, 239; Second Brattle Quantum Report, ¶¶ 8, 30.

[734] Taylor Wessing memorandum.

[735] Rev. Tr. Day 4 (ENG), 1:9 to 3:8.

[736] Procedural Order No. 7 dated 13 July 2018, ¶ 7.

[737] Cl. PHB, ¶ 234.

deliberately caused a particular harm.[738]  Criteria such as these can only be applied on a case by case basis. Although Claimant states that tribunals in other cases have "*accommodated the impact of taxation in order to make the claimant whole*," it has not identified a prior award that grosses-up an investor for taxes on an award that are due to its home State.[739]

550. There is reason to question the general proposition that a respondent State that is found liable for an FET violation should be required to compensate a claimant for increased taxes that claimant will owe its home State.  Even assuming that such losses might be in some circumstances compensable (which the Tribunal does not decide), the evidence in support of that loss and of the responsibility of the respondent State for it should be well-substantiated.  It is Claimant's burden to prove the claimed loss of EUR 29.1 million.

551. Taylor Wessing states that its analysis is based on "*the applicable German income tax law*."[740]  The memorandum disclaims knowledge of the taxation of Fotones, which is a Spanish company.[741]  As to the taxation of interest payments made by Fotones to Claimant, the memorandum states, "[w]*e cannot assess whether the interest would have been effectively taxed in Spain*" and that "*German tax treatment depends on the Spanish taxation*".[742]  Claimant did not provide to the Tribunal evidence regarding Spain's tax treatment of Claimant or of Claimant's investment.  Brattle does not hold itself out as having expertise in tax law (German or Spanish).  When asked at the Hearing whether Brattle had calculated the EUR 29 million tax gross-up, Mr. Caldwell responded, "*No, it's based off the Taylor Wessing conclusions.  We are simply implementing the Taylor Wessing opinion.*"[743]

---

[738] Commentary to Article 31, paragraph (10).

[739] Cl. PHB, ¶ 231.

[740] Taylor Wessing memorandum, p. 2.

[741] *Id.*, ¶ 3.5.

[742] *Id.*, ¶ 4.1.

[743] Rev. Tr. Day 4 (ENG), 101:12 to 101:14 (Mr. Caldwell).

552.  As one of its objections to the tax gross-up, Respondent asserts that Brattle's calculation of Claimant's taxes ignores the fact that dividends received by Claimant would have been generated by profits earned by Fotones, which would have been taxed by Spain at the rate of 25%.[744]

553.  Without solid evidence about the way in which Spanish taxes would affect Claimant's overall tax burden under the two scenarios on which Claimant bases its claim for a tax gross-up (that is, with or without the Disputed Measures), the Tribunal has an incomplete picture of the tax consequences for Claimant of the Disputed Measures.  The Tribunal concludes that Claimant has not provided sufficient evidence to support an award of damages based on the alleged increase in its tax burden.

554.  Having found that Claimant has not provided sufficient evidence to support its claim for a tax gross-up in the amount of EUR 29.1 million, the Tribunal has no need to address the other objections to the tax gross-up raised by Respondent.

### c.  Pre-Award interest

555.  As the Parties have recognized, the ECT does not expressly address interest due on awards based on a breach of the FET obligation.  The Tribunal is not obligated to apply to this Award the provision of the ECT that addresses the interest to be applied to an award based on a breach of Article 13 (expropriation).  It takes into account that provision (invoked by Claimant) as well as the widely divergent views of the Parties, noted above.

556.  The Tribunal also takes into consideration the testimony of Mr. Caldwell.  At the Hearing, he confirmed, as stated in Brattle's Quantum Reports, that counsel had instructed Brattle that the Spanish sovereign borrowing rate could not be what the ECT meant when it referred to a "commercial rate."  Brattle reflected that guidance in its use of the 5.94% rate for pre-Award interest.[745]  Respondent's counsel asked Mr. Caldwell about Brattle's use of Respondent's borrowing rate to calculate interest in other arbitral proceedings, as well

---

[744] Resp. PHB, ¶ 201.
[745] Rev. Tr. Day 4 (ENG), 107:24 to 108:24 (Mr. Caldwell).

as an article by Brattle co-authored by Mr. Caldwell[746] that recommends the use of a risk-free rate. Mr. Caldwell responded that "*left to my own devices, as it were, I will gravitate towards the Respondent's borrowing costs, as this article indicates.*"[747]

557. Claimant's counsel then asked Mr. Caldwell about the relevant maturity to be used to set the rate applicable to pre-Award interest, assuming "*that your counsel's view is wrong, and that one should use the Respondent's borrowing rate.*" Mr. Caldwell stated that "*the obvious interest rate*" is that of the ten-year Spanish bond.[748]

558. Taking into account the Parties' positions as to the rate of interest and the compounding of interest, as well as the evidence before it, the Tribunal considers that it is appropriate to apply the interest rate of 1.74%, which corresponds to the mean average of the yields on Spanish ten-year Treasury Bills from the date of valuation (June 2014) to the date of reference of the last available rate (November 2016), as determined by Spain's National Statistics Institute (INE).[749]

559. The Tribunal also considers that this rate (compounded quarterly) should also apply to post-Award interest. Respondent is under an obligation to comply with this Award. In the circumstances of this case, the Tribunal sees no need to set the rate applicable to post-Award interest higher than the rate that applies prior to the Award. Interest at a rate of 1.74%, compounded quarterly, sufficiently incentivizes Respondent to make prompt payment to Claimant.

---

[746] Dan Harris, Richard Caldwell, Alexis Maniatis, "A Subject of Interest: Pre-award Interest Rates in International Arbitration", The Brattle Group (DOC 19).

[747] Rev. Tr. Day 4 (ENG), 108:14 to 110:24 (Mr. Caldwell).

[748] Rev. Tr. Day 4 (ENG), 121:12 to 121:25 (Mr. Caldwell).

[749] Having noted that AMG had obtained the historical performance of the 10-year Spanish Bond from the website of the Spanish National Statistics Institute (INE) (First AMG Report, fn. 102), the Tribunal has made use of information that was available on that website as of 1 May 2019 in order to arrive at this interest rate.

## IX.    COSTS

### A.  Claimant's Cost Submission

560.  Claimant requests that the Tribunal order the Respondent to bear the entirety of the costs and expenses of this arbitration, including the fees and expenses of the Tribunal, ICSID's costs, and Claimant's legal and expert fees totaling EUR 2,918,769.12 plus USD 525,000.00, broken down as follows:

| | |
|---|---|
| Fees of Orrick Herrington & Sutcliffe | EUR 1,470,329.70 |
| Disbursements of Orrick Herrington & Sutcliffe | EUR 45,377.43 |
| Fees of Pérez-Llorca | EUR 590,493.39 |
| Disbursements of Pérez-Llorca | EUR 85,816.97 |
| Fees of The Brattle Group | EUR 694,844.00 |
| Disbursements of The Brattle Group | EUR 11,082.63 |
| Fees of Taylor Wessing Tax Expert | EUR 20,825.00 |
| Amounts paid to ICSID | USD 525,000.00[750] |
| **Total (EUR)** | **EUR 2,918,769.12** |
| **Total (USD)** | **USD 525,000.00** |

561.  Claimant argues that the above costs are reasonable, particularly in light of the duration and scope of the proceedings.  In Claimant's view, the Tribunal has broad discretion with respect to the allocation of costs and it should exercise such discretion to make an award on costs in its favour.

562.  Claimant submits that, as a consequence of Respondent's breaches of the ECT, "*Spain is obliged as a matter of international law to restore the plaintiff to its* ex-ante *status*"which encompasses Respondent's obligation to bear the entirety of the arbitration costs and expenses.[751]  In addition, Claimant considers that Respondent's conduct throughout the

---

[750] Claimant notes that this amount includes a USD 25,000.00 lodging fee that it paid to ICSID for the registration of the arbitration.  Cl. Sub. Costs, fn. 4.

[751] *Id.*, ¶¶ 1-2.

proceedings provides additional grounds for holding it responsible for the entirety of the costs and expenses of this arbitration.

563. Claimant further requests that the Tribunal order Respondent to pay interest at the rate of 5.94% on these amounts until full payment of the Award to be compounded quarterly, running from the date of the Award.

## B. Respondent's Cost Submission

564. Respondent requests that the Tribunal order the Claimant to bear the entirety of the costs and expenses of this arbitration, including the fees and expenses of the Tribunal, ICSID's costs, and the fees of the legal representatives of Spain, their experts and advisors, as well as any other cost or expense that has been incurred.

565. The costs incurred by Respondent in this proceeding total EUR 1,451,176.39, broken down as follows:

| | |
|---|---|
| Advance on Costs paid to ICSID | EUR 437,619.11 |
| Expert Reports | EUR 423,500.00 |
| Translations | EUR 26,077.65 |
| Editing Services (document binding, scanning and photocopying in Madrid and Paris) | EUR 48,419.92 |
| Courier | EUR 2,344.75 |
| Travelling Expenses | EUR 29,324.96 |
| Legal fees | EUR 483.890.00 |
| **Total (EUR)** | **EUR 1,451,176.39** |

566. Respondent further requests that the Tribunal order Claimant to pay a reasonable interest rate on this amount from the date on which those costs are incurred and the date of their actual payment.

## C. The Tribunal's Decision on Costs

567.  Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid.  Such decision shall form part of the award.*

568.  This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

569.  The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount (in USD) to:

| Arbitrators' fees and expenses | |
| --- | --- |
| Judge Joan Donoghue | USD 162,752.36 |
| Professor Giorgio Sacerdoti | USD 101,621.06 |
| Sir David Williams | USD 66,262.67 |
| Mrs. Anna Joubin-Bret | USD 48,000.00 |
| Dr. Stanimir Alexandrov | USD 33,000.00 |
| ICSID's administrative fees | USD 148,000.00 |
| Direct expenses (estimated)[752] | USD 154,376.06 |
| **Total** | **USD 714,012.15** |

---

[752] This amount includes estimated charges relating to the dispatch of this Award (courier, printing and copying).  The ICSID Secretariat will provide the Parties with a detailed financial statement of the case account once all invoices are received and the account is final.

570.    The above costs have been paid out of the advances made by the Parties in equal parts.[753]

571.    In the main, Claimant has prevailed in this case. The Tribunal rejected Respondent's jurisdictional objections, save for its objection in respect of the TVPEE. The Tribunal found that the Second Set of Disputed Measures violated the ECT, but did not find that the First Set of Disputed Measures violated the ECT. As a consequence of these conclusions on liability, the Tribunal awarded Claimant EUR 40.98 million in respect of the loss in the value of Claimant's investment, rather than EUR 52.7 million, which was Claimant's claim. The Tribunal also rejected Claimant's claim of EUR 29.1 million as a tax gross-up.

572.    In light of the Tribunal's conclusions as to jurisdiction, liability and quantum, the damages awarded by the Tribunal (prior to the addition of pre-award interest) are EUR 40.98 million, in comparison to EUR 95.8 million claimed by Claimant.

573.    The Tribunal considers that each Party conducted itself professionally during the course of these proceedings.

574.    Having considered all of these factors, and in exercise of the discretion vested in it by Article 61(2) of the ICSID Convention, the Tribunal decides that each Party should bear its own costs and expenses and that Respondent should bear 100% of the cost of the proceedings.

575.    Accordingly, the Tribunal orders Respondent to pay to Claimant USD 357,006.075 for the expended portion of Claimant's advances to ICSID.[754]

---

[753] The remaining balance will be reimbursed by ICSID to the Parties in proportion to the payments that they advanced to ICSID.

[754] As noted at ¶ 570 *supra*, the costs of this proceeding were paid out of advances made by the Parties following the Tribunal's constitution. Accordingly, the Tribunal has excluded from this calculation the USD 25,000.00 non-refundable fee paid by Claimant to ICSID for the registration of this case.

## X.    AWARD

576. For the reasons set forth above, the Tribunal unanimously decides as follows:

(1)    The Tribunal has jurisdiction under the ICSID Convention and the ECT over Claimant's claims, except for its claim that the TVPEE violates Article 10(1) of the ECT.

(2)    Respondent breached its obligation under Article 10(1) of the ECT to accord fair and equitable treatment to Claimant's investment.  In view of this decision, the Tribunal does not make a decision in respect of the other violations of the ECT alleged by Claimant.

(3)    As a consequence of the breach of Article 10(1) of the ECT, Respondent shall pay Claimant compensation in the amount of EUR 40.98 million.

(4)    Respondent shall pay interest to Claimant on the sum awarded in subparagraph (3) above, at the rate of 1.74% annually, compounded quarterly, *(i)* from 30 June 2014 to the date of this Award, and *(ii)* from the date of this Award until the date of payment.

(5)    Each Party shall bear its legal costs and expenses without contribution by the other Party.

(6)    To give effect to the Tribunal's decision that Respondent shall bear the costs of this proceeding, Respondent shall pay Claimant USD 357,006.075.

(7)    All other claims and defences by either Party are hereby rejected.

Professor Giorgio Sacerdoti
Arbitrator

Sir David A R Williams KNZM, QC
Arbitrator

Date: 11 July 2019

Date: 18 July 2019

Judge Joan E. Donoghue
President of the Tribunal

Date: 24 July 2019